

**WATSTEIN TEREPKA** LLP

# MEMO ENDORSED

Ryan Watstein
Ryan@wtlaw.com
404-782-0695

November 4, 2024

> Plaintiffs are directed to respond to Defendants' motion to compel by November 8, 2024.
>
> SO ORDERED.
>
> Edgardo Ramos, U.S.D.J.
> Dated: November 5, 2024
> New York, New York

**VIA ECF**

Hon. Edgardo Ramos
U.S. District Court for the Southern District of New York
40 Foley Square
Courtroom 619
New York, NY 10007

Re:   ***Brous v. Eligo Energy, LLC***, 24 Civ. 1260 – Defendants' Motion to Compel Production
of Plaintiff Schuster's Engagement Letter

Dear Judge Ramos:

We represent Defendants and write to seek an order requiring Plaintiffs to produce purported class representative Michelle Schuster's engagement letter with her attorneys. The bottom line is this: Plaintiffs demand that Defendants spend millions reviewing and producing millions of pages of discovery materials. But they refuse to produce the most basic discovery materials themselves. Relevant here, they refuse to produce their engagement letter with counsel, even though it is relevant to adequacy, an element Plaintiffs bear the burden to prove under Rule 23. Plaintiffs' counsel also improperly directed Ms. Schuster not to answer questions about their financial arrangement at deposition. This left Defendants no way to obtain this critical information and suggests Plaintiffs are hiding information relevant to adequacy. Those concerns are particularly acute given Plaintiff's recent perjury and her counsel's attempt to use that perjury as the primary basis to obtain enormous amounts of additional discovery. The Court should order Plaintiffs to produce the engagement letter.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Engagement letters are not privileged. *See, e.g.*, *In re Shargel*, 742 F.2d 61, 62 (2d Cir. 1984) ("[w]e have consistently held that ... fee information [is], absent special circumstances, not privileged"); *Poston v. Syracuse Univ.*, 2023 WL 5822287, at *2 (N.D.N.Y. Aug. 21, 2023) (finding that "engagement letter(s) or retention agreement(s) between Plaintiff and her counsel [are] relevant and not privileged under the attorney-client privilege and therefore should be produced at this stage of discovery"). And engagement letters are relevant to adequacy in putative class actions. *E.g.*, *Epstein v. Am. Reserve Corp.*, 1985 WL 2598, at *3 (N.D. Ill. Sept. 18, 1985) (engagement letters go to adequacy because they are "relevant to the ability of named plaintiffs to protect the interest of potential class members"); *Virgne v. C.R. England, Inc.*, 2020 WL 12754552, at *2 (S.D. Ind. Feb. 20, 2020) (finding engagement letters relevant to adequacy); *Williams v. Bd. of Educ. of Chi.*, 2022 WL 4182434, at *5 (N.D. Ill. Sept. 13, 2022) (finding inadequacy where scope of retention stripped

| Atlanta | Los Angeles | Miami |
|---|---|---|
| 1055 Howe M Road, 8th F oor | 515 S. F ower Street, 19th F oor | 218 NW 24th Street, 3rd F oor |
| At anta, GA 30318 | Los Ange es, CA 90071 | M am , FL 33127 |

 **www.wtlaw.com**      Ryan@wtlaw.com      404-782-0695

plaintiff of settlement authority). "Adequacy of representation," in turn, "is perhaps the most significant of the prerequisites to a determination of class certification." *Pope v. Harvard Banschares, Inc.*, 240 F.R.D. 383, 390 (N.D. Ill. 2006) (cleaned up). Counsel is inadequate where prospective class counsel places their financial interests above their clients. *E.g.*, *Kulig v. Midland Funding, LLC*, 2014 WL 5017817, at *5-6 (S.D.N.Y. Sept. 26, 2014).

For these reasons, Courts routinely order production of engagement letters in putative class actions, particularly when Defendants try and are not permitted to obtain that information via deposition. *E.g.*, *Poston*, 2023 WL 5822287 (ordering production of engagement and retention letters); *Epstein*, 1985 WL 2598, at *3 (requiring putative class action plaintiffs to disclose fee agreement with counsel); *Virgne*, 2020 WL 12754552, at *2 (ordering production of engagement agreements); *Bolding v. Banner Bank*, 2020 WL 3667132, at *1 (W.D. Wash. July 6, 2020) ("plaintiffs cannot deprive defendant of the opportunity to gather relevant information regarding the incentive and decision-making structures . . . through depositions and then object to requests for the fee agreements on the ground that there is no reasonable basis to suspect the existence of a conflict or improper incentives.").

Here, Plaintiffs are pursuing a putative class action where they and their counsel bear the burden to prove adequacy and thus where the terms of engagement are highly relevant. Though unnecessary, Defendants have also established a strong showing of need for the engagement letter. To that end, after Plaintiffs' counsel refused to produce the engagement letter in response to RFPs, and further refused during several conferrals, Defendants deposed Ms. Schuster to obtain this information through alternative means. But Ms. Schuster did not testify about her fee arrangement with counsel, both because she allegedly could not recall details and because her counsel improperly instructed her not to answer under the guise of privilege, even though engagement letters aren't privileged. *See, e.g.*, *In re Shargel*, 742 F.2d at 62; Schuster Tr. at 38:20-51:19. Relevance and need are thus established here, as substantive questions remain about the nature of the fee arrangement and whether other terms in the agreement bear on Plaintiff's or her counsel's adequacy. *See, e.g.*, *Virgne*, 2020 WL 12754552, at *2 (ordering plaintiff to produce her engagement agreement because she was unable to testify about her fee arrangement with counsel).

Though Defendants do not need to establish more, other considerations make the need for an order compelling production of the engagement letter even more acute. First, Ms. Schuster's limited testimony is both useless and suggests her and counsel's inadequacy. That's because she perjured herself repeatedly during her deposition, and her counsel relied on that false testimony to attempt to obtain massively overbroad discovery. Specifically, Ms. Schuster was adamant during her deposition that she had received a mailer from Defendants in 2016, and even described what the mailer looked like. But a call recording that Ms. Schuster didn't know about contradicts her testimony to a degree that cannot be overstated:

| Deposition | Call Recording |
|---|---|
| Q. And there it says in the first sentence [of paragraph 52 of the Complaint], in the fall of 2016, a representative from Eligo solicited Plaintiff Schuster and she agreed to switch her electricity supplier to Eligo; is that a true statement?<br>    A. **Well, it was actually like a market mailer**. Like some kind of a marketing mailer that came in the mail. . . . And **it gave like a phone number to call and . . . then I called the phone number**.” Ex. B, Schuster Dep. 58:23-59:19 (emphasis added).<br>    Q. Well, help me reconcile, because what 50 -- Paragraph 52 says is that, ‘In the fall of 2016, a representative from Eligo solicited Plaintiff Schuster.’ **Which makes it sound like someone called you?**<br>    **A. Correct.**<br>    **Q. But that’s not the case.** . . .<br>    A. **I was solicited by mail**.” *Id.* at 60:14-24 (emphasis added).<br>    “Q. You were solicited by mail and not by a representative; is that correct?<br>. . .<br>    A. **I was solicited by mail**.” *Id.* at 60:25-61:4 (emphasis added). | “**I received a message on my answering machine** and I’m not really sure if it applies to me at all but I can give you a reference number that was left.” LaPointe Decl., Ex. A, Ex. 1 at 0:03-0:14. |

As a result, Defendants have strong reason to suspect both Ms. Schuster and her counsel are inadequate and cannot trust Ms. Schuster’s limited testimony on her financial arrangements with counsel,[1] most of which was cut off by her counsel’s instructions not to answer. Defendants’ suspicions are particularly justified given the nature of Ms. Schuster’s false statements: she just so happened to falsely testify about receiving mail solicitations at the same time her counsel was pressing for production of written marketing materials.

     Second, and relatedly, the vastly disproportionate nature of discovery in this case further compels the propriety of an order requiring production of the engagement letter. To this end, Plaintiffs have asked Defendants to search more than five million documents as part of a fishing expedition that will cost millions of dollars, have filed nearly a dozen letter motions, and seek to force Defendants to agree to a 40+ page ESI protocol that will foist still more in expense on Defendants—all while refusing to share in a dime of the costs. That Plaintiffs would improperly instruct Ms. Schuster not to answer questions about her fee agreement and then force Defendants to expend yet more time and expense moving to compel that document is beyond the pale. The Court should order Plaintiffs to immediately produce their engagement agreement with counsel.

     Respectfully,

*/s/ Ryan D. Watstein*

Ryan D. Watstein

---

[1] Plaintiffs’ counsel essentially admits the false testimony at ECF No. 99 at 2-3.

# EXHIBIT A

Docusign Envelope ID: ...

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated,

       Plaintiffs,

v.

**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**,

       Defendants.

Case No. 1:24-CV-01260-ER

**DECLARATION OF ANDY LAPOINTE**

I, Andy Lapointe, in accordance with 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct.

1. My name is Andy Lapointe. I am over 18 years of age and competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2. I am currently employed as the Chief Compliance Officer of Eligo Energy, LLC ("Eligo"), which is a defendant in the above-captioned case.

3. Since this litigation began, from time to time I have assisted Eligo's outside legal counsel on various tasks related to the case, such as searching for documents that might be relevant to the Plaintiffs' allegations.

4. Early in the case, I attempted to retrieve any recordings of telephone calls between Plaintiff Michelle Schuster and representatives of Eligo. I located the recording of a call between Ms. Schuster and Trusted TPV on October 6, 2016. At the

time, Trusted TPV was a third-party vendor that handled customer enrollment calls for Eligo.

5.     Ms. Schuster's call with Trusted TPV occurred after she had been transferred to Trusted TPV by another third-party vendor that made outbound telemarketing calls for Eligo. That vendor was Consumer Energy Partners, or CEP.

6.     I attempted to find any recordings of Ms. Schuster's call with CEP. Initially, I was able to search CEP's call management software system for Ms. Schuster's phone number. I found no recordings of any calls between CEP and Ms. Schuster. I also contacted CEP's representative and requested that he attempt to locate Ms Schusters inbound call recording.  CEP's representative informed me that CEP had been using a different call management software system when the call took place in 2016 and that he was unable to find the requested call recording as a result. I therefore believed at the time that CEP did not retain any recordings of calls it may have had with Ms. Schuster in October 2016.

7.     On October 22, 2024, I listened to Ms. Schuster's sworn disposition by patching into the live audio feed supplied by the court reporting service. Ms. Schuster testified that she had enrolled with Eligo in 2016 after receiving a "flyer" through the mail, after which she placed a call to Eligo using a phone number from that 'flyer' to enroll. I was struck by that testimony because Eligo uses CEP only for outbound telemarketing calls, and not to answer inbound calls from direct mail or other media-driven campaigns.

8.     Ms. Schuster's testimony caused me to try again to locate any recording of Ms. Schuster's call with CEP. I spoke to a representative of CEP, who indicated that CEP might have some old, archived call recordings stored on physical data storage devices that were kept after CEP switched to the new  call management software system that  I had searched earlier in the case. I asked CEP to search those data storage devices for any recordings of calls with Ms. Schuster.

9.     On or about Thursday October 24, 2024, CEP informed me they had found the recording of Ms. Schuster's call with CEP on October 6, 2016. I have provided a copy of that recording to Eligo's outside counsel in this case. I also had a transcription of the call made, a true and correct copy of which is attached to my declaration as Exhibit 1.  That transcription accurately reflects the call between Ms. Schuster and CEP on October 6, 2016.

I declare under penalty of perjury under the laws of the State of New York and the United States of America that the foregoing is true and correct.

Executed on October 28, 2024 in Chicago, IL.

Andy Lapointe

Andy Lapointe

# EXHIBIT 1

**Transcript (auto-generated)**

Andy Lapointe at 8:46 PM

0:01 I'm not really sure.

0:02 I have a, I received a message on my answering machine and I'm not really sure if it, if it applies to me at all, but I can give you a reference number that was left.

0:17 was kind of off.

0:19 Ok.

0:19 E as in Ed, 462161.

0:25 Thank you.

0:26 And am I speaking with Michelle Schuster?

0:28 Yeah, it is in, it's in regards to a fixed rate on the supply portion of your electric bill.

0:37 Do you have a copy of your bill with you?

0:40 No, I don't.

0:42 Are you able to put me on hold and grab a copy of one?

0:45, I'm not sure here.

0:50 I might be able to.

0:52 So what, what is it that's happening then?

0:54 Well, you're allowed to choose whichever supplier you want that has the best fixed rate.

1:01 Your bill is generated by delivery charges which comes from our G N E which you can never change.

1:09 The supply portion of your bill is also how your bill is generated.

1:15 It's depending on how much you're being charged times however many K W H which is kilowatts that you use for the month and that's how they decide how much you pay them on the bill every month.

1:28 Ok.

1:29 And if you go ahead and grab a copy of your bill, I'll show you the current rate that you're paying and see if we're able to get that lowered for you.

1:37So you save money on your bill during the, during the winter months.

1:41Yes, ma'am.

1:43Ok.

1:43Let's see here.

1:44Ok.

1:46Just say a one year job.

1:49Ok.

1:50you went on a ok there is a 49 he's loud.

2:01Oh is it you hear him?

2:04Ok that's ok I can hear your that's so funny.

2:14All right let's see if I can get in here.

2:17Are you looking online?

2:20Yeah.

2:20Oh ok you don't have a paper bill anywhere.

2:23No I don't get anything paper.

2:25Yeah.

2:27Ok let me know when you work your magic.

2:31Ok.

2:33All right it was the air to be on the excuse me you.

2:49let's see here so you can see the benefits they're there for your benefit you know because if you're on.

2:57.

3:08Ok.

3:09Alright.

3:10Alright let's start out at the very first page because everyone's field is different it's it's either gonna say consolidated account summary or it's just gonna say account summary

that's on the very first page or you add that you as the person that ok that's a slower that's little movement here on the computer.

3:48Slow motion it's thinking where are you?

3:54I'm actually in Atlanta, Georgia.

3:57Ok.

3:57Yeah, our company is based out where I'm talking at.

4:00That storm is not gonna touch you guys.

4:01Is it?

4:02, I hope not.

4:04I've been hearing about them saying they were evacuating people in Florida and all that stuff.

4:09We're not that, yeah, we're not that far away.

4:12So we may get some, some rain or something.

4:15But I hope, yeah, I hope it doesn't get too bad around here.

4:20Friends of ours in Jacksonville just left the house.

4:23They boarded it up and took everything of value and you know, all of their, their cars.

4:30Yeah, because they figured they're estimating about 5 to 7 ft of water that's gonna get in.

4:36Oh, my goodness.

4:37So they just left, you know, all the furniture and everything.

4:40They took all their valuables and pictures and, oh my goodness, that's so sad.

4:48Well, I know I actually on, I'm here on my first page and ok, so what am I looking for then?

4:59, it'll either say consolidated account summary or it just say account summary.

5:05That page.

5:07Ok, which means you're, you're, you're participating in the Choice Program right now.

5:12 Let's look at the very last page of the bill and just see if you're at a lower rate than what we're able to, sign you up the very last page.

5:25 It says electricity supply detail.

5:30 Mhm.

5:31 And then it shows you your current supply 70 six kilowatts at 0.1139.

5:39 So you're paying 11 cents per kilowatt is what that means.

5:44 And the rate that we have,, which is a fixed rate during the winter months is 0.05 0.49.

5:52 So that's almost, that's half of what you're currently paying.

5:56 Sure.

5:57 Yeah, that's supplier you have, they're, they're charging, they're charging you a, what's gonna happen after that?

6:03 So then where, where do we go after that?

6:05 Well, after, yeah, after the three months is up, you become eligible for a fixed rate, available at that time as well.

6:12 It's just basically to keep, you know, to keep you lower than what the, current suppliers are charging.

6:19 That's pretty well.

6:20 I spoke to someone who's had a higher but that's pretty high.

6:23 11 cents per kilowatt.

6:26 Yeah, I, I should have been paying more attention to all of this and I hadn't been, so you don't even get a deal.

6:33 I know and I never look at it.

6:35 It's always online.

6:36 I know it, I'm, I'm just very lazy and it's not a good way of handling my No, because you know, you, you, you're just looking at what they say you owe and say, ok, well, bill.

6:47 No, you, yeah, this is, yeah, I can go ahead and the name of your company then.

6:54 Eigo E L I G O O K.

6:58 Ego Energy.

7:00Ok?

7:00And, and that's the only thing that would change on your bill.

7:03It would say eli go energy.

7:04A however many I'm sorry, is zero point 0549.

7:12Ok.

7:13So which is 0549.

7:15Yep, which is about five cents per kilowatt versus the 11 cents you're paying?

7:23That is ridiculous.

7:26No, that sounds good to me.

7:27All right.

7:28Well, I do.

7:28There's one other number I need, I think it's on page.

7:32, let's see, maybe page three of your bill.

7:36It's A P O D ID number.



8:09Ok.

8:10Now I am required by the state of Massachusetts to do a third party verification is basically just a recording to reiterate the name address on the account.

8:20They are gonna read that our number back to you to make sure that I entered every incorrectly and you will receive all of this in writing within about 1 to 7 business days.

8:31Our G N E is gonna send you notification that your rate has changed takes about 30 days before you'll see it.

8:38 So it may not be on the very next bill because that was probably already generated.

8:43 So you probably see it on the next one and then you'll just get a welcome letter from ego energy pretty much explaining the terms and everything of pretty much what we talked about and that's, it.

8:56 Doesn't cost, does, doesn't cost you anything.

8:59 If you wanna go back to paying 11 cents, you do have the option.

9:04 You do have the option to do that.

9:07 Perfect.

9:08 No, that's perfect.

9:09 I can, maybe I'll have enough saved to get a new pair of shoes.

9:13 All right.

9:14 Well, I'm gonna go ahead and get everything started.

9:17 It's just like I said, you just answer his question after beep.

9:20 Don't panic.

9:21 If you missed the 800 number or the confirmation number, I'll give that to you at the end.

9:26 But if we stop, then I'll have to do it all over again and it is takes a couple of minutes.

9:31 So just bear with me.

9:32 I'm gonna go ahead and I'm gonna go ahead and get it started.

9:36 Ok?

9:37 No problem.

9:38 Thank you for calling Trusted T PV for Ego Energy.

9:43 Please enter the transaction ID.

9:49 This call is confirm your enrollment for electricity supply service with Elgo Energy, Rochester gas and electric authorized electricity supplier.

9:59 Today's date is October 6th 2016 4:58 p.m. And for your protection, this call is being recorded.

10:11 Please say yes.

10:12 To confirm as the primary account holder or someone with authority to make changes to this account.

10:21 Please state your full name as it appears on your electricity bill.

10:30 Please state your full address as it appears on your electricity bill including city state and zip code ████████████████████████████████████████████.

11:01 Please say yes to confirm.

11:04 Yes, to verify your account.

11:07 Please state your date of birth.

11:11 1019 64 Energy will provide your through your local utility at a rate of 5.49 cents per kilowatt hour for the first three months.

11:24 And we'll continue at a month to month rate based on market and wholesale factors, weather patterns and pricing strategy.

11:32 Your service with Alago energy will begin at the next applicable billing period after October 6th 2016, it is free to enroll no monthly fees.

11:45 At least 30% of your electricity is derived from renewable resources.

11:51 When enrolling with ego energy, you will receive one bill from Rochester Gas Electric Ego is an independent seller of power and energy service certified by the New York State Public Service Commission and does not take the place of or represent your utility.

12:09 Rochester Gas and Electric will continue to deliver your electricity, read your meters and respond to emergencies to activate your enrollment.

12:20 Ego is approved to obtain and review your account details with your utility for the period of your service to manage your account disclosure.

12:28 Call our customer service number at 8887448125, applicable taxes, service and delivery charges apply.

12:38 Savings are not guaranteed.

12:40 Please say yes to confirm within one day.

12:46 Eggo Energy will send you a welcome package that will include a written agreement with the terms and account details.

12:53 Summarized in this call.

12:55 You have three days after receiving your welcome package to cancel before your enrollment.

13:02 Should you wish to cancel during this period?

13:04 Please call the customer service number at 8887448125.

13:10 Rochester Gas and Electric at 807 432110.

13:17 You will also receive a letter from Rochester Gas and Electric confirming your enrollment with ego energy.

13:24 You are also protected by the state of New York consumer bill of rights that can be found on Eligos website and in your welcome package, please say yes to confirm lastly to confirm your enrollment with Ego Energy for your electricity supply service.

13:40 Please say yes to confirm.

13:44 If you are not completely satisfied with ego energy, you may cancel at any time by calling our toll free number at 18887448125.

13:55 Your unique confirmation number is 152803.

14:01 Thank you for selecting Ego Energy.

14:03 Please stay on the line so that you can be transferred back to the agent to finalize your next steps.

14:08 Thank you.

14:11 Ok, Miss Schuster, that was long.

14:16 Were you able to write down the phone numbers?

14:20 Yes, I'm pretty sure.

14:21 8887448125.

14:24 And did you get your confirmation number.

14:27 Yes, ma'am.

14:28 2803.

14:30 Yep, you're all set and it looks like I said, all this will come out in the mail to you if you want.

14:35 You might wanna just take a keep an eye on your next bill so you can, you know, just, you'll, you'll definitely be able to take advantage of the savings because you're paying more of it now.

14:46 Yeah.

14:46 Yeah.

14:47 Yeah, because you're paying, you're paying half of what you were paying.

14:50 Ok.

14:50 You have a wonderful day.

14:52 Thank you very much.

14:53 You're very welcome.

14:55 Good bye you.

# EXHIBIT B

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
 2    ----------------------------------------X
      IRA BROUS AND MICHELLE SCHUSTER, ON BEHALF OF
 3    THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,
                          Plaintiffs,
 4

 5           -against-        Index No. 1:24-cv-01260-ER

 6

 7    ELIGO ENERGY, LLC and ELIGO ENERGY NY, LLC,

 8                          Defendants.

 9    ----------------------------------------X

10                          October 22, 2024

11                          9:51 a.m.

12

13           A VIDEOTAPED ZOOM DEPOSITION OF MICHELLE

14    SCHUSTER, a Plaintiff herein, taken by the

15    respective parties, pursuant to Order, before

16    Larin Kaywood, a Notary Public for and within

17    the State of New York.

18

19

20

21

22

23

24

25
```

1  I did, I don't remember any of that.

2     Q.  And I take it the answer to these are

3  going to be no, but I just want to be sure.

4  Did you look into how much your lawyers have

5  asked for in attorney fee awards in any class

6  actions that they handled in other cases?

7     A.  No.

8          MR. BLANKINSHIP:  Objection.  Asked

9     and answered.

10    Q.  So I take it -- well, let me --

11         THE WITNESS:  It's a low battery on

12    this.

13         THE VIDEOGRAPHER:  Okay.  Thank you.

14    Q.  All right.  We'll come back to that.

15  Let's go back to the complaint for a moment,

16  which I think is still in front of you as

17  Exhibit 1.  And if I could direct your

18  attention to Page 19.  Can you see Paragraph

19  52, which is directly under the heading

20  "Plaintiff, Michelle Schuster's dealings with

21  Eligo"?

22    A.  Yes.

23    Q.  And there it says in the first

24  sentence, in the fall of 2016, a representative

25  from Eligo solicited Plaintiff Schuster and she

1   agreed to switch her electricity supplier to

2   Eligo; is that a true statement?

3       A.  Well, it was actually like a market

4   mailer.  Like some kind of a marketing mailer

5   that came in the mail.  Like it wasn't a person

6   at my door.  It was -- so I received something

7   in the mail, like a marketing flyer, marketing

8   mailer that, you know, was advertising, you

9   know, lower electricity prices.

10          And I think it explained like ESCOs

11   and, you know, Eligo is an ESCO and it

12   described how, you know, that the price would

13   be based on the price that Eligo would pay, and

14   then that savings would be passed on to me, the

15   customer.

16       Q.  Okay.  And --

17       A.  And it gave like a phone number to

18   call and I believe I -- you know, that's -- and

19   then I called the phone number.

20       Q.  I see.  So this marketing mailer

21   is -- do you still have a copy of that?

22       A.  No.

23       Q.  Do you know what you did with it after

24   you looked at it?  And I know that's a long

25   time ago, but --

**IRA BROUS, ET AL. vs ELIGO ENERGY, LLC, ET AL.**
**Michelle Schuster on 10/22/2024**

1      A.  I don't know.

2      Q.  It's not something you saved for your

3  files?

4      A.  No, not from that long ago.

5      Q.  So if I understand correctly, you

6  received this mailer, it had a phone number to

7  call and you initiated the call to that phone

8  number; is that right?

9      A.  I answered the call -- yeah, right.

10  Like I called the phone number.

11     Q.  And I take it you spoke to a

12  representative of Eligo on the phone?

13     A.  Yes.

14     Q.  Well, help me reconcile, because what

15  50 -- Paragraph 52 says is that, "In the fall

16  of 2016, a representative from Eligo solicited

17  Plaintiff Schuster."  Which makes it sound like

18  someone called you?

19     A.  Correct.

20     Q.  But that's not the case.

21        MR. BLANKINSHIP:  Objection.

22     Mischaracterizes the testimony on the

23     document.

24     A.  I was solicited by mail.

25     Q.  You were solicited by mail, not by a

**IRA BROUS, ET AL. vs ELIGO ENERGY, LLC, ET AL.**
**Michelle Schuster on 10/22/2024**

1  representative; is that right?

2        MR. BLANKINSHIP:  Objection.

3     Mischaracterizes her testimony.

4     A.  I was solicited by mail.

5     Q.  Okay.  All right.  So then you

6  call -- you see the mailer and you call the

7  number.  And I know this is a long time ago,

8  but it's important to the case.  So can you

9  tell me everything you recall that was said on

10  that phone call?

11     A.  The -- well, basically, you know that

12  I would be signing up with Eligo as an

13  electricity supplier that they have a rate -- a

14  market rate that they would buy the electricity

15  at.  Eligo would pay a certain rate for the

16  electricity, and then my cost would be based on

17  that rate.

18        So whatever Eligo was paying, whatever

19  I would pay would reflect that rate.  However,

20  there would be that introductory rate at the

21  beginning of five cents per kilowatt hour.

22     Q.  And that introductory rate was going

23  to be a fixed rate, correct?

24     A.  Correct.

25     Q.  And that would've -- that fixed rate