OB7LBroC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IRA BROUS and MICHELLE
    SCHUSTER, on behalf of
4   themselves and all others
    similarly situated,

5
                    Plaintiffs,
6
             v.                          24 Civ. 1260 (ER)
7
    ELIGO ENERGY, LLC and ELIGO
8   ENERGY NY, LLC,

9                   Defendants.
                                         Telephone Conference
10  ------------------------------x
                                         New York, N.Y.
11                                       November 7, 2024
                                         11:00 a.m.
12
    Before:
13
                        HON. EDGARDO RAMOS,
14
                                         District Judge
15

16                          APPEARANCES

17  WITTELS MCINTURFF PALIKOVIC
         Attorneys for Plaintiffs
18  BY:  J. BURKETT MCINTURFF
         JESSICA HUNTER
19
    FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
20       Attorneys for Plaintiffs
    BY:  D. GREG BLANKINSHIP
21
    WATSTEIN TEREPKA LLP
22       Attorneys for Defendants
    BY:  RYAN WATSTEIN
23       ABIGAIL HOWD
         DAVID MEADOWS
24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

OB7LBroC

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. BLANKINSHIP:  Good morning, your Honor.  This is |

         (Case called)

         MR. BLANKINSHIP:  Good morning, your Honor.  This is

Greg Blankinship representing the plaintiffs.  And also with me

today are my co-counsel, Burkett McInturff and Jessica Hunter.

         MR. MEADOWS:  Good morning, your Honor.  This is Ryan

Watstein for defendant Eligo Energy.  And with me are my

colleagues, David Meadows and Abigail Howd.

         THE COURT:  Good morning to you all.

         This matter is on for a conference.  I note for the

record that it is being conducted by telephone.  I want to

advise the parties -- also, there are a number of issues that

we need to discuss.  I only have 45 minutes, so please, please

be as concise as you possibly can in discussing these various

topics.

         Let me also say at the outset that we are here to

discuss any number of letters that have been filed, beginning

on October 22.  On that day, I believe I got five or six

letters from Plaintiffs' counsel, all involving different

discovery issues, and each at least three pages long, many with

exhibits that went into the hundreds of pages.  I have been

doing this for sometime now, and never in any case of any size

have I ever gotten that deluge of letters on one day.

         Mr. McInturff, I believe you signed these letters.  I

consider this to be close to an abuse of my individual rules.

I don't know why it was that you needed to file that many

OB7LBroC

```
 1   letters, but in any event, it's done.  Please refrain from

 2   doing that in the future.

 3            Now, let's discuss these one at a time.  There is a

 4   dispute concerning the time frame of discovery.  These are

 5   addressed at document 74 and 101.  Mr. Blankinship, tell me

 6   what the issue is there.  Apparently you want to go back to

 7   2012.  Is that right?

 8            MR. BLANKINSHIP:  Your Honor, if it's okay with you,

 9   my co-counsel, Mr. McInturff, will handle this particular

10   issue.

11            THE COURT:  Mr. McInturff.

12            MR. MCINTURFF:  Yes, your Honor.  And I apologize for

13   the many letters.  We certainly did not intend to overburden

14   the Court or to violate your Honor's rules.  It's just that the

15   number of disputes that have come up is quite large.  And, in

16   fact, preceding ECF number 74, which I am happy to talk about,

17   is ECF number 69 and 83, which is the letter motion that is

18   what this conference was scheduled for.  I just wanted to bring

19   that to the Court's attention.

20            THE COURT:  Okay.  Let's discuss this one first.

21            MR. MCINTURFF:  Okay.  So by background, the named

22   plaintiff, Ms. Schuster's contract is dated October 9, 2016,

23   and this case involves a breach of contract claim as well as

24   consumer protection claims related to the contract and the

25   welcome letter that Plaintiff Schuster received in 2018 -- I'm
```

OB7LBroC

1    sorry, that she received when she signed up in 2016.  The

2    defendants are proposing to limit discovery to the presumptive

3    six-year -- or to limit ESI e-mail collections to the

4    presumptive six-year statute of limitations, and we disagree

5    with the limitation of the e-mail collection to just 2018 for

6    several reasons.  The first is, Ms. Schuster signed up in 2016.

7    Her contract was dated 2016.

8            Defendants have also produced all of their New York

9    contracts.  As your Honor will recall, this case is currently

10   limited to New York class discovery.  They produced all of

11   their New York contracts, and they produced them in

12   chronological order at ECF number 44-7.  Ms. Schuster's

13   contract is just the second of many contracts that were

14   produced in chronological order.

15           The first contract that was produced is dated 2014,

16   February of 2014, so early 2014, and that contract contains the

17   exact same pricing term that Plaintiffs allege in this case was

18   breached and contains a deceptive description of how Defendant

19   will set its rate.  So there is most certainly e-mails going

20   back to when Eligo started doing business in New York, which is

21   2013, that are germane to the claims at issue in the case,

22   particularly, you know, what's in this contract, e-mails from

23   the defendant talking about complying with the terms of the

24   contract, how defendants set up its initial rate-setting

25   practices to comply with the terms of the contract.

OB7LBroC

1          Now, it is also undisputed that there are class

2     members who have claims during the baseline statute of

3     limitations period who were enrolled under the terms of these

4     contracts, Ms. Schuster being the representative.  Again, she

5     enrolled in 2016, and her claims come into the present.

6          So all we are asking for Defendant to do is to collect

7     e-mail that goes back to when it started doing business in

8     New York, that's 2013, and then to enter the stopping point not

9     to be the day that Plaintiff filed the complaint, but rather,

10     the day that they make their collection.  So whenever they

11     collect the e-mail, that would be the day that they stop.

12     That's a very common practice in electronic discovery.  And

13     there is no dispute that e-mail and other forms of

14     communication are relevant.  The only issue is, is it

15     proportional to go back that far in time, and then to collect

16     as of the date that they make the collection, and not cut it

17     off with the complaint.

18          Now, Eligo's response is, essentially, to misstate our

19     request.  We are not looking for e-mails since the inception of

20     the company.  We are just looking for e-mails for when Eligo

21     started doing business in New York.  We are also not looking

22     for Eligo to make multiple collections.  We are just saying

23     that when Eligo makes its e-mail collection, it should make the

24     collection as of the date it collects, and not cut it off at

25     the complaint.

OB7LBroC

1          Now, under the normal discovery rules, once we have

2   shown that e-mail is relevant, which, again, no party disputes,

3   the burden shifts to Eligo to show that the discovery is

4   disproportionate.  The issue here is that Eligo has made no

5   showing whatsoever regarding disproportionality.  And one of

6   the overall themes of this case is that -- or in the, I should

7   say, in the motions that we are going to discuss today, is

8   Eligo has repeatedly complained that the discovery we are

9   seeking in this case is not proportional, but what Eligo is not

10  disclosing is the tens of millions of dollars at stake in this

11  case and the tens of thousands, if not more than 100,000,

12  potential class members in this case.

13          We recently looked at the public data on Eligo's

14  electricity sales alone, not including gas sales, in 2023, and

15  it's in -- well into $70 million.  My co-counsel,

16  Mr. Blankinship, and I have done a number of these cases

17  against independent energy companies that overcharge their

18  customers, and damages in those cases are typically well into

19  the tens of millions of dollars.

20          So the question here posed by this motion is, is this

21  a digital e-mail collection disproportionate to the needs of

22  the case?  And Plaintiffs posit that Eligo has not met its

23  burden to show that e-mail collection for the period that no

24  one disputes covers the class period should not be done.

25          THE COURT:  Mr. Watstein.

OB7LBroC

1              MR. MEADOWS:  Your Honor, David Meadows.  With your

2     permission, I will address this.

3              THE COURT:  Mr. Meadows.

4              MR. MEADOWS:  Thank you, Your Honor.

5              When you introduced this motion this morning, your

6     Honor, you were exactly right about what Plaintiffs are

7     seeking.  They want us to collect e-mails going back 12 and a

8     half years, all the way to, essentially, the inception of

9     Eligo, which was founded in 2012 -- didn't exist before that --

10    to collect virtually every e-mail that is currently stored on

11    their company's systems, which would essentially be every

12    e-mail that the company ever exchanged, whether internally or

13    externally.

14             To give you a sense of the scale of that, we have

15    already collected e-mails confined to the presumptive class

16    period, and what we have collected is over 4 million e-mails.

17    I think 4.25, to be precise.  Now, in relation to that, and I

18    think -- I do agree with opposing counsel, the issue here is

19    proportionality more than anything.  So when we factor in

20    proportionality, we should be looking at, I think, primarily

21    two things:  One is the proportion of the discovery that the

22    plaintiffs are seeking relative to Eligo's size and

23    capabilities to produce it, and then, secondly, to the

24    legitimate needs of this case.

25             Now, firstly, Eligo, as I said, is a young company.

1    It's a small company.  It has fewer than 50 employees.  I think

2    it was three years ago Eligo suffered a sizable financial loss

3    from operations that nearly bankrupted the company.  Even

4    though its sales may be in the tens of millions of dollars, its

5    net income is generally much, much smaller than that.

6          The scope of the e-mail discovery that Plaintiffs are

7    requesting here alone would cost hundreds of thousands of

8    dollars, if not millions, to search and produce.  And so at a

9    threshold level, that is completely disproportionate to Eligo's

10   resources.

11         And by the way, given even the number of motions the

12   plaintiffs have been filing, which you noted at the outset,

13   your Honor, and the amount of time and effort that has required

14   us to devote to that, among other tasks on the case, our client

15   has been incurring a run rate on legal fees of over $200,000 a

16   month, which is unsustainable for this small company.  But let

17   me also address what are the legitimate needs of the case.  Is

18   there any legitimate need for the plaintiffs to insist on

19   collecting e-mails that are 12 and a half years old?  And the

20   answer is, there isn't.

21         This is certainly not the only or the first case of

22   this kind filed against an ESCO in the Second Circuit.  There

23   are many.  What the Second Circuit has repeatedly held is that

24   these are fairly simple and straightforward cases that rise and

25   fall on the language in the customer agreement that's at issue.

OB7LBroC

1    Here, Eligo's customer agreement was quite simple.  It directed

2    that Eligo would calculate variable rates for green electricity

3    according to some very broadly described factors, based on

4    market factors like market pricing, and things of that nature,

5    none of which are defined in the agreement.

6         Now, we have already produced the core information and

7    are further in the process of producing the core information on

8    whether Eligo complied with that very simple contractual

9    directive.  In fact, most of the rate setting that was done

10   under the class period was done with a machine learning model

11   called Groove.  We have already begun producing the inputs into

12   that Groove model.  Plaintiffs know what rates we charge.  And

13   so the issue of showing whether or not we took into account the

14   requisite market factors as vaguely or as broadly defined in

15   the contract is really not going to be subject to much dispute.

16   And, in fact, your Honor, we intend to move for summary

17   judgment on that issue in fairly short order under binding

18   Second Circuit authority which we think is going to be right on

19   point with this case and show that we are entitled to judgment

20   as a matter of law.  So the scope of discovery they are seeking

21   is huge.  They have no legitimate need to prove a breach by

22   trolling through millions of e-mails that are up to almost 13

23   years old, and it is completely out of proportion to what the

24   case involves.

25        And as a last addition -- I am trying to be brief --

OB7LBroC

1    we filed a motion last night to ask you to place overall

2    proportional limitations on discovery, given the incredible

3    demand the plaintiffs are making in this case and the number of

4    motions they have been filing.  And I would respectfully submit

5    that a very efficient way to sort through what you now have in

6    front of you is to, frankly, defer all of these motions and

7    take up that overall motion to limit discovery, because we

8    think that what's going on here is an abuse of the discovery

9    process that is designed, if not intended, to pressure us with

10    costs to settle what we regard as baseless claims.

11            THE COURT:  So what's your counterproposal,

12    Mr. Meadows, to --

13            MR. MEADOWS:  On this discreet issue, your Honor, it

14    would be that the e-mail collection be limited to the class

15    period, which is almost seven years in length, and that also,

16    the overall number of e-mails that Eligo is obligated to search

17    and produce be strictly limited in number, given the massive

18    number that we have already collected.

19            THE COURT:  I am going to restrict the time period

20    from October of 2016 to the date of the filing of this

21    complaint, which is February 20.  I am not going to impose any

22    limit on the number, unless, Mr. Meadows, you come back and

23    say, you know, there's, you know, 50 million e-mails and it's

24    going to be too expensive for us to produce them.

25            MR. MEADOWS:  Your Honor, if I may interject.  I think

OB7LBroC

```
 1   that is part of what we are saying, yes.  We have already

 2   collected the e-mails over the period that you just identified.

 3   That number is over 4 million.  Even with -- we have tried some

 4   basic term searching against that already, and even that has

 5   not reduced our number below the hundreds of thousands, which

 6   would cost over a million dollars, we think, to review.  So

 7   here again, I think we need some overall limits on ESI

 8   discovery to save us from the incredible burden that would be

 9   required for us to review these 4 million plus e-mails that we

10   have already collected.

11           THE COURT:  Have you agreed on search terms?

12           MR. MCINTURFF:  Your Honor, this is Burkett McInturff.

13   Can I respond to some of the comments defense counsel raised,

14   to put things in context?

15           THE COURT:  No.

16           Mr. Meadows.

17           MR. MEADOWS:  We have agreed on search terms with the

18   other side.  In fact, we have not received any search terms

19   from the plaintiffs until, I think, two days ago, when we were

20   in the midst of replying to all of these motions.

21           What we have done thus far, your Honor, is run some

22   search terms of our own against that set of 4.25 million

23   e-mails to get a sense of what they yield and how much we can

24   kind of knock that number down.  And given the shear number of

25   e-mails, we are having a very hard time with reasonable search
```

OB7LBroC

1    terms getting that number anywhere below the mid hundreds of

2    thousands.  And even that as a review database would impose

3    costs of approximately a million dollars on us to review.

4           MR. WATSTEIN:  This is Ryan Watstein.  May I add

5    something briefly?

6           THE COURT:  Very briefly.

7           MR. WATSTEIN:  I just want to say that that is only

8    e-mails.  There are a vast number of other data sources that

9    Plaintiffs are seeking here.  So when we talk about 4. whatever

10   million e-mails, there's also millions of other documents in

11   other databases that there are also motions about that we need

12   to keep in mind.  And that's why -- and I just want to stress,

13   we filed this motion to limit discovery last night.  We would

14   ask that the Court not pre-judge that motion, at least without

15   having it fully briefed because, again, our client cannot

16   sustain what would be equivalent to a company like Amazon

17   spending a billion dollars a month in discovery.

18          When you take the size of Eligo and their resources

19   and you extrapolate it, as you must in a proportionality

20   analysis, they are effectively asking us to do $300 billion

21   worth of discovery for an Amazon-like company, which, of

22   course, is just preposterous.  So that's why we filed the

23   motion to limit discovery.

24          The only question that remains in this case is whether

25   our client set its rate pursuant to the contract.  The Second

OB7LBroC

Circuit's Agway decision, which we cite in our letters, makes
that very, very, very simple.  Binding authority.  Plaintiffs'
counsel here were on the other side.  They lost, making the
exact same argument they are making in this case, and we are
going to show and we already have shown with 30(b)(6) testimony
and the documents we produced, we calculated the rates exactly
like the defendant in Agway did under, basically, the same
contract language.  For us to be required to spend $200,000 a
month for years that it would take to review all these
materials only to get summary judgment is the epitome of
disproportionality.  Thank you, Your Honor.

          MR. MCINTURFF:  This is Burkett McInturff.  May I
please respond?

          THE COURT:  Briefly.

          MR. MCINTURFF:  This is all incredibly premature.  We
are talking about the date range of collecting e-mails, and
those e-mails are going to be sorted with search terms.  It
remains to be seen what's going to happen with those e-mails
afterwards.

          Mr. Blankinship's firm and my firm have done over a
dozen of these cases.  Mr. Blankinship was lead counsel in the
Agway case.  Agway came down before this case was filed.  If we
thought Agway would have defeated the claims at issue in this
case, we would have never brought the case.  We recently
prevailed on a very similar argument that defense counsel is

OB7LBroC

1   making here about the nature of the contract before Judge

2   Halpern in July.  This is a very specialized area of

3   litigation.  And with all due respect, the defendants' claims

4   about Agway, which they are just making now -- they never made

5   them in their motion to dismiss -- the claims that they are

6   making about Agway are simply mistaken.  They don't understand

7   the scope of the law.

8           What Agway says is that the contract has to explicitly

9   grant discretion, and here, there is no such discretion

10  granted, as, again, Judge Halpern recently held in another

11  case.  But this is all -- this idea of limiting discovery and

12  that we are imposing hundreds of millions -- billions of

13  dollars just like on Amazon, it's simply insincere.  Again, we

14  have done these cases many times.  We are not asking for

15  anything out of the ordinary.

16          Eligo has not -- and specifically, right now, we are

17  talking about the date range of collection.  And your Honor

18  issued an order and said that Eligo shouldn't -- we shouldn't

19  limit the total number of potential e-mails collected, which is

20  very sensible.  There is no reason that we need to get into

21  issues of limiting discovery and summary judgment motions that

22  haven't been filed and arguments that were never made on the

23  motion to dismiss.

24          So with all due respect, I think that defense counsel

25  is putting the cart way before the horse here.

OB7LBroC

1          THE COURT:  I have issued my decision.  The parties

2   should agree on search terms.  And again, if there is a motion

3   to be made concerning proportionality or costs, they should be

4   made at the appropriate time.

5          It is now 22 minutes after the hour.  I advised the

6   parties at the outset that I have 45 minutes and they should be

7   concise.  No one thus far has been concise.  So let's move on

8   to the next issue and see how far we get.

9          Discovery collection concerning Slack.

10  Mr. Blankinship or --

11          MR. MCINTURFF:  I will take this one.  This is Burkett

12  McInturff.

13          This is pretty straightforward.  On August 30, defense

14  counsel wrote, quote, "Everything is in e-mail, Slack, and

15  Asana."  On September 5, Eligo filed a document with this Court

16  at ECF number 53 at 2 that states, quote, "Most of the

17  responsive documents are stored in e-mail, Slack and Asana, and

18  locating them will require ESI searching with the assistance of

19  professional vendors."

20          On September 9, defense counsel wrote to Plaintiffs,

21  quote, "Defendants will produce all public and private Slack

22  channels Eligo's IP administrators have access to."

23          After that, Eligo changed its position, and since

24  forcing us to file a motion, we filed the letter motion.  Eligo

25  has now changed its position once again.  Eligo's current

OB7LBroC

position is that it will produce all of the public and private

Slack data if Plaintiffs pay for the collection.  Again, that's

a change in position than Eligo -- this is Eligo's now third

position on Slack messages.

        But the fundamental question here is, has Eligo shown

what -- has Eligo met its burden to show whether the costs

should be shifted to Plaintiffs?  Eligo has said that this will

cost $18,000 to collect and another $6,000 to do in a prompt

manner, and our position is that the amount at stake in this

litigation pales in comparison to that.  This ESI is

acceptable.  Defense counsel has admitted in writing multiple

times that the ESI contains responsive material.  Their

30(b)(6) witness testified that he uses it in the ordinary

course, which is unquestionably relevant, and the defendants

are simply trying to shift the cost to Plaintiffs as a way of

delaying this discovery.

        Slack is an informal -- more informal manner than

e-mail, and what's in Slack is going to show contemporaneous

back and forth between the relevant players.  And again, in

terms of ESI burden, it's important to note that the parties

have agreed not to collect all of Eligo's ESI and review all of

Eligo's ESI.  We are talking about ESI of 13 custodians.  So

there's 13 key players whose ESI is going to be collected.

That ESI is then going to have search terms applied to it.

Again, Plaintiffs have offered to Defendants, if they want,

OB7LBroC

 1    they can simply avoid the review burden that they claim is so

 2    expensive, and just produce the search hits, but apparently

 3    Defendants aren't interested in that.

 4         That said, the issue of Slack, it's like another

 5    e-mail system that the defendants have.  They have admitted

 6    multiple times that it contains responsive information, and

 7    they haven't shown their grounds for shifting the cost to

 8    Plaintiffs to collect this information for search term

 9    application.

10         THE COURT:  Mr. Watstein or Mr. Meadows.

11         MR. MEADOWS:  Yes, your Honor.  David Meadows.

12         To be brief, at your request, and to echo what

13    Mr. Watstein said earlier, this is a good example of the

14    incrementalism we are dealing with here.  We have gotten over

15    4 million e-mails, but that's not enough for the plaintiffs.

16    They also want us to collect, review, and produce these Slack

17    databases.  And Slack is a team messaging software that, yes,

18    we early on identified as having potentially relevant documents

19    on it.  But the question from a proportionality standpoint is

20    not just relevance.  It goes beyond that to, what is the

21    marginal utility or value of these additional databases that

22    the plaintiffs want us to search?  And here, there is none.

23         In fact, the plaintiffs took a 30(b)(6) deposition

24    very recently and asked our representative some basic questions

25    about what was in Slack, and the only evidence that they

OB7LBroC

1    adduced is that Slack is used by some employees in the regular

2    course of business.  Well, of course, it is, but that doesn't

3    mean that it has anything of any marginal utility over and

4    above the rate-setting machine learning that we are already

5    producing, the e-mails that we are going to produce responsive

6    to your order, which is millions of documents.

7            And on top of that, from a proportionality standpoint,

8    to even access these Slack documents, to get into review

9    database to even look at them, we have got to incur $18,000 of

10   expenses.  When we took that issue to the plaintiffs and asked

11   for some cost sharing, they said, Not one penny; we will

12   contribute nothing.  And that's their position on discovery

13   generally, which is, they get everything and it costs them

14   nothing, even at the risk of practically bankrupting Eligo.  So

15   without any showing of any marginal relevance here, and the

16   overall burden that we are incurring in this discovery, we

17   would ask you to deny this.

18           And then if I might very briefly harken back.  The

19   letter motion that was filed last night about discovery, I do

20   think we would like an opportunity to fully brief that, to

21   bring the evidence before the Court about the disproportionate

22   burden that all of these requests are imposing on us.  Thank

23   you.

24           THE COURT:  Let me ask about -- is Slack just another

25   way to e-mail, Mr. Meadows?

OB7LBroC

1              MR. MEADOWS:  It's similar to that, from my

2      understanding, your Honor.  It is not exactly the same thing.

3      If you think about team messaging, you know, things like Teams

4      or software similar to that, it can be similar to e-mail, but

5      it is not the exact same thing.

6              THE COURT:  But it's just a way of one employee of the

7      company communicating with another employee at the company

8      about company business?

9              MR. MEADOWS:  That's correct.  Yes.

10             THE COURT:  And so why should that be completely

11     divorced from the universe of relevant documents that ought to

12     be examined?

13             MR. MEADOWS:  Because, your Honor, in the

14     proportionality analysis, we look beyond relevance, and we look

15     to the marginal value or utility.

16             Now, what we know is, we are going to look at and

17     produce e-mails.  We are going to look at and produce rate

18     setting information from other databases.  Is there any

19     evidence that any use of Slack discusses any matters about rate

20     setting, the core issue in the case, that you don't already

21     find in the databases we're collecting and reviewing and

22     producing?  And the plaintiffs had an opportunity to develop

23     that evidence, and they did not do it.  There is no

24     testimony -- you certainly don't see any cited in their letter

25     motion -- saying that Slack has any special relevance or

OB7LBroC

1    utility whatsoever in this case, but it does have unusual costs

2    to review that are not present elsewhere.  And so that's the

3    difference.

4            THE COURT:  But that's not --

5            MR. MCINTURFF:  If I may.

6            THE COURT:  No.

7            That's not how I view proportionality.  You don't say,

8    well, we have, you know, five buckets of information; you can

9    look at one bucket, and not look in the other four buckets.

10   The way that I view proportionality is, you look at all five

11   buckets, and you determine, How do we whittle down the

12   information in these five buckets?  I don't see why Slack, the

13   Slack information, should be completely excluded.  And my

14   understanding was that you folks agreed that there were

15   potentially relevant documents in Slack, but that you agreed to

16   produce them at some point.  Am I wrong about that?

17           MR. MEADOWS:  I think the distinction that we are

18   drawing is, early on, when they were asking us to identify

19   potentially relevant sources, we appropriately identified

20   Slack.  What we didn't know then, what we do know now, is the

21   shear volume of data in the other databases that we had

22   identified.  Knowing now just how many e-mails we have, knowing

23   now that we have the Groove data, which is the input that

24   actually generated variable rates, and other databases -- those

25   are just two of seven, I believe, that the plaintiffs are

OB7LBroC

1    demanding that we search and produce.  There's got to be some

2    proportional limits imposed on that, and that's our position.

3        THE COURT:  I agree, there ought to be proportional

4    limits, but not by saying, Okay, we are not going to look in

5    these other four buckets.  Again, figure out what the universe

6    is.  Figure out the appropriate search terms.  And then, again,

7    if there are going to be issues concerning costs, et cetera,

8    then you can come back, but not until then.

9        MR. WATSTEIN:  Your Honor, this is Ryan Watstein

10   following up on that.  The issue, I think, here is that there

11   is a cost to get these documents into a database that is

12   searchable and producible, and that's why we went to

13   Plaintiffs' counsel and said, Look, we are not saying you can't

14   have any Slack information; we are saying that if you want us

15   to search this duplicative source, we have to upgrade our

16   license.  It's going to cost $18,000.  We want you to bear some

17   of that cost because we already are giving you searches of

18   5 million e-mails, and it will be duplicative.  So there

19   already is a cost, your Honor.  So that's already ripe.  And

20   what we are asking you is, if they want us to search that

21   additional source that will be duplicative, that they haven't

22   established contains any variable rate communication, they

23   should have to pay for the license upgrade, or whatever fee

24   there is to search that data.

25       THE COURT:  I don't know that they have to pay for all

OB7LBroC

```
 1   of it, but I will direct them to share in the cost, whatever
 2   that cost may be.
 3            MR. MCINTURFF:  Your Honor, this is Burkett McInturff.
 4   Can I respond?
 5            Slack is a form of communication that the defendant
 6   uses in the ordinary course.  That they have to incur charges
 7   to collect this information doesn't mean that they get to shift
 8   the cost to us.  And defense counsel is misrepresenting the
 9   record when they say we haven't established that Slack contains
10   relevant and independent information.
11            Again, the defense counsel wrote in a public filing in
12   this case that most -- quote, "Most of the responsive documents
13   are stored in e-mail, Slack, and Asana."  So defense counsel
14   has already written that in the record.  I took a 30(b)(6)
15   deposition on September 17, and Eligo testified that each
16   custodian, each of the 13 custodians, use Slack in conducting
17   their affairs.  That's cited in our letter as Exhibit D.
18            This same witness testified that he is a member of
19   Slack channels with other custodians, and that he is, quote,
20   "sure" other custodians have additional Slack channels, quote,
21   "given how Slack is used," closed quote.  Slack is clearly a
22   key mode of communication at Defendants, as it is in many, many
23   companies.  And the idea that Defendants can, A, slow down
24   production by creating a dispute as to who has to pay for the
25   collection, and then, B, shift the cost to Plaintiffs without
```

OB7LBroC

1    establishing any of the requisite criteria, the first one being

2    that the information is inaccessible, it's accessible.  It's

3    not Plaintiffs' fault that the defendant has to pay for an

4    upgrade so it can collect its Slack material.  They made the

5    choice.  Eligo made the choice to use Slack in the way it did.

6    Eligo made the choice to purchase the subscription tier it

7    purchased.  It's not on Plaintiffs to pay for Eligo to collect

8    a source of ESI that it used in the ordinary course.

9              THE COURT:  Are you done?

10             MR. MCINTURFF:  Yes.

11             THE COURT:  I have made my decision.  You can

12    contribute to it, or you don't get it, to the upgrade.

13             By the way, my understanding is that the upgrade will

14    hasten the ability to cull through the various e-mails.

15             MR. MEADOWS:  That's correct, your Honor.

16             THE COURT:  Discovery concerning topics 14(a) to (b)

17    and 23 in the 30(b)(6) deposition.

18             Mr. Blankinship or McInturff.

19             MR. MCINTURFF:  This is me, your Honor, Mr. McInturff.

20    Just to flag, we have jumped over ECF number 76, which is about

21    redactions.

22             THE COURT:  Okay.  Talk about the redactions.

23             MR. MCINTURFF:  Okay.  So there's two issues in the

24    redactions motion.  The first is relevant to redactions, and

25    then the second is standalone personally identifiable

OB7LBroC

1    information redactions.

2         On relevancy redactions, the case law overwhelmingly

3    disfavors relevancy redactions.  Eligo is claiming to reserve

4    the right to make unilateral relevancy redactions.  That's not

5    consistent with Eligo's complaint about discovery costs because

6    now they are saying they want to make a bunch of redactions.

7    The case law, again, is very clear, especially when there is a

8    protective order in place, that relevancy redactions of

9    otherwise responsive documents is not proper.

10        This issue first came up in our negotiation of ESI

11   protocol draft.  On September 9, Eligo's version of the ESI

12   protocol draft agreed with our proposal that relevancy

13   redactions be disallowed.  Then they changed course, and now

14   they are claiming that it's premature to deal with this issue,

15   but that's not accurate.

16        We need to deal with this issue at the outset because

17   what's going to happen is we are going to get documents that

18   are redacted for relevance.  We are going to go back to Eligo,

19   we are going to say, these are improperly redacted.  And then

20   we are going to get complaints about excessive motion practice,

21   and expect to have to go back.  So relevancy redactions should

22   be disallowed in this case, as they are in most cases.

23        And then the second issue is, Eligo wants to redact

24   the personally identifiable information of third parties.  So

25   we filed -- our motion deals with both potential class members,

OB7LBroC

1   other Eligo customers, as well as non-Eligo personnel.  In

2   response to our motion, Eligo changed its position and is only

3   really talking about absent class members.  Plaintiffs have

4   agreed with Eligo that if they produce large data sets of

5   big -- big productions of rate charging data, you know, all of

6   the people in Brooklyn that are Eligo customers, when that

7   comes across, it's going to contain thousands and thousands of

8   names.  We don't need that.  We said that Eligo can redact

9   that.

10       What we are talking about is e-mail and Slack

11  communications and other electronically stored information that

12  may happen to have a class member's personally identifiable

13  information in it.  Typically this comes up with people

14  complaining.  They will do things like they will write to the

15  CEO or customer service complaints will get escalated.  Eligo

16  wants to redact those because they are afraid that we are going

17  to contact potential class members and solicit them as

18  plaintiffs.  We have no intention of doing that.  This is

19  simply a way to slow down discovery.  It's going to make

20  discovery more expensive.

21       There is no reason for Eligo to be able to redact

22  absent class member names.  Class counsel is entitled to

23  contact those individuals for witnesses if we believe that

24  that's appropriate.  Typically, if we do that, it's a very

25  small number of potential class members.

OB7LBroC

1          Defense counsel's response cited a case I had with

2     Judge Parker.  They misrepresented that case was an energy

3     case.  It was not an energy case.  It was about a weight loss

4     app that uses psychology to help people maintain a healthy

5     weight.  And Judge Parker was very sensitive to the fact that

6     the customers of that company had disclosed very private

7     information about their body mass and body image issues,

8     substance use, relationship habits.  And Judge Parker limited

9     our ability to contact absent class members.  She believed that

10    people would be disturbed by getting contacted by lawyers about

11    an app where they had revealed highly personal information.

12    That is not the case here.

13          Again, we don't have any immediate intention of

14    contacting absent class members.  And the idea that Defendants

15    can redact their names in discovery that's going to go out is

16    just going to complicate our review.  It's going to impose

17    costs on Plaintiffs, and it's improper.

18          THE COURT:  Mr. Meadows.

19          MR. WATSTEIN:  This is Ryan Watstein.  I will take the

20    response to this one.

21          I will start very briefly with the redactions for

22    relevance.  So the bottom line is that that asks for an

23    advisory opinion.  We have, as we just talked about, millions

24    and millions of documents that we have not even yet run search

25    terms on because, even though we asked for search terms for

OB7LBroC

```
 1    months, we just got them yesterday from Plaintiffs' counsel,
 2    who says we are trying to slow down discovery.  So we don't yet
 3    know what we are going to find, but what we do know is this
 4    Court, your Honor, has already placed certain limitations on
 5    discovery.
 6         For example, your Honor held that six straight
 7    information was off limits for the time being.  Secondly, and
 8    much more importantly, your Honor limited discovery to the
 9    New York claims.  There's eight different states at issue under
10    the Eligo penumbra.  So it very well could be the case that we
11    don't redact anything, but it also could be the case that there
12    is a bunch of information in documents that are half about
13    other states and half about New York.  We wanted to redact the
14    information about other states because your Honor already held
15    that's off limits.
16         So, again, this is just another example of filing an
17    unnecessary motion that is not -- it's trying to get a gotcha
18    on us.  They want a ruling from your Honor without even letting
19    us look at the documents and determine if we even anticipate
20    redacting anything.  So for that reason, we think that portion
21    of their motion should be denied outright.  They can reraise it
22    if there are issues with redactions down the road, but there
23    are currently not, and we are entitled to preserve our
24    objection until we review the document.  So that is relevance
25    redaction.
```

OB7LBroC

```
 1                And the second category is redaction of class member
 2     PII.  So at the outset there, I want to address this point
 3     about slowing down discovery.  Again, we just got search terms
 4     yesterday.  We filed a motion last night asking for the Court
 5     to order an expedited period of discovery on the core issue in
 6     this case so that we can show whether claims are precluded by
 7     binding Second Circuit authority.  We will show -- your Honor
 8     will decide.  They can argue this case isn't like Agway.  We
 9     will show that it is.  So all this discussion about how much
10     money is at issue in this case and everything else, and how
11     many class members there are, that all assumes they have valid
12     claims.
13                I am going to make a prediction.  We are going to
14     spend millions and millions of dollars defending this case only
15     to get summary judgment under the Agway decision.  Setting that
16     aside for a minute and going back to the PII redaction, they
17     say they don't have any immediate intention of contacting class
18     members.  They are currently advertising on social media for
19     additional claims against Eligo.  So the idea that they don't
20     have any intention of contacting class members strains
21     credulity.
22                And the Supreme Court has said a plaintiff in a
23     putative class action like this do not get, normally, any
24     information, any personally identifiable information of
25     putative class members.  And in the Nichols case that we cited
```

OB7LBroC

```
 1   involving Plaintiffs' counsel, they tried to distinguish it,
 2   but it's not distinguishable.  Judge Parker said there that
 3   they argued that they merely sought to use the information to
 4   solicit fact witnesses, not representative plaintiffs.  The
 5   Court called it too cute by half, and the Court entered a gag
 6   order saying, You are not to contact any of these people.  And
 7   in doing so, the Court based that on the Supreme Court's
 8   precedent that I mentioned that says they don't get that
 9   information precertification.
10           So the concerns there -- the concerns here are far
11   more dire, given that they are already advertising for
12   additional plaintiffs.  And they say, Well, we are not going to
13   know what the information is if you redact it; we won't know
14   the context.  But that's not true either because we are only
15   going to do partial redactions.
16           So, for example, if there is PII, there will be a
17   partial redaction showing the name Steve, and they will know it
18   is about somebody named Steve; they just won't have the
19   information to contact that person precertification, which they
20   are not entitled to.
21           I just had a hearing on this exact issue yesterday in
22   front of Judge Gilbert in the Northern District of Illinois.
23   And just like we are asking here, he said, Absolutely not; you
24   don't get any of this information precertification; I consider
25   myself a fiduciary of the uncertified class; you don't get to
```

OB7LBroC

1    contact those people until you show that class certification is

2    proper.

3                THE COURT:  Okay.  Look, it's 11:45.  I told you folks

4    I only had 45 minutes and that I had to leave by then.  It is

5    astonishing to me that despite the fact I specifically told you

6    that I had 45 minutes, and that there were any number of issues

7    that we had to cover, and, please be concise, not a single

8    lawyer on this call has heeded that advice.  We are adjourned.

9                (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25