Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANNE BROUS, AS THE EXECUTOR OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated, | Civil Case No.: 24 Civ. 01260 (ER) |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| **ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**, | **JURY TRIAL DEMANDED** |
| Defendants | |

# TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................................ 1

PARTIES ............................................................................................................................... 4

JURISDICTION AND VENUE ............................................................................................ 8

FACTUAL ALLEGATIONS ................................................................................................ 9

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets................................ 9

    B.   Plaintiff Ira Brous's Dealings With Eligo........................................................................ 21

    C.   Plaintiff Michelle Schuster's Dealings With Eligo.......................................................... 21

    D.   Eligo's Unauthorized Pricing Practices ........................................................................... 21

    E.   Eligo's Unauthorized Monthly Fees ................................................................................ 36

    F.   Eligo Violated New York's Variable Rate Disclosure Law ............................................ 36

    G.   Tolling Of The Statute Of Limitations............................................................................. 37

CLASS ACTION ALLEGATIONS ..................................................................................... 38

CAUSES OF ACTION ........................................................................................................ 42

COUNT I: BREACH OF CONTRACT ............................................................................... 42

COUNT II:  IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.................... 44

COUNT III: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 .................. 47

COUNT IV: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-D(3) .......... 51

COUNT V: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-D(7)............ 54

COUNT VI: UNJUST ENRICHMENT ............................................................................... 56

PRAYER FOR RELIEF ...................................................................................................... 57

JURY DEMAND ................................................................................................................. 57

Plaintiffs Anne Brous as the executor of the estate of Ira Brous and Michelle Schuster (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy NY, LLC (hereinafter "Eligo" or "Defendants") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## **NATURE OF THE CASE**

1.      This action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused tens of thousands of commercial and residential customers New York to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Eligo is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States.  Eligo has taken advantage of deregulation to exploit customers hoping to save on their energy costs. This case centers on the pricing practices Eligo used on its New York variable rate customers.

3.      Eligo represents in its customer contract with Plaintiffs that it will charge a "monthly variable kWh rate that may be periodically adjusted for market conditions."  The contract then goes on to delineate exactly how those adjustments for market conditions are made, and specifically identifies how "[v]ariable price is determined."  The contract states that "all" variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."  Eligo's contract with Plaintiffs further represents that "[a]pplicable taxes will be factored into the variable price."

4.      Eligo's representations in its form customer contract about how variable energy rates are calculated are false and deceptive, and designed to take advantage of customers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy pricing and cost information.  Eligo contracted to charge a variable rate that "shall" be "calculated" using four verifiable and documented factors: (1) the wholesale "market pricing" of Eligo's energy supply; (2) the minor "other market price factors" that account for the ancillary fees accompanying Eligo's supply costs; (3) the "transportation costs" Eligo incurs when its energy is transported from the wholesale market to the delivery point where the customer's utility takes it from the transmission system; and (4) "applicable taxes."

5.      In reality, however, Eligo did not provide customers with variable rates "calculated" from wholesale market pricing and Eligo's other documented costs to supply energy plus applicable taxes.  Instead, Eligo used a pricing methodology that charged excessive and varying profit margins with the intent of depriving customers of the benefits of a rate calculated using the contract's four enumerated factors.  Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates.  Nor does the contract provide Defendants with discretion to pick and choose the weight of the factors set forth in Eligo's contracts and then apply whatever markup it sees fit.  Yet Eligo's varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment to do the opposite.

6.      Indeed, Eligo has always followed a uniform policy, not of charging a rate calculated in accordance with the contract, ███████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

2

██████████████████████████████████████████████████

████████████████████████████████████████████.

7.    Eligo also admits that its variable rates are set using factors that are not among the four factors listed in Eligo's variable rate pricing term.  For example, Eligo has admitted that it sets variable rates by considering things like "legislative and regulatory uncertainty."  In other words, Eligo charges customers a premium on the off chance that regulators or legislators will restrict its future operations in a way that affects future profits.

8.    Eligo also adds a monthly fee to variable rate customers' bills, even though its contract does not provide that monthly fees (as opposed to a per kilowatt hour charge based on the customer's usage) can be tacked onto variable rate customers' monthly bills.

9.    As a result of Eligo's unlawful acts described herein, tens of thousands of unsuspecting customers have been, and continue to be, fleeced by Eligo out of tens of millions of dollars in exorbitant charges for electricity and natural gas.  Defendants' scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

10.    Plaintiffs and other Eligo customers (the "Class") have been injured by Eligo's unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Eligo's breach of contract, breach of the duty of good faith and fair dealing, violation of New York consumer protection statutes, and unjust enrichment.

11.    Only through a class action can Eligo's customers remedy its ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.

Further, many customers do not realize they are victims of Eligo's deceptive and unlawful conduct.  With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Eligo engage in fair and upright business practices.

## PARTIES

12.     Former Plaintiff Ira Brous ("Mr. Brous") resided in Ithaca, New York.  Mr. Brous enrolled with Eligo on or around July 13, 2017.  Eligo charged Mr. Brous a fixed rate for electricity from August 2017 until January 2018, after which it began charging him a variable rate.  Mr. Brous cancelled his Eligo account in or around November 2023.  Unbeknownst to Mr. Brous, Eligo charged him excessive and unauthorized variable rates every month.

13.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Mr. Brous paid more for his home energy supply than he otherwise should have paid.

14.     Mr. Brous filed the original complaint against Defendants in this action on February 20, 2024.  ECF No. 1. Mr. Brous sadly passed away after filing the original complaint. On April 22, 2025, the Court ordered Mr. Brous' widow, Anne Brous ("Mrs. Brous"), his sole successor and the executor of his estate, to be substituted in place and stead of Mr. Brous as a Plaintiff in this action.  ECF No. 192.

15.     Plaintiff Michelle Schuster resides in Rochester, New York.  Plaintiff Schuster enrolled with Eligo on or around October 9, 2016.  Eligo charged Plaintiff Schuster a fixed rate for electricity from November 2016 until January 2017, after which it began charging her a variable rate.  Plaintiff cancelled her Eligo account in or around November 2023.  Unbeknownst to Plaintiff Schuster, Eligo charged her excessive variable rates every month.

16.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiff Schuster paid more for her home energy supply than she otherwise should have paid.

17.     Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC.  On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida.  Accordingly, Eligo Energy, LLC is a citizen of Florida.

18.     Defendant Eligo Energy NY, LLC is a New York limited liability company with its principal place of business in Chicago, Illinois.  On information and belief, Eligo Energy NY, LLC is a wholly owned subsidiary of Eligo Energy, LLC.  Accordingly, Eligo Energy NY, LLC is a citizen of Florida.

19.     Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy NY, LLC.  Eligo Energy, LLC and Eligo Energy NY, LLC hold themselves out as a single company—Eligo Energy.[1]  Eligo Energy NY, LLC has no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[2]  There is a unified executive team, and on information and belief they are all employed by Eligo Energy, LLC.  That unified executive team controls all operational and financial aspects of Eligo Energy

---

[1] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story (last visited Nov. 13, 2024).

[2] *Compare id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606") *with* **Exhibit A** (Plaintiff Brous's Contract) at 3 (stating that Eligo Energy NY, LLC is "located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803") *and* **Exhibit B** (Plaintiff Schuster's Contract) at 2 (same).

NY, LLC.  For example, Eligo Energy New York, LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the Eligo brand nationally.  Defendants have also admitted that attorneys at Eligo Energy, LLC were responsible for drafting customer communications and customer contracts.  Eligo's current Controller, Chief Compliance Officer, Executive Chairman, VP of Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for their employment by Eligo Energy, LLC.  All of these individuals were voluntarily designated by defense counsel as key players whose ESI will be collected for search in this matter.  Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant Eligo Energy NY, LLC, to perpetrate the unlawful conduct challenged in this lawsuit.

20.    All of the operations and activities related to acquiring and servicing Eligo's customers (including Eligo's customers in New York) are directed and executed by Eligo Energy, LLC, including marketing and making sales to New York consumers, setting the exorbitant variable rates for those customers and imposing improper monthly fees, purchasing electricity at wholesale, and handling billing and other back office activities.  Eligo Energy, LLC also owns and operates the computer software and hardware used to set rates for all Eligo customers.  Eligo Energy, LLC employs the individuals that conducted the activities challenged in this litigation.  For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy, LLC's executive team sets pricing strategy for New York customers including Plaintiffs.  Those individuals include Eligo Energy, LLC's CEO, head of Risk team, and CIO.  Eligo Energy NY, LLC's 30(b)(6) witness also testified that he did not know if a separate group of people manage Eligo Energy NY, LLC as opposed to Eligo Energy, LLC, he could not identify

documents that list the names or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo Energy NY, LLC.

21. Eligo Energy, LLC also holds itself out to customers as their supplier of electricity and the contracting entity. Although Plaintiffs' contracts with Eligo bear the heading "Eligo Energy NY, LLC Terms of Service,"[3] the Welcome Letter marketing material sent to both Plaintiffs upon enrollment, which enclosed Eligo's contracts, bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606.[4]

Both letters further state that "[i]n the next few days, you will be receiving a notice from [the local utility] of change of your supplier ***to Eligo Energy, LLC***." (Emphasis added)[5] The letters also state that they enclose "a copy of the terms and conditions of your agreement with Eligo Energy" and are signed "Eligo Energy."[6]

22. Further, monthly invoices produced by Defendants in this litigation reflecting the charges for Ms. Schuster's electricity supply bear the "EligoEnergy" logo, were issued by "Eligo Energy, LLC," and directed Ms. Schuster to remit payments to "Eligo Energy, LLC." *See, e.g.,* DEF00001. Likewise, communications concerning Plaintiffs' accounts were sent by "Eligo Energy, LLC" and did not mention Defendant Eligo Energy NY, LLC.

23. Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy NY, LLC as a separate entity. Rather, it used the corporate entity Eligo Energy NY, LLC interchangeably with itself. For example, invoices for wholesale electricity purchases from the New York

---

[3] Ex. A at 3; Ex. B at 2.

[4] Ex. A at 1; Ex. B at 1.

[5] Ex. A at 1; Ex. B at 1.

[6] Ex. A at 1; Ex. B at 1.

Independent System Operator (NYSIO) for Defendants' New York customers were addressed to "Eligo Energy, LLC."  Similarly, invoices from electric utility companies (NY State Electric & Gas Corporation and Rochester Gas & Electric) addressed to "Eligo Energy NY, LLC" were paid from an account controlled by Defendant Eligo Energy, LLC.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

24.    This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

### Personal Jurisdiction

25.    This Court has General and Specific Personal Jurisdiction over Defendant Eligo Energy NY, LLC because it is a New York limited liability company, and it advertises, markets, distributes, and sells energy to New York customers, including Plaintiffs.  This Court has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets, distributes, and sells energy to New York customers, including Plaintiffs.

### Venue

26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Both Defendants are limited liability companies that are deemed to reside in any judicial district in which they are subject to the court's personal jurisdiction.  28 U.S.C. § 1391(c)(2).  Because both Defendants are subject

to this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this District under § 1391(b)(1).

## FACTUAL ALLEGATIONS

### A.    The History Of Deregulation And ESCOs' Role In Energy Markets

27.    In the 1990s and 2000s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), deregulated the market for retail energy supply.  Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay.  As a result, the energy supply markets in New York, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Pennsylvania, and Washington, D.C. are open to competition, and customers and small businesses may choose their energy supplier.

28.    Since New York opened its retail energy markets to competition, millions of New York residential and small business customers have switched to an ESCO.  Deregulation laws in other states are substantially similar.

29.    ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or extract natural gas.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer.  ESCOs merely buy electricity and natural gas and then sell that energy to end-users with a mark-up.  Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers.  The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the

customer's energy supply.  The only value that ESCOs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

30.     ESCOs are subject to minimal regulation by state utility regulators like the NYPSC.  ESCOs like Eligo do not have to file their rates, or the method by which those rates are set.  Instead, an ESCO customer's rates are governed by the contract between the ESCO and the customer (and the relevant consumer protection and contract law).

31.     Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility.  For example, in New York, as in many states, the utilities charge energy supply rates that reflect the same cost-factors set forth in Eligo's customer contract.  Indeed, in New York the utilities' supply rates serve as pass throughs of the utilities' energy supply cost from the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale energy and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as Eligo incur).  New York utilities purchase energy, ancillary services, and capacity daily from NYISO's wholesale market based on customer consumption and pass actual costs on to their customers.

32.     ESCOs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices.  But ESCOs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers,

such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price.  The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

33.    Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the cost-based factors set forth in Eligo's contract; accordingly, no consumer would ever agree to Eligo's variable rate if they knew the truth.

34.    The only way Eligo can retain variable rate customers is by hiding the fact that Eligo's rates are not "calculated" from its documented supply costs plus applicable taxes. Instead, Eligo's rates are the result of unbridled price gouging and profiteering.  Eligo does not have discretion to merely "consider" its documented supply costs and then add whatever markup it chooses.   To the extent Eligo claims it has discretion in setting rates (it does not), that discretion is cabined by the contract's explicit promise that the customer's rates will be calculated "in response to market pricing, transportation costs, and other market price factors." Any discretion Eligo may have had is also cabined by customers' reasonable expectations that Eligo will not price gouge customers for the same energy sold by their local utilities.

35.    Eligo took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates.  In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline.  However, Eligo exploits deregulated markets by consistently charging its customers far more than its contractual pricing term permits and failing

11

to adequately disclose how its variable rates are actually determined.

36.    One of deregulation's main unintended consequences has been the proliferation of ESCOs like Eligo whose business model is primarily based on taking advantage of customers. As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[7]  As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiffs challenge here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity.  Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, ***short-term "teaser" rates followed by skyrocketing variable prices***—many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas.  The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[8]

37.    For years, New York regulators have also been calling out the high levels of misconduct that pervade the state's deregulated energy markets.  For example, in 2014 the

---

[7] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 1 (2009).

[8] *Id.* at 3–4 (emphasis added).

NYPSC concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[9]  The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[10]  The NYPSC concluded that:

> [A]s currently structured, the retail energy commodity markets for residential and small nonresidential customers cannot be considered to be workably competitive.  Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition[.][11]

38.    Statistics from the New York Attorney General's ("NYAG") office confirm the pattern of activity this class action seeks to combat.  From at least the year 2000 to the present, the NYAG has investigated numerous ESCOs' deceptive and illegal business practices.  These investigations have resulted in multiple settlements providing for extensive injunctive relief and millions in restitution and penalties.

39.    The unlawful conduct of ESCOs like Eligo has been devastating to New York customers.  For example, "[a]ccording to the data provided by [New York's] utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December

---

[9] NYPSC, CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

[10] *Id.* at 11.

[11] *Id.* at 10.

31, 2016."[12]  "Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period."[13]  Combining these two groups, New York customers have been "'overcharged' by over $1.3 billion dollars over this time period."[14]

40.    New York's low-income customers have also been hit hard.  The utilities reported that low-income ESCO customers (a subset of the residential customers mentioned above) "collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility."[15]

41.    On December 16, 2016, based on the flood of customer complaints, negative media reports, and data demonstrating massive overcharges, the NYPSC prohibited ESCOs from serving low-income customers, because of "the persistent ESCO failure to address (or even apparently to acknowledge) the problem of overcharges to [low income] customers[.]"[16]

42.    Following the first part of the evidentiary hearing announced in December 2016, on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and

---

[12] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

[13] *Id.* at 3.

[14] *Id*.

[15] *Id*.

[16] NYPSC, CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.[17]

* * *

The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.  Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers.  For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[18]

* * *

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires.  In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully

---

[17] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

[18] *Id.* at 41–42 (citations omitted).

informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[19]

43.    As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[20]  Likewise, when the ESCOs claimed that their provision to customers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[21]

44.    Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[22]  The NYPSC staff went on to state that "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an

---

[19] *Id.* at 86 (citations omitted).

[20] *Id.* at 37.

[21] *Id.* at 87.

[22] *Id.* at 69.

ESCO is likely to receive the same or less renewable energy than they were receiving from the

utility, even if they are sold a "green" commodity product."[23]

45.    Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers.  These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[24]

46.    Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes

that banned, starting in February 2020, the variable rate pricing practices engaged in by Eligo

and impacting the entire New York ESCO marketplace.[25]

47.    The NYPSC's press release announcing the new regulations stressed that banning

variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging

New York consumers" and that the regulations only went forward after "the state's highest court

definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection

regulation."[26]  The regulations themselves likewise condemn ESCOs' conduct and declare that

deception has become a "business model" in the deregulated energy market:

---

[23] *Id*. at 69–70.

[24] *Id*.

[25] NYPSC, CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 108–10 (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[26] Press Release, NYPSC, PSC Enacts Significant Reforms to the Retail Energy Market (Dec. 12,

> Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO customers that pay significant premiums for products with little or no apparent added benefit, . . . it appears that a material level of misleading marketing practices continues to plague the retail access market.
>
> * * *
>
> The persistence of complaints related to ESCO marketing practices is indicative of some ESCOs continuing to skirt rules and attempting to avoid accountability as part of their business model.[27]

48.     The NYPSC's variable rate ban followed its two-year investigation of ESCO practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19 parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[28]

49.     The NYPSC prefaced the variable rate ban with the observation that variable energy rates like those Defendants charged Plaintiffs and Class Members are "[t]he most commonly offered ESCO product" and that this popular product is frequently provided at "a higher price than charged by the utilities."[29]  The incongruity of customers paying ESCOs more for the exact same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material benefits to consumers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.[30]

---

2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7B2F86EF23-5B31-46D3-846D-DAD7C0D7381A%7D.

[27] December 12 Order at 88–90.

[28] *Id.* at 3–4.

[29] *Id.* at 11.

[30] *Id.* at 12.

50.     In fact, the NYPSC found it "troubling" that even after considering reams of evidence, "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."[31]  This fact only highlighted the NYPSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."[32]  Accordingly, and on this record, the NYPSC banned variable energy rates like those Defendants charged Plaintiffs and Class Members.[33]  In place of these floating variable rates, the NYPSC required ESCOs to guarantee that their variable rates would save customers money compared to what the utility would have charged.[34]  Under the new regulations, if the ESCO charges the customer more than the utility, the customer is owed a refund for the difference.[35]  In this litigation, the difference between what Eligo charged customers for the same energy Class Members' utilities would have supplied, and what the utilities would have charged for that energy is likely in the tens of millions of dollars.

51.     Moreover, the NYPSC's findings of widespread and unjustified overcharging underscore and highlight the importance and perniciousness of Defendants' practices challenged in this lawsuit.  Likewise, the NYPSC's finding that ESCOs' overcharging is completely unjustified bolsters Plaintiffs' claims that Defendants' variable rate pricing practices breached the duty of good faith and fair dealing.  ESCOs' improper pricing practices go undetected

---

[31] *Id.* at 30.

[32] *Id.* at 31.

[33] *Id.* at 39.

[34] *Id.*

[35] *Id.*

because it is virtually impossible for customers to ferret out the fact that they are being
overcharged.

52.     In its December 12 Order, the NYPSC also faulted ESCOs for concealing critical
pricing data from both ordinary customers **and the NYPSC itself**: "without transparent or
unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the
prices being charged by ESCOs are just and reasonable."[36]

53.     The NYPSC then proceeded to "reject all arguments that customers will be better
off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[37] and
required that ESCO bills show how much the customer's utility would have charged.[38]

54.     In addition, in response to the mounting evidence of ESCOs' improper pricing
practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation
(A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain
express consent from customers prior to increasing prices.[39]  The legislation was introduced after
reports that ESCOs in New York, like Eligo, charge some of the highest residential energy costs
in the United States.[40]

55.     New York is not the only state using the overwhelming evidence of customer
harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

---

[36] *Id.* at 31.

[37] *Id.* at 33.

[38] *Id.* at 33–34.

[39] Press Release, Governor Kathy Hochul, Governor Hochul Signs Legislation to Protect
Consumers from Surprise Price Increases in Energy Bills (Sept. 20, 2023),  *available at*
https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-
surprise-price-increases-energy-bills.

[40] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

**B.    Former Plaintiff Ira Brous's Dealings With Eligo**

56.    In the summer of 2017, Eligo solicited Plaintiff Brous, and he agreed to switch his electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff Brous with marketing material (dubbed a "Welcome Letter" in industry parlance) stating "[w]elcome to Eligo Energy, authorized supplier of NYSEG. . . . In the next few days, you will be receiving a notice from NYSEG of change of your supplier to Eligo Energy, LLC."  *See* Ex. A at 1.  The letter also enclosed a copy of Eligo's standardized adhesion contract for New York customers. *Id.* at 3.

57.    Eligo began supplying electricity to residence Mr. Brous shared with his wife Plaintiff Brous and it continued to do so until Mr. Brous cancelled in or around November 2023.

58.    After a roughly six-month fixed rate period, Eligo began charging Mr. Brous a variable rate for electricity in or around January 2018.

**C.    Plaintiff Michelle Schuster's Dealings With Eligo**

59.    In the fall of 2016, Eligo solicited Plaintiff Schuster, and she agreed to switch her electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff Schuster with a Welcome Letter stating "[w]elcome to Eligo Energy, authorized supplier of RG&E. . . . In the next few days, you will be receiving a notice from RG&E of change of your supplier to Eligo Energy, LLC."  *See* Ex. B at 1.  The letter also enclosed a copy of Eligo's standard, uniform contract.  *Id.* at 2.

60.    Eligo began supplying electricity to Plaintiff Schuster's residence and it continued to do so she cancelled in or around November 2023.

61.    Eligo began charging Plaintiff Schuster a variable rate for electricity in or around January 2017.

**D.    Eligo's Unauthorized Pricing Practices**

62.     In its standard form contract, Eligo represents that "all" variable rates "shall" be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."  Eligo further represents that "[a]pplicable taxes will be factored into the variable price."

63.     This pricing term has the same legal operation as other contracts Eligo used for sales with New York customers.  *See* ECF No. 44-7, Ex. 44–46.

64.     The variable rate pricing structure outlined in Eligo's contract has four verifiable and documented components: (1) "market pricing," which is the price to procure energy from the wholesale market; (2) the minor "market price factors" that encompass the ancillary fees charged in connection with wholesale supply purchases; (3) the "transportation costs" Eligo pays to transport the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (4) applicable taxes.

65.     In light of Eligo's representations in its customer contract about how variable rates "shall" be "calculated," any reasonable consumer, including Plaintiffs, would reasonably expect that Eligo's variable rates would reflect the cost factors set forth in the contract and would only vary "in response to" changes in those costs.  Eligo's contract does not give Eligo discretion to set prices as it sees fit.  Instead, the contract restricts Eligo's rates to rates that are "calculated on a monthly basis in response to" the four components outlined in the contract.

66.     None of the four cost factors identified in Eligo's customer contract explain its exorbitant charges.  For example, the costs of energy and related minor charges on the relevant wholesale market do not account for Eligo's excessive rates.  As detailed below, Eligo's rates far exceed those identifiable costs and were not "calculated" in "response to" those verifiable costs.

67.    Eligo's customer contract also refers to "transportation costs" and "appliable taxes" as components of Eligo's variable rates, but while Eligo may incur those costs in other markets, they do not apply in New York.  In certain markets, such as those in the Pennsylvania-New Jersey-Maryland Interconnection region, ESCOs like Eligo pay a relatively small sum for the cost of transporting the energy from the wholesale market to the point of delivery where the customer's utility takes possession of the energy from the transmission system.  In New York (Plaintiffs' market), however, this cost is paid by the utility—here, NYSEG or RG&E—not by Eligo.  The utilities then pass this cost onto customers in connection with the utility's **_delivery_** charges, not the supply portion of the customer's bill.  Accordingly, "transportation costs" cannot be factored into the rates Eligo charges New York customers.

68.    Similarly, Plaintiffs' bills showing Eligo's rate contain a separate line item for sales tax and Eligo pays no tax on its purchases from the wholesale market. Thus, in New York, "applicable taxes" cannot be factored into Eligo's variable rate.

69.    Instead, the only one of the four factors enumerated in the contract that would cause the customer's rate to materially vary from month to month is Eligo's cost to purchase its customers' energy supply on the relevant wholesale market.

70.    Eligo purchases its energy supply on the competitive wholesale market.  The cost of wholesale energy is overwhelmingly the largest cost Eligo incurs.  The other cost factors outlined in the contract that may affect Eligo's variable rate (such as additional market price factors) are minor and are included in the local utility's supply charges as well.[41]  These additional costs are relatively insignificant in terms of the overall costs Eligo incurs to procure

---

[41] As noted above, in New York, transportation costs are billed to customers by their utilities as delivery charges.  To the extent Eligo pays transportation costs in other markets, however, such relatively minor costs would also be reflected in the local utilities' supply costs.

natural gas and electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.

71.    Therefore, Eligo's supply costs cannot explain Eligo's egregiously high variable rates or the reason its rates are disconnected from changes in wholesale costs.  Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent they are even included as "other market price factors" (they are not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs.  In fact, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

72.    Eligo's outrageous rates are in fact a result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's supply costs, and its consideration of other non-cost factors like legislative and regulatory risk.  No reasonable consumer would expect that a variable rate that "shall" be "calculated on a monthly basis in response" to the four factors enumerated in the contract would in fact be set using Eligo's determination of the highest feasible rate and other non-cost factors.

### Benchmark One: The Local Utility's Contemporaneous Supply Rate

73.    A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo does not follow its contract's pricing formula in good faith.  Publicly available data on the local utilities' rates, like New York State Electric and Gas Corporation ("NYSEG") and Rochester Gas and Electric ("RG&E"), which are the utilities serving Plaintiffs' residences, serve as an ideal indicator of the four price components set forth in Eligo's customer contract: (1) the wholesale cost of energy; (2) the

ancillary fees charged in connection with wholesale supply purchases; (3) the "transportation costs" Eligo pays to transport the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (4) applicable taxes.[42] This is because the utilities' energy procurement costs are the same costs ESCOs like Eligo incur and the utility's rate serves as a pure passthrough of those costs. Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which are the correlated factors outlined in Eligo's contract. Consequently, local utilities' supply rates are the ideal comparator for determining whether Eligo's rates are "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."

74.    In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate. Using the utility's rates as a benchmark for the contract's enumerated cost factors shows that Eligo's rates were driven by excessive mark-ups and profiteering.

75.    The following table compares Former Plaintiff Brous's variable supply rates from Eligo for twelve billing periods to his local utility NYSEG's contemporaneous rates.

| Billing Period | Eligo Rate ($/kWh) | NYSEG Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 10/6/2022–10/31/2022 | 0.24 | 0.07 | 3.67x | 267% |

---

[42] As explained above, neither transportation costs nor taxes affect energy supply rates in New York—whether those rates are charged by Eligo, the local utilities, or other ESCOs.

| 11/1/2022–12/5/2022 | 0.24 | 0.08 | 2.97x | 197% |
| 12/6/2022–1/3/2023 | 0.24 | 0.06 | 3.72x | 272% |
| 1/4/2023–2/1/2023 | 0.24 | 0.09 | 2.81x | 181% |
| 2/2/2023–3/1/2023 | 0.24 | 0.07 | 3.34x | 234% |
| 3/2/2023–4/3/2023 | 0.19 | 0.09 | 2.11x | 111% |
| 4/4/2023–5/2/2023 | 0.19 | 0.03 | 6.06x | 506% |
| 5/3/2023–5/31/2023 | 0.18 | 0.05 | 3.78x | 278% |
| 6/1/2023–7/3/2023 | 0.18 | 0.06 | 2.98x | 198% |
| 7/4/2023–8/2/2023 | 0.17 | 0.04 | 3.78x | 278% |
| 8/3/2023–9/1/2023 | 0.17 | 0.06 | 2.59x | 159% |
| 9/2/2023–10/2/2023 | 0.20 | 0.07 | 2.78x | 178% |

76.    The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff Brous's account and NYSEG's contemporaneous rates. Eligo's rate was more than *double* NYSEG's rate in *every* billing period, more than *triple* NYSEG's rate in six out of twelve billing periods, and more than *six times* NYSEG's rate in April 2023.  On average, Eligo's rates were *more than triple* NYSEG's rates.

77.    The following table compares Plaintiff Schuster's variable supply rates from Eligo for twenty billing periods to her local utility RG&E's contemporaneous rates.

| Billing Period | Eligo Rate ($/kWh) | RG&E Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/25/2021–7/27/2021 | 0.16 | 0.04 | 3.65x | 265% |
| 7/28/2021–8/25/2021 | 0.16 | 0.05 | 3.5x | 250% |
| 8/26/2021–9/24/2021 | 0.16 | 0.05 | 3.15x | 215% |
| 9/25/2021–10/26/2021 | 0.17 | 0.06 | 2.94x | 194% |

| 10/27/2021–11/24/2021 | 0.17 | 0.05 | 3.37x | 237% |
| 11/25/2021–12/27/2021 | 0.16 | 0.05 | 3.47x | 247% |
| 12/28/2021–1/26/2022 | 0.18 | 0.06 | 3.02x | 202% |
| 1/27/2022–2/25/2022 | 0.18 | 0.05 | 3.42x | 242% |
| 2/26/2022–3/25/2022 | 0.16 | 0.07 | 2.37x | 137% |
| 3/26/2022–4/28/2022 | 0.16 | 0.06 | 2.56x | 156% |
| 4/29/2022–5/25/2022 | 0.19 | 0.08 | 2.5x | 150% |
| 5/26/2022–6/28/2022 | 0.16 | 0.04 | 3.74x | 274% |
| 6/29/2022–7/26/2022 | 0.16 | 0.07 | 2.24x | 124% |
| 7/27/2022–8/25/2022 | 0.24 | 0.06 | 3.89x | 289% |
| 8/26/2022–9/27/2022 | 0.20 | 0.07 | 2.8x | 180% |
| 9/28/2022–10/26/2022 | 0.20 | 0.06 | 3.16x | 216% |
| 10/27/2022–11/23/2022 | 0.22 | 0.09 | 2.45x | 145% |
| 11/24/2022–12/22/2022 | 0.20 | 0.07 | 2.96x | 196% |
| 12/23/2022–1/25/2023 | 0.20 | 0.07 | 2.86x | 186% |
| 1/26/2023–2/25/2023 | 0.17 | 0.06 | 2.81x | 181% |

78.    The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff Schuster's account and RG&E's contemporaneous rates. Eligo's rate was more than *double* RG&E's rate in *every* billing period and more than *triple* RG&E's rate in ten billing periods.  On average, Eligo's rates were *more than triple* RG&E's rates.

79.    The local utility's rates are a reasonable, pre-discovery benchmark of the four cost-related factors in Eligo's customer contract.  As explained above, the local utility is Eligo's primary competitor in Plaintiffs' service territories, and the local utilities' supply rates reflect the

wholesale cost of energy and the cost of related ancillaries—the same costs that ESCOs like

Eligo incur in New York.  Thus, the utility's rate is an ideal stand in for a rate that reflects the

cost-factors in Eligo's contract.

80.     The discrepancy between the utility's rates and Eligo's rates is thus attributable to

Eligo's failure to calculate rates in accordance with the contract's exclusive factors and instead

results from Eligo's price gouging.

81.     Further, Eligo's contract with Plaintiffs does not allow it to include the price of

obtaining renewable energy credits ("RECs") or carbon offsets for energy supply.  Even if it did,

however, the cost of obtaining said credits or offsets for 30% (or 50% or even 100%) of the

energy it supplied to Plaintiffs and the Class is very small and does not account for Eligo's high

rates.  For example, the cost to purchase renewable energy credits for 30% of the electricity

Eligo supplied to Plaintiffs would have been, on average, less than a penny per kWh—

approximately 3% of Eligo's average rate.[43]  Even when Eligo was purchasing RECs that

corresponded to more than 30% of customer usage, the costs to purchase RECs is a small

percentage of its actual costs because the average cost to purchase RECs for 100% of each kWh

supplied to a customer was only two cents per kWh.  Indeed, Eligo's costs associated with

purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale

markets, and these costs cannot explain Eligo's exorbitant rates.

### Benchmark Two: Eligo's Own Fixed Rates

82.     Eigo's own fixed rates, which are significantly lower than its variable rates,

demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable

---

[43] Eligo's contracts state that its electricity products "are derived from at least 30% renewable sources."  Ex. A at 3; Ex. B at 2.

profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add ***lower*** margins to its variable rates.  Yet the opposite is true.

83.     That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates did not comply with the contract's rate-setting formula.  For example, from the first quarter of 2022 through the end of 2023, Eligo's variable rate was always substantially higher than its fixed rate:[44]



84.     There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers.  Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different.  In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy.  The only reason that Eligo's variable rates are so much higher than its fixed

---

[44] *See* Actual Weighted Average Historic Price for Electric Supply as Reported by the Supplier in 14850, NYS Power to Choose, available at https://documents.dps.ny.gov/PTC/historic-pricing/14850/1/335,179/975 (as visited on Feb. 20, 2024).

rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's pricing term.

85.    Eligo's rates also cannot be explained by the price of renewable energy credits. As both variable rates and fixed rates offered by Eligo are "derived from at least 30% [or another specified percentage] renewable sources," renewable energy credit pricing does not explain the discrepancy between the two pricing plans.

### Benchmark Three: Market Supply Costs

86.    A comparison of Eligo's rates to prevailing market costs also demonstrates that Eligo does not set rates in compliance with the contract's variable rate formula.

87.    The tables below, *see* ¶¶ 91, 95, identify (i) the variable rate Eligo charged Plaintiffs, (ii) the corresponding "Market Supply Costs," and (iii) the differences between Eligo's rates and the contemporaneous Market Supply Costs.

88.    The Market Supply Costs below are based on the costs that an ESCO incurs supplying a retail customer for each billing period, including the cost to procure renewable energy credits for 30% of the customer's consumption.  The Market Supply Costs for electricity include the weighted day-ahead NYISO electricity prices in Plaintiffs' respective utility zones, ancillary services costs, capacity costs, and various relatively small charges related to the NYISO (all costs that would be included in Eligo's contractual formula).  These charges are tracked by NYISO's Market Monitor, the external consultant that independently evaluates the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to NYISO's Federal Energy Regulatory Commission regulation and tariff.

89.     The Market Supply Costs represent the costs and charges that are relevant to the costs that Eligo and other ESCOs incur in providing energy to retail customers, including renewable energy credits for 30% of supply.  Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.  That Eligo's rates are so vastly different from Market Supply Costs demonstrates that Eligo's rates are not derived from the specific cost inputs outlined in Eligo's contract.

90.     The below chart shows a market supply comparison for Plaintiff Brous for twelve billing periods:

| Billing Period | Eligo Rate ($/kWh) | Market Supply Cost ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 10/6/2022–10/31/2022 | 0.24 | 0.06 | 4.11x | 311% |
| 11/1/2022–12/5/2022 | 0.24 | 0.04 | 5.52x | 452% |
| 12/6/2022–1/3/2023 | 0.24 | 0.09 | 2.57x | 157% |
| 1/4/2023–2/1/2023 | 0.24 | 0.05 | 4.62x | 362% |
| 2/2/2023–3/1/2023 | 0.24 | 0.05 | 4.64x | 364% |
| 3/2/2023–4/3/2023 | 0.19 | 0.04 | 5.26x | 426% |
| 4/4/2023–5/2/2023 | 0.19 | 0.04 | 4.69x | 369% |
| 5/3/2023–5/31/2023 | 0.18 | 0.04 | 4.94x | 394% |
| 6/1/2023–7/3/2023 | 0.18 | 0.04 | 4x | 300% |
| 7/4/2023–8/2/2023 | 0.17 | 0.07 | 2.56x | 156% |
| 8/3/2023–9/1/2023 | 0.17 | 0.05 | 3.15x | 215% |
| 9/2/2023–10/2/2023 | 0.20 | 0.06 | 3.45x | 245% |

91.     Again, Eligo's other supply costs are minimal compared to its wholesale supply costs and the table above shows that its variable rates are consistently and substantially higher

than a rate based on wholesale costs, which further demonstrates that Eligo's rates are not calculated based on the factors set forth in its customer contract.

92.     Eligo's rates charged to Plaintiff Brous were more than *triple* the Market Supply Costs in nearly every period, were more than *five times* Market Supply Costs twice, and were, on average, *more than four times higher than* Market Supply Costs.

93.     Eligo's rates also fail to fluctuate in accordance with Market Supply Costs. For instance, between October 6, 2022 and February 1, 2023, Market Supply Costs varied by a difference of at least 33% every month, yet Eligo's variable rate remained constant—and outrageously high—at $0.24/kWh. That Eligo's rates do to track the Market Supply Costs is further proof that Eligo is not following its contractual commitment to charge variable rates "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" and is instead levying an excessive and unreasonable fluctuating margin.

94.     The below chart shows the same analysis for Plaintiff Schuster for twenty billing periods:

| Billing Period | Eligo Rate ($/kWh) | Market Supply Costs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/25/2021–7/27/2021 | 0.16 | 0.05 | 3.15x | 215% |
| 7/28/2021–8/25/2021 | 0.16 | 0.05 | 2.92x | 192% |
| 8/26/2021–9/24/2021 | 0.16 | 0.05 | 2.94x | 194% |
| 9/25/2021–10/26/2021 | 0.17 | 0.06 | 2.84x | 184% |
| 10/27/2021–11/24/2021 | 0.17 | 0.06 | 2.97x | 197% |
| 11/25/2021–12/27/2021 | 0.16 | 0.05 | 3.06x | 201% |
| 12/28/2021–1/26/2022 | 0.18 | 0.09 | 1.91x | 91% |

| 1/27/2022–2/25/2022 | 0.18 | 0.09 | 1.92x | 92% |
| 2/26/2022–3/25/2022 | 0.16 | 0.06 | 2.9x | 190% |
| 3/26/2022–4/28/2022 | 0.16 | 0.05 | 3.18x | 218% |
| 4/29/2022–5/25/2022 | 0.19 | 0.04 | 4.51x | 351% |
| 5/26/2022–6/28/2022 | 0.16 | 0.07 | 2.15x | 115% |
| 6/29/2022–7/26/2022 | 0.16 | 0.09 | 1.87x | 87% |
| 7/27/2022–8/25/2022 | 0.24 | 0.10 | 2.32x | 132% |
| 8/26/2022–9/27/2022 | 0.20 | 0.09 | 2.33x | 133% |
| 9/28/2022–10/26/2022 | 0.20 | 0.06 | 3.37x | 237% |
| 10/27/2022–11/23/2022 | 0.22 | 0.04 | 4.85x | 385% |
| 11/24/2022–12/22/2022 | 0.20 | 0.06 | 3.24x | 224% |
| 12/23/2022–1/25/2023 | 0.20 | 0.07 | 2.78x | 178% |
| 1/26/2023–2/25/2023 | 0.17 | 0.05 | 3.46x | 246% |

95.    Eligo's rates were higher than the Market Supply Costs for all provided months and were, on average, ***nearly triple*** Market Supply Costs.

96.    Eligo's rates for Plaintiff Schuster also fail to fluctuate in accordance with Market Supply Costs.  To take one example, between August 26, 2022 and November 23, 2022, Market Supply Costs steadily declined from $0.09/kWh to $0.04/kWh—a decrease of over 50%—while at the same time, Eligo's rates ***increased*** from $0.20/kWh to $0.22/kWh.  This again demonstrates that Eligo prioritized its profits over adherence to the terms of its contract.

97.    That Eligo's rates are so much higher than its costs to acquire the electricity it sells to customers cannot be explained by the price of renewable energy credits because, as explained above, even assuming that Eligo purchased RECs to cover 100% of customer usage, the average price Eligo paid for such RECs was only two cents per kWh.  To the extent Eligo

purchased RECs covering less than 100% of usage, its REC costs would have been lower than two cents per kWh.

98.     Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to market prices but are instead outrageously higher.

99.     No reasonable consumer who knew the truth about Eligo's exorbitant rates would have chosen it as an energy supplier.

100.    Eligo lulled customers into purchasing its energy supply via material misrepresentations and omissions about its variable energy rates.  Eligo did so to reap excessive profits at the expense of unsuspecting customers.  Eligo acted with actual malice, or wanton and willful disregard for customers' well-being.

101.    In this case, Eligo knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

102.    It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[45] and "Nudges."[46]

---

[45] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[46] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

103.    Eligo's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that customers will compare Eligo's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

104.    Eligo did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates customers' local utilities charge.  Eligo likewise failed to adequately disclose to Plaintiffs that in paying Eligo's variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from their local utility.

105.    Eligo knew that its variable rates were consistently and significantly higher than the local utility's rates.

106.    Eligo's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

107.    Moreover, Eligo at no time alerted or informed Plaintiffs that the cost for energy would be continuously *significantly* higher than the same energy sold by their local utility.

108.    A reasonable consumer understands and expects that variable energy rates will reflect the wholesale price for the commodity, that is, the wholesale market price available to Eligo for the energy it in turn supplies to its retail customers.

109.    However, Eligo's variable rates are much higher than wholesale market price of energy in New York.

110.    Eligo's omissions with respect to the rates it would charge were materially misleading.

### E.    Eligo's Unauthorized Monthly Fees

111.    Contrary to the express terms of the contract, Eligo charges its variable rate customers additional and unauthorized monthly fees.

112.    Eligo's contract with Plaintiffs provides that the "price" for variable rate customers will be a "monthly variable kWh rate," meaning that the rate will be on a per kilowatt hour basis calculated in accordance with the four factors outlined in the contract.  Nowhere does the contract authorize Eligo to charge variable rate customers an additional monthly fee.

113.    However, Eligo frequently charges variable rate customers a monthly fee.  For example, from July 2018 to March 2022, Eligo charged Plaintiff Schuster a monthly fee of $4.93 forty-four times.

114.    Customers like Ms. Schuster were thus injured by being charged an unauthorized additional monthly fee.

### F.    Eligo Violated New York's Variable Rate Disclosure Law

115.    Because of the New York Legislature's concerns with skyrocketing variable rates, New York adopted N.Y. Gen. Bus. Law § 349-d(7), which requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."   The law is explicitly designed to allow energy consumers to make informed choices: "These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed decisions on their choices for gas and electric service . . . ."[47]

116.    Through its conduct, Eligo violated both the spirit and letter of N.Y. Gen. Bus. Law § 349-d(7).

---

[47] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 4 (2009).

117.    Eligo's marketing material Welcome Letter that it mailed directly to Plaintiffs never clearly and conspicuously identified that it would be charging its customers a variable rate. Specifically, the Welcome Letter does not mention whatsoever that Eligo will charge its customers a variable rate.  In fact, the word "variable" does not appear anywhere in this marketing material.  Eligo's Welcome Letter also does not identify Defendants' unauthorized and improper monthly fee. Because this fee is added to Eligo's variable rate, it is a "variable charge" under N.Y. Gen. Bus. Law § 349-d(7).

**G.    Tolling Of The Statute Of Limitations**

*A.    Continuing Violation Tolling Allegations*

118.    Given that Defendants have engaged in a series of deceptive acts and omissions for which they billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Eligo's last wrongful act against Plaintiffs and other customers when Eligo last charged them a variable energy rate.

*B.    Fraudulent Concealment Tolling*

119.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein throughout the period relevant to this action.

120.    Instead of adequately disclosing its true practices to Plaintiffs and their other customers, Defendants actively concealed and misrepresented their true practices.

*C.    Estoppel Tolling*

121.    Defendants were under a continuous duty to disclose its practices to Plaintiffs and their other customers.

122.    Defendants knowingly, affirmatively, and actively concealed the true nature of their practices from Plaintiffs and their other customers.

123.    Based on the foregoing and the other allegations herein, Defendants are estopped from relying on any statutes of limitations in defense of this action.

D.    *Discovery Rule Tolling*

124.    Eligo's customers do not have access to information about its costs or how Eligo actually sets its variable rates. Nor do reasonable consumers undertake an examination of the difficult-to-access and interpret wholesale cost data applicable to their electricity market when assessing whether their electricity rates are too high. Accordingly, Plaintiffs and other Eligo customers did not realize that they were being overcharged.

125.    Nor would Plaintiffs and other Eligo customers consumers have discovered that Eligo was overcharging them in the exercise of reasonable diligence, given the information asymmetry and the difficulty if not impossibility of obtaining information about Eligo's actual costs and how Eligo actually sets its variable rates.

126.    Accordingly, Plaintiffs' and other Eligo customers' lack of notice, actual or constructive, that Eligo was overcharging them meant that they did not previously discover or reasonably should have discovered that they had a cause of action as a result of being harmed by Defendants' conduct.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all residential and commercial customers in New York who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment pursuant to a contract containing a pricing term stating that variable rates

would be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" (the "Class").

128.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class—their marketing and billing practices—and this case is about the responsibility of Defendants for their knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

129.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants. Also excluded from the Class are any residential or commercial customers included in the proposed classes that are preliminarily defined in *Bodkin et al. v. Eligo Energy LLC et al.*, No. 25 Civ. 96 (W.D. Pa.). or *Orzolek v. Eligo Energy, LLC et al.*, No. 25 Civ. 78 (E.D. Oh.).  Any customer included in any class that is eventually certified in *Bodkin* or *Orzolek* is also excluded from the Class.

130.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiffs file their motion for class certification.  Any further modification, however, will not include non-New York customers or customers included in any proposed or certified classes in *Bodkin* or *Orzolek*.

131.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Eligo.  Plaintiffs believe, however, that based on the publicly available data concerning Eligo's customers in New York, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

132.    The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

133.    Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

134.    Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

135.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.    Whether Eligo's misrepresentations and omissions are materially misleading;

      b.    Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c.   Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

    d.   Whether Eligo's conduct violates N.Y. Gen. Bus. Law § 349 and § 349-d;

    e.   Whether Eligo was unjustly enriched as a result of its conduct;

    f.   Whether Class Members have been injured by Eligo's conduct;

    g.   Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices; and

    h.   The extent of class-wide injury and the measure of damages for those injuries.

136.    A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

137.    A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

138.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

139.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a.  Whether Eligo's misrepresentations and omissions are materially misleading;

b.  Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

c.  Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

d.  Whether Eligo's conduct violates N.Y. Gen. Bus. Law § 349 and § 349-d;

e.  Whether Eligo was unjustly enriched as a result of its conduct;

f.  Whether Class Members have been injured by Eligo's conduct; and

g.  Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices.

140.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### Breach Of Contract
### (On Behalf Of The Class)

141.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.    Eligo customers have customer agreements whose variable rate terms are substantially similar.

143.    Plaintiffs and the Class entered into valid contracts with Eligo for the provision of electricity.

144.    Eligo represents in its customer contract that its variable rate for electricity will be "calculated on a monthly basis in response to market pricing, transportation costs, and other

market price factors." Eligo further represents that "[a]pplicable taxes will be factored into the variable price."

145. Upon information and belief, Plaintiffs were subject to the same or substantially similar contractual terms as all of Eligo's variable rate customers included in the proposed Class.

146. Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Eligo charged for natural gas and electricity.

147. However, Eligo failed to perform its obligations under its contracts to charge rates in accordance with the formula set forth in its contracts. Instead, Eligo charged variable rates for natural gas and electricity that were untethered from the formula upon which the parties agreed the rate would be based.

148. Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged a variable rate calculated from the formula identified in Eligo's customer contract.

149. Eligo also charged variable rate customers a flat monthly fee which is not authorized by the contract. Plaintiffs and the Class were injured because they were billed, and they paid, these unauthorized fees.

150. By reason of the foregoing, Eligo is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

151. Eligo Energy NY, LLC is not the only Defendant liable for this breach of contract claim. Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach. For example, the Welcome Letters sent by Eligo Energy, LLC state that it will be Plaintiffs' new energy supplier and that "a copy of the terms and conditions of

your agreement with Eligo Energy" are enclosed.

152.     Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the Welcome Letters and contracts, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

153.     In addition, Eligo Energy NY, LLC contracted on Eligo Energy, LLC's behalf.

154.     And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

**COUNT II**
**In The Alternative, Breach Of The Implied Covenant Of Good Faith And Fair Dealing**
**(On Behalf Of The Class)**

155.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.     Plaintiffs and the Class contracted with Eligo for the provision of natural gas and electricity supply.

157.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms. This cause of action is pleaded in the alternative to Plaintiffs' contract claims.

158.     Under the contract, to the extent Eligo had discretion to set the variable rate for natural gas and electricity, it was obligated to exercise its discretion in good faith.  Eligo exercised its discretion in bad faith.  Specifically, Eligo acted with a bad motive and continued to gouge customers.  Eligo has known for years (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers

paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.  Despite this superior knowledge, Eligo acted with a bad motive and continued to gouge customers and small businesses.

159.    Eligo's failure to disclose the material information (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged  is what permitted Eligo to charge Plaintiffs whatever it wanted—unburdened by disclosing the truth about its rate setting practices—and Plaintiffs experienced the adverse consequences in the performance of the parties' agreement.

160.    Eligo also failed to disclose that it had no intention of charging a rate reflective of its actual costs, or that the primary factor it considers when setting the variable rates is its ability to obtain excessive and unreasonable profits from high rates without causing too much customer attrition when customers notice Eligo's excessive rates.

161.    Plaintiffs reasonably expected that Eligo's variable energy rates would not be continuously and significantly higher than the utility's rates or other ESCOs' rates, which provide

the same energy supply as Eligo. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.

162. Plaintiffs also reasonably expected that Eligo would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo. Eligo knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

163. Eligo breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Eligo's variable energy rate would be commensurate with Eligo's costs. Eligo also acted in bad faith when it charged variable rate customers monthly fees even though the contract did not authorize such fees.

164. As a result of Eligo's breaches, Eligo is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

165. Eligo Energy NY, LLC is not the only Defendant liable for this breach of the duty of good faith and fair dealing. Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach. For example, the Welcome Letters sent by Eligo Energy, LLC state that it will be Plaintiffs' new energy supplier and that "a copy of the terms and conditions of your agreement with Eligo Energy" are enclosed.

166. Eligo Energy, LLC is also a party to the contract under agency principles. Eligo Energy, LLC's conduct in sending the Welcome Letters and contracts, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

167. In addition, Eligo Energy NY, LLC contracted on Eligo Energy, LLC's behalf.

168.    And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

## COUNT III
### Violation Of New York General Business Law § 349
### (On Behalf Of The Class)

169.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349 on their own behalf and on behalf of each member of the Class.

171.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N N.Y. Gen. Bus. Law § 349.

172.    Eligo's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

173.    Eligo has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, including:

 a. Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

 b. Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

 c. Failing to provide customers adequate advance notice of the variable rates it would charge;

 d. Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

     e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

     f.   Failing to adequately disclose that it charges a monthly fee when the contract promised that the rate for electricity would be a kWh charge based on the factors enumerated in the contract; and

     g.   Affirmatively misrepresenting the factors used to determine a customer's variable rate.

174.    The above deceptive practices and acts by Eligo were material misrepresentations or omissions of existing or past facts.

175.    Eligo knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

176.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

177.    Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

178.    Each of Eligo's contracts include a multi-day rescissionary period.  During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract.  Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

179.    Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

180.    Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

181.   Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

182.   Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

183.   Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

184.   Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 173 above, Eligo deprived customers of the ability to make informed purchasing decisions.

185.   Eligo's practices are unconscionable and outside the norm of reasonable business practices.

186.   As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action but not less than $50

for each violation, such damages to be trebled trebled, plus attorneys' fees, and the costs of this suit.

187.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Eligo's practices to be unlawful, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

188.    As a result of Eligo's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349.

189.    Eligo Energy NY, LLC is not the only Defendant liable for violating N.Y. Gen. Bus. Law § 349.  It was Eligo Energy, LLC that solicited New York customers; it was Eligo Energy, LLC that sent the Welcome Letters and contracts to New York customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to New York customers; it was Eligo Energy, LLC that communicated with New York customers and it was Eligo Energy, LLC that set the rates and monthly fees that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how variable rates would be calculated.

190.    And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating N.Y. Gen. Bus. Law § 349.

## COUNT IV
### Violation Of New York General Business Law § 349-d(3)
### (On Behalf Of Plaintiffs And The Class)

191.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

192.     Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d on their own behalf and on behalf of each member of the Class.

193.     N.Y. Gen. Bus. Law §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

194.     Defendants offer for sale energy services for and on behalf of an ESCO.

195.     Eligo has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349-d(3), including:

   a.    Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

   b.    Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

   c.    Failing to provide customers adequate advance notice of the variable rates it would charge;

   d.    Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

   e.    Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

   f.    Failing to adequately disclose that it charges a monthly fee when the contract promised that the rate for electricity would be a kWh charge based on the factors enumerated in the contract; and

g. Affirmatively misrepresenting the factors used to determine a customer's variable rate.

196. The above deceptive practices and acts by Eligo were material misrepresentations or omissions of existing or past facts.

197. Eligo's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy customers.

198. Eligo knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

199. Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

200. Each of Eligo's contracts include a multi-day rescissionary period. During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract. Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

201. Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

202. Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

203. Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

204.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

205.    Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

206.    Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 195 above, Eligo deprived customers of the ability to make informed purchasing decisions.

207.    Eligo's practices are unconscionable and outside the norm of reasonable business practices.

208.    As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees, and the costs of this suit.

209.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to N.Y. Gen. Bus. Law § 349-d(10), this Court has the power to award such relief,

including but not limited to, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

210.    Eligo Energy NY, LLC is not the only Defendant liable for violating N.Y. Gen. Bus. Law § 349-d(3).  It was Eligo Energy, LLC that solicited New York customers; it was Eligo Energy, LLC that sent the Welcome Letters and contracts to New York customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to New York customers; and it was Eligo Energy, LLC that set the rates and monthly fees that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how variable rates would be calculated.

211.    And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating N.Y. Gen. Bus. Law § 349-d(3).

### COUNT V
**Violation Of New York General Business Law § 349-d(7)**
**(On Behalf Of Plaintiffs And The Class)**

212.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

213.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d(7) on their own behalf and on behalf of each member of the Class.

214.    Section 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  N.Y. Gen. Bus. Law § 349-d(7).

215.    The marketing materials Eligo provided to Plaintiffs and the Class fail to clearly and conspicuously disclose that Plaintiffs will be charged variable rates.

216.    Specifically, the Welcome Letter marketing material Eligo sent to Plaintiffs does not disclose that Plaintiffs would be charged variable rates or that a monthly fee is part of the variable charge.  In fact, the word "variable" does not appear anywhere in these marketing materials.

217.    Eligo's Welcome Letter constitutes independent "marketing materials" under Section 349-d(7).

218.    Eligo's contract also does not identify the monthly fee as a component of the variable charge.

219.    Through its conduct described above, Eligo has violated N.Y. Gen. Bus. Law § 349-d(7) and has caused injury to Plaintiffs and Eligo's other variable rate customers in New York.

220.    Under N.Y. Gen. Bus. Law § 349-d(10), Plaintiffs have a private right of action to enforce N.Y. Gen. Bus. Law § 349-d(7).  As a direct and proximate result of Eligo's conduct, Plaintiffs and the Class have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

221.    Plaintiffs also seek an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. Gen. Bus. Law § 349-d(10).

222.    Eligo Energy NY, LLC is not the only Defendant liable for violating N.Y. Gen. Bus. Law § 349-d(7).  It was Eligo Energy, LLC that solicited New York customers; it was Eligo Energy, LLC that sent the Welcome Letters and contracts to New York customers; and it was Eligo Energy, LLC that drafted those letters and the contracts sent to New York customers.

223.    And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating N.Y. Gen. Bus. Law § 349-d(7).

## COUNT VI
### In The Alternative, Unjust Enrichment
### (On Behalf Of The Class)

224.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

225.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs does not intend to proceed with their unjust enrichment claim.

226.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Eligo by contracting with Eligo for electricity or natural gas.  Plaintiffs and the Class would not have contracted with Eligo for electricity and natural gas had they known that Eligo would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

227.    Plaintiffs and the Class Members would not have purchased energy from Eligo had they known the truth about Eligo's variable energy rates.

228.    By engaging in the conduct described above, Eligo has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

229.    It would be unjust and inequitable for Eligo to retain the payments Plaintiffs and Class Members made for excessive energy charges.

230.    Therefore, Eligo is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Eligo's actions.

231.    As alleged above, Eligo Energy, LLC is also liable for this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)     Issue an order certifying the Class defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)     Find and declare that Defendants have committed the violations of law alleged herein;

(c)     Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)     Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(e)     Render an award of punitive damages;

(f)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

Dated: May XX, 2025
White Plains, New York          **FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**

By:     _/s/ D. Greg Blankinship_
        D. Greg Blankinship
        Daniel Martin
        One North Broadway, Suite 900
        White Plains, New York 10601
        Tel: (914) 298-3281
        Fax: (914) 824-1561
        gblankinship@fbfglaw.com
        dmartin@fbfglaw.com

        J. Burkett McInturff

Tiasha Palikovic
Jessica L. Hunter
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jbm@wittelslaw.com
tpalikovic@wittelslaw.com
jlh@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*