**FBFG** | Finkelstein, Blankinship, Frei-Pearson & Garber, LLP

One North Broadway, Suite 900
WHITE PLAINS, NY 10601
Phone: (914) 298-3281
Fax: (845) 562-3492
www.fbfglaw.com

**Via ECF**                                                                 June 24, 2025
Honorable Edgardo Ramos
United States District Court
40 Foley Square, Courtroom 619
New York, NY 10007

      Re:      ***Brous et al. v. Eligo Energy, LLC, et al.*, No. 1:24-cv-1260 (ER)**

Dear Judge Ramos,

Pursuant to the Court's Individual Rule 2.A, Plaintiffs write to request a pre-motion conference on their renewed motion to compel Defendants Eligo Energy, LLC and Eligo Energy NY, LLC (collectively, "Eligo") to produce discovery regarding customer complaints.

The Court previously issued an oral ruling denying Plaintiffs' motion to compel production of this discovery during the April 16, 2025 discovery conference. However, the recent declaration of a former Eligo Director of Operations shows that the business practices challenged in this lawsuit spurred substantial customer complaints. The business records generated by this backlash (which are not burdensome to produce) are relevant to several of Plaintiffs' claims. Customer complaints bear on how reasonable consumers react when they discover Eligo's deceptive scheme. They also demonstrate that Eligo set variable rates in bad faith, because Eligo continued overcharging despite knowing that customers who discovered its scheme complained about improper and unfair charges.

Based on the facts revealed in the Declaration of Elizabeth Stone, attached as **Ex. A**, Plaintiffs renew their request that the Court direct Eligo to produce records of customer complaints that it maintained in the ordinary course, as well as documents reflecting complaints that can be identified in already-collected ESI. *See* ECF No. 174 at 2–3 (Plaintiffs' prior application regarding customer complaints).[1]

    **A.  The Whistleblower Declaration Establishes That Eligo Has Relevant and Responsive Complaint-Related Business Records.**

In a June 17, 2025 declaration, Eligo's former Director of Operations attests that Eligo's top brass preyed on variable rate customers like Plaintiffs and knew their business practices were producing outsized levels of customer complaints. Ex. A at ¶¶ 10–14.

Ms. Stone "oversaw customer service, billing, and coordination with utilities" during the time Plaintiffs were Eligo customers and her work "covered all markets where Eligo sold energy supply[,]" including New York. *Id.* ¶ 2. Ms. Stone "attended regular business review meetings where Eligo's leadership developed business strategy, including strategy regarding variable rates, customer acquisition, and how Eligo managed existing customers." *Id.* ¶ 3. "Eligo's variable rates were essentially made up and were set with the goal of getting as much money as possible from

---

[1] Unlike in the prior motion, Plaintiffs do not now seek discovery regarding Eligo's policies and procedures for handling complaints; they seek only records of the complaints themselves.

customers[,]" and "[r]ates were not tied to Eligo's supply costs or the wholesale cost of energy in any way." *Id.* ¶ 5.

Specifically, "Eligo's variable rate strategy took advantage of customers' ignorance about how much Eligo paid for the energy supply it was reselling to customers" and "Eligo's goal was to determine how high it could push a customer's variable rate without triggering too many complaints or cancellations." *Id.* ¶ 6. "Eligo used its fixed rates to convince customers to switch to Eligo so that they would eventually be defaulted to a variable rate" because "[l]eadership knew that once customers were on a variable rate, Eligo could extract much higher margins as compared to its fixed rates" and that "once the customer transitioned off of their fixed rate, Eligo would gradually ratchet up the variable rate so the customer would not appreciate that the rate they were paying Eligo was getting higher and higher." *Id.* ¶ 8.

Because of these strategies, "[r]ate-related complaints dominated the workload." *Id.* ¶ 11. "As the person responsible for managing customer service and operations, [Ms. Stone] saw firsthand the volume of complaints Eligo received." *Id.* ¶ 10. "It was a level of blowback [she] had not encountered before." *Id.* ¶ 11. "Customers were upset and confused" and "had no idea they had been moved off a fixed rate or why they were paying so much." *Id.* ¶ 10. Ms. Stone attested that "[t]he level of customer complaints at Eligo was unlike anything [she] had ever experienced before[,]" and that Eligo's "customer service teams were often overwhelmed." *Id.* ¶¶ 10–11.

"Eligo's leadership knew about these complaints, but did not care" and "understood that their strategies were driving the complaints." *Id.* ¶ 12. "Eligo's leadership did not deal transparently and ethically with its customers" and "was aware that regulators were trying to make it harder to gouge variable rate customers, but that did not change leadership's focus on charging the highest variable rates they could." *Id.* ¶ 13. Ms. Stone "managed the fallout from angry customers" and attested that Eligo's scheme "was exploitative and was designed to trick Eligo's customers." *Id.* ¶ 14.

### B. The Court Should Order Eligo To Produce Complaint-Related Discovery.

The Court's April 16 oral ruling, *see* **Ex. B**, April 16, 2025 Tr. at 12:14, was an interlocutory ruling that is "subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties." *See Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting Fed. R. Civ. P. 54(b)). Such rulings are subject to revision based on "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05 MD 1720, 2025 WL 927059, at *7 (E.D.N.Y. Mar. 27, 2025) (quoting *Off. Comm. of Unsecured Creditors of Color Tile*, 322 F.3d at 167). Here, Plaintiffs' request is made based on new evidence.[2]

---

[2] "Courts often treat successive motions seeking the same relief as *de facto* motions for reconsideration," but "courts have substantial discretion to excuse procedural improprieties[,]" such as timeliness, in this context. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2025 WL 927059, at *7, *9. Here, it would have been impossible to adhere to Local Civil Rule 6.3's 14-day timeframe for motions for reconsideration because Ms. Stone came forward

This consumer class action alleges that Eligo's "variable rate" pricing practices are deceptive and resulted in tens of millions of dollars of overcharges on New Yorkers' electricity bills. ECF No. 120 ("Amended Complaint") ¶ 1. The Amended Complaint asserts that Eligo's variable rates are not calculated in accordance with the pricing formula in Eligo's customer contract. *Id.* ¶¶ 143–70 (Counts I–II). It further alleges that Eligo's variable rate practices contravene state consumer protection law. *Id.* ¶¶ 171–225, (Counts III–V). The Amended Complaint details six material misrepresentations and omissions, including that Eligo: conceals its true variable rate calculation methodology; misrepresented the factors used to set variable rates; fails to adequately disclose that its variable rates are consistently and significantly higher than the local utility's; and fails to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the utility would have charged. *See, e.g.*, *id.* ¶¶ 175(a)–(g); 197(a)–(g). These exact allegations plead "false advertising and deceptive trade practices" by third-party energy suppliers like Eligo that violate New York consumer protection law. *See Weinberg v. CleanChoice Energy, Inc.*, No. 23 Civ. 09685 (PMH), 2024 WL 3446515, at *10 (S.D.N.Y. July 17, 2024).

Many courts have held that complaints about a defendant's practices are relevant to consumer protection claims based on deceptiveness. *See New York v. Pa. Higher Educ. Assistance Agency*, No. 19 Civ. 9155 (ER), 2022 WL 951048, at *5–*6 (S.D.N.Y. Mar. 30, 2022) (Ramos, J.) (observing in consumer protection action that "complaints related to the [plaintiff's] claims" are "squarely within the scope of discovery"); *see also FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (while proof of actual deception is not necessary to show deceptive business practices, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances"); *FTC v. Adept Mgmt. Inc.*, No. 16 Civ. 00720 (CL), 2018 WL 4623152, at *4 (D. Or. Sept. 25, 2018) (consumer complaints "are probative, and they tend to support the Court's conclusion that the net impression of the mailer is deceptive").

Thank you for the Court's attention to this matter.

Dated: June 24, 2025                    Respectfully submitted,

By:    /s/ D. Greg Blankinship
D. Greg Blankinship
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

---

more than 14 days after the Court's April 16 oral ruling. This letter motion is brought only seven days after Plaintiffs received the new evidence Ms. Stone possessed.

J. Burkett McInturff
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jbm@wittelslaw.com

*Counsel for Plaintiffs and the Proposed Class*