# Exhibit B

P4GBROUC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IRA BROUS, *on behalf of*
     *themselves and all others*
4    *similarly situated*,

5                    Plaintiffs,

6            v.                            24 Civ. 1260 (ER)

7    ELIGO ENERGY, LLC, *et al*,

8                    Defendants.
                                          Teleconference
9    ------------------------------x
                                          New York, N.Y.
10                                        April 16, 2025
                                          2:30 p.m.
11
     Before:
12
                         HON. EDGARDO RAMOS,
13
                                          District Judge
14

15                         APPEARANCES

16   WITTELS McINTURFF PALIKOVIC
          Attorneys for Plaintiffs
17   BY:  J. BURKETT McINTURFF

18   FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
          Attorneys for Plaintiffs
19   BY:  DANIEL J. MARTIN

20   WATSTEIN TEREPKA, LLP
          Attorneys for Defendants
21   BY:  DAVID MEADOWS
          LEO P. O'TOOLE

22

23

24

25

P4GBROUC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3    the record starting with counsel for Brous.

4          MR. McINTURFF:  Good afternoon, your Honor.  This is

5    Burkett McInturff from Wittels McInturff Palikovic on behalf of

6    plaintiff and the proposed class.  I also have with me here my

7    colleague Dan Martin from Finkelstein Blankinship also on

8    behalf of plaintiff and the proposed class.

9          THE DEPUTY CLERK:  Counsel for defendant.

10         MR. MEADOWS:  Good afternoon, your Honor.  This is

11   David Meadows on behalf of the defendants joined by my

12   colleague Leo O'Toole.

13         THE COURT:  Good afternoon to you all.  This matter is

14   on for a conference.  I note for the record this is being

15   conducted by telephone.  Because there is a little bit of

16   history with this case, I want to admonish the attorneys to be

17   concise in their responses to my questions, and to be as

18   efficient as we can as we go through this hearing.  There are

19   several matters concerning discovery that the parties are

20   disputing.  They are set forth in Mr. McInturff's letter of

21   March 21.  I will take them one at a time.  First of all, the

22   issue concerning I believe it was non-New York market

23   conditions contracts.  Mr. McInturff, I'll hear you.

24         MR. McINTURFF:  Yes, your Honor.  This is Burkett

25   McInturff.  Your Honor, the amended complaint in this case

P4GBROUC

1    pleads a proposed class that encompasses customers from outside

2    of New York, and the claims at issue are both breach of

3    contract and consumer protection claims.  And it's well-settled

4    that a plaintiff in our position is allowed to pursue discovery

5    in pursuit of their Rule 23 showing.  And now that discovery is

6    underway and Eligo's begun producing documents and we've taken

7    a 30(b)(6) deposition, we've identified four additional

8    jurisdictions where we believe that customers in those

9    jurisdictions can be included in a propose class where the

10   named plaintiffs in this case can be the representatives.

11        And so understanding that we want to streamline the

12   issues, we made a proposal to Eligo that we could minimize any

13   additional discovery by just asking that they produce the same

14   customer level data that they've agreed to provide for New

15   York.  So that's what the customers were charged and the basis

16   of those charges.  That's an electronic production which

17   shouldn't be too burdensome.  And then we ask that they also

18   produce the ESI that they withheld solely because it did not

19   touch on New York.  If your Honor will recall when we had our

20   very first conference in this case on May 9, 2024, it was on

21   Eligo's premotion letter in advance of its first motion to

22   dismiss.  And the Court at that juncture allowed discovery to

23   proceed, but only on behalf of New York customers because

24   Eligo's anticipated motion at that time sought to remove to

25   strike class allegations that extended beyond New York.  And so

P4GBROUC

1   the Court made a determination at that point prior to briefing

2   on that motion the discovery was going to be limited to the New

3   York customers.  That determination was without prejudice.

4        We've since amended the complaint.  We've engaged in

5   discovery, and that discovery has lead us to believe that we

6   can move forward with certification of a class that includes

7   customers not just from New York, but also from the four

8   additional jurisdictions mentioned in our letter, Washington,

9   D.C., Illinois, Massachusetts and Maryland.  We don't think

10  that our request is particularly burdensome.  In fact, Eligo's

11  counsel agreed in writing to produce this discovery.  But what

12  they wanted in exchange, we didn't think was reasonable, and

13  it's not reasonable.  And the proffered exchange was that Eligo

14  would produce the request of discovery if we stayed the actions

15  that we also have pending on behalf of our clients who are in

16  Pennsylvania and Ohio.  But we couldn't agree to that because

17  our pending class actions in Pennsylvania and Ohio are

18  different cases.

19       In Pennsylvania it involves a different contract

20  terms.  The customers that are subject to the Pennsylvania-type

21  contract are not going to be within this class, and

22  we're not going to move to certify a class that includes

23  customers that have the same type of Pennsylvania contract.

24  The Ohio contract is a little tricker, and the issue really

25  gets tied up in the two key issues that has actually brought us

P4GBROUC

1  here to your Honor on this dispute, which is whether we can

2  bring claims on behalf of customers from other states and the

3  scope of the class we can certify.

4         So we're here in good faith -- and we've proposed a

5  good faith solution to allow plaintiff the discovery we need to

6  seek to certify the class we believe we can certify -- and to

7  do so at minimal burden to defendant -- while we still have

8  pending the issue defendant is disputing that we can bring the

9  claims on behalf of customers in other states.  And they're

10  disputing that we can certify a class with the scope that we

11  believe that discovery will allow us to certify.  So our

12  proposal here is there's minimal additional discovery.  And

13  then once we've moved for certification, and once the Court has

14  weighed in on defendant's motion to strike and weighed in on

15  the certification decision, we can decide what we'll do with

16  the Ohio case.

17         The Pennsylvania case will always remain separate

18  because it's a different contract, but that's our proposal.  We

19  think it's reasonable.  We think it's consistent with Rule One.

20  We're not trying to make anybody do any additional work, but we

21  do need the discovery to certify the class.  So that's our

22  proposal, and we would hope that the Court will find it

23  reasonable.

24         THE COURT:  Mr. Meadows.

25         MR. MEADOWS:  Thank you, your Honor.  I'm afraid I

P4GBROUC

```
1    differ with Mr. McInturff about the reasonableness of his

2    proposal and the burden that it would impose on Eligo.  And if

3    I may, I want to give you a little bit of a background because

4    I think it's going to cut through all of the issues that we're

5    here to talk about today, and I'll be brief about it.

6            But Mr. McInturff is not quite correct in describing

7    that discovery is merely underway, or that we are in the

8    process of producing documents.  In fact, discovery is almost

9    over.  We are on the eve of depositions in this case, which

10   have to be concluded under the existing schedule order by the

11   end of May.  And in fact, we have completed our document

12   production.  Now that's very important because that has been a

13   very expensive and arduous process, which was the result of

14   extensive negotiations between us and Mr. McInturff and his

15   colleagues.  That process included a very lengthy exchange of

16   search terms, which we repeatedly ran against our ESI database,

17   gave the other side hit reports.  And I think there were nine

18   separate hit reports provided, or at least nine iterations of

19   the search terms, which resulted in a total review database of

20   214,000 documents, which we have now at great cost reviewed and

21   produced the relevant documents.

22           Now, it is only at the very end of that process that

23   plaintiff's counsel has said -- and I don't mean to be overly

24   casual about this -- but have said essentially, oh, by the way,

25   we would now like to open discovery to other states, other
```

P4GBROUC

1    jurisdictions, other than New York, even though you, your

2    Honor, expressly limited discovery to the New York issues

3    almost a full year ago.  And so we would submit that it's just

4    at this point in the case, it is far too late to revisit that

5    order now, and to drastically revise the scope of discovery

6    after we have produced all our documents and as we are getting

7    ready for depositions.  So that's that a practical point, and

8    we think is reason enough to deny this request.

9             But substantively, the request also rest on a very

10   false premise.  And if you read in plaintiff's letter, the gist

11   of their argument is that Eligo's contracts in New York are

12   essentially the same as those in the other jurisdictions where

13   it now wants to engage in discovery, which I believe is

14   Maryland, Washington, D.C., and there are two other states.

15   They even go so far as to call these contracts standard form

16   standardized contracts, and that's not true.  As they admit

17   elsewhere in their letter, there are substantive differences

18   between these contracts from state to state.  And just as one

19   high-level example, the New York contracts to which the named

20   plaintiffs are parties with us, identify four variable pricing

21   factors.

22            Where in some of the other states where Eligo does

23   business and where plaintiffs now want to seek discovery, there

24   are ten factors, or maybe even more than that in some cases.

25   And those factors differ from state to state and geography to

P4GBROUC

1    geography because they consider things like weather patterns

2    and other things that naturally differ from region to region.

3    So the motion rests on a false premise.  It seeks to undue an

4    order that you entered over a year ago and on which everyone

5    has relied, certainly Eligo has relied in fashioning the scope

6    of discovery in making its document production. And we submit

7    that it's simply inefficient, disproportionate and way too late

8    to revise that now.

9          THE COURT:  That first request by Brous is denied.

10   The next issue concerns the so-called limited renewal of

11   plaintiff's motion for consumer protection discovery.

12   Mr. McInturff, I'll hear you.

13         MR. McINTURFF:  Yes, your Honor.  So the complaint at

14   issue in this case includes consumer protection claims, and we

15   had requested in a prior letter, we teed up the issue that

16   defendant was refusing to provide customer complaints.  And

17   your Honor raised that issue at the last conference.  My

18   colleague Mr. Blankinship said on the record that we were

19   reserving our rights with respect to any outstanding issues.

20   He didn't appreciate, and we didn't appreciate, at the time

21   that the Court was thereafter going to terminate the pending

22   motions.  We promptly reraised the issue with the defendant.

23   We even narrowed the request at this point to a narrower set.

24   All we're asking for is any complaint repository that were

25   maintained in the ordinary course, and that Eligo not withhold

P4GBROUC

1    any complaints that crop up in the ESI that's subject to the

2    order.

3         If I could respond relatedly to defense counsel's

4    claims about where we are in discovery.  They just finish

5    producing their first round of documents.  We still have -- the

6    motion to dismiss is outstanding.  There's still the motion to

7    substitute the named plaintiff.  One of the named plaintiffs is

8    outstanding, so we don't agree that discovery is over in this

9    case.  We consider the case to be sort of in the middle of the

10   case, and we don't think that producing complaint repositories

11   that are maintained in the ordinary course or withholding

12   complaints or producing complaints that have been withheld in

13   the ESI that's the subject of the current review.  We think

14   that's very reasonable.  As we said in our letter, consumer

15   complaints and consumer protection matters are a routine part

16   of discovery.

17        I know in your Honor's *New York V. Penn Higher

18   Education* case, your Honor held that complaints were relevant

19   to the New York Attorney General's claim that a student loan

20   servicer committed deceptive practices.  That same case

21   involved claims under New York's GBL 349 just like this case.

22   So the rationale that this Court adopted in the *New York v.

23   Penn Higher Education* case applies.  Customer complaints are a

24   standard part of any consumer protection case, and we didn't

25   wait too long to raise this issue.  This case is conflicts

P4GBROUC

1   litigation.  Eligo has waited longer on other discovery issues

2   in this case, and we raised this issue with Eligo a month after

3   your Honor raised it at the February 7 conference.  Thereafter

4   we had a meet and confer, and we filed our papers promptly.

5       In the interim period, we had to respond to a motion

6   that Eligo filed on March 12th, but we haven't been delaying,

7   and our request here is reasonable and proportionate, because

8   we do have consumer protection claim that Eligo has not moved

9   to dismiss.  Those are live claims, and the complaint related

10  discovery goes to those claims.

11      THE COURT:  Mr. Meadows.

12      MR. MEADOWS:  Thank you, your Honor.  I think this is

13  a very similar issue to the first, because here the plaintiffs

14  are again asking you to not only undue an order that you

15  entered about six weeks ago I believe, but also would have the

16  net effect -- if you granted it -- would have the effect of

17  again undoing our very carefully negotiated agreements on ESI

18  and discovery.  And in particular, the consumer protection

19  documents that plaintiff are asking you to grant them access to

20  today were the subject of a prior discovery letter motion that

21  they filed, in particular document 69 on the docket.

22      Now the last time we were before you on a discovery

23  letter motion -- and as you know the letter motion practice has

24  been extensive in this case, you ask the parties point blank,

25  look, there's a number of letter motions on the docket that

P4GBROUC

haven't ruled on.  I want to know which of these are still
alive, which need my attention.  And Mr. McInturff's colleague
Mr. Blankinship at that hearing told you, and I quote from the
hearing transcript, "I don't think there are any outstanding
issues.  I think we've worked through those amongst ourselves
or moved passed them."  Now based on that representation and
not long after that February 7 hearing, you entered an order, I
believe it's docket 164, terminating I believe it was eight or
nine separate letter motions, including the letter motion that
related to these consumer protection materials that we're here
again talking about today.

          Now if plaintiff's counsel either misspoke or told you
that they had moved pass an issue that they actually hadn't
moved pass, I think it was incumbent on them to say something
about that a lot sooner than they have.  Because, again, that
representation was made at a hearing on February 7th.  Here we
are today in mid-April where they're asking you to go back and
undo an order in which terminated that motion.  Again, it's
just way too late to do that.  And it's especially way too late
because we not only finalized the search term negotiation, but
completed our production.  And they're now asking us to go
back, not only undo the order, but go back and reopen our
document production, reopen our review, to give them documents
that were requested in a motion that has been denied six or
seven weeks ago.  It's unreasonable on its face, and for those

P4GBROUC

1    reasons we would ask you to deny this.

2             THE COURT:  Plaintiff I'll give you 60 seconds,

3    Mr. McInturff.

4             MR. McINTURFF:  Yes, your Honor.  Mr. Meadows left out

5    the quote from the transcript where my colleague

6    Mr. Blankinship said, "To be candid, your Honor, I didn't

7    anticipate that we were going to go back to discuss some of

8    those prior issues, but reserving my right to do so. I don't

9    think there are any outstanding issues I recall."  Again, your

10   Honor, this is basic consumer protection discovery that

11   shouldn't be withheld.  It's not burdensome, and we negotiated

12   the discovery.  We negotiated with the understanding that there

13   were many issues still outstanding before the Court.

14            THE COURT:  The request is denied.  The next issue

15   concerns should the Court direct Eligo to provide a hit report

16   for its Slack collection. Mr. McInturff.

17            MR. McINTURFF:  Yes, your Honor.  Our request here is

18   very straightforward.  We just want a hit report.  We haven't

19   asked for anything.  Eligo hasn't refused any request that

20   we've made.  We just want the hit report.  The background here

21   is, we had requested that Eligo collect Slack.  They collected

22   the Slack messages.  As your Honor might recall, Slack is a

23   collaboration platform that is different than email.  They

24   collected the Slack messages, but they didn't tell us they had

25   done so.  The Court had ordered that we pay for the Slack

P4GBROUC

1  collection, so we had no expectation they were going to collect

2  it before we paid them.  When we reached out to them and asked

3  if they had made the collection with the expectation of paying,

4  then they told us that they had already made the collection and

5  they didn't tell us about it.  Slack is a different animal than

6  email.

7

8      We're not necessarily saying that anything has to be

9  done at this point, but we were waiting for them to tell us

10  when they collected Slack so that we could search it in the

11  appropriate way.  Because the way people talk, communicate on

12  Slack is different than they do in email.  I'll just add that

13  since we filed our letter, there's been guidance from the

14  Sedona conference that has come out that has reinforce that

15  Slack may require different search terms because -- and I'm

16  quoting -- "users often communicate much more informally on

17  collaboration platforms than they do in emails; for example,

18  therefore, the same search terms may not yield the intended

19  result."

20      So what we're trying to do here now that we found out

21  recently on March 6 that Eligo in fact had folded in the Slack

22  communications into the ESI search, we just want a hit report

23  to make sure that the search terms that were negotiated and

24  agreed on are working properly on Slack.  We haven't requested

25  that they produce anything else.  It's just the information

P4GBROUC

1    that we would have expected would have been provided once they

2    uploaded the Slack ESI to their system and began searching it.

3    But for reasons we don't understand, Eligo decided not to

4    notify us that they had done that, but we're asking for a hit

5    report.

6              THE COURT:  Can I ask you, putting aside the Sedona

7    recent recommendation as such it is, nothing that you just

8    mentioned about Slack arose the nature of it, the way people

9    communicate, none of that arose over the last several weeks,

10   did it, those observations?

11             MR. McINTURFF:  No, your Honor.  We didn't know that

12   it had been collected until the last several weeks.  That's the

13   issue.

14             THE COURT:  When you were putting together your

15   proposed hit terms, you knew what Slack was and how it

16   operated?

17             MR. McINTURFF:  Correct, but we thought we were

18   searching email.  We thought we were searching email.

19             THE COURT:  Mr. Meadows.

20             MR. MEADOWS:  Thank you, your Honor.  I think as you

21   might already be suspecting, this request again would reopen

22   our search term agreement and negotiation and expand it pretty

23   considerably.  Now, the supposed basis for that, that

24   Mr. McInturff offered you, is that they didn't know or that we

25   didn't disclose that the Slack collection was included in

P4GBROUC

1  database against which we were running the search terms as we

2  negotiated them.

3           And I simply don't understand that because as you may

4  recall this issue regarding Slack first came before you late

5  last year.  We had a November 7 conference, at which you

6  ordered us to collect and produce documents from the Slack

7  messaging system.  And of course we obeyed your order.  We went

8  out and we collected the documents, and we put them in our

9  review database.  Now, as we went through the search term

10 negotiation process -- again as I mention earlier, we

11 extensively negotiated and communicated with plaintiffs'

12 counsel.  We shared the hit reports with them multiple times.

13 They asked us questions about the results.  There was an

14 extensive back and forth.

15          Now, at no point did they ask us for a hit report from

16 Slack.  At no point did they ask us any specific question about

17 Slack.  And if they had, we would have answered them.  And I

18 submit to you that it was obvious that we were including Slack

19 in the documents we were searching both because the numbers

20 were enormous.  The parties had to work very hard to get to a

21 search term list that even got our review universe to 214,000

22 documents so we were obviously dealing with a huge amount of

23 data, and all they had to do was ask.  To ask now only after we

24 had reached an agreement -- and by the way, our agreement on

25 search terms is in writing.  It is memorialized in email.

P4GBROUC

1          To ask now to reopen this, I think once again it's far

2    too late.  It's fundamentally unfair to my client, and it's

3    very much for the purpose of revising the search term agreement

4    that plaintiff's counsel reached with us back in January of

5    this year.  As Mr. McInturff even said during his initial

6    presentation, in his view I think Slack -- and I wrote it down,

7    may require different search terms.  It's way too late for

8    that.  And last point, very important to understand.  From the

9    defendant's perspective in the search term negotiation, we were

10   obviously very concerned with the overall burden and cost of

11   the review.  And so our chief negotiating goal, which we made

12   very clear to plaintiffs counsel was, we needed to get to an

13   overall number of documents in our review database that we

14   considered to be reasonable and proportional, and that number

15   was going to be in the low 200,000.

16          Plaintiff counsel agreed to that.  They now want to

17   expand it over that number.  By how much, remains to be seen.

18   But this whole Slack hit report is for the purpose of revising

19   the search term agreement and making us search more ESI than we

20   ever agreed to search and more ESI than the plaintiffs agreed

21   that we should have to search.

22          THE COURT:  Mr. McInturff, 60 seconds.

23          MR. McINTURFF:  Yes, your Honor.  Discovery is an

24   iterative process.  Discovery is not one and done.  And the

25   case law is very clear that search terms require testing and

P4GBROUC

1  careful planning.  The idea that defendant uploaded a bunch of

2  documents from a different type of communication systems that

3  requires a different type of search term, the idea that we're

4  somehow bound is not appropriate.  More importantly, we're not

5  necessarily asking for any changes.  We want the information to

6  see if our search terms work on this other communication

7  platform.  The case in the Southern District is clear that ESI

8  should be a transparent process that involves corroboration.

9  It's not gotcha.  It's not surprise.  This was a big surprise

10  to us.  Again, we haven't asked for any remedial measures yet.

11  We just want information.  It would take them less time than

12  this call to produce a hit report.

13       THE COURT:  Mr. McInturff, I'm really trying to figure

14  out what difference it makes, because I remember the discussion

15  concerning Slack.  I remember that Eligo did not want to

16  produce ESI from Slack.  They wanted to just limit it to, email

17  as I recall.  And I said you can't sort of arbitrarily limit an

18  entire, or carve out an entire mode of communication.  If I

19  recall they weren't very happy with my decision in that regard,

20  although they weren't in front of me, it was fairly obvious.  I

21  don't know what difference it would have made in terms of the

22  search terms that are used.  They're English.  And although

23  people may use abbreviations or less than full sentences, but

24  they still use words.  Those words would be the same over the

25  various modes of communication.

P4GBROUC

1          And as Mr. Meadows indicated, the parties apparently

2     agreed to a universe of a particular number of hits.  You've

3     reached that number.  I don't know what difference it makes.

4          MR. McINTURFF:  Your Honor, that's why we're asking

5     for a hit report.  We can see from the hit report.  If I can

6     read a little bit more of this briefing from Sedona that came

7     out in April.  It says, "It is necessary to understand what

8     abbreviations, acronyms, shorthand, and slang are likely to be

9     used by the communications in the specific matter."  We can't

10    be sure what the effect of using email only search terms on a

11    different platform is until we can see the effect of those

12    email only search terms are on that platform.  We're just

13    trying to get the information to see what the effect was.

14         If we believe something is necessary to be done, we'll

15    raise it with defendants.  And if we can't agree, we'll raise

16    it with your Honor.  We're not even at the point of being able

17    to say that the email search term worked or didn't work because

18    we can't see the results from the hit report.

19         THE COURT:  Okay.  That application is denied.  I do

20    note that there is a letter that was submitted by plaintiffs on

21    April 14 concerning another apparently related two issues of

22    discovery.  Mr. Meadows, I don't know whether you've had an

23    opportunity to review or are prepared to address the issues in

24    that April 14 letter?

25         MR. McINTURFF:  Your Honor, if I could interrupt.  I

P4GBROUC

1    apologize.  There's still an issue left in the letter we're

2    talking about from the 21st of March.

3            THE COURT:  The video files?

4            MR. McINTURFF:  Yes, sir.

5            THE COURT:  Mr. McInturff, why don't you tell me what

6    that is about.

7            MR. McINTURFF:  So the issue here is standard ESI

8    discovery practice.  Video files and audio files can't be

9    identified using search terms.  You can't plug a search term

10   into a system and pull up responsive or relevant video or audio

11   files.  So the parties initially in our original ESI proposal

12   agreed that audio and video files would be searched for

13   independently by counsel.  We were unable to agree on an ESI

14   protocol, and one wasn't entered.  And we found out recently

15   that what defendants did was is they, the only audio and video

16   file that they have reviewed are audio and video files that

17   were either attached to emails that hit on search terms; or

18   where a search term hit on the file name.

19            Thus far they've produced, other than named plaintiff

20   call recordings, they've produced two substantive audio video

21   files. One is sort of a recording training session, and one is

22   a video training session.  It's very helpful discovery saying a

23   picture is worth a thousand words.  These are very likely to be

24   trial exhibits.  These audio videos are used in the ordinary

25   course, and Eligo's search for them is not reasonable.  It's

P4GBROUC

1    not consistent with standard practice, and it doesn't represent

2    a reasonable search under Rule 26 (G).  What we've asked them

3    is, their 30(b)(6) testified that Eligo has accessible video

4    recording that are kept in a location that are for training.

5    So we ask counsel to identify those and produce any video

6    recordings that are responsive.  Again, they've already

7    produced one training document.  It's very informative.

8           And then we also ask that defense counsel interview

9    the key Eligo personnel and ask that they identify any other

10   video or audio files that are potentially responsive to our

11   discovery request.  That's ordinary discovery practices.  And

12   the idea that only search terms could be used to identify audio

13   and video files, frankly it's just an inadequate search.  We're

14   asking that your Honor direct Eligo to perform a reasonable

15   search.

16          THE COURT:  Can I ask, so the video files and audio

17   files that you are asking for or that you are referring to are

18   all internal Eligo training material; is that it?  Is that

19   accurate?

20          MR. McINTURFF:  The 30(b)(6) witness testified that

21   there is a repository video recording that are "in the training

22   context." There may be other video recordings we don't know

23   about.  But what we're asking is, is that counsel perform a

24   reasonable search.  I could see that there may be video

25   recordings about specific rate setting decisions that aren't

P4GBROUC

1    necessarily training, per se, but certainly the training

2    documents would be the low hanging fruit.

3         THE COURT:  And how many of these have you received,

4    just one I think you said in your letter?

5         MR. McINTURFF:  We've received one.  After our letter,

6    Eligo made a subsequent production and we received one

7    additional.

8         THE COURT:  So you have two videos?

9         MR. McINTURFF:  We have one video that discusses

10   Eligo's training and hedging strategies.  And then we have one

11   recording that we're still trying to get to the bottom of.  We

12   know what it's discussing, but it's not clear if it's Eligo

13   because it's discussing gas sales in New York.  And counsel has

14   repeatedly represented that Eligo didn't sell gas in New York.

15        THE COURT:  Is that a video or audio recording?

16        MR. McINTURFF:  That's an audio file.

17        THE COURT:  Okay.  Mr. Meadow?

18        MR. MEADOWS:  Thank you, your Honor.  It's simply not

19   true that we haven't done an adequate search.  Our search for

20   responsive documents has encompassed multiple databases and

21   hundreds of thousands of documents.  In many, many cases search

22   terms are sufficient to identify responsive audio and video

23   files because they might be attached to emails.  They might be

24   attached to other documents that hit on the search terms that

25   indicate that those attachments are potentially relevant.

P4GBROUC

1              When we have encountered those in our review, we have

2    actually listened to the audio files or watch the video files

3    as the case may be to determine if they're responsive.  And one

4    of the reasons why the plaintiffs have seen very relatively few

5    audio and video files is that we have found the responsiveness

6    rate is exceptionally low.  It's just not the case that these

7    files relate to the issues that are alive in this case which

8    are essentially variable rate class setting.  Eligo does many

9    things other than that.  There are many aspects of its

10   business.  And these videos by and large just don't relate to

11   that.  So it's not even clear to me what more exactly we would

12   be ordered to do if you were to grant this request.  But

13   certainly we have not excluded any audio or video files from

14   our review.  We have reviews hundreds and thousands of

15   documents.  And when we've come across these files, we've

16   listened to them and watched them and we have produced what's

17   responsive to the discovery requests.

18             THE COURT:  Let me ask you this:  Does Eligo have,

19   lack of a better word, a library of videos or training

20   materials that it stores somewhere if you know?

21             MR. MEADOWS:  I'm not aware of a library of videos,

22   certainly not a library of videos that would exist utterly

23   apart from the other documents that we have collected, which

24   are not just email or Slack, but all sorts of different

25   databases, including the databases that Eligo actually uses to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4GBROUC

1    set rates.  So of course as part of a document collection of

2    this size, I can't, your Honor, in good faith represent that

3    there isn't some video out there or some audio file that we

4    haven't collected, but that's always the case.  And I'm not

5    aware of any repository that we have not searched or made a

6    reasonable effort to search.

7            THE COURT:  Mr. McInturff.

8            MR. McINTURFF:  Yes, your Honor.  Eligo's 30(b)(6)

9    witness testified that they had accessible video recordings

10   that are kept in the ordinary course.  And he specifically

11   testified that they're "in the training context."  So what I

12   haven't heard defense counsel say is that they run that down or

13   that they have interviewed custodians about potentially

14   responsive audio or video files.

15           THE COURT:  Make a determination whether or not they

16   are consistent with the 30(b)(6) witness's deposition any

17   additional training video, etc., that may not exist in the

18   context of the searches that you've already conducted.  And

19   again, I don't know exactly what it was that this witness said,

20   and I don't know whether that witness was involved in the

21   document production.  Although I assume he or she was, but to

22   the extent that there is any other training areas or training

23   function within Eligo that may have some of these videos, you

24   should run that down and report back to Mr. McInturff.

25           MR. MEADOWS:  Understood, your Honor.  And with one

P4GBROUC

1    clarification if I may.  I think we all understand that

2    training is a very broad concept, and there may be training

3    videos or audio files that have nothing to do with rate setting

4    or anything else that's at issue here.  With that

5    understanding, we're certainly happy to go back and be double

6    sure that anything that's potentially relevant, we will talk to

7    our people and make sure we've covered.

8         THE COURT:  Absolutely.  I'm not suggesting that you

9    turn over irrelevant materials.

10        MR. MEADOWS:  Understood.  Always helps to be extra

11   clear.  Thank you for indulging me on that.

12        THE COURT:  Okay.  We were talking about, I raise the

13   issue of the April 14th letter.  Mr. Meadows, I don't know if

14   you had an opportunity to review or digest that request.  So

15   you tell me?

16        MR. MEADOWS:  Thank you.  I have not yet, your Honor.

17   In fact, everything else going on in the case, I plan to ask

18   you today for an extension on our time to respond to that

19   letter.  I believe currently, it may be Friday of this week, it

20   would be a great help to us to have until Wednesday of next

21   week to respond to that.

22        THE COURT:  That application is granted.  With that,

23   unless there's anything else that we should discuss today,

24   Mr. McInturff.

25        MR. McINTURFF:  No, your Honor.

P4GBROUC

1          THE COURT:  Mr. Meadows?

2          MR. MEADOWS:  No, thank you, your Honor.

3          THE COURT:  In that event, we're adjourned.  Stay

4   well.

5          (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25