

May 13, 2025

<u>Via ECF</u>
The Honorable Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square, Courtroom 619
New York, New York 10007

Re:    <u>Brous, et al. v. Eligo Energy, LLC, et al.</u>, No: 1:24-CV-1260 (ER)

Dear Judge Ramos:

On behalf of Plaintiffs and the Proposed Class ("Plaintiffs"), we write in response to the May 9, 2025 application filed by Defendants Eligo Energy, LLC and Eligo Energy NY, LLC ("Eligo" or "Defendants") requesting that the Court issue a protective order with respect to the depositions of Eligo co-founders and board members Mark Friedgan and Alex Goldstein (who twice served as Eligo's CEO). ECF No. 208. Because Messrs. Friedgan and Goldstein were closely involved in Eligo's day-to-day operations and specifically the New York rate-setting practices that are at the center of this litigation, there are abundant grounds to allow these depositions to go forward.

**Relevant Background**: Eligo is an energy retailer that plays a middleman role. Eligo does not produce the electricity it sells to New York consumers. It buys energy at wholesale and resells it with a markup. The thrust of this class action is that Eligo massively overcharged its New York variable rate customers. Eligo's excessive rates violated the rate-setting formula in Eligo's customer contract, which promises that "all" variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." The contract also states that "[a]pplicable taxes" are included. "Market pricing," "transportation costs," "other market price factors," and "applicable taxes" are all verifiable factors. "Market pricing" is Eligo's cost to procure energy from the wholesale market; "market price factors" are the minor ancillary fees charged in connection with wholesale supply purchases; "transportation costs" are what Eligo pays to transport the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system; and "taxes" are the taxes that either Eligo paid or the sales tax imposed on the customer's purchase.

Instead of making the contractually-promised "calculations" based on these contractual factors, Eligo instead set variable rates based on its assessment of how high of a rate it could charge before too many customers quit. This was a breach of contract. Eligo's overcharging also violated the covenant of good faith and fair dealing, rendered the form contract's pricing term a material misrepresentation in violation of New York consumer protection law, and Eligo omitted key information about how it set rates (another consumer protection violation). Eligo also tacked on an unauthorized monthly fee and appears to have ignored New York's 2021 ban on the very rate-setting practices Eligo used here. Discovery shows that, in early 2020, Eligo swapped its historical rate-setting methodology for a "proprietary machine-learning model" called "GROOVE" that was

used to "calculate customized variable rates for each customer." ECF No. 185-4 at 7. "GROOVE" stands for " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " DEF000902.

**Each of the Two Witnesses Have Unique Relevant Information**: When considering whether to block the deposition of a high-ranking employee, courts "begin with the proposition that plaintiffs have no burden to show that the deponents have any relevant knowledge." *Keebaugh v. Int'l Bus. Machines*, No. 18 Civ. 12126, 2020 WL 774238, at *2 (S.D.N.Y. Feb. 18, 2020). Even when a high-ranking officer denies relevant personal knowledge, this "claim . . . is subject to testing by the examining party." *Sticky Fingers Rests., LLC v. Sticky's Holdings, LLC*, No. 22 Civ. 5606, 2023 WL 7401492, at *2 (S.D.N.Y. Nov. 9, 2023) (citations omitted). In fact, "barring a party from taking a deposition is [a] most extraordinary relief" that is "exceedingly difficult" to establish. *Gen. Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 82 (S.D.N.Y. 2002) (cleaned up). Where high-level executives "*may* have unique, non-duplicative information," courts routinely decline to bar their deposition. *Keebaugh*, 2020 WL 774328, at *2 (emphasis added); *see also Scott v. Chipotle Grill, Inc.*, 306 F.R.D. 120, 123 (S.D.N.Y. 2015) ("A claim that the executive has no knowledge of any relevant facts should not be allowed to prevent his examination[.]"). Here, there is ample proof that Messrs. Goldstein and Friedgan have unique relevant knowledge.

**Co-Founder Mark Friedgan**: Mr. Friedgan is likely to provide unique, relevant testimony regarding GROOVE, Eligo's risk and pricing strategy, and Eligo's buying and selling of wholesale energy. Regarding GROOVE, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A, DEF034343. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. Friedgan is also a member of Eligo's Risk Management Policy Committee, Ex. B at DEF007563, and as of April 2023 was, along with Goldstein, one of only three Eligo authorized energy traders, *id*. at DEF007579. Similarly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. C, DEF093021.

**Former CEO and Co-Founder Alex Goldstein**: Mr. Goldstein is likely to provide unique, relevant testimony regarding New York pricing, buying and selling of energy, and GROOVE. As to pricing, Eligo's 30(b)(6) witness explicitly named Goldstein as someone who "participated in pricing for New York." ECF No. 112-4 at 49:3–23. Eligo further admitted in an interrogatory response that Goldstein was one of the persons responsible for setting rates and deciding margins for Eligo's New York customers. Ex. D at 2–5. Like Friedgan, Goldstein is also a member of Eligo's Risk Management Policy Committee and was one of a small number of authorized traders. *See* Ex. B at DEF007563, DEF007579. Goldstein also took part in writing and approving the risk policy. Ex. E, DEF090123. He is formally listed as a manager of Defendant Eligo New York, LLC. Ex. F at 4. As noted above, Mr. Goldstein was involved in ▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. G, DEF052971.

None of this is news to Eligo, which designated Mr. Goldstein as an ESI custodian. ECF No. 75-1 at 1. Eligo states that Goldstein was CEO from May 2012 to October 2017 but omits that he was also CEO from March 2023 to May 2024. *Id.* In his lengthy tenure as Eligo's chief executive, Goldstein "may have the last word" on why Eligo made certain decisions and as "the ultimate authority," and his "views as to why [Eligo made decisions] may be of far greater probative value on the issue of intent and motive than the views of the lower-level executives." *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 146 (D. Mass. 1987). Indeed, it is common for courts in this District allow "depositions of high ranking corporate executives where questions have been raised regarding corporate policies." *Gen. Star Indem. Co.*, 210 F.R.D. at 84 (citing *Travelers Rental Co.*, 116 F.R.D. at 146). The foregoing demonstrates that Friedgan and Goldstein have first-hand, unique knowledge that is relevant to this action and that these depositions are proportional to the needs of this consumer protection class action.

**The "Apex Doctrine" is No Bar to These Two Depositions**: Although Eligo makes various apex arguments, each boils down to Eligo's claim that Friedgan and Goldstein lack unique, relevant knowledge. ECF No. 208 at 2. This alone is insufficient to bar their depositions. *See Scott*, 306 F.R.D. at 120 ("[T]he mere fact that the executive has a busy schedule or claims no unique knowledge of relevant facts is simply not a basis for foreclosing otherwise proper discovery."). Moreover, discovery paints a different picture. Eligo's 30(b)(6) witness testified that "a very small group of people" does all of the work for Eligo nationally. ECF No. 112-4 at 41:18–21; *see also* Ex. H, May 9, 2024 Hr'g Tr. at 8:14–15 (Eligo's lawyers claiming "Eligo is a small company").

As Friedgan and Goldstein have important, unique knowledge, their depositions should proceed over any apex concerns. *See Six West Retail Acquisition v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 102–04 (S.D.N.Y. 2001) (allowing deposition of Sony's CEO in a "narrow dispute. . .about the proper management of the plaintiff's three theatres located in Manhattan" because Sony Corporation's CEO was "well informed" about the facts at issue in the litigation, "fielded several reports from senior members of Sony's management team" on relevant issues, "took part in [relevant] discussions," and was present during a relevant board meeting where minutes were "succinct and offer no additional details"); *see also id.* at 103 (ruling that "the plaintiff should be permitted to question [Sony's CEO] about his own understanding of [the underlying facts] and the role he played in the board's discussion."). Eligo is certainly no Sony and Plaintiffs have adduced ample proof that Messrs. Friedgan and Goldstein have relevant, unique information.

Eligo's claims of "harassment" likewise ring hollow. This consumer protection action involves tens of thousands of Eligo's New York customers who were harmed by the challenged conduct, from which Eligo derived tens of millions of dollars in revenue.[1] This action is thus "not an inconsequential case in which a chief executive's deposition is sought merely to harass or to force settlement." *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 90 Civ. 7811, 1993 WL 34678, at *2 (S.D.N.Y. Feb. 4, 1993); *see also Chevron Corp. v. Donziger*, No. 11 Civ. 691, 2013 WL 1896932, at *1 (S.D.N.Y. May 7, 2013) (denying apex motion where case is "far from [] trivial [and [e]nough is at stake to justify the deposition of an apex witness").

---

[1] According to the Energy Information Agency, Eligo had more than 11,000 customers and derived over $13 million in revenue in New York in 2023 alone. *See* Table 12, https://www.eia.gov/electricity/sales_revenue_price/.

Thank you for the Court's attention to this matter.

                                               Respectfully submitted,

                                               /s/ Ethan D. Roman
                                                Ethan D. Roman

cc: All Counsel of Record