

Ryan Watstein<br>
Ryan@wtlaw.com<br>
404-782-0695

September 16, 2025

**VIA ECF**
Hon. Edgardo Ramos
U.S. District Court for the Southern District of New York
40 Foley Square
Courtroom 619
New York, NY 10007

  Re: *Brous v. Eligo Energy, LLC*, 24 Civ. 1260 – Response to Plaintiffs' Letter Motion for Risk Committee Meeting Reports (Doc. 268)

Dear Judge Ramos:

  As Plaintiffs admit, their central claim is whether Eligo set variable rates for electricity in compliance with a customer agreement that granted Eligo discretion to calculate those rates in response to "market pricing" and "market price factors." *See* Doc. 268 at 1. Eligo has already produced tens of thousands of documents and made multiple employees available for depositions bearing on how it sets variable rates. In their latest pre-motion discovery letter—their ***twenty-second*** contested letter motion in this litigation—Plaintiffs once again seek documents that have nothing to do with Eligo's rate setting. This time, Plaintiffs ask the Court to compel the production of all monthly reports, even if they didn't hit on any of the parties' agreed-upon search terms, presented to Eligo's Risk Management Policy Committee (the "Risk Committee")—a committee that did *not* set rates, let alone variable rates. Because the documents Plaintiffs seek are irrelevant and disproportionate to any legitimate need of this case, the Court should deny this request.

**<u>Monthly reports to Eligo's Risk Committee are not relevant.</u>**

  Eligo periodically purchases hedges, *i.e.*, it buys energy ahead of time to mitigate risks that it may incur higher costs on the spot market, if needed, to meet customer demand. May 9, 2025 Deposition of Michael Sander at 41. Hedges are complex transactions, and Eligo's Risk Committee exists to monitor Eligo's hedge positions and ensure they are in line with the company's hedging policy. *Id*. at 53. The Risk Committee does not set variable rates for Eligo's customers. Indeed, Committee meetings typically involve reports made by Eligo's risk manager, Scott Glotzbach, who presents the company's hedge positions. *Id*. Mr. Glotzbach testified unequivocally that he has never had any responsibility for setting variable rates. Glotzbach Dep. at 136. He only participated in setting rates for fixed-rate customers. *Id*. at 16–17. So, Mr. Glotzbach's reports to the Risk Committee concerning hedges had nothing to do with variable rate setting.

**Atlanta**
75 14th Street NE, Ste. 2600
Atlanta, GA 30309

**Los Angeles**
515 S. Flower Street, 19th Floor
Los Angeles, CA 90071

**Miami**
218 NW 24th Street, 3rd Floor
Miami, FL 33127

 www.wtlaw.com    Ryan@wtlaw.com    404-782-0695

Despite this, some of the reports made to the Risk Committee both hit on the parties' agreed-upon ESI search terms and, in an abundance of caution, were deemed responsive to Plaintiffs' document requests based on a manual review. Eligo therefore produced those documents. The remainder of the Risk Committee reports either did not hit on the search terms or were deemed non-responsive during Eligo's manual review. This is hardly surprising since, as discussed above, the reports were never used in setting variable rates for electricity.

Plaintiffs nevertheless demand that Eligo conduct a hunt-and-peck search for every such report over the entirety of the seven-year class period on the theory that Eligo's costs for purchasing hedges were necessarily baked into Eligo's variable rates. But that is not so. For one thing, Mr. Glotzbach testified that Eligo purchased hedges on a portfolio basis, as opposed to purchasing hedges unique to Eligo's variable rate customers. Glotzbach Dep. at 74–75. For another, Eligo's customer contract was not a cost-plus contract. Eligo did not set variable rates by adding up its costs precisely because the contract gave Eligo discretion to consider broad concepts like "market pricing" and "market price factors." Martinez v. Agway Energy Servs., 88 F.4th 401, 412 (2d Cir. 2023)(stating that "it is not clear to us that the term 'market-related factors' in the Agreement is synonymous with and limited to market costs such as the cost of procuring energy").

In any case, whatever costs Eligo considered in setting variable rates are already reflected in the vast quantities of documents and data that Eligo produced to Plaintiffs. For example, Eligo has produced all the inputs and outputs to its machine learning rate-setting model called GROOVE. That is in addition to the more than 30,000 documents Eligo produced per the parties' agreement on ESI search terms, through which Eligo reviewed more than 200,000 documents. Those substantial productions did not omit data concerning hedging. On the contrary, Eligo has produced more than 500 executed hedging contracts; Eligo's risk policies; board meeting and operational reports with slides concerning hedging; and hundreds (if not thousands) of Slack chats and emails related to hedging. Additional Risk Committee reports relating to compliance and not to rate setting will add nothing to this existing discovery, especially since the reports in question have already been deemed non-responsive. Discovery of these additional reports is therefore disproportionate to any legitimate need of this case, even if the reports were relevant to begin with (which they aren't).

Plaintiffs attempt to sidestep these relevancy and proportionality issues by arguing that all 72 Risk Committee reports are in a discrete location that can be "easily" collected and produced. But those contentions rely on distortions of the record. For example, Plaintiffs misrepresent Scott Glotzbach's testimony by arguing that he said all such reports are stored in one "easily" accessible location. What Mr. Glotzbach actually said was that reports made "while I have worked" at Eligo are accessible, but "I can't speak for when I didn't" work at Eligo. Glotzbach Dep. at 120. And since Mr. Glotzbach worked at Eligo for just 24 of the 72 months at issue, his testimony doesn't remotely establish that all 72 reports are readily accessible. Plaintiffs similarly distort Mr. Glotzbach's testimony by arguing that data relating to Eligo's hedging transactions can be "easily produced." In fact, Mr. Glotzbach said "I'm not exactly sure where [data on the cost of hedges] ends up" after the transactions are finalized. *Id*. at 48.

**Plaintiffs' request to bar Eligo from using hedging in its defense is meritless and betrays a fundamental misunderstanding of the terms of the litigation.**

Lastly, Plaintiffs request that if the Court does not order production of the Risk Committee reports, that it bar Eligo from arguing that the "absence of evidence related to hedging" is a defense to Plaintiffs' claims. But Eligo is not arguing that there is an "absence" of such evidence. As noted above, Eligo has already produced thousands of documents related to hedging. The issue is that the *additional* data Plaintiffs seek is irrelevant and not discoverable under the parties' own agreed-upon ESI protocol. The notion that Eligo should be barred from raising a defense merely because it hasn't produced ever irrelevant scrap of paper Plaintiffs demand makes a mockery of both the Rules of Civil Procedure and the Rules of Evidence.

In any event, Eligo does not anticipate raising any supposed "absence" of hedging-related data as a defense because Plaintiffs' claims fundamentally misunderstand Eligo's customer contract. Here again, the issue is not whether Eligo's variable rates can be re-engineered by adding Eligo's costs, as if Eligo made a cost-plus contract with its customers. Eligo's contracts granted it discretion to adjust rates according to "market pricing" and "other market price factors," which the Second Circuit has held to be far broader than the "cost of procuring energy." *Martinez*, 88 F.4th at 410. And that is why Plaintiffs' claims, like their current request for yet more irrelevant and disproportionate discovery, must necessarily fail. *Richards v. Direct Energy Servs.*, 915 F.3d 88, 92–93 (2d Cir. 2019) (affirming judgment for ESCO in pricing case with variable rate "based on business and market conditions").

\* \* \* \* \*

Because Plaintiffs' latest letter-motion requests irrelevant information and misconstrues the central issues in this litigation, the Court should deny this request and place no limitation on Eligo's defenses.

        Respectfully,

        */s/ Ryan Watstein*
        Ryan Watstein