## BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**IN RE:** Eligo Energy Litigation                    MDL-_____

### MOTION OF DEFENDANTS FOR TRANSFER OF ACTIONS TO THE SOUTHERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

Eligo Energy, LLC ("Eligo")[1], defendant in the actions identified below, respectfully moves

this Panel, pursuant to 28 U.S.C. § 1407, to transfer the following three actions to the United States

District Court for the Southern District of New York, so that they may be centralized and

coordinated with another closely related action, *Brous v. Eligo Energy, LLC et al.*, Case No. 1:24-

cv-01260-ER, United States District Court for the Southern District of New York[2]:

1.  *Bodkin v. Eligo Energy, LLC et al.*, Case No. 2:25-CV-00094-CB, United States District Court for the Western District of Pennsylvania;

2.  *Orzolek v, Eligo Energy, LLC et al.*, Case No. 2:25-cv-00078-SDM-EPD, United States District Court for the Southern District of Ohio; and

3.  *Whiteside v. Eligo Energy, LLC et al.*, Case No. 1:25-cv-02532-JRR, United States District Court for the District of Maryland.

Those actions are also described on Eligo's supporting Schedule of Actions, filed

contemporaneously herewith. As explained in Eligo's accompanying Brief, all these actions were

filed by the same law firms, are currently pending in different federal district courts, and present

overlapping questions of fact. Transfer of *Bodkin, Orzolek,* and *Whiteside* to the Southern District

---

[1] Each complaint also names a state-specific Eligo affiliate as a defendant. For purposes of this Motion, all the defendants in each of the four actions is included within the definition of "Eligo" and joins this motion to transfer.

[2] Eligo does not seek the formal consolidation of these actions under Fed. R. Civ. P. 42.

of New York will serve the convenience of the parties and witnesses, eliminate duplicative proceedings, and promote the just and efficient conduct of the actions.

Dated: September 30, 2025        Respectfully submitted,

*/s/ Ryan D. Watstein*

Ryan D. Watstein
David E. Meadows
Abigail Howd
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
ahowd@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC and the other Eligo Defendants*

# BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**IN RE:** Eligo Energy Litigation

MDL-_____

# DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO TRANSFER ACTIONS PURSUANT TO 28 U.S.C. § 1407

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................2

III. ARGUMENT .........................................................................................................6

   A.  Legal Standard ..............................................................................................6

       1.  The actions share common issues of fact ..............................................8

       2.  Centralization will promote just and efficient litigation......................10

           a)  Centralization will reduce or eliminate
               duplicative discovery ....................................................................10

           b)  Centralization is necessary to avoid inconsistent
               rulings and schedules ...................................................................12

IV. CONCLUSION ...................................................................................................14

## I.      INTRODUCTION

Eligo Energy is an energy service company, or an "ESCO," that provides electricity and natural gas in nine states plus the District of Columbia. In recent years, ESCOs have frequently been the target of consumer class actions accusing them of overcharging customers. *See generally Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 92 (2d Cir. 2019) (stating, in a class action against an ESCO, "[t]his is the latest in a line of class actions challenging consumer gas and electricity rates in the wake of market deregulation"). Eligo is one of the most recent targets and is now defending four separate putative class actions filed in four different federal district courts, each brought by the same firms and arising from the same alleged conduct.[1]

All four lawsuits accuse Eligo of breaching its customer contracts and misleading customers by failing to calculate variable electricity rates in accordance with contractually specified criteria. Indeed, the federal judge presiding over one of the suits, *Orzolek v. Eligo*, has already found that the plaintiffs' factual allegations are nearly identical from case to case. *See* Ex. 5 hereto (order issued in *Orzolek v. Eligo*, stating "the facts alleged in *Bodkin* are nearly identical to the facts alleged in *Brous* and this case").

But the four class actions now pending against Eligo do not just share a common factual core. Absent centralization, they also threaten highly duplicative discovery, inconsistent rulings on procedural and substantive issues, and substantial inefficiencies for both the parties and courts now presiding over them. That is particularly so because the earliest-filed action, *Brous v. Eligo*,

---

[1] As set forth in Eligo's accompanying Motion and Schedule of Actions, the cases are (1) *Brous v. Eligo Energy, LLC et al.*, Case No. 1:24-cv-01260-ER, United States District Court for the Southern District of New York, (2) *Bodkin v. Eligo Energy, LLC et al.*, Case No. 2:25-CV-00094-CB, United States District Court for the Western District of Pennsylvania, (3) *Orzolek v, Eligo Energy, LLC et al.*, Case No. 2:25-cv-00078-SDM-EPD, United States District Court for the Southern District of Ohio, (4) *Whiteside v. Eligo Energy, LLC et al.*, Case No. 1:25-cv-02532-JRR, United States District Court for the District of Maryland.

has advanced through discovery and is now on the eve of summary judgment motions. In that case, Judge Edgardo Ramos has issued **more than twenty** discovery rulings, overseen significant case management issues, and presided over extensive fact discovery. Eligo has reviewed more than 200,000 documents, produced more than 25,000, and made more than eight current or former employees available for depositions.

In stark contrast, discovery has not yet opened in the other three actions. But that has not stopped Plaintiff's counsel from serving discovery that shows they have no intention of honoring Judge Ramos's discovery rulings in *Brous*. For example, they have announced that they intend to re-depose the same witnesses in each case. It will be all but impossible to avoid duplicative discovery or to ensure consistent rulings among these four actions, unless they are centralized before Judge Ramos, who is by far the judge most familiar with the parties, their claims and defenses, and the counsel involved. Centralization is also consistent with Plaintiff's initial intent to bring a nationwide class action in *Brous*.

For all of those reasons, and as explained further below, this case meets all the requirements for centralization under 28 U.S.C. § 1407. *Bodkin*, *Orzolek,* and *Whiteside* should be transferred to the Southern District of New York to be coordinated and managed by Judge Ramos.

## II.    BACKGROUND

This spate of litigation against Eligo began in February 2024, with the filing of *Brous v. Eligo* in the Southern District of New York. Initially, *Brous* was filed as a national class action brought on behalf of Eligo variable-rate customers in all nine states where Eligo does business, plus the District of Columbia. *See* Ex. 1 hereto, ¶ 1 (original complaint in *Brous,* alleging that "this action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused thousands of commercial and residential customers in Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably

more for their electricity and natural gas than they should otherwise have paid"). The plaintiffs'

core allegations in *Brous* were that Eligo breached its customer contracts by setting variable rates

that were untethered to Eligo's costs of procuring energy, and that the contracts did not "give Eligo

discretion to set prices as it sees fit." *Id*. ¶¶ 55-62.

Despite bringing a national class action, the named plaintiffs in Brous were and are

residents of New York. Eligo therefore moved to dismiss the plaintiffs' non-New York claims on

the grounds that they lacked class standing to bring them. The plaintiffs and their counsel could

have cured that defect by adding plaintiffs from other states, but they either chose not to do so or

could not find any non-New York residents willing to lend their names to a complaint against

Eligo. So, the plaintiffs opposed Eligo's motion to dismiss, arguing that it was appropriate for two

New York residents to represent absent class members from eight different states, and that their

national class action should proceed in (and only in) the Southern District of New York.

*Brous* was assigned to Judge Edgardo Ramos, who has presided over the case since its

inception. In that time, Judge Ramos has devoted substantial time and effort to managing the case,

including ruling on more than twenty discovery motions. *See* Ex. 9 hereto (*Brous* docket). After

nearly a year of litigation in *Brous*, and after Judge Ramos denied many of the plaintiffs' discovery

motions, plaintiffs' counsel began to file additional putative class actions against Eligo in other

federal district courts. That series of filings began with *Bodkin v. Eligo²*, filed in the Western

District of Pennsylvania in late January 2025. Like *Brous*, *Bodkin* was initially pled as a national

class action brought on behalf of Eligo customers in eight states, plus the District of Columbia.

*See* Ex. 2 hereto (Bodkin Complaint) ¶ 1. Bodkin therefore repeated the same substantive

---

² *Bodkin v. Eligo Energy, LLC et al*., Case No. 2:25-CV-00094-CB, United States District Court
for the Western District of Pennsylvania.

allegations made in *Brous*. For that reason, Eligo moved to stay *Bodkin*, and that motion remains pending before the *Bodkin* court. *See* Ex. 3 hereto (*Bodkin docket*). No discovery or other substantive proceedings have taken place in *Bodkin* in the eight months since it was filed. *Id.*

Before *Bodkin* was stayed, however, Plaintiffs served written discovery on Eligo. The Plaintiffs' document requests and interrogatories were entirely duplicative of what they sought – and in many cases were denied by Judge Ramos – in *Brous*. That duplicative discovery was one of the reasons why Judge Bissoon of the Western District of Pennsylvania expressed serious doubts about whether Plaintiffs could maintain overlapping class actions in *Brous* and *Bodkin*, and invited Eligo to file its motion to stay.

Just days after filing *Bodkin*, plaintiffs' counsel filed yet another putative class action against Eligo, this time in the Southern District of Ohio. *See* Ex. 4 hereto (complaint filed in *Orzolek v. Eligo*). *Orzolek* was nearly a carbon copy of *Brous* and *Bodkin*. Like those cases, the *Orzolek* complaint sought to "redress Eligo's breach of contract that has [allegedly] caused tens of thousands of commercial and residential customers in Ohio, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid." *Id.* at ¶ 1.

Eligo moved to dismiss (or, in the alternative, stay) *Orzolek*. In a recently issued order, and without addressing Eligo's arguments for dismissal, the court stayed *Orzolek* in deference to *Bodkin* and *Brous*. *See* Ex. 5 hereto at 3 (order by *Orzolek* court examining the allegations in all three cases and stating that "the facts alleged in *Bodkin* are nearly identical to the facts alleged in *Brous* and this case"). As the *Orzolek* court noted, plaintiffs' counsel recently sought to amend their complaint in *Brous* to include only New York customers, and Judge Ramos granted that motion. *Id.* at 3. Similarly, in *Bodkin*, plaintiffs' counsel has moved for leave to amend to exclude

4

from the proposed class any members of the proposed classes in *Orzolek* or *Brous*. *Id*. at 4. That motion remains pending in *Bodkin*. *Id*.

Despite those proposed amendments, however, the substantive allegations against Eligo – that it overcharged customers in breach of its customer contracts – have not changed. If anything, the proposed amendments have underscored that all of the cases arise from the same factual core. Indeed, the complaints in *Bodkin* and *Orzolek* use information gained in discovery in *Brous* to further plaintiffs' theory that Eligo did not follow contractually specified criteria in setting variable rates. In particular, *Bodkin* and *Orzolek* rest on the identical allegation that Eligo breached its customer contracts because its "outrageous rates are the result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on an assessment of how high a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup." *See* Ex. 2 (Bodkin Compl.) ¶ 79; *Orzolek* (Ex. 4 ¶ 52). The second amended complaint in *Brous* (Ex. 6 ¶ 72) contains the same allegation as the most recently filed case, *Whiteside*. Ex. 7 (Whiteside Compl.) ¶ 42.

*Whiteside* was filed in the District of Maryland on August 1, 2025. *Id*. It seeks to certify a class of Eligo customers in seven states (including Pennsylvania, where *Bodkin* is pending) plus the District of Columbia. *Id*. ¶ 1. As noted above, *Whiteside* relies on the same substantive allegations as the three earlier-filed cases, in that it challenges the same alleged "uniform and consistent practice" of charging customers as much as they are willing to pay, as opposed to hewing to a contractually-required formula for setting rates that is based on Eligo's costs to acquire energy. *Id*. at ¶ 42. Indeed, each of the operative complaints contains a section alleging that Eligo's

variable rates were excessive because they exceeded those of the relevant local utilities, despite the utilities' energy acquisition costs allegedly being the same as Eligo's.

As in *Bodkin* and *Orzolek*, there have been no substantive proceedings in *Whiteside*, and no discovery has taken place. *See* Ex. 8 (*Whiteside* docket). The only case to have advanced into discovery is *Brous*. There, document productions and fact witness depositions have been completed. Both sides have exchanged expert reports. Eligo intends to file a motion for summary judgment within months, which will challenge plaintiffs' erroneous interpretation of the customer agreement on which *Brous* (along with the other three cases) is based. In particular, Eligo will explain that its customer contracts granted it discretion to set rates according to broad factors such as "market conditions," "market pricing" and/or "market price factors," which, according to plaintiffs' own allegations, appear in contracts at issue in each of the four cases. *See* Ex. 6 ¶ 3; Ex. 4 ¶ 3; Ex. 2 ¶ 3; Ex. 7 ¶ 4. Thus, Judge Ramos will soon be called upon to decide issues central to all four cases – namely, whether Eligo's customer contracts granted it discretion to set variable rates and, relatedly, whether Eligo's alleged "uniform and consistent practice" pricing strategy was inconsistent with the broad language of the customer contracts.

## III.   ARGUMENT

The purposes of centralization are to avoid inconsistent rulings and streamline litigation, for the benefit of the parties and federal courts. All of those purposes will be well served by transferring *Bodkin*, *Whiteside*, and *Orzolek* to the Southern District of New York, where the cases can be efficiently managed by Judge Ramos.

### A.   Legal Standard

To centralize actions under 28 U.S.C. § 1407, two requirements must be met. First, the actions must share "one or more common questions of fact." *Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 671 (9th Cir. 2025) (quoting 28 U.S.C. § 1407).

Second, transfers must be "for the convenience of parties and witnesses and [must] promote the just and efficient conduct of such actions." *Id*.

As to the first requirement, "[t]ransfer under Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant where, as here, the actions still arise from a common factual core." *In re FTX Cryptocurrency Exch. Collapse Litig.*, 677 F. Supp. 3d 1379, 1381 (J.P.M.L. 2023); *see also In re: Home Depot, Inc. Customer Data Sec. Breach Litig.*, 65 F. Supp. 3d 1398, 1399–400 (J.P.M.L. 2014) ("As we have stated on numerous occasions, a complete identity of common factual issues is not a prerequisite to transfer under Section 1407, and the presence of additional facts or differing legal theories is not significant when the actions arise from a common factual core."). Moreover, "Section 1407 contains no requirement that common factual questions predominate over individual ones." *Id*. Nor is there a requirement of "complete identity or even majority of common factual issues as a prerequisite to transfer." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 669 F. Supp. 3d 1375, 1380 (J.P.M.L. 2023) (quoting *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005)). The existence of differing legal theories is also no barrier to transfer. *See* Wright & Miller, Fed. Prac. & Prod. § 3863 (4th ed.) ("[T]he fact different legal theories are advanced in some or all of the cases [should not] prevent coordination and transfer.")

The second requirement – that transfer serves convenience and efficiency – is assessed in light of the MDL statute's purpose. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1230 (9th Cir. 2006). Courts generally evaluate whether transfer will: (1) eliminate duplication in discovery, (2) avoid conflicting rulings and schedules, (3) reduce litigation costs, and (4) conserve the time and effort of the parties, the attorneys, the witnesses, and the courts.

*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410, (2015) (quoting Fed. J. Ctr., *Manual for Complex Litig.* § 20.131 (4th ed. 2004)).

Here, both requirements are met, and the cases should be centralized before Judge Ramos.

### 1.    The actions share common issues of fact.

Section 1407 permits centralization "when civil actions involve one or more common issues of fact." Courts consistently apply this provision to cases arising from a "common factual core," even if there is no complete overlap. *In re Marriott*, 363 F. Supp. 3d at 1374. A "common factual core" exists where multiple complaints "overlap significantly" by naming the same defendants and alleging the same causes of action. *In re Keffer Dev. Servs., LLC, Data Sec. Breach Litig.*, 2025 WL 2327173, at *2 (J.P.M.L. Aug. 8, 2025).

All four cases arise from the same factual core. Each lawsuit names Eligo as a defendant and asserts the same (or substantially similar) breach of contract and state consumer protection claims. As noted above, and underscoring the close relation between all four cases, Plaintiffs used facts learned in discovery in *Brous* to support their allegations in *Bodkin*, *Orzolek*, *Whiteside*, and in the second amended *Brous* complaint. So, all four complaints now rest on the nearly identical allegation that Eligo's "rates are the result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on an assessment of how high a rate it can charge before too many customers quit, irrespective of Eligo's costs to supply energy it simply resells at a markup." *See* Ex. 2 (*Bodkin* Compl.) ¶ 79; Ex. 4 (*Orzolek* Compl.) ¶ 52; Ex. 6 (*Brous* Second Amended Compl.) ¶ 72; Ex. 7 (*Whiteside* Compl.) ¶ 42. Each case will require the court to determine whether Eligo in fact had any such "uniform and consistent practice," and whether that practice breached Eligo's customer agreements. Those common factual issues are more than sufficient to supply the

"common factual core" necessary for centralization under 298 U.S.C. § 1407, regardless of other differences between the actions. *See, e.g.*, *In re Marriott*, 363 F. Supp. 3d at 1374.

The contracts themselves present additional common factual questions. Each complaint alleges that Eligo was obligated to tie variable electricity rates to its costs to acquire energy. For example, the recently-filed second amended complaint in *Brous* asserts that Eligo failed to base rates on "documented costs to supply energy", ¶ 5, and that its "supply costs cannot explain Eligo's egregiously high variable rates or the reason its rates are disconnected from changes in wholesale costs." *Id.* ¶ 71. The other complaints echo the same allegations. *See* Ex. 2 (*Bodkin* Compl.) ¶¶ 68-69, 71, 75; Ex. 7 (*Whiteside* Compl.) ¶ 40; Ex. 4 (*Orzolek* Compl.) ¶ 50.

Another common issue is whether Eligo's contracts granted it discretion to set variable rates, a potentially dispositive issue. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 410 (2d Cir. 2023) (stating, in a class action against an ESCO, that "[t]he dispositive questions are whether an agreement entitled the energy services provider to use discretion in setting its rates and, if so, how the agreement cabined that discretion"). To that point, each of the four complaints alleges that "Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates." Ex. 7 (*Whiteside* Compl.) ¶ 5; Ex. 6 (*Brous* Second Amended Compl.) ¶ 5. And the fact that the plaintiffs served overlapping written discovery in *Brous* and *Bodkin* – even seeking documents in Bodkin that Judge Ramos ruled off-limits in *Brous* – confirms that the cases share a common factual core.

While there may be state-to-state differences in contracts and even within each state over the seven-year putative class periods, Section 1407 does not require complete overlap.[3] *See In re Marriott*, 363 F. Supp. 3d at 1374 (stating that Section 1407 "does not require a complete identity of common factual issues"). Those differences do not negate the presence of a common factual core for purposes of centralization. Plaintiffs' allegations share a sufficiently common core of facts to justify centralization in the Southern District of New York. *Id*.

### 2.    Centralization will promote just and efficient litigation.

Centralization before Judge Ramos will also promote efficiency and justice across the four cases.  Every factor courts consider in evaluating this issue strongly favors transfer.

#### a)    *Centralization will reduce or eliminate duplicative discovery.*

Centralization before Judge Ramos will certainly eliminate what promises to be highly duplicative discovery if the cases are not transferred to the Southern District of New York. Discovery in *Brous* has been extensive: more than 25,000 documents produced, over eleven depositions completed, and 22 discovery motions decided. Ex. 9 (*Brous* docket). The *Bodkin*, *Orzolek*, and *Whiteside* plaintiffs are likely to seek the very same documents and depositions their counsel already obtained *Brous*. The plaintiffs in *Bodkin* have already done so, serving written discovery that substantially overlaps with what they served in *Brous*. The same can be expected in both *Orzolek* and *Whiteside*, thus subjecting Eligo to four overlapping sets of written discovery requests. The same will be true of depositions, where the plaintiffs will likely seek to re-depose the same Eligo witnesses who have already testified – some multiple times – in *Brous*. One of the primary purposes of 20 U.S.C. § 1407 is to stop precisely this sort of duplicative discovery.

---

[3] Nothing in this brief should be construed as conceding that Eligo's customer contracts, or the ways in which it set rates, are sufficiently similar to satisfy Fed. R. Civ. P. 23's requirements for class certification. This brief addresses only the requirements of 28 U.S.C. § 1407, which are fundamentally different from Rule 23's.

In fact, Plaintiffs' counsel has confirmed that they intend to seek overlapping documents in all four cases and to re-depose the same Eligo witnesses up to four times each. They said as much in a letter sent to Eligo's counsel on September 28, 2025, just days after Eligo notified the Bodkin court that it intended to move to transfer that action under 288 U.S.C. § 1407. *See* Ex. 10 (letter from plaintiffs' counsel). There, Plaintiffs' counsel proposed for the first time ever to informally coordinate discovery in all four cases. But that proposal – made for the obvious purpose of thwarting this motion to transfer – was hollow. Among other things, Plaintiffs' counsel sought to reserve their right to depose each Eligo witness in each of the four cases, subject only to a vague and unenforceable undertaking to use their "best efforts" not to ask the "same questions." *Id*. Nor did Plaintiffs' counsel offer to abide by any of Judge Ramos's twenty-plus discovery rulings, or to take any other measures to eliminate inconsistent rulings in the four cases.

Centralizing the cases before Judge Ramos will allow him to efficiently manage discovery and eliminate duplication that plaintiffs' belated proposal seeks to preserve. Judge Ramos is uniquely suited to do so because he has already presided over discovery in *Brous*, during which he has heard and decided an incredible 22 discovery motions filed by the Plaintiffs. Judge Ramos also protected certain Eligo witnesses — including its co-founders — from depositions. Without centralization, the plaintiffs are certain to pursue the same depositions that Judge Ramos denied them. Their failure to say otherwise in the letter they sent to attempt to thwart centralization confirms that.

By contrast, discovery has not opened in any of the other cases, and so none of the other assigned judges has had any experience managing discovery in this case. Those factors weigh strongly in favor of assigning all four cases to Judge Ramos. *In re: Aetna, Inc., Out-Of-Network UCR Rates Litig.*, 609 F. Supp. 2d 1370, 1371 (J.P.M.L. 2009) (centralizing cases and stating "we

have selected the District of New Jersey, because (1) Judge Faith S. Hochberg has been presiding over the action before her since July 2007 and she is well-versed with the issues involved in this litigation"); *In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 923 F. Supp. 2d 1376, 1379 (J.P.M.L. 2013) (centralizing cases despite one case being "substantially advanced," and stating "by deciding to assign this litigation to the Honorable Freda L. Wolfson, who has presided over *Mattson* since its commencement, we are confident that she can resolve any problems that may arise due to the different stages of the cases"); *In re L. E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) (stating "[w]e have often held that a factor to be considered in the selection of a transferee district is whether the pretrial proceedings in the action or actions in a particular forum are significantly more advanced than those in any of the actions in the other jurisdictions" and transferring cases to the judge who had presided over the most advanced case); *In re Frost Pat.*, 316 F. Supp. 977, 979 (J.P.M.L. 1970) ("While we may not have selected the District of Delaware at the outset of this litigation, the advanced state of discovery in several actions pending there and Judge Wright's familiarity with this litigation compels the selection of the District of Delaware as the only practical transferee forum at this time.").

### b) Centralization is necessary to avoid inconsistent rulings and schedules.

Without transfer, inconsistent rulings are inevitable. Judge Ramos has already decided numerous discovery issues, such as the scope of document production, including ESI discovery. He has also protected certain Eligo personnel, including Eligo's co-founders, from depositions. Without centralization, Eligo could be forced to re-litigate the same discovery issues in *Bodkin*, *Whiteside*, and *Orzolek*. If that were to happen, it is almost certain that inconsistent discovery rulings would result. Judge Ramos is therefore in the best position to ensure that all four cases are litigated in a way that is both efficient and consistent.

The same applies to substantive matters. In *Brous*, Eligo anticipates filing a motion for summary judgment before the end of this year. That motion will address legal issues that are common to all four cases, including how Eligo's customer contracts should be interpreted and applied. Central to that issue is whether (and to what extent) Eligo's contracts granted it discretion to set variable rates, and whether Eligo's attempt to balance revenue and customer retention was a breach of that contract. Without centralization, there is a significant potential for four different courts to reach inconsistent rulings on those core issues. The same applies to class certification. Without centralization, it could be possible for four courts to reach four different conclusions on whether or to what extent the proposed classes may be certified under Fed. R. Civ. P. 23.

Centralization will also serve the goal of efficiency because, given the similar language used in Eligo's various customer contracts, Judge Ramos' summary judgment ruling in *Brous* may very well resolve issues that would otherwise have to be briefed and argued in *Bodkin*, *Whiteside*, and *Orzolek*. There is considerable efficiency to be gained in having one federal judge manage and decide those issues. Briefing and arguing four separate dispositive motions in four different courts, and potentially four separate motions for class certification, on the other hand, represents precisely the sort of expensive and inefficient procedure that 28 U.S.C. § 11407 was enacted to prevent.

And for the same reasons, centralization will reduce litigation costs and conserve time and effort for the parties and courts. That is particularly so for plaintiffs' counsel, who are based in New York. Moreover, Judge Ramos has already shown that he can efficiently manage this litigation in a cost-effective way for all other parties and their counsel, regardless of their location. In any case, it is far more efficient for the parties to direct their efforts to a single federal judge, as opposed to what they are now doing, which is litigating before four different federal courts, each separated by hundreds of miles.

## IV.    CONCLUSION

These four cases meet all the requirements for transfer and centralization under 28 U.S.C. § 1407. They involve common issues of fact, and transfer will promote the just and efficient conduct of this litigation. The Panel should therefore transfer *Bodkin*, *Whiteside*, and *Orzolek* to the Southern District of New York, where Judge Ramos can use the experience and expertise he has gained in Brous to efficiently manage these cases.

Date:  September 30, 2025

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein
David E. Meadows
Abigail Howd
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
ahowd@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC
and the other Defendants*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**MDL-_____ - IN RE**: Eligo Litigation

**SCHEDULE OF ACTIONS**

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| Michelle Schuster and Anne Brous, as Executrix of the Estate of Ira Brous, on behalf of themselves and all others similarly situated v. Eligo Energy, LLC and Eligo Energy NY, LLC | S.D.N.Y. | 1:24-cv-1260-ER | Edgardo Ramos |
| Tina Bodkin and Thomas Bodkin, on behalf of themselves and all others similarly situated v. Eligo Energy, LLC and Eligo Energy PA, LLC | W.D. Pa. | 2:25-cv-00094-CB | Cathy Bissoon |
| Thomas Orzolek, on behalf of himself and all others similarly situated v. Eligo Energy, LLC and Eligo Energy OH, LLC | S.D. Ohio | 2:25-cv-00078-SDM-EPD | Sarah D. Morrison |
| Sharon Whiteside, on behalf of herself and all others similarly situated v. Eligo Energy, LLC and Eligo Energy MD, LLC | D. Md. | 2:25-cv-02532-JRR | Julie Rebecca Rubin |

*[Signature Appears on Following Page]*

Dated: September 30, 2025

Respectfully submitted,

_/s/ Ryan D. Watstein_ _____

Ryan D. Watstein
David E. Meadows
Abigail Howd
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
ahowd@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC and the other Eligo defendants*

## BEFORE THE UNITED STATES JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

**IN RE:** Eligo Energy Litigation                      MDL-_____

### DEFENDANTS' ORAL ARGUMENT STATEMENT
### REGARDING MOTION FOR TRANSFER

Eligo Energy, LLC respectfully submits that oral argument will aid the Panel in deciding Eligo's motion to transfer under 28 U.S.C. § 1407 for several reasons.

First, the Panel would benefit from oral argument because the four class actions against Eligo are proceeding on entirely different tracks. *Brous v. Eligo* has advanced through nearly all fact and expert discovery and is nearing dispositive motions, while the three later-filed cases remain at the pleading stage. This sharp divide creates real risks of duplicative discovery, inconsistent rulings, and wasted resources. Hearing from counsel directly will provide the Panel with a clearer picture of how centralization can resolve these problems and why leaving the cases scattered across four courts would exacerbate them.

Second, Plaintiffs have proposed "informal coordination" as an alternative to transfer. On paper, that suggestion may seem plausible, but in practice, it is unworkable. Plaintiffs have already served overlapping discovery requests, have indicated they intend to re-depose the same witnesses, and have declined to be bound by Judge Ramos's twenty-plus discovery rulings in *Brous*. Only formal centralization can eliminate those inefficiencies. Oral presentations from counsel will allow the Panel to weigh these competing claims and confirm that transfer under Section 1407 is the only realistic way to ensure consistency and efficiency.

Third, oral argument will also assist the Panel in determining the most appropriate transferee forum. Judge Ramos has presided over *Brous* for more than a year, managed extensive discovery, and ruled on numerous disputes. He is uniquely familiar with the parties, counsel, and legal issues, and no other judge has comparable experience with this litigation. Centralizing the cases before him would conserve resources and avoid inconsistent outcomes. Allowing counsel to address these considerations directly will give the Panel the best record on which to base its decision.

For all these reasons, oral argument will materially aid the Panel's consideration of this motion and should be heard.

Dated: September 30, 2025

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein
David E. Meadows
Abigail L. Howd
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
ahowd@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC and the other Eligo defendants*

# EXHIBIT 1

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated, | Civil Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**, | **JURY TRIAL DEMANDED** |
| Defendants | |

## <u>TABLE OF CONTENTS</u>

NATURE OF THE CASE ................................................................................................. 1

PARTIES ....................................................................................................................... 3

JURISDICTION AND VENUE ...................................................................................... 5

FACTUAL ALLEGATIONS .......................................................................................... 6

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets ................... 6

    B.   Plaintiff Ira Brous's Dealings with Eligo ...................................................... 18

    C.   Plaintiff Michelle Schuster's Dealings with Eligo ......................................... 19

    D.   Eligo's Unauthorized Pricing Practices ........................................................ 19

    E.   Eligo Violated New York's Variable Rate Disclosure Law ............................ 33

CLASS ACTION ALLEGATIONS ............................................................................... 34

CAUSES OF ACTION ................................................................................................. 38

COUNT I: BREACH OF CONTRACT ......................................................................... 38

COUNT II: BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING .................................................................... 39

COUNT III: VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349 ................................................................................................ 41

COUNT IV: VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349-d(3) ........................................................................................ 44

COUNT V: VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349-d(7) ........................................................................................ 47

COUNT VI: VIOLATION OF MATERIALLY IDENTICAL
STATE CONSUMER PROTECTION STATUTES ........................................................ 49

COUNT VII: UNJUST ENRICHMENT ........................................................................ 53

PRAYER FOR RELIEF ................................................................................................ 53

JURY DEMAND .......................................................................................................... 53

NOTICE TO ATTORNEYS GENERAL ....................................................................... 54

Plaintiffs Ira Brous and Michelle Schuster (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy NY, LLC (hereinafter "Eligo" or "Defendants") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      This action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused thousands of commercial and residential customers in Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Eligo is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States.  Eligo has taken advantage of deregulation to exploit customers hoping to save on their energy costs.

3.      Eligo represents in its customer contract with Plaintiffs that its variable energy rate will be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."  Eligo's contract with Plaintiffs further represents that its variable rate "may be periodically adjusted for market conditions" and that "[a]pplicable taxes will be factored into the variable price."

4.      Eligo's representations in its form customer contract about how variable energy rates are calculated are false and deceptive, and designed to take advantage of customers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy

pricing and cost information.  Eligo contracted to charge a rate "calculated" using four verifiable and documented factors: (1) the wholesale "market pricing" of Eligo's energy supply; (2) the minor "other market price factors" that account for the ancillary fees accompanying Eligo's supply costs; (3) the "transportation costs" Eligo incurs when its energy is transported from the wholesale market to the delivery point where the customer's utility takes it from the transmission system; and (4) "applicable taxes."

5.     In reality, however, Eligo did not provide customers with prices "calculated" from wholesale market pricing and Eligo's other documented costs to supply energy plus applicable taxes.  Instead, Eligo used a pricing methodology that charged excessive and varying profit margins with the intent of depriving customers of the benefits of a rate calculated using the contract's four enumerated factors.  Eligo's contract does not provide Defendant with discretion to pick and choose the weight of the factors set forth in its contracts and then apply whatever markup it sees fit.  Yet that varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' rates, notwithstanding its contractual commitment to do the opposite.

6.     As a result of Eligo's unlawful acts described herein, thousands of unsuspecting customers have been, and continue to be, fleeced by Eligo out of millions of dollars in exorbitant charges for electricity and natural gas.  Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

7.     Plaintiffs and other Eligo customers (the "Class") have been injured by Eligo's unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Eligo's breach of contract, breach of the duty

of good faith and fair dealing, violation of state consumer protection statutes, and unjust enrichment.

8.      Only through a class action can Eligo's customers remedy its ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of Eligo's deceptive and unlawful conduct.  With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Eligo engage in fair and upright business practices.

## PARTIES

9.      Plaintiff Ira Brous resides in Ithaca, New York.  Plaintiff Brous enrolled with Eligo on or around July 13, 2017.  Eligo charged Plaintiff Brous a fixed rate for electricity from August 2017 until January 2018, after which it began charging him a variable rate.  Plaintiff Brous cancelled his Eligo account in or around November 2023.  Unbeknownst to Plaintiff Brous, Eligo charged him excessive and unauthorized variable rates every month.

10.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiff Brous paid more for his home energy supply than he otherwise should have paid.

11.     Plaintiff Michelle Schuster resides in Rochester, New York.  Plaintiff Schuster enrolled with Eligo on or around October 9, 2016.  Eligo charged Plaintiff Schuster a fixed rate for electricity from November 2016 until January 2017, after which it began charging her a variable rate.  Plaintiff cancelled her Eligo account in or around November 2023.  Unbeknownst to Plaintiff Schuster, Eligo charged her excessive variable rates every month.

12.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiff Schuster paid more for her home energy supply than she otherwise should have paid.

13.     Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC.  On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida.  Accordingly, Eligo Energy, LLC is a citizen of Florida.

14.     Defendant Eligo Energy NY, LLC is a New York limited liability company with its principal place of business in Chicago, Illinois.  On information and belief, Eligo Energy NY, LLC is a wholly owned subsidiary of Eligo Energy, LLC.  Accordingly, Eligo Energy NY, LLC is a citizen of Florida.

15.     Upon information and belief, Defendant Eligo Energy, LLC completely controls its operating affiliates, including Defendant Eligo Energy NY, LLC.  Public data show that Eligo Energy, LLC and Eligo Energy NY, LLC hold themselves out as a single company—Eligo Energy.[1]  On information and belief, Eligo Energy NY, LLC has no separate offices and operates out of a single office in Chicago, Illinois with Eligo Energy, LLC.[2]  On information and belief, there is a unified executive team that controls all operational and financial aspects of both

---

[1] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story (last visited Feb. 20, 2024).

[2] *Compare id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606") *with* **Exhibit A** (Plaintiff Brous's Contract) at 3 (stating that Eligo Energy NY, LLC is "located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803") *and* **Exhibit B** (Plaintiff Schuster's Contract) at 2 (same).

Defendants, which are run on a consolidated basis as one company.  Defendant Eligo Energy,

LLC uses its operating affiliates, including Defendant Eligo Energy NY, LLC to perpetrate the

unlawful conduct challenged in this lawsuit.

16.     For example, although the contracts received by both Plaintiffs bear the heading

"Eligo Energy NY, LLC Terms of Service,"[3] the Welcome Letter marketing material sent to both

Plaintiffs upon enrollment, which enclosed Eligo's contracts, bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606.[4]

Both letters further state that "[i]n the next few days, you will be receiving a notice from [the

local utility] of change of your supplier to Eligo Energy, LLC."[5]  The letters also state that they

enclose "a copy of the terms and conditions of your agreement with Eligo Energy" and are

signed "Eligo Energy."[6]

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

17.     This Court has jurisdiction over the claims asserted in this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the

Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and

diversity of citizenship exists between at least one member of the Class and Defendants.

### *Personal Jurisdiction*

18.     This Court has General and Specific Personal Jurisdiction over Defendant Eligo

---

[3] Ex. A at 3; Ex. B at 2.

[4] Ex. A at 1; Ex. B at 1.

[5] Ex. A at 1; Ex. B at 1.

[6] Ex. A at 1; Ex. B at 1.

Energy NY, LLC because it is a New York limited liability company, and it advertises, markets, distributes, and sells energy to New York customers, including Plaintiffs. This Court has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets, distributes, and sells energy to New York customers, including Plaintiffs.

### *Venue*

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Both Defendants are limited liability companies that are deemed to reside in any judicial district in which they are subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this District under § 1391(b)(1).

### FACTUAL ALLEGATIONS

### A. The History Of Deregulation And ESCOs' Role In Energy Markets

20. In the 1990s and 2000s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), deregulated the market for retail energy supply. Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay. As a result, the energy supply markets in New York, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Pennsylvania, and Washington, D.C. are open to competition, and customers and small businesses may choose their energy supplier.

21. Since New York opened its retail energy markets to competition, millions of New York residential and small business customers have switched to an ESCO. Deregulation laws in other states are substantially similar.

22.     ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy. ESCOs then sell that energy to end-user customers. However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or extract natural gas. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ESCOs merely buy electricity and natural gas and then sell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply. The only value that ESCOs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

23.     ESCOs are subject to minimal regulation by state utility regulators like the NYPSC. ESCOs like Eligo do not have to file their rates, or the method by which those rates are set. Instead, an ESCO customer's rates are governed by the contract between the ESCO and the customer (and the relevant consumer protection and contract law).

24.     Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility. For example, in New York, as in many states, the utilities charge energy supply rates that reflect the same cost-factors set forth in Eligo's customer contract. Indeed, in New York the utilities' supply rates serve as pass throughs of the utilities' energy supply cost from the New York Independent System Operator's ("NYISO") competitive

short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale energy and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as Eligo incur). New York utilities purchase energy, ancillary services, and capacity daily from NYISO's wholesale market based on customer consumption and pass actual costs on to their customers.

25. ESCOs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices. But ESCOs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers, such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

26. Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the cost-based factors set forth in Eligo's contract; accordingly, no consumer would ever agree to Eligo's variable rate if they knew the truth.

27. The only way Eligo can retain variable rate customers is by hiding the fact that Eligo's rates are not "calculated" from its documented supply costs plus applicable taxes. Instead, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" its documented supply costs and then add whatever markup

it chooses.   To the extent Eligo claims it has discretion in setting rates (it does not), that discretion is cabined by the contract's explicit promise that the customer's rates will be calculated "in response to market pricing, transportation costs, and other market price factors." Any discretion Eligo may have had is also cabined by customers' reasonable expectations that Eligo will not price gouge customers for the same energy sold by their local utilities.

28.     Eligo took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates.  In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline.  However, Eligo exploits deregulated markets by consistently charging its customers far more than its contractual pricing term permits and failing to adequately disclose how its variable rates are actually determined.

29.     One of deregulation's main unintended consequences has been the proliferation of ESCOs like Eligo whose business model is primarily based on taking advantage of customers. As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[7]  As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiffs challenge here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity.  Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.

---

[7] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 1 (2009).

* * *

High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, **short-term "teaser" rates followed by skyrocketing variable prices**—many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[8]

30.     For years, New York regulators have also been calling out the high levels of misconduct that pervade the state's deregulated energy markets. For example, in 2014 the NYPSC concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[9] The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[10] The NYPSC concluded that:

[A]s currently structured, the retail energy commodity markets for residential and small nonresidential customers cannot be considered to be workably competitive. Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition[.][11]

---

[8] *Id.* at 3–4 (emphasis added).

[9] NYPSC, CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

[10] *Id.* at 11.

[11] *Id.* at 10.

31. Statistics from the New York Attorney General's ("NYAG") office confirm the pattern of activity this class action seeks to combat. From at least the year 2000 to the present, the NYAG has investigated numerous ESCOs' deceptive and illegal business practices. These investigations have resulted in multiple settlements providing for extensive injunctive relief and millions in restitution and penalties.

32. The unlawful conduct of ESCOs like Eligo has been devastating to New York customers. For example, "[a]ccording to the data provided by [New York's] utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December 31, 2016."[12] "Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period."[13] Combining these two groups, New York customers have been "'overcharged' by over $1.3 billion dollars over this time period."[14]

33. New York's low-income customers have also been hit hard. The utilities reported that low-income ESCO customers (a subset of the residential customers mentioned above) "collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility."[15]

34. On December 16, 2016, based on the flood of customer complaints, negative

---

[12] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

[13] *Id.* at 3.

[14] *Id.*

[15] *Id.*

media reports, and data demonstrating massive overcharges, the NYPSC prohibited ESCOs from

serving low-income customers, because of "the persistent ESCO failure to address (or even

apparently to acknowledge) the problem of overcharges to [low income] customers[.]"[16]

    35.    Following the first part of the evidentiary hearing announced in December 2016,

on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed
> market structure that results in customers being fooled by
> advertising and marketing tricks into paying substantially more for
> commodity service than they had remained full utility customers,
> yet thinking they are getting a better deal.  Rather than fierce ESCO
> against ESCO price competition working to protect customers from
> excessive charges, ESCOs have deliberately obfuscated prices and
> resisted market reforms such that the Commission's decision to
> allow ESCOs access to the utility distribution systems to sell electric
> and gas commodity products to mass market customers has proven
> to be no longer just and reasonable.[17]
>
>                     * * *
>
> The primary problem with the retail markets for mass market
> customers is the overcharging of customers for commodity due to
> the lack of transparency to customers on ESCO prices and products;
> this lack of transparency allows ESCOs to charge customers
> practically whatever they want without customers' understanding
> that they are paying substantially more than if they received full
> utility service.  Consequently, potential commodity customers
> attempting to choose between the ESCO offerings and the default
> utility service cannot readily determine which ESCO offers the best
> price for comparable products or if the ESCOs' prices can possibly
> "beat" or even be competitive with the utility's default commodity
> service for the duration of the contract term.
>
> Thus, as the current retail access mass markets are structured,
> customers simply cannot make fully informed and fact-based
> choices on price . . . since the terms and pricing of the ESCO product
> offerings are not transparent to customers.  For variable rate

---

[16] NYPSC, CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income
Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

[17] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1
(Mar. 30, 2018).

products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[18]

* * *

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[19]

36.     As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[20]  Likewise, when the ESCOs claimed that their provision to customers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[21]

---

[18] *Id.* at 41–42 (citations omitted).

[19] *Id.* at 86 (citations omitted).

[20] *Id.* at 37.

[21] *Id.* at 87.

37.     Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[22]  The NYPSC staff went on to state that "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a "green" commodity product."[23]

38.     Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers.  These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[24]

---

[22] *Id.* at 69.

[23] *Id*. at 69–70.

[24] *Id*.

39.     Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes that banned, starting in February 2020, the variable rate pricing practices engaged in by Eligo and impacting the entire New York ESCO marketplace.[25]

40.     The NYPSC's press release announcing the new regulations stressed that banning variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging New York consumers" and that the regulations only went forward after "the state's highest court definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection regulation."[26]  The regulations themselves likewise condemn ESCOs' conduct and declare that deception has become a "business model" in the deregulated energy market:

> Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO customers that pay significant premiums for products with little or no apparent added benefit, . . . it appears that a material level of misleading marketing practices continues to plague the retail access market.
>
> * * *
>
> The persistence of complaints related to ESCO marketing practices is indicative of some ESCOs continuing to skirt rules and attempting to avoid accountability as part of their business model.[27]

---

[25] NYPSC, CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 108–10 (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[26] Press Release, NYPSC, PSC Enacts Significant Reforms to the Retail Energy Market (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7B2F86EF23-5B31-46D3-846D-DAD7C0D7381A%7D.

[27] December 12 Order at 88–90.

41. The NYPSC's variable rate ban followed its two-year investigation of ESCO practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19 parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[28]

42. The NYPSC prefaced the variable rate ban with the observation that variable energy rates like those Defendants charged Plaintiffs and Class Members are "[t]he most commonly offered ESCO product" and that this popular product is frequently provided at "a higher price than charged by the utilities."[29] The incongruity of customers paying ESCOs more for the exact same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material benefits to consumers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.[30]

43. In fact, the NYPSC found it "troubling" that even after considering reams of evidence, "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."[31] This fact only highlighted the NYPSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."[32] Accordingly, and on this record, the NYPSC banned variable energy rates like those Defendants charged Plaintiffs and Class Members.[33] In place of these floating variable rates, the NYPSC required ESCOs to guarantee

---

[28] *Id.* at 3–4.

[29] *Id.* at 11.

[30] *Id.* at 12.

[31] *Id.* at 30.

[32] *Id.* at 31.

[33] *Id.* at 39.

that their variable rates would save customers money compared to what the utility would have charged.[34]  Under the new regulations, if the ESCO charges the customer more than the utility, the customer is owed a refund for the difference.[35]  In this litigation, the difference between what Eligo charged customers for the same energy Class Members' utilities would have supplied, and what the utilities would have charged for that energy is likely in the tens of millions of dollars.

44.    Moreover, the NYPSC's findings of widespread and unjustified overcharging underscore and highlight the importance and perniciousness of Defendants' practices challenged in this lawsuit.  Likewise, the NYPSC's finding that ESCOs' overcharging is completely unjustified bolsters Plaintiffs' claims that Defendants' variable rate pricing practices breached the duty of good faith and fair dealing.  ESCOs' improper pricing practices go undetected because it is virtually impossible for customers to ferret out the fact that they are being overcharged.

45.    In its December 12 Order, the NYPSC also faulted ESCOs for concealing critical pricing data from both ordinary customers *and the NYPSC itself*: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[36]

---

[34] *Id.*

[35] *Id.*

[36] *Id.* at 31.

46.     The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[37] and required that ESCO bills show how much the customer's utility would have charged.[38]

47.     In addition, just recently and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[39]  The legislation was introduced after reports that ESCOs in New York, like Eligo, charge some of the highest residential energy costs in the United States.[40]

48.     New York is not the only state using the overwhelming evidence of customer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

**B.     Plaintiff Ira Brous's Dealings with Eligo**

49.     In the summer of 2017, a representative from Eligo solicited Plaintiff Brous, and he agreed to switch his electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff Brous with marketing material (dubbed a "Welcome Letter" in industry parlance) stating "[w]elcome to Eligo Energy, authorized supplier of NYSEG. . . . In the next few days, you will be receiving a notice from NYSEG of change of your supplier to Eligo

---

[37] *Id.* at 33.

[38] *Id.* at 33–34.

[39] Press Release, Governor Kathy Hochul, Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills (Sept. 20, 2023),  *available at* https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills.

[40] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

Energy, LLC." *See* Ex. A at 1.  The letter also enclosed a copy of Eligo's standard, uniform contract.  *Id.* at 3.

50.     Eligo began supplying electricity to Plaintiff Brous's residence and it continued to do so until he cancelled in our around November 2023.

51.     After a roughly six-month fixed rate period, Eligo began charging Plaintiff Brous a variable rate for electricity in or around January 2018.

**C.     Plaintiff Michelle Schuster's Dealings with Eligo**

52.     In the fall of 2016, a representative from Eligo solicited Plaintiff Schuster, and she agreed to switch her electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff Schuster with a Welcome Letter stating "[w]elcome to Eligo Energy, authorized supplier of RG&E. . . . In the next few days, you will be receiving a notice from RG&E of change of your supplier to Eligo Energy, LLC." *See* Ex. B at 1.  The letter also enclosed a copy of Eligo's standard, uniform contract.  *Id.* at 2.

53.     Eligo began supplying electricity to Plaintiff Schuster's residence and it continued to do so she cancelled in our around November 2023.

54.     Eligo began charging Plaintiff Schuster a variable rate for electricity in or around January 2017.

**D.     Eligo's Unauthorized Pricing Practices**

55.     In its standard form contract, Eligo represents that its variable rates will be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."  Eligo further represents that its variable rate "may be periodically adjusted for market conditions" and that "[a]pplicable taxes will be factored into the variable price."

56. Upon information and belief, these terms are substantially similar to the variable rate contractual terms for all of Eligo's customers in the United States.

57. The variable rate pricing structure outlined in Eligo's contract has four verifiable and documented components: (1) "market pricing," which is Eligo's cost to procure energy from the wholesale market; (2) the minor "market price factors" that encompass the ancillary fees charged in connection with wholesale supply purchases; (3) the "transportation costs" Eligo pays to transport the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (4) applicable taxes.

58. In light of Eligo's representations in its customer contract about how variable rates are "calculated," any reasonable consumer, including Plaintiffs, would reasonably expect that Eligo's variable rates would reflect the cost factors set forth in the contract and would only vary "in response to" changes in those costs. Eligo's contract does not give Eligo discretion to set prices as it sees fit. Instead, the contract restricts Eligo's rates to the four components outlined in the contract.

59. None of the four cost factors identified in Eligo's customer contract explain its exorbitant charges. For example, the costs of energy and related minor charges on the relevant wholesale market do not account for Eligo's excessive rates. As detailed below, Eligo's rates far exceed those identifiable costs and were not "calculated" in "response to" those verifiable costs.

60. Eligo's customer contract also refers to "transportation costs" and "appliable taxes" as components of Eligo's variable rates, but while Eligo may incur those costs in other markets, they do not apply in New York. In certain markets, such as those in the Pennsylvania-New Jersey-Maryland Interconnection region, ESCOs like Eligo pay a relatively small sum for the cost of transporting the energy from the wholesale market to the point of delivery where the

customer's utility takes possession of the energy from the transmission system.  In New York

(Plaintiffs' market), however, this cost is paid by the utility—here, NYSEG or RG&E—not by

Eligo.  The utilities then pass this cost onto customers in connection with the utility's **_delivery_**

charges, not the supply portion of the customer's bill.  Accordingly, "transportation costs" cannot

be factored into the rates Eligo charges New York customers.

61.     Similarly, Plaintiffs' bills showing Eligo's rate contain a separate line item for

sales tax and Eligo pays no tax on its purchases from the wholesale market. Thus, in New York,

"applicable taxes" cannot be factored into Eligo's variable rate.

62.     Instead, the only factor that would cause the customer's rate to materially vary

from month to month is Eligo's cost to purchase its customers' energy supply on the relevant

wholesale market.

63.     Eligo purchases its energy supply on the competitive wholesale market.  The cost

of wholesale energy is overwhelmingly the largest cost Eligo incurs.  The other cost factors

outlined in the contract that may affect Eligo's variable rate (such as additional market price

factors) are minor and are included in the local utility's supply charges as well.[41]  These

additional costs are relatively insignificant in terms of the overall costs Eligo incurs to procure

natural gas and electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs

incur these costs as well, yet they offer substantially lower rates.

64.     Therefore, Eligo's supply costs cannot explain Eligo's egregiously high variable

rates or be the reason its rates are disconnected from changes in wholesale costs.  Eligo's

overhead costs (which are minor compared to its much larger supply costs)—to the extent they

---

[41] As noted above, in New York, transportation costs are billed to customers by their utilities as
delivery charges.  To the extent Eligo pays transportation costs in other markets, however, such
relatively minor costs would also be reflected in the local utilities' supply costs.

are even included as "other market price factors" (they are not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs.  In fact, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

### *Benchmark One: The Local Utility's Contemporaneous Supply Rate*

65.     A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo does not follow its contract's pricing formula in good faith.  Publicly available data on the local utilities' rates, like New York State Electric and Gas Corporation ("NYSEG") and Rochester Gas and Electric ("RG&E"), which are the utilities serving Plaintiffs' residences, serve as an ideal indicator of the four price components set forth in Eligo's customer contract: (1) the wholesale cost of energy; (2) the ancillary fees charged in connection with wholesale supply purchases; (3) the "transportation costs" Eligo pays to transport  the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (4) applicable taxes.[42]  This is because the utilities' energy procurement costs are the same costs ESCOs like Eligo incur and the utility's rate serves as a pure passthrough of those costs.  Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which are the correlated factors outlined in Eligo's contract.  Consequently, local utilities' supply rates are the ideal comparator for determining whether Eligo's rates are "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factor."

---

[42] As explained above, neither transportation costs nor taxes affect energy supply rates in New York—whether those rates are charged by Eligo, the local utilities, or other ESCOs.

66. In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate. Using the utility's rates as a benchmark for the contract's enumerated cost factors shows that Eligo's rates were driven by excessive mark-ups and profiteering.

67. The following table compares Plaintiff Brous's variable supply rates from Eligo for twelve billing periods to his local utility NYSEG's contemporaneous rates.

| Billing Period | Eligo Rate ($/kWh) | NYSEG Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 10/6/2022–10/31/2022 | 0.24 | 0.07 | 3.67x | 267% |
| 11/1/2022–12/5/2022 | 0.24 | 0.08 | 2.97x | 197% |
| 12/6/2022–1/3/2023 | 0.24 | 0.06 | 3.72x | 272% |
| 1/4/2023–2/1/2023 | 0.24 | 0.09 | 2.81x | 181% |
| 2/2/2023–3/1/2023 | 0.24 | 0.07 | 3.34x | 234% |
| 3/2/2023–4/3/2023 | 0.19 | 0.09 | 2.11x | 111% |
| 4/4/2023–5/2/2023 | 0.19 | 0.03 | 6.06x | 506% |
| 5/3/2023–5/31/2023 | 0.18 | 0.05 | 3.78x | 278% |
| 6/1/2023–7/3/2023 | 0.18 | 0.06 | 2.98x | 198% |
| 7/4/2023–8/2/2023 | 0.17 | 0.04 | 3.78x | 278% |
| 8/3/2023–9/1/2023 | 0.17 | 0.06 | 2.59x | 159% |
| 9/2/2023–10/2/2023 | 0.20 | 0.07 | 2.78x | 178% |

68. The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff Brous's account and NYSEG's contemporaneous rates. Eligo's rate was more than **double** NYSEG's rate in **every** billing period, more than **triple** NYSEG's rate in six out of twelve billing periods, and more than **six times** NYSEG's rate in April 2023. On average, Eligo's rates were **more than triple** NYSEG's rates.

69. The following table compares Plaintiff Schuster's variable supply rates from Eligo for twenty billing periods to her local utility RG&E's contemporaneous rates.

| Billing Period | Eligo Rate ($/kWh) | RG&E Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/25/2021–7/27/2021 | 0.16 | 0.04 | 3.65x | 265% |
| 7/28/2021–8/25/2021 | 0.16 | 0.05 | 3.5x | 250% |
| 8/26/2021–9/24/2021 | 0.16 | 0.05 | 3.15x | 215% |
| 9/25/2021–10/26/2021 | 0.17 | 0.06 | 2.94x | 194% |
| 10/27/2021–11/24/2021 | 0.17 | 0.05 | 3.37x | 237% |
| 11/25/2021–12/27/2021 | 0.16 | 0.05 | 3.47x | 247% |
| 12/28/2021–1/26/2022 | 0.18 | 0.06 | 3.02x | 202% |
| 1/27/2022–2/25/2022 | 0.18 | 0.05 | 3.42x | 242% |
| 2/26/2022–3/25/2022 | 0.16 | 0.07 | 2.37x | 137% |
| 3/26/2022–4/28/2022 | 0.16 | 0.06 | 2.56x | 156% |
| 4/29/2022–5/25/2022 | 0.19 | 0.08 | 2.5x | 150% |
| 5/26/2022–6/28/2022 | 0.16 | 0.04 | 3.74x | 274% |
| 6/29/2022–7/26/2022 | 0.16 | 0.07 | 2.24x | 124% |
| 7/27/2022–8/25/2022 | 0.24 | 0.06 | 3.89x | 289% |
| 8/26/2022–9/27/2022 | 0.20 | 0.07 | 2.8x | 180% |

| | | | |
|---|---|---|---|
| 9/28/2022–10/26/2022 | 0.20 | 0.06 | 3.16x | 216% |
| 10/27/2022–11/23/2022 | 0.22 | 0.09 | 2.45x | 145% |
| 11/24/2022–12/22/2022 | 0.20 | 0.07 | 2.96x | 196% |
| 12/23/2022–1/25/2023 | 0.20 | 0.07 | 2.86x | 186% |
| 1/26/2023–2/25/2023 | 0.17 | 0.06 | 2.81x | 181% |

70.     The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff Schuster's account and RG&E's contemporaneous rates. Eligo's rate was more than **double** RG&E's rate in **every** billing period and more than **triple** RG&E's rate in ten billing periods.  On average, Eligo's rates were **more than triple** RG&E's rates.

71.     The local utility's rates are a reasonable, pre-discovery benchmark of the four cost-related factors in Eligo's customer contract.  As explained above, the local utility is Eligo's primary competitor in Plaintiffs' service territories, and the local utilities' supply rates reflect the wholesale cost of energy and the cost of related ancillaries—the same costs that ESCOs like Eligo incur in New York.  In markets outside of New York where Eligo incurs transportation costs and taxes, the local utilities' rates would also reflect those costs.  Thus, the utility's rate is an ideal stand in for a rate that reflects the cost-factors in Eligo's contract.

72.     The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to calculate rates in accordance with the contract's exclusive factors and instead results from Eligo's profit gouging.

73.     Further, Eligo's contract with Plaintiffs does not allow it to include the price of obtaining renewable energy credits or carbon offsets for energy supply.  Even if it did, however, the cost of obtaining said credits or offsets for thirty percent of the energy it supplied to Plaintiffs

and the Class is very small and does not account for Eligo's high rates.  For example, the cost to purchase renewable energy credits for thirty percent of the electricity Eligo supplied to Plaintiffs would have been, on average, less than a penny per kWh—approximately 3% of Eligo's average rate.[43]  Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and these costs cannot explain Eligo's exorbitant rates.

### *Benchmark Two: Eligo's Own Fixed Rates*

74.     Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add ***lower*** margins to its variable rates.  Yet the opposite is true.

75.     That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates did not comply with the contract's rate-setting formula.  For example, from the first quarter of 2022 through the end of 2023, Eligo's variable rate was always substantially higher than its fixed rate:[44]

---

[43] Eligo's contracts state that its electricity products "are derived from at least 30% renewable sources."  Ex. A at 3; Ex. B at 2.

[44] *See* Actual Weighted Average Historic Price for Electric Supply as Reported by the Supplier in 14850, NYS Power to Choose, *available at* https://documents.dps.ny.gov/PTC/historic-pricing/14850/1/335,179/975 (last visited Feb. 20, 2024).



76.     There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers.  Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different.  In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy.  The only reason that Eligo's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's pricing term.

77.     Eligo's rates also cannot be explained by the price of renewable energy credits.  As both variable rates and fixed rates offered by Eligo are "derived from at least 30% renewable sources," renewable energy credit pricing does not explain the discrepancy between the two pricing plans.

### *Benchmark Three: Market Supply Costs*

78.     A comparison of Eligo's rates to prevailing market costs also demonstrates that Eligo does not set rates in compliance with the contract's variable rate formula.

79.     The tables below, *see* ¶¶ 82, 86, identify (i) the variable rate Eligo charged Plaintiffs, (ii) the corresponding "Market Supply Costs," and (iii) the differences between Eligo's rates and the contemporaneous Market Supply Costs.

80.     The Market Supply Costs below are based on the costs that an ESCO incurs supplying a retail customer for each billing period, including the cost to procure renewable energy credits for thirty percent of the customer's consumption.  The Market Supply Costs for electricity include the weighted day-ahead NYISO electricity prices in Plaintiffs' respective utility zones, ancillary services costs, capacity costs, and various relatively small charges related to the NYISO (all costs that would be included in Eligo's contractual formula).  These charges are tracked by NYISO's Market Monitor, the external consultant that independently evaluates the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to NYISO's Federal Energy Regulatory Commission regulation and tariff.

81.     The Market Supply Costs represent the costs and charges that are relevant to the costs that Eligo and other ESCOs incur in providing energy to retail customers, including renewable energy credits for thirty percent of supply.  Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.  That Eligo's rates are so vastly different from Market Supply Costs demonstrates that Eligo's rates are not derived from the specific cost inputs outlined in Eligo's contract.

82.     The below chart shows a market supply comparison for Plaintiff Brous for twelve billing periods:

| Billing Period | Eligo Rate ($/kWh) | Market Supply Cost ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 10/6/2022–10/31/2022 | 0.24 | 0.06 | 4.11x | 311% |
| 11/1/2022–12/5/2022 | 0.24 | 0.04 | 5.52x | 452% |
| 12/6/2022–1/3/2023 | 0.24 | 0.09 | 2.57x | 157% |
| 1/4/2023–2/1/2023 | 0.24 | 0.05 | 4.62x | 362% |
| 2/2/2023–3/1/2023 | 0.24 | 0.05 | 4.64x | 364% |
| 3/2/2023–4/3/2023 | 0.19 | 0.04 | 5.26x | 426% |
| 4/4/2023–5/2/2023 | 0.19 | 0.04 | 4.69x | 369% |
| 5/3/2023–5/31/2023 | 0.18 | 0.04 | 4.94x | 394% |
| 6/1/2023–7/3/2023 | 0.18 | 0.04 | 4x | 300% |
| 7/4/2023–8/2/2023 | 0.17 | 0.07 | 2.56x | 156% |
| 8/3/2023–9/1/2023 | 0.17 | 0.05 | 3.15x | 215% |
| 9/2/2023–10/2/2023 | 0.20 | 0.06 | 3.45x | 245% |

83.     Again, Eligo's other supply costs are minimal compared to its wholesale supply costs and the table above shows that its variable rates are consistently and substantially higher than a rate based on wholesale costs, which further demonstrates that Eligo's rates are not calculated based on the factors set forth in its customer contract.

84.     Eligo's rates charged to Plaintiff Brous were more than *triple* the Market Supply Costs in nearly every period, were more than *five times* Market Supply Costs twice, and were, on average, *more than four times higher than* Market Supply Costs.

85.     Eligo's rates also fail to fluctuate in accordance with Market Supply Costs.  For instance, between October 6, 2022 and February 1, 2023, Market Supply Costs varied by a difference of at least 33% every month, yet Eligo's variable rate remained constant—and

outrageously high—at $0.24/kWh. That Eligo's rates do to track the Market Supply Costs is further proof that Eligo is not following its contractual commitment to charge variable rates "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" and is instead levying an excessive and unreasonable fluctuating margin.

86. The below chart shows the same analysis for Plaintiff Schuster for twenty billing periods:

| Billing Period | Eligo Rate ($/kWh) | Market Supply Costs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/25/2021–7/27/2021 | 0.16 | 0.05 | 3.15x | 215% |
| 7/28/2021–8/25/2021 | 0.16 | 0.05 | 2.92x | 192% |
| 8/26/2021–9/24/2021 | 0.16 | 0.05 | 2.94x | 194% |
| 9/25/2021–10/26/2021 | 0.17 | 0.06 | 2.84x | 184% |
| 10/27/2021–11/24/2021 | 0.17 | 0.06 | 2.97x | 197% |
| 11/25/2021–12/27/2021 | 0.16 | 0.05 | 3.06x | 201% |
| 12/28/2021–1/26/2022 | 0.18 | 0.09 | 1.91x | 91% |
| 1/27/2022–2/25/2022 | 0.18 | 0.09 | 1.92x | 92% |
| 2/26/2022–3/25/2022 | 0.16 | 0.06 | 2.9x | 190% |
| 3/26/2022–4/28/2022 | 0.16 | 0.05 | 3.18x | 218% |
| 4/29/2022–5/25/2022 | 0.19 | 0.04 | 4.51x | 351% |
| 5/26/2022–6/28/2022 | 0.16 | 0.07 | 2.15x | 115% |
| 6/29/2022–7/26/2022 | 0.16 | 0.09 | 1.87x | 87% |
| 7/27/2022–8/25/2022 | 0.24 | 0.10 | 2.32x | 132% |
| 8/26/2022–9/27/2022 | 0.20 | 0.09 | 2.33x | 133% |
| 9/28/2022–10/26/2022 | 0.20 | 0.06 | 3.37x | 237% |

| 10/27/2022–11/23/2022 | 0.22 | 0.04 | 4.85x | 385% |
| 11/24/2022–12/22/2022 | 0.20 | 0.06 | 3.24x | 224% |
| 12/23/2022–1/25/2023 | 0.20 | 0.07 | 2.78x | 178% |
| 1/26/2023–2/25/2023 | 0.17 | 0.05 | 3.46x | 246% |

87.     Eligo's rates were higher than the Market Supply Costs for all provided months and were, on average, ***nearly triple*** Market Supply Costs.

88.     Eligo's rates for Plaintiff Schuster also fail to fluctuate in accordance with Market Supply Costs.  To take one example, between August 26, 2022 and November 23, 2022, Market Supply Costs steadily declined from $0.09/kWh to $0.04/kWh—a decrease of over 50%—while at the same time, Eligo's rates ***increased*** from $0.20/kWh to $0.22/kWh.  This again demonstrates that Eligo prioritized its profits over adherence to the terms of its contract.

89.     Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to market prices but are instead outrageously higher.

90.     No reasonable consumer who knew the truth about Eligo's exorbitant rates would have chosen it as an energy supplier.

91.     Eligo lulled customers into purchasing its energy supply via material misrepresentations and omissions about its variable energy rates.  Eligo did so to reap excessive profits at the expense of unsuspecting customers.  Eligo acted with actual malice, or wanton and willful disregard for customers' well-being.

92.     In this case, Eligo knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

93.     It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[45] and "Nudges."[46]

94.     Eligo's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that customers will compare Eligo's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

95.     Eligo did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates customers' local utilities charge.  Eligo likewise failed to adequately disclose to Plaintiffs that in paying Eligo's variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from their local utility.

96.     Eligo knew that its variable rates were consistently and significantly higher than the local utility's rates.

---

[45] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[46] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

97. Eligo's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

98. Moreover, Eligo at no time alerted or informed Plaintiffs that the cost for energy would be continuously *significantly* higher than the same energy sold by their local utility.

99. A reasonable consumer understands and expects that variable energy rates will reflect the wholesale price for the commodity, that is, the wholesale market price available to Eligo for the energy it in turn supplies to its retail customers.

100. However, Eligo's variable rates are much higher than wholesale market price of energy in New York.

101. Eligo's omissions with respect to the rates it would charge were materially misleading.

102. Given that Eligo has engaged in a series of deceptive acts and omissions for which it billed customers and customers continued to pay, the continuing violation doctrine applies.

**E.    Eligo Violated New York's Variable Rate Disclosure Law**

103. Because of the New York Legislature's concerns with skyrocketing variable rates, New York adopted N.Y. Gen. Bus. Law § 349-d(7), which requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."   The law is explicitly designed to allow energy consumers to make informed choices: "These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed

decisions on their choices for gas and electric service . . . ."[47]

104.    Through its conduct, Eligo violated both the spirit and letter of N.Y. Gen. Bus. Law § 349-d(7).

105.    Eligo's marketing material Welcome Letter that it mailed directly to Plaintiffs never clearly and conspicuously identified that it would be charging its customers a variable rate. Specifically, the Welcome Letter does not mention whatsoever that Eligo will charge its customers a variable rate.  In fact, the word "variable" does not appear anywhere in this marketing material.

## CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential and commercial customers in the United States who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment (the "Class").

107.    Plaintiffs also bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all New York residential and commercial customers who were charged for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment (the "New York Subclass").

108.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class—their marketing and billing practices—and this case is about the

---

[47] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 4 (2009).

responsibility of Defendants for their knowledge and conduct in deceiving its customers. This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions. Upon information and belief, the variable rate provisions in the customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

109. Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

110. Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

111. Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Eligo. Plaintiffs believe, however, that based on the publicly available data concerning Eligo's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

112. The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

113.     Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

114.     Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

115.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

    a.  Whether Eligo's misrepresentations and omissions are materially misleading;

    b.  Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c.  Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

    d.  Whether Eligo's conduct violates various state consumer protection and unfair competition statutes;

    e.  Whether Eligo was unjustly enriched as a result of its conduct;

    f.  Whether Class Members have been injured by Eligo's conduct;

    g.  Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices; and

    h.  The extent of class-wide injury and the measure of damages for those injuries.

116.    A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

117.    A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

118.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

119.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

    a. Whether Eligo's misrepresentations and omissions are materially misleading;

    b. Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c. Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

    d. Whether Eligo's conduct violates various state consumer protection and unfair competition statutes;

    e. Whether Eligo was unjustly enriched as a result of its conduct;

    f. Whether Class Members have been injured by Eligo's conduct; and

      g.  Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices.

120.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### Breach Of Contract
### (On Behalf Of The Class)

121.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

122.    Eligo customers have customer agreements whose variable rate terms are substantially similar.

123.    Plaintiffs and the Class entered into valid contracts with Eligo for the provision of electricity.

124.    Eligo represents in its customer contract that its variable rate for electricity will be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."  Eligo further represents that its variable rate "may be periodically adjusted for market conditions" and that "[a]pplicable taxes will be factored into the variable price."

125.    Upon information and belief, Plaintiffs were subject to the same or substantially similar contractual terms as all of Eligo's variable rate customers in the United States.

126.    Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Eligo charged for natural gas and electricity.

127.    However, Eligo failed to perform its obligations under its contracts to charge rates

in accordance with the formula set forth in its contracts. Instead, Eligo charged variable rates for natural gas and electricity that were untethered from the formula upon which the parties agreed the rate would be based.

128. Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged a variable rate calculated from the formula identified in Eligo's customer contract.

129. By reason of the foregoing, Eligo is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## <u>COUNT II</u>
### In The Alternative, Breach Of The Implied Covenant Of Good Faith And Fair Dealing (On Behalf Of The Class)

130. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131. Plaintiffs and the Class contracted with Eligo for the provision of natural gas and electricity supply.

132. Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms. This cause of action is pleaded in the alternative to Plaintiffs' contract claims.

133. Under the contract, to the extent Eligo had discretion to set the variable rate for natural gas and electricity, it was obligated to exercise its discretion in good faith. Eligo exercised its discretion in bad faith. Specifically, Eligo acted with a bad motive and continued to gouge customers. Eligo has known for years (i) that its variable energy rates are consistently and

significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged. Despite this superior knowledge, Eligo acted with a bad motive and continued to gouge customers and small businesses.

134.     Eligo's failure to disclose the material information (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged  is what permitted Eligo to charge Plaintiffs whatever it wanted—unburdened by disclosing the truth about its rate setting practices—and Plaintiffs experienced the adverse consequences in the performance of the parties' agreement.

135.     Plaintiffs reasonably expected that Eligo's variable energy rates would not be continuously and significantly higher than the utility's rates or other ESCOs' rates, which provide the same energy supply as Eligo. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.

136.     Plaintiffs also reasonably expected that Eligo would refrain from price gouging.

Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo. Eligo knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

137.    Eligo breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Eligo's variable energy rate would be commensurate with Eligo's costs.

138.    As a result of Eligo's breaches, Eligo is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

### COUNT III
### Violation Of New York General Business Law § 349
### (On Behalf Of The New York Subclass)

139.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

140.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349 on their own behalf and on behalf of each member of the New York Subclass.

141.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N N.Y. Gen. Bus. Law § 349.

142.    Eligo's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

143.    Eligo has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, including:

a. Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

b. Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

c. Failing to provide customers adequate advance notice of the variable rates it would charge;

d. Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

e. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

f. Affirmatively misrepresenting the factors used to determine a customer's variable rate.

144. The above deceptive practices and acts by Eligo were material misrepresentations or omissions of existing or past facts.

145. Eligo knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

146. The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

147. Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

148. Each of Eligo's contracts include a multi-day rescissionary period. During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates

will be based upon the formula identified in the contract. Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

149. Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

150. Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

151. Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

152. Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

153. Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

154. Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers. By making the material omissions outlined in Paragraph 143 above, Eligo deprived customers of the ability to make informed purchasing decisions.

155. Eligo's practices are unconscionable and outside the norm of reasonable business practices.

156. As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate

they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action but not less than $50 for each violation, such damages to be trebled trebled, plus attorneys' fees, and the costs of this suit.

157.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Eligo's practices to be unlawful, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

158.    As a result of Eligo's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349.

**COUNT IV**
**Violation Of New York General Business Law § 349-d(3)**
**(On Behalf Of Plaintiffs And The New York Subclass)**

159.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

160.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d on their own behalf and on behalf of each member of the New York Subclass.

161. N.Y. Gen. Bus. Law §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

162. Defendants offer for sale energy services for and on behalf of an ESCO.

163. Eligo has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349-d(3), including:

    a. Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    b. Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

    c. Failing to provide customers adequate advance notice of the variable rates it would charge;

    d. Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

    e. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

    f. Affirmatively misrepresenting the factors used to determine a customer's variable rate.

164. The above deceptive practices and acts by Eligo were material misrepresentations or omissions of existing or past facts.

165. Eligo's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy customers.

166. Eligo knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

167.     Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

168.     Each of Eligo's contracts include a multi-day rescissionary period.  During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract.  Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

169.     Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

170.     Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

171.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

172.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

173.     Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

174.     Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in

46

Paragraph 143 above, Eligo deprived customers of the ability to make informed purchasing decisions.

175. Eligo's practices are unconscionable and outside the norm of reasonable business practices.

176. As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo. By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled trebled, plus attorneys' fees, and the costs of this suit.

177. Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to N.Y. Gen. Bus. Law § 349-d(10), this Court has the power to award such relief, including but not limited to, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

## COUNT V
### Violation Of New York General Business Law § 349-d(7)
### (On Behalf Of Plaintiffs And The New York Subclass)

178. Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

179.  Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d(7) on their own behalf and on behalf of each member of the New York Subclass.

180.  Section 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  N.Y. Gen. Bus. Law § 349-d(7).

181.  The marketing materials Eligo provided to Plaintiffs and the New York Subclass fail to clearly and conspicuously disclose that Plaintiffs will be charged variable rates.

182.  Specifically, the Welcome Letter marketing material Eligo sent to Plaintiffs does not disclose that Plaintiffs would be charged variable rates.  In fact, the word "variable" does not appear anywhere in these marketing materials.

183.  Eligo's Welcome Letter constitutes independent "marketing materials" under Section 349-d(7).

184.  Through its conduct described above, Eligo has violated N.Y. Gen. Bus. Law § 349-d(7) and has caused injury to Plaintiffs and Eligo's other variable rate customers in New York.

185.  Under N.Y. Gen. Bus. Law § 349-d(10), Plaintiffs have a private right of action to enforce N.Y. Gen. Bus. Law § 349-d(7).  As a direct and proximate result of Eligo's conduct, Plaintiffs and the New York Subclass have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

186.  Plaintiffs also seek an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. Gen. Bus. Law § 349-d(10).

## COUNT VI
**Violation Of Materially Identical State Consumer Protection Statutes**
**(On Behalf Of The Class)**

187.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

188.    Pursuant to the materially identical consumer protection statutes of Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C., consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

189.    Eligo violated at least the following materially identical statutes:

    a.   Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b;

    b.   Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2;

    c.   Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-303, *et seq.*;

    d.   Massachusetts Consumer Protection law, Mass. Ann. Laws ch. 93A, § 2;

    e.   Michigan Consumer Protection Act, M.C.L. § 445.903;

    f.   New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

    g.   New York General Business Law § 349;

    h.   Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02, .03;

    i.   Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4); and

      j.   District of Columbia Consumer Protection Procedures Act, D.C. Code

         § 28-3904, *et seq.*

190.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

191.    Eligo's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

192.    Eligo has engaged in, and continues to engage in, deceptive acts and practices, including:

    a.   Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    b.   Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

    c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    d.   Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

    e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

    f.   Affirmatively misrepresenting the factors used to determine a customer's variable rate.

193.    The above unfair and deceptive practices and acts by Eligo were material omissions of existing or past facts.

194.    Eligo knew or believed that the above unfair and deceptive practices and acts were material omissions.

195.     The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

196.     Eligo first made these misrepresentations prior to the conclusion of the rescissionary period of the contract, during which Eligo's contract served as a solicitation.  The agreement is not legally binding prior to the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the costs and factors identified in the contract. Eligo also knew that its variable rate is not in fact calculated using the formula set forth in its customer contract.

197.     Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

198.     Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

199.     Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

200.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing of variable rates was premised on offering customers a lower energy rate than the customer's local utility.

201.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

202.     Eligo's omission that Eligo's variable rate for energy was consistently substantially higher than the local utility rate is material to prospective customers.

203.    Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 192 above, Eligo deprived customers of the ability to make informed purchasing decisions.

204.    Eligo's practices are unconscionable and outside the norm of reasonable business practices.

205.    As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the factors outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

206.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. This Court has the power to award such relief, including but not limited to, an order declaring Eligo's practices to be unlawful, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

207.    As a result of Eligo's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

## COUNT VII
### In The Alternative, Unjust Enrichment
### (On Behalf Of The Class)

208.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

209.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs does not intend to proceed with their unjust enrichment claim.

210.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Eligo by contracting with Eligo for electricity or natural gas.  Plaintiffs and the Class would not have contracted with Eligo for electricity and natural gas had they known that Eligo would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

211.    Plaintiffs and the Class Members would not have purchased energy from Eligo had they known the truth about Eligo's variable energy rates.

212.    By engaging in the conduct described above, Eligo has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

213.    It would be unjust and inequitable for Eligo to retain the payments Plaintiffs and Class Members made for excessive energy charges.

214.    Therefore, Eligo is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Eligo's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)     Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)     Find and declare that Defendants have committed the violations of law alleged herein;

(c)     Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)     Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(e)     Render an award of punitive damages;

(f)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

## NOTICE TO ATTORNEYS GENERAL

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 I.L.C.S § 505/10a(d).

Dated: February 20, 2024
New York, New York                              **WITTELS MCINTURFF PALIKOVIC**

                                        By:     *J. Burket McInturff*
                                                J. Burkett McInturff
                                                305 BROADWAY, 7TH FLOOR

NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com

D. Greg Blankinship
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# Exhibit A



201 W. Lake St. Ste 151
Chicago, IL 60606

July 13, 2017

Dear IRA BROUS,

Welcome to Eligo Energy, authorized supplier of NYSEG. We're excited about your activation!

In the next few days, you will be receiving a notice from NYSEG of change of your supplier to Eligo Energy, LLC. You will still remain a customer of NYSEG, and they will continue to handle your billing, as well as any and all service issues. There will be no lapse in your electricity service.

Enclosed for your records are:

- a copy of the terms and conditions of your agreement with Eligo Energy
- the New York ESCO Consumers Bill of Rights

If your account is tax exempt, fax or email a copy of your Exempt Certificate to 1-312-380-0186 or customerservice@eligoenergy.com. Please be sure to include your utility account number.

If you have any questions regarding your energy bill or are dissatisfied with Eligo Energy in any way, please call customer service at 1-888-744-8125.

As your local utility, NYSEG will continue to read your meter, handle any power outages or emergency services, and continue to send you your bill.

Thank you for your business!

Sincerely,
Eligo Energy

July 13, 2017

**New York State Public Service Commission**
**Your Rights as an Energy Services Company Consumer**
**ESCO Consumers Bill of Rights**

Customers can purchase energy from an Energy Services Company (ESCO) or from a traditional utility. If you choose to purchase energy from an ESCO you are entitled to:

- A clear description of the services offered by the ESCO.
- Receive energy delivery and 24 hour emergency services from your utility company.
- Clear procedures for switching energy suppliers, including information about the enrollment process.
- Disclosure, in simple and clear language, of the terms and conditions of the agreement between you and the ESCO including:
  - price and all variable charges or fees;
  - length of the agreement;
  - terms for renewal of the agreement;
  - cancellation process and any early termination fees, which are limited by law; and
  - conditions, if any, under which the ESCO guarantees cost savings.
- Rescind an agreement with an ESCO within three days of receiving the agreement, if you are a residential customer.
- A description of how pre payment agreements work, if offered.
- Notice from the ESCO, no less than thirty days prior to the contract renewal date, of the renewal terms and the options you have as a customer.
- A fair and timely complaint resolution process.
- Provision of any written documents (contracts, marketing materials, and this ESCO Consumers Bill of Rights) in the same language used to enroll you as a customer.

If you are a residential customer you are also entitled to the rights and protections of the Home Energy Fair Practices Act (HEFPA) which requires that all utility customers be treated fairly with regard to application for service, customer billing, and complaint procedures. For more information go to www.dps.ny.gov/resright.html.

ESCOs that do not assure these consumer rights could lose their eligibility to provide service in New York. Please report any complaints to the Department of Public Service at 1 800 342 3377 (8:30 am    4:00 pm), by mail at Office of Consumer Services, NYS Department of Public Service, 3 Empire State Plaza, Albany, NY 12223, or online at http://www.dps.ny.gov.

You can find more information about your energy alternatives by visiting: www.AskPSC.com

**Eligo Energy NY, LLC Terms of Service**

**New York · Residential Customer**

This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of New York State Electric and Gas Corporation ("NYSEG" or "Utility").

| Price | First 6 months at a fixed rate of $0.07990 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
|---|---|
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 6 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

**Service:** Customer will begin receiving electricity at the time of the first scheduled meter reading by the Utility after the date on which Customer is eligible to switch suppliers. Supply of energy to Customer shall continue pursuant to this Agreement. By executing or approving this Agreement, under the terms of New York's Utility Energy Service Company (ESCO) Referral Program, Customer agrees to initiate service and begin enrollment.

**Price:** All electricity products described herein are derived from at least 30% renewable sources. For fixed price products during the Initial Term, Customer shall pay the fixed generation rate and a monthly charge as provided in the Agreement Summary after enrollment at the next applicable billing period. For Eligo Energy's All-inclusive products, the electricity service is inclusive of all Expected Monthly Usage for a flat monthly fee as provided in the Agreement Summary. Expected Monthly Usage is calculated based on customer historical usage. For usage significantly exceeding Expected Monthly Usage, each additional kWh exceeding the limit providing in the Agreement Summary will be charged at the overage rate as provided in the Agreement Summary. Following the Initial Term as provided in the Agreement Summary, the generation rate will continue as a monthly variable rate that may be periodically adjusted to market conditions. Customer may compare price terms by looking at the rates posted on Supplier's website (http://www.eligoenergy.com) and on Customer's monthly bill. In addition, Customer shall pay and be responsible for all other amounts, such as service and delivery charges, from the Utility, including any applicable taxes. Customer also understands that the Utility may charge a switching fee when enrolling with Supplier. Customer is responsible for cancelling any existing supplier agreement.

**Customer Eligibility:** To be eligible for Eligo All-inclusive service, customers must have 12 months of usage history for their current residence and are not enrolled in budget billing or other public assistance programs.

**Right of Rescission:** Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time.

**Term:** Service with Supplier will commence 2017-08-03. Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer.

**Cancellation:** Customer may cancel this Agreement, for any reason, at any time, as provided in the Agreement Summary. The cancellation becomes effective when Customer's new supplier or the Utility completes the change. Cancellation will not relieve Customer of any payment obligations for electricity provided to Customer by Supplier before cancellation. Customer may make such a cancellation by contacting Supplier or the Utility (orally, electronically or in writing). Customer may not be served under the same rates, terms, and conditions that apply to others when switching back to the Utility. Supplier may revert Customer to Utility for non-payment at the time of the next meter reading with at least 15 days written notice and an opportunity to cure. A final bill will be rendered within twenty (20) days after the final scheduled meter reading or, if access is unavailable, an estimate of consumption will be used in the final bill, which will be reconciled subsequent to the final meter reading.

**Billing:** Supplier will serve only the supply portion of Customer's electricity bill. All other services currently supplied by the Utility will continue to be supplied by the Utility. Customer will continue to receive one monthly electric bill processed and provided by the Utility in accordance with its billing practices. At the present time, Supplier is able to offer budget billing for the generation portion of the bill to Customers who qualify under New York's Home Energy Fair Practices Act (HEFPA). In the event of Customer bankruptcy, late payment, or nonpayment, Supplier has the right to cancel this Agreement.

**Collection of Past Due Charges:** Utility will remain responsible for collecting late payments. The utility will charge 1.50% of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance.

**Environmental Disclosure Information:** Supplier will provide to the Customer, with the Agreement, information (accompanying the Agreement) regarding the approximate generation resource mix and environmental characteristics of the power supplies.

**Confidentiality:** Supplier will not disclose Customer's social security number and/or account number(s) without the Customer's consent except for the Supplier's own collections and credit reporting efforts, participation in programs funded by the Universal Service Fund, or assigning Customer's Agreement to another supplier.

**Contact Information:** In the event of an emergency such as a power failure, downed power line, or other life-threatening emergency, Customer should contact the Utility at 1-800-572-1111 (toll free) or Emergency Services at 911. For other service matters Customer can call Utility at 1-800-572-1111 (toll-free). For all other inquiries, time, Customer may contact Supplier at 1-888-744-8125, 24 hours a day and 7 days a week. Customer shall contact Supplier with any change in Customers email address and/or withdrawal of consent for electronic retention of Customer information. If Customer's complaint is not resolved after they have called Supplier and/or Utility, or for general Utility information, Customer may contact the New York State Department of Public Service for assistance at 1-888-697-7728 from 6 a.m. ET to 5 p.m. ET weekdays or at http://www.dps.ny.gov/.

**Dispute Resolution:** In the event of a billing dispute or a disagreement involving Supplier's service hereunder, the parties will use their best efforts to resolve the dispute. Customer should contact Supplier by telephone or in writing as provided above. The dispute or complaint relating to Customer may be submitted by either party at any time to the New York State Department of Public Service ("NYDPS") pursuant to its Complaint Handling Procedures ("Procedures") by calling the NYDPS at 1-888-697-7728 or by writing to the NYDPS at: New York State Department of Public Service, Empire State Plaza Agency Building 3, Albany, NY 12223-1350, or through its website at: http://www.dps.ny.gov/. During the pendency of any dispute, Customer must pay the bill in full minus the specific disputed amount. Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms herein shall lie exclusively in the New York. This Agreement shall be construed under and shall be governed by the laws of the New York without regard to application of its conflicts of laws and principles.

**Customer Relocation:** If Customer moves to a new address within Supplier's current service territory, Customer should contact Supplier in order to re-enroll at the new location.

**Changes to Agreement:** This is an Agreement for residential service. In the event that Customer's account under this Agreement is not a residential account and for other reasons provided herein, Supplier may modify this Agreement at any time from residential to commercial terms. Supplier may modify this Agreement, or change these terms in connection with any renewal of this Agreement, or if there are adverse changes in the laws, rules or market conditions affecting Supplier's ability to perform hereunder, by providing thirty (30) to sixty (60) days prior written notice.

**Assignment:** Customer may not assign this Agreement without Supplier's written consent. Customer hereby acknowledges and consents to Supplier's pledge and contingent assignment or subrogation of any and all rights and obligations hereunder. This Agreement is binding upon Customer and Supplier, and each party's heirs, successors and permitted assigns. Any required notice of assignment will be considered complete when it is mailed to the Customer's address on file with the Supplier. There are no third-party beneficiaries to this Agreement.

**Limitations of Liability:** Neither the Customer nor the Supplier shall assume liability or responsibility for any special, indirect, consequential or punitive damages for items associated with the failure of Utility to perform its duties, including but not limited to operations and maintenance of their system or interruptions of service, termination of service, or from damages arising from structural damage as a result of negligence.

**Authorization:** Customer authorizes Supplier to obtain and review information regarding the customer's credit history from credit reporting agencies, and the following information from the Utility: consumption history, billing determinants, credit information, public assistance status, existence of medical emergencies, status as to whether Customer has a medical emergency, is human needs, elderly, blind or disabled and data applicable to cold weather periods under PSL § 32 (3); and information pertaining to PSL § 33, tax status and eligibility for economic development or other incentives. This information may be used by Supplier to determine whether it will commence and/or continue to provide energy supply service to Customer and will not be disclosed to a third-party unless required by law. Customer's execution of this Agreement shall constitute authorization for the release of this information to Supplier. This authorization will remain in effect during the term of this Agreement. Customer may rescind this authorization at any time by providing written notice thereof to Supplier or calling Supplier at 1-888-744-8125. Supplier reserves the right to cancel this Agreement in the event Customer rescinds the authorization.

**Agreement Summary**

| Contact Information | |
|---|---|
| Sales Rep | Webform CEP |
| Customer | Ira Brous |
| Contact Name | |
| Contact Phone | ██████████ |
| Contact Email | |
| Utility | New York State Electric and Gas Corporation |
| Mailing/Billing/Service Address | ██████████ Ithaca NY ██████ |

| Custom Product Types | | | | |
|---|---|---|---|---|
| Choose One | Initial Term | Price | Product | Cancellation Service Charge |
| ☐ | 6 months | $0.07990 / kWh | Fixed - Residential (30.0% Renewable) | No Cancellation Service Charges. |

| Utility Account Numbers |
|---|
| ██████████ |

| Additional Info | |
|---|---|
| ICAP | 1.31 kW |
| Estimated Annual Usage | 14.0 MWh |

For each location, term shall start after the first applicable meter read cycle after **August 3, 2017**.

✓ Customer indicated that he has read and agreed to the Terms of Service and affirmed that he is an authorized decision-maker for this energy account.

Additional data recorded during customer enrollment:

| | |
|---|---|
| Date and Time of Enrollment | 2017-07-13 17:41:19 UTC |
| Customer Eligo Account Number | ██████████ |
| Customer IP Address | unknown |

# Exhibit B



201 W. Lake St. Ste 151
Chicago, IL 60606

October 09, 2016

Dear Michelle Schuster,

Welcome to Eligo Energy, authorized supplier of RG&E. We're excited about your activation!

In the next few days, you will be receiving a notice from RG&E of change of your supplier to Eligo Energy, LLC. You will still remain a customer of RG&E, and they will continue to handle your billing, as well as any and all service issues. There will be no lapse in your electricity service.

Enclosed for your records are:

- a copy of the terms and conditions of your agreement with Eligo Energy
- the New York ESCO Consumers Bill of Rights

**You may be eligible for more savings via our all-inclusive product. Call to find out if you qualify at 1-888-744-8125**

If your account is tax exempt, fax or email a copy of your Exempt Certificate to 1-312-380-0186 or customerservice@eligoenergy.com. Please be sure to include your utility account number.

If you have any questions regarding your energy bill or are dissatisfied with Eligo Energy in any way, please call customer service at 1-888-744-8125, Monday through Friday, 9AM-6PM ET.

As your local utility, RG&E will continue to read your meter, handle any power outages or emergency services, and continue to send you your bill.

Thank you for your business!

Sincerely,
Eligo Energy

October 09, 2016

**Eligo Energy NY, LLC Terms of Service**
**New York - Residential Customer**
This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of Rochester Gas and Electric ("RG&E" or "Utility").

| | |
|---|---|
| Price | First 3 months at a fixed rate of $0.05490 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 3 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

**Service:** Customer will begin receiving electricity at the time of the first scheduled meter reading by the Utility after the date on which Customer is eligible to switch suppliers. Supply of energy to Customer shall continue pursuant to this Agreement. By executing or approving this Agreement, under the terms of New York's Utility Energy Service Company (ESCO) Referral Program, Customer agrees to initiate service and begin enrollment. **Price:** All electricity products described herein are derived from at least 30% renewable sources. For fixed price products during the Initial Term, Customer shall pay the fixed generation rate and a monthly charge as provided in the Agreement Summary after enrollment at the next applicable billing period. For Eligo Energy's All-Inclusive products, the electricity service is inclusive of all Expected Monthly Usage for a flat monthly fee as provided in the Agreement Summary. Expected Monthly Usage is calculated based on customer historical usage. For usage significantly exceeding Expected Monthly Usage, each additional kWh exceeding the limit providing in the Agreement Summary will be charged at the overage rate as provided in the Agreement Summary. Following the Initial Term as provided in the Agreement Summary, the generation rate will continue as a monthly variable rate that may be periodically adjusted to market conditions. Customer may compare price terms by looking at the rates posted on Supplier's website (http://www.eligoenergy.com) and on Customer's monthly bill. In addition, Customer shall pay and be responsible for all other amounts, such as service and delivery charges, from the Utility, including any applicable taxes. Customer also understands that the Utility may charge a switching fee when enrolling with Supplier. Customer is responsible for cancelling any existing supplier agreement.
**Customer Eligibility:** To be eligible for Eligo All-Inclusive service, customers must have 12 months of usage history for their current residence and are not enrolled in budget billing or other public assistance programs.
**Right of Rescission:** Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time.
**Term:** Service with Supplier will commence with the next available meter reading after the Utility and Supplier process the request.Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer.
**Cancellation:** Customer may cancel this Agreement, for any reason, at any time, as provided in the Agreement Summary.The cancellation becomes effective when Customer's new supplier or the Utility completes the change. Cancellation will not relieve Customer of any payment obligations for electricity provided to Customer by Supplier before Cancellation. Customer may make such a cancellation by contacting Supplier or the Utility (orally, electronically or in writing). Customer may not be served under the same rates, terms, and conditions that apply to others when switching back to the Utility. Supplier may revert Customer to Utility for non-payment at the time of the next meter reading with at least 15 days written notice and an opportunity to cure. A final bill will be rendered within twenty (20) days after the final scheduled meter reading or, if access is unavailable, an estimate of consumption will be used in the final bill, which will be reconciled subsequent to the final meter reading.
**Billing:** Supplier will serve only the supply portion of Customer's electricity bill. All other services currently supplied by the Utility will continue to be supplied by the Utility. Customer will continue to receive one monthly electric bill processed and provided by the Utility in accordance with its billing practices. At the present time, Supplier is able to offer budget billing for the generation portion of the bill to Customers who qualify under New York's Home Energy Fair Practices Act (HEFPA). In the event of Customer bankruptcy, late payment, or nonpayment, Supplier has the right to cancel this Agreement.
**Collection of Past Due Charges:** Utility will remain responsible for collecting late payments. The utility will charge 1.50% of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance.
**Environmental Disclosure Information:** Supplier will provide to the Customer, with the Agreement, information (accompanying the Agreement) regarding the approximate generation resource mix and environmental characteristics of the power supplies.
**Confidentiality:** Supplier will not disclose Customer's social security number and/or account number(s) without the Customer's consent except for the Supplier's own collections and credit reporting efforts, participation in programs funded by the Universal Service Fund, or assigning Customer's Agreement to another supplier.
**Contact Information:** In the event of an emergency such as a power failure, downed power line, or other life-threatening emergency, Customer should contact the Utility at 1-800-743-2110 (toll free) or Emergency Services at 911. For other service matters Customer can call Utility at 1-800-743-2110 (toll-free). For all other inquiries, the Customer may contact Supplier at 1-888-744-8125, 24 hours a day and 7 days a week. Customer shall contact Supplier with any change in Customer's email address and/or withdrawal of consent for electronic retention of Customer information. If Customer's complaint is not resolved after they have called Supplier and/or Utility, or for general Utility information, Customer may contact the New York State Department of Public Service for assistance at 1-888-697-7728 from 6 a.m. ET to 5 p.m. ET weekdays or at http://www.dps.ny.gov/.
**Dispute Resolution:** In the event of a billing dispute or a disagreement involving Supplier's service hereunder, the parties will use their best efforts to resolve the dispute. Should Customer contact Supplier by telephone or in writing as provided above. The dispute or complaint relating to Customer may be submitted by either party at any time the New the New York State Department of Public Service ("NYDPS") pursuant to its Complaint Handling Procedures ("Procedures") by calling the NYDPS at 1-888-697-7728 or by writing to the NYDPS at: New York State Department of Public Service, Empire State Plaza Building 3, Albany, NY 12223-1350, or through its website at: http://www.dps.ny.gov/. During the pendency of any dispute, Customer must pay the bill in full minus the specific disputed amount. Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms herein shall lie exclusively in the New York. This Agreement shall be construed under and shall be governed by the laws of the New York without regard to application of its conflicts of laws and principles.
**Customer Relocation:** If Customer moves to a new address within Supplier's current service territory, Customer should contact Supplier in order to re-enroll at the new location.
**Changes to Agreement:** This is an Agreement for residential service. In the event that Customer's account under this Agreement is not a residential account and for other reasons provided herein, Supplier may modify this Agreement at any time from residential to commercial terms. Supplier may modify this Agreement, or change these terms in connection with any renewal of this Agreement, or if there are adverse changes in the laws, rules or market conditions affecting Supplier's ability to perform hereunder, by providing thirty (30) to sixty (60) days prior written notice.
**Assignment:** Customer may not assign this Agreement without Supplier's written consent. Customer hereby acknowledges and consents to Supplier's pledge and contingent assignment or subrogation of any and all rights and obligations hereunder. This Agreement is binding upon Customer and

Supplier, and each party's heirs, successors and permitted assigns. Any required notice of assignment will be considered complete when it is mailed to the Customer's address on file with the Supplier. There are no third-party beneficiaries to this Agreement.

**Limitations of Liability:** Neither the Customer nor the Supplier shall assume liability or responsibility for any special, indirect, consequential or punitive damages for items associated with the failure of Utility to perform its duties, including but not limited to operations and maintenance of their system or interruptions of service, termination of service, or from damages arising from structural damage as a result of negligence.

**Authorization:** Customer authorizes Supplier to obtain and review information regarding the customer's credit history from credit reporting agencies, and the following information from the Utility: consumption history, billing determinants, credit information, public assistance status, existence of medical emergencies, status as to whether Customer has a medical emergency, is human needs, elderly, blind or disabled and data applicable to cold weather periods under PSL § 32 (3); and information pertaining to PSL § 33, tax status and eligibility for economic development or other incentives. This information may be used by Supplier to determine whether it will commence and/or continue to provide energy supply service to Customer and will not be disclosed to a third-party unless required by law. Customer's execution of this Agreement shall constitute authorization for the release of this information to Supplier. This authorization will remain in effect during the term of this Agreement. Customer may rescind this authorization at any time by providing written notice thereof to Supplier or calling Supplier at 1-888-744-8125. Supplier reserves the right to cancel this Agreement in the event Customer rescinds the authorization.

## Agreement Summary

| Contact Information | |
|---|---|
| Customer | MICHELLE SCHUSTER |
| Contact Phone | |
| Contact Email | |
| Utility | Rochester Gas and Electric |
| Mailing/Billing/Service Address | ███████  Rochester NY ██████ |

| Custom Product Types | | | | |
|---|---|---|---|---|
| **Choose One** | **Initial Term** | **Price** | **Product** | **Cancellation Service Charge** |
| ☐ | 3 months | $0.05490 / kWh | Fixed | No Cancellation Service Charges. |

| Utility Account Numbers |
|---|
| ████████ |

| Additional Info |
|---|

| ✓ | Customer indicated that he has read and agreed to the Terms of Service and affirmed that he is an authorized decision-maker for this energy account. |
|---|---|

**New York State Public Service Commission**
**Your Rights as an Energy Services Company Consumer**
**ESCO Consumers Bill of Rights**

Customers can purchase energy from an Energy Services Company (ESCO) or from a traditional utility. If you choose to purchase energy from an ESCO you are entitled to:

- A clear description of the services offered by the ESCO.
- Receive energy delivery and 24 hour emergency services from your utility company.
- Clear procedures for switching energy suppliers, including information about the enrollment process.
- Disclosure, in simple and clear language, of the terms and conditions of the agreement between you and the ESCO including:
  - price and all variable charges or fees;
  - length of the agreement;
  - terms for renewal of the agreement;
  - cancellation process and any early termination fees, which are limited by law; and
  - conditions, if any, under which the ESCO guarantees cost savings.
- Rescind an agreement with an ESCO within three days of receiving the agreement, if you are a residential customer.
- A description of how pre-payment agreements work, if offered.
- Notice from the ESCO, no less than thirty days prior to the contract renewal date, of the renewal terms and the options you have as a customer.
- A fair and timely complaint resolution process.
- Provision of any written documents (contracts, marketing materials, and this ESCO Consumers Bill of Rights) in the same language used to enroll you as a customer.

If you are a residential customer you are also entitled to the rights and protections of the Home Energy Fair Practices Act (HEFPA) which requires that all utility customers be treated fairly with regard to application for service, customer billing, and complaint procedures. For more information go to www.dps.ny.gov/resright.html.

ESCOs that do not assure these consumer rights could lose their eligibility to provide service in New York. Please report any complaints to the Department of Public Service at 1-800-342-3377 (8:30 am - 4:00 pm), by mail at Office of Consumer Services, NYS Department of Public Service, 3 Empire State Plaza, Albany, NY 12223, or online at http://www.dps.ny.gov.

You can find more information about your energy alternatives by visiting: www.AskPSC.com

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TINA BODKIN** and **THOMAS BODKIN**, on behalf of themselves and all others similarly situated, | Civil Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **ELIGO ENERGY, LLC** and **ELIGO ENERGY PA, LLC**, | **JURY TRIAL DEMANDED** |
| Defendants | |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................. 1

PARTIES ....................................................................................................... 3

JURISDICTION AND VENUE ...................................................................... 6

FACTUAL ALLEGATIONS ........................................................................... 7

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets................................ 7

    B.   Plaintiffs' Dealings With Eligo.................................................................. 20

    C.   Eligo's Unauthorized Pricing Practices ...................................................... 21

    D.   Tolling Of The Statute Of Limitations........................................................ 35

CLASS ACTION ALLEGATIONS .............................................................. 36

CAUSES OF ACTION ................................................................................. 40

COUNT I: BREACH OF CONTRACT ......................................................... 40

COUNT II: IN THE ALTERNATIVE, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ......................................... 42

COUNT III: VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ................................................ 45

COUNT IV: VIOLATION OF MATERIALLY IDENTICAL STATE CONSUMER PROTECTION STATUTES........................................................ 49

COUNT V:  IN THE ALTERNATIVE, UNJUST ENRICHMENT ............................................. 53

PRAYER FOR RELIEF ................................................................................ 54

JURY DEMAND ........................................................................................... 55

NOTICE TO ATTORNEYS GENERAL ....................................................... 55

Plaintiffs Tina Bodkin and Thomas Bodkin (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy PA, LLC (hereinafter "Eligo" or "Defendants") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.     This action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused tens of thousands of commercial and residential customers in Pennsylvania, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.     Eligo is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States. Eligo has taken advantage of deregulation to exploit customers hoping to save on their energy costs.

3.     Eligo represents in its contracts with its electricity customers like Plaintiffs that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."[1] Elsewhere, Eligo's contract states that variable electricity rates will be calculated "based on" or "based upon" specified "factors" including "PJM wholesale energy market conditions," "weather patterns," "fluctuations in energy supply and demand," and "costs to serve customers."

---

[1] "PJM" is "PJM Interconnection LLC," which operates one of the world's largest competitive wholesale electricity markets and manages the reliability of the electricity transmission grid that transports that electricity. PJM manages the buying, selling, and delivery of electricity, and coordinates the movement of wholesale electricity in all or part of 13 states (Pennsylvania, Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Tennessee, Virginia and West Virginia) and the District of Columbia.

4.     Eligo's representations to consumers about how variable energy rates are calculated are false and deceptive, and designed to take advantage of customers' good faith and their lack of knowledge about, and access to, accurate information about how Eligo in fact sets its variable rates.

5.     In reality, Eligo did not charge variable rates based on PJM wholesale market prices and a $0.01 per kWh adder. Nor did Eligo calculate its variable rates based on the factors outlined elsewhere in its contract. Instead, Eligo used a pricing methodology, undisclosed to the consumer, that set variable rates based on Eligo's assessment of how high of a rate it could charge before too many customers quit. This methodology was employed with the intent of depriving customers of the benefits of a rate calculated in the ways Eligo represented to customers.

6.     Eligo's conduct represents a classic bait and switch: tell customers specific facts about how Eligo's variable rates are derived and then charge as much as Eligo thinks the customer will stomach (or not notice).

7.     Eligo's contract does not describe such a practice. Instead, it contains multiple misleading statements about how variable rates are calculated. Eligo's contract also does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates. Nor does the contract provide Defendants with discretion to ignore the factors set forth in Eligo's contracts and then apply whatever markup it sees fit. Yet Eligo's varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment charge rates "based upon" or "based on" the specific criteria outlined in the contract.

8.      Indeed, Eligo has always followed a uniform policy of charging a rate not calculated in accordance with the way Eligo describes to customers. Eligo has also admitted that its variable rates are set using factors that are not listed in Eligo's contract.

9.      As a result of Eligo's unlawful acts described herein, tens of thousands of unsuspecting customers have been, and continue to be, fleeced by Eligo out of tens of millions of dollars in exorbitant charges for electricity and natural gas. Defendants' scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

10.     Plaintiffs and other Eligo customers (the "Class") have been injured by Eligo's unlawful practices. Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Eligo's breach of contract, breach of the duty of good faith and fair dealing, violation of state consumer protection statutes, and unjust enrichment.

11.     Only through a class action can Eligo's customers remedy its ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, many customers do not realize they are victims of Eligo's deceptive and unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Eligo engage in fair and upright business practices.

**PARTIES**

12.     Plaintiffs Tina Bodkin and Thomas Bodkin reside in Butler, Pennsylvania. Plaintiffs are married to one another, and they share a home in Butler. Plaintiffs enrolled their home's electricity account with Eligo on or around June 2018. Eligo charged Plaintiffs a fixed

rate for electricity from in or around June 2018 until in our around June 2021, after which Eligo began charging a variable rate. Plaintiffs canceled their Eligo account in or around March 2022. Unbeknownst to Plaintiffs, Eligo charged them excessive and unauthorized variable rates every month they were on Eligo's variable rate plan.

13.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiffs paid more for their home energy supply than they otherwise should have paid.

14.     Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC. On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida. Accordingly, Eligo Energy, LLC is a citizen of Florida.

15.     Defendant Eligo Energy PA, LLC is a Pennsylvania limited liability company with its principal place of business in Chicago, Illinois. On information and belief, Eligo Energy PA, LLC is a wholly owned subsidiary of Eligo Energy, LLC. Accordingly, Eligo Energy PA, LLC is a citizen of Florida.

16.     Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy PA, LLC. Eligo Energy, LLC and Eligo Energy PA, LLC hold themselves out as a single company—Eligo Energy.[2] Eligo Energy PA, LLC has no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[3] There is a unified executive team, and on information and belief they are all employed by Eligo Energy,

---

[2] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story (last visited Jan. 17, 2025).

[3] *See id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606").

LLC. That unified executive team controls all operational and financial aspects of Eligo Energy PA, LLC. For example, in a separate consumer class action pending against Eligo Energy NY, LLC in the United States District Court for the Southern District of New York, the New York LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the Eligo brand nationally. Defendants have also admitted that attorneys at Eligo Energy, LLC were responsible for drafting customer communications and customer contracts. Defendant Eligo Energy PA, LLC's current Controller, Chief Compliance Officer, Executive Chairman, VP of Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for their employment by Eligo Energy, LLC. All of these individuals were voluntarily designated by defense counsel in the S.D.N.Y. action as key players whose ESI will be collected for search in that matter. Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant Eligo Energy PA, LLC, to perpetrate the unlawful conduct challenged in this lawsuit.

17. All of the operations and activities related to acquiring and servicing Eligo's customers (including Eligo's customers in Pennsylvania) are directed and executed by Eligo Energy, LLC, including marketing and making sales to Pennsylvania consumers, setting the exorbitant variable rates for those customers, purchasing electricity at wholesale, and handling billing and other back office activities. Eligo Energy, LLC also owns and operates the computer software and hardware used to set rates for all Eligo customers, including Eligo's customers in Pennsylvania. Eligo Energy, LLC employs the individuals that conducted the activities challenged in this litigation. For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy, LLC's executive team sets pricing strategy for New York customers. Those individuals include Eligo Energy, LLC's CEO, head of Risk team, and CIO. Eligo Energy NY, LLC's 30(b)(6) witness also testified that he did not know if a separate group of people manage

Eligo Energy NY, LLC as opposed to Eligo Energy, LLC, he could not identify documents that list the names or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo Energy NY, LLC.

18.     Eligo Energy, LLC also holds itself out to customers as their supplier of electricity and the contracting entity.  Although Plaintiffs' contract with Eligo states that the agreement is between Plaintiffs and Eligo Energy PA, LLC, the cover letter enclosing Eligo's contract, bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606

The letter further states that "[i]n the next few days, you will be receiving a notice from [the local utility] of change of your supplier ***to Eligo Energy, LLC***." (Emphasis added).  Eligo's cover letter also states that they enclose "a copy of the Terms of Service with Eligo Energy" and are signed "Sincerely, Eligo Energy."

19.     Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy PA, LLC as a separate entity.  Rather, it used the corporate entity Eligo Energy PA, LLC interchangeably with itself.  For example, invoices for wholesale electricity purchases from the New York Independent System Operator (NYSIO) for Eligo's New York customers were addressed to "Eligo Energy, LLC."  Similarly, invoices from New York electric utility companies (NY State Electric & Gas Corporation and Rochester Gas & Electric) addressed to "Eligo Energy NY, LLC" were paid from an account controlled by Defendant Eligo Energy, LLC.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

20.     This Court has jurisdiction over the claims asserted in this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and at least one Defendant.

*Personal Jurisdiction*

21.     This Court has General and Specific Personal Jurisdiction over Defendant Eligo Energy PA, LLC because it is a Pennsylvania limited liability company, and it advertises, markets, distributes, and sells energy to Pennsylvania customers, including Plaintiffs.  This Court has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets, distributes, and sells energy to Pennsylvania customers, including Plaintiffs.

*Venue*

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1).  Both Defendants are limited liability companies that are deemed to reside in any judicial district in which they are subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this District under § 1391(b)(1).

**FACTUAL ALLEGATIONS**

A.     **The History Of Deregulation And ESCOs' Role In Energy Markets**

23.     In the 1990s and 2000s, numerous state legislatures and state regulatory agencies, deregulated the market for retail energy supply.  Pennsylvania deregulated its electricity market in 1996. In 1999, Pennsylvania deregulates its natural gas market. Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers

and small businesses pay. As a result, the energy supply markets in Pennsylvania, New York, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, Ohio, and Washington, D.C. are open to competition, and customers and small businesses may choose their supplier.

24.    Since Pennsylvania opened its retail energy markets to competition, millions of Pennsylvania residential and small business customers have switched to an ESCO.  Deregulation laws in other states are substantially similar.

25.    ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or extract natural gas.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ESCOs merely buy electricity and natural gas and then sell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers.  The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply. The only value that ESCOs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

26.    ESCOs like Eligo do not have to file their rates with the Pennsylvania Public Utility Commission (the "PUC") nor seek approval for the method by which those rates are set.

Instead, an ESCO customer's rates are governed by the contract between the ESCO and the customer.

27.    Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility.  For example, in Pennsylvania, as in many states, the utilities charge energy supply rates that are driven by the wholesale cost of energy on the PJM, supply and demand for that energy, weather patterns, the cost to serve customers, and industry regulation—the same costs that ESCOs like Eligo incur in Pennsylvania.  Indeed, in Pennsylvania, the PUC sets the supply rate of the local utility, WestPenn Power, based on WestPenn's costs and expenses to purchase and serve energy supply to its customers.[4] WestPenn's supply rate includes both the wholesale cost of energy purchased on the competitive wholesale supply market (via a competitive auction for 6-months of supply), the cost to transmit that energy to the point of delivery where WestPenn acquires the energy from the transmission system, and WestPenn's documented overhead attributable to its acquisition of customers' energy supply.[5]

28.    ESCOs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices. But ESCOs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers, such as by purchasing futures contracts for the delivery of electricity and natural gas in the future

---

[4] First Energy Electric Company Tariff, p. 203-207, https://www.firstenergycorp.com/content/dam/customer/Customer%20Choice/Files/PA/tariffs/fe-pa-retail-tariff.pdf. WestPenn Power is a subsidiary of First Energy.

[5] *Id*.

at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

29.    Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from its commitment to charge variable rates equal to PJM wholesale market prices and a $0.01 per kWh adder. Nor did Eligo calculate its variable rates based on the factors outlined elsewhere in its contract. Instead, using a predatory pricing methodology it deceptively hid from its customers, Eligo gouged customers with exorbitant electricity rates. Accordingly, no consumer would ever agree to Eligo's variable rate-setting practices if they knew the truth.

30.    The only way Eligo can retain variable rate customers is by hiding the fact that Eligo's rates are not "based upon" PJM wholesale market prices and a $0.01 per kWh adder. Eligo also hides the fact that it did calculate and charge variable rates "based on" the factors outlined elsewhere in its contract.

31.    Instead, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" PJM wholesale market prices and then add whatever markup it chooses. To the extent Eligo claims it has discretion in setting rates (it does not), that discretion is constrained by the contract's explicit promise that the customer's rates will be "based upon" PJM wholesale market prices and a $0.01 per kWh adder. Likewise, any discretion is cabined by Eligo's statement that it will charge rates "based on" the specific factors outlined elsewhere in its customer contract. Any discretion Eligo may have had is also cabined

by customers' reasonable expectations that Eligo will not price gouge customers for the same energy sold by their local utilities.

32.     Eligo took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, Eligo exploits deregulated markets by consistently charging its customers far more than its contract permits and failing to adequately disclose how its variable rates are actually determined.

33.     One of deregulation's main unintended consequences has been the proliferation of ESCOs like Eligo whose business model is primarily based on taking advantage of customers. In restructuring the Pennsylvania electricity market, the state legislature recognized that "electricity service is essential to the health and well-being of all residents . . . and should be available to all customers on reasonable terms and conditions." 66 Pa. C.S. § 2802(9). "[I]t is now in the public interest to permit retail customers to obtain direct access to a competitive generation market [and] safe and affordable transmission and distribution service." *Id* at (3).

34.     Unfortunately, Pennsylvania's hope for a more affordable energy market for consumers has gone unfulfilled. Data collected by Pennsylvania utilities makes clear that customers who switched to ESCOs paid significantly higher rates than they otherwise would have, had they remained with the default utility. One utility, FirstEnergy Companies, found that over a 58-month period from June 2013 to March 2018, nearly 65% of its low-income customers who switched to an ESCO paid higher rates than they would have had they not switched,

resulting in $18.3 million in increased electricity costs just to low-income consumers in the utility's service territory.[6]

35.     Another utility, PPL Electric Utilities Corporation ("PPL") found that low-income consumers in its service territory who switched to ESCOs paid an additional $2,743,872 over a 12-month period.[7]

36.     A 2024 report on Pennsylvania's Standard Offer Program ("SOP") illustrates ESCOs' predatory practice of ratcheting up variable rates at the conclusion of a fixed-rate period. Under the SOP, customers are assigned to ESCOs at a heavily regulated rate "generally guaranteed to save the customer money."[8] Once this regulated rate expires, customers are automatically switched to a variable rate with the same ESCO. According the 2024 report, conducted by Pennsylvania utility Duquesne Light, 89% of customers who continued as variable rate customers with their SOP-assigned ESCO paid more in the first month than they would have paid their local utility. Within that group, 84% paid over 10% more, 38% paid between 50-100% more, and 18% paid over 100% more. In the aggregate, the approximately 4,200 consumers who remained with their ESCO for four months after the SOP term paid $486,000 more than default service during this period—an overcharge of nearly $30 per consumer per month.[9]

---

[6] Motion of Commissioner David W. Sweet, Pennsylvania PUC, Electric Distribution Company Default Service Plans—Customer Assistance Program Shopping, Public Meeting (December 20, 2018). See http://www.puc.state.pa.us//pcdocs/1599226.pdf

[7] *Id.*

[8] Statement of Vice Chair Kimberly Barrow, Docket No. P-2024-3046008, (Pa. Pub. Util. Comm'n Jan. 8, 2025).

[9] Paul Ring, Report: Nearly 40% Of Customers Remaining With Retail Supplier After End Of Standard Offer Program Paid 50-100% More Than Applicable Price To Compare, EnergyChoiceMatters.com (Jan. 1, 2025), http://www.energychoicematters.com/stories/20250101a.html.

37.     Evaluating the SOP program, PUC Vice Chair Kimberly Barrow decried ESCOs' exploitation of unsuspecting enrollees, explaining that "SOP customers . . . are rolled into higher—never lower—monthly contracts [by ESCOs] . . . which, depending on the time of year, can result in exorbitant energy bills."[10]

38.     Worse still, Pennsylvania consumers hoping for cheaper electricity have endured years unfair and deceptive marketing and sales tactics by ESCOs. In 2022 the PUC "urge[d] Pennsylvania consumers to be alert for potential energy marketing scams."[11] In 2023, the Pennsylvania Office of Consumer Advocate and Pennsylvania Office of the Attorney General "urge[d] Pennsylvanians . . . to be careful and wary about door-to-door sales of energy."[12]

39.      In 2021, Defendant Eligo Energy PA, LLC was investigated by the PUC Bureau of Investigation and Enforcement for its own misleading and deceptive marketing practices, resulting in a settlement in which Eligo paid a civil penalty of $188,125.[13]

40.     These misleading practices have been particularly harmful during periods of high electricity prices, when consumers feel more pressure to shop for lower costs and are thus more vulnerable to deceptive marketing.[14] As Patrick Cicero, then-acting Consumer Advocate for the

---

[10] Statement of Vice Chair Kimberly Barrow, Docket No. P-2024-3046008, (Pa. Pub. Util. Comm'n Jan. 8, 2025).

[11] Press Release, Pennsylvania Public Utility Commission, PUC Urges Consumers to Be Alert for Energy Marketing Scams (July 18, 2022), https://www.puc.pa.gov/press-release/2022/puc-urges-consumers-to-be-alert-for-energy-marketing-scams.

[12] Office of Att'y Gen. of Pa., *AG Henry, Office of Consumer Advocate Urge Pennsylvanians to Explore Energy Options Amidst Increases; Be Aware of Door-to-Door Solicitation*, Pa. Off. of Att'y Gen. (Oct. 18, 2023), https://www.attorneygeneral.gov/taking-action/ag-henry-office-of-consumer-advocate-urge-pennsylvanians-to-explore-energy-options-amidst-increases-be-aware-of-door-to-door-solicitation/.

[13] *Pennsylvania Public Utility Commission, Bureau of Investigation and Enforcement v. Eligo Energy PA, LLC*, Docket No. M-2020-3019204 (Pa. Pub. Util. Comm. Oct. 29, 2020) (Joint Petition for Approval of Settlement).

[14] Pennsylvania Settles with Another Energy Supplier for Deceptive Marketing During Polar

Pennsylvania Office of Consumer Advocate, noted during a 2022 period of rising electricity prices, "I'm worried this is going to be a marketer's dream. They're going to market over the fear of price increases. And you may get a deal you don't want to get."[15] Rob Ballenger, director of the energy unit at Pennsylvania's Community Legal Services, also warned of the danger ESCOs pose to consumers, saying "[i]f someone knocks on your door and says, hey, I'm here to save you money on your electricity, you should be suspicious of that. I would just say no thank you and shut the door."[16]

41.     Pennsylvania is not the only state where there is overwhelming evidence of consumer harm from ESCO practices.  A 2021 analysis by the *Wall Street Journal*, for example, found that "in nearly every state where they operate, retailers have charged more than regulated incumbents."[17] Data from Massachusetts, Connecticut, Illinois, Maine, Maryland, New York, and Pennsylvania confirm that consumers pay far too much when they sign up with ESCOs instead of sticking with their utility companies.[18]

---

Vortex, *Nat. Gas Intel.* (Dec. 29, 2015), https://naturalgasintel.com/news/pennsylvania-settles-with-another-energy-supplier-for-deceptive-marketing-during-polar-vortex/.

[15] Susan Phillips, *Consumer advocates in Pennsylvania caution against switching electric suppliers as utilities rase rates*, StateImpact Pennsylvania (June 9, 2022), https://stateimpact.npr.org/pennsylvania/2022/06/09/consumer-advocates-in-pennsylvania-caution-against-switching-electric-suppliers-as-utilities-raise-rates-2/

[16] *Id.*

[17] Scott Patterson & Tom McGinty, *Deregulation Aimed to Lower Home-Power Bills. For Many, It Didn't*, WALL ST. J. (Mar. 8, 2021), https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623?page=16.

[18] Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

42.     In 2023, both of Massachusetts' two United States Senators and a Massachusetts Member of Congress noted that "consumers—disproportionately in low-income communities and communities of color—have endured unfair and deceptive marketing and sales tactics by competitive electric suppliers, saddling those consumers with higher electric bills and costing them hundreds of millions of dollars in net losses."[19]

43.     The Legislators' Letter cites the findings of the Massachusetts Attorney General's office that "in the last seven years, individual residential customers who received their electric supply from competitive suppliers paid $607 million more on their electric bills than they would have paid to their default utility."[20] As the Massachusetts Attorney General testified to the state legislature, "these suppliers use deceptive marketing tactics that hide the fact that their products do not provide consumers with meaningful savings and in fact, can result in higher utility bills."[21] ESCOs' deceptive tactics also include, "failing to disclose industry consensus about price drops and that, if basic service prices decreased, consumers would pay higher prices under the competitive plan."[22]

44.     The Massachusetts Attorney General and the mayor of Boston noted in January 2024 that ESCOs in Massachusetts have employed "pervasive misleading marketing practices."[23]

---

[19] *Id.*

[20] *Id.* (citing Remarks of Attorney General Andrea Joy Campbell before the Joint Committee on Telecommunications, Utilities and Energy, Massachusetts House of Representatives (Sept. 21, 2023) ("MA A.G. Remarks"); *see also* Miriam Wasser, *Why a plan to drive down electric prices in Mass. Led to higher bills*, NPR (May 8, 2023), https://www.wbur.org/news/2023/05/08/massachusetts-eversource-national-grid-third-party-competitive-electricity.

[21] *Id.* (citing MA A.G. Remarks)

[22] *Id.* at 3.

[23] Andrea Campbell & Michelle Wu, Massachusetts Should Ban Third-Party Electric Suppliers, Bos. Globe (Sept. 29, 2024).

ESCOs like Eligo "have a track record of deploying aggressive, deceptive marketing tactics," and "routinely claim that the energy they sell helps Massachusetts achieve its clean energy goals" but "nothing could be further from the truth."[24]

45.    "Especially troublesome, the Attorney General's Office found that ESCOs have targeted vulnerable populations:

- low-income customers in Massachusetts are nearly twice as likely to sign up with ESCOs and are charged higher rates than non-low-income customers;

- assuming 600-kilowatt hour per month usage, typical for a Massachusetts household, an average non-low-income customer who signed up with an ESCO lost $222 per year while the average low-income customer lost $254 per year;

- low-income customers collectively experienced an annual net loss of more than $20 million due to higher rates and additional monthly fees;

- communities of color, communities with low median incomes, and communities with high percentages of residents lacking English proficiency correlate with higher rates of participation in the individual residential market for electric supply; and

- customers of advanced age who cannot understand the transaction or are particularly vulnerable are targeted and subjected to aggressive sales tactics."[25]

46.    In fact, "[f]orty percent of residents in Dorchester and Mattapan, two Boston neighborhoods with a high proportion of low-income residents, are enrolled with one of these

---

[24] *Id.*

[25] Legislators' Letter at 2 (citing MA A.G. Remarks; Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, Massachusetts Attorney General's Office (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download, and *In re Liberty Power Holdings LLC*, Addendum to Proof of Claim Filed by the Commonwealth of Massachusetts, Case No. 21-13797-SMG (Bankr. S.D. Fla.)).

suppliers."[26] "Compared to the city's Community Choice Electricity program, residents have

paid suppliers as much as $300 extra per month."[27]

47.     In New York, the staff of New York's utility regulator (that "NYPSC") made the

following findings relevant here:

> [M]ass market ESCO customers have become the victims of a failed
> market structure that results in customers being fooled by
> advertising and marketing tricks into paying substantially more for
> commodity service than they had remained full utility customers,
> yet thinking they are getting a better deal.[28]
>
> * * *
>
> The primary problem with the retail markets for mass market
> customers is the overcharging of customers for commodity due to
> the lack of transparency to customers on ESCO prices and products;
> this lack of transparency allows ESCOs to charge customers
> practically whatever they want without customers' understanding
> that they are paying substantially more than if they received full
> utility service. Consequently, potential commodity customers
> attempting to choose between the ESCO offerings and the default
> utility service cannot readily determine which ESCO offers the best
> price for comparable products or if the ESCOs' prices can possibly
> "beat" or even be competitive with the utility's default commodity
> service for the duration of the contract term.
>
> Thus, as the current retail access mass markets are structured,
> customers simply cannot make fully informed and fact-based
> choices on price . . . since the terms and pricing of the ESCO product
> offerings are not transparent to customers. For variable rate products
> this is due, in large part, to the fact that ESCOs often offer "teaser
> rates" to start, and after expiration of the teaser rate, the rate is
> changed to what is called a "market rate" that is not transparent to
> the customer, and the contract signed by the customer does not
> provide information on how that "market rate" is calculated.[29]

---

[26] Campbell & Wu, n.23 *supra*.

[27] *Id.*

[28] CASE 12-M-0476, Dep't of Public Service Staff Unredacted Initial Brief, at 1, N.Y. Pub. Servs. Comm'n (Mar. 30, 2018).

[29] *Id.* at 41–42 (citations omitted).

* * *

ESCOs take advantage of the mass market customers' lack of
knowledge and understanding of, among other issues, the electric
and gas commodity markets, commodity pricing, and contract terms
(which often extend to three full pages), and in particular, the
ESCOs' use of teaser rates and "market based rate" mechanisms that
customers are charged after the teaser rate expires. In fact, ESCOs
appear to be unwilling to provide the necessary product pricing
details as to how those "market based rates" are derived to mass
market customers in a manner that is transparent so as to enable an
open and competitive marketplace where customers can participate
fairly and with the necessary knowledge to make rational and fully
informed decisions on whether it is in their best interest to take
commodity service from their default utility, or from a particular
ESCO among competing but equally opaque choices.[30]

48.     As for the ESCOs' claim that their marketing and overhead costs explain the

overcharges, NYPSC staff found that these costs do "not justify the significant overcharges"

ESCOs levied.[31]

49.     Similarly, the NYPSC staff found that the "claim that at least a portion of the

significant delta between ESCO and utility charges is explained by ESCOs offering renewable

energy is disingenuous at best. ESCOs may be charging a premium for green energy, but they are

not actually providing a significant amount of added renewable energy to customers in New

York."[32]

50.     Instead, NYPSC staff reached the following conclusion:

The massive $1.3 billion in overcharges is the result of higher, and
more often than not, significantly higher, commodity costs imposed
by the ESCOs on unsuspecting residential and other mass market
customers. These Overcharges are simply due to (1) the lack of
transparency and greed in the market, which prevents customers
from making rational economic choices based on facts rather than

---

[30] *Id.* at 86 (citations omitted).

[31] *Id.* at 37.

[32] *Id.* at 69.

the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[33]

51.     Thereafter, the NYPSC found that ESCOs' overcharging is completely unjustified and faulted ESCOs for concealing critical pricing data from both ordinary consumers **and the NYPSC itself**: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[34]

52.     The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[35] and required that ESCO bills show how much the consumer's utility would have charged.[36]

53.     In addition, and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[37] The legislation was

---

[33] *Id*.

[34] CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 31, N.Y. Pub. Servs. Comm'n (Dec. 12, 2019), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[35] *Id.* at 33.

[36] *Id.* at 33–34.

[37] Press Release, Governor Kathy Hochul, *Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills* (Sept. 20, 2023), https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills.

introduced after reports that ESCOs in New York, like Eligo, charge some of the highest residential energy costs in the United States.[38]

54.     Oregon's electric utility restructuring law allows for sales of alternative electric supply only to commercial and industrial customers, not to residential customers. Connecticut has banned the sale of variable rate electricity, and on May 8, 2024, the Governor of Maryland signed a retail energy market reform bill that prohibits ESCOs from charging variable rates that "exceed the trailing 12-month average of the electric company's standard offer service rate in the electric company's service territory"[39]

55.     There is also a growing call for increased civil enforcement.  For example, in December 2023 both of Massachusetts' United States Senators and a Massachusetts Member of Congress urged the Federal Trade Commission to begin enforcement actions against ESCOs because state regulatory enforcement activity has proven "difficult for state officials," and after ten years of pursuing ESCOs the Massachusetts Attorney General's office "has recovered only $19 million—a small fraction of the more than $600 million lost" by Massachusetts customers.[40]

**B.     Plaintiffs' Dealings With Eligo**

56.     In the summer of 2018, Eligo solicited Plaintiffs, and they agreed to switch their electricity supplier to Eligo.  As part of the enrollment process, Plaintiffs believe Eligo provided them with a packet of marketing material with a cover letter stating "[w]elcome to Eligo Energy,

---

[38] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

[39] *Maryland Gov. Signs Retail Market Reform Bill*, ENERGY CHOICE MATTERS, http://www.energychoicematters.com/stories/20240507z.html.

[40] Legislators' Letter at 3 (citing Chris Lisinski, State House News Service, *Mass. leaders eye changes to 'predatory' electric sales tactics*, WBUR (June 6, 2023), https://www.wbur.org/news/2023/06/06/mass-leaders-eye-changes-to-predatory-electric-sales-tactics).

authorized supplier of West Penn Power. . . . In the next few days, you will be receiving a notice from West Penn Power of change of your supplier to Eligo Energy, LLC." The letter also stated that it enclosed "for your records" a copy of the "Terms of Service with Eligo Energy" and "a copy of the PA customer disclosure."

57. In its marketing packet, Eligo made representations about how variable rates were calculated, as detailed below. *See infra* ¶¶ 62–70.

58. Eligo's claims about its variable rates did not disclose that that Eligo would in fact look to charge the variable rates that represented Eligo's assessment of how high of a rate it can charge before running customers off.

59. Had Plaintiffs known that Eligo would not uphold the explicit commitments it made about how variable rates would be calculated, Plaintiffs would have acted differently— namely, Plaintiffs would not have agreed to switch to Eligo.

60. Eligo thereafter began supplying electricity to Plaintiffs' residence and it continued to do so until they cancelled in or around March 2022.

61. After approximately three years on Eligo's fixed rate, Eligo began charging Plaintiffs a variable rate for electricity in or around June 2021.

**C.    Eligo's Unauthorized Pricing Practices**

62. In the marketing packet Plaintiffs believe they received from Eligo, Eligo first represents on a page with the heading "Fixed and Variable Rate Disclosure" that "[t]his label pertains to an agreement for electric generation service between "Eligo Energy AP, LLC ("Eligo") and [customer]." The page also advises the customer that "[y]ou may cancel this agreement at any time before midnight of the third business day after receiving this disclosure[.]" The page also has a section called "Terms of Service" with a subheading called "Variable Price."

The "Variable Price" section of these "Terms of Service" states that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."

63.     Another page in the marketing packet contains an untitled chart. The chart lists Eligo as being "responsible for all generation charges." The chart also has a "Price Structure" row that states "[y]our variable rate will be based upon PJM wholesale market conditions predicted weather patterns, retail competition, wholesale commodity energy costs, fluctuations in energy supply and demand, industry regulations, pricing strategies, cost to serve customers, among many factors." The chart also says that "[t]he supply price may not always provide savings" as compared to the customer's local utility.

64.     The packet contains a third page with the heading "Eligo Energy PA, LLC Terms of Service." That page has a paragraph titled "Price and Service" that states "for variable month-to-month products, Customer shall pay a variable price (derived from 100% renewable sources through use of Renewable Energy Credits) that can change monthly." The "Price and Service" paragraph also states that "Eligo may increase or decrease your variable rate based on several factors, including but not limited to changes in wholesale energy market prices in the PJM Markets, current and anticipated weather patterns, retail competition, wholesale commodity energy costs, fluctuations in energy supply and demand, industry regulations, pricing strategies, costs to serve customers, among many factors." The paragraph also states that "Vendor shall not impose any fees or charges on Customer other than the Price set forth above." The capitalized term "Price" is not defined anywhere in the marketing packet and there is no price "set forth above" other than in the "Variable Price" section of the "Terms of Service" that states that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01

per kWh will be applied." This same page also states that "Customer may cancel this agreement at any time before midnight of the third business day after receiving this disclosure[.]"

65.     Eligo uses the same or substantially similar marketing packets for other Eligo customers in Pennsylvania and in the other states where Eligo does business.

66.     There are essentially two different representations in Eligo's marketing packet regarding how variable rates are set. First, the "Terms of Service" in the page with the heading "Fixed and Variable Rate Disclosure" promises the customer that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."

67.     Second, the page with the unnamed chart containing a row labeled "Price Structure" and the paragraph called "Price and Service" in the page with the heading "Eligo Energy PA, LLC Terms of Service" both promise that Eligo's variable rates are "based upon" and "based on" a formula that uses discrete "factors" to calculate variable rates. Both pages in the marketing packet state that the factors are (1) "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to as "PJM wholesale market conditions"), (2) "weather patterns," (3) "retail competition," (4) "wholesale commodity energy costs," (5) "fluctuations in energy supply and demand," (6) "industry regulations," (7) "pricing strategies," (8) "costs to serve customers," and (9) and "many" other (unnamed) "factors." Again, on the "Eligo Energy PA, LLC Terms of Service" page, the paragraph that states what Eligo's variable rates are "based on" also states that "Vendor shall not impose any fees or charges on Customer other than the Price set forth above."

68.     In light of Eligo's representations in the "Terms of Service" on the page with the heading "Fixed and Variable Rate Disclosure" that the customer's rate "will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied," any reasonable

consumer, including Plaintiffs, would reasonably expect that Eligo's variable rates would be calculated using the relevant wholesale energy market price in the PJM plus a $0.01 per kWh adder.

69.     Given those same representations, no consumer would reasonably expect that Eligo's variable rates would be calculated based on an undisclosed pricing methodology designed to extract as much money as possible from consumers irrespective of Eligo's cost to purchase energy at wholesale.

70.     Regarding the indefinite list of "factors" Eligo also says its rates are "based on," any reasonable consumer reading those factors would not understand that Eligo would in fact be setting variable rates based on its assessment of how high of a rate it can charge before too many customers quit. Instead, a reasonable consumer reading Eligo's listed factors would expect Eligo to document and follow the listed factors and that customers' variable rates would only change in response to movements in the values of those documented factors. Indeed, if a reasonable consumer had previously been taught about how wholesale energy is purchased by utilities on the PJM and then how the utility sets the price for that energy when it resells it to the customer, it would not be unreasonable for the customer to think that Eligo's prices would be very close to the utility's prices, especially over the longer term.  Afterall, the utility is customers' main alternative to Eligo, and Eligo states in its marketing packet that "[t]he supply price may not *always* provide savings" (emphasis added) as compared to the utility thereby strongly suggesting that most of the time (or at least half of the time) Eligo's rates are lower than the utility's rates.

71.     Eligo's contract does not give Eligo discretion to set prices as it sees fit. Instead, the contract restricts Eligo's rates to rates that are "based upon PJM wholesale market conditions and an adder of $0.01 per kWh."

72.     Eligo's exorbitant variable rates are not traceable to "PJM wholesale market conditions and an adder of $0.01 per kWh."  Nor do Eligo's rates reflect monthly changes in a list of documented "factors" such as "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to as "PJM wholesale market conditions"), "weather patterns," "wholesale commodity energy costs," or "costs to serve customers."

73.     Instead, Eligo's rates are explained by its practice of charging the highest feasible rate before customers notice their excessive energy bills and quit Eligo.

74.     Eligo is merely a middleman that buys energy at wholesale and resells it at a markup. Eligo's costs to supply customers with energy do not explain its exorbitant charges. The costs of energy and related minor charges on the relevant wholesale market do not account for Eligo's excessive rates.  As detailed below, Eligo's variable rates far exceed those identifiable costs and were thus not reflective of "PJM wholesale market conditions and an adder of $0.01 per kWh," or any reasonable attempt to assign numerical values to the "factors" listed in Eligo's contract and then derive a variable rate in good faith.

75.     Instead, the only factor enumerated in the packet Eligo provides to prospective customers that would cause the customer's rate to materially vary from month to month is Eligo's cost to purchase its customers' energy supply on the relevant wholesale market.

76.     Eligo purchases its energy supply on the competitive wholesale market. The cost of wholesale energy is overwhelmingly the largest cost Eligo incurs. This is why Eligo contracts with customers to calculate and charge a variable rate using the cost plus formula in the "Terms of Service" page with the heading "Fixed and Variable Rate Disclosure." That formula, "PJM wholesale market conditions and an adder of $0.01 per kWh," aligns with an ESCO's role as an energy supply reseller.

77.     Eligo's supply costs do not explain Eligo's egregiously high variable rates or be the reason its rates are disconnected from changes in wholesale costs.  Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent Eligo even documented and itemized such costs when it set customers' monthly variable rates (Eligo did not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs.  For example, while Eligo has tens of thousands of customers, the address on its website and correspondence with customers "201 W Lake St #151, Chicago, IL 60606" is in truth the address of a tiny mailbox in a UPS store that provides "mailbox and postal solutions." Nor does the cost to serve customers, which is a minor cost in comparison to the costs to procure energy at wholesale, explain Eligo's outrageously high rates.  Nor were there any industry regulations that would justify Eligo's outrageously high rates.

78.      In fact, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

79.     Eligo's outrageous rates are a result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup.

***Benchmark One:* PJM Wholesale Market Prices And An Adder Of $0.01 Per kWh.**

80.     A comparison of Eligo's rates to prevailing market costs in the PJM shows that Eligo does not set its variable rates in compliance with its customer contract.

81.     The table below, *see* ¶ 84, identifies (i) the variable rate Eligo charged Plaintiffs, (ii) the corresponding "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to in its customer contract as "PJM wholesale market conditions") plus a

$0.01 per kWh adder, and (iii) the differences between Eligo's rates and the rate promised in Eligo's contract.

82.     The PJM market prices below are based on the costs that an ESCO incurs supplying a retail customer for each billing period. The PJM market prices for electricity include the weighted day-ahead PJM electricity prices in Plaintiffs' respective utility zones, ancillary services costs, capacity costs, transmission costs, and various relatively small charges related to the NYISO.  These charges are tracked by PJM's Market Monitor, the external consultant that independently evaluates the PJM wholesale electricity market.  PJM's Market Monitor is appointed pursuant to PJM's Federal Energy Regulatory Commission regulation and tariff.

83.     That Eligo's rates are so vastly different from PJM market prices plus a $0.01 per kWh adder demonstrates that Eligo's variable rates do not represent any good faith effort by Eligo to charge customers a rate that aligns with the contract documents Eligo gives prospective customers. The PJM market prices also represent the costs and charges that that Eligo and other ESCOs incur in procuring energy supply for their retail customers. Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.

84.     The below chart shows a comparison of the variable rates Eligo charged Plaintiffs for seven billing periods to a rate that is based on PJM market prices plus a $0.01 per kWh adder:

| Billing Period | Eligo Rate ($/kWh) | PJM Market Prices Plus A $0.01 Per kWh Adder ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 7/26/21 - 8/23/21 | $0.1237 | $0.0708 | 1.7 | 75% |
| 8/24/21 - 9/22/21 | $0.1201 | $0.0772 | 1.6 | 56% |
| 9/23/21 - 10/21/21 | $0.1630 | $0.0864 | 1.9 | 89% |

| 10/22/21 - 11/21/21 | $0.1630 | $0.0966 | 1.7 | 69% |
| 11/22/21 - 12/20/21 | $0.1806 | $0.0787 | 2.3 | 130% |
| 12/21/21 - 1/20/22 | $0.1806 | $0.0734 | 2.5 | 146% |
| 1/21/22 - 2/20/22 | $0.1656 | $0.0895 | 1.9 | 85% |

85.     The table above shows that Eligo's variable rates are consistently and substantially higher than a rate based on the formula set forth in Eligo's customer contract.

86.     Eligo's rates charged to Plaintiffs were more than 50% higher than the PJM market price plus a $0.01 per kWh adder in **every billing period**, were more than ***double*** the PJM market prices plus a $0.01 per kWh adder twice, and were, on average, ***over ninety percent higher*** than the PJM market prices plus a $0.01 per kWh adder.

87.     Eligo's rates also failed to fluctuate in accordance with PJM market prices plus a $0.01 per kWh adder.  For instance, between November 22, 2021 and December 20, 2021, the PJM market price plus a $0.01 per kWh adder was $0.0787, an ***19% decrease*** from the prior period. Eligo's rate for that same period, however, was $0.1806 per kWh, an ***11% increase*** from its rate during the prior period. During the next period, the PJM market price plus a $0.01 kWh decreased by another ***7%***, but Eligo's rate remained the same—and outrageously high—at $0.1806/kWh, nearly ***150% higher*** than the PJM market price plus a $0.01 kWh adder.

88.     That Eligo's rates do not track the PJM market prices is further proof that Eligo is not following its contractual commitment to its customers and is instead levying an excessive and unreasonable fluctuating margin.

89.     Eligo claims elsewhere in the marketing packet is gives to prospective customers that variable rates are "derived from 100% renewable sources through the use of Renewable Energy Credits."[41]

90.     That Eligo's variable rates are so much higher than its costs to acquire the electricity it sells to customers cannot be explained by the price of renewable energy credits. Even assuming that Eligo purchased RECs to cover 100% of customer usage, the average price Eligo could have paid for such RECs was only 1.8 cents per kWh.  To the extent Eligo purchased RECs covering less than 100% of usage, its REC costs would have been lower than 1.8 cents per kWh.

91.     Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to market prices but are instead outrageously higher.

### Benchmark Two: The Local Utility's Contemporaneous Supply Rate

92.     A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo's variable rates are not "based upon" or "based on" a formula that uses discrete "factors" to calculate variable rates. Two pages in the marketing packet Eligo gives to prospective customers state that the factors are (1) "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to as "PJM wholesale market conditions"), (2) "weather patterns," (3) "retail competition," (4)

---

[41] Renewable Energy Credit's or "REC" are tradable certificates that represents the environmental benefits of electricity generated from renewable sources by a different part. RECs are tradable commodities that can be bought and sold in the market.

"wholesale commodity energy costs," (5) "fluctuations in energy supply and demand," (6) "industry regulations," (7) "pricing strategies," (8) "costs to serve customers," and (9) and "many" other unnamed "factors." These factors overwhelmingly point to PJM market prices or events that affect PJM market prices, which are the exact same factors that drive the local utility WestPenn Power's contemporaneous supply rate.

93.     Publicly available data on the local utilities' rates, like WestPenn Power, which is the utility serving Plaintiffs' home, serve as an ideal indicator a price that is "based upon" or "based on" the factors Eligo outlines on two of the pages in the marketing packet given to customers. This is because the utilities' energy procurement costs are the same costs ESCOs like Eligo incur and the utility's rate serves as a pure passthrough of those costs.  Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which is what the "factors" outlined in Eligo's contract overwhelmingly point to.  Consequently, local utilities' supply rates are the ideal comparator for determining (at the pleading stage) whether Eligo's variable rates are actually "based upon" or "based on" a formula that measures the listed factors and uses those listed "factors" to derive customers' variable rates (as opposed to charging unsuspecting customers the highest possible price that will not produce unsustainable levels of customer attrition).

94.     In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate.  Using the utility's rates as a benchmark for the contract's

enumerated cost factors shows that Eligo's rates were driven by excessive mark-ups and profiteering.

95.     The following table compares Plaintiffs' variable supply rates from Eligo for seven billing periods to their local utility WestPenn Power's contemporaneous supply rates.

| Billing Period | Eligo Rate ($/kWh) | WestPenn Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 7/26/21 - 8/23/21 | $0.1237 | $ 0.0571 | 2.2 | 117% |
| 8/24/21 - 9/22/21 | $0.1201 | $ 0.0552 | 2.2 | 118% |
| 9/23/21 - 10/21/21 | $0.1630 | $ 0.0545 | 3.0 | 199% |
| 10/22/21 - 11/21/21 | $0.1630 | $ 0.0545 | 3.0 | 199% |
| 11/22/21 - 12/20/21 | $0.1806 | $ 0.0562 | 3.2 | 221% |
| 12/21/21 - 1/20/22 | $0.1806 | $ 0.0570 | 3.2 | 217% |
| 1/21/22 - 2/20/22 | $0.1656 | $ 0.0570 | 2.9 | 191% |

96.     The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiffs' account and WestPenn's contemporaneous rates.  Eligo's rate was more than **double** WestPenn's rate in **every** billing period, and at least **triple** WestPenn's rate in four out of seven billing periods.  On average, Eligo's rates were **more than 2.8 times** WestPenn's rates.

97.     The local utility's rates are a reasonable, pre-discovery benchmark of the factors Eligo lists in its customer contract, especially since elsewhere in Eligo's customer contract the ESCO promises to charge PJM market prices plus a $0.01 per kWh adder.  As explained above, the local utility is Eligo's primary competitor in Plaintiffs' service territory, and the local utility's supply rate reflects the wholesale cost of energy, supply and demand for that energy, weather patterns, the cost to serve customers, and industry regulation—the same costs that ESCOs like

Eligo incur in Pennsylvania.  Thus, the utility's rate is an ideal benchmark for a rate that was calculated using a formula built on the "factors" Eligo describes in the marketing packet it gives to customers.

98.     The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to charge variable rates "based upon" or "based on" a formula that uses discrete "factors" (especially the ones named in the documents Eligo gave to customers) to calculate Eligo's variable rates

99.     Further, that Eligo's states in its marketing packet that its variable rate energy is "derived from 100% renewable sources through the use of Renewable Energy Credits" does not does not account for Eligo's excessive variable energy rates.  For example, the cost to purchase renewable energy credits for 100% of the electricity Eligo supplied to Plaintiffs would have been, on average, less than two pennies per kWh—approximately 12% of Eligo's average rate. Indeed, Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and these costs cannot explain Eligo's exorbitant rates.

***Benchmark Three: Eligo's Own Fixed Rates***

100.     Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add ***lower*** margins to its variable rates.  Yet the opposite is true.

101.    That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates were not set in accordance with the representations Eligo made to customers regarding its variable energy rates.

102.    There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers.  Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different.  In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy.  The only reason that Eligo's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's pricing term.

103.    Eligo's rates also cannot be explained by the price of renewable energy credits.  As noted above, the cost of renewable energy credits do not explain Eligo's excessive variable rates.

***Summary of Eligo's Omissions***

104.    No reasonable consumer who knew the truth about Eligo's exorbitant rates would have chosen it as an energy supplier.

105.    Eligo lulled customers into purchasing its energy supply via material misrepresentations and omissions about its variable energy rates.  Eligo did so to reap excessive profits at the expense of unsuspecting customers.  Eligo acted with actual malice, or wanton and willful disregard for customers' well-being.

106.     In this case, Eligo knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

107.     It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[42] and "Nudges."[43]

108.     Eligo's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that customers will compare Eligo's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

109.     Eligo did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates customers' local utilities charge.  Eligo likewise failed to adequately disclose to Plaintiffs that in paying Eligo's variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from their local utility.

110.     Eligo knew that its variable rates were consistently and significantly higher than the local utility's rates.

---

[42] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[43] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

111.     Eligo's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

112.     Moreover, Eligo at no time alerted or informed Plaintiffs that the cost for energy would be continuously *significantly* higher than the same energy sold by their local utility.

113.     A reasonable consumer understands and expects that variable energy rates will reflect the wholesale price for the commodity, that is, the wholesale market price available to Eligo for the energy it in turn supplies to its retail customers.

114.     However, Eligo's variable rates are much higher than wholesale market price of energy in Pennsylvania.

115.     Eligo's omissions with respect to the rates it would charge were materially misleading.

**D.     Tolling Of The Statute Of Limitations**

*A.     Continuing Violation Tolling Allegations*

116.     Given that Defendants have engaged in a series of deceptive acts and omissions for which they billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Eligo's last wrongful act against Plaintiffs and other customers when Eligo last charged them a variable energy rate.

*B.     Fraudulent Concealment Tolling*

117.     All applicable statutes of limitation have also been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein throughout the period relevant to this action.

118.     Instead of adequately disclosing its true practices to Plaintiffs and their other customers, Defendants actively concealed and misrepresented their true practices.

*C.    Estoppel Tolling*

119.    Defendants were under a continuous duty to disclose its practices to Plaintiffs and their other customers.

120.    Defendants knowingly, affirmatively, and actively concealed the true nature of their practices from Plaintiffs and their other customers.

121.    Based on the foregoing and the other allegations herein, Defendants are estopped from relying on any statutes of limitations in defense of this action.

*D.    Discovery Rule Tolling*

122.    Eligo's customers do not have access to information about its costs or how Eligo actually sets its variable rates. Nor do reasonable consumers undertake an examination of the difficult-to-access and interpret wholesale cost data applicable to their electricity market when assessing whether their electricity rates are too high. Accordingly, Plaintiffs and other Eligo customers did not realize that they were being overcharged.

123.    Nor would Plaintiffs and other Eligo customers consumers have discovered that Eligo was overcharging them in the exercise of reasonable diligence, given the information asymmetry and the difficulty if not impossibility of obtaining information about Eligo's actual costs and how Eligo actually sets its variable rates.

124.    Accordingly, Plaintiffs' and other Eligo customers' lack of notice, actual or constructive, that Eligo was overcharging them meant that they did not previously discover or reasonably should have discovered that they had a cause of action as a result of being harmed by Defendants' conduct.

## CLASS ACTION ALLEGATIONS

125.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential

and commercial customers in the United States who were charged a variable rate for electricity

or natural gas services by Eligo from the earliest allowable date through the date of judgment

(the "Class") and who had a contract with Eligo that specified that the variable rate would be

based on prices in a specific wholesale market like PJM.

126.    Plaintiffs also bring this action on their own behalf and additionally, pursuant to

Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all

Pennsylvania residential and commercial customers who were charged for electricity or natural

gas services by Eligo from the earliest allowable date through the date of judgment (the

"Pennsylvania Subclass").

127.    As alleged throughout this Complaint, the Class claims all derive directly from a

single course of conduct by Defendants.  Defendants have engaged in uniform and standardized

conduct toward the Class and this case is about the responsibility of Defendants for their

knowledge and conduct in deceiving its customers.  This conduct did not meaningfully

differentiate among individual Class members in its degree of care or candor, its actions or

inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the

customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

128.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of

Defendants; any entity in which Defendants have or had a controlling interest, or which

Defendants otherwise control or controlled; and any officer, director, employee, legal

representative, predecessor, successor, or assignee of Defendants.

129.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or

amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their

motion for class certification.

130.     Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Eligo.  Plaintiffs believe, however, that based on the publicly available data concerning Eligo's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

131.     The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

132.     Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

133.     Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

134.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.   Whether Eligo's misrepresentations and omissions are materially misleading;

    b. Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

    c. Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

    d. Whether Eligo's conduct violates various state consumer protection and unfair competition statutes;

    e. Whether Eligo was unjustly enriched as a result of its conduct;

    f. Whether Class Members have been injured by Eligo's conduct;

    g. Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices; and

    h. The extent of class-wide injury and the measure of damages for those injuries.

135. A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

136. A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

137. A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

138.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

      a.   Whether Eligo's misrepresentations and omissions are materially misleading;

      b.   Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates as promised in Eligo's contract;

      c.   Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

      d.   Whether Eligo's conduct violates various state consumer protection and unfair competition statutes;

      e.   Whether Eligo was unjustly enriched as a result of its conduct;

      f.   Whether Class Members have been injured by Eligo's conduct; and

      g.   Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices.

139.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (On Behalf Of The Class)

140.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.    Eligo customers have customer agreements whose variable rate terms are substantially similar.

142.    Plaintiffs and the Class entered into valid contracts with Eligo for the provision of electricity.

143.    Eligo represents in its customer contract that its variable rate for electricity "will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."

144.    Elsewhere, Eligo's contract states that variable electricity rates will be calculated "based on" or "based upon" discrete "factors" including "PJM wholesale energy market conditions," "weather patterns," "fluctuations in energy supply and demand," and "costs to serve customers."

145.    Upon information and belief, Plaintiffs were subject to the same or substantially similar contractual terms as all of Eligo's variable rate customers in the United States.

146.    Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Eligo charged for natural gas and electricity.

147.    However, Eligo failed to perform its obligations under its contracts to charge variable rates based on the criteria described in Eligo's contract. Instead, Eligo charged variable rates for natural gas and electricity that were based on Eligo's assessment of how high of a rate it can charge before too many customers quit.

148.    Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged a variable rate calculated from PJM market prices plus a $0.01 per kWh adder.

149.    Plaintiffs and the Class were also damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged variable rates "based upon" or "based on" a formula that uses discrete "factors" (especially the ones named in the documents Eligo gave to customers) to calculate Eligo's variable rates.

41

150.     By reason of the foregoing, Eligo is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

151.     Eligo Energy PA, LLC is not the only Defendant liable for this breach of contract claim.  Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach.  For example, the cover letter sent by Eligo Energy, LLC states that it will be Plaintiffs' new energy supplier and that "a copy of the Terms of Service with Eligo Energy" are enclosed "for your records."

152.     Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the cover letter and contract, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

153.     In addition, Eligo Energy PA, LLC contracted on Eligo Energy, LLC's behalf.

154.     And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

## COUNT II
## IN THE ALTERNATIVE, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf Of The Class)

155.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.     Plaintiffs and the Class contracted with Eligo for the provision of natural gas and electricity supply.

157.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and

may be breached even if there is no breach of the contract's express terms. This cause of action is pleaded in the alternative to Plaintiffs' contract claims.

158.    Under the contract, to the extent Eligo had discretion to set the variable rate for natural gas and electricity, it was obligated to exercise its discretion in good faith. Eligo exercised its discretion in bad faith. Specifically, Eligo acted with a bad motive and continued to gouge customers. Eligo has known for years (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged. Despite this superior knowledge, Eligo acted with a bad motive and continued to gouge customers and small businesses.

159.    Eligo's failure to disclose the material information (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged is what permitted Eligo to charge Plaintiffs whatever it wanted—unburdened by disclosing the truth about its rate setting practices—and Plaintiffs

experienced the adverse consequences in the performance of the parties' agreement.

160.   Eligo also failed to disclose that it had no intention of charging a rate reflective of its actual costs, or that the primary factor it considers when setting the variable rates is its ability to obtain excessive and unreasonable profits from high rates without causing too much customer attrition when customers notice Eligo's excessive rates.

161.   Plaintiffs reasonably expected that Eligo's variable energy rates would not be continuously and significantly higher than the utility's rates, which provide the same energy supply as Eligo.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.

162.   Plaintiffs also reasonably expected that Eligo would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.  Eligo knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

163.   Eligo breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Eligo's variable energy rate would be commensurate with Eligo's costs.

164.   As a result of Eligo's breaches, Eligo is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

165.   Eligo Energy PA, LLC is not the only Defendant liable for this breach of contract claim.  Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach.  For example, the cover letter sent by Eligo Energy, LLC states that it will be Plaintiffs' new energy supplier and that "a copy of the Terms of Service with Eligo

Energy" are enclosed "for your records."

166.     Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo

Energy, LLC's conduct in sending the cover letter and contract, along with identifying itself as

Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by

the contracts it mailed to its customers.

167.     In addition, Eligo Energy PA, LLC contracted on Eligo Energy, LLC's behalf.

168.     And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy,

LLC and is thus liable for breaching the contract.

<u>COUNT III</u>
**VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER**
**PROTECTION LAW**
**(UTPCPL 73 P.A.C.S.A. § 201-1 *et seq*.)**
**(On Behalf Of Plaintiffs And The Pennsylvania Subclass)**

169.     Plaintiffs reallege and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

170.     Plaintiffs and Class Members purchased goods, namely, electricity, from Eligo for

a personal, family, or household purpose, namely, for use in their shared home.

171.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law

("UTPCPL") prohibits "unfair or deceptive acts or practices." 73 P.S. § 201-3(a).

172.     The UTPCPL defines unfair or deceptive acts or practices to include any

"fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."

73 P.S. § 201-2(4)(xxi).

173.     Interpreting this provision of the UTPCPL, the Pennsylvania Supreme Court has

explained that "an act or practice is deceptive or unfair if it has the capacity or tendency to

deceive, and neither the intention to deceive nor actual deception must be proved; rather, it need

only be shown that the acts and practices are capable of being interpreted in a misleading way."

*Gregg v. Ameriprise Financial, Inc.*, 664 Pa. 567, 585 (2021) (quoting *Commonwealth by*

*Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 625 (2018)).

174.    Eligo has engaged in, and continues to engage in, deceptive acts and practices in

violation of 73 P.S. § 201-3(a), including:

> a.  Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;
>
> b.  Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;
>
> c.  Failing to provide customers adequate advance notice of the variable rates it would charge;
>
> d.  Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;
>
> e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and
>
> f.  Affirmatively misrepresenting how a customer's variable rate will be determined.

175.    The above deceptive practices and acts by Eligo were material misrepresentations

or omissions of existing or past facts.

176.    Each of the above material misrepresentations or omissions was a fraudulent and

deceptive practice.

177.    Plaintiff and Class Members justifiably relied on Eligo's material

misrepresentations and omissions. But for Eligo's material misrepresentations and omissions as

to how Eligo calculates electricity rates, and had Plaintiff and Class Members known of Eligo's

deceptive conduct, Plaintiff and Class Members would not have switched to Eligo.

178.     Eligo's acts are not only deceptive and unfair, but also contrary to the public policy underlying the UTPCPL, the "general purpose" of which "is to protect the public from fraud and unfair or deceptive business practices." *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595 (E.D. Pa. Jan. 14, 2010).

179.     Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

180.     Each of Eligo's contracts include a multi-day rescissionary period.  During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract.  Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

181.     Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

182.     Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

183.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

184.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

47

185.     Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

186.     Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 174 above, Eligo deprived customers of the ability to make informed purchasing decisions.

187.     Eligo's practices are unconscionable and outside the norm of reasonable business practices.

188.     As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action or one hundred dollars ($100), whichever is greater. 73 P.S. § 201-9.2(a). Plaintiff and Pennsylvania Class Members are further entitled to have their actual damages trebled to an amount of not less than one hundred dollars ($100).

189.     Plaintiff and Pennsylvania Class Members are further entitled to their costs and reasonable attorneys' fees.

190.     Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to  73 P.S. § 201-9.2(a), this Court has the power to award such relief, including but not

limited to, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

191.    Eligo Energy PA, LLC is not the only Defendant liable for violating the UTPCPL. It was Eligo Energy, LLC that solicited Pennsylvania customers; it was Eligo Energy, LLC that sent the cover letters and contracts to Pennsylvania customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to Pennsylvania customers; and it was Eligo Energy, LLC that set the rates that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how variable rates would be calculated.

192.    And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating the UTPCPL.

**COUNT IV**
**VIOLATION OF MATERIALLY IDENTICAL STATE CONSUMER PROTECTION STATUTES**
**(On Behalf Of The Class)**

193.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.    Pursuant to the materially identical consumer protection statutes of Connecticut, Illinois, Maryland, Michigan, New Jersey, New York, Pennsylvania, and Washington, D.C., consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

195.    Eligo violated at least the following materially identical statutes:

    a.   Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b;

    b.   Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2;

    c.   Maryland Consumer Protection Act, Md. Commercial Law Code Ann.

       § 13-303, *et seq.*;

    d.   Michigan Consumer Protection Act, M.C.L. § 445.903;

    e.   New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

    f.   New York General Business Law § 349;

    g.   Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73

       P.S. § 201-2(4); and

    h.   District of Columbia Consumer Protection Procedures Act, D.C. Code

       § 28-3904, *et seq.*

196.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

197.    Eligo's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

198.    Eligo has engaged in, and continues to engage in, deceptive acts and practices, including:

    a.   Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    b.   Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

    c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    d.   Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

     e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

     a.   Affirmatively misrepresenting how a customer's variable rate will be determined.

199.   The above unfair and deceptive practices and acts by Eligo were material omissions of existing or past facts.

200.   Eligo knew or believed that the above unfair and deceptive practices and acts were material omissions.

201.   The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

202.   Eligo first made these misrepresentations prior to the conclusion of the rescissionary period of the contract, during which Eligo's contract served as a solicitation.  The agreement is not legally binding prior to the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the costs and factors identified in the contract. Eligo also knew that its variable rate is not in fact calculated using the formula set forth in its customer contract.

203.   Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

204.   Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

205.   Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

206.   Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing of variable rates was premised on offering customers a lower energy rate than the customer's local utility.

207.   Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

208.   Eligo's omission that Eligo's variable rate for energy was consistently substantially higher than the local utility rate is material to prospective customers.

209.   Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 192 above, Eligo deprived customers of the ability to make informed purchasing decisions.

210.   Eligo's practices are unconscionable and outside the norm of reasonable business practices.

211.   As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the factors outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

212.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. This Court has the power to award such relief, including but not limited to, an order declaring Eligo's practices to be unlawful, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

213.    As a result of Eligo's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

214.    Eligo Energy PA, LLC is not the only Defendant liable for violating these consumer protection laws.  It was Eligo Energy, LLC that solicited customers in Connecticut, Illinois, Maryland, Michigan, New Jersey, New York, Pennsylvania, and Washington, D.C.; it was Eligo Energy, LLC that sent the cover letters and contracts to these customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to these customers; and it was Eligo Energy, LLC that set the rates that that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how rates variable rates would be calculated.

215.    And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for these consumer protection laws.

### COUNT V:
### IN THE ALTERNATIVE, UNJUST ENRICHMENT
### (On Behalf Of The Class)

216.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

217. This cause of action is pleaded in the alternative to Plaintiffs' contract claims. To the extent the Court determines that a valid contract exists between the parties, Plaintiffs does not intend to proceed with their unjust enrichment claim.

218. Plaintiffs and the Class Members conferred a tangible economic benefit upon Eligo by contracting with Eligo for electricity or natural gas. Plaintiffs and the Class would not have contracted with Eligo for electricity and natural gas had they known that Eligo would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

219. Plaintiffs and the Class Members would not have purchased energy from Eligo had they known the truth about Eligo's variable energy rates.

220. By engaging in the conduct described above, Eligo has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

221. It would be unjust and inequitable for Eligo to retain the payments Plaintiffs and Class Members made for excessive energy charges.

222. Therefore, Eligo is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Eligo's actions.

223. As alleged above, Eligo Energy, LLC is also liable for this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a) Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b) Find and declare that Defendants have committed the violations of law alleged herein;

(c)     Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)     Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(e)     Render an award of punitive damages;

(f)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

## NOTICE TO ATTORNEYS GENERAL

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 I.L.C.S § 505/10a(d).

Dated: Jan. 21, 2025                    **EDGAR SNYDER & ASSOCIATES**
Pittsburgh, Pennsylvania

By:      /s/ Nicholas Katko
         Nicholas Katko (PA I.D. No. 322843)
         U.S. Steel Tower, 10th Floor
         600 Grant Street
         Pittsburgh, Pennsylvania 15219
         Tel: (412) 394-4516
         Fax: (412) 391-1830
         nkatko@edgarsnyder.com

         *(Additional Counsel next page)*

55

Jessica L. Hunter[†] (PA I.D. No. 321951)
J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jlh@wittelslaw.com
jbm@wittelslaw.com

D. Greg Blankinship*
**FINKELSTEIN BLANKINSHIP**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed Class*

[†]*Application Accepted, Swearing-In Forthcoming*     **Pro Hac Vice Application Forthcoming*

# EXHIBIT 3

**U.S. District Court**
**Western District of Pennsylvania (Pittsburgh)**
**CIVIL DOCKET FOR CASE #: 2:25-cv-00094-CB**

BODKIN et al v. ELIGO ENERGY, LLC et al
Assigned to: Judge Cathy Bissoon
Demand: $9,999,000
Cause: 28:1332 Diversity-Other Contract

Date Filed: 01/21/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**
**TINA BODKIN**

represented by **Douglas Gregory Blankinship**
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
One North Broadway
Suite 900
White Plains, NY 10601
914-298-3290
Email: gblankinship@fbfglaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff , III**
18 Half Mile Road
Armonk, NY 10504
910-476-7253
Email: jbm@wittelslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff**
J. Burkett McInturff
NY
305 Broadway
FL 7
New York, NY 10007
910-476-7253
Email: jbm@wittelslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Katko**
Edgar Snyder & Associates, LLC
225 North Shore Drive
Suite 200
Pittsburgh, PA 15212
412-394-4516
Fax: 412-391-1830
Email: nkatko@edgarsnyder.com
*TERMINATED: 03/04/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Hunter**
Jessica Hunter
305 Broadway
Ste FL 7
New York, NY 10007
570-647-9815
Email: jlh@wittelslaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**THOMAS BODKIN**
*on behalf of themselves and all others similarly situated*

represented by **Douglas Gregory Blankinship**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Katko**
(See above for address)
*TERMINATED: 03/04/2025*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Hunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.
**Defendant**
**ELIGO ENERGY, LLC**                                  represented by **David Meadows**
                                                                      Watstein Terepka LLP
                                                                      75 14th Street NE
                                                                      Ste 2600
                                                                      Atlanta, GA 30309
                                                                      404-602-4371
                                                                      Email: dmeadows@wtlaw.com
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Ryan Watstein**
                                                                      Watstein Terepka LLP
                                                                      75 14th Street NE
                                                                      Ste 2600
                                                                      Atlanta, GA 30309
                                                                      404-782-0695
                                                                      Email: ryan@wtlaw.com
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Abigail Howd**
                                                                      Watstein Terepka LLP
                                                                      75 14th Street NE
                                                                      Ste 2600
                                                                      Atlanta, GA 30309
                                                                      470-234-4974
                                                                      Email: ahowd@wtlaw.com
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Leland P. Schermer**
                                                                      Marcus & Shapira LLP
                                                                      One Oxford Centre
                                                                      301 Grant Street
                                                                      Ste 35th Fl.
                                                                      Pittsburgh, PA 15219-6401
                                                                      412-338-3990
                                                                      Fax: 412-391-8758
                                                                      Email: schermer@marcus-shapira.com
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Leo Patrick O'Toole**
                                                                      Watstein Terepka LLP
                                                                      75 14th Street NE
                                                                      Ste 2600
                                                                      Atlanta, GA 30309
                                                                      404-779-5190
                                                                      Email: lotoole@wtlaw.com
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Ryan Stephen Shymansky**
                                                                      Marcus & Shapira LLP
                                                                      301 Grant Street
                                                                      Ste 35th Floor
                                                                      Pittsburgh, PA 15219
                                                                      412-445-3625
                                                                      Email: shymansky@marcus-shapira.com
                                                                      *ATTORNEY TO BE NOTICED*

**Defendant**
**ELIGO ENERGY PA, LLC**                               represented by **David Meadows**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Ryan Watstein**
                                                                      (See above for address)
                                                                      *LEAD ATTORNEY*
                                                                      *PRO HAC VICE*
                                                                      *ATTORNEY TO BE NOTICED*

                                                                      **Abigail Howd**
                                                                      (See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leland P. Schermer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leo Patrick O'Toole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Stephen Shymansky**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/21/2025 | 1 | COMPLAINT against ELIGO ENERGY, LLC, ELIGO ENERGY PA, LLC(Filing fee, including Administrative fee, $405, receipt number APAWDC-8657853), filed by THOMAS BODKIN, TINA BODKIN. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons) (Katko, Nicholas) (Entered: 01/21/2025) |
| 01/21/2025 | 2 | MOTION for attorney J. Burkett McInturff, Esq. to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-8658066) by THOMAS BODKIN, TINA BODKIN. (Attachments: # 1 Affidavit, # 2 Exhibit) (Katko, Nicholas) Link added to Errata filed at 5 . Modified text on 1/22/2025. (kss) (Entered: 01/21/2025) |
| 01/21/2025 | 3 | MOTION for attorney D. Greg Blankinship, Esq. to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-8658084) by THOMAS BODKIN, TINA BODKIN. (Attachments: # 1 Affidavit, # 2 Exhibit) (Katko, Nicholas) (Entered: 01/21/2025) |
| 01/21/2025 | | Judge Arthur J. Schwab added. (kss) (Entered: 01/21/2025) |
| 01/21/2025 | 4 | Summons Issued as to ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Summons Eligo Energy, LLC) (kss) (Entered: 01/21/2025) |
| 01/21/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 1 COMPLAINT. ERROR: Party did not file disclosure statement identifying citizenship as required pursuant to FRCvP 7.1(a)(2). CORRECTION: Attorney advised to file statement within 7 days under Civil > Other Filings > Other Documents > Disclosure Statement (LR 7.1.A and/or FRCvP 7.1(a)(2)). Disclosure Statement due by 1/28/2025. (kss) (Entered: 01/21/2025) |
| 01/21/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 2 Motion to Appear Pro Hac Vice, 3 Motion to Appear Pro Hac Vice. ERRORS: Filer & signature on document must be the attorney seeking admission. Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney advised of signature & filer requirements. Attorneys to resubmit the documents using the Errata event with a proposed order as an attachment to the main document. (kss) (Entered: 01/21/2025) |
| 01/21/2025 | 5 | Errata re 2 Motion to Appear Pro Hac Vice of *J. Burkett McInturff* by TINA BODKIN, THOMAS BODKIN. Reason for Correction: Filer & Attorney Signature, Proposed Order. (Attachments: # 1 Affidavit (Affidavit with Certificate of Good Standing attached), # 2 Proposed Order) (McInturff, J. Burkett) (Entered: 01/21/2025) |
| 01/21/2025 | 6 | Errata re 3 Motion to Appear Pro Hac Vice of *D. Greg Blankinship, Esq.* by TINA BODKIN, THOMAS BODKIN. Reason for Correction: Filer & Attorney Signature, Proposed Order. (Attachments: # 1 Affidavit (Affidavit with Certificate of Good Standing attached), # 2 Proposed Order) (Blankinship, Douglas) Link added to Errata filed at 6 . Modified text on 1/22/2025. (kss) (Entered: 01/21/2025) |
| 01/23/2025 | 7 | TEXT ORDER OF RECUSAL. Pursuant to 28 U.S.C. 455(a), this Court hereby recuses itself as to all matters of the above-captioned case and requests that this case be assigned to another member of the Court. Judge Arthur J. Schwab recused. Signed by Judge Arthur J. Schwab on 1/23/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (lar) (Entered: 01/23/2025) |
| 01/23/2025 | | Judge Joy Flowers Conti added. (bjr) (Entered: 01/23/2025) |
| 01/24/2025 | 8 | ORDER REASSIGNING CASE. The Clerk of Court is directed to reassign this case to another member of the court for all further proceedings. Judge Joy Flowers Conti no longer assigned to case. Signed by Judge Joy Flowers Conti on 1/24/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (lyk) (Entered: 01/24/2025) |
| 01/24/2025 | | Judge Cathy Bissoon added. (bjr) (Entered: 01/24/2025) |
| 01/24/2025 | 9 | ORDER governing procedures for motions filed under Fed. R. Civ. P. 12. See contents of this filing for instructions. Signed by Judge Cathy Bissoon on 1/24/2025. (jmm) (Entered: 01/24/2025) |
| 01/24/2025 | 10 | ORDER granting 2 Motion for J. Burkett McInturff to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 1/24/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 01/24/2025) |
| 01/24/2025 | 11 | ORDER granting 3 Motion for D. Greg Blankinship to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 1/24/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 01/24/2025) |
| 01/27/2025 | 12 | Disclosure Statement, declaring citizenship by TINA BODKIN, THOMAS BODKIN. (McInturff, J. Burkett) (Entered: 01/27/2025) |
| 01/27/2025 | 13 | WAIVER OF SERVICE Returned Executed by TINA BODKIN, THOMAS BODKIN. ELIGO ENERGY, LLC waiver sent on 1/21/2025, answer due 3/24/2025. (Blankinship, Douglas) (Entered: 01/27/2025) |
| 01/27/2025 | 14 | WAIVER OF SERVICE Returned Executed by TINA BODKIN, THOMAS BODKIN. ELIGO ENERGY PA, LLC waiver sent on 1/21/2025, answer due 3/24/2025. (Blankinship, Douglas) (Entered: 01/27/2025) |
| 02/14/2025 | 15 | NOTICE of Appearance by Jessica Hunter on behalf of THOMAS BODKIN, TINA BODKIN. (Hunter, Jessica) (Entered: 02/14/2025) |
| 02/14/2025 | | Attorney is advised to disregard this message as disclosure was filed at 12 ; CLERK'S OFFICE QUALITY CONTROL MESSAGE re 15 Notice of Appearance. ERROR: Party did not file disclosure statement identifying citizenship as required pursuant to FRCvP 7.1(a)(2). CORRECTION: Attorney advised to file statement within 7 days under Civil > Other Filings > Other Documents > Disclosure Statement (LR 7.1.A and/or FRCvP 7.1(a)(2)). Disclosure Statement due by 2/21/2025. (cel) Modified text on 2/14/2025. (cel) (Entered: 02/14/2025) |
| 03/04/2025 | 16 | MOTION to Withdraw *Appearance of Nicholas Katko* by THOMAS BODKIN, TINA BODKIN. (Attachments: # 1 Proposed Order) (Katko, Nicholas) (Entered: 03/04/2025) |
| 03/04/2025 | 17 | ORDER granting 16 MOTION to Withdraw Appearance of Nicholas Katko. Attorney Nicholas Katko is terminated as to this matter. Signed by Judge Cathy Bissoon on 3/4/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 03/04/2025) |
| 03/21/2025 | 18 | NOTICE of Appearance by Leland P. Schermer on behalf of ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Schermer, Leland) (Entered: 03/21/2025) |
| 03/21/2025 | 19 | NOTICE of Appearance by Ryan Stephen Shymansky on behalf of ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Shymansky, Ryan) (Entered: 03/21/2025) |

| 03/21/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 18 Notice of Appearance, 19 Notice of Appearance. ERROR: Party did not file disclosure statement identifying both all parent companies, subsidiaries, and affiliates that have issued shares or debt securities to the public AND citizenship as required pursuant to both LR 7.1.A and FRCvP 7.1(a)(2). CORRECTION: Attorney advised to file statement within 7 days under Civil > Other Filings > Other Documents > Disclosure Statement (LR 7.1.A and/or FRCvP 7.1(a)(2)). Disclosure Statement due by 3/28/2025. (kss) (Entered: 03/21/2025) |
|---|---|---|
| 03/21/2025 | 20 | MOTION for attorney Ryan D. Watstein to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-8768840) by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Affidavit) (Watstein, Ryan) (Entered: 03/21/2025) |
| 03/24/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 20 Motion to Appear Pro Hac Vice. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (kss) (Entered: 03/24/2025) |
| 03/24/2025 | 21 | Proposed Order re 20 Motion to Appear Pro Hac Vice *for Ryan D. Watstein* by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 03/24/2025) |
| 03/24/2025 | 22 | ORDER granting 20 Motion for Ryan D. Watstein to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 3/24/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 03/24/2025) |
| 03/24/2025 | 23 | *Defendants'* ANSWER to 1 Complaint by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) Modified text on 3/25/2025 to add document linkage. (kss) (Entered: 03/24/2025) |
| 03/24/2025 | 24 | Disclosure Statement identifying None as corporate parent or other affiliate by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 03/24/2025) |
| 03/25/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 23 Answer to Complaint. ERROR: Attorney signature missing required information (Pennsylvania or other state bar number). CORRECTION: Attorney directed to comply with requirements of LCvR 5.2(B) in all future filings. This message is for informational purposes only. CLERK'S OFFICE QUALITY CONTROL MESSAGE. ERROR: Document not linked. CORRECTION: Linked to appropriate document. This message is for informational purposes only. (kss) (Entered: 03/25/2025) |
| 03/25/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 24 Disclosure Statement. ERROR: Party did not file disclosure statement identifying citizenship as required pursuant to FRCvP 7.1(a)(2). CORRECTION: Attorney advised to file statement within 7 days under Civil > Other Filings > Other Documents > Disclosure Statement (LR 7.1.A and/or FRCvP 7.1(a)(2)). Disclosure Statement due by 4/1/2025. (kss) QC message sent in error due to class action. Advised attorney to disregard. Modified text on 3/25/2025. (kss) (Entered: 03/25/2025) |
| 03/25/2025 | 25 | ORDER. A Video Initial Case Management Conference is set for **5/2/2025 at 11:00 AM** before Judge Cathy Bissoon. See contents of this filing for detailed instructions and deadlines. Signed by Judge Cathy Bissoon on 3/25/2025. (jmm) (Entered: 03/25/2025) |
| 03/25/2025 | 26 | ORDER. All counsel of record in this case must read the attached article on mediation prior to the Initial Case Management Conference and share the same with their client(s). The attached article is being disseminated with permission of the author and The Pennsylvania Lawyer. Signed by Judge Cathy Bissoon on 3/25/2025. (Attachments: # 1 Appendix Mediation Article) (jmm) (Entered: 03/25/2025) |
| 03/31/2025 | 27 | MOTION for attorney David E. Meadows to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-8783849) by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit A - Affidavit of David E. Meadows, # 2 Proposed Order) (Meadows, David) (Entered: 03/31/2025) |
| 04/01/2025 | 28 | MOTION for attorney Leo P. O'Toole to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-8784652) by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit A - Affidavit of Leo P. O'Toole, # 2 Proposed Order) (O'Toole, Leo) (Entered: 04/01/2025) |
| 04/01/2025 | 29 | ORDER granting 27 Motion for David E. Meadows to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 4/1/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 04/01/2025) |
| 04/01/2025 | 30 | MOTION for attorney Abigail L. Howd to Appear Pro Hac Vice, (Filing fee $70, Receipt # APAWDC-8784685) by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit A - Affidavit of Abigail Howd, # 2 Proposed Order) (Howd, Abigail) (Entered: 04/01/2025) |
| 04/01/2025 | 31 | ORDER granting 28 Motion for Leo P. O'Toole to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 4/1/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 04/01/2025) |
| 04/01/2025 | 32 | ORDER granting 30 Motion for Abigail L. Howd to Appear Pro Hac Vice. Signed by Judge Cathy Bissoon on 4/1/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jmm) (Entered: 04/01/2025) |
| 04/25/2025 | 33 | REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Exhibit A - Brous v. Eligo Energy, et al., Apr. 16 Hrg. Tr.) (Hunter, Jessica) (Entered: 04/25/2025) |
| 04/29/2025 | 34 | STIPULATION selecting ADR process by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Meadows, David) (Entered: 04/29/2025) |
| 05/02/2025 | 35 | Minute Entry for proceedings held before Judge Cathy Bissoon: Initial Case Management Conference held on 5/2/2025. The Court will issue an order memorializing the instructions for moving forward. (Court Reporter: None) (jmm) (Entered: 05/02/2025) |
| 05/02/2025 | 36 | ORDER. As discussed at today's Conference, by 5/9/2025, the parties shall file a joint status report. The status report should identify any areas of agreement and, to the extent there is disagreement, their opposing positions should be summarized. In the event that Defendants will file a motion to stay, it is due by 5/13/2025, and Plaintiffs' response will be due by 5/16/2025. In addition, the parties shall use the time between now and the status report deadline to further discuss the selection of a mutually acceptable ADR neutral; and they shall file an amended ADR stipulation by the due date of the status report (5/9/2025). Information regarding Court-approved neutrals can be found on the Court's website: https://www.pawd.uscourts.gov/alternative-dispute-resolution, "Find an ADR Neutral" (former district and magistrate judges from this District also are popular choices, and they are identifiable on the internet). Unaffiliated neutrals are permissible, in conformity with the Court ADR Program's Policies and Procedures. See ADR Ps & Ps (available through the link above). Should the parties fail to reach agreement regarding a neutral, the Court will not appoint one endorsed by only one side, but instead will select its own, and no party's preference will be assured. Signed by Judge Cathy Bissoon on 5/2/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 05/02/2025) |
| 05/08/2025 | 37 | First MOTION for Leave to File Amended Complaint, by THOMAS BODKIN, TINA BODKIN. (Attachments: # 1 Exhibit A - Proposed First Amended Complaint, # 2 Exhibit B - Redline Comparision) (Hunter, Jessica) Modified text on 5/8/2025 to correct relief. (kss) (Entered: 05/08/2025) |
| 05/08/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 37 Motion for Leave to File Amended Complaint. ERROR: Incorrect relief selected. CORRECTION: Changed relief from Motion to Amend to Motion for Leave to File Amended Complaint. This message is for informational purposes only. CLERK'S OFFICE QUALITY CONTROL MESSAGE re 37 Motion for Leave to File Amended Complaint. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (kss) (Entered: 05/08/2025) |
| 05/09/2025 | 38 | Proposed Order re 37 Motion for Leave to File Amended Complaint, by THOMAS BODKIN, TINA BODKIN. (Hunter, Jessica) (Entered: 05/09/2025) |
| 05/09/2025 | 39 | STATUS REPORT *Regarding Defendants' Forthcoming Motion to Stay Discovery and ADR Stipulation* by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 05/09/2025) |
| 05/09/2025 | 40 | STIPULATION selecting ADR process by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 05/09/2025) |
| 05/12/2025 | 41 | Unopposed MOTION to Extend Time to File Motion to Stay by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 05/12/2025) |

| 05/13/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 41 Motion to Extend Time to File Motion to Stay. ERROR: Proposed Order was made part of main document. CORRECTION: Attorney advised that in future proposed orders are to be made attachments to the main document. This message is for informational purposes only. (kss) (Entered: 05/13/2025) |
|---|---|---|
| 05/13/2025 | 42 | ORDER granting 41 Defendants' unopposed Motion for extension of time to file a motion to stay, as follows. Defendants' new deadline is 5/20/2025, and the motion should include their position regarding Plaintiffs' Motion (Doc. 37) for leave to amend (for the sake of economy, a separate response to Plaintiffs' Motion is not required and should not be filed). Plaintiffs' deadline to respond, per the original schedule, would be 5/23/2025. Defendants' Motion proposes that Plaintiffs' response be due by 5/29/2025, and the Court is unaware whether Plaintiffs' consent was conditioned on Defendants' agreement to such an extension. In any event, and to prevent unfair surprise, the Court will grant Defendants' request as presented, and the deadline for Plaintiffs to respond is 5/29/2025. The response shall address all matters contained in Defendants' filing. Signed by Judge Cathy Bissoon on 5/13/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 05/13/2025) |
| 05/20/2025 | 43 | MOTION to Stay *Under First-Filed Rule* by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Proposed Order) (Watstein, Ryan) (Entered: 05/20/2025) |
| 05/20/2025 | 44 | BRIEF in Support re 43 Motion to Stay *Under First-Filed Rule* filed by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit A - Plaintiffs' First Requests for Production to Eligo, # 2 Exhibit B - Eligo's Opposition to Brous Motion to Amend) (Watstein, Ryan) (Entered: 05/20/2025) |
| 05/21/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 43 Motion to Stay, 44 Brief in Support of Motion. ERROR: Attorney signature missing required information (Pennsylvania or other state bar number). CORRECTION: Attorney directed to comply with requirements of LCvR 5.2(B) in all future filings. This message is for informational purposes only. (kss) (Entered: 05/21/2025) |
| 05/29/2025 | 45 | BRIEF in Opposition re 43 Motion to Stay filed by THOMAS BODKIN, TINA BODKIN. (Attachments: # 1 Exhibit A - Brous April 16, 2025 Hr'g Tr., # 2 Exhibit B - Brous May 9, 2024 Hr'g Tr.) (McInturff, J. Burkett) (Entered: 05/29/2025) |
| 06/05/2025 | 46 | MOTION for Leave to File Reply Brief in Support of 43 Motion to Stay by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit Reply Brief in Support of Motion to Stay, # 2 Proposed Order) (Watstein, Ryan) Modified text on 6/6/2025 to add document linkage. (kss) (Entered: 06/05/2025) |
| 06/06/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 46 Motion for Leave to File Reply Brief in Support. ERROR: Document not linked. CORRECTION: Linked to appropriate document. This message is for informational purposes only. (kss) (Entered: 06/06/2025) |
| 06/06/2025 | 47 | ORDER granting 46 Motion for leave to file a reply. The reply brief attached to the Motion is deemed filed, and a surreply will not be considered. Signed by Judge Cathy Bissoon on 6/6/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 06/06/2025) |
| 06/09/2025 | 48 | NOTICE *of Supplemental Authority* by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC (Watstein, Ryan) (Entered: 06/09/2025) |
| 06/09/2025 | 49 | NOTICE *of Filing* by THOMAS BODKIN, TINA BODKIN (Attachments: # 1 Exhibit A - Brous Pls.' Not. of Withdrawal of Opp'n, # 2 Exhibit B - 2025.06.09 Hr'g Tr.) (McInturff, J. Burkett) (Entered: 06/09/2025) |
| 06/11/2025 | 50 | MOTION for Leave to File Response to Plaintiffs' 49 Notice of Filing in Brous by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit Response to Plaintiffs' Notice of Filing in Brous) (Watstein, Ryan) Modified text on 6/12/2025 to add document linkage. (kss) (Entered: 06/11/2025) |
| 06/12/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 50 Motion for Leave to File Response. ERROR: Document not linked. CORRECTION: Linked to appropriate document. This message is for informational purposes only. (kss) (Entered: 06/12/2025) |
| 06/12/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 50 Motion for Leave to File Response. ERROR: Proposed Order, which is required for all motions in civil cases per Local Rule LCvR7, was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (kss) (Entered: 06/12/2025) |
| 06/12/2025 | 51 | Proposed Order re 50 Motion for Leave to File, by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 06/12/2025) |
| 06/20/2025 | 52 | STATUS REPORT *ON MANDATORY MEDIATION SCHEDULING* by THOMAS BODKIN, TINA BODKIN. (McInturff, J. Burkett) (Entered: 06/20/2025) |
| 06/30/2025 | 53 | Joint MOTION to Extend Time to Conduct Mediation by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) (Entered: 06/30/2025) |
| 07/01/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 53 Motion to Extend Time to Conduct Mediation. CORRECTION: Attorney advised that in future proposed orders are to be made attachments to the main document. This message is for informational purposes only. (kss) (Entered: 07/01/2025) |
| 07/25/2025 | 54 | NOTICE of Change of Address by Ryan Watstein (Watstein, Ryan) (Entered: 07/25/2025) |
| 07/25/2025 | 55 | ORDER granting 53 Joint Motion to extend deadline for mediation. The new deadline is 10/16/2025. Signed by Judge Cathy Bissoon on 7/25/2025. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 07/25/2025) |
| 08/22/2025 | 56 | STATUS REPORT *ON MANDATORY MEDIATION SCHEDULING* by THOMAS BODKIN, TINA BODKIN. (McInturff, J. Burkett) (Entered: 08/22/2025) |
| 08/27/2025 | 57 | RESPONSE to 56 Status Report, filed by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Attachments: # 1 Exhibit A - Email Correspondence re: Mediation Scheduling) (Watstein, Ryan) (Entered: 08/27/2025) |
| 09/17/2025 | 58 | NOTICE *of Supplemental Authority* by THOMAS BODKIN, TINA BODKIN re 43 Motion to Stay, 37 Motion for Leave to File Amended Complaint, (Attachments: # 1 Exhibit A (Brous et al. v. Eligo Opinion and Order), # 2 Exhibit B (Orzolek v. Eligo Order), # 3 Exhibit C (Brous Second Amended Complaint)) (McInturff, J. Burkett) (Entered: 09/17/2025) |
| 09/25/2025 | 59 | RESPONSE re 58 Notice of Supplemental Authority and Notice of Intent to Move to Transfer filed by ELIGO ENERGY PA, LLC, ELIGO ENERGY, LLC. (Watstein, Ryan) Modified text on 9/26/2025 to add document linkage. (kss) (Entered: 09/25/2025) |
| 09/26/2025 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 59 Response. ERROR: Document not linked. CORRECTION: Linked to appropriate document. This message is for informational purposes only. (kss) (Entered: 09/26/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/26/2025 11:44:36 | | |
| **PACER Login:** | rwatstein0093945 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:25-cv-00094-CB |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **THOMAS ORZOLEK**, on behalf of himself and all others similarly situated, | Civil Case No.: 2:25-cv-00078 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **ELIGO ENERGY, LLC** and **ELIGO ENERGY OH, LLC**, | |
| Defendants | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

NATURE OF THE CASE ................................................................................................ 1

PARTIES ....................................................................................................................... 3

JURISDICTION AND VENUE ...................................................................................... 6

FACTUAL ALLEGATIONS .......................................................................................... 7

   A.   THE HISTORY OF DEREGULATION AND CRES' ROLE IN ENERGY MARKETS ................... 7
   B.   PLAINTIFF TOM ORZOLEK'S DEALINGS WITH ELIGO ........................................... 13
   C.   ELIGO'S UNAUTHORIZED PRICING PRACTICES ................................................... 14

CLASS ACTION ALLEGATIONS ............................................................................... 22

CAUSES OF ACTION .................................................................................................. 25

COUNT I: BREACH OF CONTRACT ......................................................................... 25

PRAYER FOR RELIEF ................................................................................................. 27

JURY DEMAND ........................................................................................................... 27

Plaintiff Thomas Orzolek ("Plaintiff"), by his attorneys, Goldenberg Schneider, L.P.A., Wittels McInturff Palikovic, and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, brings this proposed class action in his individual capacity, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy OH, LLC (hereinafter "Eligo" or "Defendants") and hereby alleges the following with knowledge as to his own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      This action seeks to redress Eligo's breach of contract that has caused tens of thousands of commercial and residential customers in Ohio, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Eligo is a certified retail energy supplier ("CRES") that competes with local utilities to sell electricity and natural gas in deregulated energy markets across the United States. Eligo plays a middleman role. It buys energy on the wholesale market and resells it to customers with a markup.  It does not produce or deliver the energy it supplies to customers.

3.      Eligo represents in its customer contract that Eligo's variable energy rates "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."  In other words, Eligo's contract represents that customers' rates are "based on" just two identifiable factors: (1) the cost of wholesale energy, and (2) the cost of Renewable Energy Certificates.[1]

---

[1] Renewable Energy Certificates or "RECs" are tradable certificates that represent the environmental benefits of electricity generated from renewable sources by a different party. RECs are tradable commodities that can be bought and sold in the market. CRESs like Eligo buy RECs and pair them with the "brown" energy they purchase at wholesale and then market their energy supply as "100% renewable energy."

Eligo's contract also represents that the variable rate "may" be "periodically adjusted" in accordance with wholesale market conditions.

4.      In reality, Eligo did not provide customers with variable rates based on its wholesale supply and REC costs.  Instead, Eligo used a pricing methodology that charged excessive and varying profit margins with the intent of depriving customers of the benefits of a rate calculated using the contract's two identifiable pricing criteria.  Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates.  Nor does the contract provide Defendants with discretion to pick and choose the weight of the two factors and then apply whatever markup it sees fit.  Yet Eligo's varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment to do the opposite.

5.      Indeed, Eligo has always followed a uniform policy of charging a rate not calculated in accordance with the way described in Eligo's contract. Eligo has also admitted that its variable rates are set using factors that are not listed in Eligo's contract.

6.      As a result of Eligo's breach of contract, tens of thousands of customers have been, and continue to be, fleeced by Eligo out of tens of millions of dollars in exorbitant charges for electricity and natural gas.

7.      Plaintiff and other Eligo customers (the "Class") have been injured by Eligo's breach of contract.  Plaintiff and the Class therefore seek damages, restitution, and declaratory relief for Eligo's breach of contract.

8.      Only through a class action can Eligo's customers remedy its ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's breach of

contract, it makes no financial sense for an individual customer to bring his or her own lawsuit. With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like Eligo honor the terms of their customer contracts.

## **PARTIES**

9.     Plaintiff Thomas Orzolek resides in Bridgeport, Ohio.  Plaintiff enrolled with Eligo in or around September 2018. Eligo charged Mr. Orzolek a fixed rate for electricity from September 2018 until June 2022, after which it began charging a variable rate. Plaintiff cancelled his Eligo account in or around January 2023. Eligo charged Plaintiff excessive and unauthorized variable rates every month he was on Eligo's variable rate plan.

10.     As a result of Eligo's unauthorized conduct, Mr. Orzolek paid more for his home energy supply than he otherwise should have paid.

11.     Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC. On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida. Accordingly, Eligo Energy, LLC is a citizen of Florida.

12.     Defendant Eligo Energy OH, LLC is an Ohio limited liability company with its principal place of business in Chicago, Illinois.  On information and belief, Eligo Energy OH, LLC is a wholly owned subsidiary of Eligo Energy, LLC. Accordingly, Eligo Energy OH, LLC is a citizen of Florida.

13.     Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy OH, LLC. Eligo Energy, LLC and Eligo Energy

OH, LLC hold themselves out as a single company—Eligo Energy.[2] Eligo Energy OH, LLC has no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[3] There is a unified executive team, and on information and belief they are all employed by Eligo Energy, LLC. That unified executive team controls all operational and financial aspects of Eligo Energy OH, LLC. For example, in a separate consumer class action pending against Eligo Energy NY, LLC in the United States District Court for the Southern District of New York, the New York LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the Eligo brand nationally. Defendants have also admitted that attorneys at Eligo Energy, LLC were responsible for drafting customer communications and customer contracts. Defendant Eligo Energy OH, LLC's current Controller, Chief Compliance Officer, Executive Chairman, VP of Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for their employment by Eligo Energy, LLC. All of these individuals were voluntarily designated by defense counsel in the S.D.N.Y. action as key players whose ESI will be collected for search in that matter. Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant Eligo Energy OH, LLC, take the acts challenged in this lawsuit.

14.    All of the operations and activities related to acquiring and servicing Eligo's customers (including Eligo's customers in Ohio) are directed and executed by Eligo Energy, LLC, including marketing and making sales to Ohio consumers, setting the exorbitant variable rates for those customers, purchasing energy at wholesale, and handling billing and other back-office activities. Eligo Energy, LLC also owns and operates the computer software and hardware used to set rates for all Eligo customers, including Eligo's customers in Ohio. Eligo Energy, LLC

---

[2] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story.

[3] *See id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606").

employs the individuals that conducted the activities challenged in this litigation. For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy, LLC's executive team sets pricing strategy for New York customers. Those individuals include Eligo Energy, LLC's CEO, head of Risk team, and CIO. Eligo Energy NY, LLC's 30(b)(6) witness also testified that he did not know if a separate group of people manage Eligo Energy NY, LLC as opposed to Eligo Energy, LLC, he could not identify documents that list the names or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo Energy NY, LLC.

15. Eligo Energy, LLC also holds itself out to customers as their supplier of electricity and the contracting entity. Although Plaintiff's contract with Eligo states that the agreement is between Plaintiff and Eligo Energy OH, LLC, Eligo sends Ohio customers like Plaintiff a cover letter enclosing Eligo's contract that bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606

The letter further states that "[i]n the next few days, you will be receiving a notice from [the local utility] of change of your supplier **_to Eligo Energy, LLC_**." (Emphasis added). Eligo's cover letter also states that they enclose "a copy of the Terms of Service with Eligo Energy" and are signed "Sincerely, Eligo Energy."

16. Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy OH, LLC as a separate entity. Rather, it used the corporate entity Eligo Energy OH, LLC interchangeably with itself. For example, invoices for wholesale electricity purchases from the New York Independent System Operator (NYSIO) for Eligo's New York customers were addressed to "Eligo Energy, LLC." Similarly, invoices from New York electric utility companies (NY State

Electric & Gas Corporation and Rochester Gas & Electric) addressed to "Eligo Energy NY, LLC" were paid from an account controlled by Defendant Eligo Energy, LLC.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

17.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and at least one Defendant.

### *Personal Jurisdiction*

18.     This Court has General and Specific Personal Jurisdiction over Defendant Eligo Energy OH, LLC because it is an Ohio limited liability company, and it advertises, markets, distributes, and sells energy to Ohio customers, including Plaintiff. This Court has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets, distributes, and sells energy to Ohio customers, including Plaintiff.

### *Venue*

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1).  Both Defendants are limited liability companies that are deemed to reside in any judicial district in which they are subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this District under § 1391(b)(1).

## FACTUAL ALLEGATIONS

**A.     The History Of Deregulation And CRESs' Role In Energy Markets**

20.     In the 1990s and 2000s, numerous states, including Ohio, deregulated their markets for retail energy. Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay. Deregulation laws in other states are substantially similar.

21.     Since Ohio opened its retail energy markets to competition, millions of Ohio residential and small business customers have switched to a CRES.

22.     CRESs, the new energy suppliers, compete primarily against local utilities. CRESs purchase energy directly or indirectly from the wholesale energy market.  CRESs then sell that energy to end-user customers.  However, CRESs do not ***deliver*** energy to customers' homes and businesses, and the overwhelming majority do not produce electricity or extract natural gas.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer.  CRESs merely buy electricity and natural gas at wholesale and then sell that energy to end-users with a mark-up.  Thus, CRESs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers.  The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or a CRES sets the price for the customer's energy supply. The only value that CRESs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge.  Absent such savings, CRESs merely siphon money from end users in the form of increased (and unnecessary) charges.

23.     CRESs are subject to minimal regulation by state utility regulators like the Public Utilities Commission of Ohio ("PUCO").  CRESs are statutorily exempted from the vast

majority of the PUCO's regulations, including those that concern the setting of rates for consumers. Instead, the calculation of a CRES customer's rates are governed by the contract between the CRESs and the customer.

24.     Customers who do not switch to a CRES for their energy supply continue to receive their supply from their local utility. For example, in Ohio, as in many states, the utilities charge energy supply rates that are driven by the wholesale cost of energy and the market conditions that affect that cost—the same costs that CRESs like Eligo incur in Ohio.  Indeed, in Ohio, AEP Ohio's rates are based on its costs and expenses to purchase and serve energy supply to its customers.[4] AEP Ohio's supply rate includes both the wholesale cost of energy purchased on the competitive wholesale supply market (via a competitive auction for 6-months of supply), the cost to transmit that energy to the point of delivery where AEP Ohio acquires the energy from the transmission system, and AEP Ohio's documented overhead attributable to its acquisition of customers' energy supply.[5]

25.     CRESs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices. But CRESs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing

---

[4] AEP Ohio, https://www.aepohio.com/company/about/rates/generation-supply. "For the generation (supply) portion of your bill, a competitive market auction process is used. This is where energy supply companies submit bids in the auction for the ability to supply energy to AEP Ohio customers for a specified time period at the lowest price possible."

[5] AEP Ohio Tariff, https://www.aepohio.com/lib/docs/ratesandtariffs/Ohio/January2025AEPOhioTariffBook.pdf, Sheet No. 450 thru 452 and Ohio Power Company's Electric Security Plan, p. 7, https://aepohiocbp.com/assets/files/ESP%20III%20Application%20(Book%201).PDF: "The Company's proposed ESP [Electric Security Plan] will provide transparency in AEP Ohio's SSO [Standard Service Offer] pricing, through the introduction of a Generation Energy (GENE) rider, a generation Capacity (GENC) rider, a Basic Transmission Cost Rider (BTCR), and an Auction Cost Reconciliation Rider (ACRR), which will give consumers a comparable price that they can use to compare information when determining whether to select an alternative supplier."

energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers, such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow CRESs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

26.     Because of their increased flexibility, CRESs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the two factors Eligo's contract ties variable rates to.

27.     Instead, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" its wholesale supply and REC costs and then add whatever markup it chooses.

28.     One of deregulation's main unintended consequences has been the proliferation of CRESs like Eligo whose business model is primarily based on taking advantage of customers.

29.     An exhaustive 2024 analysis of 2,022,842 retail electricity offerings in Ohio— from 2014 to 2023—found that between 65% to 73% of competitive retail offers exceeded the utility's default service rate.[6] For the offers that exceeded the default service price, they did so by an average of 26% to 32%, despite providing no benefit to the consumer.[7]

30.     In an interview, the study's primary author reported that "[e]very day we see

---

[6] Dormady et al., *Efficiency and Consumer Welfare under Retail Electricity Deregulation: Analysis of Ohio's Retail Choice Markets*, 6 J. OF CRITICAL INFRASTRUCTURE POLICY e12031, at 1 (2024), https://doi.org/10.1002/jci3.12031.

[7] *Id.*

prices that are three, four, in some cases 500% away from the wholesale price, there's just huge dispersion in these markets . . . [i]magine if Honda tried to sell a Honda Civic[] for $300,000."[8] Unfortunately in Ohio, "some consumers are committing to the $300,000-Honda-Civic of electric rates, because they don't know any better."[9]

31.    The accumulated cost of these pricing practices is staggering—in Ohio's deregulated natural gas sector, "consumers who have chosen a marketer [like Eligo] have spent **$2 billion more** than consumers who chose the standard offer," according to the Ohio Consumers' Counsel.[10]

32.    Worse, the studies' authors found that CRESs' conduct in Ohio has worsened over time; the longer deregulation goes on, the greater CRESs like Eligo overcharge their customers, even during periods where wholesale supply costs are going down:

> Interestingly, we observe a historical trend of increasing magnitudes over time, abrogated of course by the post-Covid, wartime economy carrying over into 2022 and 2023. This indicates that while the retail market continued to develop and expand, and while the wholesale market was backwardated [i.e., lower future price than current price] and declining in price, the propensity of CRES suppliers to offer contracts exceeding the SSO has increased over time. In other words, *while the wholesale market was delivering year-over-year decreases in prices, CRES suppliers were increasingly offering less competitive products to residential customers*.[11]

33.    Ultimately, the study's authors determined that the explanation for CRESs' consistently high prices lay not in wholesale price inputs or the purchase of renewable energy credits, but in CRESs' continuing exploitation of unsuspecting and vulnerable consumers:

---

[8] "Study reveals flaws in Ohio's retail electricity marketplace", WOSU Public Media (Jan. 27, 2025), https://www.wosu.org/politics-government/2025-01-27/study-reveals-flaws-in-ohios-retail-electricity-marketplace.

[9] *Id.*

[10] *Id.*

[11] Dormady *et al.* at 9 (emphasis added).

Put simply, we argue that the issue is opportunism; CRES suppliers exploit known demand-side shortcomings and information asymetries on the part of consumers . . . [A] more comprehensive understanding of retail electricity markets must also take into account **the high level of misconduct and deception on the part of profit-maximizing retailers**.

                                    . . .

[I]n resale markets of homogenous products, the product cannot be improved upon and can only be resold. Innovation is constrained. It is not as if a retail supplier will innovate by creating a more efficient electron. **The only way in which these resellers can innovate is through finding newer and more crafty ways to engage in price discrimination**. . . . And, because it is costless for retailers to post multiple offers each day, across a range of different prices and contract terms, they can segment consumer populations by degrees of information asymmetry. Here, we find that many CRES suppliers post multiple offers each day, across a range of prices, filing both competitive and uncompetitive offers alike, for the purpose of segmenting their customer populations. **For a CRES supplier, filing competitive offers for well-informed consumers and exploitative offers for others only has upside and no downside**[.][12]

34.    Summarizing their results, the authors concluded that "the end result [of electricity market deregulation] is that consumers see larger markups, inaccessible savings, and commonplace unscrupulous retail sales practices[.]"[13]

35.    Ohio is not the only state where there is overwhelming evidence of consumer harm from CRES practices. A 2021 analysis by the *Wall Street Journal*, for example, found that "in nearly every state where they operate, retailers have charged more than regulated incumbents."[14] Data from Massachusetts, Connecticut, Illinois, Maine, Maryland, New York,

---

[12] *Id.* at 15 (emphasis added).

[13] *Id.* at 16.

[14] Scott Patterson & Tom McGinty, *Deregulation Aimed to Lower Home-Power Bills. For Many, It Didn't*, WALL ST. J. (Mar. 8, 2021), https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623?page=16.

and Pennsylvania confirm that consumers pay far too much when they sign up with CRESs instead of sticking with their utility companies.[15]

36. In 2023, both of Massachusetts' two United States Senators and a Massachusetts Member of Congress criticized CRESs, noting that they found it "[e]specially troublesome [that] the Attorney General's Office found that CRESs have targeted vulnerable populations:

- low-income customers in Massachusetts are nearly twice as likely to sign up with CRESs and are charged higher rates than non-low-income customers;

- assuming 600-kilowatt hour per month usage, typical for a Massachusetts household, an average non-low-income customer who signed up with a CRES lost $222 per year while the average low-income customer lost $254 per year;

- low-income customers collectively experienced an annual net loss of more than $20 million due to higher rates and additional monthly fees;

- communities of color, communities with low median incomes, and communities with high percentages of residents lacking English proficiency correlate with higher rates of participation in the individual residential market for electric supply; and

- customers of advanced age who cannot understand the transaction or are particularly vulnerable are targeted and subjected to aggressive sales tactics."[16]

---

[15] Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

[16] Legislators' Letter at 2 (citing MA A.G. Remarks; Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, Massachusetts Attorney General's Office (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download, and *In re Liberty Power Holdings LLC*, Addendum to Proof of Claim Filed by the Commonwealth of Massachusetts, Case No. 21-13797-SMG (Bankr. S.D. Fla.)).

37.     In fact, "[f]orty percent of residents in Dorchester and Mattapan, two Boston neighborhoods with a high proportion of low-income residents, are enrolled with one of these suppliers."[17] "Compared to the city's Community Choice Electricity program, residents have paid suppliers as much as $300 extra per month."[18]

38.     There is also a growing call for increased civil enforcement.  For example, in December 2023 both of Massachusetts' United States Senators and a Massachusetts Member of Congress urged the Federal Trade Commission to begin enforcement actions against CRESs because state regulatory enforcement activity has proven "difficult for state officials," and after ten years of pursuing CRESs the Massachusetts Attorney General's office "has recovered only $19 million—a small fraction of the more than $600 million lost" by Massachusetts customers.[19]

**B.     Plaintiff Tom Orzolek's Dealings With Eligo**

39.     In or around August or September 2018, Eligo solicited Plaintiff Orzolek, and he agreed to switch his electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff with Eligo's standard customer contract.

40.     Eligo began supplying electricity to Plaintiff Orzolek's residence and it continued to do so until he cancelled in our around January 2023.

41.     Eligo charged Plaintiff a fixed rate from approximately September 2018 to June 2022.  Thereafter, Eligo began charging Plaintiff Orzolek a variable rate for electricity. Eligo charged Plaintiff excessive and unauthorized variable rates every month he was on Eligo's

---

[17] Campbell & Wu, n.23 *supra*.

[18] *Id.*

[19] Legislators' Letter at 3 (citing Chris Lisinski, State House News Service, *Mass. leaders eye changes to 'predatory' electric sales tactics*, WBUR (June 6, 2023), https://www.wbur.org/news/2023/06/06/mass-leaders-eye-changes-to-predatory-electric-sales-tactics).

variable rate plan.

**C.     Eligo's Unauthorized Pricing Practices**

42.     In its form contract, Eligo represents that after the expiration of any fixed rate term, variable rates "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."

43.     The variable rate pricing structure outlined in Eligo's contract has two verifiable and documented components: (1) Eligo's cost to procure energy supply at wholesale, and (2) the cost of RECs to offset 100% of the customers' energy usage, which Eligo buys so it can claim to be providing "100% renewable energy."[20]

44.     Any reasonable consumer of gas or electricity delivered from the utility would expect and understand that Eligo's promise that its variable rate would be periodically adjusted to "market conditions" means that adjustments would only be made based on changes in costs in the market from which Eligo procures electricity or natural gas (the wholesale market). After all, the utilities' supply rates are "market-based" rates and they purchase electricity and natural gas in the competitive wholesale market just like Eligo does.  And like any commodities broker whose business is to purchase a commodity on a wholesale market and then resell that commodity to customers at a markup, when Eligo promises variable rates "based on" the underlying energy supply and states that those rates may thereafter be periodically adjusted to "market conditions," a reasonable person would understand Eligo to be promising a rate that fluctuates solely based on the wholesale cost of that commodity.

---

[20] Customers that switch to a CRES still consume the exact same energy that is delivered by their local utility.  When a CRES customer turns on a light switch or uses a gas range, the energy they are consuming is identical to the energy consumed by a utility customer.

45.    Eligo's contract does not give Eligo discretion to set prices as it sees fit.  Instead, the contract restricts Eligo's rates to rates that are "based on" Eligo's REC and wholesale supply costs.

46.    Neither of the two cost factors identified in Eligo's customer contract explain its exorbitant charges.  For example, the costs Eligo pays for energy on the relevant wholesale market do not account for Eligo's excessive rates. And Eligo's REC costs are minimal.  As detailed below, Eligo's rates far exceed those identifiable costs and were not "based on" those verifiable costs.

47.    Instead, Eligo's rates are explained by its practice of charging the highest feasible rate before too many customers notice their excessive energy bills and quit Eligo.

48.    Eligo is merely a middleman that buys energy at wholesale and resells it at a markup. Eligo's costs to supply customers with energy do not explain its exorbitant charges.  As detailed below, Eligo's variable rates far exceed those identifiable costs and were thus not "based on" Eligo's REC and market supply costs.

49.    Eligo purchases its energy supply on the competitive wholesale market.  For Ohio customers, that market is called the "PJM" and it is one of the world's largest competitive wholesale electricity markets.  PJM Interconnection, LLC operates this market and it manages the buying, setting, and delivery of electricity and coordinates the movement of wholesale electricity in all or part of 13 states (Ohio, Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Pennsylvania, Tennessee, Virginia and West Virginia) and the District of Columbia.

50.    The cost of wholesale energy from the PJM is overwhelmingly the largest cost Eligo incurs. Eligo's supply costs do not explain Eligo's egregiously high variable rates or the

reason its rates are disconnected from changes in wholesale costs. Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent Eligo even documented and itemized such costs when it set customers' monthly variable rates (Eligo did not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs. For example, while Eligo has tens of thousands of customers across the United States, the address on its website and correspondence with customers "201 W Lake St #151, Chicago, IL 60606" is in truth the address of a tiny mailbox in a UPS store that provides "mailbox and postal solutions."

51.      In fact, as shown below, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

52.      Eligo's outrageous rates are a result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup.

***Benchmark One: Wholesale Market Prices And 100% REC Costs.***

53.      A comparison of Eligo's rates to prevailing wholesale market costs plus the cost of RECs for offsetting 100% of Plaintiff's consumption shows that Eligo does not set its variable rates in compliance with its customer contract.

54.      The table below, *see* ¶ 59, identifies (i) the variable rate Eligo charged Plaintiff, (ii) the corresponding wholesale market conditions plus the cost of RECs, and (iii) the differences between Eligo's rates and the rate promised in Eligo's contract.

55.     The market prices below are based on the costs that a CRES incurs supplying a retail customer in Plaintiff's utility zone (AEP Ohio) for each billing period. The PJM market prices for electricity include the weighted day-ahead PJM electricity prices in Plaintiff's respective utility zone, ancillary services costs, capacity costs, transmission costs, and various relatively small charges related to purchasing energy at the PJM (the same costs Eligo incurs in the wholesale market to procure electricity for its customers).  These charges are tracked by PJM's Market Monitor, the external consultant that independently evaluates the PJM wholesale electricity market.

56.     As for REC costs, assuming Eligo purchased RECs to cover 100% of customer usage, the average price Eligo could have paid for such RECs was only 0.4 cents per kWh. To the extent Eligo purchased RECs covering less than 100% of usage, its REC costs would have been lower than 0.4 cents per kWh.

57.     That Eligo's rates are so vastly different from PJM market prices plus the costs of 100% RECs demonstrates that Eligo's variable rates do not aligns with Eligo's contract. The PJM market prices also represent the costs and charges that that Eligo and other CRESs incur in procuring energy supply for their retail customers. Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.

58.     The chart below shows a comparison of the variable rates Eligo charged Plaintiff for seven billing periods to a rate that is based on PJM market prices plus 100% RECs:

| Billing Period | Eligo Rate ($/kWh) | PJM Market Prices Plus 100% RECs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/22/22 - 7/22/22 | $0.1890 | $0.1135 | 1.7 | 67% |
| 7/22/22 - 8/22/22 | $0.1890 | $0.1233 | 1.5 | 53% |
| 8/22/22 - 9/21/22 | $0.1890 | $0.1214 | 1.6 | 56% |
| 9/21/22 - 10/20/22 | $0.2105 | $0.0915 | 2.3 | 130% |
| 10/20/22 - 11/18/22 | $0.2072 | $0.0823 | 2.5 | 152% |
| 11/18/22 - 12/21/22 | $0.1990 | $0.0893 | 2.2 | 123% |
| 12/21/22 - 1/24/23 | $0.1990 | $0.0922 | 2.2 | 116% |

59.     The chart above shows that Eligo's variable rates are consistently and substantially higher than a rate based on the formula set forth in Eligo's customer contract.

60.     Eligo's rates charged to Plaintiff were more than 50% higher than the PJM market price plus the cost of 100% RECs to offset Plaintiff's usage in **every billing period**, were more than **_double_** the PJM market prices plus 100% RECs four times out of seven, and were, on average, **_over ninety-nine percent higher_** than the PJM market prices plus 100% RECs.

61.     Eligo also failed to adjust its rates in accordance with PJM market prices plus 100% RECs. For instance, between September 21, 2022 and October 20, 2022, the PJM market price plus 100% RECs was $0.0915, a **_25% decrease_** from the prior period. Eligo's rate for that same period, however, was $0.2105 per kWh, an **_11% increase_** from its rate during the prior period. During the next period, the PJM market price plus 100% RECs decreased by another **_11%_**, but Eligo's rate remained almost exactly the same (it decreased by 1.5%)—and

outrageously high—at $0.2072/kWh, over *150% higher* than the PJM market price plus the cost of 100% RECs.

62.     That Eligo's rates do not track the PJM market prices is further proof that Eligo is not following its contractual commitment to its customers and is instead levying an excessive and unreasonable fluctuating margin.

63.     Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that a CRES will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to the factors outlined in its contract but are instead outrageously higher.

### *Benchmark Two: The Local Utility's Contemporaneous Supply Rate*

64.     A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo's variable rates are not "based on" Eligo's REC and wholesale supply costs.  Wholesale supply costs drive the local utility AEP Ohio's contemporaneous supply rate.

65.     Publicly available data on the local utilities' rates, like AEP Ohio, which is the utility serving Plaintiff's home, serve as an ideal indicator a price that is "based on" the factors identified in Eligo's contract. This is because the utilities' energy procurement costs are the same costs CRESs like Eligo incur and the utility's rate serves as a pure passthrough of those costs. Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which is what Eligo also does.  Consequently, local utilities' supply rates are the ideal comparator for determining (at the pleading stage) whether Eligo's variable rates are actually "based on" Eligo's REC and

wholesale supply costs (as opposed to charging unsuspecting customers the highest possible price that will not produce unsustainable levels of customer attrition).

66.     In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate.  Using the utility's rates as a benchmark for Eligo's rates shows that Eligo's rates were driven by excessive mark-ups and profiteering.

67.     The following table compares Plaintiff's variable supply rates from Eligo for seven billing periods to his local utility AEP Ohio's contemporaneous supply rates.

| Billing Period | Eligo Rate ($/kWh) | AEP Ohio Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/22/22 - 7/22/22 | $0.1890 | $0.0715 | 2.6 | 164% |
| 7/22/22 - 8/22/22 | $0.1890 | $0.0723 | 2.6 | 161% |
| 8/22/22 - 9/21/22 | $0.1890 | $0.0723 | 2.6 | 161% |
| 9/21/22 - 10/20/22 | $0.2105 | $0.0729 | 2.9 | 189% |
| 10/20/22 - 11/18/22 | $0.2072 | $0.0732 | 2.8 | 183% |
| 11/18/22 - 12/21/22 | $0.1990 | $0.0732 | 2.7 | 172% |
| 12/21/22 - 1/24/23 | $0.1990 | $0.0691 | 2.9 | 188% |

68.     The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff's account and AEP Ohio's contemporaneous rates.  Eligo's rate was more than *2.6 times* AEP Ohio's rate in *every* billing period.  On average, Eligo's rates were *more than 2.7 times* AEP Ohio's rates.

69.     The local utility's rates are a reasonable, pre-discovery benchmark of a rate that is a "monthly variable rate that may be periodically adjusted to market conditions." As explained above, the local utility is Eligo's primary competitor in Plaintiff's service territory, and the local utility's supply rate reflects the same costs that CRESs like Eligo incur in Ohio.  Thus, the utility's rate is an ideal benchmark for a rate that was calculated in accordance with the pricing term in Eligo's customer contract.

70.     The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to charge variable rates "based on" the two criteria identified in Eligo's customer contract.

71.     Further, that Eligo claims to sell "100% renewable energy (through use of Renewable Energy Certificates) does not account for Eligo's excessive variable energy rates. For example, the cost to purchase renewable energy credits for 100% of the electricity Eligo supplied to Plaintiff would have been, on average, less than four tenths of a penny per kWh— approximately 2% of Eligo's average rate. Indeed, Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and these costs cannot explain Eligo's exorbitant rates.

**Benchmark Three: Eligo's Own Fixed Rates**

72.     Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add *lower* margins to its variable rates.  Yet the opposite is true.

73. That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates were not set in accordance with the representations Eligo made to customers regarding its variable energy rates.

74. There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers. Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different. In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy. The only reason that Eligo's variable rates are so much higher than its fixed rates is that it sets variable rates in transparent violation of its contract's pricing term.

75. Eligo's rates also cannot be explained by the price of renewable energy credits. As noted above, the cost of renewable energy credits do not explain Eligo's excessive variable rates.

## CLASS ACTION ALLEGATIONS

76. Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential and commercial customers in the United States who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment and whose contracts contained the same or equivalent pricing term as Plaintiff's contract (the "Class").

77. As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants. Defendants have engaged in uniform and standardized conduct toward the Class—their contracting and rate-setting practices—and this case is about the responsibility of Defendants for their conduct in calculating customers' variable energy rates.

22

This conduct did not meaningfully differentiate among individual Class members. Upon information and belief, the variable rate provisions in the customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

78.     Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

79.     Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files his motion for class certification.

80.     Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Eligo. Plaintiff believes, however, that based on the publicly available data concerning Eligo's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

81.     The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

82.     Plaintiff is an adequate class representative. His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the

Defendants. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

83.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

84.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.  Whether Eligo breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract;

      b.  Whether Class Members have been injured by Eligo's conduct; and

      c.  The extent of class-wide injury and the measure of damages for those injuries.

85.     A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

86.     A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

87.     A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any

questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

88.     Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

> a.  Whether Eligo breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract; and
>
> b.  Whether Class Members have been injured by Eligo's conduct.

89.     Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I:
### Breach Of Contract
### (On Behalf Of The Class)

90.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     Eligo customers have customer agreements whose variable rate terms are substantially similar.

92.     Plaintiff and the Class entered into valid contracts with Eligo for the provision of electricity.

93.     Eligo represents in its customer contract that its variable rate for electricity "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."

94.     Upon information and belief, Plaintiff was subject to the same or substantially similar contractual terms as all Class Members.

95.     Pursuant to the contracts, Plaintiff and the Class paid the variable rates Eligo charged for natural gas and electricity.

96.     However, Eligo failed to perform its obligations under its contracts to charge rates in accordance with the formula set forth in its contracts.  Instead, Eligo charged variable rates for natural gas and electricity that were untethered from the formula upon which the parties agreed the rate would be based.

97.     Plaintiff and the Class was damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged a variable rate calculated from the formula identified in Eligo's customer contract.

98.     By reason of the foregoing, Eligo is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

99.     Eligo Energy OH, LLC is not the only Defendant liable for this breach of contract claim.  Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach.  For example, the cover letters sent by Eligo Energy, LLC to Plaintiff and other Class Members state that it would be customers' new energy supplier and that "a copy of the terms and conditions of your agreement with Eligo Energy" are enclosed.

100.     Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the cover letters and contracts, along with identifying itself as customers' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

101.     In addition, Eligo Energy OH, LLC contracted on Eligo Energy, LLC's behalf.

102.     And as alleged above, Eligo Energy OH, LLC is the alter ego of Eligo Energy,

LLC and is thus liable for breaching the contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendants have breached their contracts with the Class;

(c)    Render an award of compensatory damages, the precise amount of which is to be determined at trial;

(d)    Render an award of punitive damages;

(e)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(f)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any

issue triable of right.

Dated: January 30, 2025
       Cincinnati, Ohio

**GOLDENBERG SCHNEIDER, L.P.A.**

By:    */s/ Jeffrey S. Goldenberg*
       Jeffrey S. Goldenberg (0063771)
       4445 Lake Forest Drive, Suite 490
       Cincinnati, Ohio 45242
       Tel: (513) 345-8297
       Fax: (513) 345-8294
       jgoldenberg@gs-legal.com

D. Greg Blankinship*
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jbm@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

*\* Pro Hac Vice Application Forthcoming*

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**THOMAS ORZOLEK,**

        **Plaintiff,**

  **v.**

**ELIGO ENERGY, LLC,** *et al.,*

        **Defendants.**

:

:

**Case No. 2:25-cv-78**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Elizabeth A.**
**Preston Deavers**

## <u>ORDER</u>

This matter is before the Court on the Motion to Dismiss or, in the Alternative, to Stay the Case (ECF No. 11) and the Motion to Stay Discovery (ECF No. 21) filed by Eligo Energy, LLC and its subsidiary Eligo Energy OH, LLC (collectively "Eligo"). In support of both Motions, Eligo invokes the first-to-file rule—citing similarly situated class action lawsuits filed by Mr. Orzolek's counsel in New York, *Brous v. Eligo Energy, LLC*, No. 1:24-CV-1260 (S.D.N.Y. filed Feb. 20, 2024), and Pennsylvania, *Bodkin v. Eligo Energy, LLC*, No. 2:25-CV-94 (W.D. Penn. filed Jan. 21, 2025). (ECF No. 11, PAGEID # 63; ECF No. 21, PAGEID # 138.)

For the reasons below, the Court **STAYS** this action pending resolution of the motion to amend the complaint in *Bodkin*.

## I.    BACKGROUND

### A.    Mr. Orzolek filed this action on January 30, 2025.

Eligo is a competitive retail energy supplier ("CRES") that buys energy at wholesale and then sells it to end users with a mark-up. (Compl., ECF No. 1, ¶¶ 2,

22.) Mr. Orzolek, an Ohio resident, contracted with Eligo for electricity; the contract provided that Eligo would charge him variable rates after the expiration of any fixed rate term and that such variable rates "will be based on 100% renewable energy (through use of Renewable Energy Certificates) and will continue as a monthly variable rate that may be periodically adjusted to market conditions." (*Id.* ¶¶ 39, 42.)

Eligo charged Mr. Orzolek a fixed rate from approximately September 2018 to June 2022 and then switched him to a variable rate plan. (*Id.* ¶ 41.) Eligo charged Mr. Orzolek variable rates until Mr. Orzolek canceled the contract in or around January 2023. (*Id.* ¶ 40.)

On January 30, 2025, Mr. Orzolek filed this action on behalf of himself and a putative nationwide class of Eligo customers with equivalent contract terms, alleging Eligo charged him variable rates that violated his contract's pricing terms. (*Id.* ¶ 76.)

**B.** ***Brous*** **and** ***Bodkin*** **were filed before Mr. Orzolek's case.**

**1.** ***Brous*** **was filed on February 20, 2024.**

The *Brous* plaintiffs signed contracts with Eligo[1] for electricity that stipulate that the "monthly variable kWh rate [] may be periodically adjusted for market conditions." First Am. Compl. ¶ 3, *Brous*, No. 1:24-CV-1260 (S.D.N.Y. filed Nov. 13, 2024) (ECF No. 120). Those contracts provide that the variable rates shall be

---

[1] The *Brous* action was filed against Eligo Energy, LLC and its subsidiary Eligo Energy NY, LLC.

calculated in response to "market pricing, transportation costs, and other market price factors" as well as "applicable taxes[.]" *Id.*

The *Brous* plaintiffs contend that Eligo charged them variable rates that violated their contracts' pricing terms. *Id.* ¶ 67. On February 20, 2024, the *Brous* plaintiffs filed an action on behalf of themselves and a putative class of Eligo customers "who were charged a variable rate for electricity or natural gas services by Eligo[.]" *Id.* ¶ 128.

Eligo moved to dismiss the *Brous* claims arguing, among other things, that the *Brous* plaintiffs lack class standing to assert out-of-state claims on behalf on behalf of putative class members in other states. *See* Mot. to Dismiss, *Brous*, No. 1:24-CV-1260 (S.D.N.Y. filed June 4, 2024) (ECF No. 140); Mem. of Law in Supp. of Mot. to Dismiss, *Brous*, No. 1:24-CV-1260 (S.D.N.Y. filed June 4, 2024) (ECF No. 141). The *Brous* plaintiffs then moved to amend their complaint to narrow the geographic scope of their proposed class to only New York residents and exclude any Eligo customer included in the proposed classes in *Bodkin* or this case. *See* Mot. for Leave to File Second Am. Class Action Compl. Ex. A ¶¶ 127, 129, *Brous*, No. 1:24-CV-1260 (S.D.N.Y. filed June 27, 2025) (ECF No. 247-1). The *Brous* court granted the *Brous* plaintiffs' motion to amend and denied Eligo's motion to dismiss. Order & Opinion, *Brous*, No. 1:24-CV-1260 (S.D.N.Y. filed Sept. 12, 2025) (ECF No. 271).

### 2. *Bodkin* was filed on January 21, 2025.

The facts alleged in *Bodkin* are nearly identical to the facts alleged in *Brous* and this case. The *Bodkin* plaintiffs signed a contract with Eligo for electricity that

3

provided that Eligo would charge them a variable rate based upon "PJM wholesale market conditions and an adder of $0.01 per kWh[]" as well as factors including "PJM wholesale energy market conditions," "weather patterns," "fluctuations in energy supply and demand," and "costs to serve customers." Compl. ¶ 3, *Bodkin*, No. 2:25-CV-94 (W.D. Penn. filed Jan. 21, 2025) (ECF No. 1).

The *Bodkin* plaintiffs contend that Eligo[2] charged them variable rates that violated their contract's pricing terms. *Id.* ¶ 147. On January 21, 2025, the *Bodkin* plaintiffs filed an action on behalf of themselves and a putative nationwide class of Eligo customers "who were charged a variable rate for electricity or natural gas services . . . and who had a contract with Eligo that specified that the variable rate would be based on prices in a specific wholesale market like PJM." *Id.* ¶ 125.

The *Bodkin* plaintiffs moved to amend their complaint to narrow the proposed class and exclude any Eligo customers included in the proposed classes in *Brous* or this case. *See* Mot. for Leave to File Am. Compl. Ex. A ¶ 128, *Bodkin*, No. 2:25-CV-94 (W.D. Penn. filed May 8, 2025) (ECF No. 37-1). Eligo then filed a motion to stay under the first-to-file rule, arguing that *Bodkin* should be stayed because of its potential overlap with the claims and class in *Brous*. *See* Mot. to Stay, *Bodkin*, No. 2:25-CV-94 (W.D. Penn. filed May 20, 2025) (ECF No. 43). The *Bodkin* court has not yet ruled on either motion.

---

[2] The *Bodkin* action was filed against Eligo Energy, LLC and its subsidiary Eligo Energy PA, LLC.

## II.    LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in ever court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–255 (1936); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). "The district court's broad discretion includes the power to stay a matter pending resolution of independent proceedings which bear upon the case at hand." *Unroe v. Vilsack*, No. 2:11-CV-592, 2012 WL 3527219, at *1 (S.D. Ohio Aug. 14, 2012) (Sargus, J.) (internal quotations and citations omitted). Factors that the Court considers in determining whether to stay a case include: (1) the potentiality of another case having a dispositive effect on the case to be stayed; (2) the judicial economy to be saved by waiting on a dispositive decision; (3) the public welfare; and (4) the hardship/prejudice to the party opposing the stay, given its duration. *Latta v. U.S. Dep't of Educ.*, 653 F. Supp. 3d 435, 439 (S.D. Ohio 2023) (Watson, J.) (citing *Michael v. Ghee*, 325 F. Supp. 2d 829, 831 (N.D. Ohio 2004)); *see also Landis*, 299 U.S. at 255.

## III.    ANALYSIS

Eligo moved to stay this case in its entirety and to stay discovery, arguing, among other things, that the Court should apply the first-to-file rule because the proposed classes in both *Brous* and *Bodkin* will include Mr. Orzolek. (ECF No. 11, PAGEID # 63–64.) The first-to-file rule provides that "when actions involving nearly

5

identical parties and issues have been filed in two different district courts 'the court in which the first suit was filed should generally proceed to judgment.'" *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001) (citation omitted). When the first-to-file rule is invoked in the context of class actions, courts must "evaluate the identity of the parties by looking at overlap with the putative class." *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 791 (6th Cir. 2016).

The Court finds instead that a brief stay is warranted pending the outcome of the motion to amend the complaint in *Bodkin*.

Although the *Brous* court has narrowed the geographic scope of the *Brous* class such that it excludes Mr. Orzolek, the operative proposed class in *Bodkin* would include Mr. Orzolek because he was an Eligo customer "charged a variable rate for electricity or natural gas services[.]" Compl. ¶ 125, *Bodkin*, No. 2:25-CV-94.[3] However, the pending motion to amend the *Bodkin* complaint, if granted, would exclude Mr. Orzolek as a class member. Mot. for Leave to File Am. Compl. Ex. A ¶ 128, *Bodkin*, No. 2:25-CV-94. A stay in this action will promote judicial economy because the ruling on the motion to amend the complaint in *Bodkin* will likely be

---

[3] The operative *Bodkin* complaint's proposed class definition limits its class to customers who had "a contract with Eligo that specified that the variable rate would be based on prices in a specific wholesale market like PJM." Compl. ¶ 125, *Bodkin*, No. 2:25-CV-94. While Mr. Orzolek's contract specified that his variable rate would be based on "100% renewable energy (through use of Renewable Energy Certificates)" and may be adjusted to "market conditions", he argues that the term "market conditions" means "the conditions on the wholesale commodity market where Eligo buys its energy." (ECF No. 19, PAGEID # 128.) While the Court expresses no opinion on the merits of Mr. Orzolek's argument, it notes that Mr. Orzolek's interpretation of his contract would place him within the *Bodkin* class.

dispositive of whether the first-to-file rule applies here. The public welfare is also served by reducing unnecessary judicial expenditures caused by duplicative cases. *See Rowe v. JPMorgan Chase Bank, N.A.*, 2024 WL 4328940, at *3 (S.D. Ohio Sep. 24, 2024) (Sargus, J.). Finally, a stay will not cause significant hardship or prejudice to the parties, particularly considering that the stay will last only until the *Bodkin* court rules on the pending motion to amend.

## IV.    CONCLUSION

For the reasons above, the Court hereby **STAYS** this case until the *Bodkin* court issues its decision on the pending motion to amend the complaint. The parties are **ORDERED** to file a joint status report in 6 months or when that decision has been issued, whichever is earlier.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANNE BROUS, AS THE EXECUTOR OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>         v.<br><br>**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**,<br><br>         Defendants | Civil Case No.: 24 Civ. 01260 (ER)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................ 1

PARTIES ............................................................................................................ 4

JURISDICTION AND VENUE ............................................................................... 8

FACTUAL ALLEGATIONS ................................................................................... 9

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets.............................. 9

    B.   Plaintiff Ira Brous's Dealings With Eligo ...................................................... 21

    C.   Plaintiff Michelle Schuster's Dealings With Eligo........................................... 21

    D.   Eligo's Unauthorized Pricing Practices ........................................................ 22

    E.   Eligo's Unauthorized Monthly Fees ............................................................ 36

    F.   Eligo Violated New York's Variable Rate Disclosure Law ............................... 36

    G.   Tolling Of The Statute Of Limitations.......................................................... 37

CLASS ACTION ALLEGATIONS ......................................................................... 38

CAUSES OF ACTION .......................................................................................... 42

COUNT I: BREACH OF CONTRACT UNDER NEW YORK LAW ........................... 42

COUNT II:  IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.................... 44

COUNT III: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 .................. 47

COUNT IV: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-D(3) ......... 51

COUNT V: VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-D(7)........... 54

COUNT VI: UNJUST ENRICHMENT ................................................................... 56

PRAYER FOR RELIEF ........................................................................................ 57

JURY DEMAND ................................................................................................. 57

Plaintiffs Anne Brous as the executor of the estate of Ira Brous and Michelle Schuster (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy NY, LLC (hereinafter "Eligo" or "Defendants") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## **NATURE OF THE CASE**

1.      This action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused tens of thousands of commercial and residential customers New York to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Eligo is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States.  Eligo has taken advantage of deregulation to exploit customers hoping to save on their energy costs. This case centers on the pricing practices Eligo used on its New York variable rate customers.

3.      Eligo represents in its customer contract with Plaintiffs that it will charge a "monthly variable kWh rate that may be periodically adjusted for market conditions."  The contract then goes on to delineate exactly how those adjustments for market conditions are made, and specifically identifies how "[v]ariable price is determined."  The contract states that "all" variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."  Eligo's contract with Plaintiffs further represents that "[a]pplicable taxes will be factored into the variable price."

4.      Eligo's representations in its form customer contract about how variable energy rates are calculated are false and deceptive, and designed to take advantage of customers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy pricing and cost information.  Eligo contracted to charge a variable rate that "shall" be "calculated" using four verifiable and documented factors: (1) the wholesale "market pricing" of Eligo's energy supply; (2) the minor "other market price factors" that account for the ancillary fees accompanying Eligo's supply costs; (3) the "transportation costs" Eligo incurs when its energy is transported from the wholesale market to the delivery point where the customer's utility takes it from the transmission system; and (4) "applicable taxes."

5.      In reality, however, Eligo did not provide customers with variable rates "calculated" from wholesale market pricing and Eligo's other documented costs to supply energy plus applicable taxes.  Instead, Eligo used a pricing methodology that charged excessive and varying profit margins with the intent of depriving customers of the benefits of a rate calculated using the contract's four enumerated factors.  Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates.  Nor does the contract provide Defendants with discretion to pick and choose the weight of the factors set forth in Eligo's contracts and then apply whatever markup it sees fit.  Yet Eligo's varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment to do the opposite.

6.      Indeed, Eligo has always followed a uniform policy, not of charging a rate calculated in accordance with the contract, ███████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████

███████████████████████████████████

███████████████████████████

7. Eligo also admits that its variable rates are set using factors that are not among the four factors listed in Eligo's variable rate pricing term. For example, Eligo has admitted that it sets variable rates by considering things like "legislative and regulatory uncertainty." In other words, Eligo charges customers a premium on the off chance that regulators or legislators will restrict its future operations in a way that affects future profits.

8. Eligo also adds a monthly fee to variable rate customers' bills, even though its contract does not provide that monthly fees (as opposed to a per kilowatt hour charge based on the customer's usage) can be tacked onto variable rate customers' monthly bills.

9. As a result of Eligo's unlawful acts described herein, tens of thousands of unsuspecting customers have been, and continue to be, fleeced by Eligo out of tens of millions of dollars in exorbitant charges for electricity and natural gas. Defendants' scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

10. Plaintiffs and other Eligo customers (the "Class") have been injured by Eligo's unlawful practices. Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Eligo's breach of contract, breach of the duty of good faith and fair dealing, violation of New York consumer protection statutes, and unjust enrichment.

11. Only through a class action can Eligo's customers remedy its ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.

Further, many customers do not realize they are victims of Eligo's deceptive and unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Eligo engage in fair and upright business practices.

## PARTIES

12.     Former Plaintiff Ira Brous ("Mr. Brous") resided in Ithaca, New York. Mr. Brous enrolled with Eligo on or around July 13, 2017. Eligo charged Mr. Brous a fixed rate for electricity from August 2017 until January 2018, after which it began charging him a variable rate. Mr. Brous cancelled his Eligo account in or around November 2023. Unbeknownst to Mr. Brous, Eligo charged him excessive and unauthorized variable rates every month.

13.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Mr. Brous paid more for his home energy supply than he otherwise should have paid.

14.     Mr. Brous filed the original complaint against Defendants in this action on February 20, 2024. ECF No. 1. Mr. Brous sadly passed away after filing the original complaint. On April 22, 2025, the Court ordered Mr. Brous' widow, Anne Brous ("Mrs. Brous"), his sole successor and the executor of his estate, to be substituted in place and stead of Mr. Brous as a Plaintiff in this action. ECF No. 192.

15.     Plaintiff Michelle Schuster resides in Rochester, New York. Plaintiff Schuster enrolled with Eligo on or around October 9, 2016. Eligo charged Plaintiff Schuster a fixed rate for electricity from November 2016 until January 2017, after which it began charging her a variable rate. Plaintiff cancelled her Eligo account in or around November 2023. Unbeknownst to Plaintiff Schuster, Eligo charged her excessive variable rates every month.

16.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiff Schuster paid more for her home energy supply than she otherwise should have paid.

17.     Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC.  On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida.  Accordingly, Eligo Energy, LLC is a citizen of Florida.

18.     Defendant Eligo Energy NY, LLC is a New York limited liability company with its principal place of business in Chicago, Illinois.  On information and belief, Eligo Energy NY, LLC is a wholly owned subsidiary of Eligo Energy, LLC.  Accordingly, Eligo Energy NY, LLC is a citizen of Florida.

19.     Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy NY, LLC.  Eligo Energy, LLC and Eligo Energy NY, LLC hold themselves out as a single company—Eligo Energy.[1]  Eligo Energy NY, LLC has no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[2]  There is a unified executive team, and on information and belief they are all employed by Eligo Energy, LLC.  That unified executive team controls all operational and financial aspects of Eligo Energy

---

[1] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story (last visited Nov. 13, 2024).

[2] *Compare id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606") *with* **Exhibit A** (Plaintiff Brous's Contract) at 3 (stating that Eligo Energy NY, LLC is "located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803") *and* **Exhibit B** (Plaintiff Schuster's Contract) at 2 (same).

NY, LLC. For example, Eligo Energy New York, LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the Eligo brand nationally. Defendants have also admitted that attorneys at Eligo Energy, LLC were responsible for drafting customer communications and customer contracts. Eligo's current Controller, Chief Compliance Officer, Executive Chairman, VP of Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for their employment by Eligo Energy, LLC. All of these individuals were voluntarily designated by defense counsel as key players whose ESI will be collected for search in this matter. Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant Eligo Energy NY, LLC, to perpetrate the unlawful conduct challenged in this lawsuit.

20.     All of the operations and activities related to acquiring and servicing Eligo's customers (including Eligo's customers in New York) are directed and executed by Eligo Energy, LLC, including marketing and making sales to New York consumers, setting the exorbitant variable rates for those customers and imposing improper monthly fees, purchasing electricity at wholesale, and handling billing and other back office activities. Eligo Energy, LLC also owns and operates the computer software and hardware used to set rates for all Eligo customers. Eligo Energy, LLC employs the individuals that conducted the activities challenged in this litigation. For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy, LLC's executive team sets pricing strategy for New York customers including Plaintiffs. Those individuals include Eligo Energy, LLC's CEO, head of Risk team, and CIO. Eligo Energy NY, LLC's 30(b)(6) witness also testified that he did not know if a separate group of people manage Eligo Energy NY, LLC as opposed to Eligo Energy, LLC, he could not identify

documents that list the names or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo Energy NY, LLC.

21.     Eligo Energy, LLC also holds itself out to customers as their supplier of electricity and the contracting entity.  Although Plaintiffs' contracts with Eligo bear the heading "Eligo Energy NY, LLC Terms of Service,"[3] the Welcome Letter marketing material sent to both Plaintiffs upon enrollment, which enclosed Eligo's contracts, bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606.[4]

Both letters further state that "[i]n the next few days, you will be receiving a notice from [the local utility] of change of your supplier ***to Eligo Energy, LLC***." (Emphasis added)[5]  The letters also state that they enclose "a copy of the terms and conditions of your agreement with Eligo Energy" and are signed "Eligo Energy."[6]

22.     Further, monthly invoices produced by Defendants in this litigation reflecting the charges for Ms. Schuster's electricity supply bear the "EligoEnergy" logo, were issued by "Eligo Energy, LLC," and directed Ms. Schuster to remit payments to "Eligo Energy, LLC."  *See, e.g.,* DEF00001.  Likewise, communications concerning Plaintiffs' accounts were sent by "Eligo Energy, LLC" and did not mention Defendant Eligo Energy NY, LLC.

23.     Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy NY, LLC as a separate entity.  Rather, it used the corporate entity Eligo Energy NY, LLC interchangeably with itself.  For example, invoices for wholesale electricity purchases from the New York

---

[3] Ex. A at 3; Ex. B at 2.

[4] Ex. A at 1; Ex. B at 1.

[5] Ex. A at 1; Ex. B at 1.

[6] Ex. A at 1; Ex. B at 1.

Independent System Operator (NYSIO) for Defendants' New York customers were addressed to "Eligo Energy, LLC."  Similarly, invoices from electric utility companies (NY State Electric & Gas Corporation and Rochester Gas & Electric) addressed to "Eligo Energy NY, LLC" were paid from an account controlled by Defendant Eligo Energy, LLC.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

24.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

### *Personal Jurisdiction*

25.     This Court has General and Specific Personal Jurisdiction over Defendant Eligo Energy NY, LLC because it is a New York limited liability company, and it advertises, markets, distributes, and sells energy to New York customers, including Plaintiffs.  This Court has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets, distributes, and sells energy to New York customers, including Plaintiffs.

### *Venue*

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Both Defendants are limited liability companies that are deemed to reside in any judicial district in which they are subject to the court's personal jurisdiction.  28 U.S.C. § 1391(c)(2).  Because both Defendants are subject

to this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this District under § 1391(b)(1).

## FACTUAL ALLEGATIONS

**A.    The History Of Deregulation And ESCOs' Role In Energy Markets**

27.    In the 1990s and 2000s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), deregulated the market for retail energy supply.  Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay.  As a result, the energy supply markets in New York, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Pennsylvania, and Washington, D.C. are open to competition, and customers and small businesses may choose their energy supplier.

28.    Since New York opened its retail energy markets to competition, millions of New York residential and small business customers have switched to an ESCO.  Deregulation laws in other states are substantially similar.

29.    ESCOs, the new energy suppliers, compete primarily against local utilities.  ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or extract natural gas.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer.  ESCOs merely buy electricity and natural gas and then sell that energy to end-users with a mark-up.  Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers.  The local utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is whether the utility or an ESCO sets the price for the

customer's energy supply.  The only value that ESCOs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

30.     ESCOs are subject to minimal regulation by state utility regulators like the NYPSC.  ESCOs like Eligo do not have to file their rates, or the method by which those rates are set.  Instead, an ESCO customer's rates are governed by the contract between the ESCO and the customer (and the relevant consumer protection and contract law).

31.     Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility.  For example, in New York, as in many states, the utilities charge energy supply rates that reflect the same cost-factors set forth in Eligo's customer contract.  Indeed, in New York the utilities' supply rates serve as pass throughs of the utilities' energy supply cost from the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale energy and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as Eligo incur).  New York utilities purchase energy, ancillary services, and capacity daily from NYISO's wholesale market based on customer consumption and pass actual costs on to their customers.

32.     ESCOs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices.  But ESCOs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers,

such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

33.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the cost-based factors set forth in Eligo's contract; accordingly, no consumer would ever agree to Eligo's variable rate if they knew the truth.

34.     The only way Eligo can retain variable rate customers is by hiding the fact that Eligo's rates are not "calculated" from its documented supply costs plus applicable taxes. Instead, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" its documented supply costs and then add whatever markup it chooses.   To the extent Eligo claims it has discretion in setting rates (it does not), that discretion is cabined by the contract's explicit promise that the customer's rates will be calculated "in response to market pricing, transportation costs, and other market price factors." Any discretion Eligo may have had is also cabined by customers' reasonable expectations that Eligo will not price gouge customers for the same energy sold by their local utilities.

35.     Eligo took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, Eligo exploits deregulated markets by consistently charging its customers far more than its contractual pricing term permits and failing

to adequately disclose how its variable rates are actually determined.

36.     One of deregulation's main unintended consequences has been the proliferation of ESCOs like Eligo whose business model is primarily based on taking advantage of customers. As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers."[7]   As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights, codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct Plaintiffs challenge here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity.   Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, **short-term "teaser" rates followed by skyrocketing variable prices**—many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas.   The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[8]

37.     For years, New York regulators have also been calling out the high levels of misconduct that pervade the state's deregulated energy markets.   For example, in 2014 the

---

[7] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 1 (2009).

[8] *Id.* at 3–4 (emphasis added).

NYPSC concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[9]  The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[10]  The NYPSC concluded that:

> [A]s currently structured, the retail energy commodity markets for residential and small nonresidential customers cannot be considered to be workably competitive.  Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition[.][11]

38.     Statistics from the New York Attorney General's ("NYAG") office confirm the pattern of activity this class action seeks to combat.  From at least the year 2000 to the present, the NYAG has investigated numerous ESCOs' deceptive and illegal business practices.  These investigations have resulted in multiple settlements providing for extensive injunctive relief and millions in restitution and penalties.

39.     The unlawful conduct of ESCOs like Eligo has been devastating to New York customers.  For example, "[a]ccording to the data provided by [New York's] utilities, the approximately two million New York State residential utility customers who took commodity service from an ESCO collectively paid almost $1.2 billion more than they would have paid if they purchased commodity from their distribution utility during the 36-months ending December

---

[9] NYPSC, CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

[10] *Id*. at 11.

[11] *Id*. at 10.

31, 2016."[12]  "Additionally, small commercial customers paid $136 million more than they would have paid if they instead simply remained with their default utilities for commodity supply for the same 36-month period."[13]  Combining these two groups, New York customers have been "'overcharged' by over $1.3 billion dollars over this time period."[14]

40.     New York's low-income customers have also been hit hard.  The utilities reported that low-income ESCO customers (a subset of the residential customers mentioned above) "collectively paid in excess of $146 million more than they would have paid if they took commodity supply from their utility."[15]

41.     On December 16, 2016, based on the flood of customer complaints, negative media reports, and data demonstrating massive overcharges, the NYPSC prohibited ESCOs from serving low-income customers, because of "the persistent ESCO failure to address (or even apparently to acknowledge) the problem of overcharges to [low income] customers[.]"[16]

42.     Following the first part of the evidentiary hearing announced in December 2016, on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.  Rather than fierce ESCO against ESCO price competition working to protect customers from excessive charges, ESCOs have deliberately obfuscated prices and

---

[12] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2 (Mar. 30, 2018).

[13] *Id.* at 3.

[14] *Id*.

[15] *Id*.

[16] NYPSC, CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

resisted market reforms such that the Commission's decision to allow ESCOs access to the utility distribution systems to sell electric and gas commodity products to mass market customers has proven to be no longer just and reasonable.[17]

\* \* \*

The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service. Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers. For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[18]

\* \* \*

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully

---

[17] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

[18] *Id.* at 41–42 (citations omitted).

informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[19]

43.     As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[20]  Likewise, when the ESCOs claimed that their provision to customers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[21]

44.     Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[22]  The NYPSC staff went on to state that "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an

---

[19] *Id.* at 86 (citations omitted).

[20] *Id.* at 37.

[21] *Id.* at 87.

[22] *Id.* at 69.

ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a "green" commodity product."[23]

45.    Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers.  These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market.  These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[24]

46.    Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes that banned, starting in February 2020, the variable rate pricing practices engaged in by Eligo and impacting the entire New York ESCO marketplace.[25]

47.    The NYPSC's press release announcing the new regulations stressed that banning variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging New York consumers" and that the regulations only went forward after "the state's highest court definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection regulation."[26]  The regulations themselves likewise condemn ESCOs' conduct and declare that deception has become a "business model" in the deregulated energy market:

---

[23] *Id*. at 69–70.

[24] *Id*.

[25] NYPSC, CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 108–10 (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[26] Press Release, NYPSC, PSC Enacts Significant Reforms to the Retail Energy Market (Dec. 12,

> Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO customers that pay significant premiums for products with little or no apparent added benefit, . . . it appears that a material level of misleading marketing practices continues to plague the retail access market.
>
> &ast; &ast; &ast;
>
> The persistence of complaints related to ESCO marketing practices is indicative of some ESCOs continuing to skirt rules and attempting to avoid accountability as part of their business model.[27]

48.     The NYPSC's variable rate ban followed its two-year investigation of ESCO practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19 parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[28]

49.     The NYPSC prefaced the variable rate ban with the observation that variable energy rates like those Defendants charged Plaintiffs and Class Members are "[t]he most commonly offered ESCO product" and that this popular product is frequently provided at "a higher price than charged by the utilities."[29]  The incongruity of customers paying ESCOs more for the exact same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material benefits to consumers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.[30]

---

2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7B2F86EF23-5B31-46D3-846D-DAD7C0D7381A%7D.

[27] December 12 Order at 88–90.

[28] *Id.* at 3–4.

[29] *Id.* at 11.

[30] *Id.* at 12.

50.    In fact, the NYPSC found it "troubling" that even after considering reams of evidence, "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."[31]  This fact only highlighted the NYPSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."[32]  Accordingly, and on this record, the NYPSC banned variable energy rates like those Defendants charged Plaintiffs and Class Members.[33]  In place of these floating variable rates, the NYPSC required ESCOs to guarantee that their variable rates would save customers money compared to what the utility would have charged.[34]  Under the new regulations, if the ESCO charges the customer more than the utility, the customer is owed a refund for the difference.[35]  In this litigation, the difference between what Eligo charged customers for the same energy Class Members' utilities would have supplied, and what the utilities would have charged for that energy is likely in the tens of millions of dollars.

51.    Moreover, the NYPSC's findings of widespread and unjustified overcharging underscore and highlight the importance and perniciousness of Defendants' practices challenged in this lawsuit.  Likewise, the NYPSC's finding that ESCOs' overcharging is completely unjustified bolsters Plaintiffs' claims that Defendants' variable rate pricing practices breached the duty of good faith and fair dealing.  ESCOs' improper pricing practices go undetected

---

[31] *Id.* at 30.

[32] *Id.* at 31.

[33] *Id.* at 39.

[34] *Id.*

[35] *Id.*

because it is virtually impossible for customers to ferret out the fact that they are being overcharged.

52.     In its December 12 Order, the NYPSC also faulted ESCOs for concealing critical pricing data from both ordinary customers **and the NYPSC itself**: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[36]

53.     The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[37] and required that ESCO bills show how much the customer's utility would have charged.[38]

54.     In addition, in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[39]  The legislation was introduced after reports that ESCOs in New York, like Eligo, charge some of the highest residential energy costs in the United States.[40]

55.     New York is not the only state using the overwhelming evidence of customer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

---

[36] *Id.* at 31.

[37] *Id.* at 33.

[38] *Id.* at 33–34.

[39] Press Release, Governor Kathy Hochul, Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills (Sept. 20, 2023),  *available at* https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills.

[40] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

**B.      Former Plaintiff Ira Brous's Dealings With Eligo**

56.      In the summer of 2017, Eligo solicited Plaintiff Brous, and he agreed to switch his electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff Brous with marketing material (dubbed a "Welcome Letter" in industry parlance) stating "[w]elcome to Eligo Energy, authorized supplier of NYSEG. . . . In the next few days, you will be receiving a notice from NYSEG of change of your supplier to Eligo Energy, LLC."  *See* Ex. A at 1.  The letter also enclosed a copy of Eligo's standardized adhesion contract for New York customers. *Id.* at 3.

57.      Eligo began supplying electricity to residence Mr. Brous shared with his wife Plaintiff Brous and it continued to do so until Mr. Brous cancelled in or around November 2023.

58.      After a roughly six-month fixed rate period, Eligo began charging Mr. Brous a variable rate for electricity in or around January 2018.

**C.      Plaintiff Michelle Schuster's Dealings With Eligo**

59.      In the fall of 2016, Eligo solicited Plaintiff Schuster, and she agreed to switch her electricity supplier to Eligo.  As part of the enrollment process, Eligo provided Plaintiff Schuster with a Welcome Letter stating "[w]elcome to Eligo Energy, authorized supplier of RG&E. . . . In the next few days, you will be receiving a notice from RG&E of change of your supplier to Eligo Energy, LLC."  *See* Ex. B at 1.  The letter also enclosed a copy of Eligo's standard, uniform contract.  *Id.* at 2.

60.      Eligo began supplying electricity to Plaintiff Schuster's residence and it continued to do so she cancelled in or around November 2023.

61.      Eligo began charging Plaintiff Schuster a variable rate for electricity in or around January 2017.

**D.     Eligo's Unauthorized Pricing Practices**

62.     In its standard form contract, Eligo represents that "all" variable rates "shall" be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Eligo further represents that "[a]pplicable taxes will be factored into the variable price."

63.     This pricing term has the same legal operation as other contracts Eligo used for sales with New York customers. *See* ECF No. 44-7, Ex. 44–46.

64.     The variable rate pricing structure outlined in Eligo's contract has four verifiable and documented components: (1) "market pricing," which is the price to procure energy from the wholesale market; (2) the minor "market price factors" that encompass the ancillary fees charged in connection with wholesale supply purchases; (3) the "transportation costs" Eligo pays to transport the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (4) applicable taxes.

65.     In light of Eligo's representations in its customer contract about how variable rates "shall" be "calculated," any reasonable consumer, including Plaintiffs, would reasonably expect that Eligo's variable rates would reflect the cost factors set forth in the contract and would only vary "in response to" changes in those costs. Eligo's contract does not give Eligo discretion to set prices as it sees fit. Instead, the contract restricts Eligo's rates to rates that are "calculated on a monthly basis in response to" the four components outlined in the contract.

66.     None of the four cost factors identified in Eligo's customer contract explain its exorbitant charges. For example, the costs of energy and related minor charges on the relevant wholesale market do not account for Eligo's excessive rates. As detailed below, Eligo's rates far exceed those identifiable costs and were not "calculated" in "response to" those verifiable costs.

67.     Eligo's customer contract also refers to "transportation costs" and "appliable taxes" as components of Eligo's variable rates, but while Eligo may incur those costs in other markets, they do not apply in New York.  In certain markets, such as those in the Pennsylvania-New Jersey-Maryland Interconnection region, ESCOs like Eligo pay a relatively small sum for the cost of transporting the energy from the wholesale market to the point of delivery where the customer's utility takes possession of the energy from the transmission system.  In New York (Plaintiffs' market), however, this cost is paid by the utility—here, NYSEG or RG&E—not by Eligo.  The utilities then pass this cost onto customers in connection with the utility's **_delivery_** charges, not the supply portion of the customer's bill.  Accordingly, "transportation costs" cannot be factored into the rates Eligo charges New York customers.

68.     Similarly, Plaintiffs' bills showing Eligo's rate contain a separate line item for sales tax and Eligo pays no tax on its purchases from the wholesale market. Thus, in New York, "applicable taxes" cannot be factored into Eligo's variable rate.

69.     Instead, the only one of the four factors enumerated in the contract that would cause the customer's rate to materially vary from month to month is Eligo's cost to purchase its customers' energy supply on the relevant wholesale market.

70.     Eligo purchases its energy supply on the competitive wholesale market.  The cost of wholesale energy is overwhelmingly the largest cost Eligo incurs.  The other cost factors outlined in the contract that may affect Eligo's variable rate (such as additional market price factors) are minor and are included in the local utility's supply charges as well.[41]  These additional costs are relatively insignificant in terms of the overall costs Eligo incurs to procure

---

[41] As noted above, in New York, transportation costs are billed to customers by their utilities as delivery charges.  To the extent Eligo pays transportation costs in other markets, however, such relatively minor costs would also be reflected in the local utilities' supply costs.

natural gas and electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.

71.     Therefore, Eligo's supply costs cannot explain Eligo's egregiously high variable rates or the reason its rates are disconnected from changes in wholesale costs.  Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent they are even included as "other market price factors" (they are not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs.  In fact, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

72.     Eligo's outrageous rates are in fact a result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's supply costs, and its consideration of other non-cost factors like legislative and regulatory risk.  No reasonable consumer would expect that a variable rate that "shall" be "calculated on a monthly basis in response" to the four factors enumerated in the contract would in fact be set using Eligo's determination of the highest feasible rate and other non-cost factors.

### Benchmark One: The Local Utility's Contemporaneous Supply Rate

73.     A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo does not follow its contract's pricing formula in good faith.  Publicly available data on the local utilities' rates, like New York State Electric and Gas Corporation ("NYSEG") and Rochester Gas and Electric ("RG&E"), which are the utilities serving Plaintiffs' residences, serve as an ideal indicator of the four price components set forth in Eligo's customer contract: (1) the wholesale cost of energy; (2) the

ancillary fees charged in connection with wholesale supply purchases; (3) the "transportation costs" Eligo pays to transport the energy from the wholesale market to the point of delivery where the customer's utility takes the energy from the transmission system, and (4) applicable taxes.[42] This is because the utilities' energy procurement costs are the same costs ESCOs like Eligo incur and the utility's rate serves as a pure passthrough of those costs. Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which are the correlated factors outlined in Eligo's contract. Consequently, local utilities' supply rates are the ideal comparator for determining whether Eligo's rates are "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."

74.     In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate. Using the utility's rates as a benchmark for the contract's enumerated cost factors shows that Eligo's rates were driven by excessive mark-ups and profiteering.

75.     The following table compares Former Plaintiff Brous's variable supply rates from Eligo for twelve billing periods to his local utility NYSEG's contemporaneous rates.

| Billing Period | Eligo Rate ($/kWh) | NYSEG Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 10/6/2022–10/31/2022 | 0.24 | 0.07 | 3.67x | 267% |

---

[42] As explained above, neither transportation costs nor taxes affect energy supply rates in New York—whether those rates are charged by Eligo, the local utilities, or other ESCOs.

| 11/1/2022–12/5/2022 | 0.24 | 0.08 | 2.97x | 197% |
| 12/6/2022–1/3/2023 | 0.24 | 0.06 | 3.72x | 272% |
| 1/4/2023–2/1/2023 | 0.24 | 0.09 | 2.81x | 181% |
| 2/2/2023–3/1/2023 | 0.24 | 0.07 | 3.34x | 234% |
| 3/2/2023–4/3/2023 | 0.19 | 0.09 | 2.11x | 111% |
| 4/4/2023–5/2/2023 | 0.19 | 0.03 | 6.06x | 506% |
| 5/3/2023–5/31/2023 | 0.18 | 0.05 | 3.78x | 278% |
| 6/1/2023–7/3/2023 | 0.18 | 0.06 | 2.98x | 198% |
| 7/4/2023–8/2/2023 | 0.17 | 0.04 | 3.78x | 278% |
| 8/3/2023–9/1/2023 | 0.17 | 0.06 | 2.59x | 159% |
| 9/2/2023–10/2/2023 | 0.20 | 0.07 | 2.78x | 178% |

76.     The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff Brous's account and NYSEG's contemporaneous rates. Eligo's rate was more than **double** NYSEG's rate in **every** billing period, more than **triple** NYSEG's rate in six out of twelve billing periods, and more than **six times** NYSEG's rate in April 2023.  On average, Eligo's rates were **more than triple** NYSEG's rates.

77.     The following table compares Plaintiff Schuster's variable supply rates from Eligo for twenty billing periods to her local utility RG&E's contemporaneous rates.

| Billing Period | Eligo Rate ($/kWh) | RG&E Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/25/2021–7/27/2021 | 0.16 | 0.04 | 3.65x | 265% |
| 7/28/2021–8/25/2021 | 0.16 | 0.05 | 3.5x | 250% |
| 8/26/2021–9/24/2021 | 0.16 | 0.05 | 3.15x | 215% |
| 9/25/2021–10/26/2021 | 0.17 | 0.06 | 2.94x | 194% |

| | | | |
|---|---|---|---|
| 10/27/2021–11/24/2021 | 0.17 | 0.05 | 3.37x | 237% |
| 11/25/2021–12/27/2021 | 0.16 | 0.05 | 3.47x | 247% |
| 12/28/2021–1/26/2022 | 0.18 | 0.06 | 3.02x | 202% |
| 1/27/2022–2/25/2022 | 0.18 | 0.05 | 3.42x | 242% |
| 2/26/2022–3/25/2022 | 0.16 | 0.07 | 2.37x | 137% |
| 3/26/2022–4/28/2022 | 0.16 | 0.06 | 2.56x | 156% |
| 4/29/2022–5/25/2022 | 0.19 | 0.08 | 2.5x | 150% |
| 5/26/2022–6/28/2022 | 0.16 | 0.04 | 3.74x | 274% |
| 6/29/2022–7/26/2022 | 0.16 | 0.07 | 2.24x | 124% |
| 7/27/2022–8/25/2022 | 0.24 | 0.06 | 3.89x | 289% |
| 8/26/2022–9/27/2022 | 0.20 | 0.07 | 2.8x | 180% |
| 9/28/2022–10/26/2022 | 0.20 | 0.06 | 3.16x | 216% |
| 10/27/2022–11/23/2022 | 0.22 | 0.09 | 2.45x | 145% |
| 11/24/2022–12/22/2022 | 0.20 | 0.07 | 2.96x | 196% |
| 12/23/2022–1/25/2023 | 0.20 | 0.07 | 2.86x | 186% |
| 1/26/2023–2/25/2023 | 0.17 | 0.06 | 2.81x | 181% |

78. The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff Schuster's account and RG&E's contemporaneous rates. Eligo's rate was more than **double** RG&E's rate in **every** billing period and more than **triple** RG&E's rate in ten billing periods. On average, Eligo's rates were **more than triple** RG&E's rates.

79. The local utility's rates are a reasonable, pre-discovery benchmark of the four cost-related factors in Eligo's customer contract. As explained above, the local utility is Eligo's primary competitor in Plaintiffs' service territories, and the local utilities' supply rates reflect the

wholesale cost of energy and the cost of related ancillaries—the same costs that ESCOs like Eligo incur in New York. Thus, the utility's rate is an ideal stand in for a rate that reflects the cost-factors in Eligo's contract.

80. The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to calculate rates in accordance with the contract's exclusive factors and instead results from Eligo's price gouging.

81. Further, Eligo's contract with Plaintiffs does not allow it to include the price of obtaining renewable energy credits ("RECs") or carbon offsets for energy supply. Even if it did, however, the cost of obtaining said credits or offsets for 30% (or 50% or even 100%) of the energy it supplied to Plaintiffs and the Class is very small and does not account for Eligo's high rates. For example, the cost to purchase renewable energy credits for 30% of the electricity Eligo supplied to Plaintiffs would have been, on average, less than a penny per kWh— approximately 3% of Eligo's average rate.[43] Even when Eligo was purchasing RECs that corresponded to more than 30% of customer usage, the costs to purchase RECs is a small percentage of its actual costs because the average cost to purchase RECs for 100% of each kWh supplied to a customer was only two cents per kWh. Indeed, Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and these costs cannot explain Eligo's exorbitant rates.

### Benchmark Two: Eligo's Own Fixed Rates

82. Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable

---

[43] Eligo's contracts state that its electricity products "are derived from at least 30% renewable sources." Ex. A at 3; Ex. B at 2.

profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add **lower** margins to its variable rates.  Yet the opposite is true.

83.     That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates did not comply with the contract's rate-setting formula.  For example, from the first quarter of 2022 through the end of 2023, Eligo's variable rate was always substantially higher than its fixed rate:[44]



84.     There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers.  Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different.  In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy.  The only reason that Eligo's variable rates are so much higher than its fixed

---

[44] *See* Actual Weighted Average Historic Price for Electric Supply as Reported by the Supplier in 14850, NYS Power to Choose, available at https://documents.dps.ny.gov/PTC/historic-pricing/14850/1/335,179/975 (as visited on Feb. 20, 2024).

rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's pricing term.

85.     Eligo's rates also cannot be explained by the price of renewable energy credits. As both variable rates and fixed rates offered by Eligo are "derived from at least 30% [or another specified percentage] renewable sources," renewable energy credit pricing does not explain the discrepancy between the two pricing plans.

**Benchmark Three: Market Supply Costs**

86.     A comparison of Eligo's rates to prevailing market costs also demonstrates that Eligo does not set rates in compliance with the contract's variable rate formula.

87.     The tables below, *see* ¶¶ 90, 94, identify (i) the variable rate Eligo charged Plaintiffs, (ii) the corresponding "Market Supply Costs," and (iii) the differences between Eligo's rates and the contemporaneous Market Supply Costs.

88.     The Market Supply Costs below are based on the costs that an ESCO incurs supplying a retail customer for each billing period, including the cost to procure renewable energy credits for 30% of the customer's consumption.  The Market Supply Costs for electricity include the weighted day-ahead NYISO electricity prices in Plaintiffs' respective utility zones, ancillary services costs, capacity costs, and various relatively small charges related to the NYISO (all costs that would be included in Eligo's contractual formula).  These charges are tracked by NYISO's Market Monitor, the external consultant that independently evaluates the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to NYISO's Federal Energy Regulatory Commission regulation and tariff.

89.     The Market Supply Costs represent the costs and charges that are relevant to the costs that Eligo and other ESCOs incur in providing energy to retail customers, including renewable energy credits for 30% of supply.  Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.  That Eligo's rates are so vastly different from Market Supply Costs demonstrates that Eligo's rates are not derived from the specific cost inputs outlined in Eligo's contract.

90.     The below chart shows a market supply comparison for Plaintiff Brous for twelve billing periods:

| Billing Period | Eligo Rate ($/kWh) | Market Supply Cost ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 10/6/2022–10/31/2022 | 0.24 | 0.06 | 4.11x | 311% |
| 11/1/2022–12/5/2022 | 0.24 | 0.04 | 5.52x | 452% |
| 12/6/2022–1/3/2023 | 0.24 | 0.09 | 2.57x | 157% |
| 1/4/2023–2/1/2023 | 0.24 | 0.05 | 4.62x | 362% |
| 2/2/2023–3/1/2023 | 0.24 | 0.05 | 4.64x | 364% |
| 3/2/2023–4/3/2023 | 0.19 | 0.04 | 5.26x | 426% |
| 4/4/2023–5/2/2023 | 0.19 | 0.04 | 4.69x | 369% |
| 5/3/2023–5/31/2023 | 0.18 | 0.04 | 4.94x | 394% |
| 6/1/2023–7/3/2023 | 0.18 | 0.04 | 4x | 300% |
| 7/4/2023–8/2/2023 | 0.17 | 0.07 | 2.56x | 156% |
| 8/3/2023–9/1/2023 | 0.17 | 0.05 | 3.15x | 215% |
| 9/2/2023–10/2/2023 | 0.20 | 0.06 | 3.45x | 245% |

91.     Again, Eligo's other supply costs are minimal compared to its wholesale supply costs and the table above shows that its variable rates are consistently and substantially higher

than a rate based on wholesale costs, which further demonstrates that Eligo's rates are not calculated based on the factors set forth in its customer contract.

92.     Eligo's rates charged to Plaintiff Brous were more than ***triple*** the Market Supply Costs in nearly every period, were more than ***five times*** Market Supply Costs twice, and were, on average, ***more than four times higher than*** Market Supply Costs.

93.     Eligo's rates also fail to fluctuate in accordance with Market Supply Costs.  For instance, between October 6, 2022 and February 1, 2023, Market Supply Costs varied by a difference of at least 33% every month, yet Eligo's variable rate remained constant—and outrageously high—at $0.24/kWh.  That Eligo's rates do to track the Market Supply Costs is further proof that Eligo is not following its contractual commitment to charge variable rates "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" and is instead levying an excessive and unreasonable fluctuating margin.

94.     The below chart shows the same analysis for Plaintiff Schuster for twenty billing periods:

| Billing Period | Eligo Rate ($/kWh) | Market Supply Costs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/25/2021–7/27/2021 | 0.16 | 0.05 | 3.15x | 215% |
| 7/28/2021–8/25/2021 | 0.16 | 0.05 | 2.92x | 192% |
| 8/26/2021–9/24/2021 | 0.16 | 0.05 | 2.94x | 194% |
| 9/25/2021–10/26/2021 | 0.17 | 0.06 | 2.84x | 184% |
| 10/27/2021–11/24/2021 | 0.17 | 0.06 | 2.97x | 197% |
| 11/25/2021–12/27/2021 | 0.16 | 0.05 | 3.06x | 201% |
| 12/28/2021–1/26/2022 | 0.18 | 0.09 | 1.91x | 91% |

| 1/27/2022–2/25/2022 | 0.18 | 0.09 | 1.92x | 92% |
| 2/26/2022–3/25/2022 | 0.16 | 0.06 | 2.9x | 190% |
| 3/26/2022–4/28/2022 | 0.16 | 0.05 | 3.18x | 218% |
| 4/29/2022–5/25/2022 | 0.19 | 0.04 | 4.51x | 351% |
| 5/26/2022–6/28/2022 | 0.16 | 0.07 | 2.15x | 115% |
| 6/29/2022–7/26/2022 | 0.16 | 0.09 | 1.87x | 87% |
| 7/27/2022–8/25/2022 | 0.24 | 0.10 | 2.32x | 132% |
| 8/26/2022–9/27/2022 | 0.20 | 0.09 | 2.33x | 133% |
| 9/28/2022–10/26/2022 | 0.20 | 0.06 | 3.37x | 237% |
| 10/27/2022–11/23/2022 | 0.22 | 0.04 | 4.85x | 385% |
| 11/24/2022–12/22/2022 | 0.20 | 0.06 | 3.24x | 224% |
| 12/23/2022–1/25/2023 | 0.20 | 0.07 | 2.78x | 178% |
| 1/26/2023–2/25/2023 | 0.17 | 0.05 | 3.46x | 246% |

95.     Eligo's rates were higher than the Market Supply Costs for all provided months and were, on average, ***nearly triple*** Market Supply Costs.

96.     Eligo's rates for Plaintiff Schuster also fail to fluctuate in accordance with Market Supply Costs.  To take one example, between August 26, 2022 and November 23, 2022, Market Supply Costs steadily declined from $0.09/kWh to $0.04/kWh—a decrease of over 50%—while at the same time, Eligo's rates ***increased*** from $0.20/kWh to $0.22/kWh.  This again demonstrates that Eligo prioritized its profits over adherence to the terms of its contract.

97.     That Eligo's rates are so much higher than its costs to acquire the electricity it sells to customers cannot be explained by the price of renewable energy credits because, as explained above, even assuming that Eligo purchased RECs to cover 100% of customer usage, the average price Eligo paid for such RECs was only two cents per kWh.  To the extent Eligo

33

purchased RECs covering less than 100% of usage, its REC costs would have been lower than two cents per kWh.

98.     Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to market prices but are instead outrageously higher.

99.     No reasonable consumer who knew the truth about Eligo's exorbitant rates would have chosen it as an energy supplier.

100.    Eligo lulled customers into purchasing its energy supply via material misrepresentations and omissions about its variable energy rates.  Eligo did so to reap excessive profits at the expense of unsuspecting customers.  Eligo acted with actual malice, or wanton and willful disregard for customers' well-being.

101.    In this case, Eligo knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

102.    It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[45] and "Nudges."[46]

---

[45] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[46] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

103. Eligo's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that customers will compare Eligo's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

104. Eligo did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates customers' local utilities charge. Eligo likewise failed to adequately disclose to Plaintiffs that in paying Eligo's variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from their local utility.

105. Eligo knew that its variable rates were consistently and significantly higher than the local utility's rates.

106. Eligo's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

107. Moreover, Eligo at no time alerted or informed Plaintiffs that the cost for energy would be continuously *significantly* higher than the same energy sold by their local utility.

108. A reasonable consumer understands and expects that variable energy rates will reflect the wholesale price for the commodity, that is, the wholesale market price available to Eligo for the energy it in turn supplies to its retail customers.

109. However, Eligo's variable rates are much higher than wholesale market price of energy in New York.

110. Eligo's omissions with respect to the rates it would charge were materially misleading.

**E.      Eligo's Unauthorized Monthly Fees**

111.     Contrary to the express terms of the contract, Eligo charges its variable rate customers additional and unauthorized monthly fees.

112.     Eligo's contract with Plaintiffs provides that the "price" for variable rate customers will be a "monthly variable kWh rate," meaning that the rate will be on a per kilowatt hour basis calculated in accordance with the four factors outlined in the contract.  Nowhere does the contract authorize Eligo to charge variable rate customers an additional monthly fee.

113.     However, Eligo frequently charges variable rate customers a monthly fee.  For example, from July 2018 to March 2022, Eligo charged Plaintiff Schuster a monthly fee of $4.93 forty-four times.

114.     Customers like Ms. Schuster were thus injured by being charged an unauthorized additional monthly fee.

**F.      Eligo Violated New York's Variable Rate Disclosure Law**

115.     Because of the New York Legislature's concerns with skyrocketing variable rates, New York adopted N.Y. Gen. Bus. Law § 349-d(7), which requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."   The law is explicitly designed to allow energy consumers to make informed choices: "These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed decisions on their choices for gas and electric service . . . ."[47]

116.     Through its conduct, Eligo violated both the spirit and letter of N.Y. Gen. Bus. Law § 349-d(7).

_____

[47] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 4 (2009).

117.    Eligo's marketing material Welcome Letter that it mailed directly to Plaintiffs never clearly and conspicuously identified that it would be charging its customers a variable rate. Specifically, the Welcome Letter does not mention whatsoever that Eligo will charge its customers a variable rate.  In fact, the word "variable" does not appear anywhere in this marketing material.  Eligo's Welcome Letter also does not identify Defendants' unauthorized and improper monthly fee. Because this fee is added to Eligo's variable rate, it is a "variable charge" under N.Y. Gen. Bus. Law § 349-d(7).

**G.    Tolling Of The Statute Of Limitations**

*A.    Continuing Violation Tolling Allegations*

118.    Given that Defendants have engaged in a series of deceptive acts and omissions for which they billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Eligo's last wrongful act against Plaintiffs and other customers when Eligo last charged them a variable energy rate.

*B.    Fraudulent Concealment Tolling*

119.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein throughout the period relevant to this action.

120.    Instead of adequately disclosing its true practices to Plaintiffs and their other customers, Defendants actively concealed and misrepresented their true practices.

*C.    Estoppel Tolling*

121.    Defendants were under a continuous duty to disclose its practices to Plaintiffs and their other customers.

122.    Defendants knowingly, affirmatively, and actively concealed the true nature of their practices from Plaintiffs and their other customers.

123.    Based on the foregoing and the other allegations herein, Defendants are estopped from relying on any statutes of limitations in defense of this action.

D.    *Discovery Rule Tolling*

124.    Eligo's customers do not have access to information about its costs or how Eligo actually sets its variable rates. Nor do reasonable consumers undertake an examination of the difficult-to-access and interpret wholesale cost data applicable to their electricity market when assessing whether their electricity rates are too high. Accordingly, Plaintiffs and other Eligo customers did not realize that they were being overcharged.

125.    Nor would Plaintiffs and other Eligo customers consumers have discovered that Eligo was overcharging them in the exercise of reasonable diligence, given the information asymmetry and the difficulty if not impossibility of obtaining information about Eligo's actual costs and how Eligo actually sets its variable rates.

126.    Accordingly, Plaintiffs' and other Eligo customers' lack of notice, actual or constructive, that Eligo was overcharging them meant that they did not previously discover or reasonably should have discovered that they had a cause of action as a result of being harmed by Defendants' conduct.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all residential and commercial customers in New York who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment pursuant to a contract containing a pricing term stating that variable rates

would be "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" (the "Class").

128.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class—their marketing and billing practices—and this case is about the responsibility of Defendants for their knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

129.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants. Also excluded from the Class are any residential or commercial customers included in the proposed classes that are preliminarily defined in *Bodkin et al. v. Eligo Energy LLC et al.*, No. 25 Civ. 96 (W.D. Pa.). or *Orzolek v. Eligo Energy, LLC et al.*, No. 25 Civ. 78 (E.D. Oh.).  Any customer included in any class that is eventually certified in *Bodkin* or *Orzolek* is also excluded from the Class.

130.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiffs file their motion for class certification.  Any further modification, however, will not include non-New York customers or customers included in any proposed or certified classes in *Bodkin* or *Orzolek*.

131.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Eligo.  Plaintiffs believe, however, that based on the publicly available data concerning Eligo's customers in New York, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

132.    The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control.  Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

133.    Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

134.    Plaintiffs will fairly and adequately protect the interests of all Class Members.  Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

135.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

> a.   Whether Eligo's misrepresentations and omissions are materially misleading;
>
> b.   Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

40

     c.   Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

     d.   Whether Eligo's conduct violates N.Y. Gen. Bus. Law § 349 and § 349-d;

     e.   Whether Eligo was unjustly enriched as a result of its conduct;

     f.   Whether Class Members have been injured by Eligo's conduct;

     g.   Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices; and

     h.   The extent of class-wide injury and the measure of damages for those injuries.

136.    A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

137.    A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

138.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

139.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a.  Whether Eligo's misrepresentations and omissions are materially misleading;

b.  Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

c.  Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

d.  Whether Eligo's conduct violates N.Y. Gen. Bus. Law § 349 and § 349-d;

e.  Whether Eligo was unjustly enriched as a result of its conduct;

f.  Whether Class Members have been injured by Eligo's conduct; and

g.  Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices.

140.  Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### Breach Of Contract Under New York Law
### (On Behalf Of The Class)

141.  Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.  Eligo customers have customer agreements whose variable rate terms are substantially similar.

143.  Plaintiffs and the Class entered into valid contracts with Eligo for the provision of electricity.

144.  Eligo represents in its customer contract that its variable rate for electricity will be "calculated on a monthly basis in response to market pricing, transportation costs, and other

market price factors." Eligo further represents that "[a]pplicable taxes will be factored into the variable price."

145.    Upon information and belief, Plaintiffs were subject to the same or substantially similar contractual terms as all of Eligo's variable rate customers included in the proposed Class.

146.    Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Eligo charged for natural gas and electricity.

147.    However, Eligo failed to perform its obligations under its contracts to charge rates in accordance with the formula set forth in its contracts. Instead, Eligo charged variable rates for natural gas and electricity that were untethered from the formula upon which the parties agreed the rate would be based.

148.    Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Eligo charged a variable rate calculated from the formula identified in Eligo's customer contract.

149.    Eligo also charged variable rate customers a flat monthly fee which is not authorized by the contract. Plaintiffs and the Class were injured because they were billed, and they paid, these unauthorized fees.

150.    By reason of the foregoing, Eligo is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

151.    Eligo Energy NY, LLC is not the only Defendant liable for this breach of contract claim. Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach. For example, the Welcome Letters sent by Eligo Energy, LLC state that it will be Plaintiffs' new energy supplier and that "a copy of the terms and conditions of

your agreement with Eligo Energy" are enclosed.

152.     Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the Welcome Letters and contracts, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

153.     In addition, Eligo Energy NY, LLC contracted on Eligo Energy, LLC's behalf.

154.     And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

### COUNT II
### In The Alternative, Breach Of The Implied Covenant Of Good Faith And Fair Dealing
### (On Behalf Of The Class)

155.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.     Plaintiffs and the Class contracted with Eligo for the provision of electricity supply.

157.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms. This cause of action is pleaded in the alternative to Plaintiffs' contract claims.

158.     Under the contract, to the extent Eligo had discretion to set the variable rate for electricity, it was obligated to exercise its discretion in good faith.  Eligo exercised its discretion in bad faith.  Specifically, Eligo acted with a bad motive and continued to gouge customers.   Eligo has known for years (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically

higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged. Despite this superior knowledge, Eligo acted with a bad motive and continued to gouge customers and small businesses.

159.    Eligo's failure to disclose the material information (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged  is what permitted Eligo to charge Plaintiffs whatever it wanted—unburdened by disclosing the truth about its rate setting practices—and Plaintiffs experienced the adverse consequences in the performance of the parties' agreement.

160.    Eligo also failed to disclose that it had no intention of charging a rate reflective of its actual costs, or that the primary factor it considers when setting the variable rates is its ability to obtain excessive and unreasonable profits from high rates without causing too much customer attrition when customers notice Eligo's excessive rates.

161.    Plaintiffs reasonably expected that Eligo's variable energy rates would not be continuously and significantly higher than the utility's rates or other ESCOs' rates, which provide the same energy supply as Eligo. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.

162.     Plaintiffs also reasonably expected that Eligo would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.  Eligo knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

163.     Eligo breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Eligo's variable energy rate would be commensurate with Eligo's costs.  Eligo also acted in bad faith when it charged variable rate customers monthly fees even though the contract did not authorize such fees.

164.     As a result of Eligo's breaches, Eligo is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

165.     Eligo Energy NY, LLC is not the only Defendant liable for this breach of the duty of good faith and fair dealing.  Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach.  For example, the Welcome Letters sent by Eligo Energy, LLC state that it will be Plaintiffs' new energy supplier and that "a copy of the terms and conditions of your agreement with Eligo Energy" are enclosed.

166.     Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the Welcome Letters and contracts, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

167.     In addition, Eligo Energy NY, LLC contracted on Eligo Energy, LLC's behalf.

168.     And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

## COUNT III
### Violation Of New York General Business Law § 349
### (On Behalf Of The Class)

169.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349 on their own behalf and on behalf of each member of the Class.

171.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N N.Y. Gen. Bus. Law § 349.

172.    Eligo's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

173.    Eligo has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, including:

      a.  Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

      b.  Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

      c.  Failing to provide customers adequate advance notice of the variable rates it would charge;

      d.  Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

      e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

     f.   Failing to adequately disclose that it charges a monthly fee when the contract promised that the rate for electricity would be a kWh charge based on the factors enumerated in the contract; and

     g.   Affirmatively misrepresenting the factors used to determine a customer's variable rate.

174.    The above deceptive practices and acts by Eligo were material misrepresentations or omissions of existing or past facts.

175.    Eligo knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

176.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

177.    Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

178.    Each of Eligo's contracts include a multi-day rescissionary period.  During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract.  Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

179.    Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

180.    Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

181.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

182.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

183.    Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

184.    Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 173 above, Eligo deprived customers of the ability to make informed purchasing decisions.

185.    Eligo's practices are unconscionable and outside the norm of reasonable business practices.

186.    As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action but not less than $50

for each violation, such damages to be trebled trebled, plus attorneys' fees, and the costs of this suit.

187.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Eligo's practices to be unlawful, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

188.    As a result of Eligo's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349.

189.    Eligo Energy NY, LLC is not the only Defendant liable for violating N.Y. Gen. Bus. Law § 349.  It was Eligo Energy, LLC that solicited New York customers; it was Eligo Energy, LLC that sent the Welcome Letters and contracts to New York customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to New York customers; it was Eligo Energy, LLC that communicated with New York customers and it was Eligo Energy, LLC that set the rates and monthly fees that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how variable rates would be calculated.

190.    And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating N.Y. Gen. Bus. Law § 349.

## COUNT IV
### Violation Of New York General Business Law § 349-d(3)
### (On Behalf Of Plaintiffs And The Class)

191.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

192.     Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d on their own behalf and on behalf of each member of the Class.

193.     N.Y. Gen. Bus. Law §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

194.     Defendants offer for sale energy services for and on behalf of an ESCO.

195.     Eligo has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349-d(3), including:

   a.   Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

   b.   Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

   c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

   d.   Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

   e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

   f.   Failing to adequately disclose that it charges a monthly fee when the contract promised that the rate for electricity would be a kWh charge based on the factors enumerated in the contract; and

g. Affirmatively misrepresenting the factors used to determine a customer's variable rate.

196.    The above deceptive practices and acts by Eligo were material misrepresentations or omissions of existing or past facts.

197.    Eligo's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy customers.

198.    Eligo knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

199.    Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

200.    Each of Eligo's contracts include a multi-day rescissionary period.  During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract.  Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

201.    Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

202.    Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

203.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

204.     Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

205.     Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

206.     Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 195 above, Eligo deprived customers of the ability to make informed purchasing decisions.

207.     Eligo's practices are unconscionable and outside the norm of reasonable business practices.

208.     As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees, and the costs of this suit.

209.     Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to N.Y. Gen. Bus. Law § 349-d(10), this Court has the power to award such relief,

including but not limited to, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

210. Eligo Energy NY, LLC is not the only Defendant liable for violating N.Y. Gen. Bus. Law § 349-d(3). It was Eligo Energy, LLC that solicited New York customers; it was Eligo Energy, LLC that sent the Welcome Letters and contracts to New York customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to New York customers; and it was Eligo Energy, LLC that set the rates and monthly fees that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how variable rates would be calculated.

211. And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating N.Y. Gen. Bus. Law § 349-d(3).

## COUNT V
### Violation Of New York General Business Law § 349-d(7)
### (On Behalf Of Plaintiffs And The Class)

212. Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

213. Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d(7) on their own behalf and on behalf of each member of the Class.

214. Section 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified." N.Y. Gen. Bus. Law § 349-d(7).

215. The marketing materials Eligo provided to Plaintiffs and the Class fail to clearly and conspicuously disclose that Plaintiffs will be charged variable rates.

216.    Specifically, the Welcome Letter marketing material Eligo sent to Plaintiffs does not disclose that Plaintiffs would be charged variable rates or that a monthly fee is part of the variable charge.  In fact, the word "variable" does not appear anywhere in these marketing materials.

217.    Eligo's Welcome Letter constitutes independent "marketing materials" under Section 349-d(7).

218.    Eligo's contract also does not identify the monthly fee as a component of the variable charge.

219.    Through its conduct described above, Eligo has violated N.Y. Gen. Bus. Law § 349-d(7) and has caused injury to Plaintiffs and Eligo's other variable rate customers in New York.

220.    Under N.Y. Gen. Bus. Law § 349-d(10), Plaintiffs have a private right of action to enforce N.Y. Gen. Bus. Law § 349-d(7).  As a direct and proximate result of Eligo's conduct, Plaintiffs and the Class have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

221.    Plaintiffs also seek an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. Gen. Bus. Law § 349-d(10).

222.    Eligo Energy NY, LLC is not the only Defendant liable for violating N.Y. Gen. Bus. Law § 349-d(7).  It was Eligo Energy, LLC that solicited New York customers; it was Eligo Energy, LLC that sent the Welcome Letters and contracts to New York customers; and it was Eligo Energy, LLC that drafted those letters and the contracts sent to New York customers.

223.    And as alleged above, Eligo Energy NY, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating N.Y. Gen. Bus. Law § 349-d(7).

## COUNT VI
### In The Alternative, Unjust Enrichment
### (On Behalf Of The Class)

224.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

225.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs does not intend to proceed with their unjust enrichment claim.

226.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Eligo by contracting with Eligo for electricity or natural gas.  Plaintiffs and the Class would not have contracted with Eligo for electricity and natural gas had they known that Eligo would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

227.    Plaintiffs and the Class Members would not have purchased energy from Eligo had they known the truth about Eligo's variable energy rates.

228.    By engaging in the conduct described above, Eligo has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

229.    It would be unjust and inequitable for Eligo to retain the payments Plaintiffs and Class Members made for excessive energy charges.

230.    Therefore, Eligo is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Eligo's actions.

231.    As alleged above, Eligo Energy, LLC is also liable for this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)    Issue an order certifying the Class defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendants have committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(e)    Render an award of punitive damages;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

Dated: September 16, 2025
White Plains, New York

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**

By:    /s/ D. Greg Blankinship
       D. Greg Blankinship
       Daniel Martin
       One North Broadway, Suite 900
       White Plains, New York 10601
       Tel: (914) 298-3281
       Fax: (914) 824-1561
       gblankinship@fbfglaw.com
       dmartin@fbfglaw.com

J. Burkett McInturff
Tiasha Palikovic
Jessica L. Hunter
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jbm@wittelslaw.com
tpalikovic@wittelslaw.com
jlh@wittelslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# Exhibit A



201 W. Lake St. Ste 151
Chicago, IL 60606

July 13, 2017

Dear IRA BROUS,

Welcome to Eligo Energy, authorized supplier of NYSEG. We're excited about your activation!

In the next few days, you will be receiving a notice from NYSEG of change of your supplier to Eligo Energy, LLC. You will still remain a customer of NYSEG, and they will continue to handle your billing, as well as any and all service issues. There will be no lapse in your electricity service.

Enclosed for your records are:

- a copy of the terms and conditions of your agreement with Eligo Energy
- the New York ESCO Consumers Bill of Rights

If your account is tax exempt, fax or email a copy of your Exempt Certificate to 1-312-380-0186 or customerservice@eligoenergy.com. Please be sure to include your utility account number.

If you have any questions regarding your energy bill or are dissatisfied with Eligo Energy in any way, please call customer service at 1-888-744-8125.

As your local utility, NYSEG will continue to read your meter, handle any power outages or emergency services, and continue to send you your bill.

Thank you for your business!

Sincerely,
Eligo Energy

July 13, 2017

**New York State Public Service Commission**
**Your Rights as an Energy Services Company Consumer**
**ESCO Consumers Bill of Rights**

Customers can purchase energy from an Energy Services Company (ESCO) or from a traditional utility. If you choose to purchase energy from an ESCO you are entitled to:

- A clear description of the services offered by the ESCO.
- Receive energy delivery and 24 hour emergency services from your utility company.
- Clear procedures for switching energy suppliers, including information about the enrollment process.
- Disclosure, in simple and clear language, of the terms and conditions of the agreement between you and the ESCO including:
  - price and all variable charges or fees;
  - length of the agreement;
  - terms for renewal of the agreement;
  - cancellation process and any early termination fees, which are limited by law; and
  - conditions, if any, under which the ESCO guarantees cost savings.
- Rescind an agreement with an ESCO within three days of receiving the agreement, if you are a residential customer.
- A description of how pre payment agreements work, if offered.
- Notice from the ESCO, no less than thirty days prior to the contract renewal date, of the renewal terms and the options you have as a customer.
- A fair and timely complaint resolution process.
- Provision of any written documents (contracts, marketing materials, and this ESCO Consumers Bill of Rights) in the same language used to enroll you as a customer.

If you are a residential customer you are also entitled to the rights and protections of the Home Energy Fair Practices Act (HEFPA) which requires that all utility customers be treated fairly with regard to application for service, customer billing, and complaint procedures. For more information go to www.dps.ny.gov/resright.html.

ESCOs that do not assure these consumer rights could lose their eligibility to provide service in New York. Please report any complaints to the Department of Public Service at 1 800 342 3377 (8:30 am   4:00 pm), by mail at Office of Consumer Services, NYS Department of Public Service, 3 Empire State Plaza, Albany, NY 12223, or online at http://www.dps.ny.gov.

You can find more information about your energy alternatives by visiting: www.AskPSC.com

**Eligo Energy NY, LLC Terms of Service**

**New York - Residential Customer**

This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of New York State Electric and Gas Corporation ("NYSEG" or "Utility")

| Price | First 6 months at a fixed rate of $0.07990 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
|---|---|
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 6 month fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

**Service:** Customer will begin receiving electricity at the time of the first scheduled meter reading by the Utility after the date on which Customer is eligible to switch suppliers. Supply of energy to Customer shall continue pursuant to this Agreement. By executing or approving this Agreement, under the terms of New York's Utility Energy Service Company (ESCO) Referral Program, Customer agrees to initiate service and begin enrollment.

**Price:** All electricity products described herein are derived from at least 30% renewable sources. For fixed price products during the Initial Term, Customer shall pay the fixed generation rate and a monthly charge as provided in the Agreement Summary after enrollment at the next applicable billing period. For Eligo Energy's All-inclusive products, the electricity service is inclusive of all Expected Monthly Usage for a flat monthly fee as provided in the Agreement Summary. Expected Monthly Usage is calculated based on customer historical usage. For usage significantly exceeding Expected Monthly Usage, each additional kWh exceeding the limit provided in the Agreement Summary will be charged at the overage rate as provided in the Agreement Summary. Following the Initial Term as provided in the Agreement Summary, the generation rate will continue as a monthly variable rate that may be periodically adjusted to market conditions. Customer may compare price terms by looking at the rates posted on Supplier's website (http://www.eligoenergy.com) and on Customer's monthly bill. In addition, Customer shall pay and be responsible for all other amounts, such as service and delivery charges, from the Utility, including any applicable taxes. Customer also understands that the Utility may charge a switching fee when enrolling with Supplier. Customer is responsible for cancelling any existing supplier agreement.

**Customer Eligibility:** To be eligible for Eligo All-inclusive service, customers must have 12 months of usage history for their current residence and are not enrolled in budget billing or other public assistance programs.

**Right of Rescission:** Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time.

**Term:** Service with Supplier will commence 2017-08-03. Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer.

**Cancellation:** Customer may cancel this Agreement, for any reason, at any time, as provided in the Agreement Summary. The cancellation becomes effective when Customer's new supplier or the Utility completes the change. Cancellation will not relieve Customer of any payment obligations for electricity provided to Customer by Supplier before cancellation. Customer may make such a cancellation by contacting Supplier or the Utility (orally, electronically or in writing). Customer may not be served under the same rates, terms, and conditions that apply to others when switching back to the Utility. Supplier may revert Customer to Utility for non-payment at the time of the next meter reading with at least 15 days written notice and an opportunity to cure. A final bill will be rendered within twenty (20) days after the final scheduled meter reading or, if access is unavailable, an estimate of consumption will be used in the final bill, which will be reconciled subsequent to the final meter reading.

**Billing:** Supplier will serve only the supply portion of Customer's electricity bill. All other services currently supplied by the Utility will continue to be supplied by the Utility. Customer will continue to receive one monthly electric bill processed and provided by the Utility in accordance with its billing practices. At the present time, Supplier is able to offer budget billing for the generation portion of the bill to Customers who qualify under New York's Home Energy Fair Practices Act (HEFPA). In the event of Customer bankruptcy, late payment, or nonpayment, Supplier has the right to cancel this Agreement.

**Collection of Past Due Charges:** Utility will remain responsible for collecting late payments. The utility will charge 1.50% of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance.

**Environmental Disclosure Information:** Supplier will provide to the Customer, with the Agreement, information (accompanying the Agreement) regarding the approximate generation resource mix and environmental characteristics of the power supplies.

**Confidentiality:** Supplier will not disclose Customer's social security number and/or account number(s) without the Customer's consent except for the Supplier's own collections and credit reporting efforts, participation in programs funded by the Universal Service Fund, or assigning Customer's Agreement to another supplier.

**Contact Information:** In the event of an emergency such as a power failure, downed power line, or other life-threatening emergency, Customer should contact the Utility at 1-800-572-1111 (toll free) or Emergency Services at 911. For other service matters Customer can call Utility at 1-800-572-1111 (toll-free). For all other inquiries, the Customer may contact Supplier at 1-888-744-8125, 24 hours a day and 7 days a week. Customer shall contact Supplier with any change in Customer's email address and/or withdrawal of consent for electronic transfer of Customer information. If Customer's complaint is not resolved after they have called Supplier and/or Utility, or for general Utility information, Customer may contact the New York State Department of Public Service for assistance at 1-888-697-7728 from 6 a.m. ET to 5 p.m. ET weekdays or at http://www.dps.ny.gov/.

**Dispute Resolution:** In the event of a billing dispute or a disagreement involving Supplier's service hereunder, the parties will use their best efforts to resolve the dispute. Customer should contact Supplier by telephone or in writing as provided above. The dispute or complaint relating to Customer may be submitted by either party at any time to the New York State Department of Public Service ("NYDPS") pursuant to its Complaint Handling Procedures ("Procedures") by calling the NYDPS at 1-888-697-7728 or by writing to the NYDPS at: New York State Department of Public Service, Empire State Plaza Agency Building 3, Albany, NY 12223-1350, or through its website at: http://www.dps.ny.gov/. During the pendency of any dispute, Customer must pay the bill in full minus the specific disputed amount. Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms herein shall lie exclusively in the New York. This Agreement shall be construed under and shall be governed by the laws of the New York without regard to application of its conflicts of laws and principles.

**Customer Relocation:** If Customer moves to a new address within Supplier's current service territory, Customer should contact Supplier in order to re-enroll at the new location.

**Changes to Agreement:** This is an Agreement for residential service. In the event that Customer's account under this Agreement is not a residential account and for other reasons provided herein, Supplier may modify this Agreement at any time from residential to commercial terms. Supplier may modify this Agreement, or change these terms in connection with any renewal of this Agreement, or if there are adverse changes in the laws, rules or market conditions affecting Suppliers ability to perform hereunder, by providing thirty (30) to sixty (60) days prior written notice.

**Assignment:** Customer may not assign this Agreement without Supplier's written consent. Customer hereby acknowledges and consents to Supplier's pledge and contingent assignment or subrogation of any and all rights and obligations hereunder. This Agreement is binding upon Customer and Supplier, and each party's heirs, successors and permitted assigns. Any required notice of assignment will be considered complete when it is mailed to the Customer's address on file with the Supplier. There are no third-party beneficiaries to this Agreement.

**Limitations of Liability:** Neither the Customer nor the Supplier shall assume liability or responsibility for any special, indirect, consequential or punitive damages for items associated with the failure of Utility to perform its duties, including but not limited to operations and maintenance of their system or interruptions of service, termination of service, or from damages arising from structural damage as a result of negligence.

**Authorization:** Customer authorizes Supplier to obtain and review information regarding the customer's credit history from credit reporting agencies, and the following information from the Utility: consumption history, billing determinants, credit information, public assistance status, existence of medical emergencies, status as to whether Customer has a medical emergency, is human needs, elderly, blind or disabled and data applicable to cold weather periods under PSL § 32 (3); and information pertaining to PSL § 33, tax status and eligibility for economic development or other incentives. This information may be used by Supplier to determine whether it will commence and/or continue to provide energy supply service to Customer and will not be disclosed to a third-party unless required by law. Customer's execution of this Agreement shall constitute authorization for the release of this information to Supplier. This authorization will remain in effect during the term of this Agreement. Customer may rescind this authorization at any time by providing written notice thereof to Supplier or calling Supplier at 1-888-744-8125. Supplier reserves the right to cancel this Agreement in the event Customer rescinds the authorization.

**Agreement Summary**

| Contact Information | |
|---|---|
| Sales Rep | Webform CEP |
| Customer | Ira Brous |
| Contact Name | |
| Contact Phone | ███████████ |
| Contact Email | |
| Utility | New York State Electric and Gas Corporation |
| Mailing/Billing/Service Address | ████████ Ithaca NY █████ |

| Custom Product Types | | | | |
|---|---|---|---|---|
| Choose One | Initial Term | Price | Product | Cancellation Service Charge |
| ☐ | 6 months | $0.07990 / kWh | Fixed - Residential (30.0% Renewable) | No Cancellation Service Charges. |

| Utility Account Numbers |
|---|
| ██████████ |

| Additional Info | |
|---|---|
| ICAP | 1.31 kW |
| Estimated Annual Usage | 14.0 MWh |

For each location, term shall start after the first applicable meter read cycle after **August 3, 2017**.

✓ Customer indicated that he has read and agreed to the Terms of Service and affirmed that he is an authorized decision-maker for this energy account.

Additional data recorded during customer enrollment:

| | |
|---|---|
| Date and Time of Enrollment | 2017-07-13 17:41:19 UTC |
| Customer Eligo Account Number | █████████████ |
| Customer IP Address | unknown |

# Exhibit B



201 W. Lake St. Ste 151
Chicago, IL 60606

October 09, 2016

Dear Michelle Schuster,

Welcome to Eligo Energy, authorized supplier of RG&E. We're excited about your activation!

In the next few days, you will be receiving a notice from RG&E of change of your supplier to Eligo Energy, LLC. You will still remain a customer of RG&E, and they will continue to handle your billing, as well as any and all service issues. There will be no lapse in your electricity service.

Enclosed for your records are:

- a copy of the terms and conditions of your agreement with Eligo Energy
- the New York ESCO Consumers Bill of Rights

**You may be eligible for more savings via our all-inclusive product. Call to find out if you qualify at 1-888-744-8125**

If your account is tax exempt, fax or email a copy of your Exempt Certificate to 1-312-380-0186 or customerservice@eligoenergy.com. Please be sure to include your utility account number.

If you have any questions regarding your energy bill or are dissatisfied with Eligo Energy in any way, please call customer service at 1-888-744-8125, Monday through Friday, 9AM-6PM ET.

As your local utility, RG&E will continue to read your meter, handle any power outages or emergency services, and continue to send you your bill.

Thank you for your business!

Sincerely,
Eligo Energy

October 09, 2016

**Eligo Energy NY, LLC Terms of Service**
**New York - Residential Customer**
This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of Rochester Gas and Electric ("RG&E" or "Utility").

| | |
|---|---|
| Price | First 3 months at a fixed rate of $0.05490 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 3 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

**Service:** Customer will begin receiving electricity at the time of the first scheduled meter reading by the Utility after the date on which Customer is eligible to switch suppliers. Supply of energy to Customer shall continue pursuant to this Agreement. By executing or approving this Agreement, under the terms of New York's Utility Energy Service Company (ESCO) Referral Program, Customer agrees to initiate service and begin enrollment.
**Price:** All electricity products described herein are derived from at least 30% renewable sources. For fixed price products during the Initial Term, Customer shall pay the fixed generation rate and a monthly charge as provided in the Agreement Summary after enrollment at the next applicable billing period. For Eligo Energy's All-Inclusive products, the electricity service is inclusive of all Expected Monthly Usage for a flat monthly fee as provided in the Agreement Summary. Expected Monthly Usage is calculated based on customer historical usage. For usage significantly exceeding Expected Monthly Usage, each additional kWh exceeding the limit provided in the Agreement Summary will be charged at the overage rate as provided in the Agreement Summary. Following the Initial Term as provided in the Agreement Summary, the generation rate will continue as a monthly variable rate that may be periodically adjusted to market conditions. Customer may compare price terms by looking at the rates posted on Supplier's website (http://www.eligoenergy.com) and on Customer's monthly bill. In addition, Customer shall pay and be responsible for all other amounts, such as service and delivery charges, from the Utility, including any applicable taxes. Customer also understands that the Utility may charge a switching fee when enrolling with Supplier. Customer is responsible for cancelling any existing supplier agreement.
**Customer Eligibility:** To be eligible for Eligo All-Inclusive service, customers must have 12 months of usage history for their current residence and are not enrolled in budget billing or other public assistance programs.
**Right of Rescission:** Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time.
**Term:** Service with Supplier will commence with the next available meter reading after the Utility and Supplier process the request. Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer.
**Cancellation:** Customer may cancel this Agreement, for any reason, at any time, as provided in the Agreement Summary. The cancellation becomes effective when Customer's new supplier or the Utility completes the change. Cancellation will not relieve Customer of any payment obligations for electricity provided to Customer by Supplier before cancellation. Customer may make such a cancellation by contacting Supplier or the Utility (orally, electronically or in writing). Customer may not be served under the same rates, terms, and conditions that apply to others when switching back to the Utility. Supplier may revert Customer to Utility for non-payment at the time of the next meter reading with at least 15 days written notice and an opportunity to cure. A final bill will be rendered within twenty (20) days after the final scheduled meter reading or, if access is unavailable, an estimate of consumption will be used in the final bill, which will be reconciled subsequent to the final meter reading.
**Billing:** Supplier will serve only the supply portion of Customer's electricity bill. All other services currently supplied by the Utility will continue to be supplied by the Utility. Customer will continue to receive one monthly electric bill processed and provided by the Utility in accordance with its billing practices. At the present time, Supplier is able to offer budget billing for the generation portion of the bill to Customers who qualify under New York's Home Energy Fair Practices Act (HEFPA). In the event of Customer bankruptcy, late payment, or nonpayment, Supplier has the right to cancel this Agreement.
**Collection of Past Due Charges:** Utility will remain responsible for collecting late payments. The utility will charge 1.50% of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance.
**Environmental Disclosure Information:** Supplier will provide to the Customer, with the Agreement, information (accompanying the Agreement) regarding the approximate generation resource mix and environmental characteristics of the power supplies.
**Confidentiality:** Supplier will not disclose Customer's social security number and/or account number(s) without the Customer's consent except for the Supplier's own collections and credit reporting efforts, participation in programs funded by the Universal Service Fund, or assigning Customer's Agreement to another supplier.
**Contact Information:** In the event of an emergency such as a power failure, downed power line, or other life-threatening emergency, Customer should contact the Utility at 1-800-743-2110 (toll free) or Emergency Services at 911. For other service matters Customer can call Utility at 1-800-743-2110 (toll-free). For all other inquiries, the Customer may contact Supplier at 1-888-744-8125, 24 hours a day and 7 days a week. Customer shall contact Supplier with any change in Customer's email address and/or withdrawal of consent for electronic retention of Customer information. If Customer's complaint is not resolved after they have called Supplier and/or Utility, or for general Utility information, Customer may contact the New York State Department of Public Service for assistance at 1-888-697-7728 from 6 a.m. ET to 5 p.m. ET weekdays or at http://www.dps.ny.gov/.
**Dispute Resolution:** In the event of a billing dispute or a disagreement involving Supplier's service hereunder, the parties will use their best efforts to resolve the dispute. Customer should contact Supplier by telephone or in writing as provided above. The dispute or complaint relating to Customer may be submitted by either party at any time to the New York State Department of Public Service ("NYDPS") pursuant to its Complaint Handling Procedures ("Procedures") by calling the NYDPS at 1-888-697-7728 or by writing to the NYDPS at: New York State Department of Public Service, Empire State Plaza Building 3, Albany, NY 12223-1350, or through its website at: http://www.dps.ny.gov/. During the pendency of any dispute, Customer must pay the bill in full minus the specific disputed amount. Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms herein shall lie exclusively in the New York. This Agreement shall be construed under and shall be governed by the laws of the New York without regard to application of its conflicts of laws and principles.
**Customer Relocation:** If Customer moves to an address within Supplier's current service territory, Customer should contact Supplier in order to re-enroll at the new location.
**Changes to Agreement:** This is an Agreement for residential service. In the event that Customer's account under this Agreement is not a residential account and for other reasons provided herein, Supplier may modify this Agreement at any time from residential to commercial terms. Supplier may modify this Agreement, or change these terms in connection with any renewal of this Agreement, or if there are adverse changes in the laws, rules or market conditions affecting Supplier's ability to perform hereunder, by providing thirty (30) to sixty (60) days prior written notice.
**Assignment:** Customer may not assign this Agreement without Supplier's written consent. Customer hereby acknowledges and consents to Supplier's pledge and contingent assignment or subrogation of any and all rights and obligations hereunder. This Agreement is binding upon Customer and

Supplier, and each party's heirs, successors and permitted assigns. Any required notice of assignment will be considered complete when it is mailed to the Customer's address on file with the Supplier. There are no third-party beneficiaries to this Agreement.

**Limitations of Liability:** Neither the Customer nor the Supplier shall assume liability or responsibility for any special, indirect, consequential or punitive damages for items associated with the failure of Utility to perform its duties, including but not limited to operations and maintenance of their system or interruptions of service, termination of service, or from damages arising from structural damage as a result of negligence.

**Authorization:** Customer authorizes Supplier to obtain and review information regarding the customer's credit history from credit reporting agencies, and the following information from the Utility: consumption history, billing determinants, credit information, public assistance status, existence of medical emergencies, status as to whether Customer has a medical emergency, is human needs, elderly, blind or disabled and data applicable to cold weather periods under PSL § 32 (3); and information pertaining to PSL § 33, tax status and eligibility for economic development or other incentives. This information may be used by Supplier to determine whether it will commence and/or continue to provide energy supply service to Customer and will not be disclosed to a third-party unless required by law. Customer's execution of this Agreement shall constitute authorization for the release of this information to Supplier. This authorization will remain in effect during the term of this Agreement. Customer may rescind this authorization at any time by providing written notice thereof to Supplier or calling Supplier at 1-888-744-8125. Supplier reserves the right to cancel this Agreement in the event Customer rescinds the authorization.

## Agreement Summary

| Contact Information | |
|---|---|
| Customer | MICHELLE SCHUSTER |
| Contact Phone | |
| Contact Email | |
| Utility | Rochester Gas and Electric |
| Mailing/Billing/Service Address | ███████████ Rochester NY ████████ |

| Custom Product Types | | | | |
|---|---|---|---|---|
| Choose One | Initial Term | Price | Product | Cancellation Service Charge |
| ☐ | 3 months | $0.05490 / kWh | Fixed | No Cancellation Service Charges. |

| Utility Account Numbers |
|---|
| ████████████ |

| Additional Info |
|---|

| ✓ | Customer indicated that he has read and agreed to the Terms of Service and affirmed that he is an authorized decision-maker for this energy account. |
|---|---|

**New York State Public Service Commission**
**Your Rights as an Energy Services Company Consumer**
**ESCO Consumers Bill of Rights**

Customers can purchase energy from an Energy Services Company (ESCO) or from a traditional utility. If you choose to purchase energy from an ESCO you are entitled to:

- A clear description of the services offered by the ESCO.
- Receive energy delivery and 24 hour emergency services from your utility company.
- Clear procedures for switching energy suppliers, including information about the enrollment process.
- Disclosure, in simple and clear language, of the terms and conditions of the agreement between you and the ESCO including:
  - price and all variable charges or fees;
  - length of the agreement;
  - terms for renewal of the agreement;
  - cancellation process and any early termination fees, which are limited by law; and
  - conditions, if any, under which the ESCO guarantees cost savings.
- Rescind an agreement with an ESCO within three days of receiving the agreement, if you are a residential customer.
- A description of how pre-payment agreements work, if offered.
- Notice from the ESCO, no less than thirty days prior to the contract renewal date, of the renewal terms and the options you have as a customer.
- A fair and timely complaint resolution process.
- Provision of any written documents (contracts, marketing materials, and this ESCO Consumers Bill of Rights) in the same language used to enroll you as a customer.

If you are a residential customer you are also entitled to the rights and protections of the Home Energy Fair Practices Act (HEFPA) which requires that all utility customers be treated fairly with regard to application for service, customer billing, and complaint procedures. For more information go to www.dps.ny.gov/resright.html.

ESCOs that do not assure these consumer rights could lose their eligibility to provide service in New York. Please report any complaints to the Department of Public Service at 1-800-342-3377 (8:30 am - 4:00 pm), by mail at Office of Consumer Services, NYS Department of Public Service, 3 Empire State Plaza, Albany, NY 12223, or online at http://www.dps.ny.gov.

You can find more information about your energy alternatives by visiting: www.AskPSC.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNE BROUS *and* MICHELLE
SCHUSTER, *on behalf of themselves
and all others similarly situated*,

Plaintiffs,

– *against* –

ELIGO ENERGY, LLC *and* ELIGO
ENERGY NY, LLC,

Defendants.

**OPINION & ORDER**

24-cv-01260 (ER)

RAMOS, D.J.:

Anne Brous[1] and Michelle Schuster (together, "Plaintiffs") brought this putative

class action against Eligo Energy, LLC and Eligo Energy NY, LLC (collectively, "Eligo")

alleging breach of contract and violations of various state consumer protection statutes.

Doc. 120.[2] Before the Court are (1) Eligo's motion to dismiss all out-of-state claims

pursuant to Federal Rule of Civil Procedure 12(b)(6) and (2) Plaintiffs' motion for leave

to file a second amended complaint pursuant to Federal Rules of Civil Procedure 15 and

16. Docs. 140, 246, 247. For the following reasons, Plaintiffs' motion for leave to file a

second amended complaint is GRANTED, and Eligo's motion to dismiss is DENIED as

moot.

---

[1] The Court granted Plaintiffs' motion to substitute Anne Brous as plaintiff in place of her husband, Ira
Brous, who passed after the complaint was filed, on April 22, 2025. Doc. 192.

[2] Plaintiffs specifically allege Eligo violated the following materially identical statutes: Connecticut Unfair
Trade Practices Act § 42-110b; Illinois Consumer Fraud Act § 505/2; Maryland Consumer Protection Act §
13-303, et seq.; Michigan Consumer Protection Act § 445.903; New Jersey Consumer Fraud Act § 56:8-2;
New York General Business Law § 349; Pennsylvania Unfair Trade Practices and Consumer Protection
Law § 201-2(4); and District of Columbia Consumer Protection Procedures § 28-3904, et seq. Doc. 120 ¶
228.

## I.      BACKGROUND

### A.  Factual Background

Eligo is a company that sells natural gas and electricity across the United States. Doc. 120 ¶ 2.  Plaintiffs are New York residents who separately contracted with Eligo for their residential electricity supply.  *Id.* ¶¶ 12, 16.  Eligo thereafter supplied electricity to Plaintiffs until Plaintiffs cancelled their contracts in November 2023.  *Id.*

Plaintiffs allege that Eligo's "deceptive and bad faith pricing practices have caused tens of thousands of commercial and residential customers" across the United States "to pay considerably more for their electricity and natural gas than they should otherwise have paid."  *Id.* ¶ 1.

### B.  Procedural History

Plaintiffs initiated this putative class action on February 20, 2024, on behalf of all Eligo customers in the United States (the "Class"), and all Eligo customers in New York (the "Subclass").  Doc. 1 ¶¶ 106–07.  Plaintiffs asserted the following causes of action: on behalf of the Class, breach of contract and violations of the various consumer protection statutes; and, on behalf of the Subclass, breach of contract and violations of New York General Business Law § 349.  *Id.* ¶¶ 121–214.

On May 9, 2024, at a pre-motion conference, the Court granted Eligo's request for leave to file a motion to dismiss and limited discovery to New York claims until the motion was decided.  Doc. 225.  On June 4, 2024, Eligo moved to dismiss (1) Plaintiffs' out-of-state claims, (2) the claims against Eligo Energy, LLC, and (3) the claim under New York General Business Law § 349-d(7).  Doc. 27.  In response, Plaintiffs amended their complaint on November 13, 2024.  Doc. 120.

On January 6, 2025, Eligo moved to dismiss Plaintiffs' out-of-state claims in the amended complaint.  Doc. 140.  Eligo specifically argues that (1) Plaintiffs' contracts are materially different from the out-of-state customers' contracts; (2) Plaintiffs lack statutory standing to pursue claims under out-of-state consumer protection statutes; (3) the out-of-

state customers agreed to resolve disputes in their home states; and (4) this Court lacks personal jurisdiction over the out-of-state claims. Doc. 141. On January 27, 2025, Plaintiffs filed their opposition, and on February 20, 2025, Eligo filed their reply. Docs. 152, 169.

On March 21, 2025, a month after the motion to dismiss was fully briefed, Plaintiffs filed a letter, seeking to expand discovery to four additional jurisdictions, Washington, D.C., Illinois, Massachusetts, and Maryland. *See* Doc. 174. At a discovery conference on April 16, 2025, the Court rejected Plaintiffs' request to expand discovery to the four additional states ("April 16, 2025 Order"). Doc. 199.

On May 7, 2025, Plaintiffs requested leave to file a second amended complaint to strike all the out-of-state claims and narrow the scope of the proposed class to New York customers only. Docs. 206, 207.[3] On June 9, 2025, Plaintiffs filed a notice of withdrawal of their opposition to Eligo's motion to dismiss, and on June 20, 2025, Eligo filed a response to Plaintiffs' notice. Docs. 233, 239.[4]

After filing this action, Plaintiffs' counsel filed two overlapping class actions against Eligo in Pennsylvania, *Bodkin et al. v. Eligo Energy, et al.*, No. 2:25-cv-94 (CB) (W.D.P.A.) ("*Bodkin*"), and in Ohio, *Orzolek v. Eligo Energy, LLC et al.*, No. 25-cv-00078 (SDM) (EPD) (E.D. Ohio) ("*Orzolek*"). In both *Bodkin* and *Orzolek*, Eligo has moved to stay under the "first-to-file rule." *See Bodkin*, Doc. 43; *Orzolek*, Doc. 21.[5]

---

[3] The deadline to amend pleadings was November 13, 2024. *See* Doc. 265.

[4] The Court previously filed an order on June 6, 2025 noting the following: "For the avoidance of doubt, although at today's conference the Court granted Plaintiffs leave to move to amend the complaint, the Court does not agree with Plaintiffs' counsel that such motion 'moots' the pending motion to dismiss … The pending motion to dismiss will be adjudicated by the Court." Doc. 230. After this order, Plaintiffs filed their notice of withdrawal of their opposition. Doc. 233.

[5] "The first-to-file rule is used to determine whether a cause of action needs to be adjudicated as a compulsory counterclaim and provides that 'where there are two competing lawsuits involving substantially the same issue, the first suit should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second.'" *Internet Law Library, Inc. v. Southridge Capital Management LLC*, 208 F.R.D. 59, 64 (S.D.N.Y. 2002) (citations omitted); *see also Baram v. Doe*, No. 23-cv-1758 (ER), 2024 WL 232319, at

### C. Proposed Amendments

In the operative complaint, Plaintiffs propose a class of all Eligo residential and commercial customers in the United States who were charged a variable rate for electricity or natural gas services by Eligo.  Doc. 120 ¶ 128.

In the proposed amended complaint, Plaintiffs propose a class limited to New York customers (the "Amended Class") and strikes all the other claims regarding violations of consumer protection statutes of all other states.  Doc. 247-1 ¶ 127; *see* Doc. 247-2 at 62–66.  The proposed amended complaint also clarifies that "excluded from the [Amended] Class are any residential or commercial customers included in the proposed classes that are preliminarily defined in *Bodkin* ... or *Orzolek* ...  Any customer included in any class that is eventually certified in *Bodkin* or *Orzolek* is also excluded from the [Amended] Class."  *Id.* ¶ 129.  The proposed amended complaint also adds that any further modification to the Amended Class "will not include non-New York customers." *Id.* ¶ 130.

## II.     LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that

---

*6 (S.D.N.Y. Jan. 22, 2024), *appeal dismissed* (June 12, 2024).  The rule sounds in judicial comity and "embodies considerations of judicial administration and conservation of resources."  *Fit & Fun Playscapes, LLC v. Sensory Path, Inc.*, No. 19-cv-11697 (NSR), 2022 WL 118257, at *3 (S.D.N.Y. Jan. 12, 2022) (citation omitted).  Thus, it applies only where two actions "involving the same parties and issues are pending simultaneously in different federal courts."  *Sotheby's, Inc. v. Minor*, No. 08-cv-7694 (BSJ) (HBP), 2009 WL 73134, at *1 (S.D.N.Y. Jan. 6, 2009) (citations omitted).

a defendant has acted unlawfully." *Id.* However, this "flexible plausibility standard" is

not a heightened pleading standard. *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50

n.3 (2d Cir. 2007) (internal quotation marks and citation omitted). And "a complaint . . .

does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550

U.S. at 555.

 The question on a motion to dismiss "is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs*

*for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc.*

*v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal

Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal

sufficiency of the plaintiff's statement of a claim for relief without resolving a contest

regarding its substantive merits" or "weigh[ing] the evidence that might be offered to

support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks

omitted) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F3d

150, 155 (2d Cir. 2006)). Thus, when ruling on a motion to dismiss pursuant to Rule

12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all

reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir.

2014) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013)).

 **B. Leave to Amend**

 "Rules 15 and 16 of the Federal Rules of Civil Procedure set forth the standards

under which a party may amend a pleading." *Summerwind West Condominium Owners*

*Association, Inc. v. Mt. Hawley Insurance Co.*, No. 22-cv-3165 (JPC), 2023 WL

8307561, at *3 (S.D.N.Y. Dec. 1, 2023). "Generally, '[a] district court has discretion to

deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice

to the opposing party.'" *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (quoting

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "Mere delay,

however, absent a showing of bad faith or undue prejudice, does not provide a basis for a

district court to deny the right to amend." *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citations omitted). Absent some reason for doing so, denying leave to amend is an abuse of the district court's discretion. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

At the outset of litigation, "[a] party may amend its pleading once as a matter of course" within certain prescribed time limits. Fed. R. Civ. P. 15(a)(1). Outside those limits, a party may amend only with the written consent of the opposing party or with leave of the court. Fed. R. Civ. P. 15(a)(2). At that stage, the Second Circuit has explained, Rule 15 operates under a "permissive standard" that is "consistent with our 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted).

Where, as here, the deadline to amend their pleadings has passed, the lenient standard of Rule 15 must be balanced against the requirement of Rule 16(b) that the Court's scheduling order "shall not be modified except upon a showing of good cause." *Holmes*, 568 F.3d at 334–35 (quoting *Grochowski v. Phoenix Construction*, 318 F.3d 80, 86 (2d Cir. 2003)); *see also Sacerdote v. New York University*, 9 F.4th 95, 115 (2d Cir. 2021).

## III. DISCUSSION

### A. Motion to Amend

The Court will first address the motion to amend. *See GGC International Limited v. Ver*, No. 24-cv-1533 (JPC), 2025 WL 81319, at *1 (S.D.N.Y. Jan. 13, 2025) ("When a court is faced with [a] motion[] to dismiss [the] complaint and a motion for leave to file an amended complaint, the court may focus first on the motion for leave to amend because granting the motion for leave to amend moots the pending motion[] to dismiss.") (quoting *Cummins, Inc. v. New York Life Insurance*, No. 10-cv-9252 (TPG), 2012 WL 3870308, at *2 (S.D.N.Y. Sept. 6, 2012)). The Court will address whether Plaintiffs'

proposed amended complaint meets Rules 15 and 16 standards and will address Rule 16 first.

### 1. Rule 16

Plaintiffs argue that they have established good cause for amendment under Rule 16 because (1) they sought to amend three weeks after the Court denied their request to expand discovery to other jurisdictions, and (2) the amendment "does not require additional discovery or adjustment of any case deadlines." Doc. 248 at 13. Plaintiffs further explain that prior to the April 16, 2025 Order, they "believed in good faith that non-New York claims in at least four other jurisdictions could reasonably fall within the proposed class." *Id.* at 14. Defendants counter that Plaintiffs' "factual basis to amend … was in [Plaintiffs'] possession" by August 9, 2024, specifically when Eligo provided Plaintiffs the customer contracts of the other four jurisdictions. Doc. 256 at 7–8. In response, Plaintiffs explain that although Eligo did produce a limited set of non-New York contracts in August 2024, "[i]t was not until [they] had a more robust and reliable discovery record in February 2025 that they had the facts they needed to make their [] motion seeking to expand discovery" to the other four jurisdictions. Doc. 260 at 7.

Whether good cause exists depends primarily on the diligence of the party seeking amendment. *See Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007). "[T]he court may deny leave to amend where the party seeking it knew or should have known the facts sought to be added to the complaint." *Cummins*, 2012 WL 3870308, at *3. Where delayed discovery prevented a party from discovering facts sufficient to support a cause of action, a party must show that it acted diligently upon learning the new facts. *See e.g.*, *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (noting that delayed discovery and settlement negotiations deferred plaintiff's ability to discover facts, and holding that plaintiff acted diligently by seeking leave to file an amended complaint only two months after acquiring information). While the diligence inquiry is the primary consideration, courts may also consider other relevant

factors including whether the proposed amendment would result in prejudice to defendants. *See Kassner*, 496 F.3d at 244.

Here, Plaintiffs have met the "good cause" standard. Plaintiffs sought leave to amend three weeks after the Court denied their request to expand discovery to non-New York claims, which satisfies the diligence requirement under Rule 16. *See Olaf Sööt Design, LLC v. Daktronics, Inc.*, 299 F. Supp. 3d 395, 398–99 (S.D.N.Y. Oct. 26, 2017) (diligence satisfied where "Plaintiff filed the instant motion to amend within a few months" of reviewing relevant evidence); *Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*, 283 F.R.D. 142, 148–49 (S.D.N.Y. 2012) (finding diligence and permitting amendment filed two months after facts learned in discovery). In addition, the amendment does not prejudice Eligo because it will not require additional discovery, does not affect any other deadlines, and will not delay resolution of the case. *Dominguez v. Walsh*, No. 22-cv-6443 (KMK), 2023 WL 6199861, at *1 (S.D.N.Y. Sept. 22, 2023) ("Undue prejudice speaks to whether the amendment will require the opposing party to expend significant resources in discovery and whether resolution of the dispute will be delayed.") (internal quotation marks and citations omitted). Accordingly, Plaintiffs' proposed amendment meets the Rule 16 standard.

  2. *Rule 15*

  a. *Undue Delay*

As previously discussed, the Court finds that there was no undue delay because Plaintiffs' proposed amendment was filed only three weeks after the April 16, 2025 Order. *See Community Association Underwriters of America, Inc. v. Main Line Fire Protection Corp.*, No. 18-cv-4273 (PMH) (JCM), 2020 WL 5089444, at *2–*3 (S.D.N.Y. Aug. 28, 2020) (finding no undue delay where plaintiff filed its motion to amend two months after it discovered new information).

### b. Bad Faith

Plaintiffs argue that Eligo cannot show that their proposed amendment is made in bad faith because the purpose of the amendment is to conform the class to comply with the April 16, 2025 Order. Doc. 248 at 16. Plaintiffs further explain that the parties agree that the claims of non-New York customers are now not part of this case. *Id.* Eligo counters that there is bad faith because "after failing to expand discovery" in this action, Plaintiffs "now seek to abandon their multi-state claims to relitigate them" in *Bodkin* and *Orzolek*. Doc. 256 at 9.[6] In response, Plaintiffs argue that "[i]t is not forum shopping to litigate non-New York claims in other fora only after losing multiple [] motions to litigate those claims here." Doc. 260 at 9.

To establish that a plaintiff's amendment is made in bad faith, the defendant must show "something more than mere delay or inadvertence for the court to refuse to allow amendment, such as seeking to derive some unique tactical advantage through their amendment." *Usov v. Lazar*, No. 13-cv-818 (RWS), 2014 WL 4354691, at *8 (S.D.N.Y. Sept. 2, 2014) (internal quotation mark omitted) (quoting *Primetime 24 Joint Venture v. DirecTV, Inc.*, No. 99-cv-3307 (RMB) (MHD), 2000 WL 426396, *5–*6 (S.D.N.Y. Apr. 20, 2000)).

The Court finds that Eligo has not satisfied their burden of showing bad faith. Here, the proposed amendment seeks to limit this action only to New York claims, and the parties agree that the action should be limited to New York claims. In addition, contrary to Eligo's arguments, "[a] change in litigation strategy is a legitimate reason for

---

[6] In support of their argument, Eligo cites to *O'Rear v. Diaz*, No. 24-cv-1669 (PAE), 2025 WL 835018 (S.D.N.Y. Mar. 14, 2025), which held that the plaintiff acted with undue delay and bad faith. Doc. 256 at 9. Eligo explains that in *O'Rear*, "[t]he plaintiff admitted that she sought to amend in response to prior adverse rulings … and with the express purpose of forcing remand to state court." *Id.* However, as Plaintiffs explain, "they seek [] to conform the pleadings to a ruling already issued by the Court, and unlike in *O'Rear*, doing so will cause no disruption, no delay, and no changes to the case management plan." Doc. 260 at 10. Plaintiffs further note that "there [are no] forum shopping concerns [because] the [m]otion does not seek to divest this Court of jurisdiction and the case will proceed … regardless of how the Court rules here." *Id.*

seeking to amend a pleading under the liberal standard of Rule 15(a)." *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 98 (S.D.N.Y. 2010) (citations omitted).

    *c.  Futility*

    Eligo argues that the proposed amendment would be futile because it does not add new allegations or causes of action; it only removes non-New York consumer protection claims. Doc. 256 at 11. Plaintiffs argue that there are no futility concerns because the amendment does not propose a new or revised claim, and Eligo's motion does not attack the substance of any pending claim. Doc. 248 at 17 (citing *Leo v. Siemens Medical Solutions USA, Inc.*, No. 25-cv-415 (JGLC), 2025 WL 1591891, at *2 (S.D.N.Y. June 5, 2025) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss.")).

    The Second Circuit has held that leave to amend may be denied on the basis of futility when it is "beyond doubt that the plaintiff can prove no set of facts in support of his amended claims." *Pangburn v. Culberston*, 200 F.3d 65, 71 (2d Cir. 1999) (internal quotation marks and citation omitted). The party opposing the motion to amend bears the burden of establishing the amendment's futility. *Ithaca Capital Investments I S.A. v. Trump Panama Hotel Management LLC*, 450 F. Supp. 3d 358, 377 (S.D.N.Y. 2020) (citation omitted); *see also In re Latam Airlines Group S.A.*, No. 22-cv-8068 (ER), 2023 WL 4741335, at *4 (S.D.N.Y. July 25, 2023). In determining whether an amendment is futile, the court evaluates the amended complaint "through the prism of a Rule 12(b)(6) analysis." *Henneberry v. Sumitomo Corp. of America*, 415 F. Supp. 2d 423, 433 (S.D.N.Y. 2006); *see also Agerbrink v. Model Service LLC*, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016). Following this standard, courts accept a plaintiff's factual allegations as true and draw reasonable inferences in their favor. *Agerbrink*, 155 F. Supp. 3d at 456; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The trial court "has broad discretion in determining whether to grant leave to amend," *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000), but generally, will not deny leave to amend based on futility unless the

proposed amendment is clearly frivolous or legally insufficient. *See In re Boesky Securities Litigation*, 882 F. Supp. 1371, 1379 (S.D.N.Y. 1995) (citation omitted). Beyond these considerations, the court does not need to consider the substantive merits of the plaintiff's claim on a motion to amend. *Id.* (citation omitted).

Eligo has not met their burden of establishing the futility of the proposed amendment. *See Ithaca Capital*, 450 F. Supp. 3d at 377; *Leo*, 2025 WL 1591891, at *2. Here, the claims that Eligo moves to dismiss are the same claims that Plaintiffs propose to strike in their proposed amended complaint.

    *3. Undue Prejudice*

Plaintiffs argue that Eligo will not suffer undue prejudice from the proposed amendment because the amendment would narrow the class to New York claims. Doc. 248 at 17.[7] Eligo argues that the proposed amendment is prejudicial because they have "already expended over $1 million in legal fees defending this case, including briefing two motions to dismiss the non-New York claims and opposing over a dozen discovery motions." Doc. 256 at 10. Eligo further argues that if Plaintiffs' motion is granted, Eligo will be "forced to re-litigate many of the same issues in different forums, causing unnecessary duplication of efforts and delays, [and] also incur the added burden of fighting collateral estoppel disputes." *Id.*

In determining whether parties would be prejudiced, courts consider whether the amendment would: "(1) require the [defendant] to 'expend significant additional resources to conduct discovery and prepare for trial,' (2) significantly prolong the resolution of the action, or (3) 'prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Cummings-Fowler v. Suffolk County Community College*, 282 F.R.D. 292, 297 (E.D.N.Y. 2012) (quoting *Monahan v. New York City Department of*

---

[7] Plaintiffs also argue that "[e]ven though Eligo already persuaded [this Court] that non-New York claims belong elsewhere, Eligo now seeks to convince Judges Bissoon and Morrison that their cases should be litigated before [this Court] [and] Eligo is basing its 'first-to-file' claim on the fact that the operative complaint here proposes a nationwide class." Doc. 248 at 17.

*Corrections*, 214 F.3d 275, 284 (2d Cir. 2000)).  Generally, "the [defendant's] burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading."  *United States ex rel. Maritime Administration v. Continental Illinois National Bank and Trust Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989) (citation omitted).  "Rather, we will be most hesitant to allow amendment where doing so unfairly surprises the [defendant] and impedes the fair prosecution of the claim." *Monahan*, 214 F.3d at 284.  "The party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Cummings-Fowler*, 282 F.R.D. at 296 (citation omitted).

The Court does not find that amendment would unduly prejudice Eligo.  As previously discussed, the amendment will not require additional discovery, does not affect any other deadlines, and will not delay resolution of this action. *Dominguez*, 2023 WL 6199861, at *1.  Thus, Eligo has not identified how leave to amend in this action would inure to their detriment.

* * *

Accordingly, Plaintiffs' proposed amendment meets the Rule 15 standard.

### B.  Motion to Dismiss[8]

Because the Court has granted leave to amend, it denies the motion to dismiss as moot. *See GGC International Limited*, 2025 WL 81319, at  *1 ("granting the motion for leave to amend moots the pending motion[] to dismiss.") (citation omitted).

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' motion for leave to file a second amended complaint is GRANTED, and Eligo's motion to dismiss is DENIED as moot.

---

[8] Eligo argues that the proposed amended complaint includes language expressly reserving Plaintiffs' right to later reexpand the class and "[t]hat reservation undermines the utility of the proposed amendment by signaling that Plaintiffs have no intention of abiding by the narrowed scope."  Doc. 256 at 12.  However, as Plaintiffs explain, this reservation is a standard provision of class action complaints, and a specific class definition is defined only after the Court rules on the Rule 23 motion.  Doc. 260 at 12.  Plaintiffs also assert the following:  "In case there is any lingering doubt, Plaintiffs will make it unequivocal:  Plaintiffs will not attempt to adjudicate non-New York claims in this action." *Id.* at 12–13.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 140, 207, 246, 247.

It is SO ORDERED.

Dated:  September 12, 2025
        New York, New York

_____
            EDGARDO RAMOS, U.S.D.J.

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## <u>FOR THE DISTRICT OF MARYLAND</u>

|  |  |
|---|---|
| SHARON WHITESIDE, | * |
| on behalf of herself and all others similarly situated, | * |
| Plaintiff, | * |
| v. | * |
| ELIGO ENERGY, LLC and ELIGO ENERGY MD, LLC, | * |
| Defendant. | * |

Civ. No.  1:25-cv-2532

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

\* \* \* \* \* \* \* \* \*

# TABLE OF CONTENTS

NATURE OF THE CASE ............................................................................................ 1

PARTIES ................................................................................................................... 3

JURISDICTION AND VENUE .................................................................................. 6

FACTUAL ALLEGATIONS ...................................................................................... 7

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets ............... 7
    B.   Plaintiff Sharon Whiteside's Dealings With Eligo ........................................ 9
    C.   Eligo's Unauthorized Pricing Practices ...................................................... 10

CLASS ACTION ALLEGATIONS ........................................................................... 20

CAUSE OF ACTION ............................................................................................... 23

    COUNT I: BREACH OF CONTRACT ................................................................ 23

PRAYER FOR RELIEF ........................................................................................... 25

JURY DEMAND ...................................................................................................... 26

Plaintiff Sharon Whiteside ("Plaintiff"), by her attorneys The Law Office of Derek A.

Hills, Wittels McInturff Palikovic, and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP,

brings this proposed class action in her individual capacity, and on behalf of a Class of customers

defined below, against Defendants Eligo Energy, LLC and Eligo Energy MD, LLC (hereinafter

"Eligo" or "Defendants") and hereby alleges the following with knowledge as to her own acts,

and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      This class action against Eligo, an independent energy service company

("ESCO"), arises from Eligo's breach of contract while supplying electricity and natural gas to

its commercial and residential customers, causing tens of thousands of customers in Maryland

Illinois, Massachusetts, Michigan, New Jersey, New York, Pennsylvania, and Washington, D.C.

to pay considerably more for their energy supply than they contracted for.

2.      Eligo competes with local utilities to sell electricity in deregulated energy

markets.  Eligo plays a middleman role, buying energy on the wholesale market and reselling it

to customers with a markup.  It does not produce or deliver the energy it supplies to customers.

3.      Traditionally, electricity and natural gas was supplied by regulated utilities like

Baltimore Gas and Electric Company ("BGE").  The utilities' rates were strictly controlled.  In

1990s and 2000s, numerous states, including Maryland, deregulated their retail energy markets

such that customers were permitted to choose from a variety of companies selling energy supply.

4.      Eligo represents in its customer contract that its variable energy rates "will be

based on 100% renewable energy (through use of Renewable Energy Credits) and will continue

as a monthly variable rate that may be periodically adjusted to market conditions."  In other

words, Eligo's contract represents that customers' rates are "based on" just two identifiable

1

factors: (1) the cost of wholesale energy, and (2) the cost of Renewable Energy Credits.[1] Eligo's contract also represents that the variable rate "may" be "periodically adjusted" in accordance with wholesale market conditions.

5.      In reality, Eligo did not provide customers with variable rates based on its wholesale supply and REC costs. Instead, Eligo used a pricing methodology that charged excessive and varying profit margins rather than the rate calculated using the contract's two identifiable pricing criteria.  Eligo's contract does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates.  Nor does the contract provide Defendants with discretion to pick and choose the weight of the two factors and then apply whatever markup it sees fit.  Yet a varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment to do the opposite.

6.      Indeed, Eligo has always followed a uniform policy of charging a rate not calculated in the way described in Eligo's contract. Eligo has also admitted that its variable rates are set using factors that are not listed in Eligo's contract.

7.      As a result of Eligo's breach of contract, Eligo has overcharged tens of thousands of customers by tens of millions of dollars in exorbitant charges for electricity and natural gas and continues to do so.

8.      Plaintiff and the Class of Eligo's electric and gas customers preliminary defined below (the "Class") have been injured by Defendants' breach of contract and breach of the duty

---

[1] Renewable Energy Credits or "RECs" are tradable certificates that represent the environmental benefits of electricity generated from renewable sources by third parties (not Eligo). RECs are tradable commodities that can be bought and sold in the market. ESCOs like Eligo buy RECs and pair them with the "brown" energy they purchase at wholesale and then market their energy supply as "100% renewable energy."

of good faith and fair dealing.  Plaintiff and the Class therefore seek damages, restitution, and declaratory relief.  Residential energy costs are a significant portion of most families' and small business' budgets. Defendants' improper pricing practices are unconscionable.

9.      Only through a class action can Eligo's customers remedy its ongoing unauthorized conduct.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's rate setting, it makes no financial sense for an individual customer to bring his or her own lawsuit.  With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like Eligo honor the terms of their customer contracts and deal fairly with their customers.

## PARTIES

10.      Plaintiff Sharon Whiteside resides in Crownsville, Maryland.  Ms. Whiteside was an Eligo customer from in or around August 2018 to in or around January 2025.

11.      Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC. On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida. Accordingly, Eligo Energy, LLC is a citizen of Florida.

12.      Defendant Eligo Energy MD, LLC is a Maryland limited liability company with its principal place of business in Chicago, Illinois.  On information and belief, Eligo Energy MD, LLC is a wholly owned subsidiary of Eligo Energy, LLC. Accordingly, Eligo Energy MD, LLC is a citizen of Florida.

13.     Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy MD, LLC. Eligo Energy, LLC and Eligo Energy MD, LLC hold themselves out as a single company—Eligo Energy.[2] Eligo Energy MD, LLC has no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[3]  There is a unified executive team, and on information and belief they are all employed by Eligo Energy, LLC. That unified executive team controls all operational and financial aspects of Eligo Energy MD, LLC. For example, in a separate consumer class action pending against Eligo Energy NY, LLC in the United States District Court for the Southern District of New York, the New York LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the Eligo brand nationally.  Defendants have also admitted that attorneys at Eligo Energy, LLC were responsible for drafting customer communications and customer contracts. Eligo's current Controller, Chief Compliance Officer, Executive Chairman, VP of Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for their employment by Eligo Energy, LLC.  All of these individuals were voluntarily designated by defense counsel in the S.D.N.Y. action as key players whose ESI will be collected for search in that matter.  Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant Eligo Energy MD, LLC, to perpetrate the acts challenged in this lawsuit.

14.     All of the operations and activities related to acquiring and servicing Eligo's customers (including Eligo's customers in Maryland) are directed and executed by Eligo Energy, LLC, including marketing and making sales to Maryland consumers, setting the exorbitant variable rates for those customers, purchasing energy at wholesale, and handling billing and

---

[2] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story.

[3] *See id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606").

other back-office activities. Eligo Energy, LLC also owns and operates the computer software

and hardware used to set rates for all Eligo customers, including Eligo's customers in Maryland.

Eligo Energy, LLC employs the individuals that conducted the activities challenged in this

litigation. For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy,

LLC's executive team sets pricing strategy for New York customers. Those individuals include

Eligo Energy, LLC's CEO, head of Risk team, and CIO.  Eligo Energy NY, LLC's 30(b)(6)

witness also testified that he did not know if a separate group of people manage Eligo Energy

NY, LLC as opposed to Eligo Energy, LLC, he could not identify documents that list the names

or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo

Energy NY, LLC. On information and belief, the same is true for Eligo's Maryland operations.

15.     Eligo Energy, LLC also holds itself out to customers as their supplier of

electricity or natural gas and as the contracting entity. Although Plaintiff's contract with Eligo

states that the agreement is between Plaintiff and Eligo Energy MD, LLC, Eligo sends Maryland

customers like Plaintiff a cover letter enclosing Eligo's contract that bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606

The letter further states that "[i]n the next few days, you will be receiving a notice from [the

local utility] of change of your supplier ***to Eligo Energy, LLC***." (emphasis added). Eligo's cover

letters also state that they enclose "a copy of the terms and conditions of your agreement with

Eligo Energy" and are signed "Sincerely, Eligo Energy."

16.     Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy MD, LLC as

a separate entity. Rather, it used the corporate entity Eligo Energy MD, LLC interchangeably

with itself.

5

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

17.     This Court has jurisdiction over the claims asserted in this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the

Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and

diversity of citizenship exists between at least one member of the Class and at least one

Defendant.

### *Personal Jurisdiction*

18.     This Court has General and Specific Personal Jurisdiction over Defendant Eligo

Energy MD, LLC because it is a Maryland limited liability company, and it advertises, markets,

distributes, and sells energy to Maryland customers, including Plaintiff. This Court has Specific

Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises, markets,

distributes, and sells energy to Maryland customers, including Plaintiff.

### *Venue*

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue

is proper in "a judicial district in which any defendant resides, if all defendants are residents of

the State in which the district is located." 28 U.S.C. § 1391(b)(1).  Both Defendants are limited

liability companies that are deemed to reside in any judicial district in which they are subject to

the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to

this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this

District under § 1391(b)(1).

# FACTUAL ALLEGATIONS

## A.  The History Of Deregulation And ESCOs' Role In Energy Markets

20.    In the 1990s and 2000s, numerous states, including Maryland, deregulated their markets for retail energy. Among the goals of deregulation was increased competition, with an eye towards reducing energy rates customers and small businesses pay. Deregulation laws in other states are substantially similar.

21.    Since Maryland opened its retail energy markets to competition, hundreds of thousands of Maryland residential and small business customers have switched to an ESCO.

22.    ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from the wholesale energy market and then sell that energy to end-user customers.  However, ESCOs do not **_deliver_** energy, and the overwhelming majority do not produce electricity or extract natural gas.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer.

23.    ESCOs merely buy electricity and natural gas at wholesale and then sell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, instead just buying energy from a producer and re-selling it to customers.  The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply. The only value that ESCOs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like

local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.[4]

24. Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility. For example, in Maryland, as in many states, the utilities charge energy supply rates that are driven by the wholesale cost of energy and the market conditions that affect that cost—the same costs that ESCOs like Eligo incur in Maryland. Indeed, in Maryland, BGE's rates are based on its costs and expenses to purchase and serve energy supply to its customers. BGE's supply rate includes both the wholesale cost of energy purchased on the competitive wholesale supply market, the cost to transmit that energy to the point of delivery where BGE acquires the energy from the transmission system,[5] and BGE's documented overhead attributable to its acquisition of customers' energy supply.[6]

25. ESCOs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices. But ESCOs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers,

---

[4] Indeed, data from Maryland and other states with deregulated energy markets confirm that consumers pay far too much when they sign up with ESCOs instead of sticking with their utility companies. Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

[5] BGE, *Electric Service Rates and Tariffs, Rider 1* at 76, available via https://www.bge.com/my-account/my-dashboard/rates-tariffs/electric-service-rates-tariffs (Electric supply service provided to customers "shall include energy, capacity, line losses, transmission and related ancillary services.").

[6] *Id*. at 77 (Retail prices include "[a]n Administrative Charge, consisting of incremental, uncollectible and cash working capital costs, an administrative adjustment and a return[.]").

such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

26.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet, here, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" its wholesale supply and REC costs and then add whatever markup it chooses.

27.     Eligo's variable rates are wholly detached from the two factors Eligo's contract states that customers' rates will be "based on."

**B.     Plaintiff Sharon Whiteside's Dealings With Eligo**

28.     In or around July 2018, Plaintiff Whiteside switched her electricity supplier to Eligo. As part of the enrollment process, Eligo provided Plaintiff with Eligo's standard customer contract.

29.     Eligo began supplying electricity to Plaintiff Whiteside's residence and it continued to do so until she stopped using Eligo as her electricity supplier in or around January 2025.

30.     Upon information and belief, Eligo charged Plaintiff a fixed rate for six months beginning in or around August 2018. Thereafter, Eligo began charging Plaintiff Whiteside a variable rate for electricity. Eligo charged Plaintiff improperly calculated variable rates every month she was on Eligo's variable rate plan.

31.     As a result of Eligo's excessive rates, Ms. Whiteside paid more for her electricity supply than she otherwise should have paid.

C.    **Eligo's Unauthorized Pricing Practices**

32.    In its form contract, Eligo represents that after the expiration of any fixed rate term, variable rates "will be based on 100% renewable energy (through use of Renewable Energy Credits) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."

33.    The variable rate pricing structure outlined in Eligo's contract has two verifiable and documented components: (1) Eligo's cost to procure energy supply at wholesale, and (2) the cost of RECs to offset 100% of the customers' energy usage, which Eligo buys so it can claim to be providing "100% renewable energy."[7]

34.    Any reasonable consumer of gas or electricity delivered from the utility would expect and understand that Eligo's promise that its variable rate would be periodically adjusted to "market conditions" means that adjustments would only be made based on changes in costs in the market from which Eligo procures electricity or natural gas (the wholesale market). After all, the utilities' supply rates are "market-based" rates and they purchase electricity and natural gas in the competitive wholesale market just like Eligo does.  And like any commodities broker whose business is to purchase a commodity on a wholesale market and then resell that commodity to customers at a markup, when Eligo promises variable rates "based on" the underlying energy supply and states that those rates may thereafter be periodically adjusted to "market conditions," a reasonable person would understand Eligo to be promising a rate that fluctuates solely based on the wholesale cost of that commodity.

---

[7] Customers that switch to an ESCO still consume the exact same energy that is delivered by their local utility.  When an ESCO customer turns on a light switch or uses a gas range, the energy she is consuming is identical to the energy consumed by a utility customer.

35.     Eligo's contract does not give Eligo discretion to set prices as it sees fit.  Instead, the contract restricts Eligo's rates to rates that are "based on" Eligo's REC and wholesale supply costs.

36.     Neither of the two cost factors identified in Eligo's customer contract explain the excessive rates its charged Plaintiff.  For example, the costs Eligo pays for energy on the relevant wholesale market make up only a modest fraction of Eligo's excessive rates. And Eligo's REC costs are minimal.  As detailed below, Eligo's rates far exceed those identifiable costs and were not "based on" those verifiable costs.

37.     Instead, Eligo's rates are explained by its practice of charging the highest feasible rate before too many customers notice their excessive energy bills and quit Eligo.

38.     Eligo is merely a middleman that buys energy at wholesale and resells it at a markup.  Eligo's costs to supply customers with energy do not explain its exorbitant charges.  As detailed below, Eligo's variable rates far exceed those identifiable costs and were thus not "based on" Eligo's REC and market supply costs as required by the contract Eligo entered into with Plaintiff and the Class.

39.     Eligo purchases its energy supply on the competitive wholesale market.  For Maryland customers, that market is called the "PJM" and it is one of the world's largest competitive wholesale electricity markets.  PJM Interconnection, LLC operates this market and it manages the buying, setting, and delivery of electricity and coordinates the movement of wholesale electricity in all or part of 13 states (Maryland, Delaware, Illinois, Indiana, Kentucky, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia) and the District of Columbia.

40. The cost of wholesale energy from the PJM is overwhelmingly the largest cost Eligo incurs. Eligo's supply costs do not explain the much higher variable rates Eligo charged Plaintiff or the reason its rates are disconnected from changes in wholesale costs. Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent Eligo even documented and itemized such costs when it set customers' monthly variable rates (Eligo did not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs. For example, while Eligo has tens of thousands of customers across the United States, the address on its website and correspondence with customers "201 W Lake St Suite 151, Chicago, IL 60606" is in truth the address of a tiny mailbox in a UPS store that provides "mailbox and postal solutions."

41. In fact, as shown below, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting the unreasonable and excessive margins Eligo layered on top of its wholesale supply and REC costs.

42. Eligo's excessive rates are a result of its uniform and consistent practice of setting rates not calculated from the factors enumerated in its customer contract, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup.

***Benchmark One: Wholesale Market Prices And 100% REC Costs.***

43. A comparison of Eligo's rates to prevailing wholesale market costs plus the cost of RECs for offsetting 100% of Plaintiff's consumption shows that Eligo does not set its variable rates in compliance with its customer contract.

44. The table below, *see* ¶ 48, identifies (i) the variable rate Eligo charged Plaintiff, (ii) the corresponding wholesale market conditions plus the cost of 100% RECs, and (iii) the differences between Eligo's rates and the rate promised in Eligo's contract.

45.     The market prices below are based on the costs that an ESCO incurs supplying a retail customer in Plaintiff's utility zone (BGE) for each billing period. The PJM market prices for electricity include the weighted day-ahead PJM electricity prices in Plaintiff's utility zone, ancillary services costs, capacity costs, transmission costs, and various relatively small charges related to purchasing energy at the PJM (the same costs Eligo incurs in the wholesale market to procure electricity for its customers).  These charges are tracked by PJM's Market Monitor, the external consultant that independently evaluates the PJM wholesale electricity market.

46.     As for REC costs, assuming Eligo actually purchased RECs to cover 100% of customer usage, the average cost to Eligo for such RECs was on average only 2.6 cents per kWh. To the extent Eligo purchased RECs covering *less* than 100% of usage, its REC costs would have been lower.

47.     That Eligo's rates are so vastly different from PJM market prices plus the costs of 100% RECs demonstrates that Eligo's variable rates do not aligns with Eligo's contract. The PJM market prices also represent the costs and charges that that Eligo and other ESCOs incur in procuring energy supply for their retail customers.  Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.

48.     The chart on the next page shows a comparison of the variable rates Eligo charged Plaintiff for nineteen billing periods to a rate that is based on wholesale PJM market prices plus 100% RECs:

13

| Billing Period | Eligo Rate ($/kWh) | PJM Market Prices Plus 100% RECs ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 7/7/23 - 8/7/23 | $0.20899 | $0.093027 | 2.2 | 125% |
| 8/7/23 - 9/6/23 | $0.20770 | $0.088148 | 2.4 | 136% |
| 9/6/23 - 10/5/23 | $0.20900 | $0.091626 | 2.3 | 128% |
| 10/5/23 - 11/3/23 | $0.19900 | $0.096537 | 2.1 | 106% |
| 11/3/23 - 12/5/23 | $0.19900 | $0.083400 | 2.4 | 139% |
| 12/5/23 - 1/5/24 | $0.19900 | $0.085508 | 2.3 | 133% |
| 1/5/24 - 2/3/24 | $0.19900 | $0.102145 | 1.9 | 95% |
| 2/3/24 - 3/7/24 | $0.19900 | $0.076010 | 2.6 | 162% |
| 3/7/24 - 4/4/24 | $0.19900 | $0.074355 | 2.7 | 168% |
| 4/4/24 - 5/3/24 | $0.19900 | $0.080974 | 2.5 | 146% |
| 5/3/24 - 6/5/24 | $0.19900 | $0.089487 | 2.2 | 122% |
| 6/5/24 - 7/5/24 | $0.19900 | $0.087616 | 2.3 | 127% |
| 7/5/24 - 8/6/24 | $0.19900 | $0.120714 | 1.6 | 65% |
| 8/6/24 - 9/5/24 | $0.19709 | $0.086603 | 2.3 | 128% |
| 9/5/24 - 10/7/24 | $0.19900 | $0.088539 | 2.2 | 125% |
| 10/7/24 - 11/5/24 | $0.21500 | $0.085725 | 2.5 | 151% |
| 11/5/24 - 12/5/24 | $0.21500 | $0.094228 | 2.3 | 128% |
| 12/5/24 - 1/7/25 | $0.21500 | $0.094764 | 2.3 | 127% |
| 1/7/25 - 2/5/25 | $0.21500 | $0.126440 | 1.7 | 70% |

49.   The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiff's account and a rate based on the formula set forth in Eligo's customer contract.

50.   Eligo's rates charged to Plaintiff were 65% more or higher than the PJM market price plus the cost of 100% RECs to offset Plaintiff's usage in *every billing period*, were more than *double* the PJM market prices plus 100% RECs sixteen times out of nineteen, and were, on average, *over 125% higher* than the PJM market prices plus 100% RECs.

51.   Eligo also failed to adjust its rates in accordance with PJM market prices plus 100% RECs.  For instance, during the period from February 3, 2024 to March 7, 2024, the PJM market price plus 100% RECs *decreased by 26%* as compared to the previous billing period, but Eligo's outrageously high rate remained the same—more than *2.6 times higher* than the PJM market price plus the cost of 100% RECs.  And for the period between October 7, 2024 and November 5, 2024, the PJM market price plus 100% RECs *decreased by 3%* from the prior period but Eligo's rate *increased by 8%*.

52.   That Eligo's rates do not track the PJM market prices is further proof that Eligo is not following its contractual commitment to its customers and is instead levying an excessive and unreasonable fluctuating margin.

53.   Eligo's ability to make a profit does not justify its excessive rates. A reasonable customer might understand that an ESCO will attempt to make a reasonable profit by selling retail energy.  However, such a customer would also expect that Eligo's profiteering would not be so extreme that Eligo's revenue goals—not its supply or REC costs—would be the factor that actually drove rates.  Otherwise, it would be pointless for a reasonable customer to contract for rates "based on" Eligo's supply costs and REC costs.

***Benchmark Two: The Local Utility's Contemporaneous Supply Rate***

54.     A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo's variable rates are not "based on" Eligo's REC and wholesale supply costs.  Wholesale supply costs also drive the local utility BGE's contemporaneous supply rate.

55.     Publicly available data on the local utilities' rates, like BGE, which is the utility serving Plaintiff's home, serve as an ideal indicator of a variable rate that is "based on" the factors identified in Eligo's contract. This is because the utilities' energy procurement costs are the same costs ESCOs like Eligo incur and the utilities' rates serve as a pure passthrough of those costs.  Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which is what Eligo also does.  Consequently, local utilities' supply rates are an apt comparator for determining (at the pleading stage) whether Eligo's variable rates are actually "based on" Eligo's REC and wholesale supply costs (as opposed to charging unsuspecting customers the highest possible price that will not produce unsustainable levels of customer attrition).

56.     In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match utility rates in any given month, they should be commensurate.  Using the utility's rates as a benchmark for Eligo's rates shows that Eligo's rates were driven by excessive mark-ups and profiteering.

57.     The following table compares Plaintiff's variable supply rates from Eligo for nineteen billing periods to her local utility BGE's contemporaneous supply rates, which already

16

build in the cost of some RECs.[8]

| Billing Period | Eligo Rate ($/kWh) | BGE Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 7/7/23 - 8/7/23 | $0.20899 | $0.099830 | 2.1 | 109% |
| 8/7/23 - 9/6/23 | $0.20770 | $0.099830 | 2.1 | 108% |
| 9/6/23 - 10/5/23 | $0.20900 | $0.118520 | 1.8 | 76% |
| 10/5/23 - 11/3/23 | $0.19900 | $0.118520 | 1.7 | 68% |
| 11/3/23 - 12/5/23 | $0.19900 | $0.118520 | 1.7 | 68% |
| 12/5/23 - 1/5/24 | $0.19900 | $0.118520 | 1.7 | 68% |
| 1/5/24 - 2/3/24 | $0.19900 | $0.111540 | 1.8 | 78% |
| 2/3/24 - 3/7/24 | $0.19900 | $0.111540 | 1.8 | 78% |
| 3/7/24 - 4/4/24 | $0.19900 | $0.111540 | 1.8 | 78% |
| 4/4/24 - 5/3/24 | $0.19900 | $0.111540 | 1.8 | 78% |
| 5/3/24 - 6/5/24 | $0.19900 | $0.111070 | 1.8 | 79% |
| 6/5/24 - 7/5/24 | $0.19900 | $0.111070 | 1.8 | 79% |
| 7/5/24 - 8/6/24 | $0.19900 | $0.111070 | 1.8 | 79% |
| 8/6/24 - 9/5/24 | $0.19709 | $0.111070 | 1.8 | 77% |
| 9/5/24 - 10/7/24 | $0.19900 | $0.119220 | 1.7 | 67% |
| 10/7/24 - 11/5/24 | $0.21500 | $0.119220 | 1.8 | 80% |
| 11/5/24 - 12/5/24 | $0.21500 | $0.119220 | 1.8 | 80% |

---

[8] *See* Maryland Renewable Energy Portfolio Standard Program – Frequently Asked Questions, MARYLAND PSC, https://www.psc.state.md.us/electricity/maryland-renewable-energy-portfolio-standard-program-frequently-asked-questions/ ("The objective of Maryland's Renewable Portfolio Standard (RPS) is to recognize and develop the benefits associated with a diverse collection of renewable energy supplies. . . . The RPS Program requires electricity suppliers to meet a prescribed minimum portion of their retail electricity sales with various renewable energy sources, . . . implemented through the creation, sale and transfer of Renewable Energy Credits (RECs).").

| 12/5/24 - 1/7/25 | $0.21500 | $0.119220 | 1.8 | 80% |
| 1/7/25 - 2/5/25 | $0.21500 | $0.118990 | 1.8 | 81% |

58.  The chart above shows that Eligo's variable rates for Plaintiff's account are consistently and substantially higher than BGE's contemporaneous rates.  Eligo's rates charged to Plaintiff were more than 65% higher than BGE's rate in *every* billing period.

59.  The local utility's rates are a reasonable, pre-discovery benchmark of a rate that is "based on 100% renewable energy (through use of Renewable Energy Credits) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."  As explained above, the local utility is Eligo's primary competitor in Plaintiff's service territory, and the local utility's supply rate reflects the same costs that ESCOs like Eligo incur in Maryland.  Thus, the utility's rate is an ideal benchmark for a rate that was calculated in accordance with the pricing term in Eligo's customer contract. This is particularly so where, as in Maryland, utilities are already required to meet a prescribed minimum portion of their retail electricity sales with RECs.[9]

60.  The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to charge variable rates "based on" the two criteria identified in Eligo's customer contract.

61.  Further, that Eligo claims to sell "100% renewable energy (through use of Renewable Energy Credits)" does not account for Eligo's excessive variable energy rates.  For example, while the utility rate already embeds a certain REC percentage, the cost for Eligo to purchase RECs for 100% of the electricity Eligo supplied to Plaintiff would have been, on average, just 1.6 to 1.7 cents more per kWh than the cost of the minimum RECs already

---

[9] *See supra* n.8.

embedded in the utility rate—approximately 8% of Eligo's average rate. Indeed, Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and thus the additional REC costs cannot explain Eligo's exorbitant rates.

***Benchmark Three: Eligo's Own Fixed Rates***

62.     Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add ***lower*** margins to its variable rates.  Yet the opposite is true.

63.     That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates were not set in accordance with the representations Eligo made to customers regarding its variable energy rates.

64.     There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers.  Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different.  In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy.  The only reason that Eligo's variable rates are so much higher than its fixed rates is that it sets variable rates in transparent violation of its contract's pricing term.

65.     Eligo's rates also cannot be explained by the price of RECs.  As noted above, the cost of RECs does not explain Eligo's excessive variable rates.

## CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action on her own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all residential and commercial customers in every state in the United States other than Ohio and New York who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment and whose contracts contain a pricing term stating that variable rates "may be periodically adjusted to market conditions" or an equivalent pricing term (the "Class").

67.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class—their contracting and rate-setting practices—and this case is about the responsibility of Defendants for their conduct in calculating customers' variable energy rates. This conduct did not meaningfully differentiate among individual Class members.  Upon information and belief, the variable rate provisions in the customer agreements for many of Eligo's customers (the "Class Members") are materially the same.

68.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

69.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add Subclasses, when Plaintiff files her motion for class certification.

70.     Plaintiff does not know the exact size of the Class since such information is in the exclusive control of Eligo.  Plaintiff believes, however, that based on the publicly available data concerning Eligo's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

71.     The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

72.     Plaintiff is an adequate class representative.  Her claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Plaintiff and the other members of the Class were subject to the same or similar conduct by the Defendants.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

73.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent her interests and those of the Class.

74.     Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

            a.  Whether Eligo breached its customer contracts and violated the duty of
                good faith and fair dealing by failing to set variable rates in the method
                dictated by the parties' contract;

     b.   Whether Class Members have been injured by Eligo's conduct; and

     c.   The extent of class-wide injury and the measure of damages for those injuries.

75.    A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

76.    A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

77.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

78.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

     a.   Whether Eligo breached its contract with Plaintiff and Class Members and violated the duty of good faith and fair dealing by failing to set variable rates in the method dictated by the parties' contract; and

     b.   Whether Class Members have been injured by Eligo's conduct.

79.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSE OF ACTION

### COUNT I:
### Breach Of Contract
### (On Behalf Of The Class)

80. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

81. Eligo customers have customer agreements whose variable rate terms are substantially similar.

82. Plaintiff and the Class entered into valid contracts with Eligo for the provision of energy supply.

83. Eligo represents in its customer contract that its variable rate for electricity "will be based on 100% renewable energy (through use of Renewable Energy Credits) and will continue as a monthly variable rate that may be periodically adjusted to market conditions."

84. Pursuant to the contracts, Plaintiff and the Class paid the variable rates Eligo charged for natural gas and electricity.

85. However, Eligo failed to perform its obligations under its contracts to charge rates in accordance with the formula set forth in its contracts. Instead, Eligo charged variable rates for electricity and natural gas that were untethered from the formula upon which the parties agreed the rate would be based.

86. Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity and natural gas that was higher than it would have been had Eligo charged a variable rate calculated from the formula identified in Eligo's customer contract.

87. By reason of the foregoing, Eligo is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such

damages to be determined at trial, plus attorneys' fees and expenses.

88.    Alternatively, Eligo's conduct breached the implied covenant of good faith and fair dealing applicable to Plaintiff's contract and the contracts of members of the Class.

89.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

90.    Under the contract, to the extent Defendants had discretion to set the variable rate for energy based on energy market pricing, they were obligated to exercise their discretion in good faith.

91.    Plaintiff reasonably expected that the variable energy rates would, notwithstanding Defendants' profit goals, would be based on (1) Eligo's cost to procure energy supply at wholesale, and (2) the cost of RECs to offset 100% of the customers' energy usage, and that Defendants would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class Members would not have bought energy from Defendants.

92.    Defendants breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations that Defendants' variable energy rate would be commensurate with market conditions.

93.    By reason of the foregoing, Defendants are liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Defendants' breaches, the amount of such damages to be determined at trial, plus attorneys' fees and expenses.

94.    Eligo Energy MD, LLC is not the only Defendant liable for this breach of contract claim.  Defendant Eligo Energy, LLC is also directly liable because it was the primary

contracting party and thus directly liable for breach. For example, the cover letters sent by Eligo Energy, LLC to Plaintiff and other Class Members state that it would be customers' new energy supplier and that "a copy of the terms and conditions of your agreement with Eligo Energy" are enclosed.

95.     Eligo Energy, LLC is also a party to the contract under agency principles. Eligo Energy, LLC's conduct in sending the cover letters and contracts, along with identifying itself as customers' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

96.     In addition, Eligo Energy MD, LLC contracted on Eligo Energy, LLC's behalf.

97.     And as alleged above, Eligo Energy MD, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b)     Find and declare that Defendants have breached their contracts with Plaintiff and the Class;

(c)     Render an award of compensatory damages of at least $100,000,000, the precise amount of which is to be determined at trial;

(d)     Render an award of punitive damages;

(e)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(f)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

Dated: August 1, 2025          **The Law Office Of Derek A. Hills, LLC**

By:    */s/ Derek A. Hills*
Derek A. Hills (Fed. Bar. No. 19925)
129 N. West Street, Suite 1
Easton, MD 21601
Tel: 443-239-4626
dhills@dahlawoffice.com

D. Greg Blankinship*
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (914) 775-8862
Fax: (914) 775-8862
jbm@wittelslaw.com

*Attorneys for Plaintiff and the Proposed Class*

*\* Pro Hac Vice Application Forthcoming*

# EXHIBIT 8

**U.S. District Court**
**District of Maryland (Baltimore)**
**CIVIL DOCKET FOR CASE #: 1:25-cv-02532-JRR**

Whiteside v. Eligo Energy, LLC et al
Assigned to: Judge Julie Rebecca Rubin
Demand: $9,999,000
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 08/01/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Sharon Whiteside**
*on behalf of herself and all others similarly situated*

represented by **Douglas Gregory Blankinship**
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
One North Broadway
Suite 900
White Plains, NY 10601
914-298-3290
Email: gblankinship@fbfglaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff**
Wittels McInturff Palikovic
305 Broadway
FL 7
New York, NY 10007
914-775-8862
Email: jbm@wittelslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek A. Hills**
The Law Office of Derek A. Hills
129 North West St.
Suite 1
Easton, MD 21601
443-239-4626
Email: dhills@dahlawoffice.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eligo Energy, LLC**

**Defendant**

**Eligo Energy MD, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2025 | 1 | COMPLAINT *SHARON WHITESIDE, on behalf of herself and all others similarly situated*, against All Defendants ( Filing fee $ 405 receipt number AMDDC-12144961.), filed by SHARON WHITESIDE. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons)(Hills, Derek) (Additional attachment(s) added on 8/4/2025: # 4 Flattened Civil Cover Sheet, # 5 Flattened Summons 1, # 6 Flattened Summons 2) (bg3s). (Entered: 08/01/2025) |
| 08/01/2025 | 2 | MOTION to Appear Pro Hac Vice for J. Burkett McInturff (Filing fee $100, receipt number AMDDC-12144991.) by SHARON WHITESIDE(Hills, Derek) (Entered: 08/01/2025) |
| 08/01/2025 | 3 | MOTION to Appear Pro Hac Vice for D. Greg Blankinship (Filing fee $100, receipt number AMDDC-12144998.) by SHARON WHITESIDE(Hills, Derek) (Entered: 08/01/2025) |
| 08/04/2025 | 4 | QC NOTICE: 1 Complaint, filed by Sharon Whiteside was filed incorrectly. \*\*Not all pdf documents were flattened prior to filing. All pdfs uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing. \*\*This filing has been corrected by court staff and no further corrective action is required. (bg3s, Deputy Clerk) (Entered: 08/04/2025) |
| 08/04/2025 | 5 | Summons Issued 21 days as to Eligo Energy MD, LLC, Eligo Energy, LLC.(bg3s, Deputy Clerk) (Entered: 08/04/2025) |
| 08/05/2025 | 6 | PAPERLESS ORDER granting 2 Motion to Appear Pro Hac Vice on behalf of J. Burkett McInturff. Directing attorney J. Burkett McInturff to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 8/5/2025. (mh4s, Deputy Clerk) (Entered: 08/05/2025) |
| 08/05/2025 | 7 | PAPERLESS ORDER granting 3 Motion to Appear Pro Hac Vice on behalf of Douglas Gregory Blankinship. Directing attorney Douglas Gregory Blankinship to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 8/5/2025. (mh4s, Deputy Clerk) (Entered: 08/05/2025) |
| 08/11/2025 | 8 | WAIVER OF SERVICE Returned Executed by Sharon Whiteside. Eligo Energy MD, LLC waiver sent on 8/4/2025, answer due 10/3/2025.(McInturff, J.) (Entered: 08/11/2025) |
| 08/11/2025 | 9 | WAIVER OF SERVICE Returned Executed by Sharon Whiteside. Eligo Energy, LLC waiver sent on 8/4/2025, answer due 10/3/2025.(McInturff, J.) (Entered: 08/11/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/26/2025 11:47:54 | | |
| **PACER Login:** | rwatstein0093945 | **Client Code:** |

| Description: | Docket Report | Search Criteria: | 1:25-cv-02532-JRR |
|---|---|---|---|
| Billable Pages: | 2 | Cost: | 0.20 |

# EXHIBIT 9

9/26/25, 11:34 AM  Case 1:24-cv-01260-ER  Document 83-1  Filed 09/30/25  Page 316 of 341
SDNY CM/ECF NextGen Version 1.8/ECF Filed 09/30/25

ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:24-cv-01260-ER**

Brous et al v. Eligo Energy, LLC et al
Assigned to: Judge Edgardo Ramos
Demand: $9,999,000
Cause: 28:1332oc Diversity-Other Contract

Date Filed: 02/20/2024
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

<u>**Plaintiff**</u>

**Ira Brous**
*on behalf of themselves and all others similarly situated*
*TERMINATED: 04/22/2025*

represented by **Daniel James Martin**
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
One North Broadway
Ste 900
White Plains, NY 10601
914-729-6157
Email: dmartin@fbfglaw.com
*ATTORNEY TO BE NOTICED*

**Douglas Gregory Blankinship**
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
One North Broadway
Suite 900
White Plains, NY 10601
914-298-3290
Email: gblankinship@fbfglaw.com
*ATTORNEY TO BE NOTICED*

**Erin Kelley**
Finkelstein, Blankinship, Frei-Pearson & Garber LLP
One North Broadway
Suite 900
White Plains, NY 10601
914-639-3710
Email: ekelley@fbfglaw.com
*ATTORNEY TO BE NOTICED*

**Ethan Daniel Roman**
Wittels McInturff Palikovic
305 Broadway
Ste Floor 7
New York, NY 10007
914-775-8862
Email: edr@wittelslaw.com
*ATTORNEY TO BE NOTICED*

**Jessica Hunter**
Wittels McInturff Palikovic
18 Half Mile Road
Armonk, NY 10504
914-775-8862
Email: jlh@wittelslaw.com
*ATTORNEY TO BE NOTICED*

**Tiasha Palikovic**
Wittels McInturff Palikovic
18 Half Mile Road
Armonk, NY 10504
646-266-2630
Email: tpalikovic@wittelslaw.com
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff**
Wittels McInturff Palikovic
18 Half Mile Road
Armonk, NY 10504
910-476-7253
Email: jbm@wittelslaw.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Michelle Schuster**
*on behalf of themselves and all others similarly situated*

represented by **Andrey Belenky**
Wittels McInturff Palikovic
305 Broadway
Ste 7th Floor
New York, NY 10007
914-775-8862
Email: abelenky@wittelslaw.com
*ATTORNEY TO BE NOTICED*

**Daniel James Martin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas Gregory Blankinship**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erin Kelley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ethan Daniel Roman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Hunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiasha Palikovic**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J. Burkett McInturff**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Anne Brous**                                          represented by  **Andrey Belenky**
*as the Executor of the Estate of Ira Brous*                           (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Douglas Gregory Blankinship**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Erin Kelley**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Ethan Daniel Roman**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Jessica Hunter**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Tiasha Palikovic**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **J. Burkett McInturff**
                                                                        (See above for address)
                                                                        *ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Eligo Energy, LLC**                                   represented by  **Ryan D. Watstein**
                                                                        Watstein Terepka LLP
                                                                        75 14th Street NE
                                                                        Ste 2600
                                                                        Atlanta, GA 30309
                                                                        404-782-0695
                                                                        Email: ryan@wtlaw.com
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Abigail Howd**
                                                                        Watstein Terepka LLP
                                                                        75 14th Street NE
                                                                        Ste 2600
                                                                        Atlanta, GA 30309
                                                                        470-234-4974
                                                                        Email: ahowd@wtlaw.com
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **David Meadows**
                                                                        Watstein Terepka LLP
                                                                        75 14th Street NE
                                                                        Ste 2600
                                                                        Atlanta, GA 30309
                                                                        404-602-4371
                                                                        Email: dmeadows@wtlaw.com
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Leo Patrick O'Toole**
                                                                        Watstein Terepka LLP

75 14th Street NE
Ste 2600
Atlanta, GA 30309
404-779-5190
Email: lotoole@wtlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eligo Energy NY, LLC**          represented by **Ryan D. Watstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abigail Howd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Meadows**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leo Patrick O'Toole**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/20/2024 | 1 | COMPLAINT against Eligo Energy NY, LLC, Eligo Energy, LLC. (Filing Fee $ 405.00, Receipt Number ANYSDC-28968697)Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(McInturff, J. Burkett) (Entered: 02/20/2024) |
| 02/20/2024 | 2 | CIVIL COVER SHEET filed..(McInturff, J. Burkett) (Entered: 02/20/2024) |
| 02/20/2024 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Eligo Energy, LLC, re: 1 Complaint. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 02/20/2024) |
| 02/20/2024 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Eligo Energy NY, LLC, re: 1 Complaint. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 02/20/2024) |
| 02/21/2024 | | ***NOTICE TO ATTORNEY REGARDING CIVIL CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney J. Burkett McInturff. The following case opening statistical information was erroneously selected/entered: Citizenship Defendant code 2 (Citizen of Another State); Dollar Demand $50,000,000;. The following correction(s) have been made to your case entry: the Citizenship Defendant code has been modified to 5 (Incorporated/Principal Place of Business-Other State); the Dollar Demand has been modified to $9,999,000;. (jgo) (Entered: 02/21/2024) |
| 02/21/2024 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney J. Burkett McInturff. The party information for the following party/parties has been modified: Ira Brous; Michelle Schuster. The information for the party/parties has been modified for the following reason/reasons: party text was omitted;. (jgo) (Entered: 02/21/2024) |
| 02/21/2024 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Edgardo Ramos. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(jgo) (Entered: 02/21/2024) |
| 02/21/2024 | | Magistrate Judge Gary Stein is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (jgo) (Entered: 02/21/2024) |
| 02/21/2024 | | Case Designated ECF. (jgo) (Entered: 02/21/2024) |
| 02/21/2024 | 5 | ELECTRONIC SUMMONS ISSUED as to Eligo Energy NY, LLC..(jgo) (Entered: 02/21/2024) |
| 02/21/2024 | 6 | ELECTRONIC SUMMONS ISSUED as to Eligo Energy, LLC..(jgo) (Entered: 02/21/2024) |
| 02/21/2024 | 7 | NOTICE OF APPEARANCE by Douglas Gregory Blankinship on behalf of Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 02/21/2024) |
| 02/21/2024 | 8 | NOTICE OF APPEARANCE by Erin Kelley on behalf of Ira Brous, Michelle Schuster..(Kelley, Erin) (Entered: 02/21/2024) |
| 03/05/2024 | 9 | SUMMONS RETURNED EXECUTED. Eligo Energy, LLC served on 2/27/2024, answer due 3/19/2024. Service was accepted by AJ Peterson, Authorized Agent. Document filed by Ira Brous; Michelle Schuster..(Blankinship, Douglas) (Entered: 03/05/2024) |
| 03/05/2024 | 10 | SUMMONS RETURNED EXECUTED. Eligo Energy NY, LLC served on 2/28/2024, answer due 3/20/2024. Service was accepted by Sue Zouky, Authorized Agent. Document filed by Ira Brous; Michelle Schuster..(Blankinship, Douglas) (Entered: 03/05/2024) |
| 03/12/2024 | 11 | NOTICE OF APPEARANCE by Leo Patrick O'Toole on behalf of Eligo Energy NY, LLC, Eligo Energy, LLC..(O'Toole, Leo) (Entered: 03/12/2024) |
| 03/12/2024 | 12 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(O'Toole, Leo) (Entered: 03/12/2024) |
| 03/12/2024 | 13 | LETTER MOTION for Extension of Time to File Answer *or Move with Respect to the Complaint* addressed to Judge Edgardo Ramos from Leo O'Toole dated March 12, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(O'Toole, Leo) (Entered: 03/12/2024) |
| 03/13/2024 | 14 | ORDER granting 13 Letter Motion for Extension of Time to Answer re 13 LETTER MOTION for Extension of Time to File Answer *or Move with Respect to the Complaint* addressed to Judge Edgardo Ramos from Leo O'Toole dated March 12, 2024. Defendants' request for an extension of time to respond to the complaint, until April 19, 2024, is granted. SO ORDERED. Eligo Energy NY, LLC answer due 4/19/2024; Eligo Energy, LLC answer due 4/19/2024. (Signed by Judge Edgardo Ramos on 3/13/2024) (jca) (Entered: 03/13/2024) |
| 04/12/2024 | 15 | MOTION for Abigail L. Howd to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29209814. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Affidavit Affidavit of Abigail L. Howd, # 2 Proposed Order [Proposed] Order on Motion for Admission Pro Hac Vice).(Howd, Abigail) (Entered: 04/12/2024) |
| 04/12/2024 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 15 MOTION for Abigail L. Howd to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29209814. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz) (Entered: 04/12/2024) |

| 04/16/2024 | 16 | LETTER MOTION for Conference re: 1 Complaint addressed to Judge Edgardo Ramos from Leo O'Toole dated April 16, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(O'Toole, Leo) (Entered: 04/16/2024) |
| 04/19/2024 | 17 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from J. Burkett McInturff dated April 19, 2024 re: 16 LETTER MOTION for Conference re: 1 Complaint addressed to Judge Edgardo Ramos from Leo O'Toole dated April 16, 2024. . Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 04/19/2024) |
| 04/23/2024 | 18 | FILING ERROR - DEFICIENT DOCKET ENTRY - MOTION for Ryan D. Wattstein to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29259281. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Affidavit Affidavit of Ryan D. Wattstein, # 2 Proposed Order Proposed Order Granting Motion for Admission Pro Hac Vice).(Wattstein, Ryan) Modified on 4/23/2024 (rju). (Entered: 04/23/2024) |
| 04/23/2024 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 18 MOTION for Ryan D. Wattstein to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-29259281. Motion and supporting papers to be reviewed by Clerk's Office staff. The filing is deficient for the following reason(s): missing Certificate of Good Standing from State or Supreme Court of Georgia; Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (rju)** (Entered: 04/23/2024) |
| 04/24/2024 | 19 | ORDER granting 16 Letter Motion for Conference re: 1 Complaint. A pre-motion conference will be held on May 6, 2024, at 11:30 AM by telephone. The parties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/24/2024) |
| 04/29/2024 | 20 | MOTION for Ryan D. Wattstein to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Affidavit Affidavit of Ryan D. Wattstein, # 2 Proposed Order Proposed Order Granting Motion for Admission Pro Hac Vice).(Wattstein, Ryan) (Entered: 04/29/2024) |
| 04/29/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Ryan D. Wattstein to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 04/29/2024) |
| 05/01/2024 | | RESCHEDULING NOTICE: The pre-motion conference previously scheduled for May 6, 2024, is hereby rescheduled for May 9, 2024, at 3:30 p.m. The parties are reminded to call (877) 411-9748 and enter access code 3029857# when prompted. (jar) (Entered: 05/01/2024) |
| 05/07/2024 | 21 | ORDER granting 20 Motion for Ryan D. Wattstein to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 05/07/2024) |
| 05/09/2024 | 22 | ORDER granting 15 Motion for Abigail L. Howd to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 05/09/2024) |
| 05/09/2024 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 5/9/2024 by telephone. Plaintiffs' and Defendants' counsel present. Defendants were granted leave to file a motion to dismiss with the following briefing schedule: moving papers due May 30, 2024; opposition due June 20, 2024; and reply due June 27, 2024. Discovery with respect to the New York claims will proceed. The parties were directed to submit a proposed joint case management plan and scheduling order by May 13, 2024. (jar) (Entered: 05/14/2024) |
| 05/13/2024 | 23 | PROPOSED SCHEDULING ORDER. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 05/13/2024) |
| 05/17/2024 | 24 | CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER: All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Amended Pleadings due by 11/13/2024. Joinder of Parties due by 8/13/2024. Non-expert depositions shall be completed by 2/13/2025. Expert Deposition due by 6/6/2025. Discovery due by 6/6/2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 5/17/2024) (mml) (Entered: 05/20/2024) |
| 05/29/2024 | 25 | LETTER MOTION for Extension of Time (Unopposed Request for Extension of Time to File Motion to Dismiss) addressed to Judge Edgardo Ramos from Ryan D. Wattstein dated May 29, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Wattstein, Ryan) (Entered: 05/29/2024) |
| 05/30/2024 | 26 | ORDER granting 25 Letter Motion for Extension of TimeThe application for an extension of the motion to dismiss briefing schedule is granted. The motion is due June 4, 2024; response due June 25, 2024; and reply due July 2, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 5/30/2024) (jca) (Entered: 05/30/2024) |
| 05/30/2024 | | Set/Reset Deadlines: Motions due by 6/4/2024. Responses due by 6/25/2024 Replies due by 7/2/2024. (jca) (Entered: 05/30/2024) |
| 06/04/2024 | 27 | MOTION to Dismiss (Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss). Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. Responses due by 6/25/2024..(Wattstein, Ryan) (Entered: 06/04/2024) |
| 06/04/2024 | 28 | MEMORANDUM OF LAW in Support re: 27 MOTION to Dismiss (Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss).. (Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Memorandum of Law in Support of Their Motion to Dismiss). Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Wattstein, Ryan) (Entered: 06/04/2024) |
| 06/04/2024 | 29 | DECLARATION of Andrew LaPointe in Support re: 27 MOTION to Dismiss (Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss).. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit A).(Wattstein, Ryan) (Entered: 06/04/2024) |
| 06/17/2024 | 30 | CONSENT LETTER MOTION for Extension of Time to File Opposition and Reply Briefs Regarding Defendants' Partial Motion to Dismiss [ECF No. 27] addressed to Judge Edgardo Ramos from J. Burkett McInturff dated June 16, 2024. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 06/17/2024) |
| 06/18/2024 | 31 | ORDER granting 30 Letter Motion for Extension of Time to File. Plaintiff's request for an extension of time to file their opposition, until July 9, 2024 is granted. Defendants' time to file their reply is also extended until July 16, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 6/18/2024) (jca) (Entered: 06/18/2024) |
| 06/18/2024 | | Set/Reset Deadlines: Responses due by 7/9/2024, Replies due by 7/16/2024. (jca) (Entered: 06/18/2024) |
| 07/03/2024 | 32 | JOINT LETTER MOTION for Extension of Time to File Response/Reply to Defendants' Partial Motion to Dismiss addressed to Judge Edgardo Ramos from J. Burkett McInturff dated July 3, 2024. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 07/03/2024) |
| 07/08/2024 | 33 | ORDER granting 32 Letter Motion for Extension of Time to File Response/Reply re 32 JOINT LETTER MOTION for Extension of Time to File Response/Reply to Defendants' Partial Motion to Dismiss addressed to Judge Edgardo Ramos from J. Burkett McInturff dated July 3, 2024. Plaintiffs' request for an extension of time to file their opposition, until July 16, 2024, and an extension of time for Defendants' to file their reply, until July 30, 2024, is granted. SO ORDERED. Responses due by 7/16/2024 Replies due by 7/30/2024. (Signed by Judge Edgardo Ramos on 7/8/2024) (jca) (Entered: 07/08/2024) |
| 07/16/2024 | 34 | MEMORANDUM OF LAW in Opposition re: 27 MOTION to Dismiss (Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss). . Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 07/16/2024) |
| 07/23/2024 | 35 | LETTER MOTION for Extension of Time to File Response/Reply as to 28 Memorandum of Law in Support of Motion, 29 Declaration in Support of Motion, 27 MOTION to Dismiss (Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss). addressed to Judge Edgardo Ramos from Ryan D. Wattstein dated July 23, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Wattstein, Ryan) (Entered: 07/23/2024) |
| 07/24/2024 | 36 | ORDER granting 35 Letter Motion for Extension of Time to File Response/Reply Defendants' request for an extension of time to file their reply, until August 9, 2024, is granted. SO ORDERED. Replies due by 8/9/2024.. (Signed by Judge Edgardo Ramos on 7/24/2024) (jca) (Entered: 07/24/2024) |

| 08/05/2024 | 37 | PROPOSED PROTECTIVE ORDER. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 08/05/2024) |
| 08/06/2024 | 38 | STIPULATION AND PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material... SO ORDERED. (Signed by Judge Edgardo Ramos on 8/6/2024) (tg) (Entered: 08/06/2024) |
| 08/06/2024 | 39 | LETTER MOTION for Leave to File Excess Pages *(Unopposed Request for Leave to File Excess Pages)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated August 6, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 08/06/2024) |
| 08/06/2024 | 40 | CONSENT LETTER MOTION for Extension of Time *to Join Additional Parties to November 13, 2024* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated August 6, 2024. Document filed by Michelle Schuster..(McInturff, J. Burkett) (Entered: 08/06/2024) |
| 08/07/2024 | 41 | ORDER granting 39 Letter Motion for Leave to File Excess Pages Defendants' request for a five page extension of the page limit for their reply brief is granted. SO ORDERED. (Signed by Judge Edgardo Ramos on 8/7/2024) (jca) (Entered: 08/07/2024) |
| 08/07/2024 | 42 | ORDER granting 40 Letter Motion for Extension of Time. Plaintiff's request for an extension of time to join additional parties, until November 13, 2024, is granted. SO ORDERED. Joinder of Parties due by 11/13/2024. (Signed by Judge Edgardo Ramos on 8/7/2024) (jca) (Entered: 08/07/2024) |
| 08/09/2024 | 43 | REPLY MEMORANDUM OF LAW in Support re: 27 MOTION to Dismiss *(Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss)*. *(Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Reply Memorandum in Support of Their Motion to Dismiss/Strike)*. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 08/09/2024) |
| 08/09/2024 | 44 | DECLARATION of Andrew LaPointe in Support re: 27 MOTION to Dismiss *(Notice of Defendants Eligo Energy, LLC and Eligo Energy NY, LLC's Motion to Dismiss)*.. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit 1 - 6 DC Contracts, # 2 Exhibit 7 - 19 IL Contracts, # 3 Exhibit 20 - 21 MA Contracts, # 4 Exhibit 22 - 34 MD Contracts, # 5 Exhibit 35 - 37 MI Contracts, # 6 Exhibit 38 - 43 NJ Contracts, # 7 Exhibit 44 - 49 NY Contracts, # 8 Exhibit 50 - 66 OH Contracts, # 9 Exhibit 67 - 80 PA Contracts).(Watstein, Ryan) (Entered: 08/09/2024) |
| 08/12/2024 | 45 | SUGGESTION OF DEATH upon the record as to Ira Brous on 03-23-24 . Document filed by Ira Brous, Michelle Schuster.(McInturff, J. Burkett) (Entered: 08/12/2024) |
| 08/21/2024 | 46 | LETTER MOTION for Discovery *Regarding Discovery Disputes* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated August 21, 2024. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Defendants' Responses to Plaintiff's First Set of Requests for Production, # 2 Exhibit B - Hamlen v. Gateway Hearing Transcript 7.12.17).(Blankinship, Douglas) (Entered: 08/21/2024) |
| 08/22/2024 | 47 | ORDER granting 46 Letter Motion for Discovery *Regarding Discovery Disputes*. Eligo is directed to respond by August 22, 2024. A telephonic pre-motion conference will be held on September 10, 2024, at 11 a.m. The parties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 08/22/2024) |
| 08/22/2024 | 48 | AMENDED ORDER granting 46 LETTER MOTION for Discovery *Regarding Discovery Disputes*. Eligo is directed to respond by August 29, 2024. A telephonic pre-motion conference will be held on September 10, 2024, at 11 a.m. The parties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted. (HEREBY ORDERED by Judge Edgardo Ramos) (Text Only Order) (jar) (Entered: 08/22/2024) |
| 08/26/2024 | 49 | LETTER MOTION for Leave to File addressed to Judge Edgardo Ramos from D. Greg Blankinship dated August 26, 2024. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 08/26/2024) |
| 08/27/2024 | 50 | ORDER with respect to 49 Letter Motion for Leave to File Document. Defendants are directed to respond by August 30, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 8/27/2024) (mml) (Entered: 08/27/2024) |
| 08/27/2024 | | Set/Reset Deadlines: Responses due by 8/30/2024. (mml) (Entered: 08/27/2024) |
| 08/28/2024 | 51 | LETTER MOTION for Extension of Time to File Response/Reply as to 49 LETTER MOTION for Leave to File addressed to Judge Edgardo Ramos from D. Greg Blankinship dated August 26, 2024. *(Unopposed Request to Extend Defendants Deadlines to Respond to Plaintiffs Letter Motions Regarding Discovery Disputes (ECF No. 46) and and For Leave to File Sur-Reply (ECF No. 49))* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated August 28, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 08/28/2024) |
| 08/29/2024 | 52 | ORDER granting 51 Letter Motion for Extension of Time to File Response/Reply. Defendants' request for an extension of time to respond to the letter motions, until September 5, 2024, is granted. SO ORDERED. Responses due by 9/5/2024. (Signed by Judge Edgardo Ramos on 8/29/2024) (mml) (Entered: 08/29/2024) |
| 09/05/2024 | 53 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated September 5, 2024 re: 46 LETTER MOTION for Discovery *Regarding Discovery Disputes* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated August 21, 2024. . Document filed by Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 09/05/2024) |
| 09/05/2024 | 54 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated September 5, 2024 re: 49 LETTER MOTION for Leave to File addressed to Judge Edgardo Ramos from D. Greg Blankinship dated August 26, 2024. . Document filed by Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 09/05/2024) |
| 09/06/2024 | 55 | MEMO ENDORSEMENT on re: 54 Response to Motion, filed by Eligo Energy NY, LLC ENDORSEMENT The Court is in receipt of the parties' letters on this issue. Plaintiffs' requests to strike the contracts or alternatively to file a sur-reply are denied. SO ORDERED. (Signed by Judge Edgardo Ramos on 9/6/2024). (jca) (Entered: 09/06/2024) |
| 09/10/2024 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 9/10/2024 by phone. Plaintiffs' and Defendants' counsel present. Plaintiffs' application for Eligo to produce discovery regarding fixed rates is denied without prejudice. Eligo is required to produce both class and merits discovery. The parties represented they were in the process of resolving the other discovery disputes. (jar) (Entered: 09/17/2024) |
| 09/13/2024 | 56 | LETTER MOTION for Conference *re Plaintiffs' Anticipated Rule 25 Motion for Substitution* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 9-13-2024. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Certificate of Voluntary Administration).(McInturff, J. Burkett) (Entered: 09/13/2024) |
| 09/16/2024 | 57 | ORDER entered 56 Motion for Conference. Eligo is directed to respond by Thursday, September 19, 2024. (HEREBY ORDERED by Judge Edgardo Ramos) (Text Only Order) (jar) (Entered: 09/16/2024) |
| 09/16/2024 | 58 | NOTICE OF APPEARANCE by Tiasha Palikovic on behalf of Ira Brous, Michelle Schuster..(Palikovic, Tiasha) (Entered: 09/16/2024) |
| 09/16/2024 | 59 | NOTICE OF APPEARANCE by Jessica Hunter on behalf of Ira Brous, Michelle Schuster..(Hunter, Jessica) (Entered: 09/16/2024) |
| 09/19/2024 | 60 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated September 19, 2024 re: 56 LETTER MOTION for Conference *re Plaintiffs' Anticipated Rule 25 Motion for Substitution* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 9-13-24. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Terepka, Alexander) (Entered: 09/19/2024) |
| 09/19/2024 | 61 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated September 19, 2024 re: 56 LETTER MOTION for Conference *re Plaintiffs' Anticipated Rule 25 Motion for Substitution* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 9-13-24. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Terepka, Alexander) (Entered: 09/19/2024) |
| 09/20/2024 | 62 | ORDER granting 56 Letter Motion for Conference. A telephonic pre-motion conference will be held on October 4, 2024, at 11:30 AM. The parties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 09/20/2024) |
| 09/25/2024 | 63 | MOTION for David E. Meadows to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC...(Meadows, David) (Entered: 09/25/2024) |

| 09/25/2024 | | Pro Hac Vice Fee Payment: for 63 MOTION for David E. Meadows to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.**. Filing fee $ 200.00, receipt number ANYSDC-29944270..(Meadows, David) (Entered: 09/25/2024) |
| 09/25/2024 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 63 MOTION for David E. Meadows to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 09/25/2024) |
| 09/26/2024 | 64 | TRANSCRIPT of Proceedings re: conference held on 9/10/2024 before Judge Edgardo Ramos. Court Reporter/Transcriber: Devon Gerber, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/17/2024. Redacted Transcript Deadline set for 10/28/2024. Release of Transcript Restriction set for 12/26/2024..(Moya, Goretti) (Entered: 09/26/2024) |
| 09/26/2024 | 65 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 9/10/24 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 09/26/2024) |
| 09/26/2024 | 66 | LETTER MOTION for Discovery *re 30(b)(6) deposition* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 26, 2024. Document filed by Ira Brous. (Attachments: # 1 Exhibit E-mail Correspondence Memorializing Agreement, # 2 Exhibit 30(b)(1) Depo. Notice to Mr. Sandler, # 3 Exhibit E-mail Correspondence Memorializing Agreement, # 4 Exhibit Pls' 1st 30(b)(6) Depo. Notice, # 5 Exhibit Pls' 2d 30(b)(6) Depo. Notice).(Blankinship, Douglas) (Entered: 09/26/2024) |
| 09/27/2024 | 67 | ORDER with respect to 66 Letter Motion for Discovery This issue will be addressed at the conference scheduled for October 4, 2024. Defendant is directed to respond to this letter by October 2, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 9/27/2024) (jca) (Entered: 09/27/2024) |
| 09/27/2024 | | Set/Reset Deadlines: Responses due by 10/2/2024 (jca) (Entered: 09/27/2024) |
| 09/27/2024 | 68 | ORDER granting 63 Motion for David E. Meadows to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 09/27/2024) |
| 10/02/2024 | 69 | LETTER MOTION for Conference addressed to Judge Edgardo Ramos from D. Greg Blankinship dated October 2, 2024. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Defendants' Responses to Plaintiffs' 1st Set of Request for Production, # 2 Exhibit B - Deficiency Letter, # 3 Exhibit C - Email Correspondence).(Blankinship, Douglas) (Entered: 10/02/2024) |
| 10/02/2024 | 70 | SUPPLEMENTAL LETTER MOTION for Local Rule 37.2 Conference (*Letter Motion to Add Item to Oct 4 Discovery Conference*) addressed to Judge Edgardo Ramos from Jessica L. Hunter dated 10-2-24. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Email Correspondence).(Hunter, Jessica) (Entered: 10/02/2024) |
| 10/02/2024 | 71 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 2, 2024 re: 66 LETTER MOTION for Discovery *re 30(b)(6) deposition* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 26, 2024 . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit A - Email from September 24).(Watstein, Ryan) (Entered: 10/02/2024) |
| 10/04/2024 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 10/4/2024 by telephone. Plaintiffs and Defendants counsel present. Plaintiffs application for leave to file a motion for substitution was granted. Plaintiffs motion is due by October 25, 2024, Defendants opposition is due by November 15, 2024, and Plaintiffs reply is due by November 22, 2024. The second Rule 30(b)(6) deposition of Mr. Sandler will be completed within 3.5 hours. The parties represented there were no other discovery disputes to resolve. (Motions terminated: 66 LETTER MOTION for Discovery *re 30(b)(6) deposition* and 70 SUPPLEMENTAL LETTER MOTION for Local Rule 37.2 Conference (*Letter Motion to Add Item to Oct 4 Discovery Conference*)). (jar) (Entered: 10/10/2024) |
| 10/07/2024 | 72 | LETTER MOTION for Extension of Time to File Response/Reply as to 69 LETTER MOTION for Conference addressed to Judge Edgardo Ramos from D. Greg Blankinship dated October 2, 2024. addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 7, 2024. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC...(Watstein, Ryan) (Entered: 10/07/2024) |
| 10/08/2024 | 73 | ORDER granting 72 Letter Motion for Extension of Time to File Response/ReplyDefendants are granted an extension to respond to Plaintiffs' letter, until October 29, 2024. A telephonic discovery conference will be held on November 7, 2024, at 11 :00 AM. The palties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted. SO ORDERED. Responses due by 10/29/2024. (Signed by Judge Edgardo Ramos on 10/8/2024) (jca) (Entered: 10/08/2024) |
| 10/08/2024 | | Set/Reset Hearings: Telephone Conference set for 11/7/2024 at 11:00 AM before Judge Edgardo Ramos. (jca) (Entered: 10/08/2024) |
| 10/22/2024 | 74 | LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Improper Narrowing of Discovery Time-Frame* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - 9-10-24 Hearing Transcript, # 2 Exhibit B - 9-30-24 Email Chain).(McInturff, J. Burkett) (Entered: 10/22/2024) |
| 10/22/2024 | 75 | LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Timely Produce Custodial Slack Communications* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - List of Eligo Custodians, # 2 Exhibit B - 8/30/24 A. Howd Email, # 3 Exhibit C - 9/9/24 A. Howd Email, # 4 Exhibit D - 9/17/24 Sandler 30(b)(6) Deposition Transcript, # 5 Exhibit E - 10/10/24 L. O'Toole Email, # 6 Exhibit F - Slack Privacy FAQs, # 7 Exhibit G - Slack Workplace Administration).(McInturff, J. Burkett) (Entered: 10/22/2024) |
| 10/22/2024 | 76 | LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Improper Redactions of Produced Materials* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 10/22/2024) |
| 10/22/2024 | 77 | LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Provide Information Sought By ESI 30(b)(6) Topics 14 and 23* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - IL Eligo Settlement Press Release, # 2 Exhibit B - PA Eligo Petition re Settlement).(McInturff, J. Burkett) (Entered: 10/22/2024) |
| 10/22/2024 | 78 | LETTER MOTION for Conference re: 77 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Provide Information Sought By ESI 30(b)(6) Topics 14 and 23* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24., 74 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Improper Narrowing of Discovery Time-Frame* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24., 76 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Improper Redactions of Produced Materials* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24., 75 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Timely Produce Custodial Slack Communications* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 10/22/2024) |
| 10/22/2024 | 79 | ORDER with respect to 78 LETTER MOTION for Conference re: 77 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Provide Information Sought By ESI 30(b)(6) Topics 14 and 23* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated Defendants are directed to respond to Plaintiffs' letter motions, Docs. 74-77, by October 25, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/22/2024) (ar) (Entered: 10/23/2024) |
| 10/23/2024 | 80 | TRANSCRIPT of Proceedings re: CONFERENCE held on 10/4/2024 before Judge Edgardo Ramos. Court Reporter/Transcriber: Nicole DIMasi, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/13/2024. Redacted Transcript Deadline set for 11/25/2024. Release of Transcript Restriction set for 1/21/2025..(McGuirk, Kelly) (Entered: 10/23/2024) |
| 10/23/2024 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 10/4/24 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request |

| | | |
|---|---|---|
| | | Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 10/23/2024) |
| 10/23/2024 | 82 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -(SEE # 83)** LETTER addressed to Judge Edgardo Ramos from D. Greg Blankinship dated October 23, 2024 re: Update to Issues Raised in October 2, 2024 Pre-Motion Conference Letter (ECF No. 69). Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) Modified on 10/23/2024 (kj). (Entered: 10/23/2024) |
| 10/23/2024 | 83 | LETTER addressed to Judge Edgardo Ramos from D. Greg Blankinship dated October 23, 2024 re: Update to Issues Raised in October 2, 2024 Pre-Motion Conference Letter (ECF No. 69). Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Defendants' Responses to Plaintiffs' Request for Production, # 2 Exhibit 2 - Defendants October 11, 2024 Letter to Plaintiffs).(Blankinship, Douglas) (Entered: 10/23/2024) |
| 10/24/2024 | 84 | MEMO ENDORSEMENT on re: 83 Letter, filed by Ira Brous, Michelle Schuster ENDORSEMENT Defendants are directed to respond to Plaintiff's letter by October 25, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/24/2024) (jca) (Entered: 10/24/2024) |
| 10/25/2024 | 85 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 77 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Refusal to Provide Information Sought By ESI 30(b)(6) Topics 14 and 23 addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24., 74 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Improper Narrowing of Discovery Time-Frame addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24., 83 Letter, 76 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Improper Redactions of Produced Materials addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24., 75 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Refusal to Timely Produce Custodial Slack Communications addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. (Unopposed Request to Extend Defendants Deadlines to Respond to Plaintiffs Five Letter-Motions (ECF Nos. 74-77, 83)) addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 25, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 10/25/2024) |
| 10/25/2024 | 86 | ORDER granting 85 Letter Motion for Extension of Time to File Response/ReplyDefendants' request to extend deadline to respond to Plaintiffs' letter motions (Docs. 74-77, 83) to November 4, 2024 is granted. SO ORDERED. Responses due by 11/4/2024 (Signed by Judge Edgardo Ramos on 10/25/2024) (jca) (Entered: 10/25/2024) |
| 10/25/2024 | 87 | MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous . Document filed by Michelle Schuster..(Hunter, Jessica) (Entered: 10/25/2024) |
| 10/25/2024 | 88 | MEMORANDUM OF LAW in Support re: 87 MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous . . Document filed by Michelle Schuster..(Hunter, Jessica) (Entered: 10/25/2024) |
| 10/25/2024 | 89 | DECLARATION of Jessica L. Hunter in Support re: 87 MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous .. Document filed by Michelle Schuster. (Attachments: # 1 Exhibit 1 - Certificate of Voluntary Administration).(Hunter, Jessica) (Entered: 10/25/2024) |
| 10/25/2024 | 90 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan Watstein dated October 25, 2024 re: 78 LETTER MOTION for Conference re: 77 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Refusal to Provide Information Sought By ESI 30(b)(6) Topics 14 and 23 addressed to Judge Edgardo Ramos from J. Burkett McInturff dated. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 10/25/2024) |
| 10/25/2024 | 91 | LETTER MOTION for Local Rule 37.2 Conference re Disputed ESI Protocol Provisions addressed to Judge Edgardo Ramos from J. Burkett McInturff dated Oct. 25, 2024. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A (Email Chain), # 2 Exhibit B (Redline of Aug. 5 and Sep. 9 Protocol Proposals)), # 3 Exhibit C (Email Chain), # 4 Exhibit D (Plaintiffs' [Proposed] ESI Protocol), # 5 Exhibit E (Eligo's [Proposed] ESI Protocol), # 6 Exhibit F (ESI Proposal Comparison Chart), # 7 Exhibit G (HOP Litigation ESI Protocol), # 8 Exhibit H (MB Litigation ESI Protocol), # 9 Exhibit I (NYHC Litigation Search Term Protocol), # 10 Exhibit J (NYHC Litigation ESI Protocol), # 11 Exhibit K (XOOM Energy Litigation ESI Protocol), # 12 Exhibit L (Just Energy Litigation ESI Protocol)).(McInturff, J. Burkett) (Entered: 10/25/2024) |
| 10/28/2024 | 92 | LETTER MOTION for Extension of Time to File Response/Reply as to 91 LETTER MOTION for Local Rule 37.2 Conference re Disputed ESI Protocol Provisions addressed to Judge Edgardo Ramos from J. Burkett McInturff dated Oct. 25, 2024. addressed to Judge Edgardo Ramos from Ryan Watstein dated October 28, 2024 Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 10/28/2024) |
| 10/28/2024 | 93 | LETTER MOTION for Discovery (Defendant's Letter Motion for Protective Order as to Marketing Topics in 30(b)(6) Deposition) addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 28, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit A - Declaration of Andy Lapointe, # 2 Exhibit B - Schuster Deposition Excerpts, # 3 Exhibit C - Email from G. Blankenship, # 4 Exhibit D - Notice of Deposition). (Watstein, Ryan) (Entered: 10/28/2024) |
| 10/28/2024 | 94 | ORDER. On October 28, 2024, the Court was advised by Defendants that Doc. 75-4 contained confidential information as defined in the protective order entered in this case, Doc. 38. Doc. 75-4 has been temporarily placed on "Selected Parties" viewing status. Defendants are directed to submit the document with the proposed redactions and a letter providing the basis for the proposed redactions by October 30, 2024. Plaintiffs shall file any opposition by November 1, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/28/24) (yv) (Entered: 10/29/2024) |
| 10/29/2024 | 95 | ORDER granting 92 Letter Motion for Extension of Time to File Response/Reply Defendants are directed to respond to Plaintiffs' letter motion, Doc. 91, by November 4, 2024. SO ORDERED. Responses due by 11/4/2024 (Signed by Judge Edgardo Ramos on 10/29/2024) (jca) (Entered: 10/29/2024) |
| 10/29/2024 | 96 | ORDER with respect to 93 Letter Motion for Discovery Plaintiffs are directed to respond to Defendants' letter motion by November 1, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 10/29/2024) (jca) (Entered: 10/29/2024) |
| 10/29/2024 | | Set/Reset Deadlines: Responses due by 11/1/2024 (jca) (Entered: 10/29/2024) |
| 10/30/2024 | 97 | LETTER MOTION to Seal Limited Portions of Defendant's 30(b)(6) Deposition Transcript addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 30, 2024. Document filed by Eligo Energy, LLC. (Attachments: # 1 Exhibit Redacted 30(b)(6) Deposition Transcript).(Watstein, Ryan) (Entered: 10/30/2024) |
| 11/01/2024 | 98 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from J. Burkett McInturff dated November 1, 2024 re: 97 LETTER MOTION to Seal Limited Portions of Defendant's 30(b)(6) Deposition Transcript addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 30, 2024. . Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 11/01/2024) |
| 11/01/2024 | 99 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 11-1-24 re: 93 LETTER MOTION for Discovery (Defendant's Letter Motion for Protective Order as to Marketing Topics in 30(b)(6) Deposition) addressed to Judge Edgardo Ramos from Ryan D. Watstein dated October 28, 2024. . Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 11/01/2024) |
| 11/04/2024 | 100 | LETTER MOTION to Compel Plaintiff Schuster to Produce Engagement Letter addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 4, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/04/2024) |
| 11/04/2024 | 101 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 4, 2024 re: 74 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Improper Narrowing of Discovery Time-Frame addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/04/2024) |
| 11/04/2024 | 102 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 4, 2024 re: 76 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Improper Redactions of Produced Materials addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/04/2024) |
| 11/04/2024 | 103 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 4, 2024 re: 77 LETTER MOTION for Local Rule 37.2 Conference re Defendants' Refusal to Provide Information Sought By ESI 30(b)(6) Topics 14 and 23 addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit Plaintiffs' Rule 30(b)(6) Notice).(Watstein, Ryan) (Entered: 11/04/2024) |

| 11/04/2024 | 104 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Wattstein dated November 4, 2024 re: 69 LETTER MOTION for Conference addressed to Judge Edgardo Ramos from D. Greg Blankinship dated October 2, 2024. *and re:* 83 *LETTER re: Update to Issues Raised in ECF No. 69*. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/04/2024) |
| 11/04/2024 | 105 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Wattstein dated November 4, 2024 re: 91 LETTER MOTION for Local Rule 37.2 Conference *re Disputed ESI Protocol Provisions* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated Oct. 25, 2024. . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/04/2024) |
| 11/04/2024 | 106 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Wattstein dated November 4, 2024 re: 75 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Timely Produce Custodial Slack Communications* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/04/2024) |
| 11/05/2024 | 107 | ORDER with respect to 100 Letter Motion to Compel Plaintiffs are directed to respond to Defendants' motion to compel by November 8, 2024. SO ORDERED. (Signed by Judge Edgardo Ramos on 11/5/2024) (jca) (Entered: 11/06/2024) |
| 11/05/2024 | | Set/Reset Deadlines: Responses due by 11/8/2024 (jca) (Entered: 11/06/2024) |
| 11/06/2024 | 108 | LETTER MOTION for Discovery (*Defendant's Letter Motion to Bifurcate and Limit Discovery*) addressed to Judge Edgardo Ramos from Ryan D. Watstein dated 11/06/2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/06/2024) |
| 11/06/2024 | 109 | ORDER granting 97 Letter Motion to Seal. Defendants Eligo Energy, LLC and Eligo Energy NY, LLCs motion to seal limited portions of defendants Rule 30(b) (6) corporate representatives deposition transcript, Doc. 75-4, is granted. Plaintiffs Ira Brous and Michelle Schuster are directed to refile Doc. 75 and the attachments, including the proposed redacted document, on the docket for public view. Defendants having filed a motion to seal limited portions of defendants 30(b)(6) corporate representative deposition transcript and proposed redacted document (Doc. 97), the Court respectfully directs the Clerk of Court to modify the viewing level for Doc. 75 and the attachments to the Selected Parties viewing level. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 11/6/24) (yv) (Entered: 11/07/2024) |
| 11/07/2024 | 110 | ORDER denying without prejudice 76 Letter Motion for Local Rule 37.2 Conference. Plaintiffs' request to preclude redactions of irrelevant portions of responsive documents is denied without prejudice. Plaintiffs' request to preclude redactions of personally identifiable information is denied. SO ORDERED. (Signed by Judge Edgardo Ramos on 11/7/2024) (tg) (Entered: 11/08/2024) |
| 11/07/2024 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 11/7/24 by telephone. Plaintiff's and Defendant's counsel present. The Court decided the discovery disputes as set forth on the record. (jar) (Entered: 12/06/2024) |
| 11/08/2024 | 111 | ORDER with respect to 108 Letter Motion for Discovery Plaintiffs are directed to respond to Defendants' request to bifurcate and limit discovery by November 12, 2024. SO ORDERED.. (Signed by Judge Edgardo Ramos on 11/8/2024) (jca) (Entered: 11/08/2024) |
| 11/08/2024 | | Set/Reset Deadlines: Responses due by 11/12/2024 (jca) (Entered: 11/08/2024) |
| 11/08/2024 | 112 | REDACTION to 75 LETTER MOTION for Local Rule 37.2 Conference *re Defendants' Refusal to Timely Produce Custodial Slack Communications* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 10/22/24. (*See also Order 109 directing Plaintiffs to refile 75 and attachments with approved redactions to [75-4]*) by Ira Brous, Michelle Schuster (Attachments: # 1 Exhibit A - List of Eligo Custodians, # 2 Exhibit B - 8/30/24 A. Howd Email, # 3 Exhibit C - 9/9/24 A. Howd Email , # 4 Exhibit D - REDACTED 9/17/24 Sandler 30(b)(6) Deposition Transcript, # 5 Exhibit E - 10/10/24 L. O'Toole Email, # 6 Exhibit F - Slack Privacy FAQs, # 7 Exhibit G - Slack Workplace Administration).(Hunter, Jessica) (Entered: 11/08/2024) |
| 11/08/2024 | 113 | NOTICE OF APPEARANCE by Daniel James Martin on behalf of Ira Brous, Michelle Schuster..(Martin, Daniel) (Entered: 11/08/2024) |
| 11/08/2024 | 114 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 11/8/24 re: 100 LETTER MOTION to Compel Plaintiff Schuster to Produce Engagement Letter addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 4, 2024. . Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Schuster Depo. Tr. Excerpts).(Blankinship, Douglas) (Entered: 11/08/2024) |
| 11/12/2024 | 115 | ORDER denying 78 Letter Motion for Conference Plaintiffs' request for an in-person conference with ESI experts to discuss four letter motions, Docs. 74-77, is denied. SO ORDERED. (Signed by Judge Edgardo Ramos on 11/12/2024) (jca) (Entered: 11/12/2024) |
| 11/12/2024 | 116 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 11-12-24 re: 108 LETTER MOTION for Discovery (*Defendant's Letter Motion to Bifurcate and Limit Discovery*) addressed to Judge Edgardo Ramos from Ryan D. Watstein dated 11/06/2024. (*Redacted Version for Public View*). Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Redacted Excerpts of 10-29-24 30(b)(6) Dep, # 2 Exhibit B - Jenkins Order, # 3 Exhibit C - Burzawa Order).(Blankinship, Douglas) (Entered: 11/12/2024) |
| 11/12/2024 | 117 | LETTER MOTION to Seal (*Redact Provisionally Portions of Plaintiffs' Opposition to Defendants' Second Motion to Bifurcate Discovery, Doc. 116, and Exhibit A thereto* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 11-12-24. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 11/12/2024) |
| 11/12/2024 | 118 | ***SELECTED PARTIES***LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 11-12-24 re: 108 LETTER MOTION for Discovery (*Defendant's Letter Motion to Bifurcate and Limit Discovery*) addressed to Judge Edgardo Ramos from Ryan D. Watstein dated 11/06/2024. (*Sealed Version - Provisional*). Document filed by Ira Brous, Michelle Schuster, Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit A - Excerpts of 10-29-24 30(b)(6) Dep., # 2 Exhibit B - Jenkins Order, # 3 Exhibit C - Burzawa Order)Motion or Order to File Under Seal: 117 . (Blankinship, Douglas) (Entered: 11/12/2024) |
| 11/13/2024 | 119 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 87 MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous . addressed to Judge Edgardo Ramos from Ryan Watstein dated November 13, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC...(Watstein, Ryan) (Entered: 11/13/2024) |
| 11/13/2024 | 120 | AMENDED COMPLAINT amending 1 Complaint against Eligo Energy NY, LLC, Eligo Energy, LLC with JURY DEMAND.Document filed by Ira Brous, Michelle Schuster. Related document: 1 Complaint. (Attachments: # 1 Exhibit A to Amended Complaint, Brous Contract., # 2 Exhibit B to Amended Complaint, Schuster Contract, # 3 Exhibit Order Authorizing Amendment of Pleadings).(Blankinship, Douglas) (Entered: 11/13/2024) |
| 11/13/2024 | 121 | LETTER MOTION to Seal (*Redact Provisionally Portions of Plaintiffs' Amended Complaint, Doc. 120* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 11-13-24. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 11/13/2024) |
| 11/13/2024 | 122 | ***SELECTED PARTIES*** AMENDED COMPLAINT amending 1 Complaint against Eligo Energy NY, LLC, Eligo Energy, LLC with JURY DEMAND.Document filed by Ira Brous, Michelle Schuster, Eligo Energy, LLC, Eligo Energy NY, LLC. Related document: 1 Complaint. (Attachments: # 1 Exhibit A to Amended Complaint, Brous Contract., # 2 Exhibit B to Amended Complaint, Schuster Contract, # 3 Exhibit Order Authorizing Amendment of Pleadings)Motion or Order to File Under Seal: 121. (Blankinship, Douglas) (Entered: 11/13/2024) |
| 11/14/2024 | 123 | ORDER granting 119 Letter Motion for Extension of Time to File Response/Reply Defendants' requests to extend deadline to respond to Plaintiffs' motion for substitution, Doc. 87, to November 22, 2024 and to extend Plaintiffs' reply to December 10, 2024 are granted. SO ORDERED. Responses due by 11/22/2024 Replies due by 12/10/2024.. (Signed by Judge Edgardo Ramos on 11/14/2024) (jca) (Entered: 11/14/2024) |
| 11/14/2024 | 124 | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/7/2024 before Judge Edgardo Ramos. Court Reporter/Transcriber: Lisa O'Brien, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/5/2024. Redacted Transcript Deadline set for 12/16/2024. Release of Transcript Restriction set for 2/12/2025..(McGuirk, Kelly) (Entered: 11/14/2024) |
| 11/14/2024 | 125 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 11/7/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to |

| | | Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 11/14/2024) |
|---|---|---|
| 11/15/2024 | 126 | ORDER granting 117 Letter Motion to Seal. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 11/15/2024) |
| 11/15/2024 | 127 | SUPPLEMENTAL LETTER MOTION for Local Rule 37.2 Conference *re: 100 LETTER MOTION to Compel Engagement Letter and 108 LETTER MOTION to Bifurcate and Limit Discovery* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 15, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/15/2024) |
| 11/15/2024 | 128 | ORDER granting 121 Letter Motion to Seal. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 11/15/2024) |
| 11/18/2024 | 129 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated November 18, 2024 re: 127 SUPPLEMENTAL LETTER MOTION for Local Rule 37.2 Conference *re: 100 LETTER MOTION to Compel Engagement Letter and 108 LETTER MOTION to Bifurcate and Limit Discovery* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 15, 202 . Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - G. Blankinship Nov. 6 Email, # 2 Exhibit B - Email Chain, # 3 Exhibit C - Nov. 7 Hrg. Tr.)(Blankinship, Douglas) (Entered: 11/18/2024) |
| 11/22/2024 | 130 | RESPONSE in Opposition to Motion re: 87 MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous . . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Affidavit of Leo O'Toole, # 2 Exhibit Excerpt of Discovery Responses, # 3 Exhibit July 26, 2024 Email, # 4 Exhibit Sep. 6, 2024 Email Chain, # 5 Exhibit Sept. 23, 2024 Email Chain, # 6 Exhibit Oct. 14, 2024 Email Chain, # 7 Exhibit Excerpt of Nov. 7, 2024 Hearing Transcript, # 8 Exhibit Nov. 7, 2024 Email Chain, # 9 Exhibit Response in Opposition to Motion to Quash, # 10 Exhibit Excerpt of Schuster Deposition Recording).(Watstein, Ryan) (Entered: 11/22/2024) |
| 11/27/2024 | 131 | LETTER MOTION for Conference re: 120 Amended Complaint, addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 27, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 11/27/2024) |
| 12/02/2024 | 132 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 131 LETTER MOTION for Conference re: 120 Amended Complaint, addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 27, 2024. addressed to Judge Edgardo Ramos from J. Burkett McInturff dated Dec. 2, 2024. Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 12/02/2024) |
| 12/03/2024 | 133 | ORDER granting 132 Letter Motion for Extension of Time to File Response/Reply Plaintiffs' request for an extension to respond to the letter, Doc. 131, is granted. Plaintiffs are directed to respond by December 10, 2024. SO ORDERED. Responses due by 12/10/2024. (Signed by Judge Edgardo Ramos on 12/3/2024) (jca) (Entered: 12/03/2024) |
| 12/10/2024 | 134 | REPLY MEMORANDUM OF LAW in Support re: 87 MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous . . Document filed by Michelle Schuster..(Hunter, Jessica) (Entered: 12/10/2024) |
| 12/10/2024 | 135 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated December 10, 2024 re: 131 LETTER MOTION for Conference re: 120 Amended Complaint, addressed to Judge Edgardo Ramos from Ryan D. Watstein dated November 27, 2024. . Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 12/10/2024) |
| 12/16/2024 | 136 | ORDER denying 127 Letter Motion for Local Rule 37.2 Conference. The Court denies the requests for bifurcated discovery and summary judgment briefing. In the alternative, Defendants requested that the Court enter a briefing schedule for a renewed motion to dismiss/strike based on the amended complaint. Doc. 131. The Court grants the request for a renewed motion to dismiss/strike. The briefing will be completed on the following schedule: moving papers due January 6, 2025; opposition due January 27, 2025; and reply due February 3, 2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 12/16/2024) (tg) (Entered: 12/16/2024) |
| 12/16/2024 | | Set/Reset Deadlines: Motions due by 1/6/2025. Responses due by 1/27/2025 Replies due by 2/3/2025. (tg) (Entered: 12/16/2024) |
| 12/17/2024 | 137 | ORDER terminating 27 Motion to Dismiss. Accordingly, as the original complaint is no longer the operative complaint, the first filed motion to dismiss, Doc. 27. The Clerk of Court is respectfully directed to terminate the motion, Document 27. SO ORDERED. (Signed by Judge Edgardo Ramos on 12/17/2024) (sgz) (Entered: 12/17/2024) |
| 12/19/2024 | 138 | JOINT LETTER MOTION to Seal *(Joint Motion to Seal Limited Portions of Defendants' Second 30(b)(6) Corporate Representative Transcript (ECF Nos. 116-1, 118-1))* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated December 19, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 12/19/2024) |
| 12/19/2024 | 139 | JOINT LETTER MOTION to Seal *(Joint Motion to Seal Limited Portions of Plaintiffs Amended Complaint (ECF Nos. 120, 122))* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated December 19, 2024. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 12/19/2024) |
| 01/06/2025 | 140 | MOTION to Dismiss *or Strike Amended Complaint.* Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. Responses due by 1/27/2025.(Watstein, Ryan) (Entered: 01/06/2025) |
| 01/06/2025 | 141 | MEMORANDUM OF LAW in Support re: 140 MOTION to Dismiss *or Strike Amended Complaint.* . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 01/06/2025) |
| 01/06/2025 | 142 | DECLARATION of Andrew LaPointe in Support re: 140 MOTION to Dismiss *or Strike Amended Complaint..* Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit 1-6 DC Contracts, # 2 Exhibit 7-19 IL Contracts, # 3 Exhibit 20-28 MA Contracts, # 4 Exhibit 29-41 MD Contracts, # 5 Exhibit 42-44 MI Contracts, # 6 Exhibit 45-50 NJ Contracts, # 7 Exhibit 51-56 NY Contracts, # 8 Exhibit 57-73 OH Contracts, # 9 Exhibit 74-87 PA Contracts).(Watstein, Ryan) (Entered: 01/06/2025) |
| 01/08/2025 | 143 | LETTER MOTION for Local Rule 37.2 Conference *re Fixed Rate Discovery* addressed to Judge Edgardo Ramos from G. Blankinship dated 01-08-2025. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Defs.' Second Suppl. Resp. to Pls.' Interrog. No. 8).(Blankinship, Douglas) (Entered: 01/08/2025) |
| 01/08/2025 | 144 | LETTER MOTION to Seal *(Redact Provisionally Portions of Plaintiffs' Letter Motion for Local Rule 37.2 Conference re Fixed Rate Discovery (ECF No. 143)* addressed to Judge Edgardo Ramos from G. Blankinship dated 01-08-2025. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 01/08/2025) |
| 01/08/2025 | 145 | ***SELECTED PARTIES*** LETTER MOTION for Local Rule 37.2 Conference *re Fixed Rate Discovery* addressed to Judge Edgardo Ramos from G. Blankinship dated 01-08-2025. Document filed by Ira Brous, Michelle Schuster, Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit A - Defs.' Second Suppl. Resp. to Pls.' Interrog. No. 8) Motion or Order to File Under Seal: 144 .(Blankinship, Douglas) (Entered: 01/08/2025) |
| 01/10/2025 | 146 | ORDER with respect to 145 Letter Motion for Local Rule 37.2 Conference Defendants are directed to respond to this letter by January 13, 2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 1/9/2025) (jca) (Entered: 01/10/2025) |
| 01/10/2025 | | Set/Reset Deadlines: Responses due by 1/13/2025 (jca) (Entered: 01/10/2025) |
| 01/10/2025 | 147 | ORDER granting 144 Letter Motion to Seal. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 01/10/2025) |
| 01/13/2025 | 148 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated 1/13/25 re: 143 LETTER MOTION for Local Rule 37.2 Conference *re Fixed Rate Discovery* addressed to Judge Edgardo Ramos from G. Blankinship dated 01-08-2025 . . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 01/13/2025) |
| 01/15/2025 | 149 | ORDER denying 143 Letter Motion for Local Rule 37.2 ConferencePlaintiff's request is denied. SO ORDERED. (Signed by Judge Edgardo Ramos on 1/15/2025) (jca) (Entered: 01/15/2025) |

| 01/24/2025 | 150 | LETTER MOTION for Discovery *Re-Open Plaintiff Schuster's Deposition and Compel Written Discovery* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated January 24, 2025. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit A - Excerpts from Schuster Deposition Transcript, # 2 Exhibit B - Lapointe Declaration, # 3 Exhibit C - Transcript of Schuster phone call).(Watstein, Ryan) (Entered: 01/24/2025) |
|---|---|---|
| 01/27/2025 | 151 | ORDER with respect to 150 Letter Motion for Discovery Plaintiffs are directed to respond to this letter by January 30, 2025. SO ORDERED.. (Signed by Judge Edgardo Ramos on 1/27/2025) (jca) (Entered: 01/27/2025) |
| 01/27/2025 | | Set/Reset Deadlines: Responses due by 1/30/2025 (jca) (Entered: 01/27/2025) |
| 01/27/2025 | 152 | MEMORANDUM OF LAW in Opposition re: 140 MOTION to Dismiss *or Strike Amended Complaint.* . Document filed by Ira Brous, Michelle Schuster.. (Blankinship, Douglas) (Entered: 01/27/2025) |
| 01/27/2025 | 153 | LETTER MOTION to Seal *Redact Provisionally Portions of Plaintiffs' Memorandum of Law in Opposition re 140 Motion to Dismiss or Strike Amended Complaint, Doc. 152* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 01-27-2025. Document filed by Ira Brous, Michelle Schuster.. (Blankinship, Douglas) (Entered: 01/27/2025) |
| 01/27/2025 | 154 | ***SELECTED PARTIES*** MEMORANDUM OF LAW in Opposition re: 140 MOTION to Dismiss *or Strike Amended Complaint.* . Document filed by Ira Brous, Michelle Schuster. Motion or Order to File Under Seal: 153 .(Blankinship, Douglas) (Entered: 01/27/2025) |
| 01/28/2025 | 155 | ORDER granting 153 Motion to Seal/Redact Provisionally Portions of Plaintiffs' Memorandum of Law in Opposition re 140 Motion to Dismiss or Strike Amended Complaint, Doc. 152. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 01/28/2025) |
| 01/30/2025 | 156 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 01-30-2025 re: 150 LETTER MOTION for Discovery *Re-Open Plaintiff Schuster's Deposition and Compel Written Discovery* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated January 24, 2025. . Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Eligo's Response to Plaintiffs' First RFPs, # 2 Exhibit B - Aug. 20, 2024 Email, # 3 Exhibit C - Plaintiff Schuster's Response to Eligo's First RFPs).(Blankinship, Douglas) (Entered: 01/30/2025) |
| 01/31/2025 | 157 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 140 MOTION to Dismiss *or Strike Amended Complaint.* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated January 31, 2025. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 01/31/2025) |
| 01/31/2025 | 158 | ORDER granting 157 Letter Motion for Extension of Time to File Response/Reply. Defendants' request for an extension to file their reply in support of their motion to dismiss is granted. Defendants are directed to file their reply by February 13, 2025. SO ORDERED. Replies due by 2/13/2025. (Signed by Judge Edgardo Ramos on 1/31/2025) (sgz) (Entered: 01/31/2025) |
| 01/31/2025 | 159 | MEMO ENDORSEMENT on re: 156 Response in Opposition to Motion,, filed by Ira Brous, Michelle Schuster. ENDORSEMENT: A telephone conference will be held on February 7, 2025, at 11:00 a.m. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conference start time. ( Telephone Conference set for 2/7/2025 at 11:00 AM before Judge Edgardo Ramos.) (Signed by Judge Edgardo Ramos on 1/31/2025) (rro) (Entered: 02/03/2025) |
| 02/04/2025 | 160 | JOINT LETTER MOTION for Extension of Time *for all remaining deadlines* addressed to Judge Edgardo Ramos from J. Burkett McInturff dated 2/4/2025. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Proposed Order Proposed Revised Civil Case Discovery Plan and Scheduling Order). (McInturff, J. Burkett) (Entered: 02/04/2025) |
| 02/05/2025 | 161 | JOINT LETTER MOTION to Seal *Limited Portions of Plaintiffs' Letter Motion Regarding Fixed Rate Discovery (ECF Nos. 143, 145)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated February 5, 2025. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 02/05/2025) |
| 02/05/2025 | 162 | JOINT LETTER MOTION to Seal */Unseal Provisionally Sealed Portions of Plaintiffs Opposition to Defendants Motion to Dismiss the Amended Complaint (ECF Nos. 152, 154)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated February 5, 2025. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 02/05/2025) |
| 02/06/2025 | 163 | REVISED CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER granting 160 Letter Motion for Extension of Time. This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f): All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Non-expert depositions shall be completed by 5/23/25. Depositions shall proceed concurrently. Discovery due by 9/19/2025. (And as further set forth herein.) SO ORDERED. (Signed by Judge Edgardo Ramos on 2/6/2025) (jca) (Entered: 02/06/2025) |
| 02/07/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 2/7/2025 by telephone. Plaintiffs' and Defendants' counsel present. Discovery disputes were decided on the record. The Court will issue an order terminating as moot the remaining discovery motions. (jar) (Entered: 02/07/2025) |
| 02/07/2025 | 164 | ORDER terminating 69 Letter Motion for Conference ; terminating 74 Letter Motion for Local Rule 37.2 Conference; terminating 75 Letter Motion for Local Rule 37.2 Conference; terminating 77 Letter Motion for Local Rule 37.2 Conference; terminating 91 Letter Motion for Local Rule 37.2 Conference; terminating 93 Letter Motion for Discovery; terminating 100 Letter Motion to Compel; terminating 108 Letter Motion for Discovery; terminating 131 Letter Motion for Conference ; terminating 145 Letter Motion for Local Rule 37.2 Conference; terminating 150 Letter Motion for Discovery. Based on the representations made by counsel during today's conference, the prior pending discovery disputes have been resolved. The Clerk of Court is respectfully directed to terminate the following motions, Docs. 69, 74, 75, 77, 91, 93, 100, 108, 131, 145, 150. IT SO ORDERED.. (Signed by Judge Edgardo Ramos on 2/7/2025) (jca) (Entered: 02/07/2025) |
| 02/12/2025 | 165 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 140 MOTION to Dismiss *or Strike Amended Complaint.* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated February 12, 2025. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 02/12/2025) |
| 02/13/2025 | 166 | ORDER granting 165 Letter Motion for Extension of Time to File Response/Reply Defendants' request for an extension to file the reply in support of their motion to dismiss is granted. Defendants are directed to file the reply by February 20, 2025. SO ORDERED Replies due by 2/20/2025.. (Signed by Judge Edgardo Ramos on 2/13/2025) (jca) (Entered: 02/13/2025) |
| 02/20/2025 | 167 | TRANSCRIPT of Proceedings re: CONFERENCE held on 2/7/2025 before Judge Edgardo Ramos. Court Reporter/Transcriber: Amy Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/13/2025. Redacted Transcript Deadline set for 3/24/2025. Release of Transcript Restriction set for 5/21/2025..(McGuirk, Kelly) (Entered: 02/20/2025) |
| 02/20/2025 | 168 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 2/7/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 02/20/2025) |
| 02/20/2025 | 169 | REPLY MEMORANDUM OF LAW in Support re: 140 MOTION to Dismiss *or Strike Amended Complaint.* . Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC..(Watstein, Ryan) (Entered: 02/20/2025) |
| 03/12/2025 | 170 | LETTER MOTION for Discovery *and for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated March 12, 2025. Document filed by Eligo Energy, LLC, Eligo Energy NY, LLC. (Attachments: # 1 Exhibit A - Proposed Protective Order).(Watstein, Ryan) (Entered: 03/12/2025) |
| 03/13/2025 | 171 | ORDER with respect to 170 Letter Motion for Discovery Plaintiffs are directed to respond by March 17, 2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 3/13/2025) (Entered: 03/13/2025) |

| 03/13/2025 | | Set/Reset Deadlines: Responses due by 3/17/2025 (jca) (Entered: 03/13/2025) |
|---|---|---|
| 03/17/2025 | 172 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from D. Greg Blankinship dated March 17, 2025 re: 170 LETTER MOTION for Discovery *and for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated March 12, 2025. . Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 03/17/2025) |
| 03/18/2025 | 173 | ORDER denying without prejudice to renewal 170 Letter Motion for Discovery At this juncture, and in the absence of allegations of wrongdoing, Counsel's representations that "Plaintiffs have not used, and will not use, personally identifying information (`PII`) produced in discovery to contact absent class members," Doc. 172, is sufficient to satisfy the Court that Counsel will act accordingly. Defendants' motion is denied without prejudice to refile if circumstances warrant. SO ORDERED.. (Signed by Judge Edgardo Ramos on 3/18/2025) (jca) (Entered: 03/18/2025) |
| 03/21/2025 | 174 | LETTER MOTION for Local Rule 37.2 Conference *Regarding Four Unresolved Discovery Impasses* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated March 21, 2025. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 03/21/2025) |
| 03/25/2025 | 175 | ORDER granting 174 Letter Motion for Local Rule 37.2 Conference. Defendants are directed to respond by April 1, 2025. A telephonic premotion conference will be held on April 16, 2025, at 02:30 PM. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 03/25/2025) |
| 03/25/2025 | 176 | LETTER MOTION for Extension of Time to File Response/Reply as to 175 Order on Motion for Local Rule 37.2 Conference,, addressed to Judge Edgardo Ramos from Ryan D. Watstein dated March 25, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 03/25/2025) |
| 03/26/2025 | 177 | ORDER granting 176 Letter Motion for Extension of Time to File Response/Reply Defendants' request for an extension to respond to Plaintiffs' letter motion, Doc. 174, is granted. Defendants are directed to respond by April 4, 2025. SO ORDERED. Responses due by 4/4/2025 (Signed by Judge Edgardo Ramos on 3/26/2025) (jca) (Entered: 03/26/2025) |
| 04/01/2025 | 178 | ORDER granting 138 Letter Motion to Seal Limited Portions of Defendants' Second 30(b)(6) Corporate Representative Transcript (ECF Nos. 116-1, 118-1). (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/01/2025) |
| 04/01/2025 | 179 | ORDER granting 139 Letter Motion to Seal (Joint Motion to Seal Limited Portions of Plaintiffs Amended Complaint (ECF Nos. 120, 122).) (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/01/2025) |
| 04/01/2025 | 180 | ORDER granting 161 Letter Motion to Seal Limited Portions of Plaintiffs' Letter Motion Regarding Fixed Rate Discovery (ECF Nos. 143, 145). (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/01/2025) |
| 04/01/2025 | 181 | ORDER granting 162 Letter Motion to Seal/Unseal Provisionally Sealed Portions of Plaintiffs Opposition to Defendants Motion to Dismiss the Amended Complaint (ECF Nos. 152, 154). (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/01/2025) |
| 04/04/2025 | 182 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from Ryan Watstein dated April 4, 2025 re: 174 LETTER MOTION for Local Rule 37.2 Conference *Regarding Four Unresolved Discovery Impasses* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated March 21, 2025. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 04/04/2025) |
| 04/14/2025 | 183 | LETTER MOTION to Seal addressed to Judge Edgardo Ramos from D. Greg Blankinship dated April 14, 2025. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 04/14/2025) |
| 04/14/2025 | 184 | ***SELECTED PARTIES*** LETTER MOTION for Conference *re Withholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated April 14, 2025. Document filed by Ira Brous, Michelle Schuster, Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit 1 - Defendants' Responses to Plaintiff's 1st Set of Req. for Produc., # 2 Exhibit 2 - Defendants' Responses to Plaintiff's 1st Set of Interrog., # 3 Exhibit 3 - Defendants' 1st Suppl Resp to Pls' 1st Set of Interrog., # 4 Exhibit 4 - Defendants' 2d Suppl Resp to Pls' 1st Set of Interrog., # 5 Exhibit 5 - Email Correspondence, # 6 Exhibit 6 - Email Correspondence, # 7 Exhibit 7 - Plaintiffs' Second Set of ROGs, # 8 Exhibit 8 - Plaintiffs' April Rule 30(b)(6) Deposition Notice)Motion or Order to File Under Seal: 183 .(Blankinship, Douglas) (Entered: 04/14/2025) |
| 04/14/2025 | 185 | LETTER MOTION for Conference *re Withholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated April 14, 2025. Document filed by Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Defendants' Responses to Plaintiff's 1st Set of Req. for Produc., # 2 Exhibit 2 - Defendants' Responses to Plaintiff's 1st Set of Interrog., # 3 Exhibit 3 - Defendants' 1st Suppl Resp to Pls' 1st Set of Interrog., # 4 Exhibit 4 - Defendants' 2d Suppl Resp to Pls' 1st Set of Interrog., # 5 Exhibit 5 - Email Correspondence Redacted, # 6 Exhibit 6 - Email Correspondence Redacted, # 7 Exhibit 7 - Plaintiffs' Second Set of ROGs Redacted, # 8 Exhibit 8 - Plaintiffs' April Rule 30(b)(6) Deposition Notice Redacted).(Blankinship, Douglas) (Entered: 04/14/2025) |
| 04/15/2025 | 186 | REDACTION to 118 Response in Opposition to Motion,, by Ira Brous, Michelle Schuster (Attachments: # 1 Exhibit A - Oct. 29, 2024 30(b)(6) Dep. Tr.)..(McInturff, J. Burkett) (Entered: 04/15/2025) |
| 04/15/2025 | 187 | REDACTION to 120 Amended Complaint, by Ira Brous, Michelle Schuster.(McInturff, J. Burkett) (Entered: 04/15/2025) |
| 04/15/2025 | 188 | REDACTION *to 145 LETTER MOTION for Local Rule 37.2 Conference re Fixed Rate Discovery* by Ira Brous, Michelle Schuster.(McInturff, J. Burkett) (Entered: 04/15/2025) |
| 04/15/2025 | 189 | MEMORANDUM OF LAW in Opposition re: 140 MOTION to Dismiss *or Strike Amended Complaint. Previously filed under seal at [ECF No. 152/154], now publicly filed per ECF No. 181.* Document filed by Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 04/15/2025) |
| 04/16/2025 | 190 | ORDER granting 183 Letter Motion to Seal. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/16/2025) |
| 04/16/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 4/16/2025 by telephone. Plaintiffs and Defendants' counsel present. The Court decided discovery the disputes on the record. Defendants' application for an extension of time, until Wednesday, April 23, to respond to Plaintiffs' premotion letter is granted. (jar) Modified on 4/16/2025 (jar). (Entered: 04/16/2025) |
| 04/22/2025 | 191 | LETTER MOTION for Oral Argument *via Video Conference or In-Person to Present Eligo Electronic Files in Support of Plaintiffs' Application at ECF No. 185* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated April 22, 2025. Document filed by Ira Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 04/22/2025) |
| 04/22/2025 | 192 | OPINION & ORDER re: 87 MOTION to Substitute Party. Old Party: Ira Brous, New Party: Anne Brous filed by Michelle Schuster. For the foregoing reasons, Plaintiffs' motion to substitute is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 87. It is SO ORDERED. Anne Brous added. Ira Brous (on behalf of themselves and all others similarly situated) terminated. (Signed by Judge Edgardo Ramos on 4/22/2025) (mml) (Entered: 04/23/2025) |
| 04/23/2025 | 193 | LETTER MOTION to Seal *Portions of Defendants Response to Plaintiffs April 14, 2025 Letter Motion (ECF No. 185)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated April 23, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 04/23/2025) |
| 04/23/2025 | 194 | ***SELECTED PARTIES***LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated April 23, 2025 re: 185 LETTER MOTION for Conference *re Withholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated April 14, 2025. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC, Anne Brous, Michelle Schuster. Motion or Order to File Under Seal: 193 .(Watstein, Ryan) (Entered: 04/23/2025) |
| 04/23/2025 | 195 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated April 23, 2025 re: 185 LETTER MOTION for Conference *re Withholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated April 14, 2025. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 04/23/2025) |

| 04/24/2025 | 196 | ORDER granting 193 Letter Motion to Seal Portions of Defendants Response to Plaintiffs April 14, 2025 Letter Motion (ECF No. 185). (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 04/24/2025) |
| 04/24/2025 | 197 | MEMO ENDORSEMENT on re: 194 Response in Opposition to Motion, filed by Eligo Energy, LLC, Eligo Energy NY, LLC. ENDORSEMENT: A telephonic pre-motion conference will be held on May 1, 2025, at 10:30 a.m. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. SO ORDERED. (Signed by Judge Edgardo Ramos on 4/24/2025) (Pre-Motion Conference set for 5/1/2025 at 10:30 AM before Judge Edgardo Ramos.) (ar) (Entered: 04/24/2025) |
| 04/25/2025 | 199 | TRANSCRIPT of Proceedings re: CONFERENCE held on 4/16/2025 before Judge Edgardo Ramos. Court Reporter/Transcriber: Sharonda Jones, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/16/2025. Redacted Transcript Deadline set for 5/27/2025. Release of Transcript Restriction set for 7/24/2025..(McGuirk, Kelly) (Entered: 04/25/2025) |
| 04/25/2025 | 200 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 4/16/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 04/25/2025) |
| 04/25/2025 | | ***DELETED DOCUMENT. Deleted document number 198 Notice of Filing of Transcript. The document was incorrectly filed in this case. (Deleted as per Court Reporters request) (js) (Entered: 04/28/2025) |
| 04/30/2025 | 201 | JOINT LETTER MOTION to Seal *Unseal Provisionally Sealed Portions of Plaintiffs' April 14, 2025 Letter Motion (ECF 184/185)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated April 30, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 04/30/2025) |
| 05/01/2025 | 202 | NOTICE OF APPEARANCE by Ethan Daniel Roman on behalf of Anne Brous, Michelle Schuster..(Roman, Ethan) (Entered: 05/01/2025) |
| 05/01/2025 | 203 | ORDER granting 201 Letter Motion to Seal. The Clerk of the Court is respectfully directed to unseal the April 14, 2025 letter motion, doc. 184. SO ORDERED. (Signed by Judge Edgardo Ramos on 5/1/2025) (jca) (Entered: 05/01/2025) |
| 05/01/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 5/1/2025 by telephone. Plaintiffs' and Defendants' counsel present. Discovery disputes were decided on the record. (jar) (Entered: 05/02/2025) |
| 05/07/2025 | 204 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/1/2025 before Judge Edgardo Ramos. Court Reporter/Transcriber: Lisa O'Brien, (212) 805-0320. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/28/2025. Redacted Transcript Deadline set for 6/9/2025. Release of Transcript Restriction set for 8/5/2025..(McGuirk, Kelly) (Entered: 05/07/2025) |
| 05/07/2025 | 205 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 5/1/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 05/07/2025) |
| 05/07/2025 | 206 | LETTER MOTION for Leave to File Second Amended Class Action Complaint addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 05/07/2025. Document filed by Anne Brous, Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Second Amended Class Action Complaint, # 2 Exhibit B - Redline Comparison).(Blankinship, Douglas) (Entered: 05/07/2025) |
| 05/07/2025 | 207 | ***SELECTED PARTIES*** LETTER MOTION for Leave to File Second Amended Class Action Complaint addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 05/07/2025. Document filed by Ira Brous, Anne Brous, Michelle Schuster, Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit A - Second Amended Class Action Complaint, # 2 Exhibit B - Redline Comparison)Motion or Order to File Under Seal: 179 .(Blankinship, Douglas) (Entered: 05/07/2025) |
| 05/09/2025 | 208 | LETTER MOTION for Local Rule 37.2 Conference *for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated May 9, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 05/09/2025) |
| 05/09/2025 | 209 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 206 LETTER MOTION for Leave to File Second Amended Class Action Complaint addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 05/07/2025 LETTER MOTION to Judge Edgardo Ramos from Ryan Watstein dated May 9, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 05/09/2025) |
| 05/12/2025 | 210 | ORDER granting 209 Letter Motion for Extension of Time to File Response/Reply. Defendants' request is granted. Defendants are directed to respond to Plaintiffs' letter motion by May 19, 2025. Responses due 5/19/2025 (Signed by Judge Edgardo Ramos on 5/12/2025) (rro) (Entered: 05/12/2025) |
| 05/13/2025 | 211 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ethan D. Roman dated 05/13/2025 re: 208 LETTER MOTION for Local Rule 37.2 Conference *for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated May 9, 2025. . Document filed by Anne Brous, Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - DEF034343, # 2 Exhibit B - DEF007563, # 3 Exhibit C - DEF093021, # 4 Exhibit D - Defs.' Supp. Resp. to Pls.' 1st Interrogatories, # 5 Exhibit E - DEF090123, # 6 Exhibit F - NY DoS Filing, # 7 Exhibit G - DEF052971, # 8 Exhibit H - 2024.05.09 Hrg Tr.).(Roman, Ethan) (Entered: 05/13/2025) |
| 05/13/2025 | 212 | LETTER MOTION to Seal *Redact Provisionally Portions of Plaintiffs' Response (and Accompanying Exhibits) to 208 Defendants' Pre-Motion Letter Seeking a Protective Order* addressed to Judge Edgardo Ramos from Ethan D. Roman dated 05/13/2025. Document filed by Anne Brous, Ira Brous, Michelle Schuster..(Roman, Ethan) (Entered: 05/13/2025) |
| 05/13/2025 | 213 | ***SELECTED PARTIES***LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ethan D. Roman dated 05/13/2025 re: 208 LETTER MOTION for Local Rule 37.2 Conference *for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated May 9, 2025. . Document filed by Ira Brous, Anne Brous, Michelle Schuster, Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit A - DEF034343, # 2 Exhibit B - DEF007563, # 3 Exhibit C - DEF093021, # 4 Exhibit D - Defs.' Supp. Resp. to Pls.' 1st Interrogatories, # 5 Exhibit E - DEF090123, # 6 Exhibit F - NY DoS Filing, # 7 Exhibit G - DEF052971, # 8 Exhibit H - 2024.05.09 Hrg Tr.)Motion or Order to File Under Seal: 212 .(Roman, Ethan) (Entered: 05/13/2025) |
| 05/14/2025 | 214 | ORDER granting 208 Letter Motion for Local Rule 37.2 Conference. A telephonic premotion conference will be held on May 20, 2025, at 11:00 AM. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 05/14/2025) |
| 05/15/2025 | 215 | LETTER addressed to Judge Edgardo Ramos from Ryan Watstein dated May 15, 2025 re: Request for an Earlier Hearing Date re: Defendants' Letter-Motion to Quash Depositions (ECF No. 208). Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 05/15/2025) |
| 05/15/2025 | 216 | JOINT LETTER MOTION for Extension of Time of *Remaining Deadlines in Scheduling Order* addressed to Judge Edgardo Ramos from Ryan Watstein dated May 15, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit Ex. A - Proposed Revised Scheduling Order). (Watstein, Ryan) (Entered: 05/15/2025) |

| 05/16/2025 | 217 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ethan D. Roman dated 05/16/2025 re: 208 LETTER MOTION for Local Rule 37.2 Conference *for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated May 9, 2025. *(Supplement Providing Additional Information).* Document filed by Anne Brous, Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit I - DEF050666, # 2 Exhibit J - DEF088659). (Roman, Ethan) (Entered: 05/16/2025) |
| 05/16/2025 | 218 | LETTER MOTION to Seal *(Redact Provisionally Portions of Plaintiffs' Supplement (and Accompanying Exhibits) to* 208 *Defendants' Pre-Motion Letter Seeking a Protective Order)* addressed to Judge Edgardo Ramos from Ethan D. Roman dated 05/16/2025. Document filed by Anne Brous, Ira Brous, Michelle Schuster..(Roman, Ethan) (Entered: 05/16/2025) |
| 05/16/2025 | 219 | ***SELECTED PARTIES***LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ethan D. Roman dated 05/16/2025 re: 208 LETTER MOTION for Local Rule 37.2 Conference *for Protective Order* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated May 9, 2025. *(Supplement Providing Additional Information).* Document filed by Ira Brous, Anne Brous, Michelle Schuster, Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit I - DEF050666, # 2 Exhibit J - DEF088659)Motion or Order to File Under Seal: 218 .(Roman, Ethan) (Entered: 05/16/2025) |
| 05/16/2025 | 220 | MEMO ENDORSEMENT on re: 215 Letter, filed by Eligo Energy, LLC, Eligo Energy NY, LLC. ENDORSEMENT: The telephonic premotion conference presently scheduled for May 20, 2025, is rescheduled for May 19, 2025, at 10:30 a.m. SO ORDERED. (Pre-Motion Conference set for 5/19/2025 at 10:30 AM before Judge Edgardo Ramos.) (Signed by Judge Edgardo Ramos on 5/16/2025) (mml) (Entered: 05/19/2025) |
| 05/16/2025 | 221 | SECOND REVISED CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER granting 216 Letter Motion for Extension of Time. All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Non-expert depositions must be completed by 6/20/2025. Expert Deposition due by 10/17/2025. Discovery due by 10/17/2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 5/16/2025) (mml) (Entered: 05/19/2025) |
| 05/19/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 5/19/2025 by telephone. Plaintiffs' and Defendants' counsel present. For the reasons stated on the record, the motion for a protective order as to Mr. Friedgan is granted and the motion for a protective order for Mr. Goldstein is granted without prejudice. (jar) (Entered: 05/19/2025) |
| 05/19/2025 | 222 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan Watstein dated May 19, 2025 re: 206 LETTER MOTION for Leave to File Second Amended Class Action Complaint addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 05/07/2025 . . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit A - Plaintiffs' Baldwin Discovery Requests).(Watstein, Ryan) (Entered: 05/19/2025) |
| 05/23/2025 | 223 | ORDER granting 218 Letter Motion to Seal. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 05/23/2025) |
| 05/23/2025 | 224 | ORDER granting 206 Motion for Leave to File Document. A telephonic premotion conference will be held on June 6, 2025, at 10 a.m. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 05/23/2025) |
| 05/27/2025 | 225 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/9/2024 before Judge Edgardo Ramos. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/17/2025. Redacted Transcript Deadline set for 6/27/2025. Release of Transcript Restriction set for 8/25/2025..(McGuirk, Kelly) (Entered: 05/27/2025) |
| 05/27/2025 | 226 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 5/9/2024 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 05/27/2025) |
| 05/30/2025 | 227 | JOINT LETTER MOTION to Seal *Limited Portions of Plaintiffs' Responses to Defendants' Motion for Protective Order (ECF Nos. 213 & 219)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated May 30, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 05/30/2025) |
| 06/02/2025 | 228 | ORDER granting 227 Letter Motion to Seal *Limited Portions of Plaintiffs' Responses to Defendants' Motion for Protective Order (ECF Nos. 213 & 219).* (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 06/02/2025) |
| 06/04/2025 | 229 | NOTICE OF APPEARANCE by Andrey Belenky on behalf of Anne Brous, Michelle Schuster..(Belenky, Andrey) (Entered: 06/04/2025) |
| 06/06/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre-Motion Conference held on 6/6/2025 by telephone. Plaintiffs' and Defendants' counsel, present. Plaintiffs were granted leave to file a motion to second amended class action complaint with the following briefing schedule: moving papers due June 27, 2025; opposition due July 18, 2025; and reply due July 25, 2025. (jar) (Entered: 06/06/2025) |
| 06/06/2025 | 230 | ORDER with respect to 140 Motion to Dismiss. For the avoidance of doubt, although at today's conference the Court granted Plaintiffs leave to move to amend the complaint, the Court does not agree with Plaintiffs' counsel that such motion "moots" the pending motion to dismiss. Doc. 140. The pending motion to dismiss will be adjudicated by the Court. IT SO ORDERED.. (Signed by Judge Edgardo Ramos on 6/6/2025) (jca) (Entered: 06/06/2025) |
| 06/09/2025 | 231 | TRANSCRIPT of Proceedings re: MOTION held on 5/19/2025 before Judge Edgardo Ramos. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/30/2025. Redacted Transcript Deadline set for 7/10/2025. Release of Transcript Restriction set for 9/8/2025..(McGuirk, Kelly) (Entered: 06/09/2025) |
| 06/09/2025 | 232 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a MOTION proceeding held on 5/19/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 06/09/2025) |
| 06/09/2025 | 233 | NOTICE of Withdrawal of Opposition re: 152 Memorandum of Law in Opposition to Motion,, 140 MOTION to Dismiss *or Strike Amended Complaint..* Document filed by Anne Brous, Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 06/09/2025) |
| 06/12/2025 | 234 | LETTER MOTION for Leave to File Response *to Plaintiffs' Notice of Non-Opposition to Eligo's Motion to Dismiss/Strike Non-New York Claims (ECF No. 233.)* addressed to Judge Edgardo Ramos from Ryan D. Watstein dated June 12, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC.. (Watstein, Ryan) (Entered: 06/12/2025) |
| 06/13/2025 | 235 | ORDER granting 234 Letter Motion for Leave to File Document. Defendants' request to file a response to Plaintiffs' notice of withdrawal is granted. Defendants are directed to file a response by June 20, 2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 6/13/2025) (jca) (Entered: 06/13/2025) |
| 06/13/2025 | | Set/Reset Deadlines: Responses due by 6/20/2025 (jca) (Entered: 06/13/2025) |
| 06/13/2025 | 236 | LETTER MOTION for Extension of Time *to Take the Deposition of Ramsey Brous* addressed to Judge Edgardo Ramos from Ryan Watstein dated June 13, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 06/13/2025) |
| 06/16/2025 | 237 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from D Greg Blankinship dated June 16, 2025 re: 236 LETTER MOTION for Extension of Time *to Take the Deposition of Ramsey Brous* addressed to Judge Edgardo Ramos from Ryan Watstein dated June 13, 2025. . Document filed by Anne Brous, Michelle Schuster.(Blankinship, Douglas) (Entered: 06/16/2025) |
| 06/17/2025 | 238 | ORDER denying as moot 236 Letter Motion for Extension of Time. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 06/17/2025) |

| | | |
|---|---|---|
| 06/20/2025 | 239 | NOTICE of Response to Plaintiffs' Notice of Withdrawal of Opposition to the Motion to Dismiss/Strike Non-New York Claims re: 235 Order on Motion for Leave to File Document, 233 Notice (Other). Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit 1 - Notice of Filing, # 2 Exhibit 2 - Proposed Order Granting Defendants' Partial Motion to Dismiss or Strike the First Amended Complaint).(Watstein, Ryan) (Entered: 06/20/2025) |
| 06/24/2025 | 240 | LETTER MOTION for Local Rule 37.2 Conference re Renewed Motion to Compel Complaint-Related Discovery addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 06/24/2025. Document filed by Anne Brous, Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Declaration of Elizabeth Stone, # 2 Exhibit B - 2025.04.16 Disco. Hr'g Tr.).(Blankinship, Douglas) (Entered: 06/24/2025) |
| 06/26/2025 | 241 | LETTER addressed to Judge Edgardo Ramos from D. Greg Blankinship dated June 26, 2025 re: Status of Forthcoming Discovery Disputes and Case Management Proposals. Document filed by Anne Brous, Michelle Schuster.(Blankinship, Douglas) (Entered: 06/26/2025) |
| 06/27/2025 | 242 | MEMO ENDORSEMENT on re: 241 Letter filed by Anne Brous, Michelle Schuster. ENDORSEMENT: Defendants are directed to respond by July 1, 2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 6/27/2025) (tg) (Entered: 06/27/2025) |
| 06/27/2025 | 243 | LETTER MOTION for Extension of Time to File Response/Reply to ECF No. 240, Renewed Letter Motion to Compel Complaint-Related Discovery addressed to Judge Edgardo Ramos from Ryan D. Watstein dated June 27, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 06/27/2025) |
| 06/27/2025 | 244 | ORDER with respect to 240 Letter Motion for Local Rule 37.2 Conference. Defendants' request is granted. Defendants are directed to respond to Plaintiffs' letter motion, Doc. 240, by July 11, 2025. SO ORDERED. (Signed by Judge Edgardo Ramos on 6/27/2025) (jca) (Entered: 06/27/2025) |
| 06/27/2025 | | Set/Reset Deadlines: Responses due by 7/11/2025 (jca) (Entered: 06/27/2025) |
| 06/27/2025 | 245 | ORDER granting 240 Letter Motion for Local Rule 37.2 Conference. A telephonic pre-motion conference will be held on July 16, 2025, at 10:00 AM. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 06/27/2025) |
| 06/27/2025 | 246 | ***SELECTED PARTIES*** MOTION for Leave to File Second Amended Class Action Complaint . Document filed by Ira Brous, Anne Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Proposed Second Amended Class Action Complaint, # 2 Exhibit B - Redline to First Amended Class Action Complaint)Motion or Order to File Under Seal: 128 .(McInturff, J. Burkett) (Entered: 06/27/2025) |
| 06/27/2025 | 247 | MOTION for Leave to File Second Amended Class Action Complaint . Document filed by Anne Brous, Ira Brous, Michelle Schuster. (Attachments: # 1 Exhibit A - Proposed Second Amended Class Action Complaint, # 2 Exhibit B - Redline to First Amended Class Action Complaint).(McInturff, J. Burkett) (Entered: 06/27/2025) |
| 06/27/2025 | 248 | MEMORANDUM OF LAW in Support re: 246 MOTION for Leave to File Second Amended Class Action Complaint . . Document filed by Anne Brous, Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 06/27/2025) |
| 07/01/2025 | 249 | LETTER addressed to Judge Edgardo Ramos from Ryan D. Watstein dated July 1, 2025 re: Response to Plaintiffs' Status Update Letter (ECF No. 241). Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 07/01/2025) |
| 07/02/2025 | 250 | MEMO ENDORSEMENT on re: 249 Letter filed by Eligo Energy NY, LLC, Eligo Energy, LLC. ENDORSEMENT: The Court has reviewed the letters. Docs. 241 and 249, and will continue to address discovery disputes as they arise in the ordinary course. SO ORDERED. (Signed by Judge Edgardo Ramos on 7/2/2025) (jca) (Entered: 07/02/2025) |
| 07/03/2025 | 251 | LETTER MOTION for Extension of Time of Remaining Scheduling Order Deadlines addressed to Judge Edgardo Ramos from D. Greg Blankinship dated July 3, 2025. Document filed by Anne Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Proposed Revised Case Discovery Plan, # 2 Exhibit 2 - July 2, 2025 Email Correspondence).(Blankinship, Douglas) (Entered: 07/03/2025) |
| 07/07/2025 | 252 | REDACTION to 213 Response in Opposition to Motion,,, from Ethan D. Roman dated 05/13/2025 re: 208 LETTER MOTION for Local Rule 37.2 Conference for Protective Order. (See also Order 228 granting parties' joint motion to seal ECF No. 213 with narrowed redactions). Document filed by Anne Brous, Michelle Schuster. (McInturff, J. Burkett) (Entered: 07/07/2025) |
| 07/07/2025 | 253 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated July 7, 2025 re: 251 LETTER MOTION for Extension of Time of Remaining Scheduling Order Deadlines addressed to Judge Edgardo Ramos from D. Greg Blankinship dated July 3, 2025 . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 07/07/2025) |
| 07/08/2025 | 254 | CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER granting 251 Letter Motion for Extension of Time. All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Non-expert depositions shall be completed by 6/20/25. 19. The next case management conference is scheduled for November 14, 2025 at 11 AM. The Clerk of the Court is respectfully directed to terminate the motion, doc. 251. Deposition due by 11/14/2025. Discovery due by 11/14/2025.. (Signed by Judge Edgardo Ramos on 7/8/2025) (sgz) (Entered: 07/09/2025) |
| 07/08/2025 | | Set/Reset Hearings: Case Management Conference set for 11/14/2025 at 11:00 AM before Judge Edgardo Ramos. (sgz) (Entered: 07/09/2025) |
| 07/11/2025 | 255 | LETTER RESPONSE to Motion addressed to Judge Edgardo Ramos from Ryan D. Watstein dated July 11, 2025 re: 240 LETTER MOTION for Local Rule 37.2 Conference re Renewed Motion to Compel Complaint-Related Discovery addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 06/24/2025 . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit 1 - Email).(Watstein, Ryan) (Entered: 07/11/2025) |
| 07/16/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Telephone Pre-Motion Conference held on 7/16/2025. Plaintiffs' and Defendants' counsel present. For the reasons stated on the record, Plaintiffs' renewed motion to compel Defendants to produce discovery regarding customer complaints is denied. (jar) (Entered: 07/16/2025) |
| 07/18/2025 | 256 | RESPONSE in Opposition to Motion re: 247 MOTION for Leave to File Second Amended Class Action Complaint . . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 07/18/2025) |
| 07/21/2025 | 257 | LETTER MOTION for Local Rule 37.2 Conference re Production of Customer-Level Data addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 07/21/2025. Document filed by Anne Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 07/21/2025) |
| 07/24/2025 | 258 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan Watstein dated July 24, 2025 re: 257 LETTER MOTION for Local Rule 37.2 Conference re Production of Customer-Level Data addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 07/21/2025. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit A - 2024-11-07 Hearing Transcript).(Watstein, Ryan) (Entered: 07/24/2025) |
| 07/25/2025 | 259 | NOTICE OF CHANGE OF ADDRESS by Ryan D. Watstein on behalf of Eligo Energy NY, LLC, Eligo Energy, LLC. New Address: Watstein Terepka LLP, 75 14th Street NE, Ste. 2600, ATLANTA, GA, United States 30309,..(Watstein, Ryan) (Entered: 07/25/2025) |
| 07/25/2025 | 260 | REPLY MEMORANDUM OF LAW in Support re: 247 MOTION for Leave to File Second Amended Class Action Complaint . . Document filed by Anne Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 07/25/2025) |
| 07/29/2025 | 261 | ORDER granting 257 Letter Motion for Local Rule 37.2 Conference. A telephonic pre-motion conference will be held on August 8, 2025, at 11:30 AM. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. SO ORDERED. Telephone Conference set for 8/8/2025 at 11:30 AM before Judge Edgardo Ramos.. (Signed by Judge Edgardo Ramos on 7/29/2025) (jca) (Entered: 07/29/2025) |

| 08/04/2025 | 262 | CONSENT LETTER MOTION to Seal *ECF No. 151* addressed to Judge Edgardo Ramos from Jessica L. Hunter dated 08/04/2025. Document filed by Anne Brous, Michelle Schuster..(Hunter, Jessica) (Entered: 08/04/2025) |
| 08/07/2025 | 263 | ORDER granting 262 Letter Motion to Seal. The application to seal the order is granted. The Clerk of the Court is respectfully directed to modify the viewing level for Order, doc. 151, to case participants.SO ORDERED. (Signed by Judge Edgardo Ramos on 8/7/2025) (sgz) (Entered: 08/08/2025) |
| 08/08/2025 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Telephonic Pre-Motion Conference held on 8/8/2025. Plaintiffs' and Defendants' counsel present. For the reasons stated on the record, Plaintiffs' motion to compel defendants to produce customer-level data predating 2018 is denied. (jar) (Entered: 08/29/2025) |
| 08/14/2025 | 264 | CONSENT LETTER MOTION for Extension of Time to Complete Discovery *with Proposed Revised Scheduling Order* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated August 14, 2025. Document filed by Anne Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Proposed Revised Scheduling Order).(Blankinship, Douglas) (Entered: 08/14/2025) |
| 08/15/2025 | 265 | THIRD REVISED CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER granting 264 Letter Motion for Extension of Time to Complete Discovery. All parties do not consent to conduct all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). This case is to be tried to a jury. Expert Deposition due by 12/5/2025. Discovery due by 12/5/2025. The next case management conference presently scheduled for November 14, 2025, is adjourned to December 5, 2025, at 11:30 a.m. SO ORDERED. (Signed by Judge Edgardo Ramos on 8/15/2025) (mml) (Entered: 08/18/2025) |
| 08/18/2025 | | Set/Reset Hearings: Case Management Conference set for 12/5/2025 at 11:30 AM before Judge Edgardo Ramos. (mml) (Entered: 08/18/2025) |
| 09/05/2025 | 266 | LETTER MOTION for Conference *re Withholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 5, 2025. Document filed by Anne Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Email Correspondence, # 2 Exhibit 2 - May 6, 2025 Glotzbach Deposition Transcript Excerpt, # 3 Exhibit 3 - RMPC Report).(Blankinship, Douglas) (Entered: 09/05/2025) |
| 09/05/2025 | 267 | LETTER MOTION to Seal */Redact Provisionally Letter Motion for Conference re Witholding of Discovery (ECF No. 266)* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 5, 2025. Document filed by Anne Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 09/05/2025) |
| 09/05/2025 | 268 | ***SELECTED PARTIES*** LETTER MOTION for Conference *re Witholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 5, 2025. Document filed by Anne Brous, Michelle Schuster. (Attachments: # 1 Exhibit 1 - Email Correspondence, # 2 Exhibit 2 - May 6, 2025 Glotzbach Deposition Transcript Excerpt, # 3 Exhibit 3 - RMPC Report)Motion or Order to File Under Seal: 267 .(Blankinship, Douglas) (Entered: 09/05/2025) |
| 09/08/2025 | 269 | ORDER granting 267 Letter Motion to Seal */Redact Provisionally Letter Motion for Conference re Witholding of Discovery (ECF No. 266)*. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 09/08/2025) |
| 09/08/2025 | 270 | ORDER granting 266 Letter Motion for Conference. Eligo is directed to respond by September 16, 2025. A telephonic premotion conference will be held on September 24, 2025, at 11:30 AM. The parties are instructed to call (855) 244-8681; enter access code 2301 087 7354#; and enter # again when asked to enter the attendee ID number. The parties are further instructed to join the call five (5) minutes prior to the conferences start time. (HEREBY ORDERED by Judge Edgardo Ramos)(Text Only Order) (jar) (Entered: 09/08/2025) |
| 09/12/2025 | 271 | OPINION & ORDER re: 140 MOTION to Dismiss or Strike Amended Complaint. filed by Eligo Energy, LLC, Eligo Energy NY, LLC, 207 LETTER MOTION for Leave to File Second Amended Class Action Complaint addressed to Judge Edgardo Ramos from D. Greg Blankinship dated 05/07/2025. filed by Anne Brous, Ira Brous, Michelle Schuster, 246 MOTION for Leave to File Second Amended Class Action Complaint . filed by Anne Brous, Ira Brous, Michelle Schuster, 247 MOTION for Leave to File Second Amended Class Action Complaint . filed by Anne Brous, Ira Brous, Michelle Schuster. For the reasons set forth above, Plaintiffs' motion for leave to file a second amended complaint is GRANTED, and Eligo's motion to dismiss is DENIED as moot. The Clerk of Court is respectfully directed to terminate the motions, Docs. 140, 207, 246, 247. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 9/12/2025) (rro) (Entered: 09/15/2025) |
| 09/16/2025 | 272 | SECOND AMENDED COMPLAINT amending 120 Amended Complaint, against Eligo Energy NY, LLC, Eligo Energy, LLC with JURY DEMAND.Document filed by Anne Brous, Michelle Schuster. Related document: 120 Amended Complaint,. (Attachments: # 1 Exhibit A to Amended Complaint, Brous Contract, # 2 Exhibit B to Amended Complaint, # 3 Exhibit Order Authorizing Amendment of Pleadings).(Blankinship, Douglas) (Entered: 09/16/2025) |
| 09/16/2025 | 273 | LETTER RESPONSE in Opposition to Motion addressed to Judge Edgardo Ramos from Ryan Watstein dated September 16, 2025 re: 268 LETTER MOTION for Conference *re Witholding of Discovery* addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 5, 2025. . Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 09/16/2025) |
| 09/17/2025 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Douglas Gregory Blankinship. The party information for the following party/parties has been modified: Anne Brous. The information for the party/parties has been modified for the following reason/reasons: party text was omitted;. (jgo) (Entered: 09/17/2025) |
| 09/18/2025 | 274 | LETTER addressed to Judge Edgardo Ramos from D. Greg Blankinship dated September 18, 2025 re: Notice of Withdrawal of Letter Motion ECF 268. Document filed by Anne Brous, Michelle Schuster..(Blankinship, Douglas) (Entered: 09/18/2025) |
| 09/18/2025 | 275 | ***SELECTED PARTIES***SECOND AMENDED COMPLAINT amending 120 Amended Complaint, against Eligo Energy NY, LLC, Eligo Energy, LLC with JURY DEMAND.Document filed by Eligo Energy NY, LLC, Anne Brous, Eligo Energy, LLC, Michelle Schuster. Related document: 120 Amended Complaint,. (Attachments: # 1 Exhibit A to Amended Complaint, Brous Contract, # 2 Exhibit B to Amended Complaint, Schuster Contract)Motion or Order to File Under Seal: 179 .(McInturff, J. Burkett) (Entered: 09/18/2025) |
| 09/18/2025 | 276 | MEMO ENDORSEMENT on re: 274 Letter filed by Anne Brous, Michelle Schuster. ENDORSEMENT: The premotion conference scheduled for September 24, 2025, is hereby canceled. SO ORDERED. (Signed by Judge Edgardo Ramos on 9/18/2025) (mml) (Entered: 09/19/2025) |
| 09/23/2025 | 277 | LETTER MOTION to Compel Communications Involving Ramsey Brous addressed to Judge Edgardo Ramos from Ryan Watstein dated September 23, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC. (Attachments: # 1 Exhibit 1 - Ramsey Brous Deposition Excerpts, # 2 Exhibit - Anne Brous Deposition Excerpts).(Watstein, Ryan) (Entered: 09/23/2025) |
| 09/24/2025 | 278 | LETTER MOTION to Seal */Unseal Portions of Plaintiffs' Letter Motion for Discovery into Hedging Costs (ECF 266/268)* addressed to Judge Edgardo Ramos from September 24, 2025 dated September 24, 2025. Document filed by Eligo Energy NY, LLC, Eligo Energy, LLC..(Watstein, Ryan) (Entered: 09/24/2025) |
| 09/25/2025 | 279 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply as to 277 LETTER MOTION to Compel Communications Involving Ramsey Brous addressed to Judge Edgardo Ramos from Ryan Watstein dated September 23, 2025. addressed to Judge Edgardo Ramos from J. Burkett McInturff dated September 25, 2025. Document filed by Anne Brous, Ira Brous, Michelle Schuster..(McInturff, J. Burkett) (Entered: 09/25/2025) |

| **PACER Service Center** | | |
| **Transaction Receipt** | | |
| 09/26/2025 11:34:55 | | |
| **PACER Login:** | rwatstein0093945 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-01260-ER |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# EXHIBIT 10

# FBFG | Finkelstein, Blankinship, Frei-Pearson & Garber, LLP

One North Broadway, Suite 900
WHITE PLAINS, NY 10601
Phone: (914) 298-3281
Fax: (845) 562-3492
www.fbfglaw.com

**VIA EMAIL**                                                    September 29, 2025

David Meadows
Watstein Terepka LLP
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
dmeadows@wtlaw.com

> **Re:** ***Brous et al. v. Eligo Energy, LLC, et al., 24 Civ. 1260 (S.D.N.Y);***
> ***Bodkin et al. v. Eligo Energy, LLC et al., 25 Civ. 94 (W.D. Pa.);***
> ***Orzolek v. Eligo Energy, LLC et al., 25 Civ. 78 (S.D. Ohio);***
> ***Whiteside v. Eligo Energy, LLC et al., 25 Civ. 02532 (D. Md.)***

Mr. Meadows:

We write to reiterate Plaintiffs' offer to engage in informally coordinated discovery amongst the four cases in which all of the Plaintiffs are represented by Wittels McInturff Palikovic and Finkelsten, Blankinship, Frei-Pearson & Garber, LLP and all Defendants are represented by your firm: *Brous et al. v. Eligo Energy, LLC et al.*, 24 Civ. 1260 (S.D.N.Y); *Bodkin et al. v. Eligo Energy, LLC et al.*, 25 Civ. 94 (W.D. Pa.); *Orzolek v. Eligo Energy, LLC et al.*, 25 Civ. 78 (S.D. Ohio); *Whiteside v. Eligo Energy, LLC et al.*, 25 Civ. 02532 (D. Md.).

To avoid duplicative discovery, and for the convenience of the parties and witnesses, we propose (as we have before) that:

- The parties agree that any documents, data, or deposition testimony obtained in one case can be used in all cases;
- The exact same documents or data produced in one case need not be re-produced in another case;
- Plaintiffs will use their best efforts not to unnecessarily ask the same questions already put to deponents who have been deposed in one of the four cases; and
- Plaintiffs will continue to travel to whatever location is most convenient for the witnesses, irrespective of the Court in which a case is pending.

Plaintiffs will also consider any reasonable proposals Defendants might have.

Dated: September 29, 2025
      White Plains, New York

                          Thank you,

                        By: */s/ D. Greg Blankinship*
                            D. Greg Blankinship
                            **FINKELSTEIN, BLANKINSHIP,**
                            **FREI-PEARSON & GARBER, LLP**
                            One North Broadway, Suite 900
                            White Plains, New York 10601
                            Tel: (914) 298-3281
                            Fax: (914) 824-1561
                            gblankinship@fbfglaw.com

CC: All Counsel of Record (via email)

# EXHIBIT 11

JURY,STAYED

**U.S. District Court**
**Southern District of Ohio (Columbus)**
**CIVIL DOCKET FOR CASE #: 2:25-cv-00078-SDM-EPD**

Orzolek v. Eligo Energy, LLC et al
Assigned to: Chief District Judge Sarah D. Morrison
Referred to: Magistrate Judge Elizabeth Preston Deavers
Cause: 28:1332 Diversity-Contract Default

Date Filed: 01/30/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Thomas Orzolek**
*on behalf of himself and all others similarly situated*

represented by **Jeffrey Scott Goldenberg**
Goldenberg Schneider, LPA
4445 Lake Forest Drive
Suite 490
Cincinnati, OH 45242
513-345-8291
Fax: 513-345-8294
Email: jgoldenberg@gs-legal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas Greg Blankinship**
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
One North Broadway
Suite 900
White Plains, NY 10601
914-298-3290
Email: gblankinship@fbfglaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Burkett McInturff**
Wittels McInturff Palikovic
305 Broadway
Floor 7
New York, NY 10007
914-775-8862
Email: jbm@wittelslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eligo Energy, LLC**

represented by **Keith Dye**
Watstein Terepka LLP
75 14th Street NE
Suite 2600
Atlanta, GA 30309
404-600-1415
Email: kdye@wtlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leo Patrick O'Toole**
Watstein Terepka LLP
1055 Howell Mill Road
Atlanta, GA 30318
404-779-5190
Email: lotoole@wtlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan David Watstein**
Watstein Terepka LLP
75 14th Street NE
Ste 2600
Atlanta, GA 30309
404-782-0695
Email: ryan@wtlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eligo Energy OH, LLC**

represented by **Keith Dye**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leo Patrick O'Toole**
(See above for address)
*PRO HAC VICE*

ATTORNEY TO BE NOTICED

**Ryan David Watstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/30/2025 | 1 | COMPLAINT with JURY DEMAND against Eligo Energy OH, LLC, Eligo Energy, LLC ( Filing fee $ 405 paid - receipt number: AOHSDC-10353391), filed by Thomas Orzolek. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Eligo Energy, # 3 Summons Eligo Energy OH) (Goldenberg, Jeffrey) (Entered: 01/30/2025) |
| 01/31/2025 | 2 | Summons Issued as to Eligo Energy OH, LLC, Eligo Energy, LLC. (mas) (Entered: 01/31/2025) |
| 01/31/2025 | 3 | MOTION for Leave to Appear Pro Hac Vice (Filing fee $200 paid, receipt number AOHSDC-10355968) of D. Greg Blankinship by Plaintiff Thomas Orzolek. (Attachments: # 1 Certificate of Good Standing) (Goldenberg, Jeffrey) (Entered: 01/31/2025) |
| 01/31/2025 | 4 | MOTION for Leave to Appear Pro Hac Vice (Filing fee $200 paid, receipt number AOHSDC-10355973) of J. Burkett McInturff by Plaintiff Thomas Orzolek. (Attachments: # 1 Certificate of Good Standing) (Goldenberg, Jeffrey) (Entered: 01/31/2025) |
| 02/05/2025 | 5 | NOTATION ORDER granting 3 4 Motions for Leave to Appear Pro Hac Vice of D. Greg Blankinship and J. Burkett McInturff as Co-Counsel. Co-Counsel is directed to register for e-filing through PACER unless they have done so previously. Signed by Magistrate Judge Elizabeth Preston Deavers on 2/5/25. (sem) (Entered: 02/05/2025) |
| 02/07/2025 | 6 | WAIVER OF SERVICE Returned Executed. Waiver sent to Eligo Energy OH, LLC on 1/31/2025, answer due 4/1/2025. (McInturff, James) (Entered: 02/07/2025) |
| 02/07/2025 | 7 | WAIVER OF SERVICE Returned Executed. Waiver sent to Eligo Energy, LLC on 1/31/2025, answer due 4/1/2025. (McInturff, James) (Entered: 02/07/2025) |
| 03/31/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice (Filing fee $200 paid, receipt number AOHSDC-10441603) of Ryan D. Watstein by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Dye, Keith) (Entered: 03/31/2025) |
| 03/31/2025 | 9 | Corporate Disclosure Statement by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Dye, Keith) (Entered: 03/31/2025) |
| 04/01/2025 | 10 | NOTATION ORDER granting 8 Motion for Leave to Appear Pro Hac Vice of Ryan D Watstein as co-counsel. Co-counsel is directed to register for e-filing through PACER unless they have done so previously. Signed by Magistrate Judge Elizabeth Preston Deavers on 4/1/2025. (kk2) (Entered: 04/01/2025) |
| 04/01/2025 | 11 | MOTION to Dismiss *or, in the Alternative, to Stay the Case under the First-to-File Doctrine* by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Attachments: # 1 Affidavit Declaration of Andrew LaPointe in Support of Defendants' Motion to Dismiss, # 2 Exhibit A - Orzolek Contract, # 3 Exhibit B - Orzolek Renewal Offer) (Dye, Keith) (Entered: 04/01/2025) |
| 04/02/2025 | 12 | NOTICE of Hearing:<br><br>Counsel shall call 11-551-285-1373 to participate in the telephone conference with Magistrate Judge Elizabeth Preston Deavers. The Meeting ID is 161 603 4081 and the Meeting Passcode is 581746.<br><br>**NOTE: You will be required to use this information each time the Court conducts a telephone conference before Magistrate Judge Deavers unless otherwise instructed.**Preliminary Pretrial Conference set for 4/30/2025 10:00 AM in Zoom Meeting before Magistrate Judge Elizabeth Preston Deavers. (sln) Modified on 4/25/2025 (sln). (Entered: 04/02/2025) |
| 04/03/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice (Filing fee $200 paid, receipt number AOHSDC-10448294) of Leo P. O'Toole by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Dye, Keith) (Entered: 04/03/2025) |
| 04/04/2025 | 14 | NOTATION ORDER granting 13 Motion for Leave to Appear Pro Hac Vice of Leo P O'Toole as co-counsel. Co-counsel is directed to register for e-filing through PACER unless they have done so previously. Signed by Magistrate Judge Elizabeth Preston Deavers on 4/4/2025. (kk2) (Entered: 04/04/2025) |
| 04/09/2025 | 15 | Consent MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss *or, in the Alternative, to Stay the Case under the First-to-File Doctrine* New date requested 5/8/2025. by Plaintiff Thomas Orzolek. (Attachments: # 1 Text of Proposed Order) (McInturff, James) (Entered: 04/09/2025) |
| 04/10/2025 | 16 | NOTATION ORDER granting 15 Motion for Extension of Time to File Response to 11 MOTION to Dismiss or, in the Alternative, to Stay the Case under the First-to-File Doctrine. Response due by 5/8/2025. Signed by Magistrate Judge Elizabeth Preston Deavers on 4/10/2025. (EPD) (Entered: 04/10/2025) |
| 04/24/2025 | 17 | RULE 26(f) REPORT by Plaintiff Thomas Orzolek. (McInturff, James) (Entered: 04/24/2025) |
| 04/30/2025 | | Minute Entry for proceedings held before Magistrate Judge Elizabeth Preston Deavers: Preliminary Pretrial Conference held on 4/30/2025. Discovery temporarily stayed. Defendant's will file a Motion to Stay Discovery by 5/9/2025. (sln) (Entered: 04/30/2025) |
| 05/08/2025 | 18 | Unopposed MOTION for Extension of Time to File *Motion to Stay Discovery* by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. New date requested 5/16/2025. (Watstein, Ryan) Modified on 5/9/2025 to correct text (kk2) (Entered: 05/08/2025) |
| 05/08/2025 | 19 | RESPONSE in Opposition re 11 MOTION to Dismiss *or, in the Alternative, to Stay the Case under the First-to-File Doctrine* filed by Plaintiff Thomas Orzolek. (McInturff, James) (Entered: 05/08/2025) |
| 05/09/2025 | 20 | NOTATION ORDER granting 18 Motion for Extension of Time to File Motion to Stay Discovery. Motion to Stay Discovery due by 5/16/2025. Signed by Magistrate Judge Elizabeth Preston Deavers on 5/9/2025. (EPD) (Entered: 05/09/2025) |
| 05/16/2025 | 21 | MOTION to Stay *Discovery* by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Watstein, Ryan) (Entered: 05/16/2025) |
| 05/20/2025 | 22 | Unopposed MOTION for Extension of Time to File Response/Reply as to 11 MOTION to Dismiss *or, in the Alternative, to Stay the Case under the First-to-File Doctrine* New date requested 6/5/2025. by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Attachments: # 1 Text of Proposed Order Proposed Order) (Watstein, Ryan) (Entered: 05/20/2025) |
| 05/21/2025 | 23 | NOTATION ORDER granting 22 Motion for Extension of Time to File Reply to 11 MOTION to Dismiss *or, in the Alternative, to Stay the Case under the First-to-File Doctrine* Reply due by 6/5/2025. Signed by Magistrate Judge Elizabeth Preston Deavers on 5/21/2025. (EPD) (Entered: 05/21/2025) |
| 05/23/2025 | 24 | RESPONSE in Opposition re 21 MOTION to Stay *Discovery* filed by Plaintiff Thomas Orzolek. (Attachments: # 1 Exhibit A - May 9, 2024 Tr., # 2 Exhibit B - Brous ECF No. 169, # 3 Exhibit C - Brous ECF No. 141) (McInturff, James) (Entered: 05/23/2025) |
| 05/30/2025 | 25 | REPLY to Response to Motion re 21 MOTION to Stay *Discovery* filed by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Watstein, Ryan) (Entered: 05/30/2025) |
| 06/05/2025 | 26 | REPLY to Response to Motion re 11 MOTION to Dismiss *or, in the Alternative, to Stay the Case under the First-to-File Doctrine* filed by Defendants Eligo Energy OH, LLC, Eligo Energy, LLC. (Watstein, Ryan) (Entered: 06/05/2025) |
| 07/25/2025 | 27 | NOTICE of Change of Address by Ryan David Watstein (Watstein, Ryan) (Entered: 07/25/2025) |

| 09/16/2025 | 28 | ORDER STAYING CASE - the Court hereby STAYS this case until the Bodkin court issues its decision on the pending motion to amend the complaint. The parties are ORDERED to file a joint status report in 6 months or when that decision has been issued, whichever is earlier. Status Report will be due on or before 3/16/2026. Signed by Chief District Judge Sarah D. Morrison on 9/16/2025. (tb) (Entered: 09/16/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/26/2025 11:45:21 | | |
| **PACER Login:** | rwatstein0093945 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:25-cv-00078-SDM-EPD |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# BEFORE THE UNITED STATES JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

**IN RE:** Eligo Energy Litigation                                MDL-_____

## PROOF OF SERVICE

In compliance with Rule 4.1(a) of the Rule of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that I caused a true and correct copy of the foregoing Motion, Brief, Schedule of Actions, copies of Complaints and dockets, and this Certificate of Service to be served by email on September 30, 2025 to the following:

\*\*\*

**Clerk of Courts**

| | |
|---|---|
| Clerk, Southern District of New York<br>New York, New York | Clerk, Western District of Pennsylvania<br>Pittsburgh, Pennsylvania |
| Clerk, Southern District of Ohio<br>Columbus, Ohio | Clerk, Maryland<br>Baltimore, Maryland |

\*\*\*

**Anne Brous, as Executrix of the Estate of Ira Brous and Michelle Schuster, on behalf of themselves and all others similarly situated v. Eligo Energy, LLC and Eligo Energy NY, LLC, No. 1:24-cv-01260-ER (S.D.N.Y.).**

| | |
|---|---|
| Daniel James Martin<br>Douglas Gregory Blankinship<br>Erin Kelley<br>Finkelstein, Blankinship, Frei-Pearson &<br>Garber, LLP<br>One North Broadway, Suite 900<br>White Plains, NY 10601<br>Email: dmartin@fbfglaw.com<br>Email: gblankinship@fbfglaw.com<br>Email: ekelley@fbfglaw.com | Daniel James Martin<br>Douglas Gregory Blankinship<br>Erin Kelley<br>Finkelstein, Blankinship, Frei-Pearson &<br>Garber, LLP<br>One North Broadway, Suite 900<br>White Plains, NY 10601<br>Email: dmartin@fbfglaw.com<br>Email: gblankinship@fbfglaw.com<br>Email: ekelley@fbfglaw.com |

Ethan Daniel Roman
Audrey Belenky
Wittels McInturff Palikovic
305 Broadway, Floor 7
New York, NY 10007
Email: edr@wittelslaw.com
Email: abelenky@wittelslaw.com

Jessica Hunter
Tiasha Palikovic
J. Burkett McInturff
Wittels McInturff Palikovic
18 Half Mile Road
Armonk, NY 10504
Email: jlh@wittelslaw.com
Email: tpalikovic@wittelslaw.com
Email: jbm@wittelslaw.com

*Counsel for Plaintiffs*

\*\*\*

**Tina Bodkin, on behalf of herself and all others similarly situated v. Eligo Energy, LLC and Eligo Energy PA, LLC, No. 2:25-cv-00094-CB (W.D. Pa.).**

Douglas Gregory Blankenship
Finkelstein, Blankinship, Frei-Pearson &
Garber, LLP
One North Broadway, Suite 900
White Plains, NY 10601
Email: gblankinship@fbfglaw.com

James Burkett McInturff
Wittels McInturff Palikovic
305 Broadway, Floor 7
New York, NY 10007
Email: jbm@wittelslaw.com

Jessica Hunter
James Burkett McInturff, III
Wittels McInturff Palikovic
18 Half Mile Road
Armonk, NY 10504
Email: jlh@wittelslaw.com
Email: jbm@wittelslaw.com

Nicholas Katko
Edgar Snyder & Associates, LLC
225 North Shore Drive, Suite 200
Pittsburgh, PA 15212
Email: nkatko@edgarsnyder.com

*Counsel for Plaintiff*

\*\*\*

**Thomas Orozolek, on behalf of himself and all others similarly situated v. Eligo Energy, LLC and Eligo Energy OH, LLC, No. 2:25-cv-00078-SDM-EPD (S.D. Ohio).**

Jeffrey Scott Goldenberg
Goldenberg Schneider, LPA
4445 Lake Forest Drive
Suite 490
Cincinnati, OH 45242
Email: jgoldenberg@gs-legal.com

Douglas Gregory Blankenship
Finkelstein, Blankinship, Frei-Pearson &
Garber, LLP
One North Broadway, Suite 900
White Plains, NY 10601
Email: gblankinship@fbfglaw.com

James Burkett McInturff
Wittels McInturff Palikovic
305 Broadway, Floor 7
New York, NY 10007
Email: jbm@wittelslaw.com

*Counsel for Plaintiff*

\*\*\*

**Sharon Whiteside, on behalf of herself and all others similarly situated v. Eligo Energy, LLC and Eligo Energy MD, LLC, No. 1:25-cv-02532-JRR (D. Md.).**

Douglas Gregory Blankenship
Finkelstein, Blankinship, Frei-Pearson &
Garber, LLP
One North Broadway, Suite 900
White Plains, NY 10601
Email: gblankinship@fbfglaw.com

James Burkett McInturff
Wittels McInturff Palikovic
305 Broadway, Floor 7
New York, NY 10007
Email: jbm@wittelslaw.com

Derek A. Hills
The Law Office of Derek A. Hills
129 North West Street, Suite 1
Easton, MD 21601
Email: dhills@dahlawoffice.com

*Counsel for Plaintiff*

\*\*\*

*[Remainder of Page Intentionally Blank – Signature on Following Page]*

3

Dated: September 30, 2025

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein
David E. Meadows
Abigail L. Howd
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
ahowd@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC; Eligo Energy NY, LLC; Eligo Energy PA, LLC; Eligo Energy OH, LLC; and Eligo Energy MD, LLC*