# Exhibit D

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3    IRA BROUS, AND MICHELLE SCHUSTER,

4    ON BEHALF OF THEMSELVES AND ALL

5    OTHERS SIMILARLY SITUATED,

6

7         Plaintiffs,

8    V                              Case No.:  1:24-CV-01260

9    ELIGO ENERGY, LLC AND ELIGO

10   ENERGY NY, LLC

11        Defendants,

12   _____X

13              DEPOSITION OF: JOSEPH RAMSEY BROUS

14              DATE:          August 15, 2025

15              TIME:          10:10 a.m. to 11:40 a.m.

16              VENUE:         Regus

17                             125 East State Street

18                             Ithaca, New York 14850

19

20

21   Reported by Cari Roraback

22

23

24

Joseph Ramsey Brous                                              August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 10

1    A. Thirteen years.
2    Q. Okay. Where are you currently
3  employed?
4    A. College Town Bagels Incorporated.
5    Q. Is that the family business?
6    A. It is.
7    Q. Okay. How long have you worked
8  there?
9    A. Since 1981.
10   Q. Okay. Have you held any other
11 positions during that time period?
12   A. No, I have not.
13   Q. Okay. And what is your current
14 position at the company?
15   A. I am one of the owners.
16   Q. And are you an -- are you an active
17 owner? Do you --
18   A. I am.
19   Q. Okay. So you actually take part in
20 managing the business?
21   A. Correct.
22   Q. Okay. What is your highest level of
23 education?
24   A. Bachelor's degree, four-years of

Page 11

1  college.
2    Q. And where was that from?
3    A. Ithaca College.
4    Q. When did you graduate?
5    A. 1990.
6    Q. Okay. And are you married?
7    A. Yes.
8    Q. What's your spouse's name?
9    A. Melissa.
10   Q. Same last name?
11   A. No, Burress.
12   Q. How do you spell that?
13   A. B-U-R-R-E-S-S.
14   Q. Okay. And how -- how long have you
15 been married?
16   A. We've been married thirteen years.
17   Q. Okay. And what is your relationship
18 to Ira Brous?
19   A. I'm his son.
20   Q. Okay. And to Anne Brous?
21   A. Her son.
22   Q. Okay. Do you have any role, any
23 formal role, in administering your father's estate?
24   A. No.

Page 12

1    Q. And you were never an Eligo Energy
2  customer, right?
3    A. Correct.
4    Q. You never signed or agreed to an
5  Eligo contract, right?
6    A. Correct.
7    Q. Okay. And you never participated in
8  a third-party verification call for Eligo Energy?
9    A. I did not.
10   Q. And you've never received an Eligo
11 bill in your name?
12   A. I have not.
13   Q. And you have no alleged financial
14 injury as a result of the conduct that's at issue in
15 this lawsuit, right?
16   A. Correct.
17   Q. I'd like to walk through a timeline
18 of relevant events so that I can orient myself. So,
19 this lawsuit was filed in early 2024, does that sound
20 right to you?
21   A. I believe so.
22   Q. Okay. Well, let me ask you this.
23 What was your role in -- what has your role been in this
24 lawsuit?

Page 13

1    A. I'm not sure I understand the
2  question.
3    Q. Okay. Yeah, let me -- let me unpack
4  that. You're not a party to the lawsuit, right?
5    A. Not that I'm aware of.
6    Q. Okay. And who do you understand the
7  parties to this lawsuit to be?
8    A. I believe there's a class with a
9  couple of named Plaintiffs.
10   Q. Who do you understand the named
11 Plaintiffs to be?
12   A. My mother being one, Anne Brous, and
13 I don't know the other persons.
14   Q. Okay. And what do you understand --
15 and who do you understand the Defendant or Defendants to
16 be?
17   A. Eligo Energy.
18   Q. Okay. Any others?
19   A. Not that I'm aware of.
20   Q. Okay. And how did Ms. Brous come to
21 be involved in the lawsuit, if you know?
22   A. Well, my parents and I discussed the
23 matter, and they were interested in making contact with
24 a law firm regarding the issue.

4 (Pages 10 - 13)

Joseph Ramsey Brous August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 14

1  Q. Okay. When did -- let -- let me
2  back up a bit. When did you first hear of Eligo Energy?
3  A. It was on a Monday. I honestly
4  can't tell you the date off the top of my head, but it
5  was at my parents' house.
6  Q. Okay.
7  A. When I was visiting with them.
8  Q. And was that in 2023? So the year
9  before the lawsuit was filed?
10  A. That -- that sounds correct to me.
11  Q. Okay. There were some -- do you
12  remember having some phone calls with Eligo Energy?
13  A. I do.
14  Q. Okay. And that was, I believe, in
15  late 2023, does that sound right?
16  A. That sounds right.
17  Q. Okay. So, in order to nail down the
18  timeline of when you first heard of Eligo and first had
19  that conversation with your parents, would that have
20  been before the phone calls you had with Eligo?
21  A. I'm sorry, can you repeat the
22  question?
23  Q. Sure. So, the -- when you first
24  became aware of Eligo --

Page 15

1  A. Yeah.
2  Q. -- and you first had that
3  conversation about potential legal action --
4  A. Yeah.
5  Q. -- would that have been before the
6  conversations that you had with Eligo? On that Monday?
7  A. Yes.
8  Q. Okay. Do you know how long that
9  Monday conversation would have preceded the calls that
10  you had with Eligo in late 2023?
11  A. It was all the same day, it was
12  within the hour.
13  Q. Okay. Understood. So -- so what
14  you're saying is that the date that you first talked to
15  your parents about potential legal action against Eligo
16  was the same date that you called Eligo?
17  MR. MARTIN: Objection. Mischaracterizes
18  testimony.
19  Q. And if that's not accurate, tell me.
20  I'm just trying to understand the timeline.
21  A. I'm sorry, can you repeat the
22  question?
23  Q. Sure. So, as -- as I understand it
24  from what you said, the date that you first talked about

Page 16

1  potential legal action with your parents was on a
2  Monday, right?
3  A. Yes.
4  Q. Okay. And from your other testimony
5  so far, I understood that it was that same date that you
6  first had a conversation with Eligo?
7  A. Correct.
8  Q. Okay. Okay. And I think that was
9  November 2023. Does that sound right?
10  A. I would need to look. I'm sorry, I
11  don't know off the top of my head.
12  Q. Okay. But it would be whatever the
13  date, the call that you had with Eligo asking for the
14  welcome letter?
15  A. I believe that that's the case, if
16  that was the same call where I asked for the service to
17  be canceled. And I -- I think that that all happened in
18  the same conversation.
19  Q. Okay. And what precipitated the
20  conversation that you had with your parents about
21  potential legal action against Eligo?
22  A. I'm sorry, can you repeat the
23  question?
24  Q. Sure. What -- the question was what

Page 17

1  precipitated -- what caused you to have a conversation
2  with your parents about potential legal action against
3  Eligo?
4  A. Well, they were of the impression
5  that they had been overcharged for quite a while, and I
6  was in agreement with that. And I did a Google search
7  very quickly about, I believe I put in Eligo scam was
8  the term that I Googled. And very quickly came upon the
9  name of the law firm that was handling the class action
10  suit.
11  Q. Okay. So that's how you connected
12  with --
13  A. With the law firm.
14  Q. Okay. And which law firm was that?
15  A. It was McInturff -- I don't even
16  know the name off the top of my head.
17  Q. Okay. But the -- the firm with
18  McInturff in the name?
19  A. Yes, thank you. Yeah. I don't know
20  off the top of my head.
21  Q. Okay. And so you said a minute ago
22  that your parents had an impression that they'd been
23  overcharged. Did -- did they communicate that to you
24  for the first time on that Monday or?

5 (Pages 14 - 17)

Case 1:24-cv-01260-ER    Document 293-1    Filed 10/14/25    Page 5 of 12

Joseph Ramsey Brous    August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 18

1   A. No.
2   Q. Okay.
3   A. They did not.
4   Q. When did they first communicate that
5   to you?
6   A. It had actually been mentioned by my
7   mother numerous times that she was concerned about the
8   charges on her electric bill, and was wanting me to
9   please take a look at them. And that -- on that Monday
10  was the time that I actually finally did lay my eyes on
11  the bills.
12  Q. Do you remember how long before that
13  Monday your mom first mentioned charges?
14  A. I think it was probably a few
15  months.
16  Q. Okay. And what about your dad? Did
17  your dad mention anything about the charges or was it
18  primarily your mother?
19  A. No, not that I recall.
20  Q. Okay. And when you had the conver
21  -- when you -- when you looked at the -- did you look at
22  the bills that Monday?
23  A. I did.
24  Q. Okay. And who was there?

Page 19

1   A. My mother, my father and myself.
2   Q. Okay. And at that point you had not
3   seen the contract, right?
4   A. Correct.
5   Q. Okay. And at that point you had not
6   heard the T.P.V., right?
7   A. I'm sorry, the what?
8   Q. The -- well, let's back up. Do you
9   know what a -- I -- I take it you don't know what a
10  T.P.V. is?
11  A. I do not.
12  Q. Okay. How about -- well, I'll
13  represent to you it's third -- stands for Third-Party
14  Verification. It's a --
15  A. Oh, okay.
16  Q. Okay.
17  A. I do know that term.
18  Q. So, have you ever heard the Third-
19  Party Verification call that led to your father having
20  signed up with Eligo?
21  A. I can't recall. It may have been
22  something that the attorneys and I had talked about.
23  MR. MARTIN: I'll just caution you not to
24  reveal the substance of any conversations with

Page 20

1   attorneys.
2   THE WITNESS: Okay.
3   BY MR. WATSTEIN: (Cont'g.)
4   Q. So, let me ask you this. Before --
5   the lawsuit was filed in -- well, strike that.
6   Before you all, as in you and your
7   family, decided to move forward with the lawsuit, had
8   you heard the Third-Party Verification call?
9   A. No.
10  Q. And what -- when -- when you spoke
11  on this Monday with your parents about the Eligo
12  charges, did you reach some sort of conclusion of your
13  own about them?
14  A. I -- I had an impression about it.
15  Q. And what was the impression?
16  A. That they were exorbitant.
17  Q. And what -- is that because -- well,
18  I'll just ask you, why did you think that?
19  A. Well, my mother was the first to
20  think it, and I -- once I took a look, I was in
21  agreement.
22  Q. Okay. And was that based on what
23  your understanding was about utility rates at the time?
24  A. Yes.

Page 21

1   Q. So just to be clear, it's your
2   testimony that your mother was the first person in your
3   family to raise an issue with the Eligo bills, or was it
4   you?
5   A. No, my mom.
6   Q. Okay. And was it you who reached
7   out to counsel first?
8   A. I believe that's the case.
9   Q. Okay. And that was the McInturff
10  firm?
11  A. Correct.
12  Q. And how did you reach out?
13  A. I honestly don't recall. It was
14  either by telephone or email, I don't recall.
15  Q. Okay. But you've had emails with
16  counsel in this case?
17  MR. MARTIN: Excuse me. You can answer
18  the question about whether you've had emails, just don't
19  reveal the substance of any communications.
20  A. I do believe I've had emails.
21  Q. And you had emails before the
22  lawsuit was filed with counsel, yes?
23  A. I believe so.
24  Q. And do you remember when the first

Case 1:24-cv-01260-ER    Document 293-1    Filed 10/14/25    Page 6 of 12

Joseph Ramsey Brous                                                    August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 22

1    time you spoke with a lawyer at the McInturff firm?
2        A.  I -- no, I don't know the exact
3    date, if that's what you're asking.
4        Q.  Well, I guess -- I'll be more
5    specific.  Do you know if it was in 2023 or 2024?
6        A.  Oh, it was in 2023.
7        Q.  Okay.  And how -- how did that
8    conversation occur, over the phone or in person?
9        A.  Over the phone.
10       Q.  And do you remember who you spoke
11   to?
12       A.  Burkett.
13       Q.  Okay.  And who was present during
14   that conversation on the phone?
15       A.  My mother.
16       Q.  Okay.  So it was you, your mother
17   and Burkett?
18       A.  Correct.
19       Q.  Okay.  Do you remember how many
20   conversations you had in -- in approximately with
21   counsel before the lawsuit was filed?
22       A.  I honestly couldn't tell you.
23       Q.  More than five?
24       A.  Possibly.

Page 23

1        Q.  Okay.  And who was present on those
2    calls?  Certainly you?
3        A.  Yes.
4        Q.  And was your mother present on every
5    one of those calls?
6        A.  I -- I don't recall.
7        Q.  Was your father present on any of
8    those calls?
9        A.  I don't believe so.
10       Q.  And going back briefly to the Third-
11   Party Verification, is it your testimony that you have -
12   - you have heard it or you're not sure if you've ever
13   heard the Third-Party Verification?
14           MR. MARTIN:  Objection.  Asked and
15   answered.
16       Q.  You can answer the question.
17       A.  Yeah, I do think I answered that
18   earlier.
19       Q.  Okay.  But I -- I guess I'm not a
20   hundred percent clear on it.  I -- I just want to know
21   whether you have a specific recollection of listening to
22   the Third-Party Verification call ever.
23           MR. MARTIN:  Same objection.
24       Q.  Would it help you to hear it?

Page 24

1        A.  If you wish to play it.
2        Q.  Sure, I'll show you a copy of it.
3    How about that?
4        A.  Sure.
5            MR. WATSTEIN:  This will be Defendant's
6    Exhibit Number One.
7            MR. MARTIN:  Do you have another copy of
8    it?
9            MR. WATSTEIN:  I do.
10           MR. MARTIN:  So I just -- I want to
11   object.  We've were talking about T.P.V. recording.
12   What you're showing as Exhibit -- what looks like a
13   transcript.
14           MR. WATSTEIN:  That's right.  Yeah, it's
15   just easier than trying to show him a recording.
16           BY MR. WATSTEIN:  (Cont'g.)
17       Q.  Now, I recognize that this is not a
18   recording itself, but rather a transcript of a
19   recording.  But what I'd like to ask you is, do you
20   recognize the substance of what's been marked as Exhibit
21   Number One?
22       A.  Yes.
23       Q.  Okay.  So you've seen this before?
24       A.  I haven't seen it.

Page 25

1        Q.  You've heard it?
2        A.  Correct.
3        Q.  Okay.  And do you remember -- did
4    you hear that in connection with this lawsuit?
5        A.  Yes, I did.
6        Q.  Okay.  Was it after the lawsuit was
7    filed?
8        A.  Yes, it -- yes, it was.
9        Q.  Okay.  And ultimately this lawsuit
10   was filed in Ira's name, right?
11       A.  Originally.
12       Q.  Originally, yes.
13       A.  Well, I believe it -- my
14   understanding, it was in the two names.
15       Q.  That's right.
16       A.  His being one.
17       Q.  Ira and Ms. Schuster being the other
18   person.
19       A.  I'll take your word for it.
20       Q.  Yeah.  And the question that I have
21   for you is, do you know -- do you know why it was filed
22   in Ira's name as one of the two named Plaintiffs?
23       A.  My understanding is the bill was in
24   his name, so it was filed in his name.

Case 1:24-cv-01260-ER   Document 293-1   Filed 10/14/25   Page 7 of 12

Joseph Ramsey Brous                                      August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 26

1   Q. Is it fair to say, then, that your
2   desire to meet with lawyers about the Eligo matter was
3   driven by the price of your parents' bill alone?
4        MR. MARTIN: Objection. Again, I just
5   want to caution you to not reveal any substance of any
6   communication with lawyers or why you were seeking their
7   advice.
8        A. I have no desire to meet with
9   lawyers.
10       Q. That wasn't my question, though.
11       A. Oh, I'm sorry.
12       Q. Yeah. My -- my question was, you --
13  you originally contacted counsel in this case, right?
14       A. Correct.
15       Q. Okay. So what I'm trying to figure
16  out is, was the reason that you and your family
17  contacted counsel about Eligo driven by the price of
18  your parents' bills alone?
19       MR. MARTIN: Same objections and caution,
20  please.
21       A. My reason for contacting counsel was
22  to possibly get compensation for overcharges for my
23  parents.
24       Q. And do you have an understanding of

Page 27

1   how -- how the prices for your parents' Eligo service
2   were determined?
3        A. No.
4        Q. And do you have an understanding of
5   what the relevant contract documents provided about how
6   variable rates with Eligo would be determined?
7        A. I have some understanding.
8        Q. What's your understanding?
9        A. My understanding is that the rates
10  would be, after the fixed period, which I believe was
11  six months, that they would be variable based on the
12  market.
13       Q. And what do you understand -- what
14  do you understand variable based on the market to mean?
15       A. It means that if the commodity goes
16  up in price, the price would go up. If the commodity
17  goes down in price, it would go down.
18       Q. Okay. And where -- where did you
19  get that understanding about the interpretation of the
20  market?
21       A. I've been purchasing from ESCOs for
22  the business for numerous years.
23       Q. Okay. So, do you -- I -- I take it
24  that the family business gets its electricity from

Page 28

1   ESCOs?
2        A. Correct.
3        Q. Okay. What -- what ESCO currently
4   provides service for the business?
5        A. Empire Natural Gas.
6        Q. Does Empire Natural Gas provide
7   electricity too?
8        A. Correct.
9        Q. And how long have you been with
10  Empire?
11       A. Many years.
12       Q. And were you with an -- was the
13  business with an ESCO before Empire?
14       A. Yes. I can't recall with who, it
15  was a long time ago.
16       Q. Do you know if your parents were
17  with an ESCO before Eligo?
18       A. I'm not aware of that, if they were.
19       Q. Okay. And are you currently with an
20  ESCO, personally?
21       A. I am.
22       Q. What ESCO is that?
23       A. Empire Natural Gas.
24       Q. Okay. For your home service too?

Page 29

1        A. Correct.
2        Q. And have you been, for your home
3   service, with any other ESCOs?
4        A. Yes.
5        Q. Which other ESCOs?
6        A. I don't recall.
7        Q. Okay. And have you -- have you
8   taken any issue with how Empire calculates your rates?
9        A. No.
10       Q. And do you know how Empire
11  calculates your rates?
12       A. I -- I would have to look. I
13  believe it's like a nine max plus or a nine max minus
14  kind of situation.
15       Q. Okay. And that's for both home and
16  work?
17       A. Correct.
18       Q. Okay. And -- and so -- okay. So
19  then your understanding of how you thought that the
20  Eligo rates would be calculated was based on your
21  interaction primarily with Empire then?
22       A. I suppose.
23       Q. And you called Eligo impersonating
24  your father at some point, didn't you?

Case 1:24-cv-01260-ER   Document 293-1   Filed 10/14/25   Page 8 of 12

Joseph Ramsey Brous                                              August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 30

1  A. I suppose you could call it
2  impersonating.
3  Q. Okay. How many times did you do
4  that?
5  A. Once or twice, probably twice.
6  Q. And you didn't have any sort of
7  Power of Attorney for your father, did you?
8  A. Not at that time.
9  Q. Did you later?
10 A. I did.
11 Q. When did that come about?
12 A. Power of Attorney?
13 Q. Yes.
14 A. I can't give you the exact date, but
15 sometime between that and when he died.
16 Q. So, was it before the lawsuit was
17 filed?
18 A. No.
19 Q. After that?
20 A. Correct.
21 Q. Okay. Are you represented here
22 today?
23 A. Yes.
24 Q. By whom?

Page 31

1  A. The same law firm that filed the
2  lawsuit, I believe.
3  Q. Okay. When did they start
4  representing you?
5  A. I -- I can't remember the exact
6  date. Sometime within the last year.
7  Q. Okay. Did they start repre -- what
8  -- what caused them to start representing you? Was it
9  our desire to take your deposition?
10 A. I believe that's the case.
11 Q. Okay. So they would have started
12 representing you in response to our request to take your
13 deposition?
14 A. I believe that's correct.
15 Q. Do you have an engagement letter
16 with them?
17 A. On me?
18 Q. No, not on you. Do you -- do you --
19 does one exist?
20 A. I believe so.
21 Q. Did you -- so your -- you said, I
22 believe so. Have you signed an engagement letter with
23 the law firm?
24 A. I believe I did.

Page 32

1  Q. Okay. Do you know when you did
2  that?
3  A. No.
4  Q. Was it within the last month?
5  A. I don't believe so.
6  Q. The last two months?
7  A. I don't recall.
8  Q. Do you remember if it was after your
9  mother's deposition?
10 A. I don't recall.
11 Q. Would that have been presumably
12 transmitted to you by email?
13 A. I believe so.
14 Q. So if you needed to find the date,
15 you would look at your email?
16 A. If it was transmitted to me by
17 email, then yes.
18 Q. And what is the engagement that you
19 have with your lawyers related to this deposition or
20 something else?
21 MR. MARTIN: Objection again. Please
22 don't reveal the substance of communications or what
23 legal advice you were seeking, the purpose of legal
24 advice.

Page 33

1  Q. Yeah, to be clear, I'll ask the
2  question again. What I'm trying to determine is, what
3  is the subject matter of -- of the legal representation
4  that you have with your counsel?
5  A. I believe it's the class action suit
6  against Eligo.
7  Q. Okay. So it's your testimony that
8  they represent you with respect to the class action that
9  you're not a party to?
10 A. That's my understanding.
11 Q. Okay. How many times have you --
12 how many times have you met with counsel in this case,
13 approximately, over the phone or in person?
14 A. Two or three.
15 Q. Is that two to three times in
16 person?
17 A. No.
18 Q. How many times have you met with
19 them in person?
20 A. In total. In person? Once.
21 Q. When was that?
22 A. Yesterday.
23 Q. So, I believe -- okay. So what
24 you're saying is you only had two phone calls with them?

Joseph Ramsey Brous August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 34

1  A. That's not what I'm saying.
2  Q. Okay. So can you approximate the
3  number of phone calls that you've had with counsel?
4  A. Ten.
5  Q. And on some of those phone calls, it
6  was just you, correct, not your parents?
7  A. On some.
8  Q. And as far as you can remember, your
9  father was not on those calls, right?
10 A. Correct.
11 Q. And those phone calls date back to
12 2023, yes?
13 A. That sounds correct.
14 Q. Of the approximately ten phone calls
15 that you've had with counsel, how many of them would
16 have been before the lawsuit was filed?
17 A. I don't know.
18 Q. How many phone calls have you had
19 with counsel since Anne's deposition?
20 A. I don't recall. Maybe one.
21 Q. When you met with counsel yesterday,
22 did you review any written materials?
23 A. One item.
24 Q. What item was that?

Page 35

1  A. Notice of deposition, I believe it
2  was called.
3  Q. Okay. Have you read your mother's
4  deposition transcript?
5  A. I have not.
6  Q. Have you spoken with her about the
7  deposition?
8  A. Not about the substance. I knew
9  that she had done it.
10 Q. Have you communicated with counsel
11 by text ever?
12 A. Yes.
13 Q. How about -- and then by email too,
14 yes?
15 A. Yes.
16 Q. Okay. And if -- if you've had
17 around ten phone calls with them, I would imagine that
18 you've had a lot more emails than that, right?
19 A. I don't know the number.
20 Q. Okay. Did you review the complaint
21 before it was filed in this case?
22 A. No.
23 Q. What -- be -- before your mother's
24 deposition, what was the substance of what you discussed

Page 36

1  with counsel in this case?
2  MR. MARTIN: Please don't bring up the
3  substance of communications with counsel.
4  MR. WATSTEIN: Okay. So clearly the
5  privilege has been waived here. He's testified that he
6  very recently engaged you all's firm. There were
7  numerous communications involving a third-party who's
8  not a party to the litigation. Is it your instruction
9  to him that he can't answer any questions about the
10 substance of your communications with him?
11 MR. MARTIN: Yeah, I -- I don't think
12 there has been a waiver, and I think there are attorney-
13 client communication privileges and common interest
14 privileges at issue.
15 MR. WATSTEIN: Okay. Are you going to
16 give that same instruction as to any question I ask
17 about the substance of his communications with you and
18 your firm?
19 MR. MARTIN: I'd love to take it as it
20 comes. I guess I'm not sure what you're planning on
21 asking.
22 MR. WATSTEIN: Well, I -- I -- I plan on
23 -- I believe there's been a privilege waiver, and I plan
24 on asking about the substance of his communications with

Page 37

1  your firm over an extended period of time, up until the
2  time you began to represent him in connection with his
3  deposition. So the question I have for you is, do you
4  really want me to ask every one of those questions and
5  have you instruct him not to answer, or are you telling
6  me that you're going to instruct him not to answer all
7  those questions?
8  MR. MARTIN: I'm telling you that I
9  disagree that there's been a waiver here. So I -- I
10 guess if you're planning on asking about the substance
11 of communications with the attorneys, then yes, I'd
12 instruct him not to answer.
13 MR. WATSTEIN: Okay. We'll -- we'll take
14 that up with the court, but we don't need to belabor it
15 during the deposition.
16 BY MR. WATSTEIN: (Cont'g.)
17 Q. You would agree, Mr. Brous, that
18 some people are willing to pay more for green energy.
19 Would you?
20 A. I imagine people will pay for most
21 anything.
22 Q. Right. And I guess the value of
23 that to some people is different than it is to other
24 people, right?

10 (Pages 34 - 37)

Case 1:24-cv-01260-ER   Document 293-1   Filed 10/14/25   Page 10 of 12

Joseph Ramsey Brous                                                                    August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 50

1  MR. MARTIN: Can we just take a brief --
2  MR. WATSTEIN: Yeah.
3  MR. MARTIN: -- break?
4  MR. WATSTEIN: Sure.
5  VIDEOGRAPHER: The time on the monitor is
6  eleven twenty. We are off the record.
7  (Off the record 11:20 a.m.)
8  (On the record 11:34 a.m.)
9  VIDEOGRAPHER: The time on the monitor is
10 eleven thirty-four. This begins media three. We're on
11 the record.
12 CROSS EXAMINATION
13 BY MR. MARTIN:
14 Q. Mr. Brous, just briefly, I want to
15 talk about when you engaged with Burkett's firm. I'm
16 just going to say W.M.P., if that works for you. Do you
17 recall whether you engaged W.M.P.'s services before the
18 complaint in this litigation was filed?
19 A. So, I was reminded about the timing
20 of my engaging that, in fact, yes, that I had engaged
21 prior to, I guess, my father engaging the firm.
22 Q. Okay. So what -- what I asked you
23 was a little different. Do you recall if you engaged
24 W.M.P. before the lawsuit was filed?

Page 51

1  A. Yes.
2  Q. All right. And you said that was --
3  you engaged W.M.P. before your father did? Is that what
4  you just said?
5  A. I -- I believe that's correct.
6  Q. Okay. That is all I have. Thank
7  you.
8  MR. WATSTEIN: I have a couple follow-up
9  questions.
10 REDIRECT EXAMINATION
11 BY MR. WATSTEIN:
12 Q. Can you tell me the amount of time
13 that we were off the record on the last break?
14 A. We were off the record for fourteen
15 minutes.
16 Q. Okay. So after I finished my
17 questioning, we went off the record for fourteen minutes
18 and your attorney left the room, right?
19 A. Yes.
20 Q. Okay. And then your attorney came
21 back in here and asked you to go out there with him,
22 right?
23 A. Yes.
24 Q. And then you spoke with him, right?

Page 52

1  A. Yes.
2  Q. Okay. And then he came back in here
3  and asked you that question, right?
4  A. Yes.
5  Q. And your question was influenced by
6  what you spoke with him about, wasn't it? Your answer
7  was influenced by what you spoke with him about, wasn't
8  it?
9  A. I -- my memory was -- I -- I -- my
10 memory was jogged, and so I guess I needed to correct
11 what I had said earlier.
12 Q. How was your memory jogged? Did you
13 look at something to refresh your recollection?
14 A. No, sir.
15 Q. Okay. So your memory was jogged by
16 something that your counsel told you?
17 A. It was something that he asked me.
18 Q. What did he ask you?
19 A. He asked me when I had engaged with
20 the firm.
21 Q. Okay. But I asked you that earlier,
22 didn't I?
23 A. Yes, you did.
24 Q. Okay. So why was your answer to him

Page 53

1  different than it was to me?
2  A. I apologize. My memory is
3  apparently not a hundred percent.
4  Q. Okay. So it's your testimony now
5  that you engaged W.M.P. prior to when your father, who
6  actually filed the lawsuit, engaged them?
7  A. I believe that's true.
8  Q. And what did you engage W.M.P.
9  about?
10 A. About Eligo and a class action suit.
11 Q. Okay. But you never had Eligo's
12 service, right?
13 A. That's correct.
14 Q. Okay. So I'm -- I'm trying to
15 understand how you would have engaged Eligo personally.
16 Are you -- are you saying that you engaged Eligo on your
17 parents' behalf, or that you engag -- you -- I'm sorry,
18 that you engaged W.M.P. on your parents' behalf, or that
19 you engaged them on your own behalf?
20 A. I believe I engaged them on my own
21 behalf.
22 Q. About Eligo, even though you were
23 never an Eligo customer?
24 A. Correct.

Joseph Ramsey Brous  August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 54

1  Q. Okay. Why?
2  A. I -- I was advised at the time.
3  Q. By counsel?
4  A. Yes.
5  Q. Okay. And have -- has W.M.P. given
6  you legal advice about your experiences with Eligo?
7  MR. MARTIN: So you can answer yes or no,
8  but please don't get into the substance of
9  communications with counsel.
10  A. Can you repeat the question?
11  Q. Has W.M.P. given you legal advice
12  about your interactions with Eligo?
13  A. No, not that I recall.
14  Q. Okay. And did you sign an
15  engagement agreement at this time that you now claim to
16  have engaged W.M.P.?
17  A. I believe I did.
18  Q. Do you have a copy of that?
19  A. Not on me.
20  Q. I'm saying, do you have a copy of it
21  at all?
22  A. I don't know the answer. I would
23  have to look.
24  Q. Okay. Where would it be kept?

Page 55

1  Where would you keep something like that?
2  A. I suppose it would be in my
3  computer.
4  Q. Is there like a particular folder
5  that you would file something like that in?
6  A. No.
7  Q. Do you have a -- I know that I sort
8  my emails by matter. Of course, I'm a lawyer, so that
9  makes sense. How do you sort your emails?
10  A. Chronologically.
11  Q. Okay. Do you -- do you store emails
12  in folders or do you just leave them in your inbox?
13  A. I store them in folders by year.
14  Q. Okay. You store -- okay, you store
15  them by year? You don't break them down by subject
16  matter?
17  A. Correct.
18  Q. Okay. So you don't have an Eligo
19  Energy folder or something like that?
20  A. Correct.
21  Q. No folder about this lawsuit?
22  A. No.
23  Q. And again, other than talking with
24  your lawyer, is there anything else that you claim

Page 56

1  refreshed your recollection about your date of
2  engagement?
3  A. No.
4  Q. That's all I have.
5  MR. MARTIN: Is that it?
6  MR. WATSTEIN: That's it.
7  MR. MARTIN: Anybody online have any
8  questions?
9  MR. LAPOINTE: I do not.
10  MR. MOORE: No.
11  VIDEOGRAPHER: Anybody online going to
12  want a copy of the video?
13  MR. LAPOINTE: That won't be necessary.
14  We'll get a -- we'll get a copy from Mr. Watstein.
15  Thank you.
16  MR. MARTIN: We don't need a copy of the
17  video.
18  VIDEOGRAPHER: Okay. Just the ordering
19  attorney. The time on the monitor is eleven forty.
20  This includes today's testimony given by Ramsey Brous.
21  Total number of meeting units was three and will be
22  retained by Veritext.
23  (The deposition concluded at 11:40 a.m.)
24

Page 57

1
  I, JOSEPH RAMSEY BROUS, have read the foregoing
2  record of my testimony taken at the time and place noted in
   the heading hereof and do hereby acknowledge:
3  (Please check one)
       ( ) That it is a true and correct transcript of
4  same.
       ( ) With the exceptions noted in the attached
5  errata sheet, it is a true and correct transcript of same.
6
       X_____
7
       JOSEPH RAMSEY BROUS
8
9  Sworn to before me this
   _____day of _____, 2025.
10  X_____
   NOTARY PUBLIC
11  My Commission Expires:
   _____
12
13
14
15
16
17
18
19
20
21
22
23
24

15 (Pages 54 - 57)
Veritext Legal Solutions
800.808.4958   770.343.9696

Case 1:24-cv-01260-ER    Document 293-1    Filed 10/14/25    Page 12 of 12

Joseph Ramsey Brous                                           August 15, 2025
Brous, Et Al. Vs. Eligo Energy, LLC, Et Al.

Page 58

1  I, CARI RORABACK, do hereby certify that the foregoing
2  testimony of JOSEPH RAMSEY BROUS was taken by me, in the
3  cause, at the time and place, and in the presence of counsel,
4  as stated in the caption hereto, at Page 1 hereof; that
5  before giving testimony said witness was duly sworn to
6  testify the truth, the whole truth and nothing but the truth;
7  that the foregoing typewritten transcription, consisting of
8  pages number 1 to 56, inclusive, is a true record prepared by
9  Associated Reporters Int'l., Inc. from materials provided by
10 me.
11
12
13
14
15
16
17       *Cari Roraback*
         CARI RORABACK, Reporter
18
19
20
21
22
23
24

Page 59

1
         (800) 523-7887
2
   Job No. ATL7508532
3  Case Name: Brous v Eligo Energy et al
   Case Number: 1:24-CV-01260
4  Deponent: Joseph Ramsey Brous
   Deposition Date: 8-15-25
5  Examining Attorney: Ryan Watstein, Esq.
6  Dear Mr. Brous:
7
   Please read and make any changes and/or corrections in your
   testimony and sign the transcript in the presence of a notary
8
   public. Please do so within thirty (30) days. If you fail
9  to sign the transcript within thirty (30) days, it will be
   delivered to the appropriate parties without signature.
10 Return the transcript with corrections, if any, to:
11
        WATSTEIN TEREPKA, LLP
12      BY: RYAN WATSTEIN, ESQ.
        74 14th Street NE #2600
13      White Plains, New York 10601
14 CORRECTIONS:
15
   _____ Word or phrase: _____
            Corrected to: _____
16
   _____ Word or phrase: _____
17          Corrected to: _____
   _____ Word or phrase: _____
18          Corrected to: _____
   _____ Word or phrase: _____
19          Corrected to: _____
   _____ Word or phrase: _____
20          Corrected to: _____
   _____ Word or phrase: _____
21          Corrected to: _____
   _____ Word or phrase: _____
22          Corrected to: _____
   _____
23
   Date Signed         _____
24                     JOSEPH RAMSEY BROUS

Page 60

1  DANIEL MARTIN, ESQ.
2  dmartin@fbfglaw.com
3            August 22, 2025
4  RE: Brous, Et Al. v. Eligo Energy, LLC, Et Al.
5  8/15/2025, Joseph Ramsey Brous (#7508532)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-southeast@veritext.com
16   Return completed errata within 30 days from
17 receipt of testimony.
18    If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22         Yours,
23         Veritext Legal Solutions
24
25