# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**ANNE BROUS, AS THE EXECUTOR OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER,** on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC,**

Defendants.

Civil Case No.: 1:24-cv-01260-ER

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT OF DR. DEBRA ARON AND ANY TESTIMONY SHE MIGHT OFFER AT TRIAL

---

**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship
Daniel J. Martin
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com
dmartin@fbfglaw.com

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Andrey Belenky
Ethan D. Roman
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com
abelenky@wittelslaw.com
edr@wittelslaw.com

Dated: January 16, 2026

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 6

LEGAL STANDARD .................................................................................................. 7

ARGUMENT ............................................................................................................. 8

   I.   Dr. Aron's Opinions Should Be Excluded Because She Is Unqualified. ........................ 8

   II.  Each Of Dr. Aron's Opinions Should Be Excluded As Irrelevant And Unreliable........... 9

      A.   The Court Should Exclude Dr. Aron's Opinion ██████████████ ███████████████████ .............................................. 9

      B.   The Court Should Exclude Dr. Aron's Opinions That Are Based On Her Incorrect View That Eligo ████████████████████ ███████████████ ............................................ 11

         1.   Dr. Aron's Opinions Do Not Account For The Contractual Constraints On Eligo's Pricing Conduct.......................................................... 12

         2.   Dr. Aron's Opinions Do Not Account For The Regulatory Constraints On Eligo's Pricing Conduct.......................................................... 16

      C.   Dr. Aron's Opinion That ██████████████████████████ ███ Should Be Excluded Because Dr. Aron's ████████████ ........ 20

      D.   The Court Should Exclude Dr. Aron's Opinion That Utility Rates Are Not Reflective Of The Costs ESCOs Like Eligo Incur To Serve Retail Customers. ........ 21

   III.  Dr. Aron's Expert Opinions Should Be Excluded Under F.R.E. 403 Because They Are More Prejudicial Than Probative.................................................... 24

CONCLUSION.......................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
 364 F. Supp. 3d 291 (S.D.N.Y. 2019) ................................................................. 24

*Amorgianos v. Nat'l R.R. Pass. Corp.*,
 303 F.3d 256 (2d Cir. 2002) .......................................................................... 7, 8, 18

*Anthem, Inc. v. Express Scripts, Inc.*,
 660 F. Supp. 3d 169 (S.D.N.Y. 2023) ............................................................. 7, 11

*Baker v. Weber*,
 No. 19-CV-1093, 2021 WL 4480998 (S.D.N.Y. Sept. 30, 2021) .......................... 15

*Bell v. Gateway Energy Servs. Corp.*,
 No. 31168/2018 (Rockland Cnty. Sup. Ct. Jan. 8, 2021) ..................................... 5

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
 No. 14-CV-751, 2019 WL 1369007 (S.D. Cal. Mar. 26, 2019) ............................ 11

*Calltrol Corp. v. LoxySoftAB*,
 No. 18-CV-9026, 2025 WL 2720984 (S.D.N.Y. Sept. 24, 2025) .......................... 19

*Cambridge Cap. LLC v. Ruby Has LLC*,
 675 F. Supp. 3d 363 (S.D.N.Y. 2023) ................................................................. 15

*Chen v. Hiko Energy, LLC*,
 No. 14-CV-1771, 2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) ............................ 5

*City of N.Y. v. FedEx Ground Package Sys.*,
 No. 13-CV-9173, 2018 WL 4961455 (S.D.N.Y. Oct. 10, 2018) ............................. 9

*Claridge v. N. Am. Power & Gas, LLC*,
 No. 15-CV-1261, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) ............................. 3

*Comfortex Co., Ltd. v. Xcel Brands, Inc.*,
 No. 21-CV-7326, 2024 WL 1255535 (S.D.N.Y. Mar. 25, 2024) ...................... 21, 24

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993) .................................................................................... 7, 8, 18

*Dibrino v. Rockefeller Ctr. N., Inc.*,
No. 103, -- N.Y.3d --, 2025 WL 3670593 (N.Y. Dec. 18, 2025)..............................................11

*Dollman v. Mast Indus.*,
No. 08-CV-10184, 2011 WL 3911035 (S.D.N.Y. Sep. 6, 2011).......................................9, 19

*Donohue v. Cuomo*,
38 N.Y.3d 1 (N.Y. 2022)........................................................................................................11

*Faulkner v. Arista Records LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014)......................................................................................21

*Fleisher v. Phoenix Life Ins. Co.*,
18 F. Supp. 3d 456 (S.D.N.Y. 2014)........................................................................................3

*Franchitti v. Cognizant Tech. Sols. Corp.*,
No. 21-CV-2174, 2025 WL 2123655 (S.D.N.Y. July 29, 2025)..............................................19

*Freeman v. Deebs-Elkenaney*,
No. 22-CV-2435, 2024 WL 3634738 (S.D.N.Y. Aug. 1, 2024).........................................19, 21

*Grasshopper Gardens, Inc. v. PMA Mech. LLC*,
No. 23-CV-1257, 2025 WL 2711066 (N.D.N.Y. Sep. 23, 2025).............................................25

*In re Puda Coal Sec. Inc., Litig.*,
30 F. Supp. 3d 230 (S.D.N.Y. 2014).................................................................................19, 25

*Martinez v. Agway Energy Servs., LLC*,
88 F.4th 401 (2d Cir. 2023)......................................................................................12, 13, 14

*Meehancombs Glob. Credit Opps. Master Fund, LP v. Caesars Ent. Corp.*,
162 F. Supp. 3d 200 (S.D.N.Y. 2015)....................................................................................15

*Melville v. HOP Energy, LLC*,
No. 21-CV-10406, 2023 WL 2648775 (S.D.N.Y. Mar. 27, 2023)...........................................14

*MHR Cap. Partners LP v. Presstek, Inc.*,
12 N.Y.3d 640 (N.Y. 2009)....................................................................................................11

*Mirkin v. XOOM Energy, LLC*,
931 F.3d 173 (2d Cir. 2019)...............................................................................................5, 13

*Mirkin v. XOOM Energy, LLC*,
No. 18-CV-2949, 2023 WL 5200294 (E.D.N.Y. Aug. 14, 2023)...................................3, 14, 16

*Mirkin v. XOOM Energy, LLC*,
   No. 18-CV-2949, 2023 WL 5622099 (E.D.N.Y. Aug. 31, 2023) ............................................ 16

*Mirkin v. XOOM Energy, LLC*,
   No. 18-CV-2949, 2025 WL 16333 (E.D.N.Y. Jan. 2, 2025) ............................................ 11, 25

*Nimely v. City of N.Y.*,
   414 F.3d 381 (2d Cir. 2005) ........................................................................ 18, 24, 25

*Oladapo v. Smart One Energy, LLC*,
   No. 14-CV-7117, 2016 WL 344976 (S.D.N.Y. Jan. 27, 2016) ................................................. 5

*Querub v. Hong Kong*,
   649 F. App'x 55 (2d Cir. 2016) .................................................................... 18, 19, 25

*Richards v. Direct Energy Servs., LLC*,
   915 F.3d 88 (2d Cir. 2019) ................................................................................ 13, 14

*Scott v. Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................................ 8, 24

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................................... 8

*Stanley v. Direct Energy Servs., LLC*,
   466 F. Supp. 3d 415 (S.D.N.Y. 2020) .......................................................................... 13

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
   709 F. Supp. 2d 821, 833–34 (C.D. Cal. 2010) ................................................................ 21

*Weinberg v. CleanChoice Energy, Inc.*,
   No. 23-CV-9685, 2024 WL 3446515 (S.D.N.Y. July 17, 2024) ........................................ 13, 14

*Wiener v. ACA Equitable Life Ins. Co.*,
   No. 16-4CV-019, 2019 WL 1228074 (S.D.N.Y. Mar. 16, 2019) ............................................ 19

## Other Authorities

NYPSC Case 00-M-0504,
   Statement of Policy on Unbundling and Order Directing Tariff Filings (Aug. 25, 2004) ........ 22

NYPSC Case 12-M-0476,
   Unif. Bus. Pracs. (issued Feb. 2014) ...................................................................... 9, 11

NYPSC Case 98-M-1343,
  In the Matter of Retail Access Bus. Rules, Order Adopting Unif. Bus. Pracs. and
  Requiring Tariff Amends. (issued Jan. 22, 1999) ................................................................... 16

NYPSC Cases 15-M-0127, et. al.,
  Ord. Adopting Changes to the Retail Access Energy Mkt. and Estab. Further Process
  (Dec. 12, 2019) ........................................................................................................................ 17

**Rules**

Fed. R. Evid. 403 ................................................................................................................. 8, 24

Fed. R. Evid. 702 ........................................................................................................ 7, 8, 18, 24

## INTRODUCTION

The expert opinions offered at trial in this action must account for the specific business and regulatory operating environment of New York energy service companies, or "ESCOs." Defendants' expert witness Dr. Debra Aron is not qualified to testify regarding that operating environment, and this lack of expertise produced multiple critical errors that permeate her report. Her proposed testimony applies the wrong analytical framework to a non-existent business environment, rendering her opinions irrelevant and unreliable. Her opinions should be excluded, and she should not be permitted to testify at trial.

By way of relevant background, Defendants Eligo Energy, LLC and Eligo Energy NY, LLC (collectively "Eligo") operate an ESCO. ESCOs purchase electricity on New York's wholesale electricity market (the same market from which utilities purchase their supply) and they re-sell it to end users. Eligo does not generate electricity (that is the job of generation companies); it does not distribute electricity (that is the utility's job); and it does not bill or collect payment for the electricity it sells (that is also the utility's job). Instead, Eligo is just a middleman, purchasing electricity at a cost and then passing those costs plus a mark-up to its retail customers.

New York ESCOs do not operate in a fully deregulated and laissez faire market. Because electricity is an essential public good, ESCOs are subject to a myriad of regulatory and other legal constraints. For example, under New York Public Service Commission ("NYPSC") regulations, Eligo cannot simply set electricity prices like an ordinary retailer; instead, it must give customers a written contract and "Disclosure Statement" that governs how their electricity rates are set.

Eligo signs up new customers via its "fixed" rate offering that freezes the customer's rate per kilowatt-hour for a few months. After the fixed rate period ends, customers are charged Eligo's "variable" rate. Eligo's contracts with Plaintiffs and the proposed Class contain a provision in the Disclosure Statement that specifically notifies customers how "[v]ariable price is determined" and

states that "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market prices factors." *See* Ex. 1,[1] DEF000127, 28 (Brous contract highlighted); Ex. 2, DEF093223, 24 (Schuster contract highlighted).

This binding contract term expressly promises that Eligo's variable rates "***shall be calculated***" monthly "***in response to***" three identified inputs: "market pricing," "transportation costs," and "other market price factors." Construed in the context of applicable New York law and regulations, this pricing term does not give Eligo discretion to charge whatever rates it thinks customers will tolerate. Further, Eligo's contract served as a solicitation during a "cooling-off" period required by New York regulation. Because Eligo's contract is therefore marketing material, its content must comply with both general New York consumer protection law and a specific consumer protection statute enacted to target ESCO abuses in New York's energy market.

Discovery shows that Eligo ███████████████████████████████████████ ███████████████████████ For example, Eligo ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████ Ex. 3, Defs.' Objs. and Second Suppl. Resps. to Pls.' First Set of Interrogs., dated Oct. 18, 2024, 4–5, 7 (response to interrogatory 8). Internal Eligo documents likewise ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

---

[1] All citations in this memorandum to "Ex." refer to exhibits to the accompanying Declaration of D. Greg Blankinship, dated January 16, 2026 ("Blankinship Decl.").

These and other facts unearthed in discovery show a transparent violation of Eligo's contractual promise that all variable rates "shall be calculated in response to market prices, transportation costs, and other market price factors." The contract does not give Eligo discretion to set prices as it sees fit. Instead, it "required the variation in the variable rates to be determined solely" in response to the contract's three identified inputs. *Mirkin v. XOOM Energy, LLC,* No. 18-CV-2949, 2023 WL 5200294, at * 7 (E.D.N.Y. Aug. 14, 2023). Just as in *Mirkin*, where the ESCO's contract promised rates "based on" identified factors, here, Eligo's contract promises rates "calculated on a monthly basis in response to" identified factors. And just as in *Mirkin*, "when you make a calculation 'based on' specific factors, you take only those factors into account; . . . You calculate a baseball player's batting average 'based on' his number of hits and his number of at bats—nothing more and nothing less." *Id.* at 5 (quoting *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 471 (S.D.N.Y. 2014)); *id.* at 6 (determining ESCO contract " requires the monthly variable rates to be determined by [identified inputs]—and ***only*** those costs." (emphasis added)).

In discovery, Eligo produced no documents showing the contractually required "calculations" based only on "market prices," "transportation costs," and "other market price factors." *See id.* at 8 (evidence of ESCO's reliance on non-contractual factors sufficient to show question of fact as to whether ESCO "set [customers'] monthly variable rate in compliance with the contract"). Thus, Plaintiffs' experts calculated the variable rates Eligo should have charged under the contract. *See Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261, 2016 WL 7009062, at *3 (S.D.N.Y. Nov. 30, 2016) (ESCO customer could show contract damages by calculating "the difference between [the ESCO's] actual charged rate and a hypothetical rate calculated pursuant to the factors described in the Sales Agreement").

3

The experts calculated the contract rate by identifying reference inputs for "market pricing," "transportation costs," and "other market price factors" and then used hard, undisputed data to assign monthly values to those inputs. Because the Court has not yet had the opportunity to construe Eligo's contract, Plaintiffs' experts were asked to provide monthly variable rate calculations under three different contract constructions.

Under the first construction, the experts were instructed to look to internal Eligo data for the inputs for "market pricing," "transportation costs," and "other market price factors." To perform these calculations, Plaintiffs' experts used ███████████████████████████████ █████████████████████.[2] Ex. 6, Expert Report of Edo Macan, dated Sept. 12, 2025 ("Macan Rep.") ¶¶ 135–55 (describing Method 1). Under the second construction, the experts were directed to assume that the contract inputs referred to the actual prices in the wholesale market in which Eligo, other ESCOs, and utilities procure their electricity supply. For this calculation, Plaintiffs' experts looked to publicly available energy market data. *Id.* ¶¶ 156–72 (Method 2). Under the third construction, the experts were directed to identify prevailing retail electricity rates. The experts calculated prevailing rates by reference to the market-weighted rates of the top eleven retailers in Plaintiffs' locations. *Id.* ¶¶ 173–88 (Method 3).

Under any of the three methods, Eligo's overcharges are substantial, as exemplified below in the comparison graph for 5+ years of Plaintiff Schuster's Eligo rates.

---

[2] Because ESCOs must submit their rates to the local utility in advance of each billing month, they use wholesale cost estimates for that next month to gauge their costs of goods sold.



*Id.* ¶ 183, Fig. 7. As an additional measure of damages under both Plaintiffs' consumer protection and contract liability theories, Plaintiffs' experts also measured the difference between the rate customers would have paid if their local utility were their supplier rather than Eligo.[3] Those calculations likewise show substantial overcharges on both an individual and class-wide basis.

Eligo takes a different view of its contractual obligations. Eligo contends that it can set variable rates based on the orally-conveyed term "pricing strategies," even though that term is not in the written contract and NYPSC regulations unequivocally require ESCO contracts to be reduced to a single agreement. Eligo's fallback view is that "market prices" means that it can charge whatever it wants as though the term "market" just means whatever the market will bear.

---

[3] *See Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 178 n.2 (2d Cir. 2019) (utility rates are "another reflection of the Market Supply Cost" because utilities "participate in the wholesale energy market"); *Chen v. Hiko Energy, LLC*, No. 14-CV-1771, 2014 WL 7389011, at *6 (S.D.N.Y. Dec. 29, 2014) (utility rate as comparator for rate based on "market-related factors"); *Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117, 2016 WL 344976, at *4 (S.D.N.Y. Jan. 27, 2016) (same); Ex. 7, *Bell v. Gateway Energy Servs. Corp.*, No. 31168/2018, at 4 (Rockland Cnty. Sup. Ct. Jan. 8, 2021) (same).

In other words, Eligo's view is that its statement regarding how "[v]ariable price is determined" does not constrain pricing and that Eligo can set variable rates as if there were no contract at all.

To support its contract reading, Eligo offers not an expert in New York's electricity markets, but instead Dr. Aron, an academic economist with zero academic or practical experience in New York ESCOs' operating environment. Her entire report should be stricken for that reason alone. Not surprisingly, given this lack of expertise, Dr. Aron parrots Eligo's contract reading. But she does so without accounting for the rules governing New York ESCOs. Moreover, Dr. Aron's lack of relevant expertise leads her to make numerous obvious and critical errors that underscore her lack of qualifications. Dr. Aron's opinions should be excluded.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 12, 2025, the Parties exchanged expert reports. Plaintiffs provided the expert reports of Dr. Frank Felder, Dr. John N. O'Brien, and Edo Macan. Defendants provided a single expert report from Dr. Aron. *See* Ex. 8, Expert Report of Dr. Debra Aron ("Aron Rep.").

Eligo submits Dr. Aron's report to support the claim that Eligo can base its rates on its determination as to how high it can increase rates before too many customers notice and quit. To that end, Dr. Aron opines that:



---

[4] *See* Aron Rep. ¶ 99

[5] *See, e.g., id.* ¶ 82

[6] *See, e.g., id.* ¶ 55.

████████████████████████████████████████████████

████████████████████████████

On October 31, 2025, Plaintiffs provided rebuttal expert reports from their three experts, responding to Dr. Aron's expert report and highlighting that its many deficiencies stem directly from Dr. Aron's lack of relevant expertise. *See* Ex. 9, Expert Rebuttal Report of Frank Felder, PhD ("Felder Rebuttal"); Ex. 10, Rebuttal Expert Report of Dr. John N. O'Brien ("O'Brien Rebuttal"); Ex. 11, Rebuttal Report of Edo Macan ("Macan Rebuttal"). Although Plaintiffs' initial expert reports directly undercut all her opinions, Dr. Aron chose not to issue a rebuttal report.

## LEGAL STANDARD

Trial courts have a "gatekeeping" obligation for all expert testimony and must ensure that any expert testimony admitted "rests on a reliable foundation" and is "relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (same).

To assess relevance, "courts must evaluate whether the expert testimony would assist the factfinder in the process of understanding the evidence or determining a fact at issue." *Anthem, Inc. v. Express Scripts, Inc.*, 660 F. Supp. 3d 169, 181 (S.D.N.Y. 2023) (Ramos, J.); *see also* Fed. R. Evid. 702(a) (expert testimony admissible only if "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. "This 'helpfulness' standard requires as a precondition to admissibility that the expert

---

[7] *See, e.g.*, *id.* ¶¶ 26, 106–13.

[8] *See, e.g.*, *id.* ¶¶ 26, 114–36.

testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (cleaned up).

The "reliability" prong is meant to exclude unsupported expert testimony. *Daubert*, 509 U.S. at 589–90. This inquiry requires that the testimony is both "based on sufficient facts or data" and "the product of reliable principles and methods," and that the expert applied "the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. "To warrant admissibility, [] it is critical that an expert's analysis be reliable at every step," meaning failure at "*any* step" renders the testimony inadmissible. *Amorgianos*, 303 F.3d at 267 (emphasis in original, quotation omitted).

In addition, even if admissible under Rule 702, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

## ARGUMENT

Dr. Aron is not qualified to provide expert opinions regarding variable rate pricing in New York's electricity market. Being an experienced economist and professional testifying expert does not change this, and her lack of relevant experience led her to make numerous fundamental errors that irretrievably taint her opinions. Accordingly, Dr. Aron's expert opinions are neither relevant nor reliable and should be excluded from consideration in this litigation under Rule 702.

## I.    Dr. Aron's Opinions Should Be Excluded Because She Is Unqualified.

Although Dr. Aron has a degree in economics and is a professional testifying expert, she has no relevant experience in New York electricity markets. All Eligo can cite are two previous litigation engagements in the last fourteen years purportedly related to energy markets. But those two litigation engagements are insufficient. *SEC v. Tourre*, 950 F. Supp. 2d 666, 679 (S.D.N.Y. 2013) ("Being a professional testifying expert in the financial area does not give an individual the

qualification to opine in every financial area as to every type of analysis."). Courts, including Your Honor, exclude experts who lack relevant expertise. *See, e.g.*, *City of N.Y. v. FedEx Ground Package Sys.*, No. 13-CV-9173, 2018 WL 4961455, at *2 (S.D.N.Y. Oct. 10, 2018) (Ramos, J.) (excluding experts and holding "a proposed expert witness must be, in fact, an expert in the area about which he or she intends to testify" and "an expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified" (quotations omitted)); *Dollman v. Mast Indus.*, No. 08-CV-10184, 2011 WL 3911035, at *4 (S.D.N.Y. Sep. 6, 2011) (excluding expert with "an extensive background in labor economics" who had "no specific experience, however, relating to the fashion industry or the fashion industry job market").

## II.     <u>Each Of Dr. Aron's Opinions Should Be Excluded As Irrelevant And Unreliable.</u>

Dr. Aron's lack of expertise causes her to offer opinions that are irrevocably flawed, rendering them irrelevant and unreliable.

### A.     <u>The Court Should Exclude Dr. Aron's Opinion That Eligo's Contract</u> ███████████████████████████

Dr. Aron's main opinion is that ███████████████████████████████████████ ████████████████████████████████████████████████ Aron Rep. ¶ 26. This view is premised on her incorrect assertion that ████████████████████████ ███████████████████████████ *Id.* ¶ 99; *see also id.* ¶ 82 ██████████████ ████████████████████████████

But "pricing strategies" is not in the contract, much less in the pricing term that describes how the "[v]ariable price is determined." That phrase instead comes from phone calls made by a ***third party*** pursuant to NYPSC regulations that require a verification that the consumer actually wants to enroll with the ESCO (referred to as a "TPV" call). Ex. 12, NYPSC Case 12-M-0476, Unif. Bus. Pracs. (Feb. 25, 2014) ("2014 UBP"), at 24, 33. Throughout discovery Eligo has

incorrectly claimed that the term "pricing strategies" is part of its customer contract. *See, e.g.*, ECF 148 at 3 (claiming contracts at issue "provide[] for variable pricing according to . . . 'pricing strategies'"); ECF 108 at 1 (similar); ECF 131 at 2 (similar). Dr. Aron's uncritical acceptance of Eligo's dubious claim led her to opine ████████████████████████████████████████ ████████████████████████████ Aron Rep. ¶¶ 26, 82–105.

Had she possessed sufficient expertise in New York's electricity markets, Dr. Aron would know that NYPSC regulations require ESCOs to provide customers with ***written*** contracts and to set rates based solely on the terms appearing in the box at the top of those contracts (the "Disclosure Statement"), not prior oral statements by third parties. As Plaintiffs' expert Mr. Macan explained:

> [T]he NYPSC's Uniform Business Practices ("UBP") in effect for the customers that enrolled prior to June 21, 2019 (the class members in this case) required Eligo to "provide" customers by "mail, e-mail or fax" a written "copy" of the offer terms that "describe the offer in detail, including the specific prices, terms, and conditions of ESCO service." 2014 UBP at p. 35, 2018 UBP at p. 35 (same). None of the documents Eligo provided to the Class Action Plaintiffs contain the term "pricing strategies," especially not the NY Terms of Service or the Variable Price Term (which latter term is contained in a "Disclosure Statement" that the NYPSC mandated be provided to ESCO customers). That Dr. Aron would clai ███████████████ ████████████████████████████████████████ reflects her lack of expertise in New York's retail electricity industry.

Macan Rebuttal at 3–4.

Dr. O'Brien's opening report likewise cited relevant regulations to explain why mentioning "pricing strategies" during the TPV call does not somehow amend Eligo's written contract. According to the NYPSC's UBP, the Disclosure Statement trumps potentially conflicting terms:

> In the event that the text in the Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the Statement shall constitute the agreement with the customer notwithstanding a conflicting term expressed elsewhere in the agreement.

2014 UBP at 25; Ex. 13, Expert Report of Dr. John N. O'Brien, dated Sept. 12, 2025 ("O'Brien Rep.") at 61–67. But Dr. Aron chose not to issue a rebuttal report, conceding that her discussion of "pricing strategies" is irrelevant because that term is not part of the contract.

And of course, under New York law, oral statements by a third party cannot supplement or supplant terms in a written contract. *See MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (N.Y. 2009) (party intent is "generally discerned from the four corners of the document itself" and a contract is "enforced according to the plain meaning of its terms." (cleaned up)); *see also Dibrino v. Rockefeller Ctr. N., Inc.*, No. 103, -- N.Y.3d --, 2025 WL 3670593, at *2 (N.Y. Dec. 18, 2025) (same); *Donohue v. Cuomo*, 38 N.Y.3d 1, 12–13 (N.Y. 2022) (same).

Courts exclude as irrelevant expert opinions that are based on the wrong contract terms or inaccurate contract readings. *See, e.g., Anthem*, 660 F. Supp. 3d at 181–82; *Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949, 2025 WL 16333, at *4 (E.D.N.Y. Jan. 2, 2025) (excluding as irrelevant expert opinion based on incorrect contract interpretation); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 14-CV-751, 2019 WL 1369007, at *11 (S.D. Cal. Mar. 26, 2019) ("Mr. Jans's contract interpretation is incorrect. . . . [T]hese opinions will be excluded."). Dr. Aron's expert report, which relies heavily on Eligo's non-existent contractual right to set variable rates based on "pricing strategies," Aron Rep. ¶¶ 82–105, should be stricken.

### B. The Court Should Exclude Dr. Aron's Opinions That Are Based On Her Incorrect View That Eligo ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Dr. Aron opines that Eligo's rates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g., id.* ¶ 40 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dr. Aron thus opines that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 99; ¶¶ 40, 82–105.

These generic economic opinions are irrelevant and unreliable because, owing to Dr. Aron's lack of relevant expertise, they fail to account for the contractual and regulatory constraints on Eligo's pricing practices. The Court should strike paragraphs 40 and 82–105 of Dr. Aron's report.

### 1.    Dr. Aron's Opinions Do Not Account For The Contractual Constraints On Eligo's Pricing Conduct.

Controlling Second Circuit law makes clear that Eligo's customer contract does not grant it "discretion" to set rates however it sees fit. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 411 (2d Cir. 2023) (ESCO contract requiring rates to be "based on" identified factors "did not describe the monthly variable rate as being set according to the ESCO's discretion"). In *Martinez*, the Second Circuit distilled the existing ESCO contract case law into two "dispositive questions" that arise in ESCO contract cases: "[1] whether an agreement entitled the energy services provider to use discretion in setting its rates and, [2] if so, how the agreement cabined that discretion." *Id.* at 410. In other words, the Second Circuit specifically recognized two different categories of ESCO pricing terms with different legal operations—first, pricing terms (like here) that do not expressly grant price-setting discretion and instead tie rates to identified inputs; and second, pricing terms (like in *Martinez*) that expressly provide the ESCO with price-setting "discretion" and then cabin that discretion in varying degrees. *Id.* at 410–11.

If a pricing term falls into the first *Martinez* category, the ESCO's rates must be set according to the contractual factors, and the analysis stops. *Id.* If the term falls into the second *Martinez* category, the court then determines whether the ESCO exercised its express price-setting discretion in bad faith or in a way that strays from the terms cabining that discretion. *Id.*

In *Martinez*, the Second Circuit drew a stark contrast between two of its precedents: on the one hand, *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88 (2d Cir. 2019), where variable rates were set using the ESCO's explicit "discretion" to set rates "higher or lower each month based upon business and market conditions," and on the other hand, *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), where "the relevant agreement did not describe the monthly variable rate as being set according to the ESCO's discretion." *Martinez*, 88 F.4th at 410–11.[9]

The ESCO's pricing term in *Martinez* unequivocally stated that variable rates will "be determined at [the ESCO's] discretion." *Id.* at 408. Thus, the Second Circuit assessed the factual record under the second *Martinez* step. *Id.* at 410.[10] Here, the word "discretion" is conspicuously absent from Eligo's contractual promise regarding how the "[v]ariable price is determined." Instead, Eligo's contract makes clear that "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market prices factors." Eligo's rates are thus assessed under the first *Martinez* step. *See id.* at 411.

This case is no different from the others in this District where courts determined that energy supplier contracts did not grant rate-setting discretion. *See, e.g.*, *Stanley*, 466 F. Supp. 3d at 426 (observing the Second Circuit's ruling in "*Richards* relied heavily on the contractual language explicitly indicating that the plaintiff's rates were subject to Defendant's *discretion*, a critical term that is absent here." (emphasis original)); *Weinberg v. CleanChoice Energy, Inc.*, No. 23-CV-9685, 2024 WL 3446515, at *10 (S.D.N.Y. July 17, 2024) ("The variable rate pricing terms in both *Richards* and *Agway* provided that the rate would be set at the ESCO's discretion. No such

---

[9] Prior to *Martinez*, Judge Karas described *Mirkin* and *Richards* as "goalposts" for ESCO contract cases. *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 425–26 (S.D.N.Y. 2020).

[10] Indeed, the *Martinez* plaintiff "acknowledge[d] that the Agreement allowed [the ESCO] to use its discretion to set the monthly variable rate[.]" *Id.*

language is present in the instant term."); *Melville v. HOP Energy, LLC*, No. 21-CV-10406, 2023 WL 2648775, at *7 (S.D.N.Y. Mar. 27, 2023) (refusing energy company's claim of discretion where company agreed to charge "our" prevailing "retail" price because contract omitted that the company "maintained the 'discretion' to set the variable rate 'based on business and market conditions'" (quoting *Richards*, 915 F.3d at 98)). Nonetheless, Dr. Aron's opinions sidestep the fact that Eligo's contract does not allow rate-setting discretion.

True, Eligo's contract lists "other market price factors" in addition to "transportation costs" and "market pricing," but the reference to "other market price factors" does not grant discretion by implication. In *Martinez*, where the ESCO contract referenced "margins," the Second Circuit did not look to that term and instead made clear that whether an ESCO has discretion turns on whether it is "contractually provided." 88 F.4th at 411; *see also Mirkin*, 2023 WL 5200294, at *6 ("*Richards* in fact confirms that contractual silence does not allow unbounded discretion[.]"). Moreover, because Eligo's is an adhesion contract, any vagueness is construed against Eligo. *See Mirkin*, 2023 WL 5200294, at *5 (pricing term vagueness construed against ESCO).

Judge Halpern's analysis in *Weinberg* is also instructive. There, the contract stated rates:

> may vary each month and [are] based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins. This list of factors is not exhaustive and no single factor will determine the rate. Additionally, we seek to acquire a majority of our anticipated electricity supply in advance rather than from the spot market. For all of these reasons, your variable rate may not correlate with changes in wholesale market prices or your utility's rates. Your variable rate may be higher than your utility rate or other suppliers' rates.

2024 WL 3446515, at *9. Despite expansive list of "factors," Judge Halpern found the lack of an express grant of discretion was dispositive under Second Circuit precedent in *Richards*, *Mirkin*, and *Agway*. *Id.* at 10.

14

By contrast, Dr. Aron's opinions ignore that Eligo's contract invokes a mathematical formula when it promised that variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market prices factors." Dr. Aron recognizes that ███████████████████████████████████████████████████████████████ ███████████ Aron Rep. ¶ 26, but her analysis reads that term out of the contract entirely. If the contract permitted ███████████████████████████████████████████████ ██████████████████████████████ Failure to account for such key contract terms taints her proposed testimony. *See Meehancombs Glob. Credit Opps. Master Fund, LP v. Caesars Ent. Corp.*, 162 F. Supp. 3d 200, 210 (S.D.N.Y. 2015) ("[I]nterpretations that render contract terms meaningless or superfluous" should be avoided.).

Similarly, the phrase "other market price factors" indicates that both "market pricing" and "transportation costs" are "market price factors." Since "transportation costs" refers to Eligo costs, "market pricing" also refers to Eligo costs. *See Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 390 (S.D.N.Y. 2023) ("Under familiar contract interpretation principles, each item in a list of items is interpreted by the company it keeps."). An ESCO's energy procurement cost is its biggest cost to supply energy so it is unsurprising that the contract first lists the "market pricing" cost, followed by "transportation costs," followed by a cost-related catchall for "other market price factors." *See Baker v. Weber*, No. 19-CV-1093, 2021 WL 4480998, at *7 (S.D.N.Y. Sept. 30, 2021) ("Under the *ejusdem generis* principle, when general words follow specific words, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (cleaned up)).[11]

---

[11] The pricing term also states that state that "[a]pplicable taxes will also be factored into the variable price." Exs. 1–2. In New York, the local utility separately charges and collects taxes on Eligo's variable rates, if any.

Dr. Aron likewise ignores contractual constraints on Eligo's margins. That Eligo's pricing term does not identify a specific profit margin does not somehow give it a contractual right to pad its variable rates with unreasonable markups. In *Mirkin*, the court found that an ESCO pricing term that was silent on the specific profit margin allowed the ESCO to impose a "reasonable" markup that would be fixed and "remain proportionate" relative to the contract's identified pricing inputs. *Mirkin*, 2023 WL 5200294, at *6. In other words, the ESCO could charge a markup above the contract inputs, but the markup had to be fixed such that "the variation in the variable rates to be determined solely" by the contract's identified inputs. *Id.* at *6–7; *see also Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949, 2023 WL 5622099, at *2, *7 (E.D.N.Y. Aug. 31, 2023) (granting class certification and noting contractual obligation of fixed, reasonable margin). Conversely, Dr. Aron offers ███████████████████████████████████████████████

### 2.   Dr. Aron's Opinions Do Not Account For The Regulatory Constraints On Eligo's Pricing Conduct.

As noted by Dr. O'Brien, "[t]he terms and performance under the contract must be evaluated through the lens of the NYPSC's binding Orders and requirements of the Uniform Business Practices." O'Brien Rebuttal at 6. In other words, by opining that ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

***First***, as discussed in Section II.A above, when Dr. Aron ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████[12] ***Second***, Dr. Aron opines that Eligo's pricing ████████████████████

---

[12] *See generally* Ex. 14, NYPSC Case 98-M-1343, In the Matter of Retail Access Bus. Rules, Order Adopting Unif. Bus. Pracs. and Requiring Tariff Amends. (Jan. 22, 1999).

███████████████████████████████████████████████ Aron Rep.

¶¶ 55, 61, 67–70.[13] Dr. Aron states that ███████████████████████████████

█████████████████████████████████████████████████████████

████████████████████ Aron Rep. ¶ 55. That statement is incorrect and misleading. The NYPSC sets

limits on ESCO rates ████████████████████████████ If Dr. Aron were qualified,

she would know that ESCOs can only ████████████████████████████

Indeed, the NYPSC specifically requires that the "premium charged by the ESCO for a

renewable product must be commensurate with the incremental costs it incurs to provide the

product." Ex. 15, NYPSC Cases 15-M-0127, et. al., Ord. Adopting Changes to the Retail Access

Energy Mkt. and Estab. Further Process (Dec. 12, 2019) ("NYPSC Order"), at 81. While Dr. Aron

███████████████████████ of the NYPSC Order, ████████████████████████████

█████████████████████████████████████████████████████████

Plaintiffs' expert Dr. Felder addressed this issue in his opening report, Ex. 16, Expert

Report of Frank Felder PhD ("Felder Rep.") ¶¶ 20–21, which Dr. Aron chose not to rebut. As Dr.

O'Brien explained, Dr. Aron ████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████ O'Brien Rebuttal at 3. This basic

misunderstanding of applicable regulation merits excluding Dr. Aron's opinion on this matter.

Dr. Aron's opinion should also be excluded because it is unreliable. She opines that Eligo's

█████████████████████████████████████████████████████████

---

[13] A REC certifies that 1 megawatt-hour of electricity was produced from a renewable source (e.g.,
solar or wind) and delivered to the New York electricity grid.

███████████████████████████████████████ Aron Rep. ¶ 110; *see also id.*

¶¶ 111–13, 125–31. Although Dr. Aron concedes that █████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████ as the NYPSC

mandated. Dr. Aron's omission is inexplicable because ██████████████████████

█████████████████████████████████████████████████████████████████

███████████████████ *See* Felder Rep. ¶¶ 27, 32, 51 n.32.

By contrast, Plaintiffs' experts used █████████████████████████████

██████████████████████████████████████████████████████████ *See*

Felder Rep. ¶¶ 39–43, 51, 51 nn.32 & 33, 66; *see also* Macan Rep. ¶¶ 135, 139–41, 147, 162. Dr.

Aron did not issue a rebuttal ████████████████████████████████████████

████████████ Instead, Dr. Aron's opinion "is connected to existing data only by the *ipse dixit* of

the expert" and must be excluded. *Nimely v. City of N.Y.*, 414 F.3d 381, 396–97 (2d Cir. 2005);

*see also Amorgianos*, 303 F.3d at 266 ("Thus, when an expert opinion is based on data, a

methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert*

and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

*Querub v. Hong Kong* provides a useful illustration of how Dr. Aron's lack of relevant

expertise renders her opinions irrelevant and unreliable. 649 F. App'x 55 (2d Cir. 2016) (summary

order). *Quereb* turned on whether the defendant accounting firm complied with Public Company

Accounting Oversight Board ("PCAOB") auditing standards in financial statements for a U.S.-

listed company headquartered in China. 649 F. App'x at 56, 58. The *Quereb* plaintiffs' sole expert

witness, accountant Hou, "testified that [defendant] failed to comply with the auditing standards

of Hong Kong and/or the People's Republic of China." *Id.* at 56. But she was not an expert on PCAOB and thus could not opine whether the audits met PCAOB standards. *Id.* at 56. In affirming the district court's decision to strike Hou's report under Rules 702 and 403, the Second Circuit noted that "Hou lacks experience and expertise in conducting or reviewing audits done according to PCAOB standards and is therefore not qualified to opine on [them]." *Id.* The Second Circuit further held that "Hou's testimony that auditing standards in Hong Kong or PRC do not materially differ from PCAOB standards is speculative. Because she is not qualified to opine on PCAOB standards, she has no basis for comparing them with other standards." *Id.*; *see also Freeman v. Deebs-Elkenaney*, No. 22-CV-2435, 2024 WL 3634738, at *2 (S.D.N.Y. Aug. 1, 2024) ("This 'helpfulness' standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." (cleaned up)); *Dollman*, 2011 WL 3911035, at *4 (excluding expert with "extensive background in labor economics" who was "undoubtedly qualified to offer expert testimony on . . . general economic damages" as irrelevant due to lack of industry-specific experience).[14]

Just as the district court in *Quereb* found that "the basis of Hou's methodology, application of Hong Kong and PRC accounting standards, is an inappropriate starting point,"[15] so too in this

---

[14] Similar opinions striking expert testimony for lack of qualification are legion. *See, e.g.*, *Franchitti v. Cognizant Tech. Sols. Corp.*, No. 21-CV-2174, 2025 WL 2123655, at *5 (S.D.N.Y. July 29, 2025) (expert unqualified due to lack of expertise in industries (information technology and consulting) at issue); *Calltrol Corp. v. LoxySoftAB*, No. 18-CV-9026, 2025 WL 2720984, at *3 (S.D.N.Y. Sept. 24, 2025) (expert qualified in telecommunications and communications software industry, but unqualified to opine on contract law, economics, or business matters); *Wiener v. ACA Equitable Life Ins. Co.*, No. 16-4CV-019, 2019 WL 1228074, at *8–9 (S.D.N.Y. Mar. 16, 2019) (Ramos, J.), *rev'd in part on other grounds*, 113 F.4th 201 (2d Cir. 2024) (actuarial expert unqualified to opine on non-actuarial subjects).

[15] *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 255 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016).

case, applying general economic principles relevant to free markets is an inappropriate starting point for analyzing an ESCO's conduct governed by both contract and regulation.

**C.   Dr. Aron's Opinion That** ████████████████████████████████
          **Should Be Excluded Because Dr. Aron's** ████████████████

Dr. Aron opines that ████████████████████████████████████████████████████

████████████████████████████████████████████████ Aron Rep. ¶ 114. Her

opinions regarding ██████████████████, *id.* ¶¶ 114–36, are unreliable for at least two reasons.

First, Dr. Aron's ████████████████████████████████████████████ *See,*

*e.g.*, Aron Rep. App'x 1-297. Second, Dr. Aron ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See, e.g.*, *id.*

App'x 1-660. To illustrate, if seller "A" sells 1 million units at \$10 and seller "B" sells 5 units at

\$100, under ████████████████████████████████████████

Dr. Aron correctly concedes that ██████████████████████████████████████

████████████████████████████████████████ Aron Rep. ¶ 32. ████████████

████████████████████████████████ Ex. 17, Dep. Tr. of Andrew LaPointe, dated June 18, 2025,

at 86:22–25 ████████████████████████████ Utilities are Eligo's largest

competitors. Felder Rebuttal ¶ 29; *see also* Macan Rebuttal ¶ 19. Yet Dr. Aron failed to include

████████████████████████████████████████████████████████████

██████████████████ Aron Rep. ¶ 118; *see also id.* ¶ 120 n.187. Dr. Aron is incorrect.

As Dr. Felder's ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ Felder Rebuttal ¶ 29 (emphasis added). Inexplicably, although Dr. Felder's

original report ███████████████████████████████████████████████████

██████ *See* Felder Rep. ¶¶ 29, 62–63; *see also id.* Ex. B (listing sources of utility data).

Dr. Aron's failure to use available and critical data (and misuse of the data collected) warrants exclusion. "Exclusion of expert testimony is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion." *Freeman*, 2024 WL 3634738, at *7 (internal quotation omit ted); *see also Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 382–83 (S.D.N.Y. 2014) (damages estimate unreliable due to ignoring relevant data); *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 833–34 (C.D. Cal. 2010) (expert report unreliable for excluding relevant competitors in market share analysis); *Comfortex Co., Ltd. v. Xcel Brands, Inc.*, No. 21-CV-7326, 2024 WL 1255535, at *7 (S.D.N.Y. Mar. 25, 2024) (Ramos, J.) (excluding report "based on data that is simply inadequate to support the conclusions reached").

### D.    The Court Should Exclude Dr. Aron's Opinion That Utility Rates Are Not Reflective Of The Costs ESCOs Like Eligo Incur To Serve Retail Customers.

Dr. Aron's claims ███████████████ Aron Rep. ¶¶ 106–13, are flawed and should be stricken. ████████████████████████████████████ *id.* ¶ 54 n.91, and ██████████████████████████████████████ *id.* ¶ 108 n.172, ███████████████ ███████████████ *Id.* ¶ 108. She supports this claim with four unreliable claims.

First, Dr. Aron claims ████████████████████████████████████ ██████████████████████[16] This claim lacks credible support. Applicable regulation requires New York utilities to purchase electricity supply on the same wholesale market that ESCOs can and do buy from. O'Brien Rep. at 20. The utility supply rate is a passthrough of those

---

[16] While local utilities ***supply*** only the 90% of customers that do not purchase from ESCOs, they ***distribute*** all customers' electricity and charge a separate rate for doing so.

wholesale prices, plus utilities' supply-related overhead. Macan Rep. ¶ 30. ███████████

█████████████████████████████████████████ as Dr. Aron opines.

Utility distribution rates are ███████████████ because distribution charges are

scrutinized by the NYPSC precisely to prevent high distribution charges. Felder Rebuttal ¶ 21

("[T]he NYPSC actively polices the allocation of utility costs across its distribution and supply

charges." (citing NYPSC Case 00-M-0504, Statement of Policy on Unbundling and Order

Directing Tariff Filings (Aug. 25, 2004), at 2)).

Owing to her lack of expertise in New York's energy market, Dr. Aron ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ Notably, as Dr.

Felder also points out, Dr. Aron could have ████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ Felder Rebuttal ¶ 19. Dr. Aron's decision not to do so

further renders her opinion unreliable and little more than impermissible *ipse dixit*.

Second, Dr. Aron also claims ████████████████████████████████

████████████████████████ Aron Rep. ¶ 108.[17] ████████████████████

██████████████████████████████████████████████████████████

████████████████ *Id.* ¶ 108 n.172. Again, Dr. Aron could have conducted an empirical

analysis to support her claim, but she did not. *See* Felder Rebuttal ¶ 20 ("[U]tilities' Merchant

Function Charges are publicly available, ██████████████████████████████

---

[17] The Merchant Function Charge is a fixed per kilowatt-hour charge that reflects the utility's administrative costs for obtaining electricity. *See, e.g.,* "Billing Glossary," NYSEG, https://www.nyseg.com/account/understandyourbill/billingglossary; *see also* Aron Rep. ¶ 108 n.171 ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

Third, Dr. Aron briefly opines that ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Aron Rep. ¶ 109 (citing NYPSC Order at 47).

Dr. Aron's claim is refuted by her own cited authority. The NYPSC explained that this complaint by ESCOs—raised primarily "in the context of variable-rate gas commodity service"[18]—fails to acknowledge that "out-of-period adjustments by the utilities ultimately are a zero-sum game: for any downward adjustment made to a customer's bill, a corresponding out-of-period increase must be made. This process moderates fluctuations in customer bills that otherwise would result from market activity." NYPSC Order at 43. ████████████████████████

███████████████████████████████████████████████████

████ *Id.* Dr. Aron's opinion is also unreliable because it is unsupported by data or empirical analysis. *See* Felder Rebuttal ¶ 28 ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

Fourth and finally, Dr. Aron claims ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[18] *See* Aron Rep. ¶ 31 ████████████████████████████████████████████████.

Aron Rep. ¶ 110. Yet she 

Felder Rebuttal ¶ 49; *see also* Macan

Rebuttal ¶ 36. As discussed above, Dr. Felder and Mr. Macan performed this analysis in their

opening reports,

*See supra* § II.B.2.

      Dr. Aron claims ████ are "speculative and conjectural, and fail[] to comply

with *Daubert*'s reliability requirement." *Scott*, 315 F.R.D. at 54–55 (excluding expert testimony

based solely on defendant's representations with "no reference to the underlying data" or

indication that the expert "made any attempts to verify" the accuracy of the information);

*Comfortex*, 2024 WL 1255535, at *7 (excluding report "based on data that is simply inadequate to

support the conclusions reached"). Her testimony in paragraphs 106–13 should be excluded.

## III.    Dr. Aron's Expert Opinions Should Be Excluded Under F.R.E. 403 Because They Are More Prejudicial Than Probative.

      "In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and

'may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury.'" *Nimely*, 414 F.3d 381, 397 (quoting

Fed. R. Evid. 403). "The Rule 403 inquiry is particularly important in the context of expert

testimony, 'given the unique weight such evidence may have in a jury's deliberations.'"

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 325 (S.D.N.Y. 2019)

(quoting *Nimely*, 414 F.3d at 397).

      *Querub* also serves as an apt illustration of the interplay of Rules 702 and 403. In addition

to excluding expert opinions by the plaintiff's expert Hou on the relevant standard of care for an

auditor under Rule 702, the district court and the Second Circuit prohibited Hou from offering

expert opinions on **any other subject** under Rule 403. *Puda Coal*, 30 F. Supp. 3d at 255; *Quereb*, 649 F. App'x at 57. The reason was that to "the extent that Hou could provide information relating to bookkeeping and recordkeeping in Hong Kong or China"—an area where she had expertise— her "opinions run the very real risk of misleading the jury as to the applicable standard of care." *Puda Coal*, 30 F. Supp. 3d at 255; *Quereb*, 649 F. App'x at 57 ("Opinions on Hong Kong and/or PRC auditing standards . . . would risk muddling the issue of the applicable standard of care."). Permitting Hou to "testify as plaintiffs' 'accounting expert'" presented too great a risk "that a factfinder would take Hou's opinions as setting the standard of care against which the Auditors' conduct should be measured." *Puda Coal*, 30 F. Supp. 3d at 255; *Quereb*, 649 F. App'x at 57.

Here, Dr. Aron writes about economic theory but does not account for the regulatory and contractual constraints on Eligo's conduct. Instead, Dr. Aron would have the jury assume that the economic theory she mentions applies to Eligo's rate-setting and, hence, that Eligo is behaving as any other rational firm would in an entirely free and open market. Testimony from Eligo's "seasoned and impressively credentialed [] expert, regarding the results of [her generic economic analysis and distortion of Eligo's operating constraints], would prove to be both powerful and quite misleading." *Grasshopper Gardens, Inc. v. PMA Mech. LLC*, No. 23-CV-1257, 2025 WL 2711066, at *10 (N.D.N.Y. Sep. 23, 2025) (cleaned up). Rule 403 is designed to prevent precisely that. *See Nimely*, 414 F.3d at 397–98 (district court abused its discretion by admitting misleading expert testimony); *see also Mirkin*, 2025 WL 16333, at *3 ("[Defendant's expert's] analysis bears only minimal probative value to a fact of consequence, and is instead probative of a fact that is facially similar but ultimately immaterial to [ESCO's] liability. The risk that the jury will confuse those issues . . . is significant, and I therefore exclude that opinion under Fed. R. Evid. 403."). Dr. Aron's opinions should similarly be excluded under Rule 403.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs respectfully request that the Court exclude Dr. Aron's expert report and any related testimony she might offer at trial.

Dated: January 16, 2026    Respectfully submitted,

        By: */s/ D. Greg Blankinship* 
         D. Greg Blankinship
         Daniel J. Martin
         **FINKELSTEIN, BLANKINSHIP,**
         **FREI-PEARSON & GARBER, LLP**
         One North Broadway, Suite 900
         White Plains, New York 10601
         Tel: (914) 298-3281
         Fax: (914) 824-1561
         gblankinship@fbfglaw.com
         dmartin@fbfglaw.com

         **WITTELS MCINTURFF PALIKOVIC**
         J. Burkett McInturff
         Andrey Belenky
         Ethan D. Roman
         305 BROADWAY, 7TH FLOOR
         New York, New York 10007
         Telephone: (914) 775-8862
         Fax: (914) 775-8862
         jbm@wittelslaw.com
         abelenky@wittelslaw.com
         edr@wittelslaw.com

         *Counsel for Plaintiffs and the Proposed Class*

## <u>LOCAL CIVIL RULE 7.1 CERTIFICATION</u>

I certify that this Memorandum of Law contains 8,394 words and complies with Local Civil Rule 7.1's requirements.

Dated: January 16, 2026              By:    <u>*/s/ D. Greg Blankinship*</u>
                                            D. Greg Blankinship

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 16, 2026, the foregoing was served via ECF on all counsel of record.

By:     <u>/s/ *D. Greg Blankinship*</u>
        D. Greg Blankinship