Exhibit 14

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the City of
Albany on January 13, 1999

COMMISSIONERS PRESENT:

Maureen O. Helmer, Chairman
Thomas J. Dunleavy
James D. Bennett

CASE 98-M-1343 - In the Matter of Retail Access Business Rules.

ORDER ADOPTING UNIFORM BUSINESS
PRACTICES AND REQUIRING TARIFF AMENDMENTS

(Issued and Effective January 22, 1999)

BY THE COMMISSION:

INTRODUCTION

We have recognized that certain inconsistencies exist among the retail access business rules and procedures of the various gas and electric utilities and have expressed our desire that those inconsistences be minimized.  We therefore directed our staff to work with interested parties in an attempt to provide some degree of standardization for the key procedures.

Staff held meetings with the utilities, gas marketers, the electric energy services companies (ESCOs) and other interested persons to determine which of the utilities' many retail access rules and procedures were most amenable to standardization and where priorities should be focused.  Based on those inquiries, staff developed a draft proposal that was issued on October 7, 1998 for comment by interested parties.  Comments were received from 21 entities.  Appendix A contains a list of those entities.

We have determined that the proposal should be adopted with certain modifications designed to accommodate the comments and concerns raised by the parties and to address additional matters we consider relevant.  We have also determined that

CASE 98-M-1343

several of the procedures set forth by staff in the October 7 draft proposal are not ripe for consideration at this time.

Appendix B contains the appropriate practices and procedures necessary to foster competition in New York State at this time.  They represent a balancing of the issues and concerns raised in this proceeding by the interested parties.  We recognize, however, that because electric and gas retail competition is in it infancy in New York State, flexibility must be allowed and revisions will likely be required as we learn more about actual market conditions.

We are issuing this abbreviated Order today to initiate changes in retail access procedures by May 1, 1999, except with respect to any procedures that would require modification of communications systems (existing systems should continue to be used to implement the procedures until we make determinations in the Electronic Data Interchange Proceeding).[1]  A more comprehensive Order will be issued shortly to explain our decisions and to address the parties' comments.  The statute of limitations for filing petitions for rehearing or clarification will be deemed to run from the date of issuance of the comprehensive Order.

We discuss below several of the significant provisions of the practices.

<u>DISCUSSION</u>

<u>ESCO Creditworthiness</u>[2]

ESCOs, as part of providing gas or electricity to customers, currently use supply balancing services from utilities and may also provide a single bill or act as a customer's billing agent (<u>i.e.</u>, the customer pays the ESCO for both the commodity

---

[1] Case 98-M-0667 - <u>In the Matter of a Statewide Assessment of Customer Information Systems</u>.

[2] The term "ESCO" is used in this Order to refer to energy services companies, natural gas marketers and direct customers, where applicable.

CASE 98-M-1343

and the utility delivery; the ESCO remits the latter charge to the utility).  These actions expose utilities to financial risk from possible non-delivery or non-payment, and utilities currently require ESCOs to meet creditworthiness criteria or post security.

### Credit Evaluation

Staff had proposed that utilities continue to evaluate creditworthiness, but use uniform criteria.  Con Edison proposed an alternative to utility-based creditworthiness evaluations.  It would generally exempt a company with a satisfactory credit rating (BBB from Standard and Poor's or Fitch, or Baa2 from Moody's) from posting security.  Con Edison's approach is adopted.  The procedures we adopt here will also allow for Dun & Bradstreet ratings, to be used in conjunction with a good payment history, to provide an exemption.  Relying on the rating agencies will provide objectivity and avoid redundant and possibly inconsistent credit evaluations.

### Calculation of Security Amount

Companies that do not meet the creditworthiness standard will have to post security based, in most cases, on an estimate of maximum imbalances over 30 days.  ESCOs billing for utility service as well as their own service will generally have to post additional security equal to up to 60 days of their customers' projected maximum aggregate energy requirements priced at the utility's applicable tariff delivery rates.

### Direct Customers

Large customers procuring their own energy also expose utilities to financial risk.  The rules will allow such customers to avoid posting security if they were rated creditworthy and have 12 months of good payment history.  Unrated customers will avoid posting security if they had 24 months of good payment history.  Direct customers with inadequate ratings or payment

CASE 98-M-1343

history will be required to provide the full security
requirement.

### Other Issues

- no security will be required of an ESCO when a
  utility bills on its behalf and has the right to
  retain funds to offset utility charges.

- utilities will not be allowed to vary an existing
  level of security unless credit exposure changes
  by either 10% or a certain dollar amount, to be
  proposed and resolved in compliance filings.

- Staff proposed the use of a lockbox--a procedure
  where payments from customers are sent to a
  mutually acceptable third party and that entity
  distributes the money--to reduce the security
  requirement to 20% of what would otherwise be
  required.  Based on parties' comments, we will
  revise the procedures so that the lockbox may
  cover 50% of such security.


### Historical Customer Information

The procedures require that 24 months of historical
customer usage information be provided to the customer or its
designee free of charge.  The rules would also require utilities
to provide, upon written consent of the customer, 12 months of
credit information (incidence of late payment history and number
of disconnections.)

The specified information identified above that is
requested to be provided more than twice in any twelve month
period or for periods beyond the time frames listed above is to
be provided for a $15 fee.  Any other types of usage and billing
information, to the extent that it exists with the utility, will
be provided for a cost-based fee.


### Customer Consumption Data

The proposed practices would have required that
utilities make all data recorded by and retrieved from customers'

-4-

CASE 98-M-1343

meters available to ESCOs within 48 hours.  Utilities commented
that such a time frame was not practicable.  The revised practice
requires the delivery of information at the same time the data
are acceptable to the utility to bill its customer.  Other
information, such as load balancing charges and other parameters
used in determining bills, is to be provided, if available, for a
fee.

Utility Billing and Collection Services

        The practices require ESCOs to pay utility charges
within 20 business days of the date of the invoice (30 business
days if acting as a billing agent).  Late payment charges of 1.5%
a month would apply to overdue amounts.  Utilities are to be
allowed to recover collection expenses from ESCOs.

Service Initiation

        The practices provide that customers seeking utility
delivery service would be able to initiate both delivery and
supply service with one phone call to the ESCO, although they
could contact the utility and ESCO separately if they preferred.

Customer Switching

        Parties' comments convinced us that gas and electric
industries operate differently.  Accordingly, we will not require
uniform switching date requirements.  In most service
territories, natural gas marketers nominate gas for
transportation on a monthly basis.  Therefore, gas customers will
be allowed to switch suppliers on the first day of the month or
on the customers' meter reading dates as determined by each
utility.  Electric customers will be allowed to switch only on
the meter reading date in order to minimize confusion and avoid
estimated bills.

        Frequent customer switching imposes administrative and
operational costs on utilities and may be the result of customers
gaming the system: choosing, for example, ESCO services based on
a spot commodity cost when prices are low and returning to the

-5-

CASE 98-M-1343

utility's services, the prices for which might be capped or averaged when spot prices are high.  To minimize the gaming, the practices allow utilities to require that customers returning voluntarily to utility bundled service stay with the utility for a specified period, unless the utilities employ some mechanism to flow through market prices to returning customers.

To allow utilities to recover reasonable costs while still enabling competition, the procedures provide that a customer may switch voluntarily from the utility to an ESCO without charge and may switch voluntarily again, once without charge, either between ESCOs or back to the utility.

Slamming

ESCOs will have to use one of the four methods to obtain customer authorization (letter of agreement, third party verification, ESCO taping of customer authorization or customer initiation of service change.)  ESCOs would be responsible for wrongful charges if found slamming.  To minimize the impact of slamming, the rules will require utilities to notify customers that their energy supplier has been changed.  Customers will have 5 days to notify the utility of an invalid switch.  Staff will approve the notice to be sent to customers and will monitor utility activities to prevent anticompetitive practices.

Billing Agency Arrangements

The procedures contemplate that a customer may authorize an ESCO to consolidate ESCO and utility bills into one bill, to collect payment from the customer, and to remit the payment to the utility on behalf of the customer.  The procedures require that customer payments be applied, unless otherwise directed by the customer, first to utility bills, and that late payment charges leveled by the utility not be passed through to the customer if the customer's payment was timely.  Furthermore, a customer having paid a utility bill in a timely fashion to a billing agent ESCO should not be billed again for that utility service.  Therefore, utilities will not be permitted to rebill a

-6-

CASE 98-M-1343

customer in such a situation.  The procedures also allow
utilities to terminate the billing agency arrangement for a
particular ESCO under certain circumstances.

Dispute Resolution Process

        For disputes between ESCOs and utilities, the practices
provide for a process that enlists a written description of the
issue, a response, a meeting, and a request for resolution by the
Department.

Compliance Procedures

        Compliance filings for the necessary tariff
modification will be due within 45 calendar days of this Order.
Utilities should consult with our staff in order to develop
consistent tariff language.  The utilities will also be allowed,
in their compliance filings, to request temporary waivers or
modifications of specific provisions of the procedures set forth
in Appendix B so long as they provide an explanation as to what
new information or circumstances have arisen that would make
conformance with the procedures impractical.  In the
comprehensive Order, we will establish a process for authorizing
temporary suspensions of the individual procedures for emergency
situations that arise once the procedures become effective.
Finally, as will also be explained in more detail in the
comprehensive Order, the utilities will be allowed to request
recovery of any prudent, verifiable net incremental costs or net
lost revenues that result from implementation of the procedures
set forth in Appendix B and which they can subsequently prove to
exist, subject to any limitations or deferral mechanisms that may
have been established in the orders establishing rate plans.

The Commission orders:

        1.  Each jurisdictional major gas corporation and major
electric corporation shall file, within 45 calendar days of this
Order, revised tariff leaves, to become effective on May 1, 1999,
to provide procedures consistent with the substantive contents of

CASE 98-M-1343

Appendix B, except that the filings may request temporary waivers or modifications of specific provisions, as provided for in the text of this Order, and need not implement provisions related to communications systems, also as provided for in the text of this Order.

      2.  Copies of the compliance filings shall be served on the parties identified in Appendix A, who shall have 10 calendar days following such service to submit comments to the Commission.

      3.  This proceeding is continued.

            By the Commission,

  (SIGNED)                  DEBRA RENNER
                            Acting Secretary

**COMMENTING PARTIES**

The Energy Association of New York State

Consolidated Edison Company
  of New York, Inc.

Niagara Mohawk Power Corporation

New York State Electric & Gas Corporation

Rochester Gas and Electric Corporation

Central Hudson Gas & Electric Corporation

Orange and Rockland Utilities, Inc.

The Brooklyn Union Companies

National Fuel Gas Distribution Corporation

A consortium of Marketers consisting of:

> Agway Energy Services, Inc.
> ECONnergy Energy Company, Inc.
> Empire State Petroleum
>   Association, Inc., and
> Total Gas & Electric, Inc.

A consortium of Marketers consisting of:

> AllEnergy Marketing Company, L.L.C.
> Enserch Energy Services, Inc., and
> Statoil Energy, Inc.

A consortium of Marketers consisting of:

> New York Energy Service Providers
>   Association, and
> NEV East, L.L.C.

The National Association of Energy
  Services Companies

The National Energy Marketers Association

The Joint Supporters and its member
  Key Span Energy Services, Inc.

NorAm Energy Management, Inc.

Con Edison Solutions

PSEG Energy Technologies, Inc.

Multiple Intervenors

New York State Consumer Protection Board

East Coast Energy, Inc.

**STATE OF NEW YORK**
**PUBLIC SERVICE COMMISSION**

**UNIFORM RETAIL ACCESS**

**BUSINESS PRACTICES**

**CASE 98-M-1343**

**TABLE OF CONTENTS**

Page #

Definitions......................................................... 1

Creditworthiness.................................................... 3

Customer Information................................................ 9

Uniform Utility Billing and Collection Services and Charges....... 11

New Delivery Customer Requirements................................ 15

Switching Requirements............................................ 17

Slamming Prevention Process....................................... 20

Partial Requirements Customers.................................... 22

Billing Agency Arrangements....................................... 23

Metering.......................................................... 27

Discontinuance of Service......................................... 28

Dispute Resolution Process........................................ 38

## DEFINITIONS

<u>Aggregator</u> - a non-utility entity that aggregates customers (including direct customers) for the purpose of obtaining electricity and/or natural gas supply for those customers but does not sell electricity or natural gas to those customers.

<u>Billing Agency</u> - an arrangement between a customer and an ESCO/Marketer ("Billing Agency Agreement") in which a "Billing Agent" is authorized by a customer to:  receive the customer's bills from the utility; consolidate those bills with the ESCO/Marketer's charges; rebill the entire amount to the customer in a single bill format; receive payments from the customer; and remit the appropriate part of payments to the utility.  ESCO's/Marketers offering billing agency services may perform those services itself or obtain a third party to perform the services, but in either case, the ESCO/Marketer is considered to be the customer's billing agent.  Customers may also individually establish arrangements with third parties to perform similar services on their behalf, but those arrangements are not the subject of the uniform business rules.

<u>Cramming</u> - the addition of unauthorized charges to a customer's bill.

<u>Direct Customer</u> - a customer that purchases and schedules delivery of electricity or natural gas for its own consumption and not for resale. Direct Customers do not have to file an application with the Department of Public Service to become eligible as an ESCO/Marketer, but must comply with certain operating requirements established by the utilities and, when available, the Independent System Operator (ISO).

> <u>Electric</u> - a customer, with a load of 1 MW or more of electricity, that acts on its own behalf to obtain electric energy and capacity from one or more suppliers.

> <u>Natural Gas</u> - a customer, with an annual natural gas consumption in excess of 3,500 Dekatherms, that acts on its own behalf in arranging to bring natural gas to the utility's city gate.

<u>Energy Services Company (ESCO)</u> - any non-utility entity that can perform energy and customer service functions in a competitive environment, including provision of energy and assistance in the efficiency of its use.  The term ESCO is used herein to refer to entities that are deemed eligible by the Department of Public Service to provide electricity and associated customer service functions to end use customers in New York State.

<u>Involuntary Switch</u> - a process or situation where a customer's energy supplier is changed from one provider to another without the customer's authorization.  An involuntary switch that is not in accord with the "Discontinuance of Service" provision set forth in the rules is referred to as "slamming."

<u>Lockbox</u> - a collection mechanism agreed upon by a utility and an ESCO/Marketer/Direct Customer which employs a third party financial institution to receive and disburse customer payments.

<u>Marketer</u> - any non-utility entity that is determined eligible by the Department of Public Service to provide or arrange to provide gas supply and other services on behalf of end use customers in New York State using the local utility's distribution system.

<u>New Delivery Customer</u> - a customer that initiates delivery service.

<u>Special Meter Read</u> - a service provided to obtain an actual meter reading on a date that is different than the regularly scheduled meter read date.

<u>Special Needs Customer</u> - a customer, as defined by the Home Energy Fair Practices Act (HEFPA), with documented medical conditions or who is elderly, blind or physically challenged.  HEFPA makes available to these customers special protections regarding utility service and life threatening situations.

<u>Voluntary Switch</u> - a process or situation where a customer's energy supplier is changed from one provider to another with the customer's direct authorization.

## CREDITWORTHINESS

A. <u>Applicability</u>

These standards apply to ESCOs/Marketers selling electricity and/or natural gas to retail customers and to retail customers procuring their own energy supplies (Direct Customers). Each entity must qualify on an individual basis. These standards do not apply in circumstances involving credit risks of the Independent System Operator, any applicable Power Exchange, or wholesale energy suppliers (except to the extent associated with load balancing and settlement by the utility). No security is required in situations where, and to the extent, a utility bills customers on behalf of an ESCO/Marketer and has the right to retain funds collected by the billing to off-set utility charges (<u>e.g.</u>, imbalance charges).

Under the applicable circumstances, the ESCO/Marketer/Direct Customer's participation in a utility's retail access program is contingent upon the ESCO/Marketer/Direct Customer satisfying a credit appraisal based on independent bond/credit ratings and supplying any security that may be found necessary to meet the utility's credit requirements. Credit appraisals and security requirements will be reviewed by the utility annually, at a minimum.

B. <u>Creditworthiness Determinants For ESCO's Marketers</u>
(See Section E below for credit requirements for Direct Customers)

An ESCO/Marketer can satisfy the utility's credit requirement by:

o     it or its guarantor having a minimum rating of "BBB" from S&P's, "Baa2" from Moody's, or "BBB" from Fitch ("Minimum Rating"); or

o     having a minimum "1A2" rating from Dun & Bradstreet coupled with 24 months good payment history; or

o     posting security in an acceptable form as listed in Section D below;

but the utility will have the option to require an ESCO/Marketer having the Minimum Rating to post security:

o     for the amount by which the utility's Credit Exposure (see Section C below) for any ESCO/Marketer exceeds 5% of the utility's applicable revenues for the applicable time period (<u>e.g.</u>, 30 days of gas revenues for gas balancing); or

o     for the full amount of the Credit Exposure if (1) the ESCO/Marketer or its guarantor is at the Minimum Rating and is placed on credit watch with negative implications by any of the three designated rating agencies or the utility

-3-

receives information that indicates that the ESCO/Marketer's or its guarantor's credit rating could be downgraded below the Minimum Rating (which security requirement will be lifted if the ESCO/Marketer's or its guarantor's credit rating is not downgraded during the ensuing 60 days), or (2) the ESCO's status as a billing agent is terminated by another New York utility for failing to render timely bills to customers or to make timely payments to the utility; or

The utility may, at its discretion, reduce or eliminate any security requirements as long as this standard is applied equitably to all ESCO/Marketers existing and new.

The utility's evaluation must be completed within 10 business days after receiving the application.  The utility must provide the rationale for its determination and the calculation supporting the credit limit and any resulting security requirement (as discussed in Section C below).  The utility must perform its credit evaluation and associated security calculation in a non-discriminatory manner.

C.    Credit Exposure/Security Calculation

If the ESCO/Marketer meets the credit requirements in Section B, or a Direct Customer receives a waiver as set forth in Section E below, no security may be required.  If the ESCO/Marketer does not meet the credit requirements in Section B, or the requirements of Section E cannot be met for Direct Customers, security in an amount equal to the credit exposure may be sought and provided in a form as set forth in Section D below.

The maximum security amounts identified below are associated with the risk of the failure of an ESCO/Marketer, delivering a single bill for delivery and commodity service to the retail customer, to pay the utility (Paragraph 1 below) and, the failure of a gas marketer or ESCO to pay the utility for underdeliveries when that marketer/ESCO has underdelivered by up to 100% of its customers' needs (Paragraphs 2 and 3 below).

1.    Delivery

The maximum security associated with the electric or natural gas delivery risk, where the ESCO/Marketer bills customers for both delivery and commodity services, may be no more than 60 days of an ESCO/Marketer's customers' projected peak period energy requirements over the coming 12 months priced at the utility's applicable delivery tariff rate, including relevant competitive transition and customer charges.

The maximum security associated with the electric or natural gas delivery risk, where the ESCO/Marketer is acting as the customer's billing agent, may be no more than 45 days of an ESCO/Marketer's customers' projected peak period energy

-4-

requirements over the coming 12 months priced at the utility's applicable delivery tariff rate, including relevant competitive transition and customer charges. The amount of security may be reduced to the extent the ESCO/Marketer's customers maintain direct debit agreements with the utility.

2.  <u>Gas Imbalances</u>

The maximum security associated with natural gas balancing and settlement risk will be determined for each season. The seasons are defined as Summer (April 1 - October 31) and Winter (November 1 - March 31). This credit exposure may be no more than as determined by: (a) the maximum daily quantity (MDQ) of a Marketer's customers' projected aggregate consumption (or Direct Customer's projected consumption), based on the appropriate season of the past year; (b) priced at the highest month's average daily closing NYMEX price, at the Henry Hub, plus upstream capacity charges to the city gate, for the appropriate season of the past year; and (c) times 30 days. The ESCO/Marketer may, at its option, elect to have the security determined annually, rather than seasonally in which case it will be based on the winter season.

3.  <u>Electric Imbalances</u>

The maximum security associated with the electric imbalance risk of the utility may be no more than as determined by: (a) the maximum daily quantity (kWh) of an ESCO's customers' projected aggregate consumption (or Direct Customer's projected consumption) over the coming 12 months; (b) priced at the highest month's average daily spot market price, for the area in which the ESCO's customers (or the Direct Customer) are located, during the previous 12 months; and (c) times 30 days. If an average daily spot market price is not available for the previous 12 months, the average shall be for the period in which such data does exist. If the ISO has not been established, the spot price will be the real time price or buy back rate as specified by each utility's tariff.

D.  <u>Security Instruments</u>

Upon notification by the utility that an ESCO/Marketer/Direct Customer has failed to satisfy the credit requirements or, subsequently, while providing service to retail customers, no longer satisfies the credit requirements, such ESCO/Marketer/Direct Customer

may still obtain or retain credit approval from the utility if it pays any outstanding balance due the utility for services rendered and elects to provide one of the following, as mutually agreed by the parties:

1.   an advance deposit or prepayment;

2.   a standby irrevocable letter of credit issued by a bank, insurance company or other financial institution with at least an "A" bond rating;

3.   security interest in collateral found to be satisfactory to the utility;

4.   a guarantee, acceptable to the utility, by another party or entity with a satisfactory credit rating of at least "BBB" by S&P's, "Baa2" by Moody's or "BBB" by Fitch;

5.   a lockbox mechanism as described in Section F below (not applicable for Direct Customers);

6.   a surety bond from a bank, insurance company or other financial institution with at least an "A" bond rating; or,

7.   other mutually acceptable means of providing or establishing adequate security (e.g., escrow accounts, loss pooling, etc.).

If the rating of a bank or insurance company or other financial institution from whom an ESCO/Marketer/Direct Customer has obtained a letter of credit or surety bond falls below an "A" rating, the ESCO/Marketer/Direct Customer shall have 5 days to obtain a substitute letter of credit or surety bond from an "A" rated bank or insurance company or other financial institution.

If the ESCO/Marketer/Direct Customer's credit standing ceases to meet the utility's credit requirements or if its financial exposure changes due to increased usage during the period of service, then the utility has the right to require security or prepayment as specified herein.  The utility, however, may not request additional security unless the credit exposure increases by at least 10%, or a reasonable utility specified threshold.  If the security is not tendered within 5 business days after such request, then the utility may initiate a process to discontinue retail access service to the ESCO/Marketer/Direct Customer.  Deposits received in cash will accumulate interest at the applicable rate per annum approved by the New York State Public Service Commission for Other Customer Capital. If the ESCO/Marketer/Direct Customer subsequently satisfies the credit appraisal without the need for some or all of the security requirement, the utility shall return the appropriate portion of the ESCO/Marketer/Direct Customer's advance deposit with accumulated interest.  Similarly, if the utility's credit risk is determined to

decrease by at least 10%, or a reasonable utility specified threshold, relative to the amount of security on deposit, the excess shall be refunded with accumulated interest within five business days of such determination.

E.    Retail customers procuring their own energy (Direct Customers)

The aforementioned creditworthiness standards shall be waived for a customer procuring its own energy, provided that such customer's accounts are current and have been maintained current for 12 months, and provided that the customer's long-term unsecured debt securities are, and remain, rated a minimum of BBB, Baa2 or BBB by S&P's Moody's or Fitch, respectively.  If the customer's debt is not rated, its account with the utility must be current, and it must not have a poor payment history with the utility for the past 24 months.


F.    Lockbox Mechanism

An alternative security mechanism for ESCOs/Marketers shall be available in the form of a "lockbox" for any of the security requirements specified above.  A lockbox will reduce any security requirements to 50% of what would otherwise be required.  Under the lockbox, an ESCO/Marketer's customer's payments will be made to a lockbox, which will be administered by a mutually agreed upon entity. All costs associated with implementing and administering the lockbox will be the responsibility of the ESCO/Marketer.  The allocation of funds in the lockbox between the utility and the ESCO/Marketer, and other administrative rules, must be agreed to by both parties, with the utility having first rights on funds in the lockbox to off-set utility charges.  The administrative rules shall specify the terms under which the lockbox mechanism shall be terminated for non-compliance.  The utility, after petition to the Commission, is permitted to terminate the lockbox and request full security if expected customer payments are not received in a timely manner.


G.    Calling on Security

The utility may call upon the security posted by an ESCO/Marketer/Direct Customer after providing 5 days' notice to the ESCO/Marketer/Direct Customer whenever the ESCO/Marketer Direct Customer fails to pay the utility on a timely basis, unless the ESCO/Marketer/Direct Customer makes payment in full within the 5-day notice period.

The utility may call upon the security posted by an ESCO/Marketer/Direct Customer without prior notice if the ESCO/Marketer/Direct Customer files a petition in bankruptcy (or equivalent, including the filing of an involuntary petition in bankruptcy against the ESCO/Marketer/Direct Customer) or for any

-7-

reason an ESCO/Marketer ceases to provide service to its customers under the utility's program.

If an ESCO/Marketer, acting as a billing agent, has posted security with a utility, the utility will apply the security to the customers' delivery charges and customer late payment charges (if applicable) for any unpaid amounts due from customers.

## CUSTOMER INFORMATION

A.  <u>Historical</u>

Utilities must provide, free of charge to customers or their authorized designees, at least 24 consecutive months (or for the life of the account, if less) of the customer's most recent usage and billing information for each of the customers' accounts.  A fee (up to $15.00) may be charged for data beyond the 24 month period.  Information not identified below shall be supplied, if available, at the utility's incremental cost.  The usage and billing information shall be made available in the manner(s) utilities currently use until EDI mechanisms are functional.

The usage and billing information that must be provided free of charge shall include:  meter reading dates, consumption (Mcf, kW, kWh, and RKVA, as appropriate, including on- and off-peak or other recorded interval data as appropriate), total dollars billed for the billing period, service classification, tax district(s), meter number (where applicable) and type of meter reading (by company, by customer, or estimated).  Where more than one meter is associated with an account, the applicable information must be provided for each meter, where available.  Customer class load profiles are not customer specific information but shall be supplied.

Credit information shall also be made available free of charge for the most recent 12 month period.  A fee of up to $15 may be charged for credit information beyond the 12 month period.  Credit information to be provided, shall include whether or not the customer had late payments and/or had been disconnected during the past 12 months.

All free information must be available at the time requested or as prescribed by the utility's tariffs until EDI mechanisms are functional.  If additional information (as defined above) is requested a response must be provided within five business days of the request, either supplying the requested information, specifying when such information will be provided, or advising that such information does not exist.

All historical customer information obtained from a utility by an ESCO/Marketer must be kept confidential and not disclosed to others, unless otherwise authorized by the customer.  All other customer information, such as account numbers (and any passwords used, if applicable), telephone numbers and service addresses shall also be kept confidential and not disclosed to others, unless otherwise authorized by the customer.

A utility may not disclose a customer's billing and usage history customer has notified the utility, in writing, that such information should not be disclosed.  The information may thereafter be disclosed to an ESCO/Marketer only with the customer's written authorization.

B.    <u>Current</u>

Utilities must make available to ESCOs/Marketers/Direct Customers all data recorded by and currently retrieved from their customer meters and all other information necessary to compute the customers most recent bill.  All such information to be furnished by the utility must be provided electronically, at no charge, to ESCOs/Marketers/Direct Customers at the same time the data is acceptable by the utility to bill its customers.  Where estimated meter readings are used, the estimates must also be provided free of charge to ESCOs/Marketers/Direct Customers at the same time the data is acceptable by the utility to bill its customers.  All subsequent changes or corrections and adjustments to previously supplied data and metering equipment should be made available to the ESCOs/Marketers/Direct Customers at the same time it is acceptable to be used for its customers.

**UNIFORM UTILITY BILLING AND COLLECTION SERVICES AND CHARGES**

A.    Invoices

Invoices shall be issued to ESCOs/Marketers/Direct Customers monthly for imbalances, extraordinary customer data provided on request (over and above the information provided without charge), special meter reading charges, adjustments to prior invoices, and other retail tariff services provided at the request of the ESCOs/Marketers/Direct Customers. Services requested directly by customers will be billed directly to the customers unless ESCOs/Marketers request that those charges be billed to them instead. This option does not apply to the single retailer model. The provisions described below relate only to retail access billing and collection services and charges to be paid by ESCOs/Marketers/Direct Customers. The costs of any payment defaults that occur due to mutually agreed-upon terms between a utility and an ESCO/Marketer/Direct Customer may not be borne by any other customers/ratepayers and other ESCOs/Marketers/Direct Customers.

B.    Invoice Payments

1.    Terms of Payment

Bills are payable upon presentation and are subject to late payment charges. ESCOs/Marketers/Direct Customers shall pay the full amount stated in the invoice, without deduction, set-off or counterclaim, within 20 business days from the date of the invoice transmittal. On the first day following the 20 business day grace period, late payment charges at the rate of 1.5% per month will be applicable to all overdue billed amounts, including arrears and unpaid late payment charges. (Note: Payment of customers' charges, on behalf of customers, by an ESCO/Marketer/Billing agent, are due within 30 business days of the Billing Agent's receipt of the customers' billing information, subject to the rules under Billing Agency Arrangements herein). Because an ESCO/Marketer/Direct Customer or utility may request expeditious resolution by the Department of Public Service of a complaint or dispute, bills will not be suspended as a consequence of a complaint filed. Utilities and ESCOs/Marketers/Direct Customers are permitted to, by mutual agreement, develop customized billing and collection arrangements.

Claims that invoices are not correct must be made in writing no more than three months after the date of the material change.

-11-

2.    Payment Form

Payment for services shall be rendered to the utilities by electronic funds transfers.  Utilities and ESCOs/Marketers/Direct Customers are permitted to, by mutual agreement, establish other forms of payment.

3.    Application of Payments

Unless otherwise agreed to by the utility and the ESCO/Marketer/Direct Customer, payments will be applied to arrears first and then to current charges.

4.    Failure to Make Payment

Upon failure of the ESCO/Marketer/Direct Customer to make any payment when due, the utility may draw down on any security that may be available (as described in the Creditworthiness section).

C.    Billing Questions and Disputes

1.    Access to Billing Back-up Information

Upon implementation of utility EDI systems, ESCOs/Marketers/Direct Customers shall have access to data elements that will enable them to perform necessary billing back-up calculations.

2.    Inquiries

(a)    All questions concerning invoices should be directed to a pre-specified department (by department name and telephone number) within the utility.  This department shall direct such inquiries to the appropriate areas of responsibility which shall be available to explain how the invoice amounts were determined.

(b)    Responses to billing or by electronic transmission must be acknowledged in writing, promptly, but no later than five business days from the utility's receipt of the inquiry.  The utility must investigate and respond to the complainant, in writing, no later than 20 business days from the utility's receipt of the inquiry.

3.    Overpayments

(a)    Overpayments made by an ESCO/Marketer as a result of an inaccurate invoice or as determined through the Dispute Resolution Process shall be credited

-12-

to the ESCO/Marketer's account if a prior shortage exists or be refunded otherwise. Such credit or refund must occur within five business days of a determination that an overpayment occurred. Such overpayments shall earn interest at the rate of 1.5% per month from the date of the overpayment until the date of the credit or repayment, whichever applies. The refund shall be rendered to the ESCO/Marketer by electronic funds transfers.

(b)  Overpayments made voluntarily by an ESCO/Marketer/Direct Customer shall be credited to the ESCO/Marketer's account and shall not earn interest unless the overpayment is applied to the security deposit account.

D.  <u>Charges to ESCO/Marketers from Utility</u>

Utilities may charge ESCOs/Marketers/Direct Customers for the following:

1.  Energy imbalances, based on each utility's tariff or operating agreement.

2.  Late payment charges, at a rate of 1.5% per month, applicable to all overdue billed amounts, including arrears and unpaid late payment charges and to underbillings, as determined through the Dispute Resolution Section, herein. Interest on the latter is only payable when associated with a finding of deficiency on the part of the party holding the funds determined to be due the other party.

3.  Additional historical customer usage, billing and credit information available upon request under the Historic Customer Information Section requirements.

4.  Special meter reading charges, as described in the "Switching Requirements" Section.

5.  Other rates and charges approved by the Public Service Commission and set forth in the utility's tariff, including, but not limited to, transportation or distribution rates, miscellaneous surcharges and taxes.

-13-

## <u>NEW DELIVERY CUSTOMER REQUIREMENTS</u>

A.   Process Required for ESCOs/Marketers/Direct Customers to Notify Utilities of New Delivery Customers (<u>e.g.</u>, Customers That Are Initiating Delivery Service)

    1.   New delivery customers may initiate service by contacting the utility and/or an ESCO/Marketer. ESCOs/Marketers/Direct Customers shall provide utilities notices of new delivery customers choosing the ESCO/Marketers for supply with the ESCO/Marketers/Direct Customers' authorized signatures or unique identifiers.  The utilities shall acknowledge receipt of the notices within five business days.

    2.   The notices for new residential service for applicants whose previous utility bills, if any, have been paid or are covered by a deferred payment plan, and that do not require construction must be submitted at least five calendar days prior to the requested service date; other notices must be submitted at least 10 calendar days prior to the requested service date.  All notices shall contain the information identified below.

    3.   A uniform statewide format shall be used for the notice.

    4.   The point to which this information is to be submitted, <u>e.g.</u>, person, number, and/or office, shall be identified in the utility's operating procedures.

B.   Information to be Submitted by ESCO/Marketer/Direct Customer

    1.   ESCOs/Marketers/Direct Customers shall provide the name, service address, mailing address, and telephone number (and universal account number when established) of new customers that will need delivery service from utilities.

    2.   ESCO's/Marketers acting as the customer's agent in establishing utility delivery service shall provide the information about the customer that the utility needs to establish service, as specified in the utilities' tariffs.

    3.   ESCOs/Marketers/Direct Customers shall also provide information about the customer's special needs, if any, including life support equipment.

C.    Commencement of Service

For new delivery customers, services will commence after all connections are complete in accordance with provisions of the utility's non-retail access tariff.  A special meter reading as applicable will then be performed at no charge.

Except for the "Single Retailer" model, new delivery customers must be accepted by the utility before service may commence; any conditions set forth in the utilities' tariffs for the initiation of service to such new delivery customers must be met.

D.    Initiation of Service Fees, Deposits, or Other Requirements

Any fees, deposits requirements, or other charges identified in a utility's tariff will apply to initiation of service to new delivery customers.

E.    Special Meter Reading Fees

There will be no utility fees for special meter readings if performed in conjunction with the initiation of new delivery service.

## SWITCHING REQUIREMENTS

A.   Process Required for ESCOs/Marketers/Direct Customers to
     Notify Utilities of Switches

    1.   ESCOs/Marketers/Direct Customers shall provide to
         utilities notices of requested switches, with the
         ESCO/Marketer/Direct Customers' signatures or unique
         identifiers.  The utilities shall acknowledge receipt
         of the notices within 5 business days.

    2.   The notices must be submitted at least 10 calendar days
         prior to the requested switch dates and contain the
         information identified below.

    3.   A uniform statewide format shall be used for the
         notices.

    4.   The point to which this information is to be submitted,
         e.g., person, number, and/or office, shall be
         identified in the utility's operating procedures.

B.   Information to be Submitted by ESCO/Marketer/Direct Customer

    1.   ESCOs/Marketers shall provide the name, service
         address, mailing address, and account number; or meter
         number if under the single retailer model, or the
         universal account number if established, of the
         customers to be switched.

    2.   ESCOs/Marketers/Direct Customers shall also provide
         information about the customers' special needs, if any
         (mandatory if reselling delivery services; optional
         otherwise).

C.   Notice Period Required and Switch Date

    1.   The notice for an electric switch must be submitted at
         least 10 calendar days before the customer's regular
         meter reading date or a requested special meter
         reading.

    2.   A special meter reading for switching electric
         customers may be requested for a fee if the regular
         reading would not occur on the 10th day after the
         notice.

    3.   The electric switch will then occur on the sooner of
         the regular or special meter reading date.

4.   The notice for a gas switch must be submitted at least 10 calendar days before either the customer's regular meter reading date or the first of the calendar month, as specified in each utility's tariff.

5.   The gas switch will then occur on either the customer's regular meter reading date or the first of the calendar month, as specified in each utility's tariff.

D.   Frequency of Switches Allowed

1.   No restrictions, except as may result from the notice period requirement or as may be specified in contracts between ESCO's/Marketers and customers or as may result from utility requirements for bundled service. Customers voluntarily returning to utility bundled service may be required to remain with this utility bundled service for a minimum period of time, not to exceed 12 months, as may be specified in each utility's tariff, unless the utility addresses its risk through mechanisms such as a fuel adjustment clause or pass through of the market price.

2.   If utilities can show that the frequency and/or pattern of switches is having negative impacts on the system, the utility, or other customers, they can propose measures to address such impacts at that time.

E.   Switching Fees

1.   There may be no charge for a customer's switch from utility bundled service at any time, (_i.e._, each switch away from the utility).

2.   There may be no charges for involuntary switches. Involuntary switches are those initiated by an ESCO/Marketer rather than the customer, when for example the ESCO/Marketer goes out of business, assigns its customers to another supplier, or decides to no longer serve a customer.

3.   During a customer's first year of retail access participation, there may be no charge of the customer's first voluntary switch per commodity.  A voluntary switch is one initiated by the customer.

4.   A switching fee, of up to $10, as can be set forth in each utility's tariff, may be charged for all other voluntary switches.

-17-

F.   Special Meter Reading Fees

Up to $20 may be charged to the party (ESCO/Marketer/Direct Customer or retail access customer) requesting a special meter reading, as may be established by each utility in its retail access tariff.  A special meter reading is a meter reading performed on a date other than the customer's regularly scheduled meter reading date.

G.   Verification of Accounts

1.   The utility shall provide notice of receipt of a switching request to the current ESCO/Marketer, if any, as discussed further in the section on Slamming Rules.

2.   To enable the parties to verify accounts, utilities upon the request of an ESCO/Marketer shall provide, by the 5th business day of each calendar quarter, a listing of the ESCO's/Marketer's customers that were receiving its retail access services as of the 1st calendar day of the quarter.

H.   Budget Billing Adjustments

Utility budget billings shall be adjusted at the switch dates as required to reflect changes in utility service and shall be reflected in the customers' next bills.

## SLAMMING PREVENTION PROCESS

A.   Slamming, defined as a switch of a retail customer from one provider to another without the customer's authorization (except as may be allowed under the "Discontinuance of Service" provisions discussed later), is not permitted.  To minimize the chance of slamming, the following process must be used:

1.   To request a switch, ESCOs/Marketers must notify the utility of the switch using the process outlined under "Switching Requirements".

2.   Upon receipt of the request from an ESCO/Marketer, the utility must, at least five calendar days prior to the switch date, send a verification letter to the affected customer and notify the incumbent ESCO/Marketer, if any, that is serving the customer at that time.  After EDI becomes available, utilities will notify incumbent ESCO/Marketer about customer enrollment information electronically.

3.   The verification letter must advise the customer of the switch request and ask that he/she contact the designated utility within five (5) calendar days if the switch request information is incorrect.  The general content of the letter must be filed with Department of Public Service for review before it is used for this purpose.

4.   If the customer notifies the utility that the request is not valid, the switch will not be made or will be reversed. If the current ESCO/Marketer notifies the utility that the request is not valid, the utility will contact the customer for verification and then follow the procedure noted herein for notices that come directly from customers.

5.   All unauthorized switches must be reported by the utility to the Department of Public Service.

B.   ESCOs/Marketers that switch customers without the customers' authorizations will be fully responsible for all wrongful charges applied to the customers' bills and for all reasonable costs incurred by the utilities.  Such ESCOs'/Marketers' eligibility to serve retail customers in New York State may also be terminated by the New York State Public Service Commission and/or a monetary penalty may be imposed.

C.    ESCOs/Marketers must retain for six years documentation of a customers' authorizations to switch.  Such documentation must be in the form of one of the following:

    1.    written agreements signed by the customers;

    2.    written statements by independent third parties that witnessed or heard verbal commitments by the customers;

    3.    tape recordings made by ESCOS/Marketers of the customers' verbal commitments; and

    4.    electronic transmittals that can be shown to have originated with the customers.

## PARTIAL REQUIREMENTS CUSTOMERS

Utilities at this time, have the option of allowing eligible retail customers to select more than one ESCO at a time per customer account - per commodity. Eligible customers who have a designated portion of their load supplied by their utility, at an economic development discount or any other discount authorized by tariff, regulation or law or supplied by the New York Power Authority (NYPA), with the remaining portion of their load provided at the utility's applicable tariff provisions, shall be permitted retail access for the portion of their load served at the applicable tariff rates. Also, unless prohibited by a prior settlement agreement, retail customers that receive an economic development discount for all their standard load may continue to receive a discount and take retail access unless the discount was specified as a generation discount or a result of rate design differences. Retail customers with discounts on delivery services will not be required to forego such discounts to participate in retail access for the commodity portion of their service.

## BILLING AGENCY ARRANGEMENTS

A.   ESCOs/Marketers and utilities may elect to offer customers a "Billing Agency" arrangement in which the customer will authorize an ESCO/Marketer, to act as a Billing Agent, hereafter ESCO/Marketer/Billing Agent, to receive the customers' bills from the utility, consolidate them with the ESCO/Marketer/Billing Agent's charges, rebill the entire amount to the customer, receive payments from the customer, and then remit payments to the utility for its services, with the balance being retained by or transmitted to the ESCO/Marketer/Billing Agent.  The customer must choose the billing agency arrangement before it may be used as the mechanism to bill the customer.  If the ESCO/Marketer/Billing Agent and its customers use such an arrangement, the ESCO/Marketer/Billing Agent must comply with the conditions listed below.

   1.   The ESCO/Marketer/Billing Agent must apply all customer payments, unless otherwise directed by the customer, first to utility charges, past due and current, then to ESCO/Marketer/Billing Agent charges, past due and current.  If the customer has entered into a deferred payment agreement with the utility, customer payments shall be applied, first to current utility charges, including the agreed upon installment payment under the deferred payment agreement, then to ESCO/Marketer/Billing Agent charges, past due and current.  If a customer with a deferred payment agreement pays more than the current bill and agreed upon installment payment charges, payments should be allocated first to all current plus agreed upon deferred charges and the balance first to the utility and then to the ESCO/Marketer/Billing Agent account, unless otherwise directed by the customer.

   2.   ESCOs/Marketers/Billing Agents may not pass along to customers any late payment charges assessed by the utility if the customers remitted payments, in the amount due to the utility, to the ESCO/Marketer/Billing Agent by the due date of the utility bill.

   3.   ESCO/Marketer/Billing Agents can negotiate deferred payment arrangements or intercede on behalf of a customer on other related utility matters provided it can demonstrate that the customer has given it the authority to do so.

   4.   ESCOs/Marketers must include a clear, plain language explanation of billing agency and its implications in

-22-

their standard contract/disclosure statements, if such an arrangement is to be offered.

5.  ESCOs/Marketers must distribute annually, to each customer, the "Summary of Customer Rights Notice", and to each gas customer, the "Annual Gas Safety Notice", which will be provided to them, in bulk, by the utility.

B.  Where the utility and the ESCO/Marketer elect a billing agency arrangement, utilities must comply with the following requirements.

1.  Utilities must provide the ESCO/Marketer with the "Summary of Customer Rights Notice" and the "Annual Gas Safety Notice", in bulk, for distribution by the ESCO/Marketer to customers annually.

2.  Utilities should incorporate bill messages regarding a customer's specific bill (e.g., messages regarding adjustments, level billing plan) into the billing information transmitted electronically.

3.  Utilities must send all communications regarding specific customer actions or requests (e.g., credit-related notices, meter access notices) directly to the customer.

4.  Utilities may assess late payment charges on ESCOs/Marketers only if payment is not received within 30 business days of the Billing Agent's receipt of the customers' billing information.  Until EDI is implemented and fully operational, no late payment charges will be assessed to an ESCO/Marketer/Billing Agent provided the ESCO/Marketer/Billing Agent uses the dispute resolution procedure and can demonstrate that the payment to the utility was late due to the fault of the utility.  (Once EDI is implemented, the grace period may be modified.)

5.  Any delays in transmitting billing data caused by the utility must be reflected as a comparable adjustment in the corresponding due date for both the ESCO/Marketer/Billing Agent and the customer.

6.  Security may be collected from the ESCO/Marketer as specified by the Creditworthiness requirements described elsewhere.

7.  Utilities must continue to accept payment of utility charges at all payment agencies where payments for

customers who have not selected billing agency are accepted.

8.  Utilities and ESCOs/Marketers/Billing Agents are permitted, by mutual agreement, to develop customized billing and collection arrangements.

9.  Utilities may not collect amounts due from customers, who have paid the ESCO/Marketer/Billing Agent, in the event the ESCO/Marketer/Billing Agent fails to pay the customers' full bill to the utility.  The utility may rely on available security to cover such losses and may notify the Commission if it wishes to recover any lost revenues beyond those covered by the security deposits.

C.  Upon mutual agreement between the ESCO/Marketer and the utility, a lockbox arrangement for administering the billing agency arrangement may be arranged.  The allocation of funds in the lockbox must be consistent with the terms described under the Creditworthiness rules.
ESCO/Marketers must comply with all the requirements above, except that where a lockbox is used utilities may not require more than 50% of the security that would otherwise be required from ESCOs/Marketers.  The administrative rules shall specify the terms under which the lockbox mechanism shall be terminated for noncompliance.

D.  Utilities may terminate a billing agency arrangement and send its invoices for delivery charges directly to the ESCO's customers after providing five business days' notice to the ESCO/Marketer/Billing Agent if:

o   the ESCO/Marketer agent has not paid the utility on a timely basis for its delivery charges, unless such payment is made in full before the expiration of the five business day notice period (note:  untimely payments may be a basis for a termination if a pattern of such payments develops); or

o   the ESCO/Marketer's credit rating or security is no longer adequate as respects its credit requirements and the ESCO/Marketer fails to post the necessary additional security within the five business day notice period; or

o   the utility draws on the ESCO's/Marketer's security deposit and the ESCO does not reinstate the required security within five business days; or

o   the ESCO/Marketer has on several occasions failed, after notice from the utility, to meet its other obligations as billing agent, as set forth in the

-24-

utility's tariff, operating procedures and/or
agreement(s) with the utility (if applicable).

## METERING

Unless and until such time as the Commission determines otherwise, the following metering provisions shall apply. Customers that choose to take part in retail access programs may continue to use the same metering equipment that is in place at the time of their applications for retail access. Such customers, however, may request the installation of a different Commission-approved meter, with the cost of such meter and installation to be borne by the customer and with the utility retaining sole control of the meter and responsibility for the installation, maintenance and compliance with Commission regulations. Customers electing to have such meters installed will be billed, for retail access purposes, based on the data collected from these meters. Utilities shall own such meters, except as noted below.

The utilities must allow large commercial and industrial time-of-use customers (as defined in the tariffs) to have the option of owning Commission-approved meters, with the utility retaining sole control of those meters. Such customers, or their designees, shall be allowed to receive data directly from the meters on a real-time or other basis, without incurring a fee, provided that such customers install and maintain, at their own expense, the necessary ancillary equipment required to provide read-only access. Such access may require the installation by the utility of a different type of meter/recorder that will allow multiple access, with the cost responsibility of such meter/recorder and installation to be borne by the customer and with the utility retaining sole control of the meter and responsibility for the installation, maintenance and compliance with Commission regulations.

A schedule of meter upgrade charges shall be provided or referenced in the tariff. Additional metering information, consistent with Public Service Commission Opinion No. 97-13, must be available from the utility upon request.

## DISCONTINUANCE OF SERVICE

A. Voluntary Discontinuance of ESCO/Marketer Operations in a Utility's Service Area

    1. An ESCO/Marketer may discontinue operations (in whole or significant part) in a utility's service territory at will (subject to any penalties or sanctions that may arise due to contractual obligations), upon submission of a written notice to the utility and the ESCO/Marketer's customers at least 15 calendar days prior to the discontinuance date. The notice to retail customers shall inform them:

        (a) that the discontinuance shall occur at the first meter reading date or the first of the month after the notice period expires (if timely), or the utility may estimate the readings at the discontinuance date or provide for a special meter read;

        (b) of their option either to select another ESCO/Marketer to be their energy service provider or to return to regulated utility service;

        (c) that if they do select other ESCO/Marketers, those entities will file switch requests with the utility on their behalf, and there will be no fee charged by the utility for the switches;

        (d) that after the discontinuance and unless/until new ESCO/Marketers are selected and the switches are completed, service will be provided by the utility company under its applicable tariff rate, unless such utility has notified the customer that delivery services will be terminated on or before the discontinuance date (not applicable to the "single retailer" model being used in Rochester Gas and Electric Corporation's service area); and

        (e) that there will be no switching fee charged by the utility to the customer for a switch back to the utility, whether as an interim measure until a new ESCO/Marketer is selected or as a permanent action.

    2. The utility must, within five calendar days of the notice from the ESCO/Marketer, also send a notice to the ESCO/Marketer's customers containing the same information as required above, but also providing a list with names and telephone numbers of eligible ESCOs/Marketers who have indicated a willingness to serve retail customers in the utility's service area.

-27-

3.     If the utility learns that an ESCO/Marketer has discontinued operations in its service territory without giving the proper notice to Retail Customers and to the utility in accordance with the above requirements prior to discontinuing operations, the utility shall immediately inform the Public Service Commission and then, if directed, notify all of the ESCO's customers as required above.  In the notification, the utility shall also advise the customers that effective immediately their service is being provided by the utility under the standard tariff rate and that payment for such service from the date of the notice until a subsequent switch takes place must be made to the utility.

4.     If the ESCO/Marketer does not give notice to its Retail Customers and to the utility in accordance with the above requirements prior to discontinuing operations, the ESCO/Marketer may be determined ineligible by the New York State Public Service Commission to sell electricity or natural gas to retail customers in New York State and/or may be assessed a monetary penalty by the New York State Public Service Commission.

5.     Upon the discontinuance of an ESCO/Marketer, the ESCO/Marketer shall remain responsible for payment or reimbursement of any and all sums owed under the Tariff or under any tariffs on file with the FERC, and service agreements relating thereto, or under any agreements between the ESCO/Marketer and the utility.  The ESCO/Marketer shall also remain obligated to customers to the extent provided for in any contracts with them.

6.     Upon receipt of a switch request from a subsequent ESCO/Marketer following the discontinuance notice, the utility will verify the intended switch with the customer in accordance with the Slamming Prevention Process (e.g., the utility must notify the customer within five calendar days of the switch request).

7.     If a more expeditious discontinuance process is judged to be needed in a specific situation, the ESCO/Marketer may request such expedited treatment upon a showing of need to the Public Service Commission or its designee, who shall have the authority to grant such a request. The Commission or its designee may also, for good cause, initiate an expeditious discontinuance process on its own motion.  Utilities shall also have standing in any such processes.

8.     Sample copies of the form of the notices to customers under this process shall be provided to the Department

-28-

of Public Service for review at least five calendar days before the letters are sent to customers.

B.  Discontinuance of Sales by ESCO/Marketer to Individual Retail Customer

1.  An ESCO/Marketer may discontinue sales to individual retail customers in a utility's service territory at will (except as may be otherwise limited by contracts with customers), upon submission of a notice to those individual customers and to the utility at least 15 calendar days prior to the discontinuance date.  The notice to retail customers shall inform them:

(a) of the date of the discontinuance (which should be at the customers next meter read date or the first of the month consistent with the utility's switching tariffs);

(b) of their option either to select another ESCO/Marketer to be their energy service provider or to return to regulated utility service;

(c) that if they do select other ESCO/Marketers, those entities will file switch requests with the utility on their behalf, and there will be no fee charged by the utility for the switches; and

(d) that after the discontinuance and until new ESCO/Marketers are selected and the switches are completed, service will be provided by the utility company under its applicable tariff rate, unless such utility has notified the customer that delivery services will be terminated on or before the discontinuance date (not applicable to the "single retailer" model being used in Rochester Gas and Electric Corporation's service area).

2.  Sample copies of the form of the notices to customers under this process shall be provided to the Department of Public Service for review at least five calendar days before the letters are sent to customers.

3.  If the ESCO/Marketer does not give the required notice to its retail customers and to the utility, the ESCO/Marketer may be determined ineligible by the New York State Public Service Commission to sell electricity or natural gas to retail customers in New York State and/or may be assessed a monetary penalty by the New York State Public Service Commission.

-29-

4.    Upon receipt of a switch request from a subsequent ESCO/Marketer following the discontinuance notice, the utility will verify the intended switch with the customer in accordance with the "Slamming Prevention Process," (e.g., the utility must notify the customer within five calendar days of the switch request).

C.    Involuntary Discontinuance of an ESCO/Marketer/Direct Customer's Right to Provide Service to Retail Customers

1.    A utility shall have the right to initiate a process to discontinue an ESCO/Marketer/Direct Customer's participation in the utility's Retail Access Program:

(a)    where the utility determines that it is necessary or desirable for safety or for system reliability reasons (including, but not limited to, the proper scheduling and delivery of electric energy and capacity to meet the needs of customers), which shall include an understanding that:

(1)    actual scheduled deliveries must not deviate consistently and unreasonably beyond a pre-determined percentage (to be set forth in the tariff) of the ESCO/Marketer/Direct Customer's day ahead forecast schedule of energy supply requirements; and,

(2)    day ahead forecast schedules must not deviate consistently and unreasonably beyond a pre-determined percentage (to be set forth in the tariff) of the ESCO/Marketer/Direct Customer's actual aggregate customer load in the service territory, unless balancing service is provided by the utility;

(b)    where the ESCO/Marketer/Direct Customer fails to comply with the terms and conditions of the utility's tariff or distribution operating agreement;

(c)    where there is a continued pattern of attempts to transfer retail customers without proper customer authorization (slamming).

(d)    where the FERC issues an order authorizing discontinuance of participation by the ESCO/Direct Customer under the utility's open access transmission tariff; or

-30-

(e) where a court of competent jurisdiction issues an order authorizing discontinuance of the ESCO/Marketer/Direct Customer; or,

(f) where the New York State Public Service Commission has determined that the ESCO/Marketer is not eligible to sell electricity or natural gas to retail customers in the state, for reasons including:

    (1) an ESCO/Marketer's failure to adhere to the policies and procedures described in its disclosure to customers;

    (2) failure to comply with prescribed consumer protections;

    (3) an unacceptably high volume of customer complaints;

    (4) failure of an ESCO to comply with applicable ISO and Power Exchange requests;

    (5) failure to comply with prescribed reporting requirements;

    (6) failure to comply with oversight requirements;

    (7) failure to apprise the New York State Public Service Commission of all material changes in the information in the applicant's initial filing;

    (8) failure to comply with the voluntary discontinuance requirements set forth above; or,

    (9) failure to comply with other applicable requirements of the New York State Public Service Commission, including those in Opinion No. 97-5; Opinion and Order Establishing Regulatory Policies for the Provision of Retail Energy Services, issued May 19,1997, in Case 94-E-0952; and, in the Order Clarifying Consumer Protections, issued October 25, 1996, in Cases 93-G-0932, et. al.

(g) where the ESCO/Marketer/Direct Customer fails to pay a bill for delivery services or an imbalance charge when due, does not pay the bill within 10 calendar days after being notified of the non-receipt of payment, and the available security is

-31-

or will be insufficient to cover the amount of default.

2.    The utility may initiate the process to discontinue an ESCO/Marketer/Direct Customer by providing the ESCO/Marketer/Direct Customer a notice (with a copy to the New York State Public Service Commission) that advises the ESCO/Marketer/Direct Customer that its right to switch additional customers is suspended immediately.  The notice shall also state that unless the stated cause for the discontinuance is corrected within a designated period (not less than 10 calendar days) from the ESCO/Marketer's receipt of the notice, or the New York State Public Service Commission, or its designee, requires otherwise, the ESCO/Marketer's existing customers will be notified that the ESCO/Marketer will be discontinued.  The discontinuance will take place no longer than 15 calendar days after the end of the designated period to cure the problem except that in cases of non-payment of invoices, the discontinuance will take place at the end of the designated period.  Discontinuance of Direct Customers may be initiated by a similar notice stating that unless the identified cause is corrected within the designated period (e.g., not less than 10 calendar days), or the New York State Public Service Commission, or its designee, requires otherwise, the Direct Customer will no longer be allowed to procure its own energy supplies.  The discontinuance process will stop if the ESCO/Marketer/Director Customer corrects the problem within the 10 day period unless otherwise directed by the Commission.  If a more expedited process is deemed necessary for any discontinuance, the process outlined in Sub-section 6 below may be followed.

3.    The utility may suspend or discontinue an ESCO/Marketer/Direct Customer immediately if an imminent risk exists that compromises the safety or operational reliability of the utility's system.  Notices shall be sent to customers as specified in Subsection 4 below.

4.    The notices to be sent to customers by utilities shall advise them:

      (a) that the discontinuance shall (or did) occur at the first meter reading date, or the first of the month, or another date where the utility may estimate the readings at the discontinuance date or provide for a special meter read;

-32-

    (b) of their option either to either select another ESCO/Marketer to be their energy service provider or to return to regulated utility service;

    (c) of the names and telephone numbers of eligible ESCOs/Marketers that have indicated a willingness to serve retail customers in the utility's service territory;

    (d) that if they do select other ESCO/Marketers, those entities will file switch requests with the utility on their behalf, and there will be no fee charged by the utility for the switches; and

    (e) that after the discontinuance and unless/until new ESCO/Marketers are selected and the switches are completed, service will be provided by the utility company under its applicable tariff rate, unless such utility has notified the customer that delivery services will be terminated on or before the discontinuance date (not applicable to the "single retailer" model being used in Rochester Gas and Electric Corporation's service area).

5. Sample copies of the form of the notices to customers shall be submitted to the Department of Public Service for review at least five calendar days before the letters are sent to customers.

6. If a more expeditious discontinuance process is judged to be needed in a specific situation, the utility may request such expedited treatment upon a showing of need to the Public Service Commission or its designee, who shall have the authority to grant such a request. The Commission or its designee may also, for good cause, initiate an expeditious discontinuance process without a request by a utility. The ESCO/Marketer/Direct Customer shall have standing in any such process.

7. ESCOs/Marketers may contest any suspension or proposed discontinuance by use of the "Dispute Resolution Process" if that process is initiated in a timely manner.

8. Upon any discontinuance of an ESCO/Marketer, the ESCO/Marketer shall remain responsible for payment or reimbursement of any and all sums owed under the Tariff or under any tariffs on file with the FERC, and service agreements relating thereto, or under any agreements between the ESCO/Marketer and the utility. The ESCO/Marketer shall also remain obligated to customers to the extent provided for in any contracts with them.

-33-

9.   Upon receipt of a switch request from a subsequent ESCO/Marketer following the discontinuance notice, the utility will verify the intended switch with the customer in accordance with the Slamming Prevention Process, (_e.g._, the utility must notify customers within five calendar days of the switch request).

D.   Discontinuance of a Direct Customer

A Direct Customer may voluntarily discontinue securing its own energy supplies by notifying the utility of its intent to discontinue acting as a Direct Customer and to switch to another supplier or to return to utility service in accordance with the "Switching Requirements" previously presented.  A Direct Customer may be involuntarily discontinued for the reasons, and in the same manner, as an ESCO/Marketer would be discontinued, to the extent applicable (see Section C above), except that notices to customers are not required where the Direct Customer is a single customer.

E.   Assignment of ESCO/Marketer Contracts

1.   An ESCO/Marketer may assign customer contracts to other eligible ESCOs/Marketers, and transfer the rights to serve those customers, provided that the ESCO/Marketer's contracts and disclosure statements clearly state that such assignments and transfers may occur.  The assignment and transfer may be initiated upon submission of a notice to the utility, the Public Service Commission and the ESCO/Marketer's customers at least 15 calendar days prior to the transfer date.  The notice to the utility and the Public Service Commission shall include a copy of the assignment document(s) executed by officers of all the involved ESCOs/Marketers and a copy of the notice being sent to customers.  The notice to retail customers shall inform them:

(a)   of the date(s) of the assignments;

(b)   that service will be provided by the assigned ESCO/Marketer;

(c)   of any changes in the contract or disclosure statement terms (to the extent permitted by the existing contracts or disclosure statements), including ministerial changes such as telephone numbers, mailing addresses, etc.

-34-

2. The utility must, within five calendar days of the notice from the ESCO/Marketer, also send a notice to the ESCO/Marketer's assigned customers advising them that transfer requests have been received and will be executed.

3. Sample copies of the form of the notice to customers shall be submitted to the Department of Public Service for review at least five calendar days before the letters are sent to customers.

4. If the utility learns that an ESCO/Marketer has assigned customers and transferred service to other ESCOs/Marketers without giving the required notices (in contracts and/or disclosure statement and in the letters to be sent at least 15 days prior to the transfer of service) to Retail Customers and to the utility in accordance with the above requirements, the utility shall immediately inform the Department of Public Service and then, if directed, notify all of the ESCO/Marketer's customers in accordance with the procedures noted above.

5. If an ESCO/Marketer does not give the required notices to its Retail Customers, the utility and the Commission in accordance with the above requirements prior to transferring customers, the ESCO/Marketer may be determined ineligible by the New York State Public Service Commission to sell electricity or natural gas to retail customers in New York State and/or may be assessed a monetary penalty by the New York State Public Service Commission.

6. The assignment document(s) (copies of which shall be provided to the utility and the Commission) shall indicate which party will be responsible for payment or reimbursement of any and all sums owed under the Tariff or under any tariffs on file with the FERC, and service agreements relating thereto, or under any agreements between the ESCO/Marketer and the utility and between the ESCO/Marketer and customers.

7. If a more expeditious transfer process is judged to be needed in a specific situation, the ESCO/Marketer may request such expedited treatment upon a showing of need to the Public Service Commission or its designee, who shall have the authority to grant such a request. The utility company shall have standing in any such process.

## DISPUTE RESOLUTION PROCESS

The following process is expected to be followed to address all retail access disputes/complaints between ESCOs/Marketers/Direct Customers and utilities with respect to retail access program issues.  Disputes involving retail customers, of either the ESCOs/Marketers or of the utilities, are not addressed by this process.  Each ESCO/Marketer/Direct Customer and utility shall designate specific personnel to be responsible for responding to complaints and disputes under this process.  The parties may also pursue other legal mechanisms to address complaints and disputes.

A.   Any ESCO/Marketer/Direct Customer or utility may initiate the dispute resolution process by presenting a written description of the dispute/complaint, and a proposed resolution, to the other party(ies) involved in the dispute, sent in a manner that will verify its receipt.

B.   The other party(ies) must, as soon as possible, but in no case more than 15 calendar days following receipt of the complaint, provide a written response to the complaining party(ies), with an alternative resolution proposal if the complaining party's(ies') proposed resolution is deemed unacceptable; or, with the results of any informal resolution that may have been reached with the other party(ies) prior to that date.

C.   If the initial exchange of written material (and perhaps verbal discussions) does not resolve the dispute, the complaining party(ies) may request a meeting(s) to discuss the matter further.  The responding party(ies) must agree to such a meeting(s) to be held within 15 calendar days following the request.

D.   The parties may agree to use alternative dispute resolution techniques with mutually agreed-upon time frames that may differ from those defined in the dispute solution process.

E.   If a resolution is not obtained within 45 calendar days after the initial complaint letter, either party may file the complaint with the Department of Public Service for resolution.

F.  If an ESCO/Marketer/Direct Customer or utility believes that special circumstances (such as an emergency involving public safety, system reliability or significant financial risk) exist that would require more expeditious resolution of a dispute or complaint than might be expected under the process described here, it may submit its complaint to the Department of Public Service, with a copy provided to the other party(ies) involved in the dispute.  The Department will respond to such a filing by:

    1.  expeditiously resolving the dispute; or

    2.  advising that the standard dispute resolution process described above be followed.

G.  If a dispute involves the accuracy of invoiced charges, the invoiced charges must be paid, subject to refund with the applied interest (1.5% per month).  This interest is only payable when associated with a finding of deficiency on the part of the party holding the funds determined to be due the other party.

H.  If any reasonable resolution between an ESCO/Marketer/Direct Customer, including the utility's affiliate, and the utility results in generic competitive benefits, those benefits should also be available to other ESCOs/Marketers/Direct Customers, including the affiliate of that utility, where applicable.

I.  All correspondence or documents to be delivered from one party to another under this process must be sent in a manner that provides verification that it is received within the time periods specified by this dispute resolution process.