Exhibit 37

OB7LBroC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IRA BROUS and MICHELLE
     SCHUSTER, on behalf of
4    themselves and all others
     similarly situated,

5
                   Plaintiffs,
6
            v.                              24 Civ. 1260 (ER)
7
     ELIGO ENERGY, LLC and ELIGO
8    ENERGY NY, LLC,

9                  Defendants.
                                            Telephone Conference
10   ------------------------------x
                                            New York, N.Y.
11                                          November 7, 2024
                                            11:00 a.m.
12
     Before:
13
                        HON. EDGARDO RAMOS,
14
                                            District Judge
15

16                          APPEARANCES

17   WITTELS MCINTURFF PALIKOVIC
          Attorneys for Plaintiffs
18   BY:  J. BURKETT MCINTURFF
          JESSICA HUNTER
19
     FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
20        Attorneys for Plaintiffs
     BY:  D. GREG BLANKINSHIP
21
     WATSTEIN TEREPKA LLP
22        Attorneys for Defendants
     BY:  RYAN WATSTEIN
23        ABIGAIL HOWD
          DAVID MEADOWS
24

25
```

OB7LBroC

1              (Case called)

2              MR. BLANKINSHIP:  Good morning, your Honor.  This is

3    Greg Blankinship representing the plaintiffs.  And also with me

4    today are my co-counsel, Burkett McInturff and Jessica Hunter.

5              MR. MEADOWS:  Good morning, your Honor.  This is Ryan

6    Watstein for defendant Eligo Energy.  And with me are my

7    colleagues, David Meadows and Abigail Howd.

8              THE COURT:  Good morning to you all.

9              This matter is on for a conference.  I note for the

10   record that it is being conducted by telephone.  I want to

11   advise the parties -- also, there are a number of issues that

12   we need to discuss.  I only have 45 minutes, so please, please

13   be as concise as you possibly can in discussing these various

14   topics.

15             Let me also say at the outset that we are here to

16   discuss any number of letters that have been filed, beginning

17   on October 22.  On that day, I believe I got five or six

18   letters from Plaintiffs' counsel, all involving different

19   discovery issues, and each at least three pages long, many with

20   exhibits that went into the hundreds of pages.  I have been

21   doing this for sometime now, and never in any case of any size

22   have I ever gotten that deluge of letters on one day.

23             Mr. McInturff, I believe you signed these letters.  I

24   consider this to be close to an abuse of my individual rules.

25   I don't know why it was that you needed to file that many

OB7LBroC

 1    letters, but in any event, it's done.  Please refrain from

 2    doing that in the future.

 3            Now, let's discuss these one at a time.  There is a

 4    dispute concerning the time frame of discovery.  These are

 5    addressed at document 74 and 101.  Mr. Blankinship, tell me

 6    what the issue is there.  Apparently you want to go back to

 7    2012.  Is that right?

 8            MR. BLANKINSHIP:  Your Honor, if it's okay with you,

 9    my co-counsel, Mr. McInturff, will handle this particular

10    issue.

11            THE COURT:  Mr. McInturff.

12            MR. MCINTURFF:  Yes, your Honor.  And I apologize for

13    the many letters.  We certainly did not intend to overburden

14    the Court or to violate your Honor's rules.  It's just that the

15    number of disputes that have come up is quite large.  And, in

16    fact, preceding ECF number 74, which I am happy to talk about,

17    is ECF number 69 and 83, which is the letter motion that is

18    what this conference was scheduled for.  I just wanted to bring

19    that to the Court's attention.

20            THE COURT:  Okay.  Let's discuss this one first.

21            MR. MCINTURFF:  Okay.  So by background, the named

22    plaintiff, Ms. Schuster's contract is dated October 9, 2016,

23    and this case involves a breach of contract claim as well as

24    consumer protection claims related to the contract and the

25    welcome letter that Plaintiff Schuster received in 2018 -- I'm

OB7LBroC

sorry, that she received when she signed up in 2016.  The

defendants are proposing to limit discovery to the presumptive

six-year -- or to limit ESI e-mail collections to the

presumptive six-year statute of limitations, and we disagree

with the limitation of the e-mail collection to just 2018 for

several reasons.  The first is, Ms. Schuster signed up in 2016.

Her contract was dated 2016.

         Defendants have also produced all of their New York

contracts.  As your Honor will recall, this case is currently

limited to New York class discovery.  They produced all of

their New York contracts, and they produced them in

chronological order at ECF number 44-7.  Ms. Schuster's

contract is just the second of many contracts that were

produced in chronological order.

         The first contract that was produced is dated 2014,

February of 2014, so early 2014, and that contract contains the

exact same pricing term that Plaintiffs allege in this case was

breached and contains a deceptive description of how Defendant

will set its rate.  So there is most certainly e-mails going

back to when Eligo started doing business in New York, which is

2013, that are germane to the claims at issue in the case,

particularly, you know, what's in this contract, e-mails from

the defendant talking about complying with the terms of the

contract, how defendants set up its initial rate-setting

practices to comply with the terms of the contract.

OB7LBroC

1          Now, it is also undisputed that there are class

2   members who have claims during the baseline statute of

3   limitations period who were enrolled under the terms of these

4   contracts, Ms. Schuster being the representative.  Again, she

5   enrolled in 2016, and her claims come into the present.

6          So all we are asking for Defendant to do is to collect

7   e-mail that goes back to when it started doing business in

8   New York, that's 2013, and then to enter the stopping point not

9   to be the day that Plaintiff filed the complaint, but rather,

10  the day that they make their collection.  So whenever they

11  collect the e-mail, that would be the day that they stop.

12  That's a very common practice in electronic discovery.  And

13  there is no dispute that e-mail and other forms of

14  communication are relevant.  The only issue is, is it

15  proportional to go back that far in time, and then to collect

16  as of the date that they make the collection, and not cut it

17  off with the complaint.

18         Now, Eligo's response is, essentially, to misstate our

19  request.  We are not looking for e-mails since the inception of

20  the company.  We are just looking for e-mails for when Eligo

21  started doing business in New York.  We are also not looking

22  for Eligo to make multiple collections.  We are just saying

23  that when Eligo makes its e-mail collection, it should make the

24  collection as of the date it collects, and not cut it off at

25  the complaint.

OB7LBroC

1          Now, under the normal discovery rules, once we have

2     shown that e-mail is relevant, which, again, no party disputes,

3     the burden shifts to Eligo to show that the discovery is

4     disproportionate.  The issue here is that Eligo has made no

5     showing whatsoever regarding disproportionality.  And one of

6     the overall themes of this case is that -- or in the, I should

7     say, in the motions that we are going to discuss today, is

8     Eligo has repeatedly complained that the discovery we are

9     seeking in this case is not proportional, but what Eligo is not

10    disclosing is the tens of millions of dollars at stake in this

11    case and the tens of thousands, if not more than 100,000,

12    potential class members in this case.

13          We recently looked at the public data on Eligo's

14    electricity sales alone, not including gas sales, in 2023, and

15    it's in -- well into $70 million.  My co-counsel,

16    Mr. Blankinship, and I have done a number of these cases

17    against independent energy companies that overcharge their

18    customers, and damages in those cases are typically well into

19    the tens of millions of dollars.

20          So the question here posed by this motion is, is this

21    a digital e-mail collection disproportionate to the needs of

22    the case?  And Plaintiffs posit that Eligo has not met its

23    burden to show that e-mail collection for the period that no

24    one disputes covers the class period should not be done.

25          THE COURT:  Mr. Watstein.

OB7LBroC

```
 1              MR. MEADOWS:  Your Honor, David Meadows.  With your
 2    permission, I will address this.
 3              THE COURT:  Mr. Meadows.
 4              MR. MEADOWS:  Thank you, Your Honor.
 5              When you introduced this motion this morning, your
 6    Honor, you were exactly right about what Plaintiffs are
 7    seeking.  They want us to collect e-mails going back 12 and a
 8    half years, all the way to, essentially, the inception of
 9    Eligo, which was founded in 2012 -- didn't exist before that --
10    to collect virtually every e-mail that is currently stored on
11    their company's systems, which would essentially be every
12    e-mail that the company ever exchanged, whether internally or
13    externally.
14              To give you a sense of the scale of that, we have
15    already collected e-mails confined to the presumptive class
16    period, and what we have collected is over 4 million e-mails.
17    I think 4.25, to be precise.  Now, in relation to that, and I
18    think -- I do agree with opposing counsel, the issue here is
19    proportionality more than anything.  So when we factor in
20    proportionality, we should be looking at, I think, primarily
21    two things:  One is the proportion of the discovery that the
22    plaintiffs are seeking relative to Eligo's size and
23    capabilities to produce it, and then, secondly, to the
24    legitimate needs of this case.
25              Now, firstly, Eligo, as I said, is a young company.
```

OB7LBroC

1    It's a small company.  It has fewer than 50 employees.  I think

2    it was three years ago Eligo suffered a sizable financial loss

3    from operations that nearly bankrupted the company.  Even

4    though its sales may be in the tens of millions of dollars, its

5    net income is generally much, much smaller than that.

6           The scope of the e-mail discovery that Plaintiffs are

7    requesting here alone would cost hundreds of thousands of

8    dollars, if not millions, to search and produce.  And so at a

9    threshold level, that is completely disproportionate to Eligo's

10   resources.

11          And by the way, given even the number of motions the

12   plaintiffs have been filing, which you noted at the outset,

13   your Honor, and the amount of time and effort that has required

14   us to devote to that, among other tasks on the case, our client

15   has been incurring a run rate on legal fees of over $200,000 a

16   month, which is unsustainable for this small company.  But let

17   me also address what are the legitimate needs of the case.  Is

18   there any legitimate need for the plaintiffs to insist on

19   collecting e-mails that are 12 and a half years old?  And the

20   answer is, there isn't.

21          This is certainly not the only or the first case of

22   this kind filed against an ESCO in the Second Circuit.  There

23   are many.  What the Second Circuit has repeatedly held is that

24   these are fairly simple and straightforward cases that rise and

25   fall on the language in the customer agreement that's at issue.

1    Here, Eligo's customer agreement was quite simple.  It directed

2    that Eligo would calculate variable rates for green electricity

3    according to some very broadly described factors, based on

4    market factors like market pricing, and things of that nature,

5    none of which are defined in the agreement.

6          Now, we have already produced the core information and

7    are further in the process of producing the core information on

8    whether Eligo complied with that very simple contractual

9    directive.  In fact, most of the rate setting that was done

10   under the class period was done with a machine learning model

11   called Groove.  We have already begun producing the inputs into

12   that Groove model.  Plaintiffs know what rates we charge.  And

13   so the issue of showing whether or not we took into account the

14   requisite market factors as vaguely or as broadly defined in

15   the contract is really not going to be subject to much dispute.

16   And, in fact, your Honor, we intend to move for summary

17   judgment on that issue in fairly short order under binding

18   Second Circuit authority which we think is going to be right on

19   point with this case and show that we are entitled to judgment

20   as a matter of law.  So the scope of discovery they are seeking

21   is huge.  They have no legitimate need to prove a breach by

22   trolling through millions of e-mails that are up to almost 13

23   years old, and it is completely out of proportion to what the

24   case involves.

25          And as a last addition -- I am trying to be brief --

OB7LBroC

1    we filed a motion last night to ask you to place overall

2    proportional limitations on discovery, given the incredible

3    demand the plaintiffs are making in this case and the number of

4    motions they have been filing.  And I would respectfully submit

5    that a very efficient way to sort through what you now have in

6    front of you is to, frankly, defer all of these motions and

7    take up that overall motion to limit discovery, because we

8    think that what's going on here is an abuse of the discovery

9    process that is designed, if not intended, to pressure us with

10   costs to settle what we regard as baseless claims.

11        THE COURT:  So what's your counterproposal,

12   Mr. Meadows, to --

13        MR. MEADOWS:  On this discreet issue, your Honor, it

14   would be that the e-mail collection be limited to the class

15   period, which is almost seven years in length, and that also,

16   the overall number of e-mails that Eligo is obligated to search

17   and produce be strictly limited in number, given the massive

18   number that we have already collected.

19        THE COURT:  I am going to restrict the time period

20   from October of 2016 to the date of the filing of this

21   complaint, which is February 20.  I am not going to impose any

22   limit on the number, unless, Mr. Meadows, you come back and

23   say, you know, there's, you know, 50 million e-mails and it's

24   going to be too expensive for us to produce them.

25        MR. MEADOWS:  Your Honor, if I may interject.  I think

OB7LBroC

1    that is part of what we are saying, yes.  We have already

2    collected the e-mails over the period that you just identified.

3    That number is over 4 million.  Even with -- we have tried some

4    basic term searching against that already, and even that has

5    not reduced our number below the hundreds of thousands, which

6    would cost over a million dollars, we think, to review.  So

7    here again, I think we need some overall limits on ESI

8    discovery to save us from the incredible burden that would be

9    required for us to review these 4 million plus e-mails that we

10   have already collected.

11             THE COURT:  Have you agreed on search terms?

12             MR. MCINTURFF:  Your Honor, this is Burkett McInturff.

13   Can I respond to some of the comments defense counsel raised,

14   to put things in context?

15             THE COURT:  No.

16             Mr. Meadows.

17             MR. MEADOWS:  We have agreed on search terms with the

18   other side.  In fact, we have not received any search terms

19   from the plaintiffs until, I think, two days ago, when we were

20   in the midst of replying to all of these motions.

21             What we have done thus far, your Honor, is run some

22   search terms of our own against that set of 4.25 million

23   e-mails to get a sense of what they yield and how much we can

24   kind of knock that number down.  And given the shear number of

25   e-mails, we are having a very hard time with reasonable search

OB7LBroC

1    terms getting that number anywhere below the mid hundreds of

2    thousands.  And even that as a review database would impose

3    costs of approximately a million dollars on us to review.

4         MR. WATSTEIN:  This is Ryan Watstein.  May I add

5    something briefly?

6         THE COURT:  Very briefly.

7         MR. WATSTEIN:  I just want to say that that is only

8    e-mails.  There are a vast number of other data sources that

9    Plaintiffs are seeking here.  So when we talk about 4. whatever

10   million e-mails, there's also millions of other documents in

11   other databases that there are also motions about that we need

12   to keep in mind.  And that's why -- and I just want to stress,

13   we filed this motion to limit discovery last night.  We would

14   ask that the Court not pre-judge that motion, at least without

15   having it fully briefed because, again, our client cannot

16   sustain what would be equivalent to a company like Amazon

17   spending a billion dollars a month in discovery.

18        When you take the size of Eligo and their resources

19   and you extrapolate it, as you must in a proportionality

20   analysis, they are effectively asking us to do $300 billion

21   worth of discovery for an Amazon-like company, which, of

22   course, is just preposterous.  So that's why we filed the

23   motion to limit discovery.

24        The only question that remains in this case is whether

25   our client set its rate pursuant to the contract.  The Second

OB7LBroC

1  Circuit's Agway decision, which we cite in our letters, makes

2  that very, very, very simple.  Binding authority.  Plaintiffs'

3  counsel here were on the other side.  They lost, making the

4  exact same argument they are making in this case, and we are

5  going to show and we already have shown with 30(b)(6) testimony

6  and the documents we produced, we calculated the rates exactly

7  like the defendant in Agway did under, basically, the same

8  contract language.  For us to be required to spend $200,000 a

9  month for years that it would take to review all these

10  materials only to get summary judgment is the epitome of

11  disproportionality.  Thank you, Your Honor.

12        MR. MCINTURFF:  This is Burkett McInturff.  May I

13  please respond?

14        THE COURT:  Briefly.

15        MR. MCINTURFF:  This is all incredibly premature.  We

16  are talking about the date range of collecting e-mails, and

17  those e-mails are going to be sorted with search terms.  It

18  remains to be seen what's going to happen with those e-mails

19  afterwards.

20        Mr. Blankinship's firm and my firm have done over a

21  dozen of these cases.  Mr. Blankinship was lead counsel in the

22  Agway case.  Agway came down before this case was filed.  If we

23  thought Agway would have defeated the claims at issue in this

24  case, we would have never brought the case.  We recently

25  prevailed on a very similar argument that defense counsel is

OB7LBroC

1    making here about the nature of the contract before Judge

2    Halpern in July.  This is a very specialized area of

3    litigation.  And with all due respect, the defendants' claims

4    about Agway, which they are just making now -- they never made

5    them in their motion to dismiss -- the claims that they are

6    making about Agway are simply mistaken.  They don't understand

7    the scope of the law.

8         What Agway says is that the contract has to explicitly

9    grant discretion, and here, there is no such discretion

10   granted, as, again, Judge Halpern recently held in another

11   case.  But this is all -- this idea of limiting discovery and

12   that we are imposing hundreds of millions -- billions of

13   dollars just like on Amazon, it's simply insincere.  Again, we

14   have done these cases many times.  We are not asking for

15   anything out of the ordinary.

16        Eligo has not -- and specifically, right now, we are

17   talking about the date range of collection.  And your Honor

18   issued an order and said that Eligo shouldn't -- we shouldn't

19   limit the total number of potential e-mails collected, which is

20   very sensible.  There is no reason that we need to get into

21   issues of limiting discovery and summary judgment motions that

22   haven't been filed and arguments that were never made on the

23   motion to dismiss.

24        So with all due respect, I think that defense counsel

25   is putting the cart way before the horse here.

OB7LBroC

1          THE COURT:  I have issued my decision.  The parties

2     should agree on search terms.  And again, if there is a motion

3     to be made concerning proportionality or costs, they should be

4     made at the appropriate time.

5          It is now 22 minutes after the hour.  I advised the

6     parties at the outset that I have 45 minutes and they should be

7     concise.  No one thus far has been concise.  So let's move on

8     to the next issue and see how far we get.

9          Discovery collection concerning Slack.

10    Mr. Blankinship or --

11         MR. MCINTURFF:  I will take this one.  This is Burkett

12    McInturff.

13         This is pretty straightforward.  On August 30, defense

14    counsel wrote, quote, "Everything is in e-mail, Slack, and

15    Asana."  On September 5, Eligo filed a document with this Court

16    at ECF number 53 at 2 that states, quote, "Most of the

17    responsive documents are stored in e-mail, Slack and Asana, and

18    locating them will require ESI searching with the assistance of

19    professional vendors."

20         On September 9, defense counsel wrote to Plaintiffs,

21    quote, "Defendants will produce all public and private Slack

22    channels Eligo's IP administrators have access to."

23         After that, Eligo changed its position, and since

24    forcing us to file a motion, we filed the letter motion.  Eligo

25    has now changed its position once again.  Eligo's current

OB7LBroC

1    position is that it will produce all of the public and private

2    Slack data if Plaintiffs pay for the collection.  Again, that's

3    a change in position than Eligo -- this is Eligo's now third

4    position on Slack messages.

5          But the fundamental question here is, has Eligo shown

6    what -- has Eligo met its burden to show whether the costs

7    should be shifted to Plaintiffs?  Eligo has said that this will

8    cost $18,000 to collect and another $6,000 to do in a prompt

9    manner, and our position is that the amount at stake in this

10   litigation pales in comparison to that.  This ESI is

11   acceptable.  Defense counsel has admitted in writing multiple

12   times that the ESI contains responsive material.  Their

13   30(b)(6) witness testified that he uses it in the ordinary

14   course, which is unquestionably relevant, and the defendants

15   are simply trying to shift the cost to Plaintiffs as a way of

16   delaying this discovery.

17         Slack is an informal -- more informal manner than

18   e-mail, and what's in Slack is going to show contemporaneous

19   back and forth between the relevant players.  And again, in

20   terms of ESI burden, it's important to note that the parties

21   have agreed not to collect all of Eligo's ESI and review all of

22   Eligo's ESI.  We are talking about ESI of 13 custodians.  So

23   there's 13 key players whose ESI is going to be collected.

24   That ESI is then going to have search terms applied to it.

25   Again, Plaintiffs have offered to Defendants, if they want,

OB7LBroC

1    they can simply avoid the review burden that they claim is so

2    expensive, and just produce the search hits, but apparently

3    Defendants aren't interested in that.

4            That said, the issue of Slack, it's like another

5    e-mail system that the defendants have.  They have admitted

6    multiple times that it contains responsive information, and

7    they haven't shown their grounds for shifting the cost to

8    Plaintiffs to collect this information for search term

9    application.

10           THE COURT:  Mr. Watstein or Mr. Meadows.

11           MR. MEADOWS:  Yes, your Honor.  David Meadows.

12           To be brief, at your request, and to echo what

13   Mr. Watstein said earlier, this is a good example of the

14   incrementalism we are dealing with here.  We have gotten over

15   4 million e-mails, but that's not enough for the plaintiffs.

16   They also want us to collect, review, and produce these Slack

17   databases.  And Slack is a team messaging software that, yes,

18   we early on identified as having potentially relevant documents

19   on it.  But the question from a proportionality standpoint is

20   not just relevance.  It goes beyond that to, what is the

21   marginal utility or value of these additional databases that

22   the plaintiffs want us to search?  And here, there is none.

23           In fact, the plaintiffs took a 30(b)(6) deposition

24   very recently and asked our representative some basic questions

25   about what was in Slack, and the only evidence that they

OB7LBroC

1    adduced is that Slack is used by some employees in the regular

2    course of business.  Well, of course, it is, but that doesn't

3    mean that it has anything of any marginal utility over and

4    above the rate-setting machine learning that we are already

5    producing, the e-mails that we are going to produce responsive

6    to your order, which is millions of documents.

7         And on top of that, from a proportionality standpoint,

8    to even access these Slack documents, to get into review

9    database to even look at them, we have got to incur $18,000 of

10   expenses.  When we took that issue to the plaintiffs and asked

11   for some cost sharing, they said, Not one penny; we will

12   contribute nothing.  And that's their position on discovery

13   generally, which is, they get everything and it costs them

14   nothing, even at the risk of practically bankrupting Eligo.  So

15   without any showing of any marginal relevance here, and the

16   overall burden that we are incurring in this discovery, we

17   would ask you to deny this.

18        And then if I might very briefly harken back.  The

19   letter motion that was filed last night about discovery, I do

20   think we would like an opportunity to fully brief that, to

21   bring the evidence before the Court about the disproportionate

22   burden that all of these requests are imposing on us.  Thank

23   you.

24        THE COURT:  Let me ask about -- is Slack just another

25   way to e-mail, Mr. Meadows?

OB7LBroC

1            MR. MEADOWS:  It's similar to that, from my

2    understanding, your Honor.  It is not exactly the same thing.

3    If you think about team messaging, you know, things like Teams

4    or software similar to that, it can be similar to e-mail, but

5    it is not the exact same thing.

6            THE COURT:  But it's just a way of one employee of the

7    company communicating with another employee at the company

8    about company business?

9            MR. MEADOWS:  That's correct.  Yes.

10            THE COURT:  And so why should that be completely

11    divorced from the universe of relevant documents that ought to

12    be examined?

13            MR. MEADOWS:  Because, your Honor, in the

14    proportionality analysis, we look beyond relevance, and we look

15    to the marginal value or utility.

16            Now, what we know is, we are going to look at and

17    produce e-mails.  We are going to look at and produce rate

18    setting information from other databases.  Is there any

19    evidence that any use of Slack discusses any matters about rate

20    setting, the core issue in the case, that you don't already

21    find in the databases we're collecting and reviewing and

22    producing?  And the plaintiffs had an opportunity to develop

23    that evidence, and they did not do it.  There is no

24    testimony -- you certainly don't see any cited in their letter

25    motion -- saying that Slack has any special relevance or

OB7LBroC

1  utility whatsoever in this case, but it does have unusual costs

2  to review that are not present elsewhere.  And so that's the

3  difference.

4           THE COURT:  But that's not --

5           MR. MCINTURFF:  If I may.

6           THE COURT:  No.

7           That's not how I view proportionality.  You don't say,

8  well, we have, you know, five buckets of information; you can

9  look at one bucket, and not look in the other four buckets.

10  The way that I view proportionality is, you look at all five

11  buckets, and you determine, How do we whittle down the

12  information in these five buckets?  I don't see why Slack, the

13  Slack information, should be completely excluded.  And my

14  understanding was that you folks agreed that there were

15  potentially relevant documents in Slack, but that you agreed to

16  produce them at some point.  Am I wrong about that?

17           MR. MEADOWS:  I think the distinction that we are

18  drawing is, early on, when they were asking us to identify

19  potentially relevant sources, we appropriately identified

20  Slack.  What we didn't know then, what we do know now, is the

21  shear volume of data in the other databases that we had

22  identified.  Knowing now just how many e-mails we have, knowing

23  now that we have the Groove data, which is the input that

24  actually generated variable rates, and other databases -- those

25  are just two of seven, I believe, that the plaintiffs are

OB7LBroC

1    demanding that we search and produce.  There's got to be some

2    proportional limits imposed on that, and that's our position.

3        THE COURT:  I agree, there ought to be proportional

4    limits, but not by saying, Okay, we are not going to look in

5    these other four buckets.  Again, figure out what the universe

6    is.  Figure out the appropriate search terms.  And then, again,

7    if there are going to be issues concerning costs, et cetera,

8    then you can come back, but not until then.

9        MR. WATSTEIN:  Your Honor, this is Ryan Watstein

10   following up on that.  The issue, I think, here is that there

11   is a cost to get these documents into a database that is

12   searchable and producible, and that's why we went to

13   Plaintiffs' counsel and said, Look, we are not saying you can't

14   have any Slack information; we are saying that if you want us

15   to search this duplicative source, we have to upgrade our

16   license.  It's going to cost $18,000.  We want you to bear some

17   of that cost because we already are giving you searches of

18   5 million e-mails, and it will be duplicative.  So there

19   already is a cost, your Honor.  So that's already ripe.  And

20   what we are asking you is, if they want us to search that

21   additional source that will be duplicative, that they haven't

22   established contains any variable rate communication, they

23   should have to pay for the license upgrade, or whatever fee

24   there is to search that data.

25       THE COURT:  I don't know that they have to pay for all

OB7LBroC

 1    of it, but I will direct them to share in the cost, whatever

 2    that cost may be.

 3         MR. MCINTURFF:  Your Honor, this is Burkett McInturff.

 4    Can I respond?

 5         Slack is a form of communication that the defendant

 6    uses in the ordinary course.  That they have to incur charges

 7    to collect this information doesn't mean that they get to shift

 8    the cost to us.  And defense counsel is misrepresenting the

 9    record when they say we haven't established that Slack contains

10    relevant and independent information.

11         Again, the defense counsel wrote in a public filing in

12    this case that most -- quote, "Most of the responsive documents

13    are stored in e-mail, Slack, and Asana."  So defense counsel

14    has already written that in the record.  I took a 30(b)(6)

15    deposition on September 17, and Eligo testified that each

16    custodian, each of the 13 custodians, use Slack in conducting

17    their affairs.  That's cited in our letter as Exhibit D.

18         This same witness testified that he is a member of

19    Slack channels with other custodians, and that he is, quote,

20    "sure" other custodians have additional Slack channels, quote,

21    "given how Slack is used," closed quote.  Slack is clearly a

22    key mode of communication at Defendants, as it is in many, many

23    companies.  And the idea that Defendants can, A, slow down

24    production by creating a dispute as to who has to pay for the

25    collection, and then, B, shift the cost to Plaintiffs without

OB7LBroC

```
 1    establishing any of the requisite criteria, the first one being
 2    that the information is inaccessible, it's accessible.  It's
 3    not Plaintiffs' fault that the defendant has to pay for an
 4    upgrade so it can collect its Slack material.  They made the
 5    choice.  Eligo made the choice to use Slack in the way it did.
 6    Eligo made the choice to purchase the subscription tier it
 7    purchased.  It's not on Plaintiffs to pay for Eligo to collect
 8    a source of ESI that it used in the ordinary course.
 9              THE COURT:  Are you done?
10              MR. MCINTURFF:  Yes.
11              THE COURT:  I have made my decision.  You can
12    contribute to it, or you don't get it, to the upgrade.
13              By the way, my understanding is that the upgrade will
14    hasten the ability to cull through the various e-mails.
15              MR. MEADOWS:  That's correct, your Honor.
16              THE COURT:  Discovery concerning topics 14(a) to (b)
17    and 23 in the 30(b)(6) deposition.
18              Mr. Blankinship or McInturff.
19              MR. MCINTURFF:  This is me, your Honor, Mr. McInturff.
20    Just to flag, we have jumped over ECF number 76, which is about
21    redactions.
22              THE COURT:  Okay.  Talk about the redactions.
23              MR. MCINTURFF:  Okay.  So there's two issues in the
24    redactions motion.  The first is relevant to redactions, and
25    then the second is standalone personally identifiable
```

OB7LBroC

1    information redactions.

2            On relevancy redactions, the case law overwhelmingly

3    disfavors relevancy redactions.  Eligo is claiming to reserve

4    the right to make unilateral relevancy redactions.  That's not

5    consistent with Eligo's complaint about discovery costs because

6    now they are saying they want to make a bunch of redactions.

7    The case law, again, is very clear, especially when there is a

8    protective order in place, that relevancy redactions of

9    otherwise responsive documents is not proper.

10           This issue first came up in our negotiation of ESI

11   protocol draft.  On September 9, Eligo's version of the ESI

12   protocol draft agreed with our proposal that relevancy

13   redactions be disallowed.  Then they changed course, and now

14   they are claiming that it's premature to deal with this issue,

15   but that's not accurate.

16           We need to deal with this issue at the outset because

17   what's going to happen is we are going to get documents that

18   are redacted for relevance.  We are going to go back to Eligo,

19   we are going to say, these are improperly redacted.  And then

20   we are going to get complaints about excessive motion practice,

21   and expect to have to go back.  So relevancy redactions should

22   be disallowed in this case, as they are in most cases.

23           And then the second issue is, Eligo wants to redact

24   the personally identifiable information of third parties.  So

25   we filed -- our motion deals with both potential class members,

OB7LBroC

1    other Eligo customers, as well as non-Eligo personnel.  In

2    response to our motion, Eligo changed its position and is only

3    really talking about absent class members.  Plaintiffs have

4    agreed with Eligo that if they produce large data sets of

5    big -- big productions of rate charging data, you know, all of

6    the people in Brooklyn that are Eligo customers, when that

7    comes across, it's going to contain thousands and thousands of

8    names.  We don't need that.  We said that Eligo can redact

9    that.

10        What we are talking about is e-mail and Slack

11    communications and other electronically stored information that

12    may happen to have a class member's personally identifiable

13    information in it.  Typically this comes up with people

14    complaining.  They will do things like they will write to the

15    CEO or customer service complaints will get escalated.  Eligo

16    wants to redact those because they are afraid that we are going

17    to contact potential class members and solicit them as

18    plaintiffs.  We have no intention of doing that.  This is

19    simply a way to slow down discovery.  It's going to make

20    discovery more expensive.

21        There is no reason for Eligo to be able to redact

22    absent class member names.  Class counsel is entitled to

23    contact those individuals for witnesses if we believe that

24    that's appropriate.  Typically, if we do that, it's a very

25    small number of potential class members.

OB7LBroC

1          Defense counsel's response cited a case I had with

2     Judge Parker.  They misrepresented that case was an energy

3     case.  It was not an energy case.  It was about a weight loss

4     app that uses psychology to help people maintain a healthy

5     weight.  And Judge Parker was very sensitive to the fact that

6     the customers of that company had disclosed very private

7     information about their body mass and body image issues,

8     substance use, relationship habits.  And Judge Parker limited

9     our ability to contact absent class members.  She believed that

10    people would be disturbed by getting contacted by lawyers about

11    an app where they had revealed highly personal information.

12    That is not the case here.

13          Again, we don't have any immediate intention of

14    contacting absent class members.  And the idea that Defendants

15    can redact their names in discovery that's going to go out is

16    just going to complicate our review.  It's going to impose

17    costs on Plaintiffs, and it's improper.

18          THE COURT:  Mr. Meadows.

19          MR. WATSTEIN:  This is Ryan Watstein.  I will take the

20    response to this one.

21          I will start very briefly with the redactions for

22    relevance.  So the bottom line is that that asks for an

23    advisory opinion.  We have, as we just talked about, millions

24    and millions of documents that we have not even yet run search

25    terms on because, even though we asked for search terms for

OB7LBroC

1    months, we just got them yesterday from Plaintiffs' counsel,

2    who says we are trying to slow down discovery.  So we don't yet

3    know what we are going to find, but what we do know is this

4    Court, your Honor, has already placed certain limitations on

5    discovery.

6           For example, your Honor held that six straight

7    information was off limits for the time being.  Secondly, and

8    much more importantly, your Honor limited discovery to the

9    New York claims.  There's eight different states at issue under

10   the Eligo penumbra.  So it very well could be the case that we

11   don't redact anything, but it also could be the case that there

12   is a bunch of information in documents that are half about

13   other states and half about New York.  We wanted to redact the

14   information about other states because your Honor already held

15   that's off limits.

16          So, again, this is just another example of filing an

17   unnecessary motion that is not -- it's trying to get a gotcha

18   on us.  They want a ruling from your Honor without even letting

19   us look at the documents and determine if we even anticipate

20   redacting anything.  So for that reason, we think that portion

21   of their motion should be denied outright.  They can reraise it

22   if there are issues with redactions down the road, but there

23   are currently not, and we are entitled to preserve our

24   objection until we review the document.  So that is relevance

25   redaction.

OB7LBroC

```
1              And the second category is redaction of class member
2      PII.  So at the outset there, I want to address this point
3      about slowing down discovery.  Again, we just got search terms
4      yesterday.  We filed a motion last night asking for the Court
5      to order an expedited period of discovery on the core issue in
6      this case so that we can show whether claims are precluded by
7      binding Second Circuit authority.  We will show -- your Honor
8      will decide.  They can argue this case isn't like Agway.  We
9      will show that it is.  So all this discussion about how much
10     money is at issue in this case and everything else, and how
11     many class members there are, that all assumes they have valid
12     claims.
13             I am going to make a prediction.  We are going to
14     spend millions and millions of dollars defending this case only
15     to get summary judgment under the Agway decision.  Setting that
16     aside for a minute and going back to the PII redaction, they
17     say they don't have any immediate intention of contacting class
18     members.  They are currently advertising on social media for
19     additional claims against Eligo.  So the idea that they don't
20     have any intention of contacting class members strains
21     credulity.
22             And the Supreme Court has said a plaintiff in a
23     putative class action like this do not get, normally, any
24     information, any personally identifiable information of
25     putative class members.  And in the Nichols case that we cited
```

OB7LBroC

 1    involving Plaintiffs' counsel, they tried to distinguish it,

 2    but it's not distinguishable.  Judge Parker said there that

 3    they argued that they merely sought to use the information to

 4    solicit fact witnesses, not representative plaintiffs.  The

 5    Court called it too cute by half, and the Court entered a gag

 6    order saying, You are not to contact any of these people.  And

 7    in doing so, the Court based that on the Supreme Court's

 8    precedent that I mentioned that says they don't get that

 9    information precertification.

10         So the concerns there -- the concerns here are far

11    more dire, given that they are already advertising for

12    additional plaintiffs.  And they say, Well, we are not going to

13    know what the information is if you redact it; we won't know

14    the context.  But that's not true either because we are only

15    going to do partial redactions.

16         So, for example, if there is PII, there will be a

17    partial redaction showing the name Steve, and they will know it

18    is about somebody named Steve; they just won't have the

19    information to contact that person precertification, which they

20    are not entitled to.

21         I just had a hearing on this exact issue yesterday in

22    front of Judge Gilbert in the Northern District of Illinois.

23    And just like we are asking here, he said, Absolutely not; you

24    don't get any of this information precertification; I consider

25    myself a fiduciary of the uncertified class; you don't get to

OB7LBroC

1  contact those people until you show that class certification is

2  proper.

3              THE COURT:  Okay.  Look, it's 11:45.  I told you folks

4  I only had 45 minutes and that I had to leave by then.  It is

5  astonishing to me that despite the fact I specifically told you

6  that I had 45 minutes, and that there were any number of issues

7  that we had to cover, and, please be concise, not a single

8  lawyer on this call has heeded that advice.  We are adjourned.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25