UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ANNE BROUS, AS THE EXECUTOR OF
THE ESTATE OF IRA BROUS** and
**MICHELLE SCHUSTER**, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

**ELIGO ENERGY, LLC** and **ELIGO
ENERGY NY, LLC**,

      Defendants.

Case No. 1:24-cv-01260-ER

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION TO EXCLUDE EXPERT REPORTS OF DR. DEBRA ARON
AND ANY TESTIMONY SHE MIGHT OFFER AT TRIAL**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ..................................................................................2

III.  ARGUMENT ..........................................................................................................6

      A.    Legal Standard...............................................................................................6

      B.    Plaintiffs' Motion to Exclude Dr. Aron's Testimony Should be Denied. ..............7

            1.    Dr. Aron is Qualified. ..................................................................................7

            2.    Dr. Aron's Opinions are Relevant and Reliable. .........................................9

                  a)    Dr. Aron's Opinions Are Faithful to Eligo's
                        Customer Contract and the Undisputed Facts. ...............................9

                  b)    Dr. Aron's Opinions Are Relevant and Reliable
                        Because They Are Grounded in the Relevant
                        Contractual and Regulatory Framework. ....................................11

                        (1)    Eligo's Contract—Including the Necessarily
                               Inexhaustive "Other Market Price Factors"
                               Term Granted It Discretion in Rate Setting.......................11

                        (2)    Dr. Aron Does Not Contend There Are
                               "No Restraints" on Eligo's Pricing...................................15

                  c)    Dr. Aron's Opinion About Benchmark
                        Comparators—the Same Comparators that She
                        Used in Agway—Are Valid, Relevant, and Admissible. ..............18

                        (1)    The Second Circuit Has Already Rejected
                               Plaintiffs' Premise that Utility Rates are the
                               Relevant Comparator in ESCO Contract Cases. ..............18

                        (2)    Dr. Aron's Refusal to Treat Utility Rates as a
                               Benchmark is Grounded in the NYPSC's
                               Market Design and Economic Methodology....................19

                        (3)    Plaintiffs' Attacks on Dr. Aron's
                               Methodology Are Meritless..............................................20

(4)    Plaintiffs' Market-Share, "Missing Utilities," and
REC Costs Critiques, if Relevant at All, Go to
Weight, Not Admissibility—and Their Own
Weighting Approach Proves Dr. Aron's Point. .................22

C.    RULE 403 EXCLUSION IS UNWARRANTED AND PREMATURE. .............24

IV.    CONCLUSION ...................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**

*Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*,
2021 WL 1906468 (E.D.N.Y. May 12, 2021) ............................................................8

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ...........................................................................6, 7

*Brown v. Agway Energy Servs.*,
822 F. App'x 100 (3d Cir. 2020) ........................................................................14

*C Sys. Inc. v. Town of Colonie, New York*,
213 F. Supp. 2d 171 (N.D.N.Y. 2002)...................................................................7

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ....................................................................6

*Claridge v. N. Am. Power & Gas*,
2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016)........................................................4

*Coda v. Constellation Energy Power Choice*,
2018 WL 3201796 (D.N.J. June 29, 2018) ...........................................................14

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)........................................................................................6, 8

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
2006 WL 2128785 (S.D.N.Y. July 28, 2006) .........................................................8

*Marcus Dairy, Inc. v. Rollin Dairy Corp.*,
2008 WL 4425954 (D. Conn. Sept. 24, 2008) .......................................................13

*Martinez v. Agway Energy Services*,
88 F.4th 401 (2d Cir. 2023) .........................................................................passim

*Martinez v. Agway Energy Servs., LLC*,
2022 WL 306437 (N.D.N.Y. Feb. 2, 2022) ...........................................................8

*Mass Laborers' Health and Welfare Fund v. Blue Cross and Blue Shield of Mass.*,
66 F. 4th 307 (1st Cir. 2023)............................................................................12

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2nd Cir. 1995) ...........................................................................8

*Mercado v. Verde Energy USA*,
2020 WL 1650404 (N.D. Ill. Jan. 29, 2020) .........................................................14

*Mirkin v. XOOM Energy*,
 931 F.3d 173 (2d Cir. 2019) ............................................................................4

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross and Blue Shield of Mich.*,
 722 F.3d 861 (6th Cir. 2013) ..........................................................................13

*Quereb v. Hong Kong,*
 649 F. App'x 55 (2d Cir. 2016) .......................................................................18

*Richards v. Direct Energy Services, LLC,*
 915 F.3d 88 (2d Cir. 2019) .......................................................................passim

*Richards v. Direct Energy Servs., LLC,*
 246 F. Supp. 3d 538 (D. Conn. 2017).......................................................15, 17

*Ruggiero v. Warner-Lambert Co.*,
 424 F.3d 249 (2d Cir. 2005) .............................................................................6

*Sevugan v. Direct Energy Servs., LLC*,
 931 F.3d 610 (7th Cir. 2019) ..........................................................................19

*Sommer v. CleanChoice Energy,*
 800 F. Supp. 3d 239 (D. Mass. Sept. 9, 2025)...........................................4, 12, 13

*Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*,
 349 F.3d 277 (6th Cir. 2003) ..........................................................................13

**Rules**

FRE 403 .........................................................................................................25

FRE 702 .......................................................................................6, 22, 25, 26

## I.    INTRODUCTION

Plaintiffs' motion seeks to exclude the testimony of Dr. Debra Aron—the economist whose work helped define how courts in this Circuit analyze ESCO "market-based" pricing terms. Dr. Aron served as the key economics expert for the ESCO defendant in *Martinez v. Agway Energy Services,* 88 F.4th 401 (2d Cir. 2023). There, the Second Circuit affirmed summary judgment for an ESCO in reliance on an analysis by Dr. Aron very similar to what she offers here, showing that Eligo's variable rates were in line with those of its ESCO competitors.

Dr. Aron's opinions are not just relevant but essential because, as in *Agway*, they will aid the Court in deciding that Eligo's variable-rate pricing of its green energy products was entirely consistent with broad, open-ended pricing terms, including "market pricing" and "other market price factors." As Dr. Aron explains, from an economic perspective, the core rate-setting terms in Eligo's contract ("market conditions," "market pricing" and "other market price factors") encompass a wide variety of considerations, including customer demand, profit margins, customer retention, and other factors impacting sellers in competitive markets. Dr. Aron's testimony will aid the Court in rejecting Plaintiffs' attempts to re-write Eligo's contract into a cost-plus agreement, and to also reject Plaintiffs' contention that Eligo breached the contract by seeking to strike a balance between maximizing profits and retaining customers. As Dr. Aron explains, Eligo's rate setting was entirely consistent with how rational market participants behave across a wide range of industries and circumstances.

Dr. Aron's opinions are not just well-supported in economic literature, but consistent with Second Circuit precedent. In *Agway*, the Second Circuit rejected the same arguments on which Plaintiffs rely here—namely, that a contract allowing an ESCO to set rates according to market-related factors somehow restricted the ESCO to setting prices equal to its "cost of procuring energy" or prohibited the ESCO from pursuing ordinary economic goals "like reducing customer

losses, achieving target profit margins, and matching competitors' rates." *Agway*, 88 F.4th at 412. Dr. Aron's opinions will also aid the Court in understanding why Eligo's rates shouldn't be compared to those charged by utilities, as opposed to other ESCOs that, like Eligo, sell green energy. And once again, the Second Circuit's ESCO precedents have adopted Dr. Aron's approach while rejecting those advanced by Plaintiffs. In *Richards v. Direct Energy Services, LLC*, the Second Circuit declined to view utility rates as the relevant comparator because that approach would defeat "the entire point of electricity deregulation" by imposing a regulated utility rate on unregulated ESCOs. 915 F.3d 88, 99 (2d Cir. 2019). For the reasons addressed further below, the Court should deny Plaintiffs' motion to exclude Dr. Aron's testimony.

## II.    FACTUAL BACKGROUND

Eligo is an energy supply company, or "ESCO," that operates in several states. This case concerns two New York residents—Ira Brous and Michelle Schuster—who chose Eligo as their electricity supplier. They allege that Eligo overcharged them by failing to calculate variable rates for electricity as provided in Eligo's contract.

Before enrolling with Eligo, Plaintiffs were both customers with other ESCOs and were not customers of their local utility. Ex. 1, DEF093950 (Brous Pre-Eligo Customer Information); Ex. 2, DEF093953 (Schuster Pre-Eligo Customer Information). Eligo offered a product that the utilities did not: electricity derived from green or renewable sources, in excess of the floor amount required by NY law for all utilities and suppliers. Ex. 3, DEF000138 (Schuster Enrollment Packet); Ex. 4, DEF093223 (Brous Enrollment Packet); Ex. 5, A. Brous Dep. at 36 ███████████████ ████████████████████████████████████████; Ex. 6, M. Schuster Dep. at 77 ███████████ ███████████████████████████████.

Both Plaintiffs enrolled with Eligo by telephone through a third-party verification ("TPV") call with an Eligo representative. Ex. 7, DEF000126 (Schuster TPV Call); Ex. 8, DEF093222

(Brous TPV call). During that call, the representative explained that Eligo would provide electricity at an introductory fixed rate and then "continue at a month-to-month rate based on market and wholesale factors, weather patterns, and pricing strategies." *Id.* Each Plaintiff verbally assented to have their variable rates calculated according to those broadly described factors. *Id.* The call also made clear that Eligo did not guarantee savings, and that the Plaintiffs could cancel their Eligo service at any time and for any reason. *Id.* The New York Public Service Commission ("NYPSC") requires TPVs for such telephonic enrollments and repeatedly approved Eligo's TPV script. Ex. 9, 2014 UBP at 171; Ex. 10–16, NYPSC regulatory filings, including TPV scripts.

A few days after enrolling, Plaintiffs received Eligo's standard energy supply contract, which said, in relevant part, that after the initial fixed-rate period the Plaintiffs' rate would convert to a "monthly variable kWh rate that may be periodically adjusted for market conditions," and that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 3, DEF000138 (Schuster Enrollment Packet); Ex. 4, DEF093223 (Brous Enrollment Packet). The contract did not define "market conditions," "market pricing," or the necessarily inexhaustive term "other market price factors." Nor did it contain any formula or other specific method that Eligo would use to calculate variable rates. Plaintiffs remained Eligo customers for multiple years without complaint. Both customers' Eligo service was cancelled in 2023, and this lawsuit followed.

From the start, Plaintiffs' claims have been based on demonstrable mischaracterizations of Eligo's customer contract. Plaintiffs claim the contract requires variable rates to be calculated on a cost-plus basis, with Eligo's rates limited to the "wholesale cost of energy" plus an unspecified arbitrary margin that would have bankrupted Eligo. Second Am. Compl. ¶ 64. In truth, however, Eligo's contract says nothing of the kind. There is no reference to any cost-plus pricing structure. The contract says nothing about a "reasonable margin." Nor is there any reference to the wholesale

price of energy, much less language limiting Eligo's variable rates to wholesale prices. Nor is there any specific reference to a wholesale energy index, as is ubiquitous in cost-plus contracts.

This case is hardly the first time Plaintiffs' counsel have tried to rewrite an ESCO agreement that provided for market-based pricing into a cost-plus contract. Just a few months ago, in fact, the District of Massachusetts dismissed a claim for breach of contract filed by Plaintiffs' counsel against CleanChoice Energy, another ESCO. *Sommer v. CleanChoice Energy*, 800 F. Supp. 3d 239 (D. Mass. Sept. 9, 2025). There the court rejected the plaintiffs' claims that CleanChoice was contractually bound to set rates equal to its procurement costs plus an arbitrary margin. And in another relatively recent ESCO case filed by Plaintiffs' counsel, the Second Circuit rejected Plaintiffs' argument that terms similar to "market pricing" and "other market price factors" refer exclusively to an ESCO's costs of procuring energy. *Agway*, 88 F.4th 401 at 410.

Inexcusably, Plaintiffs (at 3) cite the *Claridge* case to suggest that the court there held that plaintiffs could show damages by subtracting a customer's actual rate from the expert's hypothetical rate, even though the court there never held that, and it was only summarizing Plaintiffs' contentions as part of the background to its order. *Id.* (citing *Claridge v. N. Am. Power & Gas*, 2016 WL 7009062, at *3 (S.D.N.Y. Nov. 30, 2016)). Moreover, the contract here is entirely different from the *Claridge* contract, which did provide a mathematical formula. Likewise, Plaintiffs' repeated citations to *Mirkin v. Xoom* are unavailing because the contract at issue there provided for a rate based on the ESCO's "actual and estimated supply costs," and therefore truly was a cost-plus contract. *Mirkin v. XOOM Energy*, 931 F.3d 173, 175 (2d Cir. 2019).

In *Agway*, both the Second Circuit and district court expressly relied on the expert report of an economist, Dr. Debra Aron. *Agway*, 88 F.4th at 410. In particular, the courts credited Dr. Aron's expert opinion that Agway's rates were in line with those of its ESCO competitors and were therefore market-based. But Dr. Aron's expertise and reliability weren't just accepted in

*Agway*—they were conceded by the plaintiffs, represented by the same lawyers in this case, who didn't challenge Dr. Aron's qualifications or opinion after taking her deposition.

To assist the Court in understanding and determining the economic and market pricing concepts inherent in Eligo's contract, Eligo retained Dr. Aron in this case. She issued a detailed report that explains, from an economic standpoint, how terms like "market pricing" and "other market price factors" cannot be understood as a cost-plus arrangement. According to Dr. Aron, "market pricing" and "other market price factors" are economic concepts that encompass a variety of well-understood competitive considerations, including (but not limited to) consumer demand, the seller's profit margins, and promoting customer retention. Ex. 17, Aron Report §§ IX.A–B. Dr. Aron's analysis and opinions undermine Plaintiffs' assertions about what "any reasonable consumer" would expect based on Eligo's contract because she explains that, according to basic economic precepts, it would be rational for customers to expect Eligo—like any other rational, for-profit seller operating in a competitive market—to seek a profit maximizing price that balances price with customer retention. Ex. 17, Aron Report ¶ 98–99. Dr. Aron also compared Eligo's variable rates with those of other ESCOs offering comparable residential electric service in New York and demonstrated that Eligo's variable rates were within the range of those prevailing market prices. Her analysis here follows the same methodology that Dr. Aron used in *Agway*, and she used the same source of data (maintained by the NYPSC) as she used in the *Agway* case. Aron Decl. ¶ 7; Ex. 17, Aron Report ¶ 116 n.179; Ex. 18, Aron Agway Expert Report, ¶¶ 109–110, n.150.

In *Agway*, Plaintiffs' counsel conceded the admissibility of Dr. Aron's opinions. Yet they now ask this Court to exclude Dr. Aron's testimony without offering any legitimate reason why this Court should order exclusion when the *Agway* court in fact found Dr. Aron's analysis of material assistance. If anything, Plaintiffs' motion betrays a fundamental misunderstanding—as well as outright misrepresentations—of Dr. Aron's analysis, support, and conclusions. For the

reasons set forth below, Dr. Aron's qualifications, analyses, and opinions easily pass *Daubert* muster, and Plaintiffs' motion to exclude her testimony should be denied.

## III.   ARGUMENT

### A.   Legal Standard

Rule 702 of the Federal Rules of Evidence provides that expert testimony is generally admissible if it will help the trier of fact to understand the evidence or determine a fact in issue, and the testimony is the product of reliable principles and methods. *See* FRE 702. "As the Supreme Court explained in *Daubert*, Rule 702 requires the district court to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).

"To ensure relevance, the Court must ensure that the expert's testimony fits the facts of the case." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 120 (S.D.N.Y. 2022) (cleaned up). The district court should also "look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). The district court enjoys wide discretion in determining whether an expert's testimony is relevant. *Id.*

As to reliability, "the inquiry envisioned by Rule 702 is . . . a flexible one," in which the "gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (cleaned up). The "flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Id.* Although there is "no definitive checklist" for reliability, factors to consider include

6

whether a particular technique or theory has gained "general acceptance" in the relevant scientific or academic community. *Id*.

Dr. Aron's opinions easily meet these standards. As in *Agway*, her primary opinion—that Eligo's variable rates were within the range of its ESCO competitors—perfectly fits the facts of this case. So too does her opinion that the economic concepts expressed in Eligo's customer contract—again, "market pricing," "other market price factors" and "market conditions"—are inconsistent with Plaintiffs' contention that Eligo's contract requires cost-plus pricing. Nor is there any legitimate question about the reliability of her opinions. Economists frequently assess market prices and assist triers of fact in understanding the underlying market factors that impact demand, supply, and pricing. Just as in *Agway*, Dr. Aron's opinions are helpful, reliable, and should be admitted.

### B. Plaintiffs' Motion to Exclude Dr. Aron's Testimony Should be Denied.

#### 1. Dr. Aron is Qualified.

Plaintiffs begin their argument with a superficial, one-paragraph argument (at 8) that Dr. Aron "has no relevant experience in New York electricity markets" and is therefore unqualified to testify in a case involving an ESCO.[1] Plaintiffs' argument is wrong as a matter of basic principles, because there is no requirement that an economist demonstrate specific industry experience before testifying about economic principles or market forces. *See C Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) (stating that "[a]n economist, through his or her educational training, is qualified to educate the fact finder about . . . broad economic principles and market forces"); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) (admitting expert and noting that "[i]t is not important

---

[1] Plaintiffs take no issue with her demonstrated expertise as an economist. Nor could they. Ex. 17, Aron Report at 61 *et seq.* (CV) (listing extensive research, teaching, publication, and consulting work in the field of pricing).

that [the expert] does not have specific training in the field of optometry or experience related to the eye care profession because his opinions involve financial rather than industry specific analysis"); *see also Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*, 2021 WL 1906468, at *4 (E.D.N.Y. May 12, 2021) (Where "'well-trained people with somewhat more general qualifications are available, it is error to exclude' their testimony simply because their qualifications are 'insufficiently tailored to the facts of this case.'").

Here, Dr. Aron's unquestioned qualifications as an economist are more than sufficient to support her opinions about the economic meaning of concepts like "market pricing" and "other market price factors." So, too, is she qualified as a professional economist to examine industry price data and conclude that Eligo's variable rates were within the range of applicable market prices. Any claims that Dr. Aron lacks energy industry experience "go to the weight, not the admissibility, of h[er] testimony. *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993)).

In any case, Plaintiffs are also wrong to assume that Dr. Aron has no experience with New York electricity markets. That issue was put to rest in *Agway*, where both the district court and Second Circuit expressly relied upon Dr. Aron's analysis showing that Agway charged variable rates consistent with "market-related factors." *See Agway* at 416; see also *Martinez v. Agway Energy Servs., LLC*, 2022 WL 306437 (N.D.N.Y. Feb. 2, 2022). Plaintiffs offer no reason why Dr. Aron was qualified in *Agway* but isn't qualified here. In fact, Plaintiffs make no mention of Dr. Aron's role in *Agway* or the fact that their counsel didn't challenge her qualifications in that case.

Agway's contract said that Agway would calculate variable rates to "reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors . . . ." 88 F.4th at 407. As the district court stated, however, Dr. Aron, "compar[ed] Defendants' rates to

the rates charged by other New York ESCO participants in the market using publicly available "historical pricing data reported quarterly by ESCOs that offer energy-related value-added services," and showed that Agway's rates were in line with those charged by other ESCOs. *Id*. The Second Circuit reached the same conclusion on appeal. *Agway*, 88 F.4th at 416 (noting "expert evidence comparing its variable rates to rates offered by other ESCOs").

Here, using the same publicly available ESCO pricing database she used in *Agway*, Dr. Aron has compared Eligo's variable rates to those charged by other ESCOs offering products in the same geographic markets and shown that Eligo's rates were in line with those of the markets in which Eligo competed. Aron Decl. ¶ 7; Ex. 17, Aron Report ¶116 n.179; Ex. 18, Aron Agway Expert Report, ¶¶ 109–110, n.150. That showing is of critical importance because Eligo's contract is even more permissive than the *Agway* contract and said that Eligo would set variable rates based upon "market conditions," "market pricing," and "other market pricing factors." *Agway* (not to mention the rest of her professional and scholarly experience, training, and expertise) shows there is no reason to exclude Dr. Aron's testimony.

### 2.    Dr. Aron's Opinions are Relevant and Reliable.

#### a)    Dr. Aron's Opinions Are Faithful to Eligo's Customer Contract and the Undisputed Facts.

Plaintiffs argue that Dr. Aron's opinions are irrelevant because they are inconsistent with Eligo's customer contract, but Plaintiffs are wrong. In fact, as Dr. Aron's report illustrates, it is Plaintiffs who distort the plain language of the agreement and the economic concepts it embraces.

Plaintiffs' primary argument (at 9) is that Dr. Aron has essentially supplemented "Eligo's customer contract by opining that it contains the term 'pricing strategies.'" But Dr. Aron's report makes clear that she has done no such thing. *See* Ex. 17, Aron Report ¶ 14, n. 15. While it is true that Dr. Aron's report discusses the phrase "pricing strategies" and its economic meaning, Dr. Aron has not opined that the phrase appears in Eligo's written customer contract. Instead, she

acknowledges that "pricing strategies" was part of the TPV script read to the Plaintiffs (and other Eligo customers) during the telephonic enrollment process. As Plaintiffs concede (at 9), they verbally agreed during that call that Eligo would set variable electricity rates according to "market and wholesale factors, weather patterns, and *pricing strategies*." *Id.* ¶ 14 (emphasis added). It is only *after* Plaintiffs verbally assented to this language in the TPV call that they received Eligo's written customer contract which provides that the price "may be periodically adjusted for market conditions," and that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." *Id.* ¶ 16.

Dr. Aron acknowledges that the parties disagree about whether the TPV call is part of the contract between Eligo and its customers. *Id.* ¶ 14 n. 15. Nowhere in her report, however, does Dr. Aron take any position on that disputed issue of contract law. If the Court ultimately decides that the TPV call script is part of Eligo's customer contract, then Dr. Aron's limited opinions about the economic meaning of "pricing strategies" will be helpful to the trier of fact to understand how economists understand that term and how it applies to the facts of this case. Aron Decl. ¶ 5. And even if the Court decides the TPV is not part of the contract, Dr. Aron's testimony on the meaning of the term "pricing strategies" will aid the Court in understanding an economist's perspective on the economic terms that indisputably are part of the written agreement. *Id.* ¶ 4–5.[2]

Moreover, none of Dr. Aron's opinions depend on whether "pricing strategies" is part of the contract. *Id.* ¶ 4. At one level, Plaintiffs' overblown hair-splitting is a matter of form over

---

[2] For the record, Plaintiffs are wrong on the law. **Eligo's written terms, which the NYPSC approved, contain no integration clause.** Ex. 3–4. Despite this, Plaintiffs (at 10–11) argue that the TPV terms should be excluded under the New York Uniform Business Practices because they "conflict" with the written terms, but there is no conflict between the broad terms in the written agreement—market conditions, market pricing, and other market-price factors—and the terms in the TPV, such as pricing strategies. Ex. 9, 2014 UBP at 172 (providing guidance where "a **conflicting** term [is] expressed elsewhere in the agreement").

substance: as Dr. Aron makes clear, a rational firm pricing in line with "market pricing" and "other market price factors" is not going to be "observably different" from a firm pricing in line with those two concepts plus "pricing strategies." *Id*. ¶ 5. So, it is relevant for the Court to hear that the TPV language to which the Plaintiffs indisputably agreed is functionally the same as and informative of the language of the written agreement. And as her report makes clear, Dr. Aron has offered that opinion without conflating the TPV script and written agreement, and that no rational customer could have enrolled with Eligo believing that Eligo would use a cost-plus rate structure, as Plaintiffs now claim. *See* Ex. 17, Aron Report ¶ 139 ███████████████████████

███████████████████████████████████████████

███████████████████████████

> **b)    Dr. Aron's Opinions Are Relevant and Reliable Because They Are Grounded in the Relevant Contractual and Regulatory Framework.**

Plaintiffs (at 11-16) further distort Dr. Aron's report and Eligo's contract by arguing that Dr. Aron hasn't considered contractual constraints on Eligo's rate setting. In particular, Plaintiffs argue that Eligo's customer contract doesn't grant discretion in rate setting, but limits Eligo's variable rates to its costs of procuring energy plus a reasonable margin. But this argument is impossible to square with the contract itself and no basis on which to exclude Dr. Aron's opinions.

> **(1)    Eligo's Contract—Including the Necessarily Inexhaustive "Other Market Price Factors" Term Granted It Discretion in Rate Setting.**

According to Plaintiffs (at 14), "Dr. Aron's opinions ignore that Eligo's contract *invokes a mathematical formula* when it promised that variable rates 'shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors,'" which are not specified in the contract. (Emphasis supplied.) But a simple review of the contract reveals that is false. Nowhere does the contract describe any specific calculation—or even a specific list of

variables—to be used in calculating variable rates. Instead, the contract's rate-setting criteria are broad, undefined references to "market pricing," which includes the market pricing factors specifically listed *and* any number of unlisted "*other* market price factors" and "market conditions," each of which encompasses a wide variety of economic considerations.

Because the contract does not say which (or how many) of these various considerations to use, much less how they should be weighed or applied in setting variable rates, the agreement necessarily grants Eligo discretion to set rates. That was precisely the conclusion reached by the court just last year in *Sommer*, where the ESCO contract at issue said that "a variable supply rate may vary each month and is based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins. This list of factors is not exhaustive and no single factor will determine the rate." 800 F. Supp. 3d at 246. The court found that language to grant the ESCO price-setting discretion, regardless of the fact that "the magic word discretion does not appear in the contract." *Id*.

The *Sommer* court based its holding on a long line of decisions across the country construing "broad language that affords a party flexibility" as a grant of discretion. *Id*. (collecting cases and quoting *Mass Laborers' Health and Welfare Fund v. Blue Cross and Blue Shield of Mass*., 66 F. 4th 307, 319 (1st Cir. 2023)). For example, the Sixth Circuit held that a contract which "nowhere . . . set forth the dollar amount . . . or even a method by which the [] fee is to be calculated," "in no way cabined [d]efendant's discretion to charge or set the [] fee." *Pipefitters Loc. 636 Ins. Fund v. Blue Cross and Blue Shield of Mich.*, 722 F.3d 861, 867 (6th Cir. 2013). Those decisions are consistent with a long line of authority addressing "open price term" contracts for the sale of goods, which routinely hold that when a contract merely lists factors to be considered in setting a price, it necessarily grants the seller the discretion to set that price in good faith. *See,*

*e.g., Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*, 349 F.3d 277, 282 (6th Cir. 2003); *Marcus Dairy, Inc. v. Rollin Dairy Corp.*, 2008 WL 4425954, at *6 (D. Conn. Sept. 24, 2008) (contract granted discretion to set prices where "it sets out factors upon which price adjustments shall be made, [and] leaves Marcus discretion to weigh increases and decreases in prices paid to the farmer and other market indicators.")

Here, as Dr. Aron's report makes clear, Eligo's contract did nothing more than list a set of broadly defined market-based factors to be considered in rate setting, without saying how they should be taken into account. Even the Plaintiffs admitted that it was up to Eligo to decide what market factors to use in setting variable rates. Ex. 5, Anne Brous Dep. at 114 ▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dr. Aron's report explains how economists understand the inherently economic pricing principles in the agreement and will therefore help the trier of fact to determine how those principles impacted Eligo's discretionary rate-setting authority.

Plaintiffs counter that the contract couldn't grant discretion to Eligo without using the word "discretion." The *Sommer* court rejected that form-over-substance argument, and for good reason. 800 F. Supp. 3d at 246. The only way to set a price under Eligo's contract is for Eligo to use the contract's very broad factors to set one. And as Dr. Aron explains in her report, broad concepts like "market prices" and "other market price factors" encompass many different economic considerations that rational sellers can, and often do, balance against each other in setting prices. Here, the contract plainly delegated the task of balancing those many factors to Eligo, without describing how Eligo should go about doing that.

Plaintiffs (at 15) err even more fundamentally by arguing that Eligo lacked discretion because "market prices" and "other market price factors" somehow refer exclusively to Eligo's

costs of procuring energy, despite the clear language of the written terms and the TPV. That argument is not only inconsistent with the contract's plain language but contrary to Second Circuit precedent. When faced with language like "other market price factors," circuit courts have consistently interpreted these expressions broadly in ESCO cases. For example, in *Agway*, the Second Circuit found that the "unspecified 'market-related factors'" was not "limited to market costs such as the cost of procuring energy." *Agway*, 88 F.4th at 412. In another ESCO case affirming summary judgment for the ESCO defendant, the Second Circuit interpreted "business and market conditions" to include considerations like "achiev[ing] a target profit margin, match[ing] competitors' prices, and reduc[ing] customer losses." *Richards*, 915 F.3d at 98. Likewise, the Third Circuit found that the "open-ended phrase 'market-related charges'" allowed Agway to "base its prices on factors other than its cost of acquiring electricity." *Brown v. Agway Energy Servs.*, 822 F. App'x 100, 103 (3d Cir. 2020). These three decisions are consistent with a broader trend in the case law to interpret ESCO pricing terms broadly. *Coda v. Constellation Energy Power Choice*, 2018 WL 3201796, at *6 (D.N.J. June 29, 2018) (granting motion to dismiss and stating that "the Court does not agree with Plaintiff that the 'market conditions' referred to in the Variable–Rate Factors mean only 'wholesale costs' and 'competing rates'"); *see also Mercado v. Verde Energy USA*, 2020 WL 1650404, at *2 (N.D. Ill. Jan. 29, 2020) (agreement only promising that the rate "may change monthly with market conditions" was "a far cry from a promise that the rate would change based on market conditions" and "may well be the equivalent of a statement that defendant reserved discretion in the setting of its rates"). Other courts have also rejected Plaintiffs' theory that a "market conditions" contract like Eligo's somehow amounts to a cost-plus pricing structure. *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 552–53 (D. Conn. 2017) (noting "no reasonable fact-finder could conclude that the phrase ["business and market conditions"] required [the ESCO] to have a specific profit margin" and no "reasonable jury

14

would conclude that [the ESCO's] pursuit of a desirable profit margin was not a 'business and market condition'").

In short, Plaintiffs' request to exclude Dr. Aron because she ignores the "mathematical formula" in the contract fails for the self-evident reason that there is no mathematical formula in the contract. Instead, the terms of the agreement are broad, market-based terms, like "market pricing" and "market price factors" that inherently give Eligo discretion in setting rates, and Dr. Aron's analysis provides the critical and useful perspective of an economist on how economists understand these inescapably economic terms.

### (2) Dr. Aron Does Not Contend There Are "No Restraints" on Eligo's Pricing.

Plaintiffs (at 16–20) again distort Dr. Aron's opinion by arguing that she has opined there are no contractual or regulatory constraints on Eligo's rate setting. In contrast, she explains that the contract's market-based criteria impose very real and meaningful constraints on Eligo because, in a competitive retail market, an ESCO cannot raise prices without limit: if it prices materially above the market for sustained periods, customers will predictably switch to competitors, and the ESCO will lose sales and market share. Ex. 17, Aron Report ¶¶ 86–87 ("[I]t is a standard economic principle that the existence of competitive offerings in the marketplace creates a discipline on any company's prices, because companies face the following tradeoff: by charging a higher price, they can earn a higher profit margin on each unit that they sell, but by charging a higher price they sell fewer units because, in competitive markets, customers can defect to alternative providers."). Those customer-switching dynamics are not theoretical—they are the ordinary mechanism by which competition disciplines pricing. Thus, the same economic incentives Plaintiffs label as a "scheme" (profit-seeking coupled with efforts to reduce customer attrition) are, in economic terms, features of a market-pricing framework: firms set prices with demonstrable attention to rival prices

15

and risk losing customers if prices drift meaningfully above the competitive range.

Consistent with that framework, Dr. Aron then tests Plaintiffs' allegations against extensive market data rather than assumptions. She performs a detailed competitor-rate comparison across time periods and utility territories and shows that Eligo's variable rates generally fall within the range of rates of other ESCOs offering comparable service. Ex. 17, Aron Report at ¶¶ 114–136. That empirical result demonstrates that Eligo's pricing behavior was set mindful of "market conditions" and "market pricing" in the way economists would expect. In short, Dr. Aron's opinion is not that Eligo had "anything goes" discretion; it is that Eligo's discretion was meaningfully bounded by the discipline of competition, and the data confirm that Eligo's prices were generally in line with the market rather than persistently above it. *Id.* ¶ 119.

Plaintiffs (at 16–18) mischaracterize the New York regulatory framework and argue that "if Dr. Aron were qualified, she would know that ESCOs can only raise rates based on their incremental REC costs." This is as untrue as it is patronizing. Plaintiffs ignore Dr. Aron's extensive and careful analysis of the relevant policy documents, including the Commission's goals in creating a retail market for green energy ESCO products. Ex. 17, Aron Report ¶¶ 50–62. For example, Dr. Aron points out the Commission acknowledged that "customers who voluntarily buy clean energy 'are ***New York's most valuable asset towards achieving its [green energy] goals***.'" Ex. 17, Aron Report ¶ 62. The Commission then created a market to achieve those goals. The ordering paragraphs—effectively, the "holding" of the order—made clear that going forward ESCOs could only offer three categories of mass-market products: (i) guaranteed savings products, (ii) fixed-rate products priced within 5% of the trailing 12-month average utility supply rate, and (iii) renewable energy products. Ex. 19, 2019 Reset Order at 108. This is the crux of the Reset Order, and what Dr. Aron cited in her report. Ex. 17, Aron Report ¶ 51. The Commission imposed specific numerical pricing restrictions on the first two categories but did not adopt a numerical rate

cap for renewable products, which is what Eligo provides.

Plaintiffs' argument that Dr. Aron is "incorrect" rests entirely on one passing sentence in the dicta of the 2019 Reset Order suggesting that renewable rates should be "commensurate with costs." But this language appears nowhere in the controlling portion of the NYPSC's order, and if the Commission had wanted to impose a pricing restriction on renewable products, it would have done so, just as it did for the other two products. This is especially true because the NYPSC actively reviewed ESCOs' contracts and rates year after year and continually permitted Eligo to operate—*if the NYPSC thought that Eligo's variable rates were not compliant with its Reset Order, they could and would have acted.* And there is certainly no basis for Plaintiffs' claim that Eligo's rates must have been tied to the cost of procuring energy for only its variable-rate customers. *Richards*, 246 F. Supp. 3d at 552 (noting that the phrase "business and market conditions" permitted company to "seek different profits on variable rates than it sought from other products").

In defiance of the Commission's regulation and the parties' contract, Plaintiffs seek to effectively end the green energy market and judicially re-regulate the deregulated space, and have judges and juries second-guess Eligo's variable rates, which the Commission has repeatedly approved year after year. Nothing in the Reset Order suggests the Commission intended plaintiffs' firms to deputize themselves as roaming "rate police" and sue ESCOs in lawyer-driven cases based on after-the-fact disagreement over whether an uncapped renewable product was sufficiently "commensurate" with costs—particularly where the Commission itself maintained ongoing oversight over contract terms and variable rates charged and continued to allow the ESCO to operate.

Plaintiffs' extensive reliance on the inapposite *Quereb v. Hong Kong* case is misplaced. 649 F. App'x 55 (2d Cir. 2016). There, the plaintiffs' sole expert was an expert in Chinese auditing standards who freely admitted that she had no expertise in US auditing standards and could not

opine on US auditing standards. *Id.* at 56. The Court determined that the US auditing standards applied and struck the expert because she admitted that she could not opine on US auditing standards and because her opinion about Chinese auditing standards was irrelevant and risked confusing the jury. *Id.* at 57. There's nothing remotely analogous here, and Plaintiffs make no effort to explain how the retail energy market is so different in kind with respect to the incentives and pricing practices of ESCOs from the other kinds of markets that expert economists routinely opine on.

        **c)     Dr. Aron's Opinion About Benchmark Comparators—the Same Comparators that She Used in *Agway*—Are Valid, Relevant, and Admissible.**

Plaintiffs (at 20–24) lastly ask the Court to exclude Dr. Aron on the theory that her market analysis is "fatally flawed" because she did not treat utility rates as the proper benchmark against which to compare Eligo's rates. The governing case law and the NYPSC's own regulatory structure contradict Plaintiffs' arguments.

        **(1)     The Second Circuit Has Already Rejected Plaintiffs' Premise that Utility Rates are the Relevant Comparator in ESCO Contract Cases.**

Plaintiffs' utility-as-benchmark theory is directly at odds with controlling authority. The Second Circuit has held that imposing liability on ESCOs for exceeding regulated utility prices would make the utility rate binding on ESCOs, defeating "the entire point of electricity deregulation." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 99 (2d Cir. 2019). The Seventh Circuit came to the same conclusion in *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 615–16 (7th Cir. 2019) (quoting *Richards* and explaining that using the utility's regulated default rate as the comparator would effectively make that regulated rate binding on competitive suppliers, contrary to deregulation). That logic answers Plaintiffs' "benchmark" complaint at the threshold. Plaintiffs are not identifying any defect in Dr. Aron's methods; they are trying to use litigation to

force a liability benchmark that the Second Circuit has already rejected. And it makes especially little sense here because both Plaintiffs joined Eligo from another ESCO—not their local utility.

### (2) Dr. Aron's Refusal to Treat Utility Rates as a Benchmark is Grounded in the NYPSC's Market Design and Economic Methodology.

Even if the case law did not already foreclose Plaintiffs' approach, Dr. Aron provides extensive economic reasoning for why utility rates are not an apples-to-apples benchmark for evaluating ESCO pricing in a deregulated market. Ex. 17, Aron Report § IX.C, ¶¶ 85, 90–92. As she explains, from an economic perspective, the utility is not offering the same product. Eligo's product contains a far higher percent of green energy than any NY utility. *Id.*, Ex. 6.



Indeed, Dr. Aron explained that the regulator permitted ESCOs to offer variable rate green energy products at rates that are set by the ESCO rather than the regulator, recognizing that the green energy rates would be expected to be higher than the utility rate. Ex. 17, Aron Report ¶¶ 51–56. More broadly, utility rates are set through a regulatory process, driven by rate cases, cost allocations, and policy decisions that are not tethered to the same competitive dynamics that govern ESCO rates. *Id.* ¶¶ 106–113. ESCOs, by contrast, must set prices and manage risk in a competitive marketplace—where price is influenced by competitive positioning, customer acquisition and

19

retention dynamics, and other market factors that do not apply to a regulated monopoly utility. *Id.* ¶¶ 83–105.

Dr. Aron employed the same core economic reasoning in *Agway*. There too, she explained that the utility's "price to compare" is not a valid benchmark for assessing whether an ESCO's rate is "competitive," including because the utility rate is regulated and may not reflect competitive outcomes, and because the utility does not necessarily provide a comparable product in the way ESCO offerings do. Ex. 17, Agway Report ¶¶ 103–05. In other words, Plaintiffs' attempt to portray Dr. Aron's benchmark selection as ad hoc collapses under scrutiny—because the same economic framework appears in her prior ESCO work, is founded in economic principles, and is rooted in how regulated versus competitive pricing actually operates.

### (3)    Plaintiffs' Attacks on Dr. Aron's Methodology Are Meritless.

Unable to identify any genuine methodological flaw, Plaintiffs try (at 21–23) to insinuate that Dr. Aron's reliance on record materials is improper by criticizing her citations to testimony in the NYPSC's 2019 Reset Order as "statements by consultants paid by ESCOs" and her reference to an interview with Eligo compliance staff. None of this withstands scrutiny.

Start with the NYPSC testimony. The Reset Order was issued after extensive proceedings, including submissions and testimony from multiple stakeholders. Dr. Aron cites that NYPSC record for a basic economic point: that rate of return regulation distorts utilities' incentives in rate cases by cost-allocation dynamics (including incentives to shift common costs away from the portion of the bill exposed to competition). Ex. 17, Aron Report ¶ 108. She made the same point in *Agway* using the same underlying NYPSC proceeding as the source for that proposition. *See* Ex. 18, Aron Agway Report ¶ 105. Plaintiffs supply no evidence that the witnesses whose testimony she cites were "paid by ESCOs" for their NYPSC participation, nor do they cite to any

testimony in the same record on direct or cross examination that challenged the testimony Dr. Aron cited. Notably, Plaintiffs do not cite to any NYPSC testimony, paid or otherwise, to justify their arbitrary numerical rate cap that would bankrupt Eligo and the rest of the ESCO industry and frustrate the NYPSC's policy for accelerating its green energy transition.

Plaintiffs (at 23–24) also seize on the fact that Dr. Aron referenced a discussion with Eligo compliance staff concerning an operational compliance question—whether New York's framework ever requires ESCOs to buy renewable energy credits for more than 100% of the customer's load. As an initial matter, it is not only proper but necessary for experts to consult subject matter experts upon which they rely—only "experts" who think they have expertise in all fields or that they are lawyers would refuse to consult subject matter experts. Plaintiffs' experts spent pages condescendingly criticizing Dr. Aron's understanding of the regulatory regime—yet Plaintiffs did not do the most basic thing: ask the regulator. Defendants did, and the agency confirmed Eligo's understanding of the regulatory regime, upon which Dr. Aron relied. Ex. 20, Email from NYPSC ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Accordingly, Plaintiffs' criticism provides no basis for exclusion under Rule 702 and only demonstrates Plaintiffs' ignorance of the law. Plaintiffs further blatantly misrepresent Dr. Aron's reliance on subject matter experts, asserting that she relies on SME interviews for other facts in her report. Dr. Aron's report is heavily footnoted, and only one of the propositions referenced by Plaintiffs as having subject matter expert interview support as her "sole support" cited to her interviews at all; all had other, documentary foundations cited in footnotes.

Finally, Plaintiffs' attack on Dr. Aron's discussion of utility accounting practices is baseless. She explains the economic logic for why regulated cost allocation can produce utility

rate structures that do not reflect competitive market prices. Ex. 17, Aron Report ¶¶ 106–113. Plaintiffs' quotation (at 23) to the NYPSC order proves Dr. Aron's point—"the out-of-period adjustments by the utilities" are insulated from the competitive market and serve to "moderate[] fluctuations in customer bills that otherwise would result from *market activity*." (emphasis added). Even Plaintiff's expert Dr. Felder has publicly espoused Dr. Aron's position previously. *See* Felder Kabuki Dance Video (Felder: "In the utility world it doesn't really matter when you do the accounting you just put in a deferred account and you work through . . . the kabuki dance of rate setting and rate making and all that . . . in a commodity world you've got to close the books daily."). Plaintiffs can disagree; that is what cross-examination is for. They could also have asked Dr. Aron had they taken her deposition; they did not do so. Ultimately, there is no basis to exclude Dr. Aron's rigorously supported economic analysis, especially given Dr. Felder's own statements.

### (4) Plaintiffs' Market-Share, "Missing Utilities," and REC Costs Critiques, if Relevant at All, Go to Weight, Not Admissibility—and Their Own Weighting Approach Proves Dr. Aron's Point.

Plaintiffs then pivot to two supposed "data defects": (i) Dr. Aron did not perform a weighted average of utilities and ESCOs by market share, and (ii) she failed to compute and sum up REC costs in her report. Neither criticism identifies an unreliable method. They are, at most, disputes about how to present market information best left for cross-examination.

First, Plaintiffs provide no authority for the proposition that market-share weighting is a valid method that an economist would use to demonstrate the *range* of prices available in a market, let alone a prerequisite to a reliable market analysis. Dr. Aron analyzed whether Eligo's variable rates were consistent with market pricing across ESCO rates in dozens of utility subzones over many years. Weighting may be potentially useful if the opinion is based on the average price ESCO consumers pay across ESCOs. But Dr. Aron does not offer an opinion about the average price that

ESCO consumers pay, weighted or unweighted. Her opinion is about the market offerings and pertains to the range of prices that ESCOs charged in each relevant marketplace, which is shown explicitly in the 1,152 exhibits attached to her report. Ex. 17, Aron Report, Appendices 1-3.

More importantly, this case supplies the perfect illustration of why Plaintiffs' weighting demand is outcome-driven rather than methodological. Because the utility supplies 80–90% of the residential customer base, a weighted average of ESCOs' and utilities' prices will necessarily collapse into something indistinguishable from the utility price. That is not "market pricing" and certainly provides no information about the range of available ESCO prices available in the marketplace; it is simply the regulated utility rate with a thin layer of arithmetic on top. Plaintiffs' own exhibits and expert work demonstrate exactly that effect. See Ex. 21, Macan Dep. at 312 (acknowledging that utility price and weighted average comparison "look very, very similar"), Ex. 21, Macan Dep. Ex. 8 (charts comparing utility price and weighted average). And that is precisely why *Richards* warns against making regulated utility rates the yardstick: it would transform deregulated "market-based" pricing terms into a re-regulated regime tethered to the utility price.

Second, Plaintiffs' complaint that Dr. Aron did not use utility data for three of the five utilities or for certain subzones is beside the point because Dr. Aron did not adopt the utility rate as the primary benchmark in the first place, for reasons she thoroughly explained and supported, as already discussed. Her principal analysis compares Eligo to other ESCOs operating in the same zones and quarters. She only included utility data as a reference point for the named Plaintiffs' utility subzones to show why Plaintiffs' benchmark theory is untenable: the utility is consistently the lowest (or among the lowest) rates, and if utility rates became the liability yardstick, virtually every ESCO would be "liable" in virtually every period under Plaintiffs' theory. Ex. 17, Aron Report App. 1-432 through 1-473; 1-776 through 1-808 (utility vs ESCO comparisons in the named Plaintiffs' subzones).

But Plaintiffs' critique here is also disingenuous. Plaintiffs assert that Dr. Aron is incorrect that rates for some of the utilities are unavailable and criticize her for not "correcting" her error; but their claim is not that those utility rates are in fact publicly available but only that they "can be determined by publicly available information." What that artful wording means—as was clear from Dr. Felder's deposition and will be more fully elaborated in Eligo's Daubert motion to exclude Dr. Felder—is that certain utility rates can purportedly be calculated by cobbling together information on the components of utility prices from numerous data sources that comprise a 44-page list attached to Dr. Felder's report; some of those sources are links that do not work and cannot be found. Plaintiffs did not disclose Mr. Macan or Dr. Felder's workpapers to allow verification; nor were even the purported calculated utility rates themselves disclosed to allow replication. Hence, notwithstanding Plaintiffs' patronizing assertions about what "anyone with expertise in New York's energy market knows," there remains no evidence that monthly utility rates for all utility subzones can be reliably determined from public information.

Finally, Plaintiffs (at 23–24) fault Dr. Aron for not computing Eligo's REC costs and using those costs to "justify" Eligo's rates. That argument misunderstands the contract terms. This is not a cost-plus contract. It does not state that price is equal to "REC cost + supply cost." The contract provides for a market price. The economically appropriate way to test that allegation is to examine whether Eligo's rates behaved like market prices in the relevant competitive market—meaning, among other things, whether they tracked the range of what similarly situated competitors charged in the same zones and periods. That is exactly what Dr. Aron did.

## C.    RULE 403 EXCLUSION IS UNWARRANTED AND PREMATURE.

Plaintiffs' fallback request to exclude Dr. Aron under Rule 403 fails for the same reason their Rule 702 arguments fail. Her testimony is offered to help the factfinder understand market-based pricing language and evaluate pricing conduct in the relevant competitive context, not to

inflate the jury or smuggle in an improper legal standard. To the extent Plaintiffs' complaints have any merit, those criticisms go to weight, not exclusion. For example, Plaintiffs can certainly cross-examine her at trial as to whether a weighted average of prices that include the utility price would drive the purported benchmark to the utility price; a reasonable jury would be able to understand the effect. There is nothing that needs to be hidden to protect the jury from some imagined arcane economic wizardry because Dr. Aron's analysis is visual and easy to understand. In short, Plaintiffs have shown no prejudice that Dr. Aron's testimony would cause, let alone prejudice substantially outweighs probative value, so there is no basis for Rule 403 exclusion.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude Dr. Aron under FRE 702.

Dated: February 20, 2026

Respectfully submitted,
*/s/ Ryan Watstein*
Ryan D. Watstein (*pro hac vice*)
David Meadows (*pro hac vice*)
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
lotoole@wtlaw.com
*Attorneys for Defendants Eligo Energy, LLC
and Eligo Energy NY, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein
