# Exhibit 18

## *Agway* Expert Report of Dr. Debra Aron

### *Brous, et al. v. Eligo Energy, LLC, et al.* Case No. 1:24-cv-01260-ER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

NAOMI GONZALES,

               Plaintiffs,

    v.

AGWAY ENERGY SERVICES, LLC,

            Defendant.

Case No. 5:18-CV-235 (MAD/ATB)

# EXPERT REPORT OF

# Dr. DEBRA J. ARON

September 21, 2020

**PRIVILEGED AND CONFIDENTIAL**

# Table of Contents

I.     NAME AND QUALIFICATIONS ................................................................ 1

II.    ASSIGNMENT ........................................................................................ 2

III.   SUMMARY OF OPINIONS ..................................................................... 3

IV.   UNDERSTANDING OF THE CASE ........................................................ 6

V.     AGWAY'S BUSINESS AND RELEVANT INDUSTRY FACTS ................... 9
     A. The Electricity Industry in New York and Pennsylvania ......................... 9
     B. Agway ................................................................................................ 11
     C. Direct Energy ..................................................................................... 14
     D. Relevant Regulatory Facts .................................................................. 14
        i.   2019 NY PSC Order ...................................................................... 15

VI.   OVERVIEW OF DR. FELDER'S REPORT ............................................. 18
     A. Dr. Felder's Methodology #1 .............................................................. 18
     B. Dr. Felder's Methodology #2 .............................................................. 21
     C. Dr. Felder's Individual Class Member Damages Calculation .................... 22

VII.   DR. FELDER'S REPORT FAILS TO ADDRESS THE FOUNDATIONAL ALLEGATIONS
        RELATING TO PRICES AND COSTS IN THIS CASE ............................. 22
     A. The Allegation That Agway's Prices Do Not Reflect Agway's Costs as Described in
        Its Customer Agreements Is Contradicted by the Data ............................ 26
     B. The Evidence Is, Contrary to Dr. Felder's Unsupported Conclusion, That Agway's
        Variable Rate Is Consistent with Those of Its Competitors ...................... 28
     C. Dr. Felder Does Not Address the Allegation That Agway's Variable Rate Is
        Untethered from Wholesale Rates ........................................................ 35

VIII.   DR. FELDER'S OVERCHARGES METHODOLOGIES ARE UNRELATED TO THE FACTS AND
        ALLEGATIONS IN THIS CASE ............................................................. 36
     A. Dr. Felder Did Not Provide Any Theory of Damages in Which It Is Correct to Count
        Only Positive "Overcharges" ............................................................... 37
     B. Dr. Felder Failed to Properly Account for the Value of Electric EnergyGuard and in
        Some Cases for the Cost of Electric EnergyGuard ................................. 38

IX.   DR. FELDER'S FIRST METHODOLOGY IS NOT BASED ON ANY COGNIZABLE DAMAGES
        THEORY THAT TIES THE DAMAGES TO THE ALLEGED MISCONDUCT, IS ARBITRARY,
        AND IS BIASED ................................................................................... 44
     A. Dr. Felder's Methodology #1 Assumptions Are Arbitrary ....................... 44
     B. Dr. Felder Failed to Account for All of Agway's Electric Service Costs ....... 47
     C. Other Defects in Dr. Felder's Methodology #1 ..................................... 48

X.     DR. FELDER'S SECOND METHODOLOGY IS CONTRARY TO THE FACTS OF THE CASE
        AND IS BIASED ................................................................................... 51
     A. Dr. Felder's Methodology #2 But-For Scenarios Are Unsupported ........... 51

    B.   The Data Upon Which Dr. Felder Relied for His PTCs Are Unreliable, and Are at Too High a Level of Aggregation for the Purposes to Which He Applies Them........53

    C.   Other Defects in Dr. Felder's Methodology #2 ...........................................................55

**XI.**    **DR. FELDER'S METHODOLOGIES CANNOT DISTINGUISH BETWEEN PURPORTED CLASS MEMBERS WHO WERE HARMED BY THE PURPORTED BAD ACTS AND THOSE WHO WERE NOT...............................................................................................................56**

**XII.**   **DEFECTS IN DR. FELDER'S CALCULATIONS OF INDIVIDUAL DAMAGES .........................58**

**XIII.**  **DR. FELDER'S (AND PLAINTIFF'S) ASSERTIONS REGARDING THE POLICY PURPOSE OF RETAIL ELECTRICITY DEREGULATION ARE INCORRECT ..............................................59**

**PRIVILEGED AND CONFIDENTIAL**

# I. NAME AND QUALIFICATIONS

1. My name is Debra J. Aron. I am a Vice President at Charles Rivers Associates ("CRA"). CRA is an international economics and finance consulting firm that provides economic expertise for litigation, regulatory proceedings, policy debates, and business strategy. My business address is One South Wacker Drive, Suite 3400, Chicago, Illinois, 60606.

2. I received a Ph.D. in economics from the University of Chicago in 1985, where my honors included a Milton Friedman Fund fellowship, a Pew Foundation teaching fellowship, and a Center for the Study of the Economy and the State dissertation fellowship. I was an Assistant Professor of Managerial Economics and Decision Sciences from 1985 to 1992 at the J. L. Kellogg Graduate School of Management, Northwestern University, and a Visiting Assistant Professor of Managerial Economics and Decision Sciences at the Kellogg School from 1993-1995. I was named a National Fellow of the Hoover Institution, a think tank at Stanford University, for the academic year 1992-1993, where I studied innovation and product proliferation in multiproduct firms. Concurrent with my position at Northwestern University, I also held the position of Faculty Research Fellow with the National Bureau of Economic Research from 1987-1990. At Northwestern University, I have taught Masters and Ph.D. courses in managerial economics, information economics, the economics and strategy of pricing, and the economics of competitive strategy.

3. I am a member of the American Economic Association and the Econometric Society. I have published scholarly articles on innovation, competition, incentives, and pricing in several leading academic journals, including the American Economic Review, the RAND Journal of Economics, and the Journal of Law, Economics, and Organization. I am co-author of the economics chapter of the American Bar Association's Practice Guide on Telecommunications and Antitrust (the Telecom Antitrust Handbook), First and Second Editions.

4. In my consulting career, I have focused to a large extent on the interaction between firms' incentives, competitive behavior, regulation, and market outcomes. One area of specialty in my research, teaching, and consulting work has been pricing. I have published articles in scholarly journals on pricing strategy and pricing economics, and I have taught the course on

**PRIVILEGED AND CONFIDENTIAL**

pricing to MBA students at Northwestern University.  I have testified at deposition, at trial, and in regulatory proceedings on numerous occasions on issues pertaining to pricing, costing, and competition, and on the effects of competitive conditions on prices and economic outcomes.  I have testified in antitrust price fixing matters and other antitrust litigation.

5. Over the last twenty years I have testified in federal cases as well as in state courts of law and before regulatory agencies and state legislatures regarding a variety of economic issues in technology industries, service industries, consumer products industries, and manufacturing. During that time a considerable amount of my consulting work, research, and testimony have pertained to regulated industries, with particular focus on the interaction between regulated and unregulated firms, the policy implications of specific deregulatory rules, and the economic goals of deregulation.  I am co-author of the economics chapter of the American Bar Association's handbook on telecommunications and antitrust, a professional guide for lawyers on the intersection between competition and regulation in the telecommunications industry.

6. I have testified on damages in a variety of matters including contract disputes, antitrust cases, and intellectual property matters, among others.  My experience includes several class action matters (including class certification), including matters alleging deception or fraud, one of which pertained to alleged overcharges for an energy-related warranty service offered by an energy services company affiliated with a utility in Illinois.

7. My professional qualifications are detailed in my curriculum vitae, which is attached as Exhibit 1 to this report.

## II.  ASSIGNMENT

8. I was retained by Defendant Agway Energy Services, LLC ("Agway") to provide expert analysis and opinions in this matter.  I have been asked to assess the report offered by Plaintiff's expert Dr. Frank Felder[1] on economic damages purportedly sustained by Plaintiff and, as I understand his report, other customers of Agway.  I have also been asked to

---

[1] Expert report of Frank Felder, Ph.D., July 23, 2020 (hereafter, *07/23/2020 Felder Report*).

PRIVILEGED AND CONFIDENTIAL

examine whether Dr. Felder has provided a reliable methodology by which damages could be assessed on a class-wide basis.

9.  I have been assisted in my work by staff at CRA. In the course of conducting my analysis, I and members of my staff have reviewed legal filings, depositions, and data produced by the parties, and publicly-available documents and information that we have gathered. I have also reviewed the Expert Report of Dr. Felder, I attended his deposition, and I reviewed his work papers that were produced. A list of the documents that I considered in my analysis is contained in Exhibit 2.

10. Dr. Felder did not produce his workpapers with his report; he produced some of his workpapers two weeks later after request by Agway's counsel. Some of the support materials were redacted in a way that limited my ability to assess them. In addition, Dr. Felder did not provide a list of the documents he considered in preparing his opinions. In my experience of over 25 years serving as an expert witness I am unaccustomed to an expert failing to produce his or her reliance materials or failing to produce a list of documents considered, and as a result of this witness's failure to do so I am unable to fully probe his opinions. If and when the relevant materials are produced I will supplement my report if asked to do so.

11. In addition, if other information becomes available during the course of this litigation that may be relevant to my analysis and opinions, I will revise my opinions and update my expert report as appropriate.

12. CRA bills for my time on this matter at my usual and customary rate of $825 per hour and for the time of my staff at their usual and customary rates.

## III.  SUMMARY OF OPINIONS

13. Dr. Felder's report fails to meet the fundamental requirement of an expert damages analysis, which is that damages be causally related to the allegations in the case. Dr. Felder acknowledged that he was unaware of the allegations in the case, that he had not reviewed any of the procedural documents, interrogatories, or depositions in the case, and that the framework for his methodologies was determined by counsel.

PRIVILEGED AND CONFIDENTIAL

14. Plaintiff's fundamental factual allegations—including that Agway's rates are purportedly not "competitive" because they are purportedly substantially higher than rates charged by other ESCOs and the local utilities, and that they purportedly do not comport with the language of the agreement that Agway's rates reflect the costs of electricity plus other costs, fees, charges, and a margin—are subject to economic analysis. Dr. Felder did not undertake any analysis of these allegations.

15. I analyzed these claims and found that the data show that Agway's rates are set according to the plain language cited in Plaintiff's complaint as the operative language in the contract and according to Agway's deposition testimony. I also compared the rates charged by ESCOs offering service in the same geographic areas and quarters as Agway to Agway's rates in those areas by quarter and found that Agway's rates are consistently below the substantial majority of the ESCOs, despite the fact that the comparison ESCOs offer commodity service only, while Agway's price included EnergyGuard, a value-added service, in most comparisons.

16. Dr. Felder purports to calculate aggregate overcharges paid by Agway customers by comparing what Agway customers paid to various benchmarks. But none of his benchmarks is valid because, among other reasons, Dr. Felder ignored the fact that Agway's price includes electric EnergyGuard. Dr. Felder made no attempt to quantify the value of electric EnergyGuard to consumers, to assess what the market price of electric EnergyGuard would be if sold separately, what the prices of comparable warranty products, if any, are in the market, what Agway's margin is on electric EnergyGuard, what the margins on comparable warranty products in the marketplace, if any, are, what Agway's costs of risk bearing are, or any other relevant facts. Dr. Felder even ignored entirely the consumer survey results in the record that provide insight into the satisfaction of Agway customers with electric EnergyGuard service. These survey results show that consumers who received electric EnergyGuard repair service were overwhelmingly pleased with the service and some indicated in the additional comments that they would have been unable to afford the repairs without it.

17. Dr. Felder leans heavily on a regulatory order issued by the New York Public Service Commission ("NY PSC") that, he asserts, stands for the proposition that the price utilities

**PRIVILEGED AND CONFIDENTIAL**

charge for electricity supply is an "appropriate" benchmark for Agway's prices. He fails to acknowledge, however, that the NY PSC explicitly exempted Agway from the comparison to utilities' prices, and did so *because* Agway had demonstrated that EnergyGuard provides value to consumers. Hence, the NY PSC order reached the opposite conclusion to that for which Dr. Felder relies on it.

18. Dr. Felder offered no factual or analytical foundation for his purported benchmarks other than the NY PSC Order that he misrepresents. His benchmarks that are based on various assumed accounting profit margins are entirely ad hoc and arbitrary. Dr. Felder offers no foundation, no evidence, and no analysis for asserting that the margins he imposes are reasonable, are consistent with actual margins in the industry, or are consistent with competition in an unregulated market. His assertion that an accounting profit margin of zero is reasonable violates economic teaching that a company must cover its costs, including its cost of capital (which is not included in an accounting profit margin), to remain solvent. His assertion that it is reasonable for Agway to be limited in perpetuity to margins equal to its introductory rate margins ignores the fact that in real markets, especially those in which competitors face established incumbents, companies often and reasonably offer unprofitable and unsustainable introductory rates to reduce consumers' risk of trying a new vendor. His assertion that margins of five or 10 percent are reasonable is arbitrary; Dr. Felder does not even show that these margins would cover Agway's cost of capital and therefore even provide a positive economic margin as necessary for a company to be viable on an ongoing basis, let alone show that these margins are consistent with margins in comparable unregulated industries (or in any industries).

19. Dr. Felder also commits significant conceptual errors, including his failure to offset, for any given customer or for aggregates of customers, months in which the Agway price was below the asserted benchmark (during which, if the benchmarks were valid, customers would have been better off with Agway service than the alternative) against months in which the Agway price was above the benchmark (during which, if the benchmarks were valid, customers would have been better off with the alternative than the Agway service). Failing to offset, for each customer, that customer's negative overcharges against that customer's positive ones is

**PRIVILEGED AND CONFIDENTIAL**

inconsistent with economic principles of consumer welfare and it inflates his calculated overcharges even if his benchmarks were valid.

20. Dr. Felder was not aware of the class or subclass definitions proposed by the plaintiff and did not address the question of whether it could be determined on a class-wide basis without individualized inquiry which consumers were misled (if any) and which were not. Consumers subscribed to Agway via multiple avenues, and Dr. Felder offered no evidence as to whether any customers other than the named plaintiff considered themselves misled in the process they underwent to subscribe or considered themselves harmed. Neither Plaintiff nor any other witness has offered a means for identifying among the set of potential class members those who were harmed by the alleged bad acts and distinguishing them from those who felt that the got what they paid for, received something of value for the price, and/or were charged what they were told to expect they would be charged.

## IV.   UNDERSTANDING OF THE CASE

21. Defendant Agway is an energy service company ("ESCO")[2] that sells electricity and natural gas to residential and commercial customers in New York, Pennsylvania, and Maryland.[3]  I understand that this case concerns Agway's sales of electricity to residential customers in New York and Pennsylvania.

22. I understand that Naomi Gonzales ("Plaintiff") has brought a class action complaint against Agway.  Plaintiff alleges that Agway "breached its contract with its consumers by charging variable rates not based on the factors specified in the customer agreements"[4] and engaged in "deceptive and bad faith pricing practices" that "caused thousands of New York and

---

[2] "ESCO" is the commonly used term in New York to refer to competitive (i.e., non-utility) energy services providers.  See Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process, *CASE 15-M-0127 - In the Matter of Eligibility Criteria for Energy Service Companies*, et al., State of New York Public Service Commission, December 12, 2019 (hereafter, *2019 NY PSC Order*), pp. 1-2.  In Pennsylvania, an ESCO is referred to as a competitive electric generation supplier ("EGS").  66 Pa. C.S. § 2803 (https://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/66/00.028..HTM).  I will use the term ESCO to refer to competitive energy services providers in both states.

[3] Suburban Propane Partners, L.P., Form 10-K, for the fiscal year ended September 28, 2019 (hereafter, *2019 Suburban Propane 10-K*), p. 5.

[4] Class Action Complaint, *Naomi Gonzales, v. Agway Energy Services, LLC*, In the United States District Court for the District of Delaware, Case No. 5:18-CV-235 (MAD/ATB), December 6, 2017 (hereafter, *Complaint*), ¶ 45, 52, 70.

PRIVILEGED AND CONFIDENTIAL

Pennsylvania customers to pay considerably more for their electricity than they should otherwise have paid."[5]  Specifically, Plaintiff alleges that Agway "lures" its customers into switching to Agway electricity service by offering them introductory teaser rates that are fixed and that are lower than the local utility rates for electricity, and then Agway switches customers to its monthly variable rate, which is "invariably higher than the initial teaser rate"[6] and is higher than the variable electricity rates of its competitors (utilities and other ESCOs who provide electricity services in New York and Pennsylvania).[7]  Plaintiff also alleges that Agway's profit margins are too high and not "commercially reasonable."[8]

23.  Agway provides a document to all new customers that discloses its terms and conditions of service (the "disclosure statement").[9]  According to the Complaint, the disclosure statement provided to Plaintiff says that Agway's variable rate "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."[10]

24.  According to the Complaint, "any reasonable consumer, including Ms. Gonzales, would understand based on these representations that Agway's variable rate would reflect Agway's costs for purchasing electricity at wholesale, and that the variable rate would be competitive with the rate offered by the local utility and other ESCOs."[11]  Plaintiff claims that, instead, (a) "Agway's rates are substantially higher than rates charged by other ESCOs and the local utilities," and (b) Agway's rates "are untethered from changes in wholesale rates." [12]

---

[5] *Complaint*, ¶ 1.
[6] *Complaint*, ¶ 2.
[7] *Complaint*, ¶ 2.
[8] *Complaint*, ¶ 37.
[9] Deposition of Michael A. Schueler, August 30, 2018 (hereafter, *08/30/2018 Schueler Deposition*), pp. 151:20-152:1; p. 157:18-22.  Deposition of Patricia Robinson, July 7, 2020 (hereafter, *07/07/2020 Robinson Deposition*, pp. 83:7-84:1 and Exhibit 3.
[10] *Complaint*, ¶ 21, AGWAY 583795.
[11] *Complaint*, ¶ 22.
[12] *Complaint*, ¶ 17.

**PRIVILEGED AND CONFIDENTIAL**

25. I understand that Plaintiff is a resident of New York and that she switched her electricity service from her local utility Central Hudson to Agway in February 2016.[13] I understand that Agway mailed Ms. Gonzales its standard residential customer disclosure statement, quoted above, and a welcome letter (collectively, the "Agreement"), as well as other informational materials.[14] Ms. Gonzales was offered an introductory rate of $0.044 per kWh that lasted two months, after which she was switched to a variable rate.[15] In addition, Ms. Gonzales became automatically enrolled in Agway's energy services repair program, EnergyGuard, which provides customers, including Ms. Gonzales, up to $1,000 per year for central air conditioning unit repairs and up to $1,000 per year for electric wires repairs.[16]

26. I understand that Agway provided Plaintiff with electricity services from February 2016 through October 2017,[17] and that in October 2017, Ms. Gonzales cancelled her contract with Agway.[18]

27. Plaintiff claims that the monthly variable rate that she paid to Agway until she canceled her service was inconsistent with the terms of her Agreement with Agway.[19] Plaintiff also claims that Agway's rate was "outrageously high."[20] She alleges that damages are the difference between the rate charged by Agway and the rate that would have been charged had Agway charged prices based on market conditions and factors specified in its Agreement.[21]

28. Plaintiff proposes the following class:

> [A]ll Agway New York and Pennsylvania consumers charged a variable rate for residential electricity services by Agway from November 2011 to the present (the "Class" or "Class Members").[22]

29. Plaintiff also proposes the following subclass:

---

[13] *Complaint*, ¶ 5, 23.
[14] *08/30/2018 Schueler Deposition*, p. 151 and Exhibit 10.
[15] *08/30/2018 Schueler Deposition*, p. 126 and Exhibits 5 and 10.
[16] *08/30/2018 Schueler Deposition*, Exhibit 10.
[17] *Complaint*, ¶ 5.
[18] *Complaint*, ¶ 23.
[19] *Complaint*, ¶ 21-22, 34.
[20] *Complaint*, ¶ 34, 37.
[21] *Complaint*, ¶ 56. I this report, I use terms "price" and "rate" interchangeably when referring to retail energy prices.
[22] *Complaint*, ¶ 42. I understand that the class period starts in December 2011 and not in November 2011.

**PRIVILEGED AND CONFIDENTIAL**

Agway's New York customers charged a variable rate for residential electricity services by Agway from November 2011 to the present (the "New York Sub-Class").[23]

30. The proposed Class and New York Sub-Class exclude "Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant."[24]

## V.   AGWAY'S BUSINESS AND RELEVANT INDUSTRY FACTS

### A.   The Electricity Industry in New York and Pennsylvania

31. In the electricity industry, incumbent utilities historically had unique geographic territories over which they held monopoly rights to provide service to customers.[25]  The incumbent utilities built out extensive distribution networks, which are the wires that extend into customers' homes and businesses over which electricity is delivered.  The utilities also historically generated electricity via multiple generation plants.[26]  The electric utilities in New York are regulated by the NY PSC and in Pennsylvania by the Pennsylvania Public Utility Commission ("PPUC").

32. In the late 1990s,[27] regulators in those two states (and others) redefined regulatory policy governing electricity.  In the new framework, electricity generation is not considered a monopoly service.  Rather, competitors have been allowed to enter the marketplace to

---

[23] *Complaint*, ¶ 43.  I understand that the class period starts in December 2011 and not in November 2011.

[24] *Complaint*, ¶ 44.

[25] "Energy Primer: A Handbook of Energy Market Basics," U.S. Department of Energy, Federal Energy Regulatory Commission, November 2015, pp. 38-39, https://www.ferc.gov/sites/default/files/2020-05/energy-primer.pdf; Agis Salpukas, "Deregulation May Change New York Power Authority," *The New York Times*, July 11, 1997, https://www.nytimes.com/1997/07/11/business/deregulation-may-change-new-york-power-authority.html?campaignId=7JFJX.

[26] "Inventory of Electric Utility Power Plants in the United States 2000," U.S. Department of Energy, Energy Information Administration, Office of Coal, Nuclear, Electric and Alternate Fuels, March 2002, Table 20, https://www.eia.gov/electricity/archive/009500.pdf.

[27] "Pennsylvaniain [*sic*] Ranked No. 1 in Nation for Electric Deregulation," Pennsylvania Public Utility Commission Press Release, February 7, 2001, http://www.puc.state.pa.us/about_puc/press_releases.aspx?showpr=588; "New York Deregulation," Power2Switch, accessed September 15, 2020, https://power2switch.com/NY/deregulation/index.html.

PRIVILEGED AND CONFIDENTIAL

generate electricity and/or purchase electricity generated by other companies and to sell that electricity to consumers and businesses. This has opened the market to retail competition.

33. Entrants into the retail electricity businesses are permitted to deliver the electricity they generate or purchase from generators to each of their customers using the distribution network of the incumbent utility that owns the distribution lines to that customer, and the incumbent utilities are required to allow the entrants to use their distribution facilities at a regulated price.

34. Opening the market for electricity generation to competition increased the complexity of sourcing, pricing, and delivering energy from the generation plants to customers, because supply and demand have to be coordinated across multiple competing independent generators and locations. Hence, to coordinate supply and demand for wholesale electricity generation, the Federal Energy Regulatory Commission ("FERC") instituted independent organizations, called regional transmission organizations ("RTOs") and Independent System Operators ("ISOs"), to manage and coordinate wholesale electricity markets.[28]

35. The New York Independent System Operator ("NYISO") is responsible for managing New York's wholesale electric market,[29] and PJM, an RTO, is responsible for managing Pennsylvania's wholesale electric market.[30] The NYISO and PJM are responsible for ensuring reliable supply of electricity in all of parts of New York and Pennsylvania, respectively.[31] Both NYISO and PJM are also responsible for administering internet-based bid markets in their respective states in which participants buy and sell day-ahead and spot-market energy and other services.[32]

---

[28] "Regional Transmission Organizations/Independent System Operators," Federal Energy Regulatory Commission, accessed September 18, 2020, https://www.ferc.gov/industries-data/electric/power-sales-and-markets/rtos-and-isos.

[29] "What We Do," New York Independent System Operator, accessed September 15, 2020, https://www.nyiso.com/what-we-do.

[30] "PJM 2019 Financial Report," PJM Interconnection, L.L.C., 2019, https://www.pjm.com/-/media/about-pjm/newsroom/annual-reports/2019-financials.ashx?la=en (hereafter, *PJM 2019 Financial Report*), p. 3.

[31] "What We Do," New York Independent System Operator, accessed September 15, 2020, https://www.nyiso.com/what-we-do.

[32] "What We Do," New York Independent System Operator, accessed September 15, 2020, https://www.nyiso.com/what-we-do; https://www.nyiso.com/documents/20142/3625950/mpug.pdf/, p. 8; *PJM 2019 Financial Report*, p. 3.

**PRIVILEGED AND CONFIDENTIAL**

## B. Agway

36.    Agway Energy Services ("Agway") is a wholly-owned subsidiary of Suburban Propane.[33]
Agway is a limited liability Delaware corporation[34] with a primary place of business in
Syracuse, New York.[35]  Agway is an ESCO, meaning that Agway is eligible under the rules
of the state of New York and Pennsylvania to sell electricity to residential and commercial
consumers using the incumbent utilities' transmission or distribution systems.[36]

37.    As of November 2019, Agway served 45,967 residential and commercial accounts in New
York and Pennsylvania.  The majority of these customers, over 87 percent, were residents of
New York.  Of the 45,967 customers in New York and Pennsylvania, 61 percent were
electricity accounts and 39 percent were natural gas accounts.  Among electricity accounts,
approximately 87 percent were residential, and approximately 13 percent were commercial.[37]

38.    Agway operates in competition with the incumbent electric utilities in New York and
Pennsylvania and with other ESCOs that do business in Agway's service footprint in these
states.   Exhibit 3 shows the list of utility territories served by Agway and the number of
Agway's residential electric accounts in each territory as of December 2019.  The exhibit
shows that the total number of Agway electric residential accounts as of December 2019 was
over 26,500 and the vast majority of these (over 90 percent) resided in New York.

39.    Agway provided its electricity services in New York since the beginning of the class period
(December 2011), and it expanded electricity service to Pennsylvania in September 2015.[38]

---

[33] *2019 Suburban Propane 10-K*, p. 5; *07/07/2020 Robinson Deposition*, pp. 23-24.  Patricia Robinson is Agway's
      Director of Operations and Accounting.
[34] *2019 Suburban Propane 10-K*, Exhibit 21.1.
[35] "Contact Us," Agway Energy, accessed September 15, 2020, https://www.agwayenergy.com/support/contact-us/.
[36] *2019 NY PSC Order*, fn. 1; 66 Pa. C.S. §§2802(14), 2803
      (https://www.legis.state.pa.us/WU01/LI/CT/HTM/66/00.028..HTM).
[37] AGWAY 529444, tab "SalesDetailsReport_mod."
[38] See AGWAY 000023 and AGWAY 144668.

**PRIVILEGED AND CONFIDENTIAL**

40. Agway's residential electric service offerings include standard residential electric service as well as a renewable energy service called "GreenChoice."[39] Agway also offers discounts on its service to its employees and employees of Suburban Propane.[40]

41. All Agway customers are offered an introductory rate that is specified in the disclosure statement that each new Agway customer receives. The introductory rate is usually offered for 1-2 billing cycles.[41] After the introductory rate expires, a customer is transitioned to a variable rate that changes each month.[42]

42. According to Agway's current residential disclosure statement, its variable electric rate in New York is set as follows:

> The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges, renewable and clean energy standard compliance charges, and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses (including, without limitation, those expenses relating to its EnergyGuard$^{TM}$ program) and margins.[43]

43. According to Agway's current residential disclosure statement, its variable electric rate in Pennsylvania is set as follows:

> The Electric Variable Rate shall be set each month at Agway's discretion and reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges, renewable energy compliance charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses (including, without limitation, those expenses

---

[39] "Agway GreenChoice™: Renewable Electricity Frequently Asked Questions," Agway Energy Services, accessed August 4, 2020, https://www.agwayenergy.com/electricity/agway-green-choice/.

[40] Agway 000023; Deposition of Michael A. Schueler, June 22, 2020 (hereafter, *06/22/2020 Schueler Deposition*), p. 34.

[41] *06/22/2020 Schueler Deposition*, p. 35.

[42] AGWAY 770877; AGWAY 770883. AGWAY 770877 and AGWAY 770883 are Agway's disclosure statements for New York and Pennsylvania, respectively, that are currently in effect. For effective dates of these disclosure statements, see Memorandum, John D. Coyle and Jennifer Gorga Capone (Bevan, Mosca & Guiditta, P.C.) to CRA Staff, Re: Response to CRA Memo dated April 22, 2020 Presenting Questions Regarding Data Production in Gonzales v. Agway, May 18, 2020 (hereafter, *05/18/2020 Response to CRA Memo*).

[43] For current New York residential disclosure statement, see AGWAY 770877. For effective dates of this disclosure statement, see *05/18/2020 Response to CRA Memo*.

PRIVILEGED AND CONFIDENTIAL

relating to its EnergyGuard[TM] program) and margins. The underlying costs are a derivative of the PJM market.[44]

44. All of Agway's residential electric customers are automatically enrolled in its electric EnergyGuard program.[45] Exhibit 4 shows the timing of rollout of the electric EnergyGuard program by utility territory, according to information provided to me by counsel.

45. There are three ways by which Agway obtains new customers in New York and Pennsylvania. Customers may sign up when they receive a telemarketer's call, by visiting Agway's website, or by calling Suburban Propane's call center.[46] If a customer signs up for Agway service via Agway's website, the customer's data are sent to the local utility to inform it that the customer is now Agway's customer.[47] If a customer signs up for Agway's service via a telemarketer's call or by calling Suburban Propane's call center, she subsequently receives a third-party verification call to confirm that she wants to purchase services from Agway, to verify customer information, and to explain some of the terms of Agway's service.[48] After a successful third-party verification call, Agway sends a request to the local utility to switch that customer to Agway. After Agway receives a confirmation from the utility that a new customer is enrolled in Agway's service, Agway mails that customer a welcome package that includes a welcome letter, a customer disclosure statement, and brochures describing the services that Agway provides.[49]

46. Agway purchases its electricity supply that it provides to its customers in New York and Pennsylvania from Direct Energy.[50]

---

[44] For current Pennsylvania residential disclosure statement, see AGWAY 770883. For effective dates of this disclosure statement, see *05/18/2020 Response to CRA Memo*.

[45] "Residential Repair Protection: Peace of Mind Comes Standard," Agway Energy Services, accessed August 4, 2020, https://www.agwayenergy.com/energyguard/residential-protection/.

[46] *06/22/2020 Schueler Deposition*, pp. 42:15-43:1; *07/07/2020 Robinson Deposition*, pp. 47:15-48:2.

[47] *08/30/2018 Schueler Deposition*, pp. 88:11-89.22

[48] *06/22/2020 Schueler Deposition*, pp. 50:2-10; *08/30/2018 Schueler Deposition*, pp. 92:23-95:3, 98:12-99:17, and Exhibit 8.

[49] *07/07/2020 Robinson Deposition*, p. 80:10-20; *08/30/2018 Schueler Deposition*, pp. 94:6-95:3, pp. 99:23-100:6.

[50] *6/22/2020 Schueler Deposition*, pp. 63:20-64:1.

PRIVILEGED AND CONFIDENTIAL

### C.    Direct Energy

47.   Direct Energy is a wholesale provider of power and natural gas.[51]  It is also one of the largest retail providers of electricity, natural gas, and home and business energy-related services in North America,[52] providing retail services in 50 U.S. states, the District of Columbia, and in eight provinces in Canada.[53]

48.   According to Michael Schueler, Vice President of Products Supply at Suburban Propane[54] Agway finds it cost-efficient to procure electricity from Direct Energy.[55]  The prices that Direct Energy charges to Agway for electricity supply include the costs Direct Energy incurs for energy, capacity,[56] ancillary services, other costs required to purchase electricity,[57] and Direct Energy's margin.[58]  According to Mr. Schueler, the prices that Direct Energy charges Agway in New York are based on the NYISO market prices, and in Pennsylvania Direct Energy prices are based on the PJM market prices.[59]

### D.    Relevant Regulatory Facts

49.   ESCOs are not subject to the same regulatory oversight and control as are the utilities.  The NY PSC and PPUC have authority to limit or discontinue ESCOs' access to distribution systems of utilities for electricity and natural gas, but do not govern, approve, or control the ESCOs' prices or their rates of return.[60]

---

[51] "Wholesale Energy," Direct Energy, accessed September 15, 2020, https://business.directenergy.com/wholesale.
[52] "Our Footprint and History," Direct Energy, accessed September 15, 2020, https://www.directenergy.com/about/history.
[53] "Our Footprint and History," Direct Energy, accessed September 15, 2020, https://www.directenergy.com/about/history; "Fact Sheet," Direct Energy, 2020, https://www.directenergy.com/docs/deCorpFactsSheet2020.pdf.
[54] *06/22/2020 Schueler Deposition*, p. 16:14-16.  One of Mr. Schueler's primary responsibilities is to manage Agway's business.  *6/22/2020 Schueler Deposition*, p. 17:4-12.
[55] *06/22/2020 Schueler Deposition*, pp. 101:13-102:3.  *08/30/2018 Schueler Deposition*, p. 67:7-19.
[56] *06/22/2020 Schueler Deposition*, pp. 97:16-98:22.
[57] *07/07/2020 Robinson Deposition*, p. 106.
[58] *06/22/2020 Schueler Deposition*, pp. 148:18-149:5.
[59] *06/22/2020 Schueler Deposition*, p. 64:2-22.
[60] PSL, §5(1)(b) and §65(1) (https://www.nysenate.gov/legislation/laws/PBS); *2019 NY PSC Order*, p. 6.  In New York, the NY PSC has authority to condition ESCOs' eligibility to access the utility distribution systems on terms and conditions that the NY PSC considers "just and reasonable."  For example, the NY PSC can prohibit utilities from distributing ESCOs' products if the NY PSC considers such products harmful to consumers.  The NY PSC can also impose various requirements on ESCOs, such as a requirement to demonstrate that ESCOs' products do not harm consumers.  See *2019 NY PSC Order*, pp. 6-7.  In Pennsylvania, ESCOs are required to

PRIVILEGED AND CONFIDENTIAL

### i. 2019 NY PSC Order

50. In December 2019, the NY PSC issued an order (hereafter, "2019 NY PSC Order") that was implemented to strengthen "protections for residential and small commercial customers (mass market customers) in the retail energy market."[61] This order was a result of proceedings initiated in December 2016.[62] The goal of these proceedings was to investigate whether "the regulatory regime applicable to ESCOs requires modification; new ESCO rules and products could be developed that would provide the desired benefits to residential and small commercial customers; or the retail access market should be closed entirely."[63] The regulatory hearing for these proceedings was held in Albany over ten days in November-December 2017. Multiple interested parties submitted direct and rebuttal testimony, cross-examination testimony, exhibits, initial and reply briefs, and public comments.[64] I understand that these proceedings are not completed and that Track II of these proceedings will address the outstanding issues.[65]

51. One of the areas that the NY PSC examined is whether the value-added products and services that were being offered by ESCOs to NY customers provide value to consumers.[66] The NY PSC found that:

> [N]o ESCO party could or would produce objective evidence regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO

---

obtain a license from the PPUC to participate in retail markets. ESCOs are also required to show financial responsibility and comply with other requirements that the PPUC deems necessary to "ensure continuation of safe and reliable electric service" to all consumers in Pennsylvania. See 66 Pa. C.S. §§2802(14), 2804(1), and 2809(a) (https://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/66/00.028..HTM). Utilities' prices, unlike ESCOs' prices, are regulated by the utilities commission. Utilities participate in rate cases to determine the amounts to charge consumers for electricity. See "Major Rate Case Process Overview," New York State Department of Public Service, accessed September 18, 2020, https://www3.dps.ny.gov/W/PSCWeb.nsf/0/364D0704BEEC5B7D85257856006C56B3?OpenDocument; 66 Pa. C.S. §§1301(a), 1302, and 1303 (https://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=66&div=0&chpt=13); "The PUC Ratemaking Process and the Role of Consumers," Pennsylvania Public Utility Commission, accessed September 18, 2020, https://www.puc.state.pa.us/general/consumer_ed/pdf/Ratemaking_Complaints.pdf.

[61] *2019 NY PSC Order*, p. 1.
[62] *2019 NY PSC Order*, p. 2.
[63] *2019 NY PSC Order*, p. 3.
[64] *2019 NY PSC Order*, pp. 3-4.
[65] *2019 NY PSC Order*, p. 109.
[66] *2019 NY PSC Order*, p. 44.

PRIVILEGED AND CONFIDENTIAL

customers are charged for the value-added product or service; and what type and level of benefit is obtained by customers who receive the products or services offered.[67]

The NY PSC also found that:

[T]here is little to no credible evidence on this record that the so-called "value-added" product [sic] and services offered by ESCOs are, in fact, providing a valuable benefit to customers.[68]

52. Based on its findings, the 2019 NY PSC Order placed restrictions on the types of products that ESCOs can offer to mass-market consumers in NY. Specifically, the order mandated that any product that an ESCO markets must satisfy one of the following three criteria:

(a) it must include guaranteed savings [relative to utility prices over an annual period or with greater frequency]; or,

(b) it must be a fixed-rate product compliant with a price limit; or,

(c) it must be a renewably sourced product compliant with rules regarding content, sourcing, and transparency, discussed [in a different] section [of the order].[69]

53. Notably, the NY PSC exempted one ESCO, Agway, from these requirements "due to the specific, credible evidence Agway submitted regarding the energy-related value of [its EnergyGuard] product."[70] Thus, Agway does not have to comply with any of the three above-listed criteria and does not have to provide savings relative to the utility service.

54. Specifically, the NY PSC found that Agway was the only ESCO that provided "specific, credible," and "meaningful" evidence about the value of its EnergyGuard service to its customers:

The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, due to the specific, credible evidence Agway submitted regarding the energy-related value of this product.[71]

---

[67] *2019 NY PSC Order*, p. 51.
[68] *2019 NY PSC Order*, p. 44.
[69] *2019 NY PSC Order*, p. 23; 39-41.
[70] *2019 NY PSC Order*, p. 23.
[71] *2019 NY PSC Order*, p. 23.

PRIVILEGED AND CONFIDENTIAL

. . .

> Because, with the exception of Agway's EnergyGuard product, no
> meaningful evidence was provided to demonstrate that any energy-
> related value-added product or service currently offered provides
> benefits to customers comparable to its costs, the provision of such
> a product or service is not sufficient at this time to demonstrate that
> an ESCO offering benefits customers and should be permitted.[72]

55. In January 2020, numerous parties submitted petitions to the NY PSC for rehearing,

reconsideration, or clarification of its 2019 NY PSC Order. The NY PSC issued its Order on

Rehearing, Reconsideration, and Providing Clarification on September 18, 2020 ("2020 NY

PSC Order").[73] In that order, the NY PSC denied the motions for rehearing and

reconsideration. It granted the petitions for clarification and reasserted, with additional

detail, the three criteria to which ESCOs' products are subject. It also added a fourth

criterion, that ESCOs can also offer a product or service that has been expressly authorized

by the Commission.[74]

56. The Commission reaffirmed its conclusion that Agway's EnergyGuard product is a value-

added product and its approval of Agway's product without requiring Agway to qualify one

of the first three of the above-mentioned criteria.[75] The order specifically observed that

Agway made a clear factual record to demonstrate the unique value of its EnergyGuard

product:

> In contrast to the vast majority of ESCOs, Agway made use of the
> administrative process to demonstrate that its EnergyGuard product
> provided unique value. The fact that Agway provided a clear record
> basis regarding product value explains why the Commission was able
> to immediately allow it to continue offering that product.[76]

57. I understand that the NY PSC requirement that ESCOs other than Agway must satisfy at least

one of the three original criteria or the additional criterion added in the 2020 NY PSC Order,

---

[72] *2019 NY PSC Order*, p. 53.
[73] Order on Rehearing, Reconsideration, and Providing Clarification, *CASE 15-M-0127 - In the Matter of Eligibility Criteria for Energy Service Companies*, et al., State of New York Public Service Commission, September 1, 2020, pp. 2-3.
[74] *2020 NY PSC Order,* pp. 54-55.
[75] *2020 NY PSC Order,* pp. 40-41.
[76] *2020 NY PSC Order,* p. 41.

**PRIVILEGED AND CONFIDENTIAL**

has not yet been implemented.[77]  The 2020 NY PSC Order establishes a timeline to be able to renew contracts with existing customers and enroll new customers in New York.[78]

## VI.  OVERVIEW OF DR. FELDER'S REPORT

58.  Dr. Felder purports to calculate "overcharges" paid by customers, which he defines as "the amount of money that a customer was overcharged for purchasing [electric service] from the ESCO or [as the amount of money that a customer] would have saved if [she] instead purchased [electric service] from the utility."[79]

59.  Dr. Felder provides two different methodologies or approaches to quantify aggregate overcharges for Agway electricity customers in New York and Pennsylvania.

### A.  Dr. Felder's Methodology #1

60.  In his first methodology, Dr. Felder calculates aggregated overcharges for Agway electricity customers in New York and Pennsylvania as the "difference between Agway's [total] revenues and its total costs plus a margin."[80]

61.  Dr. Felder calculates overcharges assuming four different margins: (1) zero; (2) the average margin that Agway purportedly earned during months in which customers were charged the introductory rate from May 2014 through November 2019,[81] which Dr. Felder estimates to be $0.003184/kWh; (3) five percent; and (4) 10 percent.[82]

62.  For each assumed margin, Dr. Felder calculates overcharges on a month-by-month basis for the period from December 2011 through November 2019.[83]  He calculates the total overcharges as the sum of the monthly overcharges, including in the sum only monthly overcharges that are positive.  He treats overcharges as positive in a given month if the

---

[77] "Industry & Energy Service Company (ESCO) Competitive Market Information," New York State Department of Public Service, accessed September 14, 2020, https://www3.dps.ny.gov/W/PSCWeb.nsf/All/3F6ED8DE50C6306185257687006F3A5F?OpenDocument.

[78] *2020 NY PSC Order,* p. 56.

[79] *07/23/2020 Felder Report*, p. 6.

[80] *07/23/2020 Felder Report*, p. 9.

[81] *07/23/2020 Felder Report*, p. 13 and fn. 14.

[82] *07/23/2020 Felder Report*, p. 13.

[83] *07/23/2020 Felder Report*, p. 12.

PRIVILEGED AND CONFIDENTIAL

revenues exceed the costs plus the assumed margin in that month, and he treats overcharges as zero if the revenues are below the costs plus a margin in that month.[84]

63. To estimate Agway's total revenues in each month, Dr. Felder uses Agway's sales detail reports. These reports contain for each customer for each billing cycle the customer's total charges, the costs of electricity associated with serving that customer, the customer's electricity usage, the name of the customer's local utility, and additional information.[85]

64. Dr. Felder estimates Agway's total costs of providing service to electric customers in each month as the sum of the following components:

- Agway's costs of goods sold ("COGS") (i.e., the cost of electricity to Agway);

- Agway's overhead associated with the total volume of electricity sold in kilowatt-hours ("kWh");

- various fees that Agway pays, such as the New York State Energy Research and Development Authority ("NYSERDA") fee (which applies to NY customers), the Gross Receipt Tax ("GRT") (which applies to Consolidated Edison customers in NY and to all customers in PA), the Direct Energy National Grid charge (which applies to customers of National Grid in NY);[86] and

- EnergyGuard expenses.[87]

65. Dr. Felder estimates the amount of Agway's total Cost of Goods Sold ("COGS") by summing up electricity expenses associated with each customer from Agway's sales detail reports produced in discovery.

66. Agway's profit and loss statements do not disaggregate overhead into overhead associated with Agway's electricity business and overhead associated with its gas business. To estimate Agway's overhead that applies to Agway's electricity business, Dr. Felder sums up all of Agway's non-COGS expenses from Agway's profit and loss statements; he subtracts aggregated gas and electricity expenses related to the EnergyGuard program from the total non-COGS expenses; and then allocates the remaining non-COGS expenses to electricity

---

[84] *07/23/2020 Felder Report*, p. 12.
[85] *07/23/2020 Felder Report*, Table 2; *07/07/2020 Robinson Deposition,* pp. 67-79 and Exhibit 2.
[86] *07/23/2020 Felder Report*, p. 11.
[87] *07/23/2020 Felder Report*, p. 9, Tables 4 and 6.

**PRIVILEGED AND CONFIDENTIAL**

service in proportion to the total electricity revenues relative to Agway's total revenues from electricity and gas. He then divides the overhead that he allocates to the electricity business by the total volume of kWh to put overhead costs on a per kWh basis.[88]

67. Dr. Felder assumes that the fees paid by Agway (i.e., the NYSERDA fee, the GRT, and the Direct Energy National Grid charge) were constant over the class period.[89]  To calculate the total amount of fees associated with each utility territory and month, Dr. Felder calculates kilowatt-hours sold in that utility territory and month and he then multiplies the applicable fee amounts by the kilowatt-hours sold.[90]

68. In addition, Dr. Felder calculates that Agway's total EnergyGuard costs associated with electric service were $583,900 for the period from October 2010 through September 2018.[91]  Dr. Felder asserts that Plaintiff alleges that electric EnergyGuard costs should not be included in Agway's total costs.[92]  Dr. Felder calculates overcharges both including electric EnergyGuard costs in Agway's assumed total costs (the "EnergyGuard scenario") in his Table 4 and excluding electric EnergyGuard costs from Agway's assumed total costs (the "No EnergyGuard scenario") in his Table 4.  In the EnergyGuard scenario, Dr. Felder does not apply any margin on EnergyGuard expenses when he subtracts them from Agway's revenues.

69. Dr. Felder includes in his calculations only customers who were charged Agway's variable rate and only in those months in which these customers paid variable rates.[93]  He does not include in his overcharges calculations the excess or shortfall of revenues over costs for the same customers for months in which they were charged introductory rates.  He also does not

---

[88] *07/23/2020 Felder Report*, pp. 11-12 and Table 3.

[89] *07/23/2020 Felder Report*, fn. 13 and p.11.

[90] See *07/23/2020 Felder Report,* Formula (2) and p. 11.

[91] *07/23/2020 Felder Report*, Table 3, p. 11.

[92] *07/23/2020 Felder Report*, p. 13.  He offers no cite for this allegation and no such allegation is made in the *12/06/2017 Complaint*.  Dr. Felder testified that he did not speak with Plaintiff and that Plaintiff's counsel provided him with certain facts and assumptions upon which he relied. Dr. Felder produced heavily redacted communications with counsel, the unredacted parts of which do not support Dr. Felder's characterization of Plaintiff's position.  See *08/26/2020 Felder Deposition*, pp. 14:14-16:13, 21:16-20, 146:12-147:20.

[93] *07/23/2020 Felder Report*, p. 8 and fn. 10.

**PRIVILEGED AND CONFIDENTIAL**

include customers who purchased green products but also paid variable rates or customers who paid discounted rates.[94]

70. Dr. Felder calculates overcharges aggregating New York and Pennsylvania customers. He does not calculate aggregate overcharges for New York customers only, although the Plaintiff proposes a New York Sub-Class.

### B. Dr. Felder's Methodology #2

71. In his second methodology, Dr. Felder calculates aggregated overcharges for Agway customers in New York and Pennsylvania as the difference between Agway's total revenues from these customers and electricity charges that these customers would had paid had their prices been equal to "the utilities' default service price to compare" marked up by "associated margin variations."[95] Although Dr. Felder's wording implies that he calculates Agway's total costs as the default service price to compare ("PTC") marked up by various profit margins, his methodology does not apply any profit margin on the utility PTC.

72. Dr. Felder uses the PTCs from Agway's spreadsheets that were created by Agway for marketing purposes.[96]

73. Dr. Felder calculates overcharges according to his second methodology under four scenarios: with and without accounting for Agway's overhead, and, for each of those assumptions, with and without accounting for Agway's costs of electric EnergyGuard. In no scenario does he add to the PTC the fees (the NYSERDA fee, the Direct Energy National Grid charge, or the GRT) that Agway pays and that Dr. Felder adds to costs in his methodology #1.[97]

74. Similar to his methodology #1, Dr. Felder calculates overcharges on a monthly basis, and includes only positive monthly overcharges in his calculation.[98] Also like his methodology #1 calculations, Dr. Felder restricts the base of customers to only customers who were charged a variable rate by Agway and only in those months in which these customers paid

---

[94] *07/23/2020 Felder Report*, fn. 10.
[95] *07/23/2020 Felder Report*, p. 14. The "price to compare" is the electricity price charged for the default service by the utility serving the customer's territory. *07/23/2020 Felder Report*, p. 4.
[96] *07/07/2020 Robinson Deposition*, pp. 128:1-131:5.
[97] *07/23/2020 Felder Report*, p. 14 and Table 6.
[98] *07/23/2020 Felder Report*, pp. 12, 15.

**PRIVILEGED AND CONFIDENTIAL**

variable rates. He does not include in his overcharges calculations months in which the same customers paid introductory rates. He also does not include in his overcharges calculations customers who purchased green products and paid variable green rates or customers who paid discounted rates.[99]

75. Dr. Felder's methodology #2 overcharges are calculated over the period from January 2013 through November 2019.[100]

### C. Dr. Felder's Individual Class Member Damages Calculation

76. Dr. Felder also calculated "individual damages" using his two overcharges methodologies for one anonymized potential class member with customer ID #39440 for one month.[101]

77. He did not calculate damages for this customer for the entire tenure of the customer with Agway. He also did not include any electric EnergyGuard costs in his individual damages calculations.

## VII. DR. FELDER'S REPORT FAILS TO ADDRESS THE FOUNDATIONAL ALLEGATIONS RELATING TO PRICES AND COSTS IN THIS CASE

78. As a general principle, economic damages must have a causal nexus to the alleged bad acts.[102] A proper damages analysis must begin with a substantive consideration of the allegations and, in conjunction with the facts in the case, an assessment of the harms, if any, that would flow causally from the alleged bad acts to the plaintiff(s).

79. It is fair to say that Dr. Felder does not offer an opinion as to whether the calculations that he presents in his report are relevant to the allegations in this case or whether they can constitute damages. Dr. Felder admitted in his deposition that he is unaware of the allegations in this case and that his methodologies for determining overcharges (articulated in the statement of his scope of work on page 1 of his report) were dictated by counsel.[103] His methodologies,

---

[99] *07/23/2020 Felder Report*, fn. 10.
[100] *07/23/2020 Felder Report*, fn. 16 and Table 5.
[101] Dr. Felder made an error in the customer ID for whom he calculated damages in his Table 7. The customer ID #394440 should be "#39440" instead. See *07/23/2020 Felder Report*, Section V and Table 7.
[102] Mark Allen, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 3rd ed., (Washington, D.C.: National Academies Press, 2011) (hereafter, *2011 Allen et al.*), p. 432.
[103] *08/26/2020 Felder Deposition*, pp. 19:16-20:5, 32:5-24.

PRIVILEGED AND CONFIDENTIAL

therefore, are not the product of an independent expert assessment of the causal effects of the alleged bad acts and his report, in consequence, is a calculation exercise to quantify the frameworks Plaintiff's counsel directed. Dr. Felder admitted that he has never reviewed the complaint in this matter, deposition transcripts, Plaintiff's responses to interrogatories, Agway's responses to interrogatories, Agway's responses to document requests, or Agway's initial disclosures.[104] He has never spoken with the Plaintiff.[105] Dr. Felder did not indicate in his report or his deposition an awareness of the proposed definition of the class nor of the existence of a proposed subclass.[106] His opinions, therefore, are divorced from the facts of this case as well as the allegations.

80. This case is, in part, a breach of contract case. I understand that the language of the contract, or "Agreement" that was allegedly violated is contained in Agway's disclosure statement.[107] It appears that Dr. Felder has not reviewed any disclosure statements that Agway provided to customers in NY other than that of Ms. Gonzales;[108] Dr. Felder has not reviewed any disclosure statements that listed the terms and conditions of Agway's service provided to customers in PA.[109]

81. Dr. Felder relies on language in the welcome letter sent by Agway to Ms. Gonzales, which I understand is considered part of Agway's customer Agreement,[110] in support of his overcharges methodology that compares Agway's prices to the price of the incumbent utilities.[111] Dr. Felder did not review any welcome letters provided to Agway's customers other than that of Ms. Gonzales in NY; he has not reviewed any welcome letters provided to Agway's customers in PA; and he did not know whether welcome letters provided to other customers in NY and PA were the same as the welcome letter provided to Ms. Gonzales or

---

[104] *08/26/2020 Felder Deposition,* pp. 22-23, 29-30.
[105] *08/26/2020 Felder Deposition,* p. 21:16-20.
[106] *08/26/2020 Felder Deposition,* pp. 156:17-157:4.
[107] *Complaint,* ¶ 21, AGWAY 583795-6.
[108] Dr. Felder has not cited any disclosure statements other than Ms. Gonzales's in his report.
[109] *08/26/2020 Felder Deposition,* p. 213:10-14.
[110] *08/30/2018 Schueler Deposition,* pp. 153-155.
[111] The language he cites says: "We're excited to be providing you with this special offer, you will receive a competitive monthly variable price starting with your next scheduled meter reading." *07/23/2020 Felder Report,* p. 8.

PRIVILEGED AND CONFIDENTIAL

whether welcome letters changed over time.[112]   In fact, not all welcome letters that Agway sent to its customers in New York and Pennsylvania contained language cited by Dr. Felder in his report on p. 8.[113]

82.  In addition, Dr. Felder has not reviewed any other materials that Ms. Gonzales received during her enrollment with Agway: He did not review EnergyGuard brochures provided to Ms. Gonzales; he did not review the audio recording of the third-party verification call to Ms. Gonzales of her enrollment with Agway; he did not know whether Ms. Gonzales was advised of the terms and conditions of Agway's service on that call.[114]

83.  Dr. Felder was unaware of the reasons as to why Ms. Gonzales discontinued service with Agway.[115]   He also did not know whether Ms. Gonzales used the EnergyGuard repair program.[116]

84.  Given Dr. Felder's lack of knowledge of the facts of the case and lack of knowledge of the allegations in the case, his opinions cannot be formed on the basis of consideration of a causal nexus to the allegations in light of the facts.

85.  The central allegation in this case is that Agway's customer Agreement language describing how Agway's electric variable rates are determined is either misleading or false.[117]   Plaintiff alleges that the Agreement language indicates that Agway's variable electric rate "would be competitive with the rate offered by the local utility and other ESCOs."[118]   Plaintiff claims that, instead, (a) "Agway's rates are substantially higher than rates charged by other ESCOs and the local utilities," and are therefore not "competitive," and (b) Agway's rates "are untethered from changes in wholesale rates," as indicated by the purported facts that,

---

[112] *08/26/2020 Felder Deposition*, pp. 26-27.
[113] See, for example, welcome letters in AGWAY 578576, AGWAY 578577, AGWAY 578578, AGWAY 583025, AGWAY 712373, AGWAY 770885, and Letter, John D. Coyle (Bevan, Mosca & Guiditta, P.C.) to Chantal Khalil, Esq. (Finkelstein, Blankinship, Frei-Pearson & Garber, LLP), Re: Naomi Gonzales v. Agway Energy Services, LLC, Civil Action No. 5:18-cv-235 (MAD/ATB), July 9, 2018, Exhibit 3-E.  For dates when these Bates stamped welcome letters were in effect, see *05/18/2020 Response to CRA Memo*.
[114] *08/26/2020 Felder Deposition*, p. 28.
[115] *08/26/2020 Felder Deposition*, p. 29.
[116] *08/26/2020 Felder Deposition*, p. 29.
[117] *Complaint*, ¶¶ 18-22, 34.
[118] *Complaint*, ¶ 22.

PRIVILEGED AND CONFIDENTIAL

according to the Complaint, Agway's rates are higher than and do not move in the same direction as the utility's rates.[119]

86. Whether the language of the Agreement cited by Plaintiff, that Agway's rates "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins"[120] constitute an assertion that Agway's variable rates would be "competitive with the rate offered by the local utility and other ESCOs"[121] is a matter for the finder of fact or finder of law, but the factual assertions listed in (a) and (b) are amenable to expert analysis. In addition, the foundational assertion that Agway's prices do not comport with the language of the agreement that Agway's rates reflect the costs of electricity plus other costs, fees, charges, and a margin, is subject to economic analysis. These factual assertions can be demonstrated as true or false using relevant data and standard analytical, statistical, and economic tools.

87. To assess whether Agway's prices reasonably reflect its energy supply costs plus other costs, fees, expenses, and a margin calls for quantifying the correlation between Agway's costs and its prices. Assessment of allegation (a) calls for a comparison of Agway's rates to the rates of its competitors. Assessment of allegation (b) calls for a demonstration of the relationship, or lack thereof, between Agway's rates and relevant wholesale rates.

88. Dr. Felder has performed no analysis of the allegations in this case. I understand that Dr. Felder is Plaintiff's only expert witness, and therefore Plaintiff has not put forward any expert evidence relating to its economic allegations.

89. Below I examine each of the allegations I just enumerated and provide the conclusions of my analyses.

---

[119] *Complaint*, ¶ 17. Plaintiff also claims that utilities' rates are "pure reflections of the monthly average market costs of wholesale electricity, associated costs, transmission, and distribution." *Complaint*, ¶ 29.
[120] *Complaint*, ¶ 21.
[121] *Complaint*, ¶ 22.

**PRIVILEGED AND CONFIDENTIAL**

### A. The Allegation That Agway's Prices Do Not Reflect Agway's Costs as Described in Its Customer Agreements Is Contradicted by the Data

90. Dr. Felder never attempts to demonstrate that Agway's prices do not reflect Agway's costs as described in its customer Agreements. Dr. Felder testified that he does not know how Agway determines its variable rate.[122]

91. I analyzed Agway's costs and variable rates. I find that Agway's variable rates are set as described in its contract language.

92. According to Agway, its variable rate purportedly has two components:[123]

$$variable\ rate = supply\ cost + fixed\ adder. \qquad (1)$$

93. Agway's supply cost is the cost that Agway pays Direct Energy for supplying electricity for a specific customer for a specific bill cycle.[124] As I explained in section V, Agway's supply cost includes the costs Direct Energy incurs for energy, capacity, ancillary services, other costs required to purchase electricity, and Direct Energy's margin.[125] Agway's fixed adder covers the GRT tax; the NYSERDA charges; the employee discounts; the fees associated with purchases of green energy; the overhead costs that include labor, systems cost, EDI services advertising, marketing, EnergyGuard costs, purchase of receivables, and postage; and Agway's margin.[126] All of these components of the variable rate are listed in the disclosure statement that Agway sends to its customers in New York and Pennsylvania.

94. According to the data I have reviewed, Agway's fixed adder varies by utility and the type of customer (i.e., residential, commercial, green, and customers receiving employee discounts) in New York and by the type of consumer in Pennsylvania.[127] The fixed adder does not vary, however, month-by-month but rather tends to be constant over many months. For example,

---

[122] *08/26/2020 Felder Deposition*, pp. 115-116.
[123] *08/30/2018 Schuler deposition*, pp. 161-162; *07/07/2020 Robinson Deposition,* p. 103:4-104:23.
[124] *07/07/2020 Robinson Deposition*, pp. 68:13-17, 78:9-24; 103:4-104:23.
[125] *06/22/2020 Schueler Deposition*, pp. 97-98, 148-149; *07/07/2020 Robinson Deposition*, p. 106. I understand that in Pennsylvania, the price charged by Direct Energy to Agway also includes environmental credits that Direct Energy purchases on behalf of Agway. *07/07/2020 Robinson Deposition*, p. 106:9:17. I understand that in New York, for the period from November 2013 through November 2019, the price charged by Direct Energy to Agway also included the Direct Energy National Grid charge of $0.0025 per kWh. Based on interview with Agway staff.
[126] AGWAY 000023; *08/30/2018 Schuler Deposition*, pp. 163, 165, 212-213.
[127] AGWAY 000023.

**PRIVILEGED AND CONFIDENTIAL**

the fixed adder for residential electric service in New York has not changed since November 2, 2017 and the fixed adder for residential electric service in Pennsylvania has not changed since February 21, 2019; before that it changed on October 5, 2017.[128]  According to Patricia Robinson, Agway's Director of Operations and Accounting, the fixed adder typically changes only when costs change to offset changes in the costs.[129]

95. Hence, if variable prices are indeed set according to equation (1), I conclude they would be consistent with the description of how prices are determined in the Agreement language cited in the Complaint.  I therefore analyzed Agway's actual prices for each residential customer and each billing cycle in comparison to Agway's supply cost that it paid to Direct Energy for serving that customer during that billing cycle and the fixed adder charged by Agway based on that customer type, utility territory, and billing cycle.

96. To check whether the variable rate is set according to its description, I computed the variable rate a consumer would pay if Agway indeed set its price according to equation (1) (which I call the "compliant" variable rate) by summing the cost Agway paid to Direct Energy to serve a specific customer during a specific billing cycle and the fixed adder that Agway had in effect on the last day of that customer's billing cycle.  Using Agway's customer billing records for the period from November 2013 through November 2019, which provide the prices Agway actually charged,[130] I calculated the correlation between the compliant variable rate that I calculated, and the variable rate Agway charged consumers as reported in the data. If Agway sets its price according to formula (1), then the correlation between Agway's expected variable rate and the variable rate Agway charged to consumers should be close to one.[131]

---

[128] AGWAY 000023.
[129] *07/07/2020 Robinson Deposition,* pp. 24:19-24, 115:14-116:1.
[130] Customer billing records are produced by Agway in the sales detail reports.
[131] The correlation coefficient measures the strength and direction of a linear relationship between the two variables. The sign of the correlation coefficient measures the direction of the relationship, while the magnitude measures the strength of the relationship.  The correlation coefficient ranges between -1 and 1.  A correlation coefficient close to 1 suggests a positive strong linear relationship between the two variables, while a coefficient close to -1 suggests a strong negative linear relationship.  James H. Stock and Mark W. Watson, INTRODUCTION TO ECONOMETRICS, 3rd ed. (Boston: Pearson Education Limited, 2015), pp. 92-93.

**PRIVILEGED AND CONFIDENTIAL**

97. The estimated correlation between the expected variable rate and the actual rate Agway charged its customers is 0.956 and it is statistically significant at the 99 percent level.[132]  In addition, the mean difference between the variable rate charged to customers and the compliant variable rate is -$0.00126 per kWh, which is approximately 1.3 percent of the average variable rate.[133]  I conclude that  Agway's pricing structure is consistent with the plain language of its Agreement.

### B. The Evidence Is, Contrary to Dr. Felder's Unsupported Conclusion, That Agway's Variable Rate Is Consistent with Those of Its Competitors

98. Dr. Felder offers the opinion that, "[b]ased upon the NYPSC findings," the utility's price is an "appropriate benchmark" for assessing whether Agway's rates are competitive.[134]  I understand him to not be offering an independent expert opinion as to how to assess whether a price in a market is competitive, consistent with the fact that, as he volunteered in his deposition, he is not an economist.[135]  Rather, he relies only on the findings of the NY PSC in its 2019 NY PSC Order, an order he cites eight times in his 18-page report.

99. Dr. Felder's assertion that the utility price to compare is an appropriate benchmark for assessing whether Agway's variable price is competitive is incorrect both on economic grounds and with respect to the 2019 NY PSC Order upon which his opinion is based.

100. With respect to the 2019 NY PSC Order, that order does not support Dr. Felder's assertion. Dr. Felder cites to four passages in the 2019 NY PSC Order that he purports stand for the proposition that utility prices are an appropriate benchmark for Agway's rates.[136]  Specifically, he quotes:

> While certain ESCO products may justifiably cost the customer more [then the utility cost], it is troubling that, after the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates were generally – or in any specific instances – justified.[137] It is both notable and troubling that no ESCO

---

[132] See workpaper to this paragraph.
[133] Agway's average variable rate in the data I used to calculate correlations is $0.09462.  1.3% = $0.00126/$0.09462*100%.
[134] *07/23/2020 Felder Report*, p. 8.
[135] *07/23/2020 Felder Report*, Exhibit A; *08/26/2020 Felder Deposition*, pp. 96:24-97:2.
[136] *07/23/2020 Felder Report*, pp. 7-8.
[137] *2019 NY PSC Order*, p. 30; *07/23/2020 Felder Report*, p. 7.

PRIVILEGED AND CONFIDENTIAL

party could or would produce objective evidence regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO customers are charged for the value-added product or service; and what type and level of benefit is obtained by customers who receive the products or services offered.[138]

We [NY PSC] find that there is no demonstrated customer benefit to allowing ESCOs to offer this [variable-rate, commodity-only] service to mass-market customers.[139]

Because customers receive no value when they pay a premium for variable-rate commodity-only service from ESCOs, ESCOs will be prohibited from offering variable-rate, commodity-only service except where the offering includes guaranteed savings. [footnote omitted][140]

101. Dr. Felder omitted key language relevant to this matter, however. The same order also says:

The Commission provides one exception to these three criteria and allows Agway a limited opportunity to continue to offer its EnergyGuard service, due to the specific, credible evidence Agway submitted regarding the energy-related value of this product. As discussed below, the Commission permits a limited opportunity for other ESCOs to apply for the opportunity to sell a product/service similar to EnergyGuard.[141]

. . .

Because, with the exception of Agway's EnergyGuard product, no meaningful evidence was provided to demonstrate that any energy-related value-added product or service currently offered provides benefits to customers comparable to its costs, the provision of such a product or service is not sufficient at this time to demonstrate that an ESCO offering benefits customers and should be permitted.[142]

102. Hence, as I explained in Section V.D, the NY PSC found that Agway's service is not directly comparable to the service provided by the utility because Agway provides its customers a

---

[138] *2019 NY PSC Order*, p. 51; *07/23/2020 Felder Report*, p. 7.
[139] *2019 NY PSC Order*, p. 37; *07/23/2020 Felder Report*, pp. 7-8.
[140] *2019 NY PSC Order*, p. 39; *07/23/2020 Felder Report*, pp. 8.
[141] *2019 NY PSC Order*, p. 23
[142] *2019 NY PSC Order*, p. 53

PRIVILEGED AND CONFIDENTIAL

value-added service. The NY PSC found that Agway demonstrated that its EnergyGuard service provides energy-related value to consumers.

103. When the price of one product includes a value-added service that another supplier does not provide, as an economic matter the prices are not directly comparable. Consistent with that economic principle, the NY PSC exempted Agway from the requirement established (but, as noted earlier, not implemented as of this writing) that other ESCOs guarantee their customers that they would not charge them more than the local utility on an annual basis, or that they provide fixed-rate service only subject to a price limit, or that they provide a renewable energy source subject to certain requirements. The NY PSC exempted Agway because Agway provides a value-added service. The utility price to compare is the price of electric service alone, without any value-added services; therefore, the utility's price to compare is not a valid benchmark for Agway's price.[143]

104. As an economic matter, the utility's price to compare is not a valid benchmark for assessing whether an ESCO's rate is competitive for at least two reasons in addition to the fact that the utility does not offer a comparable value-added product to Agway's electric EnergyGuard.

105. First, the utility's price to compare is regulated, whereas Agway's price is not, as I explained in Section V.D. In regulated industries, the price set via the regulatory process will generally not be consistent with competitive outcomes and, in particular, may not fully cover their relevant costs for policy or other reasons. In the case of electric utilities, these companies undergo rate cases that determine how their expenses are allocated between the delivery service and supply service. During the NY PSC 2017 hearing preceding the 2019 NY PSC Order (case 15-M-0127), several participants raised concerns that the allocation of costs between delivery and supply services at least in New York is such that it makes the utility

---

[143] Dr. Felder testified in his deposition that, according to the NY PSC Order, Agway did not provide "objective" evidence regarding to value of its EnergyGuard service that the NY PSC requested. See *08/26/2020 Felder Deposition*, pp. 116:22-130:25. Dr. Felder's interpretation of the 2019 NY PSC Order's language notwithstanding, the NY PSC exempted Agway from the "savings" requirement it applied to other ESCOs because the NY PSC found that Agway's service provides value to its consumers.

**PRIVILEGED AND CONFIDENTIAL**

price to compare artificially low.[144]  This also indicates that the utility PTC is not a valid benchmark for Agway's variable rate.

106.  Second, the utility is only one supplier in the market.  There are hundreds of other competitors offering retail electricity services in each of New York and Pennsylvania[145] and one cannot assess whether one ESCO's price is "competitive" without assessing the price of its ESCO competitors.  Indeed, the Complaint asserts that a competitive price should be consistent the prices of the utility and other ESCOs:

> Agway exploits the deregulation and the lack of regulatory oversight in the energy market by luring customers with enticing teaser rates and false promises that it will offer market-based variable rates when, in fact, Agway's rates are substantially higher than rates charged by other ESCOs and the local utilities.[146]

107. Dr. Felder never attempts to compare Agway's rates to other ESCOs' rates.  He did not analyze variable rates for electricity that other ESCOs offered in New York or Pennsylvania during the class period.

108. I compared Agway's variable rate for electricity with other ESCOs' variable rates for electricity in New York.[147]  I find that Agway's variable rate is within the range of variable rates offered by other ESCOs in New York.

109. In order to compare Agway's price with prices offered by other ESCOs, I used historical pricing data reported quarterly by ESCOs that offer no energy-related value-added services ("commodity-only ESCOs") to the NY PSC.  The NY PSC requires that commodity-only

---

[144] Evidentiary Hearing, *CASE 15-M-0127 - In the Matter of Eligibility Criteria for Energy Service Companies*, et al., State of New York Public Service Commission, November 29, 2017 (hereafter, *11/29/2017 Hearing Transcript*), Direct Testimony of John R. Hanger, September 15, 2017, p. 19:3-11; *11/29/2017 Hearing Transcript,* Direct Testimony of Michal Kagan, September 15, 2017, p. 8:5-14; Evidentiary Hearing, *CASE 15-M-0127 - In the Matter of Eligibility Criteria for Energy Service Companies*, et al., State of New York Public Service Commission, November 30, 2017 (hereafter, *11/30/2017 Hearing Transcript*), Testimony of Charles J. Cicchetti, Ph.D., pp. 7, 13, 20, 22-23.

[145] *2019 NY PSC Order*, p. 14; "Suppliers List," Pennsylvania Public Utility Commission, accessed September 17, 2020, http://www.puc.state.pa.us/consumer_info/electricity/suppliers_list.aspx.

[146] *Complaint*, ¶ 17.

[147] I did not compare Agway's rates with other ESCOs' rates in Pennsylvania because no public data containing ESCOs' rates in Pennsylvania were available.

**PRIVILEGED AND CONFIDENTIAL**

ESCOs report their prices to the NY PSC quarterly; ESCOs that offer energy-related value-added services are not required to report their prices to the NY PSC.[148]

110. Publicly available data on ESCO prices are available for the period from 2014 Q2, when commodity-only ESCOs started reporting their prices to the NY PSC,[149] through 2020 Q2.[150] The prices that ESCOs report are averages of prices for each category weighted by the amount of electricity sold.[151] For my analysis, I restricted the data to include only residential variable rates for electricity. These restrictions maximized comparability and relevance to this case.

111. I performed two analyses described below.

112. In the first analysis, I compared the residential variable rate filed by Agway to the NY PSC with the rates of other ESCOs in utility territories, zones, and quarters for which Agway filed its rate. Agway rolled out its electric EnergyGuard program in New York starting January 2013 through February 2015.[152] Thus, there were several quarters during which Agway was not offering electric EnergyGuard in some utility territories. Agway reported its prices to the NY PSC for these utility territories in these quarters.

113. Exhibit 5 shows the utility territories, quarters, and zones that I used in my first analysis. The exhibit shows that Agway reported its variable rate for the zones corresponding to Con Edison, NY State Electric & Gas, and National Grid territories for various quarters over 2014 Q2-2015 Q3. The exhibit also shows the number of ESCOs other than Agway that reported residential variable rates for the same utilities' territories, quarters, and zones included in my data.

114. Exhibit 6 shows for each utility, quarter, and zone combination in my data the number of ESCOs (excluding Agway) that reported their prices, the median of ESCOs' prices

---

[148] Order Taking Actions to Improve the Residential and Small Non-Residential Retail Access Markets, *CASE 12-M-0476 - Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State*, et al., State of New York Public Service Commission, February 25, 2014 (hereafter, *2014 NY PSC Order*), pp. 16-17.

[149] *2014 NY PSC Order,* p. 17.

[150] See ESCOs' historical pricing data from the NY PSC website (Matter Number 14-02555), http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=46965&MNO=14-02555.

[151] See *2014 NY PSC Order*, p. 17. The "category" is defined by the quarter, the contract term length (if any), the rate type (fixed or variable), the utility territory, and the utility zone.

[152] See Exhibit 4.

PRIVILEGED AND CONFIDENTIAL

(including Agway's reported variable rate), the maximum of ESCOs' prices (including Agway's reported variable rate), and Agway's reported variable rate. The exhibit shows that Agway's variable rate is never the highest variable rate charged for electricity service for the combinations of the utility, quarter, and zone for which Agway's reported its variable rate to the NY PSC. Also, the exhibit shows that across the 63 combinations of utility, quarter, and zone, in 40 instances (63 percent) Agway's rate was below the median rate calculated for the universe of available residential variable rates in my data within each combination.

115. Exhibits 7, 8, and 9 show plots of variable rates for all ESCOs available in my data for each combination of utility, zone, and quarter in Exhibit 6. These charts show that Agway's variable rate is consistently within the range of variable rates charged by other ESCOs in the same utility territory, zone, and quarter.

116. In the second analysis, I compare Agway's variable rate to other ESCOs' variable rates in quarters and in utility territories in which Agway was offering EnergyGuard. Comparing Agway's price to commodity-only ESCOs is useful despite the fact that Agway provided a value-added product while other ESCOs did not. The comparison is useful because, to the extent that Agway's prices are below those of commodity-only ESCOs, consumers are certainly better off with Agway than with the commodity-only competitor because Agway's rate includes the additional value of the EnergyGuard service.

117. As Exhibit 5 shows, Agway offered EnergyGuard in some utility territories where it operated since 2014 Q2 and in all utility territories where it operated by 2015 Q4 and therefore did not report its rates to the NY PSC for the utility territories and quarters for which it offered EnergyGuard. I therefore calculated Agway's weighted average variable rate for each New York utility territory for each quarter from 2014 Q2 through 2019 Q4, excluding quarters and utility territories in which Agway did not provide EnergyGuard, using data produced by Agway.[153] I calculated Agway's weighted average variable rates for residential electric customers by dividing Agway's total quarterly revenue from these customers by the total quarterly electricity sold (in kWh) to these customers in each utility's territory in New York

---

[153] *Agway COS Summary data*. Agway did not provide EnergyGuard in the Con Edison territory during 2014 Q2-2015 Q3, in the NY State Electric & Gas territory during 2014 Q2-2014 Q4, and in the National Grid territory during 2014 Q2-2015 Q1. See Exhibit 5.

**PRIVILEGED AND CONFIDENTIAL**

where Agway provides its service.  Because the weighted average I could calculate is a weighted average by quarter and utility territory (but not by zone),[154] I restricted my analysis of rates reported by other ESCOs to the NY PSC to include only those that were reported as a single price for all zones within a utility territory to ensure that rates are as comparable as possible (as the rates reported as a single price for all zones are, purportedly, also weighted averages by quarter and utility territory.[155]

118. Agway provided service to its residential customers in all zones in the Central Hudson, National Grid, Orange & Rockland, and Con Edison's territories during 2014 Q2-2019 Q4, as shown in Exhibit 10.  In the NY State Electric & Gas territory, Agway served all but one zone, and in the Rochester Gas & Electric territory, Agway served one out of three zones.

119. Exhibit 11 shows utilities' territories, quarters, and the number of ESCOs, excluding Agway, in my data used for this analysis.

120. Exhibit 12 shows, for each combination of utility and quarter, the number of ESCOs (excluding Agway) used for comparison with Agway's calculated variable rate, the median of these ESCOs' rates (including Agway's calculated variable rate), the maximum of the ESCOs' rates (including Agway's calculated variable rate), and Agway's calculated rate. The exhibit shows that there are 125 different utility-quarter combinations in my data.  In 122 of these combinations (or 98 percent), Agway's rate is below the median rate.  In addition, the exhibit shows that Agway's rate is never the highest rate in any utility territory in any quarter in my data.  Exhibits 13-18 show plots of the rates for all of the ESCOs in my data for each utility and quarter from Exhibit 12.

121. Both Exhibit 12 and these charts demonstrate that Agway's calculated residential variable rate is within the range of residential variable rates offered by other ESCOs, although Agway's service included a value-added service while other ESCOs offered commodity-only service.  The evidence from my analysis is that Agway's rate is consistent with (and,

---

[154] *Agway COS Summary data* was not disaggregated by utility zone, so I could not calculate Agway's weighted average price by quarter, utility territory, and zone.  Thus, I could not compare Agway's rates to the rates reported by other ESCOs by quarter, utility territory, and individual zones.

[155] See *2014 NY PSC Order*, p. 17.

**PRIVILEGED AND CONFIDENTIAL**

generally, below) the prices of its competitors even without accounting for the additional value that is uniquely included in Agway's offering.

### C. Dr. Felder Does Not Address the Allegation That Agway's Variable Rate Is Untethered from Wholesale Rates

122. Regarding the allegation in the Complaint that Agway's rates "are untethered from changes in wholesale rates,"[156] Dr. Felder does not mention or address it in his report.

123. The Complaint offers an analysis that purports to show that the Agway rate paid by the named plaintiff "was consistently significantly higher" than the rates of Central Hudson (the utility in her area) and that there is a "disconnect between fluctuations in wholesale electricity prices and costs (as demonstrated by Central Hudson's rates, which are a pure reflection of actual wholesale market rates because they are based on the daily spot market) and Agway's rates."[157]

124. The premise of this assertion is incorrect. First, utilities' retail rates are not necessarily indicative of the daily spot market rates, because, among other reasons, utilities are required to hedge at least part of their energy supply.[158] In addition, utilities can defer some of their costs to a future period if the utility commission allows it.[159] Thus, the Complaint's assertion that "New York utility rates. . .serve as pure reflections of the monthly average market costs of wholesale electricity, associated costs, transmission, and distribution"[160] is simply incorrect.

125. Hence, there are at least two reasons Agway's variable rate and utilities' rates may not be correlated: (1) Agway and the utility procure energy from different sources and the different

---

[156] *Complaint*, ¶ 17.

[157] *Complaint*, ¶ 25, 29.

[158] Order Requiring Development of Utility-Specific Guidelines for Electric Commodity Supply Portfolios and Instituting a Phase II to Address Longer-Term Issues, *CASE 06-M-1017 – Proceeding on Motion of the Commission as to the Policies, Practices and Procedures For Utility Commodity Supply Service to Residential and Small Commercial and Industrial Customers*, State of New York Public Service Commission, April 19, 2007, pp. 1-2. Also, for example, in its 2019 10-K Con Edison states that it "enters into derivative transactions to hedge the costs of a portion of its expected purchases." O&R, a subsidiary of Con Edison, similarly enters into transactions to hedge a portion of its energy supply. See Consolidated Edison, Inc., Form 10-K, for the fiscal year ended December 31, 2019 (hereafter, *2019 Con Edison 10-K*), pp. 14, 22, 27.

[159] *2019 NY PSC Order*, p. 43.

[160] *Complaint*, ¶ 27.

PRIVILEGED AND CONFIDENTIAL

sources may use different hedging strategies; and (2) the utility can defer some of its electricity costs to a future period if the utility commission allows it.[161]  ESCOs may or may not have the ability to smooth prices for customers, depending on their competitive environment, but, as unregulated firms, to the extent they can do so their strategies for price-smoothing may deviate from that of the utility and that of other ESCOs.

## VIII.  DR. FELDER'S OVERCHARGES METHODOLOGIES ARE UNRELATED TO THE FACTS AND ALLEGATIONS IN THIS CASE

126. Economic damages to a person from an allegedly bad act are equal to the net value or profits the person would have received in the "but-for" world in which the bad act had not occurred, minus the net value or profits that the person received in the actual world in which the bad act did occur.[162]

127. Conceptualizing the damages as the difference between the net value received in the (properly defined) but-for world and the actual net value received isolates the damages to only those *caused by* the alleged bad acts.   It is the obligation of the damages expert to identify a model that establishes the causal nexus between the alleged bad acts and the purported damages.[163]

128. An overarching defect in Dr. Felder's damages methodologies is that he fails to identify the relevant but-for worlds, and therefore fails to offer a coherent framework for isolating the damages caused by the alleged bad acts.

129. By failing to determine the but-for world that is consistent with Plaintiff's allegations in this case, Dr. Felder has not conducted the analysis necessary to isolate damages caused by the alleged deception.  Unless damages are caused by, and are limited to those caused by, the allegations in the case, they are not proper economic damages.

---

[161] *2019 NY PSC Order*, p. 43.
[162] *2011 Allen et al.*, p. 432.
[163] *2011 Allen et al.*, p. 432.

**PRIVILEGED AND CONFIDENTIAL**

### A. Dr. Felder Did Not Provide Any Theory of Damages in Which It Is Correct to Count Only Positive "Overcharges"

130. In both his methodology #1 and his methodology #2, Dr. Felder counted only positive monthly overcharges in his total overcharges, meaning that he only included monthly overcharges for those months when Agway charged customers more than the benchmark.  He claims that he calculated overcharges in this way because Agway promised "competitive monthly variable price," which Dr. Felder interpreted to mean that Agway promised to provide a price at or below the benchmark on a monthly basis.[164]

131. First, I will discuss in Section IX that Dr. Felder's interpretation that competitive price means the lowest price of the available similar alternatives is inconsistent with economic theory.  In an economic market no rational unregulated firm has an objective to offer a price that is the lowest in the market; instead, a rational firm's objective is to maximize its profit.

132. Second, Dr. Felder failed to identify any but-for world or provide any theory of damages in which it is correct to count months in which a customer paid more than the benchmark as damages but to ignore the months in which the same customer paid less than the benchmark (for whatever benchmark he is considering).  It is contrary to the standard economic models of consumer decision-making that teach that consumers would weigh positive months against negative ones when considering whether they are better off with one provider or another.

133. Third, his methodology that compares Agway's price against a benchmark each month instead of comparing cumulative charges over the customer's tenure with Agway against benchmark charges over the same period of time is inconsistent with the 2019 NY PSC Order on which Dr. Felder extensively relied in his opinions.  The NY PSC did not mandate that a commodity-only, variable rate ESCO guarantee savings to its customers each month as compared to the local utility service.  The 2019 NY PSC Order stated that the ESCO must guarantee savings on an annual basis or with greater frequency in some cases.[165]  Nowhere in its order the NY PSC requires ESCOs to guarantee savings each month.  The 2020 NY PSC Order was even more direct: according to the clarification, the first of the three criteria

---

[164] *07/23/2020 Felder Report*, pp. 12-13; *08/26/2020 Felder Deposition*, pp. 158:17-159:2.
[165] *2019 NY PSC Order*, p. 41.

PRIVILEGED AND CONFIDENTIAL

established by the NY PSC requires that ESCOs (other than Agway) provide "guaranteed savings over the utility price, *as reconciled on an annual basis*."[166] (emphasis added.)

134. I understand that one of the reasons that the NY PSC did not require guaranteed savings each month is because utilities make so-called "out-of-period" adjustments to its customers' bills to mitigate fluctuations in charges due to inclement weather or other changes in the marketplace.[167]  To mitigate the concern that the comparison of utilities' and ESCOs' prices might be invalid on the month-to-month basis due to such out-of-period adjustments, the NY PSC decided that the price comparison should be done on an annual basis (or with greater frequency, when necessary).[168]

135. The logic articulated by the NY PSC is consistent with economic logic.  Economic rationality dictates that when considering a choice of two providers, the customer would consider whether overall welfare would be higher with one than the other over the period of time during which the customer intends to remain with the provider, considering that in some months one provider might offer a better price, and in others the other might be preferred. Unless Dr. Felder is positing a but-for world in which customers make an affirmative decision to switch providers each month, his failure to offset the positive overcharge months with the negative ones is biased and improper.  Dr. Felder offers no assertion, let alone evidence, that customers tend to shop each month for the cheapest supplier, rather than making decisions periodically, such as on an annual basis, as implied by the NY PSC.

### B.    Dr. Felder Failed to Properly Account for the Value of Electric EnergyGuard and in Some Cases for the Cost of Electric EnergyGuard

136. Some scenarios in Dr. Felder's overcharges calculations in Tables 4 and 6 of his report completely ignore the costs of the electric EnergyGuard program.  The only explanation that Dr. Felder provides is that "the Plaintiff contends that the EnergyGuard should not be considered in the overcharge analysis."[169]  As noted earlier, Dr. Felder provided no evidence that Plaintiff makes this contention and it is not contained in the complaint.

---

[166] *2020 NY PSC Order*, p. 55.
[167] *2019 NY PSC Order*, p. 43.
[168] *2019 NY PSC Order*, p. 43.
[169] *07/23/2020 Felder Report*, p. 13.

**PRIVILEGED AND CONFIDENTIAL**

137. As an economic matter, it is incorrect to exclude the costs of electric EnergyGuard from a quantification of Agway's costs, and neither Dr. Felder nor Plaintiff provided any reason that these costs should be excluded. Excluding Agway's electric EnergyGuard costs inflates Dr. Felder's calculated overcharges.

138. Whether or not Dr. Felder accounts for the cost of electric EnergyGuard, in all cases he fails to account for the value of electric EnergyGuard service to consumers. When customers receive a value-added service bundled into what would otherwise be a commodity energy service, a fundamental question that one must address in attempting to quantify a purported "overcharge" is what it means to be overcharged for a unique and valued service. Dr. Felder never addresses this issue in his report. It is unambiguously incorrect to simply compare (as Dr. Felder does in his "methodology #2") the price of the value-added bundle against a commodity-only service and consider the difference (if any) as an overcharge. In economic markets, the price of a product reflects consumers' willingness to pay, which is to say, it reflects the value consumers place on the product. In equilibrium, particularly when a product is unique or differentiated from other companies' offerings, that price will typically exceed the product's cost, the difference being a return to the provider's innovation.

139. For the same reason, it is incorrect to assume (as Dr. Felder does in his methodology #1) that the margins earned by companies that offer a commodity product are the relevant margins or the competitive margins for a company that offers a differentiated value-added service. Companies that offer value-added services earn margins in competitive markets that reflect the unique value to consumers of the services, which may be well in excess of their costs. Hence, while, as I discuss in Section IX.A, Dr. Felder did not provide any support for the assertion that *any* companies in any relevant market typically earn the margins he assumed in his methodology #1, he certainly did not offer any analysis of what margin a company offering a bundled value-added service would earn. In both of his methodologies, his comparisons are fundamentally incorrect and cannot identify an "overcharge."

140. In his deposition, Dr. Felder testified that he accounted for the *value* of EnergyGuard by accounting for the *cost* to Agway of providing EnergyGuard (which he did only in certain scenarios and not others, as noted earlier). In particular, he testified that assuming that the value of EnergyGuard equals its cost is consistent with the 2019 NY PSC Order, which states

PRIVILEGED AND CONFIDENTIAL

that "[b]ecause Agway provided detailed evidence demonstrating that EnergyGuard provides a unique benefit that may be reasonably comparable to its costs, Agway may continue to offer EnergyGuard during this interim period."[170]

141. Dr. Felder's interpretation of the 2019 NY PSC Order is incorrect. In the excerpt that Dr. Felder cited in his deposition, the NY PSC's reference to EnergyGuard's unique benefit being reasonably comparable to its costs is not a reference to *Agway's* costs but rather to the costs of EnergyGuard to *consumers*;[171] indeed, the NY PSC said throughout the order that the additional cost *to consumers* of a value-added product should be commensurate with the benefits that customers receive from the value-added product.[172] For example, the NY PSC states:

> The Commission recognizes that, based upon actual costs, certain ESCO products will be more expensive than default utility service. However, because energy services are essential to customers' health and wellbeing, the additional cost to customers must not outweigh the purported benefits to them.[173]

142. Dr. Felder admitted that he has not conducted any analysis to estimate the value of electric EnergyGuard to Agway's customers.[174] Whether electric EnergyGuard service is perceived by consumers as valuable is a question that is amenable to empirical analysis, however. Dr. Felder has not, for example, surveyed Agway's customers about the value that they receive from electric EnergyGuard service, and he did not know whether Agway conducted any customer surveys about the value of electric EnergyGuard.[175] He did not take it upon himself to consider any other form of analysis of the value of electric EnergyGuard to consumers, either. Indeed, he did not even interview his client Ms. Gonzalez about her perception of electric EnergyGuard (insofar as he did not communicate with her at all).

143. In fact, survey data collected by Agway about the value of electric EnergyGuard service shows that electric EnergyGuard is perceived by the surveyed customers as valuable. Agway

---

[170] *2019 NY PSC Order*, p. 54; *08/26/2020 Felder Deposition*, p. 127:1-15.
[171] *2019 NY PSC Order*, p. 54.
[172] *2019 NY PSC Order*, pp. 37, 43.
[173] *2019 NY PSC Order*, p. 37.
[174] *08/26/2020 Felder Deposition*, p. 164:7-12.
[175] *08/26/2020 Felder Deposition*, pp. 162:25-163:7.

PRIVILEGED AND CONFIDENTIAL

surveyed customers who received central air conditioning or electric wiring repair services under the electric EnergyGuard program. After the service was performed, Agway mailed a survey to each such customer and asked them to rate various aspects of Agway's service from 1 to 5, with 5 being the highest and 1 being the lowest rating. The survey also allowed customers to leave comments.[176]

144. The survey asked the following six questions:[177]

   1) When you called in to request service, how would you rate the help your received?

   2) How would you rate our service response time?

   3) How would you rate the service you received from our Technician that did the service work?

   4) Were they able to fix the problem right away?….yes/no

   5) How valuable do you feel this Peace of Mind coverage is to you and your family?

   6) Would you recommend Agway Energy Services to your friends and family?

145. The data that contain survey results cover the period from January 2014 through September 2019.[178] There are 1,912 calls in total associated with electric EnergyGuard service from residential customers. For the 1,912 services performed, Agway received 503 survey responses with at least one question answered. This implies 26 percent survey response rate.

146. Exhibit 19 depicts responses to survey questions 1, 2, 3, 5, and 6.[179] The exhibit shows that for each survey question, the overwhelming majority of customers, 85 percent or more, gave Agway's service the highest grade for each aspect of electric EnergyGuard service about

---

[176] The version of Agway's survey that was sent from the EnergyGuard rollout until March 2016 is available in AGWAY 710356; the version of Agway's survey that was sent between March 2016 and December 2018 is available in AGWAY 710648; and the version of Agway's survey that was sent since January 2019 is available in AGWAY 709681. For effective dates, see *05/18/2020 Response to CRA Memo*.

[177] See AGWAY 710356, AGWAY 710648, and AGWAY 709681.

[178] Most of the observations in the survey data are from the January 2015 through September 2019 period (based on the service date).

[179] The exhibit does not show the responses to question 4 as a bar but rather provides the responses in the text because the question is not on the same 5-point scale as the other questions and because an inability to fix a problem right away may indicate unavailability of parts required for repairs rather than indicate a deficiency in the perceived quality of Agway's service.

**PRIVILEGED AND CONFIDENTIAL**

which they were asked.  Also, almost 92 percent of survey responses gave the highest grade when they were asked whether electric EnergyGuard coverage is valuable to the respondent and her family, and more than 93 percent of survey responses gave the highest grade when asked whether they would recommend electric EnergyGuard to the respondent's friends and family.

147. While we do not know what the experiences were of consumers who did not respond to the survey, the fact that the respondents reported positive experiences at high rates indicates that at least some customers perceived electric EnergyGuard as valuable.

148. The value of a service like electric EnergyGuard, like other warranty and insurance products, is that it limits the risks associated with the possibility that the customer will have to incur significant, unanticipated expenses.  With insurance products generally, the value in risk reduction is that customer trades off having to make a certain expenditure (the cost of the insurance) against the possibility, but not certainty, of having to make a very large expenditure but also the possibility of not having to make any expenditure at all.  The preference for making a certain expenditure over the gamble of a possibly large but possibly zero expenditure, for equal expected values, is called "risk aversion."[180]

149. For example, if a customer faces a 10% probability of an essential appliance (such as a water heater or plumbing fixture) breaking and having to make a repair expenditure of $1,000 in a year and a 90% probability of the appliance not breaking, thereby having to make no repair expenditure, the expected value of that risky prospect is an expenditure of $100.  Someone not averse to risk would be indifferent between $1,000 worth of insurance costing $100 and the risky prospect.  But a risk averse person would value the certainty that would come with insurance and would value the insurance at more than $100.

150. The value in the insurance includes the fact that without insurance the person would have to keep an emergency fund available in case of an appliance failure; such a fund might be a hardship for someone with limited capacity for savings.  Even for customers for whom the savings is not a hardship, the emergency fund imposes an opportunity cost associated with

---

[180] Russell Cooper and Andrew John, MICROECONOMICS: THEORY THROUGH APPLICATIONS (Saylor Foundation, 2011), Chapter 4.3.

PRIVILEGED AND CONFIDENTIAL

not being able to use the funds for other desired expenditures. In addition, insurance creates peace of mind for some consumers. All of these phenomena contribute to the value that some consumers place on insurance products such as electric EnergyGuard.

151. The value each consumer ascribes to a product such as EnergyGuard will vary from consumer to consumer depending on the consumer's income and wealth, the age and condition of the facilities being insured, whether a landlord or the tenant would be responsible for repairs, and the individual's anxiety over uncertain prospects of dealing with repair bills, among other factors.

152. Comments from the electric EnergyGuard survey indicate the that the program is valued by at least some people who have limited income:

- "Your service tech was unable to come right away. I was able to call a tech in the area who came next day and got the problem resolved. I was told I could submit the bill for reimbursement which I did. This service is a blessing for elderly and those on a fixed income who do not have the funds for repairs. Thank you."[181]

- "We appreciate the convenience of this service and as senior citizens on a fixed income it is a life saver. Thanks."[182]

- "I am so very thankful for this service. I am elderly and my husband died in Nov 17. I have much less income to be able to afford repair work. Two outlets in my home did not work and without this service I would not have been able to fix them. Thank You so very much."[183]

153. Although Dr. Felder made no inquiry into the value of EnergyGuard, he asserts that the overcharges he estimated are not "commensurate" with EnergyGuard's costs.[184] Dr. Felder performed no analysis that could support that conclusion either. For example, he did not attempt to estimate the implicit or effective price that Agway customers paid for EnergyGuard and did not attempt to identify comparable or similar warranty services in the market to which he could compare the Agway EnergyGuard prices to assess their competitiveness.[185] He also did not attempt to calculate Agway's margin on EnergyGuard and compare it to the margins on comparable insurance products in the marketplace. His

---

[181] AGWAY 742510.
[182] AGWAY 742510.
[183] AGWAY 742510.
[184] *07/26/2020 Felder Report*, p. 17.
[185] *08/26/2020 Felder Deposition*, p. 55:14-21.

PRIVILEGED AND CONFIDENTIAL

perfunctory and conclusory opinions regarding whether the amounts consumers paid to Agway are "commensurate" with Agway's costs is simply without support either in theory or in evidence.

154. Finally, Dr. Felder has misstated the economic cost of EnergyGuard to Agway because he failed to account for the cost that Agway incurs by assuming the risk from its customers of unexpected expenses on repairs of their central air conditioning and electric wiring. Providing an insurance product is risky because of the possibility of surges in claims that may call for unexpected levels of expenditure obligations by insurers, which in turn increases the costs that the insurer must incur to obtain business capital. Dr. Felder has not quantified or considered the costs to Agway of risk bearing.

## IX. DR. FELDER'S FIRST METHODOLOGY IS NOT BASED ON ANY COGNIZABLE DAMAGES THEORY THAT TIES THE DAMAGES TO THE ALLEGED MISCONDUCT, IS ARBITRARY, AND IS BIASED

### A. Dr. Felder's Methodology #1 Assumptions Are Arbitrary

155. Dr. Felder does not articulate what the but-for world is that would give rise to his overcharges methodology #1, but the implied but-for world for this scenario is that Agway would have earned accounting profit margin of either zero, the average introductory rate margin, five percent, or 10 percent.[186] According to Dr. Felder, these margins are "reasonable" for Agway.[187]

156. These assumed margin rates are utterly arbitrary. Dr. Felder does not offer any evidence that these margins are "reasonable," nor any analysis indicating what his criteria for being "reasonable" are. He claimed in his deposition that he relied on his prior work and experience as to what profit margins other ESCOS earn when he chose these margin values, but he offered no support, evidence, or analysis for any of them in his report, deposition, or subsequent discovery.[188] He admitted in his deposition that he did not perform any analysis in this case to reach his opinion regarding what "some and perhaps even many" ESCOS

---

[186] *07/23/2020 Felder Report*, p. 13.
[187] *07/23/2020 Felder Report*, pp. 1, 14.
[188] *08/26/2020 Felder Deposition*, pp. 170:20-171:21.

**PRIVILEGED AND CONFIDENTIAL**

earn.[189]  When pressed in his deposition for the basis of his assertion that "some and perhaps even many" ESCOs earn zero or small margins he referred to an analysis that he conducted for ESCOs in New York "a couple of years ago, several years ago,"[190] but he produced no workpapers and referenced no analysis he has ever conducted in this case or any other of the margins earned by any ESCOs that could form the basis for his opinion in this case.  Indeed, he did not quantify the margin that Agway itself has earned.

157. Dr. Felder also does not offer any competitive analysis of energy markets in New York or Pennsylvania purporting to demonstrate that his assumed margins are consistent with the margins that Agway's competitors earn for similar services.   Dr. Felder also offers no evidence that his assumed profit margins resemble profit margins in any other markets for electricity (or any other products or services).

158. Dr. Felder's assumed scenario of a zero margin is not only arbitrary but unsupportable on its face.  The margins that Dr. Felder applies in his analysis are measures of accounting profits, not economic profits.  They are calculated on the basis of Agway's accounting statements, which do not include a return to capital.  Providing a return to capital that is commensurate with the risk of the business is a cost of doing business, however, and no business can survive in the long run without covering all its costs, including its risk-adjusted cost of capital.  Hence, because accounting profits do not account for a return to capital, a company cannot survive in the long run with a zero accounting profit.  Accounting profits must at a minimum be large enough to cover a firm's risk-adjusted cost of capital for the firm to remain viable in the long run.[191]

159. Dr. Felder's assumption that it is reasonable to posit a scenario in which Agway would be limited as an ongoing matter to a zero accounting margin is, therefore, simply inconsistent with economic principles and unsupportable.

160. Dr. Felder's assumed margin equal to the margin earned at the introductory rate is similarly unreasonable.  Introductory rates, especially for companies facing an established incumbent,

---

[189] *08/26/2020 Felder Deposition*, pp. 166:11-20, 167:4-10; *07/23/2020 Felder Report*, p. 6.
[190] *08/26/2020 Felder Deposition*, p. 167:4-21.
[191] Dennis W. Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION, 4th ed., (Boston: Pearson/Addison Wesley, 2005) (hereafter, *2005 Carlton & Perloff*), pp. 86; 271.

PRIVILEGED AND CONFIDENTIAL

may be below cost or otherwise provide a margin that would not be sustainable in the long run. This is rational and sound pricing behavior. One reason for these pricing strategies is to encourage customers to try a new supplier by reducing the risk that they face—they know that if they don't like the new supplier, they can switch back and will have received a bargain in the meantime. It is often difficult to persuade customers to try new products or new suppliers, especially for new entrants facing an entrenched incumbent that customers are accustomed to using. Offering a very attractive but temporary price (or, in some cases, even free trials or free products) is one recognized way for businesses to win customers.

161. Low or even below-cost introductory prices are not a proper benchmark for a competitive price. While it is rational for companies to offer introductory prices in order to make it less risky and provide an incentive for customers to try them out, introductory prices would not be sufficient to sustain a company in the long run and therefore are not long run competitive prices. It is therefore highly biased to apply the return earned on an introductory rate as a benchmark. It is equivalent to asserting that because Netflix offers a 30-day free trial, Netflix should be required to offer its service for free to all customers permanently; or that because the grocery store gives away free samples of new products on Sundays, grocery stores should be required to give those products away for free to all customer permanently.

162. Dr. Felder did not show that his assumed five percent and 10 percent margins would cover Agway's risk-adjusted cost of capital, which would be necessary for Agway to remain solvent in the long-run; let alone showing that a company offering a unique value-added product would earn margins at these levels. Dr. Felder also did not offer an opinion or present any analysis or evidence as to what Agway's cost of capital is.

163. Indeed, Dr. Felder has entirely failed to appreciate and failed to account for the fact that competitive markets award a premium to companies that offer a unique product that provides value to consumers over the profits or margins that commodity providers are expected to earn. The prospect of earning a premium is the incentive for companies to innovate and take risks to offer new or unique products and differentiate themselves. Dr. Felder offered no evidence and articulated no recognition that assessment of a "reasonable" margin for Agway would necessitate consideration of margins to companies with unique and differentiated offerings. His analysis is not only arbitrary but is biased for this reason as well.

**PRIVILEGED AND CONFIDENTIAL**

### B. Dr. Felder Failed to Account for All of Agway's Electric Service Costs

164. As I noted in Section V.B, Agway is a wholly-owned subsidiary of Suburban Propane. Suburban Propane is a nationwide marketer and distributer of a diverse set of energy-related products that specializes in the "distribution of propane, fuel oil and refined fuels, as well as the marketing of natural gas and electricity in deregulated markets."[192]  Agway's revenue accounted for approximately four percent of Suburban Propane's revenue in the fiscal year that ended in September 2018.[193]

165. The phenomenon of being able to make more efficient use of resources due to offering multiple services is known is "economies of scope."[194]  Agway and Suburban Propane generate economies of scope through their respective operations because they are able to share resources.  Such shared resources include real estate, labor, and software licenses.[195]

166. Agway's office space rent is covered by Suburban Propane and is not charged to Agway.[196]  Thus, Agway's rent expenses do not appear on Agway's P&L statement.

167. Agway employs 11 full-time employees.[197]  However, in its regular operations, Agway utilizes Suburban Propane's resources, such as its human resources department, legal department, marketing department, tax department, and treasury.[198]  Agway also does not have its own call center.  It uses Suburban Propane's call center that has several employees who are trained to respond to calls related to Agway's business.[199]  According to Agway, most of these expenses are not charged to Agway but are covered by Suburban Propane.[200]  In addition, the salary of Michael Schueler, who is the Vice President of Product Supply at

---

[192] *2019 Suburban Propane 10-K*, p. 1.
[193] *2019 Suburban Propane 10-K*, p. 22, AGWAY 000148.
[194] See, for example, *2005 Carlton & Perloff*, pp. 45, 76, 805.
[195] Based on my interview with Agway staff.  See also, *06/22/2020 Schueler Deposition*, pp. 42, 81, 120, 125; *07/07/2020 Robinson Deposition*, pp. 143, 152.
[196] Based on my interview of Agway's staff.
[197] *07/07/2020 Robinson Deposition*, p. 140
[198] Based on my interview of Agway's staff.
[199] Based on my interview of Agway's staff.  See also *06/22/2020 Schueler Deposition*, pp. 42, 81; *07/07/2020 Robinson Deposition*, p. 152
[200] I am aware of three employees who were shared by Agway and Suburban Propane and whose salaries were allocated between the two businesses.  These include one developer for whom hours spent on Agway's business were charged to Agway and two marketing employees whose salaries were equally split between Agway and Suburban Propane for the period of 14 months.  Based on my interview with Agway's staff.

**PRIVILEGED AND CONFIDENTIAL**

Suburban Propane and whose primary job responsibility is to manage Agway's business, is charged to Suburban Propane and not to Agway.[201]  Therefore, these expenses are not accounted for in Agway's P&L statements.

168. In addition, Agway uses several of Suburban Propane's software systems.  These include a payroll system; an SAP general ledger and accounts payable systems; COR360, a system used for accounts payable; a Hyperion system for budgeting; check-scanning and cash-related systems; a system called "SLIC" used for telemarketing; and a call dispatch system.  In addition, Agway uses Suburban Propane's servers and network.  All expenses associated with these systems are covered by Suburban Propane and are not charged to Agway.  Only Agway's databases that contain its customer data—NirvanaSoft and its predecessor Safari—have been covered by Agway (i.e., appear on Agway's books).[202]

169. According to Agway's staff, most or all of the resources and systems that are currently covered by Suburban Propane and used by Agway in its business operations would be required if Agway operated as a separate from Suburban Propane entity.[203]

170. None of the costs that are covered by Suburban Propane appear on Agway's P&L statements that Dr. Felder used to calculate Agway's total costs in his methodology # 1.  By failing to account for these costs, Dr. Felder understated Agway's total costs and therefore overstated his estimated overcharges.

### C.    Other Defects in Dr. Felder's Methodology #1

171. Additionally, even if Dr. Felder's methodology #1 were conceptually correct, his calculations suffer from multiple errors.  Below I describe six flaws in Dr. Felder's analysis that additionally demonstrate that his overcharges calculations are unreliable.

172. First, Dr. Felder apparently introduced errors when he imported the data and constructed his data set for analysis.[204]  For example, Dr. Felder's Table 1 shows a list of utilities' territories

---

[201] *06/22/2020 Schueler Deposition*, pp. 16-17, 125.
[202] *07/07/2020 Robinson Deposition*, pp. 30:23-31:18.  Based on my interview of Agway's staff.
[203] Based on my interview of Agway's staff.
[204] The data that Dr. Felder used in his damages calculations were provided by Dr. Felder in "Gonzales v Agway Overcharges Calculations.xlsx," tab "Integrated 2011 to 2019."

PRIVILEGED AND CONFIDENTIAL

in which Agway serves customers. Dr. Felder included PEPCO in the list of utilities that operate in Pennsylvania in which territories Agway serves customers. Agway indeed serves customers in PEPCO's territory, but PEPCO operates in Maryland and the District of Columbia and not in Pennsylvania.[205] Therefore, this utility should have been excluded from Dr. Felder's analysis.

173. I also find that Dr. Felder did not include numerous observations for various months and utilities' territories in which Agway did provide electric service to residential customers.[206]

174. Second, as I explained in Section VIII.A, there is no conventional model of damages that would ignore negative damages months and include only positive damages months, and this methodology is inconsistent with the 2019 NY PSC Order. All positive and negative monthly damages should be included in the aggregated damages amount.

175. Third, neither the proposed Class nor the proposed New York Sub-Class definition specifies that for customers who were charged a variable rate for residential electricity service, months in which such customers were charged an introductory rate should be excluded from the calculation of overcharges and it is incorrect as an economic matter to do so. The months during which customers paid introductory rates benefited customers during their tenure with Agway. To determine the overall benefit or detriment to a customer from being an Agway customer it is necessary to examine the customer's full tenure with Agway. By excluding all introductory rate months from his analysis, Dr. Felder's analysis is inconsistent with the class definitions and with economic principles, and it is biased in favor of higher estimated overcharges.

176. Fourth, Dr. Felder erroneously assumed that Agway paid the NYSERDA charge the entire period that he used to calculate overcharges per methodology #1 (December 2011 through

---

[205] "Contact Information," Potomac Electric Power Company, accessed September 19, 2020, https://www.pepco.com/AboutUs/Pages/CompanyInformation.aspx?Origin=PEPCOButtomNavigation.

[206] For example, Dr. Felder did not include the 1.5 million kWh that Agway sold to residential customers in the RG&E territory in February 2015, the 1.2 million kWh that Agway sold to residential customers in the RG&E territory in October 2015, or the 1.1 million kWh that Agway sold to residential customers in the RG&E territory in November 2015. Dr. Felder did not produce his code or any other workpapers that show how he created his analysis dataset for his overcharges calculations. Thus, I cannot identify the source of his data manipulation errors.

PRIVILEGED AND CONFIDENTIAL

November 2019).  However, Agway only started paying the NYSERDA charge in April 2017.[207]

177. Fifth, Dr. Felder double counted the Direct Energy National Grid charge of $0.0025 per kWh when he calculated Agway's COGS for the period from November 2013 through November 2019.  During this period the Direct Energy National Grid charge was included in Agway's costs in the sales detail reports.[208]

178. In addition, Dr. Felder's revenue and COGS totals used in his overcharges calculation are based on data that extend through November 2019, whereas Dr. Felder's data from which he calculates overhead and electric EnergyGuard costs extend only through September 2018.[209]  Dr. Felder's analysis thereby understates Agway's costs because he includes no EnergyGuard costs for the period from October 2018 through November 2019.  Dr. Felder made no attempt to adjust his calculation for the mismatched time periods or missing data.  By understating costs of EnergyGuard included in his overcharges calculations, Dr. Felder's overcharges calculations are biased upward.

179. Overall, Dr. Felder's methodology #1 is unreliable and suffers from multiple defects: Dr. Felder's but-for profit margins are arbitrary and unsupported and some of them are inconsistent with simple economic principles; at least some of Dr. Felder's assumed margins that Agway would apparently earn in the but-for world are inconsistent with Agway's solvency in the long-run; Dr. Felder's overcharges calculation fails to offer any valid methodology to account for the value of electric EnergyGuard to Agway's customers; Dr. Felder fails to account for all costs that Agway incurs in its electric service business operations; Dr. Felder fails to include negative overcharges; and Dr. Felder's methodology suffers from multiple additional defects.  In addition, Dr. Felder's calculations are inconsistent with the proposed Class definition, and Dr. Felder fails to provide any estimated overcharges amount for the proposed New York Sub-Class.

---

[207] Based on the interview of Agway's staff.  Also see AGWAY 589526.
[208] Based on the interview of Agway's staff.
[209] *07/23/2020 Felder Report*, p. 11.  Dr. Felder uses several different datasets to estimate overcharges.  He uses the sales detail reports to calculate Agway's revenues and COGS and he uses Agway's P&L data to estimate Agway's overhead and EnergyGuard costs.  See *07/23/2020 Felder Report*, pp. 10-12.

PRIVILEGED AND CONFIDENTIAL

## X.   DR. FELDER'S SECOND METHODOLOGY IS CONTRARY TO THE FACTS OF THE CASE AND IS BIASED

### A.   Dr. Felder's Methodology #2 But-For Scenarios Are Unsupported

180. Dr. Felder does not articulate in his report what the but-for world in his methodology #2 is.[210] Dr. Felder appears to assume two alternative but-for scenarios in his methodology #2: (1) a "zero-margin, no overhead" scenario that implies that in the but-for world, consumers would be purchasing from their local utilities' instead of Agway, and (2) "zero-margin" scenario (with overhead) that implies that in the but-for world, the utility's PTC would constitute Agway's cost of goods sold, to which Agway would add overhead but no margin to set its price.[211] inconsistent with the facts of this case..

181. In his first assumed scenario, Dr. Felder did not offer any customer survey or other analysis that would demonstrate that customers would have purchased from the utility rather than staying with Agway or purchasing electricity from a different ESCO but for the alleged bad acts.  His assumption that customers would purchase electricity from the utility if Agway's contract did not have alleged deceptive language is arbitrary and without any support.

182. His first scenario also relies on the assumption that utility PTC is an "appropriate" benchmark for Agway's competitive price.[212]  Dr. Felder assumes that any price that Agway charges in excess of the utility's price is an "overcharge."  But this assumption ignores the fact that Agway offers a value-added service that the utility does not offer, a fact that invalidates the utility's price as an upper-bound benchmark, as I explained in Section VIII.B. The fact that Agway offers a value-added service is why, indeed, the NY PSC exempted

---

[210] See, for example, *08/26/2020 Felder Deposition*, p. 74:7-11.

[211] Dr. Felder did not articulate any but-for world in any scenario, as I have pointed out, and his report is not internally consistent on his interpretation of methodology #2.  The interpretations of his scenarios are what I infer from elliptical commentary in his report and deposition.  With respect to his apparent view that the but-for world in the "zero-margin, no overhead" scenario is that consumers would purchase from their local utilities, please see Dr. Felder's report, p. 1, where he states that one of the topics that he covers in his report is "[w]hat Agway customers on variable pricing would have saved, that is how much they were overcharged, if they were a default retail electricity customer of their utility versus what they actually paid Agway."  With respect to his apparent view that the but-for world in the "zero-margin" (with overhead) scenario is that Agway could purchase electricity at the utility's PTC, please see Section IV of Dr. Felder's report where he states that "[Agway's] COGS used in Formula 2 are based upon the utilities' default service price to compare and associated margin variations."

[212] *07/23/2020 Felder Report*, p. 8.

**PRIVILEGED AND CONFIDENTIAL**

Agway, in passages ignored by Dr. Felder, from the very requirement that Dr. Felder's scenario imposes.

183. For his second assumed scenario, Dr. Felder does not articulate a fact pattern in which a utility's PTC—which is the utility's retail price for electricity supply, including taxes, fees, and at least some of the utility's overhead, not a wholesale price of electricity supply—would be Agway's cost of goods sold.

184. In his deposition, Dr. Felder implied that Agway "would have been able" to procure electricity at a price commensurate with the utility's PTC.[213]  Dr. Felder offers no explanation as to why, if Agway could obtain energy at a lower cost than it does, it has not done so; and there are no allegations in this case that, if true, would cause Agway to pay more for the energy it procures than it has to.  There is no but-for world in which, as *a result of not engaging in the alleged bad acts*, Agway "would have been able" to procure energy more cheaply than it in fact did.   This overcharges scenario, therefore, has no causal relationship to the allegations in this case.

185. Agway, like any unregulated company, has an incentive to obtain its resources at the lowest possible cost (subject to quality and availability constraints).  The more cheaply it can obtain electricity supply, the more profits it can earn on its sales of electricity.  If Agway could obtain electricity supply at prices below those it currently pays it would have every economic incentive to do so.  Contrary to Dr. Felder's unsupported assertion, there is no reason to believe that Agway could obtain electricity more cheaply than it does and Dr. Felder offers no such reason.

186. As I discussed in Section V.B, Agway obtains electricity supply from a nationwide wholesaler called Direct Energy. Agway obtains its energy supply from Direct Energy in part because Agway believes that Direct Energy, as a large and sophisticated energy company, has expertise and scale to obtain electricity supply economically.[214]  Agway does not have the scale of a utility and Dr. Felder offers no justification for the assumption that not only

---

[213] *08/26/2020 Felder Deposition*, pp. 170:24-171:7.
[214] *06/22/2020 Schueler Deposition*, pp. 101:13-102:3; *08/30/2018 Schueler Deposition*, p. 67:7-19.

PRIVILEGED AND CONFIDENTIAL

could Agway procure electricity supply at lower costs than it does through Direct Energy, but that it could procure energy supply at costs commensurate with those of a utility.

187. In addition, by assuming that Agway would sell at its supply cost plus a markup for overhead but with zero margin, Dr. Felder's second scenario would require Agway to make sustained losses. Dr. Felder assumption that Agway would have purchased electricity at the utility PTC and earned zero accounting profit margin for the period from January 2013 through November 2019 implies that Agway would have earned negative economic profit margin over this period because it would be unable to cover its cost of capital. No firm would be sustainable earning negative economic profit margins over such period of time, indicating that Dr. Felder's second assumed but-for scenario is simply implausible and inconsistent with economic principles.

### B. The Data Upon Which Dr. Felder Relied for His PTCs Are Unreliable, and Are at Too High a Level of Aggregation for the Purposes to Which He Applies Them

188. Dr. Felder did not use the PTC reported by the utilities for his methodology #2 calculation of overcharges that purportedly compares Agway's prices to the utilities' PTCs. Instead, he used the utility PTCs from the spreadsheets produced by Agway.[215] Dr. Felder did not verify the accuracy of these data.[216] Dr. Felder did not know the purpose with which Agway collected the utility PTC data or how Agway used it in its operations, if at all.[217] Dr. Felder also did not know at which point during a month Agway's staff collected utilities' prices; whether these prices were somehow averaged or approximated;[218] or whether these prices were collected for a specific utility zone or specific customer rate class.[219]

189. I compared the PTC used by Dr. Felder for Central Hudson, Ms. Gonzales's utility in New York, with the historic PTC as reported on Central Hudson's own website. Central Hudson reports PTCs on its current, active web site for the period from November 2016 through

---

[215] *07/23/2020 Felder Report*, Table 5.
[216] *08/26/2020 Felder Deposition*, pp. 78:3-12, 210:19-211:2.
[217] *08/26/2020 Felder Deposition*, pp. 80:18-81:14.
[218] *08/26/2020 Felder Deposition*, p. 97:7-22.
[219] *08/26/2020 Felder Deposition*, pp. 78:3-80:17.

**PRIVILEGED AND CONFIDENTIAL**

September 2020.[220] Exhibit 20 plots the PTC used by Dr. Felder (from Agway's spreadsheets) and the PTC provided by Central Hudson on its website for the period from November 2016 through December 2019.  The exhibit shows that before October 2017 Dr. Felder's PTC and Central Hudson's reported PTCs are quite different, with no apparent relationship between them.  After October 2017, it is visually apparent that Central Hudson's reported PTC and Dr. Felder's PTC move in the same direction but with a lag.  Dr. Felder's PTC appears to be related to the historic PTC in the previous month, which suggests that Agway systematically recorded the PTC in the month subsequent to the month in which the PTC was reported by Central Hudson.  This could be an artifact of the fact that PTCs were typically published by Central Hudson around mid-month rather than at the beginning or end of a month.  For example, if Agway recorded the PTC for the month of October on October 1, 2017, then it could have recorded the PTC that was published by Central Hudson on September 11, 2017, since the next PTC would have been published by Central Hudson on October 10, 2017 and would have been unavailable to Agway on October 1, 2017.

190. For some months Dr. Felder's PTC would be too high and for some it would be too low.  These deviations would not balance out in his analysis, however, because (for one reason) Dr. Felder included only positive monthly overcharges in his aggregated overcharges calculation.  Hence, the magnitude and direction of the effect of his lack of rigor cannot be predicted.

191. Even if the PTC data upon which Dr. Felder relied were accurate, it is reported at too high a level of aggregation to be adequately applied to the overcharges analysis he performs.

192. Agway's spreadsheets contain only one utility PTC for each utility for each month for residential customers.[221]  Utilities' residential prices, however, vary within a month by the

---

[220] The numbers on Central Hudson's website are called the "supply charge."  The "supply charge" is the PTC except that it does not include the Merchant Function Charge ("MFC").  See "Gas & Electric Supply Prices," Central Hudson, accessed September 18, 2020, https://www.cenhud.com/account-resources/rates/gas--electric-supply-prices/.  It is not known whether Agway's PTC data include the MFC.  Even if it does, however, the major observable differences between Agway's PTC data and Central Hudson's website data are not explainable by the omission of the MFC in the data on the web site.  Also see "Electric Bills Explained," Central Hudson, accessed September 18, 2020, https://www.cenhud.com/globalassets/pdf/billexplained_electric.pdf.

[221] See, for example, any file provided by Agway that Dr. Felder listed in Table 5 of his report.

**PRIVILEGED AND CONFIDENTIAL**

customer's zone; the customer's rate class or the customer's profile code;[222] and the customers' billing cycle.[223] Utility prices may also vary by hour or by peak/off-peak hours and by other factors.[224]

193. Agway's residential prices vary by similar factors as utility prices: by utility territory, utility zone, customer's rate class or customer's profile code, and customer's billing cycle.[225] In his analysis, Dr. Felder compared Agway's customer-specific prices to the single, aggregated utility PTC.

194. Dr. Felder asserted in his deposition that the customer-specific utility PTCs are publicly available and that it is possible to compare Agway's customer-specific rates with the utility PTCs for the same customer.[226] Dr. Felder did not do so in his analysis however, nor did he refer or allude to the existence of such data in his report. When requested to produce the sources of these data Dr. Felder failed to do so.

### C.   Other Defects in Dr. Felder's Methodology #2

195. Dr. Felder testified that he did not know whether the utility PTC included the MFC fee that is charged by utilities when a retail customer buys electricity supply from the utility.[227] If the PTC data do not include the MFC, Dr. Felder's overcharges calculation in both scenarios would be overstated, because his PTC would be smaller than the actual energy supply charges from utilities to consumers.[228]

196. Because Dr. Felder used the same data to calculate electricity revenues and units sold in his methodology #2 as in methodology #1, all my observations about the errors he made

---

[222] "Profile code" is a code assigned to customers by their local utility based on their usage over time. *07/07/2020 Robinson Deposition*, pp. 58:17-59-23. For National Grid, the price is determined based on the customer's "rate class" instead of the profile code. *07/07/2020 Robinson Deposition*, pp. 167:9-168:8.

[223] *07/07/2020 Robinson Deposition*, pp. 58:17-59-14.

[224] See, for example, "Real Time Prices," Orange & Rockland, accessed September 19, 2020, https://apps.coned.com/ORMyAccount/RTP/NYRtp.aspx. See "Gas & Electric Supply Prices," Central Hudson, accessed September 19, 2020, https://www.cenhud.com/account-resources/rates/gas--electric-supply-prices/.

[225] *07/07/2020 Robinson Deposition*, pp. 58:22-59:4.

[226] *08/26/2020 Felder Deposition*, pp. 140:17-142:3.

[227] *08/26/2020 Felder Deposition,* p. 137:13-17.

[228] "Electric Bills Explained," Central Hudson, accessed September 18, 2020, https://www.cenhud.com/globalassets/pdf/billexplained_electric.pdf.

PRIVILEGED AND CONFIDENTIAL

constructing his analysis data set that I described in Section X.C apply to his methodology #2 as well. [229]   In addition, Dr. Felder ignored negative overcharges and only summed up positive overcharges to arrive at total overcharges, contrary to sound principles of consumer welfare, thereby biasing his results.  Dr. Felder also wrongfully ignored introductory rate months for variable rate customers which is inconsistent with sound economic analysis.  Further, Dr. Felder estimated Agway's overhead and electric EnergyGuard costs using Agway's P&L data for the period from October 2010 through September 2018, while he calculated revenues and COGS using sales detail reports data for the period from January 2013 through November 2019.[230]  If Dr. Felder used the same period to estimate electric EnergyGuard costs as he used for the overcharges calculation (i.e., January 2013 through November 2019), the electric EnergyGuard costs would be higher and, therefore, overcharges lower.

197. Overall, some of the identified errors, when corrected, would be expected to increase the estimated overcharges, all else equal, while other corrections would be expected to decrease them.

## XI.    DR. FELDER'S METHODOLOGIES CANNOT DISTINGUISH BETWEEN PURPORTED CLASS MEMBERS WHO WERE HARMED BY THE PURPORTED BAD ACTS AND THOSE WHO WERE NOT

198. To the extent Plaintiff's case is based on a theory of deception, I am aware of no evidence in the case that any consumers were misled.  Dr. Felder has also offered no methodology by which it can be determined which consumers were misled and which were not misled without an individual inquiry such as deposition testimony.

199. I understand that class treatment requires a plaintiff to be able to distinguish from among potential class members those who were in fact harmed and be able to exclude those who were not harmed, and to be able to do so without individualized inquiry that would make class treatment impractical.  I understand this is referred to as the requirement of

---

[229] The data that Dr. Felder used in his overcharges calculations were provided by Dr. Felder in his spreadsheet "Gonzales v Agway Overcharges Calculations.xlsx," tab "Integrated 2011 to 2019."
[230] See *07/23/2020 Felder Report*, pp. 10-12.

**PRIVILEGED AND CONFIDENTIAL**

"ascertainability." If the damages methodology cannot distinguish between those customers who were harmed by the alleged bad acts and those who were not, it fails to establish a causal link between the allegations and the damages.[231] Dr. Felder has offered no analysis or methodology that would address the difficulty inherent in ascertaining among potential class members those who were actually harmed.

200. It is consistent with economic theory that a customer would willingly pay a price that, on average, exceeds the price of the default utility service in order to gain the value to that customer of the electric EnergyGuard program. Hence, if any customer paid more to Agway during their tenure with Agway than they would have paid to the default provider during that period, that does not constitute evidence that the customer was misled, nor does it provide evidence that the customer was harmed. Dr. Felder offers no evidence that there were any customers who were in fact harmed and no methodology for identifying those who were misled and harmed by the purportedly misleading acts.

201. Dr. Felder also fails to account for differences in the information that may have been provided to customers when they subscribed to Agway. For example, he offered no analysis of the three different processes described in Section V.B by which customers signed up for Agway service and whether customers may have been exposed to materially different information as between those processes. In addition, Dr. Felder relies on language in Ms. Gonzales's welcome letter regarding Agway offering a "competitive monthly variable price" as justification for his overcharges methodologies[232] in light of the fact that the quoted "competitive monthly variable price" language does not appear in all welcome letters, as noted in Section VII, his justification for his proposed methodologies cannot be applicable to all potential class members.

202. In addition, as I explained in Section VIII.B, customers' attitudes toward risk vary according to numerous factors, including income, wealth, perceived probability of the insured emergency occurring, and simply willingness to bear uncertainty. Because consumers are heterogeneous with respect to their attitudes toward risk and insurance, it is to be expected that some consumers would find an insurance product such as EnergyGuard to be highly

---

[231] *2011 Allen et al.*, p. 432.
[232] *07/23/2020 Felder Report*, p. 8.

**PRIVILEGED AND CONFIDENTIAL**

valuable and be willing to pay a substantial premium for it, while others may ascribe less value to such a service.

203. Average annual expense per service call under Agway's electric EnergyGuard was between $352 and $399 between 2015 and 2019.[233] Many customers, such as those whose survey comments I quoted in Section VIII.B, may find unexpected expenditures of this magnitude to be prohibitive. Other customers, with more risk tolerance due to objective factors and/or due to underlying comfort with uncertainty, may not be averse to taking the risk of such expenditures arising, and may therefore place a relatively low value on an insurance service such as EnergyGuard. The former types of customers may not consider themselves misled or harmed in any way, while the latter may. I am aware of no means of distinguishing between these types of customers without individualized inquiry, and Dr. Felder has offered none.

## XII. DEFECTS IN DR. FELDER'S CALCULATIONS OF INDIVIDUAL DAMAGES

204. Dr. Felder applied versions of his methodologies #1 and #2 to calculate one month of damages for an anonymous individual customer. The defects and errors I discussed related to Dr. Felder's methodologies #1 and #2 therefore infect Dr. Felder's calculation of a single anonymous customer's damages provided in Table 7 of his report.

205. In addition, in his methodology for calculating overcharges for an individual customer, Dr. Felder ignores the value and costs of the electric EnergyGuard program. That is, he did not include the costs of electric EnergyGuard when calculating overcharges and made no allowance or adjustment for its value to the customer. His failure to account in any way for the costs of EnergyGuard in his calculation of overcharges for an individual customer is inconsistent with the evidence that EnergyGuard is valuable and imposes costs on Agway. It is also inconsistent with the versions of Dr. Felder's own methodologies #1 and #2 in which he accounts for electric EnergyGuard costs. As explained earlier, Dr. Felder offers alternative scenarios in both of his methodologies in which he includes EnergyGuard costs; in his calculations of individual damages he abandons these scenarios, inflating his damages calculations even if all else in the analyses were correct.

---

[233] See AGWAY 742510 and AGWAY 764600.

**PRIVILEGED AND CONFIDENTIAL**

206. Dr. Felder did not explain how the anonymized customer was chosen, and whether the choice was random. He did not calculate the damages for the named Plaintiff. If the customer was chosen at random, Dr. Felder did not provide his algorithm for randomization to demonstrate that the choice was unbiased. If the choice was not random, Dr. Felder did not disclose his criteria for choosing this customer in this month, and there were no workpapers produced that described his process. Hence, his choice of a single anonymous customer in a single month was not performed according to a reproducible methodology and it is not known whether the choice was unbiased and compliant with accepted scientific methods. Therefore, the calculated damages associated with the anonymized customer/month cannot be considered representative of damages that would be calculated for a typical customer/month or for other customers or other months more generally.

## XIII. DR. FELDER'S (AND PLAINTIFF'S) ASSERTIONS REGARDING THE POLICY PURPOSE OF RETAIL ELECTRICITY DEREGULATION ARE INCORRECT

207. Both Plaintiff and Dr. Felder misrepresent the NY PSC public policy goal.

208. Plaintiff asserts in her complaint:

> The public policy motivation for allowing consumers a choice of electricity suppliers is to enable retail customers to obtain lower costs compared to the heavily regulated utility. The premise behind this policy is that competition would result in ESCOs being more aggressive than the monopoly utility in reducing wholesale purchasing costs and thereby lower prices and costs for retail customers.[234]

209. Dr. Felder presents a similar claim in his report, and he even repeats the last sentence from the previous quote from the Plaintiff's complaint:

> The public policy motivation for allowing retail customers to be able to select their ESCO and not being locked into buying electricity from their utility was to enable retail customers to lower their costs compared to what the monopoly utility provided and for retail customers to have more choices. The premise behind this policy is that competition would result in ESCOs being more aggressive than

---

[234] *12/06/2017 Complaint*, ¶ 13.

**PRIVILEGED AND CONFIDENTIAL**

the monopoly utility in reducing wholesale purchasing costs and thereby lower prices and costs for retail customers. [235]

. . .

With the introduction of retail electricity markets, the public policy goal is to have ESCOs use these multiple procurement options in innovative and cost-effective ways to procure electricity at or below prices that they would have paid if they had purchased electricity from their utility and pass a share of those savings to its [sic] customers.[236]

210. Both of these assertions about the public goal of the NY PSC are incorrect. The NY PSC clearly states in multiple related orders that its goal is not only to promote competition and lower energy prices to consumers, but also to promote increased availability of renewable energy and energy efficiency services, and promote availability of innovative services of value to consumers in the energy markets.

211. For example, the NY PSC states in its 2016 order:

The Commission has begun to reform New York State's energy industry to, among other things, promote increased availability of energy efficiency services, increases in distributed generation, including deeper penetration of market based distributed and grid-based renewable energy resources, and enhancement of customer knowledge with tools that will support effective management of their total energy bill, and animate markets. Development of markets in which vendors offer innovative services of value to consumers, and in which consumers can participate with confidence, is critically important to the success of the Reforming the Energy Vision (REV) initiative. [footnote omitted][237]

212. And the NY PSC stated in the 2019 NY PSC Order:

The Commission expected that allowing ESCOs to market commodity to customers would lead to productive innovation. It

---

[235] *07/23/2020 Felder Report*, p. 4.
[236] *07/23/2020 Felder Report*, p. 6.
[237] Order Resetting Retail Energy Markets and Establishing Further Process, *CASE 15-M-0127 - In the Matter of Eligibility Criteria for Energy Service Companies*, et al., State of New York Public Service Commission, February 23, 2016 (hereafter, *2016 NY PSC Order*), p. 3.

PRIVILEGED AND CONFIDENTIAL

anticipated that ESCOs would offer products and services to customers that utilities could not offer.[238]

213. In fact, as discussed earlier, the NY PSC exempted Agway from the requirements imposed in the 2019 NY PSC Order because Agway offers an energy-related value-added product. In addition, the NY PSC stated in the 2019 NY PSC Order that if any other ESCO wished to offer a product similar to Agway's EnergyGuard, such ESCO could submit a petition for waiver from the above-mentioned requirements "explaining the benefits its product provides and how they will reasonably relate to its cost,"[239] thereby further manifesting its policy goal of promoting innovation and introduction of value-added energy-related products.

214. The PPUC states a similar goal for the policy in their 1998-1999 annual report. This report was released the same year that the legislation containing the restructuring guidelines for the electricity market in Pennsylvania, Title 66, was passed:

> In 1999, the Commission restructured the markets for both electricity generation and natural gas supply. Customers may now choose from a number of suppliers that generate their electricity or supply their natural gas. The Commission believes that competition among suppliers will lower prices, improve customer services and spur the development of new products.[240]

215. The PPUC reiterates similar goals in its recent annual report from 2018-2019. The Commission "took additional steps to strengthen and enhance Pennsylvania's competitive market"[241] including improving the official electric shopping website to make it easier for consumers to see new products:

> The PUC's official website for electric shopping – PAPowerSwitch.com – was the focus of continued enhancements, including direct links connecting PAPowerSwitch shoppers to suppliers' online enrollment webpages and the ability to display new products being offered by suppliers, including but not limited to flat monthly prices, enrollment fees and, eventually, time-of-use products.[242]

---

[238] *2019 NY PSC Order*, p. 44.
[239] *2019 NY PSC Order*, p. 54.
[240] Pennsylvania Public Utility Commission 1998/1999 Annual Report, p. 5.
[241] Pennsylvania Public Utility Commission 2018-19 Annual Report, p. 17.
[242] Pennsylvania Public Utility Commission 2018-19 Annual Report, p. 18.

**PRIVILEGED AND CONFIDENTIAL**

216. In addition, the PAPowerSwitch.com website contains multiple resources for customers in which it addresses the reasons consumers should engage in shopping for electricity. While cost savings represents one reason, finding a better match for their needs is also emphasized:

> You can shop based on price, environmental preferences or special services and deals.[243]

> The power to switch electric suppliers gives you greater control over your electric bill. For example, if you can get a lower rate from a competing supplier, you can switch suppliers. You can also customize your energy use with green options and other services that might be beneficial for your home or business.[244]

> By shopping for competing suppliers, you may be able to save money, find suppliers that use green/renewable energy resources, or get different types of services.[245]

217. Therefore, the deregulation of energy markets in New York and Pennsylvania did not have a single public policy goal, as Plaintiff and Dr. Felder claim. The policymakers hoped that introducing more competition would promote the broader goals of competition, which may include lower prices if regulated prices were inefficiently high, but would also include encouraging innovation and introduction of value-added products, such as EnergyGuard, in these markets.

Debra J. Aron, Ph.D.

---

[243] "Shopping for Electricity," Pennsylvania Public Utility Commission, March 2016, p. 1.
[244] "How Switching Electricity Can Help," Pennsylvania Public Utility Commission, accessed September 2, 2020, https://www.papowerswitch.com/about-switching-electricity/how-electric-choice-can-help/#.
[245] "Choosing an Electric Supplier," Pennsylvania Public Utility Commission, accessed September 2, 2020. https://www.papowerswitch.com/about-switching-electricity/how-to-choose-a-supplier/#.

**PRIVILEGED AND CONFIDENTIAL**



Exhibit 1

## Debra J. Aron
Vice President

PhD, Economics
University of Chicago

BA, Economics
University of California at Los
Angeles

Dr. Debra J. Aron is a Vice President in the Competition Practice.  Debra applies her expertise in economic and policy matters, including competition and antitrust analysis, intellectual property, class certification, and damages analysis, in both regulatory and litigation disputes.  She has provided expert testimony for over 20 years in a variety of high-stakes federal, state, regulatory, and arbitration cases relating to competition and antitrust including market definition, conduct cases, and price fixing damages, intellectual property damages including patents and trade secrets; class actions and class certification including consumer fraud matters and TCPA; pricing; unjust enrichment; and economic cost analyses.  She also has conducted competition analyses in several high-profile mergers and macroeconomic analyses of pricing and investment changes.  Dr. Aron's practice spans many industries, and she has a specific expertise in telecommunications and technology, including wireless services, wireline services, backbone, RAN, and customer premises equipment, satellite communications, and computer technology.

## Publications

"The Economics of 5G Deployment in the 'Race' to 5G: The Role of Massive MIMO," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (August 2020).

"The Economics of 5G Deployment in the 'Race' to 5G: The Role of Mid-Band Spectrum," with Olga Ukhaneva and Chloe Sun, *CRA Insights: The Economics of 5G* (July 2020).

"An Economic Perspective on Balancing Unquantified Harms and Benefits Under the Consumer Welfare Standard," with Steven Tenn, 2019 COLUM. BUS. L. REV. (2019).

"Lessons from the Economic Deregulation of the Airline and Telecommunications Industries," *Infrastructure* 58, no. 2 (Winter 2019).

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, June 19, 2013.  Available at SSRN: http://ssrn.com/abstract=1674082.

Contributing author, ABA SECTION OF ANTITRUST LAW, TELECOM ANTITRUST HANDBOOK, Second Edition, (Chicago: American Bar Association), March 2013.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan T. Ingraham, *Review of Network Economics* 11, issue 4, 2012.

"Social Welfare Implications of Liability Rules in Major Environmental Damages Cases," with Francis X. Pampush, Environmental Litigation Committee Newsletter, Fall 2011.

"Regulatory Policy and the Reverse Cellophane Fallacy," with David E. Burnstein, *Journal of Competition Law and Economics* 2010; doi: 10.1093/joclec/nhp033.

"Investment in Next Generation Networks and Wholesale Telecommunications Regulation," with Robert W. Crandall, November 3, 2008.  Available at SSRN: http://ssrn.com/abstract=1294910.

"Pricing Principles and Pricing Methodologies for Essential Facilities," May 2008.

Contributing author, ABA SECTION OF ANTITRUST LAW, TELECOM ANTITRUST HANDBOOK, (2005), (Chicago: American Bar Association), 2005.

"The Proper Treatment of Spare Network Capacity in Regulatory Cost Models," with Ana Danies, May 2005.  Available at SSRN http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133365.

"State Commissions Systematically Have Set UNE Prices Below Their Actual Costs," with Frank Pampush and E. Gerry Keith, November 2003.  Available at SSRN http://ssrn.com/abstract=3327613.

"Broadband Adoption in the United States: An Empirical Analysis," with David E. Burnstein, in DOWN TO THE WIRE: STUDIES IN THE DIFFUSION AND REGULATION OF TELECOMMUNICATIONS TECHNOLOGIES, Allan Shampine, ed., (Nova Science Publishers, Hauppauge, NY, 2003).

"Developments in the Theory of Vertical Foreclosure as Applied to Regulated Telecommunications Markets" (March 2002), Prepared for Presentation at The American Bar Association Section of Antitrust Law, 50th Annual Spring Meeting.

"Modifications at HHIs for Vertical Supply Relationships" with Wenqing Li and James Langenfeld, White Paper submitted to European Commission, February 2000.

"Economic Theories of Tying and Foreclosure Applied—And Not Applied—in Microsoft," with Steven S. Wildman, *Antitrust* 14, no. 1, 1999, pp.48-52.

"Effecting a Price Squeeze Through Bundled Pricing," with Steven S. Wildman, in COMPETITION, REGULATION, AND CONVERGENCE: CURRENT TRENDS IN TELECOMMUNICATIONS POLICY RESEARCH, Gillett and Vogelsang, eds. (New Jersey: Lawrence Erlbaum Associates, Inc.) 1999, pp. 1-17.

"Worldwide Wait?  How the Telecom Act's Unbundling Requirements Slow the Development of the Network Infrastructure," with Ken Dunmore and Frank Pampush, *Industrial and Corporate Change* 7, no. 4, 1998, pp. 615-621.

"The Pricing of Customer Access in Telecommunications," with Steven S. Wildman, *Industrial and Corporate Change* 5, no. 4, 1996, pp. 1029-1047.

"Bonus and Penalty Schemes as Equilibrium Incentive Devices, With Application to Manufacturing Systems," with Pau Olivella, *Journal of Law, Economics, and Organization* 10, Spring 1994, pp. 1-34.

"Diversification as a Strategic Preemptive Weapon," *Journal of Economics and Management Strategy* 2, Spring 1993, pp. 41-70.

"Using the Capital Market as a Monitor: Corporate Spin-offs in an Agency Framework," *RAND Journal of Economics* 22, Winter 1991, pp. 505-518.

"Firm Organization and the Economic Approach to Personnel Management, *American Economic Review* 80, no. 2, May 1990, pp. 23-27.

"The Introduction of New Products," with Edward P. Lazear, *American Economic Review* 80, no. 2, May 1990, pp. 421-426.

"Ability, Moral Hazard, Firm Size, and Diversification," *RAND Journal of Economics* 19, Spring 1988, pp. 72-87.

"Worker Reputation and Productivity Incentives," *Journal of Labor Economics* 5, no. 4, October 1987, part 2, pp. S87-S106.

"The Role of Managerial Ability and Moral Hazard in the Determination of Firm Size, Growth and Diversification," Ph.D. Dissertation, University of Chicago, August 1985.

## Presentations

Panelist, Platform Antitrust, "On the Intersection Between Antitrust Enforcement and Other Regulatory Spheres as it Relates to Digital Platforms," Global Competition Review Live 9th Annual Antitrust Law Leaders Forum, Miami Beach, Florida, February 2020.

"Balancing Unquantified Benefits and Harms Under the Consumer Welfare Standard," The New York State Bar Association Antitrust Law Section, 2019 William Howard Taft Lecture, Commenter to the remarks of The Honorable Douglas H. Ginsburg, New York, New York, September 2019.

"The Impact on the U.S. Economy of Excluding Huawei from Participation in the U.S. Market for Wireless Network Equipment," Presentation at the Fiscal Year 2019 National Defense Authorization Act, Section 889, Public Meeting of Department of Defense, General Services Administration, and NASA, Washington, D.C., July 19, 2019.

Moderator, "Your Expert Is Your Friend: How to Effectively Deliver Expert Testimony," ABA: The Woman Advocate Committee Regional CLE Program: Raising the Bar, Chicago, Illinois, October 2018.

"Lessons from the Deregulation of the Airline and Telecommunications Industries," ABA Infrastructure and Regulated Industries Section, Dallas, Texas, August 2018.

"Economic Fundamentals: Vertical and Coordinated Effects in Mergers," ABA Section of Antitrust Law, Fundamentals of Antitrust Economics Series, Chicago, Illinois, July 2018.

Panelist, "Considerations for the Economists' Analysis in Opt-Out Relative to Class Action Litigation," ABA 5th Annual Western Regional CLE Program on Class Actions and Mass Torts, San Francisco, California, June 2018.

"Lessons from the Deregulation of the Airline and Telecommunications Industries," ABA Infrastructure and Regulated Industries Section, Fall Council Meeting, Palm Beach, Florida, October 2017.

"Economic Fundamentals: Vertical and Coordinated Effects in Mergers," ABA Section of Antitrust Law, Fundamentals of Antitrust Economics Series, Washington, D.C., May 2016.

Panelist, "Economic Fundamentals: Market Power," ABA Spring Meeting, Washington, D.C., April 2016.

"The Economic Impact of Electricity Price Increases in Puerto Rico," ABA Section of Public Utility, Communications and Transportation Law, Spring Council Meeting, Naples, Florida, March 2016.

Moderator, "Effective Cross-Examination of the Expert Witness: Practical Tips and Video Clips," ABA Annual Meeting, Chicago, Illinois, July 2015.

Moderator, "The Science of Persuasion: Practical Insights from Research on Expert Witness Effectiveness and Jury Decision-Making," ABA Section of Litigation Annual Conference, New Orleans, Louisiana, April 2015.

Panelist, "How to Manage Conversations with Expert Witnesses," ABA Section of Litigation, Environmental, Mass Torts, & Products Liability Litigation Committees' Joint CLE Seminar, Avon, Colorado, January 30, 2014.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," Federal Communications Commission, Washington, D.C., June 11, 2013.

Panelist, "A Primer: Getting the Most Out of Your Experts — Do's and Don'ts in the Use of Expert Witnesses: Learning from the Experts," ABA Section of Litigation Annual Conference, Chicago, Illinois, April 26, 2013.

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, Wesleyan University, Middletown, Connecticut, March 27, 2013.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan Ingraham, The 40th Research Conference on Communication, Information and Internet Policy (TPRC), September 22, 2012.

Panelist, "Two Decades of Daubert: Junk Science Replaced by Junk Rulings?" ABA Section of Litigation Annual Conference, Washington, DC, April 20, 2012.

"The Effects of Legacy Pricing Regulation on Adoption of Broadband Service in the United States," with Allan Ingraham, New America Foundation, workshop on Defining and Measuring Meaningful Broadband Adoption, April 11, 2012, Washington, DC.

"Social Welfare Implications of Liability Rules in Major Environmental Damages Cases," with Francis X. Pampush, American Bar Association Sections of Litigation and Criminal Justice Joint Annual Conference, April 15, 2011, Miami, Florida.

"Consumer Benefits of Intrastate Access Rate Reform in Minnesota," Center for Science, Technology and Public Policy, Humphrey School of Public Affairs, University of Minnesota, January 26, 2011.

"An Empirical Analysis of Regulator Mandates on the Pass Through of Switched Access Fees for In-State Long-Distance Telecommunications in the U.S.," with David E. Burnstein, Ana Danies, and Gerry Keith, The 38th Research Conference on Communication, Information and Internet Policy (Telecommunications Policy Research Conference), October 3, 2010, George Mason University Law School, Arlington, Virginia.

"Pricing Principles and Pricing Methodologies for Essential Facilities," The 36th Research Conference on Communication, Information and Internet Policy (TPRC), September 27, 2008.

"Regulatory Policy and the Reverse Cellophane Fallacy," with David E. Burnstein, 17th Biennial International Telecommunications Society Conference, Montréal, Québec, Canada, June 24-27, 2008.

"The Use of Economic Analysis in 'Industry Expert' Testimony," CLE course, XPRT Forum, March 7, 2008.

Presentations to the New Jersey Board of Public Utilities and to the New Jersey Legislature's Telecommunications Utilities Committee regarding the economic principles for a forward-looking regulatory agenda in light of the facts of competition nationwide and in New Jersey, and the costs of regulation, October – November 2006.

"The Interaction of Regulation with Economics and Financial Analysis in Litigation, Policy, and Strategy Consulting," CLE course, XPRT Forum, October 7, 2006.

"Comments on 'Economic Analysis in FCC Merger Proceedings,'" Conference on Economic Analysis and FCC Decisionmaking, presented by the Federal Communications Bar Association (FCBA) and Stanford Institute for Economic Policy Research (SIEPR), Washington, D.C., March 15, 2006.

"Economic Principles for Consumer Protection Rules," Pri Telecom / Tech Briefing, Santa Clara, California, October 11, 2005.

"The Proper Treatment of Spare Network Capacity in Regulatory Cost Models," Presentation at the Advanced Workshop in Regulation and Competition, Center for Research in Regulated Industries, Skytop, Pennsylvania, May 2005.

"Telecommunications Regulation: What's Obsolete?  What Will Become Obsolete?" Presentation at the State and City Telecom Reform Conference, Heartland Institute, Chicago, Illinois, December 2004.

"Trends in Telecommunications Demand & Supply," Presentation at the 46th Annual NARUC Regulatory Studies Program, Michigan State University, August 2004.

"The Economic Costs of Proposed Wireless Regulations in California," Presentation to Commissioners Brown and Kennedy, California Public Utilities Commission, San Francisco, California, April 2004.

"The Economics of UNE Pricing: Presentation to Staff," Ex parte presentation to the staff of the FCC, in FCC WC Docket No. 03-173: Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, March 2004.Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, March 2004.

"The High Cost of Proposed New Wireless Regulations," Presentation to the Pacific Research Institute conference "Regulating Wireless in California: Bill of Rights... or Wrongs?" San Francisco, California, April 2003.

"The TELRIC Showdown," Panelist, NARUC Staff Subcommittee on Telecommunications, 2002 Annual Convention, Chicago, Illinois, November 2002.

"Economic Principles for Efficient Pricing of Municipal Rights-of-Way," National Association of Telecommunications Officers and Advisors (NATOA), Chicago, Illinois, September 2002.

"Trends in Voice and Broadband Competition in Telecommunications Markets: Markets, Strategies, and Regulation," 82nd Annual Convention of the Indiana Telecommunications Association, Lexington, Kentucky, June 2002.

"Broadband Deployment in the United States," Emerging Opportunities in Broadband Symposium, Northwestern University, Evanston, Illinois, December 2001.

"Local Competition in Illinois," Illinois Telecommunications Symposium, Northwestern University, Evanston, Illinois, December 2000.

"Licensing and Access to Innovations in Telecommunications and Information Services," Telecommunications Policy Research Conference, Alexandria, Virginia, September 2000.

"Effecting a Price Squeeze Through Bundled Pricing," Federal Communications Commission, Washington, D.C., May 1999.

"Competitive and Strategic Use of Optional Calling Plans and Volume Pricing Plans," The Institute for International Research Conference for Competitive Pricing of Telecommunications Services, Chicago, Illinois, July 1998.

"Effecting a Price Squeeze Through Bundled Pricing," Consortium for Research in Telecommunications Policy Conference, University of Michigan, Ann Arbor, Michigan, June 1998.

"The Pricing of Customer Access in Telecommunications," Conference on Public Policy and Corporate Strategy for the Information Economy, Evanston, Illinois, May 1996.

"Diversification as a Strategic Preemptive Weapon," University of Iowa, Iowa City, Iowa, February 1994.

"Diversification as a Strategic Preemptive Weapon, "University of Buffalo, Buffalo, New York, February 1994.

"Diversification as a Strategic Preemptive Weapon," University of Southern California, Los Angeles, California, December 1993.

"Strategic Pricing," Winter Meetings of the Econometric Society, Discussant, Anaheim, California, December 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Michigan State University, Lansing, Michigan, November 1993.

"Diversification as a Strategic Preemptive Weapon," Rutgers University, New Brunswick, New Jersey, November 1993.

"Diversification as a Strategic Preemptive Weapon," University of California at Santa Cruz, Santa Cruz, California, November 1993.

"Diversification as a Strategic Preemptive Weapon," Graduate School of Business, Stanford University, Stanford, California, November 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Purdue University, West Lafayette, Indiana, September 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Summer Meetings of the Econometric Society, Boston University, Boston, Massachusetts, June 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of California, Department of Economics, Berkeley, California, May 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Stanford University, Graduate School of Business, Stanford, California, May 1993.

"Diversification as a Strategic Preemptive Weapon," Stanford University, Graduate School of Business, Stanford, California, April 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Hoover Institution, Stanford, California, April 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of California, Graduate School of Business, Berkeley, California, February 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Stanford University, Department of Economics, Stanford, California, February 1993.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," Hoover Institution, Stanford, California, January 1993.

"Pricing Strategies," Session Discussant, 1992 North American Winter Meeting of The Econometric Society, Anaheim, California, January 1992.

"Diversification as a Strategic Preemptive Weapon," University of Toronto, Toronto, Canada, November 1991.

"Diversification as a Strategic Preemptive Weapon," Queen's University, Kingston, Ontario, Canada, November 1991.

"Bonuses and Penalties as Equilibrium Incentive Devices, with Application to Manufacturing Systems," University of Chicago, Chicago, Illinois, June 1991.

"The Timing of Entry into New Markets," Summer Meetings of the Econometric Society, University of Pennsylvania, Philadelphia, Pennsylvania, June 1991.

"Innovation, Imitation, Productive Differentiation, and the Value of Information in New Markets," University of Chicago, Chicago, Illinois, April 1991.

"Bonuses and Penalties as Equilibrium Incentive Devices, with Application to Manufacturing Systems," Winter Meetings of the Econometric Society, Washington, D.C., December 1990.

"Corporate Spin-offs in an Agency Framework," University of Washington, Seattle, Washington, October 1990.

"The Timing of Entry Into New Markets," University of British Columbia, Vancouver, British Columbia, October 1990.

"Corporate Spin-offs in an Agency Framework," Texas A&M University, College Station, Texas, April 1990.

"Firm Organization and the Economic Approach to Personnel Management," Winter Meetings of the American Economic Association, New York, New York, December 1989.

"Corporate Spin-offs in an Agency Framework," Western Finance Association Meetings, Seattle, Washington, June 1989.

"Corporate Spin-offs in an Agency Framework," University of Rochester, Rochester, New York, May 1989.

"Corporate Spin-offs in an Agency Framework," North American Summer Meetings of the Econometric Society, Minneapolis, Minnesota, June 1988.

"Competition, Relativism, and Market Choice," North American Summer Meetings of the Econometric Society, Berkeley, California, June 1987.

"Competition, Relativism, and Market Choice," University of Chicago, Chicago, Illinois, April 1987.

"Rate Reform and Competition in Electric Power," Discussant, Conference on Competitive Issues in Electric Power, Northwestern University, Evanston, Illinois, March 1987.

"Worker Reputation and Productivity Incentives," New Economics of Personnel Conference, Arizona State University, Tempe, Arizona, April 1986.

"Ability, Moral Hazard, and Firm Diversification," Various Universities, 1985, 1994, including Yale University, University of Rochester, Stanford University, University of Minnesota, California Institute of Technology, Duke University, Northwestern University, Brown University, Harvard University, University of California - Los Angeles, University of Pennsylvania.

## Academic Journal Refereeing

Dr. Aron has served as a referee for The Rand Journal of Economics, the Journal of Political Economy, the Journal of Finance, the American Economic Review, the Quarterly Journal of Economics, the Journal of Industrial Economics, the Journal of Economics and Business, the Journal of Economic Theory, the Journal of Labor Economics, the Review of Industrial Organization, the European Economic Review, the Journal of Economics and Management Strategy, the International Review of Economics and Business, the Quarterly Review of Economics and Business, Management Science, the Journal of Public Economics, the Journal of Institutional and Theoretical Economics, and the National Science Foundation.

## Testimony (2011-2020)

Trial Testimony of Debra J. Aron in Sumotext Corp. v. Zoove, Inc. et al., United States District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF-NMCx, March 3, 2020.

Trial Testimony of Debra J. Aron in Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd. et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:17-cv-01973, February 3-4, 2020.

Hearing Testimony of Debra J. Aron in Order Instituting Rulemaking into the Review of California High Cost Fund-A Program, Before the Public Utilities Commission of the State of California, Rulemaking 11-11-007, January 29-30, 2020.

Prefiled Written Testimony of Debra J. Aron in Order Instituting Rulemaking into the Review of California High Cost Fund-A Program, Before the Public Utilities Commission of the State of California, Rulemaking 11-11-007, November 15, 2019.

Trial Testimony of Debra J. Aron in Hewlett-Packard Co. v. Quanta Storage Inc. et al., United States District Court for the Southern District of Texas, Houston Division, Case No. 4:18-cv-00762, October 21, 2019.

Deposition of Debra J. Aron in Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd. et al., United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:17-cv-01973, September 20, 2019.

Deposition of Debra J. Aron in Jonathan Coffey et al. v. WCW & Air, Inc. et al., United States District Court, for the Northern District of Florida, Pensacola Division, Case No. 3:17-cv-90-TKW-HTC, September 13, 2019.

Deposition of Debra J. Aron in <u>Sumotext Corp. v. Zoove, Inc. et al.</u>, United States District Court, Northern District of California, San Jose Division, Case No. 5:16-cv-01370-BLF-NMCx, August 1, 2019.

Deposition of Debra J. Aron in <u>Waddell Williams, et al. v. Bluestem Brands, Inc.</u>, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-CV-1971-T-27AAS, September 21, 2018.

Deposition of Debra J. Aron in <u>Robert Hossfeld, et al. v. Compass Bank, N.A., et al.</u>, United States District Court, Northern District of Alabama, Southern Division, Case No. 2:16-CV-2017-ACA, September 7, 2018.

Deposition of Debra J. Aron in <u>Ventures Edge legal, PLLC, et al. v. GoDaddy.com, LLC, et al.</u>, United States District Court, District of Arizona, Case No. 2:15-cv-02291-GMS, January 30, 2018.

Deposition of Debra J. Aron in <u>Rajesh Verma, et al. v. Memorial Healthcare Group Inc., et al.</u>, United States District Court, Middle District of Florida, Jacksonville Division, Case No. 3:16-CV-00427-HLA-JRK, June 27, 2017.

Trial Testimony of Debra J. Aron in <u>T-Mobile USA, Inc. v. Huawei Device, USA, Inc., et al.</u>, In the United States District Court for the Western District of Washington at Seattle, Case No. C14-1351-RAJ, May 12, 2017.

Deposition of Debra J. Aron in <u>Re Optical Disk Drive Antitrust Litigation, Hewlett-Packard Company v. Toshiba Corp., et al.</u>, United States District Court, Northern District of California, MDL Docket No. 3:10-MD-02143-RS, Case No. 3:13-cv-05370-RS, March 23, 2017.

Deposition of Debra J. Aron in <u>Peerless Network, Inc., et al. v. AT&T Corp.</u>, In the United States District Court for the Southern District of New York, Case No. 15 CV 870, February 17, 2017.

Trial Testimony of Debra J. Aron in <u>Thomas H. Krakauer, et al. v. Dish Network, L.L.C.</u>, In the United States District Court for the Middle District of North Carolina, Durham Division, Case No. 1:14-CV-333, January 17, 2017.

Deposition of Debra J. Aron in <u>T-Mobile USA, Inc. v. Huawei Device, USA, Inc., et al.</u>, In the United States District Court for the Western District of Washington at Seattle, Case No. C14-1351-RAJ, September 29, 2016.

Deposition of Debra J. Aron in <u>Southwestern Bell Telephone Co., et al. v. V247 Telecom, LLC, et al.</u>, In the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:14-CV-01409-M, August 31, 2016.

Hearing Testimony of Dr. Debra J. Aron in <u>Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042</u>, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, July 20, 2016.

Prefiled Written Rebuttal Testimony of Dr. Debra J. Aron in Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, July 15, 2016.

Prefiled Written Testimony of Dr. Debra J. Aron in Order Instituting Investigation into the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Questions raised in the Limited Rehearing of Decision 08-09-042, Before the Public Utilities Commission of the State of California, Investigation 15-11-007, June 1, 2016 and March 5, 2016.

Deposition of Debra J. Aron in Ramzy Ayyad, et al. v. Sprint Spectrum, L.P., In the Superior Court of the State of California for the County of Alameda, Case No.: RG03-121510, March 29, 2016.

Deposition of Debra J. Aron in Avnet, Inc. and BSP Software, LLC v. Motio, Inc., In the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:12-cv-2100, March 9, 2016.

Deposition of Debra J. Aron in Lena K. Thodos and David Miller, et al. v. Nicor, Inc., et al., In the Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No.: 1:12-cv-2100, February 22, 2016.

Deposition of Debra J. Aron in Henry Espejo v. Santander Consumer USA, Inc., In the United States District Court for the Northern District of Illinois, Eastern Division, Case No.: 1:11-cv-08987, January 12, 2016.

Deposition of Debra J. Aron in Rachel Johnson, et al., v. Yahoo!, Inc. and Zenaida Calderin, et al. v. Yahoo!, Inc., in the United States District Court for the Northern District of Illinois, Eastern Division, Case Nos.: 14-cv-2028 and 14-cv-2753 and Rafael David Sherman, et al., v. Yahoo!, Inc., In the United States District Court for the Southern District of California, Case No.: 13-CV-00041-GPC-WVG (Combined), June 23, 2015.

Trial Testimony of Debra J. Aron in Salsgiver Communications, Inc., et al., v. Consolidated Communications Holdings, Inc., et al., In the Court of Common Pleas, Allegheny County, Pennsylvania, Case No. No. GD 08-7616, May 2015.Communications Holdings, Inc., et al., In the Court of Common Pleas, Allegheny County, Pennsylvania, Case No. GD 08-7616, May 2015.

Deposition of Debra J. Aron in Herbert Chen et al. v. Robert Howard-Anderson et al., In the Court of Chancery of the State of Delaware, Case No. C.A. 5878-VCL, December 16, 2014.

Deposition of Debra J. Aron in Sprint Communications Company L.P. v. Comcast Cable Communications, LLC, et al., In the United States District Court for the District of Delaware, Case No. 1:12-cv-01013-RGA, November 20, 2014.

Testimony of Debra J. Aron in Bayer CropScience LP v. Albaugh, Inc., et al., Before the American Arbitration Association, Case No. 16-171-Y-00511-12, October 20-21, 2014.

Trial Testimony of Debra J. Aron in Comcast IP Holdings I, LLC v. Sprint Communications Company L.P., et al., In the United States District Court for the District of Delaware, Case No. 12-205-RGA (CJB), October 9, 2014.

Prefiled Written Reply Testimony of Debra J. Aron in The Utility Reform Network v. Pacific Bell Telephone Company, Before the Public Utilities Commission of the State of California, Case No. 13-12-005, October 3, 2014.

Deposition of Debra J. Aron in Amanda Balschmiter, et al., v. TD Auto Finance, LLC, In the United States District Court, Northern District of Illinois, Eastern Division, Case No. 13cv1186, September 10, 2014.

Prefiled Written Testimony of Debra J. Aron in The Utility Reform Network v. Pacific Bell Telephone Company, Before the Public Utilities Commission of the State of California, Case No. 13-12-005, August 22, 2014.

Deposition of Debra J. Aron in Grant Birchmeier, et al., v. Caribbean Cruise Line, Inc., et al., In the United States District Court, Northern District of Illinois, Eastern Division, Case No. 12 CV 4069, July 19, 2014.

Deposition of Debra J. Aron in Comcast IP Holdings I, LLC v. Sprint Communications Company L.P., et al., United States District Court for the District of Delaware, Case No. 12-205-RGA(CJB), July 11, 2014.

Deposition of Debra J. Aron in In re: Methyl Tertiary Butyl Ether Products Liability Litigation, Commonwealth of Puerto Rico, et al., v. Shell Oil Co., et al., In the United States District Court, Southern District of New York, Case No. 07 Civ. 10470, May 27, 2014.

Depositions of Debra J. Aron in In re: Polyurethane Foam Antitrust Litigation, General Motors, L.L.C. v. Carpenter Co., et al., In the United States District Court for the Northern District of Ohio, Western Division, Case No. 3:12-pf-10027-JZ, April 30, 2014 and September 8, 2014.

Trial Testimony of Debra J. Aron in Seth Warnick, et al., v. Dish Network, L.L.C., In the United States District Court, District of Colorado, Civil Action No. 12-cv-01952-WYD, March 20, 2014.

Deposition of Debra J. Aron in Seth Warnick, et al., v. Dish Network, L.L.C., In the United States District Court, District of Colorado, Civil Action No. 12-cv-01952-WYD, September 25, 2013.

Deposition of Debra J. Aron in In re: Methyl Tertiary Butyl Ether ("MTBE") Product Liability Litigation, New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al., In the United States District Court, Southern District of New York, No. 08 Civ. 312, May 29, 2013.

Prefiled Written Testimony and Reply Testimony of Debra J. Aron in In the Matter of the Petition Filed by ALASCOM, INC. d/b/a AT&T ALASKA to be Relieved of its Carrier of Last Resort Responsibilities in Certain Locations in Southwest Alaska, Before the Regulatory Commission of Alaska, Docket No. U-12-127, April 1, 2013 and January 17, 2013.

Deposition of Debra J. Aron in <u>William Douglas Fulghum, et al., v. Embarq Corporation, et al.</u>, In the United States District Court for the District of Kansas, Civil Action No.: 07-CV-2602 (EFM/JPO), November 29, 2011.

Deposition of Debra J. Aron in <u>Southwestern Bell Telephone Company, et al., v. IDT Telecom, Inc., et al.</u>, In the United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3-09-CV-1268-P, November 10, 2011.

Direct and Rebuttal Testimony of Debra J. Aron in the <u>Matter of Petition of Sprint to Reduce Intrastate Switched Access Rates of Incumbent Local Exchange Carriers in North Carolina</u>, Before the North Carolina Utilities Commission, Docket No. P-100, Sub 167, August 18, 2011 and September 27, 2011.

Prefiled Written Testimony and Rebuttal Testimony of Debra J. Aron in the <u>Matter of: An Investigation Into the Intrastate Switched Access Rates of All Kentucky Incumbent and Competitive Local Exchange Carriers</u>, Commonwealth of Kentucky, Before the Public Service Commission, Docket No. 2010-00398, September 30, 2011, and July 8, 2011.

Testimony of Debra J. Aron before the Utilities Committee of the Kansas Legislature regarding the status of competition in telecommunications markets in Kansas, February 2011.

Testimony of Debra J. Aron before the Telecommunications Committee of the Legislature of the state of Washington regarding the consumer benefits and competitive effects of switched access reform, February 2011.

## Professional organizations

Member, American Economic Association

Member, Econometric Society

Associate Member, American Bar Association

Past Member, Telecommunications Policy Research Conference Program Committee

## Honors and awards

Guthman Research Chair, Kellogg Graduate School of Management, Northwestern University, Summer 1994.

Hoover National Fellowship, Hoover Institution, 1992-1993.

Faculty Research Fellow, National Bureau of Economic Research, 1987-1990.

PepsiCo Research Chair, Northwestern University, 1990.

Kellogg Research Professorship, Northwestern University, 1989.

National Science Foundation Research Grant, 1987-1988.

Buchanan Chair, Kellogg Graduate School of Management, Northwestern University, 1987-1988.

IBM Chair, Kellogg Graduate School of Management, Northwestern University, 1986-1987.

## Teaching

Courses taught: Pricing Strategy; Information, Communication, and Competition (economics of strategy and competition); Intermediate Microeconomic Theory; Managerial Economics (microeconomic theory as applied to business strategy and decision making) at the M.B.A. level, The Economics of Information at the Ph.D. level.

Also qualified to teach: graduate Microeconomic Theory; Industrial Organization and Labor Economics; the Economics of Personnel; Public Finance; Project Evaluation; Applied Game Theory.

## Professional history

| | |
|---|---|
| 2019–Present | *Vice President*, Charles River Associates, Chicago, IL |
| 2018–2019 | *Principal and Senior Managing Director*, Ankura Consulting Group, Chicago, IL |
| 2010-2018 | *Principal and Managing Director*, Navigant Economics, Chicago, IL |
| 2000-2016 | *Adjunct Associate Professor*, Northwestern University, Evanston, IL |
| 1995-2010 | *Managing Director*, LECG, LLC, Evanston, IL |
| 1993-1995 | *Visiting Assistant Professor of Managerial Economics*, Northwestern University, Evanston, IL |
| 1985-1992 | *Assistant Professor of Managerial Economics*, Northwestern University, Evanston, IL |
| 1992-1993 | *National Fellow*, Hoover Institution at Stanford University, Stanford, CA |
| 1983-1984 | *Instructor*, University of Chicago Department of Economics, Chicago, IL |
| 1979-1980 | *Staff Economist*, Civil Aeronautics Board, Office of Economic Analysis, Washington, D.C. |

September 2020

**Exhibit 3**
**PA & NY Agway Electric Residential Customer Base**
December 2019

| Utility Footprint | Number of Agway Accounts in Utility Footprint |
|---|---|
| **New York** | |
| National Grid | 12,668 |
| New York State Electric and Gas | 4,070 |
| Rochester Gas & Electric | 1,133 |
| Central Hudson | 972 |
| Con Edison | 4,381 |
| Orange & Rockland | 1,021 |
| **All** | **24,245** |
| **Pennsylvania** | |
| West Penn Power | 689 |
| Pennsylvania Electric Company | 423 |
| Pennsylvania Power | 254 |
| Metropolitan Edison | 243 |
| PECO Energy | 204 |
| Duquesne Light Company | 173 |
| PPL Electric Utilities | 342 |
| **All** | **2,328** |
| **Total** | |
| **All** | **26,573** |

**Source:** AGWAY 762719

PRIVILEGED AND CONFIDENTIAL

**Exhibit 10**
**Utility Zones and Zones Served by Agway, Q2 2014-Q4 2019**

| Utility Territory | Utility Zones | Sources for Column [B] | Agway Zones Served | All Zones Served by Agway? |
|---|---|---|---|---|
| **[A]** | **[B]** | **[C]** | **[D]** | **[E]** |
| NY State Electric & Gas | A,B,C,D,E,F,G,H | [2] | A,C,D,E,F,G,H | No |
| Rochester Gas & Electric | A,B,C | [3] | B | No |
| Central Hudson | E,G | [4],[5],[6] | E,G | Yes |
| National Grid | A,B,C,D,E,F | [7] | A,B,C,D,E,F | Yes |
| Orange & Rockland | G | [6],[8] | G | Yes |
| Con Edison | H,I,J | [9] | H,I,J | Yes |

**Note:** While most or all of Orange & Rockland territory is located in zone G, we could not verify that Orange & Rockland serves only zone G nor could inquiries to Orange & Rockland customer service or inquiries to the New York State Department of Public Service confirm that Orange & Rockland's territory does or does not extend past the boundaries of zone G.

**Sources:**
[1] *Agway's Sales Detail Reports*
[2] "ISO Maps," NYSEG,
https://www.nyseg.com/wps/portal/nyseg/networksfooter/suppliersandpartners/servicesandresources/isomaps
[3] "ISO Maps," RG&E,
https://www.rge.com/wps/portal/rge/networksfooter/suppliersandpartners/servicesandresources/isomaps/!ut/p/
z0/fU69DoIwGHwWB0bzVSAGR9IYjQaiW-liGiy1im35WoiPbxmMi3G7u9wfcGDAjZi0EkFbI_rIG76-
ZKtqu88pqXeboiRnQmlxqo8pyTM4AP9viA0pVrRSwJ0It6U2nQXmJU66lV6YK0pvR4wYmPb2KZyfM_o-
DLwE3loT5CsAQyWFwsv3XUI6a4PEhPjRuV5LnNucwGAijOqPiYR8JtyDN4UvF2815gKS/
[4] "Central Hudson Hourly Pricing Provision," Central Hudson, September 14-16, 2020,
https://www.cenhud.com/globalassets/pdf/fall2010hpp_chpresent.pdf.
[5] Central Hudson outage map, accessed September 21, 2020, https://stormcentral.cenhud.com/.
[6] "NYISO Zones and Energy Facilities in NY State," New York State Department of Public Service,
accessed September 21, 2020,
https://www.arcgis.com/apps/SimpleViewer/index.html?appid=57dee4f96ed041ed8b68af7d314c0137.
[7] "Load Zones," National Grid, accessed September 21, 2020,
https://www9.nationalgridus.com/niagaramohawk/non_html/rates_load_zones.pdf.
[8] Orange & Rockland outage map, accessed September 21, 2020,
https://outagemap.oru.com/external/default.html.
[9] Con Edison zones, accessed September 21, 2020,
https://apps.coned.com/CEMyAccount/CSOL/LoadZone.aspx.

**Exhibit 11**
**Utilities, Quarters, and the Number of ESCOs in the Data Used to Compare Agway's Calculated Variable Rate with Other ESCOs' Reported Variable Rates**

| Utility Territory | Quarters | Number of ESCOs Excluding Agway |
|---|---|---|
| Central Hudson | 2014 Q2-2019 Q4 | 18 |
| Con Edison | 2015 Q4-2019 Q4 | 44 |
| National Grid | 2015 Q2-2019 Q4 | 21 |
| NY State Electric & Gas | 2015 Q1-2019 Q4 | 14 |
| Orange & Rockland | 2014 Q2-2019 Q4 | 27 |
| Rochester Gas & Electric | 2014 Q2-2019 Q4 | 23 |

**Sources:**
[1] Exhibit 12
[2] ESCOs' historical pricing data from the NY PSC website (Matter Number 14-02555), at
http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=46965&MNO=14-02555.

**Exhibit 12**
**Comparison of Agway's Calculated Weighted Average Variable Rate with Other ESCOs' Reported Variable Rates by Utility and Quarter**

| Utility Territory | Quarter | Number of ESCOs Excluding Agway | Median Variable Rate per kWh (Excluding Agway's Calculated Weighted Average Variable Rate) | Maximum Variable Rate per kWh (Excluding Agway's Calculated Weighted Average Variable Rate) | Agway's Calculated Weighted Average Variable Rate per kWh | Is Agway's Calculated Weighted Average Variable Rate below the Median Variable Rate? | Is Agway's Calculated Weighted Average Variable Rate below the Maximum Variable Rate? |
|---|---|---|---|---|---|---|---|
| Central Hudson | 2014 Q2 | 8 | $ 0.131 | $ 0.150 | $ 0.112 | Yes | Yes |
| Central Hudson | 2014 Q3 | 6 | $ 0.120 | $ 0.148 | $ 0.100 | Yes | Yes |
| Central Hudson | 2014 Q4 | 6 | $ 0.114 | $ 0.148 | $ 0.098 | Yes | Yes |
| Central Hudson | 2015 Q1 | 6 | $ 0.127 | $ 0.164 | $ 0.114 | Yes | Yes |
| Central Hudson | 2015 Q2 | 6 | $ 0.122 | $ 0.150 | $ 0.102 | Yes | Yes |
| Central Hudson | 2015 Q3 | 9 | $ 0.118 | $ 0.911 | $ 0.091 | Yes | Yes |
| Central Hudson | 2015 Q4 | 8 | $ 0.108 | $ 0.149 | $ 0.088 | Yes | Yes |
| Central Hudson | 2016 Q1 | 7 | $ 0.100 | $ 0.128 | $ 0.080 | Yes | Yes |
| Central Hudson | 2016 Q2 | 8 | $ 0.111 | $ 0.127 | $ 0.079 | Yes | Yes |
| Central Hudson | 2016 Q3 | 4 | $ 0.116 | $ 0.129 | $ 0.093 | Yes | Yes |
| Central Hudson | 2016 Q4 | 5 | $ 0.112 | $ 0.130 | $ 0.084 | Yes | Yes |
| Central Hudson | 2017 Q1 | 8 | $ 0.105 | $ 0.140 | $ 0.091 | Yes | Yes |
| Central Hudson | 2017 Q2 | 5 | $ 0.115 | $ 0.149 | $ 0.092 | Yes | Yes |
| Central Hudson | 2017 Q3 | 5 | $ 0.110 | $ 0.147 | $ 0.093 | Yes | Yes |
| Central Hudson | 2017 Q4 | 5 | $ 0.110 | $ 0.147 | $ 0.081 | Yes | Yes |
| Central Hudson | 2018 Q1 | 7 | $ 0.139 | $ 0.160 | $ 0.113 | Yes | Yes |
| Central Hudson | 2018 Q2 | 8 | $ 0.124 | $ 0.148 | $ 0.100 | Yes | Yes |
| Central Hudson | 2018 Q3 | 6 | $ 0.124 | $ 0.145 | $ 0.111 | Yes | Yes |
| Central Hudson | 2018 Q4 | 7 | $ 0.122 | $ 0.160 | $ 0.103 | Yes | Yes |
| Central Hudson | 2019 Q1 | 9 | $ 0.110 | $ 0.139 | $ 0.088 | Yes | Yes |
| Central Hudson | 2019 Q2 | 8 | $ 0.108 | $ 0.140 | $ 0.084 | Yes | Yes |
| Central Hudson | 2019 Q3 | 7 | $ 0.108 | $ 0.140 | $ 0.086 | Yes | Yes |
| Central Hudson | 2019 Q4 | 8 | $ 0.108 | $ 0.140 | $ 0.081 | Yes | Yes |
| Con Edison | 2015 Q4 | 12 | $ 0.130 | $ 0.165 | $ 0.110 | Yes | Yes |
| Con Edison | 2016 Q1 | 12 | $ 0.131 | $ 0.145 | $ 0.096 | Yes | Yes |
| Con Edison | 2016 Q2 | 14 | $ 0.123 | $ 0.160 | $ 0.096 | Yes | Yes |
| Con Edison | 2016 Q3 | 10 | $ 0.124 | $ 0.183 | $ 0.108 | Yes | Yes |
| Con Edison | 2016 Q4 | 13 | $ 0.129 | $ 0.197 | $ 0.102 | Yes | Yes |
| Con Edison | 2017 Q1 | 16 | $ 0.111 | $ 0.182 | $ 0.103 | Yes | Yes |
| Con Edison | 2017 Q2 | 14 | $ 0.118 | $ 0.183 | $ 0.105 | Yes | Yes |
| Con Edison | 2017 Q3 | 13 | $ 0.124 | $ 0.195 | $ 0.112 | Yes | Yes |
| Con Edison | 2017 Q4 | 13 | $ 0.123 | $ 0.196 | $ 0.100 | Yes | Yes |
| Con Edison | 2018 Q1 | 25 | $ 0.133 | $ 0.200 | $ 0.122 | Yes | Yes |
| Con Edison | 2018 Q2 | 28 | $ 0.106 | $ 0.206 | $ 0.102 | Yes | Yes |
| Con Edison | 2018 Q3 | 24 | $ 0.111 | $ 0.206 | $ 0.110 | Yes | Yes |
| Con Edison | 2018 Q4 | 22 | $ 0.116 | $ 0.206 | $ 0.108 | Yes | Yes |
| Con Edison | 2019 Q1 | 22 | $ 0.113 | $ 0.206 | $ 0.094 | Yes | Yes |
| Con Edison | 2019 Q2 | 17 | $ 0.108 | $ 0.206 | $ 0.091 | Yes | Yes |
| Con Edison | 2019 Q3 | 19 | $ 0.107 | $ 0.206 | $ 0.104 | Yes | Yes |
| Con Edison | 2019 Q4 | 17 | $ 0.131 | $ 0.206 | $ 0.100 | Yes | Yes |
| NY State Electric & Gas | 2015 Q1 | 4 | $ 0.126 | $ 0.176 | $ 0.105 | Yes | Yes |
| NY State Electric & Gas | 2015 Q2 | 5 | $ 0.130 | $ 0.146 | $ 0.079 | Yes | Yes |
| NY State Electric & Gas | 2015 Q3 | 4 | $ 0.103 | $ 0.120 | $ 0.083 | Yes | Yes |
| NY State Electric & Gas | 2015 Q4 | 6 | $ 0.100 | $ 0.118 | $ 0.075 | Yes | Yes |
| NY State Electric & Gas | 2016 Q1 | 4 | $ 0.100 | $ 0.120 | $ 0.069 | Yes | Yes |
| NY State Electric & Gas | 2016 Q2 | 6 | $ 0.105 | $ 0.120 | $ 0.070 | Yes | Yes |
| NY State Electric & Gas | 2016 Q3 | 4 | $ 0.106 | $ 0.119 | $ 0.086 | Yes | Yes |
| NY State Electric & Gas | 2016 Q4 | 7 | $ 0.100 | $ 0.122 | $ 0.075 | Yes | Yes |
| NY State Electric & Gas | 2017 Q1 | 7 | $ 0.109 | $ 0.139 | $ 0.076 | Yes | Yes |
| NY State Electric & Gas | 2017 Q2 | 4 | $ 0.114 | $ 0.140 | $ 0.078 | Yes | Yes |
| NY State Electric & Gas | 2017 Q3 | 4 | $ 0.101 | $ 0.140 | $ 0.083 | Yes | Yes |
| NY State Electric & Gas | 2017 Q4 | 5 | $ 0.110 | $ 0.130 | $ 0.073 | Yes | Yes |
| NY State Electric & Gas | 2018 Q1 | 8 | $ 0.116 | $ 0.170 | $ 0.092 | Yes | Yes |
| NY State Electric & Gas | 2018 Q2 | 8 | $ 0.110 | $ 0.154 | $ 0.079 | Yes | Yes |
| NY State Electric & Gas | 2018 Q3 | 6 | $ 0.118 | $ 0.167 | $ 0.095 | Yes | Yes |
| NY State Electric & Gas | 2018 Q4 | 5 | $ 0.120 | $ 0.160 | $ 0.086 | Yes | Yes |
| NY State Electric & Gas | 2019 Q1 | 7 | $ 0.120 | $ 0.447 | $ 0.081 | Yes | Yes |
| NY State Electric & Gas | 2019 Q2 | 6 | $ 0.114 | $ 0.367 | $ 0.073 | Yes | Yes |

PRIVILEGED AND CONFIDENTIAL

**Exhibit 12**
**Comparison of Agway's Calculated Weighted Average Variable Rate with Other ESCOs' Reported Variable Rates by Utility and Quarter**

| Utility Territory | Quarter | Number of ESCOs Excluding Agway | Median Variable Rate per kWh (Excluding Agway's Calculated Weighted Average Rate) | Maximum Variable Rate per kWh (Excluding Agway's Calculated Weighted Average Rate) | Agway's Calculated Weighted Average Variable Rate per kWh | Is Agway's Calculated Weighted Average Variable Rate below the Median Variable Rate? | Is Agway's Calculated Weighted Average Variable Rate below the Maximum Variable Rate? |
|---|---|---|---|---|---|---|---|
| NY State Electric & Gas | 2019 Q3 | 5 | $ 0.125 | $ 0.146 | $ 0.077 | Yes | Yes |
| NY State Electric & Gas | 2019 Q4 | 7 | $ 0.120 | $ 0.146 | $ 0.069 | Yes | Yes |
| National Grid | 2015 Q2 | 9 | $ 0.120 | $ 0.140 | $ 0.079 | Yes | Yes |
| National Grid | 2015 Q3 | 11 | $ 0.108 | $ 0.128 | $ 0.081 | Yes | Yes |
| National Grid | 2015 Q4 | 11 | $ 0.105 | $ 0.126 | $ 0.077 | Yes | Yes |
| National Grid | 2016 Q1 | 7 | $ 0.099 | $ 0.121 | $ 0.073 | Yes | Yes |
| National Grid | 2016 Q2 | 9 | $ 0.099 | $ 0.127 | $ 0.070 | Yes | Yes |
| National Grid | 2016 Q3 | 4 | $ 0.116 | $ 0.121 | $ 0.084 | Yes | Yes |
| National Grid | 2016 Q4 | 9 | $ 0.098 | $ 0.121 | $ 0.072 | Yes | Yes |
| National Grid | 2017 Q1 | 8 | $ 0.112 | $ 0.133 | $ 0.084 | Yes | Yes |
| National Grid | 2017 Q2 | 5 | $ 0.090 | $ 0.139 | $ 0.075 | Yes | Yes |
| National Grid | 2017 Q3 | 6 | $ 0.094 | $ 0.139 | $ 0.079 | Yes | Yes |
| National Grid | 2017 Q4 | 6 | $ 0.096 | $ 0.139 | $ 0.071 | Yes | Yes |
| National Grid | 2018 Q1 | 8 | $ 0.114 | $ 0.140 | $ 0.088 | Yes | Yes |
| National Grid | 2018 Q2 | 9 | $ 0.112 | $ 0.170 | $ 0.073 | Yes | Yes |
| National Grid | 2018 Q3 | 8 | $ 0.115 | $ 0.135 | $ 0.085 | Yes | Yes |
| National Grid | 2018 Q4 | 11 | $ 0.105 | $ 0.139 | $ 0.083 | Yes | Yes |
| National Grid | 2019 Q1 | 10 | $ 0.112 | $ 0.136 | $ 0.093 | Yes | Yes |
| National Grid | 2019 Q2 | 7 | $ 0.088 | $ 0.140 | $ 0.072 | Yes | Yes |
| National Grid | 2019 Q3 | 5 | $ 0.108 | $ 0.140 | $ 0.072 | Yes | Yes |
| National Grid | 2019 Q4 | 10 | $ 0.093 | $ 0.140 | $ 0.067 | Yes | Yes |
| Orange & Rockland | 2014 Q2 | 12 | $ 0.131 | $ 0.185 | $ 0.120 | Yes | Yes |
| Orange & Rockland | 2014 Q3 | 8 | $ 0.111 | $ 0.148 | $ 0.115 | No | Yes |
| Orange & Rockland | 2014 Q4 | 8 | $ 0.111 | $ 0.165 | $ 0.103 | Yes | Yes |
| Orange & Rockland | 2015 Q1 | 10 | $ 0.129 | $ 0.186 | $ 0.123 | Yes | Yes |
| Orange & Rockland | 2015 Q2 | 12 | $ 0.123 | $ 0.179 | $ 0.096 | Yes | Yes |
| Orange & Rockland | 2015 Q3 | 12 | $ 0.121 | $ 0.144 | $ 0.099 | Yes | Yes |
| Orange & Rockland | 2015 Q4 | 13 | $ 0.110 | $ 0.143 | $ 0.090 | Yes | Yes |
| Orange & Rockland | 2016 Q1 | 9 | $ 0.110 | $ 0.144 | $ 0.084 | Yes | Yes |
| Orange & Rockland | 2016 Q2 | 13 | $ 0.107 | $ 0.144 | $ 0.082 | Yes | Yes |
| Orange & Rockland | 2016 Q3 | 8 | $ 0.116 | $ 0.146 | $ 0.102 | Yes | Yes |
| Orange & Rockland | 2016 Q4 | 9 | $ 0.112 | $ 0.140 | $ 0.089 | Yes | Yes |
| Orange & Rockland | 2017 Q1 | 12 | $ 0.116 | $ 0.142 | $ 0.096 | Yes | Yes |
| Orange & Rockland | 2017 Q2 | 9 | $ 0.117 | $ 0.150 | $ 0.093 | Yes | Yes |
| Orange & Rockland | 2017 Q3 | 8 | $ 0.120 | $ 0.150 | $ 0.105 | Yes | Yes |
| Orange & Rockland | 2017 Q4 | 9 | $ 0.120 | $ 0.141 | $ 0.089 | Yes | Yes |
| Orange & Rockland | 2018 Q1 | 12 | $ 0.127 | $ 0.180 | $ 0.115 | Yes | Yes |
| Orange & Rockland | 2018 Q2 | 12 | $ 0.128 | $ 0.162 | $ 0.095 | Yes | Yes |
| Orange & Rockland | 2018 Q3 | 9 | $ 0.133 | $ 0.174 | $ 0.115 | Yes | Yes |
| Orange & Rockland | 2018 Q4 | 10 | $ 0.127 | $ 0.225 | $ 0.105 | Yes | Yes |
| Orange & Rockland | 2019 Q1 | 12 | $ 0.124 | $ 0.146 | $ 0.092 | Yes | Yes |
| Orange & Rockland | 2019 Q2 | 9 | $ 0.116 | $ 0.145 | $ 0.083 | Yes | Yes |
| Orange & Rockland | 2019 Q3 | 8 | $ 0.113 | $ 0.146 | $ 0.089 | Yes | Yes |
| Orange & Rockland | 2019 Q4 | 8 | $ 0.121 | $ 0.146 | $ 0.082 | Yes | Yes |
| Rochester Gas & Electric | 2014 Q2 | 11 | $ 0.122 | $ 0.920 | $ 0.097 | Yes | Yes |
| Rochester Gas & Electric | 2014 Q3 | 6 | $ 0.107 | $ 0.136 | $ 0.091 | Yes | Yes |
| Rochester Gas & Electric | 2014 Q4 | 5 | $ 0.099 | $ 0.154 | $ 0.083 | Yes | Yes |
| Rochester Gas & Electric | 2015 Q1 | 8 | $ 0.110 | $ 0.157 | $ 0.095 | Yes | Yes |
| Rochester Gas & Electric | 2015 Q2 | 9 | $ 0.110 | $ 0.129 | $ 0.074 | Yes | Yes |
| Rochester Gas & Electric | 2015 Q3 | 10 | $ 0.106 | $ 0.128 | $ 0.079 | Yes | Yes |
| Rochester Gas & Electric | 2015 Q4 | 11 | $ 0.100 | $ 0.114 | $ 0.071 | Yes | Yes |
| Rochester Gas & Electric | 2016 Q1 | 9 | $ 0.099 | $ 0.110 | $ 0.063 | Yes | Yes |
| Rochester Gas & Electric | 2016 Q2 | 15 | $ 0.099 | $ 0.120 | $ 0.066 | Yes | Yes |
| Rochester Gas & Electric | 2016 Q3 | 8 | $ 0.101 | $ 0.116 | $ 0.083 | Yes | Yes |
| Rochester Gas & Electric | 2016 Q4 | 9 | $ 0.099 | $ 0.133 | $ 0.072 | Yes | Yes |
| Rochester Gas & Electric | 2017 Q1 | 11 | $ 0.100 | $ 0.139 | $ 0.071 | Yes | Yes |
| Rochester Gas & Electric | 2017 Q2 | 10 | $ 0.099 | $ 0.133 | $ 0.075 | Yes | Yes |
| Rochester Gas & Electric | 2017 Q3 | 7 | $ 0.099 | $ 0.119 | $ 0.081 | Yes | Yes |

PRIVILEGED AND CONFIDENTIAL

**Exhibit 12**
**Comparison of Agway's Calculated Weighted Average Variable Rate with Other ESCOs' Reported Variable Rates by Utility and Quarter**

| Utility Territory | Quarter | Number of ESCOs Excluding Agway | Median Variable Rate per kWh (Excluding Agway's Calculated Weighted Average Variable Rate) | Maximum Variable Rate per kWh (Excluding Agway's Calculated Weighted Average Variable Rate) | Agway's Calculated Weighted Average Variable Rate per kWh | Is Agway's Calculated Weighted Average Variable Rate below the Median Variable Rate? | Is Agway's Calculated Weighted Average Variable Rate below the Maximum Variable Rate? |
|---|---|---|---|---|---|---|---|
| Rochester Gas & Electric | 2017 Q4 | 7 | $ 0.103 | $ 0.119 | $ 0.070 | Yes | Yes |
| Rochester Gas & Electric | 2018 Q1 | 10 | $ 0.101 | $ 0.170 | $ 0.086 | Yes | Yes |
| Rochester Gas & Electric | 2018 Q2 | 9 | $ 0.106 | $ 0.138 | $ 0.086 | Yes | Yes |
| Rochester Gas & Electric | 2018 Q3 | 7 | $ 0.118 | $ 0.145 | $ 0.094 | Yes | Yes |
| Rochester Gas & Electric | 2018 Q4 | 7 | $ 0.120 | $ 0.142 | $ 0.083 | Yes | Yes |
| Rochester Gas & Electric | 2019 Q1 | 8 | $ 0.112 | $ 0.123 | $ 0.077 | Yes | Yes |
| Rochester Gas & Electric | 2019 Q2 | 5 | $ 0.120 | $ 0.135 | $ 0.068 | Yes | Yes |
| Rochester Gas & Electric | 2019 Q3 | 4 | $ 0.121 | $ 0.135 | $ 0.071 | Yes | Yes |
| Rochester Gas & Electric | 2019 Q4 | 7 | $ 0.118 | $ 0.133 | $ 0.066 | Yes | Yes |

**Total Share of "Yes"**                                                                                                 99%                100%

**Notes:**
[1] For this analysis, I used ESCOs' historical pricing data reported on the NY PSC website, corresponding to the matter number 14-02555. I used data recorded in document types "Reports," "Correspondence," and "Exhibits." In my analysis, I used all the data reported in Excel format. I excluded data for County Energy Corp., M&R Energy Resources Corporation, and South Jersey Energy Company that were reported in Excel files but in a different format than all the other data. I included variable rates for electric service for residential customers for utility territories in which Agway provided service from 2014 Q2 through 2019 Q4. I excluded quarters in which Agway did not provide EnergyGuard (as indicated in Exhibit 5). I restricted the data to include only those ESCOs that reported a single price for all utility zones.
[2] For instances when several variable rates were reported by the same ESCO for the same utility territoryand quarter, I used an average of these rates when these rates were filed on the same day as reported in the "Date Filed" field on the NY PSC website and I used the most recently filed variable rate when variable rates were filed on different dates.
[3] I excluded variable rates above $2 and at or below $0.
[4] When the ESCO's name was missing in the file submitted to the NY PSC, I used the ESCO's name listed in the field "Filing On Behalf Of" on the NY PSC website.
[5] When the quarter and year associated with the filed rate were missing, I used the quarter and year from the "File Name" filed on the NY PSC website.
[6] Agway operated in all zones in the Central Hudson, Con Edison, National Grid, and Orange & Rockland territories during Q2 2014 through Q4 2019. Agway operated in zones A, C, D, E, F, G, H and did not operate in zone B in the NY State Electric & Gas territory. Agway operated in zone B and did not operate in zones A and C in the Rochester Gas & Electric territory from Q2 2014 through Q4 2019.
[7] Agway's calculated weighted average variable rate is the weighted average variable rate calculated using Agway COS Summary data as follows:

$$weighted\ average\ variable\ rate_{jq} = \frac{total\ revenues_{jq}}{total\ kWh_{jq}},$$ where $j$ denotes a utility's territory and $q$ denotes quarter. Agway's calculated weighted average variable rate for 2019 Q4 was calculated based on data from October and November 2019.

**Sources:**
[1] ESCOs' historical pricing data from the NY PSC website (Matter Number 14-02555), at
http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=46965&MNO=14-02555.
[2] *Agway COS Summary Data*
[3] Exhibit 10

PRIVILEGED AND CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2016q1

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even,
the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2016q2

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even, the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



# NY ESCOs' Variable Rates: Central Hudson, 2016q3

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even, the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2016q4

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even, the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2017q1

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even,
the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2017q2

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even,
the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2017q3

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even,
the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

PRIVILEGED AND CONFIDENTIAL.



NY ESCOs' Variable Rates: Central Hudson, 2017q4

Average Rate in $ per kWh

Sources:
[1] ESCOs' historical rates submitted to the NY PSC
[2] Exhibit 12
Notes:
[1] Red horizontal line shows Agway's calculated weighted average variable rate per kWh.
[2] Green horizontal line shows the median variable rate per kWh (excluding Agway). When the number of ESCOs is even, the median is calculated as the average of the two central ordered observations.
[3] ESCOs' full names are reported in Exhibit 21.

**Exhibit 21**
**List of New York ESCOs Used for Pricing Analysis**

| ESCO Name | ESCO's Name as It Appears in Charts |
|---|---|
| ABN Energy, LLC d/b/a GreatEnergyRebate.com | ESCO 1 |
| AMERISTAR ENERGY, LLC | ESCO 2 |
| AP Gas & Electric (NY), LLC | ESCO 3 |
| ASC Energy Services, Inc. | ESCO 4 |
| Abest Power & Gas, LLC | ESCO 5 |
| Agera Energy,LLC | ESCO 6 |
| All American Power Gas, LLC | ESCO 7 |
| All Choice Energy, LLC | ESCO 8 |
| Alpha Gas and Electric, LLC | ESCO 9 |
| Ambit New York, LLC | ESCO 10 |
| Astral Energy LLC | ESCO 11 |
| Atlantic Energy, LLC | ESCO 12 |
| Atlantic Power & Gas LLC | ESCO 13 |
| BBPC, LLC d/b/a Great Eastern Energy | ESCO 14 |
| BLUCO ENERGY, LLC | ESCO 15 |
| BlueRock Energy, Inc. | ESCO 16 |
| Bounce Energy NY LLC | ESCO 17 |
| Brown's Energy Services, LLC | ESCO 18 |
| Buy Energy Direct, LLC | ESCO 19 |
| CenStar Energy Corp. | ESCO 20 |
| Chief Energy Power, LLC | ESCO 21 |
| Citizens Choice Energy, LLC d/b/a AmeriChoice Energy | ESCO 22 |
| City Power & Gas, LLC | ESCO 23 |
| Clearview Electric, Inc. d/b/a Clearview Energy | ESCO 24 |
| Commerce Energy, Inc. d/b/a Amigo Energy | ESCO 25 |
| Consolidated Edison Solutions, Inc. | ESCO 26 |
| Constellation Energy Power Choice, LLC | ESCO 27 |
| Constellation Energy Services of New York, Inc. | ESCO 28 |
| Constellation NewEnergy, Inc. | ESCO 29 |
| Direct Energy Services | ESCO 30 |
| Drift Marketplace, Inc. | ESCO 31 |
| East Coast Power & Gas | ESCO 32 |
| Eligo Energy NY, LLC | ESCO 33 |
| Energy Cooperative of America, Inc. d/b/a Energy Cooperative of New York | ESCO 34 |
| Energy Plus Holdings LLC | ESCO 35 |
| Energy Technology Savings, Inc. DBA Logical Buildings | ESCO 36 |
| EnergyMark, LLC | ESCO 37 |
| Entrust Energy East, Inc. | ESCO 38 |
| Ethical Electric, Inc. d/b/a Clean Energy Option d/b/a CleanChoice Energy, Inc. | ESCO 39 |
| Family Energy, Inc. | ESCO 40 |
| First Choice Energy, LLC | ESCO 41 |

**Exhibit 21**
**List of New York ESCOs Used for Pricing Analysis**

| ESCO Name | ESCO's Name as It Appears in Charts |
|---|---|
| Flanders | ESCO 42 |
| Flanders Energy LLC | ESCO 43 |
| Frontier Utilities Northeast LLC | ESCO 44 |
| Galaxy | ESCO 45 |
| Galaxy Energy LLC | ESCO 46 |
| Gateway Energy Services Corp | ESCO 47 |
| Global Energy, LLC dba NYC Clean Energy | ESCO 48 |
| Great Eastern Energy | ESCO 49 |
| Greenlight Energy Inc. | ESCO 50 |
| HIKO Energy, LLC | ESCO 51 |
| Hudson Energy Services, LLC | ESCO 52 |
| IDT Energy, Inc. | ESCO 53 |
| IGS Energy | ESCO 54 |
| Infinite Energy Corp d/b/a Definite Energy Group | ESCO 55 |
| JOSCO Energy Corp. | ESCO 56 |
| Just Energy New York Corp. d/b/a Just Energy | ESCO 57 |
| Kiwi Energy NY LLC | ESCO 58 |
| L&L Energy LLC | ESCO 59 |
| Lexington Power & Light, LLC | ESCO 60 |
| Liberty Power Holdings, LLC | ESCO 61 |
| Major Energy Electric Services, LLC | ESCO 62 |
| Marathon Energy Corporation d/b/a Marathon Power | ESCO 63 |
| Maximum Power and Gas | ESCO 64 |
| Median Energy Corp. | ESCO 65 |
| Mitchell Supreme Fuel Co. d/b/a Supreme Energy | ESCO 66 |
| Mpower Energy, LLC | ESCO 67 |
| NRG Residential Solutions | ESCO 68 |
| NYSEG Solutions, LLC | ESCO 69 |
| National Gas & Electric, LLC | ESCO 70 |
| New Wave Energy Corporation | ESCO 71 |
| Next Utility Energy LLC | ESCO 72 |
| North American Power & Gas, LLC | ESCO 73 |
| North Energy Power, LLC | ESCO 74 |
| Oasis Energy | ESCO 75 |
| PURE | ESCO 76 |
| Pay Less Energy, LLC | ESCO 77 |
| Perigee Energy, LLC | ESCO 78 |
| Phoenix Energy Group, LLC | ESCO 79 |
| Plymouth Rock Energy LLC | ESCO 80 |
| Quantum Power Corp | ESCO 81 |
| Renaissance Power & Gas, Inc. | ESCO 82 |

**Exhibit 21**
**List of New York ESCOs Used for Pricing Analysis**

| ESCO Name | ESCO's Name as It Appears in Charts |
|---|---|
| Residents Energy, LLC | ESCO 83 |
| Robison Energy Commercial , LLC | ESCO 84 |
| Robison Energy, LLC | ESCO 85 |
| S.J.Energy Partners, Inc | ESCO 86 |
| SBR Energy, LLC | ESCO 87 |
| Smart One Energy, LLC | ESCO 88 |
| South Bay Energy Corp. | ESCO 90 |
| Sperian Energy Corp. | ESCO 91 |
| Starion Energy NY, Inc. | ESCO 92 |
| Stream Energy New York, LLC | ESCO 93 |
| Supreme Energy Inc. | ESCO 95 |
| U.S. Energy Partners LLC | ESCO 96 |
| Utility Expense Reduction, LLC | ESCO 97 |
| XOOM Energy New York, LLC | ESCO 98 |
| Zone One Energy LLC | ESCO 99 |

**Note:**
The ESCOs on this list are all the ESCOs in the data used in the analysis reported in Exhibit 6 and Exhibit 12. ESCOs on this list either reported residential variable rates to the NY PSC in utility territories, zones, and quarters in which Agway also reported residential variables rates to the NY PSC (Exhibit 6) or they reported one rate for all zones in utility territories and quarters in which Agway did not report residential variable rates to the NY PSC (Exhibit 12).

**Sources:**
[1] ESCOs' historical pricing data from the NY PSC website (Matter Number 14-02555), at http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=46965&MNO=14-02555.
[2] Exhibits 6 and 12