

Ryan Watstein<br>
Ryan@wtlaw.com<br>
404-782-0695

February 27, 2026

**VIA ECF**
Hon. Edgardo Ramos
U.S. District Court for the Southern District of New York
40 Foley Square
Courtroom 619
New York, NY 10007

> Re:   *Brous v. Eligo Energy, LLC*, 24 Civ. 1260 – Eligo's Pre-Motion Letter Request to File a Motion for Summary Judgment

Dear Judge Ramos:

Pursuant to Your Honor's Individual Rule § 2.ii, Defendants write to request a pre-motion conference to address Eligo's request for permission to file a motion for summary judgment. Defendants intend to move for summary judgment on all claims asserted by Plaintiffs, including their claims for breach of Eligo's customer contract, unjust enrichment, and alleged violations of New York consumer protection statutes. Thus, if successful, Defendants' motion will end this case.

Summary judgment is warranted because Plaintiffs' claims rest on a demonstrable mischaracterization of Eligo's customer contract as it pertains to setting variable rates for the supply of electricity. As relevant here, the contract for the supply of Plaintiffs' green electricity provides that variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" and "may be periodically adjusted for market conditions." The recorded third-party contract verification call through which Plaintiffs enrolled with Eligo—where Eligo read Plaintiffs the material terms and Plaintiffs verbally confirmed their agreement to each—provided non-exhaustive examples of "market price factors," including that Eligo's would employ "pricing strategies" in setting variable rates.

Plaintiffs attempt to twist this straightforward "market price factors" language into a "cost-plus" arrangement, under which Eligo's variable rate must equal the wholesale prices Eligo paid for energy plus an unspecified, "reasonable" margin determined unilaterally by Plaintiffs' counsel. *See* Second Amended Complaint ¶ 64 (alleging that "market pricing" means Eligo's "price to procure energy from the wholesale market" and "other market price factors" refers only to "ancillary fees charged on connection with wholesale supply purchases). Plaintiffs' expert witnesses have adopted this same misreading of Eligo's contract and baked it into Plaintiffs' damages model. *See* Expert Report of Edo Macan ¶ 130 (opining that "market pricing means the wholesale market"); ¶ 132 (stating that "other market price factors is a catchall that means the pass through of other small miscellaneous fees and charges associated with the wholesale market price . . .") Ironically, the "reasonable margin" that Plaintiffs' counsel manufactured would have

---

|  |  |  |
|:---:|:---:|:---:|
| **Atlanta** | **Los Angeles** | **Miami** |
| 75 14th Street NE, Ste. 2600 | 515 S. Flower Street, 19th Floor | 218 NW 24th Street, 3rd Floor |
| Atlanta, GA 30309 | Los Angeles, CA 90071 | Miami, FL 33127 |

 www.wtlaw.com      Ryan@wtlaw.com      404-782-0695

long ago put Eligo—and the other ESCOs with which Eligo competes in the ESCO electricity market—out of business.

There is no support for Plaintiffs' attempt to transform their ESCO "market" contract into "wholesale costs plus a margin determined by Plaintiff's counsel." For one thing, Eligo's contract doesn't use the words "wholesale market" or refer to Eligo's costs of procuring energy at all. For another, the Second Circuit has already held that ESCO contracts basing rates on broad concepts like "market conditions" can't be read to require an ESCO to restrict its variable rates to its energy procurement costs. *See Richards v. Direct Energy Servs.*, LLC., 915 F.3d 88, 97 (2d. Cir. 2019) (holding that an ESCO contract providing that variable rates would vary "based upon business and market conditions" did not "suggest that the variable rate bears a direct relationship to Direct Energy's procurement costs"); *see also Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 412 (2d Cir. 2023) (stating that "it is not clear to us that the term 'market-related factors' in the Agreement is synonymous with and limited to market costs such as the cost of procuring energy."). Plaintiffs' argument to the contrary ignores this line of authority and twists the language of Eligo's contract far beyond its plain meaning, which New York law does not allow.

Plaintiffs' allegations further ignore the fact that Eligo *necessarily* had contractual discretion to set variable rates. *See Agway, LLC*, 88 F.4th at 410 (stating that "the dispositive questions" in an ESCO case "are whether an agreement entitled the energy services provider to use discretion in setting its rates and, if so, how the agreement cabined that discretion"). Eligo's contract did not define "market pricing," "other market price factors," or "market conditions." Nor did it set forth any formula or other objective method of calculating rates. The contract, therefore, granted Eligo the right to set rates in its discretion using the agreement's broad, market-based criteria. *See Sommer v. CleanChoice Energy*, 800 F. Supp. 3d 239 (D. Mass. Sept. 9, 2025) (holding that an ESCO's contract granted it discretion to set variable rates); *see also Nieves v. Just Energy New York Corp*, 2020 WL 6803056, at *6 (W.D.N.Y. Nov. 19, 2020) ("What constituted "business and market conditions" was left to Defendant's discretion in setting the variable rates."). The only way for Plaintiffs to prove a breach of those provisions is to show that Eligo set variable rates in violation of the implied duty of good faith and fair dealing, which Plaintiffs cannot do. *See Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 810 (2d Cir. 2014) ("In order to find a breach of the implied covenant, a party's action must directly violate an obligation that may be presumed to have been intended by the parties.") (cleaned up).

The evidence unfirmly shows that Eligo considered many criteria in setting rates, including (but not limited to) competitor prices, its own profit margins, and minimizing customer attrition. It is well established that such ordinary business considerations are not wrongful and are entirely consistent with the market-based criteria in Eligo's customer contract. *Martinez*, 88 F.4th at 412 (stating that "[i]n *Richards*, for example, we appeared to interpret the similar term 'business and market conditions' to embrace considerations like reducing customer losses, achieving target profit margins, and matching competitors' rates."); *Richards*, 915 F.3d at 98 ("The record reflects that Direct Energy set the variable rate to achieve a target profit margin, match competitors' prices, and reduce customer losses, among other objectives. As a matter of plain meaning, these sorts of considerations constitute "business and market conditions."); *Nieves*,

2020 WL 6803056, at *4 (stating that "business and market conditions" included achieving "the desired profit margin for Defendant's investors.").

Moreover, Eligo's variable rates were squarely in line with its "market" – i.e., those of its ESCO competitors that, like Eligo, sold electricity generated from renewable sources. Dr. Debra Aron, who served as the defendant's expert in *Agway*, showed in her detailed report that Eligo's variable rates were market-based. In *Agway*, both the Second Circuit and the district court relied on similar testimony by Dr. Aron in granting summary judgment to the defendant ESCO. *Agway*. 88 F.4th at 416; *see also Martinez v. Agway Energy Servs*., 2022 WL 306437 (N.D.N.Y. Feb. 2. 2022). The same result is warranted here.

Plaintiffs attempt to muddy the waters by claiming that Eligo's rates exceeded those charged by regulated utilities. But Eligo never promised that its rates for its greener products would equal the utilities' rates; on the contrary, Eligo expressly informed customers that savings were "not guaranteed." *See Agway*, 88 F.4th at 415 ("Agway specified that '[s]avings are NOT guaranteed' and made no representations that its prices would always be lower than those of the incumbent utilities, for example."). In any case, multiple courts have rejected Plaintiffs' argument that ESCOs, which are creations of *deregulation* in the energy industry, can be evaluated by comparison to regulated utilities. *Richards*, 915 F.3d at 104; *see also Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 616 (7th Cir. 2019) (holding that the utility's "price is not a market price at all; it is a regulated price" and that utilities do not "participate in the general market for electricity, and thus they are not proper comparators with Direct Energy to gauge market price").

Plaintiffs' consumer protection claims fare no better because Plaintiffs have failed to identify any misleading statement by Eligo. Eligo's contract made plain that Eligo would calculate variable rates, not according to its procurement costs, but based on various market factors that Eligo had discretion to both identify and weigh. The agreement also made plain that Eligo's customers would not necessarily save money, and that they could cancel at any time if they believed they were paying too much. Because there was nothing misleading about any of that, Plaintiffs have no viable claim under New York's consumer protection statute. *Agway*, 88 F.4th at 417; *Richards*, 915 F.3d at 101 (affirming summary judgment to ESCO because "the contract unambiguously allowed Direct Energy to set the variable rate the way it did."). The Plaintiffs received "exactly what they bargained for: after paying a fixed rate below the [default utility rate] for a fixed time, [Plaintiffs] would pay a variable rate set at [Eligo's] discretion." *Richards*, 915 F.3d at 99.

If the Court permits Eligo to file its motion for summary judgment (which it should), Eligo proposes that its motion be filed on or before March 17, 2026, and suggests that the parties and Court discuss this matter further at the upcoming status conference.

Respectfully,

*/s/ Ryan Watstein*
Ryan Watstein