## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**ANNE BROUS, AS THE EXECUTRIX OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**,

      Defendants.

Case No. 1:24-CV-01260-ER

## DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF MR. EDO MACAN AND ANY TESTIMONY HE MIGHT OFFER AT TRIAL

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................... 1

II.  STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ................... 2

    A.  Eligo's Customer Contract ..................................................................... 2

    B.  Plaintiffs' Claims. ................................................................................ 4

    C.  Mr. Macan's Opinions and Past Testimony ................................................ 4

III.  LEGAL STANDARD ............................................................................... 6

IV.  MR. MACAN'S OPINIONS ARE IRRELEVANT AND UNRELIABLE. ..................... 7

    A.  The Court Should Exclude Mr. Macan Because
        He Engages in Extensive Interpretation of the
        Contract Without Using Any Recognizable Methodology. ................................... 7

        1.  Mr. Macan Offers Improper and Unmethodological
            Opinions on the Meaning of the Term "Market Pricing." ........................... 9

        2.  Mr. Macan Offers Improper and Unmethodological
            Opinions on the Meaning of the Term "Transportation
            Costs" and "Other Market Price Factors." ................................ 11

        3.  Mr. Macan Opines that Eligo's Rates Are Limited to a
            Fixed 5–6% Margin Mentioned Nowhere in the Contract ........................ 12

    B.  The Court Should Exclude Mr. Macan's Damages
        Estimates Because They Are the Product of an Inherently
        Unreliable "Black Box" That Cannot Be Tested or Verified. .............................. 15

        1.  The Court Should Exclude Mr. Macan's Damages
            Estimates Because Plaintiffs Have Not Disclosed
            Mr. Macan's Monthly "Contract" Rate Figures, His Monthly
            Overcharge Calculations, or Any of the Intermediate Calculations. ........ 16

        2.  The Court Should Exclude Mr. Macan's Damages Calculations
            Because They Ignore How Eligo Actually Billed its Customers ............. 18

        3.  The Calculations for Method #1—Mr. Macan's
            "Preferred" Method—Are Uniquely Unreliable. ................................ 18

            a.  The Method #1 Calculations Rest on
                "Extremely Messy" Third-Party Spreadsheets
                that Mr. Macan Does Not Understand. ........................ 18

b.    Without Any Methodology, Mr. Macan
Manipulated the Values within these Spreadsheets
and Used Them in a Way Eligo Never Did. ................................. 19

4.    The Calculations for Method #2—a
Cost-Plus Method, Using NYISO Day-Ahead
Costs—Ignore Eligo's Actual Costs and Cannot Be Tested.................... 21

5.    The Remaining Calculation Methods Are
Either Unreliable or a Poor Fit for the Facts of This Case....................... 22

V.    THE COURT SHOULD EXCLUDE MR. MACAN
BECAUSE HE IS UNQUALIFIED TO OFFER HIS OPINIONS. ................................. 24

VI.    CONCLUSION ................................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**

*Actors Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*,
  2012 WL 13070024 (S.D.N.Y. Sept. 18, 2012) ........................................................ 8

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting*,
  743 F. Supp. 3d 530 (S.D.N.Y. 2024) ...................................................................... 9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ..................................................................................... 16

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) .......................................................................................... 9

*Constr. Indus. Servs. Corp. v. Hanover Ins. Co.*,
  206 F.R.D. 43 (E.D.N.Y. 2001) ............................................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ............................................................................................... 6, 7

*EBC v. Clark Bldg. Sys.*,
  618 F.3d 253 (3d Cir. 2010) ..................................................................................... 11

*FERC v. Elec. Power Supply Ass'n*,
  577 U.S. 260 (2016) .................................................................................................. 25

*FPP, LLC v. Xaxis US, LLC*,
  2017 WL 11456572 (S.D.N.Y. Feb. 13, 2017) ........................................................ 24

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .................................................................................................. 10

*Golden Unicorn Enters. v. Audible*,
  2024 WL 5182671 (2d Cir. Dec. 20, 2024) ............................................................. 24

*Great White Bear v. Mervyns*,
  2008 WL 2220662 (S.D.N.Y. May 27, 2008) ...................................................... 7, 18

*Hernandez v. The Off. of the Comm'r of Baseball*,
  335 F.R.D. 45 (S.D.N.Y. 2020) ............................................................................... 16

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  293 F.R.D. 568 (S.D.N.Y. 2013) ............................................................................. 17

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*,
  14 F. Supp. 2d 391 (S.D.N.Y. 1988) ......................................................................... 7

*Lava Trading v. Hartford Fire Ins. Co.*,
2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ...................................................... 7, 16

*Martinez v. Agway Energy Servs.*,
88 F.4th 401 (2d Cir. 2023) ................................................................... 11, 13, 14

*Marx & Co. v. Diners' Club Inc.*,
550 F.2d 505 (2d Cir. 1977) ......................................................................... 6, 8

*Open Text S.A. v. Box*,
2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ..................................................... 16

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
571 F. Supp. 3d 106 (S.D.N.Y. 2021) ............................................................. 10

*Richards v. Direct Energy Servs., LLC*,
915 F.3d 88 (2d Cir. 2019) ..................................................................... 12, 23

*Richards v. Direct Energy Servs., LLC*,
246 F. Supp. 3d 538 (D. Conn. 2017) ...................................................... passim

*Ruggiero v. Warner-Lambert Co.*,
424 F.3d 249 (2d Cir. 2005) .......................................................................... 6

*Sec. & Exch. Comm'n v. SBB Rsch. Grp.*,
2024 WL 4894315 (N.D. Ill. Nov. 26, 2024) .................................................... 10

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ........................................................................ 17

*United States v. Castillo*,
924 F.2d 1227 (2d Cir. 1991) ........................................................................ 24

*Winston v. Marriott Int'l*,
2006 WL 1229111 (E.D.N.Y. May 8, 2006) ...................................................... 11

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005) ......................................................................... 16

**Rules**

Fed. R. Civ. P. 37 ............................................................................................ 7

Fed. R. Civ. P. 26 ...................................................................................... 7, 17

Fed. R. Evid. 702 ................................................................................ 6, 7, 21, 24

## I.    INTRODUCTION

It is black-letter law that experts can't testify as to what a contract means. It is equally well-established that experts can't base their testimony on unsupportable assumptions about a contract or interpretations of a contract supplied by counsel. And an expert must produce sufficient information such that their calculations can be reproduced. Here, Plaintiffs' damages expert Edo Macan violates all three rules. His testimony must therefore be excluded.

Mr. Macan – an electrical engineer with no degree in economics – claims to calculate the "damages" suffered by the putative class, measured by the amount by which they were supposedly "overcharged" by Eligo. To do that, Mr. Macan claims to calculate what Eligo's customers should have been charged under their customer agreement with Eligo, then compares that to what Eligo actually charged its customers. In doing so, Mr. Macan opines what Eligo's customer contract means and how it supposedly required Eligo to calculate variable rates for electricity. But settled law provides that interpreting the contract is an issue of law reserved for this Court. And even if Mr. Macan was permitted to interpret the agreement – which he isn't – he has unreasonably adopted the interpretation first proffered by Plaintiffs' counsel, which can't be reconciled with the plain text of the agreement and which this Court must reject as a matter of law.

Eligo's contract provided that variable rates for electricity would be set in response to undefined "market pricing" and "other market price factors," and that rates would also be "periodically adjusted" for "market conditions." According to the Plaintiffs and Mr. Macan, those market-based criteria somehow restricted Eligo's rates to its "wholesale cost of energy" plus a "reasonable margin" of 5-6%. In other words, Mr. Macan and the Plaintiffs claim that Eligo's rate-setting was limited to price fluctuations on the *wholesale* market, to the complete exclusion of any and all conditions prevailing on the *retail* market for electricity.

But that isn't what the contract says – in fact, it makes no reference whatsoever to the

wholesale market or to wholesale market prices. And Mr. Macan's interpretation is further inconsistent with the very purpose of Eligo's customer contract, which was to govern retail prices for electricity. Nor does the contract say anything about Eligo's profit margins, much less limit Eligo to the 5-6% margin that Mr. Macan conjures from whole cloth. All of Mr. Macan's damages models are based on these unreasonable and plainly erroneous interpretations of the agreement, and they must therefore be excluded.

This is not the first time Mr. Macan has peddled impermissible and unreliable testimony in support of a class action against an ESCO. Indeed, here Mr. Macan relies on the same erroneous contract interpretation the court rejected in *Richards v. Direct Energy*. There, the court squarely rejected Mr. Macan's testimony that "business and market conditions," as referenced in an ESCO rate-setting contract, restricted the ESCO's rates to its wholesale cost plus a defined margin. 246 F. Supp. 3d 538, 552–53 (D. Conn. 2017). Mr. Macan apparently learned nothing from the *Richards* court's exclusion of his testimony, which during his deposition he claimed not to remember. So, he has recycled essentially the same testimony here. But Mr. Macan's attempt to re-write Eligo's contract fares no better than his attempt to do so in *Richards*.

Even apart from these legal and economic flaws, Mr. Macan's damages opinions fail because they are untestable. He presents high-level formulas and annual totals, but has refused to produce the underlying workpapers, intermediate calculations, and monthly inputs necessary to verify his math. Without access to those materials, neither Defendants nor the Court can assess whether his calculations are accurate, consistent, or even internally coherent. That lack of transparency independently requires exclusion.

## II.    STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A.    Eligo's Customer Contract

Eligo is an energy supply company, or "ESCO," that operates in several states. This case

concerns two New York residents—Ira Brous and Michelle Schuster—who chose Eligo as their electricity supplier. They allege that Eligo overcharged them by failing to calculate variable rates for electricity as provided in Eligo's contract.

Both Plaintiffs enrolled with Eligo by telephone through a third-party verification ("TPV") call with an Eligo representative. Ex. 01, DEF000126 (Schuster TPV Call); Ex. 02, DEF093222 (Brous TPV call). During that call, the representative explained that Eligo would provide electricity at an introductory fixed rate and then "continue at a month-to-month rate based on market and wholesale factors, weather patterns, and pricing strategies." *Id.* Each Plaintiff verbally assented to have their variable rates calculated according to those broadly described factors. *Id.* The call also made clear that Eligo did not guarantee savings, and that the Plaintiffs could cancel their Eligo service at any time and for any reason. *Id.* The New York Public Service Commission ("NYPSC") requires TPVs for such telephonic enrollments and repeatedly approved Eligo's TPV script. Ex. 03, 2014 UBP at 171; Ex. 04-10, NYPSC regulatory filings, including TPV scripts.

A few days after enrolling, Plaintiffs received Eligo's standard energy supply contract, which said, in relevant part, that after the initial fixed-rate period the Plaintiffs would convert to a "monthly variable kWh rate that may be periodically adjusted for market conditions," and that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 11, DEF000138 (Schuster Enrollment Packet); Ex. 12, DEF093223 (Brous Enrollment Packet). The contract did not define "market conditions," "market pricing," or the necessarily inexhaustive term "other market price factors." Nor did it contain any formula or other specific method that Eligo would use to calculate variable rates. The contract further provided that Eligo did not guarantee that Plaintiffs (or any Eligo customer) would save money by switching to Eligo, and that the Plaintiffs could cancel their Eligo service at any time and for any reason.

3

### B.    Plaintiffs' Claims.

Plaintiffs primarily accuse Eligo of breaching its contract by failing to set variable rates for electricity in accordance with the contract's rate-setting criteria. Plaintiffs also allege follow-on claims for breach of the implied duty of good faith and fair dealing, violations of New York consumer protection statutes, and unjust enrichment.

All of Plaintiffs' claims rest on the allegation that the contract's rate-setting criteria – i.e., that variable rates would be set according to "market pricing" and "other market price factors" – required Eligo to base its rates exclusively on Eligo's "cost to procure energy from the wholesale market." Second Am. Compl. ¶ 64; *see also id*. ¶¶ 4, 70, 71. The contract, however, says nothing about the wholesale cost of energy. Nor does it contain any formula or other objective method for calculating variable rates. It is further silent as to Eligo's profit margin.

### C.    Mr. Macan's Opinions and Past Testimony.

Plaintiffs retained Edo Macan as an expert to testify about Plaintiffs' alleged damages. Mr. Macan holds a degree in electrical engineering and has no degree in economics. He has never worked at or for an ESCO, and his only direct experience working in the energy industry (apart from his current role as a professional testifying expert) is a one-year stint at Duke Energy, which ended many years ago. There is no reported decision admitting Mr. Macan's testimony in an ESCO case. But as discussed further below, his testimony in *Richards v. Direct Energy* – which is strikingly similar to the opinions he offers here – was criticized at great length by the court. *Richards*, 246 F. Supp. 3d at 551–53.

As in *Richards*, Mr. Macan has adopted Plaintiffs' proffered interpretation of Eligo's customer contract lock, stock, and barrel. Mr. Macan opines that "market pricing," as referenced in the contract, "means the wholesale market" and only the wholesale market. Ex. 13, Macan Report ¶ 130. He further confines the term "other market price factors" to "small miscellaneous

fees and charges associated with the wholesale market price that may not be explicitly itemized in the 'market pricing' from the wholesale market." *Id.* ¶ 132. Although Mr. Macan acknowledges that Eligo operates in both the wholesale market (where it buys energy) and a retail market (where Eligo sells electricity to end users), he excludes any possibility that "market pricing" and "other market price factors" can be read to refer to the retail market, even though the entire point of Eligo's customer contract is to govern its retail price for electricity. *See id.* ¶¶ 13(k), 114 (referring to the retail market in which Eligo competes); Ex. 14, Macan Dep. at 174-75. Based on those opinions about what Eligo's contract means, Mr. Macan opines that Eligo charged "commercially unreasonable" variable rates in excess of its wholesale procurement costs. Ex. 13, Macan Report ¶ 13.

Mr. Macan further opines that Eligo breached by charging rates that incorporated what he regards as excessive or "unreasonable" profit margins. Mr. Macan acknowledges that Eligo's contract makes no reference to profit margins. Macan Dep. at 204. Yet he opines that the agreement restricted Eligo to charging a "reasonable" margin above its wholesale procurement costs, in the amount of 5 to 6%. *Id.* That opinion, according to Mr. Macan, is based solely on "common sense" and "basic principles of economics," as opposed to any language in Eligo's contract. *Id.* at 218.

 Mr. Macan further opines that Eligo's margins were not

commercially reasonable or set in good faith, but the sensational margins that he uses disregard all costs apart from the estimated cost of purchasing energy. Ex. 13, Macan Report at 7–9.

Mr. Macan offered strikingly similar testimony in another recent ESCO class action. *See Richards*, 246 F. Supp. 3d at 552–53. There, he opined that the phrase "business and market conditions" in an ESCO contract required the ESCO to limit its rates to procurement costs plus a reasonable margin. The court comprehensively rejected this approach. *Id.* (holding that "no reasonable fact-finder could conclude that the phrase ["business and market conditions"] required [the ESCO] to have a specific profit margin" and no "reasonable jury would conclude that [the ESCO's] pursuit of a desirable profit margin was not a 'business and market condition'").

## III.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "As the Supreme Court explained in *Daubert*, Rule 702 requires the district court to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).

Expert witnesses may not render "legal opinions as to the meaning of the contract terms at issue," as the "[c]onstruction (of a contract) is always a matter of law for the Court." *See Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (internal quotation marks and citations omitted, second alteration in original); *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*,

14 F. Supp. 2d 391, 404 (S.D.N.Y. 1988) (excluding expert report where the expert "would inevitably have to discuss his construction of the contract and the parties' obligations thereunder," as such "testimony would usurp the role of the jury").

Finally, "[a] damage figure in an expert report cannot satisfy Rule 26(a)(2)(B) simply by stating a conclusory figure and then attaching documents that purportedly support that figure. Rather, the report must supply actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure." *Great White Bear v. Mervyns*, 2008 WL 2220662, at *3 (S.D.N.Y. May 27, 2008). Where an expert fails to provide this required information, exclusion is warranted under *Daubert*, Fed. R. Evid. 702, and Fed. R. Civ. P. 26 and 37. *Id.*; *Lava Trading v. Hartford Fire Ins. Co.*, 2005 WL 4684238, at *19 (S.D.N.Y. Apr. 11, 2005).

## IV.    MR. MACAN'S OPINIONS ARE IRRELEVANT AND UNRELIABLE.

Mr. Macan's testimony and opinions fail Rule 702 for two overarching reasons. First, Mr. Macan improperly interprets the contract and opines that Eligo has breached this contract. Second, Mr. Macan put forth a black box damages calculations model that cannot be examined or replicated and should therefore be excluded.

### A.    The Court Should Exclude Mr. Macan Because He Engages in Extensive Interpretation of the Contract Without Using Any Recognizable Methodology.

The Court should exclude Mr. Macan because he improperly interprets the contract to transform it from the market-based pricing mechanism it contains to a cost-plus arrangement that is mentioned nowhere in the agreement. This is perhaps most obvious in paragraphs 130-32, where Mr. Macan flatly states that "market pricing – means the wholesale market" and that "other market price factors – is a catchall that means the pass through of other small miscellaneous fees and charges associated with the wholesale market price that may not be explicitly itemized in the

market pricing from the wholesale market." Those opinions about what Eligo's contract means then inform Mr. Macan's opinions that Eligo breached the contract by trying to maximize profits, as opposed to tracking its "procurement costs." Ex. [13], Macan Report ¶ 62, 65, 97, 99. Indeed, Mr. Macan devotes an entire section of his report to his assertion that "Eligo's variable rates were not" calculated as the contract required. See *id.* ¶ 107 (opining that Eligo's "rate-setting criteria" used a "profit maximizing strategy . . . rather than an effort to apply a formula that calculates a variable rate in response to market prices, transportation costs, or other market price factors").

At his deposition, Mr. Macan repeatedly admitted that he was engaging in contract interpretation before later trying to change his answers via an errata sheet. For example, Mr. Macan testified that "to same extent [*sic*] why I interpreted market pricing to mean what I've done in -- under the method one, I've – I've" done the same for profit margins. Ex. 14, Macan Dep. at 217. He further testified that Eligo's contract is "an index contract. It – it clearly states that the variable rate will be set to something that is observable, that is in my interpretation, you know, a wholesale cost of energy. And so, in that sense that's – that that sort of, that's the, it's, you know, the preferred reading in a sense that it's an index contract." *Id.* at 157:24–158:6. Even in his report, Mr. Macan states that "Method 1" of his damages model "represents [his] preferred contract reading." Ex. 13, Macan Report ¶ 154; Ex. 14, Macan Dep. at 157:24–158:6. None of this is allowed. "The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." *Marx & Co.*, 550 F.2d at 510; *Actors Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.,* 2012 WL 13070024, * 1 (S.D.N.Y. Sept. 18, 2012) (stating that "experts are not permitted to simply interpret disputed contracts"). On these grounds alone, Mr. Macan and his opinions should be struck.

Plaintiffs concede as much by attempting to re-cast Mr. Macan's proffered interpretations of the agreement as mere assumptions he was instructed to follow. But Mr. Macan's unqualified

statements about what the key contractual terms mean (Report ¶¶ 130-32) can't be reconciled with his later assertions that he is merely assuming an interpretation supplied by Plaintiffs' counsel.[1] In any case, Mr. Macan's adoption of an unreasonable assumption about what the contract means is no more admissible than his own proffered interpretation of the contract because his counsel's purported assumptions are "so unrealistic and contradictory" to the plain language of the contract as to justify exclusion. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Even Mr. Macan's argument that he is merely "operationalizing" his counsel's legal interpretation using his experience in the industry energy fails flat. *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting*, 743 F. Supp. 3d 530, 544 (S.D.N.Y. 2024) (excluding expert opinion regarding contract despite "attempt to frame his interpretation as merely a matter of [industry] practice"). So, it is of no help to Mr. Macan to claim that he merely assumed the contract to mean something other than what it plainly says.

### 1. Mr. Macan Offers Improper and Unmethodological Opinions on the Meaning of the Term "Market Pricing."

In addition to being unauthorized, Mr. Macan's interpretations of the agreement also suffer from a complete lack of any methodology. This is not a case where Mr. Macan purports to explain technical words that have industry-specific meanings. On the contrary, Mr. Macan denied that whatever expertise might have added anything to his construction of the agreement. He testified:

> Q: What's the methodology that you employed to reach the conclusion that market pricing means the wholesale market?
>
> A: ***What do you mean by "method" – what do you mean by "methodology?"*** . . . I'm an energy market expert. I've done energy pricing for 25 years. Somebody tells

---

[1] Ex. 13, Macan Report ¶ 129; Ex. 14 Macan Dep. at 163 (Q: Are you offering your own opinion as to what [the Variable Price Term] means or were you told to assume that? A: I was told to assume that."); *id.* at 164:19–21 ("I did not interpret anything here. Interpretation has been given to me."); *id.* at 165:5–12 ("Q: how did you arrive at the interpretation of market pricing that it means the wholesale market? A: I did not arrive at that. As I explained, I was provided with the legal interpretation of the contract language.").

me market pricing; it means pricing instrument to the market . . . ***Market pricing is like how – how much it's going to cost for us to, you know, acquire these good, that we're going to resell later on. It's just a combination of – of you, know, basic logic and – and you know, understanding what the term means.***

Ex. 14, Macan Dep. at 167:13–168:13.

When pressed for any support for his interpretation that "market pricing" in the retail ESCO contract means "wholesale cost of energy," Mr. Macan cited to two academic sources in his report, but he was unable to recall anything about these sources, including even whether they were books or articles. *Id.* at 172:13–173:12 ("I'm just blanking out").[2] As Mr. Macan explained during the deposition, he "chose what [market pricing] meant, with all its components. . . I chose that it meant wholesale market. . . the wholesale cost of energy." *Id.* at 175:14–176:17. Although he conceded that Eligo operates in both the wholesale market (where it buys energy) and a retail market (where Eligo sells electricity to end users), Mr. Macan nevertheless inexplicably construes the "market pricing" term in Eligo's customer (i.e., retail) contract to mean wholesale market pricing. *See* Ex. 13, Macan Report ¶¶ 13(k), 114 (referring to the retail market in which Eligo competes); Ex. 14, Macan Dep. at 174-75. This *ipse dixit* testimony is improper and requires exclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Having admitted in his deposition that he had no methodology to support his contract interpretation, Macan tried to invent one after the fact via an errata. Mr. Macan re-wrote large chunks of his testimony to try and undo the admissions he made during the deposition. For

---

[2] Mr. Macan's total lack of familiarity with this material is all the more striking, given that he only cited four academic sources in his entire report. This unfamiliarity presents an independent basis to exclude Mr. Macan. *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 115 (S.D.N.Y. 2021) (excluding expert for lack of familiarity with report); *Sec. & Exch. Comm'n v. SBB Rsch. Grp.*, 2024 WL 4894315, at *15 (N.D. Ill. Nov. 26, 2024) (excluding an "expert's opinion where the expert could not recall the content of the documents he relied upon in forming his opinion"). The studies cited by Mr. Macan predate Eligo's existence, never mention ESCOs, focus entirely on extremely large industrial customers with a different rate structure and provides no support for Mr. Macan's claim that "market pricing" in the contract means "wholesale market."

example, Mr. Macan testified that the absence of the word "wholesale" in the contract gave him pause in equating "market pricing" with wholesale energy costs; despite this unequivocal testimony, Plaintiffs' counsel's errata tries to rewrite the testimony by simply adding a "not" that Mr. Macan never said. *Compare* Dep. at 197:10–1 ("it did give me pause") *with* Ex. 16, Errata at 3 ("it did NOT give me pause")*.* Mr. Macan's after-the-fact revision of his own sworn testimony only underscores the lack of any reliable methodology and the necessity of excluding his testimony. *Winston v. Marriott Int'l*, 2006 WL 1229111, at *6 & n.2 (E.D.N.Y. May 8, 2006); *EBC v. Clark Bldg. Sys.*, 618 F.3d 253, 267–68 (3d Cir. 2010).

### 2.    Mr. Macan Offers Improper and Unmethodological Opinions on the Meaning of the Term "Transportation Costs" and "Other Market Price Factors."

Mr. Macan takes a similarly fast and loose approach with the remaining terms in the written contract. He reads "transportation costs" entirely out of the contract because he maintains such costs do not exist. The only support he provides for this conclusion is a reference to a color-coded map of states in an Eligo PowerPoint that has nothing to do with costs or pricing. Ex. 13, Macan Report at 135 (citing DEF064884 at 11); Ex. 17 (DEF064884).

Mr. Macan also distorts the term "other market price factors" beyond reasonable recognition to consist of precisely three randomly-chosen costs, none of which are mentioned anywhere in the agreement: 1) "sleeve" costs, 2) purchase of receivable costs, and 3) billing costs. Ex. 13, Macan Report ¶¶ 144–46; 164–65. Mr. Macan could identify no conceivable methodology that would justify turning this simple, open-ended phrase into an itemized list of specific costs that Eligo never mentioned in any contract with its customers. Moreover, Mr. Macan's attempt to re-write this phrase is inconsistent with binding Second Circuit authority. For example, in *Agway*, the Second Circuit found that the "unspecified 'market-related factors'" was not "limited to market costs such as the cost of procuring energy." *Martinez v. Agway Energy Servs.*, 88 F.4th 401, 412

(2d Cir. 2023). Another Second Circuit ESCO case interpreted "business and market conditions" to include considerations like "achiev[ing] a target profit margin, match[ing] competitors' prices, and reduc[ing] customer losses." *Richards*, 915 F.3d at 98; *see also* ECF 340 at 13–15 (gathering cases construing inexhaustive terms in ESCO contracts broadly).

### 3. Mr. Macan Opines that Eligo's Rates Are Limited to a Fixed 5–6% Margin Mentioned Nowhere in the Contract.

Mr. Macan reads a specific margin into Eligo's contract—even though it contains no margin term—and opines that Eligo was contractually bound to charge a variable rate reflecting the cost of procuring energy plus a 5–6% margin.

***First***, nothing in the written materials or the TPV provides for a specific margin, much less than a fixed margin on only the cost of supply energy. Again, Mr. Macan offers no explanation or methodology that would support his extracontractual stretch:

> **Q**: Well, let's start with margin. You include a margin in your method one and method two damage calculations, don't you?
> **A**: Yes, I do.
> **Q**: Does the word "margin" appear anywhere in the variable price term?
> **A**: No, it doesn't.
> **Q**: So what is the source then by which you conclude that it's appropriate to include a margin in your damage calculations?
> **A**: It's – it's -- as I explained in the testimony, it's a -- it's a construct of -- of a contractual price. ***Looking at it as an economist, you cannot run a business unless you, you know, can make some money doing it.*** And I've tried to – I've – I've, you know, I've done it in a way that economically makes sense. And -- and this means, you know, an ESCO that's purely, you know, buying wholesale and just reselling to retail at a cost that would be unsustainable in the long term because they, you know, they need to pay for overhead, they need to pay for their expenses, they need to make some money. ***That's -- that just – it's common sense, so.***

Ex. 14, Macan Dep. at 204:18–205:17.

Mr. Macan tried to do something very similar in the *Richards v. Direct Energy* litigation, and the court rejected his maneuver. There, the contract provided for "business and market conditions." Mr. Macan opined that such a term required Eligo to charge a fixed profit margin

based on the supply cost for its variable rate customers. The court there comprehensively rejected Mr. Macan's argument and found that "[n]o reasonable fact finder could conclude that the phrase 'business and market conditions' implied a particular profit margin." *Richards*, 246 F. Supp. 3d at 552. The court also found, as a matter of law, that the contract did not require the ESCO "to have a specific profit margin" and permitted the ESCO "to seek different profits on variable rates than fixed rates. *Id.* Likewise, the court in *Agway* excluded Dr. Felder when he performed a damages calculations based on "his subjective views on the reasonableness of margins." *Agway*, 88 F.4th at 414. Despite being involved in one of these two cases, Mr. Macan never considered this binding Second Circuit precedent, which contradict his proffered contract interpretation on which this case depends.

**Second**, Mr. Macan's margin opinion is improper because his 5% and 6.38% markups do not reflect any relevant comparator and are not methodologically derived. As Mr. Macan admitted, the NYPSC never placed a 5% numerical rate cap on green energy products, like Plaintiffs' energy, and the NYPSC 5% limit on fixed-rate, brown energy related to utility retrospective 12-month average prices, which are unconnected to prospective energy costs or profit margins. Macan Dep. at 252:6–9; 252:24–253:5. Mr. Macan's use of the 6% margin is equally improper. He adopted this measure from Eligo's credit policy, which mandated a ***minimum*** 6% margin on fixed-rate customers to ensure Eligo remained solvent, but there is no basis to transform this 6% floor on fixed-rate customers into a 6% ceiling on variable-rate customers. Dep. at 258:18–259:7. Mr. Macan again admitted freely that there was no methodology behind either the 5% or 6% margin:

> Q: Describe for me the methodology you used to select [5] percent as the best comparator marker.
> A: ***There's really no methodology***. . . .
> Q: Tell me, what, you know, expertise, methodology did you apply to determine that it wouldn't be economically unreasonable to adopt 6 percent?
> A: ***Again, none***.

Dep. at 250:21–23, 253:16–19.

Yet again, having admitted in his deposition that he had no methodology to support his contract interpretation, Macan tried to invent one after the fact via errata, comprehensively rewriting his substantive testimony, as shown by the comparison below:

| Page | Mr. Macan's Testimony | Plaintiffs' Counsel "Errata" |
|------|----------------------|------------------------------|
| 250:23 | There's really no methodology. | There's really no methodology in a strictly mathematical sense. I did not derive the 5 percent figure from a dataset of inputs like I did in Method one. The methodology I used is detailed in paragraphs 191 to 196 of my report. |
| 253:19 | Again, none. | Again, none from a strictly mathematical sense of deriving a margin. The methodology I used is detailed in paragraphs 197 to 199 of my report. |

But these last-second revisions get Mr. Macan nowhere. The fact remains that – and as Mr. Macan admits -- Eligo's contract is entirely silent on the issue of a profit margin. To inject a specific margin of 5%, 6%, or any other number is completely arbitrary and cannot be the product of an objective or reliable methodology. Nothing about Mr. Macan's opinions can derive a profit margin from a contract that does not contain one or justify imposing a single-digit margin cap to which neither Eligo nor its customers ever agreed. That is precisely the result reached in Agway, where the court rejected the same opinion from Mr. Macan. *Agway*, 88 F.4th at 414 (affirming exclusion of Dr. Felder and noting his "subjective and unsupported view of what a 'reasonable margin' would have been").

**Third,** Mr. Macan should be excluded because his margin calculation focuses entirely on the cost of procuring energy and ignores all of Eligo's other costs, such as marketing, payroll, and legal expenses, which he had access to. Ex. 15, DEF093355 (accounting data from 2013 to 2024 with hundreds of itemized expenses). ███████████████████████████████

████████████████████████████████████████████████



Both Mr. Macan and Dr. Felder ignore this evidence from Eligo and instead invent their own margins based on only one cost, the wholesale cost of energy, from the dozens of costs that Eligo faced as a business.[3]

### B. The Court Should Exclude Mr. Macan's Damages Estimates Because They Are the Product of an Inherently Unreliable "Black Box" That Cannot Be Tested or Verified.

To provide some background, Mr. Macan is responsible for calculating the damages for the named Plaintiffs and his calculations tracks the following high-level conceptual structure:

*Monthly Damages = (Eligo's Rate – Macan's "Contract" Rate) x Usage.* Ex. 13, Macan Report ¶¶ 151, 169. "Eligo's rate" is what Plaintiffs were actually charged, and the "contract" rate is what

---

[3] Independently, the Court should exclude Mr. Macan because he ignores part of the contract—the "price" term provides that the variable rate "***may*** be adjusted according to market conditions," and the only basis for ignoring this indisputably relevant term is 30(b)(6) deposition testimony that the terms "market pricing, transportation costs, and other market price factors" can help explain what "market conditions" means. But that testimony doesn't justify ignoring this term, as well as the third-party verification call language concerning "pricing strategies."

Mr. Macan thinks Eligo should have charged Plaintiffs. The difference between these two values is the overcharge. That, however, is where the transparency ends. For each method, Mr. Macan discloses only: 1) a high-level, vague formula of the damage method and 2) final aggregate or annual dollar totals. He never discloses the monthly damages or the monthly "contract" rate or any of the intermediate data used to produce the "contract" rate. It is black-letter law that a damages "estimate must be testable. Someone else using the same data and methods must be able to replicate the result." *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238, at \*17 (S.D.N.Y. Apr. 11, 2005); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (Easterbrook, J.); *Open Text S.A. v. Box*, 2015 WL 349197, at \*6 (N.D. Cal. Jan. 23, 2015) (excluding opinion where "opacity of [expert's] damages methodology makes it impossible to verify whether" they correctly calculated damages). Because Mr. Macan does not disclose the data and calculations necessary to test his damages estimates, the Court should exclude these opinions.

> **1.      The Court Should Exclude Mr. Macan's Damages Estimates Because Plaintiffs Have Not Disclosed Mr. Macan's Monthly "Contract" Rate Figures, His Monthly Overcharge Calculations, or Any of the Intermediate Calculations.**

The Court should exclude Mr. Macan because he has not produced the data or calculations on which his damages estimates rely. Shortly after receiving Mr. Macan's initial report, Defendants asked for Mr. Macan's workpapers and internal calculations to verify his math and understand how he arrived at the damage estimates that he did. Extraordinarily, Plaintiffs' counsel has asserted privilege over all of Mr. Macan's intermediate calculations and other workpapers. Ex. 19, (Blankinship email asserting privilege over expert calculations). This makes no sense on multiple levels. First, Mr. Macan's internal workpapers were never privileged to begin with. *Hernandez v. The Off. of the Comm'r of Baseball*, 335 F.R.D. 45, 47, 50 (S.D.N.Y. 2020)

(document created by expert explaining "expanded methodology" was not protected by work-product doctrine). Second, even if they somehow contain some privileged information, disclosing that privileged data to Mr. Macan would have broken privilege and mandated production under Rule 26. *Constr. Indus. Servs. Corp. v. Hanover Ins. Co.*, 206 F.R.D. 43, 54 (E.D.N.Y. 2001) ("[L]itigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 293 F.R.D. 568, 578 (S.D.N.Y. 2013) (stating "that when a testifying expert considers factual information in forming an opinion that she intends to offer at trial, an unconditional claim of privilege cannot be maintained"). Ultimately, there is no non-frivolous basis for this assertion of privilege.[4] Without Mr. Macan's data and his calculations, Defendants have no way of seeing and testing how Mr. Macan arrived at his aggregate calculations of damages. In fact, Mr. Macan does not appear to have saved his calculations anywhere. Ex. 14, Macan Dep. at 248:18–249:8 (Q: [I]s there a place where you preserved or saved the POWWR spreadsheets as you used them . . . ? A: . . . I don't think so. . . . I certainly don't have records of any interim versions.)

Mr. Macan's damages models should be excluded precisely because they provide nothing more than an "opaque and sparse" high-level description of his formulas and "conclusory figure[s]" of aggregate damages without ever disclosing the "actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure." *Great White Bear*,

---

[4] Furthermore, Plaintiffs' assertion that Mr. Macan's workpapers are privileged creates a sword-shield problem because an expert cannot simultaneously: 1) offer opinions that purport to calculate thousands of dollars in individual damages and millions in class damages and 2) shield the calculations that supposedly support those opinions from any kind of scrutiny. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword.").

2008 WL 2220662 at *3. Just as in *Great White Bear*, Mr. Macan "has failed to supply any calculation which ties the numbers contained in the underlying documents to the [aggregate damages] figure he cites," and so he should be excluded. *Id.*

### 2.    The Court Should Exclude Mr. Macan's Damages Calculations Because They Ignore How Eligo Actually Billed its Customers.

Even based on the limited data available, Mr. Macan's calculations contain a fundamental mismatch. He calculates the "contract" rate on a calendar-month basis, but Eligo did not bill customers on calendar months. Instead, Plaintiffs' billing periods routinely spanned two months and varied in length—from roughly three and a half weeks to five weeks. Mr. Macan never explains how he maps a monthly hypothetical rate onto these irregular billing periods. For example, one of Plaintiff Schuster's final bills covered electricity used from August 26 to September 26, but the invoice was issued on November 2. Mr. Macan does not disclose whether he used August, September, or November data—or how he handled the split between months. Because he also withheld his underlying calculations, there is no way to determine how he aligned his monthly rates with actual billing periods or whether his model accounts for months in which Plaintiffs paid less than the hypothetical rate.

### 3.    The Calculations for Method #1—Mr. Macan's "Preferred" Method— Are Uniquely Unreliable.

#### a.    The Method #1 Calculations Rest on "Extremely Messy" Third-Party Spreadsheets that Mr. Macan Does Not Understand.

Mr. Macan's preferred method, Method #1, is also the least reliable of his methods. To produce the "contract" rate under this method, Mr. Macan used spreadsheets from a third-party company named POWWR. The POWWR spreadsheets are huge: each contains dozens of tabs, and each tab contains hundreds of rows and columns, many of which are hidden or inaccessible. In Mr. Macan's own words, these spreadsheets are "extremely messy" with "hidden columns [and]

hidden sheets. It was extremely messy" and "really, really hard to use." Ex. 14, Macan Dep. at 247:13–19.

Mr. Macan's analysis using these documents is unreliable on multiple levels. First, Mr. Macan repeatedly acknowledged that the POWWR model was not a reliable model. *Id.* at 289:2–3 ("I did not attempt to make a nonfunctional model functional"); 293:9 (describing POWWR spreadsheets as a "mess of a model"). Second, Mr. Macan had no knowledge of how POWWR generates its estimates and was not able to access the underlying formulas. *Id.* at 237:6–9, 240:12–241:1. Third, the cells within these vast spreadsheets are connected by formulas, so that when one cell is changed, it often has an effect on other cells. Mr. Macan testified that he did not know what effect changing one cell would have on the other cells in the spreadsheet and that "it would be an impossible task" "for the biggest Excel expert" to figure out how the sheets work. *Id.* at 291:24–292:4. Fourth, Mr. Macan had never used POWWR spreadsheets, despite his long tenure in the energy industry, and conducted no independent review to determine that POWWR and the POWWR spreadsheets were reliable. Ex. 14, Macan Dep. at 236:20–23, 237:16–19. Nor did Mr. Macan have access to the encrypted information in the POWWR sheets; Plaintiffs' counsel asked Eligo for these passwords when they were preparing their expert reports, but Defendants do not have access to that encrypted information. Ex. 20 (Blankinship email requesting password for access to encrypted sheets).

> **b. Without Any Methodology, Mr. Macan Manipulated the Values within these Spreadsheets and Used Them in a Way Eligo Never Did.**

Leaving aside the inherent unreliability of this "extremely messy" black box, Mr. Macan manipulates the values within the spreadsheets and uses them in a way that Eligo never did. Eligo used the POWWR spreadsheets only with a narrow subset of fixed rate customers and did not use the POWWR model to price either Plaintiff or any other variable rate customer.

There is no methodology behind Mr. Macan's eleven modifications to the spreadsheet values to produce his POWWR cost estimates. Ex. 13, Macan Report ¶ 136. Eligo never used these modified values to price any customer, let alone variable rate customers. For example, the November 2023 POWWR spreadsheet came prepopulated with a 7.5% inflation rate. Ex. 14, Macan Dep. at 288:5–10. Despite persistent inflation at the time, Mr. Macan changed this value to 0%. *Id.* at 288:11–12. He acknowledged that this would change some cells within the spreadsheet but did not know how or which cells it would change. *Id.* at 288:13–289:6. Likewise, Mr. Macan changed the pre-populated general interest rate from 6% to 0%; Mr. Macan could not explain whether this was an annual or monthly rate or why POWWR included this in their spreadsheets. When challenged on this modification, Mr. Macan only offered "conjecture" that this change was "negligible" because this was a "product that's going to be priced two weeks now." *Id.* at 243:22–244:5, 245:21–23. As another example, Mr. Macan chose to change the spreadsheet to select the "Variable w/Cap" product type—████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Mr. Macan does none of that here.

Mr. Macan produced the partial POWWR estimates for only one month in the class period and breaks down the POWWR estimate into categories like "energy," "capacity", "ancillary services," and "T&D losses" but never explains in his report which cells in the spreadsheet these amounts refer to or why he has excluded other values in the spreadsheet, making it impossible to reverse engineer or check with calculations. To provide some perspective, the summary page alone on this spreadsheet has more than a hundred rows and a hundred columns. This is not a reliable way of calculating damages under *Daubert*, and his calculations are even more opaque for the other seventy-one months in the class period, for which he has provided *zero* breakdown.

4. **The Calculations for Method #2—a Cost-Plus Method, Using NYISO Day-Ahead Costs—Ignore Eligo's Actual Costs and Cannot Be Tested.**

Mr. Macan's "Method #2" purports to measure damages by comparing the rates Eligo charged to a benchmark derived from NYISO day-ahead market prices. Like Method #1, this approach fails under *Daubert* because it is untethered to the parties' contract—the parties did not agree to an index contract tied to NYISO day-ahead costs plus a 6% margin.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████. Rule 702 does not permit an expert to disregard the facts of this litigation based on his personal views. Because Method #2 is built on that counterfactual assumption, it is unreliable and should be excluded.

Method #2 also fails for a more basic reason: it cannot be replicated. Yet he again fails to disclose the actual values he used. The only hint as to what he used is a reference to the materials considered by another expert, Dr. Felder, but that is not disclosure. Moreover, the dozens of links in Dr. Felder's materials considered either lack dates, do not clearly correspond to the relevant data points, or were broken and altogether inaccessible. Ex. 22, Felder Dep. at 345–48. And even functional links are useless without knowing what settings or values Mr. Macan selected. Without that information, Defendants and the Court cannot replicate or test his calculations. Method #2 is therefore just another untestable black box.

Method #2 is further compromised because Mr. Macan did not independently compile all of the data he used. Instead, he relied on information provided by Plaintiffs' other expert, Dr. Frank Felder. Ex. 13, Macan Report ¶¶ 158–165. Yet Dr. Felder has also declined to produce the underlying data and calculations supporting his own work. This creates a compounding reliability problem. The Court cannot determine what data Dr. Felder actually provided, whether it corresponds to Mr. Macan's data, whether the two experts are using consistent parameters or are misunderstanding or misapplying the other expert's data. When one expert's undisclosed analysis becomes an input into another expert's damages model, the reliability concerns multiply, especially here where the data chain itself is opaque.

> **5.    The Remaining Calculation Methods Are Either Unreliable or a Poor Fit for the Facts of This Case.**

The Court should exclude the opinions and testimony associated with Methods #3 and #4 because they are contrary to Second Circuit law, unreliable, opaque, and a poor fit for the facts of the case. While Mr. Macan presents Method #3 (comparison to weighted average of utility and 10 ESCOs) and Method #4 (comparison to utility price to compare) as two distinct calculation methodologies, Methods #3 and #4 yield indistinguishable results when you place them side by side. Ex. 14, Macan Dep. at 312 (acknowledging that Method 3 and Method 4 comparisons "look very, very similar"), Ex. [21], Macan Dep. Ex. 8 (charts comparing utility price and weighted average). Whenever the comparison rate in Method #3 increases, the comparison rate in Method #4 follows suit and vice versa. The simple reason for this is that the utility comprises such a large percentage of Plaintiffs' "prevailing market" calculation in Method #3, such that Method #3 collapses into a comparison against the utility, just like Method #4.

Method #3 and 4's comparison to the utility merits exclusion because it disregards the terms of the contract—which says nothing about utility rates—and therefore is a poor fit for the

facts of the case and will not help the factfinder calculate damages. Separately, Methods #3 and 4 should be excluded because the Second Circuit has rejected utility rates as the relevant comparator to calculate damages in an ESCO action like this one because that approach would defeat "the entire point of electricity deregulation" by imposing a regulated utility rate on unregulated ESCOs. *Richards*, 915 F.3d at 99. Leaving those arguments aside, Mr. Macan's calculations under Methods #3 and 4 are unreliable because he relied on Dr. Felder to gather the utility price to compare data, and neither Mr. Macan nor Dr. Felder have disclosed that data, making it impossible to recreate and verify (or falsify) Mr. Macan's calculations. This reliance further obscures the already opaque calculation method and raises concerns regarding the reliability of these calculations. And this is especially important in the context of the utility price to compare. The price to compare is not a simple discrete figure; instead, one has to compile together different data from different sources to reach the final price to compare, and this calculation varies depending on the utility and service zone. Moreover, as Dr. Felder testified in his deposition, there are potentially dozens of different utility "prices to compare" within a single month depending on the customer's utility, service zone, rate classification, and date of service. Ex. 22, Felder Dep. at 351:18-352:20. Given this enormous complexity, and Mr. Macan's failure to disclose any of the data that determined his calculations under Method #3 and 4, his opinions should be excluded on this point.

The Court should exclude Mr. Macan's opinions as to Method #5 because it is entirely predicated on the calculations of the opaque black boxes in Methods #1-4 and interprets how GBL § 349 multipliers and minimum and maximum damages caps will affect damages in total. This analysis is improper both because it consists of simple arithmetic, which is not a "specialized knowledge" under Fed. R. Evid. 702 (*see* Method #7 below), and offers a legal interpretation and application of GBL § 349. Neither is permissible for an expert to do.

Method #6 employs an identical approach to Method #2 (*see* Macan Report ¶ 225), so the Court should strike the Method #6 testimony for the same reasons as the Method #2 testimony laid out above. *See supra* at 21–23.

Method #7 consists solely of summing up the "monthly fee" column within a CSV file (DEF093924) and repackaging that as a method of damage calculations. Because Mr. Macan is "drawing solely on figures that would be in evidence before the trier of fact and then performing simple arithmetic on those figures, [he] is not deploying 'specialized knowledge' to 'help the trier of fact' in any way." *FPP, LLC v. Xaxis US, LLC*, 2017 WL 11456572, at *2 (S.D.N.Y. Feb. 13, 2017); *see also United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991); *Golden Unicorn Enters. v. Audible*, 2024 WL 5182671, at *3 (2d Cir. Dec. 20, 2024) (affirming exclusion of expert who simply used sum function in excel).

Finally, Method #8 should be excluded because it is entirely predicated on Mr. Macan's improper arithmetic in Method #7 and because it interprets and seeks to instruct the jury on the damages multipliers, minimums, and maximums—that is not the role of an expert.

## V.    THE COURT SHOULD EXCLUDE MR. MACAN BECAUSE HE IS UNQUALIFIED TO OFFER HIS OPINIONS.

The Court should exclude Mr. Macan because he lacks the expertise necessary to opine on the questions he purports to answer in this case. He is an electrical engineer, not an economist, and he has no training or experience in retail price setting or consumer-facing market dynamics. He does have past experience offering written testimony to FERC, the federal regulator, in support of mergers between wholesale power generators, like power plants. But that testimony has no relevance here. By law, FERC regulates only at the interstate, wholesale level (e.g., the electricity grid and power plants) and "may not regulate either within-state wholesale sales or, more pertinent here, retail sales of electricity (i.e., sales directly to users)." *FERC v. Elec. Power Supply Ass'n*,

577 U.S. 260, 267 (2016) (Kagan, J.). The New York Public Service Commission (NYPSC)—not FERC—regulates the retail market, including the New York residential ESCO market. *See id.* Macan's work for FERC does not qualify him to testify about how "market pricing, transportation costs, and other market-price factors" should be understood or "operationalized" in a New York ESCO retail contract, or how a retail supplier should price to comply with such terms. Indeed, by his own testimony, he has never set or helped set retail prices for any ESCO or utility, let alone done any work concerning retail pricing in New York. Ex. 14, Macan Dep. 17–18. Mr. Macan's track record in this litigation space confirms his lack of expertise. *See Richards*, 246 F. Supp. at 552–53 (rejecting proposed contract interpretation and margin calculation). Because Mr. Macan lacks the requisite experience with retail pricing, the Court should exclude Mr. Macan.

## VI.    CONCLUSION

For the foregoing reasons, the Court should exclude Mr. Macan and the opinions he offers.

*[Signature Appears on Following Page]*

Dated: March 13, 2026                    Respectfully submitted,

                                         */s/ Ryan D. Watstein*
                                         Ryan D. Watstein (*pro hac vice*)
                                         David Meadows (*pro hac vice*)
                                         Leo P. O'Toole
                                         **WATSTEIN TEREPKA LLP**
                                         75 14th St NE, Suite 2600
                                         Atlanta, GA 30309
                                         ryan@wtlaw.com
                                         dmeadows@wtlaw.com
                                         lotoole@wtlaw.com

                                         *Attorneys for Defendants Eligo Energy, LLC
                                         and Eligo Energy NY, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*

Ryan D. Watstein
