# Exhibit 3

## 2014 UBP

*Brous, et al. v. Eligo Energy, LLC, et al.*
*Case No. 1:24-cv-01260-ER*

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the City of
Albany on February 20, 2014

COMMISSIONERS PRESENT:

Audrey Zibelman, Chair
Patricia L. Acampora
Garry A. Brown
Gregg C. Sayre
Diane X. Burman

CASE 12-M-0476 - Proceeding on Motion of the Commission to Assess
Certain Aspects of the Residential and Small
Non-residential Retail Energy Markets in New
York State.

CASE 98-M-1343 - In the Matter of Retail Access Business Rules.

CASE 06-M-0647 - In the Matter of Energy Service Company Price
Reporting Requirements.

CASE 98-M-0667 - In the Matter of Electronic Data Interchange.

ORDER TAKING ACTIONS TO IMPROVE THE RESIDENTIAL AND SMALL NON-
RESIDENTIAL RETAIL ACCESS MARKETS

(Issued and Effective February 25, 2014)

BY THE COMMISSION:

<u>INTRODUCTION</u>

        In this Order, this Commission directs improvements to
New York State's retail energy markets serving the State's two
largest groups of customers, residential and small non-
residential customers.[1]  The actions taken here target issues

---

[1]  For the purposes of this Order, a "small non-residential
customer" means an electricity customer in a utility service
classification that does not have a demand rate element,
and/or a natural gas customer in a service classification that
provides firm service.

CASE 12-M-0476 et al.

raised by preliminary investigations by the Department of Public Service Staff (Staff) and confirmed by additional information provided to Staff through comments submitted in the course of the comprehensive market review previously ordered by the Commission in this proceeding.[2]

The information gathered by Staff in this proceeding indicates that competitive retail energy markets are functioning well for large commercial and industrial customers, including providing these customers with a wide range of energy-related value-added services.[3] Conversely, the investigation reveals that with few exceptions, the retail energy markets serving residential and small non-residential customers have failed to provide similar energy-related value-added products or services

---

[2] Case 12-M-0476 et al., Order Instituting Proceeding and Seeking Comments Regarding the Operation of the Retail Energy Markets in New York State (issued October 19, 2012)(October 2012 Order).

[3] Outside the definition recognized within the field of economics, "value-added" generally refers to something more than the standard; something that exceeds the expectations associated with provision of what is otherwise an undifferentiated commodity.  We make no further attempt to define the terms "value-added" or "value" beyond their common usage except to note that whether a particular offering falls within the definition of "value-added" may depend on a case-by-case qualitative assessment.  Such case-by-case assessments have been employed in other areas where bright line distinctions cannot easily be drawn.  See, Leegin Creative Leather Prods. V. PSKS, Inc., 551 U.S. 877, 899 (2007)(whether a particular action constitutes a "restraint of trade").

CASE 12-M-0476 et al.

to these "mass market" customers.[4]  Significantly, the
residential and small non-residential markets have also
generated a number of complaints concerning ESCO marketing
practices.[5]

In light of the apparent scarcity of energy-related
value-added products and services available in the residential
and small non-residential markets; the high complaint rates; and
what appears to be a large number of active ESCOs generating
revenues by offering consumers little more than higher prices,
it is apparent that these markets are not providing sufficient
competition or innovation to properly serve consumers.

As recently stated, the Commission recognizes that
retail markets have been and will be an integral part of the
regulatory framework.  In the future, these markets should
foster the innovation and economic investment required to
continue to modernize New York's power system design and
operation.[6]  The development of market competition within
regulated industries is an ongoing process.  The ultimate goal

---

[4]  Here, the term "mass markets" includes markets available to
residential and small non-residential customers (collectively
mass market customers) and is used to represent the large
number of customers in these groups.  It is not meant to imply
any particular level of uniformity regarding individual
customer's needs or desires for a product or service.  Rather
it is expected that the market will provide a wide range of
products to these very large but varied markets.

[5]  At this time, administrative complaint rates related to
regulated corporations are not only an indication of corporate
performance but represent more "public costs" incurred by
government entities in order to field and properly address
such complaints.  Mechanisms could be established to shift at
least some of the cost of fielding complaints and properly
addressing ESCO/customer disputes.

[6]  Case 07-M-0548, Proceeding on Motion of the Commission
Regarding an Energy Efficiency Portfolio Standard, Order
Approving EEPS Program Changes (issued December 23,
2013)(December Order).

CASE 12-M-0476 et al.

of this work is the development of a competitive market
structure which leads to innovation and other consumer and
societal benefits.  This Commission must also ensure that the
function of these markets is properly aligned with other aspects
of the regulatory framework including the roles and
responsibilities of regulated utilities and ratepayer supported
clean energy programs.

In support of this Commission's realignment of the
regulatory framework, this Order addresses major weaknesses in
the residential and small non-residential retail energy markets
due to the lack of accurate, transparent and useful information
and marketing behavior that creates and too often relies on
customer confusion.  The Commission also directs Staff to
continue its investigation into the State's retail markets in
conjunction with the upcoming proceeding regarding modernization
of the Commission's regulatory paradigm including clean energy
programs and retail and wholesale market designs.[7]

BACKGROUND

The Commission recognized the importance of developing
competitive retail energy markets in New York State over two
decades ago.[8]  Since then, as experience with these markets has
been gained, the Commission has adjusted its rules and policies
to both encourage and accommodate competition within the
markets.  Interactions between ESCOs and customers are primarily
governed by the Uniform Business Practices (UBP), first adopted
in 1999.[9]  The UBP is designed to ensure a consistent set of

---

[7]  Id. at p. 43.

[8]  93-M-0229, Proceeding on Competitive Opportunities, Order
     Instituting Proceeding (issued March 19, 1993).

[9]  Case 98-M-1343, In the Matter of Retail Access Business Rules,
     Order Adopting Uniform Business Practices and Requiring Tariff
     Amendments (issued January 22, 1999).

CASE 12-M-0476 et al.

operating practices for retail competition and to afford
customers with appropriate protections in their dealings with
ESCOs.  Consistent understanding and enforcement of the UBP is
obtained through its explicit incorporation into utility
tariffs.  We have made periodic updates to the UPB, most
recently in 2010.[10]

   Currently, there are 214 ESCOs deemed eligible to
provide electricity in New York State and 221 ESCOs are deemed
eligible to provide natural gas.  Approximately 24 and 20
percent of residential electricity and natural gas customers,
respectively, purchase energy commodity from an ESCO.[11]
Similarly, 35 and 33 percent of small commercial electricity and
natural gas customers, respectively, purchase energy commodity
from an ESCO.  In contrast, approximately 72 and 58 percent of
large non-residential electricity and natural gas customers,
respectively, purchase energy commodity from an ESCO.

   Staff began its current review of the performance of
the retail electricity and natural gas markets in 2012.  Staff's
review identified a number of concerns related to the retail
markets serving residential and small non-residential customers
and the Commission commenced this proceeding in order to address
those issues.[12]  In this review, Staff was provided with a large
amount of information by commenting parties.  Staff also met
with many ESCOs, representatives from ESCO and other energy

---

[10] In 2010, the Legislature created an "Energy Services Company
Consumers Bill of Rights" which is also reflected in the UBP.
See Gen. Bus. Law §349-d and Case 98-M-1343, supra, Order
Implementing Chapter 416 of the Laws of 2010 (issued
December 17, 2010).

[11] Percentages are based on April 2012 gas migration data and
June 2013 electric migration data.

[12] The October 2012 Order and related notice sought comment on a
number of specific questions related to the issues indentified
through Staff's market review.

CASE 12-M-0476 <u>et</u> <u>al.</u>

trade associations, employees from the large regulated energy
utilities and various other stakeholders and interested parties.
Staff also organized consumer meetings that included local
community groups, advocates of low-income consumers, and large
numbers of consumers.  Further, Staff developed an on-line
survey soliciting information from consumers regarding their
real-life experiences with the retail energy market.

          Staff also performed an extensive review of ESCO-
related consumer complaints received by the Department.  Staff
analyzed utility billing data regarding prices charged and/or
dollar amounts billed by ESCOs in their service territories, and
developed utility/ESCO bill comparisons.  Finally, Staff
reviewed ESCO websites and other marketing materials to gauge
the types and frequency of value-added services offered by ESCOs
to mass market customers.

<u>NOTICE OF PROPOSED RULEMAKING</u>

          On October 19, 2012, the Office of the Secretary
issued a notice soliciting responses to a list of 15 questions
related to the residential and small non-residential retail
energy markets in New York State (October 2012 Notice).[13]  In
accordance with the State Administrative Procedure Act (SAPA)
§202(1), notice of the October 2012 Notice was published in the
<u>State Register</u> on November 7, 2012.  The SAPA §202(1)(a) period
for submitting comments in response to the notices expired on
December 24, 2012.

---

[13] Originally, initial comments were to be submitted by
December 27, 2012 and reply comments were to be submitted by
January 10, 2013.  Multiple extensions of these deadlines were
authorized, resulting in initial and reply comments being
filed by February 1, 2013 and March 15, 2013, respectively.

CASE 12-M-0476 <u>et al.</u>

SUMMARY OF COMMENTS

Numerous parties submitted initial comments[14] and reply comments.[15]  In addition, approximately 50 comments from the

---

[14] The following parties submitted initial comments:  the Business Council of New York (Business Council), Central Hudson Gas & Electric Corporation (Central Hudson), Constellation New Energy (Constellation), Choose Energy (Choose), Compete Coalition (Compete), jointly by Consolidated Edison Company of New York, Inc. and Orange & Rockland Utilities, Inc. (Con Edison/O&R), Consolidated Edison Solutions, Inc. (CES), Consumer Power Advocates (CPA), Direct Energy Services, LLC (Direct), Federal Trade Commission (FTC), Great Eastern Energy (GEE), IDT Energy, Inc. (IDT), Independent Power Producers of New York, Inc. (IPPNY), Joint Utilities (Central Hudson, KeySpan Gas East Corp. d/b/a National Grid(KEDLI), National Fuel Gas Distribution Corporation(NFG), New York State Electric & Gas Corporation(NYSEG), Niagara Mohawk Power Corporation d/b/a National Grid (NMPC), Rochester Gas and Electric Corporation(RGE), and the Brooklyn Union Gas Company d/b/a National Grid NY(KEDNY)), National Energy Marketers Association (NEM), NFG, jointly by KEDLI, NMPC and KEDNY, New York City Department of Consumer Affairs (DCA), New York State Office of the Attorney General (OAG), New York State Department of State-Utility Intervention Unit (UIU), jointly by NYSEG and RGE (NYSEG/RGE),  New York State Energy Marketers Coalition (NYEMC), NRG Retail Affiliates (Energy Plus Holdings LLC, Green Mountain Energy Company, Reliant Energy Northeast LLC) (NRG), jointly by Pace Energy and Climate Center and the Alliance for Clean Energy New York, Inc.(PACE/ACE), jointly by Public Utility Law Project and AARP of New York (PULP/AARP), Retail Energy Supply Association (RESA), Small Customer Marketer Coalition (SCMC), and, US Energy Partners, LLC.(USEP).  The New York State Office of General Services (OGS) filed a letter on November 15, 2012, which we are treating as initial comments.

[15] Reply comments were submitted by Con Edison/O&R, Constellation, Direct, Joint Utilities, Joint Energy Service Companies (Agway Energy Services, LLC, Chief Energy Power, LLC, Direct, Dominion Retail, Inc. t/a Dominion Retail Energy, GEE, IDT., Infinite Energy Inc. dba Intelligent Energy, Integrys Energy Services, Inc., Interstate Gas Supply, Inc. dba IGS Energy, North American Power & Gas, LLC, NRG Retail Northeast, and US Gas & Electric, Inc.) (Joint ESCOs),

CASE 12-M-0476 et al.

public were filed.[16]  The parties comments have been thoroughly considered and summaries of the comments are included in Attachment A.  In addition, comments directly related to the actions we take today are addressed in the body of this Order.

DISCUSSION

In our December Order in the Energy Efficiency Portfolio Standard (EEPS) proceeding, we announced our upcoming initiative to consider a broad restructuring of distribution utility regulation in order to better align the responsibilities and motivations of the utilities with the interests of the State's energy consumers.[17]  As noted in the December Order, we believe that retail markets play an essential role in

---

Multiple Intervenors (MI), National Fuel Resources (NFR), NEMA, NRG, the Public Advocate for New York City (NYCPA). PULP/AARP, RESA, SCMC, and UIU.  Supplemental comments were filed by NYSEMC, RESA and SCMC.

[16] Eighteen commenters proposed that door-to-door and telemarketing of electricity and natural gas should either be prohibited or subjected to stricter requirements; twelve recommended that ESCOs be required to post historic and current pricing data on their websites; eleven commented that the savings promised by ESCOs have not materialized and ESCO representatives provide misleading information; eleven stated that ESCOs should disclose additional information on contracts regarding rate changes and other issues; and, eight consumers stated that they would benefit from additional information regarding their energy choices including comparison of current and historical pricing.  Additionally, two comments were received on each of the following issues:  whether customers in utility-sponsored programs that enroll customers with ESCOs should be provided additional information about the prices that are applicable after the introductory period; whether ESCOs should conduct marketing by direct mail instead of other approaches which are perceived as aggressive; whether additional consumer safeguards are required; and, whether restructuring of the energy market has provided benefits to consumers.

[17] December Order, pp. 1-3.

CASE 12-M-0476 et al.

stimulating needed innovation and encouraging economic investment in energy systems.

The core policy outcomes established in the December Order include a strong emphasis on demand-side resources and market animation[18] that will in all likelihood result in greatly increased opportunities in the retail energy markets serving residential and small non-residential customers.  Our goal is competitive retail energy markets in which ESCOs and other vendors offer a wide range of innovative products and services to enable mass market customers to more effectively manage and control their energy bills.

To guide regulatory policy, we use the concept of workable, or effective, competition.  Competition is considered to be workable when the underlying conditions required for perfect competition[19] have not been met, but the price and output of a market are very similar to that which would have resulted from a perfectly competitive market.  An alternative definition

---

[18] Id., pp. 21-23.  The five core policy outcomes identified in the Order are (i) the development of widely available and accurate information and tools to permit customers to effectively manage their bills; (ii) animation of markets with characteristics that will support innovation and encourage private investment in energy efficiency and clean energy technology and facilities; (iii) improved system wide efficiency resulting in reductions in cost and pollution; (iv) fuel and resource diversity including demand-side, customer-sited facilities and other distributed energy resources; and (v) continually improving reliability and resilience.

[19] Perfect competition assumes numerous buyers and sellers, each with small market share, so that individual market participants cannot influence the price.  Textbook definitions of perfect competition also require, among other things, that all buyers and sellers have perfect and complete information on present and future market conditions, and that all market participants can freely enter and leave the market. These strict conditions are unlikely to exist in actual markets. Nevertheless, vigorous competition can exist even when there are substantial departures from these conditions.

CASE 12-M-0476 et al.

of a workably competitive market is one that produces outcomes that are better than would be produced by economic regulation, but not as good as would be produced by perfect competition.

The key question in determining whether a market is workably competitive is whether the deviations from the strict conditions of perfect competition are of any economic consequence, in terms of the price and quality of the product. In general, a market is more likely to be workably competitive, the larger the number of suppliers and buyers, the lower the concentration of market share among the largest suppliers, the more information which market participants (buyers and sellers) have about market conditions, and the easier it is for suppliers and buyers to enter and leave the market.

Based on Staff's review, we find that retail energy markets are functioning well for large non-residential customers. The vast majority of these relatively sophisticated customers obtain their energy commodity from an ESCO and report savings and/or benefits from value-added services including energy price risk management and energy-related value-added services such as demand response and load management.

In contrast, we have several concerns about retail energy markets for residential and small non-residential customers. We find that as currently structured, the retail energy commodity markets for residential and small non-residential customers cannot be considered to be workably competitive. Although there are a large number of suppliers and buyers, and suppliers can readily enter and exit the market, the general absence of information on market conditions, particularly the price charged by competitors, is an impediment to effective competition (i.e., neither buyers nor sellers have good information about prices). Additionally, Staff's review shows a large variation in the price charged for energy

CASE 12-M-0476 et al.

commodity services with no value-added attributes, a result that is inconsistent with a workably competitive market.  Despite the large number of ESCOs, there seems to be almost no competitive pressure to innovate and provide value-added services or products to residential and small non-residential customers.

Staff's investigation also showed that, with the exception of electricity from renewable sources, energy-related value-added products or services were generally very limited. Several ESCOs offer loyalty rewards, such as a cash rebate for customers who purchase service for a full year. Other ESCOs offer products with a price fixed for more than 12 months, which may provide important customer benefits.  Very few ESCOs offered energy-related value-added services to mass market customers such as demand management programs or tools, voluntary dynamic pricing programs or tools, or energy efficiency measures.

We fully expect that, under the proper regulatory conditions, market competition will stimulate innovation and promote the economic investment that will be required to strengthen New York State's energy systems as they evolve to become more consumer oriented.  To advance this goal, we direct immediate improvements to the residential and small non-residential retail markets as explained below.  These improvements are described in Part I below and are intended to address a number of issues to help ensure the development of workably competitive retail energy markets by increasing and improving the information available to customers. In Part II, we strengthen rules and procedures applicable to ESCO marketing and customer enrollment and describe other housekeeping changes to the UBP.

Further, to help ensure that retail markets offer innovative new energy-related products and services, we also direct further investigation into the retail energy mass

CASE 12-M-0476 et al.

markets, intended to indentify how we facilitate the development
of energy-related value-added product and service offerings for
mass market energy consumers.  Our directives for further
analysis are detailed in Part III.


PART I

MARKET TRANSPARENCY – IMPROVING AND INCREASING AVAILABLE
INFORMATION

Workable competition requires that consumers possess
sufficient market knowledge to make informed decisions regarding
what and how much to consume and which firms can provide the
best value to customers.  Currently, it is extremely difficult
for mass market retail energy customers to access pricing
information relevant to their decision to commence, continue or
terminate service through an ESCO.  ESCOs do not provide
standardized products or pricing and primarily provide
prospective customers information on prices currently available,
while only historical data related to regulated utility prices
is widely available.  Further, many ESCO sales agreements rarely
include a set price and many simply state that the ESCO will
determine future prices.

We believe that retail customers should have ready
access to comparative pricing and/or billing information to
empower them to make more informed decisions regarding commodity
prices available in the retail market.  Consumer access to
better price information will increase the competitive pressure
on ESCOs to provide lower prices and/or other forms of increased
value to consumers.

The October 2012 Notice solicited responses to a
number of specific questions related to increasing the quality
and quantity of historic ESCO pricing or billing information
available to residential and small non-residential energy

CASE 12-M-0476 et al.

consumers.  The inquiries included specifics related to methods for delivering/presenting the information (on-bill or on-line); whether particular customers should be provided with different or additional information; whether the Commission should collect and make available ESCO price data through the Commission's website; and, whether ESCOs should be bound by the prices posted to the "Power to Choose" website.

Commenters were divided regarding the specific information that should be provided, with many expressing concerns that adjustments to the reported prices and/or detailed explanations would be required to ensure price comparisons are "apples-to-apples."[20]  Many commenters stated that total bill comparisons are more useful than commodity price comparisons because they include all the charges incurred by the customer and limit potential confusion related to the impact of commodity charges versus delivery and other charges on a utility bill. Views also diverged on the best-delivery method for the information.

It is important that customers who obtain their commodity from an ESCO, as well as those who obtain their commodity from the utility, have additional, easy-to-understand information to assist them in making informed decisions concerning their energy supplier.  Such information will enhance price transparency and sharpen competition for the benefit of

---

[20] A number of ESCO commenters questioned whether utility bills are correctly unbundled.  Such questions are beyond the scope of these proceedings.  Unbundled rates for individual utilities are approved in individual rate cases and are based on detailed analyses which conform to the provisions set forth in Case 00-M-0504 - Proceeding on Motion of the Commission Regarding Provider of Last Resort Responsibilities, the Role of Utilities in Competitive Energy Markets, and Fostering the Development of Retail Competitive Opportunities.  Changes to the unbundling methodology or specific rates should be considered in individual rate cases.

CASE 12-M-0476 et al.

energy consumers.  At this juncture, we conclude that a
reasonable method for making this information readily available
is to provide a historic bill calculator through the utilities
websites.

A.  Historic Bill Comparison

        Central Hudson and NFG already provide web-based
historic bill calculators for residential and small non-
residential customers, developed in collaboration with Staff.
NMPC recently implemented a similar tool for residential
customers.[21]  The historic bill calculators allow existing ESCO
customers[22] receiving a consolidated utility bill,[23] to compare
the total amount charged, including utility delivery service and
ESCO supply charges, with the total the customers would have
been paid if purchasing commodity service from the utility for
that period.  Thus, these calculators provide customers with a
direct comparison of the amount they were billed, including ESCO
charges, in each month for up to 12 months, with what the
customer would have paid if commodity service had been obtained
from the utility for that same period.

        The historic bill calculators are powerful tools.
Therefore, we direct Con Edison, O&R, KEDLI, KEDNY, NYSEG and
RG&E to develop and make available on their websites similar
historic bill calculators, in consultation with Staff, within

---

[21] Cases 12-E-0201 and 12-G-0202, NMPC – Electric and Gas Rates,
Order Approving Electric and Gas Rate Plans in Accord with
Joint Proposal (issued March 15, 2013).

[22] Utility only customers are unable to take advantage of a
historic bill comparison because they do not have an ESCO
billing history.

[23] A consolidated utility bill reflects the utility delivery
charges as well as the ESCO's commodity service charges.

CASE 12-M-0476 et al.

180 days of the issuance of this Order.[24]  Further NMPC's
calculator shall be expanded to provide this comparative
information for small non-residential customers.  The
calculators shall have the capability to compare at least 12
months of relevant billing data, and must also provide available
bill comparisons to customers with less than 12 months of
billing history.

We also require inclusion of clear disclosure
statements to inform customers that:  (1) the historic bill
calculator is most useful if the customer has been served by an
ESCO for at least twelve months; (2) the information presented
is historic and is not necessarily indicative of future prices
for either utility or ESCO service; (3) the price comparison
does not account for any value-added service(s) such as green
energy; and (4) the price comparison does not reflect any
affinity rewards programs or rebates that may be provided by the
customer's ESCO separately from the customer's utility bill.

Prior to implementation, the calculator must be made
available to the ESCOs and their trade associations for testing
not less than ten days prior to implementation and each utility
shall submit a letter to the Secretary to the Commission
affirming that its historic bill calculator was tested and is
accurate.  In addition, Staff must confirm that the disclosure
language is consistent with the language above.

---

[24] Parties in rate cases for Con Edison's electric, gas and steam
operations, Cases 13-E-0030, 12-G-0031 and 13-S-0032, filed a
Joint Proposal on December 31, 2013.  That Joint Proposal
calls for  Con Edison to develop and implement an on-line
historic bill calculator "as soon as practicable but no later
than December 31, 2014."  While we do not modify that deadline
in this Order, we encourage Con Edison to implement an on-line
historic bill calculator within 180 days of the date of this
Order.

CASE 12-M-0476 et al.

At this time, we will not require the addition of a
historic bill calculator to the Department's website.  Because
bill comparison calculators must incorporate data specific to a
customer's account, including similar functionality on the
Department's website would require extending the existing
security infrastructure and procedures employed by the utilities
to the Department's website.

We will not direct, at this time, that consolidated
utility bills include a direct comparison of what the customer
would have paid if the customer had purchased supply from the
distribution utility.  However, we will require that a brief
message be included on each consolidated utility bill for mass
market customers that advertises the availability and location
of the historic bill calculator.

B.  Historic ESCO Pricing Data

To further our interest in establishing workably
competitive markets for retail energy commodity services for
mass market customers, we direct ESCOs to file certain historic
pricing information for dissemination to the public.

We reject the argument by some parties that historic
pricing information would provide little value.  Better and more
usable information is likely to help customers make informed
purchase decisions.  We recognize, however, that it could be
confusing and counterproductive to aggregate an ESCO's charges
for widely varying services, such as variable price, fixed price
and energy-related value-added services.  Thus, we will collect
historic data from ESCOs in categories of similar products, to
allow actual and prospective customers to compare the prices of
similar services that have been charged by each ESCO offering
that type of service.

We require ESCOs to begin reporting historic pricing
data.  Until and unless the Power-to-Choose website is modified

CASE 12-M-0476 et al.

to include the information we identify here, we direct ESCOs to file with the Secretary, a separate average unit price for products with no energy-related value-added services for each of four groups of customers and by geographic area:[25] i) residential price fixed for a minimum 12 month period; ii) residential variable price; iii) small non-residential price fixed for a minimum 12 month period; and iv) small non-residential variable price. The averages should be weighted by the amount of commodity sold at each price within each category. ESCOs shall also file the number of customers purchasing products in those categories. ESCOs shall file the required information quarterly, reflecting data over the previous period, within 30 days of the end of each calendar quarter (i.e., data must be provided no later than April 30th, July 30th, October 30th and January 30th of each year), beginning with the data on prices charged in the second quarter of 2014.

We now confirm our intention, indicated in the October 2012 Order and Notice, to publish comparative pricing information for the categories identified above. We anticipate development of a list of the average price billed for each ESCO, separately for consumers in specific geographic areas of a utility service territory. We expect to sort the list based on average price, and organize ESCOs into quartiles, based on the average price charged to customers in the historical period. For the category of variable priced products with no energy-related value-added attributes, we anticipate that comparable information regarding utility charges will also be presented. The utility information will be adjusted to account for differences between how ESCOs and utilities charge for bill

---

[25] For example, with regard to Con Edison's service territory, pricing would be reported separately for New York City and Westchester County.

CASE 12-M-0476 et al.

processing and other charges in order charges in order
facilitate a direct comparison.  Publishing this comparative
historic bill information will assist mass market consumers in
assessing whether their current energy supplier meets their
needs.

Staff will further develop definitions of the product
categories and the specific format(s) for reporting the data in
a manner consistent with the requirements of this Order. In
addition, Staff will explore whether and how this historic
pricing information should be posted on the expanded Power to
Choose website.  These and other implementation issues will be
addressed at a technical conference to be held within 60 days of
the date of this Order.

C.  Expansion/Improvement of the "Power to Choose" website

Some information regarding ESCO pricing is available
on the Department's "Power to Choose" website.  However, the
information is limited to residential prices.  Also, ESCOs are
required to input their pricing information to the Power to
Choose website at least once every 30 days but are free, at any
time, to make offers to consumers at prices other than those
posted on this website.  Thus, the prices listed on Power to
Choose represent a snapshot that may not reflect prices that are
actually available to new customers at that time.[26]

To improve the accuracy and transparency of ESCO
pricing, we will expand the Power to Choose website to include
current pricing for small non-residential customers.  As
recommended by most parties, we will also require ESCOs to honor
all rates posted on the Power to Choose website regardless of

_____

[26] The Power to Choose website contains disclaimers which state
that the prices are illustrative, to alert customers that it
is only the starting point for price discovery and that an
actual offer to provide service must be obtained directly from
an ESCO.

CASE 12-M-0476 <u>et al.</u>

whether an ESCO chooses to update its prices only once every 30 days as required or more frequently. The requirement to honor prices posted on the Power to Choose website will include pricing for small non-residential customers as the website's functionality is expanded.

Residential and small non-residential customers who contact the ESCO to take service must be guaranteed to pay no more than the price posted on Power to Choose at that time for the product the consumer chooses to purchase.[27] This requirement will greatly increase the value of the website for empowering consumers and increasing competition within the markets.

D.  Other Information Related Issues

We will not require additional information be provided to payment troubled customers or low income customers. We will however, adopt the recommendation by PULP/AARP concerning the minimum amount that ESCO customers must pay to avoid service termination. The Home Energy Fair Practices Act (HEFPA)[28] allows a customer to have his or her utility service reconnected following termination for non-payment by paying the lesser of the combined utility delivery and ESCO commodity charges or the

---

[27] The price must be guaranteed for the term stated on Power to Choose. For example, if the product is a variable rate product where the price is recalculated monthly, then the ESCO must guarantee that the customer will pay no more than the price stated on the website at the time the customer requested service for the customer's first month of service from the ESCO.

[28] Public Service Law (PSL) §32(5)(d) requires the utility to reconnect service, after termination for nonpayment, based on collecting an amount that would not otherwise exceed the utility's commodity prices. Customers are not affirmatively informed of their right to obtain reconnection by paying the lesser amount. Furthermore, utilities seek payment arrangements on the full amount overdue and not the lesser amount, if applicable, when customers call to avoid termination for nonpayment.

CASE 12-M-0476 et al.

bundled utility commodity and delivery charges. In practice, most utilities issue a termination notice which shows what the customer owes in total for delivery and commodity, including ESCO charges. If the customer doesn't pay the amount owed or negotiate a deferred payment agreement, the customer's service is subject to termination. Once terminated, in order to have service reconnected the customer must pay the lesser of the amount on the termination notice or what the customer would have paid for service if the distribution utility provided the customer's commodity. Some utilities, however, allow the customer to pay the lesser amount to maintain service without interruption.

PULP/AARP recommends that the utility be prohibited from terminating service to a customer if the customer's ESCO charges are higher than what the customer would have been charged for utility bundled service. We conclude that, in the event the customer owes more for service through an ESCO than what he or she would have owed for bundled utility service, the customer can avoid termination of service by paying the lesser amount. Further, in such cases the differential will be charged back to the ESCO. Utility termination notices modified to reflect this option must be filed with the Secretary to the Commission within 60 days of the date of this Order and in use within 90 days of the date of this Order.

E.  ESCO Referral Programs

Under ESCO referral programs, a utility offers certain customers contacting it for non-emergency reasons, the opportunity to enroll with ESCOs which agree to offer a 7% discount off of the price of utility energy commodity service for a two-month introductory period. Customers that do not request enrollment with a particular participating ESCO can be randomly assigned to an ESCO on a rotating basis. Con Edison,

CASE 12-M-0476 et al.

O&R, Central Hudson and NMPC currently operate such programs.[29]
In general, ESCOs believe these programs should continue.
Consumer advocates believe they should be terminated and
utilities recommend that they be provided at the discretion of
individual utilities.

These programs facilitate customer enrollment by
allowing ESCOs to avoid marketing, verification and enrollment
costs.  When these programs were established, they were
explicitly conceived of as an interim, near-term strategy to
expand the market.  The programs appear to have outlived their
usefulness.  In the nine years since the programs were approved
they have facilitated customer migration to ESCOs.  However, we
have found that the vast majority of mass market ESCO customers
experience higher bills than they would have as full service
utility customers and the programs have provided little or no
competitive pressure or other value-added benefits to these
retail markets.  Under these circumstances, we will not continue
to endorse these referral programs, which, as structured, create
an expectation that the customer will save money in comparison
to what they would have paid the utility.

Accordingly, utilities should cease their ESCO
referral programs within 60 days of issuance of this Order.  We
may reconsider the use of ESCO referral programs in the future,
if new circumstances suggest such programs will bring benefits
to consumers and the market in general.  We may also consider
re-designed referral programs to encourage the availability and
use of energy related value-added services.  However, in order

---

[29] NYSEG/RG&E, KEDLI and KEDNY have proposed ESCO Referral
Programs, but we have not taken action on those proposals.
ESCOs have not reported any interest in a decision on these
filings.  NFG had an ESCO Referral Program until 2008, but
abandoned it due to reportedly high implementation costs and
low participation.

CASE 12-M-0476 et al.

to maintain a reasonably level playing field, we concur with UIU
and direct that the utilities continue to inform new and moving
residential and small business customers of their option to
select an ESCO and how to obtain information on ESCO products.

F.   Treatment of Customers Participating in Utility Low Income
     Assistance Programs.

        As discussed earlier, residential customers are
generally paying more for commodity service from an ESCO than if
they had purchased their energy from the utility.  We expect
that the increase in information and transparency in the retail
markets will increase competitive pressure and significantly
sharpen competition.  However, we must ensure that the current
operation of the residential retail energy market does not
negatively impact other policy goals.

        An important component of our statutory policy is the
continued provision of electric and natural gas service to all
residential customers.[30]  To that end, we authorize more than
$100 million annually for ratepayer-funded utility low income
assistance programs.  These ratepayer funds augment taxpayer
funds that provide financial assistance to utility customers
through the Home Energy Assistance Program (HEAP).

        As explained in the October 2012 Order, in at least
one utility service territory, customers participating in the
utility's low-income assistance program are more likely to
obtain their energy commodity from an ESCO than customers who do
not participate in these programs.  We are concerned about the
use of ratepayer and taxpayer funds intended to assist low

_____

[30] PSL §30 states that the continued provision of electric and
   natural gas service to all residential customers "is necessary
   for the preservation of the health and general welfare and is
   in the public interest."

CASE 12-M-0476 et al.

income customers instead paying ESCOs for higher priced
commodity without corresponding value to the customer.

As a threshold matter, several parties point out that
customers who participate in utility low income assistance
programs and HEAP are benefitting, or could benefit, from
obtaining service from an ESCO.  However, the data we have
reviewed show that residential ESCO customers in New York State,
as a group, have not benefited in recent years in comparison
with what they would have paid if they were full service
customers of the utility.

We note that all customers, particularly those who
participate in utility low income assistance programs and HEAP
can benefit from energy-related value-added services such as
home energy management services, demand response programs and
tools, energy efficiency measures, and other tangible services
as determined by Staff.  By helping customers reduce their
utility bills, such services make it easier for customers
participating in utility low income assistance programs or HEAP
to pay their energy bills, and maintain the value of existing
financial assistance programs.  However, at this time the scope
of value-added services offered by ESCOs to residential
customers continues to be very limited.

By charging more for energy supply without providing
energy-related value-added benefits, ESCOs serving customers who
participate in utility low income assistance programs or receive
HEAP benefits diminish the value of those programs.  Diminishing
the value of public assistance in relation to customers' bills
will make it harder for those consumers to pay their utility
bills in full, which may lead to increased arrears and utility
shut-offs, to the detriment of utilities and their customers.
Further, the use of limited utility low income assistance
program and HEAP funds to pay ESCOs higher-than-necessary energy

CASE 12-M-0476 et al.

prices reduces the availability of the funds for other
consumers.

Continuing to allow participants in utility low income
assistance programs and HEAP to purchase energy commodity from
an ESCO, without a guarantee of savings in comparison with what
the customer would have paid the utility, or without tangible
energy-related value-added services that may reduce a customer's
overall energy bill, is not in the public interest.  Doing so
diminishes the value of utility low income assistance programs
and federal and state assistance programs.  In addition, it may
also interfere with our interest in minimizing the unnecessary
termination of essential electricity and natural gas service to
residential customers.

Therefore, we agree, in part, with the recommendation
of utilities, OAG and PULP/AARP.  Specifically, we require that
ESCOs serving customers participating in utility low income
assistance programs must do so with products that guarantee
savings over what the customer would otherwise pay to the
utility.  To comply with this guarantee, an ESCO must be able to
compare actual customer bills to what the customer would have
been billed at the utility's rates and, on at least an annual
basis, provide any required refund as a credit on the customer's
bill.  Alternatively, ESCOs may also provide these customers
energy-related value-added services that are designed to reduce
customers' overall energy bills as described above.[31]  If an ESCO
cannot or will not comply with these conditions, it can choose

---

[31] We emphasize that it is not up to the utilities to enforce
    this policy.

CASE 12-M-0476 et al.

not to serve customers participating in utility low income
assistance programs or HEAP.[32]

      To accommodate this new policy and to assist ESCOs in
determining whether prospective customers qualify as low income,
several administrative changes are required.  Currently, as part
of the process of enrolling a new customer, ESCOs must obtain
customer authorization for the utility to release certain
information to the ESCO.  The information is transmitted via
Electronic data interchange (EDI), but does not indicate whether
a potential customer is a participant in either a utility low
income assistance program or HEAP.  In order for the ESCO to
obtain this information, two things need to happen.  First, the
ESCO must seek customer authorization to obtain that
information, which requires a modification to the customer
authorization rules in the UBP.  Second, as discussed above, EDI
standards must be modified to provide a field for information on
the customer's low income program enrollment status.

      ESCOs that intend to serve customers participating in
low income assistance programs, but do not provide qualifying
value-added services, must develop a mechanism to implement the
price guarantee.  That mechanism must enable the ESCO to compare
the actual customer bill to what the customer would have been
billed if served by the utility and, on at least an annual

---

[32] As explained in prior Commission Orders, ESCOs are not
required to only charge tariffed prices approved by this
Commission.  See Case 06-M-0647 et al., supra, Order Adopting
ESCO Price Reporting Requirements and Enforcement Mechanisms
(issued November 8, 2006)(p. 11).  In requiring that ESCOs
guarantee savings compared to what the customer would have
paid to the utility for customers who participate in utility
low income assistance programs and HEAP, we do not change this
policy.  ESCOs remain free to set prices without seeking
Commission approval.  The ESCO must only show that it can
offer the customer value beyond what the utility would
provide, either through savings or value-added services.

CASE 12-M-0476 et al.

basis, provide any required credit on the consolidated utility bill.  Billing changes may be necessary to accommodate ESCO credits and should be implemented within 90 days.

Regarding customers who are participants in the utilities' low income assistance programs and/or HEAP, and who are currently served by ESCOs, we will require that, within 90 days of the date of this Order, each utility provide a notice, through a bill insert or targeted letter, to such customers. The notice must inform the customer (1) that he or she may be eligible for a lower rate from their ESCO, and (2) that the customer should contact his or her ESCO to inform it that he or she is a participant in a utility low income assistance program and/or HEAP.

For a low income customer with an ESCO contract without an early termination fee who contacts his or her ESCO, the ESCO may offer one or more plans that comply with our policy, or the ESCO shall offer to switch the customer back to utility default service without an early termination fee.  For a low income customer with an ESCO contract that includes an early termination fee who contacts his or her ESCO, the ESCO must inform the customer of his or her options to continue with ESCO service for a specified number of months or pay the specified early termination fee.  For a low income customer who does nothing in response to the notice, the ESCO may keep the customer on his or her existing plan for the remainder of the plan's then-current term, but shall not renew the existing plan unless it complies with our policy for new low-income customer enrollments.  In such a situation, the ESCO must either switch the customer back to utility default service at the end of the current term and notify the customer that it is doing so, or obtain affirmative customer agreement to a new plan that complies with our policy.

CASE 12-M-0476 et al.

          Further details regarding the implementation of this
new policy concerning ESCO offerings for customers who
participate in utility low-income assistance programs and HEAP
are to be addressed at the technical conference to be convened
within 60 days of issuance of this notice.


                              PART II
          IMPROVEMENTS TO MARKETING AND CUSTOMER ENROLLMENT
          The UBP establishes marketing standards that ESCOs and
their representatives must follow when marketing to consumers,
including through in-person contact, such as door-to-door
marketing.  We have strengthened these rules on occasion to
address new developments and concerns.  However, apparent abuses
continue.

          At this time, we will build on recommendations to
establish more stringent requirements regarding ESCO marketing
in order to reflect best practices.  We identify new
requirements for ESCO marketing in a few areas of critical
importance, incorporate these new requirements in the UBP and,
as with other UBP modifications, require that they be
implemented by ESCOs within 90 days of the issuance of this
Order.[33]

A.  ESCO Customer Agreement Verification

          Under our current rules, verification of customer
agreement to take service from an ESCO may be obtained through a
signature on a written agreement, through electronic
authorization, or through a recorded telephonic authorization.
ESCO representatives conducting door-to-door marketing are

---

[33] General Business Law §349-d(12) specifically permits the
Commission to adopt additional requirements relating to ESCO
marketing practices that are not inconsistent with the
statute.  We find that our new requirements are consistent
with GBL §349-d.

CASE 12-M-0476 et al.

required to obtain customer authorization by having the customer
sign a written agreement in the presence of the sales
representative.  In practice, while not currently required by
the UBP, many ESCOs verify the door-to-door agreements through a
recorded telephonic verification process similar to the Third
Party Verification (TPV) process frequently used for the
verification of a change of telecommunications carriers.
However, unlike the requirements for changes in telephone
service providers, the ESCO marketing representative may be
present to assist or coach the customer in completing the ESCO
enrollment authorization.

        Utilities and representatives of consumers generally
express strong concerns with door-to-door marketing and urge
that it be prohibited or that additional safeguards be
implemented to help protect consumers.  The OAG recommends that
we adopt new requirements governing this form of marketing
including recording of the entire door-to-door sales
presentation and discussion with the customer.  Even two ESCOs,
GEE and USEP, state that they do not support door-to-door
marketing.  Generally, however, ESCOs support the continued
viability of door-to-door marketing as a marketing practice.

        To address our continuing concerns with door-to-door
marketing, and reflecting the best practices of ESCOs operating
in New York, we require that sales which result from marketing
that in any way includes door-to-door marketing be subject to
independent TPV after the sales agent has left the customer's
premises.  Further, because Staff reports a number of marketing
complaints related to telephonic sales, we require that
independent TPV be required for all telephonic enrollments as
well.  The requirement for independent TPV applies to any sales
that originated as, or included, either a door-to-door or
telephonic marketing component.  Because we receive few

CASE 12-M-0476 et al.

complaints about enrollments resulting from direct mail campaigns or electronic authorizations, we will not extend a requirement for independent TPV to those marketing modes at this time.[34]

We adopt several requirements developed by the FCC to help ensure the integrity of the verification process. Specifically, we require that TPV be conducted by an entity that: (1) is not owned or controlled by the ESCO, its parent, affiliates or agents; (2) whose compensation is not related to whether or not the ESCO enrollment is confirmed; and (3) is in a location that is physically separate from the ESCO, its parent, affiliates or agents. In addition, the TPV must be between the independent verifying entity and the potential ESCO customer, without participation by the ESCO or its marketing representative. Ideally, the TPV would be made several hours after the marketing agent has left the residence. The call must also be recorded and the recording kept for the longer of two years or the duration of the sales agreement.

A critical component of TPV is the questions that the independent verifying entity is to ask the prospective ESCO customer. In recognition of the numerous complaints of slamming and misrepresentation by individuals marketing on behalf of ESCOs, we require that TPV entities ask and receive an affirmative response from the customer, at a minimum, to the questions contained in the revised UBP Section 5, Attachment 1. The ESCO may enroll the customer only if the answers to each of the questions required in UPB Section 5, Attachment 1 demonstrate that the marketing was conducted in accord with UBP

---

[34] However, if a customer's agreement is via electronic means, for example, but the customer was marketed to at least in part through door-to-door marketing, then that customer's agreement must be confirmed through independent TPV before the ESCO may enroll the customer.

CASE 12-M-0476 <u>et</u> <u>al.</u>

requirements, and that the customer correctly understands the provisions of the contract.  If the ESCO would like to personalize the TPV by, for example, asking additional questions specific to the marketing call (<u>e.g.</u>, was the ESCO representative courteous), it may do so.

B.  Marketer Identification Statement

The UPB already requires that ESCO representatives conducting door-to-door marketing produce identification and identify the ESCO which they represent, "as soon as possible and prior to describing any products or services offered by the ESCO."  To help address continuing complaints of customer confusion regarding who ESCO marketers represent, the October 2012 Notice sought comments on a potential change to the UBP that would require that marketers begin an in-person interaction with a potential customer with a specific disclosure statement, such as: "My name is ____.  I represent [ESCO name].  [ESCO name] can provide you with your electricity and/or natural gas. I do not work for or represent your utility."

In view of our continuing concerns about ESCO marketing practices, we will require use of a brief disclosure statement as identified in the October 2012 Notice.  This disclosure statement must be delivered immediately after any introductory greeting.  This statement shall be used by all ESCOs, ESCO representatives, and ESCO agents, in all in-person interactions with potential customers at locations other than the ESCO's place of business, where the interaction is for the purpose of describing, marketing or selling any product or service offered by the ESCO. The disclosure statement must also be used in all telephonic interactions with potential customers.

C.  Visual Identification of Door-to-Door Marketers

To facilitate our ability to enforce the UBP, we require that all ESCOs and their representatives conducting

-30-

CASE 12-M-0476 et al.

door-to-door marketing, offer to all consumers contacted through door-to-door marketing a business card or similar information which includes: the name of the sales agent; the ESCO represented; a contact number at the ESCO that the consumer can use for inquiries, verification and to register a complaint about the sales practices of the agent; and, the date and time of visit.[35]  Since we already require that ESCOs provide all prospective customers with the ESCO Consumer Bill of Rights, the marketing agent's business card can be attached to that document.

        Similarly, to facilitate enforcement of door-to-door provisions of the UBP, we require that all ESCOs maintain a record of the territories in which they and their marketing representatives conduct door-to-door marketing.  Constellation reports that it maintains a list of the ZIP Codes to which its door-to-door marketing firms and their agents are assigned, to facilitate compliance.  We find compilation and maintenance of such lists, to be a best practice.  Therefore, we require each ESCO to maintain lists each day of the ZIP Codes in which each of its marketing representatives are conducting door-to-door marketing.  In the event of a complaint, this information will help the ESCOs identify which marketing representative is the subject of the allegation.  Finally, such information should be in a form that can be reported to Staff upon request, and should be retained by the ESCO for a minimum of six months.

        The UBP already requires that ESCO marketing representatives, who contact consumers in person, have identification that is visible at all times.  The identification must display the agent's name and photograph, the name and logo

---

[35] The card must be offered to the consumer whether or not the contact results in a sale.

CASE 12-M-0476 et al.

of the ESCO, and the telephone number of the ESCO.  The newly
prescribed introductory statement, together with the independent
TPV in which prospective ESCO customers must confirm that they
understand that the ESCO is not associated with the utility
before the ESCO enrollment can be completed, reduces the need,
at this time, for additional specific requirements concerning
attire of ESCO agents.

     We reiterate our continuing concern with door-to-door
marketing of energy services.  We affirm that we have ample
statutory authority to impose additional requirements upon
entities conducting such marketing.  We shall not hesitate in
imposing additional requirements on ESCOs conducting door-to-
door marketing, where warranted.

D.  Other Modes of Enrollment

     The UBP specifies requirements to enroll customers via
door-to-door sales, telemarketing and Internet.  These
requirements have been updated and revised in recent years.
However, other modes of enrollment not envisioned by the UBP are
possible, such as enrollment by e-mail.  Irrespective of how the
sales transaction occurs, the established requirements for
enrolling customers remain the same.

E.  ESCO Contract Renewals

     The UBP includes numerous detailed requirements for
receiving, processing and fulfilling requests for changing a
customer's energy provider.  In contrast, the UBP contains very
few requirements concerning the information that must be
provided to customers for contract renewals, conversions of
contracts from fixed to variable prices, or changes in the rate
during existing contracts.  Regarding contract renewals, the UBP
requires express consent from a customer except for changes in
rates or for contracts that renew on a monthly basis where the
rate methodology is specified.

CASE 12-M-0476 et al.

        The absence of a requirement that customers provide
express consent to contract renewals or rate changes raises
concerns.  Constellation correctly points out that automatic
contract renewal is a common practice for cable and cell phone
service.  However, unlike most ESCO services, cable and cell
phone providers inform the customer of the price that the
customer will pay going forward.  For ESCO service, enhanced
protections are necessary.

        Several parties, including Joint Utilities and UIU,
support requiring affirmative customer consent on all contract
renewals.  We decline at this time, to adopt such a requirement
since it may inappropriately drive ESCO customers back to
utility commodity service and raise ESCO operational costs.
However, we require ESCOs to publish, on all contract renewal
notices for mass market customers for services with no energy-
related value-added attributes, a prominent message stating that
tools to help the customer compare historic and present ESCO
prices are available on, or can be accessed from, the
Department's website.  When issuing renewal notices, ESCOs must
use a standardized format.  Staff will develop a standard
renewal notice and make it available to ESCOs on the
Department's website.  Further, in the event of a fixed rate
contract that renews at a fixed rate, the ESCOs shall provide
the customer with additional notice prior to the issuance of the
first bill under the terms of the contract as renewed, but not
more than ten days prior to issuance of that bill.  This
additional notice shall include the new rate and inform the
customer that, consistent with GBL §349-d(6) and the UBP, he or
she cannot be charged a termination fee if he or she objects to
the renewal within three business days of the customer's next
bill.

CASE 12-M-0476 et al.

        Finally, we are concerned that customers may not
recognize the significance of the renewal notice when they
receive it in the mail.  Accordingly, we require that the
renewal notice be sent in an envelope which states in bold
lettering:  "IMPORTANT: YOUR [ESCO NAME] CONTRACT RENEWAL OFFER
IS ENCLOSED.  THIS MAY AFFECT THE PRICE YOU PAY FOR ENERGY
SUPPLY."

F.  ESCO Contracts – Variable Price Methodology

        The UBP already requires that the customer disclosure
statement identify, among other things, the price, whether the
price is fixed or variable and, if variable, how the price is
set.  In practice, these descriptions of how the variable price
is established may include vague or complicated, yet non-
specific, language.  Some parties' recommend that the disclosure
statement be required to specify the methodology, index, or
formula used by the supplier and that the formula should be
publicly available and external to the supplier's ability to
change or interpret the index, formula, or methodology.

        We decline to require that ESCOs specify their
variable rate methodology and tie it to publicly available
information.  Such a formula is unlikely to provide meaningful,
actionable information for mass market customers.  In addition,
such an approach would place undue weight on the published rate
methodology, instead of on the actual attributes of the service
valued by customers such as the extent of energy-related value-
added services and the actual price charged by the ESCO.
Further, as described in this Order, we are taking other
significant action to enhance the transparency of prices
actually charged by ESCOs, which is of far greater benefit to
consumers than publication of a variable price formula.
Moreover, imposing a requirement to publish a rate methodology
would unduly constrain ESCOs and inhibit their ability to

CASE 12-M-0476 <u>et al.</u>

respond to unanticipated market factors, thereby potentially impeding competition.

However, we encourage ESCOs to provide meaningful, understandable information to customers about how variable prices are determined, consistent with the UBP. Clear, plain language descriptions will assist customers in understanding ESCO offerings and enhance consumer confidence in retail energy markets.

## G. Enforcement of Marketing Rules

Currently, upon Staff identification of a pattern of apparent violations of our marketing rules, Staff initiates a multi-step investigation and enforcement process. First, the ESCO is served with a Notice of Investigation (NOI) identifying apparent violations of the UBP, to which the ESCO must provide a written response. Second, upon a finding by Staff of a continuing and significant pattern of apparent UBP violations, the ESCO receives a second notice, referred to as a Notice of Failure (NOF), which requires the ESCO to file with the Department detailed information pertaining to each complaint the ESCO receives going forward. The NOF also commences a cure period, during which the ESCO is provided an opportunity to take corrective action. If, following the NOF, Staff continues to observe an apparent pattern of continuing and substantial violations of the UBP, this Commission may issue an order to show cause, which provides the ESCO an opportunity to demonstrate why the Commission should not impose consequences, such as suspending the authority of the ESCO to acquire new customers.

Based on the recent experience, we conclude that the process of investigating apparent violations of the UBP should be streamlined. Accordingly, we modify the process to combine the Notice of Investigation and Notice of Failure steps

-35-

CASE 12-M-0476 et al.

identified above.  Upon identification of a pattern of apparent
violations of the UBP, the ESCO will be sent a single Notice of
Apparent Failure, in which it will be invited to provide a
written response to identified complaints, required to provide
detailed information for each subsequent complaint, and be
provided a standardized cure period of 30 days.  The procedural
steps of a Commission-issued order to show cause and a
Commission Order imposing consequences, remain unchanged.  These
streamlined procedures will facilitate prompt enforcement action
where appropriate, thereby protecting consumers, and effectively
uses regulatory resources while also preserving the ability of
ESCOs to respond to allegations.  We will respond forcefully to
evidence of significant and continuing violations of the
marketing provisions of the UBP.

H.  Purchase of Receivables

        Utilities provide billing and collection services, by
use of consolidated utility billing (CUB), for the vast majority
of ESCOs serving residential customers.  Utilities also purchase
accounts receivable from most of the ESCOs providing service in
their respective service territories.  We previously adopted the
Purchase of Receivable (POR) model to, among other things,
reduce ESCO costs thereby promoting retail access, and ensure
that customers receive the full benefits of HEFPA.

        Receivables are purchased either with recourse or
without recourse.  When receivables are purchased without
recourse, the value of the receivables being purchased is
generally discounted based on historical net write off
percentages (POR discount).  The utility then assumes full
responsibility for collections from customers.  The POR discount
is based on the payment history of all ESCO customers, or all
ESCO customers in a specific service class.  It does not vary by
ESCO.  In contrast, where receivables are purchased with

CASE 12-M-0476 et al.

recourse, if the customer does not pay his or her bill, the utility charges a portion of the write off to the ESCO and the ESCO assumes responsibility for the collection of those amounts. The amount charged back to the ESCO is the difference between what the customer owed the utility including ESCO charges and what the customer would have owed the utility had he or she been a full service customer of the utility.

        In general the utilities are opposed to a requirement to implement POR with recourse stating that the existing POR programs with CUB have been instrumental in increasing customer participation in the retail access market.  The utilities indicate that changing to POR with recourse would require system programming and testing at significant costs and would also require modifications to utility collection processes, accounting procedures, and internal controls.

        We are concerned that POR without recourse, in which the POR discount is uniform across all ESCOs, may decrease the incentive for ESCOs to charge existing customers reasonable rates.  Moreover, a single POR discount appears to disadvantage ESCOs that enroll and retain good-paying customers at competitive prices.  We therefore direct that the POR programs be modified so that POR discount rates are calculated and established for individual ESCOs.  We expect that this approach will avoid the substantial time and costs of requiring POR with recourse, while achieving many of the same beneficial results.[36]

---

[36] As explained above, PSL §32(5)(d) provides that customers may have service restored by paying the lesser of their delivery and ESCO commodity charges or the applicable full service delivery and commodity charges.  Customers may forestall terminations in the same manner.  Under those limited circumstances we require that the utility charge back to the ESCO any uncollected amounts.

CASE 12-M-0476 et al.

Implementation of ESCO specific POR discount rates may require modifications to the utilities' customer information and billing systems and to utility billing services agreements.

A collaborative should be held within 60 days of this Order with the intent of implementing ESCO specific POR discount rates within 180 days. Further, the ESCO specific POR discount rates must be reviewed and, if necessary, reset annually and the utilities are required to file annual reports which identify the ESCO specific POR discount rate in a format determined through the collaborative.

I. ESCO Customer Enrollments Through Third Parties

Energy brokers who represent multiple ESCOs are playing an increasing role in retail energy markets. Typically, these brokers solicit consumers with the promise that the broker will evaluate consumers' energy needs and match them with the best available product (usually claiming to find the ESCO offer with the lowest price). These entities may not disclose to consumers whether they have established agency relationships with multiple ESCOs, or the source of their compensation. While some brokers are compensated by the ESCO, others may be compensated with a portion of the consumer's monthly energy bill for the duration of the contract.

Energy brokers and other third parties, who are not themselves ESCOs, can play an important role in retail energy markets and assist consumers in making informed decisions. The importance of these entities as an intermediary between mass market consumers and ESCOs may grow in the future. However, we have concerns about the practices of some of these entities, which can lead to consumer harm, damage to the reputation of third party marketers as a group, as well as damage to the

CASE 12-M-0476 et al.

reputation of the competitive retail energy supply industry.[37]
Since they are not ESCOs, these third parties are not themselves
subject to the UBP, and are subject only to regulation under the
State's general consumer protection statutes.

We emphasize that ESCOs are responsible for ensuring
that all of their customer enrollments satisfy the requirements
of the UBP, irrespective of who solicits or identifies the
potential customer.  To re-enforce this responsibility, we
modify the UBP's definition of "ESCO marketing representative"
to state that the term encompasses the ESCO, its employees,
agents or contractors/vendors conducting marketing activities on
behalf of the ESCO or ESCOs.  Further, the definition includes
subcontractors, employees, agents, vendors and representatives
not directly contracted by the ESCO who conduct marketing or
sales activities on behalf of the ESCO, such as energy brokers.

In addition, we agree with the concerns of parties who
would have us oversee the activities of energy brokers and/or
third party agents of the ESCOs.  Accordingly, we modify the UBP
to require that ESCOs provide us with information on the
entities marketing on their behalf as well as how those entities
are marketing to customers (door-to-door, telephone sales,
multi-level sales, etc.).  ESCOs should initially file this
information within 90 days of the date of this Order.  Further,
whenever an ESCO's marketing plan changes the ESCO must notify
Staff.  The information we require includes names, any assumed
business name or alias, address, phone numbers and owner(s) or

---

[37] For example, we are aware of nuisance calls from energy
brokers to prospective customers in which the entity
responsible for the calls is not identified,
misrepresentations by energy brokers in conversations with
potential customers, and an absence of transparency concerning
the entity that will provide the energy service and how the
energy broker is compensated.

CASE 12-M-0476 et al.

principal(s).  The information should be updated at least annually.  We also require that ESCOs, upon request from Staff at any time, provide the same information with respect to the third party marketer who has had a contact with a particular consumer, to help with the investigation, resolution and analysis of customer complaints.  If Staff determines that a specific third party marketer is acting in a manner that is inconsistent with the UBP, Staff will inform the ESCOs who use that marketer of any documented incidents.  We will continue to monitor third party marketers' involvement with energy consumers and ESCOs, as well as the UBP compliance of ESCOs who partner with these entities, to determine if further action on our part is required.

J.  New York State Office of General Services as a Direct Customer

        The New York State Office of General Services (OGS) requests that the definition of "Direct Customer" be modified to fulfill OGS' requirements under State Finance Law (SFL) §97-g, which OGS describes as the aggregation of "the electric load of state facilities within the NYISO Zones across the State."  RESA objects to that request, asserting that OGS' proposal to modify the UBP and its efforts to be provided status as an ESCO is contrary to the goals of creating a retail energy market populated by independent competitive ESCOs.  In contrast, RESA asserts that OGS, a state agency, is not a competitive entity subject to the rigors of the marketplace or competition, including the basic standard of operating on a for-profit basis.  RESA maintains that conferring ESCO status on a state agency and forcing the remainder of the ESCO community to compete with OGS would create an uneven playing field.  Consistent with the Commission directives to eliminate barriers that would impede the growth of competitive markets in New York State, RESA

CASE 12-M-0476 <u>et</u> <u>al.</u>

requests that we examine the impact of allowing a state agency or other entity that is not a for-profit competitive enterprise to obtain and operate under ESCO status in New York.

The goal of SFL §97-g is to allow OGS to provide centralized services, including electricity supply to ensure the lowest cost to state taxpayers. Denying OGS the ability to acquire energy as a direct customer would require it to incur unnecessary costs, thereby contravening the intent of SFL §97-g. Further, contrary to RESA's suggestion, at least one not-for-profit ESCO has been operating in the State for nearly a decade, and its customers have received significant benefits. At this time, we need not examine the impact of allowing a not-for-profit organization to operate as an ESCO. Accordingly, we adopt OGS' proposal to modify the definition of "Direct Customer" in the UBP.

K.  Other

Parties also raised other issues that need not be addressed here. These issues include: complaint reporting, which has already been addressed through the recently implemented ESCO Scorecard; customer education, which is being discussed by the Retail Markets Stakeholders group; and the changing role of the utility, which will be discussed in an upcoming proceeding.

L.  UBP Housekeeping[38]

We take this opportunity to make necessary modifications to the UBP. As evident from the descriptions below, these modifications are of a non-controversial nature.

Section 2.D.6.b is modified to include natural gas, which was omitted in error:

---

[38] In this section, language deleted from the previous version of the UBP is ~~struckthrough~~ and new language is **bolded.**

-41-

CASE 12-M-0476 <u>et al.</u>

Consequences for non-compliance in one or more of the categories set forth in UBP Section 2.D.5 may include one or more of the following restrictions on an ESCO's opportunity to sell **natural gas** and/or electricity to retail customers.

The definition of EDI and Sections 2.B.a and 2.B.m are modified to reflect the change in the Department's web address from www.dps.ny.state.us to www.dps.ny.gov.

The definition of Energy Broker is changed to reflect that an energy broker can work on behalf of any customer, not just direct customers:

Energy broker – A non-utility entity that performs energy management or procurement functions on behalf of ~~direct~~ customers or ESCOs but does not make retail energy sales to customers.

The definition of ESCO is modified to reflect that an ESCO sells electricity and/or natural gas and that the term "marketer" is no longer generally used as it was when the previous version of the definition was adopted:

Energy services company (ESCO) – An entity eligible to sell electricity and/or natural gas to end-use customers using the transmission or distribution system of a utility. ESCOs may perform other retail service functions. ~~Sometimes, other terms are used for such entities, such as, ESCO/Marketer to describe a supplier of both commodities, ESCO to describe a supplier of electricity and marketer to describe a supplier of natural gas. For simplicity, the term ESCO is used in the UBP to refer to suppliers of natural gas and/or electricity.~~

-42-

CASE 12-M-0476 <u>et</u> <u>al.</u>

The definition of Marketer is removed because, as just stated, it is no longer used in the UBP, with the term ESCO used in its place.

Sections 2.C, 2.D.2.a, 2.D.4.a and 2.D.5.e are modified to specify that the form referred to in each section is the Retail Access Eligibility Form.

Section 2.C.1 is modified to clarify what testing must be completed:

> ESCOs deemed eligible to provide commodity service by the Department must begin serving customers within two-years from the date of the letter notifying the ESCO of their eligibility status (eligibility letter).  The ESCO that does not begin serving customers within such two-year period may be required to conduct additional <u>EDI</u> ~~Phase I~~ testing before enrollments will be processed.

Section 5.B.4.b is modified to reflect that it refers to a specific Statement:

> Such contract shall also include on the first page thereof a Customer Disclosure Statement (the Statement).  The text within this Statement shall state in plain language the terms and conditions described above and set forth in Attachment 4 – Sample Customer Disclosure Statement.  When the form contract is used by the ESCO as its agreement with the customer, the Customer Disclosure Statement shall also contain the price term of the agreement.  In the event that the text in ~~this~~ **the** Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the

CASE 12-M-0476 et al.

> Statement shall constitute the agreement with the
> customer notwithstanding a conflicting term
> expressed elsewhere in the agreement.

Section 5.D.6 is modified to clarify that there can be
only one incumbent ESCO and that the incumbent ESCO must have
specific customer authorization prior to cancelling a pending
enrollment:[39]

> Upon acceptance of an enrollment request, the
> distribution utility shall send a notice to ~~any~~
> **the** incumbent ESCO that the customer's service
> with that ESCO will be terminated on the
> effective date of the new enrollment.  In the
> event that the distribution utility receives
> notice from the pending ESCO, the incumbent ESCO
> **(with specific customer authorization for each
> cancellation)** or the customer, no later than
> three business days before the effective date
> that a pending enrollment is cancelled, the
> distribution utility shall transmit a request to
> reinstate service to ~~any~~ **the** incumbent ESCO,
> unless the **incumbent** ESCO previously terminated
> service to the customer or the customer requests
> a return to full utility service.

Section 5.L. is modified to reflect that the tariffed
rate from special meter readings may vary by utility:

> A distribution utility may establish a ~~$20~~ fee in
> its tariffs for a special meter reading.

---

[39] Cases 98-M-1343 and 98-M-0667, supra, Order Granting Petition
(issued September 2009).

CASE 12-M-0476 et al.

## M.  Modification of EDI Requirements

        The Commission has established standards for EDI that
ensure uniformity in business communications between ESCOs and
utilities.[40]  From time to time, we have modified these standards
to reflect changes in our UBP and to accommodate operational
changes in competitive retail energy markets.  At this time, the
EDI standards must be modified to accommodate the exchange of
information necessary to implement actions directed in this
order, as well as information that may assist ESCOs in providing
new and creative value-added products to mass market customers.

        To facilitate the adoption of the required EDI
changes, Staff will convene a collaborative within 30 days of
the date of this Order to address the changes discussed below.
The revised EDI standards should be filed for Commission
consideration within 120 days of the date of this Order.[41]

        As explained above, the EDI standards must be modified
to effectuate our new requirements regarding customers who
participate in utility low income assistance programs and/or
HEAP.  Utilities must be able to use EDI to provide ESCOs with
the customer's status as a participant in the utility low income
assistance programs and/or HEAP.

        In addition, ESCOs have asked that, when a utility
rejects an EDI enrollment, the utility provide a reason code.
Requiring that the utilities provide a reason code would give

---

[40]  Case 98-M-0667, In the Matter of Electronic Data Interchange.

[41]  The results of the EDI Collaborative should be filed in Case
      98-M-0667.

CASE 12-M-0476 et al.

ESCOs an opportunity to overcome any unknown barriers to enrolling a customer.[42]

Presently, ESCOs may use EDI to obtain information from the utility regarding a potential customer's monthly energy usage, service class, life support equipment indicator, and more.[43]  As explained below, we are considering changes to our oversight of retail energy markets that may include additional opportunities for ESCOs offering energy-related value-added products.  To accommodate these changes, it will be necessary for the utility to obtain information on whether the ESCO service provided to a customer includes energy-related value-added attributes.  Therefore, the EDI standards must be modified to allow the ESCO to provide information identifying whether the customer is purchasing an energy-related value-added service and the nature of that service.

In addition, ESCOs contemplating offering dynamic pricing options to prospective customers, as well as demand response and tools to help manage energy use, have indicated an interest in obtaining additional information about prospective customers' historic energy usage patterns.  The additional information would allow ESCOs to better understand the cost of serving particular customers and to create a product to meet the particular customer's energy management needs.  The EDI standards need to be modified to allow utilities to provide ESCOs with the following information:  (1) a specific

---

[42] One reason for the rejection of an enrollment request is that the customer has an "enrollment block" on his or her account. The enrollment block prevents an ESCO from enrolling the customer unless the customer first removes the enrollment block.

[43] An ESCO may request this information regarding a customer of the utility, so long as the ESCO has the customer's authorization.

CASE 12-M-0476 <u>et</u> <u>al.</u>

prospective customer's Installed Capacity (ICAP) tag, which indicates the customer's peak electricity demand; (2) customer's number of meters and meter numbers; (3) whether the customer's account is settled with the ISO utilizing an actual 'hourly' or a 'class shape' methodology; (4) whether the customer receives any special delivery or commodity "first through the meter" incentives or incentives from the New York Power Authority; (5) whether the utility indentifies the customer as tax exempt; (6) the customer's Standard Industrial Classification (SIC) code; and, (7) whether the customer is currently served by the utility.

PART III

<u>FACILITATION OF ENERGY-RELATED VALUE-ADDED SERVICES</u>

In our December 30, 2013 order in Case 07-M-0548 we announced an initiative to restructure energy efficiency and other clean energy programs consistent with a comprehensive evaluation of how our regulatory paradigms and markets are serving our fundamental objectives.  These objectives include (i) customer tools for effective management of bills; (ii) animation of markets; (iii) system wide efficiency; (iv) fuel and resource diversity; and (v) reliability and resilience. Among the critical questions identified in that order is how to enable market-based deployment of distributed energy resources and load management on a greater scale.  We anticipate initiating a wide-ranging proceeding to examine this and related questions.

This strong emphasis on demand-side resources and market animation will in all likelihood result in greatly increased opportunities for ESCOs to offer value-added services to residential customers.  Our goal is to transition to competitive retail energy markets in which ESCOs and other vendors offer a wide range of innovative products and services

CASE 12-M-0476 et al.

to enable mass market customers to more effectively manage and control their energy bills.  To advance this goal, we launch a new phase of our assessment of the retail energy mass markets, through which we will identify additional actions that could facilitate the development of value-added product and service offerings for mass market energy consumers.

This effort will include a review of where retail energy markets are working better for mass market customers, by providing more innovation and more energy-related value-added services.  Best practices in terms of regulatory policies, market structures, and business practices in other states and countries will be identified.[44]

Our inquiry here is focused in the following areas:

A.  Costs of Acquiring New Customers

B.  Billing

C.  Processing of Enrollment Requests

D.  Net Metering Refinements

E.  Other Proposals to Facilitate Energy-Related Value-Added Services

F.  Data Availability

G.  ESCO Eligibility

H.  ESCO Compliance

A.  Costs of Acquiring New Customers

Staff reports that the costs to ESCOs of acquiring mass market customers is relatively high, in comparison with the expected net revenue from each such customer.  These customer acquisition costs may decline as a percentage of net revenue as customers purchase more energy-related value-added services.  We seek recommendations regarding actions we could take to reduce

---

[44] One study of these issues is the Annual Baseline Assessment of Choice in Canada and the United States (ABACCUS), a report sponsored by competitive energy services companies.

CASE 12-M-0476 et al.

the costs to ESCOs of acquiring such customers.  Specifically,
we seek comments on the following:

- Are there specific actions that the Commission could take
  to reduce the costs to ESCOs of acquiring mass market
  customers who will purchase energy-related value-added
  services?  What are the costs and benefits of these
  potential actions?

- Should a new generation of utility ESCO referral programs
  be developed to facilitate customer awareness of energy-
  related value-added services offered by ESCOs?  Should
  utilities be directed to obtain information from their
  customers regarding their interest in energy-related
  value-added services that might facilitate ESCO
  marketing?  Should customers be referred to specific
  ESCOs based on their interest in energy-related value-
  added services?  What are the costs and benefits of these
  potential changes?

B.  Billing

        The "multi-retailer model" in use throughout New York
allows for different options for billing and payment processing,
including "dual billing," where each party bills and processes
payments for its own services, and "consolidated billing," where
one of the parties issues a bill which includes its own charges
as well as charges from other parties.  Consolidated billing can
refer to a single bill issued by a utility, consolidated utility
billing (CUB), or by an ESCO, consolidated ESCO billing (CEB).
Additionally, the "single-retailer model" is available in NFG's
service territory, which utilizes CEB.  Under the single-
retailer model, the ESCO bills the customer for both commodity
and delivery.

CASE 12-M-0476 et al.

        The Billing Order[45] states that retail access customers
should be able to receive consolidated bills from either their
utility company or from their ESCO for both commodity and
delivery services.  Additionally, the Billing Order required
utilities to file tariff amendments to allow retail access
customers to choose the entity from whom they would like to
receive their bill.  However, EDI transactions to accommodate
CEB have not been implemented statewide.

        In NFG's service territory where the single retailer
model, utilizing CEB, is available, ESCOs have made considerable
investments in order to bill customers.  Further, we are not
aware of complaints or problems related to CEB or dual billing.
ESCOs may decide to bill customers directly because they are
providing a value-added service, something we continue to
encourage.

        With regard to CUB, the May 2001 Order[46] adopted UBP
modifications that allowed the utilities to implement either a
"Bill Ready" or "Rate Ready" method for handling ESCO data.  The
"Bill Ready" method requires that the ESCO, after receiving the
customer's usage data from the utility, calculate its own
charges and send those charges, along with any bill messages, to
the utility via EDI.  The "Rate Ready" method eliminates the
need for the ESCO to receive customers' usage data and instead
provides for the ESCO to furnish bill messages and rates to the
utility so that the utility can calculate both its and the
ESCO's charges and issue the customer's bill.  UBP Section 9.C

---

[45] Case 99-M-0631, In the Matter of Customer Billing Arrangements
Alternative Billing Arrangements, Order Providing for Customer
Choice of Billing Entity, (issued March 22, 2000)(Billing
Order).

[46] Cases 99-M-0631 and 98-M-1343, supra, Order Establishing
Uniform Retail Access Billing and Payment Processing Practices
(issued May 18, 2001) (May 2001 Order).

CASE 12-M-0476 et al.

allows utilities to choose either the bill ready or rate ready billing method.  This choice of whether a utility provides bill ready or rate ready CUB is based upon the capabilities of the utilities' respective billing systems.  Additionally, the lowest cost method available was considered in an effort to keep the costs of retail access to a minimum.

Several parties filed comments in response to the October 2012 Notice recommending changes to the rules governing billing.  The recommended changes ranged from increasing the availability of CEB to requiring that customers be billed only via CUB.  One party advocates for requiring that the utilities be both bill ready and rate ready for consolidated bills. However, we take no actions with regard to billing at this time. Instead we seek further comment on facilitating CEB and on potential modifications to CUB.

We recognize that ESCOs having direct relationships and frequent communications with their customers may facilitate additional customer engagement and interest in energy-related value-added services.  The UBP already provides for CEB, so there does not appear to be a regulatory impediment to CEB.  Our policy provides the opportunity for ESCOs to use CEB, but we note that ESCOs using CEB will also be responsible for implementation of the Home Energy Fair Practices Act.  We seek comment on whether there are further actions we could take that would facilitate CEB.

- Are changes to Commission policies concerning CEB required to remove unwarranted barrier(s) or impediment(s) to ESCOs seeking to use CEB?  What are the costs and benefits of any proposed modifications to the Commission's policies to further facilitate CEB?

Currently, under CUB, utilities provide limited space on bills for ESCOs to include messages to their customers.  This

-51-

CASE 12-M-0476 et al.

may constrain the ability of ESCOs using CUB to effectively use bill messages to market energy-related value-added services. Expanding the space available for bill messages regarding value-added offerings may facilitate customer adoption of such services.  In addition, utility billing systems generally do not now accommodate customer-specific messages from ESCOs.  The ability of ESCOs to provide customer-specific messages regarding energy-related value-added services may allow ESCOs to provide tailored information that increases customers' understanding of how they could benefit from particular energy-related value-added services.

- Under CUB, what are the benefits and costs of requiring utilities to increase the space on bills to be used for ESCOs to provide information regarding energy-related value-added products and services, to approximately 1000 characters?  What are the benefits and costs of requiring utilities to modify their billing systems to enable ESCOs to provide tailored customer-specific billing messages regarding energy-related value-added services?

Several ESCOs have indicated an interest in offering time-of-use products to customers, including those customers the ESCOs bill through CUB.  ESCOs assert that some changes to utility billing systems are required before ESCOs may offer these services to mass market customers.  Utility billing systems, however, may not accommodate such changes without substantial development costs.

- What specific changes to utility billing systems are required to facilitate the ability of ESCOs to offer time-of-use products for mass market customers?

- What are the benefits and costs of requiring utilities to allow ESCOs to charge, through CUB, for time-of-use products developed by ESCOs.

CASE 12-M-0476 et al.

- What other modifications to CUB should be considered to
  facilitate development of energy related value-added
  services, and what are the benefits and costs of such
  modifications?

    Interested parties should also provide input regarding
other potential regulatory changes to utility billing systems or
other systems and processes (e.g., New York Independent System
Operator reconciliation systems), that would be expected to
enhance the ability of ESCOs to offer energy-related value-added
services to mass market customers.

C.  Processing of Enrollment Requests

    Currently, ESCOs must transmit an enrollment request
to the distribution utility no later than 15 calendar days prior
to the effective date of an enrollment.  Further, with the
exception of a new installation, or a special meter reading, a
change of providers is effective: for an electric customer, on
the next regularly scheduled meter reading date; and, for a gas
customer, on the next regularly scheduled meter reading date or
on the first day of the month, in accordance with provisions set
forth in the distribution utility's tariff.  As a result, it may
take up to 45 days between the time a customer signs a contract
with an ESCO, until the time when ESCO service is first
provided, if the meters are read monthly, and up to 75 days if
the meters are read bi-monthly.  Accordingly, we seek comment on
opportunities to minimize the period between enrollment and
provision of service to ESCO customers.

- To what extent do current enrollment requirements limit
  the ability of ESCOs to offer value-added services?  What
  specific actions can be taken to reduce the period
  between when a customer enrolls with an ESCO and when
  service commences, and what are the benefits and costs of
  those actions?

CASE 12-M-0476 et al.

D.  Net Metering Refinements

      Current established policies governing utility net metering address issues including billing of customer usage, allocation of net metering credits and the settlement of outstanding balances that may be owed to or by the utility, and generally contemplate the involvement of only customers and their utility.  If the customer obtains energy supply from an ESCO, however, this may add an additional layer of complexity. We seek comment on the extent to which our existing net metering policies prevent or discourage ESCOs from providing value-added services on a net metered account.

- Do existing rules governing net metering, particularly concerning billing, allocation of credit and the settlement of outstanding balances, impose undue costs or burdens on ESCOs?  If so, explain those concerns and their impact on ESCO operations and the ability of ESCOs to offer value-added services requiring net metering.

      To the extent the Commission's current net metering rules affect the provision of service by an ESCO to a net metered customer, what specific rule changes should be considered?  What are the benefits and costs of those proposals?

E.  Other Proposals to Facilitate Energy-Related Value-Added Services

      There may be other barriers to ESCOs seeking to offer energy-related value-added services as well as additional regulatory changes that could be expected to enhance the ability of ESCOs to offer such services to mass market customers.

- What other specific barriers to offering energy-related value-added services do ESCOs face?  What action should the Commission take to address those barriers and what are the costs and benefits of those actions?

CASE 12-M-0476 <u>et al.</u>

- What other specific regulatory changes to enhance the ability of ESCOs to offer energy-related value-added services to mass market customers should be considered by the Commission?  What are the benefits and costs of those proposals?

F.  Data Availability

ESCOs' ability to develop and market innovative energy-related value-added services may also be enhanced by the availability of additional data.  This data may include customer-specific data such as usage information, as well as information about network constraints which, if available, may provide an incentive for developers to create new demand management services.  Such data, if available, could facilitate development of new business models to address consumers' energy management needs.

- What specific data might be available to assist ESCOs in developing innovative energy-related value added services?
- Who currently owns or maintains that data, and what are the barriers to making that data available to ESCOs and other parties?  What are the costs and benefits of removing or reducing those barriers?
- How can this data be made generally available?  Are there specific standards and protocols that should be adopted to ensure statewide consistency and ensure customer privacy?

G.  ESCO Eligibility

We have not revisited the ESCO eligibility requirements for several years.  Our research indicates that several states, including Maryland and Connecticut, assess a licensing fee for new ESCOs.  Others, including New Jersey,

CASE 12-M-0476 et al.

require an annual fee from ESCOs.  Further, most states have
fewer ESCOs than in New York.  We invite comment on changes to
eligibility requirements that are consistent with our efforts to
encourage energy-related value-added services as well as
compliance with our UBP.

H. ESCO Compliance

        To facilitate ESCO compliance with the UBP, we are
considering requiring that the annual and tri-annual filings
required by the UBP (Section 2.D.2), be accompanied by a letter
from the ESCO's Chief Executive Officer certifying that the
filing is in full compliance with the UBP and that the ESCO has
the resources and practices in place to ensure compliance with
the UBP and other Orders related to retail supply service.  We
invite comments on whether this level of certification is
necessary.

CONCLUSION

        We take the actions and adopt the modifications to the
UBP as discussed herein to address marketing practices, ESCO
referral, low income customers, and other consumer protections.
The Commission orders:

        1.    Revisions to the Uniform Business Practices, as
set forth in Appendix B to this Order, are adopted in accordance
with the discussion in the body of this Order.  Energy Service
Companies (ESCOs) eligible to operate in New York are directed
to comply with the revised Uniform Business Practices.

        2.    The Uniform Business Practices, as amended, are
adopted prospectively and apply to new ESCO service agreements
and to renewals of current ESCO service agreements.

        3.    Electric and gas distribution utilities that have
tariffed provisions providing for retail access are directed to
file tariff amendments or addenda to incorporate or reflect in
their tariffs the Uniform Business Practices revisions approved

CASE 12-M-0476 et al.

in Ordering Clause No. 1.  The tariff revisions shall be allowed to become effective on not less than one day's notice on or before March 1, 2014.

4.    The requirements of Public Service Law §66(12)(b) as to newspaper publication of the tariff revisions filed in accordance with Ordering Clause No. 3 are waived because this Order gives adequate notice of the changes.

5.    Electric and gas distribution utilities that have tariffed provisions providing for retail access are directed to develop historic bill calculators in accord with the discussion in the body of this Order.  Each utility required to develop and implement an historic bill calculator shall file with the Secretary, within 180 days of the date of this order, a certification that the historic bill calculator has been developed and tested, is accurate and can be made available to customers on the utility's website.

6.    Electric and gas distribution utilities that have tariffed provisions providing for retail access are directed to modify their termination notices in accord with the discussion in the body of this Order and shall file the modified termination notices with the Secretary, within 60 days of the date of this order.  The modified termination notices shall be in use within 90 days of the date of this Order.

7.    Electric and gas distribution utilities that have tariffed provisions providing for retail access are directed to provide to their customers who are also ESCO customers and who participate in that utility's low income customer assistance program and/or who the utility has knowledge that the customer has received Home Energy Assistance Program benefits a notice as described in the body of this Order, within 90 days of the date of this Order.

CASE 12-M-0476 et al.

      8.   Consolidated Edison Company of New York, Inc.,
Orange and Rockland Utilities, Inc., Central Hudson Gas &
Electric Corporation and Niagara Mohawk Power Corporation d/b/a
National Grid shall cease operating their respective ESCO
referral programs within 60 days of the date of this Order.

      9.   Each ESCO eligible to serve customers in New York
State shall file with the Secretary, within 90 days of the date
of this Order, information on entities marketing on behalf of
the ESCO in accordance with the body of this Order.

      10.  Staff is directed to:

      a.   hold a technical conference within 60 days
of the date of this Order to assist in the implementation of the
new requirements implemented by this Order;

      b.   convene a collaborative within 60 days of
the date of this Order to assist in implementing ESCO specific
POR discount rates in accordance with the body of this Order;

      c.   convene a collaborative within 30 days of
the date of this Order to address changes to the Electronic Data
Interchange standards in accordance with the body of this Order.

      11.  The Secretary is directed to issue a notice
seeking comments in response to the questions contained in the
body of this Order.

      12.  The Secretary, in her sole discretion may extend
the deadlines set forth in this order, provided the request for
such extension is in writing, including a justification for the
extension, and filed on a timely basis, which should be on at
least one day's notice prior to any affected deadline.

CASE 12-M-0476 <u>et</u> <u>al.</u>

    13.  These proceedings are continued.

                  By the Commission,

*Kathleen H. Burgess*

Digitally Signed by Secretary
New York Public Service Commission

             KATHLEEN H. BURGESS
                 Secretary

# Table of Contents

Information for Current ESCO Customers (Questions 1, 2, 3).................................................................4

Data for Potential Customers (Questions 4, 5) .......................................................................21

ESCO Referral Programs (Question 6)......................................................................................31

Low Income Customers (Question 7) .......................................................................................35

Door-to-Door Marketing (Question 8, 9, 10, 11).......................................................................43

ESCO Contracts (Questions 12, 13) ..........................................................................................61

Purchase of Receivables (POR) (Question 14) ..........................................................................69

Other Proposals & Uncategorized Comments (Question 15) .....................................................75

# LIST OF PARTIES SUBMITTING COMMENTS

BC ......................................................................................................... Business Council

Central Hudson ....................................................... Central Hudson Gas & Electric Corporation

CES ......................................................................... Consolidated Edison Solutions, Inc.

Choose ................................................................................................... Choose Energy, Inc.

Compete ................................................................................................. Compete Coalition

Con Edison/O&R ......................................................... Consolidated Edison Company of New York, Inc.
and Orange & Rockland Utilities, Inc.

Constellation .................................................................................. Constellation NewEnergy, Inc.

CPA ................................................................................................... Consumer Power Advocates

DCA ......................................................................... New York City Department of Consumer Affairs

Direct ................................................................................................ Direct Energy Services, LLC

FTC ................................................................................................ Federal Trade Commission

GEE ................................................................................................ Great Eastern Energy

IDT ................................................................................................ IDT Energy, Inc.

IPPNY ............................................................... Independent Power Producers of New York, Inc.

Joint ESCOs .................................................. Joint comments of Agway Energy Services, LLC; Chief Energy
Power, LLC, Direct Energy Services, LLC, Dominion Retail,
Inc., t/a Dominion Retail Energy; Great Eastern Energy; IDT
Energy, Inc.; Infinite Energy Inc., dba Intelligent Energy;
Integrys Energy Services, Inc.; Interstate Gas Supply, Inc.,
dba IGS Energy; North American Power & Gas, LLC; NRG
Retail Northeast; and US Gas & Electric, Inc.

Joint Utilities ............................................................ Joint comments of Central Hudson, NFG, KEDNY,
KEDLI, NMPC, NYSEG, RG&E

MI ......................................................................................................... Multiple Intervenors

National Grid ...................................................... Joint comments of The Brooklyn Union Gas Company
d/b/a National Grid NY (KEDNY); KeySpan Gas
East Corporation d/b/a National Grid (KEDLI); and
Niagara Mohawk Power Corporation d/b/a National
Grid (NMPC)

NEM ................................................................................................ National Energy Marketers Association

NFG ................................................................................................ National Fuel Gas Distribution Corporation

NFR ................................................................................................ National Fuel Resources, Inc.

NRG ................................................................................................ Combined Comments of Green Mountain Energy
Company; Reliant Energy Northeast, LLC; and
Energy Plus Holdings LLC (NRG Retail
Affiliates)

NYCPA ................................................................Office of the Public Advocate for the City of New York

NYSEG/RG&E ........................................Joint Comments of New York State Electric & Gas Corporation (NYSEG) and Rochester Gas and Electric Corporation (RG&E)

NYSEMC .....................................................................New York State Energy Marketers Coalition

OAG.............................................................Comments of Eric T. Schneiderman, Attorney General of the State of New York

OGS ......................................................................State of New York Office of General Services

PACE & ACE NY ....................................... Joint Comments of Pace Energy and Climate Center and Alliance for Clean Energy New York

PULP/AARP ..................................... Joint Comments of Public Utility Law Project and AARP

RESA ..................................................................................Retail Energy Supply Association

SCMC ....................................................................................Small Customer Marketer Coalition

UIU .......................................................................Utility Intervention Unit of the New York State Department of State's Division of Consumer Protection

USEP..............................................................................................U.S. Energy Partners LLC

# DEFINITION OF ACRONYMS

EDI............................................................................ Electronic Data Interchange

ESCO ......................................................................... Energy Service Company

ETF ....................................................................................Early Termination Fee

GBL ................................................................................. General Business Law

HEAP ......................................................... Home Energy Assistance Program

HEFPA .......................................................... Home Energy Fair Practices Act

D2D...........................................................................................Door-to-Door

POR...............................................................................Purchase of Receivables

PTC .......................................................................................Power to Choose

MFC ..............................................................................Merchant Function Charge

UBP...........................................................................Uniform Business Practices

## Information for Current ESCO Customers (Questions 1, 2, 3)

1. What are the benefits and costs of requiring that utilities develop and make available historic bill calculators through utility websites and/or smart phones to enable ESCO customers to compare their actual charges to what they would have paid if they were a full-service utility customer?  How should such tools be designed so that they are easy to use, factually oriented, and produce accurate and useful information for ESCO customers?

**Central Hudson**

Central Hudson has an online bill comparison tool available on its website.  The tool allows ESCO customers to whom Central Hudson issues consolidated bills to compare the total utility charges, including ESCO supply, with the charges that would have been paid if the commodity service had been purchased from Central Hudson instead.  Central Hudson said that since this tool uses historic data not indicative of future prices, it will be of limited use in evaluating future supply decisions.

**CES**

CES states that the comparison should use at least a year of data to avoid comparing seasonal movements of a variable product to a fixed price product.  Further, CES states that the tool should also include clear disclaimers that the information presented is historical and not indicative of future prices.  Additionally, according to CES, the tool should include an appropriate description of the utility default price (e.g., that it varies monthly, reflects the fuel mix and environmental attributes of the energy in the New York wholesale market) so that customers who purchase a fixed price or green product can know that the price comparison may not be relevant.  CES assert that bill comparisons should not be provided with less than a year of actual data.

**Con Edison/O&R**

Con Edison and O&R state that customers can benefit from the ability to compare pricing information provided via web site or mobile applications but did not elaborate on the specific benefits.  Con Edison and O&R estimate a cost of between $200,000 and $300,000 to develop the tool.  Moreover, Con Edison and O&R state that the design of a historical pricing tool should include the ability to provide utility charges over an annual period or the life of the account, if shorter.  Con Edison and O&R propose that the web-based tool would calculate and provide the customer with historical bills based on a full service bundled rate that was in effect for the historical period up to 12 months.

**Constellation**

Constellation asserts that online historic bill calculator tools are of limited use for consumers in a competitive retail market. In addition, Constellation states that historic comparisons between an ESCO product and utility full service rates will not be able to take into account special aspects of an ESCO's bundling offer. Constellation advocates for a price comparison tool that provides a forward looking "apples-to-apples" comparison. Constellation advocates that any price comparison tool be designed through a collaborative working group including utility, ESCO, consumer, and staff representatives in order to evaluate what approaches other states/markets have taken, whether a standard methodology should be developed, and what the standards should be. In its reply comments, Constellation stated that a historic look-back comparison is of little use and again recommends a forward looking price-to-compare..

**CPA**

CPA states that bill calculators are a valuable tool to verify the accuracy of bills, but the use of bill calculators to compare various purchase options is problematic. Further, states CPA, any number of variables may combine to make such comparisons difficult, if not impossible. According to CPA, a comparison of rates at any particular point in time is more likely to be misleading than informative.

**DCA**

DCA stresses the importance of transparency to consumers ability to assess the costs and benefits of their energy supplier decisions. DCA states that consumers should have access to a historic calculator to enable them to evaluate whether their decision to switch to an ESCO saved or cost them money. Further, DCA states that benefit to having an online historical price calculator and enhanced monthly statement disclosures is that it will further enable easy comparison shopping. DCA notes that this is akin to the required historical return disclosures in the mutual fund marketplace. According to DCA, the historic online calculator will empower consumers and increase competitive pressure to make the market more efficient.

**Direct**

Direct commented that it agrees with and fully supports the RESA comments with respect to the creation of historic bill calculators.

**GEE**

GEE states that the cost to develop the tool would be high and all costs related to the development of the tool should be borne by all ratepayers through the utility base distribution rates. Additionally, GEE comments that the tool would have to be backward looking and would have to overcome a number of hurdles to produce a true "apples to apples" comparison. In addition, GEE said the tool should be

designed in a manner that does not require customers to have sophisticated computer skills.  GEE also comments that Commission regulations and cost recovery procedures, which allow monthly adjustments to utility commodity costs, should be updated in order to accommodate a competitive climate.

**IDT**

IDT stated that in order for a calculator to serve as anything but illustrative, it needs to consider fluctuations in energy prices with rates available in a real-time environment.  Additionally, IDT continued, in order to provide an accurate comparison, billing calculators would need to be able to factor in value-added items such a free month of service, discounted rate periods, introductory offers, tenure rebates, and other money saving consumer incentives.  Finally, IDT commented that to be relevant and accurate, all charges, taxes, fees, prorates and true-ups billed by the utility would need to be made available as an apples-to-apples comparison can be made.

**Joint Utilities**

The Joint Utilities state that there are several benefits to such a tool,  Further, the Joint Utilities state that each utility should be allowed to decide whether to utilize an online calculator or an on-bill message, or both.  The Joint Utilities also note that costs may be unique to a particular service territory or utility billing system.  In reply comments, the Joint Utilities state that objections to the online bill calculator predicated on the need for further unbundling of utility rates are inapposite.  The Joint Utilities note that the unbundling of rates was addressed exhaustively in Case 00-M-0504.  In response to comments seeking a collaborative to develop a "price-to-compare," the Joint Utilities explain that for customers who shop to save money, a comparison of historical total bills over a relevant time period is easier to comprehend.  Further, the Joint Utilities state that the historic calculator is most useful with longer periods of time, however it is appropriate to provide all available information to customers with new accounts, who may not have at least twelve months of data available.  The Joint Utilities approve of the way RESA details what is involved in calculating monthly bill totals for both ESCO and utility supply service.

**National Grid**

National Grid states that providing comparative bill information on the web, in bills and in certain notices would help customers make informed choices about energy supply..  National Grid explains that it estimated the costs for NMPC to deliver these comparisons through the web, bills, deferred payment agreement default notices and disconnection notices would be $298,000, with the web component costing approximately $38,000.  Further, National Grid estimates that extending this tool to small non-residential customers would cost approximately $175,000.  With regard to developing these capabilities for KEDLI,

National Grid states that, while it has not formally estimated these costs, it believes the cost to be approximately $430,000.  For KEDNY, while National Grid did not formally estimate these costs, it believes the cost would be in the range of $1.5 million.

## NEM

NEM states that it always supports increased price transparency in utility rate structures, but asserts that there is a lack of that transparency in New York.  NEM maintains that with the lack of transparency in utility rates, there are minimal to no benefits to be gained from the online bill calculator, and such a calculator could actually be misleading and contrary to the public interest.  NEM recommends further Commission action toward disclosure of accurate utility bill transparency and requiring utilities to auction off their competitive functions into the marketplace for competitive bids.  With regard to the proposed historical bill calculator, NEM describes it as "an overly prescriptive, and in fact, misleading regime that forces all ESCO products to be evaluated" in one manner.  NEM adds that if the Commission were to require a historical bill calculator, it should be put out to bid.

## NFG

In its comments, NFG states that it has implemented a historical web-based bill calculator which has the benefit of assisting customers in making informed choices about their gas supply.  According to NFG, the calculator has value for customers of ESCOs offering service under any model (e.g., fixed or variable pricing or bundled with value-added services).  NFG notes that the utility bill amount is factual information that customers can use as a benchmark against which they can assess the relative value of their ESCO's service.  NFG states that to use the bill calculator, the customer is required to provide authenticating information.  Further, NFG explains that, for ease of comparison, up to twelve months of historical information is summarized in a table.  NFG states that, for each month, the calculator provides the total ESCO bill, the total bill if the customer had received gas supply from NFG and a simple difference between the two.  The calculator also includes totals for each column.  According to NFG, additional web screens offer a breakdown of ESCO and utility monthly totals into gas supply and delivery amounts that reflect, but do not detail, taxes, surcharges, and other adjustments.

## NRG

NRG asserts that providing customers with access to historic price data will not inform customers' energy supply purchasing decisions, as those decisions are based solely on future commodity prices.  NRG states that all utilities' costs associated with the procurement and provision of the commodity need to be included in any comparison (e.g., call center costs, billing costs, corporate sponsorships, public service advertising, salaries, payroll taxes, benefits, expenses, rent, insurance, office supplies, accounting,

Case 1:24-cv-01260-ER    Document 360-3    Filed 03/13/26    Page 68 of 213

Case 12-M-0476, et al.                                                    Attachment A

information technology, and facilities costs).  Further, NRG states that, if the utility's costs are described as NRG envisions, a cost calculator could be made available to customers on the Commission's PTC website, rather than on each of the utilities' websites.  In its reply comments, NRG asserts that although a majority of commenting parties support some form of an online price calculator, such a calculator will not help consumers unless and until there is greater price transparency for utility default supply pricing.  NRG continues, describing a number of costs it believes should be allocated in the utilities' reported commodity price.

### NYSEG/RG&E

NYSEG/RG&E state that, if utilities are required to provide customers with bill comparison information, that the comparison be placed on customers' monthly bills.  NYSEG/RG&E question whether an online tool would be sufficiently utilized to justify the time and cost for development.  However, NYSEG/RG&E believe such a tool could be applied for both residential and small non-residential customers.  NYSEG/RG&E estimates the cost for developing a secure web tool between $290,000 and $560,000.

### NYSEMC

NYSEMC states that, if the online bill calculator is based on a full bill basis, reflecting the entire cost impact to consumers, it can be viable.  NYSEMC stressed that all utility costs associated with the procurement and provision of the commodity should be included in the price comparison to avoid skewing the comparative results.  NYSEMC maintains that true comparisons can only be implemented for like products.  Comparing differing products, e.g., fixed prices, renewable energy prices, etc., states NYSEMC, would not be applicable or appropriate for any bill calculator.  Further, NYSEMC asserts that historic prices are not an indication of future prices and that any calculator will require disclaimers.  Finally, NYSEMC states that the development of these calculators will result in an increase in cost of service without providing a meaningful benefit.

### OAG

According to the OAG, the majority of residential and small business customers choose to engage the services of an ESCo solely to lower their energy bills, but that they have difficulty in determining whether their use of an ESCO has resulted in savings.  OAG asserts that price transparency is necessary for genuine competition to exist and to deliver real benefits to consumers.  In its comments, OAG points to the success of Central Hudson's and NFG's online bill calculator which provides a benefit to consumers by enabling ESCO customers to compare rates to find out if they are saving money or paying more for their energy.  The tool also has the benefit of allowing a comparison of the ESCO and utility prices for the

previous year so consumers can evaluate the longer-term competitiveness of their ESCO. In addition, with access to comparison data, ESCO customers will be less likely to be misled by ESCO representatives who in the past have give false information to consumers who inquire about their supply charges.  Regarding the design of a tool, OAG says because not all residential and small business customers have internet access, utilities should provide similar information by telephone.

**PULP/AARP**

PULP/AARP supports the development of bill calculators and comments that calculators should focus on the generation or competitive portion of the utility bill and ensure that customers are not confused between the regulated distribution charges and competitive charges offered by ESCOs.

**RESA**

RESA identified a benefit of developing a historic bill calculator as the provision of useful information to the consumer by allowing the consumer to monitor the pricing history associated with ESCO service. RESA commented that the tool should analyze data for a longer, more useful period.  RESA also comments that the web model should fully incorporate all of the unique financial elements associated with retail access external to the utilities' commodity charges.  RESA recommends that the cost comparison should provide a calculation on a total bill basis comparing the commodity cost and delivery charges of ESCO service with the same for utility service.  Further, RESA believes the web portal should also include disclaimers that highlight differentiating factors associated with varying products and services.  Finally, RESA states that, in view of the fact that the utility rate in any month is subject to out-of-period adjustments, the bill calculator should include an estimate by utility of the percentage by which the rate may be modified by such adjustments.

**SCMC**

SCMC states that online historic bill calculators appear to be a workable tool, that, if properly implemented, can provide useful information.  SCMC states that a 12 month time horizon is ideal. Further, SCMC states that a total bill calculation which compares the cost of ESCO commodity and delivery service with the same charges applied to full service customers should be provided. Additionally, SCMC believes that the website should provide disclaimers highlighting that the ESCO may be providing unique products that are materially different than utility service.

**UIU**

UIU comments that historical comparative energy supply pricing would benefit customers by making it easier for customers to evaluate benefits and savings, and determine whether or not they made the right decision in selecting an ESCO for energy supply.  However, according to UIU, the historical bill

calculator will provide real benefit to the customers' energy supply decision making process only if customers are highly motivated to use them to determine whether or not they benefitted from participating in retail access.  UIU suggests providing consumers with a tool combining both a historical and a prospective bill calculator.  According to UIU, this would provide additional benefits to customers by making both personal energy supply consumption and billing information readily accessible to customers who want to compare energy supply options and pricing from ESCOs with their full-service utility.  Additionally, UIU notes that there are many variables for consumers to consider in comparing ESCO and utility prices.

**USEP**

USEP asserts that this is the wrong question.  Instead, USEP states, utility rates are too complex.  Continuing, USEP asserts that customers could make good decisions and rate comparisons would be moot if utility rates were simplified.

2.   What are the benefits and costs of requiring that utilities include a line item on ESCO customer bills that identifies what the customer would have paid had supply been purchased from the utility?  Precisely what information should be published on the bill so that it is most useful to customers?

**Central Hudson**

Central Hudson could accommodate this by re-establishing a program that provides this information as a message on consolidated bills.  This change to Central Hudson's bill would result in minimal incremental costs.  Central Hudson states that the information it would include on the bill would be the total charges the customer would have incurred if they were full service and the dollar amount they saved or paid based on receiving their supply from that ESCO for the period being billed.  According to Central Hudson, having this information will benefit customers since they will be able to evaluate their decision regarding receiving their energy supply from an ESCO.

**CES**

In its comments, CES states that the use of a monthly line item bill comparison is highly problematic, because it would present customers with a consistent "apples to oranges" mismatch and should be avoided.

**Con Edison/O&R**

Con Edison and O&R state that monthly comparisons are not sufficient to evaluate ESCO offers.  Accordingly, state Con Edison and O&R there is no benefit in providing a line item on the ESCO

customer bill that identifies what the customer would have paid had supply been purchased from the utility.  Con Edison and O&R also commented that changing customer bills to include additional data elements is a complex and extremely costly process, but did not detail specific costs.

### Constellation

Constellation opposes any historical price comparison, such as a line item on customers' ESCO customers' bills.  Constellation asserts that such a line item would provide little, if any, value to customers in evaluating their going forward options.  Constellation states that, if the Commission were to pursue a line item price comparison on ESCO customers' bills, it should be addressed in a collaborative.

### CPA

CPA asserts that including the amounts that a customer would have paid is not helpful without a full reconciliation of the difference between ESCO and utility rates.

### Direct

Direct strongly opposes the use of a monthly line item on the customer's bill for the reasons set forth in RESA's comments.  Direct would support providing a message on the bill that provides a link to a page on the website for the customer's ESCO where the ESCO would lay out the ESCO's historical pricing.

### FTC

FTC states that the asymmetric approach described in Question 2 may tilt rather than level the competitive playing field.  FTC suggests having disclosures comparing the commodity electric service offerings that currently dominate the market against a benchmark.

### GEE

In its comments, GEE states a theoretical benefit of this methodology is that it would allow ESCO customers to compare what their charges were and what they have been from the utility on each bill. However, GEE continues, this "snapshot" approach could be misleading to customers.  GEE notes that utility adjustments to commodity charges across months may preclude an "apples to apples" comparison between ESCO and utility charges on a monthly basis.  GEE asserts that, while most ESCOs do not necessarily show savings in every bill period as compared to the utility, it has always been the ESCOs' contention that savings, if any, would be achieved on an annual basis.

### IDT

IDT stated that for the on-bill comparison to provide an apples-to-apples comparison, a mechanism would be required to reflect value-added items offered on the utility bill.

Case 1:24-cv-01260-ER    Document 360-3    Filed 03/13/26    Page 72 of 213

Case 12-M-0476, et al.                                                    Attachment A

**Joint Utilities**

Similar to the Joint Utilities response to question 1, described above, the Joint Utilities state that, while there are some benefits to the proposals, presentation of bill information should be addressed on a company-by-company basis.  In reply comments, the Joint Utilities state that proposals from other parties regarding including additional information on bills raises many issues, including space limitations, added customer confusion and increased costs.  Further, the Joint Utilities oppose UIU's proposal that utilities should be required to send a letter to customers at the end of their contract terms with ESCOs, because much of the information called for by UIU is not available to the utilities.

**National Grid**

In order to display an ESCO bill comparison on customer bills, National Grid states that it would add a new section to display a new chart.  Continuing, National Grid explains that this chart would only display for a given service if there was at least one month of ESCO consolidated (one bill) billing in the last 12 months.  According to National Grid, the chart would display for, gas and/or electric, a line for the current bill and another line for the last 12 months (aggregated).  Each line would show the supplier name, total ESCO bill amount, total comparable National Grid bill amount, and the difference between the two amounts.  National Grid would also include a note stating that a more detailed breakdown of the customer's last 12 months can be obtained by visiting the Company's website or calling customer service. National Grid stated that for NMPC, it estimates that this on bill capability represents approximately $62,000 of the total provided in response to question 1.  For KEDLI, in addition to the amounts described in response to question 1, National Grid believes the on-bill capability would cost approximately $400,000.  For KEDNY, National Grid believes the on-bill capability would cost approximately $500,000 assuming that the rate structures defined in the response to Question 1 were also developed.

**NEM**

NEM asserts that including a comparison of the ESCO's charges and what the utility would have charged on customers' bills is both flawed and inherently misleading.  NEM raises concerns about adjustments to the utility commodity charges across billing periods.  Further, NEM maintains that the proposal assumes that savings "versus an artificially understated utility commodity rate" is the only value consumers can derive from the marketplace.  In reply comments, NEM states its agreement with FTC that a bill line item would tilt, rather than level, the competitive playing field in favor of the utility.

**NFG**

According to NFG, the online calculator has the advantage of being used by customers with a demonstrated interest in comparing prices, which is in concert with helping customers to make an

informed choice.  In contrast, NFG states that the customer bill line item would be "pushed" to customers who might not otherwise have an interest in using it.  Another concern that NFG has with the bill line item, is that, since the information is available to customers online, the line item would add redundant information on the bill in a space that is already crowded with data.

## NRG

NRG maintains that, a utility price in any given month is not a "true" price, as it may be adjusted upward or downward to reflect reconciliations in future months.  Additionally, NRG states that an on-bill price comparison exacerbates the idea that the choice of a commodity supplier is made based only on price and does not reflect other attributes.  Further, NRG advocates modifications and standardization of the utility consolidated bill formats statewide.  To that end, NRG recommends that utilities be required to use the bill-ready consolidated billing method.  In its reply comments, NRG expresses its strong disagreement with those commenting parties who wish to layer price comparison information on the customer bill.  NRG also notes that many commenters agreed with its recommendation to develop a uniform, competition-friendly consolidated bill.

## NYSEG/RG&E

NYSEG/RG&E provide an example of the utility price to compare bill message on the bills of electric residential and small non-residential supply service customers.  NYSEG/RG&E state that this could be included on the bills of electric and gas residential and small non-residential customers receiving supply from an alternate provider.  The message would contain the same information, supply price during the billing period including the Merchant Function Charge, and also note that additional taxes and NYSEG's bill issuance charge would apply.  Further, NYSEG/RG&E state that another bill message alternative is to provide the exact difference between the customer's ESCO supply service bill and what the customer would have paid under the utility supply service option, including all taxes and the bill issuance charge.  NYSEG/RG&E estimate that it would cost approximately $110,000 to implement this last option.  NYSEG/RG&E state that it would cost less to only specify the supply and merchant function charge for the bill period.  The benefit of this methodology is that all utility customers receive a bill, and would thus have access to the price to compare every month.

## NYSEMC

NYSEMC states that a line item on customer bills that provides a fair and accurate price comparison will be nearly impossible to create.  In addition, NYSEMC notes that, apart from the on-bill price comparison, NYSEMC believes that a uniform, competition-friendly bill format should be developed for all utilities.

## PULP/AARP

PULP/AARP commented that the utility's monthly bill should provide either the applicable price to compare or contain a conspicuous notice that customers can compare their ESCO price to the utility's price to compare by accessing a specific website or calling the utility's call center.

## RESA

RESA states that the use of a monthly line item bill comparison is highly problematic and should not be implemented. The use of a one-month time period erroneously focuses attention on a short, limited time horizon rather than a longer 12 month period that provides a more accurate picture, particularly when the ESCO provides a fixed price product. RESA also opines that as the on-bill comparison would only appear on ESCO customers' bills, it could be viewed as discriminatory. In reply comments, RESA notes other parties statements that short-term comparison of ESCO and utility bills, particularly when the ESCO product is fixed price is an "apples to oranges" comparison.

## SCMC

SCMC comments that the potential benefits of a line item are limited, if any, while the potential for providing unclear and misleading information is high. SCMC takes issue with the one-month time horizon, the accuracy of the pricing comparisons and the inability to reflect fixed price and value-added products. In reply comments, SCMC notes that Con Edison/O&R and NFG agree that an on bill monthly price comparison has drawbacks.

## UIU

UIU states that placing comparable prices on a customer's bill would afford customers the ability to assess risk and make an informed decision when selecting an ESCO or remaining with their full service utility for energy supply. UIU states that the comparable pricing information should include, at a minimum: (1) the amount of the previous month's total bill, including delivery, supply, gross receipts tax, and sales tax; (2) the amount the total bill of the previous month's bill had the customer purchased energy supply from the full service utility; and, (3) the calculated difference in monthly cost (ESCO versus full service utility), plus cumulative costs or savings amount for the customer. UIU maintains that the comparable pricing information should appear in each month's bill and at the end of the term of the agreement in a letter to the customer outlining the benefits received by participating in the program and contracting with the ESCO. UIU stresses that, in calculating the customer's comparable data between the ESCO and the full service utility, the comparable data should accurately reflect and include all taxes, surcharges and other adjustments that would have been applicable on both delivery and supply, during the applicable time period. UIU believes that utilities should present the comparable data to customers in a

fair and transparent form on their bill and in multiple languages, minimally those languages referenced in Governor Cuomo's Language Access Program. In addition, UIU asks that the Commission consider requiring the inclusion of the following information consolidated bills: total bill including all taxes, surcharges, and adjustments (ESCO vs. utility); total bill savings (per billing cycle over a 12-month period); graph displaying total bill (utility vs. ESCO) over 12-24 month period; and, additional ESCO information such as type of price (fixed or variable), length of agreement and ending date with the ESCO (if fixed contract term), and a reference to the PTC and ESCO websites.

## USEP

USEP states that utility rates need to be simplified.

3.  What are the benefits and costs of requiring that utilities explain to payment troubled ESCO customers contacting the utility, or provide to such customers in a subsequent mailing, what the customer would have paid had the energy supply been purchased from the utility, and the difference between that amount and what they were actually billed for energy supplied by the ESCO? What information should utilities provide to low income and payment troubled ESCO customers to assist them in making informed decisions and how should utilities provide that information?

## Central Hudson

Central Hudson asserts that, since the Company has implemented the online calculator and has the capability to add a line item to the consumer's bill, these two items would provide enough information to payment troubled ESCO customers to enable them to evaluate their decision. Further, Central Hudson explains that if a payment troubled ESCO customer calls into its call center, a customer service representative could direct that customer to utilize the online calculator. According to Central Hudson, to go a step further and provide subsequent informatory mailings will result in additional incremental costs, including a one-time fee of $5000 for programming by our bill print vendor and estimated yearly incremental costs of $66,500.

## CES

CES states that the issue of how to address competitive offerings to low income and/or payment challenged customers is a complex one and any resolution must balance privacy concerns with a customer's right to shop. According to CES, it is far from clear that there should be restrictions or a prohibition on selling more expensive renewable products if that is what the customer ultimately wants.

## Constellation

Constellation comments that asking the utilities' customer service representatives to provide information to payment-troubled ESCO customers may prove difficult or even impossible given the multitude of offerings that ESCOs may provide to customers in the utility's service area.  Constellation also refers to its comments in response to questions 1 and 2, summarized above, and question 7, summarized below.

## Con Edison/O&R

Con Edison and O&R state that payment troubled and low income customers can benefit prospectively from information that allows them to compare what they paid for energy supply provided by the ESCO to what they would have paid had the energy supply been purchased from the utility.  Con Edison and O&R propose to direct the customer to a web or mobile application such as that described in Question 1 in order to access comparative pricing information.  Further, state Con Edison and O&R, this information can also be mailed or emailed to the customer at their request.  Regarding costs, Con Edison and O&R assert that such a program would involve some increase in the number and length of call center contacts and add administrative and mailing costs.  However, Con Edison and O&R did not project the costs that will be experienced in providing this information, but state that they would seek recovery if significant costs are incurred relative to these activities.

## CPA

CPA states that payment-troubled ESCO customers need to settle their accounts with the ESCO, without interference from the utility.  Further, CPA commented that low income customers are capable of making informed decisions on the same basis as all other residential customers and  they should not receive preferential treatment.

## Direct

Direct generally agrees with RESA's comments in response to this question.  Direct states that a clear definition of "payment troubled ESCO customer" should be put forth for further discussion.  DES sees a clear distinction between what it would view as payment troubled and low income.  According to Direct, some customers do in fact have the means to pay their bills but for one reason or another, they do not pay them on time.  In Direct's view, these customers should not be provided any additional information unless they are disputing a specific charge.

## FTC

FTC comments that policies that help customers understand costs and make well-informed choices are particularly important for low income and payment troubled customers.

## GEE

GEE states that it is not in favor of ESCOs serving residential low income customers.  GEE states that it would support proactively notifying low income or payment troubled residential customers of gross inequities regarding charges levied by ESCOs versus the utilities.  GEE suggests that gross inequities could be defined by some percent variation threshold.  With regard to payment troubled small commercial customers, GEE believes that no additional outreach is needed for commercial customers.

## IDT

IDT comments that until the utility has systems and processes in place to accurately represent the ESCO's complete value-added proposition, the utility should remain neutral.  Further, IDT states that if an ESCO customer calls the utility, the utility should advise the customer of his/her current rate and then transfer the call to the ESCO.

## Joint Utilities

The Joint Utilities state that the ability to identify and differentiate payment troubled customers will vary by service territory, as will the proper communication tools.  Accordingly, Joint Utilities recommends that a decision on methods for reaching out to payment troubled customers be left to each utility.

## National Grid

National Grid states that it could develop capabilities to provide ESCO bill comparisons to customers on deferred payment agreement default notices, disconnection notices and one-time ESCO customer letters.  National Grid would  format these comparisons consistent with the format described in its response to Question 2 for inclusion on retail customer bills.  National Grid explains that, with regard to NMPC, the estimate provided in response to question 1, described above, includes the costs to develop these capabilities.  Specifically, National Grid states, these capabilities represent approximately $200,000 of the total estimated cost.  For KEDLI and KEDNY, National Grid has not developed formal estimates and states that the costs for these capabilities should be considered incremental to the figures it provided in response to question 1.  National Grid believes that for each of KEDLI and KEDNY, developing these capabilities would cost approximately $400,000.

## NEM

In response to question 3, NEM reiterates that the problems it sees as inherent in an ESCO versus utility bill comparison are equally applicable regardless of the consumer's income level.  NEM notes that the ESCO Consumers Bill of Rights makes clear what information consumers are entitled to.  Further, NEM states that the Commission should not adopt a market structure that would force products to be tied in any way to a regulated, volatile and extremely opaque bundled utility default service, regardless of income,

demographics or creditworthiness.  In its reply comments, NEM states that it agrees with OAG, that utilities should not be allowed or encouraged to make statements to low income or other customers about the value of competitive offers.

## NFG

NFG believe it most cost-effective to provide customers with notice that they can access the historical calculator, rather than send customers unsolicited information.  Further, NFG asserts that all customers, not just those who are payment-troubled or low-income could benefit from this information, and could benefit prior to receiving a termination notice.  Accordingly, NFG proposes that ESCO enrollment verification letters sent by the utilities could include a link to the online bill calculator.  NFG asserts that, since ESCOs are a utility for the purposes of HEFPA, ESCOs have responsibilities to the customer as well.  NFG sees the following benefits of the October 2012 Notice's proposal for payment troubled ESCO customers: (1) a billing comparison can be provided to the Customer to help them determine if they are saving money on their energy bill; (2) customers can be encouraged to periodically view the billing comparison online and to take a proactive role in managing their energy costs; and, (3) upon receipt of this information, customers can contact their ESCOs to ask for a projection of anticipated energy costs for the duration of the customer contract.  NFG also notes that the proposal would impose certain costs as well, namely that call centers would experience longer talk times responding to billing comparison questions which will diminish services provided to other customers and, formatting changes and associated testing will be necessary to modify the termination/disconnection notice to include a billing comparison.

## NRG

NRG states that utilities should provide any customer, regardless of personal economic circumstance, should be able to obtain, over the phone or by email, with accurate, unbiased information about the utility's pricing for their specific account for a particular time period.  Likewise, NRG states, an ESCO customer should be able to obtain price information for the product on which they are enrolled for a specific time period by contacting the ESCO call center or by email request.  NRG does not support a subsequent mailing by utilities to customers to provide price comparison information.  Further, NRG states that utilities should not be interpreting the pricing of ESCO products as utilities do not have comprehensive information about the ESCO products.

## NYSEG/RG&E

With regard to requiring the utilities to explain to payment troubled customers what the customers would have paid had the energy supply been purchased from the utility, NYSEG/RG&E note several issues.

First, according to NYSEG/RG&E, defining and identifying "payment troubled" is problematic. Considering all of the possible combinations of customers' ability to pay and/or willingness to pay, NYSEG/RG&E state that it would be incredibly difficult, if not impossible, for them to differentiate between customers. Thus, NYSEG/RG&E recommend that all customers have equal choice in choosing an energy supplier with consistent information available to customers within a service classification. Further, NYSEG/RG&E express concern about engaging in discussions with customers regarding the customers ESCO charges.

## NYSEMC

NYSEMC feels that additional efforts should be made to educate consumers about their energy choices and purchases. NYSEMC maintains that low income and payment troubled customers should maintain the right to shop for energy, including those arrangements that provide for potential added value to customers such as long-term fixed prices, energy products that are good for the environment or energy equipment repair protection. NYSEMC maintains that, to facilitate customer education, utilities and ESCOs should both be obligated to provide customers price information upon request, for up to the most recent 12 months. NYSEMC avers that any policies driven by perceived social benefit should not distort market prices, and that accurate comparative cost information will not be possible until utilities unbundle all commodity-related expenses and include them in the utility commodity costs.

## OAG

The OAG notes cites data from Cases 12-E-0201 and 12-G-0202 that shows that, while most ESCO customers do not recognize savings over what they would have paid the utility, low income customers appear to fair worse as a group. The OAG recommends that, to ensure that low income and payment-troubled ESCO customers learn the true value of their ESCO's pricing, the Commission should direct utilities to provide such customers bill comparisons through bill disclosures. Further, the OAG recommends that utilities be required to inform such customers that not all ESCOs provide bill savings.

## PULP/AARP

PULP/AARP noted that, while low income and payment troubled customers are more likely than others to experience adverse consequences from selecting an ESCO, all customers deserve access to information about ESCO prices as compared to commodity purchased from the utility. PULP/AARP recommends that the Commission stop promoting customer choice as primarily a means to save on the customer's bill. PULP/AARP states that it is unreasonable to expect utilities to take on the obligation to inform customers about ESCO pricing other than through competitively-neutral bill calculators and standardized advice about how to compare prices and by referring customers to the PTC website.

**RESA**

RESA states that, if online historic bill calculators are available, they should be helpful to the customer. For customers unable to use the online calculator, RESA states that the utility should directly provide this data to the customer. RESA also directs attention to the Low Income Customer Working Group of the Forum, which has developed a comprehensive summary that deals with the concerns applicable to this customer group that also addresses the issues raised in Question 3. RESA states that it would support consideration of the elements incorporated in the summary.

**SCMC**

According to SCMC, if the purpose is to supply historical comparative information, with the introduction of the historical bill calculator, all residential customers including those that are low income or having difficulties making payments will have the ability access data concerning the comparative pricing relationship between utility and ESCO service and act on that information as they see fit. SCMC states that, if the customer is unaware of the existence of the historical pricing calculator, the utility can provide the data to the customer or direct the customer to the website. Further, SCMC notes that the Low Income Customer Working Group of the Forum has examined this issue, among others endemic to these customer groupings and has drafted a summary that provides guidance that directly addresses this matter.

**UIU**

While UIU would like to see all customers receive the same comparable data as UIU suggested in response to the preceding questions, UIU believes that all customers enrolled in utility low income programs be properly advised about individualized price comparison data whenever they come into contact with utility personnel, whether over the phone, at outreach and education meetings, or by mail.

**USEP**

USEP states that, notwithstanding its general philosophy in favor of customer choice, payment troubled customers should not be allowed to participate in customer choice programs. USEP asserts that the idea of extra mailings and information is a waste of time and paper. USEP suggests that utilities reject attempts to enroll payment troubled customers.

## Data for Potential Customers (Questions 4, 5)

4.  What are the reasons why the Commission should, or should not, collect monthly data on prices charged by ESCOs to residential and small non-residential customers for all or some of their products?  How would Commission publication of all or part of this data assist customers and/or impact retail competition?  What level of data aggregation would be sufficient to adequately address the need to maintain the confidentiality of customer-specific data? (Collection of Monthly Data)

**CES**

According to CES, the publication of historical price data is inappropriate and can be misleading due to a variety of products variably priced according to location, contract terms, individual customer usage and market conditions.

**Con Edison/O&R**

Con Edison and O&R state that it is generally beneficial for customers to have access to ESCO pricing information to help them select an energy supplier.  According to Con Edison and O&R, proprietary pricing information should be provided on ESCOs' websites obtainable through links on the PSC's "Power to Choose website.  Con Edison and O&R state that sufficient data aggregation can be provided at the customer-type level (e.g., residential, residential heating, small non-residential).

**Constellation**

Constellation asserts that there is little value in providing historical pricing of ESCO products.

As in its responses to questions 1 through 3, Constellation asserts that the collection and publication of historical information is unable to take into account differences in and benefits of various product types, Further, Constellation argues that publishing such information may create greater customer confusion, place a greater burden on ESCOs for data collection.  According to Constellation, aggregated prices for all ESCOs (or for any individual ESCO) will not provide an accurate comparison to current or historic utility full-service default rates due to the variables (including value added services) taken into consideration for ESCO pricing.  Instead, Constellation suggests regularly reviewing the current offers made available from ESCOs, and compare those offers against the utility's contemporaneous supply price.

**CPA**

According to CPA, while a database of published prices may be a useful tool for consumers, simple price comparisons do not adequately reflect the differences in other terms and conditions that are relevant to setting the price.  CPA recommends that data should be published only in the aggregate of all reported

contracts, without attribution to any particular ESCO, and disaggregated by region and by the term of the contract.

## Direct

Direct supports RESA's comments.

## FTC

Policies which require public disclosure of actual prices or rate formulas in standard, machine readable formats may result in third parties developing user friendly price comparison and calculator websites.

## GEE

While Great Eastern states that it agrees with the objective of gathering and publishing ESCO price data for residential and small commercial customers, the Commission must be careful to present such data in a clear and understandable fashion. GEE states that it cannot see how this would work in a manner that would represent the value that the customer is actually receiving. According to GEE, this is a very complex issue and it may be a good idea to form a separate technical proceeding with all of the stakeholders in order to flesh out the requirements that would best serve all participants.

## IDT

IDT states that base rates alone offer an incomplete story since they do not include value-added items, promotions and respective value. In addition, IDT asserts that if the Commission seeks to publish ESCO prices, the Commission would need to capture and communicate the added advantages of choosing an ESCO above and beyond the value offered by the ESCO directly, such as reduced taxes, back-out credits, reduced billing fees and government fees. Therefore, IDT states that it is impractical for the Commission to publish all or part of this in a manner that would actually assist customers and/or further retail competition.

## Joint Utilities

According to the Joint Utilities, having the Commission collect monthly data on prices charged by ESCOs will increase ESCOs' awareness that the regulator is monitoring pricing. Further, the Joint Utilities state that customers will have easy access to information on ESCO pricing, which can be utilized to help them select a supplier. The Joint Utilities recommend that the Commission can facilitate access by providing links to the ESCO websites from the PTC website. With respect to data aggregation, the Joint Utilities believe it should be sufficient to provide data at the customer class/level (e.g. residential, residential heating, small non-residential).

Case 1:24-cv-01260-ER    Document 360-3    Filed 03/13/26    Page 83 of 213

Case 12-M-0476, et al.                                                    Attachment A

## NEM

NEM states that the Commission currently publishes ESCO price data on the PTC website, which provides a comprehensive collection of the pricing options that are available to consumers. According to NEM, encouraging consumers to shop, without a monopoly in the competitive market, is the best way to assure that consumers are getting the best value at all times. However, NEM asserts that requiring a more extensive collection nof ESCO price data would treat ESCOs like regulated utilities. Further, NEM states that the publication of the highly confidential and proprietary pricing data identified by the Commission would undermine the marketplace and competitively injure ESCOs. NEM submits that the Commission has, as in its prior Orders, answered the question of the permissible degree of granularity/ aggregation of marketer information that should be subject to disclosure and should be continued in its current form. NEM again urges the Commission to force the disclosure of comparably transparent pricing by utilities.

## NRG

NRG states that historical prices offered, which are no longer available to new customers will only cause confusion. Instead, NRG recommends that the information available on PTC be enhanced to include continuously-current, valid prices for ESCO offers available to the general public. Furthermore, NRG states that the utilities' current default pricing should be posted and updated on PTC in real time and should advise customers when it will change next. Additionally, NRG recommends requiring that any price shown be available to any consumer shopping at that time. Finally, NRG recommends a standard whereby current information about prices for ESCOs' offers are posted, easily found, and clearly stated on ESCO websites, including a downloadable Customer Disclosure Statement with price information for such products.

## NYSEG/RG&E

NYSEG/RG&E recommend that the Commission collect, store and present ESCO prices. Further, NYSEG/RG&E recognize that ESCOs might have contracts with commercial customers that are contractually identified as confidential for the customer's benefit. Accordingly, NYSEG/RG&E would support the gathering of only residential customer information, or allowing ESCOs to file data under Trade Secret Protection.

## NYSEMC

NYSEMC believes that, until utilities are no longer selling energy commodity, the most important thing for retail markets is that utility prices must be completely unbundled to show every cost component associated with producing a commodity price. In addition, maintains NYSEMC, individual price breakdown on ESCO products and services should only be a function of the competitive marketplace.

Further, states NYSEMC, if the marketplace is in fact allowed to function without preferential treatment for the incumbent utility, then consumers themselves will dictate what they prefer and will shape the future of the market by their choices.

## PULP/AARP

PULP/AARP states that the Commission should, either directly or through an authorized third party, collect and publish ESCO pricing data for every pricing plan offered to New York residential customers. Further, PULP/AARP recommends that the Commission require ESCOs to timely and accurately report their current pricing programs and any price changes.

## RESA

According to RESA, the compilation of historical price data would not provide any appreciable incremental benefit to consumers or to the enhancement of the retail access market.  First, states RESA, ESCOs serving residential customers already must post all of their standardized offerings, which presents the customer with a significant amount of relatively current pricing information. Second, continues RESA, the compilation of historical data does not necessarily indicate what products and pricing the customer will experience going forward.  Third, opines RESA, this type of pricing data compilation would not reflect the beneficial cost impact of the MFC, bill credits, sales tax savings and referral program mandated discounts and as a result, customers would not be informed of the true value of taking ESCO service.  Fourth, notes RESA, with the online historic bill calculator in place each customer has the ability to know exactly what the ESCO charged that customer.  Fifth, according to RESA, ESCOs often provide different products, where the price can change daily based on location and customer usage patterns and providing aggregated or average data does not present an accurate picture of what an individual customer would be charged, while further disaggregation could breach customer confidentiality.  Sixth, RESA believes that the focus on monthly "price" denigrates fixed, green and value-added products that are designed to meet other customer interests.  Seventh, RESA asserts that this proposal would require ESCOs and Staff to develop a costly new administrative structure that will further increase the cost of electricity to consumers.

## SCMC

SCMC maintains that the collection of incremental monthly data on prices charged by ESCOs would not engender material benefits over the current reporting requirements and may engender confusion, increased administrative costs and faulty cost presentations. By focusing only on "price" of commodity, SCMC states that benefits from the waiver of MFC charges, bill credits, sales tax savings and referral program mandated discounts are overlooked.  Additionally, SCMC asserts that the customer is primarily

interested in the products and related terms that the ESCO will be charging on a prospective basis. Finally, SCMC notes that, as part of its marketing efforts the ESCO may develop unique products or offers in response to evolving marketing conditions that go beyond its standard products, and requiring disclosure of such information raises confidentiality and competitive concerns.  In reply comments, SCMC notes that several commenters seek a greater level of reporting of ESCO historical data and pricing, which SCMC believes is not an approach worth pursuing as ESCOs already provide a considerable amount of residential related data.

### UIU

According to UIU, collecting and providing historical pricing data for comparability purposes, through a combined historical and prospective bill calculator could help drive energy market efficiencies, push poor performing ESCOs out of the business, and most importantly, reduce prices over time in the retail access program, thereby benefitting all customers.

### USEP

USEP states that the "collection of data" suggests moving the market in the wrong direction, with greater regulatory oversight by the Commission.  Instead, USEP suggests the development of a website like that used by the Pennsylvania Public Utilities Commission. According to USEP, ESCOs post prices and details on their service offerings enabling customers to make informed decisions.  USEP avers that a fully competitive market should not require filing of data with a regulatory agency for its review.

5.  What are the advantages and disadvantages of requiring ESCOs to honor rates and terms posted on the Commission's "Power to Choose" website?  What are the benefits and costs of requiring that ESCOs post all of their offerings on that website?  What other enhancements to the site should be considered to increase its usefulness to consumers?

### Choose

Choose Energy recommends that additional consumer information be provided regarding energy choice. Choose asserts that the manner in which utility default pricing is set in New York makes it difficult to compare an ESCO plan with the utility offering on a going forward basis, and that th is difficulty prompts consumer uncertainty.  Choose proposes that consideration be given to use of its own energy portal, via the PTC website so that ESCOs can input data about their products and prices for direct customer access. This "white label product," according to Choose Energy, would provide more immediate information to consumers with greater accessibility.

## CES

CES states that ESCOs should only post prices on the PTC that are generally available to new customers at the time the rate is posted.  However, CES continues, ESCOs can change their pricing in response to changes in market conditions and often offer customer-specific pricing based on individual customer usage patterns as well as special incentives for internet-based enrollments.  Accordingly, states CES, posting all ESCO offerings would be neither practical nor meaningful, especially for those customer-specific products and prices that were generally not available to other customers.

## Con Edison/O&R

Con Edison and O&R believe that it is important that customers have access to clear and complete information with respect to ESCO rates, services and terms, both before and after enrollment.  Whether provided at the Commission's PTC website or at their own ESCO websites, there is a clear benefit to having all pricing information and terms public and easily accessible.  However, Con Edison and O&R assert, such a requirement might pose difficulties for ESCOs with respect to their ability to be competitive with other ESCOS and also their ability to negotiate deals and customized offerings with customers. According to Con Edison and O&R, the PTC website should also make it clear that customers should contact the ESCO for an explanation of the terms of the ESCO agreement.  Further, state Con Edison and O&R, it is critical that the ESCO provide this information in some written format and that the ESCO fully honors the rates and terms of the agreement.  In reply comments, Con Edison and O&R explain that, because of the energy purchasing process used by utilities, utilities cannot accurately create a forward-looking price to compare as sought by UIU, Constellation and IPPNY.  Further, according to Con Edison and O&R, even if the forward-looking tool were possible, there are several downsides, generally arising if the forecasted utility price does not materialize.

## Constellation

Constellation recommends empowering a PTC Work Group to provide recommendations regarding the appropriate structure and content of the PTC website, using attributes from other states with higher levels of residential customer shopping, such as those used in Illinois, Ohio, Pennsylvania and Texas. According to Constellation,  a well designed PTC website can provide many benefits.  Constellation asserts that the Commission should clearly define the methodology for calculating the most accurate price for each utility based on their respective tariffs and procurement structures.  Further, Constellation maintains that: (1) the PTC site should be designed with flexibility and functionality in mind, allowing for ease of access and timely comparison information; (2) ESCOs should not be required to participate in the site, and those that do participate should not be required to publish all their offers on the site, as some ESCO options will not be amenable to the standard types of products that are established for comparison on the site; (3) ESCOs

that opt-into participating in the site should be required to regularly update and always honor their respective pricing posted on the site; and (4) the site should make clear that other offers may exist, and that consumers should contact ESCOs directly, or visit ESCOs' own sites for the full array of each ESCO's product lines.

## CPA

CPA asserts that the problem with requiring ESCOs to post all their offerings on the PTC website is that utility rates in New York are very complex, making valid comparisons nearly impossible for even the most well informed customers.  According to CPA, public posting also raises significant issues:  (1) for what period would the ESCO be required to honor any particular posted rate; (2) in the event that an ESCO developed a new product, could that product be offered before it was posted; (3) if it were required to be posted, would the Commission review posted prices; and, (4) would Commission review cause a delay in price changes?

## DCA

In its comments, DCA stresses the need for enhancements to the PTC website to ensure it reflects current pricing of ESCOs.  In addition, DCA recommends considering additional enhancements for customer assistance in making energy choices.  DCA states that the Commission should not underestimate consumers' abilities to understand and compare costs, even when the information appears to be technical or complicated.

## Direct

Direct supports RESA's comments.  In its reply comments, Direct states that the proposal of NRG to locate the online bill calculator on the PTC website is intriguing as the data and disclaimers could be uniform and managed by the Commission.  Additionally, Direct comments approvingly of Constellation's recommendation for an ESCO rating system on the PTC website and recommends a working group to vet the details of this proposal.

## FTC

FTC recommends providing consumers with a tool to compare implications of rate formulas for hypothetical bills showing costs for each month of the calendar year.  FTC specifically notes that this may be helpful for fixed price versus variable price comparison.

## GEE

GEE states that useful, dependable information is the most valuable asset to consumers in the marketplace and the challenge is that the information must be accurately conveyed.  According to GEE, a truly

competitive ESCO will welcome the opportunity to highlight and offer their products where they can be compared to others.  GEE believes it is important to also have space to allow ESCOs to post their "value-added" options, if any, as commodity pricing alone may not accurately reflect the overall value of an ESCO's package to a consumer.

## IDT

IDT does not believe that there an inherent problem with ESCOs honoring the posted rates.  However, IDT sees the PTC website as containing\ "representative" rates, however ESCOs may offer alternative charges reflecting fluctuating prices during the month.  IDT states that requiring ESCOs to post detailed information about all of their offerings will only contribute to additional confusion.  IDT states that the PTC website should include other ESCO promotions, value-added services or products, or rebate programs.  Moreover, IDT states that the PTC website should focus on education to assist in choosing offers best suited to customer's needs.

## IPPNY

IPPNY recommended the  creation of a forward-looking "price-to-compare" that captures at least a 6-12 month period.  In addition, IPPNY commented that the PTC website should incorporate the latest technology platform to offer consumers real-time price competition.  Further, IPPNY states that the Commission should utilize a rating system, such as employed by Illinois and Texas, to enable consumers to evaluate products and services offered by ESCOs.

## Joint Utilities

The Joint Utilities observe that because of the wide variety of different product offerings and pricing methodologies some ESCOs have for each type of customer, it may not be practicable for ESCOs to post all of their offerings and provide timely updates.  Notwithstanding, the Joint Utilities state that the posting of rates and terms on the PTC website could promote price certainty to the customer.  If the Commission does require that ESCOs post all of their rates, terms and offerings, ESCOs must be required to honor those rates.

## NEM

According to NEM, the purpose of online posting and transparency should be to inform the public of actual purchase prices that are reasonably recent and updated.  NEM continues, stating that it should be an option left to the competitive marketplace to determine if the posting of many varied permutations of rates helps to educate consumers or merely confuses them.  NEM opines that, if the Commission if the Commission is concerned about the ability to verify ESCO offers, the UBP provides for investigations of violations of the UBP marketing standards.  Further, NEM again asserts that, to enhance the usefulness of

the PTC website, utility commodity pricing should be more transparent and easily understandable to consumers.

## NRG

NRG maintains that ESCOs should honor rates and terms posted on the Commission's PTC website. Further, NRG asserts that the PTC web site would be more useful to residential consumers if it included current and updated ESCO prices as well as utilities' default rates.  In addition, NRG recommends enhancing the PTC website to include a pop-up window with each individual ESCO offer that displays a Customer Disclosure Statement for customer sales agreement associated with that offer.  NRG also suggests that the PTC website include more consumer education content and make allow customers to sort offers by variables such as rate per kWh, variable or fixed rates, length of term, the inclusion of a monthly customer charge, ETFs, renewable energy offers, and value-added offers.  NRG recommends a continuous, statewide consumer education program to include informing customers about the PTC web site.

## NYSEMC

NYSEMC states that ESCOs should be held responsible for the accuracy and timeliness of rates and terms posted on the PTC website. However, continues NYSEMC, ESCOs should not be required to post every offer as products and services change based on customer need and the market environment. NYSEMC believes that the PTC website should not be viewed as the long-term shopping clearinghouse for all competitive market activity, but rather as a transitional tool that should be used to help build consumer confidence since it is sponsored by the Commission.  NYSEMC states that the PTC website should be utilized to drive information on choice – not primarily as the site for consumers to make a choice as significant consumer education is needed.  NYSEMC recommends using organizations such as the American Coalition of Competitive Energy Suppliers to help drive additional useful content for consumers.

## PULP/AARP

According to PULP/AARP, an ESCO that submits prices and terms for the PTC website should be required to actually offer those prices and terms to any customer upon request for a minimum period of time.  Further, PULP/AARP recommends an investigation for deceptive advertising and marketing of any ESCO that submits prices and terms to the PTC website and subsequently fails to actually market or offer this product to New York customers.  In addition, PULP/AARP state that the PTC website should include all the products and services offered by the ESCO to residential customers.

## OAG

The OAG recommends modifying the PTC website to require ESCOs to post current and historical prices as a tool for customer price comparison.  According to the OAG, ESCOs should be required to update their postings at the time prices, terms or product offers change.  Further, the OAG states that ESCOs should be required to post the rates charged to customers after the initial "teaser" rate offered at enrollment. Continuing, the OAG states that this requirement would prevent ESCOs from using short-term pricing gimmicks. By providing data for consumers to compare ESCO pricing over time with utility pricing, through "apples to apples" comparisons, such as a 12-month period, the OAG asserts consumers would be empowered to discern which ESCOs have lower competitive prices during most of the year, particularly for consumers with fixed price sales agreements.

## RESA

RESA states that ESCOs should be required to honor all posted rates and terms applicable to eligible customers in order to avoid misleading customers. However, RESA notes that posting all ESCO offerings would require constant filings and re-filing, creating administrative burdens for the ESCO and engendering customer confusion especially in instances where the posted price would not be available to all customers.  RESA also opines that the site could also be enhanced if the customer had the ability to sort offers by product type rather than just by ESCO name.  RESA characterizes UIU's proposal to expand the information presented on the PTC website as tantamount to restricting competitive markets to a regulated model.

## SCMC

SCMC states that all ESCOs that post products on the PTC website should be obligated to fully comply with all of the terms and conditions associated therewith, thus assuring customers that the information posted on the web site is accurate and enforceable.  With respect to the inclusion of additional information, SCMC incorporates its response to Question 4.  In reply comments, SCMC states that UIU's proposal for a forward-looking web calculator is highly impractical and "not moored in reality."

## UIU

UIU provides a number of recommendations for enhancement of the PTC website.  First, UIU recommends that ESCOs be required to update their prices on the PTC website each time they change their prices, preferably displayed as a statement, just as utilities are mandated to display their rates to customers.  UIU asserts that a customer's ability to check energy supply prices on the PTC website and lock in prices would provide an incentive to ESCOs to keep their prices up to date and relevant. Continuing, UIU states that requiring consistent updating of prices would also allow the PSC to closely

Case 1:24-cv-01260-ER    Document 360-3    Filed 03/13/26    Page 91 of 213

Case 12-M-0476, et al.                                                    Attachment A

monitor ESCO prices and potentially reduce the number of customer complaints it receives about ESCOs. Second, UIU believes that the prices posted on the PTC website should be the ones that customers can sign a contract for and receive from the ESCO.  Third, UIU recommends enhancing the ability of residential and small commercial customers to compare energy supply prices easily by standardizing the format for presenting pricing options to customers. Fourth, UIU recommends standardizing ETF language displayed on the PTC website.  In addition, UIU proposes that the PTC website include: all of an ESCO's energy supply prices, value added service offerings, and a description of all their contract and legal language on the PTC website in a standardized format; only currently available prices; explanations of cancellation policies; explanations of any deposit requirements; explanations of the contract term, including what happens to energy supply prices at the end of the contract term; explanation of how ESCO disputes are handled; information on reaching the ESCO's customer service call center; explanation of how billing changes occur when the customer switches to an ESCO for energy supply; information regarding special initiation charges, how sign up bonuses or limited time offers work, any add-ons or exclusions, and initiation of collection charges; and translations in conformance with the Governor's Language Access Program.

**USEP**

According to USEP, simplifying the utility rates will result in simplified offers by the ESCOs.  USEP suggests a website more akin to the PA PUC website PA Power Switch.  USEP asserts that the PA website effectively provides customers the critical information to shop.  USEP highlights that the PA website differentiates floating and fixed price offers, product with green power attributes and shows the comparable utility rates.

## ESCO Referral Programs (Question 6)

6.  What is the basis for continuing the existing ESCO Referral Programs in the service territories of Con Edison, Orange & Rockland, Central Hudson, and National Grid (upstate)?  If these programs should continue, should they be modified, and how long should they be maintained? (ESCO Referral Programs)

**Central Hudson**

Due to dramatically diminished enrollment through this program, Central Hudson recommends that this program be discontinued.  However, if Central Hudson were to continue to administer this program the Company would need to evaluate the costs necessary to support the program and seek recovery from the ESCOs.

## CES

According to CES, from the customer's perspective, this is a no-strings-attached risk-free offer unmatched by products in other competitive industries.  In addition, states CES, since the cost of the program (inclusive of a portion of the utilities' call center costs) is funded by the participating ESCOs, there is no burden on other ratepayers.  In sum, CES states that there is no reason why the program should not continue as is.

## Con Edison/O&R

According to Con Edison and O&R, the ESCO  Referral Programs continue to serve as a way, funded by ESCOs, of introducing customers to competitive supply.  Further, state Con Edison and O&R, as currently structured, customers are provided with information to assist them in assessing the ESCO offer and also have an opportunity to research other opportunities in the marketplace.  Con Edison and O&R support each utility's discretion to continue or discontinue its own referral program based on each utility's analysis of various factors affecting the market, such as the maturity of its referral program, the amount of shopping in its service territory and the recent participation rates in the program.

## Constellation

Constellation supports the carefully developed and well-planned ESCO referral programs all ready in place. Among other characteristics that Constellation believes should mark any referral program, ESCOs that opt-into the programs should simply agree to a pre-determined, fixed, uniform market rate, for a fixed and uniform term of at least three months, but no more than six months.  Further, according to Constellation, absent an affirmative action on the part of a customer at the end of the introductory period, a customer should remain with the incumbent ESCO on a month-to-month basis, without ETFs.

## Direct

Direct agrees with RESA's comments.  In addition, Direct states that it views the expansion of Con Edison's PowerMove program to include referral to ESCOs at service initiation as successful.  Direct would not only like to see these programs continue, but would like to see them expanded to all utility service territories so that these programs are available to customers who are signing up for new service.

## GEE

In GEE's opinion, ESCO referral programs should be discontinued.  According to GEE, at best ESCO referral programs are underutilized, not cost effective and of insignificant value to customers. At worst, they are tantamount to a "bait and switch" program.

### IDT

IDT states that the costs to set up and operate ESCO referral programs are borne by the participating ESCOs and the programs lend credibility to deregulation and to those ESCOs approved and licensed by the Commission. Further, states IDT, the programs also provide consumers with an opportunity to try ESCO service and, if they wish, return to utility service at any point without penalty. IDT supports continuing ESCO referral programs.

### Joint Utilities

The Joint Utilities state that these programs are reaching the point of diminishing returns. However, continue the Joint Utilities, on an individual service territory basis, there may be circumstances that merit continuing an existing ESCO referral program. Accordingly, the Joint Utilities believe that utilities administering programs that they consider to be beneficial for customers should be permitted to continue such programs. Further, the Joint Utilities aver that since ESCO referral programs benefit the ESCOs economically, ESCOs should continue to be responsible for the costs of such programs.

### NEM

NEM asserts that the advantages of the ESCO referral program remain the same today as when first approved by this Commission. In addition, NEM states that the implementation costs of the Con Edison, O&R, Central Hudson and National Grid programs have already been paid and the cost to continue them is *de minimis*. NEM asserts that ESCOs are likely operating legitimately within a Commission-sanctioned referral program and that price gouging should not be possible, since consumers are free to switch, but that if the Commission has concerns that participating ESCOs have received an inordinate amount of complaints, then the Commission should investigate those ESCOs' conduct. NEM urges that the Commission refrain from adding requirements that could unnecessarily complicate the process and restrict ESCO participation.

### NRG

NRG believes ESCO referral programs should be discontinued and replaced with day-one switching. NRG states that the emphasis on introductory pricing discounted from utility rates can impede customer familiarity with the broader range of offers and benefits in the retail market. NRG asserts that customers should be allowed to choose and enroll for ESCO commodity supply service, as well as set up a delivery account, at the time of requesting new service initiation for a premise. Further, NRG recommends that customers be able to initiate service through either the ESCO of their choice or the utility. Should the Commission choose to retain referral programs, NRG states that ESCOs should be prohibited from marketing referral program pricing on the PTC website.

## NYSEG/RG&E

According to NYSEG/RG&E, the retail access market in New York State has matured to the point where customers are aware of their ability to choose an energy supplier, and the ESCO referral programs were originally designed to promote the retail access market during its development period.  Thus, maintain NYSEG/RG&E, there is no longer a need for ESCO referral programs.

## NYSEMC

According to NYSEMC, some ESCOs believe these programs should continue as they are – and claim they have served a useful purpose in most markets – while others are ambivalent or feel that other methods of market development should be employed to promote energy choice.  Given the wide disparity of opinion, NYSEMC recommends that the Commission convene and oversee a working group of interested parties to review and make recommendations on the current referral programs.

## OAG

The OAG asserts that, whatever merits ESCO Referral programs may have had when the industry was new, the program is no longer needed and is misleading to consumers.  Continuing, the OAG states that guaranteeing a 7% discount for two introductory months, without regard to the ESCOs rates after the introductory period, the program gives consumers false expectations.  In addition, the OAG states that, if the consumer chooses to go back to the utility, it then can take as long as two more months before the consumer is switched back. During that period, the unwanted ESCO continues charging consumer its premium rates.  Accordingly, the OAG recommends that the Commission discontinue the ESCO referral programs.

## PULP/AARP

PULP/AARP recommend that the Commission eliminate the current referral programs.  Instead, state PULP/AARP, utilities should be required to affirmatively inform new and moving customers of their option to select an ESCO and refer customers to the PTC website for current ESCO offers.  According to PULP/AARP, those ESCOs that care to offer new customers a discount can do so through their own promotional efforts and report the prices and offers at the PTC website.

## RESA

RESA maintains that these programs are paid for by ESCOs and serve a useful purpose as they allow customers to tryout retail access at no risk, with guaranteed discounts for first two months and the ability to cancel after two months without any liability.  Under these conditions, states RESA, the programs should continue.  RESA does favor better informing customers of their rights under the programs and there improving communication to customers advising them of their choice to enroll in the program. In its

reply comments, RESA asserts that OAG and PULP/AARP fail to understand that ESCO referral programs are of direct financial benefit to the customer and objects to characterizing the programs as misleading.

## SCMC

According to SCMC, the benefits of the referral programs are substantial and continued provision of such benefits is reasonable and logical.  Further, notes SCMC, all of the referral program costs are recovered from ESCOs.  RESA believes that customers will continue to benefit from the programs and the programs should continue without any imposed deadlines.  In reply comments, SCMC asserts that several parties erroneously call for discontinuance of ESCO referral programs, whereas SCMC believes these programs should continue.  SCMC states that the utilities that have the longest and most successful programs attest to the successful operation of the programs and their benefit to consumers.

## UIU

According to UIU, continuation of current ESCO referral programs without first completing a thorough review may falsely signal to customers that the Commission and the participating utilities have concluded that customers are benefiting from the referral programs.  UIU maintains that customer surveys, analysis and reporting are needed to gain insights into the retail energy markets to produce clear and convincing information to confirm or dispute customer benefits, including savings, across all utility customer classes.  UIU believes that the proposed modifications included in the 2012 Notice are inadequate.

## USEP

USEP asserts that, if there is utility pricing that is simple and transparent, customers who want to shop will do so.  USEP maintains that the referral programs force ESCOs into a loss leader situation, which is not necessary in today's market.  USEP would rather that the effort go toward consumer education and toward building a robust website that is user friendly.

# Low Income Customers (Question 7)

7.  What are the advantages and disadvantages of allowing customers participating in any state for federal energy assistance program, such as the Home Energy Assistance Program, or in any utility-sponsored affordability program, to obtain commodity service from an ESCO?  How does the analysis change if the ESCO guarantees a price no higher than that charged by the utility? (Low Income Consumers)

## Central Hudson

Central Hudson firmly believes that unless ESCOs start offering fixed rates or pricing guarantees at or below the levels being charged by the utilities, it is not ideal for these customers to participate in Retail Access programs. Specifically, Central Hudson notes the incongruity of granting HEAP assistance to customers who may be paying significantly more than if they were supplied by the utility.

## CES

CES incorporates its response to Question 3, described above. Additionally, CES states that customers receiving assistance from HEAP may well prefer a fixed-priced supply product to better align with their monthly cash flow. Further, CES states that requiring ESCOs serving HEAP customers to guarantee the price to be no higher than the utility's variably priced default product would effectively preclude the use of fixed-priced supply contracts for HEAP customers.

## Con Edison/O&R

According to Con Edison and O&R, customers participating in state or federal energy assistance programs, or in utility-sponsored affordability programs can benefit from energy choice. Nevertheless, state Con Edison and O&R, ensuring that these customers pay no more than what the utility would have charged would avoid the benefits such customers receive from being offset by higher energy prices. However, Con Edison and O&R state that obstacles would be: (1) ESCO access to sensitive customer financial information, and (2) potentially complex changes to ESCOs' systems to guarantee that the charge would not exceed the utilities' price.

## Constellation

Constellation states that access to competitive retail market offerings can provide benefits to all types of customers, irrespective of the customers' participation in energy assistance programs. However, Constellation asserts that requiring ESCOs to offer a price no higher than the utility's default rate is impractical and, in cases where a utility's price changes daily or even monthly, may be operationally impossible for ESCOs.

Constellation recommends that the Commission require that the utilities inform ESCOs whether a customer account is receiving assistance program benefits. In addition, the Commission could provide, through a well-developed PTC website, easily accessible education regarding the characteristics and benefits of various product types including, but not limited to, fixed-price solutions for budget certainty.

Additionally, Constellation urges the Commission to work with other policymakers and interested parties to design and implement fully portable electric assistance benefits that customers will receive allowing low income customers to take advantage of any ESCO and utility offerings available. Finally, the

Commission could better serve low income customers by developing and requiring non-recourse POR structures for all utilities.

## CPA

According to CPA, absent a finding that customers in these assistance programs are particularly vulnerable to predatory or abusive practices, these customers should enjoy the same opportunity as all other customers.  In addition, CPA states that to the extent ESCOs make themselves subject to audit by the various agencies and advocates for these programs, all customers will benefit if abusive practices are discovered.

## Direct

Direct agrees with RESA that every customer in New York should have the right to choose, regardless of whether or not they are participating in any type of assistance program.  In addition, Direct states that this is an area in which smart meter deployment has a tremendous potential to enable ESCOs to provide value to customers, especially low income customers.

## FTC

FTC comments that the Commission should develop policies to coordinate enforcement of consumer protections laws with allowing low income populations to participate in the retail access market. Additional consumer education and consumer testing should be implemented in order to provide information that customers require to make decisions.  FTC notes that allowing low-income customers to enroll with an ESCO that guaranteed that its total charge would not exceed the utility's total charge seems to harness competition to benefit such customers.

## GEE

GEE believes customers participating in low income assistance programs should be precluded from participating in retail access programs.  If the Commission does allow their participation in retail access, GEE asserts that safeguards must be put into place to ensure that they are not subject to predatory practices.  GEE states that, minimally, full disclosure of low income benefits that are available should be required.  According to GEE, requiring a price no higher than the utility's would be a solution but very difficult, costly and burdensome to administer.  GEE states that to administer a guarantee, systems would need to be built to monitor both utility and ESCO pricing and a mechanism would have to be developed to keep the customer whole.

## IDT

IDT states that all customers should have the ability to select price and/or service that meets their needs, which will foster an open and competitive market.  Additionally, IDT maintains that if the ESCO guarantees a price no higher than that charged by the utility, it only bolsters IDT's position that anyone regardless of economic status should be able to participate in retail access programs.  IDT states that customers, even if they participate in low income assistance programs should be able to take advantage of savings in other ways, such as value-added services, promotions and rebates.  IDT recommends renewed outreach and education to assist consumers in the evaluation of utility and ESCO offerings.

## Joint Utilities

The Joint Utilities state that customers participating in energy assistance programs or utility sponsored affordability programs who obtain ESCO services could see advantages, including the possibility of lower pricing, bundled services from the ESCO, or price stability.  Further, state the Joint Utilities, a price guarantee may limit the service offered by an ESCO; however it would mitigate harm to customers that might be overpaying an ESCO for supply.  The Joint Utilities note that, if an ESCO offers a guarantee that its price will be no higher than the utility, checks and balances would need to be implemented to ensure appropriate oversight and monitoring.  Unless the scope of assistance programs is narrowed, the Joint Utilities believe that it would be nearly impossible to track customer eligibility status for programs outside of current utility billing systems capabilities.  In reply comments, the Joint Utilities emphasize that a cautious approach to implementing changes, if any, will be the most cost-effective path forward.  The Joint Utilities note the sensitive or confidential nature of customer information that parties propose sharing between ESCOs and utilities.  Further, the Joint Utilities recommend the development of UBP or other administrative rules that would identify and perhaps certify ESCOs to serve customers who participate in low income assistance programs.  Additionally, state the Joint Utilities, both RESA and SCMC overstate support and consensus for the Summary developed by the Low Income Customer Working Group.

## NEM

NEM states that all consumers, including low income consumers, benefit from the option of obtaining commodity from an ESCO for many reasons.  According to NEM, imposing price controls on any class of consumers would undermine the efficient operation of the market as a whole and increase costs for all New York consumers.  NEM raises privacy concerns with identifying which customers are considered low income.  NEM continues, stating that, aside from the difficulties of identifying which consumers would be eligible for which offers and the related increase in acquisition costs associated therewith, the burden of meeting Renewable Portfolio Standards requirements will then be disproportionately shifted to

all other consumers.  In its reply comments, NEM notes that the Joint Utilities identified operational difficulties to prohibiting low income customers from participating in retail access programs. Additionally, NEM states that even if it could be done, the costs, risks and inefficiencies of limiting ESCOs to a capped price for low income customers would not be justified.

## NFG

NFG observes that income based discounted rate programs were specifically designed in recognition of the fact that, for a subset of low income customers, market based rates may not be deemed affordable. According to NFG, when customers enrolled in a utility's affordable rate program obtain commodity service from an ESCO that charges more than the utility's rate, then utility customers hwo fund the low-income rate subsidy ultimately fund the ESCO's gain.  NFG asserts that the cost of non-energy products or services should not form a basis for disconnection, termination or suspension of utility service.

NFG states that, if an ESCO can provide a price no higher than the utility's, particularly if the ESCO also provides value-added services, then the customer enrolled in an energy assistance program benefits.  NFG states that there is precedent for vendors to charge limited rates to customers who receive HEAP assistance.  NFG points to the New York State Office of Temporary and Disability Assistance, which has a program to help HEAP recipients receive favorable pricing, on heating oil.  NFG allows that fixed pricing, more or less price hedging, renewable resources and value-added services can provide benefits to all customers.  However, according to NFG, the incremental cost of these choices is not readily apparent or available.  In NFG's view, it would be helpful, especially for customers participating in energy assistance programs, for ESCOs to separately state the cost of energy and the other services provided. NFG observes that ESCOs agreeing to restrictions on the rates they may charge would be subject to a form of rate regulation, and that ESCOs may not want to serve this customer group at a lower cost. Further, NFG continues, it would not necessarily be a failing if low income customers' have a "'utility only' proposition," as this could simply be a recognition of the limits of the market in the face of conflict between two public policy goals.

## NRG

According to NRG, all customers, regardless of their economic status, should have the right to choose the products and services that meet their individual needs.  NRG endorses the voluntary implementation by ESCOs of measures such as waiving monthly customer charges and ETFs for customers receiving HEAP benefits.  NRG states that such measures are consistent with the New York utilities' low income customer programs.  In its reply comments, NRG states that low income customers should not be prevented from using renewable energy supply service or any other value-added supply for their homes.  For support, NRG notes that the "Lifeline" program does not restrict subsidized customers from upgrading or

purchasing additional telecommunications services.  With regard to proposals to require ESCOs to guarantee savings versus the utility for low income customers NRG states that it is neither practical nor sustainable.

## NYCPA

NYCPA filed reply comments in which it stresses the special consumer protection issues relating to ESCO customers participating in low income energy assistance programs.  NYCPA states that, by their very definition, customers participating in low-income utility assistance programs are especially vulnerable to predatory or abusive business practices.  NYCPA expressed concern that HEAP and utility assistance program funds are ultimately benefiting ESCOs rather than the intended consumers. Ultimately, NYCPA urges the Commission to effectively protect consumers, particularly those most vulnerable to predatory or abusive business practices, against the currently unchecked bargaining power of ESCO representatives.

## NYSEG/RG&E

NYSEG/RG&E believe that there should be no limitation to any group of consumers from participating in the retail energy market regardless of demographic or socio-economic circumstance.  NYSEG/RG&E state that the idea of limiting certain groups participation in retail access appears to be predicated on the idea that certain customers are at a disadvantage regarding deceptive marketing or excessive pricing. Further, state NYSEG/RG&E, it would be difficult to track the various government programs and services received by customers as well as tracking the customers who move in and out of such programs.

## NYSEMC

NYSEMC believes that low income and payment troubled customers should maintain the right to shop for energy, including those arrangements that provide for value-added services to customers such as long-term fixed prices, energy products that are good for the environment or energy equipment repair protection.  NYSEMC maintains that these energy prices should *not* be subject to any mandatory discount – the marketplace should determine the product value to consumers.  However, maintains NYSEMC, until the utility is removed from the provider role, there will never be an accurate and natural state of competition.  That being said, NYSEMC explains that ESCOs realize the important considerations that need to be given to those in need.  NYSEMC believes that providing low income customers with the ability to terminate their ESCO agreement at any time on 30 days notice would provide such customers flexibility in shopping for the lowest possible price.  To facilitate this, NYSEMC recommends establishing a simple and uniform method of determining the definition of a low income customer (i.e.,

HEAP eligibility or similar method). Lastly, NYSEMC states that consumer education is one of the most critical factors for all customers in an emerging retail market.

## OAG

The OAG states that HEAP subsidies are limited and other energy assistance subsidies are inadequate to meet the full needs of participants.  Further, the OAG asserts that, with regard to ESCO customers, these subsidies serve to benefit ESCOs, not their customers.  Accordingly, the OAG recommends that, in order for participants to receive the benefits of low income programs or utility affordability programs while having the ability to shop for products and services that best suit their needs, ESCOs should be required to charge customers who receive energy assistance subsidies no more than what the customer would have paid if he or she had remained with the utility.  The OAG notes that ESCOs should be free to choose not to make such offers, and that ESCOs will need to have the utilities identify which customers receive energy assistance subsidies.

## PULP/AARP

PULP/AARP explains that it is unreasonable for the Commission to approve discounts and reduced rates for low income customer classes in utility rate cases, which shifts responsibility for the foregone revenue to all other customers, but then allow ESCOs to charge higher rates that result in unaffordable or higher bills.  PULP/AARP note that this contributes to the higher collection costs to all customers and adverse health and safety impacts on the low income households.  PULP/AARP support an assurance that low income customers would not pay more if they switch to an ESCO to help ensure that the intended benefits of HEAP and utility assistance programs actually have the intended effect of reducing energy expense burdens for participating customers.  PULP/AARP recommend that the Commission create targeted educational programs and outreach to low income customers in light of evidence that such customers have selected ESCOs at a higher rate than other customers and are paying more for essential electricity and natural gas service compared to utility default service.

## RESA

RESA states that all customers, regardless of economic status, have the potential to benefit from competition.  In terms of developing a new model for ESCO service provided to low income customers, RESA recommends consideration of the Summary developed by the Low Income Customer Working Group.  RESA notes that the Commission has applied other policies to all customers, such as the Renewable Portfolio Standard, even if such policies could result in potentially higher prices.  RESA avers that this summary reflects the deliberations of a variety of parties and presents a comprehensive approach which maintains service to this class while incorporating meaningful additional customer protections.  In

its reply comments, RESA further describes the proposals in the Summary developed by the Low Income Customer Working Group. In response to OAG and PULP/AARP's discussion of data regarding ESCO pricing for low income customers in Case 12-E-0201, RESA provides an analysis prepared by the Hudson River Energy Group, which RESA states concludes that PULP does not recognize several critical elements that must be considered. RESA argues that the retail market situation is more nuanced and complex than what PULP/AARP and other parties have portrayed.

## SCMC

SCMC opines that the Commission should not favor policy initiatives that limit or prohibit customer choice for any particular group, including low income customers. SCMC states that, through customer choice, low income customers can obtain price stability, value-added products, potential savings, and an alternative to monopoly utility service. SCMC refers to the summary presented by Low Income Customer Working Group, which, SCMC states, provides a multi-level approach to address the concerns associated with low income customers. In reply comments, SCMC states that it is reasonable to take effective measures to ensure that low-income customers are provided with adequate information and, under the correct circumstances, to achieve some level of price protection. As in its initial comments, SCMC recommends adoption of the summary presented by the Low Income Customer Working Group.

## UIU

UIU is concerned about the participation of any new customers participating in utility low income assistance programs in retail access until such time as the retail access market for residential customers is workably competitive by offering clear benefits and bottom line savings to the low income assistance program customer. UIU states that the data suggests that low income customers are more likely to obtain their energy supply from an ESCO and pay more to an ESCO than they would pay to the utility for energy supply. UIU asserts that residential retail access, as currently operated, is inconsistent with the Commission's efforts to assist residential customers in maintaining electricity and natural gas service through the authorization of more than $100 million annually for ratepayer-funded financial assistance programs. UIU believes that limiting ESCO pricing to be no higher than the utility and making the customer whole should be explored further. In its reply comments, UIU calls for the development of a state-wide market-based solution for low-income households. UIU proposes to negotiating supply service contracts either state-wide, by utility service territory or other grouping for all low-income households. UIU conceptualizes that this group of customers would be guaranteed to be charged no more than they would have paid to their utility for supply service. UIU asserts that this is similar to the HEAP oil program administered by the New York State Office of Temporary and Disability Assistance. Further, UIU states that a low-income assistance natural gas aggregation program has already been implemented

in New York through NFG's Public Assistance Cooperative for Energy program. UIU also provides a description of what it views as the numerous potential benefits of its proposal.

**USEP**

USEP maintains that low income customers should not be eligible to participate in customer choice.

## Door-to-Door Marketing (Question 8, 9, 10, 11)

8.   What are the legal and policy reasons for permitting or prohibiting door-to-door marketing of electricity and/or natural gas to residential and/or small non-residential customers?

**CES**

CES comments that, to the extent that D2D sales result in higher incidents of customer complaints, the Commission should first ensure that the existing UBP requirements are being adhered to. CES continues, stating that, if there are real or perceived gaps, the Commission should direct Staff to benchmark the UBP with practices in other states and, if appropriate, work with stakeholders to identify quality control standards that could be implemented by all ESCOs and D2D vendors in New York.

**Con Edison/O&R**

Con Edison and O&R state that UBP Section 10.C.1 provides rules to be applied to in-person contact with customers that can be used to regulate the performance of D2D marketing. Further, states Con Edison and O&R, the Commission may address inappropriate marketing behavior by overseeing the ESCOs' review of their D2D marketing efforts in light of complaints received and the cancellation and rescission rates associated with these efforts. Finally, Con Edison and O&R suggest that Staff expand the scope of the survey it is currently undertaking to obtain customer feedback on preferred marketing approaches.

**Constellation**

Constellation supports permitting D2D marketing of electricity and natural gas to customers throughout New York State, subject to the "best practices" for regulations that Constellation outlines and recommends in response to Question 10, described below. Constellation also comments that carefully regulated D2D marketing  provides consumers with person-to-person interaction and a question and answer opportunity to learn more about consumers' options, and allows for energy suppliers to explain the benefits the suppliers' offers. In reply to concerns raised by other commenters, Constellation asserts that the benefits of D2D should not be disregarded without first attempting to fix the issues that are causing concern.

## CPA

CPA states that D2D marketing often leads to abusive practices. According to CPA, ESCOs often use contractors for D2D marketing, allowing the ESCO to avoid accountability. CPA continues, stating that in the worst cases, marketers misrepresent themselves as utility employees, and are able to slam accounts using customer information obtained by deceptive means. CPA finds no mitigating value in unsolicited marketing.

## Direct

Direct agrees with RESA's comments with respect to whether to permit or prohibit D2D marketing. Direct fully recognizes that any D2D program must be conducted correctly with a sufficient level of quality assurance and safeguards against unscrupulous behavior. Thus, Direct supports certain incremental measures that would apply to D2D sales: (1) every agent that is engaged in D2D sales should be registered with the Commission, and, if reasonably practicable, the Commission should also maintain a registry of agents who have been found by the Commission to have engaged in conduct that violates the UBP or other applicable regulations; (2) companies in the business of conducting D2D sales on behalf of an ESCO should be subject to some kind of registration and bonding requirement enforced by the Commission; (3) all agents engaged in D2D sales should have a background check and drug test performed before being allowed to sell on behalf of an ESCO; (4) appropriate training should be conducted and agents should be tested to ensure that they understand the applicable rules and regulations for selling electricity or natural gas to residential customers; and (5) a TPV should be required for all D2D sales and should only be conducted after the agent has left the premises. According to Direct, implementing these measures would strike the right balance between protecting customers and allowing customers' access to a sales channel that many find effective and that ESCOs have a clear right to use. In its reply comments, Direct agrees with NEM regarding the value of D2D marketing.

## GEE

In general, GEE does not support D2D marketing. Gee states that, while D2D marketing can be a very useful tool in providing customers with information and access to the marketplace, if not properly managed it can lead to deceit and predatory practices. According to GEE, while many ESCOs have strict training guidelines and supervision of their field sales forces, others do not. GEE believes that the Commission should insist on formal and ongoing training programs for all D2D marketing personnel and require proof that such training has been done and the Commission may want to go as far as listing an approved training course on their website for use by all market participants. GEE supports referring marketing practices that are fraudulent or detrimental to consumers to the Attorney General's Office for investigation. GEE states that, in opposing D2D marketing, it would exclude unscheduled commercial or

even residential appointments that are done in a one-off manner based on a reference or the fact that a trained salesperson may be in the vicinity.

## IDT

IDT comments that D2D marketing is a legal sales activity for which many local municipalities have established rules and/or regulations, including registration requirements.  IDT also states that the UBP has criteria regarding customer enrollment and switch authorization and marketing standards. According to IDT, the real issue is the chain of responsibility of the agent representing the ESCO which is difficult to directly monitor.  IDT states that ,many ESCOs have strict quality assurance programs which monitor and train representatives, however, some sales representatives may be employed by one ESCO and then another, which results in fraudulently obtained customer names and account information.  IDT recommends that the Commission consider these options: creation of a direct agent registry which would require the past work history of a sales agent to be disclosed prior to hiring by another ESCO; licensing or a qualifying process requirement for D2D companies to complete prior to marketing ESCO energy services or products.

## Joint Utilities

The Joint Utilities state that, for years New York lawmakers and the Commission have recognized the dangers to consumers inherent in D2D sales and have implemented a policy aimed at eliminating those dangers.  The Joint Utilities point specifically to the following statutes: (1) the *Door-to-Door Sales Protection Act*, codified in the New York Personal Property Law  at sections 425 through 431; (2) GBL §349, which prohibits "deceptive acts and practices;" and, (3) the ESCO Consumers Bill of Rights, codified in GBL §349-d.  According to the Joint Utilities, these acts strive to protect consumers from high pressure D2D sales tactics.  The Joint Utilities explain that the Commission has acted to protect prospective customers reached through D2D marketing in its *Order Implementing Chapter 416 of the Laws of 2010*.  According to the Joint Utilities, in light of the continuing risks associated with D2D marketing, it is apparent that the State policy directed at shielding consumers from these dangers can only be fulfilled by a prohibition of this sales technique by ESCOs and their agents.  In response to a number of ESCO commenters, the Joint Utilities note that D2D marketing is not the only way ESCOs and customers can engage in person-to-person contact, which the Joint Utilities see as including home sales appointments with prospective customers.

## NEM

According to NEM, D2D sales serve multiple important public interests.  NEM comments that informed consumer consent through adequate disclosures is the cornerstone for all effective and legitimate

marketing activities.  Further, NEM believes that D2D sales can be accomplished consistent with the goals of informed consent and consumer protection.  NEM asserts that D2D marketing contacts are another venue for consumers to become educated about product offerings.  NEM allows that, if after a Commission investigation, a person or entity is found to violate UBP marketing practices with respect to D2D sales, the person or entity is and should be subject to the Commission's enforcement action.

## NRG

NRG asserts that the answer to any Commission concern about D2D marketing is not more regulation.  NRG comments that New York law allows for D2D sales of consumer goods and services and the UBP and ESCO Consumer Bill of Rights contain rules for D2D marketing.  In addition, states NRG, many municipalities and counties in New York impose additional regulation on D2D sales activity in their respective jurisdiction.  According to NRG, compliance with those rules, backed up by consistent, fair, and vigorous enforcement action by the Commission, along with the best practices from the industry itself, is the best path to reducing any unscrupulous marketing practices.

## NYSEG/RG&E.

NYSEG/RG&E supports Joint Utilities' position to eliminate D2D marketing.  Citing a drop in customer migration from NYSEG/RG&E to ESCOs in their service territories in the past two years and an additional 21 new qualifying ESCOs, NYSEG/RG&E believe that customers are switching between ESCOs.  NYSEG/RG&E believe that the effectiveness of D2D marketing to encourage migration from the utility to ESCOs has decreased.

## NYSEMC

In its comments, NYSEMC says that the current version of the Uniform Business Practices ("UBPs") has clear delineation on how D2D marketing is to be conducted.  NYSEMC does not believe that this or any other channel of marketing should be prohibited.  NYSEMC argues that, since D2D marketing is conducted for the sale of other services, it should be allowed for energy.  Concerns should be addressed through existing standards and requirements.  NYSEMC recommends that the industry promote Quality Assurance Best Practices (such as those developed by the National Energy Marketers Association) as an educational and guidance tool for all ESCOs.  In addition, NYSEMC believes that the ESCO Consumer Bill of Rights has a prominent role to play as information provided to the consumer.  Finally, states NYSEMC, fair and deliberate enforcement of UBP marketing standards by the Commission is essential.

## OAG

According to the OAG, throughout the history of the ESCO marketing in New York State, consumers have been plagued by fraudulent D2D sales pitches.  Further, states the OAG, ESCOs often delegate

compliance with D2D rules to contractors and then fail to monitor the activities of the sales team conducting D2D marketing.  The OAG recommends that, because of the chronic and growing incidence of abuses, the Commission should ban D2D marketing.  The OAG asserts that ESCOs still have a wide range of marketing options available to them that do not suffer from the abuses unique to D2D marketing.

### RESA

RESA comments that, as the use of D2D marketing is currently authorized and circumscribed under various statutes and regulations, any action by the Commission to prohibit D2D marketing would run into conflict with these existing statutes and regulations, and would likely become highly contentious.  In reply comments, RESA asserts that contrary to the description in the comments of the Joint Utilities, the D2D approach can, if properly exercised, provide several benefits to consumers.

### SCMC

SCMC believes that the Commission should eschew policies that would entail prohibition of individual marketing protocols such as D2D marketing for any particular group.  Further, SCMC questions whether the Commission is empowered to prohibit D2D marketing.  SCMC continues, stating that the more productive and market compatible approach would entail::identifying and delineating individual problems or concerns with D2D marketing; (2) determining if the concerns can be addressed through consistent and timely application of existing regulations and standards; (3) if additional steps are deemed necessary, developing strategically targeted measures or regulations to redress the problem, applied to all affected parties.  In line with this approach, SCMC  believes that the Commission should consider developing standardized D2D marketing practices and related vendor monitoring and quality control standards, in cooperation with all interested parties.  According to SCMC, these would be binding on all ESCOs and marketing vendors, and would be tailored to address the specific issues associated with the use of D2D marketing activities in connection with mass market customers.  In addition, SCMC states that the Commission should further consider setting up registration and bonding requirements for vendors marketing commodity service.  SCMC believes that, through such a regulatory construct, the marketing vendor would be directly incentivized to assure compliance with the UBP and all applicable standards.

### UIU

UIU states that Staff's review has found that D2D marketing is often associated with what residential customers perceive to be high-pressure sales techniques, which may not be conducive to customers making an informed decision concerning their best residential energy supply choice. Further, UIU states that seniors are often most vulnerable to D2d marketers if aggressive tactics are presented in person.  In

reviewing the proposals in the October 2012 Order, UIU observes that the proposals may be difficult to monitor and enforce.  Instead, UIU recommends setting very high standards for D2D marketing.

9.  What are the reasons why the Commission should continue to permit termination fees in sales contracts made between ESCOs and residential and small non-residential customers through the door-to-door marketing channel?  Are there circumstances under which termination fees for such contracts would be appropriate (*e.g.*, fixed-rate contracts), and what should an ESCO be required to demonstrate to be able to include termination fees for door-to-door marketing in its sales contract?

## CES

CES states that ETFs are an appropriate and necessary tool to protect ESCOs from the early termination of fixed-priced contracts and to recover customer acquisition and/or marketing costs such as airline miles and gift cards over the term of the contract.  According to CES, the existing UBP requirements provide appropriate limitations on the applicability of ETFs.  Further, CES asserts that a prohibition on ETFs could reduce the number and type of product offerings available to customers. CES recommends that, to the extent there are concerns over the application of ETFs, DPS Staff should ensure that ESCOs are complying with the existing UBPs which already require clear disclosure of ETFs.

## Con Edison/O&R

Con Edison and O&R state that the UBP provides adequate protections to customers with regard to ETFs and customers' ability to cancel an agreement within three days of receipt.  Accordingly, state Con Edison and O&R ESCO sales contracts obtained in D2D marketing calls should not be treated any differently than those obtained through some other marketing channel for the purposes of ETFs.

## Constellation

Constellation states that ETFs may not be appropriate for variable rate customer contracts, particularly where customers have no insight into their next month's pricing under their variable rate ESCO contract. However, Constellation continues, with respect to fixed-price energy commodity ESCO contracts, often an ESCO may purchase all or a portion of the power necessary to supply the customer for the entire contract term at the time the contract is executed.  Accordingly, Constellation argues, ETFs in a fixed-price contract represent an important provision that upholds the benefit of the bargain reached between the two contracting parties, regardless of the sales channel.  Further, Constellation states that a reasonable ETF included in fixed-price contracts would allow the ESCO to recover, for instance, the difference between the amounts the customer would have paid to the ESCO under the contract had it not been terminated early and the amount for which the ESCO can resell such electricity to a third party under

then-current market conditions, as well as other costs the ESCO may incur in collecting amounts owed under the contract (e.g., including attorneys' fees, expenses and court costs).  Not allowing reasonable ETFs in fixed-price contracts, according to Constellation, will serve only to increase costs for all other customers in the marketplace, as without ETFs for fixed-price contracts, an ESCO would need to allocate the risks of defaults by fixed-price customers across all other customers it serves or intends to serve.  Constellation avers that an explanation of an ETF should be clearly identified in the customer's terms and conditions prior to enrollment, and it may be appropriate – particularly for D2D sales – to identify the existence of an ETF and obtain the customer's consent through a third-party verification ("TPV") call.

## CPA

CPA maintains that ETFs are an ordinary part of many commercial transactions, and should not be prohibited.  In CPA's view, ESCOs may make long term commitments to provide service, and ESCOs have a legitimate interest in guaranteeing the recovery of the associated costs.  CPA states that all fees must be disclosed to the customer.

## Direct

Direct supports RESA's comments.

## GEE

According to GEE, ETFs may in some cases be warranted and necessary.  GEE states that, where ETFs are warranted, customers be made fully aware of the implications of their failure to abide by the terms of the contract.  In the case of residential customers, GEE believes that any ETFs be highlighted and affirmatively acknowledged by the customer.  In the case of small commercial customers GEE believes that the contract is a sufficient vehicle to achieve this purpose.

## IDT

IDT states that ETFs serve a purpose to both ESCOs and consumers per the contractual arrangement between the two parties.  IDT continues, stating that ETFs provide some financial protection to the ESCO who purchases the supply in advance on behalf of the customer while also providing the consumer protection with a clear definition of the terms of the contract.  IDT maintains that consumers should be able to choose between short-term pricing plans that do not require ETFs and longer-term deals that have ETFs, but also likely a fixed price component.

## Joint Utilities

The Joint Utilities state that customers solicited through the D2D marketing channel are not as protected as when they are approached through other marketing channels.  Accordingly, the Joint Utilities believe

customers should be provided with an opportunity to sign up for ESCO service and subsequently terminate without penalty.

## NEM

NEM asserts that ETFs are controlled by law, specifically GBL §349-d, which sets forth a formula for calculating the maximum ETF that may be assessed but does not ban its use.  According to NEM, this is strong evidence that the legislature recognized that there are important reasons to permit the use of ETFs. NEM continues, stating that ETFs serve an important public purpose for marketers and consumers.  NEM opines that a potential ban on ETFs could encourage consumers to knowingly and willingly enter into contracts that they fully understand and then unfairly back out of the deal without consequence if they later find a lower priced offer.  NEM continues, stating that when this happens, the marketer that actively hedged to provide fixed-price commodity service to that customer would unfairly bear the financial consequences of the customer's decision. Rather than eliminating ETFs, NEM recommends that the Commission and marketers ensure that consumers receive accurate and complete disclosure of the terms and conditions of the ESCO's offer, including the ETF, if applicable.  NEM notes that the UBP currently requires ESCOs to accurately disclose the terms and conditions of a contract to a consumer, including ETFs.

## NRG

NRG states that GBL §349-d and the ESCO Consumers Bill of Rights already limit ETFs by ESCOs related to residential and non-residential customers acquired enrolled through D2D marketing.  According to NRG, ETFs for fixed-term service contracts provide an appropriate and fair mechanism for ESCOs to recover the cost associated with arranging for supply in the event a customer breaks an agreement. Further, states NRG, restricting and/or eliminating ETFs will result in higher prices and less options for all customers, since the substantial financial risk associated with early cancellation will be included in ESCO prices.

## NYSEMC

According to NYSEMC, as long as customers are provided with a complete description of ETFs up front, there should not be any prohibition of ETFs, whether a sale of energy is arrived at through D2D marketing or otherwise. NYSEMC maintains that the current UBP and ESCO Consumer Bill of Rights provide valuable guidance to ESCOs and consumers alike.  Further, NYSEMC notes that some ESCOs may not charge ETFs, or may choose to waive them as a competitive incentive to consumers.

Case 12-M-0476, et al.                                                    Attachment A

## OAG

The OAG asserts that, given the long history of abusive D2D practices by ESCOs, the Commission should bar ESCOs from enforcing ETFs on sales obtained through D2D marketing if the customer cancels within six months of enrollment or demonstrates that the marketer employed deceptive practices.

## PULP/AARP

PULP/AARP assert that the Commission should generally regulate ETFs in residential customer ESCO contracts and not merely those entered into via D2D or telemarketing channels. Specifically, PULP/AARP recommend that the Commission reduce the currently allowed $150 ETF, and an ESCO should be prohibited from charging any ETF in excess of $50.00. PULP/AARP state that the Commission should impose this consumer protection as a condition of its licensing or certification process. In its reply comments, PULP/AARP ask that the Commission halt marketing practices which prey on the elderly and poor for at least a temporary period until significant reforms are adopted and the Commission has demonstrated its commitment to enforcement of current and revised policies.

## RESA

According to RESA, regardless of the specific marketing channel employed by the ESCO, there are defined costs that are incurred if a customer terminates or breaches a contract prior to the expiration of its term. RESA specifically notes that this can be the case for fixed-price contracts or contracts that include value-added and green products. RESA opines that the purpose of the ETF is to reflect those costs and/or those risks incurred by the ESCO, which would go unrecovered should the customer break the contract with the ESCO.

Further, RESA argues that the Commission lacks the regulatory authority to preclude or further limit ETFs in sales contracts made between an ESCO and a residential or a non-residential customer marketed through the D2D marketing channel as the legislature defined ETF limits in GBL §349-d.

## SCMC

SCMC states that ESCOs have the discretion to apply an ETF in conformance with GBL §349-d. In addition, SCMC states that there are sound costing and competitive reasons for providing the ESCO with the discretion of using an ETF, including the costs an ESCO incurs to acquire each customer.

## UIU

UIU believes that, given the high pressure nature of D2D marketing and the history of deceptive marketing tactics, the imposition of ETFs should not be allowed. In the event the Commission continues to allow ETFs, UIU recommends that consumers should be given three months to terminate without a fee and there must be evidence that the consumer was presented with two months of price comparative billing

data showing what the consumer paid for energy supply.  Further, UIU states that, as is the case in the
wireless industry, ETFs should be prorated.


10. Are there other conditions or requirements that should be imposed on D2D marketing by ESCOs,
    such as a requirement that such marketers begin an interaction with a potential customer with a
    disclosure statement?  An example of a possible disclosure statement is:  "My name is _____.  I
    represent _____.  _____ can provide you with your electricity and/or natural gas.  I do not work for or
    represent your utility."  How should such a requirement be enforced? (Conditions or requirements)

**CES**

CES states that the current UBP already requires that an ESCO's marketing representative identify the
ESCO which they represent and explain that they do not represent the distribution utility.  CES
recommends that Staff should investigate any allegations that ESCOs (and their marketing
representatives) are not complying with this requirement.

**Con Edison/O&R**

Con Edison and O&R agree that a disclosure statement would be beneficial in helping to eliminate some
of the confusion that may arise through D2D marketing.  Moreover, Con Edison and O&R state that the
Commission should continue to hold ESCOs accountable for the performance of the ESCO
representatives and their agents in performing D2D marketing. In addition, Con Edison and O&R suggest
that these requirements could be further enforced through surveys performed by an independent survey
company that would contact customers within a number of days after marketing visits and ask questions
specific to the marketing representative's compliance with requirements.  Con Edison and O&R envision
that, where deficiencies are identified, the survey providers can send immediate alerts to ESCOs and
Commission Staff and other parties, as applicable.  Further, Con Edison and O&R propose that the survey
provider can prepare performance reports on a regularly scheduled basis.

**Constellation**

Constellation recommends that the Commission adopt a robust set of D2D marketing standards and
requirements that balance the educational and market benefits of the channel with the need for consumer
protections.  Constellation recommends that  minimum standards include the following: (1) two
mandatory background checks for every D2D sales agent employed by a marketing firm that is selling on
behalf of an ESCO; (2) required drug screening for all marketing firm agents; (3) required TPV calls for
D2D sales contracts; (4) a requirement that the sales agent leaves the home for such TPV call; (5) a
requirement that a sales agent be terminated by the marketing firm upon a finding that a basic telephone

number has been used for more than one enrollment (an indication of improper activity by the agent), and that the customers that were attempting to be enrolled with such phone number be kept on/returned to utility service without penalties; (6) required maintenance by the ESCO of the ZIP Codes for the specific territories to which marketing firms and their agents are assigned for such ESCO (as well as ZIP Codes for which agents are restricted to sell on behalf of the ESCO), to allow for ease of checks upon Commission or internal inquiries; (7) a requirement that deal-contingent payments to agents not be made for a particular customer contract until the utility accepts the customer's enrollment; and (8) a requirement that ESCOs refrain from paying their marketing firms/agents for any sales for which customers are not successfully enrolled, removing incentives for inappropriate sales activities by D2D agents.

## CPA

CPA comments that D2D marketers should be required to disclose who they represent.

## Direct

Direct agrees with RESA's comments with respect to the additional requirements that should be imposed on D2D marketing.  In addition Direct refers to the additional measures it recommended in response to question 8, described above.  In its reply comments, Direct states that interacting with a consumer at the home is a very effective tool if used properly.  Direct states that it does not believe the recommendation of OAG to require ESCOs to record the entire D2D sales presentation is practical.  Direct approves of the comments of the Joint Utilities and NYSEG/RG&E which suggest that ESCOs be required to provide consumers with a paper trail.  Finally, Direct states that, if the Commission is looking for ESCOs to move away from some of the traditional ESCO marketing methods, ESCOs should be allowed to submit an enrollment without the customer's account number.

## GEE

GEE states that D2D salespeople should identify themselves as an ESCO representative with no affiliation to the utility.  GEE recommends that photo identification should be presented to the potential customer that clearly identifies the salesperson and the company he or she represents.  Further, GEE believes that there must be no attire, uniforms, hats etc. that may be confused with any apparel worn by an utility's employees. Finally, ESCO marketers should not use logos or insignias on any documents, vehicles or identification that resembles anything used by the utility.

## IDT

IDT states that UBP Section 10.C.1.b already requires a disclosure statement at the door prior to making offers to prospective customers and IDT already provides a disclosure statement.  IDT also states that its

TPV script includes a statement to determine if it was provided.  According to IDT, if the disclosure statement was not provided, the enrollment is cancelled.

## Joint Utilities

If ESCO D2D marketing is permitted to continue, then the Joint Utilities believe a statement of this nature should be required.  The Joint Utilities note that requiring the disclosure statement at the beginning of the D2D interaction is new, but that the substance of the statement is already required by the UBP.  According to the Joint Utilities, enforcing compliance, could be problematic.  In reply comments, the Joint Utilities express strong support for the creation of new UBP provisions relating to marketing activities conducted by energy brokers.  The Joint Utilities additionally express support for a collaborative to develop additional intensive oversight and enforcement tools for D2D marketing practices.

## NEM

NEM states that the UBP sets forth specific marketing standards applicable to "in-person contact with customers," which requires a disclosure statement similar to the possible disclosure statement in this question. NEM asserts that it is likely that statements such as this are already standard market practice.

## NRG

NRG states that Section 10 of the UBP already requires an ESCO sales representative, "as soon as possible and prior to describing any products or services offered for sale by the ESCO," to produce identification in a format and including content described in the UBP, as well as identify the ESCO the agent represents as an independent energy marketing company.  NRG asserts that ESCO D2D marketing representatives must also immediately provide customers with a copy of the ESCO Consumers Bill of Rights.  NRG recommends that the Commission look to the New York Retail Energy Market Stakeholders Forum to develop additional quality assurance standards and best practices for D2D marketing, including methods for enforcing such standards and best practices.

## NYSEG/RG&E

NYSEG/RG&E support increased oversight over ESCO D2D marketing. Even after adoption of Section 10 (Marketing Standards) of the Uniform Business Practices, NYSEG/RG&E state that they have received large numbers of customer calls reporting ESCO marketing representatives identifying themselves as utility employees or working on behalf of the utility when such is not the case. NYSEG/RG&E believes the best way to address this situation is to require all salespeople or energy brokers to have to read a disclaimer statement such as that proposed in this question.  In addition, NYSEG/RG&E believes that every D2D energy sales person should be required to provide every customer who they sign up or solicit (unsuccessfully) a piece of paper stating the salesperson's name,

company, ID number, parent company phone number, and the date and time of day of the visit. According to NYSEG/RG&E, this would ensure that customer complaints or confusion could be addressed swiftly and action could be taken by the Commission for any violations.  In addition, continue NYSEG/RG&E, the ESCO Consumer Bill of Rights should be given to every prospective or signed customer, not just those who have chosen to take supply service from an ESCO.  Further, opine NYSEG/RG&E, as part of any sales pitch, ESCOs should also be required to tell customers that by signing up for supply service with the ESCO the customer will be switching suppliers, but that the provider of delivery service will remain the same.  NYSEG/RG&E note that they receive complaints from customers who state that the ESCO marketer stated that the customer" will not be switching because NYSEG/RG&E will continue to deliver the energy to you," which NYSEG/RG&E believe to be a false statement.

## NYSEMC

NYSEMC states that Section 10 of the UBP already includes the requirement that sales and marketing agents disclose up-front that they are representatives of independent energy marketers and not representatives of the consumer's distribution utility.  Moreover, notes NYSEMC, the UBP also require disclosure of the ESCO Customer Bill of Rights which is meant to help inform customers of their rights during all ESCO transactions. NYSEMC maintains that no additional conditions or requirements are necessary.  According to NYSEMC, although the current regulation is adequate, the level of consumer education is not.  The PTC website should be utilized to drive information on choice – not primarily as a site for consumers to make a choice.

## OAG

While the OAG supports a prohibition on D2D marketing, in the alternative, the OAG recommends that all D2D marketers be required to carry a portable digital voice recorder and record the entire interaction between the marketer and the consumer and that ESCOs should not process any sales that are not accompanied by a complete recording.

## PULP/AARP

With regard to D2D marketing consumer protections, AARP/PULP recommend that the Commission consider certain best practices at a minimum: (1) suppliers should be required to develop and implement standards and qualifications for employees and agents engaged to interact with retail customers, and document that there are procedures in place to prevent the hiring or engagement of individuals that do not meet these standards; (2) a supplier should be explicitly prohibited from hiring or allowing any agent to represent it unless it has conducted a criminal background check on the individual obtained from the

appropriate New York authorities and any other state in which the individual has resided in the last 12 months; (3) suppliers should be required to conduct such background checks on existing employees or agents within six months of the effective date of the regulations; (4) this background check should include, but not be limited, to any sex offender database maintained by the State; (5) suppliers should be explicitly prohibited from retaining, hiring or engaging any employee or agent who was convicted of a felony or misdemeanor when the conviction reflects adversely on the person's suitability for such employment.  In addition, PULP/AARP states that ESCOs should ensure the training of its agents on various related subjects including state and federal laws and regulations governing marketing, telemarketing, consumer protection and D2D sales.  PULP/AARP also provides detailed comments regarding guidelines for D2D sales including requirements for identification badges, and specific conduct by agents during their D2D contact with consumers.

### RESA

RESA states that the disclosure language is already included in UBP Section 10.C.1.a and b, which require certain disclosures by a D2D marketer prior to describing any product.  According to RESA, these elements could be codified in a disclosure statement that all D2D marketers would be required to follow.  RESA opines that, to verify compliance with this disclosure, the Commission may consider requiring that the disclosure be recorded during the solicitation with the customer or have the customer verify through a recording that this information was provided.

In addition, RESA states that the current UBP does not impose any direct regulation of third-party vendors and instead holds ESCOs liable for actions taken by third-party vendors, even where the vendor is not exclusive to the ESCO and the ESCO cannot exert control over the sale process.  RESA requests that the Commission consider establishing registration and bonding requirements that would be applicable to such vendors marketing natural gas and/or electricity, and making such vendors subject to applicable UBP provisions rather than prohibiting specific marketing approaches. In this manner, the vendor would have a direct interest in ensuring that the vendor-based marketing practices are in compliance with all applicable standards.  To further enhance the marketing process, especially for residential and small commercial customers, RESA urges the Commission, in consultation with the industry to develop and standardize best D2D marketing practices as well as vendor monitoring and quality control standards that would then be implemented by all ESCOs in New York.

In reply comments, RESA asks that the Commission consider some additional measures that would enhance the level of consumer protection, including: (standardized disclosure requirements for D2D customers; (2) standardized best marketing and quality control standards applicable to D2d; and, (3) some form of recording verification at the point of sale.

## SCMC

SCMC supports developing and requiring the use of a disclosure statement incorporating the items noted in the question as well as the other items codified in UBP Section 10.C.1.  According to SCMC, the use of such a standardized format by all ESCOs would help ensure that the customer is properly apprised of key elements needed to make an informed choice. To help ensure compliance, SCMC recommends implementing a verification recording in which the customer would acknowledge that the disclosure statement was provided.  In reply comments, SCMC asserts that its review of initial comments indicates support for implementation of the following measures: (1) registration and bonding requirements for third-party vendors; (2) development of standardized disclosure requirements; (3) implementation of standardized best marketing and quality control standards; and, direct use of recording verification at the point of sale.  In response ot the proposed additional measures of PULP/AARP, SCMC states that PULP/AARP seeks to supplant the carefully constructed provisions of the UBP which already govern all critical aspects of the retail access program and therefore should be rejected.

## UIU

UIU states that standards for D2D marketing could include registration and formal training of ESCO solicitors; the use of standardized contracts, with clearly stated terms and conditions; consumer warnings; and an administrative procedure for suspension and revocation of registrations for violations.  According to UIU, registration of ESCO solicitors would provide a reasonable way to enforce the use of a disclosure statement.  UIU states that a well-designed disclosure statement could significantly ameliorate some of the problems associated with D2D marketing practices.

## USEP

USEP states that it never has and never will engage in D2D marketing.  Further, USEP asserts that D2D sales tend to be in densely populated low income areas and that there is not enough paper and ink to develop rules for D2D marketing that will be workable and prevent problems.  USEP states that time is better spent on more critical market issues.

11. Should the Commission have the authority to preclude or limit an ESCO's D2D marketing in the future in specific circumstances?

## CES

CES states that, in instances where an ESCO violates the UBPs, it would be appropriate for the Commission to exercise its authority to impose consequences on or otherwise limit or even prohibit the marketing channels available to that ESCO.

**Con Edison/O&R**

According to Con Edison and O&R, the Commission should have the authority to penalize ESCOs that do not comply with D2D marketing requirements. Con Edison and O&R state that penalties for non-compliance should go beyond precluding or limiting an ESCO's D2D marketing activities and should include fines, remedial actions and the suspension of ESCO operations in the franchise area.

**Constellation**

Constellation observes that the Commission always retains oversight and jurisdiction over licenses issued to ESCOs for marketing to and serving customers in the State. According to Constellation, if the Commission finds egregious or consistent wrongdoings by an ESCO, it can take appropriate actions with respect to that ESCO's license, provided that an ESCO retains proper due process rights to address any allegations. Further, Constellation encourages the Commission to adopt the marketing standards and requirements, Constellation proposed in response to Question 10, above, and states that such standards and requirements are the best way that the Commission can encourage and enforce appropriate practices in D2D marketing.

**CPA**

CPA asserts that, in its experience, some ESCOs have used contract marketers without adequate oversight. According to CPA, to the extent any ESCO is found to benefit from slamming or from any other seriously abusive practice, whether caused by a contractor or its employee, that ESCO should be prohibited from using D2D sales for at least one year.

**Direct**

Direct agrees with RESA's comments.

**GEE**

GEE believes that the Commission must have the authority to impose punitive measures on an ESCO or an ESCO's agent that fails to comply with all provisions of the UBP. According to GEE, punitive measures should be progressive, including, monetary fines, restriction on marketing activities and termination of authorization to conduct business within New York.

**IDT**

IDT comments that the Commission should not have the authority to preclude or limit ESCO D2D marketing practices in any circumstance. According to IDT, enforcement of this sales venue's practices and policies are difficult, but is the responsibility of the ESCO that employees or contracts with the D2D company or contractor. IDT states that the Commission should have direct oversight of companies that

provide direct marketing services.  IDT recommends setting up a database or registry where such companies and/or their agents are registered to monitor those who have a prior history of noncompliance.

### Joint Utilities

The Joint Utilities believe the Commission already has the authority to preclude or limit an ESCO's D2D marketing and recommend that the UBP be amended to both eliminate D2D marketing in residential circumstances and severely restrict/limit D2D marketing in non-residential circumstances.  The Joint Utilities believe that another round of UBP based controls on D2D marketing by ESCOs and their agents will do little to assuage the widespread consumer confusion and dissatisfaction.  According to the Joint Utilities, should the Commission choose not to fully eliminate D2D marketing by ESCOs then the Commission should adopt policies that would include: (1) ESCOs taking full responsibility for the sign-up of every customer who they supply, whether or not that customer was signed by a broker, contractor or employee; (2) a clear paper trail requiring all D2D salespeople to provide written identification (name, company, phone number, employee number, etc.) to avoid customer confusion and allow for swift follow-up; and, (3) giving Staff, in response to Customer complaints, the authority to suspend the ability of ESCOs to sign up customers through the D2D marketing channel.

### NEM

According to NEM, when judging the degree of liability or punitive actions that should be taken in response to a given fact or fact pattern, the Commission should exercise the appropriate judgment and expertise that resides with its Staff and technical experts.  NEM argues against prejudging potential infractions.  Further, NEM notes that other marketing channels, such as online sales, may be just as susceptible to fraud or otherwise illegal conduct, but that the Commission would not ban all online transactions.

### NRG

According to NRG, the Commission, under Section 2 of the UBP, already has broad authority to suspend an ESCO's marketing, revoke an ESCO's eligibility to operate in New York, or take "any other measures that the Commission may deem appropriate" for failing to comply with consumer protections or any provision of the UBP.

### NYSEG/RG&E

NYSEG/RG&E believe the Commission should have broader authority to act swiftly and decisively regarding ESCO violations.  NYSEG/RG&E recommend that the Commission should be allowed to review and levy fines based on provable violations. They suggest that this could be accomplished by requiring ESCOs to post a bond or security with the Commission that could be drawn upon should a fine

be levied.  NYSEG/RG&E assert that requiring an ESCO to post security sends a signal that violations will not be tolerated.

## NYSEMC

NYSEMC maintains that the Commission should not preclude or limit an ESCO's ability to market in any specific channel at any time, as this would set the wrong precedent.  In instances of alleged non-compliance with the UBP, the Commission should investigate, and following the due process outlined within Section 2 of the UBP, to impose the consequences outlined in Section 2.D.5.b. as needed.

## RESA

RESA states that, under the UBP, the Commission already has authority to restrict an ESCO's marketing capability if the Commission finds that the ESCO is failing to comply with applicable standards.

## PULP/AARP

PULP/AARP states that the Commission should generally take a more proactive and resource intensive oversight and enforcement role with regard to ESCO marketing and contract behaviors.  PULP/AARP suggests that the Commission adopt additional enforcement remedies: (1) requiring adherence to marketing standards as a condition of eligibility to market electricity and gas; (2) implementation as necessary through the rescission of any authority to market to customers in New York; (3) recompense to customers where misleading and unlawful behavior has occurred; (4) assessing civil penalties for violation of orders or regulations; (5)  adoption of conditions to any license or certificate that might include a prohibition on a particular marketing channel that the ESCO has abused.  PULP/AARP also included the details of Maine's ESCO rules (Maine PUC, Chapter 305) in its comments.  PULP/AARP state that the Commission should hold ESCOs liable for the conduct of any of their agents, whether directly employed or under contract.  PULP/AARP maintain that the Commission should not be injected directly into the oversight of individual sales agents, as this would be resource-intensive and impractical.

## SCMC

SCMC incorporates its response to Question 8.

## UIU

UIU recommends amending the UBP to include a no tolerance policy regarding improper D2D marketing practices.

# ESCO Contracts (Questions 12, 13)

12. What are the advantages and disadvantages of modifying the UBP to require ESCOs to obtain affirmative consent from customers for contract renewals involving a change in price?  What are the advantages and disadvantages of requiring ESCOs to obtain affirmative consent from customers for all contract renewals?

## CES

CES states that requiring an affirmative consent from customers at the time of renewal would be inconsistent with other competitive industries, would increase costs and would create a significant bias towards utility default service.  In addition, states CES, requiring affirmative consent at the time of renewal would deny customers the convenience of automatically continuing service with their chosen provider.  Further, CES explains that such a requirement would likely create customer confusion because customers would automatically revert to the utility's default service and start receiving the default product with pricing terms that they did not affirmatively select.

## Con Edison/O&R

Con Edison and O&R state that requiring affirmative consent for all contract renewals, whether associated with a change in price or not, will assist in ensuring that customers are aware of their contractual obligations and will eliminate the possibility of ESCOs continuing service to customers without their consent.

## Constellation

Constellation supports continuation of the State's current practice of requiring existing ESCO customers to opt-out of renewing with their ESCOs if they are not agreeable to the terms of the ESCOs' renewal offers. According to Constellation, this promotes continued development of retail markets by not creating complications for customers that have taken advantage of the competitive markets by making a choice, and who do not want to have to continually opt-into choosing the ESCO that they have already evaluated and selected.

## CPA

CPA states that all contract renewals should require affirmative consent.  CPA continues, stating that in the case of contracts which are extended without a material change in terms, the consent requirement serves as an opportunity for the customer to review the terms and to consider alternate suppliers.

**Direct**

Direct agrees with RESA's comments.

**FTC**

The FTC notes that requiring affirmative customer consent on all contract renewals may drive consumers back to utility default service and raise ESCOs' operational costs. However, continues the FTC, the practice may discourage ESCOs from exploiting inattentive customers through raising charges. Further, the FTC notes that requiring affirmative consent may create significant subscriber retention costs for ESCOs.

**GEE**

According to GEE, the advantage to obtaining a customer's affirmative consent is that there is then documentation that the customer has been made aware of, and has agreed to the new price. In contrast, GEE states that the disadvantage is that the customer may not be readily available to provide their affirmative consent, and as a result, may not be afforded the best price available at the time of renewal. Instead of requiring affirmative consent, GEE recommends allowing the contract to evergreen at a variable rate which the customer can cancel with 30 days' notice.

**Joint Utilities**

According to the Joint Utilities, requiring affirmative consent for all contract renewals, whether associated with a change in price or not, will assist in ensuring that customers are aware of their contractual obligations and will eliminate the possibility of ESCOs reassigning customers without consent. The Joint Utilities do state that, consistent with current practice, the Commission should not require utilities to enforce requirements of this nature because they are a contractual matter between ESCOs and their customers.

**NEM**

NEM supports the Commission's 2010 Order adopting UBP Section 5.B.4.d. and the current regulatory price disclosure requirements. According to NEM, these regulatory disclosure and notice requirements protect consumers and represent a significant compliance cost to all market participants. NEM states that expanding those requirements is costly and unnecessary, especially where variable price products are used on a month-to-month basis. Further, NEM asserts that customers are provided with multiple notices and layers of protection to ensure that they understand the price an renewal terms of an ESCO agreement. In its reply comments, NEM agrees with FTC that requiring affirmative consent for contract renewals could undermine the ability of ESCOs to provide more value to consumers than standard service.

## NRG

NRG asserts that UBP Section 5, GBL §349-d, and the ESCO Consumers Bill of Rights already provide adequate disclosure, notice, and protection for customers concerning renewals.  Customers are additionally protected by their ability to terminate without penalty a renewal within three business days of receipt of the first bill under the renewal agreement.  NRG approves of FTC's comments regarding the disadvantages of requiring affirmative consent.

## NYSEG/RG&E

Utilities should not be required to police this issue or be held accountable for any contractual arrangements between ESCOs and their customers.

## NYSEMC

NYSEMC supports the Commission's previous decision that a consumer's express consent should not be required for a fixed-rate contract that renews as a fixed-rate contract with a new rate.  NYSEMC does not see a benefit to customers of requiring affirmative consent for a renewal of a variable rate contract that can be cancelled at any time.  According to NYSEMC, the disadvantage of obtaining affirmative consent from customers for all contract renewals is that it adds significant burden to the ESCO, who must now communicate with each customer following the initial term of a every contract.

## OAG

According to the OAG, the Commission should revise the UBP to require that ESCOs take steps necessary to ensure that consumers realize the significance of the renewal notice and that they are being asked to accept a different price or other terms for their energy supply for an extended time period.  The OAG recommends that the front of the envelope containing the renewal offer should state in bold text "IMPORTANT: YOUR *[ESCO NAME]* CONTRACT RENEWAL OFFER IS ENCLOSED.  THE PRICE YOU WILL PAY IS BEING CHANGED."  Further, the OAG would require that the enclosed renewal offer highlight all material changes in the contract terms, in a manner similar to the disclosures that are required with the ESCO's initial offer.  The OAG also believes that renewal offers to consumers should also include a comparison of the ESCO's prices with those of the utility during the period of the expiring contract showing the total savings from or premium paid to the ESCO.  Further, the OAG states that ESCOs should also be required to enclose a pre-addressed return postcard or letter with checkboxes for the consumers to indicate their acceptance or rejection of the renewal offer.

## PULP/AARP

AARP/PULP strongly endorse a reform that would require an ESCO to obtain affirmative consent from a customer to renew a contract with any change in price or other material term.  According to AARP/PULP,

the key consumer protection issue is how or whether a supplier can interpret a customer's silence as agreement to changed terms or to a renewal of an expiring contract.  PULP/AARP assert that while customers who leave the utility and agree to be served by a supplier have agreed to a certain "bargain" and have affirmatively provided evidence of such agreement in the verification process, the supplier should not be able to interpret this initial agreement to allow the supplier to change the basis of this bargain without also assuring affirmative customer consent.  In reply comments, PULP/AARP state that ESCOs objections to additional regulations with respect to contract renewal practices are self-serving and should not be relied upon.  PULP/AARP continue to advocate for requiring affirmative consent to any material change in contract terms at renewal or as a revision to an existing contract.

## RESA

RESA states that current regulation, including GBL §349-d, provide customers with a high level of protection with regard to contract renewals.  In view of this level of protection, RESA maintains that requiring affirmative consent to a change in rate or any renewal provides little additional benefit while imposing a material administrative and costly burden on ESCOs marketing to mass customers.  In addition, RESA recommends developing a standardized renewal notice format to ensure that all customers subject to the renewal provisions are provided with a notice that incorporates all applicable disclosures.  In reply comments, RESA dismisses OAG's call for enhanced notification of ESCO contract renewals, stating that the requirements of GBL §349-d are sufficient.  RESA also states that PULP/AARP's recommendation to require affirmative consent for any change is unnecessary and impractical.

## SCMC

SCMC explains that GBL §349-d(6) establishes a comprehensive approach to the issue of contract renewals that provides considerable protection to the consumer. In addition, SCMC states that the proposed requirement that affirmative consent be required for all contracts renewals or for a rate change is impractical, unworkable and would create a substantial administrative cost that would raise the cost of ESCO service.  SCMC also expresses concern that the contacts that would be required to secure customers' affirmative consent may engender Do Not Call complaints by customers.  In reply comments, SCMC reiterates its belief that GBL §349-d provides a reasonable renewal process in response to proposals, to increase renewal notice, consent and cancellation requirements.

## UIU

According to UIU, the absence of an express consent requirement raises concerns with respect to both fixed and variable priced contracts.  UIU recommends that ESCOs be required to obtain affirmative

consent from consumers for all contract renewals, that customers be given at least 14 days to change their mind about renewing the contract, and that ETFs should be prorated.

### USEP

According to USEP, Contract Law in New York works quite well.  USEP asserts that there is no need to change it in any way to protect customers purchasing energy in the retail energy marketplace.

13. What are the advantages and disadvantages of requiring ESCOs to provide their rate methodology and related billing calculations to customers with variable rate contracts?  What are the advantages and disadvantages of requiring all variable rate methodologies to be based on specified formulas tied to publicly available information, with the formulas varying by ESCO?  If this is to be required, when and how should ESCOs provide this information? (Provision of rate methodology and billing calculations)

### CES

CES states that Staff should ensure that ESCO contracts providing for monthly variable service include a description of the components that will comprise the total monthly price.

### Con Edison/O&R

Con Edison and O&R reiterate the point made in their response to Question 5, that customers should be provided with clear and complete information with respect to the ESCO pricing program associated with their service, whether or not the formula is tied to publicly available information.  Con Edison and O&R state that this information should be provided to customers in plain language in their sales agreement.

### Constellation

Constellation does not favor requiring ESCOs to provide their rate methodology and related billing calculations as they likely include an ESCO's proprietary and commercially sensitive information regarding supply purchases, timing, margin management and hedging strategies.  Further, Constellation maintains that with respect to variable price contracts and offers, ESCOs should be required to be clear about the variable nature of the product, stating, for instance, how often prices can change and what termination rights are held by the customer.  Constellation continues, stating that variable-price contracts should not include ETFs, providing a reasonable "check" on the rates offered under any variable methodologies.

## CPA

CPA does not believe that all ESCO contracts must be tied to public information. Further, CPA does not believe it necessary to require ESCOs to disclose rate methodologies.

## Direct

Direct agrees with RESA's comments.

## GEE

GEE states that commercial customers in general are aware of the terms of their agreement and are capable of calculating their own charges, however residential customers may be less commercially sophisticated and could require assistance in calculating their own charges. However, GEE cannot think of any general formula that could be developed to portray an ESCO's rate methodology.

## FTC

FTC suggests an alternative, revising data fields on the PTC website so that customers can readily identify which ESCOs do and do not meaningfully disclose their variable rate formulas. In addition, FTC states that a mandate to base rates on public price indices is more likely to help customers if accompanied by web calculators or tools to explain the implications.

## IDT

According to IDT, provision of the specific rate methodology beyond basic rates per unit, rebates and value-added calculation information will not facilitate the decision making process for the average consumer. Additionally, IDT argues that disclosure of the proprietary rate methodologies will compromise the ESCOs' business models. IDT states that the retail energy market cannot be "one-size-fits-all" and consumers will sift out good or bad products over time and the market and/or provider will survive or fail on its own.

## Joint Utilities

The Joint Utilities observe that given the complexity and variety of rate methodologies between ESCOs, this type of granular information may be more confusing than useful. The Joint Utilities do believe that this information may be useful to the Commission or to other third parties that have the ability and sophistication to review and analyze pricing methods.

## NEM

According to NEM, requiring each element of the ESCO rate to be filed and/or published, would be an inappropriate, time-consuming and cumbersome regulatory burden similar to a utility tariff filing. NEM maintains that this is antithetical to the necessary ability of ESCOs to rapidly and efficiently design and

offer products that provide value in response to ever-changing market conditions.  Additionally, NEM states that requiring ESCOs to disclose formulas for designing rates is equivalent to providing their competitors with highly confidential and proprietary competitive pricing strategies and business strategies.

### NRG

According to NRG, ESCOs that comply with the requirements of Section 5 of the UBP should be making adequate, understandable disclosures concerning their variable rate products that will allow potential customers to make an informed decision.  Further, NRG asserts that, to the extent that the Commission is suggesting that ESCOs provide their rate methodology greater than what the UBP currently requires could disadvantage customers.  NRG maintains that the information provided would only be reflective of the customer's current supplier and would not allow the customer to meaningfully compare this information with that of other suppliers that may not employ the same methodology.  NRG also asserts that requiring ESCOs to base rate methodologies on specified formulas could be inflexible and stifle innovation.  Finally, NRG asserts that much of the information required to be disclosed under this approach would be proprietary information, the release of which could cause significant injury to ESCOs, thus ultimately stifling competition and choice in a growing industry.

### NYSEG/RG&E

NYSEG/RG&E recognize that all ESCOs could develop a different methodology to price their supply.  According to NYSEG/RG&E, requiring a single methodology could stop ESCOs from trying new, innovative approaches and might keep prices higher in the future if ESCOs can't be creative.

### NYSEMC

According to NYSEMC, ESCOs are not at liberty to disclose their confidential business models.  Furthermore, states NYSEMC, it would be complicated, confusing, and impractical to require ESCOs to provide all of their rate methodology and related billing calculations to customers with variable rate contracts – just as it has historically been the case for utilities.  While NYSEMC notes that some ESCOs may choose to disclose pricing indexes or methodologies as part of their product offering and marketing; requiring them to do so would be arbitrary and non-competitive.

### PULP/AARP

PULP/AARP strongly urge the Commission to require ESCOs to make Terms of Service documents publicly available to any prospective customer with a link to such Terms on the PTC website. According to PULP/AARP, the Terms of Service disclosures should include the price (fixed or variable and, if variable, the specific methodology used to vary the price); the term of the contract; ETF, if any; late fees;

additional recurring and nonrecurring charges; and the billing options available to the customer.  Further, PULP/AARP recommend that variable rate contract disclosures inform the customer of an example of how the price of their contract would have changed in the past 12-24 months if the contract had been in place with the methodology included in the supplier's contract.  PULP/AARP state that variable rate contracts should be required to identify the specific index, formula, or methodology that is external to the supplier's own manipulation or discretion to govern their terms. According to PULP/AARP, it is unreasonable and unfair for residential customers to be exposed to a monthly change in price for essential electricity or natural gas service based on an unidentified or unknown methodology.  In reply comments, PULP/AARP note the comments of ESCOs that argue against identifying pricing methodologies.  In response, PULP/AARP recommend that such contracts should be prohibited for residential customers because such contracts do not provide any price.  PULP/AARP state that GBL §349-d allows the Commission to prohibit the retail sale of energy to residential customers through contracts that fail to state an initial price and identify the methodology that will be used to make price changes during the term of the contract.

**RESA**

RESA states that ESCOs are currently required include a description of the components that will comprise a total monthly variable price.  RESA continues, stating that the key element of the monthly variable price is the flexibility provided to the ESCO in fashioning a supply product that will reflect market costs on a monthly basis.  According to RESA, if ESCOs are locked into certain valuations, the ESCO's ability to respond to shifts in market conditions becomes limited.  Further, notes RESA, ESCO pricing can also be especially complex as it needs to project and incorporate numerous moving parts, including, capacity, NYISO's settlement procedures, and many other factors.  For these reasons, RESA argues, it would also be unwise to require each ESCO to adhere to a specified formula that is locked into specific values for each component.  Further, RESA asserts that an ESCO's pricing program constitutes competitively sensitive and valuable information that can be compromised where a publicly stated specific formula must be followed.  In reply comments, RESA asserts that PULP/AARP seeks to have the Commission regulate each ESCO's variable rate methodology and related contract terms in an attempt to impose monopoly type rate regulation on the competitive retail market.

**SCMC**

According to SCMC, in view of the complexity and competitive nature of ESCO pricing, it would not be efficacious to require an ESCO to disclose details of its rate methodologies, or follow a prescribed formula or rate methodology in setting prices.  SCMC explains that ESCO pricing is very complex, for example, on the electric side numerous factors may need to be estimated and incorporated in the final

price.  Furthermore, SCMC asserts that an ESCO's pricing program constitutes competitively sensitive and valuable information that can be compromised where a publicly stated specific formula must be followed.  In reply comments, SCMC states that other parties are unreasonable to suggest that the Commission "essentially control" ESCOs' variable rate methodology by requiring that ESCOs follow a specific public formula.  SCMC reiterates that ESCOs' flexibility in setting variable rates is essential.

### UIU

UIU states that ESCOs should be required to provide their price methodology and related billing calculations by regular mail, electronic mail and cell phone text to customers with variable rate contracts whenever any prices are changed.  According to UIU, the more those customers know about prices, the easier it is for them to make informed decisions about whether to continue purchasing energy supply through the ESCO.

### USEP

USEP asserts that, if the incredibly complex pricing mechanism used by the utility is simplified, the ESCO offerings will be simplified as well.  Further, states USEP, the components of a variable price offering, energy (with different hourly prices that must be load shaped), ancillaries, uninstalled Capacity and losses are challenging to calculate on a customer-by-customer basis each month.  According to USEP, there are no published indices that can easily be referenced and used by an ESCO to charge for its service.

## Purchase of Receivables (POR) (Question 14)

14. What would be the impact of requiring utilities to purchase receivables with recourse and thereby have ESCOs assume whole or partial responsibility for the uncollectibles of their customer?  Should this be a requirement?  What would be the impact of discontinuing POR without recourse for some ESCOs and how would those ESCOs be identified?

### Central Hudson

Since 2004, Central Hudson has used POR without recourse.  Central Hudson opposes returning to POR with recourse, either in whole or in part.  Central Hudson asserts that returning to POR with recourse would require over 400 hours of program changing and testing plus significant operations costs and changes to its collection process, accounting procedures, internal controls, and administrative updates.

## CES

According to CES, POR without recourse could result in two separate termination processes, one implemented by the ESCO for non-payment of its supply charges and a separate one implemented by the utility for non-payment of its delivery charges, which likely would create significant confusion and result in complaints by customers.

## Con Edison/O&R

According to Con Edison and O&R, there are no clear benefits to be gained from changing the purchase of a receivables model to a recourse model. Con Edison and O&R state that the competitive energy market has matured and a change to the recourse model would not make any significant changes in ESCO marketing practices, customer portfolio or pricing practices. In the view of Con Edison and O&R, such a change would, however, create the need to completely revamp the systems and processes supporting utility consolidated billing purchase of receivables programs, and at considerable expense. In addition, state Con Edison and O&R, due to the complexity of HEFPA regulations related to customers served by both utility and ESCO providers, it would be extremely difficult to properly administer customer protections under a POR with recourse model, due to the need to coordinate activities between the utility and the ESCO. In reply comments, Con Edison and O&R maintain their position and further expound on the difficulties they foresee in moving to a POR with recourse model.

## Constellation

Constellation asserts that the Commission should require non-recourse POR structures for all utilities, as the lack of non-recourse POR structures serves to increase market costs and risks, and will be detrimental to end use consumers in all customer classes. According to Constellation, recourse POR programs unnecessarily harm customers in several ways: (1) they deny some customers access to competitive options currently available in New York's electricity market; (2) they create a negative experience and perception for customers just learning about competitive electricity markets; and, (3) they dampen further development of the competitive market by reducing the number of ESCOs that are willing to participate in the market, especially for residential and other small customers. In addition, Constellation states that, from a policy perspective, a level playing field between utility service and ESCO offers is necessary to ensure that the benefits of competition are accessible to New York State's consumers. Constellation maintains that a recourse POR program treats ESCOs differently (i.e., as less important) than utility receivables – creating a preference for utility service – as only utilities retain an ability to disconnect customers for unreasonable non-payment. An ESCO can only seek to collect receivables through a collections agency, which has the additional downside of tarnishing a customer's credit rating, and/or move the customer back to utility service, either way leaving the ESCO at a high risk of never being paid.

Case 12-M-0476, et al.                                                          Attachment A

## CPA

CPA states that utilities should have the ability to discontinue POR without recourse in the case of any ESCO whose uncollectible rate is found to be more than one standard deviation greater than the rate for all load serving entities (including the regulated utility) in a particular service territory. CPA statese that it is easy to imagine that an ESCO could develop a business strategy of enrolling poor credit customers and merely selling the receivable. According to CPA, that situation is costly for ratepayers, and of no benefit to the poor credit ESCO customer.

## Direct

Direct agrees with RESA's comments.

## GEE

GEE states that initiating a purchase of receivables program with recourse would produce few benefits while creating numerous problems for utilities, ESCOs and customers. According to GEE, collection activities are always best managed by the utilities who have the knowledge and background to ensure that no customer is treated arbitrarily. GEE advocates that ESCOs should always have the ability to offer their customers consolidated billing with purchase of receivables or a dual billing option to allow for additional flexibility in billing options to the customer.

## IDT

According to IDT, the Commission should not mandate POR with recourse for several reasons: (1) ESCOs already pay for and are responsible for the uncollectible portion of their customer base; (2) it would increase utility uncollectible rates rather than stabilize them; (3) it would eliminate the ability of low income consumers to participate in energy choice due to ESCO credit checks and leave such customers in the utility customer base.

## Joint Utilities

The Joint Utilities oppose mandating a POR with full recourse. According to the Joint Utilities, the effect could ultimately be the same as if POR was discontinued. The experience of some of the Joint Utilities has been that POR programs, and specifically, consolidated billing, have been key to growing the number of customers willing to try a competitive supplier. According to the Joint Utilities, considering how intertwined these POR programs are with the utility's existing rate structure and the amount of variability between the utility programs, every utility should be allowed to decide POR program structure and which recourse decision is best for them rather than mandating one single solution for all utilities. The Joint Utilities oppose the OAG's proposal to move to POR with full recourse. The Joint Utilities also oppose the UIU and PULP/AARP proposals to move to a partial recourse model. In explaining these positions,

the Joint Utilities state that shifting to full or partial recourse may have detrimental effects on the retail markets and consumers, and would require extensive modifications to utilities' customer systems and EDI interfaces.  Alternatively, the Joint Utilities state, there may be options within the current POR without recourse programs, such as more frequent updates to discount rates.

**National Grid**

National Grid agrees with the objections to mandating POR with recourse raised in the Joint Utilities comments.  Further, National Grid states it opposes mandating POR with recourse absent significant changes to HEFPA.  National Grid explains that prior Commission orders adopting changes to HEFPA applied the same consumer rights and protections to ESCO customers as utility customers and provided guidance on proration of payments on residential and small non-residential customer bills.  According to National Grid, these changes made it impractical for NMPC to continue offering POR with recourse and for KEDLI and KEDNY to continue their-pay-as-you-get-paid models.

**NEM**

NEM explains what it views as the reasons behind the Commission's decision to implement POR without recourse in the past.  NEM characterizes the current POR without recourse programs as "well-functioning" and "stunningly successful."  NEM asserts that there is no evidence to justify a change in POR policy.  According to NEM, requiring POR with recourse would impact the ability of ESCOs to serve all consumers, regardless of income or credit status.  Additionally, NEM argues that the additional costs to ESCOs recreating the utility back office and collection infrastructure would be prohibitive, driving up energy costs for end users.  Further, NEM opines that requiring POR with recourse would necessarily require substantial additional regulatory analysis and rule changes.  NEM also states that, if ESCOs are effectively mandated to provide ESCO consolidated billing then the utilities should be required to discount all of their charges by the same percentages and fees they currently collect from ESCOs for utility consolidated billing.  Moreover, under POR with recourse, NEM asserts that ESCOs must be empowered to disconnect service upon non-payment of ESCO consolidated bills in the same manner as utilities.  Finally, NEM explains that it believes that utilities' POR discount rates are a function of the utilities' system-wide bad debt rates, including both ESCO and non-ESCO utility customers.

**NFG**

NFG explains that it provides POR with partial recourse and does not recommend POR with full recourse. NFG explains that, ESCOs are at risk for the uncollectibles of their customers above the amount the customer would have paid to NFG under a comparable sales service.  According to NFG, this makes the ESCO at risk for the portion of the ESCO's charges related to the product differentiation, e.g., differences

in hedging and value-added services. Purchase discounts provided in the POR program provide adequate compensation to the Company for assuming the receivable and should be continued.

## NRG

NRG supports maintaining POR without recourse for utility consolidated billing. Suspension rights of ESCOs and utilities are balanced under the PSL, minimizing customer disruption and inconvenience.

## NYSEG/RG&E

NYSEG/RG&E oppose changes to the POR programs. They express concern that a change in the POR Program to allow "recourse" could have serious operational ramifications and cause customer dissatisfaction..Because of concerns regarding the flow of information between the ESCO and the utility, NYSEG/RG&E state that a program with recourse could lead to ESCOs directing the utility to shut off for non-payment when all HEFPA requirements are not satisfied. NYSEG/RG&E also state that, if POR with recourse is required, the Companies would have to redesign their billing and EDI systems which would be costly in terms of dollars spent on design and programming, as well as thousands of IT personnel hours.

## NYSEMC

NYSEMC believes POR without recourse makes the most sense. According to NYSEMC, in those instances where recourse was previously applied to POR, the after-the-fact collection efforts were cumbersome and unsuccessful. NYSEMC states that, if POR with recourse was applied throughout New York, NYSEMC predicts that the ESCO community would virtually abandon these markets. In addition to the continuation of POR programs without recourse, NYSEMC would like to see a supplier billing option made available. NYSEMC expects that, once the utilities exit the merchant function, some competitive suppliers may wish to put in place billing systems which can enable consolidated ESCO billing with a utility POR option.

## OAG

The OAG supports mandating POR with full recourse. According to the OAG, to qualify as independent competitors, ESCOs should bear the full risk of their customers' uncollectible accounts. After fifteen years in existence, ESCOs today have adequate financial resources to stand on their own. The OAG believes that for there to be a genuinely competitive retail energy market, utility ratepayers and shareholders should not be responsible for ESCO collections.

**PULP/AARP**

PULP/AARP recommend that the utility not be allowed to threaten or to terminate service for ESCO charges that exceed the utility's default service charges. According to PULP/AARP, this reform would impose the obligation on the ESCO to collect charges in excess of the utility's default charges through competitive market debt collection channels. PULP/AARP maintain that such a policy would be competitively neutral in that the Commission would not be required to identify those ESCOs that would not be allowed to use the POR programs. In reply comments, PULP/AARP state that the Commission should reconsider these policies in light of the significant subsidy and support that the current billing and collection system has given to ESCOs.

**RESA**

RESA maintains that POR without recourse addresses concerns that there would be two HEFPA processes for treatment of customer non-payment and termination separately pursued by the utility and the ESCO. Further, RESA asserts that POR with recourse would result in additional business costs to the ESCOs, which would result in higher costs and fewer energy offerings to residential and small non-residential consumers. In reply comments, RESA notes that the utilities oppose mandating POR with recourse.

**SCMC**

SCMC opines that the use of purchase of receivables with recourse would not serve the interests of any party, including the customer. SCMC observes that the customer could be subject to suspension of delivery service, separately, for failure to pay ESCO charges and for non-payment of utility distribution charges. According to SCMC, under POR without recourse, the customer can avoid suspension under this process by submitting payment of an amount capped at what the customer would have paid had service been provided by the utility. In reply comments, SCMC highlights the opposition of the utilities to POR with recourse.

**UIU**

UIU comments that, based on the history of retail access to date, ESCOs should assume more responsibility for the un-collectibles of their customers. UIU believes this would weed out ESCOs whose unsavory marketing practices have resulted in a much higher than average level of uncollectibles. UIU believes that POR without recourse substantially weakens the incentive that exists in most competitive markets for ESCOs to acquire customers who are willing and able to pay as well as the incentive for ESCOs to charge reasonable prices.

**USEP**

USEP believes that it is critical for POR programs to be without recourse. USEP asserts that positioning ESCOs to have the right to terminate service to customers for non-payment invites issues and problems that could be difficult to manage.

# Other Proposals & Uncategorized Comments (Question 15)

15.    What other modifications to existing retail market programs or practices, including modifications to the UBP, should be considered, and why?

**Public Comments**

Approximately 50 comments were received from members of the public in Case 12-M-0476 since that case was instituted. Many of the comments echoed concerns raised in the October 2012 Order. Some commenters expressed concern over what they perceived as inexplicable increases in the rate charged by their ESCO. A number of commenters stated that ESCOs should be required to publish their current and historic prices to assist in shopping for an energy supplier. One commenter states that, he was responsible for negotiating a beneficial ESCO contract for his employer (a paper mill), but that his experience with ESCOs as a residential customer have been negative. Other comments expressed that the residential retail energy market is overwhelming and confusing, and that it requires additional oversight and reforms, One commenter described experiences with various ESCOs that ranged from satisfied to dissatisfied. One public comment was received from an energy broker, which states that it is impractical and unnecessary to require that brokers carry identification badges.

**BC**

BC states that the retail energy market is working very well for large commercial and industrial customers. In addition, BC notes that, at least for large customers, ESCOs successfully compete on the issue of price certainty and also provide value-added product offerings. Further, states BC, the Commission is acting appropriately to explore how to improve the market experience for mass market customers so they too can benefit from retail energy choice. BC states that the Commission should be cautious that the Commission's actions do not impair the market for commercial and industrial customers.

**Compete**

Compete believes that competitive retail markets provide residents and businesses reliable, environmentally sound electricity at the lowest available cost. Further, states Compete, the rules for New York's retail energy markets are working. Thus, Compete recommends that the Commission exercise caution and not take actions that could have a negative impact on these markets.

## Con Edison/O&R

In reply comments, Con Edison and O&R respond to OAG's request that utilities effectuate switches in a customer's supplier more promptly. Con Edison and O&R state that the current process outlined in the UBP reflects the needs of ESCOs and utilities for a reasonable amount of time to perform functions related to switching of the customer. Con Edison and O&R note that the UBP allows for off-cycle changes in providers where a special meter read may be necessary.

Con Edison and O&R also respond to UIU and NYC DCA's recommendations that utility consolidated bills be enhanced to include comparative pricing information, Con Edison and O&R state that, while the recommended enhancements could be accommodated, the enhancements would likely require a significant investment of time and money. Further, Con Edison and O&R state that utility bills already contain a large amount of information, the additional information may result in customer confusion and/or longer bills.

Con Edison and O&R also oppose the UIU's proposal that utilities be required to send a letter to customers at the end of a contract term with an ESCO to explain the amount of savings received by the customer from the ESCO. Con Edison and O&R object to any rule that would require them to provide to a customer any characterization of the results of the customer's relationship with his or her ESCO. Additionally, Con Edison and O&R note that utilities do not presently have access to the specific contract terms for each ESCO customer, and should customers call Con Edison or O&R, the call center representatives are not in a position to discuss the terms of an ESCO contract.

Finally, in their reply comments, Con Edison and O&R state their agreement with PULP/AARP's recommendation that the Commission and thereby the utilities "stop promoting customer choice as primarily a means to 'save' on the customer's bill." In the alternative, Con Edison and O&R state that retail choice should be advertized as a means to find the best energy value to satisfy the individual customer's needs.

## Constellation

Constellation supports improved consumer education, particularly for the benefit of residential customers. In addition, Constellation recommends that the Commission adopt the data access recommendations of the LDC Format Working Group. Further, Constellation recommends that the Commission adopt an ESCO rating system similar to the ESCO rating system currently utilized in Texas. Finally, Constellation recommends that the Commission modify its rules for licensure to encompass certain third-party marketers. Specifically, Constellation recommends that the Commission should require a third party to be licensed where: (a) The third party is paid through an ESCO on behalf of a customer with respect to a

particular transaction/contract between the ESCO and customer; and (b) Such third party takes actions on behalf of the customer that amount to more than an endorsement or referral of the ESCO.  In its reply comments, Constellation notes that many parties appear to agree with it that there is a need for increased consumer education and protection.  Additionally, Constellation states its agreement with the OAG's comments that the Commission should supervise energy brokers and that ESCOs should be required to provide a clear explanation of ETFs in the terms and conditions provided to customers prior to enrollment.

**Direct**

Direct believes customers and ESCOs would benefit from the availability of consolidated ESCO billing, provided it was available on appropriate operational and financial terms.  Direct also favors creation of a more effective complaint tracking system that would report the number of complaints against an ESCO in relation to the size of the ESCO's customer base.  In addition, Direct explained that it views the following as measures that would overcome barriers to continued market development:  (1) a change to utility default service prices set on a monthly variable basis which Direct asserts is difficult for customers to understand and make comparisons against; (2) the increased availability of smart meters for residential and small commercial customers; and, (3) a renewed commitment to customer education.  In its reply comments, Direct agrees with NRG's proposals for day-one switching and seamless moves, the creation of a customer funded consumer education program and the creation of an Office of Retail Energy Markets.  Direct also agrees with NYSEMC's support for supplier consolidated billing.  Finally, Direct expresses its support of the roll out of a smart grid program in New York.

**GEE**

GEE recommends addressing the transparency of utility commodity rate computations to facilitate proper apples-to-apples comparisons.

**IPPNY**

IPPNY states that it generally saw benefits to both wholesale and retail competition in New York.  IPPNY recommends that  the Commission provide up-to-date consumer education programs that offer energy procurement tips and a simplified, consumer-friendly access to the many energy-related programs that various New York agencies offer.  Furthermore, states IPPNY, the Commission should consider accelerating competition by proposing new ways to moving existing utility customers into competitive markets through vehicles such as the Basic Generation Service program operated by New Jersey.

**Joint ESCOS**

The Joint ESCOs filed reply comments which contend that unless and until utility rates are transparent and market based, problems will persist that will prohibit the true benefits of a robust energy marketplace where products and prices can be compared. The Joint ESCOs call for a complete redesign of utility commodity rates.

**Joint Utilities**

The Joint Utilities recommend that the UBP be amended to provide for general principles to be applied in evaluating the suitability of any current or new marketing channel, including the utilization of so-called "brokers", "agents" or independent marketing contractors  The Joint Utilities recommend that the existing UBP definition for ESCO marketing representative be modified to include subcontractors, employees, vendors and representatives not directly contracted by the ESCO who conduct marketing or sales activities on behalf of the ESCO. The Joint Utilities also recommend that UBP Section 2.D.5.b be modified to include natural gas.

In reply comments, the Joint Utilities oppose a number of proposed billing changes raised in other parties' initial comments. First, the Joint Utilities question the interest in ESCO consolidated billing as proposed by Direct and note that, in any event, there are no regulatory impediments to ESCO consolidated billing. Further, the Joint Utilities do not believe that ESCOs should be provided with a financial incentive or subsidy to pursue ESCO consolidated billing. The Joint Utilities also oppose the proposal of the NRG Retail Affiliates and Constellation that the Commission should work with utilities and ESCOs to develop a uniform, competition-friendly format for consolidated billing offered by distribution companies and ESCOs. According to the Joint Utilities, the format of utility combined bills is not confusing to customers. In contrast, assert the Joint Utilities,  customer familiarity with utility provided bills is one reason that the predominant mode of ESCO billing is utility prepared consolidated bills. The Joint Utilities oppose, as redundant and costly, the proposal of USEP that utilities be required to offer ESCOs both rate ready and bill ready billing options. The Joint Utilities explain that whether a utility provides bill ready or rate ready ESCO consolidated bills is based upon the capabilities of the utility's billing system. In response to UIU's proposal that all ESCO billing be done through consolidated utility bills, the Joint Utilities pose a threshold question – "Should utility billing systems be enhanced to be capable of billing any ESCO service or should ESCO products be simplified to a subset of offerings that can be billed by existing utility systems?"

In reply to the Direct's proposal for a statewide commitment to smart meters, the Joint Utilities state that issues surrounding the installation of smart meters are outside the scope of this proceeding. The Joint Utilities assert that prospective use of smart meters should be addressed on an individual utility basis in

future rate proceedings.  Additionally, the Joint Utilities also oppose the comments of NRG, NYSEMC and NEM, which state those parties' desire to remove utilities as a supply option in New York.  The Joint Utilities state that 75% of customers utilize the utility as their energy supplier and that it is not axiomatic that customers who do not choose ESCO service are not making a choice.  In addition, the Joint Utilities state that requiring prompt changes in supplier (i.e., mid-cycle), as proposed by the OAG could be costly to implement.  In the alternative, the Joint Utilities propose requiring ESCOs to charge "safe harbor" rates until the customer's supplier could be switched.  In response to the PULP/AARP comment that customers are not affirmatively informed of their right to obtain reconnection by paying the lesser of the ESCO's or Utility's supply charges, the Joint Utilities aver that there are many precautions and customer protections in the utilities' systems and practices and that the utilities periodically advise customers of their rights under HEFPA.  The Joint Utilities state that they do not oppose PULP/AARP's recommendation that customer choice cease being promoted as primarily a means to save on the customer's bill.  Finally, the Joint Utilities assert that the Commission should exercise caution in adopting any proposals that would require the expenditure of customer funds.

## **MI**

MI only filed reply comments.  In its comments, MI questions the benefit of expending material resources to provide commodity price comparisons that are not truly apples-to-apples comparisons.  MI asserts that descriptions of utility commodity prices should include and explain a number of variables beyond the basic cost of commodity.  Further, MI cautions against sanctioning comparisons that are misleading.  MI asserts that it could be misleading to compare fixed-price or heavily-hedged contracts with utility-provided market-based or lightly-hedged prices.  MI also comments that ESCO-utility price comparisons could be misleading if they fail to account for "green energy" offerings or value-added services.  MI echoes the comments of BC, that the Commission should be careful not to impair the large non-residential retail markets in the process of improving the status quo for residential and small non-residential customers.  Finally, MI notes comments of the Joint Utilities and RESA with regard to cost recovery and stats that, if utilities incur costs as a result of actions taken to improve the residential and small non-residential retail markets, then such costs should be recovered from those customer classes, not from large commercial and industrial customers.

## **National Grid**

National Grid agrees with the Joint Utility response to Question 15.  In addition, National Grid supports the imposition of strict fines and sanctions on ESCOs for deceptive practices, such as unauthorized enrollments.  National Grid believes that per-occurrence monetary penalties and possible suspension or

termination of marketing/operations for the offending ESCO are warranted and would provide a greater disincentive for such conduct.

## NEM

NEM recommends further unbundling and increased transparency of utility pricing and rate structures. NEM asserts that the concerns implied in the Commission's October 2012 Order should be addressed through a three prong approach: (1) delineation of a uniform set of behavioral standards for marketplace actors, with clear consequences for violations, as already incorporated into Section 10 of the UBP; (2) effective enforcement of the behavioral standards as a strong deterrent against potential marketplace misconduct; and (3), reliance on market-based products to serve all customers.  In reply comments, NEM alleges that there are extremely volatile residential utility default prices, which should be fully investigated by the Commission.  Further, NEM renews its call for additional proceedings regarding the unbundling and transparency of utility rates.

In reply comments, NEM emphasizes its belief that the Commission should not make changes to the existing retail market structure, but should provide clarity regarding what constitutes expected conduct in the marketplace.  NEM states that, subsequent to the submission of its initial comments in this case, it has adopted National Marketing Standards of Conduct that it believes are on point.  Further, NEM recommends instituting a new proceeding to define rational, prudent and consistently applied behavioral standards.  NEM believes this, coupled with a reasonable, prudent and understandable system of corrective actions, restitution standards and/or penalties for violations of the standards will encourage ESCOs to make good faith efforts to correct errors and avoid further infractions or mistakes.  NEM opposes the suggestion made by UIU that consolidated utility billing be mandated.

## NFR

NFR filed comments in opposition to UIU's proposal to require consolidated utility billing.  NFR notes that some ESCOs provide billing services to their customers and have made significant investments in order to do so.  Additionally, NFR explains that, ESCOs may make various offers to customers that may be difficult, if not impossible for utility billing systems to accommodate.  NFR opines that, if consolidated utility billing were mandated, those offers would either become impossible, or utilities would be required to invest in upgrading their billing systems in order to accommodate billing for those offers.

## NRG

NRG urges the Commission to use the Governor's call for privatization of energy service on Long Island in his January 9, 2013 State of the State message as an opportunity to establish a model for a fully-competitive retail energy market that could be replicated across the State.  Under a fully-competitive

model for Long Island, ESCOs would provide commodity and energy services, while the new distribution service provider would focus on the reliability and safety of the transmission and delivery system.  NRG also proposes a "Market Advancement Plan" which includes: greater price transparency by utilities and ESCOs, day-one switching and seamless moves, continuous consumer education, statewide uniformity of the retail market structure and programs, greater enforcement of the existing rules by the Department and the Commission, biennial Commission review of ESCO eligibility, the establishment of an Office of Retail Energy Markets within the Department, formalization of the New York Retail Energy Market Stakeholders Forum, relieving utilities of most or all of their default service responsibilities to allow utilities to focus on system reliability, and empowering customers to take charge of their energy usage.  In reply comments, NRG states that the Commission should continue to permit ETFs in sales contracts between ESCOs and residential and small non-residential customers.

**NYSEG/RG&E**

NYSEG/RG&E state that, if the Commission continues to allow ESCOs to charge ETFs, it should be explicitly recognized that ESCOs are not allowed to place these fees on utility consolidated bills. NYSEG/RG&E state that these charges are not based on energy supplied to the customer, and ESCOs should be required to collect any non-supply-based fees or charges directly from customers.  Additionally, NYSEG/RG&E note that a number of proposals could result in significant costs for the utilities. NYSEG/RG&E request contemporaneous recovery through an existing or new surcharge. NYSEG/RG&E also state that, to the extent any of these costs are incurred for ESCO promotional programs, the ESCOs should fully fund the portion considered promotional.

**NYSEMC**

NYSEMC states that it is time for New York State to begin looking ahead towards the point at which the utility can be replaced as the sole default provider in order to fully develop the competitive marketplace. NYSEMC believes much more effort needs to be placed on consumer education throughout New York State, which would require an equal commitment by the Commission, utilities, and ESCOs.  Further, comments NYSEMC, when necessary, enforcement efforts related to the UBPs need to be timely, uniform, and consistent with due process.  In addition, NYSEMC avers that more dialogue and an active working group is needed to establish consistent and effective EDI practices between the utilities and the ESCOs.  NYSEMC also filed supplemental comments which respond to certain specific questions posed by another party.

## OAG

The OAG recommends that the Commission adopt standards limiting the size of ETFs for residential and small business customers in fixed-rate contracts.  The OAG recognizes that ETFs may be necessary because ESCOs offering fixed-price contracts can incur costs in arranging for supply to meet the anticipated needs of their customers over the life of their contract.  The OAG can accept ETFs that are proportionate to the risk incurred by the ESCO. However, continues the OAG, some ESCOs charge excessive ETFs that amount to an unlawful penalty.  Additionally, the OAG states that the economic harm to an ESCO from consumer cancellations is modest, as residential and small business usage levels are far lower than for larger commercial and industrial customers.  Moreover, the OAG notes that consumers lack the bargaining power and information to negotiate fair ETFs with an ESCO.  In contrast, the OAG recommends that the Commission prohibit ETFs of any amount for ESCO variable-rate contracts with residential or small business customers.  The OAG maintains that allowing the ESCOs to raise their rates without any limit while locking consumers into a contract with an ETF is highly inequitable.

The OAG believes that the Commission should supervise brokers who purport to represent multiple ESCOs.  The OAG recommends that these entities should be required to register with the Department and provide basic information identifying the principals of the entity, its form of organization, contact information, history of business in other jurisdictions and any prior regulatory or law enforcement sanctions.  .Continuing, the OAG states that registered brokers should be required to certify that their employees and agents have been trained to comply with the UBP rules and to disclose to prospective customers the nature of the broker's compensation (e.g., paid by the ESCO or the customer, fixed commission or a surcharge on each unit consumed) before any ESCO contract can become valid. The OAG also recommends authorizing Staff, where appropriate, to investigate an ESCO broker's activities to verify that the claims made in its solicitations are true.  The OAG would bar unregistered businesses that engage in broker activities from doing business with New York consumers.

The OAG supports vigorous enforcement of the UBP Marketing Standards.  The OAG recommends that the Commission adopt formal auditing protocols to be followed whenever clear indicators of abusive behavior become known. Where compliance failures are found, the OAG would require independent monitoring of future marketing activities.  According to the OAG, those ESCOs found to cross the line of dishonest business practices must be disciplined with marketing restrictions, monetary penalties, and, where appropriate, exclusion from doing business in New York.

The OAG recommends that customer requests to cancel ESCO service should be promptly honored, eliminating the 45- to 60-day lag period (and sometimes even longer) between a consumer telling his/her ESCO to cancel service and the utility switching the consumer back to the utility (or to another ESCO).

The OAG states that consumers who are dissatisfied with the rates charged by an ESCO should not be forced to continue paying an unwanted ESCO's rates for two or more months after cancellation.  The OAG would require ESCOs to notify the utility of a customer's cancellation within one business day and to submit periodic reports documenting compliance with this standard.  According to the OAG, those that fail to comply should be required to refund to the consumer the difference between what the ESCO charged and what the subsequent provider charged for the period of the delay. Further, the OAG would require utilities to effect customer cancellation orders more promptly by informing the customer that he/she can request that a special reading be taken within a week at a reasonable fee.  Furthermore, according to the OAG, utilities commonly allow customers to report their meter reading by postcard or telephone, and similar options should be extended to ESCO customers who desire to accelerate the termination of their ESCO's service.

## OGS

OGS requested a change to the definition of Direct Customer contained in the UBP.  OGS states that the change will allow OGS to fulfill the requirements established under State Finance Law §97-g, to aggregate the electric load of state facilities within the New York Independent System Operator Zones across New York State.

## PACE & ACE NY

Pace & ACE NY encourage the Commission to consider the benefits of New York's competitive energy markets as they relate to promoting clean power.  According to Pace & ACE NY, a narrow focus on pricing ignores the innovative products and services that retail energy markets can incent ESCOs to create.

## PULP/AARP

PULP/AARP recommend that the Commission reform its consumer education policies and its handling of customer complaints concerning ESCOs' supplier behaviors. PULP/AARP recommend that the Commission publish a complaint index for all active marketers on at least a quarterly basis and take more proactive steps to initiate formal investigations and undertake enforcement and compliance actions against suppliers with above average complaint ratios.  Further, state PULP/AARP, the Commission should also allow for public comments on customers' experiences with individual suppliers to be published on the Commission's website.  Additionally, PULP/AARP opine that the Commission should publish substantive complaint trends, formal or informal investigations or other indicia of actions taken to enforce the current regulations.  PULP/AARP believe it would be fruitful for the Commission to conduct a survey and study to find out why customers leave ESCO service and to better understand the ESCO

customer experience.  PULP/AARP also recommend that the Commission: (1) utilize its certification process to act as a gatekeeper to prevent suppliers that have a history of investigations and adverse activities in other states from operating in New York; (2) modify regulations to reflect the need for disclosures that reflect all fixed, variable and recurring charges in a uniform manner and highlight other important contract terms; (3) proactively review contract terms of ESCOs that generate significantly higher complaint levels.  In its reply comments, PULP/AARP summarized public comments received as of the date of PULP/AARP's reply submission, noting that the comments were generally not favorable to ESCOs.  PULP/AARP note that the initial comments of those it characterizes as consumer advocates, as well as the Joint Utilities, call for reform in marketing and disclosure practices.  PULP/AARP characterizes the comments of ESCOs and their organizations as generally recommending that the Commission "stay the course" or make more radical changes to enhance their business opportunities. PULP/AARP notes that even some of the ESCO commenters point to the need for additional regulatory initiatives with respect to price disclosure, enforcement and enhanced consumer protections with respect to D2D marketing practices.

In its reply comments, PULP/AARP states that the lack of stable and longer term price signals about default utility service is a significant defect that allows suppliers to market products based on customer confusion.  PULP/AARP recommend that the Commission improve current utility commodity pricing policies.  PULP/AARP also states that there was relatively widespread agreement, including from RESA and NEM that the Commission should take more forceful enforcement actions against suppliers that violate existing norms.  PULP/AARP suggest that those norms need reform, including the adoption of more specific licensing and enforcement requirements.  PULP/AARP support consumer education by the Commission, but only if undertaken pursuant to a publicly developed education plan and underwritten, in part by ESCOs, since ESCOs will benefit from additional migration to retail access programs.  Finally, while PULP/AARP agree with FTC about the need to create careful disclosure designs and consider the impact of research in such designs, PULP/AARP question whether FTC has a complete understanding of the retail energy markets in New York and the history of those markets.

## **RESA**

RESA expresses opposition to the proposal of OGS.  RESA asserts that the OGS proposal could impede the growth of competitive markets in New York State.  Accordingly, RESA asks that the Commission examine the impact of allowing a state agency or other entity that is not a for-profit competitive enterprise to obtain and operate under ESCO status in New York.  RESA maintains that the OGS proposal appears solely to benefit OGS in its effort to secure customers in competition with ESCOs and does not provide any benefit to the manner in which ESCOs provide supply options to retail customers.  In reply

comments, RESA dismisses proposals for additional enforcement remedies such as penalties or bonding, stating that the Commission already has significant powers to enforce the UBP and good practices by ESCOS.  RESA responds to OAG's suggestion that ETFs should be limited or precluded for ESCOs serving residential customers by stating that this approach is unlawful and unnecessary.  RESA states that UIU's proposal that consumers be given additional time to terminate without imposition of an ETF is overbroad and inconsistent with existing law.  RESA also filed supplemental comments which respond to certain specific questions posed by another party.

## SCMC

SCMC recommends limiting the applicability of potential actions to residential customers, and not including small commercial customers.  SCMC avers that the determination of who would be incorporated in the classification of "small" commercial customers is vague and overbroad.  With respect to cost recovery, SCMC recommends continuing to recover platform and infrastructure related costs from ratepayers and promotional program costs from ESCOs.  In reply comments, SCMC urges rejection of UIU's proposal to mandate consolidated utility billing.  Additionally, SCMC states that proposals for additional enforcement penalties, such as bonding, are unnecessary given existing enforcement options.  SCMC also filed supplemental comments which respond to certain specific questions posed by another party.

## UIU

UIU recommends several additional measures: (1). provide translation and interpretation services for limited-English proficient New Yorkers; (2) modify the UBP to allow for only consolidated utility billing; (3) complaints about ESCO marketing practices should be available to the general public on the PTC website, without certain confidential material, to deter the bad actors; (4) after a certain threshold number, financial penalties and metrics for ESCOs switching customers without authorization need to be clearly defined in the UBP, heavily monitored, and enforced; and (5) strict marketing guidelines need to be enforced and ESCOs sanctioned appropriately.

## USEP

USEP makes the following recommendations: (1) require the utilities to be both bill ready and rate ready for consolidated bills; (2) simplify the utility pricing and make it more transparent; (3) any posting of utility prices should include the merchant function charge; (4) upgrade the PTC website to give meaningful information and drive customers to it; (5) the PTC website should be careful to differentiate fixed versus variable offerings and offerings for renewable energy; (6) POR should be without recourse

and the POR rates should be kept low; and, (7) the market for commercial/industrial customers works quite well, and any changes to UBP should not impact this highly competitive and effective market.

Attachment B

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

UNIFORM BUSINESS PRACTICES
CASE 98-M-1343

~~June 2012~~
FEBRUARY 2014

TABLE OF CONTENTS

SECTION 1:  DEFINITIONS.............................................................................................. 1

SECTION 2:  ELIGIBILITY REQUIREMENTS ............................................................... 6

SECTION 3:  CREDITWORTHINESS ............................................................................. 15

SECTION 4:  CUSTOMER INFORMATION......................................................... ~~19~~20

SECTION 5:  CHANGES IN SERVICE PROVIDERS.................................................... 24

SECTION 6:  CUSTOMER INQUIRIES.................................................................. ~~39~~42

SECTION 7:  DISTRIBUTION UTILITY INVOICES .............................................. 44~~41~~

SECTION 8:  DISPUTES INVOLVING DISTRIBUTION UTILITIES, ESCOs OR DIRECT CUSTOMERS ............................................................................ 46

SECTION 9:  BILLING AND PAYMENT PROCESSING ....................................... ~~45~~48

SECTION 10:  MARKETING STANDARDS........................................................... ~~59~~62

# SECTION 1:  DEFINITIONS

As used in the Uniform Business Practices (UBP), the following terms shall have the following meanings:

Assignment – Transfer by one ESCO to another ESCO of its rights and responsibilities relating to provision of electric and/or gas supply under a sales agreement.

Bill ready – A consolidated billing practice that requires each non-billing party, after receiving customers' usage data, to calculate its charges and send via EDI charges, billing information, and bill messages to the billing party in a form that allows the transfer of the information to the bill in a format the billing party selects.

Billing cycle – The period for which a customer is billed for usage of electricity or natural gas.

Billing services agreement (BSA) – An agreement between the distribution utility and the ESCO stating the billing practices and procedures and the rights and responsibilities of billing and non-billing parties relating to issuance of consolidated bills to customers.

Budget billing – A billing plan that provides for level or uniform amounts due each billing period over a set number of periods, typically 12 months, and determined by dividing projected annual charges by the number of periods.  Installment amounts may be adjusted during the period and may include reconciliations at the end of the budget period to account for differences between actual charges and installment amounts.

Business day – Monday through Friday, except for public holidays.

Consolidated billing – A billing option that provides customers with a single bill combining charges from more than one service  provider and issued by a distribution utility providing delivery service (utility consolidated bill) or by a commodity supplier (ESCO consolidated bill).

Customer inquiry – A question or request for information from a customer relating to a rate, term, or condition of service provided by an ESCO, distribution utility or other service provider.

Cramming – The addition of unauthorized charges to a customer's bill.

Deferred payment agreement (DPA) – A fair and equitable payment plan agreed upon by a customer and utility and/or a customer and an ESCO that allows a customer to pay an overdue amount in installments.  A DPA is based upon the customer's financial circumstances and ability to pay the overdue amount while making payment on current charges.

Demand – The amount of electricity or natural gas that is or could be immediately needed by a customer at any given point in time referred to as customer load.  For consolidated billing, the term is used in the context of "billing period demand" for customer bills.

> Electric – The amount of electricity, measured in kilowatts (kW), that a customer uses at a point in time, the customer's usage averaged over a period, or capacity of facilities reserved for the customer for stand-by or other service.
>
> Natural Gas – The amount of gas measured in cubic feet or therms that a customer uses or may use over a period, or capacity of facilities reserved for the customer for stand-by or other service.

<u>Direct customer</u> – An entity that purchases and schedules delivery of electricity or natural gas for its own consumption and not for resale.  A customer with ~~a~~an aggregated minimum peak connected load of 1 MW ~~at~~to a ~~single~~designated zonal service point qualifies for direct purchase and scheduling of electricity provided the customer complies with NYISO requirements.  A customer with annual ~~use~~usage of a minimum of 3,500 dekatherms of natural gas at a single service point qualifies for direct purchase and scheduling of natural gas.

<u>Distribution utility</u> – A gas or electric corporation owning, operating or managing electric or gas facilities for the purpose of distributing gas or electricity to end users.

<u>Distribution utility customer account number</u> – A number used by a distribution utility to identify the account of a utility customer.

<u>Distribution utility tariff</u> – A schedule of rates, terms and conditions of services provided by a distribution utility.

<u>Door-to-door sales</u> – The sale of energy services in which the ESCO or the ESCO's representative personally solicits the sale, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller; provided that "door-to-door sales" shall not include any sale which is conducted and consummated entirely by mail, telephone or other electronic means, or during a scheduled appointment at the premises of a buyer of nonresidential utility service, or through solicitations of commercial accounts at trade or business shows, conventions or expositions.

<u>Drop</u> – A transaction that closes a customer's account with a provider.  This term is used when:  (1) a customer's enrollment is pending and the customer rescinds the enrollment; (2) a customer enrolled with an ESCO returns to distribution utility service or enrolls with another ESCO; or (3) the ESCO discontinues service to a customer.

<u>Dual billing</u> – A billing option that provides for separate calculation of charges and presentation of bills to the customer by the distribution utility and ESCO.

<u>Electronic data interchange (EDI)</u> – The computer-to-computer exchange of routine information in a standard format using established data processing protocols.  EDI transactions are used in retail access programs to switch customers from one supplier to another or to exchange customers' history, usage or billing data between a distribution utility or MDSP and an ESCO.  Transaction set standards, processing protocols and test plans are authorized in orders issued by the Public Service Commission in Case 98-M-0667, <u>In the Matter of Electronic Data Interchange</u> and available on the Department of Public Service website at:  www.dps.~~state.~~ny.~~us~~gov/98m0667.htm.

<u>Energy broker</u> – A non-utility entity that performs energy management or procurement functions on behalf of ~~direct~~ customers or ESCOs but does not make retail energy sales to customers.

<u>Energy services company (ESCO)</u> – An entity eligible to sell electricity and/or natural gas to end-use customers using the transmission or distribution system of a utility.  ESCOs may perform other retail service functions. ~~Sometimes, other terms are used for such entities, such as, ESCO/Marketer to describe a supplier of both commodities, ESCO to describe a supplier of electricity and marketer to describe a supplier of natural gas.  For simplicity, the term ESCO is used in the UBP to refer to suppliers of natural gas and/or electricity.~~

ESCO marketing representative – An entity that is ~~either~~ the ESCO, an employee of the ESCO, an agent of the ESCO, or a contractor/vendor conducting, on behalf of the ESCO or ESCOs, any marketing activity that is designed to enroll customers with the ESCO. It also includes subcontractors, employees, agents, vendors and representatives not directly contracted by the ESCO who conduct marketing or sales activities on behalf of the ESCO.

Enroll/Enrollment – The process used to switch a customer from a distribution utility to an ESCO or from one ESCO to another.

Enrollment date – The effective date for commencement of electric or natural gas service from an ESCO or distribution utility.

Guarantor – An entity that agrees to pay another's debt or perform another's duty, liability or obligation.

Independent Third Party Verification – the confirmation of a customer's agreement take service from an ESCO or authorization for the ESCO to request information by a Verification Agent.

Interval data – Actual energy usage for a specific time interval for a specific period recorded by a meter or other measurement device.

Load profile – Actual or estimated customer energy usage by interval over a period representing usage for a customer or average usage for a customer class.

Lockbox – A billing payment receipt method agreed upon by a distribution utility and an ESCO, involving use of a third party financial institution to receive and disburse customer payments.

~~Marketer – The term marketer typically refers to the supplier of natural gas. In the UBP, the term ESCO is used to refer to a supplier of either or both electricity and natural gas.~~

Marketing - The publication, dissemination or distribution of informational and advertising materials regarding the ESCO's services and products to the public by print, broadcast, electronic media, direct mail or by telecommunication.

Meter – A device for determination of the units of electric or natural gas service supplied to consumers.

Meter Data Service Provider (MDSP) – An entity that provides meter data services, consisting of meter readings, meter data translations, and customer association, validation, editing and estimation.

Meter Service Provider (MSP) – An entity that installs, maintains, tests and removes meters, or other measurement devices and related equipment.

Multi-retailer model – A model for retail access that involves provision of electric or natural gas supply and of delivery service, provided separately to end use customers by two or more entities.

New York State Independent System Operator (NYISO) - An independent management organization, authorized by the Federal Energy Regulatory Commission, operating the bulk electric transmission system.

New delivery customer – A customer initiating delivery service by a distribution utility.

Nomination – A request for delivery of a physical quantity of natural gas or for its delivery at a specific point under a purchase, sale, or transportation agreement.

Office of Consumer Services – Office, within the Department of Public Service, which receives and makes determinations concerning customer complaints.  Office of Consumer Services (OCS) identifies the exiting Office or its successor in the event the Office name is changed.

Pay-as-you-get-paid method – A payment processing method offered by a billing party presenting consolidated bills, whereby the billing party forwards payment to the non-billing party after receiving payment from the customer.

Pending enrollment – A stage in processing an enrollment that commences with validation of an enrollment transaction request and ends on the enrollment date that the new supplier is expected to deliver energy.

Pending ESCO – An ESCO is a pending ESCO from the date of receipt of an EDI notice containing the effective date for a customer's enrollment until the ESCO commences commodity service for that customer.

Plain Language – Written in clear and coherent manner using words with common and everyday meaning and avoiding legal or energy industry terms, acronyms and abbreviations that a person of ordinary intelligence would not be expected to understand.  If use of a technical term is necessary, the term is clearly defined in the portion of the text where it is used.

Purchased accounts receivable – A debt owed to an ESCO by a customer for receipt of supplies of gas or electricity and transferred to a distribution utility in exchange for consideration.

> With recourse – Purchase of accounts receivable with recourse by a distribution utility means that the ESCO remains liable if its customers fail to make payments.  A distribution utility that purchases accounts receivable with recourse sends payments to an ESCO at predetermined intervals for amounts billed that are not in dispute and may offset subsequent purchase payments against or obtain reimbursement from an ESCO of any unpaid amounts.

> Without recourse – Purchase of accounts receivable without recourse by a distribution utility means that the ESCO is not liable if its customers fail to make payments.  A distribution utility that purchases accounts receivable without recourse sends payments to an ESCO at predetermined intervals for amounts billed that are not in dispute and has no right to seek reimbursement from an ESCO of any unpaid amounts.

Rate ready – A consolidated billing practice that requires each non-billing party to furnish in advance of the billing cycle, rates, rate codes or prices (fixed and/or variable), tax rates, billing information, and bill messages to the billing party.  The billing party, after receipt of usage data from the MDSP, uses the information on record to calculate the non-billing party's charges.

Residential customer – An individual or occupant of a residential premise as defined in 16 NYCRR Part 11.2(a)(2).

Sales agreement – An agreement between a customer and an ESCO that contains the terms and conditions governing the supply of electricity and/or natural gas provided by an ESCO.  The agreement may be a written contract signed by the customer or a

statement supporting a customer's verifiable verbal or electronic authorization to enter into an agreement with the ESCO for the services specified.

<u>Single retailer model</u> – A model for retail access that involves provision of electric and/or natural gas service to end users by an ESCO that purchases delivery service from the distribution utility and resells it along with electricity and/or natural gas to end users.

<u>Slamming</u> – Enrollment of a customer by an ESCO without authorization.

<u>Small non-residential customer – a non-residential electricity customer in a utility service classification that does not have a demand rate element or a non-residential natural gas customer in a utility service classification that provides firm service.</u>

<u>Special meter reading</u> – An actual meter reading performed, upon request, on a date that is different than the regularly scheduled meter reading date.

<u>Special needs customer</u> – A customer who has a certified medical emergency condition, who is elderly, blind or physically challenged, or who may suffer serious impairment to health or safety as a result of service termination during cold weather periods and, thus, is eligible for special procedures before termination of service under the Home Energy Fair Practices Act (HEFPA) (Public Service Law §32(3)).

<u>Switch</u> – Transfer of a customer from one ESCO to another, from a distribution utility to an ESCO, or from an ESCO to a distribution utility.

<u>Switching cycle</u> – For electric service, the period between the date of the last meter read and the next regularly scheduled meter read.  For gas customers, the period between the date of the last meter read and the next regularly scheduled meter read or the first day of the month and the first day of the following month.

<u>Termination Fee</u> – An amount specified in an ESCO sales agreement where such agreement permits the ESCO to assess and collect a charge in such amount to a customer who terminates the agreement before the end of a term described in that agreement, regardless of whether the assessed amount is identified as a fee, a charge, liquidated damages or a methodology for the calculation of damages, and regardless of whether it is fixed, scaled or subject to calculation based on market factors.

<u>Verification Agent</u> - An entity that is ~~either the ESCO or a~~ an independent vendor/contractor~~/vendor~~ conducting, on behalf of the ESCO, verification of ~~a~~an agreement, resulting, at least in part, from telephonic ~~agreement~~or door-to-door marketing, with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, as required by Section 5, Attachment 1  of the UBP.

# SECTION 2:  ELIGIBILITY REQUIREMENTS

A.  Applicability

This Section sets forth the process that an applicant is required to follow for a Department of Public Service (the Department) finding of eligibility to sell natural gas or electricity as an ESCO, that an ESCO is required to follow to maintain eligibility, and that a distribution utility is required to follow for discontinuance of an ESCO's or Direct Customer's participation in a distribution utility's retail access program.

B.  Application Requirements

1.  Applicants seeking eligibility to sell natural gas and/or electricity as ESCOs are required to submit to the Department an application package containing the following information and attachments:

   a.  A completed Retail Access Eligibility Form, available on the Department website:  ~~www.dps.state.ny.us~~ www.dps.ny.gov

   b.  A sample standard Sales Agreement for each customer class that meets the requirements set forth in Section 5.B.3, infra.

   c.  Sample forms of the notices sent upon assignment of sales agreements, discontinuance of service, or transfer of customers to other providers.

   d.  A sample ESCO bill used when dual billing is in effect and, if applicable, a sample ESCO consolidated bill, with terms stated in clear, plain language;

   e.  Procedures used to obtain customer authorization for ESCO access to a customers' historic usage or credit information;

   f.  Sample copies of informational and promotional materials that the ESCO uses for mass marketing purposes;

   g.  Proof of registration with the New York State Department of State;

   h.  Internal procedures for prevention of slamming and cramming;

   i.  Name, postal and e-mail addresses, and telephone and fax numbers for the applicant's main office;

   j.  Names and addresses of any entities that hold ownership interests of 10% or more in the ESCO, including a contact name for corporate entities and partnerships;

   k.  Detailed explanation of any criminal or regulatory sanctions imposed during the previous 36 months against any senior officers of the ESCO or any entities holding ownership interests of 10% or more in the ESCO;

   l.  A copy of the ESCO's quality assurance program, which is designed to monitor (a) compliance with Section 10 of the UBP and (b) accuracy of the ESCO marketing materials provided to prospective customers; ~~and,~~

   m.  A completed Service Provider Contact Form, which can be found on the Department's website ~~(~~ http://www.dps.~~state.~~ny.~~us~~gov/ocs.html~~),~~, identifying the ESCO's employee(s) responsible for resolving consumer complaints received by the Department and referred to the ESCO ~~.~~; and

   m. n.   A list of the entities, including contractors and sub-contractors, that will
           market to customers on behalf of the ESCO.  The list must include the
           entities' names, addresses, phone numbers and owners, managers, and/or
           principals. This list must be updated regularly as entities are added or
           removed.

2. Applicants shall submit to the Department Test Moderator designated EDI
   transactions required for syntactical verification in the Phase I testing program.
   The Department shall maintain a list of ESCOs that successfully complete Phase I
   test requirements by transaction type.

3. An ESCO that knowingly makes false statements in its application package is
   subject to denial or revocation of eligibility.

4. If the application package contains information that is a trade secret or sensitive
   for security reasons, the applicant may request that the Department withhold
   disclosure of the information, pursuant to the Freedom of Information Law
   (Public Officers Law Article 6) and Public Service Commission regulations (16
   NYCRR §6-1.3).

C. Department Review Process

   The Department shall review the application package and conduct EDI Phase I testing
   as required for each applicant.  An ESCO shall notify the Department of any major
   changes in the information submitted in the Retail Access Eligibility Form and/or
   application package that occurs during the Department review process.  The
   Department shall advise the applicant, in writing, if the applicant submitted the
   required information and EDI testing is successfully completed.

   1. ESCOs deemed eligible to provide commodity service by the Department must
      begin serving customers within two-years from the date of the letter notifying the
      ESCO of their eligibility status (eligibility letter).  The ESCO that does not begin
      serving customers within such two-year period may be required to conduct
      additional Phase IEDI testing before enrollments will be processed.

D. Maintaining ESCO Eligibility Status

   1. An ESCO shall submit by January 31 each year (January 31 Statement):

      a. a statement that the information and attachments in its Retail Access
         Eligibility Form and application package are current; or

      a. a description of revisions to the Form and application package and a copy of
         the revised portions or, at the ESCO's option, a copy of the revised portions
         identifying the revisions by highlighting or other means.

   3. 2. An ESCO shall update all the information it submitted in its original application
      package to the Department every three years, starting from the date of its
      eligibility letter, consistent with the requirements of UBP Section 2.B.  An
      ESCO's status as an eligible supplier is continuous from the date of the
      Department eligibility letter, unless revoked or otherwise limited in accordance
      with UBP Section 2.D.5.  If the three year anniversary date falls within one month
      of January 31, the ESCO shall resubmit its application package in lieu of the
      January 31 statement.

a.   a description of revisions to the Retail Access Eligibility Form and application package and a copy of the revised portions or, at the ESCO's option, a copy of the revised portions identifying the revisions by highlighting or other means.

3.   An ESCO shall file with the Secretary, a separate average unit price for products with no energy-related value added services for each of four groups of customers and by load zone: i) residential price fixed for a minimum 12 month period; ii) residential variable price; iii) small commercial price fixed for a minimum 12 month period and iv) small commercial variable price.  The averages should be weighted by the amount of commodity sold at each price within each customer category.  ESCOs shall also file the number of customers purchasing products in those categories.  ESCOs shall file the required information quarterly, reflecting data over that period, within 30 days of the end of each calendar quarter (i.e., data must be provided no later than April 30th, July 30th, October 30th and January 30th of each year).[1]

4.   An ESCO shall submit at other times during the year:

a.   A description of any major change in the Retail Access Eligibility Form and/or application package and a copy of the revised portions or, at the ESCO's option, a copy of the revised portions identifying the revisions by highlighting or other means.  For purposes of Subdivision D of this Section, the term, "major change," means a revision in the terms and conditions applicable to the business relationship between the ESCO and its customers, including provisions governing the process for termination of sales agreements.

b.   Changes in marketing plans, including changes to the list required in sub-section B.1.n of this Section of the UBP.

b. c. Changes in the ESCO's business and customer service information displayed on the Department's Website.

c.   No later than the 5th day of each month, each price, on a per unit basis, that the ESCO offered and would have charged for each of its services generally available to eligible residential customers as of the 1st day of that month, along with such other information about each price as is required to complete the standardized price reporting format developed by the Department.

d.   At least once every thirty days, each ESCO serving residential and/or small non-residential customers must post a price for each product it offers to those customer classes (e.g., fixed-price, variable-price, renewable energy, with each type of value-added service, etc) on the Power to Choose website.  The posted prices shall not include any introductory, promotional or "teaser" rate.  Each ESCO must guarantee to charge new customers no more than the price of the ESCOs posted offers at the time of the customer's agreement for each product.

---

[1]   If the Power-to-Choose website is modified to allow ESCOs to file this information there, the Department may notify ESCOs that compliance with this provision may be accomplished in that manner.

      ~~d.~~ e. Changes in personnel responsible for resolving consumer complaints received by the Department and referred to the ESCO.

5. An ESCO may be subject to the consequences listed in UBP Section 2.D.5.b for reasons, including, but not limited to:

    a. false or misleading information in the application package;

    b. failure to adhere to the policies and procedures described in its Sales Agreement;

    c. failure to comply with required customer protections;

    d. failure to comply with applicable NYISO requirements, reporting requirements, or Department oversight requirements;

    e. failure to provide notice to the Department of any material changes in the information contained in the Retail Access Eligibility Form or application package;

    f. failure to comply with the UBP terms and conditions, including discontinuance requirements;

    g. failure to comply with EDI transaction set standards and processing protocols and/or use properly functioning EDI systems;

    h. repeated failures to comply with price reporting requirements, reporting misleading price information, or continuing to fail to comply with price reporting requirements after withdrawal of eligibility to enroll new customers;

    i. failure to comply with the Commission's Environmental Disclosure Requirements or failure to comply with other Commission Orders, Rules or Regulations;

    j. failure to reply to a complaint filed with the Department and referred to the ESCO within the timeframe established by the Department' Office of Consumer Services which is not less than five days;

    k. any of the reasons stated in Subdivision F of this Section; or

    l. failure to comply with any of the Marketing Standards set forth in Section 10 of the UBP.

6. In determining the appropriate consequence for a failure or non-compliance in one or more of the categories set forth in UBP Section 2.D.4, the Commission or Department may take into account the nature, the circumstances, including the scope of harm to individual customers, and the gravity of the failure or non-compliance, as well as the ESCO's history of previous violations.

    a. The Commission or Department shall:

        1. Notify the ESCO in writing of its failure to comply and request that the ESCO take appropriate corrective action or provide remedies within the directed cure period, which will be based on a reasonable amount of time given the nature of the issue to be cured.

        2. Upon failure of the ESCO to take corrective actions or provide remedies within the cure period, the Commission may impose the consequences listed in subparagraph b of this paragraph.

3. Consequences shall not be imposed until after the ESCO is provided notice and an opportunity to respond.

4. The notice of consequences imposed by the Commission will be published on the Department's website.

b. Consequences for non-compliance in one or more of the categories set forth in UBP Section 2.D.45 may include one or more of the following restrictions on an ESCO's opportunity to sell electricity and/or natural gas to retail customers:

1. Suspension from a specific Commission approved retail program in either a specific service territory or all territories in New York;

2. Suspension of the ability to enroll new customers in either a specific service territory or all service territories in New York;

3. Imposition of a requirement to record all telephonic marketing presentations, which shall be made available to the Department for review;

4. Reimbursements to customers who did not receive savings promised in the ESCO's sales agreement/Customer Disclosure Statement or substantially demonstrated to have been included in the ESCO's marketing presentation or to customers who incurred costs as a result of the ESCO's failure to comply with the marketing standards set forth in Section 10 of the UBP;

5. Release of customers from sales agreements without imposition of early termination fees;

6. Revocation of an ESCO's eligibility to operate in New York; and,

7. Any other measures that the Commission may deem appropriate.

c. Consequences imposed pursuant to this paragraph shall continue to apply until the ESCO's failure to comply with the UBP has been cured or the Commission or Department has determined that no further cure is necessary.

7. An ESCO's eligibility to serve customers is valid unless: the ESCO abandons its eligibility status; or such status is revoked by the Commission through a final order pursuant to UBP Section 2.D.5.

8. The Department shall notify distribution utilities upon notice to the ESCO, and the NYISO if applicable, of any determination to revoke an ESCO's eligibility to sell natural gas and/or electricity. The distribution utility shall notify the ESCO's customers, in accordance with paragraph 3 of Subdivision F of this Section, of any Department revocation of an ESCO's eligibility.

E. Distribution Utility Requirements

1. After receipt of the Department's compliance letter, the ESCO shall notify the distribution utility, and NYISO if applicable, of its eligibility status and intent to complete the process to commence operation in the distribution utility's service area, including execution of any operating agreement that is required.

2. Upon satisfaction of the distribution utility's and, if applicable the NYISO's requirements, and successful completion of EDI testing conducted by the distribution utility, the ESCO may enter into an operating agreement, if any is

required, with the distribution utility to commence operations in its service territory.

F. Discontinuance of an ESCO's and Direct Customer's Participation in a Retail Access Program

1. In accordance with the procedures established in this Subdivision, a distribution utility may discontinue an ESCO's or Direct Customer's participation in its retail access program for the following reasons:

   a. Failure to act that is likely to cause, or has caused, a significant risk or condition that compromises the safety, system security, or operational reliability of the distribution utility 's system, and the ESCO or Direct Customer failed to eliminate immediately the risk or condition upon verified receipt of a non-EDI notice;

   b. Failure to provide natural gas (provided zero quantity) to the distribution utility's city gate;

   c. Failure to pay an invoice upon the due date;

   d. Failure to provide for delivery of at least 95% of the amount of natural gas directed by a distribution utility for delivery or at least 80% of the daily metered usage of the ESCO's customers or a Direct Customer's specified load or lower percentages included in a balancing program established in a distribution utility's tariff and/or any operating agreement;

   e. Failure to maintain a creditworthiness standard or provide required security;

   f. Failure to comply with the terms and conditions of a distribution utility's tariff, operating agreement, or Gas Transportation Operating Procedures (GTOP) Manual to the extent that said documents are consistent with the provisions of the UBP;

   g. Discontinuance of an ESCO's or Direct Customer's participation in a distribution utility's retail access program by the NYISO; or,

   h. Commission determination that an ESCO is not eligible to sell natural gas or electricity to retail customers.

2. To initiate the discontinuance process, a distribution utility shall send a non-EDI discontinuance notice by overnight mail and verified receipt, to the ESCO or Direct Customer and the Department. The notice shall contain the following information:

   a. The reason, cure period, if any, and effective date for the discontinuance;

   b. A statement that the distribution utility shall notify the ESCO's customers of the discontinuance if the ESCO fails to correct the deficiency described in the notice within the cure period, unless the Department directs the distribution utility to stop the discontinuance process;

   c. The distribution utility may suspend the ESCO's right to enroll customers until correction of the deficiency; and

   d. Correction of the deficiency within the cure period, or a Department directive, will end the discontinuance process.

3. The distribution utility shall send notices to the ESCO's customers informing them of the discontinuance and providing the following information:

   a. The discontinuance shall or did occur on one of the following dates selected by the distribution utility:  the scheduled meter read date, the first day of the month, or another date, if readings are estimated, or on the date of a special meter read;

   b. Customers have the option to select another ESCO or return to full utility service or, if a program authorizing random assignment is in effect, to enroll with a designated ESCO through that program;

   c. Names and telephone numbers of ESCOs offering service to retail customers in the distribution utility's service territory;

   d. Any ESCO selected by a customer may file an enrollment request on the customer's behalf with the distribution utility, and the distribution utility shall charge no fee for changing the customer's provider to the new ESCO; and,

   e. During any interim between discontinuance of a customer's current ESCO and enrollment with a new ESCO, the distribution utility shall provide service under its applicable tariff, unless the distribution utility notified the customer that it is terminating its delivery services to the customer on or before the discontinuance date.

4. The distribution utility shall submit a sample copy of its discontinuance notice to the Department for review and approval prior to distribution to customers.

5. The distribution utility may request permission from the Department to expedite the discontinuance process, upon a showing that it is necessary for safe and adequate service or in the public interest.  Any expeditious discontinuance process shall include the ESCO or Direct Customer, and the distribution utility.

6. Upon any discontinuance, an ESCO or Direct Customer shall remain responsible for payment or reimbursement of any and all sums owed under the distribution utility tariffs, any tariffs on file with the FERC and service agreements relating thereto, or any agreements between the ESCO and the distribution utility.

7. The notice requirements and time limits for a distribution utility to discontinue an ESCO's or Direct Customer's participation in a distribution utility's retail access program (discontinue participation) are:

   a. Upon a distribution utility determination that an ESCO's or Direct Customer's action, or failure to act, is likely to cause, or has caused, a significant risk or condition that compromises the safety, system security, or operational reliability of the distribution utility's system and that the ESCO or Direct Customer failed to eliminate immediately the risk or condition upon verified receipt of a non-EDI notice, the distribution utility may discontinue participation as soon as practicable.

   b. Upon a distribution utility determination that an ESCO or Direct Customer responsible for the delivery of natural gas failed, except under force majeure conditions, to deliver natural gas (provided zero quantity) to the distribution utility's service territory for its load, the distribution utility may discontinue

participation no sooner than two business days after receipt by the ESCO or Direct Customer of a discontinuance notice.

c.  Upon a distribution utility determination that an ESCO or Direct Customer failed to pay an invoice on the due date, as specified in the distribution utility's tariff, and the ESCO's or Direct Customer's required security or credit limit is insufficient to cover the unpaid amount, with interest, the distribution utility may discontinue participation no sooner than ten business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer pays the amount due on or before the expiration of the cure period, the distribution utility shall stop the process to discontinue participation.

d.  Upon a distribution utility determination that an ESCO or Direct Customer responsible for the nomination and delivery of natural gas failed, except in force majeure conditions, to nominate and/or deliver sufficient natural gas to the distribution utility's service territory to satisfy at least 95% of the amount of natural gas directed by a distribution utility for delivery or at least 80% of the daily metered usage of the ESCO's customers or the Direct Customer's specified load or lower percentages included in a balancing program established in a distribution utility's tariffs and/or any operating agreement on any three days during any month,  the distribution utility may initiate a discontinuance process no sooner than five business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer provides adequate assurances and a description of any necessary process changes that ensure adequate nominations and deliveries on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue the discontinuance process because the assurances and proposed process changes are inadequate, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that the distribution utility will discontinue participation on or before the expiration of 15 business days from the end of the cure period.  If a failure to provide sufficient natural gas for any 3 days during a calendar month occurred during the past 12 months and the distribution utility sent a related discontinuance notice for each occurrence, it may discontinue participation no sooner than two business days after receipt by an ESCO or Direct Customer of a discontinuance notice.

e.  Upon a distribution utility determination that an ESCO or Direct Customer failed to provide or maintain a creditworthiness standard or required security, the distribution utility may initiate a discontinuance process no sooner than five business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer satisfies the creditworthiness standard or provides the required security on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue with the discontinuance process because the ESCO or Direct Customer failed to

comply with the creditworthiness standard or provide adequate security, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that it will discontinue participation on or before 15 days from the expiration of the cure period.  If a failure to comply with the creditworthiness standard or provide adequate security occurred twice during the past 12 months and the distribution utility sent a related discontinuance notice for each failure, it may discontinue participation no sooner than two business days after receipt by an ESCO or Direct Customer of a discontinuance notice.

f.   Upon a distribution utility determination that an ESCO or Direct Customer failed, except in force majeure conditions, to comply with any other applicable provision of the distribution utility's tariff, operating agreement, or GTOP manual, the distribution utility may initiate a discontinuance process no sooner than ten business days (cure period) after receipt by the ESCO or Direct Customer of a discontinuance notice.  If the ESCO or Direct Customer provides adequate assurances and a description of any necessary process changes that ensure compliance on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process.  Upon a determination to continue the discontinuance process because the assurances and proposed process changes are inadequate, the distribution utility shall notify the ESCO or Direct Customer that it will discontinue participation no later than 15 business days from the expiration of the cure period.  The distribution utility shall notify the ESCO's customers that it will discontinue participation on or before the expiration of 15 business days after the end of the cure period.

# SECTION 3: CREDITWORTHINESS

A. Applicability

This Section establishes creditworthiness standards that apply to ESCOs and Direct Customers. An ESCO's and Direct Customer's participation in a distribution utility's retail access program is contingent upon satisfaction of creditworthiness requirements and provision of any security.

B. ESCOs

1. An ESCO shall satisfy a distribution utility's creditworthiness requirements if:

   a. The ESCO, or a guarantor, maintains a minimum rating from one of the rating agencies and no rating below the minimum from one of the other two rating agencies. For the purposes of this Section, minimum rating shall mean "BBB" from Standard & Poor's, "Baa2" from Moody's Investor Service, or "BBB" from Fitch Ratings (minimum rating); or,

   b. The ESCO enters into a billing arrangement with the distribution utility, whereby the distribution utility bills customers on behalf of the ESCO and retains the funds it collects to offset any balancing and billing service charges provided that the distribution utility has a priority security interest with a first right of access to the funds. The ESCO shall submit an affidavit from a senior officer attesting to such utility interest and right. Except that an ESCO serving customers outside of such billing arrangement, must satisfy the security requirements of UBP Section 3.D with respect to those customers.

2. If an ESCO, or a guarantor, is not rated by Standard & Poor's, Moody's Investor Service or Fitch Ratings, it shall satisfy a distribution utility's creditworthiness requirements if the ESCO, or a guarantor:

   a. Maintains a minimum "1A2" rating from Dun & Bradstreet (Dun and Bradstreet minimum rating) and the ESCO maintains 24 months good payment history with the distribution utility; and,

   b. Provides any security required by the distribution utility, calculated in accordance with Subdivision D, after deduction of the following unsecured credit allowances:

| Rating | Unsecured Credit Allowance |
|---|---|
| 5A1 or 5A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 4A1 or 4A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 3A1 or 3A2 | 30% of an ESCO's tangible net worth, up to 5% of the distribution utility's average monthly revenues for the applicable service |
| 2A1 or 2A2 | 50% of an ESCO's tangible net worth, up to $500,000 |
| 1A1 or 1A2 | 50% of an ESCO's tangible net worth, up to $375,000 |

An ESCO shall provide information, upon request of the distribution utility, to enable the distribution utility to verify the ESCO's equity. The distribution utility may request reasonable information to obtain the verification and shall safeguard it as confidential information and protect it from public disclosure. The distribution utility may deny the unsecured credit allowance to any ESCO that fails to provide the requested information.

3. A distribution utility may require an ESCO to provide and maintain security in the full amount of the distribution utility's credit risk, calculated in accordance with Subdivision D, if:

   a. The ESCO, or a guarantor, is not rated;

   b. The ESCO, or a guarantor, with a minimum rating is placed on credit watch with negative implications or is rated below the minimum rating;

   c. The ESCO, or a guarantor, is rated below the Dun & Bradstreet minimum rating or the ESCO fails to maintain 24 months good payment history with the distribution utility; or,

   d. An ESCO issuing consolidated bills fails to render timely bills to customers or to make timely payments to the distribution utility.

4. If a distribution utility's credit risk, associated with an ESCO's participation in its retail access program, exceeds 5% of the distribution utility's average monthly revenues for the applicable service, the distribution utility may require the ESCO, in addition to maintaining a minimum rating, to provide and maintain security in the amount of such excess credit risk.

C. Direct Customers

A Direct Customer shall satisfy a distribution utility's creditworthiness requirements if:

1. Its account is current and remained current for the past 12 months; and,

2. If its debt is rated, it maintains a minimum rating of its long-term unsecured debt securities from one of the rating agencies and no rating below the minimum rating from one of the other two rating agencies.

D. Calculation of Credit Risk and Security

The distribution utility shall calculate its credit risk and establish its security requirements as follows:

1. Delivery Service Risk

   a. For an ESCO that issues a consolidated bill under a multi-retailer model, a distribution utility may require security in an amount no greater than 45 days of peak usage of the ESCO's customers' projected energy requirements during the next 12 months, priced at the distribution utility's applicable delivery service rate and including relevant customer charges.

   b. For an ESCO that bills customers for delivery and commodity services under a single retailer model, a distribution utility may require security in an amount no greater than 60 days of peak usage of the ESCO's customers' projected energy requirements during the next 12 months, priced at the distribution utility's applicable delivery service rate and including relevant customer charges.

   c. Upon an ESCO request, the distribution utility shall establish separate security requirements for summer (April 1 - October 31) and winter (November 1 - March 31) and may retain winter security until the end of  two months (April and May) after the end of the winter period.

2. Natural Gas Imbalance Risk

   a. The distribution utility may require an ESCO or Direct Customer to provide security in an amount no greater than the ESCO's customers' or a Direct Customer's projected maximum daily quantity times peak forecasted NYMEX price for the next 12 months and for upstream capacity to the city gate times 10 days.

   b. Upon the request of an ESCO or Direct Customer, the distribution utility shall establish separate security requirements for summer (April 1 - October 31) and winter (November 1 - March 31) and may retain winter security until the end of  two months (April and May) after the end of the winter period.

3. Major Change in Risk

   a. A major change shall mean a change in credit risk of more than the greater of 10% or $200,000.

   b. The ESCO or Direct Customer shall promptly notify the distribution utility and the Department of any major change in credit and or rating risk.

   c. The distribution utility may require an ESCO or a Direct Customer, within five days, to provide additional amounts of security if a major change occurs to increase its credit risk, as follows:

      1. If Standard & Poors, Moody's Investor Service, or Fitch Ratings downgrades an ESCO's, or its guarantor's, rating or a Direct Customer's

        debt below the minimum rating or Dun & Bradstreet downgrades an
        ESCO's, or its guarantor's, rating or a Direct Customer's debt; or,

    2.  An increase occurs in customer usage or in energy prices and such
        increase is sustained for at least 30 days.

  d.  In the event that a major change occurs to decrease a distribution utility's
     credit and/or rating risk, results in compliance by an ESCO or Direct
     Customer with creditworthiness requirements, and elimination of the basis for
     holding some or all of the security, the distribution utility shall return or
     release the excess amount of the ESCO's or Direct Customer's security with
     accumulated interest, if applicable.  The distribution utility shall return such
     amount within five business days after receipt of an ESCO or Direct Customer
     notice informing the distribution utility of the occurrence of such major
     change.

E.  Security Instruments

  1.  The following financial arrangements are acceptable methods of providing
     security:

    a.  Deposit or prepayment, which shall accumulate interest at the applicable rate
      per annum approved by the Public Service Commission for "Other Customer
      Capital";

    b.  Standby irrevocable letter of credit or surety bond issued by a bank, insurance
      company or other financial institution with at least an "A" bond rating;

    c.  Security interest in collateral; or,

    d.  Guarantee by another party or entity with a credit rating of at least "BBB" by
      S&P, "Baa2" by Moody's, or "BBB" by Fitch; or

    e.  Other means of providing or establishing adequate security.

  2.  A distribution utility may refuse to accept any of these methods for just cause
     provided that its policy is applied in a nondiscriminatory manner to any ESCO.

  3.  If the credit rating of a bank, insurance company, or other financial institution that
     issues a letter of credit or surety bond to an ESCO or Direct Customer falls below
     an "A" rating, the distribution utility shall allow a minimum of five business days
     for an ESCO or Direct Customer to obtain a substitute letter of credit or surety
     bond from an "A" rated bank, insurance company, or other financial institution.

F.  Lockbox

If the distribution utility and ESCO arrange for a lockbox, security requirements are
reduced by 50% provided that the arrangement includes the following:

  1.  Agreement on allocation of funds and the first right of the distribution utility, in
     the event of an ESCO's financial difficulty, to obtain funds in the lockbox
     deposited to the credit of the ESCO;

  2.  Establishment of rules for managing the lockbox;

  3.  Agreement on conditions for terminating the lockbox for non-compliance with the
     rules or for failure to receive customer payments on a timely basis; and,

4.   Responsibility of an ESCO for any costs associated with implementing and administering the lockbox.

G.  Calling on Security

1.   If an ESCO or Direct Customer fails to pay the distribution utility, in accordance with UPB Section 7, Invoices, the distribution utility may draw from security provided that the distribution utility notifies the ESCO or Direct Customer five business days' in advance of the withdrawal and the ESCO or Direct Customer fails to make full payment before the expiration of the five business days.

2.   If an ESCO receives a discontinuance notice or elects to discontinue service to customers and owes amounts to the distribution utility, the distribution utility may draw from the security provided by the ESCO without prior notice.

3.   If an ESCO files a petition or an involuntary petition is filed against an ESCO under the laws pertaining to bankruptcy, the distribution utility may draw from security, to the extent permitted by applicable law.

H.  Application by Distribution Utilities

1.   Within ten business days after receipt of a complete ESCO application, a distribution utility shall complete its evaluation of initial creditworthiness, state the rationale for its determination, and provide the calculation supporting the credit limit and any resulting security requirement.

2.   A distribution utility shall perform, at least annually, an evaluation, at no charge, of an ESCO's satisfaction of creditworthiness standards and security requirements.

3.   A distribution utility shall perform evaluations of creditworthiness, security requirements, and security calculations in a non-discriminatory and reasonable manner.

4.   Pending resolution of any dispute, the ESCO or Direct Customer shall provide requested security within the time required in this Section.

5.   A distribution utility may reduce or eliminate any security requirement provided that it reduces or eliminates the requirement in a nondiscriminatory manner for any ESCO or Direct Customer.  The distribution utility may request reasonable information to evaluate credit risk.  If an ESCO or Direct Customer fails to provide the requested information, a distribution utility may deny the ESCO or Direct Customer an opportunity to provide lower or no security.

# SECTION 4:  CUSTOMER INFORMATION

A. Applicability

This Section establishes practices for release of customer information by distribution utilities or MDSPs to ESCOs and Direct Customers and identifies the content of information sets.  The distribution utility or MDSP and an ESCO shall use EDI standards, to the extent developed, for transmittal of customer information and may transmit data, in addition to the minimum information required, via EDI or by means of an alternative system.

B. Customer Authorization Process

The distribution utility or MDSP shall provide information about a specific customer requested by an ESCO authorized by the customer to receive the information.

1. An ESCO shall obtain customer authorization to request information, in accordance with the procedures in UBP Section 5, Changes in Service Providers, Attachments 1, 2, and 3.  An ESCO shall inform its customers of the types of information to be obtained, to whom it will be given, how it will be used, and how long the authorizations will be valid.  The authorization is valid for no longer than six months unless the sales agreement provides for a longer time.

2. A distribution utility and a MDSP shall assume that an ESCO obtained proper customer authorization if the ESCO is eligible to provide service and submits a valid information request.

3. An ESCO shall retain, for a minimum of two years or for the length of the sales agreement whichever is longer, verifiable proof of authorization for each customer.  Verification records shall be provided by an ESCO, upon request of the Department, within five calendar days after a request is made.  Locations for storage of the records shall be at the discretion of the ESCOs.

4. Upon request of a customer, a distribution utility and/or MDSP shall block access by ESCOs to information about the customer.

5. An ESCO and its agent shall comply with statutory and regulatory requirements pertaining to applicable state and federal do-not-call registries.

C. Customer Information Provided to ESCOs[1]

1. Release of Information.  A distribution utility and a MDSP shall use the following practices for transferring customer information to an ESCO:

   a. A distribution utility shall provide the information in the Billing Determinant Information Set upon acceptance of an ESCO's enrollment request and the information in the Customer Contact Information Set and the Credit Information Set, upon ESCO request.

---

[1]    Upon enrollment of a customer, an ESCO shall receive usage data and any subsequent changes, corrections and adjustments to previously supplied data or estimated consumption for a period, at the same time that the distribution utility validates them for use.  An ESCO issuing consolidated bills is entitled to receive billing information, in accordance with UBP Section 9, Billing and Payment Processing.

b. The distribution utility or MDSP shall respond within two business days to valid requests for information as established in EDI transaction standards and within five business days to requests for data and information for which an EDI transaction standard is not available. The distribution utility or MDSP shall provide the reason for rejection of any valid information request.

2. Customer Contact Information Set. The distribution utility or MDSP, to the extent it possesses the information, shall provide, upon an ESCO request, consumption history for an electric account and consumption history and/or[1] a gas profile for a gas account.

a. Consumption history[2] for an electric or gas account shall include:

1. Customer's service address;

2. Electric or gas account indicator;

3. Sales tax district used by the distribution utility and whether the utility indentifies the customer as tax exempt;

4. Rate service class and subclass or rider by account and by meter, where applicable;

5. Electric load profile reference category or code, if not based on service class, whether the customer's account is settled with the ISO utilizing an actual 'hourly' or a 'class shape' methodology, or Installed Capacity (ICAP) tag, which indicates the customer's peak electricity demand;

6. Customer's number of meters and meter numbers;

7. Whether the customer receives any special delivery or commodity "first through the meter" incentives, or incentives from the New York Power Authority;

8. The customer's Standard Industrial Classification (SIC) code;

6.9. Usage type (e.g., kWh or therm), reporting period, and type of consumption (actual, estimated, or billed);

10. Whether the customer's commodity service is currently provided by the utility;

11. Whether the customer receives Home Energy Assistance Program benefits or is enrolled in the low income assistance program administered by the utility;

7.12. 12 months, or the life of the account, whichever is less, of customer data via EDI and, upon separate request, an additional 12 months, or the life of the account, whichever is less, of customer data via EDI or an alternative system at the discretion of the distribution utility or

---

[1] If a distribution utility or MDSP offer a gas profile and consumption history, an ESCO may choose either option. A distribution utility or MDSP shall make available, upon request, class average load profiles for electric customers.

[2] A distribution utility or MDSP, in addition to EDI transmittal, may provide Web based access to customer history information.

MDSP, and, where applicable, demand information;[1] if the customer has more than one meter associated with an account, the distribution utility or MDSP shall provide the applicable information, if available, for each meter; and

8.13._____Electronic interval data in summary form (billing determinants aggregated in the rating periods under a distribution utility's tariffs) via EDI, and if requested in detail, via an acceptable alternative electronic format.

b. A gas profile for a gas account shall include:

1. Customer's service address;

2. Gas account indicator;

3. Customer's number of meters and meter numbers;

4. Sales tax district used by the distribution utility for billing and whether the utility indentifies the customer as tax exempt;;

5. The customer's Standard Industrial Classification (SIC) code;

6. Whether the customer's commodity service is currently provided by the utility;

3.7.Whether the customer receives Home Energy Assistance Program benefits or is enrolled in the low income assistance program administered by the utility;

4.8.Rate service class and subclass or rider, by account and by meter, where applicable;

5.9.Date of gas profile; and,

6.10._____Weather normalization forecast of the customer's gas consumption for the most recent 12 months or life of the account, whichever is less, and the factors used to develop the forecast.

3. Billing Determinant Information Set. Upon acceptance of an ESCO enrollment request, a distribution utility shall provide the following billing information for an electric or gas account, as applicable[2]:

a. Customer's service address, and billing address, if different;

b. Electric and/or gas account indicator;

c. Meter reading date or cycle and reporting period;

d. Billing date or cycle and billing period;

e. Meter number, if available;

f. Distribution utility rate class and subclass, by meter;

g. Description of usage measurement type and reporting period;

---

[1] A distribution utility may provide data for a standard 24 months or life of the account, whichever is less, as part of its Customer Contract Information Set.

[2] As specified in the EDI standard for an enrollment request and response, the distribution utility may transmit additional data elements, based upon the request, the responding distribution utility, and the commodity type.

    h.  Customer's load profile group, for electric accounts only;

    i.  Life support equipment indicator;

    j.  Gas pool indicator, for gas accounts only;

    k.  Gas capacity/assignment obligation code;

    l.  Customer's location based marginal pricing zone, for electric accounts only; and,

    m.  Budget billing indicator.[1]

4. Credit Information Set.  The distribution utility or MDSP shall provide credit information for the most recent 24 months or life of the account, whichever is less, upon receipt of an ESCO's electronic or written affirmation that the customer provided authorization for release of the information to the ESCO.  Credit information shall include number of times a late payment charge was assessed and incidents of service disconnection.

D.  Direct Customer Information

A Direct Customer shall receive usage data and any subsequent changes, corrections and adjustments to previously supplied data, and estimated consumption for a period, at the same time that the distribution utility validates them for use.  The distribution utility or MDSP shall make available, upon request, to an electric Direct Customer, a class load profile for its service class.

E.  Charges for Customer Information

No distribution utility or MDSP shall impose charges upon ESCOs or Direct Customers for provision of the information described in this Section.  The distribution utility may impose an incremental cost based fee, authorized in tariffs for an ESCO's request for customer data for a period in excess of 24 months or for detailed interval data per account for any length of time.

F.  Unauthorized Information Release

An ESCO, its employees, agents, and designees, are prohibited from selling, disclosing or providing any customer information obtained from a distribution utility or MDSP, in accordance with this Section, to others, including their affiliates, unless such sale, disclosure or provision is required to facilitate or maintain service to the customer or is specifically authorized by the customer or required by legal authority. If such authorization is requested from the customer, the ESCO shall, prior to authorization, describe to the customer the information it intends to release and the recipient of the information.

---

[1]   This indicator is limited to 12 month levelized payment plans and does not include other payment plans.

# SECTION 5:  CHANGES IN SERVICE PROVIDERS

A.  Applicability

This Section establishes practices for receiving, processing, and fulfilling requests for changing a customer's electricity or natural gas provider and for obtaining a customer's authorization for the change.  A change in a provider includes transfer from:  (1) one ESCO to another; (2) an ESCO to a distribution utility; and (3) a distribution utility to an ESCO.  This Section also establishes practices for:  an ESCO's drop of a customer or a customer's drop of an ESCO, retention of an ESCO after a customer's relocation within a distribution utility's service area, assignment of a customer, and initiation or discontinuance of procurement of electricity or natural gas supplies by a Direct Customer.  This Section does not establish practices for obtaining other energy-related services or changing billing options.

The process of changing a service provider is comprised of two steps.  For enrollment with an ESCO, the first step is obtaining customer agreement, and any required third party verification, to accept electric and/or natural gas service, or both, according to the terms and conditions of an offer.  A sales agreement establishes the terms and conditions of the customer's business arrangement with the ESCO.  The second step is enrollment and the distribution utility's modification of its records to list the customer's transfer to a provider on a specific date.  This transactionThe second step is primarily between the ESCO and the distribution utility.

B.  Customer Agreement

An ESCO, or its agent, may solicit and enter into a sales agreement with a customer subject to the following requirements.

1.  The ESCO shall obtain a customer agreement to initiate service and enroll a customer and customer authorization to release information to the ESCO by means of one of the following methods.

   a.  Telephone agreement and authorization, preceded, or followed within three business days, by provision of a sales agreement, in accordance with requirements in Attachment 1 – Telephonic Agreement and Authorization/Third Party Verification Requirements;

   b.  Electronic agreement and authorization, attached to an electronic version of the sales agreement, in accordance with requirements in Attachment 2 – Electronic Agreement and Authorization Requirements; or

   c.  Written agreement bearing a customer's signature on a sales agreement (original or fax copy of a signed document), in accordance with requirements in Attachment 3 – Written Agreement and Authorization Requirements.

2.  For any sale that originated through or included either a door-to-door or telephonic marketing component, each enrollment is only valid with an independent third party verification.

2.3.The ESCO shall provide residential customers the right to cancel a sales agreement within three business days after its receipt (cancellation period).

3.4.The standard Sales Agreements for each customer class shall include the following information written in plain language:

a.  Terms and conditions applicable to the business relationship between the ESCO and the customer which includes:

1.  provisions governing the process for rescinding or terminating an agreement by the ESCO or the customer including provisions stating that a residential customer may rescind the agreement within three business days after its receipt;

2.  the placeholder for the price or how the price is determined, the terms and conditions of the agreement, including the term and end date, if any, of the agreement, the amount of the termination fee and the method of calculating the termination fee, if any, the amount of late payment fees, if applicable, and the provisions, if any, for the renewal of the agreement; and,

3.  a clear description of the conditions, if any, that must be present in order for savings to be provided to the customer, if savings are guaranteed.

b.  Such contract shall also include on the first page thereof a Customer Disclosure Statement (the Statement).  The text within this Statement shall state in plain language the terms and conditions described above and set forth in Attachment 4 – Sample Customer Disclosure Statement.  When the form contract is used by the ESCO as its agreement with the customer, the Customer Disclosure Statement shall also contain the price term of the agreement.  In the event that the text in thisthe Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the Statement shall constitute the agreement with the customer notwithstanding a conflicting term expressed elsewhere in the agreement.

c.  Procedures for resolving disputes between the ESCO and a customer;

d.  Consumer protections provided by the ESCO to the customer;

e.  Method for applying payments and consequences of non-payment;

f.  Any charges and fees, services, options or products offered by the ESCO;

g.  Department contact information, including the Department ESCO hotline at 1-888-697-7728;

h.  ESCO contact information, including a local or toll-free number from the customer's service location, and procedures used for after-hours contacts and emergency contacts, including transfer of emergency calls directly to a distribution utility and/or an answering machine message that includes an emergency number for direct contact with the distribution utility.

i.  A statement that the ESCO shall provide at least 15 calendar days notice prior to any cancellation of service to a customer; and

j.  If a condition of service, a statement that the ESCO reserves the right to assign the contract to another ESCO.

k.  A statement explaining that, for Low Income Assistance Program enrollees and/or HEAP recipients, there is a guarantee of savings compared to what the

customer would have been charged by the utility, or that the ESCO is providing energy-related services designed  to reduce the customer's overall energy bill.

4.5. Additional terms and conditions applicable to residential customers and customers solicited via door-to-door sales include:

   a.  Prepayments – no agreement for the provision of energy by an ESCO shall require a prepayment.  Where an ESCO is the billing party, it may offer a customer an option of prepayment.  Any agreement providing for prepayment may be cancelled by the customer, without penalty within 90 calendar days from the date of such agreement.  Any unused portion of the prepayment shall be returned to the customer within 30 business days following cancellation of the agreement.

   b.  Termination fees – no agreement for the provision of energy by an ESCO shall require a termination or early cancellation fee in excess of either a) $100 for any contract with a remaining term of less than 12 months; or b) $200 for any contract with a remaining term of more than 12 months or; c) twice the estimated bill for energy services for an average month, provided that an estimate of an average monthly bill was provided to the customer when the offer was made by the ESCO along with the amount of any early termination fee.  To calculate such average monthly bill, the ESCO may use an average of the customer's actual usage for the previous twelve months or if such data is unavailable at the time the offer is made apply the usage for a typical customer in that service classification as reported by the distribution utility or the Commission, and multiply it by the ESCO's estimate of the average annual rate that will be charged under the agreement.

   c.  Variable charges – all variable charges must be clearly and conspicuously identified in all contracts, sales agreements and marketing materials.

   d.  Material changes and renewals– no material changes shall be made in the terms or duration of any contract for the provision of energy by an ESCO without the express consent of the customer obtained under the methods authorized in the UBP.  This shall not restrict an ESCO from renewing a contract by clearly informing the customer in writing, not less than thirty days nor more than sixty days prior to the renewal date, of the renewal terms and the customer's option to reject the renewal terms.  A customer shall not be charged a termination fee as set forth in Section 5.B.3.1.a herein, if the customer objects to such renewal within three business days of receipt of the first billing statement under the agreement as renewed.  Regarding contract renewals, with the exception of a rate change, or an initial sales agreement that specifies that the agreement renews on a monthly basis with a variable rate methodology which was specified in the initial sales agreement, all other changes will be considered material and will require that the ESCO obtain the customer's express consent for renewal.

   e.  A renewal notice in the standardized format provided by the Department, must be used.

> f.  The renewal notice must be enclosed in an envelope which states in bold lettering:  "IMPORTANT: YOUR [ESCO NAME] CONTRACT RENEWAL OFFER IS ENCLOSED. THIS MAY AFFECT THE PRICE YOU PAY FOR ENERGY SUPPLY."
>
> g.  When a fixed-price agreement is renewed as a fixed-price agreement, the ESCO shall provide the customer with an additional notice before the issuance of the first billing statement under the terms of the contract as renewed, but not more than 10 days prior to the date of the issuance of that bill.  This notice shall inform the customer of the new rate and of his or her opportunity to object to the renewal, without the imposition of any early termination fees, within three days of receiving the first billing statement under the terms of the contract as renewed.

C.  Provision of List of ESCOs to Customers

Distribution utilities shall offer to provide a customer who requests initiation of delivery service with an up-to-date list of ESCOs and provide the list at any time, upon request of any customer.

D.  Customer Enrollment Procedures

1.  An ESCO shall transmit an enrollment request[1] to a distribution utility no later than 15 calendar days prior to the effective date of the enrollment.  The enrollment request shall contain as a minimum, the information required for processing set forth in Attachment 5, Enrollment Request.

2.  The distribution utility shall process enrollment requests in the order received.

3.  The distribution utility shall accept only one valid enrollment request[2] for each commodity per customer during a switching cycle.  If the distribution utility receives multiple enrollment requests for the same customer during a switching cycle, it shall accept the first valid enrollment request and reject subsequent requests.

4.  An ESCO shall submit an enrollment request after it ~~provides~~obtains customer authorization, and third party verification where required, and it has provided the sales agreement to the customer and, for residential customers, after the expiration of the cancellation period.[3]

5.  After receipt of an enrollment request, the distribution utility shall, within one business day, acknowledge its receipt, and, within two business days, provide a response indicating rejection and the reason, or acceptance and the effective date for the change of provider.

---

[1]  ~~When a utility customer selects, or agrees to be randomly assigned to an ESCO through participation in an ESCO Referral Program, an enrollment request from an ESCO is not sent.  The utility will enroll the participating customer, notify the ESCO of the customer selection or designation, and provide customer account details via a response transaction.~~

[2]  Criteria for determining the validity of an EDI transaction are described in the EDI processing protocols adopted in Case 98-M-0667, Electronic Data Interchange.

[3]  ~~When the utility enrolls the customer with an ESCO, in conjunction with the customer's participation in an ESCO Referral Program, it is the responsibility of the ESCO to provide the customer with a sales agreement.  A customer enrolled by the utility will continue to have the opportunity to cancel prior to the expiration of the initial incentive period established by the utility.~~

6. Upon acceptance of an enrollment request, the distribution utility shall send a notice to ~~any~~the incumbent ESCO that the customer's service with that ESCO will be terminated on the effective date of the new enrollment. In the event that the distribution utility receives notice from the pending ESCO, the incumbent ESCO (with specific customer authorization for each cancellation), or the customer, no later than three business days before the effective date that a pending enrollment is cancelled, the distribution utility shall transmit a request to reinstate service to ~~any~~the incumbent ESCO, unless the incumbent ESCO previously terminated service to the customer or the customer requests a return to full utility service.

7. With the exception of a new installation use of an interim estimate of consumption or a special meter reading,[1] a change of providers is effective: for an electric customer, on the next regularly scheduled meter reading date; and, for a gas customer, on the next regularly scheduled meter reading date or the first day of the month, in accordance with provisions set forth in the distribution utility's tariff.[2] The distribution utility shall set the effective date, which shall be no sooner than 15 calendar days after receipt of an enrollment request. Service to new delivery customers is effective after the installation is complete and, if necessary, inspected.

8. An off-cycle change of an electric service provider is allowed no later than 15 calendar days before the date requested for the change if a new ESCO or a customer arranges for a special meter reading or agrees to accept an interim date for estimating consumption. The ESCO or customer is required to pay the cost for any special meter reading, in accordance with provisions set forth in the distribution utility's tariff. A change based upon an interim estimate of consumption or a special meter reading is effective on the date of the interim estimate or special meter reading. Off-cycle changes of gas service providers are allowed if the incumbent and new ESCO agree on an effective date no later than 15 calendar days following the request.

E. Customer Notification

1. The distribution utility shall send no later than one calendar day after acceptance of an enrollment request a verification letter to the customer notifying the customer of the acceptance. The notice shall inform the customer that if the enrollment is unauthorized or the customer decides to cancel it, the customer is required immediately to so notify the distribution utility and the pending ESCO.

2. Upon receipt of such cancellation, the distribution utility shall cancel the pending enrollment and reinstate the customer with the incumbent ESCO, if any, or the distribution utility, provided that no less than three business days remain before the planned effective date. If less than three business days remain, the change to the new provider shall occur and remain effective for one billing cycle. The

---

[1] If meters are read bimonthly and bills are issued monthly using estimated usage, the effective date for the interim months is the date usage is estimated for billing purposes.

[2] If meters are not read within two business days of the scheduled meter reading day, the distribution utility or MDSP shall estimate usage as of the scheduled meter reading day. The effective date for a change of provider is that date, except where changes of natural gas suppliers are scheduled for the first of the month.

customer shall return to full utility service at the end of the next switching cycle, unless the customer is enrolled by another ESCO at least 15 days before the beginning of the next switching cycle.

3. If a customer notifies the pending ESCO of such cancellation, the pending ESCO shall send a customer's drop request to the distribution utility at least three business days prior to the effective date for the pending enrollment.

F.   Rejection of Enrollment Requests

The distribution utility may reject an enrollment request for any of the following reasons:

1. Inability to validate the transaction;

2. Missing or inaccurate data in the enrollment request;

3. ESCO's ineligibility to provide service in the specified territory;

4. No active or pending delivery service;

5. A pending valid prior enrollment request; or

6. The account is coded as ineligible for switching.

G.   Customer Relocations Within a Service Territory

1. A customer requesting relocation of service within a distribution utility's service territory and continuation of its ESCO service, arranges for continuation at the new location of delivery service by contacting the distribution utility and of commodity service by contacting the ESCO.[1] Each provider contacted by the customer shall remind the customer of the need to contact the other provider to initiate the change in service or arrange for a conference call with the other provider and customer, and within two days, notify the other provider that a customer requested relocation of service.

2. The distribution utility's representative shall inform the customer, or the customer's agent, and the ESCO of the effective dates, contingent upon the customer's approval, for discontinuance of service at one location and commencement of service at the new location.  The ESCO shall confirm to the distribution utility that it shall continue service to the customer at the new location.

3. In the event that the ESCO is unable, or does not wish to continue service to the customer at the new location, the distribution utility shall provide full utility service to the customer.

H.   Customers Returning to Full Utility Service

1. A customer arranges for a return to full utility service by contacting either the ESCO or the distribution utility in accordance with this paragraph.  An ESCO contacted by the customer shall, within two days, process the customer's request to return to full utility service. A utility contacted by a customer shall remind the customer to contact the ESCO about their returning to full utility service

---

[1]   In the Single Retailer Model, the customer contacts only its ESCO.  The ESCO notifies the distribution utility of the customer's new service location and mailing address, if applicable.  Direct customers contact only the distribution utility.

provided, however, that if the customer has already contacted the ESCO or wants to proceed without contacting the ESCO, the utility shall, within two days, process the customer's request to return to full utility service. If a change to full utility service results in restrictions on the customer's right to choose another supplier or application of a rate that is different than the one applicable to other full service customers, the distribution utility shall provide advance notice to the customer.

2. A Direct Customer that intends to change from procuring its own supplies to full utility service shall notify the distribution utility.

3. No ESCO shall transfer 5,000 or more customers during a billing cycle to full utility service, unless it provides no less than 60 calendar days notice to the distribution utility and Department. The transfers shall occur on the customers' regularly scheduled meter reading dates, unless the distribution utility and ESCO agree to a different schedule.

4. The following process sets forth the steps for an ESCO's return of a customer to full utility service.

   a. An ESCO may discontinue service to a customer and return the customer to full utility service provided that the ESCO notifies the customer and the distribution utility no later than 15 calendar days before the effective date of the drop. The ESCO's right to discontinue service to any customer is subject to any limitations contained in its sales agreement.

   b. An ESCO's notice to retail customers shall provide the following information:

      1. Effective date of the discontinuance, established by the distribution utility, unless the ESCO arranged for an off-cycle date;

      2. Statement that the customer has the option to select another ESCO, receive full utility service from the distribution utility, or, if available in the distribution utility's service area and the customer is eligible, accept random assignment by the distribution utility to an ESCO; and,

      3. Statement that customer shall receive full utility service until the customer selects a new ESCO and the change in providers is effective, unless the distribution utility notified the customer that it will terminate its delivery service on or before the discontinuance date.

   c. The ESCO shall provide a sample form of the notice it plans to send to its customers when it transfers 5,000 or more customers to the Department for review no later than five calendar days before mailing the notice to customers.

I. New Delivery Customers

1. A customer may initiate distribution utility delivery service and subsequently enter into a customer agreement with an ESCO for commodity supply, or arrange for both services at the same time.

2. A customer may initiate commodity supply through programs offered by some distribution utilities that involve assignments of customers to ESCOs that have agreed to accept additional customers.

3. 2. A customer may authorize an ESCO to act as the customer's agent (ESCO agent) in establishing distribution utility service. The ESCO agent shall retain, and produce upon request, documentation that the customer authorized the ESCO to act as the customer's agent.

4. 3. An ESCO acting as a customer's agent shall establish a new delivery account on behalf of the customer and enroll the customer with the distribution utility so that ESCO commodity service commences when distribution utility delivery service begins. The ESCO shall retain, and produce upon request, documentation that the customer authorized the ESCO to act as the customer's agent. An ESCO that is a customer's agent is authorized to submit the customer's application for new delivery service, in compliance with requirements for such applications stated in the law, rules and distribution utility tariffs. An ESCO shall provide the customer's name, service address and, if different, mailing address, telephone number, customer's requested service date for initiation of delivery service, and information about any special need customers, including any need for life support equipment. An ESCO shall refer a customer directly to a distribution utility for arrangement of distribution related matters, such as contribution-in-aid of construction and construction of facilities necessary to provide delivery service and settling of arrears and posting security.

5. 4. Upon a customer's application for service, the distribution utility shall provide an ESCO with the effective date for initiation of delivery service and any other customer information provided to an ESCO in an acceptance of an enrollment request. The distribution utility may notify the customer of the acceptance.

J.  Multiple Assignments of Sales Agreements

1.  An ESCO may assign all or a portion of its sales agreements to other ESCOs provided that the assigned sales agreements clearly authorize such assignments or the ESCO provides notice to its customers prior to the assignments and an opportunity for each customer to choose another ESCO or return to full utility service. An ESCO shall provide a written notice no later than 30 calendar days prior to the assignment or transfer date to each customer and distribution utility. The notice to the distribution utility shall include a copy of the assignment document, with financial information redacted, executed by the officers of the involved ESCOs, and a copy of the notice sent to the customer, or, if a form notice, a copy of the form and a list of recipients.

2.  The assignment documents shall specify the party responsible for payment or reimbursement of any and all sums owed under any distribution utility tariff or Federal Energy Regulatory Commission tariff and any service agreements relating thereto, and under any agreements between ESCOs and distribution utilities and between ESCOs and their customers.

3.  An ESCO's notices to customers shall provide the following information:

    a.  Effective date of the assignment;

    b.  The name, mailing and e-mail addresses, and telephone number of the assigned ESCO; and,

      c.  Any changes in the prices, terms and conditions of service, to the extent permitted by the sales agreement.

    4.  The ESCO shall provide sample forms and any major modifications of such notices to the Department for review no later than five calendar days before mailing them to customers.

    5.  The distribution utility shall, within two business days after receipt of an assignment request, acknowledge and initiate processing of the request and send written notice of the request to the ESCO's assigned customer.

K.  Unauthorized Customer Transfers

    1.  A change of a customer to another energy provider without the customer's authorization, commonly known as slamming, is not permitted.  The distribution utility shall report slamming allegations to the Department on at least a monthly basis.

    2.  An ESCO that engages in slamming shall refund to a customer the difference between charges imposed by the slamming ESCO that exceed the amount the customer would have paid its incumbent provider and pay any reasonable costs incurred by the distribution utility to change the customer's provider from the ESCO that engaged in slamming to another provider.

    3.  ESCOs shall retain for two years or for the length of the sales agreement whichever is longer, documentation of a customer's authorization to change providers.  Such documentation shall comply with the requirements described in Attachments 1, 2 or 3.

L.  Lists of ESCO Customers, Budget Billing, Charges and Fees

    1.  A distribution utility, upon an ESCO's request, shall provide at no charge, once each calendar quarter, a list of the ESCO's customers at the time of the request and, monthly, the number of accounts enrolled with an ESCO and the ESCO's sales (kWh and/or dekatherms).  ESCOs may obtain such customer lists at other times for cost-based fees set forth in distribution utility tariffs.

    2.  A distribution utility shall adjust its bills rendered under a budget billing plan on the effective date for changing a provider and include the adjustments in the customer's next bill.

    3.  Upon enrollment of a distribution utility customer with an ESCO or return of an ESCO customer to full utility service, a distribution utility shall impose no restrictions on the number or frequency of changes of gas or electricity providers, except as provided in this paragraph.  The distribution utility shall accept only one valid enrollment request for each commodity per customer during a switching cycle.  If multiple requests are received for the same customer during a switching cycle, the distribution utility shall accept the first valid enrollment request and reject subsequent enrollment requests.

    4.  A distribution utility shall impose no charge for changing a customer's gas or electricity provider.

    5.  A distribution utility may establish a $20 fee in its tariffs for a special meter reading.

Attachment 1

**Telephonic Agreement and Authorization/Third Party Verification Requirements**

A.  To enter into a telephonic agreement with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, ~~an ESCO or its agent,~~ after the marketing call has ended, the transaction shall include an independent third party verification, in which an independent entity calls the potential customer and audio ~~record~~records the telephone conversation with the potential customer.  The independent third party verification shall be conducted without the ESCO marketing representative's presence, either on the telephone or in person.  The conversation shall contain the following information, as applicable, to substantiate the customer's agreement or authorization: in the order described below.  The following information shall be used in satisfying the independent third party verification requirement for sales which originated or included a door-to-door marketing component as well.

1.  A statement that the conversation is recorded and that oral acceptance of the ESCO's offer is an agreement to initiate service and begin enrollment;

2.  A question to the customer asking if he or she understands that the specific ESCO is not the distribution utility.

3.  A statement from the customer verifying the customer's name, postal and any e-mail address (if the customer chooses to provide it), distribution utility customer account number, and any additional information needed to verify the customer's identity.

4.  A statement from the customer that he or she has authority to make changes to this account.

5.  A question to the customer inquiring if the ESCO marketing representative began his or her interaction by stating his or her name and that he or she represents the ESCO, not the customer's utility, and an affirmative response from the customer.

6.  A question to the customer inquiring if the ESCO marketing representative provided the customer with the ESCO's contact information in written form, and an affirmative response from the customer.

7.  A question to the customer inquiring if the ESCO marketing representative provided copies of, or access to, the ESCO Consumer Bill or Rights, and an affirmative response from the customer.

8.  A question to the customer asking if the ESCO marketing representative explained that the price of ____ (electricity and/or natural gas) is ____ under the contract, and an affirmative response from the customer.

9.  A question to the customer asking if the ESCO marketing representative explained that the contract term is for ___ months and that the early termination fee (if any) is ___, and an affirmative response from the customer.

10. A question to the customer asking if the ESCO marketing representative stated whether savings were guaranteed, and a response from the customer.  If the customer states that the ESCO marketing representative guaranteed savings, a

question to the customer of what savings were guaranteed, and a response from the customer.

2.11.      A description in plain language of the prices, terms and conditions of the ESCO's offer, including a statement of the circumstances, if any, under which the ESCO may assess an early termination fee and the amount of any such assessment or how the assessment is calculated;

3.12.      If savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a plain language description of the conditions that must be present in order for the savings to occur;

4.13.      A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

5.14.      A statement from the customer, in response to a question from a the verification agent, accepting such terms and conditions;

6.15.      A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP and the purposes of its use, a request that the customer provide authorization for release of this information, and effective the effective duration of the authorization;

7.16.      A statement from the customer providing such authorization;

17. A A statement from the customer, in response to a question from the verification agent, that the customer has or has not already received a written copy of the sales agreement.

18. If the customer affirms that he or she has already received a written copy of the sales agreement, a statement that a residential customer may rescind the agreement within three business days after the date of the verification call.

19. If the third party verification is one required for a written or electronic agreement, a statement of the customer, in response to a question from the verification agent, that the customer has signed and/or submitted the sales agreement.

8.20.      If the customer does not affirm that he or she has already received a written copy of the sales agreement, then, a statement in plain language that a customer will receive a written copy of the sales agreement by mail, e-mail or fax; that a residential customer may rescind the agreement within three business days after the latter of the date of its receipt, or the date of the verification call; how such rescission can be accomplished, and that in the absence of such rescission, an enforceable agreement will be created; a statement that a customer may rescind the authorization for release of information at any time; provision of a local or toll-free telephone number or e-mail address to the customer for these purposes; upon cancellation of the agreement, the ESCO shall provide a cancellation number to the customer during the telephone call or in response to an e-mail message; and

9.      A statement from the customer verifying the date and time of the verification telephone call; and

~~10.~~21.     ~~A statement from the customer providing or verifying the customer's name, postal and any e-mail address (if the customer chooses to provide it), distribution utility customer account number, and any additional information needed to verify the customer's identity.~~

B.   The ESCO, or its agent, shall provide a copy of any Customer Disclosure Statement and sales agreement to the customer by mail, e-mail or fax within three business days after the telephone agreement and ~~authorization~~independent third party verification occurs.  The sales agreement shall set forth the customer's rights and responsibilities and describe the offer in detail, including the specific prices, terms, and conditions of ESCO service.  Such agreement shall be substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

C.   The ~~ESCO, or its agent,~~independent third party verification shall ~~conduct the telephone conversation~~be conducted in the same language used in marketing or sales materials presented to the customer, and ~~communicate~~communicated clearly and in plain language.

D.   An ESCO shall retain ~~telephonic agreement and/or authorization~~independent third party verification records for two years from the effective date of the agreement and/or authorization or for the length of the sales agreement whichever is longer.  In the event of any dispute involving ~~a telephonic~~ agreement ~~or~~. authorization and/or the independent third party verification , the ESCO shall make available the audio recording of the customer's agreement and/or authorization, including the independent third party verification within five business days after a request from the Department.

**Attachment 2**

**Electronic Agreement and Authorization Requirements**

A.  To enter into an electronic agreement with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information, an ESCO, or its agent, shall electronically record communications with the potential customer. As required in Section 5, the Electronic Agreement and authorization may also require an independent third party verification call, which must include the information in Attachment 1.  An ESCO shall provide the following electronic information, as applicable, to substantiate the customer's agreement and/or authorization:

1.  A statement that electronic acceptance of a sales agreement is an agreement to initiate service and begin enrollment;

2.  The Customer Disclosure Statement and the sales agreement containing the prices, terms and conditions applicable to the customer, which, if printed as a physical document, would be substantially the same, in form, and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

3.  If savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a written statement which includes a plain language description of the conditions that must be present in order for the savings to be provided;

4.  An identification number and date to allow the customer to verify the specific sales agreement to which the customer assents;

5.  A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

6.  A requirement that the customer accept or not accept the sales agreement by clicking the appropriate box, displayed as part of the terms and conditions; after the customer clicks the appropriate box to accept the sales agreement, the system shall display a conspicuous notice that the ESCO accepts the customer;

7.  Use of an electronic process that prompts a customer to print or save the sales agreement and provides an option for the customer to request a hard copy of the sales agreement; an ESCO shall send the hard copy by mail within three business days after a customer's request;

8.  A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP and the purposes of its use, a request that the customer provide authorization for release of this information, and the effective duration of the authorization;

9.  A requirement that the customer agree or not agree to provide such authorization by clicking the appropriate box, displayed as part of the terms and conditions;

10. A statement that a residential customer may rescind the agreement and authorization within three business days after electronic acceptance of the sales

agreement; a statement that a customer may rescind the authorization for release of information at any time; provision of a local or toll-free telephone number, and/or an e-mail address for these purposes; upon cancellation of the agreement, the ESCO shall provide a cancellation number;

11. Verification of the date and time of the electronic agreement and authorization; and

12. Provision by the customer of the customer's name, address, distribution utility customer account number, and any additional information to verify the customer's identify.

B. The ESCO shall, within three business days of any final agreement to initiate service to a customer, send an electronic confirmation notice to the customer at the customer's e-mail address.

C. The ESCO shall use an encryption standard that ensures the privacy of electronically transferred customer information, including information relating to enrollment, renewal, re-negotiation, and cancellation.

D. Upon request of a customer, the ESCO shall make available additional copies of the sales agreement throughout its duration.  An ESCO shall provide a toll-free telephone number and e-mail address for a customer to request a copy of the sales agreement.

E. An ESCO shall retain documentation of a customer's agreement, in a retrievable format for two years from the effective date of the customer's acceptance and/or authorization or for the length of the sales agreement whichever is longer.  In the event of any dispute involving an electronic agreement or authorization, the ESCO shall provide a copy of the customer's acceptance of the sales agreement and/or authorization for release of information or provide on-line access to the acceptance and/or authorization within five calendar days after a request from the Department.

Attachment 3

## Written Agreement and Authorization Requirements

A. An ESCO may enter into a written agreement (original or fax copy of a signed document) with a customer to initiate service and begin enrollment or to obtain customer authorization for release of information.  As required in Section 5, the Electronic Agreement and authorization may also require an independent third party verification call, which must include the information in Attachment 1.  A sales agreement shall contain, in addition to the Customer Disclosure Statement discussed in UBP Section 2.B.1.b.2, the following information, as applicable:

1. A statement that a signature on a sales agreement is an agreement to initiate service and begin enrollment;

2. A description of the specific prices, terms, and conditions of ESCO service applicable to the customer, which is substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b and, if savings are guaranteed, or guaranteed under only certain circumstances, the ESCO must provide a plain language description of the conditions that must be present in order for the savings to be provided;

3. A description of the types of information that the ESCO needs to obtain from a distribution utility or MDSP, the purposes of its use, and effective duration of the authorization;

4. A statement that acceptance of the agreement is an authorization for release of such information;

5. A customer signature and date; the sales agreement shall be physically separate from any check, prize or other document that confers any benefit on the customer as a result of the customer's selection of the ESCO;

6. A statement that a residential customer may rescind the agreement within three business days after signing the sales agreement; a statement that a customer may rescind the authorization for release of information at any time; provision of a local, toll-free telephone number, and/or e-mail address for these purposes; the customer may fax a copy of a signed sales agreement to the ESCO; upon cancellation of the agreement, the ESCO shall provide a cancellation number; and

7. The customer's name, mail and any e-mail address (if the customer chooses to provide it), distribution utility account number, and any additional information to verify the customer's identify.

8. A statement from the ESCO that energy supply will be provided by the ESCO, and that energy delivery shall continue to be provided by the customer's utility; and that said utility will also be available to respond to leaks or other emergencies should they occur;

B. ESCOs shall retain written agreements and/or authorizations for two years from the effective date of the agreement and/or authorization or for the length of the agreement whichever is longer.  In the event of any dispute involving a sales agreement or

authorization, the ESCO shall provide a copy of the sales agreement and/or authorization within five business days after a request from the Department.

**Attachment 4**

**Sample Customer Disclosure Statement**

| | |
|---|---|
| Price | |
| Fixed or Variable and, if variable, how the price is determined | |
| Length of the agreement and end date | |
| Process customer may use to rescind the agreement without penalty | |
| Amount of Early Termination Fee and method of calculation | |
| Amount of Late Payment Fee and method of calculation | |
| Provisions for renewal of the agreement | |
| Conditions under which savings to the customer are guaranteed | |

**Attachment 5**

**Enrollment and Drop Requests Information Requirements**

A.  An ESCO shall provide the following information for enrollment requests, and an ESCO or distribution utility shall provide the following information for drop requests:

 1.  Utility ID (DUNS# or tax ID);

 2.  ESCO ID (DUNS# or tax ID);

 3.  Commodity requested (electric or gas); and,

 4.  Customer's utility account number (including check digit, if applicable).

B.  The following information is required for enrollment requests:

 1.  Customer's bill option;

 2.  For distribution utility rate ready consolidated billing:

    a.  an ESCO's fixed charge, commodity price, sales and use tax rate or rate code;

    b.  ESCO customer account number;

    c.  budget billing status indicator; and,

    d.  tax exemption percent and portion taxed as residential.

 3.  For Single Retailer Model:  special needs indicator;

 4.  For gas service:  gas capacity assignment/obligation indicator, and, if applicable, gas pool ID, gas supply service options, and human needs indicator;

 5.  For electric service:  indicator for a partial requirements customer, if applicable.

C.  The following information is required for drop requests:

 1.  Reason for the drop;

 2.  For distribution utility request, service end date;

 3.  For ESCO initiated request, effective date of customer move, if applicable; and

 4.  For ESCO initiated request in Single Retailer Model, customer's service and mailing address.

# SECTION 6:  CUSTOMER INQUIRIES

A.  Applicability

This Section establishes requirements for responses by an ESCO or distribution utility to retail access customer inquiries.  An ESCO or distribution utility shall respond to customer inquiries sent by means of electronic mail, telecommunication services, mail, or in meetings.  The subjects raised in inquiries may result in the filing of complaints.

B.  General

1.  Distribution utilities and ESCOs shall provide consistent and fair treatment to customers.

2.  Distribution utilities and ESCOs shall maintain processes and procedures to resolve customer inquiries without undue discrimination and in an efficient manner and provide an acknowledgement or response to a customer inquiry within 2 days and, if only an acknowledgement is provided, a response within 14 days.

3.  Distribution utilities and ESCOs shall provide local or toll-free telephone access from the customer's service area to customer service representatives (CSRs) responsible for responding to customer inquiries and complaints.

4.  CSRs shall obtain information from the customer to access and verify the account or premises information.  Once verification is made, the CSR shall determine the nature of the inquiry, and, based on this determination, decide whether the distribution utility or the ESCO is responsible for assisting the customer.

5.  The CSR shall follow normal procedures for responding to inquiries.  If the inquiry is specific to another provider's service, the CSR shall take one of the following actions:

a.  Forward/transfer the inquiry to the responsible party;

b.  Direct the customer to contact the responsible party; or,

c.  Contact the responsible party to resolve the matter and provide a response to the customer.

6.  Each distribution utility and ESCO shall maintain a customer service group to coordinate and communicate information regarding customer inquiries and designate a representative to provide information relating to customer inquiries to the Department.

7.  ESCOs may provide a teletypewriter (TTY) system or access to TTY number, consistent with distribution utility tariffs.

C.  Specific Requests for Information

1.  A distribution utility or ESCO shall respond directly to customer inquiries for any information that is related to commodity supply and/or delivery service, to the extent it has the necessary information to respond.

2.  The entity responsible for the accuracy of meter readings shall respond to customer inquiries related to usage.

3. The distribution utility and ESCO shall respond to customer inquiries about billing and payment processing, in accordance with UBP Section 9, Billing and Payment Processing.

D. Emergency Contacts

1. An emergency call means any communication from a customer concerning an emergency situation relating to the distribution system, including, but not limited to, reports of gas odor, natural disaster, downed wires, electrical contact, or fire.

2. The ESCO CSR shall transfer emergency telephone calls directly to the distribution utility or provide the distribution utility's emergency number for direct contact to the distribution utility.  If no ESCO CSR is available, the ESCO shall provide for after-hours emergency contacts, including transfer of emergency calls directly to a distribution utility or an answering machine message that includes an emergency number for direct contact to the distribution utility.

3. Each ESCO shall provide periodic notices or bill messages to its customers directing them to contact the distribution utility in emergency situations and providing the emergency number.

# SECTION 7:  DISTRIBUTION UTILITY INVOICES

A.  Applicability

This Section establishes procedures for invoices of charges for services provided by the distribution utility directly to an ESCO or Direct Customer.  A distribution utility and ESCO or Direct Customer may agree to establish other arrangements and procedures for presentation and collection of invoices for services rendered.

B.  Invoices

1.  An ESCO or Direct Customer shall pay the full amount due, without deduction, set-off or counterclaim, within 20 calendar days after the date of electronic transmittal or postmarked date (due date).  Subsequent to the due date, charges are overdue and subject to late payment charges at the rate of 1.5% per month.  The overdue charges include the amount overdue, any other arrears, and unpaid late payment charges.  The distribution utility may provide, upon request, supporting or back-up data in electronic form, if available on its computer system.

2.  A distribution utility shall provide interest at the rate of 1.5% on an overpayment caused by the distribution utility's erroneous billing, provided that it may, without applying interest, credit all or a portion of the overpayment to the next bill issued within 30 days and/or refund all or a portion of the overpayment, upon request, within 30 days after its receipt.  The distribution utility shall refund any credit balances, upon request.

3.  An ESCO or Direct Customer shall make payments by means of an electronic funds transfer.  A distribution utility shall use any partial payments first to pay any arrears and second to pay current charges.

C.  Billing Inquiries and Disputes

1.  An ESCO or Direct Customer shall make any claims relating to inaccuracies of invoices in writing no later than 90 calendar days after the date of electronic transmittal or postmarked date.  ESCOs and/or Direct Customers are responsible for payment of disputed charges during any pending dispute.

2.  A distribution utility shall designate an employee and provide a telephone number and e-mail address for receipt of inquiries from an ESCO or Direct Customer relating to invoices.  The employee shall direct an ESCO or Direct Customer that presents an inquiry or complaint to the responsible and knowledgeable person able to explain charges on an invoice.

3.  A distribution utility shall acknowledge in writing receipt of an inquiry within five calendar days after its receipt.  A distribution utility shall investigate and respond in writing to the inquiry within 20 calendar days after its receipt.

4.  A distribution utility shall refund any overpayments, including interest, within five calendar days after it makes a determination that an ESCO or Direct Customer made an overpayment.  It may provide the refund by applying a credit to any overdue amounts or making direct payment of any remainder.  The distribution utility shall provide refunds by means of an electronic funds transfer.

Interest is calculated at the rate of 1.5 % per month from the date of the overpayment to the refund.

5. No interest is required on overpayments voluntarily made by an ESCO or Direct Customer to an account, unless an overpayment is applied to security.

# SECTION 8:  DISPUTES INVOLVING DISTRIBUTION UTILITIES, ESCOs OR DIRECT CUSTOMERS

A.  Applicability

This Section describes the dispute resolution processes available at the Department to resolve disputes relating to competitive energy markets involving utilities, ESCOs and/or Direct Customers, including disputes alleging anti-competitive practices.  The processes are not available to resolve disputes between retail customers and ESCOs or distribution utilities.  They are also not applicable to matters that, in the opinion of the Department Staff, should be submitted by formal petition to the Public Service Commission for its determination or are pending before a court, state or federal agency.  The availability of the processes does not limit the rights of a distribution utility, ESCO or Direct Customer to submit any dispute to another body for resolution.

B.  Dispute Resolution Processes

The parties shall in good faith use reasonable efforts to resolve any dispute before invoking any of these processes.  Distribution utility tariffs and operating and service agreements between the parties shall identify the processes used to resolve disputes, and shall refer to the dispute resolution processes described in this Section as acceptable processes to resolve disputes.

1.  Standard Process

The parties shall use a method to send documents described in this paragraph that will verify the date of receipt.

Any distribution utility, ESCO or Direct Customer may initiate a formal dispute resolution process by providing written notice to the opposing party and Department Staff.  Such notice shall include a statement that the UBP dispute resolution process is initiated, a description of the dispute, and a proposed resolution with supporting rationale.  Department Staff may participate in the process at this or any later point to facilitate the parties' discussions and to assist the parties in reaching a mutually acceptable resolution.

a.  No later than ten calendar days following receipt of the dispute description, if no mutually acceptable resolution is reached, the opposing party shall provide a written response containing an alternative proposal for resolution with supporting rationale and send a copy to Department Staff.

b.  No later than ten days after receipt of the response, if no mutually acceptable resolution is reached, any party or Department Staff may request that the parties schedule a meeting for further discussions.  The parties shall meet no later than 15 calendar days following such request, upon advance notice to Department Staff, unless the parties and Department Staff agree upon another date.  The Department may assign one or more Staff members to assist the parties in resolving the dispute.

c.  If no mutually acceptable resolution is reached within 40 calendar days after receipt of the written description of the dispute, any party may request an

initial decision from the Department.  A party to the dispute may appeal the initial decision to the Public Service Commission.

d.  If the parties reach a mutually acceptable resolution of the dispute, they shall provide to Department Staff a description of the general terms of the resolution.

2.  Expedited Process

In the event that an emergency situation arises to justify immediate resolution of a dispute, any party may file a formal dispute resolution request with the Secretary to the Public Service Commission asking for expedited resolution.  An emergency situation includes, but is not limited to, a threat to public safety or system reliability or a significant financial risk to the parties or the public.  The filing party shall provide a copy of the request to other involved parties and the Department Staff designated to receive information related to dispute resolution under this Section.  The request shall describe in detail the emergency situation requiring expedited resolution, state in detail the facts of the dispute, and, to the extent known, set forth the positions of the parties.

# SECTION 9:  BILLING AND PAYMENT PROCESSING

A.  Applicability

This Section establishes requirements[1] for billing and payment processing options offered by a distribution utility and ESCO in a multi-retailer model.  This Section does not establish requirements for billing and payment processing in the single retailer model.  A distribution utility and ESCO shall comply with the requirements established in this Section, unless they agree upon modifications or other procedures for billing and payment processing in a Billing Services Agreement.

B.  Billing and Payment Processing Options:  General Requirements

1.  A distribution utility shall offer to ESCOs without undue discrimination the billing and payment processing options available in its service territory.

2.  A customer participating in a retail access program shall select from the billing and payment processing options offered by ESCOs.

3.  A distribution utility shall allow its customers to select, through their ESCOs, one of the billing and payment options available in the distribution utility's service territory.  An ESCO may offer to its customers billing and payment processing options available in the customer's service territory and shall maintain or provide for the capability of issuing a separate bill for its services under the dual billing option.  An ESCO customer may direct the billing party to send its consolidated bills or dual bills to a third party for processing and payment.

4.  A distribution utility or ESCO may perform the responsibilities of a billing party for a customer and the other provider (non-billing party) based upon the billing and payment processing options available to the customer and the customer's choice.

5.  A distribution utility or MDSP shall make validated usage information available to the billing and non-billing parties at the time that the distribution utility or MDSP determines that the information is acceptable.[2]

6.  Information on customer usage, billing, and credit is confidential.  A distribution utility or MDSP may release such information, upon a customer's authorization, in accordance with the UBP Section 5, Changes in Service Providers.

7.  A distribution utility and ESCO shall demonstrate the technical capability to exchange information electronically for their billing and payment processing options.

8.  An ESCO shall provide 60 calendar days notice by mail, e-mail or fax to a distribution utility of any plan to offer a billing option that is not currently offered to its customers.  The distribution utility may agree to a shorter notice period preceding initiation of the option.  The 60 calendar-day notice shall not impose any obligation on any party to proceed without a successful test of data exchange capability and the fulfillment of other obligations described in this Section.  If an ESCO later changes its system, it shall provide adequate advance notice and conduct any additional testing required.

---

[1]  The requirements are applicable when EDI is available upon issuance by the Commission of data standards applicable to a bill model and operational upon successful completion of the testing required for a bill model.

[2]  A distribution utility or MDSP shall provide electronic interval data in summary form (billing determinants aggregated in the rating periods under a distribution utility's tariffs) via EDI and, if requested, in detail via an acceptable alternative electronic format if retrieved from meters.

9. A distribution utility and an ESCO are responsible for separately remitting their tax payments to the appropriate taxing authorities.

10. Where the ESCO is the billing party, it may offer a customer an option of prepayment. Where a distribution utility is the consolidated billing party, the distribution utility is not required to support processing of prepayments or application of customer prepayments to ESCO charges.

C. Consolidated Billing:  General Requirements

1. A distribution utility and ESCO shall establish in a billing services agreement (BSA) detailed expectations for their responsibilities, including consequences for any failure to carry out such responsibilities.

2. A distribution utility may use the bill ready or rate ready method[1] for issuing consolidated bills.  An ESCO that offers consolidated billing shall use a bill ready method.

3. A customer receiving delivery service from a distribution utility that is a combination natural gas and electric corporation (combination retail access customer) may receive a consolidated bill for both energy services if:

   a. The distribution utility issues the consolidated bill;

   b. One ESCO supplies the customer with both natural gas and electricity;

   c. An ESCO supplying only one of the commodities agrees to bill for charges for the service provided by the other ESCO; or,

   d. Separate distribution utility accounts are established for each service.

4. A combination retail access customer may receive separate consolidated bills for each commodity or a dual bill for one commodity and a consolidated bill for the other provided that the distribution utility's system is capable of providing separate accounts for each commodity.  A distribution utility shall establish bill cycles and payment due dates.  A distribution utility may charge a fee, as set forth in its tariff, to an ESCO to establish, upon the ESCO's request, a separate account for one of the commodities the distribution utility provides.

D. Consolidated Billing:  Functions and Responsibilities

1. A billing party shall perform the following functions and responsibilities:

   a. If the bill ready method is used, receive bill charges and other billing information from the non-billing party;

   b. If the rate ready method is used, receive rates, rate codes and/or prices (fixed and/or variable) and other billing information from the non-billing party;

   c. Receive bill messages and bill inserts from the non-billing party;

   d. If the bill ready method is used, acknowledge receipt of the non-billing party's information and accept or reject it;

   e. If the rate ready method is used,[1] calculate billed charges, including sales and use taxes; the non-billing party is required to provide the customer's sales and use tax rate to the billing party;

---

[1] A distribution utility electing the rate ready method for utility consolidated billing is not obligated to calculate or bill separately for other goods and services that an ESCO may provide.

    f.   Print or make available electronically consolidated bills that state the non-billing party's charges, including taxes, arrearages, late fees, and bill messages;

    g.   Insert in bill envelopes consolidated bills and inserts required by statute, regulation or Public Service Commission order;

    h.   Stamp, sort and mail consolidated bills or, if authorized, transmit bills electronically;

    i.   Cancel and rebill charges;

    j.   Notify the non-billing party of amounts billed, by account, within two business days after rendering bills to customers;

    k.   Receive and record customer payments;

    l.   Allocate and transmit the non-billing party's share of receipts, by account, to the non-billing party;

    m.  Respond to general inquiries and complaints about the bill and its format; refer customers to the non-billing party for inquiries and complaints related to the non-billing party's rates, charges, services, or calculations; and,

    n.   Maintain records of billing information, including amounts collected, remaining and transferred, and dates.

2.   If the bill ready method is used, each party shall calculate and separately state sales and use taxes applicable to its charges; if the rate ready method is used, the billing party shall calculate and separately state the state sales and use taxes applicable to its charges and the non-billing party's charges.

3.   A party that requires a customer's deposit shall administer it.  If a non-billing party applies a customer deposit to an outstanding balance, it shall notify the billing party.

4.   Upon receipt of payments, a non-billing party shall notify the billing party.

5.   To initiate consolidated billing using the rate ready method, the non-billing party shall provide the billing party with the rates, rate codes, and/or prices (fixed and/or variable) and tax rates necessary to calculate the non-billing party's charges.  The billing party shall specify in the BSA the number of prices for each service class per commodity accepted, deadline for transmission, effective date, and acceptable frequency of changes.[2]

6.   The billing party may process special handling requests from customers provided that it obtains agreement from the non-billing party for requests that affect it;

7.   The billing party is not required to calculate or provide separate statements to customers regarding gross receipts taxes applicable to a non-billing party's charges.  The non-billing party may calculate and provide information on the gross receipts taxes applicable to its charges in a bill message or, if the bill ready method is used, as a line item on the bill.

8.   The non-billing party may offer special billing features, such as budget billing or average payment plans.

---

[1]  A distribution utility is not required to calculate or bill for ESCO services that are not directly related to the commodity it delivers.

[2]  If a billing party's billing system is capable of providing the service, a billing party shall, upon request, apply a different rate, rate code, and/or price and tax rate to usage during different portions of the billing cycle to service provided after the effective date of the change.  The non-billing party shall request a change in the rate, rate code, and/or price no later than four business days prior to the effective date requested.

E.  Consolidated Billing:  Initiation, Changes or Discontinuance

1.  Initiation

    a.  An ESCO that proposes to issue consolidated bills shall establish and provide to a distribution utility written procedures for billing and payment processing that ensure billing accuracy and timeliness, proper distribution of a distribution utility's bill messages and inserts, and proper allocation and transfer of distribution utility funds.

    b.  No distribution utility may impose a fee on an ESCO to process its application to offer consolidated billing.

2.  Changes

A request to change a customer's billing option shall be made on or before 15 calendar days prior to the scheduled meter reading date.

3.  Suspension and Discontinuance

    a.  A distribution utility may suspend or discontinue an ESCO's right to offer consolidated billing as a billing party or a non-billing party for failure to comply with a BSA. Suspension of the right to offer consolidated billing means that the ESCO is prohibited from offering consolidated billing to new customers.

    b.  Upon a determination by a distribution utility to suspend or discontinue an ESCO's right to offer consolidated billing to customers, it shall provide notice on or before 15 calendar days prior to the proposed date for the suspension or discontinuance (cure period) to the ESCO and state the reason for its determination.  Upon failure of the ESCO to correct the deficiency on or before the expiration of the cure period, the distribution utility may require a change to dual billing for the ESCO's customers.

    c.  Upon discontinuance of consolidated billing rights, an ESCO may reapply to the distribution utility to offer consolidated billing.  A distribution utility shall expedite consideration of such requests.  Customers may begin receiving consolidated bills again after requirements are satisfied, including submission of transaction requests to establish consolidated billing for customers.

F.  Consolidated Billing:  Customer Requests

1.  A customer may request an ESCO to change its billing option.  The ESCO shall request the bill option change on or before 15 calendar days prior to the scheduled meter reading date. An EDI change request is used to request a change in a customer's bill option.  After receipt of the change request, a distribution utility shall, within one business day, acknowledge receipt of the request and, within two days, provide a response indicating rejection and the reason or acceptance and the effective date.

2.  No distribution utility may impose a charge on a customer or an ESCO for changing a billing option.

3.  When more than one request to change a customer's billing option is transmitted for a billing cycle, a billing party shall accept the last timely request received.

4.  A distribution utility may deny a request to initiate consolidated billing or discontinue consolidated billing for a customer with an amount past due for at least 38 calendar days, unless the past due amount is subject to a DPA and the customer is fulfilling DPA obligations.

G.  Consolidated Billing:  Content

1.  A billing party may decide upon the format for its consolidated bill provided that it states a summary of total charges and separately states distribution utility and ESCO charges in sufficient detail to allow a customer to judge their accuracy.  Such separate statements shall appear in clearly separated portions of the bill and identify their source, distribution utility or ESCO.  An ESCO that provides consolidated billing shall state on its consolidated bill the unadjusted distribution utility charges for delivery services provided by a distribution utility, without change.

2.  A consolidated bill shall contain the information listed in Attachment 1, General Information, preferably in a summary section.  The billing party may place the information on the bill in any order or location.

3.  A consolidated bill shall contain the information listed in Attachment 2, Distribution Utility Content, separately stated for each distribution utility.

4.  A consolidated bill shall contain the information listed in Attachment 3, ESCO Content, separately stated for each ESCO.

5.  If the rate ready method is used, the ESCO shall provide to the distribution utility information listed in Attachment 3, ESCO Section Content, to the extent necessary for the distribution utility to calculate and issue bills.  To initiate utility consolidated billing using the rate ready method, an ESCO shall provide the information to the distribution utility on or before 15 calendar days prior to the scheduled meter reading date.  An ESCO may request a price or rate change no later than four business days prior to its effective date.

6.  If a billing party and non-billing party agree to show the non-billing party's logo on the bill, the non-billing party shall provide it in an acceptable electronic format at least thirty days before its initial use.

7.  If the rate ready method is used, a non-billing party is not required to provide information after it is initially submitted, except when a change is made.

8.  When an ESCO issues a consolidated bill and the distribution utility transmits bill ready data, the distribution utility shall transmit to the ESCO at the appropriate time the applicable information listed in Attachment 2, Distribution Utility Content, items d – q, and the customer's name and service address.

9.  When an ESCO issues consolidated bills on behalf of other ESCOs and distribution utilities and the other ESCOs provide information, the non-billing ESCOs shall provide bill ready information listed in Attachment 3, ESCO Content to the billing ESCO.

10.  No party shall engage in cramming.

11.  A non-billing party may display its bill messages up to 480 characters in length on the bill provided that the billing party raises no reasonable objection to the message.  There is no limit in message length for the billing party.  If the bill ready method is used, the non-billing party shall transmit the text of the messages or agreed upon message codes in the same EDI transaction as the billed charges.  If the rate ready method is used, a non-billing party shall submit a common bill message on or before 15 calendar days before the date used.  Unless a final print date is provided, the billing party shall continue to print the message on bills until the non-billing party transmits a different message or requests its discontinuance.  In emergencies requiring printing of messages on bills, the billing party shall accommodate the needs of the non-billing party, if practicable.

12. The billing party shall, in a timely manner, print on bills or insert into bill envelopes information that a statute, regulation, or Public Service Commission order requires a distribution utility or ESCO to send to its customers. The billing party may not assess charges for inclusion of required inserts that do not exceed one-half ounce. A distribution utility may charge for any excess weight in accordance with its tariff. The party responsible for providing the information shall submit it to the billing party. If the information is provided in a bill insert, the responsible party shall deliver the inserts in preprinted bulk form in a proper size on or before 15 calendar days before the date requested for initiation of distribution to customers to a location designated by the billing party.

13. Due dates and other general payment terms and conditions shall be identical for distribution utility and ESCO charges, unless different terms and conditions would have no impact on them. In the event of a conflict, the distribution utility's payment terms and conditions shall govern.

H. Consolidated Billing: Bill Issuance

1. No late charge may be applied to customers' bills for distribution utility charges, if payment is received by the billing party within the grace period.

2. If the bill ready method is used, the non-billing party shall transmit its charges and other information to the billing party on or before two business days after receipt of valid usage data for a customer account. If the rate ready method is used, the non-billing party shall transmit any revisions in rate and/or price data to the billing party on or before four business days prior to the prescribed date.

3. If the bill ready method is used, a billing party that receives a non-billing party's transaction within the prescribed time and rejects the transaction for cause shall, within one business day after receipt of the transaction, send the non-billing party an EDI reject transaction and state the reason for the rejection. The non-billing party may, if time permits, submit a corrected file containing billing charges for inclusion in the current billing statement.

4. If a non-billing party's transaction is sent to the billing party outside the prescribed time frame, the billing party may reject the transaction and shall notify the non-billing party on or before two business days after its receipt that the charges were not billed. The non-billing party may resubmit its charges the following billing period in accordance with prescribed time limits and without late charges. If the bill ready method is used, the non-billing party may submit a separate bill to the customer and notify the billing party of the action. The parties may also agree that the billing party shall hold the non-billing party's charges for inclusion in the next bill.

5. If a non-billing party's transaction is accepted using the bill ready method, the billing party shall render a bill within two business days after receipt of the transaction. If a rate ready method is used, a billing party shall render a bill in accordance with the distribution utility's regular bill issuance schedule. A bill is rendered upon transfer to the custody of the U.S. Postal Service or other delivery service or, if authorized by a customer, sent electronically to a valid e-mail address or telefax number, displayed on a secure website, or presented directly to the customer or customer's representative.

6. If the billing party has not purchased a non-billing party's accounts receivable, is able to process the non-billing party's transaction, and is unable to render a bill within the prescribed

time, the billing party shall notify the non-billing party immediately. A billing party shall afford customers the same grace period to pay the bill.

7. If the rate ready method is used, the billing party shall provide to the non-billing party within two business days after bill issuance, a statement of the accounts billed, date of issuance and amount of the non-billing party's charges shown on the bill (past due, current, and late payment charges and taxes).

I. Consolidated Billing: Cancellations and Rebills

1. If non-billing party errors occur and are not corrected before the bill is issued, a billing party is not required to cancel bills or issue new bills. The non-billing party shall provide any necessary explanations to the customer and billing party and make any necessary adjustments on the next bill.

2. If billing party errors cause the non-billing party charges to miss the billing window, the billing party shall cancel and reissue the bills within two business days after notification, unless the billing party and non-billing party arrange an alternative bill correction process.[1] A billing party shall afford customers the same grace period to pay bills.

3. If no party errs, the parties may agree to cancel and rebill.

4. To cancel a bill, a billing party shall:

   a. Cancel usage by billing period;

   b. Send consumption in the cancel transaction that matches consumption sent in the original transaction;

   c. Send cancelled usage at the same level of detail as the original usage;

   d. Using the rate ready method, if a bill is to be cancelled and reissued, recalculate charges and issue revised bills to customers within two business days after receipt of the revised usage data;

   e. Using the bill ready method, if a bill is to be cancelled and reissued, issue the revised bill to customers within two business days after receipt of the revised usage data.

5. To restate usage for a period, the distribution utility or MDSP shall first cancel usage for that period and then send the full set of restatement transactions.

J. Consolidated Billing: Payment Processing and Remittance

1. The parties shall set forth their responsibilities, performance parameters, financial arrangements and other details associated with payment processing and remittance in a BSA, subject to the requirements in this Section.

   a. In the Pay-as-You-Get-Paid Method, the billing party sends payments to the non-billing party, within two business days of receipt and posting of the funds and processes the payments in accordance with the required priority for application of payments established in this Section.

   b. A BSA shall establish procedures for processing payments made on any purchased accounts receivable.

2. Payment Processing

---

[1] Such errors do not include usage-related adjustments necessary when an actual meter reading becomes available to replace an estimated reading required, for example, because a customer denies access to a meter.

a. The billing party shall notify the non-billing party that payment is received and send payments to the non-billing party, within two business days after receipt and posting, by use of Electronic Funds Transfer (EFT), Automated Clearing House (ACH), or similar means to banks or other entities as agreed upon by the parties.  The notice shall include, in account detail, the payments received from customers, the date payments are posted, the date payments are transferred, and the amounts allocated to the non-billing party's charges.

b. The billing party may impose late payment charges on unpaid amounts not in dispute for the non-billing party provided the terms of the late payment charges are stated in a tariff or a sales agreement and previously disclosed to the customers.  If the bill ready method is used, each party shall calculate its late payment charges.  If the rate ready method is used, the billing party shall calculate the non-billing party's late payment charges under terms agreed upon by the parties.  If a customer's check is returned for any reason, the billing party may charge the customer's account for the return fee and any reasonable administrative fee.

c. Upon failure of the billing party to pay the non-billing party its proper share of customer payments within two business days after their receipt and posting or at the time agreed upon when accounts receivable are purchased, the billing party shall pay interest on the unremitted amount.  The billing party shall calculate the interest at the rate of 1.5 percent per month from the date the payment was due to be received by the non-billing party or its bank.[1]  The payment of interest is in addition to, and not in lieu of, the rights and remedies otherwise available to the parties.

3. Collections

The billing party is not responsible for collection of non-billing party funds, unless agreed to in a BSA.

4. Application of payments

a. The billing party[2] shall allocate customer payments to the following categories of charges on the bill or contained in a notice that are not in dispute in this order of priority of payment: (1) amounts owed to avoid termination, suspension or disconnection of commodity or delivery service; (2) amounts owed under a DPA, including installment payments and current charges; (3) arrears; and (4) current charges not associated with a DPA. The billing party shall pro-rate payments to the charges within each category in proportion to each party's charges in that category. After satisfaction of the charges in a category, assuming available funds, the remainder of the payment shall apply to the next highest category according to the priority of payments and in the same manner as described above until the payment is exhausted.

b. The billing party may retain any payment amounts in excess of the amounts due as prepayments for future charges or return the excess amounts to customers.  The billing

---

[1]  Upon request, the billing party shall provide the non-billing party with a verified copy of the posting log of payments received and transferred to the non-billing party during any calendar month specified by the non-billing party.

[2]  Distribution utilities supplying delivery service for both natural gas and electricity to customers receiving consolidated bills shall apply the receipts to the separate services in accordance with their regular procedures.  Where a consolidated bill displays delivery charges for separate gas and electric distribution utilities, the customer's payments shall be first prorated between the utility accounts in accordance with the amount each is due compared with the total amount due both distribution utilities.

party shall, in a timely manner, combine any excess payment amounts with the customer's payment on the next bill, and allocate and pro-rate the sum as set forth in Section 9.J.4.a.[1]

   c.  When the billing or non-billing party enters into a multi-month payment agreement with a customer or waives any charges, that party shall notify the other party of such action.

   d.  The billing party shall hold payments received without account numbers or enough information for the billing party to identify the accounts and attempt to obtain information to identify the payer.  If sufficient information is not obtained to identify the account information prior to the next bill, the billing party shall present the unpaid amount and late charge, if applicable, on the bill.  If the customer contacts the billing party to inquire about the late charge and the lack of payment credit, the billing party shall resolve the matter and reverse the late charges.  The billing party shall notify the non-billing party of the matter and its resolution and then allocate payments as necessary to balance the account.

5.  Multiple Account Payment Processing

Processing of a single customer payment for multiple accounts requires proactive action on the part of the billing party and the non-billing party to apply payments correctly.  The parties shall set forth arrangements for multiple account payment processing in a BSA.

6.  Non-billing Party's Balance

   a.  Except as provided in Section 9.J.6 d., when a final bill is issued, the billing party shall maintain a current and past due balance for each account of the non-billing party until payment of the last bill issued for service provided by the non-billing party or 23 days after issuance of such bill, whichever is sooner.  After such time, the account shall be considered "inactive."

   b.  Except as provided in Section 9.J.6 d., when a customer changes to a new ESCO, the billing party shall continue to receive and apply a customer's payments for the active account of the prior ESCO.  If the customer does not pay the outstanding balance owed to the prior ESCO on or before 23 days after the final bill containing the prior ESCO's charges is issued, the billing party shall notify the ESCO and report the balance due.

   c.  With regard to a new distribution utility/ESCO relationship following a change of ESCOs or a change in a distribution utility, the new billing party shall, upon request of the new non-billing party, bill for the balances that may exist at the time of the change.  The new billing party may include the arrears on current bills or in a separate bill if its billing system is not capable of accepting prior charges.  If a change of providers occurs, a distribution utility is not required to post any arrears of the prior ESCO on consolidated bills issued after the final billing of its charges, unless the arrears become the property of the new ESCO and it provides documentation of its property right to the distribution utility.

   d.  Upon ESCO termination of the commodity supply of a residential customer due to failure to pay charges, the billing party shall maintain a current and past due balance for the account of the terminating ESCO for one year from the date of termination by the ESCO.

---

[1]  Where the customer elects to make a charitable donation, such as funding a low income program, satisfaction of the donation shall be made prior to allocation and pro-ration of the customer's excess payment.

In the event that the terminating ESCO seeks suspension of delivery service within one year of the termination, or the residential customer has a DPA, the billing party shall maintain a current and past due balance for each account of the terminating ESCO until the arrears are paid in full.

7. Customer Disputes:  Initiating a Bill Complaint

   a. A customer or authorized representative may initiate a customer complaint regarding some or all of the charges on the customer's bill at any time.

   b. When a complaint relates to the entire bill, to only the billing party's charges or services, or, using the rate ready method, to calculation of the billing or non-billing party's charges, the customer should contact the billing party.  The billing party shall resolve the complaint and, if appropriate, place the customer's account in dispute.  In the event the inquiry concerns only a non-billing party's bill, charges, services, or calculations, the billing party shall refer the customer to the non-billing party.

8. Customer Complaints:  Notification

   a. Upon a determination that a complaint affects the entire bill, the billing party shall notify the non-billing party of the subject and amount in dispute, if known.

   b. The non-billing party shall inform the billing party of disputes related to non-billing party charges that would affect the billing process.

   c. Once such complaints are resolved and the billed amounts are no longer in dispute, the other party shall be notified.

K. Consolidated Billing:  Call Centers

A billing party shall provide call centers with toll-free or local telephone access available 24 hours a day and an answering machine or voice mail service during the hours when call center staff is not available.  A billing party shall maintain adequate staff to respond to customers' inquiries or refer inquiries to the non-billing party, where appropriate, within two business days.

L. Dual Billing

1. The distribution utility and ESCO, acting as separate billing parties, shall render separate bills directly to the customer or the customer's representative. The customer or its representative shall pay the distribution utility and the ESCO separately.

2. The distribution utility's bill shall conform to the standards set by the Public Service Commission.

3. The distribution utility or MDSP shall transmit usage data to the ESCO at the time the information is available for rendering bills to customers, which may or may not coincide with meter reading cycle dates.

4. The ESCO may decide upon its bill format provided that it states its charges in sufficient detail to allow customers to judge the accuracy of their bills.  At a minimum, an ESCO shall provide the following information:

   a. Customer's name and billing address and, if different, service address;

   b. Customer's account number or ID;

   c. Period or date associated with each product or service billed;

   d. Name of the entity rendering the bill;

   e. Address to which payments should be sent or the location where payments may be made;

    f.   Local or toll free number for billing inquiries; if an ESCO enrolls and communicates with customers electronically, an e-mail address and telephone number with area code;

    g.   Due date for payment and a statement that late payment charges shall apply to payments received after the due date; and

    h.   Amount and date of payments received since the last bill.

5.   Whenever a distribution utility or MDSP cancels consumption for an account, it shall provide a notice of cancellation and restated billing parameters for the  account to an ESCO and a distribution utility, if applicable, and shall:

    a.   Cancel usage by billing period;

    b.   Send consumption in the cancel transaction that matches consumption sent in the original transaction;

    c.   Send cancelled usage at the same level of detail as the original usage; and,

    d.   To restate usage for a period, cancel usage for that period and send the full set of billing parameter restatements.

**Attachment 1**

### General Information

A.  Customer name

B.  Service address

C.  Billing address, if different than service address

D.  Billing party account number, if any

E.  Start of billing cycle period (prior meter reading date for metered customers)

F.  Starting period meter reading (for metered customers)

G.  End of billing cycle period (current meter reading date for metered customers)

H.  Ending period meter reading (for metered customers)

I.  Billing period metered usage, any multiplier necessary to convert usage to billing units and resulting billing units (for metered customers)

J.  Billing period demand, if applicable

K.  Indicators, if usage is estimated, actual or customer provided

L.  Total current charges (total of billing and non-billing party charges, including late charges and taxes)

M.  Total prior billed charges (total of billing and non-billing party prior bill charges, including prior late charges and taxes)

N.  Total credits since last bill (total of billing and non-billing party credits);

O.  Date through which the credits are applied

P.  Total current bill (total of billing and non-billing party charges plus prior bill charges less credits)

Q.  Billing party name (and billing party logo, if billing party wishes it shown)

R.  Billing party address

S.  Billing party toll-free or local telephone number, and for a billing party that enrolls and communicates electronically with customers, an e-mail address and telephone number with area code, in lieu of a toll-free or local telephone number

T.  Distribution utility toll free-or local telephone number and emergency telephone number

U.  Method and location for payments

V.  Date of bill

W.  Payment due date

X.  Billing party messages of any length that apply in general to the bill and services provided by billing and non-billing parties, that are not reasonably objectionable to the parties

**Attachment 2**

## Distribution Utility Content

A.  Distribution utility name, and logo, if the parties agree

B.  Distribution utility address, if the distribution utility is not the billing party

C.  Distribution utility toll-free or local telephone number for inquiries about the distribution utility portion of the bill, if the distribution utility is not the billing party, and distribution utility emergency number

D.  Distribution utility customer account number, if the distribution utility is not the billing party

E.  Distribution utility rate classification identifier

F.  Distribution utility rates per billing unit, if applicable

G.  Distribution utility rates not based on billing units, if applicable, and unbundled, if applicable

H.  Distribution utility charge adjustments and adders, separately stated

I.  Taxes on distribution utility charges, if separately stated

J.  Billing period total distribution utility charges

K.  Prior billing period total distribution utility charges, including any prior late charges

L.  Credits on prior distribution utility charges

M.  Net prior distribution utility balance remaining, unless included in total prior billed charges stated in the General Information Section

N.  Late charge for unpaid prior distribution utility balance, unless included in total prior billed charges stated in the General Information Section

O.  Total amount due for distribution utility services

P.  If a budget bill, applicable billing information and resulting budget bill amount due for distribution utility services

Q.  The distribution utility's bill message, if any, up to 480 characters, if the distribution utility is not the billing party

**Attachment 3**

## ESCO Content

A.  ESCO name and logo, if parties agree

B.  ESCO address, if the ESCO is not the billing party

C.  ESCO toll-free or local telephone number for billing inquiries if the ESCO is not the billing party; ESCOs that enroll and communicate electronically with customer may provide an e-mail address and telephone number with area code in lieu of a toll-free or local telephone number; if a rate ready method is used, the billing party shall include a notice directing ESCO customers to call the billing party first to clarify bill calculations

D.  ESCO account number, if the ESCO is not the billing party and has a unique account number

E.  ESCO rate classification, if applicable

F.  ESCO rate per billing unit, if applicable

G.  ESCO rate not based on distribution utility unit, if applicable

H.  ESCO charge adjustments and adders, if any, separately stated

I.  Taxes on ESCO charges, if required to be separately stated

J.  Billing period total ESCO charges

K.  Prior billing period total ESCO charges, including any prior late charges, unless included in total prior billed charges stated in the General Information Section

L.  Credits on prior ESCO charges

M.  Net prior ESCO balance remaining

N.  Total amount due for ESCO services

O.  If a budget bill, applicable billing information and resulting budget bill amount due

P.  The ESCO's bill message, if any, up to 480 characters, if the ESCO is the non-billing party.

# SECTION 10:  MARKETING STANDARDS

A.  Applicability

This Section describes the standards that ESCOs and ESCO marketing representatives must follow when marketing to customers in New York.

B.  Training of Marketing Representatives

1.  ESCOs shall ensure that the training of their marketing representatives includes:

6.a. Knowledge of this Section and awareness of the other Sections of the New York Uniform Business Practices;

7.b. Knowledge of the ESCO's products and services;

8.c. Knowledge of ESCO rates, payment options and the customers' right to cancel, including the applicability of an early termination fee;

9.d. Knowledge of the applicable provisions of the Home Energy Fair Practices Act that pertains to residential customers; and,

10.e.  The ability to provide the customer with a toll-free number from which the customer may obtain information about the ESCO's mechanisms for handling billing questions, disputes, and complaints.

C.  Contact with Customers

1.  In-Person Contact with Customers[1]

ESCO marketing representatives who contact customers in person at a location other than the ESCO's place of business for the purpose of selling any product or service offered by the ESCO shall, ~~as soon as possible and prior to describing any products or services offered for sale by the ESCO~~before making any other statements or representations to the customer:

a.  Introduce him or herself with an opening statement that identifies the ESCO which he or she represents as an Energy Services Company, identifies him or herself as a representative of that specific ESCO; explains that he or she does not represent the distribution utility; and, explains the purpose of the solicitation.

a.b. Produce identification, to be visible at all times thereafter, which:

1.  Prominently displays in reasonable size type face the full name of the marketing representative;

2.  Displays a photograph of the marketing representative and depicts the legitimate trade name and logo of the ESCO they are representing;

3.  Provides the ESCO telephone number for inquires, verification and complaints.

b.c. ~~Identify the ESCO which they represent as an independent energy marketer, and identify him or her as a representative of that specific ESCO; explain that he or she does not represent the distribution utility; and, explain the purpose of the solicitation.~~ During the sales presentation, the marketing representative must also state that if customer purchases natural gas and/or electricity from the ESCO, that the customer's utility will continue to deliver their energy and will respond to any leaks or emergencies. This requirement may be fulfilled either (a) by an oral statement by the ESCO marketing representative, or (b)

---

[1] Including but not limited to marketing encompassed -in the definition of door to door sales.

written material left by the ESCO marketing representative.  Further, ESCOs that are affiliates of distribution utilities should not describe or disclose their relationship to the distribution utility unless such information is specifically requested by the customer.

d.   ~~An ESCO marketing representative shall~~An ESCO marketing representative must provide each prospective residential customer a business card or similar tangible object with the ESCO marketing representative's name; ESCO's name, address, and phone number; date and time of visit and website information for inquires, verification and complaints.

~~e.~~e. An ESCO marketing representative must provide each prospective residential customer or customer that is marketed to via door to door marketing, with a copy of the ESCO Consumers Bill of Rights, before the ~~marketer~~ESCO marketing representative makes his or her sales presentation.

~~d.~~f. An ESCO marketing representative ~~will~~must provide the customer with written information regarding ESCO products and services immediately upon request which ~~shall~~must include the ESCOs name and telephone number for inquires, verification and complaints.  Any written materials, including contracts, sales agreements, marketing materials and the ESCO Consumers Bill of Rights, must be provided to the customer in the same language utilized to solicit the customer.

~~e.~~g. Where it is apparent that the customer's English language skills are insufficient to allow the customer to understand and respond to the information conveyed by the ESCO marketing representative or where the customer or another third party informs the ESCO marketing representative of this circumstance, the ESCO marketing representative shall either find a representative in the area who is fluent in the customer's language to continue the marketing activity in his/her stead or terminate the in-person contact with the customer.  The use of translation services and language identification cards is permitted.

~~f.~~h. An ESCO marketing representative ~~shall~~must leave the premises of a customer when requested to do so by the customer or the owner ~~or /~~occupant of the premises.

i.   As stated in Section 5.B.2, before the ESCO may enroll a customer with whom the ESCO's contact originated through or included a door-to-door marketing component, the customer's agreement must be confirmed through independent third party verification in conformance with Section 5, Attachment 1, after the marketing representative has left the customer's premises.

j.   All ESCOs who have ESCO marketing representatives conducting door-to-door marketing must maintain a daily record, by zip code, of the  territories in which the ESCO's marketing representatives have conducted door-to-door marketing.  The information should be in a form that can be reported to Staff upon request, and should be retained by the ESCO for a minimum of six months.

2.  Telephone Contact with Customers

ESCO marketing representatives who contact customers by telephone for the purpose of selling any product or service offered by the ESCO shall:

a.  Provide the ESCO marketing representative's first name and, on request, the identification number;

b.  State the name of the ESCO on whose behalf the call is being made;

    c.  Never represent that the ESCO marketing representative is an employee or representative or acting on behalf of a distribution utility.  In addition, the ESCO marketing representative must clearly indicate that taking service from an ESCO will not affect the customer's distribution service and such service will continue to be provided by the customer's distribution utility;

    d.  State the purpose of the telephone call;

    e.  Where it is apparent that the customer's English language skills are insufficient to allow the customer to understand and respond to the information conveyed by the ESCO representative or where the customer or another third party informs the ESCO marketing representative of this circumstance, the ESCO marketing representative will immediately transfer the customer to a representative who speaks the customer's language, if such a representative is available, or terminate the call; and,

    f.  Remove Customers' names from the marketing database upon Customers' request.

    g.  When marketing to residential customers the ~~marketer~~ESCO marketing representative must also:

        1.  Explain that he or she does not represent the distribution utility;

        2.  Explain the purpose of the solicitation;

        3.  Notify each prospective customer of the ESCO Consumer Bill of Rights, where they can find it, and also provide a copy of the ESCO Consumer Bill of Rights with any written material sent to the customer including the sales agreement ; and,

        4.  Provide any written materials, including contracts, sales agreements, marketing materials and the ESCO Consumers Bill of Rights, must be provided to the customer in the same language utilized to solicit the customer.

    h.  As stated in Section 5.B.2, before the ESCO may enroll a customer with whom the ESCO's contact originated through or included a telephonic component, the customer's agreement must be confirmed through independent third party verification in accordance with Section 5, Attachment 1.

  3.  Electronic Enrollments

    a.  When marketing to residential customers the ESCO Consumer Bill of Rights should be provided to prospective customers as a non-avoidable screen which a customer must affirmatively acknowledge to verify they have seen the document, prior to effecting an enrollment.

  4.  Conduct

    ESCOs shall:

    a.  Not engage in misleading or deceptive conduct as defined by State or federal law, or by Commission rule, regulation or Order;

    b.  Not make false or misleading representations including misrepresenting rates or savings offered by the ESCO;

    c.  Provide the customer with written information, upon request, or with a website address at which information can be obtained, if the customer requests such information via the internet;

    d.   Use reasonable efforts to provide accurate and timely information about services and products.  Such information will include information about rates, contract terms, early termination fees and right of cancellation consistent with Section 2 of the UBP and any other relevant Section;

    e.   Ensure that any product or service offerings that are made by an ESCO contain information written in plain language that is designed to be understood by the customer. This shall include providing any written information to the customer in a language in which the ESCO representative has substantive discussions with the customer or in which a contract is negotiated;

    f.   Investigate customer inquiries and complaints concerning marketing practices within five days of receipt of the complaint; and,

    g.   Cooperate with the Department and PSC regarding marketing practices proscribed by the UBP and with local law enforcement in investigations concerning deceptive marketing practices.

5.  Dispute Resolution

ESCOs will maintain an internal process for handling customer complaints and resolving disputes arising from marketing activities and shall respond promptly to complaints forwarded by the Department.