# Exhibit 13

## Expert Report of Edo Macan

*Brous, et al. v. Eligo Energy, LLC, et al.*
*Case No. 1:24-cv-01260-ER*

# Expert Report of
# Edo Macan

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Eligo Energy Class Action Litigation**

**No: 24 Civ. 1260 (ER)**

**September 12, 2025**

I.    **INTRODUCTION**

1.      This is the Expert Report of Edo Macan. I am a Managing Director at Econ One Research Inc. and an international expert in quantitative analysis of electric and natural gas markets. My business address is 1100 Vermont Ave. NW, Suite 400, Washington, D.C. 20005.

A.    **Parties to the Dispute**

2.      Counsel for Plaintiffs Michelle Schuster and Anne Brous as the executor of the estate of Ira Brous (jointly, the "Class Action Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class") asked me to comment on certain matters associated with these New York customers' contracts and business dealings with Eligo Energy, LLC and Eligo Energy NY, LLC ("Eligo").

3.      I understand that the Class Action Plaintiffs contracted with Eligo for their retail power supply. I further understand that the Class Actions Plaintiffs' contracts with Eligo commenced with a fixed-rate plan feature, and once that fixed-rate period expired, the contracts automatically converted to a variable rate.

4.      It is my understanding that Eligo started supplying electricity to New York customers in or around 2013. I also understand that Eligo did not provide natural gas services to New York customers, so my discussion focuses on electricity only.

5.      From the First Amended Class Action Complaint and the proposed Second Amended Class Action Complaint, I understand that former Plaintiff Ira Brous resided in Ithaca, New York. In July 2017, Mr. Brous enrolled with Eligo and was charged a fixed rate for electricity from August 2017 until January 2018, after which Eligo began charging him a variable rate. In or around November 2023, Mr. Brous's Eligo account was cancelled. I understand that the Court ordered Mr. Brous's widow,

Anne Brous, to be substituted as a Plaintiff in this action after Mr. Brous passed away in 2024.

6.      I also understand that Plaintiff Michelle Schuster resides in Rochester, New York. In October 2016, Plaintiff Schuster enrolled with Eligo and was charged a fixed rate for electricity for three months, from November 2016 until January 2017, after which Eligo began charging her a variable rate. In November 2023, Plaintiff Schuster cancelled her Eligo account.

7.      Ira Brous and Michelle Schuster's Eligo electricity purchases were made pursuant to Eligo's Terms of Service for New York Residential Customers (the "NY Terms of Service"). The Terms of Service defined how variable electricity rates would be calculated after the fixed-price period expired. Those terms of service are attached as Exhibit 1 (Schuster) and Exhibit 2 (Brous).

8.      I understand that one of the main issues in this lawsuit is whether Eligo's variable electricity rates were set in accordance with the NY Terms of Service's statement regarding how the "[v]ariable price is determined." Specifically, the NY Terms of Service state that *"all"* Eligo variable rates *"shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."* Although the NY Terms of Service also state that *"[a]pplicable taxes will also be factored into the variable price,"* I understand that the local incumbent utility separately charged and collected the taxes on Eligo's variable rates, if any. I also understand that Eligo periodically implemented different versions of the NY Terms of Service for new customers during the period of February 20, 2018 to the present (the proposed "Class Period"), but continued to sell variable rate electricity to existing customers pursuant to

the pricing term that Eligo would *"calculate"* customers' variable rates *"on a monthly basis in response to"* the three identified inputs of *"market pricing," "transportation costs,"* and "*other market price factors*." I further understand that Eligo's NY Terms of Service continued to use this same pricing term until June 21, 2019, and therefore, all Eligo customers in New York who enrolled with Eligo before June 21, 2019 were subject to this term. Counsel for the Class Action Plaintiffs have informed me that the Class in this matter is made up of only residential customers in New York who were charged a variable rate for electricity under this pricing term, which I will now refer to in this report as the "Variable Price Term." I also understand that the NY Terms of Service contain a statement that following the fixed-rate period, customers' variable rates *"may"* be "periodically adjusted for market conditions." *See* Exhibits 1 and 2. I understand that Eligo's 30(b)(6) witness testified that the Variable Price Term explains what the term "market conditions" means.[1]

9.      I understand that other issues in this lawsuit include whether Eligo's charged commercially reasonable variable rates, whether Eligo could charge the Class Action Plaintiffs and the Class an additional monthly fee that is not referenced in the NY Terms of Service, and what would have been a commercially reasonable variable rate margin for Eligo to charge.

   **B.    Assignment**

10.     I have been asked by Counsel for the Class Action Plaintiffs to undertake an analysis to examine the following issues relevant to this case:

---

[1] Michael Sandler, 10/29/2024 30(b)(6) Dep. ("Sandler, 10/29/2024 30(b)(6)"), p. 49:15-21.

a.      The relevant fundamentals of acquiring electricity supply to serve New York retail electricity customers such as the Class Action Plaintiffs and the Class, including the conditions under which energy service companies ("ESCOs") such as Eligo procure the electricity supply they resell to their customers.

b.      How Eligo set the variable rates charged to the Class Action Plaintiffs and the Class.

c.      The gross margins that resulted from the variable rates Eligo charged.[2]

d.      Whether Eligo's variable rate-setting practices aligned with the Variable Price Term's rate-setting formula.

e.      Whether the way Eligo set the variable rate was commercially reasonable and in good faith.

f.      The methods for calculating the variable rate Eligo was contractually bound to charge under different potential legal constructions of the Variable Price Term. These methods will be used to develop damages models for the Class Action Plaintiffs' and the Class's claims if Eligo is found to have breached the Variable Price Term.

g.      Benchmarks for a reasonable variable-rate margin for Eligo to charge.

h.      The method for calculating the damages of the Class Action Plaintiffs' and the Class's claims if Eligo is found to have violated the implied covenant of good faith and fair dealing.

---

[2] In this report, I use the term "margin" to mean the percentage of price constituting profit. Margin = (P – C)/P*100%. I use the term "markup" to mean the percentage of cost added to cost, which results in price. Markup = (P-C)/C * 100%. For example, if the cost is $100 and the price is $125, the margin is 20%—($125-$100)/$125*100%, but the markup is 25%—($125-$100)/$100*100%.

i.      The method for calculating the damages of the Class Action Plaintiffs' and the Class's claims if Eligo is found to have violated the New York consumer protection laws at issue in this lawsuit.

j.      The method for calculating the damages of the Class Action Plaintiffs and the Class if Eligo is found to have been unjustly enriched.

k.      My opinions and damages models were developed by relying on (1) my expertise and experience in the energy industry and (2) some of the data and documents produced by Eligo in discovery, as well as some of the deposition testimony of Eligo's current and former employees. The list of data, documents, and depositions I considered is set forth in Exhibit 3.

### C.    Qualifications

11.     I have over 25 years of consulting and industry experience in the analysis of electric power markets in United States, Europe, and Asia. I advise clients on a variety of economic and financial issues in the energy markets. My consulting work includes all types of quantitative analyses such as valuation of physical energy assets (e.g., power plants), development and application of stochastic financial models in energy and financial markets, risk analytics and risk management strategies, pricing energy derivatives, valuation of real options in the energy industry, asset optimization, hedging strategies, demand side management, price forecasting, valuation of renewable resources, market structure issues, contract disputes, and mergers and acquisitions.

12.     Prior to consulting, I was an Associate Director of Corporate Risk Management at Duke Energy in Houston. I hold B. S. and M. Eng. Degrees in Electrical

Engineering and Computer Science from MIT where I started my energy career by developing proprietary nodal pricing algorithms on the IEEE Reliability Test System. My curriculum vitae, including a list of all publications I authored in the previous 10 years and all cases in which I testified as an expert at trial or by deposition in the previous 4 years, is attached as Exhibit 4.

> **D.**    **Summary of Expert Opinions**

13.    I have reached the following expert opinions with respect to the issues noted above:

a.  Eligo is an ESCO. It has provided electric utility services to residential retail customers in New York, including the Class Action Plaintiffs and the Class, since 2013. Eligo, like other ESCOs, purchases the power it then resells to customers from the power markets operated by the New York Independent System Operator (the "NYISO"). Eligo only provides electric supply to retail customers. It does not generate, transmit, or distribute the energy it sells. Instead, its role is one of a retail marketing intermediary. Eligo and other ESCOs simply resell the energy they buy at wholesale to customers with an added markup. For the Class Action Plaintiffs and the Class, Eligo sold electricity under both fixed- and variable-rate pricing structures.

b.  I understand that electricity transactions for both the Class Action Plaintiffs and the Class were all subject to the Variable Price Term. This term states that "all" Class variable rates *"shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."* But my review of Eligo's discovery documents, however, shows that Eligo did not set variable rates by performing a variable rate "calculate[ion] on a monthly basis" whereby the ultimate rate

changed "in response to" inputs labeled "market pricing," "transportation costs", and "other market price factors." Instead, Eligo set the Class's variable rates by using a strategy that balanced Eligo's desire to maximize its variable-rate margins while not driving off too many of these profitable variable-rate customers, as discussed more fully in Section III.B.1. This practice is inconsistent with calculating a rate that varies "in response to" the three inputs listed in the Variable Price Term. Further, by its own admission, Eligo used "factors" including undisclosed and subjective considerations such as "legislative and regulatory uncertainty" that are nowhere mentioned in the Variable Price Term.[3]

     c.  It is not surprising that Eligo, like other ESCOs, would charge some markup over its procurement costs. This covers legitimate costs of doing business and enables ESCOs to obtain a reasonable return. For Eligo, the average markup assessed on variable-rate customers based on the difference between Eligo's variable rates and the procurement costs Eligo expected to incur (this is reflected in damages Method 1):

| Year | Markup[4] |
|------|--------|
| 2018 | 99.6% |
| 2019 | 72.4% |
| 2020 | 115.8% |
| 2021 | 90.5% |

---

[3] Defs' 2nd Supp. Resps. to Pls' 1st Set of Interrogs. No. 8.

[4] The markup calculation in this table was provided by Dr. Frank Felder.

| 2022 | 43.3% |
|------|-------|
| 2023 | 93.5% |
| 2024 | 52.0% |

d.  The average variable rate markup Eligo added to its projected New York variable rate costs (on average 80.95% on a straight basis and 76.96%[5] on average on a revenue weighted basis) was much higher than Eligo's 6% target for fixed-rate margins. *See* DEF008057 (Risk Policy v.1.5.5, effective 11/1/2016), p. 13. Such high margins being assessed on variable-rate customers is not reasonably suggested by the Variable Price Term. Instead, Eligo's strategy with respect to its variable-rate business is to set rates high for those variable-rate customers that continue with Eligo service, while managing churn on those customers so that sufficient customers would stick around to continue to be charged high margins going forward. *See* paragraphs 74–75. Eligo's risks associated with variable-rate customers do not justify the high margins Eligo charged, especially when considering Eligo's target 6% fixed-rate margin. From an economics perspective, the fact that Eligo charged higher margins to its variable-rate customers compared to fixed-rate customers is not justifiable because Eligo has more risk when serving fixed-rate customers. Specifically, Eligo bears all the price risk in fixed-rate contracts while having the ability to adjust rates for variable-rate customers in the event of wholesale market fluctuations. The differences in the margins Eligo realized

---

[5] The average variable markup figures were provided by Dr. Frank Felder.

for variable rates as compared to fixed rates provides clear evidence that Eligo's variable rates were not commercially reasonable or set in good faith.

e.  I also understand that starting in 2018, consistent with its strategy of setting variable rates to maximize profit without causing excessive churn, Eligo began using a neural-network program called "GROOVE" to set New York variable rates. I understand that "GROOVE" is an acronym for "Growing Revenue Out Of Variable Experimentation." Eligo used GROOVE to maximize its variable-rate margins over a predefined period. Broadly, GROOVE had two components: (1) model training and (2) variable-rate recommendations. During the training stage, Eligo provided data to GROOVE to predict customer behavior, namely the probability of a given customer discontinuing Eligo's variable-rate service at a given variable rate. During the rate recommendation stage, GROOVE would recommend a rate for each customer to maximize Eligo's margin over the given period by balancing the expected churn that high rates would cause with the additional profits to be expected from those high rates. The section of the NY Terms of Service stating how customers' "[v]ariable price is determined" (i.e., the Variable Price Term) does not mention "growing revenue out of variable experimentation." It is not commercially reasonable for a seller like Eligo to impose a contractual pricing formula stating variable rates "shall be calculated on a monthly basis in response to" three identified inputs, only for that seller to instead seek to "grow revenue" by experimenting with variable rates, and particularly by determining how high rates can go before too many customers terminate their service. *See* Arikan, Andac, *Opportunism is in the Eye of the Beholder: Antecedents of Subjective Opportunism Judgments*, 161 Journal of Business Ethics 573, 573 (2020) (describing

improper "opportunism" as an "economic agents' proclivity to seek self-interest in a strategic manner (including the use of guile)" and "making false or empty . . . promises in the expectation that individual advantage will thereby be realized"); O. C. Ferrell, John Fraedrich & Linda Ferrell, *Business Ethics: Ethical Decision Making and Cases* 7 (8th ed., South-Western, Cengage Learning 2011) ("If profits are realized through misconduct, however, the life of the organization may be shortened."). Eligo's practice is not consistent with a promise to calculate a rate that varies "on a monthly basis in response to" the three criteria listed in the Variable Price Term.

f.  I reviewed the testimony of multiple Eligo employees that set New York variable rates which shows that Eligo had no process in place to ensure that New York variable rates were "calculated" on a "monthly basis in response to" the inputs listed in the Variable Price Term. *See* Section III.C below. I have not seen any established formula for mathematically "calculating" variable rates in accordance with the Variable Price Term, nor any Eligo documents specifically attempting to tie Eligo's variable-rate setting to the contracts the Class Action Plaintiffs and the Class entered into with Eligo.

g.  I understand that the parties to this litigation have differing views on what steps Eligo should have taken to charge a variable rate that was "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" as directed by the Variable Price Term. Counsel for the Class Action Plaintiffs have asked me to assume that the legal operation of the Variable Price Term will be determined as one of three different readings. Accordingly, I have developed a method for calculating the variable rates Eligo should have charged the Class Action Plaintiffs and the Class for each of these three different readings. With very few

exceptions, the variable rates Eligo charged the Class Action Plaintiffs were higher than any of the corresponding rates I calculated under each of the three different readings. Each method (called Methods 1 to 3 in this report) can serve as a measure of damages if Eligo is found to have breached the Variable Price Term. The variation in methodology depends on the ultimate determination of the Variable Price Term's legal operation. If it is determined that other or additional inputs are needed to conform any given method to the Variable Price Term's legal operation, I can update the relevant method to reflect any additional directives.

h.   Method 1 calculates the variable contract rate by determining and summing up Eligo's expected wholesale procurement costs and other costs of goods sold for any given month and then applying one of two possible reasonable adders (expressed as either a margin or a markup). I recommend this method because it is based on Eligo's own anticipated costs. It is also a conservative method because I effectively take Eligo's costs as given, without opining on the validity or appropriateness of specific costs and simply allowing for a reasonable margin or markup on top of Eligo's cost estimates.

i.   Method 2 calculates the variable contract rate by determining and summing up the wholesale market costs of the energy supply Eligo provided in any given month and other costs of goods sold and then applying one of two possible reasonable adders (expressed as either a markup or a margin). While not the preferred method, this method has the benefit of being objectively determined without reference to Eligo's underlying costs (which, ex ante, are unknown to Eligo's customers).

j.    I was also instructed that Methods 1 and 2 should include a reasonable markup/margin input on top of procurement costs. 5% represents the best comparator markup to use for setting a variable rate in accordance with the Variable Price Term. Nonetheless, it would not be commercially or economically unreasonable for the ultimate fact finder to adopt 6% as a reasonable fixed-margin input for Methods 1 and 2. When translated to a markup, the 6% margin figure can be expressed as a 6.38% markup. These commercially reasonable quantities contrast to the average 80.95% markup Eligo used for its New York variable rates during the Class Period. Expert Report of Frank Felder, Ph.d. at paragraph 82. Eligo's average markup is 12.68 times the target 6.38% markup Eligo used for its riskier fixed-rate plans.

k.    Method 3 calculates the variable contract rate by determining and summing up the prevailing retail market price of the electricity Eligo sold in any given month in any given New York service territory. Method 3 does not add a markup or margin to the prevailing retail market price because Eligo's margin would be determined by its ability to achieve lower procurement costs and other costs of goods sold as compared to its competitors, especially its main competitor—the incumbent utility.

l.    Method 4 provides a method for calculating damages for the Class Action Plaintiffs' and the Class based on the utility's contemporaneous supply rate. In New York, this rate is often referred to as the "Price to Compare." This method is based on the theory that no reasonable variable-rate customer would knowingly pay Eligo's variable rates if they were adequately informed about Eligo's practices. Under this scenario, it is assumed that the reasonable customer would have instead purchased at the default utility service rate or at a similar pass-through rate.

m.  Method 5 provides a method for calculating the statutory damages available to the Class Action Plaintiffs and the Class under New York consumer protection law.

n.  Method 6 provides a method for calculating the damages available to the Class Action Plaintiffs and the Class under their unjust enrichment theory.

o.  Method 7 calculates damages for an unauthorized monthly fee, nowhere mentioned in the NY Terms of Service, that Eligo also charged the Class Action Plaintiffs and the Class. This method sums the total of monthly fees charged to the Class Action Plaintiffs and the Class.

p.  Method 8 provides a method for calculating the statutory damages under New York consumer protection law related to Eligo's monthly fees.

q.  For the Class Action Plaintiffs and the Class, Eligo produced transaction level data for their purchases of variable-rate electricity for spans the period of February 2018 through February 2024. To the extent my analysis depends on this data, that analysis can be easily updated if and when additional data is produced.

r.  My analysis relies on the data requested from and produced by Eligo. I assume this data is accurate and validated by Eligo. It is not in my scope to validate the data Eligo provided, including its accuracy. My analysis also relies on publicly available data from NYISO and New York utilities collected and compiled by Dr. Frank Felder. My analysis also relies on the Annual Electric Power Industry Reports (Form EIA-861) available from the U.S. Energy Information Administration, the New York Department of Public Services quarterly filings of ESCO rates, and the ICAP Forecast documents from NYISO.

s.  I reserve the right to revise my findings if new information becomes available.

### E.  **Compensation**

14.    Econ One is compensated at a rate of $750 per hour of my time. Econ One's staff supporting this engagement are billed at their standard hourly rates.

### F.  **Report Organization**

15.    The substantive remainder of the report is organized as follows:

16.    Section II provides general background on New York's deregulated energy supply market, including how New York ESCOs like Eligo procure the power they resell to New York customers.

17.    Section III details Eligo's rate-setting practices.

18.    Section IV sets forth Eligo's Terms of Service and specifically the Variable Price Term. This section also discusses the three inputs listed in the Variable Price Term.

19.    Section V discusses methods of damages calculations and provides calculations for the Class Action Plaintiffs.

## II.  NEW YORK'S DEREGULATED ENERGY SUPPLY MARKET

### A.  **NYISO Markets**

20.    NYISO, under its tariff approved by the Federal Energy Regulatory Commission, operates New York's electricity markets for energy, ancillary reserves, and capacity. The following paragraphs outline the operation of these NYISO markets.[6] It is

---

[6] There are also non-NYISO markets for hedges in energy and capacity that are used as financial swap type transactions. These transactions are typically structured as swaps on NYISO spot prices.

important to first note that the cost of energy is by far the largest component of the total wholesale load commitment for an ESCO, followed by the capacity cost, ancillary services, uplift and NYISO operations.[7] As part of the settlement process, NYISO allocates all these costs to individual incumbent utilities (such as Con Edison in New York) or to ESCOs like Eligo. These costs are broken down by company and region in very detailed electronic billing statements prepared by NYISO and provided to market participants.

### 1. Energy market

21.     The NYISO procures power from generators by using digital auction structures to meet varying loads. Underlying these auctions are markets which reflect the peculiar nature of electricity (it cannot be efficiently stored on a large scale, so power must be generated as it is needed) and the fact that the transmission grid has constraints on flows that must be acknowledged in operations and efficient pricing. Furthermore, NYISO uses location-based marginal prices ("LBMPs") for pricing electricity. In simple terms, LBMPs reflect, for any time period, the marginal cost of providing electricity (i.e., the cost of the most expensive resource being used at that time), the marginal impact of transmission constraints (also known as "congestion"), and marginal losses on the grid.

22.     There is also a temporal component to running the power system. NYISO must ensure ahead of time that sufficient resources are committed to meet the expected demand for the next day because some generating resources may need several hours

---

[7] Potomac Economics, *2024 State of the Market Report for the New York ISO Markets*, at 3 (May 14, 2025), https://www.potomaceconomics.com/wp-content/uploads/2025/05/NYISO-2024-SOM-Full-Report_5-14-2025-final.pdf

of advance notice to start producing electricity. This is the reason for the day-ahead auction, which commits generating resources to certain levels of power generation and results in day-ahead market ("DAM") prices.

23.     In real time, however, circumstances can change. Demand may vary, some resources may be unexpectedly unavailable, etc. NYISO therefore needs flexibility to bring additional generators online or to ramp up or down previously committed resources to meet actual demand.

24.     This flexibility is accomplished via the real-time market ("RTM"). A retail supplier will often buy a large portion of its load in the DAM (paying the DAM price), with other remaining and balancing volumes cleared at the RTM prices. On average, DAM and RTM prices are quite similar, especially over time.

25.     The NYISO system is composed of nodes that represent generating resources or load centers. These nodes are interconnected by transmission lines and are aggregated into zones. NYISO is divided into the following eleven zones: West (Zone A), Genesee (Zone B), Central (Zone C), North (Zone D), Mohawk Valley (Zone E), Capital (Zone F), Hudson Valley (Zone G), Millwood (Zone H), Dunwoodie (Zone I), NYC (Zone J), and Long Island (Zone K).

26.     Generators are paid the nodal DAM or RTM price for all the electricity delivered at their respective nodes. Wholesale market participants serving demand pay the zonal DAM or RTM price at their respective load zones. The zonal price is the load-weighted average price of the nodal prices (i.e., Locational Based Marginal Prices or LBMPs) in that zone. There are both day-ahead and real-time zonal prices.

27.    The energy markets are open to all registered electricity sellers and buyers. This includes ESCOs like Eligo, as well as incumbent utilities like Con Edison, Rochester Gas & Electric, and New York State Electric and Gas. NYISO's electricity market allows all buyers to buy power at the same rates and delivery terms.

### 2.    Capacity market

28.    It can take several years to build incremental power generation capacity. Therefore, if system operators want to ensure that there is enough capacity installed to meet future expected load growth, a market mechanism other than the DAM and the RTM (which are both short-term markets) can be used. NYISO accomplishes this through its Installed Capacity ("ICAP") market.[8]  NYISO holds capacity auctions for the summer and winter seasons ahead of the delivery term to ensure the availability of sufficient qualified resources to satisfy future needs and to allow enough time to construct additional capacity resources. Following these seasonal auctions, NYISO also holds monthly and spot auctions to ensure requirements are satisfied as more information about capacity needs becomes available. After clearing each auction, NYISO awards chosen capacity resources with capacity payments for their commitment to be available when needed. These capacity costs are allocated to various load serving entities based on their capacity shares.

### 3.    Ancillary services market

29.    To maintain the balance of supply and demand and ensure reliability, NYISO and other markets use specific products and services such as operating

---

[8] NYISO, *Installed Capacity Market*, https://www.nyiso.com/installed-capacity-market.

reserves and regulation.[9] NYISO pays for the resources that provide these services, and the corresponding costs are allocated to electric utilities and ESCOs. These ancillary services costs are typically only a small portion of total electricity procurement costs.

**B.    Supplying Retail Electricity To New York Customers**

30.    Residential and small commercial customers in New York and other states can choose their electricity supplier; New York customers do not have to buy their electricity supply from their local utility at its standard supply rate. But even if customers switch to an ESCO like Eligo, there is no difference in the electricity delivered to the customer's meter and their power continues to be delivered by the local incumbent utility. In New York, the local utility also issues the customer's bills and collect payment, for both ESCO customers and customers who stay with the utility. This means that even if a customer switches to an ESCO, they still only receive one bill from the utility. The utility also handles collections on unpaid bills and terminating a customer's service (including an ESCO customer) if they do not pay their bill. Unlike the default New York utility rates, which serve as pass throughs of the utility's procurements costs and supply-related overhead, ESCOs can offer different rate plans, and at varying prices. How an ESCO's rates are determined is a matter of contract between the ESCO and its customer.

**1.    The variable rates charged by New York utilities**

31.    Eligo sold electricity to customers of five different New York utilities. Those utilities are:

---

[9] NYISO, *Ancillary Services*, https://www.nyiso.com/ancillary-services.

a.   Con Edison

b.   Niagara Mohawk

c.   New York State Electric and Gas

d.   Orange and Rockland

e.   Rochester Gas & Electric

32.   In New York, the local utility charges a variable supply rate that is a pass through of the utility's underlying supply costs and additional supply-related overhead. As New York State Electric and Gas's "Understanding Your Bill" website notes, "*[w]e can buy energy on your behalf, passing the cost directly to you without markup*."[10]

### 2.   Components of procurement costs for ESCOs

33.   ESCOs like Eligo must procure power from NYISO or entities that re-sell power bought from NYISO. This involves purchases of energy, capacity, and ancillary services as described in Section II.A above. In addition, some states require suppliers (whether they be utilities charging standard service rates or ESCOs charging prices set by private contracts) to meet renewable energy standards. New York's Clean Energy Standard ("CES") requires all load serving entities (including ESCOs like Eligo) to procure renewable energy certificates ("RECs") and zero-emissions credits ("ZECs") to meet their obligations under the CES based on their amount of statewide load. RECs and ZECs are merely offsets and do not change the character of the energy delivered to the customer.

---

[10] NYSEG, *Understand Your Bill*, https://www.nyseg.com/understand-your-bill.

34.     As discussed below, while the Variable Price Term was the same for the Class Action Plaintiffs and all members of the Class, over time Eligo committed to purchasing increasing levels of RECs.

35.     ESCOs may be liable to pay for distribution level losses (in the local utility system) which typically set as a percentage of energy usage.

36.     ESCOs like Eligo that lack the credit to purchase wholesale electricity directly from the wholesale market will enter into Power Purchase Agreements ("PPAs") with third parties to provide that credit. In return the ESCO pays a "sleeve" charge expressed as a dollar per kilowatt amount added to the supply rate the ESCO otherwise would pay for wholesale electricity from the wholesale market.

37.     In New York, utilities offer Purchase of Receivables ("POR") programs to retail suppliers allowing them only to sell electricity to customers while the utility continues to do the billing and collecting on the ESCO's behalf (i.e., "consolidated billing"). One benefit of POR program to the ESCO is that it gets paid promptly by the utility regardless of whether the customer ultimately pays. This is implemented in practice by having the utilities purchase receivables (the right to collect customer bills) from ESCOs at a discount while charging the ESCOs POR fees, typically expressed as a percentage of the receivable to cover bad debt risk and administrative costs.

38.     Finally, there may also be other miscellaneous fees and costs, although these are typically small.

39.     In summary, the following categories of costs contribute to Eligo's cost to procure the electricity it resells to New York customers:

       a.     ISO energy procurement costs

    b.    Capacity costs

    c.    Ancillary services costs

    d.    REC costs

    e.    Costs associated with distribution and transmission losses

    f.    Sleeve costs

    g.    POR fees

**C.    <u>Fixed-Rate and Variable-Rate Products</u>**

40.    Eligo sells electricity at both a fixed rate for a set period of time and at a variable rate that can change each month. Although the underlying commodity being sold to customers (i.e., electricity) is the exact same, there are some key differences between fixed- and variable-rate pricing. Most importantly, ESCOs have the option to adjust their variable rates monthly as procurement costs change. The same is not true for fixed rates. Eligo and other ESCOs carry lower financial risk serving variable-rate customers compared to fixed-rate customers. This is because ESCOs are contractually obliged to charge their fixed-rate customers a fixed unit cost for the entire duration of the fixed-rate term. This increases the ESCO's exposure to procurement cost price risk.

41.    ESCOs tend to buy electricity on forward basis to "hedge" their energy price risk. While specific hedging strategies vary across retailers, most ESCOs including Eligo, buy financial hedges and procure energy in the day-ahead market. From the Eligo materials I have reviewed, it appears that Eligo bought energy for all their customers without separating costs for variable- and fixed-rate customers, and thus sharing some

of the costs, that may not necessarily be applicable to variable-rate customers.[11] This bundling of energy slated for fixed- and variable-rate customers is not commercially reasonable, because the risk level associated with variable-rate customers is different compared to the risk level associated with fixed-rate customers.

42.    In fact, engaging in long-term forward hedging is unnecessary when buying energy for variable-rate customers for several reasons. First, ESCOs have enough operating flexibility to adjust their pricing monthly as their procurement costs change and as they are contractually obligated to do. Second, there is less price uncertainty buying short-term than long-term. Third, by procuring energy for their variable-rate customers in the day-ahead market, rather than on forward basis, ESCOs can also better control their volumetric risks as they have a much better sense of the amount of energy they need to procure a month out compared to the lead time on a fixed-rate product, which can be a year or more out.

43.    From a commercial and economic perspective, longer term hedging is an inefficient and expensive risk management strategy for procuring energy for variable-rate customers alone. If ESCOs buy energy for both their fixed- and variable-rate customers, without separating their hedging costs between the two types of customers, they are effectively subsidizing their fixed-rate customers at the expense of variable-rate customers. This is true even if ESCOs are charging the same margins for variable- and fixed-rate customers.

---

[11] *See* Scott Glotzbach Dep. ("Glotzbach"), p. 74:14–75:08; *see also* Brian Feely Dep. ("Feely"), p. 44:08–16, 77:07–18, 84:01–07 (Eligo relied on same sources to set rates for fixed- and variable-rate customers); Michael Sandler, 9/17/2024 30(b)(6) Dep. ("Sandler, 9/17/2025 30(b)(6)"), p. 115:14–19 (same).

44.     It is even more economically unreasonable for ESCOs to charge a higher margin on lower-risk variable-rate products than the corresponding, higher-risk fixed-rate products. Charging higher margins on lower risk variable-rate products effectively allows ESCOs to exploit variable-rate customers. As discussed below, in April 2021, the New York Public Service Commission ("NYPSC") began requiring that ESCO's fixed-rate markups be set a 5% to account for the fact that fixed-rate plans merely reflect financial arrangements.

45.     Both variable- and fixed-rate products were profitable for Eligo. Feely, p. 49:19–50:7 (agreeing that Eligo's fixed-rate customers were a profitable business line). Indeed, Eligo's risk policy mandates that fixed rates be priced such that a profitable margin of at least 6% is guaranteed. *See* DEF008057 (Risk Policy v.1.5.5, effective 11/1/2016), p. 13.

### D.     The Results of Eligo's Financial Hedges Are Not "Market Prices" Or "Other Market Price Factors."

46.     Based on my limited review of the hedging materials produced by Eligo, I was not able to find any evidence that Eligo included expenses associated with their hedging transactions in their variable-rate calculations. It appears that Eligo did not purchase physical forward contracts for procuring energy for future periods. Instead, Eligo entered into financial hedges to mitigate price risk. While Eligo sometimes made money on its financial hedges, I was not able to find any evidence that Eligo reduced their variable rates to account for those profits. Regardless, it appears that the hedging

costs Eligo incurred were negligible, and if so, accounting for them would not materially change any of my conclusions.[12]

47.    The evidence shows that Eligo hedged its expected load in New York with financial swaps; it did not purchase physical commodities futures. *See* Glotzbach, p. 37:14–42:19; DEF062894, p. 7; DEF089734, p. 12 ("Can only trade financial contracts in NYISO, not physical."); DEF089900, p. 2. Eligo's hedging strategy was designed to "lock in margin" on "high margin variable and short-term fixed contracts." DEF063942, p. 10; *see also id.* at 2 ("The **most important** goal of baseload hedging is to protect future gross margin by reducing the future energy cost variability." (emphasis in original)).

48.    Eligo also did not use its hedging expenses when setting New York variable rates. *See* Glotzbach, p. 112:24–113:04. Eligo employees responsible for setting fixed and variable rates during the Class Period testified that they relied on cost data from the POWWR models—which does not contain information about Eligo's hedging portfolio—to set rates. *Id.* at p. 16:18–20:07 (discussing responsibility for pricing fixed-rate agreements using rates generated by POWWR models); *see also id.* at p. 135:02–136:21 (discussing responsibility for pricing fixed-rate agreements); *id.* at p. 253:19–254:13, 258:08–259:14 (POWWR model outputs do not reflect hedging expenses); Feely, p. 75:02–07 (Eligo used cost estimates in POWWR models for fixed

---

[12] For example, Eligo estimated its New York hedging losses in July 2017 to be only $7,258. *See* DEF036940, p. 7; *see also id.* (estimating New York hedging losses of $45,117 in August 2017); DEF017209, p. 1 (estimating New York hedging losses of $19,461 in November 2021).

and variable rates); *id.* at p. 77:14–18 (POWWR models provided "Eligo an estimate of all of its costs to procure electricity at some point in the future").[13]

49.    Likewise, Eligo did not treat hedging as a cost for purposes of calculating its net income from electricity sales. *See, e.g.*, DEF042867, p. 5 (2017Q4 Board Meeting); ("Unrealized hedge P&L gain excluded from operating results because it was not indicative of true performance."); DEF010447, p. 12 (characterizing "unrealized hedge gain / (loss)" as "financing costs" and excluding from net income statement); DEF078479, p. 5 (excluding "unrealized losses on M-to-M Hedges" from net income); DEF064434, p. 16 (financials in 2022 presentation accounting for "Mark-to-Market Gain/(Loss) on Hedges" under "Other Income," not "COGS").

50.    Eligo's hedging sometimes generated meaningful profits,[14] but it appears that those gains were not shared with its customers. For example, in January 2022, Eligo's hedges in New York generated a profit of $559,898. *See* DEF085690, p. 2. Likewise, Eligo profited on its hedges in all but two of the previous 12 months— including a $4.3M profit in February 2021—returning a net total of $8.1M. *See* DEF085690, p. 3. But there is no indication that Eligo's customers benefited from decreased rates as a result. Likewise, in April 2022, Eligo unwound hedge positions

---

[13] *See also, e.g.*, DEF036427 p. 2–7 (considering costs for: electricity price, load profile, capacity, transmission, ancillaries, line losses, POR rates, RECs); DEF062894, p. 11 (listing same as "variables in pricing"); DEF042819, p. 7 (cost determined by electricity price, load profile, capacity, transmission, ancillaries).

[14] *See, e.g.*, DEF006082, p. 2 (reporting $163,915 profit from New York hedges in July 2022); *id.* at 3 (reporting $5,535,283 profit from Eligo's hedges over previous 12 months); DEF057188, p. 23 ("Hedging profitable."); *id.* at 20 (reporting $120,000 profit from hedges in April 2018), *id.* at 21 ("May [2018] hedges profitably [sic] by $85k."), *id.* at 23 ("October [2018] trades made a profit of $120,000.").

when they were well in the money, generating a return of approximately $6.5M. *See* DEF062026 & DEF006275. Eligo did not pass this onto to its customers; instead treating it as a "windfall" for the company that "generat[ed] badly needed cash" and bolstered its financial statements at a time Eligo was trying to close a significant transaction. *See id.*; *see also* DEF040622, p. 5.

**E.    The NYPSC Has Determined That ESCO Variable-Rate Pricing Practices Are Unjustified**

51.    Eligo's Variable Price Term obscured its bad faith pricing. Retail customers cannot know ex ante the numerical values of the inputs for Eligo's "market pricing, transportation costs, and other market price factors," nor is there any way for customers to check Eligo's "calculations" to determine whether Eligo properly calculated its customer rates.

52.    In economic terms, the relationship between an ESCO like Eligo and its customers is characterized as one of information asymmetry. In this scenario, one party to the transaction (Eligo) has better information than the other (customers such as the Class Action Plaintiffs and the Class). When there is substantial information asymmetry, efficient customer choices are made increasingly more difficult and the seller's opportunities to exploit the buyer increase.

53.    This exploitation scenario is well documented when it comes to ESCOs and variable rates in New York. For example, the NYPSC conducted a detailed investigation into ESCO practices and developed an extensive record. That record consisted of "initial testimony, rebuttal testimony, cross-examination testimony and

exhibits, initial briefs, reply briefs, and public comments."[15] The NYPSC also held an evidentiary hearing spanning November 29, 2017 through December 12, 2017.[16] This hearing was overseen by two administrative law judges.[17] The hearing transcript consists of "4,233 pages of testimony and cross-examination of 22 witnesses and panels of witnesses."[18] Based on this lengthy record, on December 12, 2019, the NYPSC issued its Reset Order. In relevant part, the Reset Order states:

> The record establishes that many of the concerns raised by the non-ESCO parties about the current operation of the retail access market are warranted. The Commission shares those concerns, particularly regarding the lack of easily accessible and comprehensible product and pricing information and, the number of complaints alleging that bad-acting ESCOs were misleading and exploiting customers. Thus, we conclude that significant changes to provisions governing retail access are needed to provide adequate protections for New York customers. If market participants are unwilling, or unable, to provide material benefits to customers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.[19]

54.    The NYPSC also observed that:

> [A]fter the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above

---

[15] "Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process," at 3 (NYPSC December 12, 2019) ("Reset Order").

[16] *Id.* at 3–4.

[17] *Id.* at 4.

[18] *Id.*

[19] *Id.* at 12.

utility rates were generally – or in any specific instances – justified.[20]

55.     Regarding ESCO variable rates specifically, the NYPSC concluded those variable rates offered no demonstrable benefit over default utility service, stating in part:

> [V]ariable-rate, commodity-only service is obtainable from the utility, most often at a lower price than from an ESCO and without any termination fee. We find that there is no demonstrated customer benefit to allowing ESCOs to offer this service to mass-market customers.[21]

56.     Because ESCOs offered so little value and their informational and customer abuse issues were significant, the NYPSC determined that variable-rate products like Eligo's should be banned. Under the Reset Order, new variable-rate plans were required to offer guaranteed savings compared to the utility's variable rates or comply with increased renewable energy requirements.[22] The NYPSC ordered:

> [E]nergy service companies (ESCOs) shall enroll new residential or small non-residential customers (mass-market customers) or renew existing mass-market customer contracts for gas and/or electric service only if at least one of the following conditions is met: (1) enrollment includes a guaranteed savings over the utility price, as reconciled on an annual basis; . . .; (3) enrollment is for a renewably sourced electric commodity product that (a) has a renewable mix that is at least 50% greater than the ESCO's current Renewable Energy Standard (RES) obligation, (b) the ESCO complies with the RES locational and delivery requirements when procuring Renewable Energy Credits (RECs) or entering into bilateral contracts for renewable commodity supply, and (3) there is transparency of information and disclosures provided

---

[20] *Id.* at 30.

[21] *Id.* at 37.

[22] *Id.* at 108.

to the customer with respect to pricing and commodity sourcing.[23]

57.    With respect to ESCO fixed-rate pricing, the NYPSC found as follows:

[T]he record in this case establishes that customers who choose fixed-rate ESCO products frequently pay a significant premium for the product. Fixed-rate products cannot provide meaningful benefits to customers unless they are reasonably priced.[24]

58.    The NYPSC further found that although ESCOs' then-fixed-rate practices typically did not provide meaningful benefits to customers: *"[t]he information in the record suggests that most ESCOs could continue to offer fixed-rate products if a reasonable price cap were adopted."*[25]

59.    The NYPSC then found that *"because a typical risk premium in financial markets ranges between 3.5% to 5.5% . . . a reasonable price premium associated with fixed-rate ESCO products would be 5%."*[26] The NYPSC ordered that New York ESCOs could only offer fixed-rate products that were *"limited to a price no greater than the trailing 12-month average utility supply rate plus a premium of no more than 5%."*[27] The NYPSC capped the rates that could be charged under fixed-rate plans for customer

---

[23] *Id.*

[24] *Id.* at 64.

[25] *Id.* at 67.

[26] *Id.* at 67. Offering a longer-term fixed-rate product requires some commercial party to bear this risk, which is not free. This is common in both energy commodity markets (like electricity and gas) and financial products (such as loans and mortgages) someone has to be compensated to take that price risk. In this proceeding, I understand that NYPSC set the 5% reasonable fixed-rate markup cap based on analogous risk premia for financial products, where similarly a commercial party was absorbing the fixed-rate risk.

[27] *Id.*

protection reasons to what it considered a reasonable price premium or markup of 5% on top of the utility supply rate.

60.    The NYPSC's findings provide objective criteria and analysis of ESCO variable- and fixed-rate pricing in New York. As discussed in more detail below, these criteria inform my opinions about the reasonableness of any proposed markup over costs that may be applied in this case.

## III.    ELIGO'S VARIABLE-RATE PRICING PRACTICES

### A.    Eligo Fixed-Rate and Variable-Rate Pricing

61.    Eligo markets to residential customers by offering low fixed rates for a short period of time—typically 1–6 months—after which Eligo charges customers variable rates that it sets on a monthly basis. *See* DEF010143; *see also, e.g.*, DEF000127, p. 2; DEF093223, p. 3. Eligo's short-term fixed rates function as teaser rates used to obtain customers; Eligo expects that later imposing higher variable rates will "result in company profits over the long-term." Andrew LaPointe Dep. ("LaPointe"), p. 59:08–10 *("[O]ur variable pricing strategy obviously produces higher profits than the fixed contracts.")*; Feely, p. 49:19–22, 72:06–11; DEF010153, p. 17. Eligo employees described the fixed rates as "teaser rates." DEF010143. The vast majority of Eligo's profits are derived from variable-rate customers. *See* DEF001835 (noting that the variable-rate-setting process "governs 2/3 of [Eligo's] gross margin"); DEF034510.

### B.    Eligo's General Variable-Rate Pricing Principles

62.    Eligo consistently set variable rates based on a profit maximization strategy, largely untethered to changes to its electricity procurement costs and other costs of goods sold. Sandler, 10/29/2024 30(b)(6), p. 105:17–106:08; Yuri Ashuev Dep. ("Ashuev"), p. 159:14–16. Contrary to the NY Terms of Service, Eligo's variable rates

are not calculated "on a monthly basis in response to market pricing, transportation

costs, and other market price factors." *See* Feely, p. 56:01–10; DEF018536;

DEF000127, p. 2; DEF093223, p. 3. Indeed, Eligo's variable-rate pricing practices have

remained the same despite later changes to the Variable Price Term, and the individuals

responsible for setting variable rates were unaware of the contracts' pricing terms. *See*

LaPointe, p. 33:25–36:25; Feely, p. 54:12–23; Brandon Carr Dep. ("Carr"), p. 60:10–22,

131:11–132:02.

### 1.    Eligo's Overall Variable-Rate Pricing Strategy

63.    Eligo's management set the company's variable-rate pricing strategy,

which dictated that variable rates be set at the price Eligo projected would extract the

most profit without causing excessive customer attrition or churn. *See* Ken Pedotto Dep.

("Pedotto"), p. 120:16–124:15; *see also* Sandler, 10/29/2024 30(b)(6), p. 29:03–31:08;

Sandler, 9/17/2025 30(b)(6), p. 44:18–45:19, 48:09–23.

64.    Consistent with that policy, Eligo's management directed that customers'

rates be increased gradually after they transition from fixed rates to avoid excessive

churn and regulatory action. Feely, p. 34:21–35:04; DEF000935, p. 10. As Eligo's Chief

Information Officer testified: *"One of the rules around the setting of the rates wanted to*

*make sure that the customer did not see a sudden large spike in their bill."* Sandler

10/29/2024 30(b)(6), p. 29:03–31:08; *see also* Ashuev, p. 126:06–129:04, 167:06–23,

176:18–24 (discussing Eligo's "policy" for setting maximum permissible rate increase

per month); DEF044161. For example, once customers' fixed-rate term expired, Eligo

usually did not set the initial variable rate above the initial fixed rate, which Eligo

employees described as "teaser rates." DEF010143; *see also* DEF000935, p. 10.

65.    Eligo's pricing strategy also included using rate caps (the maximum variable rate that could be charged in each utility service area) that it adjusted periodically. *See* Ashuev, p. 47:01–04, 79:02–12, 85:01–86:04; Sandler 10/29/2024 30(b)(6), p. 33:15–35:10; DEF000935, p. 3.[28] But the purpose of the caps, which are unreasonably high, was not to ensure that the rate would be calculated based on "market pricing, transportation costs, and other market price factors." Instead, the rate caps were put in place to ensure that customer attrition would not be too high and to avoid regulatory scrutiny. Feely, p. 34:21–35:04; DEF000935, p. 10. Eligo's rate cap policy is also a one-way street, allowing the company to gradually increase prices, avoiding attrition from bill shock; it does not allow for rate cap decreases. As Eligo concluded, in service zones without reliable competitor information like New York, *"the new rate caps stay the same or increase by no more than 15% from the current rate to maintain the current profit margin."* DEF000935, p. 9.[29]

66.    Eligo's protocol to set rate caps reflected management's policy that the company did not want to:

1.    Earn less margin on average

2.    Lower its current rates in any zone

3.    Impose price increases large enough to cause excess attrition or regulatory action

---

[28] Eligo's management also imposed a rate floor in the form of a minimum variable rate. This floor was generally calculated as a fixed amount below the maximum rate. *See* Ashuev, p. 85:01–86:04.

[29] The rate increase limitation of 15% in Eligo's rate cap protocol presentation was an "arbitrary number" that "seemed conservative." DEF000935, p. 10; *see also id.* at 7 (noting 15% figure "was an arbitrary number").

DEF000935, p. 3.

67.     In New York, Eligo's rate caps are set at the price required to achieve *at least* the average margin projected from all variable-rate accounts from the previous billing cycle. *See* DEF000935, p. 3–10; DEF000903; Ashuev, p. 91:21–93:19, 112:07–16, 152:03–153:13; LaPointe, p. 69:12–78:04, 80:07–81:09.[30] To set the rate caps, Eligo first determined what rate cap was needed to achieve the same margin from the prior month which Eligo described as the "First Draft Rate."[31] Projected costs were supplied by a third party called POWWR, which offers pricing, forecasting, load analytics, and reporting and is well recognized in the industry.[32]

68.     If the First Draft Rate was lower than the existing rate cap, that indicated that Eligo could obtain the same margin as the prior month at a lower rate in some utility service areas (e.g., in markets with decreasing costs). But Eligo did not reduce rate caps even when costs went down because doing so would violate the protocol's assumption that current rates should not decrease. In those circumstances, Eligo increased the First Draft Rate to be equal to the existing rate cap, which it described as the "Second Draft Rate." DEF000935, p. 5.

69.     Eligo also limits rate cap increases to below whatever Eligo's management determined was likely to cause excess churn or lead to regulatory scrutiny. DEF000935,

---

[30] Eligo does not consider competitor pricing in New York. *See* DEF00935, p. 4 (stating that competitor pricing was only considered in six markets, based in Pennsylvania and Illinois).

[31] DEF000903; DEF000935; Ashuev, p. 91:21–93:19.

[32] Acquisition International, *POWWR, Sustainable Energy CFO of the Year 2024 (Europe): Maarten Juch*, https://www.acquisition-international.com/winners/powwr/.

p. 7–10. Eligo depicted the rate cap process graphically, employing an "arbitrary" assumption that a price increase of more than 15% would violate the company's pricing rules:



DEF000935, p. 8; *see also id*. at 7 (noting 15% figure "was an arbitrary number").

### 2.    Eligo's Forecasted Costs

70.    Eligo's Risk Policy contains a "Retail Pricing Policy Rules and Procedures" section that has remained largely unchanged during the period relevant to this litigation. The Retail Pricing Policy provided that: "Retail prices offered to customers shall cover all direct costs associated with fulfillment, and provide for a gross margin to cover selling, general and administrative expenses, and profits." DEF008057, p. 13 (Risk Policy v.1.5.5, effective 11/1/2016); *see also, e.g.*, DEF007921, p. 13 (Risk Policy v. 1.6, effective 6/1/2017); DEF007559, p. 11  (Risk Policy v.2.3, effective 4/10/2023).

71.    Eligo calculated these projected costs based on pricing model spreadsheets provided by POWWR. Sandler, 10/29/24 30(b)(6), p. 100:05–23, 150:05–24; DEF007559, p. 22 (same).[33] POWWR's pricing model spreadsheets contain the

---

[33] Previous versions of the Risk Policy identify the source of the pricing model spreadsheet using the name of POWWR's predecessor, "ESCO Advisors." *See*

forecasted figures that Eligo management used to set rate caps, fixed rates, and variable rates. *See* Glotzbach, p. 155:15–18, 176:20–180:06; LaPointe, p. 117:02–24; Feely, p. 44:13–16, 60:09–61:06, 75:02–77:18, 83:18–84:07; Sandler, 10/29/2024 30(b)(6), p. 105:17–106:08; Ashuev, p. 91:21–93:19; DEF048506, p. 10; DEF089734, p. 46.

72.    Although both fixed rates starting the following month and variable rates for the following month were set using identical cost projections, Eligo's variable rates were consistently significantly higher than its fixed rates. *See* LaPointe, p. 138:23–141:15. For example, in July 2021, Eligo's variable rate charged to customers in NYSEG ISO Zone C was two or three times higher than its fixed rate; variable rates charged to customers in RGE ISO Zone B were at least double the fixed rate. DEF090990, p. 48, 62.

C.    **Eligo's Variable-Rate Methodology**

73.    To set variable rates, Eligo took the following steps, typically on the 15th of each month. *See* DEF010143.

74.    First, Eligo identified all variable-rate customers. For customers whose fixed-rate terms ended the previous month, Eligo typically charged the same teaser rate used when the customer enrolled. *See* DEF044161; DEF000935, p. 10; DEF056566, p. 15; DEF034524, p. 1; Sandler, 10/29/2024 30(b)(6), p. 14:17–15:05. This was a pricing strategy to mitigate the risk that a customer might immediately cancel service

---

DEF008057, p. 24; DEF007921, p. 24 (same); *see also* Sandler, 10/29/24 30(b)(6), p. 100:05–23.

with Eligo if rates increased too quickly—a concept known as "bill shock." *See* Feely, p. 34:21–35:01, 46:23–47:13; DEF034103.

75.    For customers that had been on the variable rate for more than one month, Eligo followed the policy described above where it charged the rate it believes will return the maximum profit while avoiding excess churn. *See* Pedotto, p. 120:16–124:15. Variable rates were set to return excessive margins set by Eligo management for each service zone without causing excessive churn. *See* DEF036402, p. 22 ("Each Utility and ISO Zone is reviewed every two weeks to determine if variable prices are healthy and are not leading to excessive customer attrition."); Carr, p. 70:23–71:15, 91:07–19.

76.    Variable rates were often set to equal the rate caps set by Eligo management, unless that rate was too much of an increase above the previously billed rate. *See* DEF034524; DEF000239 (depicting identical figures for the rates charged based on the model [column K] and the rate cap [column M]); DEF044161. Variable rates under Eligo's pricing strategy provided for "aggressive" margin targets. DEF093021, p. 2.

77.    Over time, Eligo turned to data analytics to find the best balance between charging excessively high rates and causing too much customer attrition. Beginning in September 2017, Eligo began testing analytics on a random subset of variable-rate customers to determine how high of a margin it could impose without causing excessive churn. *See* DEF056566, p. 3; Carr, p. 63:04–64:06; Sandler, 10/29/2024 30(b)(6), p. 51:11–52:07, 90:14–92:13. Employing the same methodology to determine its forecasted cost, Eligo set rates based on a target margin of 30%–60% above costs.

DEF056566, p. 3; Sandler, 10/29/2024 30(b)(6), p. 91:09–92:03, 160:12–24. Eligo's strategy was to increase "pricing until [it] s[aw] a drop percentage occur that [it] no longer want[ed] to exceed." DEF017488; *see also id.* (Mr. Pedotto agreeing with proposed approach).

78.     Beginning in December 2017, Eligo began setting rates based on target margins calculated "on revenue, not cost" with a default target margin of 40% for all variable rates. DEF056566, p. 3; DEF000912, p. 2. In January 2018, Eligo began "creating default margins for each iso zone." DEF056566, p. 3. This pricing methodology "led to the creation of GROOVE."[34] Sandler, 10/29/2024 30(b)(6), p. 90:17–18; *see also id.* at 90:14–92:13; Carr, p. 72:06–76:25; Pedotto, p. 21:14–22:13.

79.     GROOVE is Eligo's proprietary pricing model that employed machine learning and artificial intelligence to "return[] the rates with the greatest expected profit." DEF000902. Eligo designed GROOVE to propose account-specific rates that "[b]alance maximizing profit with maximizing retention, look[ing] mainly at maximizing profit over the lifetime of the account." DEF010143. GROOVE proposed variable rates that it predicted would maximize Eligo's profit generated from each account over a predefined period—usually 12 months. DEF01014; DEF000902. GROOVE was specifically developed and implemented to increase profit collected from variable-rate customers. *See* Sandler, 10/29/2024 30(b)(6), p. 109:22–110:03; Feely, p. 45:03–08; *see also* DEF017488; DEF005009.

---

[34] "GROOVE" is an acronym that stands for "Growing Revenue Out Of Variable Experimentation." *See* DEF000902.

80.    In September and October 2018, Eligo began using GROOVE to set a subset of customers' variable rates. *See* DEF000238; DEF003251, p. 1; DEF003310, p. 2; Carr, p. 63:11–15. By January 2019, an Eligo employee responsible for GROOVE's development reported that the pricing model was being used for the majority of the company's variable-rate customers. DEF005855. As of September 30, 2021, GROOVE had proposed rates for "over 2/3 of the variable book for over a year." DEF093021, p. 2; *see also id.* ("41k of 45k total off-contract customers [91%] will be on groove as of the next batch."); Sandler, 9/17/2024 30(b)(6), p. 70:03–18.

81.    GROOVE was trained on historical data. Those inputs are not limited to Eligo's costs but instead use a variety of inputs that are not related to market prices or other market price factors. For example, GROOVE considers a customer's ZIP code, even though it pays the same wholesale costs for everyone within the same service zone that encompasses many ZIP codes, the sales channel that was used the acquire the customer, the term length of the teaser fixed rate used to enroll the customer, the number of days since the customer signed up with Eligo, the population within the customer's ZIP code, the number of days since the customer's account was automatically rolled from a fixed rate to the variable rate, and the teaser fixed rate Eligo initially charged. Carr, p. 136:03–145:20. The only reason these are GROOVE inputs is that they can be predictors of how likely a customer is to notice that Eligo is overcharging them, causing them to terminate Eligo's service. These inputs are not "market price" factors.

82.    GROOVE also incorporated the rate caps and rate growth restrictions Eligo's management set. *See* DEF000902; DEF091914, p. 2–3 (suggesting raising rate

cap inputs and re-running model to generate more profitable rates). Although GROOVE's proposed variable rates occasionally varied from rates generated without it, GROOVE rates reflected the same pricing strategy and process. *See* Feely, p. 21:23–22:04, 47:04–13; Pedotto, p. 21:23–22:13; DEF001835; DEF007250 (stating GROOVE's proposed rates can always be set at the rate cap for "a long-time variable customer").

83.    In November 2019, a member of Eligo's Risk & Data Analytics Department projected that charging variable rates proposed by GROOVE "will produce $147 of additional profit per modeled customer over their lifetime of bills, compared to them receiving traditional variable rates." DEF002982. In May 2020, that same employee estimated that GROOVE had produced "$2.78 million in additional profit" compared to the anticipated profit from accounts billed variable rates proposed by the traditional pricing model. DEF005009.

84.    Each month, members of Eligo's Risk & Data Analytics Department generated proposed variable rates to obtain the target margin set by management based on the forecasted costs. Sandler, 9/17/2024 30(b)(6), p. 45:20–48:02, 49:04–15. The proposed variable rates generated by the traditional pricing model and GROOVE were then merged into a single spreadsheet and sent to Eligo management. *See* Feely, p. 14:17–17:01; DEF010130, p. 1–2; *see also* DEF016210 & DEF016211 (proposing variable rates generated under both pricing models); DEF002993 (same); Carr, p. 175:23–176:14.

85.    Eligo's management reviewed the proposed rates to ensure that they were consistent with the company's margin and churn strategy—for example, confirming

rates were within the rate caps set for each service zone and that no proposed rate presented a significant increase above the previous month's rate. Feely, p. 14:17–17:01, 24:15–28:23; Ashuev, p. 77:08–82:10, 106:07–13; LaPointe, p. 43:02–11; DEF010143. Once approved, the variable rates were uploaded to Eligo's billing system and transmitted to the utility. *See* Feely, p. 24:15–26:04; DEF010130, p. 3; DEF010143.

86.    Eligo admits that it made no effort to ensure that its variable rates were set according to the Variable Price Term in the NY Terms of Service. In response to a question about what Eligo did to ensure its variable rates complied with the Variable Price Term, Mr. LaPointe testified that Eligo's Compliance, Legal, Analytics, and Business Departments met "with the software developers whenever there's a change in anything that we're doing." LaPointe, p. 22:02–23:07; 33:20–34:10. But the two employees responsible for Eligo's rate-setting software programs admitted that they never considered the Variable Price Term. Mr. Feely, former VP of Risk testified that he never considered customers' contract terms when setting rates and didn't know anything about the contract terms. Feely, p. 54:12–22 ("Q. Do you know what the variable rate pricing term was in those contracts? A. I wouldn't know the details of customer contracts. Q. Okay. So it stands to reason then you didn't consider those -- you didn't consider the pricing terms of those customer contracts when you were setting variable rates; is that fair to say? A. I wasn't considering any pricing in the contract while setting variable rates."). Mr. Carr, former Director of Analytics and Data Science, testified that he had no knowledge of customers' contract terms, that the terms were not inputs to GROOVE, and that he did not program GROOVE to set rates in compliance with the Pricing Term. Carr., p. 131:15–132:2 ("Did you program that GROOVE model to

ensure that variable rates were set in compliance with variable rate pricing terms in customer contracts? A. No. It was not my responsibility to make sure that the GROOVE workflow complied with contract language. Q. Do you know what the variable rate pricing terms were in customer contracts? A. No. Q. Okay. Was that customer contract language an input in GROOVE?  A. No.").

### D.    Eligo's Rate-Setting Methodology Illustrated For The Class Action Plaintiffs

87.     Bay way of example, in March 2018, Eligo forecast that it would incur a projected cost of $0.0403973/kWh to supply Plaintiff Brous with variable-rate electricity in April 2018; it charged $0.08037/kwh—a 98.95% mark up over its projected costs. *See* DEF093127, p. 8.[35] In September 2018, Eligo forecast that it would incur a projected cost of $0.036699684/kWh to supply Plaintiff Brous with variable-rate electricity in October 2018; it charged $0.092589/kwh—a 152.29% mark up over its projected costs. *See* DEF093127, p. 7. In September 2019, Eligo forecast that it would incur a projected cost of $0.03578/kWh to supply Plaintiff Brous with variable-rate electricity in October 2019; it charged $0.12972/kwh—a 262.55% mark up over its projected costs. *See* DEF093127, p. 7. In September 2020, Eligo forecast that it would incur a projected cost of $0.03347/kWh to supply Plaintiff Brous with variable-rate electricity in October 2020; it charged $0.16/kwh—a 378.04% mark up over its projected costs. *See* DEF093127, p. 6.

---

[35] As discussed above, Eligo typically charged the same teaser rate used for the fixed-price term for customers that it had recently moved to variable-rate pricing. Plaintiff Brous's contract with Eligo provided for a fixed rate of $0.0799/kwh until February 2018. *See* DEF093223, p. 3; DEF093229, p. 2.

88.    Similarly, in March 2018, Eligo forecast that it would incur a projected cost of $0.037979/kWh to supply Plaintiff Schuster with variable-rate electricity in April 2018; it charged $0.08/kwh—a 104.47% mark up over its projected costs. *See* DEF000006, p. 7. In September 2018, Eligo forecast that it would incur a projected cost of $0.03500628/kWh to supply Plaintiff Schuster with variable-rate electricity in October 2018; it charged $0.085/kwh—a 142.81% mark up over its projected costs. *See* DEF000006, p. 7. In September 2019, Eligo forecast that it would incur a projected cost of $0.03376/kWh to supply Plaintiff Schuster with variable-rate electricity in October 2019; it charged $0.13838/kwh—a 309.89% mark up over its projected costs. *See* DEF000006, p. 6. In September 2020, Eligo forecast that it would incur a projected cost of $0.03306/kWh to supply Plaintiff Schuster with variable-rate electricity in October 2019; it charged $0.16/kwh—a 383.97% mark up over its projected costs. *See* DEF000006, p. 5.

### E.    Review of Eligo's Variable-Rate Discovery Materials

89.    I understand a core issue in this litigation is whether Eligo's variable rates were set in accordance with the Variable Price Term. To help analyze this issue, I reviewed the materials Eligo produced in discovery regarding its pricing.

90.    I also understand that the Class Action Plaintiffs requested all information Eligo used to set rates, including all the components of Eligo's costs to supply energy to the Class. I was informed by Counsel for the Class Action Plaintiffs that in response to the discovery requests, Eligo produced documents and data that quantify the supply costs Eligo used to set its rates, including the POWWR's pricing model spreadsheets that Eligo management used to set variable rates. *See* Glotzbach, p. 155:15–18, 176:20–180:06.

91.     Eligo also produced customer-level monthly data that includes each customer's enrollment date, start and end dates of variable-rate coverage, monthly rate and usage, utility service territory, and the teaser rate that was offered to a given customer.

92.     I have seen no evidence, in the material Eligo produced, of any variable-rate calculations used by Eligo that are directly related to the Variable Price Term. The POWWR reports do contain elements that build up to what Eligo considers to be its wholesale costs, but this is generally well below the rate Eligo ultimately charged. I have also seen no evidence in the discovery materials that Eligo maintained a fixed or proportionate markup or margin.

93.     Eligo also admitted that it used additional criteria, such as margin, retention, hedging, New York legislative and regulatory uncertainty to set customer variable rates. Specifically, Eligo stated: "These market pricing factors include contract date, utility provider, load profile, capacity tag, historical usage, predicted future usage, costs to serve (e.g., supply costs, transportation costs, taxes), time of year, margin, retention, hedging, Utility POR, REC/ZEC costs, New York legislative and regulatory uncertainty, and competitors' rates.[36] After approximately January 2020, Groove has been Eligo's proprietary machine-learning model that uses these market pricing factors to calculate customized variable rates for each customer."[37]

---

[36] In fact, Eligo did not consider competitors rates in New York because it did not obtain what it considered to be sufficient data regarding what rates its competitors charged. *See* DEF00935, p. 4 (stating that competitor pricing was only considered in six markets, based in Pennsylvania and Illinois).

[37] Defs' 2nd Supp. Resps. to Pls' 1st Set of Interrogs. No. 8.

94.     In fact, many Eligo documents show that it simply set rates as high as possible, balanced against customers canceling their Eligo service because their bills were too high. For example:

95.     In September 2017, Eligo selected some variable-rate customers, including customers in New York, for a "margin experiment" whereby the margins applied to those customers' rates would range from 30–60%. DEF035686. By December 2017, Eligo's new "default" margin was 40%. *Id.*

96.     In January 2019, then Data Scientist Brandon Carr reported early GROOVE results noting that customers paying GROOVE rates "had 8% higher revenue, with only a 1.4% increase in attrition." DEF003251. By March 2019, Carr noted that "the numbers are so universally good for GROOVE that I wonder if I haven't done something very stupid in this analysis." DEF002975. GROOVE was estimated to result in "an increase in un-discounted profit of hundreds of dollars per customer[]." DEF006263.

97.     Eligo policies also did not reflect the Variable Price Term's contractual commitment that "*all*" Eligo variable rates "*shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors.*" In September 2019, the "Eligo Energy, LLC Internal Variable Rate Pricing Policy" instructed employees that Eligo's contract meant "*the price payable during any Holdover Term [i.e., variable-rate customers] shall be based on a rate variable at Eligo's discretion.*" DEF044663.

98.     In a Slack message, after an Eligo employee stated that approximately 30% of Eligo customers were being charged rates set by GROOVE, Eligo founder Mark

Friedgan responded by involving Eligo's CEO and another employee in the conversation while commenting "*I thought we were trying to actually make money here*." The employee who made the initial comment then noted that "the margin targets for the 'conventional' variable process are still aggressive." DEF093021.

99.    Eligo rates were also not calculated "in response to" changes in Eligo's costs. An attachment to a July 2020 Slack chat stated that when costs decreased, "*[f]or those accounts on variable pricing, we could choose to pass on the price decrease, or we could maintain the prices and keep the higher profit margins. Our pricing model will seek to optimize long term value by balancing between margin and attrition/retention*." DEF092208. Similarly, when asked about what would happen to customer rates in the event of an economic slowdown, CEO Ken Pedotto said *"that would be a great scenario for us, because we'd lower prices more slowly than our prices drop. We did that exact thing leading into the pandemic and it worked out very well for us . . . ."* DEF018356. Eligo acknowledged that declines in wholesale costs are not passed through to the customer: asked if falling wholesale costs mean variable rates "*should go down as well,*" the 30(b)(6) witness answered, "*I wouldn't agree with that at all,*" because wholesale cost is only "*one of many components*." [38]

100.    Despite the additional profit generated by GROOVE, Eligo would make changes to drive rates even higher. In September 2021, Director of Analytics and Data Science Brandon Carr told CEO Ken Pedotto *"[w]e can further bump up the ceilings, and raise the floor [GROOVE] uses, to get higher rates out."* Pedotto responded that

---

[38] Sandler, 10/29/24 30(b)(6), p. 12:10-15, 13:19-21.

Eligo should *"bump up ceiling by $4 and $2 vs the 1 and 2 we discussed before."* DEF089518.

101.    In October 2021, CEO Ken Pedotto told Eligo founders Mark Friedgan and Alexander Goldstein that *"we normally optimize prices to maximize margin."* DEF035411.

102.    In February 2022, Eligo employee Lance Cooper told Chief of Staff LaPointe and CEO Pedotto that *"[u]sing the GROOVE rates and perchannel/month margin targets raises variable margin by almost 50%. I think that's what we were looking to see."* Pedotto replied "thanks" and suggested additional tweaks. The same day, Cooper again noted that *"GROOVE rates alone brought overall variable margin up something like 50%."* DEF091165.

103.    In a July 2022 Asana task discussing variable rates, Carr said to Ashuev that *"[b]asically, we now need to ensure that the rates in the batch files we send to SMARTs are high, and we need to make sure that the rates SMARTs actually ends up charging the customers are high."* DEF014702.

104.    Another July 2022 Asana task was titled *"[d]etermine if we can raise variable rates above what Groove is recommending."* DEF005130. As Cooper noted in November 2022, Eligo decisionmakers thought that *"GROOVE wasn't aggressive enough"* in raising variable rates. DEF092066.

105.    A July 2022 monthly operations close presentation summed up Eligo's variable-rate goal succinctly: *"Extracting as much money from variable [rate customers] as possible."* DEF077463.

106.    If Eligo were setting rates as directed by the Variable Price Term, such documents would not even exist.

### F.    Eligo's Variable Rates Were Not "Calculated On A Monthly Basis In Response To" The Three Inputs Listed In The Variable Price Term

107.    My analysis of Eligo's materials shows the pricing practices it used on variable-rate customers. First, I note that the monthly cost data that Eligo used to set variable rates was substantially lower than the rate charged to the Class Action Plaintiffs and the Class. Second, I note that the rate charged is not mathematically "calculated in response to" any discernable set of inputs for "market prices," "transportation costs," or "other market price factors." Third, by Eligo's own admission, its use of additional rate-setting criteria not listed in the Variable Price Term reveals a profit-maximizing strategy for Eligo, rather than an effort to apply a formula that calculates a variable rate in response to market prices, transportation costs, or other market price factors.

108.    Such practices do not fall within the economic concept of calculating a rate "in response to" the factors listed in the Variable Price Term. *See* O.C. Ferrell, John Fraedrich & Linda Ferrell, *Business Ethics: Ethical Decision Making and Cases* (8th ed. 2011), at 67 (defining lying by commission as "creating a perception or belief by words that intentionally deceive the receiver of the message" and describing the impropriety of implementing such tactics in contracts).

### G.    Analysis of Eligo's Variable-Rate Margins

109.    In this section, I examine Eligo's variable-rate gross margins and compare these margins to Eligo's own target margins for New York fixed-rate business. I also analyze whether the risks of serving variable-rate customers justifies the high variable-rate margins observed from Eligo's data.

110.    The variable-rate margins Eligo extracted from class members can be determined based on the difference between the variable rates Eligo charged its customers and the wholesale costs Eligo expected to pay to supply customers with electricity (which is reflected in damages Method 1). Expressed in terms of a markup over costs, comparing Eligo's rates to its expected costs reveals Eligo's practice of imposing unreasonably high markups on its variable rate customers:

| Year | Markup[39] |
|------|------------|
| 2018 | 99.6% |
| 2019 | 72.4% |
| 2020 | 115.8% |
| 2021 | 90.5% |
| 2022 | 43.3% |
| 2023 | 93.5% |
| 2024 | 52.0% |

111.    I do not have information on Eligo's overhead (including fixed costs for personnel, systems, etc.) for supplying New York variable-rate customers. However, I note that Eligo has a gross margin target of approximately 6% for its fixed-rate business (or 6.38% markup), which is intended to provide a profit even when accounting for overhead. DEF008057 (Risk Policy v.1.5.5, effective 11/1/2016), p. 13 ("In order to

---

[39] The markup calculation in this table was provided by Dr. Frank Felder.

protect and maintain profit margins . . . Retail prices offered to customers shall cover all direct costs associated with fulfillment, and provide for a gross margin to cover selling, general and administrative expenses, and profits . . . The Company shall set its minimum acceptable gross margin at 6% . . ."). This target gross margin, set by Eligo prior to litigation, presumably allows the company to adequately cover its costs of supplying customers and making a reasonable profit. Indeed, the Risk Policy provides that the margin is intended to cover overhead costs. Id.

112.    When comparing Eligo's costs for fixed- and variable-rate customers, other than customer acquisition costs (which are only applicable to fixed-rate customers because variable-rate customers were already Eligo customers), Eligo's other costs should be generally consistent. There is thus no economically valid reason for Eligo to charge substantially higher margins on its variable rates than its fixed rates. In fact, there are reasons to believe that this 6% target gross margin would be more than sufficient for Eligo to serve its New York variable-rate customers.

113.    First, the prices charged to variable-rate customers can be changed monthly, unlike in the fixed-price context, which is financially riskier because Eligo has committed to charging the same fixed rate for the duration of the fixed-rate period. Fixed-rate customers are the legitimate reason why ESCOs engage in hedging or procuring energy months and years in advance. They do this to average out their procurement costs, as waiting until contract commencement to buy in the spot market could significantly increase their procurement costs without being able to raise their rate accordingly to the fixed-rate customers. In this sense, ESCOs' price risks associated with serving fixed-rate customers are much greater than those for variable-rate ones.

49

114.    Second, as I understand it, all variable-rate customers have come off fixed-rate plans and are being supplied on a month-to-month variable rate. There may be costs of acquiring new fixed-rate customers in the retail market, but these should not apply to Eligo's New York variable-rate book of business.

115.    In sum, the 6% margin targeted by Eligo for its fixed-price business is likely generous for the variable-rate business. Yet Eligo still charged variable-rate customers substantially higher margins on average than the margins used for fixed-rate customers. I understand from Dr. Felder, that on average Eligo charged a revenue-weighted variable-rate markup of 76.96% during the Class Period. The simple average of Eligo's variable-rate markup is 80.95%.[40] I have seen no Eligo policies that discuss the need to build up or justify the higher margins charged to variable-rate customers over fixed-rate customers. Hence, I see no economic reason why Eligo could justifiably impose average markups of 80.95% on its variable-rate sales compared to its 6.38% fixed-rate target markup.

116.    Variable-rate customer churn also posed modest volumetric risks. An unexpectedly high churn rate, when many variable-rate customers left Eligo, could have led to some volumetric risks for Eligo in serving these customers. But these risks appear modest in practice. Unless Eligo was always wrong in the same way, these risks even out over time. Sometimes prices and quantities would move unfavorably, but they are also about as likely to move favorably.

---

[40] The average variable markup figures were provided by Dr. Frank Felder.

117.    The much larger markup Eligo garnered from variable-rate customers was more than 12 times the target 6.38% markup on its fixed-price book. This is a very large gap, which is not explainable by risks or costs in serving variable-rate customers.

118.    Eligo's rate-setting policy with respect to its variable-rate customers was and is to maximize revenue while avoiding losing customers through account churn. If these customers switched away from Eligo, they would not have been a source of high margins in the future. Such a rate-setting strategy is not consistent with the Variable Price Term's statement that "*all*" Eligo variable rates "*shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors.*"

119.    Two other important observations are also in order. First, my margin analysis does not account for the additional monthly fees Eligo charged variable-rate customers. These fees only serve to further increase Eligo's variable-rate margins.

120.    Second, I understand that Eligo did not implement different rate setting methods with respect to the Class Action Plaintiffs and the Class after Eligo implemented new contract language for new variable-rate customers after July 24, 2020. That variable-price term states that "[c]ustomer shall pay a variable" that "can change monthly at Supplier's discretion" and that *"Supplier may increase or decrease your variable rate, without limit, based on several factors, including, but not limited to, changes in the wholesale energy market prices within your respective ISO markets, business and market conditions, current and anticipated weather patterns, retail competition, wholesale commodity energy costs, fluctuations in energy supply and*

*demand, industry regulations, pricing strategies, costs to serve customers, among many factors."*

121.    Consistent with Eligo's internal communications about variable rates, this suggests that instead of following the contractual Variable Price Term in the NY Terms of Service applicable in this lawsuit, which required Eligo to calculate monthly variable rates "in response to" three listed inputs, Eligo used its discretion, and charged the Class Action Plaintiffs and the Class rates I understand to be inconsistent with the Variable Price Term.

122.    Indeed, Eligo employees admitted that Eligo did not change the way it set variable rates based on differences in customer contracts, including because Eligo acted as though the variable-rate pricing term in the contract used after July 24, 2020 (which unlike prior contracts allowed Eligo to set rates at its discretion) was the same as the pricing term in prior contract versions in New York. *See* LaPointe, p. 33:13–16 *("My understanding is that all of the versions of the contract that we have gave us – you know, gave us the discretion to charge variable rates in the way that we did.")*; *id.* at 36:21–25 *("We know that -- we know our pricing method for both customers [one enrolled in 2017 and one in 2020] is the same. We know that both of the contracts fit within the parameters that are allowed by our contracts. So, no, we would not have to make that distinction.")*; Feely, p. 54:12--22 (admitting that he did not consider contract pricing terms at all when setting variable rates); Carr, p. 131:15–132:2 (same). This also suggests that Eligo always used its discretion when setting rates prior to July 24, 2020, even though a different Variable Price Term applied to the Class Action Plaintiffs and the Class. And as described above, by its own admission Eligo used other criteria not

included in its NY Terms of Service when setting the company's rates for the Class

Action Plaintiffs and the Class.

## IV.    ELIGO'S TERMS OF SERVICE AND VARIOUS INTERPRETATIONS OF THE RELEVANT TERMS

### A.    Eligo's NY Terms of Service

123.    I understand from Counsel that the Class Action Plaintiffs were initially

enrolled in a fixed teaser rate that then automatically converted to a variable rate. Over

time Eligo used different versions of the NY Terms of Service. There are 3 different

versions of the Variable Price Term that govern the transactions of the Class Action

Plaintiffs and the Class.

124.    NY Terms of Service 1 (Inception to 2/28/2016) has the following pricing

term:

> Variable price is determined: Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price.

125.    NY Terms of Service 2 (3/1/2016 – 9/18/20217) has the following pricing

term:

> Variable price is determined: Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price.

126.    NY Terms of Service 3 (9/19/2017 – 6/20/2019) has the following pricing

term:

> Variable price is determined: Other than fixed rates, all rates shall be based on 100% renewable energy (through use of Renewable Energy Credits) and calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price.

127. Each version of the Variable Price Term has the following operative language relevant to this dispute: *"all [variable] rates . . . shall be . . . calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."* None of these versions authorize an additional monthly fee.

128. Further, and as discussed above, in paragraph 120 (DEF044663), Eligo later changed the Variable Price Term provided to New York customers and expressly gave itself rate-setting discretion.

129. I understand that the parties dispute the meaning of the Variable Price Term's statement that *"all"* variable rates *"shall"* be *"calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."* I have been asked by Counsel for the Class Action Plaintiffs to consider three different constructions of the Variable Price Term and thereafter calculate a variable rate based on that construction. Those constructions assume that "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors" means:

    a.  a rate calculated in response to the direct wholesale costs Eligo expected to incur to purchase electricity, transportation costs, and other market price factors (and only those costs), plus a reasonable proportional markup;

    b.  a rate calculated in response to the actual wholesale market prices, transportation costs, and other market price factors Eligo would have actually paid had it purchased electricity on the NYISO day ahead market (and only those costs), plus a reasonable fixed markup; or

    c.  a rate calculated in response to prevailing retail prices available in the relevant utility zone.

### B.    The Three Listed Inputs For The Variable Price Term

130.    "*market pricing*" – Means the wholesale market. There are many ways to structure energy procurement contracts. Most typical structures are (1) fixed-price contracts, (2) indexed contracts or (3) block and index type contracts (which is the blend of the first two). As previously discussed, in a fixed-price scenario, the customer is locked in at a set price for the duration of fixed-price period which can be as short as a month or be longer in duration. Regardless of fluctuations in the seller's wholesale costs, the customer's price remains the same. Such contracts provide price certainty for the customer but also expose the ESCO to energy price risk when wholesale market prices increase. On the other hand, the fixed-price customer pays a "premium" for price protection that will benefit the seller when wholesale market prices decrease. Indexed contracts are sort of the opposite of fixed contracts in the sense that their price fluctuates with a pre-specified price index available from a market. Market pricing is a term used to indicate that a contract or trading position is priced based on current prices in the relevant market. In the context of an ESCO electric contract, and just like with fixed-price contracts, the relevant market is the wholesale electricity market. *See* Hopper et al., *Customer Response to Day-Ahead Market Hourly Pricing: Choices and Performance*, 2006 ("[The research] examines the experience of 149 large customers of Niagara Mohawk Power Corporation (NMPC), an upstate New York utility, that have been exposed to hourly prices indexed to day-ahead, wholesale spot market prices as the default service under retail competition since 1998."); C. Goldman, *Customer Strategies for Responding to Day-Ahead Market Hourly Electricity Pricing*, 2005 (SC-3A tariff is a type of real-time pricing "that provides firm, day-ahead notice of hourly varying

prices indexed to New York Independent System Operator (NYISO) day-ahead market prices.")

131.    "*transportation costs*" – Is a term that rarely comes up in electricity pricing and is more common in pricing of other commodities, such as gas, oil, and coal. Based on my experience, the only "transportation" cost for electricity that could be potentially called a transportation cost is so-called "wheeling" cost. Wheeling cost is a transmission rate which utilities charge when market participants schedule power deliveries through their service territories. Typically, this is a small unit cost that market participants pay when scheduling power transmissions through neighboring utilities. These costs do not exist in ISOs such as NYISO where all market participants have equal access to the transmission grid of the entire system. It is highly unlikely to see wheeling cost assessed in the context of electric retailers even outside of an ISO as ESCOs do not tend to buy energy via bilateral contracts with a regulated utility outside of their ISO market, and I have seen no evidence of Eligo incurring wheeling costs to serve New York variable-rate customers.

132.    "*other market price factors*" – Is a catchall that means the pass through of other small miscellaneous fees and charges associated with the wholesale market price that may not be explicitly itemized in the "market pricing" from the wholesale market.

## V.    METHODS OF CALCULATING DAMAGES

### A.    <u>Methods For Calculating Breach of Contract Damages</u>

133.    Counsel for the Class Action Plaintiffs directed me to assume that breach of contract damages should be calculated as the difference between the monthly variable rate Eligo charged and a hypothetical rate calculated monthly in response to the factors listed in the Variable Price Term.

134.    In the remainder of this section, I provide three alternate damage calculations based on three different legal understandings of the Variable Price Term. I have formulated Methods 1, 2, and 3 with the aim of calculating a monthly rate that varies in response to objective factors.

### 1.    Method 1: Using Eligo's Own Anticipated Procurement Costs

135.    This method identified the rate Eligo should have charged by calculating a rate on a monthly basis that varies in response to Eligo's anticipated costs for "market pricing," "transportation costs," and "other market price factors." As noted previously, I was asked by Counsel for the Class Action Plaintiffs to outline the market costs faced by Eligo in serving its variable-rate customers. To make these calculations, I require values for each of the elements discussed in Section II.B.2 above. Under this reading of the Variable Price Term, there is no input for "transportation costs" because as discussed in Section IV.B above, these costs do not exist in ISOs such as NYISO and I saw no evidence of Eligo paying transportation costs to serve New York variable-rate electricity customers. DEF064884 at 11. For purposes of this Method 1, the inputs for "market pricing" are the POWWR procurement cost data Eligo used to set monthly variable rates and the voluntary REC cost that I calculated and added to the procurement cost as discussed in paragraphs 138-142. The inputs for "other market price factors" are discussed in paragraphs 143 through 146. These cost components come from the POWRR Reports as well, and I include them in my estimate of the procurement cost, as these are costs ESCOs like Eligo typically incur to serve customers and Eligo in fact did incur.

136.    "Eligo's Market Pricing" was taken from the 15th day of the month POWWR Report for the month prior to the monthly rate at issue (or the closest to the

15th with the nearest time stamp), after configuring the parameters on the Title Page tab of the report as follows:

- Inflation Rate set to 0.00%

- General Interest Rate set to 0.00%

For a given NY Utility, the Summary Page was configured as follows:

- Start Date set to set to the first of the month at issue

- Product Type set to Variable w/Cap

- State set to New York

- Utility, Rate/Profile, and Load Zone set, respectively, to the utility, rate category, and NYISO load zone corresponding to the customer

- Municipality set to "ALL OTHER"

- Gross Margin Target % set to 0.00%

- Term set to 1-month

137.    The costs included in the POWWR reports comprise among others: the energy cost, the capacity cost, the mandatory REC cost, line losses, NTAC fees, and SCADA fees.

a.    <u>Wholesale "Market Pricing" - Procurement Costs For Eligo</u>

138.    **Energy Procurement Costs:** I was given access to detailed information on the costs Eligo anticipated it would pay for energy, ancillary services, and capacity for its New York sales. This information came in the form of reports from a third party called POWWR. This information was used to determine the monthly cost (in dollars per megawatt hour) for service for variable-rate customers using Eligo's own data.

139.    **Renewable Energy Credit Costs**: It is my understanding that Eligo claims that it purchases RECs and ZECs to satisfy New York state-mandated minimums

as well as voluntary REC commitments under the Reset Order and the NY Terms of Service. *See* Glotzbach, p. 13:14–14:22; 125:08–20, 171:09–172:16. My damages calculations reflect the costs to purchase RECs and ZECs sufficient to satisfy those commitments.

A.    For customers who enrolled with Eligo on or before February 29, 2016:[41]

- For service periods with a start date on or before April 15, 2021, I would add costs for the purchase of RECs and ZECs to comply with the RES obligation; no voluntary REC costs apply.

- From April 16, 2021 onward, I would add costs for the purchase of RECs equal to 50% of customer usage plus the costs for the purchase of RECs and ZECs to comply with the RES obligation.

B.    For customers who enrolled with Eligo from March 1, 2016 to September 18, 2017:[42]

- For service periods with a start date on or before April 15, 2021, I added costs for the purchase of RECs and ZECs to comply with the RES obligation as well as costs for the purchase of RECs equal to the difference between 30% of customer usage and the applicable RES obligation percentage.

- From April 16, 2021 onward, I added costs for the purchase of RECs equal to 50% of customer usage plus the cost for the purchase of RECs and ZECs to comply with the RES obligation.

---

[41] NY Terms of Service 1 applies to these customers, which does not include a promise to provide renewable energy or for the purchase of voluntary RECs. *See* Defs' Resps. to Pls' 4th Set of Interrogs. Nos. 2 & 3; *see also* DEF000132; DEF046920.

[42] NY Terms of Service 2 applies to these customers, which provides for "at least 30%" renewable energy. *See* Defs' Resps. to Pls' 4th Set of Interrogs. Nos. 3 & 4; *see also* DEF000138; DEF046920.

C.    For customers who enrolled with Eligo from September 19, 2017 to June 20, 2019,[43] for all periods, I would add costs for the purchase of ZECs to comply with the RES obligation and would add the costs for the purchase of RECs equal to 100% of customer usage.

140.    For the damages calculation reflected in this Method 1, I used the RES obligations and REC and ZEC costs reflected in the POWWR reports for the cost of mandatory and voluntary RECs and ZECs. As mentioned previously, the State of New York requires LSEs to purchase renewable energy certificates or "RECs" and zero-emission credits or "ZECs." The obligation mandated by NYPSC is already included in the rate on the Summary Page of the POWRR Reports. However, certain versions of Eligo's NY Terms of Service offer variable rates with a higher percentage of REC than the minimum obligation set by the PSC. I included the difference as a Market Price Factor.

141.    Specifically, the applicable REC cost is multiplied by the percentage difference between Eligo's contractual obligation and the PSC mandated REC requirement to obtain the voluntary REC cost.

142.    **Transmission and Distribution Losses ("T&D Losses")**: These are typically calculated as a percentage of energy usage and represent costs associated with electric energy lost in the distribution network. Costs associated with losses are

---

[43] NY Terms of Service 3 applies to these customers, which provides for 100% renewable energy. *See* Defs' Resps. to Pls' 4th Set of Interrogs. Nos. 4 & 5; *see also* DEF000143; DEF046920.

expressed on a dollar per megawatt hour basis and are included in the POWWR data used for the calculation.

b.    <u>Other Market Price Factors</u>

143.    Other market price factors refer to various fees that do not fall in any of the previous categories. These include sleeve costs, POR fees, and other miscellaneous cost factors as discussed in more detail below.

144.    **Sleeve Costs**: Because Eligo lacks the good credit to make purchases directly from NYISO or other parties, it contracts with a third party who has sufficient credit to assure NYISO that Eligo's bills for energy will be paid. Eligo refers to this as a "sleeve" and the cost associated as a sleeve cost. This cost (which is reflected in the POWWR data) is minimal. Prior to and including November 2019 it was 0.09 cents per kilowatt hour, and after that time it was 0.075 cents per kilowatt hour – less than a penny. I have accounted for sleeve costs in Method 1 because they are included in the POWWR data.

145.    **Purchase of Receivables ("POR")**: Utilities in New York, who handle billing and collections assume the risk that customers will not pay their bills. Accordingly, they charge ESCOs a fee called Purchase of Receivables or "POR." I apply the POR rate (which is reflected in the POWWR data and is minimal) to the total cost obtained by summing the cost components to get the POR fee.

146.    **Other Miscellaneous Cost Factors**: Other miscellaneous cost factors include consolidated billing fees which are fees charged by utilities to ESCOs for the handling of billing and payment processing. These were included in the POWWR data.

c.     Calculation Of Eligo's Supply-Related Costs

147.   Table 1 and Table 2 below illustrate how Eligo's estimated procurement costs for, respectively, Plaintiff Schuster and Plaintiff Brous are constructed using market data regarding Eligo's anticipated wholesale market costs for the month of November 2023. It shows the breakdown between seven cost components that are commonly used in the industry while using POWWR data for energy, ancillary services, capacity, T&D losses, mandatory REC costs, and other miscellaneous costs and calculating voluntary REC costs and Eligo's voluntary commitments using figures from Eligo's POWWR data.

148.   This procurement cost total includes the direct market costs faced by Eligo in serving variable-rate customers when electricity was supplied, as can be seen in Table 1 and Table 2 below.

**Table 1 – Estimate of Eligo's Procurement Cost for Plaintiff Schuster for November 2023 (cents/kWh)**

|     | Cost Component | Estimated Procurement Cost |
|-----|----------------|----------------------------|
| [1] | Energy | 2.48 |
| [2] | Capacity | 0.92 |
| [3] | Ancillary Services | 0.45 |
| [4] | T&D Losses | 0.20 |
| [5] | Mandatory RECs | 0.49 |
| [6] | Voluntary RECs | 1.28 |
| [7] | Miscellaneous | 0.22 |
| [8] | **Total (cents/kWh)** | **6.04** |

[1]-[5] Sourced from POWWR reports; [6]-[7] Calculated based on data from POWWR reports; [8] Sum of [1]-[7]

**Table 2 – Estimate of Eligo's Procurement Cost for Plaintiff Brous for November 2023 (cents/kWh)**

|      | Cost Component | Estimated Procurement Cost |
|------|----------------|----------------------------|
| [1]  | Energy | 2.82 |
| [2]  | Capacity | 1.27 |
| [3]  | Ancillary Services | 0.45 |
| [4]  | T&D Losses | 0.24 |
| [5]  | Mandatory RECs | 0.49 |
| [6]  | Voluntary RECs | 1.28 |
| [7]  | Miscellaneous | 0.32 |
| [8]  | **Total (cents/kWh)** | **6.87** |

[1]-[5] Sourced from POWRR reports; [6]-[7] Calculated based on data from POWRR reports; [8] Sum of [1]-[7]

149.    Figure 1 and Figure 2 show the cost breakdowns of Eligo's estimated

monthly procurement cost from February 2018 to November 2023 for Plaintiffs Schuster

and Brous, respectively, and the variable rates Eligo charged each of the Plaintiffs.

**Figure 1 – Breakdown of Eligo's Estimated Procurement Cost in NY for Plaintiff Schuster vs. Variable Rate Charged to Plaintiff Schuster**



**Figure 2 – Breakdown of Eligo's Estimated Procurement Cost in NY for Plaintiff Brous vs. Variable Rate Charged to Plaintiff Brous**



150.    Once these cost inputs are accounted for, the contractual price can be derived via the following straightforward formula: If a markup is given, Allowed Rate in a given month = (Eligo's Market Pricing + Eligo's Transportation Cost + Eligo's Other Market Price Factors) * (1 + Markup); if a margin is given, Allowed Rate in a given month = (Eligo's Market Pricing + Eligo's Transportation Cost + Eligo's Other Market Price Factors) / (1 - Margin). The appropriate "markup"/"margin" input is discussed in Section V.A.4 below.

151.    Damages per customer per month = (Eligo's Price - Allowed Rate) * Usage, for that month.

152.    Damages per customer = Damages per customer per month added for all applicable months.

153.    Class Damages = Damages per customer added for all class members.

154.    From an economics perspective, Method 1 represents the preferred contract reading. First, tying the rate "calculated on a monthly basis in response to" Eligo's expected procurement costs makes the contract an indexed contract that is a risk-sharing arrangement whereby Eligo notified customers that its rates would be calculated to pass on its costs.

155.    In addition, the market conditions related to a particular contract should economically concern the costs of procuring and retailing power. The underlying economic activity is fundamentally tied to procuring power in the wholesale markets and billing customers for these costs; it is therefore sensible that rates under the parties' contract should reflect the seller's wholesale costs of serving those contracts (plus reasonable markup for covering relevant costs).

### 2.    Method 2: Using Objective Market Price Procurement Costs

156.    This method identified the rate Eligo should have charged by calculating a rate on a monthly basis that varies in response to NYISO costs for "market pricing," "transportation costs," and "other market price factors." For this method I was asked by Counsel for the Class Action Plaintiffs to determine the actual "market pricing" of electricity on the wholesale market for electricity for the two New York utility zones where each of the Class Action Plaintiffs is located.

157.    The "market pricing" input for this Method 2 is considered to be the electricity procurement cost discussed in paragraphs 158 through 162. The input for the "other market price factors," which include miscellaneous costs which ESCOs like Eligo typically incur to serve customers and Eligo in fact did incur, is discussed in paragraphs 164 and 165.

65

158.    For the energy cost, I used historical day-ahead market prices for the zones analyzed (i.e., I used monthly averages of hourly zonal DAM LBMPs) based on data that was obtained by Dr. Felder from NYISO.

159.    For ancillary services, I used monthly data on additional services obtained from Dr. Felder from NYISO.

160.    I used capacity costs expressed in dollars per megawatt hour calculated by Dr. Felder and based on monthly capacity market prices, monthly amounts of capacity cleared by the market, and monthly load data obtained from NYISO.

161.    Transmission and distribution costs are typically calculated as a percentage of energy usage and represent costs associated with electric energy lost in the transmission and distribution networks. Dr. Felder compiled data on annual estimates of New York State T&D losses from EIA's State Electricity Profiles. I applied the annual T&D loss percentages provided by Dr. Felder to the energy and ancillary services costs to estimate the costs related to T&D losses.

162.    For mandatory and voluntary REC costs, I used the amount of RECs and ZECs Eligo had to purchase to comply or exceed the RECs and ZECs requirement set by the PSC as described in paragraph 139 and the costs provided by NYSERDA[44] for Tier 1 RECs and ZECs and gathered by Dr. Felder. Dr. Felder identified what the REC and ZEC requirements were, how they changed over time, and what actual REC and ZEC costs were over time.

---

[44]  Costs for the 2023 Compliance Year available at https://www.nyserda.ny.gov/All-Programs/Clean-Energy-Standard/LSE-Obligations/2023-Compliance-Year.

163.    Like with Method 1, under this reading of the Variable Price Term, there is no input for "transportation costs" because those costs do not exist in the NYISO.

164.    Miscellaneous costs include POR fees and sleeve costs. I used data on utility-specific POR rates gathered by Dr. Felder to calculate the POR fees. For sleeve costs, I used data from the POWRR reports described in paragraph 144.

165.    In addition to POR fees and sleeve costs, there is one other cost that I took into account. Billing and payment processing ("BPP") charges are utility-specific consolidated billing fees charged to ESCOs because utilities handle the billing and processing of payments for ESCOs' customers. I used data on utility-specific BPP fees provided by Dr. Felder. BPP fees are typically charged on a per invoice basis. I treat BPP fees separately from the market cost that I calculate (which is expressed in per units of energy terms) but nonetheless account for them in my calculation of damages.

166.    Table 3 and Table 4 below illustrate how the market cost is constructed using market data for the month of November 2023 for Plaintiffs Schuster and Brous, respectively. Figure 3 and Figure 4 show the cost breakdowns of the estimated market cost from February 2018 to November 2023 for Plaintiff Schuster in Zone B and for Plaintiff Brous in Zone C, respectively, and the variable rates Eligo charged each of the Plaintiffs.

**Table 3 - Estimate of Market Cost for Plaintiff Schuster in Zone B for November 2023 (cents/kWh)**

| | Cost Component | Market Cost |
|---|---|---|
| [1] | Energy | 2.71 |
| [2] | Capacity | 0.31 |
| [3] | Ancillary Services | 0.32 |
| [4] | T&D Losses | 0.13 |
| [5] | Mandatory RECs | 0.56 |
| [6] | Voluntary RECs | 1.75 |
| [7] | Miscellaneous | 0.15 |
| [8] | **Total Cost (cents/kWh)** | **5.94** |

[1]-[3] Sourced from NYISO market data and Market Operations Reports; [4] Calculated based on [1] and [3] and T&D loss percentage from EIA; [5], [6] Based on REC and ZEC prices from NYSERDA and the outline in paragraph 162; [7] Sourced from POWRR Reports and corresponding electric utility data; [8] Sum of [1]-[7]

**Table 4 - Estimate of Market Cost for Plaintiff Brous in Zone C for November 2023 (cents/kWh)**

| | Cost Component | Market Cost |
|---|---|---|
| [1] | Energy | 2.80 |
| [2] | Capacity | 0.31 |
| [3] | Ancillary Services | 0.32 |
| [4] | T&D Losses | 0.13 |
| [5] | Mandatory RECs | 0.56 |
| [6] | Voluntary RECs | 1.75 |
| [7] | Miscellaneous | 0.15 |
| [8] | **Total Cost (cents/kWh)** | **6.02** |

[1]-[3] Sourced from NYISO market data and Market Operations Reports; [4] Calculated based on [1] and [3] and T&D loss percentage from EIA; [5], [6] Based on REC and ZEC prices from NYSERDA and the outline in paragraph 162; [7] Sourced from POWRR Reports and corresponding electric utility data; [8] Sum of [1]-[7]

**Figure 3 - Breakdown of Estimated Market Cost for Plaintiff Schuster in Zone B vs. Variable Rate Charged to Plaintiff Schuster**



**Figure 4 - Breakdown of Estimated Market Cost for Plaintiff Brous in Zone C vs. Variable Rate Charged to Plaintiff Brous**



167.    As discussed above, day-ahead prices were used for this method. This is because the overwhelming majority of electricity supply is purchased on the day-ahead market as compared to the real-time market and differences between day-ahead and real-time prices even out over time.

168.    Once these cost inputs are accounted for, the contractual price can be derived via the following simple formula: If a markup is given, Contract Rate in a given month = (Actual Market Pricing + Actual Transportation Cost + Actual Other Market Price Factors) * (1 + Markup); if a margin is given Contract Rate in a given month = (Actual Market Pricing + Actual Transportation Cost + Actual Other Market Price Factors) / (1 - Margin). As with Method 1, the appropriate "markup" input is discussed in Section V.A.4 below.

169.    Damages per customer per month = (Eligo's Price - Contract Rate) * Usage – BPP fees[45] adjusted for Margin or Markup, for that month.

170.    Damages per customer = Damages per customer per month added for all applicable months.

171.    Class Damages = Damages per customer added for all class members.

172.    From an economics perspective, Method 2 represents a reasonable contract reading. First, retail energy customers are inertial and thus it would be commercially reasonable for customers to outsource the policing of Eligo's underlying procurement costs to an external benchmark that is publicly verifiable—prices on the

---

[45] Since both Plaintiffs Schuster and Brous were invoiced on a monthly basis, I account for the BPP fees by subtracting the BPP fee per invoice before obtaining the monthly damages.

prevailing wholesale market. This reading is grounded in public data as opposed to the internal Eligo figures used in Method 1. One of the benefits of this reading is that it avoids the type of non-transparent variable-rate "calculations" Eligo ultimately performed on the Class Action Plaintiffs and the Class. This is especially true because consumers are more likely to pay attention to the total amount they are charged for their electricity bill (which includes both delivery and supply charges and depends on the customer's usage, which also varies seasonally) as opposed to Eligo's fluctuating variable rates. Second, this reading is consistent with the central premise of deregulation. By basing rates on objective market prices, Eligo could increase its margins by beating the prevailing procurement market prices.

### 3.    Method 3: Using Prevailing Retail Prices

173.    This method identified the rate Eligo should have charged by calculating a rate on a monthly basis that varies in response to prevailing retail market prices. This Method examines the difference between Eligo's variable rates and the contemporaneous prevailing variable rate of electricity in a local market corresponding to the overlap of the relevant utility service territory and the relevant NYISO zone. To determine the prevailing variable electricity rate, I calculated the weighted average of variable rates of suppliers that supply electricity in a given local market. To do this, I weighted the extent of economic demand for variable rates in each local market as opposed to a simple average. The weighting accounts for each supply alternative's relative market share.

174.    For each of the Class Action Plaintiffs, I estimated the prevailing rate by taking a weighted average of the rate for the utility (which charges a variable rate calculated in response to changes to its costs) whose service territory the Plaintiff is in

and the variable rates of ten representative ESCOs for the local market the Plaintiff is in. I considered a Plaintiff's local market to be the overlap of the Plaintiff's utility service territory and the NYISO zone the Plaintiff is in. The corresponding monthly utility rates were obtained by Dr. Felder from publicly available sources. I obtained the ESCO rates from the NY DPS filings which are made on a quarterly basis (even though the prevailing rates are monthly, the ESCO variable rates I used for the calculation only vary quarterly). For every year in the period I analyzed and for each local market, I determined the representative ESCOs by taking the ten ESCOs (excluding Eligo) with the largest sales volume for residential service in the state of New York for the year which have filed with the NY DPS at least one variable rate for residential service for every quarter of the year for the corresponding local market. I obtained annual residential sales in megawatt hours for ESCOs and utilities from EIA Form 861.

175.   The weights for the weighted average for each ESCO and utility were computed based on the ESCO's or the utility's relative share of estimated annual residential sales in the local market. To estimate the annual residential sales for an ESCO for a local market, I took a share of the ESCO's annual residential NYISO sales, where the share is equal to the amount of NYISO load in the zone corresponding to the local market relative to the total NYISO load. To estimate the annual residential sales for a utility for a local market, I took a share of the utility's bundled annual residential NYISO sales, where the share is equal to the peak load of the transmission district corresponding to the utility in the zone corresponding to the local market relative to the

transmission district's total NYISO peak.[46] For a local market, the estimated annual

residential sales are equal to the sum of the ten ESCOs' estimated annual residential

sales and the utility's estimated annual residential sales. A list of the other ESCOs used

is attached as Exhibit 5.

176.   Prevailing rates from February 2018 to November 2023 for each of the

Class Action Plaintiffs' territories, RGE – Zone B for Plaintiff Schuster and NYSEG –

Zone C for Plaintiff Brous, are shown in Figure 5 and

177.   Figure **6**, respectively, along with the variable rates Eligo charged the

Plaintiffs.

**Figure 5  – Estimated Prevailing Rate for RGE - Zone B for Plaintiff Schuster vs. Variable Rate Charged to Plaintiff Schuster**



---

[46] NYISO produced an ICAP forecast for every year in the period I analyzed. As an example, the 2024 ICAP forecast is available at https://www.nyiso.com/documents/20142/41827058/01%202024%20ICAP%20Forecast.pdf/5024d1b3-5ab1-0e8c-03e9-4a0bf850f384.

**Figure 6 – Estimated Prevailing Rate for NYSEG - Zone C for Plaintiff Brous vs. Variable Rate Charged to Plaintiff Brous**



178.    Having determined the prevailing monthly rate for a given zone, damages would be calculated as follows:

179.    Damages per customer per month = (Eligo's Rate – Prevailing Rate) * Usage, for that month.

180.    Damages per customer = Damages per customer per month added for all applicable months.

181.    Class Damages = Damages per customer added for all class members.

182.    From an economics perspective, Method 3 also represents a reasonable contract reading. First, like Method 2, it is based on public, verifiable data and does not require transparency from Eligo. Second, Method 3 relies more on market competition than other methods, insofar as it looks to prevailing retail rates. Though, this could also

be considered a shortcoming because Method 3 incorporates the rate-setting of ESCOs that had much more discretionary contractual pricing structures than what is provided for in the Variable Price Term. As discussed above, at some point Eligo even amended the NY Terms of Service to give itself rate-setting discretion. Other ESCOs were capable of doing this same thing and in fact did so. By accounting for other ESCOs' rates, Method 3 allows Eligo a degree of discretion that the Variable Price Term does not provide. There are also a variety of variable-rate products in the retail market, including guaranteed savings and green (to varying degrees). Those prices are also reflected in Method 3.

183.    Figure 7 and Figure 8 compare the hypothetical rates estimated using (1) Eligo's procurement cost under Method 1, (2) the market cost under Method 2, and (3) the prevailing rate under Method 3 to the variable rate Eligo charged Plaintiffs for Plaintiff Schuster and Plaintiff Brous, respectively.

**Figure 7 – Comparison of Eligo's Estimated Procurement Cost for Plaintiff Schuster Calculated in Method 1, the Estimated Market Cost for Plaintiff Schuster in Zone B Calculated in Method 2, Estimated Prevailing Rate for RGE - Zone B for Plaintiff Schuster Calculated in Method 3, and Variable Rate Charged to Plaintiff Schuster**



**Figure 8 - Comparison of Eligo's Estimated Procurement Cost for Plaintiff Brous Calculated in Method 1, the Estimated Market Cost for Plaintiff Brous in Zone C Calculated in Method 2, the Estimated Prevailing Rate for NYSEG - Zone C for Plaintiff Brous Calculated in Method 3, and Variable Rate Charged to Plaintiff Brous**



184.    Furthermore, if I assume that Eligo did have pricing discretion under the Variable Price Term, I understand that any discretion is still constrained by Eligo's obligation to act in good faith in pricing customers' variable-rate energy and to thus charge a commercially reasonable variable rate.

185.    Under that scenario the question is whether Eligo abused its power to determine (without advising its variable-rate customers) whether its rates complied with the Variable Price Term's statement that "all" Eligo variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors."

186.    Based on my review of the evidence produced by Eligo, it is my opinion that Eligo's rates were not commercially reasonable. First, as explained above, Eligo's rates were substantially higher than contemporaneous prevailing retail rates. Second, the Declaration of Eligo's former director of operations is evidence of Eligo preying on its customers. Specifically, the former director of operations states: "Leadership's strategy was to charge the highest possible rate that would not produce too much customer attrition. Eligo's variable rates were essentially made up and were set with the goal of getting as much money as possible from customers." Stone Decl. Paragraph 5. She also states that company leadership's rate-setting "methods were predatory. Leadership was aware that regulators were trying to make it harder to gouge variable-rate customers, but that did not change leadership's focus on charging the highest variable rates they could." Stone Decl. Paragraph 13.

187.    Third, Eligo has admitted that it set rates as high as possible without alerting customers. Eligo's pricing data and other discovery shows that Eligo set rates higher for certain customers who were predicted to be less likely to notice and used a "glide path" model for customers who had recently transitioned from their fixed rates. *Compare* DEF034103 (CEO of company that generated significant proportion of Eligo customers telling Eligo's General Counsel, Founder Mark Friedgan, and employee responsible for setting rates that Eligo needed to "be much more discreet [*sic*]" in customer communications regarding rate changes); DEF034103 (Eligo CEO Ken Pedotto "agree[ing]" that Eligo should "continuously turn up the volume [i.e., increase rates] on our customers flowing on variable until we see a drop percentage occur that we are no longer wanting to exceed" and adding "we are going to optimize margin

dollars taking pricing and retention into account."), *with* DEF003405 (Eligo Head of Analytics noting that the CEO ""does not really believe that we would be able to charge the Groove margins to the commercial customers").

188.    In my opinion, in the context of ESCOs exercising price-setting discretion in good faith would be to charge the prevailing rate. Therefore, in the event the factfinder construes the Variable Price Term in a manner that provides Eligo with discretion to set variable rates, the damages computation would also follow the model outlined in this Method 3.

### 4.    Markups For Methods 1 and 2

189.    Methods 1 and 2 above rely on determining the price Eligo was allowed to charge variable-rate customers by adding a markup to costs permitted by the Variable Price Term or dividing these costs by (1-margin). Below I provide two separate methodologies of determining a reasonable and objective markup/margin.

190.    I was instructed by Counsel for the Class Action Plaintiffs to determine a single markup or margin to be applied to the rates determined Methods 1 and 2. The basis for this is the language in the Variable Price Term, which states that "all" variable rates "shall be calculated on a monthly basis **in response to** market pricing, transportation costs, and other market price factors." I was instructed by Counsel for the Class Action Plaintiffs to assume that a rate calculated "in response" to the listed inputs varies based only on those inputs and not based on a fluctuating markup applied at Eligo's discretion. If the Variable Price Term is read to permit a fluctuating margin, the ultimate rate is not calculated "in response to" the listed inputs.

a.   Markup A – 5% Based on the Reset Order

191.   As previously noted, the NYPSC has been especially critical of ESCOs' variable-rate pricing practices. In December 2019 the NYPSC announced a ban on ESCO variable rates unless the ESCO guaranteed savings compared to the utility's rates, or the ESCO offered a compliant green energy product.

192.   As the NYPSC made clear in announcing the ban, customers suffer economic harm when they pay an ESCO more than they would have paid under the utility default service rate. As the NYPSC rightly reasoned, ESCOs that charge more are simply exploiting their customers' lack of information about prevailing retail prices. The NYPSC's logic is also consistent with my economic analysis—but for imperfect information, reasonable customers would not choose to pay more for the same product. They get the same product from the utility, delivered in the same way. Like Eligo, the utility must procure energy, capacity, ancillary services, RECs, etc. to provide service. The utility's rate also passes through its non-supply costs of procuring these elements (staff, hardware and software systems, and overhead) in its default service rates.

193.   As part of the Reset Order, the NYPSC (an independent third party with expertise in Eligo's market) adopted a 5% maximum markup for ESCO fixed-rate plans. Specifically, the 5% markup was found by the NYPSC to be a "just and reasonable" proportionate risk premium for a New York ESCO product.[47] To set the markup, the NYPSC invoked its mandate to ensure customers receive "electric service at just and

---

[47] Reset Order at p. 67.

reasonable rates," and weighed the costs and benefits of fixed-rate plans.[48] The NYPSC found that the trailing 12-month average utility supply rate, which is a variable rate, offered "a meaningful baseline against which to judge the reasonableness of the price of ESCO fixed-rate products" and then permitted 5% markup on top of that average "because a typical risk premium in financial markets ranges between 3.5% to 5.5%."[49] According to this rationale, and because an ESCO bears more financial risk on fixed-rate products than variable-rate plans, the NYPSC's 5% figure is a conservative markup over cost to use for Eligo's variable rates.

194.    In addition, this 5% markup also protects consumers' interests vis-à-vis Eligo's undisclosed variable rate "calculations" and the Price Term's complete silence regarding a markup term. The 5% figure is grounded in the regulator's independent pricing judgment on a New York ESCO product and is based on objective criteria, not Eligo's discretion.

195.    Finally, while a variable rate calculated in accordance with the Variable Price Term does not offer the price protection of a fixed-rate plan, a 5% markup was independently and objectively-determined by the regulator of the relevant market to be a markup that "most" ESCOs could sustain on a product that is riskier than the variable-rate product Eligo sold to the Class Action Plaintiffs and the Class.[50]

---

[48] *Id.* at 66 ("[I]f the cost incurred is significantly more than the value of the benefit achieved, then the Commission cannot permit ESCOs to offer such products.").

[49] *Id.* at 67.

[50] *Id.*

196.    The 5% markup thus presents the best context for determining an appropriate markup under the Variable Price Term.

### b. Markup B – 6.38% Based on Eligo's Target Fixed-Rate Margin

197.    Markup B of 6.38% is based on Eligo's target fixed-rate margin in New York. DEF008057 (Risk Policy v.1.5.5, effective 11/1/2016), p. 13.

198.    While Markup B is ultimately based on Eligo's subjective rate-setting as to its fixed-rate product margin, this markup provides an apt benchmark for maximum commercially reasonable margin, especially in a scenario where Eligo is allowed to have had some price-setting discretion, but was still required to act reasonably and in good faith.

199.    From economic point of view, it would not be reasonable for Eligo to charge a higher margin on lower-risk variable-rate products than its higher-risk fixed-rate products. A higher variable-rate margin allows Eligo to exploit variable-rate customers. Markup B recognizes this and is consistent with my understanding of the legal and contractual constraints on Eligo's pricing behavior. Markup B also serves as a cross-check for the reasonableness of Markup A.

### 5.    Method 4: The Method of Calculating Damages Based on Price to Compare or Utility Rate

200.    Under this method I calculate damages based on a theory that no reasonable variable-rate customer would knowingly pay Eligo's variable rates if they were adequately informed about Eligo's practices. Under this scenario, it is assumed that the reasonable customer would elect to purchase a default utility service rate or a similar rate that is calculated in response to wholesale procurement costs and related costs.

201.    New York utilities charge variable rates that reflect a pass through of the utility's costs of procuring the power, plus the related costs of fulfilling its supply function, including the overhead needed to perform this function. In New York, the utility's contemporaneous supply rate is often referred to as the "Price to Compare."

202.    Dr. Felder has collected the applicable utility Price to Compare.

203.    Damages per customer per month = (Eligo's Rate – Price to Compare/Utility Rate) * Usage, for that month.

204.    Damages per customer = Damages per customer per month added for all applicable months.

205.    Class Damages = Damages per customer added for all class members.

206.    From an economics perspective, Method 4 also produces a reasonable measure of damages because utility rates are regulated, and, therefore, both just and reasonable, but also directly representative of underlying costs of doing business. First, with respect to the utility rates, NYPSC said:

> While certain ESCO products may justifiably cost the customer more [than the utility cost], it is troubling that, after the extensive process associated with this track, neither ESCOs nor any other party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates were generally – or in any specific instances – justified.[51]

207.    NYPSC also noted that:

> It is both notable and troubling that no ESCO party could or would produce objective evidence regarding: the specific value-added products or services that are currently offered in New York; how many ESCO customers elect to receive those products and services; the level of premium ESCO customers are charged for the value-added product or service; and what

---

[51] *Id.* at 30.

type and level of benefit is obtained by customers who receive the products or services offered.[52]

208.   Method 4 rates for February 2018 to November 2023 for each of the Class Action Plaintiffs' territories, RGE for Plaintiff Schuster and NYSEG West for Plaintiff Brous, are shown in Figure 9 and Figure 10, respectively, along with the variable rates Eligo charged the Plaintiffs.

**Figure 9 - Price to Compare for RGE for Plaintiff Schuster vs. Variable Rate Charged to Plaintiff Schuster**



---

[52] *Id.* at 51.

**Figure 10 - Price to Compare for NYSEG West for Plaintiff Brous vs. Variable Rate Charged to Plaintiff Brous**



209.    Having determined the Method 4 rate for a given zone, damages would be calculated as follows:

210.    Damages per customer per month = (Eligo's Rate – Method 4 Rate) * Usage, for that month.

211.    Damages per customer = Damages per customer per month added for all applicable months.

212.    Class Damages = Damages per customer added for all class members.

### 6.    Method 5: The Method of Calculating Damages for GBL §§ 349, 349-d(3), and 349-d(7) Violations

213.    For this method I was asked by Counsel for the Class Action Plaintiffs to outline a method for calculating statutory penalties if Eligo is found to have violated the following New York consumer protection laws.

214.    GBL § 349: To the extent Eligo's conduct is found to be deceptive, damages are each customer's actual damages or a minimum $50 per customer, whichever is larger.[53]

215.    Damages per customer = the customer's total actual damages[54] or $50, whichever is greater.

216.    Class Damages = The maximum allowable damages per customer (whether actual damages or $50) added for all class members.

217.    GBL § 349-d(3): To the extent Eligo's conduct is found to be deceptive in the context of energy services, damages are each customer's actual damages or a minimum $500 per customer, whichever is greater.

218.    Damages per customer = The customer's total actual damages or $500, whichever is greater.

219.    Class Damages = The maximum allowable damages per customer (whether actual damages or $500) added for all class members.

220.    GBL § 349-d(7): To the extent Eligo's conduct is found to violate GBL § 349-d(7), damages are each customer's actual damages or a minimum $500 per customer, whichever is greater.

---

[53] If for any of the calculations below it is determined that the minimum statutory damages are to be calculated on a per-overcharge basis, my methodology can be easily updated.

[54] The customer's total actual damages could be based on any of the sums derived from Methods 1 to 4, depending on what method is ultimately determined to apply to this claim.

221.    Damages per customer = The customer's total actual damages or $500, whichever is greater.

222.    Class Damages = The maximum allowable damages per customer (whether actual damages or $500) added for all class members.

223.    To the extent it is determined that any customer's actual damages should be trebled with a maximum of either $1,000 or $10,000, I can perform those calculations using each customer's actual damages.

### 7.    Method 6: The Method of Calculating Damages for Unjust Enrichment

224.    To the extent Plaintiffs prevail on their Unjust Enrichment claim, the damages computation would follow the model outlined in Method 2 above with the measure of damages being the difference between Eligo's actual costs plus a reasonable margin and the rate Eligo actually charged.

### 8.    Method 7: The Method of Calculating Monthly Fee Damages for Breach Of Contract.

225.    For this method I was asked by Counsel for the Class Action Plaintiffs to outline a method for calculating breach of contract damage for Eligo's imposition of an unauthorized monthly fee. The method for calculating damages for that claim is to sum the total of monthly fees charged to the Class Action Plaintiffs and the Class.

### 9.    Method 8: The Method of Calculating Monthly Fee Damages for GBL §§ 349, 349-d(3), and 349-d(7) Violations

226.    For this method I was asked by Counsel for the Class Action Plaintiffs to outline a method for calculating statutory penalties if Eligo's monthly fee is found to have violated the following New York consumer protection laws.

227.    GBL § 349: To the extent Eligo's monthly fee is found to be deceptive, damages are each customer's actual damages or a minimum $50 per customer, whichever is larger.[55]

228.    Damages per customer = The customer's total actual damages based on Method 7 or $50, whichever is greater.

229.    Class Damages = The maximum allowable damages per customer (whether actual damages or $50) added for all class members.

230.    GBL § 349-d(3): To the extent Eligo's monthly fee is found to be deceptive in the context of energy services, damages are each customer's actual damages or a minimum $500 per customer, whichever is greater.

231.    Damages per customer = The customer's total actual damages based on Method 7 or $500, whichever is greater.

232.    Class Damages = The maximum allowable damages per customer (whether actual damages or $500) added for all class members.

233.    GBL § 349-d(7): To the extent Eligo's monthly fee is found to violate GBL § 349-d(7), damages are each customer's actual damages or a minimum $500 per customer, whichever is greater.

234.    Damages per customer = The customer's total actual damages or $500, whichever is greater.

235.    Class Damages = The maximum allowable damages per customer (whether actual damages or $500) added for all class members.

---

[55] As previously noted, my methodology can be updated if it is determined that the minimum statutory damages are to be calculated on a per-overcharge basis.

236.   To the extent it is determined that any customer's actual damages should be trebled with a maximum of either $1,000 or $10,000, I can perform those calculations using each customer's actual damages.

### 10.   Named Plaintiff Damages Summary

237.   Below is a summary of each Named Plaintiff's damages under Methods 1 to 8.

238.   Plaintiff Schuster:

| Year | Method 1 Damages w/ 5% Markup | Method 1 Damages w/ 6.38% Markup | Method 2 Damages w/ 5% Markup | Method 2 Damages w/ 6.38% Markup | Method 3 Damages | Method 4 Damages |
|---|---|---|---|---|---|---|
| 2018 | $555.26 | $547.30 | $549.51 | $541.47 | $507.84 | $549.17 |
| 2019 | $1,336.69 | $1,327.50 | $1,473.84 | $1,466.45 | $1,421.74 | $1,484.96 |
| 2020 | $1,315.10 | $1,306.81 | $1,378.77 | $1,371.32 | $1,247.27 | $1,305.54 |
| 2021 | $1,396.10 | $1,384.30 | $1,407.72 | $1,396.08 | $1,549.83 | $1,585.89 |
| 2022 | $927.14 | $911.21 | $1,068.95 | $1,054.88 | $1,321.28 | $1,349.94 |
| 2023 | $1,147.34 | $1,136.73 | $1,237.78 | $1,228.36 | $1,278.28 | $1,306.63 |
| **Total** | **$6,677.63** | **$6,613.86** | **$7,116.57** | **$7,058.56** | **$7,326.24** | **$7,582.13** |

a.   Method 5 – The damages under GBL §§ 349, 349-d(3), and 349-d(7) are Plaintiff Schuster's actual damages, as shown in the above table, because the actual damages are higher than the statutory minimums. If the Court applies treble damages, the damages would still be the actual damages in the above table pursuant to GBL § 349 because that statute has a $1,000 statutory maximum for treble damages and actual damages exceed $1,000. However, if the Court applies treble damages under GBL § 349-d, the damages would be $10,000, which is that statute's treble damages cap.

b.   Method 6 – The damages calculation for unjust enrichment tracks the damages of Method 2, with the measure of damages being the difference between

Eligo's actual costs plus a reasonable margin and the rate Eligo actually charged. Accordingly, damages would be $7,116.57.

   c.   Method 7 – Under a breach of contract theory, Plaintiff Schuster had $216.92 in actual damages from authorized monthly fees.

   d.   Method 8 – Under GBL § 349, actual damages are $216.92 for unauthorized fees, but if the Court trebles the award, damages would be $650.76. Under GLB § 349-d, there is a statutory minimum damages of $500, which would apply because actual damages are less than $500. If the Court were to apply treble damages, the award would be $650.76.

   239.   Plaintiff Brous:

| Year | Method 1 Damages w/ 5% Markup | Method 1 Damages w/ 6.38% Markup | Method 2 Damages w/ 5% Markup | Method 2 Damages w/ 6.38% Markup | Method 3 Damages | Method 4 Damages |
|------|------|------|------|------|------|------|
| 2018 | $484.11 | $475.11 | $542.62 | $534.39 | $433.26 | $500.03 |
| 2019 | $814.34 | $803.73 | $964.33 | $955.68 | $890.62 | $984.97 |
| 2020 | $1,639.25 | $1,630.50 | $1,735.65 | $1,728.16 | $1,559.27 | $1,646.02 |
| 2021 | $1,591.49 | $1,577.96 | $1,668.16 | $1,655.64 | $1,790.68 | $1,847.39 |
| 2022 | $1,618.13 | $1,595.75 | $1,695.42 | $1,674.06 | $2,024.69 | $2,080.35 |
| 2023 | $1,247.64 | $1,231.69 | $1,618.56 | $1,607.49 | $1,513.05 | $1,568.53 |
| **Total** | **$7,394.97** | **$7,314.74** | **$8,224.74** | **$8,155.42** | **$8,211.57** | **$8,627.29** |

   a.   Method 5 – The damages under GBL §§ 349, 349-d(3), and 349-d(7) are the actual damages, as demonstrated in the above table, because actual damages are higher than the statutory minimums. If the Court applies treble damages, the damages would still be the actual damages in the above table pursuant to GBL § 349 because that statute has a $1,000 statutory maximum for treble damages and actual damages

exceed $1,000. However, if the Court applies treble damages under GBL § 349-d, the damages would be $10,000, which is that statute's treble damages cap.

b.  Method 6 – The damages calculation for unjust enrichment tracks the damages of Method 2, with the measure of damages being the difference between Eligo's actual costs plus a reasonable margin and the rate Eligo actually charged. Accordingly, damages would be $8,224.74.

240.     I reserve the right to change or modify this report if I am subsequently provided with additional data or information.

Dated: September 12, 2025

_____
Edo Macan