# Exhibit 14

## Deposition Transcript of Edo Macan

*Brous, et al. v. Eligo Energy, LLC, et al.*
*Case No. 1:24-cv-01260-ER*

Page 1

1                                            Volume:        I

                                             Pages:       323

2                                            Exhibits:       8

3                        UNITED STATES DISTRICT COURT

                         SOUTHERN DISTRICT OF NEW YORK

4

                                    C.A. No.: 1:24-CV-01260

5

       *******************************

6     IRA BROUS, AND MICHELLE SCHUSTER

      ON BEHALF OF THEMSELVES AND ALL

7     OTHERS SIMILARLY SITUATED,

           Plaintiffs

8     v.

      ELIGO ENERGY, LLC AND ELIGO

9     ENERGY NY, LLC,

           Defendants

10     *******************************

11

12            DEPOSITION of EDO MACAN, a witness called on behalf

13

14     of the Defendants, taken pursuant to the applicable provisions

15

16     of the Federal Rules of Civil Procedure, before Melissa Lupo,

17

18     a Court Reporter and Notary Public in and for the Commonwealth

19

20     of Massachusetts, at the Cambridge Center Marriott, 50

21

22     Broadway, Cambridge, Massachusetts 02142, on Wednesday,

23

24     December 17, 2025, at 9:02 a.m.

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 2

1        A P P E A R A N C E S

2

3        David Meadows, Esquire

4        Leo O'Toole, Esquire

5        WATSTEIN TEREPKA, LLP

6        75 14th Street NE #2600

7        Atlanta, GA 30309

8        404-602-4371

9        dmeadows@wtlaw.com

10           REPRESENTING: Eligo Energy, LLC and Eligo

11              Energy NY, Defendants

12

13

14       D. Greg Blankinship, Esquire

15       FINKELSTEIN, BLANKINSHIP, FREI-PEARSON &

16       GARBER, LLP

17       One North Broadway

18       White Plains, NY 10601

19       914-298-3290

20       gblanikinship@fbfglaw.com

21           REPRESENTING: Ira Brous and Michelle

22              Schuster, et al., Plaintiffs

23

24

Page 3

1        A P P E A R A N C E S (CONT.)

2

3        J. Burkett McInturff, Esquire (via Conference

4           Phone)

5        Andrey Belenky, Esquire (via Conference Phone)

6        WITTELS MCINTURFF PALIKOVIC

7        305 Broadway, 7th Floor

8        New York, NY 10007

9        jbm@wittelslaw.com

10       910-476-7253

11           REPRESENTING: Ira Brous and Michelle

12              Schuster, et al., Plaintiffs

13

14

15       Andy LaPointe, Esquire

16       In-House Counsel

17       201 West Lake Street, Suite 151

18       Chicago, IL 60606

19           REPRESENTING: Eligo Energy, LLC and Eligo

20              Energy NY, Defendants

21

22

23

24

Page 4

1        A P P E A R A N C E S (Cont.)

2

3   ALSO PRESENT:

4   Deane Cartensen, Videographer, d.cartensen@vdidepo.com

5   Goran Vojvodic, Consulting Assistant, EconONE (via Conference

6       Phone)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1                I N D E X

2   WITNESS:         DIRECT   CROSS   REDIRECT   RECROSS

3   EDO MACAN

4   By Mr. Meadows:      8

5   By Mr. Blankinship:        318

6

7

8            E X H I B I T S

9   NO.        DESCRIPTION               PAGE

10  Exhibit 1 Expert Report of Edo Macan, Sept. 12th 2025      57

11  Exhibit 2 Deposition Excerpt, LaPointe, pgs. 20-35      103

12  Exhibit 3 Deposition Excerpt, Pedotto, pgs. 99-104      113

13  Exhibit 4 DEF000907 rate_policy_8 sheet        127

14  Exhibit 5 DEF000908 rate_policy_9 sheet        127

15  Exhibit 6 Ex. 1 of Expert Report, M. Schuster T&C,      148

16       NY ESCO Consumer Bill of Rights

17  Exhibit 7 Eligo Risk Policies and Procedures, Effective  256

18       Nov. 1st 2016

19  Exhibit 8 Four Figures from Expert Report        308

20       (5, 6, 9 and 10)

21

22

23

24

2 (Pages 2 - 5)

Edo Macan                                   December 17, 2025
Brous v. Eligo Energy, LLC

Page 6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER: Okay. Good morning --
3    at 9:02 a.m. on December 17, 2025. Please note that
4    the microphones are sensitive and they may pick up
5    whispers and private conversations. Please mute
6    your phone at this time. Audio and video recording
7    will continue to take place unless all parties agree
8    to go off the record.
9          (Begin Media 1.)
10         This is Media Unit 1 of the video recorded
11   deposition of Edo Macan, in the matter of Ira Brous
12   and Michelle Schuster on behalf of themselves and
13   all others similarly situated versus Eligo Energy,
14   LLC and Eligo Energy, NY, LLC.
15         This case is filed in the United States
16   District Court for the Southern District of New
17   York, Case Number 1:24-CV-01260. The location of
18   this deposition is 50 Broadway, Cambridge,
19   Massachusetts.
20         My name is Deane Carstensen representing
21   Veritext and I'm the videographer today. I'm not
22   authorized to administer an oath. I'm not related
23   to any party in this action, nor am I financially
24   interested in the outcome. If there are any

Page 7

1    objections to proceeding, please state them at the
2    time of your appearance. Counsel and all present,
3    including on the conference call, can now please
4    state your appearance and affiliation to the record.
5          MR. MEADOWS: David Meadows and Leo O'Toole
6    for the defendants and we're accompanied by Andy
7    LaPointe who is in house with Eligo Energy.
8          MR. BLANKINSHIP: My name is Greg
9    Blankinship with Finkelstein, Blankinship, Frei-
10   Pearson & Garber, representing the plaintiffs.
11   Before I forget, we're going to reserve our right to
12   review the transcript, and to offer errata as
13   appropriate. I'll let the folks on the -- on the
14   phone introduce themselves.
15         MR. BELENKY: Andrey Belenky for plaintiff,
16   from Wittels McInturff Palikovic.
17         MR. MCINTURFF: This is Burkett McInturff
18   for plaintiffs, also Wittels McInturff Palikovic.
19         MR. VOJVODIC: This is Goran Vojvodic for
20   plaintiff also, not also-- with EconONE.
21         THE VIDEOGRAPHER: And if that is everyone
22   then thank you. Will the court reporter please
23   introduce yourself and administer the oath to the
24   witness? And then counsel may proceed.

Page 8

1          THE COURT REPORTER: Great. Good morning.
2    My name is Melissa Lupo. When we get to the end of
3    the proceeding, I may need to ask for spelling, so
4    after we wrap up, give me a moment to do that.
5          Will you please raise your right hand to
6    be sworn?
7          Do you solemnly swear to tell the truth,
8    the whole truth, and nothing but the truth?
9          MR. MACAN: I do.
10         EDO MACAN, after being satisfactorily
11   identified and duly sworn by the Notary Public, was
12   examined and testified as follows:
13         THE COURT REPORTER: Thank you.
14         DIRECT EXAMINATION
15   BY MR. MEADOWS:
16   Q    Okay. Thank you. Good morning, Mr. Macan.
17   A    Good morning.
18   Q    Can I start by asking you to state your first full
19        name for the record, please?
20   A    Edo Macan.
21   Q    Thank you. And is there any reason that you can't
22        give truthful testimony in your deposition here
23        today?
24   A    No.

Page 9

1    Q    You're not under the influence of any prescription
2         drug or anything like that that would impact --
3    A    No.
4    Q    Sorry, let me finish -- that would impact your
5         ability to testify?
6    A    No.
7    Q    Okay. I'm sure you've been through this routine
8         before, but just as a reminder, it's important that
9         you allow me to finish my questions before you begin
10        to answer. I will certainly try to let you finish
11        your answer before I ask the next question; is that
12        fair?
13   A    Yes. And understood.
14   Q    Okay. Great. Thank you. When we had -- there are
15        a number of folks listening in on this deposition on
16        the phone and it sounded like one of them is one of
17        your colleagues at EconONE; is that correct?
18   A    That's correct.
19   Q    Could you identify that person's name for the
20        record?
21   A    Goran Vojvodic.
22   Q    And what role does -- I'm sorry -- say his last name
23        one more time?
24   A    Vojvodic.

3 (Pages 6 - 9)

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 10

1   Q   Vojvodic.  Okay.
2   A   Yeah.
3   Q   Can you explain what Mr. Vojvodic's role is at
4       EconONE?
5   A   He's one of my support staff at EconONE.
6   Q   All right.  And did he work on this engagement
7       related to this case against Eligo with you?
8   A   He supported -- he supported me on some of the
9       analytical work at -- this engagement.  Correct.
10  Q   I'm sorry.  He supported you on some of the what
11      work?
12  A   Analytical work.
13  Q   Analytical work.  Okay.
14  A   Yeah.
15  Q   Can you describe for me in more detail what
16      particularly he did?
17  A   Provided audits of my work, calculations, checking
18      the numbers, administrative supportive staff,
19      consulting supportive staff.
20  Q   I see.  Other than Mr. Vojvodic, was there anyone
21      else at EconONE who worked with you on this report?
22  A   I'd have to look at my billing sheets, but if there
23      was, it'd be very junior person on, you know,
24      mundane auditing, quality control type of tasks.

Page 11

1   Q   Is it fair to say that you and Mr. Vojvodic together
2       did the bulk of the work on this particular case?
3           MR. BLANKINSHIP: Objection.  Leading.
4           THE WITNESS: I'm sorry.  Can you rephrase
5       the question one -- one --
6   BY MR. MEADOWS:
7   Q   Yeah.  I'm just -- is it fair to say that you and
8       Mr. Vojvodic did the majority of the work that led
9       up to the expert report that you're here to talk
10      about today?
11          MR. BLANKINSHIP: Same objection.
12          THE WITNESS: I've done the majority of the
13      work.
14  BY MR. MEADOWS:
15  Q   All right.  Now you mentioned -- we've talked some
16      about EconONE already.  You're currently employed as
17      a managing director at EconONE Research, correct?
18  A   Correct.
19  Q   What business is EconONE Research in?
20  A   Antitrust and economic consulting -- consultancy.
21      Mostly economists practicing across different
22      industries on litigation matters, antitrust, and
23      things of that sort.
24  Q   One of EconONE's lines of business is what it calls

Page 12

1       "litigation support," correct?
2   A   Yes, I -- I think so.
3   Q   And litigation support includes the engagement that
4       -- that you've had on this case, which is testifying
5       expert, correct?
6   A   Correct.
7   Q   Now, your bio on the EconONE website describes you
8       as a seasoned testifying expert; do you agree with
9       that?
10  A   I have been testifying for quite many years,
11      correct.
12  Q   How many years?
13  A   I have to look at my CV, but I've -- probably the
14      first written testimony report -- report format I've
15      submitted at Federal Regulatory Commission has been
16      10 years ago or something like that.  In addition to
17      that, I probably spent additional 10 years working
18      with expert witnesses, supporting expert witnesses
19      on litigation cases and all that.  I haven't -- I've
20      been -- I wasn't a witness myself at the time, but I
21      altogether combined 20 years' experience in
22      litigation.
23  Q   I see.  So some of your testimony experience is
24      before regulatory bodies; is that right?

Page 13

1   A   Correct.
2   Q   How many times have you testified in person in
3       regulatory hearings?
4   A   A couple of times.  I wouldn't recall the exact
5       number.
6   Q   A couple, meaning like two or three?
7   A   It'll be under half a dozen times.  The form that
8       testimony takes in front of mostly Federal Energy
9       Regulatory Commission isn't in a written form.  It -
10      - it's basically an expert report gets submitted.
11  Q   I see.
12  A   Few times, I -- I had to testify or defend my
13      positions in person.
14  Q   I see.
15  A   So it -- it happens -- it's more an exception than
16      the norm, which is why I don't remember the exact
17      number.
18  Q   Fair enough.
19  A   Yeah.
20  Q   And of course, here we're -- we're here today for a
21      deposition in civil litigation; you understand that?
22  A   I understand that.
23  Q   And how many times have you had your deposition
24      taken as an expert in civil litigation?

4 (Pages 10 - 13)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 14

1  A    Again, I don't recall the exact number, but a couple
2       of times -- under -- under a dozen times.  Yeah.
3  Q    Under a dozen.  All right.  Have you ever testified
4       at a trial in civil litigation?
5  A    No, I have not.
6  Q    What about at -- at a hearing before a judge that
7       was -- that was not a trial?  Have you -- have you
8       done that?
9  A    No, I have not.
10 Q    Now, you're here today as an expert witness for the
11      plaintiffs in this class action case against Eligo;
12      you understand that?
13 A    Yes.
14 Q    Have you ever testified in any capacity, whether
15      it's a deposition or any other -- in any other
16      proceeding in civil litigation on behalf of a
17      defendant?
18 A    In this case?
19 Q    In any case?
20 A    No, I haven't.
21 Q    Have you ever issued a -- an expert report in civil
22      litigation on behalf of a defendant?
23 A    No, I haven't.
24 Q    And you've been in the expert witness game for more

Page 15

1       than 10 years, correct?
2           MR. BLANKINSHIP: Objection.  Asked and
3       answered.
4           THE WITNESS: I believe I answered his
5       question.
6       BY MR. MEADOWS:
7  Q    Are you refusing to answer it again?
8  A    I believe I've answered this question already.  I
9       will answer -- yeah.
10 Q    Okay.  So my question is, have you been in a --
11      you've been in the expert witness game for more than
12      10 years, right?
13          MR. BLANKINSHIP: Objection.  Asked and
14      answered.  You can answer.
15          THE WITNESS: Yes.
16      BY MR. MEADOWS:
17 Q    Okay.  And why is it that in all that time you've
18      never issued a report on behalf of the defendant?
19          MR. BLANKINSHIP: Objection.  Outside the
20      scope of his report.  You can answer.
21          THE WITNESS: As a consultant, you do work
22      that you get hired for.  And it just turned out that
23      in as far as the civil cases are concerned, that I
24      have been retained only on the plaintiff side on --

Page 16

1       on, like I said, a couple of cases, under half a
2       dozen cases total.
3       BY MR. MEADOWS:
4  Q    All right.  Now, at an earlier point in your career,
5       as I understand it, you were employed by Duke Power
6       in Houston; is that right?
7  A    Correct.
8  Q    And Duke Power as a utility; is that right?
9  A    Correct.
10 Q    What did you do for Duke Power when you were
11      employed there?
12 A    My main role -- it's been a while, but I do remember
13      it.  My main role has been I was responsible for
14      North American power price fundamentals, meaning I
15      was responsible for internal power price forecasts
16      for the company.  My second role was working with
17      traders, ensuring that on behalf of -- I -- I was
18      part of corporate risk management, ensuring that the
19      positions and -- and trading activity that was going
20      on, the trading arm of the company was consistent
21      with what has been going on on the -- on the
22      developing side of the company.
23 Q    All right.  Duke Power is not an ESCO, is it?
24 A    No, they're not an ESCO.

Page 17

1  Q    Have you ever worked for any utility besides Duke
2       Power?
3  A    No, I have not.
4  Q    Have you ever been employed by an ESCO in any
5       capacity?
6  A    No.
7  Q    Have you ever done consulting work for an ESCO?
8  A    Nothing that comes to mind.  I've -- I've had
9       hundreds of clients over the years.  I'm pretty
10      certain that I haven't consulted for an ESCO in --
11      in New York, which is closest to this particular
12      case, but I -- I could not give you a definitive no
13      on that.  But I -- yeah, I -- I don't think so.
14 Q    Okay.  Have you ever worked with an ESCO to help it
15      set its retail prices for electricity?
16 A    No.
17 Q    What about a utility?  Have you ever worked for a
18      utility to help it set its retail prices for
19      electricity?
20 A    I'm going to have to think about this one because
21      like I said, there's been a lot of engagements.  So
22      utility rate setting comes up in -- in numerous
23      occasions and so have I been -- I -- I don't recall
24      being engaged to, you know, file regulatory, you

5 (Pages 14 - 17)

Edo Macan                                              December 17, 2025
Brous v. Eligo Energy, LLC

Page 18

1    know, rate applications or on behalf of utilities.
2    That wasn't the sole role.  But a lot of, you know,
3    many engagements that I've been involved on are very
4    much related to that process.
5    Q    Related to the process of setting rates -- retail
6    rates for electricity.
7    A    Not -- I -- I -- yeah.  I -- look -- yeah.  I -- I
8    cannot really give you a definitive yes or no.  I
9    mean, yes, the -- they are -- they are related and I
10   just -- I -- I just really -- I -- I don't recall to
11   giving a -- giving a -- give you definitive yes or
12   no.
13   Q    Okay.  Well, let me --
14   A    Can you maybe rephrase the question?  Yeah.
15   Q    Well, yeah.  Let me try to be more specific.
16   A    Sure.
17   Q    Has a -- has a utility ever come to you --
18   A    Yeah.
19   Q    -- and said, we'd like to hire you to help advise us
20   as to what we should charge retail consumers for
21   electricity?
22   A    No.  No.
23       MR. BLANKINSHIP: Objection.  Lack of
24   foundation.

Page 19

1    BY MR. MEADOWS:
2    Q    Your answer to the last question was no; is that
3    right?
4    A    I -- I've -- I've -- not in that direct capacity.
5    Yeah.
6    Q    Okay.  And I take it, this is true from some of your
7    prior answers, but just to be sure we have a clear
8    record, have you ever worked with an ESCO to help it
9    purchase power in the wholesale market in any state?
10   A    With -- with a utility?
11   Q    With an ESCO?
12   A    Not with an ESCO, but with other market
13   participants, for sure.
14   Q    What other market participants?
15   A    Like large commercial buyers, utilities.  Again, I'm
16   speaking based on my recollection.  Most cases I
17   deal with are very much related to that.  Fire
18   procurement is like one of the key -- key areas of -
19   - of the type of work we do.
20   Q    All right.  And then let's isolate that to New York.
21   Have you worked -- and this could be with anyone --
22   A    Yeah.
23   Q    -- commercial buyers, ESCOs, whoever.  Have you
24   worked with anyone with regard to purchasing power

Page 20

1    on the wholesale market in New York?
2    A    I believe I have, yes.
3    Q    Can you recall, you know, who were the clients for
4    those engagements?
5    A    Google was one of the clients that comes to mind.
6    It was a confidential engagement that I'm not sure
7    to what extent I can get into the details, but the -
8    - the subject matter, among other things, dealt with
9    energy procurement in various areas in the United
10   States and abroad, including New York.
11   Q    All right.  Going back to your testifying
12   experience, I take it you've never -- well, I think
13   I've asked you.  You've never testified on behalf of
14   an ESCO in litigation, right?
15   A    No.
16   Q    But you've testified against an ESCO in litigation,
17   correct?
18       MR. BLANKINSHIP: Objection.
19       THE WITNESS: I testified on the -- I
20   testified on the -- on the plaintiff side.  I have
21   been retained by the plaintiff in a capacity of an
22   expert witness to opine on the subject matter, and I
23   have testified in the context of that.
24   BY MR. MEADOWS:

Page 21

1    Q    How many times have you testified in that context in
2    a lawsuit against an ESCO?
3    A    I think, like I said, it was under a half a dozen
4    times.  A -- a few -- a few times, really -- half a
5    dozen times, but best estimate.
6    Q    Okay.  And I -- and I -- I think I asked that
7    question about testimony, but let me be a little bit
8    more general --
9    A    Okay.
10   Q    -- how many times have you been retained as an
11   expert witness in litigation by the plaintiff who is
12   suing an ESCO?
13   A    By -- in how many cases or by how many attorneys?
14   Q    In how many cases, yeah.  Thank you.
15   A    Half a dozen.
16   Q    Okay.
17   A    And all of them have been quite a while ago, more
18   than five, six years ago, which is why my
19   recollection is not that great.
20   Q    I see.  Can you recollect the names of any ESCOs who
21   were involved in the cases that you testified to?
22   A    Yes.  Direct Energy, Verde, Viridian Energy, I --
23   those -- those three come to mind.
24   Q    Okay.  Now you're seated next to a gentleman whose

6 (Pages 18 - 21)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 22

1    name's Greg Blankinship today, correct?
2    A    Correct.
3    Q    And Mr. Blankinship is one of the attorneys for the
4         plaintiffs in this case against Eligo, right?
5    A    Correct.
6    Q    Have you worked with Mr. Blankinship before this
7         case against Eligo?
8    A    No.
9    Q    What about any of the other lawyers representing the
10        plaintiffs in this case against Eligo, have you
11        worked with them before?
12             MR. BLANKINSHIP: Objection.  Vague.  You
13        can answer.
14             THE WITNESS: Can you -- okay.  No, I have
15        not worked for any of them before.  I have met
16        Counsel -- I always mispronounce his name -- Burkett
17        --
18    BY MR. MEADOWS:
19    Q    Mr. McInturff?
20    A    McInturff.
21    Q    Okay.  Yeah.  That's cool.
22    A    I'm sorry.  This is embarrassing, but I -- I just
23        don't retain names well.
24    Q    Sure.  Join the club but go ahead.

Page 23

1    A    I had met him on one of the previous cases.  I have
2         not worked for him, but I -- I -- I've -- I've met
3         him on one of the previous cases that I worked on.
4    Q    All right.  How did you come to meet Mr. McInturff
5         on previous cases?  Was he involved in the cases in
6         some way?
7    A    I don't -- honestly, I don't recall.  I was -- my
8         role on that case, and I don't even remember which
9         case it was; it might have been Direct.  It might
10        have been one of the other cases I've mentioned.  My
11        role was I was basically a quantum expert.  My
12        testimony, I -- I submitted testimony or expert
13        report along with another colleague at the time from
14        Charles River Associates, who's sort of, you know,
15        had the role that I have right now.
16             And my role was more -- more -- mostly
17        supportive.  The -- the portions of our expert
18        report that I testified on dealt with the -- the
19        analytic -- the analysis, basically, that we
20        submitted in the expert report.  So I don't -- I
21        honestly don't recall in what context I've met
22        Burkett at the time, because most of the -- most of
23        the communications that were held between the
24        counsels and us have been dealt with my colleague.

Page 24

1    Q    I see.  Now, you mentioned one of the prior ESCO
2         cases you were involved in was a lawsuit against
3         Direct Energy, right?
4    A    Yes.
5    Q    And Direct Energy, I believe, was based in
6         Connecticut; is that right?
7    A    Sounds right.
8    Q    Have any of the ESCO cases in which you've been
9         involved as an expert witness been filed against
10        ESCOs who are based in New York?
11             MR. BLANKINSHIP: Objection.  Objection.
12        Vague.  You can answer.
13             BY MR. MEADOWS:
14             THE WITNESS: I -- I honestly don't recall.
15    BY MR. MEADOWS:
16    Q    And I asked if those cases involved ESCOs that were
17        based in New York.  I want to broaden that, too.
18        Did any of those cases involve operations of the
19        ESCOs in the state of New York?
20    A    They -- they might have.  I -- it -- it's been more
21        than five years.  I really -- I really don't recall.
22    Q    All right.  Is the Direct Energy case the last ESCO
23        case in which you were involved as an expert?
24        Before this one, of course.

Page 25

1    A    Then -- I don't know.  I -- I don't have a copy of
2         my CV here, but if that's what it says in my CV,
3         then yes, that's -- that's what it was.  Like I
4         said, it's been more than five years ago and I -- I
5         don't really remember the sequence in which I've
6         done these cases, but it sounds about right.  I
7         mean, I know it's a vague answer, but it wasn't the
8         first one, as far as I recall.  Yeah.
9    Q    Well, I wasn't asking which was the first one, just
10        to be clear, I want to know, setting this case
11        aside, is Direct Energy the last ESCO case in which
12        you were involved?
13    A    No, no.  I -- I understand.
14    Q    Oh, okay.
15    A    I'm saying it wasn't the first case of this type
16        that -- that I worked on, so it was -- whether it
17        was that last one before this one, I honestly don't
18        recall.
19    Q    Fair enough.  I understand.  Have you ever lived in
20        the state of New York?
21    A    Not permanently.  I've spent a lot of time in New
22        York, but I haven't lived in New York.
23    Q    All right.  Have you ever been a customer of a New
24        York utility?

7 (Pages 22 - 25)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 26

1  A   No.
2  Q   I looked back at your website bio, Mr. Macan, and it
3      looks like that going back all the way to 1996, all
4      the -- all the jobs that you've had have been for
5      businesses that were based in either Massachusetts,
6      Texas, or California; does that sound right to you?
7  A   Where did you look at my CV?
8  Q   You have a website bio on the EconONE website.
9  A   Yeah.  It's -- it's a very abbreviated synopsis of
10     the work that I've done.  I -- it was really all
11     over the place.  I mean, I -- I don't want to go on
12     the record saying that I've probably done work in
13     every single state, but I've done work for 25 years,
14     predominantly US, Europe, and Asia.  I -- yeah.  All
15     over the place.  It -- it wasn't -- it didn't have a
16     geographic focus or -- nor I ever had a business
17     strategy of becoming an expert in a geographic
18     market, just to give you some color to it.  Yeah.
19     That's pretty much it.
20 Q   Understood.  I just want -- what I'm trying to get
21     at is, have you ever worked for a company or entity
22     that is actually based in the state of New York?
23          MR. BLANKINSHIP: Objection.  Vague.  Asked
24     and answered.

Page 27

1          THE WITNESS: You still want me to respond
2      to that?
3          MR. BLANKINSHIP: Yeah.  You can answer it.
4      Yeah.
5          THE WITNESS: Yeah.  Like I said, I really
6      like that -- it very much could be.  I -- I just
7      don't recall on top of my head --
8  BY MR. MEADOWS:
9  Q   Okay.
10 A   -- but it would be more likely yes than no.  I just,
11     yeah.  It's too much stuff and I don't keep track of
12     it.
13 Q   Understood.  Now, when you worked for Duke Power,
14     did Duke have any operations in the state of New
15     York?
16 A   Again, this is speaking 20-plus years ago, 20 --
17     yeah, something like that, 24 -- 24 years ago.  They
18     -- they were the second largest power company at the
19     time, right after Enron, I believe, or among the
20     top.  They had generation plants everywhere.  They
21     had -- they traded all the markets.  I don't recall
22     for a fact, but I'm 99 percent sure that, yes, that
23     there was a lot of activity in New York at the time.
24 Q   All right.  Now, you were at Duke from sometime in

Page 28

1      the year 2000 to sometime in the year 2001, does
2      that sound --
3  A   Correct.  Correct.
4  Q   That's right?  Why was your tenure at Duke, you
5      know, relatively short?
6  A   For personal reasons.  Actually, family reasons, not
7      even mine that I don't really volunteer to discuss.
8      But if you want, I can.
9  Q   No, I don't want to pry into family reasons.  I
10     think --
11 A   Yeah.
12 Q   That -- that's enough.  But you weren't asked to
13     leave Duke?
14 A   No, no, no.  No.
15 Q   And you weren't fired?
16 A   No, I wasn't fired.
17 Q   All right.  Now, since you've left Duke, I think
18     EconONE is the sixth company that you have been
19     employed by; does that sound about right?
20 A   If that's the count, I'm sure you got the count
21     right.  Yeah.
22 Q   All right.  And between working at Duke and your
23     current job at EconONE, I think you spent about nine
24     years at Charles River Associates; is that right?

Page 29

1  A   Correct.
2  Q   Was that -- where were you physically based when you
3      worked for Charles River?
4  A   In Boston.
5  Q   In Boston?  And what did you do when you were at
6      Charles River?
7  A   I did comparable work to what I'm doing right now.
8  Q   And what you're doing right now at EconONE,
9      obviously, we've talked about the litigation support
10     side.  You do some of that, right?
11 A   Yes.
12 Q   And tell me what else you do besides litigation
13     supporting your current role at EconONE?
14 A   I'd say the bulk of my work, it -- it -- first of
15     all, it -- it varies.  Like both Analysis Group,
16     Charles River, and -- and EconONE now are all
17     economic consultancies.  The nature of my work is
18     pretty similar.  Specific engagements and division
19     of -- of those engagements between sort of
20     litigation cases, regulatory work, client advisory
21     work, which is non-litigation, really varies on
22     demand.  Consultants do what they're hired to do.
23         So I'm -- I'm just answering sort of,
24     generally, I'd say, you know, the bulk of my work is

8 (Pages 26 - 29)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

1    not in litigation settings, the bulk of the work is
2    on regulatory side, working basically providing
3    testimony and expert reports to Federal Energy
4    Regulatory Commission, which is a national regulator
5    for all -- for wholesale power markets on -- on
6    issues that vary, but most often than not, relate to
7    acquisitions of energy markets and -- and similar
8    things.
9    Q    Okay. But you -- in your previous answer, you
10        mentioned wholesale power markets, and we're going
11        to talk about wholesale power markets. So that's a
12        concept that's in your report that you issued in
13        this case, right?
14            MR. BLANKINSHIP: Objection. Vague.
15            THE WITNESS: Can you please rephrase?
16    BY MR. MEADOWS:
17    Q    Yeah. I mean, in your report, we'll get into it
18        later. But you refer numerous times to the
19        wholesale power market in New York, right?
20    A    I -- I -- yeah. There -- there are certainly words,
21        wholesale power markets or something along those
22        lines, wholesale energy in my report, yes.
23    Q    Sure. And I want to understand, what is that if you
24        -- in layman's terms, what is the wholesale power

1    market?
2    A    Wholesale power markets are organized markets to buy
3        energy, you know, in -- in different parts of the
4        country. In New York, in particular, there's New
5        York ISO, which facilitates and organizes these
6        markets, like I discussed in my testimony. Day-
7        Ahead, Real-Time, so on and so forth. That's --
8        that's sort of an example of that.
9    Q    All right. So the New York, if I understand you
10        correctly, the New York ISO organizes the wholesale
11        power market in New York; is that correct?
12    A    I wouldn't say it organizes, but New York ISO --
13        yeah, I guess you -- you could -- you could say it
14        organizes, yeah.
15    Q    Is anything besides power sold on the New York ISO
16        wholesale market?
17            MR. BLANKINSHIP: Objection. Vague.
18            THE WITNESS: Can you please rephrase?
19    BY MR. MEADOWS:
20    Q    Well, yeah, I mean, I think you've testified that
21        one of the things sold on the wholesale power market
22        is, you know, power.
23    A    Yeah.
24    Q    Can I -- on that particular market, is there

1    anything else that's sold besides that?
2            MR. BLANKINSHIP: Same object -- same
3        objection.
4            THE WITNESS: What specifically are you
5        alluding to? I mean --
6    BY MR. MEADOWS:
7    Q    I'm not alluding to anything.
8    A    Okay.
9    Q    I'm asking if -- is there anything else in this --
10        whatever wholesale market is kind of organized by
11        the New York ISO, is there anything else that's sold
12        on that market besides power?
13            MR. BLANKINSHIP: Same objection.
14            THE WITNESS: I -- predominantly power or
15        mostly power. The -- the different types of power,
16        there's like, Day-Ahead and Real-Time and all kinds
17        of stuff. There are capacity markets also. I mean,
18        it's just, you know, power is -- it's a broad term
19        that encompasses a lot of things, so.
20    BY MR. MEADOWS:
21    Q    Okay. Understood. Let me switch gears a little
22        bit. A couple more questions about your background.
23        Your -- both of your -- your undergraduate degree
24        and your graduate degree, both are in electrical

1    engineering, correct?
2    A    One is in computer science as well, yeah. Master's.
3    Q    Okay. You don't have a degree in economics, do you?
4    A    No.
5    Q    No degree in accounting?
6    A    No, I don't have degrees. I've -- I've taken
7        classes. And for the 25 years of my career, I've
8        worked as a practicing energy economist. I'm going
9        to add some color to that as well, if I may.
10    Q    Well --
11            MR. BLANKINSHIP: You certainly may.
12            THE WITNESS: So --
13    BY MR. MEADOWS:
14    Q    Wait, hold on. I didn't ask another question yet.
15            MR. BLANKINSHIP: He -- he's not finished
16        answering his question. You can go ahead.
17            MR. MEADOWS: No, no, no, no.
18            MR. BLANKINSHIP: No, no. He didn't finish
19        answering his question.
20            MR. MEADOWS: He said, "I'll add details to
21        that later, if I may," and --
22            THE WITNESS: No, I didn't say later.
23            MR. BLANKINSHIP: No, no, he didn't say
24        later. You can read it back. He said -- he said,

9 (Pages 30 - 33)

Edo Macan                                        December 17, 2025
Brous v. Eligo Energy, LLC

Page 34

1    "I'm going to add some detail," and he's about to
2    add some detail.
3           MR. MEADOWS: I didn't ask him for that
4    detail.  We'll get to it.
5           MR. BLANKINSHIP: He -- he's -- this --
6    he's answering his question.  He's permitted to
7    answer his question in full.  You may -- you may
8    answer the question.
9           MR. MEADOWS: My -- listen.  The question
10   was whether he has a degree in accounting.
11          THE WITNESS: I -- I did not -- no.  You --
12          MR. MEADOWS: We'll get back to it, but you
13   are not in control of this deposition so knock it
14   off.
15          MR. BLANKINSHIP: Okay.  Use your inside
16   voice.  Be a professional.
17          Sir, you may answer the question if you
18   weren't finished.
19          MR. MEADOWS: Stop.  Now, listen.  The
20   question was whether you have a degree in
21   accounting.  I'm not going to cut you off today.
22   You can tell me --
23          MR. BLANKINSHIP: You just did.
24          MR. MEADOWS: -- all the reasons why you're

Page 35

1    an expert in economics.  That's not the question
2    that's pending, and you know that.
3           MR. BLANKINSHIP: I don't know that.  I
4    think you interrupted, like you just said you
5    wouldn't --
6           MR. MEADOWS: Stop arguing.  No, you are
7    now wasting time.  Can you stop?  Will you stop?
8           MR. BLANKINSHIP: You can answer the
9    question if you want.
10          THE WITNESS: I -- I did not finish --
11          MR. MEADOWS: Mr. Macan, I need you to stop
12   talking.  I'm not going to allow it.  This is not
13   the question.  And if we --
14          MR. BLANKINSHIP: This is horribly
15   inappropriate.
16          MR. MEADOWS: What you're doing is horribly
17   inappropriate.  You know the question, what you want
18   to say now is not responsive to this question.
19   We'll get to it.  I'm going to move on.
20          THE WITNESS: Sir, can I just say
21   something?
22          MR. MEADOWS: No, you cannot right now.
23          MR. BLANKINSHIP: Unbelievable.
24          MR. MEADOWS: Are you trying to goad me

Page 36

1    into something with these -- with these comments,
2    Greg?
3           MR. BLANKINSHIP: I am not.
4           MR. MEADOWS: On the one hand, you say I'm
5    being unprofessional, and on the other, you can't
6    control yourself, apparently, to keep your thoughts
7    to yourself; is that what's going on here?
8           MR. BLANKINSHIP: No.  I think your
9    behavior is unbelievable.  It's appropriate to note
10   that for the record.  You can go ahead.  Stop
11   wasting our time.
12   BY MR. MEADOWS:
13   Q    You don't have a degree in business, finance, or
14   management, do you?
15          MR. BLANKINSHIP: Objection.  Vague.
16          THE WITNESS: I -- I don't have a degree in
17   business, management or whatnot.  For the 25 years,
18   I've been a practicing energy economist.  Straight
19   out of school, I joined a company, one of the top
20   economic consultancies at the time, solely focused
21   on consulting in the energy space.
22          And among 20 or so of my peers at the time
23   who were all PhD economists, I was the only one that
24   made the bar or made the generation without having

Page 37

1    that formal degree.  The reason for that has been
2    that my graduate research has focused on the
3    regulation of energy markets and specifically, nodal
4    pricing on power, which was a novelty at the time.
5    This is 1997, when economists had very little idea
6    of how to price power specifically.  This is the
7    time when the markets are deregulating and this is
8    the reason why I ended up choosing this career.
9    This is what I have done at MIT in -- as a part of
10   my graduate research.
11          Needless to say, upon joining the company,
12   I've had a lot of PhD economists supporting me on
13   roles strictly because energy business is so
14   industry-specific that for someone straight out of
15   PhD or straight out of MBA, it was impossible for
16   these guys to perform this type of work.  It just
17   simply requires a lot of technical expertise about
18   the markets.
19   BY MR. MEADOWS:
20   Q    So you hold yourself out as a professional
21   economist.  Is that what I understand from your
22   answer?
23   A    Yes.
24   Q    Even though you have no degree in economics at all?

10 (Pages 34 - 37)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

1      MR. BLANKINSHIP: Objection. Vague.
2  Mischaracterizes his testimony.
3  BY MR. MEADOWS:
4  Q    Question is, you hold yourself as an economist even
5      though you don't have any degree in that discipline,
6      right?
7      MR. BLANKINSHIP: Same objections.
8      THE WITNESS: I don't. It's not -- I did
9  not say that I'm holding myself as an economist.
10  I'm -- for 25 years of my career, I'm -- I'm a
11  practicing economist. I don't have economics PhD,
12  but I have submitted numerous reports, worked for it
13  for 25 years for some of the leading energy
14  companies, testified and submitted reports in front
15  of Federal Energy Regulatory Commissions on dozens
16  of occasions. I -- in -- in -- by any stretch of
17  the imagination, that is operating as an energy
18  economist.
19  BY MR. MEADOWS:
20  Q    You're testifying in this case as an energy, as a --
21      an expert on energy economics; is that right?
22      MR. BLANKINSHIP: Objection. Vague. Lack
23  of foundation.
24      THE WITNESS: I have in my test -- in my

1      expert report, there is a -- there is a paragraph
2      where I specify specifically what's the scope of my
3      engagement in this matter and what am I -- what am I
4      testifying on. Paragraph 10.
5  BY MR. MEADOWS:
6  Q    Are you an expert in energy economics?
7      MR. BLANKINSHIP: Objection. Asked and
8  answered.
9      THE WITNESS: Yes.
10  BY MR. MEADOWS:
11  Q    And you hold -- you're going to hold yourself out to
12      the court as a qualified expert in economics,
13      correct?
14  A    Yes.
15      MR. BLANKINSHIP: Objection. Calls for
16  legal conclusion and vague.
17  BY MR. MEADOWS:
18  Q    Has any court ever held that you are qualified to
19      testify as an expert in economics?
20      MR. BLANKINSHIP: Objection. Vague. Calls
21  for a legal conclusion.
22      THE WITNESS: I believe that's a legal
23  question, and I can't opine on it.
24      MR. BLANKINSHIP: You can answer. Just you

1  --
2      THE WITNESS: If I'm a legal --
3  BY MR. MEADOWS:
4  Q    Well, I'm not asking to give your opinion. I'm
5      asking literally, in a case in which you've been
6      involved as an expert, has a -- has a court ever
7      issued a ruling saying that you're qualified to
8      testify as an economist?
9      MR. BLANKINSHIP: Same objection but you
10  can answer if you know.
11      THE WITNESS: No.
12  BY MR. MEADOWS:
13  Q    Have -- has any court ever ruled that you are not
14      qualified to testify as an economist?
15  A    No.
16      MR. BLANKINSHIP: Same objections.
17  BY MR. MEADOWS:
18  Q    You've just never been involved in a -- in a civil
19      litigation matter that's gotten to the point where
20      the court has ruled on your qualifications one way
21      or the other.
22      MR. BLANKINSHIP: Same objections.
23      THE WITNESS: Yes.
24  BY MR. MEADOWS:

1  Q    You don't possess a CPA license, correct?
2  A    No.
3  Q    And when I say, "CPA," I think you understand,
4      you're not a certified public accountant.
5  A    No, I don't have that certification.
6  Q    You don't hold yourself out as an expert on
7      Generally Accepted Accounting Principles, do you?
8  A    I don't have a CPA.
9  Q    Do you regard yourself as an expert on GAAP,
10      Generally Accepted Accounting Principles?
11      MR. BLANKINSHIP: Asked and answered.
12      THE WITNESS: I don't have a CPA.
13  BY MR. MEADOWS:
14  Q    But I'm asking if you regard yourself as an expert,
15      not whether you have a CPA. Do you regard yourself
16      as an expert on Generally Accepted Accounting
17      Principles?
18      MR. BLANKINSHIP: Same objection.
19      THE WITNESS: I -- I would not testify in a
20      -- in a capacity of an expert on that matter. So if
21      that meets the threshold of expertise, then the
22      answer is no.
23  BY MR. MEADOWS:
24  Q    All right. And you don't have a law degree, right?

11 (Pages 38 - 41)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 42

1  A    No.
2  Q    You're not licensed to practice law in any state,
3       are you?
4  A    No.
5  Q    And I take it that you don't claim to have any
6       expertise in legal matters, do you?
7  A    Other than being an expert witness and working in
8       this industry for over 20 years.
9  Q    Certainly, you're not claiming in this case to be an
10      expert on the law of contracts, are you?
11 A    No, I'm not -- I'm -- I'm not an attorney.  I don't
12      pretend to be one.  I'm here merely to opine on
13      economic matters in -- in this case.
14 Q    Are you offering any opinion -- we'll get to this in
15      more detail, but I want to follow up on that answer.
16      Are you offering any opinion in this case about how
17      the Eligo's customer contract should be interpreted?
18 A    No.
19 Q    Have you ever heard of something called the "implied
20      duty of good faith and fair dealing"?
21 A    I've -- I've heard of it, yes.
22 Q    Do you know what it -- what it is?
23 A    It's -- it's a -- it's a legal term and I'm going to
24      not try to conjecture on interpretation of legal

Page 43

1       terms.
2  Q    And I'm not going to ask you for your conjecture, I
3       just -- do you have any understanding of what the
4       implied duty of good faith and fair dealing is?
5  A    I -- I do, but I mean, I can -- I can give you a
6       layman's response, or -- because I'm not an
7       attorney.
8  Q    Whatever your understanding is as a non-attorney,
9       that's all I'm looking for.
10 A    Yeah.  So, I mean, there -- there's -- there there's
11      -- there's a body of law that basically governs
12      conduct and -- and things like this.  And -- and in
13      -- in this particular case, I think I mentioned it
14      in my -- one of my -- in -- in the -- in the report
15      at some point.  It's like universal business
16      practices.  Outside of the contractual language,
17      outside of the regulatory constraints, there's sort
18      of common law that applies to -- to the sort of
19      situation at hand.  And -- and I'm not an attorney.
20      I can't tell you more than that.  If you want to
21      rephrase it, I'm happy to discuss.  But that's --
22 Q    Well, my question was what is your understanding of
23      the implied duty of good faith and fair dealing?
24      And other than the answer you just gave, do you have

Page 44

1       anything to add to that question?
2  A    I -- I mean, I -- the -- the counterparties in a
3       transaction have -- have a, you know, duty to -- to,
4       you know, behave.  You know, in a -- in -- in a --
5       in a -- in -- in this particular case, ESCOs have a
6       duty to, and again, my understanding, not legal -- a
7       legal interpretation, have a duty to treat their
8       customers in a -- in a fair and just way --
9  Q    So --
10 A    -- and charge rates that are fair and just.
11 Q    So that's your understanding -- understanding of the
12      duty of good faith -- fair -- treat your customers
13      in a fair and just way; is that right?
14          MR. BLANKINSHIP: Objection.  Asked and
15      answered.  Mischaracterizes testimony.
16          THE WITNESS: No.  I -- I've -- I've -- my
17      answer was that they had a -- they have a duty to
18      charge rates that are fair and just, not treat --
19      treat this overly vague.  And, you know, in this
20      particular case, they have a -- they have a duty to
21      charge rates that are fair and just.
22  BY MR. MEADOWS:
23 Q    What's the source of that duty that you just
24      testified to?

Page 45

1          MR. BLANKINSHIP: Objection.  Asked and
2       answered.
3          THE WITNESS: I believe it's the -- it's
4       the -- it's the common law.  I'm not -- I'm not an
5       attorney.  I don't know nor I'm pretending to know
6       the nuances of where things come from.  That is my
7       non-legal understanding of how to -- how the law
8       works.
9   BY MR. MEADOWS:
10 Q    Okay.  A couple more background questions in this
11      morning session, and by the way, I'm sure you
12      understand, if you'd like to break at any point, as
13      long as a question's not pending, you're -- I'm
14      welcome -- sorry --
15 A    Yeah, but --
16 Q    -- you're welcome to have one, is what I was trying
17      to say.  So just let me know if you need to break at
18      any point.
19 A    But if I can -- can I say something?
20 Q    Sure.
21 A    Just in the spirit of keeping this amicable, I
22      really was trying to elaborate on my first couple
23      of, you know, I -- I did -- I didn't -- that -- that
24      interchange was completely unnecessary, I was trying

12 (Pages 42 - 45)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 46

1    to elaborate, as you can see, there's -- I -- I'm
2    not an attorney. I was trying to elaborate on my
3    response before that, and you did cut me off in the
4    middle of answering that question.
5  Q   Okay.
6  A   I just want to state it for the record.
7  Q   Okay. Okay. Why did you want to bring that up in
8    response to me offering you the opportunity to have
9    a break whenever you'd like one? What was it about
10    that that wanted -- that made you want to say that?
11       MR. BLANKINSHIP: Objection. Vague.
12    Outside the scope of his expert testimony.
13       THE WITNESS: I wanted to do that in the
14    spirit of, you know, continuing an amicable
15    conversation. That -- that -- that's all. That was
16    the only purpose. Because your suggestion that I
17    can take a break whenever I want is in my mind, in
18    the same spirit. I know that I can request a break
19    at any point. You're being kind by offering me
20    that, thinking that maybe I'm not aware of that.
21    I'm fully aware of that.
22  BY MR. MEADOWS:
23  Q   Okay.
24  A   In the same way, I wanted to tell you that what

Page 47

1    Counsel said was actually absolutely right. I -- I
2    really did -- wanted to elaborate on that question,
3    but that's completely fine. So that's all.
4  Q   Okay. Now, you're being compensated for your work
5    on this case at the rate of $750 an hour, correct?
6  A   Correct.
7  Q   And please forgive me, your colleague, who's on the
8    phone, who -- whose last name I've already
9    forgotten, is --
10  A   Sure. Vojvodic.
11  Q   Yes. Vojvodic. Does he have an hourly rate that
12    he's charging on this matter as well?
13  A   He does.
14  Q   And what is that?
15  A   I believe it's 5 -- 500 or 525 -- 525.
16  Q   All right. Now, the $750 an hour rate that you're
17    charging the plaintiffs on this case, is that the
18    same rate that you charge other clients for your
19    work in -- during this calendar year?
20  A   No. No, it's not.
21  Q   How does the rate that you're charging in this case
22    differ from other rates that you charge for your
23    work? And I'm isolating this to the year 2025.
24  A   Yeah, it doesn't, it just sort of gets updated. I -

Page 48

1    - I joined the company fairly recently, in 2024. I
2    believe my rate at Charles River was comparable.
3    And so initial rate was sort of set 750 and then I
4    believe when I was -- and -- and then later -- and
5    then later in the year, I was retained on multiple
6    other cases where I've, you know, charged a
7    different rate.
8  Q   When you say, "you were retained on other cases,"
9    are you talking about litigation matters?
10  A   No.
11  Q   Regulatory matters.
12  A   Regulatory matters.
13  Q   And the rates that you're charging, the regulatory
14    matters, are they higher or lower than the 750 that
15    you're charging here?
16  A   In this particular case, there were -- there were
17    higher rates.
18  Q   All right. Why is -- why are you charging a higher
19    rate on those regulatory matters?
20       MR. BLANKINSHIP: Objection. Asked and
21    answered.
22       THE WITNESS: It -- all the prices go up.
23    Our labor costs go up as well. And I -- it became
24    apparent to me that I did not realize that, you

Page 49

1    know, market has moved, and I adjusted my rates
2    accordingly.
3  BY MR. MEADOWS:
4  Q   I see. But you haven't adjusted your rate on the
5    Eligo matter since the engagement came in the door;
6    is that right?
7  A   No, I haven't.
8  Q   Do you intend to adjust the rate going forward into
9    the year 2026?
10  A   I haven't made the decision. Usually, rates are
11    updated on a calendar basis. The reason why I
12    haven't adjusted it here is because when I was
13    initially contacted by counsel on this matter, they
14    asked me to disclose my rate, and the rate that I
15    told them was the prevailing rate that I was
16    charging at the time. And I thought it would be
17    fair -- unfair to change the rate in the middle of
18    the year, so.
19  Q   How did -- are you the one who determined that your
20    rate on this matter would be $750 an hour?
21  A   Yes.
22  Q   How did you come up with that number?
23  A   I didn't come up with the number. That's the --
24    that was my understanding at the time of -- of --

13 (Pages 46 - 49)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

1    well, that was -- that was the rate that I set,
2    billing rate to six months after joining the
3    company.
4    Q    Right. But my question, I think, is a little bit
5        more broad of how did you arrive at 750 versus some
6        other number, what goes into that?
7    A    Budgeting. I -- I run a -- I have support staff
8        working for me. You know, my -- my time is
9        valuable. I -- there's not a tremendous amount of
10       calculation that goes in it. Economic consultants
11       have rates that they charge. I believe my rate at
12       Charles River has been and JS Held, was quite
13       comparable to that. And I just -- as a -- you know,
14       until -- until I sort of, you know, I just set it, I
15       just set it at the time. I didn't -- it's not
16       something that I put too much thought into it. It
17       was a default rate. Whatever I was charging before,
18       I had that rate.
19   Q    Is -- are you at least trying to keep your billable
20       rate in line with what you perceive to be the market
21       for other people who are in your line of business?
22           MR. BLANKINSHIP: Objection. Vague.
23           THE WITNESS: I don't really know what
24       other people charge. I -- I have no information

1    other than anecdotal evidence of what other people
2    charge in terms of my competitors. You know, I know
3    a few colleagues in my company what they charge,
4    and, you know, that -- that's roughly what it is.
5    Yeah.
6    BY MR. MEADOWS:
7    Q    All right. How much has your firm charged the
8        plaintiffs to date for your firm's work on this
9        case? Not just yours personally, but EconONE.
10   A    I really don't know the figure.
11   Q    I mean, do you have a -- even a ballpark of what the
12       total charges have been?
13           MR. BLANKINSHIP: Objection. Asked and
14       answered.
15           THE WITNESS: I -- I don't have the -- I
16       don't have the exact figure. We send invoices
17       monthly, and I just don't have the figure.
18   BY MR. MEADOWS:
19   Q    Are you involved in that monthly invoicing process?
20   A    I am.
21   Q    And do you review the bills before they're sent to
22       whoever it is at the plaintiffs' firms who
23       receive them?
24   A    I am.

1    Q    So every -- and the bills go out monthly?
2    A    They generally go out monthly. Correct.
3    Q    Okay. But you, as we sit here today, you don't have
4        any recollection of what the rough total of those
5        bills that have gone out is?
6            MR. BLANKINSHIP: Objection. Asked and
7        answered.
8            THE WITNESS: I -- I can't give you a total
9        figure. There are -- there are multiple invoices
10       and -- and which ones were paid, which ones were not
11       paid, you know, what went out, I -- I just don't
12       have the total number.
13   BY MR. MEADOWS:
14   Q    I understand. I'm not asking for exact total. I
15       just want to be clear. You don't even have a rough
16       order of magnitude in mind about how much your firm
17       has charged?
18           MR. BLANKINSHIP: Objection. Asked and
19       answered.
20           THE WITNESS: I don't -- I don't have a
21       total. I don't have a number. I mean, if you can
22       ask me, is it higher than -- I, like, I don't want
23       to speculate. I mean, I just don't -- I don't know
24       exactly. If you ask me at this point, how much have

1    you been compensated for this? I don't know. I've
2    been compensated $750, me, personally, an hour for
3    the work that I have performed, and my staff has
4    been compensated at their commensurate rates for the
5    work that they have performed. And so I just --
6    BY MR. MEADOWS:
7    Q    Okay. And just to clarify, I think you said you've
8        personally been compensated at 750 an hour. Now,
9        you don't personally receive that 750 --
10   A    Yeah. No, no, I'm sorry. Yeah. I misspoke.
11       Through -- through the invoices that, you know,
12       clients pay invoices and the company receives
13       invoices.
14   Q    Right. And that's what I want to get. I just want
15       to clarify that's --
16   A    Yes. Yes.
17   Q    So the invoices for EconONE's work on this case are
18       issued by EconONE, correct?
19   A    Correct.
20   Q    And they go to plaintiffs' law firms who hired
21       EconONE, correct?
22   A    Yeah. Approved by me and issued by the company.
23       Correct.
24   Q    Right. And then when money comes in in payment of

14 (Pages 50 - 53)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 54

1    those invoices, that doesn't hit your bank account,
2    does it?
3  A  No.
4  Q  It goes to whatever EconONE bank account.
5  A  It goes to the EconONE bank account. And I don't --
6    I don't even know. Like, I don't believe I even get
7    a notification of what was paid, what wasn't paid at
8    some point in time.
9  Q  Okay.
10  A  I looked where we are and -- and that's -- that's
11    why I'm -- I'm just not -- I'm focused on my work
12    less than that most of the time, so.
13  Q  All right. Now, I don't -- I'm not asking you any
14    questions about how much you're personally being
15    compensated by EconONE. I just want to --
16  A  No, no, no, I understand.
17  Q  I know. I just want to clarify because I am going
18    to ask you some process questions about that.
19  A  Okay.
20  Q  Your compensation at EconONE, is it salary-based,
21    commission-based? Can -- what?
22  A  It's salary plus discretionary bonus.
23  Q  All right. And is the discretionary bonus annual?
24  A  Discretionary bonus is annual. Correct.

Page 55

1  Q  All right. And are there any inputs that go into
2    how that discretionary bonus is determined?
3    MR. BLANKINSHIP: I'm just going to object.
4    This is all outside the scope of the expert report
5    and the required disclosures under Rule 26, but you
6    can answer.
7    THE WITNESS: I'm sorry, can you repeat the
8    question?
9  BY MR. MEADOWS:
10  Q  Sure. What go -- what goes into -- what are the
11    inputs that go into the setting of your annual
12    bonus? Again, not asking you how much you've been
13    paid or any amounts, just what goes into it.
14    MR. BLANKINSHIP: Same objections.
15    THE WITNESS: I -- I -- you know, I don't -
16    - I -- I don't know the exact formula. It's, I
17    guess, how much work has been performed, thus, you
18    know, how much work has been billed, what are the --
19    what -- what are the costs of performing that work,
20    both in terms of salaries for the support staff,
21    administrative costs, expenditures? Like, you know,
22    like any other company. Pretty much that.
23    And -- and so if -- if, you know, all the
24    costs are covered, and I don't know how the company

Page 56

1    does profits and whatnot, you know there's
2    discretionary money left for bonuses. I allocated
3    bonuses for -- for my group.
4  BY MR. MEADOWS:
5  Q  Tell me how this engagement, or your engagement on
6    this case came to EconONE, where -- did you -- did
7    you get a call from someone, or did the call come
8    into someone else at EconONE?
9    MR. BLANKINSHIP: Same objections. Outside
10    the scope of the report and the required Rule 26
11    disclosures, but you can answer.
12    THE WITNESS: I -- I got a call and I
13    honestly don't remember, was it from Burkett, who I,
14    like I said, met once or twice, five years before,
15    or from Greg, one of the two of them? Had -- that's
16    -- that's how it came about.
17  BY MR. MEADOWS:
18  Q  How long ago was that?
19    MR. BLANKINSHIP: Same objections.
20    THE WITNESS: I believe this was the
21    beginning of the year, February or March.
22  BY MR. MEADOWS:
23  Q  Of 2025?
24  A  Of 2025.

Page 57

1  Q  All right.
2  A  Speaking on recollection, it could be, yeah.
3  Q  Sure.
4  A  Was definitely '25, but months I could be off.
5    MR. MEADOWS: Let's give a copy of the
6    report to mark.
7    MR. O'TOOLE: You could use. Yeah.
8    THE WITNESS: What's that?
9    MR. O'TOOLE: You could use. Yeah.
10    MR. MEADOWS: Yeah, I don't -- yeah. So I
11    just need to separate those.
12    MR. O'TOOLE: Yeah.
13    MR. MEADOWS: Yeah. Thanks. Can I mark
14    this -- mark this as Exhibit 1? Thank you.
15    (Whereupon, Ex. 1 Expert Report of Edo Macan, Sept.
16    12th 2025 is marked for identification.)
17  BY MR. MEADOWS:
18  Q  Mr. Macan, I know you've brought some copies of the
19    report.
20  A  Okay.
21    MR. MEADOWS: I've gone ahead and mark this
22    one. Greg, I've got an extra copy if you'd like.
23    THE WITNESS: Thanks.
24  BY MR. MEADOWS:

15 (Pages 54 - 57)

Edo Macan                                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 58

1  Q    That's Exhibit 1 to your deposition. Obviously,
2       we're going to talk about this throughout --
3  A    Sure.
4  Q    -- the deposition today, but I take it you recognize
5       Exhibit 1 as a copy of the expert report that you
6       issued and signed in connection with this case?
7           MR. BLANKINSHIP: Yeah. I'd just like to
8       note that the exhibits to the report are not
9       included in this copy.
10 BY MR. MEADOWS:
11 Q    Yeah, that's right. This is -- just to save volume,
12      we didn't include those. But other than the
13      exhibits and the schedules, were -- this is the copy
14      of the report that you issued, correct?
15 A    That's --
16          MR. BLANKINSHIP: Objection. Vague.
17          THE WITNESS: That's what it looks like
18      based on the front page.
19 BY MR. MEADOWS:
20 Q    So I want to ask you, Mr. Macan, who wrote this
21      report?
22 A    I wrote this report.
23 Q    Did anyone work with you on actually, you know,
24      putting the words to paper and writing with --

Page 59

1       writing this?
2           MR. BLANKINSHIP: Objection. Vague.
3           THE WITNESS: What specifically do you
4       mean?
5  BY MR. MEADOWS:
6  Q    I mean, did anybody work on the wordsmithing and the
7       actual drafting of this besides you?
8           MR. BLANKINSHIP: Same objection.
9           THE WITNESS: I -- I wrote this report.
10 BY MR. MEADOWS:
11 Q    What about anybody from the plaintiffs' law firms,
12      did any -- did anybody from those firms help you
13      write the report?
14          MR. BLANKINSHIP: Objection. Vague.
15          THE WITNESS: Specifically, what do you
16      mean by helping me write the report?
17 BY MR. MEADOWS:
18 Q    Well, let's take one example. Did you send drafts
19      of the report to the plaintiffs' law firms before
20      the final version was signed?
21          MR. BLANKINSHIP: Objection. Vague.
22          THE WITNESS: Yes. I've sent drafts of the
23      report.
24 BY MR. MEADOWS:

Page 60

1  Q    And did they make comments or red lines to the
2       drafts?
3  A    I believe they've made -- they made comments and
4       suggestions that we discussed for my consideration,
5       but ultimately, anything that I have -- ultimately,
6       the final version was -- was words that I wrote, and
7       they were done by and improved by me. Yeah.
8  Q    But certainly, there were instances in which the
9       plaintiffs' lawyers made suggestions on the drafting
10      of the report that you -- that you accepted,
11      correct?
12          MR. BLANKINSHIP: Objection. Asked and
13      answered.
14          THE WITNESS: Do I answer the same --
15          MR. BLANKINSHIP: You can -- you can
16      answer.
17          THE WITNESS: Like -- like I said, I -- I'd
18      -- there were -- there were suggested comments that
19      I took into consideration in -- in finalizing my
20      report.
21 BY MR. MEADOWS:
22 Q    I understand that. What I want to -- what I'm
23      trying to get to is that certainly, there were
24      instances in which the plaintiffs' lawyers made

Page 61

1       specific suggested edits to the language in your
2       report that you accepted, correct?
3           MR. BLANKINSHIP: Objection. Asked and
4       answered. Foundation. You can answer again.
5           THE WITNESS: I just don't know how to
6       answer it any -- any other way. I've answered three
7       different ways. Can you be more specific? Are you
8       saying if there is a word where they said, you know,
9       they suggested this word should not be this, but
10      like offered, you know, a different word for
11      something, and I ultimately accepted that word as an
12      example?
13 BY MR. MEADOWS:
14 Q    Exactly.
15 A    I'm sure there were -- there were instances like
16      that.
17 Q    Right. Okay. How many drafts went back and forth
18      between EconONE and the -- and the plaintiffs'
19      lawyers before the final report was signed?
20 A    A couple of drafts. I don't recall the exact
21      number.
22 Q    And understanding that you can't recall the exact
23      number but does a couple mean two or three or four
24      or five?

16 (Pages 58 - 61)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

1      MR. BLANKINSHIP: Objection.  Asked and
2   answered.
3          THE WITNESS: I really can't exact --
4   recall the exact number.  I -- I -- if I had to
5   guess, it'd be like two, three, four, something like
6   that.
7   BY MR. MEADOWS:
8   Q   All right.  Now, the report obviously has a number
9      of different sections.  One of the sections of the
10     report, and in particular, I believe it is -- I'm
11     sorry.  Let me get myself oriented here.  Well,
12     really, the first section of the report, which is
13     styled Introduction, and then you've got a
14     subsection A, Parties to the Dispute, there you give
15     your understanding as to certain kind of basic facts
16     of the case, correct?
17  A   I'm sorry.
18         MR. BLANKINSHIP: Object --
19         THE WITNESS: Sorry.
20  BY MR. MEADOWS:
21  Q   Oh sure.
22  A   Can you point me to the specific point in the
23     testimony where I could --
24  Q   Yeah, I'm looking on pages 1 and 2.

1   A   Okay.
2   Q   And you've got a section titled "Introduction."  And
3      then -- and then below that is subsection A, Parties
4      to the Dispute.  Are you with me?
5   A   Yeah.  Yes, I am.
6   Q   All right.  And there, in that section, you're
7      giving your understanding as to certain kind of
8      basic facts of the case; is that fair to say?
9   A   That's fair to say.
10  Q   I want to focus your attention on paragraph 5 and
11     there in paragraph 5, you have some discussion about
12     Ira Brous, who was initially one of the named
13     plaintiffs in the case, correct?
14  A   Yeah.
15  Q   And you say, for example, when Mr. Brous enrolled
16     with Eligo, right?
17  A   Yeah.
18  Q   And then you say, in or around November 2023 and
19     again, this is in paragraph 5, it says, "In or
20     around November 2023, Mr. Brous's Eligo account was
21     canceled."  You see that?
22  A   Yeah.
23  Q   Can you tell me why that's phrased in passive voice?
24         MR. BLANKINSHIP: Objection.  Vague.

1   BY MR. MEADOWS:
2   Q   You know what "passive voice" means?
3   A   Yeah, I know.
4   Q   Yeah.
5   A   I don't really have -- don't have the answer for it.
6   Q   Don't -- you don't know?
7   A   No.
8   Q   And I -- I'm --
9   A   I use passive voice all the time.  I mean --
10  Q   Well, if you look -- I want to compare that to
11     paragraph 6, and you'll see in paragraph 6, you have
12     some discussion there related to the other named
13     plaintiff, Michelle Schuster, right?
14  A   Mm-hmm.
15  Q   And at the end of paragraph 6, you say, "In November
16     2023, Plaintiff Schuster canceled her Eligo
17     account," right?  So there you didn't choose to use
18     passive voice, right?
19  A   Yeah.
20  Q   Do you have any explanation for why, in paragraph 5,
21     you chose to describe Mr. Brous's cancellation with
22     passive voice and in -- and didn't do that in
23     paragraph 6?
24  A   Well, just different way to say the same thing.

1   Q   Are you aware that Ira Brous himself never canceled
2      his Eligo account?
3          MR. BLANKINSHIP: Objection.  Lack of
4      foundation.  Misstates the record.  You can answer.
5          THE WITNESS: I -- this is a – 90 pages,
6      just to give you the context.  I've reviewed a lot
7      of documents.  Everything I relied upon is in one of
8      my exhibits.  Facts like this, I just really cannot
9      recall right now, so.
10  BY MR. MEADOWS:
11  Q   Okay.  So are you aware that what in fact happened
12     was that Mr. Brous's son called Eligo and
13     impersonated his father to cancel the account?  Are
14     you aware of that?
15         MR. BLANKINSHIP: Objection.  Vague.
16     Mischaracterizing the record.  Lack of foundation.
17         THE WITNESS: I don't believe I'm aware of
18     that.
19  BY MR. MEADOWS:
20  Q   In all your work on the case, no one ever told you
21     that?
22         MR. BLANKINSHIP: Same objections.
23         THE WITNESS: They might, I just -- I just
24     don't recall.

17 (Pages 62 - 65)

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

Page 66

BY MR. MEADOWS:

1  BY MR. MEADOWS:
2  Q   Yeah.  Are you familiar with the name Ramsey Brous?
3  A   Is that the son?
4  Q   Yeah, it is.
5  A   Like I said, I had worked with Burkett now for five
6      months.  I couldn't recall his last name.  I really
7      could not recall the name of the son of -- of the
8      plaintiff.  It's just, that's unfortunately how my
9      mind -- my mind works.  I'm not good with names.
10 Q   Sure, but did you read Ramsey Brous's deposition in
11     this case?
12 A   Is it -- is his deposition listed on -- on the
13     documents?  I -- I can't --
14 Q   I don't believe it is.  And --
15 A   Yeah.  Okay.  If it isn't, if -- if it's not, I have
16     not read his deposition.
17 Q   All right.  So is the -- what I want to get back to
18     you, and maybe you don't remember and that if you
19     don't, you'll tell me, this comparison we're making
20     of the passive voice in paragraph 5 versus the
21     active voice in paragraph 6, is that a change that
22     the plaintiffs' lawyers made to your draft report?
23 A   I -- I really don't recall nor I would -- nor I
24     would think so.  If you're alluding to the fact that

Page 67

1      that's like a change in the writing style, I -- I
2      tend to do that quite often.  I mean, I'm not an
3      attorney.  I -- I don't conscientiously pay
4      attention to -- to that thing, and so I just really,
5      I have no idea.
6  Q   Okay.  And we'll do a few more questions.  I know
7      we've been going about maybe a little over an hour,
8      a few more, and then we'll take a break, if that's
9      agreeable to you.
10 A   Sure.  Yeah.
11 Q   Going back to paragraph 5.  You know, you say here
12     that Mr. Brous enrolled with Eligo and was charged a
13     fixed rate for electricity from August 2017 until
14     January 2018, correct?
15 A   Correct.
16 Q   And then his account was canceled in November 2023,
17     right?
18 A   Correct.
19 Q   So Mr. Brous was a customer of Eligo for something
20     like six years; is that right?
21 A   Yeah.
22 Q   And I think you're aware -- well, let me ask it this
23     way.  Can we agree that based on your review of the
24     facts, Eligo allowed -- Eligo's terms of service

Page 68

1      allowed customers to cancel at any time and for any
2      reason?
3          MR. BLANKINSHIP: Objection.  Outside the
4      scope of his -- of his report.  You can answer.
5          THE WITNESS: My general understanding of
6      that would be consistent with that.  Yeah.
7  BY MR. MEADOWS:
8  Q   So do you have any understanding as to why Mr. Brous
9      remained an Eligo customer for roughly six years?
10         MR. BLANKINSHIP: Same objection.
11         THE WITNESS: I cannot infer to his
12     reasons.  I could speculate, but I'm not here to
13     speculate.
14 BY MR. MEADOWS:
15 Q   Okay.  Is -- but is that something you ever inquired
16     about as to why he decided to remain an Eligo
17     customer for so long?
18         MR. BLANKINSHIP: Same objection.
19         THE WITNESS: No, I did not.
20 BY MR. MEADOWS:
21 Q   Do you know what Ira Brous did for a living, before
22     he unfortunately passed away?
23         MR. BLANKINSHIP: Objection.  Outside the
24     scope of his expert report.

Page 69

1          THE WITNESS: No, I don't.  And -- and like
2      these types of questions, I -- I -- for -- for -- in
3      the context of the assignment that I was given, they
4      did not seem to me, you know, extremely important.
5      And -- and no.  So -- so I -- I don't think I have.
6      I -- I don't recall, but it'd be plausible that I
7      did not look into that level of detail.  Yeah.
8  Q   Because you didn't think it was important to your
9      opinions, right?
10         MR. BLANKINSHIP: Same objection.
11         THE WITNESS: I mean, why specifically he
12     decided -- based on some of the testimony.  This is
13     sort of my -- of -- of based on my recollection.  I
14     -- I recall seeing -- seeing evidence that, you
15     know, they realized -- I mean, let me -- let me say
16     it differently.  He's one of the leading plaintiffs.
17     According to the complaint, they were dissatisfied.
18     They thought there were charged rates that
19     were inconsummerate (sic) and -- and not
20     commercially reasonable and -- and inconsistent with
21     what they thought they would be charged.  And when
22     they realized that they didn't want to take service
23     from Eligo anymore, they quit.  And so specifically,
24     what led to that, I don't know, but to me, it did

18 (Pages 66 - 69)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 70

1    not seem that relevant for the scope of the
2    assignment that I was hired to do.
3    BY MR. MEADOWS:
4    Q    And the other one -- of the questions they asked you
5         was if you knew what Mr. Brous did for a living
6         before he passed away and --
7    A    I -- I actually probably.  I probably did at the
8         time.  I -- I really, I just don't remember.  I -- I
9         don't.  I tend not to deal with a lot of stuff, and
10        I tend not, you know, not to remember things that
11        are not crucially important, not for -- yeah.
12   Q    All right.  Would it surprise you to learn that Mr.
13        Brous was an economics professor at a college?
14             MR. BLANKINSHIP: Same objection.  Outside
15        the scope.
16             THE WITNESS: No, it would not surprise me.
17   BY MR. MEADOWS:
18   Q    And one of the opinions that you express in your
19        report is that there's an information asymmetry
20        between Eligo and its customers, right?
21   A    Yes.
22   Q    And it's your view that Eligo was taking advantage
23        of that information asymmetry to overcharge its
24        customers, right?

Page 71

1    A    Yes.
2    Q    And do you -- do you think it was not relevant to
3         that opinion that one of the customers who happens
4         to be a named plaintiff in this case was actually a
5         professor of economics?
6    A    I don't think that really matters a lot because it -
7         - it's not a -- it's not a question of analytic
8         sophistication.  The -- the issue at hand is that
9         energy pricing is so obscure, even for a very
10        qualified and intelligent individual, like I'm sure
11        Plaintiff was, to figure out exactly what would be
12        the right price of energy.  It's a really hard task.
13   Q    Well, it wouldn't be hard to figure out what Eligo
14        was charging versus what the utility was charging at
15        any given time, would it?
16             MR. BLANKINSHIP: Objection.  Lack of
17        foundation.  Outside the scope of his report.
18             THE WITNESS: If one knew where to look for
19        utility rates and if the -- if the amounts involved
20        were substantive, for somebody probably earning a
21        good living to try to save a few bucks by checking
22        every month how much they're paying with the
23        electricity provider compared to how much they would
24        pay if they switched, yeah, this calculation could

Page 72

1    be done.
2             Based on everything I've seen in this case
3         and, you know, based on general intuition and -- and
4         sort of experience of these matters, I would -- I
5         would assume that, you know, Dr. -- Dr. Brous just
6         like, it did not occur to him that he's being
7         charged anything, but what he contractually signed
8         up for.  It would be a logical presumption.  And it
9         sounds like at some point, he realized that's not
10        the case and he quit.  It's as simple as that.
11   BY MR. MEADOWS:
12   Q    What do you mean, "it sounds like at some point he
13        realized that"?  Where did you hear that?
14             MR. BLANKINSHIP: Objection.  Asked and --
15        objection.  Asked and answered.
16             THE WITNESS: I didn't hear it anywhere.
17        But the fact that he was -- the fact that he decided
18        to be a lead plaintiff in a class action case is --
19        logically can mean that, you know, he was very much
20        dissatisfied with presumably the rates that he has
21        been charged by -- by Eligo.
22   BY MR. MEADOWS:
23   Q    Is there any evidence that you're relying on to say
24        that Mr. Brous, Mr. Ira Brous, decided to become a

Page 73

1    plaintiff in this case?
2             MR. BLANKINSHIP: Objection.  Outside the
3         scope of his representation of his report.
4             THE WITNESS: I -- I -- if it was discussed
5         at the outset of the case, if I have reviewed
6         documents that are shedding more light on that, I --
7         I honestly don't -- don't recall.  And again, the
8         reason why I -- I tend to have a laser focus on
9         what's my scope and what I'm here to do.  So I -- I
10        -- things like this, background things like this are
11        useful to me to put things in the context.
12             Same, like, you know, the legal things are
13        use -- useful to me to understand for the context,
14        but I'm not -- I'm not a historian, I'm not an
15        attorney, and it -- it's context, and that's it.  I
16        think if you look at the scope of my description of
17        what I've been hired to opine on, you know,
18        questions like this seem to be completely unrelevant
19        (sic) in -- in terms of the scope that I've been
20        hired to do.
21   BY MR. MEADOWS:
22   Q    All right.  I want to go back to my question I asked
23        a moment ago about the utility rates.  You're aware
24        that in New York, utility rates, you -- a customer

19 (Pages 70 - 73)

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

Page 74

1   can find the applicable utility rates just by going
2   on the website of utilities where it's -- where it's
3   disclosed, correct?
4           MR. BLANKINSHIP: Objection. Lack of
5   foundation.
6           THE WITNESS: I think that's the case. I -
7   - I don't know when that started. I do know that
8   program, I think this might have been after the
9   reset order because it used to be much more
10  difficult before. I believe, again, based on
11  recollection that the Public Service Commission,
12  among a few other things that came up in the recent
13  order, basically mandated more transparency and that
14  the website that lists, you know, rates charged, you
15  know, are -- are available.
16          I -- I'm sure, though, that they're still
17  probably not easy for some people to do because one
18  of the other experts in this case, Dr. Aron, was
19  unable to find utility rates for three out of five
20  utilities that she did her analysis on.
21          And being in the same role as me in a
22  capacity of an expert witness and being unable to
23  find utility rates for three out of five New York
24  utilities gives some credibility to that, that I --

Page 75

1   I don't know how -- how easy it is.
2   BY MR. MEADOWS:
3   Q    Did you look into at all whether Mr. Brous, Ira
4       Brous, was able to find the applicable utility rates
5       from 2019 forward on the -- on the web?
6           MR. BLANKINSHIP: Objection. Outside the
7   scope of his report.
8           THE WITNESS: I don't recall. I don't
9   think so. I don't recall.
10  BY MR. MEADOWS:
11  Q    And that wouldn't -- that issue wouldn't make any
12      difference to the opinions you've expressed here; is
13      that right?
14  A    Tell me the dates again. Can you please repeat the
15      question? Oh yeah.
16  Q    Because I think you mentioned the reset order that
17      came about in 2019, right?
18  A    Yeah. Yeah. Yeah.
19  Q    So I'm focusing on from the date of the reset order
20      forward, whether you have seen any information, one
21      way or the other, about whether Mr. Brous ever tried
22      to find the applicable utility rates online.
23  A    No, I don't think so.
24          MR. BLANKINSHIP: Same objections.

Page 76

1           THE WITNESS: I don't think so.
2   BY MR. MEADOWS:
3   Q    And I take it that it wouldn't make any difference
4       to your opinions one way or the other whether he
5       looked for the utility rates over that time or not;
6       is that right?
7   A    No, I don't think it would make any difference to
8       the -- to the methodology, to the -- to the work
9       that I've done to speak in -- in most in -- in to
10      the scope of the work that I've done. As a
11      practical matter, you know, if -- if he -- if they
12      switched earlier and everything else transpired the
13      way it did, it would certainly affect some of the
14      damage that I'm calculating at the end of the
15      report. Because the -- the -- for him specifically,
16      the -- the period would be shorter. But
17      methodologically, it wouldn't change anything.
18  Q    But for all you know, Mr. Brous may have been
19      perfectly aware of the utility rates and how they
20      compared to the Eligo rates over the seven years
21      that he was a customer of Eligo, right?
22          MR. BLANKINSHIP: Objection. Outside the
23  scope.
24          THE WITNESS: But -- I'm sorry, you were

Page 77

1   saying? Can you please refer -- repeat the
2   question? Yeah.
3   BY MR. MEADOWS:
4   Q    Yeah. So you're not able to say one way or the
5       other whether Mr. Brous was aware of the utility
6       rate, and how it compared to his Eligo rate over the
7       entire, say, six years he was a customer, right?
8           MR. BLANKINSHIP: Same objection.
9           THE WITNESS: It doesn't seem logical
10  because, like, if somebody's ready, and this is just
11  conjecture, but, you know, it -- it stands to
12  economic reason, like if -- if somebody's, you know,
13  frustrated, if I may use the term, or certainly
14  motivated enough to -- to file to become a part of a
15  class action case because he feels that he's being
16  overcharged, then it's -- it's logical to presume
17  that that happened.
18          Once they realized that they're being
19  overcharged, I could not imagine. And it's a
20  conjecture that Dr. Brous would know, you know, that
21  he's being, in his view, grossly overcharged for --
22  for, you know, years and then only decided to take
23  action. And to that degree, so, you know, later on,
24  I mean, it just -- it's -- that that's -- that's

20 (Pages 74 - 77)

Page 78

1    where I'm coming from. That's the logical reasoning
2    behind it.
3    BY MR. MEADOWS:
4    Q   Okay. But in that logical reasoning chain, you
5    don't -- you don't even know that Mr. Brous decided
6    to become a plaintiff in a lawsuit, do you?
7        MR. BLANKINSHIP: Objection. Asked and
8    answered. Lack of foundation. Outside the scope.
9    BY MR. MEADOWS:
10   Q   Because I'll represent to you that the record is and
11   the testimony by Mr. Brous's son is that Mr. Brous's
12   -- Ms. -- Ramsey Brous is the one who contacted the
13   plaintiffs' lawyers, not Ira Brous.
14       MR. BLANKINSHIP: Objection. Outside --
15   not only it is outside the scope, it lacks
16   foundation and misstates the record.
17       THE WITNESS: I -- I -- yeah. I -- I don't
18   recall those details. Like -- like, I've -- like
19   I've said, the dealings, but that the -- the
20   mechanics of what the son did versus what they did,
21   I -- I just, I -- I don't recall those details.
22   BY MR. MEADOWS:
23   Q   Right. But in your prior answer, you're the one who
24   brought up that it stands to reason that Mr. Brous

Page 79

1    was upset with Eligo because he decided to file the
2    lawsuit. But what if he didn't decide to file the
3    lawsuit? Then your chain of logical reasoning no
4    longer applies, right?
5    A   No.
6        MR. BLANKINSHIP: Objection. Outside the
7    scope. Mischaracterizes the record. Lack of
8    foundation.
9        THE WITNESS: Yeah, I -- I don't think so.
10   I was -- let me -- let me clarify. I was merely, I
11   was responding to the -- to the question that you
12   asked, which I interpreted as, it's possible that
13   Dr. Brous, you know, could have been checking the
14   utility rates and thus could have been aware that he
15   could save money by switching to utility or whatever
16   it is, and then that he didn't do anything about it.
17       And I was just merely saying that it seems
18   highly unlikely, given that the individual, without
19   getting into the details, if it's him or his son,
20   but under the presumption that it's him acting,
21   would know that knowingly, overpay for years, and
22   then wake up one day and say, oh, this is
23   unacceptable, and I'm going to -- and I'm going to,
24   you know, become a part of a -- a law -- a class

Page 80

1    action suit.
2        And so I'm -- I did not opine on any of
3    the mechanics of, like, how this really came about.
4    I -- I just don't recall parts of the
5    circumstantial stuff because, you know, I'm -- I'm
6    sure I reviewed parts of it sort of initially, but I
7    just, I -- I just really don't. I'm sorry, I just
8    don't - I just don't recall that. Yeah.
9    BY MR. MEADOWS:
10   Q   Yeah. So you -- it's fair to say, you don't know
11   one way or the other why Ira Brous decided to remain
12   a customer of Eligo from 2017 to 2023, right?
13       MR. BLANKINSHIP: Objection. Asked and
14   answered. Outside the scope.
15       THE WITNESS: Am I -- am I saying this in
16   any shape and form anywhere in my testimony?
17   Because it sounds like you're asking me for
18   something that I have not really addressed, opined
19   on, and I just want to make sure if there's
20   something specifically in my testimony that you're
21   alluding to, I would like you to direct me to it.
22   BY MR. MEADOWS:
23   Q   I'm asking -- sure. And I'm asking about paragraph
24   5, where you talk about Mr. Brous and the length of

Page 81

1    time that he was an Eligo customer. And I just want
2    to confirm, you don't know one way or the other why
3    Mr. Brous decided to be -- to remain an Eligo
4    customer from August 2017 until November 2023,
5    correct?
6    A   For --
7        MR. BLANKINSHIP: Same objections.
8        THE WITNESS: For a fact, I don't know
9    either way, correct.
10   BY MR. MEADOWS:
11   Q   Right. And so you cannot exclude the possibility
12   that Mr. Brous decided to remain a customer over
13   that time because he was perfectly satisfied with
14   Eligo's services, can you?
15       MR. BLANKINSHIP: Same objections.
16       THE WITNESS: No, I cannot exclude that
17   possibility.
18   BY MR. MEADOWS:
19   Q   Okay. All right. Let's take a brief break. Since
20   we've been going over an hour.
21       THE VIDEOGRAPHER: We are now going off the
22   record. The time is 10:22 a.m.
23   (Whereupon, the parties go off the record.)
24       THE VIDEOGRAPHER: We are now back on the

21 (Pages 78 - 81)

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

Page 82

1     record.  The time is 10:34 a.m.
2     BY MR. MEADOWS:
3     Q    Mr. Macan, I want to go back to your report, Exhibit
4          1 to your deposition, and focus on paragraph 6 again
5          for a moment, which relates to Plaintiff Michelle
6          Schuster, right?
7     A    Mm-hmm.
8     Q    And as we talked about earlier, it says there that
9          Ms. Schuster enrolled with Eligo in October of 2016,
10         right?
11    A    Yes.
12    Q    And she terminated her account with Eligo in
13         November 2023, correct?
14    A    Yes.
15    Q    So she was an Eligo customer for right around seven
16         years, right?
17    A    Yes.
18    Q    And do you have any of your -- any understanding as
19         to why Ms. Schuster decided to terminate her Eligo
20         account?
21         MR. BLANKINSHIP: Just going to object.
22         It's outside the scope.
23         THE WITNESS: I -- I don't recall.
24    BY MR. MEADOWS:

Page 83

1     Q    Okay.  And are you aware that Ms. Schuster testified
2          that before signing up with Eligo, she had been a
3          customer of her local utility?
4          MR. BLANKINSHIP: I'm going to object to
5          the extent that mischaracterizes the record.
6          THE WITNESS: I -- I don't recall.
7          MR. BLANKINSHIP: And it's outside the
8          scope.
9     BY MR. MEADOWS:
10    Q    Can you say your answer just so we have it on the
11         record?
12    A    I don't recall.
13    Q    Okay.  And Ms. Schuster, are you aware that she
14         lives in the Rochester, New York area?
15    A    I -- I believe so.
16    Q    And so she was -- if she were -- had been a customer
17         of the utility, her local utility was Rochester Gas
18         & Energy, RG&E, right?
19    A    I -- yes, I believe so.
20    Q    And over the seven-year period that Ms. Schuster was
21         a customer of Eligo, it certainly was possible for
22         her to have compared her Eligo rate to the
23         applicable RG&E rate at any given time, wasn't it?
24         MR. BLANKINSHIP: Objection.  Asked and

Page 84

1     answered.  Outside the scope.
2          THE WITNESS: Similar reasoning, I guess,
3     to what I provided for the other plaintiff.  It's
4     possible, but given, you know, they ended up being
5     plaintiffs in a class action suit against the
6     company, I -- I would -- I can only conjecture that
7     she did not do that because she would have dropped
8     out sooner.
9     BY MR. MEADOWS:
10    Q    So your, I think you used the word "conjecture," is
11         that Ms. Schuster didn't do the utility to Eligo
12         comparison.  If she had, she would have terminated
13         earlier than she did.
14         MR. BLANKINSHIP: Same objections.
15         THE WITNESS: I'm saying I can only
16    speculate.
17    BY MR. MEADOWS:
18    Q    Yeah.
19    A    I -- I don't know for a fact.  It's possible that
20         she looked at it, that she didn't know it.  I mean,
21         I -- I have -- I don't -- I don't know.  Yeah.  I
22         don't --
23    Q    Certainly, you would agree with me that there's
24         nothing Eligo could have done to hide the applicable

Page 85

1     utility rate from its customers, right?
2          MR. BLANKINSHIP: Objection.  Outside the
3     scope.  Lack of foundation.
4          THE WITNESS: I -- I cannot opine on what
5     Eligo -- or Eligo -- you're saying that utility or
6     the Eligo or can you please repeat?  Sorry.  I --
7     yeah.
8     BY MR. MEADOWS:
9     Q    Sure.  Eligo doesn't have any control over whether
10         the utility -- over whether and how the utilities
11         advertise their rates for electricity, does it?
12         MR. BLANKINSHIP: Objection.  Lack of
13    foundation and scope.
14    BY MR. MEADOWS:
15    Q    I'm going to need your answer again.  Yeah.
16    A    I understand.  I -- I -- they -- they don't.  I
17         don't think so.
18    Q    All right.  And so there's nothing Eligo can do for,
19         let's say, for example, with RG&E, to stop RG&E from
20         putting in applicable electricity rates on its
21         website, right?
22         MR. BLANKINSHIP: Same objections.
23         THE WITNESS: I don't think so.
24    BY MR. MEADOWS:

22 (Pages 82 - 85)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 86

1  Q    And there's nothing Eligo can do to stop its
2    customers from comparing the applicable utility
3    rates to the rates that Eligo is charging, is there?
4         MR. BLANKINSHIP: Same objections.
5         THE WITNESS: They cannot stop anyone from
6    comparing, but, you know, they could certainly make
7    it -- make it easier for the customers.  I mean, I
8    could see an ESCO who tries to -- tries to do what,
9    you know, tries to basically undercut the cost of
10   utility, want to emphasize the fact that their rates
11   are, you know, beating utility rates on -- on some
12   metric.  And -- and I -- I'm -- I don't think Eligo
13   has ever not only attempted to do that from all the
14   evidence that I have seen that it just wasn't even
15   considered at any given point.
16        So to answer your question succinctly, no,
17   they cannot, Eligo cannot prevent customers from
18   comparing rates.  But they sure did not, based on
19   everything I've seen, made it very clear for
20   customers to do that in the form of, this month,
21   you're saving X.  Last month, you saved Y.  You
22   know, they did get the charge.  Customers had the
23   ability to quit.  But yeah.
24   BY MR. MEADOWS:

Page 87

1  Q    Now, the way it works in New York, is even for a
2    customer who decides to enroll with Eligo, they
3    still get their monthly electric bill from the
4    utility, correct?
5  A    Correct.
6  Q    So Eligo doesn't send the -- send its customers any
7    bills directly, right?
8  A    That's --
9         MR. BLANKINSHIP: Objection.  Outside the
10   scope.
11        THE WITNESS: That's my understanding.
12   BY MR. MEADOWS:
13  Q   Right.  And so Eligo, therefore, doesn't have any
14   control over what those monthly invoices say or
15   don't say, right?
16        MR. BLANKINSHIP: Same objections.
17        THE WITNESS: True.  But they could -- they
18   could send -- I'm not saying they need to send that.
19   I'm -- I'm saying, again, this is outside of the
20   scope of what I was hired to do but you're asking me
21   for an opinion, I'm going -- I'm going to offer you
22   one.  If ESCO wanted to serve its, one of its
23   purposes, which is, you know, utilities are clumsy,
24   slow, inefficient, and -- and, you know, it's

Page 88

1    possible to buy power and, you know, achieve costs
2    for our customers, you know, they surely had freedom
3    to document that and use it as promotion to acquire
4    more customers.  And so it doesn't need to be in a
5    utility bill; it can be in a marketing pamphlet or
6    something like that.  That's what I meant.
7  BY MR. MEADOWS:
8  Q    All right.  I want to direct your attention to
9    paragraph 86 of your report, which is on page 40.
10  A   Let me just -- do you mind if I just take a quick
11   second to read through it?
12  Q    Yeah, of course.  Go ahead.
13  A    Okay.
14  Q    All right.  So at the beginning of that paragraph
15   86, you write, "Eligo admits that it made no effort
16   to ensure that its variable rates were set according
17   to the variable price term in the New York Terms of
18   Service."  Do you see that?
19  A    Yeah.
20  Q    And then after the following sentence, you cite as
21   support a reference to the deposition of Andy
22   LaPointe; you see that?
23  A    Yeah.
24  Q    Now, in cases like this where you are citing

Page 89

1    deposition testimony as, you know, support for an
2    assertion in the opinion, who -- who's the person
3    who kind of found the supporting citations and put
4    them in there?
5  A    I -- I cannot recall in this particular one, but
6    typically, the way the process would work is I -- I
7    would -- let me -- let me just give you a -- just
8    read this for a second.  I -- I -- like, I've read
9    testimonies that -- that -- my counsel provided all
10   the documents I listed that I can rely upon.  They
11   gave me a general overview of -- of who's what and -
12   - and suggestions to -- to, sort of, you know,
13   review the specific testimonies.
14        And so I read through a bunch of stuff.  I
15   flagged what seemed sort of interesting to me in
16   typical -- in -- in some cases, and in some other
17   cases, I would -- yeah.  I -- I just -- on this
18   particular one, I honestly don't remember if this
19   was -- I read it and then I quoted exactly what I
20   read.  Or this was the.  I -- I don't -- I don't
21   really recall.  Yeah.  I -- I don't recall the
22   mechanics of it.
23  Q    Okay.  Well, I mean, you mentioned one possibility.
24   Is it -- it could be that you read this part of Mr.

23 (Pages 86 - 89)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 90

1    LaPointe's deposition and put that quotation there?
2  A   Oh, I read it for sure. I read it for sure.
3  Q   Oh. All right.
4  A   I just don't know -- I just don't know if in the
5      course of sort of discussion about something,
6      whether, you know, I'm giving you a loose sort of
7      interpretation. I might have said, okay. You know,
8      in the complaint, I read in the complaint that, you
9      know, this, this, and that. Can you please point me
10     to the documents that, you know, led the counsel to
11     write specific language in the complaint?
12 Q   Right.
13 A   And then they would say, okay. These pages, this
14     document, read through it. And then I would read
15     through it, and -- and it would kind of, it would
16     add color. And -- and so, specific, at the very
17     end, you know, as I was crafting the argument in
18     this particular case or my opinion, that little
19     tidbit seemed relevant, and, you know, I pointed it
20     out and -- and that's there -- that's where the, you
21     know, that's how it ended up there. So
22     specifically, whether, you know, I asked the counsel
23     at the time for that, or I -- I just don't recall on
24     this particular instance --

Page 91

1  Q   All right.
2  A   -- describing generally how the process works.
3      Usually, like, if somebody does something for me,
4      I'm -- I'm giving directions what I'm looking for.
5      And I'm -- unless I'm convinced, I will not put
6      anything in my testimony that I'm not a hundred
7      percent convinced to be the case.
8  Q   Okay. So this first sentence in paragraph 86,
9      "Eligo admits that it made no effort to ensure that
10     its variable rates were set according to the
11     variable price term in the New York Terms of
12     Service." I take it you were convinced that that's
13     an accurate statement, right?
14         MR. BLANKINSHIP: Objection.
15     Mischaracterizes testimony. Lack of foundation.
16         THE WITNESS: Can you please rephrase the
17     question? I -- I'm -- I'm --
18     BY MR. MEADOWS:
19 Q   Let me -- is that first sentence of paragraph 86 --
20 A   Yeah.
21 Q   -- that I just read into the record, do you believe
22     that's an accurate statement?
23 A   No, I don't think it's an inaccurate statement. I
24     don't think.

Page 92

1  Q   I'm sorry. Either I misspoke or you misheard me.
2  A   Okay.
3  Q   Do you believe that that first sentence of paragraph
4      86 is an accurate statement?
5  A   Yes, I believe this is an accurate statement.
6  Q   All right. I'm glad we got that clarified. And you
7      further believe that your citation to Mr. LaPointe's
8      deposition, in particular to pages 22 and 23, 33 and
9      34, is supportive of the accuracy of that first
10     sentence in paragraph 86, right.
11 A   Let me -- let me just read it again, and I -- I will
12     tell you what I think and why. Yeah. I -- I think,
13     I -- I cannot -- I cannot say definitively -- I --
14     let me -- let me take a step back. The -- the -- it
15     doesn't -- the way that I wrote this paragraph, the
16     intention is not only whether this particular
17     sentence supports the claim made in the -- in the
18     first sentence.
19         The -- the claim is made, I believe it to
20     be true and the rest of this paragraph are -- is
21     basically anecdotal evidence that had led me to
22     believe why this -- why the statement that I have
23     made is a -- a fair assessment of -- of the
24     situation in -- in a sense that Eligo admitted,

Page 93

1      through various things quoted here, that it really
2      did not made effort -- any effort to ensure that
3      variable rates were set according to the variable
4      price term in New York Terms of Service. And I --
5      and I say that because it looks like the people that
6      were key and involved in -- in setting the rates and
7      creating the rates just did not either have
8      knowledge of the contractual language, went on
9      record to say that contractual language was not an
10     input to Groove or the price setting processes, and
11     so on and so forth.
12         And so it just -- I, you know, one -- I
13     guess what I'm saying is one -- one quotation to
14     what Mr. LaPointe said cannot be, you know, taken
15     out of context in -- in the spirit of the -- the way
16     this whole paragraph has been written.
17 Q   Well, you quote a small portion of his testimony,
18     right?
19 A   Mm-hmm.
20 Q   In the second sentence of paragraph 86, right?
21 A   Mm-hmm.
22 Q   Do you think that that quotation is taken out of
23     context in any way?
24 A   I don't -- I don't think so. I mean, I -- I don't

24 (Pages 90 - 93)

Edo Macan                                        December 17, 2025
Brous v. Eligo Energy, LLC

Page 94

1    think so --
2  Q   All right.  Aren't --
3  A   Can you -- can I ask you, like, do you have a --
4  Q   We'll look at it in a minute.  Yeah.
5  A   Okay.  Okay.
6  Q   But aren't you aware, having written and issued this
7      report, Mr. Macan, that in the paragraph that
8      follows that quoted portion of his testimony, Mr.
9      LaPointe testified that changes to the rate setting
10     methodology were run by the legal department to
11     ensure compliance with the contract.
12         MR. BLANKINSHIP: Objection.
13     Mischaracterizes his testimony.
14         THE WITNESS: Am I --
15         MR. BLANKINSHIP: Lack of foundation.
16  BY MR. MEADOWS:
17  Q   Are you aware of that?
18         MR. BLANKINSHIP: Same objections.
19         THE WITNESS: I -- I -- yes, and I believe
20     I say that in the -- in the -- in my -- in my
21     report.
22  BY MR. MEADOWS:
23  Q   You do?  I mean, because the first sentence of
24     paragraph 86 says, "Eligo admits that it made no

Page 95

1      effort to ensure that its variable rates were set
2      according to the variable price term in the New York
3      Terms of Service."  That's a pretty blanket
4      statement, right?  No effort means none.
5  A   You -- Counsel, I think you're -- let me -- let me
6      read this again.  I mean, I -- I don't want to, I
7      didn't want to waste time, and I wanted to read it
8      again.  But from -- from my understanding of the
9      process, how the process went, you know, the rates
10     were, and there is a whole section in my report on
11     it coming up with the first draft -- that the --
12     that the rates were -- the rates were sort of set at
13     some level.  They were run by the legal department.
14         They also had a policy of never lower the
15     rates.  They would, you know, run -- run the -- run
16     Groove, you know, on the -- on the sort of last
17     month's rates to see if they would be profitable.
18     If there was room to increase, they would sort of
19     increase.  People who were actually involved in
20     setting these rates knew nothing about the, you
21     know, contractual language.  And so, you know, this
22     was not, there was no, to put it sort of bluntly, I
23     mean, there wasn't anything in the -- in the Groove
24     program that they basically said, you know, we

Page 96

1      interpret the contract this way and, you know, cap
2      the rates here.
3         You know, if the price dropped or
4      something, there wasn't anything the Groove program,
5      that would say, oh, from the last month to this
6      month, procurement cost went down 50 percent.  Let's
7      drop the suggested rate by 50 percent or something
8      according to that.  It was just -- it -- it seemed
9      fairly arbitrary.  And so I -- I just, I'm not done.
10     So I -- I want to be very clear, if some, I -- I you
11     know, from what I've seen, like, I did not get an
12     impression that ultimately, you know, this all gets
13     paper-stamped by -- by people in charge, and who
14     deem that that's, you know, consistent with the
15     contract.
16         If that's what they thought, if they
17     thought that they were consistent with their
18     contractual obligations, and I'm saying the -- Mr.
19     LaPointe and -- and whoever else was serving
20     compliance with that, I'm not an attorney, that's
21     their opinion, but I've been asked to opine on
22     reasonableness on -- on rates under a different
23     legal interpretation, and that's it.
24  Q   And so Mr. Macan, in that very long previous answer,

Page 97

1      I think one of the things you said was you
2      acknowledged that Eligo ran changes to the rate
3      setting methodology by its legal department; is that
4      right?
5         MR. BLANKINSHIP: Objection.
6      Mischaracterizes testimony.
7         THE WITNESS: I -- I recall speaking, I --
8      if -- if you allow me time, I can search through my
9      -- through my report.  There's an instance in my
10     report where I say I -- I'm speaking based on
11     memory.  I do remember that there -- there's -- that
12     -- that it might be easier than me trying to
13     conjecture, just to spend a couple of minutes to try
14     to find specifically what I'm referring to if you
15     want to, if -- if you want to do that.
16  BY MR. MEADOWS:
17  Q   Right now, I'm just asking, from your recollection,
18     as a person who's written this report --
19  A   Yeah.  Yeah.
20  Q   -- are you aware that Eligo did in fact run its rate
21     setting methodology by the legal department to
22     ensure compliance with the customer contract?
23         MR. BLANKINSHIP: Objection.  Lack of
24     foundation.  Misrepresents the record.  You can

25 (Pages 94 - 97)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 98

1  answer.
2          THE WITNESS: I -- in some shape and form,
3  I -- based on recollection, I think that was the
4  case, yes.
5  BY MR. MEADOWS:
6  Q    So that -- would you agree with me that that act
7  running the rate setting methodology by the legal
8  department to ensure compliance with the contract is
9  an effort to ensure that the variable rates are
10 calculated in accordance with the variable price
11 term.
12         MR. BLANKINSHIP: Same objections.
13         THE WITNESS: I -- again, I don't know
14 about the process, but this is just explaining my
15 reasoning, and I -- I don't think so.  And the
16 reason why, because ultimately, if the people who
17 end up setting the rates are completely unaware of
18 it, it doesn't look like it's being taken into
19 account.  And in the context of everything I've
20 written in this report, that, I mean, I can give you
21 many examples, that doesn't seem to be the case.
22         So to put it really bluntly, you're
23 saying, am I aware that there is a communication,
24 you know, going from the people setting the rates to

Page 99

1  the -- to the, you know, chief legal counsel or
2  somebody else?
3          Yes, I -- I remember that.  I -- I don't
4  remember the details, but altogether, reading, based
5  on everything I've read, it -- it looked like I was
6  under the impression that, you know, the -- that the
7  -- that that senior staff or -- or compliance people
8  were under the, you know, either under the
9  impression that they were -- that they could charge
10 whatever they want, and that the people coming up
11 and actually the -- you know, calculating the actual
12 rates did not even know about any of it, and
13 therefore they behaved.
14         If -- if there is no contractual language
15 in the contract clearly stating that the rates will
16 be calculated monthly in response to X, Y and Z,
17 that's where I'm -- that -- that -- that's why I'm -
18 - you know.
19 BY MR. MEADOWS:
20 Q    Okay.  But the first sentence of paragraph 86
21 doesn't make reference to the people who are
22 calculating the rate specifically.  It says, "Eligo
23 admits that it made no effort to ensure that its
24 variable rates were set according to the variable

Page 100

1  price term."  But you're aware, despite putting that
2  in the report, as I understand your testimony, you
3  are aware that the variable price calculation
4  methodology was run by the Eligo legal department,
5  correct?
6          MR. BLANKINSHIP: Objection.
7  Mischaracterizes the testimony.  Asked and answered.
8          THE WITNESS: Yeah.  I think -- I think
9  this is really mischaracterizing what I'm trying to
10 say.  I -- I can -- I can answer with a joke if you
11 -- if you allow me so.  Yeah.
12 BY MR. MEADOWS:
13 Q    No, no, no.  I would -- I -- you're giving very
14 lengthy answers.  I'm -- I think this is a simple
15 issue as to the accuracy of this first sentence of
16 paragraph 86.  Isn't it true that Eligo, by running
17 its variable price setting methodology by the legal
18 department to ensure compliance with the contract,
19 isn't that what Eligo did?  You're aware of that,
20 right?
21         MR. BLANKINSHIP: Objection.
22 Mischaracterizes the record.  Asked and answered.
23         THE WITNESS: I said -- yeah, I mean, I --
24 I don't know how -- I don't know how else to say it.

Page 101

1  I said, based on my recollection, I recall reading
2  about -- in the process of how the variable rates
3  were set, I believe I discussed details of it.
4  Maybe I should just waste time and -- and look at it
5  later in the report.
6  BY MR. MEADOWS:
7  Q    No, no, no.  We'll -- I'm not asking you to waste
8  any time.
9  A    I mean, yeah, that -- I don't want to waste your
10 time.  That's why I'm giving you the answer.  I -- I
11 recall that the -- the sentence is made for the
12 simple reason.
13         If -- if first draft rates or whatever
14 rates are run by the legal department, they say, you
15 know, it's fine or whatnot, and the people actually
16 setting the rates, set rates, you know, completely
17 without taking into account any of the contractual
18 language, then I don't really see this, you know,
19 this sort of as an -- as an effort to, according --
20 how can someone say that variable rates were set
21 according to the variable price term if people
22 setting the rates don't even know what the variable
23 price term is, nor variable price term or any
24 elements of it are input to the Groove model that

                                    26 (Pages 98 - 101)

Page 102

1    they're using to set the rates?  That's -- that's
2    what I'm saying.
3    Q    Eligo's legal department knew what the contract
4         said, didn't it?
5              MR. BLANKINSHIP: Objection.  Lack of
6         foundation.
7              THE WITNESS: I -- I don't know what they
8         knew or what they didn't know.
9    BY MR. MEADOWS:
10   Q    You don't know one way or the other, but you do know
11        that the -- that the variable price methodology was
12        run by the legal department, right?
13             MR. BLANKINSHIP: Objection.  Lack of
14        foundation.  Misstates the record.
15             THE WITNESS: I'm saying, based on
16        recollection of reading a ton of documents in here,
17        I remember there was a -- that there was some
18        communication on initial rates that were set.  You
19        know, let -- let me just look at the -- let me just
20        look at the report later on when I'm discussing the,
21        you know, first rate, how the process is set, I -- I
22        -- you know, I might have mentioned it at that point
23        in the testimony.
24   BY MR. MEADOWS:

Page 103

1    Q    Well, let's do it this way.  I wanted to --
2    A    Yeah.
3              MR. MEADOWS: Let's mark this as Exhibit 2
4         and I'll represent to you that this will -- oh, I'm
5         sorry.
6              THE COURT REPORTER: Sorry.
7              MR. MEADOWS: No, my bad.  Okay.  My
8         apologies.
9         (Whereupon, Ex. 2 Deposition Excerpt, LaPointe, pgs.
10        20-35, is marked for identification.)
11   BY MR. MEADOWS:
12   Q    So I'll represent to you that Exhibit 2 is a series
13        of excerpts from Mr. LaPointe's deposition
14        transcript.
15             MR. BLANKINSHIP: Can we just say what
16        those are for the record?
17             MR. MEADOWS: Pages 21 --
18             MR. BLANKINSHIP: I think it starts at 20.
19             MR. MEADOWS: My copy has the page.
20             THE WITNESS: Yeah.
21             MR. MEADOWS: Oh, it does?  Okay.  Mine
22        starts at 21.  Where does yours start?
23             THE WITNESS: Twenty.
24             MR. MEADOWS: Twenty.  Okay.  So it starts

Page 104

1    at 20, and I believe, I -- hopefully, they're all
2    the same, that it runs through 34?
3              MR. BLANKINSHIP: I have 35.
4              MR. MEADOWS: Okay.
5              MR. BLANKINSHIP: But 35 is in the back
6    page.
7              MR. MEADOWS: Okay.
8              THE WITNESS: Yeah.
9              MR. MEADOWS: Maybe on my copy they got cut
10        off.  Where does it run on yours?  Did you -- you
11        have the exhibit.
12             THE WITNESS: Twenty-three -- thirty-five.
13        It's just the back page is 35.
14             MR. MEADOWS: Not on mine.  But anyway, if
15        that's what yours is --
16             THE WITNESS: Oh okay.  Yeah.  Yeah.
17             MR. MEADOWS: -- then that's what the
18        exhibit is.
19             THE WITNESS: Okay.
20   BY MR. MEADOWS:
21   Q    All right.  Now going back briefly to paragraph 86
22        of the report, we talked about how you cite Mr.
23        LaPointe's testimony, and you see that you make a
24        specific citation to page 22, lines 2 to 23, right?

Page 105

1    A    Yeah.
2    Q    And then carrying over onto page 23.
3    A    Yeah.  Let me just read it.  Okay.
4    Q    All right.  So starting on page 22 of the deposition
5         of Exhibit 2, I should say, you see at the top of
6         that page, the question that Mr. LaPointe is asked
7         by plaintiffs' counsel is, and I quote, "So my
8         question is, when Eligo set variable rates, what did
9         it do to ensure that the variable rates it set
10        complied with those variable rate pricing terms in
11        the contracts," right?
12   A    Mm-hmm.
13   Q    And this is -- this is the answer, the question and
14        answer that you are citing in your report, right?
15   A    Yeah.  Yeah.
16   Q    And the part of the answer that -- of his answer
17        that you quote is limited to when he said that they
18        met with the software developers whenever there's a
19        change in anything that we're doing, right?
20   A    Yeah.
21   Q    But what he said right after that, start -- in lines
22        15 through 19, I'm going to quote again, and then
23        it's up to the legal department to analyze the
24        change and say, Okay.  This is still compliant with

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 106

1    the contract, or no, this causes us to rewrite the
2    contract. You see that, right?
3    A    Mm-hmm.
4    Q    Do you have any reason to believe that Mr. LaPointe
5         wasn't accurately describing the variable rate
6         setting process when he said that?
7    A    No, I don't. Not at all.
8    Q    And you chose not to quote or -- that part of his
9         answer in your report, right?
10   A    Yeah. I -- I certainly did not quote his reply in -
11        - in my report, yes. Yeah.
12   Q    And you would agree with me that what Mr. LaPointe
13        describes here in his deposition on page 22, lines
14        15 through 19, that it's up to the legal department
15        to analyze the change and say, this is still
16        compliant with the contract or no, this causes us to
17        rewrite the contract, that process is an effort to
18        ensure that the variable rate setting methodology
19        complies with the contract language as Eligo
20        understood it, correct?
21            MR. BLANKINSHIP: Objection. Asked and
22        answered.
23            THE WITNESS: Again. Yeah, it's - it's --
24        I -- I don't really know -- I don't really know what

Page 107

1    this entails means or encompasses. I -- I can --
2    BY MR. MEADOWS:
3    Q    What part of it is --
4            MR. BLANKINSHIP: Hold on. He's not
5        finished with his answer yet.
6    BY MR. MEADOWS:
7    Q    What part of it is confusing to you?
8            MR. BLANKINSHIP: He is not finished with
9        his answer yet. Go ahead.
10           THE WITNESS: Like the -- the reasoning, I
11       -- as I explained before, is the -- that the -- that
12       the way the process is described, things are run by
13       the legal department, and the legal department
14       ensures compliance. And so then it goes back to the
15       people who are actually setting the rates and -- and
16       the rates are set, and there's nothing in the rate
17       setting process that, you know, seems to take into
18       account the -- the terms of service and contractual
19       terms specified in the contract. And so that's one
20       piece of information.
21           The second piece of information, and I
22       would -- I'm going to have to look through my report
23       -- is that, I think if I'm correct, there is only,
24       like, in 2019 or 2020, where Eligo actually changed

Page 108

1    the -- the terms of service, they changed the terms
2    of service. That allowed them now contractually
3    much more discretion to set rates, but the
4    underlying process of -- of setting those rates did
5    not change at all. And so, you're -- you're
6    pressing me on -- on a single sentence in a
7    paragraph that I wrote, allegedly trying to
8    demonstrate any inconsistency or my impartiality in
9    describing the testimony that I read, which I think
10   it's unfair and certainly not in the spirit that I
11   wrote.
12           I'm merely stating that if you have a
13   process that ultimately does not lead to anything or
14   leads to a single change, if my facts are correct,
15   to the -- to the terms of service, then, you know, I
16   would not qualify this as a process where, you know,
17   variable rates are, you know, set according to the -
18   - the pricing term, or that indeed, Eligo's legal
19   department believed, truly believed, that they had
20   contractual freedom to charge -- to did what they
21   did and to charge what they wanted. That is what
22   I'm saying.
23   BY MR. MEADOWS:
24   Q    Is running the variable rate setting methodology by

Page 109

1    the legal department an effort to ensure that the
2    rates comply with the contract? Yes or no?
3            MR. BLANKINSHIP: Objection. Asked and
4        answered.
5            THE WITNESS: And I -- I still have to
6        answer, you could -- you could say, on behalf of the
7        people, the -- the -- that the people setting the
8        rates or whoever is, I -- I don't know. I just
9        don't know about who does what, but whoever is
10       sending those initial rates to the legal department,
11       if that's how the process works, you could say that
12       those particular people are making an effort because
13       they're following their due diligence.
14           But if -- you know, I mean, to put it that if
15       ultimately nothing comes out of it, and I -- I
16       believe, again, speaking on recollection, I -- I
17       really would like to take my time and -- and, you
18       know, reread the section, you know, you have other -
19       - other, you know, employees that are sort of
20       testifying to things that are sort of contrary to
21       that.
22           My -- my general -- my general feeling and
23       comprehension and understanding of the process, once
24       you sum all these anecdotal evidence into -- into

28 (Pages 106 - 109)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 110

1    account, is that Eligo really behaved as they had a
2    contractual freedom to charge what they want.
3    That's the -- that's the gist of what I'm saying.
4    BY MR. MEADOWS:
5    Q    Where does Eligo admit that it made no effort to
6         ensure that its variable rates were set according to
7         the variable price term?  You're talking about an
8         admission and you're citing Mr. LaPointe's
9         testimony.  Where does he admit that the company
10        made no effort?
11             MR. BLANKINSHIP: Objection.  Asked and
12        answered.  Argumentative.
13             THE WITNESS: Yeah.  I -- I really don't.
14        I've tried answering your question like 10 different
15        times, 10 different ways.  I -- I really don't --
16        don't have another way to say this and respond to
17        you other than the last five responses that I've
18        given you on -- on this particular question.
19    BY MR. MEADOWS:
20    Q    And you're going to stand by the accuracy of the
21        first sentence of paragraph 86?
22    A    In the spirit of what they did, yes.
23    Q    What does that mean, "in the spirit of what they
24        did"?  I'm asking you about the accuracy of a

Page 111

1    sentence that you wrote in a report that you signed.
2    Is that -- is that sentence accurate or is it not
3    accurate?
4             MR. BLANKINSHIP: Objection.  Asked and
5        answered.  Argumentative.
6             THE WITNESS: I believe it's -- I believe
7        it's accurate.
8    BY MR. MEADOWS:
9    Q    And Mr. LaPointe's testimony that it's up to the
10        legal department to analyze the change and say, this
11        is -- okay.  This is still compliant with the
12        contract, or no, this caused us to rewrite the
13        contract.  You don't regard that testimony as at all
14        inconsistent with the first sentence of paragraph
15        86; is that right?
16             MR. BLANKINSHIP: Objection.  Asked and
17        answered.
18             THE WITNESS: Like I said, I'm -- I'm not
19        going to conjecture on taking a single sentence out
20        of the context of -- of pages and pages here.  In
21        fact, I would like to take my time and -- and read
22        this.  And if you insist on line of questioning on
23        this particular thing, I -- I really would want to
24        read the whole section and then maybe give you yet,

Page 112

1    you know, one more elaborate answer on -- on what
2    you're asking.  You're -- you're taking one
3    sentence, the way it's written, completely out of
4    context.
5    BY MR. MEADOWS:
6    Q    Which sentence am I taking completely out of
7        context?
8    A    The first one.  Eligo admits that there's no -- that
9        it made no effort to ensure that its variable rates
10        were set according to the variable price terms in
11        New York's Terms of Service.  And -- and look, just
12        read through the rest of the paragraph.  I don't
13        even need to waste your time.
14    Q    There's no -- there's no question pending, I think
15        you answered the prior question.  By the way, do you
16        know what position Mr. LaPointe had with Eligo or
17        has with Eligo?
18    A    I did, and I don't recall.
19    Q    He's Chief of Compliance, right?
20    A    Yeah.
21    Q    So to your knowledge, was there anybody at Eligo
22        better positioned to talk about what the process was
23        of setting variable rates and ensuring compliance
24        with the contract?

Page 113

1    A    No, it sounds like he's the guy to talk to if he's
2        the Chief of Compliance.
3    Q    And you have, again, you have no reason to -- you
4        don't have any reason to dispute his testimony that
5        changes to the rate setting methodology were run by
6        the legal department to ensure compliance with the
7        contract, do you?
8             MR. BLANKINSHIP: Objection.  Asked and
9        answered.
10             THE WITNESS: Dispute his testimony in the
11        specific pages you pointed me to?
12    BY MR. MEADOWS:
13    Q    Right.
14    A    I -- I -- I'm taking them as given.
15    Q    Okay.  You also reviewed the testimony of Ken
16        Pedotto, correct?
17    A    Yes.
18             MR. MEADOWS: We can mark that as 3 please.
19             THE COURT REPORTER: Mm-hmm.
20        (Whereupon, Ex. 3 Deposition Excerpt, Pedotto, pgs.
21        99-104, is marked for identification.)
22    BY MR. MEADOWS:
23    Q    And you're aware that Mr. Pedotto was for a time,
24        the Chief Executive Officer of Eligo, right?

29 (Pages 110 - 113)

Page 114

1  A   Again, bad with names, bad with titles, but yeah, it
2       sounds -- sounds right.
3  Q   All right.  And you've been handed Exhibit 3 to your
4       deposition, which is an excerpt of pages from Mr.
5       Pedotto's deposition transcript, which I believe,
6       correct me if I'm wrong, are 99 through 104.
7            MR. BLANKINSHIP: We have 98 to 103.
8            MR. MEADOWS: Okay.  Ninety-eight, one-oh -
9       -
10            THE COURT REPORTER: No.  He has 99 through
11       104.
12            MR. MEADOWS: Apologize for the --
13            THE WITNESS: Ninety-nine through 104.
14            MR. MEADOWS: All right.  Sorry for the --
15            THE WITNESS: Okay.
16            MR. MEADOWS: -- differences there.
17   BY MR. MEADOWS:
18  Q   And if I can call your attention to page 101.
19  A   Let me just -- let me just take a second to read
20       through what it is.
21  Q   Okay.  Mr. Macan, have you had a chance to review
22       this now?
23  A   Yeah, I just did.  I -- I just did.  Yeah.
24  Q   All right.  I want to focus your attention on the

Page 115

1       testimony on page 101.  And just for context, you
2       see in line 12, the question is asked of Mr.
3       Pedotto, "Is it fair to say that according to the
4       Slack message exchange, you are contributing to the
5       process of setting min rates and max rates for
6       variable rate customers?"  You see that?
7  A   Mm-hmm.
8  Q   So the rate setting process is being referred to
9       there, right?
10  A   Yeah.
11  Q   And the following question, beginning on page 17
12       says -- I'm sorry -- line 17 says, "And after this
13       process, there is one more step where Legal reviews
14       and makes sure the variable rates are in
15       compliance," correct?
16  A   Mm-hmm.
17  Q   And Mr. Pedotto answers yes to that.  Do you see
18       that?
19  A   Yeah.
20  Q   And now Mr. Pedotto's testimony that, yes, there was
21       a step where Legal reviews and make sure the
22       variable rates are in compliance, that's consistent
23       with the testimony we saw that Mr. LaPointe gave on
24       that same issue, isn't it?

Page 116

1  A   Yes.
2  Q   And you don't cite this testimony by Mr. Pedotto
3       about the legal review of the rate setting process
4       in paragraph 86, do you?
5  A   I don't.
6  Q   Now, having reviewed this testimony by Mr. Pedotto
7       that Legal reviews the rates and make sure that the
8       variable rates are in compliance, would you agree
9       that the first sentence of paragraph 86 is not
10       accurate?
11            MR. BLANKINSHIP: Objection.
12       Argumentative.  Asked and answered.
13            THE WITNESS: Are you asking had I reviewed
14       -- what was your -- can you repeat your question?
15       Was it, had I reviewed, would I have done this or?
16   BY MR. MEADOWS:
17  Q   I'm saying as we sit here now that you -- we've just
18       gone over --
19  A   Yeah.
20  Q   -- Mr. Pedotto's testimony in Exhibit 3.  In light
21       of that, plus Mr. LaPointe's testimony, are you
22       still standing by the accuracy of the first sentence
23       of paragraph 86?
24  A   Before I give you -- I -- I -- I'm not sure I can

Page 117

1       give you a short answer on this one, but I'll try to
2       make it as succinct I can.  In the same exhibit you
3       gave to me, if you read the very end, page 103, it
4       says, "Did" -- so this is Mr. Pedotto -- "Did -- did
5       the compliance department frequently override the
6       rates that I proposed?"  "I don't know.  I mean, you
7       know, what does frequently mean?"  "Do you recall a
8       single instance?"  "Oh, yeah, for sure.  So like,
9       okay.  Once a year.  Again, I think it'd vary
10       depending on the business situations, price,
11       volatility," so on and so forth.
12            "I know, but I'm trying to understand,
13       like, is it once in a blue moon occurrence?  You
14       know?" so on and so forth.  "I don't know.  I don't
15       think it was.  I think it was -- I -- it wasn't all
16       the time."
17            "It wasn't all the time?"  "Uh-huh."
18       "Just -- just a reminder to say yes or no," so on
19       and so forth.
20            So bottom line, you're asking me a
21       question that Mr. Pedotto is, what -- what it -- I'm
22       sorry?  What was his -- what was his position at
23       Legal?
24  Q   You don't remember?

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 118

1    A    I -- I -- CEO.
2    Q    He's the CEO of the company.  Yeah.
3    A    CEO.  Yeah.  I thought he was CEO.  I know they
4         changed and -- and was just wasn't sure.  So if a
5         person, if the CEO is unclear of details of what
6         happens with respect to, you know, who approves the
7         rate, how many times, you know, it gets approved, I
8         -- I mean, I -- I don't know.  What else do you want
9         me to tell you?
10   Q    Well, it was a simple yes or no question.
11             MR. BLANKINSHIP: He's not done answering
12        his question.
13             MR. MEADOWS: I mean, you --
14             MR. BLANKINSHIP: He's not done answering
15        your question.
16             MR. MEADOWS: I think you are done
17        answering the question.
18             THE WITNESS: I'm not.
19             MR. BLANKINSHIP: No.  He's not done
20        answering your question.
21             MR. MEADOWS: Greg, stop raising your voice
22        at me now.  Stop it.
23             MR. BLANKINSHIP: Stop interrupting the
24        witness.  Stop it.  You can finish your question.

Page 119

1              MR. MEADOWS: No.
2              MR. BLANKINSHIP: You can finish it.  He
3         can finish his answer.
4         BY MR. MEADOWS:
5    Q    It was a simple yes or no question.  Can you give me
6         a yes or no answer to, is the -- after having
7         reviewed this deposition testimony of Mr. Pedotto,
8         Mr. LaPointe, is the first sentence of paragraph 86
9         of your report that you signed, is it accurate?
10        Yes, or no?
11   A    I've -- I've answered this question.
12   Q    Is it yes, or no?  Can you give me a yes or no
13        answer?
14   A    No.  I cannot give you a yes or no on that question.
15   Q    Great.  We'll leave it there.
16   A    Because you're taking -- you're taking it out of the
17        context.
18   Q    I want to --
19             THE WITNESS: I just have to take a quick
20        bathroom break --
21             MR. MEADOWS: Sure.
22             THE WITNESS: -- if it's okay.
23             THE VIDEOGRAPHER: Sir, your microphone?
24             MR. MEADOWS: Oh, Mr. Macan.  Yeah.

Page 120

1              THE WITNESS: That's all right.
2              THE VIDEOGRAPHER: We are now going off the
3         record.  The time is 11:25.
4         (Whereupon, the parties go off the record.)
5              THE VIDEOGRAPHER: We are now back on the
6         record.  The time is 11:31.
7         BY MR. MEADOWS:
8    Q    Mr. Macan, just a couple more questions about
9         Exhibits 2 and 3.  Exhibit 2 being the deposition
10        testimony of Mr. LaPointe.  You would agree with me
11        having now re-reviewed that testimony here today
12        that Mr. LaPointe does not admit that Eligo made no
13        effort to ensure that its variable rates were set
14        according to the contract terms, right?
15             MR. BLANKINSHIP: Objection.  Asked and
16        answered.  Lacks foundation.
17             THE WITNESS: I -- I -- the -- this was the
18        one that I just literally reviewed like several
19        lines you pointed me to.  If you want me to give you
20        a blank -- blanket yes or no, I would have to read
21        this.
22             MR. BLANKINSHIP: I'm also object -- these
23        exhibits are incomplete documents, Exhibit 2 and 3.
24        BY MR. MEADOWS:

Page 121

1    Q    I mean, we just went over the testimony at an
2         earlier point in your deposition, and my question
3         again is simply having looked at the testimony that
4         we looked at prior to the break, isn't it true that
5         Mr. LaPointe does not admit that Eligo made an
6         effort -- no effort to ensure that its variable
7         rates were set in accordance with the contract?
8              MR. BLANKINSHIP: Same objections.
9         THE WITNESS: Like -- like I said, I -- unless I'm missing,
10        no, I -- I've reviewed Pedotto's -- excerpts out of
11        Pedotto's testimony.  I've only reviewed, right now,
12        seven or eight lines from Mr. LaPointe's testimony.
13        So I -- I'd like to, if you want a blanket yes or no
14        answer on this, let me -- let me review this.
15        BY MR. MEADOWS:
16   Q    You want to re-review all the deposition testimony
17        again before you answer the question.
18   A    I -- I did not -- I did not read this probably for
19        three months or -- or longer since the last time I
20        read it.  I -- I don't remember.  You're asking me
21        to give you a blanket answer on something that
22        pertains to his testimony that I've last seen
23        probably three, four months ago.
24   Q    Well, focusing on Mr. LaPointe, I mean, isn't it

31 (Pages 118 - 121)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 122

1    true -- we saw how Mr. LaPointe testified that the
2    changes to the variable rate setting methodology
3    were run by the legal department to ensure
4    compliance with the contract.  You remember that,
5    right?
6    A    Yeah.
7         MR. BLANKINSHIP: Objection.  You can
8    answer.
9    BY MR. MEADOWS:
10   Q    And you would agree with me -- with me that because
11   he testified to that he did not admit that Eligo
12   made no effort to ensure compliance with the
13   contract in variable rate setting, wouldn't you?
14        MR. BLANKINSHIP: Objection.  Asked and
15   answered.  Mischaracterizes his testimony.  You can
16   answer.
17        THE WITNESS: I -- I -- literally what I
18   said last time.  I mean, I -- I -- you're asking me
19   for the, I don't know how many times to say the same
20   thing that I have answered before, I really don't
21   know how to answer it any differently.  I've -- I've
22   gone out of my way to try to explain my position the
23   best I could, and you keep insisting on a simple yes
24   or no answer that I cannot provide because it's

Page 123

1    taking things out of context.  Simple as that.
2    BY MR. MEADOWS:
3    Q    You can't give me a yes or no answer on whether Mr.
4    -- on whether Mr. LaPointe made a specific admission
5    in testimony that you reviewed and rely on in the
6    report.  That's what you're telling me?
7         MR. BLANKINSHIP: Objection.
8    Mischaracterizes testimony.  Asked and answered.
9         THE WITNESS: What I can -- what I can tell
10   you is that I -- sitting here, I stand by the -- the
11   sentence that I wrote, "Eligo admits that it made no
12   effort to ensure that its variable rates were set
13   according to the variable price terms, and in New
14   York's -- in the New York Terms of Service," which
15   is in my report.
16   BY MR. MEADOWS:
17   Q    And nothing about Mr. LaPointe's testimony or Mr.
18   Pedotto's testimony that we're -- that we just
19   reviewed today changes your view on the accuracy of
20   the first sentence of paragraph 86, right?
21        MR. BLANKINSHIP: Objection.  Asked and
22   answered.
23        THE WITNESS: Again, restating, I've had
24   the opportunity to read seven lines from Mr.

Page 124

1    LaPointe's testimony at this point.  Last time I
2    read his testimony was one of many documents that
3    has been reviewed.  It's been months and I really, I
4    don't remember it, so.
5    BY MR. MEADOWS:
6    Q    All right.  Well, let me move on to a different
7    portion of your report, particular -- particularly
8    paragraph 65.
9         (Background conversation.)
10   BY MR. MEADOWS:
11   Q    Page 32.  And paragraph 65 talks about the concept
12   of rate caps that Eligo used in its rate setting,
13   correct?
14   A    Yes.
15   Q    I want to focus your attention about maybe halfway
16   down, maybe a little bit more in paragraph 65,
17   there's a sentence that says, "Eligo's rate cap
18   policy is also a one-way street, allowing the
19   company to gradually increase prices, avoiding
20   attrition from bill shock.  It does not allow for
21   rate cap decreases."  Do you see that?
22   A    Yes.
23   Q    And now you don't cite a specific source for that
24   sentence.  What are -- what are you aware of that

Page 125

1    supports the assertion in particular that Eligo's
2    rate cap policy does not allow for rate cap
3    decreases?
4         MR. BLANKINSHIP: Objection.
5    Mischaracterizes the very paragraph you're looking
6    at.
7         THE WITNESS: I say, "Eligo's rate cap
8    policy is also one-way street, allowing company to
9    gradually increase prices, avoiding attrition from
10   bill shock.  It does not allow for rate cap
11   decreases."
12        There is, I cannot recall exactly where,
13   but there's -- there's testimony where I've read
14   that Eligo's employees or whoever was deposed,
15   basically says exactly that, that people, when --
16   when customers, when they just got off of the fixed
17   rate -- fixed date rate -- fixed rate onto the
18   variable rates, that either the company policy or
19   the practice in -- in place was not to, you know,
20   increase the -- the rates right away because
21   presumably, you know, customers would sort of notice
22   that given the change.
23        Instead, the -- the rates were sort of,
24   you know, adjusted -- adjusted gradually.

32 (Pages 122 - 125)

Edo Macan                          December 17, 2025
Brous v. Eligo Energy, LLC

Page 126

1  Initially, manually, later on through Groove.
2          And then secondly, the reason why I wrote
3  that is I believe, and again, I cannot recall the --
4  the name of who said it, but one of the -- one of
5  the people being deposed or -- there was another
6  thing that I've read that basically, I think even
7  the -- there were -- there was clear testimony that
8  I read, and again, this should have been quoted
9  because it'd be easier for me to retain specifically
10  what I'm talking about. But they basically, you
11  know, that they -- they -- they did not really, you
12  know, they have a policy of not really, you know,
13  trying to avoid, you know, decreasing the rates if
14  possible.
15          And one example of that, to give some
16  substance to it, would be when they ran
17  profitability on the first rate, you know, even, you
18  know, even though it was profitable in sort of
19  earning returns to the extent that the rate was
20  lower than the cap rate, I believe sometimes the --
21  the rate would be increased if it allowed for
22  additional profitability.
23  BY MR. MEADOWS:
24  Q   Did you look at any documents produced in the case

Page 127

1  showing what the rate caps actually were over time?
2  A   I -- I don't recall. I don't recall.
3  Q   Well, let me show you exhibits -- we're up to 4 and
4  5, right?
5          THE COURT REPORTER: Yes.
6          MR. MEADOWS: Thank you. This is 4. I'll
7  hand it right back to you.
8  (Whereupon, Ex. 4 DEF000907 rate_policy_8 sheet, is
9  marked for identification.)
10          MR. MEADOWS: And this is going to be 5.
11  (Whereupon, Ex. 5 DEF000908 rate_policy_9 sheet, is
12  marked for identification.)
13  BY MR. MEADOWS:
14  Q   Mr. Macan, does -- let's just start with Exhibit 4.
15  Does this document look at all familiar to you?
16  A   Is it listed on -- I -- I'm -- I'm really sorry, I'm
17  -- I'm trying my best -- but I -- I've seen so many
18  documents, I -- I do not want to, you know, give you
19  a wrong answer on record. I -- I don't know, if --
20  if it was, if it was listed as one of the documents
21  that I relied upon, it means that I've at least
22  reviewed it to some extent at some point in time.
23  I -- I cannot give you a definitive yes or
24  no just looking at the print shot -- printout

Page 128

1  specific screen. This looks like different rates,
2  but yeah, I -- I don't know.
3  Q   Well, I'll represent to you, Mr. Macan, these
4  Exhibits 4 and 5 are Eligo documents that actually
5  reflect, I think, it's by utility or our service
6  zone, I should say, what Eligo's rate caps actually
7  were over time. Do you have any reason to doubt
8  that?
9          MR. BLANKINSHIP: Objection. Lack of
10  foundation.
11          THE WITNESS: I -- I don't know what they
12  are.
13  BY MR. MEADOWS:
14  Q   Well, if you -- on Exhibit 4, if you turn to page
15  14, and starting at the bottom of 14, you'll see
16  there's a -- on the left-hand column, there's a
17  reference to "RG&E_New York." And you're familiar
18  that "RG&E" stands for Rochester Gas and Energy?
19  A   Yes.
20  Q   And then for, corresponding to the RG&E column,
21  there's an entry to the -- in the column to the
22  right, 1 through 12. You see that as well, right?
23  A   I'm sorry. Say that again.
24  Q   Yeah, sure. The column to the right of RG&E --

Page 129

1  A   Yeah.
2  Q   -- is a number 1 through 12. You see that?
3  A   Yes.
4  Q   And that -- you understand that corresponds --
5  A   Month.
6  Q   -- to each month of the year.
7  A   Yeah.
8  Q   And so the rate listed there for each month
9  corresponding to RG&E is 0.209; you see that?
10  A   0.209, correct.
11  Q   Right. And then if you go to Exhibit 5, and again,
12  same pages 14 and 15, do you see, again, a variety
13  of entries there also corresponding to RG&E, New
14  York?
15  A   Yeah.
16  Q   And the rate listed there on Exhibit 5 is 0.199,
17  correct?
18  A   Correct.
19  Q   And the number 0.199 is lower than the number 0.209,
20  right?
21  A   Correct.
22  Q   Now, are -- have you been made aware at all that
23  these two documents reflect a decrease in Eligo's
24  rate cap corresponding to the RG&E Service Zone?

33 (Pages 126 - 129)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 130

1          MR. BLANKINSHIP: Objection. Lack of
2     foundation.
3          THE WITNESS: I -- I -- made aware by who?
4     BY MR. MEADOWS:
5     Q    Anyone.
6     A    I -- I don't recall.
7     Q    But I take it that when you were in the process of
8     writing the report.
9     A    Yeah.
10    Q    And this sentence in paragraph 65 that Eligo's rate
11    cap policy does not allow for rate cap decreases, no
12    one ever showed you these documents and said, you
13    should consider them in connection with whether that
14    statement is accurate, did they?
15         MR. BLANKINSHIP: Objection. Asked and
16    answered. Lack of foundation.
17         THE WITNESS: I -- I would -- I would --
18    yeah. I -- I would -- I would assume so. Yeah.
19    Correct.
20    BY MR. MEADOWS:
21    Q    So you would agree with me at least that if Exhibits
22    4 and 5 do, in fact, reflect a decrease in the rate
23    cap for the RG&E service zone, that this statement
24    in your -- in paragraph 65 of your report is

Page 131

1     something you'd have to reconsider, wouldn't you?
2          MR. BLANKINSHIP: Objection. Lack of
3     foundation.
4          THE WITNESS: Which -- which specific
5     statement?
6     BY MR. MEADOWS:
7     Q    That Eligo's rate cap policy does not allow for rate
8     cap decreases.
9     A    So look, under the -- I'm going off of what you told
10    me, that indeed these are the rate caps listed
11    historically by service territory and month. And
12    just eyeballing the exhibit that you provided to me.
13    Actually, just give me -- give me like, give me just
14    -- just a second. So, I'm sorry.
15         These are just clarification questions, to
16    answer your question, so -- so what's the -- what's
17    the Exhibit 5 versus 4? They're both RG&E, like one
18    is a cap, one is a rate. I'm just trying to
19    understand. You're asking me to opine on --
20    BY MR. MEADOWS:
21    Q    Well, I understand that it looks like you haven't
22    seen these before. My representation to you is that
23    these documents reflect Eligo's rate caps for
24    different service zones over time. And that rate

Page 132

1     policy 9, which is Exhibit 5, postdates rate policy
2     8, which is Exhibit 4.
3          MR. BLANKINSHIP: Objection. Lack of
4     foundation. Mischaracterizes the record.
5          THE WITNESS: I don't know that I haven't
6     seen them before. I just certainly don't recall any
7     of the details, if -- if the -- if the Exhibit 5
8     predates Exhibit 4 or the --
9     BY MR. MEADOWS:
10    Q    It's the other way around is what I considered.
11    Yeah.
12    A    Okay.
13    Q    Five is later than four.
14    A    Five -- five is later than four -- sorry. I have
15    them mixed up here. Five is later than four, and --
16    and these are the rate caps. Then -- then based on
17    the review of these two documents here, it looks
18    like that their -- if these are rate caps, the rate
19    cap indeed got updated from 0.209 to 0.199. The
20    way, but to answer your question now, the way that I
21    have stated this in my testimony in my report, it
22    does not allow for rate decreases.
23         I was -- I was alluding to a policy and
24    this should -- you know, looking at it, I should

Page 133

1     have had a footnote specifically what -- which
2     policy I was sort of referring to. You -- you what
3     -- you indeed have showed me the tables that
4     demonstrate that for this particular month, and
5     zone, and service territory, it looks like there was
6     an update in which the cap has been decreased from
7     0.209 to 0.199.
8     Q    All right. So as we sit here right now, based on
9     the information you've seen, you would like to kind
10    of append a footnote to that sentence to further
11    clarify what you meant; is that right?
12    A    Correct.
13    Q    Because Exhibits 4 and 5 taken together show that
14    the rate cap, at least for the RG&E service zone,
15    did decrease from one period to another.
16    A    For the month --
17         MR. BLANKINSHIP: Objection. Objection.
18    Mischaracterizes the testimony. Lack of foundation.
19    You can answer.
20         THE WITNESS: For one month, which is
21    January, I don't even know which year, for R -- for
22    RG&E service territory, assuming these are the rate
23    caps, they -- they show a decrease from 0.209 to
24    0.199.

34 (Pages 130 - 133)

Edo Macan                                                 December 17, 2025
Brous v. Eligo Energy, LLC

Page 134

1    BY MR. MEADOWS:
2    Q    Now, having seen Exhibits 4 and 5, is this issue of
3         whether the rate caps actually went up or down over
4         time, is that something you feel like you should
5         look into further after today's deposition?
6    A    No, I --
7              MR. BLANKINSHIP: Go ahead.
8              THE WITNESS: I think I've looked at it
9         plenty enough.  I -- I would not have stated the
10        opinions that I have stated, you know, unless I was
11        convinced that that's indeed what happened.  I'm
12        just, you know, I -- I offered to take my time to
13        read through it to give you more -- the more
14        examples of it, but that -- that was the gist of --
15        gist of my understanding of the situation.
16   BY MR. MEADOWS:
17   Q    Now, I -- you agree with me that Eligo didn't always
18        charge its customers all the way up to the rate cap,
19        correct?
20   A    I -- I don't recall, I don't recall the details.
21        It's not -- I would -- I would assume not, I -- I
22        just don't recall that as a fact.
23   Q    And from a month -- on a month-to-month basis,
24        sometimes Eligo's rates, and we're talking about

Page 135

1         only in New York, sometimes they went up, sometimes
2         they went down, correct?
3    A    I mean, for the two plaintiffs that I've analyzed,
4         because I've mostly looked at those zones, and I'm
5         pointing to, let's say, figures 9 and 10.
6    Q    I'm sorry, what page?
7    A    Pages 84, pages 85.  The red on the chart is the
8         Eligo's variable rate.  In both cases, at least as
9         far as the two plaintiffs are concerned, the
10        trajectory of rates was mostly up.  One of the
11        comparisons that I -- I have performed calculations
12        on later is, you know, price to compare with utility
13        rate.  If you take that as a proxy for underlying
14        costs, you can see that the trajectory of the
15        Eligo's variable rates have been mostly up.
16             So to answer your question succinctly,
17        yes, there were instances where Eligo's variable
18        rates went down, but for majority of the months, you
19        know, altogether they -- they have risen.  In -- in
20        the case of Schuster, I think it's Schuster, yeah.
21             They went up from something like eight or
22        nine bucks in -- in February 2018 to '15 by October
23        '23 so they practically doubled.  And then for --
24        for in the case of Brous -- excuse me -- they went

Page 136

1         in -- went up from like 7 to 15, being as high as 24
2         a few months before, so it's a clear upward
3         trajectory.
4    Q    Going back to my prior question about whether the
5         rate caps, whether Eligo always billed up to the
6         rate cap, I want to call your attention to paragraph
7         76.  That might help refresh your recollection on
8         that question.
9    A    Page 7 -- yeah.  Seventy-six.
10   Q    Page -- yeah.  Page 36.  And paragraph 76 says,
11        "Variable rates were often set to equal the rate cap
12        set by Eligo Management unless that rate was too
13        much of an increase above the previously billed
14        rate."  You see that?
15   A    Yeah.
16   Q    And does that help refresh your recollection that
17        Eligo did not always charge up to the rate cap?
18   A    That -- that -- yes.  I mean, that -- it's not a
19        question of refreshing, it's -- yeah.  That -- that
20        would be logical, yes.
21   Q    All right.  Now, the named plaintiffs, you know, who
22        are addressed throughout your report, Mr. Brous and
23        Ms. Schuster, they were what we could call "retail
24        electricity customers" of Eligo, right?

Page 137

1    A    Yes.
2    Q    Retail customers like Ms. Schuster and Mr. Brous,
3         they buy electricity from suppliers who are
4         available in the market, right?
5    A    Yes.
6    Q    And sometimes that's a utility, right?
7    A    Well, in New York, they always buy from New York
8         ISO.
9    Q    Well, sure their -- but their supplier could either
10        be, for billing purposes, a utility or an ESCO,
11        right?
12   A    Oh, yeah.  For the, you know, residential customers,
13        like that, correct.  Correct.
14   Q    Correct.  Yeah.  Right.  And so -- sorry, just give
15        me a moment.
16   A    Yeah.  Take your time.
17   Q    And so I take it you would agree with me then that
18        there is, within the state of New York, there is a
19        retail market for electricity, correct?
20   A    Yes.
21   Q    And in that retail market, ESCOs compete with
22        utilities for customers, right?
23   A    Yes.
24   Q    The ESCOs also compete amongst themselves for

35 (Pages 134 - 137)

Edo Macan                              December 17, 2025
Brous v. Eligo Energy, LLC

Page 138

1    customers, right?
2  A   Yes.
3  Q   And one way the ESCOs compete with one another is to
4      offer different rate plans at different -- at
5      varying prices; is that fair?
6  A   Yes.
7  Q   Meaning the ESCOs compete with one another on price,
8      right?
9  A   Yes.
10  Q   And I guess you could say that the ESCOs are also
11      competing with the utilities on price, correct?
12  A   Yes.
13  Q   There are certainly cases, I'm sure you --
14          AUTOMATED VOICE: I'm going to have to
15      close this conference because you have exceeded the
16      maximum time limit.  If you need to keep going, you
17      will have to start another call.  Thanks for
18      calling.
19          MR. BLANKINSHIP: Can we just take --
20          MR. MEADOWS: A break?  Yeah.
21          MR. BLANKINSHIP: Can we just take a break
22      and let's do that?
23          THE COURT REPORTER: Yeah, let's take a
24      break.

Page 139

1          MR. MEADOWS: I have no idea what that --
2      (Whereupon, the parties go off the record.)
3          THE VIDEOGRAPHER: Okay.  We are now back
4      on the record.  The time is 12:04 p.m.
5  BY MR. MEADOWS:
6  Q   All right.  Mr. Macan, before we broke, we were just
7      talking about the retail market for electricity in
8      New York.  I take it you -- you're aware that within
9      that market, sometimes residential customers decide,
10      for example, to leave the utility and go with an
11      ESCO; is that fair to say?
12  A   Yes.
13  Q   And sometimes retail customers who are -- I'm sorry
14      -- residential customers who are using an ESCO
15      decide to leave the ESCO and go to the utility,
16      right?
17  A   Yes.
18  Q   So that kind of movement of customers happens either
19      way?
20  A   Yeah.  Yes.
21  Q   All right.  Have you, in your role as a, you know,
22      an energy markets expert, ever studied the reasons
23      why customers decide to leave the utility and go to
24      an ESCO?

Page 140

1          MR. BLANKINSHIP: Objection.  Outside the
2      scope of his report.  You can answer.
3          THE WITNESS: Yes, I have.
4  BY MR. MEADOWS:
5  Q   Is price one of those reasons?
6  A   Yes.
7          MR. BLANKINSHIP: Same objection.
8  BY MR. MEADOWS:
9  Q   Have you ever studied why?  I take it you're aware
10      that sometimes customers, again focusing on New York
11      and residential customers, will leave one ESCO and
12      go to another ESCO, right?
13          MR. BLANKINSHIP: Same objection.
14          THE WITNESS: Yes.
15  BY MR. MEADOWS:
16  Q   And have you ever studied why that particular market
17      dynamic occurs?
18          MR. BLANKINSHIP: Same objection.
19          THE WITNESS: I don't recall that I have.
20  BY MR. MEADOWS:
21  Q   But it's fair to say that the price offered either
22      by the utility or by the various ESCOs is one
23      factor, among others, why customers might decide to
24      move from a utility to an ESCO or from an ESCO to a

Page 141

1      utility.
2          MR. BLANKINSHIP: Same objection.
3          THE WITNESS: One, but probably the most
4      dominant factor, and I know that based on the
5      experience that I have working on, there's a whole
6      field in discrete choice modeling, where you try to
7      project, you know, based on percentage of savings,
8      you know, and based on characteristics of
9      residential customers, how many customers will
10      switch for, you know, what amount of savings.  So I
11      would -- I would categorize by far the most
12      predominant for a typical customer, cost savings,
13      given that electricity is a commodity is by far, the
14      most dominant factor.
15  BY MR. MEADOWS:
16  Q   And do the ESCOs -- again, let's just focus on New
17      York -- sometimes attempt to compete with one
18      another by differentiating their product offerings
19      at all.
20          MR. BLANKINSHIP: Same objection.  Outside
21      the scope.
22          THE WITNESS: I mean, I would -- I would
23      think so, yeah.  It's logical to expect.
24  BY MR. MEADOWS:

36 (Pages 138 - 141)

Edo Macan                              December 17, 2025
Brous v. Eligo Energy, LLC

Page 142

1  Q    And in this case, you're aware that under its terms
2     of service, Eligo provided that at least 30 percent
3     of the electricity it supplied to Ms. Schuster and
4     Mr. Brous would be derived from renewable sources,
5     right?
6  A    Yes.
7          MR. BLANKINSHIP: Objection.
8     Mischaracterizes the record.  Lack of foundation.
9  BY MR. MEADOWS:
10 Q    And that's not something that all of the ESCOs in
11    New York offer, is it?
12         MR. BLANKINSHIP: Objection.  Outside the
13    scope.
14         THE WITNESS: It depends on the -- it
15    depends on the time period.  So it depends on the
16    time period, because after the reset order, the --
17    the only way that ESCOs would be allowed to offer
18    variable rates would be if they offer significant
19    amount of energy coming from renewable sources, so
20    it became -- it really became a -- a requirement.
21    Prior to the reset order, fair amount of ESCOs
22    offered, you know, some percentage of energy coming
23    from renewable sources.
24 BY MR. MEADOWS:

Page 143

1  Q    And Ms. -- I'm sorry -- Mr. Brous and Ms. Schuster,
2     they signed up with Eligo before the 2019 reset
3     order, right?
4  A    Correct.
5  Q    So at the time they signed up with Eligo, it
6     certainly wasn't the case that all ESCOs were
7     offering energy or electricity derived from
8     renewable sources, was it?
9          MR. BLANKINSHIP: Objection.  Outside the
10    scope.
11         THE WITNESS: I don't know for a fact
12    because I haven't analyzed that, but I think it's a,
13    you know, reasonable assumption.
14 BY MR. MEADOWS:
15 Q    All right.  And is -- further, it's a reasonable
16    assumption to say back in 2017, the New York
17    utilities were not offering electricity derived from
18    renewable sources, correct?
19         MR. BLANKINSHIP: Objection.  Lack of
20    foundation and scope.
21         THE WITNESS: For -- for, you know, some --
22    some -- not above what's legally mandated.
23 BY MR. MEADOWS:
24 Q    Okay.  And in the 2017 time frame, what was legally

Page 144

1     mandated in terms of renewable energy offered by
2     utilities to residential customers?
3  A    Whatever the percentage of -- of RECs and ZECs were,
4     I believe there's a table in my -- in my testimony,
5     in my report, where I specify what that is, but it
6     was on the order of a couple of percentage points.
7  Q    Like single digits?
8  A    Single digits.
9  Q    Okay.  You mentioned RECs and ZECs.  We'll talk
10    about those, but since you brought them up, what is
11    a REC?
12 A    Renewable Energy Certificates.
13 Q    What's a ZEC?
14 A    The ZECs are Zero Emission Certificates, I think.
15 Q    Okay.  So those are both acronyms.
16 A    Acronyms.  Correct.
17 Q    Right.  And a REC is something that, as you talk
18    about in the report, Eligo purchased from time to
19    time, correct?
20 A    Correct.
21 Q    Where is a REC -- again, focusing on New York --
22    where and how would one go about purchasing a REC?
23         MR. BLANKINSHIP: Objection.  Scope.  You
24    can answer.

Page 145

1          THE WITNESS: Yeah, I mean, I've never
2     purchased a REC, but they're -- they're -- I -- I
3     don't know the mechanics of -- of, you know,
4     specifically where you go and -- and purchase a REC.
5     These are financial instruments.  You -- you
6     purchase them from brokers doing this type of stuff.
7     It's very much into the operations of things.
8     They're basically financial instruments.  You know,
9     that -- that's -- that's pretty much it, you know.
10 BY MR. MEADOWS:
11 Q    Okay.  So -- and I know this seems basic, but I'm
12    just trying to make a record.  A REC is not energy
13    or power, right?
14 A    REC is a certificate that confirms that -- a REC is
15    basically a megawatt hour equivalent.  It's not --
16    it's not energy of power; it's a financial
17    certificate that basically -- I'm trying to think
18    what's the easiest way to explain this.  It's an
19    energy certificate that corresponds to the cost of a
20    single megawatt hour presumed -- produced from
21    renewable energy resources.
22 Q    Okay.
23 A    So you can think about it.  If the energy price is
24    zero on any given day because there is ample supply

37 (Pages 142 - 145)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 146

1    and you have to have 5 percent of RECs, then it
2    would be the cost of -- of, you know, producing that
3    from renewable energy resources.
4    Q    All right.  One of the opinions that you've
5    expressed in this case is that Eligo's rate setting
6    practices did not conform to what you defined in the
7    report as the variable price term in the customer
8    contract, correct?
9           MR. BLANKINSHIP: Objection.
10    Mischaracterizes the testimony.
11           THE WITNESS: Can you please point me to
12    this specific point in my report where I'm saying
13    this?
14    BY MR. MEADOWS:
15    Q    Sure.  I think I'm looking at -- yeah.  Yeah.
16    Thirteen -- paragraph 13B as in Boy.
17    A    Yeah.
18    Q    And you see, in that first sentence of paragraph
19    13B, you've got the capitalized term, variable price
20    term, right?
21    A    Yeah.
22    Q    And in -- throughout your opinion, I think, correct
23    me if you think I'm wrong, you define the variable
24    price term by reference to the three inputs that are

Page 147

1    specifically mentioned in a specific section of the
2    Eligo customer contract, right?
3    A    Yeah.  Well, I defined the variable price term in my
4    -- on page 3 in bullet point 8, where I say -- where
5    is the beginning of the sentence?  Counsel for class
6    action plaintiffs have informed me that -- that the
7    class in this matter is made up of only residential
8    customers in New York who are charged a variable
9    rate for electricity under this pricing term, which
10    is -- which I now refer to in this report as the
11    variable price term.
12    Q    Right.  And so there -- I take it from that sentence
13    in the report, there are no other inputs or factors
14    identified in the customer contract that you're
15    including within the -- your definition of the
16    variable price term, correct?
17    A    That -- that's what I'm -- that's what I'm -- that's
18    what I'm referring to.
19    Q    All right.  Since you mentioned paragraph 8, it's on
20    page 3, I believe it's the second to the last
21    sentence, you write, "I also understand that the New
22    York Terms of Service contain a statement that the -
23    - that following the fixed rate period, customers'
24    variable rate rates may be periodically adjusted for

Page 148

1    market conditions."  You see that?
2    A    Mm-hmm.
3    Q    So that language is actually in Eligo's customer
4    contract, right?
5    A    Yeah.  I -- I think that's right.
6    Q    And just to be a little bit more specific about it,
7    I'm going to show you the contract --
8    A    Okay.
9    Q    -- which I believe we're up to Exhibit 7.
10           THE COURT REPORTER: Six.
11           MR. MEADOWS: Six.  This has an Exhibit 1
12    on it.  I'm not sure why.
13           MR. BLANKINSHIP: It's attached to this
14    report.
15           MR. MEADOWS: Oh, okay.
16           MR. BLANKINSHIP: It's Exhibit 1 --
17           MR. MEADOWS: Oh, there you go.
18           MR. BLANKINSHIP: -- for Mr. Macan.
19    (Whereupon, Ex. 6, Ex. 1 of Expert Report, M.
20    Schuster T&C, NY ESCO Consumer Bill of Rights, is
21    marked for identification.)
22    BY MR. MEADOWS:
23    Q    All right.  Mr. Macan, so I think this copy of the
24    Eligo customer agreement is attached as Exhibit 1 to

Page 149

1    your report; does that sound right?
2    A    Yes.
3    Q    And so you're familiar -- I've now marked this as
4    Exhibit 6 to your deposition.  You're familiar with
5    this document?
6    A    I'm familiar with this document.
7    Q    And if you flip over, the pages aren't numbered
8    sequentially, but I think it's the third page with
9    the -- with the chart, the boxes on -- on the top.
10    A    Yeah.
11    Q    There's a box that, on the left-hand column has the
12    title "Variable Prices Determined."  You're familiar
13    with that, right?
14    A    Yes.
15    Q    And that's where the three inputs are identified
16    that you include within your definition of the
17    variable price term.
18    A    Correct.
19    Q    Right.  Now, just above that is a -- is a box that
20    has the label Price, right?
21    A    Yeah.
22    Q    And there, it says, "First three months at a fixed
23    rate of 00.5490 per kilowatt hour."
24    A    Yeah.

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 150

1    Q    And then it goes on thereafter, "monthly variable
2         kilowatt hour rate that may be periodically adjusted
3         for market conditions," correct?
4    A    Yeah.
5              MR. BLANKINSHIP: I'm just going to object.
6         You read that number wrong.
7    BY MR. MEADOWS:
8    Q    Oh -- I'm sorry -- I'd -- but we're on the same page
9         as to where we are in the contract.
10   A    We are on the same page where we are in the
11        contract.
12   Q    All right. Now, that language that says, "Monthly
13        variable kilowatt hour rate that may be periodically
14        adjusted for market conditions," you do not include
15        that language within the definition of the variable
16        price term, correct?
17             MR. BLANKINSHIP: Objection.
18        Mischaracterizes his testimony.
19             THE WITNESS: Right. Please, can -- can
20        you -- can you repeat what you just said? Just
21        repeat your question as is. I just didn't --
22   BY MR. MEADOWS:
23   Q    Sure. The language in that first box labeled Price,
24        which says that "monthly variable kilowatt hour rate

Page 151

1         that may be periodically adjusted for market
2         conditions," that particular language is not
3         included in your definition of the variable price
4         term in your report, is it?
5              MR. BLANKINSHIP: Same objection.
6              THE WITNESS: Well, I -- I -- I'm -- I'm
7         referring to -- I -- I'm -- I'm referring to the
8         variable price terms. Let me -- let me just read it
9         out loud again in my report. Counsel for -- has
10        informed me that class in this matter is made up of
11        only residential customers in New York who are
12        charged available rate of electricity in this term
13        who are charged under the -- under the electricity
14        for this term, which will now refer to this report
15        as variable rate report. This is, I mean, these are
16        -- this is the contract, right? These are the terms
17        of the contract.
18             I -- I did not specifically allude to, you
19        know, one box or -- or the other. The -- the first
20        box says price. It pertains to discussion of the
21        price. And predominantly, you know, the price is
22        going to be fixed for three months at, you know, 5.5
23        cents per kilowatt hour. Thereafter, monthly rate
24        will maybe periodically adjusted for the market.

Page 152

1         It's a high-level statement that does not go in the
2         level of specificity compared to the second box,
3         which is the variable price is determined.
4              Given that I know factually that once you
5         get off the fixed rate, you're going to get onto the
6         variable rate, I'm interpreting this as the -- the
7         second box is providing specific detail as to, you
8         know, how it's going to be adjusted periodically,
9         you know, for -- for various markets conditions.
10             And it means that, you know, market
11        pricing is going to be taken into account,
12        transportation costs, and other market price
13        factors. And so to me, it's not either/ or, you
14        know, one encompasses the other, but pretty much
15        reading the contract, and I've seen many, many
16        hundreds of contracts in -- in my professional
17        career, it's -- it's the, you know, it doesn't get
18        more explicit in terms of determination of the
19        variable price than when you have a box like this
20        that basically says, this is how it's going to be
21        determined.
22   BY MR. MEADOWS:
23   Q    Okay. But -- and I'm really just trying to
24        understand what you -- what said I -- is it the case

Page 153

1         that for purposes of your report, you interpreted
2         market conditions as it appears in the price section
3         of the contract to essentially have the same meaning
4         as market pricing and other market price factors?
5    A    I'm -- I'm -- I did not really interpret anything.
6         I mean, my -- my role here wasn't a legal one to try
7         to interpret the contract. I was given alternative
8         legal interpretations of what this contract means.
9         And my role was to operationalize the methodology
10        based on the available data under each legal
11        interpretation of -- of the contract, and devise a -
12        - devise a method to estimate, you know, the -- the
13        contractual prices that should have been charged
14        under each of these legal theories.
15             So in -- in no way do I want to say, nor
16        have I said in my testimony that I'm opining on how
17        this should be interpreted, whether the first box or
18        the second box or this and that, I'm just justifying
19        why I wrote what I wrote, and I'm simply
20        acknowledging here, you know, for the sake of
21        completeness, that my reading of this contains that
22        and, you know, merely stating the fact that this
23        document also, you know, contains the language that,
24        you know, "following the fixed rate period,

39 (Pages 150 - 153)

Edo Macan                              December 17, 2025
Brous v. Eligo Energy, LLC

Page 154

1    customer's variable rate may be periodically
2    adjusted for market conditions, and that's it."
3            And then even following up on that as to
4    what market conditions are, because that's -- can be
5    a lot of things. I've reviewed the testimony. I'm
6    sorry. This is the 30B6. Where's the foot? Yeah,
7    here Sandler's testimony, where -- where, you know,
8    he elaborates, I -- I -- if I recall correctly, on a
9    -- on a deposition sort of elaborating on what those
10   market conditions are, so.
11   Q   So you're not offering any interpretation of the
12       agreement as an -- as an expert in this case.
13           MR. BLANKINSHIP: Objection.
14   BY MR. MEADOWS:
15   Q   Just to be clear; is that right?
16   A   Objection. Mischaracterizes his testimony.
17           THE WITNESS: I'm not offering any legal
18       opinion on the contract.
19   BY MR. MEADOWS:
20   Q   But your damages models, you would agree, are based
21       on the interpretation of the agreement that is set
22       forth in your report, right?
23   A   But as I write in my report, it has provided -- been
24       provided to me by counsel.

Page 155

1    Q   And that's what I want to get at, the interpretation
2        of your agreement that kind of underlies your
3        opinions, that's not something you arrived at
4        independently, that's something plaintiffs' counsel
5        gave you and told you to assume; is that right?
6    A   The -- the -- here -- here is how that came about.
7        In -- in most cases that I've seen, usually there is
8        -- let me -- let me take that back. In the -- in the
9        cases that I have been involved, in -- in my
10       experience so far, it was clear legally what the
11       interpretation of -- of the law is. It's my
12       understanding, hearing from counsel, that that issue
13       has not really been fully resolved here, that two
14       different parties have a different interpretation
15       what the contractual legal language means.
16           And because I -- I do not want to take a
17       position on that, I'm not qualified, I'm not a
18       lawyer, I -- I wanted my role and -- and Counsel
19       never suggested anything otherwise, to be specific,
20       that an economist trying to operationalize a
21       specific interpretation of the language and that's
22       it. So Counsel --
23   Q   So -- go ahead.
24   A   If -- if you're asking, like Counsel has sort of,

Page 156

1    you know, provided, as I say in my testimony, they
2    have provided alternative legal interpretations of
3    the contractual language, and according to each
4    legal interpretation of the language, I have,
5    basically, you know, operationalized that specific
6    input parameters, market pricing, transportation
7    costs, and other -- other market price factors. And
8    what do they mean in the context of pricing
9    electricity under a given formulation?
10   Q   All right. In that case, I want to ask you
11       specifically about what you write in paragraph 154
12       on page 65.
13   A   Okay.
14           MR. BLANKINSHIP: I'm sorry. Which
15       paragraph?
16           MR. MEADOWS: 154. Are you with me?
17           THE WITNESS: Yeah. Just give me one
18       second.
19           MR. MEADOWS: Sure.
20           THE WITNESS: Yeah.
21   BY MR. MEADOWS:
22   Q   All right. And so you write -- the first sentence
23       of 154 says that "From an economics perspective,
24       method one represents the preferred contract

Page 157

1    reading," correct?
2    A   Mm-hmm.
3    Q   And so now of course, method one is one of the
4        damages methods that you include in your report,
5        right?
6    A   Mm-hmm.
7    Q   I mean it seems like you're testify -- you're
8        opining there that there is a specific contract
9        interpretation that is preferred.
10   A   No, maybe it's loose --
11   Q   Is that not right?
12   A   No.
13   Q   No.
14   A   No. Maybe it's loosely said that way. To me, it
15       made more sense. It's sort of, I'll explain it --
16       elaborate on the second sentence. The idea is,
17       let me -- what's the gist of that? The gist of that
18       is that -- that under the method one, it's what I
19       would call an "index contract," reading a contract
20       that says specifically shall be calculated on
21       monthly basis in response to market pricing,
22       transportation costs, and other market price
23       factors.
24           It's an index contract. It -- it clearly

40 (Pages 154 - 157)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 158

1    states that the variable rate will be set to
2    something that is observable, that is in my
3    interpretation, you know, a wholesale cost of
4    energy. And so, in that sense, that's -- that
5    sort of, that's the, it's, you know, the preferred
6    reading in a sense that it's an index contract. And
7    -- and so methods one and two would both sort of
8    satisfy that criteria. And I think preferred in a -
9    - I said preferred because for me, I -- I, you know,
10   I don't even get into the, you know, what's valid,
11   valid what's not, what, you know, I -- I did not
12   have -- I took -- I took Eligo's data as given. I -
13   - I did not spend time evaluating their costs in
14   method one; I take their cost as given.
15        And to me it's a preferred method because
16   it's -- it's analytically very clean. I basically
17   take their dates as given -- I'm sorry -- data is
18   given and then merely instrumentalize and
19   methodology under -- under legal interpretation.
20   There is one last element to it. I think method
21   three, to be, you know, to be -- is also has the
22   advantage because it uses the data that it's not the
23   actual data that Eligo paid for.
24        Sorry. The actual cost that Eligo ended

Page 159

1    up sort of incurring instead those were the costs
2    coming from POWWR that they were known at the time.
3    Those -- so strictly speaking, from economic point -
4    - economics point of view, if you're making a
5    decision on an investment, you should take into
6    account the data that's available to you at the
7    time. And so if they set a rate, let me give you a
8    simple example because I think it's a critical
9    point. If -- if -- what -- if they -- they get a --
10   a report from POWWR that says, you know, procurement
11   cost estimate is going to be 50 or something like
12   that, they're going to set a rate based on that
13   estimate. If it turns out that the POWWR was
14   costing much more or much less, they don't have the
15   ability to go back for that month and adjust the
16   rates.
17        And so to me, it's much more fair to use
18   that as a metric rather than a metric by using the
19   actual -- actual costs, which are not known at the
20   time, they're known two weeks later because they
21   didn't know them at the time, nor did -- nor did the
22   customers know them at the time. And so in that
23   sense, that's the benefit of method one over method
24   two.

Page 160

1  Q    You said "index contract" earlier. That -- I think
2       you said that's how you view the Eligo customer
3       contract, right?
4            MR. BLANKINSHIP: Objection.
5       Mischaracterizes the testimony.
6            THE WITNESS: It -- it's a -- I -- I --
7       again, I think, and I say this somewhere in my
8       category, there are sort of different types of
9       contracts just sort of giving labels, the general
10      buckets, there are contracts that are fixed. Are we
11      going to transact at -- at a fixed agreed price
12      which is specified nominally? Are we going to
13      transact -- it happens in energy all the time.
14      Energy contracts are tied to an index, whether it's
15      a gas rpub hub or -- or POWWR hub or whatever it
16      is.
17           So in this case, it's -- it says
18      explicitly in the language, it's tied to the shall
19      be calculated on in response to market. So it's
20      tied to market pricing, transportation costs, and --
21      and other market price factors.
22  BY MR. MEADOWS:
23  Q    Right. And that's what causes you to believe that
24      it's what we call an "index contract," right?

Page 161

1  A    In -- in spirit, yes. That's that -- yes. Correct.
2  Q    And I'm trying to understand now what you mean by
3       index contract. Are you -- are you referring to a
4       contract that is the price of which is indexed to
5       the underlying price of a commodity or something
6       like that?
7  A    It's indexed to something, it -- it relates to
8       something. So I use the term here, "indexed" in a
9       very -- in a very broad sense.
10 Q    All right. Is another word for an index contract, a
11      cost-plus contract?
12 A    Cost-plus contracts are index contracts.
13 Q    Do you think that Eligo's customer contract is in
14      the nature of a cost-plus agreement?
15 A    It sounds like a -- sounds like a legal question
16      frankly, I -- I don't -- I -- I can -- I'm -- I can
17      also offer my opinion, but just for clarificates
18      (sic), I'm not offering a legal opinion on this one.
19      You know, it -- it -- when -- when you have the
20      language that states -- states this clearly, all
21      rates, not some, all rates shall be calculated on a
22      monthly basis in response to market pricing,
23      transportation costs, and other market price
24      factors, and I have a whole section explaining, you

41 (Pages 158 - 161)

Edo Macan                                    December 17, 2025

Brous v. Eligo Energy, LLC

Page 162

1    know, how I interpreted market pricing.
2    What does it mean?  Transportation costs don't make a lot
3    of sense here.  And then other market price factors
4    in the context of both market pricing and
5    transportation costs.  I -- I -- playing devil's
6    advocate to myself, I cannot interpret this as
7    anything else, but, you know, Eligo promising to
8    charge its customers variable rates that are -- that
9    are in some way or another, consummerate with their
10   costs.  And it's -- that's the -- that's the crucial
11   argument in all this.  I -- I cannot see this being,
12   they have a discretion to do anything else because
13   then there's no point in language like this existing
14   in a contract.
15   Q    So you interpret the Eligo customer contract as not
16       giving Eligo any pricing discretion; fair?
17           MR. BLANKINSHIP: Objection.  Question
18       calls for legal conclusion.
19           THE WITNESS: I -- I -- like I said, I -- I
20       did not interpret anything here.  Interpretation has
21       been given to me.  You asked me for my opinion on
22       the index, why do I think this is -- this would fall
23       under a category of index contracts, and I have
24       provided my explanation why.

Page 163

1           I did not opine whether, you know,
2       legally, whether this is, you know, one type of
3       contract or another, or -- or interpret this
4       legally.  Legally -- legally interpreted the
5       contract.
6    BY MR. MEADOWS:
7    Q    I guess, I'm really, right now, trying to understand
8       because in a prior answer you referred to, you know,
9       my interpretation or I can't interpret this contract
10      in any other way.  So I just want to be clear, are
11      you offering as to the meaning of the -- of the
12      variable price term, are you offering your own
13      opinion as to what that means or were you told to
14      assume that?
15   A    I was told to assume that.
16   Q    Okay.  Great.  And I want to be very specific about
17      that.  If you would turn to paragraph 130 of the
18      report.
19   A    Just to clarify, I was told to assume, like I say in
20      my testimony, I was told to assume alternative legal
21      interpretations of the contract.
22   Q    Right.
23   A    Yeah.
24   Q    And -- but I want to --

Page 164

1    A    Sure.  Sure.  Point me to --
2    Q    -- with that -- through that prism, look at
3       paragraph 130.
4    A    Yeah.
5           MR. BLANKINSHIP: It's on page 55.
6           MR. MEADOWS: Yeah, 55.
7    BY MR. MEADOWS:
8    Q    Yeah.  And so there in paragraph 130, there -- you
9       see, you've got market pricing in quotations, right?
10   A    Yes.
11   Q    And that's a reference to the phrase "market
12      pricing" as it appears in the customer contract,
13      right?
14   A    Yes.
15   Q    And then following that, the report says, well,
16      taken as a whole, it says, "market pricing means the
17      wholesale market," right?
18   A    Correct.
19   Q    So just to be crystal clear, that meaning that
20      you're giving there in paragraph 130, that's
21      something you were told to assume by plaintiffs'
22      counsel, right?
23           MR. BLANKINSHIP: Objection.
24      Mischaracterizes his testimony.

Page 165

1           THE WITNESS: No, no, I'm not saying that.
2       I -- I -- I'm saying that.  The short answer is no.
3       No, I'm not -- not saying that.
4    BY MR. MEADOWS:
5    Q    All right.  Then how did you arrive at the
6       interpretation of market pricing that it means the
7       wholesale market?
8           MR. BLANKINSHIP: Objection.
9      Mischaracterizes testimony.
10           THE WITNESS: I did not arrive at that.  As
11      I explained, I was provided with the legal
12      interpretation of the contract language, three
13      different formulations, methods one through three.
14      And in the context of each legal interpretation, I
15      merely operationalized the, you know, what some of
16      the inputs into the -- into the formula and the
17      legal interpretation meant.  So in the context of,
18      let me refer to my testimony here.  Sorry.  Report.
19      I keep calling it "testimony."
20           Yeah.  So -- so I explained this in 135.
21      For method one, for example, the method identified
22      the rate Eligo should have charged by calculating
23      rate on a monthly basis, that it varies in response
24      to Eligo's anticipated cost for market pricing,

42 (Pages 162 - 165)

Edo Macan                                        December 17, 2025
Brous v. Eligo Energy, LLC

Page 166

1    transportation costs, and other market price
2    factors.
3           As I noted previously, I was asked by
4    counsel for the class action plaintiffs to outline
5    the market costs faced by Eligo in serving variable
6    rate customers.  So, you -- you know, if -- if these
7    are the inputs and this is the formula, what -- what
8    does market pricing mean in the context of this
9    legal interpretation?  And -- and that is what I've
10   done.  And my decision was to, you know, basically,
11   just -- I'm sorry -- my decision for -- that that
12   was for method two.  In method one, it cannot be
13   anything else but the -- the cost that they have
14   disclosed as, you know, being the energy cost in
15   method two from POWWR reports.
16  Q   Well, my question was about the first sentence in
17      paragraph 130 where you give a specific meaning to
18      the phrase "market pricing," and again, you say it
19      means the wholesale market.  I -- I just, I just
20      need to focus on that particular --
21  A   Sentence.
22  Q   Sentence.
23  A   Okay.
24  Q   Is that an assumption you were given to work with by

Page 167

1    the plaintiffs' counsel or is that your opinion,
2    that sentence?
3           MR. BLANKINSHIP: Objection.  Asked and
4    answered.
5           THE WITNESS: That -- I mean, that's --
6    that's my opinion.  In -- in the context of -- in
7    the context of the formulation, I cannot see market
8    pricing being anything else.  But, you know, pricing
9    of a -- pricing of a commodity, it's a term that,
10   you know, comes up often.  I mean, it -- it's just -
11   - that's -- that's what it is.
12  BY MR. MEADOWS:
13  Q   Okay.  And what -- what's the methodology that you
14      employed to reach the conclusion that market pricing
15      means the wholesale market?
16  A   What do you mean by "method" -- what do you mean by
17      "methodology"?  I mean, if I -- you're an attorney,
18      if I -- if I knew a legal term, and I told you a
19      legal term, you would have a preceived (sic) notion
20      of what that means.  I'm an energy market expert.
21      I've done energy pricing for 25 years.  Somebody
22      tells me market pricing; it means pricing instrument
23      to the market.
24           It's a derivative, it's a contract,

Page 168

1    whatever it is, find the prevailing market prices,
2    find -- if -- if those aren't available, if the
3    market is -- is not illiquid enough, find ways to
4    triangulate and come up with a -- with a fair market
5    price for something.  That is market pricing.
6           So market pricing in the context of
7    electricity retailer is they're in the business of
8    buying power wholesale, selling at retail.  Market
9    pricing is like how -- how much it's going to cost
10   for us to, you know, acquire these good, that we're
11   going to resell later on.  It's just a combination
12   of -- of, you know, basic logic and -- and, you
13   know, understanding what the term means.
14  Q   Okay.  Is there anything else other than what you
15      just described to the methodology by which you
16      concluded market pricing means the wholesale market?
17  A   Everything that I -- that I quote in -- in 131.  If
18      you give me a second, I'm going to read through it
19      to recall but --
20           MR. BLANKINSHIP: 131?
21           THE WITNESS: I'm sorry, 130, 130.  I'm
22      looking at 130 and I'm -- yeah, 130.  Yeah.  I think
23      I've -- everything I had to say on that is -- is
24      right here.

Page 169

1    BY MR. MEADOWS:
2    Q   All right.  So other than what you told me here
3        today and appears in paragraph 130 of your report,
4        there's no other analysis or methodology that you
5        employed to arrive at the conclusion that market
6        pricing means the wholesale market, correct?
7    A   Like I said, it's an -- it's an industry term that
8        has a very specific meaning in the context of the
9        problem analyzed.  If we're talking about market
10       pricing for a hedging operation, it would be pricing
11       a derivative, you know, from brokers.  If we're
12       talking about market pricing, you know, for an ESCO,
13       it can mean only one thing.  It can mean, you know,
14       pricing of -- of the goods, of procurement.
15       Basically, they're procurement costs or -- or, you
16       know, pricing of energy, pricing of electricity.
17   Q   Is there a source, an academic source, or some -- or
18       some other source that you're relying on for the
19       proposition that you just told me that within, you
20       know, a retail electricity contract like this one,
21       that market pricing can only refer to the wholesale
22       market?
23   A   I -- I think I've -- I'm trying to remember.  Hold
24       on a second.  I'm trying to remember specifically

43 (Pages 166 - 169)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 170

1    the -- the two sources I quoted here.  More examples
2    that are in this source.  No, I mean, don't want to
3    waste time on it but pretty much just whatever is in
4    130 and whatever I said today here is just
5    sufficient.
6  Q    All right.  So let me ask you about the sources then
7    that are cited in 130.  One of them is a -- is an
8    article or you'll correct, you can describe it, but
9    it's titled "Customer Response to Day-Ahead Market
10   Hourly Pricing Choices and Performance," right?
11 A    Mm-hmm.
12 Q    And then the date of -- is that an article or a
13   book?
14 A    I really -- it was one of the -- one of the
15   background materials I've consulted and I -- I
16   really don't recall.
17 Q    Okay.
18 A    It's produced as -- sorry.  Like I said, my memory
19   is really not the best and I've -- I've looked at a
20   lot of things.  I -- I -- yeah.  I -- I'm -- I'm
21   trying to -- I'm trying to recall what it was
22   specifically.  Yeah.  I'm just -- I'm not going to
23   speculate.
24 Q    All right.  The date of that -- whatever, whether

Page 171

1    it's an article or a book or whatever it is, its
2    date is 2006, right?
3  A    Yeah.
4  Q    So that predates Eligo's existence, right?
5  A    Yes.
6  Q    And from your description of this particular source,
7    you say that it -- "The research examines the
8    experience of 149 large customers of Niagara Mohawk
9    Power Corporation, an upstate New York utility,"
10   right?
11 A    Yeah.
12 Q    And so does this source deal at all with ESCOs or
13   the customers of ESCOs?
14 A    I'm -- I'm really having a hard time recalling the
15   details of it, I -- I think so.  I -- I -- I'm
16   sorry.  I'm just blanking on this one.
17 Q    And I mean, to whatever recollection you have of
18   this particular source, is there any part of it that
19   deals with the meaning of the phrase "market
20   pricing" as it relates to an ESCO customer contract?
21 A    I -- I -- like I said, I -- I really, I cannot, in
22   the spirit of it and the gist of it, for sure, I --
23   I just cannot recall.  I just cannot recall.  It's
24   the general topic, but it's not -- it's not a --

Page 172

1    that's why it's not a quotation or something
2    specific.
3  Q    When -- okay.  When's the last time you read this
4    source?
5  A    I -- I read pieces of it, you know, during this
6    engagement, but I just don't recall -- I just don't
7    recall the details more than it's here.
8  Q    All right.  Let me ask you about the second source
9    listed, which is titled "Customer Strategies for
10   Responding to Day-Ahead Market Hourly Electricity
11   Pricing."
12 A    Yeah.
13 Q    What is that, an article, a book?  What?
14 A    Same thing.  I'm just blanking out.  It -- it's
15   certainly not a physical book I had.  I -- came up
16   in research.  Whether my staff produced it, whether
17   I searched for evidence and found it, I just -- I
18   just don't -- I just don't recall.
19 Q    What is the -- again, what is the source about?
20   What is it -- what is it addressing?
21 A    I'm -- I'm sorry, I'm just not -- I'm -- I'm really
22   blanking out on these.  I -- I just don't recall the
23   details.
24 Q    I understand and --

Page 173

1  A    Other than -- other than sort of said here at the
2    time, the -- do we -- I -- I don't -- I don't have
3    this.  I -- I don't.  I -- it's -- it's a valid --
4    it's a valid question.  This is the one where I just
5    don't have a ready answer.  But, you know, I'm happy
6    to follow up on that.
7  Q    Okay.  Well, let me -- and again, you may not know,
8    but we're here and I need to make a record.
9  A    Yeah.
10 Q    Does this second source, the customer strategy
11   source, deal with New York-based ESCOs at all?
12 A    I really, I just don't recall the details of it.
13   I've -- I've -- I -- I deemed at the time that
14   they're valid references, and -- and I -- I have no
15   doubt that they are, but I'm just not recalling the
16   details to be able to elaborate on specifically
17   anything more than what I've summarized here.
18 Q    Okay.
19 A    They're -- they're merely here, you know, they're
20   merely here to, you know, provide context in
21   addition to, you know, in addition to my opinion on
22   the meaning of market pricing.  And -- and I'm going
23   to say one more thing.  It's just, it -- it's a --
24   it's a -- it -- it's almost like an industry term,

44 (Pages 170 - 173)

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

Page 174

1    you know, I mean, I -- I don't know which --
2  Q   I'm sorry but what's an industry term?  You lost me
3      there.
4  A   I'm saying market pricing has a meaning because it's
5      sort of an industry term in a -- in a sense, right?
6      So you know, if you talked, if, you know, we were
7      dealing with the mortgage-backed securities or
8      something and somebody said market pricing, everyone
9      in that industry would have a very different
10     perception of it.  So to me, it's not market pricing
11     per se.  It's really like what -- what this term
12     means to me in the context of an ESCO, you know,
13     pricing its product --
14 Q   Yeah.
15 A   -- in -- in the market.
16 Q   So we talked about earlier, Eligo buys its energy on
17     the wholesale market, right?
18 A   Mm-hmm.
19 Q   But it sells electricity on the retail market,
20     correct?
21 A   Correct.
22 Q   Now your opinion in paragraph 130 appears to exclude
23     any possibility that market pricing might refer to
24     the retail market; is that fair?

Page 175

1  A   Yes, yes.  Because I -- I'm, at least, I'm not aware
2      of an instance where an ESCO buys -- buys power from
3      another ESCO only to resell it to the customers.  So
4      market pricing means pricing of the commodity, you
5      know, depending on where they're getting it from and
6      they're getting it from the wholesale market.
7  Q   Right.  You would agree with me though that the
8      whole purpose of the customer contract that we're
9      here talking about today is to govern the terms on
10     which Eligo is going to sell electricity to
11     consumers, right?
12         MR. BLANKINSHIP: I'm just going to object.
13     Question calls for legal conclusion.
14         THE WITNESS: Yeah.  I mean like -- like
15     I've said before, it's -- I -- I was provided a
16     legal interpretation of the contract and I've done
17     the, I wouldn't call it done the math, done the
18     interpretation, done the operationalization, you
19     know, and under -- under each theory, I mean
20     there's, it's -- it's like, simple way to put it
21     like, you know, this is -- these are the elements,
22     this is the legal interpretation.
23         You know, what is market pricing in this
24     context?  What does market pricing mean under the

Page 176

1      legal interpretation summarized in method one?  And
2      then I -- I chose what it meant, with all its
3      components.
4  BY MR. MEADOWS:
5  Q   Meaning you chose that it meant wholesale market.
6  A   I chose that it meant wholesale market.
7  Q   Right.  And what I -- now what I want to get to is
8      by what methodology or what methodology did you use
9      to reach the conclusion that market pricing means
10     only the wholesale market to the complete exclusion
11     of any reference to the retail market?
12         MR. BLANKINSHIP: Objection.  Asked and
13     answered.
14         THE WITNESS: Let me -- let me restate what
15     I just said because I wasn't specific.  Not that it
16     just means the wholesale market.  It means the --
17     the wholesale cost of energy.  And -- and that's --
18     that's what I mean by the -- the wholesale market.
19     It means, under the method one, it means the cost of
20     procuring energy in the wholesale market.  Because
21     that's the -- that's just a statement of fact.  Like
22     I said, ESCOs don't buy power from other ESCOs, they
23     buy it from -- from NYISO, and NYISO is a wholesale
24     market.

Page 177

1  BY MR. MEADOWS:
2  Q   Yeah.  If it's okay with you, just a few more
3      questions on this topic --
4  A   Sure.
5  Q   -- and then we can break for lunch.
6  A   Sure.
7  Q   In rendering this opinion about the meaning of
8      market pricing, did you consider any legal
9      authorities that bear on this question at all?  By
10     legal authorities, I mean, decisions by courts.
11 A   No.  Like the -- the interpretation was provided to
12     me.  I did not want to get anywhere near legal
13     interpretation.  I'm not a lawyer, as you can see, I
14     don't try to be one.  I respect what you guys do,
15     but -- in my cup of tea, so no.
16 Q   Right.  But this interpretation that market pricing
17     means the wholesale market, you -- that's your
18     interpretation again with what you've told me,
19     right?
20         MR. BLANKINSHIP: Objection.  Asked and
21     answered.
22         THE WITNESS: As -- as an economist's
23     interpretation, what the -- what -- what the -- what
24     -- you know, what market pricing -- which -- what's

45 (Pages 174 - 177)

Edo Macan                                           December 17, 2025
Brous v. Eligo Energy, LLC

Page 178

1    market pricing in the context of a legal
2    interpretation under a specific method that has been
3    outlined.
4        BY MR. MEADOWS:
5    Q    Okay.  And you're aware that there have been other
6        class actions like this one filed against other
7        ESCOs over the last several years.
8    A    Yes.
9    Q    Are you aware of the class action that had been
10       filed against an ESCO called "Agway"?
11   A    No.
12   Q    Have you ever read -- do you know what the Second
13       Circuit Court of Appeals is?
14   A    I know of Second Circuit Court of Appeals, yeah.
15   Q    Have you ever read the Second Circuit's decision in
16       the Agway ESCO class action?
17           MR. BLANKINSHIP:  Objection.  Asked and
18       answered.
19           THE WITNESS:  No, I haven't.  I don't know
20       what Agway was.
21       BY MR. MEADOWS:
22   Q    You were involved in the Richards versus Direct
23       Energy case.
24   A    Correct.

Page 179

1    Q    And you issued an opinion in that case, correct?
2    A    I -- I was -- I submitted a report, I believe, with
3        a -- with a colleague, Seabron Adamson, if my
4        recollection is right.  Yeah.
5    Q    Okay.
6    A    And I think the report specifies -- states the scope
7        of what each one of us has done.  Yeah.
8    Q    One of the issues in that particular case, the case
9        against Direct Energy, was what was the meaning of
10       the phrase "business and market conditions" as it
11       appeared in Direct Energy's customer contract,
12       right?
13           MR. BLANKINSHIP:  Objection.  Calls for
14       legal conclusion.
15           THE WITNESS:  I -- I don't know about that.
16       BY MR. MEADOWS:
17   Q    You don't recall that?
18           MR. BLANKINSHIP:  Same objection.
19           THE WITNESS:  I -- like I said, I've -- I -
20       - I think I've explained earlier in this deposition,
21       my role on that case has been what one would call in
22       international arbitration, a quantum expert.  It was
23       I, literally, you know, do the calculation and --
24       and I testified on pretty much what I have done.  It

Page 180

1    wasn't even economic interpretation of -- of, you
2    know, what the -- was -- was -- case was about.
3        BY MR. MEADOWS:
4    Q    Well, the report that you signed addressed the legal
5        interpretation of business and market conditions,
6        didn't it?
7           MR. BLANKINSHIP:  Objection.
8        Mischaracterizes testimony, lack of foundation.
9           THE WITNESS:  I -- I'm -- knowing myself,
10       I'm sure I never provided any legal opinions or
11       stated in my report that I'm providing any kind of
12       legal -- legal opinions or legal interpretations.
13       BY MR. MEADOWS:
14   Q    But my question was, the report that you signed, did
15       it contain an interpretation of the phrase "business
16       and market conditions," didn't it?
17           MR. BLANKINSHIP:  Same objections.
18           THE WITNESS:  I -- I -- that I don't even,
19       I don't even recall.  That case was like five or six
20       years ago.  I haven't -- I haven't seen it.  I -- I
21       don't remember what's in it.  I --
22       BY MR. MEADOWS:
23   Q    Do you -- do you recall that in that case the
24       district court expressly refused to rely on the

Page 181

1    opinions that you issued in that case?
2           MR. BLANKINSHIP:  Objection.  Calls for
3        legal conclusion.
4           THE WITNESS:  I -- I don't know.
5        BY MR. MEADOWS:
6    Q    You don't recall that?
7    A    No, I -- I -- no, I don't recall that.  I -- I --
8        no.
9    Q    Well, let me see if I can refresh your recollection
10       a little bit.  In that case, the district court, in
11       the Direct Energy case, the district court issued an
12       opinion mentioning you by name and then said, "These
13       experts argue that for a middleman like Direct
14       Energy, a rate consistent with business and market
15       conditions would include the cost of procuring power
16       on the wholesale market plus an appropriate margin
17       to cover the legitimate costs and risks of supplying
18       variable rate customers."  Does that sound familiar
19       at all to you?
20   A    What -- so I -- I don't, I -- I certainly like when
21       -- when the case was done, I don't think I've even
22       looked at the case.  I mean, my -- my engagement
23       ended up when -- when we submitted the report.  I --
24       I don't -- this never went to trial and I don't -- I

46 (Pages 178 - 181)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 182

1    don't remember any of that.  I -- I don't -- I don't
2    think I've received --
3    Q   Okay.
4    A   -- you know, a legal, whatever the document is
5        called, from whoever the attorney was at the time.
6        And if anyone did, maybe my colleague would have.
7    Q   Let me read -- oh, I'm sorry -- go ahead.
8    A   No, I'm saying, I -- I definitely sort of did not
9        receive that.
10   Q   All right.
11   A   But for -- I -- you were -- yeah.  Go ahead.
12   Q   Let me read you a different, one other --
13   A   Yeah.
14   Q   -- brief part of the court's opinion in that case.
15       Again, this opinion mentions you by name, Mr. Macan.
16       It -- it goes on to say, "Mr. Richards," who's a
17       plaintiff, "Mr. Richards' experts further concluded
18       that the phrase 'business and market conditions'
19       should within -- should be interpreted as a rate
20       that is consistent with the cost of procuring power
21       in the wholesale market plus an appropriate margin
22       to cover the legitimate costs and risks of supplying
23       variable rate customers."
24            Is that an accurate description by the

Page 183

1    court of the opinion that you signed in that case?
2            MR. BLANKINSHIP: Objection.  Asked and
3        answered.
4            THE WITNESS: Can you please just -- just
5        read -- read it to me one more time?  I -- it was a
6        long, lengthy one.
7    BY MR. MEADOWS:
8    Q   Sure.
9    A   Yeah.
10   Q   Understood.
11   A   Yeah.
12   Q   What the court said is, "Mr. Richards' experts
13       further concluded that the phrase 'business and
14       market conditions' should be interpreted as a rate
15       that is consistent with the cost of procuring power
16       in the wholesale market, plus an appropriate margin
17       to cover the legitimate costs and risks of supplying
18       variable rate customers."  Does that sound like an
19       accurate description of the report that you signed?
20           MR. BLANKINSHIP: Same objection.
21           THE WITNESS: I -- I really don't.  I don't
22       recall the -- the legal, like, you know, we -- we
23       spent, my whole report, you know, is -- is very, you
24       know, discusses in detail the specific contractual

Page 184

1    language here.  Speaking, I -- for a fact, I -- I
2    don't recall what the contractual language in Direct
3    versus that one was.  Any opinion I would have made
4    would certainly be based on the specific contractual
5    language.
6            My -- my blanche view on all these things
7    is, this is in essence a contractual dispute.  And
8    so to the extent that the contractual language in
9    Direct were significantly different than this, you
10   know, any -- any legal conclusions or legal
11   opinions, or, you know, the judicial verdicts are --
12   are sort of dependent on that.  I -- yeah.  I -- I'm
13   sorry -- this was like six years ago.
14   BY MR. MEADOWS:
15   Q   Yeah.  So --
16   A   I just really don't remember the detail.
17   Q   Fair to say then, you didn't take the Direct Energy
18       Court's opinion and ruling into consideration at all
19       in rendering your opinions in this case, did you?
20   A   I -- I mean, this sounds like a legal --
21   Q   No, no, no.  I --
22   A   No, no, no?  Yeah.  Okay.
23   Q   To be clear, I'm simply asking, when you wrote your
24       opinions in this case, did you or did you not take

Page 185

1    into account any of the rulings issued by the court
2    in the Direct Energy case?
3    A   Any of the rulings?
4    Q   Any of the rulings?
5    A   No, I did not.
6    Q   Did you go back and even review the court's ruling
7        on, that mentioned your name and dealt with your
8        expert opinion?  Did you go back and review that at
9        all before issuing your opinion in this case?
10           MR. BLANKINSHIP: Objection.  Asked and
11       answered.
12           THE WITNESS: Yeah.  Like -- like -- no, I
13       -- I did not.
14   BY MR. MEADOWS:
15   Q   Just a few more questions and we'll break.
16   A   Sure.
17   Q   What the court -- the district court held in the
18       Direct Energy case is that despite your expert
19       opinion to the contrary that the phrase "business
20       and market conditions" did not limit Direct Energy's
21       variable rates to the cost of procuring power plus
22       an appropriate margin, does that sound -- does that
23       ring a bell for you at all?
24           MR. BLANKINSHIP: Objection.

47 (Pages 182 - 185)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 186

1    Mischaracterizes the record. Asked and answered.
2    You can answer.
3            THE WITNESS: Yeah, I mean, it doesn't.
4    "Business and market conditions", that -- that term
5    rings a bell, but any of this other stuff with the
6    court rule, it doesn't.
7    BY MR. MEADOWS:
8    Q    All right. And would you agree with me that the
9    phrase "business and market conditions" in an ESCO
10   contract is very similar to the phrase "market
11   pricing and market price factors" as they appear in
12   the Eligo contract?
13   A    It should not. Not at all.
14   Q    No? Very different?
15   A    Well, I mean, "business and market conditions"
16   sounds like a catch-all term. I mean, that -- it --
17   again, it depends on the contract and in which way
18   it has been sort of interpreted. But just -- just
19   comparing the two languages, I would say this is
20   much more precise. I mean, you're -- you're saying
21   shall be calculated on monthly basis but again, I
22   mean, this is just don't -- don't -- I'm not
23   offering a legal opinion.
24           I'm just saying, looking at it as a

Page 187

1    contractual language, this sounds much more precise
2    than business and market conditions.
3    Q    So do you think that the phrase "market pricing" is
4    a lot more precise than market conditions?
5            MR. BLANKINSHIP: Objection. Scope. You
6    can answer.
7            THE WITNESS: I mean, market -- is the
8    market pricing term more -- please just --
9    BY MR. MEADOWS:
10   Q    Yeah. Direct -- the market conditions was the
11   language, part of the language at issue in Direct
12   Energy. It sounds like you're telling me you think
13   that's a lot different from what the Eligo contract
14   refers to, which is market pricing; is that fair?
15           MR. BLANKINSHIP: Objection. Misconstrues
16   and mischaracterizes the record.
17           THE WITNESS: I'm saying that this
18   contractual language sounds much more precise than
19   business and market conditions. If that was the
20   contractual language in -- in Direct Energy, that's
21   what I'm saying.
22   BY MR. MEADOWS:
23   Q    All right. Well, my last question about Direct
24   Energy, and then we'll break. The court also

Page 188

1    stated, in its opinion, the district court did, that
2    no reasonable person would adopt the construction --
3    the interpretation of business and market conditions
4    that you and your colleague proffered. Are you
5    aware of that?
6            MR. BLANKINSHIP: Objection.
7    Mischaracterizes the record. Asked and answered.
8    Outside the scope. You can answer.
9            THE WITNESS: I'm -- I'm not aware of that.
10           MR. MEADOWS: Okay. If you all are ready,
11   I think it's a good time.
12           THE WITNESS: Okay.
13           MR. BLANKINSHIP: Yeah. Let's go take
14   lunch. Maybe shoot for 45 minutes?
15           MR. MEADOWS: Yeah, please.
16           THE VIDEOGRAPHER: We are now going off the
17   record. The time is 12:59.
18   (Whereupon, the parties go off the record.)
19           THE VIDEOGRAPHER: Okay. We are now back
20   on the record. The time is 1:55 p.m.
21   BY MR. MEADOWS:
22   Q    Okay. Mr. Macan, did you do anything to prepare for
23   your deposition today?
24   A    I did.

Page 189

1    Q    What did you do?
2    A    I read my report. I read my rebuttal report. I
3    skimmed through Aron's report. That's about it.
4    Q    Did you meet with anybody from plaintiffs' counsel
5    to prepare?
6    A    I -- I did. I met with plaintiffs' counsel.
7    Q    When did that meeting occur?
8    A    Yesterday.
9    Q    And how long was the meeting?
10   A    Like three --
11           MR. BLANKINSHIP: I'm just going to object
12   that that's vague.
13   BY MR. MEADOWS:
14   Q    Okay. How long is the meeting?
15   A    For four hours, three to four hours.
16   Q    And besides yourself, who was there?
17   A    Myself, Goran Vojvodic, my analyst, and the two
18   counsels. I'm sorry, physically. Physically --
19   physically, right? It does not --
20   Q    That was my question is physically. Yeah.
21   A    Physically, it was Greg and I. And I'm sorry, Greg
22   and I and -- and Goran Vojvodic, and via the phone
23   were two other counsels.
24   Q    All right. And anything to prepare for your

48 (Pages 186 - 189)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 190

1    deposition other than what you just told me?
2    A   No.  We -- we went over my -- we went over my report
3        and you know, just the general sort of preparation
4        for deposition.  It's been a while since my last
5        deposition, and, you know, just re-jog my memory on
6        how the process worked, procedural things and things
7        like that.
8    Q   Okay.  A few more questions about some of these
9        definitional terms in your report.  In particular,
10       paragraph 131, if you would.  It's page 56.
11   A   131, is that --
12   Q   Yes.
13   A   Okay.
14   Q   And in paragraph 131, you address the meaning of the
15       term in Eligo's customer contract transportation
16       costs, correct?
17   A   Mm-hmm.  Mm-hmm.
18   Q   You say it's a term that rarely comes up in
19       electricity pricing, right?
20   A   Yeah.
21   Q   And I take it that you kind of reach that conclusion
22       by virtue of your experience reviewing and dealing
23       with electricity pricing contracts, right?
24   A   Based on my professional experience, like I said,

Page 191

1        many years in it, I can elaborate but yeah,
2        transportation cost comes up often and out of
3        commodities, but not --
4        (Sneezes)
5    A   Bless you.  But not electricity.
6    Q   You know, and in that breadth of experience that
7        you're talking about may be impossible to say, but
8        your best estimate, how many ESCO retail supply
9        contracts have you had a chance to look at?
10       MR. BLANKINSHIP: I'm just going to object
11       that's vague, but you can answer.
12       THE WITNESS: I don't think I can even give
13       you an estimate.  It -- it, you know, it would be
14       that the contracts that I've reviewed as a -- as
15       part of all these, you know, litigation cases that
16       dealt with the subject matter.  I've worked in
17       hundreds of cases -- I cannot even -- I cannot even
18       give you an estimate.  Yeah.
19   BY MR. MEADOWS:
20   Q   All right.  In the context, and I think my question,
21       I said retail energy supply, I just mean retail
22       contracts between ESCOs and customers.  That's what
23       --
24   A   And that's -- that's how I interpret it.  Yeah.

Page 192

1    Q   Okay.  And has it -- an ESCO ever called on you to
2        help advise it as to how to phrase or prepare a
3        retail contract with a customer?
4    A   No.
5    Q   In the contract, the retail ESCO contracts that you
6        have reviewed, have you observed that they use
7        different language from ESCO to ESCO?
8        MR. BLANKINSHIP: Objection.  Vague.
9        THE WITNESS: Can you point me specifically
10       to what you mean?
11   BY MR. MEADOWS:
12   Q   Well, yeah, for example, the -- well, have you seen
13       an ESCO retail contract that in terms of setting
14       retail pricing, makes specific reference to the
15       wholesale cost of procuring energy?
16   A   I don't remember.
17   Q   What about an ESCO retail contract that makes a
18       specific reference to a specific margin that will be
19       charged by the ESCO?
20   A   Again, I just don't remember.
21   Q   Can you recall seeing any ESCO retail contracts
22       that, you know, indicated that, you know, very
23       specifically, that the pricing would be on a cost-
24       plus basis?

Page 193

1    A   Containing that language you mean?
2    Q   Yeah.  Yes.
3    A   Yeah, I -- I don't remember.  I can -- I can tell
4        you why.  So that I mean that the last, Direct was
5        the last litigation dealing with retail pricing that
6        I've been sort of a part of.  I don't even remember
7        the contractual language in -- in the contracts that
8        were at issue then.  When you said -- you said
9        "business and market conditions," it did ring a
10       bell, but I -- I just, it's not, you know, so far in
11       my career, I've been very sort of quantitatively
12       focused economist, and I've kind of dealt with that
13       and so --
14   Q   But aren't you drawing on your experience with ESCO
15       contracts to help the interpretations of the terms
16       "market pricing and other market price factors" in
17       this case?
18   A   I'm drawing on my industry experience to interpret
19       what these industry terms -- not interpret --
20       quantify what those industry terms mean in the
21       context of -- in the context of a contract.
22   Q   Turning back to transportation costs on page 131 --
23       I'm sorry -- paragraph 131, you say, "Based on my
24       experience" -- this is the second sentence -- "the

Edo Macan                                        December 17, 2025
Brous v. Eligo Energy, LLC

Page 194

1    only transportation cost for electricity that could
2    be potentially called the transportation cost is so-
3    called wheeling cost," correct?
4    A    Mm-hmm. Mm-hmm.
5    Q    And so is it based on -- based on that, is it your
6    view that the reference to transportation costs in
7    the customer contract refers to "wheeling costs"?
8    A    No, no. The -- the -- what -- what -- the meaning
9    of this sentence is the following. I -- I thought
10   deep and hard, what could transportation cost mean
11   in the context of an ESCO, an entity procuring
12   buying power wholesale to sell retail, especially
13   given that the ESCO is within NYISO. You know, I
14   think calling, you know, classifying wheeling rates
15   and I can explain what those are as transportation
16   costs would I think be technically inaccurate. But
17   it would be sort of an omission -- omission by a
18   non-professional or not someone versed in the
19   industry that would be understood if we're talking
20   about, you know, an area of the country where
21   there's no organized markets like ISOs, where, you
22   know, utilities have to, if you will, transport --
23   it's not transportation -- but they -- they wheel
24   energy between different service areas.

Page 195

1            And so that's kind of what that meant. I
2    mean, the -- the -- it -- it sounded like a term
3    that did not really have, you know, that was -- I --
4    I did not see anything that would, in my mind be,
5    that I would consider a transportation cost that
6    Eligo would have in -- in this context.
7    Q    Now that phrase that's in the agreement -- well let
8    me ask it this way. That phrase "transportation
9    costs," that appears word for word in the customer
10   contract, right?
11   A    Transportation costs, yes.
12   Q    And isn't it true that that phrase is the only place
13   in the sections of the contract that deal with
14   price, where a cost, where the word "cost" is
15   actually used?
16   A    Could you please repeat?
17   Q    Well, let me ask you it this way.
18   A    No, no, you did it right.
19   Q    Oh.
20   A    I just didn't -- just -- if you could say it one
21   more time exactly what you said.
22   Q    Okay. Sure. The phrase "transportation costs,"
23   that's the only place in the contract, in -- in the
24   parts of the contract that deal with, you know, the

Page 196

1    variable price or the price where the term "cost" is
2    actually referenced. Is that -- or not referenced
3    but actually used. You see what I'm asking?
4    A    You were saying, is the word "transportation"
5    mentioned anywhere else without having cost next to
6    it?
7    Q    Let me scratch it and start over.
8    A    Okay.
9    Q    Let's just look at the -- remember we looked earlier
10   at the box in the contract --
11   A    Yeah.
12   Q    Labeled variable price, how it's determined.
13   A    Yeah.
14   Q    Right? The word "cost" appears in that box only in
15   reference to transportation costs, correct?
16        MR. BLANKINSHIP: I'm objecting. That
17   statement calls for a legal conclusion.
18        THE WITNESS: I mean, as a statement of
19   fact. Yes. This box where costs only appears next
20   to transportation costs.
21   BY MR. MEADOWS:
22   Q    And I mean, as someone who's worked in the energy
23   industry for a long time, I mean, you would
24   certainly expect that Eligo as a company, you know,

Page 197

1    when it wrote this contract, was familiar with the
2    wholesale market for energy, correct?
3        MR. BLANKINSHIP: Objection. Outside the
4    scope.
5        THE WITNESS: Wholesale market for
6    electricity or some --
7    BY MR. MEADOWS:
8    Q    Electricity -- I'm sorry -- yes.
9    A    Yeah, I would.
10   Q    And does it give you any pause that despite that,
11   this customer contract, does it make any specific
12   reference to the wholesale market?
13        MR. BLANKINSHIP: Objection. Lack of
14   foundation.
15        THE WITNESS: It -- it did give me pause
16   and -- and I mean, I -- like I said, I -- I -- my
17   role was not to interpret what the, you know, what
18   the contract meant, but as far as transportation
19   costs, I -- I, it's my understanding that Eligo was
20   selling gas as well, but not in the New York, or at
21   least certainly, it's not sort of part of this
22   engagement.
23        So I haven't looked specifically where
24   that buisness activity was. And I -- I was under

50 (Pages 194 - 197)

Veritext Legal Solutions

Edo Macan                                      December 17, 2025
Brous v. Eligo Energy, LLC

Page 198

1    the assumption that, you know, maybe this is a
2    generic language that I've seen examples where
3    companies would have same catch-all language that,
4    sort of, kind of catches all things.
5              And that's -- yeah.  So because my role
6    was simply to interpret -- not interpret, my role
7    was to, you know, put a concrete quantification or -
8    - or, you know, what does that mean in the context
9    of the -- of the contract?
10             Transportation costs just, it really
11   didn't make any sense.  And -- for -- for the
12   reason, I mean, needless to be said, electricity is
13   a non-storable commodity.  It cannot be stored, let
14   alone shipped.  So how can you talk about
15   transportation costs of electricity?
16   BY MR. MEADOWS:
17   Q    Yeah.  Looking at paragraph 132, there you address
18        the meaning of the contractual phrase other market
19        price factors, right?
20   A    Mm-hmm.
21   Q    And you say it's a catch-all that means the pass
22        through of other small miscellaneous fees or charges
23        associated with the wholesale market price that may
24        not be explicit -- explicitly itemized in the market

Page 199

1    pricing from the wholesale market, correct?
2    A    Mm-hmm.  Mm-hmm.
3    Q    Now here again, the phrase "other market price
4         factors" doesn't contain the word "wholesale" at
5         all, we can agree on that.
6    A    Yes.
7    Q    And is this another example where the lack of the
8         word "wholesale" in that section of the agreement
9         gave you some pause as to whether this was really
10        the correct interpretation of that phrase?
11             MR. BLANKINSHIP: Objection.  Sorry.
12        Objection.  Mischaracterizes prior testimony, lacks
13        foundation.
14             THE WITNESS: Yeah.  I honestly don't
15        recall what the "again" refers to, so I'll answer
16        the question without the "again" because I don't --
17        I don't really know which question you were building
18        this up on.
19   BY MR. MEADOWS:
20   Q    Okay.
21   A    Yeah.  Did you want to rephrase or?
22   Q    Yeah.  Well, so your opinion is that "other market
23        price factors" refers to miscellaneous fees and
24        charges associated with the wholesale market price.

Page 200

1    Did it give you any pause in reaching that
2    conclusion that the phrase "other market price
3    factors" doesn't contain the word "wholesale" at
4    all?
5    A    No.
6    Q    Wouldn't you have expected, as an experienced energy
7         industry expert, that if Eligo intended to, you
8         know, as you said, index its retail prices to the
9         wholesale cost of energy, it would have said so
10        explicitly in this customer agreement?
11   A    I -- I have no experience opining what the
12        appropriate legal language to achieve that effect
13        would be, I'm merely going over the fact that there
14        is explicit language saying all rates shall be
15        calculated on a monthly basis in response to this,
16        this, and that.  As an economist looking at this,
17        we're talking about calculation, we're talking about
18        every single rate being calculated, every single
19        rating being calculated monthly in response to three
20        things that are basically industry terms that are
21        not -- you know, that -- that have -- that -- that
22        have a meaning in the context of an ESCO, but are
23        not specified.
24             You know, it is -- this is not an S -- S&P

Page 201

1    500 swap where it's unequivocally clear which
2    specific, you know, commodity index this is sort of
3    tied to, but in the context of an ESCO, in the
4    business of buying wholesale and selling retail, I -
5    - I don't see any other plausible explanation.  But,
6    you know, it's the -- it's the price of commodity
7    they're buying.
8    Q    Now, again, the same language relating to how the
9         variable price is determined in the box to the right
10        of that, there's no reference -- well, scratch that.
11        Let me see.  I'll withdraw that question.  I think
12        you said a couple of times, correct me if I'm wrong,
13        but that, you know, you're looking at and applying
14        the variable price term in your role as an
15        economist; is that fair?
16   A    I'm quantifying the -- the three industry terms that
17        are market pricing, transportation costs, and other
18        market price factors under a legal interpretation,
19        under alternative legal interpretations.
20   Q    I guess what I'm trying to get at is, in your view,
21        is there any difference between how an economist
22        would look at this customer contract and how a
23        lawyer would read it, to your knowledge?
24   A    Sounds like a legal question because I don't know

51 (Pages 198 - 201)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 202

1    how a lawyer would read it.  I could only tell you
2    how economists would read it, or somebody in the
3    market.
4    Q    I guess what is it about your expertise as an
5        economist that leads you to read the phrase "market
6        pricing" as a reference solely to the wholesale
7        market?
8            MR. BLANKINSHIP: Objection.  Asked and
9    answered.
10           THE WITNESS: Yeah.  I -- as I've sort of
11   explained before, it's the context of the situation.
12   We're dealing with a -- with a -- on a -- with a
13   contract dispute, the - the parting question, ESCO
14   in the business of buying wholesale and selling
15   retail.  And so in that context, to me, market
16   pricing can mean only, you know, the cost of
17   purchasing power and -- like I said, I'm not
18   aware of any ESCOs buying from ESCOs and selling to
19   other ESCOs, therefore, the relevant cost is -- is
20   everyone's buying from NYISO.  Whether the Day-Ahead
21   or the Real-Time Market, it's the -- it's the
22   procurement cost.
23   BY MR. MEADOWS:
24   Q    If you turn to paragraph 13B as in Boy, and in that

Page 203

1    paragraph you start off by making reference to the
2    variable price term again, correct?
3    A    Yes.
4    Q    And then proceed to say that, you know, described
5        what you concluded from your review of Eligo's
6        discovery documents and how Eligo went about setting
7        the variable price term, right?
8    A    Yeah.
9    Q    And then you say, in the last sentence of 13B, "This
10       practice is inconsistent with calculating a rate
11       that varies in response to the three inputs listed
12       in the variable price term.  Further, by its own
13       admission, Eligo used factors including undisclosed
14       and subjective considerations such as legislative
15       and regulatory uncertainty that are nowhere
16       mentioned in the variable price term," right?
17   A    Mm-hmm.
18   Q    So is it, I take it then it's your opinion that the
19       use of factors to calculate the variable price that
20       are nowhere mentioned in the variable price term is
21       inappropriate; is that fair?
22   A    The use of what -- the use of factors?  I'm sorry,
23       can -- can you just -- the very last thing that you
24       said, could you just repeat it again?

Page 204

1    Q    Yeah.  That it would, that based on that part of
2        your report, I take it that it's your opinion that
3        it is inappropriate to calculate a variable rate
4        under this contract by using factors that are
5        nowhere mentioned in the variable price term.
6    A    Let me just read the -- what I said here.  Yeah.  I
7        mean, a -- as a -- as a non-attorney, if -- if
8        you're -- you're pricing things outside of the, you
9        know -- yeah.  Yes.  Short answer would be yes.
10   Q    Now, in doing your damage calculations, isn't it
11       true that you have applied factors that are nowhere
12       mentioned in the variable price term?
13           MR. BLANKINSHIP: Objection.  Lacks
14   foundation.
15           THE WITNESS: Which specific factors are --
16   you want?
17   BY MR. MEADOWS:
18   Q    Well, let's start with margin.  You include a margin
19       in your method one and method two damage
20       calculations, don't you?
21   A    Yes, I do.
22   Q    Does the word "margin" appear anywhere in the
23       variable price term?
24   A    No, it doesn't.

Page 205

1    Q    So what is the source then by which you conclude
2        that it's appropriate to include a margin in your
3        damage calculations?
4    A    It's -- it's -- as I explained in the testimony,
5        it's a -- it's a construct of -- of a contractual
6        price.  Looking at it as an economist, you cannot
7        run a business unless you, you know, can make some
8        money doing it.  And I've tried to -- I've -- I've,
9        you know, I've done it in a way that economically
10       makes sense.  And -- and this means, you know, an
11       ESCO that's purely, you know, buying wholesale and
12       just reselling to retail at a cost that would be
13       unsustainable in the long term because they, you
14       know, they need to pay for overhead, they need to
15       pay for their expenses, they need to make some
16       money.  That's -- that just -- it's common sense,
17       so.
18   Q    So is it the case then that that commonsense
19       consideration overrides the language of the variable
20       price term in the limited case of margin?
21           MR. BLANKINSHIP: I'm going to object.  It
22   calls for legal conclusion.
23           THE WITNESS: Yeah.  I mean, it sounds like
24   a legal question what you're asking me.  I'm -- I'm

52 (Pages 202 - 205)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 206

1  -- I can opine a non -- I can give you a non-legal
2  answer.
3  BY MR. MEADOWS:
4  Q    I'm asking about your own analysis, your own
5       thinking on this question.
6  A    Yeah.
7  Q    Because in Paragraph 13B, you criticize Eligo for
8       using factors in rate setting that are nowhere
9       mentioned in the variable price term.  But margin
10      isn't mentioned either and --
11 A    Sure.  Sure.
12 Q    -- I'm trying -- I'm trying to figure out how you
13      reconcile that criticism of Eligo on the one hand
14      with your inclusion of margin, which is completely
15      unmentioned on the other.
16 A    Sure.  And then --
17          MR. BLANKINSHIP:  There's no question
18      pending.
19 BY MR. MEADOWS:
20 Q    That's the question.  How do you reconcile that?
21          THE WITNESS:  What did you say?
22          MR. BLANKINSHIP:  No, you can answer that.
23      Now he's asked a question, so you can answer it.
24          THE WITNESS:  Okay.  Sorry, I got confused

Page 207

1  in that.  You're going to have to repeat the
2  question for me.
3  BY MR. MEADOWS:
4  Q    Okay.
5  A    Yeah.  I'm sorry.
6  Q    Fair enough.
7  A    Yeah.
8  Q    Like I said, in 13B, you criticize Eligo for
9       considering factors that, as you say, are nowhere
10      mentioned in the variable price term, but in your
11      own damage calculations, you include a margin, even
12      though margin isn't mentioned in the variable price
13      term either.  So how do you reconcile those two
14      things?
15 A    Yeah.  Just give me one second.
16          MR. BLANKINSHIP:  I'm going to object,
17      that's asked and answered.
18          THE WITNESS:  Yeah.  I -- I have to give
19      you a little bit lengthier explanation on this
20      because I just -- I'm thinking how to tell it
21      succinctly, and the -- the gist of what I'm saying
22      is the following.
23          There is a contract, and under a specific
24      legal interpretation of what this contract means, it

Page 208

1  says, "Company will charge customers, calculate" --
2  exact language -- "shall calculate on monthly basis
3  in response to market pricing, transportation costs
4  and other market price factors."
5          This points to a process where an ESCO
6  performs a calculation in response to what I
7  perceive as, you know, underlying commodity or -- or
8  index, and tries to adjust the price.  It's charging
9  the -- the customers accordingly.
10          And so by saying in 13B, "Eligo used
11 factors undisclosed and subject to consideration,
12 such as legislative and regulatory uncertainty," and
13 this is only one factor mentioned here.  There were
14 other examples that -- that I cite, I think,
15 throughout my testimony, I'm merely saying that this
16 is not -- this is not something that has been sort
17 of disclosed to a client.  My understanding -- my
18 understanding, and again, this is sort of, a legal
19 issue that ESCOs had an obligation either to get a
20 written confirmation that -- that clients were
21 willing to switch to the variable rate service, or
22 that contractual terms had to be spelled out in
23 writing to them.
24          It's also my understanding that Eligo

Page 209

1  never attempted or has provided a formulaic
2  disclosure to its -- to its customers as to
3  specifically how they're going to be priced.  And so
4  given that they haven't -- I'm sorry -- I -- I --
5  Eligo never obtained, you know, signed -- I should -
6  - I should just consult the part of the testimony
7  where I say that, but because they did not -- they
8  did not get a sort of a formal confirmation on paper
9  that formal acceptance by the customers that they're
10 willing to -- to switch to the variable rate, they
11 had a -- they had an obligation to send in writing
12 specifically how they're going to charge for these
13 things.  And so the only thing that I've seen that
14 was communicated, sort of, in writing is that
15 contractual language that we just looked at, and
16 that contractual language does not point out, you
17 know, to factors like legislative and, you know,
18 regulatory uncertainty.
19          And so -- so that's that remark.  What
20 you're trying to say is, well, isn't that unfair if
21 then you are sort of allowing them to have, you
22 know, some return on top of that?  And -- and I'm
23 saying that's just economically, what you would
24 expect.  I -- I don't see this as inconsistency at

53 (Pages 206 - 209)

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

Page 210

1    all because I think it would be ludicrous that I,
2    you know, assume that an ESCO makes no money, you
3    know, serving its customers.
4    Q    So because a profit would be economically expected,
5         you think it -- it's okay then to include within a
6         calculation of the variable price term; is that
7         right?
8              MR. BLANKINSHIP: Objection.
9         Mischaracterizes his testimony.
10             THE WITNESS: Yeah. I don't think that's
11        what I said.
12   BY MR. MEADOWS:
13   Q    Well, I -- I'm still trying to understand because
14        here again, 13B, you very specifically criticize
15        Eligo for including factors that are nowhere
16        mentioned in the variable price term, but margin
17        isn't -- I -- margin isn't mentioned either. What
18        is -- so what is the methodology, the source by
19        which you believe that margin is appropriate to take
20        into consideration in applying the variable price
21        term?
22             MR. BLANKINSHIP: Objection. Asked and
23        answered. Mischaracterizes the report.
24             THE WITNESS: Basic -- basic economics.

Page 211

1    Anyone running a sustainable business, you know, it
2    needs to be profitable. If it's not profitable or
3    they don't pay their cost, maybe it's not profitable
4    for one time, but in the long term -- in the long
5    term, you know, it must be a profitable operation.
6    If that's not the case, they're going to cease to
7    exist.
8    BY MR. MEADOWS:
9    Q    And --
10   A    It's a basic principle of economics and competition.
11   Q    Okay. Is another basic principle of economics
12        pricing a product somewhere in the zone of where
13        your competitors are pricing it?
14             MR. BLANKINSHIP: Objection. Vague.
15        Outside the scope.
16             THE WITNESS: What do you mean by zone, do
17        you mean what they are charging?
18   BY MR. MEADOWS:
19   Q    Or is charging a -- being cognizant of a market
20        price and trying to meet it, is that an issue of
21        basic economics as well?
22             MR. BLANKINSHIP: Objection. Vague.
23             THE WITNESS: Define market price.
24   BY MR. MEADOWS:

Page 212

1    Q    You don't know what the phrase "market price" means?
2    A    In the context of what you just said, I don't
3         because I think we're --
4    Q    What about, is there a market -- is there a retail
5         market price for energy or electricity in New York?
6    A    There is a retail market price for energy in New
7         York. Yeah.
8    Q    So would it be a basic principle of economics for
9         somebody selling electricity in New York to take
10        account of the market price of retail electricity?
11   A    If they have a contract that says you can charge
12        whatever you want at your discretion, yes.
13   Q    Well, but you just told me that margin is okay to
14        include because it's the basic principle of
15        economics but now it sounds like you're adding
16        something else, too. Is it -- so is it -- it -- in
17        your view, is the pricing of Eligo's energy or
18        electricity dependent on the language of the
19        contract, basic principles of economics, or some
20        combination of both? That's what I'm trying to
21        figure out.
22   A    I -- I think --
23             MR. BLANKINSHIP: Objection. Compound and
24        mischaracterizes testimony. Lack of foundation.

Page 213

1              THE WITNESS: I -- I think --
2              MR. BLANKINSHIP: Calls for legal
3         conclusion.
4              THE WITNESS: I -- I think the -- however I
5         shall call this misunderstanding, let's say, is
6         because you're -- you're taking what I'm saying as
7         if I'm reading the contract. The price that should
8         have been charged is market price plus
9         transportation costs plus other market price
10        factors, and that's not what I'm saying.
11             I'm saying contract says the rates
12        shall be calculated on monthly basis in response to
13        these factors. Okay? And so the -- the -- that --
14        that -- the -- in the context, like I've said
15        numerous times so far, in the context of an ESCO
16        buying power wholesale, selling retail, the -- the
17        quantification of each of these parameters that I
18        have proposed is -- is the -- is the -- is the only
19        meaningful way to -- to operationalize this
20        interpretation of the law. And I think what you're
21        saying is, you know, where does the margin come from
22        in all this?
23             And I'm saying that's part of the, you
24        know, it's part of the putting this in economic

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 214

1   reality.  You -- you start with the legal.  The way
2   it works, there is language.  Attorneys, in this
3   case, my attorneys or plaintiffs' attorneys have
4   interpreted legal meaning, provided alternative
5   legal meanings for what this contract can mean or
6   means, because it's my understanding that that issue
7   has not been resolved.
8        And with -- and -- and typically, there
9   would be one interpretation that has been sort of,
10  you know, adjudicated on or -- or agreed upon.  But
11  here there -- there are multiple, and within each,
12  I'm trying to quantify this and -- and, you know,
13  basically, take these industry terms and quantify
14  them for what they are, and that's all I'm doing.
15  Q   Do any of the industry terms that you see in the
16      variable price term, in your view, include the
17      concept of a margin?
18          MR. BLANKINSHIP: Objection.  Vague.
19          THE WITNESS: Do the -- do -- I'm sorry.
20      Do any of the industry -- can you please repeat it?
21  BY MR. MEADOWS:
22  Q   Yeah.  I think what you've told me is that the
23      variable price term contains terms that have a
24      meaning within the industry to an economist, right?

Page 215

1   A   I -- the -- the -- I'm sorry, you're going to have
2       to repeat it again.  The -- the -- can you please
3       repeat it again?  The variable term.
4   Q   Let me ask you this way.
5   A   Yeah.
6   Q   Which, if any, of the -- of the actual words in the
7       variable price term, as you read it, are broad
8       enough to encompass, including a profit margin for
9       Eligo?
10  A   Okay.  And when you say, "variable price term,"
11      you're -- you're referring to the -- where is -- I'm
12      sorry.  I don't -- I'm going to look at my exhibit -
13      -
14          MR. BLANKINSHIP: The contract?
15          THE WITNESS: Yeah, the contract.  I
16      thought I had it.
17          MR. MEADOWS: Exhibit 6.
18          MR. O'TOOLE: Could it be on the retail
19      report?
20          MR. MEADOWS: No, it might be there,
21      there's a -- it's stapled, so it looks like it.
22          THE WITNESS: Okay.  Oh, I'm sorry.  Yeah.
23      Okay.  Sorry, Dave.  Can you please --
24          MR. MEADOWS: Well, let's just be sure

Page 216

1   we're talking about the same thing.
2          THE WITNESS: Hopefully, last time.  Yeah.
3      Yeah.  Yeah.  Yeah.
4   BY MR. MEADOWS:
5   Q   When we say, "variable price term," you define that
6       term in the report, right?
7   A   Yeah.  Yeah.
8   Q   And it's basically consistent with what you see in
9       the contract where it says, "Variable price is
10      determined," right?
11  A   Correct.
12  Q   So my question is within that section which, if any
13      of the terms that you see there, in your view, are
14      broad enough to encompass the concept of Eligo
15      earning a margin.
16  A   I see what you're saying.
17          MR. BLANKINSHIP: Objection.  Lack of
18      foundation.  Vague.
19          THE WITNESS: I -- I understand now what
20      you're saying.  The way -- I'll tell the first word
21      and then let me finish the -- the whole thought.
22      None.  Because the -- the way that this is phrased
23      is not that the rates are, you know, and here, you
24      know, here's the formula.  It's -- that merely says

Page 217

1   that it's calculated on a monthly basis in response
2   to market pricing, transportation costs, and other
3   market price factors.
4        It does not say, you know, it will not
5   include any -- or it -- or it will include, you
6   know, a profit margin.  It doesn't -- it doesn't go
7   into that level of specificity.  So to same extent
8   why I interpreted market pricing to mean what I've
9   done in -- under the method one, I've -- I've
10  basically, you know, done the -- the reasonable, you
11  know, adders on top of that actually, two different
12  reasonable ones.
13  BY MR. MEADOWS:
14  Q   You mean 5 percent and 6 percent is the two
15      different adders?
16  A   Well, one was the -- one was the -- pretty much the
17      -- the markup that has -- that the regulator, which
18      is the New York PSE, has found to be adequate, you
19      know, for fixed rate -- for -- for -- adequate for
20      fixed rate customers.  And the other one was Eligo's
21      own -- sorry -- I need to drink water -- Eligo's own
22      margin, 6 percent was the profit margin that they
23      were seeking on fixed rate customers.
24  Q   Right.

55 (Pages 214 - 217)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 218

1   A   It's a 6.38 markup.
2   Q   I understand that I -- but --
3   A   Yeah.
4   Q   I just want to be sure I have your full testimony on
5       what it is that allows you to include margin in
6       determining the variable price.  And I think you've
7       told me it's common sense, it's a basic principle of
8       economics, even though you concede it's not
9       mentioned there.  Is there anything else, any other
10      consideration that in your view allows margin to be
11      included in this calculation?
12          MR. BLANKINSHIP: Objection.  Asked and
13      answered.
14          THE WITNESS: Yeah.  No.  No.
15      BY MR. MEADOWS:
16  Q   All right.  Now, are there any other considerations
17      of any kind that in your view can be included in the
18      variable price determination by reference to common
19      sense or basic economic principles?
20          MR. BLANKINSHIP: Objection.  Vague.
21          THE WITNESS: Yeah, you're going to have to
22      be more specific than that.  Sorry.
23      BY MR. MEADOWS:
24  Q   Well, I can't, because I'm asking you if you're --

Page 219

1       in your view, there's anything else you think can be
2       or should be included in the variable price
3       determination under the rubric of general economic
4       principle -- basic economic principles, or common
5       sense?
6           MR. BLANKINSHIP: Same objection.
7           THE WITNESS: To the best of my ability,
8       I've -- I've operationalized or made concrete
9       calculation of the contract rate under each, you
10      know, interpretation, legal interpretation of -- of
11      the contractual language.
12      BY MR. MEADOWS:
13  Q   And well, to be specific about that, if you look at
14      Table 1 on page 62.
15          MR. BLANKINSHIP: Just give me a second.
16          MR. MEADOWS: Yeah, sure.
17      BY MR. MEADOWS:
18  Q   In that table, as I understand it, you're giving a
19      kind of a listing of the procurement costs that in -
20      - are included in your damages analysis for the
21      named plaintiffs under at least method one, correct?
22  A   Method one, yeah.  I think this is method one.
23  Q   Okay.
24  A   Yes, that's correct.

Page 220

1   Q   All right.  So I want to ask you about, because one
2       of those categories is mandatory RECs.  We talked
3       about RECs earlier, right?
4   A   Mm-hmm.  Mm-hmm.
5   Q   Now, RECs aren't mentioned in the variable price
6       term, are they?
7   A   No, they're not.
8   Q   So similar question, what is the basis on which you
9       conclude that RECs can be accounted for in the
10      variable price term if they're not actually
11      mentioned there?
12  A   Yeah.  Context of the situation.  An ESCO that's
13      operating in New York must procure minimum amounts
14      of RECs and -- and ZECs to -- to basically comply
15      with state regulations.  So in my mind, that was
16      unnecessary to be explicitly stated in the -- in the
17      contractual term because it comes as a given, given
18      the situation at hand.
19  Q   But that -- that regulatory requirement that you're
20      referring to came about in 2019 through the reset
21      order, correct?
22          MR. BLANKINSHIP: Objection.  Lack of
23      foundation.
24          THE WITNESS: My -- no, I -- I think you're

Page 221

1       referring to the voluntary RECs.  The mandatory RECs
2       were always there, I had a -- I think I have a table
3       in my report that lists what the -- what the RECs
4       percentage is, you know, what -- what were the
5       specific mandatory REC and ZEC requirements over
6       time, yeah.
7       BY MR. MEADOWS:
8   Q   And fair enough.  You do break down, in Table 1, you
9       do break down mandatory RECs versus voluntary RECs.
10  A   Yeah.
11  Q   So voluntary RECs, certainly prior to the reset
12      order were not required by any regulation, correct?
13  A   That's my understanding.
14  Q   Right.  And so -- now -- so as to those, what's the
15      basis on which you conclude that it's appropriate to
16      include them in a determination of the variable
17      price?
18  A   So now you're asking me specifically about voluntary
19      RECs, not RECs, right?
20  Q   Yes, right.
21  A   Because before it was RECs.  Because under the legal
22      interpretation provided to me by counsel, the --
23      it's my understanding that they have -- that Eligo
24      procured, was offering variable rates that had 30

56 (Pages 218 - 221)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 222

1    percent REC coverage.  Again, there's -- at some
2    point, after the reset order, it became at least 50
3    percent.  And in -- in the formulation of the -- of
4    the give -- and -- and -- sorry.  I lost my train --
5    train of thought -- and -- and I -- I believe that
6    has been disclosed in some shape or form.
7        Customers knew either through marketing
8    materials by Eligo, they -- they --, you know, it
9    wasn't a -- this wasn't a freebie that nobody knew
10   about.  They were selling something that is green.
11   And so it's a, you know, it's -- it's a legitimate
12   cost that I took into account, like all the other
13   ones here.  Is this my water?
14       MR. BLANKINSHIP:  Yeah.
15       THE WITNESS:  Sorry.  I'm just running out
16   of fuel.
17   BY MR. MEADOWS:
18   Q   I guess I'm still unclear as to why you think it's
19       okay to include the voluntary RECs in the -- in your
20       calculation of the variable price.  I understand
21       that it's a legitimate cost that Eligo incurred.
22   A   Sure.
23   Q   But there's again, just to level set.  There's no
24       reference whatsoever to voluntary RECs in the

Page 223

1    variable price term, right?
2    A   No, it's not, but that's specifically what I did.  I
3        -- I -- I'm lacking a good word -- word for it, but
4        I said I -- you know, operationalized or -- or
5        provided, you know, or implemented the legal
6        interpretation as a part of that implementation.
7        I've looked at the facts and one of the facts was,
8        you know, everyone has to provide mandatory RECs,
9        including Eligo, and Eligo disclosed and -- and was
10       selling a product that was 30 percent green, and
11       that's it.  So that -- that is not explicitly
12       mentioned in the -- in the contractual terms.  But
13       come to think of it, you know, the -- the RECs would
14       be, you know, part of -- part of could be
15       considered, you know, part of market pricing
16       because, you know, it's a -- it's a financial
17       instrument that -- whose value fluctuates on the
18       market.  That's what they bought and -- and, you
19       know, how much they paid for it varied over time.
20       And so in that sense, RECs were, you know, taken
21       into account, are mentioned under the arch --
22       umbrella of market pricing.
23       Same with capacity price.  Capacity prices
24       are not explicitly listed.  But, you know, if you're

Page 224

1    a load-serving entity in New York, you're going to
2    get charged capacity, you know, you're going to get
3    charged capacity prices.  And -- and that's what it
4    is, it goes under the same umbrella.
5    Q   But -- okay.  But earlier, and we can go back and
6        look again if you'd like to, Mr. Macan, but we
7        talked about how you define market pricing as the
8        wholesale market.  Are you now adding RECs to the
9        definition of market pricing?
10       MR. BLANKINSHIP:  Objection.
11   Mischaracterizes prior testimony.
12       THE WITNESS:  Yeah.  I -- can we look at
13   the record specifically what I said?  Because I
14   don't -- I don't believe I said market pricing is
15   only energy and capacity and --
16   BY MR. MEADOWS:
17   Q   Your report on, which we looked at paragraph 130
18       says, "market pricing means the wholesale market,
19       period."
20   A   Yeah.  I -- we've talked about that.  So --
21   Q   Right.  So would you -- are you now appending RECs
22       to that definition?
23   A   No, no, I'm -- I'm not appending anything.  I'm not
24       appending anything.  I think you're just taking the

Page 225

1    -- the sentence that is, you know, short and either
2    misunderstanding or misinterpreting what I said, I -
3    - means the wholesale market, you know, said in that
4    form, in the context that this really means market
5    pricing.  It's not.  In my interpretation, it's not,
6    you know, retail market pricing because they're
7    buying in wholesale and they're selling retail.
8        It's the wholesale market pricing.  I did
9    not say in any shape and form that RECs are, you
10   know, not -- not part of that.  And the whole idea
11   of market pricing is a business, you know, has
12   expenses.  Some of these expenses in this case
13   that's got too general.  An ESCO needs to procure
14   energy.  It needs to, you know, set -- it has these
15   other costs.  Some of these other costs are
16   fluctuating with the market, REC is one of them and
17   market pricing would pertain, okay.  What is the
18   price of RECs?  There's a market price for RECs.
19   It's not an administrative fee, it's a market price,
20   same as energy.
21   Q   And there's a retail market price for electricity,
22       too, right?
23   A   Correct.
24   Q   But you're excluding that for market pricing, aren't

57 (Pages 222 - 225)

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

Page 226

1    you?
2  A    Because ESCO is not buying in retail prices and
3       reselling, they're buying wholesale and reselling.
4  Q    By the way, RECs aren't bought or sold on the
5       wholesale market as you refer to it here, are they?
6           MR. BLANKINSHIP: Objection. Lacks
7       foundation.
8           THE WITNESS: I -- I don't think I've said
9       that.
10 BY MR. MEADOWS:
11 Q    Well, earlier I asked you where RECs are bought and
12      sold, and I think you told me you don't know. So I
13      mean, or -- it's not your opinion here --
14 A    Yeah.
15 Q    -- sitting here today, that RECs are bought and sold
16      on the same wholesale market that you're referring
17      to on -- in paragraph 130?
18 A    I've said -- I said that they're fluctuating with
19      that these are market instruments, that there --
20      there's -- they're market instruments and -- and
21      there a market price for RECs. That's -- that's
22      what I said.
23 Q    Right. But I also asked you if I wanted to buy a
24      REC, where would I go to do that? And I think then

Page 227

1       you told me you don't know.
2  A    I -- I don't know operationally how would you go
3       about doing it. Correct.
4  Q    Right. And given that you cannot tell me, right?
5       That RECs are sold on the same wholesale market that
6       you're referring to in the first sentence of
7       paragraph 130, can you --
8  A    Objection. Mischaracterizes his testimony.
9           THE WITNESS: Wholesale market is -- is --
10      is a -- is a very general term. Can you buy RECs in
11      -- in the New York ISO Day-Ahead energy market? No.
12      Can you buy RECs in the New York -- New York Real-
13      Time Market? No. It's just not how it works. I --
14      I -- yeah. I just cannot tell you specifically how
15      one does go about buying RECs, and that's -- that's
16      what I've stated. I'm -- I'm not saying that RECs
17      are retail or wholesale, everyone has -- everyone --
18      everyone is basically constrained by the same
19      environmental obligations and any load-serving
20      entity, you know, needs to satisfy them, whether
21      it's an ESCO or -- or an utility they have to buy
22      mandatory, you know, amount of RECs and ZECs to
23      comply with the regulation. That's all there is to
24      it.

Page 228

1  BY MR. MEADOWS:
2  Q    So over the last few minutes, I think we've talked
3       about three different considerations that are
4       factored into your damage calculations that are not
5       mentioned in the variable price term, which are the
6       voluntary RECs, the mandatory RECs, and margin. Are
7       there any other considerations that you deem to be
8       appropriate to include in the variable price
9       calculation that aren't mentioned in the variable
10      price term?
11          MR. BLANKINSHIP: Objection.
12      Mischaracterizes his testimony.
13          THE WITNESS: Like I said, I -- I -- it's
14      not that they're not mentioned. I -- I -- they --
15      they fall either in the market pricing bucket or in
16      the other market price factors.
17 BY MR. MEADOWS:
18 Q    Okay. So can you then give me your full definition
19      of market pricing as you understand it under this
20      agreement? Because it seems to now be broader than
21      the wholesale market. So I just want you to tell me
22      everything that you think is included in market
23      pricing.
24          MR. BLANKINSHIP: Objection. Asked and

Page 229

1       answered and calls for legal conclusion.
2           THE WITNESS: Okay. Give me one second and
3       can we take a short break after -- after this --
4           MR. MEADOWS: Yes. Yeah.
5           THE WITNESS: -- if that's okay? Okay.
6       Yeah. Paragraph 135. Okay. I said, fully, "For
7       the -- for the purposes of this method one, the
8       inputs to market pricing are power procurement cost
9       data Eligo used to set monthly variable rates and
10      the voluntary RECs cost that I calculated and added
11      to the procurement cost as discussed in paragraphs
12      138 to 142." So if at some point, and I -- I don't
13      know what I've said, I basically said it was, I
14      omitted the -- the voluntary RECs, then I would like
15      to correct what I've said because voluntary RECs are
16      certainly, you know, part of the -- part of the
17      procurement cost, and -- and in my mind, fall under
18      the -- fall under the market pricing.
19 BY MR. MEADOWS:
20 Q    Okay. I understand that. So just to be sure, other
21      than what you just told me, so the voluntary RECs,
22      is there anything else? Because wholesale costs and
23      the voluntary RECs that fall under the definition of
24      market pricing in your view.

58 (Pages 226 - 229)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 230

1    A   I mean --
2              MR. BLANKINSHIP: Is there a question
3        there?
4    BY MR. MEADOWS:
5    Q   Yeah.  Is there anything else besides those that
6        falls under the bucket of market pricing in your
7        view?
8    A   Let me just find the list about that.
9              MR. BLANKINSHIP: I'm just going to object;
10       it's asked and answered.  You can answer.
11             THE WITNESS: I -- yeah.  I don't know
12       where it is.  Pretty much all the terms fall under
13       the other market -- excuse me -- market pricing or
14       other market price factors.
15   BY MR. MEADOWS:
16   Q   Okay.  You said pretty much --
17   A   All -- all --
18   Q   Is there anything?
19   A   All -- all the terms.
20   Q   All the terms.  Okay.
21   A   Yeah.
22             MR. MEADOWS: You asked for a break.  We
23       can go ahead and take one.
24             THE WITNESS: Yeah.  Sorry, just running

Page 231

1        low on fuel.
2              MR. MEADOWS: It's okay.
3              THE VIDEOGRAPHER: We are now going off the
4        record.  The time is 2:47 p.m.
5        (Whereupon, the parties go off the record.)
6              THE VIDEOGRAPHER: Okay.  We are now back
7        on the record.  The time is 3:03 p.m.
8    BY MR. MEADOWS:
9    Q   Mr. Macan, if we could look back at the contract,
10       which I think is Exhibit 6.  I hope I have that
11       right.
12   A   Yeah.
13   Q   I just want to talk a little bit more about a few of
14       the terms and how you understood them for purposes
15       of your report.  And in that box, starting at the
16       top we talked earlier, there's a -- in the upper
17       left-hand corner it says, "price," correct?
18   A   Mm-hmm.
19   Q   Now, did you understand the reference to price there
20       to be the price that Eligo would charge at retail
21       for electricity?
22   A   Yes.
23   Q   Now, in the box just beneath that, where it says,
24       "Variable price is determined," the word "price," as

Page 232

1        it appears there, did you also understand that to be
2        a reference to the price that Eligo would charge to
3        retail customers for electricity?
4    A   Sorry.  Which the -- the variable price is
5        determined?
6    Q   Correct.
7    A   Yes.
8    Q   And then going back up, and I'm sorry to bounce
9        around, but to the first row, to the right of the
10       word "price," in the second sentence, you'll see it
11       says, "thereafter monthly variable kilowatt hour
12       rate that may be periodically adjusted for market
13       conditions."  We talked about that earlier, right?
14   A   Yeah.
15   Q   And the word "rate" as it's referred to there, did
16       you understand that to be a reference to the rate
17       that Eligo would charge its retail customers for
18       electricity?
19   A   Yes.
20   Q   And then the same word "rate" -- well, let me be
21       more specific.  In the second row how the rate of
22       variable price is determined, it says, "Other than
23       fixed rates, all rates shall be calculated."  The
24       word "rates," as it appears there, you understood

Page 233

1        that as well to be a reference to the rates that
2        Eligo would charge its retail customers for
3        electricity, correct?
4    A   Yes.
5    Q   And we've talked some about the word -- the word
6        "costs" as it refers, as it relates to
7        transportation costs in that same section of the
8        contract, right?  There you understood the word
9        "cost" to refer to a cost that Eligo would
10       potentially incur in supplying electricity, right?
11   A   The -- the cost next to transportation costs?
12   Q   Yes.
13   A   Yes.
14   Q   All right.  And you understand as an -- as an expert
15       in the energy markets, there's a difference between
16       a cost and a price, correct?
17   A   Correct.
18   Q   And a cost is something that -- let's say I'm an
19       ESCO.  A cost is something that I incur, money that
20       goes out the door, right?
21   A   Yeah.
22   Q   And a price is something that I would charge for
23       something I'm selling, correct?
24   A   Correct.

59 (Pages 230 - 233)

Edo Macan                          December 17, 2025
Brous v. Eligo Energy, LLC

Page 234

1  Q   In your damage analysis, in particular for method
2      one, you used something called the "POWWR
3      spreadsheets" to -- from which you divined costs
4      that Eligo anticipated it would pay for energy,
5      correct?
6  A   Correct.  But could you please point me to whatever
7      you're --
8  Q   Yeah, sure.  I'm looking at paragraph 138 on page
9      58.
10 A   Sure.  Okay.  Yeah.  For method one.
11 Q   Okay.  And it says there, "I was given access to
12     detailed information on the costs Eligo anticipated
13     it would pay for energy, ancillary services, and
14     capacity for its New York sales, right?
15 A   Right.
16 Q   The next sentence says that that data that you
17     referred to came from the POWWR spreadsheets, right?
18 A   Yeah.  POWWR is a third-party vendor.  It's my
19     understanding that Eligo has been getting forecasts
20     from them.  And based on these forecasts, which are
21     pretty much forecast for ultimately the cost that
22     Eligo will occur -- incur procuring power to supply
23     its customers, that -- that's what I'm called "POWWR
24     reports" -- they're called "POWWR reports."  They're

Page 235

1      Excel files.
2  Q   Okay.  And we'll look at one of them in a little
3      while but what the POWWR reports contain, as it
4      pertains to you, you know, the wholesale price of
5      energy, are not actual costs, but forecasted costs.
6  A   Correct.  Short-term forecasts.
7  Q   And you use those short-term forecasts in developing
8      your damage models, correct?
9  A   Under method one, correct.  Because it's my
10     understanding that that's exactly what Eligo did in
11     setting their rates.  They did not -- in other
12     words, they did not know the -- they -- they -- but
13     -- my -- again, my understanding is that they did
14     not know they had to disclose the rates that they're
15     going to be charged prior to them fully knowing to a
16     cent of how much they're actually going to pay for
17     different energy costs.  And because of that, they
18     went off of the POWWR reports.  POWWR reports, like
19     I said, are reports from a third party that
20     basically forecast some of these costs, how much
21     they're going to be, either the testimony of Eligo,
22     somebody's testimony, I'm -- I'm -- memory fades me
23     as to who it was.
24         There's, you know, have said that, you

Page 236

1      know, generally they have been pretty -- pretty
2      reliable.  And so, you know, those are not the
3      costs, but over a six-year period, I would assume,
4      and based on my calculations, that certainly what
5      seems to be the case, that, you know, those costs
6      are -- were pretty fair comparison -- pretty good
7      forecasts.
8  Q   Well, did you have data on the costs that Eligo
9      actually incurred to procure electricity over the
10     relevant period?
11 A   No.  Under the method two, I've objectively
12     determined what those costs that I took for granted
13     from their own financial records being POWWR reports
14     -- what those would be if they have gone into the
15     market, and sort of procured it themselves, right?
16     So it was sort of independent, objective, you know,
17     rather than taking their number for energy costs,
18     sort of on a given day, looked at, you know, what
19     those, what -- what those prices would be.
20 Q   Prior to this engagement on this case against Eligo,
21     had you ever used the POWWR spreadsheets in any
22     capacity?
23 A   No, I haven't.
24 Q   And POWWR is an acronym containing the letters P-O-

Page 237

1      W-W-R, right?
2  A   Yes.
3  Q   Do you know what that even stands for?
4  A   I did, and I don't recall.  It's in -- it's in my
5      testimony what it stands for.  Yeah.
6  Q   Okay.  Do you know how POWWR actually generates any
7      of the estimates that it includes in these various
8      spreadsheets?
9  A   No.
10 Q   Were you -- had you been familiar with POWWR, the
11     entity, at all before this engagement on the Eligo
12     case?
13 A   I -- I've -- I've heard of it.  I've heard of it.
14     I've never dealt with them or I've never used their
15     product.
16 Q   All right.  Did you undertake any kind of
17     independent assessment of how reliable or not the
18     POWWR forecasts were?
19 A   No.
20 Q   You didn't do any research on that either?
21 A   Research on how reliable their forecasts are?
22 Q   Right.
23 A   No.  Like I -- like I said, repeating myself but the
24     -- the task with respect to method one has been, you

60 (Pages 234 - 237)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 238

1    know, if the -- if the -- if -- if the contract is
2    interpreted to -- to use their, you know, the cost
3    that they had at the time when the -- the variables
4    were set, and -- and those were the POWWR -- POWWR
5    figures, I just went off of that.  No, yeah.
6  Q   Yeah.  And so you dealt with these POWWR
7    spreadsheets, I take it, pretty -- you know,
8    comprehensively in preparing this report; is that
9    fair?
10       MR. BLANKINSHIP: Objection.  Leading.
11       THE WITNESS: No.  Yeah.  Not, I wouldn't
12    say comprehensively, but I -- I have certainly, for
13    the two plaintiffs, I have reviewed the -- the POWWR
14    reports that were relevant for performing the damage
15    calculations for the two plaintiffs under the
16    methods, under the method one.
17  BY MR. MEADOWS:
18  Q   All right.  And in particular, in paragraph 136.
19    You say Eligo's market pricing was taken from the
20    15th day of the month, POWWR report for the month
21    prior to the monthly rate at issue, or closest to
22    the 15th, with the nearest timestamp after configure
23    -- configuring the parameters on the title page tab
24    of the report.  And then it goes on.  You see that?

Page 239

1  A   Mm-hmm.
2  Q   So I take it that from what you wrote in the report
3    there, that there were some occasions on which you
4    had a POWWR report for the 15th day of the month
5    that you could use, right?
6  A   Mm-hmm.
7  Q   And in other cases you didn't?
8  A   Yes.  I think that's -- that -- that's right.  I
9    think, so what that is, is, let's say the delivery
10    month or the month they're pricing is November,
11    among the documents that were produced, there were
12    multiple versions for the November pricing of -- of
13    a, your X, say, 2020.There are multiple versions.
14    And so the version that I ended up using was the one
15    closest to the -- to the 15th of -- of the month for
16    the month before.
17  Q   And did you keep a list somewhere by Bates number or
18    some other identifier of which POWWR spreadsheets
19    you used and which ones you didn't?
20  A   The ones that I ended up using in the end are -- are
21    listed among the -- in -- in my Exhibit 5 or 3 list
22    of documents relied upon.
23  Q   Okay.  Let me ask you, on page 58, you continue to
24    describe this damage calculation.  You have a number

Page 240

1    of bullet points that relate to how you configured
2    the parameters on the title page tab of the POWWR
3    spreadsheets, correct?
4  A   Mm-hmm.  Mm-hmm.
5  Q   And so these spreadsheets came to you containing
6    various cells that had values in them, right?
7  A   Correct.
8  Q   And I take it that some, maybe, or at least some of
9    these cells had formulas embedded in them; is that
10    right?
11  A   Correct.
12  Q   Did you -- were you able to access all the formulas?
13  A   Can you be specific about accessing all the
14    formulas?
15  Q   Well, to the extent there were formulas kind of
16    embedded in the spreadsheets, were you able to --
17    were you able to determine what those formulas were?
18  A   I -- I -- so that these are humongous files.  Just
19    to set the record straight.  It was humongous files.
20    They were -- the -- the information has been
21    requested from Eligo, and Eligo produced their work
22    papers in that form.  So that's all I could go off
23    of.  As far as, you know, the cost, they forecasted
24    cost based on which they operated the rates.  So I

Page 241

1    did not really have any choice but that.
2       And -- and so the task at hand was to
3    basically get the -- get the different cost figures
4    that I needed for the method one calculation from
5    the spreadsheets.  So the exercise wasn't like re-
6    hack their models, but basically, used the data
7    contained in them, and that's what I spent time on,
8    and I'm pretty sure I got it correct.
9  Q   But in your review of the POWWR spreadsheets, you
10    found that some of the information in them was
11    encrypted and password protected, right?
12       MR. BLANKINSHIP: Objection.  Lacks
13    foundation.
14       THE WITNESS: I don't recall it being
15    password protected.  They were, they -- they had
16    formatting things that were sort of like redacted.
17    But there's a -- there's a function in Excel how you
18    could, you know, basically see it.  And it certainly
19    did not require password for me to type it in.  That
20    -- the -- the documents have been provided by
21    counsel, so I don't know if counsel had to do any
22    unscripting, but shape and form in which they --
23    they were provided to me, I did not have to type in
24    any secure passwords.

61 (Pages 238 - 241)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 242

1    BY MR. MEADOWS:
2    Q    I see. Looking at the top of page 58 in the report,
3         you say that one of the configuring --
4         configurations you made was to set the inflation
5         rate to zero on the POWWR spreadsheets that you were
6         working with, correct?
7    A    Mm-hmm. Mm-hmm.
8    Q    And what is -- what is the inflation rate as
9         reflected in the POWWR spreadsheets intended to
10        reflect?
11   A    Yeah. Based on my assessment of what the POWWR
12        sheet did, it -- it looked like it was -- it was an
13        input cell that allowed, you know, an input for an
14        inflation rate, and -- and that's -- that's what it
15        was.
16   Q    Right. Well, let me ask you this way. Why did
17        POWWR include an inflation rate in its spreadsheets?
18   A    Because the spreadsheet contained pricing for -- for
19        different types of products. Some of them were, I'm
20        speaking based on recollections, you know, six
21        months out, fixed, or -- or sort of longer than
22        that. And obviously, inflation starts becoming
23        important, you know, the longer the time horizon.
24   Q    Now, when you say you set the inflation rate to

Page 243

1         zero, I take it that that means that the inflation
2         rate was generally a positive number in the POWWR
3         spreadsheets that you reset to zero; is that fair?
4    A    I -- I honestly don't remember. I -- I actually
5         think it might have been zero in some, or -- or I --
6         I -- if it wasn't, if -- if there's one where it was
7         something else, I would set it to zero based on,
8         again, bad recollection. I -- I think some of them
9         were actually zero to begin with.
10   Q    Why did you decide to reset the inflation rate to
11        zero, at least in the cases where it was a positive
12        number?
13   A    I understand, because we're talking with the
14        variable rate product. A variable rate product is
15        pretty much one month out. You're pricing it two
16        weeks before that. And so, you know, it didn't make
17        any -- make no sense to apply inflation rates in
18        such a short time horizon.
19   Q    You assume that there wouldn't be any inflation in
20        that, say, two-week period that you --
21   A    Correct. That was my assumption.
22   Q    All right. And then, there was a, I guess, a tab or
23        a cell for a general interest rate; is that right?
24   A    Correct.

Page 244

1    Q    And you also set that to zero.
2    A    Correct.
3    Q    Why did POWWR include a general interest rate in its
4         spreadsheets?
5    A    Same, I, you know, conjecture on my end because I
6         don't know for a fact why, but I would assume
7         because obviously, for product that are -- products
8         that are priced further out in time to the extent
9         that interest rates are meaningful, that there's
10        going to be a, you know, cost of capital associated
11        with it. And -- and again, I've made a simplifying
12        assumption that it's negligible in the short-term
13        horizon of two weeks.
14   Q    What, if anything, did you do to validate that
15        assumption that it would be negligible, at, you
16        know, contextualized to Eligo?
17            MR. BLANKINSHIP: Objection. Vague.
18            THE WITNESS: I -- the -- it's going to be
19        a -- a lengthier answer. So I -- I don't think I've
20        -- I -- I did not play with that. And -- and that
21        the -- the general reasoning was -- all right.
22        Sorry, Dave, could you please repeat the -- the --
23        that the question that you just asked me?
24            MR. MEADOWS: Could you -- could you read

Page 245

1         that back please?
2            THE WITNESS: The last one? Yeah. Can you
3         read the record?
4            THE COURT REPORTER: Yeah. Give me --
5         sorry.
6            THE WITNESS: It's okay.
7            THE COURT REPORTER: All right. What did
8         you do to validate that it would be negligible,
9         contextualized to Eligo?
10            THE WITNESS: Like I -- like I said before,
11        I -- I -- again, based on the best of my
12        recollection, I -- I think, in -- I -- I don't think
13        that -- I -- I think sort of setting a value to zero
14        from something that's a non-zero was probably more
15        an exception rather than the norm. I -- I don't
16        know for a fact, but the idea was, like I said, just
17        like an inflation rate. I set it to zero because I
18        -- I thought it was negligible. Because without
19        getting too technical about it, we're talking about
20        pricing a product that's going to be delivered two
21        weeks from now, so no -- goods don't exchange hand,
22        if you will, until two weeks from now. We're
23        pricing something ex ante two weeks before.
24            And so it's not a -- it's not a -- it's

62 (Pages 242 - 245)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 246

1    not the same to a situation where the money
2    exchanges hands, the customers pay for it, and then
3    wait for two weeks to get the power delivered.
4    It's, you know, I wouldn't call it, you know, risk
5    neutral pricing, but the simplest way I could
6    explain it, I thought it was appropriate because
7    like I said, power is going to be delivered two
8    weeks from then and then at some point, Eligo is
9    going to get -- get compensated that.
10          So there's no -- there's no period of
11   time, a meaningful period of time that Eligo has
12   delivered the goods, but it's waiting on a payment,
13   which would economically necessitate accrual of, you
14   know, interest rates adjusted for inflation.
15   BY MR. MEADOWS:
16   Q    The interest rate that's set forth in the POWWR
17        spreadsheets, do you know if it's an annual rate or
18        monthly or some other period?
19   A    I don't recall the detail.
20   Q    It -- did you know that at the time and don't
21        remember now, or you never knew?
22   A    I -- I -- I've made sense of it when I looked at it.
23        I just, I can't -- yeah, I -- I just don't recall
24        that level of detail now.

Page 247

1    Q    Now, did you observe, when you changed the general
2         interest rate from a positive number to zero, that
3         that change had ripple effects and other values in
4         the spreadsheets, that it would change them?
5    A    I -- I -- again, I really, I -- I can't answer that
6         question because there are two extremes of this
7         position. One, from X number of spreadsheets I've
8         looked at, did I change general interest rates from
9         whatever it was to zero in any of them, on all of
10        them? I don't have any recollection whether it was
11        this one or this one or sort of anywhere in between,
12        because I -- I looked at a lot of them in trying to
13        ascertain how these things work. They're extremely
14        messy, by the way. They had hidden columns, hidden
15        sheets. It was extremely messy. And -- and so
16        given the data was provided to me in that shape and
17        form, I would have, by the way, much rather that
18        they provided the data in a usable form. This was,
19        you know, really, really hard to use. I've made
20        best of efforts to interpret it as -- as -- in -- in
21        as unbiased and correct way as I could.
22   Q    I guess I want to understand, is it your testimony
23        that you reset the interest rate from a positive
24        number to zero in every case where there was a

Page 248

1    positive number or only sometimes?
2    A    I -- I think in every -- in every case for the --
3         for the two plaintiffs, for -- for the damages that
4         I've calculated for them based on what I wrote here,
5         I -- I would not have done this only for some. If
6         I've done for any, I would have done them for all
7         but I -- they might have been all zero to begin
8         with. I just really don't recall that for a fact.
9    Q    How would we be able to kind of go back and check
10        that if we wanted to see what you actually did?
11   A    You -- you could -- you could go into the files that
12        I have identified as POWWR reports that I relied
13        upon, see which -- confirm which ones were produced
14        for my -- to my counsel, and presumably Eligo would
15        know what -- what the, you know, input settings were
16        there.
17   Q    Well, I'm not -- well, I guess what I'm asking is,
18        is there -- is there a place where you preserved or
19        saved the POWWR spreadsheets as you used them, after
20        you made whatever configurations or changes you
21        decided to make?
22   A    I don't -- I -- I don't -- yeah. I -- I don't think
23        so. I mean, the -- this was, this was done by my,
24        you know, analyst who sort of followed the protocol.

Page 249

1    I've reviewed it, tested, it was quality controlled.
2    Specifically, I --, you know, that the -- I don't
3    think it -- so the -- the outcome of that was to,
4    you know, come up with extract pieces of inputs that
5    were provided to us in an extremely unfriendly
6    format.
7          And so I saw no relevant -- I certainly
8    don't have records of any interim versions. Not --
9    not the purpose of this to modify. The purpose of
10   this was to basically get the inputs out that were
11   not readily available. And I really want to
12   reiterate that I've -- I've seen a lot -- I worked
13   with a lot of discovery documents. These were
14   probably some of the most non-friendly, complicated,
15   convoluted, hidden files that were provided.
16   Q    We talked some earlier about margins, and your
17        inclusion of margins in your damage calculation.
18        And in that respect, I want to refer you to -- I
19        think it's 13J on page 12.
20   A    Let me just read it for a second.
21   Q    Sure.
22   A    Yeah.
23   Q    All right. So in paragraph 13J, you say, "I was
24        also instructed that methods one and two should

63 (Pages 246 - 249)

Edo Macan                                    December 17, 2025

Brous v. Eligo Energy, LLC

Page 250

1    include a reasonable markup margin input on top of
2    procurement costs," right?
3    A    Mm-hmm.
4    Q    Who instructed you in that manner?
5    A    Counsel.
6    Q    And what were you told in connection with being
7    given that instruction?
8    A    That -- that was the legal interpretation of -- of
9    the contractual term.
10   Q    And did you do anything to kind of assure yourself
11   that that instruction, that that assumption was
12   reasonable?
13   A    Like I said, it -- it's reasonable to me. I don't
14   see how you can run a business unless you have some
15   sort of markup on it, or -- or make money off of
16   something, so.
17   Q    The next sentence is that "5 percent represents the
18   best comparator markup to use for setting a variable
19   rate in accordance with the variable price term."
20   A    Yeah.
21   Q    Describe for me the methodology you used to select 5
22   percent as the best comparator marker.
23   A    There's really no methodology. I mean, the Public
24   Service Commission, who is probably the regulatory

Page 251

1    body most intimately familiar with the market and --
2    and also a regulator of the same market, after
3    having, you know, led a detailed stakeholder process
4    stemming from all the -- all the things that were
5    going on in New York for years, has as a part of the
6    reset order determined that 5 percent margin was
7    ample compensation in terms of the return for, I
8    believe, fixed rate customers.
9         And to me, everything else being equal,
10   and I like to keep things simple, the logic was
11   since variable rate customers are less risky than
12   fixed rate customers, everything -- everything else
13   being equal, you know, this would be, you know, this
14   is -- this is perfectly valid and -- and to me the
15   best, you know, economically meaningful markup to
16   use in this calculation.
17   Q    So the New York Public Service Commission, I think
18   you said, set a 5 percent margin for fixed-rate
19   products, right?
20   A    They -- they said -- I'm trying to remember the
21   details. I believe so for the fixed-rate customers,
22   and I think it would be applied to the trailing
23   average. They allowed a return on like 5 -- I'm
24   sorry, the markup on. It's somewhere in my

Page 252

1    testimony if you wanted to look at on like 12-month
2    trailing average of -- I should probably, I -- I
3    don't remember the details. The short answer is
4    yes, they -- they applied 5 percent, they -- they
5    agreed on 5 percent. Yeah.
6    Q    Right. So that 5 percent margin, the New York PSC
7    never applied that to variable rate products, did
8    it?
9    A    No, it did not.
10   Q    But in your opinion, that 5 percent is nonetheless
11   the right margin to apply to Eligo's variable rate
12   products, correct?
13        MR. BLANKINSHIP: Objection. Asked and
14   answered.
15        THE WITNESS: Yes. I've -- I've determined
16   that I should apply 5 percent, you know, to the
17   variable rate product.
18   BY MR. MEADOWS:
19   Q    And when the New York PSC developed that 5 percent
20   margin, it said that ESCOs could charge that 5
21   percent margin on the trailing 12-month average of
22   prices charged by the utilities; isn't that right?
23   A    Yeah, I think that's right.
24   Q    Right. So it wasn't a 5 percent markup over --

Page 253

1    markup over the ESCO's costs as opposed to what the
2    utilities had been charging, correct?
3    A    Yes, it was 5 percent markup over the 12 -- 12-month
4    rolling average. Sorry. Which I'm just trying to
5    save time --
6    Q    I'm not looking at anything in particular, yeah.
7    A    Okay. Yeah. I -- that -- it's been a long day.
8    Yes, that -- what you said, I agree with.
9    Q    All right. You go on in that same paragraph 13J to
10   say, "Nonetheless, it would not be commercially or
11   economically unreasonable for the ultimate fact
12   finder to adopt 6 percent as a reasonable fixed
13   rate" -- I'm sorry -- "fixed margin for inputs
14   method one and two," right?
15   A    Correct.
16   Q    Tell me, what, you know, expertise, methodology did
17   you apply to determine that it wouldn't be
18   economically unreasonable to adopt 6 percent?
19   A    Again, none. I -- I wanted something simple and
20   that made a lot of sense to me, and I opted for 6
21   percent because this was the -- this was Eligo's
22   target profit target margin on -- on its fixed-rate
23   customers. And by the same analogy, since variable
24   rate customers are -- are less risky than fixed rate

Veritext Legal Solutions

800.808.4958                                              770.343.9696

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 254

1    customers, if company themselves think that's
2    sufficient, you know, to pay for their overhead, and
3    it's a sustainable business strategy for fixed rate
4    customers, well, it should be plenty for the
5    variable rate customers.
6    Q    Your reference to 6 percent margin target by Eligo,
7        that -- that's something that you pulled out of a
8        document called "Eligo's Risk Policy," right?
9    A    I -- I think that's right.
10   Q    Right.  And that 6 percent wasn't a ceiling or a
11       cap, but just a minimum acceptable margin under
12       Eligo's policy, correct?
13           MR. BLANKINSHIP: Objection.  Lack of
14       foundation.  Mischaracterizes the record.
15           THE WITNESS: I -- I don't -- I don't
16       recall the details of it.  I just recall that it was
17       -- it was the 6 percent target margin.  I think even
18       in, I -- I've read in some of the -- some of the
19       depositions or sort of testimonies that that has
20       been corroborated that indeed that was the -- that
21       was the target margin rate for fixed rate customers.
22           Whether in some instances they charged,
23       you know, a little bit more for whatever reason, I
24       mean, I -- I guess it's plausible, I -- I don't

Page 255

1    know.  But as a matter of business strategy, it's my
2    understanding that they pursued a fixed 6 percent
3    margin target on the fixed-rate customers.
4    BY MR. MEADOWS:
5    Q    And that 6 percent margin target that you're
6        referring to, that Eligo pursue -- pursued, how did
7        you measure that over, what set of costs was it --
8        was it kind of using to generate that 6 percent
9        number?
10           MR. BLANKINSHIP: I'm sorry, could you read
11       that back for me?
12           THE COURT REPORTER: Yes.  So --
13           MR. BLANKINSHIP: Sorry, I just missed it.
14           THE COURT REPORTER: No, you're fine.  I'm
15       missing a keyword that's on the --
16           MR. MEADOWS: Do you want me to just ask it
17       again?
18           THE COURT REPORTER: No worries.
19           MR. MEADOWS: Okay.
20           THE COURT REPORTER: How did you measure
21       that over what set of costs to get that 6 percent
22       number?
23           THE WITNESS: Okay.
24           MR. BLANKINSHIP: Yeah.

Page 256

1           THE WITNESS: So I -- I don't recall the
2    details, but given that I've adjusted it to a
3    markup, a 6 percent margin equates to a 6.38 percent
4    markup.  So that would be 6 percent -- it would be
5    6.38 percent on top of the costs.
6    BY MR. MEADOWS:
7    Q    And we may have gotten our wires crossed there.
8    A    Okay.
9    Q    My question to you was not about your calculation
10       here, but about the 6 percent margin that you're
11       referencing in Eligo's documents.
12   A    Yeah.
13   Q    Do you know how Eligo came up with that 6 percent?
14   A    I don't -- I don't recall the details.
15           MR. MEADOWS: What exhibit are we up to?
16           THE COURT REPORTER: Seven.
17   (Whereupon, Ex. 7 Eligo Risk Policies and
18   Procedures, Effective Nov. 1st 2016, is marked for
19   identification.)
20   BY MR. MEADOWS:
21   Q    I'm going to show you Exhibit 7.  And I know it's a
22       lengthy document, Mr. Macan, but are you familiar
23       with Exhibit 7?
24   A    I am.

Page 257

1    Q    And does this look like the document from which you,
2        you know, kind of glean -- gleaned this 6 percent
3        margin that you referred to in paragraph 13J?
4    A    Let me -- let me try to find it.
5    Q    And just --
6    A    Looking at the cover page, I -- I -- it does ring a
7        bell.  I -- I just --
8    Q    Yeah.  And just to try to help with timing, you
9        might look at page 13.
10   A    Sure.  Please, please do.  Yeah.  I'm just going to
11       look at my report.
12           MR. BLANKINSHIP: Yeah.  I'm just going to
13       note for the record, this document is not listed on
14       Exhibit 3 of Mr. Macan's report.  Likely a different
15       version of this is included.  That document's not
16       listed.
17   BY MR. MEADOWS:
18   Q    Okay.  Well, let me ask you, since I've got this in
19       front of you, Mr. Macan.  You see in the middle of
20       the page 13, it says, "policy statement number one."
21       And there it says, "The company shall set its
22       minimum acceptable gross margin at 6 percent or 4
23       mils, unless a specific exception is made at the
24       executive level."

65 (Pages 254 - 257)

Veritext Legal Solutions

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 258

1  A   Yeah.  I see that.
2  Q   Does that look like the same language that you
3      relied on in kind of, you know, reaching the
4      conclusion that a 6 percent margin would not be
5      commercially or economically unreasonable?
6  A   I -- I don't remember the precise language.  If --
7      if it sounds like that, it was not the document that
8      I went off of, but I remember seeing a 6 percent.
9          MR. O'TOOLE:  For the record, this document
10     is included in the documents exhibits list.  It's
11     DEX008057, which is about a third of the way down,
12     the page.
13         MR. MEADOWS:  Oh thanks, Leo.
14         THE WITNESS:  Okay.  And if that's the
15     case, then I mean yes, this -- this is where the
16     number came from.
17 BY MR. MEADOWS:
18 Q   Okay.  Great.  Thank you for that.  Well, in that
19     case, with this document, I mean, we agree that what
20     this document says is that Eligo will set its
21     minimum acceptable gross margin is 6 percent, right?
22 A   Mm-hmm.
23 Q   And now in your opinion though, you're applying that
24     6 percent as a maximum margin, aren't you?

Page 259

1  A   As a margin, the only -- the -- the margin that I
2      apply, there's no minimum -- there's no fluctuating
3      margins, just a fixed margin of 6 percent under that
4      formulation.
5  Q   Right.  But you chose 6 percent versus 6.5 or 7 or a
6      higher number, right?
7  A   Yes, I chose 6 percent.
8  Q   And is it your opinion that 6 -- that no margin
9      higher than 6 percent would be commercially or
10     economically reasonable?
11 A   No.  My reasoning is that any margin that is
12     sufficient to pay for the overhead and presumably
13     earn some profit for fixed rate customers that are
14     less risky than variable rate customers should be
15     ample and adequate compensation of return for the --
16     for the variable rate customers.
17 Q   But I think I asked you this earlier.  You don't
18     know that Eligo is calculating that 6 percent margin
19     on the same cost basis as you do in your report, do
20     you?
21 A   I -- I don't -- I don't know the -- details of
22     that, no.
23 Q   All right.
24 A   But -- but if I may add one thing.

Page 260

1  Q   Sure.
2  A   The obvious -- the obvious discrepancy between the
3      two.  I mean, there may be others, but just to
4      illustrate where I'm coming from.  Hedging costs,
5      right?  Hedging costs.  There's really no reason nor
6      I've seen any evidence that Eligo has engaged in
7      hedging to protect variable rate customers.  For
8      why?
9          Because they had the ability to adjust the
10     rates as underlying procurement costs changed.  It's
11     a very different game for -- for fixed rate
12     customers because Eligo is obliged and carries the
13     price risk by offering fixed rate product.  So
14     hedging cost in my mind would be prudent cost to
15     account for if I was doing this exercise for the
16     class consisting of fixed-rate customers.
17         Now, why I'm saying this, I'm saying this
18     because it's entirely possible that the cost
19     structure of Eligo, based on which Eligo's
20     management decided that 6 percent profit margin
21     would be sufficient and a business target, it's
22     entirely possible that that cost structure is
23     slightly different from the cost structure to the --
24     for the variable rate customers.

Page 261

1          As I said, the main difference is really
2      sort of the hedging costs, but it doesn't -- that's
3      completely separate from the margin because the
4      margin comes on top of that.  So the margin is the
5      extra, the margin is the gravy.
6          So why would, you know -- if -- if Eligo
7      deems that that's sufficient compensation, if it's
8      applied on top of costs -- sorry -- that would be
9      6.38 just for clarification -- if that's sufficient
10     for these -- why for a completely different segment
11     of customers being variable customers, would it be -
12     - should it be anything else?
13 Q   Well, I want to dig into that a little bit.  And the
14     costs that you include on which you applied the 5
15     and 6 percent margin, those are reflected again in
16     Table 1 on page 62 for method one, correct?
17 A   5 and 6.38 because those are markups.  Yeah.  Okay.
18 Q   Okay.  Yeah, 5 and 6.38.
19 A   Yeah.
20 Q   Thank you.  But I -- but in again, in pinpointing
21     the costs on top of which you applied that margin,
22     those are on Table 1 on page 62 for method one.
23 A   Let me -- let me just check if these include the
24     margin or -- or they're before, include the markup,

66 (Pages 258 - 261)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 262

1    or they're before the markup?  Yeah.  This is just
2    the procurement cost.  Yes.  So these are -- these
3    are the costs.  They don't -- they don't account for
4    the markup.
5    Q    Right.  And so these are the costs that you include
6    in your calculation but -- and there are no other
7    costs that you include in your damage calculation
8    for method one, correct?
9    A    Correct.
10   Q    So this 5 or 6.38 percent margin that you're
11   calculating as part of method one doesn't include
12   administrative overhead, does it?
13   A    No.
14   Q    Doesn't include to the extent it's not an
15   administrative overhead, but just salaries for
16   professionals and personnel, does it?
17   A    I get -- I'll give you a lengthy answer.  No,
18   because all these things -- because company, or on
19   one hand, at 6.38 percent or the regulator who know
20   -- have more data about it than me and know the --
21   know the intricacies of -- of everything much more
22   than I do have found that both 5 percent and 6.38
23   percent markups are sufficient and -- and
24   commensurate with the risks involved for the fixed

Page 263

1    rate customers.
2         And so those guys also, you know, the 6
3    percent also needs to pay for the -- for -- for the
4    overhead, for the salaries and all of that.  So I'm
5    just, that's why I'm sort of making it clear.  To me
6    it was, it's just, it -- it's an apples-to-apples
7    comparison.
8         If -- if on one hand, if the business says
9    this class of customers, we want to make so much
10   money on them because they -- they are this level of
11   riskiness, everything else being equal, and that's
12   the critical term, the other part of customers, that
13   -- the other set of customers, you know, one would
14   expect rationally, at least from the economics point
15   of view, they -- they would get the same kind of
16   treatment.  The only reason why that would not be
17   true if the variable customers are risky and their -
18   - riskier than the -- than the fixed rate customers,
19   which I don't think to be the case.
20   Q    The New -- the New York PSC didn't adopt any of
21   those conclusions or rationales, did it?
22   A    Which specific ones are you referring to?
23   Q    All and any of them because it didn't, the New York
24   PSC did not adopt any sort of rate cap at all for

Page 264

1    variable rate green energy plans, did it?
2    A    Well --
3         MR. BLANKINSHIP:  Objection.
4    Mischaracterizes the record.  Lacks foundation.
5         THE WITNESS:  Yeah.  I don't -- I don't --
6    I -- I don't think that's what I said.  I said the
7    New York -- the New York regulator adopted 5 percent
8    cap on -- on the -- on the fixed-rate contracts.
9    BY MR. MEADOWS:
10   Q    Right.  And my point, and my question to you is they
11   didn't adopt that for the -- for the variable rate
12   contracts?
13   A    They did not adopt -- adopt that for the variable --
14   variable -- for the variable rates but they
15   literally closed the market.  They abolished -- if
16   you were in ESCO operating prior to the reset order
17   and you were just, you know, supplying or procuring,
18   just state mandatory amount of RECs and ZECs and --
19   let -- let me take this back.  No, they didn't but
20   they -- they -- I -- I addressed this in the
21   testimony.  They -- after the reset order, the
22   regulator basically said to the variable rate, that
23   ESCOs offering variable rates that they can -- the
24   only way for them to continue staying in the

Page 265

1    business would be, one, they have to demonstrate
2    savings over utility rates.
3         The price to compare, that was the option
4    number one.  Number two, they can offer fixed rates
5    and if they offer fixed rates, they're going to be
6    capped at 5 percent markup; or option number three,
7    they have to -- they have to supply significant
8    amount of energy sourced from renewable resources.
9    However, in the case of three, and I -- it's in my
10   testimony that -- and I'm paraphrasing, but
11   basically the -- that does not absolve them from,
12   you know, charging customers commensurate with --
13   with -- let -- let me find this.
14        I don't want to paraphrase something
15   important, but if they opt for the -- for the third
16   option, which most ESCOs did, just like ESCOs, just
17   like Eligo, they still had -- sorry, it's going to
18   take me a little while to -- to find this -- they --
19   they still had to it -- at a high level, charge just
20   and reasonable rates, having in mind that they're
21   going to have higher cost procuring RECs.
22   Q    With -- but without a rate cap, correct?
23        MR. BLANKINSHIP:  Objection.
24   Mischaracterizes the record.  Lack of foundation.

67 (Pages 262 - 265)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 266

1           THE WITNESS: Sorry, it was lengthy
2    response and I -- I don't -- without a rate cap on
3    what -- yeah.
4    BY MR. MEADOWS:
5    Q    The New York PSC -- I'm sorry.
6    A    Yeah.  I -- I know it's --
7    Q    The New York PSC never adopted a 6 percent rate cap
8         for green energy variable rate products for ESCOs,
9         did it?
10   A    No, it did not.
11   Q    All right.  And even though -- you agree with me
12        that Eligo over the relevant period to this case,
13        was selling electricity sourced from renewable
14        sources, correct?
15           MR. BLANKINSHIP: Objection.  Lack of
16        foundation.
17           THE WITNESS: From what period to what
18        period?
19   BY MR. MEADOWS:
20   Q    Over the entire relevant period to the case it was
21        set -- at least 30 percent of its energy was sourced
22        from renewable sources, correct?
23           MR. BLANKINSHIP: Same objection.
24           THE WITNESS: I -- I don't remember at what

Page 267

1    point they started selling 30 percent and above, but
2    yeah, from whatever point they started selling 30
3    percent, it's my understanding there was 30 percent
4    and then 50 percent and -- and -- yeah.  Yes,
5    correct.
6    BY MR. MEADOWS:
7    Q    Yeah.  And so despite all that, your opinion remains
8         that Eligo shouldn't be able to earn a margin over,
9         I guess, at 6.3 percent on the variable rate plans,
10        correct?
11   A    Because that margin is applied on top of the =-- on
12        the top of the additional cost they're going to have
13        as if they're not procuring RECs and on top of RECs
14        as well.
15   Q    But -- and to go back to costs that are not included
16        in your damage calculation, we talked about
17        administrative overhead and salaries, professional
18        fees are another expense that businesses incur,
19        correct?
20   A    Yeah.  Yeah.
21   Q    Not included in your damage calculation, is it?
22   A    Would be -- would be part of the -- part of the
23        markup, part of the -- part of the margin.
24   Q    So just to give an example, for the last year or so,

Page 268

1    Eligo has been locked in this litigation, which has
2    cost it millions of dollars.  Your -- is it your
3    opinion that Eligo can only recover that through the
4    6 percent margin and if it doesn't, tough luck?
5    A    Give me a -- give me a second.  Let me think about
6    this for a second.  This exercise is not about
7    trying to find -- I'm -- I'm not in a position of a
8    regulator and cases like this happen.  This is not a
9    situation where a utility is trying to justify costs
10   in sort of a ratemaking proceeding.
11        This is I'm -- I'm merely defending a
12   choice of a markup figure that I used in my
13   calculations that I thought was both conservative
14   and realistic, and I -- I based my assumption on
15   my input or my
16   decision on two -- two inputs.  One, this is what
17   Public Service Commission said is enough for -- for
18   all the ESCOs that may be having legal costs or --
19   or any other costs, that a regulator in my mind, the
20   local regulator in my mind, the body that is more
21   aware of everything that is going on than anyone on
22   the planet has made that determination.
23        And I had basically said, okay.  If -- if
24   this -- this -- if they find this to be sufficient

Page 269

1    for fixed-rate class or fixed-rate customers, it's
2    certainly sensible to what -- to what I'm saying.
3    And on the other hand, Eligo company records,
4    whatever the cost is, whatever they're applying it
5    on, they're saying that they're pursuing a 6 percent
6    target margin on the fixed customers -- fixed-rate
7    customers.
8        So it's not a question of whether they're
9    applying it on, it's a question of how much they're
10   bumping it up by.  And as an alternative measure, I
11   -- I use that.  And -- and that's -- that's all I'm
12   saying with respect to the markups.
13   Q    You also testified, I think more than once today,
14        that it's, you know, a basic principle of economics
15        and I think even fairness, that Eligo should be able
16        to earn a profit, right?
17   A    Correct.
18   Q    And you would agree with me that there are instances
19        in business where Eligo is going to incur costs that
20        aren't mentioned in your categories in Table 1, and
21        which a 6 percent margin on top of those costs
22        wouldn't be sufficient to cover, right?
23           MR. BLANKINSHIP: Objection.  Lack of
24        foundation.

68 (Pages 266 - 269)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

---

Page 270

1    BY MR. MEADOWS:
2    Q   I mean, isn't that true?
3            MR. BLANKINSHIP: Same objection.
4            THE WITNESS: Sorry.  I got interrupted
5    with the objection.  Can you please repeat and I
6    will answer?
7    BY MR. MEADOWS:
8    Q   Right.  So there are going to be instances in
9    business where Eligo faces steep costs that aren't
10   captured by the categories in your Table 1 and which
11   a 6 percent margin on those costs are not -- is not
12   going to be sufficient to cover, correct?
13           MR. BLANKINSHIP: Same objection.
14           THE WITNESS: So -- correct.  What is the
15   question?
16   BY MR. MEADOWS:
17   Q   So that was the question which you answered.  I
18   appreciate it, but so in your --
19   A   I -- I --
20           MR. BLANKINSHIP: No.  He did not answer
21   your question.
22           MR. MEADOWS: He said correct and --
23           MR. BLANKINSHIP: That's obviously not what
24   he means.

---

Page 271

1            THE WITNESS: I said, what is the question?
2    The -- the part of the same response that, yes,
3    acknowledging what you were saying, and saying, what
4    is the question?
5    BY MR. MEADOWS:
6    Q   My question was, I'm going to start over again, you
7    agree with me as an economics expert that there are
8    going to be situations where Eligo is going to incur
9    costs outside the categories that are set forth in
10   your Table 1, and which also are in excess of a 6
11   percent margin of those, on those cost categories,
12   correct?
13           MR. BLANKINSHIP: Objection.  Lack of
14   foundation.
15           THE WITNESS: As a hypothetical, yes, there
16   may be situations such as that litigation or
17   whatever it is, legal -- legal, whatever it is, yes,
18   there may be situations like that.
19   BY MR. MEADOWS:
20   Q   Okay.  And so -- and was, in fact, we know for a
21   fact that right now, Eligo is embroiled in an
22   incredibly expensive, long-running case in which
23   you're a part of, right?
24           MR. BLANKINSHIP: Objection.  Lack of

---

Page 272

1    foundation.  Mischaracterizes the record.
2    BY MR. MEADOWS:
3    Q   What about the record -- is there anything about the
4    record you think is contrary to my question that
5    says Eligo is embroiled in an incredibly expensive,
6    long-running piece of litigation?
7    A   I -- I have no --
8            MR. BLANKINSHIP: Objection.  Lack of
9    foundation.
10           THE WITNESS: I have no idea about the --
11   the cost of any of this.  I -- I I'm merely, I was
12   hired as an economist to quantify a calculation, to
13   -- to put it as -- as simply as I can.
14   BY MR. MEADOWS:
15   Q   All right.  Well, fair enough but --
16   A   So I have no idea how much you guys are spending on
17   litigation of this.  Yeah.
18   Q   Well, in a case where the costs of defending itself
19   in litigation exceed that 6 percent margin, it's
20   your opinion that Eligo just has to suffer that
21   loss, can't pass any of that onto customers,
22   correct?
23           MR. BLANKINSHIP: Objection.  Incomplete --
24   lack of foundation.

---

Page 273

1            THE WITNESS: Let -- let me -- let me
2    rephrase this, see if you agree with the question
3    and -- and provide an answer.  You're basically
4    saying in an example where there is a class action
5    against the company, in this case by variable rate
6    customers, and the company incurs legal fees as a
7    result, does company, in my opinion, have the right
8    to get compensated for the legal costs it incurs in
9    the process?  Is that the question?
10   BY MR. MEADOWS:
11   Q   That -- no, the question is the way I asked it,
12   which is that because legal fees are not included in
13   the cost categories that you're including in your
14   damages model, and if the legal fees exceed a 6
15   percent margin on those costs, it's your view that
16   the law requires that Eligo just eat that loss; is
17   that right?
18           MR. BLANKINSHIP: Same objection.
19           THE WITNESS: I -- I did not opine on the
20   legal view or whether the legal costs, you know,
21   should or should not be accounted for in -- in this
22   methodology.  As -- as I've -- as I've stated
23   probably close to a hundred times right now, my job
24   was to perform, essentially, a mathematics

---

69 (Pages 270 - 273)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 274

1    calculation under the interpretation of -- of the
2    legal language. And in method one, I have not been
3    provided with any guidance to, you know, account for
4    legal losses in -- in my calculations. That -- that
5    -- I did not interpret the contract.
6            I did not come up with the formula the way
7    my testimony has been laid out, and I thought it was
8    quite clear that there are alternative legal
9    interpretations of the contractual language. And
10   what I've done was merely perform the calculation
11   quantifying the -- the contract -- contract price
12   that should have been charged by Eligo under each
13   given legal interpretation.
14           And there's absolutely nothing else that I
15   can -- that can -- I can tell you this. And again,
16   for the record, I -- I think I've been asked this
17   question like 100 times right now.
18   BY MR. MEADOWS:
19   Q    Do you think it's commercially or economically
20   reasonable to construct a damages model that
21   excludes ordinary costs like auditors and lawyers,
22   and professional fees?
23           MR. BLANKINSHIP: Objection. Vague.
24           THE WITNESS: I -- I just don't know what

Page 275

1    else to -- it's -- it's basically the -- it's --
2    it's basically the same question. I -- I honestly
3    would -- would -- despite all the effort, I -- I
4    just don't know how else to answer that question,
5    but what I've said, so I - I don't know but --
6    BY MR. MEADOWS:
7    Q    You -- Mr. Macan, you expressed an opinion about
8    what's commercially and economically reasonable in a
9    number of different respects.
10   A    Okay.
11   Q    I'm asking you to apply that to the damages model
12   you constructed. We both agree, right, that your
13   damages models reflected in Table 1 excludes several
14   categories of costs that are absolutely routine for
15   businesses to incur, doesn't it?
16           MR. BLANKINSHIP: Objection. Objection.
17   Lack of foundation. Mischaracterizes testimony.
18   Argumentative.
19           THE WITNESS: No, it doesn't. That's not -
20   - that's not what I said. I said my task was to
21   calculate the contractual rate and I'm calculating
22   contractual rate based on legal interpretation, and
23   -- and that's what it is. The legal interpretation
24   did not include accounting for legal costs,

Page 276

1    overheads, litigation suits, or whatnot.
2    BY MR. MEADOWS:
3    Q    And I'm asking you whether that legal interpretation
4    that you assume was commercially or economically
5    reasonable. You're capable of expressing an opinion
6    as to that, aren't you?
7            MR. BLANKINSHIP: Objection. Compound.
8    The first question you ask calls for a legal
9    conclusion. The second is argumentative and vague.
10           THE WITNESS: I -- like I said, I -- I
11   don't have a legal opinion, I'm not an attorney, on
12   whether legal fees, litigation fees are -- should be
13   a part of the legal interpretation of -- of this
14   contract.
15   BY MR. MEADOWS:
16   Q    I'm not asking about the legal interpretation. I'm
17   asking you about whether something is economically
18   reasonable. You used the word, the phrase
19   "economically reasonable" throughout your opinion.
20   You agree with that, right?
21   A    Yes, I do.
22   Q    Okay. Is it economically reasonable, in your view,
23   to construct a damages opinion that excludes
24   numerous categories of costs that are routinely

Page 277

1    incurred by businesses like Eligo?
2            MR. BLANKINSHIP: Objection. Asked and
3    answered. Mischaracterized --
4            MR. MEADOWS: He's never answered it.
5            MR. BLANKINSHIP: -- mischaracterizes the
6    record, lack of foundation.
7            THE WITNESS: The reason why I haven't
8    answered it, and I -- I've said this before, I'll
9    try to say it one more time, regulators seem to
10   think so, regulators seem to think that for fixed
11   rate customers that whatever prudent business-
12   running cost they have that the margin that they
13   allowed fixed rate companies to earn on the fixed
14   rate customers should be sufficient. Eligo,
15   themselves, set the 6 percent rate, not me. And --
16   and I'm saying if the company itself and the
17   regulator, who is the policeman of the whole market,
18   think that that's ample, they -- I -- I -- I'm under
19   the assumption that they have taken into
20   consideration, on Eligo's case, the possibility of
21   having, you know, legal costs to incur, in addition
22   to labor costs, overhead, and whatnot, and as well
23   as the -- the regulator that has been conducting
24   this long stakeholder process has also evaluated and

70 (Pages 274 - 277)

Edo Macan                              December 17, 2025
Brous v. Eligo Energy, LLC

Page 278

1    -- and taken all this into consideration with coming
2    up with the -- with -- with the figure.
3            The regulator didn't come back and -- and
4    say, well, given what has transpired, you know, we
5    are increasing the rate from 6 percent to 25
6    percent.  And -- and I've seen no evidence why it
7    would be anything else.  I certainly do not pertain
8    to know the insides and out of -- of running an ESCO
9    business to opine on, you know, whether, you know, 7
10   percent is better than 6 percent.
11           I've -- I've used two benchmarks that are
12   both very unbiased, very fair, economically very
13   sound, and -- and calculated damages and -- and
14   contractual price -- prices stemming from them, who
15   actually come out to be pretty close.  So this has
16   been done two different ways.
17   BY MR. MEADOWS:
18   Q    All right.  Is there anything else other than what
19        you just described to support your conclusion, your
20        opinion, that the costs and margins and damages that
21        you've calculated are economically reasonable, or
22        have you told me everything now?
23   A    I -- I have no -- I -- I don't know, I -- everything
24        that I have to tell you about, in addition to what

Page 279

1    I've said, is -- is contained in my expert report.
2    I cannot, sitting here, say that I've covered
3    everything that I've brought up in my expert report.
4    It's a lengthy document with a lot of effort in
5    writing it down, and -- and I stand by every word
6    that I wrote in it.
7    Q    And going back to paragraph 13J, again we've looked
8         at this.  You say that it's not commercially or
9         economically unreasonable to adopt 6 percent as the
10        relevant margin?  I'll let you -- if you're not
11        there.
12   A    J, page 12?
13   Q    Yes.
14   A    Yes.  What's the question?
15   Q    You see that where 13J says that, right?
16   A    Says what, sorry?
17   Q    That it would not be commercially or economically --
18   A    Yes.  Yeah.
19   Q    -- reasonable to adopt 6 percent.
20   A    Yeah.
21   Q    And then you say that 6 percent margin can be
22        expressed as 6.38 percent, correct?
23   A    As a 6.38 percent markup.
24   Q    Right.  And my question to you is, would it be

Page 280

1    commercially or economically reasonable to go any
2    higher than that 6.38 percent?
3            MR. BLANKINSHIP: Objection.  Asked and
4    answered.
5            THE WITNESS: As -- as for an unbiased,
6    robust, conservative estimate of the risks involved
7    tied to the opinion of the regulator and the company
8    themselves, the answer is no, not -- not higher than
9    that.  And again, I'm triangulating here.
10           You know, if -- if the -- if the regulator
11   found that fixed rate customers, you know, the fixed
12   rate returns were capped at like 20 percent, and
13   Eligo was pursuing a 20 percent fixed rate margin,
14   those are two data points telling me that this line
15   of business, you know, is so costly in terms of
16   overheads and whatnot, there's so much risks
17   involved that here go two data points saying that
18   that would be sort of the adequate compensation.  I
19   -- I would know then, I would -- it would be
20   commercially reasonable to assume and economically
21   sound to say that the, you know, the appropriate
22   margin on variable rate in that case would be
23   something lower than, you know, lower or equal than
24   20 percent, and I merely applied the same logic

Page 281

1    here, so --
2    BY MR. MEADOWS:
3    Q    So as I understand your answer, based on, you know,
4         what the -- what you think the regulator said and
5         your own independent evaluation of the risk of
6         running Eligo's business, you see 6.38 percent as a
7         margin cap; is that basically right?
8    A    No.  Based on -- based on Eligo's internal profit
9         margin target of 6 percent, I did not make it -- I
10        did not make an assessment that it takes -- 6
11        percent should be sufficient for Eligo to run a
12        fixed rate business.
13   Q    Well, and as we saw earlier, that was a minimum
14        acceptable margin for, within Eligo's internal
15        document, right?
16   A    Well, I would not, I would assume that they wouldn't
17        set a business margin that keeps them underwater so
18        that would be sufficient.  And variable rate
19        customers are lower than lower-risk customers than
20        that.  So if they're above water or making money at
21        6 percent, variable rate customers compared to fixed
22        rate customers are -- are, you know, less risky
23        customers.
24   Q    So you -- well, your view is Eligo's minimum

71 (Pages 278 - 281)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 282

1    acceptable margin on fixed rate should be also
2    adopted as a maximum acceptable margin on variable
3    rate, right?
4         MR. BLANKINSHIP: Objection. Asked and
5    answered.
6    BY MR. MEADOWS:
7    Q    That's what it boils down to, isn't it?
8         MR. BLANKINSHIP: Same objection.
9    Argumentative.
10        THE WITNESS: Yeah. No, I'm -- I'm --
11   that's not what I've said, and I really don't know
12   how to say it any other way.
13   BY MR. MEADOWS:
14   Q    That's what's argumentative, right there is you're
15   not answering the questions, and you keep saying
16   that you've answered them repeatedly. I want a yes
17   or no to the simple question of you've taken a max,
18   a minimum acceptable rate in an Eligo document and
19   now you want to adopt it as a maximum, as a ceiling;
20   isn't that right? Yes or no?
21        MR. BLANKINSHIP: Objection. Objection.
22   Asked and answered.
23        THE WITNESS: I'm not adopting it as a
24   ceiling. I'm using it as -- as a -- as a markup

Page 283

1    metric, in -- in my formulation.
2    BY MR. MEADOWS:
3    Q    As a markup metric to reach a 6.38 percent margin
4    that I think you just told me a little while ago is
5    the highest you think is commercially or
6    economically reasonable, right?
7    A    But counsel --
8         MR. BLANKINSHIP: Objection. Asked and
9    answered.
10        THE WITNESS: Counsel, you're taking things
11   out of context, I -- I -- let me try one more time.
12   Let me try one more time.
13   BY MR. MEADOWS:
14   Q    Well, there's no question pending if you -- if you
15   did not understand the question.
16        MR. BLANKINSHIP: No, there was a question
17   --
18        THE WITNESS: Well, you did -- you did ask
19   me a question. I'm just, I'm taking a breath so I'm
20   going to answer.
21   BY MR. MEADOWS:
22   Q    I asked you a yes or no -- I asked you a yes or no
23   question but you're not answering.
24   A    You're -- you're not allowing me to answer.

Page 284

1    Q    The questions are not an invitation for you to
2    speechify what you're doing, so we're going to take
3    a break, but there's no question pending, and I
4    think you've given me all there is to give on this
5    line of questioning. So let's take a few minutes.
6    A    I did not --
7         MR. BLANKINSHIP: No. That's fine.
8         THE VIDEOGRAPHER: We are now going off the
9    record. The time is 4:10 p.m.
10   (Whereupon, the parties go off the record.)
11        THE VIDEOGRAPHER: Okay. We are now back
12   on the record. The time is 4:20 p.m.
13   (Background conversation.)
14   BY MR. MEADOWS:
15   Q    All right. Mr. Macan, we talked about POWWR
16   spreadsheets earlier, and I want to -- we're going
17   to take a look at one of them going back to Table 1
18   of your report on page 62, Table 1 is where you list
19   your estimate of Eligo's procurement cost for
20   Plaintiff Schuster for November 2023, correct?
21   A    Under method one, yes. Yes.
22   Q    Under method one, right. And so these -- to
23   generate these calculations, you would have looked
24   at the POWWR spreadsheet for the month prior, which

Page 285

1    would be October 2023, correct?
2    A    Correct.
3    Q    And again, you would have tried to find either the
4    15th of the month or the closest to that you
5    could get, right?
6    A    Correct.
7    Q    So could we pull that?
8         MR. O'TOOLE: Sure.
9    BY MR. MEADOWS:
10   Q    So we've got the screen behind us where we're going
11   to pull up.
12        MR. O'TOOLE: So for the record, that's
13   DEF024595. I think we'll mark that as an exhibit?
14   Yeah.
15        MR. MEADOWS: We'll just show it. I mean,
16   we've got the Bates number in the record.
17   BY MR. MEADOWS:
18   Q    So you see this displayed on the screen behind you
19   now, Mr. Macan, correct?
20   A    Yeah. It's all black.
21   Q    And yeah. And can you see at the very top? I know
22   it's a little bit small, but the date next to the
23   Bates number is 10/17/23.
24   A    Correct.

72 (Pages 282 - 285)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 286

1   Q   Do you happen to know whether this is one of the
2       POWWR spreadsheets that or the POWWR spreadsheet
3       that you used for the November 2023 calculations?
4   A   I -- I don't know based on the date. I mean, if
5       there is a -- if there is a 10/15, I would have used
6       10/15, if you know for a fact that that's the one.
7   Q   And I believe this is in the materials considered,
8       right? So I believe it is in your materials
9       considered. Yeah.
10  A   Okay. Okay. Okay. Sure.
11  Q   So as it's displayed right now, we're on the title
12      page tab, right?
13  A   Mm-hmm.
14  Q   And everything is kind of blacked out. Is this how
15      it displayed for you as well when you pulled it up?
16  A   When I got the files, that's -- that's in what --
17      yeah. That's the format in which they opened up.
18  Q   Did you do something to kind of fix this display
19      issue?
20  A   I did.
21  Q   What did you find that you --
22  A   It's not an it's -- for the record, it's not a
23      display issue. This is -- this is what I meant by
24      saying, in 25 years of being in this business, I've

Page 287

1       -- I've never been submitted data in discovery that
2       were so, in such an unfriendly format. Whether it's
3       on purpose or -- by accident, I just want to
4       state it for the record. So I -- I can -- I can
5       tell you what I've done is -- if that's what you're
6       asking for, get rid of the black.
7   Q   Yeah. What I want to know is on this screen, how
8       did you get it to not display this way and be, you
9       know, more usable than you see it now?
10  A   Sure. You see the tab Conditional Formatting
11      button? Click on that. See the clear rules towards
12      the bottom and then do clear rules from entire
13      sheet. Okay.
14  Q   Okay.
15  A   So that's going to show the content.
16  Q   All right. And then we talked about the, you know,
17      the configurations you made on the -- on the POWWR
18      spreadsheets, with I -- which I think you said that
19      you did on the title page tab, which we're looking
20      at now, correct?
21  A   Some were on title page. Some were in the -- some
22      of the other pages.
23  Q   All right. You're right. Some were on the title
24      page, which were the inflation rate, the general

Page 288

1       interest rate, and I'm looking at page 58 of your
2       report, and the rest were on the summary page. So
3       on the title --
4   A   Okay.
5   Q   I'm sorry -- on the title page, we can go ahead and
6       as you did, set the inflation rate to zero. Can you
7       do that? Well, I -- let me stop right there first,
8       do you see here on this particular sheet, the
9       inflation rate is 7.5 percent?
10  A   Yes.
11  Q   And so you would have set this to zero, correct?
12  A   Yes.
13  Q   Now, and I apologize if I asked you this before, but
14      when that change is made, to your knowledge, are
15      other values in the spreadsheet changed
16      automatically?
17          MR. BLANKINSHIP: Objection. Asked and
18      answered.
19          THE WITNESS: Yes. Some -- some cells
20      change accordingly.
21  BY MR. MEADOWS:
22  Q   And do you -- do you know how those changes are made
23      within, you know, the programming of the
24      spreadsheet?

Page 289

1   A   Like I said before, I -- the -- the -- I was -- I --
2       I did not attempt to recreate and make a
3       nonfunctional model, functional. I merely tried to
4       take data that was provided in extremely unfriendly
5       non-confidence form and tried to use it as inputs
6       into my calculation.
7   Q   Well, do you think that the data on the POWWR
8       spreadsheets is reliable?
9   A   This is the data that Eligo submitted pursuant to
10      the discovery request to provide the data -- to
11      provide this particular data. So I have to go off
12      of the assumption that they have provided the data
13      that -- that had been asked upon.
14  Q   Well, it's your report. You're going to testify
15      about damages that you've calculated. Do you think
16      that the damages that you've calculated, relying on
17      the POWWR spreadsheets, are reliable?
18  A   I can only go off of the assumption the data that
19      Eligo produced was indeed the data that they -- they
20      said that they produced. So I -- I, you know, I --
21      that's -- that's what it is. If -- if we're looking
22      at a cost and they say in their financial records
23      that, you know, the cost is X, I -- I'm going off of
24      the fact that, you know, they -- they got a POWWR

73 (Pages 286 - 289)

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

Page 290

1    report that said in that given month the -- that
2    energy cost was X.
3  Q   But back to a question I asked a few moments ago.
4    When you changed the inflation rate to zero, can you
5    tell me what other values in the spreadsheet changed
6    automatically?
7         MR. BLANKINSHIP: Objection. Asked and
8    answered.
9         THE WITNESS: Some. I -- I cannot -- did -
10   - let -- let me show you something. Let -- let me
11   show you something. I think you're going to --
12   you're going to understand where I'm coming from.
13   Can -- can you unhide the sheets in this worksheet?
14   Do you know how to do that? Sorry, who is doing it?
15   You are? Can you unhide the sheets?
16        MR. O'TOOLE: Do you want to explain what
17   you -- what you mean by that?
18        THE WITNESS: All of them. Unhide all of
19   them.
20        MR. O'TOOLE: And how do you to that?
21        THE WITNESS: You scroll to the bottom.
22   No, no. See where the tabs are? Title page? Put
23   the cursor somewhere on it, right click.
24        MR. O'TOOLE: I think it's --

Page 291

1         THE WITNESS: It can be anywhere. Just --
2         MR. O'TOOLE: I'm clicking on it. There we
3    go.
4         THE WITNESS: Unhide. Okay. So you should
5    now unhide all of these sheets. And you're going to
6    have to do it -- there we go. Okay. Can we just
7    scroll through all of the sheets? And there's more
8    to the right.
9         MR. O'TOOLE: Yeah.
10        THE WITNESS: Okay. So Counsel, I don't
11   know if you have seen this, but this is what I mean
12   by uncooperative and -- and really unfriendly
13   format. So I'm saying this not to complain, this
14   has been provided in the way it has been provided,
15   but I'm merely saying this, that to answer your
16   question, you know, whether changing an input on --
17   on an input sheet from -- from a number to a zero,
18   which cells are affected, I think it gives you the
19   illustration. The short answer is, I cannot give
20   you a definitive answer for every single cell in the
21   worksheet which -- which changed as a result. And I
22   think just scrolling through the 20 or 30 tabs in
23   this worksheet, most of them are still disabled.
24        Some are -- some are blackened out. There

Page 292

1    are -- there are macros, there are procedures behind
2    it. It's a -- it's -- it's just -- it's I think for
3    the -- for the biggest Excel expert, it would be an
4    impossible task to -- to do.
5  BY MR. MEADOWS:
6  Q   Fair enough. But you didn't rely on any of those
7    other -- the only sheets that you used in your
8    damage calculations were the title page tab and the
9    summary page, right?
10 A   Sure.
11        MR. BLANKINSHIP: Objection. Vague.
12 BY MR. MEADOWS:
13 Q   And so let me limit my question then to those two
14   pages on the spreadsheet. When you change the
15   inflation rate from 7.5 to zero, what other values
16   on the title page tab automatically change?
17 A   I'm -- I -- I -- the way to answer some of the
18   questions is say, sure, and then I catch a breath
19   and I want to elaborate on it, and in this case.
20   You didn't catch it. I wanted to say sure, but a
21   lot of these tabs are feeding into other tabs. To -
22   - to fully understand and recreate or make this
23   operational would have been an endeavor that is
24   completely, you know, above and beyond anything that

Page 293

1    -- that I have been sort of hired to do here.
2         So I would not -- I -- I would not agree
3    with an assertion that all that matters are these
4    three sheets. Like I've said, and I'm going to
5    repeat it again, I've done -- I've -- I've used
6    Excel for 20 years. I think I'm pretty proficient.
7    I've -- I've done this to the best of my ability to
8    try to literally figure out, you know, what are the
9    costs in -- in this mess of a model and -- and
10   that's what I meant by the previous statement.
11 Q   My question simply was when you change the inflation
12   rate from 7.5 to zero, do any other values that you
13   see on the title page change? I'm not asking you
14   anything other than do they change?
15 A   Sure, let's do that. Let's do that exactly. So we
16   can -- we can see it. Can you please scroll to the
17   -- oh, this is the title page. Can you go to the
18   summary page? Can we do the same thing?
19   Conditional formatting. You might kill the enable
20   content or whatever. Okay. Can you unhide the
21   columns? This is the part that I didn't get to.
22   Each of these tabs has, you know, bulk of the file
23   that you don't even see.
24        So if you do unhide columns, there's

74 (Pages 290 - 293)

Edo Macan                                    December 17, 2025

Brous v. Eligo Energy, LLC

Page 294

1    basically a whole calculation behind it. This is
2    what I meant by saying that it's -- it's, you know,
3    what you see. It's not just these three sheets.
4    There is stuff running in the background.
5          Okay. So let's do the following. If you
6    go to the title page, can you revert back to 7.5
7    percent? Seven and a half percent? Fine. Let's go
8    to the summary page. Let's scroll to the right, and
9    I cannot see from here. I'd have to get closer. So
10   let's see -- sorry, I'm going to have to walk with
11   the mic.
12  Q   I can't see it either from where we are so I -- no
13      problem.
14          THE VIDEOGRAPHER: Counsel, would you like
15   me to remain on the chair?
16          THE WITNESS: Okay. So let's do the
17   following. So let's say the energy price here,
18   32.59. If you go to -- back to the title page. So,
19   32.59.
20          MR. O'TOOLE: Can you give coordinates for
21   that? The cell number?
22          THE WITNESS: I'm sorry. AK -- AK17.
23          MR. O'TOOLE: AK17. Okay.
24          THE WITNESS: Okay? Go to title page and -

Page 295

1    - and switch inflation to zero. Okay. Go to -- go
2    to summary -- go to summary page, 32.59. So to
3    answer your question, changing the inflation rate
4    from 7 to -- to this did not affect it. And -- and
5    I'm -- I'm not surprised. And the reason why is
6    this is one month out. And the way you know that is
7    if you scroll to the left. Oh. Too far -- sorry --
8    go to the right. See, this is the next -- oops.
9    Sorry. Scroll a little bit to the left.
10          This is the next month and this is the
11   next month. So I'm -- I'm sure there were files
12   where pricing came out further out but it sounds
13   like based on this isolated change alone that I've
14   just done, just going off of the file as was
15   produced by -- by client, I cannot assume anything
16   else that pretty much the 7 percent, 7.5 percent,
17   whatever it was, inflation rate, like I conjectured
18   from economic basis, in fact, had no implication on
19   -- on the energy cost.
20  BY MR. MEADOWS:
21  Q   And was that energy cost figure that you pointed to,
22      I think it was in cell AK4 -- 17, was that the only
23      one that you used in calculating the damages?
24  A   No, it's not. Just one of them. I just used one as

Page 296

1    an example.
2   Q   All right. What about changing the general interest
3       rate to 0 percent? Does that roll up to changes in
4       --
5   A   We can again try because in order for me -- just to
6       say one more thing on the record, so in order for me
7       to get -- to be familiar enough with this, to use
8       these things in my report, you know, I've played --
9       tried different things until I sort of convinced
10      myself that, yeah, you know, it -- it's really --
11      it's far from ideal. But based on my assessment of
12      what's going on, I'm pretty sure that the cells that
13      I took actually correspond to what I think they
14      correspond, so -- to answer your question before.
15      So if we do the same thing, take the inflation back
16      to 7.5, take the general interest rate to -- to zero
17      -- sorry. I'm giving commands, whoever is doing it.
18      Okay. Go to summary page and go to AK17, 32.59.
19  Q   So in that case it did change.
20  A   It didn't change. 32.59 in both cases, the cell --
21  Q   Oh, 32. Oh, you're right.
22  A   Yeah.
23  Q   Okay.
24  A   Okay. So -- so if I may.

Page 297

1   Q   Yeah.
2   A   Like I said, it doesn't surprise me because when you
3       think about it economically, we are -- no money will
4       exchange hands. Whoever did this model clearly knew
5       how to, you know, price it because there -- there's
6       really no accrual period, if you will. You're just
7       pricing something where the transaction is going to
8       take place, you know, two weeks from then. So it
9       didn't really make sense to account for, within a
10      day or it's not even within a day, there's -- there
11      are no interest rates or inflation at that level.
12  Q   So once you made all of these configuration changes
13      to the POWWR spreadsheet, you -- what it yielded is
14      the estimated procurement costs in Table 1 on page
15      62, right?
16  A   Energy cost component, capacity cost component,
17      ancillary services cost component, T&D losses, and
18      mandatory RECs.
19  Q   So you got all of those from the POWWR spreadsheet?
20  A   Correct.
21  Q   All right. And what calculations -- were you able
22      to pull those figures directly from the POWWR
23      spreadsheet after you did these configuration
24      changes?

75 (Pages 294 - 297)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 298

1   A   Yeah. I think so. They're all in there.
2   Q   Is that the case for all -- each one of them?
3   A   I'm pretty sure.
4   Q   I mean, for example, where -- where -- do you
5       remember where would I go on the POWWR spreadsheet
6       after making these configuration changes to find
7       this 2.48 energy procurement cost? How would I like
8       recreate that?
9   A   Sure. If it's the right -- if it's the right file.
10      I'm -- I'm not sure if that is the right file. Can
11      you go to -- well, never mind. We haven't made all
12      the -- we haven't made all the changes, so.
13  Q   We haven't made all of them, no. We can do that.
14  A   So you -- you -- do you want to do that?
15  Q   Yeah, let's do that. Because I--
16  A   Okay. Sure.
17  Q   It's important for us to understand how you got
18      these numbers.
19  A   I understand. Go to the title page, please.
20  Q   Well, let's make sure we make these two changes on
21      the -- yeah.
22  A   Sounds like -- sounds like you -- okay. Let me see.
23      Is it page 17 or the --
24          THE WITNESS: Fifty-eight, page 58?

Page 299

1   BY MR. MEADOWS:
2   Q   Are you looking for these adjustments?
3   A   Adjustments, yeah.
4   Q   Oh yeah, yeah, 58. Okay. Yes.
5   A   Yeah. Okay. Okay. All right. So let's do it like
6       this. Go to set inflation rate as zero. Set
7       general interest rate to zero. Okay. Go to summary
8       page. So the start date, right, is November 1st.
9       Sorry, it's kind of hard to see from here. It
10      sounds like --
11  Q   That's what it says, "11/1/23."
12  A   Right? Yeah. Okay. Then the product type set to
13      variable with cap. State set to New York. Utility,
14      who are we talking here? Schuster or Brous?
15  Q   Schuster is the one displayed in Table 1.
16  A   It's confusing. Schuster's -- hold on a sec. I
17      think Schuster was NYSEG. Let me just confirm.
18      NYSEG service territory.
19          MR. O'TOOLE: Here. Is that helping?
20          THE WITNESS: Is that Schuster? Yeah.
21      RG&E. Okay. Thank you. Yeah. RGE. Rate profile.
22      These are the different -- these are the different
23      residential -- pick SC1. Okay. And then profile
24      load zone. It's not a comment zone. Can you go to

Page 300

1   load zone? Ah, Zone B. Yeah. B. Okay.
2           AUTOMATED VOICE: I'm going to have to
3   close this conference because you have exceeded the
4   maximum time limit. If you need to stay on the
5   line, you'll have to start another conference.
6   Thanks for calling.
7           MR. BELENKY: We're getting cut off the
8   conference.
9           THE COURT REPORTER: Yeah, we'll -- I'll
10  restart it.
11          THE WITNESS: Okay. Can we zoom out a
12  little bit?
13          MR. MEADOWS: Hold on.
14          THE WITNESS: Okay.
15          MR. BLANKINSHIP: We can -- I just --
16          THE WITNESS: Yeah. No, no, I understand.
17          THE COURT REPORTER: It'll only take me a
18  second. I don't know why it keeps doing that
19  because we even restarted it during the break, so.
20          AUTOMATED VOICE: Welcome to the Veritext
21  Conferencing Center powered by (indiscernible).
22  Thanks. I'm connecting you now.
23          THE WITNESS: There's like background
24  noise.

Page 301

1           THE COURT REPORTER: It's --
2           THE WITNESS: Okay.
3           THE COURT REPORTER: They'll fix it.
4           THE WITNESS: Okay. So we were --
5   BY MR. MEADOWS:
6   Q   Okay. So we can -- yeah, continue on.
7   A   We were at -- yeah, we were at I think, summary
8       page, right?
9   Q   Yes.
10  A   And can you scroll up, please? Municipality. All
11      other. Yeah. Okay. Then let's go to -- scroll to
12      the left, please. You see cell G20, where there is
13      gross margin target? Set that to zero, because I'm
14      going to be separately adding that on top. And then
15      -- okay. And then let's go back to the --
16  Q   Hold on a sec.
17  A   Sorry, it's really hard to see from here. Can I --
18  Q   Yeah.
19  A   -- unhook this just until I look at the screen?
20      Just zoom it out because then I -- I don't know
21      where it is. Okay. Can we go to title page? Okay.
22      Can we go to summary page again? And scroll to the
23      right. What's the figure that we have? Sorry.
24      Scroll to the right. Scroll to the right. Okay.

76 (Pages 298 - 301)

Edo Macan                                   December 17, 2025
Brous v. Eligo Energy, LLC

Page 302

1    So you see here cell AK17.
2  Q    Yes.
3  A    Whatever it was 39-something before, now it's 24.80,
4    and it's expressed in dollars per megawatt hour, so
5    expressed in cents per kilowatt hour, that's 2. 48,
6    which is what I had in Table 1 for energy cost.
7  Q    I see.  And do you have -- can you identify where
8    the 92-cent capacity figure would be found?
9  A    Sure.  Sure.  Give me a second.  Let me just -- let
10    me just get a coffee on the table.
11        THE COURT REPORTER: Don't forget to --
12        THE WITNESS: Oops.  Okay.  Is there a way
13    to unhook myself from the leash so that way I could
14    -- from the mic?
15        THE COURT REPORTER: There's another piece
16    of tape under the table, so if you undo that --
17        THE WITNESS: Okay.  Because it --
18        THE COURT REPORTER: -- you can be a little
19    more --
20        THE WITNESS: Okay.
21        THE COURT REPORTER: -- free.  You also
22    have it flipped the wrong way, so you need to turn
23    it because it's in and you need it out.
24        THE WITNESS: Sure.  I just did it.

Page 303

1        THE COURT REPORTER: You're okay, it's--
2        THE WITNESS: Yeah.  Yeah.  It's -- my
3    eyesight is not great and -- yeah, just leave it on
4    the floor.  That's okay.  All right.  So Counsel,
5    you were asking for the capacity figure?
6  BY MR. MEADOWS:
7  Q    Yes.
8  A    Capacity figure is right next to it, $9.19 expressed
9    in kilowatt hours it's 9.  -- 0.92.
10  Q    Did you say 9.92?
11  A    9.9 -- this is 9.2 or 9.92.
12  Q    I see.
13  A    Divided by 10 it's 0.92.
14  Q    Okay.  Thank you.
15        THE WITNESS: It's okay.
16        THE COURT REPORTER: It's a piece of tape,
17    let me just--
18        THE WITNESS: Okay.
19  THE COURT REPORTER: There you go.
20  BY MR. MEADOWS:
21  Q    Thank you for that.  I know the writing was really
22    small.  Let me ask you a couple of additional
23    questions.  We haven't talked about method three of
24    your damages.  And there -- and you talk about that

Page 304

1    starting on page 71, paragraph 173 says, "This
2    method identified the rate Eligo should have charged
3    by calculating a rate on a monthly basis that varies
4    in response to prevailing retail market prices,"
5    correct?
6  A    Mm-hmm.
7  Q    And how did -- tell me how you calculated prevailing
8    retail market prices for purposes of this method?
9  A    As -- as I outlined in my -- in my report, and --
10    and really at sort of a high level, I looked at --
11    first, I defined the market.  I asked myself a
12    question, who is Eligo competing with?  And the
13    answer is Eligo is competing with other ESCOs and --
14    and an incumbent utility.  And so what would be the
15    most robust way and unbiased way to estimate the
16    market prevailing rate?  That would be to take into
17    account other -- other competitors in the market and
18    also to take into account their market share,
19    because this is -- this is quite crucial.
20        And so what I've done was at a high level,
21    I figured out the -- I calculated the market share,
22    that incumbent utility.  Let me take a step back.
23    There's also a question of granularity.  So ESCOs
24    compete in different zones and in different utility

Page 305

1    service territories.
2        So to come up with an apples-to-apples
3    comparisons, I had to do this -- do this calculation
4    by NYISO zone by utility service territory, because
5    that way you would compare, you know, everyone's
6    rates for the -- for the same geographic area
7    because you know, Eligo and presumably many other
8    ESCOs were offering different rates in different
9    zones in different areas.  So I defined the term, I
10    think I called it local market.
11        So the local market which I'm going to
12    discuss is pretty much the combination of, is sort
13    of a territory encompassing a given zone and an
14    NYISO zone and utility service territory, if that
15    makes sense.  So for every local market, I basically
16    calculated the market share that ESCO had.  And
17    actually -- I'm sorry -- there's one more step
18    before that.
19        In order for this calculation to be a
20    little bit more simple and -- and productive, I
21    basically focused first on finding the top 10 ESCOs,
22    the 10 ESCOs with highest grossing energy sales in
23    every given local zone.  And then looking at now
24    knowing what the top ESCOs are, the top competitors,

77 (Pages 302 - 305)

Edo Macan                          December 17, 2025

Brous v. Eligo Energy, LLC

Page 306

1    and -- and also Eligo -- I'm sorry -- and also the
2    incumbent utility, I estimated the market share that
3    each one of these ESCOs had in that given local
4    zone. And the calculation of the prevailing market
5    rate has been basically the following form. It was
6    the market share of ESCO number one times the
7    variable rate offered in the local zone in that
8    given month, plus the market share of ESCO number
9    two, times its market share. Sorry if I said that
10   wrong. The rate for the ESCO number two times its
11   market share plus -- and I would do that for all the
12   10 top-selling ESCOs, plus the market share that the
13   incumbent utility has, times its rate. And in
14   essence, that was the -- that was the calculation.
15   Q   All right. Now, within each one of these, whether
16       we call them "zones or territories," I'm not sure.
17   A   I -- I call them, yeah, local --
18   Q   Or markets, whatever. You know what I'm talking
19       about, yeah.
20   A   Yeah, I know what you're talking about. Yeah.
21   Q   Each one of these --
22   A   Local markets. Let's -- local markets. Yeah.
23   Q   Fair enough. Which -- within each one of these
24       local markets, is it fair to say that the utility by

Page 307

1    far, had the largest percentage of market share?
2    A   Yeah. I think in -- in most of them, at least for
3        the two plaintiffs, where I looked at, they had
4        largest share, correct.
5    Q   All right. And did you ever do a comparison of
6        Eligo? Well did you ever try to calculate a
7        prevailing market rate just among the ESCOs in each
8        market zone?
9    A   I -- not in my -- not in my expert report, I think
10       it -- yeah.
11   Q   Now within these various zones, was the relevant
12       utility sell -- selling the same exact product as
13       the ESCOs?
14   A   They were -- I -- I addressed this explicitly in the
15       testimony. They were selling -- they were selling
16       that -- that -- they're basically selling -- both of
17       them were selling retail electricity. The
18       difference was in the case of Eligo and -- and some
19       of the ESCOs, they were -- they were also selling a
20       higher share of -- they were also selling sort of a
21       higher share of renewable generation in the product
22       that they offer. So yeah.
23   Q   And do you consider the renewable sourced
24       electricity to be in the same market as electricity

Page 308

1    sourced from, you know, brown sources?
2    A   What do you mean by, "in the same market"?
3    Q   Are they competing -- is an ESCO selling 100 percent
4        electricity generated 100 percent from renewable
5        sources seen as a competitor to a utility that,
6        let's say, for example, is generating none of its
7        electricity from green sources?
8            MR. BLANKINSHIP: Objection. Lack of
9    foundation.
10           THE WITNESS: I -- I don't know how, you
11   know, a typical customer would -- would sort of
12   perceive that choice of zero green compared to 100
13   percent green. I mean, looking from -- from
14   structurally, really the only difference is the
15   amount of RECs. Everything else is pretty much the
16   same.
17           And given that the RECs are sort of a
18   financial product, it's -- it's thinking about it as
19   buying an airline ticket without insurance and
20   buying an airline ticket with insurance. And I'm --
21   I'm oversimplifying just for the sake of clarity.
22   (Background conversation.)
23   BY MR. MEADOWS:
24   Q   I'm going to show you -- which one are we up to?

Page 309

1            THE COURT REPORTER: Well, you didn't mark
2    this, so 8.
3            MR. MEADOWS: Right. Eight. Okay. Go
4    ahead and mark that as 8.
5    (Whereupon, Ex. 8 Four Figures from Expert Report
6    (5, 6, 9 and 10), is marked for identification.)
7    (Background conversation.)
8            THE WITNESS: Oh, this is. Sorry. You
9    didn't give me that. There's an extra one.
10           MR. MEADOWS: Oh, that's what I was looking
11   for. Thank you.
12           THE WITNESS: Okay.
13   BY MR. MEADOWS:
14   Q   So Exhibit 8 is a kind of a compilation of some
15       graphs that we pulled from your report and
16       reproduced here for ease of reference.
17           MR. BLANKINSHIP: I'm just going to object
18   as an incomplete exhibit.
19   BY MR. MEADOWS:
20   Q   And if we look at the -- at the top, I know it's
21       double-sided. You see the one that says, "Figure 5
22       Schuster Method Three."
23   A   Mm-hmm.
24   Q   And so because this is method three, this graph in

78 (Pages 306 - 309)

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 310

1    Figure 5 is plotting the rate that Eligo, the
2    variable rate that Eligo charged Ms. Schuster
3    against the prevailing market rate for her
4    particular market zone, correct?
5  A  Yeah.  RG&E utility in zone B.  Yeah.
6  Q  Right.  And the RG&E, the weighted average market
7    price is depicted in the blue line, correct?
8  A  I believe that -- give me a second.  Yes, that is
9    correct.
10 Q  All right.  And then we can compare that to Figure
11   9, which pertains to your damages, method four,
12   right?
13 A  Figure 9 is also out of my report, Figure 9?
14 Q  It is.  Yeah.
15 A  Okay.
16 Q  It's on page 84.
17 A  Or Schuster.  Yeah.
18 Q  Okay.  And what we see depicted in Figure 9 is the
19   rate, the variable rate that Eligo charged Ms.
20   Schuster plotted against the actual price that the
21   RG&E utility charged over the same period of time,
22   correct?
23 A  Correct.
24 Q  And if we look at the blue line in Figure 5 against

Page 311

1    the gold line in Figure 9, do you agree with me that
2    there are virtually no differences between those
3    two?
4        MR. BLANKINSHIP: Objection.  Vague.
5        THE WITNESS: There -- there are definitely
6    differences because the underlying calculation is --
7    is different.  But shape-wise, they -- they look
8    very close.  Yes.
9  BY MR. MEADOWS:
10 Q  Okay.  And the same exercise, if you turn the page
11   over or flip it, I should say, we've got the same
12   charts, but this time pertaining to Ira Brous.  So
13   at the top is the method three chart which compares
14   the rate that Eligo charged Mr. Brous against the
15   weighted average market price, correct?
16 A  Correct.
17 Q  And then in Figure 10, the price that Mr. Brous was
18   charged by Eligo is compared to the actual price
19   charged by Mr. Brous's utility, right?
20 A  The -- the price to compare.  Right.
21 Q  Yes, that's what I mean.  Yes.  Thank you.
22 A  Yes.  Yeah.  Yeah.  Yeah.  Yeah.
23 Q  And here again, if we look at the blue line in
24   Figure 6 and the gold line in Figure 10, would you

Page 312

1    agree with me that there are, if any differences at
2    all, they are very small, almost invisible to the
3    naked eye?
4        MR. BLANKINSHIP: Objection.  Vague.
5        THE WITNESS: Like -- like I said,
6    calculations are completely different, but the --
7    the shapes look very, very similar, yes.
8  BY MR. MEADOWS:
9  Q  And so for purposes of method three, by doing a
10   weighted average calculation that included the
11   utility --
12 A  Yeah.
13 Q  -- you ended up with a prevailing market price that
14   was almost exactly what the utility happened to
15   charge; isn't that right?
16       MR. BLANKINSHIP: Same objections.
17       THE WITNESS: Methodologically, they're --
18   they're completely different.  The mere fact, it
19   looks like that in this particular zone over this
20   period, a large percentage of customers, and I think
21   I have a table somewhere in my report, probably
22   nowhere, have chosen to get electricity service from
23   the utility rather than -- rather than the ESCOs.
24       And if that's the case, then the -- the

Page 313

1    relative weight attributed to the -- to the utility
2    rate is going to be much higher than -- than the
3    weights of the -- attributed to the rates charged by
4    the other ESCOs, by the mere facts of the situation
5    in the market definition that -- that, you know,
6    simply utility has 90 percent of the rate and 90
7    percent of the customers go to the utility.
8  BY MR. MEADOWS:
9  Q  I understand the rationale for it.
10 A  Yeah.
11 Q  My question simply is that by choosing that
12   particular way to do a weighted average to arrive at
13   the prevailing market price, you ended up with a
14   price curve that looks almost identical to the
15   utility price itself, correct?
16       MR. BLANKINSHIP: Objection.  Asked and
17   answered.
18       THE WITNESS: Again, yes, in that area,
19   because in that area over this period, utility had,
20   it sounds like, you know, like large percentage, 80,
21   90 percent of the customers, you know, pick the
22   utility.
23 BY MR. MEADOWS:
24 Q  Yeah.

79 (Pages 310 - 313)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

1   A    If -- if this was a different area where, you know,
2        30 percent of customers opted to procure, buy, get
3        electricity from -- from the incumbent utility, then
4        they would look completely different.
5   Q    Right.  And these graphs would also look completely
6        different if you plotted the prices that Ms.
7        Schuster and Mr. Brous paid against the prices
8        charged by other Eligo -- by other ESCOs that sold
9        green energy, wouldn't it?
10            MR. BLANKINSHIP: Objection.  Lack of
11       foundation.
12            THE WITNESS: Sorry, can you please repeat
13       it?
14   BY MR. MEADOWS:
15   Q    Yeah, sure.  If you replaced the prevailing market
16       rate as you've depicted it with a depiction of the
17       rates charged by other ESCOs in each zone that sold
18       green energy, those graph lines would look
19       completely different than they look now, wouldn't
20       they?
21            MR. BLANKINSHIP: Same objection.
22            THE WITNESS: You mean -- you mean if -- if
23       in my calculation formula, I defined the market to
24       exclude the incumbent utility, and define the market

1        only as the, let's say, 10 top ESCO competitors --
2   BY MR. MEADOWS:
3   Q    Right.
4   A    And -- and have done this.
5   Q    Right.
6   A    I have not done that calculation, but, you know, I -
7        - I think it's rational to assume that given that
8        these two are quite similar.
9            MR. MEADOWS: Okay.  Why don't we take a
10       few minutes?  I don't think we have very much more,
11       but I want to do a last --
12            THE WITNESS: Okay.
13            THE VIDEOGRAPHER: We are now going off the
14       record.  The time is 5:03.
15       (Whereupon, the parties go off the record.)
16            THE VIDEOGRAPHER: Okay.  We are now back
17       on the record.  The time is 5:14 p.m.
18   BY MR. MEADOWS:
19   Q    Mr. Macan, kind of harkening back to when you showed
20       us how you used the POWWR spreadsheets, I want to
21       ask, do you have any reason to believe that Eligo
22       used the POWWR spreadsheets in the same way that you
23       did?
24   A    I -- I don't know how they -- how they use it.  You

1        saw they were extremely intricate and complex, so.
2   Q    Okay.  I want to ask you about the underlying
3        calculations you made for methods two and three of
4        your damage calculation.  Let's talk about two.  Do
5        you, in your work, did you generate, you know,
6        specific work papers that show the actual
7        mathematical calculations that led up to your
8        damages numbers for method two?
9            MR. BLANKINSHIP: Objection.  Vague.
10            THE WITNESS: I'll answer, I think -- I
11       think I know what you mean.  No, because the -- the
12       calculation is so straightforward that I think, you
13       know, I have not produced any work papers because of
14       the description and the -- and the table is pretty
15       much where, you know, it's -- it -- it -- it's done.
16   BY MR. MEADOWS:
17   Q    Well, if I wanted to check your math on method two,
18       look -- is there any source that I could look at to
19       see exactly how you roll -- you know, kind of rolled
20       up to those numbers?
21   A    Yeah, I'm sure there are Excel files that I've used
22       to add numbers up, yes, if -- if that's what you
23       mean by that, yes.
24   Q    I mean, well, Excel or anything that you generated -

1        -
2   A    Yeah.
3   Q    -- and preserved that show that, those mathematical
4        --
5   A    Yeah.  I did not do the summation on a calculator
6        and -- and wrote it in.  Yeah.
7   Q    Okay.
8   A    So I -- I -- yeah.
9   Q    And you still have possession of those now?
10   A    I -- I believe so.
11   Q    All right.  And I asked you for method two.  I won't
12       ask you the same question for method three.  I take
13       it you've got the same -- whatever sort of documents
14       you have that support your calculations for method
15       two, you've got the same thing for three; is that
16       fair?
17   A    Yes.  Yes, I think that's right.
18            MR. MEADOWS: All right.  All right.  It's
19       been a long day.  Thank you for your time.  I don't
20       have any further questions for you.
21            THE WITNESS: Okay.
22            MR. BLANKINSHIP: I'm going to have a few
23       questions, but I wanted to confer with my colleagues
24       first, so I will be back as soon as possible.  You

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

Page 318

1    just hang tight.
2           THE WITNESS: Okay.
3           MR. BLANKINSHIP: Don't talk to these guys.
4           THE VIDEOGRAPHER: Off the record, Counsel?
5           MR. BLANKINSHIP: Yes, please.
6           THE VIDEOGRAPHER: We are now going off the
7    record. The time is 5:16.
8    (Whereupon, the parties go off the record.)
9           MR. MEADOWS: I'll be right back.
10          THE VIDEOGRAPHER: All right.
11          THE VIDEOGRAPHER: Okay. We are now back
12   on the record. The time is 5:26 p.m.
13          CROSS-EXAMINATION
14   BY MR. BLANKINSHIP:
15   Q   Mr. Macan, could you look at paragraph 65 of your
16       report, which is on page 32?
17   A   Yes.
18   Q   And can you read the second to last sentence that
19       starts, "Eligo's rate cap policy is also a one-way
20       street"?
21   A   "Eligo's rate cap policy is also one-way street,
22       allowing the company to gradually increase prices,
23       avoiding attrition from bill shock. It does not
24       allow for rate cap decreases."

Page 319

1    Q   Okay. And you recall that Mr. Meadows asked you
2        what support there was for your claim that this was
3        Eligo's policy?
4    A   I do.
5    Q   Okay. And if you look at the last sentence of this
6        paragraph, does that refresh your recollection about
7        the source for that claim?
8    A   As Eligo concluded in -- in service zones, without
9        reliable competitor information like New York, the
10       new rate cap should stay the same or increase by
11       more -- no more than 15 percent from the current
12       rate to maintain. That's where it came from.
13   Q   Okay. Thank you. Would you agree that sometimes
14       companies can have a policy, but that there might be
15       exceptions to that policy that are made from time to
16       time?
17   A   Yeah. I mean, that's reasonable.
18   Q   Okay. That doesn't mean it's not the company's
19       policy. It just means there might be a few
20       exceptions on occasion.
21   A   Correct.
22          MR. MEADOWS: Objection. Leading but go
23       ahead.
24          MR. BLANKINSHIP: Okay. That's all I have.

Page 320

1           MR. MEADOWS: Okay.
2           THE COURT REPORTER: Okay.
3           THE VIDEOGRAPHER: This concludes today's
4    deposition. We are going off the record at 5:27
5    p.m.
6           Total run time of media used is 6 hours 16
7    minutes, retained by Veritext.
8              (End Media 1.)
9
10   (Whereupon, the deposition in the above-entitled
11   matter concluded at 5:28 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 321

1       E R R A T A   S H E E T
2    RE: CASE NO.: 1:24-CV-01260
3    DEPOSITION OF:  EDO MACAN
4    PAGE  LINE     PRESENTLY READS          SHOULD READ
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

81 (Pages 318 - 321)

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

Page 322

1          C E R T I F I C A T E
2          I, EDO MACAN, hereby certify
3    that I have read the foregoing transcript of my
4    testimony given in the aforementioned matter, and
5    further certify that said transcript is a true,
6    accurate and complete record of said testimony.
7
8          _____
9          EDO MACAN
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 323

1          C E R T I F I C A T E
2    COMMONWEALTH OF MASSACHUSETTS
3    COUNTY OF MIDDLESEX, ss.
4          I, Melissa Lupo, a Professional Court Reporter
5    and Notary Public in and for the Commonwealth of
6    Massachusetts, do hereby certify that the foregoing deposition
7    of EDO MACAN, was taken by me on December 17, 2025.  The said
8    witness was satisfactorily identified and duly sworn by me
9    before the commencement of their testimony; that the said
10   testimony was taken audiographically and then transcribed
11   under my direction.
12          To the best of my knowledge, the within
13   transcript is a complete, true and accurate record of said
14   deposition.
15          I am not connected by blood or marriage with
16   any of the said parties, nor interested directly or indirectly
17   in the matter in controversy.
18          In witness whereof, I have hereunto set my hand
19   and Notary Seal this 5th  day of January, 2026.
20
21
22          *Melissa Lupo*
23          Melissa Lupo
24

82 (Pages 322 - 323)

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

[& - 20]

Page 1

| & | | | |
| --- | --- | --- | --- |

**&**

**&**   2:15 7:10
  83:18

**0**

**0**   296:3
**0.199**   129:16,19
**0.199.**   132:19
  133:7,24
**0.209**   129:9,10
  129:19 132:19
  133:7,23
**0.92.**   303:9,13
**00.5490**   149:23
**01260**   1:4 6:17
  321:2
**02142**   1:22

**1**

**1**   5:10,15 6:9
  6:10 57:14,15
  58:1,5 62:24
  82:4 128:22
  129:2 148:11
  148:16,19,24
  219:14 221:8
  261:16,22
  269:20 270:10
  271:10 275:13
  284:17,18
  297:14 299:15
  302:6 320:8
**10**   5:20 12:16
  12:17 15:1,12

39:4 110:14,15
135:5 303:13
305:21,22
306:12 309:6
311:17,24
315:1
**10/15**   286:5,6
**10/17/23**
  285:23
**100**   274:17
  308:3,4,12
**10007**   3:8
**101**   114:18
  115:1
**103**   5:11 114:7
  117:3
**104**   114:6,11,13
**10601**   2:18
**10:22**   81:22
**10:34**   82:1
**11/1/23**   299:11
**113**   5:12
**11:25**   120:3
**11:31**   120:6
**12**   115:2
  128:22 129:2
  249:19 252:1
  252:21 253:3,3
  279:12
**127**   5:13,14
**12:04**   139:4
**12:59**   188:17
**12th**   5:10 57:16

**13**   257:9,20
**130**   163:17
  164:3,8,20
  166:17 168:21
  168:21,22,22
  169:3 170:4,7
  174:22 224:17
  226:17 227:7
**131**   168:17,20
  190:10,11,14
  193:22,23
**132**   198:17
**135**   165:20
  229:6
**136**   238:18
**138**   229:12
  234:8
**13b**   146:16,19
  202:24 203:9
  206:7 207:8
  208:10 210:14
**13j**   249:19,23
  253:9 257:3
  279:7,15
**14**   128:15,15
  129:12
**142**   229:12
**148**   5:15
**149**   171:8
**14th**   2:6
**15**   105:22
  106:14 129:12
  135:22 136:1
  319:11

**151**   3:17
**154**   156:11,16
  156:23
**15th**   238:20,22
  239:4,15 285:4
**16**   320:6
**17**   1:24 6:3
  115:11,12
  295:22 298:23
  323:7
**173**   304:1
**19**   105:22
  106:14
**1996**   26:3
**1997**   37:5
**1:24**   1:4 6:17
  321:2
**1:55**   188:20
**1st**   5:18 256:18
  299:8

| 2 | | | |
| --- | --- | --- | --- |

**2**   5:11 62:24
  103:3,9,12
  104:24 105:5
  120:9,9,23
  302:5
**2.48**   298:7
**20**   12:21 27:16
  27:16 36:22
  42:8 103:18
  104:1 280:12
  280:13,24
  291:22 293:6

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[20-35 - 5:16]**

Page 2

**20-35** 5:11
103:10
**2000** 28:1
**2001** 28:1
**2006** 171:2
**201** 3:17
**2016** 5:18 82:9
256:18
**2017** 67:13
80:12 81:4
143:16,24
**2018** 67:14
135:22
**2019** 75:5,17
107:24 143:2
220:20
**2020** 107:24
**2020.there**
239:13
**2023** 63:18,20
64:16 67:16
80:12 81:4
82:13 284:20
285:1 286:3
**2024** 48:1
**2025** 1:24 5:10
6:3 47:23
56:23,24 57:16
323:7
**2026** 49:9
323:19
**20941** 323:22
**21** 103:17,22

**22** 92:8 104:24
105:4 106:13
**23** 92:8 104:24
105:2 135:23
**24** 27:17,17
136:1
**24.80** 302:3
**25** 26:13 33:7
36:17 38:10,13
57:4 167:21
278:5 286:24
**256** 5:17
**26** 55:5 56:10
**2600** 2:6
**2:47** 231:4

**3**

**3** 5:12 113:18
113:20 114:3
116:20 120:9
120:23 147:4
147:20 239:21
257:14
**30** 142:2
221:24 223:10
266:21 267:1,2
267:3 291:22
314:2
**30309** 2:7
**305** 3:7
**308** 5:19
**30b6** 154:6
**318** 5:5

**32** 124:11
296:21 318:16
**32.59** 296:20
**32.59.** 294:18
294:19 295:2
296:18
**323** 1:1
**33** 92:8
**34** 92:9 104:2
**35** 104:3,5,13
**36** 136:10
**39** 302:3
**3:03** 231:7

**4**

**4** 5:13 127:3,6
127:8,14 128:4
128:14 130:22
131:17 132:2,8
133:13 134:2
257:22
**40** 88:9
**404-602-4371**
2:8
**45** 188:14
**48** 302:5
**4:10** 284:9
**4:20** 284:12

**5**

**5** 5:14,20 47:15
63:10,11,19
64:20 66:20
67:11 80:24
127:4,10,11

128:4 129:11
129:16 130:22
131:17 132:1,7
133:13 134:2
146:1 217:14
239:21 250:17
250:21 251:6
251:18,23
252:4,5,6,10,16
252:19,20,24
253:3 261:14
261:17,18
262:10,22
264:7 265:6
309:6,21 310:1
310:24
**5.5** 151:22
**50** 1:20 6:18
96:6,7 159:11
222:2 267:4
**500** 47:15
201:1
**525** 47:15,15
**55** 164:5,6
**56** 190:10
**57** 5:10
**58** 234:9
239:23 242:2
288:1 298:24
299:4
**5:03** 315:14
**5:14** 315:17
**5:16** 318:7

**5:26** 318:12
**5:28** 320:11
**5th** 323:19

**6**

**6** 5:15,20 64:11
64:11,15,23
66:21 82:4
148:19 149:4
215:17 217:14
217:22 231:10
253:12,18,20
254:6,10,17
255:2,5,8,21
256:3,4,10,13
257:2,22 258:4
258:8,21,24
259:3,5,7,8,9
259:18 260:20
261:15 263:2
266:7 268:4
269:5,21
270:11 271:10
272:19 273:14
277:15 278:5
278:10 279:9
279:19,21
281:9,10,21
309:6 311:24
320:6
**6.3** 267:9
**6.38** 218:1
256:3,5 261:9
261:17 262:10

262:19,22
279:22,23
280:2 281:6
283:3
**6.38.** 261:18
**6.5** 259:5
**60606** 3:18
**62** 219:14
261:16,22
284:18 297:15
**65** 124:8,11,16
130:10,24
156:12 318:15

**7**

**7** 5:17 136:1,9
148:9 256:17
256:21,23
259:5 278:9
295:4,16
**7.5** 288:9
292:15 293:12
294:6 295:16
296:16
**71** 304:1
**75** 2:6
**750** 47:5,16
48:3,14 49:20
50:5 53:2,8,9
**76** 136:7,10
**7th** 3:7

**8**

**8** 1:2 5:4,13,19
127:8 132:2
147:4,19 309:2
309:4,5,14
**80** 313:20
**84** 135:7
310:16
**85** 135:7
**86** 88:9,15 91:8
91:19 92:4,10
93:20 94:24
99:20 100:16
104:21 110:21
111:15 116:4,9
116:23 119:8
123:20

**9**

**9** 5:14,20
127:11 132:1
135:5 303:9
309:6 310:11
310:13,13,18
311:1
**9.19** 303:8
**9.2** 303:11
**9.9** 303:11
**9.92** 303:10
**9.92.** 303:11
**90** 65:5 313:6,6
313:21
**910-476-7253**
3:10

**914-298-3290**
2:19
**92** 302:8
**98** 114:7
**99** 27:22 114:6
114:10
**99-104** 5:12
113:21
**9:02** 1:24 6:3

**a**

**a.m.** 1:24 6:3
81:22 82:1
**abbreviated**
26:9
**ability** 9:5
86:23 159:15
219:7 260:9
293:7
**able** 75:4 77:4
173:16 240:12
240:16,17
248:9 267:8
269:15 297:21
**abolished**
264:15
**above** 136:13
143:22 149:19
267:1 281:20
292:24 320:10
**abroad** 20:10
**absolutely** 47:1
274:14 275:14

| | | | |
|---|---|---|---|
| **absolve** 265:11 | **accountant** | **acronym** | 243:4,9 248:10 |
| **academic** | 41:4 | 236:24 | 278:15 296:13 |
| 169:17 | **accounted** | **acronyms** | 305:17 |
| **acceptable** | 220:9 273:21 | 144:15,16 | **adamson** 179:3 |
| 254:11 257:22 | **accounting** | **act** 98:6 | **add** 33:9,20 |
| 258:21 281:14 | 33:5 34:10,21 | **acting** 79:20 | 34:1,2 44:1 |
| 282:1,2,18 | 41:7,10,16 | **action** 6:23 | 90:16 259:24 |
| **acceptance** | 275:24 | 14:11 72:18 | 316:22 |
| 209:9 | **accrual** 246:13 | 77:15,23 80:1 | **added** 229:10 |
| **accepted** 41:7 | 297:6 | 84:5 147:6 | **adders** 217:11 |
| 41:10,16 60:10 | **accuracy** 92:9 | 166:4 178:9,16 | 217:15 |
| 61:2,11 | 100:15 110:20 | 273:4 | **adding** 212:15 |
| **access** 234:11 | 110:24 116:22 | **actions** 178:6 | 224:8 301:14 |
| 240:12 | 123:19 | **active** 66:21 | **addition** 12:16 |
| **accessing** | **accurate** 91:13 | **activity** 16:19 | 173:21,21 |
| 240:13 | 91:22 92:4,5 | 27:23 197:24 | 277:21 278:24 |
| **accident** 287:3 | 111:2,3,7 | **actual** 59:7 | **additional** |
| **accompanied** | 116:10 119:9 | 99:11 158:23 | 12:17 126:22 |
| 7:6 | 130:14 182:24 | 158:24 159:19 | 267:12 303:22 |
| **accordance** | 183:19 322:6 | 159:19 215:6 | **address** 190:14 |
| 98:10 121:7 | 323:13 | 235:5 310:20 | 198:17 |
| 250:19 | **accurately** | 311:18 316:6 | **addressed** |
| **account** 54:1,4 | 106:5 | **actually** 26:22 | 80:18 136:22 |
| 54:5 63:20 | **achieve** 88:1 | 28:6 47:1 | 180:4 264:20 |
| 64:17 65:2,13 | 200:12 | 58:23 70:7 | 307:14 |
| 67:16 82:12,20 | **acknowledged** | 71:4 95:19 | **addressing** |
| 98:19 101:17 | 97:2 | 99:11 101:15 | 172:20 |
| 107:18 110:1 | **acknowledging** | 107:15,24 | **adequate** |
| 152:11 159:6 | 153:20 271:3 | 127:1 128:4,6 | 217:18,19 |
| 185:1 212:10 | **acquire** 88:3 | 131:13 134:3 | 259:15 280:18 |
| 222:12 223:21 | 168:10 | 148:3 195:15 | **adjudicated** |
| 260:15 262:3 | **acquisitions** | 196:2,3 217:11 | 214:10 |
| 274:3 297:9 | 30:7 | 220:10 235:16 | **adjust** 49:8 |
| 304:17,18 | | 236:9 237:6 | 159:15 208:8 |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[adjust - amicable]**                                    Page 5

260:9
**adjusted** 49:1,4
  49:12 125:24
  125:24 147:24
  150:2,14 151:1
  151:24 152:8
  154:2 232:12
  246:14 256:2
**adjustments**
  299:2,3
**administer**
  6:22 7:23
**administrative**
  10:18 55:21
  225:19 262:12
  262:15 267:17
**admission**
  110:8 123:4
  203:13
**admit** 110:5,9
  120:12 121:5
  122:11
**admits** 88:15
  91:9 94:24
  99:23 112:8
  123:11
**admitted** 92:24
**adopt** 188:2
  253:12,18
  263:20,24
  264:11,13,13
  279:9,19
  282:19

**adopted** 264:7
  266:7 282:2
**adopting**
  282:23
**advantage**
  70:22 158:22
**advertise** 85:11
**advise** 18:19
  192:2
**advisory** 29:20
**advocate** 162:6
**affect** 76:13
  295:4
**affected** 291:18
**affiliation** 7:4
**aforemention...**
  322:4
**ago** 12:16
  21:17,18 25:4
  27:16,17 56:18
  73:23 121:23
  180:20 184:13
  283:4 290:3
**agree** 6:7 12:8
  67:23 84:23
  98:6 106:12
  116:8 120:10
  122:10 130:21
  134:17 137:17
  154:20 175:7
  186:8 199:5
  253:8 258:19
  266:11 269:18
  271:7 273:2

275:12 276:20
  293:2 311:1
  312:1 319:13
**agreeable** 67:9
**agreed** 160:11
  214:10 252:5
**agreement**
  148:24 154:12
  154:21 155:2
  161:14 195:7
  199:8 200:10
  228:20
**agway** 178:10
  178:16,20
**ah** 300:1
**ahead** 22:24
  31:7 32:16
  33:16 36:10
  57:21 88:12
  107:9 134:7
  155:23 170:9
  172:10 182:7
  182:11 202:20
  227:11 230:23
  288:5 309:4
  319:23
**airline** 308:19
  308:20
**ak** 294:22
**ak17** 294:22,23
  296:18 302:1
**ak4** 295:22
**al** 2:22 3:12

**allegedly** 108:7
**allocated** 56:2
**allow** 9:9 35:12
  97:8 100:11
  124:20 125:2
  125:10 130:11
  131:7 132:22
  318:24
**allowed** 67:24
  68:1 108:2
  126:21 142:17
  242:13 251:23
  277:13
**allowing**
  124:18 125:8
  209:21 283:24
  318:22
**allows** 218:5,10
**allude** 151:18
**alluding** 32:5,7
  66:24 80:21
  132:23
**alternative**
  153:7 156:2
  163:20 201:19
  214:4 269:10
  274:8
**altogether**
  12:21 99:4
  135:19
**american** 16:14
**amicable** 45:21
  46:14

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

[amount - apparently]                              Page 6

| | | | |
|---|---|---|---|
| **amount** 50:9 | **annual** 54:23 | 191:11 199:15 | 188:7 202:9 |
| 141:10 142:19 | 54:24 55:11 | 204:9 206:2,22 | 207:17 210:23 |
| 142:21 227:22 | 246:17 | 206:23 230:10 | 218:13 229:1 |
| 264:18 265:8 | **answer** 9:10,11 | 244:19 247:5 | 230:10 252:14 |
| 308:15 | 15:7,9,14,20 | 252:3 262:17 | 270:17 277:3,4 |
| **amounts** 55:13 | 19:2 22:13 | 270:6,20 273:3 | 277:8 280:4 |
| 71:19 220:13 | 24:12 25:7 | 275:4 280:8 | 282:5,16,22 |
| **ample** 145:24 | 27:3 30:9 34:7 | 281:3 283:20 | 283:9 288:18 |
| 251:7 259:15 | 34:8,17 35:8 | 283:24 291:15 | 290:8 313:17 |
| 277:18 | 37:22 39:24 | 291:19,20 | **answering** |
| **analogy** 253:23 | 40:10 41:22 | 292:17 295:3 | 29:23 33:16,19 |
| **analysis** 23:19 | 42:15 43:24 | 296:14 304:13 | 34:6 46:4 |
| 29:15 74:20 | 44:17 55:6 | 316:10 | 110:14 118:11 |
| 169:4 206:4 | 56:11 60:14,16 | **answered** 15:3 | 118:14,17,20 |
| 219:20 234:1 | 61:4,6 64:5 | 15:4,8,14 | 282:15 283:23 |
| **analyst** 189:17 | 65:4 68:4 | 26:24 39:8 | **answers** 19:7 |
| 248:24 | 78:23 83:10 | 41:11 44:15 | 100:14 115:17 |
| **analytic** 23:19 | 85:15 86:16 | 45:2 48:21 | **ante** 245:23 |
| 71:7 | 96:24 98:1 | 51:14 52:7,19 | **anticipated** |
| **analytical** 10:9 | 100:10 101:10 | 60:13 61:4,6 | 165:24 234:4 |
| 10:12,13 | 105:13,14,16 | 62:2 72:15 | 234:12 |
| **analytically** | 105:16 106:9 | 78:8 80:14 | **antitrust** 11:20 |
| 158:16 | 107:5,9 109:6 | 84:1 100:7,22 | 11:22 |
| **analyze** 105:23 | 112:1 117:1 | 106:22 109:4 | **anybody** 59:6 |
| 106:15 111:10 | 119:3,6,13 | 110:12 111:5 | 59:11,12 |
| **analyzed** 135:3 | 121:14,17,21 | 111:17 112:15 | 112:21 189:4 |
| 143:12 169:9 | 122:8,16,21,24 | 113:9 116:12 | **anymore** 69:23 |
| **ancillary** | 123:3 127:19 | 119:11 120:16 | **anyway** 104:14 |
| 234:13 297:17 | 131:16 132:20 | 122:15,20 | **apologies** 103:8 |
| **andrey** 3:5 7:15 | 133:19 135:16 | 123:8,22 | **apologize** |
| **andy** 3:15 7:6 | 140:2 144:24 | 130:16 167:4 | 114:12 288:13 |
| 88:21 | 163:8 165:2 | 176:13 177:21 | **apparent** 48:24 |
| **anecdotal** 51:1 | 173:5 186:2 | 178:18 183:3 | **apparently** |
| 92:21 109:24 | 187:6 188:8 | 185:11 186:1 | 36:6 |

| | | | |
|---|---|---|---|
| **appeals** 178:13 | **applying** | 276:9 282:9,14 | 130:15 162:21 |
| 178:14 | 201:13 210:20 | **arm** 16:20 | 166:3 167:3 |
| **appear** 186:11 | 258:23 269:4,9 | **aron** 74:18 | 176:12 177:20 |
| 204:22 | **appreciate** | **aron's** 189:3 | 178:17 183:2 |
| **appearance** 7:2 | 270:18 | **arrive** 50:5 | 185:10 186:1 |
| 7:4 | **appropriate** | 165:5,10 169:5 | 188:7 202:8 |
| **appeared** | 7:13 36:9 | 313:12 | 206:23 207:17 |
| 179:11 | 181:16 182:21 | **arrived** 155:3 | 210:22 218:12 |
| **appears** 153:2 | 183:16 185:22 | **article** 170:8,12 | 226:11,23 |
| 164:12 169:3 | 200:12 205:2 | 171:1 172:13 | 228:24 230:10 |
| 174:22 195:9 | 210:19 221:15 | **ascertain** | 230:22 244:23 |
| 196:14,19 | 228:8 246:6 | 247:13 | 252:13 259:17 |
| 232:1,24 | 280:21 | **asia** 26:14 | 273:11 274:16 |
| **append** 133:10 | **approved** | **aside** 25:11 | 277:2 280:3 |
| **appending** | 53:22 118:7 | **asked** 15:2,13 | 282:4,22 283:8 |
| 224:21,23,24 | **approves** 118:6 | 20:13 21:6 | 283:22,22 |
| **apples** 263:6,6 | **arbitrary** 96:9 | 24:16 26:23 | 288:13,17 |
| 305:2,2 | **arbitration** | 28:12 39:7 | 289:13 290:3,7 |
| **applicable** 1:14 | 179:22 | 41:11 44:14 | 304:11 313:16 |
| 74:1 75:4,22 | **arch** 223:21 | 45:1 48:20 | 317:11 319:1 |
| 83:23 84:24 | **area** 83:14 | 49:14 51:13 | **asking** 8:18 |
| 85:20 86:2 | 194:20 305:6 | 52:6,18 60:12 | 25:9 32:9 40:4 |
| **applications** | 313:18,19 | 61:3 62:1 70:4 | 40:5 41:14 |
| 18:1 | 314:1 | 72:14,15 73:22 | 52:14 54:13 |
| **applied** 204:11 | **areas** 19:18 | 78:7 79:12 | 55:12 80:17,23 |
| 251:22 252:4,7 | 20:9 194:24 | 80:13 83:24 | 80:23 87:20 |
| 261:8,14,21 | 305:9 | 90:22 96:21 | 97:17 101:7 |
| 267:11 280:24 | **argue** 181:13 | 100:7,22 105:6 | 110:24 112:2 |
| **applies** 43:18 | **arguing** 35:6 | 106:21 109:3 | 116:13 117:20 |
| 79:4 | **argument** | 110:11 111:4 | 121:20 122:18 |
| **apply** 243:17 | 90:17 162:11 | 111:16 113:8 | 131:19 155:24 |
| 252:11,16 | **argumentative** | 115:2 116:12 | 184:23 196:3 |
| 253:17 259:2 | 110:12 111:5 | 120:15 122:14 | 205:24 206:4 |
| 275:11 | 116:12 275:18 | 123:8,21 | 218:24 221:18 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

[asking - back]

Page 8

248:17 275:11
276:3,16,17
287:6 293:13
303:5
**assertion** 89:2
125:1 293:3
**assessment**
92:23 237:17
242:11 281:10
296:11
**assignment**
69:3 70:2
**assistant** 4:5
**associated**
198:23 199:24
244:10
**associates**
23:14 28:24
**assume** 72:5
130:18 134:21
155:5 163:14
163:15,19,20
164:21 210:2
236:3 243:19
244:6 276:4
280:20 281:16
295:15 315:7
**assuming**
133:22
**assumption**
143:13,16
166:24 198:1
243:21 244:12
244:15 250:11

268:15 277:19
289:12,18
**assure** 250:10
**asymmetry**
70:19,23
**atlanta** 2:7
**attached**
148:13,24
**attempt** 141:17
289:2
**attempted**
86:13 209:1
**attention** 63:10
67:4 88:8
114:18,24
124:15 136:6
**attorney** 42:11
43:7,8,19 45:5
46:2 67:3
73:15 96:20
167:17 182:5
204:7 276:11
**attorneys** 21:13
22:3 214:2,3,3
**attributed**
313:1,3
**attrition**
124:20 125:9
318:23
**audio** 6:6
**audiographic...**
323:10
**auditing** 10:24

**auditors**
274:21
**audits** 10:17
**august** 67:13
81:4
**authorities**
177:9,10
**authorized**
6:22
**automated**
138:14 300:2
300:20
**automatically**
288:16 290:6
292:16
**available** 74:15
137:4 151:12
153:10 159:6
168:2 249:11
**average** 251:23
252:2,21 253:4
310:6 311:15
312:10 313:12
**avoid** 126:13
**avoiding**
124:19 125:9
318:23
**aware** 46:20,21
65:1,11,14,17
67:22 73:23
76:19 77:5
79:14 83:1,13
94:6,17 97:20
98:23 100:1,3

100:19 113:23
124:24 129:22
130:3 139:8
140:9 142:1
175:1 178:5,9
188:5,9 202:18
268:21

**b**

**b** 5:8 300:1,1
310:5
**back** 20:11
26:2,3 33:24
34:12 61:17
66:17 67:11
73:22 81:24
82:3 92:14
104:5,13,21
107:14 120:5
127:7 136:4
139:3 143:16
155:8 159:15
185:6,8 188:19
193:22 224:5
231:6,9 232:8
245:1 248:9
255:11 264:19
267:15 278:3
279:7 284:11
284:17 290:3
294:6,18
296:15 301:15
304:22 315:16
315:19 317:24

318:9,11
**backed** 174:7
**background**
32:22 45:10
73:10 124:9
170:15 284:13
294:4 300:23
308:22 309:7
**bad** 103:7
114:1,1 243:8
**ballpark** 51:11
**bank** 54:1,4,5
**bar** 36:24
**based** 19:16
24:5,10,17
26:5,22 29:2
54:20,21 58:18
67:23 69:12,13
72:2,3 74:10
86:18 97:10
98:3 99:4
101:1 102:15
132:16 133:8
141:4,7,8
153:10 154:20
159:12 173:11
184:4 190:24
193:23 194:5,5
204:1 234:20
236:4 240:24
242:11,20
243:7 245:11
248:4 260:19
268:14,15

275:22 281:3,8
281:8 286:4
295:13 296:11
**basic** 62:15
63:8 145:11
168:12 210:24
210:24 211:10
211:11,21
212:8,14,19
218:7,19 219:4
269:14
**basically** 13:10
23:11,19 30:2
43:11 74:13
86:9 92:21
95:24 125:15
126:6,10 145:8
145:15,17
152:20 156:5
158:16 166:10
169:15 200:20
214:13 216:8
217:10 220:14
227:18 229:13
235:20 241:3,6
241:18 249:10
264:22 265:11
268:23 273:3
275:1,2 281:7
294:1 305:15
305:21 306:5
307:16
**basis** 49:11
134:23 157:21

161:22 165:23
186:21 192:24
200:15 208:2
213:12 217:1
220:8 221:15
259:19 295:18
304:3
**bates** 239:17
285:16,23
**bathroom**
119:20
**bear** 177:9
**beating** 86:11
**becoming**
26:17 242:22
**beginning**
56:21 88:14
115:11 147:5
**behalf** 1:6,12
6:12 14:16,22
15:18 16:17
18:1 20:13
109:6
**behave** 44:4
**behaved** 99:13
110:1
**behavior** 36:9
**belenky** 3:5
7:15,15 300:7
**believe** 15:4,8
20:2 24:5
27:19 39:22
45:3 47:15
48:2,4 50:11

54:6 56:20
60:3 62:10
65:17 66:14
74:10 83:15,19
91:21 92:3,5,7
92:19,22 94:19
101:3 104:1
106:4 109:16
111:6,6 114:5
126:3,20 144:4
147:20 148:9
160:23 179:2
210:19 222:5
224:14 251:8
251:21 286:7,8
310:8 315:21
317:10
**believed** 108:19
108:19
**bell** 185:23
186:5 193:10
257:7
**benchmarks**
278:11
**beneath** 231:23
**benefit** 159:23
**best** 21:5
122:23 127:17
170:19 191:8
219:7 245:11
247:20 250:18
250:22 251:15
293:7 323:12

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

**[better - blankinship]**                                Page 10

| | | | |
|---|---|---|---|
| **better** 112:22 | **blanking** | 77:8 78:7,14 | 164:5,23 165:8 |
| 278:10 | 171:16 172:14 | 79:6 80:13 | 167:3 168:20 |
| **beyond** 292:24 | 172:22 | 81:7,15 82:21 | 175:12 176:12 |
| **biggest** 292:3 | **blankinship** | 83:4,7,24 | 177:20 178:17 |
| **bill** 5:16 87:3 | 2:14,15 5:5 7:8 | 84:14 85:2,12 | 179:13,18 |
| 88:5 124:20 | 7:9,9 11:3,11 | 85:22 86:4 | 180:7,17 181:2 |
| 125:10 148:20 | 15:2,13,19 | 87:9,16 91:14 | 183:2,20 |
| 318:23 | 18:23 20:18 | 94:12,15,18 | 185:10,24 |
| **billable** 50:19 | 22:1,3,6,12 | 97:5,23 98:12 | 187:5,15 188:6 |
| **billed** 55:18 | 24:11 26:23 | 100:6,21 102:5 | 188:13 189:11 |
| 136:5,13 | 27:3 30:14 | 102:13 103:15 | 191:10 192:8 |
| **billing** 10:22 | 31:17 32:2,13 | 103:18 104:3,5 | 196:16 197:3 |
| 50:2 137:10 | 33:11,15,18,23 | 106:21 107:4,8 | 197:13 199:11 |
| **bills** 51:21 52:1 | 34:5,15,23 | 109:3 110:11 | 202:8 204:13 |
| 52:5 87:7 | 35:3,8,14,23 | 111:4,16 113:8 | 205:21 206:17 |
| **bio** 12:7 26:2,8 | 36:3,8,15 38:1 | 114:7 116:11 | 206:22 207:16 |
| **bit** 21:7 32:22 | 38:7,22 39:7 | 118:11,14,19 | 210:8,22 |
| 50:4 124:16 | 39:15,20,24 | 118:23 119:2 | 211:14,22 |
| 148:6 181:10 | 40:9,16,22 | 120:15,22 | 212:23 213:2 |
| 207:19 231:13 | 41:11,18 44:14 | 121:8 122:7,14 | 214:18 215:14 |
| 254:23 261:13 | 45:1 46:11 | 123:7,21 125:4 | 216:17 218:12 |
| 285:22 295:9 | 48:20 50:22 | 128:9 130:1,15 | 218:20 219:6 |
| 300:12 305:20 | 51:13 52:6,18 | 131:2 132:3 | 219:15 220:22 |
| **black** 285:20 | 55:3,14 56:9 | 133:17 134:7 | 222:14 224:10 |
| 287:6 | 56:19 58:7,16 | 138:19,21 | 226:6 228:11 |
| **blacked** 286:14 | 59:2,8,14,21 | 140:1,7,13,18 | 228:24 230:2,9 |
| **blackened** | 60:12,15 61:3 | 141:2,20 142:7 | 238:10 241:12 |
| 291:24 | 62:1,18 63:24 | 142:12 143:9 | 244:17 252:13 |
| **blanche** 184:6 | 65:3,15,22 | 143:19 144:23 | 254:13 255:10 |
| **blank** 120:20 | 68:3,10,18,23 | 146:9 148:13 | 255:13,24 |
| **blanket** 95:3 | 69:10 70:14 | 148:16,18 | 257:12 264:3 |
| 120:20 121:13 | 71:16 72:14 | 150:5,17 151:5 | 265:23 266:15 |
| 121:21 | 73:2 74:4 75:6 | 154:13 156:14 | 266:23 269:23 |
| | 75:24 76:22 | 160:4 162:17 | 270:3,13,20,23 |

Edo Macan                                                December 17, 2025
Brous v. Eligo Energy, LLC

**[blankinship - business]**                                    Page 11

| | | | |
|---|---|---|---|
| 271:13,24 | **bottom** 117:20 | **broad** 32:18 | **brown** 308:1 |
| 272:8,23 | 128:15 287:12 | 50:5 161:9 | **bucket** 228:15 |
| 273:18 274:23 | 290:21 | 215:7 216:14 | 230:6 |
| 275:16 276:7 | **bought** 223:18 | **broaden** 24:17 | **buckets** 160:10 |
| 277:2,5 280:3 | 226:4,11,15 | **broader** 228:20 | **bucks** 71:21 |
| 282:4,8,21 | **bounce** 232:8 | **broadway** 1:22 | 135:22 |
| 283:8,16 284:7 | **box** 149:11,19 | 2:17 3:7 6:18 | **budgeting** 50:7 |
| 288:17 290:7 | 150:23 151:19 | **broke** 139:6 | **building** |
| 292:11 300:15 | 151:20 152:2,7 | **brokers** 145:6 | 199:17 |
| 308:8 309:17 | 152:19 153:17 | 169:11 | **buisness** |
| 311:4 312:4,16 | 153:18 196:10 | **brought** 57:18 | 197:24 |
| 313:16 314:10 | 196:14,19 | 78:24 144:10 | **bulk** 11:2 29:14 |
| 314:21 316:9 | 201:9 231:15 | 279:3 | 29:24 30:1 |
| 317:22 318:3,5 | 231:23 | **brous** 1:6 2:21 | 293:22 |
| 318:14 319:24 | **boxes** 149:9 | 3:11 6:11 | **bullet** 147:4 |
| **bless** 191:5 | **boy** 146:16 | 63:12,15 65:1 | 240:1 |
| **blood** 323:15 | 202:24 | 66:2 67:12,19 | **bumping** |
| **blue** 117:13 | **breadth** 191:6 | 68:8,21 70:5 | 269:10 |
| 310:7,24 | **break** 45:12,17 | 70:13 72:5,24 | **bunch** 89:14 |
| 311:23 | 46:9,17,18 | 72:24 75:3,4 | **burkett** 3:3 |
| **bluntly** 95:22 | 67:8 81:19 | 75:21 76:18 | 7:17 22:16 |
| 98:22 | 119:20 121:4 | 77:5,20 78:5 | 23:22 56:13 |
| **bodies** 12:24 | 138:20,21,24 | 78:12,13,24 | 66:5 |
| **body** 43:11 | 177:5 185:15 | 79:13 80:11,24 | **business** 11:19 |
| 251:1 268:20 | 187:24 221:8,9 | 81:3,12 135:24 | 11:24 26:16 |
| **boils** 282:7 | 229:3 230:22 | 136:22 137:2 | 36:13,17 37:13 |
| **bonus** 54:22,23 | 284:3 300:19 | 142:4 143:1 | 43:15 50:21 |
| 54:24 55:2,12 | **breath** 283:19 | 299:14 311:12 | 117:10 168:7 |
| **bonuses** 56:2,3 | 292:18 | 311:14,17 | 179:10 180:5 |
| **book** 170:13 | **brief** 81:19 | 314:7 | 180:15 181:14 |
| 171:1 172:13 | 182:14 | **brous's** 63:20 | 182:18 183:13 |
| 172:15 | **briefly** 104:21 | 64:21 65:12 | 185:19 186:4,9 |
| **boston** 29:4,5 | **bring** 46:7 | 66:10 78:11,11 | 186:15 187:2 |
| | | 311:19 | 187:19 188:3 |

193:9 201:4
202:14 205:7
211:1 225:11
250:14 254:3
255:1 260:21
263:8 265:1
269:19 270:9
277:11 278:9
280:15 281:6
281:12,17
286:24
**businesses** 26:5
267:18 275:15
277:1
**button** 287:11
**buy** 31:2 88:1
137:3,7 176:22
176:23 226:23
227:10,12,21
314:2
**buyers** 19:15
19:23
**buying** 168:8
194:12 201:4,7
202:14,18,20
205:11 213:16
225:7 226:2,3
227:15 308:19
308:20
**buys** 174:16
175:2,2

**c**

**c** 2:1 3:1 4:1 6:1
322:1,1 323:1
323:1
**c.a.** 1:4
**calculate**
203:19 204:3
208:1,2 275:21
307:6
**calculated**
98:10 99:16
157:20 160:19
161:21 186:21
200:15,18,19
213:12 217:1
229:10 232:23
248:4 278:13
278:21 289:15
289:16 304:7
304:21 305:16
**calculating**
76:14 99:11,22
165:22 203:10
259:18 262:11
275:21 295:23
304:3
**calculation**
50:10 71:24
100:3 179:23
200:17 208:6
210:6 218:11
219:9 222:20
228:9 239:24

241:4 249:17
251:16 256:9
262:6,7 267:16
267:21 272:12
274:1,10 289:6
294:1 305:3,19
306:4,14 311:6
312:10 314:23
315:6 316:4,12
**calculations**
10:17 135:11
204:10,20
205:3 207:11
228:4 236:4
238:15 268:13
274:4 284:23
286:3 292:8
297:21 312:6
316:3,7 317:14
**calculator**
317:5
**calendar** 47:19
49:11
**california** 26:6
**call** 7:3 56:7,7
56:12 114:18
136:6,23
138:17 157:19
160:24 175:17
179:21 213:5
246:4 306:16
306:17
**called** 1:12
42:19 65:12

178:10 182:5
192:1 194:2,3
234:2,23,24
254:8 305:10
**calling** 138:18
165:19 194:14
300:6
**calls** 11:24
39:15,20
162:18 175:13
179:13 181:2
196:17 205:22
213:2 229:1
276:8
**cambridge** 1:20
1:22 6:18
**cancel** 65:13
68:1
**canceled** 63:21
64:16 65:1
67:16
**cancellation**
64:21
**cap** 96:1
124:17,21
125:2,2,7,10
126:20 129:24
130:11,11,23
131:7,8,18
132:19 133:6
133:14 134:18
136:6,11,17
254:11 263:24
264:8 265:22

266:2,7 281:7
299:13 318:19
318:21,24
319:10
**capable** 276:5
**capacity** 14:14
17:5 19:4
20:21 32:17
41:20 74:22
223:23,23
224:2,3,15
234:14 236:22
297:16 302:8
303:5,8
**capital** 244:10
**capitalized**
146:19
**capped** 265:6
280:12
**caps** 124:12
127:1 128:6
131:10,23
132:16,18
133:23 134:3
136:5
**captured**
270:10
**career** 16:4
33:7 37:8
38:10 152:17
193:11
**carries** 260:12
**carrying** 105:2

**carstensen** 6:20
**cartensen** 4:4
**case** 6:15,17
10:7 11:2 12:4
14:11,18,19
17:12 22:4,7
22:10 23:8,9
24:22,23 25:10
25:11,15 30:13
38:20 40:5
42:9,13,16
43:13 44:5,20
47:5,17,21
48:16 51:9
53:17 56:6
58:6 62:16
63:8,13 65:20
66:11 71:4
72:2,10,18
73:1,5 74:6,18
77:15 90:18
91:7 98:4,21
126:24 135:20
135:24 142:1
143:6 146:5
152:24 154:12
156:10 160:17
178:23 179:1,8
179:8,21 180:2
180:19,23
181:1,10,11,21
181:22 182:14
183:1 184:19
184:24 185:2,9

185:18 193:17
205:18,20
211:6 214:3
225:12 236:5
236:20 237:12
247:24 248:2
258:15,19
263:19 265:9
266:12,20
271:22 272:18
273:5 277:20
280:22 292:19
296:19 298:2
307:18 312:24
321:2
**cases** 12:19
15:23 16:1,2
19:16 21:13,14
21:21 23:1,3,5
23:5,10 24:2,8
24:16,18 25:6
29:20 48:6,8
88:24 89:16,17
135:8 138:13
155:7,9 191:15
191:17 239:7
243:11 268:8
296:20
**catch** 186:16
198:3,21
292:18,20
**catches** 198:4
**categories**
220:2 269:20

270:10 271:9
271:11 273:13
275:14 276:24
**categorize**
141:11
**category** 160:8
162:23
**caused** 111:12
**causes** 106:1,16
160:23
**cease** 211:6
**ceiling** 254:10
282:19,24
**cell** 242:13
243:23 291:20
294:21 295:22
296:20 301:12
302:1
**cells** 240:6,9
288:19 291:18
296:12
**cent** 235:16
302:8
**center** 1:20
300:21
**cents** 151:23
302:5
**ceo** 118:1,2,3,3
118:5
**certain** 17:10
62:15 63:7
**certainly** 9:10
30:20 33:11
42:9 60:8,23

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

[certainly - civil]

Page 14

76:13 77:13
83:21 84:23
86:6 106:10
108:10 132:6
138:13 143:6
172:15 181:20
184:4 196:24
197:21 221:11
229:16 236:4
238:12 241:18
249:7 269:2
278:7
**certificate**
145:14,17,19
**certificates**
144:12,14
**certification**
41:5
**certified** 41:4
**certify** 322:2,5
323:6
**chain** 78:4 79:3
**chair** 294:15
**chance** 114:21
191:9
**change** 49:17
66:21 67:1
76:17 105:19
105:24 106:15
108:5,14
111:10 125:22
247:3,4,8
288:14,20
292:14,16

293:11,13,14
295:13 296:19
296:20
**changed**
107:24 108:1
118:4 247:1
260:10 288:15
290:4,5 291:21
**changes** 94:9
97:2 113:5
122:2 123:19
248:20 288:22
296:3 297:12
297:24 298:6
298:12,20
**changing**
291:16 295:3
296:2
**characteristics**
141:8
**charge** 18:20
44:10,18,21
47:18,22 50:11
50:24 51:2,3
86:22 96:13
99:9 108:20,21
110:2 134:18
136:17 162:8
208:1 209:12
212:11 231:20
232:2,17 233:2
233:22 252:20
265:19 312:15

**charged** 48:6
51:7 52:17
67:12 69:18,21
72:7,21 74:14
147:8 151:12
151:13 153:13
165:22 192:19
213:8 224:2,3
235:15 252:22
254:22 274:12
304:2 310:2,19
310:21 311:14
311:18,19
313:3 314:8,17
**charges** 51:12
198:22 199:24
**charging** 47:12
47:17,21 48:13
48:15,18 49:16
50:17 71:14,14
86:3 208:8
211:17,19
253:2 265:12
**charles** 23:14
28:24 29:3,6
29:16 48:2
50:12
**chart** 135:7
149:9 311:13
**charts** 311:12
**check** 248:9
261:23 316:17
**checking** 10:17
71:21 79:13

**chicago** 3:18
**chief** 99:1
112:19 113:2
113:24
**choice** 141:6
241:1 268:12
308:12
**choices** 170:10
**choose** 64:17
**choosing** 37:8
313:11
**chose** 64:21
106:8 176:2,5
176:6 259:5,7
**chosen** 312:22
**circuit** 178:13
178:14
**circuit's** 178:15
**circumstantial**
80:5
**citation** 92:7
104:24
**citations** 89:3
**cite** 88:20
104:22 116:2
124:23 208:14
**cited** 170:7
**citing** 88:24
105:14 110:8
**civil** 1:16 13:21
13:24 14:4,16
14:21 15:23
40:18

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[claim - commonwealth]**                              Page 15

**claim** 42:5
  92:17,19 319:2
  319:7
**claiming** 42:9
**clarificates**
  161:17
**clarification**
  131:15 261:9
**clarified** 92:6
**clarify** 53:7,15
  54:17 79:10
  133:11 163:19
**clarity** 308:21
**class** 14:11
  72:18 77:15
  79:24 84:5
  147:5,7 151:10
  166:4 178:6,9
  178:16 260:16
  263:9 269:1
  273:4
**classes** 33:7
**classifying**
  194:14
**clean** 158:16
**clear** 19:7
  25:10 52:15
  86:19 96:10
  126:7 136:2
  154:15 155:10
  163:10 164:19
  184:23 201:1
  263:5 274:8
  287:11,12

**clearly** 99:15
  157:24 161:20
  297:4
**click** 287:11
  290:23
**clicking** 291:2
**client** 29:20
  208:17 295:15
**clients** 17:9
  20:3,5 47:18
  53:12 208:20
**close** 138:15
  273:23 278:15
  300:3 311:8
**closed** 264:15
**closer** 294:9
**closest** 17:11
  238:21 239:15
  285:4
**club** 22:24
**clumsy** 87:23
**coffee** 302:10
**cognizant**
  211:19
**colleague** 23:13
  23:24 47:7
  179:3 182:6
  188:4
**colleagues** 9:17
  51:3 317:23
**college** 70:13
**color** 26:18
  33:9 90:16

**column** 128:16
  128:20,21,24
  149:11
**columns**
  247:14 293:21
  293:24
**combination**
  168:11 212:20
  305:12
**combined**
  12:21
**come** 18:17
  21:23 23:4
  45:6 49:22,23
  56:7 168:4
  213:21 223:13
  249:4 274:6
  278:3,15 305:2
**comes** 17:8,22
  20:5 53:24
  109:15 167:10
  190:18 191:2
  220:17 261:4
**coming** 78:1
  95:11 99:10
  142:19,22
  159:2 260:4
  278:1 290:12
**commands**
  296:17
**commencem...**
  323:9
**commensurate**
  53:4 262:24

  265:12
**comment**
  299:24
**comments** 36:1
  60:1,3,18
**commercial**
  19:15,23
**commercially**
  69:20 253:10
  258:5 259:9
  274:19 275:8
  276:4 279:8,17
  280:1,20 283:5
**commission**
  12:15 13:9
  30:4 54:21
  74:11 250:24
  251:17 268:17
**commissions**
  38:15
**commodities**
  191:3
**commodity**
  141:13 161:5
  167:9 175:4
  198:13 201:2,6
  208:7
**common** 43:18
  45:4 205:16
  218:7,18 219:4
**commonsense**
  205:18
**commonwealth**
  1:18 323:2,5

[communicated - concluded]                              Page 16

| | | | |
|---|---|---|---|
| **communicated** 209:14 | 311:20 | **competitor** 308:5 319:9 | 116:8 117:5 122:4,12 |
| **communication** 98:23 102:18 | **compared** 71:23 76:20 | **competitors** 51:2 211:13 | **compliant** 105:24 106:16 |
| **communicati...** 23:23 | 77:6 83:22 152:2 281:21 | 304:17 305:24 315:1 | 111:11 |
| **companies** 38:14 198:3 | 308:12 311:18 | **compilation** 309:14 | **complicated** 249:14 |
| 277:13 319:14 | **compares** 311:13 | **complain** 291:13 | **complied** 105:10 |
| **company** 16:16 16:20,22 26:21 | **comparing** 86:2,6,18 | **complaint** 69:17 90:8,8 | **complies** 106:19 |
| 27:18 28:18 | 186:19 | 90:11 | **comply** 109:2 |
| 36:19 37:11 | **comparison** 66:19 84:12 | **complete** 176:10 322:6 | 220:14 227:23 |
| 48:1 50:3 51:3 | 236:6 263:7 | 323:13 | **component** 297:16,16,17 |
| 53:12,22 55:22 | 307:5 | **completely** 45:24 47:3 | **components** 176:3 |
| 55:24 84:6 | **comparisons** 135:11 305:3 | 73:18 98:17 | **compound** 212:23 276:7 |
| 110:9 118:2 | **compensated** 47:4 53:1,2,4,8 | 101:16 112:3,6 | **comprehension** 109:23 |
| 124:19 125:8 | 54:15 246:9 | 206:14 261:3 | **comprehensi...** 238:8,12 |
| 125:18 196:24 | 273:8 | 261:10 292:24 | **computer** 33:2 |
| 208:1 254:1 | **compensation** 54:20 251:7 | 312:6,18 314:4 | **concede** 218:8 |
| 257:21 262:18 | 259:15 261:7 | 314:5,19 | **concept** 30:12 |
| 269:3 273:5,6 | 280:18 | **completeness** 153:21 | 124:11 214:17 |
| 273:7 277:16 | **compete** 137:21 | **complex** 316:1 | 216:14 |
| 280:7 318:22 | 137:24 138:3,7 | **compliance** 94:11 96:20 | **concerned** 15:23 135:9 |
| **company's** 319:18 | 141:17 304:24 | 97:22 98:8 | **conclude** 205:1 |
| **comparable** 29:7 48:2 | **competing** 138:11 304:12 | 99:7 100:18 | 220:9 221:15 |
| 50:13 | 304:13 308:3 | 107:14 112:19 | **concluded** 168:16 182:17 |
| **comparator** 250:18,22 | **competition** 211:10 | 112:23 113:2,6 | |
| **compare** 64:10 135:12 265:3 305:5 310:10 | | 115:15,22 | |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[concluded - consulted]**                                        Page 17

183:13 203:5
319:8 320:11
**concludes**
320:3
**conclusion**
39:16,21
162:18 167:14
169:5 175:13
176:9 179:14
181:3 190:21
196:17 200:2
205:22 213:3
229:1 258:4
276:9 278:19
**conclusions**
184:10 263:21
**concrete**   198:7
219:8
**conditional**
287:10 293:19
**conditions**
148:1 150:3,14
151:2 152:9
153:2 154:2,4
154:10 179:10
180:5,16
181:15 182:18
183:14 185:20
186:4,9,15
187:2,4,10,19
188:3 193:9
232:13
**conduct**   43:12

**conducting**
277:23
**confer**   317:23
**conference**   3:3
3:5 4:5 7:3
138:15 300:3,5
300:8
**conferencing**
300:21
**confidence**
289:5
**confidential**
20:6
**configuration**
297:12,23
298:6
**configurations**
242:4 248:20
287:17
**configure**
238:22
**configured**
240:1
**configuring**
238:23 242:3
**confirm**   81:2
248:13 299:17
**confirmation**
208:20 209:8
**confirms**
145:14
**conform**   146:6
**confused**
206:24

**confusing**
107:7 299:16
**conjecture**
42:24 43:2
77:11,20 84:6
84:10 97:13
111:19 244:5
**conjectured**
295:17
**connected**
323:15
**connecticut**
24:6
**connecting**
300:22
**connection**
58:6 130:13
250:6
**conscientious...**
67:3
**conservative**
268:13 280:6
**consider**
130:13 177:8
195:5 307:23
**consideration**
60:4,19 184:18
205:19 208:11
210:20 218:10
277:20 278:1
**considerations**
203:14 218:16
228:3,7

**considered**
86:15 132:10
223:15 286:7,9
**considering**
207:9
**consistent**
16:20 68:6
96:14,17
115:22 181:14
182:20 183:15
216:8
**consisting**
260:16
**constrained**
227:18
**constraints**
43:17
**construct**   205:5
274:20 276:23
**constructed**
275:12
**construction**
188:2
**consult**   209:6
**consultancies**
29:17 36:20
**consultancy**
11:20
**consultant**
15:21
**consultants**
29:22 50:10
**consulted**
17:10 170:15

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

[consulting - control]                              Page 18

| | | | |
|---|---|---|---|
| **consulting** 4:5 | 162:4 165:14 | 151:16,17 | 161:12,12 |
| 10:19 11:20 | 165:17 166:8 | 152:15 153:3,7 | 162:23 190:23 |
| 17:7 36:21 | 167:6,7 168:6 | 153:8,11 | 191:9,14,22 |
| **consumer** 5:16 | 169:8 173:20 | 154:18 156:24 | 192:5,21 193:7 |
| 148:20 | 174:12 175:24 | 157:8,19,19,24 | 193:15 264:8 |
| **consumers** | 178:1 191:20 | 158:6 160:1,3 | 264:12 |
| 18:20 175:11 | 193:21,21 | 160:24 161:3,4 | **contractual** |
| **consummerate** | 194:11 195:6 | 161:10,11,13 | 43:16 93:8,9 |
| 162:9 | 198:8 200:22 | 162:14,15 | 95:21 96:18 |
| **cont** 3:1 4:1 | 201:3 202:11 | 163:3,5,9,21 | 99:14 101:17 |
| **contacted** | 202:15 212:2 | 164:12 165:12 | 107:18 108:20 |
| 49:13 78:12 | 213:14,15 | 167:24 169:20 | 110:2 153:13 |
| **contain** 147:22 | 220:12 225:4 | 171:20 175:8 | 155:15 156:3 |
| 180:15 199:4 | 283:11 | 175:16 179:11 | 183:24 184:2,4 |
| 200:3 235:3 | **contextualized** | 186:10,12,17 | 184:7,8 187:1 |
| **contained** | 244:16 245:9 | 187:13 190:15 | 187:18,20 |
| 241:7 242:18 | **continue** 6:7 | 192:3,5,13,17 | 193:7 198:18 |
| 279:1 | 239:23 264:24 | 193:21 194:7 | 205:5 208:22 |
| **containing** | 301:6 | 195:10,13,23 | 209:15,16 |
| 193:1 236:24 | **continuing** | 195:24 196:10 | 219:11 220:17 |
| 240:5 | 46:14 | 197:1,11,18 | 223:12 250:9 |
| **contains** | **contract** 42:17 | 198:9 201:22 | 274:9 275:21 |
| 153:21,23 | 94:11 96:1,15 | 202:13 204:4 | 275:22 278:14 |
| 214:23 | 97:22 98:8 | 207:23,24 | **contractually** |
| **content** 287:15 | 99:15 100:18 | 212:11,19 | 72:7 108:2 |
| 293:20 | 102:3 106:1,2 | 213:7,11 214:5 | **contrary** |
| **context** 20:23 | 106:16,17,19 | 215:14,15 | 109:20 185:19 |
| 21:1 23:21 | 107:19 109:2 | 216:9 219:9 | 272:4 |
| 65:6 69:3 | 111:12,13 | 231:9 233:8 | **contributing** |
| 73:11,13,15 | 112:24 113:7 | 238:1 274:5,11 | 115:4 |
| 93:15,23 98:19 | 120:14 121:7 | 274:11 276:14 | **control** 10:24 |
| 111:20 112:4,7 | 122:4,13 146:8 | **contracts** 42:10 | 34:13 36:6 |
| 115:1 119:17 | 147:2,14 148:4 | 105:11 152:16 | 85:9 87:14 |
| 123:1 156:8 | 148:7 150:9,11 | 160:9,10,14 | |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

| | | | |
|---|---|---|---|
| **controlled** | 29:1 31:11 | 219:24 220:21 | 129:13,24 |
| 249:1 | 33:1 39:13 | 221:12 225:23 | **corresponds** |
| **controversy** | 41:1 47:5,6 | 227:3 229:15 | 129:4 145:19 |
| 323:17 | 52:2 53:18,19 | 231:17 232:6 | **corroborated** |
| **conversation** | 53:21,23 54:24 | 233:3,16,17,23 | 254:20 |
| 46:15 124:9 | 58:14 60:11 | 233:24 234:5,6 | **cost** 86:9 96:6 |
| 284:13 308:22 | 61:2 62:16 | 235:6,8,9 | 141:12 145:19 |
| 309:7 | 63:13 67:14,15 | 240:3,7,11 | 146:2 158:3,14 |
| **conversations** | 67:18 74:3 | 241:8 242:6 | 158:24 159:11 |
| 6:5 | 81:5,9 82:13 | 243:21,24 | 161:11,12,14 |
| **convinced** 91:5 | 87:4,5 100:5 | 244:2 247:21 | 165:24 166:13 |
| 91:7,12 134:11 | 106:20 107:23 | 252:12 253:2 | 166:14 168:9 |
| 296:9 | 108:14 113:16 | 253:15 254:12 | 176:17,19 |
| **convoluted** | 114:6 115:15 | 261:16 262:8,9 | 181:15 182:20 |
| 249:15 | 124:13 129:10 | 265:22 266:14 | 183:15 185:21 |
| **cool** 22:21 | 129:17,18,21 | 266:22 267:5 | 191:2 192:15 |
| **coordinates** | 130:19 133:12 | 267:10,19 | 192:23 194:1,2 |
| 294:20 | 134:19 135:2 | 269:17 270:12 | 194:3,10 195:5 |
| **copies** 57:18 | 137:13,13,14 | 270:14,22 | 195:14,14 |
| **copy** 25:1 57:5 | 137:19 138:11 | 271:12 272:22 | 196:1,5,14 |
| 57:22 58:5,9 | 143:4,18 | 279:22 284:20 | 200:9 202:16 |
| 58:13 103:19 | 144:16,19,20 | 285:1,2,6,19,24 | 202:19,22 |
| 104:9 148:23 | 146:8,22 | 287:20 288:11 | 205:12 211:3 |
| **corner** 231:17 | 147:16 149:18 | 297:20 304:5 | 222:12,21 |
| **corporate** | 150:3,16 157:1 | 307:4 310:4,7 | 229:8,10,11,17 |
| 16:18 | 161:1 164:18 | 310:9,22,23 | 233:9,9,11,16 |
| **corporation** | 169:6 170:8 | 311:15,16 | 233:18,19 |
| 171:9 | 174:20,21 | 313:15 319:21 | 234:21 238:2 |
| **correct** 9:17,18 | 178:24 179:1 | **correctly** 31:10 | 240:23,24 |
| 10:9 11:17,18 | 190:16 194:3 | 154:8 | 241:3 244:10 |
| 12:1,5,6,11 | 196:15 197:2 | **correspond** | 259:19 260:14 |
| 13:1 15:1 16:7 | 199:1,10 | 296:13,14 | 260:14,18,22 |
| 16:9 20:17 | 201:12 203:2 | **corresponding** | 260:23 262:2 |
| 22:1,2,5 28:3,3 | 216:11 219:21 | 128:20 129:9 | 265:21 267:12 |

Edo Macan                      December 17, 2025
Brous v. Eligo Energy, LLC

**[cost - crucial]**                                    Page 20

| | | | |
|---|---|---|---|
| 268:2 269:4 | 236:3,5,8,12,17 | **counsels** 23:24 | 301:3 302:11 |
| 271:11 272:11 | 250:2 253:1 | 189:18,23 | 302:15,18,21 |
| 273:13 277:12 | 255:7,21 256:5 | **count** 28:20,20 | 303:1,16,19 |
| 284:19 289:22 | 260:4,5,10 | **counterparties** | 309:1 320:2 |
| 289:23 290:2 | 261:2,8,14,21 | 44:2 | 323:4 |
| 295:19,21 | 262:3,5,7 | **country** 31:4 | **court's** 182:14 |
| 297:16,16,17 | 267:15 268:9 | 194:20 | 184:18 185:6 |
| 298:7 302:6 | 268:18,19 | **county** 323:3 | **courts** 177:10 |
| **costing** 159:14 | 269:19,21 | **couple** 13:4,6 | **cover** 181:17 |
| **costly** 280:15 | 270:9,11 271:9 | 14:1 16:1 | 182:22 183:17 |
| **costs** 48:23 | 272:18 273:8 | 32:22 45:10,22 | 257:6 269:22 |
| 55:19,21,24 | 273:15,20 | 61:20,23 97:13 | 270:12 |
| 88:1 135:14 | 274:21 275:14 | 120:8 144:6 | **coverage** 222:1 |
| 152:12 156:7 | 275:24 276:24 | 201:12 303:22 | **covered** 55:24 |
| 157:22 158:13 | 277:21,22 | **course** 13:20 | 279:2 |
| 159:1,19 | 278:20 293:9 | 24:24 88:12 | **cpa** 41:1,3,8,12 |
| 160:20 161:23 | 297:14 | 90:5 157:3 | 41:15 |
| 162:2,5,10 | **counsel** 3:16 | **court** 1:3,18 | **crafting** 90:17 |
| 166:1,5 169:15 | 7:2,24 22:16 | 6:16 7:22 8:1 | **creating** 93:7 |
| 181:17 182:22 | 47:1 49:13 | 8:13 39:12,18 | **credibility** |
| 183:17 190:16 | 89:9 90:10,22 | 40:6,13,20 | 74:24 |
| 193:22 194:6,7 | 95:5 99:1 | 103:6 113:19 | **criteria** 158:8 |
| 194:16 195:9 | 105:7 147:5 | 114:10 127:5 | **critical** 159:8 |
| 195:11,22 | 151:9 154:24 | 138:23 148:10 | 263:12 |
| 196:15,19,20 | 155:4,12,18,22 | 178:13,14 | **criticism** |
| 197:19 198:10 | 155:24 164:22 | 180:24 181:10 | 206:13 |
| 198:15 201:17 | 166:4 167:1 | 181:11 183:1 | **criticize** 206:7 |
| 208:3 213:9 | 189:4,6 221:22 | 183:12 185:1 | 207:8 210:14 |
| 217:2 219:19 | 241:21,21 | 185:17,17 | **cross** 5:2 |
| 225:15,15 | 248:14 250:5 | 186:6 187:24 | 318:13 |
| 229:22 233:6,7 | 283:7,10 | 188:1 245:4,7 | **crossed** 256:7 |
| 233:11 234:3 | 291:10 294:14 | 255:12,14,18 | **crucial** 162:10 |
| 234:12 235:5,5 | 303:4 318:4 | 255:20 256:16 | 304:19 |
| 235:17,20 | | 300:9,17 301:1 | |

Veritext Legal Solutions
800.808.4958                                    770.343.9696

**crucially** 70:11
**crystal** 164:19
**cup** 177:15
**current** 28:23
  29:13 319:11
**currently** 11:16
**cursor** 290:23
**curve** 313:14
**customer** 25:23
  42:17 67:19
  68:9,17 73:24
  76:21 77:7
  80:12 81:1,4
  81:12 82:15
  83:3,16,21
  87:2 97:22
  141:12 146:7
  147:2,14 148:3
  148:24 160:2
  161:13 162:15
  164:12 170:9
  171:20 172:9
  173:10 175:8
  179:11 190:15
  192:3 194:7
  195:9 197:11
  200:10 201:22
  308:11
**customer's**
  154:1
**customers** 44:8
  44:12 68:1
  70:20,24 71:3
  85:1 86:2,7,17

86:20,22 87:6
88:2,4 115:6
125:16,21
134:18 136:24
137:2,12,22
138:1 139:9,13
139:14,18,23
140:10,11,23
141:9,9 144:2
147:8,23
151:11 159:22
162:8 166:6
171:8,13 175:3
181:18 182:23
183:18 191:22
208:1,9 209:2
209:9 210:3
217:20,23
222:7 232:3,17
233:2 234:23
246:2 251:8,11
251:12,21
253:23,24
254:1,4,5,21
255:3 259:13
259:14,16
260:7,12,16,24
261:11,11
263:1,9,12,13
263:17,18
265:12 269:1,6
269:7 272:21
273:6 277:11
277:14 280:11

281:19,19,21
281:22,23
312:20 313:7
313:21 314:2
**cut** 34:21 46:3
  104:9 300:7
**cv** 1:4 6:17
  12:13 25:2,2
  26:7 321:2

|  |
| --- |
| **d** |

**d** 2:14 5:1 6:1
**d.cartensen** 4:4
**damage** 76:14
  204:10,19
  205:3 207:11
  228:4 234:1
  235:8 238:14
  239:24 249:17
  262:7 267:16
  267:21 292:8
  316:4
**damages**
  154:20 157:4
  219:20 248:3
  273:14 274:20
  275:11,13
  276:23 278:13
  278:20 289:15
  289:16 295:23
  303:24 310:11
  316:8
**data** 153:10
  158:12,17,22

158:23 159:6
229:9 234:16
236:8 241:6
247:16,18
262:20 280:14
280:17 287:1
289:4,7,9,10,11
289:12,18,19
**date** 51:8 75:19
  125:17 170:12
  170:24 171:2
  285:22 286:4
  299:8
**dates** 75:14
  158:17
**dave** 215:23
  244:22
**david** 2:3 7:5
**day** 31:6 32:16
  79:22 145:24
  170:9 172:10
  202:20 227:11
  236:18 238:20
  239:4 253:7
  297:10,10
  317:19 323:19
**deal** 19:17 70:9
  171:12 173:11
  195:13,24
**dealing** 42:20
  43:4,23 174:7
  190:22 193:5
  202:12

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**dealings**  78:19
**deals**  171:19
**dealt**  20:8
  23:18,24 185:7
  191:16 193:12
  237:14 238:6
**deane**  4:4 6:20
**december**  1:24
  6:3 323:7
**decide**  79:2
  139:9,15,23
  140:23 243:10
**decided**  68:16
  69:12 72:17,24
  77:22 78:5
  79:1 80:11
  81:3,12 82:19
  248:21 260:20
**decides**  87:2
**decision**  49:10
  159:5 166:10
  166:11 178:15
  268:16
**decisions**
  177:10
**decrease**
  129:23 130:22
  133:15,23
**decreased**
  133:6
**decreases**
  124:21 125:3
  125:11 130:11
  131:8 132:22

318:24
**decreasing**
  126:13
**deem**  96:14
  228:7
**deemed**  173:13
**deems**  261:7
**deep**  194:10
**def000907**  5:13
  127:8
**def000908**  5:14
  127:11
**def024595**
  285:13
**default**  50:17
**defend**  13:12
**defendant**
  14:17,22 15:18
**defendants**  1:9
  1:14 2:11 3:20
  7:6
**defending**
  268:11 272:18
**define**  146:23
  211:23 216:5
  224:7 314:24
**defined**  146:6
  147:3 304:11
  305:9 314:23
**definitely**  57:4
  182:8 311:5
**definition**
  147:15 149:16
  150:15 151:3

224:9,22
  228:18 229:23
  313:5
**definitional**
  190:9
**definitive**  17:12
  18:8,11 127:23
  291:20
**definitively**
  92:13
**degree**  32:23
  32:24 33:3,5
  34:10,20 36:13
  36:16 37:1,24
  38:5 41:24
  77:23
**degrees**  33:6
**delivered**
  245:20 246:3,7
  246:12
**delivery**  239:9
**demand**  29:22
**demonstrate**
  108:8 133:4
  265:1
**department**
  94:10 95:13
  97:3,21 98:8
  100:4,18
  101:14 102:3
  102:12 105:23
  106:14 107:13
  107:13 108:19
  109:1,10

111:10 113:6
  117:5 122:3
**dependent**
  184:12 212:18
**depending**
  117:10 175:5
**depends**  142:14
  142:15,15
  186:17
**depicted**  310:7
  310:18 314:16
**depiction**
  314:16
**deposed**  125:14
  126:5
**deposition**  1:12
  5:11,12 6:11
  6:18 8:22 9:15
  13:21,23 14:15
  34:13 58:1,4
  66:10,12,16
  82:4 88:21
  89:1 90:1 92:8
  103:9,13 105:4
  106:13 113:20
  114:4,5 119:7
  120:9 121:2,16
  134:5 149:4
  154:9 179:20
  188:23 190:1,4
  190:5 320:4,10
  321:3 323:6,14
**depositions**
  254:19

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[deregulating - disclosed]**                                    Page 23

| | | | |
|---|---|---|---|
| **deregulating** | 118:5 132:7 | **differ** 47:22 | **differentiating** |
| 37:7 | 134:20 171:15 | **difference** | 141:18 |
| **derivative** | 172:7,23 | 75:12 76:3,7 | **differently** |
| 167:24 169:11 | 173:12,16 | 201:21 233:15 | 69:16 122:21 |
| **derived** 142:4 | 251:21 252:3 | 261:1 307:18 | **difficult** 74:10 |
| 143:7,17 | 254:16 256:2 | 308:14 | **dig** 261:13 |
| **describe** 10:15 | 256:14 259:21 | **differences** | **digits** 144:7,8 |
| 64:21 170:8 | **determination** | 114:16 311:2,6 | **diligence** |
| 239:24 250:21 | 152:18 218:18 | 312:1 | 109:13 |
| **described** | 219:3 221:16 | **different** 11:21 | **direct** 5:2 8:14 |
| 107:12 168:15 | 268:22 | 31:3 32:15 | 19:4 21:22 |
| 203:4 278:19 | **determine** | 48:7 61:7,10 | 23:9 24:3,5,22 |
| **describes** 12:7 | 240:17 253:17 | 62:9 64:24 | 25:11 80:21 |
| 106:13 | **determined** | 96:22 110:14 | 88:8 178:22 |
| **describing** 91:2 | 49:19 55:2 | 110:15 124:6 | 179:9,11 |
| 106:5 108:9 | 149:12 152:3 | 128:1 131:24 | 181:11,13 |
| **description** 5:9 | 152:21 196:12 | 138:4,4 155:14 | 184:2,9,17 |
| 73:16 171:6 | 201:9 216:10 | 155:14 160:8 | 185:2,18,20 |
| 182:24 183:19 | 231:24 232:5 | 165:13 174:9 | 187:10,11,20 |
| 316:14 | 232:22 236:12 | 182:12 184:9 | 187:23 193:4 |
| **despite** 100:1 | 251:6 252:15 | 186:14 187:13 | **direction** |
| 185:18 197:10 | **determining** | 192:7 194:24 | 323:11 |
| 267:7 275:3 | 218:6 | 217:11,15 | **directions** 91:4 |
| **detail** 10:15 | **developed** | 228:3 235:17 | **directly** 87:7 |
| 34:1,2,4 42:15 | 252:19 | 241:3 242:19 | 297:22 323:16 |
| 69:7 152:7 | **developers** | 257:14 260:11 | **director** 11:17 |
| 183:24 184:16 | 105:18 | 260:23 261:10 | **disabled** |
| 246:19,24 | **developing** | 275:9 278:16 | 291:23 |
| **detailed** 234:12 | 16:22 235:7 | 296:9 299:22 | **discipline** 38:5 |
| 251:3 | **devil's** 162:5 | 299:22 304:24 | **disclose** 49:14 |
| **details** 20:7 | **devise** 153:11 | 304:24 305:8,8 | 235:14 |
| 33:20 78:18,21 | 153:12 | 305:9 311:7 | **disclosed** 74:3 |
| 79:19 80:4 | **dex008057** | 312:6,18 314:1 | 166:14 208:17 |
| 99:4 101:3 | 258:11 | 314:4,6,19 | 222:6 223:9 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

[disclosure - earlier]

Page 24

**disclosure**
209:2
**disclosures**
55:5 56:11
**discovery**
203:6 249:13
287:1 289:10
**discrepancy**
260:2
**discrete** 141:6
**discretion**
108:3 162:12
162:16 212:12
**discretionary**
54:22,23,24
55:2 56:2
**discuss** 28:7
43:21 305:12
**discussed** 31:6
60:4 73:4
101:3 229:11
**discusses**
183:24
**discussing**
102:20
**discussion**
63:11 64:12
90:5 151:20
**display** 286:18
286:23 287:8
**displayed**
285:18 286:11
286:15 299:15

**dispute** 62:14
63:4 113:4,10
184:7 202:13
**dissatisfied**
69:17 72:20
**district** 1:3,3
6:16,16 180:24
181:10,11
185:17 188:1
**divided** 303:13
**divined** 234:3
**division** 29:18
**dmeadows** 2:9
**document** 88:3
90:14 127:15
149:5,6 153:23
182:4 254:8
256:22 257:1
257:13 258:7,9
258:19,20
279:4 281:15
282:18
**document's**
257:15
**documents**
65:7 66:13
73:6 89:10
90:10 102:16
120:23 124:2
126:24 127:18
127:20 128:4
129:23 130:12
131:23 132:17
203:6 239:11

239:22 241:20
249:13 256:11
258:10 317:13
**doing** 29:7,8
35:16 105:19
145:6 204:10
205:8 214:14
227:3 260:15
284:2 290:14
296:17 300:18
312:9
**dollars** 268:2
302:4
**dominant**
141:4,14
**door** 49:5
233:20
**double** 309:21
**doubled** 135:23
**doubt** 128:7
173:15
**dozen** 13:7
14:2,3 16:2
21:3,5,15
**dozens** 38:15
**dr** 72:5,5 74:18
77:20 79:13
**draft** 66:22
95:11 101:13
**drafting** 59:7
60:9
**drafts** 59:18,22
60:2 61:17,20

**drawing**
193:14,18
**drink** 217:21
**drop** 96:7
**dropped** 84:7
96:3
**drug** 9:2
**due** 109:13
**duke** 16:5,8,10
16:23 17:1
27:13,14,24
28:4,13,17,22
**duly** 8:11 323:8
**duty** 42:20 43:4
43:23 44:3,6,7
44:12,17,20,23
**dynamic**
140:17

**e**

**e** 2:1,1 3:1,1 4:1
4:1 5:1,8 6:1,1
321:1,1,1
322:1,1 323:1
323:1
**earlier** 16:4
76:12 82:8
84:13 121:2
160:1 174:16
179:20 196:9
220:3 224:5
226:11 231:16
232:13 249:16
259:17 281:13

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

284:16
**earn** 259:13
267:8 269:16
277:13
**earning** 71:20
126:19 216:15
**ease** 309:16
**easier** 86:7
97:12 126:9
**easiest** 145:18
**easy** 74:17 75:1
**eat** 273:16
**economic** 11:20
29:17 36:20
42:13 50:10
77:12 159:3
180:1 213:24
218:19 219:3,4
295:18
**economically**
205:9 209:23
210:4 246:13
251:15 253:11
253:18 258:5
259:10 274:19
275:8 276:4,17
276:19,22
278:12,21
279:9,17 280:1
280:20 283:6
297:3
**economics** 33:3
35:1 37:24
38:11,21 39:6

39:12,19 70:13
71:5 156:23
159:4 210:24
211:10,11,21
212:8,15,19
218:8 263:14
269:14 271:7
**economist** 33:8
36:18 37:21
38:4,9,11,18
40:8,14 155:20
193:12 200:16
201:15,21
202:5 205:6
214:24 272:12
**economist's**
177:22
**economists**
11:21 36:23
37:5,12 202:2
**econone** 4:5
7:20 9:17 10:4
10:5,21 11:16
11:17,19 12:7
26:8 28:18,23
29:8,13,16
51:9 53:18,21
54:4,5,15,20
56:6,8 61:18
**econone's**
11:24 53:17
**edits** 61:1
**edo** 1:12 5:3,10
6:11 8:10,20

57:15 321:3
322:2,9 323:7
**effect** 200:12
**effective** 5:17
256:18
**effects** 247:3
**effort** 88:15
91:9 93:2,2
95:1,4 98:9
99:23 101:19
106:17 109:1
109:12 110:5
110:10 112:9
120:13 121:6,6
122:12 123:12
275:3 279:4
**efforts** 247:20
**eight** 114:8
121:12 135:21
298:24 309:3
**either** 26:5 81:9
92:1 93:7 99:8
125:18 137:9
139:18 140:21
152:13 206:10
207:13 208:19
210:17 222:7
225:1 228:15
235:21 237:20
285:3 294:12
**elaborate** 45:22
46:1,2 47:2
112:1 157:16
173:16 191:1

292:19
**elaborates**
154:8
**elaborating**
154:9
**electric** 87:3
**electrical** 32:24
**electricity**
17:15,19 18:6
18:21 67:13
71:23 85:11,20
136:24 137:3
137:19 139:7
141:13 142:3
143:7,17 147:9
151:12,13
156:9 168:7
169:16,20
172:10 174:19
175:10 190:19
190:23 191:5
194:1 197:6,8
198:12,15
212:5,9,10,18
225:21 231:21
232:3,18 233:3
233:10 236:9
266:13 307:17
307:24,24
308:4,7 312:22
314:3
**element** 158:20
**elements**
101:24 175:21

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

**[eligo - ended]**                                    Page 26

| | | | |
|---|---|---|---|
| **eligo** 1:8,8 2:10 | 158:24 160:2 | 273:16 274:12 | **embarrassing** |
| 2:10 3:19,19 | 162:7,15,16 | 277:1,14 | 22:22 |
| 5:17 6:13,14 | 165:22 166:5 | 280:13 281:11 | **embedded** |
| 7:7 10:7 14:11 | 174:16 175:10 | 282:18 289:9 | 240:9,16 |
| 22:4,7,10 49:5 | 186:12 187:13 | 289:19 304:2 | **embroiled** |
| 63:16,20 64:16 | 195:6 196:24 | 304:12,13 | 271:21 272:5 |
| 65:2,12 67:12 | 197:19 200:7 | 305:7 306:1 | **emission** |
| 67:19,24 68:9 | 203:6,13 206:7 | 307:6,18 310:1 | 144:14 |
| 68:16 69:23 | 206:13 207:8 | 310:2,19 | **emphasize** |
| 70:20,22 71:13 | 208:10,24 | 311:14,18 | 86:10 |
| 72:21 76:20,21 | 209:5 210:15 | 314:8 315:21 | **employed** |
| 77:6 79:1 | 215:9 216:14 | 319:8 | 11:16 16:5,11 |
| 80:12 81:1,3 | 221:23 222:8 | **eligo's** 42:17 | 17:4 28:19 |
| 82:9,12,15,19 | 222:21 223:9,9 | 67:24 81:14 | 167:14 169:5 |
| 83:2,21,22 | 229:9 231:20 | 102:3 108:18 | **employees** |
| 84:11,24 85:5 | 232:2,17 233:2 | 124:17 125:1,7 | 109:19 125:14 |
| 85:5,6,9,18 | 233:9 234:4,12 | 125:14 128:6 | **enable** 293:19 |
| 86:1,3,12,17 | 234:19,22 | 129:23 130:10 | **encompass** |
| 87:2,6,13 | 235:10,21 | 131:7,23 | 215:8 216:14 |
| 88:15 91:9 | 236:8,20 | 134:24 135:8 | **encompasses** |
| 92:24 94:24 | 237:11 240:21 | 135:15,17 | 32:19 107:1 |
| 97:2,20 99:22 | 240:21 244:16 | 146:5 148:3 | 152:14 |
| 100:4,16,19 | 245:9 246:8,11 | 158:12 161:13 | **encompassing** |
| 105:8 106:19 | 248:14 254:6 | 165:24 171:4 | 305:13 |
| 107:24 110:1,5 | 255:6 256:13 | 190:15 203:5 | **encrypted** |
| 112:8,16,17,21 | 256:17 258:20 | 212:17 217:20 | 241:11 |
| 113:24 120:12 | 259:18 260:6 | 217:21 238:19 | **endeavor** |
| 121:5 122:11 | 260:12,19 | 252:11 253:21 | 292:23 |
| 123:11 124:12 | 261:6 265:17 | 254:8,12 | **ended** 37:8 |
| 128:4 134:17 | 266:12 267:8 | 256:11 260:19 | 84:4 90:21 |
| 136:5,12,17,24 | 268:1,3 269:3 | 277:20 281:6,8 | 158:24 181:23 |
| 142:2 143:2,5 | 269:15,19 | 281:14,24 | 239:14,20 |
| 144:18 147:2 | 270:9 271:8,21 | 284:19 318:19 | 312:13 313:13 |
| 148:24 158:23 | 272:5,20 | 318:21 319:3 | |

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

**energy** 1:8,9
2:10,11 3:19
3:20 6:13,14
7:7 13:8 20:9
21:22,22 24:3
24:5,22 25:11
30:3,7,22 31:3
33:8 36:18,21
37:3,13 38:13
38:15,17,20,21
39:6 71:9,12
83:18 128:18
139:22 142:19
142:22 143:7
144:1,12
145:12,16,19
145:21,23
146:3 158:4
160:13,14
166:14 167:20
167:21 169:16
174:16 176:17
176:20 178:23
179:9 181:11
181:14 184:17
185:2,18
187:12,20,24
191:21 192:15
194:24 196:22
197:2 200:6,9
212:5,6,17
224:15 225:14
225:20 227:11
233:15 234:4

234:13 235:5
235:17 236:17
264:1 265:8
266:8,21 290:2
294:17 295:19
295:21 297:16
298:7 302:6
305:22 314:9
314:18
**energy's**
179:11 185:20
**engaged** 17:24
260:6
**engagement**
10:6,9 12:3
20:6 39:3 49:5
56:5,5 172:6
181:22 197:22
236:20 237:11
**engagements**
17:21 18:3
20:4 29:18,19
**engineering**
33:1
**enroll** 87:2
**enrolled** 63:15
67:12 82:9
**enron** 27:19
**ensure** 88:16
91:9 93:2
94:11 95:1
97:22 98:8,9
99:23 100:18
105:9 106:18

109:1 110:6
112:9 113:6
120:13 121:6
122:3,12
123:12
**ensures** 107:14
**ensuring** 16:17
16:18 112:23
**entails** 107:1
**entire** 77:7
266:20 287:12
**entirely** 260:18
260:22
**entitled** 320:10
**entity** 26:21
194:11 224:1
227:20 237:11
**entries** 129:13
**entry** 128:21
**environmental**
227:19
**equal** 136:11
251:9,13
263:11 280:23
**equates** 256:3
**equivalent**
145:15
**errata** 7:12
**esco** 5:16 16:23
16:24 17:4,7
17:10,14 19:8
19:11,12 20:14
20:16 21:2,12
24:1,8,22

25:11 86:8
87:22 137:10
139:11,14,15
139:24 140:11
140:12,24,24
148:20 169:12
171:20 174:12
175:2,3 178:10
178:16 186:9
191:8 192:1,5
192:7,7,13,17
192:19,21
193:14 194:11
194:13 200:22
201:3 202:13
205:11 208:5
210:2 213:15
220:12 225:13
226:2 227:21
233:19 264:16
278:8 305:16
306:6,8,10
308:3 315:1
**esco's** 253:1
**escos** 19:23
21:20 24:10,16
24:19 44:5
137:21,24
138:3,7,10
140:22 141:16
142:10,17,21
143:6 171:12
171:13 173:11
176:22,22

| | | | |
|---|---|---|---|
| 178:7 191:22 | **evaluating** | **example** 31:8 | **exchanges** |
| 202:18,18,19 | 158:13 | 59:18 61:12 | 246:2 |
| 208:19 252:20 | **evaluation** | 63:15 85:19 | **exclude** 81:11 |
| 264:23 265:16 | 281:5 | 126:15 139:10 | 81:16 174:22 |
| 265:16 266:8 | **everyone's** | 159:8 165:21 | 314:24 |
| 268:18 304:13 | 202:20 305:5 | 192:12 199:7 | **excludes** |
| 304:23 305:8 | **evidence** 51:1 | 267:24 273:4 | 274:21 275:13 |
| 305:21,22,24 | 69:14 72:23 | 296:1 298:4 | 276:23 |
| 306:3,12 307:7 | 86:14 92:21 | 308:6 | **excluding** |
| 307:13,19 | 109:24 172:17 | **examples** 98:21 | 225:24 |
| 312:23 313:4 | 260:6 278:6 | 134:14 170:1 | **exclusion** |
| 314:8,17 | **ex** 5:15 57:15 | 198:2 208:14 | 176:10 |
| **especially** | 103:9 113:20 | **exceed** 272:19 | **excuse** 135:24 |
| 194:12 | 127:8,11 | 273:14 | 230:13 |
| **esquire** 2:3,4 | 148:19,19 | **exceeded** | **executive** |
| 2:14 3:3,5,15 | 245:23 256:17 | 138:15 300:3 | 113:24 257:24 |
| **essence** 184:7 | 309:5 | **excel** 235:1 | **exercise** 241:5 |
| 306:14 | **exact** 13:4,16 | 241:17 292:3 | 260:15 268:6 |
| **essentially** | 14:1 51:16 | 293:6 316:21 | 311:10 |
| 153:3 273:24 | 52:14 55:16 | 316:24 | **exhibit** 5:10,11 |
| **estimate** 21:5 | 61:20,22 62:3 | **exception** | 5:12,13,14,15 |
| 153:12 159:11 | 62:4 208:2 | 13:15 245:15 | 5:17,19 57:14 |
| 159:13 191:8 | 307:12 | 257:23 | 58:1,5 82:3 |
| 191:13,18 | **exactly** 52:24 | **exceptions** | 103:3,12 |
| 280:6 284:19 | 61:14 71:11 | 319:15,20 | 104:11,18 |
| 304:15 | 89:19 125:12 | **excerpt** 5:11,12 | 105:5 114:3 |
| **estimated** | 125:15 195:21 | 103:9 113:20 | 116:20 117:2 |
| 297:14 306:2 | 235:10 293:15 | 114:4 | 120:9,23 |
| **estimates** 237:7 | 312:14 316:19 | **excerpts** | 127:14 128:14 |
| **et** 2:22 3:12 | **examination** | 103:13 121:10 | 129:11,16 |
| **europe** 26:14 | 8:14 318:13 | **excess** 271:10 | 131:12,17 |
| **evaluated** | **examined** 8:12 | **exchange** 115:4 | 132:1,2,7,8 |
| 277:24 | **examines** 171:7 | 245:21 297:4 | 148:9,11,16,24 |
| | | | 149:4 215:12 |

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

215:17 231:10
239:21 256:15
256:21,23
257:14 285:13
309:14,18
**exhibits** 1:2
58:8,13 65:8
120:9,23 127:3
128:4 130:21
133:13 134:2
258:10
**exist** 211:7
**existence** 171:4
**existing** 162:13
**expect** 141:23
196:24 209:24
263:14
**expected** 200:6
210:4
**expenditures**
55:21
**expense** 267:18
**expenses**
205:15 225:12
225:12
**expensive**
271:22 272:5
**experience**
12:21,23 20:12
72:4 141:5
155:10 171:8
190:22,24
191:6 193:14
193:18,24

200:11
**experienced**
200:6
**expert** 5:10,15
5:19 11:9 12:5
12:8,18,18
13:10,24 14:10
14:21,24 15:11
20:22 21:11
23:11,12,17,20
24:9,23 26:17
30:3 35:1
38:21 39:1,6
39:12,19 40:6
41:6,9,14,16,20
42:7,10 46:12
55:4 57:15
58:5 68:24
74:22 139:22
148:19 154:12
167:20 179:22
185:8,18 200:7
233:14 271:7
279:1,3 292:3
307:9 309:5
**expertise** 37:17
41:21 42:6
202:4 253:16
**experts** 74:18
181:13 182:17
183:12
**explain** 10:3
122:22 145:18
157:15 194:15

246:6 290:16
**explained**
107:11 165:11
165:20 179:20
202:11 205:4
**explaining**
98:14 161:24
**explanation**
64:20 162:24
201:5 207:19
**explicit** 152:18
198:24 200:14
**explicitly**
160:18 198:24
200:10 220:16
223:11,24
307:14
**express** 70:18
**expressed**
75:12 146:5
275:7 279:22
302:4,5 303:8
**expressing**
276:5
**expressly**
180:24
**extent** 20:7
83:5 126:19
127:22 184:8
217:7 240:15
244:8 262:14
**extra** 57:22
261:5 309:9

**extract** 249:4
**extremely** 69:4
247:13,15
249:5 289:4
316:1
**extremes** 247:6
**eye** 312:3
**eyeballing**
131:12
**eyesight** 303:3

**f**

**f** 322:1 323:1
**faced** 166:5
**faces** 270:9
**facilitates** 31:5
**fact** 27:22
65:11 66:24
72:17,17 81:8
84:19 86:10
97:20 111:21
130:22 134:22
143:11 153:22
176:21 184:1
196:19 200:13
244:6 245:16
248:8 253:11
271:20,21
286:6 289:24
295:18 312:18
**factor** 140:23
141:4,14
208:13

**factored** 228:4
**factors** 147:13
  152:13 153:4
  156:7 157:23
  160:21 161:24
  162:3 166:2
  186:11 193:16
  198:19 199:4
  199:23 200:3
  201:18 203:13
  203:19,22
  204:4,11,15
  206:8 207:9
  208:4,11
  209:17 210:15
  213:10,13
  217:3 228:16
  230:14
**facts** 62:15
  63:8 65:8
  67:24 108:14
  223:7,7 313:4
**factually** 152:4
**fades** 235:22
**fair** 9:12 11:1,7
  13:18 25:19
  42:20 43:4,23
  44:8,10,12,13
  44:18,21 49:17
  63:8,9 80:10
  92:23 115:3
  138:5 139:11
  140:21 142:21
  159:17 162:16

168:4 174:24
184:17 187:14
201:15 203:21
207:6 221:8
236:6 238:9
243:3 272:15
278:12 292:6
306:23,24
317:16
**fairly** 48:1 96:9
**fairness** 269:15
**faith** 42:20
  43:4,23 44:12
**fall** 162:22
  228:15 229:17
  229:18,23
  230:12
**falls** 230:6
**familiar** 66:2
  127:15 128:17
  149:3,4,6,12
  181:18 197:1
  237:10 251:1
  256:22 296:7
**family** 28:6,9
**far** 15:23 25:8
  135:9 141:11
  141:13 155:10
  193:10 197:18
  213:15 240:23
  295:7 296:11
  307:1
**father** 65:13

**fbfglaw.com**
  2:20
**february** 56:21
  135:22
**federal** 1:16
  12:15 13:8
  30:3 38:15
**fee** 225:19
**feeding** 292:21
**feel** 134:4
**feeling** 109:22
**feels** 77:15
**fees** 198:22
  199:23 267:18
  273:6,12,14
  274:22 276:12
  276:12
**field** 141:6
**fifty** 298:24
**figure** 51:10,16
  51:17 52:9
  71:11,13
  206:12 212:21
  268:12 278:2
  293:8 295:21
  301:23 302:8
  303:5,8 309:21
  310:1,10,13,13
  310:18,24
  311:1,17,24,24
**figured** 304:21
**figures** 5:19
  135:5 238:5
  241:3 297:22

309:5
**file** 17:24 77:14
  79:1,2 293:22
  295:14 298:9
  298:10
**filed** 6:15 24:9
  178:6,10
**files** 235:1
  240:18,19
  248:11 249:15
  286:16 295:11
  316:21
**final** 59:20 60:6
  61:19
**finalizing** 60:19
**finance** 36:13
**financial** 145:5
  145:8,16
  223:16 236:13
  289:22 308:18
**financially** 6:23
**find** 74:1,19,23
  75:4,22 97:14
  168:1,2,3
  230:8 257:4
  265:13,18
  268:7,24 285:3
  286:21 298:6
**finder** 253:12
**finding** 305:21
**fine** 47:3
  101:15 255:14
  284:7 294:7

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[finish - formula]**                              Page 31

| | | | |
|---|---|---|---|
| **finish** 9:4,9,10 | **five** 21:18 | **flipped** 302:22 | **forecast** 234:21 |
| 33:18 35:10 | 24:21 25:4 | **floor** 3:7 303:4 | 235:20 |
| 118:24 119:2,3 | 56:14 61:24 | **fluctuates** | **forecasted** |
| 216:21 | 66:5 74:19,23 | 223:17 | 235:5 240:23 |
| **finished** 33:15 | 104:12 110:17 | **fluctuating** | **forecasts** 16:15 |
| 34:18 107:5,8 | 132:13,14,14 | 225:16 226:18 | 234:19,20 |
| **finkelstein** 2:15 | 132:15 180:19 | 259:2 | 235:6,7 236:7 |
| 7:9 | **fix** 286:18 | **focus** 26:16 | 237:18,21 |
| **fire** 19:17 | 301:3 | 63:10 73:8 | **foregoing** |
| **fired** 28:15,16 | **fixed** 67:13 | 82:4 114:24 | 322:3 323:6 |
| **firm** 51:7 52:16 | 125:16,17,17 | 124:15 141:16 | **forget** 7:11 |
| **firm's** 51:8 | 147:23 149:22 | 166:20 | 302:11 |
| **firms** 51:22 | 151:22 152:5 | **focused** 36:20 | **forgive** 47:7 |
| 53:20 59:11,12 | 153:24 160:10 | 37:2 54:11 | **forgotten** 47:9 |
| 59:19 | 160:11 217:19 | 193:12 305:21 | **form** 13:7,9 |
| **first** 8:18 12:14 | 217:20,23 | **focusing** 75:19 | 80:16 86:20 |
| 25:8,9,15 | 232:23 242:21 | 121:24 140:10 | 98:2 222:6 |
| 29:14 45:22 | 251:8,12,18,21 | 144:21 | 225:4,9 240:22 |
| 62:12 91:8,19 | 253:12,13,22 | **folks** 7:13 9:15 | 241:22 247:17 |
| 92:3,9,18 | 253:24 254:3 | **follow** 42:15 | 247:18 289:5 |
| 94:23 95:11 | 254:21 255:2,3 | 173:6 | 306:5 |
| 99:20 100:15 | 259:3,13 | **followed** | **formal** 37:1 |
| 101:13 102:21 | 260:11,13,16 | 248:24 | 209:8,9 |
| 110:21 111:14 | 262:24 263:18 | **following** 88:20 | **format** 12:14 |
| 112:8 116:9,22 | 264:8 265:4,5 | 109:13 115:11 | 249:6 286:17 |
| 119:8 123:20 | 269:1,1,6,6 | 147:23 153:24 | 287:2 291:13 |
| 126:17 146:18 | 277:10,13,13 | 154:3 164:15 | **formatting** |
| 149:22 150:23 | 280:11,11,13 | 194:9 207:22 | 241:16 287:10 |
| 151:19 153:17 | 281:12,21 | 294:5,17 306:5 | 293:19 |
| 156:22 166:16 | 282:1 | **follows** 8:12 | **formula** 55:16 |
| 216:20 227:6 | **flagged** 89:15 | 94:8 | 165:16 166:7 |
| 232:9 276:8 | **flip** 149:7 | **foot** 154:6 | 216:24 274:6 |
| 288:7 304:11 | 311:11 | **footnote** 133:1 | 314:23 |
| 305:21 317:24 | | 133:10 | |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**formulaic**
209:1
**formulas** 240:9
240:12,14,15
240:17
**formulation**
156:9 167:7
222:3 259:4
283:1
**formulations**
165:13
**forth** 31:7
61:17 93:11
117:11,14,19
154:22 246:16
271:9
**forward** 49:8
75:5,20
**found** 89:3
172:17 217:18
241:10 262:22
268:14 280:11
302:8
**foundation**
18:24 38:23
61:4 65:4,16
71:17 74:5
78:8,16 79:8
85:3,13 91:15
94:15 97:24
102:6,14
120:16 128:10
130:2,16 131:3
132:4 133:18

142:8 143:20
180:8 197:14
199:13 204:14
212:24 216:18
220:23 226:7
241:13 254:14
264:4 265:24
266:16 269:24
271:14 272:1,9
272:24 275:17
277:6 308:9
314:11
**four** 5:19 61:23
62:5 121:23
132:13,14,15
189:15,15
309:5 310:11
**frame** 143:24
**frankly** 161:16
**free** 302:21
**freebie** 222:9
**freedom** 88:2
108:20 110:2
**frei** 2:15 7:9
**frequently**
117:5,7
**friendly** 249:14
**front** 13:8
38:14 58:18
257:19
**frustrated**
77:13
**fuel** 222:16
231:1

**full** 8:18 34:7
218:4 228:18
**fully** 46:21
155:13 229:6
235:15 292:22
**function**
241:17
**functional**
289:3
**fundamentals**
16:14
**further** 92:7
133:10 134:5
143:15 182:17
183:13 203:12
244:8 295:12
317:20 322:5

**g**

**g** 6:1
**g20** 301:12
**ga** 2:7
**gaap** 41:9
**game** 14:24
15:11 260:11
**garber** 2:16
7:10
**gas** 83:17
128:18 160:15
197:20
**gblanikinship**
2:20
**gears** 32:21

**general** 21:8
68:5 72:3
89:11 109:22
109:22 160:9
171:24 190:3
219:3 225:13
227:10 243:23
244:3,21 247:1
247:8 287:24
296:2,16 299:7
**generally** 29:24
41:7,10,16
52:2 91:2
236:1 243:2
**generate** 255:8
284:23 316:5
**generated**
308:4 316:24
**generates**
237:6
**generating**
308:6
**generation**
27:20 36:24
307:21
**generic** 198:2
**gentleman**
21:24
**geographic**
26:16,17 305:6
**getting** 79:19
175:5,6 234:19
245:19 300:7

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

**[gist - going]**                                        Page 33

| | | | |
|---|---|---|---|
| **gist** 110:3 | 86:15 110:18 | 82:3 88:12 | 150:1 182:16 |
| 134:14,15 | 113:14 125:22 | 107:9 120:4 | 224:4 233:20 |
| 157:17,17 | 141:13 145:24 | 129:11 134:7 | 238:24 |
| 171:22 207:21 | 152:4 153:7 | 139:2,10,15,23 | **going** 7:11 |
| **give** 8:4,22 | 156:9 158:12 | 140:12 144:22 | 16:19,21 17:20 |
| 17:12 18:8,11 | 158:14,17,18 | 145:4 148:17 | 20:11 26:3 |
| 26:18 40:4 | 162:21 166:24 | 152:1 155:23 | 30:10 33:8 |
| 43:5 52:8 57:5 | 194:13 209:4 | 159:15 182:7 | 34:1,21 35:12 |
| 62:14 65:6 | 220:17,17 | 182:11 185:6,8 | 35:19 36:7 |
| 89:7 98:20 | 227:4 234:11 | 188:13,18 | 39:11 42:23 |
| 111:24 116:24 | 236:18 247:16 | 217:6 224:5 | 43:2 49:8 |
| 117:1 119:5,12 | 250:7 256:2 | 226:24 227:2 | 54:17 55:3 |
| 119:14 120:19 | 274:13 278:4 | 227:15 230:23 | 58:2 67:7,11 |
| 121:21 123:3 | 284:4 290:1 | 231:5 240:22 | 74:1 79:23,23 |
| 126:15 127:18 | 305:13,23 | 248:9,11 253:9 | 81:20,21 82:21 |
| 127:23 131:13 | 306:3,8 308:17 | 267:15 280:1 | 83:4 85:15 |
| 131:13,13 | 315:7 322:4 | 280:17 284:10 | 87:21,21 98:24 |
| 134:13 137:14 | **gives** 74:24 | 288:5 289:11 | 104:21 105:22 |
| 156:17 159:7 | 291:18 | 289:18 291:3,6 | 107:22 110:20 |
| 166:17 168:18 | **giving** 18:11,11 | 293:17 294:6,7 | 111:19 120:2 |
| 191:12,18 | 63:7 90:6 91:4 | 294:18,24 | 127:10 131:9 |
| 197:10,15 | 100:13 101:10 | 295:1,1,2,8 | 136:4 138:14 |
| 200:1 206:1 | 160:9 162:16 | 296:18,18 | 138:16 148:7 |
| 207:15,18 | 164:20 219:18 | 298:5,11,19 | 150:5 151:22 |
| 219:15 222:4 | 296:17 | 299:6,7,24 | 152:5,8,11,20 |
| 228:18 229:2 | **glad** 92:6 | 301:11,15,21 | 159:11,12 |
| 245:4 262:17 | **glean** 257:2 | 301:22 303:19 | 160:11,12 |
| 267:24 268:5,5 | **gleaned** 257:2 | 309:3 313:7 | 168:9,11,18 |
| 284:4 291:19 | **go** 6:8 22:24 | 315:15 318:8 | 170:22 173:22 |
| 294:20 302:9 | 26:11 33:16 | 319:22 | 175:10,12 |
| 309:9 310:8 | 36:10 48:22,23 | **goad** 35:24 | 188:16 189:11 |
| **given** 69:3 | 52:1,2 53:20 | **goes** 50:6,10 | 191:10 200:13 |
| 71:15 79:18 | 55:1,10,11 | 54:4,5 55:10 | 205:21 207:1 |
| 83:23 84:4 | 73:22 81:23 | 55:13 107:14 | 207:16 209:3 |

Veritext Legal Solutions

800.808.4958                                        770.343.9696

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[going - heard]**                                              Page 34

209:12 211:6
215:1,12
218:21 224:1,2
230:9 231:3
232:8 235:15
235:16,21
244:10,18
245:20 246:7,9
251:5 256:21
257:10,12
265:5,17,21
267:12 268:21
269:19 270:8
270:12 271:6,8
271:8 279:7
283:20 284:2,8
284:16,17
285:10 287:15
289:14,23
290:11,12
291:5 293:4
294:10 295:14
296:12 297:7
300:2 301:14
305:11 308:24
309:17 313:2
315:13 317:22
318:6 320:4
**gold**  311:1,24
**good**  6:2 8:1,16
  8:17 42:20
  43:4,23 44:12
  66:9 71:21
  168:10 188:11

223:3 236:6
**goods**  169:14
  245:21 246:12
**google**  20:5
**goran**  4:5 7:19
  9:21 189:17,22
**gotten**  40:19
  256:7
**govern**  175:9
**governs**  43:11
**gradually**
  124:19 125:9
  125:24 318:22
**graduate**  32:24
  37:2,10
**granted**  236:12
**granularity**
  304:23
**graph**  309:24
  314:18
**graphs**  309:15
  314:5
**gravy**  261:5
**great**  8:1 9:14
  21:19 119:15
  163:16 258:18
  303:3
**green**  222:10
  223:10 264:1
  266:8 308:7,12
  308:13 314:9
  314:18
**greg**  2:14 7:8
  22:1 36:2

56:15 57:22
  118:21 189:21
  189:21
**groove**  93:10
  95:16,23 96:4
  101:24 126:1
**gross**  257:22
  258:21 301:13
**grossing**
  305:22
**grossly**  77:21
**group**  29:15
  56:3
**guess**  31:13
  55:17 62:5
  84:2 93:13
  138:10 163:7
  201:20 202:4
  222:18 243:22
  247:22 248:17
  254:24 267:9
**guidance**  274:3
**guy**  113:1
**guys**  37:16
  177:14 263:2
  272:16 318:3

**h**

**h**  5:8 321:1
**hack**  241:6
**half**  13:7 16:1
  21:3,4,15
  294:7

**halfway**  124:15
**hand**  8:5 36:4
  43:19 71:8
  127:7 128:16
  149:11 206:13
  220:18 231:17
  241:2 245:21
  262:19 263:8
  269:3 323:18
**handed**  114:3
**hands**  246:2
  297:4
**hang**  318:1
**happen**  268:8
  286:1
**happened**
  65:11 77:17
  134:11 312:14
**happens**  13:15
  71:3 118:6
  139:18 160:13
**happy**  43:21
  173:5
**hard**  71:12,13
  171:14 194:10
  247:19 299:9
  301:17
**harkening**
  315:19
**head**  27:7
**hear**  72:13,16
**heard**  42:19,21
  237:13,13

**hearing** 14:6
155:12
**hearings** 13:3
**hedging** 169:10
260:4,5,7,14
261:2
**held** 23:23
39:18 50:12
185:17
**help** 17:14,18
18:19 19:8
59:12 136:7,16
192:2 193:15
257:8
**helping** 59:16
299:19
**hereunto**
323:18
**hidden** 247:14
247:14 249:15
**hide** 84:24
**high** 136:1
152:1 265:19
304:10,20
**higher** 48:14,17
48:18 52:22
259:6,9 265:21
280:2,8 307:20
307:21 313:2
**highest** 283:5
305:22
**highly** 79:18
**hire** 18:19

**hired** 15:22
29:22 53:20
70:2 73:17,20
87:20 272:12
293:1
**historian** 73:14
**historically**
131:11
**hit** 54:1
**hmm** 64:14
82:7 93:19,21
105:12 106:3
113:19 115:7
115:16 148:2
157:2,6 170:11
174:18 190:17
190:17 194:4,4
198:20 199:2,2
203:17 220:4,4
231:18 239:1,6
240:4,4 242:7
242:7 250:3
258:22 286:13
304:6 309:23
**hold** 33:14
37:20 38:4
39:11,11 41:6
107:4 169:23
299:16 300:13
301:16
**holding** 38:9
**honestly** 23:7
23:21 24:14
25:17 56:13

73:7 89:18
199:14 243:4
275:2
**hope** 231:10
**hopefully** 104:1
216:2
**horizon** 242:23
243:18 244:13
**horribly** 35:14
35:16
**hour** 47:5,16
49:20 53:2,8
67:7 81:20
145:15,20
149:23 150:2
150:13,24
151:23 232:11
302:4,5
**hourly** 47:11
170:10 172:10
**hours** 189:15
189:15 303:9
320:6
**house** 3:16 7:7
**houston** 16:6
**hub** 160:15,15
**huh** 117:17
**humongous**
240:18,19
**hundred** 91:6
273:23
**hundreds** 17:9
152:16 191:17

**hypothetical**
271:15

**i**

**idea** 37:5 67:5
139:1 157:16
225:10 245:16
272:10,16
**ideal** 296:11
**identical**
313:14
**identification**
57:16 103:10
113:21 127:9
127:12 148:21
256:19 309:6
**identified** 8:11
147:14 149:15
165:21 248:12
304:2 323:8
**identifier**
239:18
**identify** 9:19
302:7
**il** 3:18
**illiquid** 168:3
**illustrate** 260:4
**illustration**
291:19
**imagination**
38:17
**imagine** 77:19
**impact** 9:2,4

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

| | | | |
|---|---|---|---|
| **impartiality** | 221:16 222:19 | 125:9,20 | 208:8 |
| 108:8 | 228:8 242:17 | 136:13 318:22 | **indexed** 161:4 |
| **impersonated** | 244:3 250:1 | 319:10 | 161:7,8 |
| 65:13 | 261:14,23,24 | **increased** | **indicated** |
| **implementati...** | 262:5,7,11,14 | 126:21 | 192:22 |
| 223:6 | 275:24 | **increasing** | **indirectly** |
| **implemented** | **included** 58:9 | 278:5 | 323:16 |
| 223:5 | 151:3 218:11 | **incredibly** | **indiscernible** |
| **implication** | 218:17 219:2 | 271:22 272:5 | 300:21 |
| 295:18 | 219:20 228:22 | **incumbent** | **individual** |
| **implied** 42:19 | 257:15 258:10 | 304:14,22 | 71:10 79:18 |
| 43:4,23 | 267:15,21 | 306:2,13 314:3 | **industries** |
| **important** 9:8 | 273:12 312:10 | 314:24 | 11:22 |
| 69:4,8 70:11 | **includes** 12:3 | **incur** 233:10,19 | **industry** 37:14 |
| 242:23 265:15 | 237:7 | 234:22 267:18 | 42:8 169:7 |
| 298:17 | **including** 7:3 | 269:19 271:8 | 173:24 174:2,5 |
| **impossible** | 20:10 147:15 | 275:15 277:21 | 174:9 193:18 |
| 37:15 191:7 | 203:13 210:15 | **incurred** | 193:19,20 |
| 292:4 | 215:8 223:9 | 222:21 236:9 | 194:19 196:23 |
| **impression** | 273:13 | 277:1 | 200:7,20 |
| 96:12 99:6,9 | **inclusion** | **incurring** | 201:16 214:13 |
| **improved** 60:7 | 206:14 249:17 | 159:1 | 214:15,20,24 |
| **inaccurate** | **incomplete** | **incurs** 273:6,8 | **inefficient** |
| 91:23 194:16 | 120:23 272:23 | **independent** | 87:24 |
| **inappropriate** | 309:18 | 236:16 237:17 | **infer** 68:11 |
| 35:15,17 | **inconsistency** | 281:5 | **inflation** 242:4 |
| 203:21 204:3 | 108:8 209:24 | **independently** | 242:8,14,17,22 |
| **include** 58:12 | **inconsistent** | 155:4 | 242:24 243:1 |
| 149:16 150:14 | 69:20 111:14 | **index** 157:19 | 243:10,17,19 |
| 157:4 181:15 | 203:10 | 157:24 158:6 | 245:17 246:14 |
| 204:18 205:2 | **inconsummer...** | 160:1,14,24 | 287:24 288:6,9 |
| 207:11 210:5 | 69:19 | 161:3,10,12 | 290:4 292:15 |
| 212:14 214:16 | **increase** 95:18 | 162:22,23 | 293:11 295:1,3 |
| 217:5,5 218:5 | 95:19 124:19 | 200:8 201:2 | 295:17 296:15 |

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

297:11 299:6
**influence** 9:1
**information**
50:24 70:19,23
75:20 107:20
107:21 133:9
234:12 240:20
241:10 319:9
**informed** 147:6
151:10
**initial** 48:3
102:18 109:10
**initially** 49:13
63:12 80:6
126:1
**input** 93:10
101:24 156:6
242:13,13
248:15 250:1
268:15 291:16
291:17
**inputs** 55:1,11
146:24 147:13
149:15 165:16
166:7 203:11
229:8 249:4,10
253:13 268:16
289:5
**inquired** 68:15
**inside** 34:15
**insides** 278:8
**insist** 111:22
**insisting**
122:23

**instance** 90:24
97:9 117:8
175:2
**instances** 60:8
60:24 61:15
135:17 254:22
269:18 270:8
**instructed**
249:24 250:4
**instruction**
250:7,11
**instrument**
167:22 223:17
**instrumentalize**
158:18
**instruments**
145:5,8 226:19
226:20
**insurance**
308:19,20
**intelligent**
71:10
**intend** 49:8
**intended** 200:7
242:9
**intention** 92:16
**interchange**
45:24
**interest** 243:23
244:3,9 246:14
246:16 247:2,8
247:23 288:1
296:2,16
297:11 299:7

**interested** 6:24
323:16
**interesting**
89:15
**interim** 249:8
**internal** 16:15
281:8,14
**international**
179:22
**interpret** 96:1
153:5,7 162:6
162:15,20
163:3,9 191:24
193:18,19
197:17 198:6,6
247:20 274:5
**interpretation**
42:24 44:7
90:7 96:23
153:11 154:11
154:21 155:1
155:11,14,21
156:4 157:9
158:3,19
162:20 163:9
165:6,12,14,17
166:9 175:16
175:18,22
176:1 177:11
177:13,16,18
177:23 178:2
180:1,5,15
188:3 199:10
201:18 207:24

213:20 214:9
219:10,10
221:22 223:6
225:5 250:8
274:1,13
275:22,23
276:3,13,16
**interpretations**
153:8 156:2
163:21 180:12
193:15 201:19
274:9
**interpreted**
42:17 79:12
153:1,17 162:1
163:4 182:19
183:14 186:18
214:4 217:8
238:2
**interpreting**
152:6
**interrupted**
35:4 270:4
**interrupting**
118:23
**intimately**
251:1
**intricacies**
262:21
**intricate** 316:1
**introduce** 7:14
7:23
**introduction**
62:13 63:2

**intuition** 72:3
**investment**
　159:5
**invisible** 312:2
**invitation**
　284:1
**invoices** 51:16
　52:9 53:11,12
　53:13,17 54:1
　87:14
**invoicing** 51:19
**involve** 24:18
**involved** 18:3
　21:21 23:5
　24:2,9,16,23
　25:12 40:6,18
　51:19 71:19
　93:6 95:19
　155:9 178:22
　262:24 280:6
　280:17
**ira** 1:6 2:21
　3:11 6:11
　63:12 65:1
　68:21 72:24
　75:3 78:13
　80:11 311:12
**iso** 31:5,10,12
　31:15 32:11
　137:8 227:11
**isolate** 19:20
**isolated** 295:13
**isolating** 47:23

**isos** 194:21
**issue** 71:8
　75:11 100:15
　115:24 134:2
　155:12 187:11
　193:8 208:19
　211:20 214:6
　238:21 286:19
　286:23
**issued** 14:21
　15:18 30:12
　40:7 53:18,22
　58:6,14 94:6
　179:1 181:1,11
　185:1
**issues** 30:6
　179:8
**issuing** 185:9
**it'd** 10:23 62:5
　69:6 117:9
　126:9
**it'll** 13:7 300:17
**itemized**
　198:24

**j**

**j** 3:3 279:12
**january** 67:14
　133:21 323:19
**jbm** 3:9
**job** 28:23
　273:23
**jobs** 26:4

**jog** 190:5
**join** 22:24
**joined** 36:19
　48:1
**joining** 37:11
　50:2
**joke** 100:10
**js** 50:12
**judge** 14:6
**judicial** 184:11
**junior** 10:23
**justify** 268:9
**justifying**
　153:18

**k**

**keep** 27:11 36:6
　50:19 122:23
　138:16 165:19
　239:17 251:10
　282:15
**keeping** 45:21
**keeps** 281:17
　300:18
**ken** 113:15
**key** 19:18,18
　93:6
**keyword**
　255:15
**kill** 293:19
**kilowatt** 149:23
　150:2,13,24
　151:23 232:11
　302:5 303:9

**kind** 32:10
　46:19 62:15
　63:7 89:3
　90:15 133:9
　139:18 155:2
　180:11 190:21
　193:12 195:1
　198:4 218:17
　219:19 237:16
　240:15 248:9
　250:10 255:8
　257:2 258:3
　263:15 286:14
　286:18 299:9
　309:14 315:19
　316:19
**kinds** 32:16
**knew** 70:5
　71:18 95:20
　102:3,8 167:18
　222:7,9 246:21
　297:4
**knock** 34:13
**know** 10:23
　17:24 18:1,2
　20:3 23:14
　25:1,7,10 28:5
　29:24 31:3,22
　32:18 35:2,3
　35:17 40:10
　42:22 44:3,4,4
　44:19 45:5,5
　45:17,23 46:14
　46:18 48:6

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[know - know]**

Page 39

| | | | |
|---|---|---|---|
| 49:1 50:8,13 | 101:22 102:7,8 | 158:21 159:10 | 205:10,11,14 |
| 50:14,23 51:2 | 102:10,10,19 | 159:21,22 | 208:7 209:5,17 |
| 51:2,4,10 | 102:21,22 | 161:19 162:1,7 | 209:17,22 |
| 52:11,23 53:1 | 106:24,24 | 163:1,2,8 | 210:2,3 211:1 |
| 53:11 54:6,17 | 107:17 108:15 | 165:15 166:6 | 211:5 212:1 |
| 55:15,16,18,21 | 108:16,17 | 166:10,14 | 213:21,24 |
| 55:23,24 56:1 | 109:8,9,18,18 | 167:8,10 | 214:10,12 |
| 57:18 58:23 | 109:19 112:1 | 168:10,12,13 | 216:23,24 |
| 61:5,8,10 64:2 | 112:16 117:6,7 | 169:11,12,13 | 217:4,6,10,11 |
| 64:3,6 67:6,11 | 117:12,14,14 | 169:16,20 | 217:19 219:10 |
| 68:21 69:4,15 | 118:3,6,7,8 | 172:5 173:5,7 | 221:4 222:8,11 |
| 69:24 70:10 | 122:19,21 | 173:19,20,21 | 223:4,5,8,13,14 |
| 72:3,5,19 | 125:19,21,24 | 174:1,1,6,6,12 | 223:15,16,19 |
| 73:12,17 74:7 | 126:11,12,12 | 175:5,19,21,23 | 223:20,24 |
| 74:7,14,15 | 126:13,17,18 | 177:24 178:12 | 224:2 225:1,3 |
| 75:1 76:11,18 | 127:18,19 | 178:14,19 | 225:6,10,11,14 |
| 77:11,12,20,20 | 128:2,11 132:5 | 179:15,23 | 226:12 227:1,2 |
| 77:22,23 78:5 | 132:24 133:21 | 180:2 181:4 | 227:20,22 |
| 79:13,21,24 | 134:10,12 | 182:4 183:22 | 229:13,16 |
| 80:5,10 81:2,8 | 135:12,19 | 183:23,24 | 230:11 235:4 |
| 84:4,19,20,21 | 136:21 137:12 | 184:10,11 | 235:12,14,24 |
| 86:6,9,11,22 | 139:21 141:4,7 | 190:3,5 191:6 | 236:1,2,5,16,18 |
| 87:23,24 88:1 | 141:8,10 | 191:13,15 | 237:3,6 238:1 |
| 88:2 89:1,12 | 142:22 143:11 | 192:22,22 | 238:2,7 240:23 |
| 90:4,4,6,7,9,10 | 143:13,21 | 193:10 194:13 | 241:18,21 |
| 90:17,19,21,22 | 145:3,3,8,9,11 | 194:14,20,22 | 242:13,20,23 |
| 93:12,14 95:9 | 146:2 151:19 | 195:3,24 | 243:16 244:5,6 |
| 95:15,16,21,21 | 151:21,22 | 196:24 197:17 | 244:10,16 |
| 95:24 96:1,3 | 152:4,8,9,10,14 | 198:1,7,8 | 245:16 246:4,4 |
| 96:11,12,14 | 152:17 153:12 | 199:17 200:8 | 246:14,17,20 |
| 98:13,24 99:1 | 153:20,22,23 | 200:21,24 | 247:19 248:15 |
| 99:6,8,11,12,18 | 153:24 154:7 | 201:2,6,13,24 | 248:15,24 |
| 100:24,24 | 156:1,5 158:3 | 202:16 203:4 | 249:2,4 251:3 |
| 101:15,16,18 | 158:5,9,10,11 | 204:9 205:7,9 | 251:13,13,15 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[know - lawsuit]**

Page 40

252:16 253:16
254:2,23 255:1
256:13,21
257:2 258:3
259:18,21
261:6 262:19
262:20,21
263:2,13
264:17 265:12
266:6 269:14
271:20 273:20
274:3,24 275:4
275:5 277:21
278:4,8,9,9,23
280:10,11,15
280:19,21,23
281:3,22
282:11 285:21
286:1,4,6
287:7,9,16
288:22,23
289:20,23,24
290:14 291:11
291:16 292:24
293:8,22 294:2
295:6 296:8,10
297:5,8 300:18
301:20 303:21
305:5,7 306:18
306:20 308:1
308:10,11
309:20 313:5
313:20,21
314:1 315:6,24

316:5,11,13,15
316:19
**knowing** 180:9
235:15 305:24
**knowingly**
79:21
**knowledge**
93:8 112:21
201:23 288:14
323:12
**known** 159:2
159:19,20

**l**

**label** 149:20
**labeled** 150:23
196:12
**labels** 160:9
**labor** 48:23
277:22
**lack** 18:23
38:22 65:3,16
71:16 74:4
78:8 79:7 85:3
85:12 91:15
94:15 97:23
102:5,13 128:9
130:1,16 131:2
132:3 133:18
142:8 143:19
180:8 197:13
199:7 212:24
216:17 220:22
254:13 265:24

266:15 269:23
271:13,24
272:8,24
275:17 277:6
308:8 314:10
**lacking** 223:3
**lacks** 78:15
120:16 199:12
204:13 226:6
241:12 264:4
**laid** 274:7
**lake** 3:17
**language** 43:16
61:1 90:11
93:8,9 95:21
99:14 101:18
106:19 148:3
150:12,15,23
151:2 153:23
155:15,21
156:3,4 160:18
161:20 162:13
165:12 184:1,2
184:5,8 187:1
187:11,11,18
187:20 192:7
193:1,7 198:2
198:3 200:12
200:14 201:8
205:19 208:2
209:15,16
212:18 214:2
219:11 258:2,6
274:2,9

**languages**
186:19
**lapointe** 3:15
5:11 7:7 88:22
93:14 94:9
96:19 103:9
105:6 106:4,12
112:16 115:23
119:8 120:10
120:12 121:5
121:24 122:1
123:4
**lapointe's** 90:1
92:7 103:13
104:23 110:8
111:9 116:21
121:12 123:17
124:1
**large** 19:15
171:8 312:20
313:20
**largest** 27:18
307:1,4
**laser** 73:8
**law** 41:24 42:2
42:10 43:11,18
45:4,7 51:22
53:20 59:11,19
79:24 155:11
213:20 273:16
**lawsuit** 21:2
24:2 78:6 79:2
79:3

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

| | | | |
|---|---|---|---|
| **lawyer** 155:18 | 95:13 96:23 | 214:1,4,5 | 222:23 246:24 |
| 177:13 201:23 | 97:3,21 98:7 | 219:10 221:21 | 257:24 263:10 |
| 202:1 | 99:1 100:4,17 | 223:5 229:1 | 265:19 297:11 |
| **lawyers** 22:9 | 101:14 102:3 | 250:8 268:18 | 304:10,20 |
| 60:9,24 61:19 | 102:12 105:23 | 271:17,17 | **license** 41:1 |
| 66:22 78:13 | 106:14 107:13 | 273:6,8,12,14 | **licensed** 42:2 |
| 274:21 | 107:13 108:18 | 273:20,20 | **light** 73:6 |
| **layman's** 30:24 | 109:1,10 | 274:2,4,8,13 | 116:20 |
| 43:6 | 111:10 113:6 | 275:22,23,24 | **likely** 27:10 |
| **lead** 72:18 | 115:13,21 | 276:3,8,11,12 | 257:14 |
| 108:13 | 116:3,7 117:23 | 276:13,16 | **limit** 138:16 |
| **leading** 11:3 | 122:3 153:6,8 | 277:21 | 185:20 292:13 |
| 38:13 69:16 | 153:10,14 | **legally** 143:22 | 300:4 |
| 238:10 319:22 | 154:17 155:15 | 143:24 155:10 | **limited** 105:17 |
| **leads** 108:14 | 156:2,4 158:19 | 163:2,4,4,4 | 205:20 |
| 202:5 | 161:15,18 | **legislative** | **line** 50:20,21 |
| **learn** 70:12 | 162:18 163:20 | 203:14 208:12 | 111:22 115:2 |
| **leash** 302:13 | 165:11,14,17 | 209:17 | 115:12 117:20 |
| **leave** 28:13 | 166:9 167:18 | **legitimate** | 280:14 284:5 |
| 119:15 139:10 | 167:19 175:13 | 181:17 182:22 | 300:5 310:7,24 |
| 139:15,23 | 175:16,22 | 183:17 222:11 | 311:1,23,24 |
| 140:11 303:3 | 176:1 177:8,10 | 222:21 | 321:4 |
| **led** 11:8 69:24 | 177:12 178:1 | **length** 80:24 | **lines** 11:24 |
| 90:10 92:21 | 179:14 180:4 | **lengthier** | 30:22 60:1 |
| 251:3 316:7 | 180:10,12,12 | 207:19 244:19 | 104:24 105:21 |
| **left** 28:17 56:2 | 180:12 181:3 | **lengthy** 100:14 | 106:13 120:19 |
| 128:16 149:11 | 182:4 183:22 | 183:6 256:22 | 121:12 123:24 |
| 231:17 295:7,9 | 184:10,10,20 | 262:17 266:1 | 314:18 |
| 301:12 | 186:23 196:17 | 279:4 | **list** 230:8 |
| **legal** 39:16,21 | 200:12 201:18 | **leo** 2:4 7:5 | 239:17,21 |
| 39:22 40:2 | 201:19,24 | 258:13 | 258:10 284:18 |
| 42:6,23,24 | 205:22,24 | **letters** 236:24 | **listed** 66:12 |
| 44:6,7 45:7 | 206:1 207:24 | **level** 69:7 95:13 | 89:10 127:16 |
| 73:12 94:10 | 208:18 213:2 | 152:1,2 217:7 | 127:20 129:8 |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[listed - lost]**                                              Page 42

| | | | |
|---|---|---|---|
| 129:16 131:10 | 302:18 305:20 | **longer**  79:4 | 223:7 224:17 |
| 172:9 203:11 | **lived**  25:19,22 | 121:19 242:21 | 236:18 242:12 |
| 223:24 239:21 | **lives**  83:14 | 242:23 | 246:22 247:8 |
| 257:13,16 | **living**  68:21 | **look**  10:22 | 247:12 279:7 |
| **listen**  34:9,19 | 70:5 71:21 | 12:13 18:7 | 284:23 304:10 |
| **listening**  9:15 | **llc**  1:8,9 2:10 | 26:7 64:10 | 307:3 |
| **listing**  219:19 | 3:19 6:14,14 | 69:7 71:18 | **looking**  43:9 |
| **lists**  74:14 | **llp**  2:5,16 | 73:16 75:3 | 62:24 91:4 |
| 221:3 | **load**  224:1 | 94:4 98:18 | 125:5 127:24 |
| **literally**  40:5 | 227:19 299:24 | 101:4 102:19 | 132:24 146:15 |
| 120:18 122:17 | 300:1 | 102:20 107:22 | 168:22 186:24 |
| 179:23 264:15 | **local**  83:3,17 | 112:11 126:24 | 198:17 200:16 |
| 293:8 | 268:20 305:10 | 127:15 131:9 | 201:13 205:6 |
| **litigation**  11:22 | 305:11,15,23 | 134:5 164:2 | 234:8 242:2 |
| 12:1,3,19,22 | 306:3,7,17,22 | 191:9 196:9 | 253:6 257:6 |
| 13:21,24 14:4 | 306:22,24 | 201:22 215:12 | 287:19 288:1 |
| 14:16,22 20:14 | **location**  6:17 | 219:13 224:6 | 289:21 299:2 |
| 20:16 21:11 | **locked**  268:1 | 224:12 231:9 | 305:23 308:13 |
| 29:9,12,20,21 | **logic**  168:12 | 235:2 252:1 | 309:10 |
| 30:1 40:19 | 251:10 280:24 | 257:1,9,11 | **looks**  26:3 |
| 48:9 191:15 | **logical**  72:8 | 258:2 284:17 | 58:17 93:5 |
| 193:5 268:1 | 77:9,16 78:1,4 | 301:19 309:20 | 128:1 131:21 |
| 271:16 272:6 | 79:3 136:20 | 310:24 311:7 | 132:17 133:5 |
| 272:17,19 | 141:23 | 311:23 312:7 | 215:21 312:19 |
| 276:1,12 | **logically**  72:19 | 314:4,5,18,19 | 313:14 |
| **little**  21:7 32:21 | **long**  45:13 | 316:18,18 | **loose**  90:6 |
| 37:5 50:4 67:7 | 56:18 68:17 | 318:15 319:5 | 157:10 |
| 90:18 124:16 | 96:24 183:6 | **looked**  26:2 | **loosely**  157:14 |
| 148:6 181:10 | 189:9,14 | 54:10 76:5 | **loss**  272:21 |
| 207:19 231:13 | 196:23 205:13 | 84:20 99:5 | 273:16 |
| 235:2 254:23 | 211:4,4 253:7 | 121:3,4 134:8 | **losses**  274:4 |
| 261:13 265:18 | 271:22 272:6 | 135:4 170:19 | 297:17 |
| 283:4 285:22 | 277:24 317:19 | 181:22 196:9 | **lost**  174:2 |
| 295:9 300:12 | | 197:23 209:15 | 222:4 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[lot - margin]**                                              Page 43

**lot** 17:21 18:2
  25:21 27:23
  32:19 37:12,17
  65:6 70:9 71:6
  154:5 162:2
  170:20 187:4
  187:13 247:12
  249:12,13
  253:20 279:4
  292:21
**loud** 151:9
**low** 231:1
**lower** 48:14
  95:14 126:20
  129:19 280:23
  280:23 281:19
  281:19
**luck** 268:4
**ludicrous** 210:1
**lunch** 177:5
  188:14
**lupo** 1:16 8:2
  323:4,23

**m**

**m** 5:15 148:19
**macan** 1:12 5:3
  5:10 6:11 8:9
  8:10,16,20
  26:2 35:11
  57:15,18 58:20
  82:3 94:7
  96:24 114:21
  119:24 120:8

  127:14 128:3
  139:6 148:18
  148:23 182:15
  188:22 224:6
  231:9 256:22
  257:19 275:7
  284:15 285:19
  315:19 318:15
  321:3 322:2,9
  323:7
**macan's** 257:14
**macros** 292:1
**made** 36:24,24
  46:10 49:10
  60:3,3,9,24
  66:22 86:19
  88:15 91:9
  92:17,19,23
  93:2 94:24
  99:23 101:11
  110:5,10 112:9
  120:12 121:5
  122:12 123:4
  123:11 129:22
  130:3 147:7
  151:10 157:15
  184:3 219:8
  242:4 244:11
  246:22 247:19
  248:20 253:20
  257:23 268:22
  287:17 288:14
  288:22 297:12
  298:11,12,13

  316:3 319:15
**magnitude**
  52:16
**main** 16:12,13
  261:1
**maintain**
  319:12
**majority** 11:8
  11:12 135:18
**make** 60:1
  75:11 76:3,7
  80:19 86:6,7
  99:21 104:23
  115:21 116:7
  117:2 145:12
  162:2 173:8
  197:11 198:11
  205:7,15
  243:16,17
  248:21 250:15
  263:9 281:9,10
  289:2 292:22
  297:9 298:20
  298:20
**makes** 115:14
  192:14,17
  205:10 210:2
  305:15
**making** 66:19
  109:12 159:4
  203:1 263:5
  281:20 298:6
**management**
  16:18 36:14,17

  136:12 260:20
**managing**
  11:17
**mandated**
  74:13 143:22
  144:1
**mandatory**
  220:2 221:1,5
  221:9 223:8
  227:22 228:6
  264:18 297:18
**manner** 250:4
**manually** 126:1
**march** 56:21
**margin** 181:16
  182:21 183:16
  185:22 192:18
  204:18,18,22
  205:2,20 206:9
  206:14 207:11
  207:12 210:16
  210:17,19
  212:13 213:21
  214:17 215:8
  216:15 217:6
  217:22,22
  218:5,10 228:6
  250:1 251:6,18
  252:6,11,20,21
  253:13,22
  254:6,11,17,21
  255:3,5 256:3
  256:10 257:3
  257:22 258:4

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[margin - markups]**                                       Page 44

| | | | |
|---|---|---|---|
| 258:21,24 | 49:1 50:20 | 182:18,21 | 264:15 277:17 |
| 259:1,1,3,8,11 | 137:4,19,21 | 183:14,16 | 304:4,8,11,16 |
| 259:18 260:20 | 139:7,9 140:16 | 185:20 186:4,9 | 304:17,18,21 |
| 261:3,4,4,5,15 | 148:1 150:3,14 | 186:10,11,15 | 305:10,11,15 |
| 261:21,24 | 151:1,24 | 187:2,3,4,7,8 | 305:16 306:2,4 |
| 262:10 267:8 | 152:10,12 | 187:10,14,19 | 306:6,8,9,11,12 |
| 267:11,23 | 153:2,4,4 | 188:3 193:9,16 | 307:1,7,8,24 |
| 268:4 269:6,21 | 154:2,4,10 | 193:16 197:2,5 | 308:2 310:3,4 |
| 270:11 271:11 | 156:6,7 157:21 | 197:12 198:18 | 310:6 311:15 |
| 272:19 273:15 | 157:22 160:19 | 198:23,24 | 312:13 313:5 |
| 277:12 279:10 | 160:20,21 | 199:1,3,22,24 | 313:13 314:15 |
| 279:21 280:13 | 161:22,23 | 200:2 201:17 | 314:23,24 |
| 280:22 281:7,9 | 162:1,3,4 | 201:18 202:3,5 | **marketing**  88:5 |
| 281:14,17 | 164:9,11,16,17 | 202:7,15,21 | 222:7 |
| 282:1,2 283:3 | 165:6,7,24 | 208:3,4 211:19 | **markets**  27:21 |
| 301:13 | 166:1,5,8,18,19 | 211:23 212:1,4 | 30:5,7,10,11,21 |
| **margins**  249:16 | 167:7,14,15,20 | 212:5,6,10 | 31:2,2,6 32:17 |
| 249:17 259:3 | 167:22,23 | 213:8,9 217:2 | 37:3,7,18 |
| 278:20 | 168:1,3,4,5,6,8 | 217:3,8 223:15 | 139:22 152:9 |
| **mark**  57:6,13 | 168:16,16 | 223:18,22 | 194:21 233:15 |
| 57:14,21 103:3 | 169:5,6,9,12,21 | 224:7,8,9,14,18 | 306:18,22,22 |
| 113:18 285:13 | 169:22 170:9 | 224:18 225:3,4 | 306:24 |
| 309:1,4 | 171:19 172:10 | 225:6,8,11,16 | **markup**  217:17 |
| **marked**  57:16 | 173:22 174:4,8 | 225:17,18,19 | 218:1 250:1,15 |
| 103:10 113:21 | 174:10,15,17 | 225:21,24 | 250:18 251:15 |
| 127:9,12 | 174:19,23,24 | 226:5,16,19,20 | 251:24 252:24 |
| 148:21 149:3 | 175:4,6,23,24 | 226:21 227:5,9 | 253:1,3 256:3 |
| 256:18 309:6 | 176:5,6,9,10,11 | 227:11,13 | 256:4 261:24 |
| **marker**  250:22 | 176:16,18,20 | 228:15,16,19 | 262:1,4 265:6 |
| **market**  19:9,12 | 176:24 177:8 | 228:21,22 | 267:23 268:12 |
| 19:14 20:1 | 177:16,17,24 | 229:8,18,24 | 279:23 282:24 |
| 26:18 30:19 | 178:1 179:10 | 230:6,13,13,14 | 283:3 |
| 31:1,11,16,21 | 180:5,16 | 232:12 236:15 | **markups** |
| 31:24 32:10,12 | 181:14,16 | 238:19 251:1,2 | 261:17 262:23 |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[markups - meadows]**                                Page 45

| | | | |
|---|---|---|---|
| 269:12 | **maximum** | 68:7,14,20 | 131:20 132:9 |
| **marriage** | 138:16 258:24 | 70:3,17 72:11 | 134:1,16 |
| 323:15 | 282:2,19 300:4 | 72:22 73:21 | 138:20 139:1,5 |
| **marriott**  1:20 | **mba**  37:15 | 75:2,10 76:2 | 140:4,8,15,20 |
| **massachusetts** | **mcinturff**  3:3,6 | 77:3 78:3,9,22 | 141:15,24 |
| 1:20,22 6:19 | 7:16,17,17,18 | 80:9,22 81:10 | 142:9,24 |
| 26:5 323:2,6 | 22:19,20 23:4 | 81:18 82:2,24 | 143:14,23 |
| **master's**  33:2 | **meadows**  2:3 | 83:9 84:9,17 | 145:10 146:14 |
| **materials** | 5:4 7:5,5 8:15 | 85:8,14,24 | 148:11,15,17 |
| 170:15 222:8 | 11:6,14 15:6 | 86:24 87:12 | 148:22 150:7 |
| 286:7,8 | 15:16 16:3 | 88:7 91:18 | 150:22 152:22 |
| **math**  175:17 | 19:1 20:24 | 94:16,22 97:16 | 154:14,19 |
| 316:17 | 22:18 24:13,15 | 98:5 99:19 | 156:16,19,21 |
| **mathematical** | 27:8 30:16 | 100:12 101:6 | 160:22 163:6 |
| 316:7 317:3 | 31:19 32:6,20 | 102:9,24 103:3 | 164:6,7 165:4 |
| **mathematics** | 33:13,17,20 | 103:7,11,17,19 | 167:12 169:1 |
| 273:24 | 34:3,9,12,19,24 | 103:21,24 | 176:4 177:1 |
| **matter**  6:11 | 35:6,11,16,22 | 104:4,7,9,14,17 | 178:4,21 |
| 20:8,22 39:3 | 35:24 36:4,12 | 104:20 107:2,6 | 179:16 180:3 |
| 40:19 41:20 | 37:19 38:3,19 | 108:23 110:4 | 180:13,22 |
| 47:12 49:5,13 | 39:5,10,17 | 110:19 111:8 | 181:5 183:7 |
| 49:20 76:11 | 40:3,12,17,24 | 112:5 113:12 | 184:14 185:14 |
| 147:7 151:10 | 41:13,23 44:22 | 113:18,22 | 186:7 187:9,22 |
| 191:16 255:1 | 45:9 46:22 | 114:8,12,14,16 | 188:10,15,21 |
| 320:11 322:4 | 49:3 51:6,18 | 114:17 116:16 | 189:13 191:19 |
| 323:17 | 52:13 53:6 | 118:13,16,21 | 192:11 196:21 |
| **matters**  11:22 | 55:9 56:4,17 | 119:1,4,21,24 | 197:7 198:16 |
| 42:6,13 48:9 | 56:22 57:5,10 | 120:7,24 | 199:19 202:23 |
| 48:11,12,14,19 | 57:13,17,21,24 | 121:15 122:9 | 204:17 206:3 |
| 71:6 72:4 | 58:10,19 59:5 | 123:2,16 124:5 | 206:19 207:3 |
| 293:3 | 59:10,17,24 | 124:10 126:23 | 210:12 211:8 |
| **max**  115:5 | 60:21 61:13 | 127:6,10,13 | 211:18,24 |
| 282:17 | 62:7,20 64:1 | 128:13 130:4 | 214:21 215:17 |
| | 65:10,19 66:1 | 130:20 131:6 | 215:20,24 |

Veritext Legal Solutions

800.808.4958                                770.343.9696

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

**[meadows - mechanics]**                          Page 46

| | | | |
|---|---|---|---|
| 216:4 217:13 | 314:14 315:2,9 | 186:3,15,16,20 | **meaningful** |
| 218:15,23 | 315:18 316:16 | 186:22 187:7 | 213:19 244:9 |
| 219:12,16,17 | 317:18 318:9 | 191:21 192:10 | 246:11 251:15 |
| 221:7 222:17 | 319:1,22 320:1 | 193:1,4,20 | **meanings** |
| 224:16 226:10 | **mean** 18:9 25:7 | 194:10 195:2 | 214:5 |
| 228:1,17 229:4 | 26:11 30:17 | 196:18,22,23 | **means** 64:2 |
| 229:19 230:4 | 31:20 32:5,17 | 197:16 198:8 | 95:4 107:1 |
| 230:15,22 | 43:5,10 44:2 | 198:12 202:16 | 127:21 152:10 |
| 231:2,8 238:17 | 51:11 52:21,23 | 204:7 205:23 | 153:8 155:15 |
| 242:1 244:24 | 59:4,6,16 | 211:16,17 | 163:13 164:16 |
| 246:15 252:18 | 61:23 64:9 | 214:5 217:8,14 | 165:6 166:19 |
| 255:4,16,19 | 67:2 69:11,15 | 226:13 230:1 | 167:15,20,22 |
| 256:6,15,20 | 72:12,19 77:24 | 248:23 250:23 | 168:13,16 |
| 257:17 258:13 | 84:20 86:7 | 254:24 258:15 | 169:6 174:12 |
| 258:17 264:9 | 89:23 93:24 | 258:19 260:3 | 175:4 176:9,16 |
| 266:4,19 267:6 | 94:23 95:6,23 | 270:2 285:15 | 176:16,19,19 |
| 270:1,7,16,22 | 98:20 100:23 | 286:4 290:17 | 177:17 198:21 |
| 271:5,19 272:2 | 101:9 110:23 | 291:11 298:4 | 205:10 207:24 |
| 272:14 273:10 | 117:6,7 118:8 | 308:2,13 | 212:1 214:6 |
| 274:18 275:6 | 118:13 121:1 | 311:21 314:22 | 224:18 225:3,4 |
| 276:2,15 277:4 | 121:24 122:18 | 314:22 316:11 | 243:1 270:24 |
| 278:17 281:2 | 135:3 136:18 | 316:23,24 | 319:19 |
| 282:6,13 283:2 | 141:22 145:1 | 319:17,18 | **meant** 88:6 |
| 283:13,21 | 151:15 153:6 | **meaning** 13:6 | 133:11 165:17 |
| 284:14 285:9 | 156:8 157:7 | 16:14 138:7 | 176:2,5,6 |
| 285:15,17 | 161:2 162:2 | 153:3 163:11 | 195:1 197:18 |
| 288:21 292:5 | 166:8 167:5,10 | 164:19 166:17 | 286:23 293:10 |
| 292:12 295:20 | 167:16,16,17 | 169:8 171:19 | 294:2 |
| 299:1 300:13 | 169:13,13 | 173:22 174:4 | **measure** 255:7 |
| 301:5 303:6,20 | 170:2 171:17 | 176:5 177:7 | 255:20 269:10 |
| 308:23 309:3 | 174:1 175:14 | 179:9 190:14 | **mechanics** |
| 309:10,13,19 | 175:19,24 | 194:8 198:18 | 78:20 80:3 |
| 311:9 312:8 | 176:18 177:10 | 200:22 214:4 | 89:22 145:3 |
| 313:8,23 | 181:22 184:20 | 214:24 | |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[media - minimum]**                                        Page 47

**media** 6:9,10
  320:6,8
**meet** 23:4
  189:4 211:20
**meeting** 189:7
  189:9,14
**meets** 41:21
**megawatt**
  145:15,20
  302:4
**melissa** 1:16
  8:2 323:4,23
**memory** 97:11
  170:18 190:5
  235:22
**mentioned**
  11:15 23:10
  24:1 30:10
  43:13 75:16
  89:23 102:22
  144:9 147:1,19
  185:7 196:5
  203:16,20
  204:5,12 206:9
  206:10 207:10
  207:12 208:13
  210:16,17
  218:9 220:5,11
  223:12,21
  228:5,9,14
  269:20
**mentioning**
  181:12

**mentions**
  182:15
**mere** 312:18
  313:4
**merely** 42:12
  79:10,17
  108:12 153:22
  158:18 165:15
  173:19,20
  200:13 208:15
  216:24 268:11
  272:11 274:10
  280:24 289:3
  291:15
**mess** 293:9
**message** 115:4
**messy** 247:14
  247:15
**met** 22:15 23:1
  23:2,21 56:14
  105:18 189:6
**method** 153:12
  156:24 157:3
  157:18 158:14
  158:15,20
  159:23,23
  165:21,21
  166:12,12,15
  167:16 176:1
  176:19 178:2
  204:19,19
  217:9 219:21
  219:22,22
  229:7 234:1,10

235:9 236:11
237:24 238:16
241:4 253:14
261:16,22
262:8,11 274:2
284:21,22
303:23 304:2,8
309:22,24
310:11 311:13
312:9 316:8,17
317:11,12,14
**methodologi...**
  76:17 312:17
**methodology**
  76:8 94:10
  97:3,21 98:7
  100:4,17
  102:11 106:18
  108:24 113:5
  122:2 153:9
  158:19 167:13
  167:17 168:15
  169:4 176:8,8
  210:18 250:21
  250:23 253:16
  273:22
**methods** 157:4
  158:7 165:13
  238:16 249:24
  316:3
**metric** 86:12
  159:18,18
  283:1,3

**mic** 294:11
  302:14
**michelle** 1:6
  2:21 3:11 6:12
  64:13 82:5
**microphone**
  119:23
**microphones**
  6:4
**middle** 46:4
  49:17 257:19
**middleman**
  181:13
**middlesex**
  323:3
**millions** 268:2
**mils** 257:23
**min** 115:5
**mind** 17:8 20:5
  21:23 46:17
  52:16 66:9,9
  88:10 195:4
  220:15 229:17
  260:14 265:20
  268:19,20
  298:11
**mine** 28:7
  103:21 104:14
**minimum**
  220:13 254:11
  257:22 258:21
  259:2 281:13
  281:24 282:18

| | | | |
|---|---|---|---|
| **minute** 94:4 | **misheard** 92:1 | **model** 101:24 | **month's** 95:17 |
| **minutes** 97:13 | **misinterpreting** | 273:14 274:20 | **monthly** 51:17 |
| 188:14 228:2 | 225:2 | 275:11 289:3 | 51:19 52:1,2 |
| 284:5 315:10 | **mispronounce** | 293:9 297:4 | 87:3,14 99:16 |
| 320:7 | 22:16 | **modeling** 141:6 | 150:1,12,24 |
| **miscellaneous** | **misrepresents** | **models** 154:20 | 151:23 157:21 |
| 198:22 199:23 | 97:24 | 235:8 241:6 | 161:22 165:23 |
| **mischaracteri...** | **missed** 255:13 | 275:13 | 186:21 200:15 |
| 277:3 | **missing** 121:9 | **modify** 249:9 | 200:19 208:2 |
| **mischaracteri...** | 255:15 | **mohawk** 171:8 | 213:12 217:1 |
| 38:2 44:15 | **misspoke** 53:10 | **moment** 8:4 | 229:9 232:11 |
| 79:7 83:5 | 92:1 | 73:23 82:5 | 238:21 246:18 |
| 91:15 94:13 | **misstates** 65:4 | 137:15 | 304:3 |
| 97:6 100:7,22 | 78:16 102:14 | **moments** 290:3 | **months** 50:2 |
| 122:15 123:8 | **misunderstan...** | **money** 53:24 | 57:4 66:6 |
| 125:5 132:4 | 213:5 225:2 | 56:2 79:15 | 121:19,23 |
| 133:18 142:8 | **mit** 37:9 | 205:8,16 210:2 | 124:3 135:18 |
| 146:10 150:18 | **mixed** 132:15 | 233:19 246:1 | 136:2 149:22 |
| 154:16 160:5 | **mm** 64:14 82:7 | 250:15 263:10 | 151:22 242:21 |
| 164:24 165:9 | 93:19,21 | 281:20 297:3 | **moon** 117:13 |
| 180:8 186:1 | 105:12 106:3 | **month** 71:22 | **morning** 6:2 |
| 187:16 188:7 | 113:19 115:7 | 86:20,21 96:5 | 8:1,16,17 |
| 199:12 210:9 | 115:16 148:2 | 96:6 129:5,6,8 | 45:11 |
| 210:23 212:24 | 157:2,6 170:11 | 131:11 133:4 | **mortgage** |
| 224:11 227:8 | 174:18 190:17 | 133:16,20 | 174:7 |
| 228:12 254:14 | 190:17 194:4,4 | 134:23,23,23 | **motivated** |
| 264:4 265:24 | 198:20 199:2,2 | 159:15 238:20 | 77:14 |
| 272:1 275:17 | 203:17 220:4,4 | 238:20 239:4 | **move** 35:19 |
| 277:5 | 231:18 239:1,6 | 239:10,10,15 | 124:6 140:24 |
| **mischaracteri...** | 240:4,4 242:7 | 239:16 243:15 | **moved** 49:1 |
| 65:16 100:9 | 242:7 250:3 | 252:1,21 253:3 | **movement** |
| **misconstrues** | 258:22 286:13 | 284:24 285:4 | 139:18 |
| 187:15 | 304:6 309:23 | 290:1 295:6,10 | **multiple** 48:5 |
| | | 295:11 306:8 | 52:9 214:11 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[multiple - number]**                                      Page 49

239:12,13
**mundane** 10:24
**municipality**
301:10
**mute** 6:5

**n**

**n** 2:1 3:1 4:1
5:1 6:1
**naked** 312:3
**name** 6:20 7:8
8:2,19 9:19,22
22:16 47:8
66:2,6,7 126:4
181:12 182:15
185:7
**name's** 22:1
**named** 63:12
64:12 71:4
136:21 219:21
**names** 21:20
22:23 66:9
114:1
**national** 30:4
**nature** 29:17
161:14
**ne** 2:6
**near** 177:12
**nearest** 238:22
**necessitate**
246:13
**need** 8:3 35:11
45:17 57:11
85:15 87:18

88:4 112:13
138:16 166:20
173:8 205:14
205:14,15
217:21 300:4
302:22,23
**needed** 241:4
**needless** 37:11
198:12
**needs** 211:2
225:13,14
227:20 263:3
**negligible**
244:12,15
245:8,18
**neutral** 246:5
**never** 15:18
20:12,13 40:18
65:1 95:14
145:1 155:19
180:10 181:24
209:1,5 237:14
237:14 246:21
252:7 266:7
277:4 287:1
298:11
**new** 1:3 3:8
6:16 17:11
19:20 20:1,10
24:10,17,19
25:20,21,22,23
26:22 27:14,23
30:19 31:4,4,9
31:10,11,12,15

32:11 73:24
74:23 83:14
87:1 88:17
91:11 93:4
95:2 112:11
123:13,14
128:17 129:13
135:1 137:7,7
137:18 139:8
140:10 141:16
142:11 143:16
144:21 147:8
147:21 151:11
171:9 173:11
197:20 212:5,6
212:9 217:18
220:13 224:1
227:11,12,12
234:14 251:5
251:17 252:6
252:19 263:20
263:20,23
264:7,7 266:5
266:7 299:13
319:9,10
**niagara** 171:8
**nine** 28:23
114:13 135:22
**ninety** 114:8,13
**nodal** 37:3
**noise** 300:24
**nominally**
160:12

**non** 29:21 43:8
45:7 194:18
198:13 204:7
206:1,1 245:14
249:14 289:5
**nonfunctional**
289:3
**norm** 13:16
245:15
**north** 2:17
16:14
**notary** 1:18
8:11 323:5,19
**note** 6:3 36:9
58:8 257:13
**noted** 166:3
**notice** 125:21
**notification**
54:7
**notion** 167:19
**nov** 5:18
256:18
**novelty** 37:4
**november**
63:18,20 64:15
67:16 81:4
82:13 239:10
239:12 284:20
286:3 299:8
**nuances** 45:6
**number** 6:17
9:15 13:5,17
14:1 49:22,23
50:6 52:12,21

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[number - objections]**                                              Page 50

| | | | |
|---|---|---|---|
| 61:21,23 62:4 | **o** | 69:10 70:14 | 192:8 197:3,13 |
| 62:8 129:2,19 | | 71:16 72:14,15 | 199:11,12 |
| 129:19 150:6 | **o** 6:1 236:24 | 73:2 74:4 75:6 | 202:8 204:13 |
| 236:17 239:17 | **o'toole** 2:4 7:5 | 76:22 77:8 | 210:8,22 |
| 239:24 243:2 | 258:9 285:12 | 78:7,14 79:6 | 211:14,22 |
| 243:12 247:2,7 | **oath** 6:22 7:23 | 80:13 83:24 | 212:23 214:18 |
| 247:24 248:1 | **object** 32:2 | 85:2,12 87:9 | 216:17 218:12 |
| 255:9,22 | 55:3 62:18 | 91:14 94:12 | 218:20 219:6 |
| 257:20 258:16 | 82:21 83:4 | 97:5,23 100:6 | 220:22 224:10 |
| 259:6 265:4,4 | 120:22 150:5 | 100:21 102:5 | 226:6 227:8 |
| 265:6 275:9 | 175:12 189:11 | 102:13 106:21 | 228:11,24 |
| 285:16,23 | 191:10 205:21 | 109:3 110:11 | 238:10 241:12 |
| 291:17 294:21 | 207:16 230:9 | 111:4,16 113:8 | 244:17 252:13 |
| 306:6,8,10 | 309:17 | 116:11 120:15 | 254:13 264:3 |
| **numbered** | **objecting** | 122:7,14 123:7 | 265:23 266:15 |
| 149:7 | 196:16 | 123:21 125:4 | 266:23 269:23 |
| **numbers** 10:18 | **objection** 11:3 | 128:9 130:1,15 | 270:3,5,13 |
| 298:18 316:8 | 11:11 15:2,13 | 131:2 132:3 | 271:13,24 |
| 316:20,22 | 15:19 18:23 | 133:17,17 | 272:8,23 |
| **numerous** | 20:18 22:12 | 140:1,7,13,18 | 273:18 274:23 |
| 17:22 30:18 | 24:11,11 26:23 | 141:2,20 142:7 | 275:16,16 |
| 38:12 213:15 | 30:14 31:17 | 142:12 143:9 | 276:7 277:2 |
| 276:24 | 32:3,13 36:15 | 143:19 144:23 | 280:3 282:4,8 |
| **ny** 1:9 2:11,18 | 38:1,22 39:7 | 146:9 150:17 | 282:21,21 |
| 3:8,20 5:16 | 39:15,20 40:9 | 151:5 154:13 | 283:8 288:17 |
| 6:14 148:20 | 41:18 44:14 | 154:16 160:4 | 290:7 292:11 |
| **nyiso** 176:23,23 | 45:1 46:11 | 162:17 164:23 | 308:8 311:4 |
| 194:13 202:20 | 48:20 50:22 | 165:8 167:3 | 312:4 313:16 |
| 305:4,14 | 51:13 52:6,18 | 176:12 177:20 | 314:10,21 |
| **nyseg** 299:17 | 58:16 59:2,8 | 178:17 179:13 | 316:9 319:22 |
| 299:18 | 59:14,21 60:12 | 179:18 180:7 | **objections** 7:1 |
| | 61:3 62:1 | 181:2 183:2,20 | 38:7 40:16,22 |
| | 63:24 65:3,15 | 185:10,24 | 55:14 56:9,19 |
| | 68:3,10,18,23 | 187:5,15 188:6 | 65:22 75:24 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

[objections - okay]                                              Page 51

| | | | |
|---|---|---|---|
| 81:7,15 84:14 | **occurs** 140:17 | 296:21,21 | 166:23 167:13 |
| 85:22 86:4 | **october** 82:9 | 299:4 309:8,10 | 168:14 170:17 |
| 87:16 94:18 | 135:22 285:1 | **okay** 6:2 8:16 | 172:3 173:7,18 |
| 98:12 121:8 | **offer** 7:12 | 9:7,14 10:1,13 | 177:2 178:5 |
| 180:17 312:16 | 87:21 138:4 | 15:10,17 17:14 | 179:5 182:3 |
| **objective** | 142:11,17,18 | 18:13 19:6 | 184:22 188:10 |
| 236:16 | 161:17 265:4,5 | 21:6,9,16,24 | 188:12,19,22 |
| **objectively** | 307:22 | 22:14,21 25:14 | 189:14 190:8 |
| 236:11 | **offered** 61:10 | 27:9 30:9 32:8 | 190:13 192:1 |
| **obligation** | 134:12 140:21 | 32:21 33:3 | 195:22 196:8 |
| 208:19 209:11 | 142:22 144:1 | 34:15 45:10 | 199:20 206:24 |
| **obligations** | 306:7 | 46:5,7,7,23 | 207:4 210:5 |
| 96:18 227:19 | **offering** 42:14 | 47:4 52:3 53:7 | 211:11 212:13 |
| **obliged** 260:12 | 42:16 46:8,19 | 54:9,19 57:20 | 213:13 215:10 |
| **obscure** 71:9 | 143:7,17 | 61:17 63:1 | 215:22,23 |
| **observable** | 154:11,17 | 65:11 66:15 | 219:23 222:19 |
| 158:2 | 161:18 163:11 | 67:6 68:15 | 224:5 225:17 |
| **observe** 247:1 | 163:12 186:23 | 78:4 81:19 | 228:18 229:2,5 |
| **observed** 192:6 | 221:24 260:13 | 83:1,13 88:13 | 229:5,6,20 |
| **obtained** 209:5 | 264:23 305:8 | 89:23 90:7,13 | 230:16,20 |
| **obvious** 260:2 | **offerings** | 91:8 92:2 94:5 | 231:2,6 234:10 |
| 260:2 | 141:18 | 94:5 99:20 | 234:11 235:2 |
| **obviously** 29:9 | **officer** 113:24 | 103:7,21,24 | 237:6 239:23 |
| 58:1 62:8 | **oh** 25:14 62:21 | 104:4,7,16,19 | 245:6 253:7 |
| 242:22 244:7 | 75:15 79:22 | 105:3,24 | 255:19,23 |
| 270:23 | 90:2,3 96:5 | 111:11 113:15 | 256:8 257:18 |
| **occasion** | 103:4,21 | 114:8,15,21 | 258:14,18 |
| 319:20 | 104:16 114:8 | 117:9 119:22 | 261:17,18 |
| **occasions** 17:23 | 117:8 119:24 | 132:12 139:3 | 268:23 271:20 |
| 38:16 239:3 | 137:12 148:15 | 143:24 144:9 | 275:10 276:22 |
| **occur** 72:6 | 148:17 150:8 | 144:15 145:11 | 284:11 286:10 |
| 189:7 234:22 | 182:7 195:19 | 145:22 148:8 | 286:10,10 |
| **occurrence** | 215:22 258:13 | 148:15 152:23 | 287:13,14 |
| 117:13 | 293:17 295:7 | 156:13 163:16 | 288:4 291:4,6 |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

[okay - outside]                                           Page 52

291:10 293:20
294:5,16,23,24
295:1 296:18
296:23,24
298:16,22
299:4,5,5,7,12
299:21,23
300:1,11,14
301:2,4,6,11,15
301:21,21,24
302:12,17,20
303:1,4,14,15
303:18 309:3
309:12 310:15
310:18 311:10
315:9,12,16
316:2 317:7,21
318:2,11 319:1
319:5,13,18,24
320:1,2
**omission**
194:17,17
**omitted**  229:14
**once**  56:14
77:18 109:23
117:9,13 152:4
269:13 297:12
**ones**  52:10,10
217:12 222:13
239:19,20
248:13 263:22
**online**  75:22
**oops**  295:8
302:12

**opened**  286:17
**operated**
240:24
**operating**
38:17 220:13
264:16
**operation**
169:10 211:5
**operational**
292:23
**operationaliz...**
175:18
**operationalize**
153:9 155:20
213:19
**operationalized**
156:5 165:15
219:8 223:4
**operationally**
227:2
**operations**
24:18 27:14
145:7
**opine**  20:22
39:23 42:12
73:17 80:2
85:4 96:21
131:19 163:1
206:1 273:19
278:9
**opined**  80:18
**opining**  153:16
157:8 200:11

**opinion**  40:4
42:14,16 71:3
87:21 89:2
90:18 96:21
146:22 154:18
161:17,18
162:21 163:13
167:1,6 173:21
174:22 177:7
179:1 181:12
182:14,15
183:1 184:3,18
185:8,9,19
186:23 188:1
199:22 203:18
204:2 226:13
252:10 258:23
259:8 267:7
268:3 272:20
273:7 275:7
276:5,11,19,23
278:20 280:7
**opinions**  69:9
70:18 75:12
76:4 134:10
146:4 155:3
180:10,12
181:1 184:11
184:19,24
**opportunity**
46:8 123:24
**opposed**  253:1
**opt**  265:15

**opted**  253:20
314:2
**option**  265:3,6
265:16
**order**  52:16
74:9,13 75:16
75:19 142:16
142:21 143:3
144:6 220:21
221:12 222:2
251:6 264:16
264:21 296:5,6
305:19
**ordinary**
274:21
**organized**  31:2
32:10 194:21
**organizes**  31:5
31:10,12,14
**oriented**  62:11
**outcome**  6:24
249:3
**outline**  166:4
**outlined**  178:3
304:9
**outset**  73:5
**outside**  15:19
43:16,17 46:12
55:4 56:9 68:3
68:23 70:14
71:17 73:2
75:6 76:22
78:8,14,15
79:6 80:14

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

[outside - paragraph]                                    Page 53

82:22 83:7
84:1 85:2 87:9
87:19 140:1
141:20 142:12
143:9 188:8
197:3 204:8
211:15 271:9
**overcharge**
70:23
**overcharged**
77:16,19,21
**overhead**
205:14 254:2
259:12 262:12
262:15 263:4
267:17 277:22
**overheads**
276:1 280:16
**overly** 44:19
**overpay** 79:21
**override** 117:5
**overrides**
205:19
**oversimplifyi...**
308:21
**overview** 89:11
**own** 163:12
203:12 206:4,4
207:11 217:21
217:21 236:13
281:5
**o'toole** 57:7,9
57:12 215:18
285:8 290:16

290:20,24
291:2,9 294:20
294:23 299:19

**p**

**p** 2:1,1 3:1,1
4:1,1 6:1
236:24
**p.m.** 139:4
188:20 231:4,7
284:9,12
315:17 318:12
320:5,11
**page** 5:9 58:18
88:9 103:19
104:6,13,24
105:2,4,6
106:13 114:18
115:1,11 117:3
124:11 128:14
135:6 136:9,10
136:10 147:4
147:20 149:8
150:8,10
156:12 164:5
190:10 193:22
219:14 234:8
238:23 239:23
240:2 242:2
249:19 257:6,9
257:20 258:12
261:16,22
279:12 284:18
286:12 287:19

287:21,24
288:1,2,5
290:22 292:8,9
292:16 293:13
293:17,18
294:6,8,18,24
295:2 296:18
297:14 298:19
298:23,24
299:8 301:8,21
301:22 304:1
310:16 311:10
318:16 321:4
**pages** 1:1 62:24
65:5 90:13
92:8 103:17
111:20,20
113:11 114:4
129:12 135:7,7
149:7 287:22
292:14
**paid** 52:10,11
54:7,7 55:13
158:23 223:19
314:7
**palikovic** 3:6
7:16,18
**pamphlet** 88:5
**paper** 58:24
96:13 209:8
**papers** 240:22
316:6,13
**paragraph**
39:1,4 63:10

63:11,19 64:11
64:11,15,20,23
66:20,21 67:11
80:23 82:4
88:9,14 91:8
91:19 92:3,10
92:15,20 93:16
93:20 94:7,24
99:20 100:16
104:21 108:7
110:21 111:14
112:12 116:4,9
116:23 119:8
123:20 124:8
124:11,16
125:5 130:10
130:24 136:6
136:10 146:16
146:18 147:19
156:11,15
163:17 164:3,8
164:20 166:17
169:3 174:22
190:10,14
193:23 198:17
202:24 203:1
206:7 224:17
226:17 227:7
229:6 234:8
238:18 249:23
253:9 257:3
279:7 304:1
318:15 319:6

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

[paragraphs - percent]                                              Page 54

| paragraphs | 109:12 110:18 | passwords | 96:13 98:16,24 |
|---|---|---|---|
| 229:11 | 111:23 124:7 | 241:24 | 99:7,10,21 |
| parameters | 125:1 133:4 | pause  197:10 | 101:15,21 |
| 156:6 213:17 | 140:16 151:2 | 197:15 199:9 | 107:15 109:7,7 |
| 238:23 240:2 | 166:20 171:6 | 200:1 | 109:12 125:15 |
| paraphrase | 171:18 179:8 | pay  53:12 67:3 | 126:5 |
| 265:14 | 190:9 234:1 | 71:24 205:14 | perceive  50:20 |
| paraphrasing | 238:18 253:6 | 205:15 211:3 | 208:7 308:12 |
| 265:10 | 288:8 289:11 | 234:4,13 | percent  27:22 |
| part  16:18 37:9 | 310:4 312:19 | 235:16 246:2 | 91:7 96:6,7 |
| 77:14 79:24 | 313:12 | 254:2 259:12 | 142:2 146:1 |
| 89:24 105:16 | particularly | 263:3 | 217:14,14,22 |
| 106:8 107:3,7 | 10:16 124:7 | paying  71:22 | 222:1,3 223:10 |
| 171:18 182:14 | parties  6:7 | payment  53:24 | 250:17,22 |
| 187:11 191:15 | 62:14 63:3 | 246:12 | 251:6,18 252:4 |
| 193:6 197:21 | 81:23 120:4 | pearson  2:15 | 252:5,6,10,16 |
| 204:1 209:6 | 139:2 155:14 | 7:10 | 252:19,21,24 |
| 213:23,24 | 188:18 231:5 | pedotto  5:12 | 253:3,12,18,21 |
| 223:6,14,14,15 | 284:10 315:15 | 113:16,20,23 | 254:6,10,17 |
| 225:10 229:16 | 318:8 323:16 | 115:3,17 116:2 | 255:2,5,8,21 |
| 229:16 251:5 | parting  202:13 | 116:6 117:4,21 | 256:3,3,4,5,10 |
| 262:11 263:12 | parts  31:3 80:6 | 119:7 | 256:13 257:2 |
| 267:22,22,23 | 195:24 | pedotto's  114:5 | 257:22 258:4,8 |
| 267:23 271:2 | party  6:23 | 115:20 116:20 | 258:21,24 |
| 271:23 276:13 | 234:18 235:19 | 121:10,11 | 259:3,5,7,9,18 |
| 293:21 | pass  198:21 | 123:18 | 260:20 261:15 |
| participants | 272:21 | peers  36:22 | 262:10,19,22 |
| 19:13,14 | passed  68:22 | pending  35:2 | 262:23 263:3 |
| particular  11:2 | 70:6 | 45:13 112:14 | 264:7 265:6 |
| 17:11 31:4,24 | passive  63:23 | 206:18 283:14 | 266:7,21 267:1 |
| 43:13 44:5,20 | 64:2,9,18,22 | 284:3 | 267:3,3,4,9 |
| 48:16 62:10 | 66:20 | people  50:21,24 | 268:4 269:5,21 |
| 89:5,18 90:18 | password | 51:1 74:17 | 270:11 271:11 |
| 90:24 92:8,16 | 241:11,15,19 | 93:5 95:19 | 272:19 273:15 |

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

**[percent - planet]**                                          Page 55

277:15 278:5,6
278:10,10
279:9,19,21,22
279:23 280:2
280:12,13,24
281:6,9,11,21
283:3 288:9
294:7,7 295:16
295:16 296:3
308:3,4,13
313:6,7,21
314:2 319:11
**percentage**
141:7 142:22
144:3,6 221:4
307:1 312:20
313:20
**perception**
174:10
**perfectly**  76:19
81:13 251:14
**perform**  37:16
273:24 274:10
**performance**
170:10
**performed**  53:3
53:5 55:17
135:11
**performing**
55:19 238:14
**performs**  208:6
**period**  76:16
83:20 133:15
142:15,16

147:23 153:24
224:19 236:3
236:10 243:20
246:10,11,18
266:12,17,18
266:20 297:6
310:21 312:20
313:19
**periodically**
147:24 150:2
150:13 151:1
151:24 152:8
154:1 232:12
**permanently**
25:21
**permitted**  34:6
**person**  10:23
13:2,13 89:2
97:18 118:5
188:2
**person's**  9:19
**personal**  28:6
**personally**  51:9
53:2,8,9 54:14
**personnel**
262:16
**perspective**
156:23
**pertain**  225:17
278:7
**pertaining**
311:12
**pertains**  121:22
151:20 235:4

310:11
**pgs**  5:11,12
103:9 113:20
**phd**  36:23
37:12,15 38:11
**phone**  3:4,5 4:6
6:6 7:14 9:16
47:8 189:22
**phrase**  164:11
166:18 171:19
179:10 180:15
182:18 183:13
185:19 186:9
186:10 187:3
192:2 195:7,8
195:12,22
198:18 199:3
199:10 200:2
202:5 212:1
276:18
**phrased**  63:23
216:22
**physical**  172:15
**physically**  29:2
189:18,18,19
189:20,21
**pick**  6:4 299:23
313:21
**piece**  107:20,21
272:6 302:15
303:16
**pieces**  172:5
249:4

**pinpointing**
261:20
**place**  6:7 26:11
26:15 125:19
195:12,23
248:18 297:8
**plains**  2:18
**plaintiff**  7:15
7:20 15:24
20:20,21 21:11
64:13,16 66:8
71:4,11 72:18
73:1 78:6 82:5
84:3 182:17
284:20
**plaintiffs**  1:7
2:22 3:12 7:10
7:18 14:11
22:4,10 47:17
51:8,22 53:20
59:11,19 60:9
60:24 61:18
63:13 66:22
69:16 78:13
84:5 105:7
135:3,9 136:21
147:6 155:4
164:21 166:4
167:1 189:4,6
214:3 219:21
238:13,15
248:3 307:3
**planet**  268:22

**plans** 138:4
264:1 267:9
**plants** 27:20
**plausible** 69:6
201:5 254:24
**play** 244:20
**played** 296:8
**playing** 162:5
**please** 6:3,5 7:1
7:3,22 8:5,19
30:15 31:18
47:7 75:14
77:1 85:6 90:9
91:16 113:18
146:11 150:19
183:4 187:8
188:15 195:16
214:20 215:2
215:23 234:6
244:22 245:1
257:10,10
270:5 293:16
298:19 301:10
301:12 314:12
318:5
**plenty** 134:9
254:4
**plotted** 310:20
314:6
**plotting** 310:1
**plus** 27:16
54:22 116:21
161:11,12,14
181:16 182:21

183:16 185:21
192:24 213:8,9
306:8,11,12
**point** 16:4
40:19 43:15
45:12,18 46:19
52:24 54:8
62:22,22 72:9
72:12 86:15
90:9 102:22
109:14 121:2
124:1 127:22
146:11,12
147:4 159:3,4
159:9 162:13
164:1 192:9
209:16 222:2
229:12 234:6
246:8 263:14
264:10 267:1,2
**pointed** 90:19
113:11 120:19
295:21
**pointing** 135:5
**points** 144:6
208:5 240:1
280:14,17
**policeman**
277:17
**policies** 5:17
256:17
**policy** 5:13,14
95:14 124:18
125:2,8,18

126:12 127:8
127:11 130:11
131:7 132:1,1
132:23 133:2
254:8,12
257:20 318:19
318:21 319:3
319:14,15,19
**portion** 93:17
94:8 124:7
**portions** 23:17
**position** 112:16
117:22 122:22
155:17 247:7
268:7
**positioned**
112:22
**positions** 13:13
16:19
**positive** 243:2
243:11 247:2
247:23 248:1
**possess** 41:1
**possession**
317:9
**possibility**
81:11,17 89:23
174:23 277:20
**possible** 79:12
83:21 84:4,19
88:1 126:14
260:18,22
317:24

**postdates** 132:1
**potentially**
194:2 233:10
**power** 16:5,8
16:10,14,15,23
17:2 19:9,24
27:13,18 30:5
30:10,11,19,21
30:24 31:2,11
31:15,21,22
32:12,14,15,15
32:18 37:4,6
88:1 145:13,16
168:8 171:9
175:2 176:22
181:15 182:20
183:15 185:21
194:12 202:17
213:16 229:8
234:22 246:3,7
**powered**
300:21
**powwr** 159:2
159:10,13
160:15 166:15
234:2,17,18,23
234:24 235:3
235:18,18
236:13,21,24
237:6,10,18
238:4,4,6,13,20
239:4,18 240:2
241:9 242:5,9
242:11,17

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

**[powwr - price]**                                               Page 57

| | | | |
|---|---|---|---|
| 243:2 244:3 | **preparation** | 243:15 278:15 | 151:21 152:3 |
| 246:16 248:12 | 190:3 | 293:6 295:16 | 152:12,19 |
| 248:19 284:15 | **prepare**  188:22 | 296:12 298:3 | 153:2,4 156:7 |
| 284:24 286:2,2 | 189:5,24 192:2 | 305:12 308:15 | 157:22 160:11 |
| 287:17 289:7 | **preparing** | 316:14 | 160:21 161:4,5 |
| 289:17,24 | 238:8 | **prevailing** | 161:23 162:3 |
| 297:13,19,22 | **prescription** | 49:15 168:1 | 163:12 166:1 |
| 298:5 315:20 | 9:1 | 304:4,7,16 | 168:5 186:11 |
| 315:22 | **present**  4:3 7:2 | 306:4 307:7 | 193:16 195:14 |
| **practical**  76:11 | **presently**  321:4 | 310:3 312:13 | 196:1,1,12 |
| **practically** | **preserved** | 313:13 314:15 | 198:19,23 |
| 135:23 | 248:18 317:3 | **prevent**  86:17 | 199:3,23,24 |
| **practice**  42:2 | **pressing**  108:6 | **previous**  23:1,3 | 200:2 201:6,9 |
| 125:19 203:10 | **presumably** | 23:5 30:9 | 201:14,18 |
| **practices**  43:16 | 72:20 125:21 | 96:24 293:10 | 203:2,7,12,16 |
| 146:6 | 248:14 259:12 | **previously** | 203:19,20 |
| **practicing** | 305:7 | 136:13 166:3 | 204:5,12,23 |
| 11:21 33:8 | **presume**  77:16 | **price**  16:14,15 | 205:6,20 206:9 |
| 36:18 38:11 | **presumed** | 37:6 71:12 | 207:10,12 |
| **preceived** | 145:20 | 88:17 91:11 | 208:4,8 210:6 |
| 167:19 | **presumption** | 93:4,10 95:2 | 210:16,20 |
| **precise**  186:20 | 72:8 79:20 | 96:3 98:10 | 211:20,23 |
| 187:1,4,18 | **pretend**  42:12 | 100:1,3,17 | 212:1,5,6,10 |
| 258:6 | **pretending** | 101:21,23,23 | 213:7,8,9 |
| **predates**  132:8 | 45:5 | 102:11 110:7 | 214:16,23 |
| 171:4 | **pretty**  17:9 | 112:10 117:10 | 215:7,10 216:5 |
| **predominant** | 26:19 29:18 | 123:13 135:12 | 216:9 217:3 |
| 141:12 | 55:22 95:3 | 138:7,11 140:5 | 218:6,18 219:2 |
| **predominantly** | 145:9 152:14 | 140:21 145:23 | 220:5,10 |
| 26:14 32:14 | 170:3 179:24 | 146:7,19,24 | 221:17 222:20 |
| 151:21 | 217:16 230:12 | 147:3,11,16 | 223:1,23 |
| **preferred** | 230:16 234:21 | 149:17,20 | 225:18,18,19 |
| 156:24 157:9 | 236:1,1,6,6 | 150:16,23 | 225:21 226:21 |
| 158:5,8,9,15 | 238:7 241:8 | 151:3,8,20,21 | 228:5,8,10,16 |

800.808.4958                                                 770.343.9696

Edo Macan                                        December 17, 2025
Brous v. Eligo Energy, LLC

**[price - procurement]**                                         Page 58

| | | | |
|---|---|---|---|
| 230:14 231:17 | 165:6,24 166:8 | 245:23 246:5 | **procedural** |
| 231:19,20,24 | 166:18 167:8,8 | 295:12 297:7 | 190:6 |
| 231:24 232:2,4 | 167:9,14,21,22 | **principle** | **procedure**  1:16 |
| 232:10,22 | 167:22 168:5,6 | 211:10,11 | **procedures** |
| 233:16,22 | 168:9,16 169:6 | 212:8,14 218:7 | 5:17 256:18 |
| 235:4 250:19 | 169:10,10,12 | 219:4 269:14 | 292:1 |
| 260:13 265:3 | 169:14,16,16 | **principles**  41:7 | **proceed**  7:24 |
| 274:11 278:14 | 169:21 170:10 | 41:10,17 | 203:4 |
| 294:17 297:5 | 171:20 172:11 | 212:19 218:19 | **proceeding**  7:1 |
| 310:7,20 | 173:22 174:4,8 | 219:4 | 8:3 14:16 |
| 311:15,17,18 | 174:10,13,23 | **print**  127:24 | 268:10 |
| 311:20 312:13 | 175:4,4,23,24 | **printout** | **process**  18:4,5 |
| 313:13,14,15 | 176:9 177:8,16 | 127:24 | 51:19 54:18 |
| **priced**  209:3 | 177:24 178:1 | **prior**  19:7 24:1 | 89:6 91:2 95:9 |
| 244:8 | 186:11 187:3,8 | 78:23 112:15 | 95:9 98:14 |
| **prices**  17:15,18 | 187:14 190:19 | 121:4 136:4 | 101:2 102:21 |
| 48:22 124:19 | 190:23 192:14 | 142:21 163:8 | 106:6,17 |
| 125:9 138:5 | 192:23 193:5 | 199:12 221:11 | 107:12,17 |
| 149:12 153:13 | 193:16 199:1 | 224:11 235:15 | 108:4,13,16 |
| 168:1 200:8 | 201:17 202:6 | 236:20 238:21 | 109:11,23 |
| 223:23 224:3 | 202:16 204:8 | 264:16 284:24 | 112:22 115:5,8 |
| 226:2 236:19 | 208:3 211:12 | **prism**  164:2 | 115:13 116:3 |
| 252:22 278:14 | 211:13 212:17 | **private**  6:5 | 130:7 190:6 |
| 304:4,8 314:6 | 217:2,8 223:15 | **probably**  12:13 | 208:5 251:3 |
| 314:7 318:22 | 223:22 224:7,9 | 12:17 26:12 | 273:9 277:24 |
| **pricing**  37:4 | 224:14,18 | 70:7,7 71:20 | **processes**  93:10 |
| 71:9 105:10 | 225:5,6,8,11,17 | 74:17 121:18 | **procure**  220:13 |
| 108:18 147:9 | 225:24 228:15 | 121:23 141:3 | 225:13 236:9 |
| 152:11 153:4 | 228:19,23 | 245:14 249:14 | 314:2 |
| 156:6,8 157:21 | 229:8,18,24 | 250:24 252:2 | **procured** |
| 160:15,20 | 230:6,13 | 273:23 312:21 | 221:24 236:15 |
| 161:22 162:1,4 | 238:19 239:10 | **problem**  169:9 | **procurement** |
| 162:16 164:9 | 239:12 242:18 | 294:13 | 19:18 20:9 |
| 164:12,16 | 243:15 245:20 | | 96:6 159:10 |

Edo Macan                                     December 17, 2025
Brous v. Eligo Energy, LLC

169:14,15
202:22 219:19
229:8,11,17
250:2 260:10
262:2 284:19
297:14 298:7
**procuring**
176:20 181:15
182:20 183:15
185:21 192:15
194:11 234:22
264:17 265:21
267:13
**produced**
126:24 145:20
170:18 172:16
239:11 240:21
248:13 289:19
289:20 295:15
316:13
**producing**
146:2
**product** 141:18
174:13 211:12
223:10 237:15
243:14,14
244:7 245:20
252:17 260:13
299:12 307:12
307:21 308:18
**productive**
305:20
**products**
242:19 244:7

251:19 252:7
252:12 266:8
**professional**
34:16 37:20
152:16 190:24
194:18 267:17
274:22 323:4
**professionals**
262:16
**professor** 70:13
71:5
**proffered**
188:4
**proficient**
293:6
**profile** 299:21
299:23
**profit** 210:4
215:8 217:6,22
253:22 259:13
260:20 269:16
281:8
**profitability**
126:17,22
**profitable**
95:17 126:18
211:2,2,3,5
**profits** 56:1
**program** 74:8
95:24 96:4
**programming**
288:23
**project** 141:7

**promising**
162:7
**promotion** 88:3
**proposed** 117:6
213:18
**proposition**
169:19
**protect** 260:7
**protected**
241:11,15
**protocol**
248:24
**provide** 122:24
173:20 223:8
273:3 289:10
289:11
**provided** 10:17
84:3 89:9
131:12 142:2
154:23,24
156:1,2 162:24
165:11 175:15
177:11 180:10
209:1 214:4
221:22 223:5
241:20,23
247:16,18
249:5,15 274:3
289:4,12
291:14,14
**provider** 71:23
**providing** 30:2
152:7 180:11

**provisions** 1:14
**proxy** 135:13
**prudent** 260:14
277:11
**pry** 28:9
**psc** 252:6,19
263:20,24
266:5,7
**pse** 217:18
**public** 1:18
8:11 41:4
74:11 250:23
251:17 268:17
323:5
**pull** 285:7,11
297:22
**pulled** 254:7
286:15 309:15
**purchase** 19:9
145:4,6
**purchased**
144:18 145:2
**purchasing**
19:24 144:22
202:17
**purely** 205:11
**purpose** 46:16
175:8 249:9,9
287:3
**purposes** 87:23
137:10 153:1
229:7 231:14
304:8 312:9

Edo Macan                                   December 17, 2025
Brous v. Eligo Energy, LLC

**pursuant** 1:14 289:9

**pursue** 255:6

**pursued** 255:2 255:6

**pursuing** 269:5 280:13

**put** 50:16 73:11 89:3 90:1 91:5 95:22 98:22 175:20 198:7 272:13 290:22

**putting** 58:24 85:20 100:1 213:24

**q**

**qualifications** 40:20

**qualified** 39:12 39:18 40:7,14 71:10 155:17

**qualify** 108:16

**quality** 10:24 249:1

**quantification** 198:7 213:17

**quantify** 193:20 214:12 214:13 272:12

**quantifying** 201:16 274:11

**quantitatively** 193:11

**quantum** 23:11 179:22

**question** 9:11 11:5 15:5,8,10 18:14 19:2 21:7 33:14,16 33:19 34:6,7,8 34:9,17,20 35:1,9,13,17,18 38:4 39:23 43:22 44:1 46:4 47:2 50:4 55:8 71:7 73:22 75:15 77:2 79:11 86:16 91:17 105:6,8,13 110:14,18 112:14,15 115:2,11 116:14 117:21 118:10,12,15 118:17,20,24 119:5,11,14 121:2,17 131:16 132:20 135:16 136:4,8 136:19 150:21 161:15 162:17 166:16 173:4 175:13 177:9 180:14 187:23 189:20 191:20 199:16,17

201:11,24 202:13 205:24 206:5,17,20,23 207:2 216:12 220:8 230:2 244:23 247:6 256:9 264:10 269:8,9 270:15 270:17,21 271:1,4,6 272:4 273:2,9 273:11 274:17 275:2,4 276:8 279:14,24 282:17 283:14 283:15,16,19 283:23 284:3 290:3 291:16 292:13 293:11 295:3 296:14 304:12,23 313:11 317:12

**question's** 45:13

**questioning** 111:22 284:5

**questions** 9:9 32:22 45:10 54:14,18 67:6 69:2 70:4 73:18 120:8 131:15 177:3 185:15 190:8 282:15 284:1

292:18 303:23 317:20,23

**quick** 88:10 119:19

**quit** 69:23 72:10 86:23

**quite** 12:10 21:17 50:12 67:2 274:8 304:19 315:8

**quotation** 90:1 93:13,22 172:1

**quotations** 164:9

**quote** 93:17 105:7,17,22 106:8,10 168:17

**quoted** 89:19 93:1 94:8 126:8 170:1

**r**

**r** 2:1 3:1 4:1 6:1 133:21 237:1 321:1,1 322:1 323:1

**raise** 8:5

**raising** 118:21

**ramsey** 66:2,10 78:12

**ran** 97:2 126:16

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[rarely - rates]**

Page 61

| | | | |
|---|---|---|---|
| **rarely** 190:18 | 135:13 136:5,6 | 255:3 259:13 | **rates** 18:5,6 |
| **rate** 5:13,14 | 136:11,12,14 | 259:14,16 | 44:10,18,21 |
| 17:22 18:1 | 136:17 138:4 | 260:7,11,13,16 | 47:22 48:13,17 |
| 47:5,11,16,18 | 146:5 147:9,23 | 260:24 263:1 | 49:1,10 50:11 |
| 47:21 48:2,3,7 | 147:24 149:23 | 263:18,24 | 53:4 69:18 |
| 48:19 49:4,8 | 150:2,13,24 | 264:1,8,11,22 | 71:19 72:20 |
| 49:14,14,15,17 | 151:12,15,23 | 265:22 266:2,7 | 73:23,24 74:1 |
| 49:20 50:1,2 | 152:5,6 153:24 | 266:8 267:9 | 74:14,19,23 |
| 50:11,17,18,20 | 154:1 158:1 | 269:1,1,6 | 75:4,22 76:5 |
| 67:13 77:6,6 | 159:7,12 | 273:5 275:21 | 76:19,20 79:14 |
| 83:22,23 85:1 | 165:22,23 | 275:22 277:11 | 85:11,20 86:3 |
| 94:9 96:7 97:2 | 166:6 181:14 | 277:13,14,15 | 86:3,10,11,18 |
| 97:20 98:7 | 181:18 182:19 | 278:5 280:11 | 88:16 91:10 |
| 99:22 102:21 | 182:23 183:14 | 280:12,13,22 | 93:3,6,7 95:1,9 |
| 105:10 106:5 | 183:18 200:18 | 281:12,18,21 | 95:12,12,15,17 |
| 106:18 107:16 | 203:10 204:3 | 281:22 282:1,3 | 95:20 96:2,22 |
| 108:24 113:5 | 206:8 208:21 | 282:18 287:24 | 98:9,17,24 |
| 115:6,8 116:3 | 209:10 217:19 | 288:1,6,9 | 99:12,15,24 |
| 118:7 122:2,13 | 217:20,23 | 290:4 292:15 | 101:2,13,14,16 |
| 124:12,12,17 | 219:9 232:12 | 293:12 295:3 | 101:16,20,22 |
| 124:21 125:2,2 | 232:15,16,20 | 295:17 296:3 | 102:1,18 105:8 |
| 125:7,10,17,17 | 238:21 242:5,8 | 296:16 299:6,7 | 105:9 107:15 |
| 125:17 126:17 | 242:14,17,24 | 299:21 304:2,3 | 107:16 108:3,4 |
| 126:19,20,21 | 243:2,10,14,14 | 304:16 306:5,7 | 108:17 109:2,8 |
| 127:1,8,11 | 243:23 244:3 | 306:10,13 | 109:10 110:6 |
| 128:6 129:8,16 | 245:17 246:16 | 307:7 310:1,2 | 112:9,23 115:5 |
| 129:24 130:10 | 246:17 247:2 | 310:3,19,19 | 115:5,14,22 |
| 130:11,22 | 247:23 250:19 | 311:14 313:2,6 | 116:7,8 117:6 |
| 131:7,7,10,18 | 251:8,11,12,18 | 314:16 318:19 | 120:13 121:7 |
| 131:23,24 | 251:21 252:7 | 318:21,24 | 123:12 125:18 |
| 132:1,16,18,18 | 252:11,17 | 319:10,12 | 125:20,23 |
| 132:22 133:14 | 253:13,22,24 | **ratemaking** | 126:13 128:1 |
| 133:22 134:3 | 253:24 254:3,5 | 268:10 | 134:24 135:10 |
| 134:18 135:8 | 254:21,21 | | 135:15,18 |

| | | | |
|---|---|---|---|
| 136:11 142:18 | **read**  33:24 | **ready**  77:10 | 172:21 173:12 |
| 147:24 159:16 | 66:10,16 88:11 | 173:5 188:10 | 174:11 183:21 |
| 161:21,21 | 89:8,8,14,19,20 | **real**  31:7 32:16 | 184:16 195:3 |
| 162:8 185:21 | 89:24 90:2,2,8 | 202:21 227:12 | 198:10 199:9 |
| 194:14 200:14 | 90:14,14 91:21 | **realistic**  268:14 | 199:17 225:4 |
| 213:11 216:23 | 92:11 95:6,7 | **reality**  214:1 | 241:1 247:5,19 |
| 221:24 229:9 | 99:5 105:3 | **realize**  48:24 | 247:19 248:8 |
| 232:23,23,24 | 108:9 111:21 | **realized**  69:15 | 249:11 250:23 |
| 233:1 235:11 | 111:24 112:12 | 69:22 72:9,13 | 260:5 261:1 |
| 235:14 240:24 | 114:19 117:3 | 77:18 | 282:11 291:12 |
| 243:17 244:9 | 120:20 121:18 | **really**  18:8,10 | 296:10 297:6,9 |
| 246:14 247:8 | 121:20 123:24 | 21:4 24:21,21 | 301:17 303:21 |
| 260:10 264:14 | 124:2 125:13 | 25:5 26:10 | 304:10 308:14 |
| 264:23 265:2,4 | 126:6,8 134:13 | 27:5 28:7 | **reason**  8:21 |
| 265:5,20 | 150:6 151:8 | 29:21 45:22 | 37:1,8 49:11 |
| 297:11 305:6,8 | 168:18 172:3,5 | 47:2 50:23 | 68:2 73:8 |
| 313:3 314:17 | 178:12,15 | 51:10 62:3,12 | 77:12 78:24 |
| **rather**  159:18 | 182:7,12 183:5 | 64:5 65:8 66:6 | 98:16 101:12 |
| 236:17 245:15 | 183:5 189:2,2 | 66:23 67:4 | 106:4 113:3,4 |
| 247:17 312:23 | 201:23 202:1,2 | 70:8 71:6,12 | 126:2 128:7 |
| 312:23 | 202:5 204:6 | 80:3,7,18 | 198:12 254:23 |
| **rating**  200:19 | 215:7 244:24 | 89:21 93:1 | 260:5 263:16 |
| **rational**  315:7 | 245:3 249:20 | 98:22 100:9 | 277:7 295:5 |
| **rationale**  313:9 | 254:18 255:10 | 101:18 106:24 | 315:21 |
| **rationales** | 318:18 321:4 | 106:24 109:17 | **reasonable** |
| 263:21 | 322:3 | 110:1,13,15 | 69:20 143:13 |
| **rationally** | **readily**  249:11 | 111:23 122:20 | 143:15 188:2 |
| 263:14 | **reading**  99:4 | 124:3 126:11 | 217:10,12 |
| **reach**  167:14 | 101:1 102:16 | 126:12 127:16 | 250:1,12,13 |
| 176:9 190:21 | 152:15 153:21 | 142:20 152:23 | 253:12 259:10 |
| 283:3 | 157:1,19 158:6 | 153:5 155:13 | 265:20 274:20 |
| **reaching**  200:1 | 213:7 | 163:7 170:14 | 275:8 276:5,18 |
| 258:3 | **reads**  321:4 | 170:16,19 | 276:19,22 |
| | | 171:14,21 | 278:21 279:19 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

[reasonable - recs]

Page 63

280:1,20 283:6
319:17
**reasonableness**
96:22
**reasoning** 78:1
78:4 79:3 84:2
98:15 107:10
244:21 259:11
**reasons** 28:6,6
28:9 34:24
68:12 139:22
140:5
**rebuttal** 189:2
**rec** 144:11,17
144:21,22
145:2,4,12,14
145:14 221:5
222:1 225:16
226:24
**recall** 13:4 14:1
17:23 18:10
20:3 23:7,21
24:14,21 25:8
25:18 27:7,21
61:20,22 62:4
65:9,24 66:6,7
66:23 69:6,14
73:7 75:8,9
78:18,21 80:4
80:8 82:23
83:6,12 89:5
89:21,21 90:23
97:7 101:1,11
112:18 117:7

125:12 126:3
127:2,2 130:6
132:6 134:20
134:20,22
140:19 154:8
168:19 170:16
170:21 171:23
171:23 172:6,7
172:18,22
173:12 179:17
180:19,23
181:6,7 183:22
184:2 192:21
199:15 237:4
241:14 246:19
246:23 248:8
254:16,16
256:1,14 319:1
**recalling**
171:14 173:15
**receive** 51:23
53:9 182:9
**received** 182:2
**receives** 53:12
**recent** 74:12
**recently** 48:1
**recognize** 58:4
**recollect** 21:20
**recollection**
19:16 21:19
52:4 57:2
69:13 74:11
97:17 98:3
101:1 102:16

109:16 136:7
136:16 171:17
179:4 181:9
243:8 245:12
247:10 319:6
**recollections**
242:20
**reconcile**
206:13,20
207:13
**reconsider**
131:1
**record** 6:8 7:4
8:19 9:20 19:8
26:12 36:10
46:6 65:4,16
78:10,16 79:7
81:22,23 82:1
83:5,11 91:21
93:9 97:24
100:22 102:14
103:16 120:3,4
120:6 127:19
132:4 139:2,4
142:8 145:12
173:8 186:1
187:16 188:7
188:17,18,20
224:13 231:4,5
231:7 240:19
245:3 254:14
257:13 258:9
264:4 265:24
272:1,3,4

274:16 277:6
284:9,10,12
285:12,16
286:22 287:4
296:6 315:14
315:15,17
318:4,7,8,12
320:4 322:6
323:13
**recorded** 6:10
**recording** 6:6
**records** 236:13
249:8 269:3
289:22
**recover** 268:3
**recreate** 289:2
292:22 298:8
**recross** 5:2
**recs** 144:3,9
146:1 220:2,3
220:5,9,14
221:1,1,3,9,9
221:11,19,19
221:21 222:19
222:24 223:8
223:13,20
224:8,21 225:9
225:18,18
226:4,11,15,21
227:5,10,12,15
227:16,22
228:6,6 229:10
229:14,15,21
229:23 264:18

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[recs - remember]**                                        Page 64

265:21 267:13
267:13 297:18
308:15,17
**red** 60:1 135:7
**redacted**
241:16
**redirect** 5:2
**refer** 30:18
77:1 147:10
151:14 165:18
169:21 174:23
226:5 233:9
249:18
**reference** 88:21
99:21 128:17
146:24 164:11
176:11 192:14
192:18 194:6
196:15 197:12
201:10 202:6
203:1 218:18
222:24 231:19
232:2,16 233:1
254:6 309:16
**referenced**
196:2,2
**references**
173:14
**referencing**
256:11
**referred** 115:8
163:8 232:15
234:17 257:3

**referring** 97:14
133:2 147:18
151:7,7 161:3
215:11 220:20
221:1 226:16
227:6 255:6
263:22
**refers** 187:14
194:7 199:15
199:23 233:6
**reflect** 128:5
129:23 130:22
131:23 242:10
**reflected** 242:9
261:15 275:13
**refresh** 136:7
136:16 181:9
319:6
**refreshing**
136:19
**refused** 180:24
**refusing** 15:7
**regard** 19:24
41:9,14,15
111:13
**regulation** 37:3
221:12 227:23
**regulations**
220:15
**regulator** 30:4
217:17 251:2
262:19 264:7
264:22 268:8
268:19,20

277:17,23
278:3 280:7,10
281:4
**regulators**
277:9,10
**regulatory**
12:15,24 13:3
13:9 17:24
29:20 30:2,4
38:15 43:17
48:11,12,13,19
203:15 208:12
209:18 220:19
250:24
**reiterate**
249:12
**relate** 30:6
240:1
**related** 6:22
10:7 18:4,5,9
19:17 64:12
**relates** 82:5
161:7 171:20
233:6
**relating** 201:8
**relative** 313:1
**relatively** 28:5
**relevant** 70:1
71:2 90:19
202:19 236:10
238:14 249:7
266:12,20
279:10 307:11

**reliable** 236:2
237:17,21
289:8,17 319:9
**relied** 65:7
127:21 239:22
248:12 258:3
**rely** 89:10
123:5 180:24
292:6
**relying** 72:23
169:18 289:16
**remain** 68:16
80:11 81:3,12
294:15
**remained** 68:9
**remains** 267:7
**remark** 209:19
**remember**
13:16 16:12
23:8 25:5
56:13 66:18
70:8,10 89:18
97:11 99:3,4
102:17 117:24
121:20 122:4
124:4 169:23
169:24 180:21
182:1 184:16
192:16,20
193:3,6 196:9
243:4 246:21
251:20 252:3
258:6,8 266:24
298:5

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

**[reminder - requirement]**                                    Page 65

| | | | |
|---|---|---|---|
| **reminder** 9:8 | **report** 5:10,15 | 151:14,15 | 302:21 303:1 |
| 117:18 | 5:19 10:21 | 153:1 154:22 | 303:16,19 |
| **rendering** | 11:9 12:14,14 | 154:23 157:4 | 309:1 320:2 |
| 177:7 184:19 | 13:10 14:21 | 159:10 163:18 | 323:4 |
| **renewable** | 15:18,20 23:13 | 164:15 165:18 | **reports** 30:3 |
| 142:4,19,23 | 23:18,20 30:12 | 169:3 179:2,6 | 38:12,14 |
| 143:8,18 144:1 | 30:17,22 39:1 | 180:4,11,14 | 166:15 234:24 |
| 144:12 145:21 | 43:14 55:4 | 181:23 183:19 | 234:24 235:3 |
| 146:3 265:8 | 56:10 57:6,15 | 183:23 189:2,2 | 235:18,18,19 |
| 266:13,22 | 57:19 58:5,8 | 189:3 190:2,9 | 236:13 238:14 |
| 307:21,23 | 58:14,21,22 | 204:2 210:23 | 248:12 |
| 308:4 | 59:9,13,16,19 | 215:19 216:6 | **represent** |
| **repeat** 55:7 | 59:23 60:10,20 | 221:3 224:17 | 78:10 103:4,12 |
| 75:14 77:1 | 61:2,19 62:8 | 231:15 238:8 | 128:3 |
| 85:6 116:14 | 62:10,12 66:22 | 238:20,24 | **representation** |
| 150:20,21 | 68:4,24 70:19 | 239:2,4 242:2 | 73:3 131:22 |
| 195:16 203:24 | 71:17 73:3 | 257:11,14 | **representing** |
| 207:1 214:20 | 75:7 76:15 | 259:19 279:1,3 | 2:10,21 3:11 |
| 215:2,3 244:22 | 82:3 88:9 94:7 | 284:18 288:2 | 3:19 6:20 7:10 |
| 270:5 293:5 | 94:21 95:10 | 289:14 290:1 | 22:9 |
| 314:12 | 97:9,10,18 | 296:8 304:9 | **represents** |
| **repeatedly** | 98:20 100:2 | 307:9 309:5,15 | 156:24 250:17 |
| 282:16 | 101:5 102:20 | 310:13 312:21 | **reproduced** |
| **repeating** | 104:22 105:14 | 318:16 | 309:16 |
| 237:23 | 106:9,11 | **reporter** 1:18 | **request** 46:18 |
| **rephrase** 11:4 | 107:22 111:1 | 7:22 8:1,13 | 289:10 |
| 18:14 30:15 | 119:9 123:6,15 | 103:6 113:19 | **requested** |
| 31:18 43:21 | 124:7 130:8,24 | 114:10 127:5 | 240:21 |
| 91:16 199:21 | 132:21 136:22 | 138:23 148:10 | **require** 241:19 |
| 273:2 | 140:2 144:5,18 | 245:4,7 255:12 | **required** 55:5 |
| **replaced** | 146:7,12 | 255:14,18,20 | 56:10 221:12 |
| 314:15 | 147:10,13 | 256:16 300:9 | **requirement** |
| **reply** 106:10 | 148:14,19 | 300:17 301:1,3 | 142:20 220:19 |
| | 149:1 151:4,9 | 302:11,15,18 | |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

| | | | |
|---|---|---|---|
| **requirements** | **respect** 118:6 | **retail** 17:15,18 | 116:3 121:14 |
| 221:5 | 177:14 237:24 | 18:5,20 136:23 | 121:16 132:17 |
| **requires** 37:17 | 249:18 269:12 | 137:2,19,21 | 185:6,8 203:5 |
| 273:16 | **respects** 275:9 | 139:7,13 168:8 | 241:9 |
| **reread** 109:18 | **respond** 27:1 | 169:20 174:19 | **reviewed** 65:6 |
| **research** 11:17 | 110:16 | 174:24 176:11 | 73:5 80:6 |
| 11:19 37:2,10 | **responding** | 191:8,21,21 | 113:15 116:6 |
| 171:7 172:16 | 79:11 172:10 | 192:3,5,13,14 | 116:13,15 |
| 237:20,21 | **response** 43:6 | 192:17,21 | 119:7 120:11 |
| **resell** 168:11 | 46:3,8 99:16 | 193:5 194:12 | 120:18 121:10 |
| 175:3 | 157:21 160:19 | 200:8 201:4 | 121:11 123:5 |
| **reselling** | 161:22 165:23 | 202:15 205:12 | 123:19 124:3 |
| 205:12 226:3,3 | 170:9 200:15 | 212:4,6,10 | 127:22 154:5 |
| **reserve** 7:11 | 200:19 203:11 | 213:16 215:18 | 191:14 192:6 |
| **reset** 74:9 | 208:3,6 213:12 | 225:6,7,21 | 238:13 249:1 |
| 75:16,19 | 217:1 266:2 | 226:2 227:17 | **reviewing** |
| 142:16,21 | 271:2 304:4 | 231:20 232:3 | 190:22 |
| 143:2 220:20 | **responses** | 232:17 233:2 | **reviews** 115:13 |
| 221:11 222:2 | 110:17 | 304:4,8 307:17 | 115:21 116:7 |
| 243:3,10 | **responsible** | **retailer** 168:7 | **rewrite** 106:1 |
| 247:23 251:6 | 16:13,15 | **retain** 22:23 | 106:17 111:12 |
| 264:16,21 | **responsive** | 126:9 | **rg&e** 83:18,23 |
| **residential** | 35:18 | **retained** 15:24 | 85:19,19 |
| 137:12 139:9 | **rest** 92:20 | 20:21 21:10 | 128:17,18,20 |
| 139:14 140:11 | 112:12 288:2 | 48:5,8 320:7 | 128:24 129:9 |
| 141:9 144:2 | **restart** 300:10 | **return** 209:22 | 129:13,24 |
| 147:7 151:11 | **restarted** | 251:7,23 | 130:23 131:17 |
| 299:23 | 300:19 | 259:15 | 133:14,22 |
| **resolved** | **restate** 176:14 | **returns** 126:19 | 299:21 310:5,6 |
| 155:13 214:7 | **restating** | 280:12 | 310:21 |
| **resources** | 123:23 | **revert** 294:6 | **rge** 299:21 |
| 145:21 146:3 | **result** 273:7 | **review** 7:12 | **richards** |
| 265:8 | 291:21 | 51:21 67:23 | 178:22 182:16 |
| | | 89:13 114:21 | 182:17 183:12 |

Edo Macan                               December 17, 2025
Brous v. Eligo Energy, LLC

**[rid - right]**                                          Page 67

| | | | |
|---|---|---|---|
| **rid**  287:6 | 85:21 87:7,13 | 156:10,22 | 238:18 239:5,8 |
| **right**   7:11 8:5 | 87:15 88:8,14 | 157:5,11 160:3 | 240:6,10 |
| 10:6 11:15 | 90:3,12 91:1 | 160:23,24 | 241:11 242:16 |
| 12:24 14:3 | 91:13 92:6,10 | 161:10 163:7 | 243:22,23 |
| 15:12 16:4,6,8 | 93:18,20 94:2 | 163:22 164:9 | 244:21 245:7 |
| 16:23 19:3,20 | 95:4 97:4,17 | 164:13,17,22 | 249:23 250:2 |
| 20:11,14 22:4 | 100:20 102:12 | 165:5 168:24 | 251:19 252:6 |
| 23:4,15 24:3,6 | 104:21,24 | 169:2 170:6,10 | 252:11,22,23 |
| 24:7,22 25:6 | 105:4,11,14,19 | 170:24 171:2,4 | 252:24 253:9 |
| 25:23 26:6 | 105:21 106:2,9 | 171:10 172:8 | 253:14 254:8,9 |
| 27:19,24 28:4 | 111:15 112:19 | 174:5,17 175:7 | 254:10 258:21 |
| 28:17,19,21,22 | 113:13,24 | 175:11 176:7 | 259:5,6,23 |
| 28:24 29:7,8 | 114:2,3,14,24 | 177:16,19 | 260:5 262:5 |
| 29:10 30:13,19 | 115:9 120:1,14 | 179:4,12 | 264:10 266:11 |
| 31:9 35:22 | 121:11 122:5 | 182:10 186:8 | 269:16,22 |
| 38:6,21 41:24 | 123:20 124:6 | 187:23 189:19 | 270:8 271:21 |
| 41:24 44:13 | 125:20 127:4,7 | 189:24 190:19 | 271:23 272:15 |
| 47:1,16 48:18 | 128:22,22,24 | 190:23 191:20 | 273:7,17,23 |
| 49:6 50:4 51:7 | 129:11,20 | 195:10,18 | 274:17 275:12 |
| 53:14,24 54:13 | 133:8,8,11 | 196:14 198:19 | 276:20 278:18 |
| 54:23 55:1 | 136:21,24 | 201:9 203:7,16 | 279:15,24 |
| 57:1 58:11 | 137:4,6,11,14 | 210:7 214:24 | 281:7,15 282:3 |
| 61:17 62:8 | 137:22 138:1,8 | 216:6,10 | 282:14,20 |
| 63:6,16 64:13 | 139:6,16,21 | 217:24 218:16 | 283:6 284:15 |
| 64:17,18 65:9 | 140:12 142:5 | 220:1,3 221:14 | 284:22 285:5 |
| 66:17 67:17,20 | 143:3,15 | 221:19,20 | 286:8,11,12 |
| 69:9 70:12,20 | 144:17 145:13 | 223:1 224:21 | 287:16,23,23 |
| 70:24 71:12 | 146:4,20 147:2 | 225:22 226:23 | 288:7 290:23 |
| 73:22 75:13,17 | 147:12,19 | 227:4,4 231:11 | 291:8 292:9 |
| 76:6,21 77:7 | 148:4,5,23 | 232:9,13,21 | 294:8 295:8 |
| 78:23 79:4 | 149:1,13,19,20 | 233:8,10,14,20 | 296:2,21 |
| 80:12 81:11,19 | 150:12,19 | 234:14,15,17 | 297:15,21 |
| 82:6,10,15,16 | 151:16 154:15 | 236:15 237:1 | 298:9,9,10 |
| 83:18 85:1,18 | 154:22 155:5 | 237:16,22 | 299:5,8,12 |

Edo Macan                                      December 17, 2025
Brous v. Eligo Energy, LLC

**[right - saying]**                                      Page 68

301:8,23,24,24
303:4,8 306:15
307:5 309:3
310:6,10,12
311:19,20
312:15 314:5
315:3,5 317:11
317:17,18,18
318:9,10
**rights** 5:16
148:20
**ring** 185:23
193:9 257:6
**rings** 186:5
**ripple** 247:3
**risen** 135:19
**risk** 5:17 16:18
246:4 254:8
256:17 260:13
281:5,19
**riskier** 263:18
**riskiness**
263:11
**risks** 181:17
182:22 183:17
262:24 280:6
280:16
**risky** 251:11
253:24 259:14
263:17 281:22
**river** 23:14
28:24 29:3,6
29:16 48:2
50:12

**robust** 280:6
304:15
**rochester** 83:14
83:17 128:18
**role** 9:22 10:3
16:12,13,16
18:2 23:8,11
23:15,16 29:13
74:21 139:21
153:6,9 155:18
179:21 197:17
198:5,6 201:14
**roles** 37:13
**roll** 296:3
316:19
**rolled** 316:19
**rolling** 253:4
**room** 95:18
**rough** 52:4,15
**roughly** 51:4
68:9
**routine** 9:7
275:14
**routinely**
276:24
**row** 232:9,21
**rubric** 219:3
**rule** 55:5 56:10
186:6
**ruled** 40:13,20
**rules** 1:16
287:11,12
**ruling** 40:7
184:18 185:6

**rulings** 185:1,3
185:4
**run** 50:7 94:10
95:13,15,15,15
97:20 100:4
101:14 102:12
104:10 107:12
113:5 122:3
205:7 250:14
281:11 320:6
**running** 98:7
100:16 108:24
211:1 222:15
230:24 271:22
272:6 277:12
278:8 281:6
294:4
**runs** 104:2

**s**

**s** 2:1 3:1 4:1 5:8
6:1 200:24
321:1
**s&p** 200:24
**sake** 153:20
308:21
**salaries** 55:20
262:15 263:4
267:17
**salary** 54:20,22
**sales** 234:14
305:22
**sandler's** 154:7

**satisfactorily**
8:10 323:8
**satisfied** 81:13
**satisfy** 158:8
227:20
**save** 58:11
71:21 79:15
253:5
**saved** 86:21
248:19
**saving** 86:21
**savings** 141:7
141:10,12
265:2
**saw** 115:23
122:1 249:7
281:13 316:1
**saying** 25:15
26:12 40:7
61:8 77:1
79:17 80:15
84:15 85:5
87:18,19 93:13
96:18 98:23
102:2,15
108:22 110:3
116:17 146:12
165:1,2,3
174:4 182:8
186:20,24
187:17,21
196:4 200:14
207:21 208:10
208:15 209:23

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

**[saying - see]**                                          Page 69

| | | | |
|---|---|---|---|
| 213:6,10,11,21 | **schedules** | 188:8 197:4 | 193:24 207:15 |
| 213:23 216:16 | 58:13 | 211:15 | 219:15 229:2 |
| 216:20 227:16 | **school** 36:19 | **scratch** 196:7 | 232:10,21 |
| 260:17,17 | **schuster** 1:6 | 201:10 | 249:20 268:5,6 |
| 269:2,5,12 | 2:22 3:12 5:15 | **screen** 128:1 | 276:9 300:18 |
| 271:3,3 273:4 | 6:12 64:13,16 | 285:10,18 | 302:9 310:8 |
| 277:16 280:17 | 82:6,9,19 83:1 | 287:7 301:19 | 318:18 |
| 282:15 286:24 | 83:13,20 84:11 | **scroll** 290:21 | **secondly** 126:2 |
| 291:13,15 | 135:20,20 | 291:7 293:16 | **section** 62:12 |
| 294:2 | 136:23 137:2 | 294:8 295:7,9 | 63:2,6 95:10 |
| **says** 25:2 63:19 | 142:3 143:1 | 301:10,11,22 | 109:18 111:24 |
| 82:8 94:24 | 148:20 284:20 | 301:24,24 | 147:1 153:2 |
| 99:22 115:12 | 299:14,15,17 | **scrolling** | 161:24 199:8 |
| 115:12 117:4 | 299:20 309:22 | 291:22 | 216:12 233:7 |
| 124:17 125:15 | 310:2,17,20 | **se** 174:11 | **sections** 62:9,9 |
| 136:10 149:22 | 314:7 | **seabron** 179:3 | 195:13 |
| 150:12,24 | **schuster's** | **seal** 323:19 | **secure** 241:24 |
| 151:20 152:20 | 299:16 | **search** 97:8 | **securities** 174:7 |
| 156:23 157:20 | **science** 33:2 | **searched** | **see** 10:20 12:23 |
| 159:10 160:17 | **scope** 15:20 | 172:17 | 13:11,14 21:20 |
| 164:15,16 | 39:2 46:12 | **seasoned** 12:8 | 24:1 46:1 49:4 |
| 208:1 212:11 | 55:4 56:10 | **seated** 21:24 | 63:21 64:11 |
| 213:11 216:9 | 68:4,24 70:1 | **sec** 299:16 | 86:8 88:18,22 |
| 216:24 224:18 | 70:15 71:17 | 301:16 | 95:17 101:18 |
| 231:17,23 | 73:3,9,16,19 | **second** 16:16 | 104:23 105:5 |
| 232:11,22 | 75:7 76:10,23 | 27:18 88:11 | 106:2 115:2,6 |
| 234:11,16 | 78:8,15 79:7 | 89:8 93:20 | 115:17 124:21 |
| 257:20,21 | 80:14 82:22 | 107:21 114:19 | 128:15,22 |
| 258:20 263:8 | 83:8 84:1 85:3 | 131:14 147:20 | 129:2,9,12 |
| 272:5 279:15 | 85:13 87:10,20 | 152:2,7 153:18 | 135:14 136:14 |
| 279:16 299:11 | 140:2 141:21 | 156:18 157:16 | 146:18 148:1 |
| 304:1 309:21 | 142:13 143:10 | 168:18 169:24 | 162:11 164:9 |
| **sc1** 299:23 | 143:20 144:23 | 172:8 173:10 | 167:7 177:13 |
| | 179:6 187:5 | 178:12,14,15 | 181:9 195:4 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

| | | | |
|---|---|---|---|
| 196:3 201:5,11 | 131:22 132:6 | 198:11 205:10 | **separate** 57:11 |
| 209:24 214:15 | 133:9 134:2 | 205:16 218:7 | 261:3 |
| 216:8,13,16 | 152:15 155:7 | 218:19 219:5 | **separately** |
| 232:10 238:24 | 180:20 192:12 | 223:20 243:17 | 301:14 |
| 241:18 242:2 | 198:2 209:13 | 246:22 253:20 | **sept** 5:10 57:15 |
| 248:10,13 | 249:12 260:6 | 297:9 305:15 | **sequence** 25:5 |
| 250:14 257:19 | 278:6 291:11 | **sensible** 269:2 | **sequentially** |
| 258:1 273:2 | 308:5 | **sensitive** 6:4 | 149:8 |
| 279:15 281:6 | **segment** 261:10 | **sent** 51:21 | **series** 103:12 |
| 285:18,21 | **select** 250:21 | 59:22 | **serve** 87:22 |
| 287:9,10,11 | **sell** 175:10 | **sentence** 88:20 | **service** 67:24 |
| 288:8 290:22 | 194:12 307:12 | 91:8,19 92:3 | 69:22 74:11 |
| 293:13,16,23 | **selling** 168:8 | 92:10,17,18 | 88:18 91:12 |
| 294:3,9,10,12 | 197:20 201:4 | 93:20 94:23 | 93:4 95:3 |
| 295:8 298:22 | 202:14,18 | 99:20 100:15 | 107:18 108:1,2 |
| 299:9 301:12 | 212:9 213:16 | 101:11 108:6 | 108:15 112:11 |
| 301:17 302:1,7 | 222:10 223:10 | 110:21 111:1,2 | 123:14 128:5 |
| 303:12 309:21 | 225:7 233:23 | 111:14,19 | 129:24 130:23 |
| 310:18 316:19 | 266:13 267:1,2 | 112:3,6 116:9 | 131:11,24 |
| **seeing** 69:14,14 | 306:12 307:12 | 116:22 119:8 | 133:5,14,22 |
| 192:21 258:8 | 307:15,15,16 | 123:11,20 | 142:2 147:22 |
| **seeking** 217:23 | 307:17,19,20 | 124:17,24 | 194:24 208:21 |
| **seem** 69:4 70:1 | 308:3 | 130:10 133:10 | 250:24 251:17 |
| 73:18 77:9 | **sells** 174:19 | 146:18 147:5 | 268:17 299:18 |
| 98:21 277:9,10 | **send** 51:16 | 147:12,21 | 305:1,4,14 |
| **seemed** 89:15 | 59:18 87:6,6 | 156:22 157:16 | 312:22 319:8 |
| 90:19 96:8 | 87:18,18 | 166:16,21,22 | **services** 81:14 |
| **seems** 79:17 | 209:11 | 167:2 193:24 | 234:13 297:17 |
| 107:17 145:11 | **sending** 109:10 | 194:9 203:9 | **serving** 96:19 |
| 157:7 228:20 | **senior** 99:7 | 225:1 227:6 | 166:5 210:3 |
| 236:5 | **sense** 92:24 | 232:10 234:16 | 224:1 227:19 |
| **seen** 72:2 75:20 | 157:15 158:4,6 | 250:17 318:18 | **session** 45:11 |
| 86:14,19 96:11 | 159:23 161:9 | 319:5 | **set** 17:15,18 |
| 121:22 127:17 | 162:3 174:5 | | 48:3 50:1,14 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

[set - simply]                                          Page 71

| | | | |
|---|---|---|---|
| 50:15 88:16 | 106:18 107:15 | **sheets**   10:22 | **signature** |
| 91:10 93:3 | 107:17 108:4 | 247:15 290:13 | 323:22 |
| 95:1,12 99:24 | 108:24 109:7 | 290:15 291:5,7 | **signed**   58:6 |
| 101:3,16,20 | 112:23 113:5 | 292:7 293:4 | 59:20 61:19 |
| 102:1,18,21 | 115:5,8 116:3 | 294:3 | 72:7 111:1 |
| 105:8,9 107:16 | 122:2,13 | **shipped**   198:14 | 119:9 143:2,5 |
| 108:3,17 110:6 | 124:12 146:5 | **shock**   124:20 | 180:4,14 183:1 |
| 112:10 120:13 | 192:13 203:6 | 125:10 318:23 | 183:19 209:5 |
| 121:7 123:12 | 206:8 235:11 | **shoot**   188:14 | **significant** |
| 136:11,12 | 245:13 250:18 | **short**   28:5 | 142:18 265:7 |
| 154:21 158:1 | **settings**   30:1 | 117:1 165:2 | **significantly** |
| 159:7,12 | 248:15 | 204:9 225:1 | 184:9 |
| 222:23 225:14 | **seven**   76:20 | 229:3 235:6,7 | **signing**   83:2 |
| 229:9 238:4 | 82:15 83:20 | 243:18 244:12 | **similar**   29:18 |
| 240:19 242:4 | 121:12 123:24 | 252:3 291:19 | 30:7 84:2 |
| 242:24 243:7 | 256:16 294:7 | **shorter**   76:16 | 186:10 220:8 |
| 244:1 245:17 | **seventy**   136:9 | **shot**   127:24 | 312:7 315:8 |
| 246:16 251:18 | **several**   120:18 | **show**   127:3 | **similarly**   1:7 |
| 255:7,21 | 178:7 275:13 | 133:13,23 | 6:13 |
| 257:21 258:20 | **shape**   80:16 | 148:7 256:21 | **simple**   72:10 |
| 263:13 266:21 | 98:2 222:6 | 285:15 287:15 | 100:14 101:12 |
| 271:9 277:15 | 225:9 241:22 | 290:10,11 | 118:10 119:5 |
| 281:17 288:6 | 247:16 311:7 | 308:24 316:6 | 122:23 123:1 |
| 288:11 299:6,6 | **shapes**   312:7 | 317:3 | 159:8 175:20 |
| 299:12,13 | **share**   304:18 | **showed**   130:12 | 251:10 253:19 |
| 301:13 323:18 | 304:21 305:16 | 133:3 315:19 | 282:17 305:20 |
| **setting**   17:22 | 306:2,6,8,9,11 | **showing**   127:1 | **simplest**   246:5 |
| 18:5 25:10 | 306:12 307:1,4 | **sic**   69:19 73:19 | **simplifying** |
| 55:11 93:6,10 | 307:20,21 | 161:18 167:19 | 244:11 |
| 94:9 95:20 | **shedding**   73:6 | **side**   15:24 | **simply**   37:17 |
| 97:3,21 98:7 | **sheet**   5:13,14 | 16:22 20:20 | 121:3 153:19 |
| 98:17,24 | 127:8,11 | 29:10 30:2 | 184:23 198:6 |
| 100:17 101:16 | 242:12 287:13 | **sided**   309:21 | 272:13 293:11 |
| 101:22 106:6 | 288:8 291:17 | | 313:6,11 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[single - sort]**

Page 72

single 26:13
108:6,14
111:19 117:8
144:7,8 145:20
200:18,18
291:20
sir 34:17 35:20
119:23
sit 52:3 116:17
133:8
sitting 123:10
226:15 279:2
situated 1:7
6:13
situation 43:19
92:24 134:15
202:11 220:12
220:18 246:1
268:9 313:4
situations
117:10 271:8
271:16,18
six 21:18 50:2
67:20 68:9
77:7 136:9
148:10,11
180:19 184:13
236:3 242:20
sixth 28:18
skimmed 189:3
slack 115:4
slightly 260:23
slow 87:24

small 93:17
198:22 285:22
303:22 312:2
sneezes 191:4
software
105:18
sold 31:15,21
32:1,11 226:4
226:12,15
227:5 314:8,17
sole 18:2
solely 36:20
202:6
solemnly 8:7
somebody
71:20 91:3
99:2 167:21
174:8 202:2
212:9
somebody's
77:10,12
235:22
son 65:12 66:3
66:7 78:11,20
79:19
soon 317:24
sooner 84:8
sophistication
71:8
sorry 9:4,22
10:10 11:4
22:22 45:14
53:10 55:7
62:11,17,19

76:24 80:7
85:6 92:1
103:5,6 114:14
115:12 117:22
127:16 128:23
131:14 132:14
135:6 137:14
139:13 143:1
150:8 154:6
156:14 158:17
158:24 165:18
166:11 168:21
170:18 171:16
172:21 174:2
182:7 184:13
189:18,21
193:23 197:8
199:11 203:22
206:24 207:5
209:4 214:19
215:1,12,22,23
217:21 218:22
222:4,15
230:24 232:4,8
244:22 245:5
251:24 253:4
253:13 255:10
255:13 261:8
265:17 266:1,5
270:4 279:16
288:5 290:14
294:10,22
295:7,9 296:17
299:9 301:17

301:23 305:17
306:1,9 309:8
314:12
sort 11:23
23:14 29:19,23
31:8 43:17,18
47:24 48:3
50:14 69:13
72:4 80:6
89:12,15 90:5
90:6 95:12,16
95:18,22
101:19 109:19
109:20 125:21
125:23 126:18
133:2 154:9
155:24 157:15
158:5,7 159:1
160:8,9 173:1
174:5 182:8
184:12 186:18
190:3 193:6,11
194:17 197:21
198:4 201:2
202:10 208:16
208:18 209:8
209:14,21
214:9 236:15
236:16,18
241:16 242:21
245:13 247:11
248:24 250:15
254:19 261:2
263:5,24

800.808.4958

770.343.9696

Edo Macan                                          December 17, 2025
Brous v. Eligo Energy, LLC

**[sort - spreadsheets]**                                    Page 73

| | | | |
|---|---|---|---|
| 268:10 280:18 | sourced 265:8 | 197:11 201:2 | speechify 284:2 |
| 293:1 296:9 | 266:13,21 | 204:15 207:23 | spelled 208:22 |
| 304:10 305:12 | 307:23 308:1 | 218:22 219:13 | spelling 8:3 |
| 307:20 308:11 | sources 142:4 | 221:5 232:21 | spend 97:13 |
| 308:17 317:13 | 142:19,23 | 240:13 257:23 | 158:13 |
| sound 26:6 | 143:8,18 170:1 | 263:22 316:6 | spending |
| 28:2,19 149:1 | 170:6 266:14 | specifically | 272:16 |
| 181:18 183:18 | 266:22 308:1,5 | 32:4 37:3,6 | spent 12:17 |
| 185:22 278:13 | 308:7 | 39:2 59:3,15 | 25:21 28:23 |
| 280:21 | southern 1:3 | 69:11,23 76:15 | 183:23 241:7 |
| sounded 9:16 | 6:16 | 80:20 90:22 | spirit 45:21 |
| 195:2 | space 36:21 | 97:14 99:22 | 46:14,18 93:15 |
| sounds 24:7 | speak 76:9 | 126:9 133:1 | 108:10 110:22 |
| 25:6 72:9,12 | speaking 19:16 | 145:4 147:1 | 110:23 161:1 |
| 80:17 113:1 | 27:16 57:2 | 151:18 156:11 | 171:22 |
| 114:2,2 161:15 | 97:7,10 109:16 | 157:20 169:24 | spreadsheet |
| 161:15 184:20 | 159:3 184:1 | 170:22 173:16 | 242:18 284:24 |
| 186:16 187:1 | 242:20 | 192:9,23 | 286:2 288:15 |
| 187:12,18 | specific 18:15 | 197:23 209:3 | 288:24 290:5 |
| 201:24 205:23 | 29:18 37:14 | 209:12 210:14 | 292:14 297:13 |
| 212:15 258:7 | 61:1,7 62:22 | 221:18 223:2 | 297:19,23 |
| 295:12 298:22 | 89:13 90:11,16 | 224:13 227:14 | 298:5 |
| 298:22 299:10 | 104:24 113:11 | 249:2 | spreadsheets |
| 313:20 | 123:4 124:23 | specificity | 234:3,17 |
| source 44:23 | 128:1 131:4 | 152:2 217:7 | 236:21 237:8 |
| 124:23 169:17 | 146:12 147:1 | specified | 238:7 239:18 |
| 169:17,18 | 148:6 152:7 | 107:19 160:12 | 240:3,5,16 |
| 170:2 171:6,12 | 155:19,21 | 200:23 | 241:5,9 242:5 |
| 171:18 172:4,8 | 156:5 157:8 | specifies 179:6 | 242:9,17 243:3 |
| 172:19 173:10 | 163:16 166:17 | specify 39:2 | 244:4 246:17 |
| 173:11 205:1 | 169:8 172:2 | 144:5 | 247:4,7 248:19 |
| 210:18 316:18 | 176:15 178:2 | speculate 52:23 | 284:16 286:2 |
| 319:7 | 183:24 184:4 | 68:12,13 84:16 | 287:18 289:8 |
| | 192:14,18,18 | 170:23 | 289:17 315:20 |

Edo Macan                    December 17, 2025
Brous v. Eligo Energy, LLC

[spreadsheets - suggested]                    Page 74

| | | | |
|---|---|---|---|
| 315:22 | 25:20 26:13,22 | **stop** 34:19 35:6 | 294:4 |
| **ss** 323:3 | 27:14 42:2 | 35:7,7,11 | **style** 67:1 |
| **staff** 10:5,18,19 | 46:6 137:18 | 36:10 85:19 | **styled** 62:13 |
| 50:7 53:3 | 220:15 264:18 | 86:1,5 118:21 | **subject** 20:8,22 |
| 55:20 99:7 | 287:4 299:13 | 118:22,23,24 | 191:16 208:11 |
| 172:16 | **stated** 132:21 | 288:7 | **subjective** |
| **stakeholder** | 134:9,10 | **storable** 198:13 | 203:14 |
| 251:3 277:24 | 180:11 188:1 | **stored** 198:13 | **submitted** |
| **stamped** 96:13 | 220:16 227:16 | **straight** 36:18 | 12:15 13:10 |
| **stand** 110:20 | 273:22 | 37:14,15 | 23:12,20 38:12 |
| 123:10 279:5 | **statement** | 240:19 | 38:14 179:2 |
| **standing** | 91:13,22,23 | **straightforward** | 181:23 287:1 |
| 116:22 | 92:4,5,22 95:4 | 316:12 | 289:9 |
| **stands** 77:11 | 130:14,23 | **strategies** | **subsection** |
| 78:24 128:18 | 131:5 147:22 | 172:9 | 62:14 63:3 |
| 237:3,5 | 152:1 176:21 | **strategy** 26:17 | **substance** |
| **stapled** 215:21 | 196:17,18 | 173:10 254:3 | 126:16 |
| **start** 8:18 | 257:20 293:10 | 255:1 | **substantive** |
| 103:22 105:21 | **states** 1:3 6:15 | **street** 2:6 3:17 | 71:20 |
| 127:14 138:17 | 20:10 158:1 | 124:18 125:8 | **succinct** 117:2 |
| 196:7 203:1 | 161:20,20 | 318:20,21 | **succinctly** |
| 204:18 214:1 | 179:6 | **stretch** 38:16 | 86:16 135:16 |
| 271:6 299:8 | **stating** 99:15 | **strictly** 37:13 | 207:21 |
| 300:5 | 108:12 153:22 | 159:3 | **suffer** 272:20 |
| **started** 74:7 | **stay** 300:4 | **structurally** | **sufficient** 170:5 |
| 267:1,2 | 319:10 | 308:14 | 254:2 259:12 |
| **starting** 105:4 | **staying** 264:24 | **structure** | 260:21 261:7,9 |
| 128:15 231:15 | **steep** 270:9 | 260:19,22,23 | 262:23 268:24 |
| 304:1 | **stemming** | **studied** 139:22 | 269:22 270:12 |
| **starts** 103:18 | 251:4 278:14 | 140:9,16 | 277:14 281:11 |
| 103:22,24 | **step** 92:14 | **stuff** 27:11 | 281:18 |
| 242:22 318:19 | 115:13,21 | 32:17 70:9 | **suggested** |
| **state** 7:1,4 8:18 | 304:22 305:17 | 80:5 89:14 | 60:18 61:1,9 |
| 19:9 24:19 | | 145:6 186:5 | 96:7 155:19 |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

| suggestion | supported 10:8 | 219:16 222:22 | **t** |
|---|---|---|---|
| 46:16 | 10:8,10 | 229:20 234:8 | **t** 5:8 321:1,1 |
| **suggestions** | **supporting** | 234:10 241:8 | 322:1,1 323:1 |
| 60:4,9 89:12 | 12:18 29:13 | 249:21 257:10 | 323:1 |
| **suing** 21:12 | 37:12 89:3 | 260:1 285:8 | **t&c** 5:15 |
| **suit** 80:1 84:5 | **supportive** | 286:10 287:10 | 148:20 |
| **suite** 3:17 | 10:18,19 23:17 | 292:10,18,20 | **t&d** 297:17 |
| **suits** 276:1 | 92:9 | 293:15 295:11 | **tab** 238:23 |
| **sum** 109:24 | **supports** 92:17 | 296:12 298:3,9 | 240:2 243:22 |
| **summarized** | 125:1 | 298:10,16,20 | 286:12 287:10 |
| 173:17 176:1 | **sure** 9:7 18:16 | 302:9,9,24 | 287:19 292:8 |
| **summary** 288:2 | 19:7,13 20:6 | 306:16 314:15 | 292:16 |
| 292:9 293:18 | 22:24 27:22 | 316:21 | **table** 144:4 |
| 294:8 295:2,2 | 28:20 30:23 | **surely** 88:2 | 219:14,18 |
| 296:18 299:7 | 45:11,20 47:10 | **surprise** 70:12 | 221:2,8 261:16 |
| 301:7,22 | 55:10 57:3 | 70:16 297:2 | 261:22 269:20 |
| **summation** | 58:3 61:15 | **surprised** | 270:10 271:10 |
| 317:5 | 62:21 66:10 | 295:5 | 275:13 284:17 |
| **supplied** 142:3 | 67:10 71:10 | **sustainable** | 284:18 297:14 |
| **supplier** 137:9 | 74:16 80:6,19 | 211:1 254:3 | 299:15 302:6 |
| **suppliers** 137:3 | 80:23 85:9 | **swap** 201:1 | 302:10,16 |
| **supply** 145:24 | 86:18 90:2,2 | **swear** 8:7 | 312:21 316:14 |
| 191:8,21 | 115:14,21 | **switch** 32:21 | **tables** 133:3 |
| 234:22 265:7 | 116:7,24 117:8 | 141:10 208:21 | **tabs** 290:22 |
| **supplying** | 118:4 119:21 | 209:10 295:1 | 291:22 292:21 |
| 181:17 182:22 | 128:24 137:9 | **switched** 71:24 | 292:21 293:22 |
| 183:17 233:10 | 138:13 146:15 | 76:12 | **take** 6:7 19:6 |
| 264:17 | 148:12 150:23 | **switching** | 20:12 42:5 |
| **support** 10:5 | 156:19 164:1,1 | 79:15 | 46:17 58:4 |
| 12:1,3 29:9 | 171:22 177:4,6 | **sworn** 8:6,11 | 59:18 67:8 |
| 50:7 55:20 | 180:10 183:8 | 323:8 | 69:22 76:3 |
| 88:21 89:1 | 185:16 195:22 | **synopsis** 26:9 | 77:22 81:19 |
| 278:19 317:14 | 206:11,11,16 | | 88:10 91:12 |
| 319:2 | 215:24 218:4 | | |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[take - term]**

Page 76

| | | | |
|---|---|---|---|
| 92:14 107:17 | **takes** 13:8 | 255:3,5 260:21 | 88:17 91:11 |
| 109:17 111:21 | 281:10 | 269:6 281:9 | 93:4 95:2 |
| 114:19 119:19 | **talk** 11:9 30:11 | 301:13 | 98:11 100:1 |
| 130:7 134:12 | 58:2 80:24 | **task** 71:12 | 101:21,23,23 |
| 135:13 137:16 | 112:22 113:1 | 237:24 241:2 | 108:18 110:7 |
| 137:17 138:19 | 144:9,17 | 275:20 292:4 | 146:7,19,20,24 |
| 138:21,23 | 198:14 231:13 | **tasks** 10:24 | 147:3,9,11,16 |
| 139:8 140:9 | 303:24 316:4 | **tea** 177:15 | 149:17 150:16 |
| 147:12 155:8 | 318:3 | **technical** 37:17 | 151:4,12,14 |
| 155:16 158:14 | **talked** 11:15 | 245:19 | 161:8 163:12 |
| 158:17 159:5 | 29:9 82:8 | **technically** | 167:9,18,19 |
| 184:17,24 | 104:22 174:6 | 194:16 | 168:13 169:7 |
| 188:13 190:21 | 174:16 220:2 | **tell** 8:7 29:12 | 173:24 174:2,5 |
| 203:18 204:2 | 224:7,20 228:2 | 34:22 43:20 | 174:11 186:4 |
| 210:19 212:9 | 231:16 232:13 | 46:24 56:5 | 186:16 187:8 |
| 214:13 229:3 | 233:5 249:16 | 63:23 66:19 | 190:15,18 |
| 230:23 238:7 | 267:16 284:15 | 75:14 92:12 | 195:2 196:1 |
| 239:2 240:8 | 287:16 303:23 | 118:9 123:9 | 201:14 203:2,7 |
| 243:1 264:19 | **talking** 35:12 | 193:3 202:1 | 203:12,16,20 |
| 265:18 284:2,5 | 48:9 110:7 | 207:20 216:20 | 204:5,12,23 |
| 284:17 289:4 | 126:10 134:24 | 227:4,14 | 205:13,20 |
| 296:15,16 | 139:7 169:9,12 | 228:21 253:16 | 206:9 207:10 |
| 297:8 300:17 | 175:9 191:7 | 274:15 278:24 | 207:13 210:6 |
| 304:16,18,22 | 194:19 200:17 | 287:5 290:5 | 210:16,21 |
| 315:9 317:12 | 200:17 216:1 | 304:7 | 211:4,5 214:16 |
| **taken** 1:14 | 243:13 245:19 | **telling** 123:6 | 214:23 215:3,7 |
| 13:24 33:6 | 299:14 306:18 | 187:12 280:14 | 215:10 216:5,6 |
| 93:14,22 98:18 | 306:20 | **tells** 167:22 | 220:6,10,17 |
| 133:13 152:11 | **talks** 124:11 | **tend** 67:2 70:9 | 223:1 227:10 |
| 164:16 223:20 | **tape** 302:16 | 70:10 73:8 | 228:5,10 235:6 |
| 238:19 277:19 | 303:16 | **tenure** 28:4 | 235:7 244:12 |
| 278:1 282:17 | **target** 253:22 | **terepka** 2:5 | 250:9,19 |
| 323:7,10 | 253:22 254:6 | **term** 32:18 | 263:12 305:9 |
| | 254:17,21 | 42:23 77:13 | |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

[terminate - things]                                        Page 77

| | | | |
|---|---|---|---|
| **terminate** | **test** 38:24 | 113:10,15 | 261:20 299:21 |
| 82:19 | **tested** 249:1 | 115:1,20,23 | 303:14,21 |
| **terminated** | **testified** 8:12 | 116:2,6,20,21 | 309:11 311:21 |
| 82:12 84:12 | 13:2 14:3,14 | 119:7 120:10 | 317:19 319:13 |
| **terms** 30:24 | 20:13,16,19,20 | 120:11 121:1,3 | **thanks** 57:13 |
| 43:1 51:2 | 20:23 21:1,21 | 121:11,12,16 | 57:23 138:17 |
| 55:20 67:24 | 23:18 31:20 | 121:22 122:15 | 258:13 300:6 |
| 73:19 88:17 | 38:14 44:24 | 123:5,8,17,18 | 300:22 |
| 91:11 93:4 | 83:1 94:9 | 124:1,2 125:13 | **theories** 153:14 |
| 95:3 105:10 | 122:1,11 | 126:7 132:21 | **theory** 175:19 |
| 107:18,19 | 179:24 269:13 | 133:18 144:4 | **thing** 64:24 |
| 108:1,1,15 | **testify** 9:5 | 146:10 150:18 | 67:4 111:23 |
| 112:10,11 | 13:12 39:19 | 153:16 154:5,7 | 122:20 126:6 |
| 120:14 123:13 | 40:8,14 41:19 | 154:16 156:1 | 169:13 172:14 |
| 123:14 142:1 | 157:7 289:14 | 160:5 163:20 | 173:23 203:23 |
| 144:1 147:22 | **testifying** 12:4 | 164:24 165:9 | 209:13 216:1 |
| 151:8,16 | 12:8,10 20:11 | 165:18,19 | 259:24 293:18 |
| 152:18 175:9 | 38:20 39:4 | 180:8 199:12 | 296:6,15 |
| 190:9 192:13 | 109:20 | 205:4 208:15 | 317:15 |
| 193:15,19,20 | **testimonies** | 209:6 210:9 | **things** 11:23 |
| 200:20 201:16 | 89:9,13 254:19 | 212:24 218:4 | 20:8 30:8 |
| 208:22 214:13 | **testimony** 8:22 | 224:11 227:8 | 31:21 32:19 |
| 214:15,23 | 12:14,23 13:8 | 228:12 235:21 | 43:12 45:6 |
| 216:13 223:12 | 21:7 23:12,12 | 235:22 237:5 | 70:10 73:10,10 |
| 230:12,19,20 | 30:3 31:6 38:2 | 247:22 252:1 | 73:11,12 74:12 |
| 231:14 251:7 | 44:15 46:12 | 264:21 265:10 | 93:1 97:1 |
| 280:15 | 62:23 69:12 | 274:7 275:17 | 107:12 109:20 |
| **territories** | 78:11 80:16,20 | 307:15 322:4,6 | 123:1 145:7 |
| 305:1 306:16 | 89:1 91:6,15 | 323:9,10 | 154:5 170:20 |
| **territory** | 93:17 94:8,13 | **texas** 26:6 | 184:6 190:6,6 |
| 131:11 133:5 | 97:6 100:2,7 | **thank** 7:22 8:13 | 198:4 200:20 |
| 133:22 299:18 | 102:23 104:23 | 8:16,21 9:14 | 204:8 207:14 |
| 305:4,13,14 | 108:9 110:9 | 21:14 57:14 | 209:13 241:16 |
| | 111:9,13 113:4 | 127:6 258:18 | 247:13 251:4 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[things - time]**                                      Page 78

| | | | |
|---|---|---|---|
| 251:10 262:18 | 179:6,20 | 291:22 292:2 | 200:19 201:16 |
| 283:10 296:8,9 | 181:21 182:2 | 293:6 295:22 | 203:11 228:3 |
| **think**  12:2 | 187:3,12 | 296:13 297:3 | 265:6,9 293:4 |
| 17:13,20 20:12 | 188:11 191:12 | 298:1 299:17 | 294:3 303:23 |
| 21:3,6 28:10 | 191:20 194:14 | 301:7 305:10 | 309:22,24 |
| 28:17,23 31:20 | 194:16 201:11 | 307:2,9 312:20 | 311:13 312:9 |
| 35:4 36:8 41:3 | 208:14 210:1,5 | 315:7,10 | 316:3 317:12 |
| 43:13 50:4 | 210:10 212:3 | 316:10,11,12 | 317:15 |
| 53:7 66:24 | 212:22 213:1,4 | 317:17 | **threshold** |
| 67:22 69:5,8 | 213:20 214:22 | **thinking**  46:20 | 41:21 |
| 71:2,6 73:16 | 218:6 219:1,22 | 206:5 207:20 | **ticket**  308:19 |
| 74:6,8 75:9,16 | 220:24 221:2 | 308:18 | 308:20 |
| 75:23 76:1,7 | 222:18 223:13 | **third**  149:8 | **tidbit**  90:19 |
| 79:9 84:10 | 224:24 226:8 | 234:18 235:19 | **tied**  160:14,18 |
| 85:17,23 86:12 | 226:12,24 | 258:11 265:15 | 160:20 201:3 |
| 91:23,24 92:12 | 228:2,22 | **thirteen**  146:16 | 280:7 |
| 92:12 93:22,24 | 231:10 239:8,9 | **thirty**  104:12 | **tight**  318:1 |
| 94:1 95:5 97:1 | 243:5,8 244:19 | **thought**  49:16 | **time**  6:6 7:2 |
| 98:3,15 100:8 | 245:12,12,13 | 50:16 69:18,21 | 9:23 12:20 |
| 100:8,14 | 248:2,22 249:3 | 96:16,17 118:3 | 15:17 23:13,22 |
| 103:18 107:23 | 249:19 251:17 | 194:9 215:16 | 25:21 27:19,23 |
| 108:9 112:14 | 251:22 252:23 | 216:21 222:5 | 31:7 32:16 |
| 117:9,15,15 | 254:1,9,17 | 245:18 246:6 | 35:7 36:11,20 |
| 118:16 126:6 | 259:17 263:19 | 268:13 274:7 | 36:22 37:4,7 |
| 128:5 134:8 | 264:6 268:5 | **thoughts**  36:6 | 49:16,24 50:8 |
| 135:20 141:23 | 269:13,15 | **three**  13:6 | 50:15 54:8,12 |
| 143:12 144:14 | 272:4 274:16 | 21:23 61:6,23 | 64:9 68:1 70:8 |
| 145:17,23 | 274:19 277:10 | 62:5 74:19,23 | 71:15 76:5 |
| 146:15,22,23 | 277:10,18 | 104:12 121:19 | 81:1,13,22 |
| 148:5,23 149:8 | 281:4 283:4,5 | 121:23 146:24 | 82:1 83:23 |
| 158:8,20 159:8 | 284:4 285:13 | 149:15,22 | 90:23 95:7 |
| 160:1,7 161:13 | 287:18 289:7 | 151:22 158:21 | 97:8 101:4,8 |
| 162:22 168:22 | 289:15 290:11 | 165:12,13 | 101:10 109:17 |
| 169:23 171:15 | 290:24 291:18 | 189:10,15 | 111:21 112:13 |

Edo Macan                                  December 17, 2025
Brous v. Eligo Energy, LLC

**[time - transport]**                                              Page 79

| | | | |
|---|---|---|---|
| 113:23 117:16 | **times**  13:2,4,7 | **today's**  134:5 | **topic**  171:24 |
| 117:17 120:3,6 | 13:12,23 14:2 | 320:3 | 177:3 |
| 121:19 122:18 | 14:2 21:1,4,4,5 | **together**  11:1 | **total**  16:2 51:12 |
| 124:1 127:1,22 | 21:10 30:18 | 133:13 | 52:4,8,12,14,21 |
| 128:7 131:24 | 110:15 118:7 | **told**  49:15 | 320:6 |
| 134:4,12 | 122:19 201:12 | 65:20 131:9 | **tough**  268:4 |
| 137:16 138:16 | 213:15 273:23 | 155:5 163:13 | **towards**  287:11 |
| 139:4 142:15 | 274:17 306:6,9 | 163:15,19,20 | **track**  27:11 |
| 142:16 143:5 | 306:10,13 | 164:21 167:18 | **traded**  27:21 |
| 143:24 144:18 | **timestamp** | 169:2,19 | **traders**  16:17 |
| 144:19 158:13 | 238:22 | 177:18 190:1 | **trading**  16:19 |
| 159:2,7,20,21 | **timing**  257:8 | 212:13 214:22 | 16:20 |
| 159:22 160:13 | **title**  149:12 | 218:7 226:12 | **trailing**  251:22 |
| 170:3 171:14 | 238:23 240:2 | 227:1 229:21 | 252:2,21 |
| 172:3 173:2,13 | 286:11 287:19 | 250:6 278:22 | **train**  222:4,5 |
| 182:5 183:5 | 287:21,23 | 283:4 | **trajectory** |
| 188:11,17,20 | 288:3,5 290:22 | **ton**  102:16 | 135:10,14 |
| 195:21 196:23 | 292:8,16 | **took**  60:19 | 136:3 |
| 202:21 211:4 | 293:13,17 | 158:12,12 | **transact**  160:11 |
| 216:2 221:6 | 294:6,18,24 | 222:12 236:12 | 160:13 |
| 223:19 227:13 | 298:19 301:21 | 296:13 | **transaction** |
| 231:4,7 238:3 | **titled**  63:2 | **top**  27:7,20 | 44:3 297:7 |
| 241:7 242:23 | 170:9 172:9 | 36:19 105:5 | **transcribed** |
| 243:18 244:8 | **titles**  114:1 | 149:9 209:22 | 323:10 |
| 246:11,11,20 | **today**  6:21 8:23 | 217:11 231:16 | **transcript**  7:12 |
| 253:5 277:9 | 11:10 13:20 | 242:2 250:1 | 103:14 114:5 |
| 283:11,12 | 14:10 22:1 | 256:5 261:4,8 | 322:3,5 323:13 |
| 284:9,12 300:4 | 34:21 52:3 | 261:21 267:11 | **transparency** |
| 310:21 311:12 | 58:4 120:11 | 267:12,13 | 74:13 |
| 315:14,17 | 123:19 169:3 | 269:21 285:21 | **transpired** |
| 317:19 318:7 | 170:4 175:9 | 301:14 305:21 | 76:12 278:4 |
| 318:12 319:15 | 188:23 226:15 | 305:24,24 | **transport** |
| 319:16 320:6 | 269:13 | 306:12 309:20 | 194:22 |
| | | 311:13 315:1 | |

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

**[transportation - unaware]**                              Page 80

| | | | |
|---|---|---|---|
| **transportation** | 121:4 122:1 | 268:7,9 | 306:10 307:3 |
| 152:12 156:6 | 195:12 204:11 | **turn** 128:14 | 311:3 315:8 |
| 157:22 160:20 | 263:17 270:2 | 163:17 202:24 | 316:3,4,8,17 |
| 161:23 162:2,5 | 322:5 323:13 | 302:22 311:10 | 317:11,15 |
| 166:1 190:15 | **truly** 108:19 | **turned** 15:22 | **type** 10:24 |
| 191:2 193:22 | **truth** 8:7,8,8 | **turning** 193:22 | 19:19 25:15 |
| 194:1,2,6,10,15 | **truthful** 8:22 | **turns** 159:13 | 37:16 145:6 |
| 194:23 195:5,8 | **try** 9:10 18:15 | **twenty** 103:23 | 163:2 241:19 |
| 195:11,22 | 42:24 71:21 | 103:24 104:12 | 241:23 299:12 |
| 196:4,15,20 | 97:13 117:1 | **twice** 56:14 | **types** 32:15 |
| 197:18 198:10 | 122:22 141:6 | **two** 13:6 56:15 | 69:2 160:8 |
| 198:15 201:17 | 153:6 177:14 | 61:23 62:5 | 242:19 |
| 208:3 213:9 | 257:4,8 277:9 | 129:23 132:17 | **typical** 89:16 |
| 217:2 233:7,11 | 283:11,12 | 135:3,9 155:13 | 141:12 308:11 |
| **treat** 44:7,12 | 293:8 296:5 | 158:7 159:20 | **typically** 89:6 |
| 44:18,19 | 307:6 | 159:24 166:12 | 214:8 |
| **treatment** | **trying** 26:20 | 166:15 170:1 | **u** |
| 263:16 | 35:24 45:16,22 | 186:19 189:17 | |
| **tremendous** | 45:24 46:2 | 189:23 204:19 | **uh** 117:17 |
| 50:9 | 50:19 60:23 | 207:13 217:11 | **ultimate** |
| **trial** 14:4,7 | 97:12 100:9 | 217:14 236:11 | 253:11 |
| 181:24 | 108:7 117:12 | 238:13,15 | **ultimately** 60:5 |
| **triangulate** | 126:13 127:17 | 243:15,20 | 60:5 61:11 |
| 168:4 | 131:18 145:12 | 244:13 245:20 | 96:12 98:16 |
| **triangulating** | 145:17 152:23 | 245:22,23 | 108:13 109:15 |
| 280:9 | 155:20 161:2 | 246:3,7 247:6 | 234:21 |
| **tried** 75:21 | 163:7 169:23 | 248:3 249:24 | **umbrella** |
| 110:14 205:8 | 169:24 170:21 | 253:14 260:3 | 223:22 224:4 |
| 285:3 289:3,5 | 170:21 201:20 | 265:4 268:15 | **unable** 74:19 |
| 296:9 | 206:12,12 | 268:15,16,16 | 74:22 |
| **tries** 86:8,8,9 | 209:20 210:13 | 278:11,16 | **unacceptable** |
| 208:8 | 211:20 212:20 | 280:14,17 | 79:23 |
| **true** 19:6 87:17 | 214:12 247:12 | 292:13 297:8 | **unaware** 98:17 |
| 92:20 100:16 | 251:20 253:4 | 298:20 306:9 | |

Veritext Legal Solutions

Edo Macan                              December 17, 2025
Brous v. Eligo Energy, LLC

**[unbelievable - update]**                          Page 81

**unbelievable**
  35:23 36:9
**unbiased**
  247:21 278:12
  280:5 304:15
**uncertainty**
  203:15 208:12
  209:18
**unclear** 118:5
  222:18
**uncooperative**
  291:12
**under** 9:1 13:7
  14:2,2,3 16:1
  21:3 55:5
  79:20 96:22
  99:6,8,8 131:9
  142:1 147:9
  151:13,13
  153:10,14
  156:9 157:18
  158:19,19
  162:23 175:19
  175:19,24
  176:19 178:2
  197:24 201:18
  201:19 204:4
  207:23 217:9
  219:3,9,21
  221:21 223:21
  224:4 228:19
  229:17,18,23
  230:6,12 235:9
  236:11 238:15

  238:16 254:11
  259:3 274:1,12
  277:18 284:21
  284:22 302:16
  323:11
**undercut** 86:9
**undergraduate**
  32:23
**underlies** 155:2
**underlying**
  108:4 135:13
  161:5 208:7
  260:10 311:6
  316:2
**understand**
  13:21,22 14:12
  16:5 25:13,19
  30:23 31:9
  37:21 41:3
  45:12 52:14
  54:16 60:22
  73:13 85:16
  100:2 117:12
  129:4 131:19
  131:21 147:21
  152:24 161:2
  163:7 172:24
  210:13 216:19
  218:2 219:18
  222:20 228:19
  229:20 231:19
  232:1,16
  233:14 243:13
  247:22 281:3

  283:15 290:12
  292:22 298:17
  298:19 300:16
  313:9
**understanding**
  43:3,8,22 44:6
  44:11,11 45:7
  49:24 61:22
  62:15 63:7
  68:5,8 82:18
  87:11 95:8
  109:23 134:15
  155:12 168:13
  197:19 208:17
  208:18,24
  214:6 221:13
  221:23 234:19
  235:10,13
  255:2 267:3
**understood**
  9:13 26:20
  27:13 32:21
  106:20 183:10
  194:19 231:14
  232:24 233:8
**undertake**
  237:16
**underwater**
  281:17
**undisclosed**
  203:13 208:11
**undo** 302:16
**unequivocally**
  201:1

**unfair** 49:17
  108:10 209:20
**unfortunately**
  66:8 68:22
**unfriendly**
  249:5 287:2
  289:4 291:12
**unhide** 290:13
  290:15,18
  291:4,5 293:20
  293:24
**unhook** 301:19
  302:13
**unit** 6:10
**united** 1:3 6:15
  20:9
**universal** 43:15
**unmentioned**
  206:15
**unnecessary**
  45:24 220:16
**unprofessional**
  36:5
**unreasonable**
  253:11,18
  258:5 279:9
**unrelevant**
  73:18
**unscripting**
  241:22
**unsustainable**
  205:13
**update** 133:6

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[updated - variable]**                                    Page 82

| | | | |
|---|---|---|---|
| **updated** 47:24 | **useful** 73:11,13 | 227:21 265:2 | 251:14 |
| 49:11 132:19 | **uses** 158:22 | 268:9 299:13 | **validate** 244:14 |
| **upper** 231:16 | **using** 102:1 | 304:14,22,24 | 245:8 |
| **upset** 79:1 | 139:14 159:18 | 305:4,14 306:2 | **valuable** 50:9 |
| **upstate** 171:9 | 204:4 206:8 | 306:13,24 | **value** 223:17 |
| **upward** 136:2 | 239:14,20 | 307:12 308:5 | 245:13 |
| **usable** 247:18 | 255:8 282:24 | 310:5,21 | **values** 240:6 |
| 287:9 | **usually** 49:10 | 311:19 312:11 | 247:3 288:15 |
| **use** 34:15 57:7 | 91:3 155:7 | 312:14,23 | 290:5 292:15 |
| 57:9 64:9,17 | **utilities** 18:1 | 313:1,6,7,15,19 | 293:12 |
| 73:13 77:13 | 19:15 74:2,20 | 313:22 314:3 | **variable** 88:16 |
| 88:3 159:17 | 74:24 85:10 | 314:24 | 88:17 91:10,11 |
| 161:8 176:8 | 87:23 137:22 | | 93:3,3 95:1,2 |
| 192:6 203:19 | 138:11 143:17 | **v** | 98:9,10 99:24 |
| 203:22,22 | 144:2 194:22 | | 99:24 100:3,17 |
| 235:7 238:2 | 252:22 253:2 | **v** 1:8 | 101:2,20,21,22 |
| 239:5 247:19 | **utility** 16:8 | **vague** 22:12 | 101:23 102:11 |
| 250:18 251:16 | 17:1,17,18,22 | 24:12 25:7 | 105:8,9,10 |
| 269:11 289:5 | 18:17 19:10 | 26:23 30:14 | 106:5,18 |
| 296:7 315:24 | 25:24 71:14,19 | 31:17 36:15 | 108:17,24 |
| **used** 74:9 84:10 | 73:23,24 74:1 | 38:1,22 39:16 | 110:6,7 112:9 |
| 124:12 195:15 | 74:19,23 75:4 | 39:20 44:19 | 112:10,23 |
| 196:3 203:13 | 75:22 76:5,19 | 46:11 50:22 | 115:6,14,22 |
| 208:10 229:9 | 77:5 79:14,15 | 58:16 59:2,14 | 116:8 120:13 |
| 234:2 236:21 | 83:3,17,17 | 59:21 63:24 | 121:6 122:2,13 |
| 237:14 239:19 | 84:11 85:1,5 | 65:15 189:12 | 123:12,13 |
| 241:6 248:19 | 85:10 86:2,10 | 191:11 192:8 | 125:18 135:8 |
| 250:21 268:12 | 86:11 87:4 | 211:14,22 | 135:15,17 |
| 276:18 278:11 | 88:5 128:5 | 214:18 216:18 | 136:11 142:18 |
| 286:3,5 292:7 | 135:12 137:6 | 218:20 244:17 | 146:7,19,23 |
| 293:5 295:23 | 137:10 139:10 | 274:23 276:9 | 147:3,8,11,16 |
| 295:24 315:20 | 139:15,23 | 292:11 311:4 | 147:24 149:12 |
| 315:22 316:21 | 140:22,24 | 312:4 316:9 | 149:17 150:1 |
| 320:6 | 141:1 171:9 | **valid** 158:10,11 | 150:13,15,24 |
| | | 173:3,4,14 | |

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

[variable - want]

Page 83

151:3,8,15
152:3,6,19
154:1 158:1
162:8 163:12
166:5 181:18
182:23 183:18
185:21 196:1
196:12 201:9
201:14 203:2,7
203:12,16,19
203:20 204:3,5
204:12,23
205:19 206:9
207:10,12
208:21 209:10
210:6,16,20
214:16,23
215:3,7,10
216:5,9 218:6
218:18 219:2
220:5,10
221:16,24
222:20 223:1
228:5,8,9
229:9 231:24
232:4,11,22
243:14,14
250:18,19
251:11 252:7
252:11,17
253:23 254:5
259:14,16
260:7,24
261:11 263:17

264:1,11,13,14
264:14,22,23
266:8 267:9
273:5 280:22
281:18,21
282:2 299:13
306:7 310:2,19
**variables** 238:3
**varied** 223:19
**varies** 29:15,21
165:23 203:11
304:3
**variety** 129:12
**various** 20:9
93:1 140:22
152:9 237:7
240:6 307:11
**vary** 30:6 117:9
**varying** 138:5
**vdidepo.com**
4:4
**vendor** 234:18
**verde** 21:22
**verdicts** 184:11
**veritext** 6:21
300:20 320:7
**versed** 194:18
**version** 59:20
60:6 239:14
257:15
**versions** 239:12
239:13 249:8
**versus** 6:13
50:5 66:20

71:14 78:20
131:17 178:22
184:3 221:9
259:5
**video** 6:6,10
**videographer**
4:4 6:2,21 7:21
81:21,24
119:23 120:2,5
139:3 188:16
188:19 231:3,6
284:8,11
294:14 315:13
315:16 318:4,6
318:10,11
320:3
**view** 70:22
77:21 123:19
159:4 160:2
184:6 194:6
201:20 212:17
214:16 216:13
218:10,17
219:1 229:24
230:7 263:15
273:15,20
276:22 281:24
**viridian** 21:22
**virtually** 311:2
**virtue** 190:22
**voice** 34:16
63:23 64:2,9
64:18,22 66:20
66:21 118:21

138:14 300:2
300:20
**vojvodic** 4:5
7:19,19 9:21
9:24 10:1,20
11:1,8 47:10
47:11 189:17
189:22
**vojvodic's** 10:3
**volatility**
117:11
**volume** 1:1
58:11
**voluntary**
221:1,9,11,18
222:19,24
228:6 229:10
229:14,15,21
229:23
**volunteer** 28:7

**w**

**w** 237:1,1
**wait** 33:14
246:3
**waiting** 246:12
**wake** 79:22
**walk** 294:10
**want** 24:17
25:10 26:11,20
27:1 28:8,9
30:23 35:9,17
42:15 43:20
46:6,7,10,17

Edo Macan                                December 17, 2025
Brous v. Eligo Energy, LLC

| | | | |
|---|---|---|---|
| 52:15,22 53:14 | **wanted**  46:10 | 157:14 162:9 | **wednesday** |
| 53:14 54:15,17 | 46:13,24 47:2 | 163:10 175:20 | 1:22 |
| 58:20 60:22 | 87:22 95:7 | 186:17 195:8 | **week**  243:20 |
| 63:10 64:10 | 103:1 108:21 | 195:17 205:9 | **weeks**  159:20 |
| 66:17 69:22 | 155:18 226:23 | 213:19 214:1 | 243:16 244:13 |
| 73:22 80:19 | 248:10 252:1 | 215:4 216:20 | 245:21,22,23 |
| 81:1 82:3 | 253:19 292:20 | 216:22 226:4 | 246:3,8 297:8 |
| 86:10 88:8 | 316:17 317:23 | 242:16 246:5 | **weight**  313:1 |
| 95:6,7 96:10 | **waste**  95:7 | 247:14,17,21 | **weighted**  310:6 |
| 97:15,15 99:10 | 101:4,7,9 | 258:11 264:24 | 311:15 312:10 |
| 101:9 110:2 | 112:13 170:3 | 273:11 274:6 | 313:12 |
| 111:23 114:24 | **wasting**  35:7 | 282:12 287:8 | **weights**  313:3 |
| 118:8 119:18 | 36:11 | 291:14 292:17 | **welcome**  45:14 |
| 120:19 121:13 | **water**  217:21 | 295:6 302:12 | 45:16 300:20 |
| 121:16 124:15 | 222:13 281:20 | 302:13,22 | **went**  52:11 |
| 127:18 136:6 | **watstein**  2:5 | 304:15,15 | 61:17 93:8 |
| 153:15 155:1 | **way**  23:6 26:3 | 305:5 313:12 | 95:9 96:6 |
| 155:16 156:10 | 40:20 44:8,13 | 315:22 318:19 | 121:1 134:3 |
| 163:10,16,24 | 45:11 46:24 | 318:21 | 135:1,2,18,21 |
| 170:2 176:7 | 61:6 64:24 | **ways**  61:7 | 135:24 136:1 |
| 177:12 199:21 | 67:23 75:21 | 110:15 168:3 | 181:24 190:2,2 |
| 204:16 212:12 | 76:4,13 77:4 | 278:16 | 203:6 235:18 |
| 218:4 220:1 | 80:11 81:2,9 | **we've**  11:15 | 238:5 258:8 |
| 228:21 231:13 | 87:1 89:6 | 29:9 67:7 | **west**  3:17 |
| 247:22 249:11 | 92:15 93:15,23 | 81:20 116:17 | **whatnot**  36:17 |
| 249:18 255:16 | 96:1 102:10 | 224:20 228:2 | 56:1 101:15 |
| 261:13 263:9 | 103:1 107:12 | 233:5 279:7 | 276:1 277:22 |
| 265:14 282:16 | 110:16 112:3 | 285:10,16 | 280:16 |
| 282:19 284:16 | 112:15 122:22 | 311:11 | **whatsoever** |
| 287:3,7 290:16 | 124:18 125:8 | **web**  75:5 | 222:24 |
| 292:19 298:14 | 132:10,20,20 | **website**  12:7 | **wheel**  194:23 |
| 315:11,20 | 134:18 138:3 | 26:2,8,8 74:2 | **wheeling**  194:3 |
| 316:2 | 139:19 142:17 | 74:14 85:21 | 194:7,14 |
| | 145:18 153:15 | | |

Edo Macan                           December 17, 2025
Brous v. Eligo Energy, LLC

**[when's - witness]**                                    Page 85

| | | | |
|---|---|---|---|
| **when's** 172:3 | **wires** 256:7 | 77:9 78:17 | 165:10 167:5 |
| **whereof** 323:18 | **wise** 311:7 | 79:9 80:15 | 168:21 175:14 |
| **whispers** 6:5 | **withdraw** | 81:8,16 82:23 | 176:14 177:22 |
| **white** 2:18 | 201:11 | 83:6 84:2,15 | 178:19 179:15 |
| **wholesale** 19:9 | **witness** 1:12 | 85:4,23 86:5 | 179:19 180:9 |
| 20:1 30:5,10 | 5:2 7:24 11:4 | 87:11,17 91:16 | 180:18 181:4 |
| 30:11,19,21,22 | 11:12 12:20 | 94:14,19 97:7 | 183:4,21 |
| 30:24 31:2,10 | 14:10,24 15:4 | 98:2,13 100:8 | 185:12 186:3 |
| 31:16,21 32:10 | 15:11,15,21 | 100:23 102:7 | 187:7,17 188:9 |
| 158:3 164:17 | 20:19,22 21:11 | 102:15 103:20 | 188:12 191:12 |
| 165:7 166:19 | 22:14 24:9,14 | 103:23 104:8 | 192:9 196:18 |
| 167:15 168:8 | 27:1,5 30:15 | 104:12,16,19 | 197:5,15 |
| 168:16 169:6 | 31:18 32:4,14 | 106:23 107:10 | 199:14 202:10 |
| 169:21 174:17 | 33:12,22 34:11 | 109:5 110:13 | 204:15 205:23 |
| 175:6 176:5,6 | 35:10,20 36:16 | 111:6,18 | 206:21,24 |
| 176:10,16,17 | 38:8,24 39:9 | 113:10 114:13 | 207:18 210:10 |
| 176:18,20,23 | 39:22 40:2,11 | 114:15 116:13 | 210:24 211:16 |
| 177:17 181:16 | 40:23 41:12,19 | 118:18,24 | 211:23 213:1,4 |
| 182:21 183:16 | 42:7 44:16 | 119:19,22 | 214:19 215:15 |
| 192:15 194:12 | 45:3 46:13 | 120:1,17 121:9 | 215:22 216:2 |
| 197:2,5,12 | 48:22 50:23 | 122:17 123:9 | 216:19 218:14 |
| 198:23 199:1,4 | 51:15 52:8,20 | 123:23 125:7 | 218:21 219:7 |
| 199:8,24 200:3 | 55:7,15 56:12 | 128:11 130:3 | 220:24 222:15 |
| 200:9 201:4 | 56:20 57:8,23 | 130:17 131:4 | 224:12 226:8 |
| 202:6,14 | 58:17 59:3,9 | 132:5 133:20 | 227:9 228:13 |
| 205:11 213:16 | 59:15,22 60:14 | 134:8 140:3,14 | 229:2,5 230:11 |
| 224:8,18 225:3 | 60:17 61:5 | 140:19 141:3 | 230:24 238:11 |
| 225:7,8 226:3 | 62:3,19 65:5 | 141:22 142:14 | 241:14 244:18 |
| 226:5,16 227:5 | 65:17,23 68:5 | 143:11,21 | 245:2,6,10 |
| 227:9,17 | 68:11,19 69:1 | 145:1 146:11 | 252:15 254:15 |
| 228:21 229:22 | 69:11 70:16 | 150:19 151:6 | 255:23 256:1 |
| 235:4 | 71:18 72:16 | 154:17 156:17 | 258:14 264:5 |
| **willing** 208:21 | 73:4 74:6,22 | 156:20 160:6 | 266:1,17,24 |
| 209:10 | 75:8 76:1,24 | 162:19 165:1 | 270:4,14 271:1 |

Veritext Legal Solutions

Edo Macan
Brous v. Eligo Energy, LLC

December 17, 2025

**[witness - yeah]**

Page 86

| | | | |
|---|---|---|---|
| 271:15 272:10 | 200:3 204:22 | 29:3 33:8 | 302:22 306:10 |
| 273:1,19 | 216:20 223:3,3 | 38:12 66:5 | **wrote** 58:20,22 |
| 274:24 275:19 | 231:24 232:10 | 190:6 191:16 | 59:9 60:6 |
| 276:10 277:7 | 232:15,20,24 | 196:22 249:12 | 92:15 108:7,11 |
| 280:5 282:10 | 233:5,5,8 | **working** 12:17 | 111:1 123:11 |
| 282:23 283:10 | 276:18 279:5 | 16:16 28:22 | 126:2 153:19 |
| 283:18 288:19 | **words** 30:20 | 30:2 42:7 50:8 | 153:19 184:23 |
| 290:9,18,21 | 58:24 60:6 | 141:5 242:6 | 197:1 239:2 |
| 291:1,4,10 | 215:6 235:12 | **works** 45:8 | 248:4 279:6 |
| 294:16,22,24 | **wordsmithing** | 66:9 87:1 91:2 | 317:6 |
| 298:24 299:20 | 59:6 | 109:11 214:2 | **wtlaw.com** 2:9 |
| 300:11,14,16 | **work** 10:6,9,11 | 227:13 | |
| 300:23 301:2,4 | 10:12,13,17 | **worksheet** | **x** |
| 302:12,17,20 | 11:2,8,13 | 290:13 291:21 | **x** 5:1,8 86:21 |
| 302:24 303:2 | 15:21 17:7 | 291:23 | 99:16 239:13 |
| 303:15,18 | 19:19 26:10,12 | **worries** 255:18 | 247:7 289:23 |
| 308:10 309:8 | 26:13 29:7,14 | **wrap** 8:4 | 290:2 |
| 309:12 311:5 | 29:17,20,21,24 | **write** 59:13,16 | |
| 312:5,17 | 30:1 37:16 | 88:15 90:11 | **y** |
| 313:18 314:12 | 47:4,19,23 | 147:21 154:23 | **y** 86:21 99:16 |
| 314:22 315:12 | 51:8 53:3,5,17 | 156:11,22 | **yeah** 10:2,14 |
| 316:10 317:21 | 54:11 55:17,18 | **writing** 58:24 | 11:7 13:19 |
| 318:2 323:8,18 | 55:19 58:23 | 59:1 67:1 | 14:2 15:9 |
| **witnesses** 12:18 | 59:6 65:20 | 130:8 208:23 | 17:13 18:7,7 |
| 12:18 | 76:8,10 89:6 | 209:11,14 | 18:14,15,18 |
| **wittels** 3:6 7:16 | 166:24 240:21 | 279:5 303:21 | 19:5,22 21:14 |
| 7:18 | 247:13 316:5,6 | **written** 12:14 | 22:21 25:8 |
| **wittelslaw.com** | 316:13 | 13:9 93:16 | 26:9,14,18 |
| 3:9 | **worked** 10:21 | 94:6 97:18 | 27:3,4,5,11,17 |
| **word** 61:8,9,10 | 17:1,14,17 | 98:20 112:3 | 28:11,21 30:17 |
| 61:11 84:10 | 19:8,21,24 | 208:20 | 30:20 31:13,14 |
| 161:10 195:9,9 | 22:6,11,15 | **wrong** 114:6 | 31:20,23 33:2 |
| 195:14 196:4 | 23:2,3 25:16 | 127:19 146:23 | 43:10 45:15 |
| 196:14 199:4,8 | 26:21 27:13 | 150:6 201:12 | 47:24 51:5 |
| | | | 53:10,10,22 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[yeah - years]**                                              Page 87

| | | | |
|---|---|---|---|
| 57:2,7,9,10,10 | 137:12,14,16 | 210:10 212:7 | 298:1,15,21 |
| 57:12,13 58:7 | 138:20,23 | 214:22 215:5 | 299:3,4,4,5,12 |
| 58:11 60:7 | 139:20 141:23 | 215:15,22 | 299:20,21 |
| 62:24 63:5,14 | 145:1 146:15 | 216:2,3,3,3,7,7 | 300:1,9,16 |
| 63:17,22 64:3 | 146:15,17,21 | 218:3,14,21 | 301:6,7,11,18 |
| 64:4,19 66:2,4 | 147:3 148:5 | 219:16,22 | 303:2,2,3 |
| 66:15 67:10,21 | 149:10,21,24 | 220:12 221:6 | 306:17,19,20 |
| 68:6 69:7 | 150:4 154:6 | 221:10 222:14 | 306:20,22 |
| 70:11 71:24 | 156:17,20 | 224:12,20 | 307:2,10,22 |
| 75:15,18,18,18 | 163:23 164:4,6 | 226:14 227:14 | 310:5,5,14,17 |
| 77:2,4 78:17 | 164:8 165:20 | 229:4,6 230:5 | 311:22,22,22 |
| 79:9 80:8,10 | 168:22,22 | 230:11,21,24 | 311:22 312:12 |
| 84:18,21 85:7 | 170:20,22 | 231:12 232:14 | 313:10,24 |
| 85:15 86:23 | 171:3,11 | 233:21 234:8 | 314:15 316:21 |
| 88:12,19,23 | 172:12 173:9 | 234:10,18 | 317:2,5,6,8 |
| 89:17,21 91:20 | 174:14 175:14 | 237:5 238:5,6 | 319:17 |
| 92:12 94:4 | 177:2 178:14 | 238:11 242:11 | **year**  28:1,1 |
| 97:19,19 100:8 | 179:4,7 182:11 | 245:2,4 246:23 | 47:19,23 48:5 |
| 100:11,23 | 182:13 183:9 | 248:22 249:22 | 49:9,18 56:21 |
| 101:9 103:2,20 | 183:11 184:12 | 250:20 252:5 | 83:20 117:9 |
| 104:8,16,16 | 184:15,22 | 252:23 253:6,7 | 129:6 133:21 |
| 105:1,3,15,15 | 185:12 186:3 | 255:24 256:12 | 236:3 267:24 |
| 105:20 106:10 | 187:10 188:13 | 257:8,10,12 | **years**  12:10,12 |
| 106:11,23 | 188:15 189:20 | 258:1 261:17 | 12:16,17,21 |
| 110:13 112:20 | 190:20 191:1 | 261:18,19 | 15:1,12 17:9 |
| 114:1,23,23 | 191:18,24 | 262:1 264:5 | 21:18 24:21 |
| 115:10,19 | 192:12 193:2,3 | 266:3,6 267:2 | 25:4 26:13 |
| 116:19 117:8 | 196:11,13 | 267:4,7,20,20 | 27:16,17 28:24 |
| 118:2,3 119:24 | 197:9 198:5,17 | 272:17 279:18 | 33:7 36:17 |
| 122:6 128:2,24 | 199:14,21,22 | 279:20 282:10 | 38:10,13 42:8 |
| 129:1,7,15 | 202:10 203:8 | 285:14,20,21 | 56:14 67:20 |
| 130:9,18,18 | 204:1,6,9 | 286:9,17 287:7 | 68:9 76:20 |
| 132:11 135:20 | 205:23 206:6 | 291:9 296:10 | 77:7,22 79:21 |
| 136:9,10,15,19 | 207:5,7,15,18 | 296:22 297:1 | 82:16 167:21 |

Edo Macan                                    December 17, 2025
Brous v. Eligo Energy, LLC

**[years - zoom]**                                          Page 88

| | | |
|---|---|---|
| 178:7 180:20 | 252:19 263:20 | 310:4,5 312:19 |
| 184:13 191:1 | 263:23 264:7,7 | 314:17 |
| 251:5 286:24 | 266:5,7 299:13 | **zones** 131:24 |
| 293:6 | 319:9 | 135:4 304:24 |
| **yesterday** | **york's** 112:11 | 305:9 306:16 |
| 189:8 | 123:14 | 307:11 319:8 |
| **yielded** 297:13 | | **zoom** 300:11 |
| **york** 1:3 3:8 | **z** | 301:20 |
| 6:17 17:11 | | |
| 19:20 20:1,10 | **z** 99:16 | |
| 24:10,17,19 | **zec** 144:13 | |
| 25:20,22,22,24 | 221:5 | |
| 26:22 27:15,23 | **zecs** 144:3,9,14 | |
| 30:19 31:4,5,9 | 220:14 227:22 | |
| 31:10,11,12,15 | 264:18 | |
| 32:11 73:24 | **zero** 144:14 | |
| 74:23 83:14 | 145:24 242:5 | |
| 87:1 88:17 | 243:1,3,5,7,9 | |
| 91:11 93:4 | 243:11 244:1 | |
| 95:2 123:14 | 245:13,14,17 | |
| 128:17 129:14 | 247:2,9,24 | |
| 135:1 137:7,7 | 248:7 288:6,11 | |
| 137:18 139:8 | 290:4 291:17 | |
| 140:10 141:17 | 292:15 293:12 | |
| 142:11 143:16 | 295:1 296:16 | |
| 144:21 147:8 | 299:6,7 301:13 | |
| 147:22 151:11 | 308:12 | |
| 171:9 173:11 | **zone** 128:6 | |
| 197:20 212:5,7 | 129:24 130:23 | |
| 212:9 217:18 | 133:5,14 | |
| 220:13 224:1 | 211:12,16 | |
| 227:11,12,12 | 299:24,24 | |
| 234:14 251:5 | 300:1,1 305:4 | |
| 251:17 252:6 | 305:13,14,23 | |
| | 306:4,7 307:8 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.