## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**ANNE BROUS, AS THE EXECUTRIX OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**,

     Defendants.

Case No. 1:24-CV-01260-ER

## <u>DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. FRANK FELDER AND ANY TESTIMONY HE MIGHT OFFER AT TRIAL</u>

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ...................3

        A.      Eligo's Customer Contract. ...............................................................3

        B.      Plaintiffs' Claims. ...............................................................................4

        C.      Dr. Felder's Opinion. ..........................................................................5

        D.      Dr. Felder's Opinion in Agway. ..........................................................6

III.    LEGAL STANDARD ........................................................................................7

IV.     THE COURT SHOULD STRIKE DR. FELDER'S OPINIONS
        BECAUSE THEY RELY ON MR. MACAN'S IMPROPER
        AND INADMISSIBLE INTERPRETATION OF ELIGO'S CONTRACT. .....................8

V.      DR. FELDER'S BLACK BOX CLASSWIDE DAMAGES MODEL IS
        UNRELIABLE BECAUSE IT CANNOT BE TESTED OR REPLICATED. ..................9

        A.      The Court Should Exclude Dr. Felder Because He Refuses to
                Disclose the Calculations Necessary to Replicate His Results. ...........10

        B.      The Numerous Mistakes in Dr. Felder's Calculations in *Agway* Provide
                Even More Support for Excluding His Testimony on Damages Totals. ...............18

        C.      The Limited Portions of Felder's Calculations That
                Can Be Reconstructed Reveal Basic Errors. ........................................20

VI.     FELDER'S MODEL IGNORES INDIVIDUALIZED FACTORS
        NECESSARY TO CALCULATE RELIABLE CLASSWIDE DAMAGES....................21

VII.    THE COURT SHOULD EXCLUDE DR. FELDER
        BECAUSE HE IS UNQUALIFIED TO OFFER HIS OPINIONS. .................................24

VIII.   CONCLUSION .................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) .......................................................................................7, 19

*Constr. Indus. Servs. Corp. v. Hanover Ins. Co.*,
  206 F.R.D. 43 (E.D.N.Y. 2001) ..........................................................................................19

*Daubert v. Merrell Dow Pharm. Inc.*,
  509 U.S. 579 (1993).....................................................................................................passim

*Fleming v. Village of Rockville Centre*,
  801 F.Supp.3d 113 (E.D.N.Y. 2025) ...................................................................................10

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...............................................................................................................8

*Golden Unicorn Enters. v. Audible*,
  2024 WL 5182671 (2d Cir. Dec. 20, 2024) .........................................................................17

*Great White Bear v. Mervyns*,
  2008 WL 2220662 (S.D.N.Y. May 27, 2008) ..................................................................9, 10

*Hernandez v. The Off. of the Comm'r of Baseball*,
  335 F.R.D. 45 (S.D.N.Y. 2020) ...........................................................................................19

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  293 F.R.D. 568 (S.D.N.Y. 2013) .........................................................................................19

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................................................................20

*LaMarca v. United States*, 31 F. Supp. 2d 110 (E.D.N.Y. 1998).............................................9, 10

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
  2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ..................................................................8, 10

*Martinez v. Agway Energy Servs.*,
  2022 WL 306437 (N.D.N.Y. Feb. 2, 2022) ..........................................................................19

*Martinez v. Agway Energy Servs.*,
  88 F.4th 401 (2d Cir. 2023) ................................................................................2, 6, 12, 18

*Richards v. Direct Energy Services, LLC*,
  915 F.3d 88 (2d Cir. 2019) ..................................................................................................15

*Sevugan v. Direct Energy Servs.*,
  931 F.3d 610 (7th Cir. 2019) ........................................................................15

*Todd v. XOOM Energy Maryland*,
  2020 WL 4784767 (D. Md. Aug. 18, 2020) ...................................................22, 23

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) .......................................................................19

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ..........................................................................8

**Rules**

Fed. R. Civ. P. 26 ...................................................................................8, 9, 19

Fed. R. Civ. P. 37 ...........................................................................................9

Fed. R. Evid. 702 .......................................................................................7, 20

## I.    INTRODUCTION

Plaintiffs' damages expert, Dr. Frank Felder, has one job: to tell the Court that Defendants owe the putative class more than $90 million, an amount that would bankrupt Eligo several times over. But he refuses to show how he got there.

At a high level, Dr. Felder's damages model proceeds in two steps. First, relying on the tortured interpretation of Eligo's contract manufactured by Plaintiffs' counsel and their other expert, Edo Macan, Dr. Felder calculates a hypothetical "contract rate." That's the price he believes Eligo should have charged its tens of thousands of variable rate customers each month during the class period. He generates these hypothetical "contract rates" using several different data sources, including estimated third-party POWWR spreadsheets, NYISO day-ahead wholesale prices, utility "price to compare" rates, and a weighted average of 11 energy suppliers' rates. Second, he subtracts those contract rates from the amounts Eligo actually charged customers and aggregates the resulting differences across the putative class. That produces the total damages for the tens of thousands of putative class members exceeding $90 million.

The problems with Dr. Felder's analysis occur at every step of this process. Most fundamentally, Dr. Felder's entire damages model is built on Mr. Macan's interpretation of Eligo's contract, which is irreconcilable with the agreement's plain language. As described in Eligo's motion to exclude Mr. Macan's testimony, Mr. Macan opines that Eligo was required to confine its variable rates to its wholesale energy procurement costs plus a margin not to exceed 6%, even though Eligo's contract says nothing of the sort. Because Dr. Felder relies upon Mr. Macan's work and bakes those unjustifiable errors into his report and conclusions, the exclusion of Mr. Macan's testimony likewise requires that Dr. Felder's testimony be excluded, too.

Dr. Felder's damages calculations must also be excluded because they are the product of a "black box" methodology that can't be tested, much less shown to be reliable. Dr. Felder has

refused to disclose his benchmark inputs, the monthly "contract rates" he used to calculate damages, Eligo's purported overcharges, or the underlying calculations required to reach those monthly amounts. Instead, Dr. Felder only provides aggregate damages for tens of thousands of customers on an annual basis, even though Plaintiffs claim that each Eligo customer was overcharged by varying amounts monthly. Because Plaintiffs have withheld his workpapers based on "privilege," Defendants cannot see how Dr. Felder reached his damage totals or test the accuracy of his calculations. Because Dr. Felder's model cannot be tested or verified, Plaintiffs cannot carry their burden to show it is reliable under *Daubert*.

An expert opinion must be transparent enough for the opposing party—and the Court—to examine the methodology and determine whether it is reliable. Dr. Felder's model fails that basic requirement. It is a black box. An abstract formula is announced, undisclosed inputs go in, and undisclosed monthly outputs are produced. These outputs are then cobbled together into aggregate damages estimates, like $90 million, and the steps in between remain concealed. The lack of disclosure here is especially important because of the scale of Dr. Felder's calculations. His damages calculations supposedly span hundreds of thousands of customer billing periods and millions of individual computations, none of which he has disclosed.

As with Plaintiffs' other experts, this is not the first time Dr. Felder has offered unreliable damages opinions in an ESCO litigation. It appears that Dr. Felder's refusal to disclose his underlying calculations and workpapers is part of an effort to avoid the exclusion of his testimony, which is precisely what happened in cases where Dr. Felder did disclose his data. For example, Dr. Felder disclosed his damages calculations in *Agway*, which revealed that Dr. Felder made fundamental errors—using data for a state that was not at issue in the litigation, double-counting certain elements, and even using utility data that bore no relationship to publicly available data on the utility's website. The *Agway* court excluded his testimony, and the Second Circuit affirmed,

holding that the methodology rested on unreliable assumptions and insufficient data. Dr. Felder

seeks to avoid the same result here, not by improving his analysis, but by withholding his data and

calculations from scrutiny. This makes a mockery of Plaintiffs' burden to show reliability under

the *Daubert* standard and cannot be allowed.

The Court should exclude Dr. Felder's opinions and testimony in its entirety.

## II.    STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A.    Eligo's Customer Contract.

Eligo is an energy supply company, or "ESCO," that operates in several states. This case

concerns two New York residents—Ira Brous and Michelle Schuster—who chose Eligo as their

electricity supplier. After seeing attorney advertisements, they alleged that Eligo overcharged them

by failing to calculate variable rates for electricity as provided in Eligo's contract.

Before enrolling with Eligo, Plaintiffs were both customers with other ESCOs and were

not customers of their local utility. Ex. 1, DEF093950 (Brous Pre-Eligo Customer Information);

Ex. 2, DEF093953 (Schuster Pre-Eligo Customer Information). Eligo offered a premium product

that the utilities did not: electricity derived from green or renewable sources, in excess of the floor

amount required by NY law for all utilities and suppliers. Ex. 3, DEF000138 (Schuster Enrollment

Packet); Ex. 4, DEF093223 (Brous Enrollment Packet); Ex. 5, A. Brous Dep. at 36 (███████

███████████████████████████████████); Ex. 6, M. Schuster Dep. at 77 (█████

██████████████████████).

Both Plaintiffs enrolled with Eligo by telephone through a third-party verification ("TPV")

call with an Eligo representative. Ex. 7, DEF000126 (Schuster TPV Call); Ex. 8, DEF093222

(Brous TPV call). During that call, the representative explained that Eligo would provide

electricity at an introductory fixed rate and then "continue at a month-to-month rate based on

market and wholesale factors, weather patterns, and pricing strategies." *Id.* Each Plaintiff verbally

assented to have their variable rates calculated according to those broadly described factors. *Id.* The call also made clear that Eligo did not guarantee savings, and that the Plaintiffs could cancel their Eligo service at any time and for any reason. *Id.* The New York Public Service Commission ("NYPSC") requires TPVs for such telephonic enrollments and repeatedly approved Eligo's TPV script. Ex. 9, 2014 UBP at 171; Exs. 10-16, NYPSC regulatory filings, including TPV scripts.

A few days after enrolling, Plaintiffs received Eligo's standard energy supply contract, which said, in relevant part, that after the initial fixed-rate period the Plaintiffs would convert to a "monthly variable kWh rate that may be periodically adjusted for market conditions," and that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 3, DEF000138 (Schuster Enrollment Packet); Ex. 4, DEF093223 (Brous Enrollment Packet). The contract did not define "market conditions," "market pricing," or the necessarily inexhaustive term "other market price factors." Nor did it contain any formula or other specific method that Eligo would use to calculate variable rates. The contract further provided that Eligo did not guarantee that Plaintiffs (or any Eligo customer) would save money by switching to Eligo, and that the Plaintiffs could cancel their Eligo service at any time and for any reason.

### B.    Plaintiffs' Claims.

After enrolling with Eligo, each Plaintiff remained an Eligo customer for several years, without complaint. In late 2023, however, the Plaintiffs saw advertisements from the lawyers who now represent them in the case. Ex. 6, Schuster Dep. at 24-27. Shortly after receiving those solicitations, the Plaintiffs cancelled their Eligo service and filed this lawsuit.

Plaintiffs primarily accuse Eligo of breaching its contract by failing to set variable rates for electricity in accordance with the contract's rate-setting criteria. Plaintiffs also allege follow-on claims for breach of the implied duty of good faith and fair dealing, violations of New York

4

consumer protection statutes, and unjust enrichment. All of Plaintiffs' claims rest on the allegation that the contract's rate-setting criteria – i.e., that variable rates would be set according to "market pricing" and "other market price factors" – required Eligo to base its rates exclusively on Eligo's "cost to procure energy from the wholesale market." Second Am. Compl. ¶ 64; *see also id.* ¶¶ 4, 70-71. In other words, according to Plaintiffs, the contract sets forth a cost-plus pricing structure and gives Eligo no discretion at all in rate setting. *See id.* ¶¶ 5, 34. Plaintiffs rely on those allegations even though the contract contains no reference to any cost-plus pricing structure and says nothing about the wholesale cost of energy, much less limit Eligo's variable rates to those wholesale prices—and even though the TPV made explicit the obvious point that "market" and "wholesale" factors are two *different* concepts. *See supra* at 3.

### C.    Dr. Felder's Opinion.

Since at least 2011, Dr. Felder has served as an expert for Plaintiffs' counsel in dozens of lawsuits brought against ESCOs. Ex. 17, Felder Dep. at 11–16. Here, Plaintiffs' counsel again retained Dr. Felder to testify concerning the Plaintiffs' alleged damages.

Dr. Felder's central function in this litigation is to compute classwide damages by calculating how much each Eligo variable rate electricity customer in New York was "overcharged." Ex. 18, Felder Report ¶¶ 31–80. Working in conjunction with Plaintiffs' other damages expert, Edo Macan, Dr. Felder constructed a model that supposedly shows the total amount putative class members were allegedly overcharged by Eligo. To compute the aggregate overcharge for each billing period, Dr. Felder first had to determine what Eligo "should" have charged its tens of thousands of variable rate customers, otherwise known as the "contract" rate, and then had to subtract that amount from what the customers actually paid. *See, e.g., id.* ¶ 34. To derive the amount the Plaintiffs allegedly should have been charged, Dr. Felder relied heavily on the work of Mr. Macan. As explained in Eligo's motion to exclude Mr. Macan's testimony (at 7–

16), Mr. Macan generated those rates based on his opinion that Eligo's contract required cost-plus pricing, and limited Eligo to charging its wholesale cost of acquiring energy plus a "reasonable margin" of 5-6%. Dr. Felder adopted and used Mr. Macan's interpretation of Eligo's contract.

Dr. Felder then used those opinions and assumptions to quantify "contract" rates for every variable rate electricity invoice received by the members of the proposed class during the six-year class period. This required Dr. Felder to account for the fact that New York residents are served by several different utilities in various different service zones. Dr. Felder then subtracted these "contract" rates from the amounts that Eligo actually billed its variable rate customers to determine the alleged overcharge. *See, e.g.*, Ex. 18, Felder Report ¶ 34. Dr. Felder offers several different "methods" of his damages calculations, but each shares this same basic structure.

Dr. Felder did not disclose the contract rate for any customer under any method and did not disclose any information concerning the purported individual overcharges on a per-customer basis. Instead, he provided a broad, high-level formula and an aggregate classwide damages total without disclosing his monthly input data, monthly "contract" rates, monthly overcharges, or how he calculates these values or ultimately arrives at the aggregate damages total.

### D.    Dr. Felder's Opinion in *Agway*.

Dr. Felder offered a similar expert opinion on damages in *Agway.* Unlike here, Dr. Felder disclosed his underlying calculations. With those disclosures, Agway was able to show through its expert, Dr. Aron, that Dr. Felder made fundamental errors in his calculations—using data for a state that was not at issue in the litigation, double counting certain elements, and even using utility data that bore no relationship to publicly available data on the utility's website. Ex. 19, Aron *Agway* Report ¶¶ 172–89. The *Agway* court excluded his testimony, and the Second Circuit affirmed, holding that the methodology rested on unreliable assumptions and insufficient data. *Martinez v. Agway Energy Servs.*, 88 F.4th 401, 414 (2d Cir. 2023). Shortly after Dr. Felder

produced his expert report in this litigation, Defendants asked for his underlying workpapers and calculations so that they could verify the accuracy of his calculations. Plaintiffs' counsel refused to produce any workpapers on the grounds of privilege. Ex. 20, (Blankinship email asserting privilege over expert calculations).

## III.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). The reliability inquiry applies to each step of the expert's analysis. *Id.* at 267 ("To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step."). "[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *Id.* "The proponent [of an expert] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702, advisory committee notes.

Courts must also ensure that an expert has reliably applied a valid methodology to the facts of the case. Here, it is Plaintiffs' burden to show Dr. Felder passes *Daubert* muster. Fed. R. Evid. 702, Adv. Cmte. Note. When an expert relies on unsupported assumptions, incomplete data, analytical leaps that are not adequately explained, or where "there is simply too great an analytical

gap between the data and the opinion proffered," the testimony must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238, at *17 (S.D.N.Y. Apr. 11, 2005). And if a theory cannot be tested and verified, it cannot be deemed reliable and must be excluded from evidence. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (affirming exclusion and noting that "conclusions that are not falsifiable aren't worth much to either science or the judiciary") (Easterbrook, J.).

Finally, "[a] damage figure in an expert report cannot satisfy Rule 26(a)(2)(B) simply by stating a conclusory figure and then attaching documents that purportedly support that figure. Rather, the report must supply actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure." *Id.* at *3. Where an expert fails to provide this required information, exclusion is warranted under *Daubert*, FRE 702, and FRCP 26 and 37. *Id.*; *Lava Trading*, 2005 WL 4684238, at *19.

## IV.    THE COURT SHOULD STRIKE DR. FELDER'S OPINIONS BECAUSE THEY RELY ON MR. MACAN'S IMPROPER AND INADMISSIBLE INTERPRETATION OF ELIGO'S CONTRACT.

As a threshold point, Dr. Felder's damages opinions are unreliable because they are entirely dependent on the impermissible contract interpretation offered by Plaintiffs' other expert, Mr. Macan. To calculate total "overcharges" across the putative class, Dr. Felder calculates the amount that he thinks every Eligo class member should have paid under various different models, which he calls the "contract rate," and subtracts that amount from what each customer actually paid. *See, e.g.*, Ex. 18, Felder Rep. ¶ 34. To determine the "contract rate," Dr. Felder relies on Mr. Macan's interpretation of the contract and opinion as to how Eligo's variable rates should have been

calculated and does not independently interpret the governing contract or analyze its pricing provisions. Ex. 17, Felder Dep. at 49:4–9. But as Defendants argued in their motion to exclude Mr. Macan's testimony, Mr. Macan's proffered interpretation of the agreement defies its plain language.

Because Felder's damages calculations assume the validity of Macan's contract interpretation, exclusion of Macan's opinions independently requires exclusion of Felder's damages opinions. Felder's models measure alleged overcharges by comparing Eligo's actual prices to hypothetical prices ("contract rates") derived from Macan's interpretation. If that interpretation is incorrect, the hypothetical benchmark prices and damages calculations in Felder's analysis are too, and the entire premise of his opinions is wrong.

## V.    DR. FELDER'S BLACK BOX CLASSWIDE DAMAGES MODEL IS UNRELIABLE BECAUSE IT CANNOT BE TESTED OR REPLICATED.

Federal law requires a testifying expert to provide "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). In other words, the report must disclose both its conclusions, as well as explain "'how' and 'why' the expert reached those conclusions." *Great White Bear v. Mervyns*, 2008 WL 2220662, at *2 (S.D.N.Y. May 27, 2008). "A damage figure in an expert report cannot satisfy Rule 26(a)(2)(B) simply by stating a conclusory figure and then attaching documents that purportedly support that figure. Rather, the report must supply actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure." *Id.* at *3. A report that fails to disclose actual calculations is subject to "self executing" and "automatic" sanction of exclusion under Rule 37(c)(1) and fails to meet the reliability requirement of *Daubert*. *LaMarca v. United States*, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1998); Fed. R. Civ. P. 37(c)(1); *Lava Trading v. Hartford Fire Ins. Co.*, 2005 WL 4684238, at *19

(S.D.N.Y. Apr. 11, 2005).

Dr. Felder's damages models should be excluded precisely because they provide nothing more than an "opaque and sparse" high-level description of his formulas and "conclusory figure[s]" of aggregate damages without ever disclosing the "actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure." *Great White Bear*, 2008 WL 2220662 at *3. Just as in *Great White Bear*, Dr. Felder "has failed to supply any calculation which ties the numbers contained in the underlying documents to the [aggregate damages] figure he cites." *Id.*

Defendants asked for Dr. Felder's calculations and underlying workpapers so that Defendants' expert Dr. Aron could test and verify Dr. Felder's calculations, just like she did in the *Agway* litigation. Plaintiffs refused and, in so doing, denied Defendants "a reasonable opportunity [to] prepare for effective cross examination and . . . arrange for expert testimony from other witnesses." *LaMarca*, 31 F. Supp. 2d at 122; *Fleming v. Village of Rockville Centre,* 801 F. Supp. 3d 113, 128 (E.D.N.Y. 2025) ("[b]ecause [the expert] has not disclosed the basis for his opinion, the jury would have no basis to judge its credibility. Even permitting Defendants to cross examine [him] on this topic would be futile, because Defendants could not attack the formation of the opinion without the underlying materials on which it is based. Accordingly, the [ ] opinion is excluded.").[1] This refusal renders Dr. Felder's opinions untestable and inadmissible.

### A. The Court Should Exclude Dr. Felder Because He Refuses to Disclose the Calculations Necessary to Replicate His Results.

---

[1] Consistent with standard practice, Dr. Aron disclosed her entire workpapers, including all of the underlying data, formulas, code, and programs used in her report so that Plaintiffs' experts could replicate her results and test her opinions.

Dr. Felder's damages opinions must be excluded because he refuses to disclose the data and intermediate calculations used to calculate his aggregate damage totals, which combine the purported overcharges of tens of thousands of putative class members.

**<u>Method #1</u>**

Using Mr. Macan's interpretation of the contract under Method #1, Dr. Felder calculates overcharges using cost estimates derived from POWWR pricing spreadsheets. POWWR is a third party whose services Eligo uses to set the contract rate for a narrow set of fixed rate customers who receive bespoke pricing based on their unique characteristics, like historical energy usage. Eligo does not use these spreadsheets for the vast majority of fixed-rate customers or any variable rate customers. Dr. Felder nevertheless uses these POWWR spreadsheets because they contain energy procurement cost estimates. But Dr. Felder has no understanding of POWWR or its spreadsheets and had never heard of the company before encountering the POWWR spreadsheets as part of this litigation. Ex. 17, Felder Dep. at 229:20-230:21. Nor did Dr. Felder have access to the encrypted information in the POWWR sheets; Plaintiffs' counsel asked Eligo for these passwords when they were preparing their expert reports, but Defendants do not have access to that encrypted information. Ex. 26, (Blankinship email requesting password for access to encrypted sheets); Ex. 17, Felder Dep. at 235–36.

Despite all this, Dr. Felder purports to calculate the "contract rate" (what Eligo should have charged its customers) by manipulating these spreadsheets to produce cost estimates and then adding a 5 or 6% margin to that cost estimate. He then takes this contract rate and subtracts it from what each customer actually paid to determine each customer's overcharge for every month. But Dr. Felder discloses so little of his calculations that it is not possible to test or verify his calculations.

The first gap in Dr. Felder's calculations is his failure to disclose which POWWR spreadsheets he used for which months to calculate the contract rate. In *Agway*, Dr. Felder clearly disclosed which documents he used to calculate damages in which months. Ex. 21, Felder *Agway* Report at 10 (table with monthly breakdown of bates numbers). Here, in contrast, he simply explains that he used POWWR spreadsheets from the 15th day of the previous month to calculate a certain month's contract rate, but this is of little help as not all of the POWWR spreadsheets have date data, and it forces Defendants to guess which sheets he used for which months.

The second gap is that Defendants and the Court do not know what data was input into these files and what settings were used for each month because of Dr. Felder's meager, high-level description of his method. As one example, the POWWR spreadsheets contain a dropdown menu for the "rate/profile" category with dozens of indecipherable acronyms that one must select in order to receive a cost estimate. *See, e.g.,* Ex. 22, DEF018655 (POWWR spreadsheet with options for rate/profile include "FACILITY, CO BOOK, not used, RNH, RHT, TN1, TN2," etc.). Dr. Felder does not disclose which of those options he uses, leaving Defendants to guess how to reverse engineer Dr. Felder's calculations. Confounding things further, the POWWR spreadsheets come prepopulated with different values that can have a dramatic impact on the cost estimate. For example, when Defendants followed the high-level formulas in Dr. Felder's report, one of the POWWR spreadsheets produced a facially inaccurate cost estimate of $14,000/MWh, which is hundreds of times a standard cost estimate (e.g., $40-120/MWh). When confronted with this at his deposition, Dr. Felder testified that he didn't specifically recall such an outlier, but that "it was either caught . . . or it was immaterial." Ex. 17, Felder Dep. at 373:8–377:21. Again, because we do not have Dr. Felder's workpapers, it's not clear how or if this error was caught or corrected. And Dr. Felder can't jump the reliability hurdle merely by speculating that demonstrated errors in his data were either caught or didn't matter in the first place. Without knowing which spreadsheets

and what inputs Dr. Felder used, Defendants and the Court cannot calculate or know the "contract rate" or what Eligo allegedly should have charged.

No one apart from defense counsel and Dr. Felder's team know what the outputs of the POWWR spreadsheets or the "contract rate" were for the tens of thousands of customer invoices included in Dr. Felder's analysis. Without these hundreds of thousands of data points, there is no way to calculate each customer's "overcharges" by subtracting what customers should have paid from what they actually paid. What this ultimately means is that Defendants have no way of knowing how Dr. Felder arrived at his multi-million-dollar damages estimates. They are left only with his say-so, which is not sufficient.

In addition to calculating classwide damages, Dr. Felder also calculated straight and revenue-weighted margin/markup across the entire class, and these margin calculations, which use the "contract rate" cost estimates from Method #1, also fail to disclose the data or calculations used to arrive at these numbers. It is impossible for Defendants to replicate or verify Dr. Felder's markup/margin calculations because we do not know the underlying contract rates.

Independently, these classwide margin calculations should be struck because they ignore data of Eligo's margins and reconstruct margins using only one of Eligo's dozens of costs. Just like Mr. Macan, Dr. Felder ignores actual cost data and instead calculated a "profit margin" based on the estimated cost of wholesale energy and nothing else. Ex. 18, Felder Report ¶ 82. By ignoring most of Eligo's actual costs, including overhead, marketing, and legal compliance, Dr. Felder can arrive at sensational profit margins, but these don't correspond to reality. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

**Method #2**

For Method #2, Dr. Felder calculated the contract rate using a combination of NYISO's day-ahead wholesale price (an hourly, location-specific price set in the wholesale electricity market) and an assortment of other charges, including ancillary costs, capacity charges, and transmission losses. Here, again, Dr. Felder does not disclose what values he used and instead directs Defendants to dozens of pages of links to websites on his materials considered list. This is insufficient because it is unclear which links correspond to which data points—many of which do not have a date associated with them and do not clearly correspond to any of these categories— and puts the burden on Defendants to guess which documents he used and how. A substantial number of the links included in Dr. Felder's materials considered were broken, so Defendants received error messages when they tried to access the sources that Dr. Felder used. Ex. 17, Felder Dep. at 345–48. But even having the correct website link doesn't help because we don't know how Dr. Felder used these websites. Felder's links that correspond to static PDFs have multiple values and it's unclear which values Dr. Felder used for what calculations, and the links that correspond to live websites where you can enter different settings and get different outputs are only helpful if you follow the exact same settings that Dr. Felder used in order to receive the same data that Dr. Felder used. This is just one example of how Dr. Felder's black box calculations make it impossible for Defendants or  the Court to test and verify his damages calculations.

**<u>Methods #3 and 4</u>**

In Methods #3 and 4, Dr. Felder abandons the "preferred" cost-plus interpretation used in Methods #1 and 2 and uses a backup or alternate calculation that determines the contract rate by using either the utility price to compare or a "prevailing market rate." He then subtracts that rate from what customers actually paid to determine overcharges. Again, Dr. Felder fails to disclose the necessary facts and data to test his calculations, which should therefore be excluded. Separately, these methods should be excluded because they are nothing more than a comparison

between Eligo's variable rates and a utility's rate, which circuit courts have repeatedly rejected as a basis for comparison or proving breach. *Richards v. Direct Energy Servs.*, 915 F.3d 88, 99 (2d Cir. 2019) (noting it would defeat "the entire point of electricity deregulation" to impose a regulated utility rate on unregulated ESCOs); *Sevugan v. Direct Energy Servs.*, 931 F.3d 610, 616 (7th Cir. 2019) (The utility "price is not a market price at all; it is a regulated price," and thus utility prices "are not proper comparators with [an ESCO] to gauge market price.").

The contract rate for Method #4 consists entirely of the utility price to compare, which Dr. Felder does not disclose. Determining the utility price to compare is not a simple calculation, as Dr. Felder made clear in his uninterrupted, 34-line response during his deposition. Ex. 17, Felder Dep. at 339:18–341:7. And there is not just one price to compare within a utility. Instead, different customers pay different rates and have different "prices to compare" depending on their service zone, their rate classification, their specific billing cycle, or by hourly peak/off-peak pricing. *Id.* at 351:18-352:20. In other words, for each month and each utility, there are dozens of different prices to compare for customers. Dr. Felder dealt with this diversity by "averaging" these many prices to compare. *Id.* at 354:9–10. We have no idea what he averaged or how and this number is not available anywhere.

None of this is disclosed in Dr. Felder's report. His section on Method #4 consists of only six sentences and gives the reader no clue how to determine what price to compare data that Dr. Felder used as the benchmark. And because Dr. Felder refused to produce any of his workpapers that would explain how these very high-level formulas were operationalized, Defendants cannot verify that the calculations were performed accurately.

The contract rate for Method #3 is a weighted average of the utility price to compare and 10 leading ESCO rates, which Dr. Felder calls the "prevailing market rate." Although Mr. Macan presents Method #3 (comparison to the weighted average of the utility and ten ESCOs) and Method

15

#4 (comparison to the utility price to compare) as distinct methodologies, the two produce essentially the same results when viewed side by side. Ex. 24, Macan Dep. at 312 (acknowledging that Method 3 and Method 4 comparisons "look very, very similar"), Ex. 25, Macan Dep. Ex. 8 (charts comparing utility price and weighted average). The two methods parrot each other for the straightforward reason that the utility price to compare makes up 80-90% of the weighted prevailing market rate, such that Method #3's contract rate tracks the utility rate itself with only a thin layer of arithmetic on top. In practice, then, Method #3 collapses into a comparison against the utility—the same comparison performed explicitly in Method #4.

Ultimately, Defendants cannot reconstruct Dr. Felder's overcharges under Method #3 because we do not know Dr. Felder's average price to compare that he calculated using the variety of price to compare figures available. Even if we knew that value, it would still be impossible to calculate the weighted average without Dr. Felder's underlying workpapers because he uses two different measures (total load and peak load) to calculate ESCO market share and utility market share respectively (see Macan Report ¶ 175), meaning that we don't know how he is weighting these different rates or how he is combining monthly utility rates with quarterly ESCO rates and annual measures of load.

To the extent Defendants understand Dr. Felder's calculations under Method #3, he appears to be making an apples-to-oranges comparison by selecting the 10 representative ESCOs based on total load—regardless of whether this is brown, fixed, guaranteed savings, aggregation, or variable—and then suggesting that that ESCO's variable rates are representative of the market— even if the ESCO has a very small variable rate customer base. Nor is there any consideration here that Eligo was offering a green energy product, unlike the utilities and the ESCOs that it is being compared to. Dr. Felder did not disclose his calculations or the underlying data to Defendants and instead "hid the ball" and told Defendants to try to reverse engineer his calculations.

**Methods #5 through 8**

Under Method #5, Dr. Felder took the hundreds of thousands of individual monthly overcharge calculations—none of which have been shared with Defendants—and then applied statutory minimums and maximums from GBL § 349 as damage multipliers. These multipliers included treble damages and damage minimums of at least $500 per customer. Ex. 18, Felder Rep. ¶¶ 68–70. In effect, Dr. Felder transforms his earlier aggregate damages calculations of roughly $20–$30 million and triples them by interpreting and applying GBL § 349.

First, this method should be struck because Dr. Felder cannot interpret and apply GBL § 349—that is the exclusive province of the Court and the jury. Second, this method should be struck because he fails to disclose the facts and calculations underlying his aggregate damage totals. Defendants do not have access to hundreds of thousands of underlying monthly overcharge calculations for all the reasons stated above and cannot see how Dr. Felder applied his understanding of GBL § 349. In essence, Method 5 imposes a second black box—Dr. Felder's damage multiplier calculations—on the preexisting black box—Dr. Felder's monthly overcharge calculations—providing yet more reason for the Court to exclude this testimony.

Dr. Felder's Method 6 calculations use the exact same methodology as Method 2 and should be excluded for all the reasons that his calculations under Method #2 should be excluded. Dr. Felder's Method 7 calculations simply sum up one column in an excel spreadsheet, requiring no expertise. The jury is capable of performing this basic arithmetic by itself and so Dr. Felder's testimony on this point should be struck. *Golden Unicorn Enters. v. Audible*, 2024 WL 5182671, at *3 (2d Cir. Dec. 20, 2024). Dr. Felder's Method #8 calculations, which apply GBL § 349 damage multipliers to his Method #7, should be struck because it employs the impermissible approach of Method #5 to the impermissible calculations in Method #7 and should be struck for all of the reasons those two other methods should be struck.

17

Again, Defendants can see none of the calculations behind these methods, which in some cases triple Plaintiffs' damages estimates for the class. Dr. Felder acknowledged his blasé approach to his calculations for Methods 5 through 8 in his deposition: "some of them come from Methods 1 through 3, they may or may not be Mr. Macan's report, but they were further modifi- -- calculations based on the damages I've calculated. ***The higher of this, the lower of that, blah, blah, blah.***" Ex. 17, Felder Dep. at 220:6–12.

## B.    The Numerous Mistakes in Dr. Felder's Calculations in *Agway* Provide Even More Support for Excluding His Testimony on Damages Totals.

The Court should exclude Dr. Felder because he is refusing to produce his workpapers in this litigation to avoid the same scrutiny that ultimately led to him being excluded in *Agway*. There, Dr. Felder disclosed his underlying calculations, and Defendants' expert Dr. Aron was able to show the following elementary errors in his calculation:

- Dr. Felder used Maryland and District of Columbia data to perform damages calculations for Pennsylvania customers. Ex. 19, Aron *Agway* Report ¶ 172.

- The "price to compare" values that he used had "no apparent relationship" to the price to compare values that Defendant's expert found on the utility website. *Id.* ¶ 189.

- Dr. Felder double counted certain components when calculating damages. *Id.* ¶ 177.

- Dr. Felder assumed that certain charges applied for the entire period when they only applied for part of the period and vice versa. *Id.* ¶¶ 176, 178.

With the benefit of this scrutiny, the court in *Agway* determined that Dr. Felder's report rested upon "unreliable methodology and insufficient data" and was "simply inadequate to support the conclusions reached." *Martinez v. Agway Energy Servs.*, 2022 WL 306437, at *14 (N.D.N.Y. Feb.

2, 2022). Defendants asked for Dr. Felder's calculations to provide to Dr. Aron to perform the same analysis and criticism.

To avoid the same outcome here, Plaintiffs' counsel refused to produce them and have insulated Dr. Felder's calculations from any such criticism by asserting privilege over his workpapers. Ex. 20, (Blankinship email asserting privilege over expert calculations). This makes no sense on multiple levels. First, Dr. Felder's internal workpapers were never privileged to begin with. *Hernandez v. The Off. of the Comm'r of Baseball*, 335 F.R.D. 45, 47, 50 (S.D.N.Y. 2020) (document created by expert explaining "expanded methodology" was not protected by work-product doctrine). Second, even if they somehow contain some privileged information, disclosing that privileged data to Dr. Felder would have broken privilege and mandated production under Rule 26. *Constr. Indus. Servs. Corp. v. Hanover Ins. Co.*, 206 F.R.D. 43, 54 (E.D.N.Y. 2001) ("[L]itigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 293 F.R.D. 568, 578 (S.D.N.Y. 2013). Ultimately, there is no non-frivolous basis for this assertion of privilege, and the Court should not reward such gamesmanship.[2]

The scope of Dr. Felder's calculations also reaffirms that the Court should exclude him. *Amorgianos* requires reliability at "every step" of the way. Dr. Felder's undisclosed calculations contain thousands, if not millions, of undisclosed steps to reach classwide damages estimate

---

[2] Furthermore, Plaintiffs' assertion that Dr. Felder's workpapers are privileged creates a sword-shield problem because an expert cannot simultaneously: 1) offer opinions that purport to calculate thousands of dollars in individual damages and millions in class damages and 2) shield the calculations that supposedly support those opinions from any kind of scrutiny. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword.").

approaching $90 million. Because of a tactical decision by Plaintiffs' counsel to conceal Dr. Felder's workpapers from any scrutiny, neither Defendants nor the Court can determine whether the nearly $90 million damages figure is the product of a reliable analytical process or the result of undiscovered errors embedded in a massive set of computations. Rule 702 does not permit such opaque expert testimony.

**C.    The Limited Portions of Felder's Calculations That Can Be Reconstructed Reveal Basic Errors.**

The limited portions of Felder's analysis that can be reconstructed from the materials he produced already reveal basic computational errors. For starters, there are a number of elementary errors underlying his damages calculation. For example, Dr. Felder calculated damages for 73 months even though the relevant class period here is six years or 72 months. Ex. 17, Felder Dep. at 213:22-215:5. He claims to have used cell FP118 within the "PRS" tab of the POWWR spreadsheet to calculate the cost of renewable energy certificates, but the POWWR spreadsheets do not contain a tab named "PRS." There is a tab named "RPS costs," however, cell FP118 on this sheet refers to renewable energy certificates *for New Jersey, not New York*. And his lack of understanding of the POWWR spreadsheets (see supra at 11) leads him to make demonstrably untrue claims. He claims, for example, that the POWWR model did not price voluntary renewable energy credits. Felder Report ¶ 22. This is wrong, as Dr. Felder admitted at his deposition (Ex. 17, Felder Dep. at 297:22–302:6) and provides further evidence for why his opinion should be excluded. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 565–66 (S.D.N.Y. 2004) (excluding expert opinion that relied on a misunderstanding of the factual record).

Dr. Felder's calculations are also inaccurate and unreliable because they suffer from a basic chronological flaw: they compare prices from different time periods. Rather than using data from when customers actually consumed electricity, he calculates what customers supposedly "should

have paid" (the contract rate) using utility rates and cost estimates from the invoice date—often months later. For example, for Ms. Schuster's August–September 2023 consumption, Dr. Felder relied on November cost estimates simply because the invoice was issued then. This approach makes no sense and is a poor fit for the contract at issue, which provides for market pricing, and not for future cost estimates. Separately, his calculations are a poor fit because Eligo's invoices to its customers virtually always straddled at least two months and varied considerably in length, and Dr. Felder's contract rates are calculated using calendar month data.

Dr. Felder's calculations are also unreliable because they ignore a central term of the contracts: each agreement expressly states that "there are no guaranteed savings." Exs. 27-29 (DEF000132, DEF000138, DEF000143). Yet his model excludes any months in which customers paid less with Eligo than they would have under his benchmark. Ex. 18, Felder Report ¶ 47 n.29. For example, if a customer saved $5 in one month but paid $4 more the next, the customer would be $1 better off overall—but Dr. Felder's model would still report $4 in damages. Ex. 17, Felder Dep. at 200:9–201:3. There is no methodological basis for discarding favorable months in this way; the approach disregards the contract terms and produces the same heads-I-win, tails-you-lose damages theory Plaintiffs advance throughout this case.

Because Felder refuses to disclose the formulas, intermediate calculations, and workpapers necessary to replicate his damages analysis—and because the limited portions of the analysis that can be reconstructed already reveal basic errors—his opinions are unreliable and should be excluded.

## VI. Felder's Model Ignores Individualized Factors Necessary to Calculate Reliable Classwide Damages.

Dr. Felder's classwide damages model is also unreliable because it ignores numerous customer-specific factors that materially affect the calculation of any alleged overcharge. Instead

of accounting for the differences among tens of thousands of individual customers in the proposed class, Felder treats those customers as though they were indistinguishable, rendering the resulting damages calculations unreliable.

To begin with, Felder's model fails to account for differences in customers' prior electricity suppliers. Some Eligo customers previously received service from their local utility, while others switched from a different ESCO. For example, both Plaintiffs joined Eligo from other ESCOs. *See supra* at 3. There is no methodological basis for applying a "market" rate that consists either entirely or predominantly of the utility rate when those customers would have never received the utility rate in the first place and certainly would not have expected it. Dr. Felder makes no distinction between former ESCO customers from former utility customers and instead applies a one-size-fits-all approach to customers with different histories and expectations.

Felder's model is also unreliable because it fails to account for differences in customers' utility rate classifications. Utilities assign customers to specific rate classifications based on usage patterns or service characteristics, and these service classifications affect the cost of electricity. As Dr. Felder acknowledged during his deposition, a residential utility customer with residential heat may pay a higher rate for electricity from their utility than a customer without residential heat. Ex. 21, Felder *Agway* Dep. at 76:3–23. But Dr. Felder's model entirely ignores these distinctions and thereby provides customers who would have had more expensive rate classifications with a windfall in damages.

Similarly, Felder does not account for different marketing content that customers may have received during marketing calls. In past ESCO litigation, Dr. Felder "specifically" and repeatedly testified that a customer's damages would depend on what marketing messages the ESCO told that customer. *Todd v. XOOM Energy Maryland*, 2020 WL 4784767, at *18 (D. Md. Aug. 18, 2020) (testifying that he would "'absolutely' need to know 'what was committed to'" the customer

"because '[y]ou have to have a point of comparison'"). Based on Dr. Felder's testimony, the court in *Todd v. Xoom* denied certification to the class of ESCO customers and found that "[i]ndividualized damages inquiries here are inevitable." Just as in *Todd*, Dr. Felder acknowledged that his damages calculations in the Eligo litigation would depend on what Eligo told that specific customer. Ex. 17, Felder Dep. at 213:6–20 (acknowledging that if different conditions were represented to different customers, he would need to adjust his calculations accordingly). Just as in *Todd*, "individualized damages inquiries" in the Eligo litigation are "inevitable," but Dr. Felder makes no efforts to conduct an individualized assessment of the class members' damages and his model should therefore be excluded.

Likewise, Dr. Felder also does not account for whether customers verified the terms of their agreement through a third-party verification ("TPV") call. Just like the marketing messages, the TPV script communicated certain terms, like "pricing strategies," to Eligo's customers who enrolled via telephone. Ex. 10, TPV Script. Customers who enrolled through other methods, like Eligo's website, would not have heard and affirmatively consented to this language. The disclosures in the TPV are relevant to the pricing expectations associated with each enrollment, and Dr. Felder's model impermissibly ignores them and assumes that every customer received identical terms and disclosures.

Finally, as stated above, customers who begin or end service on different dates may therefore be subject to different utility "price to compare" values even within the same month and the same utility service zone. Ex. 17, Felder Dep. 351:18-352:20. Felder's model does not adjust for these customer-level differences in billing cycles. By ignoring the specific billing periods associated with individual customers, Felder again applies a uniform and inflexible benchmark to a diverse group of customers.

These omissions reveal a fundamental flaw in Felder's methodology. Rather than analyzing the circumstances of individual customers, Felder constructs a simplified model that assumes uniformity across the entire class. When an expert's methodology depends on treating materially different observations as though they were identical, the resulting analysis cannot reliably measure damages.

## VII.    THE COURT SHOULD EXCLUDE DR. FELDER BECAUSE HE IS UNQUALIFIED TO OFFER HIS OPINIONS.

Dr. Felder is also not qualified to offer the opinions presented in his report. Despite his long tenure in the energy industry, Dr. Felder has virtually no experience with ESCOs. Instead, Dr. Felder's primary experience with ESCO and ESCO pricing appears to come from serving as a repeat expert witness for plaintiffs' firms challenging ESCO practices. He has billed at least $200,000 on this litigation alone and has worked for Plaintiffs' counsel on dozens of similar anti-ESCO lawsuits that they have brought over the past 15 years. Ex. 17, Felder Dep. at 11–16. Through those engagements, Dr. Felder has earned hundreds of thousands, if not millions, of dollars offering reliably critical opinions of ESCO pricing practices. *Id.* at 78–81. Notably, he has never testified for an ESCO in the dozens of cases he has been involved in. *Id.* at 29.

Dr. Felder's own public statements show bias that makes him unqualified to offer his opinions. For at least the past ten years, Dr. Felder has repeatedly criticized the idea that electricity is a market good and has instead expressed the view that access to electricity is a right or a "merit good" that "should be made available based upon need instead of willingness to pay." Ex. 31, Felder Article on Residential Energy Markets at 38, n.45; Felder Rutgers Video at 2:37 (opining that electricity is a right and not "a commodity where prices and markets determine it all"); Felder REI Video at 21:18 (within electricity price setting, "there's a lot of strategic behavior, that's economist speak for lying"). Those statements reveal a preconceived view of how electricity

should be bought and sold that is hostile to and biased against the market-based conditions in the contracts at issue, rendering him unqualified to offer his opinions.

Finally, where he purports to bring his expertise in the energy industry to bear, his opinions are either wrong or irrelevant to the fact finder. For example, he criticizes Dr. Aron at length for her analysis of renewable energy certificates and maintains that Eligo did not need to provide more than 100% of its RECs. But Dr. Felder was wrong in both his method and his conclusion on this point—he doesn't cite or apply any unique energy expertise when discussing the issue and never considered whether any limitations on REC purchases related to individual customers or to the portfolio as a whole. Ex. 17, Felder Dep. at 313. More to the point, he was wrong as to the conclusion—the NYPSC confirmed. Ex. 32, Email to NYPSC. Much of his remaining testimony concerns energy markets in general or simply selectively quotes portions of regulatory decisions regarding broader, pre-2019 trends within the ESCO industry.

## VIII.   CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Felder and the opinions he offers.

Dated: March 13, 2026                           Respectfully submitted,

                                                */s/ Ryan D. Watstein*
                                                Ryan D. Watstein (*pro hac vice*)
                                                David Meadows (*pro hac vice*)
                                                Leo P. O'Toole
                                                **WATSTEIN TEREPKA LLP**
                                                1055 Howell Mill Rd. 8th Floor
                                                Atlanta, Georgia 30318
                                                Tel: (404) 782-0695
                                                ryan@wtlaw.com
                                                dmeadows@wtlaw.com
                                                lotoole@wtlaw.com

                                                *Attorneys for Defendants Eligo Energy, LLC*
                                                *and Eligo Energy NY, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


<u>*/s/ Ryan D. Watstein*</u>
Ryan D. Watstein