# Exhibit 18

## Expert Report of Frank Felder, Ph.D.

***Brous, et al. v. Eligo Energy, LLC, et al.***
**Case No. 1:24-cv-01260-ER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNE BROUS, AS THE EXECUTOR OF THE ESTATE OF IRA BROUS and MICHELLE SCHUSTER, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br>  v.<br><br>ELIGO ENERGY, LLC and ELIGO ENERGY NY, LLC,<br><br>      Defendants. | Case No. 24 Civ. 01260 (ER) |

**EXPERT REPORT OF FRANK FELDER, PH.D.**

## I.     INTRODUCTION AND QUALIFICATIONS

1.      I am Frank A. Felder, Ph.D., Principal of Independent Electricity Consultants, LLC.  I am the former Director of the Center for Energy, Economic and Environmental Policy, former Director of the Rutgers University Energy Institute and former Research Professor at the Edward J. Bloustein School of Planning and Public Policy, Rutgers University.  I have been asked by Plaintiffs' Counsel in the matter of *Brous et al. v. Eligo Energy, LLC et al.* to provide my expert opinions.  I am being compensated at $550 per hour.

2.      In this report, I am offering my expert opinions on the following topics:

      a.      Background on U.S. and New York Energy Deregulation; and

      b.      Computation of damages using methods and formulas developed by another expert, Edo Macan.

3.      My expert opinions are based upon a review of discovery materials (including Eligo's data regarding its rates and the costs it incurs to provide its New York customers with electricity), publicly available data and my professional background and experience.  I reserve the right to modify my findings based upon new information.

4.      Regarding my professional background and experience, I conduct research and teach in the areas of energy markets and policy.  I also publish and consult extensively on almost all aspects of wholesale and retail energy markets in the United States and internationally.  Since the implementation of electricity markets in the United States in the early 1990s, I have been involved as a researcher and consultant working on market design and policy, especially in the Northeast and mid-Atlantic regions.  I have advised utilities, independent generation owners, generation and transmission developers, wholesale market administrators, public agencies, energy service companies ("ESCOs") such as Eligo and other industry participants.  For almost

two decades, I have delivered a two-day short course on electricity markets attended by approximately 3,000 professionals representing a cross section of the industry including electric and natural gas utilities, independent power producers, ESCOs, federal and state regulators, wholesale market operators and others.

5.     I have served on the Board of Directors of an ESCO that operated in New York in addition to providing consulting and training to ESCO employees.  During 2011-2013, I co-chaired the New York Independent System Operator's ("NYISO") Consumer Advisory Council, which advised the NYISO Board of Directors and senior management of New York's wholesale electricity market operator and market administrator on retail consumer issues.  I have also consulted for market participants that buy and sell power within the NYISO and mid-Atlantic regions.

6.     I hold doctorate and master's degrees from the Massachusetts Institute of Technology where my studies focused on electricity markets and power systems.  Prior to my graduate studies, I served as a nuclear engineer and submarine officer in the United States Navy.  My undergraduate degrees are in applied mathematics from Columbia College and the School of Engineering and Applied Sciences, Columbia University.  My curriculum vita (that includes all publications authored or co-authored by me in the last 10 years) is provided in Exhibit A.  Exhibit B lists the materials I considered in forming my opinions.

## II.     U.S. WHOLESALE AND RETAIL ELECTRICITY MARKETS

### A.     Overview

7.     Starting in the 1990s, the United States proceeded to design and implement wholesale and retail electricity markets.  The federal government regulates the portions of the electric industry that cross state lines.  Individual states, however, regulate the local distribution

of electricity and whether there should be retail markets for electricity.  Figure 1 below illustrates

the electricity supply chain starting with electricity generation, transmission and distribution.

**Figure 1: The Electric Power Supply Chain**



Reference:  U.S.-Canada Power System Outage Task Force, Final Report on the 2003 Blackout

in the United States and Canada (Apr. 2004), p. 5.

8.     New York has established retail electricity markets.  Retail customers must still

purchase the transmission and distribution of electricity from their local utilities but may either

purchase the electricity commodity from either an ESCO or purchase default service from their

local utility.  The entity responsible for serving a particular group of retail electricity customers

is referred to as the load serving entity ("LSE").  The LSE is either an ESCO or, if the customer

does not select an ESCO, the local electric distribution utility.  Other terms for ESCOs include

"load supplier," "third-party supplier," or "retail supplier."

9.     Establishing these new electricity markets was a major policy shift from the past.

Prior to this shift, retail customers—industrial, commercial and residential—had to purchase

both the commodity and the delivery of electricity from their local utility.  They did not have a

choice of their electricity supplier.  The public policy motivation for allowing retail customers to

4

be able to select an alternate supplier and not being locked into buying electricity from their utility was to, among other things, enable retail customers to lower their costs compared to what the monopoly utility provided.

10.    As part of its retail market policy, New York (as well as other states) set up default purchasing services of electricity for those customers that choose not to select an ESCO, referred to as "default service" or "standard offer service."  In the electric utility industry, the term "rate" refers to the price per unit (dollar per kilowatt-hour or $/kWh) that a utility or ESCO charges.  The term "rate" is synonymous with the term "price."  The term "price to compare" or "PTC" refers to the utility rate for customers on utility standard offer service.  This is the price a customer could potentially use to compare an ESCO's offered price to the default service price. In New York, the PTC is a variable rate that changes monthly based on the utilities cost to purchase wholesale electricity.

11.    Eligo is an ESCO that served residential electricity customers in New York and other states.  Eligo switches customers to a variable rate after an introductory fixed-rate period that typically lasts three to six months.  In both common parlance and Eligo's own internal documents, such rates are sometimes referred to as a "teaser rate." *See* DEF003511, DEF050668 After the teaser rate period ends, Eligo's variable rate is purportedly set in accordance with the terms of the contract it has with its customers.

12.    ESCOs such as Eligo have multiple options to procure electricity for resale to retail customers in New York.  These options include the following:

- Own electric power plants and produce the electricity for sale;

- Purchase wholesale electricity directly from power plant owners;

- Purchase electricity through the day-ahead and real-time electricity markets from NYISO;

- •  Purchase electricity from wholesale marketers and brokers; and

- •  Multiple combinations of the above.

13. The wholesale price of the electricity that ESCOs purchase to supply their customers, as in any market, varies according with supply and demand.

**B.**    **Public Policy and the Utility Price to Compare**

14. With the introduction of retail electricity markets, the public policy goal is to have ESCOs use their multiple procurement options in innovative and cost-effective ways to procure electricity at or below prices that customers would have paid if they had purchased electricity from their utility and for the ESCOs to pass a share of those savings to its customers. It is no longer up to the regulatory process, as it was prior to the introduction of retail electricity markets, to ensure that retail customers' rates appropriately covered their utility's procurement costs. Instead, whether ESCOs' procurement strategies are successful is the sole responsibility of the ESCO and not its retail customers.

15. The New York Public Service Commission ("NYPSC" or "Commission") issued on December 12, 2019, an Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("NYPSC Order"), which pertains to my analysis.

16. The NYPSC regulates retail energy markets including the ability of ESCOs, such as Eligo, to sell electricity to residential and other retail customers, such as Plaintiffs, in New York. The NYPSC conducted an extensive investigation into the business practices of ESCOs as the basis for its Order. "In designing and implementing these changes, the Commission relies on its extensive experience regarding the retail energy market. The Commission is also guided by the considerable record in the instant proceedings, which parties were invited to develop for the

purpose of further illuminating the current state of the Retail Energy Market."[1]  The NYPSC

Order continues:  "The record in these proceedings consists of initial testimony, rebuttal

testimony, cross-examination testimony and exhibits, initial briefs, reply briefs, and public

comments.  The evidentiary hearing took place before two Administrative Law Judges (ALJs)

over ten days in Albany, beginning on Wednesday, November 29, 2017 and continuing through

Tuesday, December 12, 2017.  The transcript of the hearing consists of 4,233 pages of testimony

and cross-examination of 22 witnesses and panels of witnesses."[2]

      17.    Based upon this record, the NYPSC made the following findings that are relevant

to this report:

      18.    <u>Higher ESCO charges compared to utility charges are not justified</u>.  "While

certain ESCO products may justifiably cost the customer more [than the utility cost], it is

troubling that, after the extensive process associated with this track, neither ESCOs nor any other

party have shown, to any meaningful degree of certainty, that ESCO charges above utility rates

were generally – or in any specific instances – justified."[3]  "It is both notable and troubling that

no ESCO party could or would produce objective evidence regarding:  the specific value-added

products or services that are currently offered in New York; how many ESCO customers elect to

receive those products and services; the level of premium ESCO customers are charged for the

value-added product or service; and what type and level of benefit is obtained by customers who

receive the products or services offered."[4]

---

[1] NYPSC Order at 2.

[2] NYPSC Order at 3–4.

[3] NYPSC Order at 30.

[4] NYPSC Order at 51.

19.    <u>Variable rate plans offer no demonstrated consumer benefits.</u>  "We [NYPSC] find that there is no demonstrated customer benefit to allowing ESCOs to offer this [variable-rate, commodity-only service] to mass-market customers."[5]  "Because customers receive no value when they pay a premium for variable-rate commodity-only service from ESCOs, ESCOs will be prohibited from offering variable-rate, commodity-only service except where the offering includes guaranteed savings."[6]  The NYPSC Order was intended to "strengthen[] protections for residential and small commercial customers (mass-market customers) in the retail energy market" to address "concerns about reports of customer abuses in the retail access market[.]"[7] In particular, the NYSPC Order essentially limited the offerings of ESCOs like Eligo to a single product: The default rule imposed by the NYPSC Order is that ESCOs must serve the mass market with guaranteed savings products – products where ESCOs must meet or beat the price of equivalent utility commodity service on an annual basis (the guaranteed savings rule).[8]

20.    The NYPSC provided a small number of express exceptions to this default rule, most notably that "renewably sourced electric commodity products that meet specified quality and authenticity standards can be sold at a market price."[9] When an ESCO purchases RECs to meet this "Renewable Energy Standard" or "RES," the ESCO must purchase "at least 50%

---

[5] NYPSC Order at 37.

[6] NYPSC Order at 39.

[7] NYPSC Order at 1–2.

[8] No. 14-M-0476, NYPSC Order on Rehearing, Reconsideration & Providing Clarification, p. 20 (Sept. 18, 2020) (the "Reset Clarification Order").

[9] Reset Clarification Order at 21.

greater than is required by the RES LSE obligation for the year" under New York's "Clean Energy Standard" or "CES."[10]

21.    An ESCO offering a product that satisfies these requirements may offer a variable rate product that does not guarantee savings compared to what the utility would have charged. The NYPSC recognized that "ESCOs likely cannot provide renewable energy in a percentage greater than the utility at a price that is equal to or less than the utility.  Nonetheless, the premium charged by the ESCO for a renewable product must be commensurate with the incremental costs it incurs to provide the product."[11]

22.    Eligo appears to have used this provision instead of the NYPSC Order's "default rule" that ESCOs must serve the mass market with guaranteed savings products.  DEF089734, p. 45.  Different versions of Eligo's residential supply agreement provide for varying levels of renewable electricity.  S*ee, e.g.*, DEF000132 (0% renewable) ("NY Terms of Service 1"); DEF000138 (30% renewable) ("NY Terms of Service 2"); DEF000143 (100% renewable) ("NY Terms of Service 3").

23.    Another important policy relevant to calculating damages is New York's Clean Energy Standard (the "CES").  On August 1, 2016, the NYPSC adopted "a Clean Energy Standard consisting of a Renewable Energy Standard and a Zero-Emissions Credit Requirement program."[12]

---

[10] NYPSC Order at 77 ("For example, the Tier 1 LSE obligation for 2019 is 0.78%.  Therefore, any ESCO offering a renewable product in 2019 would be required to market only renewable products that are at least 50.78% renewable.").

[11] NYPSC Order at 80.

[12] *See* No. 15-E-0302, NYPSC Order Adopting a Clean Energy Standard, p. 154 (Aug. 01, 2016).  New York's previous framework for renewable energy, the Renewable Portfolio Standard, expired on December 31, 2015.  *See* Renewable Portfolio Standard | Department of Public Service.

24.     The Renewable Energy Standard requires each LSE, which includes Eligo and other ESCOs, to procure NY Tier 1 renewable energy credits ("RECs"), "in quantities that satisfy mandatory minimum percentage proportions of the total load served by the LSE" with an incrementally larger obligation each year.[13]  The NYPSC has since modified the RES obligations several times, including by revising the Tier 1 REC minimums and imposing additional financial requirements.[14]

25.     ESCOs must also purchase Zero-Emissions Credits ("ZECs").  The Zero-Emissions Credits Requirement program "provides support for certain nuclear power facilities in the State."[15]  "In contrast to the Tier 1 RES program," a "uniform per MWh rate" is calculated annual and assessed against "each LSE's actual wholesale load" which is then used "to calculate each LSE's ZEC monthly obligation."[16]

26.     Eligo may have also unilaterally increased its voluntary REC commitments in response to the NYPSC Order.  For example, Eligo sent postcards to the Plaintiffs stating that "through the purchase of Renewable Energy Certificates, your electricity supply will include renewably sourced electricity that is at least 50% greater than the current Renewable Energy Standard obligation."  DEF000124; DEF093219.  Eligo then apparently changed the Plaintiffs' electricity product from the "at least 30% renewable" provided under their NY Terms of Service to a product with the renewable mix required under the exception discussed above.  However,

---

[13] CES at 78.

[14] *See, e.g.*, No. 15-E-0302, NYPSC Order Adopting Modifications to the CES, pp. 3, 131-133; No. 15-E-0302, NYPSC Order Modifying CES LSE Obligations, pp. 2, 5–6, 10–13 (Mar. 16, 2022).

[15] No. 15-E-0302, NYPSC Order Adopting Modifications to the CES, p. 2 n.1 (Oct. 15, 2020).

[16] No. 15-E-0302, NYPSC Order Adopting Modifications to the CES, p. 2 n.1 (Oct. 15, 2020); *see also* CES at 19–20; Glotzbach, pp. 252:05–20.

Eligo stated that the timing of the change would "depend on the effective date" of the NYPSC

Order.  DEF000124; DEF093219.[17]

27.    Eligo relies on forecasted cost data provided in the POWWR models to determine

its estimated cost to supply electricity.  *See* Glotzbach, pp. 159:23–161:22, 163:24–166:24,

249:18–253:08; LaPointe, pp. 29:16–30:17, 116:11–117:24; Feely, pp. 75:02–77:18.  The

POWWR pricing model incorporates the projected cost of Eligo's RES obligation under the CES

(e.g., mandatory Tier 1 RECs).  Glotzbach, pp. 171:09–172:09, 195:05–22; Feely, pp. 87:03–13.

28.    The POWWR pricing model does not include estimated costs for Eligo's

voluntary REC commitments associated with the NYPSC Order or any commitments in the

Eligo Terms of Service in effect for any given customer.  I have seen no evidence suggesting that

Eligo collects or is concerned with its estimated costs for voluntary REC commitments when

calculating its estimated cost to supply electricity.  Eligo does not appear to consider voluntary

REC costs to constitute supply costs.  For example, when Eligo calculates its estimated gross

profit by subtracting the cost of goods sold (or "COGS") from revenue, the only REC costs Eligo

includes in its COGS are those mandated by the CES.  Glotzbach, pp. 124:06–125:20 (discussing

Ex. 8 (DEF053487), p. 5).  Nonetheless, my damages calculations include a cost for Eligo's

voluntary REC purchases.

## III.    CALCULATION OF CLASS DAMAGES

29.    In this section, I calculate the amount that Eligo damaged its customers.  My

damage calculations are based upon the provided Eligo Customer Data Set spreadsheet but

limited to customers who enrolled with Eligo on or before June 20, 2019.  This Customer Data

Set lists the invoices Eligo issued from February 2018 (inclusive) to February 2024 (inclusive).

---

[17] The NYPSC Order's terms became effective on April 15, 2021.  *See* Reset Clarification Order at 54–55.

The utilities in the Eligo Customer Data Set are the following: Consolidated Edison ("ConED"), Rochester Gas and Electric ("RG&E"), Orange and Rockland ("O&R"), Niagara Mohawk ("NiMo") and New York State Electric and Gas ("NYSEG").  The Eligo Customer Data Set contains a customer identification number, the invoice data, the service start and end dates, the service (utility) zone, the variable rate that Eligo charged the customer, the rate when the customer was on a fixed price rate, the monthly fee Eligo charged in addition to any supply rates it charged, the customer usage or purchase of electricity in kilowatt-hours (kWh), the total supply charges (i.e., what Eligo charge the customer that month for energy supply), the customer's contract executed date and the NYISO zone where the customer is located.[18]  Table 1 summarizes the number of customers, invoices and the total amount Eligo charged its customers who made purchases under either NY Terms of Service 1, 2 or 3 based upon the Eligo Customer Data Set.

---

[18] DEF093924 – 6.20.19 Customer Data Set.  I used the invoice date to determine the date of the rates that I analyzed.  There are 28,540 entries or "zero or negative adjustments" in this data set that I treated as retrospective billing adjustments as indicated by having zero or negative amounts in the "total supply charges" column.  10,132 had $0 in the "total supply charges" column and therefore were not considered in my damages calculations.  For 17,366 of the remaining entries, I found the corresponding positive entry that exactly cancels the amount of these negative adjustments.  I removed these 17,366 entries and their mirror match from consideration in the damages calculations performed for this report.  For the remaining 1,042 negative adjustments, I could not match the negative adjustment to a specific charge or invoice.  For these negative, non-matching adjustments, I treated them as refunds from Eligo and subtracted the negative amount from each customer's total damages as calculated under the methods used in this report.  The result of this process is that 69 customers did no have positive invoices and were thus not considered in the damages calculations.

**Table 1: Summary of the Eligo Customer Data Set**

| Utility | No. of Customers | No. of Invoices | Customer Charges |
|---|---|---|---|
| ConEd | 3,651 | 102,674 | $6,462,488.96 |
| NiMo | 11,156 | 355,116 | $29,202,336.93 |
| NYSEG[19] | 9,094 | 279,415 | $20,892,093.60 |
| O&RU | 643 | 19,121 | $1,605,845.39 |
| RG&E | 2,713 | 81,986 | $6,169,637.00 |
| Total | 27,257 | 838,312 | $64,332,401.90 |

30. In Methods 1-3 developed by Plaintiffs' additional expert Edo Macan, the damages are the difference between the variable rate Eligo charged each customer and a contract variable rate (meaning the rate Eligo should have charged under the NY Terms of Service) for each customer calculated in accordance with the relevant Method multiplied by the amount of electricity the customer purchased. I then sum up each customer's monthly overcharge to determine the total overcharges. In Method 4, I calculate damages based on the corresponding PTC. In Method 5, I calculate statutory damages for deceptive practices on a per-customer basis. Method 6 for unjust enrichment damages refers back to my calculations under Method 2. Method 7 calculates contract damages from Eligo's monthly fee. In Method 8, I calculate statutory damages for consumer protection violations arising from Eligo's monthly fee.

31. I recite the formulas Plaintiffs' Counsel provided from Mr. Macan, explain where the inputs from the formulas are obtained and provide the results of calculations. Plaintiffs' Counsel informed me that Mr. Macan also stated that for the Methods that include markup

---

[19] The utility for 236 invoices for 15 customers was listed as "NYSEG-agg." I treated those customer invoices as though the identified utility was NYSEG.

(Methods 1 and 2), I should use a 5% markup and 6% margin (which translates into a 6.38% markup).[20]

### A.    Method 1 – Eligo POWWR Month Ahead Forecast

32.    In Method 1, I use Eligo's month ahead forecast for its costs, which are determined by POWWR, a firm that Eligo retained for this purpose. Eligo relies on forecasted cost data provided in the POWWR pricing models to determine its estimated cost to supply electricity. *See* Glotzbach, pp. 159:23–161:22, 163:24–166:24, 249:18–253:08; LaPointe, pp. 29:16–30:17, 116:11–117:24; Feely, pp. 75:02–77:18. The POWWR pricing model incorporates the projected cost of Eligo's RES and ZEC obligations under the CES (e.g., mandatory Tier 1 RECs). Glotzbach, pp. 171:09–172:09, 195:05–22; Feely, pp. 87:03–13.

33.    Eligo receives almost daily forecasts from POWWR in the form of an Excel spreadsheet. For the damages calculation period, I used the POWWR pricing model results published on the 15th of the month or the closest date to the 15th with the latest timestamp. DEF010143 (Eligo "Electric Variable Rate Checks" document stating "we seek to set rates on the 15th of the month.")

34.    **Contract Rate** for a customer in a given month = (Eligo's Forecasted Wholesale Market Price + Eligo's Transportation Cost + Eligo's Other Market Price Factors) × (1 + Markup).[21]

---

[20] The formula that relates "Cost Mark Up" to "Margin" is Cost Mark Up = Cost/(1-Margin). A 6% margin equals 1.0638 referred to as a 6.38% markup.

[21] If a margin is given, **Contract Rate** for a customer in a given month = (Eligo's Forecasted Wholesale Market Price + Eligo's Transportation Cost + Eligo's Other Market Price Factors) / (1 - Margin).

**Damages per customer per month** = [(Eligo's Rate) – (Contract Rate)] × (Usage)], for that month.[22]

**Damages per customer** = damages per customer per month added for all applicable months.

**Class Damages** = Damages per customer added for all class members.

35.     Eligo's Rate that it charged each customer and Usage for each customer for each month is available from the Customer Level Data produced by Eligo as noted above.

36.     Contract Rate for this Method 1 is comprised of the following components: Eligo's Market Price of Electricity, RECs and ZECs, Sleeve Costs, Transmission and Distribution Losses, POR, and Consolidated Billing

### 1.     Eligo's Market Price for Electricity

37.     I was advised by Plaintiffs' Counsel that "Eligo's Market Pricing" should be taken from the relevant POWWR Reports as discussed in paragraph 33, Summary Page Tab, Cell G22, after configuring the parameters on the Title Page tab of the report as follows:

- Inflation Rate set to 0.00%

- General Interest Rate set to 0.00%

For a given NY Utility, the Summary Page was configured as follows:

- Start Date set to set to the first of the month considered

- Product Type set to Variable w/Cap

---

[22] Months in which a customer's contract rate was higher than Eligo's rate are treated as having zero damages. Any customer accounts that did not have at least one month where the Eligo rate was higher than the contract rate under any of Methods 1 to 4 were identified and removed from consideration. That number is 271. When looking at each method, for Method 1 there are 667 and 696 such customers for the respective markups of 5% and 6.38%. For Method 2 there are 704 and 730 such customers for the respective markups of 5% and 6.38%. For Method 3, the number is 455, and for Method 4, the number is 318. If requested, I can provide the customer identification numbers for these customers. If it is later determined that any particular method or methods should be used to calculate damages after liability is determined, my analysis can be updated to identify and remove any customer accounts that did not have at least one instance of where the Eligo rate was higher than the applicable contract rate.

- State set to New York

- Utility, Rate/Profile, and Load Zone set, respectively, to the utility, rate category, and NYISO load zone corresponding to the customer

- Municipality set to "ALL OTHER"

- Gross Margin Target % set to 0.00%

- Term set to 1-month

38.    Eligo's Market Pricing from Summary Page Tab, Cell G22 includes the following components:

- Energy cost;

- Capacity cost;

- Ancillary Services;

- Mandatory RECs/ZECs cost;

- Even though Cell G22 did not include voluntary RECs cost, I was instructed to included them in the Eligo Market Price as discussed below; and

- Transmission and Distribution Losses.

39.    As mentioned previously, New York requires LSEs to purchase renewable energy certificates or "RECs." The REC obligation mandated by NYPSC is already included in the rate on the Summary Page, Cell G22.  However, certain versions of Eligo's NY Terms of Service offer variable rates with a higher percentage of RECs than the minimum obligation set by the NYPSC.  I included the difference as a Market Price Factor.

40.    PRS Tab Cell FP118 provides POWWR's estimated cost of 1 MWh of Tier 1 REC.  That value was divided by 1,000 to derive the per kWh cost of RECs.  Then the per kWh RECs cost is multiplied by the percentage difference between Eligo's contractual obligation and the NYPSC mandated REC requirements.

41.    Eligo claims that it purchases RECs to satisfy New York's required minimums as well as voluntary REC commitments under the NYPSC Order and the NY Terms of Service.[23] I have identified what those commitments were and how they changed over time, and the class damages analysis reflects the costs to purchase RECs sufficient to satisfy those commitments.

42.    I have calculated Eligo's voluntary REC costs as follows:

For customers who enrolled with Eligo[24] on or before February 29, 2016:[25]

- For periods on or before April 15, 2021, I added costs for the purchase of RECs to comply with the RES obligation; no voluntary REC costs apply.

- From April 16, 2021 onward, I added costs for the purchase of RECs equal to 50% of customer usage plus the applicable RECs percentage.

For customers who enrolled with Eligo from March 1, 2016 to September 18, 2017:[26]

- For periods on or before April 15, 2021, I added costs for the purchase of RECs equal to the difference between 30% of customer usage and the applicable RES obligation plus the applicable RECs percentage.

- From April 16, 2021 onward, I added costs for the purchase of RECs equal to 50% of customer usage plus the applicable RECs percentage.

For customers who enrolled with Eligo from September 19, 2017, to June 20, 2019:[27]

- For all periods, I added costs for the purchase of RECs equal to 100% of customer usage.

---

[23] *See* Glotzbach, pp. 13:14–14:22; 125:08–20, 171:09–172:16.

[24] Enrollment date obtained from DEF093924, column K ("executed_date").

[25] NY Terms of Service 1 applies to these customers, which does not include a promise to provide renewable energy or for the purchase of voluntary RECs. *See* 2025.06.25 Defs' Resps. to Pls' 4th Set of Interrogs., Resp. Nos. 2 & 3; *see also* DEF000132; DEF046920.

[26] NY Terms of Service 2 applies to these customers, which provides for "at least 30%" renewable energy. *See* 2025.06.25 Defs' Resps. to Pls' 4th Set of Interrogs., Resp. Nos. 3 & 4; *see also* DEF000138; DEF046920.

[27] NY Terms of Service 3 applies to these customers, which provides for 100% renewable energy. *See* 2025.06.25 Defs' Resps. to Pls' 4th Set of Interrogs., Resp. Nos. 4 & 5; *see also* DEF000143; DEF046920.

43.    For the damages calculation reflected in Method 1 (based on Eligo's estimated costs), I used the RES obligations and REC costs reflected in the POWWR reports.

### 2.    Eligo's Transportation Costs

44.    Plaintiffs' Counsel informed me that Mr. Macan also stated that transportation costs should be zero for this calculation.

### 3.    Eligo's Other Market Price Factors

45.    Other Market Price Factors, also referred to as Miscellaneous Charges, include the following components:

- Sleeve Adder from tab "Tittle Page" in column called "Adder;

- POR (Purchase of Receivables) obtained by multiplying the POR percentage by the total cost of other components; and

- Consolidated Billing Fee.

### B.    <u>Method 2 – Actual Market Prices in NYISO Wholesale Electricity Market</u>

46.    In Method 2, I used actual historical wholesale market prices to determine the Contract Rate.

47.    **Contract Rate** in a given month = (Actual Market Pricing + Actual Transportation Cost + Actual Other Market Price Factors) × (1 + Markup).[28]

**Damages per customer per month** = [(Eligo's Rate) × (Usage) – (Contract Rate) × (Usage)] – [(BPP Fees) × (1 + Markup)], for that month.

**Damages per customer** = damages per customer per month added for all applicable months.

**Class Damages** = Damages per customer added for all class members.[29]

---

[28] If a margin is used, **Contract Rate** for a customer in a given month = (Actual Market Pricing + Actual Transportation Cost + Actual Other Market Price Factors) / (1 - Margin).

[29] Months in which a customer's contract rate was higher than Eligo's rate are treated as having zero damages.

48.     With the exception of sleeve costs, this method uses public data to compute Contract Rate.  As in Method 1, Eligo's Rate and Usage for each customer for each month is available from the Customer Level Data produced by Eligo.

49.     Contract Rate for this Method 2 is comprised of the following components:

**1.     Actual Market Prices**

50.     Actual Market Prices are calculated by using publicly available NYISO costs for the appropriate zone.  This includes:

- Energy cost of electricity on the day-ahead market;[30]

- Capacity charges;

- Ancillary services costs;

- RECs and ZECs, as discussed below; and

- Transmission and Distribution Losses based upon U.S. Energy Information Administration data for New York.[31]

51.     I used the following compliance percentages (applicable to RECs only) and costs for mandatory RECs and ZECs presented in Tables 2 and 3.  Both the amount of mandatory and voluntary RECs (*see infra*) are based upon the retail usage and therefore transmission and distribution losses do not apply to their purchase.

---

[30] I used day-ahead prices because historically quantities of day-ahead energy purchases are significantly greater than the quantities of real-time purchases in New York.  Using NYISO data, I also compared monthly day-ahead energy prices with real-time energy prices during the class period of February 2018 through February 2024 and found that on average these prices were similar with day-ahead prices being higher than real-time prices about 50% of the time and vice-versa.

[31] U.S. Energy Information Administration, New York Electricity Profile, https://www.eia.gov/electricity/state/newyork/.

**Table 2: Actual New York REC Costs And Compliance Percentages**

| Compliance Year | REC Compliance | REC Prices ($/MWh) | | | |
| --- | --- | --- | --- | --- | --- |
| | | Jan-Mar | Apr-Jun | Jul-Sep | Oct-Dec |
| 2018 | .15% | $17.01 | $17.01 | $17.01 | $17.01 |
| 2019 | .78% | $22.43 | $22.43 | $22.43 | $22.43 |
| 2020 | 2.84% | $22.09 | $22.09 | $22.09 | $22.09 |
| 2021 | 2.04% | $22.33 | $22.56 | $22.01 | $22.47 |
| 2022 | 3.25% | $22.25 | $19.56 | $21.84 | $19.01 |
| 2023 | 6.16% | $20.10 | $25.69 | $36.62 | $35.01 |
| 2024 | 6.45% | $31.78 | | | |

REC Compliance Year is from January 1 to December 31.[32]

---

[32] Tier I quarterly prices were used in the damage calculations. *See* N.Y. State Energy Research & Dev. Auth., *2024 Clean Energy Standard Compliance Year: LSE Obligations* (2025), https://www.nyserda.ny.gov/All-Programs/Clean-Energy-Standard/LSE-Obligations/2024-Compliance-Year.

**Table 3: Actual New York ZEC Adders to Electricity Cost**

| Compliance Year | ZEC Adder ($/MWh) |
|---|---|
| 2017 (April 2017 – March 2018) | $3.2310 |
| 2018 (April 2018 – March 2019) | $3.8030 |
| 2019 (April 2019 – March 2020) | $3.2080 |
| 2020 (April 2020 – March 2021) | $3.6621 |
| 2021 (April 2021 – March 2022) | $3.9768 |
| 2022 (April 2022 – March 2023) | $3.9371 |
| 2022 (April 2023 – March 2024) | $3.4014 |

ZEC Compliance Year is from April to March, e.g., Compliance Year 2018 is from April 2018 to March 2019.[33]

### 2.    Actual Transportation Costs

52.    Plaintiffs' Counsel informed me that Mr. Macan stated that transportation costs should be zero for this calculation.

### 3.    Actual Other Market Price Factors

53.    NYISO costs related to transmission service that ESCOs like Eligo are charged for purchasing electricity from the New York wholesale market.[34]  These include:

- Sleeve Adder obtained from POWWR reports;

---

[33] N.Y. State Energy Rsch. & Dev. Auth., 2023 Clean Energy Standard Compliance Year: LSE Obligations, https://www.nyserda.ny.gov/All-Programs/Clean-Energy-Standard/LSE-Obligations/2023-Compliance-Year (Compliance Years 2020-2023); *see also* Consol. Edison Co. of N.Y., Schedule for Electricity Service, P.S.C. No. 10 – Electricity Tariff, https://www.coned.com/en/rates-tariffs/rates/electric-rates-schedule/electric-psc-10?facettab=c3d857b0-d6e1-4512-a8c2-e809525a694b.

[34] New York Power Authority ("NYPA") Transmission Adjustment Charge ("NTAC") and the Transmission Service Charge ("TSC") are based upon NYISO reports.

- POR calculated by multiplying the POR percentage (obtained for each utility) by the total cost of other components; and

- BPP (Billing and Payment Processing) fee.

## C.    <u>Method 3 – Prevailing Retail Rates</u>

54.    In Method 3, I used the Prevailing Rate, calculated by Mr. Macan as the weighted average of retail prices of other suppliers in a given zone, including the local utility and ESCOs that operate in that zone.

55.    **Damages per customer per month** = (Eligo's Rate) × (Usage) – (Prevailing Rate) × (Usage), for that month.

**Damages per customer** = damages per customer per month added for all applicable months.[35]

**Class Damages** = Damages per customer added for all class members.

56.    Eligo's Rate and Usage for each customer for each month is available from the Customer Level Data produced by Eligo.[36]

57.    Prevailing Rate is calculated by Mr. Macan as weighted average of the utility and ten largest ESCOs in a given zone, including the local utility and all the ESCOs that operate in that zone.

58.    For Method 3 (based on prevailing retail rates), I did not add costs for mandatory REC or ZEC compliance because Eligo's competitors also had to meet mandatory REC or ZEC compliance.

59.    I did not include any costs associated with the purchase of voluntary RECs.

---

[35] Months in which a customer's contract rate was higher than Eligo's rate are treated as having zero damages.

[36] Eligo's data includes RG&E Customers in Zone A, but RG&E does not report a PTC for Zone A. These customers were assigned the prevailing retail rates associated with RG&E Zone B. This situation did not occur for any other Eligo customers in other utilities and zones.

60.     Per instructions from Plaintiffs' Counsel, I did not make any adjustments for markup, T&D losses, POR, consolidated billing, or sleeve costs.

61.     There are 3 customers who are in NYSEG, Zone I in the Eligo Customer Data Set. Because NYSEG does not serve Zone I, Plaintiffs' counsel instructed me to exclude these customers from the Method 3 damage calculations.

### D.     Method 4 – Utility Price to Compare

62.     **Damages per customer per month** = (Eligo's Rate) × (Usage) – (Utility Price to Compare Rate) × (Usage), for that month.

**Damages per customer** = Damages per customer per month added for all applicable months.[37]

**Class Damages** = Damages per customer added for all class members.

63.     Price to Compare is the utility price in the same zone in the same month.[38]

64.     For Method 4 (based upon the utilities PTC), utilities are required to purchase the required number of RECs and ZECs, whose costs are included in the PTC.

65.     I did not include any costs associated with the purchase of voluntary RECs.

### E.     Results of Calculations for Methods 1 through 4

66.     The results of the class-wide calculations for Methods 1 through 4 are presented in Table 4.

---

[37] Months in which a customer's contract rate was higher than Eligo's rate are treated as having zero damages.

[38] RG&E does not report a PTC for Zone A.  Eligo customers whose utility is RG&E and whose Zone is A, the RG&E PTC for Zone B is used.  This situation did not occur for any other Eligo customers in other utilities and zones.

**Table 4: Class Overcharges for Methods 1 through 4**

| Overcharges at 5% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 1,694,545.92 | $ 2,217,530.75 |
| NiMo | $ 11,955,869.94 | $ 13,617,089.04 |
| NYSEG | $ 9,673,261.90 | $ 10,885,711.91 |
| O&R | $ 593,843.03 | $ 726,482.49 |
| RG&E | $ 3,068,321.61 | $ 3,300,830.88 |
| Total | $ 26,985,842.39 | $ 30,747,645.07 |

| Overcharges at 6.38% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 1,645,135.75 | $ 2,170,156.64 |
| NiMo | $ 11,751,632.65 | $ 13,423,561.44 |
| NYSEG | $ 9,530,051.31 | $ 10,755,316.39 |
| O&R | $ 581,534.32 | $ 715,352.23 |
| RG&E | $ 3,028,352.66 | $ 3,263,091.03 |
| Total | $ 26,536,706.69 | $ 30,327,477.73 |

| Overcharges at No Markup | | |
|---|---|---|
| Utility | Method 3 | Method 4 |
| ConEd | $ 2,120,133.91 | $ 2,295,097.85 |
| NiMo | $ 15,288,689.58 | $ 16,503,772.85 |
| NYSEG | $ 10,777,330.34 | $ 12,001,940.04 |
| O&R | $ 637,197.61 | $ 700,479.71 |
| RG&E | $ 3,642,463.70 | $ 3,812,362.27 |
| Total | $ 32,465,815.13 | $ 35,313,652.72 |

F. **Method 5 – Deceptive Practices Statutory Penalties**

67.    I was informed by Plaintiffs' Counsel that Method 5 calculates statutory damages. I was also asked to compute class damages on the per-customer basis.  For the "actual damages" calculation for comparison under this method, I used actual damages calculated using each of Methods 1 to 4.

### 1.    GBL 349: At Least $50 Per Customer

68.    **Damages Per Customer** = $50 or total actual damages, whichever is greater.

**Class Damages** = Damages Per Customer added for all class members.

### 2.    GBL 349: Treble Damages up to $1,000 Per Customer

69.    **Damages Per Customer** = 3 × actual damages per customer (up to $1,000 per customer) or actual damages, whichever is higher.

**Class Damages** = Damages Per Customer added for all class members.

### 3.    GBL § 349-d(3), (7), & (10): At Least $500 Per Customer

70.    **Damages Per Customer** = $500 or total actual damages, whichever is greater.

**Class Damages** = Damages Per Customer added for all class members.

### 4.    GBL § 349-d(3), (7), & (10): Treble Damage up to $10,000 Per Customer

71.    Damages Per Customer = 3 × actual damages per customer (up to $10,000 per customer) or actual damages, whichever is higher.

**Class Damages** = Damages Per Customer added for all class members.

## G.    Method 6 – Unjust Enrichment Damages

72.    Damages calculations for this Method refer back to Method 2.

## H.    Method 7 – Monthly Fee Damages

73.    I also calculated damages associated with the monthly fees that Eligo charged some of its customers.  The sum of these fees for the class from the Eligo Customer Data Set is $442,511.90.

## I.    Method 8 – Monthly Fee Statutory Penalties

74.    I was informed by Plaintiffs' Counsel that Method 8 calculates statutory damages in connection with the monthly fee violations.  I was also asked to compute class damages.  For

the "actual damages" calculation, I used actual damages calculated using Method 7 (the Monthly Fee Damages).

### 1.    GBL 349: At Least $50 Per Customer

75.    **Damages Per Customer** = $50 or total actual damages, whichever is greater.

**Class Damages** = Damages Per Customer added for all class members.

### 2.    GBL 349: Treble Damages up to $1,000 Per Customer

76.    **Damages Per Customer** = 3 × actual damages per customer (up to $1,000 per customer) or actual damages, whichever is higher.

**Class Damages** = Damages Per Customer added for all class members.

### 3.    GBL § 349-d(3), (7), & (10): At Least $500 Per Customer

77.    **Damages Per Customer** = $500 or total actual damages, whichever is greater.

**Class Damages** = Damages Per Customer added for all class members.

### 4.    GBL § 349-d(3), (7), & (10): Treble Damage up to $10,000 Per Customer

78.    Damages Per Customer = 3 × actual damages per customer (up to $10,000 per customer) or actual damages, whichever is higher.

**Class Damages** = Damages Per Customer added for all class members.

## IV.    DAMAGE VALUES FOR METHODS FIVE THROUGH EIGHT

79.    This section presents the class-wide numerical damage calculations based upon the methods described previously.  Recall that Methods 3 and 4 do not include any markups.

**Table 5: Class 349 Damages**

| 349 Damages at 5% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 1,716,491.84 | $ 2,236,630.97 |
| NiMo | $ 11,983,167.98 | $ 13,642,154.92 |
| NYSEG | $ 9,697,138.21 | $ 10,906,998.83 |
| O&R | $ 596,170.80 | $ 729,192.35 |
| RG&E | $ 3,076,256.02 | $ 3,307,653.58 |
| Total | $ 27,069,224.84 | $ 30,822,630.65 |

| 349 Damages at 6.38% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 1,666,894.23 | $ 2,189,270.74 |
| NiMo | $ 11,779,608.65 | $ 13,449,276.21 |
| NYSEG | $ 9,554,504.18 | $ 10,777,121.01 |
| O&R | $ 583,962.55 | $ 717,903.90 |
| RG&E | $ 3,036,473.64 | $ 3,270,119.82 |
| Total | $ 26,621,443.26 | $ 30,403,691.68 |

| 349 Damages at No Markup | | |
|---|---|---|
| Utility | Method 3 | Method 4 |
| ConEd | $ 2,139,313.05 | $ 2,313,144.07 |
| NiMo | $ 15,312,386.11 | $ 16,526,820.38 |
| NYSEG | $ 10,800,057.27 | $ 12,020,135.69 |
| O&R | $ 640,146.35 | $ 703,196.79 |
| RG&E | $ 3,648,812.55 | $ 3,818,117.05 |
| Total | $ 32,540,715.33 | $ 35,381,413.98 |

**Table 6: Class 349-d Damages**

| 349-d Damages at 5% Markup | | | | |
|---|---|---|---|---|
| **Utility** | **Method 1** | | **Method 2** | |
| ConEd | $ | 2,471,590.24 | $ | 2,915,582.54 |
| NiMo | $ | 13,529,516.17 | $ | 15,126,940.80 |
| NYSEG | $ | 11,144,752.75 | $ | 12,287,984.89 |
| O&R | $ | 700,396.11 | $ | 828,154.13 |
| RG&E | $ | 3,502,419.31 | $ | 3,718,463.85 |
| Total | $ | 31,348,674.58 | $ | 34,877,126.22 |

| 349-d Damages at 6.38% Markup | | | | |
|---|---|---|---|---|
| **Utility** | **Method 1** | | **Method 2** | |
| ConEd | $ | 2,425,351.55 | $ | 2,870,918.95 |
| NiMo | $ | 13,340,545.75 | $ | 14,947,317.74 |
| NYSEG | $ | 11,015,597.63 | $ | 12,170,400.91 |
| O&R | $ | 689,562.60 | $ | 815,683.72 |
| RG&E | $ | 3,466,287.21 | $ | 3,684,629.12 |
| Total | $ | 30,937,344.73 | $ | 34,488,950.44 |

| 349-d Damages at No Markup | | | | |
|---|---|---|---|---|
| **Utility** | **Method 3** | | **Method 4** | |
| ConEd | $ | 2,833,385.53 | $ | 2,991,297.87 |
| NiMo | $ | 16,736,503.24 | $ | 17,882,858.39 |
| NYSEG | $ | 12,214,908.20 | $ | 13,298,508.05 |
| O&R | $ | 745,881.90 | $ | 806,999.78 |
| RG&E | $ | 4,045,938.40 | $ | 4,197,103.30 |
| Total | $ | 36,576,617.26 | $ | 39,176,767.38 |

**Table 7: Class Treble 349 Damages**

| Treble 349 Damages at 5% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 2,541,438.81 | $ 2,989,877.39 |
| NiMo | $ 14,011,249.36 | $ 15,574,302.38 |
| NYSEG | $ 11,453,389.15 | $ 12,613,485.90 |
| O&R | $ 709,883.80 | $ 838,152.78 |
| RG&E | $ 3,573,327.51 | $ 3,796,024.41 |
| Total | $ 32,289,288.63 | $ 35,811,842.86 |

| Treble 349 Damages at 6.38% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 2,494,578.62 | $ 2,944,000.46 |
| NiMo | $ 13,814,336.71 | $ 15,384,741.65 |
| NYSEG | $ 11,310,331.59 | $ 12,482,336.16 |
| O&R | $ 697,588.45 | $ 826,631.52 |
| RG&E | $ 3,533,596.60 | $ 3,758,358.82 |
| Total | $ 31,850,431.96 | $ 35,396,068.61 |

| Treble 349 Damages at No Markup | | |
|---|---|---|
| Utility | Method 3 | Method 4 |
| ConEd | $ 2,903,386.47 | $ 3,082,369.58 |
| NiMo | $ 17,266,249.64 | $ 18,441,754.02 |
| NYSEG | $ 12,553,716.16 | $ 13,758,329.24 |
| O&R | $ 742,603.55 | $ 808,927.96 |
| RG&E | $ 4,142,352.93 | $ 4,309,489.94 |
| Total | $ 37,608,308.76 | $ 40,400,870.75 |

**Table 8: Class Treble 349-d Damages**

| Treble 349-d Damages at 5% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 5,135,766.73 | $ 6,383,001.90 |
| NiMo | $ 33,900,297.53 | $ 37,111,357.96 |
| NYSEG | $ 26,617,214.96 | $ 28,720,107.42 |
| O&R | $ 1,665,217.00 | $ 1,940,210.55 |
| RG&E | $ 8,367,882.63 | $ 8,767,909.62 |
| Total | $ 75,686,378.84 | $ 82,922,587.45 |

| Treble 349-d Damages at 6.38% Markup | | |
|---|---|---|
| Utility | Method 1 | Method 2 |
| ConEd | $ 5,004,666.44 | $ 6,264,163.42 |
| NiMo | $ 33,452,075.78 | $ 36,729,585.46 |
| NYSEG | $ 26,327,185.79 | $ 28,474,233.98 |
| O&R | $ 1,637,212.15 | $ 1,915,158.59 |
| RG&E | $ 8,288,900.62 | $ 8,697,441.41 |
| Total | $ 74,710,040.77 | $ 82,080,582.87 |

| Treble 349-d Damages at No Markup | | |
|---|---|---|
| Utility | Method 3 | Method 4 |
| ConEd | $ 6,309,710.49 | $ 6,741,318.91 |
| NiMo | $ 40,261,311.18 | $ 42,472,522.33 |
| NYSEG | $ 28,492,199.90 | $ 30,925,248.59 |
| O&R | $ 1,792,125.52 | $ 1,930,487.02 |
| RG&E | $ 9,369,808.22 | $ 9,679,027.23 |
| Total | $ 86,225,155.31 | $ 91,748,604.08 |

80.     Table 9 reports the damages per 349, 349-d, treble 349, and treble 349-d for the customers charged monthly fees

**Table 9: Class Contract Damages Associated with Eligo's Monthly Fee**

| Sum of Fees | Standard 349 | Treble 349 | Standard 349d | Treble 349d |
|---|---|---|---|---|
| $ 442,511.90 | $ 527,167.90 | $ 1,377,268.00 | $ 2,415,500.00 | $ 2,655,343.00 |

81.     If the Court modifies any of these damage models (including the use of a different margin markup, different contract method inputs, or calculating statutory damages by violation

instead of per customer), I can produce modified individual and class-wide damages calculations. Moreover, since I calculated damages for each customer invoice, I can calculate individual customer damages or payments based upon a global damage value and how the payment of damages is assigned to customers (e.g., by customer, by kWh usage, number of invoices, etc.). I can also calculate pre- and post-judgement interest for any damage method for a given interest rate.

## V.     ADDITIONAL CALCULATIONS

82.     I calculated for Mr. Macan the straight and revenue weighted average of Eligo's price mark-up percentage, (Price Eligo Charged – POWWR Cost from Method 1)/(POWWR Cost from Method 1), for each year in the class period and the respective values are 80.95% and 76.96%. I also calculated Eligo's straight average price mark-up percentages for the years 2018 to 2024. Those average mark-ups are 99.6% (2018), 72.4% (2019), 115.8% (2020), 90.5% (2021), 43.3% (2022), 93.5% (2023), 52.0% (2024).

## VI.     CONCLUSION

This concludes my testimony.

_Frank A. Felder_

_____

Frank A. Felder, Ph.D
September 12, 2025