# Exhibit 30

## *Agway* Felder Deposition Transcript

***Brous, et al. v. Eligo Energy, LLC, et al.***
**Case No. 1:24-cv-01260-ER**

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF NEW YORK
2
     Civil Action No. 5:18-cv-235 (MAD/ATB)
3
     - - - - - - - - - - - - - - - - - - - X
4
     NAOMI GONZALES,
5
                              Plaintiff,
6               v.
7    AGWAY ENERGY SERVICES, LLC
8                              Defendant.
9    - - - - - - - - - - - - - - - - - - - X
10
                     August 26, 2020
11                    10:28 a.m.
12            DEPOSITION of Expert Witness, FRANK
13   ANDREW FELDER, PH.D., held via Virtual Zoom, Veritext
14   Legal Solutions, 290 West Mount Pleasant Avenue,
15   #3200, Livingston, New Jersey, before Cynthia Zoller,
16   R.P.R., Notary Public and Certified Court Reporter of
17   the State of New Jersey.
18
19
20
21
22
23
24
25

Page 2

```
1   A P P E A R A N C E S:
2
3
4   FINKELSTEIN, BLANKINSHIP,
    FREI-PEARSON & GARBER, LLP91
5           Attorneys for Plaintiff
            445 Hamilton Avenue, Suite 605
6           White Plains, New York  10601
7   BY:  GREG BLANKINSHIP, ESQ.
         CHANTAL KHALIL, ESQ.
8   PHONE:  914-298-3281
            914-298-3294
9   EMAIL:  gblankinship@fbfglaw.com
            ckhalil@fbfglaw.com
10
11
    BEVAN, MOSCA & GUIDITTA, PC
12          Attorneys for Defendant
            222 Mount Airy Road
13          Basking Ridge, New Jersey  07920
14  BY:  JOHN COYLE, ESQ.
         JENNIFER GORGA CAPONE, ESQ.
15  PHONE:  908-848-5922
            908-753-8300
16  EMAIL:  jcoyle@bmg.law
            jcapone@bmg.law
17
18
19  Also present:
20  CHARLES RIVER ASSOCIATES
    Debra J. Aron, Ph.D.
21  One South Wacker Drive 34th Floor
    Chicago, Illinois  60606
22  DAron@crai.com
23
24  Brian James, Videographer
    VERITEXT
25
```

1                    I N D E X
2

   Exhibits marked by Attorney via Veritext Exhibit
3  Share:
4

   EXHIBITS                                      PAGE
5

   0001  Amended Notice of Deposition of
6        Plaintiff's Expert Witness
         (Frank Felder, Ph.D.)                    10
7

   0002  Plaintiff's Expert Report               17
8

   0003  Copy of Gonzalez vs. Agway
9        Calculations                            16
10 0004  Complaint Filed 12/6/17                 33
11 0005  Plaintiff's Welcome Letter              56
12 0006  Plaintiff's Disclosure Statement        56
13 0007  EnergyGuard Brochure                    48
14 0008  Central Hudson Electric Bills           91
15 0009  Revenue Article VII Legislation        101
16 0010  Reset Order No. 2                      118
17 0011  The Fed - Publications
         Report on the Economic Well-Being
18       of U.S. Households in 2019 - May
         2020                                    196
19

   0012  U.S. Court of Appeals Case
20       In the Matter of James Brown            211
21 0013  Central Hudson Utility Bill             226
22

   EXAMINATION BY:
23

   MR. COYLE:                                 5, 232
24

   MR. BLANKINSHIP:                         223, 241
25

Page 4

1          THE VIDEOGRAPHER:  We are on the video

2   record.  The time is 10:28, today's date is August

3   26, 2020.  Would counsel please state your appearance

4   for the record.

5          MR. COYLE:  Good morning.  My name is

6   John Coyle from the law firm of Bevan, Mosca &

7   Guiditta.  I'm the counsel for Agway Energy Services,

8   LLC.

9          MS. CAPONE:  Jennifer Capone, also from

10  Bevan, Mosca & Guiditta, for defendant, Agway.

11          MR. BLANKINSHIP:  My name is Greg

12  Blankinship with Finkelstein Blankinship Frei-Pearson

13  & Garber, LLP, representing the plaintiff.  Also with

14  me today, well, virtually with me today is my

15  associate, Chantal Khalil.  We represent the

16  plaintiff.

17          MR. COYLE:  I just want to say, this is

18  John Coyle, also with me virtually is Dr. Debra Aron,

19  Ph.D.  She is joining us without the video and on

20  mute as a consultant.  I think that's everybody.

21          THE VIDEOGRAPHER:  Would the court

22  reporter please swear in the witness.

23     (At 10:30 a.m. the Reporter read the caption and

24  the following statement into the record:)

25          "The attorneys participating in this

1  deposition acknowledge that I am not physically
2  present in the deposition room and that I will be
3  reporting this deposition remotely.  They further
4  acknowledge that in lieu of an oath administered in
5  person, I will administer the oath remotely.  The
6  parties and their counsel consent to this arrangement
7  and waive any objections to this manner of reporting.
8  Please indicate your agreement by stating your name
9  and your agreement on the record."
10          MR. COYLE:  John Coyle, I agree.
11          MS. CAPONE:  Jennifer Capone, I agree.
12          MR. BLANKINSHIP:  This is Greg
13  Blankinship, I agree as well, on behalf of the
14  plaintiff.
15          MS. KHALIL:  Chantal Khalil, I agree.
16  F R A N K   A N D R E W   F E L D E R,
17       Expert Witness herein, having been first duly
18  sworn by Cynthia Zoller, R.P.R., a Notary Public and
19  Certified Court Reporter within and for the State of
20  New Jersey, was examined and testified as follows:
21          THE WITNESS:  Frank Andrew Felder, 25
22  Lambiance Court, Highland Park, New Jersey  08094.
23  EXAMINATION BY
24  MR. COYLE:
25       Q.    Good morning, Dr. Felder.

1     A.    Good morning, Mr. Coyle.

2     Q.    Do you prefer me to call you Dr. Felder,

3  Frank, Mr. Felder, what's your preference?

4     A.    I have no preference.

5     Q.    I'll use Dr. Felder.  If I slip up and

6  call you Mr. Felder, it's not intended as a sleight,

7  it's just a common slip of the tongue as it goes

8  along.  Do you understand?

9     A.    Yes.

10     Q.    I understand we are doing this virtually

11  and we have had some technical difficulties along the

12  way.  I hope we have them under our belt, but no

13  promises.  We'll do the best we can if anything comes

14  up.  Do you understand?

15     A.    Yes.

16     Q.    And I know you are an old pro at being

17  deposed, but I just have a few foundational questions

18  I'll ask you just to get things started.  Do you

19  understand?

20     A.    Yes.

21     Q.    And the first one is one that virtually

22  on the screen is a court reporter who is taking down

23  every question that's said verbally and every

24  response from you orally.  Even though, we can see

25  you on the video nodding or gesturing with your

Page 7

1  hands, the court reporter is not permitted to take

2  down those gestures.  Do you understand that?

3          A.    Yes.  Yes.

4          Q.    And that today while we are in the most

5  informal of settings for a deposition, you are in

6  some office room and we are all in different places,

7  do you understand that your testimony today is under

8  oath as you are giving it?

9          A.    Yes.

10         Q.    And that your testimony may be used in

11 further court proceedings or other legal effects in

12 this matter, do you understand?

13         A.    Yes.

14         Q.    Do you understand that you've been

15 offered as a witness to appear pursuant to a notice

16 of deposition served in the matter of Naomi Gonzales

17 versus Agway Energy Services, LLC?

18         A.    Yes.

19              MR. BLANKINSHIP: Objection.  Calls for a

20 legal conclusion.  Frank, don't forget to give me

21 just a little time to object.

22         A.    Yes.

23         Q.    How are you feeling today, sir?

24         A.    Very well.

25         Q.    Are you under the influence of any

1    alcohol or medication that would affect your ability

2    to testify truthfully, today?

3          A.    No.

4          Q.    In the course of this deposition if you

5    need a break for whatever reason, please let us know,

6    we'll go off the record.  I only ask that you wait

7    until you have answered any pending questions, if

8    possible, do you understand?

9          A.    Yes.

10          Q.    And I know it's harder since we are all

11   not in the same room, but you have two attorneys

12   representing you here, Mr. Blankinship and Ms.

13   Khalil.  If they object, do not continue to answer,

14   do you understand that?

15          A.    Yes.

16          Q.    At the end of the objection there will be

17   a colloquy between the attorneys and you'll be given

18   an instruction whether to answer or not or something

19   else, do you understand that as well?

20          A.    Yes.

21          MR. BLANKINSHIP: I'm going to object.

22   I'm not really sure about that instruction.  I may

23   object from time to time based upon form objections

24   or whatever. Dr. Felder should go ahead and answer

25   the question, unless I specifically tell him not to.

Page 9

1    Obviously, John, if you want to ask me what the basis
2    of my objections are, I'll be happy to specify them
3    and I'm going to try to keep them short, but I don't
4    think we have to have a conversation every time I
5    object about whether Dr. Felder is going to answer,
6    it will take forever.
7                 MR. COYLE:  That's okay.  I typically,
8    with my objection, in that form I'll say objection,
9    you can answer, but everybody has their thing. If you
10   want the witness to answer when you object, I'm not
11   going to get in the way.
12                MR. BLANKINSHIP: Unless I tell him not to
13   answer specifically, he can go ahead and answer the
14   question, notwithstanding my objections.
15        Q.    Do you understand that clarification from
16   your attorney, Mr. Felder?
17        A.    Yes.  Mr. Blankinship is not my attorney.
18        Q.    I apologize.  Do you understand the
19   instructions from Mr. Blankinship?
20        A.    Yes.
21        Q.    Okay. Do you have any questions for me
22   before we begin?
23        A.    No.
24        Q.    Are you ready to proceed?
25        A.    Yes.

Page 10

1          Q.     Okay.  Mr. Felder, we are going to test

2     out the Veritext Exhibit Share and I'm going to

3     direct your attention to Exhibit 1, if you are able

4     to, it's an amended deposition notice.  Please let me

5     know if you pull that up.

6          (Discussion was held off the record.)

7          (Whereupon Exhibit 0001 was marked for

8     Identification.)

9          Q.     Mr. Felder, were you able to see that

10    document?

11         A.     Yes.

12         Q.     Have you seen this document before today?

13         A.     I think without the exhibit, but I, I

14    believe I was sent the deposition notice.

15         Q.     Are you referring to the yellow exhibit

16    sticker on the bottom right?

17         A.     No.  Exhibit A.

18         Q.     Sorry, go ahead.

19         A.     I just don't recall one way or the other,

20    if I saw Exhibit A, Page, the last page.

21         Q.     Page Number 4 at the bottom?

22         A.     Yes.

23         Q.     Okay.  Do you have an understanding that

24    you are here pursuant to this notice of deposition?

25         A.     Yes.

Page 11

1       Q.     And I'm drawing your attention to Page 4

2    and I know you say you are not sure if you've seen

3    that before so this may be somewhat limited. Did you

4    produce your File Number 1, the complete file of

5    Frank Felder, Ph.D., at eight o'clock this morning?

6              MR. BLANKINSHIP: I'm just going to

7    interject here for a moment and I'm obviously not

8    going to prevent him from answering, but I note for

9    the record, we had extended email communications

10   regarding what information Dr. Felder would produce

11   pursuant to Rule 26A as he's required to and we've

12   made all that production so, you know,

13   notwithstanding whatever is in Exhibit A, we produced

14   what we've agreed to and I don't, we don't have any

15   intention of producing anything else.

16             MR. COYLE: Okay. Mr. Blankinship, I know

17   we have had this back-and-forth in another

18   deposition.  We are going to try to do what we can to

19   limit speaking objections.  I understand this was a

20   little more lengthy due to the nature of the course

21   of your objection.  My simple answer is, my

22   recollection, I guess we'll wait and see what the

23   judge says at the end of the day, was that you had

24   said to me there were certain materials that Mr.

25   Felder had and that I would confirm them at the

Page 12

1   deposition.

2               MR. BLANKINSHIP: If you want, but I don't

3   want to be accused of continuing to speak.

4               MR. COYLE: There's no need for this.

5       Q.      The question is simply, so I'll go back

6   to this, Mr. Felder, I guess I'll withdraw the prior

7   question and ask it again.

8               Did you produce today the complete file

9   of Frank Felder, Ph.D. in this matter?

10              MR. BLANKINSHIP: Objection, vague.

11      A.      I didn't produce anything today.

12      Q.      Okay.  Number 2, did you produce all

13  materials upon which you relied in the preparation of

14  the expert report of Frank Felder, Ph.D. dated July

15  23rd, 2020?

16      A.      Yes, or if they were publicly available,

17  the reference to them.

18      Q.      Okay. And number three, all treatises,

19  reference materials, or other authorities upon which

20  you relied on in the preparation of your report?

21      A.      Again, subject if they were publicly

22  available or part of the defendant's discovery, I

23  didn't reproduce them.

24      Q.      Okay.  But you would have referenced

25  them?

Page 13

```
 1        A.      Yes.

 2        Q.      In your report?

 3        A.      Yes, yes, yes.

 4        Q.      Number 4 is all notes, correspondence,

 5   emails, letters, and/or documents that conveyed facts

 6   and/or data considered by you in the preparation of

 7   your report.  Did you produce any of that nature?

 8        A.      No.

 9        Q.      You haven't -- sorry, go ahead.

10        A.      Could you define what you mean by

11   produced?

12        Q.      Well, the deposition notice calls for the

13   production of documents to counsel for defendants at

14   8:00 a.m. today or prior to the date of the

15   deposition so by produced, I mean did you cause to be

16   sent to me?

17        A.      I didn't cause anything to be sent to

18   you.

19        Q.      Okay.

20                MR. BLANKINSHIP: Sorry, I'm just going to

21   retroactively object, because that's a vague

22   question.

23        Q.      Did you personally send any of those

24   things to me by email, first class mail, or

25   otherwise?
```

1        A.      No.

2        Q.      Did you ask anybody to send those things

3    to me via any method of communication?

4        A.      No.

5        Q.      Were you asked to gather your notes,

6    correspondence, emails, letters and/or documents that

7    conveyed facts and/or data considered by you in the

8    preparation of your report?

9              MR. BLANKINSHIP: Objection, vague and

10   compound.

11       A.      I was asked to by Mr. Blankinship's firm

12   to produce my report and the associated Excel file

13   for the basis of that report.

14       Q.      Okay.  Were there materials -- withdrawn.

15              Were there any correspondence sent to you

16   conveying facts or data used by you in preparation of

17   your report?

18       A.      Yes.

19       Q.      Okay.  Were there any emails that

20   conveyed facts and/or data considered by you in the

21   preparation of your report?

22       A.      Yes.

23       Q.      Were there -- did you take any notes of

24   telephone conversations that conveyed facts and/or

25   data considered by you in the preparation of your

Page 15

1    report?

2          A.      No.

3          Q.      Did you have any telephone conversations

4    with anyone that conveyed facts or data considered by

5    you in the preparation of your report?

6          A.      Yes.

7          Q.      And during those calls you did not take

8    any notes or any other recordings of the information

9    conveyed to you?

10         A.      Not that are not produced in my report

11   sheets.

12         Q.      So subject -- and we'll get to your

13   worksheet in just a moment -- so subject to it being

14   otherwise on your worksheet, there was nothing else

15   of notes that you have?

16         A.      That's right.

17         Q.      I think I got to emails.  Letters, did

18   you receive any letters that conveyed facts and/or

19   data considered by you in the preparation of your

20   report?

21         A.      I don't understand the question.  Letters

22   separate from emails?  I don't understand the

23   question.

24         Q.      Well, I will represent to you that the

25   intention of asking this question in the way Mr.

Page 16

1    Blankinship objected to is compound.  I'm going

2    through each of the items that's listed in number 4

3    to find out if you received any of those things that

4    conveyed facts and/or data considered by you in the

5    preparation of your report.  So you responded as you

6    did for notes and correspondence, responded for

7    emails.  Letters, if you have letters separate from

8    email, I'm just --

9          A.    No letters separate from emails.

10         Q.    Okay.  And then the last, do you have any

11   documents that conveyed facts and/or data considered

12   by you in the preparation of your report?

13         A.    Not that we haven't already discussed.

14         Q.    Okay.  I'm going to skip ahead for a

15   moment, Mr. Felder, and draw your attention to

16   Exhibit 3 that should be in the published folder.

17         (Whereupon, Exhibit 0003 was marked for

18   Identification.)

19              MR. BLANKINSHIP: John, is that going to

20   be Dr. Felder's Excel worksheet, because I still

21   don't have the Veritext Share, but I have --

22              MR. COYLE: Yes, it is, Greg.

23              MR. BLANKINSHIP: Thank you.

24         Q.    Mr. Felder, I'll represent to you that

25   I'm showing you what's been marked as Exhibit 3 for

Page 17

1    identification.  It's an Excel worksheet that is

2    titled, I believe, "Copy of Gonzales v. Agway

3    Overcharges Calculations.XLS."  It is an Excel

4    spreadsheet with what looks like a few tabs on the

5    bottom of the sheet, do you see that?

6         A.    Yes.

7         Q.    Have you seen this document before today?

8         A.    Yes.

9         Q.    Is this a document prepared by you?

10        A.    Yes.

11        Q.    Is this the document you were referring

12   to that you said other than your worksheet?

13        A.    Yes.  These are my worksheets in this

14   Excel workbook.

15        Q.    And the report you prepared was based on

16   the information on this worksheet?

17              MR. BLANKINSHIP: Objection, vague,

18   mischaracterizes his testimony.

19        A.    The materials that I relied upon were

20   stated in my report and the calculations in that

21   report are based on the, this worksheet, this

22   workbook.

23        Q.    Okay.  Let's go back to your report.

24   Sir, can you go to Exhibit 2, please?

25              (Whereupon, Exhibit 0002 was marked for

Page 18

1   Identification.)

2        Q.    Do you have that open, sir?

3        A.    Yes.

4        Q.    Mr. Felder, I'm showing you what's been

5   marked as Exhibit 2 for identification. It is a

6   document bearing the title, "Expert Report of Frank

7   Felder, Ph.D." and it is dated -- my apologies -- it

8   is dated July 23rd, 2020.  Have you seen this

9   document before?

10       A.    Yes.

11       Q.    It looks to me, in fact, if you have the

12  right PDF, it should be 41 pages long.  Is that your

13  document?

14       A.    Yes.

15             MR. BLANKINSHIP: I'm sorry to interrupt.

16  Can I just clarify, the expert report, do you mean 40

17  pages plus the cover?  Because my document has Page

18  40 is the last one where he's got honors and awards

19  and depositions.

20             MR. COYLE: Thank you, Mr. Blankinship,

21  I'll try to clarify.

22       Q.    For the purposes I was referring to the

23  PDF, the actual PDF itself is 41 pages.  Mr.

24  Blankinship is correct that the last page of the

25  document says "Page 40," but the cover page counts as

Page 19

```
1   one for purposes of the PDF.  If I'm drawing your
2   attention to a page, Dr. Felder, I'll try to refer to
3   it by the numbered page on the bottom of it for
4   clarification purposes and see if that helps
5   everybody get on the same page.  Do you understand?
6        A.    Yes.
7        Q.    Is that, is that okay with you?  Would
8   you prefer a different method?
9        A.    That's fine.
10       Q.    Okay. If I refer to your report, I'm
11  referring to this document.  Do you understand that?
12       A.    Yes.
13       Q.    Do you prefer I refer to it as something
14  else or just as your report?
15       A.    Whatever you are comfortable with.
16       Q.    Okay.  With respect to your retention in
17  this matter, how did you determine the scope of your
18  engagement?
19             MR. BLANKINSHIP: Objection, vague.
20       A.    Mr. Blankinship described the scope.
21       Q.    And what was that scope?
22       A.    On Page 1 of my report I was asked to
23  address the three questions that are numbered 1, 2,
24  and 3.
25       Q.    Okay.  Were those questions given to you
```

Page 20

1    by Mr. Blankinship or was the -- were those questions
2    given to you by Mr. Blankinship?
3          A.    I don't recall if they were explicitly
4    given, like the literal questions, but the scope was
5    encompassed or reflected in those three questions.
6          Q.    After those three questions on Page 1 of
7    your report, you then have a section here, I'll just
8    read this for you into the record.  It says:
9                "My expert opinions are based upon a
10   review of discovery materials (including Agway's data
11   regarding its rates and the costs it incurs to
12   provide its customers with electricity), generally
13   electricity market conditions and my professional
14   background and experience."
15               Did I read that correctly?
16         A.    Yes.
17         Q.    How is it determined what discovery
18   materials you would review?
19               MR. BLANKINSHIP: Objection, vague.
20         A.    Given the scope of the questions or the
21   scope reflected in the questions, that determined the
22   discovery materials that I reviewed.
23         Q.    Did you have access to an electronic
24   production of documents from Agway?
25               MR. BLANKINSHIP: Objection, vague.

Page 21

1        A.      Yes, I did.

2                MR. COYLE: I'm sorry, Mr. Blankinship

3    appeared to have objected.

4                MR. BLANKINSHIP: I objected to that was a

5    vague question.

6                MR. COYLE:  Sure.

7        A.      Yes, I -- yes, I did.

8        Q.      Were you given access to look at any

9    documents in the database that you wished?

10       A.      Yes, I was.

11       Q.      Did plaintiff's counsel give you a list

12   of the documents to look at within that section?

13       A.      Yes.

14       Q.      How did they give that to you?

15       A.      Electronically via email.

16       Q.      Did you speak with Ms. Gonzales?

17       A.      No.

18       Q.      Did you exchange emails with Ms.

19   Gonzales?

20       A.      No.

21       Q.      Did you ask plaintiff's counsel for

22   things that they didn't provide you?

23       A.      Not that I recall, no.

24       Q.      I should have given you an instruction at

25   the beginning of this, which is in the course of this

Page 22

1   deposition there may come a point that something, for

2   whatever reason, jogs your memory and you want to go

3   back and revisit a prior answer, either that you

4   answered something like "I don't know" or you

5   actually answered more directly.  If that happens,

6   please let me know and I'll find the time to finish

7   the line of questioning rather than having to jump

8   back so you can amend or update your answers as

9   needed.  Do you understand that?

10          A.     Yes.

11                 MR. BLANKINSHIP: I'm just going to object

12   to the instruction.  If you have questions for Mr.

13   Felder, he'll answer them.

14                 MR. COYLE: Okay.

15          Q.     So it appears Mr. Blankinship has told

16   you not to revisit questions that you've answered.

17                 MR. COYLE: We'll deal with that later.

18                 MR. BLANKINSHIP: Objection -- my

19   instruction.

20                 MR. COYLE: Okay.

21          Q.     Mr. Felder, were you provided with the

22   complaint in this matter?

23          A.     I don't recall one way or the other. I

24   don't think so.

25          Q.     You've done a number of expert reports in

Page 23

1  the energy field, would that be fair to say?

2           MR. BLANKINSHIP: Objection, vague.

3      A.    I've done reports in the area of energy,

4  correct.

5      Q.    You've written other reports in

6  connection with class actions brought against ESCO's,

7  energy supply companies, correct?

8      A.    Yes.

9      Q.    In those other, other matters did you

10  look at the complaint in any of those?

11      A.    Yes.

12           MR. BLANKINSHIP: Objection.  Outside the

13  scope.  You can answer.  Sorry, you can answer.

14      A.    Yes, I have seen complaints in other

15  matters.

16      Q.    Did you ask to see the complaint in this

17  matter?

18      A.    No, I did not.

19      Q.    Was there a specific reason you didn't

20  ask to see the complaint?

21      A.    Given the scope that I, we just

22  referenced, I was able to proceed.

23      Q.    Did you read any deposition transcripts

24  in this matter?

25      A.    No, I did not.

Page 24

1          Q.      I guess I should have said transcripts
2     from the witnesses in this matter, but you answered
3     already.  Does that change your answer?
4          A.      No.
5          Q.      Did you ask to see any?
6          A.      At one point I did, but I did not need to
7     look at it.
8          Q.      Were you provided a summary of the
9     deposition?
10         A.      Yes.  Yes, I was.
11         Q.      Was that done -- how was that conveyed to
12    you?
13         A.      Via email.
14         Q.      Do you recall which witness' deposition
15    was summarized for you?
16         A.      I do not recall the witness' name.
17         Q.      If I was to represent to you that there
18    were three depositions taken in this matter to date;
19    Michael Schuller was deposed in 2018 as a 30(B)6
20    witness for Agway, Mr. Schuller was again deposed as
21    a 30(B)6 witness for Agway in 2020 and Patricia
22    Robinson was deposed in 2020 as a 30(B)6 witness for
23    Agway, does that refresh your recollection as to
24    which summary or which summaries you received?
25         A.      Yes.

1       Q.      So which summary or summaries do you
2   recall receiving?
3       A.      I think it was regarding Patricia's
4   deposition.
5       Q.      Did you review any enrollment information
6   for Ms. Gonzales?
7               MR. BLANKINSHIP: Objection, vague.
8       A.      No.
9       Q.      Did you review a document entitled,
10  "Welcome Letter" with respect to Ms. Gonzales's
11  enrollment with Agway?
12      A.      Yes.
13      Q.      I didn't see that listed in the documents
14  in your complaint at any point so --
15              MR. BLANKINSHIP: Objection, vague.
16      Q.      I think I said complaint, I meant to say
17  report.
18              MR. BLANKINSHIP: Is there a question?
19      Q.      Sure.  I didn't see that referenced in
20  your report; is that correct?
21      A.      I don't know what you did or did not see.
22      Q.      Fair point.  Is that referenced in your
23  report?
24      A.      Yes.
25      Q.      Where is that referenced in your report?

Page 26

1          A.      Page 8, Footnote 9.

2          Q.      Okay.  Have you reviewed any EnergyGuard

3     brochures provided to Ms. Gonzales?

4          A.      No.

5          Q.      Have you reviewed any EnergyGuard

6     brochures provided to any Agway customer?

7          A.      No.

8          Q.      Other than the welcome letter for Ms.

9     Gonzales, have you reviewed any other welcome

10    letters?

11         A.      No, I have not.

12         Q.      Do you have an understanding as you sit

13    here today, whether the welcome letters were the same

14    for customers of Agway at all utilities in New York?

15         A.      I don't have an understanding one way or

16    the other.

17         Q.      Do you have an understanding whether the

18    welcome letters for New York customers of Agway

19    changed over the course of time?

20         A.      I don't know.

21         Q.      Same question for Pennsylvania.  Did you

22    review any Pennsylvania welcome letters for customers

23    of Agway?

24         A.      No.

25         Q.      Do you have an understanding if Agway

Page 27

1  used the same welcome letters for all Pennsylvania

2  customers?

3        A.     I do not have an understanding.

4        Q.     Do you have an understanding as to

5  whether or not those welcome letters changed over the

6  course of time?

7        A.     I do not have an understanding of that.

8        Q.     Did you review the terms and conditions

9  form document that was provided to Ms. Gonzales?

10       A.     Yes.

11              MR. BLANKINSHIP: Objection, vague.

12       Q.     I'm going to try to shortcut some of the

13  names you recall, but do you have an understanding of

14  the document that says, "Terms and Conditions" for

15  Agway?  Have you seen a document to that effect?

16       A.     If that document is Bates number 583994,

17  is that what you are referring to?

18       Q.     Yes, I am?

19       A.     Then, yes, I do.

20       Q.     What would you call that type of

21  document?  I just want to find a way to refer to it

22  in the same way.

23       A.     I may have just cited the, in the quote

24  in the first page of the offer letter, but then

25  attached to it was the sequential Bates numbers with

Page 28

1   the contract, I recall the contract so there's a

2   welcome letter and a contract.

3          Q.     And do you have an understanding there

4   was also an EnergyGuard brochure provided at the same

5   time?

6          A.     I don't have an understanding one way or

7   the other.

8          Q.     Okay.  So if I were to refer to those

9   documents collectively as "the contract," would that

10  be fair to you?

11         A.     Yes.

12         Q.     Did you review the audio-recording of the

13  third-party verification call from Ms. Gonzales's

14  enrollment with Agway?

15         A.     No.

16         Q.     Did you review a transcript of the

17  third-party verification call of Ms. Gonzales's

18  enrollment with Agway?

19         A.     No.

20         Q.     Do you know what she was told on the

21  third-party verification call regarding the terms of

22  her enrollment with Agway?

23         A.     Given that I didn't review the call, no.

24         Q.     Did you review her termination of service

25  call?

1        A.      No.

2        Q.      Did you review any notes regarding her

3    termination of service?

4        A.      No, I did not.

5        Q.      Do you have an understanding as to how

6    long Ms. Gonzales was a customer of Agway?

7        A.      No, I do not.

8        Q.      Do you have an understanding as to what

9    reason she provided for why she was discontinuing her

10   service?

11       A.      No.

12       Q.      Do you know if she used the EnergyGuard

13   repair warranty program?

14       A.      No, I do not.

15       Q.      Did you review plaintiff's responses to

16   interrogatories in preparation of your report?

17       A.      No, I did not.

18       Q.      Did you review Agway's initial

19   disclosures?

20       A.      No.

21       Q.      Did you review Agway's answers to

22   interrogatories?

23       A.      No, I did not.

24       Q.      Did you review Agway's written responses

25   to document requests?

1         A.     No, I did not.

2         Q.     In the past when you've done other expert

3    reports in class action matters brought against

4    ESCO's, do you recall if you've reviewed the

5    depositions that were taken?

6              MR. BLANKINSHIP: Objection, outside the

7    scope.

8         A.     Yes.  Yes.

9         Q.     And what is your answer for that?

10             MR. BLANKINSHIP: Same objection.

11        A.     I recall reviewing the depositions of

12   other, related to the matters or obtained during

13   those matters.

14        Q.     Did you feel those depositions were not

15   relevant for you to review today?

16             MR. BLANKINSHIP: Objection.

17        Q.     Withdrawn.  I'll withdraw the question.

18             Did you feel that those depositions were

19   not necessary for you to review in preparing your

20   report in this matter?

21             MR. BLANKINSHIP: Objection vague.

22        A.     I have no idea what depositions you are

23   talking about.

24        Q.     Well, did you -- do you know who Michael

25   Schuller is?

Page 31

```
 1        A.     He's an employee of Agway.
 2        Q.     Employee?  What gave you that information
 3   that he's an employee?
 4        A.     Well, I inferred it from he's affiliated
 5   with Agway and given that you said five minutes ago
 6   that he was deposed as part of this proceeding.
 7        Q.     Okay.  So there were three 30(b)6
 8   witness' depositions taken of Agway in the course of
 9   this matter, that's my representation to you, okay?
10   And you didn't review any of the deposition
11   transcripts, correct?
12             MR. BLANKINSHIP: Objection, asked and
13   answered.
14        A.     That's correct.
15        Q.     As a matter of fact, you actually don't
16   know other than inferring, who Michael Schuller is,
17   correct?
18             MR. BLANKINSHIP: Objection,
19   mischaracterizes his testimony.
20        A.     I did not review the depositions that you
21   referred to.  No, I did not.
22        Q.     Okay. But actually my question was
23   actually different.  It was other than inferring that
24   he worked for Agway, you do not know who Michael
25   Schuller is?
```

Page 32

1          A.      That's correct.

2          Q.      Do you know what Patricia Robinson's role

3    is with Agway?

4          A.      No.  I don't know her, her role.

5          Q.      I know you testified a few moments ago or

6    minutes ago that you didn't actually read the

7    complaint, correct?

8          A.      I don't recall reading the complaint,

9    that's correct.

10         Q.      What is your understanding of the

11   allegations and claims that are raised in the

12   complaint?

13                 MR. BLANKINSHIP: Objection, vague.

14         A.      The question, my understanding of the

15   basis of the claim, the question pertaining to this

16   matter is whether Ms. Gonzales and other customers of

17   Agway were appropriately charged when they were, when

18   they were variable rate customers of Agway.

19         Q.      Do you have an understanding of the

20   actual specific causes of actions that are alleged in

21   this matter?

22                 MR. BLANKINSHIP: Objection, vague.

23         A.      I don't have a legal understanding of the

24   cause of actions in this matter.

25         Q.      Do you have an understanding of the

1  proposed class that is offered in this matter?

2           MR. BLANKINSHIP: Objection, scope.

3      A.    It relates to the variable customers,

4  variable rate customers of Agway.

5      Q.    In any geographic location?

6      A.    New York and Pennsylvania over the time

7  period or, that I covered in my report.

8      Q.    Okay.

9           MR. COYLE:  Just a second.

10       (Discussion was held off the record.)

11     Q.    Mr. Felder, I was speaking off-camera to

12  the attorney working with me here.  She is putting

13  another document in, which will be Exhibit 4 so I'll

14  let you know when that gets published and uploaded.

15          (Whereupon, Exhibit 0004 was marked for

16  Identification.)

17          MR. COYLE:  Greg, it's the complaint, in

18  case if you are not in Exhibit Share yet.

19          MR. BLANKINSHIP:  I'm not in Exhibit

20  Share.  Can you just email it to me?

21          MR. COYLE: Your complaint?

22          MR. BLANKINSHIP: Yes.  I mean, just so we

23  --

24          MR. COYLE: I understand, I understand.

25          MR. BLANKINSHIP: -- so we are all on the

Page 34

1    same page on what, as to what version.

2               MR. COYLE: Sure.

3         A.    I have it before me.

4               MR. COYLE:  Mr. Blankinship, Ms. Capone

5    from my office is emailing that to you.

6               MR. BLANKINSHIP: Thank you.

7               MR. COYLE: Do you want me to wait until

8    it comes up, Greg, until you get it?

9               MR. BLANKINSHIP: No.  I think we can

10   proceed for now.  If I want to stop based on your

11   questions, I'll ask.

12              MR. COYLE:  Okay.

13        Q.    Dr. Felder, I'm virtually showing you

14   what's been marked as Exhibit 4 for identification in

15   this matter.  It is a document entitled, "Class

16   Action Complaint" in the matter of "Naomi Gonzales v.

17   Agway Energy Services, LLC."  I'll only note to you

18   it is a 22 page PDF and the document at the top says,

19   "In the United States District Court for the District

20   of Delaware," despite the fact that this matter is

21   currently proceeding in New York, that is the

22   document that was originally filed in the

23   complaint -- sorry, that was the complaint that was

24   originally filed in District Court in Delaware.

25              So as you look at this document, does

Page 35

1    this refresh your recollection as to whether you've

2    seen this before today, sir, this being Exhibit 4 for

3    identification?

4         A.     I don't recall seeing this document.

5         Q.     Okay.  I'm drawing your attention to

6    paragraph numbered 15, which is on Page 5 of the

7    complaint, referring to the number at the bottom of

8    the page.  Please scroll down and let me know when

9    you see that.

10        A.     I'm at Paragraph 15.

11        Q.     I'm going to read into the record, my

12   question is actually did I read it correctly, then

13   I'll ask some follow-up. Paragraph 15 says:

14             "Consumers who do not choose to switch to

15   an ESCO for their energy supply, continue to receive

16   their supply from their local utility; however, if a

17   customer switches to an ESCO, the customer will have

18   his or her energy 'supplied' by the ESCO, but still

19   'delivered' by their existing utility.  The

20   customer's existing utility continues to bill the

21   customer for both the energy supply and delivery

22   costs.  The only difference to the customer is which

23   company sets the price for the customer's energy

24   supply."

25             Did I read that correctly?

1          A.     Yes.

2          Q.     Do you agree with that last sentence,

3     "The only difference to the customer is that the

4     company sets the price for the customer's energy

5     supply"?

6                 MR. BLANKINSHIP: Objection, outside the

7     scope.

8          A.     Well, I haven't read the document, as I

9     indicated, so I don't know the broader context of

10    that statement.

11         Q.     Would you say then -- okay.  Regardless

12    of how it reads in the complaint, would you say the

13    only difference to the customer as to whether or not

14    they are on the ESCO supply or on their local utility

15    is which company sets the price for the customer's

16    energy supply?

17                MR. BLANKINSHIP: Objection, vague.

18         A.     It would depend on the type of contract

19    the customer has with the ESCO.

20         Q.     What do you mean by that?

21         A.     It would depend on the contract the

22    customer has with the ESCO.

23         Q.     With respect to Ms. Gonzales's contract,

24    is the only difference between her being on her

25    utility or receiving supply from Agway -- withdrawn.

Page 37

```
 1            What is the difference for Ms. Gonzales
 2    specifically, with respect to her contract between
 3    her being on the utility supply and receiving her
 4    supply from Agway?
 5        A.    When you say, I know we talked about this
 6    before, but I want to be perfectly clear, when you
 7    say contract, are you referring to the terms and
 8    conditions and the welcome letter or just the terms
 9    and conditions.
10        Q.    I'm sorry, that's why I asked you that
11    before for what you are saying, contract.  I thought
12    you said contract meant to the welcome letter and the
13    terms and conditions so I should say with respect to
14    the terms and conditions welcome letter and I'll
15    reference, I'll represent to you that her welcome
16    letter says the EnergyGuard brochure.  With respect
17    to those documents, what is the difference?
18            MR. BLANKINSHIP:  Objection.
19            MR. COYLE:  Sorry.
20            MR. BLANKINSHIP:  I'm sorry.  I'm going
21    to object to lack of foundation and compound. You can
22    answer.
23        A.    May I see the welcome letter and the
24    terms and conditions, please?
25        Q.    Of course.
```

1           MR. BLANKINSHIP: If you guys could email

2    them to me, that would be awesome.

3           MR. COYLE: We'll do the same, we'll do

4    the same routine.  Just for anybody participating, I

5    found that you sometimes need to refresh Veritext's

6    Exhibit Share screen to get new exhibits to pop up.

7        A.    So I have the welcome letter.

8        Q.    Okay, thank you.

9           MR. COYLE:  Just so we have this here for

10   the record, and Greg they are being sent to you, so

11   --

12       A.    And I have what you call the disclosure

13   statement that I have been calling the terms and

14   conditions.

15       Q.    Okay.  We'll go through these one by one.

16   Dr. Felder --

17           MR. BLANKINSHIP:  I'm sorry, if you don't

18   mind just waiting until I have them.

19           MR. COYLE: Of course.

20           MR. BLANKINSHIP: I'm sure they'll be

21   here, one second.

22       (Discussion was held off the record.)

23         (Thereupon, Exhibit 0005 was marked for

24   Identification.)

25           MR. BLANKINSHIP: Which one are we doing

1    first?

2         Q.      Dr. Felder, we'll start with Exhibit 5.

3    We are showing you what's been marked as Exhibit 5

4    for identification.  It is a document, a one-page

5    document bearing the Bates number at the bottom,

6    Agway 583794, it is a document that has a date of

7    January 22nd, 2016 and the stated recipient on that

8    document is Naomi Gonzales, do you see this?

9         A.      Yes.

10        Q.      Okay.  Have you seen this before today?

11        A.      Yes.  I referenced it in my report.

12        Q.      Okay.  We are talking about the welcome

13   letter so if I'm referring to the welcome letter, if

14   you are referring to the welcome letter, let's refer

15   to this document in particular?

16        A.      Correct.

17        Q.      Okay.  If it's a different welcome

18   letter, we'll try to clarify it either in my question

19   or your answer?

20        A.      Okay.  Just one caveat, I didn't

21   double-check that this is the same Bates number as in

22   my report, but I assume from five minutes ago --

23        Q.      I can double-check for you.  I believe it

24   is, but it's Footnotes --

25        A.      8 or something.

Page 40

1          Q.     I'll represent to you Footnote 9 says,
2     Bates number "Agway 583794" bold and --
3          A.     Okay, thank you.
4          Q.     So I'm also going to flip back and forth.
5     It's harder -- if it's in paper, I can give you two
6     different documents here, we've got to do a little
7     virtually flipping so I'll also virtually hand you
8     what's been marked as Exhibit 6 for identification.
9     It is the, it is a two-page document bearing the
10    Bates number Agway 583795 and 96.  You mentioned the
11    fact that in the document you reviewed, it was the
12    welcome letter followed subsequently by the
13    residential customer disclosure statement and these
14    are all sequential Bates numbers, if that's
15    consistent with you?
16         A.     Yes.
17         Q.     With that representation, is that a
18    document you've seen before and used in preparation
19    for your report?
20         A.     Yes.
21         Q.     Okay.  So let's just be clear, if we are
22    going to call the other document Agway 5, the welcome
23    letter, should we call this the disclosure statement,
24    the customer disclosure statement, the contract, what
25    should we call this?

1    A.    Disclosure statement is what you've been

2    using so that works with me.

3    Q.    Okay.  I'll try to be consistent, but no

4    promises.  Okay.  The question that I was asking

5    before that led to this and I'll revise it, it may

6    not be the exact question, but I'll paraphrase it now

7    is, I asked, I read a section from the complaint, it

8    said the only difference to the customer is which

9    company sets the price for the customer's energy

10    supply, then I moved onto the next question, which

11    was with respect to Naomi Gonzales.  What was the

12    difference for her between what she received from the

13    utility and what from under Agway, you said you

14    wanted to see the contract and here's where we are.

15                MR. BLANKINSHIP: Objection, vague.

16                MR. COYLE:  Sorry.

17                MR. BLANKINSHIP:  Objection, vague,

18    outside the scope and compound.

19    A.    Well, the welcome letter mentions

20    EnergyGuard.

21    Q.    Okay.  So is that the difference between

22    Ms. Gonzales was on the, on her Central Hudson as her

23    default utility and Agway as her supplier?

24    A.    Yes.

25    Q.    Do you have an understanding about the

1    terms and conditions of EnergyGuard?

2         A.    That for electricity, just a vague,

3    mainly based off the name, I'm in "Description" here

4    in this letter.

5         Q.    What is your understanding of the

6    benefits to, the potential benefits to a customer

7    from EnergyGuard?

8              MR. BLANKINSHIP: Objection, lacks

9    foundation.

10        A.    The statement in the letter that's in

11   bold toward the bottom third of the letter that

12   starts "For being an Agway electricity customer."

13        Q.    Is it the paragraph that says, "For being

14   an Agway electricity customer, we also include the

15   piece of mind and added value of Agway Energy

16   Services' EnergyGuard repair program.  Agway

17   EnergyGuard provides you with protection in the event

18   of a breakdown of your residential central air

19   conditioning unit or problem with the electrical

20   wiring in your home, it provides up a maximum of

21   $1,000 for parts and labor per each service plan

22   every calendar year that you are a customer."  Did I

23   read that correctly?

24        A.    Yes.

25        Q.    And I believe you mentioned that that

1   section is in bold on the welcome letter; is that

2   correct?

3               MR. BLANKINSHIP:  Is there a question?

4               MR. COYLE:  Of course.

5       A.      Yes.

6       Q.      You quote from the welcome letter in your

7   report and I don't see you quote this provision of

8   being, of EnergyGuard; is that correct?

9       A.      Let me go back to my report.

10      Q.      Sure.  That should be Exhibit 2, I

11  believe.

12      A.      No, I did not quote the paragraph you

13  just read in my report.

14      Q.      But you would agree with me that there's

15  a difference between Ms. Gonzales's enrollment with

16  Central Hudson and with Agway and one of those

17  differences would be the EnergyGuard service repair

18  program, correct?

19              MR. BLANKINSHIP: Objection, vague and

20  compound.

21      A.      EnergyGuard also -- I'm sorry -- Agway

22  also offered EnergyGuard, whereas, the utility did

23  not, as part of the, it's default service.

24      Q.      Do you know if Central Hudson offers a

25  similar repair program like the EnergyGuard repair

Page 44

1   program?

2        A.      In general, utilities do, but I do not

3   know if Central Hudson does.

4        Q.      Do you know any utility that provides a

5   program with similar coverage that the EnergyGuard

6   program does?

7        A.      Yes.

8        Q.      Which utility is that?

9        A.      PSE&G, my utility -- not my utility, the

10  utility that I am connected with.

11       Q.      That is in New Jersey?

12       A.      Is there a question?

13       Q.      So then the answer to that would be, yes,

14  right?

15       A.      Correct.

16       Q.      I'm sorry, this is just an example, I

17  know I'm looking at you so I know when you are

18  nodding, but the court reporter can't take that down.

19       A.      Right.

20       Q.      Do you know of a utility in New York that

21  provides a similar service?

22       A.      I don't know one way or the other.

23       Q.      How about with Pennsylvania?

24       A.      I don't know one way or the other,

25  although, it's common practice, I believe, for

Page 45

1   utilities to provide this service.
2        Q.    Do you know how much you pay monthly for
3   the service for PSE&G, you personally, being Dr.
4   Felder?
5        A.    I don't take that service from PSE&G.
6        Q.    Thank you for clarifying.  Do you know
7   how much that service costs?
8        A.    No, I do not, but it wasn't worth it.
9        Q.    Okay.  To you?
10       A.    That's right, to me.  I don't know about
11  my next-door neighbor.
12       Q.    Would it be fair to say that there may be
13  other customers of PSE&G that have purchased that
14  service?
15            MR. BLANKINSHIP: Objection, scope.
16       A.    I don't know one way or the other.
17       Q.    You are rather learned and experienced in
18  lecturing with respect to energy services in New
19  Jersey.  Do you have any idea as to whether anybody
20  purchases that sort of plan?
21            MR. BLANKINSHIP: Same objection.
22       A.    I have not asked people if they purchased
23  that plan from PSE&G so I don't know how many people
24  do.
25       Q.    I guess the question was did anybody, but

1   not do you think if anyone --

2               MR. BLANKINSHIP: Objection.

3       A.      I would guess some people do, but I just

4   don't know one way or the other.

5       Q.      But to you, you made a choice not to

6   purchase it?

7               MR. BLANKINSHIP: Same objection.

8       Q.      Correct?

9       A.      Is there a question?

10      Q.      Because to you, you did whatever internal

11  calculation you did.  You determined that the

12  benefits did not -- you tell me, what general

13  calculation did you do in deciding not to purchase

14  it?

15              MR. BLANKINSHIP: Objection, outside the

16  scope of his expert report.

17      A.      I looked at the cost, I looked at my

18  existing warranties on my appliances and decided not

19  to purchase that additional service.

20      Q.      Do you know how many customers of

21  variable rate electricity Agway has right now?

22      A.      No.

23      Q.      Do you know what percentage of Agway's

24  electrical variable rate customers submit EnergyGuard

25  claims?

Page 47

1          A.      No.

2          Q.      Do you know, do you know how much the

3   average covered claim that is paid by Agway for

4   EnergyGuard repairs for an electrical variable rate

5   customer is?

6          A.      No.  Presumably, it's less than $1,000.

7          Q.      What makes you say that?

8          A.      It provides up to a maximum of $1,000 for

9   parts and labor per each service plan each calendar

10  year that you are a customer.

11         Q.      My question, you said less than $1,000, I

12  mean, I suppose it could be $1,000?

13         A.      Less than or equal to $1,000, correct.

14  Thank you.

15         Q.      And that's with respect to, I guess, the

16  breakdown of the residential central air conditioning

17  unit or problem with electrical wiring, correct?

18         A.      If you are just rereading the paragraph

19  you read into the record, I agree.

20         Q.      Other than as I read the paragraph, do

21  you have a different understanding of the EnergyGuard

22  service?

23         A.      No.

24         Q.      Okay. So the maximum annual benefit to a

25  residential customer of Agway is $2,000 per calendar

1    year, correct?

2            MR. BLANKINSHIP: Objection, lack of

3    foundation.

4        A.    I'm not clear what each service plan

5    refers to so I don't, it's not clear to me from

6    reading this if the residential central air is a

7    separate plan from the electrical wiring in one's

8    home.

9        Q.    I'm sorry.  I started talking and you

10   weren't finished so my apologies.

11       A.    My answer is complete.

12       Q.    Do you know if the recipient of this

13   letter would have received an EnergyGuard brochure as

14   well?

15       A.    I don't know if she did or did not.

16       Q.    Do you know if Agway responded in its

17   answers to interrogatories one way or another,

18   whether or not that EnergyGuard brochure was provided

19   to customers?

20       A.    I don't know -- you asked that question

21   and I didn't read those interrogatories.

22            (Whereupon, Exhibit 0007 was marked for

23   Identification.)

24       Q.    Okay.  Sir, I'm direct your attention to

25   Exhibit 7, which has been published?

Page 49

1           MR. COYLE:  Greg, that should have been

2    sent to you as well.

3           MR. BLANKINSHIP: Which one is that?

4           MR. COYLE: It is, it's loading.

5           MR. BLANKINSHIP: Got it.

6      Q.    Dr. Felder, I'm handing you what's been

7    marked as Exhibit 7 for identification, a document

8    bearing, a two-page document bearing the Bates number

9    Agway 002966 and 2967.  Have you seen this before

10   today?

11     A.    No.

12           MR. COYLE: Jen, do you know if we can

13   rotate this on the screen?

14     Q.    Dr. Felder, while this is sideways, if

15   you hover your mouse over the screen, a little bar

16   pulls up on the bottom and one of the options is

17   "rotate."

18     A.    I've rotated it.

19     Q.    Okay.  Have you seen this before today,

20   this being this Exhibit 7?

21     A.    I just answered that question, but no, I

22   have not.

23     Q.    The answer is, I've asked you that

24   question before you've actually seen it.  I guess,

25   now that I've shown you the document, I guess I

1    should have said does this refresh your recollection

2    as you whether or not you have seen this?

3                MR. BLANKINSHIP: Is there any --

4         Q.    Does that refresh your recollection as to

5    whether or not you've seen this?

6         A.    Besides, I've only seen this document

7    today, this morning.

8         Q.    If you come to the, turn to the second

9    page of this document, the portion that's bearing the

10   Bates number 2967 under the heading in the middle of

11   the page that says, "Piece of Mind Comes Standard,"

12   can you look there for a moment?

13        A.    Yes.

14        Q.    Okay. It has two bullet pointed items in

15   bold:  "Outstanding Repair Coverage" and under that

16   is "Home central air conditioning repair up to $1,000

17   each calendar year in covered parts and labor" and

18   below that is "Home electric line repair up to $1,000

19   each calendar year in covered parts and labor," do

20   you see that?

21        A.    Yes.

22                MR. BLANKINSHIP: Object to the

23   characterization of the document --

24   mischaracterization.

25        Q.    Does that clarify for you whether or not

1    these are conjunctive or dysjunctive or what the

2    services that are provided by Agway's EnergyGuard

3    program are?

4         A.    It seems to suggest that it's both, but

5    it doesn't say "or/and" so --

6         Q.    Okay.  I'll make a representation to you,

7    had you read Mr. Schuller's deposition, you would

8    have read in some sum and substance, that the

9    EnergyGuard repair program provides both for

10   residential electrical customers $1,000 per calendar

11   year of central air conditioning repair and $1,000

12   per calendar year of electric line repair.  Do you

13   happen to know if there's a deductible for these

14   repairs?

15             MR. BLANKINSHIP: Objection, lack of

16   foundation, to the extent that that private colloquy

17   was a question.

18        A.    I don't know if there was a deductible.

19        Q.    Do you see a deductible -- okay.  Do you

20   feel that whether or not there's a deductible is

21   relevant for determining the value of the EnergyGuard

22   repair program to a customer?

23        A.    Yes.  A deductible would factor into any

24   type of warranty or insurance, insurance product.

25        Q.    Do you also feel that the maximum

1   provided covered benefit would be relevant to a

2   customer, a residential customer receiving this

3   service?

4           A.    The value of an insurance or warranty

5   depends on its costs, what are the terms and

6   conditions, the, any limit cap and any deductibles,

7   among other factors.

8           Q.    Have you studied insurance markets in

9   your professional career?

10          A.    Only very narrowly, related to the energy

11  issues.

12          Q.    What do you mean by energy issues?

13          A.    Well, I've been, I have -- anything

14  related to -- well, not anything, but I've had in

15  prior work reviewed contracts that provided some type

16  of warranty or insurance piece, but I can only recall

17  one or two times that came up.

18          Q.    So would your experience with that would

19  be reviewing contracts that contained some segment of

20  insurance?

21          MR. BLANKINSHIP: Objection,

22  mischaracterizes his testimony.

23          A.    It was, it was a contract that contained

24  some insurance-like provisions or warranty-like

25  provisions in the context or part of an electricity

Page 53

1    agreement.

2         Q.    And what was the context in which you

3    reviewed that?

4         A.    They were disputes of over, disputes over

5    contracts related to electricity and power plans.

6         Q.    Would it be, could you characterize that

7    further?  Would it be something like a dispute as to

8    whether or not something was covered?  I'm trying to

9    find the nature of how you reviewed that.

10              MR. BLANKINSHIP: Objection, vague.

11        A.    It's been a while.  They weren't the

12   major focus or even, they weren't the focus of the

13   engagement.

14        Q.    Okay. So if I can summarize, I'm not

15   trying to put words in your mouth, I'm trying to

16   summarize what you answered, it's fair to say, in the

17   course of your professional career, you've reviewed

18   contracts that contain insurance-like clauses in the

19   energy field, but that was not the focus of your

20   engagement; is that correct?

21        A.    I think my answer summarizes my answer.

22        Q.    Okay.  Other than that which you've just

23   testified to, have you studied insurance markets in

24   your professional career?

25              MR. BLANKINSHIP:  Objection, asked and

1   answered.

2       A.    Well, again, in this -- in energy in

3   general, electricity in particular, hedging

4   instruments, which are a risk management tool, which

5   is what insurance and warranties do in general, I

6   have studied those.  I will --

7       Q.    Okay.  So with respect to hedging and

8   other types of energy purchases, to the extent that

9   those are actually insurance, that's something you've

10  done professionally, correct?

11      A.    I think I said, and the reporter can

12  correct me, insurance-like or risk management-like

13  instruments, so insurance hedging, warranties are

14  primarily to manage risk and so as they pertained to,

15  I've studied those as they've pertained to

16  electricity primarily in natural gas.

17      Q.    Have you ever studied in your

18  professional career any warranties for consumers?

19      A.    I don't understand what a warranty for

20  consumer is.

21      Q.    Okay.  Well, let me back up. Have you

22  ever in the course of your professional career

23  studied insurance provided to residential consumers

24  in New Jersey, New York, Pennsylvania, any state?

25      A.    Life insurance?  Health insurance?  What

Page 55

1    insurance are you talking about?

2         Q.    Any insurance, any insurance.

3         A.    Any?

4         Q.    The globe of insurance.

5         A.    I have not studied the globe of

6    insurance.

7               MR. BLANKINSHIP: Objection, vague.

8         Q.    In the course of your work in this

9    matter, this matter being the Gonzales matter, have

10   you done any analysis about the statistical

11   properties of the risks against which EnergyGuard

12   customers are insured?

13        A.    No, I have not.

14        Q.    Did you perform an analysis to identify

15   insurance products sold in the marketplace that would

16   be economically comparable to EnergyGuard?

17        A.    No, I did not.

18        Q.    Did you perform an analysis to compare

19   the prices, costs, and risks of EnergyGuard with any

20   other comparable insurance or warranty products?

21        A.    I did not.

22        Q.    Are you aware -- are you familiar with

23   the insurance-related financial metric known as "loss

24   ratio"?

25        A.    No.

Page 56

1        Q.    Are you familiar with the

2   insurance-related financial metric known as "expense

3   ratio"?

4        A.    No, I'm not.

5        Q.    Are you familiar with the insurance

6   related-financial metric known as "dividend ratio"?

7        A.    No.

8        Q.    Are you familiar with the

9   insurance-related financial metric, "combined ratio"?

10       A.    No.

11         (Whereupon, Exhibits 0005 and 0006 were

12   marked for Identification.)

13       Q.    So bringing this back to Exhibit 5 and

14   Exhibit 6, Exhibit 5 being the welcome letter and

15   Exhibit 6 being the customer disclosure statement for

16   Ms. Gonzales, would it be fair to say, one

17   significant difference for Ms. Gonzales was the

18   EnergyGuard warranty program?

19              MR. BLANKINSHIP: Objection, vague.

20       A.    I'm happy to read the, I guess, what

21   we've been calling the terms and conditions or the

22   customer disclosure letter or document, Exhibit 6. I

23   don't recall EnergyGuard being mentioned in that

24   document --

25       Q.    Okay.

Page 57

1          A.       -- Exhibit 6.

2          Q.       Okay.  Do you have that have document

3     open in front of you, sir?

4          A.       Yes, I do.

5          Q.       Okay.  Under the top box at the top of

6     this, do you see that, the top box on Page 1 of

7     Exhibit 6?

8          A.       Yes.

9          Q.       What do you refer to that as, if

10    anything?

11         A.       Well, the label, that top -- do you mean

12    the top box or the box immediately below "Variable"?

13    Which box are you referring to?

14         Q.       The top series of what looks like boxes,

15    as opposed to the text, in the top third of the

16    document.

17         A.       Well, it's called, I think you are

18    referring to the residential customer disclosure

19    statement and then there's a table of two columns and

20    seven rows, I believe.

21         Q.       Okay.  Under that table, the first

22    numbered section is entitled, "Service," do you see

23    that?

24         A.       Yes.

25         Q.       The second sentence of that paragraph,

Page 58

1    that paragraph being number 1, "Service" says, "The
2    Agreement" in capitals "also includes the cover
3    letter and any approved addenda." Did I read that
4    correctly?
5         A.    Yes.
6         Q.    And if I wanted to be more thorough, I
7    would back up and the prior sentence says, "This is
8    an agreement between Agway Energy Services, LLC
9    (Agway) and the undersigned customer (Customer),
10   under which Customer shall initiate energy service
11   and begin their enrollment with Agway 'The
12   Agreement'" in caps "so looking at that together."
13   Did I read those correctly?
14        A.    Yes.
15        Q.    Would you agree with me that the cover
16   letter that it references is Exhibit 5, plaintiff's
17   welcome letter?
18        A.    We've established that.
19        Q.    Okay.  The reason I'm asking you that
20   question is you just said you don't believe that
21   EnergyGuard is referenced in the welcome -- in the
22   disclosure statement; is that correct?
23        A.    Can we have the court reporter read back
24   what I said?
25        Q.    It might be a couple questions back.  I

Page 59

```
 1   guess I could just as you that question over again
 2   and we can correct the record as need be.  The two of
 3   these documents together, the two of these being
 4   Exhibit 5 and Exhibit 6, are part of what's defined
 5   as the "Agreement" in Exhibit 6, correct?
 6              MR. BLANKINSHIP:  Objection, calls for a
 7   legal conclusion.
 8        A.    Yes.
 9        Q.    And if there was any other addenda, such
10   as for example, Exhibit 7, that would be part of it
11   as well, correct?
12              MR. BLANKINSHIP: Objection, lack of
13   foundation.
14        A.    I don't know if Exhibit 7 would, the
15   glossy brochure, is an addendum or not to this.
16        Q.    Did you ask if it was?
17              MR. BLANKINSHIP: Objection, vague.
18        A.    I didn't look at the glossy brochure.
19        Q.    I'm sorry.  Did you ask what materials
20   were given to customers like Ms. Gonzales when they
21   enrolled with Agway?
22              MR. BLANKINSHIP: Objection, vague.
23        A.    I was provided the cover letter and then
24   the prior documents, Exhibit 5 and 6, those were the
25   documents I reviewed pertaining to what was provided
```

Page 60

1   to customers, Ms. Gonzales.

2          Q.     I'm sorry, I stepped over your answer

3   again.

4      (Discussion was held off the record.)

5          Q.     I believe you said "Ms. Gonzales," Dr.

6   Felder, but I don't want to testify for you, the

7   reporter didn't get the rest of it down.

8          A.     To Ms. Gonzales.

9          Q.     Sir, going back to Exhibit 4, which is

10  the complaint in this matter and drawing your

11  attention to Page 5, Paragraph 17, please let me know

12  when you've received -- when you have that.

13         A.     I'm at that.

14         Q.     I'll read this into the record and then

15  I'll ask you questions afterwards.  My question is

16  going to be:  Did I read this correctly?  Paragraph

17  17 states:

18             "Agway exploits the deregulation and the

19  lack of regulatory oversight in the energy market by

20  luring customers with enticing teaser rates and false

21  promises that it will offer market-based variable

22  rates, when in fact, Agway's rates are substantially

23  higher than rates charged by other ESCO's in the

24  local utilities and are untethered from changes in

25  wholesale rates."

Page 61

1           Did I read that correctly?

2      A.     Yes.

3      Q.     With respect to New York in 2020, are

4  Agway's rates substantially higher than rates charged

5  by other ESCO's?

6           MR. BLANKINSHIP: Objection, scope.

7      A.     I didn't look at that question.

8      Q.     Okay.  I'll skip ahead a couple of

9  questions.  Would it be fair to say, you don't know

10  with respect to New York in any given year, whether

11  Agway's rates are substantially higher than rates

12  charged by other ESCO's?

13           MR. BLANKINSHIP:  Objection, asked and

14  answered, outside the scope.

15      A.     I didn't look at that question.

16      Q.     Would it be the same for Pennsylvania?

17  Did you look at that question in connection with

18  Pennsylvania, other ESCO's?

19           MR. BLANKINSHIP: Same objections.

20      A.     That is correct.

21      Q.     Okay.  We are using the term "ESCO."  Do

22  you understand that to mean "Energy Supply Company,"

23  the common shorthand used in the State of New York to

24  refer to third-party suppliers?

25      A.     Yes.

Page 62

1      Q.      And in Pennsylvania it would be referred
2   to general as an ESE; is that correct?
3      A.      ESCO's are referred to by a variety of
4   names, I think I listed some in my report, but yes.
5      Q.      Okay.  For purposes of this deposition,
6   I'll just use the phrase "ESCO," which is what's in
7   your report.  I don't mean to narrow it
8   geographically if another term is used, do you
9   understand, with respect to New York and
10   Pennsylvania?
11      A.      Yes.
12      Q.      Okay.  Third-party suppliers in New
13   Jersey, TPS, ESCO, whatever, just we'll call it the
14   general global term ESCO, correct?  Do you
15   understand?
16      A.      Yes.
17      Q.      So my series of questions for asking you
18   about substantially higher, I'm just going to
19   rephrase that question.
20            Do you have any idea how Agway's rates
21   compare to the rates charged by any other ESCO in the
22   State of New York at any point in time?
23            MR. BLANKINSHIP: Objection --
24      A.      I did not.
25            MR. BLANKINSHIP:  -- Asked and answered.

Page 63

1       A.    I did not look at that question, as I've
2   indicated.
3       Q.    And I'll ask it just one more time,
4   because my other question was substantially higher.
5             Do you have any idea how Agway's rates
6   compare to any other ESCO rates in Pennsylvania at
7   any point in time?
8             MR. BLANKINSHIP: Same objections.
9       A.    As indicated, I didn't look at that
10  question.
11      Q.    Do you know any other ESCO's --
12  withdrawn.
13            Are you aware of any other ESCO's in New
14  York that provide a product to residential consumers
15  similar to EnergyGuard?
16      A.    I don't know one way or the other.
17            MR. COYLE:  Mr. Blankinship, I think
18  you're objection -- you came over -- the reporter --
19  (Discussion was held off the record.)
20            MR. BLANKINSHIP:  I'm sorry.  I said,
21  objection, scope, which is the shorthand that I've
22  been using for it's outside the scope of his expert
23  report.
24      Q.    Would that be also the same for
25  Pennsylvania, you do not know if any other ESCO's

Page 64

1    provide a similar EnergyGuard-like product in

2    Pennsylvania to residential consumers?

3                MR. BLANKINSHIP: Same objections.

4         A.    I don't -- with that question, so.

5         Q.    I thought I said -- okay. I thought I did

6    it so rather than quibble, are you aware of any other

7    ESCO in Pennsylvania that provides a product similar

8    to EnergyGuard to residential consumers?

9                MR. BLANKINSHIP: Same objection.

10        A.    I'm not aware one way or the other.

11        Q.    Do you still have Exhibit 4 open in front

12   of you, sir?

13        A.    Yes.

14                MR. BLANKINSHIP:  That's the complaint,

15   John?

16                MR. COYLE: Yes, it is.  I'm sorry, Mr.

17   Blankinship, yes.

18        Q.    Exhibit 4 for identification, the

19   complaint, drawing your attention to Paragraph 18,

20   the first sentence of this and I'll read it and my

21   question is did I read it correctly:

22                "Agway solicited Ms. Gonzales in or

23   around December 2015, representing that it would

24   charge a rate lower than the local utility, Central

25   Hudson."

1              Did I read that correctly?

2    A.       Yes.

3    Q.       Do you know if that's correct?

4    A.       I don't know.

5    Q.       So you are not opining in any way as to

6    whether or not that is correct?  That's not part of

7    your opinion?

8    A.       That's correct.

9    Q.       I draw your attention to one other

10   paragraph of this complaint right now, Paragraph 36,

11   a couple of pages down, referring to Exhibit 4,

12   still, and the first sentence, I'll read it, it's a

13   little long:

14           "The other factors Agway identified in

15   the agreement (other than cost of electricity and

16   capacity, ancillaries, transmission and distribution)

17   that affect its variable rate (i.e., 'applicable

18   taxes, fees, charges, or other assessments in Agway's

19   costs, expenses')are relatively insignificant in

20   terms of the overall costs Agway incurs to provide

21   retail electricity and do not fluctuate over time."

22           Did I read that correctly?

23   A.       Yes.

24   Q.       In the course of documents you reviewed

25   for this case, would it be correct that Agway's other

1    factors do not fluctuate over time?

2                   MR. BLANKINSHIP: Objection, vague.

3        A.    As I indicated in my report in a

4    footnote, there were still some open issues with

5    respect to some charges, such as the gross receipt

6    tax, the service charge and whether or not they

7    changed over time and I guess the discovery there, at

8    least as I understand it at the time I submitted my

9    report was, I was unclear whether those factors did

10   change over time.  The -- I examined as part of my

11   report the other expenses, general administrative

12   expenses, and they were reported by time, by month

13   and calendar year and those numbers, you know, are

14   what they are.

15       Q.    Okay.  Was one of those, and we can pull

16   up that, those, whatever documents you referred to

17   that in a moment.  Do you have an understanding that

18   the costs of the EnergyGuard program did not

19   fluctuate over time?

20       A.    The -- I recall when looking at the

21   numbers of the EnergyGuard that I pulled from the

22   statement covering, roughly, the time period 2011 to

23   2018, I then cited in my report that the value for

24   EnergyGuard was different for different years.

25       Q.    Would you say you are generally familiar

Page 67

```
 1   with way the New York ISO set up?
 2        A.     Yes.
 3        Q.     Would it be fair to say that there are a
 4   number of different ISO zones in the State of New
 5   York?
 6        A.     There's one ISO, the New York ISO.  It
 7   operates, or it divides the state into Zones A
 8   through K, I believe --
 9        Q.     I think it's K, but I understand.  So
10   within the New York ISO, the single independent
11   service organization, there are multiple zones, A
12   through J or K, correct?
13        A.     Yes.
14        Q.     And are there any zones that have more
15   than one default utility or is it just one default
16   utility per zone?
17        A.     In general, their roughly, a utility per
18   zone, but that's not exactly correct.  There are I
19   believe zones which have multiple utilities in the
20   same zone or, and the reverse, a utility can span
21   across multiple zones.
22        Q.     Okay.  And would you also agree that
23   within each ISO zone -- if I use that for "ISO zone,"
24   do you understand that I'm referring to a specific
25   zone in the New York ISO --
```

1          A.      Yes.

2          Q.      -- within each ISO zone?

3                  Within each ISO zone there are also

4      different types of rate classes, correct?

5          A.      I believe you are referring to rate

6      classes of a utility, not a rate class established by

7      the New York ISO, but I don't know what you are

8      referring to when you say rate class.

9          Q.      I was.  I meant within each ISO, not per

10     each ISO so I guess I would say this different.  Each

11     utility in New York has different rate

12     classifications for residential customers, correct?

13         A.      I don't understand if the question is are

14     the rate classes different for residential customers,

15     different across each utility in New York, or do New

16     York utilities have different rate classes and one of

17     those rate classes is residential.  I don't

18     understand the question.

19         Q.      Okay.  Ms. Gonzales, her default utility

20     where she were housed when she was receiving energy

21     service from Agway, was under Central Hudson Utility,

22     correct?

23         A.      Yes, according to the complaint we saw.

24         Q.      Do you have an understanding as to

25     whether Central Hudson has different rate

Page 69

1    classifications for residential customers during the

2    time that Ms. Gonzales was there?

3            MR. BLANKINSHIP: Objection, vague.

4        A.      Utilities, yes, have different

5    residential rate classes in general.  I don't recall

6    specifically looking at Central Hudson to see how

7    many different residential rate classes they have,

8    but I assume they do, yes, for residential customers.

9        Q.      Right.  There's also classifications for

10   commercial, large commercial or industrial, but with

11   respect to residential customers, I'm talking about,

12   correct?

13       A.      That's correct.

14       Q.      One of the opinions you rendered in the

15   course of this matter is with respect to how much

16   consumers in New York would have been charged if they

17   had stayed on default utility instead of receiving

18   Agway service, correct?

19       A.      Can you point me to --

20       Q.      Yeah, yeah, let's pull that up.  So your

21   report is Exhibit 2, sir, and if you go to the first

22   number -- do you have that up?

23       A.      Yes, I do.

24       Q.      On the first numbered page, not the cover

25   page, Item No. 3, you've been asked to offer your

Page 70

1    expert opinion on the following topics and one of

2    them is:  "What Agway customers on variable pricing

3    would have saved, that is, how much they were

4    overcharged if they were a default retail electricity

5    customer of their utility versus what they actually

6    paid Agway."

7              Did I read that correctly?

8        A.    Yes.

9        Q.    So is it fair to say, that that's one of

10   your opinions today, calculating how much that was?

11       A.    It refers to the question so the question

12   is not my opinion, but yes, I did offer opinions in

13   response to that question.

14       Q.    And if you turn to the numbered Page 14

15   of your report, subheading "IV," that is this portion

16   of your opinion, correct?

17       A.    Well, I lay out the basis for my opinion

18   in the report, but Table IV and the sentence below

19   Table IV, the, for Section 4 are my findings.

20       Q.    Table VI?

21       A.    I'm sorry, I apologize, I was looking at

22   the wrong table.  I'm sorry, I thought you said Table

23   XIV.  Please repeat your question.  I misinterpreted,

24   I misunderstood your question, I apologize.

25       Q.    That's okay, I'll ask it somewhat

Page 71

1   differently.  Under heading "IV" starting on Page 14

2   of your report through 15, you issued your opinion

3   with respect to "Actual Agway variable prices and

4   charges compared to default service," correct?

5           A.      Yes.

6           Q.      And you mentioned Table V, but I think

7   you meant to say Table VI, which starts on Page 15,

8   or is on Page 15.

9           A.      I think I said Table IV, but I'm wrong in

10  saying Table IV.  I meant to refer to Table VI,

11  correct.

12          Q.      Yes -- no, no.  Actually, I'm sorry, you

13  were correct, that is Table IV you were referring

14  to -- never mind.  Table VI, Table VI is the answer.

15          A.      Yes.  The numerical answer, yes.

16                  MR. BLANKINSHIP: I hate to interrupt, but

17  we've been online here for a couple of hours and it's

18  lunchtime.  Should we take 30 minutes?

19                  MR. COYLE: That's fine by me.  Dr.

20  Felder, is that okay with you?

21                  THE WITNESS:  Sure.

22                  MR. COYLE:  Sure thing.  Let's take a 30

23  minute break for lunch.  We'll circle back in 30

24  minutes.  I'm going to say connected and just mute

25  and shut off my video, because I don't know if I'll

Page 72

1    be able to get back in.

2                    MR. BLANKINSHIP:  Great.

3                    MR. COYLE:  I'll do that and let's go off

4    the record for 30 minutes.  At 12:30 we'll come back

5    and see if we need a couple more minutes to clean up.

6                    THE VIDEOGRAPHER:  Off the video record,

7    the time is 12:03.

8    (Recess:  12:03 p.m. to 12:32 p.m.)

9                    THE VIDEOGRAPHER: We are on the video

10   record the time is 12:32.

11        Q.    Good afternoon, Dr. Felder.

12        A.    Good afternoon, Mr. Coyle.

13        Q.    I appreciate Mr. Blankinship telling us

14   to take a break.  If you wanted to take a break for

15   any reason, just let me know and we'll do this.

16                    MR. BLANKINSHIP: Before we start,

17   pursuant to Rule 30, we reserve our right to review

18   the transcript and read it and note any errata,

19   as appropriate.

20                    MR. COYLE: I could hear it because I knew

21   what you were saying, but I'm not sure that it's

22   actually -- Cindy, were you able to take that down?

23   (Discussion was held off the record.)

24                    MR. BLANKINSHIP:  I was saying, I was

25   saying, pursuant to Rule 30, we reserve our right to

Page 73

1    read and review the transcript and provide

2    appropriate errata, if necessary and appropriate.

3            Q.    Okay.  Thank you, Dr. Felder.  Before we

4    took a break, we were talking about, generally

5    speaking, the different zones within the NYISO, the

6    New York ISO, and within each zone there is either a,

7    generally one utility, but they also may lead across

8    the different zones in some way, just generally

9    speaking so that's what we were talking about and I

10   was asking about different rate classifications

11   within residential customers in the zones and we are

12   were talking about Central Hudson at that time so --

13   I meant that as a summary so we can lead into what we

14   are talking about not, not that that's exactly what

15   you testified to, but just a general lead-in.

16            So in Section 4 of your report, which is

17   the part we were just looking at before, Exhibit 2

18   for identification, starting at Page 14 -- 15, you

19   calculated or you issued an opinion about the amount

20   Agway's customers would have been charged if they

21   were on default service instead of Agway service,

22   correct?

23            A.    Of what that overcharge was, yes.

24            Q.    Actually, I said the two parts, the

25   charge would have been on the utility and then the

Page 74

1    overcharge if Agway charged more, is that, is that

2    correct?  Do you agree with that?

3                MR. COYLE:  Greg, I can't hear your

4    objection.

5                MR. BLANKINSHIP:  Vague.  Objection,

6    vague.

7         A.    In order to calculate the results

8    presented in Table VI, I calculated what customers

9    were charged from Agway and subtracted what they

10   would have been charged if they had purchased default

11   service from the utility.

12        Q.    Would you agree with me that for that

13   calculation to have any meaning, you need to do an

14   apples to apples comparison?

15               MR. BLANKINSHIP: Objection, vague.

16        A.    I'm not sure what you mean by apples to

17   apples comparison.

18        Q.    Okay.  How about, you would have to

19   compare a customer in the same zone to a customer in

20   the same zone, correct?

21               MR. BLANKINSHIP: Objection, vague.

22        A.    When I did my calculations based off data

23   provided by Agway, I did it on Agway summarized the

24   aggregated customers by utility and provided the,

25   what they charged, plus additional information, and

Page 75

1    then I used the price to compare for that utility in

2    order to calculate that difference.

3              Q.    But you did a -- you didn't, for example,

4    compare the rate charged to a customer in Central

5    Hudson in January 2017 to the rate charged by the

6    utility to a Con Ed customer in Brooklyn in June

7    2018?

8              MR. BLANKINSHIP: Objection, foundation

9    and vague.

10             A.    I used price to compare that varied by

11   month and by utility.

12             Q.    Okay.  So you, so it would be important

13   to compare one customer to find out how much they

14   would have been charged by the utility, as opposed to

15   just two different comparisons?  Do you understand

16   the question?

17             MR. BLANKINSHIP: I'm going to object as

18   vague.

19             A.    No, I don't.

20             Q.    Would you agree with me that different

21   utility, different utilities charge different prices

22   for electricity in a given month in New York?

23             A.    Yes.

24             Q.    Would you agree with me that, for

25   example, the same utility might charge different

1    rates in different zones in a month in New York?

2         A.    Yes.

3         Q.    And do you agree with me that customers

4    at a different rate classification from a utility

5    might be charged different rates?

6         A.    Yes.

7         Q.    For example, one common one in New York

8    is residential heat or residential non-heat,

9    referring to whether they have electrical heat,

10   correct?

11        A.    That's correct.

12        Q.    So for example, a customer that has

13   residential electric heat is charged a higher rate

14   per kilowatt than a customer who does not have

15   electric heat?

16        A.    Is there a question?

17        Q.    I thought that was it.  Would you agree

18   with that statement?

19        A.    I haven't looked, but there are different

20   rates.  It's per kilowatt hour, not kilowatt, but

21   putting that unit aside, yes, there are different

22   classes of residential customers and they could be

23   charged different energy supply rates.

24        Q.    Is that something you took into account

25   as part of your opinion on -- and by the way, when I

Page 77

1   say your opinion for the next while of questioning,

2   I'm referring to your opinion on IV about the

3   comparison between the default charge.

4        A.    So the methodology that I described in my

5   report, I can account for different price to compares

6   for the same utility in different zones and I've done

7   that in the past.  In this case, given the data and

8   the aggregation, I aggregated as Agway did, using

9   price to compares provided by Agway to calculate my,

10  to make my calculations.

11       Q.    Okay.  So the answer is you used the

12  information that Agway had for price to compare

13  without doing any independent modification of that

14  number?

15       A.    That's correct, I used the price to

16  compare provided by Agway, prices to compare provided

17  by Agway, correct.

18       Q.    And those are the numbers listed in your

19  Table V, actually, Table V of your report?

20       A.    No.  Those are the, those are the Bates

21  Numbers of the documents, the Excel spreadsheets that

22  I pulled the price to compare, that's correct.

23       Q.    Thank you, that's what I meant. Those

24  were the Bates numbers -- sorry -- Table V contains

25  the Bates numbers of the documents you looked at to

1    get the price to compare for your comparison?

2           A.     Correct.

3           Q.     Do you know if in fact, those were the

4    prices to compare for those utilities at those months

5    listed?

6           A.     I did not reconfirm that they were.

7           Q.     So the answer is no, you don't know?

8                  MR. BLANKINSHIP: Objection.

9           A.     That's correct.  That's correct.  I mean,

10   I checked the reasonableness of them, but no, I did

11   not go back and cross-check with the utility's price

12   to compare.  I used the data that Agway provided me.

13          Q.     Do you know if Agway's witnesses, the

14   30(B)6 witnesses were asked any questions as to how

15   they calculated the price to compare that's on those

16   sheets that you referenced in Table V?

17          A.     As I indicated earlier, I did not review

18   those depositions.

19          Q.     I asked a more subtle question.  Do you

20   know if Agway's witnesses at the deposition testified

21   about how the price to compare is calculated that

22   goes on these sheets that you referenced in Table V?

23                 MR. BLANKINSHIP:  Objection, asked and

24   answered.

25          A.     I believe I've answered that question,

1    but no, I do not know what they said or didn't say

2    with respect to how they tabulated the price to

3    compares based on the Excel spreadsheets or the big

4    numbers I reference in Table V.

5          Q.    Do you know if the number that they have

6    put, they being Agway -- withdraw the question.

7                Do you know if the number that Agway has

8    put in the price to compare on those spreadsheets, do

9    you know what rate class that's for?

10         A.    The -- it's for residential, but I do not

11   know, and I suspect it's for the major residential

12   class, but no, unless it's stipulated in the

13   document.

14         Q.    Why would you assume it's for the major

15   residential class?

16         A.    Well, electric heat in New York and the

17   northern states is relatively small so typically,

18   there's a standard residential SC1, Service Class 1

19   is typically, for utilities not everywhere in all

20   utilities in the U.S. and that is their typical

21   residential rate.  There could be other residential

22   rates for heating, there could be, again, it depends

23   on the utility, but no, I did not double-check, as I

24   said before, which rate class, the price to compare

25   that they pulled.

Page 80

1          Q.      When you looked at the Agway customer

2     base, do you know if Agway had any customers who were

3     on the S -- you said Service Class 1, as opposed to

4     Service Class 2?

5          A.      I did not check that one way or the

6     other.

7          Q.      So is it possible that your table

8     compares prices Agway charged customers for Service

9     Class 1 to rates to price to compare for customers

10    for Service Class 2?

11         A.      It is possible that -- well, it is

12    possible that the data that Agway provided me had a

13    rate for one residential rate class when they were

14    serving a customer for a different rate class. That

15    being said, in their analysis in their spreadsheets,

16    they were doing that comparison, which I then

17    developed.

18         Q.      Do you know what Agway used these pricing

19    worksheets, and I'm referring to the ones that are

20    identified by the Bates number in Table V, do you

21    know what Agway used those for?

22         A.      I inferred, like every other ESCO, they

23    monitor the price to compare as part of their

24    business analyses.

25         Q.      What are you basing that on in this

Page 81

1   particular case?

2       A.    Well, one is the name of price to

3   compare; secondly, they collected the data

4   systematically for utilities over the time period;

5   three, it makes economic sense for a company who is

6   selling a product to compare it to other, other

7   products, the prices of similar, identical products

8   and it's consistent with my experience as working for

9   an ESCO and consistent with my experience of the

10  various ESCO litigation cases that I have been

11  involved in and it is consistent with what the New

12  York Public Service Commission, among many other

13  states did, in analyzing the value proposition of

14  variable rate products.

15      Q.    You are referring to Reset Order 2?

16      A.    That's the abbreviation for the New York

17  Public Service Commission order, that, as well as

18  orders and similar reports done in other states.

19      Q.    Okay.  I'm going to circle back at the

20  moment, but I just want to put on the record so that

21  we're all clear we're talking about the same thing.

22  When either of us said Reset Order 2 referring to the

23  New York State -- sorry, withdrawn -- we are

24  referring to the State of New York Public Service

25  Commission Order, December 12th, 2019, adopting

Page 82

1   changes to the retail access energy market and

2   establishing further process, correct?

3        A.    Yes.  I cite it on Page 7 of my report.

4        Q.    Page 6?  6?  It's cited in your report.

5        A.    It's cited in my report.  I stand

6   corrected, it started on Page 6.  Thank you.

7        Q.    You call it the PSC Order.  Would you

8   rather call it PSC Order instead of Reset Order 2,

9   that just how I refer to it?

10       A.    Yeah.  Either way works, whatever you are

11  comfortable with.

12       Q.    Okay.  I'll probably switch between them

13  and I'll write myself a note and I'll probably get it

14  wrong. Reset Order 2, New York PSC Order, referring

15  to that December 19th order?

16       A.    Yes.

17       Q.    And that's what you reference in your

18  testimony?

19       A.    Yes.  My report exhibit that we are

20  talking about, yes.

21       Q.    Now, that's not a decision from a court,

22  correct?

23             MR. BLANKINSHIP: Objection, vague, calls

24  for --

25       A.    It's a decision from the New York Public

Page 83

1    Service Commission, which is a regulatory body that

2    issued a report.  They went through a judicial-like

3    process, but it's -- regulatory agencies in the U.S.,

4    energy regulatory agencies, such as, the Public

5    Service Commission, Federal Regulatory Commission and

6    so forth, do have quasi-judicial function, but no, I

7    would not refer to it as a court, I would refer to it

8    as a public service commission.

9         Q.    Do you think that NY PSC Order or Reset

10   Order 2 is relevant to your opinions here?

11        A.    Yes, as I describe in my report.

12        Q.    So even though it's not a judicial

13   because of it's a quasi-judicial, I think was your

14   term, from the regulatory agency, that's something

15   that an expert in your field would rely on?

16        A.    I'm not relying on it because it's a

17   quasi-judicial, although, they went through a

18   process, as I described, in terms of witnesses,

19   testimony, hearings and paper filings and so forth,

20   the reason I rely upon it is, it is consistent with

21   the history of deregulation in the United States,

22   which I reference in my report, it's consistent with

23   my experience and background, it's consistent with

24   the reports, similar reports of other agencies,

25   government agencies, some are public service

1    commissions will be analogue in other states and it's

2    consistent with my findings in this matter.

3         Q.    Okay. Did you participate in the

4    underlying proceedings on behalf of any entity?

5              MR. BLANKINSHIP: Objection, vague.

6         A.    No, I did not.

7              MR. COYLE:  Mr. Blankinship had an

8    objection.  Did you hear it, Cindy?

9    (Discussion was held off the record.)

10        Q.    Did you monitor in some fashion, the

11   underlying proceedings?

12             MR. BLANKINSHIP: Same objection.

13        A.    I -- not while they were active going on,

14   no, I did not.

15        Q.    Subsequent to them concluding, did you

16   have a chance to look back at the underlying

17   proceedings?

18        A.    The 181-page report or so, does reflect

19   the testimony and the input of multiple stakeholders

20   so when they summarize a particular issue, and this

21   is common among not just regulatory agencies, but

22   certainly in my field, they would summarize the

23   input, the arguments, the facts and then they would

24   render their findings and the other regulatory

25   proposals or policy changes so yes, as part of the

Page 85

1    report, I did.

2          Q.     Okay. This may seem disjointed, but I'm

3    circling back to your answer.  Before we talked about

4    Reset Order 2, you talked about a bunch of things and

5    I'm trying to unpack that some, some of them so if it

6    seems out of sequence --

7          A.     I understand.

8          Q.     Do you know how Central Hudson Utility in

9    New York calculates its price to compare today?

10         A.     It calculates, like all the utilities in

11   New York and elsewhere that have retail competition,

12   the price to compare based on a tariff, in this case,

13   that it files with the New York energy regulators,

14   the Public Service Commission, but, so as of today,

15   no, I did not check their tariff today.

16         Q.     My question, I apologize, I didn't mean

17   the actual rate today, I meant their methodology for

18   how they calculate it.  Does that change your answer?

19         A.     The way the utilities purchase energy,

20   and it varies state by state and even within a state

21   there can be some variations, but in New York in

22   particular, the way they purchase their, and when I

23   mean wholesale electricity, which includes a variety

24   of components, but those are purchased via the

25   markets that the New York Independent System

1  Operator, NYISO, New York ISO administers pursuant to

2  a tariff, a Federal Regulatory Energy Commission

3  tariff.

4       Q.    Okay.  So for example, for Central Hudson

5  you could go on their websites theoretically, right

6  now, and find out their price to compare?

7       A.    Yeah.  Maybe not literally, for today,

8  but in recent history, yes, or even for this month,

9  yes.

10      Q.    Okay.  Do you have an understanding as to

11 whether or not that is the actual price that a

12 customer will be charged in that service month?

13            MR. BLANKINSHIP: Objection, vague.

14      A.    Well, the name is "price to compare."

15 The point of the term "price to compare" is to make,

16 and I'll borrow a phrase, apples to apples

17 comparison, which was referred to, I believe, in the

18 case of a Pennsylvania utility so that customers

19 could decide whether or not to buy from the energy

20 portion, the commodity portion from the utility or

21 from an ESCO.  There are some adjustments made and

22 again, it varies by utility, because the utility may

23 buy a certain volume of electricity for a particular

24 month and then due to weather changes or other

25 external events, they may over- or undersupply and

Page 87

1    then there are some adjustments that are made, but

2    they show up in the next month or subsequent month,

3    but the price to compare is that comparison price,

4    that's right.

5         Q.    Okay.  You are referring to a market

6    price adjustment or some, some reference to that

7    phrase, correct?

8         A.    Again, those adjustments vary by

9    utilities.  In New York a common term is market --

10   "merchant function charge," there could be some

11   variations on that, I believe, Con Ed has two of

12   them, but that's correct.

13        Q.    So the price that's listed on, let's just

14   call it July 1st, 2020, so I don't want to make it

15   today, the price that's listed on a utility's website

16   for the price to compare on July 1st, 2020, may not

17   actually be the ultimate rate that a customer in that

18   month is charged in that month?

19             MR. BLANKINSHIP:  Objection,

20   mischaracterizes his testimony.

21        A.    There may be an adjustment in a

22   subsequent month, but that's based, my understanding,

23   that's based on the volume in that subsequent month.

24        Q.    Okay.  Do you know if that differs by

25   utility?

1      A.      Yes.   In New York, yes, it does, or it
2   can differ by utility, yes.
3      Q.      Do you know, let me ask you this
4   question:   If I have one customer, hypothetical
5   customer lives in my house, me, I'm on a utility in
6   New York, I'm on Central Hudson, I am SC1 Residential
7   Non-Heat Service Class and my billing cycle is June
8   29th to July 28th, whatever the billing cycle is, and
9   my next-door neighbor, same rate class, same utility,
10   same everything and their billing cycle is June 1st
11   to June 30th, do you know if we'll be charged the
12   same rate by the utility?
13      A.      It differs by utility so for example, Con
14   Edison, yes, you would be charged a different rate to
15   account for the billing, the individual billing
16   cycles, because the utilities don't check the meter
17   of everyone one day a month, they spread it out over
18   the 20 or 22 business days that month.   The
19   methodology that I offered and I've done this in the
20   past, can account for that.   Those changes tend to be
21   small, the fact that you are billed, you know, day
22   one through day 30 and I'm billed day two of the next
23   month and so forth, think of a rolling kind of a
24   movement, but the underlying methodology if necessary
25   that I offer, can account for that.

Page 89

1        Q.      Did the methodology used in this case

2   account for that?

3        A.      I did that in aggregate so the fact that

4   Agway has an aggregate set of customers, presumably,

5   they are randomly, roughly randomly, equally,

6   uniformly spread over the billing cycle so to the

7   extent that a particular billing cycle had this right

8   and then the next billing cycle a little bit lower

9   and the next one a little bit higher, that that

10  average would, would wash out so I did it in

11  aggregate.

12       Q.      Have you ever heard of something referred

13  to as an MFC supply charge?

14       A.      Yes.

15       Q.      What is an MFC supply charge?

16       A.      I've heard of it specifically in the

17  context of Con Ed and two other utilities in New

18  York; merchant supply charge.  I might have gotten

19  that -- did you say MSC or MFC?

20       Q.      MFC.

21              MR. BLANKINSHIP:  Objection.

22       A.      Merchant function charge.  Again, those

23  are part of these adjustments that I talked about.

24       Q.      So if you had two customers and one is on

25  Con Ed and one is on Agway, are they both charged the

Page 90

```
 1   same merchant function charge?
 2        A.    I would have to go back and look at for a
 3   particular utility or for a particular customer.
 4   That being said, I used the data that was provided by
 5   Agway.
 6        Q.    No, I understand, but my question was not
 7   about the data.  My question is are those, are both
 8   those customers both charged the MFC supply charge?
 9             MR. BLANKINSHIP: Objection.
10        A.    I would have to look at a particular
11   utility and read the definition of the merchant
12   function charge to make that determination.
13        Q.    Okay.  Do you have an understanding if
14   ESCO customers are charged the merchant function
15   charge for Central Hudson?
16        A.    I don't know if they are or not.
17        Q.    Do you know if they are charged the MFC
18   charge for Con Ed?
19        A.    Again, I do not know if they are or not.
20   The question is -- no, I do not.
21        Q.    Do you know if they are charged that for
22   NYSEG?
23        A.    Could you define the merchant function
24   charge so then --
25        Q.    Sure.
```

Page 91

1        A.      And bring up the tariff that you are

2    referring to?

3        Q.      Okay.  Let's see what I got here.

4            MR. COYLE: Do you have an exhibit marked

5    on this?  Greg, did you get into the docu-share yet

6    or is it still emailed to you?

7            MR. BLANKINSHIP:  Yeah, I have it here.

8    Nobody reached out to me --

9            MR. COYLE: Me either, so okay.

10        (Whereupon, Exhibit 0008 was marked for

11    Identification.)

12        Q.      Dr. Felder, if you refresh, there's an

13    Exhibit 8.

14            MR. COYLE: It's going to be emailed to

15    you in a moment, Greg.

16        A.      I have it.

17            MR. BLANKINSHIP:  If you guys don't mind

18    holding on until I get it.  I'm just logging on.

19            MR. COYLE: Yes.  Mr. Blankinship, let us

20    know when you get there, please.

21            MR. BLANKINSHIP: I will, I'm just

22    waiting.  I'm in.

23

24        Q.      Dr. Felder, I'm showing you what's been

25    marked as Exhibit 8 for identification.  It is a PDF

Page 92

```
 1    bearing the title on the top, "Electric Bills
 2    Explained."
 3                  MR. BLANKINSHIP:  Before you go on, John,
 4    do you have a Bates number for this, for this
 5    document?
 6                  MR. COYLE:  No.  No, I do not.
 7                  MR. BLANKINSHIP: Has it been produced
 8    yet?
 9                  MR. COYLE: No, it has not.
10                  MR. BLANKINSHIP:  All right.  Well, then
11    I'm going to object that you withheld this document
12    from the production for the obvious purposes of
13    sandbagging us and we'll, yeah, so I'm objecting to
14    the entire line of questioning, but of course, I'll
15    let Dr. Felder answer.
16                  MR. COYLE:  Okay.  Dr. Felder asked for
17    what I was referring to so your objection is noted.
18        Q.      I'll represent to you, Dr. Felder, that
19    within the last seven days I pulled this up off the
20    Central Hudson website on their "Electric Bills
21    Explained."
22                  MR. BLANKINSHIP: Just for the record, Dr.
23    Felder asked you to refer to the, the tariff.  This
24    is not it.
25                  MR. COYLE: Thank you for the speaking
```

Page 93

1    objection, Mr. Blankinship.  I understand what he

2    said.  Can we try to keep it to the proper objections

3    for Federal Rules?  I can point them out to you if

4    you don't understand them.

5              MR. BLANKINSHIP:  I do completely

6    understand them.  You even had a colloquy with me

7    about the document you are producing -- and I was

8    clarifying.

9              MR. COYLE: Thank you.

10        Q.    Dr. Felder, have you seen something in

11   some form similar to this for utilities about how to

12   have customers explain their bills -- understand

13   their bills?

14        A.    Yes.

15              MR. BLANKINSHIP: Objection, vague.

16        A.    Yes, I have.

17        Q.    If you look in the box, the shaded box in

18   the right-hand top side, you see an example of a

19   hypothetical customer for a hypothetical bill,

20   correct?

21        A.    Yes, I do.

22        Q.    In this particular case, it has for

23   Central Hudson "E100 Non-Heating," do you see that on

24   the top line?

25        A.    Yes, I do.

1          Q.      You referred to SC1, that's a commonly

2     phrased term.  Would it be fair to say, each utility

3     often has their own nomenclature for different

4     classifications?

5          A.      Yes.  And I'm not surprised that it's a

6     non-heating example that's being provided.

7          Q.      Why is that?

8          A.      Because as I indicated, I suspect the

9     vast majority of electric customers in residential

10    are non-heating in New York, given the climate.

11         Q.      Under the section that has "Energy Supply

12    Charges" near the little circles, "2," "3," and star,

13    do you see that?

14         A.      Yes.

15         Q.      Okay.  It has a number of charges there.

16    One is an MFC supply charge, do you see that one?

17         A.      Yes, I do.

18         Q.      One is a market price, do you see that?

19         A.      Yes.

20         Q.      And then the market price adjustment

21    below that, do you see that?

22         A.      Yes.

23         Q.      And then "New York State and Local

24    Taxes," do you see that?

25         A.      Yes.

1      Q.     And then if you follow the hash tag under

2    "Total Electricity Costs," it says, "For this billing

3    period, the average cost of energy we purchased for

4    you was" blank "excluding per kilowatt hours

5    including taxes, you can use this number to compare

6    our prices to other suppliers' prices."  Do you see

7    that?

8      A.     Yes, I do.

9      Q.     Would you agree with me that that's

10   probably a general summary as to price to compare?

11     A.     Yes.

12     Q.     So do you know at the beginning of the

13   month if the price to compare listed for a specific

14   utility in a specific month is the same as the price

15   to compare at the end of the month?

16            MR. BLANKINSHIP: Objection, vague.

17     A.     I have not checked to see if posted

18   prices change over time for the same month for the

19   same utility for the same rate class.

20     Q.     But you know, you talked about a market

21   price adjustment being something and if you look at

22   this number 3, in this particular example, "This

23   defines market price adjustment as an adjustment

24   either plus or minus of the previous month's market

25   price of electricity, to reflect any differences

1    caused by the timing in billing and collection."  Did

2    I read that correctly?

3         A.    That's right.  So this would be in this

4    case, based on previous month, as indicated.

5         Q.    I apologize, I thought you were done.

6    Would that generally be your understanding of a

7    market price adjustment, regardless of what's written

8    on the bill?

9              MR. BLANKINSHIP: Objection, vague.

10        A.    They are not always, necessarily -- I'm

11   not sure the key element is that they are retroactive

12   or not, but yes, and in this case, the market price

13   adjustment was $1.27 out of a total electricity cost

14   of $63.40.

15        Q.    Right.  I guess you could also say 1.27

16   out of the total supply commodity cost of $60.62,

17   correct?

18        A.    Yes, that's right.  That would be the

19   right comparison.  It would be compared to the total

20   supply charge, yes.

21        Q.    And one of them is maybe 9 percent as

22   opposed to being 1, 2 percent?  I'm sort of,

23   apologizes, I'm not an economist.

24        A.    I understand, I understand.  You don't

25   have to be an economist, neither am I, to understand

1  that, but yes.  I would note that these adjustments

2  may be negative or positive over time.

3        Q.    Absolutely, correct.  I think this

4  actually says this adjustment is either plus or

5  minus, it could be different.

6        A.    Right, so.

7        Q.    So do you know when in the course of the

8  monthly calendar Agway pulls the price to compare for

9  a utility?

10       A.    No.  I do not know when they pull the

11 price to compare for a particular utility in a given

12 month.

13       Q.    Do you know if Agway averages or

14 approximates the number it puts on those charts you

15 referenced in Table V to put down for the utility

16 price to compare?

17             MR. BLANKINSHIP: Sorry, I missed that

18 question.  Could you read that back to me, Cindy?

19        (Thereupon, the Reporter read the requested

20 portion.)

21             MR. BLANKINSHIP: Okay.

22       A.    No, I do not.

23       Q.    With respect to in the hypothetical

24 example at Exhibit 8, there's a line item there for

25 "NYS and Local Taxes," do you see that, do you see

Page 98

1    that there?

2         A.    Yes.

3         Q.    Currently, and I don't mean this day, but

4    at the current time, do you know if New York

5    residential customers are charged State tax on their

6    delivery charges?

7         A.    I don't know for all of New York

8    residential customers if they are or not, on the

9    delivery portion.

10              MR. BLANKINSHIP: I'm going to

11   retroactively object to that.  That's outside the

12   scope.

13        Q.    Do you know if there are different local

14   taxes assessed on residential customers for the

15   delivery charges portion of their bill?

16              MR. BLANKINSHIP: Same objection.

17        A.    Yes.  I believe there are different ones;

18   for example, New York City taxes may vary, be

19   different than Upstate for the delivery portion, but

20   I don't know for sure.

21        Q.    Do you know if that's ever changed --

22   withdrawn.

23              Do you know if that's the same for a

24   customer if they receive electricity through an ESCO

25   or through the utility?

1           MR. BLANKINSHIP: Same objection.

2      A.      I don't know as of today, but originally

3  when I was working for an ESCO in New York, there

4  were different taxes and in fact, if you were on an

5  ESCO, the rate you paid was different, in that case

6  lower, to encourage people to switch from the utility

7  to the ESCO and I believe that those rates have

8  changed over time and maybe even that additional

9  inducement has gone away, but I don't know what the

10  statuses are today.

11      Q.      Okay.  We'll get into the documents in a

12  moment, but I just want to ask, I think these are

13  consistent with what you are testifying, we'll go

14  into the depth, waiting until it's necessary --

15  assume that you understand so remember this is off

16  the top of your head.

17              I'll represent to you that there's a New

18  York State Tax Law, Section 1101-B and 1105-B that

19  imposes sales taxes on the transportation,

20  transmission, or distribution of electricity, is that

21  something consistent with your understanding of this

22  now, currently?

23              MR. BLANKINSHIP: Objection, scope.

24      A.      Yes.  Yes.  State tax, the distribution

25  part of utility bills, that is correct.

1      Q.     And if I was also to represent to you

2  that there's a similar parallel provision, which is

3  1105-C, that modified that rate of tax for customers

4  who received electricity from an ESCO, would that be

5  consistent with what you were talking about?

6              MR. BLANKINSHIP: Same objection.

7      A.     Yes.  Yes.

8      Q.     And as for the timing, I'll pull up the

9  document I just want to ask you for this.  I will

10  also represent to you that in the 2020 New York State

11  budget there's a proposal to eliminate that

12  incentive, the incentive being the waiver of tax for

13  ESCO customers.  Would that be consistent with your

14  understanding of that was in place and is no longer

15  in place?

16             MR. BLANKINSHIP: Same objection.

17      A.     I'm not sure I understand the question. I

18  think the question is if I'm familiar with a

19  proposal, the answer is no; then the proposal would

20  remove the, the waiver of taxes that a customer who

21  purchases his electricity from an ESCO does not have

22  to pay or perhaps, a smaller amount, compared to what

23  they would have to pay, compared if they were

24  purchasing default service through the utility.

25      Q.     Okay. I'm going to make this less vague,

Page 101

1    because it's not helping out.  I'm going to pull up a

2    document for you, just a moment.

3              (Whereupon, Exhibit 0009 was marked for

4    Identification.)

5              MR. COYLE:  Did you get the emails, Greg?

6    It's on it's way to you, Mr. Blankinship.

7              MR. BLANKINSHIP: Okay, thank you.

8        Q.    Okay.  Dr. Felder, showing you what's

9    been marked as Exhibit 9 for identification, it is a

10   document called the "Fiscal Year 2020 New York State

11   Executive Budget Revenue Article VII Legislation

12   Memorandum in Support."

13             MR. BLANKINSHIP: John, do you have a

14   Bates number for that?

15             MR. COYLE: I do not, sir.

16             MR. BLANKINSHIP: Well, then I assume, I

17   take it, that that's because you haven't produced it

18   so far in this litigation.

19             MR. COYLE: No, sir.  You are entirely

20   correct.  This not an Agway document, this is the law

21   of the State of New York.  I'm asking Dr. Felder

22   about the basis of the information and his opinions.

23   I don't normally in the process of producing sections

24   and sending them over and Bates numbering them, but I

25   understand your objection and that will be resolved

                                                      Page 102

1    at whatever time.

2              MR. BLANKINSHIP:  Okay.  Well, I'm

3    actually going to make it.  I'm objecting to the fact

4    that you obviously withheld this document from prior

5    production for the purposes of sandbagging us in this

6    deposition.  I'll object to any questions regarding

7    it, but I'm not going to instruct Dr. Felder not to

8    answer.

9              MR. COYLE:  Okay.

10             MR. BLANKINSHIP:  I still don't have the

11   document --

12             MR. COYLE:  Okay.

13             MR. BLANKINSHIP: I just got an

14   unscannable encrypted -- yeah, what you are trying to

15   send me is what got kicked by our antivirus program,

16   because you tried to mess up my computer, John.

17             MR. COYLE: Well, I actually am not.

18   Chantal, do you have the Veritext file share?

19             MS. KHALIL:  Yeah.

20             MR. COYLE:  You can download the document

21   and you should be able to email it to Greg,

22   Hopefully, it doesn't bounce in your server.  I've

23   got to find the -- I could send you, Greg, the web

24   link for this.

25             THE WITNESS:  While you guys sort that

Page 103

1    out, I'm just going to run to a restroom break.

2    There's no question on the table.

3              MR. COYLE: No question pending.  Let's

4    take, take five.

5              THE WITNESS:  Thank you so much.

6              MR. COYLE: Wait, we've just got to go off

7    the record first.

8    (Discussion was held off the record.)

9              THE VIDEOGRAPHER: Off the video record.

10   The time is 1:19.

11   (Recess:  1:19 p.m. to 1:25 p.m.)

12             THE VIDEOGRAPHER: We are on the video

13   record.  The time is 1:25.

14        Q.    Dr. Felder, referring to Exhibit 9 for

15   identification, do you have that document open in

16   front of you?

17        A.    Yes.

18        Q.    If you go to the second page of the PDF,

19   there is a table of contents.  Do you have that page

20   in front of you?

21        A.    Yes, I do.

22        Q.    And part H is titled, "Discontinue the

23   Energy Services Sales Tax Exemptions," starting Page

24   15, do you see that?

25        A.    Yes.  And we are, just to be clear, we

                                        Page 104

1    are refer to the "FY 2020 New York State Executive

2    Budget Revenue Article VII Legislation Memorandum in

3    Support"?

4         Q.    Yes, sir, that's the title of the

5    document, yes.

6         A.    So is this a memorandum or is this

7    legislation?

8         Q.    I can read this again.  The title of it

9    is what the title of it is and the document is what

10   the document is.

11        A.    Okay.

12             MR. BLANKINSHIP: I'm just going to object

13   that you've introduced a document that you haven't

14   produced before and now you are not giving us

15   information about whether this is a law that's

16   actually passed.  I mean, you can ask all the

17   questions you want, but it's not very helpful if you

18   don't -- if you are, if you are going to give us the

19   document at the last minute, you could always try to

20   explain what it is.

21             MR. COYLE: Yeah, I will.  Just since we

22   are in the talky mode, this, Dr. Felder had explained

23   that this used to be the fact that there was a credit

24   and his understanding is that it is no longer the

25   case or something -- the testimony is what the

1  testimony is.  I'm not characterizing what his

2  testimony is.

3          Q.     Sir, can you turn to Page 15 of that

4  document, Part H.

5          A.     Yes.

6          Q.     So the first paragraph under "Summary,"

7  do you see that, "Summary of Provisions and Statement

8  in Support"?

9          A.     Yes.

10         Q.     Okay. I'll read this into the record

11 here, which says, "Tax Law Sections 1101-B and 1105-B

12 impose sales tax on the transportation, transmission,

13 or distribution of gas or electricity. Tax Law

14 Section 1105-C reduces the rate of tax on the

15 transportation, transmission, or distribution of gas

16 or electricity to zero, where it's sold separately

17 from the commodity.  This provision was enacted to

18 promote competition after the utility deregulation of

19 the late 1990's, by providing an incentive for

20 customers to purchase gas and electricity from

21 third-party energy service companies, often referred

22 to as Energy Service Companies (ESCO's.)

23 Consequently, customers who purchase gas or

24 electricity service from the utility company, pay

25 sales tax on the transportation, transmission, or

1    delivery, while customers who purchase from ESCO's do

2    not."  Did I read that correctly?

3         A.    Yes, you did.

4         Q.    So is that, generally speaking, when we

5    pull up the Tax Law sections if we need to.  I'll

6    tell you the Tax Law sections are utterly, enormous.

7    We can pull them up.  The law will be what the law

8    is.  The law isn't what John Coyle says, it is the

9    law is the law.

10             Do you have an understanding that in the

11   late 1990's that New York imposed a waiver of this

12   tax on customers who receive electricity from an

13   ESCO?

14             MR. BLANKINSHIP: Objection to the scope.

15        A.    As I testified before, I was working for

16   an ESCO at the time and I mentioned that, yes.

17        Q.    And that if you read to the next section,

18   it says, "Competition among ESCO's is well developed.

19   New York utilities offer multiple alternative ESCO

20   gas and electricity suppliers.  This exemption

21   perpetrates unequal treatment among utility

22   customers; for example, a business purchasing its

23   electricity from the local utility company will pay a

24   sales tax on its total electric or gas bill, while

25   another business purchasing gas or electricity from

Page 107

1    an ESCO will pay sales tax only on the gas or

2    electricity, but not on the transportation,

3    transmission, or distribution of that gas or

4    electricity." Did I read that correctly?

5         A.    Yes.

6         Q.    Do you agree that that tax causes an

7    imbalance or the waiver of that tax or the

8    non-uniform or un-uniform application of that tax?

9              MR. BLANKINSHIP: Objection, outside the

10   scope.

11        A.    The language you read indicates that it

12   favors energy service companies or if I were a

13   customer, all else equal, which I think is your

14   version of the apples to the apples, I would switch

15   to an ESCO, because then I'm exempt from this tax on

16   the delivery portion of my bill and so given that

17   this is the policy as you stipulated in place now,

18   that is, the waiver or the tax exemption exists,

19   because this seems to be a proposal to remove it,

20   that buying ESCO's are favored, all else equal,

21   compared to purchasing electricity from a utility,

22   because of this tax waiver, so.

23        Q.    Okay.  And if you scroll down to the next

24   page, Tax Page 16, it says under the effective date,

25   "This bill will take effect June 1st, 2019."  And in

1  fact, I'll make a representation that this bill was

2  enacted and did take effect June 1st, 2019.  So prior

3  to that date, there would have been the disparate

4  treatment in terms of the amount charged to customers

5  of an ESCO versus a utility, correct?

6            MR. BLANKINSHIP: Objection, foundation.

7       A.    I'm sorry, I'll wait for the objection

8  and then I'll answer.

9            MR. BLANKINSHIP:  That's all.  I'm done.

10 Objection.  I made my objection.

11      A.    I agree, prior to that date, granting

12 your stipulation that this bill has become a law,

13 then the fact that customers or customers who select

14 ESCO will receive a lower charge, all else equal,

15 compared to if they stay with their utility.

16      Q.    Back to your report.  When you did your

17 comparisons in Section 4 of your report, the section

18 we talked about this whole time, did you take in

19 effect, into account the amount of this tax

20 differential?

21      A.    Can you tell me the date the bill became

22 a law?

23      Q.    June 1st, 2019.

24      A.    So no, I did not, but that would, if I

25 would, qualitatively, it would increase the damages

Page 109

1    or the overcharges -- I'm sorry -- it would increase

2    the overcharges, because customers, there would be

3    additional savings that I should credit for, for

4    being on the ESCO versus the utility.

5         Q.    That would increase the damages?

6         A.    Yes.

7         Q.    So if I'm an ESCO customer and I'm

8    charged $10 for supply and the utility customer is

9    charged $9 for supply, but $2.00 in taxes, is there

10   damages that the ESCO has overcharged the customer in

11   your calculation?

12              MR. BLANKINSHIP: Objection, vague,

13   compound.

14        A.    So I calculated overcharge what a

15   customer would have paid, the difference between what

16   they pay Agway and what they would have paid if they

17   were on the utility.  Let's assume to make this

18   straightforward in this example that both Agway and

19   the utility have the same "price to compare," that

20   is, Agway's rate was ten cents a kilowatt hour and

21   the utility's rate was ten cents a kilowatt hour, but

22   because I am a, prior to the enactment of this

23   legislation, let's assume that my savings, my tax

24   exemption prior to July or June 2019, I forgot the

25   exact date --

Page 110

1      Q.      June 1st.

2      A.      -- June 1st, let's assume my tax savings

3   was one sent a kilowatt hour; in other words, if I

4   was a customer of Agway, I paid one cent less on my

5   distribution, my delivery piece of the bill, because

6   I was eligible for the tax exemption so my total cost

7   would be ten plus one, 11, versus the price to

8   compare -- sorry -- the Agway by being -- getting the

9   tax exemption, it's as if I added one cent to the

10  utility or subtracted one sent from Agway.  So

11  instead of being ten and ten, now if I'm a customer

12  of the utility, I pay the additional tax, I'm paying

13  11 so that the benefit for being on, there's greater

14  differences, because if I was on Agway, I would avoid

15  paying this charge which I should account for.

16     Q.      Okay.

17     A.      Think about this way, Mr. Coyle, the

18  document that you provided us described that the

19  whole point of this or the major thrust of this now

20  defunct or overturned or revised legislation, was to

21  induce customers to switch from their utility to the

22  ESCO and then it says those facts have changed, at

23  least according to that document, so the inducement

24  was to further benefit being a customer of an ESCO.

25     Q.      Right.

1        A.     So that would increase the overcharges.

2        Q.     I'm still confused by that, because I

3    think it would decrease the overcharges, because in

4    your example, let me ask you a question, is the sales

5    tax taxed in terms of cents on the kilowatt hour or

6    is it on the total amount of the distribution charge?

7    Because we could pull this back up a second.  I

8    believe that Article IX references that it was taxed

9    on the distribution charge -- let me pull it up, I

10   apologize, the closing page -- "transportation,

11   transmission, or distribution of gas or electricity."

12   Is that charged to customers per kilowatt hour?

13       A.     I think it varies by the utility.

14   Typically, utilities have a small fixed charge that's

15   independent of your usage and then even on the

16   delivery piece, the brunt of the charge, particularly

17   for residential, is a per kilowatt hour per charge,

18   but I think my example is the same, the only reason I

19   did it on a per kilowatt hour basis was just to

20   simplify the math.

21       Q.     Okay.

22       A.     But --

23       Q.     I'm sorry, you said, "but" so I started

24   talking so I'll stop.  I'll wait.  I'm sorry.

25       A.     So before the tax, if the utility and the

Page 112

1  distribution company are charging, before the removal

2  of the exemption, they are charging the same price to

3  compare, right, then the, by switching to, by being

4  on the ESCO, there's an additional savings.  If I do

5  not account for that additional savings, I

6  understated the overcharges.

7        Q.    Well, did you account for that savings?

8              MR. BLANKINSHIP: Objection, asked and

9  answered.

10        A.    As I said, I did not.

11        Q.    Do have any idea what the magnitude of

12  the, do you have any idea of the magnitude of the

13  sales tax savings for the customers in your Chart 5

14  for 2013 would be?

15        A.    No I don't, but I'll, I'll try to

16  calculate that.

17        Q.    Did you calculate the transmission --

18  withdrawn.

19              I realize I, too, like you, am not an

20  economist, but to me, if Agway charges you $10 for a

21  commodity charge and the utility charged you $10 for

22  a commodity charge, and the utility charges you $2.00

23  for tax -- the utility doesn't charge you for tax --

24  but you are charged $2.00 for tax from the utility,

25  you are paying more for being on the utility, right?

Page 113

1          MR. BLANKINSHIP: Objection.  Asked and

2     answered, argumentative.

3          A.    Right.  So if I switch to the ESCO, I

4     save that money. I did not account for that and

5     therefore, my overcharges would underestimate the

6     benefit of switching to Agway.

7          Q.    Okay.  Then, I agree.  I thought you were

8     saying before, you would have understated the amount

9     of the overcharge and I think your last statement is

10    more correct.  May be you misspoke earlier.  I

11    thought you --

12         A.    Let's read back that statement that I

13    just said.

14         Q.    Why don't we forget what you may or may

15    not have said before.

16         A.    No.  No.  That's now how this --

17              MR. BLANKINSHIP:  Objection.  You are

18    mischaracterizing his testimony.

19              MR. COYLE: Sure, that's why we have a

20    court reporter.

21         Q.    The question is, would you agree that

22    if -- then I'm going to ask it again and Mr.

23    Blankinship is going to object, asked and answered,

24    so that's where we are -- if Agway charges you $10

25    for supply and the utility charged you $10 for

Page 114

1    supply, because you are a utility customer, you are
2    charges $2.00 for tax, you are charged less for being
3    an Agway customer?
4              MR. BLANKINSHIP:  Objection, asked and
5    answered, argumentative.
6        A.    For the -- that's right. So prior to June
7    1st, 2019 or was it 2020, but the assumption was the
8    energy price was the same, that's the ten bucks so
9    prior to the change in the law, there's an additional
10   dollar, what I should have done is taken the, the
11   equivalent would have been take the utility price to
12   compare -- let me think about this so we are making
13   sure we are not crossing, cross-talking each other.
14   Let me just think for a moment.
15             So Agway should have been be able to
16   charge an even lower rate than the utility price to
17   compare, to reflect the savings, the avoided tax on
18   the transmission and distribution that a customer
19   does not have to pay by being a member of Agway.  And
20   when I was a member of an energy service company in
21   New York, we did exactly that, that we committed to
22   customers that they would pay the price to compare
23   minus a fraction, a portion of that tax savings and
24   that was our inducement to, that was our way of
25   providing a comparable, a product at a lower price,

Page 115

1    by sharing some of those tax savings with the

2    customer.

3         Q.    What ESCO was that?

4         A.    It was actually called -- it was called

5    energy service providers, ESPI, and we did that very

6    strategy.  That was one of our ways to provide a

7    variable priced product at a lower rate than the

8    price to compare by sharing those tax savings with

9    customers.

10        Q.    Okay.  Do you know if that was the method

11   by which Agway communicated its rates to Ms.

12   Gonzales?

13        A.    The communication I'm aware of between

14   Agway and Ms. Gonzales, we have talked at length,

15   which was the prior exhibit and we can pull that up

16   and we can go through that, whether or not it

17   contains the customer disclosure statement and the

18   introductory letter, whether it addresses those

19   taxes.

20        Q.    Well, I meant what you just described.

21   Maybe my question was vague and Mr. Blankinship

22   didn't actually object this time.  You described how

23   a company you worked for at sometime in the past

24   calculated its prices for customers.  That how Agway

25   calculates its prices for customers?

Page 116

1          A.     I don't know how Agway calculates its

2     variable prices for customers.  The point of my last

3     explanation was we used that tax exemption as a way

4     to provide and undercut the utility's price to

5     compare, it gave us a competitive advantage.

6          Q.     Did that company -- I apologize -- did

7     that company you worked for, did they provide any

8     sort of warranty to customers who received an

9     electric variable rate?

10         A.     I don't recall them providing warranty.

11    They may have provided some other services, but I

12    don't recall one way or the other.

13         Q.     Do you think you would recall whether

14    they had something similar to the EnergyGuard

15    program?

16         A.     I don't believe -- we didn't have

17    something similar to that EnergyGuard program, no.

18         Q.     And would you agree with me that one of

19    the ways businesses compete with each other could be

20    on price?

21                MR. BLANKINSHIP: Objection, vague, scope.

22         A.     Yes.  That is one of the ways businesses

23    compete, that's right.

24         Q.     And another way could be a product

25    differentiation?

Page 117

1                MR. BLANKINSHIP: Same thing, same
2    objections.
3         A.    Are we speaking in general?   In general,
4    yes.  In this case, the New York Public Service
5    Commission through it's finding that we just, Reset
6    2, I think is what you are referring to, went through
7    an extensive comprehensive analysis on that question
8    and at least for variable priced customers, did not
9    find those added services to be of value.  In fact,
10   it says, if I may read it into the record.
11        Q.    Sure.
12        A.    Page 7, "It is both notable and troubling
13   that no ESCO party could or would provide objective
14   evidence regarding the specific value-added products
15   or services that are currently offered in New York,
16   how many ESCO customers elect to receive those
17   products and services, the level of premium ESCO
18   customers are charged for the value-added products or
19   services, and what type and level of benefit is
20   obtained by customers who receive the product or
21   services offered."
22        Q.    Thank you.  Since you read from this, I
23   guess --
24                MR. COYLE:  Jen, do you have the Reset
25   Order 2?  We might as well make it an exhibit, since

Page 118

1    you read it rather than read it from the report.

2    Greg, I'll email it to you in a moment.  It's the New

3    York PSC Order or Reset Order 2.  We'll mark that 10

4    for identification.

5        (Whereupon Exhibit 0010 was marked for

6    Identification.)

7                MR. COYLE:  Do you have that, Greg, or

8    should we give it a minute?

9                MR. BLANKINSHIP: I don't have it yet, but

10   if you give me a minute, I'm sure it will pop up.

11               MR. COYLE: Actually, it's on its way to

12   you now.  Mr. Blankinship, let me know when it comes

13   through.  It's loading, it might take a minute.

14               MR. BLANKINSHIP: I think I just got it.

15   Okay.

16        Q.    Dr. Felder, we are handing you what's

17   been marked as Exhibit 10 for identification. It is

18   the State of New York Public Service Commission Order

19   Adopting Changes to the Retail" --

20   (Discussion was held off the record.)

21               MR. COYLE:  Sorry, Cindy.

22        Q.    -- "Access Energy Market and Establishing

23   Further Process."  Have you seen this document

24   before, Dr. Felder?

25        A.    Yes.

1    Q.    While I didn't produce it in this case,

2    this is a document that you referenced quite

3    extensively in your, your -- the report, correct?

4    A.    I referenced it in my report, yes.

5    Q.    Extensively is my characterization.  It's

6    referenced in your report?

7    A.    Yes.

8    Q.    Correct?  And that's the report you were

9    just explaining maybe 45 minutes ago, about the

10   nature of the proceeding, etcetera.  I called it

11   quasi-judiciary, you explained to me that it's not

12   actually correct, that it's something you relied

13   upon, your testimony is what it was on that.  I'm

14   going to paraphrase it wrong.  That's correct, right?

15   A.    Yes.  We discussed this document

16   recently.

17   Q.    And that was what you were just reading

18   to when you decided to read something into the

19   record, correct?

20   A.    Yes.

21   Q.    And if we turn to Page 51 of this, and

22   the pages, I'll refer to the page on the bottom of

23   it, not the page of the PDF because they, they don't

24   line up.  I believe if you turn to Page 51 is where

25   you were recording that from, if I see that

Page 120

1    correctly, the second full, the second full

2    paragraph, is that what you were just reading?

3         A.    Yes.

4         Q.    I know this is a lengthy document, but

5    did you read the whole thing, Dr. Felder?

6              MR. BLANKINSHIP: Objection.

7              MR. COYLE: What's the objection, Greg.

8              MR. BLANKINSHIP: Asked and answered.

9         A.    I did.

10        Q.    Okay.  If you turn to the next page of

11   this, in the first full paragraph that starts with

12   the word "Nonetheless," do you see that?

13        A.    Yes.

14        Q.    I'll just read the first two sentences:

15              "Nonetheless, we recognize that whether

16   or to what extent such products are currently

17   offered, appropriate value-added products and

18   services have the potential to provide benefits to

19   customers.  We reiterate, however, that consistent

20   with the purpose of the retail energy market, only

21   energy-related products and services will satisfy the

22   Commission's definition of value-added products or

23   services.  As a notable example of a service that

24   meets this definition, Agway offers 'EnergyGuard' as

25   a service bundled with both natural gas and

Page 121

1    electricity supply."

2                 Did you read that correctly?

3         A.     Yes.

4         Q.     Turn down to the next page for a moment.

5    Page 53, the last paragraph that starts, "Because,"

6    do you see that paragraph?

7         A.     Yes.

8         Q.     I'll just read this into the record and

9    tell me if I read this correctly:  "Because, with the

10   exception of Agway's EnergyGuard product, no

11   meaningful evidence was provided to demonstrate that

12   any energy-related value-added product or service

13   currently offered provides benefits to customers

14   comparable to its costs, the provision of such a

15   product or service is not sufficient at this time to

16   demonstrate that an ESCO offering benefits to

17   customers and should be permitted."  Did I read that

18   correctly?

19        A.     Yes.

20        Q.     I apologize, I'm going to get you to flip

21   back to your report.  I hope it doesn't cut this, cut

22   you off.  Your report was 2, Exhibit 2 for

23   identification, sir.

24        A.     Yes.

25        Q.     If you turn to Page 17, the numbered page

Page 122

1    on the bottom of your report.

2           A.     Yes.

3           Q.     The second sentence of your Section 6 is:

4                  "As the New York PSC," -- I'm sorry, you

5    said "NY PSC," but you meant New York Public Service

6    Commission, correct?  That's the acronym, New York

7    Public Service Commission?

8           A.     Yes.

9           Q.     "As the NY PSC found in its proceeding,

10   no ESCO provided objective evidence of the value such

11   services provided."  Did I read that correct?

12          A.     Yes.

13          Q.     You are referring to the NY PSC Order or

14   Reset Order 2, right?

15          A.     Yes.

16          Q.     But on Page 53, which I just was at, I

17   apologize, I'm flipping back.  I have to find it

18   again.  It actually says, "Because, with the

19   exception of Agway's EnergyGuard product." You

20   omitted that portion from your report, correct?

21          A.     I'm just getting back to Page 53. I said,

22   "No objective evidence." This was evidence provided

23   by Agway.  My report, let's go back to my report.

24          Q.     Yes, let's.

25          A.     Page 17?

1     Q.     Yup.

2     A.     Again.

3     Q.     I'm sorry, it's the nature of flipping

4    here.

5     A.     Yeah.

6     Q.     "As the NY PSC found in its proceeding,

7    no ESCO provided objective evidence."

8          MR. BLANKINSHIP: Sorry, where are we?  I

9    thought we were on Page 17 that you are reading from.

10          MR. COYLE: Greg, flip back to Page 17 of

11    his report.  It's Exhibit 2 if that wasn't clear.

12          MR. BLANKINSHIP: Okay, I'm there.  Thank

13    you.

14     A.     So my phrase in there is:

15          "No ESCO provided objective evidence of a

16    value of such services provided" and then when we go

17    back to the reset order, the first page you read was

18    the 451, where I cited and then you went on so then

19    you went on Page 52, it says, "Agway offers

20    EnergyGuard" -- I'm sorry.  Let's see, I'm now --

21          So Page 51, "It's both notable and

22    troubling that no ESCO party could or would provide

23    objective evidence regarding," so the fact that Agway

24    provided information or evidence is separate from

25    whether they provided objective evidence.

1      Q.      So, but your report says, "As the PSC

2   found" so is it your opinion as you are reading this,

3   your report is based on the fact that the PSC found

4   that EnergyGuard did not provide objective evidence

5   of the value of such services?

6            MR. BLANKINSHIP: Objection,

7   argumentative.

8      A.      EnergyGuard doesn't provide anything,

9   Agway provided it, but that quibble aside --

10     Q.      Sure.

11     A.      -- on Page 51, the sentence I just read,

12   it says, "No ESCO party could or would provide

13   objective evidence" and then it talks about as

14   notable, an example, "Agway offers EnergyGuard as a

15   service."  "Agway claims that this service," blah,

16   blah, blah.  "Agway asserts that the value," blah,

17   blah, blah --

18     Q.      Right.  I'm sorry, the difference is --

19            MR. BLANKINSHIP: John, he's not finished

20   with his answer.  Dr. Felder, would you like to

21   finish your answer?

22     A.      And so I'm making -- thank you -- I'm

23   making the distinction between offering evidence and

24   the assessment of whether that evidence is objective.

25     Q.      I understand.  Are you finished now?

Page 125

1          A.      Yes.

2          Q.      Thank you.  So you are differentiating

3    that the PSC was reciting that Agway claimed certain

4    things, but the PSC doesn't agree?

5          A.      Yes, per the wording that you had me

6    read.

7          Q.      Okay.

8          A.      And in the paragraph you referenced, yes.

9          Q.      Okay. Can you turn back to the Reset

10   Order 2, please, Exhibit 10 for identification, Page

11   54, please.

12         A.      Yes.

13         Q.      The first full paragraph that starts with

14   "To be clear," do you see that?

15         A.      Yes.

16         Q.      Okay.  The end of the fifth line, I'm

17   going to read it.  It says, "Because Agway provided

18   detailed evidence demonstrating that EnergyGuard

19   provides a unique benefit that may be reasonably

20   comparable to its costs, Agway may continue to offer

21   EnergyGuard during this interim period."  Did I read

22   that correctly?

23         A.      Yes.

24         Q.      So do you interpret that as that is

25   simply the PSC repeating what Agway alleges, this

Page 126

```
 1    isn't a finding from the PSC?
 2         A.      It has the word "may." Secondly, this
 3    sentence, let's reread the sentence, the part of it
 4    that I want to emphasize.
 5         Q.      Sure.  I'll read it again.
 6         A.      No, no.
 7         Q.      That's okay, I'll read the whole
 8    sentence.
 9              MR. BLANKINSHIP: Mr. Coyle, he's not
10    finished with his answer yet.
11              MR. COYLE:  I understand that.  There's
12    no question.
13              MR. BLANKINSHIP:  Dr. Felder, if you want
14    to finish your answer, you may.
15         Q.      That's fine.  I'll read the sentence and
16    you could tell me what portion --
17              MR. BLANKINSHIP: Let Dr. Felder finish
18    his answer, I would appreciate it.  Dr. Felder, you
19    can continue.
20              MR. COYLE: I understand, Greg. I'm
21    withdrawing the question.  New question.
22              MR. BLANKINSHIP:  He can finish his
23    answer.  Dr. Felder, why don't you finish your
24    answer.
25         Q.      Please finish, Dr. Felder, explain.
```

Page 127

1      A.     The language we were discussing on Page

2    54, based on the bottom of the page of the Reset

3    Order, states:

4              "Because Agway provided detailed evidence

5    demonstrating that EnergyGuard provides a unique

6    benefit that may be reasonably compared to its cost,

7    Agway continued to offer, Agway may continue to offer

8    its EnergyGuard during the interim period."

9              In my analysis, I account for the cost of

10   Agway's EnergyGuard a little over 500, 5.6, 560,000,

11   whatever that number is; moreover, the finding here,

12   the statement here is "may provide" a reasonably

13   benefit compared to the cost, that plus the reading

14   of the sentence we just went over, is the basis of my

15   findings.

16      Q.     Okay.  So if I can summarize this, you

17   are interpreting the first part of that sentence

18   which says, "Because Agway provided detailed evidence

19   demonstrating that EnergyGuard provides a unique

20   benefit that may be reasonably comparable to its

21   costs," you are saying by the word "may" it means the

22   PSC isn't finding this, is that --

23      A.     The question --

24              MR. BLANKINSHIP: Objection, asked and

25   answered, argumentative.

1          A.      The way we got into this was the word

2     "objective," which I had in my report.  Here the PSC

3     does two things.  It omits the word "objective."  It

4     doesn't say because Agway provided detailed objective

5     evidence, it just said it provides detailed evidence

6     and then it goes on that its benefits may be

7     comparable to,  "may be reasonably comparable to its

8     costs" and I account for its costs in my analysis.

9          Q.      Would it be fair to say that the effect

10    of Reset Order 2 is that no ESCO can charge more than

11    the utility for variable rate electricity, except for

12    Agway?

13                 MR. BLANKINSHIP: Objection, lack of

14    foundation.

15         A.      I would have to read the whole order.

16         Q.      Well, let me --

17         A.      I don't know.  I don't know. I don't

18    know, I don't have an opinion on that.

19         Q.      Well, listen, I know Mr. Blankinship

20    objected, but I asked you if you read the whole thing

21    and I asked that question for a reason.  So I'll go

22    back to that sentence that we keep tripping over,

23    which is that after "may be reasonably comparable to

24    its costs, Agway may continue to offer EnergyGuard

25    during this interim period."

1            And then if you skip down to the last

2    sentence of this paragraph, "If any other ESCO wishes

3    to offer a product like EnergyGuard during the

4    pendency of Track 2, it may submit a petition for

5    waiver to the Commission explaining the benefits its

6    product provides and how they will reasonably relate

7    to its costs."  Did I read that correctly?

8         A.    Yes.

9         Q.    And just to bring this down to the next

10   page, 55, if you have that in front of you, sir.

11        A.    Yes.

12        Q.    The last paragraph, I'll just read this

13   sentence:

14            "In the instance of EnergyGuard and in

15   any other instance in which the Commission concludes

16   that ESCO's meet this threshold criteria and

17   therefore, are permitted to charge prices higher than

18   the utility default supply rate for energy-related

19   value-added products and services, price and

20   transparency will ensure that the customer and the

21   Commission can identify the portion of the total ESCO

22   bill that is attributable to the commodity and the

23   portion that is attributable to the energy-related

24   value-added product or service." Did I read that

25   correctly?

Page 130

1          A.     Yes.

2          Q.     So the Commission is saying Agway can

3    offer EnergyGuard and is permitted to charge prices

4    higher than the utility default supply rate and

5    anybody else who meets the same criteria as

6    EnergyGuard can do the same, correct?

7               MR. BLANKINSHIP: Objection, lack of

8    foundation, compound.

9          A.     With the important qualification that we

10   read in multiple times, "reasonably comparable to its

11   costs," which I accounted for in my analysis.

12         Q.     No, I understand you keep saying that.

13   But my question to you was, is Agway permitted to

14   charge more than the utility default rate as a result

15   of Reset Order 2?  Stop.

16               MR. BLANKINSHIP: Objection, asked and

17   answered, scope.

18         A.     Consistent with the requirements that you

19   just read into the record regarding, and now I'm just

20   getting lost, you read most recently on Page --

21         Q.     55.

22         A.     -- 55, subject to those conditions.

23         Q.     So were you finished?  I didn't mean to

24   step on your answer.

25         A.     Yes, I'm finished.

1        Q.      Is there any other ESCO that is permitted

2   to do the same during the Track 2 proceedings here?

3                MR. BLANKINSHIP: Objection to scope,

4   foundation.

5        A.      As you read into the record how another

6   ESCO could do that through the, I don't want to call

7   it the application process, but through a process.

8        Q.      No.  My question is how -- you are

9   correct.  My question to the prior one was somebody

10  could do this, but my question is does Reset Order 2

11  say any other ESCO other than Agway is permitted to

12  do this?

13               MR. BLANKINSHIP: Objection, scope and

14  asked and answered.

15     (Discussion was held off the record.)

16               MR. BLANKINSHIP:  Do you want to have

17  that question read back, Dr. Felder?

18               THE WITNESS:  Yes, why don't we do that.

19               MR. COYLE:  Okay.  Withdraw it and then

20  I'll just ask a new one and pause, Mr. Blankinship

21  will object or not and then we'll have a cleaner

22  record.

23               MR. BLANKINSHIP:  I'll go with object.

24       Q.      Does Reset Order 2 name any other ESCO

25  that may charge more than the utility default supply

1    rate for energy-related value-added products or

2    services?

3              MR. BLANKINSHIP: Same objections.

4         A.    Not in the material that you read that

5    I -- so without reading the whole order again to make

6    sure, but no, not in the state, in the portion of the

7    order that you read.

8         Q.    Well, I don't want to be unfair and play

9    gotcha.  Why don't we just take a minute and you read

10   and let me know if there's another ESCO identified

11   other than Agway that's permitted and I'll wait here

12   and you let me know when you are ready to answer.

13             MR. BLANKINSHIP: I'm going to object to

14   the scope.

15        A.    I'll take your word that there's no other

16   energy service company, although, they are allowed to

17   do so if they go through the process, but if you

18   stipulate there's no other name besides Agway, I can

19   review the order at another time to confirm that.

20        Q.    Okay.  I will stipulate to that.  I will

21   tell you that, I'm sure you'll get a rebuttal report

22   and in the event that there are other ones that are

23   named here that I somehow missed in this long order,

24   I'm sure you'll point it out to me at such a time,

25   but I will tell you that there aren't and does that

Page 133

1   change the findings of your report?

2            MR. BLANKINSHIP: Objection, scope.

3       A.    No.

4       Q.    I know we've been talking about the old,

5   infamous apples to apples for customers in New York.

6   Is that the same for Pennsylvania?

7            MR. BLANKINSHIP: Objection.

8       Q.    That's not really a question, fair

9   question.  Let me ask the question differently.

10           With respect to Pennsylvania, are there

11  any charges that utility customers are charged that

12  ESCO customers aren't?

13      A.    Not that I know of off the top of my head

14  that pertain to the price to compare.

15      Q.    Well, how about without that

16  qualification?

17           MR. BLANKINSHIP: Objection, scope.

18      A.    Yeah, I don't know if there's the

19  analogue of any tax issues that we've been discussing

20  in Pennsylvania.

21      Q.    Going back to your report, which is

22  Felder 2 for identification, on Page 7 -- sorry, Page

23  15, looking at the bottom of the page.

24      A.    Yes.

25      Q.    Do you calculate the number, the results

```
1   of calculating Agway's overcharges based upon utility
2   price to compare, do you see that?
3       A.    Yes.
4       Q.    If you were to actually render an opinion
5   as to the difference between what Agway's customers
6   were charged versus what the utility's customers were
7   charged, that wouldn't be the number, right?
8             MR. BLANKINSHIP: Objection, vague.
9       A.    This is my calculation in aggregate of
10  what Agway's customers paid Agway versus what they
11  would have paid the utilities.
12      Q.    So the, the tax doesn't affect this
13  number?
14            MR. BLANKINSHIP: Objection, vague.
15      A.    I discussed this about the tax, but
16  that's right, it would have an affect on this number.
17      Q.    And if there were any --
18      A.    It could raise the number or lower the
19  number, depending on what those are; for example,
20  when we talked about those adjustments, if I did not
21  include them, they could be positive or negative --
22      Q.    Right.
23      A.    -- so if appropriate, they could raise or
24  lower the overcharge calculation, but the methodology
25  I used could be done on an individual customer
```

Page 135

1   basis --

2       Q.      But you didn't do that?

3       A.      -- of accounting for them.

4       Q.      I'm sorry, I though you were done.  But

5   you didn't do that?

6       A.      No.  Given the -- I used the spreadsheet

7   provided by Agway, which aggregated by utility, by

8   month as the basis of my calculations.

9       Q.      You have access to all of Agway's data

10  that was produced, I believe you testified at the

11  beginning of this matter, right?

12      A.      Only with respect to the --

13              MR. BLANKINSHIP:  Objection,

14  mischaracterizes his testimony.

15      A.      With respect to the billing information,

16  yes, I believe so.  Yes.

17      Q.      No. I thought my question was the

18  electronic document production.  Did you have

19  something -- maybe we had different things in mind

20  and I shouldn't have been so vague.  I'll represent

21  to you that Agway had produced an electronic database

22  of some --

23              MR. COYLE:  Jen, give me a magnitude.

24      Q.      -- 300,000 documents, I think that's

25  undercounting it by a lot.  Did you have access to

Page 136

1    that database?

2         A.    I did not directly have access to that

3    database, no.

4         Q.    How did you indirectly have access to

5    that database?

6         A.    Well, if I needed information,

7    presumably, that would have affected my analysis, I

8    could have requested it.

9         Q.    Did you request things at times that were

10   then given to you from that database?

11        A.    Or from -- if you mean database in the

12   set of discovery, yes, I believe, yes.

13        Q.    I'll call it the electronic production.

14        A.    The electronic production, yes.

15        Q.    The database was misleading, it's not a

16   database.  It's a data set of documents.  Do you have

17   any idea as to whether or not the sales details for

18   every customer on a month-by-month basis were

19   produced by Agway in this matter?

20        A.    They were produced and I have those

21   spreadsheets.

22        Q.    The spreadsheets that have every single

23   customer?

24        A.    Well, I don't know if they have every

25   single Agway customer, but yes, they had detailed

Page 137

1    billing records.  In fact, I gave a sample and I

2    discussed in my testimony of a particular customer in

3    Table VII.

4         Q.    Right.  So you could have done a

5    customer-by-customer comparison?

6         A.    Yes.  As I described in my testimony that

7    I could do that, you know, once the set of customers

8    was defined for this legal proceeding.

9         Q.    In your Table VII do you have that sales

10   tax that we've been talking about for a while,

11   listed?

12        A.    No, I do not.

13        Q.    Do you have a merchant function charge or

14   adjustment reflected here?

15        A.    To the extent it's part of the price to

16   compare, it would be in there, but if not, they were

17   based off Agway's provided price to compare.

18        Q.    You keep saying Agway's provided price to

19   compare.  If I was to tell you that there's --

20   withdrawn.

21              If I was to make a representation to you

22   that there was testimony that you didn't read in this

23   matter that Agway compiled that for marketing

24   purposes, would that be significant to you in terms

25   of whether you should be using that for your

Page 138

1   analysis?

2            MR. BLANKINSHIP: I'm going to object,

3   lack of foundation, incomplete hypothetical,

4   mischaracterizes the record.

5        A.    I would read the deposition to see to

6   what extent it would affect my analysis. It could

7   increase the overcharge calculations, it could

8   decrease them, it could be not material and as I

9   point out, my methodology does allow me to do it

10  customer by customer, if necessary.

11       Q.    Well, you say your methodology does allow

12  you to, but you didn't and I'm looking at your

13  report, not the report you could have done, right?

14            MR. BLANKINSHIP: Objection,

15  argumentative.

16       A.    I'm looking at the report I did and in

17  the report that I did, in Section 7, Page 18, I've

18  calculated the overcharges, charges to customers

19  assuming different margins and whether EnergyGuard

20  should be included.  I've demonstrated that the

21  method that I have used should be applied to Agway's

22  aggregate sales and to each customer individually

23  using a standardized formula.

24       Q.    But your standardized formula doesn't

25  take into account the specific price a customer would

1    have been charged if they were on utility service,

2    the total amount they would have been charged on

3    utility service versus under Agway's service?

4             MR. BLANKINSHIP: Objection, asked and

5    answered, mischaracterizes the testimony.

6        A.    No.  My methodology would include in the

7    price to compare all the components.  So for example,

8    if you go to the Con Ed website and you look at the

9    price to compare, it stipulates that the price to

10   compare is, there's a file you look up, there's the

11   MSC1, MSC2, you add them together and you get what

12   they call, I believe, the supply costs and that would

13   be the price to compare and so that is embedded in

14   the formulas that I, or referred to in Formulas 1 and

15   2 on Page 9 in my testimony.

16       Q.    With, with omissions, right?

17            MR. BLANKINSHIP: Objection --

18       Q.    Sales tax?

19   (Discussion was held off the record.)

20            MR. BLANKINSHIP:  Argumentative, asked

21   and answered.

22            MR. COYLE:  Wait, wait, I'm sorry, Mr.

23   Blankinship, it would be helpful if you wait until

24   I'm finish with my questions and then add the

25   objections, it will be easier for the reporter.

Page 140

```
 1              MR. BLANKINSHIP:  I'm sorry.  There was a
 2   big, long pause there so I thought that meant you
 3   were done with your question.
 4              MR. COYLE:  Fair, wouldn't be the first
 5   time.
 6        Q.    Would you like me to re ask the question,
 7   Dr. Felder?
 8        A.    Please.
 9        Q.    How would your methodology allow you to
10   determine a customer's specific price to compare?
11        A.    It would be in Formula 2.  I would
12   replace the cost of goods sold with the -- in Formula
13   2 it would be using the costs -- what the customer
14   would have paid if they were purchasing electricity
15   from the utility so that would be all the components
16   of the price to compare.
17        Q.    What data would you use for that
18   customer's specific price to compare?
19        A.    The customer, its rate class, and the
20   zone that it's in and the period of time and if data
21   was sufficiently available, you could do it on a
22   billing cycle, as we've discussed previously.
23        Q.    But you didn't do that?
24              MR. BLANKINSHIP:  Objection, Asked and
25   answered, argumentative.
```

Page 141

1        A.     I did not do that.  I did that using
2    aggregate data, that's correct.
3        Q.     And I know we are going to go through
4    this one more time.  Where would you get that data
5    that you are talking about to determine that for
6    every customer?
7             MR. BLANKINSHIP: Objection, asked and
8    answered.
9        A.     Well, I've done this in the past.  So for
10   Con Ed they have a website that lists the price to
11   compare, what you are calling the apples to apples,
12   what you are calling the price to compare and the
13   components that go into that and you get through the
14   website and you pull those files and then you combine
15   the supply charge, the merchant function charge or
16   the equivalent merchant supply charge, whatever, put
17   those together and that becomes the price that's then
18   used in the calculations, as I described.
19       Q.     Okay.  And I know we keep talking over
20   this, but you didn't do that here.  You just did --
21             MR. BLANKINSHIP:  Same objection.
22             MR. COYLE:  I'm sorry.  Mr. Blankinship,
23   same objection?
24             MR. BLANKINSHIP:  He can answer.
25       A.     I'm happy to answer for the fifth, sixth

1  time, but no.  As I said in my report, as I said in

2  my testimony, I did not do that on an individual

3  level, but I could do that on an individual level.

4       Q.    If you wanted to calculate how much the

5  tax savings was off the distribution and transmission

6  charge for these customers individually or in the

7  aggregate, how would you do that?

8       A.    I would need to know the, what the tax

9  exemption was and to the extent it was on a per

10 kilowatt hour charge, I would use the per kilowatt

11 hour variable sales either at a customer level or the

12 aggregate level to then calculate the total amount.

13      Q.    Let me ask you a question.  Prior to

14 being retained in this matter, you were aware of

15 these sales tax savings for ESCO customers, correct?

16      A.    As I mentioned, yes.

17      Q.    And you didn't include that in your

18 calculations here.  Why?

19            MR. BLANKINSHIP: Objection,

20 argumentative, asked and answered half a dozen times

21 now.

22      Q.    The why is different, but I'll -- why?

23      A.    I didn't think it was -- it would have,

24 it would have increased the overcharges, as we've

25 discussed, so I was just doing everything on the

Page 143

1    energy side of the bill, not any additional savings

2    on the transmission, distribution side of the bill.

3         Q.    I know this sort of we've gone over this

4    for a long time -- do you know if this sales tax

5    savings was something that was conveyed to Ms.

6    Gonzales at the time of her enrollment?

7              MR. BLANKINSHIP: Objection, scope.

8         A.    Nothing beyond the documents we've

9    discussed so far today.

10        Q.    Okay.

11             MR. COYLE: Can we take two?  I think I'm

12   done with this area.  I want to sort the documents

13   and move on and take five.  If anyone wants to use

14   the restroom and we'll pick in just a few moments?

15             MR. BLANKINSHIP:  Yeah, why don't you

16   give us ten.  I think we've been going for almost two

17   hours.

18             MR. COYLE: That's kind of what I thought,

19   ten is perfect.

20             THE VIDEOGRAPHER: Off the video record.

21   The time is 2:23.

22   (Recess: 2:23 p.m. to 2:41 p.m.)

23             THE VIDEOGRAPHER: We are on the video

24   record.  The time is 2:41.

25        Q.    Good afternoon, Dr. Felder.

Page 144

1          A.      Good afternoon.

2          Q.      Going back to your expert report, which

3    is Exhibit 2.  I'm sorry, I took a break and I lost

4    my document.  There we go.  Exhibit 2 for

5    identification, drawing your attention to Section 3

6    of your report, which starts on Page 8.  Please let

7    me know when you've pulled that up.

8          A.      Yes.

9          Q.      So for the very first sentence of this

10   section you say, "In this section and Section IV, I

11   calculate the amount that Agway overcharged its

12   variable rate customers in New York and Pennsylvania

13   under varies assumptions." Did I read that correctly?

14         A.      Yes.

15         Q.      What were those assumptions?

16         A.      Those assumptions are then listed in this

17   report so they pertain to Agway's revenues, its cost

18   of goods sold, the various fees in Agway's total cost

19   and the time period in question.

20         Q.      Can you specifically point me to those,

21   please, in your report?

22         A.      So Table I lists the utilities that I

23   considered; Table II lists the time period where I

24   pulled the revenues; the cost of goods sold, that's

25   listed on Page 10; on Page 11 I identified the

Page 145

1    NYSERDA fee, the New York State Energy Research and

2    Development Authority; the gross receipt tax, the

3    direct emergency charge, or the HESS charge and

4    overhead expenses, which I then provide in more

5    detail in Table III, and then in Table IV where I

6    report the various cases, the no margin introductory

7    rate margin, the 5 percent and the 10 percent margin

8    cases, those are described on Page 13.

9         Q.    Okay.  And perhaps, my question was less

10   clear than I thought it was.  I follow your tables.

11   My question, you said under various assumptions. Is

12   that -- these appear to be listings of things so what

13   is that, what are the examples of the assumptions

14   that are set forth in Table I?

15        A.    The assumptions of which utilities that

16   I, that -- which Agway customers were affiliated with

17   which utilities that I considered.

18        Q.    Okay.  Do you happen to know if you've

19   listed any utilities that aren't in New York or

20   Pennsylvania?

21        A.    I didn't check to see if I listed them

22   all.  I pulled these names based on the data I looked

23   at for Agway.

24        Q.    So your assumption for Table I was that

25   these are the applicable utilities for the purposes

Page 146

1   of this report?

2        A.    Yes, based on the, the Agway discovery

3   data that I looked at.

4        Q.    And then for Table II, your assumption is

5   that those are the sale and cost of goods funds?  I'm

6   trying to get at the answer, you had answered -- your

7   report says "under various assumptions" and I asked

8   you if those were assumptions and then you went

9   through these.  I'm just trying to explore how these

10  are the assumptions, the various assumptions in your

11  report?

12       A.    Right. So in order to calculate the

13  overcharges, I needed to know how much Agway, the

14  revenue for a particular month and utility for the

15  aggregated set of customers, the number of units

16  sold, the cost of goods sold and in Table II

17  identified where I pulled those numerical values

18  from.

19       Q.    Okay.  And then the same thing on the

20  next page where you mentioned the NYSERDA fee, the

21  gross receipts tax, the direct energy charge,

22  correct?

23       A.    That's right.

24       Q.    So before in the items I just listed,

25  your sentence in your report is, "I have been

1   informed by plaintiff's counsel that Agway had the
2   following costs in addition to its cost of goods
3   sold."  Correct?
4           A.      Yes.
5           Q.      How was that conveyed to you?
6           A.      It was conveyed a telephone call and
7   based on a summary --
8   (Discussion was held off the record.)
9           Q.      I believe my question was asking you how
10  was this information conveyed to you and you started
11  to answer, but I don't remember exactly where you
12  stopped answering.
13              MR. BLANKINSHIP: Cindy, can you read back
14  what you got for his answer?
15      (Thereupon, the Reporter read the requested
16  portion.)
17          A.      -- of depositions that was provided in
18  the email to me.
19          Q.      By whom?
20          A.      By Chantal, I believe.
21          Q.      In Note 10 of your report, which should
22  be on Page 8, in Note 10 of your report, it says, "I
23  identified 'variable rate customers' in the relevant
24  spreadsheets provided by Agway as any class of
25  customer that Agway used the term variable in its

Page 148

```
1    description such as variable."  Did I read that
2    correctly?
3         A.     Yes.
4              MR. BLANKINSHIP: You didn't read the
5    whole sentence.
6              MR. COYLE:  I'm sorry, I thought that was
7    the next footnote.  Thank you, Mr. Blankinship.
8         Q.    It then continues:  "'Daily variable,
9    variable price,' 'fixed to variable' and 'fixed to
10   variable priced.' I did not 'variable sensitive,'
11   which is an employee discount product.  I did not
12   include 'green variables'" and "green variables" in
13   quotes, "transactions."
14              MR. COYLE:  Thank you.  I thought that
15   was the next footnote, my apologies.
16        Q.    So why did you exclude green variable
17   customers?
18        A.    Because they may have provided an
19   additional green value that's not in the price to
20   compare and also, I didn't, I don't think I had data
21   on the cost, the additional cost of goods sold to
22   Agway for "greening" their electricity sales.
23        Q.    Did you ask for such data?
24        A.    I believe I did and was told it was not
25   available, but I don't, I'm not a hundred percent
```

Page 149

1    sure of that recollection.

2         Q.    Okay.  Let me flip a document for a

3    moment here.  We'll go to the disclosure statement,

4    Agway 6, Exhibit 6 for identification.  Let me try to

5    zoom in -- do you have this in front of you, Exhibit

6    6, the Residential Customer Disclosure Statement?

7         A.    Do I?  I thought --

8         Q.    Yes.

9         A.    Yes, I do, I'm sorry.

10        Q.    So in Section, in the table, the second

11   row of the table it has kept it as a recitation of

12   factors that are included in the electric variable

13   rate.  Do you see those?

14        A.    Yes.

15        Q.    Okay. I'll just read this and then I'll

16   ask you follow-up questions.  At the last portion of

17   the second line, second table row at the top of

18   Exhibit 6 it says, "The electric variable rate shall

19   each month reflect the cost of electricity acquired

20   by Agway from all sources (including energy,

21   capacity, settlement, ancillaries) related

22   transmission and distribution charges and other

23   market-related factors, plus all applicable taxes,

24   fees, charges and other assessments and Agway's costs

25   expenses and margins."  Did I read that correctly?

Page 150

1       A.      Yes.

2       Q.      I want to go through these one by one and

3  just know that that's not a question specifically

4  directed to you.

5             What is your understanding of the energy

6  costs from Agway?  And we are going through these in

7  order in the paragraphs.

8             MR. BLANKINSHIP: Objection, vague.

9       A.      My understanding the cost of goods

10 sold --

11            MR. BLANKINSHIP: Dr. Felder, I can't hear

12 you.

13            MR. COYLE: I could hear you low.

14            THE WITNESS:  Can you hear me now.

15 (Discussion was held off the record.)

16      A.      So the cost of the goods sold that I used

17 from Agway should reflect the energy, capacity,

18 settlement and ancillary and charges to delivery to

19 that zone for that utility.

20            MR. COYLE:  I'm hearing an echo.  I don't

21 know if others are as well.

22 (Discussion was held off the record.)

23      A.      The cost of the goods sold includes the

24 energy, capacity, settlement and ancillaries and to

25 the extent relevant, transmission and distribution

Page 151

1  charges and other market-related factors so that's
2  the cost of goods sold I used to cover those items.
3      Q.    Okay. Can you separately break down what
4  are the other components of it?  What are the
5  capacity, settlement, and ancillary portions of that?
6      A.    Those were not provided and I looked at,
7  I just used the aggregated cost of goods sold that
8  contained those components.
9      Q.    So if I understand this correctly, you
10 looked at what Agway calculated its cost of goods
11 sold were and that's what you are reading in as the
12 cost of electricity?
13     A.    Yes.  That's the data they provided,
14 that's the data I used.
15     Q.    Well, I'd say it's the data you used, I
16 mean, I don't, I don't know if you could say it's the
17 data you provided, because you didn't look at the
18 300,000 documents that were provided, correct?
19         MR. BLANKINSHIP: I'm going to object.
20 That's argumentative, mischaracterizes his testimony.
21     A.    I identified the cost of goods sold data
22 that I used.
23     Q.    Okay.  But your actual testimony is
24 that's the only data that Agway provided and I'm
25 asking what's your basis for saying that?

1      A.      I didn't say the word "only," I just, the

2   cost of goods data that I used is, I applied that to

3   the energy, capacity, settlement, and ancillary and

4   any applicable transmission and distribution charges.

5      Q.      Okay. So with respect to the end, later

6   part of that list, charges or other assessments, do

7   you see that portion of the calculation?

8      A.      Yes.

9      Q.      So what does that comprise of?

10     A.      Well, I --

11             MR. BLANKINSHIP: Objection.

12             MR. COYLE:  Sorry, Mr. Blankinship, we

13   couldn't hear your objection.

14             MR. BLANKINSHIP: Sorry.  I said that was

15   a vague question.

16     A.      So I used the EnergyGuard numbers that I

17   described and I used, and that was part of a broader

18   set of expenses and costs that I put under the

19   category of GNA, general administrative or other

20   expenses.

21     Q.      So which of these factors would the

22   EnergyGuard costs factor into?

23             MR. BLANKINSHIP: Objection, lack of

24   foundation.

25     A.      Agway's costs.

1      Q.     Okay.  Did you include in your

2  calculations any other values for EnergyGuard other

3  than its direct costs for repairs?

4      A.     No, I did not.  I would say the

5  EnergyGuard costs that I used, my understanding is

6  that, that number or monthly numbers that I

7  tabulated, but the final number includes EnergyGuard

8  to both fixed and variable, but I applied the whole

9  number to variable sales.

10     Q.     Globally speaking, when you were doing

11 your calculations did you include the introductory

12 rate periods of charges for variable rate customers?

13            MR. BLANKINSHIP: Objection, vague.

14     A.     No, I did not.

15     Q.     Why not?

16     A.     I would have to double-check my file, but

17 unless it said, you know, variable, as I described in

18 my testimony.

19     Q.     Okay.  Would you agree generally, that a

20 customer who enrolls with Agway's variable rate is

21 charged an introductory rate for a period of time?

22     A.     Yes.  I stated so in my testimony.

23     Q.     And then they are charged Agway's

24 variable rate, correct?

25     A.     That's right.

Page 154

```
 1        Q.     And your calculation excludes the, the

 2   introductory period?

 3               MR. BLANKINSHIP: Objection, asked and

 4   answered.

 5        A.     Something's going on with my computer, I

 6   apologize.  I do not believe I included the

 7   introductory period --

 8        Q.     Do you know if -- okay.  I apologize, I

 9   thought you were done.

10               Do you know if any customers enrolled

11   with Agway's service and discontinued after the

12   introductory period?

13        A.     I didn't check one way or the other.

14        Q.     When you are answering this question, you

15   seem to be looking at a document.  Can you tell me

16   what you are actually looking at?  Are you looking at

17   the customer disclosure statement or something else?

18        A.     I was just trying to pull up the -- I was

19   just bouncing between reports, but I was trying to

20   pull up my Excel spreadsheet.

21        Q.     Exhibit 3?

22        A.     Exhibit 3, but for some reason, so we can

23   wait until we get there.

24        Q.     It takes a while to load, depending

25   upon --
```

1         A.     Yeah, so.

2         Q.     Okay.  So I believe my question was --

3    and I apologize that I stepped on my question and I

4    asked you another question -- do you know if any of

5    the Agway customers enrolled, received the

6    introductory rate and then dropped?

7         A.     I don't know one way or the other if they

8    did or didn't.

9         Q.     Is that something that sounds relevant to

10   you for calculating the amounts of damages?

11        A.     Well, no, because I calculated damages on

12   a monthly basis so if an introductory customer should

13   be part of the, the class, then they would, for those

14   months, if they then dropped off after the

15   introductory period or two months after the next, the

16   subsequent months would pick up or not pick up as

17   appropriate, those, those calculations.

18        Q.     As you sit here today, do you know if

19   those customers who where on an introductory rate

20   were classified in those months as variable rate or

21   fixed rate or anything else?

22        A.     I'm just looking for the footnote where I

23   described which customers that I included.

24        Q.     It might be Footnote 10.

25        A.     10, yeah.  So none of those have the

1   phrase "introductory" in them.

2        Q.     Right.  But do you know what phrase Agway

3   uses for the introductory period customers?

4        A.     I would assume, something with the phrase

5   "introductory period" or the equivalent.

6        Q.     Why would you make that assumption?

7        A.     In order to distinguish it from -- now --

8   from other customers.  I mean, they did have when you

9   go through the data, the aggregate data and the

10  detail, they'll have like "introductory period" and

11  that's how I pulled the introductory margin so it's

12  identified in the underlying data.

13       Q.     Okay.  But you pulled that out for your

14  calculations here in Section 3?

15       A.     Yes, except to when I calculated what the

16  margin was for introductory customers.

17       Q.     I know we discussed this earlier, but we

18  had, I know you said you did not, you testified you

19  did not read the complaint.  Do you have an

20  understanding as to what the scope of the proposed

21  class that's set forth in the complaint is?

22            MR. BLANKINSHIP: Objection, asked and

23  answered.

24       A.     No.  My understanding of the scope of a

25  class is it, some, what is related to the time

Page 157

1    period, geography and the utilities that I listed,

2    but that it's still, as I note in my report in

3    Section 7, that's still being determined, is my

4    understanding.

5         Q.    In the course of doing your calculations

6    for overcharges, I note that according to your table,

7    there were some months where the utility price was

8    higher that you calculated than the ESCO price, than

9    Agway's price, correct?

10        A.    Yes.

11        Q.    It appears to me that you then did not

12   include that negative amount in calculating how much

13   Agway overcharged its customers; is that correct?

14        A.    That's correct.

15        Q.    Why did you do that?

16        A.    We were referring to Page 12 and 13 of my

17   testimony, just for reference, and as I state there

18   is, I call those negative overcharges and given the,

19   the customer welcome letter and the conditions, the

20   what we've been calling the terms and conditions or

21   the disclosure statement and the fact that the

22   variable rate is then on a monthly basis, that I only

23   included the times on the overcharges were positive;

24   in other words, when a customer paid more than my

25   benchmark, because that was the, the agreement that

Page 158

1    they had with Agway.

2         Q.    Who had with Agway?

3         A.    The customer.

4         Q.    The customer?

5         A.    Variable customers.

6         Q.    So let me ask you a question.  If in

7    month A, August, I'm charged, I'm on Agway and I'm

8    charged $5 less than what I would have been on my

9    utility and in the next month I'm charged $4 more

10   than I would have been on the utility, your opinion

11   is that in the aggregate, I have been, I have been

12   overcharged, Agway overcharged me $4 more than if I

13   had been on the utility?

14        MR. BLANKINSHIP: Objection, incomplete

15   hypothetical, lack of foundation and mischaracterizes

16   his testimony, compound.

17        A.    I looked at each month individually and

18   as I say on Page 12 and 13, the plaintiff was

19   promised a competitive monthly variable price and so

20   I looked at each month individually and asked whether

21   or not they were, depending on the different

22   benchmarks I used and cases, to calculate the

23   overcharge so that's correct, I would only have

24   looked at the month where they were overcharged $4.

25   They were promised, in my understanding or committed

1    to that bargain for that month.  The fact that in a

2    prior month or in a subsequent month is not relevant.

3         Q.     Was that limitation on your calculations

4    requested to be by plaintiff?

5              MR. BLANKINSHIP: Objection, scope.

6         A.     I've not talked to the plaintiff.

7         Q.     I apologize.  Was that limitation

8    requested of you by plaintiff's counsel?

9              MR. BLANKINSHIP: Objection.

10        A.     No.  I raised the issue.

11        Q.     So if you made a subjective

12   determination, there's a couple of elements, one is

13   that you made a determination that the price charged

14   by Agway in a certain month was not competitive

15   market based and if you made that calculation, you

16   included it, but if you found a month that you

17   figured that it was competitive market based, you

18   excluded it, correct?

19              MR. BLANKINSHIP: Objection.  That's

20   vague, compound, and mischaracterizes his testimony.

21        A.     I think I have been clear.  I wouldn't

22   call it a subjective judgment at all. It's based on

23   the history of deregulation that I identified in my

24   testimony, it's based on the New York Public Service

25   Commission report that we discussed and other similar

Page 160

1    reports from other jurisdictions, it's based on the

2    terminology "price to compare" on that part of the

3    analysis and it's based on the bold statement at the

4    very top of Agway's welcome letter where it, which I

5    quote in the report, "You will receive a competitive

6    monthly variable price starting with your next

7    scheduled meter reading." So that's the basis of my

8    calculation.

9         Q.    Okay.  Competitive means what to you?

10        A.    That there wasn't a similar alternative

11   that, so a similar alternative at the same or lower

12   price.

13        Q.    So what did you use the comparative for

14   making that determination?  What other ESCO prices?

15             MR. BLANKINSHIP: Objection, lack of

16   foundation, mischaracterizes his testimony, outside

17   the scope of his report.

18        A.    Well, first of all, the welcome letter

19   says the "competitive monthly variable price" so I

20   used the utility price to compare, which is

21   consistent with the four or five things I just laid

22   out.  Secondly, the actual terms and conditions, in

23   fact, I just read them into the record at your

24   request, talk about Agway's costs and we went through

25   that list and based on the data provided by Agway, I

Page 161

1    compiled those costs and so those are the benchmarks
2    that I used.
3          Q.     Okay.  Did Central Hudson, I know we said
4    this before, did Central Hudson extend an
5    EnergyGuard-like service product to Ms. Gonzales if
6    she stayed on the --
7          A.     Yes.
8                 MR. BLANKINSHIP:  Objection --
9        (Discussion was held off the record and the
10   Reporter read the partial question.)
11         Q.     -- default service?
12       (Discussion was held off the record and the
13   Reporter read the question.)
14                MR. BLANKINSHIP:  Objection, asked and
15   answered
16         A.     I believe I've answered that question,
17   but I do not know if they did or did not, but I don't
18   think they did.
19         Q.     Did you investigate as to whether or not
20   they did?
21                MR. BLANKINSHIP: Same objection.
22         A.     No, I didn't.
23         Q.     Do you feel it makes economic sense to
24   compare the rates charges by one ESCO that gives you
25   electricity, with another ESCO that gives you

Page 162

1   electricity plus EnergyGuard?

2              MR. BLANKINSHIP: Objection, outside the

3   scope, incomplete hypothetical.

4        A.    I did do that analysis.  I completed the

5   cost of EnergyGuard in my analysis and the

6   assumptions that we've been discussing and it's --

7   yes, so I did include that.

8        Q.    Well, you included the cost of energy,

9   but let me ask you a different question. Did you

10  include any value for EnergyGuard?

11       A.    The value I assigned to EnergyGuard was

12  its cost, which is consistent with the Public Service

13  Commission.  In fact, I over-assigned the value of

14  EnergyGuard or the cost of EnergyGuard, because I

15  included both fixed and variable costs associated

16  with EnergyGuard into my analysis.

17       Q.    When you say consistent with the PSC, I

18  guess we are going to have to beg to differ as to

19  what Reset Order 2 says, but --

20             MR. BLANKINSHIP: Objection,

21  argumentative.

22             MR. COYLE: That's fine.

23       Q.    You did not include a separate --

24  withdrawn.

25             Let me ask this question differently. Did

Page 163

1   you do any surveys of Agway's customers to find out
2   whether they had a value to them of EnergyGuard?
3              MR. BLANKINSHIP: Objection, scope.
4       A.    No, I did not.
5       Q.    Do you know if Agway has done that?
6              MR. BLANKINSHIP: Same objection.
7       A.    I don't know if they have or haven't.
8       Q.    Have you done any value in the
9   marketplace about what value customers apply to any
10  warranty product?
11             MR. BLANKINSHIP: Same objections.
12      A.    I've looked at what the New York Public
13  Service Commission did in their filings that we've
14  discussed, the order, the Reset Order and I also,
15  but no, I have not done any independent analysis on
16  my own.
17      Q.    In the course of your professional career
18  at any point in time, did you look into how customers
19  value warranty products?
20             MR. BLANKINSHIP: Objection.
21      A.    Not beyond myself and the anecdotal
22  evidence that we talked about I think before lunch.
23      Q.    And your purpose, your value was you
24  looked at the costs of the proposed warranty for
25  PSE&G and the proposed benefits and you determined

1  that for whatever reason, for you, the costs did not,

2  the costs outweighed the benefits of whatever your

3  calculation is, correct?

4       A.     That's right.

5              MR. BLANKINSHIP: Objection, scope.

6       A.     That's right.

7       Q.     But you have done nothing to determine

8  what value customers of Agway put on EnergyGuard,

9  correct?

10             MR. BLANKINSHIP:  Objection, asked and

11 answered, scope.

12      A.     That's correct.

13      Q.     I believe, I know you, your comment, you

14 just referenced your comment from before lunch.  Have

15 you ever purchased any extended warranties yourself?

16             MR. BLANKINSHIP: Objection, scope, asked

17 and answered.

18      A.     I believe so on, I think it's on a

19 question like on Apple products extended warranty,

20 yes, I do do that.

21      Q.     In those particular instances, you made a

22 determination that the cost did not exceed the value

23 to you?

24             MR. BLANKINSHIP: Same objections.

25      A.     Well, my wife made that determination so

Page 165

1    maybe I should, if you are asking for myself, but

2    yes, if we purchased, I think, maybe early in my life

3    I feel like, for an appliance and then I did -- it's

4    not something I do frequently outside of the Apple

5    products.

6          Q.    Or is it your wife does it on the Apple

7    products, but you don't?

8                MR. BLANKINSHIP: Same objections.

9          A.    She's upstairs, I can bring her down, we

10   can have a family discussion.

11         Q.    There's no need for that.

12         A.    I would agree.

13         Q.    Okay.  Back to your report, less than

14   Apple.  You talk about setting reasonable margins, do

15   you recall that on Page 8 through 9 of your report?

16               MR. BLANKINSHIP: I'm just pulling it up,

17   so.

18         Q.    I guess it's not Page 8 through 9.

19         A.    What page are you referring to?

20         Q.    I apologize, I have the wrong note down.

21   It points -- here you go.

22               Page 13, can you explain your overcharges

23   calculation, Table IV?

24         A.    Yes.

25         Q.    Sorry, go ahead.  I didn't mean to talk

Page 166

1    over you.

2            A.      Please ask a specific question, because

3    I'm hunting for the term "reasonable" and I'm not

4    sure where in the report you are referring to.

5            Q.      Okay.  It's perhaps, you didn't use it.

6    What did you consider to be a permissible rate of

7    return for Agway?

8                    MR. BLANKINSHIP: Objection, vague.

9            A.      So I looked at margins of 5 and 10

10   percent as part of my analysis.

11           Q.      What is the economic support for use of a

12   5 or 10 percent margin?

13                   MR. BLANKINSHIP: Objection, vague.

14           A.      Both my --

15                   MR. BLANKINSHIP: Scope.

16           A.      Both my experience in the industry when I

17   was working for an ESCO, what I have seen in other

18   cases and also based on my price to compare analysis,

19   which it also informed the cost of goods analysis,

20   what I mean, the, Agway's total cost analysis.

21           Q.      Okay.  And I know we've said this, I just

22   want to make sure, because it's referenced here on

23   the two columns in Table IV.  The only value you

24   assigned for EnergyGuard was its costs, whether those

25   costs were included in your calculations, correct?

1          MR. BLANKINSHIP: Objection.

2     A.     Yes.  The costs for EnergyGuard for those

3  fixed and variable customers, I added all of it in.

4     Q.     Okay.  Have you calculated any other ESCO

5  profit margins in New York at anytime?

6     A.     If you mean by -- yes, profit margin

7  margins, yes.

8     Q.     In connection with this report or in

9  connection with something else?

10     A.     In connection with something else.

11     Q.     In connection with another expert report

12  you prepared?

13     A.     Yes.

14     Q.     Do you have an understanding as you sit

15  here today, what is, what are the spread of profit

16  margins for ESCO's in New York in 2020?

17     A.     I, well, first, ESCO's tend to keep their

18  data confidential, for obviously commercial reasons

19  and other reasons. Those calculations I did, I would

20  have to check, they were a couple of years ago,

21  several years ago.

22     Q.     So would your answer be no?

23     A.     I'm sorry, that's right.  I have not

24  looked at any, I have not seen any 2020 data.  If

25  Agway would like to provide it, that would be, I

1    would take a look at it.  I'm not sure it's relevant

2    though, but so.

3        Q.    Well, let's leave the objections to Mr.

4    Blankinship.

5        A.    Okay.  I'm sorry, I didn't mean it that

6    way, I just -- so no, I have not looked at any 2020

7    ESCO margins.

8            MR. BLANKINSHIP: I'm going to object to

9    your colloquy there, Mr. Coyle.  That wasn't an

10   objection.  He was explaining his views on --

11       Q.    Okay.  Then I withdraw that.

12            Okay. So you don't think  that the price

13   and the profit margins of other ESCO's is relevant to

14   your analysis?

15       A.    Well, for the price to compare analysis,

16   no, because the idea is that's the benchmark that an

17   ESCO or comparable good be providing or less.  In

18   fact, the point of point of restructuring as we've

19   gone on, or I've gone on, is to do that.  With

20   respect to the cost of goods service analysis and I

21   include it in expenses and other factors, I think the

22   issue is, is whether or not Agway was charging its

23   costs or fees, etcetera, based on the contract that

24   we've read from.

25       Q.    Do you have the disclosure, the customer

Page 169

1  disclosure statement open?

2      A.    I do now.

3      Q.    Okay.  In that pricing section in the

4  table that we are reading from, do you see anything

5  that indicates that savings over the utility price

6  are not guaranteed to a customer?

7      A.    As I said in my report, that's reference

8  from an introductory level from the very top of the

9  letter in bold.

10      Q.    Other than that, in this customer

11  disclosure statement, is that referenced there at

12  all?

13          MR. BLANKINSHIP: Objection, vague.

14      A.    I recall this was the document that we

15  coupled, that we went back and forth with the

16  introductory level, but no.  In that table it does

17  not have the wording that's at the top of the

18  introductory letter, but I could double-check to make

19  sure.

20      Q.    I'll draw your attention to one of the

21  portions of it.  The last row in the table, the top

22  of Exhibit 6 on the left it says, "Conditions under

23  which savings to the customer are guaranteed" and on

24  the right it says, "Savings are NOT guaranteed" and

25  "NOT" is in all caps in bold, do you see that?

1      A.     Yes.

2      Q.     So when I asked you the question of would

3  you say that the customer disclosure statement makes

4  any representation as to whether or not savings are

5  guaranteed, would you like to amend your prior

6  answer?

7              MR. BLANKINSHIP: Objection.

8      A.     No.  Because it's part of -- the basis

9  for that is the phrase I said on the introductory

10  level and we went through this morning where you

11  married the introductory letter with this two-pager

12  and with the agenda on the Agway EnergyGuard so if

13  you want me to say is the last row, Exhibit 6, the

14  first page, "Savings are not guaranteed," you are

15  right that that's stated in that table.

16      Q.     Well, you say I married the two together.

17  Do you disagree with marrying those together?

18      A.     No, which is why I'm examining them in

19  the entirety.

20      Q.     Okay.  So going back to what we were just

21  talking about a moment ago, what did you use as a

22  basis for you setting a 5 percent margin on Table --

23  I lost the table -- Table IV?

24      A.     I'm just pulling up Table IV.  I think I

25  described that, but the basis is my experience in the

1    industry, as a consultant, as part of litigation, as

2    being involved in the energy service industry, that's

3    the basis for using a margin of both 5 and 10 percent

4    and the fact that even with those margins, if Agway

5    would have been able to procure electricity at a much

6    lower cost commensurate with the price to compare,

7    they would have made a substantial amount of money.

8         Q.    So other than, I know you said your

9    experience in the industry and your testimony is what

10   your testimony was, I'm not going to paraphrase it,

11   there's not a specific thing that you've pointed to

12   to say what the profit marriage for any other ESCO

13   is?

14              MR. BLANKINSHIP: Objection, asked and

15   answered, scope.

16        A.    As I said for my analysis, which is a

17   two-pronged analysis, it doesn't depend on the margin

18   of another ESCO, it depends on the agreement that we

19   talked about in different manifestations and the

20   utility price to compare and my experience and

21   background in the industry.

22        Q.    Okay.  Would you agree with me, though

23   that the residential customer disclosure statement

24   allows Agway to include its expenses and margins?

25        A.    I can go back and check, but yes, that

Page 172

1    sounds like familiar language.

2          Q.    That actually charges or other

3    assessments in Agway's costs, expenses and margins,

4    that's what I was referring to.

5                MR. BLANKINSHIP:  Objection.

6          A.    Right.  Presumably, there's some limit on

7    the amount of margin they could charge.

8          Q.    What's the limit?

9          A.    Well, I think 5 or 10 percent is a

10   reasonable margin, but I didn't go and draw, do a,

11   you know, a hard line where that limit is.

12         Q.    Well, you just said there should be some

13   limit to it and Questions 5 and 10 are both rather

14   radically different numbers.  What is the, what is

15   the margin that Agway contractually, in your opinion,

16   was obligated to charge?

17               MR. BLANKINSHIP: Objection.  There's no

18   question, that's just a statement.

19               MR. COYLE:  That wasn't a statement.  I

20   said what was, that's why it's a question.

21         Q.    What was the margin that Agway was

22   permitted to charge, question?

23               MR. BLANKINSHIP: Objection, asked and

24   answered.

25         A.    I did a two-pronged analysis based on the

1    clause in the introductory letter, that was a

2    competitive rate, loosely speaking, I mean I

3    summarized it, and there I used the price to compare

4    analysis where Agway made substantial amounts of

5    money and based on Agway's cost of goods sold, plus

6    expenses, and we've gone through the list, I also

7    added a reasonable margin based on my experience of 5

8    and 10 percent and reported the results.

9        Q.    Okay.  We'll let me just ask you this

10   question.  There's a -- I feel like we are going in a

11   circle.  I asked you what is the margin and you've

12   defended what you did let me ask you a question.

13            Can you answer what margin is the most

14   Agway would be permitted to charge?

15            MR. BLANKINSHIP: Objection, asked and

16   answered.

17            MR. COYLE:  I would say, asked.

18            MR. BLANKINSHIP: And now you're just

19   being argumentative.

20       A.    Based on the price to compare analysis,

21   which stems from my whole litany, plus the

22   introductory level, the margin is not an issue.  They

23   should be able to beat the price to compare -- but

24   that feeds into my analysis and then also, a 5 or 10

25   percent, but no, I did not do an analysis and say

Page 174

1    here is the bright line between reasonable and

2    unreasonable margins for acceptable or unacceptable

3    or whatever the term-of-art I should use.

4         Q.    Well, I used "reasonable" before and you

5    said you didn't see "reasonable" in your report,

6    but --

7              MR. BLANKINSHIP:   That mischaracterizes

8    his testimony.

9         A.    Mr. Coyle, that's just not correct.  If I

10   may, I said I was looking for the word "reasonable"

11   in my report.  I was trying to respond to your

12   question with having the document and the phrase in

13   front of me.  I did use the word "reasonable" in my

14   report, but when I said to you I was looking for it,

15   I was trying to make sure I have the material in

16   front of me so I can answer your question.

17        Q.    Okay.  On Page 14, I guess, I was going

18   to say it's on Page 14 of your report and if you need

19   a moment to pull it up.

20        A.    No.  I'm there.

21        Q.    Okay.  You did say, "reasonable margins

22   of 5 or 10 percent," correct?

23        A.    Yes.  Right above Section 4, although,

24   the Agway contract not for including a margin, a

25   large amount of the overcharges even after

1  considerable reasonable margins of 5 and 10 percent,

2  indicate that Agway is not charging its rates based

3  on its costs.

4         Q.    Would 15 percent have been a reasonable

5  margin?

6              MR. BLANKINSHIP: Objection, scope.

7         A.    I believe 5 and 10 percent are a

8  reasonable margin.  I also believe beating the price

9  to compare and whatever the, that implicit margin is,

10  it is a reasonable margin, but I'm not determined

11  that 15 percent or 14.2 percent are reasonable

12  margins.

13         Q.    Why not?

14         A.    Because I don't need to for the basis of

15  my report.  I said that I did my calculations and how

16  I did my calculations.  If the legal process tells me

17  to provide a, do calculations of the different

18  margin, as I say in my report, I could do that if

19  requested.

20         Q.    Is that a profit margin that you could

21  have used that would have hit zero for damages under

22  your calculation?

23              MR. BLANKINSHIP: Objection, vague.

24         A.    Mathematically, assuming it's convex,

25  there could be a unique solution.

1      Q.    It looks like at zero margin, you've

2   calculated 30 million and something damages --

3      A.    Yeah.

4      Q.    -- at 5 -- sorry -- at 5 percent you have

5   24, at 10 percent you are at 17, assuming some sort

6   of linearity, maybe eventually, you would drop off to

7   a zero margin?

8      A.    That's right.

9            MR. BLANKINSHIP: Objection.

10     A.    I mean, well, actually, under the cost of

11  goods, you actually did the calculation for me, thank

12  you.  Yeah, for, on Page 15, Table VI, the

13  "overcharge no margin" is the level of damages, are

14  overcharges.  There were potentially additional

15  damages and those are the numbers you just referred

16  to.

17     Q.    Well, that's no margin, as opposed to we

18  are talking about the other one --

19     (Discussion was held off the record and the

20  Reporter read the partial question.)

21           MR. COYLE:  -- no marriage as opposed to

22  much larger margin and that's when Dr. Felder

23  responded.

24     A.    Yes, that's right.  No problem, I wasn't

25  trying to be, I am who I am at this hour.  That's

1   right.  I could have backed out or someone could have

2   backed out the implicit margin at zero overcharges,

3   depending on how I calculated, yes, sir.

4         Q.    So right now, if I understand this

5   correctly, and I think we can wrap this piece over,

6   is that you have not calculated what's the maximum

7   reasonable margin that Agway could have charged

8   consistent with its documents?

9             MR. BLANKINSHIP: Objection, asked and

10  answered, mischaracterizes his testimony.

11        A.    That's right.  I just did my analysis for

12  the cost piece at 5 or 10 percent margin, that's

13  right.

14            THE WITNESS:  At some point can we do a

15  break?  It doesn't have to be immediately, but a

16  bathroom break?

17            MR. COYLE: It's not an endurance contest

18  so if you want to take five, let's go take five.  Do

19  you want to take ten, take a brief break?

20            MR. BLANKINSHIP:  Yes, five minutes is

21  fine.  Thank you so much.

22            MR. COYLE: We are going to go off the

23  record for the reporter.

24  (Recess:  3:37 p.m. to 3:42 p.m.)

25            THE VIDEOGRAPHER:  We are on the video

1    record.  The time is 3:42.

2        Q.    I'm going to try to use my time more

3    productively and cut things out here.

4            Okay.  I believe your report indicates

5    and your testimony of such, that you referenced

6    Agway's COGS calculations.  That's something you

7    included in your calculations?

8        A.    Yes.

9        Q.    And I can pull some of them up, but would

10   it be generally, my understanding of your report,

11   sorry, let me ask the question and restart this.

12           You used the numbers that Agway

13   calculated rather than line-iteming it and

14   recalculating it yourself, correct?

15       A.    That's right.  I used the numbers in the

16   table from the Bates files that I referenced in Table

17   II, that's correct, sir.

18   (Discussion was held off the record.)

19       Q.    Okay.  I know I was asking you questions

20   about Agway's COGS.  Do you consider the expenses

21   that were listed on those, those P&L statements to be

22   properly includible under Agway's contract?

23       A.    Yes.  That's why I included them, as I

24   described in my testimony, yes.

25       Q.    Okay.  In your analysis did you factor in

1    the cost of capital for Agway?

2                MR. BLANKINSHIP: Objection, vague.

3        A.    To the extent those costs were reflected

4    in the P&L, such as service on debt or so forth, they

5    would be included.

6        Q.    If I was to make a representation for you

7    that Patricia Robinson testified that none of the

8    cost categories included cost of capital, I'll make

9    that representation, if it's correct, it's correct

10   we'll let that be, is that something that you are

11   familiar with calculating, cost of capital?

12       A.    Yes.

13               MR. BLANKINSHIP: Objection, vague.

14       Q.    And subject to Ms. Robinson's statement,

15   correct, that it's not included on the P&L statement,

16   is that something that you feel would have been

17   properly chargeable by Agway to customers under the

18   agreement?

19               MR. BLANKINSHIP: Same objection.

20       A.    It's not identified within the,

21   explicitly as the cost of capital, to the extent the

22   term "margin" included, includes that concept, then I

23   did when I included a 5 or 10 percent margin.

24       Q.    Perhaps, my question was looking for more

25   of a fine answer to the question.  Maybe it's just

Page 180

1    the nature of the question.

2              Is the cost of capital in and of itself,

3    a component that Agway would be permissible to

4    include in its COGS under the agreement?

5         A.    It would show up as part of their margin.

6         Q.    Those are actually two different

7    questions.  I'm asking you to forget what's on the

8    COGS sheet, right?  Is the cost of capital something

9    that has economic meaning?

10        A.    Yes.

11        Q.    Is the cost of capital something that

12   Agway could have charged or included in its pricing

13   formula, in your opinion?

14        A.    As part of the margin, yes.

15        Q.    And as I believe your testimony was that

16   to the extent that that's something that's

17   permissibly included, you haven't -- it's subsumed

18   within your 5 to 10 percent calculation?

19        A.    That's right, for the cost analysis.

20        Q.    Even though, that would -- I'm sorry, go

21   ahead.

22        A.    Although, I say in my testimony, there's

23   no, the price to compare analysis, the whole point as

24   I described in my testimony and then emphasized in

25   the price to compare analysis, is that ESCO's are not

Page 181

```
 1    guaranteed a particular profit margin cost of
 2    capital.  I realize there's an economic distinction
 3    we can go into if you like, and part of a motivation,
 4    a major motivation to switch to "deregulation" was to
 5    not have this guaranteed cost to capital, loosely
 6    speaking, people may call that profit so that was
 7    part of the motivation behind the regulatory shift I
 8    described.
 9         Q.    So for example, in your Table IV with 5
10    percent or 10 percent margin, if you assigned a
11    factor for cost of capital, it would just lower that
12    margin number slightly or depending upon whatever
13    that cost of capital was?
14              MR. BLANKINSHIP: Objection,
15    mischaracterizes his testimony.
16         A.    I would have to -- so the way I did that
17    calculation, I took all of Agway's costs as provided
18    by Agway and then added on a margin, a profit margin
19    that would reflect a equilibrium over a long period
20    of time, the cost of capital of the industry, not of
21    Agway in particular, if we are going to be precise
22    about this.
23         Q.    Okay.  And with respect to your zero
24    margin line, that would have ascribed zero to that?
25         A.    That's right.  It would have just
```

Page 182

1    recovered its, its costs, that's right.
2         Q.    Are you familiar with the concept of
3    economic profit?
4         A.    Yes.
5         Q.    What's the difference -- are you also
6    familiar with the concept of accounting profit?
7         A.    Yes.
8         Q.    What's the difference between those, in
9    your opinion?
10             MR. BLANKINSHIP: Object to the scope.
11        A.    Sometimes my prior statement gets into
12   that.  So economists talk about the cost to capital.
13   That's the costs like labor inputs and so forth. They
14   then refer to profit as any return above the cost of
15   the capital so that will be economic profit sometimes
16   called rent, economic rent.  So in the utility world,
17   which is where my background is in, a utilities cost
18   of capital, based on their debt, their percent debt,
19   type of debt, their equity, their percent of equity,
20   basically, their financial structure times the
21   associated cost of debt, cost of equity, pulled in
22   together are called the weighted average cost of
23   capital, so that would sometimes, or loosely, people
24   would just say profit.  So if a utility's cost of
25   capital is 12 percent and they've earned through the

1  accounting, now there are different accountings for

2  taxes, there's accounting for reporting to the SEC or

3  whoever someone reports the financial to, but the

4  accounting, if they also accounting wise for that

5  period, had a return of 12 percent, their net profit,

6  an economist would say their profit was zero, their

7  economic cost of capital was the same as their

8  accounting cost of capital, using the right one, you

9  and you may say, a person would say, well, they

10  earned 12 percent, that was their profit, but they

11  are really referring to their cost of capital.

12        Q.    The 12 percent -- I'm sorry were you

13  finished?

14        A.    Yes.

15        Q.    The 12 percent would be like an

16  accounting profit, as opposed to the zero and your

17  hypothetical would be the economic profit?

18        A.    Yes.

19        Q.    Do you have an understanding whether the

20  COGS calculation that you relied on was an economic

21  or accounting profit margin?

22        A.    The COGS calculation should be an

23  economic one.  It is based on the -- well, primarily,

24  for the P&L piece, the data I was provided, am I

25  being clear when I refer to the P&L piece?

Page 184

1      Q.      You are.  We can pull one up if you like.

2   I think I said, I think I meant to reference the P&L.

3   If I referenced something else -- let me rephrase the

4   question.  I didn't mean to step on you.

5              For the purposes of the P&L, the P&L

6   reports that you used for your analysis here, do you

7   have an understanding as to whether or not that is an

8   accounting profit or an economic profit calculation?

9      A.      I assume, because it was a P&L, it was

10  accounting based, but for the purposes of my

11  calculation, I assumed it, it reflected the

12  underlying economic, at least in aggregate.

13     Q.      If you -- if as I represented at the

14  beginning of this and according to Patricia Robinson,

15  the cost of capital was not included in that, would

16  that just confirm to you that that differentiated

17  between a accounting profit sheet, as opposed to an

18  economic profit?

19     A.      Yes.  Although, I've seen accounting

20  profit and P&L statements where they include the cost

21  of that service and then obviously, it's part of your

22  cost of capital.

23     Q.      But that's not listed here?

24     A.      I'm taking your stipulation, but that's

25  correct, yes.  But the cost of goods sold piece is

Page 185

```
1    either that, the economic policy was I think that was
2    the cost that HESS or Direct Energy was charging for
3    the provision of electricity and then the revenues
4    are the revenues based on the invoices aggregated, as
5    we discussed, that they collect not related to the
6    invoice so there may be some lag and if it crosses
7    accounting years, it has that implication, but yes,
8    that summarizes what I, my thoughts on this.
9         Q.    Brief question, only because you
10   reference it, do you have an understanding whether
11   Direct Energy is ESCO competitor in the New York
12   marketplace?
13             MR. BLANKINSHIP: Objection, scope.
14        A.    I assume, you mean a competitor to Agway.
15        Q.    Let me rephrase and write, and read a
16   better question.  Do you have an understanding
17   whether Direct Energy is an ESCO servicing
18   residential customers in the New York market?
19             MR. BLANKINSHIP: Same objection.
20        A.    I believe they do, but I don't know if
21   they are servicing them today or what type of
22   customers if they are.  I haven't looked into that
23   recently.
24        Q.    Would it be fair to say that they
25   serviced customers at some point in the class range
```

1    that you've done from 2011 to 2019?

2              MR. BLANKINSHIP: Same objection, asked

3    and answered.

4         A.    I don't know one way or the other. I

5    wouldn't be surprised.  I've done some work for

6    Direct Energy in the past so that would sound

7    reasonable, but I haven't checked.

8         Q.    Do you happen to know if Direct Energy

9    offers New York residential customers a warranty or

10   EnergyGuard type program?

11             MR. BLANKINSHIP: Same objections.

12        A.    I don't know if they do or don't.

13        Q.    Although, I guess, you would say we're

14   still under the Google catch-all if you are not aware

15   if anybody does offer that type of program in New

16   York?

17             MR. BLANKINSHIP: Same objections.

18        A.    I don't know one way or the other, if

19   ESCO's offer -- well, apparently, from the Public

20   Service Commission, there are other value products,

21   to what extent they overlap with EnergyGuard, I

22   haven't done, if at all, I can't say.

23        (Discussion was held off the record.)

24        Q.    I would say Reset Order 2 says other

25   ESCO's can apply for approval of an EnergyGuard-like

1  product.  I will represent to you that none have been
2  granted that yet.
3          MR. BLANKINSHIP: Objection, lack of
4  foundation.
5      Q.    It's not a lack of foundation, it's my
6  representation to you.
7      A.    Thank you for that representation.
8          MR. BLANKINSHIP: Same objection.
9      Q.    Have you followed Reset Order 2
10  proceedings after the order was issued?
11      A.    No, I have not.
12      Q.    You mentioned something a few times both
13  in your report and your testimony today.  Now, I'm
14  making parenthetical's.  I could tell you are used to
15  doing administrative procedures, because you keep
16  referencing your report as your testimony.  I think
17  you're referring to your, your pre-file testimony, as
18  opposed to your report.  It's just a slip of what we
19  are doing, of what we are doing here.
20          With respect to the PSC Order, which is
21  Exhibit 10, if you could pull that up for me, please?
22      A.    Okay.
23      Q.    So you referenced a couple times in your
24  report and your testimony today that one of the
25  purposes of deregulation was to allow customers to

1   save money, correct?

2          A.     Yes.

3          Q.     I believe you actually said in your

4   report, and I'll pull the quote, that that's, that's

5   from what the PSC -- that's from the PSC; is that

6   correct?

7          A.     Can you tell me which page of my report?

8          Q.     Yeah.  Page 4 of your report, sir.  I'll

9   find you and read you the quote.  In the first full

10  paragraph on Page 4 you say, "The public policy

11  motivation for allowing retail customers to be able

12  to select their ESCO and not being locked into buying

13  electricity from the utility, was to enable retail

14  customers to lower their costs, compared to what the

15  monopoly utility provided and for retail customers to

16  have more choices."

17               Did I read that correctly?

18         A.     Yes.

19         Q.     Is that something you agree with?

20         A.     Yes, which is why I wrote it in the

21  report.

22         Q.     Okay.  Would it also be fair to say that

23  the Public Service Commission, one of the purposes of

24  deregulation was to allow ESCO's to market products

25  to customers that the utilities could not offer?  I'm

Page 189

1   asking generally and then I'll give you the piece.

2         A.    The line you just quoted says that at the

3   end, "and for retail customers to have more choices."

4         Q.    No.  Actually, I'm sorry, I was asking

5   you not to quote your report.  I know what your

6   report says.  I'm asking you is that, do you believe

7   the PSC, and I guess I'll be less specific.  If you

8   go to Reset Order 2, which is Exhibit 10, please.

9         A.    Okay.

10         Q.    Okay.  In the paragraph at the, Page 44,

11   the full paragraph starting at Page 44.

12         A.    Just give me a second, please. I'm on

13   Page 44.

14         Q.    It says, "The Commission expected that

15   allowing ESCO's to market commodity to customers

16   would lead to product innovation and anticipated that

17   ESCO's would offer products to services to customers

18   that utilities could not offer and that expectation

19   had only been partially fulfilled."  And that's how

20   we go into this other thing, so -- did I read that

21   correctly?

22         A.    Yes.  And then you had some commentary,

23   but yes, you read that correctly.

24         Q.    Stopping at the word "fulfilled," if I

25   narrowed myself to not commentating, that would have

Page 190

1    been the quote from the PSC?

2            A.      Yes.   We agree that you've read those

3    lines correctly.

4            Q.      So looking at that globally, would it be

5    fair to say that one of the purposes of the PSC's

6    deregulation was to inspire innovation in products,

7    correct?

8            A.      Yes.   Yes, as I indicate in my report.

9            Q.      Would you consider EnergyGuard to be one

10   of those such innovations?

11           A.      Well, utilities for a long time in

12   different jurisdiction and by utilities varies, have

13   offered some type of warranty program and I mentioned

14   the one that my utility offers and it's been offering

15   it for me for, ever since I believe I moved here, but

16   subject to check, so I don't know if it's innovation

17   in terms of a new idea.  We've already discussed how

18   I assessed the, the value of that service offering

19   and how I considered it in my testimony, or report.

20           Q.      And I don't want to re-go through all the

21   other testimony you came up with, but it was you

22   looked at all the costs for it, you did not ascribe

23   an independent value, subject on nondependent on the

24   costs?

25                   MR. BLANKINSHIP:  Objection,

1    mischaracterizes his testimony.

2        Q.    I was trying not to go through it all

3    again, I just -- you mentioned you ascribed the value

4    to EnergyGuard in your in your answer just a moment

5    ago and I was saying, earlier you testified that when

6    you were doing your calculations, you did not add any

7    independent value other than the cost, is that true?

8        A.    Any additional value beyond the cost of

9    EnergyGuard, that is correct.  In fact, I overstated

10   the cost of EnergyGuard, because I included the total

11   fee for EnergyGuard that was also applied to fixed

12   rate customers and not just variable rate customers.

13       Q.    Well, I suppose it's only an

14   over-calculation, because you chose to exclude the

15   introductory rate customers from your damages

16   analysis?

17            MR. BLANKINSHIP: Objection,

18   mischaracterizes his testimony.

19       A.    I'm not sure I followed -- you know, to

20   the extent -- I'm not sure I followed -- in and of

21   itself, just in the EnergyGuard topic, in and of

22   itself, it's a statement that I included all the

23   energy costs and my understanding of the number that

24   I applied, some of those costs were to serve fixed

25   rate customers their EnergyGuard warranty or service.

1          Q.     Those would be customers who were doing

2     their introductory period with Agway, submitted a

3     repair bill?

4          A.     Well, but Agway also serves fixed rate

5     customers that aren't on the introductory rate and if

6     they -- I'm not clear on the premise of the question.

7          Q.     Sure.  What is your basis for saying that

8     Agway served fix rate residential customers in New

9     York?

10         A.     Because the total number of kilowatt

11    hours -- well, because in the underlying data there

12    were fixed rate customers, which I didn't include in

13    the analysis.

14         Q.     Do you know if any of the corporate

15    witnesses testified that there were no fixed rate

16    customers in New York currently?

17         A.     If there were no fixed rate customers in

18    New York, then you are right, the EnergyGuard would

19    just apply to the introductory rate piece, but we

20    also -- yes.

21         Q.     I'm looking for one thing, I apologize

22    for the delay.  I apologize, Dr. Felder, it took me a

23    moment to find the document.

24         A.     No problem.

25         Q.     So before we get to the document, I'll

1    just ask you some questions here.  Have you ever read

2    any economic studies that dealt with how consumers

3    deal with unexpected expenses?

4              MR. BLANKINSHIP: Objection, scope.

5         A.    In my graduate course in macroeconomics

6    there was a question on that topic in the first

7    mid-term so I don't know if I read economic, the

8    underlying economic study, but I certainly heard the

9    professor's discussion on that topic.

10        Q.    So is that a mid-term you answered or a

11   mid-term you issued as a professor?

12        A.    No.  This was when I was a student so

13   unfortunately, as a student, the professor gets to

14   ask the question so I was answering the mid-term, I

15   wasn't preparing it. I was taking a class --

16        Q.    I understand.

17        A.    -- in 1993 or so.

18        Q.    Okay.  Are you aware of an annual report

19   for the Board of Governors of the Federal Reserve

20   System addressing this?

21             MR. BLANKINSHIP: Objection, scope.

22        A.    No.  I mean, I assume they issue annual

23   reports, but to the extent, no, I have not looked at

24   any annual reports by the Fed.

25        Q.    By the way, that essay, was it a graduate

Page 194

1    class or an undergraduate?

2            A.      It was a graduate class.

3            Q.      How did you do?

4            A.      To be honest, I screwed up the answer on

5    that question.

6            Q.      What did you, what did you answer?

7                    MR. BLANKINSHIP: Same objection.

8            A.      This is --

9            Q.      As much as you can recall 25 years later.

10           A.      Well, unfortunately, you recall the

11   questions you don't answer correctly, but the

12   question was if someone had an unexpected expense and

13   I think it involved a refrigerator breaking or

14   something, how would that affect their future

15   consumption and my recollection is that the correct

16   answer is that people attenuate their consumption,

17   their expenditures based not only on their individual

18   month, but over their lifetime so if I get a windfall

19   or the reverse, a negative windfall this month of 5

20   percent, I don't reduce my expenses by 5 percent,

21   because I recognize that over, I should look at my

22   lifetime earnings and maybe I'll only reduce my

23   expenditures 2 or 3 percent or whether, or some

24   smaller fraction.  Now, whether that's the right

25   economic answer, I don't know, but I think that was

Page 195

1    the answer I should have given, or at least,

2    articulated more clearly.

3         Q.    Thank you, and subject to you recalling

4    this 20 recent 30 years later.

5              Was that a graduate class or was it an

6    undergraduate class you were taking while as a

7    graduate student?

8              MR. BLANKINSHIP: Objection, asked and

9    answered.

10        A.    Graduate.  Graduate -- did I --

11        Q.    You did.  No, no somebody was mentioning

12   something, that's okay.

13             So I believe you said you are not

14   surprised that the Board of Governors of the Federal

15   Reserve mark annual exhibits, because that's what

16   they do, but you haven't read a specific annual

17   report on this, is that, am I summarizing your

18   testimony?

19             MR. BLANKINSHIP: Objection, asked and

20   answered.

21        A.    I'm not surprised the Fed issues annual

22   reports.  The scope or the particular subject

23   matters, I wouldn't know what they do.  Presumably,

24   it's on current economic issues.  I assume you are

25   talking about the Federal Reserve Board, is that --

Page 196

1         Q.     I am, the Fed, technically, the Board of
2    Governors, the Federal Reserve System, the Federal
3    Reserve Board, same technical thing.
4              (Whereupon, Exhibit 0011 was marked for
5    Identification.)
6                   MR. COYLE:  Sir, I think we just
7    published a document marked as 11.
8                   MR. BLANKINSHIP: I have it in the email.
9                   MR. COYLE:  I'm stealing all the reports
10   from him.
11                  MR. BLANKINSHIP:  That's because you
12   haven't produced the reports.
13                  MR. COYLE:  That is correct.
14                  MR. BLANKINSHIP:  I'm going to make the
15   same objection.  You obviously, withheld this
16   document for purposes of sandbagging during this
17   deposition and I object to any questions regarding
18   it.
19                  MR. COYLE:  Sure.
20                  MR. BLANKINSHIP: I'm not going to
21   instruct Dr. Felder not to answer.
22                  MR. COYLE:  We could discuss it --
23                  MR. BLANKINSHIP:  Sorry, sorry go ahead.
24                  MR. COYLE:  We could discuss later what
25   intentional holding is.  This is an expert, I'm

Page 197

1    asking him if he's familiar with treatises and
2    information, whether I'm permitted to, or statutes,
3    we'll find out later.  I am saying, though, I will
4    say this as a speaking, since we're at this moment,
5    it appears that you sent Dr. Felder a subpoena
6    removing, the, those deposition, removing Exhibit A
7    requested documents.  That, we'll discuss at a later
8    point as well and there's no need to discuss it any
9    further, but you say I'm intentionally withholding
10   things, we can discuss what intentionally withholding
11   things means at a later time.
12            MR. BLANKINSHIP:  Okay.  I'm going to
13   object to your characterization of Dr. Felder's
14   testimony regarding the exhibit and I think you're
15   skating close to violating your duty of candor by
16   making those statements on the record.
17            MR. COYLE:  Okay.
18       Q.    Dr. Felder, do you have Exhibit 11 in
19   that front of you, sir?
20       A.    Yes.
21       Q.    I'll represent to you that that is a PDF
22   of the, a PDF that I printed off the Fed's
23   publications website, the actual scroll for it is at
24   the bottom of page,
25   FederalReserve.govpublications2020, etcetera,

Page 198

1    etcetera.

2              Do you want to take a moment and look at

3    this?  It's actually not that long.  I don't want to

4    sandbag you by asking you questions that you haven't

5    read this before and I recognize you haven't seen

6    this before.  If you would like to take a moment, I

7    don't have a lot of questions on it, but I just want

8    you to familiarize yourself.

9         A.    Okay.  I'll let you know when I'm done

10   reading it.

11   (Pause.)

12        A.    Yes.

13        Q.    I recognize that you didn't see this

14   before today, you didn't see the context of

15   everything else of what it is.  I understand it's

16   limited in the manner it's -- would it be fair to say

17   that this report analyzed something that they do,

18   analyzed how people would handle a $400 emergency

19   expense that they didn't expect?

20             MR. BLANKINSHIP: Objection, scope and

21   lack of foundation.

22        A.    Yes, in the time period 2019 to 2020 --

23        Q.    Sorry, go ahead.

24        A.    And in the context of COVID.

25        Q.    Right.  I'll also represent to you that

Page 199

1    this is an annual report that they do every year.

2    They look at this issue outside of the context of

3    COVID to see how people would pay bills at any given

4    time.  I don't have the history of them here, but I

5    can pull them up, if need be.

6                    MR. BLANKINSHIP: Object to the lack of

7    foundation.  Sounds like more documents you should

8    have produced.

9                    MR. COYLE:  Sure.  I will also say --

10   okay.

11        Q.    Dr. Felder, would it be fair to say that

12   if according to the Board of Governors in 2019, 37

13   percent of households could not have paid an

14   unexpected $400 bill?

15                   MR. BLANKINSHIP: Objection.

16        A.    Can you point me to that precise language

17   or what part of the document you are referring to?

18        Q.    Sure.  I'm referring to the first bar

19   graph on Page 1.

20        A.    On Page --

21        Q.    Page 1 of Exhibit 11, yes.

22        A.    I assume, you are subtracting 100 from

23   63?

24        Q.    I was.  And if you go to the next line,

25   it says, "The remaining 37 percent of adults who

Page 200

1    would not have paid completely with cash or
2    equivalent," blah, blah, blah.  I apologize, go ahead
3    and answer.
4        A.    I'll just read the line, because I don't
5    know if it links up exactly with your, the statement
6    of your question, "which cash or equivalent may have
7    had more difficulty covering such an expense," but
8    yes, if that's what you are referring to, the report
9    says that.
10            MR. COYLE:  Okay. Can we go off the
11   record for just one moment?
12       (Discussion was held off the record.)
13            THE VIDEOGRAPHER: Off the video record.
14   The time to 4:19.
15   (Recess:  4:19 p.m. to 4:29 p.m.)
16            THE VIDEOGRAPHER: We are on the video
17   record.  The time is 4:29.
18       Q.    Okay. Dr. Felder, I have a couple of
19   other questions for you unrelated to that exhibit.
20   I'm trying to go back through the notes we had here
21   on the break to look at other things here.  I think
22   we are generally done.  I know that isn't a question.
23            Let me ask you a question and I apologize
24   since it's going to come out of left field, because
25   there's sort of throughout the dep, the random parts

1    of the deposition today.

2              If an ESCO provides a value-added service

3    to a customer in addition to just simply supplying

4    electricity, will customers, in your opinion, be

5    willing to pay a premium for the value-added service?

6              MR. BLANKINSHIP: Objection, scope.

7         A.   Some customers may be willing to pay

8    something above, I think in this case, you're

9    implicitly referencing the price to compare or kind

10   of the vanilla product for an additional product or

11   service, but the question is a totalogy so people pay

12   for something of value, yeah, by definition.

13        Q.   Well, would you say that a customer who

14   submitted a repair claim for EnergyGuard, do you

15   think that they would value the EnergyGuard service

16   that they received?

17             MR. BLANKINSHIP: Objection, scope.  It's

18   also an incomplete hypothetical.

19        A.   Well, I think I would have to know more,

20   you know, they would, if the claim was rejected, if

21   the claim didn't cover all their costs, if the claim

22   was unduly burdensome to complete, if, or it was,

23   took a lot of time, they would have to evaluate those

24   factors along with the additional costs they paid for

25   that claim.

1      Q.      Have you looked into any of those factors

2  with respect to EnergyGuard in this matter?

3              MR. BLANKINSHIP: Objection, vague and

4  scope.

5      A.      I have not.

6      Q.      Do you happen to know if any of the

7  witnesses who testified for Agway testified about the

8  rejected rate of claims?

9      A.      I do not know.

10     Q.      I want to jump back to your report, if

11  you may, sir, that is Felder 2.

12     A.      Okay.

13     Q.      On Page 6 of your report, the last third

14  of that first paragraph under "B," starting with, the

15  line starts with the word "Customers," do you see

16  that, one, two, three, four, five -- six from the

17  bottom?  "Customers," then the next sentence starts

18  "ESCO's, unlike utilities," do you see that?

19     A.      I'm sorry.  Yes, I do.

20     Q.      Why don't you read that and then I have

21  just a few follow-up questions. The statement from

22  your report is:

23              "ESCO's, unlike utilities prior to the

24  introduction of the retail electricity markets, as a

25  matter of public policy, do not get to claw back any

1    above-market costs in order to ensure that they

2    recover all their costs plus a profit margin (unlike

3    ESCO's when utilities do procure power at

4    below-market costs, they had to pass along all those

5    savings to their customers) in retail electricity

6    markets, some and perhaps, even many ESCO's may not

7    make money or may only make small margins."

8              Did I read that correctly?  And I believe

9    I added an extra "the" in the beginning part of this.

10        A.    Yes, you did.

11        Q.    I want to focus on the first part of this

12   where you talk about utilities, "unlike utilities

13   prior to the introduction of retail electricity

14   markets," what time period are you referring to?

15        A.    Really, since the cost of service regime

16   was implemented and it varied at different times in

17   different states, roughly, coming out of the 1930's

18   and later.

19        Q.    Are you saying that prior to that point

20   in time, utilities were able to claw back

21   above-market costs and after that point in time, they

22   are not?

23              MR. BLANKINSHIP:  Objection,

24   mischaracterizes his testimony.

25        A.    Prior to that point of time, and it

1    varied by state, but there weren't utilities that we

2    thought of.  Thomas Edison went around and sold

3    electricity at various city blocks typically, to the

4    wealthy, not surprisingly, so it was a business, it

5    wasn't a cost of service machine.  He charged

6    whatever price he could get so it wasn't competitive

7    so putting aside that beginning part, at least in the

8    U.S. context of the industry, subsequently, roughly,

9    the 1930's we developed a cost of service regime in

10   which utilities, roughly speaking, submitted their

11   costs, including their costs to capital to the

12   regulators both state and federal as applicable, and

13   then recovered those costs subject to the rate-making

14   process, obviously, politics is involved, the policy

15   in the U.S. is utilities have the opportunity to

16   recover their, depends on the jurisdiction, prudent

17   or used and useful costs.

18        Q.    And that's it, you used the phrase

19   "above-market costs," do you see that, "as they do

20   not get to claw back any above-market costs"?

21        A.    Yes.

22        Q.    What are you referring to there?

23   Basically, what's "above-market costs" in that

24   sentence?

25        A.    So if an ESCO purchased electricity at a

1    rate above what they could have purchased the same at

2    the wholesale level electricity or they purchased,

3    and that would be above-market costs if they could

4    have bought the electricity, but -- just bear with

5    me, my ear pods did their thing.

6        (Discussion was held off the record.)

7        A.    So if an energy service company, ESCO,

8    bought wholesale electricity at five cents a kilowatt

9    hour and they could have bought it at three cents a

10   kilowatt hour for the same periods and geographic

11   zone in the case of -- so same quantity, then they

12   were paying above-market costs.

13       Q.    So is it your opinion that the

14   determinate factor is what an ESCO could have bought

15   electricity for, not did buy electricity for?

16            MR. BLANKINSHIP: Objection,

17   mischaracterizes his testimony.

18       A.    Well, here if -- I'm just saying that --

19   what I'm saying here is that if a, if I'm an ESCO and

20   I commit to sell you electricity at 10 cents a

21   kilowatt hour and I turn out that I bought it at 11

22   cents, I don't get to come back to you and say, well,

23   you know, my real costs were 11 cents, I know I said

24   I would sell it to you at ten cents and now I claw

25   back that extra one cent per kilowatt hour, that's

1    what I'm trying to say.

2         Q.    So you are talking about a fixed rate

3    scenario where if I have a customer and an ESCO says,

4    I'll sell it to you at 10 cents a kilowatt hour and

5    it costs me more than 10 cents a kilowatt hour to

6    procure, I'm still contracting and about to sell it

7    to them for 10, is that's what you're talking about?

8         A.    But it could also, it apply in general so

9    if I post my variable rate for next month at 10 cents

10   and it turns out my actual costs are 11 cents, then,

11   and that was what my contract said, then I don't get

12   to claw back that 11 cents, that additional one cent.

13        Q.    Is that what happened here with Agway and

14   Ms. Gonzales?

15        A.    The -- well, there's another, that -- I

16   don't know if Agway went back and said I need to

17   raise your -- my rate, because, my variable rate so I

18   just, I don't know.  The other piece I'm trying to

19   say here is that the market cost itself, let's say

20   even if my variable rate is 10 cents and I buy it at

21   five cents, but I could have bought it at three

22   cents, I just, you know, the market rate or the

23   market price sets what ESCO should buy and sell

24   electricity at so that's all.  They don't get to --

25   there's a market rate that determines these, the

1    costs.  It's not a process where an ESCO says, well,

2    you know, I messed up in buying electricity, I spent

3    too much money buying it from, for lack of a better

4    example, HESS or Direct Energy, and so, Mrs.

5    Gonzales, you owe me some money, because you know, I

6    kind of messed up on purchasing electricity.

7         Q.    Sure.  I want to go into that just a

8    little bit deeper.  So if Agway goes to -- let's take

9    it out of Agway.  If a hypothetical ESCO goes on the

10   daily spot market and buys electricity for 10 cents a

11   kilowatt hour, but had they done something different,

12   they could have bought it at nine cents, are you

13   saying that they should only be permitted to charge

14   their customers nine cents?

15        A.    No.  They can -- no.  I'm just saying

16   that they, retroactively they don't get to, because

17   it's a market-based transaction, go to the regulators

18   and say, whoops, I made a mistake on how I procured

19   electricity, I need additional revenue from

20   customers.

21        Q.    But ESCO's do not go back to regulators

22   to set their rate, correct?

23        A.    That's my whole point of this. So I say

24   in my next clause:  "Unlike ESCO's when utilities do

25   procure" -- so under the costs of service regime

1    there wasn't a price, there was a costs of service

2    regime, a rate and if the utilities had the

3    opportunity to recover that rate, which included the

4    cost, cost of capital -- etcetera, and I'm just

5    saying that regulatory bargain as you just said,

6    doesn't apply to ESCO's.  They don't have -- yeah.

7          Q.    Okay. I just wanted to make sure that I

8    understand this and I think, I think, I think we are

9    on the same page.  I just got -- I want to go through

10   this one tiny piece, so I want to circle back to

11   this.

12          When you were testifying however you

13   testified, you were not saying that the price that

14   ESCO's should charge is what they hypothetically

15   could have bought, as opposed to what they bought,

16   right?

17          MR. BLANKINSHIP: Objection, vague.

18          A.    Well, I did my analysis in two ways. One

19   is under the cost analysis, I used the costs that

20   Agway provided and we discussed how I did that and

21   under the price to compare analysis where the

22   benchmark was the utility price to compare based on

23   that introductory line and the introductory letter

24   then its costs are not, in that analysis are not

25   relevant.  What's relevant is the, the price that the

1    customer could have bought the power from, from the

2    utility so there I did do a but-for analysis.

3         Q.    You said the price to compare in the

4    first letter, line of the welcome letter, what we are

5    calling the welcome letter, can you pull that up, on

6    Exhibit 5?

7         A.    Yes, I have it.

8         Q.    I don't see "price to compare"?

9         A.    Yeah.  It was all condensed in my

10   wording.  That line that's in bold, the first bold

11   line in that letter, "We are excited to be providing

12   you with a special offer.  You will receive a

13   competitive monthly variable price starting with your

14   next scheduled meter reading."  The competitive

15   monthly variable price that I used was the utility's

16   price to compare.

17        Q.    So your interpretation of this sentence

18   is that Agway is saying to Ms. Gonzales, you will be

19   charged a price competitive to the price to compare

20   from the utility?

21             MR. BLANKINSHIP: Objection,

22   mischaracterizes his testimony, outside the scope.

23        A.    That's what I used to do the analysis.

24   Now, in theory, the market price could have been even

25   less and there could have been an ESCO in New York

1    for a particular customer, a particular time charging

2    even a lower rate.  Those rates historically aren't

3    readily variable so then my damage -- my overcharges

4    would be too low, but I used to, as the benchmark for

5    the competitive monthly variable price, the price to

6    compare by the utility, that's correct.

7         Q.    But was there another ESCO who was

8    charging less for that same month and that same

9    customer?  You said there could be.  Was there?

10        A.    There could be.  I do not know.  As I

11   said, the data is not readily available so I had to

12   use the utility price to compare.

13        Q.    Well, you used the utility price to

14   compare that was reflected on the spreadsheet from

15   Agway?

16        A.    That's correct.  We've gone over that.

17        Q.    Okay.

18        A.    Because --

19        Q.    I want to clarify, because you said you

20   used the utility price to compare.  Did you compare

21   those numbers from the spreadsheets with the historic

22   price to compare from the utilities?

23             MR. BLANKINSHIP: Objection, asked and

24   answered.

25        A.    As I said before, I used the price to

1   compare as provided by Agway.  I did not go back and

2   check each utility.

3        Q.    I think, and I know you've -- this is a

4   whole series of different questions that come up for

5   this so I apologize, this is a piece of repetition,

6   but I'm trying to put a bow in it and wrap it over.

7             So your interpretation of that bold

8   section from plaintiff's welcome letter, Exhibit 5,

9   is saying that Agway is agreeing to provide a

10  competitive price to the utility rate?

11       A.    Right.

12            MR. BLANKINSHIP: Objection, asked and

13  answered, argumentative, mischaracterizes his

14  testimony.

15       A.    In order to implement that sentence, I

16  used the, I said the competitive monthly variable

17  price is the utility's price to compare or lower. It

18  could be lower, as we discussed.

19            MR. COYLE:  Sorry, when I mute -- I was

20  asking to have another document loaded.  It's going

21  to be Exhibit 12.

22       (Whereupon, Exhibit 0012 was marked for

23  Identification.)

24       Q.    I'm hypothetically sending you a new

25  exhibit.

Page 212

1        A.    Here, I got it or I have it loaded.  I

2    don't know if Mr. Blankinship does.

3              MR. BLANKINSHIP: I don't yet.

4              MR. COYLE: I'll wait until he does. It's

5    a short PDF, you should get it shortly.

6              MR. BLANKINSHIP:  Okay. I have it.

7        Q.    Dr. Felder, I'm handing you virtually

8    what's been marked as Exhibit 12 for identification.

9    I'll represent to you that it's a Third Circuit Court

10   of Appeals decision from yesterday in the matter of

11   James Brown versus Agway Energy Services, LLC.

12             MR. COYLE:  And to skip ahead for your

13   questions, no, I didn't produce this, no, I didn't

14   withhold it, it is a law case.

15       Q.    Have you -- Dr. Felder, have you heard of

16   this Brown versus Agway Energy Services lawsuit?

17       A.    No.

18       Q.    I'll represent to you that this is a

19   lawsuit concerning the variable rate charged to

20   residential customers in Pennsylvania only, during a

21   similar time period to what we are dealing with in

22   this matter, but unlike Ms. Gonzales who is a

23   resident of New York, Mr. Brown was a resident of

24   Pennsylvania, understood?

25       A.    Yes.

Page 213

1          Q.     I know you are not a lawyer so I'm not

2     asking for your legal opinion of this, but I want to

3     draw your attention to Page 5 of this opinion,

4     please?

5          A.     Okay.

6          Q.     First, before I get into this, I'm sure I

7     asked you this --

8               MR. COYLE:  And you can object as asked

9     and answered.

10         Q.     -- I don't remember you answering.  Did

11    you look at any of the residential customer

12    disclosure statements for Pennsylvania customers in

13    connection with your expert opinions here today?

14         A.     No.

15         Q.     I'll read the first paragraph:

16              "Brown argues that Agway breached its

17    contract by setting prices not sufficiently tethered

18    to its of acquiring the electricity it resold. It

19    points to data showing that Agway charged prices

20    substantially higher than what he could have paid to

21    a traditional electricity provider."

22              Did I read that correctly?

23         A.     Yes.

24         Q.     Obviously, these are different cases and

25    different pieces of this, but that is sort of one of

1    your opinions here today, that comparing calculating

2    the damages that Agway charged customers in

3    Pennsylvania compared to what they could have paid on

4    the default service utility; is that correct?

5         A.    I did calculations that illustrate that

6    difference, that overcharge, yes.

7         Q.    In sum and substance, I'm not going to

8    try, your report is what it is and your testimony has

9    been what it is and I'm not trying to supercede both

10   of those.

11        The next sentence of this document,

12   Exhibit 12 says, "The problem with that theory is a

13   simply one.  The plain language of Brown's contract

14   gives Agway flexibility to set prices based on a

15   variety of factors, not just the cost of acquiring

16   electricity."

17        Did I read that correctly?

18      A.    Yes.

19      Q.    Do you agree with that statement as it

20   applies to Pennsylvania customers of Agway?

21        MR. BLANKINSHIP:  Objection, lack of

22   foundation, incomplete hypothetical and it's outside

23   the scope.

24      A.    I don't have an opinion on that. I

25   haven't read Brown's contract.

Page 215

1      Q.      Well, you did issue an opinion as to how

2  much Agway overcharged Pennsylvania customers, right?

3      A.      Well, when I -- well, first of all, in my

4  report I included not just the cost of acquiring

5  electricity, the cost of goods sold.  I included the

6  expenses, additional costs on the P&L that we

7  discussed and in different situations, the margin

8  including the EnergyGuard and in the price to compare

9  analysis I used that, as we've been discussing, to

10  reflect the variable, competitive variable rate

11  that's in the introductory level and I also included

12  the EnergyGuard as well.

13      Q.      Okay.  And I apologize if my question is

14  imprecise.  Your opinions in your expert report

15  regarding damages, cover damages for a class of New

16  York customers has been defined extensively at the

17  deposition and Pennsylvania customers, correct?

18      A.      My only quibble with that is the

19  definition of class, which it's my understanding, as

20  I noted in some footnotes that we discussed and even

21  at the end of my report, is still to my

22  understanding, not definitive, but, yes, I calculated

23  it as we discussed for New York and Pennsylvania

24  utilities.

25      Q.      Okay. So for your tables, your tables

1    for, Table VI for overcharges includes Pennsylvania

2    and New York in all your totals in your report?

3          A.    Yes.

4          Q.    Okay. So the next portion of Exhibit 12

5    says, "The contract in this case is replete with

6    language giving Agway discretion to set prices on

7    factors other than rates charged by traditional

8    electric utility companies.  The contract states that

9    the price charged to customers is set each month 'at

10   Agway's discretion' and 'reflects multiple enumerated

11   factors' pending cite."

12               Did I read that correctly?

13         A.    Yes.

14         Q.    Is that consistent with the contract for

15   Pennsylvania customers of Agway during the period of

16   time you've calculated damages?

17               MR. BLANKINSHIP: Objection, lack of

18   foundation.

19         A.    As I said, I only reviewed the contract

20   of, for Ms. Gonzales.

21         Q.    Okay. So you don't know?

22               MR. BLANKINSHIP: Objection, asked and

23   answered.

24         A.    That's correct.

25         Q.    The next, it continues."

Page 217

1            "In more detail, the contract states

2    Agway will set a price based on" and then it's block

3    indented for a quote, "all of the costs incurred in

4    providing service to Customer, including the

5    following:  Electricity acquired by Agway for all

6    sources (including energy, capacity, settlement,

7    ancillaries), transmission and distribution charges"

8    there's an ellipsis, "other market-related charges

9    plus all applicable taxes including gross receipts

10   tax, fees, charges, or other assessment and Agway's

11   costs expenses and margins."

12            Did I read that correctly?

13       A.    Yes.

14       Q.    I recognize that there's an ellipsis,

15   which makes this more complicated. Is that similar to

16   the contract agreement for Ms. Gonzales in terms of

17   the language subject to the ellipsis coming out on

18   the pieces?

19            MR. BLANKINSHIP: Objection, vague and

20   incomplete, hypothetical and you are also

21   incompletely reading the document itself.  Okay.

22       A.    Yes, it's similar.

23       Q.    At least, especially, with respect to the

24   end part of it, "charges or other assessments and

25   Agway's costs, expenses, and margins," correct?

Page 218

1    A.    Yes.

2    Q.    Now, this is going back to Exhibit 12,

3    the Third Circuit then says, "Several words in this

4    contractual provision make clear that Agway can base

5    its prices on factors other than the costs of

6    acquiring electricity including the open-ended phrase

7    market related charges. Further, the provision makes

8    clear that Agway can consider its own "costs,

9    expenses, and margins" in setting prices.  One

10   obvious cost is Agway's EnergyGuard service.  The

11   fact that Agway provides that service to Brown

12   undermines his comparison of Agway's prices to that

13   of a traditional electric utility supplier which may

14   not provide such a service."

15          Did I read that correctly?

16   A.    Yes.

17   Q.    That seems to go right at the heart of a

18   portion of your opinion which is the comparison

19   between Agway's prices and that of a traditional

20   utility supplier; is that correct?

21   A.    No.

22          MR. BLANKINSHIP: Objection, argumentative

23   and mischaracterizes his testimony.  You can answer.

24   Q.    What was your answer?

25   A.    My answer was, no.

Page 219

1        Q.    It's not?  Even the sentence that says

2    the fact that Agway provides that service, being

3    Agway's EnergyGuard service to Brown, undermines his

4    comparison of Agway's prices to that of a traditional

5    electric utility supplier which may not provide such

6    a service, that isn't -- I guess, before I ask you

7    the question, I read that correctly, right?

8              MR. BLANKINSHIP: Objection, asked and

9    answered.

10       A.    Yes.

11       Q.    So barring the legal implications of

12   this, and I know you are not a lawyer so I'm not

13   going to ask you to analyze this -- the Third Circuit

14   here is saying quite clear, the fact that Agway

15   provides EnergyGuard to Brown undermines his

16   comparisons of Agway's prices to that of a

17   traditional electric utility supplier.

18             MR. BLANKINSHIP: Objection, calls for a

19   legal conclusion, mischaracterizes the Third

20   Circuit's opinion for a variety of reasons.

21             MR. COYLE:  I'd like to hear how I

22   mischaracterized it.

23       Q.    But you can go on, you can answer, Dr.

24   Felder.

25             MR. BLANKINSHIP: I would be happy to

1    discuss that.  Would you like to hear the basis of my

2    objection or are you just throwing in a little aside

3    for no value?

4              MR. COYLE: We can discuss it later.

5              MR. BLANKINSHIP: So you are withdrawing

6    your request for me to clarify the objection?

7              MR. COYLE: Yes, please.

8              MR. BLANKINSHIP: Okay.

9         A.    We have to read the prior sentence as

10   well, "The obvious cost is Agway's EnergyGuard

11   service," which I included in my calculations.

12        Q.    Right, but you are also ignoring the

13   sentence that says, "comparing the price that Mr.

14   Brown was charged by Agway to the utility price" --

15             MR. BLANKINSHIP: Objection,

16   argumentative, badgering and completely

17   mischaracterizes what he just said, literally.

18        Q.    If I told you that Mr. Brown was a

19   customer of Agway from March 2016 to December of

20   2016, would that give you an indication as to whether

21   or not Mr. Brown's contract was one of the ones

22   that's covered by your damages spread for

23   Pennsylvania?

24        A.    I don't know.

25        Q.    Well, you did calculate damages in Table

Page 221

1  V from March of 2016, April, May, June, July, August,

2  September, October, November 2016, correct?

3        A.     Yes.  So it should fall, if I understand

4  the time periods correctly, yes.

5        Q.     Do you feel the specific language of Mrs.

6  Gonzales's -- or Ms. Gonzales's contract -- I

7  apologize -- was relevant to your analysis?

8        A.     Yes, as I described in my report.

9        Q.     Did you feel the specific language of the

10 Pennsylvania contracts was relevant to your analysis?

11       A.     Yes.  To the extent as I said, I had

12 looked at Ms. Gonzales's for that basis and the

13 introductory letter, as we've been talking about so

14 yes.

15       Q.     But you don't know if the New York and

16 the Pennsylvania contracts were the same, were they?

17       A.     We just went through this, Mr. Coyle.

18       Q.     That's right, I know.  I just asked you

19 and you answered yes, but you looked at Ms.

20 Gonzales's for this information.  Ms. Gonzales is a

21 New York customer, correct?

22       A.     Yes.

23       Q.     A Pennsylvania customer in Erie who

24 enrolled at the same exact day as Ms. Gonzales, would

25 they get the same customer disclosure statement?

Page 222

1          A.      I don't know.  Presumably, it would be

2     similar.  Obviously, it would have a different name

3     and address.  I don't know if it was, the

4     Pennsylvania ones were the same are different.

5                    MR. COYLE:  Okay.  Just one moment, I

6     think we are done.  I just want to circle back to one

7     thing.  Let's just go off the record for two minutes.

8     I think we might be at that point.

9                    MR. BLANKINSHIP: Okay.

10                    THE VIDEOGRAPHER:  We're off the video

11     record.  The time is 5:03.

12     (Recess:  5:03 p.m. to 5:05 p.m.)

13                    THE VIDEOGRAPHER: On the video record.

14     The time is 5:05.

15                    MR. COYLE:  Dr. Felder, I have no further

16     questions at this time.

17                    MR. BLANKINSHIP:  Dr. Felder, this is Mr.

18     Blankinship.  I do have a few questions.  Before I

19     start, though, I have one exhibit that I would like

20     to include which was previously produced.  How do we,

21     can I just email this to Jennifer and John and you

22     guys can publish it should I sent it to Cindy, too,

23     what should we do?

24                    MR. COYLE: If you send it to us, Greg, we

25     can publish it the same way.

Page 223

1            MR. BLANKINSHIP: Let's do that.  I'm

2    going to send that to you now.  I've got a couple of

3    questions first so maybe if Jennifer would be so kind

4    as to publish that while I ask the questions while we

5    get there.

6    EXAMINATION BY

7    MR. BLANKINSHIP:

8        Q.    So if we are ready, Dr. Felder, I would

9    like to draw your attention to the residential

10   customer disclosure statement and I'm sorry, I forget

11   which exhibit that was, because I don't have them

12   marked yet.

13       A.    Yes.

14       Q.    Okay.  Now, under "How price is

15   determined" at the top, there's a section that we've

16   read many, many times called the "Electric Variable

17   Rate," the section describes how the electric

18   variable rate shall each month be set.  Do you see

19   that paragraph?

20       A.    Yes.

21       Q.    Is there anything in this paragraph that

22   allows Agway to base its variable rate on the value

23   of the services it provides, as opposed to the costs

24   of the services it provides?

25       A.    No.  The terminology says it should

Page 224

1  reflect the costs and then the sentence we read
2  several times.
3       Q.    Okay.  And does that have anything to do
4  with the reason why you didn't include or evaluate
5  the value of EnergyGuard aside from its costs when
6  doing your, when issuing your opinions?
7       A.    That, that was one of the reasons, along
8  with the back-and-forth from the New York Public
9  Service Commission order where they talk about these
10  value-added services and they refer to costs, but
11  yes, that's right, this statement talks about costs.
12       Q.    Okay. Thank you, I appreciate that.
13            Now, let's, if we could, let's take a
14  look at the Reset Order, which I think is Exhibit 10?
15       A.    Yes.
16       Q.    If everyone's there, I'm looking at Page
17  55.
18            MR. BLANKINSHIP:  John, do you need a
19  second?
20            MR. COYLE: Just one second.
21            MR. BLANKINSHIP: Sure.
22       A.    I'm on 55.
23       Q.    Let's just give John a second.
24            MR. COYLE: Yup, got it.
25       Q.    The first full paragraph says, "The Track

Page 225

1    2 process should address the issue by focusing on

2    first determining how to identify actual

3    energy-related value-added products and services that

4    may be provided by an ESCO along with energy supplied

5    service and second, ensuring that pricing for such

6    products is transparent.  The Track 2 process should

7    then address whether ESCO's should have shown us

8    sufficient willingness and ability to provide such

9    value-added products, such that the Commission should

10   consider expanding the category of permissible

11   value-added products or services."

12            Would you agree, Dr. Felder, that pricing

13   transparency is important with respect to the value

14   of or the costs of value-added services like

15   EnergyGuard?

16        A.    Yes, I do.

17        Q.    And am I reading this correctly that at

18   the point at which the Public Service Commission had

19   issued this Reset Order, they hadn't actually been

20   able to make that determination including with

21   respect to EnergyGuard, because there wasn't that

22   kind of transparency either in the material submitted

23   to them or in the information that was available to

24   the customers?

25            MR. COYLE:  Objection, foundation.  You

Page 226

1    can answer.

2            A.    Yes, that's my understanding.

3            Q.    Okay.  Then if we could now take a look

4    at the new exhibit.

5                  MR. COYLE: It should be published by now.

6                  MR. BLANKINSHIP: Okay.

7                  MR. COYLE: It's No. 13, Greg.

8                  MR. BLANKINSHIP: Thank you.

9         (Whereupon, Exhibit 0013 was marked for

10   Identification.)

11           A.    Yes, I have it.

12           Q.    Okay.  And I'll represent to you that

13   this is one of the bills that Ms. Gonzales received

14   and it's Bates stamped Gonzales 24, 25, and 26. Do

15   you recognize this as a typical bill that a consumer

16   would receive in the Central Hudson Utility region?

17           A.    Yes.

18           Q.    Okay.  And if you look at Page 2, there's

19   a section called, "Electric Supplier Info Rate E100,"

20   do you see that section?

21           A.    Yes.

22           Q.    Is there any information that's provided

23   in this section that would inform consumers about the

24   value or the costs of EnergyGuard, as opposed to the

25   commodity being provided?

Page 227

1        A.      No.  There's no mention of EnergyGuard in

2    that section that you just referenced.

3        Q.      Would you -- do you believe that the kind

4    of transparency that the Public Service Commission is

5    calling for with respect to additional value-added

6    products is provided in this bill?

7        A.      No. It would be a separate line item

8    expressing that transparency that you just

9    referenced.

10       Q.      Okay. And in your report you identified

11   the total costs that Agway incurred to provide

12   EnergyGuard services to its electricity customers,

13   correct?

14       A.      Yes.

15       Q.      And do you have an opinion as to whether

16   or not those costs justify the rates that Agway

17   charges, those costs specific to EnergyGuard?

18       A.      Yes. I said in my report that that

19   additional $500,000 plus was not commensurate with

20   the, the overcharges that I calculated.

21       Q.      And you, in the past, you've worked for

22   regulatory commissions like the Public -- the New

23   York Public Service Commission, correct?

24       A.      With the New Jersey Board of Public

25   Utilities, I've not been under contract.  I don't

Page 228

1    recall with the New York Public Service Commission,

2    but I have worked with commission staff maybe as --

3    but not, if you mean employed by them or a

4    consultant, the answer is no, but I've worked with --

5    specifically, the answer is no.  It's specifically as

6    a consultant or employee for the Public Service

7    Commission, but I have worked under contract for the

8    Board of Public Utilities, which is the New Jersey

9    counterpart.

10        Q.    Okay.  Based on your experience with

11   other, with the New York Public Service Commission or

12   other similar commissions and your understanding of

13   Reset Order 2, do you believe that the Public Service

14   Commission would think that $500,000 in costs would

15   justify overcharging consumers by approximately $30

16   million compared to what they would have paid had

17   they been with a utility?

18             MR. COYLE: Objection to form. You can

19   answer.

20        A.    No, they would not. They would be, not

21   just them, but rate counsel, rate peer advocates and

22   their counterparts would not find, hence, the basis

23   for my statement, that those costs are commensurate

24   with the additional charges.

25        Q.    Okay. Earlier there was some discussion

Page 229

1  about the sales tax that, at least through

2  approximately 2019, according to Mr. Coyle, was

3  charged to customers of the utilities for their

4  delivery charge, but not charged to customers of

5  ESCO's.  You mentioned that you had some experience

6  experience with that charge because of your time

7  working with a New York ESCO, am I; is that correct?

8        A.    Yes.

9        Q.    Is it fair to say that that sales tax

10 charge is quite small in comparison to the other

11 charges like the commodity charge and the like?

12       A.    Yes. My recollection is it was between .2

13 cents per kilowatt hour and .4 cents per kilowatt

14 hour and so it was a small piece of the overall bill.

15       Q.    So you would expect that even if, even

16 if, regardless of whether or not the charge, the

17 overcharged amount would go up or down, the inclusion

18 of that piece would be de minimus; is that fair to

19 say?

20       A.    I would have to do the calculation, but

21 my expectation is that it would be small relative to

22 the overcharges that I calculated.

23       Q.    Okay.  And you could easily do that

24 calculation, right?  It's just adding an additional

25 factor into your spreadsheet, it's not a problem; is

Page 230

1    that fair to say?

2        A.    That's right. Once I had the data in

3    terms of the avoided sales tax, I would apply it to

4    the data Agway provided and that would be a

5    straightforward calculation.

6        Q.    In the beginning of the deposition Mr.

7    Coyle was asking you some questions about the

8    contents of emails that you received from my office

9    and you mentioned that those emails contained data or

10   facts that, that you considered in your report. Is it

11   accurate to say that all of the facts and all of the

12   data that were provided to you in those emails are

13   reflected in your report and that you haven't failed

14   to list -- well, let's leave it at that.  Is it fair

15   for me to say that all facts and data, spreadsheets

16   or whatever that were sent in those emails are

17   reflected and identified in your report?

18       A.    Yes.  I mean, obviously, subject to going

19   back to the email and reading it line by line, but

20   yes, those emails were basically, or that email was

21   the applicable charges, gross receipt tax, NYSERDA

22   charge and also the footnote that those numbers were

23   still being settled or are undergoing the discovery

24   process.

25       Q.    Okay.  If Agway provided you data

Page 231

1    regarding its cost of capital, could you incorporate

2    that into your analysis?

3         A.    Yes, if appropriate.

4         Q.    And that would be easy, right?

5         A.    Apparently, with Agway nothing is easy,

6    but -- I apologize for that. I was just --

7              MR. COYLE: Let's stick to -- the

8    witness's punchy rollie --

9         A.    I, I think you understand -- meant, but I

10   mean, subject to the accounting issue, the economic,

11   but yes, if I had numbers for the cost of capital, I

12   could apply that, as appropriate, to my analysis.

13        Q.    Let's look at Exhibit 11, which was the

14   belated, belatedly, belatedly produced document from

15   the Federal Reserve Board. If you could take a look

16   at Page 2, please?

17        A.    Okay.

18        Q.    The second line after that, after Figure

19   15 says, "Nearly three in 10 adults were either

20   unable to pay their monthly bills or were one modest

21   financial setback away from failing to pay monthly

22   bills in full.  16 percent of adults don't expect to

23   pay all of their bills full in the month of the

24   survey, in full in the month of the survey in October

25   2019."

1          I'm reading that correctly, aren't I?

2     A.     Yes.

3     Q.     And in Table 9 under "Bill Type," the

4     second listed is "water, gas, or electric bill; is

5     that correct?

6     A.     Yes.

7     Q.     Is it fair to say that one of the reasons

8     why consumers are unable to pay their electricity

9     bill is that they are being significantly overcharged

10    by independent energy companies?

11    A.     Yes.

12    Q.     And in fact, one of the reasons why

13    consumers might not able to withstand having to pay

14    some kind of mysterious $400 bill is because they

15    consistently, is at least in some instances, because

16    they have to overpay for their electricity bills from

17    ESCO's, correct?

18    A.     That's correct.

19          MR. BLANKINSHIP: Objection to lack of

20    foundation.  You could answer.

21    A.     That's correct.

22          MR. BLANKINSHIP: I think that's all that

23    I've got.

24    EXAMINATION BY

25    MR. COYLE:

Page 233

1          Q.     All right.  Some follow-up, Dr. Felder.

2      (Discussion was held off the record.)

3          Q.     Dr. Felder, would it be fair, looking at

4  Exhibit 13, the one Mr. Blankinship forwarded to you,

5  Naomi Gonzales's bill, do you have that in front of

6  you?

7          A.     Yes.  Now, I do.

8          Q.     On that bill on the second page of it,

9  you see $2.15 New York State and local taxes and

10 surcharges, did I read that correctly?

11         A.     Yes.

12         Q.     I believe in response to a question from

13 Mr. Blankinship, you said that over the scope of that

14 whole period of time, this would be a de minimus

15 charge; is that fair to say?  Is that the word that

16 was used?

17         A.     Mr. Blankinship used the word de minimus.

18         Q.     And you said yes.

19         A.     Let's read the record.  I think I said

20 it's not significant.

21         Q.     Okay. Do you happen to know if $2.15 is

22 representative of the taxes for a residential

23 customer in New York at the time of this bill for Ms.

24 Gonzales?

25         A.     Well, first, my understanding is the

Page 234

1   local taxes varied by with where you are in the state

2   so no, without looking at all the bills, I don't know

3   if $2.15 is too high or too low or about right.

4           Q.    Do you know how many month bills you've

5   calculated damages for in the totality of your

6   calculation here?  Do you understand by month bills?

7                 MR. BLANKINSHIP: Objection.

8           A.    Yes.  No, I don't.

9           Q.    Do you have any idea of the magnitude of

10  it?

11                MR. BLANKINSHIP: Same objection.

12          A.    I'm not going to guess, offhand, no.

13          Q.    Let's just say it's three, four, five,

14  six -- seven years and 12 months, approximately, so

15  that's, my math is failing me, 70 -- 84 months at

16  least, in that calculation of Table V.  How many

17  customers on average did Agway have in that period of

18  time?

19          A.    I don't know.

20          Q.    And in Table II you expanded that for a

21  year and a half otherwise, 2012, 2013 -- again, same

22  question, you don't know how many customers Agway

23  would have had?

24                MR. BLANKINSHIP: Objection, asked and

25  answered.

1          A.      I have the same answer as I gave before,
2     I don't know that number.
3          Q.      Dr. Felder, with respect to Reset Order
4     2, would it be fair to say that you are generally
5     familiar with New York State regulatory proceedings
6     before the PSC?  Bad question, let me rephrase it
7     before you answer.
8                  Do you have an understanding today
9     whether any ESCO can break out an itemized charged
10    for evaluated service on a utility bill in New York
11    State today?
12         A.      I don't know if they could do that, they
13    could -- one way or the other.
14         Q.      If I was to represent to you that there
15    was an entire track of proceedings, and we can go
16    through and read Reset Order 2, discussing the
17    technical facts that the PSC doesn't know how to get
18    this on the bills, would that surprise you?
19         A.      My understanding, that would not surprise
20    me; although, the ESCO can always send a bill
21    independent of the electric utility bills to their
22    customers.
23         Q.      Did the PSC require the ESCO's to do
24    that?
25         A.      That I, I don't know.  Again, it's

1  pushing my memory, but I think that issue did come up
2  in the reset order about how to resolve that, but
3  certainly, an ESCO could communicate that to its
4  customers either through a separate bill or through a
5  letter or on its website or Twitter or many other
6  social media capabilities.
7       Q.    Barring Agway being able to tweet things
8  to Ms. Gonzales, if I was to represent to you that
9  the Central Hudson bills do not, do not have the
10  billing platform capacity for ESCO to put a second
11  line for the price of value-added service, would that
12  surprise you?
13           MR. BLANKINSHIP: Objection,
14  mischaracterizes his testimony, argumentative.
15       A.    My experience with utility billing is
16  what seems easy is not so it just doesn't apply to
17  Agway, I guess, but I wouldn't be shocked, but as I
18  said, there are other means of communicating that
19  information.
20       Q.    Sure.  Such as Twitter and the like that
21  you testified to.
22           MR. BLANKINSHIP: Objection,
23  mischaracterizes his testimony again.
24           MR. COYLE:  That's right, he didn't say
25  Twitter, I apologize.

```
                                            Page 237
 1        Q.     Let me say this:  I will represent to you
 2   as somebody whose firm is involved in those Track 3
 3   proceedings, the whole purpose of Reset Order 2, the
 4   entire portion of the part that says Agway is
 5   permitted to do this until we figure out how to break
 6   it out, is really a chronological explanation that
 7   this still hasn't been broken out.  Do you -- when
 8   was Reset Order 2 issued?
 9             MR. BLANKINSHIP: So there's a lot to
10   unpack there.  I'm not really sure -- I'm going to
11   object to the colloquy, because there wasn't an
12   actual statement and it's vague and it's compound and
13   it lacks foundation, but if you are only asking that
14   last question about when the order was, I suppose I
15   don't have any objection.
16             MR. COYLE:  Sure.
17             MR. BLANKINSHIP:  Well, you made a long
18   statement and then you asked a totally unrelated
19   question so I am not exactly sure how you want to
20   respond to that.
21        Q.     Dr. Felder, when was the reset order?
22        A.     It's in the exhibits.
23        Q.     I'll represent to you the first page
24   says, "December 12, 2019."  Does that sound
25   consistent with what that is?
```

1          A.     Yes.

2          Q.     As it stands today, has the PSC allowed

3   Agway to still sell energy-related value service of

4   EnergyGuard as part of its bundled rate above the

5   price the utility charges?

6                 MR. BLANKINSHIP: Objection, vague,

7   mischaracterizes, lack of foundation.  You can

8   answer.

9          Q.     Your answer?

10         A.     As it stands today, no, I don't know.

11         Q.     Do you think that's significant when you

12  talk about Reset Order 2?  The idea that Agway is

13  still permitted to sell this under Reset Order 2 is

14  not something you have any information about?  I know

15  you were just answering that.

16                MR. BLANKINSHIP: Objection,

17  mischaracterizes his testimony.

18         Q.     You don't know?

19         A.     Could you repeat the question, please?

20         Q.     Sure.  You do not know today whether

21  Reset Order 2 still allows Agway to sell its variable

22  rate to electric customers in New York, including

23  EnergyGuard, at a per kilowatt hour above the utility

24  price to compare?

25                MR. BLANKINSHIP: Same objections.

1      A.      That's correct, I don't know that.

2      Q.      And we are talking about the default

3  bill. You mentioned that utility, things for utility

4  billing is not as easy as it sounds.  Is that

5  something you have first-hand experience from your

6  time with the BPU in New Jersey?

7      A.      Yes.  Not just them, but yes.

8      Q.      Tell me -- sorry, I didn't mean to talk

9  over you, I thought you were done.

10              Would it be, I recall when they changed

11  the sales tax in New Jersey, it took what seemed like

12  wild horses and a thousand steeds to try to find a

13  way to change this on the billing platform, so I know

14  I'm being colloquial.  Do you recall difficulty

15  changing the sales tax in the billing platform?

16      A.      I don't specifically recall that issue in

17  New Jersey. I certainly recall difficulties in part

18  of this issue and other issues of making adjustments

19  on utility bills.  It's not an easy process by any

20  means, or it may not be an easy process.

21      Q.      Is a residential customer in New York

22  able to locate the price to compare for their current

23  utility?

24              MR. BLANKINSHIP: Objection, vague.

25      A.      Those prices are variable at least on the

Page 240

1  web and they may depending on the utility and the

2  state, I know you limit this to New York, on the, on

3  the invoice as well, the utility invoice.

4      Q.    The invoice we looked at for Ms. Gonzales

5  did not have the simple, the comparative rate for

6  Central Hudson listed, correct?

7      A.    Yeah, I do not see it on Page 2 or Page

8  3, I don't think it's on Page 1, that's correct.

9      Q.    Which utility -- withdrawn.

10           Do any of the utilities in New York from

11  2011 to the present include the price to compare from

12  the utility on their bills?

13      A.    I don't know.

14      Q.    Looking at that bill that we used for Ms.

15  Gonzales, that specific bill, it listed the rate per

16  kilowatt hour that Agway was charging Ms. Gonzales,

17  correct?

18      A.    Yes.

19      Q.    Could Ms. Gonzales have clicked on the

20  web for Central Hudson and found out the price to

21  compare at the same time?

22           MR. BLANKINSHIP: Objection, scope.

23      A.    I haven't checked, but the utilities do

24  provide, the New York utilities do provide price to

25  compare information on their website so she could

1  have investigated that, yes, or called the utility,

2  customer service.

3       Q.    I apologize.  And had she done so, she

4  would have been told what the comparative, comparable

5  price to compare would have been?

6       A.    I would assume so, yes.  Or she could

7  have found that out, yes.

8            MR. COYLE: No further questions.

9            MR. BLANKINSHIP: I just have a quick

10  follow-up.

11     (Discussion was held off the record.)

12  EXAMINATION BY

13  MR. BLANKINSHIP:

14       Q.    I'm looking -- Dr. Felder, could you take

15  a look at the last exhibit, the utility bill.  Above

16  the little section we were looking at, there's that

17  line item, NYS and local taxes and surcharges for

18  $2.15, do you see that?

19       A.    Yes.

20       Q.    That includes more than just the sales

21  tax that was, the differential sales tax, right,

22  because that -- well, yes, that's my question.

23       A.    I would have to check to see, but yeah,

24  potentially, it could.

25       Q.    Because that's a New York State tax, it's

Page 242

1    not a local tax or a surcharge, right?

2          A.    I would have to double-check, but it may

3    include other taxes beyond what was waived.

4          Q.    Okay.

5          A.    Well, on what was waived would not have

6    been here so the piece that's missing is what was

7    waived.

8          Q.    Right.  So this can't -- so since?

9          A.    -- could mean anything.

10         Q.    Right.  So since the New York ESCO's

11   didn't have to pay this tax, by definition, this line

12   item of $2.15 could not have been the waived tax that

13   Mr. Coyle was so interested in talking about before,

14   correct?

15         A.    That's right.  Although, waived taxes for

16   politicians can mean certain things.  But that's

17   right, the waived piece, I don't think there's that

18   $2.15.

19              MR. BLANKINSHIP:  Okay.  That's all I've

20   got.

21              MR. COYLE: Nothing else and I think that

22   we're all set.

23              THE VIDEOGRAPHER: We are off the video

24   record.  The time is 5:32.

25         (The matter was concluded at 5:32 p.m.)

Page 243

1              *                    *                    *

2

3

4

5

6
                          _____

7                         Frank Andrew Felder, Ph.D.

8

9

10   Subscribed and sworn to

11   before me this _____ day

12   of _____, 2020

13

     _____.

14

          Notary Public

15

16

17

18

19

20

21

22

23

24

25

Page 244

```
 1

 2

 3                    CERTIFICATE

 4

 5          I, CYNTHIA ZOLLER, Certified Court

 6   Reporter of the State of New Jersey, License No.

 7   30X100178500, do hereby certify that the foregoing is

 8   a true and accurate record of the proceedings.

 9            I DO FURTHER CERTIFY that I am not

10   related through blood or through marriage, to any of

11   the parties to this action, and that I have no

12   financial interest in this action.

13

14

15

16

17

18   Cynthia Zoller, C.C.R., R.P.R.

     Notary Public of the State of New Jersey

19

     My Commission Expires June 30, 2022

20

21

22

23

24

25
```

Page 245

1                          ERRATA SHEET
                    VERITEXT LEGAL SOLUTIONS
2                     330 OLD COUNTRY ROAD
                    MINEOLA, NEW YORK 10001
3                        516-608-2400
4    NAME OF CASE: NAOMI GONZALES v. AGWAY ENERGY SERVICES
     DATE OF DEPOSITION: AUGUST 26th 2020
5    NAME OF DEPONENT: FRANK ANDREW FELDER, PH.D.
6    PAGE    LINE(S)      CHANGE            REASON
7    ____|_____|_____|_____
8    ____|_____|_____|_____
9    ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20   ____|_____|_____|_____
21                     _____
                       FRANK ANDREW FELDER, PH.D.
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS____DAY OF _____, 20__.
24
     _____    _____
25   (NOTARY PUBLIC)             MY COMMISSION EXPIRES:

[& - 22]                                                                        Page 1

**&**

**&**    2:4,11 4:6,10,13

**0**

**0001**    3:5 10:7
**0002**    3:7 17:25
**0003**    3:8 16:17
**0004**    3:10 33:15
**0005**    3:11 38:23
    56:11
**0006**    3:12 56:11
**0007**    3:13 48:22
**0008**    3:14 91:10
**0009**    3:15 101:3
**0010**    3:16 118:5
**0011**    3:17 196:4
**0012**    3:19 211:22
**0013**    3:21 226:9
**002966**    49:9
**07920**    2:13
**08094**    5:22

**1**

**1**    10:3 11:4 19:22
    19:23 20:6 57:6
    58:1 79:18 80:3,9
    96:22 139:14
    199:19,21 240:8
**1,000**    42:21 47:6,8
    47:11,12,13 50:16
    50:18 51:10,11
**1.27**    96:13,15
**10**    3:6 109:8
    112:20,21 113:24
    113:25 118:3,17
    125:10 144:25
    145:7 147:21,22
    155:24,25 166:9
    166:12 171:3
    172:9,13 173:8,24
    174:22 175:1,7
    176:5 177:12

179:23 180:18
181:10 187:21
189:8 205:20
206:4,5,7,9,20
207:10 224:14
231:19
**100**    199:22
**10001**    245:2
**101**    3:15
**10601**    2:6
**10:28**    1:11 4:2
**10:30**    4:23
**11**    110:7,13 144:25
    196:7 197:18
    199:21 205:21,23
    206:10,12 231:13
**1101**    99:18 105:11
**1105**    99:18 100:3
    105:11,14
**118**    3:16
**12**    157:16 158:18
    182:25 183:5,10
    183:12,15 211:21
    212:8 214:12
    216:4 218:2
    234:14 237:24
**12/6/17**    3:10
**12:03**    72:7,8
**12:30**    72:4
**12:32**    72:8,10
**12th**    81:25
**13**    145:8 157:16
    158:18 165:22
    226:7 233:4
**14**    70:14 71:1
    73:18 174:17,18
**14.2**    175:11
**14001**    244:17
**15**    35:6,10,13 71:2
    71:7,8 73:18
    103:24 105:3

133:23 175:4,11
176:12 231:19
**16**    3:9 107:24
    231:22
**17**    3:7 60:11,17
    121:25 122:25
    123:9,10 176:5
**18**    64:19 138:17
**181**    84:18
**1930's**    203:17
    204:9
**196**    3:18
**1990's**    105:19
    106:11
**1993**    193:17
**19th**    82:15
**1:19**    103:10,11
**1:25**    103:11,13
**1st**    87:14,16 88:10
    107:25 108:2,23
    110:1,2 114:7

**2**

**2**    3:16 12:12 17:24
    18:5 19:23 43:10
    69:21 73:17 80:4
    80:10 81:15,22
    82:8,14 83:10
    85:4 94:12 96:22
    117:6,25 118:3
    121:22,22 122:14
    123:11 125:10
    128:10 129:4
    130:15 131:2,10
    131:24 133:22
    139:15 140:11,13
    144:3,4 162:19
    186:24 187:9
    189:8 194:23
    202:11 225:1,6
    226:18 228:13
    229:12 231:16

235:4,16 237:3,8
238:12,13,21
240:7
**2,000**    47:25
**2.00**    109:9 112:22
    112:24 114:2
**2.15**    233:9,21
    234:3 241:18
    242:12
**2.15.**    242:18
**20**    88:18 195:4
    245:23
**2011**    66:22 186:1
    240:11
**2012**    234:21
**2013**    112:14
    234:21
**2015**    64:23
**2016**    39:7 220:19
    220:20 221:1,2
**2017**    75:5
**2018**    24:19 66:23
    75:7
**2019**    3:18 81:25
    107:25 108:2,23
    109:24 114:7
    186:1 198:22
    199:12 229:2
    231:25 237:24
**2020**    1:10 3:18 4:3
    12:15 18:8 24:21
    24:22 61:3 87:14
    87:16 100:10
    101:10 104:1
    114:7 167:16,24
    168:6 198:22
    243:12 245:4
**2022**    244:19
**211**    3:20
**22**    34:18 88:18

**222** 2:12
**223** 3:24
**226** 3:21
**22nd** 39:7
**232** 3:23
**235** 1:2
**23rd** 12:15 18:8
**24** 176:5 226:14
**241** 3:24
**25** 5:21 194:9
  226:14
**26** 1:10 4:3 226:14
**26a** 11:11
**26th** 245:4
**28th** 88:8
**290** 1:14
**2967** 49:9 50:10
**29th** 88:8
**2:23** 143:21,22
**2:41** 143:22,24

**3**

**3** 16:16,25 19:24
  69:25 94:12 95:22
  144:5 154:21,22
  156:14 194:23
  237:2 240:8
**30** 24:19,21,22
  31:7 71:18,22,23
  72:4,17,25 78:14
  88:22 176:2 195:4
  228:15 244:19
**300,000** 135:24
  151:18
**30th** 88:11
**30x100178500**
  244:7
**3200** 1:15
**33** 3:10
**330** 245:2
**34th** 2:21

**36** 65:10
**37** 199:12,25
**3:37** 177:24
**3:42** 177:24 178:1

**4**

**4** 10:21 11:1 13:4
  16:2 33:13 34:14
  35:2 60:9 64:11
  64:18 65:11 70:19
  73:16 108:17
  158:9,12,24
  174:23 188:8,10
  229:13
**40** 18:16,18,25
**400** 198:18 199:14
  232:14
**41** 18:12,23
**44** 189:10,11,13
**445** 2:5
**45** 119:9
**451** 123:18
**48** 3:13
**4:19** 200:14,15
**4:29** 200:15,17

**5**

**5** 3:23 35:6 39:2,3
  40:22 56:13,14
  58:16 59:4,24
  60:11 112:13
  145:7 158:8 166:9
  166:12 170:22
  171:3 172:9,13
  173:7,24 174:22
  175:1,7 176:4,4
  177:12 179:23
  180:18 181:9
  194:19,20 209:6
  211:8 213:3
**5.6** 127:10

**500** 127:10
**500,000** 227:19
  228:14
**51** 119:21,24
  123:21 124:11
**516-608-2400**
  245:3
**52** 123:19
**53** 121:5 122:16,21
**54** 125:11 127:2
**55** 129:10 130:21
  130:22 224:17,22
**56** 3:11,12
**560,000** 127:10
**583794** 39:6 40:2
**583795** 40:10
**583994** 27:16
**5:03** 222:11,12
**5:05** 222:12,14
**5:18** 1:2
**5:32** 242:24,25

**6**

**6** 24:19,21,22 31:7
  40:8 56:14,15,22
  57:1,7 59:4,5,24
  78:14 82:4,4,6
  122:3 149:4,4,6,18
  169:22 170:13
  202:13
**60.62** 96:16
**605** 2:5
**60606** 2:21
**63** 199:23
**63.40.** 96:14

**7**

**7** 48:25 49:7,20
  59:10,14 82:3
  117:12 133:22
  138:17 157:3

**70** 234:15

**8**

**8** 26:1 39:25 91:13
  91:25 97:24 144:6
  147:22 165:15,18
**84** 234:15
**8:00** 13:14

**9**

**9** 26:1 40:1 96:21
  101:9 103:14
  109:9 139:15
  165:15,18 232:3
**908-753-8300** 2:15
**908-848-5922** 2:15
**91** 3:14
**914-298-3281** 2:8
**914-298-3294** 2:8
**96** 40:10

**a**

**a.m.** 1:11 4:23
  13:14
**abbreviation**
  81:16
**ability** 8:1 225:8
**able** 10:3,9 23:22
  72:1,22 102:21
  114:15 171:5
  173:23 188:11
  203:20 225:20
  232:13 236:7
  239:22
**absolutely** 97:3
**acceptable** 174:2
**access** 20:23 21:8
  82:1 118:22 135:9
  135:25 136:2,4
**account** 76:24
  77:5 88:15,20,25
  89:2 108:19
  110:15 112:5,7

113:4 127:9 128:8
138:25
accounted 130:11
accounting 135:3
182:6 183:1,2,4,4
183:8,16,21 184:8
184:10,17,19
185:7 231:10
accountings 183:1
accurate 230:11
244:8
accused 12:3
acknowledge 5:1,4
acquired 149:19
217:5
acquiring 213:18
214:15 215:4
218:6
acronym 122:6
action 1:2 30:3
34:16 244:11,12
actions 23:6 32:20
32:24
active 84:13
actual 18:23 32:20
71:3 85:17 86:11
151:23 160:22
197:23 206:10
225:2 237:12
add 139:11,24
191:6
added 42:15 110:9
117:9,14,18
120:17,22 121:12
129:19,24 132:1
167:3 173:7
181:18 201:2,5
203:9 224:10
225:3,9,11,14
227:5 236:11

addenda 58:3 59:9
addendum 59:15
adding 229:24
addition 147:2
201:3
additional 46:19
74:25 99:8 109:3
110:12 112:4,5
114:9 143:1
148:19,21 176:14
191:8 201:10,24
206:12 207:19
215:6 227:5,19
228:24 229:24
address 19:23
222:3 225:1,7
addresses 115:18
addressing 193:20
adjustment 87:6
87:21 94:20 95:21
95:23,23 96:7,13
97:4 137:14
adjustments 86:21
87:1,8 89:23 97:1
134:20 239:18
administer 5:5
administered 5:4
administers 86:1
administrative
66:11 152:19
187:15
adopting 81:25
118:19
adults 199:25
231:19,22
advantage 116:5
advocates 228:21
affect 8:1 65:17
134:12,16 138:6
194:14

affiliated 31:4
145:16
afternoon 72:11
72:12 143:25
144:1
agencies 83:3,4,24
83:25 84:21
agency 83:14
agenda 170:12
aggregate 89:3,4
89:11 134:9
138:22 141:2
142:7,12 156:9
158:11 184:12
aggregated 74:24
77:8 135:7 146:15
151:7 185:4
aggregation 77:8
ago 31:5 32:5,6
39:22 119:9
167:20,21 170:21
191:5
agree 5:10,11,13
5:15 36:2 43:14
47:19 58:15 67:22
74:2,12 75:20,24
76:3,17 95:9
107:6 108:11
113:7,21 116:18
125:4 153:19
165:12 171:22
188:19 190:2
214:19 225:12
agreed 11:14
agreeing 211:9
agreement 5:8,9
53:1 58:2,8,12
59:5 65:15 157:25
171:18 179:18
180:4 217:16

agway 1:7 3:8 4:7
4:10 7:17 17:2
20:24 24:20,21,23
25:11 26:6,14,18
26:23,25 27:15
28:14,18,22 29:6
31:1,5,8,24 32:3
32:17,18 33:4
34:17 36:25 37:4
39:6 40:2,10,22
41:13,23 42:12,14
42:15,16 43:16,21
46:21 47:3,25
48:16 49:9 58:8,9
58:11 59:21 60:18
64:22 65:14,20
68:21 69:18 70:2
70:6 71:3 73:21
74:1,9,23,23 77:8
77:9,12,16,17
78:12 79:6,7 80:1
80:2,8,12,18,21
89:4,25 90:5 97:8
97:13 101:20
109:16,18 110:4,8
110:10,14 112:20
113:6,24 114:3,15
114:19 115:11,14
115:24 116:1
120:24 122:23
123:19,23 124:9
124:14,15,16
125:3,17,20,25
127:4,7,7,18 128:4
128:12,24 130:2
130:13 131:11
132:11,18 134:10
135:7,21 136:19
136:25 137:23
144:11 145:16,23
146:2,13 147:1,24

147:25 148:22
149:4,20 150:6,17
151:10,24 155:5
156:2 157:13
158:1,2,7,12
159:14 160:25
163:5 164:8 166:7
167:25 168:22
170:12 171:4,24
172:15,21 173:4
173:14 174:24
175:2 177:7
178:12 179:1,17
180:3,12 181:18
181:21 185:14
192:2,4,8 202:7
206:13,16 207:8,9
208:20 209:18
210:15 211:1,9
212:11,16 213:16
213:19 214:2,14
214:20 215:2
216:6,15 217:2,5
218:4,8,11 219:2
219:14 220:14,19
223:22 227:11,16
230:4,25 231:5
234:17,22 236:7
236:17 237:4
238:3,12,21
240:16 245:4
**agway's** 20:10
29:18,21,24 46:23
51:2 60:22 61:4
61:11 62:20 63:5
65:18,25 73:20
78:13,20 109:20
121:10 122:19
127:10 134:1,5,10
135:9 137:17,18
138:21 139:3

144:17,18 149:24
152:25 153:20,23
154:11 157:9
160:4,24 163:1
166:20 172:3
173:5 178:6,20,22
181:17 216:10
217:10,25 218:10
218:12,19 219:3,4
219:16 220:10
**ahead** 8:24 9:13
10:18 13:9 16:14
61:8 165:25
180:21 196:23
198:23 200:2
212:12
**air** 42:18 47:16
48:6 50:16 51:11
**airy** 2:12
**alcohol** 8:1
**allegations** 32:11
**alleged** 32:20
**alleges** 125:25
**allow** 138:9,11
140:9 187:25
188:24
**allowed** 132:16
238:2
**allowing** 188:11
189:15
**allows** 171:24
223:22 238:21
**alternative** 106:19
160:10,11
**amend** 22:8 170:5
**amended** 3:5 10:4
**amount** 73:19
100:22 108:4,19
111:6 113:8 139:2
142:12 144:11
157:12 171:7

172:7 174:25
229:17
**amounts** 155:10
173:4
**analogue** 84:1
133:19
**analyses** 80:24
**analysis** 55:10,14
55:18 80:15 117:7
127:9 128:8
130:11 136:7
138:1,6 160:3
162:4,5,16 163:15
166:10,18,19,20
168:14,15,20
171:16,17 172:25
173:4,20,24,25
177:11 178:25
180:19,23,25
184:6 191:16
192:13 208:18,19
208:21,24 209:2
209:23 215:9
221:7,10 231:2,12
**analyze** 219:13
**analyzed** 198:17
198:18
**analyzing** 81:13
**ancillaries** 65:16
149:21 150:24
217:7
**ancillary** 150:18
151:5 152:3
**andrew** 1:13 5:21
243:7 245:5,21
**anecdotal** 163:21
**annual** 47:24
193:18,22,24
195:15,16,21
199:1

**answer** 8:13,18,24
9:5,9,10,13,13
11:21 22:3,13
23:13,13 24:3
30:9 37:22 39:19
44:13 48:11 49:23
53:21,21 60:2
71:14,15 77:11
78:7 85:3,18
92:15 100:19
102:8 108:8
124:20,21 126:10
126:14,18,23,24
130:24 132:12
141:24,25 146:6
147:11,14 167:22
170:6 173:13
174:16 179:25
191:4 194:4,6,11
194:16,25 195:1
196:21 200:3
218:23,24,25
219:23 226:1
228:4,5,19 232:20
235:1,7 238:8,9
**answered** 8:7 22:4
22:5,16 24:2
31:13 49:21 53:16
54:1 61:14 62:25
78:24,25 112:9
113:2,23 114:5
120:8 127:25
130:17 131:14
139:5,21 140:25
141:8 142:20
146:6 154:4
156:23 161:15,16
164:11,17 171:15
172:24 173:16
177:10 186:3
193:10 195:9,20

210:24 211:13
213:9 216:23
219:9 221:19
234:25
**answering** 11:8
147:12 154:14
193:14 213:10
238:15
**answers** 22:8
29:21 48:17
**anticipated** 189:16
**antivirus** 102:15
**anybody** 14:2 38:4
45:19,25 130:5
186:15
**anytime** 167:5
**apologies** 18:7
48:10 148:15
**apologize** 9:18
70:21,24 85:16
96:5 111:10 116:6
121:20 122:17
154:6,8 155:3
159:7 165:20
192:21,22 200:2
200:23 211:5
215:13 221:7
231:6 236:25
241:3
**apologizes** 96:23
**apparently** 186:19
231:5
**appeals** 3:19
212:10
**appear** 7:15
145:12
**appearance** 4:3
**appeared** 21:3
**appears** 22:15
157:11 197:5

**apple** 164:19
165:4,6,14
**apples** 74:14,14,16
74:17 86:16,16
107:14,14 133:5,5
141:11,11
**appliance** 165:3
**appliances** 46:18
**applicable** 65:17
145:25 149:23
152:4 204:12
217:9 230:21
**application** 107:8
131:7
**applied** 138:21
152:2 153:8
191:11,24
**applies** 214:20
**apply** 163:9
186:25 192:19
206:8 208:6 230:3
231:12 236:16
**appreciate** 72:13
126:18 224:12
**appropriate** 72:19
73:2,2 120:17
134:23 155:17
231:3,12
**appropriately**
32:17
**approval** 186:25
**approved** 58:3
**approximately**
228:15 229:2
234:14
**approximates**
97:14
**april** 221:1
**area** 23:3 143:12
**argues** 213:16

**argumentative**
113:2 114:5 124:7
127:25 138:15
139:20 140:25
142:20 151:20
162:21 173:19
211:13 218:22
220:16 236:14
**arguments** 84:23
**aron** 2:20 4:18
**arrangement** 5:6
**art** 174:3
**article** 3:15 101:11
104:2 111:8
**articulated** 195:2
**ascribe** 190:22
**ascribed** 181:24
191:3
**aside** 76:21 124:9
204:7 220:2 224:5
**asked** 14:5,11
19:22 31:12 37:10
41:7 45:22 48:20
49:23 53:25 61:13
62:25 69:25 78:14
78:19,23 92:16,23
112:8 113:1,23
114:4 120:8
127:24 128:20,21
130:16 131:14
139:4,20 140:24
141:7 142:20
146:7 154:3 155:4
156:22 158:20
161:14 164:10,16
170:2 171:14
172:23 173:11,15
173:17 177:9
186:2 195:8,19
210:23 211:12
213:7,8 216:22

219:8 221:18
234:24 237:18
**asking** 15:25 41:4
58:19 62:17 73:10
101:21 147:9
151:25 165:1
178:19 180:7
189:1,4,6 197:1
198:4 211:20
213:2 230:7
237:13
**asserts** 124:16
**assessed** 98:14
190:18
**assessment** 124:24
217:10
**assessments** 65:18
149:24 152:6
172:3 217:24
**assigned** 162:11
162:13 166:24
181:10
**associate** 4:15
**associated** 14:12
162:15 182:21
**associates** 2:20
**assume** 39:22 69:8
79:14 99:15
101:16 109:17,23
110:2 156:4 184:9
185:14 193:22
195:24 199:22
241:6
**assumed** 184:11
**assuming** 138:19
175:24 176:5
**assumption** 114:7
145:24 146:4
156:6
**assumptions**
144:13,15,16

145:11,13,15
146:7,8,10,10
162:6
**atb** 1:2
**attached** 27:25
**attention** 10:3
11:1 16:15 19:2
35:5 48:24 60:11
64:19 65:9 144:5
169:20 213:3
223:9
**attenuate** 194:16
**attorney** 3:2 9:16
9:17 33:12
**attorneys** 2:5,12
4:25 8:11,17
**attributable**
129:22,23
**audio** 28:12
**august** 1:10 4:2
158:7 221:1 245:4
**authorities** 12:19
**authority** 145:2
**available** 12:16,22
140:21 148:25
210:11 225:23
**avenue** 1:14 2:5
**average** 47:3
89:10 95:3 182:22
234:17
**averages** 97:13
**avoid** 110:14
**avoided** 114:17
230:3
**awards** 18:18
**aware** 55:22 63:13
64:6,10 115:13
142:14 186:14
193:18
**awesome** 38:2

**b**

**b** 24:19,21,22 31:7
78:14 99:18,18
105:11,11 202:14
**back** 11:17 12:5
17:23 22:3,8 40:4
43:9 54:21 56:13
58:7,23,25 60:9
71:23 72:1,4
78:11 81:19 84:16
85:3 90:2 97:18
108:16 111:7
113:12 121:21
122:17,21,23
123:10,17 125:9
128:22 131:17
133:21 144:2
147:13 165:13
169:15 170:20
171:25 200:20
202:10,25 203:20
204:20 205:22,25
206:12,16 207:21
208:10 211:1
218:2 222:6 224:8
230:19
**backed** 177:1,2
**background** 20:14
83:23 171:21
182:17
**bad** 235:6
**badgering** 220:16
**bar** 49:15 199:18
**bargain** 159:1
208:5
**barring** 219:11
236:7
**base** 80:2 218:4
223:22
**based** 8:23 17:15
17:21 20:9 34:10

42:3 60:21 74:22
79:3 85:12 87:22
87:23 96:4 124:3
127:2 134:1
137:17 145:22
146:2 147:7
159:15,17,22,24
160:1,3,25 166:18
168:23 172:25
173:5,7,20 175:2
182:18 183:23
184:10 185:4
194:17 207:17
208:22 214:14
217:2 228:10
**basically** 182:20
204:23 230:20
**basing** 80:25
**basis** 9:1 14:13
32:15 70:17
101:22 111:19
127:14 135:1,8
136:18 151:25
155:12 157:22
160:7 170:8,22,25
171:3 175:14
192:7 220:1
221:12 228:22
**basking** 2:13
**bates** 27:16,25
39:5,21 40:2,10,14
49:8 50:10 77:20
77:24,25 80:20
92:4 101:14,24
178:16 226:14
**bathroom** 177:16
**bear** 205:4
**bearing** 18:6 39:5
40:9 49:8,8 50:9
92:1

**beat** 173:23
**beating** 175:8
**beg** 162:18
**beginning** 21:25
95:12 135:11
184:14 203:9
204:7 230:6
**behalf** 5:13 84:4
**belated** 231:14
**belatedly** 231:14
231:14
**believe** 10:14 17:2
39:23 42:25 43:11
44:25 57:20 58:20
60:5 67:8,19 68:5
78:25 86:17 87:11
98:17 99:7 111:8
116:16 119:24
135:10,16 136:12
139:12 147:9,20
148:24 154:6
155:2 161:16
164:13,18 175:7,8
178:4 180:15
185:20 188:3
189:6 190:15
195:13 203:8
227:3 228:13
233:12
**belt** 6:12
**benchmark**
157:25 168:16
208:22 210:4
**benchmarks**
158:22 161:1
**benefit** 47:24 52:1
110:13,24 113:6
117:19 125:19
127:6,13,20
**benefits** 42:6,6
46:12 120:18

[benefits - bottom]                                                      Page 7

121:13,16 128:6
129:5 163:25
164:2
**best**  6:13
**better**  185:16
207:3
**bevan**  2:11 4:6,10
**beyond**  143:8
163:21 191:8
242:3
**big**  79:3 140:2
**bill**  3:21 35:20
93:19 96:8 98:15
106:24 107:16,25
108:1,12,21 110:5
129:22 143:1,2
192:3 199:14
226:15 227:6
229:14 232:3,4,9
232:14 233:5,8,23
235:10,20 236:4
239:3 240:14,15
241:15
**billed**  88:21,22
**billing**  88:7,8,10
88:15,15 89:6,7,8
95:2 96:1 135:15
137:1 140:22
236:10,15 239:4
239:13,15
**bills**  3:14 92:1,20
93:12,13 99:25
199:3 226:13
231:20,22,23
232:16 234:2,4,6
235:18,21 236:9
239:19 240:12
**bit**  89:8,9 207:8
**blah**  124:15,16,16
124:16,17,17
200:2,2,2

**blank**  95:4
**blankinship**  2:4,7
3:24 4:11,12,12
5:12,13 7:19 8:12
8:21 9:12,17,19
11:6,16 12:2,10
13:20 14:9 16:1
16:19,23 17:17
18:15,20,24 19:19
19:20 20:1,2,19,25
21:2,4 22:11,15,18
23:2,12 25:7,15,18
27:11 30:6,10,16
30:21 31:12,18
32:13,22 33:2,19
33:22,25 34:4,6,9
36:6,17 37:18,20
38:1,17,20,25
41:15,17 42:8
43:3,19 45:15,21
46:2,7,15 48:2
49:3,5 50:3,22
51:15 52:21 53:10
53:25 55:7 56:19
59:6,12,17,22 61:6
61:13,19 62:23,25
63:8,17,20 64:3,9
64:14,17 66:2
69:3 71:16 72:2
72:13,16,24 74:5
74:15,21 75:8,17
78:8,23 82:23
84:5,7,12 86:13
87:19 89:21 90:9
91:7,17,19,21 92:3
92:7,10,22 93:1,5
93:15 95:16 96:9
97:17,21 98:10,16
99:1,23 100:6,16
101:6,7,13,16
102:2,10,13

104:12 106:14
107:9 108:6,9
109:12 112:8
113:1,17,23 114:4
115:21 116:21
117:1 118:9,12,14
120:6,8 123:8,12
124:6,19 126:9,13
126:17,22 127:24
128:13,19 130:7
130:16 131:3,13
131:16,20,23
132:3,13 133:2,7
133:17 134:8,14
135:13 138:2,14
139:4,17,20,23
140:1,24 141:7,21
141:22,24 142:19
143:7,15 147:13
148:4,7 150:8,11
151:19 152:11,12
152:14,23 153:13
154:3 156:22
158:14 159:5,9,19
160:15 161:8,14
161:21 162:2,20
163:3,6,11,20
164:5,10,16,24
165:8,16 166:8,13
166:15 167:1
168:4,8 169:13
170:7 171:14
172:5,17,23
173:15,18 174:7
175:6,23 176:9
177:9,20 179:2,13
179:19 181:14
182:10 185:13,19
186:2,11,17 187:3
187:8 190:25
191:17 193:4,21

194:7 195:8,19
196:8,11,14,20,23
197:12 198:20
199:6,15 201:6,17
202:3 203:23
205:16 208:17
209:21 210:23
211:12 212:2,3,6
214:21 216:17,22
217:19 218:22
219:8,18,25 220:5
220:8,15 222:9,17
222:18 223:1,7
224:18,21 226:6,8
232:19,22 233:4
233:13,17 234:7
234:11,24 236:13
236:22 237:9,17
238:6,16,25
239:24 240:22
241:9,13 242:19
**blankinship's**
14:11
**block**  217:2
**blocks**  204:3
**blood**  244:10
**bmg.law**  2:16,16
**board**  193:19
195:14,25 196:1,3
199:12 227:24
228:8 231:15
**body**  83:1
**bold**  40:2 42:11
43:1 50:15 160:3
169:9,25 209:10
209:10 211:7
**borrow**  86:16
**bottom**  10:16,21
17:5 19:3 35:7
39:5 42:11 49:16
119:22 122:1

[bottom - case]                                                                 Page 8

127:2 133:23
197:24 202:17
**bought** 205:4,8,9
205:14,21 206:21
207:12 208:15,15
209:1
**bounce** 102:22
**bouncing** 154:19
**bow** 211:6
**box** 57:5,6,12,12
57:13 93:17,17
**boxes** 57:14
**bpu** 239:6
**breached** 213:16
**break** 8:5 71:23
72:14,14 73:4
103:1 144:3 151:3
177:15,16,19
200:21 235:9
237:5
**breakdown** 42:18
47:16
**breaking** 194:13
**brian** 2:24
**brief** 177:19 185:9
**bright** 174:1
**bring** 91:1 129:9
165:9
**bringing** 56:13
**broader** 36:9
152:17
**brochure** 3:13
28:4 37:16 48:13
48:18 59:15,18
**brochures** 26:3,6
**broken** 237:7
**brooklyn** 75:6
**brought** 23:6 30:3
**brown** 3:20
212:11,16,23
213:16 218:11

219:3,15 220:14
220:18
**brown's** 214:13,25
220:21
**brunt** 111:16
**bucks** 114:8
**budget** 100:11
101:11 104:2
**bullet** 50:14
**bunch** 85:4
**bundled** 120:25
238:4
**burdensome**
201:22
**business** 80:24
88:18 106:22,25
204:4
**businesses** 116:19
116:22
**buy** 86:19,23
205:15 206:20,23
**buying** 107:20
188:12 207:2,3
**buys** 207:10

**c**

**c** 2:1 100:3 105:14
**c.c.r.** 244:18
**calculate** 74:7
75:2 77:9 85:18
112:16,17 133:25
142:4,12 144:11
146:12 158:22
220:25
**calculated** 73:19
74:8 78:15,21
109:14 115:24
138:18 151:10
155:11 156:15
157:8 167:4 176:2
177:3,6 178:13
215:22 216:16

227:20 229:22
234:5
**calculates** 85:9,10
115:25 116:1
**calculating** 70:10
134:1 155:10
157:12 179:11
214:1
**calculation** 46:11
46:13 74:13
109:11 134:9,24
152:7 154:1
159:15 160:8
164:3 165:23
175:22 176:11
180:18 181:17
183:20,22 184:8
184:11 191:14
229:20,24 230:5
234:6,16
**calculations** 3:9
17:20 74:22 77:10
135:8 138:7
141:18 142:18
153:2,11 155:17
156:14 157:5
159:3 166:25
167:19 175:15,16
175:17 178:6,7
191:6 214:5
220:11
**calculations.xls.**
17:3
**calendar** 42:22
47:9,25 50:17,19
51:10,12 66:13
97:8
**call** 6:2,6 27:20
28:13,17,21,23,25
38:12 40:22,23,25
62:13 82:7,8

87:14 131:6
136:13 139:12
147:6 157:18
159:22 181:6
**called** 57:17
101:10 115:4,4
119:10 182:16,22
223:16 226:19
241:1
**calling** 38:13
56:21 141:11,12
157:20 209:5
227:5
**calls** 7:19 13:12
15:7 59:6 82:23
219:18
**camera** 33:11
**candor** 197:15
**cap** 52:6
**capabilities** 236:6
**capacity** 65:16
149:21 150:17,24
151:5 152:3 217:6
236:10
**capital** 179:1,8,11
179:21 180:2,8,11
181:2,5,11,13,20
182:12,15,18,23
182:25 183:7,8,11
184:15,22 204:11
208:4 231:1,11
**capitals** 58:2
**capone** 2:14 4:9,9
5:11,11 34:4
**caps** 58:12 169:25
**caption** 4:23
**career** 52:9 53:17
53:24 54:18,22
163:17
**case** 3:19 33:18
65:25 77:7 81:1

85:12 86:18 89:1
93:22 96:4,12
99:5 104:25 117:4
119:1 201:8
205:11 212:14
216:5 245:4
**cases** 81:10 145:6
145:8 158:22
166:18 213:24
**cash** 200:1,6
**catch** 186:14
**categories** 179:8
**category** 152:19
225:10
**cause** 13:15,17
32:24
**caused** 96:1
**causes** 32:20 107:6
**caveat** 39:20
**cent** 110:4,9
205:25 206:12
**central** 3:14,21
41:22 42:18 43:16
43:24 44:3 47:16
48:6 50:16 51:11
64:24 68:21,25
69:6 73:12 75:4
85:8 86:4 88:6
90:15 92:20 93:23
161:3,4 226:16
236:9 240:6,20
**cents** 109:20,21
111:5 205:8,9,20
205:22,23,24
206:4,5,9,10,12,20
206:21,22 207:10
207:12,14 229:13
229:13
**certain** 11:24
86:23 125:3
159:14 242:16

**certainly** 84:22
193:8 236:3
239:17
**certificate** 244:3
**certified** 1:16 5:19
244:5
**certify** 244:7,9
**chance** 84:16
**change** 24:3 66:10
85:18 95:18 114:9
133:1 239:13
245:6
**changed** 26:19
27:5 66:7 98:21
99:8 110:22
239:10
**changes** 60:24
82:1 84:25 86:24
88:20 118:19
**changing** 239:15
**chantal** 2:7 4:15
5:15 102:18
147:20
**characterization**
50:23 119:5
197:13
**characterize** 53:6
**characterizing**
105:1
**charge** 64:24 66:6
73:25 75:21,25
77:3 87:10 89:13
89:15,18,22 90:1,8
90:12,15,18,24
94:16 96:20
108:14 110:15
111:6,9,14,16,17
112:21,22,23
114:16 128:10
129:17 130:3,14
131:25 137:13

141:15,15,16
142:6,10 145:3,3
146:21 172:7,16
172:22 173:14
207:13 208:14
229:4,6,10,11,16
230:22 233:15
**chargeable** 179:17
**charged** 32:17
60:23 61:4,12
62:21 69:16 73:20
74:1,9,10,25 75:4
75:5,14 76:5,13,23
80:8 86:12 87:18
88:11,14 89:25
90:8,14,17,21 98:5
108:4 109:8,9
111:12 112:21,24
113:25 114:2
117:18 133:11
134:6,7 139:1,2
153:21,23 158:7,8
158:9 159:13
177:7 180:12
204:5 209:19
212:19 213:19
214:2 216:7,9
220:14 229:3,4
235:9
**charges** 65:18
66:5 71:4 94:12
94:15 98:6,15
112:20,22 113:24
114:2 133:11
138:18 149:22,24
150:18 151:1
152:4,6 153:12
161:24 172:2
217:7,8,10,24
218:7 227:17
228:24 229:11

230:21 238:5
**charging** 112:1,2
168:22 175:2
185:2 210:1,8
240:16
**charles** 2:20
**chart** 112:13
**charts** 97:14
**check** 39:21,23
78:11 79:23 80:5
85:15 88:16
145:21 153:16
154:13 167:20
169:18 171:25
190:16 211:2
241:23 242:2
**checked** 78:10
95:17 186:7
240:23
**chicago** 2:21
**choice** 46:5
**choices** 188:16
189:3
**choose** 35:14
**chose** 191:14
**chronological**
237:6
**cindy** 72:22 84:8
97:18 118:21
147:13 222:22
**circle** 71:23 81:19
173:11 208:10
222:6
**circles** 94:12
**circling** 85:3
**circuit** 212:9
218:3 219:13
**circuit's** 219:20
**cite** 82:3 216:11
**cited** 27:23 66:23
82:4,5 123:18

city  98:18 204:3
civil  1:2
ckhalil  2:9
claim  32:15 47:3
  201:14,20,21,21
  201:25
claimed  125:3
claims  32:11 46:25
  124:15 202:8
clarification  9:15
  19:4
clarify  18:16,21
  39:18 50:25
  210:19 220:6
clarifying  45:6
  93:8
class  13:24 23:6
  30:3 33:1 34:15
  68:6,8 79:9,12,15
  79:18,24 80:3,4,9
  80:10,13,14 88:7,9
  95:19 140:19
  147:24 155:13
  156:21,25 185:25
  193:15 194:1,2
  195:5,6 215:15,19
classes  68:4,6,14
  68:16,17 69:5,7
  76:22
classification  76:4
classifications
  68:12 69:1,9
  73:10 94:4
classified  155:20
clause  173:1
  207:24
clauses  53:18
claw  202:25
  203:20 204:20
  205:24 206:12

clean  72:5
cleaner  131:21
clear  37:6 40:21
  48:4,5 81:21
  103:25 123:11
  125:14 145:10
  159:21 183:25
  192:6 218:4,8
  219:14
clearly  195:2
clicked  240:19
climate  94:10
close  197:15
closing  111:10
cogs  178:6,20
  180:4,8 183:20,22
collect  185:5
collected  81:3
collection  96:1
collectively  28:9
colloquial  239:14
colloquy  8:17
  51:16 93:6 168:9
  237:11
columns  57:19
  166:23
combine  141:14
combined  56:9
come  22:1 50:8
  72:4 200:24
  205:22 211:4
  236:1
comes  6:13 34:8
  50:11 118:12
comfortable  19:15
  82:11
coming  203:17
  217:17
commensurate
  171:6 227:19
  228:23

comment  164:13
  164:14
commentary
  189:22
commentating
  189:25
commercial  69:10
  69:10 167:18
commission  81:12
  81:17,25 83:1,5,5
  83:8 85:14 86:2
  117:5 118:18
  122:6,7 129:5,15
  129:21 130:2
  159:25 162:13
  163:13 186:20
  188:23 189:14
  224:9 225:9,18
  227:4,23 228:1,2,7
  228:11,14 244:19
  245:25
commission's
  120:22
commissions  84:1
  227:22 228:12
commit  205:20
committed  114:21
  158:25
commodity  86:20
  96:16 105:17
  112:21,22 129:22
  189:15 226:25
  229:11
common  6:7 44:25
  61:23 76:7 84:21
  87:9
commonly  94:1
communicate
  236:3
communicated
  115:11

communicating
  236:18
communication
  14:3 115:13
communications
  11:9
companies  23:7
  105:21,22 107:12
  216:8 232:10
company  35:23
  36:4,15 41:9
  61:22 81:5 105:24
  106:23 112:1
  114:20 115:23
  116:6,7 132:16
  205:7
comparable  55:16
  55:20 114:25
  121:14 125:20
  127:20 128:7,7,23
  130:10 168:17
  241:4
comparative
  160:13 240:5
  241:4
compare  55:18
  62:21 63:6 74:19
  75:1,4,10,13 77:12
  77:16,16,22 78:1,4
  78:12,15,21 79:8
  79:24 80:9,23
  81:3,6 85:9,12
  86:6,14,15 87:3,16
  95:5,10,13,15 97:8
  97:11,16 109:19
  110:8 112:3
  114:12,17,22
  115:8 116:5
  133:14 134:2
  137:16,17,19
  139:7,9,10,13

140:10,16,18
141:11,12 148:20
160:2,20 161:24
166:18 168:15
171:6,20 173:3,20
173:23 175:9
180:23,25 201:9
208:21,22 209:3,8
209:16,19 210:6
210:12,14,20,20
210:22 211:1,17
215:8 238:24
239:22 240:11,21
240:25 241:5
**compared** 71:4
96:19 100:22,23
107:21 108:15
127:6,13 188:14
214:3 228:16
**compares** 77:5,9
79:3 80:8
**comparing** 214:1
220:13
**comparison** 74:14
74:17 77:3 78:1
80:16 86:17 87:3
96:19 137:5
218:12,18 219:4
229:10
**comparisons**
75:15 108:17
219:16
**compete** 116:19
116:23
**competition** 85:11
105:18 106:18
**competitive** 116:5
158:19 159:14,17
160:5,9,19 173:2
204:6 209:13,14
209:19 210:5

211:10,16 215:10
**competitor** 185:11
185:14
**compiled** 137:23
161:1
**complaint** 3:10
22:22 23:10,16,20
25:14,16 32:7,8,12
33:17,21 34:16,23
34:23 35:7 36:12
41:7 60:10 64:14
64:19 65:10 68:23
156:19,21
**complaints** 23:14
**complete** 11:4
12:8 48:11 201:22
**completed** 162:4
**completely** 93:5
200:1 220:16
**complicated**
217:15
**component** 180:3
**components** 85:24
139:7 140:15
141:13 151:4,8
**compound** 14:10
16:1 37:21 41:18
43:20 109:13
130:8 158:16
159:20 237:12
**comprehensive**
117:7
**comprise** 152:9
**computer** 102:16
154:5
**con** 75:6 87:11
88:13 89:17,25
90:18 139:8
141:10
**concept** 179:22
182:2,6

**concerning** 212:19
**concluded** 242:25
**concludes** 129:15
**concluding** 84:15
**conclusion** 7:20
59:7 219:19
**condensed** 209:9
**conditioning**
42:19 47:16 50:16
51:11
**conditions** 20:13
27:8,14 37:8,9,13
37:14,24 38:14
42:1 52:6 56:21
130:22 157:19,20
160:22 169:22
**confidential**
167:18
**confirm** 11:25
132:19 184:16
**confused** 111:2
**conjunctive** 51:1
**connected** 44:10
71:24
**connection** 23:6
61:17 167:8,9,10
167:11 213:13
**consent** 5:6
**consequently**
105:23
**consider** 166:6
178:20 190:9
218:8 225:10
**considerable**
175:1
**considered** 13:6
14:7,20,25 15:4,19
16:4,11 144:23
145:17 190:19
230:10

**consistent** 40:15
41:3 81:8,9,11
83:20,22,23 84:2
99:13,21 100:5,13
120:19 130:18
160:21 162:12,17
177:8 216:14
237:25
**consistently**
232:15
**consultant** 4:20
171:1 228:4,6
**consumer** 54:20
226:15
**consumers** 35:14
54:18,23 63:14
64:2,8 69:16
193:2 226:23
228:15 232:8,13
**consumption**
194:15,16
**contain** 53:18
**contained** 52:19
52:23 151:8 230:9
**contains** 77:24
115:17
**contents** 103:19
230:8
**contest** 177:17
**context** 36:9 52:25
53:2 89:17 198:14
198:24 199:2
204:8
**continue** 8:13
35:15 125:20
126:19 127:7
128:24
**continued** 127:7
**continues** 35:20
148:8 216:25

**continuing**  12:3
**contract**  28:1,1,2
  28:9 36:18,21,23
  37:2,7,11,12 40:24
  41:14 52:23
  168:23 174:24
  178:22 206:11
  213:17 214:13,25
  216:5,8,14,19
  217:1,16 220:21
  221:6 227:25
  228:7
**contracting**  206:6
**contracts**  52:15,19
  53:5,18 221:10,16
**contractual**  218:4
**contractually**
  172:15
**conversation**  9:4
**conversations**
  14:24 15:3
**convex**  175:24
**conveyed**  13:5
  14:7,20,24 15:4,9
  15:18 16:4,11
  24:11 143:5 147:5
  147:6,10
**conveying**  14:16
**copy**  3:8 17:2
**corporate**  192:14
**correct**  18:24 23:4
  23:7 25:20 31:11
  31:14,17 32:1,7,9
  39:16 43:2,8,18
  44:15 46:8 47:13
  47:17 48:1 53:20
  54:10,12 58:22
  59:2,5,11 61:20
  62:2,14 65:3,6,8
  65:25 67:12,18
  68:4,12,22 69:12

69:13,18 70:16
71:4,11,13 73:22
74:2,20 76:10,11
77:15,17,22 78:2,9
78:9 82:2,22 87:7
87:12 93:20 96:17
97:3 99:25 101:20
108:5 113:10
119:3,8,12,14,19
122:6,11,20 130:6
131:9 141:2
142:15 146:22
147:3 151:18
153:24 157:9,13
157:14 158:23
159:18 164:3,9,12
166:25 174:9,22
178:14,17 179:9,9
179:15 184:25
188:1,6 190:7
191:9 194:15
196:13 207:22
210:6,16 214:4
215:17 216:24
217:25 218:20
221:2,21 227:13
227:23 229:7
232:5,17,18,21
239:1 240:6,8,17
242:14
**corrected**  82:6
**correctly**  20:15
  35:12,25 42:23
  58:4,13 60:16
  61:1 64:21 65:1
  65:22 70:7 96:2
  106:2 107:4 120:1
  121:2,9,18 125:22
  129:7,25 144:13
  148:2 149:25
  151:9 177:5

188:17 189:21,23
190:3 194:11
203:8 213:22
214:17 216:12
217:12 218:15
219:7 221:4
225:17 232:1
233:10
**correspondence**
  13:4 14:6,15 16:6
**cost**  46:17 65:15
  95:3 96:13,16
  110:6 127:6,9,13
  140:12 144:17,18
  144:24 146:5,16
  147:2 148:21,21
  149:19 150:9,16
  150:23 151:2,7,10
  151:12,21 152:2
  162:5,8,12,14
  164:22 166:19,20
  168:20 171:6
  173:5 176:10
  177:12 179:1,8,8
  179:11,21 180:2,8
  180:11,19 181:1,5
  181:11,13,20
  182:12,14,17,21
  182:21,22,24
  183:7,8,11 184:15
  184:20,22,25
  185:2 191:7,8,10
  203:15 204:5,9
  206:19 208:4,4,19
  214:15 215:4,5
  218:10 220:10
  231:1,11
**costs**  20:11 35:22
  45:7 52:5 55:19
  65:19,20 66:18
  95:2 121:14

125:20 127:21
128:8,8,24 129:7
130:11 139:12
140:13 147:2
149:24 150:6
152:18,22,25
153:3,5 160:24
161:1 162:15
163:24 164:1,2
166:24,25 167:2
168:23 172:3
175:3 179:3
181:17 182:1,13
188:14 190:22,24
191:23,24 201:21
201:24 203:1,2,4
203:21 204:11,11
204:13,17,19,20
204:23 205:3,12
205:23 206:5,10
207:1,25 208:1,19
208:24 215:6
217:3,11,25 218:5
218:8 223:23
224:1,5,10,11
225:14 226:24
227:11,16,17
228:14,23
**counsel**  4:3,7 5:6
  13:13 21:11,21
  147:1 159:8
  228:21
**counterpart**  228:9
**counterparts**
  228:22
**country**  245:2
**counts**  18:25
**couple**  58:25 61:8
  65:11 71:17 72:5
  159:12 167:20
  187:23 200:18

223:2
**coupled** 169:15
**course** 8:4 11:20
21:25 26:19 27:6
31:8 37:25 38:19
43:4 53:17 54:22
55:8 65:24 69:15
92:14 97:7 157:5
163:17 193:5
**court** 1:1,16 3:19
4:21 5:19,22 6:22
7:1,11 34:19,24
44:18 58:23 82:21
83:7 113:20 212:9
244:5
**cover** 18:17,25
58:2,15 59:23
69:24 151:2
201:21 215:15
**coverage** 44:5
50:15
**covered** 33:7 47:3
50:17,19 52:1
53:8 220:22
**covering** 66:22
200:7
**covid** 198:24
199:3
**coyle** 2:14 3:23 4:5
4:6,17,18 5:10,10
5:24 6:1 9:7 11:16
12:4 16:22 18:20
21:2,6 22:14,17,20
33:9,17,21,24 34:2
34:4,7,12 37:19
38:3,9,19 41:16
43:4 49:1,4,12
63:17 64:16 71:19
71:22 72:3,12,20
74:3 84:7 91:4,9
91:14,19 92:6,9,16

92:25 93:9 101:5
101:15,19 102:9
102:12,17,20
103:3,6 104:21
106:8 110:17
113:19 117:24
118:7,11,21 120:7
123:10 126:9,11
126:20 131:19
135:23 139:22
140:4 141:22
143:11,18 148:6
148:14 150:13,20
152:12 162:22
168:9 172:19
173:17 174:9
176:21 177:17,22
196:6,9,13,19,22
196:24 197:17
199:9 200:10
211:19 212:4,12
213:8 219:21
220:4,7 221:17
222:5,15,24
224:20,24 225:25
226:5,7 228:18
229:2 230:7 231:7
232:25 236:24
237:16 241:8
242:13,21
**crai.com** 2:22
**credit** 104:23
109:3
**criteria** 129:16
130:5
**cross** 78:11 114:13
**crosses** 185:6
**crossing** 114:13
**current** 98:4
195:24 239:22

**currently** 34:21
98:3 99:22 117:15
120:16 121:13
192:16
**customer** 26:6
29:6 35:17,17,21
35:22 36:3,13,19
36:22 40:13,24
41:8 42:6,12,14,22
47:5,10,25 51:22
52:2,2 56:15,22
57:18 58:9,9,10
70:5 74:19,19
75:4,6,13 76:12,14
80:1,14 86:12
87:17 88:4,5 90:3
93:19 98:24
100:20 107:13
109:7,8,10,15
110:4,11,24 114:1
114:3,18 115:2,17
129:20 134:25
136:18,23,25
137:2,5,5 138:10
138:10,22,25
140:13,19 141:6
142:11 147:25
149:6 153:20
154:17 155:12
157:19,24 158:3,4
168:25 169:6,10
169:23 170:3
171:23 201:3,13
206:3 209:1 210:1
210:9 213:11
217:4 220:19
221:21,23,25
223:10 233:23
239:21 241:2
**customer's** 35:20
35:23 36:4,15

41:9 140:10,18
**customers** 20:12
26:14,18,22 27:2
32:16,18 33:3,4
45:13 46:20,24
48:19 51:10 55:12
59:20 60:1,20
68:12,14 69:1,8,11
70:2 73:11,20
74:8,24 76:3,22
80:2,8,9 86:18
89:4,24 90:8,14
93:12 94:9 98:5,8
98:14 100:3,13
105:20,23 106:1
106:12,22 108:4
108:13,13 109:2
110:21 111:12
112:13 114:22
115:9,24,25 116:2
116:8 117:8,16,18
117:20 120:19
121:13,17 133:5
133:11,12 134:5,6
134:10 137:7
138:18 142:6,15
144:12 145:16
146:15 147:23
148:17 153:12
154:10 155:5,19
155:23 156:3,8,16
157:13 158:5
163:1,9,18 164:8
167:3 179:17
185:18,22,25
186:9 187:25
188:11,14,15,25
189:3,15,17
191:12,12,15,25
192:1,5,8,12,16,17
201:4,7 202:15,17

203:5 207:14,20
212:20 213:12
214:2,20 215:2,16
215:17 216:9,15
225:24 227:12
229:3,4 234:17,22
235:22 236:4
238:22
**cut** 121:21,21
178:3
**cv** 1:2
**cycle** 88:7,8,10
89:6,7,8 140:22
**cycles** 88:16
**cynthia** 1:15 5:18
244:5,18

**d**

**d** 3:1 5:16,16
**daily** 148:8 207:10
**damage** 210:3
**damages** 108:25
109:5,10 155:10
155:11 175:21
176:2,13,15
191:15 214:2
215:15,15 216:16
220:22,25 234:5
**daron** 2:22
**data** 13:6 14:7,16
14:20,25 15:4,19
16:4,11 20:10
74:22 77:7 78:12
80:12 81:3 90:4,7
135:9 136:16
140:17,20 141:2,4
145:22 146:3
148:20,23 151:13
151:14,15,17,21
151:24 152:2
156:9,9,12 160:25
167:18,24 183:24

192:11 210:11
213:19 230:2,4,9
230:12,15,25
**database** 21:9
135:21 136:1,3,5
136:10,11,15,16
**date** 4:2 13:14
24:18 39:6 107:24
108:3,11,21
109:25 245:4
**dated** 12:14 18:7,8
**day** 11:23 88:17
88:21,22,22 98:3
221:24 243:11
245:23
**days** 88:18 92:19
**de** 229:18 233:14
233:17
**deal** 22:17 193:3
**dealing** 212:21
**dealt** 193:2
**debra** 2:20 4:18
**debt** 179:4 182:18
182:18,19,21
**december** 64:23
81:25 82:15
220:19 237:24
**decide** 86:19
**decided** 46:18
119:18
**deciding** 46:13
**decision** 82:21,25
212:10
**decrease** 111:3
138:8
**deductible** 51:13
51:18,19,20,23
**deductibles** 52:6
**deeper** 207:8
**default** 41:23
43:23 67:15,15

68:19 69:17 70:4
71:4 73:21 74:10
77:3 100:24
129:18 130:4,14
131:25 161:11
214:4 239:2
**defendant** 1:8
2:12 4:10
**defendant's** 12:22
**defendants** 13:13
**defended** 173:12
**define** 13:10 90:23
**defined** 59:4 137:8
215:16
**defines** 95:23
**definition** 90:11
120:22,24 201:12
215:19 242:11
**definitive** 215:22
**defunct** 110:20
**delaware** 34:20,24
**delay** 192:22
**delivered** 35:19
**delivery** 35:21
98:6,9,15,19 106:1
107:16 110:5
111:16 150:18
229:4
**demonstrate**
121:11,16
**demonstrated**
138:20
**demonstrating**
125:18 127:5,19
**dep** 200:25
**depend** 36:18,21
171:17
**depending** 134:19
154:24 158:21
177:3 181:12
240:1

**depends** 52:5
79:22 171:18
204:16
**deponent** 245:5
**deposed** 6:17
24:19,20,22 31:6
**deposition** 1:12
3:5 5:1,2,3 7:5,16
8:4 10:4,14,24
11:18 12:1 13:12
13:15 22:1 23:23
24:9,14 25:4
31:10 51:7 62:5
78:20 102:6 138:5
196:17 197:6
201:1 215:17
230:6 245:4
**depositions** 18:19
24:18 30:5,11,14
30:18,22 31:8,20
78:18 147:17
**depth** 99:14
**deregulation**
60:18 83:21
105:18 159:23
181:4 187:25
188:24 190:6
**describe** 83:11
**described** 19:20
77:4 83:18 110:18
115:20,22 137:6
141:18 145:8
152:17 153:17
155:23 170:25
178:24 180:24
181:8 221:8
**describes** 223:17
**description** 42:3
148:1
**despite** 34:20

detail 145:5
156:10 217:1
detailed 125:18
127:4,18 128:4,5
136:25
details 136:17
determinate
205:14
determination
90:12 159:12,13
160:14 164:22,25
225:20
determine 19:17
140:10 141:5
164:7
determined 20:17
20:21 46:11 157:3
163:25 175:10
223:15
determines 206:25
determining 51:21
225:2
developed 80:17
106:18 204:9
development
145:2
differ 88:2 162:18
difference 35:22
36:3,13,24 37:1,17
41:8,12,21 43:15
56:17 75:2 109:15
124:18 134:5
182:5,8 214:6
differences 43:17
95:25 110:14
different 7:6 19:8
31:23 39:17 40:6
47:21 66:24,24
67:4 68:4,10,11,14
68:15,16,25 69:4,7
73:5,8,10 75:15,20

75:21,21,25 76:1,4
76:5,19,21,23 77:5
77:6 80:14 88:14
94:3 97:5 98:13
98:17,19 99:4,5
135:19 138:19
142:22 158:21
162:9 171:19
172:14 175:17
180:6 183:1
190:12 203:16,17
207:11 211:4
213:24,25 215:7
222:2,4
differential 108:20
241:21
differentiated
184:16
differentiating
125:2
differentiation
116:25
differently 71:1
133:9 162:25
differs 87:24
88:13
difficulties 6:11
239:17
difficulty 200:7
239:14
direct 10:3 48:24
145:3 146:21
153:3 185:2,11,17
186:6,8 207:4
directed 150:4
directly 22:5
136:2
disagree 170:17
disclosure 3:12
38:12 40:13,23,24
41:1 56:15,22

57:18 58:22
115:17 149:3,6
154:17 157:21
168:25 169:1,11
170:3 171:23
213:12 221:25
223:10
disclosures 29:19
discontinue
103:22
discontinued
154:11
discontinuing 29:9
discount 148:11
discovery 12:22
20:10,17,22 66:7
136:12 146:2
230:23
discretion 216:6
216:10
discuss 196:22,24
197:7,8,10 220:1,4
discussed 16:13
119:15 134:15
137:2 140:22
142:25 143:9
156:17 159:25
163:14 185:5
190:17 208:20
211:18 215:7,20
215:23
discussing 127:1
133:19 162:6
215:9 235:16
discussion 10:6
33:10 38:22 60:4
63:19 72:23 84:9
103:8 118:20
131:15 139:19
147:8 150:15,22
161:9,12 165:10

176:19 178:18
186:23 193:9
200:12 205:6
228:25 233:2
241:11
disjointed 85:2
disparate 108:3
dispute 53:7
disputes 53:4,4
distinction 124:23
181:2
distinguish 156:7
distribution 65:16
99:20,24 105:13
105:15 107:3
110:5 111:6,9,11
112:1 114:18
142:5 143:2
149:22 150:25
152:4 217:7
district 1:1,1
34:19,19,24
dividend 56:6
divides 67:7
docu 91:5
document 10:10
10:12 17:7,9,11
18:6,9,13,17,25
19:11 25:9 27:9
27:14,15,16,21
29:25 33:13 34:15
34:18,22,25 35:4
36:8 39:4,5,6,8,15
40:9,11,18,22 49:7
49:8,25 50:6,9,23
56:22,24 57:2,16
79:13 92:5,11
93:7 100:9 101:2
101:10,20 102:4
102:11,20 103:15
104:5,9,10,13,19

105:4 110:18,23
118:23 119:2,15
120:4 135:18
144:4 149:2
154:15 169:14
174:12 192:23,25
196:7,16 199:17
211:20 214:11
217:21 231:14
**documents** 13:5
13:13 14:6 16:11
20:24 21:9,12
25:13 28:9 37:17
40:6 59:3,24,25
65:24 66:16 77:21
77:25 99:11
135:24 136:16
143:8,12 151:18
177:8 197:7 199:7
**doing** 6:10 38:25
77:13 80:16
142:25 153:10
157:5 187:15,19
187:19 191:6
192:1 224:6
**dollar** 114:10
**door** 45:11 88:9
**double** 39:21,23
79:23 153:16
169:18 242:2
**download** 102:20
**dozen** 142:20
**dr** 4:18 5:25 6:2,5
8:24 9:5 11:10
16:20 19:2 34:13
38:16 39:2 45:3
49:6,14 60:5
71:19 72:11 73:3
91:12,24 92:15,16
92:18,22 93:10
101:8,21 102:7

103:14 104:22
118:16,24 120:5
124:20 126:13,17
126:18,23,25
131:17 140:7
143:25 150:11
176:22 192:22
196:21 197:5,13
197:18 199:11
200:18 212:7,15
219:23 222:15,17
223:8 225:12
233:1,3 235:3
237:21 241:14
**draw** 16:15 65:9
169:20 172:10
213:3 223:9
**drawing** 11:1 19:1
35:5 60:10 64:19
144:5
**drive** 2:21
**drop** 176:6
**dropped** 155:6,14
**due** 11:20 86:24
**duly** 5:17
**duty** 197:15
**dysjunctive** 51:1

**e**

**e** 2:1,1 3:1 5:16,16
5:16
**e100** 93:23 226:19
**ear** 205:5
**earlier** 78:17
113:10 156:17
191:5 228:25
**early** 165:2
**earned** 182:25
183:10
**earnings** 194:22
**easier** 139:25

**easily** 229:23
**easy** 231:4,5
236:16 239:4,19
239:20
**echo** 150:20
**economic** 3:17
81:5 161:23
166:11 180:9
181:2 182:3,15,16
183:7,17,20,23
184:8,12,18 185:1
193:2,7,8 194:25
195:24 231:10
**economically** 55:16
**economist** 96:23
96:25 112:20
183:6
**economists** 182:12
**ed** 75:6 87:11
89:17,25 90:18
139:8 141:10
**edison** 88:14 204:2
**effect** 27:15
107:25 108:2,19
128:9
**effective** 107:24
**effects** 7:11
**eight** 11:5
**either** 22:3 39:18
73:6 81:22 82:10
91:9 95:24 97:4
142:11 185:1
225:22 231:19
236:4
**elect** 117:16
**electric** 3:14 50:18
51:12 76:13,15
79:16 92:1,20
94:9 106:24 116:9
149:12,18 216:8

218:13 219:5,17
223:16,17 226:19
232:4 235:21
238:22
**electrical** 42:19
46:24 47:4,17
48:7 51:10 76:9
**electricity** 20:12
20:13 42:2,12,14
46:21 52:25 53:5
54:3,16 65:15,21
70:4 75:22 85:23
86:23 95:2,25
96:13 98:24 99:20
100:4,21 105:13
105:16,20,24
106:12,20,23,25
107:2,4,21 111:11
121:1 128:11
140:14 148:22
149:19 151:12
161:25 162:1
171:5 185:3
188:13 201:4
202:24 203:5,13
204:3,25 205:2,4,8
205:15,15,20
206:24 207:2,6,10
207:19 213:18,21
214:16 215:5
217:5 218:6
227:12 232:8,16
**electronic** 20:23
135:18,21 136:13
136:14
**electronically** 21:15
**element** 96:11
**elements** 159:12
**eligible** 110:6

eliminate 100:11
ellipsis 217:8,14
  217:17
email 2:9,16 11:9
  13:24 16:8 21:15
  24:13 33:20 38:1
  102:21 118:2
  147:18 196:8
  222:21 230:19,20
emailed 91:6,14
emailing 34:5
emails 13:5 14:6
  14:19 15:17,22
  16:7,9 21:19
  101:5 230:8,9,12
  230:16,20
embedded 139:13
emergency 145:3
  198:18
emphasize 126:4
emphasized
  180:24
employed 228:3
employee 31:1,2,3
  148:11 228:6
enable 188:13
enacted 105:17
  108:2
enactment 109:22
encompassed 20:5
encourage 99:6
encrypted 102:14
ended 218:6
endurance 177:17
energy 1:7 4:7
  7:17 23:1,3,7
  34:17 35:15,18,21
  35:23 36:4,16
  41:9 42:15 45:18
  52:10,12 53:19
  54:2,8 58:8,10

60:19 61:22 68:20
76:23 82:1 83:4
85:13,19 86:2,19
94:11 95:3 103:23
105:21,22 107:12
114:8,20 115:5
118:22 120:20,21
121:12 129:18,23
132:1,16 143:1
145:1 146:21
149:20 150:5,17
150:24 152:3
162:8 171:2 185:2
185:11,17 186:6,8
191:23 205:7
207:4 212:11,16
217:6 225:3,4
232:10 238:3
245:4
energyguard 3:13
  26:2,5 28:4 29:12
  37:16 41:20 42:1
  42:7,16,17 43:8,17
  43:21,22,25 44:5
  46:24 47:4,21
  48:13,18 51:2,9,21
  55:11,16,19 56:18
  56:23 58:21 63:15
  64:1,8 66:18,21,24
  116:14,17 120:24
  121:10 122:19
  123:20 124:4,8,14
  125:18,21 127:5,8
  127:10,19 128:24
  129:3,14 130:3,6
  138:19 152:16,22
  153:2,5,7 161:5
  162:1,5,10,11,14
  162:14,16 163:2
  164:8 166:24
  167:2 170:12

186:10,21,25
190:9 191:4,9,10
191:11,21,25
192:18 201:14,15
202:2 215:8,12
218:10 219:3,15
220:10 224:5
225:15,21 226:24
227:1,12,17 238:4
238:23
engagement 19:18
  53:13,20
enormous 106:6
enrolled 59:21
  154:10 155:5
  221:24
enrollment 25:5
  25:11 28:14,18,22
  43:15 58:11 143:6
enrolls 153:20
ensure 129:20
  203:1
ensuring 225:5
enticing 60:20
entire 92:14
  235:15 237:4
entirely 101:19
entirety 170:19
entitled 25:9 34:15
  57:22
entity 84:4
enumerated
  216:10
equal 47:13
  107:13,20 108:14
equally 89:5
equilibrium
  181:19
equity 182:19,19
  182:21

equivalent 114:11
  141:16 156:5
  200:2,6
erie 221:23
errata 72:18 73:2
  245:1
esco 35:15,17,18
  36:14,19,22 61:21
  62:6,13,14,21 63:6
  64:7 80:22 81:9
  81:10 86:21 90:14
  98:24 99:3,5,7
  100:4,13,21
  106:13,16,19
  107:1,15 108:5,14
  109:4,7,10 110:22
  110:24 112:4
  113:3 115:3
  117:13,16,17
  121:16 122:10
  123:7,15,22
  124:12 128:10
  129:2,21 131:1,6
  131:11,24 132:10
  133:12 142:15
  157:8 160:14
  161:24,25 166:17
  167:4 168:7,17
  171:12,18 185:11
  185:17 188:12
  201:2 204:25
  205:7,14,19 206:3
  206:23 207:1,9
  209:25 210:7
  225:4 229:7 235:9
  235:20 236:3,10
esco's 23:6 30:4
  60:23 61:5,12,18
  62:3 63:11,13,25
  105:22 106:1,18
  107:20 129:16

167:16,17 168:13
180:25 186:19,25
188:24 189:15,17
202:18,23 203:3,6
207:21,24 208:6
208:14 225:7
229:5 232:17
235:23 242:10
**ese** 62:2
**especially** 217:23
**espi** 115:5
**esq** 2:7,7,14,14
**essay** 193:25
**established** 58:18
68:6
**establishing** 82:2
118:22
**etcetera** 119:10
168:23 197:25
198:1 208:4
**evaluate** 201:23
224:4
**evaluated** 235:10
**event** 42:17
132:22
**events** 86:25
**eventually** 176:6
**everybody** 4:20
9:9 19:5
**everyone's** 224:16
**evidence** 117:14
121:11 122:10,22
122:22 123:7,15
123:23,24,25
124:4,13,23,24
125:18 127:4,18
128:5,5 163:22
**exact** 41:6 109:25
221:24
**exactly** 67:18
73:14 114:21

147:11 200:5
237:19
**examination** 3:22
5:23 223:6 232:24
241:12
**examined** 5:20
66:10
**examining** 170:18
**example** 44:16
59:10 75:3,25
76:7,12 86:4
88:13 93:18 94:6
95:22 97:24 98:18
106:22 109:18
111:4,18 120:23
124:14 134:19
139:7 181:9 207:4
**examples** 145:13
**exceed** 164:22
**excel** 14:12 16:20
17:1,3,14 77:21
79:3 154:20
**exception** 121:10
122:19
**exchange** 21:18
**excited** 209:11
**exclude** 148:16
191:14
**excluded** 159:18
**excludes** 154:1
**excluding** 95:4
**executive** 101:11
104:1
**exempt** 107:15
**exemption** 106:20
107:18 109:24
110:6,9 112:2
116:3 142:9
**exemptions**
103:23

**exhibit** 3:2 10:2,3
10:7,13,15,17,20
11:13 16:16,17,25
17:24,25 18:5
33:13,15,18,19
34:14 35:2 38:6
38:23 39:2,3 40:8
43:10 48:22,25
49:7,20 56:13,14
56:14,15,22 57:1,7
58:16 59:4,4,5,10
59:14,24 60:9
64:11,18 65:11
69:21 73:17 82:19
91:4,10,13,25
97:24 101:3,9
103:14 115:15
117:25 118:5,17
121:22 123:11
125:10 144:3,4
149:4,5,18 154:21
154:22 169:22
170:13 187:21
189:8 196:4 197:6
197:14,18 199:21
200:19 209:6
211:8,21,22,25
212:8 214:12
216:4 218:2
222:19 223:11
224:14 226:4,9
231:13 233:4
241:15
**exhibits** 3:2,4 38:6
56:11 195:15
237:22
**existing** 35:19,20
46:18
**exists** 107:18
**expanded** 234:20

**expanding** 225:10
**expect** 198:19
229:15 231:22
**expectation**
189:18 229:21
**expected** 189:14
**expenditures**
194:17,23
**expense** 56:2
194:12 198:19
200:7
**expenses** 65:19
66:11,12 145:4
149:25 152:18,20
168:21 171:24
172:3 173:6
178:20 193:3
194:20 215:6
217:11,25 218:9
**experience** 20:14
52:18 81:8,9
83:23 166:16
170:25 171:9,20
173:7 228:10
229:5,6 236:15
239:5
**experienced** 45:17
**expert** 1:12 3:6,7
5:17 12:14 18:6
18:16 20:9 22:25
30:2 46:16 63:22
70:1 83:15 144:2
167:11 196:25
213:13 215:14
**expires** 244:19
245:25
**explain** 93:12
104:20 126:25
165:22
**explained** 92:2,21
104:22 119:11

explaining 119:9
129:5 168:10
explanation 116:3
237:6
explicitly 20:3
179:21
exploits 60:18
explore 146:9
expressing 227:8
extend 161:4
extended 11:9
164:15,19
extensive 117:7
extensively 119:3
119:5 215:16
extent 51:16 54:8
89:7 120:16
137:15 138:6
142:9 150:25
179:3,21 180:16
186:21 191:20
193:23 221:11
external 86:25
extra 203:9 205:25

**f**

f 5:16,16
fact 18:11 31:15
34:20 40:11 60:22
78:3 88:21 89:3
99:4 102:3 104:23
108:1,13 117:9
123:23 124:3
137:1 157:21
159:1 160:23
162:13 168:18
171:4 191:9
218:11 219:2,14
232:12
factor 51:23
152:22 178:25
181:11 205:14

229:25
factors 52:7 65:14
66:1,9 149:12,23
151:1 152:21
168:21 201:24
202:1 214:15
216:7,11 218:5
facts 13:5 14:7,16
14:20,24 15:4,18
16:4,11 84:23
110:22 230:10,11
230:15 235:17
failed 230:13
failing 231:21
234:15
fair 23:1 25:22
28:10 45:12 53:16
56:16 61:9 67:3
70:9 94:2 128:9
133:8 140:4
185:24 188:22
190:5 198:16
199:11 229:9,18
230:1,14 232:7
233:3,15 235:4
fall 221:3
false 60:20
familiar 55:22
56:1,5,8 66:25
100:18 172:1
179:11 182:2,6
197:1 235:5
familiarize 198:8
family 165:10
far 101:18 143:9
fashion 84:10
favored 107:20
favors 107:12
fbfglaw.com 2:9,9
fed 3:17 193:24
195:21 196:1

fed's 197:22
federal 83:5 86:2
93:3 193:19
195:14,25 196:2,2
204:12 231:15
federalreserve.g...
197:25
fee 145:1 146:20
191:11
feeds 173:24
feel 30:14,18 51:20
51:25 161:23
165:3 173:10
179:16 221:5,9
feeling 7:23
fees 65:18 144:18
149:24 168:23
217:10
felder 1:13 3:6
5:21,25 6:2,3,5,6
8:24 9:5,16 10:1,9
11:5,10,25 12:6,9
12:14 16:15,24
18:4,7 19:2 22:13
22:21 33:11 34:13
38:16 39:2 45:4
49:6,14 60:6
71:20 72:11 73:3
91:12,24 92:15,16
92:18,23 93:10
101:8,21 102:7
103:14 104:22
118:16,24 120:5
124:20 126:13,17
126:18,23,25
131:17 133:22
140:7 143:25
150:11 176:22
192:22 196:21
197:5,18 199:11
200:18 202:11

212:7,15 219:24
222:15,17 223:8
225:12 233:1,3
235:3 237:21
241:14 243:7
245:5,21
felder's 16:20
197:13
field 23:1 53:19
83:15 84:22
200:24
fifth 125:16
141:25
figure 231:18
237:5
figured 159:17
file 11:4,4 12:8
14:12 102:18
139:10 153:16
187:17
filed 3:10 34:22,24
files 85:13 141:14
178:16
filings 83:19
163:13
final 153:7
financial 55:23
56:2,6,9 182:20
183:3 231:21
244:12
find 16:3 22:6
27:21 53:9 75:13
86:6 102:23 117:9
122:17 163:1
188:9 192:23
197:3 228:22
239:12
finding 117:5
126:1 127:11,22
findings 70:19
84:2,24 127:15

133:1
**fine** 19:9 71:19
  126:15 162:22
  177:21 179:25
**finish** 22:6 124:21
  126:14,17,22,23
  126:25 139:24
**finished** 48:10
  124:19,25 126:10
  130:23,25 183:13
**finkelstein** 2:4
  4:12
**firm** 4:6 14:11
  237:2
**first** 5:17 6:21
  13:24 27:24 39:1
  57:21 64:20 65:12
  69:21,24 103:7
  105:6 120:11,14
  123:17 125:13
  127:17 140:4
  144:9 160:18
  167:17 170:14
  188:9 193:6
  199:18 202:14
  203:11 209:4,10
  213:6,15 215:3
  223:3 224:25
  225:2 233:25
  237:23 239:5
**fiscal** 101:10
**five** 31:5 39:22
  103:4 143:13
  160:21 177:18,18
  177:20 202:16
  205:8 206:21
  234:13
**fix** 192:8
**fixed** 111:14 148:9
  148:9 153:8
  155:21 162:15

167:3 191:11,24
  192:4,12,15,17
  206:2
**flexibility** 214:14
**flip** 40:4 121:20
  123:10 149:2
**flipping** 40:7
  122:17 123:3
**floor** 2:21
**fluctuate** 65:21
  66:1,19
**focus** 53:12,12,19
  203:11
**focusing** 225:1
**folder** 16:16
**follow** 35:13 95:1
  145:10 149:16
  202:21 233:1
  241:10
**followed** 40:12
  187:9 191:19,20
**following** 4:24
  70:1 147:2 217:5
**follows** 5:20
**footnote** 26:1 40:1
  66:4 148:7,15
  155:22,24 230:22
**footnotes** 39:24
  215:20
**foregoing** 244:7
**forever** 9:6
**forget** 7:20 113:14
  180:7 223:10
**forgot** 109:24
**form** 8:23 9:8 27:9
  93:11 228:18
**formula** 138:23,24
  140:11,12 180:13
**formulas** 139:14
  139:14

**forth** 11:17 40:4
  83:6,19 88:23
  145:14 156:21
  169:15 179:4
  182:13 224:8
**forwarded** 233:4
**found** 38:5 122:9
  123:6 124:2,3
  159:16 240:20
  241:7
**foundation** 37:21
  42:9 48:3 51:16
  59:13 75:8 108:6
  128:14 130:8
  131:4 138:3
  152:24 158:15
  160:16 187:4,5
  198:21 199:7
  214:22 216:18
  225:25 232:20
  237:13 238:7
**foundational** 6:17
**four** 160:21
  202:16 234:13
**fraction** 114:23
  194:24
**frank** 1:12 3:6
  5:21 6:3 7:20 11:5
  12:9,14 18:6
  243:7 245:5,21
**frei** 2:4 4:12
**frequently** 165:4
**front** 57:3 64:11
  103:16,20 129:10
  149:5 174:13,16
  197:19 233:5
**fulfilled** 189:19,24
**full** 120:1,1,11
  125:13 188:9
  189:11 224:25
  231:22,23,24

**function** 83:6
  87:10 89:22 90:1
  90:12,14,23
  137:13 141:15
**funds** 146:5
**further** 5:3 7:11
  53:7 82:2 110:24
  118:23 197:9
  218:7 222:15
  241:8 244:9
**future** 194:14
**fy** 104:1

**g**

**garber** 2:4 4:13
**gas** 54:16 105:13
  105:15,20,23
  106:20,24,25
  107:1,3 111:11
  120:25 232:4
**gather** 14:5
**gblankinship** 2:9
**general** 44:2 46:12
  54:3,5 62:2,14
  66:11 67:17 69:5
  73:15 95:10 117:3
  117:3 152:19
  206:8
**generally** 20:12
  66:25 73:4,7,8
  96:6 106:4 153:19
  178:10 189:1
  200:22 235:4
**geographic** 33:5
  205:10
**geographically**
  62:8
**geography** 157:1
**gestures** 7:2
**gesturing** 6:25
**getting** 110:8
  122:21 130:20

give  7:20 21:11,14
  40:5 104:18 118:8
  118:10 135:23
  143:16 189:1,12
  220:20 224:23
given  8:17 19:25
  20:2,4,20 21:8,24
  23:21 28:23 31:5
  59:20 61:10 75:22
  77:7 94:10 97:11
  107:16 135:6
  136:10 157:18
  195:1 199:3
gives  161:24,25
  214:14
giving  7:8 104:14
  216:6
global  62:14
globally  153:10
  190:4
globe  55:4,5
glossy  59:15,18
gna  152:19
go  8:6,24 9:13
  10:18 12:5 13:9
  17:23,24 22:2
  38:15 43:9 69:21
  72:3 78:11 86:5
  90:2 92:3 99:13
  103:6,18 115:16
  122:23 123:16
  128:21 131:23
  132:17 139:8
  141:3,13 144:4
  149:3 150:2 156:9
  165:21,25 171:25
  172:10 177:18,22
  180:20 181:3
  189:8,20 190:20
  191:2 196:23
  198:23 199:24

200:2,10,20 207:7
  207:17,21 208:9
  211:1 218:17
  219:23 222:7
  229:17 235:15
goes  6:7 78:22
  128:6 207:8,9
going  8:21 9:3,5
  9:11 10:1,2 11:6,8
  11:18 13:20 16:1
  16:14,19 22:11
  27:12 35:11 37:20
  40:4,22 60:9,16
  62:18 71:24 75:17
  81:19 84:13 91:14
  92:11 98:10
  100:25 101:1
  102:3,7 103:1
  104:12,18 113:22
  113:23 119:14
  121:20 125:17
  132:13 133:21
  138:2 141:3
  143:16 144:2
  150:6 151:19
  154:5 162:18
  168:8 170:20
  171:10 173:10
  174:17 177:22
  178:2 181:21
  196:14,20 197:12
  200:24 211:20
  214:7 218:2
  219:13 223:2
  230:18 234:12
  237:10
gonzales  1:4 7:16
  17:2 21:16,19
  25:6 26:3,9 27:9
  29:6 32:16 34:16
  37:1 39:8 41:11

41:22 55:9 56:16
  56:17 59:20 60:1
  60:5,8 64:22
  68:19 69:2 115:12
  115:14 143:6
  161:5 206:14
  207:5 209:18
  212:22 216:20
  217:16 221:20,24
  226:13,14 233:24
  236:8 240:4,15,16
  240:19 245:4
gonzales's  25:10
  28:13,17 36:23
  43:15 221:6,6,12
  221:20 233:5
gonzalez  3:8
good  4:5 5:25 6:1
  72:11,12 143:25
  144:1 168:17
goods  140:12
  144:18,24 146:5
  146:16 147:2
  148:21 150:9,16
  150:23 151:2,7,10
  151:21 152:2
  166:19 168:20
  173:5 176:11
  184:25 215:5
google  186:14
gorga  2:14
gotcha  132:9
gotten  89:18
government  83:25
governors  193:19
  195:14 196:2
  199:12
graduate  193:5,25
  194:2 195:5,7,10
  195:10

granted  187:2
granting  108:11
graph  199:19
great  72:2
greater  110:13
green  148:12,12
  148:16,19
greening  148:22
greg  2:7 4:11 5:12
  16:22 33:17 34:8
  38:10 49:1 74:3
  91:5,15 101:5
  102:21,23 118:2,7
  120:7 123:10
  126:20 222:24
  226:7
gross  66:5 145:2
  146:21 217:9
  230:21
guaranteed  169:6
  169:23,24 170:5
  170:14 181:1,5
guess  11:22 12:6
  24:1 45:25 46:3
  47:15 49:24,25
  56:20 59:1 66:7
  68:10 96:15
  117:23 162:18
  165:18 174:17
  186:13 189:7
  219:6 234:12
  236:17
guiditta  2:11 4:7
  4:10
guys  38:1 91:17
  102:25 222:22

**h**

h  103:22 105:4
half  142:20 234:21
hamilton  2:5

**hand** 40:7 93:18
  239:5
**handing** 49:6
  118:16 212:7
**handle** 198:18
**hands** 7:1
**happen** 51:13
  145:18 186:8
  202:6 233:21
**happened** 206:13
**happens** 22:5
**happy** 9:2 56:20
  141:25 219:25
**hard** 172:11
**harder** 8:10 40:5
**hash** 95:1
**hate** 71:16
**he'll** 22:13
**head** 99:16 133:13
**heading** 50:10
  71:1
**health** 54:25
**hear** 72:20 74:3
  84:8 150:11,13,14
  152:13 219:21
  220:1
**heard** 89:12,16
  193:8 212:15
**hearing** 150:20
**hearings** 83:19
**heart** 218:17
**heat** 76:8,8,9,13
  76:15 79:16 88:7
**heating** 79:22
  93:23 94:6,10
**hedging** 54:3,7,13
**held** 1:13 10:6
  33:10 38:22 60:4
  63:19 72:23 84:9
  103:8 118:20
  131:15 139:19

  147:8 150:15,22
  161:9,12 176:19
  178:18 186:23
  200:12 205:6
  233:2 241:11
**helpful** 104:17
  139:23
**helping** 101:1
**helps** 19:4
**hess** 145:3 185:2
  207:4
**high** 234:3
**higher** 60:23 61:4
  61:11 62:18 63:4
  76:13 89:9 129:17
  130:4 157:8
  213:20
**highland** 5:22
**historic** 210:21
**historically** 210:2
**history** 83:21 86:8
  159:23 199:4
**hit** 175:21
**holding** 91:18
  196:25
**home** 42:20 48:8
  50:16,18
**honest** 194:4
**honors** 18:18
**hope** 6:12 121:21
**hopefully** 102:22
**horses** 239:12
**hour** 76:20 109:20
  109:21 110:3
  111:5,12,17,19
  142:10,11 176:25
  205:9,10,21,25
  206:4,5 207:11
  229:13,14 238:23
  240:16

**hours** 71:17 95:4
  143:17 192:11
**house** 88:5
**housed** 68:20
**households** 3:18
  199:13
**hover** 49:15
**hudson** 3:14,21
  41:22 43:16,24
  44:3 64:25 68:21
  68:25 69:6 73:12
  75:5 85:8 86:4
  88:6 90:15 92:20
  93:23 161:3,4
  226:16 236:9
  240:6,20
**hundred** 148:25
**hunting** 166:3
**hypothetical** 88:4
  93:19,19 97:23
  138:3 158:15
  162:3 183:17
  201:18 207:9
  214:22 217:20
**hypothetically**
  208:14 211:24

## i

**i.e.** 65:17
**idea** 30:22 45:19
  62:20 63:5 112:11
  112:12 136:17
  168:16 190:17
  234:9 238:12
**identical** 81:7
**identification** 10:8
  16:18 17:1 18:1,5
  33:16 34:14 35:3
  38:24 39:4 40:8
  48:23 49:7 56:12
  64:18 73:18 91:11
  91:25 101:4,9

  103:15 118:4,6,17
  121:23 125:10
  133:22 144:5
  149:4 196:5
  211:23 212:8
  226:10
**identified** 65:14
  80:20 132:10
  144:25 146:17
  147:23 151:21
  156:12 159:23
  179:20 227:10
  230:17
**identify** 55:14
  129:21 225:2
**ignoring** 220:12
**ii** 144:23 146:4,16
  178:17 234:20
**iii** 145:5
**illinois** 2:21
**illustrate** 214:5
**imbalance** 107:7
**immediately** 57:12
  177:15
**implement** 211:15
**implemented**
  203:16
**implication** 185:7
**implications**
  219:11
**implicit** 175:9
  177:2
**implicitly** 201:9
**important** 75:12
  130:9 225:13
**impose** 105:12
**imposed** 106:11
**imposes** 99:19
**imprecise** 215:14
**incentive** 100:12
  100:12 105:19

**include** 42:14 134:21 139:6 142:17 148:12 153:1,11 157:12 162:7,10,23 168:21 171:24 180:4 184:20 192:12 222:20 224:4 240:11 242:3

**included** 138:20 149:12 154:6 155:23 157:23 159:16 162:8,15 166:25 178:7,23 179:5,8,15,22,23 180:12,17 184:15 191:10,22 208:3 215:4,5,11 220:11

**includes** 58:2 85:23 150:23 153:7 179:22 216:1 241:20

**includible** 178:22

**including** 20:10 95:5 149:20 174:24 204:11 215:8 217:4,6,9 218:6 225:20 238:22

**inclusion** 229:17

**incomplete** 138:3 158:14 162:3 201:18 214:22 217:20

**incompletely** 217:21

**incorporate** 231:1

**increase** 108:25 109:1,5 111:1 138:7

**increased** 142:24

**incurred** 217:3 227:11

**incurs** 20:11 65:20

**indented** 217:3

**independent** 67:10 77:13 85:25 111:15 163:15 190:23 191:7 232:10 235:21

**indicate** 5:8 175:2 190:8

**indicated** 36:9 63:2,9 66:3 78:17 94:8 96:4

**indicates** 107:11 169:5 178:4

**indication** 220:20

**indirectly** 136:4

**individual** 88:15 134:25 142:2,3 194:17

**individually** 138:22 142:6 158:17,20

**induce** 110:21

**inducement** 99:9 110:23 114:24

**industrial** 69:10

**industry** 166:16 171:1,2,9,21 181:20 204:8

**infamous** 133:5

**inferred** 31:4 80:22

**inferring** 31:16,23

**influence** 7:25

**info** 226:19

**inform** 226:23

**informal** 7:5

**information** 11:10 15:8 17:16 25:5 31:2 74:25 77:12 101:22 104:15 123:24 135:15 136:6 147:10 197:2 221:20 225:23 226:22 236:19 238:14 240:25

**informed** 147:1 166:19

**initial** 29:18

**initiate** 58:10

**innovation** 189:16 190:6,16

**innovations** 190:10

**input** 84:19,23

**inputs** 182:13

**insignificant** 65:19

**inspire** 190:6

**instance** 129:14,15

**instances** 164:21 232:15

**instruct** 102:7 196:21

**instruction** 8:18 8:22 21:24 22:12 22:19

**instructions** 9:19

**instruments** 54:4 54:13

**insurance** 51:24 51:24 52:4,8,16,20 52:24 53:18,23 54:5,9,12,13,23,25 54:25 55:1,2,2,4,6 55:15,20,23 56:2,5 56:9

**insured** 55:12

**intended** 6:6

**intention** 11:15 15:25

**intentional** 196:25

**intentionally** 197:9,10

**interest** 244:12

**interested** 242:13

**interim** 125:21 127:8 128:25

**interject** 11:7

**internal** 46:10

**interpret** 125:24

**interpretation** 209:17 211:7

**interpreting** 127:17

**interrogatories** 29:16,22 48:17,21

**interrupt** 18:15 71:16

**introduced** 104:13

**introduction** 202:24 203:13

**introductory** 115:18 145:6 153:11,21 154:2,7 154:12 155:6,12 155:15,19 156:1,3 156:5,10,11,16 169:8,16,18 170:9 170:11 173:1,22 191:15 192:2,5,19 208:23,23 215:11 221:13

**investigate** 161:19

**investigated** 241:1

**invoice** 185:6 240:3,3,4

**invoices** 185:4
**involved** 81:11
  171:2 194:13
  204:14 237:2
**iso** 67:1,4,6,6,10
  67:23,23,25 68:2,3
  68:7,9,10 73:6
  86:1
**issue** 84:20 159:10
  168:22 173:22
  193:22 199:2
  215:1 225:1
  231:10 236:1
  239:16,18
**issued** 71:2 73:19
  83:2 187:10
  193:11 225:19
  237:8
**issues** 52:11,12
  66:4 133:19
  195:21,24 239:18
**issuing** 224:6
**item** 69:25 97:24
  227:7 241:17
  242:12
**iteming** 178:13
**itemized** 235:9
**items** 16:2 50:14
  146:24 151:2
**iv** 70:15,18,19
  71:1,9,10,13 77:2
  144:10 145:5
  165:23 166:23
  170:23,24 181:9
**ix** 111:8

**j**

**j** 2:20 67:12
**james** 2:24 3:20
  212:11
**january** 39:7 75:5

**jcapone** 2:16
**jcoyle** 2:16
**jen** 49:12 117:24
  135:23
**jennifer** 2:14 4:9
  5:11 222:21 223:3
**jersey** 1:15,17
  2:13 5:20,22
  44:11 45:19 54:24
  62:13 227:24
  228:8 239:6,11,17
  244:6,18
**jogs** 22:2
**john** 2:14 4:6,18
  5:10 9:1 16:19
  64:15 92:3 101:13
  102:16 106:8
  124:19 222:21
  224:18,23
**joining** 4:19
**judge** 11:23
**judgment** 159:22
**judicial** 83:2,6,12
  83:13,17
**judiciary** 119:11
**july** 12:14 18:8
  87:14,16 88:8
  109:24 221:1
**jump** 22:7 202:10
**june** 75:6 88:7,10
  88:11 107:25
  108:2,23 109:24
  110:1,2 114:6
  221:1 244:19
**jurisdiction**
  190:12 204:16
**jurisdictions**
  160:1
**justify** 227:16
  228:15

**k**

**k** 5:16 67:8,9,12
**keep** 9:3 93:2
  128:22 130:12
  137:18 141:19
  167:17 187:15
**kept** 149:11
**key** 96:11
**khalil** 2:7 4:15
  5:15,15 8:13
  102:19
**kicked** 102:15
**kilowatt** 76:14,20
  76:20 95:4 109:20
  109:21 110:3
  111:5,12,17,19
  142:10,10 192:10
  205:8,10,21,25
  206:4,5 207:11
  229:13,13 238:23
  240:16
**kind** 88:23 143:18
  201:9 207:6 223:3
  225:22 227:3
  232:14
**knew** 72:20
**know** 6:16 8:5,10
  10:5 11:2,12,16
  22:4,6 25:21
  26:20 28:20 29:12
  30:24 31:16,24
  32:2,4,5 33:14
  35:8 36:9 37:5
  43:24 44:3,4,17,17
  44:20,22,24 45:2,6
  45:10,16,23 46:4
  46:20,23 47:2,2
  48:12,15,16,20
  49:12 51:13,18
  59:14 60:11 61:9
  63:11,16,25 65:3,4

66:13 68:7 71:25
72:15 78:3,7,13,20
79:1,5,7,9,11 80:2
80:18,21 85:8
87:24 88:3,11,21
90:16,17,19,21
91:20 95:12,20
97:7,10,13 98:4,7
98:13,20,21,23
99:2,9 115:10
116:1 118:12
120:4 128:17,17
128:18,19 132:10
132:12 133:4,13
133:18 136:24
137:7 141:3,19
142:8 143:3,4
144:7 145:18
146:13 150:3,21
151:16 153:17
154:8,10 155:4,7
155:18 156:2,17
156:18 161:3,17
163:5,7 164:13
166:21 171:8
172:11 178:19
185:20 186:4,8,12
186:18 189:5
190:16 191:19
192:14 193:7
194:25 195:23
198:9 200:5,22
201:19,20 202:6,9
205:23,23 206:16
206:18,22 207:2,5
210:10 211:3
212:2 213:1
216:21 219:12
220:24 221:15,18
222:1,3 233:21
234:2,4,19,22

235:2,12,17,25
238:10,14,18,20
239:1,13 240:2,13
**known** 55:23 56:2
56:6

**l**

**l** 5:16
**label** 57:11
**labor** 42:21 47:9
50:17,19 182:13
**lack** 37:21 48:2
51:15 59:12 60:19
128:13 130:7
138:3 152:23
158:15 160:15
187:3,5 198:21
199:6 207:3
214:21 216:17
232:19 238:7
**lacks** 42:8 237:13
**lag** 185:6
**laid** 160:21
**lambiance** 5:22
**language** 107:11
127:1 172:1
199:16 214:13
216:6 217:17
221:5,9
**large** 69:10 174:25
**larger** 176:22
**late** 105:19 106:11
**law** 4:6 99:18
101:20 104:15
105:11,13 106:5,6
106:7,7,8,9,9
108:12,22 114:9
212:14
**lawsuit** 212:16,19
**lawyer** 213:1
219:12

**lay** 70:17
**lead** 73:7,13,15
189:16
**learned** 45:17
**leave** 168:3 230:14
**lecturing** 45:18
**led** 41:5
**left** 169:22 200:24
**legal** 1:14 7:11,20
32:23 59:7 137:8
175:16 213:2
219:11,19 245:1
**legislation** 3:15
101:11 104:2,7
109:23 110:20
**length** 115:14
**lengthy** 11:20
120:4
**letter** 3:11 25:10
26:8 27:24 28:2
37:8,12,14,16,23
38:7 39:13,13,14
39:18 40:12,23
41:19 42:4,10,11
43:1,6 48:13
56:14,22 58:3,16
58:17 59:23
115:18 157:19
160:4,18 169:9,18
170:11 173:1
208:23 209:4,4,5
209:11 211:8
221:13 236:5
**letters** 13:5 14:6
15:17,18,21 16:7,7
16:9 26:10,13,18
26:22 27:1,5
**level** 117:17,19
142:3,3,11,12
169:8,16 170:10
173:22 176:13

205:2 215:11
**license** 244:6
**lieu** 5:4
**life** 54:25 165:2
**lifetime** 194:18,22
**limit** 11:19 52:6
172:6,8,11,13
240:2
**limitation** 159:3,7
**limited** 11:3
198:16
**line** 22:7 50:18
51:12 92:14 93:24
97:24 119:24
125:16 149:17
172:11 174:1
178:13 181:24
189:2 199:24
200:4 202:15
208:23 209:4,10
209:11 227:7
230:19,19 231:18
236:11 241:17
242:11 245:6
**linearity** 176:6
**lines** 190:3
**link** 102:24
**links** 200:5
**list** 21:11 152:6
160:25 173:6
230:14
**listed** 16:2 25:13
62:4 77:18 78:5
87:13,15 95:13
137:11 144:16,25
145:19,21 146:24
157:1 178:21
184:23 232:4
240:6,15
**listen** 128:19

**listings** 145:12
**lists** 141:10 144:22
144:23
**litany** 173:21
**literal** 20:4
**literally** 86:7
220:17
**litigation** 81:10
101:18 171:1
**little** 7:21 11:20
40:6 49:15 65:13
89:8,9 94:12
127:10 207:8
220:2 241:16
**lives** 88:5
**livingston** 1:15
**llc** 1:7 4:8 7:17
34:17 58:8 212:11
**llp** 4:13
**llp91** 2:4
**load** 154:24
**loaded** 211:20
212:1
**loading** 49:4
118:13
**local** 35:16 36:14
60:24 64:24 94:23
97:25 98:13
106:23 233:9
234:1 241:17
242:1
**locate** 239:22
**location** 33:5
**locked** 188:12
**logging** 91:18
**long** 18:12 29:6
65:13 132:23
140:2 143:4
181:19 190:11
198:3 237:17

**longer** 100:14
104:24
**look** 21:8,12 23:10
24:7 34:25 50:12
59:18 61:7,15,17
63:1,9 84:16 90:2
90:10 93:17 95:21
139:8,10 151:17
163:18 168:1
194:21 198:2
199:2 200:21
213:11 224:14
226:3,18 231:13
231:15 241:15
**looked** 46:17,17
76:19 77:25 80:1
145:22 146:3
151:6,10 158:17
158:20,24 163:12
163:24 166:9
167:24 168:6
185:22 190:22
193:23 202:1
221:12,19 240:4
**looking** 44:17
58:12 66:20 69:6
70:21 73:17
133:23 138:12,16
154:15,16,16
155:22 174:10,14
179:24 190:4
192:21 224:16
233:3 234:2
240:14 241:14,16
**looks** 17:4 18:11
57:14 176:1
**loosely** 173:2
181:5 182:23
**loss** 55:23
**lost** 130:20 144:3
170:23

**lot** 135:25 198:7
201:23 237:9
**low** 150:13 210:4
234:3
**lower** 64:24 89:8
99:6 108:14
114:16,25 115:7
134:18,24 160:11
171:6 181:11
188:14 210:2
211:17,18
**lunch** 71:23
163:22 164:14
**lunchtime** 71:18
**luring** 60:20

## m

**machine** 204:5
**macroeconomics**
193:5
**mad** 1:2
**magnitude** 112:11
112:12 135:23
234:9
**mail** 13:24
**major** 53:12 79:11
79:14 110:19
181:4
**majority** 94:9
**making** 114:12
124:22,23 160:14
187:14 197:16
204:13 239:18
**manage** 54:14
**management** 54:4
54:12
**manifestations**
171:19
**manner** 5:7
198:16
**march** 220:19
221:1

**margin** 145:6,7,7
156:11,16 166:12
167:6 170:22
171:3,17 172:7,10
172:15,21 173:7
173:11,13,22
174:24 175:5,8,9
175:10,18,20
176:1,7,13,17,22
177:2,7,12 179:22
179:23 180:5,14
181:1,10,12,18,18
181:24 183:21
203:2 215:7
**margins** 138:19
149:25 165:14
166:9 167:5,7,16
168:7,13 171:4,24
172:3 174:2,21
175:1,12 203:7
217:11,25 218:9
**mark** 118:3
195:15
**marked** 3:2 10:7
16:17,25 17:25
18:5 33:15 34:14
38:23 39:3 40:8
48:22 49:7 56:12
91:4,10,25 101:3,9
118:5,17 196:4,7
211:22 212:8
223:12 226:9
**market** 20:13
60:19,21 82:1
87:5,9 94:18,20
95:20,23,24 96:7
96:12 118:22
120:20 149:23
151:1 159:15,17
185:18 188:24
189:15 203:1,4,21

204:19,20,23
205:3,12 206:19
206:22,23,25
207:10,17 209:24
217:8 218:7
**marketing** 137:23
**marketplace**
55:15 163:9
185:12
**markets** 52:8
53:23 85:25
202:24 203:6,14
**marriage** 171:12
176:21 244:10
**married** 170:11,16
**marrying** 170:17
**material** 132:4
138:8 174:15
225:22
**materials** 11:24
12:13,19 14:14
17:19 20:10,18,22
59:19
**math** 111:20
234:15
**mathematically**
175:24
**matter** 3:20 7:12
7:16 12:9 19:17
22:22 23:17,24
24:2,18 30:20
31:9,15 32:16,21
32:24 33:1 34:15
34:16,20 55:9,9,9
60:10 69:15 84:2
135:11 136:19
137:23 142:14
202:2,25 212:10
212:22 242:25
**matters** 23:9,15
30:3,12,13 195:23

**maximum** 42:20 47:8,24 51:25 177:6
**mean** 13:10,15 18:16 33:22 36:20 47:12 52:12 57:11 61:22 62:7 74:16 78:9 85:16,23 98:3 104:16 130:23 136:11 151:16 156:8 165:25 166:20 167:6 168:5 173:2 176:10 184:4 185:14 193:22 228:3 230:18 231:10 239:8 242:9,16
**meaning** 74:13 180:9
**meaningful** 121:11
**means** 127:21 160:9 197:11 236:18 239:20
**meant** 25:16 37:12 68:9 71:7,10 73:13 77:23 85:17 115:20 122:5 140:2 184:2 231:9
**media** 236:6
**medication** 8:1
**meet** 129:16
**meets** 120:24 130:5
**member** 114:19 114:20
**memorandum** 101:12 104:2,6
**memory** 22:2 236:1

**mention** 227:1
**mentioned** 40:10 42:25 56:23 71:6 106:16 142:16 146:20 187:12 190:13 191:3 229:5 230:9 239:3
**mentioning** 195:11
**mentions** 41:19
**merchant** 87:10 89:18,22 90:1,11 90:14,23 137:13 141:15,16
**mess** 102:16
**messed** 207:2,6
**meter** 88:16 160:7 209:14
**method** 14:3 19:8 115:10 138:21
**methodology** 77:4 85:17 88:19,24 89:1 134:24 138:9 138:11 139:6 140:9
**metric** 55:23 56:2 56:6,9
**mfc** 89:13,15,19 89:20 90:8,17 94:16
**michael** 24:19 30:24 31:16,24
**mid** 193:7,10,11 193:14
**middle** 50:10
**million** 176:2 228:16
**mind** 38:18 42:15 50:11 71:14 91:17 135:19

**mineola** 245:2
**minimus** 229:18 233:14,17
**minus** 95:24 97:5 114:23
**minute** 71:23 104:19 118:8,10 118:13 132:9
**minutes** 31:5 32:6 39:22 71:18,24 72:4,5 119:9 177:20 222:7
**mischaracterizat...** 50:24
**mischaracterized** 219:22
**mischaracterizes** 17:18 31:19 52:22 87:20 135:14 138:4 139:5 151:20 158:15 159:20 160:16 174:7 177:10 181:15 191:1,18 203:24 205:17 209:22 211:13 218:23 219:19 220:17 236:14,23 238:7,17
**mischaracterizing** 113:18
**misinterpreted** 70:23
**misleading** 136:15
**missed** 97:17 132:23
**missing** 242:6
**misspoke** 113:10
**mistake** 207:18
**misunderstood** 70:24

**mode** 104:22
**modest** 231:20
**modification** 77:13
**modified** 100:3
**moment** 11:7 15:13 16:15 50:12 66:17 81:20 91:15 99:12 101:2 114:14 118:2 121:4 149:3 170:21 174:19 191:4 192:23 197:4 198:2,6 200:11 222:5
**moments** 32:5 143:14
**money** 113:4 171:7 173:5 188:1 203:7 207:3,5
**monitor** 80:23 84:10
**monopoly** 188:15
**month** 66:12 75:11,22 76:1 86:8,12,24 87:2,2 87:18,18,22,23 88:17,18,23 95:13 95:14,15,18 96:4 97:12 135:8 136:18,18 146:14 149:19 158:7,9,17 158:20,24 159:1,2 159:2,14,16 194:18,19 206:9 210:8 216:9 223:18 231:23,24 234:4,6
**month's** 95:24
**monthly** 45:2 97:8 153:6 155:12

157:22 158:19
160:6,19 209:13
209:15 210:5
211:16 231:20,21
**months** 78:4
155:14,15,16,20
157:7 234:14,15
**morning** 4:5 5:25
6:1 11:5 50:7
170:10
**mosca** 2:11 4:6,10
**motivation** 181:3
181:4,7 188:11
**mount** 1:14 2:12
**mouse** 49:15
**mouth** 53:15
**move** 143:13
**moved** 41:10
190:15
**movement** 88:24
**msc** 89:19
**msc1** 139:11
**msc2** 139:11
**multiple** 67:11,19
67:21 84:19
106:19 130:10
216:10
**mute** 4:20 71:24
211:19
**mysterious** 232:14

**n**

**n** 2:1 3:1 5:16,16
**name** 4:5,11 5:8
24:16 42:3 81:2
86:14 131:24
132:18 222:2
245:4,5
**named** 132:23
**names** 27:13 62:4
145:22

**naomi** 1:4 7:16
34:16 39:8 41:11
233:5 245:4
**narrow** 62:7
**narrowed** 189:25
**narrowly** 52:10
**natural** 54:16
120:25
**nature** 11:20 13:7
53:9 119:10 123:3
180:1
**near** 94:12
**nearly** 231:19
**necessarily** 96:10
**necessary** 30:19
73:2 88:24 99:14
138:10
**need** 8:5 12:4 24:6
38:5 59:2 72:5
74:13 106:5 142:8
165:11 174:18
175:14 197:8
199:5 206:16
207:19 224:18
**needed** 22:9 136:6
146:13
**negative** 97:2
134:21 157:12,18
194:19
**neighbor** 45:11
88:9
**neither** 96:25
**net** 183:5
**never** 71:14
**new** 1:1,15,17 2:6
2:13 5:20,22
26:14,18 33:6
34:21 38:6 44:11
44:20 45:18 54:24
54:24 61:3,10,23
62:9,12,22 63:13

67:1,4,6,10,25
68:7,11,15,15
69:16 73:6 75:22
76:1,7 79:16
81:11,16,23,24
82:14,25 85:9,11
85:13,21,25 86:1
87:9 88:1,6 89:17
94:10,23 98:4,7,18
99:3,17 100:10
101:10,21 104:1
106:11,19 114:21
117:4,15 118:2,18
122:4,5,6 126:21
131:20 133:5
144:12 145:1,19
159:24 163:12
167:5,16 185:11
185:18 186:9,15
190:17 192:8,16
192:18 209:25
211:24 212:23
215:15,23 216:2
221:15,21 224:8
226:4 227:22,24
228:1,8,11 229:7
233:9,23 235:5,10
238:22 239:6,11
239:17,21 240:2
240:10,24 241:25
242:10 244:6,18
245:2
**nine** 207:12,14
**nodding** 6:25
44:18
**nomenclature**
94:3
**non** 76:8 88:7
93:23 94:6,10
107:8

**nondependent**
190:23
**normally** 101:23
**northern** 1:1
79:17
**notable** 117:12
120:23 123:21
124:14
**notary** 1:16 5:18
243:14 244:18
245:25
**note** 11:8 34:17
72:18 82:13 97:1
147:21,22 157:2,6
165:20
**noted** 92:17
215:20
**notes** 13:4 14:5,23
15:8,15 16:6 29:2
200:20
**notice** 3:5 7:15
10:4,14,24 13:12
**notwithstanding**
9:14 11:13
**november** 221:2
**number** 10:21
11:4 12:12,18
13:4 16:2 22:25
27:16 35:7 39:5
39:21 40:2,10
49:8 50:10 58:1
67:4 69:22 77:14
79:5,7 80:20 92:4
94:15 95:5,22
97:14 101:14
127:11 133:25
134:7,13,16,18,19
146:15 153:6,7,9
181:12 191:23
192:10 235:2

**numbered** 19:3,23
35:6 57:22 69:24
70:14 121:25
**numbering** 101:24
**numbers** 27:25
40:14 66:13,21
77:18,21,24,25
79:4 152:16 153:6
172:14 176:15
178:12,15 210:21
230:22 231:11
**numerical** 71:15
146:17
**ny** 83:9 122:5,9,13
123:6
**nyiso** 73:5 86:1
**nys** 97:25 241:17
**nyseg** 90:22
**nyserda** 145:1
146:20 230:21

**o**

**o'clock** 11:5
**oath** 5:4,5 7:8
**object** 7:21 8:13
8:21,23 9:5,10
13:21 22:11 37:21
50:22 75:17 92:11
98:11 102:6
104:12 113:23
115:22 131:21,23
132:13 138:2
151:19 168:8
182:10 196:17
197:13 199:6
213:8 237:11
**objected** 16:1 21:3
21:4 128:20
**objecting** 92:13
102:3
**objection** 7:19
8:16 9:8,8 11:21

12:10 14:9 17:17
19:19 20:19,25
22:18 23:2,12
25:7,15 27:11
30:6,10,16,21
31:12,18 32:13,22
33:2 36:6,17
37:18 41:15,17
42:8 43:19 45:15
45:21 46:2,7,15
48:2 51:15 52:21
53:10,25 55:7
56:19 59:6,12,17
59:22 61:6,13
62:23 63:18,21
64:9 66:2 69:3
74:4,5,15,21 75:8
78:8,23 82:23
84:5,8,12 86:13
87:19 89:21 90:9
92:17 93:1,15
95:16 96:9 98:16
99:1,23 100:6,16
101:25 106:14
107:9 108:6,7,10
108:10 109:12
112:8 113:1,17
114:4 116:21
120:6,7 124:6
127:24 128:13
130:7,16 131:3,13
133:2,7,17 134:8
134:14 135:13
138:14 139:4,17
140:24 141:7,21
141:23 142:19
143:7 150:8
152:11,13,23
153:13 154:3
156:22 158:14
159:5,9,19 160:15

161:8,14,21 162:2
162:20 163:3,6,20
164:5,10,16 166:8
166:13 167:1
168:10 169:13
170:7 171:14
172:5,17,23
173:15 175:6,23
176:9 177:9 179:2
179:13,19 181:14
185:13,19 186:2
187:3,8 190:25
191:17 193:4,21
194:7 195:8,19
196:15 198:20
199:15 201:6,17
202:3 203:23
205:16 208:17
209:21 210:23
211:12 214:21
216:17,22 217:19
218:22 219:8,18
220:2,6,15 225:25
228:18 232:19
234:7,11,24
236:13,22 237:15
238:6,16 239:24
240:22
**objections** 5:7
8:23 9:2,14 11:19
61:19 63:8 64:3
93:2 117:2 132:3
139:25 163:11
164:24 165:8
168:3 186:11,17
238:25
**objective** 117:13
122:10,22 123:7
123:15,23,25
124:4,13,24 128:2
128:3,4

**obligated** 172:16
**obtained** 30:12
117:20
**obvious** 92:12
218:10 220:10
**obviously** 9:1 11:7
102:4 167:18
184:21 196:15
204:14 213:24
222:2 230:18
**october** 221:2
231:24
**offer** 27:24 60:21
69:25 70:12 88:25
106:19 125:20
127:7,7 128:24
129:3 130:3
186:15,19 188:25
189:17,18 209:12
**offered** 7:15 33:1
43:22 88:19
117:15,21 120:17
121:13 190:13
**offering** 121:16
124:23 190:14,18
**offers** 43:24
120:24 123:19
124:14 186:9
190:14
**offhand** 234:12
**office** 7:6 34:5
230:8
**okay** 9:7,21 10:1
10:23 11:16 12:12
12:18,24 13:19
14:14,19 16:10,14
17:23 19:7,10,16
19:25 22:14,20
26:2 28:8 31:7,9
31:22 33:8 34:12
35:5 36:11 38:8

38:15 39:10,12,17
39:20 40:3,21
41:3,4,21 45:9
47:24 48:24 49:19
50:14 51:6,19
53:14,22 54:7,21
56:25 57:2,5,21
58:19 61:8,21
62:5,12 64:5
66:15 67:22 68:19
70:25 71:20 73:3
74:18 75:12 77:11
81:19 82:12 84:3
85:2 86:4,10 87:5
87:24 90:13 91:3
91:9 92:16 94:15
97:21 99:11
100:25 101:7,8
102:2,9,12 104:11
105:10 107:23
110:16 111:21
113:7 115:10
118:15 120:10
123:12 125:7,9,16
126:7 127:16
131:19 132:20
141:19 143:10
145:9,18 146:19
149:2,15 151:3,23
152:5 153:1,19
154:8 155:2
156:13 160:9
161:3 165:13
166:5,21 167:4
168:5,11,12 169:3
170:20 171:22
173:9 174:17,21
178:4,19,25
181:23 187:22
188:22 189:9,10
193:18 195:12

197:12,17 198:9
199:10 200:10,18
202:12 208:7
210:17 212:6
213:5 215:13,25
216:4,21 217:21
220:8 222:5,9
223:14 224:3,12
226:3,6,12,18
227:10 228:10,25
229:23 230:25
231:17 233:21
242:4,19
**old** 6:16 133:4
245:2
**omissions** 139:16
**omits** 128:3
**omitted** 122:20
**once** 137:7 230:2
**one's** 48:7
**ones** 80:19 98:17
132:22 220:21
222:4
**online** 71:17
**open** 18:2 57:3
64:11 66:4 103:15
169:1 218:6
**operates** 67:7
**operator** 86:1
**opining** 65:5
**opinion** 65:7 70:1
70:12,16,17 71:2
73:19 76:25 77:1
77:2 124:2 128:18
134:4 158:10
172:15 180:13
182:9 201:4
205:13 213:2,3
214:24 215:1
218:18 219:20
227:15

**opinions** 20:9
69:14 70:10,12
83:10 101:22
213:13 214:1
215:14 224:6
**opportunity**
204:15 208:3
**opposed** 57:15
75:14 80:3 96:22
176:17,21 183:16
184:17 187:18
208:15 223:23
226:24
**options** 49:16
**orally** 6:24
**order** 3:16 74:7
75:2 81:15,17,22
81:25 82:7,8,8,14
82:14,15 83:9,10
85:4 117:25 118:3
118:3,18 122:13
122:14 123:17
125:10 127:3
128:10,15 130:15
131:10,24 132:5,7
132:19,23 146:12
150:7 156:7
162:19 163:14,14
186:24 187:9,10
187:20 189:8
203:1 211:15
224:9,14 225:19
228:13 235:3,16
236:2 237:3,8,14
237:21 238:12,13
238:21
**orders** 81:18
**organization**
67:11
**originally** 34:22
34:24 99:2

**outside** 23:12 30:6
36:6 41:18 46:15
61:14 63:22 98:11
107:9 160:16
162:2 165:4 199:2
209:22 214:22
**outstanding** 50:15
**outweighed** 164:2
**overall** 65:20
229:14
**overcharge** 73:23
74:1 109:14 113:9
134:24 138:7
158:23 176:13
214:6
**overcharged** 70:4
109:10 144:11
157:13 158:12,12
158:24 215:2
229:17 232:9
**overcharges** 17:3
109:1,2 111:1,3
112:6 113:5 134:1
138:18 142:24
146:13 157:6,18
157:23 165:22
174:25 176:14
177:2 210:3 216:1
227:20 229:22
**overcharging**
228:15
**overhead** 145:4
**overlap** 186:21
**overpay** 232:16
**oversight** 60:19
**overstated** 191:9
**overturned** 110:20
**owe** 207:5

| p | | | |
|---|---|---|---|
| **p** 2:1,1 | 197:24 199:19,20 | 103:22 105:4 | **pause** 131:20 |
| **p&l** 178:21 179:4 | 199:21 202:13 | 126:3 127:17 | 140:2 198:11 |
| 179:15 183:24,25 | 208:9 213:3 | 137:15 152:6,17 | **pay** 45:2 100:22 |
| 184:2,5,5,9,20 | 224:16 226:18 | 155:13 160:2 | 100:23 105:24 |
| 215:6 | 231:16 233:8 | 166:10 170:8 | 106:23 107:1 |
| **p.m.** 72:8,8 103:11 | 237:23 240:7,7,8 | 171:1 180:5,14 | 109:16 110:12 |
| 103:11 143:22,22 | 245:6 | 181:3,7 184:21 | 114:19,22 199:3 |
| 177:24,24 200:15 | **pager** 170:11 | 199:17 203:9,11 | 201:5,7,11 231:20 |
| 200:15 222:12,12 | **pages** 18:12,17,23 | 204:7 217:24 | 231:21,23 232:8 |
| 242:25 | 65:11 119:22 | 237:4 238:4 | 232:13 242:11 |
| **page** 3:4 10:20,20 | **paid** 47:3 70:6 | 239:17 | **paying** 110:12,15 |
| 10:21 11:1 18:17 | 99:5 109:15,16 | **partial** 161:10 | 112:25 205:12 |
| 18:24,25,25 19:2,3 | 110:4 134:10,11 | 176:20 | **pc** 2:11 |
| 19:5,22 20:6 26:1 | 140:14 157:24 | **partially** 189:19 | **pdf** 18:12,23,23 |
| 27:24 34:1,18 | 199:13 200:1 | **participate** 84:3 | 19:1 34:18 91:25 |
| 35:6,8 39:4 40:9 | 201:24 213:20 | **participating** 4:25 | 103:18 119:23 |
| 49:8 50:9,11 57:6 | 214:3 228:16 | 38:4 | 197:21,22 212:5 |
| 60:11 69:24,25 | **paper** 40:5 83:19 | **particular** 39:15 | **pearson** 2:4 4:12 |
| 70:14 71:1,7,8 | **paragraph** 35:6 | 54:3 81:1 84:20 | **peer** 228:21 |
| 73:18 82:3,4,6 | 35:10,13 42:13 | 85:22 86:23 89:7 | **pendency** 129:4 |
| 84:18 103:18,19 | 43:12 47:18,20 | 90:3,3,10 93:22 | **pending** 8:7 103:3 |
| 103:23 105:3 | 57:25 58:1 60:11 | 95:22 97:11 137:2 | 216:11 |
| 107:24,24 111:10 | 60:16 64:19 65:10 | 146:14 164:21 | **pennsylvania** |
| 117:12 119:21,22 | 65:10 105:6 120:2 | 181:1,21 195:22 | 26:21,22 27:1 |
| 119:23,24 120:10 | 120:11 121:5,6 | 210:1,1 | 33:6 44:23 54:24 |
| 121:4,5,25,25 | 125:8,13 129:2,12 | **particularly** | 61:16,18 62:1,10 |
| 122:16,21,25 | 188:10 189:10,11 | 111:16 | 63:6,25 64:2,7 |
| 123:9,10,17,19,21 | 202:14 213:15 | **parties** 5:6 244:11 | 86:18 133:6,10,20 |
| 124:11 125:10 | 223:19,21 224:25 | **parts** 42:21 47:9 | 144:12 145:20 |
| 127:1,2 129:10 | **paragraphs** 150:7 | 50:17,19 73:24 | 212:20,24 213:12 |
| 130:20 133:22,22 | **parallel** 100:2 | 200:25 | 214:3,20 215:2,17 |
| 133:23 138:17 | **paraphrase** 41:6 | **party** 28:13,17,21 | 215:23 216:1,15 |
| 139:15 144:6,25 | 119:14 171:10 | 61:24 62:12 | 220:23 221:10,16 |
| 144:25 145:8 | **parenthetical's** | 105:21 117:13 | 221:23 222:4 |
| 146:20 147:22 | 187:14 | 123:22 124:12 | **people** 45:22,23 |
| 157:16 158:18 | **park** 5:22 | **pass** 203:4 | 46:3 99:6 181:6 |
| 165:15,18,19,22 | **part** 12:22 31:6 | **passed** 104:16 | 182:23 194:16 |
| 170:14 174:17,18 | 43:23 52:25 59:4 | **patricia** 24:21 | 198:18 199:3 |
| 176:12 188:7,8,10 | 59:10 65:6 66:10 | 32:2 179:7 184:14 | 201:11 |
| 189:10,11,13 | 73:17 76:25 80:23 | **patricia's** 25:3 | **percent** 96:21,22 |
| | 84:25 89:23 99:25 | | 145:7,7 148:25 |

166:10,12 170:22
171:3 172:9 173:8
173:25 174:22
175:1,4,7,11,11
176:4,5 177:12
179:23 180:18
181:10,10 182:18
182:19,25 183:5
183:10,12,15
194:20,20,23
199:13,25 231:22
**percentage** 46:23
**perfect** 143:19
**perfectly** 37:6
**perform** 55:14,18
**period** 33:7 66:22
81:4 95:3 125:21
127:8 128:25
140:20 144:19,23
153:21 154:2,7,12
155:15 156:3,5,10
157:1 181:19
183:5 192:2
198:22 203:14
212:21 216:15
233:14 234:17
**periods** 153:12
205:10 221:4
**permissible** 166:6
180:3 225:10
**permissibly**
180:17
**permitted** 7:1
121:17 129:17
130:3,13 131:1,11
132:11 172:22
173:14 197:2
207:13 237:5
238:13
**perpetrates**
106:21

**person** 5:5 183:9
**personally** 13:23
45:3
**pertain** 133:14
144:17
**pertained** 54:14
54:15
**pertaining** 32:15
59:25
**petition** 129:4
**ph.d.** 1:13 2:20 3:6
4:19 11:5 12:9,14
18:7 243:7 245:5
245:21
**phone** 2:8,15
**phrase** 62:6 86:16
87:7 123:14 156:1
156:2,4 170:9
174:12 204:18
218:6
**phrased** 94:2
**physically** 5:1
**pick** 143:14
155:16,16
**piece** 42:15 50:11
52:16 110:5
111:16 177:5,12
183:24,25 184:25
189:1 192:19
206:18 208:10
211:5 229:14,18
242:6,17
**pieces** 213:25
217:18
**place** 100:14,15
107:17
**places** 7:6
**plain** 214:13
**plains** 2:6
**plaintiff** 1:5 2:5
4:13,16 5:14

158:18 159:4,6
**plaintiff's** 3:6,7,11
3:12 21:11,21
29:15 58:16 147:1
159:8 211:8
**plan** 42:21 45:20
45:23 47:9 48:4,7
**plans** 53:5
**platform** 236:10
239:13,15
**play** 132:8
**pleasant** 1:14
**please** 4:3,22 5:8
8:5 10:4 17:24
22:6 35:8 37:24
60:11 70:23 91:20
125:10,11 126:25
140:8 144:6,21
166:2 187:21
189:8,12 213:4
220:7 231:16
238:19
**plus** 18:17 74:25
95:24 97:4 110:7
127:13 149:23
162:1 173:5,21
203:2 217:9
227:19
**pods** 205:5
**point** 22:1 24:6
25:14,22 62:22
63:7 69:19 86:15
93:3 110:19 116:2
132:24 138:9
144:20 163:18
168:18,18 177:14
180:23 185:25
197:8 199:16
203:19,21,25
207:23 222:8
225:18

**pointed** 50:14
171:11
**points** 165:21
213:19
**policy** 84:25
107:17 185:1
188:10 202:25
204:14
**politicians** 242:16
**politics** 204:14
**pop** 38:6 118:10
**portion** 50:9 70:15
86:20,20 97:20
98:9,15,19 107:16
114:23 122:20
126:16 129:21,23
132:6 147:16
149:16 152:7
216:4 218:18
237:4
**portions** 151:5
169:21
**positive** 97:2
134:21 157:23
**possible** 8:8 80:7
80:11,12
**post** 206:9
**posted** 95:17
**potential** 42:6
120:18
**potentially** 176:14
241:24
**power** 53:5 203:3
209:1
**practice** 44:25
**pre** 187:17
**precise** 181:21
199:16
**prefer** 6:2 19:8,13
**preference** 6:3,4

**premise** 192:6
**premium** 117:17
201:5
**preparation** 12:13
12:20 13:6 14:8
14:16,21,25 15:5
15:19 16:5,12
29:16 40:18
**prepared** 17:9,15
167:12
**preparing** 30:19
193:15
**present** 2:19 5:2
240:11
**presented** 74:8
**presumably** 47:6
89:4 136:7 172:6
195:23 222:1
**prevent** 11:8
**previous** 95:24
96:4
**previously** 140:22
222:20
**price** 35:23 36:4
36:15 41:9 75:1
75:10 77:5,9,12,15
77:22 78:1,11,15
78:21 79:2,8,24
80:9,23 81:2 85:9
85:12 86:6,11,14
86:15 87:3,3,6,13
87:15,16 94:18,20
95:10,13,14,21,23
95:25 96:7,12
97:8,11,16 109:19
110:7 112:2 114:8
114:11,16,22,25
115:8 116:4,20
129:19 133:14
134:2 137:15,17
137:18 138:25

139:7,9,9,13
140:10,16,18
141:10,12,17
148:9,19 157:7,8,9
158:19 159:13
160:2,6,12,19,20
166:18 168:12,15
169:5 171:6,20
173:3,20,23 175:8
180:23,25 201:9
204:6 206:23
208:1,13,21,22,25
209:3,8,13,15,16
209:19,19,24
210:5,5,12,13,20
210:22,25 211:10
211:17,17 215:8
216:9 217:2
220:13,14 223:14
236:11 238:5,24
239:22 240:11,20
240:24 241:5
**priced** 115:7 117:8
148:10
**prices** 55:19 71:3
75:21 77:16 78:4
80:8 81:7 95:6,6
95:18 115:24,25
116:2 129:17
130:3 160:14
213:17,19 214:14
216:6 218:5,9,12
218:19 219:4,16
239:25
**pricing** 70:2 80:18
169:3 180:12
225:5,12
**primarily** 54:14
54:16 183:23
**printed** 197:22

**prior** 12:6 13:14
22:3 52:15 58:7
59:24 102:4 108:2
108:11 109:22,24
114:6,9 115:15
131:9 142:13
159:2 170:5
182:11 202:23
203:13,19,25
220:9
**private** 51:16
**pro** 6:16
**probably** 82:12,13
95:10
**problem** 42:19
47:17 176:24
192:24 214:12
229:25
**procedures** 187:15
**proceed** 9:24
23:22 34:10
**proceeding** 31:6
34:21 119:10
122:9 123:6 137:8
**proceedings** 7:11
84:4,11,17 131:2
187:10 235:5,15
237:3 244:8
**process** 82:2 83:3
83:18 101:23
118:23 131:7,7
132:17 175:16
204:14 207:1
225:1,6 230:24
239:19,20
**procure** 171:5
203:3 206:6
207:25
**procured** 207:18
**produce** 11:4,10
12:8,11,12 13:7

14:12 119:1
212:13
**produced** 11:13
13:11,15 15:10
92:7 101:17
104:14 135:10,21
136:19,20 196:12
199:8 222:20
231:14
**producing** 11:15
93:7 101:23
**product** 51:24
63:14 64:1,7 81:6
114:25 115:7
116:24 117:20
121:10,12,15
122:19 129:3,6,24
148:11 161:5
163:10 187:1
189:16 201:10,10
**production** 11:12
13:13 20:24 92:12
102:5 135:18
136:13,14
**productively**
178:3
**products** 55:15,20
81:7,7,14 117:14
117:17,18 120:16
120:17,21,22
129:19 132:1
163:19 164:19
165:5,7 186:20
188:24 189:17
190:6 225:3,6,9,11
227:6
**professional** 20:13
52:9 53:17,24
54:18,22 163:17
**professionally**
54:10

**professor**  193:11
  193:13
**professor's**  193:9
**profit**  167:5,6,15
  168:13 171:12
  175:20 181:1,6,18
  182:3,6,14,15,24
  183:5,6,10,16,17
  183:21 184:8,8,17
  184:18,20 203:2
**program**  29:13
  42:16 43:18,25
  44:1,5,6 51:3,9,22
  56:18 66:18
  102:15 116:15,17
  186:10,15 190:13
**promised**  158:19
  158:25
**promises**  6:13
  41:4 60:21
**promote**  105:18
**pronged**  171:17
  172:25
**proper**  93:2
**properly**  178:22
  179:17
**properties**  55:11
**proposal**  100:11
  100:19,19 107:19
**proposals**  84:25
**proposed**  33:1
  156:20 163:24,25
**proposition**  81:13
**protection**  42:17
**provide**  20:12
  21:22 45:1 63:14
  64:1 65:20 73:1
  115:6 116:4,7
  117:13 120:18
  123:22 124:4,8,12
  127:12 145:4

167:25 175:17
  211:9 218:14
  219:5 225:8
  227:11 240:24,24
**provided**  22:21
  24:8 26:3,6 27:9
  28:4 29:9 48:18
  51:2 52:1,15
  54:23 59:23,25
  74:23,24 77:9,16
  77:16 78:12 80:12
  90:4 94:6 110:18
  116:11 121:11
  122:10,11,22
  123:7,15,16,24,25
  124:9 125:17
  127:4,18 128:4
  135:7 137:17,18
  147:17,24 148:18
  151:6,13,17,18,24
  160:25 181:17
  183:24 188:15
  208:20 211:1
  225:4 226:22,25
  227:6 230:4,12,25
**provider**  213:21
**providers**  115:5
**provides**  42:17,20
  44:4,21 47:8 51:9
  64:7 121:13
  125:19 127:5,19
  128:5 129:6 201:2
  218:11 219:2,15
  223:23,24
**providing**  105:19
  114:25 116:10
  168:17 209:11
  217:4
**provision**  43:7
  100:2 105:17
  121:14 185:3

218:4,7
**provisions**  52:24
  52:25 105:7
**prudent**  204:16
**psc**  82:7,8,14 83:9
  118:3 122:4,5,9,13
  123:6 124:1,3
  125:3,4,25 126:1
  127:22 128:2
  162:17 187:20
  188:5,5 189:7
  190:1 235:6,17,23
  238:2
**psc's**  190:5
**pse&g**  44:9 45:3,5
  45:13,23 163:25
**public**  1:16 5:18
  81:12,17,24 82:25
  83:4,8,25 85:14
  117:4 118:18
  122:5,7 159:24
  162:12 163:12
  186:19 188:10,23
  202:25 224:8
  225:18 227:4,22
  227:23,24 228:1,6
  228:8,11,13
  243:14 244:18
  245:25
**publications**  3:17
  197:23
**publicly**  12:16,21
**publish**  222:22,25
  223:4
**published**  16:16
  33:14 48:25 196:7
  226:5
**pull**  10:5 66:15
  69:20 97:10 100:8
  101:1 106:5,7
  111:7,9 115:15

141:14 154:18,20
  174:19 178:9
  184:1 187:21
  188:4 199:5 209:5
**pulled**  66:21 77:22
  79:25 92:19 144:7
  144:24 145:22
  146:17 156:11,13
  182:21
**pulling**  165:16
  170:24
**pulls**  49:16 97:8
**punchy**  231:8
**purchase**  46:6,13
  46:19 85:19,22
  105:20,23 106:1
**purchased**  45:13
  45:22 74:10 85:24
  95:3 164:15 165:2
  204:25 205:1,2
**purchases**  45:20
  54:8 100:21
**purchasing**  100:24
  106:22,25 107:21
  140:14 207:6
**purpose**  120:20
  163:23 237:3
**purposes**  18:22
  19:1,4 62:5 92:12
  102:5 137:24
  145:25 184:5,10
  187:25 188:23
  190:5 196:16
**pursuant**  7:15
  10:24 11:11 72:17
  72:25 86:1
**pushing**  236:1
**put**  53:15 79:6,8
  81:20 97:15
  141:16 152:18
  164:8 211:6

236:10
**puts** 97:14
**putting** 33:12
76:21 204:7

**q**

**qualification**
130:9 133:16
**qualitatively**
108:25
**quantity** 205:11
**quasi** 83:6,13,17
119:11
**question** 6:23 8:25
9:14 12:5,7 13:22
15:21,23,25 21:5
25:18 26:21 30:17
31:22 32:14,15
35:12 39:18 41:4
41:6,10 43:3
44:12 45:25 46:9
47:11 48:20 49:21
49:24 51:17 58:20
59:1 60:15 61:7
61:15,17 62:19
63:1,4,10 64:4,21
68:13,18 70:11,11
70:13,23,24 75:16
76:16 78:19,25
79:6 85:16 88:4
90:6,7,20 97:18
100:17,18 103:2,3
111:4 113:21
115:21 117:7
126:12,21,21
127:23 128:21
130:13 131:8,9,10
131:17 133:8,9,9
135:17 140:3,6
142:13 144:19
145:9,11 147:9
150:3 152:15

154:14 155:2,3,4
158:6 161:10,13
161:16 162:9,25
164:19 166:2
170:2 172:18,20
172:22 173:10,12
174:12,16 176:20
178:11 179:24,25
180:1 184:4 185:9
185:16 192:6
193:6,14 194:5,12
200:6,22,23
201:11 215:13
219:7 233:12
234:22 235:6
237:14,19 238:19
241:22
**questioning** 22:7
77:1 92:14
**questions** 6:17 8:7
9:21 19:23,25
20:1,4,5,6,20,21
22:12,16 34:11
58:25 60:15 61:9
62:17 78:14 102:6
104:17 139:24
149:16 172:13
178:19 180:7
193:1 194:11
196:17 198:4,7
200:19 202:21
211:4 212:13
222:16,18 223:3,4
230:7 241:8
**quibble** 64:6 124:9
215:18
**quick** 241:9
**quite** 119:2 219:14
229:10
**quote** 27:23 43:6,7
43:12 160:5 188:4

188:9 189:5 190:1
217:3
**quoted** 189:2
**quotes** 148:13

**r**

**r** 2:1 5:16,16,16
**r.p.r.** 1:16 5:18
244:18
**radically** 172:14
**raise** 134:18,23
206:17
**raised** 32:11
159:10
**random** 200:25
**randomly** 89:5,5
**range** 185:25
**rate** 32:18 33:4
46:21,24 47:4
64:24 65:17 68:4
68:5,6,8,11,14,16
68:17,25 69:5,7
73:10 75:4,5 76:4
76:13 79:9,21,24
80:13,13,14 81:14
85:17 87:17 88:9
88:12,14 95:19
99:5 100:3 105:14
109:20,21 114:16
115:7 116:9
128:11 129:18
130:4,14 132:1
140:19 144:12
145:7 147:23
149:13,18 153:12
153:12,20,21,24
155:6,19,20,21
157:22 166:6
173:2 191:12,12
191:15,25 192:4,5
192:8,12,15,17,19
202:8 204:13

205:1 206:2,9,17
206:17,20,22,25
207:22 208:2,3
210:2 211:10
212:19 215:10
223:17,18,22
226:19 228:21,21
238:4,22 240:5,15
**rates** 20:11 60:20
60:22,22,23,25
61:4,4,11,11 62:20
62:21 63:5,6 76:1
76:5,20,23 79:22
80:9 99:7 115:11
161:24 175:2
210:2 216:7
227:16
**ratio** 55:24 56:3,6
56:9
**reached** 91:8
**read** 4:23 20:8,15
23:23 32:6 35:11
35:12,25 36:8
41:7 42:23 43:13
47:19,20 48:21
51:7,8 56:20 58:3
58:13,23 60:14,16
61:1 64:20,21
65:1,12,22 70:7
72:18 73:1 90:11
96:2 97:18,19
104:8 105:10
106:2,17 107:4,11
113:12 117:10,22
118:1,1 119:18
120:5,14 121:2,8,9
121:17 122:11
123:17 124:11
125:6,17,21 126:5
126:7,15 128:15
128:20 129:7,12

129:24 130:10,19
130:20 131:5,17
132:4,7,9 137:22
138:5 144:13
147:13,15 148:1,4
149:15,25 156:19
160:23 161:10,13
168:24 176:20
185:15 188:9,17
189:20,23 190:2
193:1,7 195:16
198:5 200:4
202:20 203:8
213:15,22 214:17
214:25 216:12
217:12 218:15
219:7 220:9
223:16 224:1
233:10,19 235:16
**readily** 210:3,11
**reading** 32:8 48:6
119:17 120:2
123:9 124:2
127:13 132:5
151:11 160:7
169:4 198:10
209:14 217:21
225:17 230:19
232:1
**reads** 36:12
**ready** 9:24 132:12
223:8
**real** 205:23
**realize** 112:19
181:2
**really** 8:22 133:8
183:11 203:15
237:6,10
**reason** 8:5 22:2
23:19 29:9 58:19
72:15 83:20

111:18 128:21
154:22 164:1
224:4 245:6
**reasonable** 165:14
166:3 172:10
173:7 174:1,4,5,10
174:13,21 175:1,4
175:8,10,11 177:7
186:7
**reasonableness**
78:10
**reasonably** 125:19
127:6,12,20 128:7
128:23 129:6
130:10
**reasons** 167:18,19
219:20 224:7
232:7,12
**rebuttal** 132:21
**recalculating**
178:14
**recall** 10:19 20:3
21:23 22:23 24:14
24:16 25:2 27:13
28:1 30:4,11 32:8
35:4 52:16 56:23
66:20 69:5 116:10
116:12,13 165:15
169:14 194:9,10
228:1 239:10,14
239:16,17
**recalling** 195:3
**receipt** 66:5 145:2
230:21
**receipts** 146:21
217:9
**receive** 15:18
35:15 98:24
106:12 108:14
117:16,20 160:5
209:12 226:16

**received** 16:3
24:24 41:12 48:13
60:12 100:4 116:8
155:5 201:16
226:13 230:8
**receiving** 25:2
36:25 37:3 52:2
68:20 69:17
**recess** 72:8 103:11
143:22 177:24
200:15 222:12
**recipient** 39:7
48:12
**recitation** 149:11
**reciting** 125:3
**recognize** 120:15
194:21 198:5,13
217:14 226:15
**recollection** 11:22
24:23 35:1 50:1,4
149:1 194:15
229:12
**reconfirm** 78:6
**record** 4:2,4,24
5:9 8:6 10:6 11:9
20:8 33:10 35:11
38:10,22 47:19
59:2 60:4,14
63:19 72:4,6,10,23
81:20 84:9 92:22
103:7,8,9,13
105:10 117:10
118:20 119:19
121:8 130:19
131:5,15,22 138:4
139:19 143:20,24
147:8 150:15,22
160:23 161:9,12
176:19 177:23
178:1,18 186:23
197:16 200:11,12

200:13,17 205:6
222:7,11,13 233:2
233:19 241:11
242:24 244:8
**recording** 28:12
119:25
**recordings** 15:8
**records** 137:1
**recover** 203:2
204:16 208:3
**recovered** 182:1
204:13
**reduce** 194:20,22
**reduces** 105:14
**refer** 19:2,10,13
27:21 28:8 39:14
57:9 61:24 71:10
82:9 83:7,7 92:23
104:1 119:22
182:14 183:25
224:10
**reference** 12:17,19
37:15 79:4 82:17
83:22 87:6 157:17
169:7 184:2
185:10
**referenced** 12:24
23:22 25:19,22,25
39:11 58:21 78:16
78:22 97:15 119:2
119:4,6 125:8
164:14 166:22
169:11 178:5,16
184:3 187:23
227:2,9
**references** 58:16
111:8
**referencing**
187:16 201:9
**referred** 31:21
62:1,3 66:16

86:17 89:12 94:1
105:21 139:14
176:15
**referring** 10:15
17:11 18:22 19:11
27:17 35:7 37:7
39:13,14 57:13,18
65:11 67:24 68:5
68:8 71:13 76:9
77:2 80:19 81:15
81:22,24 82:14
87:5 91:2 92:17
103:14 117:6
122:13 157:16
165:19 166:4
172:4 183:11
187:17 199:17,18
200:8 203:14
204:22
**refers** 48:5 70:11
**reflect** 84:18 95:25
114:17 149:19
150:17 181:19
215:10 224:1
**reflected** 20:5,21
137:14 179:3
184:11 210:14
230:13,17
**reflects** 216:10
**refresh** 24:23 35:1
38:5 50:1,4 91:12
**refrigerator**
194:13
**regarding** 11:10
20:11 25:3 28:21
29:2 102:6 117:14
123:23 130:19
196:17 197:14
215:15 231:1
**regardless** 36:11
96:7 229:16

**regime** 203:15
204:9 207:25
208:2
**region** 226:16
**regulators** 85:13
204:12 207:17,21
**regulatory** 60:19
83:1,3,4,5,14
84:21,24 86:2
181:7 208:5
227:22 235:5
**reiterate** 120:19
**rejected** 201:20
202:8
**relate** 129:6
**related** 30:12
52:10,14 53:5
55:23 56:2,6,9
120:21 121:12
129:18,23 132:1
149:21,23 151:1
156:25 185:5
217:8 218:7 225:3
238:3 244:10
**relates** 33:3
**relative** 229:21
**relatively** 65:19
79:17
**relevant** 30:15
51:21 52:1 83:10
147:23 150:25
155:9 159:2 168:1
168:13 208:25,25
221:7,10
**relied** 12:13,20
17:19 119:12
183:20
**rely** 83:15,20
**relying** 83:16
**remaining** 199:25

**remember** 99:15
147:11 213:10
**remotely** 5:3,5
**removal** 112:1
**remove** 100:20
107:19
**removing** 197:6,6
**render** 84:24
134:4
**rendered** 69:14
**rent** 182:16,16
**repair** 29:13 42:16
43:17,25,25 50:15
50:16,18 51:9,11
51:12,22 192:3
201:14
**repairs** 47:4 51:14
153:3
**repeat** 70:23
238:19
**repeating** 125:25
**repetition** 211:5
**rephrase** 62:19
184:3 185:15
235:6
**replace** 140:12
**replete** 216:5
**report** 3:7,17
12:14,20 13:2,7
14:8,12,13,17,21
15:1,5,10,20 16:5
16:12 17:15,20,21
17:23 18:6,16
19:10,14,22 20:7
25:17,20,23,25
29:16 30:20 33:7
39:11,22 40:19
43:7,9,13 46:16
62:4,7 63:23 66:3
66:9,11,23 69:21
70:15,18 71:2

73:16 77:5,19
82:3,4,5,19 83:2
83:11,22 84:18
85:1 108:16,17
118:1 119:3,4,6,8
121:21,22 122:1
122:20,23,23
123:11 124:1,3
128:2 132:21
133:1,21 138:13
138:13,16,17
142:1 144:2,6,17
144:21 145:6
146:1,7,11,25
147:21,22 157:2
159:25 160:5,17
165:13,15 166:4
167:8,11 169:7
174:5,11,14,18
175:15,18 178:4
178:10 187:13,16
187:18,24 188:4,7
188:8,21 189:5,6
190:8,19 193:18
195:17 198:17
199:1 200:8
202:10,13,22
214:8 215:4,14,21
216:2 221:8
227:10,18 230:10
230:13,17
**reported** 66:12
173:8
**reporter** 1:16 4:22
4:23 5:19 6:22 7:1
44:18 54:11 58:23
60:7 63:18 97:19
113:20 139:25
147:15 161:10,13
176:20 177:23
244:6

**reporting** 5:3,7
  183:2
**reports** 22:25 23:3
  23:5 30:3 81:18
  83:24,24 154:19
  160:1 183:3 184:6
  193:23,24 195:22
  196:9,12
**represent** 4:15
  15:24 16:24 24:17
  37:15 40:1 92:18
  99:17 100:1,10
  135:20 187:1
  197:21 198:25
  212:9,18 226:12
  235:14 236:8
  237:1,23
**representation**
  31:9 40:17 51:6
  108:1 137:21
  170:4 179:6,9
  187:6,7
**representative**
  233:22
**represented**
  184:13
**representing** 4:13
  8:12 64:23
**reproduce** 12:23
**request** 136:9
  160:24 220:6
**requested** 97:19
  136:8 147:15
  159:4,8 175:19
  197:7
**requests** 29:25
**require** 235:23
**required** 11:11
**requirements**
  130:18

**reread** 126:3
**rereading** 47:18
**research** 145:1
**reserve** 72:17,25
  193:19 195:15,25
  196:2,3 231:15
**reset** 3:16 81:15
  81:22 82:8,14
  83:9 85:4 117:5
  117:24 118:3
  122:14 123:17
  125:9 127:2
  128:10 130:15
  131:10,24 162:19
  163:14 186:24
  187:9 189:8
  224:14 225:19
  228:13 235:3,16
  236:2 237:3,8,21
  238:12,13,21
**resident** 212:23,23
**residential** 40:13
  42:18 47:16,25
  48:6 51:10 52:2
  54:23 57:18 63:14
  64:2,8 68:12,14,17
  69:1,5,7,8,11
  73:11 76:8,8,13,22
  79:10,11,15,18,21
  79:21 80:13 88:6
  94:9 98:5,8,14
  111:17 149:6
  171:23 185:18
  186:9 192:8
  212:20 213:11
  223:9 233:22
  239:21
**resold** 213:18
**resolve** 236:2
**resolved** 101:25

**respect** 19:16
  25:10 36:23 37:2
  37:13,16 41:11
  45:18 47:15 54:7
  61:3,10 62:9 66:5
  69:11,15 71:3
  79:2 97:23 133:10
  135:12,15 152:5
  168:20 181:23
  187:20 202:2
  217:23 225:13,21
  227:5 235:3
**respond** 174:11
  237:20
**responded** 16:5,6
  48:16 176:23
**response** 6:24
  70:13 233:12
**responses** 29:15
  29:24
**rest** 60:7
**restart** 178:11
**restroom** 103:1
  143:14
**restructuring**
  168:18
**result** 130:14
**results** 74:7
  133:25 173:8
**retail** 65:21 70:4
  82:1 85:11 118:19
  120:20 188:11,13
  188:15 189:3
  202:24 203:5,13
**retained** 142:14
**retention** 19:16
**retroactive** 96:11
**retroactively**
  13:21 98:11
  207:16

**return** 166:7
  182:14 183:5
**revenue** 3:15
  101:11 104:2
  146:14 207:19
**revenues** 144:17
  144:24 185:3,4
**reverse** 67:20
  194:19
**review** 20:10,18
  25:5,9 26:22 27:8
  28:12,16,23,24
  29:2,15,18,21,24
  30:15,19 31:10,20
  72:17 73:1 78:17
  132:19
**reviewed** 20:22
  26:2,5,9 30:4
  40:11 52:15 53:3
  53:9,17 59:25
  65:24 216:19
**reviewing** 30:11
  52:19
**revise** 41:5
**revised** 110:20
**revisit** 22:3,16
**ridge** 2:13
**right** 10:16 15:16
  18:12 44:14,19
  45:10 46:21 65:10
  69:9 72:17,25
  86:5 87:4 89:7
  92:10 93:18 96:3
  96:15,18,19 97:6
  110:25 112:3,25
  113:3 114:6
  116:23 119:14
  122:14 124:18
  134:7,16,22
  135:11 137:4
  138:13 139:16

146:12,23 153:25
156:2 164:4,6
167:23 169:24
170:15 172:6
174:23 176:8,24
177:1,4,11,13
178:15 180:8,19
181:25 182:1
183:8 192:18
194:24 198:25
208:16 211:11
215:2 218:17
219:7 220:12
221:18 224:11
229:24 230:2
231:4 233:1 234:3
236:24 241:21
242:1,8,10,15,17
**risk**   54:4,12,14
**risks**   55:11,19
**river**   2:20
**road**   2:12 245:2
**robinson**   24:22
179:7 184:14
**robinson's**   32:2
179:14
**role**   32:2,4
**rollie**   231:8
**rolling**   88:23
**room**   5:2 7:6 8:11
**rotate**   49:13,17
**rotated**   49:18
**roughly**   66:22
67:17 89:5 203:17
204:8,10
**routine**   38:4
**row**   149:11,17
169:21 170:13
**rows**   57:20
**rule**   11:11 72:17
72:25

**rules**   93:3
**run**   103:1

**s**

**s**   2:1 80:3 245:6
**sale**   146:5
**sales**   99:19 103:23
105:12,25 106:24
107:1 111:4
112:13 136:17
137:9 138:22
139:18 142:11,15
143:4 148:22
153:9 229:1,9
230:3 239:11,15
241:20,21
**sample**   137:1
**sandbag**   198:4
**sandbagging**
92:13 102:5
196:16
**satisfy**   120:21
**save**   113:4 188:1
**saved**   70:3
**savings**   109:3,23
110:2 112:4,5,7,13
114:17,23 115:1,8
142:5,15 143:1,5
169:5,23,24 170:4
170:14 203:5
**saw**   10:20 68:23
**saying**   37:11 71:10
72:21,24,25 113:8
127:21 130:2,12
137:18 151:25
191:5 192:7 197:3
203:19 205:18,19
207:13,15 208:5
208:13 209:18
211:9 219:14
**says**   11:23 18:25
20:8 27:14 34:18

35:13 37:16 40:1
42:13 50:11 58:1
58:7 95:2 97:4
105:11 106:8,18
107:24 110:22
117:10 122:18
123:19 124:1,12
125:17 127:18
146:7 147:22
149:18 160:19
162:19 169:22,24
186:24 189:2,6,14
199:25 200:9
206:3 207:1
214:12 216:5
218:3 219:1
220:13 223:25
224:25 231:19
237:4,24
**sc1**   79:18 88:6
94:1
**scenario**   206:3
**scheduled**   160:7
209:14
**schuller**   24:19,20
30:25 31:16,25
**schuller's**   51:7
**scope**   19:17,20,21
20:4,20,21 23:13
23:21 30:7 33:2
36:7 41:18 45:15
46:16 61:6,14
63:21,22 98:12
99:23 106:14
107:10 116:21
130:17 131:3,13
132:14 133:2,17
143:7 156:20,24
159:5 160:17
162:3 163:3 164:5
164:11,16 166:15

171:15 175:6
182:10 185:13
193:4,21 195:22
198:20 201:6,17
202:4 209:22
214:23 233:13
240:22
**screen**   6:22 38:6
49:13,15
**screwed**   194:4
**scroll**   35:8 107:23
197:23
**sec**   183:2
**second**   33:9 38:21
50:8 57:25 103:18
111:7 120:1,1
122:3 149:10,17
149:17 189:12
224:19,20,23
225:5 231:18
232:4 233:8
236:10
**secondly**   81:3
126:2 160:22
**section**   20:7 21:12
41:7 43:1 57:22
70:19 73:16 94:11
99:18 105:14
106:17 108:17,17
122:3 138:17
144:5,10,10,10
149:10 156:14
157:3 169:3
174:23 211:8
223:15,17 226:19
226:20,23 227:2
241:16
**sections**   101:23
105:11 106:5,6
**see**   6:24 10:9
11:22 17:5 19:4

23:16,20 24:5
25:13,19,21 35:9
37:23 39:8 41:14
43:7 50:20 51:19
57:6,22 69:6 72:5
91:3 93:18,23
94:13,16,18,21,24
95:6,17 97:25,25
103:24 105:7
119:25 120:12
121:6 123:20
125:14 134:2
138:5 145:21
149:13 152:7
169:4,25 174:5
198:13,14 199:3
202:15,18 204:19
209:8 223:18
226:20 233:9
240:7 241:18,23
**seeing** 35:4
**seen** 10:12 11:2
17:7 18:8 23:14
27:15 35:2 39:10
40:18 49:9,19,24
50:2,5,6 93:10
118:23 166:17
167:24 184:19
198:5
**segment** 52:19
**select** 108:13
188:12
**sell** 205:20,24
206:4,6,23 238:3
238:13,21
**selling** 81:6
**send** 13:23 14:2
102:15,23 222:24
223:2 235:20
**sending** 101:24
211:24

**sense** 81:5 161:23
**sensitive** 148:10
**sent** 10:14 13:16
13:17 14:15 38:10
49:2 110:3,10
197:5 222:22
230:16
**sentence** 36:2
57:25 58:7 64:20
65:12 70:18 122:3
124:11 126:3,3,8
126:15 127:14,17
128:22 129:2,13
144:9 146:25
148:5 202:17
204:24 209:17
211:15 214:11
219:1 220:9,13
224:1
**sentences** 120:14
**separate** 15:22
16:7,9 48:7
123:24 162:23
227:7 236:4
**separately** 105:16
151:3
**september** 221:2
**sequence** 85:6
**sequential** 27:25
40:14
**series** 57:14 62:17
211:4
**serve** 191:24
**served** 7:16 192:8
**server** 102:22
**serves** 192:4
**service** 28:24 29:3
29:10 42:21 43:17
43:23 44:21 45:1
45:3,5,7,14 46:19
47:9,22 48:4 52:3

57:22 58:1,10
66:6 67:11 68:21
69:18 71:4 73:21
73:21 74:11 79:18
80:3,4,8,10 81:12
81:17,24 83:1,5,8
83:25 85:14 86:12
88:7 100:24
105:21,22,24
107:12 114:20
115:5 117:4
118:18 120:23,25
121:12,15 122:5,7
124:15,15 129:24
132:16 139:1,3,3
154:11 159:24
161:5,11 162:12
163:13 168:20
171:2 179:4
184:21 186:20
188:23 190:18
191:25 201:2,5,11
201:15 203:15
204:5,9 205:7
207:25 208:1
214:4 217:4
218:10,11,14
219:2,3,6 220:11
224:9 225:5,18
227:4,23 228:1,6
228:11,13 235:10
236:11 238:3
241:2
**serviced** 185:25
**services** 1:7 4:7
7:17 34:17 42:16
45:18 51:2 58:8
103:23 116:11
117:9,15,17,19,21
120:18,21,23
122:11 123:16

124:5 129:19
132:2 189:17
212:11,16 223:23
223:24 224:10
225:3,11,14
227:12 245:4
**servicing** 185:17
185:21
**serving** 80:14
**set** 67:1 89:4
136:12,16 137:7
145:14 146:15
152:18 156:21
207:22 214:14
216:6,9 217:2
223:18 242:22
**setback** 231:21
**sets** 35:23 36:4,15
41:9 206:23
**setting** 165:14
170:22 213:17
218:9
**settings** 7:5
**settled** 230:23
**settlement** 149:21
150:18,24 151:5
152:3 217:6
**seven** 57:20 92:19
234:14
**shaded** 93:17
**share** 3:3 10:2
16:21 33:18,20
38:6 91:5 102:18
**sharing** 115:1,8
**sheet** 17:5 180:8
184:17 245:1
**sheets** 15:11 78:16
78:22
**shift** 181:7
**shocked** 236:17

**short** 9:3 212:5
**shortcut** 27:12
**shorthand** 61:23
  63:21
**shortly** 212:5
**show** 87:2 180:5
**showing** 16:25
  18:4 34:13 39:3
  91:24 101:8
  213:19
**shown** 49:25 225:7
**shut** 71:25
**side** 93:18 143:1,2
**sideways** 49:14
**signature** 244:17
**significant** 56:17
  137:24 233:20
  238:11
**significantly** 232:9
**similar** 43:25 44:5
  44:21 63:15 64:1
  64:7 81:7,18
  83:24 93:11 100:2
  116:14,17 159:25
  160:10,11 212:21
  217:15,22 222:2
  228:12
**simple** 11:21
  240:5
**simplify** 111:20
**simply** 12:5
  125:25 201:3
  214:13
**single** 67:10
  136:22,25
**sir** 7:23 17:24 18:2
  35:2 48:24 57:3
  60:9 64:12 69:21
  101:15,19 104:4
  105:3 121:23
  129:10 177:3

178:17 188:8
  196:6 197:19
  202:11
**sit** 26:12 155:18
  167:14
**situations** 215:7
**six** 202:16 234:14
**sixth** 141:25
**skating** 197:15
**skip** 16:14 61:8
  129:1 212:12
**sleight** 6:6
**slightly** 181:12
**slip** 6:5,7 187:18
**small** 79:17 88:21
  111:14 203:7
  229:10,14,21
**smaller** 100:22
  194:24
**social** 236:6
**sold** 55:15 105:16
  140:12 144:18,24
  146:16,16 147:3
  148:21 150:10,16
  150:23 151:2,7,11
  151:21 173:5
  184:25 204:2
  215:5
**solicited** 64:22
**solution** 175:25
**solutions** 1:14
  245:1
**somebody** 131:9
  195:11 237:2
**something's** 154:5
**somewhat** 11:3
  70:25
**sorry** 10:18 13:9
  13:20 18:15 21:2
  23:13 34:23 37:10
  37:19,20 38:17

41:16 43:21 44:16
  48:9 59:19 60:2
  63:20 64:16 70:21
  70:22 71:12 77:24
  81:23 97:17 108:7
  109:1 110:8
  111:23,24 118:21
  122:4 123:3,8,20
  124:18 133:22
  135:4 139:22
  140:1 141:22
  144:3 148:6 149:9
  152:12,14 165:25
  167:23 168:5
  176:4 178:11
  180:20 183:12
  189:4 196:23,23
  198:23 202:19
  211:19 223:10
  239:8
**sort** 45:20 96:22
  102:25 116:8
  143:3,12 176:5
  200:25 213:25
**sound** 186:6
  237:24
**sounds** 155:9
  172:1 199:7 239:4
**sources** 149:20
  217:6
**south** 2:21
**span** 67:20
**speak** 12:3 21:16
**speaking** 11:19
  33:11 73:5,9
  92:25 106:4 117:3
  153:10 173:2
  181:6 197:4
  204:10
**special** 209:12

**specific** 23:19
  32:20 67:24 95:13
  95:14 117:14
  138:25 140:10,18
  166:2 171:11
  189:7 195:16
  221:5,9 227:17
  240:15
**specifically** 8:25
  9:13 37:2 69:6
  89:16 144:20
  150:3 228:5,5
  239:16
**specify** 9:2
**spent** 207:2
**spot** 207:10
**spread** 88:17 89:6
  167:15 220:22
**spreadsheet** 17:4
  135:6 154:20
  210:14 229:25
**spreadsheets**
  77:21 79:3,8
  80:15 136:21,22
  147:24 210:21
  230:15
**staff** 228:2
**stakeholders**
  84:19
**stamped** 226:14
**stand** 82:5
**standard** 50:11
  79:18
**standardized**
  138:23,24
**stands** 238:2,10
**star** 94:12
**start** 39:2 72:16
  222:19
**started** 6:18 48:9
  82:6 111:23

147:10
**starting** 71:1
73:18 103:23
160:6 189:11
202:14 209:13
**starts** 42:12 71:7
120:11 121:5
125:13 144:6
202:15,17
**state** 1:17 4:3 5:19
54:24 61:23 62:22
67:4,7 81:23,24
85:20,20,20 94:23
98:5 99:18,24
100:10 101:10,21
104:1 118:18
132:6 145:1
157:17 204:1,12
233:9 234:1 235:5
235:11 240:2
241:25 244:6,18
**stated** 17:20 39:7
153:22 170:15
**statement** 3:12
4:24 36:10 38:13
40:13,23,24 41:1
42:10 56:15 57:19
58:22 66:22 76:18
105:7 113:9,12
115:17 127:12
149:3,6 154:17
157:21 160:3
169:1,11 170:3
171:23 172:18,19
179:14,15 182:11
191:22 200:5
202:21 214:19
221:25 223:10
224:11 228:23
237:12,18

**statements** 178:21
184:20 197:16
213:12
**states** 1:1 34:19
60:17 79:17 81:13
81:18 83:21 84:1
127:3 203:17
216:8 217:1
**stating** 5:8
**statistical** 55:10
**statuses** 99:10
**statutes** 197:2
**stay** 108:15
**stayed** 69:17 161:6
**stealing** 196:9
**steeds** 239:12
**stems** 173:21
**step** 130:24 184:4
**stepped** 60:2
155:3
**stick** 231:7
**sticker** 10:16
**stipulate** 132:18
132:20
**stipulated** 79:12
107:17
**stipulates** 139:9
**stipulation** 108:12
184:24
**stop** 34:10 111:24
130:15
**stopped** 147:12
**stopping** 189:24
**straightforward**
109:18 230:5
**strategy** 115:6
**structure** 182:20
**student** 193:12,13
195:7
**studied** 52:8 53:23
54:6,15,17,23 55:5

**studies** 193:2
**study** 193:8
**subheading** 70:15
**subject** 12:21
15:12,13 130:22
179:14 190:16,23
195:3,22 204:13
217:17 230:18
231:10
**subjective** 159:11
159:22
**submit** 46:24
129:4
**submitted** 66:8
192:2 201:14
204:10 225:22
**subpoena** 197:5
**subscribed** 243:10
245:22
**subsequent** 84:15
87:2,22,23 155:16
159:2
**subsequently**
40:12 204:8
**substance** 51:8
214:7
**substantial** 171:7
173:4
**substantially**
60:22 61:4,11
62:18 63:4 213:20
**subsumed** 180:17
**subtle** 78:19
**subtracted** 74:9
110:10
**subtracting**
199:22
**sufficient** 121:15
225:8
**sufficiently** 140:21
213:17

**suggest** 51:4
**suite** 2:5
**sum** 51:8 214:7
**summaries** 24:24
25:1
**summarize** 53:14
53:16 84:20,22
127:16
**summarized** 24:15
74:23 173:3
**summarizes** 53:21
185:8
**summarizing**
195:17
**summary** 24:8,24
25:1 73:13 95:10
105:6,7 147:7
**supercede** 214:9
**supplied** 35:18
225:4
**supplier** 41:23
218:13,20 219:5
219:17 226:19
**suppliers** 61:24
62:12 95:6 106:20
**supply** 23:7 35:15
35:16,21,24 36:5
36:14,16,25 37:3,4
41:10 61:22 76:23
89:13,15,18 90:8
94:11,16 96:16,20
109:8,9 113:25
114:1 121:1
129:18 130:4
131:25 139:12
141:15,16
**supplying** 201:3
**support** 101:12
104:3 105:8
166:11

**suppose** 47:12
191:13 237:14
**surcharge** 242:1
**surcharges** 233:10
241:17
**sure** 8:22 11:2
21:6 25:19 34:2
38:20 43:10 71:21
71:22 72:21 74:16
90:25 96:11 98:20
100:17 113:19
114:13 117:11
118:10 124:10
126:5 132:6,21,24
149:1 166:4,22
168:1 169:19
174:15 191:19,20
192:7 196:19
199:9,18 207:7
208:7 213:6
224:21 236:20
237:10,16,19
238:20
**surprise** 235:18,19
236:12
**surprised** 94:5
186:5 195:14,21
**surprisingly** 204:4
**survey** 231:24,24
**surveys** 163:1
**suspect** 79:11 94:8
**swear** 4:22
**switch** 35:14 82:12
99:6 107:14
110:21 113:3
181:4
**switches** 35:17
**switching** 112:3
113:6
**sworn** 5:18 243:10
245:22

**system** 85:25
193:20 196:2
**systematically**
81:4

**t**

**table** 57:19,21
70:18,19,20,22,22
71:6,7,9,10,10,13
71:14,14 74:8
77:19,19,24 78:16
78:22 79:4 80:7
80:20 97:15 103:2
103:19 137:3,9
144:22,23 145:5,5
145:14,24 146:4
146:16 149:10,11
149:17 157:6
165:23 166:23
169:4,16,21
170:15,22,23,23
170:24 176:12
178:16,16 181:9
216:1 220:25
232:3 234:16,20
**tables** 145:10
215:25,25
**tabs** 17:4
**tabulated** 79:2
153:7
**tag** 95:1
**take** 7:1 9:6 14:23
15:7 44:18 45:5
71:18,22 72:14,14
72:22 101:17
103:4,4 107:25
108:2,18 114:11
118:13 132:9,15
138:25 143:11,13
168:1 177:18,18
177:19,19 198:2,6
207:8 224:13

226:3 231:15
241:14
**taken** 24:18 30:5
31:8 114:10
**takes** 154:24
**talk** 160:24 165:14
165:25 182:12
203:12 224:9
238:12 239:8
**talked** 37:5 85:3,4
89:23 95:20
108:18 115:14
134:20 159:6
163:22 171:19
**talking** 30:23
39:12 48:9 55:1
69:11 73:4,9,12,14
81:21 82:20 100:5
111:24 114:13
133:4 137:10
141:5,19 170:21
176:18 195:25
206:2,7 221:13
239:2 242:13
**talks** 124:13
224:11
**talky** 104:22
**tariff** 85:12,15
86:2,3 91:1 92:23
**tax** 66:6 98:5
99:18,24 100:3,12
103:23 105:11,12
105:13,14,25
106:5,6,12,24
107:1,6,7,8,15,18
107:22,24 108:19
109:23 110:2,6,9
110:12 111:5,25
112:13,23,23,24
114:2,17,23 115:1
115:8 116:3

133:19 134:12,15
137:10 139:18
142:5,8,15 143:4
145:2 146:21
217:10 229:1,9
230:3,21 239:11
239:15 241:21,21
241:25 242:1,11
242:12
**taxed** 111:5,8
**taxes** 65:18 94:24
95:5 97:25 98:14
98:18 99:4,19
100:20 109:9
115:19 149:25
183:2 217:9 233:9
233:22 234:1
241:17 242:3,15
**teaser** 60:20
**technical** 6:11
196:3 235:17
**technically** 196:1
**telephone** 14:24
15:3 147:6
**tell** 8:25 9:12
46:12 106:6
108:21 121:9
126:16 132:21,25
137:19 154:15
187:14 188:7
239:8
**telling** 72:13
**tells** 175:16
**ten** 109:20,21
110:7,11,11 114:8
143:16,19 177:19
205:24
**tend** 88:20 167:17
**term** 61:21 62:8
62:14 83:14 86:15
87:9 94:2 147:25

**[term - times]** Page 44

166:3 174:3
179:22 193:7,10
193:11,14
**termination** 28:24
29:3
**terminology** 160:2
223:25
**terms** 27:8,14
28:21 37:7,8,13,14
37:24 38:13 42:1
52:5 56:21 65:20
83:18 108:4 111:5
137:24 157:20
160:22 190:17
217:16 230:3
**test** 10:1
**testified** 5:20 32:5
53:23 73:15 78:20
106:15 135:10
156:18 179:7
191:5 192:15
202:7,7 208:13
236:21
**testify** 8:2 60:6
**testifying** 99:13
208:12
**testimony** 7:7,10
17:18 31:19 52:22
82:18 83:19 84:19
87:20 104:25
105:1,2 113:18
119:13 135:14
137:2,6,22 139:5
139:15 142:2
151:20,23 153:18
153:22 157:17
158:16 159:20,24
160:16 171:9,10
174:8 177:10
178:5,24 180:15
180:22,24 181:15

187:13,16,17,24
190:19,21 191:1
191:18 195:18
197:14 203:24
205:17 209:22
211:14 214:8
218:23 236:14,23
238:17
**tethered** 213:17
**text** 57:15
**thank** 16:23 18:20
34:6 38:8 40:3
45:6 47:14 73:3
77:23 82:6 92:25
93:9 101:7 103:5
117:22 123:12
124:22 125:2
148:7,14 176:11
177:21 187:7
195:3 224:12
226:8
**theoretically** 86:5
**theory** 209:24
214:12
**thing** 9:9 71:22
81:21 117:1 120:5
128:20 146:19
171:11 189:20
192:21 196:3
205:5 222:7
**things** 6:18 13:24
14:2 16:3 21:22
85:4 125:4 128:3
135:19 136:9
145:12 160:21
178:3 197:10,11
200:21 236:7
239:3 242:16
**think** 4:20 9:4
10:13 15:17 22:24
25:3,16 34:9 46:1

53:21 54:11 57:17
62:4 63:17 67:9
71:6,9 83:9,13
88:23 97:3 99:12
100:18 107:13
110:17 111:3,13
111:18 113:9
114:12,14 116:13
117:6 118:14
135:24 142:23
143:11,16 148:20
159:21 161:18
163:22 164:18
165:2 168:12,21
170:24 172:9
177:5 184:2,2
185:1 187:16
194:13,25 196:6
197:14 200:21
201:8,15,19 208:8
208:8,8 211:3
222:6,8 224:14
228:14 231:9
232:22 233:19
236:1 238:11
240:8 242:17,21
**third** 28:13,17,21
42:11 57:15 61:24
62:12 105:21
202:13 212:9
218:3 219:13,19
**thomas** 204:2
**thorough** 58:6
**thought** 37:11
64:5,5 70:22
76:17 96:5 113:7
113:11 123:9
135:17 140:2
143:18 145:10
148:6,14 149:7
154:9 204:2 239:9

**thoughts** 185:8
**thousand** 239:12
**three** 12:18 19:23
20:5,6 24:18 31:7
81:5 202:16 205:9
206:21 231:19
234:13
**threshold** 129:16
**throwing** 220:2
**thrust** 110:19
**time** 4:2 7:21 8:23
8:23 9:4 22:6
26:19 27:6 28:5
33:6 62:22 63:3,7
65:21 66:1,7,8,10
66:12,19,22 69:2
72:7,10 73:12
81:4 95:18 97:2
98:4 99:8 102:1
103:10,13 106:16
108:18 115:22
121:15 132:19,24
140:5,20 141:4
142:1 143:4,6,21
143:24 144:19,23
153:21 156:25
163:18 178:1,2
181:20 190:11
197:11 198:22
199:4 200:14,17
201:23 203:14,20
203:21,25 210:1
212:21 216:16
221:4 222:11,14
222:16 229:6
233:14,23 234:18
239:6 240:21
242:24
**times** 52:17
130:10 136:9
142:20 157:23

182:20 187:12,23
203:16 223:16
224:2
**timing** 96:1 100:8
**tiny** 208:10
**title** 18:6 92:1
104:4,8,9
**titled** 17:2 103:22
**today** 4:14,14 7:4
7:7,23 8:2 10:12
12:8,11 13:14
17:7 26:13 30:15
49:19 50:7 70:10
85:9,14,15,17 86:7
87:15 99:2,10
143:9 155:18
167:15 185:21
187:13,24 198:14
201:1 213:13
214:1 235:8,11
238:2,10,20
**today's** 4:2
**told** 22:15 28:20
148:24 220:18
241:4
**tongue** 6:7
**tool** 54:4
**top** 34:18 57:5,5,6
57:11,12,14,15
92:1 93:18,24
99:16 133:13
149:17 160:4
169:8,17,21
223:15
**topic** 191:21 193:6
193:9
**topics** 70:1
**total** 95:2 96:13,16
96:19 106:24
110:6 111:6

129:21 139:2
142:12 144:18
166:20 191:10
192:10 227:11
**totality** 234:5
**totally** 237:18
**totalogy** 201:11
**totals** 216:2
**tps** 62:13
**track** 129:4 131:2
224:25 225:6
235:15 237:2
**traditional** 213:21
216:7 218:13,19
219:4,17
**transaction**
207:17
**transactions**
148:13
**transcript** 28:16
72:18 73:1
**transcripts** 23:23
24:1 31:11
**transmission**
65:16 99:20
105:12,15,25
107:3 111:11
112:17 114:18
142:5 143:2
149:22 150:25
152:4 217:7
**transparency**
129:20 225:13,22
227:4,8
**transparent** 225:6
**transportation**
99:19 105:12,15
105:25 107:2
111:10
**treatises** 12:18
197:1

**treatment** 106:21
108:4
**tried** 102:16
**tripping** 128:22
**troubling** 117:12
123:22
**true** 191:7 244:8
**truthfully** 8:2
**try** 9:3 11:18
18:21 19:2 27:12
39:18 41:3 93:2
104:19 112:15
149:4 178:2 214:8
239:12
**trying** 53:8,15,15
85:5 102:14 146:6
146:9 154:18,19
174:11,15 176:25
191:2 200:20
206:1,18 211:6
214:9
**turn** 50:8 70:14
105:3 119:21,24
120:10 121:4,25
125:9 205:21
**turns** 206:10
**tweet** 236:7
**twitter** 236:5,20
236:25
**two** 8:11 40:5,9
49:8 50:14 52:17
57:19 59:2,3
73:24 75:15 87:11
88:22 89:17,24
120:14 128:3
143:11,16 155:15
166:23 170:11,16
171:17 172:25
180:6 202:16
208:18 222:7

**type** 27:20 36:18
51:24 52:15
117:19 182:19
185:21 186:10,15
190:13 232:3
**types** 54:8 68:4
**typical** 79:20
226:15
**typically** 9:7 79:17
79:19 111:14
204:3

**u**

**u.s.** 3:18,19 79:20
83:3 204:8,15
**ultimate** 87:17
**un** 107:8
**unable** 231:20
232:8
**unacceptable**
174:2
**unclear** 66:9
**undercounting**
135:25
**undercut** 116:4
**underestimate**
113:5
**undergoing**
230:23
**undergraduate**
194:1 195:6
**underlying** 84:4
84:11,16 88:24
156:12 184:12
192:11 193:8
**undermines**
218:12 219:3,15
**undersigned** 58:9
**understand** 6:8,10
6:14,19 7:2,7,12
7:14 8:8,14,19
9:15,18 11:19

15:21,22 19:5,11
22:9 33:24,24
54:19 61:22 62:9
62:15 66:8 67:9
67:24 68:13,18
75:15 85:7 90:6
93:1,4,6,12 96:24
96:24,25 99:15
100:17 101:25
124:25 126:11,20
130:12 151:9
177:4 193:16
198:15 208:8
221:23 231:9 234:6
**understanding**
10:23 26:12,15,17
26:25 27:3,4,7,13
28:3,6 29:5,8
32:10,14,19,23,25
41:25 42:5 47:21
66:17 68:24 86:10
87:22 90:13 96:6
99:21 100:14
104:24 106:10
150:5,9 153:5
156:20,24 157:4
158:25 167:14
178:10 183:19
184:7 185:10,16
191:23 215:19,22
226:2 228:12
233:25 235:8,19
**understated** 112:6
113:8
**understood**
212:24
**undersupply**
86:25
**unduly** 201:22
**unequal** 106:21

**unexpected** 193:3
194:12 199:14
**unfair** 132:8
**unfortunately**
193:13 194:10
**uniform** 107:8,8
**uniformly** 89:6
**unique** 125:19
127:5,19 175:25
**unit** 42:19 47:17
76:21
**united** 1:1 34:19
83:21
**units** 146:15
**unpack** 85:5
237:10
**unreasonable**
174:2
**unrelated** 200:19
237:18
**unscannable**
102:14
**untethered** 60:24
**update** 22:8
**uploaded** 33:14
**upstairs** 165:9
**upstate** 98:19
**usage** 111:15
**use** 6:5 62:6 67:23
95:5 140:17
142:10 143:13
160:13 166:5,11
170:21 174:3,13
178:2 210:12
**useful** 204:17
**uses** 156:3
**utilities** 26:14 44:2
45:1 60:24 67:19
68:16 69:4 75:21
78:4 79:19,20
81:4 85:10,19

87:9 88:16 89:17
93:11 106:19
111:14 134:11
144:22 145:15,17
145:19,25 157:1
182:17 188:25
189:18 190:11,12
202:18,23 203:3
203:12,12,20
204:1,10,15
207:24 208:2
210:22 215:24
227:25 228:8
229:3 240:10,23
240:24
**utility** 3:21 35:16
35:19,20 36:14,25
37:3 41:13,23
43:22 44:4,8,9,9
44:10,20 64:24
67:15,16,17,20
68:6,11,15,19,21
69:17 70:5 73:7
73:25 74:11,24
75:1,6,11,14,21,25
76:4 77:6 79:23
85:8 86:18,20,22
86:22 87:25 88:2
88:5,9,12,13 90:3
90:11 94:2 95:14
95:19 97:9,11,15
98:25 99:6,25
100:24 105:18,24
106:21,23 107:21
108:5,15 109:4,8
109:17,19 110:10
110:12,21 111:13
111:25 112:21,22
112:23,24,25
113:25 114:1,11
114:16 128:11

129:18 130:4,14
131:25 133:11
134:1 135:7 139:1
139:3 140:15
146:14 150:19
157:7 158:9,10,13
160:20 169:5
171:20 182:16
188:13,15 190:14
208:22 209:2,20
210:6,12,13,20
211:2,10 214:4
216:8 218:13,20
219:5,17 220:14
226:16 228:17
235:10,21 236:15
238:5,23 239:3,3
239:19,23 240:1,3
240:9,12 241:1,15
**utility's** 78:11
87:15 109:21
116:4 134:6
182:24 209:15
211:17
**utterly** 106:6

**v**

**v** 1:6 17:2 34:16
71:6 77:19,19,24
78:16,22 79:4
80:20 97:15 221:1
234:16 245:4
**vague** 12:10 13:21
14:9 17:17 19:19
20:19,25 21:5
23:2 25:7,15
27:11 30:21 32:13
32:22 36:17 41:15
41:17 42:2 43:19
53:10 55:7 56:19
59:17,22 66:2
69:3 74:5,6,15,21

75:9,18 82:23
84:5 86:13 93:15
95:16 96:9 100:25
109:12 115:21
116:21 134:8,14
135:20 150:8
152:15 153:13
159:20 166:8,13
169:13 175:23
179:2,13 202:3
208:17 217:19
237:12 238:6
239:24
**value** 42:15 51:21
52:4 66:23 81:13
117:9,14,18
120:17,22 121:12
122:10 123:16
124:5,16 129:19
129:24 132:1
148:19 162:10,11
162:13 163:2,8,9
163:19,23 164:8
164:22 166:23
186:20 190:18,23
191:3,7,8 201:2,5
201:12,15 220:3
223:22 224:5,10
225:3,9,11,13,14
226:24 227:5
236:11 238:3
**values** 146:17
153:2
**vanilla** 201:10
**variable** 32:18
33:3,4 46:21,24
47:4 57:12 60:21
65:17 70:2 71:3
81:14 115:7 116:2
116:9 117:8
128:11 142:11

144:12 147:23,25
148:1,8,9,9,10,10
148:16 149:12,18
153:8,9,12,17,20
153:24 155:20
157:22 158:5,19
160:6,19 162:15
167:3 191:12
206:9,17,20
209:13,15 210:3,5
211:16 212:19
215:10,10 223:16
223:18,22 238:21
239:25
**variables** 148:12
148:12
**variations** 85:21
87:11
**varied** 75:10
203:16 204:1
234:1
**varies** 85:20 86:22
111:13 144:13
190:12
**variety** 62:3 85:23
214:15 219:20
**various** 81:10
144:18 145:6,11
146:7,10 204:3
**vary** 87:8 98:18
**vast** 94:9
**verbally** 6:23
**verification** 28:13
28:17,21
**veritext** 1:13 2:24
3:2 10:2 16:21
102:18 245:1
**veritext's** 38:5
**version** 34:1
107:14

**versus** 7:17 70:5
108:5 109:4 110:7
134:6,10 139:3
212:11,16
**vi** 70:20 71:7,10
71:14,14 74:8
176:12 216:1
**video** 4:1,19 6:25
71:25 72:6,9
103:9,12 143:20
143:23 177:25
200:13,16 222:10
222:13 242:23
**videographer** 2:24
4:1,21 72:6,9
103:9,12 143:20
143:23 177:25
200:13,16 222:10
222:13 242:23
**views** 168:10
**vii** 3:15 101:11
104:2 137:3,9
**violating** 197:15
**virtual** 1:13
**virtually** 4:14,18
6:10,21 34:13
40:7,7 212:7
**volume** 86:23
87:23
**vs** 3:8

| w |
| --- |

**w** 5:16
**wacker** 2:21
**wait** 8:6 11:22
34:7 103:6 108:7
111:24 132:11
139:22,22,23
154:23 212:4
**waiting** 38:18
91:22 99:14

**waive** 5:7
**waived** 242:3,5,7
242:12,15,17
**waiver** 100:12,20
106:11 107:7,18
107:22 129:5
**want** 4:17 9:1,10
12:2,3 22:2 27:21
34:7,10 37:6 60:6
81:20 87:14 99:12
100:9 104:17
126:4,13 131:6,16
132:8 143:12
150:2 166:22
170:13 177:18,19
190:20 198:2,3,7
202:10 203:11
207:7 208:9,10
210:19 213:2
222:6 237:19
**wanted** 41:14 58:6
72:14 142:4 208:7
**wants** 143:13
**warranties** 46:18
54:5,13,18 164:15
**warranty** 29:13
51:24 52:4,16,24
54:19 55:20 56:18
116:8,10 163:10
163:19,24 164:19
186:9 190:13
191:25
**wash** 89:10
**water** 232:4
**way** 6:12 9:11
10:19 15:25 22:23
26:15 27:21,22
28:6 44:22,24
45:16 46:4 48:17
63:16 64:10 65:5
67:1 73:8 76:25

80:5 82:10 85:19
85:22 101:6
110:17 114:24
116:3,12,24
118:11 128:1
154:13 155:7
168:6 181:16
186:4,18 193:25
222:25 235:13
239:13
**ways** 115:6 116:19
116:22 208:18
**we've** 11:11,14
40:6 56:2 58:18
71:17 103:6 133:4
133:19 137:10
140:22 142:24
143:3,8,16 157:20
162:6 163:13
166:21 168:18,24
173:6 190:17
210:16 215:9
221:13 223:15
**wealthy** 204:4
**weather** 86:24
**web** 102:23 240:1
240:20
**website** 87:15
92:20 139:8
141:10,14 197:23
236:5 240:25
**websites** 86:5
**weighted** 182:22
**welcome** 3:11
25:10 26:8,9,13,18
26:22 27:1,5 28:2
37:8,12,14,15,23
38:7 39:12,13,14
39:17 40:12,22
41:19 43:1,6
56:14 58:17,21

157:19 160:4,18
209:4,5 211:8
**went** 83:2,17
117:6 123:18,19
127:14 146:8
160:24 169:15
170:10 204:2
206:16 221:17
**west** 1:14
**white** 2:6
**wholesale** 60:25
85:23 205:2,8
**whoops** 207:18
**wife** 164:25 165:6
**wild** 239:12
**willing** 201:5,7
**willingness** 225:8
**windfall** 194:18,19
**wiring** 42:20
47:17 48:7
**wise** 183:4
**wished** 21:9
**wishes** 129:2
**withdraw** 12:6
30:17 79:6 131:19
168:11
**withdrawing**
126:21 220:5
**withdrawn** 14:14
30:17 36:25 63:12
81:23 98:22
112:18 137:20
162:24 240:9
**withheld** 92:11
102:4 196:15
**withhold** 212:14
**withholding** 197:9
197:10
**withstand** 232:13
**witness** 1:12 3:6
4:22 5:17,21 7:15

9:10 24:14,16,20
24:21,22 31:8
71:21 102:25
103:5 131:18
150:14 177:14
**witness's** 231:8
**witnesses** 24:2
78:13,14,20 83:18
192:15 202:7
**word** 120:12 126:2
127:21 128:1,3
132:15 152:1
174:10,13 189:24
202:15 233:15,17
**wording** 125:5
169:17 209:10
**words** 53:15 110:3
157:24 218:3
**work** 52:15 55:8
186:5
**workbook** 17:14
17:22
**worked** 31:24
115:23 116:7
227:21 228:2,4,7
**working** 33:12
81:8 99:3 106:15
166:17 229:7
**works** 41:2 82:10
**worksheet** 15:13
15:14 16:20 17:1
17:12,16,21
**worksheets** 17:13
80:19
**world** 182:16
**worth** 45:8
**wrap** 177:5 211:6
**write** 82:13 185:15
**written** 23:5 29:24
96:7

**wrong** 70:22 71:9
82:14 119:14
165:20
**wrote** 188:20

**x**

**x** 1:3,9 3:1
**xiv** 70:23

**y**

**yeah** 69:20,20
82:10 86:7 91:7
92:13 102:14,19
104:21 123:5
133:18 143:15
155:1,25 176:3,12
188:8 201:12
208:6 209:9 240:7
241:23
**year** 42:22 47:10
48:1 50:17,19
51:11,12 61:10
66:13 101:10
199:1 234:21
**years** 66:24
167:20,21 185:7
194:9 195:4
234:14
**yellow** 10:15
**yesterday** 212:10
**york** 1:1 2:6 26:14
26:18 33:6 34:21
44:20 54:24 61:3
61:10,23 62:9,22
63:14 67:1,5,6,10
67:25 68:7,11,15
68:16 69:16 73:6
75:22 76:1,7
79:16 81:12,16,23
81:24 82:14,25
85:9,11,13,21,25
86:1 87:9 88:1,6

89:18 94:10,23
98:4,7,18 99:3,18
100:10 101:10,21
104:1 106:11,19
114:21 117:4,15
118:3,18 122:4,5,6
133:5 144:12
145:1,19 159:24
163:12 167:5,16
185:11,18 186:9
186:16 192:9,16
192:18 209:25
212:23 215:16,23
216:2 221:15,21
224:8 227:23
228:1,11 229:7
233:9,23 235:5,10
238:22 239:21
240:2,10,24
241:25 242:10
245:2

**yup** 123:1 224:24

**z**

**zero** 105:16
175:21 176:1,7
177:2 181:23,24
183:6,16

**zoller** 1:15 5:18
244:5,18

**zone** 67:16,18,20
67:23,23,25 68:2,3
73:6 74:19,20
140:20 150:19
205:11

**zones** 67:4,7,11,14
67:19,21 73:5,8,11
76:1 77:6

**zoom** 1:13 149:5

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.