# Exhibit 31

## Felder Article on Residential Energy Markets

*Brous, et al. v. Eligo Energy, LLC, et al.*
Case No. 1:24-cv-01260-ER

The Electricity Journal 32 (2019) 31–38

Contents lists available at ScienceDirect

# The Electricity Journal

journal homepage: www.elsevier.com/locate/tej



# Residential energy supply market: Unmet promises and needed reforms



Susan M. Baldwin, Frank A. Felder[*]

*Rutgers University, 33 Livingston Ave, 08901, New Brunswick, NJ, United States*

## ABSTRACT

This article explores the market distortions and behaviors that have undercut the promise and performance of residential energy markets. Market trends are discussed, and possible paths forward are identified for reducing these market distortions. If policymakers are unwilling to eliminate residential energy markets, aggressive and extensive reforms of residential energy markets are warranted.

## 1. Introduction and promises of retail energy markets

Presently, 14 states and the District of Columbia have retail energy markets: the ability of end-use consumers to purchase their electricity or natural gas directly from retail suppliers or participate in the default service program (also known as standard offer) that their local utility offers. Utilities continue to provide transmission and distribution of electricity and natural gas as this delivery function remains a regulated monopoly. The utility may also provide billing and settlement services and continue to offer low-income and other programs using a non-by-passable charge. In many instances, customers of alternative suppliers continue to receive a single bill, rendered by the utility, for both the commodity and its delivery.

Having retail energy markets offers several possible benefits. First and foremost, it was expected to lower costs for consumers. Retail suppliers – also known as retail aggregators, energy service companies, alternative suppliers, and third-party suppliers –are claimed to have strong financial incentives, unlike the regulated, monopolist utility, to procure energy on behalf of their customers at lower costs and share those costs savings with their customers. Presumably, those successful retail suppliers would grow their market share and profitability, further benefiting consumers by providing low-cost energy.

Secondly, retail suppliers would customize their service offerings to particular retail segments (industrial, commercial and residential) and customer desires. Customers who were risk-averse would be offered fixed-price contracts whereas customers who wanted to bundle their energy services and perhaps combine them with other services, such as telecommunications and cable, would be able to save and benefit from their multi-service bundles. Other innovations were expected to follow, such as green products, again benefiting those retail suppliers and by extension, their customers. The mantra was "lower costs and more variety."

Third, electric and natural gas utilities were no longer required to procure large amounts of electricity and natural gas. On the electric power side, many utilities had also divested their generation assets. If they retained the load-serving obligation, they would have to make large purchases on behalf of their retail customers, a function that would not necessarily fall within the core competencies of a delivery company. Retail competition allowed utilities to reduce their energy procurement role to only providing default service to those customers who did not affirmatively select a supplier. States typically require utilities to follow a rule-based procedure approved by the regulatory process to procure sufficient electricity and natural gas for their default customers. Although the approaches and details vary by state, typically utilities were required to buy power directly from a regional wholesale market, such as the New York Independent System Operator, via a formal auction or a request for proposals. Retail suppliers knew the standardized service and associated pricing, and their task was to attract customers away from the utility's program with better pricing, terms and additional services.

State regulators would also benefit from retail competition. Regulators would no longer be in the position of approving or disapproving the energy procurement decisions of the utilities that they regulate. Therefore, regulators would not be on the hook for utilities' mistakes and the politically undesirable consequences of any associated price increases. Recall that regulators were reeling in the 1970s and 1980s from a series of bad investments in the electric power sector – excess generation capacity, cost-overruns, and partially built nuclear power plants. Much of these costs were passed on to retail customers during periods of low or declining economic activity, further adding to

[*] Corresponding author.
*E-mail address:* ffelder@ejb.rutgers.edu (F.A. Felder).

https://doi.org/10.1016/j.tej.2019.02.003
Available online 02 March 2019
1040-6190/ © 2019 Elsevier Inc. All rights reserved.

the political consequences and adverse publicity for regulators.

So, what happened to the promise of retail energy markets? One perennial and unanticipated problem that plagues retail energy markets, in particular residential retail energy markets,[1] is aggressive and deceptive marketing such as teaser rates, multi-level marketing (also referred to as pyramid selling), confusing and vaguely worded contracts, and other anti-consumer practices.

This article explores the market distortions and behaviors that have undercut the promise and performance of residential energy markets. Market trends are discussed, and possible paths forward are identified for reducing these market distortions. The findings are the following: 1. There is widespread and overwhelming evidence that many residential energy suppliers are charging too much for the services that they provide (both relative to the prices available through utilities' standard offer and comparison to wholesale market prices), resulting in high consumer energy bills; 2. There are numerous types of deceptive and anti-competitive practices that are used by some residential energy suppliers that increase costs for consumers, regulators, and society; 3. Lower income communities and communities of color are disproportionately injured by these deceptive and anti-competitive practices; and 4. If policymakers are unwilling to eliminate residential energy markets, aggressive and extensive reforms of residential energy markets are warranted.

## 2. Consumer experience in residential energy supply markets signals widespread and long-running market distortions

Residential energy supply competition is not working as state policymakers intended. Consumers' experiences in numerous states during a multi-year time period provide compelling evidence that the benefits policymakers had anticipated have, by far and large, failed to emerge in residential energy supply markets. Instead, there is ample evidence of consumer harm.

Before delving into the specifics, it is necessary to step back and make some observations on the term "competition." Competition itself is not an end; it is a means to an end, which is efficiency. Economists define several types of efficiency, including technical efficiency (providing a good or service at the lowest cost), allocative efficiency (buyers that value a good or service the most consume it), efficient product and service variety (the market provides the efficient amount of different types of products and services), and dynamic efficiency (technical, allocative, and variety efficiency are achieved over time). Economists have also defined four categories of market failures, or situations in which a market via competition will not be efficient. If markets suffer from one or more of these failures or if policymakers have objectives that compete with efficiency, then regulatory interventions should be considered and may be warranted. Thus, claims that competition by definition is preferable or superior to other forms of economic organization are philosophical, political and perhaps polemical, but are not grounded in economic theory or practice. As a result, residential energy supply markets should be evaluated based upon their efficiency as well as broader public policy objectives, such as fairness and equity.

### 2.1. General marketing and pricing problems with retail energy suppliers

Although regulatory and legislative frameworks differ from state to state, the patterns of many suppliers' marketing practices and prices – in those states that have, through restructuring, opened their markets to competition in the residential supply market – are similar. Many consumers complain about deceptive and aggressive marketing practices and unexpected spikes in their utility bills.

Numerous investigations by state attorneys general have led to settlements and sanctions, and these investigations show no sign of abating. For example, in October 2018, the Attorney General of the State of Illinois entered into a settlement with Sperian Energy Corp. based on concerns that the supplier was defrauding residents,[2] and in November 2018, the Attorney General of the State of Illinois settled a lawsuit against IDT Energy Inc. "for thousands of violations of the state's consumer fraud laws as a result of a particularly egregious marketing scheme that disproportionately impacted African-American consumers on the South and West sides of Chicago."[3] In March 2018, Viridian Energy, LLC, agreed to pay $5 million to Massachusetts consumers to settle allegations of deceptive marketing and sales tactics.[4] In October 2018, the Attorney General of Massachusetts filed a lawsuit against Starion for deceptive sales practices leading to $30 million in overcharges to consumers.[5] However, being the subject of an investigation does not necessarily deter suppliers from subsequent anti-consumer behavior. Starion was the subject of an in-depth investigation by the Maryland Public Service Commission in 2014 for deceptive sales practices),[6] suggesting that these investigations are simply viewed by suppliers as a cost of doing business rather than a deterrent to fraudulent sales and marketing practices.

The *potential* for and the *promise* of benefits have been the driving force of policymakers' efforts to encourage competition in residential energy supply markets. Yet the reality is that, on balance, residential consumers are paying a high price for the opportunity to choose their

---

[1] This article focuses on the residential energy supply market. Many of the market deficiencies and consumer harm that characterize residential (and possibly small commercial) markets are not present in the industrial and municipal aggregation markets. Large end-use customers have more familiarity with energy supply markets and also possess greater negotiating strength than do individual residential customers.

[2] People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Sperian Energy Corp., Circuit Court of Cook County, Illinois, docket 2017-L-008604 (2017). Settlement announced October 15, 2018. See also "Attorney General Madigan Secures $2.65 Million in Refunds for Illinois Residents Defrauded by Sperian Energy," Illinois Attorney General Press Release, October 15, 2018, available at: http://www.illinoisattorneygeneral.gov/pressroom/2018 10/20181015.html.

[3] Illinois Attorney General Lisa Madigan Press Release, "Madigan Sues Another Alternative Retail Electric Supplier & Reaches $3 Million Settlement for Defrauded Customers, Madigan Alleges Company's Deceptive and Misleading Sales Tactics Disproportionately Harmed African-American Communities on Chicago's South and West Sides," November 19, 2018. The Press Release states: "Because of their clear record of charging consumers more than regulated utilities, Madigan has made multiple calls for the Illinois General Assembly to ban ARES from operating in the residential market in the state."

[4] "Competitive Electricity Supplier to Pay $5 Million Over Claims of Deceptive Sales Tactics, Overcharging Residents," Massachusetts Office of the Attorney General Press Release, March 28, 2018. https://www.mass.gov/news/competitive-electricity-supplier-to-pay-5-million-over-claims-of-deceptive-sales-tactics

[5] Commonwealth of Massachusetts v. Starion Energy, Inc.; Starteldm, LLC; Telelink, LLC; Telestars, LLC; F E Z LLC d/b/a/ Shoretek; Ruzhdi Dauti; and Dashmir Murtishi, 1884CV03199, Suffolk Superior Court, Commonwealth of Massachusetts (2018); "AG Healey Sues Starion Energy Over Deceptive Sales Tactics, Overcharging Residents by $30 Million," Massachusetts Office of the Attorney General Press Release, October 15, 2018, available at: https://www.mass.gov/news/ag-healey-sues-starion-energy-over-deceptive-sales-tactics-overcharging-residents-by-30.

[6] In 2013, the Maryland Public Service Commission had received numerous complaints about Starion Energy PA, Inc. (Starion), which ultimately led to an investigation of this supplier's practices. In July 2013, the Office of People's Counsel filed a Petition "In Support of an Expanded Investigation in to the Marketing and Trade Practices of Starion." After investigation and hearing, the Maryland PSC found Starion had engaged in numerous violations of consumer protections laws. Among other things, the PSC found significant violations by Starion of door-to-door marketing requirements. Maryland Public Service Commission Case No. 9324, In the Matter of the Investigation into the Marketing Practices of Starion Energy PA, Inc., Order 86211, issued March 7, 2014.

retail energy supplier and are not receiving a corresponding level of benefits for this choice. For example, in Massachusetts, a detailed analysis of 36 months of all suppliers' bills for retail residential electric supply shows an estimated net consumer harm of $253 million over a three-year period with the harm falling disproportionately on low-income customers and communities of color.[7] The Massachusetts analysis encompassed all third-party suppliers, not just those identified for being "bad actors." As discussed below, Connecticut, Illinois, Maryland, and Rhode Island are among the other states that have also calculated enormous financial losses or excessive monies spent by households on essential utilities that could otherwise be used for food, housing, and other goods and services.

What follows is not a comprehensive national survey of all litigation against, public utility investigations of, or consumer advocate analyses of retail energy suppliers that serve residential consumers. Instead, it primarily covers cases in which one of the authors (Baldwin) has direct experience with the investigations and analyses.

**Connecticut:** A recent "Fact Sheet" issued by the Connecticut Office of Consumer Counsel[8] shows:

- In the month of October 2018, seven out of ten residential electric supplier customers paid more than the Standard Offer in Eversource territory, and seven out of ten residential supplier customers paid more than the Standard Offer in United Illuminating territory.
- For the rolling year of November 2017 through October 2018, residential consumers who chose a retail electric supplier paid, in aggregate, $38,685,116 more than the Standard Offer.

**Illinois:** The 2018 Annual Report by the Illinois Commerce Commission to the General Assembly, the Governor, and the Illinois Commerce Commission[9] finds, among other things, evidence of high prices in Illinois' residential electric supply market:

- "On average, residential ARES [Alternative Retail Electric Supplier] customers in the ComEd territory paid around $10.2 million more per month during the last twelve months when compared to the ComEd Price-to-Compare (PTC) and $11.5 million more per month during the last twelve months when compared to the ComEd PTC including the Purchased Electricity Adjustment (PEA). In terms of cents per kWh, residential ARES customers in the ComEd territory paid about 1.289 cents/kWh more when compared to the ComEd PTC only, and about 1.445 cents/kWh more when including the PEA."[10]
- "In the Ameren Illinois territory, residential ARES customers paid around $6 million more per month during the last twelve months when compared to the Ameren Illinois PTC and $7.4 million more per month during the last twelve months when compared to the Ameren Illinois PTC including the PEA. In terms of cents per kWh, residential ARES customers in the Ameren Illinois territory paid about 1.073 cents/kWh more when compared to the Ameren Illinois PTC only, and about 1.330 cents/kWh more when including the PEA."[11]

More recently, a press release issued by the Illinois Attorney General (in which she also recommended that the Illinois Legislature ban the residential alternative retail electric market supplier market) stated:

Data shows that nearly 90 percent of the time, ARES' customers are paying higher prices for electricity than customers pay with traditional utilities. According to the ICC, ARES customers in the ComEd territory as a whole have paid more than $138 million more for electricity than ComEd customers from June 1, 2017 through May 31, 2018. Statewide, residential and small commercial customers enrolled with ARES have paid over $600 million more in electricity costs in the last four years.[12]

**Maryland:** Based on the limited public information available, the authors of a report prepared on behalf of the Maryland Office of People's Counsel computed an approximate net annual consumer *loss* of $34.1 million in the residential electric supply market and an approximate net annual consumer loss of $20.7 million in the residential gas supply market resulting from Maryland households' participation in energy supply markets. In other words, Maryland households are paying approximately $54.9 million *more* for electricity and gas than if they had purchased energy from their utilities.[13]

**Massachusetts:** At the request of the Massachusetts Office of the Attorney General, one of the authors (Baldwin) conducted an in-depth analysis of all the bills rendered on behalf of alternative suppliers by the utilities to residential customers as well as the bills rendered for those households who subscribed to the utilities' standard service for 24 billing cycles spanning July 2015 through June 2017. (The calculation of net consumer loss was updated to include the subsequent time period spanning July 2017 through June 2018).[14] Among other things, the *Massachusetts 2018 Report*[15] summarizes detailed supplier-specific data

---

[7] "Are Consumers Benefiting from Competition? An Analysis of the Individual Residential Electric Supply Market in Massachusetts," Susan M. Baldwin, prepared for the Massachusetts Attorney General's Office, March 29, 2018 ("Massachusetts 2018 Report"). "Suppliers Are Not Providing Value to Individual, Residential Customers," presentation to the New England Restructuring Roundtable, Rebecca Tepper, Chief, Energy and Telecommunications Division, Massachusetts Office of the Attorney General, October 12, 2018. Available at: http://www.raabassociates.org/main/roundtable.asp?sel=147.

[8] "OCC Fact Sheet: Electric Supplier Market, November 2017 through October 2018," Office of Consumer Counsel, updated on December 17, 2018, https://www.ct.gov/occ/lib/occ/fact_sheet_electric_supplier_market_october_2018.pdf. Also see https://www.ct.gov/occ/lib/occ/fact_sheet_electric_supplier_market_august_2018.pdf. Finally, see PURA Establishment of Rules for Electric Suppliers and EDCs Concerning Operations and Marketing in the Electric Retail Market, Connecticut Public Utilities Regulatory Authority Docket No. 13-07-18, testimony and supplemental testimony of Susan M. Baldwin and Helen E. Golding on behalf of the Connecticut Office of Consumer Counsel, March 10, 2014 and March 17, 2014.

[9] Annual Report to the General Assembly, the Governor, and the Illinois Commerce Commission, Submitted pursuant to Section 20-110 of the Illinois Public Utilities Act, Office of Retail Market Development, Illinois Commerce Commission, June 2018 ("Illinois 2018 Annual Report"), available at: https://www.icc.illinois.gov/reports/report.aspx?rt=22. The report notes that for its payment estimates: "As for the ARES prices, almost all suppliers provided us with monthly average residential rates for the past twelve months in response to a Staff Data Request." Id., at 28.

[10] Id., at 7, footnote omitted.

[11] Id., at 7.

[12] "Attorney General Madigan Secures $2.65 Million in Refunds for Illinois Residents Defrauded by Sperian Energy," Illinois Attorney General Press Release, October 15, 2018, available at: http://www.illinoisattorneygeneral.gov/pressroom/2018_10/20181015.html.

[13] "Maryland's Residential Electric and Gas Supply Markets: Where Do We Go from Here?" Susan M. Baldwin and Sarah M. Bosley, prepared for the Maryland Office of People's Counsel, November 2018 ("Maryland 2018 Report"). Unlike the calculations in some other states, these estimates are based on the prices that suppliers post on the Maryland Public Service Commission's website, and, therefore, are not necessarily the rates that suppliers actually charge consumers. Also, unlike calculations that have been conducted in other jurisdictions, these calculations are not informed about suppliers' relative market shares (which would allow one to weight the prices charged by those suppliers with more consumers proportionally more).

[14] "Suppliers Are Not Providing Value to Individual, Residential Customers," presentation to the New England Restructuring Roundtable, Rebecca Tepper, Chief, Energy and Telecommunications Division, Massachusetts Office of the Attorney General, October 12, 2018. Available at: http://www.raabassociates.org/main/roundtable.asp?sel=147.

[15] "Analysis of the Individual Residential Electric Supply Market in Massachusetts: Are Consumers Benefiting from Competition?" Susan M. Baldwin, prepared for the Massachusetts Office of the Attorney General, March

S.M. Baldwin and F.A. Felder

The Electricity Journal 32 (2019) 31–38

based on an examination of approximately six million bills for alternative suppliers' supply over a twelve-month period, including separate examinations of the prices paid and the participation levels separately for low-income households and non-low-income households. The report also analyzes zip code level data and, based on that analysis, demonstrates varying levels of participation among the state's communities, using both GIS-generated maps and U.S. Census-based demographic data. The report and its multiple appendices include calculations of consumer losses (based on the bills that customers actually paid), separately for low-income and non-income households; separately by each of the Commonwealth's municipalities (except those served by municipal aggregators or served by municipally owned power plants); and separately by each of the suppliers that serves Massachusetts households. The granular, zip code-based analyses particularly differentiate the *Massachusetts 2018 Report* from other analyses of consumer loss associated with the residential retail energy market as well as the separate analysis of the impact on low-income households and communities of color. The report includes numerous findings, a few of which follow:

- Only 12 percent of the bills rendered on behalf of suppliers were associated with savings, and those savings were less than one-third the amount of the average overpayment associated with the other 88 percent of supplier bills.[16]
- Low-income households pay 17 percent more to participate in electric supply markets than do non-low-income households.[17]
- Residents in communities with the following demographics paid higher rates to competitive suppliers:
  ○ Communities with low median incomes;
  ○ Communities with high percentages of households receiving subsidized low-income rates;
  ○ Communities with high percentages of minority households; and
  ○ Communities with high percentages of households with limited English proficiency.[18]

**Rhode Island:** The Rhode Island Division of Public Utilities and Carriers (DPUC) states that according to data it has gathered over the last five years, Rhode Island alternative supply customers paid $55 million more than they would have paid if they had been on Standard Offer. For residential customers alone, the DPUC estimates that alternative supply costs were a total of nearly $28 million above Standard Offer for that same period.[19]

These financial harms, which can be and have been computed based on a comparison of the energy prices that residential customers actually pay with the prices they would have paid had they continued to purchase standard offer services from their utilities, are just one component of the harm that occurs. Other, less easily quantifiable harms also exist. For example, households receive unwanted telemarketing calls even when they sign up for the do-not-call list. Police officers get called upon to intervene when some suppliers market door-to-door aggressively.[20] Low introductory or "teaser" rates are converted into higher rates unless consumers continually monitor their bills and can easily switch to another plan. Consumers also waste time and endure aggravation as they try to reach inadequately staffed 1–800 numbers to cancel service or question their bills. When they do get through, consumers may face termination fees as high as $150.[21] These high consumer transaction costs relative to their possible energy savings represent one of the types of market failures that economists have identified in which competition alone will not result in efficient outcomes.

There are other harms beyond transaction costs and their dampening of efficiency. Regulators have raised concerns that high supplier prices may contribute to an increase in uncollectibles–the bills that customers cannot pay, causing all ratepayers to bear the cost.[22] Energy assistance funds for low-income customers may be inefficiently used if benefits are paid to cover higher-priced supply costs.[23] Attorneys general and regulators devote administrative resources to investigating non-compliant suppliers that could instead be devoted to other purposes.

### 2.2. Disproportionate harm occurs to low-income customers and to communities of color

A detailed analysis of geographically granular data in Massachusetts showed that harm is occurring in all municipalities, rich and poor.[24] These high charges, however, particularly harm those living paycheck to paycheck, the low-income, and those on fixed incomes.[25] The analysis conducted in Massachusetts demonstrated that low-income customers participate at twice the rate of non-low-income customers (36 percent rather than 18 percent), and, on average pay higher rates to competitive suppliers than non-low-income customers.[26] The Massachusetts-based analysis also showed that the alternative residential energy supply market disproportionately harmed communities of color, a finding that is consistent with the settlement discussed earlier between the Illinois Office of the Attorney General and IDT.[27] This pattern is troubling and may well continue to be the focus of regulatory

---

(*footnote continued*)
29, 2018 ("Massachusetts 2018 Report").

[16] Id.
[17] *Id.* at viii-x, 10.
[18] *Id.*
[19] "DPUC Enacts New Rules for Competitive Electricity Suppliers Initiates Review of Competitive Supply Marketplace," Rhode Island Division of Public Utilities & Carriers, Press Release, May 8, 2018.
[20] Presentation by Mayor of Quincy, Massachusetts during press conference held by Attorney General Maura Healey, March 29, 2018. "Door-to-door competitive electric suppliers have been such a problem in our city that the Quincy Police Department has issued warnings to the public," said Quincy Mayor Thomas Koch. "For too long, these companies have sold Quincy residents, particularly seniors, a bill of goods. I am proud to join with Attorney General in

(*footnote continued*)
an effort to stop these scammers." Press Release, Office of Attorney General Maura Healey, "AG Healey Calls for Shut Down of Individual Residential Competitive Supply Industry to Protect Electric Customers," March 29, 2018. See https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.

[21] In Maryland, among the suppliers charging cancellation fees of $150 are Constellation New Energy, Green Mountain Energy, and Viridian. See *Maryland 2018 Report*, at 25, citing "Office of People's Counsel Utility Supplier Offers – October 2018," available at: http://opc.maryland.gov/ConsumerCorner/RetailSuppliers.aspx. *Maryland 2018 Report,* footnote 78 also states: "OPC's list of supplier rates in the BGE region includes a total of 60 suppliers: 33 provide some information on rates and packages available on their websites while 27 do not provide enough information for OPC to include rates for their supplier price comparison tool."
[22] Connecticut PURA Docket No. 18-06-02, "Review of Feasibility, Costs, and Benefits of Placing Certain Customers on Standard Service Pursuant to Conn. Gen. Stat. § 16-245o(m)," Notice of Proceeding, July 21, 2018.
[23] See, e.g., *Maryland 2018 Report*, at 6-7. See, also, *Massachusetts 2018 Report*, at 16.
[24] See, e.g., *Massachusetts 2018 Report*, showing that all municipalities experienced a net consumer loss. Id., at 28 and Appendix 2C (Consumer loss by municipality – aggregate and average per-household)
[25] See, also, Barbara Alexander, "An Analysis of Retail Electric and Natural Gas Competition: Recent Developments and Policy Implications for Low-Income Customers," June 2013.
[26] *Massachusetts 2018 Report*.
[27] Illinois Attorney General Lisa Madigan Press Release, "Madigan Sues Another Alternative Retail Electric Supplier & Reaches $3 Million Settlement for Defrauded Customers, Madigan Alleges Company's Deceptive and Misleading Sales Tactics Disproportionately Harmed African-American Communities on Chicago's South and West Sides," November 19, 2018.

investigation.[28]

The following table, which reproduces Table 3.3 from the *Massachusetts 2018 Report*, shows that the participation rates for low-income households located in Massachusetts communities with certain demographic attributes range between 44 percent and 47 percent, significantly higher than the low-income participation rate in other communities in Massachusetts. For example, the table below shows that in the 20 communities with the highest levels of limited English proficiency, the participation by low-income households in the individual residential supply market is 45% whereas the participation by low-income households in all other Massachusetts communities is 34% (Table 1).

## 3. Policy proposals to improve residential energy markets

From the prior analysis, not only is there a need in many states for *additional* consumer protection safeguards, but also there is ample evidence that many suppliers fail to comply with *existing* requirements. To evaluate what additional measures should be implemented, it is necessary to review how states arrived at retail energy markets and where they might be heading. The day-to-day challenge of overhauling a market that presently works primarily to suppliers' benefit and to consumers' harm is formidable and the stakes are high.

Some states now have a well-entrenched residential energy supply markets, and suppliers have a clear stake in seeing these markets continue. For example, annual aggregate billing in Massachusetts between July 2016 and June 2017 for alternative suppliers' residential electricity was approximately $438 million, with an average number of 493,275 households participating (approximately one in five households).[29] Some continue to hope that one day competition will lead to benefits and consumer protection safeguards can be tweaked to remedy market distortions. Often, the premise is that choice is better than no choice.

Other states question whether it is even possible to have residential energy supply markets that, on balance, are in the public interest. In Massachusetts, the Attorney General has concluded that, based on nearly 20 years of experience and detailed analyses of the prices that are actually charged as well as suppliers' deceptive practices, such net benefits simply are not likely to materialize and the harm is so substantial that the solution is to throw in the towel on residential energy competition.[30] The Illinois Attorney General has come to a similar conclusion.[31] In Connecticut, comprehensive efforts by the Office of Consumer Counsel, the Public Utilities Regulatory Authority, and state legislators to design and establish additional consumer protection safeguards have reduced but by no means eliminated the substantial consumer harm occurring in residential retail electric markets.[32] Connecticut regulators have a pending investigation into the participation by hardship customers in the residential retail electric market.[33]

As this article was going to press, the authors became aware of several additional developments: the Connecticut Consumer Counsel, AARP Connecticut and others called for an end to the retail residential electric market in Connecticut;[34] legislation was introduced in the Massachusetts Legislature calling for an end to the retail residential electric market;[35] and the Massachusetts Department of Public Utilities opened an investigation into consumer protection measures.[36]

### 3.1. Are benefits material or purported?

In contrast with the well-documented harm that consumers are continuing to experience, retail suppliers often claim multiple benefits. Suppliers' descriptions of potential benefits need to be viewed through the reality of consumers' actual experiences and the plethora of investigations and lawsuits that are occurring in numerous jurisdictions.

Retail energy suppliers, for example, point to consumers' ascribing

**Table 1**
Participation Rates Based on Various Demographics: Low-Income Households.

| Participation Rates – Low Income | | |
| --- | --- | --- |
| Demographics | Demographic-Specific Communities | All Other Communities |
| Majority-Minority | 45% | 31% |
| African American – Top 20 | 46% | 33% |
| Hispanic – Top 20 | 47% | 33% |
| Limited English Proficiency – Top 20 | 45% | 34% |
| Bottom 20 Median Income | 44% | 34% |
| Percent receiving low-income subsidy – Top 20 | 44% | 34% |
| Top 20 Median Income | 18% | 35% |

---

[28] "Maryland's Dysfunctional Residential Third-Party Energy Supply Market: An Assessment of Costs and Policies," Laurel Peltier and Arjun Makhijani, Ph.D., Abell Foundation, December 2018 (finding, among other things: "When compared to Baltimore Gas and Electric Company's (BGE) Standard Offer Service rates, the 40 low-income account holders interviewed for this report paid, on average, a 51 percent premium for electricity and a 78 percent premium for natural gas"). See also "Competing to Overcharge Consumers: The Competitive Electric Supplier Market in Massachusetts," Jenifer Bosco, National Consumer Law Center, April 2018

[29] *Massachusetts 2018 Report*, at 4 and 7. *See also Maryland 2018 report*, showing that, statewide, 19.4 percent of Maryland households participate in the alternative electric supply market (within the Baltimore Gas and Electric service territory the participation is 23.9%) and 21.0 percent of Maryland's households participate in the alternative gas supply market. Id. at 10 and 15.

[30] Press Release, Office of Attorney General Maura Healey, "AG Healey Calls for Shut Down of Individual Residential Competitive Supply Industry to Protect Electric Customers," March 29, 2018. https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.

[31] Illinois Attorney General Lisa Madigan Press Release, "Madigan Sues Another Alternative Retail Electric Supplier & Reaches $3 Million Settlement for Defrauded Customers, Madigan Alleges Company's Deceptive and Misleading Sales Tactics Disproportionately Harmed African-American Communities on Chicago's South and West Sides," November 19, 2018. The

(footnote continued)
Press Release states: "Because of their clear record of charging consumers more than regulated utilities, Madigan has made multiple calls for the Illinois General Assembly to ban ARES from operating in the residential market in the state."

[32] See discussions of the various consumer protection measures adopted by legislators and regulators in Connecticut in the *Massachusetts 2018 Report* and the *Maryland 2018 Report*. For evidence of ongoing consumer harm, see: "OCC Fact Sheet: Electric Supplier Market, November 2017 through October 2018," Office of Consumer Counsel, updated on December 17, 2018, https://www.ct.gov/occ/lib/occ/fact_sheet_electric_supplier_market_october_2018.pdf

[33] Connecticut PURA Docket No. 18-06-02, "Review of Feasibility, Costs, and Benefits of Placing Certain Customers on Standard Service Pursuant to Conn. Gen. Stat. § 16-245o(m)," Notice of Proceeding, July 21, 2018.

[34] See Connecticut Office of Consumer Counsel/AARP Connecticut Joint Press Release, "Time to End the Third-Party Residential Electric Supply Market," February 4, 2019, stating, among other things: "Because all of the legislative and regulatory efforts expended over the years have not created a residential electric supply market that provides a net benefit to Connecticut, Consumer Counsel Katz, AARP Connecticut, U.S. Senator Blumenthal, CT Citizen Action Group, CT Clean Water Action, Operation Fuel and Connecticut Legal Services, Inc. call for the Connecticut Legislature to protect the Connecticut economy and consumers by ending residential retail choice." Id.

[35] "An Act relative to protecting residential electric customers" (S.D. No. 880 and H.D. 1204).

[36] Massachusetts D.P.U. 19-07, Investigation by the Department of Public Utilities on its own Motion into Initiatives to Promote and Protect Consumer Interests in the Retail Electric Competitive Supply Market, Vote and Order Opening Investigation, January 18, 2019.

S.M. Baldwin and F.A. Felder                                                                                                                                      The Electricity Journal 32 (2019) 31–38

value to stable and predictable pricing. If consumers are well informed about alternatives to fixed pricing, are not misled or deceived regarding the fixed-rate plan they sign up for and can easily switch to another plan or supplier when their plan expires, then consumers that select such plans do benefit. The evidence presented above, however, suggests that these conditions are not being met and as a result, such benefits are being substantially if not entirely undercut by retail suppliers' practices.

Another purported benefit is pricing innovations such as time-of-use pricing. These innovative pricing proposals may require advance metering, whose availability depends on whether the distribution utility provides such service. Other service offerings include frequent "flier" miles, programmable thermostats, or consumer discounts. Whether these additional offerings are material is an open question that requires more investigation.

Another theoretical benefit is that alternative suppliers will supply greener energy than that provided by utilities. This purported benefit, however, needs to be scrutinized and subject to independent corroboration – otherwise customers may select suppliers to support a shift away from fossil fuels, but the suppliers may not necessarily supply electricity that is any greener than that provided under utilities' standard offers. Many states have requirements for utilities to pursue renewable energy portfolios (which consumers may not be aware of) and so any supplier claims of "green" energy would need to be additional to that of the standard offer. In addition, greenwashing is a concern, a phenomenon whereby suppliers claim to be "green" but are purchasing low-cost renewable energy certificates from sources that may not be eligible under states' Renewable Portfolio Standards.[37] Although these purchases allow a supplier to market its product as "green," they often have limited environmental benefits because they originate from older or out-of-region sources that do not promote "additionality," i.e., increase the amount renewable energy on the grid.

It is a huge disservice to those suppliers that may actually offer greener service to allow other suppliers to misrepresent the greenness of their products.[38] When customers are given accurate information and knowingly and willingly pay more, the market is working efficiently, and that additional cost is not a consumer harm. This purchasing decision is similar to a customer paying a premium for organic produce or for coffee beans harvested using fair trade practices.

### 3.2. Retail suppliers versus utilities: is the playing field level?

Retail energy suppliers assert that utilities have an unfair edge because they do not allocate sufficient costs to the retail side of their market (billing, and other overhead). Also asserted is that utilities do not charge a profit for providing retail energy services, further putting suppliers at a competitive disadvantage.

These claims have some merit because typically regulators require that distribution utilities provide energy procurement at cost (although it is not clear if costs include the cost of capital, for example on computers or buildings used to provide such services). On the other hand, utilities do not have a strong incentive to decrease costs over the long-run because those cost savings are returned to ratepayers, at least in theory, via the regulatory process. In fact, utilities have an incentive to inflate not understate their costs given cost-of-service ratemaking. Utilities may also be burdened with legacy systems and costs that are more expensive than more up-to-date systems. Finally, unlike utilities, retail suppliers do not have to make cost-of-service regulatory filings,

do not have to take on as much regulatory risk, and can enter and leave markets at will.

In summary, utilities are not competing with retail suppliers. Utilities do not market their services as providers of last resort and do profit from such services, so they have no incentive to encroach into the market share of retail suppliers. Thus, the question is not whether utilities have an unfair competitive advantage, but whether the standard offer undercuts the retail market. In any event, even if utilities' procurement services are underpriced, this does not justify the anti-consumer behavior of some retail energy suppliers, or does it explain how high supplier prices benefit residential consumers. In other words, even if it could be shown that the playing field is not level (an issue that the authors have not examined for the purpose of this article), this asymmetry does not in any way lessen or justify the substantial consumer harm that continues to occur throughout the country in residential energy supply markets.

### 3.3. Possible remedies for retail energy market reform

A widespread agreement among policymakers and the consumer advocacy community is emerging that retail energy markets are ill-serving residential consumers, although policymakers differ on what reforms should be adopted. As previously noted, the Attorney Generals of Illinois and Massachusetts have each called for the elimination of residential markets, an approach that merits serious consideration in light of the substantial consumer harm that is continuing and the challenge of enforcing laws and regulations.[39] Another alternative for state legislators and regulators would be to place a moratorium on suppliers' solicitation of new customers until regulators have had the opportunity to examine the status of retail residential energy supply markets and implement reforms as appropriate.

The major drawback with even the best of consumer protection safeguards is the challenge of ensuring that suppliers comply. Apparently, the revenues associated with high supplier prices often overshadow the cost of sanctions and settlements, which creates a financial incentive for suppliers to ignore laws and regulations. Suppliers that repeatedly are found to violate regulations should lose their ability to sell retail.

Legislators, regulators, and consumer advocates also have supported and implemented stronger consumer protection measures. The goals of such measures are generally to (1) increase transparency in the market; (2) prevent deceptive and fraudulent marketing; and (3) minimize the rate shock that occurs when teaser (variable) rates suddenly increase, leading to high electricity prices. Remedies are critical and deserve more discussion. The discussion begins by highlighting various examples of consumer protection measures:

#### 3.3.1. Prevent rate shock: a major cause of consumer complaints and net consumer loss is the prevalence of teaser rates

- Enforce all existing notice requirements regarding changes in rates so that consumers have ample time to terminate service in response

---

[37] See, e.g., http://blog.massenergy.org/blog/competitive-electricity-suppliers; see also http://blog.massenergy.org/blog/class-irecs.
[38] Similar to used car markets in which consumers have difficulty in distinguishing "lemons", consumers may not be able to ascertain the quality of retail suppliers' green offerings. See Akerlof, George A. "The market for "lemons": Quality uncertainty and the market mechanism." *Uncertainty in Economics*. 1978. 235-251.

[39] Illinois Attorney General Lisa Madigan Press Release, "Madigan Sues Another Alternative Retail Electric Supplier & Reaches $3 Million Settlement for Defrauded Customers, Madigan Alleges Company's Deceptive and Misleading Sales Tactics Disproportionately Harmed African-American Communities on Chicago's South and West Sides," November 19, 2018. The Press Release states: "Because of their clear record of charging consumers more than regulated utilities, Madigan has made multiple calls for the Illinois General Assembly to ban ARES from operating in the residential market in the state." Press Release, Office of Attorney General Maura Healey, "AG Healey Calls for Shut Down of Individual Residential Competitive Supply Industry to Protect Electric Customers," March 29, 2018. See https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.

- to increases in variable rates and establish notice requirements in states that do not have them.
- Require suppliers serving low-income customers to cap their rates at the rates that would be charged under utilities' standard offer.[40]
- Prohibit variable rates: customers should affirmatively agree to any increase in prices paid to suppliers.

### 3.3.2. Improve transparency to ensure accurate information is readily available for efficient consumer purchasing decisions

- Require utilities to include key information in residential bills, as is required in Connecticut, so that customers are clearly informed about their supply costs and the corresponding monthly charge they would pay under the standard offer, as well as the months remaining in their contract.
- Require suppliers to post their rates on a website maintained by the public utility commission and to include the lowest and highest rates that they have charged since entering the state.
- Require utilities to provide either the state public utility commission or the state consumer advocate with actual billing data so that the prices that suppliers *actually* charge consumers is public knowledge.[41]
- Require suppliers to provide the public utility commission all of their rates by month for all of their rate plans since entering the state.
- Prepare and post a "fact sheet" similar to that produced by the Connecticut Office of Consumer Counsel [42] that shows, on a supplier-specific basis, the aggregate difference between the total charges that the supplier's customers paid for the supplier's service relative to the amount that would have been paid under a utility's standard offer.
- Ensure well-maintained state public utility commission websites: Customers should be able to locate relevant information about suppliers such as prices, licenses, complaint information, independently verified information about renewable energy incremental to that required, etc.

### 3.3.3. Improve accountability to consumers and policymakers

- Routinely analyze data at the zip code level as was done in the *Massachusetts 2018 Report* in order to detect any disproportionate harm in communities of color and in low-income communities and publish annual reports of the findings and conclusions.
- Among other things, require electric and gas companies to report semi-annually to the state public utility commission and state consumer advocate agency the numbers of low-income consumers and all other residential consumers by supplier, and by electric and gas company, separately by zip code. This information would help state government agencies monitor whether any particular suppliers are targeting vulnerable populations.[43]
- Analyze the participation of low-income populations in retail energy supply markets and compare the participation with that of higher-income households.
- Compile and post in a publicly maintained clearinghouse a summary of consumer complaints as is done by the New York Public Service Commission's "scorecard;"[44]
- Require affirmative choice by consumers to renew contracts;
- Mandate that retail energy providers provide sufficient documentation to substantiate their claims regarding renewable energy and establish an independent corroboration process to prevent "greenwashing" and subject such claims to verification by an independent entity.
- Require door-to-door marketers to wear badges with clear identification.

### 3.3.4. Enhance enforcement of existing regulations

- Assessed an annual fee to cover the administrative resources required to seek compliance with consumer protection safeguards.

### 3.3.5. Reduce transaction costs

- Maintain functioning 1–800 numbers so that consumers can easily reach representatives with questions about their bills and to terminate service.
- Suppliers' termination fees should be prohibited or capped, particularly for those suppliers that have been found to have engaged in anticompetitive behavior.
- Customers should opt-in to contract renewals.
- All electric and gas companies should be required to implement a "do not switch" option for consumers to block their accounts from unauthorized switching from standard offer service, and there should be a comprehensive program to educate consumers about the availability of the no-switch option.

### 3.3.6. Pursue litigation of energy suppliers who engage in deceitful and anticompetitive practices

- Litigation is another policy response to retail supplier abuses and should be pursued in tandem with the above policies. It can either be pursued by State Attorneys General or private litigants, typically via class action law suits in which a class of similar customers is formed and are represented via lead plaintiffs and their attorneys to pursue damages on behalf of the class members. In either case, litigation can be expensive, time consuming, and uncertain. Defendants (retail suppliers) are potentially exposed to large-scale damages that should act as a deterrence to bad behavior. On the

---

[40] A change, adopted by the New York Public Service Commission in December 2016 but not fully implemented until late 2017, prohibits alternative suppliers from serving low-income customers. NYPSC Case 15-M-0127 (In the Matter of Eligibility Criteria for Energy Service Companies), Case 12-M-0476 (Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-Residential Retail Energy Markets in New York State, Case 98-M-1343 (In the Matter of Retail Access Business Rules), Order Adopting a Prohibition on Service to Low-Income Customers by Energy Service Companies, issued and effective December 16, 2016; s*ee also* Robert Walton, "New York Supreme Court Upholds State Prohibition on ESCO Sales to Low-Income Customers," Utility Dive (July 5, 2017), https://www.utilitydive.com/news/new-york-supreme-court-upholds-state-prohibition-on-esco-sales-to-low-incom/446380/. Individual suppliers are permitted to apply for a waiver of this prohibition, based on an enforceable commitment to guarantee cost savings.

[41] See for example, Appendix 5C of the *Massachusetts 2018 Report*, which includes an excerpt from a report filed by an EDC in Connecticut pursuant to PURA Docket No. 06-10-2. This report demonstrates that each individual supplier charges a wide range of rates to its customer base, further illustrating that the rates that suppliers may post on their web sites can differ significantly from the rates that they actually charge to consumers (with some of this difference due to variable rate structures).

[42] "OCC Fact Sheet: Electric Supplier Market, November 2017 through October 2018," Office of Consumer Counsel, updated on December 17, 2018, https://www.ct.gov/occ/lib/occ/fact_sheet_electric_supplier_market_october_2018.pdf

[43] See e.g., *2018 Massachusetts 2018 Report*: Appendix 2C shows household participation in the competitive supply market by zip code-municipality and Appendix 3B through 3I shows household participation separately for all households, low-income households, and non-low-income households for certain municipalities.

[44] See *Maryland 2018 Report,* Appendix 8, which includes "Excerpts from New York Department of Public Service Monthly Report on Consumer Complaint Activity." For complete reports, see: http://www3.dps.ny.gov/W/PSCWeb.nsf/All/448C499468E952C085257687006F3A82?OpenDocument

S.M. Baldwin and F.A. Felder                                                                                                      The Electricity Journal 32 (2019) 31–38

other hand, plaintiffs have corresponding costs and uncertain outcomes, perhaps resulting in the number of class actions that should be pursued. The incentive in these cases to settle is strong, which limits the disincentive to engage in bad behavior by defendants. Settlements also reduce the mitigation of damages that members of the class experienced, and in many cases consumers that were harmed do not receive any compensation for their damages. Finally, if settlements are confidential or not widely known, defendants do not suffer from adverse publicity of their bad behavior.

*3.3.7. Establish a clearinghouse among state regulators and consumers advocates that tracks bad actors*

- Since individual states regulate retail energy supply and many litigation efforts are not widely publicized, states should establish a clearinghouse funded by a fee assessed on energy retail energy providers and from fines and penalties collected from the industry to collect and disseminate information regarding unscrupulous suppliers, types of deceptive and unfair behavior, and best practices to prevent, detect, and eliminate such behavior.

### 4. Conclusion

Market imperfections in residential energy supply markets persist, causing consumers to experience millions of dollars in net consumer loss, and state attorneys general and public utility commissions to expend substantial resources to seek remedies and implement critically needed consumer protection and safeguards.

Of course, deceptive and fraudulent practices and high charges are undesirable outcomes in markets for all goods and services. The Federal Trade Commission and state attorneys general address the former for many goods and services, and efficient competition minimizes the possibility of the latter in many markets. However, efficient competition has not yet emerged in residential energy supply markets. Moreover, electricity is of particular concern because it is an essential item – what economists refer to as a merit good[45] –and also one that relates to public safety and health. Regulators' hopes for efficient markets have been unfounded. Now, with at least two decades of experience, it is necessary to consider discontinuing residential retail energy supply markets, or, in the alternative, to impose a moratorium on new customers while regulators adopt strong measures to protect customers and establish the requisite resources to enforce such measures.

**Susan M. Baldwin** Susan M. Baldwin specializes in utility economics, regulation, and public policy, with a long-standing focus on telecommunications markets and with a more recent focus on consumer issues in electric and gas markets. Ms. Baldwin has been actively involved in public policy for forty-one years. Since 2001, she has been consulting to public sector agencies, consumer advocates, and others as an independent consultant. Ms. Baldwin received her Master of Economics from Boston University, her Master of Public Policy from the Harvard Kennedy School, and her Bachelor of Arts degree in Mathematics and English from Wellesley College. Ms. Baldwin has extensive experience both in government and in the private sector.

**Frank A. Felder** Frank A. Felder is a Research Professor at the Bloustein School of Planning and Public Policy and Director of the Rutgers University Energy Institute. He specializes in electricity markets and conducts research and teaching in market design, energy planning, energy efficiency evaluation, and renewable energy policies. He has served as a consultant in over two dozen legal disputes involving retail energy suppliers and their customers involving alleged overcharges of approximately a half a billion dollars.

---

[45] A commodity that should be made available based upon need instead of willingness to pay. See Richard A. Musgrave (1957). "A Multiple Theory of Budget Determination," *FinanzArchiv*, New Series 25(1), pp. 33–43.