**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ANNE BROUS, AS THE EXECUTRIX OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**,<br><br>        Defendants. | Case No. 1:24-CV-01260-ER |

**DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF MR. JOHN N. O'BRIEN AND ANY TESTIMONY HE MIGHT OFFER AT TRIAL**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ..................................................................................2

III.  LEGAL STANDARD .............................................................................................5

IV.   ARGUMENT ..........................................................................................................7

      A.    Dr. O'Brien's Opinions That Eligo Acted Unethically Or
           Deceptively Are Irrelevant And Prejudicial. ............................................8

      B.    Dr. O'Brien's Opinions That Eligo's Contract Was
           Misleading Are Inadmissible Legal Conclusions And
           Contradict Second Circuit Precedent.......................................................10

      C.    Dr. O'Brien's Assertions That Eligo Intended to Mislead
           Customers Are Impermissible Mental-State Testimony .......................14

      D.    Dr. O'Brien's Opinions About What "Reasonable Customers"
           Believed or Would Have Done are Unsupported Speculation. ............17

      E.    Even Where Dr. O'Brien Purports To Rely On
           Expertise, His Opinions Lack A Reliable Methodology. .....................21

           1.    Dr. O'Brien's NYPSC-Based Opinions Are Not
                The Product Of A Reliable Regulatory Methodology..............................21

           2.    The Report's Mischaracterization of Record
                Evidence Further Undermines Its Reliability ..........................................23

V.    CONCLUSION .....................................................................................................23

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ...................................................................................6, 22

*Andrews v. Metro-North Commuter R.R. Co.*,
882 F.2d 705 (2d Cir. 1989) ....................................................................................8, 9

*Care Travel Co. v. Pan Am. World Airways, Inc.*,
944 F.2d 983 (2d Cir. 1991) ......................................................................................20

*Chow v. Zimny*,
2014 WL 4964408 (D. Mass. Sept. 30, 2014).........................................................14

*Dallal v. N.Y. Times Co.*,
352 F. App'x 508 (2d Cir. 2009) .................................................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ...........................................................................................passim

*DePaepe v. Gen. Motors Corp.*,
141 F.3d 715 (7th Cir. 1998) .....................................................................................16

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .............................................................................................6, 18

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................15, 16

*In re Diet Drugs*,
2000 WL 876900 (E.D. Pa. June 20, 2000)..............................................................15

*In re Intuniv Antitrust Litig.*,
2020 WL 5995326 (D. Mass. Oct. 9, 2020) ..............................................................20

*In re Opus E., LLC*,
2016 WL 1298965 (D. Del. Mar. 31, 2016)................................................................1

*In re Opus E., LLC*,
528 B.R. 30 (Bankr. D. Del. 2015)..............................................................................1

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................................................passim

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ...............................................................................................6, 22

*Loeb v. Hammond*,
  407 F.2d 779 (7th Cir. 1969) .......................................................................................21

*Martinez v. Agway Energy Servs., LLC*,
  88 F.4th 401 (2d Cir. 2023) ......................................................................................3, 12

*Marx & Co. v. Diners' Club Inc.*,
  550 F.2d 505 (2d Cir. 1977) .....................................................................................11, 21

*Nimely v. City of New York*,
  414 F.3d 381 (2nd Cir. 2005) ....................................................................................5, 6

*Richards v. Direct Energy Servs., LLC*,
  915 F.3d 88 (2d Cir. 2019) ...................................................................................passim

*SLSJ, LLC v. Kleban*,
  277 F. Supp. 3d 258 (D. Conn. 2017) ..........................................................................21

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir.1991) ....................................................................................6, 21

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994) ...........................................................................................17

*United States v. Jones*,
  2022 WL 17884450 (W.D. Ky. Dec. 23, 2022) .............................................................14

*United States v. Massino*,
  546 F.3d 123 (2d Cir. 2008) .........................................................................................10

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) .........................................................................................16

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001) ...........................................................................................17

*United States v. Scop*,
  846 F.2d 135 (2d Cir. 1988) ...........................................................................6, 9, 11, 12

iii

*United States v. Scop*,
856 F.2d 5 (2d Cir. 1988) ..............................................................................................6

**Rules**

Fed. R. Evid. 403 ....................................................................................................6, 10

Fed. R. Evid. 702 ....................................................................................................passim

Fed. R. Evid. 704 ..........................................................................................................11

**Other Authorities**

31A Am. Jur. 2d Expert and Opinion Evidence § 294 (2018) ......................................11

Jessica Guarino, Nabilah Nathani & A. Bryan Endres,
*What the Judge Ate for Breakfast: Reasonable Consumer*
*Challenges in Misleading Food Labeling Claims*,
35 Loy. Consumer L. Rev. 82 (2023)...........................................................................14

N.Y. Pub. Serv. Comm'n, Cases 15-M-0127, 12-M-0476, & 98-M-1343,
*Order Adopting Changes to the Retail Access Energy Market and*
*Establishing Further Process* at 77–80 (Dec. 12, 2019) ...............................................3

## I.    INTRODUCTION

Defendants Eligo Energy, LLC and Eligo Energy NY, LLC (collectively, "Eligo") move to exclude the expert report and testimony of Plaintiffs' expert Dr. John N. O'Brien under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs present Dr. O'Brien, an adjunct instructor of public education at Flagler College, as an expert on everything from electricity markets to business ethics to corporate formalities.[1] But his report is not a technical analysis of retail energy markets, Eligo's pricing, consumer behavior or anything else for that matter. It is, instead, a sustained effort to recast Plaintiffs' allegations and arguments as expert testimony. Throughout the report, Dr. O'Brien repeatedly labels Eligo's conduct "deceptive," "predatory," "dishonest," and "unethical," and tells the trier of fact what the evidence supposedly proves about Eligo's motives. *See, e.g.*, Ex. 1 ("O'Brien Report") at 14, 46, 56, 60. Those are not expert opinions. They are argumentative characterizations of the record, designed to inflame rather than assist.

The same is true of Dr. O'Brien's repeated assertions about what "reasonable customers" supposedly would have understood from reading Eligo's customer contract, or what those

---

[1] *See* Ex. 1 (the "O'Brien Report") at 1-2 (stating that Plaintiffs' counsel asked Dr. O'Brien to opine on, inter alia, "[e]lectricity markets," "[w]hat a reasonable residential customer would expect from Eligo's statement in its customer contract," and "Eligo's corporate structure"). Dr. O'Brien is also not a corporate governance expert and applies no discernible methodology for evaluating corporate separateness. Instead, he reviews deposition testimony and internal documents and asserts that Eligo "disregarded corporate formalities." *See* O'Brien Report at 75. Whether affiliated entities operate as separate companies or a single enterprise, however, is a legal determination—not a matter of economic expertise. Because the jury can review the same evidence and draw its own conclusions, Dr. O'Brien's paid commentary offers no specialized assistance and falls outside the scope of Rule 702. *See In re Opus E., LLC*, 528 B.R. 30, 56–57 (Bankr. D. Del. 2015), *aff'd,* 2016 WL 1298965 (D. Del. Mar. 31, 2016) (excluding expert testimony that companies operated as a "single economic unit" where the opinion rested only on the witness's "subjective impression of how the companies operated," a methodology incapable of testing or peer review).

customers might have done differently in hypothetical scenarios. Dr. O'Brien did not study Eligo's customers, did not analyze the expectations or experiences of Plaintiffs themselves, and did not apply any recognized method (assuming there is one) for determining how ordinary consumers interpret contract language or how they expect electricity to be priced. Instead, he assumes that consumers would share his own interpretation of Eligo's contract and business practices, and he presents that assumption as expert analysis. Rule 702 does not permit an expert to tell the jury, much less the court, what legal conclusion to draw from the evidence.

When deposed, Dr. O'Brien admitted that he neither conducted any study nor applied any objective, reliable methodology to reach the opinions he has offered. Ex. 2, O'Brien Dep. 155:8–18; 157:13–18; 160:1–25. Instead, he claimed several times to "rely extensively on [his] expertise." *Id.* 10:16–20. In other words, according to Dr. O'Brien, his opinions are reliable merely because he has said so, based on an appeal to his own authority. This is the very definition of an *ipse dixit* that is inadmissible under *Daubert*. Dr. O'Brien's testimony should therefore be excluded in its entirety.

## II.     FACTUAL BACKGROUND

Eligo is an energy supply company, or "ESCO," that sells electricity to retail customers in competitive electricity markets. In New York, ESCOs operate within a regulatory framework established by the New York Public Service Commission ("NYPSC"), which permits consumers to select a competitive electricity supplier rather than purchasing electricity supply from their local utility. Competitive retail electricity markets also enable customers to purchase renewable energy

2

products that can increase demand for renewable generation in New York and encourage additional investment in renewable development. [2]

This case concerns two New York residents—Ira Brous and Michelle Schuster—who chose to purchase a premium green electricity product from Eligo that was not available from their utility (after previously purchasing electricity from another ESCO). Plaintiffs allege that Eligo breached its customer agreement by charging electricity rates that were not calculated "in response to market pricing, transportation costs, and other market price factors," as referenced in Eligo's contract. ECF No. 272, Second Amended Complaint ("SAC") ¶¶ 64–66. According to Plaintiffs, the broad terms "market pricing" and "market factors" somehow restricted Eligo to basing its rates on the wholesale costs it incurred to supply energy, plus a "reasonable margin" of approximately 6% on those costs (and only those costs).

Plaintiffs base their claims on that interpretation even though the word "wholesale" appears nowhere in Eligo's contract and there is no language even suggesting that Eligo would set electricity rates on a cost-plus basis. In other ESCO cases, the Second Circuit has rejected similar attempts to turn market-based pricing into a rigid cost-plus contract, as Plaintiffs attempt here. *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 410 (2d Cir. 2023); *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 96 (2d Cir. 2019).

In an effort to prop up their discredited attempt to rewrite Eligo's contract, Plaintiffs retained three experts. All three opine that Eligo breached the agreement by setting rates to "market"—i.e., to maximize profit while avoiding driving away customers—as opposed to pricing electricity on a cost-plus basis at a randomly-picked margin that would have bankrupted Eligo.

---

[2] *See* N.Y. Pub. Serv. Comm'n, Cases 15-M-0127, 12-M-0476, & 98-M-1343, *Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process* at 77–80 (Dec. 12, 2019).

One of Plaintiffs' experts is Dr. John N. O'Brien, an adjunct instructor of public education at Flagler College, who also serves as a professional expert witness for plaintiffs (and never for defendants) in civil litigation. *See* https://www.linkedin.com/in/john-o-brien-147a793. Dr. O'Brien's 85+ page report is long on invective but bereft of any methodological analysis. Dr. O'Brien repeatedly smears Eligo with conclusory and irrelevant accusations that it acted "unethical[ly]," "intentionally," "deceptive[ly]," or "predator[ily]" in setting its prices and communicating with customers. *See, e.g.*, O'Brien Report at 14 ("[Eligo's] tactics were . . . part of a ***deliberate*** and ***deceptive*** business model that was ***designed to prey*** on customers"), 45 ("Consistent with Eligo's demonstrated ***unethical intentions*** . . ."), 46 ("The discovery I have reviewed shows that Eligo's variable rate residential business model is ***fundamentally predatory, deceptive and designed and conducted to derive predatory profits*** from Eligo's customers."), 56 ("These are ***intentionally*** dishonest tactics designed to ***prey*** on consumers who lack reasonable access to the information necessary to reveal ***Eligo's deceptive conduct***."), 60 ("Eligo's 'pricing strategy' was both ***commercially unreasonable and deceptive***.") (emphasis added).[3]

Dr. O'Brien repeatedly draws ultimate conclusions about what the evidence supposedly shows, especially as to Eligo's mental state. For example, the report asserts that Eligo's pricing practices were "unethical" and "misleading," that Eligo intentionally designed its pricing system to extract excessive profits from customers, and that Eligo's contract concealed how its variable rates were determined. *Id.* at 39, 41, 42, 45, 46, 47, 56, 60, 61, 62. Dr. O'Brien also delves deeply into speculation by purporting to describe what "reasonable customers" would have understood

---

[3] *See also* O'Brien Report at 13, 15, 22, 23, 42. 45, 46, 47, 60, 61, 62 (describing Eligo's tactics as ***deceptive*** and ***predatory***).

about Eligo's contract and pricing practices, without a hint of supporting data or analysis. *Id.* at 1, 44, 46, 57, 58, 59, 60, 87, 89.

As explained below, these opinions are inadmissible for several reasons. First, opinions that Eligo acted "unethically," "deceptively," or "predatorily" are irrelevant and highly prejudicial advocacy, not expert analysis. Second, Dr. O'Brien's opinion that Eligo's contract was misleading rests on his own interpretation of the contract's language—an issue reserved for the Court and governed by controlling precedent addressing similar ESCO agreements. Third, his repeated assertions that Eligo intended to mislead customers constitute improper testimony about Eligo's mental state. Fourth, his claims about what "reasonable customers" believed or would have understood are unsupported speculation. And finally, even where Dr. O'Brien purports to rely on expertise, his report does not employ any identifiable methodology capable of testing or validating his conclusions.

## III.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Under Rule 702, a witness qualified as an expert may offer opinion testimony only "if the proponent demonstrates to the court that ***it is more likely than not***" that the testimony: (a) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "is based on sufficient facts or data;" (c) "is the product of reliable principles and methods;" and (d) "reflects a reliable application of [those] principles and methods to the facts of the case." Fed. R. Evid. 702 (emphasis added).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 assigns trial courts a "gatekeeping" role to ensure that expert testimony admitted at trial is both reliable and relevant. 509 U.S. 579, 589, 592–94 (1993). That gatekeeping obligation applies to all forms of expert testimony, not only scientific testimony. *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 147 (1999). "In addition to the requirements of Rule 702, expert testimony is subject to Rule 403." *Nimely v. City of New York*, 414 F.3d 381, 397 (2nd Cir. 2005). Expert testimony is excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (quoting Fed. R. Evid. 403).

Consistent with these principles, the Second Circuit requires district courts to conduct a "rigorous examination" of the reasoning and methodology underlying expert testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Expert opinions must be excluded where they are connected to the evidence only by the expert's say-so. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Likewise, opinions grounded in speculation, subjective belief, or unsupported assumptions do not satisfy Rule 702. *See Nimely*, 414 F.3d at 396–97.

Even where an expert purports to rely on specialized knowledge, Rule 702 does not permit testimony that invades the province of the court or the jury. *See Dallal v. N.Y. Times Co.*, 352 F. App'x 508, 512 (2d Cir. 2009) (finding proposed expert testimony properly excluded as intruding on the province of the trial court and jury). Experts may not offer legal conclusions, interpret contractual language, or otherwise instruct the jury on the governing law. *See United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988), *modified*, 856 F.2d 5 (2d Cir. 1988) (finding "repeated statements embodying legal conclusions exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence"). Nor may experts simply summarize the record and tell the jury what conclusions to draw from the evidence. *See Nimely*, 414 F.3d at 397–98 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991)) ("We have consistently held . . . that expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,' . . .by definition does not 'aid the jury in making a decision'"). Courts also exclude expert testimony that purports to opine on a

6

party's intent, motive, or state of mind, because those determinations are reserved for the jury. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony").

## IV.    ARGUMENT

Dr. O'Brien's report fails Rule 702 for several independent reasons. Rather than offering technical analysis that would assist the trier of fact, the report advances a series of advocacy-driven conclusions about the meaning of Eligo's customer contract, Eligo's intentions and motives, and what the trier of fact should conclude from the evidence.  But expert testimony may not interpret disputed contract language, offer legal conclusions, or otherwise tell the jury how to evaluate the evidence. Nor may an expert opine on a party's intent or speculate about what "reasonable consumers" supposedly believed or understood. As explained below, substantial portions of Dr. O'Brien's report fall squarely within these prohibited categories.

Even putting aside those threshold defects, Dr. O'Brien's opinions lack anything resembling the reliable methodology *Daubert* requires. The report does not attempt to analyze Eligo's pricing through economic modeling, statistical analysis, or any other recognized method. Instead, Dr. O'Brien assumes the validity of Plaintiffs' proffered interpretation of Eligo's contract and opines that Eligo breached because it did not calculate rates in the way Plaintiffs claim it should have. Dr. O'Brien supplements those inadmissible opinions with normative judgments about Eligo's business practices—asserting that the company's pricing and contract disclosures were "misleading," "predatory," or otherwise unethical. Those conclusory labels are not derived from any identifiable analytical framework, empirical study, or accepted methodology. Nor does Dr. O'Brien employ any recognized method—such as survey research or consumer analysis—to support his repeated assertions about what "reasonable consumers" supposedly expected or understood. The sections that follow explain why these opinions are inadmissible, because they (i)

7

offer irrelevant and prejudicial ethical judgments, (ii) advance legal conclusions about Eligo's contract, (iii) opine on Eligo's intent, (iv) speculate about consumer beliefs, and (v) lack a reliable methodological foundation.

### A. Dr. O'Brien's Opinions That Eligo Acted Unethically Or Deceptively Are Irrelevant And Prejudicial.

Rule 702 permits expert testimony only when it reflects "scientific, technical, or other specialized knowledge" that will assist the trier of fact. Fed. R. Evid. 702; *see Rezulin*, 309 F. Supp. 2d at 541. That requirement serves two related purposes: it guards against opinions grounded in "subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, and ensures that experts do not testify about matters jurors can evaluate without specialized assistance. *See Andrews v. Metro-North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). But subjective belief and irrelevant speculation are all Dr. O'Brien has to offer.

Start with Dr. O'Brien's oft-repeated opinion that Eligo's conduct was "deceptive," "predatory," or otherwise "unethical":

- "In my expert opinion, the form of transaction that Eligo routinely pursues represents exactly that form of ***unethical negotiation*** of a commercial transaction, i.e., it is not handled in a 'commercially reasonable' manner."

- "Eligo's variable rate residential business model is fundamentally ***predatory, deceptive and designed and conducted to derive predatory profits*** from Eligo's customers."

- "Eligo's Terms of Service is ***deceptive***."

O'Brien Report at 41, 46, 51 (emphasis added). Those opinions (and all others like them throughout Dr. O'Brien's report) are inadmissible because liability in this case turns on legal standards governing Plaintiffs' claims for breach and related alleged violations of New York consumer protection statutes. None of the claims at issue in this case has anything to do with the

very different subject of business ethics. So, Dr. O'Brien's opinions about ethics don't fit the facts

of this case and won't help the trier of fact to understand any fact at issue. *Rezulin*, 309 F. Supp.

2d at 544 (excluding expert opinions on ethics where liability turned on legal duties and causation).

But here Dr. O'Brien's opinions are doubly inadmissible because they are not just

irrelevant, but argumentative and unduly prejudicial to boot. By repeatedly opining that Eligo acted

unethically, predatorily, intentionally, or deceptively, Dr. O'Brien is trying to "supplant the role

of counsel in making argument at trial" or the role of the jury in interpreting the evidence. *Rezulin*,

309 F. Supp. 2d at 541 (citing *Andrews*, 882 F.2d at 708). And when an expert simply tells the jury

what conclusions to draw from the evidence, the testimony provides no specialized assistance and

falls outside the scope of Rule 702. *See id.* Despite this, Dr. O'Brien routinely opines as to what

conclusions he has drawn from the evidence Plaintiffs' counsel chose to share with him:

- "***The available evidence***, including Eligo's own documents, confirms the manner in which Eligo's bad faith scheme deceived New York customers . . . ."

- "***The evidence I reviewed*** for this report confirms that Eligo's deceptive pricing scheme . . . harms societal economics."

- "***The evidence I reviewed*** for this report confirms that Eligo's pricing scheme does not constitute charging a variable rate 'calculated on a monthly basis in response to' the factors listed in the Pricing Term."

O'Brien Report at 15, 45, 56 (emphasis added).

Dr. O'Brien's report also routinely smears Eligo with invective or by speculating that it

must have acted with a culpable mental state.  The report repeatedly characterizes Eligo's conduct

using loaded terms such as "bait-and-switch," "deceptive," "predatory," and "dishonest." *See, e.g.*,

O'Brien Report at 13–15, 46–48, 56, 60, 61. Courts must exclude expert testimony framed in such

terms because it effectively instructs the jury that a party engaged in wrongdoing and is meant to

inflame, not to help the jury understand facts in evidence. *Scop*, 846 F.2d at 140 (holding expert

9

testimony describing conduct as a "scheme to defraud" and "manipulation" exceeded the permissible scope of expert opinion because it embodied "highly prejudicial" conclusions about the ultimate issues in the case).

Allowing Dr. O'Brien to present these characterizations would also create a substantial risk of unfair prejudice. Even relevant expert testimony may be excluded where "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury[.]" Fed. R. Evid. 403. "Unfair prejudice" arises when evidence invites the factfinder to decide the case on an improper basis rather than the governing legal standards. *United States v. Massino*, 546 F.3d 123, 132–33 (2d Cir. 2008). Testimony framing Eligo's conduct as unethical invites precisely that risk: it encourages jurors to decide the case based on moral condemnation rather than the legal requirements of the contract at issue.

Ultimately, Dr. O'Brien's ethical judgments add nothing that would assist the jury. To the extent the report simply recounts record evidence and urges the jury to view that evidence as proof of deception or misconduct, it offers advocacy—not expert analysis. Rule 702 does not permit an expert witness to function as an additional closing argument for one side of the case. *See Rezulin*, 309 F. Supp. 2d at 545–47, 551–52. Dr. O'Brien's testimony should therefore be excluded.

**B.    Dr. O'Brien's Opinions That Eligo's Contract Was Misleading Are Inadmissible Legal Conclusions And Contradict Second Circuit Precedent.**

Dr. O'Brien's theory that Eligo's contract was "misleading" rests on a premise that is legal—not expert—in nature: that the contract promised Eligo would set rates on a cost-plus basis, based on its wholesale cost of energy plus a "reasonable" margin (a margin on wholesale costs, no less—not a margin that accounts for Eligo's other expenses). This is the same interpretation advanced by Plaintiffs' other experts, Mr. Macan and Dr. Felder. *See* O'Brien Report at 44, 52–54; *see also* ECF Nos. 362, 358 (Defendants' *Daubert* Motions directed towards Macan and

10

Felder). Dr. O'Brien then opines that Eligo's contract was misleading because it did not disclose that Eligo would set rates using a method other than the cost-plus arrangement he invented.

As Eligo explained in its other *Daubert* motions, Plaintiffs' cost-plus interpretation finds no support in the agreement's language. It is also commercially unreasonable because, as Eligo showed in its Daubert motion directed towards Frank Felder, a rate equal to a mere 6% margin on wholesale procurement costs (and only those costs) would have put Eligo into the red and threatened its status as a going concern. *See* ECF No. 369. In any case, it is for the Court, and not for Dr. O'Brien, to interpret the contract. *Scop*, 846 F.2d at 140; *Richards*, 915 F.3d at 98 (finding expert testimony "regarding the meanings of contractual provisions [is] irrelevant and hence inadmissible") (quoting 31A Am. Jur. 2d Expert and Opinion Evidence § 294 (2018)).

The Second Circuit's decision in *United States v. Scop* illustrates why such testimony is impermissible. In *Scop*, the government presented an SEC investigator as an expert witness who repeatedly testified that the defendants had engaged in "manipulation," a "scheme to defraud," and "fraud." 846 F.2d at 139–40. The court reversed the convictions, holding that the expert's testimony embodied impermissible legal conclusions and invaded the roles of both the court and the jury. *Id.* The court explained that although expert testimony may embrace ultimate factual issues, Rule 704 does not permit experts to apply legal standards to the facts or instruct the jury on the governing law. *Id.* at 140. Such testimony is not helpful to the jury because it effectively substitutes the expert's legal judgment for that of the court. *Id.*; *see also Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) ("[E]xperience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law.").

11

Dr. O'Brien's opinions present the same problem. His conclusion that Eligo's contract was "misleading" is not a product of specialized expertise. It is simply his interpretation of what the contract required and whether Eligo performed the contract as Dr. O'Brien imagines it. But an expert may not present his own interpretation of a contract and tell the jury that the contract obligated a party to behave differently than it did. *See Scop*, 846 F.2d at 140.

The defect in Dr. O'Brien's opinion is particularly stark because his interpretation of the contract conflicts with controlling Second Circuit precedent addressing materially similar ESCO agreements. In *Richards v. Direct Energy Services, LLC*, the Second Circuit held that an ESCO contract allowing the supplier to set a variable rate "based upon business and market conditions" gave the supplier discretion to set the rate and did not require any direct relationship to procurement costs. 915 F.3d at 98–99. The court explained that nothing in the contractual language suggested that the variable rate had to bear a direct relationship to the supplier's procurement costs or any particular margin. *Id.* at 98. The court further emphasized that expert opinions proposing a different pricing methodology were irrelevant because "the construction of unambiguous contract terms is strictly a judicial function." *Id.* at 98.

More recently, courts applying *Richards* have reiterated that ESCO contracts referencing "market" pricing do not create cost-based pricing obligations. In *Martinez v. Agway Energy Services, LLC*, the court explained that *Richards* establishes that where the contract gives the supplier discretion to set prices based on "market-related factors," it "embrace[s] considerations like reducing customer losses, achieving target profit margins, and matching competitors' rates." 88 F.4th at 412. The court therefore held that "the plain language of the Agreement permitted Agway to consider factors beyond its procurement costs when setting its monthly variable rates." *Id.* at 413.

12

Dr. O'Brien's analysis assumes precisely the interpretation those decisions reject. His report repeatedly suggests that references to "market pricing" and "other market price factors" in Eligo's contract implicitly promised that Eligo's rates would correspond to its wholesale costs, with no regard for factors impacting the retail market price of electricity. *See* O'Brien Report 44, 52–54. But that is simply a legal interpretation of the contract—one that conflicts with the governing case law—not a subject of expert testimony.

Dr. O'Brien also attempts to bolster his "misleading contract" theory by criticizing Eligo's use of its machine learning system, known as "GROOVE." *See* O'Brien Report at 53 (criticizing "the use of opaque machine-learning models to set variable rates" as "completely unrelated to the consumer-understandable concept conveyed in the Pricing Term"). Dr. O'Brien suggests that Eligo's use of such a computer-based system rendered its contract disclosures misleading because Eligo never told customers it would use a machine-learning tool to set variable rates.

But here again Dr. O'Brien has no supporting methodology, and his opinion flies in the face of Eligo's contract, which says nothing about the internal means or methods Eligo would use to determine its variable rates. The notion that it was misleading or improper for Eligo to use a machine-learning program (as opposed to any other computer or software program) to help set rates has no basis in the agreement or in common sense. The contract states only that those variable rates "may be periodically adjusted for market conditions," without saying anything about how Eligo would make such adjustments. SAC ¶ 3.[4]

---

[4] Dr. O'Brien also fails to offer any reliable methodology supporting his characterizations of how GROOVE operated or its alleged effects. *See, e.g.*, O'Brien Report at 44 (asserting Eligo's rate-setting system used "numerous variables not in any manner reflective of 'market prices' to determine how high of a rate it [could] charge before too many customers quit"). He did not review the system's source code, algorithms, modeling outputs, validation materials, or training data. O'Brien Dep. 155:16–18; 157:2–18. Instead, his understanding of the system derives primarily from his interpretation of deposition testimony. *Id.* 155:14–15 ("My knowledge of GROOVE

Nor can Dr. O'Brien salvage his theory by recasting his contract interpretation as a claim about what Eligo's customers would have understood the contract to mean. *See, e.g.*, O'Brien Report at 58 (opining how a "reasonable consumer" would understand the contract disclosure that "[t]here are no guaranteed savings"). Opinions about what "reasonable consumers" would have expected or understood from the contract language are equally improper, because "reasonableness" is an objective standard and a legal term of art.[5] *See Richards*, 915 F.3d at 97 (rejecting argument that experts' attestations that "a reasonable consumer would interpret the [contract] clause this way . . . raises a plausible question of fact as to the clause's appropriate interpretation"); *see also Chow v. Zimny*, 2014 WL 4964408, at *1 (D. Mass. Sept. 30, 2014) (finding that an expert could not testify concerning how a reasonable party would have interpreted a contract to establish reliance in a fraud case). Those opinions also present a different problem: they are unsupported speculation about consumer beliefs rather than expert analysis.

### C. Dr. O'Brien's Assertions That Eligo Intended to Mislead Customers Are Impermissible Mental-State Testimony

Dr. O'Brien's report repeatedly attributes specific motives and intentions to Eligo. As courts in this Circuit have explained, "[i]nferences about the intent or motive of parties or others

---

comes from, principally, the depositions of Eligo personnel."). That testimony may describe Eligo's pricing strategy, but it does not provide a methodological basis for the sweeping conclusions Dr. O'Brien draws about how GROOVE allegedly operates or why its use supposedly rendered Eligo's contract disclosures misleading. Rule 702 requires expert testimony to rest on reliable principles and methods, not speculation about how a proprietary technological system might function. *See Daubert*, 509 U.S. at 590; *see also United States v. Jones*, 2022 WL 17884450, at *2 (W.D. Ky. Dec. 23, 2022) (excluding expert testimony regarding TraX mapping software as unreliable under Rule 702 when witness could not explain underlying algorithms).

[5] Indeed, in consumer law, "the reasonable person is 'a fictional person with an ordinary degree of reason, prudence, care, foresight, or intelligence whose conduct, conclusion, or expectation in relation to a particular circumstance or fact is used as an objective standard by which to measure or determine something.'" Jessica Guarino, Nabilah Nathani & A. Bryan Endres, *What the Judge Ate for Breakfast: Reasonable Consumer Challenges in Misleading Food Labeling Claims*, 35 Loy. Consumer L. Rev. 82 (2023) (internal citation omitted).

lie outside the bounds of expert testimony," because "[t]he question of intent is a classic jury question and not one for the experts." *Rezulin*, 309 F. Supp. 2d at 547 (quoting *In re Diet Drugs*, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000)). Expert testimony on a party's supposed motives or beliefs "has no basis in any relevant body of knowledge or expertise" and improperly substitutes the expert's judgment for that of the jury. *Id.* at 546; *see also Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (quotation omitted) (excluding expert testimony concerning defendants' state of mind because it would "supplant[] … the role of the jury [in] interpreting the evidence").

Dr. O'Brien does exactly that. Throughout his report, he asserts that Eligo deliberately designed its business practices to mislead customers and extract excessive profits. For example, he states that Eligo's pricing tactics were "part of a deliberate and deceptive business model that was designed to prey on customers." O'Brien Report at 14. He similarly concludes that Eligo's residential variable-rate business model is "fundamentally predatory, deceptive and designed . . . to derive predatory profits from Eligo's customers." *Id.* at 46. Elsewhere, he characterizes Eligo's conduct as involving "intentionally dishonest tactics designed to prey on consumers." *Id.* at 56.

These statements are not technical opinions about electricity markets. They are assertions about Eligo's intent and purpose—that the company deliberately sought to deceive its customers and exploit them financially. Determining whether a party acted with deceptive intent or improper motive, however, is a quintessential jury function. Expert witnesses may not supply that conclusion. *See Rezulin*, 309 F. Supp. 2d at 547.

The same problem appears in Dr. O'Brien's discussion of Eligo's proprietary pricing system, GROOVE. According to Dr. O'Brien, GROOVE was "a secret process to determine the variable price that will maximize the profitability of Eligo's dealings with each customer over the

15

lifetime of the customer relationship." *Id.* at 53. This characterization attributes a specific strategic purpose to Eligo's pricing system—namely, that it was designed to exploit customers while concealing that objective.

But an expert may not testify about what a company intended or designed its conduct to accomplish. As the Seventh Circuit explained when reversing the admission of similar testimony, "[t]he whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). An expert might testify about the economic consequences of a design choice, but he cannot testify that a company adopted that design for a particular motive. *Id.* Because the expert "did not participate in the deliberations" underlying the design decision, any testimony about the company's motive was impermissible speculation. *Id.*[6]

Dr. O'Brien's testimony suffers from the same defect. He was not involved in Eligo's pricing decisions and has no personal knowledge of the company's internal deliberations. His conclusions about Eligo's supposed intent, therefore, rest entirely on his interpretation of documents and testimony in the record. But drawing inferences about a party's intent from such evidence is the task of the jury, not the expert. *See Rezulin*, 309 F. Supp. 2d at 547; *Highland Cap.*, 379 F. Supp. 2d at 469.

More broadly, testimony of this kind does not assist the jury within the meaning of Rule 702. Expert testimony is helpful only where it concerns matters "beyond the ken of the average juror." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) (quotation omitted). Jurors require no expert assistance to determine whether a party acted with deceptive intent based on the evidence

---

[6] *See also* O'Brien Dep. 155:8–11 ("I did not design GROOVE."); *id.* at 155:12–15 ("My knowledge of GROOVE comes from, principally, the depositions of Eligo personnel.").

presented at trial. *See United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (expert testimony should be excluded where it concerns matters a jury can evaluate without expert assistance). Allowing an expert to present conclusions about corporate intent risks what Rule 702 seeks to avoid: the expert's testimony may appear authoritative while simply telling the jury what inference it should draw from the evidence. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Dr. O'Brien's report repeatedly crosses the line to give impermissible mental-state testimony. Rather than providing technical assistance to the jury, the report tells the jury what it should conclude about Eligo's motives and intentions—namely, that Eligo deliberately misled its customers and structured its pricing practices to exploit them. Rule 702 does not permit expert testimony of that kind. The Court should therefore exclude Dr. O'Brien's opinions regarding Eligo's intent or motives.

### D.    Dr. O'Brien's Opinions About What "Reasonable Customers" Believed or Would Have Done are Unsupported Speculation.

Dr. O'Brien also offers a series of opinions about what "ordinary consumers" or "reasonable customers" supposedly believe and expect when purchasing electricity from an energy services company. *See, e.g.*, O'Brien Report at 44 (asserting "reasonable customers" would understand the pricing term to refer to underlying energy-market conditions), 54 (stating a customer would expect Eligo to derive its variable rates from a verifiable calculation based on listed factors). These opinions are not derived from any identifiable methodology. Instead, Dr. O'Brien assumes that consumers share his interpretation of industry practices and contract language and presents those assumptions as expert conclusions.

Rule 702 does not permit expert testimony grounded in subjective belief or unsupported speculation. *See Daubert*, 509 U.S. at 590 (explaining "the word 'knowledge' connotes more than subjective belief or unsupported speculation"). An expert must rely on "scientific, technical, or

17

other specialized knowledge" that assists the jury, Fed. R. Evid. 702, not merely assert personal views about how consumers interpret contractual language or make purchasing decisions. *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.").

Dr. O'Brien's report contains numerous statements about consumer expectations that lack any analytical foundation. For example, he writes: "For ordinary consumers, energy deregulation means paying a lower cost for electricity than that charged by the incumbent utility . . . ." O'Brien Report at 11. Elsewhere, he asserts that "[a] customer, told that their supplier would 'calculate' monthly rates 'in response to' listed factors, would expect that rate-setting would be a verifiable calculation based on the identified factors." *Id.* at 54. These statements purport to describe how consumers interpret contract language and energy-market practices, yet the report does not explain how those conclusions were reached. Dr. O'Brien does not describe, much less attempt to employ, a reliable or objective methodology to determine what Eligo's customers might have expected.

Dr. O'Brien confirmed during his deposition that he performed no independent analysis of consumer understanding to support these assertions. He testified that he conducted no surveys of Eligo customers—or of electricity customers generally. O'Brien Dep. 42:24–25; 43:1–11 (Q: "Did you conduct any surveys of Eligo customers?" A: "No."). He also acknowledged that he performed no experiments or independent studies in connection with his report. O'Brien Dep. 52:19–23 (Q: "You did not conduct your own experiments or studies in preparation of this report; is that correct?" A: "That is correct."). These admissions demonstrate that Dr. O'Brien did not apply any discernible methodology to determine consumer expectations. His conclusions instead reflect his

18

personal views about how consumers behave and what they supposedly understand about electricity pricing.

The materials cited in Dr. O'Brien's report do not supply the missing analysis. The sources referenced concern general topics such as consumer understanding of utility bills, consumer trust, or cognitive biases in decision-making. For example, the report cites:

- Bill LeBlanc, *Do Customers Understand Their Utility Bill? Do They Care? What Utilities Need To Know*, ESource (Jan. 21, 2016), (O'Brien Report at 11 n.7);

- Maher Toukabri et al., *Consumer Trust, Confidence, and Price Sensitivity*, (*id.* at 43–44 n.55, 54 n.90); and

- Ralph Shad et al., *The Impact of Cognitive Biases on Consumer Decision-Making*, (*id.* at 53 n.87, 54 n.93).

None of these sources analyzes how New York ESCO customers interpret the contractual language at issue here. The LeBlanc article is an industry newsletter published by a consulting firm, not a peer-reviewed study of consumer interpretation of energy contracts. The Shad citation is an unpublished manuscript posted to an online repository and not subjected to peer review. And although Dr. O'Brien cites the Toukabri study to support claims about consumer expectations in deregulated energy markets, he acknowledged that the study examined approximately "320 Saudi Arabian participants," not New York electricity customers. O'Brien Dep. 189:23–189:4. The study therefore does not address the consumer population or contractual context relevant to this case.

Dr. O'Brien further admitted that he was not aware of any study specifically examining how New York residential electricity customers interpret ESCO contract language. *Id.* 190:13–22. Although he asserted that "numerous authorities" support his views, he acknowledged that none of those authorities were cited in his report:

**Q**: "[Y]ou're not representing that the Toukabri study samples New York ESCO customers; is that correct?"

19

> **A**: ". . . I cited one authority, and there are numerous authorities, and if we get to meet again, I will bring those with me."
>
> **Q**: "But to be clear, you did not cite any of those other authorities [in your report]; is that correct?"
>
> **A**: "I'm citing my expertise from having read numerous studies in this area. That's what my opinion is based on, not one single study."

O'Brien Dep. 190:13–191:13.

When asked to identify a study examining how consumers interpret contractual language such as "market factors," Dr. O'Brien was unable to identify the author or title of any such research and instead referenced only a vague "Danish study" he could not identify. *Id.* 196:1–16. The absence of any identifiable research underscores that his consumer-expectation opinions rest on personal belief rather than reliable analysis.

These opinions also intrude on the role of the court and the jury. By asserting what a "reasonable customer" would understand from Eligo's contract language, Dr. O'Brien effectively instructs the jury how it should interpret the agreement and evaluate consumer understanding of it. Assessing how an ordinary consumer might interpret contractual language is not relevant. *See Richards*, 915 F.3d at 97–98 (rejecting reliance on expert testimony about how a "reasonable consumer" would interpret the contract clause because "the construction of unambiguous contract terms is strictly a judicial function"); *accord In re Intuniv Antitrust Litig.*, 2020 WL 5995326, at *19 (D. Mass. Oct. 9, 2020) (excluding expert testimony interpreting a settlement agreement, including opinions about how a "reasonable company" would understand the contract). The interpretation of the contract is for the court to decide. *See Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir. 1991) ("The determination as to whether the contract language is readily susceptible to one or more interpretations is made by the court with reference to the contract alone."). And only if the court finds the contract ambiguous does its interpretation

20

enter the province of the jury. *Marx & Co.*, 550 F.2d at 510 (quoting *Loeb v. Hammond*, 407 F.2d 779 (7th Cir. 1969) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony."). Expert testimony that substitutes the expert's view of consumer behavior for the court's instruction on the law does not assist the trier of fact. *See SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 270 n.13 (D. Conn. 2017) (quoting *Bilzerian*, 926 F.2d at 1294) (explaining that the Second Circuit has "held that an expert's legal opinion on the meaning of certain contract terms was outside the witness'[s] area of expertise and was also an invasion of the court's authority to instruct the jury on the applicable law").

In short, Dr. O'Brien's opinions about what "reasonable customers" supposedly believed or expected are not grounded in any discernible methodology. They amount to little more than his personal interpretation of how consumers think and how he reads Eligo's contract in exchange for a healthy hourly payment. Rule 702 does not permit expert testimony based on such *ipse dixit*. Because these opinions rest on speculation rather than reliable analysis and invade the province of the court, they should be excluded.

### E.    Even Where Dr. O'Brien Purports To Rely On Expertise, His Opinions Lack A Reliable Methodology.

#### 1.    Dr. O'Brien's NYPSC-Based Opinions Are Not The Product Of A Reliable Regulatory Methodology.

Dr. O'Brien repeatedly purports to evaluate Eligo's conduct against the requirements and policy objectives of the New York Public Service Commission ("NYPSC"). O'Brien Report at 13, 15, 21, 63. Throughout his report, he invokes the Uniform Business Practices ("UBPs"), the NYPSC's ESCO reform orders, and related consumer-protection provisions to argue that Eligo's pricing practices were inconsistent with the regulatory framework governing ESCOs. *See* O'Brien

21

Report at 9, 12–15, 20–23, 62–66. But these opinions are not the product of any reliable regulatory methodology.

Rule 702 requires an expert to apply specialized knowledge through a reliable analytical method. An expert may not simply read regulatory materials, select provisions favorable to one side, and offer his own interpretation of what those materials require or how a party's conduct should be evaluated against them. *Amorgianos*, 303 F.3d at 267 (explaining courts must conduct a "rigorous examination" of an expert's methodology and exclude opinions that amount to unsupported speculation or subjective belief rather than reliable analysis). Courts exclude expert testimony that purports to describe or apply regulatory standards where the witness is not reliably applying expertise but instead is offering legal or policy conclusions drawn from the regulatory record itself. *See Rezulin*, 309 F. Supp. 2d at 548–49; *see also Kumho Tire*, 526 U.S. at 156 (holding an expert must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

For example, in *Rezulin*, the court excluded expert testimony purporting to evaluate a pharmaceutical manufacturer's conduct under FDA regulatory standards where the witnesses lacked the expertise to characterize the governing regulations and had no reliable basis for evaluating the company's regulatory compliance. 309 F. Supp. 2d at 548–49. The court explained that experts who cannot reliably describe or apply the governing regulatory framework may not offer opinions interpreting those regulations or commenting on a party's adherence to them. *Id.*

A similar problem is present here. Dr. O'Brien does not apply any recognized methodology for evaluating regulatory compliance under the NYPSC framework. Instead, his report assembles excerpts from NYPSC orders, UBPs provisions, deposition testimony, and internal company documents and then offers his own interpretation of what those materials mean and how Eligo's

22

practices should be judged in light of them. Those conclusions reflect Dr. O'Brien's interpretation of regulatory materials—not the application of specialized expertise through a reliable method. Because Dr. O'Brien's NYPSC-based opinions are not the product of any discernible methodology, they are inadmissible.

### 2. The Report's Mischaracterization of Record Evidence Further Undermines Its Reliability.

Dr. O'Brien's deposition testimony also revealed that portions of the report mischaracterize the underlying record. When confronted with language in his report attributed to Eligo witness Andrew LaPointe, Dr. O'Brien acknowledged that the cited deposition testimony did not contain the quoted language. O'Brien Dep. 217:11–218:21. Instead, he admitted that the statements reflected his own "characterization of the overall deposition." *Id.* 218:23–25; 219:1–6. This admission is significant because substantial portions of the report rely on narrative descriptions of deposition testimony and internal company documents. The LaPointe episode demonstrates that those descriptions do not always accurately reflect the underlying evidence.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude the Expert Report of Dr. John N. O'Brien in its entirety and preclude Dr. O'Brien from offering expert testimony at trial.

[*Signature Appears on Following Page*]

Dated: March 16, 2026

Respectfully submitted,

/s/ Ryan D. Watstein
Ryan D. Watstein (*pro hac vice*)
David Meadows (*pro hac vice*)
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
75 14th St NE, Ste.2600
Atlanta, GA 30309
Tel: (404) 418-8307
ryan@wtlaw.com
dmeadows@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC and Eligo Energy NY, LLC*

24

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*

Ryan D. Watstein

25