# Exhibit 1

## Expert Report of John O'Brien, Ph.D.

***Brous, et al. v. Eligo Energy, LLC, et al.***
***Case No. 1:24-cv-01260-ER***

*ANNE BROUS and MICHELLE*

*SCHUSTER, on behalf of themselves and all*

*others similarly situated,*

*Plaintiffs*

*v.*

*ELIGO ENERGY, LLC and ELIGO ENERGY NY, LLC,*

*Defendants*

Case No. 24-cv-01260 (ER)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Expert Report of Dr. John N. O'Brien

September 12, 2025

Provided to:

Provided by:
Vista Consulting Group. Inc.
1093 A1A Beach Blvd, S.175
St. Augustine, FL 32080

## Chapter 1 – Introduction

I have been retained to provide an expert report and testimony concerning the present litigation brought by Plaintiffs Michelle Schuster and Anne Brous as the executor of the estate of Ira Brous ("Plaintiffs") and the proposed "Class" against Eligo Energy, LLC and Eligo Energy NY, LLC ("Eligo").

My report and testimony relate to (1) the process of energy deregulation in New York, (2) how New York energy services companies ("ESCOs") like Eligo function as retail energy suppliers to residential and small commercial customers in New York's deregulated retail supply market, (3) Eligo's business practices as evident from information produced in discovery, (4) the process ESCOs like Eligo use to enroll new customers, (5) the expectations and understanding customers like Plaintiffs and the Class have when enrolling with Eligo and later paying their utility bills, and (6) the roles played by Eligo Energy, LLC and Eligo Energy NY, LLC and their relationship to one another as evident from information produced in discovery.

## Assignment

I was asked by Plaintiffs' counsel to offer my opinions on the following topics:

- Electricity markets and an overview of energy supply deregulation in New York.
- The ESCO business model generally and ESCOs' place in the larger energy marketplace.
- Eligo's business practices and the residential and small commercial customer experience with Eligo, including an analysis of internal Eligo documents and other evidence that shows Eligo's approach to its variable rate customers.
- Eligo's customer contract, its telephonic enrollment and telephonic third-party verification, the bills customers receive from their local utility and Eligo's level of customer contact after customers transition to variable rates.
- What a reasonable residential customer would expect from Eligo's statement in its customer contract about how monthly variable rates would be "calculated" monthly "in response to" a set of listed criteria and what additional important information customers would need to know about Eligo's actual practices to correctly understand what becoming an Eligo variable rate customer entails.
- How reasonable customers understand criteria like "market pricing," "transportation costs" and "other market price factors" that Eligo chose to use in its customer contract when describing how "[v]ariable price is determined."

1

- The extent to which Eligo set variable rates in New York in good faith.
- The role renewable energy credits play in producing supposedly "renewable" electricity in deregulated supply markets like New York.
- Eligo's corporate structure, its use of a New York LLC in connection with its sales to New York customers and what the evidence indicates about the relationship of that New York LLC to the main defendant in this case, Eligo Energy, LLC.

## Qualifications

I have over forty-five years of experience in energy markets, including studying energy markets and regulations concerning the oversight of electric utilities and services provided by third-parties to utility customers. I served for 10 years as a Full Scientist at the U.S. Department of Energy's ("USDOE") Brookhaven National Laboratory in its Department of Nuclear Energy where I advised electric utilities on compliance with federal and state regulations and advised the USDOE on issues associated with energy market commodity deregulation of price controls. After that, using my knowledge of commodity deregulation I founded and operated several firms in the electric and natural gas industries, including firms that offered and sold commodity services to utility customers as those markets were opened to retail competition. After those endeavors, I joined two international consulting firms where I advised US and foreign utilities and ESCOs on how to structure and manage their unregulated affiliates that sold natural gas and electricity to retail customers in competitive markets.

I am also a former sitting Commissioner on the Florida Energy Commission and former Chair of its Climate Change Subcommittee. I am currently an Adjunct Professor of Public Administration at Flagler College where, for 18 years, I have been teaching graduate-level and undergraduate courses on The Public Economy, Ethics in Government and Business and Organizational Theory and Behavior. I am also President and CEO of the Vista Consulting Group Inc., an international energy consultancy, that advises energy firms on regulatory economics, regulatory compliance and business strategies. In addition, the firm provides expert witness reports and testimony in energy-related matters in litigation.

## The Natural Gas Market Deregulation As A Precursor To Electricity Market Deregulation

My experience with the deregulation of natural gas pricing while with the USDOE led me to form, capitalize and build a company that would sell natural gas to commercial and industrial customers of existing natural gas utilities. The concept was clear to me from

participating in and studying the internal preparations of a new order from the Federal Energy Regulatory Commission ("Order 436") that was to be particularly significant in creating the framework for allowing commercial and industrial utility customers to purchase natural gas from non-utility third parties. Analogous rules were developed for the deregulation of the electric markets which I will discuss further below.

Federal Energy Regulatory Commission ("FERC") Order 436 provided interstate natural gas pipelines with optional open-access status (meaning any qualified party could use the interstate pipeline system to transport natural gas) and began the unbundling of all pipeline services. This unbundling allowed certain customers to independently buy gas supply and transportation services from pipelines to transport that gas to market. By 1985, the partial decontrol of wholesale natural gas had led to lower prices and more favorable supply conditions for commercial and industrial customers.

These changes created new natural gas markets representing an opportunity for third parties to provide utility services beyond traditional utility sales, where the interstate pipeline system and the local utility act as a transporter rather than the gas suppliers. I worked directly with businesses and government authorities to work out the details of how these third-party transactions could confidently function as the natural gas markets were being deregulated. These arrangements became the foundation for how business is conducted in today's natural gas markets. Importantly, this new market model also served as an underlying model, a virtual template, for the analogous deregulation of the electric markets.

Natural gas deregulation created opportunities for commercial and industrial customers of utilities like Niagara Mohawk in upstate New York to purchase natural gas on the open market. Niagara Mohawk was the first gas utility in New York to allow commercial customers to participate in the deregulated market. A firm that I founded, Direct Gas Supply Corporation ("DGS"), was among the very first firms to begin selling natural gas supply to Niagara Mohawk utility customers. DGS grew rapidly. After 18 months in business DGS was selling natural gas at an annualized rate of $55 million per year in revenue and was the largest company in that business during that time.

Selling natural gas to commercial customers in the early days of deregulation is analogous in many ways to the markets in which Eligo bought and sold electricity to the Plaintiffs and the Class. A vendor like DGS would search out the best price for natural gas that was available in the newly deregulated wholesale natural gas market and purchase the natural gas as a commodity, usually from a natural gas producer. Once the gas was delivered to

3

Niagara Mohawk on the interstate pipeline system, it was designated as a specific quantity of gas in the utility system pipeline that would be the property of DGS until it was delivered to the customer. DGS would bill the customer for the natural gas that was delivered, would pay Niagara Mohawk for delivering that gas from the interstate pipeline to the customer, would pay the interstate pipeline that delivered the gas from the gas producer to Niagara Mohawk, and finally DGS would pay the producer for the commodity that was originally purchased. The financial credit that was used during these transactions was provided with a standby letter of credit from a bank collateralized by DGS receivables. This entire transaction was straightforward in its components. DGS purchased the commodity gas, usually directly from the producer, and tracked the deliveries all the way to the customer.

In 1990, British Petroleum purchased a significant stake in DGS and the investment was used to fund a large expansion of the business into other states outside of New York. With the additional invested capital, under my management, DGS expanded to other states including Massachusetts, Pennsylvania, Illinois, Georgia, as well as others, selling natural gas to commercial and industrial customers in those states as they followed New York's lead and, using the same deregulated market model as New York, opened their natural gas markets to competition. In 1992 British Petroleum divested the entire company to a Texas electric utility. This coincided with my study of electricity market deregulation, which was unfolding in manner highly analogous to the deregulation of the natural gas markets years before.

With new ownership of DGS and my interest in the electric markets, in 1992 I resigned from DGS and sold my interest.

**The Electric Markets**

After leaving DGS, I entered the competitive electric markets by founding the Wheeled Electric Power Company ("WEPCO").[1] This occurred at the same time that Congress was working on the Energy Policy Act of 1992. I visited Congressional aides in Washington DC before enactment to discuss natural gas deregulation and how the lessons learned could be integrated with the legislation they were working on. It was clear to me that the new law would mark the pivotal beginning of electric market deregulation in the U.S. The new legislation was passed by Congress and signed into law on October 24, 1992, by President George H. W. Bush. The Energy Policy Act of 1992 kicked off a steady transition from

---

[1] The term "wheeling" refers to the transportation or shipping of electric power on an electric transmission system from one place to another.

comprehensive state regulation of electric commodity sales to deregulation and competition.

Perhaps the most important part of that legislation was the amendment of the Public Utility Holding Company Act of 1935. The amendment lifted critical legal barriers in electric generation markets and enabled the development of wholesale power facilities by both traditional utilities and independent power generators. The Energy Policy Act of 1992 also expanded the Federal Energy Regulatory Commission's authority to order wheeling (i.e., the shipping of electric power) under a wide range of conditions. This change ushered in a paradigm in which third parties could purchase electric power and have it delivered anywhere on the grid within transmission system congestion constraints.

As a result, in March of 1993, the New York Public Service Commission ("NYPSC") initiated a rulemaking proceeding to address competitive opportunities for retail customers to buy electric power, just as it had already established for natural gas.[2] WEPCO played a major role in that proceeding. The experience I had gained from the changes that were implemented to facilitate competitive markets in natural gas was valuable to the parties in that proceeding.

There were over 90 active parties participating in the proceeding including the regulated and municipal utilities, industrial and large commercial companies, representatives of residential and small commercial customers, labor unions, environmental groups, NYPSC Staff and other public agencies. The proceedings lasted for over nine months and involved regular public meetings with submissions and advocacy for different types of conditions to be applied to a competitive electric market. I attended the great majority of the meetings. Over 2,000 public comments were received, and a final ruling was issued on May 20, 1996.[3]

In that proceeding the term "ESCO," meaning energy service company, began being used for retail suppliers. There were only two significant ESCOs involved throughout the

---

[2] NYPSC Case 93-M-0229, Proceeding on Motion of the Commission to Address Competitive Opportunities Available to Customers of Electric and Gas Service and Develop Criteria for Utility Responses, Order Instituting Proceeding (issued Mar. 19, 1993), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={61C118A0-56E5-43D9-ACD4-323A1FAB8776}.

[3] NYPSC Cases 94-E-0952 et al., In the Matter of Competitive Opportunities Regarding Electric Service, Opinion No. 96-12 (issued May 20, 1996), https://dps.ny.gov/system/files/documents/2023/12/94-e-0952-op.-no.-94-12-.pdf.

proceeding, Enron Capital and Trade ("Enron") and my company WEPCO. I personally represented WEPCO throughout the proceeding and both WEPCO and Enron played major roles in shaping the electricity market from the standpoint of an independent electricity marketer. The New York State proceeding became a model for many other states that were also seeking to make their retail electric markets competitive.[4] WEPCO went on to market electric power to retail customers in most of these states.

In 1996, WEPCO worked with the deregulated electric generation market participants to procure electricity supplies for retail customers. WEPCO staff procured power purchases and transmission arrangements for delivery to the regulated utilities serving those customers. In 1997, the New York Power Pool filed an application with the Federal Energy Regulatory Commission to form the New York Independent System Operator ("NYISO") to handle all transmission and wholesale electric power supply transactions in New York State.

### Advising On Energy Deregulation

After my involvement with WEPCO, I became a consultant to utilities and ESCOs seeking to continue to take advantage of electricity deregulation. I was engaged by an investment group to organize a natural gas and electric power marketing firm. In service of that I organized All Power Corporation, which principally sold natural gas to commercial and industrial customers in Consolidated Edison's service area. The organization successfully acquired several thousand natural gas customers. All Power Corporation was then absorbed into the investment group's larger interests.

I was then recruited by an international energy regulatory consulting firm, Skipping Stone LLC, and I oversaw its Strategic and Regulatory Consulting Practice. My principal role was to advise electric and natural gas utilities and ESCOs (including unregulated utility-affiliated ESCOs) on how to enter and work in the new competitive markets which were then becoming national. Since most of the restructurings of the electric and natural gas utility industry were following the template that New York had developed, I was able to work with numerous traditional utilities, including Pacific Gas & Electric, Exelon, Pepco and others that wanted to learn about how the deregulated markets operated. I also did

---

[4] I also played a major role in other state proceedings that were restructuring the retail electric markets in a manner similar to New York including Connecticut, Massachusetts, New Hampshire, Rhode Island and Illinois.

corporate training for government agencies and businesses including the Federal Energy Regulatory Commission and the Nuclear Regulatory Commission. I advised the Department of Defense on fuel procurement; I trained companies, including Cummins Corp., on optimizing the value of their natural gas generators by using lower priced competitive gas supplies.

After three years at Skipping Stone, I was recruited to become the President and CEO of Global Change Associates, an international energy consulting firm. During that time, I worked with Union Fenosa, one of the largest natural gas utilities in Spain, as an advisor on deregulation. I was also engaged to assist Tokyo Power on deregulation in Japan. In addition, while there I began providing expert witness services by providing testimony in the Enron bankruptcies.

**Vista Consulting Group Inc.**

In 2004 several colleagues of mine from previous endeavors decided to form the Vista Energy Group Inc. and began doing work with various firms that were working in energy regulatory projects. After a short period of time the name of the firm was changed to the Vista Consulting Group Inc. to show that the scope of our expertise was larger than deregulated energy markets and included other types of strategic customers.

**Academic Background**

Concurrently with my activities and employment with various energy firms, I have been an adjunct faculty member at four institutions of high learning. Initially, I taught in the Chemistry Department of Syracuse University teaching General and Organic Chemistry and the Public Administration Department of the Maxwell School. I then taught at two community colleges teaching Chemistry courses. For the last 18 years I have been a faculty member of the Public Administration Department of Flagler College teaching graduate and undergraduate courses in various areas of Public Administration including The Public Economy, Ethics in Business and Government, Organizational Ethics, Organizational Theory and Behavior and Program Evaluation among others.

I have also consulted for several highly respected clients on a variety of marketing and buyer behavior topics. I have taught classes including instructional courses to US and state governments (e.g., FERC, Nuclear Regulatory Commission, U.S. Agency for International Development. NY Department of Economic Development) and major electric and natural gas utilities (e.g., Pacific Gas & Electric Company, Exelon, PEPCO) on energy market

7

deregulation involving energy marketing and consumer behavior issues. I am being compensated at a rate of $280 per hour for this report, and $380 per hour for any needed testimony. My curriculum vitae is attached as Exhibit A.

Below is a list of all cases in which I have testified, at deposition or at trial, in the last four years:

- *Robert Griffin v. Meraki Installers*, Case No. 2400010, Circuit Court, 18th Judicial District, Bay County, Florida
- *EcoFurn, LLC v. AGL Services Company et al*, In the Circuit Court of Cook County, Illinois, County Department, Law Division, 2023L008912, 24240740
- *Cafe Gelato et al v. Simon Property Group et al*, Southern District of Florida, 20-cv-60981
- *Cook et al v. South Carolina Public Service Authority*, State of South Carolina, County of Hampton, Court of Common Pleas, Fourteenth Judicial District. Case No. 2017-CP-25- 348
- *Lightsey et al v. South Carolina Electric and Gas Company*, A Wholly Owned Subsidiary of SCANA, State of South Carolina, County of Hampton, Court of Common Pleas, Fourteenth Judicial District. Case No. 2017-CP-25-335
- *Wave Length Hair Salons Of Florida D/B/A Salon Adrian et al v. CBL & Associates Properties, Inc. et al*, 2:16-cv-00206 Middle District of Florida
- *America's CNG, LLC v. City of Lake City*, Third Judicial Circuit, Columbia County, Florida Case No.: 2015-ca-000511
- *Wanxiang America Corp v Bluechip Energy LLC*, AAA Case No. 50-198-T-000516-11
- *John Deere & Co. v. TXU Energy Solutions*, Arbitration, No. 51-198-Y-01658-04
- *Tawney et al v. Columbia Natural Resources LLC et al*, Circuit Court of Roane County, West Virginia, Civil Action No. 03-C-10E
- *Metromedia Energy, Inc., v. Enserch Energy Services, Inc, et al*, United States District Court, District Of New Jersey, Civil Action No. 03-1561

Below is a list of all articles or publications I have authored in the last 10 years:

- O'Brien, John. *How to Get the Trans-Pacific Partnership Through the Lame-Duck*, The National Interest (Nov. 30, 2016), https://nationalinterest.org/feature/how-get-the-trans-pacific-partnership-through-the-lame-duck-18547.

Attached as Exhibit B is a list of the materials I considered in forming my opinions.

8

**Summary Of Expert Opinions**

Below is a summary of the expert opinions I have reached on the topics outlined above:

According to the NYPSC, deregulation of New York's retail supply market was intended to provide (1) effective competition in the generation and energy services sectors; (2) reduced prices resulting in improved economic development for the State as a whole; (3) increased consumer choice of supplier and service company; (4) a system operator that treats all participants fairly and ensures reliable service; (5) a default provider for all consumers and the continuation of a means to fund necessary public programs; (6) ample and accurate information for consumers to use in making informed decisions; and (7) the availability of information that permits adequate oversight of the market to ensure its fair operation.[5]

The deregulation of New York's retail supply market was intended to restructure the electric industry in New York in response to competitive options that had been developing in the US. The purpose was to make the retail sale of electric power, long simply treated as a passthrough of generation costs to customers, instead subject to the discipline of competitive markets. Behind the trend in retail supply deregulation was a larger national trend to stop treating the generation of electricity as a price regulated enterprise and instead make the generation and pricing of electric power subject to competition.

It was recognized that, for generators to actually compete with one another, there had to be customers that could pick and choose among entities that would sell their electricity. In other words, there had to be retail competition among end-users. The customers in the retail markets, including residents, businesses and industry, would need to have the ability to make choices in selecting among competitive electric generation suppliers for competition to materially develop in the broader market. That was the idea behind allowing ESCOs like Eligo to compete directly with local utilities like Con Edison and Rochester Gas & Electric that were selling cost-regulated electric power. The creation of healthy competition among suppliers as was described in detail in the NYPSC's Order establishing its vision and goals for opening the retail electric market and was seen as the best way to create those competitive forces. Retail supply deregulation was spurred by the NYPSC's belief that competition in the generation and energy services sectors of the electric

---

[5] NYPSC Cases 94-E-0952 et al., In the Matter of Competitive Opportunities Regarding Electric Service, Opinion No. 96-12, at 25-26 (issued May 20, 1996).

industry would be pursued for its potential to reduce rates over the long term, to increase customer choices and for other economic development advantages.[6]

Today, as a result of years of competition among electric generators since the establishment of (1) competition among generators weeding out uneconomic generators and (2) well-developed wholesale electric market mechanisms (e.g., the NYISO), the prices charged for spot market power are relatively consistent among buyers which was anticipated as the electric markets gained liquidity and numerous market participants entered the markets. As traded volumes of electric power increased, market prices became more and more consistent.

From the evidence that I have seen, Eligo purchased all of its electric power for resale to its retail customers on the open market through either the NYISO day-ahead price or the NYISO real-time (spot) price. *See* Eligo Oct. 29, 2024 30(b)(6) Dep. [61:14–63:8]. Regardless of where an ESCO ultimately procures the commodity it resells, ESCOs pay virtually the same price for the wholesale power they resell. Because of this, and in order to compete with each other, and the incumbent electric utilities, ESCOs must compete on the basis of the markups, i.e., the profit margin they add to the wholesale prices paid when selling the power to retail customers. Since the wholesale prices are essentially the same for all ESCOs with only minor variations, the field of competition among ESCOs to entice customers to buy their products by offering the best and lowest price is principally a matter of which ESCO can add the smallest markup that is added to the wholesale cost.

The margins, or markups, that are typical in commodity markets, including energy commodities, are generally low compared to retail markets in, for example, manufactured goods. ESCOs operate in this deregulated competitive commodity market, and their business model is straightforward.

As such, the competitive electric market in New York is designed so that ESCOs will compete based on the size of their markup in reselling wholesale electric power or by providing additional value-added services that utilities do not provide. While there are other factors that may allow an ESCO to charge a higher price (i.e., add a higher markup than another ESCO), such as offering fixed rate plans that shield the customer against volatility, offering products and services that help the customer reduce consumption, or

---

[6] *Id.* at 96.

providing non-energy add on home services, the opportunities for simply and ethically reselling energy supply at higher profit margins are very limited.

For ordinary consumers, energy deregulation means paying a lower cost for electricity than that charged by the incumbent utility that traditionally has provided electric power. When a Con Edison customer purchases power from Eligo, the power is still delivered to the customer by Con Edison and the bill the customer receives, which includes a charge for Eligo's electricity, also comes from Con Edison. The few small line items on the bill that indicate Eligo's charges are buried among the many other charges listed on the utility bill. There is no valid reason for a Con Edison customer to pay a higher price to Eligo for electricity than the amount that Con Edison charges for the same electricity.

When customers get their utility bills from their utility, the bill is very dense and complicated, with numerous charges on the invoice that, for the most part, mean very little to an average customer. A detailed research study on customer reactions to utility billing concluded that "[o]ur research found that only 17 percent of customers feel that they have a very good understanding of their bill, whereas 30 percent think they have a poor understanding."[7] The customer typically does not appreciate the distinction between the supply and delivery components contained in the bill, and they often don't understand the role the underlying energy rate plays in their overall bill.[8] There have been many studies conducted by academic and government institutions that verify that utility invoices are notoriously difficult to understand. A study by Lawrence Berkeley National Laboratory found these difficulties were compounded in deregulated markets, such as those in New York:

> A more common problem was the perceived clutter of the bill. Respondents often expressed puzzlement and frustration at the variety of charges, cost adjustments, and taxes listed on the bill. This was exacerbated in locations where utility deregulation was underway [such as New York] and the various components of energy service were listed; e.g., transmission, distribution, generation, etc. The proliferation of line items on the bill led most people to

---

[7] LeBlanc, Bill, *Do Customers Understand Their Utility Bill? Do They Care? What Utilities Need To Know*, ESource (Jan. 21, 2016), https://www.esource.com/email/ENEWS/2016/Billing.

[8] *Id.*; *see also* NYPSC Case 12-M-0476, et al., Proceeding on Motion of the Commission to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Markets in New York State, at 12 (Feb. 25, 2014), ("[I]t is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO.").

ignore them completely and focus solely on the amount due. The result is a bill that, by providing so much information, ends up providing very little information of use.[9]

Other studies also show that customers who receive bills from their utility that include their ESCO bill do not understand what amounts ESCOs like Eligo pay for energy supply or the markups they add in order make a reasonable return on their work as energy suppliers.[10] A major survey of customers showed that "The public is largely unfamiliar with these regulatory bodies responsible for setting their electric and gas utility rates, and a majority say they do not understand what is behind the charges on their utility bills."[11] A report on this topic by *T&D World* magazine found that "many consumers were quite skeptical about their electricity providers' motives: 43 percent agreed that most of what is included in their bill is just there to confuse them and distract them from the price."[12] Further, since their electric usage varies month to month, differences in the bottom line on the utility bill make month-to-month comparisons very difficult. These discrepancies and a lack of understanding of the large amount of information on the electric bills make it difficult for New York electric customers to appreciate the components of their bills, what they mean and which information is important. "About half of respondents said they hate opening their electricity bills, and 59 percent stated that some parts of the bill seem like they are

---

[9] Payne, Christopher T. et al., *Utility Bill Comprehension In The Commercial And Industrial Sector: Results Of Field Research*, Lawrence Berkely National Laboratory, Consumer Behavior and Non-Energy Effects, Vol. 8, 271, 274–75 (June 1, 2000), https://core.ac.uk/download/pdf/71320179.pdf.

[10] NYPSC Case 15-M-0127, et al., In the Matter of Eligibility Criteria for Energy Service Companies, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process, at 30–31 (issued Dec. 12, 2019), (hereafter "December 2019 Order") (the NYPSC has a "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of the products and/or prices that they are purchasing from the ESCO"); *see also id.* at 31 ("[T]he lack of easily accessible data about the various types of products offered by the ESCOs, including the pricing, makes it difficult for customers to make fair comparisons among the ESCO offerings to decide which ESCO product might be beneficial for them.").

[11] Hua, Charles, *Utility Bills Are Rising: An Analysis Of How Utility Bills Are Impacting American Energy Consumers And Who Determines Them*, Powerlines, at 15 (Apr. 2025), https://powerlines.org/wp-content/uploads/2025/04/PowerLines_Utility-Bills-Are-Rising_2025-1.pdf.

[12] *Survey: Consumers Struggle To Understand Their Electric Bills And Rate Options*, T&D World (Dec. 8, 2022), https://www.tdworld.com/smart-utility/article/21256039/survey-consumers-struggle-to-understand-their-electric-bills-and-rate-options.

written in another language."[13] This fact has repeatedly observed by New York's utility regulator, the NYPSC and industry participants and commentators alike.[14]

The discovery materials I have reviewed show that Eligo preyed on customers' relative lack of information in a classic "bait-and-switch" fashion. Eligo initially lured customers to purchase electric power from Eligo rather than the utility with promises of comparably low teaser "fixed rates" that were competitive with utility rates during the relatively brief fixed-rate term. *See* DEF068207, 81. However, after the fixed rate period ended, typically about three months, Eligo automatically transitioned the customers away from the "fixed rate" to a "variable rate." Eligo Oct. 29, 2024 30(b)(6) Dep. [43:4–8].

But Eligo obfuscated its actual variable rate-setting criteria and did not deal honestly or fairly with its variable rate customers. This was not merely an accident or the result of careless practices. Eligo purposefully paired its improper rate-setting practices with the information asymmetry between sellers and buyers that characterizes the deregulated retail energy market in New York, allowing Eligo to ratchet up customers' variable rates to very high levels. This was Eligo's method for deriving a higher profit margin from its customers than it could obtain if Eligo's pricing structure were transparent. Bear in mind, the field of competition among ESCOs as sellers in acquiring customers as buyers is the extent to which an ESCO can minimize the markup it charges. Instead, Eligo deceptively masked the markup behind the very limited information Eligo conveyed to its customers. Eligo failed to disclose how its variable rates were actually calculated by purposefully withholding that information from its customers.

A customer that was given Eligo's written customer contract (the "Terms of Service") and its explanation that "[v]ariable price is determined" by Eligo "calculat[ing]" a variable rate "on a monthly basis in response to market pricing, transportation costs, and other market price factors, would not reasonably expect that Eligo would deploy a series of underhanded

---

[13] Runyon, Jennifer, *Consumers Struggle To Understand Their Electric Bills and Rate Options, Report Finds*, Renewable Energy World (Dec. 12, 2022), https://www.renewableenergyworld.com/energy-business/consumers-struggle-to-understand-their-electric-bills-and-rate-options-report-finds/.

[14] *See, e.g.*, December 2019 Order at 12 (the NYPSC is concerned about "the lack of easily accessible and comprehensible product and pricing information and, the number of complaints alleging that bad-acting ESCOs were misleading and exploiting customers"); *id.* at 93 (the Retail Energy Supply Association—a trade association representing ESCOs—"believes that . . . the lack of space for ESCOs to have 'detailed line items' causes customer confusion and essentially causes the commodity cost to be hidden from customers."); *id.* at 9 ("[M]ost of the ESCOs acknowledge that there are some 'bad actors' in the market that are taking advantage of customers.").

tactics to deceptively maintain the customer's lack of knowledge to continue charging, in many cases, more than what the customer would pay if the customer simply cancelled their agreements with Eligo.[15] Instead, the pricing term in Eligo's Terms of Service (referred to hereafter as the "Pricing Term") misleads customers with false precision claims that Eligo would "calculate" customers monthly rates "in response" to identified "market factors."[16] As discussed herein, discovery shows that Eligo did no such thing. In fact, Eligo's rate structure and pricing determinations after the initial fixed teaser rate expired were not calculated to reflect "market pricing, transportation costs, and other market price factors."

Customers that had been given the assurances listed in the Pricing Term (listed on the first page of the Terms of Service) regarding how Eligo would "calculate" variable rates "in response to" the set of listed criteria would be even more surprised that Eligo later deployed a proprietary artificial intelligence pricing program called "GROOVE" or "Growing Revenue Out Of Variable Experimentation" that was designed to maximize Eligo's variable rates, and Eligo's profits, while also minimizing customer attrition.[17] The Pricing Term conveys precision: rates "shall be calculated on a monthly basis in response to" identified criteria. None of that alerts customers to the fact that they would in fact be the subjects of Eligo's "experimentation" aimed at "growing revenue." Eligo's Terms of Service misrepresented how customers' variable rates would be calculated and failed to inform customers regarding key facts about their variable rates.

In taking their offensive treatment of their customers even further, without authority to do so, Eligo also added an extra monthly fee that was not mentioned anywhere in the Terms of Service. These tactics were also not honest mistakes. They were instead part of a deliberate and deceptive business model that was designed to prey on customers and deprive them of the sole benefit that customers perceive as Eligo's role, i.e., to save them money on electricity expenditures. *See* Exhibit C. This business model is evident from the

---

[15] Carson, Thomas L., *Deception And Withholding Information In Sales*, 11 Business Ethics Quarterly, Vol. 11 275, 279 (Apr. 2001); *see also* Sherwood, Charles N.C., *A Lie Is A lie: The Ethics Of Lying In Business Negotiations*, 32 Business Ethics Quarterly 604, 619 (2021) ("Communication and cooperation within a society rely on the presumption that most people are telling the truth most of the time.")

[16] *Id.* at 289; *see also* Thomas, Manoj et al., *The Price Precision Effect: Evidence From Laboratory and Market Data*, 29 Marketing Science 175, 188 (2010) ("Sellers can strategically set precise prices and thus influence buyers' judgments and resulting [willingness to pay].").

[17] *See* DEF060238, 45 ("Eligo actively manages the pricing of its variable book with a data driven approach that optimizes gross margin over the customer life time while leading to reasonable levels of customer churn").

many incriminating Eligo documents that were generated as Eligo personnel carried out Eligo's deceptive business model.

I understand from Plaintiffs' counsel that Eligo has tried to claim that it fully and adequately apprised its customers of its deceptive rate-setting practices by contending that automated contract summary language, conveyed during a pre-recorded third-party verification call, gave Eligo rate-setting discretion that is not contained in the Terms of Service. However, under express NYPSC regulations, the written Terms of Service solely govern the transaction. The "third party" is also, by definition, not Eligo or any party to the transaction. Eligo's position is the equivalent to there being no written contract at all. Even if a statement by a third party made before a written contract became effective somehow became part of the contract, the supposed "disclosure" regarding how Eligo set variable rates is in conflict with the written Terms of Service. The bottom line is that the written Terms of Service, which is how Eligo promised to set variable prices, were essentially ignored and, as will be discussed, a completely different pricing method was applied to the significant disadvantage of the customers whose purchases were governed by those contracts.

Eligo unfairly exploited energy deregulation in New York to capture excessive profits through wholesale deception of low information customers using sophisticated tactics to enhance its unfair information advantage. Legislators and regulators have long recognized that ESCOs such as Eligo have substantially more information on energy costs than their customers and set up regulatory systems to attempt to protect these customers from ESCOs just like Eligo.[18] The available evidence, including Eligo's own documents, confirms the manner in which Eligo's bad faith scheme deceived New York customers and caused them to pay much more for their electricity than they otherwise should have paid in a good faith transaction with a seller that was dealing fairly with its customers.

**<u>Chapter 2 - History Of Energy Deregulation</u>**

Restructuring has fundamentally changed the electric power system. To understand the role of ESCOs like Eligo and the rates they charge customers, it is helpful to understand the basics of the US power system.

---

[18] December 2019 Order at 33 ("Simply put, price transparency clearly furthers the purposes of the retail energy market, and we [the NYPSC] reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue.").

The system has three main elements: generation, transmission and distribution. Power supply starts with generating plants that transform fuel sources (e.g. coal, natural gas, among others) into electricity. Electricity is then passed through high voltage transmission lines to electrical substations located near concentrations of end-users that consume electricity. This is known as the "transmission system." At the substation level, the voltage is lowered by transformers, and then after the voltage step-down, electricity is delivered through the local network to end-use customers. This part of the system is known as the "distribution system" and is the wires that visibly run down streets and are operated by a local utility that serves electric customers throughout the geographic area in which the utility has a monopoly. Below is an image the depicts the power system starting with electricity generation, transmission and distribution.



Source: U.S. Department of Energy

*See* U.S. Dep't of Energy, Office of Cybersecurity, Energy Security, & Emergency Response, *How It Works: Electric Transmission & Distribution and Protective Measures.*, at 1 (Nov. 2023), https://www.energy.gov/sites/default/files/2023-11/FINAL_CESER%20Electricity%20Grid%20Backgrounder_508.pdf?.

The overall power system is like a series of interconnected tubes. Electricity flows from all generators to all end users. Accounting for these flows is accomplished mainly by measuring the electric power input by meters at the entry points to the system and then again measured by the meters at the exit point in the system. The system is operated so that the total electricity coming in from generators equals the total being withdrawn by all

16

users at every moment. It is not possible to trace the flow of electricity from any one generator into the system and then out to end users through any particular powerline. One can think of the flow of electricity as being like the flow of water running down a grassy hill, the water follows the pull of gravity in the path that presents the least level of resistance. In the electric system, these paths change from moment to moment. This phenomenon is commonly called parallel or loop flows. Electricity flows across the network lines, and generators and consumers are all connected. As a result, regardless of whether an ESCO or the local utility is "supplying" the customer, each customer's meter receives the electricity from the same large pool of electricity.

There are also meters measuring the flow of electricity across certain "pinch points" in the systems that measure internal system flows through the transmission and distribution systems. However, the principal measurements are simply electric energy flowing in at points to entry and electric energy out at points of withdrawal from the overall system.

**<u>Traditional Electricity Supply</u>**

Before the New York electricity utility sector was restructured, only regulated utilities provided electric power to retail customers. These regulated companies, in simple terms, owned and operated the entire utility systems including electricity generation, transmission, distribution and administration within a geographic area known as a "service area." The utilities recovered their energy procurement and related overhead costs from the regulated rates charged to their customers for the electricity they consumed. Generally, New York's electric sector regulator, the NYPSC, allowed utilities to collect sufficient revenues to recover costs and to provide a fair return on their capital investments. The NYPSC also served as a check on utilities exercising abusive monopoly pricing. Each utility controlled its own generation, transmission and distribution systems.



Warwick, W.M., *A Primer on Electric Utilities, Deregulation, and Restructuring of U.S. Electricity Markets*, Pacific Northwest National Laboratory (2002), Fig. 6.2.

## Restructuring

Starting in the 1990s, the US started separating wholesale and retail electricity markets. As previously discussed, there was also a movement among state and federal regulators to allow the generation of electric power to become a competitive market. The federal government regulates the portions of the electric industry that cross state lines, which are the high voltage transmission systems. In New York, the NYISO controls the wholesale electric markets, indicated in the middle box of the illustration below. Each state, however, still regulates the local distribution of electricity by local monopoly utilities, as well as some aspects of the intrastate transmission systems, and decides whether there should be competitive customer access to electricity supplies in the state. In states with competitive retail markets like New York, retail customers still purchase the services of transmission and distribution of electricity from their local utilities, but for the electricity commodity supply, i.e., the actual supply of electricity consumed, customers can choose to buy supply from an ESCO or from their local incumbent utility as they always have.

18



**Structure of the Deregulated Electric Supply System**

*Id.*

In the restructuring of the industry, allowing the wholesale electricity markets to supplant the local regulated power system was a major policy shift from the past. Previously, customers of all levels had to purchase both the commodity and the delivery of electricity from their local incumbent utility. They did not have a choice in suppliers. However, as previously discussed, the movement toward competitive markets for electric generators in the wholesale markets, which are under the federal government's jurisdiction, gave state utility regulators the opportunity to establish competitive markets for retail electric customers under their jurisdiction.

Restructuring broke up the power system's different vertical elements of each utility owning and operating their own generation, transmission and distribution systems (as seen on the figure on p. 18) and established the wholesale power market shown as in the figure above. Previously, virtually all decisions and prices had been closely regulated by either federal or state regulatory commissions that determined retail electric prices. In New York, this involved the creation of NYISO as the independent operator of the transmission grid in

19

the state. NYISO operates short-term (daily and hourly) markets for buying and selling electric energy, ancillary services and longer-term markets for transmission capacity. These markets set wholesale supply prices and allow utilities and ESCOs to buy the electric supply and other associated products necessary to serve their customers.

At the physical level, while end users in New York could now purchase supply from an ESCO, the actual role of these suppliers is quite limited vis-à-vis the power system. The local incumbent utilities (like Con Edison) that own the distribution facilities continue as regulated monopolies for operating the distribution system (i.e. the wires running down the street and up to a customer's home) within the region they serve. The local incumbent utilities also continue reading the utilities' meters and billing end users as part of their local monopoly franchise. The customers of the utilities in New York are still physically "hooked up" to the local utility, but after restructuring, third parties, i.e., ESCOs, now have access to use the local utility's distribution systems and are able to sell electricity directly to the local utility's customers using the local utility's wires.

An ESCO customer still receives all of the electricity it consumes from the local utility, which delivers the electricity, including electricity supplied by an ESCO, over electric power lines just as it always has. The local utility remains responsible for all the physical operation and maintenance of the local distribution system. ESCOs merely purchase electricity in the wholesale market, which is then delivered from the transmission system to the distribution system, and then delivered directly to the customer by the utility system.

ESCOs like Eligo do not produce, transmit, or distribute electricity to retail customers. They are intermediaries. They merely purchase electricity in the wholesale market and arrange for the supply from the wholesale energy market to be delivered to the local utility which then delivers the electricity to the ultimate customer. In that role, the ESCO is a "middleman." Once the electricity is delivered from the wholesale transmission system, the utility does almost everything else.

When the power market was being restructured, the prevailing policy belief at the time was that ESCOs would compete to serve retail customers and help lower prices. "Saving customers money was a crucial policy goal articulated by the [NYPSC] when the retail access market was initially opened." December 2019 Order at 40.

If a customer purchases their electricity from an ESCO, the customer's total electric bill cost equals the ESCO charge for the electricity (i.e., the supply charge which is in turn paid to the ESCO by the utility), and the utility's delivery charges. This means that the source of

20

the savings an ESCO customer will realize is the difference between the utility's standard supply charge and the presumably lower ESCO supply charge. The (1) delivery charges and (2) the taxes and surcharges are the same for both the default customer and the ESCO customer, so the delivery charges do not influence the level of savings. As a direct result, it is only the difference between the supply charges of the ESCO and the supply charges of the utility that changes the price the customer pays for electricity when it leaves the utility supply and signs up with an ESCO. The only way a customer who switches to an ESCO saves money is by paying the presumably lower price of the electricity supply charge from the ESCO than the previous supply charge of the utility. If the ESCO's supply charge is higher than that of the utility, the customer loses money by switching to the ESCO.

The stated public policy of the NYPSC for allowing the ESCO system to be established and operate was to enable retail customers to lower their costs compared to what the local monopoly utility provided and for retail customers to have more choices. The hoped-for result of establishing customer choice was that competition in the wholesale electric markets would allow ESCOs to be more efficient at reducing electricity costs by having more purchasing options in the wholesale electric markets than the utilities have. By ESCOs purchasing their electricity more efficiently and at lower costs than utilities, ESCOs would then resell that power to customers at a lower price than the utilities could achieve. The result would be that ESCOs would create savings for retail electric customers that the utilities could not provide.

Unlike the rates utilities charge in New York, which are straightforward variable rates, ESCOs do have the ability to offer a wide range of different rate plans, and at varying prices. Some ESCOs, including Eligo, sell to new customers by offering a lower introductory fixed rate. These introductory fixed rates are almost always lower than the utility rates, which becomes a selling point to attract customers.

Subsequently, however, at the end of the fixed-rate term, i.e., when the fixed-rate term expires, some ESCOs like Eligo switch customers to variable-rate plans, where the rates the customers are charged are no longer fixed. Over time, significant consumer protection issues have been recognized regarding "teaser" introductory rates[19] that are followed by much higher variable rates that are unrelated the wholesale costs ESCOs incurred to purchase electricity for resale to the retail customers.

---

[19] Magnet Marke, *4 Timeless Psychological Pricing Techniques to Increase Revenue*, https://magnetmarke.com/psychological-pricing/.

**State Legislative Action Addressing ESCO Variable Rate Abuses**

New York deregulated its retail energy markets to spur competition and consumer choice, but, as pointed out above, the transition resulted in widespread pricing abuse by certain ESCOs. In 2009, to respond to these abuses, New York enacted General Business Law ("GBL") § 349-d, the "Energy Services Company Consumers Bill of Rights," that addressed the deceptive marketing, opaque variable rate pricing calculations and unfair contract practices. This statute, together with the NYPSC's Uniform Business Practices ("UBP") and subsequent rulemakings, established clear disclosure requirements for ESCOs, purposefully limited abusive ESCO contract terms, and enhanced customer initiated cancellation and renewal protections.

The Legislature observed:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity. Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.

> \* \* \*

> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, short-term "teaser" rates followed by skyrocketing variable prices -- many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[20]

To address these abuses, the legislative intent was that "all variable charges must be clearly and conspicuously identified." This intent was codified in GBL § 349-d, ¶ 7, which states:

---

[20] ESCO Consumers Bill of Rights, N.Y. Sponsor's Mem., 2009 A.B. 1558, at 1 (2009).

> In every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified.

The Legislature also specifically barred the use of deceptive practices in ESCO customer sales, which was codified in GBL § 349-d, ¶ 3, which states:

> No person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services.

The Legislature also authorized a right of private action by any person who has been injured by reason of any violation of § 349-d to enjoin such unlawful act or practice and/or recover actual damages or $500, whichever is greater. *See* GBL § 349-d, ¶ 10.

It is my understanding that, in 2023, the Legislature further amended GBL § 349-d to require ESCOs to obtain customers' express consent for any change from fixed to variable rates. GBL § 349-d(6).[21] This amendment became effective in 2024. Prior to the amendment, GBL § 349-d(6) already required ESCOs to obtain express for material changes to the terms or duration of an ESCO contract. However, and critically, the amendment now makes clear to ESCOs that switches between fixed and variable pricing plans are material changes requiring express customer consent.

The statement of justification included in the New York State Assembly memorandum in support of the bill leading to the amendment is instructive:

> Recent reports state that New York's energy service companies charge some of the highest residential energy costs in the[] United States. With that in mind it is essential that consumers have the ability to make informed choices[] when it comes to signing a contract for energy services. This legislation is intended to insure that New Yorkers have full disclosure to any

---

[21] Press Release, N.Y. State, Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills (Sept. 30, 2023), https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills.

material change in price or in contract terms that may be proposed by their energy provider. In this manner it can be ensured that the consumer consents to the changes.[22]

**Other States Taking Action**

The problem of abusive ESCO pricing practices was not isolated to New York. Other state legislatures have also taken additional steps to combat ESCO variable rate abuses. For example, in October 2015, Connecticut banned variable-rate plans for consumers.[23] In May 2024 Maryland prohibited ESCOs from charging variable rates that "exceed the trailing 12–month average of the electric company's standard offer service rate in the electric company's service territory[.]"[24] In May 2025, Ohio enacted House Bill 15 (HB15) which provides: two advance notices before fixed-rate plans transition to variable rates, annual reminders for customers remaining on variable-rate plans, and strict labeling requirements: ESCOs can only market contracts as "fixed" if price remains constant throughout the contract duration, clear explanations required for variable rate changes and methodologies.[25]

**Renewable Energy Credits ("RECs")**

After the NYPSC's December 2019 Order went into effect in April 2021, ESCOs that wanted to offer variable-rate plans to residential and small commercial customers needed to sell a product that was supported by renewable sources, such as solar or wind.[26] Because ESCOs like Eligo do not generate their own electricity, this requirement is met through REC

---

[22] Consumer Protection in Energy Contracts, N.Y. Sponsor's Mem., 2023 A.B. 703-A, at 1 (2023), https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A00703&term=2023&Memo=Y.

[23] Press Release, State of Conn., *Consumer Protection Legislation and Rights Against Third Party Electricity Suppliers* (Dec. 17, 2021), https://portal.ct.gov/heatinghelp/knowledge-base/articles/consumer-protection-legislation-and-rights-against-third-party-electricity-suppliers?language=en_US.

[24] M.D. S.B. 1, 2024 Leg., Reg. Sess., https://legiscan.com/MD/bill/SB1/2024.

[25] Price to Compare, *What Ohio Electricity Customers Should Know About the New Rate Notice Law* (July 10, 2025), https://www.pricetocompare.com/blog/what-ohio-electricity-customers-should-know-about-the-new-rate-notice-law/.

[26] December 2019 Order at 77.

purchases. A REC certifies that 1 megawatt-hour of electricity was produced from a renewable electric generation source and delivered to the New York grid, i.e., the NYISO. For example, a solar power plant produces electricity using solar energy, which is renewable power. An ESCO can purchase RECs from the plant operator to fulfill its obligation of supplying renewable energy. In essence, for ESCOs, RECs became another cost line item that contributed to their overall supply procurement costs.

New York chose to prioritize some RECs over others. The most valuable category within New York's REC framework is Tier 1 RECs, which come from renewable facilities that began commercial operation on or after January 1, 2015. These include solar photovoltaic and thermal systems, onshore and offshore wind, low-impact run-of-river hydroelectric facilities, fuel cells using non-fossil fuels and qualified biogas and biomass resources.[27] Under the state's Clean Energy Standard, Load Serving Entities ("LSEs") including utilities and ESCOs must meet progressively increasing renewable energy obligations—6.45% in 2024, rising toward 70% by 2030.

New York RECs operate within a tracking and trading infrastructure centered on NYGATS, which serves as the registry for all RECs generated within or imported into New York.[28] Trading occurs through multiple channels designed to serve different market participants. NYSERDA operates voluntary REC sales programs offering transparent pricing through annual Pre-Sales (typically July-August) and Re-Sales (February) for entities seeking compliance-grade RECs. Large purchasers can also enter long-term contracts with NYSERDA at net-weighted average costs plus administrative fees. Private market participants engage in bilateral contracts directly with renewable generators or trade RECs through the NYGATS platform. All transactions are recorded in NYGATS for specific compliance or voluntary purposes, creating a permanent record that prevents double counting.[29]

---

[27] Energy By 5, *Understanding RECs In New York* (June 20, 2024), https://www.energyby5.com/blogs/understanding-recs-in-ny-2024.

[28] New York State Energy Research and Development Authority, *NYGATS, Operating Rules, Ver. 2.4*, at 2 (June 2, 2023), https://www.nyserda.ny.gov/-/media/Project/Nyserda/Files/Programs/NYGATS/Operating-Rules.pdf.

[29] New York State Energy Research and Development Authority, *Voluntary Sales – Vintage 2025*, https://www.nyserda.ny.gov/All-Programs/Clean-Energy-Standard/Voluntary-REC-Sales/Tier-1-REC-Voluntary-Sale/2025-Voluntary-Sales.

Under the 2019 Reset Order, ESCOs can only offer renewable electric products without price caps, which are mandatory limits on the prices ESCOs can charge their customers, if their renewable mix is at least 50% greater than the applicable year's RES obligation.[30]

**REC Cost Analysis: Reasonable Pricing Structure**

New York RECs are reasonably priced within the context of retail electricity markets. Current NYSERDA pricing for a 2025 vintage Tier 1 RECs is $25.07 per megawatt hour, with 2026 vintage RECs priced at $23.96.[31]

The cost of New York RECs creates negligible burden on ESCO operations serving mass market customers, particularly when considered against the regulatory benefits of price cap exemption. The relatively modest monthly cost per customer provided ESCOs with substantial pricing flexibility for renewable products (although still constrained by the ESCO's contractual obligations and other applicable constraints on ESCO profiteering), eliminating regulatory caps that otherwise restrict pricing to trailing 12-month utility averages. For an ESCO capable of commanding even modest margins, the REC investment provides a fair return.

**Chapter 3 - Eligo's Customer Experience**

**Enrollment**

*Plaintiff Michelle Schuster*

I understand that Eligo claims to have initially solicited Plaintiff Michelle Schuster by leaving her a voicemail and that she then returned Eligo's call. I understand that the voicemail was not saved. A call from Ms. Schuster to Eligo was recorded and produced by Eligo in the litigation.

---

[30] December 2019 Order at 108. In New York, the "RES obligation" refers to the Renewable Energy Standard obligation, which requires load-serving entities (LSEs) to procure new renewable energy and purchase Renewable Energy Certificates (RECs) to fulfill their load-share of the state's clean energy goals. LSEs must meet their annual obligation by purchasing Tier 1 RECs.

[31] New York State Energy Research and Development Authority, *Voluntary Sales – Vintage 2026*, https://www.nyserda.ny.gov/All-Programs/Clean-Energy-Standard/Voluntary-REC-Sales/Tier-1-REC-Voluntary-Sale/2026-Voluntary-Sales.

On October 6, 2016, Ms. Schuster called Eligo back and spoke to Eligo's representative. The representative stated that Eligo was offering a fixed rate on the supply portion of Ms. Schuster's bill. The representative offered to compare Eligo's fixed rate offering with the rate Ms. Schuster had been paying. The representative mentioned saving money on the bill during winter months. The review of Ms. Schuster's electric bill revealed that she was paying approximately 11 ¢/kWh. Eligo's representative told Ms. Schuster that it was offering 5.49 ¢/kWh, enticing Ms. Schuster to switch to Eligo to save money on her electric bill.

Ms. Schuster asked what was going to happen after that, and the representative stated that after three months, Ms. Schuster would become eligible for the fixed rate offered by Eligo at the time. The representative explained that "they [Eligo] keep you lower than what the current suppliers are charging." At no point did the representative mention the variable rate or any information related to the variable rate.

After Ms. Schuster gave the representative her utility account number, she was transferred to Eligo's third-party verification ("TPV") provider, which presented a recorded, push-button system that prompted Ms. Schuster to make certain acknowledgements. Ms. Schuster followed the prompts. The recording stated that she was enrolling for on a fixed-rate plan at a rate of 5.49 ¢/kWh for the first three months and thereafter would continue on a month-to-month rate "based on market and wholesale factors, weather patterns, and pricing strategies."

Following the enrollment, Eligo sent Ms. Schuster its form Welcome Letter, the Terms of Service, Agreement Summary and ESCO Consumers Bill of Rights.

Eligo's Terms of Service have the following box on the first page:

**Eligo Energy NY, LLC Terms of Service**
**New York - Residential Customer**
This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of Rochester Gas and Electric ("RG&E" or "Utility").

| | |
|---|---|
| Price | First 3 months at a fixed rate of $0.05490 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 3 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

Amended Complaint, Ex. A at 3 (yellow highlight added).

The "[V]ariable price is determined" section states:

> Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price.

The Pricing Term in Eligo's Terms of Service does not explain what the terms "market pricing," "transportation costs," or "other market price factors" mean. The Pricing Term does not disclose what values or weights Eligo assigns to each of those rate components when "calculating" customers' rates "on a monthly basis in response" to those criteria. Further, when Eligo's monthly variable rate is included in the customer's utility bill, the rate is not broken down by those (or any other) criteria and no calculation is presented.

The "price" section of the same box on the Terms of Service's first page also discloses Ms. Schuster's fixed rate and states that "[t]hereafter, monthly variable kWh rate that may be periodically adjusted for market conditions." When Eligo's corporate representative was asked about this, he testified that the "factors" listed in the "[v]ariable price is determined" box explain the meaning of the term "market conditions." Eligo Oct. 29, 2024 30(b)(6) Dep. [49:15–21].

Ms. Schuster received the fixed rate of 5.49 ¢/kWh for three months following the switch to Eligo. After the three months expired, Eligo switched her to a variable rate and soon started charging variable rates that were exceptionally high.

28

Based on Eligo's statement in the Pricing Term defining how "[v]ariable price is determined," there was no good reason for Ms. Schuster to expect that Eligo would charge such rates, much less that Eligo would later start using an artificial intelligence program to extract the highest possible rate that Ms. Schuster would not notice.[32] As discussed in Chapter 4 below, this was not what she expected from Eligo.

*Former Plaintiff Ira Brous*

Ira Brous's name was listed on his family's utility bills, but his widow Anne Brous was generally responsible for interacting with various service providers for their home, including the couple's utility account.

On July 12, 2017, Anne Brous was recorded on Eligo's TPV call. The call was like Ms. Schuster's, except Eligo claims there is no recording of the sales portion of the call. Ms. Brous followed the prompts. The pre-recorded system stated that she was enrolling for a fixed-rate plan at a rate of 7.99 ¢/kWh for the first six months and that thereafter the service would continue on a month-to-month rate "based on market and wholesale factors, weather patterns, and pricing strategies."

Following the enrollment, Eligo mailed its Welcome Letter, the Terms of Service, Agreement Summary and ESCO Consumers Bill of Rights.

The Pricing Term in the Brous Terms of Service is the same as the one Eligo used for Ms. Schuster. The box on the front page of Eligo's Terms of Service has the same statement regarding how "[v]ariable price is determined" and states that "all" Eligo variable rates "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." This language establishes the false notion that the price the Brous family would pay would be related to the costs of electricity in the wholesale markets that Eligo purchased for resale to its customers.

Here is an image of the relevant section of Eligo's Terms of Service:

---

[32] Carson, *Deception and Withholding Information In Sales*, at 279, 286.

**Eligo Energy NY, LLC Terms of Service**

**New York - Residential Customer**

This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of New York State Electric and Gas Corporation ("NYSEG" or "Utility").

| | |
|---|---|
| Price | First 6 months at a fixed rate of $0.07990 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 6 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

Amended Complaint, Ex. A at 3.

The Brous family received the fixed rate of 7.99 ¢/kWh for three months following the switch to Eligo. After the three months expired, they were charged variable rates that were exceptionally high.

Like with Ms. Schuster, based on Eligo's statement in the Pricing Term about how "[v]ariable price is determined," there was no good reason for the Brous family to expect that Eligo would charge such rates, much less that Eligo would later start using an artificial intelligence program to extract the highest possible rate that the Brous family would not notice. As discussed in Chapter 4 below, this was not what Ms. Brous expected from Eligo.

**Customer Bills**

Once a customer switches to an ESCO like Eligo, there is no change in the electricity delivered. The electricity continues to flow as it did when it was supplied by the utility and the utility continues to deal with infrastructure, outages and emergencies. The only difference is that the ESCO now sets the electricity supply rate which is substituted for the utility's electric supply rate in the customer charges. The savings for the customer is the extent to which the ESCO supply rate is lower than the utility's supply rate. The customer's clear expectation is that the ESCO supply rate will, in fact, be generally lower than the utility supply rate and the customer will experience overall savings.

*Plaintiff Michelle Schuster*

Below are the pages of Ms. Schuster's RG&E bill from August 31, 2021. Pages, 1, 3, 4 and 6 are reproduced, pages 2 and 5 contain standard messages and information.

On page 1 in the Consolidated Account Summary section, the bill states "ELIGO ENERGY NY LLC Chgs 177.41." On page 3, the bill provides "RG&E Detailed Account Activity." In the Electricity section, the bill states: "Electricity Rate - ESCO Supply Service," indicating that electricity is supplied by an ESCO. The bill then breaks down "Electricity Delivery Charges," which are comprised of "Customer charge," "Delivery charge," "Transition charges [for July and August, separately]," "Revenue decoupling mech (for July and August, separately)," and "SBC charge." The Subtotal Electricity Delivery charges equal $76.56.

Irrespective of whether electricity is supplied by the utility or an ESCO (and irrespective of which ESCO), the utility's delivery charges remain the same.

Page 6 of the bill lists the name and contact information of the ESCO, in this case Eligo, and its contact information. In the Electricity Supply Detail, the bill lists

| Energy charge | 1078 kwh @ 0.16 | 172.48 |
|---|---|---|
| Energy charge | | 4.93 |

The bill indicates that Ms. Schuster used 1078 kwh and Eligo set the variable rate at 16 ¢/kwh. The second charge is a fixed fee that is not referenced anywhere in the Terms of Service Eligo sent to Ms. Schuster.

31



## RG&E

| MICHELLE SCHUSTER | |
|---|---|
| **Account Number:** | |
| **Statement Date:** | August 31, 2021 |
| **Amount Due:** | |

*Service Address:*                                                                                     Page 1 of 6

*Next Scheduled Read Date:* On or about October 26, 2021

EBPP

### Consolidated Account Summary

| | |
|---|---|
| Previous invoice | $436.36 |
| Payments received as of 08/30/21 | -872.72 |
| Balance forward | $-436.36 |
| RG&E miscellaneous charges | 0.47 |
| Budget billing amount | 142.00 |
| ELIGO ENERGY NY LLC Chgs | 177.41 |
| **Payment due upon receipt.** | **$-116.48** |

Residential

Residential consumer
discount $ 2.31

See details beginning
on page 3

See messages on page 2

To avoid a 1.5% late payment charge, please ensure payment is
received by the date displayed below.

### Budget Billing Summary          Plan End Date: 11/2021

| Current Month | Actual Charges since 12/01/20 | Budgets Billed since 12/01/20 | Budget Balance (after payment) |
|---|---|---|---|
| 142.00 | 1,304.09 | 1,278.00 | 26.09 |

Think of the minutes, money and
natural resources you'll save by doing
business online or by phone 24/7.

Visit **rge.com** to:
• View and pay your bill online
• Submit and view meter readings
• Enroll and manage budget billing
• Enroll in Autopay

Call our self-service line at
**1.800.295.7323** for billing information,
provide a meter reading and to pay by
phone.

Add $1, $2, or $5 to your payment to
make a tax-deductible donation to
RG&E and NYSEG Project SHARE
Heating Fund. Learn more at rge.com.

---

Please return bottom portion with your payment. Make checks payable to RG&E.

## RG&E

| Account Number | |
|---|---|
| | |
| **Late Fee After** | |
| 09/23/21 | |
| **Due Upon Receipt** | |
| 0.00 | |
| **Amount Paid** | |
| $ | |


RG&E
P.O. BOX 847813
BOSTON, MA 02284-7813

MICHELLE SCHUSTER

Please do not write below this line.

 **RG&E**

MICHELLE SCHUSTER

**Account Number:** ▮▮▮▮▮▮▮▮

**Statement Date:** August 31, 2021

---

**Service Address:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Page 3 of 6

*RG&E DETAILED ACCOUNT ACTIVITY*

💡 *Electricity Service - PSC19 SC1 - Residential*  Service from: 07/28/21 - 08/25/21
*Electricity Rate -  ESCO Supply Service*  PoD ID:  R01000034829275

| Meter Number | Current Meter Read Date | Reading | Previous Meter Read Date | Reading | Reading Difference | Billed Usage | Billing Period |
|---|---|---|---|---|---|---|---|
| 21237618 | 08/25/21 | 2976 A | 07/28/21 | 1898 E | 1078 | 1078 kwh | 29 days |

Type of read: A - Actual, E - Estimate, C - Customer, R - Remote and N - No read

**Electricity Delivery Charges**

| | | | | | |
|---|---|---|---|---|---|
| Customer charge | | | | | 21.70 |
| Delivery charge | 1078 | kwh | @ | 0.04977 | 53.65 |
| Transition charge - Jul | 148 | kwh | @ | -0.0019124 | -0.28 |
| Transition charge - Aug | 930 | kwh | @ | -0.0020324 | -1.89 |
| Revenue decoupling mech - Jul | 148 | kwh | @ | 0.002045 | 0.30 |
| Revenue decoupling mech - Aug | 930 | kwh | @ | -0.003247 | -3.02 |
| SBC charge | 1078 | kwh | @ | 0.005655 | 6.10 |

**Subtotal Electricity Delivery** $76.56

**Electricity Taxes and Surcharges**

| | | | | |
|---|---|---|---|---|
| Taxes on delivery charges | | @ | 2.0408% | 1.56 |

**Subtotal Electricity Taxes and Surcharges** $1.56

**Total Electricity Cost** $78.12

🔥 *Gas Service - PSC16 SC1 - Residential*  Service from: 07/28/21 - 08/25/21
*Gas Rate - RG&E Supply*  PoD ID:  R02000034829283

| Meter Number | Current Meter Read Date | Reading | Previous Meter Read Date | Reading | Reading Difference | Billed Usage | Billing Period |
|---|---|---|---|---|---|---|---|
| 00565387 | 08/25/21 | 8015 E | 07/28/21 | 8011 E | 4 | 4 ccf | 29 days |

Type of read: A - Actual, E - Estimate, C - Customer, R - Remote and N - No read

**Natural Gas Delivery Charges**

| | | | | |
|---|---|---|---|---|
| Natural gas used (ccf) | 4 | | | |
| Energy content factor | x 1.031400 | | | |
| Natural gas used (therm) | 4.1 | | | |
| Customer charge | | | | 17.30 |
| Included in customer charge | 3.0 | therm @ | 0.00 | 0.00 |
| Delivery charge for next | 1.1 | therm @ | 0.27644 | 0.30 |
| Revenue decoupling mech | 4.1 | therm @ | 0.001977 | 0.01 |
| Transition surcharge | 4.1 | therm @ | 0.001338 | 0.01 |

**Subtotal Natural Gas Delivery** $17.62

**Natural Gas Supply Charges**

| | | | | |
|---|---|---|---|---|
| Supply charge - August | 4.1 | therm @ | 0.446738 | 1.83 |
| Merchant function charge | 4.1 | therm @ | 0.017833 | 0.07 |

**Subtotal Natural Gas Supply** $1.90

**Natural Gas Taxes and Surcharges**

| | | | |
|---|---|---|---|
| Taxes on delivery charges | @ | 3.0928% | 0.54 |
| Taxes on supply charges | @ | 1.0101% | 0.02 |

**Subtotal Natural Gas Taxes and Surcharges** $0.56

 **RG&E**

|  | MICHELLE SCHUSTER |
|---|---|
| **Account Number:** | |
| **Statement Date:** | August 31, 2021 |

| *Service Address:* | Page 4 of 6 |
|---|---|

| **Total Natural Gas Cost** | **$20.08** |
|---|---|

| **Total Energy Charges** | **$98.20** |
|---|---|

## Usage Chart Information



Electricity Daily Average Comparisons

| Billing Period | Average Daily Use | Average Daily Temp |
|---|---|---|
| Aug-21 | 37 kwh | 72° F |
| Aug-20 | 62 kwh | 72° F |



Natural Gas Daily Average Comparisons

| Billing Period | Average Daily Use | Average Daily Temp |
|---|---|---|
| Aug-21 | 0 therm | 72° F |
| Aug-20 | 0 therm | 72° F |

## Miscellaneous Charges

| 08/31/21 | Payment & billing svcs charge | 0.46 |
|---|---|---|
| 08/31/21 | Payment & billing svcs GRT | 0.01 |

| **Total Miscellaneous Charges** | **$0.47** |
|---|---|

34

MICHELLE SCHUSTER

*Account Number:*

*Statement Date:*    August 31, 2021

*Service Address:*    Page 6 of 6

ELIGO ENERGY NY LLC
201 W LAKE ST STE 151
CHICAGO IL 60606-0239

www.eligoenergy.com    Account number:

Please call 888-744-8125 with
questions concerning your bill.

**Messages**

**Electricity Supply Detail**

| | | | | | |
|---|---|---|---|---|---|
| Energy charge | 1078 kwh | @ | 0.16 | | 172.48 |
| Energy charge | | | | | 4.93 |
| Current Electricity Supply Charges | | | | | $177.41 |

*Former Plaintiff Ira Brous*

Below are the pages of the Brous family's NYSEG bill from November 4, 2022. Pages, 1, 3, and 5 are reproduced, pages 2 and 4 contain standard messages and information.

On page 1, in the Consolidated Account Summary section, the bill states "ELIGO ENERGY NY LLC Chgs 264.08." On page 3, the bill provides "NYSEG Detailed Account Activity." In the Electricity section, the bill states: "Electricity Rate – 12001 ESCO Supply Service," indicating that electricity is supplied by an ESCO. The bill then breaks down "Electricity Delivery Charges," which are comprised of "Basic service charge," "Delivery charge," "Transition charges," "Revenue decoupling mech," and "SBC charge." The Subtotal Electricity Delivery charges equal $73.68.

Irrespective of whether electricity is supplied by the utility or an ESCO (and irrespective of which ESCO), the utility's delivery charges remain the same.

Page 5 of the bill lists the name and contact information of the ESCO, in this case Eligo, and its contact information. In the Electricity Supply Detail, the bill lists

35

| Energy charge | 1058 kwh @ 0.24 | 253.92 |
| State and Local Sales Tax | | 10.16 |

The bill indicates that the Brous family used 1058 kwh and Eligo set the variable rate at 24 ¢/kwh. The second charge is sales tax.





**NYSEG**

| | |
|---|---|
| | IRA BROUS |
| Account Number: | ▇▇▇▇▇▇ |
| Statement Date: | November 04, 2022 |

Service Address: ▇▇▇▇▇▇▇▇▇▇▇                           Page 3 of 5
*NYSEG DETAILED ACCOUNT ACTIVITY*

 Electricity Service - Residential          Service from:  10/06/22 - 10/31/22
   Electricity Rate -  12001 ESCO Supply Service     PoD ID:     N01000000598417

| Meter Number | Current Meter Read Date | Reading | Previous Meter Read Date | Reading | Reading Difference | Billed Usage | Billing Period |
|---|---|---|---|---|---|---|---|
| 52534041 | 10/31/22 | 85779 E | 10/06/22 | 84721 A | 1058 | 1058 kwh | 26 days |

Type of read: A - Actual, E - Estimate, C - Customer, R - Remote and N - No read

**Electricity Delivery Charges**

| | | | | | |
|---|---|---|---|---|---|
| Basic service charge | | | | | 17.00 |
| Delivery charge | 1058 | kwh | @ | 0.05095 | 53.91 |
| Transition charge | 1058 | kwh | @ | 0.00037819 | 0.40 |
| Revenue decoupling mech | 1058 | kwh | @ | -0.002073 | -2.19 |
| SBC charge | 1058 | kwh | @ | 0.004311 | 4.56 |

Subtotal Electricity Delivery                                      $73.68

**Electricity Taxes and Surcharges**

| | | | |
|---|---|---|---|
| Taxes on delivery charges | @ | 2.0408% | 1.50 |
| County sales tax | @ | 4.0000% | 3.01 |

Subtotal Electricity Taxes and Surcharges                          $4.51

**Total Electricity Cost**                                        **$78.19**

**Total Energy Charges**                                          **$78.19**

**Usage Chart Information**

Historical Electricity Consumption

| Billing Period | Average Daily Use | Average Daily Temp |
|---|---|---|
| Nov-22 | 41 kwh | 49° F |
| Nov-21 | 36 kwh | 55° F |

Electricity Daily Average Comparisons

37



IRA BROUS

Account Number: ▓▓▓▓▓▓▓▓

Statement Date: November 04, 2022

Service Address: ▓▓▓▓▓▓▓▓

Page 5 of 5

ELIGO ENERGY NY LLC
201 W LAKE ST STE 151
CHICAGO IL 60606-0239

**EligoEnergy**
www.eligoenergy.com

Please call 888-744-8125 with
questions concerning your bill.

Account number: ▓▓▓▓▓▓▓▓

**Messages**

**Electricity Supply Detail**

| | | | | |
|---|---|---|---|---|
| Energy charge | 1058 kwh | @ | 0.24 | 253.92 |
| State and Local Sales Tax | | | | 10.16 |
| Current Electricity Supply Charges | | | | $264.08 |

## Chapter 4 – Eligo's Predatory Business Model

Based on my more than forty-five years of experience in the energy industry, and expertise in fundamental principles of business ethics, consumer behavior and marketing, it is my expert opinion that the Pricing Term in Eligo's Terms of Service substantially misrepresented how Eligo determined customers' variable rates. As an academic, for almost two decades I have taught public administration college courses on business and government ethics. It is clear that when a seller intentionally withholds important information during negotiations to achieve a buyer's assent, that bargaining tactic is a serious violation of commonly accepted business ethics.[33] This is often categorized as a sin of omission[34] in ethical frameworks that have developed over centuries, and history has shown is often done in hopes of consummating an unfair transaction in which, for as long

[33] *How Ethics In Business Drive Success*, Seattle University (Dec. 28, 2022), https://www.seattleu.edu/business/online/albers/blog/how-ethics-in-business-drive-success; Carson, *Deception and Withholding Information In Sales*, at 279.

[34] Cramton, Peter C. et al., *Promoting Honesty In Negotiation: An Exercise In Practical Ethics*, 3 Business Ethics Quarterly 1, 2–3 (1993), https://cramton.umd.edu/papers1990-1994/93beq-promoting-honesty-in-negotiation.pdf.

as possible and relying on the buyer not recognizing the deception, the seller substantially benefits and the buyer is substantially penalized.[35]

## The Effect Of Asymmetry Of Transactional Understanding

The academic literature consistently identifies information asymmetry between a seller and buyer as a problematic feature of business relationships when one party, particularly the one with significantly more information, gains an advantage by conducting the sales process unethically.[36] As noted in research on transactional information asymmetry, when "one party has more information than the other, that is, knows the truth while the other is deceived," this creates market failures and undermines efficient economic functioning.[37] Scholars argue that "an efficient market requires properly matched information" and that withholding crucial information "represents a market failure."[38]

While perfect symmetry between the parties in most seller/buyer transactions is impossible to achieve, our social systems and societal economics depend on good faith and fair dealing to foster economically healthy commercial transactions.[39] This condition mandates that any lack of informational symmetry in the business relationship between a seller and buyer must be handled in a commercially reasonable manner.[40] In any transaction, both parties are seeking a "bargain" that represents a mutually beneficial transaction that serves the interests of both parties.[41] The whole point of fair and ethical negotiations is to conclude a transaction that results in both parties being better off as a result the transaction than both were before the transaction. The result of an ethically

---

[35] Luguri, Jamie et al., *Shining a Light on Dark Patterns*, 13 Journal of Legal Analysis 43, 81 (2021), https://doi.org/10.1093/jla/laaa006.

[36] Nye, Yujia et al., *The Economics Of Information Unraveling Asymmetric Information And Market Failure*, 24 Journal of Economics and Economic Education Research 1, 1–2 (2023), https://www.abacademies.org/articles/the-economics-of-information-unraveling-asymmetric-information-and-market-failure.pdf

[37] Sherwood, *A Lie Is A Lie: The Ethics Of Lying In Business Negotiations*, at 14.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] Cooter, Robert D., et al., *Theory of Bargaining*, Public Law and Economics, at 11 (Sept. 2022), https://academic.oup.com/book/44439/chapter/376361718?login=false.

negotiated transaction is a bargain that will be beneficial to both parties. In other words, the ethical conduct of both parties results in an economically efficient exchange in which both sides seek to fairly achieve the benefits each believed it bargained for.[42]

Importantly, economic efficiency also benefits the larger economy by creating new wealth (i.e., both sides win), enlarging the productivity of the economy as a whole and increasing social wealth and general welfare.[43] A seller's behavior that fails to disclose important aspects of a transaction to a buyer by misrepresentation or actively concealing significant aspects of the transaction that overly benefit the seller and significantly harm the buyer's opportunity to achieve the benefits of the bargain represents a substantial ethical breach that is not commercially reasonable and that in economic terms creates a "market failure."[44] This not only harms the buyer by depriving the buyer of the bargained-for benefits of the transaction, but also negatively affects the overall economy.[45] Unfortunately, that is how Eligo routinely conducts itself.

To properly weigh the negative impact of Eligo's behavior, one must consider an economy in which violating the tenets of ethical behavior is commonly accepted in negotiating commercial transactions.[46] That would be an economy in which all sellers, using their inherent information advantage, constructively manipulate the presentation of the terms and conditions of a proposed transaction to low information buyers to close a transaction that significantly benefits the sellers and significantly harms the buyers.[47] Most would agree that is not an economy in which most businesses would like to transact business.[48]

---

[42] Tomlinson, Luke, *Fair Bargaining; Voluntariness And Reciprocity*, Procedural Justice in the United Nations Framework Convention on Climate Change, at 134 (2015).

[43] Cooter et al., *Theory of Bargaining*, at 12.

[44] LaMarco, Nicole, *The Effects Of Corruption On Business*, Chron, https://smallbusiness.chron.com/effects-corruption-business-52808.html.

[45] Carey, Isaac, *A Study Of The Impact Of Social Trust On Economic Growth And Defining A Potential Threshold For 'High Trust' In Economic Research*, Skidmore College, at 1 (May 6, 2024), https://creativematter.skidmore.edu/cgi/viewcontent.cgi?article=1171&context=econ_studt_schol.

[46] Sherwood, *A Lie Is A Lie: The Ethics Of Lying In Business Negotiations*, 13–17.

[47] *Id.*

[48] *See, e.g.*, *The Impact Of Unethical Behavior & Business Practices On Company Reputation*, Red Flag Reporting (Dec. 21, 2023), https://www.redflagreporting.com/the-impact-of-unethical-behavior-on-company-reputation/.

In my expert opinion, the form of transaction that Eligo routinely pursues represents exactly that form of unethical negotiation of a commercial transaction, i.e., it is not handled in a "commercially reasonable" manner. Eligo's Pricing Term and sales process substantially misrepresent Eligo's variable rate pricing practices. In particular, Eligo misrepresents the customer's experience in multiple critical and interconnected ways. First, by signing up with Eligo, the buyer passively consents to a preprogrammed switch from the low-cost, fixed-rate contract to a variable-rate plan—a switch triggered automatically when the fixed term ends, without any action by the customer or meaningful notice from Eligo. Second, before the switch Eligo misleads customers about how that variable rate is determined, falsely claiming it is based on technical-sounding, market-driven criteria. In reality, once the switch occurs, Eligo abandons its promised market-based calculation and instead uses a completely different pricing arrangement that is designed to create the largest possible financial advantage for Eligo. In this scenario, Eligo used its superior electric market information advantage to substantially misrepresent the benefits described by Eligo's Terms of Service and the overall proposed transaction to the buyer.[49]

In the language of business ethics, Eligo's sales process and post transaction behavior represents:

(1) Breach of Transparency and Honesty: Ethical business practice demands transparency and honesty in dealings. Withholding crucial information important to the buyer directly contradicts this principle, undermining trust and creating an uneven playing field.[50]

(2) Information Asymmetry and Exploitation: The seller, possessing more information, gains an unfair advantage, potentially exploiting the buyer's lack of knowledge to secure a better deal for themselves. This can lead to the buyer making decisions they would not have made with full information, such as paying too much or purchasing something that doesn't meet their needs or expectations.[51]

---

[49] Akerlof, George A., *The Market For "Lemons": Quality Uncertainty And The Market Mechanism*, 84 The Quarterly Journal of Economics 3, 488, 490 (Aug. 1970), https://www.sfu.ca/~wainwrig/Econ400/akerlof.pdf.

[50] *See id.*; *see also* Jolly, Bandana P.K., *Asymmetric Information – Cause Of Market Failure*, 4 International Journal of Trend in Research and Development, 42, 43 (2017), https://www.ijtrd.com/papers/IJTRD7721.pdf.

[51] Akerlof, *The Market For "Lemons": Quality Uncertainty and the Market Mechanism,* at 490.

41

(3) Undermining Fair Bargaining: Fair bargaining depends on both parties having access to essential information to make informed decisions. Withholding information disrupts this process, making it impossible to reach a truly fair and mutually beneficial agreement. [52]

## Why Ethical Behavior Is Important In Commercial Transactions

Besides "feeling good" about how an ethical transaction is carried out, commercial transactions that arise through the ethical behaviors by the parties involved have been demonstrated to create substantial and important societal benefits.[53] Ethical transaction structures have been proven to foster efficient economic markets and efficient markets create significant economic benefits by increasing the level of general welfare.[54] There are strong public policy and economic reasons to require ethical behavior. For that reason, unethical behavior is often cited in the law and punitive damages are often awarded in litigation when unethical behavior in commercial transaction results in damages to a party.

## Eligo's Misleading Description of How "Variable Price is Determined"

Eligo represented in its Terms of Service that the variable price would be calculated based on conditions in the wholesale electricity market. As stated:

> "Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price."

This raises the question of how reasonable potential customers understand terms like "market pricing," "transportation costs" and "other market price factors" that Eligo chose to use in its customer contract when describing how "[v]ariable prices is determined."

In my experience in dealing with people who are interested in purchasing an energy commodity for their personal or small business use, when they are told that the pricing of the purchase of that energy product would be based on "market pricing", they reasonably

---

[52] *See* Fisher, Roger et al., *Getting To Yes: Negotiating Agreement Without Giving In,* Ch. 8 (2011).

[53] *How Ethics In Business Drive Success*, Seattle University (Dec. 28, 2022), https://www.seattleu.edu/business/online/albers/blog/how-ethics-in-business-drive-success.

[54] Endorfer, Richard et al., *What's The Point of Efficiency? On Heath's Market Failures Approach*, 34 Business Ethics Quarterly 35, 39–43 (2022), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/A4FB0D20853D6B0AD7100AC934AB6907/S1052150X22000215a.pdf/whats-the-point-of-efficiency-on-heaths-market-failures-approach.pdf.

expect the prices to be somewhat volatile because they are used to viewing markets like those for gasoline, heating oil, electricity, and natural gas and have had experience with that volatility in their personal lives.[55] In this case, the energy that will be purchased is electric power. The term "transportation costs" would be reflective of a reasonable person's thoughts on the tankers and trains and trucks that transport oil to and from terminals and ultimately to a gas station. For electricity, consumers can also observe utility poles and wires all around their neighborhood and places of business that deliver the electricity and recognize that the cost of having those wires is a transportation cost. The catchall term "other market factors" would reasonably signify other minor additional cost factors that are secondary to the market price of the commodity. This is like the common catchall "plus taxes and fees" or "plus taxes and other charges" that alerts the customer to the price that the total price includes some small subset of mandated charges and other potential costs that will be passed through. The catchall tells the customer not to be surprised by these small pass-throughs but also assures the buyer that they are relatively unimportant in the overall context, such that they can be referred to generically as "other" factors that are related to the specifically identified and more important "factors." Eligo's contract reinforces this when it says in the next sentence that "[a]pplicable taxes will also be factored into the variable price."

Further, it is common knowledge that energy commodity products that are sold at the consumer level are based on larger markets. For instance, it is a normal perception that gasoline is priced by the underlying international market for oil. Recent volatility in the oil markets always shows up in the gasoline markets, so it is a common conception that any energy product, including electricity, is based on some larger underlying energy market that would cause the prices to rise and fall. In fact, purchasers that I have dealt with when selling electricity reasonably understand that the dominant underlying force in electric prices is the cost of natural gas, which is most often used to generate electricity. These customers generally also know that natural gas and oil prices often move up and down together, and they have the sense that there is a general market for oil and natural gas that will dictate what the retail prices are for fuel oil and for natural gas used for home heating. In other words, they have a personal understanding that there is an underlying market which dictates the volatility of the prices of electricity, natural gas, gasoline, and fuel oil. I have often confronted this understanding that energy commodity buyers have and ask about with reasonable knowledge when considering a purchase.

---

[55] Toukabri, Maher et al., *Consumer Trust, Confidence, and Price Sensitivity: Drivers Of Engaged Consumption In Ethical Markets*, 6 International Journal of Religion 207, 207–08 (2025), https://ijor.co.uk/ijor/article/view/8645/4623.

The feedback that I have received while selling natural gas and electricity to retail customers for many years is that they understand that there is an underlying market that dictates the price of the finished energy product that they are considering buying. For gasoline, it's oil. For natural gas, it's the cost of drilling and pipeline transportation. For electricity, it is the fuel and facilities cost of generating electricity and the cost of putting it over the poles and through the wires to get it to the end user. Customers understand that there is an underlying market that dictates the price and the volatility of energy products.

This is what a reasonable customer would think about when told that their variable electricity price would be "calculated on a monthly basis in response to market pricing, transportation costs and "other market price factors." This description fits very well with the reasonable presumption a customer would have about how the cost of electricity works. That is, that their rate would be calculated "in response to" changes in **the underlying energy markets where Eligo buys their electricity.**

That is not, however, how Eligo prices its electric power. Instead, Eligo uses an internally developed and undisclosed system to maximize its long-term profit, regardless of what any underlying wholesale energy market is dictating. The price that is charged by Eligo for electric power for its variable rate customer is **not calculated "in response to" any underlying energy market. Eligo's profit taking and understanding of what levels of profit taking it can achieve, without the customer becoming sufficiently alarmed by the price increase to cancel Eligo's services, is what drives Eligo's rate setting**. Eligo's rate-setting system was internally developed over a long period of time (eventually even using machine learning) and used numerous variables **not in any manner reflective of "market prices"** to determine how high of a rate it can charge before too many customers quit. This was done to maximize profits, over the longest achievable time period, to the highest profit margins possible over the lifetime of the customers' purchases of Eligo's electricity. This was done to the significant financial benefit of Eligo and to the substantial financial detriment of Eligo's customers.

Eligo's method of calculating variable rates is completely divorced from what the customer would expect from the contract terms described above. Eligo's method has nothing to do with underlying markets. There is no calculation that determines the "market prices," "transportation costs" or catchall "other" charges that add up to the variable rate Eligo charges. Eligo does not even tie the variable price to changes in its costs, except to the extent that it increases its internally set rate caps when market prices increase to ensure that it will continue to capture outrageously high margins. That is completely

44

uncharacteristic of any energy market where market prices are determined through fair competition among market participants competing honestly with each other for customers. This is particularly egregious considering the written contract's commitment, explicitly made by Eligo, to "calculate" variable rates ***"on a monthly basis in response to" the market.***

Suffice to say, any reasonable expectation that Eligo's variable rates would be structured according to what most people would believe to be the basis for dealing with volatility in the wholesale electric market would be wildly incorrect. A market price is commonly known to be the price a market establishes when buyers and sellers are honestly doing business in a common forum for energy trading in a uniform commodity. For Eligo, no such consideration is even distantly present when it sets customers' variable rates. The only consideration is Eligo's long-term profits.

As such, it is inconceivable that any rational customer that I have ever dealt with in business would agree to purchase electricity from Eligo if they were confronted with the truth about how their variable prices would be determined.

## **Eligo's Variable Rate Pricing Scheme – How It Actually Works**

The evidence I reviewed for this report confirms that Eligo's deceptive pricing scheme—one that, through a purposefully opaque process inextricably moves the buyer from an initial, short-term buyer-beneficial fixed price transaction to a buyer-nonbeneficial variable rate transaction—harms societal economics.[56] Further, Eligo's pricing method does not come close to conforming to the variable pricing structure that is communicated in the language in the written contract. Eligo does not mathematically "calculate" a variable rate on "a monthly basis in response to" the factors listed in the Pricing Term. Consistent with Eligo's demonstrated unethical intentions, there is virtually no attempt made by Eligo to communicate clear and understandable information about Eligo's variable rates in a way that would allow truly informed choices by Eligo's variable-rate customers.

---

[56] Eligo 30(b)(6) deponent Michael Sandler testified that all customers who do not sign up for a new fixed rate are transitioned from fixed price plans to variable price plans. Eligo Oct. 29, 2024 30(b)(6) Dep. [43:4-8].

**Eligo's Residential Variable Pricing – The Admissions**

The discovery I have reviewed shows that Eligo's variable rate residential business model is fundamentally predatory, deceptive and designed and conducted to derive predatory profits from Eligo's customers. Unlike their large commercial customers, Eligo's residential customers are much less sophisticated when it comes to retail energy pricing. They normally don't have the time and resources available to study competing offers and assess the history and reputation of electricity sellers. Instead, they tend to rely on the credibility of the proposed seller from what they are told by the seller in describing the offer.[57] As a result of their reliance on the seller's honesty, they are much less capable of protecting themselves from bad actors who use the difference in knowledge about the energy markets in an unfair and dishonest manner.

To start with, Eligo does not sell its "variable-rate" electric plans directly to residential customers. However, that is where Eligo's residential customers will end up if they take no further action after accepting Eligo's fixed rate deal. Instead, to present the illusion of a proposed transaction that, over a period of time, will demonstrably benefit a customer, Eligo initially only sells and markets teaser rates—competitively priced fixed-rate plans that can save the new customers money on their electricity purchases.[58] However, after a short period of time, usually three months, Eligo shifts the customer from the desirable fixed-rate plan to a variable-rate plan unless the customer affirmatively acts to prevent that switch. In other words, start the customer with an initial pricing plan that usually does present an advantage to the customer to establish a trustworthy appearance, but thereafter and ***without any material notice*** after the fixed rate service expires, automatically switch customers to a higher cost variable-rate plan. A reasonable customer believes that any cost adjustments will be made in the manner that Eligo describes in its written contract, based on the wholesale electric market, which can be interpreted by customers as being fair.[59] Instead, Eligo's actual price changes are adjusted solely to Eligo's financial benefit. This is a violation of established ethics in the practice of pricing.[60]

---

[57] The Lead Alchemists Agency Ltd., *The Authority Bias in Marketing: Description, Psychology, and Examples*, https://www.leadalchemists.com/marketing-psychology/authority-bias/.

[58] USLegal Forms, *Teaser Rate: What You Need to Know About This Introductory Interest Rate*, https://legal-resources.uslegalforms.com/t/teaser-rate.

[59] *Pricing, Ethical Issues In*, in the Encyclopedia of Business Ethics and Society, SAGE Publications (2018), https://doi.org/10.4135/9781412956260.n645.

[60] *Id*.

During the sales process, the fixed rates presented are designed to be competitive, so Eligo can demonstrate savings if the customer buys from Eligo. As a result, Eligo then appears to be trustworthy by pointing at a rate on a customer's bill, an official document, that bolsters Eligo's credibility. The fixed-rate price, in that sales process, is a good deal and the customer's guard against deceptive sales is adequately lowered.[61] Even if the rollover to the variable rate is briefly mentioned in passing during the sign-up process, the thrust of Eligo's initial sales and marketing is focused solely on persuading the customer to agree to Eligo's temporary fixed-rate plans. *See, e.g.*, Exhibit C at 3-4.

After a fixed number of monthly billing cycles on the fixed-rate plan, usually three months, the customer's inaction is used by Eligo as a justification to transfer them into the more profitable (for Eligo) variable rate plan. By that point, many customers that initially decided to trust Eligo have not thought much about Eligo. Instead, they continue to pay their utility bills, as they always have, without going through the arduous and complicated process of analyzing one of many technical charges on the utility bill that are generally not closely studied. Eligo is aware of this common behavior and seeks not to disturb the lull in the customer's attention by ceasing direct communications with the customer, essentially going "radio silent" after the initial enrollment process. Eligo's radio silence helps obscure Eligo's deceptive variable rate-setting practices.

Eligo internally acknowledges the planned sequential "rollover-only" one-way pathway into the variable rate. As its corporate designee agreed, "all Eligo customers started on a fixed rate, and then assuming that they don't quit Eligo or sign up for another fixed rate, they roll over to the variable rate."[62]

---

[61] Pendergrass, Karen, *Heuristics: Reducing Consumer Decision Friction*, Paleo Foundation (June 5, 2019), https://paleofoundation.com/heuristics-decision-friction/.

[62] Eligo Oct. 29, 2024 30(b)(6) Dep. [43:4-8].

## How Eligo Actually Sets Variable Rates (Pre-GROOVE And After)

Eligo's variable-rate pricing strategy was to set rates at the price Eligo projected would extract the most profit without causing excessive customer attrition or churn.[63] (Bear in mind the language in the written contract on how Eligo clearly states it will "calculate" its variable rates "on a monthly basis in response to" precise-sounding "factors" and how the processes described here reflect an entirely different and dishonest intent). I have seen no Eligo documents where it calculated or assigned values to the "factors" listed in the Pricing Term and then used to values to "calculate" a variable rate "on a monthly basis in response to" those factors.

- Before Eligo developed GROOVE, it used a monthly, spreadsheet-driven process anchored in a "target markup" layered over forecast costs for purchase of the electricity it was selling. As the 30(b)(6) witness explained, "prior to GROOVE the process had multiple steps . . . there was a target — target markup that was applied as a first pass" and "that would be a target forecast markup since . . . we don't know what the actual costs are going to be so we're having to forecast those costs."[64]

- Eligo deliberately managed the magnitude of the bill price increases using a set of customer behavioral factors to minimize potential churn in order to maintain the size of its customer base and avoid regulatory scrutiny. This was done in lieu of simply setting prices by using any mathematical formula to "calculate" changes in Eligo's "middleman" supply procurement costs. The 30(b)(6) witness testified there was a "procedure in place to limit the size of the bill increase to a certain percentage" to avoid a "sudden large spike"[65] and agreed churn/attrition was a factor in variable rate setting even before GROOVE.[66] Separately, Deponent Feely, former Vice President of Finance, Risk, and Analytics, confirmed the team examined "the relationship between the price charged to a customer and the probability that that customer would exercise the right to move to one of our competitors," and that

---

[63] *See*, *e.g.*, Pedotto June 6, 2025 Dep. [120:16–124:15]. In business, churn refers to the rate at which customers stop doing business with a company over a given period. High churn rates indicate that customers are leaving, while low churn rates suggest good customer retention.
[64] Eligo Oct. 29, 2024 30(b)(6) Dep. [14:17–16:15].

[65] *Id*. [29:3–14].

[66] *Id*. [30:1–10] [30:24–31:8].

the "Groove model was an attempt to use the relationship between attrition and price" to set rates.[67] For example, Yuri Ashuev, Financial Planning & Analysis Director, wrote that "accounts that are NY residential" can "have large rate changes, while we continue a more gentle Groove massage for true commercial accounts."[68] As Eligo's own witnesses describe GROOVE, it is the proprietary, secretive data driven rate-setting process that uses variables to optimize profits and churn management, to set, on a monthly basis, the fluctuating variable rates it charges.

- Deponent Feely acknowledged monthly batches he "bless[ed]" for 27,891 variable rate changes, that is top-down price change approvals based on averages and maximum increase price points, not on customer-level market pass-throughs "calculated on a monthly basis in response to" the Pricing Term's listed factors as a customer would have expected.[69]

- Eligo's leadership also admitted that it did not tailor pricing according to the contract language. Instead, they used the same process across all customers. Lapointe confirmed "we used very broad language" so that pricing would not need to change across contract versions, and "we would not have to make that distinction" between customers on different variable pricing terms when setting the rate—"our pricing method for both customers is the same" so long as behavior was "within the boundaries" of the broad terms.[70] In other words, variable rates were set "in response to" customer behavior, not on electric wholesale market behavior.

**"Glide Path" And Bill-Change Limits**

The testimony demonstrates Eligo controlled the pace of customer bill changes (i.e., the "glide path"):

- Deponent Feely described the practice: "you would not expect drastic changes from month to month upon average," and "having large changes in bill size month to

---

[67] Feely May 15, 2025 Dep. [30:25–31:7] [32:9–16].

[68] DEF005451, 51.

[69] *Id.* [24:25–25:9][26:24–27:6].

[70] Lapointe June 18, 2025 Dep. [33:25–34:7] [36:20–25].

49

month might drive attrition."[71] He further confirmed an internal presentation deck noted "buckets adjusted to prevent large change in bill size."[72]

- Deponent Ashuev identified a management-imposed general limit embedded into the variable process—"an overall desire not to raise either rate or bill by … 40 percent as stated by Alex Goldstein"—and clarified "this is a limitation that was used in the variable rate setting process," not limited to GROOVE-only accounts.[73]

- Eligo's 30(b)(6) witness confirmed an explicit "bill increase percentage" control: "There was a procedure in place to limit the size of the bill increase to a certain percentage."[74]

These admissions show that Eligo purposefully engineered customer outcomes to avoid visible spikes (that trigger attrition) rather than pricing "calculated" monthly "in response to" the Pricing Term's stated criteria.

**Eligo's Supply Costs Versus Target Margins And Forecasts**

Eligo's own testimony undercuts any claim that variable rates are "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors":

- Eligo acknowledged that declines in wholesale costs are not passed through to the customer: asked if falling wholesale costs mean variable rates "should go down as well," the 30(b)(6) witness answered, "I wouldn't agree with that at all," because wholesale cost is only "one of many components."[75]

- Eligo also managed maximums and minimums by utility and season, independent of a simple market curve. Ashuev's Asana thread contemporaneously reflects "one

---

[71] Feely May 15, 2025 Dep. [27:21–24] [34:21–35:4].

[72] *Id.* [39:16–40:1].

[73] Ashuev May 20, 2025 Dep. [126:6–128:18].

[74] Eligo Oct. 29, 2024 30(b)(6) Dep. [29:3–14].

[75] Eligo Oct. 29, 2024 30(b)(6) Dep. [12:9-15] [13:7–21].

winter and one summer limit set for each utility" and management direction on "max rates" interaction with "adders" and "rate policy."[76]

**"Traditional" Versus GROOVE: Same Strategy, Optimized**

While Eligo describes GROOVE as a more sophisticated pricing model, its witnesses confirmed the same core variable pricing strategy—maximize long-term value to Eligo by optimizing profitable rate levels against attrition—guided both the "traditional" and GROOVE eras.

- Feely: the internal experiment examined "the relationship between the price charged to a customer and the probability that that customer would . . . move to one of our competitors," and the "Groove model was an attempt to use the relationship between attrition and price."[77] Even pre-GROOVE, the "general idea" was to consider attrition responses to price in setting variable rates.[78]

- Carr: the data science team "built machine-learning-based solutions to optimize pricing," including simulating how weather, load and wholesale movements affect expected profitability of "all future bills."[79]

- Feely again: batches of nearly 28,000 monthly rate changes were approved top-down with checks on averages and maximums, consistent with a central profit maximizing optimization process.[80]

**Customer Expectations Under The Terms Of Service's Pricing Term**

The Pricing Term that applied to Plaintiffs and the Class states that Eligo's variable rates "shall" be "calculated on a monthly basis in response to market pricing, transportation

---

[76] Ashuev May 20, 2025 Dep. [135:12-23] [138:1–6].

[77] Feely May 15, 2025 Dep. [30:25–31:7] [32:9–16]

[78] *Id*. [32:17–25].

[79] Carr May 13, 2025 Dep. [15:9-14] [46:24–47:12].

[80] Feely May 15, 2025 Dep. [24:25–25:9] [26:23–25:6].

costs, and other market price factors. Applicable taxes will also be factored into the variable price."[81]

Eligo's witnesses, however, confirm the company's actual practice involved:

- Target markups (not rates being driven by changes in values assigned to the Pricing Term's listed criteria or pass-through of procurement costs).[82]

- Bill-change caps and engineered "buckets" to suppress visible monthly fluctuations.[83]

- Maximum caps that do not decrease when market prices decline but that are instead set with the risk of excessive churn and legal risk in mind.[84]

- A unified pricing method across different contract versions and different pricing terms that did not apply the Plaintiffs or the Class, not tailored to the specific wording of the Pricing Term that governed variable rates charged to Plaintiffs and the Class.[85]

Those admissions indicate that Eligo's "monthly" response to "market pricing, transportation costs, and other market price factors" was not a straightforward mathematical calculation nor verifiable pass-through of contemporaneous market cost changes, but rather ***an internally optimized revenue-management system trained on attrition outcomes and profitability targets***. As Feely candidly summarized under oath, the goal "is to maximize long-term value to the company," and pricing used the price–attrition relationship "to help better set rates."[86] Feely once again made clear that the

---

[81] One version of this term also stated that "all rates shall be based on 100% renewable energy (through use of Renewable Energy Credits) and calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." As discussed in Chapter 2, REC costs add a modest additional charge to an ESCO's supply procurement costs.

[82] Eligo Oct. 29, 2024 30(b)(6) Dep. [15:19–16:15] [12:4–8].

[83] Feely May 15, 2025 Dep. [39:16–40:1].

[84] Eligo Oct. 29, 2024 30(b)(6) Dep. [34:14–35:10]; *see also* DEF000935, 41–44.

[85] Lapointe June 18, 2025 Dep. [36:7–25].

[86] Feely May 15, 2025 Dep. [31:17–32:16].

changes in pricing that customers paid Eligo for electricity was ***primarily based on predictions about customer behavior (churn risk), not on electricity market behavior.***

Worse, the use of opaque machine-learning models to set variable rates using the customer "price-attrition relationship," is completely unrelated to the consumer-understandable concept conveyed in the Pricing Term, that monthly rates would be "calculated on a monthly basis in response to" the three identified criteria.[87] Carr described testing "to inform thousands of simulations on all future bills," ingesting multiple inputs and producing profit-optimized price change outputs rather than a transparent monthly market-to-bill calculation.[88] That is not what a reasonable consumer would understand by "calculated on a monthly basis in response to market pricing transportation costs, and other market price factors."

As discussed above, instead of relying on any identifiable criteria that customers could use to oversee Eligo's compliance with its stated contractual commitment, Eligo used a secret process to determine the variable price that will maximize the profitability of Eligo's dealings with each customer over the lifetime of the customer relationship. "Churn management" is one function of Eligo's variable pricing mechanism that is meant only to avoid any sufficiently large monthly price increase that will cause the customer to abandon Eligo. At the same time, Eligo sets its variable rate price at a rate just below that threshold to maximize profits in any given month for that customer.

A customer that was given Eligo's customer contract and its explanation that "[v]ariable price is determined" by Eligo "calculat[ing]" a variable rate "on a monthly basis in response to market pricing, transportation costs, and other market price factors," would not reasonably expect that Eligo would deploy any (let alone all) of the unethical tactics described above.[89] Instead, the Pricing Term misleads customers with false precision claims that Eligo would mathematically "calculate" customers' monthly rates "in

---

[87] Shad, Ralph et al., *The Impact Of Cognitive Biases On Consumer Decision-Making*, EasyChair Preprint, at 5–10 (July 17, 2024), https://easychair.org/publications/preprint/M9RZD/open.

[88] Carr May 13, 2025 Dep. [46:25–47:12].

[89] Pendergrass, Karen, *Heuristics: Reducing Consumer Decision Friction*, https://paleofoundation.com/heuristics-decision-friction/.

response" to identified market "factors." [90] A customer, told that their supplier would "calculate" monthly rates "in response to" listed factors, would expect that rate-setting would be a verifiable calculation based on the identified factors.[91]

Instead, as discussed above, Eligo obfuscated its actual variable rate-setting criteria and did not deal honestly or fairly with the Class. Eligo combined its improper rate-setting practices with the information asymmetry that is clearly present in the deregulated retail energy market in New York, allowing it to ratchet up customers' variable rates to very high levels. It is unreasonable to expect residential customers to have a clear understanding of how deregulated electric markets actually operate. By contrast, Eligo's management understands the New York competitive electric markets and uses that information asymmetry to its advantage in an unethical form of transaction.

An internal document produced in discovery discusses what "factors" Eligo actually considers in calculating variable rates. Eligo "actively manages the pricing of its variable book with a data driven approach that optimizes gross margin over the customer lifetime while leading to reasonable levels of customer churn. . . We recently began using advanced machine learning techniques to optimize pricing decisions at the individual customer level."[92]

Customers that had been given the assurances listed in the Pricing Term (on the Terms of Service's first page) regarding how variable rates would be calculated would also not expect that Eligo would later implement an Artificial Intelligence algorithm called "Growing Revenue Out Of Variable Experimentation" that was designed to maximize Eligo's variable rates while minimizing customer attrition.[93]

For example, Ms. Schuster testified that when she reviewed the Terms of Service, that the variable rate would be "based on the market pricing" and "what I understood was" that

---

[90] Toukabri, Maher et al., *Consumer Trust, Confidence, and Price Sensitivity: Drivers Of Engaged Consumption In Ethical Markets*, 6 International Journal of Religion 207, 208–09 (2025), https://ijor.co.uk/ijor/article/view/8645/4623.

[91] *The Authority Bias In marketing: Description, Psychology, and Examples* (2025), https://www.leadalchemists.com/marketing-psychology/authority-bias/.

[92] DEF060238, 45.

[93] Shad, Ralph et al., *The Impact Of Cognitive Biases On Consumer Decision-Making*, at 5–10.

what "I would pay was going to be based on market prices. So whatever Eligo paid, my price – my cost would reflect what they were paying."[94] She also testified that "I trusted that Eligo was going to honor, what they had, you know, provided me with" and that Eligo would be "charging me based on the market price, based on what they were paying for their electricity, what they paid."[95]

Ms. Schuster also testified that:

> The biggest thing for me, you know, at the time I was – and still I am [a] single mom, the only provider for my son, he's in college. I needed to save money. And when I saw that opportunity to save some money on electricity, I thought, "Well, there's one thing I can do that'll save me some money." Because, you know, it looked like it was going to be a deal. Eligo was going to pay a lower price for the electricity and then they would in turn charge me, you know, a price that would reflect their own low rate that they were paying.

Schuster Oct. 22, 2024 Dep. [64:14–25].

Ms. Brous testified that she believed that Eligo was "charging in a way that was not in relation to the cost that [Eligo] was paying; which is what [she] had been led to believe would be the case in relation to the market pricing of electricity."[96] She also testified that "the contract that I agreed to said that we would be charged according to the market price of electricity that Eligo paid for and after an initial fixed period and then it would change, according to different - - for different reasons and become a variable rate after that."[97] As

---

[94] Schuster Oct. 22, 2024 Dep. [95:5–16].

[95] Schuster Oct. 22, 2024 Dep. [96:11–20]; *see also id.* [96:19–20] ("My cost was going to be related to what they were paying."); 21:9–12 ("Eligo was paying a price and that savings was hopefully going to be based on to me, but instead they doubled, tripled, quadrupled that they were paying."); 22:25–23:8 ("[W]hat I was supposed to pay was supposed to be based on the market rate. What Eligo paid my cost was supposed to reflect what they were paying. . . . whatever the market rate was for electricity for any company to buy the electricity.").

[96] Brous June 12, 2025 Dep. [35:2–3].

[97] Brous June 12, 2025 Dep. [33:20–34:6].

Ms. Schuster put it, Eligo's Terms of Service did not say "that another condition is, you know, "That you might see that we're charging you four times what we are paying."[98]

Eligo's Terms of Service is deceptive. It affirmatively misstates Eligo's variable rate pricing practices, and it omits material information about those rates. Eligo also added a monthly fee even though such a fee is not authorized by the Terms of Service. These are intentionally dishonest tactics designed to prey on consumers who lack reasonable access to the information necessary to reveal Eligo's deceptive conduct. The customers trusted Eligo. The evidence I reviewed for this report confirms that Eligo's pricing scheme does not constitute charging a variable rate "calculated on a monthly basis in response to" the factors listed in the Pricing Term. Eligo's scheme is not consistent with business ethics as is taught at major universities and management schools.[99]

There is little attempt made by Eligo to communicate information about its variable rates in a way that would allow informed customer choice, and firms that use methods such as Eligo's display little interest in building or nurturing long-term customer relationships.[100] Instead, Eligo's methods are the cornerstone of a scheme in which Eligo seeks to earn profits by luring customers into paying variable rates that they would otherwise not pay with full awareness of the actual transaction they were entering into.

The harm caused by the deceptiveness of Eligo's scheme is compounded by the wide range of customers who were targeted, which would have included vulnerable populations who would have been ill-equipped to absorb the financial losses Eligo imposed.[101] Moreover, consumers are not accustomed to a marketing practice whereby companies explain that a charge will be "calculated" monthly "in response to" certain criteria when in truth the seller

---

[98] Schuster Oct. 22, 2024 Dep. [97:11–14].

[99] Carson, Thomas L., *Deception and Information Disclosure in Business and Professional Ethics*, The Oxford Handbook of Business Ethics 335, at 342-354 (Oxford Univ. Press 2010), https://doi.org/10.1093/oxfordhb/9780195307955.003.0012.

[100] Leitzes, Jack, *Dishonesty in Business*, Michigan Journal of Economics (Apr. 7, 2023), https://sites.lsa.umich.edu/mje/2023/04/07/dishonesty-in-business/.

[101]Heidhues, Paul et al., *Inferior Products and Profitable Deception*, 43 The Review of Economic Studies 323, 323–356 (2017), https://academic.oup.com/restud/article/84/1/323/2669986?login=false.

views those criteria and what constitutes a calculation "in response" to them to be an entirely fluid, discretionary and secret act.[102]

A primary factor influencing customer electricity purchases is price.[103] This is why Eligo uses low fixed rates to entice customers to switch and then automatically defaults them to variable rates.[104] Had Eligo told customers the truth about how its variable rates were set, a reasonable customer would not have entered into a transaction with Eligo.

I have reviewed the written materials Eligo provided to Plaintiffs. In addition to Eligo's affirmative misrepresentation about how variable rates would be set, Eligo omitted several key facts about its variable rates and related rate setting practices. Those omissions are discussed in sections below.

**Omission Of The Fact That Variable Rates Are Always Substantially Higher Than The Utility Rates**

Eligo's written materials failed to disclose that its variable rates were consistently and substantially higher than those charged by customers' default local utilities. *See* Report of Frank Felder, PhD, at Section III.D-E. Eligo has the historical data on the variable rates it charged customers after they transitioned off of fixed-rate plans. DEF093924. That data shows a persistent pattern of rates exceeding those of local utilities for the same billing periods. *See* Report of Frank Felder, PhD, at Table 4. Customers lack reasonable access to Eligo's historical rate data and are thus unable to independently evaluate how Eligo's historical variable rates compare to their local rates.[105]

---

[102] Choplin, Jessica M. et al., *A Psychological Investigation of Consumer Vulnerability to Fraud: Legal and Policy Implications*, 35 Law and Psychology Review 61, 61–122 (2011).

[103] He, Xiaoping et al., *Why Do More British Consumers Not Switch Energy Suppliers? The Role of Individual Attitudes*, Cambridge Working Paper in Economics 1525, at 10 (Sept. 2015), https://www.jbs.cam.ac.uk/wp-content/uploads/2023/12/eprg-wp1515.pdf (reporting 73% of survey respondents chose their energy supplier on the basis of price).

[104] N.Y. State Assembly, *ESCOs*, (Comm. on Consumer Affairs and Protection May 1 2008), https://nyassembly.gov/comm/Consumer/20080501h/ (warning that "many ESCOs offer introductory, 'teaser' rates that end after two or three billing cycles").

[105] Lapointe June 18, 2025 Dep. [44:19–21].

That Eligo's variable rates following transition off of the fixed-rate plan are historically significantly higher than customers' default utility rate is a material fact that Eligo should have disclosed in the written materials it provided to customers.

It is my opinion that had Eligo clearly and conspicuously disclosed this fact to its customers, they would not have chosen to switch to Eligo.

**Omission Of The Fact That Customers Paying Eligo's Variable Energy Rates Receive No Material Added Benefit In Exchange For Paying Dramatically More Than The Local Utility's Rates**

Eligo also failed to disclose to its prospective customers that paying an inordinately high variable rate would provide no benefit to Eligo's variable-rate customers compared to the customers on a fixed-rate plan or customers buying electricity from the local utility. If Eligo clearly and conspicuously disclosed this fact—especially coupled with other facts that it failed to disclose—reasonable customers would not have switched to Eligo. That Eligo purchased RECs does not mean that it provided a benefit commensurate with its very high variable rates, because, as shown above, REC prices do not justify Eligo's excessive variable rates.

**Failure To Provide Customers Adequate Advance Notice Of The Variable Rates Eligo Would Charge**

Eligo set customer rates weeks before those rates were charged. Yet consistent with Eligo's business model of not reminding customers that they are in fact Eligo customers, Eligo did not give customers advance notice of the rates they would charge. If Eligo would have adequately alerted customers in advance of the rates Eligo would charge, and if Eligo would have independently brought its rates to customers' attention, customers would have had a better chance of appreciating the underhanded tactics Eligo was deploying.

**Eligo Failed To Disclose The Conditions That Must Be Present For A Variable Rate Customer To Save Money Compared To What The Customer's Local Utility Would Have Charged**

Eligo's Terms of Service state that "[t]here are no guaranteed savings." A reasonable consumer would understand this statement to mean that, while savings were not "guaranteed," they were nevertheless possible under certain circumstances. Yet Eligo failed to disclose the conditions that would have to be in place for customers to save

58

money. Had Eligo made this disclosure, customers would have appreciated that there were, in fact, no set of reasonably likely conditions under which Eligo's rate-setting practices would have produced savings compared to the local utility.

It is my opinion that had Eligo's Terms of Service and other materials made such a disclosure in a clear and conspicuous manner, a reasonable consumer would not have switched to Eligo.

**Failure To Disclose That Eligo Charges A Monthly Fee**

In addition to variable rates, Eligo charged its variable-rate customers a monthly fee. The Terms of Service were silent on this additional fee. This fee was another way for Eligo to charge a higher variable rate.

In my opinion, if Eligo had clearly and conspicuously disclosed that it would charge this additional fee even though it was not in the parties' contract, a reasonable customer would not switch to Eligo.

**Failure To Disclose How Eligo Calculated Variable Rates**

Eligo's Terms of Service failed to clearly and conspicuously disclose the methodology it actually used to calculate its variable rates. Eligo knowingly adopted a rate-setting method that was designed to maximize profit from each customer. In practice, Eligo set its variable rates as high as possible without causing significant customer attrition that would reduce overall profitability.

In later years, Eligo secretly implemented GROOVE. Eligo also set minimum and maximum rate thresholds to contain GROOVE's output within a specific range—ostensibly to minimize losses and prevent scrutiny from regulators. Profit maximization remained the overriding objective.

Although Eligo knew that this was the true method it used to set its variable rates, its Terms of Service failed to disclose this key fact. Had customers been appropriately made aware of Eligo's true approach to calculating variable rates, they would not have switched to Eligo.

Even if it is somehow determined that Eligo was contractually permitted to set rates based on "pricing strategies," Eligo failed to disclose what those pricing strategies were.

First, the phrase "pricing strategies" is unclear and can be used in a deceptive way.[106]

Second, as I discussed above, Eligo's "pricing strategy" was both commercially unreasonable and deceptive. The pricing strategy that was implied in Eligo's sales and marketing strategies was that price changes would be related to market conditions on the wholesale market where power suppliers like Eligo buy the electricity they resell to their customers. The pricing strategy that Eligo actually used was based on charging the highest price changes that would maximize revenue but would also minimize churn (lowest possible customer attrition rate in reaction to price increases). So, while the electric wholesale markets could drop significantly, Eligo's customer behavioral analytical system could still trigger price increases. Had Eligo clearly and conspicuously disclosed its actual pricing strategy, it is my expert opinion that, given accurate information rather than the deceptive statements customers were exposed to, reasonable customers would not have switched to Eligo.

**Marketing Materials Eligo Provided To Its Customers Failed To Clearly And Conspicuously Disclose That Plaintiffs Will Be Charged Variable Rates**

The mailer Eligo sent to customers upon enrollment included the Welcome Letter, the Terms of Service, Agreement Summary and ESCO Consumers Bill of Rights.

GBL § 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

The Welcome Letter is separate from Eligo's Terms of Service and is marketing in its own right. For example, the letters assure prospective customers that Eligo is the utility's "authorized supplier," that "there will be no lapse in your electricity service," and that Eligo is "excited about your activation!"

In the letter sent to Ms. Schuster, the only bolded text is that "[y]ou may be eligible for more savings via our all-inclusive product" and it invites customers to "[c]all to find out if you qualify."

---

[106] Nwankwo-Ojionu, Chimeziem E. et al., *Breaking Through the Clutter and the Impact of Ambiguous Arguments on Consumers' Purchase Decisions*, 43 Communicare: Journal for Communication Studies in Africa 31, 32 (2024), https://journals.uj.ac.za/index.php/jcsa/article/view/3003/2005.

I also understand from Plaintiffs' counsel that Eligo's chief compliance officer referred to this statement as "an offer to call a customer service line to determine if she qualified for a separate 'all inclusive' product." A letter that markets a product is, of course, marketing material.

I have examined the Welcome Letter marketing material Eligo sent to Plaintiffs and can confirm that it does not disclose that Plaintiffs would be charged variable rates or that a monthly fee would be a part of the variable charge.

Further, I understand from Plaintiffs' counsel that Eligo's Terms of Service were not binding for the first three days after receipt and thus also served as both "marketing material" and a "contract" under GBL § 349-d(7). As discussed above, the Terms of Service do not mention that Eligo would add a variable charge in the form of a monthly fee.

**Chapter 5 – Statements Made During TPV Calls Are Not A Part Of The Contract**

**The Purpose Of The Third-Party Verification Call**

The regulatory purpose of the TPV call, as described in the 2014 UBP, is to independently confirm a customer's agreement to enroll with an ESCO. Pursuant to NYPSC regulations, this process must occur for all mass market enrollments resulting from telephonic, door-to-door, direct mailer, electronic or appointment-based sales, and cannot take place in the presence of the ESCO marketing representative.[107] The TPV call serves as an unbiased record—separate from sales interactions—for verifying that the customer understood the ESCO's identity and the nature of the exchange, received relevant disclosures (such as the ESCO Consumer Bill of Rights) and provided affirmative consent for both service enrollment and information release. This helps safeguard consumers from the deceptive ESCO tactic called "slamming," whereby the customer's account is switched to an ESCO without the customer's knowledge.[108]

---

[107] The version of UBP in effect at the time of both Plaintiffs' enrollment was the version dated February 2014. *See* NYPSC Case 12-M-0476, Uniform Business Practices, at 24, 33 (issued Feb. 2014), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={6828AC15-33E4-4C97-87B2-97E35D83C407}} (hereinafter, the "2014 UBP").

[108] As New York State Senator Liz Krueger noted, "ESCOs overcharged New Yorkers to the tune of over $800 million between January of 2015 and June of 2016, according to the Public Service Commission, and have been accused of widespread fraud, including 'slamming.'" *See* Press Release, N.Y. State Senate, Senator

The TPV call ensures regulatory compliance and provides auditable documentation in the event of any enrollment dispute.

**The Regulatory Background**

The foundational NYPSC order that established the comprehensive framework for retail electric market restructuring, including third-party verification and slamming prevention requirements, is NYPSC Case 98-M-1343, In the Matter of Retail Access Business Rules. These rules are embodied in Opinion No. 99-3, Opinion and Order Concerning Uniform Business Practices (issued and effective February 16, 1999). This was a landmark order that established the UBPs that govern all ESCO operating procedures in New York. The order noted the problem with slamming and outlined procedures aimed at preventing it. *Id*. at 67-72 (discussing the slamming prevention process); 1999 UBP at 16-17 (setting rules of the slamming prevention process). Originally, "written statements by independent third parties that witnessed or heard verbal commitments by the customers" was one of the ways to document a customer's authorization to switch. *Id*. at 17.

The third-party verification requirements were strengthened in additional orders on the Case 98-M-1343 docket, particularly around 2014-2015, when the NYPSC significantly enhanced consumer protection measures in response to widespread slamming complaints. As a result, the third-party verification process became a requirement to confirm a customer's authorization to switch to ESCO under all methods of enrollment.

---

Krueger's "Slamming" Bill Becomes Law (Nov. 26, 2019), https://www.nysenate.gov/newsroom/press-releases/2019/liz-krueger/senator-kruegers-esco-slamming-bill-becomes-law. The Senator described "slamming" as follows:

> ESCOs have notoriously been cited for using deceptive sales tactics. Consultants misrepresent themselves by pretending to be employees of the local utility company. The consultants push consumers into signing predatory contracts often by cold-knocking at a home or apartment door. These exchanges result in new contracts being signed, which is called 'slamming.' Eventually, unaware consumers discover that their rates have increased dramatically.

*Id*.

**Eligo's Deliberate Attempted Misuse Of The TPV Call**

I was informed that Eligo has previously taken the position that the statement during the telephone agreement conducted on Eligo's behalf by a third party (the TPV call) that the variable rate would be "based on market and wholesale factors, weather patterns, and pricing strategies" represents what the parties contracted for when it came to how Eligo would set customers' variable rates. I was asked to offer an opinion whether the NYPSC regulations and industry practice support Eligo's claim.

As discussed above, the NYPSC promulgated UBPs, which ESCOs must follow when enrolling new customers. The version of UBP in effect at the time of both Plaintiffs' enrollment was the version dated February 2014.

The 2014 UBP provides for three ways an ESCO can obtain a customer agreement to initiate service: (1)Telephone Agreement, (2) Electronic Agreement; and (3) Written Agreement.

B. Customer Agreement

An ESCO, or its agent, may solicit and enter into a sales agreement with a customer subject to the following requirements.

1. The ESCO shall obtain a customer agreement to initiate service and enroll a customer and customer authorization to release information to the ESCO by means of one of the following methods.

a. Telephone agreement and authorization, preceded, or followed within three business days, by provision of a sales agreement, in accordance with requirements in Attachment 1 – Telephonic Agreement and Authorization/Third Party Verification Requirements;

b. Electronic agreement and authorization, attached to an electronic version of the sales agreement, in accordance with requirements in Attachment 2 – Electronic Agreement and Authorization Requirements; or

c. Written agreement bearing a customer's signature on a sales agreement (original or fax copy of a signed document), in accordance with requirements in Attachment 3 – Written Agreement and Authorization Requirements.

2014 UBP at page 24.

In accordance with Attachment 1 to Section 5 of the UBP, after the Plaintiffs were enrolled, Eligo was required to provide a copy of the Customer Disclosure Statement and a sales agreement:

> B. The ESCO, or its agent, shall provide a copy of any Customer Disclosure Statement and sales agreement to the customer by mail, e-mail or fax within three business days after the telephone agreement and independent third party verification occurs. The sales agreement shall set forth the customer's rights and responsibilities and describe the offer in detail, including the specific prices, terms, and conditions of ESCO service. Such agreement shall be substantially the same, in form and content, as the sample contract submitted to the Department pursuant to Section 2.B.1.b.

2014 UBP at page 35.

The UBP sets forth the information that must be included in the ESCO's sales agreement. One such requirement includes the Customer Disclosure Statement (the Statement):

> b. Such contract shall also include on the first page thereof a Customer Disclosure Statement (the Statement). The text within this Statement shall state in plain language the terms and conditions described above and set forth in Attachment 4 – Sample Customer Disclosure Statement.

2014 UBP at 25 (emphasis supplied).

Attachment 4 provides the following Sample Customer Disclosure Statement:

Attachment 4

**Sample Customer Disclosure Statement**

| | |
|---|---|
| Price | |
| Fixed or Variable and, if variable, how the price is determined | |
| Length of the agreement and end date | |
| Process customer may use to rescind the agreement without penalty | |
| Amount of Early Termination Fee and method of calculation | |
| Amount of Late Payment Fee and method of calculation | |
| Provisions for renewal of the agreement | |
| Conditions under which savings to the customer are guaranteed | |

2014 UBP at 40.

The form Terms of Service Eligo provided to Plaintiffs and the Class included a Customer Disclosure Statement that tracked the UBP's required format:

**Eligo Energy NY, LLC Terms of Service**
**New York - Residential Customer**
This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of Rochester Gas and Electric ("RG&E" or "Utility").

| | |
|---|---|
| Price | First 3 months at a fixed rate of $0.05490 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 3 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

Eligo Energy NY, LLC Terms of Service

New York - Residential Customer

This agreement ("Agreement") authorizes Eligo Energy NY, LLC ("Supplier"), located at 201 West Lake Street, Suite 151, Chicago, IL 60606-1803, to change my ("Customer") electric supplier in the territory of New York State Electric and Gas Corporation ("NYSEG" or "Utility").

| | |
|---|---|
| Price | First 6 months at a fixed rate of $0.07990 / kWh. Thereafter, monthly variable kWh rate that may be periodically adjusted for market conditions. |
| Variable price is determined | Other than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors. Applicable taxes will also be factored into the variable price. |
| Length of the agreement | First 6 months at a fixed rate followed by month-to-month. |
| Process customer may use to rescind this Agreement | Customer may rescind the Agreement by contacting the Supplier or the Utility and communicate his/her intent to rescind the Contract: (1) before the Supplier submits the enrollment request to the electric utility; (2) for written or Internet contracts, within 3 business days after electronic acceptance or signature of the Agreement; and (3) for telephonic enrollments, within 3 business days after the date of the receipt of the Agreement. Customer may rescind the authorization for release of information at any time. |
| Amount of Early Termination Fee | No Cancellation Service Charges. |
| Amount of Late Payment Fees | Utility will remain responsible for collecting late payments. The utility will charge 1.5% per month of the unpaid balance as a Late Payment Fee. This fee is in addition to the unpaid balance. |
| Provisions for renewal of the agreement | Service with Supplier will renew monthly until the cancellation of this Agreement by either Supplier or the Customer. |
| Conditions under which savings to the customer are guaranteed | There are no guaranteed savings. |

The UBP also provides the mechanism for resolving conflicts between the Customer Disclosure Statement and terms stated elsewhere. In such cases, the Customer Disclosure Statement governs and constitutes the agreement between the ESCO and its customer.

> b. . . . When the form contract is used by the ESCO as its agreement with the customer, the Customer Disclosure Statement shall also contain the price term of the agreement. **In the event that the text in the Statement differs from or is in conflict with a term stated elsewhere in the agreement, the term described by the text in the Statement shall constitute the agreement with the customer notwithstanding a conflicting term expressed elsewhere in the agreement.**

2014 UBP at 25 (emphasis supplied).

Based on the regulations in force at the time when Plaintiffs and the Class enrolled with Eligo, it is my opinion that the terms of the Customer Disclosure Statement uniquely and authoritatively govern how their "[v]ariable price is determined." And under the terms of the operative UBP, because the statements in the "Variable price is determined" section of the Customer Disclosure statement conflict with Eligo's statement during the TPV call that variable rates were based in part on "pricing strategies," the statements in the Customer Disclosure Statement constitute the entirety of Eligo's agreement with the customer concerning variable pricing regardless of the content of the TPV call.

## Chapter 6 - Eligo's Corporate Structure

Plaintiffs' counsel also asked me to offer an opinion regarding Eligo Energy NY, LLC and its relationship to Eligo Energy, LLC and the role Eligo Energy, LLC played in the conduct that is the subject of this lawsuit.

Eligo's business uses a primary LLC, with local LLCs in the states where it operates. These state-level LLCs have no independent assets, employees, or bank accounts. The "parent" LLC is the sole entity that conducts Eligo's affairs.

Eligo Energy, LLC's corporate structure is shown in the image below:



DEF064884, 89.

**Eligo Energy, LLC Was New York Customers' Actual Supplier**

The evidence I reviewed shows that Eligo Energy, LLC was the actor on the other side of customers' contracts with "Eligo," and Eligo Energy, LLC certainly reaped all of the benefits of Eligo's dealings with New York customers like Plaintiffs and the Class.

A 2022 Eligo document provides a "story: flow of customer" that sets out to detail every aspect of a customer's interaction with Eligo. Entitled "Detailed Platform View," it shows access points for customers and marketing partners into Eligo's business, and how Eligo sets rates, processes billing, invoicing and communications with utilities, conducts reporting, gathers pricing and communicates externally with customers. At no point is there any mention of, let alone defined and differentiated role for, Eligo's state-level subsidiaries like Eligo Energy NY, LLC. *See* DEF068207, 25. That same presentation touts the ease of signup by a single residence through "eligoenergy.com," with no mention of any state-level website for signup. *See id.* at 27; *see also* Pedotto June 6, 2025 Dep. [155:9–22] (confirming New York customers could sign up for service at "eligoenergy.com."). Andrew LaPointe, current Chief Compliance Officer, admitted that all contracts used nationwide, including New York, were drafted by Eligo Energy, LLC employees Alexander Rozenblat and Sarah Erfani. LaPointe June 18, 2025 Dep. [21:6–10]. LaPointe further admitted that Eligo Energy, LLC has authority to rewrite contracts used in New York and other states. *Id.* at [25:9–12] [31:18–32:7].

Eligo Energy, LLC also oversaw customer service for the various states, including New York, under a single umbrella. For example, customer service call volumes from various states are listed on a slide from Eligo Energy, LLC's August Operations Close presentation dated September 7, 2017. *See* DEF033906, 37.

Similarly, Eligo Energy, LLC's October 2020 close presentation, dated November 11, 2020, lays out Eligo's protocol for customer complaints. All customer calls nationwide were forwarded to Eligo Energy, LLC's customer service leadership team (abbreviated as "CS" in Eligo's presentation), and specifically two individuals: Jeanine Robinson-Gutter (Eligo Energy, LLC's then-Director of Customer Engagement) and Leah Demus (Eligo Energy, LLC's Customer Service Manager). *See* DEF084337, 64.

The CS team determined whether customer calls were likely a "pre-complaint," a term Eligo used for calls likely to be escalated to an official complaint with a state regulator. The documents show that Eligo Energy, LLC had a uniform protocol for dealing with "pre-

complaints." *See* DEF084337, 65, 75. That protocol does not mention any state-level LLCs like Eligo Energy NY, LLC.

A 2022 presentation confirms this customer service structure: Eligo Energy, LLC contracted initial customer service to call centers abroad, and handled all escalated complaints through a small team at Eligo Energy, LLC's Chicago office. *See* DEF068207, 54.

In a 2023 Slack conversation, two Eligo Energy, LLC employees note that "we are getting SO many" customer complaints, particularly out of Michigan, and discuss the burden of resolving them without any mention of state-level affiliates. *See* DEF034272, 72–73. This demonstrates that Eligo Energy, LLC was responsible for communications with customers and responding to regulatory inquiries in any state of Eligo's operations.

Balance sheets show that the call center was paid for by Eligo Energy, LLC, and not Eligo Energy NY, LLC. *See*, *e.g.*, DEF059233.

Eligo Energy, LLC also contracted with third parties to procure electricity supply for New York customers. For example, Eligo's "Energy Service Agreement" was between EDF Trading North America, LLC and Eligo Energy, LLC, not Eligo Energy NY, LLC. *See* DEF070349, 50. This Energy Services Agreement provided Eligo Energy, LLC with a line of credit to facilitate the necessary energy acquisitions to service Eligo customers nationwide, including in New York. Under the Energy Services Agreement, EDF Trading North America ("EDFT NA") would enter into various transactions on behalf of Eligo Energy, LLC, such as "Power Transactions" to supply electricity, "Capacity Transactions," and "REC Transactions" to the extent desirable or required in connection with the Power Transactions, as well as financially settled derivatives. *Id*. In exchange, Eligo Energy, LLC paid fees to EDFT NA. *See* DEF068207, 82.

I also understand that Eligo's counsel offered to stipulate that Eligo Energy, LLC "sometimes enters third-party contracts for the provision of services on behalf of Eligo NY," and then placed that proposed stipulation on the record in this case. ECF No. 255-1 at 13. I am not aware of any documents showing Eligo Energy NY, LLC entered into any third-party contracts for the provision of services to New York customers. In fact, I do not believe that Eligo Energy NY, LLC would have been able to independently perform its end of any third party contracts, given that it had no revenue or expenses. *See infra* at 79 (Rozenblat email to NYISO, DEF057788, 97).

69

Eligo Energy, LLC—and not Eligo Energy NY, LLC—also purchased financial swaps for electricity slated for New York customers. *See, e.g.*, DEF002896.

Eligo Energy, LLC participated directly in the NYISO market and was issued invoices for electricity ultimately sold to New York customers. *See, e.g.*, DEF000557. Eligo Energy NY, LLC was not a NYISO participant in the Transmission Congestion Contracts ("TCC") market. *See infra* at 80 (2017 email from NYISO stating Eligo Energy NY, LLC was ineligible to participate, DEF057923, 24).

Internal Eligo communications show Eligo Energy, LLC employees making purchases on the NYISO. For example, in an April 6, 2020 Slack communication, Scott Glotzbach, then a Commodity Risk Trader/Risk Manager, and Brian Feely, then Vice President of Finance, Risk and Analytics, planned electricity purchases for two New York service zones. *See* DEF089903, 03–05.

Eligo Energy, LLC also negotiated and bought RECs on Eligo Energy NY, LLC's behalf. *See, e.g.,* DEF018105, 05–07.

In fact, in an email related to the purchase of Massachusetts RECs, Brian Feely, Eligo's former Vice President of Finance, Risk and Analytics, explains to the broker that Eligo Energy, LLC is the top-level entity that is used for REC purchases. *See* DEF060595.

Moreover, Glotzbach admitted that Eligo Energy, LLC, and explicitly not Eligo Energy NY, LLC, was responsible for purchasing RECs. Glotzbach May 6, 2025 Dep. [174:24–175:4]; *see also* DEF018105, 05–07 (contract to purchase New York RECs listing "Eligo Energy, LLC" as the buyer); DEF018156, 56–58 (same).

Glotzbach also testified that he was responsible for reporting the retirement of RECs to New York's regulatory agencies. Glotzbach May 6, 2025 Dep. [169:5–170:24].

Glotzbach further testified that Eligo Energy, LLC's Risk Policy governed purchases of electricity and natural gas hedges for its entire business nationwide. Glotzbach May 6, 2025 Dep. [139:16–20]. He also admitted that Eligo Energy NY, LLC did not have its own risk policy. *Id.* [139:6–8].

Eligo Energy, LLC also arranged for billing and invoicing, in many cases paying for Purchase of Receivables ("POR") to local utilities. Eligo Energy, LLC's "Risk Policies and Procedures"

70

document describes "the Company's" preference for POR and participation in POR programs of multiple "local distribution companies." *See* DEF082221, 23.

In general, the Risk Policy describes nationwide policies concerning customer enrollment, billing, collection and termination, all of which are handled by Eligo Energy, LLC. Another example of Eligo Energy, LLC discussing multi-state policies is in the Eligo "Customer Maintenance Process" document, in which Eligo Energy, LLC discusses the cases of dual-billed customers (i.e., customers that receive separate bills from both the utility and Eligo) in Illinois and Michigan, showing that Eligo Energy, LLC was responsible for nationwide policies. *See* DEF041394, 94.

Eligo Energy, LLC also handled compliance for all states in which it did business, including New York, rather than delegating compliance obligations to state-level entities, according to its Vice President of Risk and Trading. LaPointe June 18, 2025 Dep. [15:24–16:22].

Eligo Energy, LLC also set all prices for fixed-rate contracts nationwide, including the limited fixed teaser periods that would ultimately transition to variable rates, for all customers across all states, including New York, in which its local LLCs operated. Glotzbach May 6, 2025 Dep. [16:18–17:10].

Eligo Energy, LLC engaged with third parties to provide pricing models for electricity to be sold in various states, including New York. Eligo's main provider of this service was a company called "POWWR." In POWWR's pricing spreadsheets, Eligo Energy, LLC—not Eligo Energy NY, LLC or any other state affiliate—is listed as the POWWR client. Glotzbach May 6, 2025 Dep. [191:7–12].

Eligo Energy, LLC also set rates for all variable rate customers nationwide, including New York. For example, Eligo Energy, LLC's Risk Policies and Procedures indicate that Eligo Energy, LLC's "retail marketing operations target residential and small commercial customers situated in various utility regions in the United States." *See* DEF082221, 23. The Risk Policies and Procedures state that Eligo Energy, LLC is "subject to regulation by utility commissions in the respective states in which it operates and to the rules and protocols of various Independent System Operators ('ISO')." *See id*.

In Eligo Energy NY, LLC's 30(b)(6) deposition, Michael Sandler, Chief Technology Officer, testified that Eligo sought to meet profit goals by setting a "target markup" for electricity rates, and that those target markups are set for the enterprise by Eligo Energy, LLC's CEO

and Chief Compliance Officer—a practice that continues today. Eligo Oct. 29, 2024 30(b)(6) Dep. [32:7–23] [33:15–23].

Once Eligo instituted GROOVE, meeting the target profit goals involved two key recurring responsibilities: (1) "supervis[ing] and review[ing] the inputs which are provided to Groove before that model is run for Eligo power customers"; and (2) "review[ing] . . . the final set of variable rates . . . before they were uploaded in our billing system which would then automatically attempt to set the rates for our customers." Ashuev May 20, 2025 Dep. [77:8–78:4]. As shown below, both tasks were handled by a small team of management-level employees at Eligo Energy, LLC for all customers nationwide.

With respect to setting the minimum and maximum variable rates for utility zones in states across the country, including New York, Financial Planning & Analysis Director Ashuev admitted that the Eligo Energy, LLC management team, including himself, Andrew LaPointe (Chief of Compliance), CJ Bacher (Chief Operating Officer) and Alex Goldstein (Chief Executive Officer), had sole responsibility. *See* Ashuev May 20, 2025 Dep. [83:6–84:13] [84:23–85:9] [93:4–94:2]; *see also* Eligo Oct. 29, 2024 30(b)(6) Dep. [34:8–13].

In one example of this process, Ashuev testified that a nationwide floor on variable rates was set at an Eligo Energy, LLC management meeting: Ashuev May 20, 2025 [85:13–86:7]. Brandon Carr, former Director of Analytics and Data Science, also testified that variable rate maximums and minimums were determined by Eligo Energy, LLC's "risk team and the executive team." Carr May 13, 2025 Dep. [161:2–162:6].

Carr and Ashuev's testimony that Eligo Energy, LLC followed a centralized process for setting rate caps and floors is corroborated by internal policy documents produced by Eligo, including a process document for setting variable rates nationwide. *See* DEF000903, 03–04.

That process document includes specific instructions based on the state for which the rates are being generated. *See* DEF000903 § 7(m)(ii–iii) (specific instructions for Maryland and Massachusetts); § 7(o) (specific instruction for Ohio).

With respect to the rates ultimately charged to consumers, Ashuev confirmed that he personally reviewed the final proposed rates for all Eligo variable rate customers before those rates were uploaded to Eligo Energy, LLC's nationwide billing system. Ashuev May 20, 2025 Dep. [81:3–82:3].

Brian Feely, Eligo Energy, LLC's former Vice President of Finance, Risk and Analytics, also described one of his responsibilities as "setting variable rates" for "[a]ll states which had variable customers at a given time." Feely May 15, 2025 Dep. [18:22–19:18]; *see also id*. [27:13–28:16] (this review involved confirming Eligo's rates don't "exceed[] any maximums in any . . . given state" and, as an example, "Massachusetts and Ohio might have different rates at different times of the year" and that he would generally compare rates against his "idea of what the – what a broad average price might be in a given state.").

Eligo Energy NY, LLC's 30(b)(6) corporate designee likewise testified that, even prior to GROOVE, target rates were "reviewed by a small group of people that were responsible for setting—quality controlling those rates" before "going to the software team to load into the billing system." Eligo Oct. 29, 2024 30(b)(6) Dep. [15:19–16:15].

Feely also testified that he approved all variable rates, whether they were set through GROOVE or the "traditional variable rate process" in place prior to GROOVE's implementation. Feely May 15, 2025 Dep. [26:20–27:11].

This deposition testimony—that all variable rates were approved by Eligo Energy, LLC management before customers were billed—is consistent with internal Eligo documents. For example, in a March 2023 Slack exchange, Ashuev explains that there was a delay in a nationwide rate schedule (a table of inputs for GROOVE) was because "our leader[109] made some changes (he wants rates to go down less aggressively)." *See* DEF089079, 79. The "final final schedule" included those GROOVE inputs for numerous states, including New York. *See id*. at 80.

I also reviewed an email, sent by Ashuev in December 2023, that shared a spreadsheet, entitled "NY Batch Prep," with Courtney Cook, an Eligo Energy, LLC Data Scientist. *See* DEF005451, 51. Ashuev provides instructions regarding New York residential account rate-setting, which Ashuev says "can have large rate changes," as opposed to commercial accounts, which receive "a more gentle Groove massage." *Id*.

I also reviewed a June 2023 internal spreadsheet produced by Eligo, which assigned various tasks to management-level Eligo employees. In that spreadsheet, the task "Select Variable Caps," described as "Use market analysis to select variable rates" is transferred from Ken Pedotto (Eligo Energy, LLC's outgoing CEO) to Alex Goldstein (its incoming CEO).

---

[109] A reference to Alex Goldstein, Eligo Energy, LLC CEO. *See* Ashuev May 20, 2025 Dep. [153:1–13] (regarding this Slack exchange, "that context makes it likely that I'm referring to Alex Goldstein").

The task "Set Variable Caps," described as "Set variable rate caps in both the groove model and whdb" is transferred from M. Peterson (former Eligo Energy, LLC Senior Data Scientist) to Yuri Ashuev (Eligo Energy, LLC's Financial Planning & Analysis Director). The task "Variable Rate Setting" is transferred from M. P[eterson] and Tholang [Mota], a former Analyst at Eligo Energy, LLC, to Yuri Ashuev. No mention is made, as to any of these tasks, of any role for any state-level affiliate like Eligo Energy NY, LLC. *See* DEF048762.

I also reviewed an internal Eligo Energy, LLC presentation entitled "Electric Rate Cap Analysis June 2023." In that presentation, an Eligo Energy, LLC employee details calculations of new rates on a nationwide basis to increase profit margin, with specific references to service zones in Illinois and Pennsylvania. *See* DEF000935, 38. The presentation also mentions setting rate caps specific to Ohio. *See id*. at 41.

Evidence also shows that the development of GROOVE, used to set rates nationwide, including in New York, was spearheaded by two Eligo Energy, LLC data scientists: Brandon Carr, Director of Data Science, and Data Scientist Corey Levinson. *See* Carr May 13, 2025 Dep. [58:10–60:6]. Mr. Levinson's LinkedIn profile states that he worked for Eligo Energy, LLC and that he "designed an ensemble model to predict customer churn; based on an individual's sensitivity predicted from the ensemble, a script optimizes the value to charge the customer to maximize expected profit over twelve months."[110]

Starting in 2017, Eligo Energy, LLC conducted what it called "margin experiments" on variable rate accounts nationwide. The experiment involved substantially increasing the margin on—and thus the rate charged to—these variable rate accounts, while monitoring attrition to determine what margin customers would tolerate. *See* Carr May 13, 2025 Dep. [90:15–91:3]; *see also* Feely May 15, 2025 Dep. [30:25–31:22] ("I recall we looked at data to investigate the relationship between the price charged to a customer and the probability that that customer would exercise the right to move to one of our competitors. . . . [T]he goal, as you would expect, is to maximize long-term value to the company."). The documents I reviewed make no mention of involvement in this experiment by any state-level LLC like Eligo Energy New York, LLC. Brian Feely's testimony confirmed that New York customers were included in the experiment. *See* Feely May 15, 2025 Dep. [36:4–13].

A Feb. 20, 2018 internal presentation, entitled "Revenue Management," explains that the margin experiment was run on variable accounts without any apparent regard to any

---

[110] LinkedIn, Corey James Levinson, https://www.linkedin.com/in/corey-james-levinson/ (last accessed Sept. 5, 2025).

specific state. *See* DEF056566, 68. The results include thousands of customers in service zones across a number of states, including New York. *See id*. at 69.

In a Board Meeting 2017 Q4 slide deck, I reviewed a slide entitled "Current Approach to Revenue Management." *See* DEF036402, 23. The slide stated that "Each Utility and ISO Zone is reviewed every two weeks to determine if variable prices are healthy and not leading to excessive customer attrition." *Id*. The example provided was the ComEd Utility Zone in Illinois. *Id*. At deposition, Brandon Carr acknowledged preparing such utility zone-level slides for review by management. Carr May 13, 2025 Dep. [91:20–92:23].

Though he did not recall at deposition to whom he provided this biweekly review, Brandon Carr emailed one such "revenue management deck" on August 21, 2018, to Mark Peterson, Brian Feely, Corey Levinson and Ken Pedotto—all senior Eligo Energy, LLC employees—as well as Zack Hurley of Consumer Energy Partners. *See* DEF056276, 76-77. No state-level affiliate was copied on the email. *Id*.

Another document, the "Eligo Energy, LLC Internal Variable Rate Pricing Policy," discusses the pricing policy set by the parent LLC. *See generally* DEF044666.

Eligo Energy, LLC also made account-level decisions for New York customers. In a December 2023 conversation, Ashuev and LaPointe decide to block approximately 100 New York accounts from re-enrolling as customers. *See* DEF089045, 46–47.

**Discovery Indicates That Eligo Energy Disregarded Corporate Formalities**

Eligo Energy NY, LLC's own corporate representative could not name Eligo Energy NY, LLC's CEO and did not know for which entity "Eligo's" CEO worked. Eligo Sept. 17, 2024 Dep. [39:8–19].

Eligo Energy, LLC's former CEO Ken Pedotto testified that he was unable to understand the distinction between Eligo Energy, LLC and Eligo Energy NY, LLC. Pedotto June 6, 2025 Dep. [175:6–15]. Pedotto participated in I2R and Eligo Energy, LLC Board meetings, but did not recall any meetings specifically for Eligo Energy NY, LLC. *Id*. [169:3–10.]

Numerous Eligo Energy, LLC employees could not differentiate between Eligo Energy, LLC and Eligo Energy NY, LLC, to the point that they could not identify which entity they worked for. Ashuev May 20, 2025 Dep. [25:2–8]; Carr May 13, 2025 Dep. [39:22–40:5]; Glotzbach May 6, 2025 Dep. [11:21–12:6]; Pedotto June 6, 2025 Dep. [163:18–164:3].

Nor could Eligo's deponents say with certainty whether Eligo Energy NY, LLC had any employees at all. Feely May 15, 2025 Dep. [17:23–18:4]; Glotzbach May 6, 2025 Dep. [12:18–22].

In correspondence with regulators, Eligo's Energy, LLC's Controller described Eligo Energy, LLC's subsidiaries as "blended in with the parent – Eligo Energy." *See* DEF011821, 21. This "blended" structure is consistent with former CEO Ken Pedotto's testimony, in which he states that he did not know which entity, Eligo Energy, LLC or Eligo Energy NY, LLC, employed the individuals he oversaw. Pedotto June 6, 2025 Dep. [165:3–14].

Nor could Pedotto identify any individual Eligo employee focused specifically on Eligo's business in New York. Pedotto June 6, 2025 Dep. [172:3–5]. While Pedotto could not distinguish between the various entities under the Eligo umbrella, he confirmed that all Eligo entities reported to him through his roles as CEO of I2R Holdings (Eligo Energy, LLC's parent company) and Eligo Energy, LLC. Pedotto June 6, 2025 Dep. [15:10–20].

Internal company reports also discuss national business without distinguishing by state. For example, training materials produced in discovery describe "Eligo Energy" as a privately held company that "offers electricity in a number of deregulated markets." *See* DEF044821, 21.

For accounting purposes, Eligo Energy, LLC also treated nationwide accounts as its own. For example, Eligo Energy, LLC recorded nationwide accounts receivable on its balance sheet. *See* DEF059233.

In a 2021 presentation to the Eligo Energy, LLC Risk Committee on Eligo's electricity hedge portfolio, Brian Feely, then Vice President of Finance, Risk and Analytics, incorporated all hedges nationwide. *See generally* DEF053488, 89; *see also* Glotzbach May 6, 2025 Dep. [117:2–9] (confirming that the data on this slide "is aggregating all of the hedges and all of the real-time purchases for all of Eligo's customers in all these different hedge points").

An internal financial plan likewise presented profit and loss without identifying profit and loss for Eligo Energy NY, LLC. DEF060254, 56. The revenue and cost of goods sold numbers closely mirror figures presented as belonging to "Eligo Energy, LLC and its subsidiaries" in a 2022 presentation to a potential deal partner. *See* DEF068207, 64.

Indeed, Eligo presented itself to external parties as a unified, undifferentiated entity. For example, in a presentation to a potential lender, Eligo provided a slide deck, entitled, "Eligo Energy Overview," that repeatedly represents all Eligo operations nationwide as those of a single, unified entity called "Eligo Energy." The slide deck states that "Eligo provides electricity to residential and commercial customers in deregulated states (as alternative to vertically integrated utilities)." *See* DEF060210, 16.

The slide deck likewise includes a map of "Eligo Markets," which shows the states, including New York, that Eligo says are "[s]erved by Eligo Energy." *See id*. at 33. In that same slide deck, Eligo describes all customers nationwide as its own, and does not break them down by state, or make any reference to any state-level LLC.

Similarly, the "Eligo Energy Business Strategy Overview" document is consistent with the other documents I reviewed; it depicts a single entity conducting business in multiple states. *See* DEF060238. The Strategy Overview document indicates that a single Eligo entity, Eligo Energy, LLC:

- Has "good geographic diversification with approximately one third of all customers located in Illinois."

- "[A]ctively manages the pricing of its variable book with a data driven approach that optimizes gross margin over the customer life time while leading to reasonable levels of customer churn. . . We recently began using advanced machine learning techniques to optimize pricing decisions at the individual customer level."

- Considers all nationwide customers as its own: "Has over 100,000 paying residential and commercial customers."

- Performs nationwide sales, customer service and operations through a "proprietary sales portal serves as primary interface point, where Eligo sales, customer service, operations, and external brokers can access the system to price energy deals, research customer accounts, and make modifications to customer information."

- Handles billing on a nationwide basis, "Eligo's billing system is a proprietary system that Eligo purchased and has modified to control enrollment, billing, and connections to utilities . . ., payment processors, printing and mailing vendors, and billing vendors."

77

- Does operations for enrollment, cancellations and billing nationwide, "[o]ur operations team verifies that all enrollments that fail to process are corrected and retried, as well as ensuring that customers requesting to be dropped are handled properly. We also constantly audit the billing process, ensuring that bills are never duplicated and sent on-time[.]"

- Does nationwide marketing: "Eligo has sent 1,000,000+ pieces of direct mail to consumers and businesses nationwide."

*Id.* at 41–46.

The Eligo Energy Business Strategy Overview document lists its management team as Eligo Energy, LLC employees. *See*, *e.g.*, *id.* at 60248 (founders Mark Friedgan and Alexander Goldstein), 49 (CEO Ken Pedotto), 50 (General Counsel and Corporate Secretary Alex Rozenblat and Chief Information Officer Michael Sandler).

In a presentation to a potential deal partner, Eligo presented nationwide income statements and projections, but characterized them as belonging only to "Eligo Energy, LLC." *See* DEF068207, 66.

In a presentation to a potential investor, Eligo Energy, LLC presented all customers nationwide as its own,[111] stating that "Eligo uses a variety of marketing channels to acquire customers" and describing customers from Illinois as "nearly ½ of the business." *See* DEF064884, 96. In that same presentation, Eligo presented total nationwide revenue as its own. *See* DEF064884, 903.

**Eligo Energy NY, LLC Was Not Capitalized**

When corresponding with NYISO, Alexander Rozenblat, Eligo's General Counsel, stated that Eligo Energy, LLC collects the revenue from New York operations and thus Eligo Energy NY, LLC has zero income and zero associated expenses.

---

[111] *See also* Pedotto June 6, 2025 Dep. [11:15–12:9] (explaining this presentation "was referring primarily to Eligo Energy, LLC").

> **From:** Alexander Rozenblat [mailto:arozenblat@eligoenergy.com]
> **Sent:** Monday, July 13, 2015 3:53 PM
> **To:** Credit Department
> **Subject:** RE: Market Participant Reporting Requirements Effective July 15, 2015 - REMINDER
>
> Hello,
>
> Eligo Energy, LLC is the revenue collecting entity. Therefore, Eligo Energy NY, LLC has zero income and zero associated expenses. This can be validated by the energy bills from NYISO – Eligo Energy NY, LLC has zero in ISO bills.

DEF057788, 97.

In that same correspondence, Rozenblat explained that he could not provide financial statements for Eligo Energy NY, LLC, because Eligo Energy NY, LLC does not have them:

> **From:** Alexander Rozenblat [mailto:arozenblat@eligoenergy.com]
> **Sent:** Monday, July 13, 2015 3:09 PM
> **To:** Credit Department
> **Subject:** RE: Market Participant Reporting Requirements Effective July 15, 2015 – REMINDER
>
> Hi, Eligo Energy NY, LLC is a wholly owned subsidiary of Eligo Energy, LLC. Eligo Energy NY, LLC does not have separate reporting or financial statements.

*Id.*

Later, when Rozenblat asked whether both Eligo Energy, LLC and Eligo Energy NY, LLC had to submit officer certification forms to NYISO, NYISO responded that Eligo Energy, LLC is "the financially responsible party" and Eligo Energy NY, LLC as a "child" in a financially responsible party relationship "is not eligible to participate in the [Transmission Congestion Contracts] Market."[112]

---

[112] "TCC Market" is a reference to NYISO.

> **From:** Credit Department [mailto:Credit_Department@nyiso.com]
> **Sent:** Tuesday, March 07, 2017 8:38 AM
> **To:** Alexander Rozenblat <arozenblat@eligoenergy.com>; Prevratil, Sheri <SPrevratil@nyiso.com>; Credit Department <Credit_Department@nyiso.com>
> **Cc:** 'Irena Friedgan' <irena@eligoenergy.com>; 'Brian Feely' <bfeely@eligoenergy.com>
> **Subject:** RE: [EXT] FW: Market Participant Reporting Requirements Effective July 15, 2015 - REMINDER
>
> Good morning Alexander,
>
> We only need the officer certification form for Eligo Energy, LLC as they are the financially responsible party.
>
> Eligo Energy, LLC would be able to participate in the TCC market. Eligo Energy NY, LLC as a child in FRP relationship, is not eligible to participate in the TCC Market.

*Id.* at 94.

Without Eligo Energy, LLC, Eligo Energy NY, LLC could not have supplied electricity to Eligo's New York customers. Eligo Energy NY, LLC also failed to maintain separate bank accounts and separate financial records. *See* Pedotto 2025 Dep. [160:7–9] (unable to identify if Eligo NY, LLC had a bank account); Glotzbach May 6, 2025 Dep. [13:2–4] (same); *see also* DEF057788, 97 ("Eligo Energy NY, LLC does not have separate reporting or financial statements.").

### Eligo Energy, LLC and Eligo Energy NY, LLC Intermingled Funds; Eligo Energy NY, LLC Had No Funds Of Its Own

Eligo Energy NY, LLC did not prepare its own financial reports and instead had its financial reporting consolidated with Eligo Energy, LLC. *See* DEF010345, 45–59; *see also* DEF010376, 76–90, DEF010500, 00-12, DEF010513, DEF010514, 14–30, DEF011677, 77–91, DEF011692, 692–706.

In Eligo Energy NY, LLC's 30(b)(6) deposition, it testified that Eligo reports gross margin "at the full enterprise level," adding that, while calculating per-utility gross margin is theoretically possible, Eligo does not calculate it in the ordinary course. Eligo Oct. 29, 2024 30(b)(6) Dep. [65:1–20].

Eligo's external communications likewise evince a single, undifferentiated enterprise. Karolina Savickaite, Eligo Energy, LLC's Controller, stated in an email that "[w]e do not report any of our subsidiaries separately, i.e., Eligo Energy NY, Eligo Energy MI, etc." DEF011821, 21.

Former CEO Ken Pedotto did not know whether Eligo Energy NY, LLC had a bank account and was not sure if he had ever seen bank statements from bank accounts for either Eligo Energy, LLC or Eligo Energy NY, LLC. Pedotto June 6, 2025 Dep. [159:24–160:12].

**Eligo Energy, LLC And Eligo Energy NY, LLC Have The Same Owners**

Eligo Energy, LLC has a 100% "Equity Interest" in Eligo Energy NY, LLC. *See* DEF070349, 465. Therefore, ultimate members/owners of Eligo Energy, LLC also own Eligo Energy NY, LLC.

The Amended and Restated ESA between EDFT NA and Eligo Energy, LLC defines "Eligo Energy, LLC, a Delaware limited liability company" as the "ESCO" that is the counterparty in the agreement. *Id.* at 50.

**Eligo Energy, LLC And Eligo Energy NY, LLC Have The Same Officers And Directors**

The same small group of people do all the work for the entire Eligo enterprise nationally. Eligo Sept. 17, 2024 30(b)(6) Dep. [41:18–21].

Eligo's counsel offered to stipulate that Eligo Energy NY, LLC "does not maintain a separate board of directors from Eligo LLC." *See* ECF No. 255-1 at 13.

**Eligo Energy NY, LLC Uses Eligo Energy LLC's Trademark**

Eligo Energy, LLC owns the trademark "ELIGOENERGY."

81



U.S. Patent & Trademark Office, Trademark Status & Document Retrieval (TSDR), available at https://tsdr.uspto.gov/#caseNumber=86209231&caseType=SERIAL_NO&searchType= statusSearch.

This trademark was used by Eligo Energy, NY LLC. *See* DEF016804, 04–05 (TPV Script), DEF000126 (Schuster TPV Call), DEF000124, 24–25 (Schuster Welcome Letter); *see also* DEF093222 (Brous TPV Call); DEF093219, 19–20 (Brous Welcome Letter).

**Eligo Energy, LLC And Eligo Energy, NY, LLC Use The Same Address, Website And Phone Number**

On its Retail Access Application to serve New York, Eligo Energy NY, LLC lists its office address, website, phone number and customer service email.

---

1. **Business Information**

A. Business Name:  Eligo Energy NY, LLC

Address:  201 W Lake St., Ste 151

City:  Chicago          State:  IL          Zip:  60606

Telephone:  888-744-8125          Fax:

Website Address:  www.eligoenergy.com

Customer Service Email Address:  customerservice@eligoenergy.com

---

DEF093401, 03.

Plaintiffs' counsel have represented to me that "Ste 151" is a small mailbox in a UPS store located at 201 W Lake St. in Chicago.

The website www.eligoenergy.com appears to belong to Eligo Energy, LLC. It provides information about various states, including New York. For example, the website provides information about various states where it is licensed, indicating that the website is in no way limited to Eligo Energy NY, LLC.

### Eligo Is Licensed in

| | |
|---|---|
| Connecticut | New Jersey |
| District of Columbia | New York |
| Illinois | Ohio |
| Maryland | Pennsylvania |
| Massachusetts | |
| Michigan | |

Eligo Energy, LLC and Eligo Energy NY, LLC use the same address and the same phone number. In the Welcome Letter sent to Michelle Schuster after she enrolled with Eligo, the return address is:

Eligo Energy, LLC
201 W Lake St Suite 151
Chicago, IL 60606

83

That same Welcome Letter lists "888-744-8125" as the customer service number she can use to contact "Eligo Energy." The letter is emblazoned with Eligo Energy, LLC's logo and states that Schuster's supplier will be "Eligo Energy, LLC." *See* DEF000138, 38. Ira Brous received a similar letter, listing the same address, phone number, logo, and lists "Eligo Energy" as the sender. Amended Complaint, Ex. A at 1.

The website also lists the same phone number and customer service email for consumers to "contact Eligo Energy":

8    How do I contact Eligo Energy?

Call 888-744-8125 if you need help. Operators available Monday through Friday 9-5 CT. You can also email customerservice@eligoenergy.com and you will receive a prompt response. Michigan customers can also call 313-486-1890 to reach a customer service operator.

*See* http://www.eligoenergy.com.

Eligo Energy, "Eligo FAQ," last visited Sept. 8, 2025), https://www.eligoenergy.com/eligo-faq.

Eligo's counsel offered to stipulate that Eligo Energy, LLC and Eligo Energy NY, LLC "share an office in Chicago, IL." *See* ECF No. 255-1 at 13; *see also* Glotzbach May 6, 2025 Dep. [12:23-13:1].

**There Is No Evidence That Eligo Energy NY, LLC Owns Property**

As discussed above, Eligo Energy NY, LLC did not have its own real property. It also did not buy the electricity that was later sold to New York customers. It did not buy hedges, RECs, or ZECs, in connection with electricity sold in New York. *See supra* at 61-62 (hedges, RECs); Glotzbach May 6, 2025 Dep. [252:3–6] (ZECs); *see also infra* at 86. It used Eligo Energy, LLC's trademark. *See supra* at 81-82.

84

**Eligo Energy NY, LLC Did Not Conduct Its Business Separately From Eligo Energy, LLC**

I have not seen any documents suggesting that Eligo Energy NY, LLC had any employees and, as discussed above, I have reviewed testimony of multiple deponents who either did not know if Eligo Energy NY, LLC had any employees, or could not name any individual working exclusively on New York business.

Yuri Ashuev, Financial Planning & Analysis Director, testified that responsibility lied solely with the Eligo Energy, LLC management team to set minimum and maximum variable rates for utility zones nationwide, *see* Ashuev May 20, 2025 Dep. [83:6–84:13] [84:23–85:9], and that no other individuals were involved in the process, *id*. [88:24–89:4].

Brian Feely, Vice President of Finance, Risk and Analytics, testified that he and his team had responsibility for "setting variable rate . . . for all of Eligo's customers in every state in which Eligo operated . . . which had variable customers at a given time." Feely May 20, 2025 Dep. [19:2–18].

Eligo Energy NY, LLC's 30(b)(6) witness testified that target rates were "reviewed by a small group of people that were responsible for setting—quality controlling those rates." Eligo Oct. 29, 2024 30(b)(6) Dep. [15:19–16:15].

Scott Glotzbach, Vice President of Risk and Trading testified that Eligo Energy, LLC, and explicitly not Eligo Energy NY, LLC, purchased RECs. Glotzbach May 6, 2025 Dep. [174:24–175:4], and that either he, or he and Brian Feely, had "sole responsibility" for purchasing RECs, *id*. [163:21–164:5].

Eligo Energy NY, LLC, was not eligible to participate in the TCC NYISO market. *See* DEF057788, 97.

Eligo Energy NY, LLC had no revenue. *See* DEF057788, 94.

In addition to the above documents and testimony, another example of Eligo Energy, LLC exercising control over New York accounts is an internal discussion in which Eligo Energy, LLC employees discuss dropping New York accounts with no input from anyone working for Eligo Energy NY, LLC. *See* DEF003092, 93.

Eligo's New York sample TPV Script confirms enrollment for electricity supply service with "Eligo Energy," not Eligo Energy NY, LLC. *See* DEF016804, 05. This same script also states

85

that "Eligo Energy will provide your electricity through your local utility . . .," and that "[y]our service with Eligo Energy will begin after utility confirmation or at the next applicable billing period . . ." *Id.* The script mentions only Eligo Energy and does not once mention Eligo Energy NY, LLC. *See id.*

In Eligo's "Energy Business Strategy Overview" document, the term "Eligo" is defined as "Eligo Energy LLC." *See* DEF060238, 38. The Strategy Overview document's text shows that Eligo Energy, LLC was responsible for all "Eligo" operations, including New York. *See Id.*

I have reviewed numerous documents showing Eligo Energy, LLC employees conducting business pertaining to New York without any apparent participation from Eligo Energy NY, LLC or its employees (if any such employees exist). *See, e.g.*, DEF057788, 788–801 (communicating with NY regulators); DEF058357, 57–58 (communicating with third-party pricing vendors); DEF03410, 10 , DEF005451, DEF006651, DEF007887, DEF034115, DEF088659, DEF089079, DEF091914, 14–16 (setting rates); DEF089045, 46-47 (blocking accounts from re-enrollment); DEF033906, 37, DEF084337, 64 (handling customer service calls); DEF068207, 82, DEF070349, 50 (contracting with third parties for electricity supply purposes); DEF002896, DEF089903, 03–05 (purchasing electricity hedges for New York customers); DEF000138, 38–42 (communicating with customers); DEF059233 (paying for customer service call center); DEF018105, 05–07 (purchasing RECs).

I have reviewed deposition testimony also showing that Eligo Energy, LLC employees conducted business pertaining to New York without any participation from Eligo Energy NY, LLC, or its employees (again, if any such employees exist). *See* Glotzbach May 6, 2025 Dep. [163:21–167:19] [169:8–170:24] [172:2–24] [174:24–175:4] [175:21–176:13] [252:3–6] (purchasing and retiring RECs); *id.* [15:13–16:9] (handling compliance); *id.* [16:18–17:10] (setting fixed rate prices); *id.* [191:7–12] (contracting with third-party providers of pricing models); *id.* [110:2–111:10] (purchasing electricity hedges); *see also* LaPointe June 18, 2025 Dep. [53:13–17] [58:15–21] (marketing and customer communications to New York customers); *id.* [20:25–21:10] (drafting contracts); *id.* [25:9–12] [31:18–32:7] (revising contracts); Ashuev May 20, 2025 Dep. [83:6–86:7] [88:24–89:4] [93:4–94:2] [94:17–95:3] (setting rate minimums and maximums); *id.* [81:3–82:3] [82:19–83:3] (setting rates); Feely May 20, 2025 Dep. [18:22–19:18] [26:20–28:16] (setting rates).

**A Reasonable Consumer Would Believe That Eligo Energy NY, LLC Was Authorized To Act As Agent Of Eligo Energy, LLC**

Through my extensive experience operating consumer-facing firms in the electric and natural gas industry (including firms offering and selling utility-related services to utility customers), teaching college courses in Public Economy, Ethics in Business and Government, as well as graduate level courses in Organizational Theory and Behavior, and operating a consultancy advising energy firms on retail energy business strategy, I have developed an expertise in how reasonable consumers understand marketing and communications from energy firms.

A reasonable customer of Eligo's electricity services in New York would, based on the Eligo Energy, LLC's conduct, believe they were dealing with only one company, "Eligo Energy," which is clearly Eligo Energy, LLC.

On Plaintiff Schuster's enrollment call with Eligo, the sales representative stated that "Eligo Energy will provide your electricity . . ." Michelle Schuster Oct. 22, 2024 Dep. [75:16–76:16].

I reviewed a sample script provided by Eligo Energy, LLC to TrustedTPV, a third-party that conducted TPV verification calls for Eligo's New York customers. This script shows that, as part of enrolling with Eligo, the customer would hear the following statements:

- "Thank you for calling TrustedTPV for Eligo Energy."
- "This call is to confirm your enrollment for electricity supply service with Eligo Energy."
- "The marketing representative represents Eligo Energy, an independent seller of electricity service[.]"
- "When enrolling with Eligo Energy, you will still receive one bill from your utility."
- "By enrolling with Eligo Energy, you authorize the release of the following information . . ."
- "Within one day, Eligo Energy will send you a welcome packet[.]"
- "The New York Consumer Bill of Rights may be found on Eligo Energy's website and in your welcome packet."
- "Did the Eligo Energy marketing representative offer to mail you a copy of the Consumer Bill of Rights or tell you how to find it online?"
- "This confirms your enrollment with Eligo Energy."

87

Not only is "EligoEnergy" Eligo Energy, LLC's trademark, but nowhere in this language communicated to customers is the name "Eligo Energy NY, LLC" mentioned. *See* DEF016804, 04–05.

In Plaintiffs Schuster and Brous' TPV calls, an automated message prepared at the direction of Eligo Energy, LLC repeatedly states that Schuster and Brous are enrolling with "Eligo Energy[,]" and makes no reference to Eligo Energy NY, LLC. The recordings make the following representations:

- "This call is to confirm your enrollment for electricity supply service with Eligo Energy."
- "Eligo Energy will provide your electricity through your local utility . . ."
- "Your service with Eligo Energy will begin at the next applicable billing period . . ."
- "When enrolling with Eligo Energy, you will receive one bill . . ."
- "Eligo is an independent seller of power and energy service certified by the New York State Public Service Commission[.]"
- "To activate your enrollment, Eligo is approved to obtain and review your account details with your utility for the period of your service."
- "Within one day, Eligo Energy will send you a welcome package that will include a written agreement with the terms and account details summarized in this call."
- "You will also receive a letter from [utility] confirming your enrollment with Eligo Energy."
- "You are also protected the State of New York consumer bill of rights that can be found on Eligo's website."
- "Lastly, to confirm your enrollment with Eligo Energy for your electricity supply service, please say yes to confirm."
- "Thank you for selecting Eligo Energy."

At no point during the call was the entity "Eligo Energy NY, LLC" ever mentioned. *See* DEF000126 (Schuster TPV Call); DEF093222 (Brous TPV Call).

Plaintiffs Schuster and Brous then received a Welcome Letter with a return address stating that the Letter was from "Eligo Energy, LLC." *See* DEF000124, 24–25 (Schuster Welcome Letter); DEF093219, 19–20 (Brous Welcome Letter). Like the TPV call, the Welcome Letters contain no mention of the entity "Eligo Energy NY, LLC." In addition to a return address identifying "Eligo Energy, LLC" as the sender, the Welcome Letters were emblazoned with Eligo Energy, LLC's logo, a photo of Chicago, Illinois (Eligo Energy, LLC's principal place of

business) and a customer service email with the domain "@eligoenergy.com." In the Welcome Letters, Eligo Energy, LLC made the following representations:

- "Thank you for being a valued customer of Eligo Energy."
- "Eligo Energy is excited about its opportunity to support sustainable energy and reduce our carbon footprint."
- The Welcome Letter was signed "Eligo Energy."

*See* DEF000124, 24-25 (Schuster Welcome Letter); *see also* DEF093219, 19–20 (Brous Welcome Letter).

A training document for "Eligo Energy [sales] calls" instructs sales representatives to state "this is just a new rate **with** Eligo as the/your new supplier" and makes no mention of any state-level entity. *See* DEF001023, 23–24 (emphasis in original).

The only place, during the entire enrollment process, where Eligo Energy NY, LLC is mentioned is in the Terms of Service— and it is mentioned there only once. The oral and written materials received by New York customers in connection with their enrollment were designed to create the impression that customers were dealing with a single entity. As discussed above, Eligo Energy, LLC's employees prepared the oral and written materials that would lead a reasonable person to believe that they were conducting business with Eligo Energy, LLC.[113]

In my opinion, reasonable customers in New York would understand that their energy supplier was a single entity, "Eligo Energy," which is Eligo Energy, LLC. A reasonable consumer cannot be expected to appreciate the difference between Eligo Energy NY, LLC and Eligo Energy, LLC. In fact, the former, long-time CEO of the company could not do so. Pedotto June 6, 2025 Dep. [175:6–15].

This report and the opinions contained are solely for Plaintiffs' counsel's use for the litigation referenced. This report is not, nor should it be relied upon as, a legal opinion. The information, analysis, and conclusions presented are based on the facts and data available at the time of this report. It is subject to revision or supplementation if new information, evidence, or data becomes available.

---

[113] Lincoln & Rowe Ltd., *Fraudulent Misrepresentation: How to Prove It and How to Deal with It*, Legal Blog, https://lincolnandrowe.com/2023/05/11/dealing-fraudulent-misrepresentation/.

Dr. John N. O'Brien

_____    9/12/2025
Signature                  Date