# Exhibit 2

## Deposition Transcript of John O'Brien, Ph.D.

*Brous, et al. v. Eligo Energy, LLC, et al.*
*Case No. 1:24-cv-01260-ER*

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. 24-cv-01260 (ER)

IRA BROUS, and MICHELLE
SCHUSTER, on behalf of
themselves and all others
similarly situated,
        Plaintiffs,
vs.
ELIGO ENERGY, LLC and ELIGO
ENERGY NY, LLC,

        Defendants.
_____/

VIDEO DEPOSITION OF

JOHN O'BRIEN

Thursday, January 29, 2026
9:00 a.m. - 4:29 p.m.
ZOOM VIDEO CONFERENCE

Stenographically Reported By:
KELLIE LEBERTE

Job No.: 7743483

John O'Brien                                     January 29, 2026
Brous v. Eligo Energy, LLC

Page 2

                        APPEARANCES:
                      REMOTE VIA ZOOM


On behalf of Plaintiffs:
       FINKELSTEIN, BLANKINSHIP FREI-PEARSON
       & GARBER, LLP
       1 North Broadway
       White Plains, New York 10601
              BY:  D. GREG BLANKINSHIP
              gblankinship@fbfglaw.com


       WITTELS MCINTURFF PALIKOVIC
       305 Broadway, Floor 7
       New York, New York 10007
              BY:  ANDREY BELENKY
              abelenky@wittelslaw.com


On behalf of Defendants:
       WATSTEIN TEREPKA LLP
       75 14th Street NE
       Suite 2600
       Atlanta, Georgia 30309
              BY:  OYINKA MURAINA
              Omuraina@wtlaw.com



ALSO PRESENT:
       MATTHEW RIESDORPH, Legal Videographer

Page 3

I N D E X

JOHN O'BRIEN

Direct Examination by Ms. Muraina. . . . . . . .    6

Cross-Examination by Mr. Blankinship . . . . . . 235

E X H I B I T S

DEFENDANT'S EXHIBITS

Exhibit 1      John O'Brien CV. . . . . . . . . .    11

Exhibit 2      John O'Brien Expert Report . . . .   48

Exhibit 3      Documents Considered . . . . . . .   50

Exhibit 4      Second Amended Complaint . . . . .   53

Exhibit 5      December 2019 Reset Order. . . . .   90

Exhibit 6      Schuster Deposition Transcript . . 121

Exhibit 7      Sandler Deposition Transcript. . . 179

Exhibit 8      Lapointe Deposition Transcript . . 212

Page 4

(Proceedings began at 9:10 a.m.)

THE VIDEOGRAPHER:  Good morning.  We're going on the record at 9:10 a.m. on January 29th, 2026.  Please note that this deposition is being conducted virtually. Quality of recording depends on quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Dr. John O'Brien taken by counsel for the Defendant in the matter of Ira Brous versus Michelle Schuster versus Eligo Energy, LLC and Eligo Energy NY, LLC, filed in the United States District Court for the Southern District of New York, Case Number 1:24-cv-01260 (ER).

This deposition is being conducted remotely using virtual technology.  My name is Matt Riesdorph representing Veritext Legal Solutions, and I am the videographer.  The court reporter is Kelli LeBerte from the firm Veritext Legal Solutions.  I am not related to

Page 5

any party in this action, nor am I financially interested in the outcome.  If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present including remotely will now state their appearances and affiliations for the record beginning with the noticing attorney followed by the swearing in of our witness by the court reporter.  Thank you.

MS. MURAINA:  Hello.  My name is Oyinka Muraina.

MR. BLANKINSHIP:  My name is Greg Blankinship.  I'm with Finkelstein, Blankinship, Frei-Pearson & Garber.  I represent the Plaintiffs in this class -- in this case.  And before we proceed, I did just want to reserve our right to read and review the transcript and submit appropriate errata as needed.

MR. BELENKY:  Good morning.  My name is Andrey Belenky.  I'm with the firm Wittels, McInturff, Palikovic on behalf of the Plaintiff.

Page 6

JOHN O'BRIEN

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MURAINA:

Q.    Good morning.

A.    Good morning.

Q.    Good morning, Dr. O'Brien.  So to start, I wanted to go through some brief introductions.  So first, you do understand that you are here today to give sworn testimony; correct?

A.    Yes, I do.

Q.    And you understand that you are under oath and that your testimony today has the same force and effect as though you're testifying in court, correct?

A.    Yes, I do.

Q.    Thank you.

Are you currently taking any medication or experiencing any condition that would interfere with your ability to understand my questions today or answer them truthfully?

A.    No, I'm not.

Q.    And if at any point you don't understand my questions, you will let me know?

Page 7

A.   Yes, I will.

Q.   And if you need a break at any point other than, of course, while a question is pending, you'll also let me know; correct?

A.   Yes.

Q.   So because we are making a written record, it is important for you to answer verbally rather than with gestures or nods.

You understand that?

A.   Yes, I do.

Q.   And so if you answer yes, you'll say yes. No, no.  Correct?

A.   Yes, I understand.

Q.   So if you realize that you are -- that after answering a question that your answer is incomplete or inaccurate, you will let me know, correct?

A.   Yes, I will.

Q.   And you will answer the questions truthfully and completely to the best of your knowledge?

A.   Yes, I will.

Q.   Thank you.

And you understand that if your counsel makes an objection, unless he instructs you not to

Page 8

answer, you are still required to answer the question?

A.    Yes, I understand.

Q.    And if you are instructed not to answer a question, you understand that I may seek a ruling from the court on that matter, correct?

A.    Yes, I do.

Q.    And if you do not remember the answer to a question, you understand it's acceptable for you to say you do not recall?

A.    Yes.

Q.    But that if you say, I don't recall, and you genuinely -- and that you genuinely do not remember, it's that you do not remember and not just that you are uncertain or uncomfortable answering; correct?

MR. BLANKINSHIP:  Objection.  Vague and compound.  You can answer.

A.    Yes.

BY MS. MURAINA:

Q.    If reviewing a document would refresh your recollection, you will let me know; correct?

MR. BLANKINSHIP:  Objection.  I don't know that that's a requirement.  We don't have any documents yet.  Seems speculative.

Page 9

BY MS. MURAINA:

Q.    Dr. O'Brien?

A.    Could you repeat the question?

Q.    If reviewing a document would refresh your recollection, you'll let me know?

MR. BLANKINSHIP:  Same objection.

A.    Yes.

BY MS. MURAINA:

Q.    And you understand today I'll be asking you questions both about your background as well as your qualifications and the opinions you offer in this case?

A.    Yes, I understand that.

Q.    And you understand that your opinions in this matter are limited to those expressed in your report and any opinions fairly encompassed within that report?

MR. BLANKINSHIP:  Objection.  Vague.

A.    Yes, I understand.

BY MS. MURAINA:

Q.    And you're not here to offer legal opinions today, correct?

A.    Absolutely correct.

Q.    And you're not here to testify as a regulator on behalf of any regulatory body, correct?

Page 10

A.    Yes, that's correct.

Q.    So moving on to the prep for today's deposition.  You reviewed certain materials in preparation, correct?

A.    I'm sorry.  Please repeat that.

Q.    You reviewed certain materials in preparation for your deposition today, correct?

A.    Yes, I did.

Q.    And those materials are identified in your expert report, correct?

MR. BLANKINSHIP:  Objection.
Mischaracterizes his testimony.  Lack of foundation.

A.    For the most part, yes.

BY MS. MURAINA:

Q.    So other than those materials, you did not conduct any new analyses or investigation specifically for today's deposition?

A.    No, but I rely extensively on my expertise.

Q.    And before today, you met with Plaintiffs' counsel to prepare for your deposition, correct?

A.    Yes, I did.

Q.    And those preparation sessions included discussion of your expert opinions in this case,

Page 11

correct?

MR. BLANKINSHIP:  Objection.  I'm going to instruct him not to answer that.  That's attorney work product.

BY MS. MURAINA:

Q.    So other than counsel for Plaintiffs, you have not discussed your testimony in this case with anyone else, correct?

A.    No.

Q.    Thank you.

So with that background in mind, I'm going to move on to your CV.  Dr. O'Brien, I'm going to show you what's been marked as Exhibit 1 shortly.

(Defendant's Exhibit Number 1 was marked for identification.)

BY MS. MURAINA:

Q.    Are you able to see that?

A.    No.

Q.    And you're still not able to see --

A.    No.

Q.    -- your CV?

A.    No.

Q.    Just give me one moment.  Thank you.

THE VIDEOGRAPHER:  Counsel, I'm not sure if you were screen sharing or using exhibit

Page 12

share.  If you are screen sharing, nothing has been shared on the Zoom screen.

MS. MURAINA:  Thank you.

I am going to introduce and mark an exhibit that has been marked as Exhibit 2.  But for the record, I'm skipping Exhibit 1.  We're having difficulty with the exhibit share at the moment.

BY MS. MURAINA:

Q.    Well, are you able to see Exhibit 1 now?

A.    Yes, I am.

Q.    Are you able to recognize this document?

A.    It's simply a title page.

Q.    Is this your -- and this is your curriculum vitae, your CV, correct?

A.    Yes, that is correct.

Q.    And you prepared and approved this CV in connection with your work as an expert, correct?

A.    Yes.

Q.    And this CV was produced in this litigation, correct?

A.    Yes.

Q.    And you would agree that this CV is intended to accurately describe your professional experience and qualifications?

Page 13

A.    Yes.

Q.    And you would agree that the statements in this CV are true and correct -- true and accurate to the best of your knowledge, correct?

A.    Yes.

Q.    So Dr. O'Brien, on your CV, it lists a number of professional roles and experiences, correct?

A.    Yes.

Q.    Your CV does not list any peer-reviewed academic publications authored by you in the last several years, correct?

A.    Correct.

Q.    So other than the materials you prepared for litigation or consulting for clients, have you published any peer-reviewed articles or reviews on -- peer-reviewed articles on retail electric pricing in the last 10 years?

A.    Not in commercial publications.

Q.    And in any peer-reviewed journals?

A.    No.

Q.    And have you published any peer-reviewed articles on consumer understanding of utility bills?

A.    No.

Q.    And would you agree that publishing

Page 14

peer-reviewed research is one way experts test and validate their methodologies?

A.    That's one way.

Q.    So I'm going to go back and ask you some questions about your experience.  I'm going to try and go in chronological order from your most recent experience and going back.

So first to your experience as President and CEO of Vista Consulting.  Your CV states that you've held this role since April 2004; is that correct?

A.    Yes.

Q.    And Vista Consulting is a consulting firm to be clear?

A.    Yes.

Q.    And Vista Consulting does not sell electricity to retail customers, correct?

A.    That's correct.

Q.    And Vista Consulting, to be clear, does not bill residential customers for electric supply; correct?

A.    Correct.

Q.    So your CV lists a number of subject matter areas in which CV -- or in which Vista Consulting Group provides expertise.  Those include

Page 15

climate change, energy technologies, institutional

matters and litigation support, correct?

     A.   Yes.

     Q.   And in your role at Vista, are you

personally engaged in selling -- I apologize.  Let

me rephrase.

          At Vista, approximately how many years

ago -- while at Vista, approximately how many years

ago did you last personally work in a role involving

the sale of electricity to retail customers?

          MR. BLANKINSHIP:  Objection.  Vague.

BY MS. MURAINA:

     Q.   I'll rephrase.

          Approximately how many years ago were you

last involved in the actual sale of electricity to

retail customers?

          MR. BLANKINSHIP:  Objection.  Vague.

BY MS. MURAINA:

     Q.   If you understand, you may --

     A.   Probably about 15 or 20 years ago.

     Q.   And Vista Consulting is your primary

source of income, correct?

     A.   My primary, yes.

     Q.   And approximately what percentage of your

personal income comes from serving as an expert

Page 16

witness or litigation consultant?

MR. BLANKINSHIP:  Objection.  Compound.

A.    Probably about 75 percent.

BY MS. MURAINA:

Q.    And what percentage of Vista Consulting's work relates to expert testimony and litigation support?

A.    Probably about 60 to 70 percent.

Q.    How many employees does Vista Consulting currently have?

A.    None.  It's all independent contractors that I hire.

Q.    So to be clear, Vista does not employ economists, statisticians, survey researchers?

A.    Not as employees.

Q.    So moving on to your role as a professor. Your CV states that since 2007, you've been teaching as an adjunct professor in public admin at Flagler College; is that correct?

A.    Yes.

Q.    You're not a tenured professor at Flagler; is that correct?

A.    I'm sorry.  What was that?

Q.    You're not a tenured professor at Flagler?

A.    No, I'm not.

Page 17

Q.    So the courses listed in your CV include ethics, public service, economics, trade policy and social research methods; correct?

A.    Yes.

Q.    So do any of those courses involve the instruction -- involve instruction on retail electric billing mechanics?

A.    Not specifically.

Q.    Do you teach any courses on how ESCO prices are calculated or presented on customer bills?

A.    Not at the college, no.

Q.    So I take it then your teaching focuses on policy and ethics -- economics rather than hands on retail electric operations?

MR. BLANKINSHIP:  Objection.  Vague.

A.    They are all related.

BY MS. MURAINA:

Q.    But you said just now that you don't teach any courses on ESCO prices or how they're calculated on customer bills, correct?

A.    Not specifically.

Q.    And you also stated that your courses do not involve the instruction on retail electric billing mechanics?

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 18

MR. BLANKINSHIP:  Objection.  Asked and answered.  Mischaracterizes his testimony.

You can answer.

A.    Not specifically.

BY MS. MURAINA:

Q.    And approximately how many years has it been since you personally worked in a role involving day-to-day interaction with retail electric customers?

MR. BLANKINSHIP:  Objection.  Vague.

A.    Fifteen years.

BY MS. MURAINA:

Q.    So turning to your role as a litigation expert, in your experience section of the CV, you state that you've been involved in over 25 different judicial actions; is that correct?

A.    Yes.

Q.    And when you refer to judicial actions, what types of matters are you including?  For example, civil trials, arbitrations, regulatory proceedings, would those all be included in judicial actions?

A.    They are generally actions taken in a court of law either on a federal or state level and generally have to do with energy issues.

Page 19

Q.    So approximately how many of those matters have involved local public utilities?

A.    At least a third of them, maybe half.

Q.    Okay.  And independent energy service companies?

A.    More recently probably at least a third of them.

Q.    And any involving regulatory disputes?

A.    Yes.

Q.    And approximately how many of those matters were involved?

A.    Probably half of them.

Q.    So just to be clear, you've said utilities comprise about a third to one half of the matters you've handled.  Independent energy service companies comprise another third.  And then regulatory disputes you said one half?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Mischaracterizes his testimony.

BY MS. MURAINA:

Q.    So that's --

MR. BLANKINSHIP:  You can answer.

A.    Those percentages that I've given you are approximate.  If I were to sit down with my case history, I could probably come up with more accurate

Page 20

answers to your questions; however, generally
speaking, I do become involved in many different
litigation issues having to do with utilities.

BY MS. MURAINA:

    Q.   And how many of those matters would you
estimate involve ESCO specifically?

        MR. BLANKINSHIP:  Objection.  Asked and
answered.

    A.   Independent energy companies --

BY MS. MURAINA:

    Q.   Right.  Could you put a number to that
amount?

    A.   No, no.  Because the term ESCO applies in
a narrow sense.  While independent energy companies
is a much more broad area.

    Q.   So specifically with respect to ESCOs, can
you provide an estimate of how many matters have
involved ESCOs?

    A.   When you say ESCOs, are you talking -- can
you define what an ESCO is for me?  Because there
are many independent energy companies that may or
may not fall into that definition.

    Q.   So when you say independent energy service
companies, what categories of companies are you
referring to?

Page 21

A.    It may be a cogenerator.  It may be a company that provides energy technologies for reduction of energy use.  It could be a battery maker for battery backups for generation.  There are a lot of independent energy companies out there.

Q.    So if I ask you specifically about electric generation suppliers, specifically those that supply electricity to retail customers, how many of those matters have you been involved in?

MR. BLANKINSHIP:  I'm just going to -- objection.  Vague.

A.    The question is very broad.  I've been involved in issues both on a regulatory and also litigation basis having to do with utilities, having to do with generators who are independent, having to do with citing of generation, and just a large spectrum in the energy industry of companies that deal independently from utilities and also litigating against utilities.

BY MS. MURAINA:

Q.    So would you be able to point to any specific example of your work with an energy -- a state regulated energy supplier specifically?

MR. BLANKINSHIP:  Objection.  Vague.

A.    Not specifically.

Page 22

BY MS. MURAINA:

Q.    So now turning to the mix of matters for which you've been retained.

Across your expert work, would you say that you're retained more often by plaintiffs or defendants?

A.    Usually more often by plaintiffs, but I do also work for defendants.

Q.    What percentage would you attribute to work with plaintiffs versus defendants?

A.    Probably 80 percent to plaintiffs.

THE VIDEOGRAPHER:  Counsel, I'm so sorry to interrupt.  This is the videographer.  I just want to let you know you are still screen sharing just as a heads up.

MS. MURAINA:  That's fine.  I'll be going back and forth referring to the exhibit.  Thank you.

BY MS. MURAINA:

Q.    And how many times have you been retained by Blankinship, McInturff?

MR. BLANKINSHIP:  Objection.  Vague.  Lack of foundation.

BY MS. MURAINA:

Q.    You may answer.

Page 23

A.    I was engaged as a subject matter expert on a case --

MR. BLANKINSHIP:  Hold on.  I'm going to just caution you not to disclose the identity of any matters that you may have worked for attorneys as a consulting expert as opposed to a testifying expert.  Because if it's just the identification of consulting work you did, then that's covered by the attorney work product privilege.

A.    One matter that I've been engaged in.

BY MS. MURAINA:

Q.    And in your work as a testifying expert, have any courts or agencies ever limited the scope of your testimony?

MR. BLANKINSHIP:  Objection.  Vague. Calls for a legal conclusion.

You can answer.

A.    There was one case where part of my testimony was limited, but not for the reason of inadequate expertise.  It was limited because the judge in the case thought that me discussing that area, which the judge did conclude I was sufficiently expert in to testify about was not germane to the question in the case.  And as a

Page 24

result, I was excluded -- my testimony was excluded in that specific area, which I can describe in detail if you'd like.  But my testimony in general was not excluded and has never been excluded.

BY MS. MURAINA:

Q.    In which case was that?

A.    That was in a case involving Columbia natural resources in a state court in West Virginia.

Q.    And even if not excluded entirely, apart from that Columbia natural resources case, have any opinions you've offered been rejected or given little weight?

A.    No.

MR. BLANKINSHIP:  Objection.  Vague and calls for legal conclusion.

A.    No.

BY MS. MURAINA:

Q.    So now turning to one of the claims in your CV.  You mention 3.5 billion in judicial recoveries?

A.    Yes.

Q.    And what does that figure represent exactly?  Is it amounts awarded by a court?

A.    Generally in the cases I've been involved in, there aren't court awards per say, but rather

Page 25

settlements that are judicially approved by the court. And in some cases those -- the amounts of those settlements are disclosed. In others there is confidentiality involved. And so I don't know all of the settlements that were made. But of the settlements that I am aware of, it comes out to approximately $3.5 billion.

Q. And with respect to that figure, those are settlement amounts as opposed to a client's claimed exposure that was avoided?

MR. BLANKINSHIP: Objection. Vague.

A. I don't understand the question.

BY MS. MURAINA:

Q. So for example, one might say that they were -- if found liable, they could have been subject to, you know, a billion dollars in damages.

You're not including figures such as that in your 3.5 billion in judicial recoveries?

A. No.

Q. And are any of those recoveries related to ESCO cases, specifically state regulated energy suppliers?

MR. BLANKINSHIP: Objection. Vague.

A. Yes.

Page 26

BY MS. MURAINA:

Q.    And did any of those actions involve alleged breach of contract?

A.    I'm not going to testify on breach of contract.  That's a legal area that I do not deal in.  So I can't really answer that question for you.

Q.    But were the plaintiffs in any of those cases alleging breach of contract?

A.    That was not an issue that I testified about, so I don't know.

Q.    And is that 3.5 billion, is it attributable to a single case or multiple cases?

MR. BLANKINSHIP:  Objection.

A.    Multiple.  Multiple cases.

BY MS. MURAINA:

Q.    And approximately how many cases make up that figure?

A.    Probably anywhere 15 to 20.

Q.    And would you say the bulk of that is related to just one or two cases versus 15?  How is that distributed?

A.    The majority of it is related to a single case.

Q.    And what's the name of that case?

A.    That was a case involving SCANA, which is

Page 27

an electric utility, and the settlement was for
$2 billion.

Q.    And that's a public utility, correct?

A.    Yes, it is.

Q.    So moving on to your experience as a
commissioner.  Your CV states that from 2006 to
2008, you served as a commissioner on the Florida
Energy Commission; correct?

A.    Yes.

MR. BLANKINSHIP:  I'm sorry to interrupt.
Can you make that bigger, please?  I'm having a
hard time reading it just because it's a little
small.

Great.  Thank you.

BY MS. MURAINA:

Q.    So that was a policy making and advisory
role to the Florida legislature, correct?

A.    Correct.

Q.    And that commission is separate and
different from the Florida Public Service
Commission, correct?

A.    It is a legislative commission, not a
regulatory commission.

Q.    And how many commissioners were there?

A.    Nine.

Page 28

Q.    And approximately how often did you meet as a body?

A.    At least once a month.

Q.    And in that role you were not selling electricity to retail customers, correct?

A.    I'm sorry.  Can you repeat the question, please?

Q.    In that role, you were not selling electricity to retail customers, correct?

A.    No.

Q.    And that role involved energy policy recommendations as opposed to retail billing or pricing operations, correct?

A.    There were some retail billing and pricing issues that were debated and discussed on the commission level.

Q.    And how many years ago did that service conclude?

A.    2008.

Q.    So your CV specifically references promulgation of energy laws and regulation.

What do you mean by promulgation in that context?

A.    Well, promulgation is the process that occurs, generally speaking, subsequent to

Page 29

legislation, usually enabling legislation, a regulatory body is funded and given a charge. That regulatory body is given the charge to interpret the legislation and to form regulations that will be used to steer the policies that the regulator believes that the legislation was aimed at concluding. And then those regulations are published as a separate set of rules. And essentially promulgation, which is usually done in the process of something called rule making.

The regulatory body goes through a process of taking public comment and input from numerous parties and the public, and formulates regulations that are meant to be essentially guides for participants in that industry to follow.

Q. So to be clear, have you drafted any statutes?

MR. BLANKINSHIP: Objection. Vague.

A. Have I draft -- I'm sorry. But have I drafted statutes? Yes. But that was just some things I've done in different times when I was lobbying on that. And the statutes -- I've never drafted a statute that a legislature has passed.

BY MS. MURAINA:

Q. Have you drafted any regulations that a

Page 30

regulatory body has adopted?

A.   When you are in a rule making proceeding, then what happens is as a party, not as a lawyer, but as an interested party as the jargon goes, one will submit proposed language on regulations to usually an administrative law judge who then makes a determination as to whether to put that in the report or not.  And the report will often suggest what the regulation should be to the commission, the regulatory commission itself, which will then consider that.

Q.   So you say that you've submitted recommendations as an interested party?

A.   That's correct.

Q.   And have you ever worked for the New York Public Service Commission?

A.   As an employee?

Q.   Correct.

A.   No.  I have as a consultant.

Q.   Have you ever served as a New York regulator or adjudicator interpreting the uniform business?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Could you make that question more clear?

John O'Brien                                      January 29, 2026
Brous v. Eligo Energy, LLC

Page 31

BY MS. MURAINA:

Q.    Have you ever served as a New York regulator or adjudicator interpreting regulations related to energy companies?

A.    No.

Q.    Have you ever had authority to interpret or enforce the uniform business practices of the New York Public Service Commission?

MR. BLANKINSHIP:  Objection.  Vague.

A.    Authority to enforce?

BY MS. MURAINA:

Q.    Yes.

A.    No.

Q.    And approximately how many times have you testified about the New York Public Service Commission and the UBPs?

By UBP, I mean the Uniform Business Practices specifically.

MR. BLANKINSHIP:  Objection.  Vague and compound.

A.    Please repeat.

BY MS. MURAINA:

Q.    How many times have you testified about the New York UBPs specifically?

A.    The New York what?

Page 32

Q.    Uniform business practices.

A.    I haven't.

Q.    And have you ever interpreted General Business Law Section 349(d)?

MR. BLANKINSHIP:   Objection.   Vague. Calls for a legal conclusion.

A.    I don't interpret the law.

BY MS. MURAINA:

Q.    And for this next section, I'm just going to go through some of your experience just to confirm.  And then I'll go on to discuss your role at Wheeled Electric Power Company in more detail.

So your CV states that you served as managing partner of Shale and Sands Oil Recovery Company from 2004 to 2020, correct?

A.    Yes.

Q.    And that work involved integration of nuclear technologies?

A.    Yes.

Q.    That role did not involve selling electricity to residential customers, correct?

MR. BLANKINSHIP:   Objection.   Vague.

A.    I'm sorry?

BY MS. MURAINA:

Q.    That role -- I apologize.

Page 33

Were you asking for clarification?

A.   Yes.

Q.   That role did not involve selling electricity to residential customers, correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Correct.

BY MS. MURAINA:

Q.   And from February 2003 to March 2004, you served as President and CEO of Global Change Associates, correct?

A.   Yes.

Q.   And that's an international consulting firm?

A.   Yes.

Q.   Did you advise any ESCOs in that role?

A.   Yes.

Q.   Could you please name some?

A.   Tokyo Electric Power.  Union Fenosa in Spain.  Those were two.

Q.   Were there any others?

A.   Yes, there were others.  I don't recall all of them.  But I advised -- advised energies on how to go about selling electricity to the public. My two major clients in that regard were Tokyo Electric Power.  And that's a Japanese electric

Page 34

company that was establishing a regulating market affiliate, which is an ESCO.

　　　　And Union Fenosa in Spain, which is the largest natural gas company in Spain.  And I was advising them on how to set up their independent electric marketing companies based on the U.S. model, which was really leading the world and still does with regard to how competition can be introduced into the energy markets, regulated energy markets.

Q.   And to be clear, are any of those -- were any of the ESCOs you advised based in the United States?

A.    Not with that -- well, yes, they were. We're going back a long way.  So I don't recall every client that I had.  But as I recall, I was advising at that time Enron Power Marketing on their ESCO operation.  My memories are not completely clear going back that far on exactly the clients I had and what I advised them on.  Yes, I did advise major firms on how to set up and operate their ESCOs.

Q.   And to be clear, that work was more than 20 years ago?

A.   Yes.

Page 35

Q.   So in what state markets are unlicensed ESCOs currently allowed to supply power and gas to retail customers?

A.   I'm sorry.  Could you repeat that question?

Q.   In what state markets are unlicensed ESCOs, so ESCOs without a license, allowed to supply power and gas to retail customers?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  You can answer.

A.   Generally speaking, ESCOs are licensed by regulators, so I don't know of any.

BY MS. MURAINA:

Q.   Thank you.

And in your role -- moving now to your role at Skipping Stone.  You were a principal at Skipping Stone from January 2000 to February 2003?

A.   Yes.

Q.   And in that role, you advised clients on restructuring and markets; correct?

A.   Yes.

Q.   And again, you were not selling electricity to residential customers in that role; correct?

A.   I'm sorry.  Please repeat that.

Page 36

Q.   You were not selling electricity to residential customers in that role?

A.   No.  I was advising utilities on how to go about doing it.

Q.   And from January 1999 to January 2000, you served as President and CEO of All Power Corporation?

MR. BLANKINSHIP:  I'm sorry.  Could you -- can you scroll down when you're referring to the next part?  Thank you.

A.   Yes.

BY MS. MURAINA:

Q.   And All Power marketed natural gas to commercial customers, correct?

A.   Yes.

Q.   It did not market retail electric service to residential customers, correct?

A.   Correct.

Q.   And that work also occurred approximately 25 years ago, correct?

I didn't hear your answer.

A.   Yes.

Q.   So now turning to your work at Wheeled Electric Power Company.

A.   Yes.

Page 37

Q.   So your CV states that from 1993 to 1998, you served as President and CEO of Wheeled Electric; is that correct?

A.   Yes.

Q.   And Wheeled Electric operated during the early period of electric industry restructuring; is that correct?

A.   Yes.

Q.   And during that time, was Wheeled Electric actively selling retail electric service?

A.   Yes.

Q.   And was Wheeled Electric selling retail electric service to residential customers at scale?

MR. BLANKINSHIP:   Objection.   Vague.

A.   Yes.

BY MS. MURAINA:

Q.   And when I say "at scale," I mean to ask whether Wheeled Electric served thousands of residential customers as opposed to administering pilot programs or limited customer groups.

Can you explain?

A.   Thousands of residential customers.

Q.   And your CV states specifically that Wheeled Electric served mass market small to medium commercial customers; is that correct?

Page 38

A.    Yes.

Q.    And now reading from the CV, it states that Wheeled Electric was able to obtain, quote, high margin customers through well-developed marketing techniques developed over three years of actual marketing and delivery of electricity to retail customers.

Did I read that correctly?

A.    Yes.

Q.    That statement refers to Wheeled Electric's experience, correct?

A.    Yes.

Q.    And high margin customers, that refers to customers that generated high profitability; is that correct?

A.    In the commercial market, yes.

Q.    And those marketing techniques were developed in the mid-1990s, correct?

A.    Yes.

Q.    Approximately 30 years ago?

A.    Yes.

Q.    And would you say that the regulatory environment for retail electric markets has changed substantially in that time?

MR. BLANKINSHIP:    Objection.    Vague.

Page 39

A.   Over a period of time there have been changes, yes.  But the underlying construct of that market remains the same.

BY MS. MURAINA:

Q.   But there have been changes, correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   There have been some changes, yes.

BY MS. MURAINA:

Q.   Going through the rest of your experience. From 1985 to 1992, you served as President and CEO of Direct Gas Supply Corporation?

A.   Yes.

Q.   And that company operated in the natural gas market, not retail electricity, correct?

A.   Yes.

Q.   And the natural gas market structure and consumer protections at that time were different than they are today, correct?

MR. BLANKINSHIP:  Objection.  Vague. Asked and answered.

A.   I'm sorry.  I don't understand your question.

BY MS. MURAINA:

Q.   Was the natural gas market and the

Page 40

consumers protections at that time, were they

different than they are today?

          MR. BLANKINSHIP:  Objection.  Vague.

     A.   For the most part they're still the same.

BY MS. MURAINA:

     Q.   And this work occurred more than 30 years

ago, correct?

     A.   Yes.

     Q.   And finally to your role at Brookhaven

National Laboratory.  You served in the role of a

full scientist from 1976 to 1985?

     A.   Yes.

     Q.   And that role involved research and

consultation on energy regulation?

     A.   Yes.

     Q.   It did not involve selling electricity to

retail customers?

     A.   There was no -- at that time there was no

selling -- independently selling electricity to

customers.

     Q.   Thank you.

          Sitting today -- sitting here today, would

you agree that your direct experience selling or

marketing retail electricity to consumers occurred

primarily in the 1990s?

John O'Brien                                          January 29, 2026
Brous v. Eligo Energy, LLC

Page 41

MR. BLANKINSHIP: Objection. Objection. Vague.

A. I have advised after that on how to perform that. And I have maintained a level of expertise with regard to the overall markets. So I wouldn't say that there was some stoppage of expertise at some point.

So I have kept up on all of that. I have given reports to regulators, for instance, even as recently as a year ago on issues that have to do with the prices of electricity that residential customers pay. So I'm not going to concede that all of my expertise somehow terminated at that point.

BY MS. MURAINA:

Q. Yes, but your direct experience selling and marketing retail electricity to consumers occurred primarily in the 1990s, correct?

MR. BLANKINSHIP: Objection. Vague. Asked and answered.

A. My direct experience of being -- representing an entity that actually sold electricity did end at that period of time.

BY MS. MURAINA:

Q. And now to clarify, do you have any formal academic training in consumer psychology?

John O'Brien                            January 29, 2026
Brous v. Eligo Energy, LLC

Page 42

MR. BLANKINSHIP:  Objection.  Vague.

A.   Yes.

BY MS. MURAINA:

Q.   And does that training involve behavioral economics?

A.   Yes.

Q.   And do you have training in survey design or sampling methodologies?

A.   Yes.

Q.   As well as training in experimental design and market research methods?

A.   Yes.

Q.   Have you ever conducted a consumer survey as part of your professional work?

MR. BLANKINSHIP:  Objection.  Vague.

A.   I have not directly conducted a consumer survey that I can recall.

BY MS. MURAINA:

Q.   And with respect to this case, did you conduct any surveys or empirical studies of Eligo customers?

A.   Could you please narrow your question? That is a vague question.

Q.   Did you conduct any surveys of Eligo customers?

Page 43

MR. BLANKINSHIP:  I'm going to object that that's vague.  You can answer.

THE WITNESS:  What's that?

MR. BLANKINSHIP:  I objected that was vague, but you can answer the question.

A.    Have I conducted, actually been the principal that designed, executed, selected samples, analyzed the results?  Was that the question?

BY MS. MURAINA:

Q.    Correct.

A.    No.

Q.    And have you done any empirical study of Eligo customers?

MR. BLANKINSHIP:  Objection.  Vague.

A.    No.

BY MS. MURAINA:

Q.    And moving on to your econometrics expertise.

Do you have any formal training in econometrics?

A.    Any what?

Q.    Econometrics.

A.    Yes.

Q.    Do you have training in regression analysis or causal inference?

Page 44

A.    I'm sorry.  I can't understand your question.

Q.    Do you have any training in regression analysis or causal inference?

A.    Yes.

Q.    In regression analysis?

A.    I teach it.

Q.    Have you built damages models in prior matters?

MR. BLANKINSHIP:  Objection.  Vague.  And I'm going to caution the witness not to discuss any consulting expert work you might have done. Only disclose any instance in which you were an actual testifying expert.

A.    Could you repeat the question?

BY MS. MURAINA:

Q.    Have you built any damages models in prior matters?

MR. BLANKINSHIP:  Same instructions. Don't talk about anything other than cases where you were a testifying expert.

A.    I generally don't testify about damage calculations, only the data that are input ultimately by a professional data expert -- I'm sorry, damage expert.

Page 45

BY MS. MURAINA:

Q. So in this case, you are not offering a damages opinion; is that correct?

MR. BLANKINSHIP: Objection. Vague. Calls for a legal conclusion.

A. No.

BY MS. MURAINA:

Q. Thank you.

MS. MURAINA: Before we proceed to the next section, could we take a five-minute break?

MR. BLANKINSHIP: Sure.

THE VIDEOGRAPHER: Thank you, Counsel.

We're going off the record. The time is 10:08 a.m., and this marks the end of media unit number one.

(A break was taken.)

THE VIDEOGRAPHER: We're going back on the record. The time is 10:17 a.m.

This marks the beginning of media unit number two. Please proceed, Counsel.

BY MS. MURAINA:

Q. So Dr. O'Brien, you were retained by counsel for Plaintiffs in this case; correct?

A. For what? I'm sorry.

Page 46

Q.   For counsel -- sorry.  Let me rephrase.

You were retained by counsel for Plaintiffs; is that correct?

A.   For plaintiffs you say?

Q.   Yes, by Plaintiffs' counsel.

A.   Yes.

Q.   You were not retained by Eligo?

A.   No.

Q.   And you were asked to review materials provided by Plaintiffs' counsel?

A.   Yes.

Q.   And you were asked to offer opinions supporting Plaintiffs' claims, correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Yes.

BY MS. MURAINA:

Q.   And you were not asked to independently investigate the facts that Plaintiffs alleged?

MR. BLANKINSHIP:  Objection.  Vague.

A.   I was not asked -- I was asked to use my expertise, and I used my expertise which has to do with organizational consumer behavior.

So I wouldn't be able to answer that the only thing I looked at was whatever Plaintiff counsel gave me.

Page 47

BY MS. MURAINA:

Q.   So would you say -- I'll rephrase.

You were not asked to determine whether Plaintiffs' allegations were true or false; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Calls for a legal conclusion.

A.   Where Plaintiffs' suggestions involve interpretation of law, I didn't go there at all.

BY MS. MURAINA:

Q.   But with respect to the facts that Plaintiffs alleged, you did not investigate whether they were true or false; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   I investigated the issues surrounding the facts that were presented and I did review things like depositions of Eligo employees.

So it was not just a matter of looking at regulatory documents provided to me.  In addition to that, I used my expertise extensively in organizational and consumer behavior, as well as my expertise in public administration.

BY MS. MURAINA:

Q.   But you accepted Plaintiffs' allegations as true; is that correct?

Page 48

MR. BLANKINSHIP:  Objection.

BY MS. MURAINA:

Q.  Fair?

A.  No.  I looked at the evidence that I was presented, the evidence that I collected, and I'm not issuing a legal opinion about whether their conclusions as alleged in the complaint are true or false.

Q.  Okay.  Understood.  I'm going to in a moment show you an exhibit that we'll mark Exhibit 2.

(Defendant's Exhibit Number 2 was marked for identification.)

BY MS. MURAINA

Q.  I'll be sharing my screen in just a moment.

Do you see Exhibit 2 on your screen?

A.  Yes, I do.

Q.  And that's your expert report in this case dated September 12th, 2025, correct?

A.  Yes.

Q.  And you reviewed the report before today's deposition, correct?

A.  Yes.

Q.  And you prepared this report; is that

Page 49

correct?

A.    Yes, I did.

Q.    And this report contains all of the opinions you intend to offer in this case?

MR. BLANKINSHIP:  Objection.  Vague.  Incomplete hypothetical.  Sorry.  Lack of foundation, I should say.

A.    Yes.

BY MS. MURAINA:

Q.    So you're not offering any opinions not contained in this report?

MR. BLANKINSHIP:  Sorry.  Objection.  Incomplete -- sorry.  Lack of foundation and vague.

A.    Not at this time.

BY MS. MURAINA:

Q.    And you did not perform any additional analyses after this report was issued; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    No, that's not correct.

BY MS. MURAINA:

Q.    What additional analyses did you conduct after issuing this report?

A.    I performed an analysis of Dr. Aron's

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 50

report and created a rebuttal report, which I also authored.  So there were other analyses that went on after this report.

Q.   Okay.  And with the exception of the rebuttal report, were there any other analyses that were conducted after this expert report?

A.   No formal analyses.

Q.   Thank you.

I'm going to stop sharing my screen.

So I am now going to mark and show you Exhibit 3 in a moment.

THE VIDEOGRAPHER:  Counsel, this is the videographer.  I want to let you know when you are screen sharing like that, you are sharing all your documents.  Just as a heads up.

MS. MURAINA:  I thought I had stopped sharing.  Thank you.

(Defendant's Exhibit Number 3 was marked for identification.)

BY MS. MURAINA:

Q.   Exhibit 3 is a document entitled "Documents Considered," correct?

A.   I see the title, yes.

Q.   And this is the list of materials you considered in forming your opinions; is that

Page 51

correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    I guess so, yeah.

Could you make that bigger?

BY MS. MURAINA:

Q.    Sure.  I'm not going through the specifics of the documents.  I wanted to let you see the general contents.  This list is intended to be complete; is that correct?

A.    As complete as I could make it at the time I reported those documents to Plaintiff counsel.

Q.    And if a document is not listed amongst these, is it fair to say that you did not rely on it in forming your opinions?

A.    No.  The fact is I rely on my expertise, which has a very deep basis and many scholarly articles that are peer-reviewed that are written by social scientists about topics that may have to do with this.  But these are the documents that I principally relied on.  But there were other studies, other things that I teach about that I rely on to form my opinions that don't -- that aren't necessarily fully captured in this document.

Q.    And from these documents, you did not consider any consumer surveys; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.  Consumer surveys.  I looked at plenty of consumer surveys and empirical studies that are done.  I'm not sure what you mean by not consider consumer surveys.

BY MS. MURAINA:

Q.  Did you consider any empirical studies or consumer surveys of Eligo customers specifically?

A.  There is no analysis that I examined where the subject pool was Eligo customers.

Q.  And other than what is listed here, you did not seek out any additional data on your own; is that correct?

A.  I am constantly seeking out additional data having to do with organizational consumer behavior because I teach courses in that.  So I can't tell you that I have stopped looking at documents that address that level of my expertise.

Q.  You did not conduct your own experiments or studies in preparation of this report; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.  That is correct.

BY MS. MURAINA:

Q.  So I'll stop sharing.

Page 53

So turning now to your reliance on the pleadings.  Your report states that you relied on the First Amended Complaint in forming your opinions; is that correct?

A.   As I recall, yes.

Q.   And did you also review the Second Amended -- Amended Complaint in this case?

A.   I believe I did.  I don't recall specifically.  Those complaints were filed a very long time ago.

Q.   All right.  If you give me a moment, I'm going to show you what we'll mark as Exhibit 4.

(Defendant's Exhibit Number 4 was marked for identification.)

BY MS. MURAINA:

Q.   What is on the screen is Exhibit 4.

Do you see that on your screen Dr. O'Brien?

A.   Yes, I do.

Q.   Exhibit 4 is the Second Amended Complaint filed in this case, correct?

A.   That's what it says, yes.

Q.   So you reviewed this document after it was filed; is that correct?

MR. BLANKINSHIP:  Objection.

Page 54

A.    Yes.

BY MS. MURAINA:

Q.    Did you revise or supplement your report after reviewing the Second Amended Complaint?

MR. BLANKINSHIP:  Objection.  Vague.

A.    I don't believe I did.  It may have been filed about the same time as the report.  But I don't recall the exact timing of when I wrote the report.

BY MS. MURAINA:

Q.    So your opinions remain based on the same assumptions you made when relying on the First Amended Complaint; is that correct?

MR. BLANKINSHIP:  Objection.
Mischaracterizes his testimony.  Vague.

A.    No.  I most likely read the second amended report as well.  The report that I provided in this case was done at the end of October, while this was filed midway through September.

So I didn't change my opinions based on the changes from the first and the second.  But I did read the second and my opinions stem from that.

BY MS. MURAINA:

Q.    So to be clear, you did not perform any new analyses based on changes between the First and

Page 55

Second Complaint?

A.   No.   I looked at the redlines.   Actually, at that time, there were very few changes that were material.

Q.   So your opinions are the same irrespective of the filing of the Second Amended Complaint?

MR. BLANKINSHIP:   Objection.   Asked and answered.

A.   Yes.

BY MS. MURAINA:

Q.   I'll stop sharing my screen now.

In forming your opinions, to go back to the complaint, you assumed the factual allegations in the complaint were true?

MR. BLANKINSHIP:   Objection.   Asked and answered.   Calls for a legal conclusion. Vague.

A.   My report is independent of the allegations in the report -- in the complaint itself.   And based on my expertise as well as evidence that not only presented, but evidence that I typically collect, analyze, and understand in the course of my teaching, as well as in other cases I'm involved in that involve similar subject matter.

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 56

BY MS. MURAINA:

Q.   Well, for example, did you test whether Plaintiffs' description of how they enrolled with Eligo was accurate?

A.   I did because much of that is also captured in the depositions of Eligo personnel, which I did read as well in the complaint.

Q.   Okay.  So based on your characterizations of your process, you would agree that assuming one party's allegations to be true is different from independently testing them; is that correct?

MR. BLANKINSHIP:  Objection.  Incomplete hypothetical.  Vague.

A.   I'm not sure what your question is.

BY MS. MURAINA:

Q.   I mean to ask:  Is there a difference between assuming a party's allegations are true and testing them independently?

MR. BLANKINSHIP:  Same objections. Outside the scope of his report.

A.   I made no assumption that the allegations were true.  I did survey a great deal of evidence, some of which you have there.  But I also, for instance, in reading the depositions of Eligo personnel led me to some conclusions as well.

Page 57

So it isn't a matter of simply assuming that what's in the complaint is, in fact, facts.

BY MS. MURAINA:

Q.   So independently assessing the evidence before you is a different process than assuming everything before you is true?

MR. BLANKINSHIP:   Objection.  Asked and answered.  Vague.  Outside the scope of his report.

A.   I believe what you're asking is, did I believe everything in the complaint without independent analysis.  Is that correct?

BY MS. MURAINA:

Q.   Yes.  And also specifically to distinguish between those two processes so that doing an independent assessment is different, categorically different from assuming everything you're presented with is true.

MR. BLANKINSHIP:   Hold on.  There's no question pending.

BY MS. MURAINA:

Q.   Is it correct that those two processes are different?

MR. BLANKINSHIP:   Objection.  Vague. Asked and answered.

Page 58

You can answer if you can.

A.    I conducted both.  I looked at the complaint, and then I looked at the evidence.  And they are different processes, but they're in the same basic process of analyzing not only the allegations, but the evidence that was provided to me, as well as evidence I developed myself, along with my expertise in putting the report together.  And that is a separate process, yes.  I did not read the complaint and pair it with what the complaint said.

BY MS. MURAINA:

Q.    Thank you.

So your report uses terms like intentional, knowing, and other types of language to -- or similar types of language to describe Eligo's conduct.

Would you agree with that statement?

A.    Could you repeat that because you're attempting to quote me and I'd like to get a little more clarity on what the quote is you're asking me about.

Q.    Specifically your report uses terms like intentional and knowing to characterize Eligo's conduct; is that correct?

Page 59

A.    Yes.

Q.    You did not personally interview Eligo personnel to determine their intent; is that correct?

A.    I rely on sworn testimony in depositions, which is essentially an interview which I didn't conduct, but was conducted under oath.  And relying on depositions is generally accepted as what an expert witness does when they are looking at the, as you put it, intentions of the opposing party.

Q.    To be clear, you did not conduct any interviews of Eligo personnel; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    I did not conduct direct interviews with Eligo personnel myself.

BY MS. MURAINA:

Q.    And there is no scientific or empirical method to determine a company's intent from outside documents alone; is that correct?

MR. BLANKINSHIP:  Objection.

A.    No.

BY MS. MURAINA:

Q.    You may answer.

MR. BLANKINSHIP:  He did.

Page 60

BY MS. MURAINA:

Q.    I apologize, I didn't hear.

A.    No.

Q.    So what would be -- in your view, what would be the scientific method for determining a company's intent looking at outside documents?

A.    Looking at a deposition where a deponent says, "We intended to do this" would be indicia of that intent.

Q.    So you would need the deponent to have said that they intended to do the activity in order to infer intent?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.  Incomplete hypothetical.

THE WITNESS:  Pardon me?

MR. BLANKINSHIP:  I said it's an incomplete hypothetical.  But you can answer.

A.    Yeah, basically if a deponent under oath says they intended to do something, it's ultimately reasonable to assume that they were telling the truth.

BY MS. MURAINA:

Q.    And what would be the -- so your inclusion -- your conclusions about Eligo's intent

Page 61

are based on inference and judgment; is that
correct?

          MR. BLANKINSHIP:  Objection.
     Mischaracterizes his testimony.  Vague.
     A.   The intent was verbatim stated by
deponents at times in the depositions and also in
other communications that were in the production,
discovery production.  I'm not certain why there's a
question about a statement like "we intended to"
does not indicate intent.
BY MS. MURAINA:
     Q.   So I ask because -- let me -- would you
agree that determining whether a defendant acted
intentionally or knowingly is typically something
reserved for the jury?
          MR. BLANKINSHIP:  Objection.  Outside the
     scope of his testimony.  Calls for a legal
     conclusion.
     A.   It's a legal conclusion and I cannot
provide you with any legal conclusions as an expert
witness rather than as an attorney.
BY MS. MURAINA:
     Q.   So then as an expert witness, you are not
qualified to assess whether the Defendant acted
intentionally or knowingly; is that correct?

Page 62

MR. BLANKINSHIP:  Objection.

Mischaracterizes his testimony.  Vague.

A.    No.  No.  I've -- your line of questioning is confusing, to say the least.  The intentionality that you are getting at was voiced verbatim by Eligo personnel in depositions.

Now in terms of whether it was legal in a court of law or anything else, I'm not a lawyer. I'm here to report on the facts as I analyze them in reading numerous different documents, including depositions that were provided under oath to questions of intentionality.

BY MS. MURAINA:

Q.    So when you say depositions related to questions of intentionality, and I understand I'm paraphrasing there, do you mean to say that you are relaying direct quotes of a deponent's testimony as opposed to legally categorizing the Defendants' activity as intentional or knowing?

MR. BLANKINSHIP:  Objection.

Mischaracterizes testimony.  Outside the scope of his report.  Calls for a legal conclusion.

A.    I don't carry the entire set of depositions in my head.  I know what I read.  And intentionality does come through the depositions

Page 63

pretty clearly.  And I am baffled by your line of
questioning when it comes to whether I can determine
that something was done intentionally when the
stated goal in the deposition is that the deponent
says, yes, we intended to do something.

So I am not testifying about the law.  I'm
not testifying about what the court will decide.
I'm not testifying about legal conclusions.  I'm
testifying about what I read.  And in my expert
capacity as somebody who can understand English, I
have determined that in fact there was
intentionality for some of the things that went on.
BY MS. MURAINA:

Q.    But when you use the term intentional or
knowing, you are not using those terms as they are
utilized in a legal sense?  Those are not legal
conclusions?

A.    I'm not drawing any legal conclusions in
this deposition at all.

Q.    So your report also contains some language
that may convey moral judgment about Eligo's
conduct.  Would you say that's correct?

MR. BLANKINSHIP:  Objection.  Vague.  Lack
of foundation.

A.    I would characterize those statements as

Page 64

based in scholarly area of my expertise and ethics. And ethics does involve morality, but really the overriding principle is that of ethical behavior.

BY MS. MURAINA:

Q.   So in this area of ethics, your characterizations are not derived from any quantitative analysis.  Would that be correct?

A.   The area of ethics is a philosophical area to start with where it starts with the philosophy. There are several very well-known scholars who have opined on what ethics are throughout centuries starting with Aristotle.

And the fact is that ethics is a well-developed area in the area of public administration, which involves the use of ethical principles in both government and business.  And the idea that it is centralized in morality is not really correct.  It is centralized in public issues.

And as a result, ethics are developed about how contracts should be pursued and implemented.  And I have a very strong area of expertise and taught many courses on ethical behavior.  And if I base a statement about something not being ethical, it is based in a far broader area of expertise than simply reading documents that are

Page 65

involved in this matter.

Q.   Would you say that conveying moral judgment -- would you say that that reflects a normative assessment of conduct on your part?

MR. BLANKINSHIP:   Objection.   Vague.

A.   Normative being normal?

BY MS. MURAINA:

Q.   Are you assessing the conduct based on your own views as opposed to using a method?

MR. BLANKINSHIP:   Objection.   Vague. Mischaracterizes his testimony.

A.   No.   I'm addressing it based on ethical principles of principally areas like good faith and fair dealing, which is an ethical principle that's embodied and is generally required to be ethical in a business transaction.

BY MS. MURAINA:

Q.   And I'm going to turn now to methodology actually.   Specifically, your use of the term "reasonable consumer expectations".

A central opinion in your report concerns what a reasonable consumer would expect; is that correct?

A.   Yes.

Q.   Within your report you did not define

Page 66

reasonable consumer using any survey instrument; is that correct?

A.   I did not conduct any surveys.

Q.   So to be clear, you did not test any actual Eligo customers in deriving your understanding of reasonable consumer?

MR. BLANKINSHIP:  Objection.  Vague. Asked and answered.

A.   Not that I'm aware of.  I had a lot of customers in New York, and I don't know if any of them were Eligo customers ultimately.

BY MS. MURAINA:

Q.   So you did not analyze whether consumer expectations varied over the seven year or so class period?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Consumer expectations have been consistent since the competitive opportunities case in 1996 where all of this started where in that proceeding the principal goal of the competitive opportunities case was about pricing and what consumers would benefit by in terms of pricing.  And what consumers' expectations were at that point in time in a -- not a legal proceeding, but a regulatory proceeding where all points of view were taken.  And as a

Page 67

result, the genesis of my understanding of consumer expectations came from that and also my experience in actually running two major ESCOs and dealing with those customers.

So I'm not sure -- you talk about a survey, a scientific survey.  And I spoke to an awful lot of these normal customers over years.  And while that's not a scientific survey, what I did then rely on was -- and this is my method -- was to look at actual scientific surveys where humans were put into a subject pool and the consistency of that subject pool was subject to the analytical tenets of statistical analysis.

And then those subjects were then tested with a protocol that looked at what their expectations might be in various studies, and then data collected.  And then standard deviations calculated, and then conclusions reached.  And that is my method of being able to render an opinion about customer expectation.

Q.   So taking a step back.  You refer to your interactions with consumers over the course of your career.  Were any of those consumers residential customers as opposed to commercial customers?

A.   Many residential customers.

Page 68

Q.    And approximately how many years ago was that?

A.    That was about 20 years ago.

Q.    And would you agree that reasonable experts could disagree about what a reasonable customer would expect?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  Vague.  Calls for a legal conclusion.  You can answer if you can.

A.    Experts come from all different colors and strains.  And I think that you could take an expert who doesn't know a lot about the energy business, for instance, and instead substitute judgments and priorities based on the sale of food in an unregulated marketplace.  And so my general area of inquiry has always involved regulated marketplaces.

So customer expectations outside of that are not where I base my expertise.  So I will, for instance, look at a government program, and there's something in public administration called program evaluation.  It is a methodology where one considers a number of different things besides price.  It might consider benefits in a transaction.  It might consider the public interest.

So it's a very broad area.  And I think

Page 69

that you can find experts that are going to make an analysis based on some other type of market that's out there aside from what the market is I think is the subject of this matter, and make some determination that lies well outside of that market.

Q.   So from saying that, do you mean to say that there can be various definitions of what one would expect a reasonable customer to conclude?

MR. BLANKINSHIP:  Objection.  Outside the scope of his testimony.  Vague.  Asked and answered.  You can answer.

A.   The context of the specific transactions matters, yes.  I would say that there are different expectations involved in different types of transactions.  And I believe that if you were looking at a pure consumer market as opposed to a highly regulated consumer market, you're going to find different expectations.

BY MS. MURAINA:

Q.   Perhaps we should turn to a specific example.  In your report, you opine that reasonable consumers would understand market factors to refer to wholesale markets; is that correct?

MR. BLANKINSHIP:  Objection.

A.   That's correct.

John O'Brien                                      January 29, 2026

Brous v. Eligo Energy, LLC

Page 70

BY MS. MURAINA:

Q.   And elsewhere in your report, you acknowledge that there is a retail market in which consumers buy electricity from ESCOs; is that correct?

A.   Yes, but that's not a market as defined in the economics of pricing.

Q.   So you did not test whether consumers might understand market factors to include retail market conditions; is that correct?

A.   That's correct.  I don't believe that they do.  I think that the market -- there is no -- first of all, there is no retail market.  A marketplace is defined by a number of buyers and sellers in a market where there are reasonable transactions going on and there is a mechanism for price discovery that ends up with a market clearing price.  That's what a market is.  There is no retail market.  That is a market -- you're talking, I assume, about ESCOs.  That is a market that is very fragmented and is typified by one-offs, one on one; one buyer, one seller making a transaction.

A marketplace as defined in the energy business involves a large number of buyers and sellers in bilateral transactions with a mechanism

Page 71

for determining a market clearing price, which is then the market price.  And that is really what a market price is.

Q.   So to be clear, you did not test whether consumers might understand market factors to refer to the retail market?

MR. BLANKINSHIP:  Same objections.  Asked and answered.

A.   Market factors to a retail energy customer, which is a context which I have dealt in for most of my life, bears the knowledge of the fact that there is a wholesale market for energy that underlies the retail market, that they go to a gas station, they see a gas pump with the pricing.  They understand that when they go back the next day, that they may have read that the international oil market has gone up in price, and therefore, they are not surprised to see the price of gasoline go up. They're not surprised to see that the price of natural gas goes up and their gas bill from utility goes up.

This is something that is well understood by consumers of energy, because in any energy commodity market, there is an underlying wholesale market in which there is price discovery, and that

Page 72

is the market.  The typical customer in my experience doesn't go to a gas station and decide that that's the market.

So yeah, I think market pricing is something that's understood to be a reflection of the underlying wholesale market.

BY MS. MURAINA:

Q.   But taking your example, you would agree that customers compare the price reflected at one gas station to the prices advertised at other gas stations in their area; correct?

A.   Yes.  And it's kind of meaningless because they will generally just go ahead with whatever gas station they're at regardless of the price.  And the fact is that they know that the market price, the actual market price of what gasoline at retail reflects is an underlying wholesale market.

Q.   Do you mean to say that consumers don't decide to perhaps buy gas in a certain area because they know that it's cheaper at one station versus another?

MR. BLANKINSHIP:  Objection. Mischaracterizes his answer.  You can answer again.

A.   They may go from one gas station to

Page 73

another, but that's not a market.  That's not how

markets work in any economic sense.

BY MS. MURAINA:

Q.    But with respect to interpreting the term,

your methodology does not rule out an interpretation

that compares prices at one retailer versus another?

MR. BLANKINSHIP:  Objection.  Asked and

answered.

A.    There's no regulatory oversight on gas

stations.  Gasoline is sold freely and there is

nothing to stop one gas station from deciding to

sell gas for a dollar a gallon more than another.

And that's why it isn't a market.  The market is the

underlying wholesale market where there is price

discovery.

So in the energy business, when we use the

term market pricing, we're referring to a market in

which there is price discovery, and that isn't the

case on the retail side in gasoline.  There is no

price discovery mechanism that a customer can rely

on.

BY MS. MURAINA:

Q.    So do you mean there is no means to

compare prices between different energy suppliers?

A.    They can compare prices by driving around

Page 74

each day, every day, and go from one gas station to another and look at what the prices are going to be. However, there is a basic assumption that the price of gasoline may vary a few cents here or there, but that the underlying price is based on the cost of oil.  And anyone who reads a paper or understands any of that would understand that to be the case.

Q.   So I'm going to move into the information asymmetry, generally, that you discussed in your report between ESCOs and consumers.

Your report does discuss information asymmetry between ESCOs and consumers, correct?

A.   Yes.

Q.   And did you analyze the background or sophistication of Ira Brous specifically?

A.   No.

Q.   So are you aware that Mr. Brous was a professor of economics?

A.   No, I don't accept that.

Q.   And you did not perform any analysis to determine whether a customer could understand their electric bill; is that correct?

MR. BLANKINSHIP:  Objection.
Mischaracterizes his testimony.  Lack of
foundation.

Page 75

A.   Yes, I did.

BY MS. MURAINA:

Q.   So are you saying you did perform an analysis to determine whether a customer could understand their electric bill?

A.   Yes.

Q.   And what analysis did you conduct?

A.   My method for determining that is based on a number of different studies that were scientifically done with human subjects.  For instance, the Lawrence Berkeley Laboratory study where an extensive sampling of utility customers was selected and put into a research pool where they were asked to analyze bills.  And general demographics and other information about that subject pool was analyzed along with the reactions of customers to attempting to fully understand their utility bills.

And it was found that clearly -- and this is one study of many.  It was clearly found that customers have a very difficult time understanding their utility bill basically for a number of reasons, but predominantly because of over information, not laid out well, and that customers really do not -- for the most part customers, the

Page 76

vast majority do not really understand their electric utility bill.  And that is a conclusion from Lawrence Berkeley National Laboratory, but is also a conclusion of other studies as well, which similarly analyzed actual human subjects reading their utility bills, and then reporting with regard to the difficulty of understanding.

Q.   So to be clear, when you say you performed an analysis, you mean you analyzed that Berkeley report, for example; is that correct?

MR. BLANKINSHIP:   Objection. Mischaracterizes testimony.

A.   I analyzed other reports as well.  And this is not a -- this is a subject that's well studied.  And what the studies show is as in the LBL study, that people do have a hard time interpreting the information on their utility bill.

So that was my method for being able to conclude as have those empirically scientifically-based studies, that they do have a difficult time, particularly for a residential, or what we call a normal, unsophisticated customer, understanding their bill.

BY MS. MURAINA:

Q.   So that opinion assumes a uniform level of

Page 77

customer understanding across different educational backgrounds, for example?

A.    I assume -- I have to go back and look, but I assume that the subject pool was screened for those conditions to make sure that there was a -- what was known as scientifically a normalization process to normalize the base.  But there's also demographic information that's collected so that they can distinguish among, for instance, different education levels.  And there was a study that showed that those with very, very high levels of education are better at understanding utility bills than people who do not have a really high level of education.

But these studies are very highly -- they're rigorous.  They involve methods that are scientifically demonstrated to be valid that were subject to statistical analysis and standard deviations to make sure that there's not a huge number of outliers in the data.

And so these conclusions, yes, I end up at the end of examining reports like that and others, including, as I have, that a normal customer has a very hard time understanding their utility bill.

Q.    So with that, to be clear, you did not

Page 78

speak to or interview Plaintiff, the named

Plaintiff, at least, Ira Brous regarding his

expectations or his understanding of his electric

bill; is that correct?

    A.   I did not interview him personally, no.

    Q.   And to summarize here, you did not conduct

any surveys?

        MR. BLANKINSHIP:  Objection.  Vague.

    Asked and answered.

    A.   I did conduct surveys.  I surveyed the

literature.

BY MS. MURAINA

    Q.   You did not conduct any experiments of

your own, correct?

        MR. BLANKINSHIP:  Objection.

    Mischaracterizes his testimony.  Asked and

        answered.

        You can answer again.

    A.   I did not put together a subject pool and

then conduct an empirical survey of that pool

myself.  What I did was relied on the scientific

basis of social science analysis, which involves

doing exactly what you've just mentioned.  It

involves oversight.  It involves conflict analysis.

It involves normative processes.  It involves

Page 79

numerous different aspects that will lead to a

conclusion which is scientifically valid, and then

accept the scientifically valid conclusion of these

well done studies by -- peer-reviewed studies, I

might add, by organizations that don't have a dog in

the fight.

BY MS. MURAINA:

    Q.    And did you attempt to falsify any of your

conclusions?

        MR. BLANKINSHIP:   Objection.   Vague.

    Argumentative.

    A.    Did I what?

BY MS. MURAINA:

    Q.    Did you attempt to falsify any of your

conclusions?

        MR. BLANKINSHIP:   Same objections.

    A.    Falsify?   I'm sorry.   I don't understand.

Falsify what the study said?

BY MS. MURAINA:

    Q.    To see if your conclusions were correct,

did you test alternative explanations?

        MR. BLANKINSHIP:   Objection.   Vague.

    A.    I looked for studies that might show

something different.   I did not find any.   So yes, I

did.

Page 80

BY MS. MURAINA:

Q.    So your opinions are based on a professional judgment or assessment of the literature rather than a testable methodology, would you agree?

MR. BLANKINSHIP:  Objection.  Vague. Mischaracterizes his testimony.

A.    That is a testable methodology.  That's how experts derive their expertise is by utilizing research, extensive research that's been done. According to scientific method and rigorous statistical analysis, that is how it's done.

It is not done by me going and setting up my own survey to try to see if all those surveys that are reported in the peer-reviewed literature are right or wrong.  There's a general presumption among experts that a peer-reviewed, statistically valid survey is in fact a reasonable conclusion.

BY MS. MURAINA:

Q.    And to be clear, those reports and analyses to which you refer, they did not study Eligo customers specifically; is that correct?

A.    They studied a normalized group of customers that probably do reflect Eligo customers; although, that is not what those studies did.  They

Page 81

did not select a pool of Eligo customers in order to reach their conclusions.  They selected customers very much like Eligo customers, I would presume. But I have not seen a study of Eligo customers.

Q.   Thank you.

So with that, I'm going to turn back to your report, specifically Chapter 2, to go a bit into the history of energy deregulation as you've laid it out.

If you give me a moment, I'll prepare the exhibit in case I want to share.

Or, you know what, let me -- could we take a five or 10-minute break, please?

THE WITNESS:  Yes.

MR. BLANKINSHIP:  Sure.

MS. MURAINA:  Thank you.

THE VIDEOGRAPHER:  Thank you, Counsel.  We are going off the record.  Time is 11:13 a.m., and this marks the end of media unit number two.

(A break was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 11:35 a.m.

This marks the beginning of media unit number three.  Please proceed, Counsel.

Page 82

MS. MURAINA:  Thank you.

BY MS. MURAINA:

Q.    Before I proceed with my next module, I wanted to go back to what you mentioned earlier.

You stated that there is no such thing as a retail market; is that correct?

A.    Not as defined by economic terminology.

Q.    If you give me a moment, I will be sharing Exhibit 2, your report.  Give me a moment.

A.    Could you enlarge that, please?

Q.    Sure.  Are you able to see page 9 of your report?

A.    Yes, I see the highlighted area.

Q.    And could you please read that highlighted excerpt for me?

A.    The customers in the retail markets including residents, businesses and industry would need to have the ability to make choices in selecting among competitive electric generation suppliers for competition to materially develop in the broader market.

Q.    Thank you.

So when you refer to retail markets there, what were you referring to?

A.    I was referring to end user markets.

Page 83

Q.    Okay.  And to be clear, you would agree that there is more than one ESCO operating in New York; is that correct?

A.    Yes.

Q.    Do you know how many ESCOs are operating in New York?

MR. BLANKINSHIP:  I'm going to object to the extent this is outside the scope of his report.

A.    I don't know how many.

BY MS. MURAINA:

Q.    Would you say that there are tens or dozens?

MR. BLANKINSHIP:  Same objection.

A.    Perhaps.

BY MS. MURAINA:

Q.    And would you say that they compete with one another?

MR. BLANKINSHIP:  Same objection.

A.    Yes, I would.

BY MS. MURAINA:

Q.    And what do they compete on?  Would you say they compete on price?

MR. BLANKINSHIP:  Same objection.  You can answer.

Page 84

A.   Yes.

BY MS. MURAINA:

Q.   And would you say that they are competing for the business of perhaps thousands of customers?

A.   Pardon me.  I'm sorry.  Could you repeat that?

Q.   And would you say they are competing for the business of thousands of customers, of different customers?

MR. BLANKINSHIP:  Same objection.  Outside the scope.

A.   Yes.

BY MS. MURAINA:

Q.   And so that would be within that context a market in which there is competition; is that correct?

A.   No.

Q.   So is it your testimony that there is no market in which ESCO independent energy suppliers compete for customers?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.

A.   The economic definition of a market has to do with a price discovery.  So when I talk about there the retail market, I'm talking qualitatively

Page 85

about the vast number of retail customers,
businesses, industry, residents and so on that have
to be able to look and search out and do price
discovery.

          The price discovery does not happen in the
retail market.  So therefore, it is not a market in
the economic sense.  And it is not a market when we
discuss market pricing where market pricing is
established.

BY MS. MURAINA:

     Q.    So when you use the term retail market,
you're not using that term in an economic sense?

     A.    I'm using it in a broad-based sense of
defining a potential set of customers.  That's what
that means.

     Q.    And is it your testimony that a reasonable
consumer would distinguish between the retail market
in the general sense and other markets as you see
it?

          MR. BLANKINSHIP:  Objection.
     Mischaracterizes his testimony.

     A.    I think that a general consumer would
understand like they do in the gasoline business
that they have one on one opportunities to seek out
pricing and do price discovery.  But that does not

Page 86

establish a market price at all.  In fact, the
prices can be all over the place.

So what you're really, I think, asking me,
I think is technically establishing of a market
price.  And there is no price discovery in the
retail market.

BY MS. MURAINA:

Q.  Well, to be clear, I'm not asking about
the market price that you've referred to.  I'm
asking about whether consumers understand that there
is competition amongst retailers?

MR. BLANKINSHIP:  Sorry.  I didn't mean to
interrupt.

A.  If they do price shopping, then they would
understand that by seeking out competitive prices.
But that wouldn't be a market price.

Q.  Understood.  Thank you.  I'll stop sharing
my screen now.

Turning to Chapter 2 of your report.  You
discuss the history of energy deregulation; is that
correct?

A.  Yes.

Q.  And that chapter provides background
context rather than case specific analysis, would
you agree?

Page 87

A.    I'm sorry.  Could you repeat that?

Q.    Chapter 2 of your report provides background context; is that correct?

A.    Yes.

Q.    And when you use the term deregulation, you are not suggesting that the energy market is unregulated; is that correct?

A.    Actually, I would say it's reregulated. It's reregulated, the regulations have changed. They are not unregulated.

Q.    So the retail energy markets in New York remain subject to extensive New York PSC regulation; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    The retail markets in New York that are subject to the jurisdiction of the New York Public Service Commission are extensively regulated in terms of price.  In other words, the Public Service Commission determines a just and reasonable price for various rate classes of customers, and allows the utilities to charge those prices principally based on the cost of producing electricity.  The -- I can't remember where I was going here.  Could you repeat the question?

Page 88

BY MS. MURAINA:

Q.   It was just confirming that retail energy markets in New York are subject to extensive New York Public Service Commission regulation; is that correct?

A.   That's correct, yes.

Q.   So deregulation as you have used the term refers primarily to the introduction of retail choice, not the elimination of regulation; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Calls for a legal conclusion.

A.   It was a move to carve a very small piece of the regulatory environment concerning retail customers.  And it was basically an experiment in the competitive opportunities proceeding in 1996, where they originally could take a very small piece of that very highly regulated market and subject it to some level of competition on the electric commodity itself to see if that competition would result in lower prices for consumers.

So it wasn't -- the term deregulation is probably a misnomer.  And I prefer actually to use the term reregulation.  But the colloquial term that's used generally is deregulation.  Because what

Page 89

they did on the federal level was they unregulated the regulated pricing of wholesale power and formed competitive markets there.

And the states in response to that took a small piece of the regulatory environment that sets prices for retail electricity, and found a way to allow some small level of competition amongst suppliers, specifically to see if that would lower consumer prices generally.

BY MS. MURAINA:

Q. Understood.

So turning to page 20 of your report. If you give me a moment, I will share my screen again.

So turning to page 20 --

A. Make that bigger, please.

Q. Sure.

Is that better?

A. Yes, I can read it.

Q. So you quote the New York Public Service Commission Order Case No. 15-M-0127. I'll refer to it as the December 2019 order as you do in your report; is that correct?

A. Yes.

Q. And on page 20, you say, saving customers money was a crucial policy goal articulated by the

Page 90

New York Public Service Commission when the retail

access market was initially opened.

Correct?

A.   Yes.

Q.   And that quotation comes from the

December 2019 order; is that correct?

A.   Yes.

Q.   Are you aware that the portion of the

order you are quoting was discussing consumer

protection concerns, specifically for low income

customers?

MR. BLANKINSHIP:  Objection.  Lack of

foundation.

A.   I can't say that I know the text that

surrounds that quote, no.

BY MS. MURAINA:

Q.   Okay.  If you give me a moment -- I'll

stop sharing -- I'll be introducing what we'll mark

as, I believe, Exhibit 5.

(Defendant's Exhibit Number 5 was marked

for identification.)

BY MS. MURAINA

Q.   All right.  I'll be sharing my screen now.

So in your report you refer to page 40 of

the December 2019 order.  I believe you were

Page 91

referring to this section of the report.

A.   Could you make that larger, please?

Q.   Sure.

So Exhibit 5 is the December 2019 order. Is that -- would you agree that's correct?

MR. BLANKINSHIP:  Objection.  Lack of foundation.

A.   Well, I'm going to assume on your honor that it is.  I need time to read it.

BY MS. MURAINA:

Q.   Thank you.  I'm happy to go back to the title page if you would prefer.

But would you say you're generally familiar with this order?

MR. BLANKINSHIP:  Objection.  Vague.

A.   It's a lengthy order and I'm generally familiar with the order, but I cannot delve into the numerous details that are in it with specificity in this testimony.

BY MS. MURAINA:

Q.   Well, you would say you cite and refer to the order throughout your report; is that correct?

A.   This is the reset order?

Q.   Yes, the December 2019 reset order.

A.   Yes, I have.  And I've read it and reread

Page 92

it.  It's a lengthy order and it goes into many different areas and different parts of the order that do intertwine.  So they're taking one piece of it -- well, let's just say it can be misleading to take one piece of it and act as if that is it rather than of the entire order.

Q.    Understood.

A.    Can I read it?  Can I read your highlighted part?

Q.    Would you like to read it on your own or were you asking to read it out loud?

MR. BLANKINSHIP:  Sorry to interrupt.

Are we going to ask him questions about this part you've highlighted?

MS. MURAINA:  Yes.

MR. BLANKINSHIP:  So you should read it.

BY MS. MURAINA:

Q.    So, specifically, the portion of the order you quote begins:  The Commission successfully implemented a guaranteed savings requirement in the low income proceeding.  In the low income proceeding, ESCOs have been required to petition the commission for permission to provide guaranteed savings offerings to low income customers.

While an ESCO that wants to provide

Page 93

service to customers who do not qualify as low income will not be required to petition the commission for permission to offer guaranteed savings products to customers, the ESCO will be required to submit information on the product to department staff and to make annual -- to make annual reports to department staff on the product.

MR. BLANKINSHIP:  Sorry.  I'm confused. Are you reading -- I thought you were going to read the part that he quoted.

MS. MURAINA:  I read the part of page 40. I'm going to go up for -- to start earlier just to make sense of the language.

BY MS. MURAINA:

Q.   So it begins:  As has been demonstrated in these proceedings, in the context of low income customer protection, it is possible for some ESCOs to serve customers at guaranteed savings.  Saving customers money was a crucial policy goal articulated by the commission when the retail access market was initially opened.

Do you see that language in the report -- in the order?

A.   I believe I see it, yes.  It's not highlighted, but I think that's on the next page.

Page 94

Q.   It's combined here.

A.   Okay.

Q.   I cannot remove the highlighting of the footnotes.

So this specific discussion is discussing low income customers in variable rate commodity only ESCO offerings; is that correct?

A.   That particular small part of the order, yes.  There apparently was a discussion involving the protection of low income customers.

Q.   So that discussion was not directed at all ESCO products or all customers uniformly, correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   That particular quote comes from this part of the order having to do with the ability of utilities to offer fixed price, discounted amounts to low income consumers.  However, the entire report, if you take it entirely, has to do with two other types of price offerings as well.

So this is one type of price offering. And to isolate this part and say that cost savings is irrelevant outside of this part of the order would be an incorrect reading of the report in my opinion.

Page 95

BY MS. MURAINA:

Q.    Well, would it be correct to state that the order does not state that every ESCO product must always save every customer money as compared to utility service?

A.    The order itself wanted to have competition.  And I'm sure we'll get into it later in this deposition.  But the gravamen of the entire proceeding was to see if competition would lower consumer prices or not.  And I believe that this order is hundreds of pages long.

And I think you can isolate parts of this order and ask questions, but it would not represent the gravamen of the proceeding which preceded it, which was the competitive market opportunities proceeding in '96, that led through to this order.

So an understanding of the entire basis of the proceeding which the PSC went through in order to introduce on a very small, very captured portion of taking regulations and introducing competition, and characterize one part of that with one of the three major product offerings and say, therefore, that only applies to this would be an incorrect interpretation of the order.

Q.    So then would you agree that when retail

Page 96

access was opened -- and I'll stop sharing now -- that when retail access was opened, the Public Service Commission articulated multiple policy goals?

MR. BLANKINSHIP:  Objection.  Vague.

A.    The principal -- the principal objective was to see if competition would lower consumer prices for electricity.  That was the dominant goal of the entire process.

As I mentioned, starting with the competitive opportunities case in 1996, which I was involved in very closely.  And that was the principle goal of the entire effort of carving out that one small piece of the regulatory structure under a set of strict rules to allow for competition to come into the market to determine whether it would lower the price.

And that goes back to, again, something you brought up a couple of minutes ago, or whenever it was.  The whole idea was you want to have competition at the generation level, which was the genesis for the entire process, which is that the federal government decided that the wholesale electric market should be subject to competition because generators were being regulated on a cost

Page 97

basis, and that it would make sense to look and see if generators competed with each other, that they would lower the general commodity price of electricity.

And in doing that, they required the selling off of generations, so that -- you were asking me about that section of my report -- the selling off of generation assets. So utility might own a generation station and they were forced to divest that. So that generators in general could compete with each other.

In order for competition to happen, it also needed to happen at the retail level in order for that test, that experiment to be effective. And so the states in response to the federal development of what's called a market, an electric market also meant and worked towards that extension in the retail markets to allow for some level, small level, very highly controlled level of competition in order to see if the entire process would work. And we're still in that phase of things.

BY MS. MURAINA:

Q. Okay. And to be clear, I was not asking -- I was not asking you to disavow that saving customers money was a policy goal.

Page 98

But you would agree that a policy goal, the language used here, a crucial policy goal indicates that there is more than one goal for the given policy; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    Saving -- the PSC does price regulation, and they are legislatively told they have to come up with fair and reasonable rates, just and reasonable rates.  And so as a result, they are concerned primarily, if not solely, with that.

Now, are there other factors involved? There is competition.  And competition may involve, for instance, giving consultation to customers on how to save by cutting back on their electric use, and some ESCOs do that.  But that's not the primary goal.  The primary goal is to lower the commodity cost of electricity.

BY MS. MURAINA:

Q.    So some examples.  Would you agree that other goals of the Public Service Commission included perhaps innovation, product innovation?

A.    The other goals that might come up are additive to the same goal.  So in other words, if -- if a condition were met to help people save money on

Page 99

their appliances, that would be in addition, yes.
And it would be an additional type of product that
could be put forward.  But that's still the primary
goal of that effort was to lower the commodity price
of electricity.  Because it goes back to the market
price.  The market price is the price established in
the wholesale market through a large number of
buyers and sellers where there is a mechanism for
price discovery to arrive at a closing price of what
the price of electricity will be.  That is the
market, the clearing price.

Q.   Okay.  So I will be sharing my screen in
just a moment.

This is Exhibit 5.  And if you go to the
bottom of page 12 here, in a discussion regarding
renewable energy products, there is a brief
statement.

Nonetheless, the Commission recognizes
that some ESCOs appear to offer customers product
and service choices that are not available from the
utilities.  Some of these types of product offerings
may have the potential to advance policy goals of
the state, including development of renewable energy
and promotion of energy related products and
services.

Page 100

Do you see that language?

A.    Yes, I do.

MR. BLANKINSHIP:  I'm sorry.  Can we see the rest of it -- the rest of that sentence and paragraph?

Thank you.

BY MS. MURAINA:

Q.    And services that help customers lower their energy consumption and/or save on energy bills.

A.    As I just described.

Q.    So would you understand that among the policy goals for the Public Service Commission included the promotion of renewable energy products?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    Public utilities by nature of their granting of a monopoly and a guarantee of profits does owe the public and the public interest across the board.  There are things like employment which they are really requested to enhance.

And so, yes, there are other policy goals that are important.  However, the principal policy goal is to have fair and reasonable rates so that they reflect the value to the customer.  Now some

Page 101

customers may want to have advice on how to cut back on their consumption by using energy saving technology devices in their house, and ESCO could offer that.

But whatever those things are, those are additive to the central goal, which is to have the least cost commodity price of the electricty which is being purchased by the customer.  They're additive.  There may be another goal that's added, but that does not displace the primary goal of the Public Service Commission, which is fair and reasonable rates.

BY MS. MURAINA:

Q.   Thank you.

So I would like to now turn to your discussion of REC costs, specifically turning to pages 24 through 26 of your report where you discuss the Renewable Energy Credits.

If you give me one moment, I'll share that on my screen.

This section of your report is labeled "Renewable Energy Credits;" is that correct?

A.   Yes.

Q.   And you offer opinions here about the cost and impact of Renewable Energy Credits on ESCO

Page 102

pricing and operations; is that correct?

A.   Yes.

Q.   And on -- beginning on page 24, you state:
Because ESCOs like Eligo do not generate their own
electricity, this requirement, being the requirement
to include renewable sources --

A.   Could you make this bigger?

Q.   Sure.

Is that adequate?

A.   Yes, that's readable.

Q.   So because ESCOs like Eligo do not
generate their own electricity, this requirement is
met through REC purchases.

Full sentence ending on page 25.

So -- well, one, is that a correct
statement in your report?

A.   Yes.

Q.   And utilities, even though they generate
electricity, also purchase RECs to meet New York's
renewable energy requirements; is that correct?

MR. BLANKINSHIP:   Objection.   Lack of
foundation.

A.   Yes.

BY MS. MURAINA:

Q.   So the need to purchase RECs is not unique

Page 103

to ESCOs; is that correct?

A.    That's correct.

Q.    Utilities are also required to comply with New York's renewable mandates; is that correct?

A.    There are requirements that they are required to meet, yes.

Q.    I'll stop sharing.

So when you discuss RECs, there are different types of RECs recognized under New York law; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    I believe there are.  But they're very constrained.  And they're also set forth in what RECs are acceptable to use.  And they're normally the ones that come out of the NYGATS system.

BY MS. MURAINA:

Q.    So Tier 1 LSE RECs are just one type of REC, then; is that correct?

A.    There are several types of RECs.

Q.    There are also voluntary EDP RECs; is that correct?

A.    I'm not familiar with that.

Q.    So are you familiar or are you aware that voluntary EDP RECs are different from Tier 1 LSE RECs?

Page 104

A.   Yes.

Q.   And ESCO's offerings in renewable products are required to purchase EDP RECs and retire them in NYGATS based on load and renewable percentage; is that correct?

MR. BLANKINSHIP:  Objection.  Lack of foundation.

A.   That's correct.

BY MS. MURAINA:

Q.   In your report, you did not distinguish between Tier 1 LSE RECs and EDP RECs in your analysis, in your cost analysis, specifically; is that correct?

A.   I don't know.  I believe so, but I don't have that in front of me.

Q.   When you say "you believe so," you believe you did not distinguish between Tier 1 and EDP RECs?

A.   The RECs that I referenced in my report were RECs that were required to be purchased in order to qualify to be selling green power.

Q.   So your report does not separately analyze the cost of EDP RECs; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   My report doesn't analyze the cost of

Page 105

RECs, period.

BY MS. MURAINA:

Q.   If you give me a moment, I will be sharing my screen momentarily.

So in a section titled "REC Cost Analysis: Reasonable Pricing Structure," you state, quote: Current NYSERDA pricing for 2025 vintage Tier 1 RECs is $25.07 per megawatt hour with 2026 vintage RECs priced at $23.96; is that correct?

A.   That's what is stated.  That's not an analysis.

Q.   So those prices come from NYSERDA publications; is that correct?

A.   Yeah, I believe there's a citation there.

Q.   So you did not analyze the actual prices paid by Eligo; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Not within the context of the transaction.

BY MS. MURAINA:

Q.   And you did not review invoices or transactional data reflecting Eligo's REC purchases; is that correct?

A.   That's correct.

Q.   And you did not review REC cost information that Eligo provided to defense, then, in

Page 106

this case; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    No.

BY MS. MURAINA:

Q.    By "no," do you mean that you did not review REC cost information; is that correct?

MR. BLANKINSHIP:  Objection.

Mischaracterizes his testimony.

A.    Not specific REC cost information.  I did, however -- I do understand the impact of REC prices on the retail price of electricity in New York State.

BY MS. MURAINA:

Q.    But you did not review REC cost information that Eligo provided; is that correct?

A.    I did not review invoices for the purchase of RECs by Eligo.  I did not.

Q.    Thank you.  I'll stop sharing for a moment.

Also on page 26, directing you to the next paragraph.  So still on page 26, you state:  The cost of New York RECs creates negligible burden on ESCO operations serving mass market customers.

Is that correct?

A.    Yes.

Q.   You did not perform a quantitative cost impact analysis to reach that conclusion; is that correct?

A.   Well, A, B, C, D, you use the alphabet. The fact is a $25 REC imposes a two-and-a-half cent burden on the price of a kilowatt hour of electricity.  This is simple.  This is very, very simple math.

So that isn't large when the average price of the commodity, which we all know anyway are set that the average price of the commodity as much as 15 or 20 cents, that a two-and-a half cent burden on that is not very large.  So it didn't require me to state a formal analysis of something as simple as that.

Q.   But you did not analyze the actual REC prices that Eligo paid; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   No, I did not.  But they generally can run from -- the general price of the RECs is something I know.  And generally speaking, the average prices are in the 20 to $30 range per megawatt hour. Sometimes they go up a little higher.  Sometimes they're even much lower than that.  But the point is

Page 108

the average is about $25, and that means a two and a
half cent burden on the price to remain commensurate
with the variable price requirements in the order.

So this is a very, very simple thing.
It's not -- it did not require extensive analysis.
And I could have put that in, but I thought it was
straightforward and easy to discern.

BY MS. MURAINA:

Q.   So you -- to be clear, you did not model
REC costs as a percentage of the total customer
bills; is that correct?

MR. BLANKINSHIP:   Objection.   Vague.
Asked and answered.

A.   I just did.

BY MS. MURAINA:

Q.   Apologies.   Perhaps I misunderstood you.
Did you state that you modeled the actual
REC costs that Eligo incurred against a percentage
of Eligo's total customer bills?

MR. BLANKINSHIP:   Objection.   Asked and
answered.   Outside the scope of his report.
You can answer.

A.   No, I did not analyze specific Eligo
purchases of RECs.   I used, as most experts would,
the representative prices that are average for REC

Page 109

prices.  And that is an analysis that I just performed for you in this deposition that it adds about two and a half cents.

And I will add that in the PSC's efforts to determine what price increase would be allowable for green energy, they did not have much data and they didn't know what they would view as being a reasonable ceiling on that.  But they did indicate that they thought it was probably around two and a half cents, which is exactly what I just indicated in my brief, very simple analysis that's very straightforward.

BY MS. MURAINA:

Q.   And to be clear, that's an average figure, the pricing figure you just offered, two cents?

A.   To be clear, that is approximately the average cost of a REC as it would be applied to the qualifications to sell green energy.  And that is approximately the cost data that would be commensurate with that cost in terms of in addition to the price which is the market price for electricity.

Q.   And if Eligo offered 100 percent green energy or renewable energy product and had to pay your figure, $25 for an EDP REC, how would that

affect the cost?

MR. BLANKINSHIP:  Objection.  Vague.
Incomplete hypothetical.

A.   I did not analyze specific Eligo purchases of RECs.  I looked at an average cost of RECs as I understand it and applied that very generally in the calculation that I've just performed for you in this deposition.

BY MS. MURAINA:

Q.   And given that, you did not analyze how REC costs interact with other ESCO costs such as customer acquisition -- I'll let you answer.

MR. BLANKINSHIP:  No, no.  There's no question.

BY MS. MURAINA:

Q.   You did not analyze how REC costs interact with other ESCO costs like customer acquisition, correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his testimony.

A.   Customer acquisition costs or the cost of doing business, they're absorbed in the overall cost scheme of any business.  There is nothing unique about it.

Page 111

BY MS. MURAINA:

Q.   I'll stop sharing my screen.  Just give me a moment.

And you did not analyze how REC costs interact with compliance costs; is that correct?

MR. BLANKINSHIP:  Same objection.

A.   Could you repeat that?

BY MS. MURAINA:

Q.   With compliance costs.

A.   What is the cost of doing business?  Every business has those.

Q.   And you did not analyze how REC costs interact with risk management costs; is that correct?

MR. BLANKINSHIP:  Objection, vague.  Lack of foundation.  Outside the scope of his report.

A.   That's just another cost of doing business.  That is not anything related specifically to the ESCO markets.

BY MS. MURAINA:

Q.   And you did not test how REC pricing would affect margins; is that correct?

MR. BLANKINSHIP:  Same objections.

A.   I just did that for you.  And secondly,

Page 112

no, I did not.  I did not look at margins and analyze to that degree.  What I did was I gave you information which would indicate what a reasonable addition for green power would be on the per kilowatt hour basis given a certain REC cost.

However, that's a formula that you can apply.  You could say RECs cost $1,000, and come up with a different number.  But in terms of that, that's -- I stand by my testimony.

BY MS. MURAINA:

Q.    So your conclusion that REC costs are, quote, negligible burden, is based on your judgment, then; is that correct?

MR. BLANKINSHIP:  Objection.

Mischaracterizes his testimony.  Vague.

A.    Yes.  It's based on what I have seen to be the average cost of a Renewable Energy Certificate as would typically be bundled with the cost of a kilowatt hour, which would be two and a half cents, three cents, two cents.  That is what the conclusion is just by taking the cost of a megawatt hour and dividing it by 1,000 per kilowatt hours and coming up with a number.  This is not rocket science.

BY MS. MURAINA:

Q.    So your conclusion, then, about the

Page 113

negligible burden is not based on an analysis of Eligo specific costs.  This is a general assessment.

Is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Mischaracterizes his testimony.

A.    Yes.  If Eligo was charging average prices, including the cost of the average REC, then yes.

BY MS. MURAINA:

Q.    There's no methodology in your report that would allow a reader to independently test your conclusion that REC costs are negligible; is that correct?

A.    No.  There is not an exposition in the report that goes through the calculation I just made.  Although, I find it a very simple explanation for anyone who knows about the electric business.

Q.    So then your report does not explain how one would empirically test whether RECs -- REC costs are negligible for a particular ESCO; is that correct?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.  Outside the scope of his report.

A.    No, it did not.  I made the presumption

Page 114

that such a simplistic calculation would be easy for individuals knowledgeable about the energy market to discern for themselves.

BY MS. MURAINA:

Q.   Understood.

MS. MURAINA:  With that, I think we can break for lunch.

MR. BLANKINSHIP:  I mean, we've only been going for 50 minutes.  I mean, I guess if you want to.  Seems like we're taking a lot of breaks and hardly going -- we haven't even gone for an hour yet.

MS. MURAINA:  Okay.  Yeah.  We can go through -- we can start through the next module then.  I just figured it was a natural break, the next module will be a little longer.

MR. BLANKINSHIP:  Is that okay with you, John?

THE WITNESS:  Yeah, I'd rather get this over with.

MR. BLANKINSHIP:  Yeah, let's roll.

MS. MURAINA:  So just give me one moment. I think we'll just go ahead and take the break now for lunch, and then we'll speed through the next few sections afterwards.

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 115

MR. BLANKINSHIP:  Okay.  What, 30 minutes?

MS. MURAINA:  30 minutes is good.

THE VIDEOGRAPHER:  Thank you, Counsel.

We're going off the record.  The time is 12:26 p.m. and this marks the end of media unit number three.

(A break was taken.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 1:00 p.m.  This marks the beginning of media unit number four.  Please proceed, Counsel.

BY MS. MURAINA:

Q.   Dr. O'Brien, one of the core opinions in this case concerns what you describe as the reasonable expectations of Eligo's customers; is that correct?

MR. BLANKINSHIP:  Objection to the extent it calls for a legal conclusion.

A.   I'm not giving a legal conclusion on what the reasonable expectation of Eligo customers is. But I believe that customers in general do have a reasonable expectation.

BY MS. MURAINA:

Q.   Okay.  And that opinion is not limited to any one customer, but is offered as a generalized

Page 116

opinion of Eligo's mass market customers; is that correct?

A.    It's not a generalized opinion.  It's a generalized opinion of customers who seek to consider alternatives to their utility in order to save money on their electric consumption by engaging a independent third party from which to purchase electricity.

Q.    So you are not offering an opinion about what any particular customer would have expected; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    It's a broad based expectation.

BY MS. MURAINA:

Q.    So I'd like to touch on how you arrived at some of these opinions.  So you shared earlier that you did not conduct any customer surveys in this case; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    I examined a number of customer surveys of normal customers.  I did not examine -- personally, I did not set up a subject pool and subject that subject pool to rigorous analysis, no.

John O'Brien                                     January 29, 2026
Brous v. Eligo Energy, LLC

Page 117

BY MS. MURAINA:

Q.    So you did not conduct any empirical testing of customer understanding --

MR. BLANKINSHIP:    Objection.

BY MS. MURAINA

Q.    -- on a pool of customers outside of Eligo customers?

MR. BLANKINSHIP:    Sorry.    I didn't mean to interrupt.    Objection.    Asked and answered.

A.    Not a scientific discovery, but quite frankly, I have interacted with a large number of customers that were considering going to an ESCO and what their concerns were.

BY MS. MURAINA:

Q.    So would you say your opinions are based on your review of documents and professional judgments?

MR. BLANKINSHIP:    Objection.    Vague.

A.    Professional judgment being professional as well as my expertise in customer behavior, yes.

BY MS. MURAINA:

Q.    In informing your opinions about customer expectations, did you rely on regulatory history and policy statements?

A.    I'm sorry, what?

Page 118

Q.   In forming your opinions about customer expectations, did you rely on regulatory history and policy statements?

A.   To a certain extent, yes.

Q.   So, for example, you rely on New York Public Service Commission orders and policy discussions; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Have I considered regulatory orders and the regulatory processes that led to those orders, yes.

BY MS. MURAINA:

Q.   And would you agree that regulatory policy goals are not the same as empirical evidence of customer or consumer understanding?

MR. BLANKINSHIP:  Objection.  Outside the scope.  Mischaracterizes his testimony.

A.   Regulatory policy goals are meant to address the concerns in the public interest of consumers.

BY MS. MURAINA

Q.   But a regulatory goal would not tell you what an individual consumer actually understood, would it?

MR. BLANKINSHIP:  Objection.  Asked and

Page 119

answered.

A.    Understanding what an individual customer would expect would require direct interaction with a specific individual customer.  And as a result of that, what I'm suggesting is that regulatory policy is meant to address a broad concern of those -- I'm sorry, broad range of those concerns that customers would have, and to inform a policy that would address those general interests.

BY MS. MURAINA:

Q.    So I want to turn to the testimony and expectations of a particular consumer, in this case a Plaintiff in this case, Ms. Schuster.

Specifically, I want to focus on some of your discussion of Ms. Schuster beginning on page 26 of your report.  If you give me a moment, I'll share that shortly.

Share my screen.

Are you able to see the text before you?

A.    Yes.

Q.    So beginning on page 26, you described the circumstances under which Ms. Schuster enrolled with Eligo; is that correct?

A.    Yes.

Q.    And your analysis assumes certain facts

Page 120

about how she came to enroll; is that correct?

A.   My analysis -- could you repeat that question, please?

Q.   Your analysis assumes certain facts about how she came to enroll with Eligo; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   Yes.

BY MS. MURAINA:

Q.   Are you aware that Ms. Schuster initially stated that she enrolled with Eligo after receiving a mailer?

A.   Is that in my report?

Q.   I don't believe that answered my question.

Are you aware that Ms. Schuster initially stated that she enrolled after receiving a mailer from Eligo?

A.   That's outside the scope of the report.

Q.   Are you aware --

MR. BLANKINSHIP:  I will object.  It is outside the scope.  You can answer.

A.   Apparently not, no.

BY MS. MURAINA:

Q.   In just a moment -- I'll stop sharing -- I will show you what we'll mark as Exhibit 6, the deposition transcript of Ms. Schuster dated May 23,

Page 121

2025.

(Defendant's Exhibit Number 6 was marked for identification.)

BY MS. MURAINA

Q.   So Ms. Schuster's deposition transcript is listed among the materials you reviewed in preparation for this deposition -- I'm sorry, reviewed in constructing your expert report; is that correct?

MR. BLANKINSHIP:   I'm going to object. Lack of foundation and vague.  You can answer.

A.   I had reviewed this.  Although, I don't recall the details of it.

BY MS. MURAINA:

Q.   We can go back to refresh that recollection.  But I'll represent that it is on your list of documents considered.

So if we turn to page 22, which I'll do now.  So on page 22, beginning at line 10, there is a question regarding Ms. Schuster's prior deposition testimony.  It says:  "Okay.  And that's the context in which I was asking these questions.  And so, I'm going to direct your attention to your answer on page 59, where you say, Well -- I'm sorry.  Well, it was actually, like, a market mailer.  Like, some

kind of marketing mailer that came in the mail."

Do you see that language on your screen?

A.   Yes, I do.

Q.   And later on page 23, again, the attorney asks or quotes Ms. Schuster's prior testimony.

"So, I received something in the mail, like, a marketing flyer, marketing mailer that, you know, was advertising, you know, lower electricity prices."

You see that language on the screen as well?

A.   Yes, I do.

Q.   And the attorney asks for clarification that Ms. Schuster was, quote, referring to something that you received in the mail from Eligo.  And Ms. Schuster answers:  "Yes."

Do you see that language?

A.   Yes.

Q.   And later the attorney asks Ms. Schuster:

"Now focusing on the testimony from that paragraph alone I read into the record, as we sit here today, is that testimony accurate?"

Ms. Schuster goes on to answer:

"At the time of my -- at the time of the deposition, my memory was that something had come in

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 123

the mail, but now I realize that I was mistaken, that it was actually a phone message that I responded to."

Do you see that language?

A.   Yes.

Q.   I'll stop sharing for now.  Thank you.

So based on that text that I read into the record just now, do you understand that Ms. Schuster admits that she lied or at least misstated how she received or how she came to enroll with Eligo in her earlier deposition testimony?

MR. BLANKINSHIP:  Objection. Argumentative.  Misstates her testimony.  Lack of foundation.  Outside the scope of Dr. O'Brien's report.

You can answer.

A.   I cannot make an admission about her intent or motivations with regard to answering a question from her recollection incorrectly in a stressful deposition.  So I cannot opine to that.

BY MS. MURAINA:

Q.   Okay.  So you're not in a position to opine as to Ms. Schuster's intention based on her deposition testimony; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.  Lack

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 124

of foundation.  Outside the scope of his
testimony.

A.   She apparently remembered something about
saving money.  I think that's indicative of
something.  So I'm not sure what the basis of your
question is.  I cannot look into her mind.  And I
also don't know if she received mail.  And I know
she did receive a phone call.

So I can't say whether she was mistaken.
And if she was mistaken, it was not a lie, I don't
believe anyway.  She apologized actually if you look
at the transcript.

BY MS. MURAINA:

Q.   And you would agree that whether a
customer enrolled after receiving a mailer versus a
recorded enrollment call could affect how one
evaluates what the customer was told?

MR. BLANKINSHIP:  Objection.  Outside the
scope of his report.  Lack of foundation.

A.   I'm not sure what you're asking.  Could
you explain a little better what you're trying to
get to?

BY MS. MURAINA:

Q.   So I'm asking that if a foundational fact
that's alleged is incorrect, that that would affect

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 125

the way that one would evaluate?

A.    That's a legal question.

Q.    Did you answer?  I apologize.  I didn't hear that.

A.    Pardon me?

Q.    I didn't hear your answer.  What was that?

A.    I said that that is a legal question that attorneys would debate.  That's not a question for an expert, so I defer the answer to that.

Q.    But you offer opinions in this case on ethics --

MR. BLANKINSHIP:  I'm sorry.  I couldn't hear you there.

BY MS. MURAINA:

Q.    You offer opinions on ethics and ethical conduct; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    Yes.

BY MS. MURAINA:

Q.    And in your report, you criticize certain conduct as misleading, deceptive or unethical; is that correct?

A.    Yes.

Q.    So I'm not asking for a legal conclusion, but do you have any view on the ethics of a witness

Page 126

admitting to false sworn testimony?

MR. BLANKINSHIP:  Objection.  Lack of foundation.  Argumentative.  Mischaracterizes the testimony.  Asked and answered.  Outside the scope of his report.  You can answer it.

A.    She admitted she made a mistake.  She did not continue -- I'm talking just as a human being here.  She did not continue to defend in any manner what you're alleging to have been a false statement. And under any kind of ethical examination, she did not violate ethics.  She made a mistake and mistakes happen.  And a mistake is not an ethical violation, especially when there's an apology and a statement to make the record correct.

BY MS. MURAINA:

Q.    Understood.

Turning now to the pricing baseline with respect to Ms. Schuster.

MR. BLANKINSHIP:  I'm sorry.  I couldn't understand that.

BY MS. MURAINA:

Q.    Turning now to the pricing baseline that Ms. Schuster, specifically the price that Ms. Schuster was offered when enrolling with Eligo.

You would agree that whether a customer

Page 127

was previously served by a utility or another ESCO

matters when evaluating price comparisons, correct?

          MR. BLANKINSHIP:  Objection.  Outside the

     scope of his report.  Lack of foundation.

     A.   That is one basis upon which that a

customer could decide to change suppliers from a

utility to an ESCO or from one ESCO to another.

There are other factors as well.  But yes, that is a

factor.

BY MS. MURAINA:

     Q.   And in your report you state that a review

of Ms. Schuster's electric bill revealed that she

was paying approximately 11 cents per kilowatt hour;

is that correct?

          MR. BLANKINSHIP:  Objection. Vague.

     A.   Could you repeat it because I'm having

trouble understanding.

BY MS. MURAINA:

     Q.   You write:  The review of Ms. Schuster's

electric bill revealed that she was paying

approximately 11 cents per kilowatt hour.

          Would you like me to go to the report?

     A.   I believe that that was what she -- as I

recall the conversation, and I don't have it in

front of me, the conversation was that she was

Page 128

paying 11 cents per kilowatt hour and she was

offered a lower price.

Q.    Just give me one moment.

A.    Pardon me?

MR. BLANKINSHIP:  She said give her a

minute.

THE VIDEOGRAPHER:  And Counsel, you want

to go off the record; correct?

MS. MURAINA:  No.  I'm just referring back

to Exhibit 2.

THE VIDEOGRAPHER:  Okay.  Sorry about

that.

BY MS. MURAINA:

Q.    I'm going to share my screen now.

Are you able to see the highlighted text?

A.    Yes.

Q.    I'll represent that we're on page 27 of

your report.  And you note:  The review of

Ms. Schuster's electric bill revealed that she was

paying approximately 11 cents per kilowatt hour.

Eligo's representative told Ms. Schuster that it was

offering 5.49 cents per kilowatt hour, enticing

Ms. Schuster to switch to Eligo to save money.

Do you see that language?

A.    Yes.

John O'Brien                              January 29, 2026
Brous v. Eligo Energy, LLC

Page 129

Q.   And are you aware of who Ms. Schuster's prior electricity supplier was at that time?

MR. BLANKINSHIP:  Objection.  Outside the scope of his --

A.   It was a utility, but I don't remember which utility.

BY MS. MURAINA:

Q.   So are you representing that her local utility was her electricity supplier at the time?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  Lack of foundation.

A.   As I recall, that conversation was a call where she was being asked to look at her utility and electric bill.  I think it was Rochester Gas and Electric, but I'm not sure.  And that she was asked to look carefully in a certain place on the bill in order to see what she was currently paying for electricity.  And the representative located -- helped her, assisted her in going through the bill until she could actually see the particular line item where her cost of electricity was indicated.

And then as I recall the conversation indicated that Eligo was willing to sell her electricity to replace that 11 cent kilowatt hour with roughly five-and-a-half cents per kilowatt hour

Page 130

for electricity.  That's how I remember that conversation.

BY MS. MURAINA:

Q.    So your report does not identify who her prior supplier was; is that correct?

A.    It does actually.  It's -- as I recall -- I'm recalling this as an audio file which I listened to.  So there is no written document here.  But what I recall is that she was looking at her utility bill which would have been her prior supplier.

Q.    And you understand that irrespective of who a consumer's electricity supplier is, it is the utility that sends the consumer the bill?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.    I'm having trouble hearing -- understanding your question.  Are you suggesting to me that it's the utility that has a list, a number on it of what they would pay the utility electricity if they were serviced under the existing tariff?

BY MS. MURAINA:

Q.    So what I'm stating -- and we can turn to a specific example.  And I'll go to page 32 of your report.

So here I believe is an example of one of

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 131

Ms. Schuster's bills.

          MR. BLANKINSHIP:  Could you make it

     larger, please?

          MS. MURAINA:  Are you able to see this?

          MR. BLANKINSHIP:  Yes.  Thank you.

BY MS. MURAINA:

     Q.   And you will see that the bill comes from

RG&E, Rochester Gas and Electric.  And you will see

here under this line item that the charge for

Eligo's electricity service is stated on an RG&E

invoice.

     A.   I don't know if that's the invoice that

they were discussing in that phone call.

     Q.   Correct.  So I'm not representing that

this is the invoice that was being discussed during

her enrollment call.  But I do mean to suggest, or

at least to ask, irrespective of who the energy

supplier is, the invoice still says RG&E; is that

correct?

     A.   Under the regulations that have been

established, the utility, the regulative utility

continues to do the billing for the ESCO, and then

redeposits those funds to the ESCO after collected.

     Q.   Got it.  And so the fact that Ms. Schuster

was reading from an RG&E invoice does not mean that

Page 132

RG&E was her electricity supplier; is that correct?

A.    During the phone call?

Q.    Yes.  You mentioned earlier that you heard a recording in which Ms. Schuster looked at her electricity supply rate by referring to an RG&E invoice, or at least a local utility invoice.  And I am asking you whether the fact that she was referring to an RG&E invoice means that RG&E was supplying her electricity at the time?

A.    This goes to my prior testimony about these bills being difficult to understand.  And I also cannot dissect the contents of that phone call from an audio that I have of it that was produced in discovery by Eligo.  And I don't know what that line item said on that bill.  My assumption is that it was the RG&E price because that is about the price that RG&E was charging back then.  But it is not a fact that I can attest to that the bill that she was looking at, which I do not have, was definitely the RG&E supply bill.  Although, from what I remember of that conversation, I believe that's how it was described.

Q.    So to be clear, are you stating that during her enrollment call, Ms. Schuster stated that she was receiving electricity supply from Rochester

Page 133

Gas and Electric?

MR. BLANKINSHIP:  Objection.
Mischaracterizes his testimony.  Lack of
foundation.

A.    I can't definitively say that because I've never seen the actual invoice that was being discussed.  However, that was my assumption because she appeared from the conversation to be a new customer enrolling in an ESCO for the first time. However, I don't know that for a fact.

But what I do know is that going to that line item on her bill, the representative of Eligo pointed that out as her cost of electricity, and then offered a lower price to lower her electric bill.

BY MS. MURAINA:

Q.    So as you sit here today, you do not know whether Ms. Schuster's supplier before Eligo was another ESCO?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Outside the scope.

A.    Not as a matter of fact.  As I say, I have heard a video call.  In that video call I believe, and I'd love to play it back right now if you have it, that the representative did say something to the

Page 134

effect, and I'm going on a memory of this now, but that's what your utility is charging you.

However, I don't have the bill to be able to verify that that particular line item says RG&E Electric Supply.

BY MS. MURAINA:

Q.   Okay.  So we'll return to that, but for now I want to direct your attention to page 27 of your report.  If you give me a moment.

On page 27 of your report, you discuss the enrollment recording.

Do you see that language before you?

A.   I see the page.  If you can make it a little bigger it would be helpful.

Okay.

Q.   And you note that Ms. Schuster was enrolled at a fixed rate of five and a half, approximately, cents per kilowatt hour for the first three months?

A.   That's my understanding of the phone call.

Q.   And that after that initial term, she would continue on a month to month rate; is that correct?

A.   I believe that that is what the agent said.  Although, again, I'm going from my memory of

Page 135

a video recording.  But I believe that that is
probably correct.

Q.   And if I direct you to the highlighted
text, could you read that for me?

A.   The recording stated -- first of all,
that's not an agent.  That's a voice recording.

"The recording stated that she was
enrolling on a fixed rate plan at a rate of 5.49
cents per kilowatt hour for the first three months,
and thereafter would continue on a month to month
rate, quote, based on market and wholesale factors,
weather patterns and pricing strategies."

Q.   And that disclosure, the disclosure that
her month to month rate would be based on market and
wholesale factors, weather patterns and pricing
strategies, that disclosure occurred before
Ms. Schuster received a welcome package; is that
correct?

MR. BLANKINSHIP:  Objection.  Lack of
foundation and mischaracterizes the testimony.

A.   I can only assume that the welcome package
was sent out after she agreed to the transaction in
that call.

BY MS. MURAINA:

Q.   Could you read the highlighted text on

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 136

page 27 for me?

A.   "Following the enrollment, Eligo sent Ms. Schuster its form welcome letter, terms of service, agreement summary, and ESCO consumer Bill of Rights."

Q.   Thank you.

So Ms. Schuster was informed at enrollment that her rate would vary after the initial three-month term; is that correct?

A.   That's correct.

Q.   So turning back to market factors.  I'm now going to page 28 of your report.

So you state that Eligo's pricing term does not explain what market pricing transportation costs or other market price factors mean, correct?

I understand there's a lot of text on the page, so I can highlight these for you.

A.   Yes, that is what is written there.

Q.   And you also state that the pricing term does not disclose what values or weights Eligo assigns to those factors, correct?

A.   Are you referring to the pricing term that is above that highlighted in yellow?

Q.   Yes, correct.  The pricing term as referenced in your report.

Page 137

A.   Yes, Eligo failed to explain what those terms meant.

Q.   And you state that the pricing term does not disclose what values or weights Eligo assigns to those factors, correct?

A.   Yes.

Q.   And that statement reflects the absence of a disclosed fixed weighting formula; is that correct?

A.   Okay.  Repeat that question.

Q.   The statement that Eligo does not disclose what values or weights it assigns to those factors reflects an absence of a weighting formula in the contract; is that correct?

A.   Yes.

Q.   So you are not stating that Eligo had no methodology for its pricing, only that the contract did not specify the weighting in that methodology; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.  Lack of foundation.

A.   What is correct is that the terms of service was three things that are determinative of the variable price that the customer would be charged.  It does not put together any relative

Page 138

weight on those three precise things.

BY MS. MURAINA:

Q.    So Eligo in its contract does not disclose the weight ascribed to market pricing, transportation costs, and other market price factors; correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    No, it does not.

BY MS. MURAINA:

Q.    And you did not analyze Eligo's actual pricing inputs or internal pricing processes in this case; is that correct?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.  Compound. Partially outside the scope of his report.

A.    No, I did.  I did.  There's market pricing, which I'm sure we'll get into a discussion about.  There's transportation costs, which is zero in New York State.  And other market factors is another area which I'm sure we'll be discussing. And those have specific meanings in the industry. So that one of them is zero and the other two are based on the wholesale markets.

Page 139

BY MS. MURAINA:

Q.    So are you stating that market pricing and other market price factors, those two phrases mean the same thing?

MR. BLANKINSHIP:    Objection. Mischaracterizes his testimony.

A.    No, I was talking about the other market pricing.  Could you scroll that back up so I can see it?  Down I should say.

BY MS. MURAINA:

Q.    That's where we discussed.  Did you want to see the --

A.    I want to see the terms of service.

MR. BLANKINSHIP:    Can you make it a little bit bigger, please?

BY MS. MURAINA:

Q.    Is that better?

A.    Yes.  To a customer what these mean is the underlying price in the wholesale market.  The customer perceives a cost plus transaction here.

So it says market pricing, that's that. Transportation cost is zero, so I'm not sure how that would factor in any way.  And other market pricing factors or market price factors is just a catch-all for some other things that have to do with

John O'Brien                          January 29, 2026
Brous v. Eligo Energy, LLC

Page 140

the wholesale market.  That's how I read it.

Q.   So you are reading this as a cost plus contract; is that correct?

A.   That's what generally customers perceive the variable pricing to be when it is stated that's in response to market pricing, meaning the market for electricity.

Q.   So is it your testimony that this was a cost plus contract?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   I believe that the customer's expectation is that it was.

BY MS. MURAINA:

Q.   Turning now to your discussion of the Brous family.  And I'll stop sharing for a moment.

So in your report turning to page 28, you discuss Eligo's pricing term with respect to Ira Brous.  And you also note that the pricing term does not explain what market pricing, transportation costs or other market price factors mean.

I'll share that for ease of review in just a moment.

Give me one moment.  That was the wrong page.

John O'Brien                               January 29, 2026
Brous v. Eligo Energy, LLC

Page 141

Beginning on page 35 of your report, you discuss former Plaintiff, Ira Brous; is that correct?

A.   Yes.

MR. BLANKINSHIP:   Could you make that a little bigger, please?

MS. MURAINA:   Sure.

BY MS. MURAINA:

Q.   You are aware that he's deceased, correct?

A.   That Ira is?

Q.   Yes.

A.   Yes.

Q.   And you never interviewed Mr. Brous?

A.   No.

Q.   And you never asked him what he understood about Eligo's pricing; is that correct?

A.   No.

Q.   And you assume in your report that Ms. Brous handled the household electric bills; is that correct?

MR. BLANKINSHIP:   Objection.   Lack of foundation.

A.   Yes.   She was the executrix.   Therefore, she had the legal authority to do that as I understand it, having been executor and so for my

Page 142

parents.

BY MS. MURAINA:

Q.    So your factual basis for the assumption that Ms. Brous handled the household bills is her role as executrix of Mr. Brous' estate; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Misstates his testimony.

A.    I'm not going to make a statement about whether it's legally the fact of the matter. However, having been an executor in cases of parents dying or spouses dying, my understanding is that the executrix here would be legally empowered to make decisions on the transaction itself.  And also that largely is traditional for a husband and wife to enter transactions together anyway.  I know that's how my marriage is.

And I did not find it unusual for her as the executrix of the Will, and also as the spouse of Ira Brous, to assume the role of dealing with the contract issues on the electricity purchase.

BY MS. MURAINA:

Q.    And are you aware that Ramsey Brous impersonated his father in order to cancel Eligo service?

Page 143

MR. BLANKINSHIP:  Objection.  Outside the scope.  Lack of foundation.  Argumentative.

A.    Would you repeat that question?

BY MS. MURAINA:

Q.    Are you aware that the Brous' son, Ramsey Brous, impersonated his father in order to cancel Eligo's service?

MR. BLANKINSHIP:  Same objections.

A.    I have no idea except that if he was instructed to cancel the service by his mother, then that seems fine.  I didn't know you would characterize that as an impersonation.  But I don't have that call and I cannot opine that.

BY MS. MURAINA:

Q.    So you did not analyze how that fact affects your opinions about consumer understanding and expectations, did you?

MR. BLANKINSHIP:  Objection.  Outside the scope.

A.    What is the question?  I'm sorry.

BY MS. MURAINA:

Q.    You did not analyze how Ramsey Brous' role in managing his parent's electric bill affected your opinions about consumer understanding and expectations?

Page 144

MR. BLANKINSHIP:  Objection.  Lack of foundation.  Mischaracterizes his testimony.

A.  I don't know how that has anything to do with it.  I don't understand your question.  I can't opine on anything legal, so I decline to answer this question.

BY MS. MURAINA:

Q.  Did you analyze Ramsey Brous' expectations with respect to Mr. and Mrs. Brous' energy bills?

MR. BLANKINSHIP:  Objection.  Outside the scope of his testimony.

A.  That was a family matter held internally by a grieving family on the death of a father.  No, I don't have an opinion and can't articulate about what went on during that discussion.  And I can't offer a legal opinion in any matter anyway on anything.  But that particular question raises a little bit of an offensive feeling that somehow family members aren't entitled to assist their parents in the death of a father.

So I can't really address that question. First of all, I don't think it's relevant.  And secondly, I have no way of knowing what was going on inside that family.  And your insinuation that there was an impersonation is brand new to me.  And if

Page 145

that was the case, it's not the place of this

litigation to figure out whether there was some kind

of a legal issue on that.  I certainly can't and

won't.

BY MS. MURAINA:

    Q.    Okay.  You didn't analyze Ramsey Brous'

role in this litigation; is that correct?

        MR. BLANKINSHIP:  Objection.  Asked and

    answered.  Outside the scope of his report.

    A.    No.  His name is Randy, I guess, what I

can tell you is you're on your own with that.

        MS. MURAINA:  I'd like to take a

    five-minute break before we go into the next

    question.

        THE WITNESS:  I can't understand.

        MR. BLANKINSHIP:  After only 45 minutes,

    she'd like to take another break.  Just as a

    note, I do have a 7:00 flight.  The more we can

    take fewer breaks and push through, I would

    very much appreciate that.

        MS. MURAINA:  I understand.  Just five

    minutes.

        (A break was taken.)

        THE VIDEOGRAPHER:  We're going off the

    record.  The time is 1:46 p.m. and this marks

Page 146

        the end of media unit number four.

                (A break was taken.)

                THE VIDEOGRAPHER:  We are going back on

        the record.  The time is 1:54 p.m.  This marks

        the beginning of media unit number five.

        Please proceed, Counsel.

BY MS. MURAINA:

        Q.    So Dr. O'Brien, I want to turn now to the

portion of your report addressing pricing in Eligo's

rate setting practices.

                So in this section of your report you're

intending to support opinions that Eligo's pricing

practices were improper, fair -- unfair or

unethical, correct?

        A.    Which section of the report?

        Q.    We can go through -- yeah, just give me a

moment.  I'll direct you to the specific page.

                I'm sharing my screen.  You'll see on page

38 in Chapter 4 you discuss Eligo's predatory

business model?

        A.    Yes.

        Q.    And in describing Eligo's business model

as quote/unquote predatory, is that a general

critique of Eligo's pricing practices?

                MR. BLANKINSHIP:  Objection.  Vague.

Page 147

A.    The critique is based in a mountain of social scientific studies on cost and consumer behaviors and predatory pricing including aspects like what's commonly known in the literature as a teaser price and then drift pricing.

So yes, there are a very large number of valid empirically-based social scientific studies to show how that sequence in a sales process leads to an unethical transaction.

BY MS. MURAINA:

Q.    But you're not providing a damages calculation here; is that correct?

A.    No, I am not.

Q.    You did not calculate the monetary injury to any customer; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    Yes, that's correct.

BY MS. MURAINA:

Q.    And you didn't model whether Eligo's pricing caused customers to pay more than they would have otherwise paid; is that correct?

MR. BLANKINSHIP:  Objection.  Lack of foundation.  Vague.

A.    Let me think about that for a moment.

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 148

That's not really true.  I'm sure we'll get into it at some point here, but the issue of green energy leaving pricing to the wind is an area that I do discuss.

BY MS. MURAINA:

Q.    But your pricing opinion here is not based on a quantified injury analysis; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    That's correct.

BY MS. MURAINA:

Q.    Turning to page 41 of your report.

So on page 41 of your report, you describe Eligo's pricing practices as commercially unreasonable; is that correct?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.  Vague.

A.    Yes, I do say that.

BY MS. MURAINA:

Q.    And you did not define commercially unreasonable anywhere in your report, do you?

A.    Commercially unreasonable is a tenet of ethics that has to do with the fair dealing with customers that have an asymmetry of information. And that is a well-established ethical principle that a seller that has a large degree of better

Page 149

information than a buyer, the seller is ethically obligated to explain in straightforward terms what the bargain looks like.  And that the bargain, if it is commercially reasonable, will benefit both parties to bargain.

That is why parties enter into agreements that are ethical is because after the agreement is consummated, both parties are better off than they were before the agreement is consummated.

Q.   So is it your testimony that only agreements where both sides benefit from the bargain are ethical?

A.   The ethical agreement stems from the understanding of the agreement before it is entered into and whether that is the way the agreement is in fact implemented.

So the question is:  Did they do what they said they were going to do is the question?  And for it to be commercially reasonable, number one, the actual stakes for, in this case, when you have a seller that has a huge degree of better information than the buyer, to honestly explain what the benefits of the proposed transaction would be for both parties, and then to execute the agreement so that it reflects that understanding.  And that's

Page 150

what a commercially reasonable transaction is.

If for some extraneous reason that has nothing to do with the transaction, for instance, there is a national security incident or a hurricane that affects the transaction so that one side or the other doesn't quite get the benefits they understood to be able to maintain from the transaction, that's a different thing.

But when a transaction is described by a high information seller to a low information buyer, and all of the benefits of that transaction and the cost of that transaction are not explained, that is not a commercially reasonable transaction.

Q.   Okay.  So you're not identifying an objective benchmark or threshold for what pricing is commercially unreasonable; is that correct?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.

A.   I thought I just did.

BY MS. MURAINA:

Q.   Okay.  I understood your testimony to be that you are describing the nature of the negotiation of the transaction.  So the information asymmetry in the transaction.

Is that what you were referring to as --

Page 151

A.   Yes.  Let me explain.  What I'm referring to is that --

THE VIDEOGRAPHER:  Dr. O'Brien, I am so sorry to interrupt.  We actually lost counsel.  So should we go off the record.

MR. BLANKINSHIP:  Yes.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:03 p.m.

(Discussion off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 2:04 p.m.  Please proceed, Counsel.

BY MS. MURAINA:

Q.   So returning to the discussion of the term commercially unreasonable.

You were not comparing Eligo's pricing to a defined industry standard to determine whether or not it was commercially unreasonable; is that correct?

MR. BLANKINSHIP:  Objection.  Mischaracterizes his testimony.

A.   Industry standard?  Yes, that is a standard in the energy industry particularly dealing with retail customers who have low information.

In other words, if I'm dealing as a seller

Page 152

like Eligo with a large commercial customer who has a high level of information with regard to the transaction, then that does not really apply because both sides are on equal plane with regard to making a determination about the value of the transaction. The bargain, as they say.

In the business of ethics, we talk about what the bargain is. And the bargain has to be described faithfully by the high information side, which is usually the seller since they're in the business, to the low information side, which is usually -- and particularly in the case of a retail electric customer who has no reason to have the level of information that's available to the seller.

Secondly, once that information is conveyed to the low information buyer, there is an obligation to perform exactly the way and in the manner that it has been described. And when that doesn't happen, that's another element of a commercially unreasonable transaction.

BY MS. MURAINA:

Q. So when you use the term "commercially unreasonable," you're referring to the information that's disclosed to the customer, not the rate or the price provided to the customer; is that correct?

John O'Brien                                        January 29, 2026
Brous v. Eligo Energy, LLC

Page 153

A.   As long as the information disclosed is in fact the truth and it's honest, then yes, that's true.

Q.   So turning to pages 41 and 42 of your report.  If you give me a moment.

Beginning on page 41, you describe Eligo's conduct using three concepts.  The first being breach of transparency and honesty.  The second being information asymmetry and exploitation.  And the third being undermining their bargaining.

Is that correct?

A.   That's what it says, yes.

Q.   And those three labels were being applied to the same underlying conduct you're criticizing; is that correct?

MR. BLANKINSHIP:   Objection.   Lack of foundation.   Misstates his testimony.

A.   Yes.

BY MS. MURAINA:

Q.   And was there a separate analysis for each of these different categories of -- or for each of these concepts?

A.   There was a global analysis that I made by taking into account the universe of facts that were presented in discovery with regard to how the

Page 154

transaction was negotiated, how the asymmetry of the information available to the buyer as opposed to the seller was exploited.  And what is the third?

Q.   The third concept you're asking?

A.   I don't have it in front of me.

Q.   It's here.  Undermining fair bargaining.

A.   The bargaining is not done fairly.  The way the bargain was negotiated did not include some of the factors involved in the pricing that Eligo went forward with.

Q.   So I hear you describing the third concept, undermining fair bargaining, with some reference it appears to the information asymmetry or the lack of information disclosed to the customer; is that correct?

A.   Yes.

Q.   These three concepts really function as describing the same criticism rather than distinct measured findings, correct?

A.   These are not discrete separate statements on my part.  They do come from a single concept, which is fair dealing and honesty and ethics.

Q.   Understood.  Thank you.

Turning now to GROOVE.

You understand that GROOVE is Eligo's

Page 155

proprietary pricing system; is that correct?

A.   I'm sorry, repeat that.

Q.   You understand that GROOVE is Eligo's proprietary pricing system; is that correct?

A.   That's what I understand, yes.

Q.   And did you not design GROOVE, correct?

A.   What?

Q.   You did not design GROOVE?

A.   I did not design GROOVE.

Q.   Yes.

A.   That's an accurate statement.

Q.   You've never operated GROOVE; is that correct?

A.   No.  My knowledge of GROOVE comes from, principally, the depositions of Eligo personnel.

Q.   And you do not have access to GROOVE's source code; is that correct?

A.   No, I don't.

Q.   So as you've used the term GROOVE in your report, you're referring to your understanding of how Eligo uses algorithmic or machine learning systems to set prices based on deposition testimony; is that correct?

A.   Yes.

Q.   So your report doesn't provide a technical

Page 156

specification or definition of GROOVE; is that correct?

A.    That's correct.

Q.    So --

A.    Let me finish.

Q.    Oh, my apologies.  Please continue.

A.    My report describes the objectives of GROOVE as described in deposition testimony, which had very little to do with market pricing, if anything, and instead substituted GROOVE as a price determination mechanism for Eligo while the customer believes something else.

Q.    Okay.  We'll be touching on that.

So you've mentioned that you relied on deposition testimony in understanding GROOVE.

Did you also rely on produced documents?

A.    On what documents?

Q.    Produced documents, so documents that Eligo produced describing GROOVE at all?

A.    I believe so.  There were a lot of documents I went over early on in this action, and I don't remember every one of them, but I do remember various segments from deposition testimony.

Q.    Can you identify, just from memory, any specific deposition testimony you relied on in

Page 157

understanding GROOVE?

MR. BLANKINSHIP:  Objection.  Lack of
foundation.

A.   Are you asking me what my understanding of
the purpose and objective of GROOVE is?

BY MS. MURAINA:

Q.   No.  I'm asking if you referred to the
testimony of any particular deponent, so any
specific deposition transcripts, in forming your
understanding of GROOVE?

A.   Could you rephrase that?  I'm having
trouble understanding.

Q.   Could you identify the deposition
testimony that you relied on in forming your
understanding?

A.   Well, it's in my report.  I can't identify
it sitting here off the top of my head.

Q.   So in understanding GROOVE, you did not
rely on any technical documents that explain how
GROOVE processes inputs; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.
Mischaracterizes testimony.

A.   No.  I relied on what the statements were
from Eligo personnel in depositions.

Page 158

BY MS. MURAINA:

Q.   So there were no validation or testing materials for GROOVE that you analyzed; is that correct?

A.   There were no what?

Q.   Testing materials for GROOVE, so testing how it operates, putting inputs, anything like that?

MR. BLANKINSHIP:  Objection.  Vague. Outside the scope of his report.

A.   No, I didn't, and it wasn't part of my report and it's not part of my opinion.

BY MS. MURAINA:

Q.   So turning to your analysis.

Did you conduct any quantitative analysis measuring GROOVE's impact on prices?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.   No, I did not.

BY MS. MURAINA:

Q.   And you did not model the relationship between attrition probability and price changes; is that correct?

MR. BLANKINSHIP:  Same objection.

A.   That's correct.

Page 159

BY MS. MURAINA:

Q.    And you did not test whether the observed prices could be explained by load volatility; is that correct?

A.    By what?

Q.    Load volatility?

MR. BLANKINSHIP:  Same objection, and vague.

A.    By what volatility?

BY MS. MURAINA:

Q.    Load, load volatility?

A.    No, I did not explore that.

Q.    Did you explore whether prices could be explained by hedging constraints?

MR. BLANKINSHIP:  Same objection.

A.    By what?

BY MS. MURAINA:

Q.    Hedging constraints, constraints related to hedging?

MR. BLANKINSHIP:  And also lack of foundation.

A.    Well, to the extent that RECs are purchased, and as far as hedging goes, no.  And they were, as I understand it, purchasing from New York ISO, as 99 percent of ESCOs do.

Page 160

So no, I did not look at hedging strategies within the New York ISO market as they were pursued by Eligo for Eligo.

BY MS. MURAINA:

Q.   And did you look at risks related to customer churn?

MR. BLANKINSHIP:   Same objections.

A.   No, I did not.

BY MS. MURAINA:

Q.   And did you test whether the observed prices were consistent with retail market prices?

MR. BLANKINSHIP:   Objection.   Vague. Outside the scope.

BY MS. MURAINA:

Q.   Did you compare Eligo's prices to the prices of other ESCOs?

MR. BLANKINSHIP:   Same objections.

A.   No, I did not.

BY MS. MURAINA:

Q.   You did not perform any regression analysis; is that correct?

A.   Of prices?

Q.   Yes, or causal modeling.

A.   No, I did not perform regression analysis of the prices that Eligo charged.

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 161

Q.    In sum, you didn't test alternative explanations for the observed pricing outcomes; is that correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  Vague.  Asked and answered.

A.    Could you repeat that question?

BY MS. MURAINA:

Q.    You did not test alternative explanations for observed pricing?

MR. BLANKINSHIP:  Same objections.

A.    I did not because the deposition testimony was very, very clear that with very minor exceptions, GROOVE was used to set the variable prices for the customers that Eligo had.

BY MS. MURAINA:

Q.    So in your report, you state that GROOVE was used to extract, quote, the highest possible rate a customer would not notice; is that correct?

A.    That is what my understanding was from deposition testimony by Eligo personnel who stated exactly -- stated that very generally as a fact.

MR. BLANKINSHIP:  If we're going to read or refer to specific quotes in his report, can we just look at it?

Page 162

MS. MURAINA:  Sure.  Moving forward I will.

BY MS. MURAINA:

Q.  So that statement is not based on a measured calculation; is that correct?

MR. BLANKINSHIP:  Same objection.  If we're going to talk about specific quotes from his report, we should look at the report.  It's not a memory test.

BY MS. MURAINA:

Q.  Give me one moment.  I'm sharing my screen.

MR. BLANKINSHIP:  Thank you.  I appreciate that.

BY MS. MURAINA:

Q.  So referring you now first to page 29.

You state:  Based on Eligo's statement in the pricing term defining how variable price is determined, there was no good reason for Ms. Schuster to expect that Eligo would charge such rates, much less that Eligo would later start using an artificial intelligence program to extract, quote, the highest possible rate, end quote, or highest possible rate that Ms. Schuster would not notice.

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 163

Do you see that language?

A.    I can see it, yes.

Q.    So that statement is not based on a measured calculation; is that correct?

A.    That's based on deposition testimony by Eligo personnel.

Q.    So your testimony is that Eligo personnel stated that they were charging the highest -- quote, the highest possible rate, end quote, that Ms. Schuster would not notice?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.

A.    Would not notice.  The part of that phrase with that is that would not induce them to terminate Eligo's service and still get the highest possible rate.  And as a result of that calculation and as a result of the testimony that I read, that is the way, the single way, that Eligo chose to set its variable prices, not based on market factors at all.

BY MS. MURAINA:

Q.    Okay.  So you did not measure customer price sensitivity in this case; is that correct?

A.    No.

Q.    And you didn't test whether customers noticed or didn't notice any particular price; is

Page 164

that correct?

A.   No.

Q.   And you did not compare the prices charged to customers who left versus customers who stayed; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   I'm sorry, could you repeat that?

BY MS. MURAINA:

Q.   You did not compare the prices charged to customers who left Eligo versus customers who stayed with Eligo?

MR. BLANKINSHIP:  Same objection.  Vague.

A.   I personally did not.

BY MS. MURAINA:

Q.   So that statement regarding the highest possible rate a customer would not notice, that statement is an inference, not a quantified finding; is that correct?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.

A.   That's a direct impression I received from deposition testimony from Eligo personnel that were, as I understand it, the people who were running GROOVE.  And that's what the purpose and objective of GROOVE was in order to get the highest possible

Page 165

profit over the longest possible term and didn't want the customer, quite frankly, to notice that the price had gone up excessively.

And that that was a machine language based artificial intelligence program which took into account a lot of variables that had to do with the customers so that it could pinpoint that highest possible price that they could charge that GROOVE would indicate that would also not cause the customer to notice that there was a large increase in the price.

BY MS. MURAINA:

Q.   And did you test that inference or impression against alternative explanations for a customer leaving?

A.   There are a lot of reasons why a customer might leave, but principally it would be based on price, as I understand it.

Q.   So now turning to a more general discussion of how pricing algorithms work.

A pricing algorithm evaluates inputs to determine which price applies, would you agree?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.   The pricing of the product is largely

Page 166

based on the inputs to the cost of the product that is being resold.

BY MS. MURAINA:

Q.   So would you say that a pricing algorithm considers inputs?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.   A pricing algorithm that would be normally used, particularly one that is described in the terms of service, would be based on the underlying wholesale price of electricity in the market in which Eligo is purchasing the electricity or leasing, and then an adder put on it for a reasonable level of profit.  That would be the pricing algorithm that is what I would expect and I think what most customers would expect.

BY MS. MURAINA:

Q.   So is your testimony that a pricing algorithm would consider wholesale market prices?

MR. BLANKINSHIP:  Objection.  Outside the scope of his testimony.

A.   A reasonable pricing mechanism as described would take into account the price discovery mechanism in the New York ISO and market clearing price as being the underlying price that

Page 167

Eligo purchases electricity at with a profit added

to it, not one that tested customer behavior.

BY MS. MURAINA:

Q.    So would a pricing algorithm consider

inputs like time, usage, wholesale market prices?

MR. BLANKINSHIP:  Objection.  Vague.

Compound.  Outside the scope of his report.

A.    My answer is --

MR. BLANKINSHIP:  And asked and answered.

A.    My answer is that those are factors which

would normally be considered, yes.

BY MS. MURAINA:

Q.    So determining how a pricing algorithm

works depends on an evaluation of the inputs; is

that correct?

MR. BLANKINSHIP:  Objection.  Outside the

scope of his report.

A.    Yes.  The inputs that are cited in the

terms of service are essentially based on the

market, which is the underlying wholesale market

that Eligo buys its electricity in.

Q.    And you would agree that "factors" implies

that there is more than one factor; is that correct?

A.    There are two factors that we've

discussed.  One is the market price, the wholesale

Page 168

market price, and the other one is the additional cost of X.  Those are the two inputs, and those are the only two inputs.

BY MS. MURAINA:

Q.   So by referring to other market price factors, is it your understanding that Eligo meant to refer to wholesale market price's price?

MR. BLANKINSHIP:  Objection.

Argumentative, and outside the scope of his

report.

A.   Yes.  I believe that is reflective of the same basic understanding of the wholesale market and that I don't really know other market factors, except that they have to be based on that same price discovery market that the New York ISO runs.

BY MS. MURAINA:

Q.   So your testimony is that the only market price factor is related to the NYISO market?

MR. BLANKINSHIP:  Objection.

Mischaracterizes his testimony.

A.   No.  If there is an additional green power and the RECs in it, and the consummate costs of the RECs would also be included in the variable price for a customer that chooses to buy green electricity rather than just for utility profits.

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 169

Q.   But factors like hedging, costs of
hedging, would not be included in your definition of
market price?

A.   The market hedging in that market is
usually rather minimal.  And I think hedging does
fit into the definition of market factors, but
actual hedging costs -- and we just parted a
conversation about GROOVE, that somehow this
complete different pricing mechanism was not
representative of that.  And bringing up hedging
costs, for instance, as a normal cost of doing
business.  And that could be something that is
included in the market price, but hedging costs are
fairly minimal because they are usually swaps.

Q.   Understood.  I'm going to stop sharing for
a moment.

So understanding, just generally, how
pricing algorithms work, you would agree that an
algorithm sometimes can perform arithmetic, such as
multiplying rate by usage?

MR. BLANKINSHIP:  Objection.  Outside the
scope of his report.  Lack of foundation.

A.   To put it simply, if you're buying 100
megawatt hours, that has certain level of
transaction costs associated with it, as opposed to

John O'Brien                              January 29, 2026
Brous v. Eligo Energy, LLC

Page 170

buying one kilowatt hour.

And the scope of a purchase does have and the quantity does have an impact on the price in any commodity; but in this case, the prices that are put forward are per kilowatt hour, not per megawatt hour.

My point is just that I think your question is asking what else can be put into the price, and you've listed several things. You said time, you said quantity.

The fact of the matter is all those things go into the price and that is a reasonable thing to put into the price, but we also have left that discussion of GROOVE, which didn't have anything to do with the market.

BY MS. MURAINA:

Q. So are you saying that GROOVE did not evaluate inputs like time, usage, rate category, you know, in order to determine price?

MR. BLANKINSHIP: Objection. Vague.

A. According to the testimony I read, the principal determinants that GROOVE works on are customer behavioral aspects of predicting, of working on demographic analyses of a customer, where pricing mechanisms that are normal for an ESCO or

Page 171

any seller of energy would be aspects that come from the market itself, the underlying wholesale market, not an analysis of the customers to simply abandon whatever it is that goes on in the market and to maximize long-term profitability by solely analyzing customer characteristics and demographics and other variables that have nothing to do with the market.

BY MS. MURAINA:

Q.    Is it your contention that Eligo did not include any of the market factors I've listed, such as time, usage, rate category in calculating customers' price?

MR. BLANKINSHIP:  Objection.  Lack of foundation.  Incomplete hypothetical. Mischaracterizes his testimony.

A.    Number one, the market factors that you talk about could be included if they are market factors.

And could you repeat the question, please?

BY MS. MURAINA:

Q.    Is it your contention that Eligo did not include inputs like time, usage, and rate category in their pricing algorithm?

MR. BLANKINSHIP:  Same objections.

A.    Time, usage, those are market factors.

Page 172

They could be market factors.

But no, my testimony is that Eligo relied primarily on GROOVE and the determinants that come from GROOVE with regard to setting the prices that it did not, except for some exceptions, they wouldn't sell below their cost.  That we know.  That they had bottom limit on it.

And that they also didn't raise it high enough to get the attention of the regulators, which was a stated goal of the pricing structure so that they wouldn't take a loss on a commodity sale, and they wouldn't raise it high enough to get the attention of the regulators that would then look at that negatively.

Those were the market factors, apparently, that Eligo was concerned with.  But aside from that, there was no consideration of what the wholesale market in electricity was doing.  It was a matter of analyzing customer characteristics and demographics and other types of indicia of the propensity for a customer to see a price and terminate service.

That was the pricing mechanism that turned out to be used in spite of the clear statement in the terms of service that it would be market factors, transportation costs, and other market

Page 173

factors.

BY MS. MURAINA:

Q.   In characterizing the pricing algorithms, your testimony is that a pricing algorithm takes inputs and calculates a price; is that correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his testimony.  Mischaracterizes his testimony today.

I'm sorry, I didn't say that right. Outside the scope of his report. Mischaracterizes his testimony today.

A.   If, in the energy business, we set a price on a commodity, then the factors that go into setting that price are the cost of that commodity, the price of doing business, and a reasonable profit.  That sets the price.

That is the traditional way and also the way that it is done in the energy business.  That is how prices are established.  They are generally not established by abandoning the market factors, except for don't sell below cost, don't get the attention of the regulator, top, bottom, and in the middle, do anything you want.

That is the essence of an unethical way to go about it because of the asymmetry of information

Page 174

that the seller has as opposed to the buyer, and the good faith and fair dealing which is supposed to lead to a bargain that they agree to that benefits both doesn't happen.

BY MS. MURAINA:

Q.   So turning now back to your report.

If you give me one moment, I'll share my screen.

And here I'm on page 44 of your report. And you discuss the way that Eligo, quote, did not calculate its price in response to the underlying energy market.

You say here:  Eligo's profit taking and understanding of what levels of profit it can achieve without customer -- without the customer becoming sufficiently alarmed by the price increase to cancel Eligo services is what drives Eligo's rate setting.

Is it your testimony that those are the exclusive factors that determine Eligo's rates?

A.   My understanding from the deposition testimony of Eligo personnel was that those were the predominant factors.

Again, I just finished saying there was a bottom limit not to sell at a loss, and an upper

Page 175

limit not to get the regulator's attention.

Aside from that, what I stated here is what was testified to under oath by Eligo personnel as the objective of operating the GROOVE program in order to establish the price of -- the variable price of electricity sold each month to customers.

Q.    Would your opinion change if you learned that Eligo did consider factors such as the wholesale market price, time, usage, and other market factors that we've discussed?

MR. BLANKINSHIP:  Objection.  Vague.  Lack of foundation.

A.    I think I've described adequately how I believe the market, in an ethical and honest manner, would operate.

The fact is that time, I don't know what you mean by time.  Per the other factors, I -- quantity, yes.  Quantity.

Could you articulate your question better?

BY MS. MURAINA:

Q.    I referenced factors like time, usage, and rate category, and you agreed that those were market factors, in addition to wholesale market prices.

So I'm asking:  If Eligo considered or input those factors in its pricing algorithm, would

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 176

that change your conclusions in this report?

MR. BLANKINSHIP:  Objection.

Mischaracterizes his testimony.  Asked and answered.

A.  First of all, I saw no evidence that those things were considered in the pricing algorithm of GROOVE.

However, what I will say is that in the energy markets, for instance, quantity -- and I've already provided you testimony on this -- large quantities of electricity on a per unit basis will sell for less than small quantities, and that's usually involving the imputation of transaction loss from the market.

BY MS. MURAINA:

Q.  Have you completed your answer?

A.  Yes, I did.

Q.  Thank you.

I'm going to turn for a moment to wholesale procurement.  And on page 10 of your report, you cite that 30(b)(6) testimony of Mike Sandler.

If you give me a moment, I'll direct you to the exact page.  I'll share my screen.

Are you able to see the highlighted text

Page 177

on the screen?

A. Yes.

Q. So you state: From the evidence that I have seen, Eligo purchased all of its electric power for resale to its retail customers on the open market through either the NYISO day-ahead price or the NYISO real-time (spot) price; is that correct?

A. Yes.

Q. And for this statement, you rely on Eligo's October 29th, 2024, 30(b)(6) deposition testimony; is that correct?

A. That is part of the reliance, yes.

Q. And to be clear, you're saying that Eligo purchased all of its power through the NYISO day-ahead or real-time price market; is that correct?

MR. BLANKINSHIP: Objection. Asked and answered.

A. Yes. In addition to that, there are PSC staff reports that report the same thing.

BY MS. MURAINA:

Q. And if you give me one moment, I'll stop sharing.

I'm going to be introducing what I believe will be Exhibit 7.

Page 178

(Defendant's Exhibit Number 7 was marked

for identification.)

BY MS. MURAINA:

Q.    I'm sharing Exhibit 7 with you, the

October 29th, 2024, 30(b)(6) deposition of Mike

Sandler.

Do you see that on your screen?

A.    Yes.

Q.    And if you give me a moment, I will be

turning to page 61.

Do you see the highlighted portion where

Mr. Sandler explains that variable customers can

leave at any time, and that hedging long term for

variable customers could leave an ESCO long on

energy?

A.    Well, I have to read this, and I can't

because it's too small.  If you could increase the

size and give me the time to read it.

Q.    If you'd like me to go to the next page.

A.    Down a little bit further.  Down a little

further, if there is more.

MR. BLANKINSHIP:  I mean, I think you

cited 61 to 64.  Should we read the rest of it?

MS. MURAINA:  I actually just said that I

was turning to page 61.  I went down to

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 179

page 62.

MR. BLANKINSHIP:  Okay.  I'm just saying that the citation -- that's fine.

BY MS. MURAINA:

Q.  Okay.  Do you see where Mr. Sandler explains that variable customers can leave at any time, and that hedging long term for variable customers could leave an ESCO long on energy?

A.  Long, yes, and the fact is that could put them in a better position, too.

Q.  And do you see where he explains that hedges for variable customers, if purchased, are generally prompt month or short term?

A.  Yes, I saw that.

Q.  And you see where he contrasts that with fixed customers, who can be hedged further out when forward prices are lower?

A.  That's a different type of transaction.

Q.  Did you see that discussion?

A.  Yes, I saw that discussion.

Q.  And he contrasts that -- I apologize.  Let me take a step back.

So that testimony discusses hedging and risk management; is that correct?

A.  Yes.

Page 180

Q.   So it does not say that Eligo purchased all of its power exclusively at day-ahead or real-time spot prices; is that correct?

A.   No, those are hedges.  They still purchase their power in that market.

Q.   But the support for your statement, quote: Eligo purchased all of its electric power for resale to its retail customers on the open market through either the NYISO day-ahead price or the NYISO real-time (spot) price; the support for that statement is not in what you just --

A.   That's exactly what he's saying.  He's saying that they buy their -- on the cash market, they buy their supply and they hedge with swaps. That's what he's saying.

Q.   Okay.  So there is a difference in the prices that are able to be realized for variable customers versus fixed-rate customers; is that correct?

MR. BLANKINSHIP:  Objection.  That's outside the scope of his report.

A.   What he says is that buying for the variable-rate customers in the prompt month, that is the real price.

The presumption that I would make reading

Page 181

that is that they would put some reasonable profit on the prompt month that they purchase for and they would convey that price to their customers.

But this does not -- whether they take a loss or not happens in the swaps, and the hedging does not happen in the cash market.  And I was referring to they buy their supply in the cash market every month.

BY MS. MURAINA:

Q.   So would you say that your statement on page 10 does not explain the distinction in hedging between fixed and -- fixed-rate and variable-rate customers?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.   The variable-rate customers are month to month.  That's what he's saying.  So they are charged based on the cash price.  And they may have swaps.

The fixed-price customers, what he's saying, as I read it, is that they buy a long-term hedge, where they go out -- which they didn't do, but they could go out and buy a fixed price through a broker.

And my understanding is that they procured

Case 1:24-cv-01260-ER    Document 381-2    Filed 03/16/26    Page 183 of 315

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 182

their energy as -- and the Public Service Commission

staff has verified this, that the purchases are made

in the real-time or day-ahead market for the

commodity itself.  The hedges are distinct from

that.

BY MS. MURAINA:

Q.    If we go back to the testimony.  Give me

one moment.

The attorney asks:  Would you agree that

the wholesale cost to serve a fixed-rate customer in

Con Ed's on each during that quarter would be the

same as fixed-rate costs as the wholesale cost to

supply a variable rate customer in that same zone?

Mr. Sandler answers:  No.

Do you see that?

A.    Yes.

Q.    So would you say that your statement on

page 10 of your report explains that distinction?

MR. BLANKINSHIP:  Objection.  Outside the

scope of his report.  Mischaracterizes his

testimony.

A.    I really can't say, because the fact is

the purchases that are made for the commodity are

made -- what he's saying is purchasing the commodity

itself on the cash market, as I've said, and that

Veritext Legal Solutions
800.808.4958                                770.343.9696

Page 183

they have hedges, particularly for fixed-price
customers, so that they can set a price at which
they would make a profit, even if the market goes
up.  That's how I'm reading this.

BY MS. MURAINA:

Q.   So page 10 of your report cites to
page 61, line 14 -- that's here -- asking:  How did
the wholesale cost to serve a fixed-rate customer
differ from the wholesale cost to serve a
variable-rate customer?

It goes on to cite to -- cite from line 14
of page 61 through line 8 of page 63.

And in that discussion, Mr. Sandler
contrasts with fixed-rate customers who can be
hedged further out and when forward prices are
lower; is that correct?

A.   Yes.

MR. BLANKINSHIP:  I'm just going to object
that is outside the scope of his testimony.

BY MS. MURAINA:

Q.   So would you say -- your statement on
page 10 does not explain that distinction; is that
correct?

MR. BLANKINSHIP:  Objection.  Vague.
Asked and answered.  Mischaracterizes his

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 184

testimony, and is outside the scope of his report.

A.   The statement that I made had to do with the cash purchases, and what this testimony says is that their cash purchases are hedged, not that they have some sort of long-term contract with the ISO.

There is a distinction between a fixed-rate customer and a variable-rate customer from the standpoint that a variable-rate customer does receive, essentially, the cash price or the prompt-month price; while the fixed-price customer, a supplier will purchase a swap in order to fix the price so that they won't lose money on the transaction.

However, that doesn't mean that there won't be a situation, as he points out, where a customer can terminate their service and essentially leave the seller with a supply contract for some amount of electricity that will be in the market at a loss should they turn around and liquidate that position.

BY MS. MURAINA:

Q.   And your report does not discuss that eventuality?

MR. BLANKINSHIP:   Objection.   Outside the

Page 185

scope of his report.  Asked and answered.

A.   My report doesn't discuss that at all.

BY MS. MURAINA:

Q.   So would you say a reader could take away an incomplete impression of Eligo's procurement practices from that statement on page 10?

MR. BLANKINSHIP:  Objection.
Argumentative.  Outside the scope of his report.

A.   What is meant is that they didn't go out to third parties to purchase electricity.  They bought from the New York ISO.  That's what that means.

BY MS. MURAINA:

Q.   You don't mean to say that the cost to service a fixed-rate customer and the cost to service a variable-rate customer would always be the same; is that correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.   I haven't addressed that at all.

BY MS. MURAINA:

Q.   You haven't addressed that.  All right. Thank you.

So I'd like to now turn to some of the

Page 186

analogies with respect to consumer expectations.

If you give me a moment, I'll stop sharing.  And we can turn to your report.

I'm going to be sharing my screen.

So on -- beginning on page 42, you discuss what you characterize as, quote:  Eligo's misleading description of how variable price is determined; is that correct?

A.   Yes.

Q.   And within this section, you discuss or you state:  Consumers reasonably expect volatility when told pricing is based on market pricing; is that correct?

A.   Yes.

Q.   And that statement is based on your experience, not on a survey of Eligo customers; is that correct?

MR. BLANKINSHIP:  Objection.  Lack of foundation.  Mischaracterizes his report.

A.   I have never surveyed directly Eligo customers.

BY MS. MURAINA:

Q.   So that means you did not test whether Eligo customers interpret market pricing as wholesale market pricing, as opposed to other retail

Page 187

market factors?

MR. BLANKINSHIP:  Same objection.

A.    My understanding, and what I've testified, what my testimony is, is that there are broad-based social scientific studies that do examine customers, like Eligo's customers, on a broad basis, and draw a scientifically-derived conclusions about their expectations and what it is that they're trying to accomplish in the transaction.

So to the extent that Eligo customers are normal customers, then yes, it would extend to Eligo customers.

BY MS. MURAINA:

Q.    But you didn't empirically measure Eligo consumer understanding in this case?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    No.  I did not survey existing Eligo customers in a sample that I collected, surveyed them with questionnaire, qualified them with demographics, and do all of the other things that would be necessary to make a statement specifically and only about Eligo customers.

However, the broad social scientific analyses that have been done certainly envelope

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 188

Eligo customers as normal customers in this scope.

BY MS. MURAINA:

Q.   Thank you.

I'm going to stop sharing for a moment. And I'm turning to one of the articles you cite by a Maher Toukabri in support of some of your consumer expectation views.  If you give me a moment, I'll direct you to the exact page.

I'm going to read the full excerpt, starting on page 42:  In my experience in dealing with people who are interested in purchasing an energy commodity for their personal or small business use, when they are told that pricing of the purchase of that energy product would be based on "market pricing," they reasonably expect the prices to be somewhat volatile because they are used to viewing markets like those for gasoline, heating oil, electricity, and natural gas and have had experience with that volatility in their personal lives.

Do you see that?

A.   Yes.

Q.   And here there is a footnote, footnote 55, which refers to an article by Toukabri, Maher or by Maher Toukabri.

Page 189

Do you see that?

A.   Yes.

Q.   And are you aware that that study involves approximately 320 Saudi Arabian participants?

MR. BLANKINSHIP:   Objection.   Lack of foundation.

A.   What I'm aware of in that study is that there were demographics used.   In addition to that, there are numerous other studies that are scientifically based that involve a sample of unions in the United States.

In Denmark, for instance, is an area where a lot of these studies take place because they have a deregulated, as we used to say, electric market. Britain.

And there are numerous other countries in which consumers make those same choices in the same way and the same conditions, because this is not a simple United States type of transition from regulated electric markets to one in which there is consumer choice involved.

In fact, there are probably dozens of countries where that is the case.   I worked with Tokyo Electric on exactly this.

And the basic way that those markets have

been set up, in my experience, which is fairly extensive, is that they follow the model that is used in the United States.

Now, that particular study is one point of information.  I could provide you a bibliography full of similar studies in different nations that reach the same basic conclusion.

So I'm not basing the opinion of mine on this study.  I'm basing it on studies, including this and many others, that reach the same conclusion.

BY MS. MURAINA:

Q.   And to be clear, you're not representing that the Toukabri study samples New York ESCO customers; is that correct?

A.   These are human beings.  They are the subject of the examination, is what do people do when they're looking at this particular type of choice in electric markets.

So I don't know if there is a competent study that I would cite on simply New York residential consumers, but I do know that there are many competent studies that indicate what human beings in a what we call deregulated market, where competition is being introduced is there.

Page 191

But if you look at the Danish studies, look at the English studies, the Japanese studies, they are everywhere, and they reach essentially the same type of conclusion, which is what I've reached here.

I cited one authority, and there are numerous authorities, and if we get to meet again, I will bring those with me.

Q.    But to be clear, you did not cite any of those other authorities here; is that correct?

A.    I'm citing my expertise from having read numerous studies in this area.  That's what my opinion is based on, not one single study.

The opinion I'm voicing at this point and what I'm saying is not an opinion based on a single study.  It's an opinion based on multiple studies looking at the same thing, different countries with the same basic areas.

And these are human beings that -- these are human beings are looking at a choice in sticking with their utility -- because regulated utilities, it's not just in the U.S.  It's all over the world we have regulated utilities that are regulated in the same manner as here, where you can't run 1,000 wires down the street.  So you have one company, you

Page 192

give it a monopoly, and then protect it from regulators making it go broke by guaranteeing a profit.  And then that company has to figure out a way to introduce competition into its retail customer base.

This is something that happens in many, many countries, and has been studied much more than even in the United States.

So that's what my opinion is based on.

Q.    I understand.

And can you point me to any other study that you purport to rely on for this statement here?

MR. BLANKINSHIP:  Objection.  Asked and answered.

You can answer.

A.    Can I, sitting here?

BY MS. MURAINA:

Q.    Yes, sir.

A.    No, but I can in the future, certainly.

Q.    And your report does not explain a methodology for generalizing findings about Saudi Arabian consumer to New York retail residential consumers; is that correct?

A.    My report, first of all, it's a method. And the method of my report is to take into account

Page 193

the broad scope of studies that are done under scientific analysis, which is what I am.  I'm a Ph.D. social scientist.

So I can look at studies and I can look at the underlying procedure that the study went through, the variables that were tested, the consistency of the customer base, the standard deviations, the analysis and everything else, and determine whether it is a scientifically valid study.

And there are -- I'll repeat myself here and I don't really want to, but there are numerous studies of exactly this phenomenon of human beings making this exact choice.

Q.    Understood.

So to summarize, you've stated you're not offering a technical critique of GROOVE itself.

Your analysis of GROOVE was based on deposition testimony; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Mischaracterizes his testimony.

A.    Repeat that question.

BY MS. MURAINA:

Q.    You are not offering a technical critique of GROOVE, the pricing algorithm itself?

Page 194

MR. BLANKINSHIP:  Objection.  Asked and answered.  Mischaracterizes his testimony.

A.    The basis I'm analyzing GROOVE on, there are statements of Eligo personnel in sworn depositions when they were questioned about the objectives of GROOVE.  I'm basing my opinion on that.

BY MS. MURAINA:

Q.    You did not perform a replicable economic model of GROOVE's effects?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Mischaracterizes his testimony.

A.    Could you ask that again?

BY MS. MURAINA:

Q.    You did not perform a replicable economic model of GROOVE's effects?

MR. BLANKINSHIP:  Same objections.

A.    No, I did not.

BY MS. MURAINA:

Q.    And you did not test alternative explanations for the pricing outcomes in this case; is that correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  Asked and answered.

A.    Yes, I did.  Alternative explanations.  I

Page 195

can't give you a quantitative answer to that, but a qualitative answer would be that it would be based, as I've already testified, on the wholesale market cost plus.

And that's how a customer expects this to happen, just like at a gasoline station, just, quite frankly, like the utility does. Utility has a fuel cost adjustment factor. When the fuel costs goes up that the utility has to acquire for resale, the retail price goes up. This is something that is very familiar to most customers who buy energy.

BY MS. MURAINA:

Q. Understood. Thank you.

MS. MURAINA: I'd like to break for a few minutes.

THE VIDEOGRAPHER: We are going off the record. The time is 3:10 p.m. and this marks the end of media unit number five.

(A break was taken.)

THE VIDEOGRAPHER: The time is 3:18 p.m. This marks the beginning of media unit number six.

Please proceed, counsel.

BY MS. MURAINA:

Q. Dr. O'Brien, before we turn to causation,

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 196

I wanted to know if you could name one study that analyzes how a reasonable consumer would understand the term "market factors" in a contract?

    A.   Well, I think the Danish study is pretty close to that.

    Q.   And who wrote the Danish study, or who authored it?

    A.   I don't carry that information in my head. It's one of many studies that I have looked at regarding this point of view.

    Q.   And I understand you may not have the name of the author.

         Do you have the title of the study?

    A.   No, I don't.  But I know it was a Danish study.  There also is a study from England about the same thing.  I don't carry the citation in my head. And I also know that there have been similar studies in Japan.

         Again, I don't carry these citations around with me.  And these are customer -- I'm sorry, consumer behavior studies that are relevant to the energy business, which is something that I do deal in with some frequency.

    Q.   So when you refer to the consumer behavior, are you saying that these articles

Page 197

specifically deal with how a consumer understands the term "market factors" or "market conditions"?

A.   Yes.  Market factors, market pricing, those are things -- and I've already included in my testimony today that when somebody goes to a gasoline station to buy fuel for their car, they understand that if they hear the price of oil is going up, they are not surprised to see the price of gasoline going up.  Or when they hear price of natural gas is going up, they are not surprised the price of the utility that is selling them natural gas goes up.  These are pretty common understandings that people have in regulated energy markets.

Q.   And to clarify, did you write any of these studies you've referenced in your report?

A.   I don't know.  I would have to go through and look at all my footnotes.

Much of it also comes from my personal experience of having dealt with hundreds of thousands of different customers in the energy markets and what I see very, very frequently in discussions that I have concerning that.

And there is nothing surprising to me about a customer who will raise, for instance, today's electricity prices, which are rising, and

Page 198

tie that to the construction of data centers, increasing demand past where it has been, increasing demand.

The energy markets in the U.S. after the Federal Energy Regulatory Commission did restructure in the electricity markets is now based on supply and demand, so that typically, for instance, with the New York ISO, if demand goes up for electricity, the price of electricity rises. If demand goes down, the price of electricity goes down.

And so supply and demand is something that people innately understand about markets. It is not uncommon at all for people to make a comment like, yeah, demand for this or that went up, and say in the next sentence or next part of the same sentence, yeah, and the price went up.

This is not something that is unknown when it comes to market pricing, the term "market pricing." And that's particularly true in the energy business because the term "market pricing" began -- and I've already explained this. It's something that is happening at the federal level when they wanted to introduce competition into the wholesale electric markets.

And the term "market pricing" was

Page 199

something that was developed in a broad based regulatory proceeding involving many players, including myself, to determine how market pricing could work.  And market pricing is something that the Federal Energy Regulatory Commission said we need to establish a certification program for sellers of the electricity in the wholesale market, that they don't have market power, that they don't have the ability through, for instance, having control of huge amounts of electric supply so that they could manipulate the price itself.  That's called market power.

And so by going through a very extensive regulatory proceeding on a national basis with nearly maybe a thousand, or certainly hundreds, it was established that they could grant the certificate to allow an electric seller to sell to the market so long as they didn't have market power. What that meant was that the normal buy and sell mechanism leading to price discovery in that market could operate fairly and freely.

And that was the genesis of the whole term "market pricing" in the energy markets.  And that terminology completely permeates the energy markets. In natural gas it does, because natural gas was also

Page 200

deregulated.  Natural gas used to be under price controls.  And they didn't work, but they couldn't figure out how to go about allowing competition to see if the market could determine what the price should be.

So in natural gas, which preceded, as in my report, as I say in my report, preceded electricity, the natural gas markets did the same thing.  What they did was they made sure that a natural gas producer would not have market power.  So they weren't big enough through the weight of their production to make the price go up or down themselves.  And then they would get a certificate that said they were allowed to sell at whatever the market will bear.

So market pricing in the energy business has had a very clear long-term definition that any professional in the energy business absolutely understands.

Q.   Understood.  I'm going to move on to causation here and injury.

So by causation, I mean whether Eligo's conduct caused customers to suffer an economic harm.

Do you understand that?

MR. BLANKINSHIP:  Objection.  Calls for a

Page 201

legal conclusion.  Outside the scope of his report.

A.   I understand what you're asking, but I don't have an opinion that has a legal impact.  I'm not testifying about anything legal.

And I think your question is:  Did anybody get harmed by overpricing?

BY MS. MURAINA:

Q.   I just mean to ask:  Do you understand what I am referring to when I refer to the phrase or to the term "causation."

MR. BLANKINSHIP:  There is no question pending.

BY MS. MURAINA:

Q.   I was just clarifying that you understand that when I say causation, I am referring to whether Eligo's conduct caused customers to suffer an economic harm.

Do you understand that concept?

MR. BLANKINSHIP:  Objection.  Outside the scope of his testimony.  Calls for a legal conclusion.

A.   I don't know.  I know that's an allegation made in the complaint, but I did not draw an opinion on it.

Page 202

BY MS. MURAINA:

Q.   And when I refer to injury, I am meaning to refer to where customers paid more than they would have otherwise paid.

Do you understand that concept?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.

A.   So are you asking me if a customer went with an ESCO, whether it was Eligo or any other, by being promised that their cost of electricity would be lower than the utilities cost and then the cost turned out to be higher than the utilities cost, was that bad?  Is that what you're asking me?

BY MS. MURAINA:

Q.   I'm referring -- well, I'm making sure that you understand what I'm referring to when I say "injury," when I'm referring to causation and then when I'm referring to injury.

But if it's vague, I can go on to the next sequence and it should be clearer.  There is no question there.

So turning back or turning now to damages.

You've shared that you're not offering a damages opinion in this case; is that correct?

MR. BLANKINSHIP:  Objection.

Page 203

Mischaracterizes his testimony.

A.   That's correct.

BY MS. MURAINA:

Q.   So you did not calculate an overcharge for any Eligo customer; is that correct?

A.   I made no empirical analysis of damages in any sense.

Q.   So that means you did not calculate the difference between what any customer would have paid in a but-for world; is that correct?

MR. BLANKINSHIP:   Objection.   Asked and answered.   Outside the scope of his report.

A.   Yes, I did not calculate damages.

BY MS. MURAINA:

Q.   Did you identify a benchmark price that customers should have paid?

MR. BLANKINSHIP:   Same objection.

A.   In form, yes.

BY MS. MURAINA:

Q.   You identified a benchmark price that customers should have paid for their electricity?

MR. BLANKINSHIP:   Same objection.

A.   If I had to choose a benchmark price, it would be the utility's retail price.

Page 204

BY MS. MURAINA:

Q.    And have you stated an opinion on what a reasonable margin would be in this case, profit margin would be in this case?

MR. BLANKINSHIP:    Objection.    Outside the scope of his report.

A.    No, I have not.

BY MS. MURAINA:

Q.    And your report does not quantify economic injury to any customer; is that correct?

MR. BLANKINSHIP:    Same objection.    Asked and answered.

A.    That's correct.

BY MS. MURAINA:

Q.    And you didn't conduct a causal model -- you did not construct a causal model linking Eligo's conduct to customer pricing outcomes; is that correct?

MR. BLANKINSHIP:    Objection.    Vague. Outside the scope of his report.

A.    I don't understand the question.

BY MS. MURAINA:

Q.    So you did not model how the prices would have differed but for the conduct that you're criticizing in this report; is that correct?

Page 205

MR. BLANKINSHIP:  Same objections.

A.   No, I did no price analysis on that level.

BY MS. MURAINA:

Q.   And you did not test whether the prices you observed were caused by actual market conditions as opposed to Eligo's conduct?

MR. BLANKINSHIP:  Objection.  Vague. Outside the scope.

A.   There was no empirical testing of pricing in my report.

BY MS. MURAINA:

Q.   And you didn't test any alternative explanations for customer pricing outcomes; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Outside the scope.

A.   Let me think.

Only what I've read in the testimony of the deponents, and also -- no, I haven't.

BY MS. MURAINA:

Q.   So your report does not contain a tested causal chain between -- or a causal chain from conduct to price to injury; is that correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  Asked and answered.

Page 206

A.    That would be a damage calculation, and that damage calculation has been made by a damage expert, not me.

BY MS. MURAINA:

Q.    So turning to some of your ethical criticism of Eligo, much of your report criticizes Eligo's conduct as unethical or unfair.

Would you say that's correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    Yes.

BY MS. MURAINA:

Q.    And you use terms like "exploitation," "undermining fair bargaining," and "commercially unreasonable;" is that correct?

A.    Yes.

Q.    Would you characterize those as ethical and normative judgments?

MR. BLANKINSHIP:  Objection.  Vague. Outside the scope of his report.

A.    It's ethical.

MR. BLANKINSHIP:  And asked and answered. Sorry, go ahead.

A.    The ethical aspect here is good faith and fair dealing, which involves curing the asymmetry of

Page 207

information and telling the truth.  That's the problem.

BY MS. MURAINA:

Q.  So ethical criticism alone does not establish that a customer suffered an economic injury, then; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Outside the scope of his report.

A.  I'm making no judgment or comment on injury.

BY MS. MURAINA:

Q.  And your report does not separately analyze whether customers were financially worse off because of the conduct you're criticizing; is that correct?

MR. BELENKY:  Objection.  Asked and answered.  Outside the scope of his report.

A.  I did no damage calculations.

BY MS. MURAINA:

Q.  In your report, you critique Eligo's pricing process and its discretion; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Outside the scope of his testimony.  Lack of foundation.

A.  What was the question?

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 208

BY MS. MURAINA:

Q.   You critique Eligo's pricing process and its use of discretion?

MR. BLANKINSHIP:  Same objections.

A.   Its use of discretion?

BY MS. MURAINA:

Q.   Yes.  Would it be fair to say your report criticizes Eligo's pricing process in how it exercised discretion?

MR. BLANKINSHIP:  Same objections, and to the extent it calls for a legal conclusion, I'm objecting on that basis as well.

A.   My report discusses the difference between what the customer thought was going to be the way that their price would be calculated as opposed to the very different way in which it was calculated.

BY MS. MURAINA:

Q.   But you did not show that that process caused customers to pay higher prices than they otherwise would have paid; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Outside the scope of his report.

A.   I didn't do any damage analysis.

BY MS. MURAINA:

Q.   And you did not compare the prices charged

Page 209

to the prices of other ESCOs; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   I did not.

BY MS. MURAINA:

Q.   So your process is -- sorry, your critique is limited to the process itself; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   No, no.  It's the material dishonesty involved, is what my critique is about.

BY MS. MURAINA:

Q.   But your critique does not venture into whether or not consumers suffered an economic injury; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Outside the scope of his report.

A.   That's correct.

BY MS. MURAINA:

Q.   And you rely, in part, on regulatory -- actually, I'll skip there.

Turning to your discussion of good faith, in your report, you suggest Eligo did not act in good faith; is that correct?

A.   Yes.

Q.   Would you agree that good faith is a

Page 210

normative or a legal concept?

MR. BLANKINSHIP:  Objection to the extent that calls for a legal conclusion, and that is vague.

A.   I'm commenting from the perspective of ethical behavior and negotiating a transaction, not legal.

BY MS. MURAINA:

Q.   And good faith is not an economic metric; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Outside the scope of his report. Mischaracterizes his testimony.

A.   Good faith and fair dealing is a concept which is applied when there is a transaction in which one party has an advantage over the other.  It is typically something that arises when one party is a very powerful party or all-knowing party, and the other is a low information and smaller entity.

And it is designed for things like the larger, more powerful entity changing the rules of how the transaction occurs, but to some extent, possibly within the stated rules.

In other words, it is an example of reinterpreting a transaction in such a way as to

Page 211

remove the benefit from the other party.  That's

what good faith and fair dealing is about.

BY MS. MURAINA:

Q.   So you did not quantify good faith or bad

faith; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   No.  Quantification is not appropriate

except in a damage calculation, which I have said I

did not do.

BY MS. MURAINA:

Q.   And would you -- let me rephrase.

You did not apply a defined standard to

measure good faith; is that correct?

MR. BLANKINSHIP:  Objection.

Mischaracterizes his report.

A.   Good faith and fair dealing is a concept

that arises from ethical behavior in parties in

commerce.  It is well established with regard to

what it means from a transactional standpoint.  And

I've already outlined and answered that question a

number of times today.

BY MS. MURAINA:

Q.   So when you use the term "good faith," you

are not referring to a legal term?

A.   No.  It's an ethical term that arises from

John O'Brien                                      January 29, 2026
Brous v. Eligo Energy, LLC

Page 212

the study of business ethics.

Q.   I'm going to turn to another deposition transcript that you stated you relied on in drafting your report.  If you give me a moment.

(Defendant's Exhibit Number 8 was marked for identification.)

BY MS. MURAINA:

Q.   I'm going to be introducing what has been marked as Exhibit 8, and it is the deposition transcript of Andrew LaPointe dated June 18, 2025.

Do you see Exhibit 8 on your screen?

A.   Yes.

Q.   You reviewed Mr. LaPointe's deposition in forming your opinions; is that correct?

A.   I did review his deposition, yes.

Q.   I don't expect you to necessarily remember so we can go back, but you cite Mr. LaPointe's testimony in your report, including on page 49; is that correct?

A.   I don't know unless you show me.

Q.   I'll stop sharing now.

I'm sharing my screen.  So I am now in the section of your report titled:  How Eligo Actually Sets Variable Rates (Pre-GROOVE and after).

Do you see that?

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 213

A.   Yes.

Q.   So turning to page 49 -- and to be clear, these are -- this is a list of bullets in which -- that you've introduced by noting you've:  Seen no Eligo documents where it calculated or assigned values to the "factors" listed in the pricing term and then used values to "calculate" a variable rate "on a monthly basis in response to" those factors.

Do you see that language?

A.   Yes.

MR. BLANKINSHIP:  I'm going to object that it mischaracterizes his testimony.

MS. MURAINA:  I believe I read directly from the report.

MR. BLANKINSHIP:  That's not the basis of my objection.  I'll be happy to explain it, if you like.

BY MS. MURAINA:

Q.   So moving down to page 49, you'll see for this bullet there is a reference footnote 70.

In that footnote 70, you cite, bullet point, a deposition of June 18, 2025.

Do you see that?

A.   Yes.

Q.   On page 49, you state that:  Eligo's

Page 214

leadership admitted that pricing was set within the

boundaries, quote/unquote, of broad contract terms

and in response to consumer -- customer behavior; is

that correct?

A.   Are you reading the shaded part?

Q.   Eligo's leadership admitted that it did

not tailor pricing according to contract language.

Instead, they used the same process across all

customers.  LaPointe confirmed we used very broad

language so that pricing would not need to change

across contract versions and, quote, we would not

have to make that distinction between customers on

different -- we would not have to make that

distinction, end quote, between customers on

different variable pricing terms when setting the

rate.  Our pricing method for both customers is the

same so long as behavior was within the boundaries

of the broad terms.

Do you see that language?

A.   Yes.

Q.   And you attribute those propositions to

Mr. LaPointe's testimony; is that correct?

A.   Yes.

Q.   Thank you.  So I'm going to return to

Mr. LaPointe's testimony.

Page 215

I will share my screen now.  So I'm now on page 33 of Mr. LaPointe's deposition transcript.

And starting at line 25 and going through page 34, line 7, could you read that silently and then aloud when you are ready?

A.   Looking at the contracts, it seems fairly obvious that we use very broad language that would cover a wide range of pricing strategy.  I think that's why we used pricing strategies language in the contract and in the TPV, because our business changes, conditions change -- our business changes, conditions change from time to time.  So we had broad, inclusive language so that it was infrequent that we would have to rewrite the contract.

Q.   Thank you.

Now I'm going to turn to page 36 and ask you to read lines 20 through 25.

A.   So, again, I will get back to you -- this is Mr. Meadows?

Q.   This is Mr. LaPointe, the answer.

A.   So, again, I will -- I'll get back to you when we know both contracts.  We know that -- we know that our pricing method for both customers is the same.  We know that both of these contracts fit within the parameters that are allowed by our

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 216

contracts.  So, no, we would not have to make that distinction.

Q.   So having read that testimony, Mr. LaPointe does not use the phrase, quote/unquote, "within the boundaries" anywhere in those passages; is that correct?

A.   Not that I recall.

Q.   He also does not say pricing was set in response to customer behavior in these passages; is that correct?

A.   What he does say is different than what's in the terms of service.

Q.   So can you point me to anywhere in his testimony where he says that pricing was set, quote, in response to, end quote, customer behavior?

MR. BLANKINSHIP:  I'm going to object.  We don't have the transcript here.

A.   What he seems to be describing is that somehow in the TPV call, the mention of pricing strategies, which he does mention is a material part of the contract.  And he says that, and it's not.

BY MS. MURAINA:

Q.   I apologize.  Please continue.

A.   That would be the problem I have with his testimony, is that the implication from what you've

Page 217

had me read -- and by the way, I don't carry the deposition here in my head in its entirety, and also I don't have the entire deposition to sit and go through again.

But the clear implication in what you had me read is that there is this thing called pricing strategies, which is part of their contract.  And it's my testimony the pricing strategies is not part of the terms of service and therefore not relevant to the contract.

Q.   On page 49, you state that Mr. LaPointe says that our pricing method for both customers is the same so long as behavior was, quote, within the boundaries, end quote, of the broad terms.

You've stated that, quote/unquote, within the boundaries is not anywhere within these passages; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.   I don't know.  I don't recall.

BY MS. MURAINA:

Q.   And you've also stated on page 49 that Mr. LaPointe stated, in other words, variable rates were set, quote, in response to, end quote, customer behavior.

You've now stated you don't see that

Page 218

anywhere in the lines we've cited of the deposition transcript, correct?

A.   I don't have the full deposition in front of me, and those statements on my part derive from a reading of a lengthy deposition, and you've had me read two sections of it and asked me to conclude what it says throughout all of the probably 50 or 100 pages of deposition testimony, and I can't do that.

Q.   I understand very well.

But, Dr. O'Brien, you cite these specific lines, specifically page 33, line 25 through page 34, line 7, and page 36, lines 20 through 25, in your report for these assertions; is that correct?

A.   Yes.

Q.   So those quotes don't appear in those lines as we've read them; is that correct?

MR. BLANKINSHIP:   Objection.   Asked and answered.   Argumentative.

A.   Apparently not.

BY MS. MURAINA:

Q.   So would you say those statements reflect your own characterization as opposed to Mr. LaPointe's exact words?

John O'Brien                                      January 29, 2026
Brous v. Eligo Energy, LLC

Page 219

A.   Those points definitely reflect my characterization of the overall deposition and points that Mr. LaPointe was making.  And it's difficult to pull these specific sentences out of it and characterize the entire deposition, which is what I was attempting to do.

And I think it's also easy to isolate quotes that make the point that one would want to make, which I apparently did not do.  But I don't have the entire deposition to read, nor do I have the time to read the whole thing.

Q.   Well, would you agree that when quotation marks are used in an expert report, readers understand those terms to reflect the witness' actual words; correct?

A.   Those quotes do, but what I was trying to model in my report was the general disposition that was expressed in the deposition, and apparently those particular quotes did not do that.

Q.   So here, specifically referring to page 49 of your report, the quoted phrases do not appear in the cited testimony; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   Apparently.

Page 220

BY MS. MURAINA:

Q.    So you combine selected testimony with your own phrasing to reach conclusions about pricing intent on page 49?

MR. BLANKINSHIP:    Objection. Mischaracterizes his testimony.    Argumentative.

A.    The reading of the entire deposition did leave me with the impressions that I was trying to convey there.

BY MS. MURAINA:

Q.    But it would be fair to say your description of Mr. LaPointe's testimony on page 49 is not a verbatim account of what he said?

MR. BLANKINSHIP:    Objection.    Asked and answered.    Argumentative.

A.    Yes.

BY MS. MURAINA:

Q.    And would it be fair to say that it adds concepts that are not stated in his actual testimony?

MR. BLANKINSHIP:    Objection.    Asked and answered.    Argumentative.

A.    No.    If you take the entire deposition, I don't back off from my position as stated.    And there is a lot more to it than just the simple

Page 221

quotes that I apparently misquoted.  There are parts of that that I wanted, but the entire deposition makes exactly the point that I was trying to make.

BY MS. MURAINA:

Q.  So understanding that those lines were misquoted, can you direct me to any other lines that support your characterization of Mr. LaPointe's testimony?

MR. BLANKINSHIP:  I'm going to object.  We don't have the entire transcript here.  We just have the one page you are showing us.

BY MS. MURAINA:

Q.  You can answer.

MR. BLANKINSHIP:  You can answer.

A.  I can't possibly answer your question without sitting down and reading the entire report and seeking out authority for what I was stating within the deposition itself.

BY MS. MURAINA:

Q.  And you had the opportunity to do so as you were drafting your report, correct?

A.  Yes.

Q.  And so to summarize, you've shared that you did not calculate damages; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and

Page 222

answered.

A.    I did not calculate damages, no.

BY MS. MURAINA:

Q.    And you did not identify a but-for price?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    I did not do any sharp conclusive pricing calculations.

BY MS. MURAINA:

Q.    And you did not in any other way quantify injury; is that correct?

A.    That's correct.

Q.    So your report, instead, characterizes Eligo's conduct as unethical or unfair, and assumes customers were harmed; is that correct?

MR. BLANKINSHIP:  Objection.  Outside the scope of his report.  Mischaracterizes his testimony.

A.    Assumes what?

BY MS. MURAINA

Q.    That customers were harmed by Eligo's conduct?

MR. BLANKINSHIP:  Same objections.

A.    It's a comment on the conduct, not on the harm.

Page 223

BY MS. MURAINA:

Q.    So would it be fair to say that your report does not independently analyze or quantify whether the conduct that you've characterized here caused customers to suffer in economic harm?

A.    I did not calculate damages at all.  And I've stipulated to that.

Q.    Thank you.  Moving on.  I'll stop sharing for now.

So as we're moving towards closing, Dr. O'Brien, I want to make sure the record is clear on the scope of your opinions.

You're not here to decide legal liability in this case; is that correct?

A.    I'm not here to opine on legal matters involving this case, no.

Q.    And you are not here to interpret the contract as a matter of law; is that correct?

A.    That's correct.

Q.    And you are not here to decide whether Eligo complied with New York regulations; is that correct?

MR. BLANKINSHIP:  Objection.  Vague.

A.    Where New York regulations state in clear black and white what conditions are and I cite those

Page 224

regulations, that leads to a conclusion that they may not have been followed. However, I'm not interpreting the legal basis of those regulations. I'm interpreting the basis upon which those regulations can be complied with or not complied with.

BY MS. MURAINA:

Q. So you are not opining on whether Eligo adhered to New York regulations, correct?

MR. BLANKINSHIP: Objection. Asked and answered. Vague.

A. I think I just answered that question.

BY MS. MURAINA:

Q. I'm asking whether you have stated an opinion on whether Eligo was in compliance with New York regulations?

MR. BLANKINSHIP: Objection. Asked and answered.

A. Where there are specific regulations that I'm familiar with and I've been judged competent to advise clients on compliance with regulations, that's the basis on which I'm making an assessment, not on the legal basis for a violation of regulations, but whether or not they complied with the spirit and intent of the regulation itself.

John O'Brien                              January 29, 2026
Brous v. Eligo Energy, LLC

Page 225

BY MS. MURAINA:

Q.   So is your testimony that there is a difference between complying with regulations legally as opposed to the spirit and intent of regulations?

MR. BLANKINSHIP:  Objection.  Calls for a legal conclusion.  Mischaracterizes his testimony.

A.   I'm not drawing legal conclusions.  I'm drawing conclusions based on my expertise in regulatory economics, my experience and my background as to whether there was compliance with a regulation and not a statute, not a law.

BY MS. MURAINA:

Q.   Do you understand the regulations to be a part of a body of law?

MR. BLANKINSHIP:  Objection.  Calls for a legal conclusion.  Outside the scope of his report.

A.   I'm not opining on anything having to do with, in my opinion, with whether the law was violated or not.  However, I am making a comment on whether a regulation was complied with in my judgment.

John O'Brien                                January 29, 2026
Brous v. Eligo Energy, LLC

Page 226

BY MS. MURAINA:

Q.    And you're not here to decide the intent or state of mind of Eligo or its employees; is that correct?

MR. BLANKINSHIP:   Objection.  Asked and answered.  Mischaracterizes his testimony. Outside the scope of his report.

A.    The evidence that I have reviewed leads me to believe that Eligo had unethical intent in characterizing the transaction and executing the transaction after it was consummated.

BY MS. MURAINA:

Q.    And is unethical intent a legal term, as you use it?

A.    Is what?

Q.    Is unethical intent a legal state of mind, as you've used it?

MR. BLANKINSHIP:   Objection.  Vague.

A.    I'm not making a comment on legal or illegal.  It's an ethical violation.

BY MS. MURAINA:

Q.    And your opinions about what a reasonable consumer would expect, those are based on your experience and judgment, correct?

MR. BLANKINSHIP:   Objection.   It

Page 227

mischaracterizes the testimony.  Asked and answered.

A.   My experience, yes, and also very, very ubiquitous social scientific studies on consumer and organizational behavior.

BY MS. MURAINA:

Q.   So as part of that analysis and study, you've concluded that the named plaintiffs had no reason to believe that Eligo would use Groove or machine learning to determine price; is that correct?

A.   Could you repeat that question?

Q.   In your analysis, you've concluded that the named plaintiffs had no reason to believe that Eligo would use GROOVE or machine learning in order to determine the price that they would pay; is that correct?

MR. BLANKINSHIP:  I'm sorry.  Could you read that back to me?

(Desired portion read back)

MR. BLANKINSHIP:  Objection.  Vague. Asked and answered.

A.   I'm not understanding the question.

BY MS. MURAINA:

Q.   So throughout this deposition you've

Page 228

shared that your belief is that Eligo's pricing practices were outside of the scope of what was promised in the party's contract; is that correct?

A.   Yes.

Q.   And with respect to those pricing practices, is it your testimony that the named plaintiffs had no reason to believe that Eligo would use machine learning in determining the price?

MR. BLANKINSHIP:  Objection.  Incomplete hypothetical.  Asked and answered.  Vague.

A.   Machine learning could be used within the context of looking at market pricing itself, but that's not what the machine learning of GROOVE was meant to do.

If machine learning had been used to, for instance, project anticipated price movements in the wholesale market, that would be a legitimate way to use it.

However, if it's used instead to calculate human behavioral -- customer human behavioral traits with regard to accepting price increases or rejecting them, then there is no reason why the plaintiff should have expected that.

BY MS. MURAINA:

Q.   So I take it, then, you're not claiming

Page 229

that the use -- the mere use of an algorithm to set prices violates Eligo's contract.

It's not the use of machine learning that violates Eligo's contract, correct?

A.    Let's just say that if there is an algorithm which calculates the market price and that algorithm is used to arrive at a price that a customer should pay, that's a very different thing than using an algorithm of completely different nature when the terms of service clearly say "market pricing," which is not what GROOVE does.

Q.    So your criticism is not that algorithms are inherently improper; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    Please rephrase or say your question again.

BY MS. MURAINA:

Q.    You are not claiming that the use of machine learning or algorithmic tools is inherently improper, correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.    Even a simple calculation of cost plus is an algorithm, so I'm not going to turn around and

Page 230

say that no algorithm can be used in any context whatsoever, which I believe is the basis of your question.

BY MS. MURAINA:

Q.   So to clarify, your criticism is not based on testing whether the prices were inconsistent with market factors?

MR. BLANKINSHIP:  Objection. Mischaracterizes his testimony.  Lack of foundation.  Outside the scope.

A.   The pricing methodology used was inconsistent with market factors.

BY MS. MURAINA:

Q.   You did not test yourself whether Eligo's prices were inconsistent with market price -- with market factors; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.

A.   I did not critique specific empirical prices charged by Eligo.  I critiqued the explanations given by Eligo personnel of how its variable prices were determined by using customer characteristic analysis rather than market analysis.

BY MS. MURAINA:

Q.   So would it be fair to say that your

Page 231

interpretation -- or your critique is based on

fairness and transparency, not based on testing of

the price?

MR. BLANKINSHIP:  Objection.

Mischaracterizes his testimony.  Asked and

answered.

A.   Could you ask that again?

BY MS. MURAINA:

Q.   So your criticism is based on your

interpretations of fairness and transparency as

opposed to testing quantitatively whether the prices

were inconsistent with market factors as you define

them?

MR. BLANKINSHIP:  Same objections.

A.   The basis of my problem with it is that

the actual pricing mechanism that was used was not

based in market factors.

The market factors, as commonly

understood, are the factors that are associated

directly with the underlying wholesale markets in

which there is price discovery and a number of

buyers and sellers that feed into the discovery of a

market clearing price.

And that is not how Eligo calculated its

variable rates, even though that's what was

Page 232

clearly -- in my opinion, clearly stated in the terms of service.

BY MS. MURAINA:

Q.    Interesting.

So sitting here today, you would not be able to identify a specific Eligo customer who you would say paid more than they otherwise would have paid absent the conduct you criticized, correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Outside the scope of his report.

A.    I have not looked at the prices paid by any individual customer, except for the examples that are set forth in the report that I wrote and are exhibits in the report.

BY MS. MURAINA:

Q.    But you did not do a quantitative analysis of the relationship between Eligo's prices and market factors; is that correct?

MR. BLANKINSHIP:  Objection.  Asked and answered.  Outside the scope of his report.

A.    No.  My critique is on the methods used in order to calculate variable price and the way that it was described in the terms of service being very different from what a customer would expect the pricing to reflect.

Page 233

BY MS. MURAINA:

Q.    Thank you.

You were retained by Plaintiffs' counsel in this case, correct?

A.    I'm sorry?

MR. BLANKINSHIP:  Objection.  Asked and answered.

BY MS. MURAINA:

Q.    You were retained by Plaintiffs' counsel in this case?

MR. BLANKINSHIP:  Sorry, one more time.

BY MS. MURAINA:

Q.    You were retained by Plaintiffs' counsel in this case; is that correct?

A.    Oh, yes.

Q.    And did you have anyone fact check your report before submitting it in this action?

A.    I had discussions with Plaintiffs' counsel regarding my report.

Q.    And did Plaintiffs' counsel -- I'll withdraw.

You are being compensated for your time; is that correct?

A.    Yes.

Q.    And you understand your role is to assist

Page 234

the Court and not to advocate for any particular outcome; is that correct?

MR. BLANKINSHIP:  Objection.  Calls for a legal conclusion.  Outside the scope of his report.

A.   I agree with that statement.

BY MS. MURAINA:

Q.   And reasonable experts reviewing the same materials could reach a different conclusion; is that correct?

MR. BLANKINSHIP:  Objection.  Vague. Asked and answered.

A.   Yes.

MS. MURAINA:  No further questions.  Thank you.

MR. BLANKINSHIP:  We'll take a little break.  I think I've got some questions, but we'll figure that out.  We'll be back in a minute.

THE VIDEOGRAPHER:  Thank you, counsel. We're going off the record.  The time is 4:14 p.m.  This marks the end of media unit number six.

(A break was taken.)

THE VIDEOGRAPHER:  We are going back on

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 235

the record.  The time is 4:19 p.m.  This marks the beginning of media unit number seven.

Please proceed, counsel.

MR. BLANKINSHIP:  Would you mind putting up Mr. LaPointe's deposition, page 34, please?  It's one of the pages that you showed him.

Could you scroll down, please?  Okay.

CROSS-EXAMINATION

BY MR. BLANKINSHIP:

Q.  Dr. O'Brien, do you recall when defense counsel asked you about some of the quotations from Mr. LaPointe -- or some of the quotes that you attributed to Mr. LaPointe on page 49, including the phrase, quote, within the boundaries of the contracts.

Do you remember that testimony?

A.  Yes.

Q.  Okay.  And then could you read for me where Mr. LaPointe -- well, just read to me here lines 17 to 20 that are in front of you.

A.  Sure.

Like -- as I said, if you have a broad set of parameters and you know that your behavior is within the boundaries of these parameters, then you don't have to change the things in the middle.

Page 236

Q.   So this is a quote from Mr. LaPointe that includes the phrase "within the boundaries" that the defense counsel was asking you about; is that correct?

A.   Yes.

Q.   So you didn't just make that up, you just cited to line 7 when you should have cited to all the way through line 20; is that fair?

A.   That's correct.

Q.   Do you see in the bottom of that bullet point on page 49, it says or you said:  In other words, variable rates were set, quote, in response to, end quote, customer behavior, not on electric wholesale market behavior.

Do you recall that?

A.   Yes.

Q.   Now, I'm going to show you your report. We have a paper copy here, but you're welcome to pull it up there, too.

So on page 28 of your report, at the top is an excerpt from a contract.

Can you read the yellow highlighted language, please?

A.   Other than fixed rates, all rates shall be calculated on a monthly basis in response to market

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

Page 237

pricing, transportation costs, and other market price factors.  Applicable taxes will also be factored into the variable price.

Q.   So the quotations on page 49 where you say "in response to," that's a reference to the in response to language in the contract, correct?

A.   Yes, it is.

MS. MURAINA:  Objection.  Leading.

MR. BLANKINSHIP:  Those are the only questions that I had.

Thank you, Doctor.  I appreciate your time.

MS. MURAINA:  If you could give us five minutes.

THE VIDEOGRAPHER:  We're going off the record.  The time is 4:23 p.m.

(A break was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 4:27 p.m.

Please proceed, counsel.

MS. MURAINA:  We have no further questions.

THE VIDEOGRAPHER:  Did we want to put transcript and video orders on the record?

MR. BLANKINSHIP:  At this time I don't

Page 238

need a video.  I'm assuming you guys will keep
a copy forever in case I need it later.

In terms of the transcript, I don't need a
rush job, but I do need it within a week.

I only want electronic version.  Please
don't send me paper.

And I'm assuming that the exhibits will be
embedded in the transcript?

Great.  That's all I have for me.  Thank
you all very much.

THE VIDEOGRAPHER:  Did you want to put
your order on the record as well?

MS. MURAINA:  Essentially we want the
same.  No need for a rough at this time.  We'll
take -- we don't need paper copies either.

THE VIDEOGRAPHER:  With that, I will bring
us off the record.

We're going off the record at 4:29 p.m. on
January 29th, 2026.  This marks the end of
today's video testimony given by Dr. John
O'Brien.  The total number of media number
units was seven and will be retained by
Veritext Legal Solutions.  Thank you so much
everyone.

(The deposition adjourned at 4:29 p.m.)

Page 239

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BAY

I, Kellie LeBerte, Shorthand Reporter and Notary Public, State of Florida, certify that JOHN O'BRIEN personally appeared before me via Zoom videoconference on the 29th day of January, 2026 and was duly sworn/affirmed.

WITNESS my hand and official seal this 5th day of February, 2026.

*Kelli LeBerte*

Kellie LeBerte, Notary Public, State of Florida

My Commission:  HH 533889

Expires: 06/02/28

Produced Identification

Type of Identification Produced: driver's license

Page 240

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF BAY

I, Kellie LeBerte, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of JOHN O'BRIEN, pages 4 through 239; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 5th day of February, 2026.

*Kelli LeBerte*

Kellie LeBerte, Notary Public

State of Florida

Page 241

Greg Blankinship

gblankinship@fbfglaw.com

February 5, 2026


RE:  Ira Brous and Michelle Schuster v Eligo Energy, LLC, et al.

DEPOSITION OF:  JOHN O'BRIEN

DATE:  January 29, 2026

JOB NO.:  7743483


        The above-referenced transcript is available for review.  The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

        The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

        It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard. If the witness fails to do so, the transcript may be used as if signed.

                    Yours,

                    Veritext Legal Solutions

   *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)

Page 242

RE:  Ira Brous and Michelle Schuster v Eligo Energy, LLC, et al.

DEPOSITION OF:  JOHN O'BRIEN

DATE:  January 29, 2026

E R R A T A   S H E E T

PAGE_____ LINE_____CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____        _____

JOHN O'BRIEN                                Date

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[& - 3.5]**

Page 1

| & | | | |
| --- | --- | --- | --- |

**&**   2:5 5:15

**0**

**01260**  1:2 4:19
**0127**  89:20
**06/02/28**
  239:21

**1**

**1**  2:6 3:12
  11:13,14 12:6
  12:10 103:17
  103:24 104:11
  104:17 105:7
**1,000**  112:7,22
  191:24
**1.310**  241:24
**10**  13:18 81:13
  121:19 176:20
  181:11 182:18
  183:6,22 185:6
**100**  109:23
  169:23 218:8
**10007**  2:10
**10601**  2:6
**10:08**  45:15
**10:17**  45:19
**11**  3:12 127:13
  127:21 128:1
  128:20 129:24
**11:13**  81:18
**11:35**  81:23

**12**  99:15
**121**  3:14
**12:26**  115:5
**12th**  48:20
**14**  183:7,11
**14th**  2:14
**15**  15:20 26:18
  26:20 89:20
  107:12
**17**  235:20
**179**  3:15
**18**  212:10
  213:22
**1976**  40:11
**1985**  39:11
  40:11
**1990s**  38:18
  40:25 41:17
**1992**  39:11
**1993**  37:1
**1996**  66:18
  88:16 96:11
**1998**  37:1
**1999**  36:5
**1:00**  115:9
**1:24**  4:19
**1:46**  145:25
**1:54**  146:4

| 2 | | | |
| --- | --- | --- | --- |

**2**  3:12 12:5
  27:2 48:11,12
  48:17 81:7
  82:9 86:19

87:2 128:10
**20**  15:20 26:18
  34:24 68:3
  89:12,14,24
  107:12,23
  215:17 218:13
  235:20 236:8
**2000**  35:17
  36:5
**2003**  33:8
  35:17
**2004**  14:10
  32:15 33:8
**2006**  27:6
**2007**  16:17
**2008**  27:7
  28:19
**2019**  3:14
  89:21 90:6,25
  91:4,24
**2020**  32:15
**2024**  177:10
  178:5
**2025**  48:20
  105:7 121:1
  212:10 213:22
**2026**  1:16 4:4
  105:8 238:19
  239:9,12
  240:18 241:2,5
  242:2
**212**  3:15
**22**  121:18,19

**23**  120:25
  122:4
**23.96**  105:9
**235**  3:4
**239**  240:9
**24**  1:2 101:17
  102:3
**25**  18:15 36:20
  102:14 107:5
  108:1 109:25
  215:3,17
  218:12,13
**25.07**  105:8
**26**  101:17
  106:20,21
  119:15,21
**2600**  2:15
**27**  128:17
  134:8,10 136:1
**28**  136:12
  140:17 236:20
**29**  1:16 162:16
  241:5 242:2
**29th**  4:4 177:10
  178:5 238:19
  239:9
**2:03**  151:8
**2:04**  151:11

| 3 | | | |
| --- | --- | --- | --- |

**3**  3:13 50:11,18
  50:21
**3.5**  24:19 25:7
  25:18 26:11

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[30 - accepted]**

Page 2

**30** 38:20 40:6 107:23 115:1,2 176:21 177:10 178:5 241:17 241:24

**30309** 2:15

**305** 2:9

**30558** 239:19 240:23

**32** 130:23

**320** 189:4

**33** 215:2 218:12

**34** 215:4 218:13 235:5

**349** 32:4

**35** 141:1

**36** 215:16 218:13

**38** 146:19

**3:10** 195:17

**3:18** 195:20

**4**

**4** 3:13 53:12,13 53:16,20 146:19 240:8

**40** 90:24 93:11

**41** 148:11,12 153:4,6

**42** 153:4 186:5 188:10

**44** 174:9

**45** 145:16

**48** 3:12

**49** 212:18 213:2,19,25 217:11,21 219:20 220:4 220:12 235:13 236:11 237:4

**4:14** 234:22

**4:19** 235:1

**4:23** 237:16

**4:27** 237:19

**4:29** 1:17 238:18,25

**5**

**5** 3:14 90:19,20 91:4 99:14 241:2

**5.49** 128:22 135:8

**50** 3:13 114:9 218:7

**53** 3:13

**533889** 239:20

**55** 188:23

**59** 121:24

**5th** 239:12 240:18

**6**

**6** 3:4,14 120:24 121:2 176:21 177:10 178:5

**60** 16:8

**61** 178:10,23,25 183:7,12

**62** 179:1

**63** 183:12

**64** 178:23

**7**

**7** 2:9 3:15 177:25 178:1,4 215:4 218:13 236:7

**70** 16:8 213:20 213:21

**75** 2:14 16:3

**7743483** 1:25 241:5

**7:00** 145:18

**8**

**8** 3:15 183:12 212:5,9,11

**80** 22:11

**9**

**9** 82:11

**90** 3:14

**96** 95:16

**99** 159:25

**9:00** 1:17

**9:10** 4:1,3

**a**

**a.m.** 1:17 4:1,3 45:15,19 81:18 81:23

**abandon** 171:3

**abandoning** 173:20

**abelenky** 2:11

**ability** 6:21 82:18 94:15 199:9

**able** 11:17,19 12:10,12 21:21 38:3 46:23 67:19 76:18 82:11 85:3 119:19 128:15 131:4 134:3 150:7 176:25 180:17 232:6

**above** 136:23 241:7

**absence** 137:7 137:13

**absent** 232:8

**absolutely** 9:23 200:18

**absorbed** 110:22

**academic** 13:11 41:25

**accept** 74:19 79:3

**acceptable** 8:9 103:14

**accepted** 47:24 59:8

John O'Brien                                     January 29, 2026
Brous v. Eligo Energy, LLC

**[accepting - agent]**                                              Page 3

| | | | |
|---|---|---|---|
| **accepting** 228:21 | **actual** 15:15 38:6 44:14 66:5 67:10 72:16 76:5 105:15 107:16 108:17 133:6 138:11 149:20 169:7 205:5 219:15 220:19 231:16 | **address** 52:18 118:19 119:6,9 144:21 | **admitting** 126:1 |
| **access** 90:2 93:20 96:1,2 155:16 | | **addressed** 185:21,23 | **adopted** 30:1 |
| | | **addressing** 65:12 146:9 | **advance** 99:22 |
| **accomplish** 187:9 | | **adds** 109:2 220:18 | **advantage** 210:16 |
| **account** 153:24 165:6 166:23 192:25 220:13 | | **adequate** 102:9 | **advertised** 72:10 |
| | | **adequately** 175:13 | **advertising** 122:8 |
| **accuracy** 241:9 | **actually** 41:21 43:6 55:2 65:19 67:3 87:8 88:23 118:23 121:25 123:2 124:11 129:20 130:6 151:4 178:24 209:20 212:23 | **adhered** 224:9 | **advice** 101:1 |
| **accurate** 13:3 19:25 56:4 122:22 155:11 | | **adjourned** 238:25 | **advise** 33:15 34:20 224:21 |
| | | **adjudicator** 30:21 31:3 | **advised** 33:22 33:22 34:12,20 35:19 41:3 |
| **accurately** 12:24 | | **adjunct** 16:18 | **advising** 34:5 34:17 36:3 |
| **achieve** 174:15 | | **adjustment** 195:8 | **advisory** 27:16 |
| **acknowledge** 70:3 | **add** 79:5 109:4 | **admin** 16:18 | **advocate** 234:1 |
| **acquire** 195:9 | **added** 101:9 167:1 | **administering** 37:19 | **affect** 110:1 111:23 124:16 124:25 |
| **acquisition** 110:12,17,21 | **adder** 166:13 | **administration** 47:22 64:15 68:20 | **affected** 143:23 |
| **act** 92:5 209:22 | **addition** 47:19 99:1 109:20 112:4 175:23 177:19 189:8 | | **affects** 143:16 150:5 |
| **acted** 61:13,24 | | **administrative** 30:6 | **affiliate** 34:2 |
| **action** 5:1 156:21 233:17 240:16,17 | | **admission** 123:17 | **affiliations** 5:7 |
| | **additional** 49:17,23 52:12 52:14 99:2 168:1,21 | **admits** 123:9 | **affirmed** 239:10 |
| **actions** 18:16 18:18,22,23 26:2 | | **admitted** 126:6 214:1,6 | **agencies** 23:14 |
| **actively** 37:10 | | | **agent** 134:24 135:6 |
| **activity** 60:11 62:19 | **additive** 98:24 101:6,9 | | |

**[ago - analyzing]**                                                   Page 4

**ago** 15:8,9,14 15:20 28:17 34:24 36:20 38:20 40:7 41:10 53:10 68:1,3 96:19

**agree** 4:11 12:23 13:2,25 40:23 56:9 58:18 61:13 68:4 72:8 80:5 83:1 86:25 91:5 95:25 98:1,20 118:13 124:14 126:25 165:22 167:22 169:18 174:3 182:9 209:25 219:12 234:6

**agreed** 135:22 175:22

**agreement** 136:4 149:7,9 149:13,14,15 149:24

**agreements** 149:6,11

**ahead** 72:13 114:23 177:6 177:15 180:2,9 182:3 206:23

**aimed** 29:6

**al** 241:4 242:1

**alarmed** 174:16

**algorithm** 165:21 166:4,8 166:15,19 167:4,13 169:19 171:23 173:4 175:25 176:6 193:25 229:1,6,7,9,25 230:1

**algorithmic** 155:21 229:20

**algorithms** 165:20 169:18 173:3 229:12

**allegation** 201:23

**allegations** 47:4,24 55:13 55:19 56:10,17 56:21 58:6

**alleged** 26:3 46:18 47:12 48:7 124:25

**alleging** 26:8 126:9

**allow** 89:7 96:15 97:18 113:11 199:17

**allowable** 109:5

**allowed** 35:2,7 200:14 215:25

**allowing** 200:3

**allows** 87:20

**aloud** 215:5

**alphabet** 107:4

**alternative** 79:21 161:1,9 165:14 194:20 194:25 205:12

**alternatives** 116:5

**amended** 3:13 53:3,7,7,20 54:4,13,16 55:6

**amount** 20:12 184:19

**amounts** 24:23 25:2,9 94:16 199:10

**analogies** 186:1

**analyses** 10:17 49:18,23 50:2 50:5,7 54:25 80:21 170:24 187:25

**analysis** 43:25 44:4,6 49:25 52:9 57:12 64:7 67:13 69:2 74:20 75:4,7 76:9 77:18 78:22,24 80:12 86:24 104:12,12

105:5,11 107:2 107:14 108:5 109:1,11 113:1 116:24 119:25 120:2,4 148:7 153:20,23 158:13,14 160:21,24 171:3 193:2,8 193:18 203:6 205:2 208:23 227:7,13 230:23,23 232:16

**analytical** 67:12

**analyze** 55:22 62:9 66:13 74:14 75:14 104:21,25 105:15 107:16 108:23 110:4 110:10,16 111:4,12 112:2 138:11 143:15 143:22 144:8 145:6 207:13 223:3

**analyzed** 43:8 75:16 76:5,9 76:13 158:3

**analyzes** 196:2

**analyzing** 58:5 171:5 172:19

John O'Brien                                    January 29, 2026
Brous v. Eligo Energy, LLC

**[analyzing - area]**                                    Page 5

194:3
**andrew** 212:10
**andrey** 2:10 5:22
**annual** 93:6,7
**answer** 6:22 7:7,11,15,19 8:1,1,4,8,18 11:3 18:3 19:22 22:25 23:18 26:6 35:10 36:21 43:2,5 46:23 58:1 59:24 60:18 68:9 69:11 72:23,23 78:18 83:25 108:22 110:12 120:20 121:11 121:23 122:23 123:16 125:3,6 125:9 126:5 144:5 167:8,10 176:16 192:15 195:1,2 215:20 221:13,14,15
**answered** 18:2 19:19 20:8 39:7,21 41:19 55:8,16 57:8 57:25 59:14 66:8 69:11 71:8 73:8 78:9 78:17 98:6

100:16 104:24 107:19 108:13 108:21 113:5 116:20 117:9 119:1 120:13 126:4 133:21 138:8 140:11 145:9 147:17 161:6 167:9 176:4 177:18 183:25 185:1 187:17 192:14 193:21 194:2 194:12,24 203:12 204:12 205:16,25 206:10,22 207:17 208:22 209:3,16 211:20 218:20 219:24 220:15 220:22 222:1,6 224:11,12,18 226:6 227:2,22 228:10 229:15 229:23 230:18 231:6 232:10 232:20 233:7 234:12
**answering** 7:15 8:15 123:18
**answers** 20:1 122:16 182:14

**anticipated** 228:16
**anybody** 201:6
**anyway** 107:10 124:11 142:16 144:16
**apart** 24:9
**apologies** 108:16 156:6
**apologize** 15:5 32:25 60:2 125:3 179:21 216:23
**apologized** 124:11
**apology** 126:13
**apparently** 94:9 120:21 124:3 172:15 218:21 219:9 219:18,25 221:1
**appear** 99:19 218:17 219:21
**appearance** 5:4
**appearances** 2:1 5:6
**appeared** 133:8 239:8
**appears** 154:13
**appliances** 99:1
**applicable** 237:2

**applied** 109:17 110:6 153:13 210:15
**applies** 20:13 95:23 165:22
**apply** 112:7 152:3 211:12
**appreciate** 145:20 162:13 237:11
**appropriate** 5:19 211:7
**approved** 12:17 25:1
**approximate** 19:24
**approximately** 15:7,8,14,24 18:6 19:1,10 25:7 26:16 28:1 31:14 36:19 38:20 68:1 109:16,19 127:13,21 128:20 134:18 189:4
**april** 14:10
**arabian** 189:4 192:22
**arbitrations** 18:20
**area** 20:15 23:23 24:2 26:5 64:1,5,8,8

64:14,14,21,24 68:15,25 72:11 72:19 82:13 138:21 148:3 189:12 191:12

**areas** 14:24 65:13 92:2 191:18

**argumentative** 79:11 123:13 126:3 143:2 168:9 185:8 218:20 220:6 220:15,22

**arises** 210:17 211:17,25

**aristotle** 64:12

**arithmetic** 169:19

**aron's** 49:25

**arrive** 99:9 229:7

**arrived** 116:15

**article** 188:24

**articles** 13:16 13:17,23 51:17 188:5 196:25

**articulate** 144:14 175:19

**articulated** 89:25 93:20 96:3

**artificial** 162:22 165:5

**ascribed** 138:4

**aside** 69:3 172:16 175:2

**asked** 18:1 19:18 20:7 39:6,21 41:19 46:9,12,17,20 46:20 47:3 55:7,15 57:7 57:25 59:13 66:8 69:10 71:7 73:7 75:14 78:9,16 98:5 100:15 104:23 107:18 108:13,20 113:4 116:19 117:9 118:25 126:4 129:13 129:15 133:20 138:7 140:10 141:15 145:8 147:16 161:5 167:9 176:3 177:17 183:25 185:1 187:16 192:13 193:20 194:1,11,24 203:11 204:11 205:15,25 206:9,22 207:16 208:21 209:2,15 218:6 218:19 219:23

220:14,21 221:25 222:5 224:10,17 226:5 227:1,22 228:10 229:14 229:22 230:17 231:5 232:9,19 233:6 234:12 235:11

**asking** 9:9 33:1 57:10 58:21 86:3,8,10 92:11 97:7,24 97:24 121:22 124:20,24 125:24 132:7 154:4 157:4,7 170:8 175:24 183:7 201:3 202:8,13 224:14 236:3

**asks** 122:5,13 122:19 182:9

**aspect** 206:24

**aspects** 79:1 147:3 170:23 171:1

**assertions** 218:14

**assess** 61:24

**assessing** 57:4 65:8

**assessment** 57:16 65:4

80:3 113:2 224:22

**assets** 97:8

**assigned** 213:5

**assigns** 136:21 137:4,12

**assist** 144:19 233:25

**assisted** 129:19

**associated** 169:25 231:19

**associates** 33:10

**assume** 60:21 70:19 77:3,4 91:8 135:21 141:18 142:20

**assumed** 55:13

**assumes** 76:25 119:25 120:4 222:14,19

**assuming** 56:9 56:17 57:1,5 57:17 238:1,7

**assumption** 56:21 74:3 132:15 133:7 142:3

**assumptions** 54:12

**asymmetry** 74:9,12 148:23 150:24 153:9 154:1,13

Case 1:24-cv-01260-ER    Document 381-2    Filed 03/16/26    Page 250 of 315

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

[asymmetry - based]

Page 7

173:25 206:25
**atlanta** 2:15
**attached**
  241:11
**attempt** 79:8
  79:14
**attempting**
  58:20 75:17
  219:6
**attention**
  121:23 134:8
  172:9,13
  173:21 175:1
**attest** 132:18
**attorney** 5:8
  11:4 23:9
  61:21 122:4,13
  122:19 182:9
  240:13,15
  241:13
**attorneys** 23:6
  125:8
**attributable**
  26:12
**attribute** 22:9
  214:21
**attributed**
  235:13
**attrition**
  158:21
**audio** 4:9 130:7
  132:13
**author** 196:12

**authored** 13:11
  50:2 196:7
**authorities**
  191:7,10
**authority** 31:6
  31:10 141:24
  191:6 221:17
**authorized**
  240:7
**available** 99:20
  152:14 154:2
  241:7
**average** 107:9
  107:11,22
  108:1,25
  109:14,17
  110:5 112:17
  113:6,7
**avoided** 25:10
**awarded** 24:23
**awards** 24:25
**aware** 25:6
  66:9 74:17
  90:8 103:23
  120:9,14,18
  129:1 141:9
  142:23 143:5
  189:3,7
**awful** 67:7

**b**

**b** 3:9 107:4
  176:21 177:10
  178:5

**back** 14:4,7
  22:17 34:15,19
  45:18 55:12
  67:21 71:15
  77:3 81:6,22
  82:4 91:11
  96:18 98:15
  99:5 101:1
  115:8 121:15
  128:9 132:17
  133:24 136:11
  139:8 146:3
  151:10 174:6
  179:22 182:7
  202:22 212:17
  215:18,21
  220:24 227:19
  227:20 234:18
  234:25 237:18
**background**
  9:10 11:11
  74:14 86:23
  87:3 225:12
**backgrounds**
  77:2
**backups** 21:4
**bad** 202:13
  211:4
**baffled** 63:1
**bargain** 149:3
  149:3,5,11
  152:6,8,8
  154:8 174:3

**bargaining**
  153:10 154:6,7
  154:12 206:14
**base** 64:23
  68:18 77:7
  192:5 193:7
**based** 34:6,12
  54:11,20,25
  55:20 56:8
  61:1 64:1,24
  65:8,12 68:14
  69:2 74:5 75:8
  76:20 80:2
  85:13 87:22
  104:4 112:12
  112:16 113:1
  116:13 117:15
  123:7,23
  135:11,14
  138:24 147:1,7
  148:6 155:22
  162:4,17 163:3
  163:5,19 165:4
  165:17 166:1
  166:10 167:19
  168:14 181:18
  186:12,15
  187:4 188:14
  189:10 191:13
  191:15,16
  192:9 193:18
  195:2 198:6
  199:1 225:10
  226:23 230:5

231:1,2,9,17
**baseline** 126:17
  126:22
**basic** 58:5 74:3
  168:12 189:25
  190:7 191:18
**basically** 60:19
  75:22 88:15
**basing** 190:8,9
  194:6
**basis** 21:14
  51:16 78:22
  95:17 97:1
  112:5 124:5
  127:5 142:3
  176:11 187:6
  194:3 199:14
  208:12 213:8
  213:15 224:3,4
  224:22,23
  230:2 231:15
  236:25
**battery** 21:3,4
**bay** 239:3
  240:4
**bear** 200:15
**bears** 71:11
**becoming**
  174:16
**began** 4:1
  198:21
**beginning** 5:7
  45:20 81:24
  102:3 115:10

119:15,21
121:19 141:1
146:5 153:6
186:5 195:21
235:2
**begins** 92:19
  93:15
**behalf** 1:5 2:4
  2:13 5:23 9:25
**behavior** 46:22
  47:21 52:16
  64:3,23 117:20
  167:2 196:21
  196:25 210:6
  211:17 214:3
  214:17 216:9
  216:15 217:13
  217:24 227:5
  235:23 236:13
  236:14
**behavioral**
  42:4 170:23
  228:20,20
**behaviors**
  147:3
**beings** 190:16
  190:24 191:19
  191:20 193:13
**belenky** 2:10
  5:21,22 207:16
**belief** 228:1
**believe** 53:8
  54:6 57:10,11
  69:15 70:11

90:19,25 93:24
95:10 103:12
104:14,16,16
105:14 115:21
120:13 124:11
127:23 130:25
132:21 133:23
134:24 135:1
140:12 156:20
168:11 175:14
177:24 213:13
226:9 227:9,14
228:7 230:2
**believes** 29:6
  156:12
**benchmark**
  150:15 203:15
  203:20,23
**benefit** 66:22
  149:4,11 211:1
**benefits** 68:23
  149:23 150:6
  150:11 174:3
**berkeley** 75:11
  76:3,9
**best** 7:20 13:4
**better** 77:12
  89:17 124:21
  139:17 148:25
  149:8,21
  175:19 179:10
**bibliography**
  190:5

**big** 200:11
**bigger** 27:11
  51:4 89:15
  102:7 134:14
  139:15 141:6
**bilateral** 70:25
**bill** 14:20 71:20
  74:22 75:5,22
  76:2,17,23
  77:24 78:4
  127:12,20
  128:19 129:14
  129:16,19
  130:9,13 131:7
  132:15,18,20
  133:12,15
  134:3 136:4
  143:23
**billing** 17:7,25
  28:12,14
  131:22
**billion** 24:19
  25:7,16,18
  26:11 27:2
**bills** 13:23
  17:11,21 75:14
  75:18 76:6
  77:12 100:10
  108:11,19
  131:1 132:11
  141:19 142:4
  144:9
**bit** 81:7 139:15
  144:18 178:20

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[black - blankinship]**

Page 9

| | | | |
|---|---|---|---|
| **black** 223:25 | 66:7,16 68:7 | 127:15 128:5 | 184:25 185:7 |
| **blankinship** | 69:9,24 71:7 | 129:3,10 | 185:19 186:18 |
| 2:5,7 3:4 5:13 | 72:22 73:7 | 130:14 131:2,5 | 187:2,16 189:5 |
| 5:14,15 8:17 | 74:23 76:11 | 133:2,20 | 192:13 193:20 |
| 8:23 9:6,18 | 78:8,15 79:10 | 135:19 137:20 | 194:1,11,17,23 |
| 10:11 11:2 | 79:16,22 80:6 | 138:7,14 139:5 | 200:25 201:12 |
| 15:11,17 16:2 | 81:15 83:7,14 | 139:14 140:10 | 201:20 202:6 |
| 17:16 18:1,10 | 83:19,24 84:10 | 141:5,21 142:7 | 202:25 203:11 |
| 19:18,22 20:7 | 84:21 85:20 | 143:1,8,18 | 203:17,22 |
| 21:10,24 22:21 | 86:12 87:14 | 144:1,10 145:8 | 204:5,11,19 |
| 22:22 23:3,16 | 88:11 90:12 | 145:16 146:25 | 205:1,7,15,24 |
| 24:14 25:11,23 | 91:6,15 92:12 | 147:16,23 | 206:9,19,22 |
| 26:13 27:10 | 92:16 93:8 | 148:8,15 | 207:7,22 208:4 |
| 29:18 30:23 | 94:13 96:5 | 150:17 151:6 | 208:10,21 |
| 31:9,19 32:5 | 98:5 100:3,15 | 151:20 153:16 | 209:2,8,15 |
| 32:22 33:5 | 102:21 103:11 | 157:2,21 158:8 | 210:2,11 211:6 |
| 35:9 36:8 | 104:6,23 | 158:16,23 | 211:14 213:11 |
| 37:14 38:25 | 105:17 106:2,7 | 159:7,15,20 | 213:15 216:16 |
| 39:6,20 40:3 | 107:18 108:12 | 160:7,12,17 | 217:18 218:19 |
| 41:1,18 42:1 | 108:20 110:2 | 161:4,11,23 | 219:23 220:5 |
| 42:15 43:1,4 | 110:13,19 | 162:6,13 | 220:14,21 |
| 43:14 44:10,19 | 111:6,15,24 | 163:11 164:6 | 221:9,14,25 |
| 45:4,12 46:14 | 112:14 113:4 | 164:12,19 | 222:5,16,23 |
| 46:19 47:6,14 | 113:22 114:8 | 165:23 166:6 | 223:23 224:10 |
| 48:1 49:5,12 | 114:17,21 | 166:20 167:6,9 | 224:17 225:6 |
| 49:20 51:2 | 115:1,17 | 167:16 168:8 | 225:17 226:5 |
| 52:1,22 53:25 | 116:12,19 | 168:19 169:21 | 226:18,25 |
| 54:5,14 55:7 | 117:4,8,18 | 170:20 171:13 | 227:18,21 |
| 55:15 56:12,19 | 118:8,16,25 | 171:24 173:6 | 228:9 229:14 |
| 57:7,19,24 | 120:6,19 | 175:11 176:2 | 229:22 230:8 |
| 59:13,21,25 | 121:10 123:12 | 177:17 178:22 | 230:17 231:4 |
| 60:13,17 61:3 | 123:25 124:18 | 179:2 180:20 | 231:14 232:9 |
| 61:16 62:1,20 | 125:12,17 | 181:14 182:19 | 232:19 233:6 |
| 63:23 65:5,10 | 126:2,19 127:3 | 183:18,24 | 233:11 234:3 |

234:11,16 235:4,9 237:9 237:25 241:1

**board** 100:20

**body** 9:25 28:2 29:2,3,11 30:1 225:16

**bottom** 99:15 172:7 173:22 174:25 236:10

**bought** 185:12

**boundaries** 214:2,17 216:5 217:14,16 235:14,24 236:2

**brand** 144:25

**breach** 26:3,4,8 153:8

**break** 7:2 45:11 45:17 81:13,21 114:7,15,23 115:7 145:13 145:17,23 146:2 195:14 195:19 234:17 234:24 237:17

**breaks** 114:11 145:19

**brief** 6:9 99:16 109:11

**bring** 191:8 238:16

**bringing** 169:10

**britain** 189:15

**broad** 20:15 21:12 68:25 85:13 116:13 119:6,7 187:4 187:6,24 193:1 199:1 214:2,9 214:18 215:7 215:13 217:14 235:22

**broader** 64:24 82:21

**broadway** 2:6 2:9

**broke** 192:2

**broker** 181:24

**brookhaven** 40:9

**brought** 96:19

**brous** 1:4 4:15 74:15,17 78:2 140:16,19 141:2,13,19 142:4,5,20,23 143:5,6,22 144:8,9 145:6 241:3 242:1

**built** 44:8,17

**bulk** 26:19

**bullet** 213:20 213:21 236:10

**bullets** 213:3

**bundled** 112:18

**burden** 106:22 107:6,12 108:2 112:12 113:1

**business** 30:22 31:7,17 32:1,4 64:16 65:16 68:12 70:24 73:16 84:4,8 85:23 110:22 110:23 111:10 111:11,19 113:17 146:20 146:22 152:7 152:11 169:12 173:12,15,18 188:13 196:22 198:20 200:16 200:18 212:1 215:10,11

**businesses** 82:17 85:2

**buy** 70:4 72:19 168:24 180:13 180:14 181:7 181:21,23 195:11 197:6 199:19

**buyer** 70:21 149:1,22 150:10 152:16 154:2 174:1

**buyers** 70:14 70:24 99:8 231:22

**buying** 169:23 170:1 180:22

**buys** 167:21

**c**

**c** 107:4

**calculate** 147:14 174:11 203:4,8,13 213:7 221:24 222:2 223:6 228:19 232:22

**calculated** 17:10,20 67:18 208:15,16 213:5 231:24 236:25

**calculates** 173:5 229:6

**calculating** 171:11

**calculation** 110:7 113:15 114:1 147:12 162:5 163:4,16 206:1,2 211:8 229:24

**calculations** 44:23 207:18 222:8

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[call - certify]**

Page 11

**call** 76:22 124:8,16 129:12 131:13 131:16 132:2 132:12,24 133:23,23 134:20 135:23 143:13 190:24 216:19
**called** 29:10 68:20 97:16 199:12 217:6
**calls** 23:17 24:15 32:6 45:5 47:7 55:16 61:17 62:22 68:8 88:12 115:18 200:25 201:21 208:11 210:3 225:6,17 234:3
**camera** 4:7
**cancel** 142:24 143:6,10 174:17
**capacity** 63:10
**captured** 51:23 56:6 95:19
**car** 197:6
**career** 67:23
**carefully** 129:16
**carry** 62:23 196:8,16,19

217:1
**carve** 88:13
**carving** 96:13
**case** 1:2 4:18 5:17 9:12 10:25 11:7 19:24 23:2,19 23:22,25 24:6 24:7,10 26:12 26:23,24,25 42:19 45:2,24 48:19 49:4 53:7,21 54:18 66:18,21 73:19 74:7 81:11 86:24 89:20 96:11 106:1 115:14 116:18 119:12,13 125:10 138:13 145:1 149:20 152:12 163:22 170:4 187:15 189:23 194:21 202:24 204:3,4 223:14,16 233:4,10,14 238:2
**cases** 24:24 25:2,21 26:8 26:12,14,16,20 44:20 55:23 142:11

**cash** 180:13 181:6,7,18 182:25 184:4,5 184:10
**catch** 139:25
**categorically** 57:16
**categories** 20:24 153:21
**categorizing** 62:18
**category** 170:18 171:11 171:22 175:22
**causal** 43:25 44:4 160:23 204:15,16 205:22,22
**causation** 195:25 200:21 200:22 201:11 201:16 202:17
**cause** 165:9
**caused** 147:21 200:23 201:17 205:5 208:19 223:5
**caution** 23:4 44:11
**ceiling** 109:8
**cent** 107:5,12 108:2 129:24
**centers** 198:1

**central** 65:21 101:6
**centralized** 64:17,18
**cents** 74:4 107:12 109:3 109:10,15 112:19,20,20 127:13,21 128:1,20,22 129:25 134:18 135:9
**centuries** 64:11
**ceo** 14:9 33:9 36:6 37:2 39:11
**certain** 10:3,6 61:8 72:19 112:5 118:4 119:25 120:4 125:20 129:16 169:24
**certainly** 145:3 187:25 192:19 199:15
**certificate** 112:17 199:17 200:13 239:1 240:1
**certification** 199:6
**certify** 239:7 240:6,12

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[chain - closing]**

Page 12

| | | | |
|---|---|---|---|
| **chain** 205:22 205:22 | 186:6 206:17 219:5 | **citation** 105:14 179:3 196:16 | **classes** 87:20 |
| **change** 15:1 33:9 54:20 127:6 175:7 176:1 214:10 215:11,12 235:25 242:4,7 242:10,13,16 242:19 | **characterized** 223:4 | **citations** 196:19 | **clear** 14:14,19 16:13 19:13 29:16 30:24 34:11,19,23 54:24 59:11 66:4 71:4 76:8 77:25 80:20 83:1 86:8 97:23 108:9 109:14,16 132:23 161:13 172:23 177:13 190:13 191:9 200:17 213:2 217:5 223:11 223:24 |
| | **characterizes** 222:13 | **cite** 91:21 176:21 183:11 183:11 188:5 190:21 191:9 212:17 213:21 218:11 223:25 | |
| | **characterizing** 173:3 226:10 | | |
| | **charge** 29:2,3 87:21 131:9 162:20 165:8 | | |
| **changed** 38:23 87:9 | **charged** 137:25 160:25 164:3,9 181:18 208:25 230:20 | **cited** 167:18 178:23 191:6 218:1 219:22 236:7,7 | |
| **changes** 39:2,5 39:8 54:21,25 55:3 158:21 215:11,11 241:9 | | **cites** 183:6 | **clearer** 202:20 |
| | **charging** 113:6 132:17 134:2 163:8 | **citing** 21:16 191:11 | **clearing** 70:17 71:1 99:11 166:25 231:23 |
| **changing** 210:21 | | **civil** 18:20 241:24,24 | |
| | **cheaper** 72:20 | **claimed** 25:9 | **clearly** 63:1 75:19,20 229:10 232:1,1 |
| **chapter** 81:7 86:19,23 87:2 146:19 | **check** 233:16 | **claiming** 228:25 229:19 | |
| | **choice** 88:9 189:21 190:19 191:20 193:14 | | **client** 34:16 |
| **characteristic** 230:23 | | **claims** 24:18 46:13 | **client's** 25:9 |
| **characteristics** 171:6 172:19 | **choices** 82:18 99:20 189:17 | **clarification** 33:1 122:13 | **clients** 13:15 33:24 34:19 35:19 224:21 |
| **characterizati...** 218:24 219:2 221:7 | **choose** 203:23 | **clarify** 41:24 197:14 230:5 | |
| | **chooses** 168:24 | | |
| **characterizati...** 56:8 64:6 | **chose** 163:18 | **clarifying** 201:15 | **climate** 15:1 |
| | **chronological** 14:6 | | **close** 196:5 |
| **characterize** 58:24 63:25 95:21 143:12 | **churn** 160:6 | **clarity** 58:21 | **closely** 96:12 |
| | **circumstances** 119:22 | **class** 5:16 66:14 | **closing** 99:9 223:10 |

**code** 155:17
**cogenerator** 21:1
**collect** 55:22
**collected** 48:5 67:17 77:8 131:23 187:19
**college** 16:19 17:12
**colloquial** 88:24
**colors** 68:10
**columbia** 24:7 24:10
**combine** 220:2
**combined** 94:1
**come** 19:25 62:25 68:10 96:16 98:8,23 103:15 105:12 112:7 122:25 154:21 171:1 172:3
**comes** 15:25 25:6 63:2 90:5 94:14 131:7 155:14 197:18 198:18
**coming** 112:22
**commensurate** 108:2 109:20
**comment** 29:12 198:13 207:9 222:24 225:22

226:19
**commenting** 210:5
**commerce** 211:18
**commercial** 13:19 36:14 37:25 38:16 67:24 152:1
**commercially** 148:13,19,21 149:4,19 150:1 150:13,16 151:15,18 152:20,22 206:14
**commission** 27:8,19,21,22 27:23 28:16 30:9,10,16 31:8,16 87:17 87:19 88:4 89:20 90:1 92:19,23 93:3 93:20 96:3 98:21 99:18 100:13 101:11 118:6 182:1 198:5 199:5 239:20
**commissioner** 27:6,7
**commissioners** 27:24

**commodity** 71:24 88:20 94:6 97:3 98:17 99:4 101:7 107:10 107:11 170:4 172:11 173:13 173:14 182:4 182:23,24 188:12
**common** 197:12
**commonly** 147:4 231:18
**communicati...** 61:7
**companies** 19:5 19:16 20:9,14 20:21,24,24 21:5,17 31:4 34:6
**company** 21:2 32:12,15 34:1 34:4 36:24 39:14 191:25 192:3
**company's** 59:19 60:6
**compare** 72:9 73:24,25 160:15 164:3,9 208:25
**compared** 95:4

**compares** 73:6
**comparing** 151:16
**comparisons** 127:2
**compensated** 233:22
**compete** 83:17 83:22,23 84:20 97:11
**competed** 97:2
**competent** 190:20,23 224:20
**competing** 84:3 84:7
**competition** 34:8 82:20 84:15 86:11 88:19,20 89:7 95:7,9,20 96:7 96:15,21,24 97:12,19 98:13 98:13 190:25 192:4 198:23 200:3
**competitive** 66:18,20 82:19 86:15 88:16 89:3 95:15 96:11
**complaint** 3:13 48:7 53:3,7,20 54:4,13 55:1,6

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[complaint - considered]**

Page 14

55:13,14,19
56:7 57:2,11
58:3,10,10
201:24
**complaints**
53:9
**complete**  51:9
51:10 169:9
**completed**
176:16 241:16
**completely**
7:20 34:18
199:24 229:9
**compliance**
111:5,9 224:15
224:21 225:12
**complied**
223:21 224:5,5
224:24 225:23
**comply**  103:3
**complying**
225:3
**compound**  8:18
16:2 31:20
138:15 167:7
**comprise**  19:14
19:16
**con**  182:11
**concede**  41:12
**concept**  154:4
154:12,21
201:19 202:5
210:1,14
211:16

**concepts**  153:7
153:22 154:17
220:19
**concern**  119:6
**concerned**
98:10 172:16
**concerning**
88:14 197:22
**concerns**  65:21
90:10 115:14
117:13 118:19
119:7
**conclude**  23:23
28:18 69:8
76:19 218:6
**concluded**
227:8,13
**concluding**
29:7
**conclusion**
23:17 24:15
32:6 45:5 47:7
55:16 61:18,19
62:22 68:9
76:2,4 79:2,3
80:18 88:12
107:2 112:11
112:20,25
113:12 115:18
115:19 125:24
190:7,11 191:4
201:1,22
208:11 210:3
224:1 225:7,18

234:4,9
**conclusions**
48:7 56:25
60:25 61:20
63:8,17,18
67:18 77:21
79:9,15,20
81:2 176:1
187:7 220:3
225:9,10
**conclusive**
222:7
**condition**  6:20
98:25
**conditions**
70:10 77:5
189:18 197:2
205:5 215:11
215:12 223:25
**conduct**  10:17
42:20,24 49:23
52:19 58:17,25
59:7,11,15
63:22 65:4,8
66:3 75:7 78:6
78:10,13,20
116:17 117:2
125:16,21
153:7,14
158:14 200:23
201:17 204:15
204:17,24
205:6,23 206:7
207:14 222:14

222:22,24
223:4 232:8
**conducted**  4:5
4:20 42:13,16
43:6 50:6 58:2
59:7
**conference**
1:18
**confidentiality**
25:4
**confirm**  32:11
**confirmed**
214:9
**confirming**
88:2
**conflict**  78:24
**confused**  93:8
**confusing**  62:4
**connected**
240:15
**connection**  4:7
12:18
**consider**  30:11
51:25 52:4,7
68:23,24 116:5
166:19 167:4
175:8
**consideration**
172:17
**considered**
3:13 50:22,25
118:9 121:17
167:11 175:24
176:6 241:18

**considering**
117:12
**considers** 68:21
166:5
**consistency**
67:11 193:7
**consistent**
66:17 160:11
**constantly**
52:14
**constrained**
103:13
**constraints**
159:14,18,18
**construct** 39:2
204:16
**constructing**
121:8
**construction**
198:1
**consultant** 16:1
30:19
**consultation**
40:14 98:14
**consulting**
13:15 14:9,13
14:13,16,19,25
15:21 16:9
23:6,8 33:12
44:12
**consulting's**
16:5
**consumer**
13:23 39:18

41:25 42:13,16
46:22 47:21
51:25 52:2,3,5
52:8,15 65:20
65:22 66:1,6
66:13,17 67:1
69:16,17 85:17
85:22 89:9
90:9 95:10
96:7 118:15,23
119:12 130:13
136:4 143:16
143:24 147:2
186:1 187:15
188:6 189:21
192:22 196:2
196:21,24
197:1 214:3
226:23 227:4
**consumer's**
130:12
**consumers** 40:1
40:24 41:16
66:21,22 67:22
67:23 69:22
70:4,8 71:5,23
72:18 74:10,12
86:10 88:21
94:17 118:20
186:11 189:17
190:22 192:23
209:13
**consummate**
168:22

**consummated**
149:8,9 226:11
**consumption**
100:9 101:2
116:6
**contain** 205:21
**contained**
49:11
**contains** 49:3
63:20
**contention**
171:9,21
**contents** 51:8
132:12
**context** 28:23
69:12 71:10
84:14 86:24
87:3 93:16
105:18 121:21
228:12 230:1
**continue** 4:10
126:7,8 134:22
135:10 156:6
216:23
**continues**
131:22
**contract** 26:3,5
26:8 137:14,17
138:3 140:3,9
142:21 184:6
184:18 196:3
214:2,7,11
215:10,14
216:21 217:7

217:10 223:18
228:3 229:2,4
236:21 237:6
**contractors**
16:11
**contracts** 64:20
215:6,22,24
216:1 235:15
**contrasts**
179:15,21
183:14
**control** 199:10
**controlled**
97:19
**controls** 200:2
**conversation**
127:24,25
129:12,22
130:2 132:21
133:8 169:8
**convey** 63:21
181:3 220:9
**conveyed**
152:16
**conveying** 65:2
**copies** 238:15
241:15
**copy** 236:18
238:2
**core** 115:13
**corporation**
36:7 39:12
**correct** 6:11,16
7:4,12,17 8:6

**[correct - cost]**

| | | | |
|---|---|---|---|
| 8:16,22 9:22 | 70:5,10,11 | 136:10,15,21 | 206:15 207:6 |
| 9:23,25 10:1,4 | 72:11 74:12,22 | 136:24 137:5,9 | 207:15,21 |
| 10:7,10,22 | 76:10 78:4,14 | 137:14,19,22 | 208:20 209:1,7 |
| 11:1,8 12:15 | 79:20 80:22 | 138:6,13 140:3 | 209:14,17,23 |
| 12:16,18,21 | 82:6 83:3 | 141:3,9,16,20 | 210:10 211:5 |
| 13:3,4,8,12,13 | 84:16 86:21 | 142:6 145:7 | 211:13 212:14 |
| 14:11,17,18,21 | 87:3,7,13 88:5 | 146:14 147:12 | 212:19 214:4 |
| 14:22 15:2,22 | 88:6,10 89:22 | 147:15,18,22 | 214:22 216:6 |
| 16:19,22 17:3 | 90:3,6 91:5,22 | 148:7,9,14 | 216:10 217:17 |
| 17:21 18:16 | 94:7,12 95:2 | 150:16 151:19 | 218:2,15,18 |
| 27:3,8,17,18,21 | 98:4 101:22 | 152:25 153:11 | 219:15,22 |
| 28:5,9,13 | 102:1,15,20 | 153:15 154:15 | 221:21,24 |
| 30:14,18 32:15 | 103:1,2,4,10,18 | 154:19 155:1,4 | 222:11,12,15 |
| 32:21 33:4,6 | 103:21 104:5,8 | 155:6,13,17,23 | 223:14,18,19 |
| 33:10 35:20,24 | 104:13,22 | 156:2,3 157:20 | 223:22 224:9 |
| 36:14,17,18,20 | 105:9,13,16,22 | 158:4,22,24 | 226:4,24 |
| 37:3,7,25 | 105:23 106:1,6 | 159:4 160:21 | 227:11,17 |
| 38:11,15,18 | 106:15,24 | 161:3,19 162:5 | 228:3 229:4,13 |
| 39:5,15,19 | 107:3,17 | 163:4,22 164:1 | 229:21 230:16 |
| 40:7 41:17 | 108:11 110:18 | 164:5,18 | 232:8,18 233:4 |
| 43:10 45:3,24 | 111:5,14,23 | 167:15,23 | 233:14,23 |
| 46:3,13 47:5 | 112:13 113:3 | 173:5 177:7,11 | 234:2,10 236:4 |
| 47:13,25 48:20 | 113:13,21 | 177:16 179:24 | 236:9 237:6 |
| 48:23 49:1,19 | 115:16 116:2 | 180:3,19 | **correctly** 38:8 |
| 49:21 50:22 | 116:11,18 | 183:16,23 | **cost** 74:5 87:22 |
| 51:1,9,25 | 118:7 119:23 | 185:18 186:8 | 94:21 96:25 |
| 52:13,21,23 | 120:1,5 121:9 | 186:13,17 | 98:18 101:7,24 |
| 53:4,21,24 | 123:24 125:16 | 190:15 191:10 | 104:12,22,25 |
| 54:13 56:11 | 125:22 126:14 | 192:23 193:19 | 105:5,24 106:6 |
| 57:12,22 58:25 | 127:2,14 128:8 | 194:22 202:24 | 106:9,14,22 |
| 59:4,12,20 | 130:5 131:14 | 203:2,5,10 | 107:1 109:17 |
| 61:2,25 63:22 | 131:19 132:1 | 204:10,13,18 | 109:19,20 |
| 64:7,18 65:23 | 134:23 135:2 | 204:25 205:14 | 110:1,5,21,22 |
| 66:2 69:23,25 | 135:18 136:9 | 205:23 206:8 | 111:10,18 |

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[cost - customer]**

Page 17

112:5,7,17,18
112:21 113:7
129:21 133:13
139:20,22
140:2,9 147:2
150:12 166:1
168:2 169:11
172:6 173:14
173:21 182:10
182:12 183:8,9
185:15,16
195:4,8 202:10
202:11,11,12
229:24
**costs** 101:16
108:10,18
110:11,11,16
110:17,21
111:4,5,9,12,13
112:11 113:2
113:12,20
136:15 138:5
138:19 140:21
168:22 169:1,7
169:11,13,25
172:25 182:12
195:8 237:1
**counsel** 4:14
5:5 7:24 10:22
11:6,24 22:12
45:13,21,24
46:1,2,5,10,25
50:12 51:11
81:17,25 115:3

115:11 128:7
146:6 151:4,12
195:23 233:3,9
233:13,18,20
234:20 235:3
235:11 236:3
237:20 240:13
240:15
**countries**
189:16,23
191:17 192:7
**county** 239:3
240:4
**couple** 96:19
**course** 7:3
55:23 67:22
**courses** 17:1,5
17:9,20,23
52:16 64:22
**court** 1:1 4:17
4:24 5:9 6:15
8:6 18:24 24:8
24:23,25 25:2
62:8 63:7
234:1
**courts** 23:14
**cover** 215:8
**covered** 23:9
**created** 50:1
**creates** 106:22
**credits** 101:18
101:22,25
**criticism**
154:18 206:6

207:4 229:12
230:5 231:9
**criticize** 125:20
**criticized** 232:8
**criticizes** 206:6
208:8
**criticizing**
153:14 204:25
207:14
**critique** 146:24
147:1 193:17
193:24 207:20
208:2 209:6,10
209:12 230:19
231:1 232:21
**critiqued**
230:20
**cross** 3:4 235:8
**crucial** 89:25
93:19 98:2
**curing** 206:25
**current** 105:7
**currently** 6:19
16:10 35:2
129:17
**curriculum**
12:15
**customer** 17:10
17:21 37:20
67:20 68:6,17
69:8 71:10
72:1 73:20
74:21 75:4
76:22 77:1,23

93:17 95:4
100:25 101:8
108:10,19
110:12,17,21
115:25 116:10
116:17,21
117:3,20,22
118:1,15 119:2
119:4 124:15
124:17 126:25
127:6 133:9
137:24 139:18
139:20 147:15
152:1,13,24,25
154:14 156:11
160:6 161:19
163:21 164:16
165:2,10,15,16
167:2 168:24
170:23,24
171:6 172:19
172:21 174:15
174:15 182:10
182:13 183:8
183:10 184:8,8
184:9,11,17
185:16,17
192:5 193:7
195:5 196:20
197:24 202:8
203:5,9 204:10
204:17 205:13
207:5 208:14
214:3 216:9,15

217:23 228:20 229:8 230:22 232:6,12,24 236:13

**customer's** 140:12

**customers** 14:17,20 15:10 15:16 18:9 21:8 28:5,9 32:21 33:4 35:3,8,23 36:2 36:14,17 37:13 37:19,22,25 38:4,7,13,14 40:17,20 41:12 42:21,25 43:13 52:8,10 66:5 66:10,11 67:4 67:7,24,24,25 72:9 75:12,17 75:21,24,25 80:22,24,24 81:1,2,3,4 82:16 84:4,8,9 84:20 85:1,14 87:20 88:15 89:24 90:11 92:24 93:1,4 93:18,19 94:6 94:10,12 97:25 98:14 99:19 100:8 101:1 106:23 115:15

115:20,21 116:1,4,22 117:6,7,12 119:7 140:4 147:21 148:23 151:24 161:15 163:24 164:4,4 164:10,10 165:7 166:16 171:3,12 175:6 177:5 178:12 178:14 179:6,8 179:12,16 180:8,18,18,23 181:3,13,16,20 183:2,14 186:16,21,24 187:5,6,10,11 187:12,19,23 188:1,1 190:15 195:11 197:20 200:23 201:17 202:3 203:16 203:21 207:13 208:19 214:9 214:12,14,16 215:23 217:12 222:15,21 223:5

**cut** 101:1
**cutting** 98:15
**cv** 1:2 3:12 4:19 11:12,21 12:15 12:17,20,23

13:3,6,10 14:9 14:23,24 16:17 17:1 18:14 24:19 27:6 28:20 32:13 37:1,23 38:2

**d**

**d** 2:7 3:1 32:4 107:4
**damage** 44:22 44:25 206:1,2 206:2 207:18 208:23 211:8
**damages** 25:16 44:8,17 45:3 147:11 202:22 202:24 203:6 203:13 221:24 222:2 223:6
**danish** 191:1 196:4,6,14
**data** 44:23,24 52:12,15 67:17 77:20 105:21 109:6,19 198:1
**date** 241:5,12 242:2,25
**dated** 48:20 120:25 212:10 240:18
**day** 18:8,8 71:15 74:1,1 177:6,15 180:2

180:9 182:3 239:9,12 240:18

**days** 241:17
**deal** 21:18 26:5 56:22 196:23 197:1
**dealing** 65:14 67:3 142:20 148:22 151:23 151:25 154:22 174:2 188:10 206:25 210:14 211:2,16
**dealt** 71:10 197:19
**death** 144:13 144:20
**debate** 125:8
**debated** 28:15
**deceased** 141:9
**december** 3:14 89:21 90:6,25 91:4,24
**deceptive** 125:21
**decide** 63:7 72:2,19 127:6 223:13,20 226:2
**decided** 96:23
**deciding** 73:11
**decisions** 142:14

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[declare - detail]**

Page 19

**declare** 242:22
**decline** 144:5
**deep** 51:16
**defend** 126:8
**defendant** 4:14
61:13,24
**defendant's**
3:11 11:14
48:12 50:18
53:13 90:20
121:2 178:1
212:5
**defendants**
1:10 2:13 22:6
22:8,10 62:18
**defense** 105:25
235:10 236:3
**defer** 125:9
**define** 20:20
65:25 148:19
231:12
**defined** 70:6,14
70:23 82:7
151:17 211:12
**defining** 85:14
162:18
**definitely**
132:19 219:1
**definition**
20:22 84:23
156:1 169:2,6
200:17
**definitions** 69:7

**definitively**
133:5
**degree** 112:2
148:25 149:21
**delivery** 38:6
**delve** 91:17
**demand** 198:2
198:3,7,8,9,11
198:14
**demographic**
77:8 170:24
**demographics**
75:15 171:6
172:19 187:21
189:8
**demonstrated**
77:17 93:15
**denmark**
189:12
**department**
93:6,7
**depends** 4:6
167:14
**deponent** 60:7
60:10,19 63:4
157:8
**deponent's**
62:17
**deponents** 61:6
205:19
**deposing**
241:13
**deposition** 1:13
3:14,15,15 4:5

4:13,20 10:3,7
10:18,22 48:23
60:7 63:4,19
95:8 109:2
110:8 120:25
121:5,7,20
122:25 123:11
123:20,24
155:22 156:8
156:15,23,25
157:9,13
161:12,21
163:5 164:22
174:21 177:10
178:5 193:19
212:2,9,13,15
213:22 215:2
217:2,3 218:1
218:3,5,8
219:2,5,10,18
220:7,23 221:2
221:18 227:25
235:5 238:25
240:8 241:4
242:2
**depositions**
47:17 56:6,24
59:5,8 61:6
62:6,11,14,24
62:25 155:15
157:24 194:5
**deregulated**
189:14 190:24
200:1

**deregulation**
81:8 86:20
87:5 88:7,22
88:25
**derive** 80:9
218:4
**derived** 64:6
187:7
**deriving** 66:5
**describe** 12:24
24:2 58:16
115:14 148:12
153:6
**described**
100:11 119:21
132:22 150:9
152:9,18 156:8
166:9,23
175:13 232:23
**describes** 156:7
**describing**
146:22 150:22
154:11,18
156:19 216:18
**description**
56:3 186:7
220:12
**design** 42:7,10
155:6,8,9
**designed** 43:7
210:20
**desired** 227:20
**detail** 24:3
32:12

[details - discussion]

**details** 91:18
121:13
**determinants**
170:22 172:3
**determination**
30:7 69:5
152:5 156:11
**determinative**
137:23
**determine** 47:3
59:3,19 63:2
74:21 75:4
96:16 109:5
151:17 165:22
170:19 174:20
193:9 199:3
200:4 227:10
227:16
**determined**
63:11 162:19
186:7 230:22
**determines**
87:19
**determining**
60:5 61:13
71:1 75:8
167:13 228:8
**develop** 82:20
**developed** 38:4
38:5,18 58:7
64:14,19 199:1
**development**
97:15 99:23

**deviations**
67:17 77:19
193:8
**devices** 101:3
**differ** 183:9
**differed** 204:24
**difference**
56:16 180:16
203:9 208:13
225:3
**different** 18:15
20:2 27:20
29:21 39:18
40:2 56:10
57:5,16,17,23
58:4 62:10
68:10,22 69:13
69:14,18 73:24
75:9 77:1,9
79:1,24 84:8
92:2,2 103:9
103:24 112:8
150:8 153:21
169:9 179:18
190:6 191:17
197:20 208:16
214:13,15
216:11 229:8,9
232:24 234:9
**difficult** 75:21
76:21 132:11
219:4
**difficulty** 12:7
76:7

**direct** 3:4 6:4
39:12 40:23
41:15,20 59:15
62:17 119:3
121:23 134:8
135:3 146:17
164:21 176:23
188:8 221:6
**directed** 94:11
**directing**
106:20
**directly** 42:16
186:20 213:13
231:20
**disagree** 68:5
**disavow** 97:24
**discern** 108:7
114:3
**disclose** 23:4
44:13 136:20
137:4,11 138:3
**disclosed** 25:3
137:8 152:24
153:1 154:14
**disclosure**
135:13,13,16
**discounted**
94:16
**discovery** 61:8
70:16 71:25
73:15,18,20
84:24 85:4,5
85:25 86:5
99:9 117:10

132:14 153:25
166:24 168:15
199:20 231:21
231:22
**discrete** 154:20
**discretion**
207:21 208:3,5
208:9
**discuss** 32:11
44:11 74:11
85:8 86:20
101:17 103:8
134:10 140:18
141:2 146:19
148:4 174:10
184:23 185:2
186:5,10
**discussed** 11:7
28:15 74:9
131:15 133:7
139:11 167:25
175:10
**discusses**
179:23 208:13
**discussing**
23:22 90:9
94:5 131:13
138:21
**discussion**
10:25 94:5,9
94:11 99:15
101:16 119:15
138:18 140:15
144:15 151:9

151:14 165:20 170:14 179:19 179:20 183:13 209:21

**discussions** 118:7 197:22 233:18

**dishonesty** 209:9

**displace** 101:10

**disposition** 219:17

**disputes** 19:8 19:17

**dissect** 132:12

**distinct** 154:18 182:4

**distinction** 181:11 182:18 183:22 184:7 214:12,14 216:2

**distinguish** 57:14 77:9 85:17 104:10 104:17

**distributed** 26:21

**district** 1:1,1 4:17,18

**divest** 97:10

**dividing** 112:22

**doctor** 237:11

**document** 8:21 9:4 12:12 50:21 51:12,23 53:23 130:8 242:23

**documents** 3:13 8:25 47:19 50:15,22 51:7,11,19,24 52:18 59:20 60:6 62:10 64:25 117:16 121:17 156:16 156:17,18,18 156:21 157:19 213:5

**dog** 79:5

**doing** 36:4 57:15 78:23 97:5 110:22 111:10,18 169:11 172:18 173:15

**dollar** 73:12

**dollars** 25:16

**dominant** 96:8

**dozens** 83:13 189:22

**dr** 4:13 6:8 9:2 11:12 13:6 45:23 49:25 53:18 115:13 123:15 146:8 151:3 195:25

218:11 223:11 235:10 238:20

**draft** 29:19

**drafted** 29:16 29:20,23,25

**drafting** 212:3 221:21

**draw** 187:6 201:24

**drawing** 63:18 225:9,10

**drift** 147:5

**driver's** 239:23

**drives** 174:17

**driving** 73:25

**duly** 6:2 239:10

**dying** 142:12 142:12

**e**

**e** 3:1,9 241:24 241:24 242:3,3 242:3

**earlier** 82:4 93:12 116:16 123:11 132:3

**early** 37:6 156:21

**ease** 140:22

**easy** 108:7 114:1 219:7

**econometrics** 43:17,20,22

**economic** 73:2 82:7 84:23 85:7,12 194:9 194:15 200:23 201:18 204:9 207:5 209:13 210:9 223:5

**economics** 17:2 17:14 42:5 70:7 74:18 225:11

**economists** 16:14

**ed's** 182:11

**edp** 103:20,24 104:3,11,17,22 109:25

**education** 77:10,11,14

**educational** 77:1

**effect** 6:15 134:1

**effective** 97:14

**effects** 194:10 194:16

**effort** 96:13 99:4

**efforts** 109:4

**either** 18:24 177:6 180:9 238:15

**electric** 13:17 14:20 17:7,15

John O'Brien

January 29, 2026

Brous v. Eligo Energy, LLC

**[electric - eligo's]**

Page 22

17:24 18:8
21:7 27:1
32:12 33:18,25
33:25 34:6
36:16,24 37:2
37:5,6,9,10,12
37:13,18,24
38:3,23 74:22
75:5 76:2 78:3
82:19 88:19
96:24 97:16
98:15 113:17
116:6 127:12
127:20 128:19
129:14,15
131:8 133:1,14
134:5 141:19
143:23 152:13
177:4 180:7
189:14,20,24
190:19 198:24
199:10,17
236:13
**electric's** 38:11
**electricity**
14:17 15:10,15
21:8 28:5,9
32:21 33:4,23
35:23 36:1
38:6 39:15
40:16,19,24
41:11,16,22
70:4 87:22
89:6 96:8 97:4

98:18 99:5,10
101:7 102:5,12
102:19 106:11
107:7 109:22
116:8 122:8
129:2,9,18,21
129:24 130:1
130:12,19
131:10 132:1,5
132:9,25
133:13 140:7
142:21 166:11
166:12 167:1
167:21 168:24
172:18 175:6
176:11 184:19
185:11 188:18
197:25 198:6,8
198:9,10 199:7
200:8 202:10
203:21
**electronic**
238:5
**element** 152:19
**eligo** 1:9,9 4:15
4:16 42:20,24
43:13 46:7
47:17 52:8,10
56:4,6,24 59:2
59:12,16 62:5
66:5,11 80:22
80:24 81:1,3,4
102:4,11
105:16,25

106:15,17
107:17 108:18
108:23 109:23
110:4 113:2,6
115:20 117:6
119:23 120:5
120:10,16
122:15 123:10
126:24 128:23
129:23 132:14
133:12,18
136:2,20 137:1
137:4,11,16
138:3 142:24
152:1 154:9
155:15,21
156:11,19
157:24 160:3,3
160:25 161:15
161:21 162:20
162:21 163:6,7
163:18 164:10
164:11,22
166:12 167:1
167:21 168:6
171:9,21 172:2
172:16 174:10
174:17,22
175:3,8,24
177:4,13 180:1
180:7 186:16
186:20,24
187:10,11,14
187:18,23

188:1 194:4
202:9 203:5
206:6 209:22
212:23 213:5
223:21 224:8
224:15 226:3,9
227:9,15 228:7
230:20,21
231:24 232:6
241:3 242:1
**eligo's** 58:17,24
60:25 63:21
105:21 108:19
115:15 116:1
128:21 131:10
136:13 138:11
140:18 141:16
143:7 146:9,12
146:19,22,24
147:20 148:13
151:16 153:6
154:25 155:3
160:15 162:17
163:15 174:13
174:17,20
177:10 185:5
186:6 187:6
200:22 201:17
204:16 205:6
206:7 207:20
208:2,8 213:25
214:6 222:14
222:21 228:1
229:2,4 230:14

Case 1:24-cv-01260-ER    Document 381-2    Filed 03/16/26    Page 266 of 315

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

[eligo's - esco's]

Page 23

232:17
**elimination**
88:9
**email** 241:13
**emailed** 241:15
**embedded**
238:8
**embodied**
65:15
**empirical** 42:20
43:12 52:3,7
59:18 78:20
117:2 118:14
203:6 205:9
230:19
**empirically**
76:19 113:19
147:7 187:14
**employ** 16:13
**employee** 30:17
240:13,14
**employees** 16:9
16:15 47:17
226:3
**employment**
100:20
**empowered**
142:13
**enabling** 29:1
**encompassed**
9:16
**ends** 70:17
**energies** 33:22

**energy** 1:9,9
4:16,16 15:1
18:25 19:4,15
20:9,14,21,23
21:2,3,5,17,22
21:23 25:21
27:8 28:11,21
31:4 34:9,9
40:14 68:12
70:23 71:9,12
71:23,23 73:16
73:24 81:8
84:19 86:20
87:6,11 88:2
99:16,23,24
100:9,9,14
101:2,18,22,25
102:20 109:6
109:18,24,24
112:17 114:2
131:17 144:9
148:2 151:23
171:1 173:12
173:18 174:12
176:9 178:15
179:8 182:1
188:12,14
195:11 196:22
197:13,20
198:4,5,20
199:5,23,24
200:16,18
241:3 242:1

**enforce** 31:7,10
**engaged** 15:5
23:1,11
**engaging** 116:6
**england** 196:15
**english** 63:10
191:2
**enhance** 100:21
**enlarge** 82:10
**enroll** 120:1,5
123:10
**enrolled** 56:3
119:22 120:10
120:15 124:15
134:17
**enrolling**
126:24 133:9
135:8
**enrollment**
124:16 131:16
132:24 134:11
136:2,7
**enron** 34:17
**enter** 142:16
149:6
**entered** 149:14
**enticing** 128:22
**entire** 62:23
92:6 94:17
95:8,17 96:9
96:13,22 97:20
217:3 219:5,10
220:7,23 221:2
221:10,16

**entirely** 24:9
94:18
**entirety** 217:2
**entitled** 50:21
144:19
**entity** 41:21
210:19,21
**envelope**
187:25
**environment**
38:23 88:14
89:5
**equal** 152:4
**er** 1:2 4:19
**errata** 5:19
241:11,13,16
**esco** 17:9,20
20:6,13,20
25:21 34:2,18
83:2 84:19
92:25 93:4
94:7,12 95:3
101:3,25
106:23 110:11
110:17 111:20
113:20 117:12
127:1,7,7
131:22,23
133:9,19 136:4
170:25 178:14
179:8 190:14
202:9
**esco's** 104:2

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[escos - exhibit]**

Page 24

escos  20:16,18
  20:19 33:15
  34:12,22 35:2
  35:7,7,11 67:3
  70:4,19 74:10
  74:12 83:5
  92:22 93:17
  98:16 99:19
  102:4,11 103:1
  159:25 160:16
  209:1
especially
  126:13
essence  173:24
essentially  29:9
  29:14 59:6
  167:19 184:10
  184:17 191:3
  238:13
establish  86:1
  175:5 199:6
  207:5
established
  85:9 99:6
  131:21 148:24
  173:19,20
  199:16 211:18
establishing
  34:1 86:4
estate  142:5
estimate  20:6
  20:17
et  241:4 242:1

ethical  64:3,15
  64:22,24 65:12
  65:14,15
  125:15 126:10
  126:12 148:24
  149:7,12,13
  175:14 206:5
  206:17,21,24
  207:4 210:6
  211:17,25
  226:20
ethically  149:1
ethics  17:2,14
  64:1,2,5,8,11
  64:13,19
  125:11,15,25
  126:11 148:22
  152:7 154:22
  212:1
evaluate  125:1
  170:18
evaluates
  124:17 165:21
evaluating
  127:2
evaluation
  68:21 167:14
eventuality
  184:24
evidence  48:4,5
  55:21,21 56:22
  57:4 58:3,6,7
  118:14 176:5
  177:3 226:8

exact  54:8
  176:24 188:8
  193:14 218:25
exactly  24:23
  34:19 78:23
  109:10 152:17
  161:22 180:12
  189:24 193:13
  221:3
examination
  3:4,4 6:4
  126:10 190:17
  235:8
examine
  116:22 187:5
examined  6:2
  52:9 116:21
examining
  77:22
example  18:20
  21:22 25:14
  56:2 69:21
  72:8 76:10
  77:2 118:5
  130:23,25
  210:24
examples  98:20
  232:12
except  143:9
  168:14 172:5
  173:20 211:8
  232:12
exception  50:4

exceptions
  161:14 172:5
excerpt  82:15
  188:9 236:21
excessively
  165:3
excluded  24:1,1
  24:4,4,9
exclusive
  174:20
exclusively
  180:2
execute  149:24
executed  43:7
executing
  226:10
executor
  141:25 142:11
executrix
  141:23 142:5
  142:13,19
exercised  208:9
exhibit  3:12,12
  3:13,13,14,14
  3:15,15 11:13
  11:14,25 12:5
  12:5,6,7,10
  22:17 48:10,11
  48:12,17 50:11
  50:18,21 53:12
  53:13,16,20
  81:11 82:9
  90:19,20 91:4
  99:14 120:24

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[exhibit - fact]**

Page 25

121:2 128:10 177:25 178:1,4 212:5,9,11
**exhibits** 3:11 232:14 238:7
**existing** 130:20 187:18
**expect** 65:22 68:6 69:8 119:3 162:20 166:15,16 186:11 188:15 212:16 226:23 232:24
**expectation** 67:20 115:20 115:22 116:13 140:12 188:7
**expectations** 65:20 66:14,17 66:23 67:2,16 68:17 69:14,18 78:3 115:15 117:23 118:2 119:12 143:17 143:25 144:8 186:1 187:8
**expected** 116:10 228:23
**expects** 195:5
**experience** 12:25 14:5,7,8 18:14 27:5 32:10 38:11

39:10 40:23 41:15,20 67:2 72:2 186:16 188:10,19 190:1 197:19 225:11 226:24 227:3
**experiences** 13:7
**experiencing** 6:20
**experiment** 88:15 97:14
**experimental** 42:10
**experiments** 52:19 78:13
**expert** 3:12 10:10,25 12:18 15:25 16:6 18:14 22:4 23:1,6,7,13,24 44:12,14,21,24 44:25 48:19 50:6 59:9 61:20,23 63:9 68:11 121:8 125:9 206:3 219:13
**expertise** 10:20 14:25 23:21 41:5,7,13 43:18 46:21,21 47:20,22 51:15

52:18 55:20 58:8 64:1,22 64:25 68:18 80:9 117:20 191:11 225:10
**experts** 14:1 68:5,10 69:1 80:9,17 108:24 234:8
**expires** 239:21
**explain** 37:21 113:18 124:21 136:14 137:1 140:20 149:2 149:22 151:1 157:19 181:11 183:22 192:20 213:16
**explained** 150:12 159:3 159:14 198:21
**explains** 178:12 179:6,11 182:18
**explanation** 113:16
**explanations** 79:21 161:2,9 165:14 194:21 194:25 205:13 230:21
**exploitation** 153:9 206:13

**exploited** 154:3
**explore** 159:12 159:13
**exposition** 113:14
**exposure** 25:10
**expressed** 9:15 219:18
**extend** 187:11
**extension** 97:17
**extensive** 75:12 80:10 87:12 88:3 108:5 190:2 199:13
**extensively** 10:19 47:20 87:17
**extent** 83:8 115:17 118:4 159:22 187:10 208:11 210:2 210:22
**extract** 161:18 162:22
**extraneous** 150:2

**f**

**fact** 51:15 57:2 63:11 64:13 71:11 72:15 80:18 86:1 107:5 124:24 131:24 132:7

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[fact - first]**

Page 26

132:18 133:10
133:22 142:10
143:15 149:16
153:2 161:22
170:11 175:16
179:9 182:22
189:22 233:16
**factor** 127:9
139:23 167:23
168:18 195:8
**factored** 237:3
**factors** 69:22
70:9 71:5,9
98:12 127:8
135:11,15
136:11,15,21
137:5,12 138:6
138:20 139:3
139:24,24
140:21 154:9
163:19 167:10
167:22,24
168:6,13 169:1
169:6 171:10
171:16,18,25
172:1,15,25
173:1,13,20
174:20,23
175:8,10,17,21
175:23,25
187:1 196:3
197:2,3 213:6
213:8 230:7,12
230:16 231:12

231:17,18,19
232:18 237:2
**facts** 46:18
47:11,16 57:2
62:9 119:25
120:4 153:24
242:23
**factual** 55:13
142:3
**failed** 137:1
**fails** 241:20
**fair** 48:3 51:13
65:14 98:9
100:24 101:11
146:13 148:22
154:6,12,22
174:2 206:14
206:25 208:7
210:14 211:2
211:16 220:11
220:18 223:2
230:25 236:8
**fairly** 9:16
154:7 169:14
190:1 199:21
215:6
**fairness** 231:2
231:10
**faith** 65:13
174:2 206:24
209:21,23,25
210:9,14 211:2
211:4,5,13,16
211:23

**faithfully** 152:9
**fall** 20:22
**false** 47:4,13
48:8 126:1,9
**falsify** 79:8,14
79:17,18
**familiar** 91:14
91:17 103:22
103:23 195:11
224:20
**family** 140:16
144:12,13,19
144:24
**far** 34:19 64:24
159:23
**father** 142:24
143:6 144:13
144:20
**fbfglaw.com**
2:7 241:1
**february** 33:8
35:17 239:12
240:18 241:2
**federal** 18:24
89:1 96:23
97:15 198:5,22
199:5 241:18
241:24
**feed** 231:22
**feeling** 144:18
**fenosa** 33:18
34:3
**fewer** 145:19

**fifteen** 18:11
**fight** 79:6
**figure** 24:22
25:8 26:17
109:14,15,25
145:2 192:3
200:3 234:18
**figured** 114:15
**figures** 25:17
**file** 130:7
**filed** 4:16 53:9
53:21,24 54:7
54:19
**filing** 55:6
**finally** 40:9
**financially** 5:1
207:13 240:16
**find** 69:1,18
79:24 113:16
142:18
**finding** 164:17
**findings** 154:19
192:21
**fine** 22:16
143:11 179:3
**finish** 156:5
**finished** 174:24
**finkelstein** 2:5
5:14
**firm** 4:24 5:22
14:13 33:13
**firms** 34:21
**first** 6:2,10
14:8 53:3

**[first - gallon]**

54:12,21,25 70:12 133:9 134:18 135:5,9 144:22 153:7 162:16 176:5 192:24

**fit** 169:6 215:24

**five** 45:10 81:13 129:25 134:17 145:13 145:21 146:5 195:18 237:13

**fix** 184:12

**fixed** 94:16 134:17 135:8 137:8 179:16 180:18 181:12 181:12,20,23 182:10,12 183:1,8,14 184:8,11 185:16 236:24

**fl** 241:14

**flagler** 16:18,21 16:24

**flight** 145:18

**floor** 2:9

**florida** 27:7,17 27:20 239:2,7 239:20 240:3 240:24 241:19 241:24

**flyer** 122:7

**focus** 119:14

**focuses** 17:13

**focusing** 122:20

**follow** 29:15 190:2

**followed** 5:8 224:2

**following** 136:2

**follows** 6:3

**food** 68:14

**footnote** 188:23 188:23 213:20 213:21

**footnotes** 94:4 197:17

**force** 6:14

**forced** 97:9

**foregoing** 240:8 242:23

**forever** 238:2

**form** 29:4 51:22 136:3 203:18

**formal** 41:24 43:19 50:7 107:14

**formed** 89:2

**former** 141:2

**forming** 50:25 51:14 53:3 55:12 118:1 157:9,14 212:14

**formula** 112:6 137:8,13

**formulates** 29:13

**forth** 22:17 103:13 232:13

**forward** 99:3 154:10 162:1 170:5 179:17 183:15

**found** 25:15 75:19,20 89:6

**foundation** 10:13 22:23 49:7,13 63:24 74:25 90:13 91:7 102:22 104:7 111:16 121:11 123:14 124:1,19 126:3 127:4 129:11 133:4 135:20 137:21 141:22 143:2 144:2 147:24 153:17 157:3 159:21 169:22 171:14 175:12 186:19 189:6 207:24 230:10

**foundational** 124:24

**four** 115:10 146:1

**fragmented** 70:20

**frankly** 117:11 165:2 195:7

**freely** 73:10 199:21

**frei** 2:5 5:15

**frequency** 196:23

**frequently** 197:21

**front** 104:15 127:25 154:5 218:3 235:20

**fuel** 195:7,8 197:6

**full** 40:11 102:14 188:9 190:6 218:3

**fully** 51:23 75:17

**function** 154:17

**funded** 29:2

**funds** 131:23

**further** 178:20 178:21 179:16 183:15 234:14 237:21 240:12

**future** 192:19

**g**

**gallon** 73:12

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[garber - going]**

Page 28

**garber** 2:5 5:15

**gas** 34:4 35:2,8
36:13 39:12,15
39:17,25 71:13
71:14,20,20
72:2,10,10,13
72:19,25 73:9
73:11,12 74:1
129:14 131:8
133:1 188:18
197:10,12
199:25,25
200:1,6,8,10

**gasoline** 71:18
72:16 73:10,19
74:4 85:23
188:17 195:6
197:6,9

**gblankinship**
2:7 241:1

**general** 24:3
32:3 51:8
68:15 75:14
80:16 85:18,22
97:3,10 107:21
113:2 115:21
119:9 146:23
165:19 219:17

**generalized**
115:25 116:3,4

**generalizing**
192:21

**generally** 18:23
18:25 20:1

24:24 28:25
35:11 44:22
59:8 65:15
72:13 74:9
88:25 89:9
91:13,16
107:20,22
110:6 140:4
161:22 169:17
173:19 179:13

**generate** 102:4
102:12,18

**generated**
38:14

**generation**
21:4,7,16
82:19 96:21
97:8,9

**generations**
97:6

**generators**
21:15 96:25
97:2,10

**genesis** 67:1
96:22 199:22

**genuinely** 8:13
8:13

**georgia** 2:15

**germane** 23:25

**gestures** 7:8

**getting** 62:5

**give** 6:11 11:23
53:11 81:10
82:8,9 89:13

90:17 101:19
105:3 111:2
114:22 119:16
128:3,5 134:9
140:24 146:16
153:5 162:11
174:7 176:23
177:22 178:9
178:18 182:7
186:2 188:7
192:1 195:1
212:4 237:13

**given** 19:23
24:11 29:2,3
41:9 98:4
110:10 112:5
230:21 238:20

**giving** 98:14
115:19

**global** 33:9
153:23

**go** 4:11 6:9
14:4,6 32:10
32:11 33:23
36:3 47:9
55:12 71:13,15
71:18 72:2,13
72:25 74:1
77:3 81:7 82:4
91:11 93:12
99:14 107:24
114:13,23
121:15 127:22
128:8 130:23

145:13 146:16
151:5 170:12
173:13,25
178:19 181:22
181:23 182:7
185:10 192:2
197:16 200:3
200:12 202:19
206:23 212:17
217:3

**goal** 63:4 66:20
89:25 93:19
96:8,13 97:25
98:1,2,3,17,17
98:24 99:4
100:24 101:6,9
101:10 118:22
172:10

**goals** 96:4
98:21,23 99:22
100:13,22
118:14,18

**goes** 29:11 30:4
71:20,21 92:1
96:18 99:5
113:15 122:23
132:10 159:23
171:4 183:3,11
195:8,10 197:5
197:12 198:8,9
198:10

**going** 4:3 11:2
11:11,12 12:4
14:4,5,7 21:10

Case 1:24-cv-01260-ER   Document 381-2   Filed 03/16/26   Page 272 of 315

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[going - heard]**

Page 29

22:16 23:3 26:4 32:9 34:15,19 39:10 41:12 43:1 44:11 45:14,18 48:9 50:9,10 51:6 53:12 65:18 69:1,17 70:15 74:2,8 80:13 81:6,18 81:22 83:7 87:23 91:8 92:13 93:9,12 114:9,11 115:4 115:8 117:12 121:10,23 128:14 129:19 133:11 134:1 134:25 136:12 142:9 144:23 145:24 146:3 149:18 151:7 151:10 161:23 162:7 169:15 176:19 177:24 183:18 186:4 188:4,9 195:16 197:8,9,10 199:13 200:20 208:14 212:2,8 213:11 214:24 215:3,16 216:16 221:9 229:25 234:21

234:25 236:17 237:15,18 238:18

**good** 4:2 5:21 6:6,7,8 65:13 115:2 162:19 174:2 206:24 209:21,23,25 210:9,14 211:2 211:4,13,16,23

**government** 64:16 68:19 96:23

**grant** 199:16

**granting** 100:18

**gravamen** 95:8 95:14

**great** 27:14 56:22 238:9

**green** 104:20 109:6,18,23 112:4 148:2 168:21,24

**greg** 2:7 5:13 241:1

**grieving** 144:13

**groove** 154:24 154:25 155:3,6 155:8,9,12,14 155:19 156:1,8 156:10,15,19 157:1,5,10,18 157:20 158:3,6

161:14,17 164:24,25 165:8 169:8 170:14,17,22 172:3,4 175:4 176:7 193:17 193:18,25 194:3,6 212:24 227:9,15 228:13 229:11

**groove's** 155:16 158:15 194:10,16

**group** 14:25 80:23

**groups** 37:20

**guarantee** 100:18

**guaranteed** 92:20,23 93:3 93:18

**guaranteeing** 192:2

**guess** 51:3 114:9 145:10

**guides** 29:14

**guys** 238:1

**h**

**h** 3:9 242:3

**half** 19:3,12,14 19:17 107:5,12 108:2 109:3,10 112:19 129:25

134:17

**hand** 239:11

**handled** 19:15 141:19 142:4

**hands** 17:14

**happen** 85:5 97:12,13 126:12 152:19 174:4 181:6 195:6

**happening** 198:22

**happens** 30:3 181:5 192:6

**happy** 91:11 213:16

**hard** 27:12 76:16 77:24

**harm** 200:23 201:18 222:25 223:5

**harmed** 201:7 222:15,21

**head** 62:24 157:17 196:8 196:16 217:2

**heads** 22:15 50:15

**hear** 36:21 60:2 125:4,6,13 154:11 197:7,9

**heard** 4:8 132:3 133:23

**[hearing - impression]**

**hearing** 130:16
**heating** 188:17
**hedge** 180:14
  181:22
**hedged** 179:16
  183:15 184:5
**hedges** 179:12
  180:4 182:4
  183:1
**hedging** 159:14
  159:18,19,23
  160:1 169:1,2
  169:4,5,7,10,13
  178:13 179:7
  179:23 181:5
  181:11
**held** 14:10
  144:12
**hello** 5:11
**help** 98:25
  100:8
**helped** 129:19
**helpful** 134:14
**hh** 239:20
**high** 38:4,13,14
  77:11,13
  150:10 152:2,9
  172:8,12
**higher** 107:24
  202:12 208:19
**highest** 161:18
  162:23,24
  163:8,9,15
  164:15,25

165:7
**highlight**
  136:17
**highlighted**
  82:13,14 92:9
  92:14 93:25
  128:15 135:3
  135:25 136:23
  176:25 178:11
  236:22
**highlighting**
  94:3
**highly** 69:17
  77:15 88:18
  97:19
**hire** 16:12
**history** 19:25
  81:8 86:20
  117:23 118:2
**hold** 23:3 57:19
**honest** 153:2
  175:14
**honestly**
  149:22
**honesty** 153:8
  154:22
**honor** 91:8
**hour** 105:8
  107:6,23 112:5
  112:19,21
  114:12 127:13
  127:21 128:1
  128:20,22
  129:24,25

134:18 135:9
  170:1,5,6
**hours** 112:22
  169:24
**house** 101:3
**household**
  141:19 142:4
**huge** 77:19
  149:21 199:10
**human** 75:10
  76:5 126:7
  190:16,23
  191:19,20
  193:13 228:20
  228:20
**humans** 67:10
**hundreds**
  95:11 197:19
  199:15
**hurricane**
  150:4
**husband**
  142:15
**hypothetical**
  49:6 56:13
  60:15,18 110:3
  171:14 228:10

**i**

**idea** 64:17
  96:20 143:9
**identification**
  11:15 23:8
  48:13 50:19

53:14 90:21
  121:3 178:2
  212:6 239:22
  239:23
**identified** 10:9
  203:20
**identify** 130:4
  156:24 157:13
  157:16 203:15
  222:4 232:6
**identifying**
  150:14
**identity** 23:4
**illegal** 226:20
**impact** 101:25
  106:10 107:2
  158:15 170:3
  201:4
**impersonated**
  142:24 143:6
**impersonation**
  143:12 144:25
**implemented**
  64:21 92:20
  149:16
**implication**
  216:25 217:5
**implies** 167:22
**important** 7:7
  100:23
**imposes** 107:5
**impression**
  164:21 165:14
  185:5

| | | | |
|---|---|---|---|
| **impressions** 220:8 | 93:2,16 94:6 94:10,17 | **indicate** 61:10 109:8 112:3 165:9 190:23 | 149:21 150:10 150:10,23 151:24 152:2,9 |
| **improper** 146:13 229:13 229:21 | **incomplete** 7:16 49:6,13 56:12 60:14,18 110:3 171:14 185:5 228:9 | **indicated** 109:10 129:21 129:23 | 152:11,14,15 152:16,23 153:1,9 154:2 154:13,14 |
| **imputation** 176:13 | **inconsistent** 230:6,12,15 231:12 | **indicates** 98:3 | 173:25 190:5 196:8 207:1 210:19 |
| **inaccurate** 7:16 | | **indicative** 124:4 | **informed** 136:7 |
| **inadequate** 23:21 | **incorrect** 94:23 95:23 124:25 | **indicia** 60:8 172:20 | **informing** 117:22 |
| **incident** 150:4 | **incorrectly** 123:19 | **individual** 118:23 119:2,4 232:12 | **infrequent** 215:13 |
| **include** 14:25 17:1 70:9 102:6 154:8 171:10,22 | **increase** 109:5 165:10 174:16 178:17 | **individuals** 114:2 | **inherently** 229:13,20 |
| **included** 10:24 18:21 98:22 100:14 168:23 169:2,13 171:17 197:4 | **increases** 228:21 | **induce** 163:14 | **initial** 134:21 136:8 |
| | **increasing** 198:2,2 | **industry** 21:17 29:15 37:6 82:17 85:2 138:22 151:17 151:22,23 | **initially** 90:2 93:21 120:9,14 |
| **includes** 236:2 | **incurred** 108:18 | **infer** 60:12 | **injury** 147:14 148:7 200:21 202:2,17,18 204:10 205:23 207:6,10 209:14 222:11 |
| **including** 5:5 18:19 25:17 62:10 77:23 82:17 99:23 113:7 147:3 190:9 199:3 212:18 235:13 | **independent** 16:11 19:4,15 20:9,14,21,23 21:5,15 34:5 55:18 57:12,16 84:19 116:7 | **inference** 43:25 44:4 61:1 164:17 165:13 | |
| | | **inform** 119:8 | **innately** 198:12 |
| **inclusion** 60:25 | **independently** 21:18 40:19 46:17 56:11,18 57:4 113:11 223:3 | **information** 74:8,11 75:15 75:24 76:17 77:8 93:5 105:25 106:6,9 106:15 112:3 148:23 149:1 | **innovation** 98:22,22 |
| **inclusive** 215:13 | | | **input** 29:12 44:23 175:25 |
| **income** 15:22 15:25 90:10 92:21,21,24 | | | **inputs** 138:12 157:20 158:7 |

Case 1:24-cv-01260-ER   Document 381-2   Filed 03/16/26   Page 275 of 315

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

[inputs - involve]

Page 32

165:21 166:1,5 167:5,14,18 168:2,3 170:18 171:22 173:5

**inquiry** 68:16

**inside** 144:24

**insinuation** 144:24

**instance** 41:9 44:13 56:24 68:13,19 75:11 77:9 98:14 150:3 169:11 176:9 189:12 197:24 198:7 199:9 228:16

**institutional** 15:1

**instruct** 11:3

**instructed** 8:4 143:10

**instruction** 17:6,6,24

**instructions** 44:19

**instructs** 7:25

**instrument** 66:1

**integration** 32:17

**intelligence** 162:22 165:5

**intend** 49:4

**intended** 12:24 51:8 60:8,11 60:20 61:9 63:5

**intending** 146:12

**intent** 59:3,19 60:6,9,12,25 61:5,10 123:18 220:4 224:25 225:4 226:2,9 226:13,16

**intention** 123:23

**intentional** 58:15,24 62:19 63:14

**intentionality** 62:4,12,15,25 63:12

**intentionally** 61:14,25 63:3

**intentions** 59:10

**interact** 110:11 110:16 111:5 111:13

**interacted** 117:11

**interaction** 18:8 119:3

**interactions** 67:22

**interest** 68:24 100:19 118:19

**interested** 5:2 30:4,13 188:11 240:16

**interesting** 232:4

**interests** 119:9

**interfere** 6:20

**internal** 138:12

**internally** 144:12

**international** 33:12 71:16

**internet** 4:7

**interpret** 29:3 31:6 32:7 186:24 223:17

**interpretation** 47:9 73:5 95:24 231:1

**interpretations** 231:10

**interpreted** 32:3

**interpreting** 30:21 31:3 73:4 76:16 224:3,4

**interrupt** 22:13 27:10 86:13 92:12 117:9 151:4

**intertwine** 92:3

**interview** 59:2 59:6 78:1,5

**interviewed** 141:13

**interviews** 59:12,15

**introduce** 12:4 95:19 192:4 198:23

**introduced** 34:9 190:25 213:4

**introducing** 90:18 95:20 177:24 212:8

**introduction** 88:8

**introductions** 6:9

**investigate** 46:18 47:12

**investigated** 47:15

**investigation** 10:17

**invoice** 131:11 131:12,15,18 131:25 132:6,6 132:8 133:6

**invoices** 105:20 106:16

**involve** 17:5,6 17:24 20:6

John O'Brien

January 29, 2026

Brous v. Eligo Energy, LLC

**[involve - know]**

Page 33

26:2 32:20 33:3 40:16 42:4 47:8 55:24 64:2 77:16 98:13 189:10

**involved** 15:15 18:15 19:2,11 20:2,18 21:9 21:13 24:24 25:4 28:11 32:17 40:13 55:24 65:1 68:16 69:14 96:12 98:12 154:9 189:21 209:10

**involves** 64:15 70:24 78:22,24 78:24,25,25 189:3 206:25

**involving** 15:9 18:7 19:8 24:7 26:25 94:9 176:13 199:2 223:16

**ira** 1:4 4:15 74:15 78:2 140:18 141:2 141:10 142:20 241:3 242:1

**irrelevant** 94:22

**irrespective** 55:5 130:11 131:17

**iso** 159:25 160:2 166:24 168:15 184:6 185:12 198:8

**isolate** 94:21 95:12 219:7

**issue** 26:9 145:3 148:2

**issued** 49:18

**issues** 18:25 20:3 21:13 28:15 41:10 47:15 64:18 142:21

**issuing** 48:6 49:24

**item** 129:21 131:9 132:15 133:12 134:4

**j**

**january** 1:16 4:4 35:17 36:5 36:5 238:19 239:9 241:5 242:2

**japan** 196:18

**japanese** 33:25 191:2

**jargon** 30:4

**job** 1:25 238:4 241:5

**john** 1:15 3:3 3:12,12 4:13 6:1 114:18 238:20 239:8 240:8 241:4 242:2,25

**journals** 13:20

**judge** 23:22,23 30:6

**judged** 224:20

**judgment** 61:1 63:21 65:3 80:3 112:12 117:19 207:9 225:24 226:24

**judgments** 68:13 117:17 206:18

**judicial** 18:16 18:18,21 24:19 25:18

**judicially** 25:1

**june** 212:10 213:22

**jurisdiction** 87:16

**jury** 61:15

**k**

**keep** 238:1

**kelli** 4:24

**kellie** 1:22 239:6,19 240:6 240:23

**kept** 41:8

**kilowatt** 107:6 112:5,19,22 127:13,21 128:1,20,22 129:24,25 134:18 135:9 170:1,5

**kind** 72:12 122:1 126:10 145:2

**know** 6:25 7:4 7:16 8:22,23 9:5 22:14 25:4 25:16 26:10 35:12 50:13 62:24 66:10 68:12 72:15,20 81:12 83:5,10 90:14 104:14 107:10,22 109:7 122:8,8 124:7,7 131:12 132:14 133:10 133:11,17 142:16 143:11 144:3 168:13 170:19 172:6 175:16 190:20 190:22 196:1 196:14,17

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[know - legal]**

Page 34

197:16 201:23
201:23 212:20
215:22,22,23
215:24 217:19
235:23
**knowing** 58:15
58:24 62:19
63:15 144:23
210:18
**knowingly**
61:14,25
**knowledge**
7:21 13:4
71:11 155:14
**knowledgeable**
114:2
**known** 64:10
77:6 147:4
**knows** 113:17

**l**

**labeled** 101:21
**labels** 153:13
**laboratory**
40:10 75:11
76:3
**lack** 10:12
22:22 49:6,13
63:23 74:24
90:12 91:6
102:21 104:6
111:15 121:11
123:13,25
124:19 126:2

127:4 129:11
133:3 135:19
137:20 141:21
143:2 144:1
147:23 153:16
154:14 157:2
159:20 169:22
171:13 175:11
186:18 189:5
207:23 230:9
**laid** 75:24 81:9
**language** 30:5
58:15,16 63:20
93:13,22 98:2
100:1 122:2,10
122:17 123:4
128:24 134:12
163:1 165:4
213:9 214:7,10
214:19 215:7,9
215:13 236:23
237:6
**lapointe** 3:15
212:10 214:9
215:20 216:4
217:11,22
219:3 235:12
235:13,19
236:1
**lapointe's**
212:13,17
214:22,25
215:2 218:25
220:12 221:7

235:5
**large** 21:16
70:24 99:7
107:9,13
117:11 147:6
148:25 152:1
165:10 176:10
**largely** 142:15
165:25
**larger** 91:2
131:3 210:21
**largest** 34:4
**law** 18:24 30:6
32:4,7 47:9
62:8 63:6
103:10 223:18
225:13,16,21
**lawrence** 75:11
76:3
**laws** 28:21
**lawyer** 30:3
62:8
**lbl** 76:15
**lead** 79:1 174:3
**leadership**
214:1,6
**leading** 34:7
199:20 237:8
**leads** 147:8
224:1 226:8
**learned** 175:7
**learning**
155:21 227:10
227:15 228:8

228:11,13,15
229:3,20
**leasing** 166:13
**leave** 165:17
178:13,14
179:6,8 184:18
220:8
**leaving** 148:3
165:15
**leberte** 1:22
4:24 239:6,19
240:6,23
**led** 56:25 95:16
118:10
**left** 164:4,10
170:13
**legal** 2:20 4:22
4:25 9:21
23:17 24:15
26:5 32:6 45:5
47:7 48:6
55:16 61:17,19
61:20 62:7,22
63:8,16,16,18
66:24 68:8
88:12 115:18
115:19 125:2,7
125:24 141:24
144:5,16 145:3
201:1,4,5,21
208:11 210:1,3
210:7 211:24
223:13,15
224:3,23 225:7

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[legal - loss]**

Page 35

225:9,18 226:13,16,19 234:4 238:23 241:23

**legally** 62:18 142:10,13 225:4

**legislation** 29:1 29:1,4,6

**legislative** 27:22

**legislatively** 98:8

**legislature** 27:17 29:23

**legitimate** 228:17

**lengthy** 91:16 92:1 218:5

**letter** 136:3

**level** 18:24 28:16 41:4 52:18 76:25 77:13 88:19 89:1,7 96:21 97:13,18,18,19 152:2,14 166:14 169:24 198:22 205:2

**levels** 77:10,11 174:14

**liability** 223:13

**liable** 25:15

**license** 35:7 239:23

**licensed** 35:11

**lie** 124:10

**lied** 123:9

**lies** 69:5

**life** 71:11

**likely** 54:16

**limit** 172:7 174:25 175:1

**limited** 9:15 23:14,20,21 37:20 115:24 209:7

**line** 62:3 63:1 121:19 129:20 131:9 132:14 133:12 134:4 183:7,11,12 215:3,4 218:12 218:13 236:7,8 242:4,7,10,13 242:16,19

**lines** 215:17 218:1,12,13,18 221:5,6 235:20

**linking** 204:16

**liquidate** 184:20

**list** 13:10 50:24 51:8 121:17 130:18 213:3

**listed** 17:1 51:12 52:11

121:6 170:9 171:10 213:6

**listened** 130:7

**lists** 13:6 14:23

**literature** 78:11 80:4,15 147:4

**litigating** 21:19

**litigation** 12:21 13:15 15:2 16:1,6 18:13 20:3 21:14 145:2,7

**little** 24:12 27:12 58:20 107:24 114:16 124:21 134:14 139:14 141:6 144:18 156:9 178:20,20 234:16

**lives** 188:20

**llc** 1:9,9 4:16,16 241:4 242:1

**llp** 2:5,14

**load** 104:4 159:3,6,11,11

**lobbying** 29:22

**local** 19:2 129:8 132:6

**located** 129:18

**long** 34:15 53:10 95:11 153:1 171:5

178:13,14 179:7,8,9 181:21 184:6 199:18 200:17 214:17 217:13

**longer** 114:16

**longest** 165:1

**look** 67:10 68:19 74:2 77:3 85:3 97:1 112:1 124:6,11 129:13,16 160:1,5 161:25 162:8 172:13 191:1,2 193:4 193:4 197:17

**looked** 46:24 48:4 52:2 55:2 58:2,3 67:15 79:23 110:5 132:4 196:9 232:11

**looking** 47:18 52:17 59:9 60:6,7 69:16 130:9 132:19 190:18 191:17 191:20 215:6 228:12

**looks** 149:3

**lose** 184:13

**loss** 172:11 174:25 176:13 181:5 184:20

John O'Brien                                     January 29, 2026
Brous v. Eligo Energy, LLC

**[lost - market]**                                              Page 36

lost 151:4
lot 21:5 66:9
  67:7 68:12
  114:10 136:16
  156:20 165:6
  165:16 189:13
  220:25
loud 92:11
love 133:24
low 90:10
  92:21,21,24
  93:1,16 94:6
  94:10,17
  150:10 151:24
  152:11,16
  210:19
lower 88:21
  89:8 95:9 96:7
  96:17 97:3
  98:17 99:4
  100:8 107:25
  122:8 128:2
  133:14,14
  179:17 183:16
  202:11
lse 103:17,24
  104:11
lunch 114:7,24

          m

m 89:20
machine
  155:21 165:4
  227:10,15

228:8,11,13,15
229:3,20
made 25:5
  54:12 56:21
  113:16,25
  126:6,11
  153:23 182:2
  182:23,24
  184:3 200:9
  201:24 203:6
  206:2
maher 188:6,24
  188:25
mail 122:1,6,15
  123:1 124:7
mailer 120:11
  120:15 121:25
  122:1,7 124:15
maintain 150:7
maintained
  41:4
major 33:24
  34:21 67:3
  95:22
majority 26:22
  76:1
make 26:16
  27:11 30:24
  51:4,10 69:1,4
  77:5,19 82:18
  89:15 91:2
  93:6,6,13 97:1
  102:7 123:17
  126:14 131:2

134:13 139:14
141:5 142:9,13
180:25 183:3
187:22 189:17
198:13 200:12
214:12,13
216:1 219:8,9
221:3 223:11
236:6
maker 21:4
makes 7:25
  30:6 221:3
making 7:6
  27:16 29:10
  30:2 70:22
  152:4 192:2
  193:14 202:15
  207:9 219:3
  224:22 225:22
  226:19
management
  111:13 179:24
managing
  32:14 143:23
mandates
  103:4
manipulate
  199:11
manner 126:8
  152:18 175:14
  191:24
march 33:8
margin 38:4,13
  204:3,4

margins 111:23
  112:1
mark 12:4
  48:10 50:10
  53:12 90:18
  120:24
marked 11:13
  11:14 12:5
  48:12 50:18
  53:13 90:20
  121:2 178:1
  212:5,9
market 34:1
  36:16 37:24
  38:16 39:3,15
  39:17,25 42:11
  69:2,3,5,16,17
  69:22 70:3,6,9
  70:10,12,13,15
  70:17,18,18,19
  70:20 71:1,2,3
  71:5,6,9,12,13
  71:16,24,25
  72:1,3,4,6,15
  72:16,17 73:1
  73:13,13,14,17
  73:17 82:6,21
  84:15,19,23,25
  85:6,6,7,8,8,11
  85:17 86:1,4,6
  86:9,16 87:6
  88:18 90:2
  93:21 95:15
  96:16,24 97:16

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[market - meaningless]**

Page 37

97:16 99:5,6,7
99:11 106:23
109:21 114:2
116:1 121:25
135:11,14
136:11,14,15
138:4,5,17,20
139:2,3,7,19,21
139:23,24
140:1,6,6,20,21
156:9 160:2,11
163:19 166:11
166:19,24
167:5,20,20,25
168:1,5,7,12,13
168:15,17,18
169:3,4,4,6,13
170:15 171:2,2
171:4,7,10,16
171:17,25
172:1,15,18,24
172:25 173:20
174:12 175:9
175:10,14,22
175:23 176:14
177:6,15 180:5
180:8,13 181:6
181:8 182:3,25
183:3 184:19
186:12,24,25
187:1 188:15
189:14 190:24
195:3 196:3
197:2,2,3,3

198:18,18,20
198:25 199:3,4
199:7,8,12,18
199:18,20,23
200:4,10,15,16
205:5 228:12
228:17 229:6
229:10 230:7
230:12,15,16
230:23 231:12
231:17,18,23
232:18 236:14
236:25 237:1
**marketed**
36:13
**marketing** 34:6
34:17 38:5,6
38:17 40:24
41:16 122:1,7
122:7
**marketplace**
68:15 70:13,23
**marketplaces**
68:16
**markets** 34:9
34:10 35:1,6
35:20 38:23
41:5 69:23
73:2 82:16,23
82:25 85:18
87:11,15 88:3
89:3 97:18
111:20 138:24
176:9 188:17

189:20,25
190:19 197:13
197:21 198:4,6
198:12,24
199:23,24
200:8 231:20
**marks** 45:15,20
81:19,24 115:5
115:9 145:25
146:4 195:17
195:21 219:13
234:22 235:1
238:19
**marriage**
142:17
**mass** 37:24
106:23 116:1
**material** 55:4
209:9 216:20
**materially**
82:20
**materials** 10:3
10:6,9,16
13:14 46:9
50:24 121:6
158:3,6 234:9
**math** 107:8
**matt** 4:22
**matter** 4:14 8:6
9:15 14:24
23:1,11 47:18
55:24 57:1
65:1 69:4
133:22 142:10

144:12,16
170:11 172:18
223:18
**matters** 15:2
18:19 19:1,11
19:14 20:5,17
21:9 22:2 23:5
44:9,18 69:13
127:2 223:15
**matthew** 2:20
**maximize**
171:5
**mcinturff** 2:9
5:23 22:21
**meadows**
215:19
**mean** 28:22
31:17 37:17
52:4 56:16
62:16 69:6
72:18 73:23
76:9 86:12
106:5 114:8,9
117:8 131:16
131:25 136:15
139:3,18
140:21 175:17
178:22 184:15
185:15 200:22
201:9
**meaning** 140:6
202:2
**meaningless**
72:12

**[meanings - misleading]**                                    Page 38

**meanings** 138:22

**means** 73:23 85:15 108:1 132:8 185:13 186:23 203:8 211:19

**meant** 29:14 97:17 118:18 119:6 137:2 168:6 185:10 199:19 228:14

**measure** 163:21 187:14 211:13

**measured** 154:19 162:5 163:4

**measuring** 158:15

**mechanics** 17:7 17:25

**mechanism** 70:16,25 73:20 99:8 156:11 166:22,24 169:9 172:22 199:20 231:16

**mechanisms** 170:25

**media** 4:12 45:15,20 81:19 81:24 115:5,10 146:1,5 195:18

195:21 234:22 235:2 238:21

**medication** 6:19

**medium** 37:24

**meet** 28:1 102:19 103:6 191:7

**megawatt** 105:8 107:23 112:21 169:24 170:5

**members** 144:19

**memories** 34:18

**memory** 122:25 134:1,25 156:24 162:9

**mention** 24:19 216:19,20

**mentioned** 78:23 82:4 96:10 132:3 156:14

**mere** 229:1

**message** 123:2

**met** 10:21 98:25 102:13

**method** 59:19 60:5 65:9 67:9 67:19 75:8 76:18 80:11 192:24,25

214:16 215:23 217:12

**methodologies** 14:2 42:8

**methodology** 65:18 68:21 73:5 80:4,8 113:10 137:17 137:18 192:21 230:11

**methods** 17:3 42:11 77:16 232:21

**metric** 210:9

**michelle** 1:4 4:15 241:3 242:1

**mid** 38:18

**middle** 173:22 235:25

**midway** 54:19

**mike** 176:21 178:5

**mind** 11:11 124:6 226:3,16 235:4

**mine** 190:8

**minimal** 169:5 169:14

**minor** 161:13

**minute** 45:10 81:13 128:6 145:13 234:19

**minutes** 96:19 114:9 115:1,2 145:16,22 195:15 237:14

**mischaracteri...** 10:12 18:2 19:19 54:15 60:14 61:4 62:2,21 65:11 72:23 74:24 76:12 78:16 80:7 84:22 85:21 106:8 112:15 113:5 113:23 118:17 126:3 133:3 135:20 138:15 139:6 144:2 148:16 150:18 151:21 157:22 163:12 164:20 168:20 171:15 173:7,11 176:3 182:20 183:25 186:19 193:21 194:2,12 203:1 210:13 211:15 213:12 220:6 222:17 225:7 226:6 227:1 230:9 231:5

**misleading** 92:4 125:21 186:6

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[misnomer - muraina]**

Page 39

| | | | |
|---|---|---|---|
| **misnomer** 88:23 | 50:11 53:11 81:10 82:8,9 89:13 90:17 99:13 101:19 105:3 106:19 111:3 114:22 119:16 120:23 128:3 134:9 140:16,23,24 146:17 147:25 153:5 162:11 169:16 174:7 176:19,23 177:22 178:9 182:8 186:2 188:4,7 212:4 | 184:11 | 10:15 11:5,16 12:3,9 15:12 15:18 16:4 17:18 18:5,12 19:20 20:4,10 21:20 22:1,16 22:19,24 23:12 24:5,17 25:13 26:1,15 27:15 29:24 31:1,11 31:22 32:8,24 33:7 35:13 36:12 37:16 39:4,9,24 40:5 41:14,23 42:3 |
| **misquoted** 221:1,6 | | **monthly** 213:8 236:25 | |
| **misstated** 123:9 | | **months** 134:19 135:9 | |
| **misstates** 123:13 142:8 153:17 | | **moral** 63:21 65:2 | |
| **mistake** 126:6 126:11,12 | | **morality** 64:2 64:17 | |
| **mistaken** 123:1 124:9,10 | | **morning** 4:2 5:21 6:6,7,8 | |
| **mistakes** 126:11 | | **mother** 143:10 | |
| **misunderstood** 108:16 | | **motivations** 123:18 | 42:18 43:9,16 44:16 45:1,7,9 45:22 46:16 47:1,10,23 48:2,14 49:9 49:16,22 50:16 50:20 51:5 52:6,24 53:15 54:2,10,23 55:10 56:1,15 57:3,13,21 58:12 59:17,23 60:1,23 61:11 61:22 62:13 63:13 64:4 65:7,17 66:12 69:19 70:1 72:7 73:3,22 75:2 76:24 |
| **mix** 22:2 | **momentarily** 105:4 | **mountain** 147:1 | |
| **model** 34:7 108:9 146:20 146:22 147:20 158:20 190:2 194:10,16 204:15,16,23 219:17 | **monetary** 147:14 | **move** 11:12 74:8 88:13 200:20 | |
| | **money** 89:25 93:19 95:4 97:25 98:25 116:6 124:4 128:23 184:13 | **movements** 228:16 | |
| | | **moving** 10:2 16:16 27:5 35:15 43:17 162:1 213:19 223:8,10 | |
| **modeled** 108:17 | **monopoly** 100:18 192:1 | **multiple** 26:12 26:14,14 96:3 191:16 | |
| **modeling** 160:23 | **month** 28:3 134:22,22 135:10,10,14 135:14 136:9 175:6 179:13 180:23 181:2,8 181:16,17 | | |
| **models** 44:8,17 | | **multiplying** 169:20 | |
| **module** 82:3 114:14,16 | | **muraina** 2:16 3:4 5:11,12 6:5 8:20 9:1,8,20 | |
| **moment** 11:23 12:8 48:10,16 | | | |

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[muraina - need]**

Page 40

| | | | n |
|---|---|---|---|

78:12 79:7,13 79:19 80:1,19 81:16 82:1,2 83:11,16,21 84:2,13 85:10 86:7 88:1 89:10 90:16,22 91:10,20 92:15 92:17 93:11,14 95:1 97:22 98:19 100:7 101:13 102:24 103:16 104:9 105:2,19 106:4 106:13 108:8 108:15 109:13 110:9,15 111:1 111:8,21 112:10,24 113:9 114:4,6 114:13,22 115:2,12,23 116:14 117:1,5 117:14,21 118:12,21 119:10 120:8 120:22 121:4 121:14 123:21 124:13,23 125:14,19 126:15,21 127:10,18 128:9,13 129:7 130:3,21 131:4

131:6 133:16 134:6 135:24 138:2,10 139:1 139:10,16 140:14 141:7,8 142:2,22 143:4 143:14,21 144:7 145:5,12 145:21 146:7 147:10,19 148:5,10,18 150:20 151:13 152:21 153:19 157:6 158:1,12 158:19 159:1 159:10,17 160:4,9,14,19 161:8,16 162:1 162:3,10,15 163:20 164:8 164:14 165:12 166:3,17 167:3 167:12 168:4 168:16 170:16 171:8,20 173:2 174:5 175:20 176:15 177:21 178:3,24 179:4 181:9 182:6 183:5,20 184:22 185:3 185:14,22 186:22 187:13 188:2 190:12

192:17 193:23 194:8,14,19 195:12,14,24 201:8,14 202:1 202:14 203:3 203:14,19 204:1,8,14,22 205:3,11,20 206:4,12 207:3 207:11,19 208:1,6,17,24 209:5,11,18 210:8 211:3,10 211:22 212:7 213:13,18 216:22 217:20 218:22 220:1 220:10,17 221:4,12,19 222:3,9,20 223:1 224:7,13 225:1,14 226:1 226:12,21 227:6,24 228:24 229:18 230:4,13,24 231:8 232:3,15 233:1,8,12 234:7,14 237:8 237:13,21 238:13

**n**  3:1
**name**  4:21 5:11 5:13,21 26:24 33:17 145:10 196:1,11
**named**  78:1 227:8,14 228:6
**narrow**  20:14 42:22
**national**  40:10 76:3 150:4 199:14
**nations**  190:6
**natural**  24:8,10 34:4 36:13 39:14,17,25 71:20 114:15 188:18 197:10 197:11 199:25 199:25 200:1,6 200:8,10
**nature**  100:17 150:22 229:10
**ne**  2:14
**nearly**  199:15
**necessarily** 51:23 212:16
**necessary** 187:22
**need**  7:2 60:10 82:18 91:9 102:25 199:6

214:10 238:1,2
238:3,4,14,15
**needed** 5:20
97:13
**negatively**
172:14
**negligible**
106:22 112:12
113:1,12,20
**negotiated**
154:1,8
**negotiating**
210:6
**negotiation**
150:23
**never** 24:4
29:22 133:6
141:13,15
155:12 186:20
**new** 1:1 2:6,10
2:10 4:18
10:17 30:15,20
31:2,7,15,24,25
54:25 66:10
83:2,6 87:11
87:12,15,16
88:3,3 89:19
90:1 102:19
103:4,9 106:11
106:22 118:5
133:8 138:20
144:25 159:24
160:2 166:24
168:15 185:12

190:14,21
192:22 198:8
223:21,24
224:9,15
**nine** 27:25
**nods** 7:8
**normal** 65:6
67:7 76:22
77:23 116:22
169:11 170:25
187:11 188:1
199:19
**normalization**
77:6
**normalize** 77:7
**normalized**
80:23
**normally**
103:14 166:8
167:11
**normative** 65:4
65:6 78:25
206:18 210:1
**north** 2:6
**notary** 239:7
239:19 240:23
**note** 4:4 128:18
134:16 140:19
145:18 241:10
**notes** 240:11
**notice** 161:19
162:25 163:10
163:13,25
164:16 165:2

165:10
**noticed** 163:25
**noticing** 5:8
**noting** 213:4
**nuclear** 32:18
**number** 4:18
11:14 13:7
14:23 20:11
45:16,21 48:12
50:18 53:13
68:22 70:14,24
75:9,22 77:20
81:19,25 85:1
90:20 99:7
112:8,23 115:6
115:10 116:21
117:11 121:2
130:18 146:1,5
147:6 149:19
171:16 178:1
195:18,21
211:21 212:5
231:21 234:23
235:2 238:21
238:21
**numerous**
29:12 62:10
79:1 91:18
189:9,16 191:7
191:12 193:12
**ny** 1:9 4:16
**nygats** 103:15
104:4

**nyiso** 168:18
177:6,7,14
180:9,9
**nyserda** 105:7
105:12

**o**

**o'brien** 1:15
3:3,12,12 4:13
6:1,8 9:2 11:12
13:6 45:23
53:18 115:13
146:8 151:3
195:25 218:11
223:11 235:10
238:21 239:8
240:8 241:4
242:2,25
**o'brien's**
123:15
**oath** 6:13 59:7
60:19 62:11
175:3 239:1
**object** 43:1
83:7 120:19
121:10 183:18
213:11 216:16
221:9
**objected** 43:4
**objecting**
208:12
**objection** 7:25
8:17,23 9:6,18
10:11 11:2

**[objection - october]**

| | | | |
|---|---|---|---|
| 15:11,17 16:2 | 94:13 96:5 | 164:6,12,19 | 227:21 228:9 |
| 17:16 18:1,10 | 98:5 100:15 | 165:23 166:6 | 229:14,22 |
| 19:18 20:7 | 102:21 103:11 | 166:20 167:6 | 230:8,17 231:4 |
| 21:11,24 22:22 | 104:6,23 | 167:16 168:8 | 232:9,19 233:6 |
| 23:16 24:14 | 105:17 106:2,7 | 168:19 169:21 | 234:3,11 237:8 |
| 25:11,23 26:13 | 107:18 108:12 | 170:20 171:13 | **objections** 5:3 |
| 29:18 30:23 | 108:20 110:2 | 173:6 175:11 | 56:19 71:7 |
| 31:9,19 32:5 | 110:19 111:6 | 176:2 177:17 | 79:16 111:24 |
| 32:22 33:5 | 111:15 112:14 | 180:20 181:14 | 143:8 160:7,17 |
| 35:9 37:14 | 113:4,22 | 182:19 183:24 | 161:11 171:24 |
| 38:25 39:6,20 | 115:17 116:12 | 184:25 185:7 | 194:17 205:1 |
| 40:3 41:1,1,18 | 116:19 117:4,9 | 185:19 186:18 | 208:4,10 |
| 42:1,15 43:14 | 117:18 118:8 | 187:2,16 189:5 | 222:23 231:14 |
| 44:10 45:4 | 118:16,25 | 192:13 193:20 | **objective** 96:6 |
| 46:14,19 47:6 | 120:6 123:12 | 194:1,11,23 | 150:15 157:5 |
| 47:14 48:1 | 123:25 124:18 | 200:25 201:20 | 164:24 175:4 |
| 49:5,12,20 | 125:17 126:2 | 202:6,25 | **objectives** |
| 51:2 52:1,22 | 127:3,15 129:3 | 203:11,17,22 | 156:7 194:6 |
| 53:25 54:5,14 | 129:10 130:14 | 204:5,11,19 | **obligated** 149:2 |
| 55:7,15 56:12 | 133:2,20 | 205:7,15,24 | **obligation** |
| 57:7,24 59:13 | 135:19 137:20 | 206:9,19 207:7 | 152:17 |
| 59:21 60:13 | 138:7,14 139:5 | 207:16,22 | **observed** 159:2 |
| 61:3,16 62:1 | 140:10 141:21 | 208:21 209:2,8 | 160:10 161:2 |
| 62:20 63:23 | 142:7 143:1,18 | 209:15 210:2 | 161:10 205:5 |
| 65:5,10 66:7 | 144:1,10 145:8 | 210:11 211:6 | **obtain** 38:3 |
| 66:16 68:7 | 146:25 147:16 | 211:14 213:16 | **obvious** 215:7 |
| 69:9,24 72:22 | 147:23 148:8 | 217:18 218:19 | **occurred** 36:19 |
| 73:7 74:23 | 148:15 150:17 | 219:23 220:5 | 40:6,24 41:17 |
| 76:11 78:8,15 | 151:20 153:16 | 220:14,21 | 135:16 |
| 79:10,22 80:6 | 157:2,21 158:8 | 221:25 222:5 | **occurs** 28:25 |
| 83:14,19,24 | 158:16,23 | 222:16 223:23 | 210:22 |
| 84:10,21 85:20 | 159:7,15 | 224:10,17 | **october** 54:18 |
| 87:14 88:11 | 160:12 161:4 | 225:6,17 226:5 | 177:10 178:5 |
| 90:12 91:6,15 | 162:6 163:11 | 226:18,25 | |

**[offensive - orders]**

Page 43

**offensive** 144:18

**offer** 9:11,21 46:12 49:4 93:3 94:16 99:19 101:4,24 125:10,15 144:16

**offered** 24:11 109:15,23 115:25 126:24 128:2 133:14

**offering** 45:2 49:10 94:20 116:9 128:22 193:17,24 202:23

**offerings** 92:24 94:7,19 95:22 99:21 104:2

**official** 239:11

**offs** 70:21

**oh** 156:6 233:15

**oil** 32:14 71:16 74:6 188:18 197:7

**okay** 19:4 48:9 50:4 56:8 83:1 90:17 94:2 97:23 99:12 114:13,17 115:1,24 121:21 123:22

128:11 134:7 134:15 137:10 145:6 150:14 150:21 156:13 163:21 179:2,5 180:16 235:7 235:18

**omuraina** 2:16

**once** 28:3 152:15

**ones** 103:15

**open** 177:5 180:8

**opened** 90:2 93:21 96:1,2

**operate** 34:21 175:15 199:21

**operated** 37:5 39:14 155:12

**operates** 158:7

**operating** 83:2 83:5 175:4

**operation** 34:18

**operations** 17:15 28:13 102:1 106:23

**opine** 69:21 123:20,23 143:13 144:5 223:15

**opined** 64:11

**opining** 224:8 225:20

**opinion** 45:3 48:6 65:21 67:19 76:25 94:24 115:24 116:1,3,4,9 144:14,16 148:6 158:11 175:7 190:8 191:13,14,15 191:16 192:9 194:6 201:4,24 202:24 204:2 224:15 225:21 232:1

**opinions** 9:11 9:14,16,22 10:25 24:11 46:12 49:4,10 50:25 51:14,22 53:4 54:11,20 54:22 55:5,12 80:2 101:24 115:13 116:16 117:15,22 118:1 125:10 125:15 143:16 143:24 146:12 212:14 223:12 226:22

**opportunities** 66:18,20 85:24 88:16 95:15 96:11

**opportunity** 221:20

**opposed** 23:6 25:9 28:12 37:19 62:18 65:9 67:24 69:16 154:2 169:25 174:1 186:25 205:6 208:15 218:24 225:4 231:11

**opposing** 59:10

**order** 3:14 14:6 60:11 81:1 89:20,21 90:6 90:9,25 91:4 91:14,16,17,22 91:23,24 92:1 92:2,6,18 93:23 94:8,15 94:22 95:3,6 95:11,13,16,18 95:24 97:12,13 97:19 104:20 108:3 116:5 129:17 142:24 143:6 164:25 170:19 175:5 184:12 227:15 232:22 238:12

**ordering** 241:15

**orders** 118:6,9 118:10 237:24

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[organizational - paragraph]**

Page 44

**organizational**
46:22 47:21
52:15 227:5
**organizations**
79:5
**originally**
88:17
**outcome** 5:2
234:2
**outcomes** 161:2
194:21 204:17
205:13
**outliers** 77:20
**outlined** 211:20
**outside** 35:9
56:20 57:8
59:19 60:6
61:16 62:21
68:7,17 69:5,9
83:8 84:10
94:22 108:21
110:19 111:16
113:23 117:6
118:16 120:17
120:20 123:14
124:1,18 126:4
127:3 129:3,10
130:14 133:21
138:16 143:1
143:18 144:10
145:9 158:9,16
160:13 161:4
165:23 166:6
166:20 167:7

167:16 168:9
169:21 173:6
173:10 180:21
181:14 182:19
183:19 184:1
184:25 185:8
185:19 194:23
201:1,20 202:6
203:12 204:5
204:20 205:8
205:16,24
206:20 207:8
207:17,23
208:22 209:16
210:12 222:16
225:18 226:7
228:2 230:10
232:10,20
234:4
**overall** 41:5
110:22 219:2
**overcharge**
203:4
**overpricing**
201:7
**overriding** 64:3
**oversight** 73:9
78:24
**owe** 100:19
**own** 52:12,19
65:9 78:14
80:14 92:10
97:9 102:4,12
145:11 218:24

220:3
**oyinka** 2:16
5:11

**p**

**p.m.** 1:17 115:5
115:9 145:25
146:4 151:8,11
195:17,20
234:22 235:1
237:16,19
238:18,25
**package** 135:17
135:21
**page** 12:13
82:11 89:12,14
89:24 90:24
91:12 93:11,25
99:15 102:3,14
106:20,21
119:15,21
121:18,19,24
122:4 128:17
130:23 134:8
134:10,13
136:1,12,17
140:17,25
141:1 146:17
146:18 148:11
148:12 153:6
162:16 174:9
176:20,24
178:10,19,25
179:1 181:11

182:18 183:6,7
183:12,12,22
185:6 186:5
188:8,10
212:18 213:2
213:19,25
215:2,4,16
217:11,21
218:12,13,13
219:20 220:4
220:12 221:11
235:5,13
236:11,20
237:4 242:4,7
242:10,13,16
242:19
**pages** 95:11
101:17 153:4
218:8 235:6
240:8
**paid** 105:16
107:17 147:22
202:3,4 203:9
203:16,21
208:20 232:7,8
232:11
**pair** 58:10
**palikovic** 2:9
5:23
**paper** 74:6
236:18 238:6
238:15
**paragraph**
100:5 106:21

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[paragraph - perspective]**

Page 45

122:21
**parameters**
215:25 235:23
235:24
**paraphrasing**
62:16
**pardon** 60:16
84:5 125:5
128:4
**parent's** 143:23
**parents** 142:1
142:11 144:20
**part** 10:14
23:19 36:10
40:4 42:14
65:4 75:25
92:9,14 93:10
93:11 94:8,14
94:21,22 95:21
154:21 158:10
158:11 163:13
177:12 198:15
209:19 214:5
216:20 217:7,8
218:4 225:16
227:7
**parted** 169:7
**partially**
138:16
**participants**
4:7 29:15
189:4
**particular** 94:8
94:14 113:20

116:10 119:12
129:20 134:4
144:17 157:8
163:25 190:4
190:18 219:19
234:1
**particularly**
76:21 151:23
152:12 166:9
183:1 198:19
**parties** 4:11
29:13 149:5,6
149:8,24
185:11 211:17
240:14,15
241:15
**partner** 32:14
**parts** 92:2
95:12 221:1
**party** 5:1 30:3
30:4,13 59:10
116:7 210:16
210:17,18,18
211:1
**party's** 56:10
56:17 228:3
**passages** 216:5
216:9 217:17
**passed** 29:23
**past** 198:2
**patterns**
135:12,15
**pay** 41:12
109:24 130:19

147:21 208:19
227:16 229:8
**paying** 127:13
127:20 128:1
128:20 129:17
**pearson** 2:5
5:15
**peer** 13:10,16
13:17,20,22
14:1 51:17
79:4 80:15,17
**penalties**
242:22
**pending** 7:3
57:20 201:13
**people** 76:16
77:13 98:25
164:23 188:11
190:17 197:13
198:12,13
**perceive** 140:4
**perceives**
139:20
**percent** 16:3,8
22:11 109:23
159:25
**percentage**
15:24 16:5
22:9 104:4
108:10,18
**percentages**
19:23
**perform** 41:4
49:17 54:24

74:20 75:3
107:1 152:17
160:20,24
169:19 194:9
194:15
**performed**
49:25 76:8
109:2 110:7
**period** 37:6
39:1 41:22
66:15 105:1
**perjury** 242:22
**permeates**
199:24
**permission**
92:23 93:3
**personal** 15:25
188:12,19
197:18
**personally** 15:5
15:9 18:7 59:2
78:5 116:22
164:13 239:8
**personnel** 56:6
56:25 59:3,12
59:16 62:6
155:15 157:24
161:21 163:6,7
164:22 174:22
175:3 194:4
230:21
**perspective**
210:5

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[petition - precise]**

Page 46

**petition** 92:22
  93:2
**ph.d.** 193:3
**phase** 97:21
**phenomenon**
  193:13
**philosophical**
  64:8
**philosophy**
  64:9
**phone** 123:2
  124:8 131:13
  132:2,12
  134:20
**phrase** 163:13
  201:10 216:4
  235:14 236:2
**phrases** 139:3
  219:21
**phrasing** 220:3
**piece** 88:13,17
  89:5 92:3,5
  96:14
**pilot** 37:20
**pinpoint** 165:7
**place** 4:10 86:2
  129:16 145:1
  189:13
**plains** 2:6
**plaintiff** 5:24
  46:24 51:11
  78:1,2 119:13
  141:2 228:23

**plaintiffs** 1:7
  2:4 5:16 10:21
  11:6 22:5,7,10
  22:11 26:7
  45:24 46:3,4,5
  46:10,13,18
  47:4,8,12,24
  56:3 227:8,14
  228:7 233:3,9
  233:13,18,20
**plan** 135:8
**plane** 152:4
**play** 133:24
**players** 199:2
**pleadings** 53:2
**please** 4:4 5:3
  10:5 27:11
  28:7 31:21
  33:17 35:25
  42:22 45:21
  81:13,25 82:10
  82:14 89:15
  91:2 115:10
  120:3 131:3
  139:15 141:6
  146:6 151:11
  156:6 171:19
  195:23 216:23
  229:16 235:3,5
  235:7 236:23
  237:20 238:5
  241:12
**plenty** 52:2

**plus** 139:20
  140:2,9 195:4
  229:24
**point** 6:24 7:2
  21:21 41:7,13
  66:23 107:25
  148:2 170:7
  190:4 191:14
  192:11 196:10
  213:22 216:13
  219:8 221:3
  236:11
**pointed** 133:13
**points** 66:25
  184:16 219:1,3
**policies** 29:5
**policy** 17:2,14
  27:16 28:11
  89:25 93:19
  96:3 97:25
  98:1,2,4 99:22
  100:13,22,23
  117:24 118:3,6
  118:13,18
  119:5,8
**pool** 52:10
  67:11,12 75:13
  75:16 77:4
  78:19,20 81:1
  116:23,24
  117:6
**portion** 90:8
  92:18 95:19
  146:9 178:11

  227:20
**position** 123:22
  179:10 184:21
  220:24
**possible** 93:17
  161:18 162:23
  162:24 163:9
  163:15 164:16
  164:25 165:1,8
**possibly** 210:23
  221:15
**potential** 85:14
  99:22
**power** 32:12
  33:18,25 34:17
  35:2,8 36:6,13
  36:24 89:2
  104:20 112:4
  168:21 177:4
  177:14 180:2,5
  180:7 199:8,12
  199:18 200:10
**powerful**
  210:18,21
**practices** 31:7
  31:18 32:1
  146:10,13,24
  148:13 185:6
  228:2,6
**pre** 212:24
**preceded** 95:14
  200:6,7
**precise** 138:1

Veritext Legal Solutions

800.808.4958

770.343.9696

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[predatory - pricing]**

Page 47

**predatory**
  146:19,23
  147:3
**predicting**
  170:23
**predominant**
  174:23
**predominantly**
  75:23
**prefer** 88:23
  91:12
**prep** 10:2
**preparation**
  10:4,7,24
  52:20 121:7
**prepare** 10:22
  81:10
**prepared** 12:17
  13:14 48:25
**present** 2:19
  5:5
**presented**
  17:10 47:16
  48:5 55:21
  57:17 153:25
**president** 14:8
  33:9 36:6 37:2
  39:11
**presume** 81:3
**presumption**
  80:16 113:25
  180:25
**pretty** 63:1
  196:4 197:12

**previously**
  127:1
**price** 68:22
  70:16,17 71:1
  71:2,3,17,18,19
  71:25 72:9,14
  72:15,16 73:14
  73:18,20 74:3
  74:5 83:23
  84:24 85:3,5
  85:25 86:1,5,5
  86:9,14,16
  87:18,19 94:16
  94:19,20 96:17
  97:3 98:7 99:4
  99:6,6,6,9,9,10
  99:11 101:7
  106:11 107:6,9
  107:11,21
  108:2,3 109:5
  109:21,21
  126:23 127:2
  128:2 132:16
  132:16 133:14
  136:15 137:24
  138:5 139:3,19
  139:24 140:21
  147:5 152:25
  156:10 158:21
  162:18 163:22
  163:25 165:3,8
  165:11,18,22
  166:11,23,25
  166:25 167:25

168:1,5,7,14,18
168:23 169:3
169:13 170:3,9
170:12,13,19
171:12 172:21
173:5,12,14,15
173:16 174:11
174:16 175:5,6
175:9 177:6,7
177:15 180:9
180:10,24
181:3,18,20,23
183:1,2 184:10
184:11,11,13
186:7 195:10
197:7,8,9,11
198:9,10,16
199:11,20
200:1,4,12
203:15,20,23
203:24 205:2
205:23 208:15
222:4 227:10
227:16 228:8
228:16,21
229:6,7 230:15
231:3,21,23
232:22 237:2,3
**price's** 168:7
**priced** 105:9
**prices** 17:10,20
  41:11 72:10
  73:6,24,25
  74:2 86:2,15

87:21 88:21
89:6,9 95:10
96:8 105:12,15
106:10 107:17
107:22 108:25
109:1 113:7
122:9 155:22
158:15 159:3
159:13 160:11
160:11,15,16
160:22,25
161:15 163:19
164:3,9 166:19
167:5 170:4
172:4 173:19
175:23 179:17
180:3,17
183:15 188:15
197:25 204:23
205:4 208:19
208:25 209:1
229:2 230:6,15
230:20,22
231:11 232:11
232:17
**pricing** 13:18
  28:13,14 66:21
  66:22 70:7
  71:14 72:4
  73:17 85:8,8
  85:25 89:2
  102:1 105:6,7
  109:15 111:22
  126:17,22

135:12,15
136:13,14,19
136:22,24
137:3,17 138:4
138:12,12,18
139:2,8,21,24
140:5,6,18,19
140:20 141:16
146:9,12,24
147:3,5,21
148:3,6,13
150:15 151:16
154:9 155:1,4
156:9 161:2,10
162:18 165:20
165:21,25
166:4,8,15,18
166:22 167:4
167:13 169:9
169:18 170:25
171:23 172:10
172:22 173:3,4
175:25 176:6
186:12,12,24
186:25 188:13
188:15 193:25
194:21 197:3
198:18,19,20
198:25 199:3,4
199:23 200:16
204:17 205:9
205:13 207:21
208:2,8 213:6
214:1,7,10,15

214:16 215:8,9
215:23 216:8
216:14,19
217:6,8,12
220:3 222:7
228:1,5,12
229:11 230:11
231:16 232:25
237:1
**primarily**
40:25 41:17
88:8 98:11
172:3
**primary** 15:21
15:23 98:16,17
99:3 101:10
**principal** 35:16
43:7 66:20
96:6,6 100:23
170:22
**principally**
51:20 65:13
87:21 155:15
165:17
**principle** 64:3
65:14 96:13
148:24
**principles**
64:16 65:13
**prior** 44:8,17
121:20 122:5
129:2 130:5,10
132:10

**priorities** 68:14
**privilege** 23:10
**probability**
158:21
**probably** 15:20
16:3,8 19:6,12
19:25 22:11
26:18 80:24
88:23 109:9
135:2 189:22
218:7
**problem** 207:2
216:24 231:15
**procedure**
193:5 241:24
241:24
**proceed** 5:17
45:9,21 81:25
82:3 115:11
146:6 151:12
195:23 235:3
237:20
**proceeding** 5:3
30:2 66:19,24
66:24 88:16
92:21,22 95:9
95:14,16,18
199:2,14
**proceedings**
4:1 18:21
93:16
**process** 28:24
29:10,11 56:9
57:5 58:5,9

77:7 96:9,22
97:20 147:8
207:21 208:2,8
208:18 209:6,7
214:8
**processes** 57:15
57:22 58:4
78:25 118:10
138:12 157:20
**procured**
181:25
**procurement**
176:20 185:5
**produced**
12:20 132:13
156:16,18,19
239:22,23
**producer**
200:10
**producing**
87:22
**product** 11:4
23:9 93:5,7
95:3,22 98:22
99:2,19,21
109:24 165:25
166:1 188:14
**production**
61:7,8 200:12
**products** 93:4
94:12 99:16,24
100:14 104:2
**professional**
12:24 13:7

Case 1:24-cv-01260-ER   Document 381-2   Filed 03/16/26   Page 292 of 315

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

[professional - qualifications]

Page 49

42:14 44:24 80:3 117:16,19 117:19 200:18

**professor** 16:16 16:18,21,24 74:18

**profit** 165:1 166:14 167:1 173:16 174:13 174:14 181:1 183:3 192:3 204:3

**profitability** 38:14 171:5

**profits** 100:18 168:25

**program** 68:19 68:20 162:22 165:5 175:4 199:6

**programs** 37:20

**project** 228:16

**promised** 202:10 228:3

**promotion** 99:24 100:14

**prompt** 179:13 180:23 181:2 184:11

**promulgation** 28:21,22,24 29:9

**propensity** 172:20

**proposed** 30:5 149:23

**propositions** 214:21

**proprietary** 155:1,4

**protect** 192:1

**protection** 90:10 93:17 94:10

**protections** 39:18 40:1

**protocol** 67:15

**provide** 20:17 61:20 92:23,25 155:25 190:5

**provided** 46:10 47:19 54:17 58:6 62:11 105:25 106:15 152:25 176:10

**provides** 14:25 21:2 86:23 87:2

**providing** 147:11

**psc** 87:12 95:18 98:7 177:19

**psc's** 109:4

**psychology** 41:25

**public** 16:18 17:2 19:2 27:3 27:20 29:12,13 30:16 31:8,15 33:23 47:22 64:14,18 68:20 68:24 87:16,18 88:4 89:19 90:1 96:2 98:21 100:13 100:17,19,19 101:11 118:6 118:19 182:1 239:7,19 240:23

**publications** 13:11,19 105:13

**published** 13:16,22 29:8

**publishing** 13:25

**pull** 219:4 236:19

**pump** 71:14

**purchase** 102:19,25 104:3 106:16 116:7 142:21 170:2 180:4 181:2 184:12 185:11 188:14

**purchased** 101:8 104:19

159:23 177:4 177:14 179:12 180:1,7

**purchases** 102:13 105:21 108:24 110:4 167:1 182:2,23 184:4,5

**purchasing** 159:24 166:12 182:24 188:11

**pure** 69:16

**purport** 192:12

**purpose** 157:5 164:24

**pursued** 64:20 160:3

**push** 145:19

**put** 20:11 30:7 59:10 67:11 75:13 78:19 99:3 108:6 137:25 166:13 169:23 170:4,8 170:13 179:9 181:1 237:23 238:11

**putting** 58:8 158:7 235:4

**q**

**qualifications** 9:11 12:25 109:18

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[qualified - rates]**

Page 50

**qualified** 61:24 187:20

**qualify** 93:1 104:20

**qualitative** 195:2

**qualitatively** 84:25

**quality** 4:6,6

**quantification** 211:7

**quantified** 148:7 164:17

**quantify** 204:9 211:4 222:10 223:3

**quantitative** 64:7 107:1 158:14 195:1 232:16

**quantitatively** 231:11

**quantities** 176:11,12

**quantity** 170:3 170:10 175:18 175:18 176:9

**quarter** 182:11

**question** 7:3,15 8:2,5,9 9:3 21:12 23:25 25:12 26:6 28:6 30:24 35:5 39:23

42:22,23 43:5 43:8 44:2,15 56:14 57:20 61:9 87:24 110:14 120:3 120:13 121:20 123:19 124:6 125:2,7,8 130:17 137:10 143:3,20 144:4 144:6,17,21 145:14 149:17 149:18 161:7 170:8 171:19 175:19 193:22 201:6,12 202:21 204:21 207:25 211:20 221:15 224:12 227:12,23 229:16 230:3

**questioned** 194:5

**questioning** 62:3 63:2

**questionnaire** 187:20

**questions** 6:21 6:25 7:19 9:10 14:5 20:1 62:12,15 92:13 95:13 121:22 234:14,17 237:10,22

**quite** 117:10 150:6 165:2 195:6

**quotation** 90:5 219:12

**quotations** 235:11 237:4

**quote** 38:3 58:20,21 89:19 90:15 92:19 94:14 105:6 112:12 122:14 135:11 146:23 161:18 162:23 162:23 163:8,9 174:10 180:6 186:6 214:2,11 214:14 216:4 216:14,15 217:13,14,15 217:23,23 235:14 236:1 236:12,13

**quoted** 93:10 219:21

**quotes** 62:17 122:5 161:24 162:7 218:17 219:8,16,19 221:1 235:12

**quoting** 90:9

**r**

**r** 242:3,3

**raise** 172:8,12 197:24

**raises** 144:17

**ramsey** 142:23 143:5,22 144:8 145:6

**randy** 145:10

**range** 107:23 119:7 215:8

**rate** 87:20 94:6 132:5 134:17 134:22 135:8,8 135:11,14 136:8 146:10 152:24 161:19 162:23,24 163:9,16 164:16 169:20 170:18 171:11 171:22 174:17 175:22 180:18 180:23 181:12 181:12,16 182:10,12,13 183:8,10,14 184:8,8,9 185:16,17 213:7 214:16

**rates** 98:9,10 100:24 101:12 162:21 174:20

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[rates - recognized]**

Page 51

212:24 217:22 231:25 236:12 236:24,24

**rather** 7:7 17:14 24:25 61:21 80:4 86:24 92:5 114:19 154:18 168:25 169:5 230:23

**reach** 81:2 107:2 190:7,10 191:3 220:3 234:9

**reached** 67:18 191:4

**reactions** 75:16

**read** 5:18 38:8 54:16,22 56:7 58:9 62:24 63:9 71:16 82:14 89:18 91:9,25 92:8,8 92:10,11,16 93:10,11 122:21 123:7 135:4,25 140:1 161:23 163:17 170:21 178:16 178:18,23 181:21 188:9 191:11 205:18 213:13 215:4 215:17 216:3

217:1,6 218:6 218:18 219:10 219:11 227:19 227:20 235:18 235:19 236:22 241:8 242:23

**readable** 102:10

**reader** 113:11 185:4

**readers** 219:13

**reading** 27:12 38:2 56:24 62:10 64:25 76:5 93:9 94:23 131:25 140:2 180:25 183:4 214:5 218:5 220:7 221:16

**reads** 74:6

**ready** 215:5

**real** 177:7,15 180:3,10,24 182:3

**realize** 7:14 123:1

**realized** 180:17

**really** 26:6 34:7 64:2,18 71:2 75:25 76:1 77:13 86:3 100:21 144:21 148:1 152:3

154:17 168:13 182:22 193:12

**reason** 23:20 150:2 152:13 162:19 227:9 227:14 228:7 228:22 241:10 242:6,9,12,15 242:18,21

**reasonable** 60:21 65:20,22 66:1,6 68:4,5 69:8,21 70:15 80:18 85:16 87:19 98:9,9 100:24 101:12 105:6 109:8 112:3 115:15 115:20,22 149:4,19 150:1 150:13 166:14 166:22 170:12 173:15 181:1 196:2 204:3 226:22 234:8 241:18

**reasonably** 186:11 188:15

**reasons** 75:23 165:16

**rebuttal** 50:1,5

**rec** 101:16 102:13 103:18 105:5,21,24

106:6,9,10,14 107:5,16 108:10,18,25 109:17,25 110:11,16 111:4,12,22 112:5,11 113:7 113:12,19

**recall** 8:10,12 33:21 34:15,16 42:17 53:5,8 54:8 121:13 127:24 129:12 129:22 130:6,9 216:7 217:19 235:10 236:15

**recalling** 130:7

**receipt** 241:17

**receive** 124:8 184:10

**received** 122:6 122:15 123:10 124:7 135:17 164:21

**receiving** 120:10,15 124:15 132:25

**recent** 14:6

**recently** 19:6 41:10

**recognize** 12:12

**recognized** 103:9

John O'Brien

January 29, 2026

Brous v. Eligo Energy, LLC

**[recognizes - regulator]**

Page 52

**recognizes**
99:18
**recollection**
8:22 9:5
121:16 123:19
**recommendat...**
28:12 30:13
**record** 4:3,11
5:7 7:6 12:6
45:14,19 81:18
81:23 115:4,9
122:21 123:8
126:14 128:8
145:25 146:4
151:5,8,9,11
195:17 223:11
234:21 235:1
237:16,19,24
238:12,17,18
240:10
**recorded** 4:9
4:13 124:16
**recording** 4:6
4:10 132:4
134:11 135:1,5
135:6,7
**recoveries**
24:20 25:18,20
**recovery** 32:14
**recs** 102:19,25
103:8,9,14,17
103:19,20,24
103:25 104:3
104:11,11,17

104:18,19,22
105:1,7,8
106:17,22
107:21 108:24
110:5,5 112:7
113:19 159:22
168:22,23
**redeposits**
131:23
**redlines** 55:2
**reduction** 21:3
**refer** 18:18
67:21 69:22
71:5 80:21
82:23 89:20
90:24 91:21
161:24 168:7
196:24 201:10
202:2,3
**reference**
154:13 213:20
237:5
**referenced**
104:18 136:25
175:21 197:15
241:7
**references**
28:20
**referred** 86:9
157:7
**referring** 20:25
22:17 36:9
73:17 82:24,25
91:1 122:14

128:9 132:5,8
136:22 150:25
151:1 152:23
155:20 162:16
168:5 181:7
201:10,16
202:15,16,17
202:18 211:24
219:20
**refers** 38:10,13
88:8 188:24
**reflect** 80:24
100:25 218:23
219:1,14
232:25
**reflected** 72:9
**reflecting**
105:21
**reflection** 72:5
**reflective**
168:11
**reflects** 65:3
72:17 137:7,13
149:25
**refresh** 8:21
9:4 121:15
**regard** 33:24
34:8 41:5 76:6
123:18 152:2,4
153:25 172:4
211:18 228:21
241:19
**regarding** 78:2
99:15 121:20

164:15 196:10
233:19
**regardless**
72:14
**regression**
43:24 44:3,6
160:20,24
**regulated**
21:23 25:21
34:9 68:16
69:17 87:17
88:18 89:2
96:25 189:20
191:21,23,23
197:13
**regulating** 34:1
**regulation**
28:21 30:9
40:14 87:12
88:4,9 98:7
224:25 225:13
225:23
**regulations**
29:4,7,13,25
30:5 31:3 87:9
95:20 131:20
223:21,24
224:1,3,5,9,16
224:19,21,24
225:3,5,15
**regulative**
131:21
**regulator** 9:25
29:5 30:21

| | | | |
|---|---|---|---|
| 31:3 173:22 | **relative** 137:25 | **remotely** 4:21 | 49:3,11,18,24 |
| **regulator's** | 240:13,14 | 5:5 | 50:1,1,3,5,6 |
| 175:1 | **relaying** 62:17 | **remove** 94:3 | 52:20 53:2 |
| **regulators** | **relevant** 144:22 | 211:1 | 54:3,7,9,17,17 |
| 35:12 41:9 | 196:21 217:9 | **render** 67:19 | 55:18,19 56:20 |
| 172:9,13 192:2 | **reliance** 53:1 | **renewable** | 57:9 58:8,14 |
| **regulatory** 9:25 | 177:12 | 99:16,23 | 58:23 62:9,22 |
| 18:20 19:8,17 | **relied** 51:20 | 100:14 101:18 | 63:20 65:21,25 |
| 21:13 27:23 | 53:2 78:21 | 101:22,25 | 68:8 69:21 |
| 29:2,3,11 30:1 | 156:14,25 | 102:6,20 103:4 | 70:2 74:10,11 |
| 30:10 38:22 | 157:14,23 | 104:2,4 109:24 | 76:10 81:7 |
| 47:19 66:24 | 172:2 212:3 | 112:17 | 82:9,12 83:9 |
| 73:9 88:14 | **rely** 10:19 | **repeat** 9:3 10:5 | 86:19 87:2 |
| 89:5 96:14 | 51:13,15,21 | 28:6 31:21 | 89:12,22 90:24 |
| 117:23 118:2,9 | 59:5 67:9 | 35:4,25 44:15 | 91:1,22 93:22 |
| 118:10,13,18 | 73:20 117:23 | 58:19 84:5 | 94:18,23 97:7 |
| 118:22 119:5 | 118:2,5 156:16 | 87:1,24 111:7 | 101:17,21 |
| 198:5 199:2,5 | 157:19 177:9 | 120:2 127:16 | 102:16 104:10 |
| 199:14 209:19 | 192:12 209:19 | 137:10 143:3 | 104:18,21,25 |
| 225:11 | **relying** 54:12 | 155:2 161:7 | 108:21 111:17 |
| **reinterpreting** | 59:7 | 164:7 171:19 | 113:10,15,18 |
| 210:25 | **remain** 54:11 | 193:11,22 | 113:24 119:16 |
| **rejected** 24:11 | 87:12 108:2 | 227:12 | 120:12,17 |
| **rejecting** | **remains** 39:3 | **rephrase** 15:6 | 121:8 123:15 |
| 228:22 | **remember** 8:8 | 15:13 46:1 | 124:19 125:20 |
| **related** 4:25 | 8:14,14 87:23 | 47:2 157:11 | 126:5 127:4,11 |
| 17:17 25:20 | 129:5 130:1 | 211:11 229:16 | 127:22 128:18 |
| 26:20,22 31:4 | 132:20 156:22 | **replace** 129:24 | 129:11 130:4 |
| 62:14 99:24 | 156:22 212:16 | **replicable** | 130:15,24 |
| 111:19 159:18 | 235:16 | 194:9,15 | 134:9,10 |
| 160:5 168:18 | **remembered** | **report** 3:12 | 136:12,25 |
| **relates** 16:6 | 124:3 | 9:16,17 10:10 | 138:16 140:17 |
| **relationship** | **remote** 2:2 | 30:8,8 35:10 | 141:1,18 145:9 |
| 158:20 232:17 | | 48:19,22,25 | 146:9,11,15 |

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[report - retail]**

Page 54

148:11,12,20
153:5 155:20
155:25 156:7
157:16 158:9
158:11,17
161:5,17,24
162:8,8 165:24
166:7 167:7,17
168:10 169:22
173:10 174:6,9
176:1,21
177:20 180:21
181:15 182:18
182:20 183:6
184:2,23 185:1
185:2,9,20
186:3,19
192:20,24,25
194:24 197:15
200:7,7 201:2
202:7 203:12
204:6,9,20,25
205:10,21,25
206:6,20 207:8
207:12,17,20
208:7,13,22
209:16,22
210:12 211:15
212:4,18,23
213:14 218:14
219:13,17,21
221:16,21
222:13,17
223:3 225:19

226:7 232:10
232:13,14,20
233:17,19
234:5 236:17
236:20 240:7
**reported** 1:21
51:11 80:15
**reporter** 4:24
5:9 239:6
240:1
**reporting** 76:6
**reports** 41:9
76:13 77:22
80:20 93:7
177:20
**represent** 5:16
24:22 95:13
121:16 128:17
**representative**
108:25 128:21
129:18 133:12
133:25 169:10
**representing**
4:22 41:21
129:8 131:14
190:13
**requested**
100:21 240:10
**require** 107:13
108:5 119:3
**required** 8:1
65:15 92:22
93:2,5 97:5
103:3,6 104:3

104:19
**requirement**
8:24 92:20
102:5,5,12
**requirements**
102:20 103:5
108:3
**reread** 91:25
**reregulated**
87:8,9
**reregulation**
88:24
**resale** 177:5
180:7 195:9
**research** 14:1
17:3 40:13
42:11 75:13
80:10,10
**researchers**
16:14
**reserve** 5:18
**reserved** 61:15
**reset** 3:14
91:23,24
**residential**
14:20 32:21
33:4 35:23
36:2,17 37:13
37:19,22 41:11
67:23,25 76:21
190:22 192:22
**residents** 82:17
85:2

**resold** 166:2
**resources** 24:8
24:10
**respect** 20:16
25:8 42:19
47:11 73:4
126:18 140:18
144:9 186:1
228:5
**responded**
123:3
**response** 89:4
97:15 140:6
174:11 213:8
214:3 216:9,15
217:23 236:12
236:25 237:5,6
**rest** 39:10
100:4,4 178:23
**restructure**
198:5
**restructuring**
35:20 37:6
**result** 24:1
64:19 67:1
88:21 98:10
119:4 163:16
163:17
**results** 43:8
**retail** 13:17
14:17 15:10,16
17:6,15,24
18:8 21:8 28:5
28:9,12,14

35:3,8 36:16 37:10,12 38:7 38:23 39:15 40:17,24 41:16 70:3,9,13,18 71:6,9,13 72:16 73:19 82:6,16,23 84:25 85:1,6 85:11,17 86:6 87:11,15 88:2 88:8,14 89:6 90:1 93:20 95:25 96:2 97:13,18 106:11 151:24 152:12 160:11 177:5 180:8 186:25 192:4 192:22 195:10 203:24

**retailer** 73:6
**retailers** 86:11
**retained** 22:3,5 22:20 45:23 46:2,7 233:3,9 233:13 238:22
**retire** 104:3
**return** 134:7 214:24
**returned** 241:17
**returning** 151:14

**revealed** 127:12,20 128:19
**review** 5:18 46:9 47:16 53:6 105:20,24 106:6,14,16 117:16 127:11 127:19 128:18 140:22 212:15 240:9 241:8
**reviewed** 10:3 10:6 13:10,16 13:17,20,22 14:1 48:22 51:17 53:23 79:4 80:15,17 121:6,8,12 212:13 226:8
**reviewing** 8:21 9:4 54:4 234:8
**reviews** 13:16
**revise** 54:3
**rewrite** 215:14
**rg&e** 131:8,10 131:18,25 132:1,5,8,8,16 132:17,20 134:4
**riesdorph** 2:20 4:22
**right** 5:18 20:11 53:11 80:16 90:23

133:24 173:9 185:23
**rights** 136:5
**rigorous** 77:16 80:11 116:24
**rises** 198:9
**rising** 197:25
**risk** 111:13 179:24
**risks** 160:5
**rochester** 129:14 131:8 132:25
**rocket** 112:23
**role** 14:10 15:4 15:9 16:16 18:7,13 27:17 28:4,8,11 32:11,20,25 33:3,15 35:15 35:16,19,23 36:2 40:9,10 40:13 142:5,20 143:22 145:7 233:25
**roles** 13:7
**roll** 114:21
**rough** 238:14
**roughly** 129:25
**rule** 29:10 30:2 73:5 241:24,24
**rules** 29:8 96:15 210:21 210:23 241:18

**ruling** 8:5
**run** 107:20 191:24
**running** 67:3 164:23
**runs** 168:15
**rush** 238:4

**s**

**s** 3:9 242:3
**sale** 15:10,15 68:14 172:11
**sales** 147:8
**sample** 187:19 189:10
**samples** 43:7 190:14
**sampling** 42:8 75:12
**sandler** 3:15 176:22 178:6 178:12 179:5 182:14 183:13
**sands** 32:14
**saudi** 189:4 192:21
**save** 95:4 98:15 98:25 100:9 116:6 128:23
**saving** 89:24 93:18 97:25 98:7 101:2 124:4

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[savings - section]**

Page 56

**savings** 92:20
92:24 93:4,18
94:21
**saw** 176:5
179:14,20
**saying** 69:6
75:3 170:17
174:24 177:13
179:2 180:12
180:13,15
181:17,21
182:24 191:15
196:25
**says** 53:22 60:8
60:20 63:5
121:21 131:18
134:4 139:21
153:12 180:22
184:4 216:14
216:21 217:12
218:7 236:11
**scale** 37:13,17
**scana** 26:25
**scheme** 110:23
**scholarly** 51:16
64:1
**scholars** 64:10
**schuster** 1:5
3:14 4:15
119:13,15,22
120:9,14,25
122:14,16,19
122:23 123:8
126:18,23,24

128:21,23
131:24 132:4
132:24 134:16
135:17 136:3,7
162:20,24
163:10 241:3
242:1
**schuster's**
121:5,20 122:5
123:23 127:12
127:19 128:19
129:1 131:1
133:18
**science** 78:22
112:23
**scientific** 59:18
60:5 67:6,8,10
78:21 80:11
117:10 147:2,7
187:5,24 193:2
227:4
**scientifically**
75:10 76:20
77:6,17 79:2,3
187:7 189:10
193:9
**scientist** 40:11
193:3
**scientists** 51:18
**scope** 23:14
35:10 56:20
57:8 61:17
62:21 68:8
69:10 83:8

84:11 108:21
110:20 111:16
113:24 118:17
120:17,20
123:14 124:1
124:19 126:5
127:4 129:4,11
130:15 133:21
138:16 143:2
143:19 144:11
145:9 158:9,17
160:13 161:5
165:24 166:7
166:21 167:7
167:17 168:9
169:22 170:2
173:7,10
180:21 181:15
182:20 183:19
184:1 185:1,8
185:20 188:1
193:1 194:24
201:1,21 202:7
203:12 204:6
204:20 205:8
205:16,25
206:20 207:8
207:17,23
208:22 209:16
210:12 222:17
223:12 225:18
226:7 228:2
230:10 232:10
232:20 234:4

**screen** 4:9
11:25 12:1,2
22:14 48:15,17
50:9,14 53:16
53:17 55:11
86:18 89:13
90:23 99:12
101:20 105:4
111:2 119:18
122:2,10
128:14 146:18
162:12 174:8
176:24 177:1
178:7 186:4
212:11,22
215:1
**screened** 77:4
**scroll** 36:9
139:8 235:7
**seal** 239:11
**search** 85:3
**second** 3:13
53:6,20 54:4
54:16,21,22
55:1,6 153:8
**secondly**
111:25 144:23
152:15
**section** 18:14
32:4,9 45:10
91:1 97:7
101:21 105:5
146:11,15
186:10 212:23

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[sections - set]**

Page 57

**sections** 114:25 218:6

**security** 150:4

**see** 11:17,19 12:10 48:17 50:23 51:7 53:17 71:14,18 71:19 79:20 80:14 82:11,13 85:18 88:20 89:8 93:22,24 95:9 96:7 97:1 97:20 100:1,3 119:19 122:2 122:10,17 123:4 128:15 128:24 129:17 129:20 131:4,7 131:8 134:12 134:13 139:8 139:12,13 146:18 163:1,2 172:21 176:25 178:7,11 179:5 179:11,15,19 182:15 188:21 189:1 197:8,21 200:4 212:11 212:25 213:9 213:19,23 214:19 217:25 236:10

**seek** 8:5 52:12 85:24 116:4

**seeking** 52:14 86:15 221:17

**seems** 8:25 114:10 143:11 215:6 216:18

**seen** 4:8 81:4 112:16 133:6 177:4 213:4

**segments** 156:23

**select** 81:1

**selected** 43:7 75:13 81:2 220:2

**selecting** 82:19

**sell** 14:16 73:12 109:18 129:23 172:6 173:21 174:25 176:12 199:17,19 200:14

**seller** 70:22 148:25 149:1 149:21 150:10 151:25 152:10 152:14 154:3 171:1 174:1 184:18 199:17

**sellers** 70:14,25 99:8 199:7 231:22

**selling** 15:5 28:4,8 32:20 33:3,23 35:22

36:1 37:10,12 40:16,19,19,23 41:15 97:6,8 104:20 197:11

**send** 238:6

**sends** 130:13

**sense** 20:14 63:16 73:2 85:7,12,13,18 93:13 97:1 203:7

**sensitivity** 163:22

**sent** 135:22 136:2

**sentence** 100:4 102:14 198:15 198:15

**sentences** 219:4

**separate** 27:19 29:8 58:9 153:20 154:20

**separately** 104:21 207:12

**september** 48:20 54:19

**sequence** 147:8 202:20

**serve** 93:18 182:10 183:8,9

**served** 27:7 30:20 31:2 32:13 33:9 36:6 37:2,18

37:24 39:11 40:10 127:1

**service** 17:2 19:4,15 20:23 27:20 28:17 30:16 31:8,15 36:16 37:10,13 87:17,18 88:4 89:19 90:1 93:1 95:5 96:3 98:21 99:20 100:13 101:11 118:6 131:10 136:4 137:23 139:13 142:25 143:7,10 163:15 166:10 167:19 172:21 172:24 182:1 184:17 185:16 185:17 216:12 217:9 229:10 232:2,23

**serviced** 130:20

**services** 99:25 100:8 174:17

**serving** 15:25 106:23

**sessions** 10:24

**set** 29:8 34:5,21 62:23 85:14 96:15 103:13 107:10 116:23 155:22 161:14

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[set - son]**

Page 58

163:18 173:12
183:2 190:1
214:1 216:8,14
217:23 229:1
232:13 235:22
236:12
**sets** 89:5
173:16 212:24
**setting** 80:13
146:10 172:4
173:14 174:18
214:15
**settlement** 25:9
27:1
**settlements**
25:1,3,5,6
**seven** 66:14
235:2 238:22
**several** 13:12
64:10 103:19
170:9
**shaded** 214:5
**shale** 32:14
**share** 12:1,7
81:11 89:13
101:19 119:16
119:18 128:14
140:22 174:7
176:24 215:1
**shared** 12:2
116:16 202:23
221:23 228:1
**sharing** 11:25
12:1 22:15

48:15 50:9,14
50:14,17 52:25
55:11 82:8
86:17 90:18,23
96:1 99:12
103:7 105:3
106:18 111:2
120:23 123:6
140:16 146:18
162:11 169:15
177:23 178:4
186:3,4 188:4
212:21,22
223:8
**sharp** 222:7
**she'd** 145:17
**sheet** 241:11,13
**shopping** 86:14
**short** 179:13
**shorthand**
239:6
**shortly** 11:13
119:17
**show** 11:13
48:10 50:10
53:12 76:15
79:23 120:24
147:8 208:18
212:20 236:17
**showed** 77:10
235:6
**showing** 221:11
**side** 73:19
150:5 152:9,11

**sides** 149:11
152:4
**sign** 241:12
**signature**
239:19 240:23
**signed** 241:21
**silently** 215:4
**similar** 55:24
58:16 190:6
196:17
**similarly** 1:6
76:5
**simple** 107:7,8
107:14 108:4
109:11 113:16
189:19 220:25
229:24
**simplistic**
114:1
**simply** 12:13
57:1 64:25
169:23 171:3
190:21
**single** 26:12,22
154:21 163:18
191:13,15
**sir** 192:18
**sit** 19:24
122:21 133:17
217:3
**sitting** 40:22,22
157:17 192:16
221:16 232:5

**situated** 1:6
**situation**
184:16
**six** 195:22
234:23
**size** 178:18
**skip** 209:20
**skipping** 12:6
35:16,17
**small** 27:13
37:24 88:13,17
89:5,7 94:8
95:19 96:14
97:18 176:12
178:17 188:12
**smaller** 210:19
**social** 17:3
51:18 78:22
147:2,7 187:5
187:24 193:3
227:4
**sold** 41:21
73:10 175:6
**solely** 98:11
171:5
**solutions** 4:23
4:25 238:23
241:23
**somebody**
63:10 197:5
**somewhat**
188:16
**son** 143:5

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[sophistication - statement]**

Page 59

**sophistication** 74:15

**sorry** 10:5 16:23 22:12 27:10 28:6 29:19 32:23 35:4,25 36:8 39:22 44:1,25 45:25 46:1 49:6,12,13 79:17 84:5 86:12 87:1 92:12 93:8 100:3 117:8,25 119:7 121:7,24 125:12 126:19 128:11 143:20 151:4 155:2 164:7 173:9 196:21 206:23 209:6 227:18 233:5,11

**sort** 184:6

**source** 15:22 155:17

**sources** 102:6

**southern** 1:1 4:18

**spain** 33:19 34:3,4

**speak** 78:1

**speaking** 20:2 28:25 35:11 107:22

**specific** 21:22 24:2 69:12,20 86:24 94:5 106:9 108:23 110:4 113:2 119:4 130:23 138:22 146:17 156:25 157:9 161:24 162:7 218:11 219:4 224:19 230:19 232:6

**specifically** 10:18 17:8,22 18:4 20:6,16 21:6,7,23,25 25:21 28:20 31:18,24 37:23 52:8 53:9 57:14 58:23 65:19 74:15 80:22 81:7 89:8 90:10 92:18 101:16 104:12 111:19 119:14 126:23 187:22 197:1 218:12 219:20

**specification** 156:1

**specificity** 91:18

**specifics** 51:6

**specify** 137:18

**spectrum** 21:17

**speculative** 8:25

**speed** 114:24

**spirit** 224:25 225:4

**spite** 172:23

**spoke** 67:6

**spot** 177:7 180:3,10

**spouse** 142:19

**spouses** 142:12

**staff** 93:6,7 177:20 182:2

**stakes** 149:20

**stand** 112:9

**standard** 67:17 77:18 151:17 151:22,23 193:7 211:12

**standpoint** 184:9 211:19

**start** 6:8 64:9 93:12 114:14 162:21

**started** 66:19

**starting** 64:12 96:10 188:10 215:3

**starts** 64:9

**state** 5:3,6 18:15,24 21:23 24:8 25:21

35:1,6 95:2,3 99:23 102:3 105:6 106:12 106:21 107:14 108:17 127:11 136:13,19 137:3 138:20 161:17 162:17 177:3 186:11 213:25 217:11 223:24 226:3 226:16 239:2,7 239:20 240:3 240:24

**stated** 17:23 61:5 63:4 82:5 105:10 120:10 120:15 131:10 132:24 135:5,7 140:5 161:21 161:22 163:8 172:10 175:2 193:16 204:2 210:23 212:3 217:15,21,22 217:25 220:19 220:24 224:14 232:1 242:23

**statement** 38:10 58:18 61:9 64:23 99:17 102:16 126:9,13 137:7 137:11 142:9

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[statement - subsequent]**

Page 60

155:11 162:4 162:17 163:3 164:15,17 172:23 177:9 180:6,11 181:10 182:17 183:21 184:3 185:6 186:15 187:22 192:12 234:6

**statements** 13:2 63:25 117:24 118:3 154:20 157:23 194:4 218:4,23

**states** 1:1 4:17 14:9 16:17 27:6 32:13 34:13 37:1,23 38:2 53:2 89:4 97:15 189:11 189:19 190:3 192:8

**stating** 130:22 132:23 137:16 139:2 221:17

**station** 71:14 72:2,10,14,20 72:25 73:11 74:1 97:9 195:6 197:6

**stations** 72:11 73:10

**statistical** 67:13 77:18 80:12

**statistically** 80:17

**statisticians** 16:14

**statute** 29:23 225:13 241:19

**statutes** 29:17 29:20,22

**stayed** 164:4,10

**steer** 29:5

**stem** 54:22

**stems** 149:13

**stenographic** 240:11

**stenographic...** 1:21 240:7

**step** 67:21 179:22

**sticking** 191:20

**stipulated** 223:7

**stone** 35:16,17

**stop** 50:9 52:25 55:11 73:11 86:17 90:18 96:1 103:7 106:18 111:2 120:23 123:6 140:16 169:15 177:22 186:2 188:4 212:21

223:8

**stoppage** 41:6

**stopped** 50:16 52:17

**straightforward** 108:7 109:12 149:2

**strains** 68:11

**strategies** 135:12,16 160:2 215:9 216:20 217:7,8

**strategy** 215:8

**street** 2:14 191:25

**stressful** 123:20

**strict** 96:15

**strong** 64:21

**structure** 39:17 96:14 105:6 172:10

**studied** 76:15 80:23 192:7

**studies** 42:20 51:21 52:3,7 52:20 67:16 75:9 76:4,15 76:20 77:15 79:4,4,23 80:25 147:2,7 187:5 189:9,13 190:6,9,23 191:1,2,2,12,16

193:1,4,13 196:9,17,21 197:15 227:4

**study** 43:12 75:11,20 76:16 77:10 79:18 80:21 81:4 189:3,7 190:4 190:9,14,21 191:13,16 192:11 193:5 193:10 196:1,4 196:6,13,15,15 212:1 227:7

**subject** 14:23 23:1 25:16 52:10 55:24 67:11,12,12 69:4 75:16 76:14 77:4,18 78:19 87:12,16 88:3,18 96:24 116:23,23,24 190:17

**subjects** 67:14 75:10 76:5

**submit** 5:19 30:5 93:5

**submitted** 30:12

**submitting** 233:17

**subsequent** 28:25

Case 1:24-cv-01260-ER    Document 381-2    Filed 03/16/26    Page 304 of 315

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

[substantially - tariff]

Page 61

**substantially**
  38:24
**substitute**
  68:13
**substituted**
  156:10
**successfully**
  92:19
**suffer** 200:23
  201:17 223:5
**suffered** 207:5
  209:13
**sufficiently**
  23:24 174:16
**suggest** 30:8
  131:16 209:22
**suggested**
  241:16
**suggesting** 87:6
  119:5 130:17
**suggestions**
  47:8
**suite** 2:15
**sum** 161:1
**summarize**
  78:6 193:16
  221:23
**summary** 136:4
**supplement**
  54:3
**supplier** 21:23
  129:2,9 130:5
  130:10,12
  131:18 132:1

133:18 184:12
**suppliers** 21:7
  25:22 73:24
  82:20 84:19
  89:8 127:6
**supply** 14:20
  21:8 35:2,7
  39:12 132:5,20
  132:25 134:5
  180:14 181:7
  182:13 184:18
  198:6,11
  199:10
**supplying**
  132:9
**support** 15:2
  16:7 146:12
  180:6,10 188:6
  221:7
**supporting**
  46:13
**supposed** 174:2
**sure** 11:24
  45:12 51:6
  52:4 56:14
  67:5 77:5,19
  81:15 82:11
  89:16 91:3
  95:7 102:8
  124:5,20
  129:15 138:18
  138:21 139:22
  141:7 148:1
  162:1 200:9

202:15 223:11
  235:21
**surprised**
  71:18,19 197:8
  197:10
**surprising**
  197:23
**surrounding**
  47:15
**surrounds**
  90:15
**survey** 16:14
  42:7,13,17
  56:22 66:1
  67:6,6,8 78:20
  80:14,18
  186:16 187:18
**surveyed** 78:10
  186:20 187:19
**surveys** 42:20
  42:24 51:25
  52:2,3,5,8 66:3
  67:10 78:7,10
  80:14 116:17
  116:21
**swap** 184:12
**swaps** 169:14
  180:14 181:5
  181:19
**swearing** 5:8
**switch** 128:23
**sworn** 6:2,11
  59:5 126:1
  194:4 239:10

**system** 103:15
  155:1,4
**systems** 155:22

**t**

**t** 3:9 242:3,3
**tailor** 214:7
**take** 4:10 17:13
  45:10 68:11
  81:12 88:17
  92:5 94:18
  114:23 145:12
  145:17,19
  166:23 172:11
  179:22 181:4
  185:4 189:13
  192:25 220:23
  228:25 234:16
  238:15
**taken** 4:13
  18:23 45:17
  66:25 81:21
  115:7 145:23
  146:2 195:19
  234:24 237:17
**takes** 173:4
**talk** 44:20 67:5
  84:24 152:7
  162:7 171:17
**talking** 20:19
  70:19 84:25
  126:7 139:7
**tariff** 130:20

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[taught - testimony]**

Page 62

| | | | |
|---|---|---|---|
| **taught** 64:22 | 88:7,22,24,24 | 217:14 219:14 | 61:4,17 62:2 |
| **taxes** 237:2 | 134:21 136:9 | 229:10 232:2 | 62:17,21 65:11 |
| **teach** 17:9,19 | 136:13,19,22 | 232:23 238:3 | 69:10 74:24 |
| 44:7 51:21 | 136:24 137:3 | **test** 14:1 56:2 | 76:12 78:16 |
| 52:16 | 140:18,19 | 66:4 70:8 71:4 | 80:7 84:18,22 |
| **teaching** 16:17 | 151:14 152:22 | 79:21 97:14 | 85:16,21 91:19 |
| 17:13 55:23 | 155:19 162:18 | 111:22 113:11 | 106:8 110:20 |
| **teaser** 147:5 | 165:1 171:5 | 113:19 159:2 | 112:9,15 113:5 |
| **technical** | 178:13 179:7 | 160:10 161:1,9 | 113:23 118:17 |
| 155:25 157:19 | 179:13 181:21 | 162:9 163:24 | 119:11 121:21 |
| 193:17,24 | 184:6 196:3 | 165:13 186:23 | 122:5,20,22 |
| **technically** | 197:2 198:18 | 194:20 205:4 | 123:11,13,24 |
| 86:4 | 198:20,25 | 205:12 230:14 | 124:2 126:1,4 |
| **techniques** | 199:22 200:17 | **testable** 80:4,8 | 132:10 133:3 |
| 38:5,17 | 201:11 211:23 | **tested** 67:14 | 135:20 138:15 |
| **technologies** | 211:24,25 | 167:2 193:6 | 139:6 140:8 |
| 15:1 21:2 | 213:6 226:13 | 205:21 | 142:8 144:2,11 |
| 32:18 | **terminate** | **testified** 6:3 | 148:16 149:10 |
| **technology** | 163:14 172:21 | 26:9 31:15,23 | 150:18,21 |
| 4:21 101:3 | 184:17 | 175:3 187:3 | 151:21 153:17 |
| **tell** 52:17 | **terminated** | 195:3 | 155:22 156:8 |
| 118:22 145:11 | 41:13 | **testify** 9:24 | 156:15,23,25 |
| **telling** 60:21 | **terminology** | 23:24 26:4 | 157:8,14,22 |
| 207:1 | 82:7 199:24 | 44:22 | 161:12,21 |
| **tenet** 148:21 | **terms** 58:14,23 | **testifying** 6:15 | 163:5,7,12,17 |
| **tenets** 67:12 | 62:7 63:15 | 23:7,13 44:14 | 164:20,22 |
| **tens** 83:12 | 66:22 87:18 | 44:21 63:6,7,8 | 166:18,21 |
| **tenured** 16:21 | 109:20 112:8 | 63:9 201:5 | 168:17,20 |
| 16:24 | 136:3 137:2,22 | **testimony** 6:11 | 170:21 171:15 |
| **terepka** 2:14 | 139:13 149:2 | 6:14 10:12 | 172:2 173:4,7 |
| **term** 20:13 | 166:10 167:19 | 11:7 16:6 18:2 | 173:8,11 |
| 63:14 65:19 | 172:24 206:13 | 19:19 23:15,20 | 174:19,22 |
| 73:4,17 85:11 | 214:2,15,18 | 24:1,3 54:15 | 176:3,10,21 |
| 85:12 87:5 | 216:12 217:9 | 59:5 60:14 | 177:11 179:23 |

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[testimony - time]**

Page 63

| | | | |
|---|---|---|---|
| 182:7,21 | 36:10 40:21 | **think** 68:11,25 | **threshold** |
| 183:19 184:1,4 | 45:8,13 50:8 | 69:3 70:12 | 150:15 |
| 187:4 193:19 | 50:17 58:13 | 72:4 85:22 | **thursday** 1:16 |
| 193:21 194:2 | 81:5,16,17 | 86:3,4 93:25 | **tie** 198:1 |
| 194:12 197:5 | 82:1,22 86:17 | 95:12 114:6,23 | **tier** 103:17,24 |
| 201:21 203:1 | 91:11 100:6 | 124:4 129:14 | 104:11,17 |
| 205:18 207:23 | 101:14 106:18 | 144:22 147:25 | 105:7 |
| 210:13 212:18 | 115:3 123:6 | 166:16 169:5 | **time** 5:4 27:12 |
| 213:12 214:22 | 131:5 136:6 | 170:7 175:13 | 34:17 37:9 |
| 214:25 216:3 | 154:23 162:13 | 178:22 196:4 | 38:24 39:1,18 |
| 216:14,25 | 176:18 185:24 | 201:6 205:17 | 40:1,18 41:22 |
| 217:8 218:8 | 188:3 195:13 | 215:8 219:7 | 45:14,19 49:15 |
| 219:22 220:2,6 | 214:24 215:15 | 224:12 234:17 | 51:10 53:10 |
| 220:12,20 | 223:8 233:2 | **third** 19:3,6,14 | 54:7 55:3 |
| 221:8 222:18 | 234:14,20 | 19:16 116:7 | 66:23 75:21 |
| 225:2,8 226:6 | 237:11 238:9 | 153:10 154:3,4 | 76:16,21 77:24 |
| 227:1 228:6 | 238:23 | 154:11 185:11 | 81:18,23 91:9 |
| 230:9 231:5 | **thing** 46:24 | **thought** 23:22 | 115:4,9 122:24 |
| 235:16 238:20 | 82:5 108:4 | 50:16 93:9 | 122:24 129:2,9 |
| 241:8,17 | 139:4 150:8 | 108:6 109:9 | 132:9 133:9 |
| **testing** 56:11 | 170:12 177:20 | 150:19 208:14 | 145:25 146:4 |
| 56:18 117:3 | 191:17 196:16 | **thousand** | 151:8,11 167:5 |
| 158:2,6,6 | 200:9 217:6 | 199:15 | 170:10,18 |
| 205:9 230:6 | 219:11 229:8 | **thousands** | 171:11,22,25 |
| 231:2,11 | **things** 29:21 | 37:18,22 84:4 | 175:9,16,17,21 |
| **text** 90:14 | 47:16 51:21 | 84:8 197:20 | 177:7,15 |
| 119:19 123:7 | 63:12 68:22 | **three** 38:5 | 178:13,18 |
| 128:15 135:4 | 97:21 100:20 | 81:25 95:22 | 179:7 180:3,10 |
| 135:25 136:16 | 101:5 137:23 | 112:20 115:6 | 182:3 195:17 |
| 176:25 | 138:1 139:25 | 134:19 135:9 | 195:20 215:12 |
| **thank** 5:9 6:18 | 170:9,11 176:6 | 136:9 137:23 | 215:12 219:11 |
| 7:23 11:10,23 | 187:21 197:4 | 138:1 153:7,13 | 233:11,22 |
| 12:3 22:17 | 210:20 235:25 | 154:17 | 234:21 235:1 |
| 27:14 35:14 | | | 237:12,16,19 |

John O'Brien

January 29, 2026

Brous v. Eligo Energy, LLC

**[time - turning]**

Page 64

| | | | |
|---|---|---|---|
| 237:25 238:14 | **total** 108:10,19 | **transactional** | 153:3 198:19 |
| **times** 22:20 | 238:21 | 105:21 211:19 | 240:10 242:23 |
| 29:21 31:14,23 | **touch** 116:15 | **transactions** | **truth** 60:22 |
| 61:6 211:21 | **touching** | 69:12,15 70:15 | 153:2 207:1 |
| **timing** 54:8 | 156:13 | 70:25 142:16 | **truthfully** 6:22 |
| **title** 12:13 | **toukabri** 188:6 | **transcript** 3:14 | 7:20 |
| 50:23 91:12 | 188:24,25 | 3:15,15 5:19 | **try** 14:5 80:14 |
| 196:13 | 190:14 | 120:25 121:5 | **trying** 124:21 |
| **titled** 105:5 | **towards** 97:17 | 124:12 212:3 | 187:8 219:16 |
| 212:23 | 223:10 | 212:10 215:2 | 220:8 221:3 |
| **today** 6:10,14 | **tpv** 215:10 | 216:17 218:2 | **turn** 65:18 |
| 6:21 9:9,22 | 216:19 | 221:10 237:24 | 69:20 81:6 |
| 10:7,21 39:19 | **trade** 17:2 | 238:3,8 240:9 | 101:15 119:11 |
| 40:2,22,22 | **traditional** | 240:10 241:7 | 121:18 130:22 |
| 122:22 133:17 | 142:15 173:17 | 241:20 | 146:8 176:19 |
| 173:8,11 197:5 | **training** 41:25 | **transcripts** | 184:20 185:25 |
| 211:21 232:5 | 42:4,7,10 | 157:9 241:14 | 186:3 195:25 |
| **today's** 10:2,18 | 43:19,24 44:3 | **transition** | 212:2 215:16 |
| 48:22 197:25 | **traits** 228:20 | 189:19 | 229:25 |
| 238:20 | **transaction** | **transparency** | **turned** 172:22 |
| **together** 58:8 | 65:16 68:23 | 153:8 231:2,10 | 202:12 |
| 78:19 137:25 | 70:22 105:18 | **transportation** | **turning** 18:13 |
| 142:16 | 135:22 139:20 | 136:14 138:5 | 22:2 24:18 |
| **tokyo** 33:18,24 | 142:14 147:9 | 138:19 139:22 | 36:23 53:1 |
| 189:24 | 149:23 150:1,3 | 140:20 172:25 | 86:19 89:12,14 |
| **told** 98:8 | 150:5,7,9,11,12 | 237:1 | 101:16 126:17 |
| 124:17 128:21 | 150:13,23,24 | **trials** 18:20 | 126:22 136:11 |
| 186:12 188:13 | 152:3,5,20 | **trouble** 127:17 | 140:15,17 |
| **took** 89:4 165:5 | 154:1 169:25 | 130:16 157:12 | 148:11 153:4 |
| **tools** 229:20 | 176:13 179:18 | **true** 13:3,3 | 154:24 158:13 |
| **top** 157:17 | 184:14 187:9 | 47:4,13,25 | 165:19 174:6 |
| 173:22 236:20 | 210:6,15,22,25 | 48:7 55:14 | 178:10,25 |
| **topics** 51:18 | 226:10,11 | 56:10,17,22 | 188:5 202:22 |
| | | 57:6,18 148:1 | 202:22 206:5 |

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[turning - uniform]**

Page 65

| | | | |
|---|---|---|---|
| 209:21 213:2 | **ubps** 31:16,24 | 25:12 39:22 | 149:14,25 |
| **two** 26:20 | **ultimately** | 44:1 55:22 | 155:20 156:15 |
| 33:19,24 45:21 | 44:24 60:20 | 62:15 63:10 | 157:1,4,10,12 |
| 57:15,22 67:3 | 66:11 | 69:22 70:9 | 157:15,18 |
| 81:20 94:18 | **uncertain** 8:15 | 71:5,15 74:7 | 161:20 168:6 |
| 107:5,12 108:1 | **uncomfortable** | 74:21 75:5,17 | 168:12 169:17 |
| 109:3,9,15 | 8:15 | 76:1 79:17 | 174:14,21 |
| 112:19,20 | **uncommon** | 85:23 86:10,15 | 181:25 187:3 |
| 138:23 139:3 | 198:13 | 100:12 106:10 | 187:15 221:5 |
| 167:24 168:2,3 | **under** 6:13 | 110:6 123:8 | 227:23 |
| 218:6 | 59:7 60:19 | 126:20 130:11 | **understandings** |
| **type** 69:2 94:20 | 62:11 96:15 | 132:11 136:16 | 197:12 |
| 99:2 103:17 | 103:9 119:22 | 141:25 144:4 | **understands** |
| 179:18 189:19 | 126:10 130:20 | 145:15,21 | 74:6 197:1 |
| 190:18 191:4 | 131:9,20 175:3 | 154:25 155:3,5 | 200:19 |
| 239:23 | 193:1 200:1 | 159:24 164:23 | **understood** |
| **types** 18:19 | 241:18 242:22 | 165:18 192:10 | 48:9 71:22 |
| 58:15,16 69:14 | **underlies** 71:13 | 196:2,11 197:7 | 72:5 86:17 |
| 94:19 99:21 | **underlying** | 198:12 200:24 | 89:11 92:7 |
| 103:9,19 | 39:2 71:24 | 201:3,9,15,19 | 114:5 118:23 |
| 172:20 | 72:6,17 73:14 | 202:5,16 | 126:16 141:15 |
| **typical** 72:1 | 74:5 139:19 | 204:21 218:10 | 150:6,21 |
| **typically** 55:22 | 153:14 166:10 | 219:14 225:15 | 154:23 169:15 |
| 61:14 112:18 | 166:25 167:20 | 233:25 | 193:15 195:13 |
| 198:7 210:17 | 171:2 174:11 | **understanding** | 200:20 231:19 |
| **typified** 70:21 | 193:5 231:20 | 13:23 66:6 | **unethical** |
| **u** | **undermining** | 67:1 75:21 | 125:21 146:14 |
| | 153:10 154:6 | 76:7,23 77:1 | 147:9 173:24 |
| **u.s.** 34:6 191:22 | 154:12 206:14 | 77:12,24 78:3 | 206:7 222:14 |
| 198:4 | **understand** | 95:17 117:3 | 226:9,13,16 |
| **ubiquitous** | 6:10,13,21,24 | 118:15 119:2 | **unfair** 146:13 |
| 227:4 | 7:9,13,24 8:3,5 | 127:17 130:17 | 206:7 222:14 |
| **ubp** 31:17 | 8:9 9:9,13,14 | 134:20 142:12 | **uniform** 30:21 |
| | 9:19 15:19 | 143:16,24 | 31:7,17 32:1 |

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[uniform - vague]**

Page 66

76:25

**uniformly** 94:12

**union** 33:18 34:3

**unions** 189:10

**unique** 102:25 110:23

**unit** 4:12 45:16 45:20 81:19,24 115:5,10 146:1 146:5 176:11 195:18,21 234:22 235:2

**united** 1:1 4:17 34:12 189:11 189:19 190:3 192:8

**units** 238:22

**universe** 153:24

**unknown** 198:17

**unlicensed** 35:1 35:6

**unquote** 146:23 214:2 216:4 217:15

**unreasonable** 148:14,20,21 150:16 151:15 151:18 152:20 152:23 206:15

**unregulated** 68:15 87:7,10 89:1

**unsophisticat...** 76:22

**unusual** 142:18

**upper** 174:25

**usage** 167:5 169:20 170:18 171:11,22,25 175:9,21

**use** 21:3 46:20 63:14 64:15 65:19 73:16 85:11 87:5 88:23 98:15 103:14 107:4 152:22 188:13 206:13 208:3,5 211:23 215:7 216:4 226:14 227:9,15 228:8 228:18 229:1,1 229:3,19

**used** 29:5 46:21 47:20 88:7,25 98:2 108:24 155:19 161:14 161:18 166:9 172:23 188:16 189:8,14 190:3 200:1 213:7 214:8,9 215:9 219:13 226:17

228:11,15,19 229:7 230:1,11 231:16 232:21 241:21

**user** 82:25

**uses** 58:14,23 155:21

**using** 4:21 11:25 63:15 65:9 66:1 85:12,13 101:2 153:7 162:21 229:9 230:22

**usually** 22:7 29:1,9 30:6 152:10,12 169:5,14 176:13

**utilities** 19:2,13 20:3 21:14,18 21:19 36:3 87:21 94:16 99:21 100:17 102:18 103:3 191:21,23 202:11,12

**utility** 13:23 27:1,3 71:20 75:12,18,22 76:2,6,17 77:12,24 95:5 97:8 116:5 127:1,7 129:5 129:6,9,13

130:9,13,18,19 131:21,21 132:6 134:2 168:25 191:21 195:7,7,9 197:11

**utility's** 203:24

**utilized** 63:16

**utilizing** 80:9

**v**

**v** 241:3 242:1

**vague** 8:17 9:18 15:11,17 17:16 18:10 21:11,24 22:22 23:16 24:14 25:11,23 29:18 30:23 31:9,19 32:5,22 33:5 37:14 38:25 39:20 40:3 41:2,18 42:1 42:15,23 43:2 43:5,14 44:10 45:4 46:14,19 47:6,14 49:5 49:14,20 51:2 52:1,22 54:5 54:15 55:17 56:13 57:8,24 61:4 62:2 63:23 65:5,10 66:7,16 68:8

John O'Brien
Brous v. Eligo Energy, LLC

January 29, 2026

**[vague - vs]**

Page 67

| | | | |
|---|---|---|---|
| 69:10 78:8 79:10,22 80:6 87:14 88:11 91:15 94:13 96:5 103:11 105:17 106:2 108:12 110:2 111:15 112:15 116:12 117:18 118:8 120:6 121:11 123:25 125:17 127:15 137:20 142:7 146:25 147:24 148:8,16 157:21 158:8 159:8 160:12 161:5 164:6,12 167:6 170:20 175:11 183:24 202:19 204:19 205:7 206:19 207:7,22 209:8 210:4,11 211:6 217:18 223:23 224:11 226:18 227:21 228:10 234:11 **valid** 77:17 79:2,3 80:18 147:7 193:9 **validate** 14:2 **validation** 158:2 | **value** 100:25 152:5 **values** 136:20 137:4,12 213:6 213:7 **variable** 94:6 108:3 137:24 140:5 161:14 162:18 163:19 168:23 175:5 178:12,14 179:6,7,12 180:17,23 181:12,16 182:13 183:10 184:8,9 185:17 186:7 212:24 213:7 214:15 217:22 230:22 231:25 232:22 236:12 237:3 **variables** 165:6 171:7 193:6 **varied** 66:14 **various** 67:16 69:7 87:20 156:23 **vary** 74:4 136:8 **vast** 76:1 85:1 **venture** 209:12 **verbally** 7:7 **verbatim** 61:5 62:5 220:13 | **verified** 182:2 **verify** 134:4 241:9 **veritext** 4:22,25 238:23 241:14 241:23 **veritext.com** 241:14 **version** 238:5 **versions** 214:11 **versus** 4:15,15 22:10 26:20 72:20 73:6 124:15 164:4 164:10 180:18 **video** 1:13,18 4:10,12 133:23 133:23 135:1 237:24 238:1 238:20 **videoconfere...** 239:9 **videographer** 2:20 4:2,23 11:24 22:12,13 45:13,18 50:12 50:13 81:17,22 115:3,8 128:7 128:11 145:24 146:3 151:3,7 151:10 195:16 195:20 234:20 234:25 237:15 237:18,23 | 238:11,16 **view** 60:4 66:25 109:7 125:25 196:10 **viewing** 188:17 **views** 65:9 188:7 **vintage** 105:7,8 **violate** 126:11 **violated** 225:22 **violates** 229:2,4 **violation** 126:12 224:23 226:20 **virginia** 24:8 **virtual** 4:21 **virtually** 4:5 **vista** 14:9,13,16 14:19,24 15:4 15:7,8,21 16:5 16:9,13 **vitae** 12:15 **voice** 135:6 **voiced** 62:5 **voicing** 191:14 **volatile** 188:16 **volatility** 159:3 159:6,9,11 186:11 188:19 **voluntary** 103:20,24 **vs** 1:8 |

John O'Brien

January 29, 2026

Brous v. Eligo Energy, LLC

**[want - wtlaw.com]**

Page 68

| w | | | |
|---|---|---|---|
| **want** 5:18 22:14 50:13 81:11 96:20 101:1 114:10 119:11,14 128:7 134:8 139:11,13 146:8 165:2 173:23 193:12 219:8 223:11 237:23 238:5 238:11,13 | **we've** 114:8 167:24 175:10 218:1,18 | 99:7 135:11,15 138:24 139:19 140:1 166:11 166:19 167:5 167:20,25 168:7,12 171:2 172:17 175:9 175:23 176:20 182:10,12 183:8,9 186:25 195:3 198:24 199:7 228:17 231:20 236:14 | 218:25 219:15 236:12 |
| | **weather** 135:12 135:15 | | **work** 11:4 12:18 15:9 16:6 21:22 22:4,8,10 23:8 23:9,13 32:17 34:23 36:19,23 40:6 42:14 44:12 73:2 97:20 165:20 169:18 199:4 200:2 |
| | **week** 238:4 | | |
| | **weight** 24:12 138:1,4 200:11 | | |
| | **weighting** 137:8,13,18 | | |
| **wanted** 6:9 51:7 82:4 95:6 196:1 198:23 221:2 | **weights** 136:20 137:4,12 | **wide** 215:8 | **worked** 18:7 23:5 30:15 97:17 189:23 |
| | **welcome** 135:17,21 136:3 236:18 | **wife** 142:15 | |
| | | **willing** 129:23 | **working** 170:24 |
| **wants** 92:25 | **went** 50:2 63:12 95:18 144:15 154:10 156:21 178:25 193:5 198:14 198:16 202:8 | **wind** 148:3 | **works** 167:14 170:22 |
| **watstein** 2:14 | | **wires** 191:25 | |
| **way** 14:1,3 34:15 89:6 125:1 139:23 144:23 149:15 152:17 154:8 163:18,18 173:17,18,24 174:10 189:18 189:25 192:4 208:14,16 210:25 217:1 222:10 228:17 232:22 236:8 | | **withdraw** 233:21 | **world** 34:7 191:22 203:10 |
| | | **witness** 4:8 5:9 16:1 43:3 44:11 59:9 60:16 61:21,23 81:14 114:19 125:25 145:15 219:14 239:11 241:8,10,12,20 | **worse** 207:13 |
| | **west** 24:8 | | **write** 127:19 197:14 |
| | **whatsoever** 230:2 | | **written** 7:6 51:17 130:8 136:18 |
| | **wheeled** 32:12 36:23 37:2,5,9 37:12,18,24 38:3,10 | **wittels** 2:9 5:22 | |
| | **white** 2:6 223:25 | **wittelslaw.com** 2:11 | **wrong** 80:16 140:24 |
| | **wholesale** 69:23 71:12,24 72:6,17 73:14 89:2 96:23 | **words** 87:18 98:24 151:25 210:24 217:22 | **wrote** 54:8 196:6 232:13 |
| | | | **wtlaw.com** 2:16 |

**[x - zoom]**                                    Page 69

| x | |
|---|---|
| **x**   3:1,9 168:2 | |
| **y** | |

**yeah**   51:3
  60:19 72:4
  105:14 114:13
  114:19,21
  146:16 198:14
  198:16
**year**   41:10
  66:14
**years**   13:12,18
  15:7,8,14,20
  18:6,11 28:17
  34:24 36:20
  38:5,20 40:6
  67:7 68:1,3
**yellow**   136:23
  236:22
**york**   1:1 2:6,10
  2:10 4:18
  30:15,20 31:2
  31:8,15,24,25
  66:10 83:3,6
  87:11,12,15,16
  88:3,4 89:19
  90:1 103:9
  106:11,22
  118:5 138:20
  159:24 160:2
  166:24 168:15
  185:12 190:14
  190:21 192:22

198:8 223:21
223:24 224:9
224:16
**york's**   102:19
  103:4

| z | |
|---|---|

**zero**   138:19,23
  139:22
**zone**   182:13
**zoom**   1:18 2:2
  12:2 239:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.