**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**ANNE BROUS, AS THE EXECUTRIX OF THE ESTATE OF IRA BROUS** and **MICHELLE SCHUSTER**, on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

**ELIGO ENERGY, LLC** and **ELIGO ENERGY NY, LLC**,

    Defendants.

Case No. 1:24-CV-01260-ER

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL BACKGROUND .......................................................................................3

      A.    Eligo Sells Green Energy in New York's Competitive Retail
           Market.................................................................................................................3

      B.    Customer Enrollment and Communications Varied Across the
           Class, with Plaintiffs Enrolling by Telephone and Agreeing to the
           TPV Terms. ......................................................................................................4

      C.    Customers Received Individualized Market-Based Variable Rates
           Based on Individualized Market Factors. ........................................................6

      D.    After Seeing Lawyers Ads, Plaintiffs Seek to Certify a Class Based
           on Theories Untethered to the Products and Contracts at Issue,
           Which They Didn't Even Read. ......................................................................9

III.    LEGAL STANDARD ..................................................................................................11

IV.     ARGUMENT ..............................................................................................................13

      A.    Plaintiffs Cannot Show That Common Questions Predominate. ...........................13

          1.    Plaintiffs Cannot Prove Breach of the Contract the Parties
              Actually Entered with Common Evidence. ...............................................13

          2.    Plaintiffs Cannot Prove Breach of the Contract Their
              Lawyers Wish They Entered with Common Evidence. ...........................16

          3.    Plaintiffs Cannot Prove Deception or Causation with
              Common Evidence. ...................................................................................18

          4.    Plaintiffs' Damages Models Fail Comcast and Cannot
              Establish Class-Wide Injury. ....................................................................22

              a.    Plaintiffs Do Not Offer a Theory-Consistent Model. ...................23

              b.    Plaintiffs Cannot Prove Classwide Injury Even
                 Under Their Models. ......................................................................26

          5.    Individualized Defenses Further Defeat Predominance. ...........................26

      B.    Plaintiffs Cannot Satisfy Rule 23(A). ...................................................................28

          1.    Plaintiffs Are Not Adequate Representatives. ..........................................28

              a.    Plaintiff Schuster is Subject to Disqualifying
              Credibility Issues. .........................................................................28

              b.    Plaintiff Brous is a Litigation-Driven, Figurehead
               Representative. ..............................................................................29

            2.      Plaintiffs' Claims Are Not Typical.............................................................30

            3.      Plaintiffs Cannot Establish Commonality. ...............................................32

      C.    A Class Action Is Not Superior. .............................................................................32

      D.    Rule 23(b)(2) Certification Is Improper. .................................................................34

V.    CONCLUSION .....................................................................................................................35

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................3

      A.    Eligo Sells Green Energy in New York's Competitive Retail
            Market.......................................................................................................3

      B.    Customer Enrollment and Communications Varied Across the
            Class, with Plaintiffs Enrolling by Telephone and Agreeing to the
            TPV Terms. ...............................................................................................4

      C.    Customers Received Individualized Market-Based Variable Rates
            Based on Individualized Market Factors. .................................................6

      D.    After Seeing Lawyers Ads, Plaintiffs Seek to Certify a Class Based
            on Theories Untethered to the Products and Contracts at Issue,
            Which They Didn't Even Read. .................................................................9

III.  LEGAL STANDARD ........................................................................................11

IV.   ARGUMENT .....................................................................................................13

      A.    Plaintiffs Cannot Show That Common Questions Predominate. ............13

            1.    Plaintiffs Cannot Prove Breach of the Contract the Parties
                  Actually Entered with Common Evidence. ..................................13

            2.    Plaintiffs Cannot Prove Breach of the Contract Their
                  Lawyers Wish They Entered with Common Evidence. ...............16

            3.    Plaintiffs Cannot Prove Deception or Causation with
                  Common Evidence. ......................................................................18

            4.    Plaintiffs' Damages Models Fail Comcast and Cannot
                  Establish Class-Wide Injury. .......................................................22

                  a.    Plaintiffs Do Not Offer a Theory-Consistent Model.....23

                  b.    Plaintiffs Cannot Prove Classwide Injury Even
                        Under Their Models. ..........................................................26

            5.    Individualized Defenses Further Defeat Predominance.............26

      B.    Plaintiffs Cannot Satisfy Rule 23(A)......................................................28

            1.    Plaintiffs Are Not Adequate Representatives. ............................28

                  a.    Plaintiff Schuster is Subject to Disqualifying
                        Credibility Issues. .............................................................28

                  b.    Plaintiff Brous is a Litigation-Driven, Figurehead
                        Representative. ..................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Attias v. CareFirst, Inc.*,
346 F.R.D. 1 (D.D.C. 2024) ...................................................................................33

*Ault v. J.M. Smucker Co.*,
310 F.R.D. 59 (S.D.N.Y. 2015)...........................................................................34, 35

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) ...................................................................................30

*Bell v. Gateway Servs. Corp.*,
NYSCEF No. 31168/2018 (Sup. Ct. Rockland Cnty. Jan. 8, 2021)........................................14

*Berni v. Barilla S.p.A.*,
964 F.3d 141 (2d Cir. 2020) ...................................................................................35

*BLT Steak LLC v. Liberty Power Corp., LLC*,
NYSCEF No. 151293/2013 (Sup. Ct. N.Y. Cnty. Aug. 14, 2020)........................................14

*Choi v. Tower Rsch. Cap. LLC*,
2022 WL 4484485 (S.D.N.Y. Sept. 27, 2022) ...................................................24, 25

*Claridge v. N. Am. Power & Gas, LLC*,
2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016) .......................................................14

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .........................................................................................passim

*Darvin v. Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) ..........................................................................30

*Diverse Partners, LP v. AgriBank, FCB*,
2019 WL 4305008 (S.D.N.Y. Sept. 11, 2019) .......................................................18

*Douyon v. N.Y. Med. Health Care, P.C.*,
894 F. Supp. 2d 245 (E.D.N.Y. 2012)..................................................................19, 20

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
31 N.Y.3d 441 (2018)............................................................................................24

*Ga. Malone & Co. v. Rieder*,
19 N.Y.3d 511 (2012)............................................................................................25

*Gordon v. Sonar Cap. Mgmt. LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015) .......................................................................28

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968) ..........................................................................................11

*Halvorson v. Auto-Owners Ins. Co.*,
  718 F.3d 773 (8th Cir. 2013) .........................................................................................18

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ..........................................................................................12

*In re Initial Pub. Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) .................................................................................11, 12, 22

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002)....................................................................................33

*In re MF Global Holdings Ltd. Inv. Litig.*,
  310 F.R.D. 230 (S.D.N.Y. 2015).....................................................................................11

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) .................................................................................12, 22, 23

*Kronenberg v. Allstate Ins. Co.*,
  743 F. Supp. 3d 465 (E.D.N.Y. 2024)..............................................17, 23, 24, 25, 26

*Leider v. Ralfe*,
  2003 WL 24571746 (S.D.N.Y. Mar. 4, 2003).........................................................34

*Martinez v. Agway Energy Servs., LLC*,
  2022 WL 306437 (N.D.N.Y. Feb. 2, 2022)..............................................................14

*Martinez v. Agway Energy Servs., LLC*,
  2022 WL 1091607 (N.D.N.Y. Apr. 12, 2022) ........................................................14

*Martinez v. Agway Energy Servs., LLC*,
  88 F.4th 401 (2d Cir. 2023) ..................................................................11, 15, 19, 21

*Mirkin v. XOOM Energy, LLC*,
  2023 WL 5622099 (E.D.N.Y. Aug. 31, 2023) ........................................................14

*Nationwide Life Ins. Co. v. Haddock*,
  460 F. App'x 26 (2d Cir. 2012)................................................................................34

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
  875 F.3d 107 (2d Cir. 2017) .....................................................................................19

*Oscar v. BMW of N. Am., LLC*,
  274 F.R.D. 498 (S.D.N.Y. 2011)..............................................................................18

iv

*Passman v. Peloton Interactive, Inc.*,
   671 F. Supp. 3d 417 (E.D.N.Y. 2023) ................................................................25

*Pelman v. McDonald's Corp.*,
   272 F.R.D. 82 (S.D.N.Y. 2010) ...................................................................19, 21

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   226 F.R.D. 456 (S.D.N.Y. 2005) ........................................................................32

*Richards v. Direct Energy Servs., LLC*,
   915 F.3d 88 (2d Cir. 2019) .................................................................................15

Roberts v. Verde Energy, USA, Inc.,
   2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017) ..........................................14

*Russell v. Forster & Garbus, LLP*,
   2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) ....................................................30

*Savino v. Computer Credit, Inc.*,
   173 F.R.D. 346 (E.D.N.Y. 1997) ........................................................................29

*Savino v. Computer Credit, Inc.*,
   164 F.3d 81 (2d Cir. 1998) .................................................................................29

*Scott v. Chipotle Mexican Grill, Inc.*,
   954 F.3d 502 (2d Cir. 2020) ...............................................................................13

*Sharpe v. A&W Concentrate Co.*,
   2021 WL 3721392 (E.D.N.Y. July 23, 2021) .....................................................26

*Smith v. John Hancock Ins. Co.*,
   2008 WL 4145709 (E.D. Pa. Sept. 3, 2008) .......................................................31

*Solomon v. Bell Atlantic Corp.*,
   9 A.D.3d 49 (N.Y. App. Div. 2004) ........................................................19, 26, 28

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) .....................................................................15, 33

*Vaccariello v. XM Satellite Radio, Inc.*,
   295 F.R.D. 62 (S.D.N.Y. 2013) ...................................................................26, 27, 28

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ....................................................................................passim

*Yeger v. E\*Trade Secs., LLC*,
   65 A.D.3d 410 (N.Y. App. Div. 2009) ................................................................19

**Statutes**

N.Y. Gen. Bus. Law § 349 ........................................................................................19, 25, 26, 27
**Rules**

Fed. R. Civ. P. 23 ...........................................................................................................passim

## I.    INTRODUCTION

Eligo is an energy supply company, or ESCO, that sells premium renewable energy products and competes with other ESCOs in New York's deregulated energy market. Plaintiffs claim that Eligo charged more than their variable-rate energy supply contracts permitted. But Plaintiffs have not carried their burden under Rule 23 to show that breach, injury, or damages can be proven with common, admissible evidence. That failure forecloses predominance—Rule 23's most demanding requirement—alone precluding certification.

The contracts at issue do not promise wholesale cost-plus pricing, utility-comparable pricing, or hold Eligo to any specific margin. They state only that Eligo's variable rate "may be periodically adjusted for market conditions" and "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Plaintiffs fail to identify a common method for translating *those terms* into a measurable standard. Without that step, there is no way to determine breach for any class member, much less all of them at once.

Instead, they ask the Court to certify a class based on models that substitute materially different, extra-contractual formulas for the "market"-based terms the contracts actually use. Their experts simply replace those terms with wholesale-cost proxies or utility-comparator benchmarks, then arbitrarily subtract part of the rate and throw in a fixed 5–6% margin that appears nowhere in the agreement. Their formulas are not merely alternative ways of measuring the same alleged injury; they are incompatible theories of what the contracts require in the first place. And *none* of them operationalizes the actual contract language. That failure alone defeats predominance and requires denial of certification.

Nor have Plaintiffs shown that common proof would exist even if the contracts contained one of their substitute formulations. Under Plaintiffs' own theories, proving breach would still require showing what Eligo supposedly should have charged each customer each month. Under

1

Plaintiffs' cost-based theories, it would depend on customer-specific cost inputs. Under their comparator theories, it would depend on customer-specific comparison prices. The record shows those inputs varied significantly across customers and over time. Plaintiffs' experts have not shown that those individualized inputs—or the resulting rates—can be established with common proof. That's presumably why the experts refused to disclose the monthly benchmark-rate figures, overcharge calculations, or intermediate work needed to test or replicate their *ipse dixit* conclusions. When they have done that in the past, they have been excluded for making unfounded assumptions and drawing inaccurate conclusions. In any event, even under Plaintiffs' own substitute formulations, they have not identified a common method to determine what Eligo should have charged, whether it deviated from that benchmark, or what damages resulted.

Plaintiffs' motion also fails for the related reason that it does not satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–36 (2013). Under *Comcast*, to obtain certification under Rule 23(b)(3), Plaintiffs must present a damages model that is consistent with—and that actually measures injury resulting from—their theory of liability. Plaintiffs have not done so. Rather than identify a theory-consistent method of determining what Eligo should have charged under the contract, Plaintiffs propose multiple methods to measure terms their lawyers wish the contract contained. Their own experts acknowledge that the appropriate model depends on the legal theory the Court ultimately adopts, and that their work will be revised to match the Court's chosen theory after the fact. But that is precisely what *Comcast* forbids. Rule 23 requires Plaintiffs to demonstrate *now* that liability and damages are susceptible to common proof under a single, defined theory; it does not permit certification based on models that may be revised later to fit a not-yet-selected legal standard. Circuit courts have repeatedly reversed district courts that have eschewed these rules in favor of an impermissible "certify now and figure it out later" approach.

Other individualized issues predominate too, such as whether the voluntary payment doctrine precludes any particular class member's claim.

And, if all this were not enough, neither Plaintiff is typical or adequate. Brous is a substituted and uninformed representative who did not review the contract, cannot describe the alleged deception, and only pursued the case because her son—without even reading the contract—told her to. Schuster is subject to serious credibility issues, having claimed she received an Eligo marketing mailer in an attempt to salvage the statutory consumer deception claims, only to abandon that point when Eligo discovered a call recording that proved her statements were false. And both named Plaintiffs are atypical of Plaintiffs' own "utility comparator" theory because they switched from other ESCOs, not from utility supply, and—at least in Brous's case—routinely chose to pay more for green energy products. Rule 23 does not permit absent class members to be bound by those whose claims are subject to clear knowledge, credibility, and causation defects.

Plaintiffs' motion for class certification should be denied.

## II. FACTUAL BACKGROUND

### A. Eligo Sells Green Energy in New York's Competitive Retail Market.

Over the past 30 years, New York has deregulated its retail electricity market to give customers greater choice among electricity suppliers and to subsidize the production of green energy. Ex. 1, Expert Report of Dr. Debra J. Aron ("Aron Report") ¶¶ 37–39 (citing various regulatory materials). As a result, customers may select either their local utility or an ESCO as their electricity supplier. *Id.* ESCOs, like Eligo, can offer products—including electricity sourced from varying levels of renewable energy, up to 100% renewable—that utilities do not. *Id.* ¶¶ 40, 63–65. The contracts at issue reflect that variation: some provided for at least 30% renewable energy, while the majority provided for 100% renewable energy, resulting in materially different product attributes and pricing expectations. *See* Exs. 20–22, DEF000132, DEF000138,

DEF000143. The New York Public Service Commission (NYPSC) has recognized that ESCO customers, like Plaintiffs, "who voluntarily buy clean energy 'are New York's most valuable asset towards achieving'" its renewable energy goals.[1] Aron Report ¶ 62.

To this end, Eligo supplies considerably more renewable energy than utilities in New York. Eligo even stood out among ESCOs for its renewable energy content, "provid[ing] a higher share of renewable energy to its retail customers than 62 to 81 percent of all ESCOs (depending on the year) that reported their EDP label data in each year from 2021 to 2023." *Id.* ¶¶ 129–31. This chart demonstrates this:



**Exhibit 6**
**Share of Renewable Fuel Sources of Eligo, Other ESCOs, and Relevant Utilities in NY**
**2016 – 2023**

**B.     Customer Enrollment and Communications Varied Across the Class, with Plaintiffs Enrolling by Telephone and Agreeing to the TPV Terms.**

Customers can enroll with Eligo through a variety of pathways, including online, in person (as a result of door-to-door marketing), and telephonically. For telephone and in-person enrollments, New York law requires a recorded enrollment call, termed a third-party verification

---

[1] Because each customer's power comes from the grid, there is generally no way for a particular customer to choose the type of power being delivered to their residence. As such, the renewable component of a particular energy plan is satisfied, in part, by retiring renewable energy credits (RECs). "In New York, a REC is a tradable instrument that represents one megawatt-hour of electricity that was generated from a renewable source in New York and delivered into the state's power grid." Aron Report ¶ 45.

("TPV"). Ex. 2, NY UBP 2014 at 172. Eligo's TPV scripts are reviewed and approved by the NYPSC as a condition of Eligo's licensure. Exs. 3–9. Customers who enroll online are not required to go through a TPV call. Customers who enroll through these channels (and within these channels) are subject to different marketing, generally by independent contractors who work with Eligo but manage their own sales agents. Ex. 32, Pedotto Dep. at 46:24–47:12.

Both Plaintiffs enrolled with Eligo by telephone with an Eligo representative. Ex. 10, DEF000126 (Schuster TPV Call); Ex. 11, DEF093222 (Brous TPV call). During Plaintiffs' TPV calls, the representative explained that Eligo would provide electricity at an introductory fixed rate and then "continue at a month-to-month rate based on market and wholesale factors, weather patterns, and pricing strategies." *See* Schuster TPV Call at 1:37–56. The call also made clear that Eligo did not guarantee savings, and that the Plaintiffs could cancel their Eligo service at any time and for any reason. *Id.* at 3:01–03, 4:10–19. Each Plaintiff verbally responded "yes" to agree to these terms and others. *Id.* at 3:03–09. Before their enrollment, both Plaintiffs had conversations with different independent (non-Eligo) sales reps.

A few days after enrolling, Plaintiffs received Eligo's written terms, which said, consistent with the TPV, that after the initial fixed-rate period the Plaintiffs would convert to a "monthly variable kWh rate that may be periodically adjusted for market conditions," and that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 12, DEF000138 (Schuster Enrollment Packet); Ex. 13, DEF093223 (Brous Enrollment Packet) at 4.

The contracts did not define "market conditions," "market pricing," or the necessarily inexhaustive plural term "other market price factors." *See generally* Schuster Enrollment Packet; Brous Enrollment Packet. Nor did they contain any formula or other specific method that Eligo

5

would use to calculate variable rates. *Id.* Again, consistent with the TPV, the contract further provided that Eligo did not guarantee that Plaintiffs (or any Eligo customer) would save money on Eligo, and that the Plaintiffs could cancel at any time and for any reason. Schuster Enrollment Packet at 3; Brous Enrollment Packet at 4.

Before enrolling with Eligo, Plaintiffs were both customers with other ESCOs, not of their local utility. Ex. 16, DEF093950 (Brous Pre-Eligo Customer Information); Ex. 17, DEF093953 (Schuster Pre-Eligo Customer Information).[2] After enrolling, both Plaintiffs received itemized monthly utility bills that listed Eligo Energy NY's supply charge as a separate item and disclosed Eligo's per-kilowatt-hour rates. *See* Ex. 18, PLAINTIFFS_0278, (Brous Itemized Bill); Ex. 19, PLAINTIFFS_0025, (Schuster Itemized Bill). Plaintiffs continued to pay those bills for more than six years—*more than 72 times each*—without cancelling their service or objecting to the rates.

### C.    Customers Received Individualized Market-Based Variable Rates Based on Individualized Market Factors.

Over the duration of the nearly eight-year class period, Eligo used a variety of different individualized considerations to set and then "periodically adjust" variable rates according to the contractual criteria of "market price factors," and "market conditions."

Before 2018, Eligo forecasted costs associated with variable rate customers using customer data, such as the current customer rate, last usage, size of customer's last bill, forecasted usage, capacity tag, time of year, and other cost components and factors that were available to Eligo. Ex. 23, Sandler 30(b)(6) Dep. at 14:12–15:18; Ex. 24, Defs.' Second Suppl. Resps. to Pls.' First Set of Interrogatories, No. 8. Eligo then applied a markup that varied by utility territory and was

---

[2] Plaintiffs switched to Eligo from other ESCOs, not from their local utilities. *See* Ex. 16, DEF093950 (Brous Pre-Eligo Customer Information); Ex. 17, DEF093953 (Schuster Pre-Eligo Customer Information). Given that, Plaintiffs may well have saved money with Eligo for their green contracts, given how Eligo's rates were consistent with, and sometimes a good bit lower than, the market. Aron Report ¶¶ 129– 31. Despite Eligo's review of over 200,000 documents, Plaintiffs' lawyers refused to identify which ESCOs their clients previously used, leaving the record devoid of any information about their prior suppliers or rates.

determined based on "unique market conditions in various utilities." Ex. 23, Sandler 30(b)(6) Dep. at 15:22–16:1. Any suggested rate was subject to a maximum rate or rate cap that was set after accounting for the rates of competitor ESCOs in the market. *Id.* at 34:14–35:5. According to Mike Sandler, Eligo's Chief Information Officer, ████████████████████████████ ████████████████████████████████████ *Id.* at 35:1–3.

███████████████████████████████

██████████████████████████████████

██████████████████████████████████

██. *See* Ex. 26, DEF000236 (████████████); Ex. 27, DEF003310 (████████████); Ex. 24, Defs.' Second Suppl. Resps. to Pls.' First Set of Interrogatories, No. 8; Ex. 28, Ashuev Dep. at 89:5–16. ████████████████████████

██████████████████████████████████

████████████████████████████ Ex. 24, Defs.'

Second Suppl. Resps. to Pls.' First Set of Interrogatories, No. 8. █████████████

██████████████████████████████████

██████████████████████████████ Ex.

23, Sandler 30(b)(6) Dep. at 112:24–113:7; Ex. 25, Carr Dep. at 105:17–106:4.

The █████████████████████████████

██████████████████████████████████

████████████████████ *See, e.g.,* Ex. 29, DEF001971 ████████

██████████████████████████████████

██████████████████████████████████

Ex. 30, DEF001907 (████████████████). ████████████

7

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Ex. 1, Aron Report ¶ 74. As Eligo's

Director of Analytics Yuri Ashuev said, "The beauty and danger of machine learning is if you give

the machine enough inputs, it would give you results it believes are best, but with the increase in

level of complexity you'd never know why." Ex. 31, DEF089319 (Slack Messages).

███████████████████████████████████████████████████████

██████████████████████████████████ The ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

*See* Ex. 23, Sandler 30(b)(6) Dep. at 34:14–35:10; Ex. 28, Ashuev Dep. at 89:21–90:12. ████████

███████████████████████████████████████████████████████

████████████████████████ *Id.* at 90:13–91:8. █████████████████████████

███████████████████████ *Id.* at 91:9–92:6. ███████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* at 93:4–19. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

*See* Ex. 32, Pedotto Dep. at 87:4–12, 101:12–103:10; Ex. 33, LaPointe Dep. at 22:2–22. If a rate

did not meet one of the requirements, "it was changed so it did." *Id.* at 87:4–12.

Eligo's internal documents confirm all this. Contrary to Plaintiffs' cost-plus theory of the

case, Eligo explained internally that ████████████████████████████████

███████████████████████████████████████████████████████

8

████████ Ex. 34, DEF001845 at 9 (Eligo Risk and Hedging Update). And Eligo's ████████

████████████████████████████████████████████████████████████████████████

████████ *Id.* (emphasis added).

These practices resulted, unsurprisingly, in rates that were in line with those of its ESCO competitors in New York, even those offering products with much less renewable energy. Ex. 1, Aron Report ¶¶ 116–124. "Prior to 2021 (i.e., before Eligo significantly increased its renewable energy content), Eligo's average residential variable rate was consistently within the 25th percentile and 75th percentile of variable rates charged by other ESCOs and the relevant utility (where utility price was available)." *Id.* ¶¶ 119, 124 "Since 2021, while Eligo's average residential variable rate generally was higher than in the preceding period, it remained within the range of variable rates charged by competitor ESCOs and almost always remained below the maximum average variable rate observed among ESCOs in every utility-zone and quarter." *Id.*

Consistent with this market-based approach, Eligo did not charge all customers within the same utility service zone the same price. It charged ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████ Ex. 35, DEF093924. ████████████████████████████████████████

████████████████████████████████████████ *Id.*

**D.    After Seeing Lawyers Ads, Plaintiffs Seek to Certify a Class Based on Theories Untethered to the Products and Contracts at Issue, Which They Didn't Even Read.**

Notwithstanding the market-based contract language, the TPV disclosures, and years of itemized monthly bills reflecting Eligo's rates, neither named Plaintiff challenged Eligo's service until after seeing attorney advertisements. *See* Ex. 18, Brous Bills; Ex. 19, Schuster Bills; Ex. 14, A. Brous Dep. at 123:5–22; Ex. 15, Schuster Dep. at 23:18–24:15. And Anne Brous's claim did not originate with her at all: after Ira Brous's death, she was substituted in as plaintiff. But the

9

lawsuit was her son's idea, who convinced his parents to serve as class representatives in a breach of contract claim even though he had never even read the contract at issue but had assumed it was a "cost plus" agreement like the one he had with a different ESCO. Ex. 38, J. Ramsey Brous Dep. at 16:24–17:10, 18:20–19:23, 28:19–29:22, 33:1–10.

Plaintiffs didn't read their contracts either, with one testifying that she skimmed it at most. Ex. 14, A. Brous Dep. at 112:15–17, 106:22–107:2 (Brous did not read); Ex. 15, Schuster Dep. at 94:21–95:25 (Schuster "skimmed over the document like we all do when we get these things that are in like a number four font"). Despite that, Plaintiffs filed this class action, claiming Eligo breached that same contract, which was also supposedly "marketing material" that somehow deceived them—even though they didn't read it—and supported a statutory deception claim under New York's General Business Law ("GBL"). *See generally* Second Am. Compl. ("SAC"), ECF No. 272.

But they didn't start with that fanciful GBL claim. Plaintiffs previously claimed that Eligo sent deceptive mailers uniformly to the class, an allegation based solely on Schuster's unequivocal testimony that she was solicited by such a mailer. Schuster Dep. at 58:23–59:15. When Eligo later discovered a call recording proving her testimony false, as this video link shows, Plaintiffs retreated to basing their GBL claim on the contract itself. *See* ECF No. 150-3 (Transcript of Schuster Telemarketing Call).

The disconnect between Plaintiffs' actual experiences and the theories advanced in this case doesn't end there. When they moved for class certification, Plaintiffs did not present a single classwide theory of the rates Eligo should have charged under the "market pricing, transportation costs, and other market price factors" term that Plaintiffs didn't read. Instead, their experts calculate hypothetical "contract rates" under three variable rate provisions not at issue in this case

but reminiscent of contracts from Plaintiffs' counsel's cases against *other* ESCOs: (a) a forecasted-cost-plus provision based on supply-related costs plus a fixed 5–6% margin; (b) a NYISO day-ahead wholesale proxy plus that same arbitrary fixed margin; and (c) a utility-dominated prevailing-retail benchmark that effectively collapses into a utility-rate comparator. *See* Macan Report, ECF No. 326-24, ¶¶ 129, 134, 174–75; Felder Report, ECF No. 326-29, ¶¶ 30–31, 34, 54, 57, 62–63. Their experts then produced only aggregate damage totals and high-level formulas. *See* Felder Daubert, ECF No. 363, at 8–9. Having been excluded before for relying on unreliable assumptions and insufficient data, *see, e.g.*, *Martinez v. Agway Energy Servs.*, 88 F.4th 401, 414 (2d Cir. 2023), they declined to disclose their monthly input data or calculations needed to test or replicate their conclusions. *See* Felder Daubert at 10–17.

In seeking to certify their class, Plaintiffs also lump together contracts for materially different products. The named Plaintiffs themselves were on only "at least 30% renewable" contracts, not the even more premium 100% renewable contracts that make up much of the proposed class. *See* Ex. 12, Schuster Welcome Packet; Ex. 13, Brous Welcome Packet.

Eligo now opposes Plaintiffs' motion for class certification.

## III.    LEGAL STANDARD

Plaintiffs misstate the governing legal standard. Pls.' Class Cert. Br. at 18. Relying on pre-*Dukes* formulations, Plaintiffs suggest that the Court may accept the complaint's allegations as true, apply Rule 23 "liberal[ly]," and certify now because a class can later be modified. [3]   That is

---

[3] Plaintiffs' suggestion, at 18, that courts may "accept the allegations in the complaint as true" cannot be reconciled with binding precedent requiring a "rigorous analysis" based on evidentiary proof, not pleadings, even where that inquiry overlaps with the merits. *See Wal-Mart*, 564 U.S. at 350–51; *Comcast*, 569 U.S. at 33–34; *In re IPO*, 471 F.3d at 41. Nor does the cited "liberal interpretation" language from *In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 235 (S.D.N.Y. 2015) and *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) reflect current law; those formulations predate the Supreme Court's clarification that Rule 23 is not a permissive standard and that courts must resolve, not defer, factual and legal disputes central to certification. *See Wal-Mart*, 564 U.S. at 350; *Comcast*, 569 U.S. at 33–34.

11

an incorrect statement of the law. As the Supreme Court and Second Circuit have made clear, Rule 23 is not a pleading standard, and certification may not rest on assumptions, leniency, or the prospect that a workable methodology might emerge later. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33, 37, 41 (2d Cir. 2006). Rather, Plaintiffs bear the burden to affirmatively prove, by a preponderance of the evidence, that every Rule 23 requirement is satisfied. *Wal-Mart*, 564 U.S. at 350; *In re Initial Pub. Offerings*, 471 F.3d at 33, 37.

Here, that requires Plaintiffs to prove all Rule 23(a) elements: numerosity, commonality, typicality, and adequacy. To certify a damages class under Rule 23(b)(3), Plaintiffs must also prove predominance and superiority. To certify an injunctive-relief class under Rule 23(b)(2), Plaintiffs must prove that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

The Court must conduct a "rigorous analysis" of the evidence, now, to determine whether Plaintiffs have met their burden on each of these elements, including resolving material factual and legal disputes relevant to certification rather than postponing them. *Wal-Mart*, 564 U.S. at 350; *In re IPO*, 471 F.3d at 33;  *see In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (plaintiffs must "affirmatively demonstrate . . . compliance with the Rule"); *In re IPO*, 471 F.3d at 41 (requiring a "definitive assessment" of Rule 23 requirements). That inquiry must overlap with the merits to the extent that merits questions bear on Rule 23. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (district court must "resolve material factual disputes relevant to each Rule 23 requirement"); *see also Dukes*, 564 U.S. at 350–51. And under *Comcast*, Plaintiffs cannot satisfy Rule 23 by offering multiple models and asking the Court to

12

decide later which one, if any, matches the governing liability theory. *Comcast*, 569 U.S. at 35–36.

Plaintiffs cannot satisfy these requirements here, so certification must be denied.

## IV.    ARGUMENT

### A.    Plaintiffs Cannot Show That Common Questions Predominate.

Plaintiffs cannot satisfy Rule 23(b)(3) because this case cannot be resolved with common proof, and predominance exists only where the issues central to liability and relief can be established through generalized evidence, rather than through individualized inquiries. *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020). That inquiry is "even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (2013). In applying that standard, the Court must examine what each claim requires and whether those elements can in fact be proven classwide, even where that analysis overlaps with the merits. *Id.* at 33–34.

That inquiry defeats certification here. Plaintiffs' claims do not turn on a single common answer. They turn on disputed theories of what Eligo's contracts required, competing benchmarks for what Eligo supposedly should have charged, and customer- and month-specific evidence concerning pricing, causation, and injury. In other words, this is not a case where common proof will answer the core liability questions "in one stroke." It is a case that would require individualized reconstruction of breach, injury, and damages across the class. Plaintiffs, therefore, cannot establish predominance.

### 1.    Plaintiffs Cannot Prove Breach of the Contract the Parties Actually Entered with Common Evidence.

Predominance fails because Plaintiffs do not identify any common method for deriving a contract rate from the actual contract language, and therefore, no common method for proving

13

classwide breach of that language.[4] The written agreements provide for a "monthly variable kWh rate that may be periodically adjusted for market conditions" and that "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Exs. 20–22, DEF000132, DEF000138, DEF000143 (New York Residential Contracts). The TPV that both Plaintiffs affirmatively agreed to is in accord: after the introductory fixed-rate period, the contract "would continue at a month-to-month rate based on market and wholesale factors, weather patterns, and pricing strategies."[5] Ex. 10, DEF000126 (Schuster TPV Call); Ex. 11, DEF093222 (Brous TPV call).

Plaintiffs offer no method at all for proving breach of *those* terms. They do not identify a classwide formula derived from "market pricing," "transportation costs," and "other market price factors"—plural—which are not even listed in the contract. Instead, Plaintiffs' experts calculate damages under three alternative, hypothetical contracts: (a) forecasted supply-related costs plus an arbitrary fixed 5–6% margin; (b) a counterfactual NYISO day-ahead wholesale proxy plus that same arbitrary fixed margin; and (c) a utility-dominated prevailing-retail benchmark that in

---

[4] Plaintiffs assert that "six courts have ruled on contested class certification motions in similar ESCO variable rate cases [and] certified a class." But those cases involved different contracts with materially different pricing commitments—often tied to identifiable benchmarks or more determinate standards—such that breach could be assessed with common proof. They did not involve contracts like Eligo's, which expressly tie rates to open-ended "market" factors without a uniform formula. As a result, none confronted the predominance problem presented here: the absence of any common method to determine what rate should have been charged in the first place. *See, e.g., Mirkin v. XOOM Energy, LLC*, 2023 WL 5622099 (E.D.N.Y. Aug. 31, 2023); *Martinez v. Agway Energy Servs., LLC*, 2022 WL 306437, at *8 (N.D.N.Y. Feb. 2, 2022), *rev'd on other grounds*, 2022 WL 1091607 (N.D.N.Y. Apr. 12, 2022); Ex. 1, *Bell v. Gateway Servs. Corp.*, NYSCEF No. 31168/2018 (Sup. Ct. Rockland Cnty. Jan. 8, 2021); *Roberts v. Verde Energy, USA, Inc.*, 2017 WL 6601993 (Conn. Super. Ct. Dec. 6, 2017); Ex. 2, *BLT Steak LLC v. Liberty Power Corp., LLC*, NYSCEF No. 151293/2013 (Sup. Ct. N.Y. Cnty. Aug. 14, 2020); *Claridge v. N. Am. Power & Gas, LLC*, 2016 WL 7009062 (S.D.N.Y. Nov. 30, 2016).

[5] This case, therefore, differs materially from cases in which the only question is whether a fixed promise was uniformly breached in the same way. For example, Plaintiffs cite *Claridge* and *Mirkin*, but those involved contracts nothing like those at issue here. In *Claridge*, the contract stated that the rate would be "calculated on the method stated above," but omitted any such method in the contract, thereby making the alleged deception itself common across the class. 2016 WL 7009062, at *1. And in *Mirkin*, the contract provided that variable rates would be based on "***actual and estimated supply costs***." 2023 WL 5622099, at *1. Those authorities are entirely irrelevant to Plaintiffs' failure to meet their burden to provide common proof of breach of the Variable Price Term at issue in *this* case.

practice collapses into a utility-rate comparator.[6] *See* Pls.' Class Cert. Br. 32–33; Expert Report of Edo Macan ("Macan Report"), ECF No. 326-24, ¶ 129; Felder Daubert at 18–20; Macan Daubert at 26–27.

None of those hypothetical, alternative contracts has anything to do with the actual contract language at issue here. The agreements at issue in this case say nothing about wholesale procurement cost, fixed profit margins, or utility rates, even making clear that "market" and "wholesale" are *separate* concepts. Exs. 20–22 (New York Residential Contracts); Ex. 12, Schuster Enrollment Packet; Ex. 13, Brous Enrollment Packet (referring to "market *and* wholesale factors"). The Second Circuit has repeatedly rejected efforts to rewrite similarly broad ESCO pricing provisions into cost-plus obligations or utility-rate guarantees. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 412–13 (2d Cir. 2023) (holding that "market-related factors" permit consideration of profit and competitive positioning); *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98–99 (2d Cir. 2019) (rejecting claim that ESCO rates must track procurement costs or utility prices).

That defect is fatal to predominance. Rule 23 requires a common method of proving breach of the contracts actually at issue, not a menu of alternative hypothetical provisions. *See Comcast*, 569 U.S. at 34–35; *see also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98–99 (S.D.N.Y. 2010) (no predominance where proving breach of contract for each individual would require "analysis of the unique characteristics" surrounding each individual and collecting cases). Because Plaintiffs do not even try to translate the actual contract language they invoke into a measurable standard, there

---

[6] Plaintiffs present Method #3 as a prevailing market rate that weights the average of the utility rate and ten representative ESCOs. Macan Report ¶ 174. But because the utility serves such a large share of customers in any service zone, that weighted average is effectively indistinguishable from the utility's price to compare ("PTC"). Even Mr. Macan had trouble distinguishing between the two methods. *See* Macan Daubert, ECF No. 367, at 22; Macan Dep. Excerpts, ECF No. 340-21, at 312 (acknowledging that Plaintiffs' "prevailing rate" and the utility price to compare "look very, very similar"); Macan Dep. Ex. 8 (ECF No. 340-41 at 5–6) (charts comparing utility price and weighted average).

is no way to determine breach for any class member, much less all of them at once, and certification must be denied.[7]

### 2. Plaintiffs Cannot Prove Breach of the Contract Their Lawyers Wish They Entered with Common Evidence.

Even if any of Plaintiffs' hypothetical, substitute contract language was at issue in this case, predominance would still fail.

First, determining whether any customer was overcharged under Plaintiffs' preferred cost-based approach would require reconstructing a different "correct" rate for each customer in each month based on customer-specific cost inputs. Those inputs include, among other things, usage patterns, load profiles, service classifications, geographic zones, and timing of consumption, all of which affect the cost to serve a given customer. *See* Ex. 1, Aron Report ¶¶ 71–74.

The record confirms that such inputs vary materially across the class. Eligo's forecasting tools, including the POWWR spreadsheets Plaintiffs rely on, required individualized inputs—such as usage history, capacity tag, and rate profile—to estimate supply costs. *See* Felder Daubert, ECF No. 369, at 11; Ex. 36, Glotzbach Dep. at 205–215. Those tools were used only for a narrow subset of *fixed-rate* customers and were not applied to the variable-rate customers at issue in this case. *Id.* So, replicating estimated costs here would require a separate, individualized calculation for each customer in each billing period.

---

[7] To be clear, this is not merely a dispute over contract interpretation. As Defendants explain in their summary judgment motion, the contract's broad references to "market conditions," "market pricing," and "other market price factors" necessarily afforded Eligo discretion in setting variable rates because the agreement identifies no closed set of inputs, no required weighting of those inputs, and no formula for translating them into a monthly rate. But even if the contract imposed some judicially enforceable pricing constraint, Plaintiffs still had to identify a single common method for translating the contract's actual terms into a contract rate and proving classwide deviation from that rate. They did not. Instead, they offered three alternative benchmarks divorced from the contract and asked the Court to treat proof of breach of those benchmarks as proof of breach of the contract at issue. That is no different than replacing a "commercially reasonable efforts" clause with a fixed deadline and calling proof of breach of the deadline proof of breach of the contract. If that sufficed, any contract claim could be certified by substituting an entirely different concrete term for the one the parties actually agreed to.

Plaintiffs' expert did not perform that individualized analysis. Instead, he replaced these customer-specific inputs with uniform assumptions and wholesale-cost proxies across materially different customers. *See* Felder Report, ECF No. 326-29, ¶ 34. That approach masks, rather than resolves, the variation in the underlying cost-related data. For example, the model would assign the same rate to (a) a residential heat customer whose high-volume winter consumption occurred in February and (b) a standard residential customer with lower usage in April, simply because both were billed in May—despite obvious differences in consumption patterns and the cost of supplying energy to those customers. *See id.*; Felder Daubert at 8–9.

The same problem arises under Plaintiffs' hypothetical utility-comparator pricing provisions. Utility prices vary based on customer-specific characteristics, including rate classification, usage patterns, and billing cycle. *See* Felder Daubert at 22–23 (citing Ex. 17, Felder Dep., ECF No. 364-17, at 351:18–352:20). There is no single "price to compare" even within a utility and a given month; rather, multiple prices apply depending on the customer's attributes. *Id.* Plaintiffs' use of averaged or proxy values does not eliminate those differences—it obscures them.

Courts confronting similar theories have rejected certification where liability depends on determining, for each class member, what should have been paid and whether that amount differs from what was actually paid. *See Kronenberg v. Allstate Ins. Co.*, 743 F. Supp. 3d 465, 491–96 (E.D.N.Y. 2024). The same is true here. Even if Plaintiffs could identify some abstract benchmark under their extra-contractual formulas, that does not establish breach or injury; determining whether any customer was harmed requires a customer-specific comparison of what was owed versus what was paid. *Id.*

Given Plaintiffs' failure of proof, this is not a case where common proof will answer the central liability question. It is a case that would require customer-by-customer and month-by-

month reconstruction of pricing, inputs, and outcomes. That is not predominance. *See Comcast*, 569 U.S. at 34–35; *see also Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 780 (8th Cir. 2013) (reversing certification of breach of contract claims arising out of a standardized insurance policy because what constitutes "usual and customary rates," the different injuries suffered and treated received by class members would "necessitate[] individual fact inquiries for each member of the class").

Plaintiffs' implied-covenant claim does not change that conclusion. It depends on the same individualized inquiries and provides no common standard for determining what rates should have been charged across the class. *See Diverse Partners, LP v. AgriBank, FCB*, 2019 WL 4305008, at *2–3, *7 (S.D.N.Y. Sept. 11, 2019) (recognizing that the implied-covenant claim presented a common question, but holding that individualized issues nonetheless defeated predominance and required denial of certification); *see also Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 510 (S.D.N.Y. 2011) (denying class certification on nationwide express and implied warranty claims where the claims raised "complicated issues of individual causation that predominate over common questions regarding the existence of a defect"). If anything, it introduces additional variability by asking what would have been "reasonable" for each customer under different circumstances.

Certification should be denied as to the contract and implied-covenant claims for this additional reason.

### 3. Plaintiffs Cannot Prove Deception or Causation with Common Evidence.

Plaintiffs' New York General Business Law ("GBL") claims fail predominance for the same basic reason as their contract claims: they cannot identify a theory of deception or injury that can be proven with common evidence. Instead, Plaintiffs' theory substitutes extra-contractual

pricing expectations for the actual disclosures customers received, and both deception and causation turn on individualized questions about what each customer saw, understood, and relied on in deciding to enroll and remain with Eligo.

To prevail under GBL § 349, Plaintiffs must prove "consumer-oriented conduct that is . . . materially misleading and that . . . plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Martinez*, 88 F.4th at 417 (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017)). While reliance is not required, causation is, and that requirement is dispositive here. *See Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 263 (E.D.N.Y. 2012). If a customer did not see or understand the alleged misrepresentation, it cannot have caused any injury. *See id.* ("If Plaintiff did not receive the letters, it follows that she could not have been injured by them."); *see also Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 85 (S.D.N.Y. 2010) (denying certification "because establishment of the causation and injury elements of Plaintiffs' [GBL § 349] claims will necessitate extensive individualized inquiries"); *Yeger v. E\*Trade Secs., LLC*, 65 A.D.3d 410, 413 (N.Y. App. Div. 2009) (denying certification despite common question of defendant's wrongful conduct because "this is only half the question," and whether the defendant's conduct "caused an individual class member to suffer actual damages depends upon facts so individualized that it is impossible to prove them on a class-wide basis") ; *Solomon,* 9 A.D.3d at 56 ("Even assuming that all the members of the class saw the same advertisements, questions as to whether each individual was reasonably misled by them predominate, given the alternative sources of information about [Defendant's product] that each may have had.").

That inquiry cannot be resolved with common proof. Customers encountered Eligo through multiple enrollment pathways—including TPV enrollment, online enrollment, and door-to-door

19

marketing—each involving different communications. *See* Ex. 2, NY UBP; Exs. 3–9, TPV scripts. Both named Plaintiffs enrolled via TPV calls, during which they were told that their rates would vary "based on market and wholesale factors, weather patterns, and pricing strategies," that savings were not guaranteed, and that they could cancel at any time. Ex. 10, Schuster TPV Call, at 1:37–56, 3:01–09; Ex. 11, Brous TPV Call. Those oral disclosures track the contract's market-based terms and directly undercut Plaintiffs' attempt to impose extra-contractual pricing expectations.

The written terms themselves—sent after enrollment—consistently provided for a "monthly variable kWh rate that may be periodically adjusted for market conditions" and "calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 12, Schuster Enrollment Packet; Ex. 13, Brous Enrollment Packet; *see also* Exs. 20–22, New York Residential Contracts. Setting aside that these disclosures were not misleading in any way, there is no evidence that either named Plaintiff actually read those materials. Brous testified she did not review the contract. Ex. 14, A. Brous Dep. at 112:15–17, 106:22–107:2. Schuster similarly testified that she merely "skimmed" it. Ex. 15, Schuster Dep. at 94:21–95:25. Those facts alone illustrate why causation cannot be established on a classwide basis: whether any alleged omission or misstatement caused injury depends on what each customer actually saw and considered. *See Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d at 263 ("If Plaintiff did not receive the letters, it follows that she could not have been injured by them.").

Plaintiffs' own theory confirms the problem. They allege that Eligo's welcome materials and contracts were deceptive because they failed to disclose specific pricing features—such as that rates might exceed utility prices or reflect internal pricing methodologies. *See* SAC, ECF No. 272, ¶¶ 117, 173. But customers did not receive or process those materials in a uniform way. Some customers enrolled online without TPV; others, like Plaintiffs, received oral disclosures before any

written materials. Some customers read the contract; others did not. And all customers received monthly bills disclosing Eligo's rates and continued service for years—more than seventy billing cycles for each Plaintiff—without cancelling. *See* Ex. 18, Brous Bills; Ex. 19, Schuster Bills. Whether any alleged omission caused any given customer injury is therefore an inherently individualized question. *Pelman*, 272 F.R.D. at 96.

Plaintiffs' damages theories underscore the same defect. Their "benefit-of-the-bargain" model depends on reconstructing a hypothetical "contract rate"—an exercise that, as shown above, requires individualized, customer- and month-specific inputs that their experts don't grapple with. Their alternative "price premium" model compares Eligo's rates to utility rates. But that theory assumes a uniform benchmark untethered to Plaintiffs' actual deception theory, which is not that Eligo promised utility rates, but that it failed to disclose various pricing considerations. *See* Pls.' Class Cert. Br. at 29–32; Macan Report ¶ 215 n.54; Felder Report ¶ 67. A model that measures price differences relative to a uniform benchmark cannot establish that any particular customer was injured "as a result of" a purported misrepresentation.

Nor can Plaintiffs avoid these individualized issues by pointing to standardized documents. Even where a form of communication exists, "whether a representation . . . [is] likely to mislead a reasonable consumer" depends on the surrounding context and the consumer's exposure to the alleged statement. *Martinez*, 88 F.4th at 417. Here, that context varies widely across the class. And even if a common question could be framed—such as whether certain language was misleading in the abstract—it would not resolve the critical question of causation: whether that language caused injury to any particular customer.

In short, Plaintiffs cannot show that deception or causation can be established "in one stroke." *Wal-Mart*, 564 U.S. at 350. Instead, the Court would have to examine, customer by

21

customer, what communications were received, whether they were read or understood, and whether they influenced the customer's decision to enroll or remain with Eligo. That would require tens of thousands of mini-trials with cross-examination of consumers and impeachment evidence from others with knowledge. Those individualized inquiries overwhelm any common questions and further preclude certification under Rule 23(b)(3).

### 4. Plaintiffs' Damages Models Fail *Comcast* and Cannot Establish Class-Wide Injury.

Plaintiffs assert (at 32–34) that "common damages issues predominate." But Plaintiffs' damages showing fails because they do not identify a theory-consistent method for proving class-wide injury. Instead, Plaintiffs present multiple damages models tied to competing and incompatible interpretations of the contract—and expressly reserve the right to revise those models depending on how the Court rules. Pls.' Class Cert. Br. at 33 (stating that "calculations can be updated to account for any subsequent order of this Court"). That is precisely what *Comcast* prohibits.

Under *Comcast*, Plaintiffs must show at the certification stage that damages are "capable of measurement on a classwide basis" through a model that measures "only those damages attributable to" their theory of liability. 569 U.S. at 35. The Second Circuit likewise requires Plaintiffs to "affirmatively demonstrate" compliance with Rule 23 with evidence now—not speculation about what might be shown later. *In re IPO*, 471 F.3d at 33; *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 117.

Plaintiffs do not meet that burden. They offer a set of alternative models and ask the Court to determine later which one—if any—matches the governing theory of liability. Such a result "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36.

22

### a.    Plaintiffs Do Not Offer a Theory-Consistent Model.

*Comcast* requires that "any model supporting a plaintiff's damages case must be consistent with its liability case" and must actually measure damages resulting from the class's asserted theory of injury. *Id.* at 35–36. Courts, therefore, must "examine the proposed damages methodology . . . to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 123 n.8; *accord Kronenberg*, 743 F. Supp. 3d 465, 500 (E.D.N.Y. 2024). Plaintiffs cannot satisfy that requirement by offering a menu of alternative models and asking the Court to decide later which one fits. *See Comcast*, 569 U.S. at 35–36.

That is precisely what Plaintiffs do here. They do not identify a single, coherent method for measuring classwide injury tied to their theory of liability. Instead, they offer multiple, incompatible approaches—each resting on different assumptions—and expressly reserve the right to revise their calculations depending on how the Court ultimately rules. *See* Pls.' Class Cert. Br. at 33. Rule 23 does not permit certification with scattershot damages theories the plaintiffs promise to revise later.

Plaintiffs' models fall into three categories—and each fails for the same reason: it does not measure the injury their theory of liability requires.

| Model Type | Plaintiffs' Method | What the Model Uses | Why It Fails Comcast |
|---|---|---|---|
| **Cost-Based Proxies (incl. repackaged variants)** | Methods 1, 2 & 6 | POWWR forecasts (developed for fixed-rate customers) or NYISO day-ahead prices (reused for unjust enrichment) | Uses proxies—not Eligo's actual costs or customer-specific rates; repackaging the same proxy under a different claim does not create a valid damages model tied to actual costs |
| **Utility-Based Benchmarks** | Methods 3 & 4 | Weighted ESCO/utility averages or utility "price to compare" (PTC) | Collapses materially different rates (zone, class, timing) into a single benchmark; no common "prevailing rate" exists |
| **Derivative / Statutory Models** | Methods 5, 7 & 8 | Outputs of other models or flat fee totals | Measures price differences or fees—not injury caused by breach or deception; untethered to causation |

23

Each category independently fails Comcast.

First, Plaintiffs' cost-based models (Methods 1, 2, and 6) do not measure what Plaintiffs' theory requires—namely, what Eligo should have charged any given customer. Method 1 relies on POWWR forecasts that were developed for a limited subset of *fixed*-rate customers, not the variable-rate customers at issue here. *See* Felder Daubert at 11. Method 2 substitutes NYISO day-ahead prices as a proxy for procurement costs, even though that assumption rests on an opaque and untestable methodology. *See id.* at 14. That alone severs the required fit between theory and model. The problem is compounded by how those prices are used. Day-ahead prices vary materially by hour—yielding hundreds of distinct prices each month—yet Method 2 collapses that variation into a non-weighted average that assigns equal weight to low-demand overnight hours and peak demand periods, when supply needs and costs differ substantially. *See id.* The resulting figure is not a measure of Eligo's actual procurement costs for any customer or any month; it is an artificial construct derived from generalized NYISO pricing data.

Method 6 simply repackages that same proxy as a measure of unjust enrichment. *See* Felder Report ¶ 72. But unjust enrichment requires proof that Defendant was enriched at Plaintiffs' expense and that equity and good conscience require restitution. *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (2018). That showing cannot be made here with common proof because Method 6 does not identify the amount any customer should have paid under the contract or whether Eligo retained any improper benefit.  As the court explained in *Kronenberg*, plaintiffs cannot establish unjust enrichment on a classwide basis where they fail to "identify with common evidence a 'true'" amount that should have been paid and thus cannot show that the defendant was "enrich[ed] unjustly at the expense of" the class. 743 F. Supp. 3d at 500 (quoting *Choi v. Tower*

*Rsch. Cap. LLC*, 2022 WL 4484485, at \*9 (S.D.N.Y. Sept. 27, 2022); *Ga. Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012)).[8]

Second, Plaintiffs' retail and utility benchmark models (Methods 3 and 4) likewise fail to measure any common injury. Those models assume that a single "prevailing" or utility-based rate can serve as the benchmark for all class members. But as Plaintiffs' own expert acknowledged, there is no single such rate: prices vary by utility zone, rate classification, billing cycle, and timing. *See* Felder Dep., ECF No. 364-17, at 351:18–352:20. Method 3 obscures that variation through a weighted average dominated by utility pricing, while Method 4 relies entirely on the utility PTC. Neither approach measures the rate a particular customer should have received pursuant to Plaintiffs' utility-based theory, and both ignore differences in customer characteristics and market conditions. Because the methods neither measure a common injury nor establish unjust enrichment through common evidence, they fail *Comcast* and cannot support predominance.

Third, Plaintiffs' derivative and statutory models (Methods 5, 7, and 8) fail for a more fundamental reason: they do not attempt to measure injury at all. Method 5 fails for the same reasons as Methods 1–4 because it simply layers statutory multipliers onto the same defective underlying calculations. *See* Felder Daubert 17–18. Method 5 also aggregates price differences and applies statutory minimums and trebling, without accounting for whether a class member was injured "by reason of" a deceptive act, as GBL § 349 requires. N.Y. Gen. Bus. Law § 349(h).[9]

---

[8] Nor does Method 6 account for the individualized circumstances that bear on whether retention of a payment would be inequitable. For example, Plaintiffs' approach applies a uniform benchmark to all customers, even though some customers switched from other ESCOs and would not have received—or expected to receive—the utility rate in a but-for world. *See* Felder Daubert at 22; *see also* Ex. 16, DEF093950 (Brous Pre-Eligo Customer Information); Ex. 17, DEF093953 (Schuster Pre-Eligo Customer Information). Such considerations "pose[] the most intractably individualized issues" and require examination of customer-specific transactions. *Choi v. Tower Rsch. Cap. LLC*, 2022 WL 4484485, at \*9 (S.D.N.Y. Sept. 27, 2022).

[9] Even if Plaintiffs invoke GBL § 349(h)'s statutory minimum as a classwide damages measure, that does not resolve predominance. The statute permits recovery only for a person "who has been injured," and requires a comparison between actual damages and the statutory award. *See Kronenberg*, 743 F. Supp. 3d at 502 n.34 (citing *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 466 n.19 (E.D.N.Y. 2023)). Where, as here, plaintiffs allege damages

25

Predominance fails where those elements cannot be shown with common evidence. *Kronenberg*, 743 F. Supp. 3d at 499. Method 5 ignores that requirement by treating any price difference as a compensable injury, rather than asking whether the difference was caused by a materially misleading practice. Methods 7 and 8 suffer from the same defect. Method 7 merely totals monthly fees that were part of the rate, without linking those fees to a deceptive practice. Method 8 then applies statutory multipliers to those same undifferentiated totals. In each instance, the model measures price differences, not injury attributable to deception. Because Methods 5, 7, and 8 do not tie damages to common proof of injury and causation, they cannot establish predominance.

> ### b.      *Plaintiffs Cannot Prove Classwide Injury Even Under Their Models.*

Even setting aside the mismatch between theory and model, Plaintiffs' methods cannot establish injury with common proof, as set out in Sections IV.A.i–ii, *supra*. Each approach requires customer-by-customer and month-by-month determinations of what each customer should have paid under the selected benchmark.

### 5.      Individualized Defenses Further Defeat Predominance.

Plaintiffs' individual cases additionally reveal a series of individualized defenses that would require customer-specific adjudication. First, the case raises voluntary-payment and customer-choice issues. The voluntary payment doctrine "bars recovery of payments voluntarily made with full knowledge of the facts." *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 74 (S.D.N.Y. 2013) (quoting *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d 49, 55 (N.Y. App. Div. 2004)).

---

per customer per month far exceeding the statutory minimum, determining whether any class member would recover actual or statutory damages "would likely be required for each class member," defeating predominance. *Id.*; *see, e.g.*, Macan Report ¶¶ 238–39 (asserting that Plaintiffs' "damages under GBL §§ 349, 349-d(3), and 349-d(7) are the actual damages . . . because actual damages are higher than the statutory minimums"). And unlike cases where statutory damages exceed any claimed injury and thus supply a uniform measure, *see Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at *7 (E.D.N.Y. July 23, 2021), Plaintiffs here identify no reliable classwide method for making that comparison.

Customers received monthly utility bills disclosing Eligo's rate, and the named Plaintiffs paid those bills for years without objection or cancellation. Evaluating whether, and to what extent, individual customers knowingly continued service after reviewing their bills and concluding they may have been overcharged is a necessarily individualized inquiry. *See id*.

Second, customers may have preferred green energy despite a higher price. Again, Plaintiffs' own claims back that up, with Brous testifying that her "main concern had to do with the environment" when choosing to use solar energy at her business. A. Brous Dep. at 12:25–13:8; *see also id*. at 120:13–121:4 (testifying, "I know who I am and I would have been concerned about [the environment]" when signing up with Eligo). That defense is especially relevant where, as Plaintiffs' own expert explains, the NYPSC allowed qualifying renewable products to be sold at market prices and recognized that such products may carry a premium commensurate with incremental costs. Felder Report ¶¶ 20–21. Whether a given customer knowingly selected, valued, or retained a green-energy product—and what representations Eligo made about those products in the various channels through which customers interacted with Eligo—is not amenable to one common answer.

Third, both named Plaintiffs switched from another ESCO rather than a utility. Methods 3 and 4 are particularly inapt for them and anyone like them, not comparing Eligo to utility default service. That is yet another individualized issue. The need to litigate these customer-specific defenses confirms that common questions do not predominate.

Fourth, individualized offset and no-injury defenses further defeat predominance. As the court explained in *Vaccariello*, "a plaintiff who has received billing credits as compensation for defendant's allegedly deceptive practices is prohibited from asserting a GBL § 349 claim," and determining which class members received such credits raises "additional individual issues." 295

27

F.R.D. at 74 (S.D.N.Y. 2013) (citing *Solomon*, 9 A.D.3d at 55). The same is true here. The record already reflects that billing credits were issued to at least one named Plaintiff. *See* Ex. 37, DEF093272 (check issued to Brous reflecting billing credit). To the extent Eligo customers received refunds, credits, or other account adjustments, the Court would need to determine, customer by customer, whether any alleged injury was reduced or eliminated. That inquiry cannot be resolved with common proof and instead requires individualized review of account-level billing and credit histories—further confirming that individualized issues predominate.

### B.    Plaintiffs Cannot Satisfy Rule 23(A).

#### 1.    Plaintiffs Are Not Adequate Representatives.

Adequacy of a proposed class representative "is widely considered the most important" Rule 23(a) requirement because absent class members will be bound by the result of the litigation. *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015). The inquiry turns on whether the named plaintiffs are credible, sufficiently informed, and capable of serving as fiduciaries for the class. *Id.* at 199. Plaintiffs fail that standard here.

##### a.    *Plaintiff Schuster is Subject to Disqualifying Credibility Issues.*

Plaintiff Schuster's adequacy fails for a straightforward reason: she has given demonstrably false testimony about a central issue in the case. Schuster claimed that she received and relied on a marketing mailer that she later admitted she never saw. Ex. 15, Schuster Dep. at 94:21–95:25. That is not a collateral inconsistency. Plaintiffs' GBL claims turn on allegedly deceptive communications, and Schuster's account of those communications is therefore central to liability.

The record shows that this was not a mistake, but a litigation-driven assertion necessary to sustain Plaintiffs' statutory theory—namely, that liability can be predicated on materials other than the contract itself. *See supra* § IV.A.iii; *see also* Defs.' Mot. to Re-Open Plaintiff Schuster's

28

Deposition & Compel Written Discovery, ECF No. 150, at 2. Where a named plaintiff's testimony is tailored to support a contested legal theory and then shown to be false, adequacy is lacking.

The Second Circuit's decision in *Savino v. Computer Credit, Inc.* is directly on point. There, the district court denied class certification where the plaintiff's inconsistent accounts of a key communication created credibility issues likely to "become the focus of the litigation," and the Second Circuit affirmed. 173 F.R.D. 346, 357 (E.D.N.Y. 1997), *aff'd*, 164 F.3d 81, 87 (2d Cir. 1998) (quotation omitted). The same is true here. Schuster's credibility will be a central issue at trial, and her testimony will be subject to impeachment on matters that go to the heart of Plaintiffs' claims. A representative who cannot be trusted to provide truthful testimony about core facts cannot serve as a fiduciary for absent class members.

### b.    *Plaintiff Brous is a Litigation-Driven, Figurehead Representative.*

Plaintiff Brous is no more adequate. The record shows that this case did not originate with her, but with her late husband, and that she was substituted after his death. Pls.' Class Cert. Br. at 12–13. Her involvement has been mediated through others—most notably her son, who handled communications with Eligo and played a central role in the dispute. *Id.* at 13; *see also* Letter-Mot. to Compel Commc'ns Involving Ramsey Brous, ECF No. 277. And like Schuster, Brous had no identified issue with Eligo's service prior to attorney solicitation.

More fundamentally, Brous lacks the basic knowledge required of a class representative. She did not review the key documents at issue, cannot describe the alleged deception, and does not know how she was damaged. A. Brous Dep. at 76:6–9, 93:24–94:1, 30:17–20, 30:14–16, 30:21–23, 63:5–64:4. Courts routinely reject such "figurehead" plaintiffs—those who did not initiate the litigation, lack familiarity with the claims, and rely on others to prosecute the case—as

29

inadequate representatives. *See Russell v. Forster & Garbus, LLP*, 2020 WL 1244804, at *8 (E.D.N.Y. Mar. 16, 2020); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 256 (S.D.N.Y. 1985).

That concern is heightened here, where Plaintiffs' counsel has pursued similar claims against multiple ESCOs based on a generalized disagreement with the business model, rather than any plaintiff-specific grievance. This defect is confirmed by the fact that Brous initiated this lawsuit at her son's urging after he spoke with Plaintiffs' counsel—even though neither Brous nor her son had read the agreement they now claim was breached. *See* Letter-Mot. to Compel Commc'ns Involving Ramsey Brous, ECF No. 277. In these circumstances, Brous is not acting as an independent fiduciary for the class, but as a litigation placeholder.

Taken together, these deficiencies confirm that the named Plaintiffs cannot adequately represent the proposed class. One plaintiff lacks the credibility necessary to present the case; the other lacks the knowledge and independence required to supervise it. Rule 23(a)(4) is therefore not satisfied.

### 2.    Plaintiffs' Claims Are Not Typical.

Separately, this case will not be litigated as a classwide dispute about Eligo's conduct, but as a series of individualized defenses directed at the named Plaintiffs. Rule 23(a)(3) requires that the representative's claims be typical of the class. Typicality is lacking where the named plaintiffs are subject to unique defenses that are likely to become the focus of the litigation. *See, e.g.*, *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). That is the case here.

First, both named Plaintiffs switched to Eligo from another ESCO—not from a utility. Ex. 16, DEF093950 (Brous Pre-Eligo Customer Information); Ex. 17, DEF093953 (Schuster Pre-Eligo Customer Information). That fact creates a fundamental mismatch between their claims and Plaintiffs' theory of liability, which assumes that customers would otherwise have purchased electricity at the utility "price to compare." If these Plaintiffs would not have received the utility

30

rate in a but-for world, then their claims are subject to individualized causation and damages defenses that do not apply to many other class members. Those defenses would necessarily become a central focus of the case.

Second, Plaintiff Brous is subject to unique defenses concerning contract formation, reliance, and causation. She did not read the Welcome Packet or contract, enrolled via TPV under her husband's name, and cannot identify any misrepresentation on which she relied. Ex. 14, A. Brous Dep. at 107:3–13, 112:14–17. Courts routinely deny certification where a named plaintiff's failure to review the alleged misrepresentation gives rise to individualized reliance issues that would dominate the litigation. *See Smith v. John Hancock Ins. Co.*, 2008 WL 4145709, at *2 (E.D. Pa. Sept. 3, 2008); *see also Beck*, 457 F.3d at 301.

Third, Plaintiff Schuster is subject to a unique and substantial credibility defense arising from her claim that she received a marketing mailer that she later admitted she never saw. Ex. 15, Schuster Dep. at 58:23–59:15; Defs.' Mot. to Re-Open Plaintiff Schuster's Deposition & Compel Written Discovery, ECF No. 150, at 2. Because Plaintiffs' deception theory depends on alleged communications with consumers, this issue will inevitably become a focal point at trial. A case that turns on the credibility of the named plaintiff with respect to a central communication is not one that can proceed on a representative basis.

These typicality problems are compounded by Plaintiffs' effort to aggregate materially different customer groups into a single class. The proposed class is composed largely of customers who purchased 100% renewable energy—a premium product that, by design, carries different pricing inputs and consumer expectations than lower-renewable or non-renewable offerings. Lumping together customers who selected different products with different attributes and price structures only amplifies the individualized issues described above. Because the named Plaintiffs'

claims are vulnerable to multiple individualized defenses—and are not representative of these materially different customer groups—they are not typical of the proposed class, and Rule 23(a)(3) is not satisfied.

### 3.    Plaintiffs Cannot Establish Commonality.

Plaintiffs cannot satisfy even Rule 23(a)(2)'s commonality requirement, often referred to as "predominance light." Commonality requires a common contention capable of producing a common answer that resolves the litigation "in one stroke." *Wal-Mart*, 564 U.S. at 350. As explained in Section IV.A, Plaintiffs' claims do not admit of such an answer. Their core questions—whether Eligo complied with the Variable Price Term and whether customers were overcharged—turn on disputed contract interpretations, competing benchmarks, and customer- and month-specific inputs that yield different answers depending on the theory applied. Plaintiffs' own experts confirm that no single methodology resolves those questions across the class. And their statutory claims likewise depend on individualized inquiries into what each customer saw, received, and relied on. Because Plaintiffs' claims cannot be resolved through a common answer "in one stroke," commonality is lacking.

### C.    A Class Action Is Not Superior.

Rule 23(b)(3) also requires Plaintiffs to show that a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 468–69 (S.D.N.Y. 2005). They cannot make that showing here.

This case would not proceed as a single, cohesive trial. As explained in Section IV.A, it would require layered determinations regarding contract construction, competing liability theories, benchmark selection, expert assumptions, customer communications, and representative-specific credibility issues—followed by customer-by-customer reconstruction of usage, billing data, and comparator rates. That is not a superior method of adjudication; it is an unmanageable one.

32

Superiority also fails because this is not a case involving small, negative-value claims that require aggregation to be vindicated. Plaintiffs' own expert estimates that the named Plaintiffs' alleged damages under their statutory theories are in the thousands of dollars. *See* Macan Report ¶¶ 238–39. Where individual claims are substantial, class treatment is not necessary to provide access to relief. *See Spagnola*, 264 F.R.D. at 99 (noting that "class treatment is appropriate in 'negative value cases,' where the individual interest of each class member's interest in the litigation is less than the cost to maintain an individual action"); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 350 (S.D.N.Y. 2002) (finding no superiority where the plaintiffs contended that contamination caused "a reduction of property value, for every class member," because plaintiffs could employ tort lawyers on a contingency basis to pursue damages). And to the extent Plaintiffs suggest that damages could be limited to statutory minimums or nominal amounts to avoid individualized issues, that approach underscores the absence of superiority. Courts have recognized that certifying a class on such a basis risks "foreclosing broad swaths of plaintiffs from pursuing much more valuable individual cases." *Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 11–12 (D.D.C. 2024). That concern applies here.

The regulatory context reinforces the point. Plaintiffs' own expert describes an extensive framework of NYPSC oversight governing ESCO practices, including the permissibility of renewable products and variable-rate offerings. Felder Report ¶¶ 15–23. The existence of ongoing regulatory supervision further weakens any claim that a sprawling class action plagued with individualized issues and made-up, inconsistent contract theories is the superior mechanism for resolving Plaintiffs' claims.

33

At bottom, Plaintiffs offer no meaningful explanation of why this case should proceed as a class action rather than through individualized litigation. Rule 23(b)(3) requires more than conclusory assurances. Superiority is lacking.

### D.       Rule 23(b)(2) Certification Is Improper.

Plaintiffs' request for certification under Rule 23(b)(2) should be denied. That provision applies only where "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," not where the case is fundamentally about individualized monetary recovery. *Wal-Mart Stores*, 564 U.S. at 360–61. The Second Circuit and courts in this Circuit have repeatedly rejected (b)(2) certification where, as here, plaintiffs primarily seek damages for alleged overcharges. *See, e.g.*, *Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (reversing Rule 23(b)(2) certification where the court would have to "determine the separate monetary recoveries to which individual plaintiffs are entitled from the funds disgorged," rendering the process "non-incidental" and "individualized"); *Leider v. Ralfe*, 2003 WL 24571746, at *10–11 (S.D.N.Y. Mar. 4, 2003) (noting that 23(b)(2) certification requires that the damages issue "neither introduce[s] new and substantial legal or factual issues, nor entail[s] complex individualized determinations," and denying certification because determining damages would "give rise to precisely such problems"); *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 68 (S.D.N.Y. 2015) (quoting *Wal-Mart*,  564 U.S. at 360) (holding that "[i]ndividualized monetary claims" that are "not incidental to the injunctive or declaratory relief" sought "are inappropriate in a class certified under Rule 23(b)(2)").

Plaintiffs' own motion confirms that this case is centered on monetary relief—overcharges, price differentials, monthly fees, statutory damages, and trebling—supported by extensive expert calculations. Pls.' Class Cert. Br. at 12–17, 32–34. Their request for injunctive relief is at most incidental to that damages-focused theory and therefore cannot support certification under Rule

34

23(b)(2). See *Wal-Mart*, 564 U.S. at 360–61. Rule 23(b)(2) "does not authorize class certification when each class member" is allegedly "entitled to an individualized award of monetary damages." *Id.* As explained at length above, Plaintiffs' eight contradictory damages theories have failed to show even an appropriate contract rate that could establish any relief—whether an injunction or damages—for the class as a whole.

In any event, injunctive relief is not appropriate here. Due to regulatory changes, for customers who have been enrolling since March 2024, Eligo no longer offers variable-rate electricity supply contracts. Plaintiffs have not shown otherwise. ████████████████████ ███████████████████████ *See* Ex. 28, Ashuev Dep. at 89:5–16. Where there is no ongoing conduct to enjoin, Rule 23(b)(2) certification is improper. *See, e.g.*, *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147–48 (2d Cir. 2020) (vacating 23(b)(2) certification and approval of settlement where past purchasers of the defendant's product had, "at most, alleged a past harm," which is "of the kind that is commonly redressable at law through the award of damages," and thus not susceptible to 23(b)(2) certification); *Ault*, 310 F.R.D. at 68 (denying 23(b)(2) certification where the defendant had removed or was in the process of removing all offending labels from its products).

Certification under Rule 23(b)(2) should therefore be denied.

## V.    CONCLUSION

At bottom, Plaintiffs ask the Court to certify a class without a common contract standard, without a common liability theory, without a valid damages model, without common proof of causation, and notwithstanding the existence of various other individual defenses and issues. Rule 23 and binding authority do not permit certification under these circumstances. For the foregoing reasons, Eligo respectfully requests that the Court deny Plaintiffs' motion for class certification.

Dated: March 27, 2026

Respectfully submitted,

/s/ Ryan D. Watstein
Ryan D. Watstein (*pro hac vice*)
David Meadows (*pro hac vice*)
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
75 14th St NE, Ste. 2600
Atlanta, GA 30309
Tel: (404) 418-8307
ryan@wtlaw.com
dmeadows@wtlaw.com
lotoole@wtlaw.com

*Attorneys for Defendants Eligo Energy, LLC*
*and Eligo Energy NY, LLC*

36

**LOCAL CIVIL RULE 7.1 CERTIFICATION**

I certify that this Memorandum of Law contains 11,506 words and complies with Local Civil Rule 7.1's requirements for a 35-page brief (8,750 words for a 25-page brief plus 350 words per additional 10 pages, for a total word limit of 12,250). See ECF 321 at 2.

*/s/ Ryan D. Watstein*
Ryan D. Watstein

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein

37