**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ANNE BROUS, AS THE EXECUTOR OF
THE ESTATE OF IRA BROUS and
MICHELLE SCHUSTER, on behalf of
themselves and all others similarly situated,

     Plaintiffs,

v.

ELIGO ENERGY, LLC and ELIGO
ENERGY NY, LLC,

     Defendants.

Case No. 1:24-CV-01260-ER

---

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   STATEMENT OF MATERIAL FACTS ...........................................................3

    A.    Eligo Sells Green Energy in New York's Competitive ESCO Market. ..................3

    B.    Plaintiffs Enroll in a Green Plan With Eligo and
       Continue as Eligo Customers for 6+ Years. ...........................................................4

    C.    Eligo Set and Adjusted Its Market Rates
       Based on Individualized Market Factors. ................................................................7

    D.    Plaintiffs Cancelled Their Eligo Service After Seeing Lawyer Ads. ......................9

III.  ARGUMENT .....................................................................................................10

    A.    Legal Standard.....................................................................................................10

    B.    Plaintiffs' Claims Fail as a Matter of Law. ..........................................................10

       1.    Eligo Set Variable Rates in Compliance
          with Its Customer Contract.........................................................................10

          a)    Eligo Never Promised to Base Variable Rates or Its
              Wholesale Procurement Costs Plus an Arbitrary Margin..............11

          b)    The Contract Vested Eligo with
              Discretion to Set Variable Rates...................................................13

          c)    Eligo Set Variable Rates in Compliance with the Contract. .........16

          d)    Plaintiffs' Claim for Breach Based on an Unauthorized
              Fee is Barred by the Voluntary Payment Doctrine........................19

       2.    Eligo Did Not Breach the Implied Duty
          of Good Faith and Fair Dealing..................................................................20

       3.    Plaintiffs' Claims Under New York
          GBL § 349 Fail as a Matter of Law...........................................................23

       4.    Plaintiffs Have No Claim For Unjust Enrichment. ....................................25

IV.   CONCLUSION .................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*19 Recordings Ltd. v. Sony Music Ent.*,
　97 F. Supp. 3d 433 (S.D.N.Y. 2015) ...................................................................................20

*ARI & Co. v. Regent Int'l Corp.*,
　273 F. Supp. 2d 518 (S.D.N.Y. 2003) .................................................................................21

*Atronic Int'l, GmbH v. SAI Semispecialists of Am., Inc.*,
　2007 WL 2493482 (E.D.N.Y. Aug. 29, 2007).....................................................................12

*Broadway Nat. Bank v. Progressive Cas. Ins. Co.*,
　775 F. Supp. 123 (S.D.N.Y. 1991) ......................................................................................10

*Brown v. Agway Energy Servs., LLC*,
　822 F. App'x 100 (3d Cir. 2020) ...................................................................................12, 13

*Camcara, Inc. v. Air Prods. & Chemicals, Inc.*,
　663 F. Supp. 3d 443 (E.D. Pa. 2023) ..................................................................................15

*Dillon v. U-A Columbia Cablevision of Westchester, Inc.*,
　100 N.Y.2d 525 (2003) ........................................................................................................20

*DRMAK Realty LLC v. Progressive Credit Union*,
　133 A.D.3d 401 (2015) ........................................................................................................19

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
　720 F.3d 84 (2d Cir. 2013) .......................................................................................20, 21, 22

*Gentile v. John Hancock Mut. Life Ins. Co.,*
　951 F. Supp. 284 (D. Mass. 1997) ......................................................................................15

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
　8 F. Supp. 3d 467 (S.D.N.Y. 2014) .....................................................................................25

*Harris v. Provident Life & Accident Ins. Co.*,
　310 F.3d 73 (2d Cir. 2002) ............................................................................................21, 22

*Jackson v. Harvest Cap. Credit Corp.*,
　2020 WL 705084 (S.D.N.Y. Feb. 12, 2020)........................................................................11

*Jackson v. Harvest Cap. Credit Corp.*,
　848 F. App'x 455 (2d Cir. 2021) .........................................................................................11

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
　274 F.3d 706 (2d Cir. 2001) ................................................................................................15

*L. Debenture Tr. Co. of N.Y0 v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ................................................................................15

*Life Ins. Fund Elite LLC v. Hamburg Com. Bank AG*,
   545 F. Supp. 3d 86 (S.D.N.Y. 2021) ...................................................................21

*Martinez v. Agway Energy Services*,
   88 F.4th 401 (2d Cir. 2023) ..........................................................................passim

*Mass. Laborers' Health and Welfare Fund v. Blue Cross Blue Shield of Mass.*,
   66 F.4th 307 (1st Cir. 2023)................................................................................16

*Mirkin v. XOOM Energy, LLC*,
   931 F.3d 173 (2d Cir. 2019) ...............................................................................16

*Moreno-Godoy v. Kartagener*,
   7 F.4th 78 (2d Cir. 2021) ....................................................................................10

*Nieves v. Just Energy New York Corp*,
   2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020) .............................................13, 14

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
   722 F.3d 861 (6th Cir. 2013) ..............................................................................16

*Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
   769 F.3d 807 (2d Cir. 2014) ...............................................................................20

*Polcom USA, LLC v. Affiliated FM Ins. Co.*,
   551 F. Supp. 3d 290 (S.D.N.Y. 2021) ................................................................21

*Richards v. Direct Energy Services*,
   915 F.3d 88 (2d Cir. 2019) ...........................................................................passim

*Sevugan v. Direct Energy Servs., LLC*,
   931 F.3d 610 (7th Cir. 2019) .........................................................................18, 19

*Sommer v. CleanChoice Energy*,
   800 F. Supp. 3d 239 (D. Mass. Sept. 9, 2025)................................................14, 15

*Stanley v. Direct Energy Servs., LLC*,
   466 F. Supp. 3d 415 (S.D.N.Y. 2020) ................................................................25

*TVT Recs. v. Island Def Jam Music Grp.*,
   412 F.3d 82 (2d Cir. 2005) .................................................................................12

*United States Naval Institute v. Charter Communications Inc.*,
   875 F.2d 1044 (2d Cir.1989) ..............................................................................10

iii

*Utica Mut. Ins. Co. v. Am. Re-Ins. Co.*,
218 A.D.3d 1283 (2023) ......................................................................................................19

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
1 N.Y.3d 470 (2004) ...........................................................................................................11

*W.W.W. Assocs., Inc. v. Giancontieri*,
566 N.E.2d 639 (N.Y. 1990) ...............................................................................................11

*Weinberg v. CleanChoice Energy, Inc.*,
2024 WL 3446515 (S.D.N.Y. July 17, 2024) .....................................................................14

**Statutes**

N.Y. Gen. Bus. Law § 349-d .........................................................................................................23

N.Y. Pub. Serv. L. § 66 ...................................................................................................................3

**Rules**

Fed. R. Civ. P. 56 ...........................................................................................................................10

**Other Authorities**

*Cases 94-E-0952 et al.*, Opinion No. 96-12, Opinion & Order Regarding Competitive
Opportunities for Electric Service (N.Y. Pub. Serv. Comm'n May 20, 1996) ........................3

## I.    INTRODUCTION

This case concerns whether a market-based ESCO contract—i.e., a contract with an energy services company that sells electricity in a deregulated retail market—can be rewritten as a cost-plus agreement. The Second Circuit has already answered that question in the negative. In *Richards v. Direct Energy Services* and *Martinez v. Agway Energy Services*, the court held that contracts tying variable rates to "business and market conditions" or "market-related factors" do not impose cost-based pricing or tie variable rates to procurement costs. 915 F.3d 88, 97–98 (2d Cir. 2019); 88 F.4th 401, 412–13 (2d Cir. 2023). *Richards* further rejected as "near frivolous" the argument that utilities, rather than other ESCOs, are the relevant comparator market for ESCOs. 915 F.3d at 99.

Like *Richards* and *Martinez*, Plaintiffs' contract with Eligo makes no mention of cost-plus pricing. It instead provides that, after a brief period of fixed rates, Eligo's variable rate "may be periodically adjusted for market conditions" and "shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Plaintiffs confirmed their agreement to market pricing during a regulator-approved and recorded third-party verification, or TPV, call. There, the Plaintiffs verbally acknowledged their variable rates would be based on "market and wholesale factors, weather patterns, and pricing strategies," with "no guarantee" of "savings" and the right to cancel at "any time."

The undisputed facts show Eligo priced its product as the contract permits. It set and adjusted rates based on market conditions and various market factors, including customer- and territory-specific data and competitor pricing, consistent with the contract. That resulted in market rates that remained within the range charged by other ESCOs.

Plaintiffs now complain that Eligo's rates were too high, but they were free to shop elsewhere for the same renewable product Eligo sold, or opt for the certainty of a longer fixed rate.

1

That's a principal feature of a deregulated retail market. But they chose not to do so. Instead, Plaintiffs remained Eligo customers for more than six years, and paid Eligo's itemized monthly bills without objection—and only sued when they saw attorney advertisements. That should be the end of the case: Plaintiffs knowingly accepted a market-priced, cancel-at-will renewable product not offered by utilities, and Eligo delivered exactly that. Because Eligo didn't breach the terms Plaintiffs agreed to, it is entitled to summary judgment.

Plaintiffs cannot avoid that outcome by rewriting the contract to replace its market-based pricing with a "wholesale cost plus a fixed 5-6% markup" pricing formula that appears nowhere in the contract. Plaintiffs' invented 6% margin on wholesale costs is insufficient to cover Eligo's operating expenses, much less sustain the business. *Richards* and *Martinez* stand for the proposition that the contract's market-based pricing means exactly what it says: that Eligo was not obligated to base its rates solely on its costs, and that Eligo was free to consider ordinary business considerations, like competitor prices, customer retention, and its own profit, in setting rates.

Plaintiffs' remaining claims fail for similar reasons. The implied-covenant claim has no independent factual predicate and must therefore be dismissed as duplicative. It also fails because it contradicts the contract's plain terms. Plaintiffs' original statutory deception claim was based on Plaintiff Schuster's false testimony about receipt of a deceptive mailer that she retracted. Plaintiffs' fallback statutory deception claim—based on the contract itself—also fails because no reasonable consumer could be misled where multiple disclosures accurately describe a market-priced product and are reinforced through years of billing at a price in line with the ESCO market. Plaintiffs can't establish causation either, as they did not even read the contracts. And because an enforceable contract governs, unjust enrichment is unavailable as a matter of law.

In sum, Plaintiffs agreed to a market-based variable rate when they signed up with Eligo and when they paid Eligo's invoices for nearly eight years. They now ask the Court to retroactively

2

impose a cost-plus price the parties never agreed to. The Second Circuit has already rejected that tactic in *Richards* and *Martinez*. This Court is bound to do the same.

## II.    STATEMENT OF MATERIAL FACTS

### A.    Eligo Sells Green Energy in New York's Competitive ESCO Market.

Eligo is an ESCO that supplies electricity to residential customers in several states, including New York. The creation of ESCOs, and the regulatory backdrop against which they operate, is well-established in this circuit. *See generally Martinez*, 88 F.4th at 406 (discussing the creation and operation of ESCOs in New York).

Until 1996, New York residents "had no choice but to purchase electricity from their local incumbent utility." *See Martinez*, 88 F.4th at 406. That year, the New York Public Service Commission (the "Commission") deregulated aspects of the retail electricity market to promote competition and innovation. *Id.*; *see also Cases 94-E-0952 et al.*, Opinion No. 96-12, Opinion & Order Regarding Competitive Opportunities for Electric Service (N.Y. Pub. Serv. Comm'n May 20, 1996); N.Y. Pub. Serv. L. § 66(12-b)(b). Part of the Commission's goal was to encourage the provision of renewable energy, which generally was not (and is not) provided by utilities. *See* Ex. 1, Expert Report of Debra Aron ("Aron Report") ¶¶ 40, 63–65. Under this deregulated landscape, consumers have a choice between ESCOs and utilities. *Martinez*, 88 F.4th at 406.

Though ESCOs are not regulated in the same manner as utilities, "[t]he Commission maintains supervisory authority over all ESCOs in the State of New York." *Id*. As relevant here, the Commission adopted Clean Energy Standards in 2016, with the goal of increasing the amount of renewable electricity in New York's power grid. *See id.* ¶¶ 43–45 (citing the Commission's August 1, 2016 Clean Energy Standard Order). Under that order, suppliers could purchase renewable energy certificates, or RECs: tradeable instruments representing one megawatt-hour of renewable energy delivered into the New York power grid. *Id*. at ¶¶ 45–46.

3

The higher the renewable content of an ESCO product, the more RECs the ESCO must purchase to cover that product's load. *See id.* ¶¶ 45, 47, 49, 52-54. For that reason, the Commission has recognized that ESCO customers, like Plaintiffs, "who voluntarily buy clean energy 'are New York's most valuable asset towards achieving'" its renewable energy goals. *Id.* ¶ 62. That's because green energy only gets sent into the grid if people are willing to fund it by buying renewable plans, as it remains generally more expensive than the brown energy the general public wants to pay for. *Id.* ¶¶ 45–47, 55.

Eligo's customers provided a particular benefit to the grid. That's because Eligo supplies considerably more renewable energy than utilities and other ESCOs, including more "than 62 to 81 percent of all ESCOs … in each year from 2021 to 2023." *Id.* ¶¶ 129–31.

In 2019, the Commission ordered that, going forward, any product an ESCO offers to mass-market customers must either (a) include guaranteed savings relative to utility prices, (b) be a fixed-price product with a price limit, or (c) be a product classified as coming from renewable sources. *Id.* ¶¶ 50–54 (citing 2019 NY PSC Order, pp. 23, 39–41). For ESCOs offering the third option, the Commission did not require any savings or regulate ESCO prices. *Id.* ¶ 55. That's because the Commission recognized, "ESCOs likely cannot provide renewable energy in a percentage greater than the utility at a price that is equal to or less than the utility." *Id.* ¶ 55 (citing 2019 NY PSC Order, p. 81).

### B.    Plaintiffs Enroll in a Green Plan with Eligo and Continue as Eligo Customers for 6+ Years.

In 2016 and 2017, respectively, Plaintiffs Schuster and Brous enrolled in high renewable content residential electric services provided by Eligo. ECF No. 272, Second Am. Compl. ¶¶ 56, 59. Before that, they were both customers with other ESCOs. Ex. 4, Brous Pre-Eligo Customer

Information; Ex. 5, Schuster Pre-Eligo Customer Information.[1] Ms. Schuster holds a degree in psychology, a diploma in business management (with economics coursework), and a graduate degree. Ex. 15, Schuster Oct. 22, 2024 Dep. 15:3–16:11. Before his passing, Ira Brous was a professor of economics at Ithaca College. Ex. 18, A. Brous Dep. at 51:16–17. He graduated from Cornell and received a PhD from Syracuse. His wife, Anne Brous, was a professor of sociology at the same school. *Id.* at 15:24–25.

Both Plaintiffs enrolled with Eligo over the phone. Ex. 2, Schuster TPV Call; Ex. 3, Brous TPV call. For phone enrollments, New York law requires a recorded enrollment call, termed a third-party verification ("TPV"). Ex. 6, NY UBP 2014 at 172. Eligo's TPV scripts are reviewed and approved by the Commission as a condition of licensure. Exs. 7–13, NYPSC regulatory filings. During those calls, Eligo explained electricity would be provided at an introductory fixed rate and then "continue at a month-to-month rate based on market and wholesale factors"—confirming "market" and "wholesale" are not the same things—"weather patterns, and pricing strategies." *See* Ex. 2, Schuster TPV Call at 1:37–56. The call also made clear that Eligo did "not guarantee" savings, and that the Plaintiffs could cancel "at any time" and for "any reason." *Id.* at 3:01–03, 4:10–19. Plaintiffs verbally responded "yes" to these terms and others. *Id.* at 3:03–09.

Eligo also informed Plaintiffs that at least 30% of the electricity would be derived from renewable sources. Ex. 2, Schuster TPV Call at 2:09–14; Ex. 3, Brous TPV Call 1:57–2:02; Ex. 15, Schuster Oct. 22, 2024 Dep. at 77:07–77:14. Ms. Schuster viewed this as an "added benefit" that "sounded positive." Ex. 15, Schuster Oct. 22, 2024 Dep. at 77:15–78:05. Though Anne Brous could not recall any of the details of her husband's enrollment with Eligo, she testified that she

---

[1] Plaintiffs may well have saved money with Eligo for their green contracts, given Eligo's rates were consistent with, and sometimes a good bit lower than, the market. *See* Ex. 1, Aron Report ¶¶ 129–31. Despite Eligo's review of over 200,000 documents, Plaintiffs' lawyers refused to identify which ESCOs their clients previously used, leaving the record devoid of any information about Plaintiffs' prior suppliers or rates.

"most likely" regarded Eligo's supply of renewable energy as a "good thing." Ex. 18, Brous Dep. at 56:23–57:8.

A few days after enrolling, Plaintiffs received Eligo's written terms, which said, consistent with the TPV, that after the initial fixed period the Plaintiffs would convert to a "monthly variable kWh rate that may be periodically adjusted for market conditions," and that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 16, Schuster Enrollment Packet at DEF000139; Ex. 17, Brous Enrollment Packet at DEF093225. The contracts did not define "market conditions," "market pricing," or the necessarily inexhaustive plural term "other market price factors." *Id*. Nor did they contain any formula or other specific method that Eligo would use to calculate variable rates. *Id.*

Again, consistent with the TPV, the contract further provided that Eligo did not guarantee savings and that the Plaintiffs could cancel at any time and for any reason. *Id*. The contracts also repeated the TPV statement that at least 30% of electricity supplied by Eligo would be derived from renewable sources. Ex. 16, Schuster Enrollment Packet at DEF000139; Ex. 17, Brous Enrollment Packet at DEF093225; Ex. 15, Schuster Oct. 22, 2024 Dep. at 99:08–12. Ms. Schuster only "skimmed" the contract before filing it away, never to look at it again. *Id*. at 94–95. Anne Brous never read the contract at all. Ex. 18, A. Brous Dep. at 112:15–17, 106:22–107:2.

After enrolling, both Plaintiffs received itemized monthly utility bills that listed Eligo Energy NY's supply charge as a separate item and disclosed Eligo's per-kilowatt-hour rates. *See* Ex. 19, Brous Itemized Bill; Ex. 20, Schuster Itemized Bill. Both Plaintiffs were also able to compare Eligo's rate to their applicable utility's rate. Ex. 15, Schuster Oct. 22, 2024 Dep. at 109:14–111:10. Ms. Schuster's bills sometimes (but not always) included an "energy charge" of $4.93. Compl. ¶ 114; Ex. 15, Schuster Oct. 22, 2024 Dep. at 104:13–16. Plaintiffs continued to

pay those bills for more than six years—*more than 72 times each*—without cancelling their service or objecting to the rates. *See, e.g.*, Ex. 19, Brous Itemized Bill; Ex. 20, Schuster Itemized Bill, *see also* Ex. 15, Schuster Oct. 22, 2024 Dep. at 100:8–24; Ex. 18, A. Brous Dep. at 65:15–66:7.

### C. Eligo Set and Adjusted Its Market Rates Based on Individualized Market Factors.

Consistent with the contract, Eligo used different individualized considerations to set and then "periodically adjust" variable rates during the class period according to the contractual criteria of "market price factors" and "market conditions." Before 2018, Eligo forecasted costs associated with variable rate customers using customer data, such as the current customer rate, last usage, size of customer's last bill, forecasted usage, and other cost components and factors that were available to Eligo. Ex. 21, Sandler 30(b)(6) Dep. at 14:12–15:18; Ex. 22, Defs.' Second Suppl. Resps. to Pls.' First Set of Interrogatories, No. 8. Eligo then applied a markup that varied by utility territory and was determined based on "unique market conditions in various utilities." Ex. 21, Sandler 30(b)(6) Dep. at 15:22-16:1. Any suggested rate was subject to a maximum rate or rate cap that was set after accounting for the rates of competitor ESCOs in the market. *Id.* at 34:14–35:5. Eligo set maximum rates such that its prices were "toward the bottom" of rates of competing ESCOs—i.e., Eligo's "market." *Id.* at 35:1–3. Eligo's rates were also impacted by weather, a market factor specifically identified in the TPV. Ex. 2, Schuster TPV Call at 1:37–56; Ex. 3, Brous TPV Call at 1:36–44.



The floor was set to ensure that Eligo's pricing remained economically sustainable at the enterprise level—i.e., that Eligo didn't go out of business—while the ceiling ensured the rate remained within those charged by competing ESCOs in Eligo's various service territories. *See* Ex. 21, Sandler 30(b)(6) Dep. at 34:14–35:10; Ex. 26, Ashuev Dep. at 89:21–91:18 (Eligo tried to set rate caps "in line with what other suppliers charged based on [Eligo's] view of the business condition and territory."). Where the rates of other ESCOs in the utility zone were publicly available, Eligo used that data. Ex. 26, Ashuev Dep. at 91:9–92:6. For the territories for which Eligo did not have a set of what it believed to be market-based rates, it would extrapolate and apply calculated margins to forecasted costs to arrive at a suggested set of rate caps. *Id.* at 93:4–19. Eligo's rates then underwent additional checks against regulatory rules and a variety of "regulatory and market filters," including a further check to ensure Eligo's rates were in line with its ESCO competitors. *See* Ex. 14, Pedotto Dep. at

8

87:4–12, 101:12–103:10; Ex. 32, LaPointe Dep. at 22:2–22. If a rate did not meet one of the requirements, "it was changed so it did." *Id.* at 87:4–12.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

These practices resulted, unsurprisingly, in rates that were in line with those of its ESCO competitors in New York, even those offering products with much less renewable energy. Ex. 1, Aron Report ¶¶ 116–124. "Prior to 2021 (i.e., before Eligo significantly increased its renewable energy content), Eligo's average residential variable rate was consistently within the 25th percentile and 75th percentile of variable rates charged by other ESCOs and the relevant utility (where utility price was available)." *Id.* ¶¶ 119, 124. Since 2021," when most Eligo plans were 100% renewable, Eligo's average residential variable rate "generally was higher than in the preceding period," but it still "remained within the range of variable rates charged by competitor ESCOs" and "almost always remained below the maximum average variable rate observed among ESCOs in every utility-zone and quarter." *Id.*

### D. Plaintiffs Cancelled Their Eligo Service After Seeing Lawyer Ads.

Neither Plaintiff challenged Eligo's service until after seeing attorney advertisements. Ex. 15, Schuster Oct. 22, 2024 Dep. at 25:9–26:4, 100:5–12; Ex. 18, A. Brous Dep. at 65:15–66:7. And Anne Brous's claim did not originate with her at all: after Ira Brous's death, she was substituted in as plaintiff. *See* ECF No. 192. But the lawsuit was her son's idea, who convinced his parents to serve as class representatives in a breach of contract claim, even though he had *never even read* the contract at issue, even at the time of his deposition. Indeed, at that deposition, he

9

testified he pushed his parents to sue because he had, after discussions with the advertising lawyers, simply "assumed" it was a "cost plus" agreement like the one *he* had with a *different* ESCO. Ex. 39, R. Brous Dep. at 13:22–14:23, 19:4–8, 29:18–21, 43:24–44:11.

## III.    ARGUMENT

### A.    Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is particularly appropriate in contract actions where the language of the contract is "clear on its face" and "its proper construction is a matter of law." *See Broadway Nat. Bank v. Progressive Cas. Ins. Co.*, 775 F. Supp. 123, 126 (S.D.N.Y. 1991), citing *United States Naval Institute v. Charter Communications Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989); *see also Martinez*, 88 F.4th at 406; *Richards*, 915 F.3d at 88. Here, as in *Martinez* and *Richards*, the plain language of Eligo's contract defeats Plaintiffs' claims, because it permitted Eligo to set variable rates as it did.

### B.    Plaintiffs' Claims Fail as a Matter of Law.

#### 1.    Eligo Set Variable Rates in Compliance with Its Customer Contract.

To prevail on a breach of contract claim under New York law, a plaintiff must show that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021). Here, Plaintiffs cannot show the third or fourth elements, because the undisputed facts show that Eligo set variable rates in compliance with its customer contract.

10

a)      **Eligo Never Promised to Base Variable Rates on Its Wholesale Procurement Costs Plus an Arbitrary Margin.**

Plaintiffs' central allegation is that Eligo was obligated to price electricity equal to its wholesale acquisition costs plus a "reasonable" profit margin of 6%. *See, e.g.*, Complaint ¶¶ 4, 5, 64, 66, 71, 97, 108, 109. Plaintiffs' experts—whose reports form the entire basis of Plaintiffs' claim for damages—adopted the same interpretation of the contract. *See* Ex. 37, Expert Report of Edo Macan ¶¶ 113(j), 130. None of these allegations can be squared with the plain language of Eligo's contract, which New York law requires to be enforced as written. *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("When parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

Eligo's contract doesn't say that "market pricing" or "market conditions" mean the wholesale market. Instead, the contract refers only to the "market" generally and thus encompasses any relevant market on which Eligo operates—including the wholesale market where Eligo bought energy and the retail market where Eligo sold electricity.[2] To interpret the contract as limiting the "market" to the wholesale market would impose a limitation that simply isn't in the agreement. *See, e.g.*, *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004); *Jackson v. Harvest Cap. Credit Corp.*, 2020 WL 705084, at *6 (S.D.N.Y. Feb. 12, 2020), *aff'd*, 848 F. App'x 455 (2d Cir. 2021) ("Further, the courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."). The same is true of Plaintiffs' contention that the contract limited Eligo to a "reasonable" margin of no more than 6% on its sales of electricity, because the agreement says nothing at all about Eligo's profits or margins.

---

[2] Plaintiffs' damages expert Edo Macan conceded that Eligo buys energy on the wholesale market, but it *sells* electricity on the retail market, where it competes with other ESCOs on price. Macan Dep at 137-38, 174.

11

The TPV call confirms this. There, Plaintiffs agreed that their service would "continue at a month-to-month rate based on market *and* wholesale factors." *See* Ex. 2, Schuster TPV Call at 1:37–56; Ex. 3, Brous TPV Call at 1:36–44 (emphasis added). That disclosure made clear that market factors and wholesale factors are two different things, and both would be used to set variable rates. The TPV underscored Eligo's pricing flexibility by saying that Eligo would employ undefined "pricing strategies" in setting variable rates—another unmistakable confirmation that Eligo did not offer cost-plus pricing.[3] Plaintiffs' allegation that Eligo was limited to charging a margin of just 6% on wholesale costs—to the complete exclusion of every other cost Eligo incurs in the regular course of business—is even more commercially unreasonable, because such a rate isn't sufficient to cover Eligo's costs and would have driven Eligo out of business. Ex. 30, Mar. 13, 2026 LaPointe Decl. ¶¶ 4–5, 7; Ex. 31, DEF093355.

It should come as no surprise, then, that Plaintiffs' attempt to convert Eligo's contract from market-based to cost-plus pricing has been soundly rejected. In *Richards,* the Second Circuit held that an ESCO contract providing that variable rates would vary "based upon business and market conditions" did not "suggest that the variable rate bears a direct relationship to Direct Energy's procurement costs." 915 F.3d at 94, 98. And *Martinez* affirmed summary judgment to an ESCO whose contract pinned rates to "market-related factors." 88 F.4th at 412. The Third Circuit reached the same result in *Brown v. Agway Energy Servs., LLC*, 822 F. App'x 100, 103 (3d Cir. 2020) (stating that the "open-ended phrase 'market-related charges'" was among several words in the

---

[3] The Welcome Packet is not a fully integrated agreement and, therefore, may be considered alongside the TPV. *See Atronic Int'l, GmbH v. SAI Semispecialists of Am., Inc.*, 2007 WL 2493482, at *7 (E.D.N.Y. Aug. 29, 2007). Alternatively, the TPV and Welcome Packet may be read together as part of a single agreement because they were part of the same transaction and each expressly referred to the other. *See TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (holding that two agreements executed months apart were part of the same agreement because they "were intended to effectuate the same result").

contract that "ma[d]e clear that Agway can base its prices on factors other than its cost of acquiring electricity.").

There is no basis for this Court to reach a different conclusion. The terms "market conditions," "market pricing," and "other market price factors" in Eligo's contract are not meaningfully different from the contracts at issue in *Martinez*, *Richards*, and *Brown*. Nor did Eligo's contract include any definitions or limitations that would give those terms a narrower meaning than ascribed to them in prior decisions. As such, interpreting Eligo's contract to require wholesale, cost-plus pricing would not only rewrite the contract's plain terms but disregard binding precedent. Because the Court can't do either, Eligo is entitled to summary judgment.

**b)    The Contract Vested Eligo with Discretion to Set Variable Rates.**

In *Martinez*, the Second Circuit stated that "[t]he dispositive questions" in an ESCO consumer case "are whether an agreement entitled the energy services provider to use discretion in setting its rates and, if so, how the agreement cabined that discretion." *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 410 (2d Cir. 2023). Here, the contract plainly granted Eligo discretion to set rates, and Eligo acted within the broad scope of that discretion.

In *Nieves v. Just Energy New York Corp*, for example, the court held that "what constituted 'business and market conditions' [in an ESCO contract] was left to Defendant's discretion in setting the variable rates." 2020 WL 6803056, at *6 (W.D.N.Y. Nov. 19, 2020). Because the contract was "silent as to what those [business and market] conditions might be, or which ones are relevant for Defendant to use in setting rates," it was up to the "Defendant [to] determine[] the relevant business and market conditions and set[] the variable rate accordingly." 2020 WL 6803056, at *4 (W.D.N.Y. Nov. 19, 2020).

13

The District of Massachusetts reached the same conclusion in *Sommer v. CleanChoice Energy*, 800 F. Supp. 3d 239 (D. Mass. Sept. 9, 2025). There the ESCO's contract provided for a "variable supply rate" that "may vary each month and is based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins." *Id*. at 243–44. The Court held that this language "emphasize[d] the discretion afforded to CleanChoice and the many variables, other than costs, that the company would consider when setting the variable rate." *Id*. [4]

Here, Eligo's contract was even broader: it said that variable rates would be determined and adjusted according to three undefined and non-exhaustive criteria. Two of those variables— "other market price factors" and "market conditions" —are both plural and inexhaustive. The contract contains no formula or other method for calculating or adjusting rates. In fact, the contract is completely silent as to which market-based factors to use or how to weigh them in the rate-setting process. Similarly, the contract says that rates "may be periodically adjusted" without limiting the number or frequency of such adjustments.

As in *Nieves* and *Sommer*, those contractual terms can *only* be interpreted as a grant of discretion to Eligo to set variable rates, because it was the only party in a position to set the price of its product and to identify and weigh the market-based criteria in doing so. Plaintiffs' proposed interpretation, on the other hand, would rewrite the contract by imposing a rigid rate-setting

---

[4] The unpublished decision *Weinberg v. CleanChoice Energy, Inc*., is not to the contrary. 2024 WL 3446515 (S.D.N.Y. July 17, 2024). Though *Weinberg* considered the same contractual language addressed in *Sommer*, the *Weinberg* court did not find a lack of discretion as a matter of law. Instead, the court held only that the complaint stated a viable claim for breach at the pleadings stage. In any event, to the degree that *Weinberg* and *Sommer* are in conflict, *Sommer* is the better-reasoned decision. As the *Sommer* court stated, "[s]everal representations made in the contract emphasize the discretion afforded to CleanChoice and the many variables, other than costs, that the company would consider when setting the variable rate." *Sommer*, 800 F. Supp. 3d at 246. Similar representations appear in Eligo's contract, such that "no reasonable consumer can read the contract and assume" that rates would be calculated in any way other than at the discretion of Eligo, accounting for the contract's broad, market-based criteria. *Id*.

formula (wholesale costs plus 6%) that is entirely absent from the contract. *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (stating that the "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."). Allowing the Plaintiffs to present that extra-contractual formula to a jury would be reversible error.

Plaintiffs have argued that Eligo couldn't have discretion to set rates because the contract didn't use the word "discretion." But that is not the law. *See, e.g.*, *Sommer*, 800 F. Supp. 3d at 246 (stating that "[a]lthough the magic word 'discretion' does not appear in the contract, no reasonable consumer can read the contract and assume otherwise."); *see also Gentile v. John Hancock Mut. Life Ins. Co.*, 951 F. Supp. 284, 290 (D. Mass. 1997) (rejecting the assertion that "magic words are required in order for a company to grant itself . . . discretion," and instead judging whether, "on balance, the subject wording . . . clearly convey[s] independent and final discretion").[5] Pricing discretion is often found in "open price term" contracts under Article 2 of the Uniform Commercial Code, even where the word "discretion" is not used in the contract. *See, e.g.*, *Camcara, Inc. v. Air Prods. & Chemicals, Inc.*, 663 F. Supp. 3d 443, 455 (E.D. Pa. 2023) (stating that "[i]n essence, an open-price term is when a contract gives a party the discretion to set a price based on factors indeterminate at the time of entering the contract and the other party has an obligation to pay the future-set price.").

Though the contract is not one for the sale of goods, it is an open price term contract in every meaningful sense. All of the contractual rate-setting variables were both undefined and indeterminate when the Plaintiffs contracted with Eligo. Plaintiffs nevertheless agreed to pay the

---

[5] This common-sense rule applies in many contexts, including the interpretation of ERISA plans, where the presence and extent of a plan administrator's discretion is often at issue. *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 739 (2d Cir. 2001) ("Although a plan need not contain any magic words such as discretion and deference, it must, nevertheless, give some unambiguous indication that discretion has been conferred.") (cleaned up).

15

"future-set price," as established and adjusted by Eligo, under the contract. In other words, the *only* way to establish a price under the contract was for Eligo to decide which market-based factors and/or conditions to use, and how to weigh them, to arrive at a monthly variable rate. *See Mass. Laborers' Health and Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 319 (1st Cir. 2023) ("[C]ourts have found discretion to exist if a contract contains broad language that affords a party flexibility in determining its course of action."); *see also Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 867 (6th Cir. 2013) (finding that a defendant was afforded broad discretion to set billing rates where the agreement "nowhere . . . set forth the dollar amount . . . or even the method by which the . . . fee is to be calculated.")

Plaintiffs have frequently relied on *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), to argue that Eligo had no pricing discretion and was contractually bound to cost-plus rates. But the agreement in *Mirkin* said that "your monthly variable rate is based on XOOM's *actual and estimated supply costs . . .*" *Id*. at 175 (emphasis added). The court found that language to constitute a promise by XOOM to—unsurprisingly—"base its rates on its supply costs." *Id*. at 176. Eligo's contract couldn't be more different. It said nothing at all about Eligo's supply costs, much less contained any promise to base Eligo's rates on them. The TPV negated any such arrangement even further, referring to "market" and "wholesale" as *different* concepts.

c)    **Eligo Set Variable Rates in Compliance with the Contract.**

Plaintiffs claim that Eligo breached by trying to set rates at a level that would achieve profit targets while not driving customers away. Compl. ¶¶ 147–148, 160. But there is nothing improper about an ESCO engaging in the ordinary business activity of trying to balance profitability and customer retention in rate setting. *See Richards*, 915 F.3d at 98 (defendant's efforts to "set the variable rate to achieve a target profit margin, match competitors' prices, and reduce customer

16

losses" were, "as a matter of plain meaning," among the "business and market conditions" the contract permitted the ESCO to consider). 915 F.3d at 98; *Martinez,* 88 F.4th at 412.

Eligo's rates also complied with the contract because, as was true in *Richards* and *Martinez*, they were thoroughly market-based. Eligo attempted to match the rates of competing ESCOs in setting its rates. *See, e.g.*, Ex. 21, Sandler 30(b)(6) Dep. at 15:22–16:1 (testifying that Eligo considered "unique market conditions in various utilities"); *id*. at 35:1–3 (Eligo set maximum rates such that its prices were "toward the bottom" of rates of competing ESCOs); Ex. 26, Ashuev Dep. at 89:21–91:18 (Eligo tried to set rate caps "in line with what other suppliers charged based on [Eligo's] view of the business condition and territory."); Ex. 21, Sandler 30(b)(6) Dep. at 34:14–35:10; Ex. 28, Sample Groove Output. Eligo also subjected its rates to a variety of "regulatory and market filters," including a further check to ensure Eligo's rates were in line with its ESCO competitors. *See* Ex. 14, Pedotto Dep. at 87:4–12, 101:12–103:10; Ex. 32, LaPointe Dep. at 22:2–22.[6]

Those efforts resulted in rates that were in line with those of Eligo's competitors—i.e., other ESCOs that, like Eligo, sold electricity generated from renewable sources. Before 2021 (i.e., before Eligo significantly increased its renewable energy content), Eligo's average residential variable rate was consistently within the 25th percentile and 75th percentile of variable rates charged by other ESCOs and the relevant utility (where utility price was available). Ex. 1, Aron Report ¶¶ 116–124. And "[s]ince 2021," when most Eligo plans were 100% renewable, rates "remained within the range of variable rates charged by competitor ESCOs and almost always remained below the maximum average variable rate observed among ESCOs in every utility-zone and quarter." *Id.*

---

[6] See also Ex. 33, DEF001845 at 9 (Eligo Risk and Hedging Update stating, "[t]he *market-based prices* charged to variable customers don't increase linearly with costs, resulting in some margin compression for variable priced customers.")

Plaintiffs don't contend that Eligo's rates were impermissibly higher than its ESCO competitors. In fact, their experts don't compare Eligo's rates to other ESCOs.[7] Instead, Plaintiffs argue that Eligo's rates were excessive because they were higher than those of regulated utilities within New York.[8] Compl. ¶¶ 73–81. But this ignores the fact that the Commission itself recognized and accepted that ESCOs supplying green electricity would inevitably and justifiably charge more than utilities. Ex. 1, Aron Report ¶ 55 (quoting the 2019 reset order) ("[w]e recognize that ESCOs likely cannot provide renewable energy in a percentage greater than the utility at a price that is equal to or less than the utility."). Moreover, *Richards* establishes that the relevant market for an ESCO includes other ESCOs and is not limited to utilities. 915 F.3d at 99 (rejecting as "near frivolous" the plaintiffs' argument that "the [utilities'] Standard Service Rates, rather than Direct Energy's private competitors' rates, are the proper comparators . . .").

As the Second Circuit held in *Richards*, it is especially inappropriate to use utility rates as a benchmark for ESCOs because "the entire point of electricity deregulation was to allow the market, rather than [state regulators], to determine rates." *Id.*; *see also Martinez*, 88 F.4th at 416 (declining to impose liability on an ESCO because "[e]nergy services companies also remain accountable to the Commission"); *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 616 (7th Cir. 2019) ("ComEd's price is not a market price at all; it is a regulated price. Neither PJM nor ComEd participate in the general market for electricity, and thus they are not proper comparators with Direct Energy to gauge market price. The only other actors in the electricity market engaging

---

[7] To the extent Plaintiffs' damages expert Edo Macan compares Eligo's rates to competitors at all, he not only includes but vastly overweighs local utilities in the comparison. Ex. 38, Expert Report of Edo Macan ¶ 174. He never does a direct comparison of Eligo's rates to those charges by other ESCOs alone, divorced from utility rates.

[8] The Complaint attempts to show Eligo's rates were excessive by comparing them to three "benchmarks": (1) the "local utility's contemporaneous supply rate," (2) Eligo's own fixed rates, and (3) market supply costs. Compl. ¶¶ 73–99. There is no comparison of Eligo's rates to those charged by other ESCOs.

18

in price competition are the other alternative retail energy suppliers in Illinois—the companies most similarly situated to Direct Energy.").

In sum, and as the court stated in *Martinez*, Eligo's contract "leaves no doubt" that Eligo's pricing decisions were permissible. *Id*. at 417. Plaintiffs cannot establish breach "by showing that [Eligo] considered its costs, margins, and expenses . . . in setting its monthly variable rate, nor by showing that [Eligo] failed to charge rates comparable to those charged by the incumbent local utilities, rather than other ESCOs." *Id*.

**d)      Plaintiffs' Claim for Breach Based on an Unauthorized Fee is Barred by the Voluntary Payment Doctrine.**

Eligo is also entitled to summary judgment on Plaintiffs' claim that Eligo breached by charging Plaintiff Schuster an "unauthorized" fee of $4.93/month. Compl. ¶¶ 111–14. Plaintiffs allege that Ms. Schuster was charged this fee on forty-four separate occasions between July 2018 and March 2022, *id*. ¶ 114, but do not identify any other individual who was charged the fee. The voluntary payment doctrine bars Ms. Schuster from recovering her voluntary payments to Eligo.

"The voluntary payment doctrine is a common-law principle that bars recovery for 'payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law.'" *Utica Mut. Ins. Co. v. Am. Re-Ins. Co.*, 218 A.D.3d 1283, 1285 (4th Dep't 2023) (quoting *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003)). Under that doctrine, "[t]he onus is on a party that receives what it perceives as an improper demand for money to take its position at the time of the demand, and litigate the issue before, rather than after, payment is made." *Id*. (citing *DRMAK Realty LLC v. Progressive Credit Union*, 133 A.D.3d 401, 403 (2015)). "There is a presumption that payments are voluntary, and any protest thereto must be made at the time of payment." *Id*. at 597.

19

The $4.93 fee was expressly identified and disclosed on the final page of Ms. Schuster's monthly bill and described as an "energy charge" of $4.93. *See* Ex. 20, Schuster Itemized Bill; *see also* Ex. 15, Schuster Oct. 22, 2024 Dep. at 104:13–105:6 (discussing Ms. Schuster's electric bills). Ms. Schuster noticed the $4.93 charge, which she described as "interesting[]" and "an extra energy charge." Ex. 15, Schuster Oct. 22, 2024 Dep. at 104. Ms. Schuster was also in possession of Eligo's customer contract over that time, and therefore able to review the agreement and decide whether the fee was "unauthorized" by the contract. *Id*. at 91-92, 94. Despite all this, Ms. Schuster voluntarily paid all of her Eligo bills, including the $4.93 fee. Ex. 15, Schuster Oct. 22, 2024 Dep. at 100. As such, the voluntary payment bars her recovery of the fee and entitles Eligo to summary judgment. *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003) (voluntary payment doctrine barred recovery of a $5 late fee paid by a cable customer even though the fee was allegedly mischaracterized as an administrative fee on the customer's bill).

### 2.    Eligo Did Not Breach the Implied Duty of Good Faith and Fair Dealing.

The implied covenant of good faith and fair dealing "embraces a pledge" that neither party will act in a way that "ha[s] the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013). When a contract gives a party discretion, that contract "include[s] an implied promise that neither party will act arbitrarily or irrationally in exercising that discretion." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 810 (2d Cir. 2014) (citation omitted); *see also 19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 438 (S.D.N.Y. 2015) (stating that the implied covenant "works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally.") "The covenant, however, does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *19 Recordings*, 97 F. Supp. 3d at 438.

20

"New York law is clear that the implied covenant cannot be used to create independent obligations beyond the contract." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003). Thus, "[i]n order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'" *Gaia House Mezz LLC v. State Street Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013).

In addition, "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Life Ins. Fund Elite LLC v. Hamburg Com. Bank AG*, 545 F. Supp. 3d 86, 92 (S.D.N.Y. 2021); *Polcom USA, LLC v. Affiliated FM Ins. Co.*, 551 F. Supp. 3d 290, 297 (S.D.N.Y. 2021) ("In order to avoid redundancy, claims of breach of the implied covenant must be premised on a distinct set of facts from those underlying a claim for breach of contract."). Thus, "[a] claim for breach of the implied covenant [of good faith and fair dealing] will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002).

Plaintiffs' claim for breach of the implied duty of good faith and fair dealing fails is entirely duplicative of Plaintiffs' claims for breach of the express contract. It expressly incorporates the same factual allegations on which Plaintiffs' claim for breach relies. *See* SAC ¶ 155. The rest of Count II makes clear that Plaintiffs' claims for breach of the express contract and breach of the implied duty rest on the same theories—in particular, that Eligo should have set variable rates equal to its wholesale procurement costs plus a fixed margin that appears nowhere in the contract and that would have bankrupted Eligo. *See id.* ¶ 160 (alleging that Eligo breached the implied duty by not charging variable rates "reflective of its actual costs"); ¶ 161 (complaining that Eligo's rates exceeded those of the relevant utilities); ¶163 (alleging a breach of the implied duty because

21

Eligo's variable rates were not "commensurate with Eligo's costs). Because Plaintiffs' claims for breach of express contract and the implied duty rest on the same predicate, there is no viable claim for breach of the implied duty. *See, e.g.*, *Harris*, 310 F.3d at 80.

Even if Plaintiffs' claim for breach of the implied duty did have a separate factual predicate (which it doesn't), it still would fail because there is no evidence that Eligo acted irrationally or arbitrarily in setting market rates—and in fact *always* adjusted rates to ensure they were completely within the range its competitors were charging for energy that often had a much lower renewable component. *See* Ex. 21, Sandler 30(b)(6) Dep. at 34:14–35:10; Ex. 26, Ashuev Dep. at 89:21–91:8. Nor did it violate any obligation that "may be presumed to have been intended by the parties." *State Street Bank*, 720 F.3d at 93. On the contrary, for the reasons explained above, Eligo's compliance with the contract's express terms defeats any claim that Eligo breached the implied duty of good faith and fair dealing. *Richards*, 915 F.3d at 99–100 ("[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract").[9]

Moreover, Eligo's contract expressly provided that savings were not guaranteed—though it's very possible that both Plaintiffs here saved money with Eligo[10]—and made no representations that its prices would be the same as incumbent utilities. So, Eligo did not breach any implied duty by setting rates above those of the relevant utilities. *See Martinez*, 88 F.4th at 415. And even if Eligo's prices did at some point exceed the Plaintiffs' expectations, they knew that they were free

---

[9] *Richards* also disposes of any claim that Eligo acted in bad faith by offering low "teaser" rates before switching customers to variable rate plans. 915 F.3d at 99–100 ("Richards's accusation that Direct Energy violated the implied covenant of good faith by "luring new customers ... by offering low fixed teaser rates" . . . is equally unavailing. Richards may find this practice objectionable, but he received exactly what he bargained for" and "offering a teaser rate is not against public policy, unethical, or substantially injurious on its own, especially when, as here, consumers can cancel the contract whenever they like without paying any fee.")

[10] *See supra* note 1.

to cancel Eligo's services at any time and shop for better rates. Had they wanted to, they could have hopped from ESCO to ESCO, repeatedly taking advantage of the "teaser rates" they now decry as unfair. But they chose not to do that, and instead paid Eligo's variable rates for seven years, without complaint, until seeing advertisements from the lawyers who brought this case.

In short, Eligo provided "exactly what [Plaintiffs] bargained for: after paying a fixed rate below the [default utility rate] for a fixed time, [Plaintiffs] would pay a variable rate set at [Eligo's] discretion." *See Richards*, 915 F.3d at 99.

### 3.    Plaintiffs' Claims Under New York GBL § 349 Fail as a Matter of Law.

Section 349-d of New York's General Business Law provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the **marketing** of energy services." N.Y. Gen. Bus. Law § 349-d(3) (emphasis added). "To state a claim for a § 349 violation, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Agway*, 88 F.4th at 417.

Eligo made no misleading statement to Plaintiffs, and especially not in any marketing materials. In fact, Plaintiffs initially attempted to base this claim on Ms. Schuster's alleged receipt of a marketing "mailer" or "flyer" from Eligo before her enrollment. Ex. 15, Schuster Oct. 22, 2024 Dep. at 59:3–9 (testifying that she received "a marketing mailer that came in the mail . . . advertising lower electricity prices" and "the price would be based on the price that Eligo would pay."). But after Eligo uncovered a call recording proving that Ms. Schuster's testimony was false, Plaintiffs abandoned that theory. As Ms. Schuster was forced to admit, she never received any marketing materials from Eligo. Ex. 40, Schuster May 23, 2025 Dep. at 24:2–6 (testifying that "now I realize I was mistaken" and that "it was not a mailer, but a phone message" that she had received from an Eligo representative). Ms. Schuster could not recall anything about the "phone

23

message" she received—in fact, she did not know at the time that Eligo had called her, and when she returned the call, she asked, "what is the name of your company?" *Id*. at 74:13–17. So, Plaintiffs are utterly unable to establish that Eligo made any pre-contract "marketing" representation to them at all, much less a materially misleading misrepresentation.

And as to the contract itself, it is not a "marketing representation;" it is a contract. And even setting aside that dispositive point, as noted above, Eligo represented in that contract only that it would charge a specific fixed rate for three months and would then calculate and adjust the variable rate using very broad factors that gave Eligo substantial discretion to set rates "in response to market pricing, transportation costs, and other market price factors." Eligo also did so after reading Plaintiffs the material terms in a regulator-approved TPV and requiring them to affirmatively agree to each term—including that market and wholesale are different and that Eligo would consider "pricing strategies" when setting its variable rates. As discussed above, Eligo set rates exactly as the contract provided and therefore did not mislead the plaintiffs. *See Martinez*, 88 F. 4th at 417 (affirming summary judgment to ESCO on GBL claim); *Richards*, 915 F.3d at 100–01 (affirming summary judgment to ESCO where plaintiff claimed that a reasonable consumer would have understood customer contract to believe variable rate would reflect "costs of procuring power . . . plus appropriate margin," which failed because "the contract unambiguously allowed Direct Energy to set the variable rate the way it did.").

The fact that the customer agreement did not define "market pricing" or "market conditions" does not make the agreement misleading. Eligo had no obligation to "disclose every factor influencing [the] variable rate." *Richards*, 915 F.3d at 101. Moreover, as discussed above, Eligo's attempt to balance profit maximization with customer retention is an ordinary business practice that was both permitted by the contract, employed by every for-profit company since the beginning of time, and neither unfair nor misleading. *Id*.

24

Moreover, Plaintiffs cannot show causation because they did not read the contract. Ex. 15, Schuster Oct. 22, 2024 Dep. at 94:21–95:25; Ex. 18, A. Brous Dep. at 112:15–17, 106:22–107:2. This dooms their claim. *See Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) ("To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased.").

Having never read the contract, all the Plaintiffs ever consented to was the TPV call script read to them during their enrollment calls. It was only during those calls that Plaintiffs manifested assent to Eligo's terms, including that their variable rates would be based on "market and wholesale factors, weather patterns, and pricing strategies," with "no guarantee" of "savings" and the right to cancel at "any time" (a statement also in the written contract). Nothing was misleading about any of that. Thus, the TPV script further defeats any claim that Plaintiffs were misled.

### 4.    Plaintiffs Have No Claim For Unjust Enrichment.

Plaintiffs concede that their agreement with Eligo is legally enforceable. This bars their claim for unjust enrichment as a matter of law. *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 430 (S.D.N.Y. 2020).

## IV.    CONCLUSION

Eligo gave the Plaintiffs exactly what it promised: it supplied electricity at rates calculated according to market pricing, other market factors, and market conditions. Eligo plainly had discretion to define and weight those broad factors in setting rates, and there is no basis – whether in the agreement or governing New York law—to second-guess Eligo's discretionary rate setting now. And Eligo's rates were in fact in line with other ESCOs, including those that employed much less renewable energy. The Court should grant summary judgment in Eligo's favor, just as the Second Circuit confirmed was proper in *Agway* and *Direct Energy*.

Dated:  April 7, 2026                              Respectfully submitted,

                                                   */s/ Ryan Watstein*
                                                   Ryan D. Watstein (*pro hac vice*)
                                                   David Meadows (*pro hac vice*)
                                                   Leo P. O'Toole
                                                   **WATSTEIN TEREPKA LLP**
                                                   75 14th Street NE, Suite 2600
                                                   Atlanta, Georgia 30309
                                                   Tel: (404) 782-0695
                                                   ryan@wtlaw.com
                                                   dmeadows@wtlaw.com
                                                   lotoole@wtlaw.com
                                                   *Attorneys for Defendants Eligo Energy, LLC*
                                                   *and Eligo Energy NY, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein

27