**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ANNE BROUS, AS THE EXECUTRIX
OF THE ESTATE OF IRA BROUS and
MICHELLE SCHUSTER, on behalf of
themselves and all others similarly situated,

     Plaintiffs,

v.

ELIGO ENERGY, LLC and ELIGO
ENERGY NY, LLC,

     Defendants.

Case No. 1:24-CV-01260-ER

---

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**A.      New York's Deregulated Retail Electricity Market and Eligo's Renewable-Energy Products.**

1.      Eligo is an energy services company ("ESCO") that supplies electricity to residential customers in several states, including New York. Ex. 14, Dep. Tr. of Ken Pedotto ("Pedotto Dep.") at 17:16–20, 23:8–13.

2.      In 1996, the New York Public Service Commission (the "Commission") deregulated aspects of the retail electricity market to promote competition and foster innovation. *See Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 406 (2d Cir. 2023) (discussing regulatory history).

3.      Under New York's deregulated retail electricity market, residential customers may choose to receive supply service from either their local utility or an ESCO. Ex. 14, Pedotto Dep. at 17:11–20.

4.      When a customer chooses an ESCO as their supplier, the utility continues to deliver the electricity, while the ESCO sets the price and receives payment for the supply service. *Id.* at 17:18–18:1, 18:8–9.

5.      The Commission retains supervisory authority over ESCOs operating in New York. *See* Ex. 35, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process, *CASE 15-M-0127 – In the Matter of Eligibility Criteria for Energy Service Companies, et al.*, N.Y. Pub. Serv. Comm'n, Dec. 12, 2019 (hereafter, "2019 NY PSC Order"), pp. 6–7; "Major Rate Case Process Overview," N.Y. State Dep't of Pub. Serv., https://dps.ny.gov/major-rate-case-process-overview (last visited Apr. 7, 2026); "Retail Access Application - General Information," N.Y. State Dep't of Pub. Serv., https://dps.ny.gov/retail-access-application-general-information (last visited Apr. 7, 2026); *Agway Energy Servs., LLC*, 88 F.4th at 406–07 (citing N.Y. Pub. Serv. L. §§ 5(1)(h), 66(1)); *see also* Expert Report of Debra Aron ("Aron Report") ¶ 39.

1

6.      The Commission adopted Clean Energy Standards in 2016 to increase the amount of electricity generated from renewable sources within New York. Ex. 36, Order Adopting a Clean Energy Standard, *CASE 15-E-0302 - Proceeding on Motion of the Commission to Implement a Large-Scale Renewable Program and a Clean Energy Standard and CASE 16-E-0270 - Petition of Constellation Energy Nuclear Group LLC; R.E. Ginna Nuclear Power Plant, LLC; and Nine Mile Point Nuclear Station, LLC to Initiate a Proceeding to Establish the Facility Costs for the R.E. Ginna and Nine Mile Point Nuclear Power Plants*, N.Y. Pub. Serv. Comm'n, Aug. 1, 2016 (hereafter, "2016 CES Order"), pp. 1–2; *see also* Ex. 1, Aron Report ¶¶ 43–45.

7.      Under the Clean Energy Standards framework, suppliers may purchase renewable energy certificates ("RECs"), which are tradeable instruments representing one megawatt-hour of electricity generated from a renewable source and delivered into the New York power grid. Ex. 36, 2016 CES Order, pp. 154–55; *see also* Ex. 1, Aron Report ¶ 45.

8.      In New York, not all RECs are treated the same: some are used to comply with the State's renewable energy requirements ("Tier 1 RECs"), while others are used to comply with the PSC's 2019 ESCO order ("EDP RECs"). Ex. 36, 2016 CES Order, pp. 14–17; Ex. 35, 2019 NY PSC Order, pp. 71–73, 78–80; *see also* Ex. 1, Aron Report ¶ 46.

9.      RECs cost money and therefore increase an energy supplier's cost of providing electricity; how much cost they add depends on how much renewable energy is included in the supplier's product and the price of RECs when the supplier buys them. Ex. 36, 2016 CES Order, pp. 16–17, 108–10, 154–55; Ex. 35, 2019 NY PSC Order, pp. 77–80; *see also* Ex. 1, Aron Report at ¶¶ 47–49.

10.      Renewable-energy generation requires financial support because renewable facilities will not be financed or built without a reasonably certain opportunity to recover their costs, and renewable products carry added incremental costs above standard utility supply;

2

voluntary customer purchases of renewable products therefore help fund those additional renewable attributes. Ex. 36, 2016 CES Order, pp. 10–11; Ex. 35, 2019 NY PSC Order, pp. 76–77, 81; *see also* Ex. 1, Aron Report ¶¶ 45–47, 55.

11.    The higher the renewable content of an ESCO product, the more RECs the ESCO must purchase to cover that product's load. Ex. 36, 2016 CES Order, pp. 14–16; Ex. 35, 2019 NY PSC Order, pp. 76, 78–9; *see also* Ex. 1, Aron Report ¶¶ 45, 47, 49, 52–54.

12.    Eligo's renewable-energy product offered a higher renewable-energy content than the standard utility supply in New York.[1] Ex. 1, Aron Report ¶¶ 110, 129–31.

13.    From 2021 to 2023, Eligo provided a higher share of renewable energy to its retail customers than between 62% and 81% of other ESCOs reporting EDP label data, depending on the year. *Id.* ¶¶ 131.

14.    In 2019, the Commission adopted an order requiring that any ESCO product offered to mass-market customers either guarantee savings relative to utility prices, be a fixed-price product with a price limit, or be a product generated from renewable sources. Ex. 35, 2019 NY PSC Order, pp. 23, 39–41 *see also* Ex. 1, Aron Report ¶¶ 50–51.

15.    The Commission did not require ESCOs offering renewable-energy products to guarantee savings relative to utility rates. Ex. 35, 2019 NY PSC Order, p. 37; *see also* Ex. 1, Aron Report ¶ 55.

16.    The Commission also did not regulate or cap the prices of ESCO products generated from renewable sources. Ex. 35, 2019 NY PSC Order, p. 37; *see also* Ex. 1, Aron Report ¶ 55.

---

[1] *See* "EDP Label," NYGATS, https://nygats.ny.gov/ng/Report/getdto_view_Report_PublicEDPLabel (last visited Apr. 7, 2026).

17.     Provided an ESCO's product satisfies the requirements of the Commission's orders and applicable Uniform Business Practices, the Commission does not set or approve the ESCO's retail prices. Ex. 35, 2019 NY PSC Order, p. 6–7; *see also* Ex. 1, Aron Report ¶ 40.

18.     The Commission recognized that ESCOs offering products with renewable content above the utility mix could not necessarily do so at a price equal to or below utility supply:

> We recognize that ESCOs likely cannot provide renewable energy in a percentage greater than the utility at a price that is equal to or less than the utility.

Ex. 35, 2019 NY PSC Order, p. 81; *see also* Ex. 1, Aron Report ¶ 55.

19.     Utilities in New York generally do not offer residential electricity products with the same renewable-energy content as Eligo's products. Ex. 35, 2019 NY PSC Order, p. 71 ("The record established that few, if any, utilities voluntarily purchase more renewably sourced electricity than they are required to procure under the RES. As such, most mass-market customers are not provided an opportunity by their default utility to purchase a higher percentage of renewable electricity. The retail access market can provide such opportunities to mass-market customers." [footnotes omitted]); ECF No. 142-7, Jan. 6, 2025 LaPointe Decl., Exs. 52 and 53; *see also* Ex. 1, Aron Report ¶¶ 61, 63–65.

**B.      Plaintiffs Enrolled with Eligo After Receiving Market-Based Disclosures.**

20.     Plaintiff Michelle Schuster enrolled in residential electric service with Eligo in 2016. *See* ECF No. 272, Second Amended Complaint ("Compl.") ¶ 59; Ex. 2, DEF000126 (Schuster TPV Call).

21.     Plaintiff Ira Brous enrolled in residential electric service with Eligo in 2017. Compl. ¶ 56; Ex. 3, DEF093222 (Brous TPV Call).

22.    Before enrolling with Eligo, both Plaintiffs had previously received residential electric supply service from ESCOs rather than from their local utilities. Ex. 4, DEF093950; Ex. 5, DEF093953.

23.    Both Plaintiffs enrolled with Eligo by telephone. Ex. 2, DEF000126 (Schuster TPV Call); Ex. 3, DEF093222 (Brous TPV Call).

24.    Under New York's Uniform Business Practices, telephone enrollments with ESCOs require third-party verification ("TPV"). Ex. 6, NY UBP 2014 at 172.

25.    Eligo's TPV scripts were reviewed and approved by the Commission in connection with Eligo's licensure. Ex. 6, NY UBP 2014 at 171; Exs. 7–13, NYPSC regulatory filings, including TPV scripts.

26.    During Ms. Schuster's TPV call, Ms. Schuster was told that, after the introductory fixed-rate period, Eligo service would continue at a month-to-month variable rate "based on market and wholesale factors, weather patterns, and pricing strategies." Ex. 2, Schuster TPV Call at 1:37–56.

27.    During Mr. Brous's TPV call, the caller was likewise told that, after the introductory fixed-rate period, Eligo service would continue at a month-to-month variable rate based on "market and wholesale factors, weather patterns, and pricing strategies." Ex. 3, Brous TPV Call at 1:36–44.

28.    During the TPV calls, Plaintiffs were told that Eligo did not guarantee savings. Ex. 2, Schuster TPV Call at 3:01–03; Ex. 3, Brous TPV Call at 2:57–59.

29.    During the TPV calls, Plaintiffs were told that they could cancel Eligo service at any time and for any reason. Ex. 2, Schuster TPV Call at 4:10–19; Ex. 3, Brous TPV Call at 4:01–12.

30.     During the TPV calls, the callers affirmatively assented to the disclosed enrollment terms as described in paragraphs 24-27 above. Ex. 2, Schuster TPV Call at 3:03–09; Ex. 3, Brous TPV Call at 2:59–3:02.

31.     During the TPV calls, Plaintiffs were informed that at least 30% of the electricity supplied by Eligo would be derived from renewable sources. Ex. 2, Schuster TPV Call at 2:09–14; Ex. 3, Brous TPV Call 1:57–2:02; Ex. 15, Schuster Dep. at 77:07–77:14.

32.     Ms. Schuster testified that the renewable-energy component of Eligo's service was an "added benefit" and "sounded positive" to her. Ex. 15, Schuster Dep. at 77:15–78:05.

### C.     Plaintiffs Received Written Terms Confirming Eligo's Market-Based Pricing and No-Savings Commitment.

33.     A few days after enrollment, Plaintiffs received Eligo's written terms and enrollment packets. Ex. 16, DEF000138 (Schuster Enrollment Packet); Ex. 17, DEF093223 (Brous Enrollment Packet).

34.     Eligo's written terms provide that, after the initial fixed-rate period, service will convert to a "monthly variable kWh rate that may be periodically adjusted for market conditions." Ex. 16, DEF000138 at 139; Ex. 17, DEF093223 at 225.

35.     Eligo's written terms further provide that, "[o]ther than fixed rates, all rates shall be calculated on a monthly basis in response to market pricing, transportation costs, and other market price factors." Ex. 16, DEF000138 at 139; Ex. 17, DEF093223 at 225.

36.     The written terms state that "There are no guaranteed savings." Ex. 16, DEF000138 at 139; Ex. 17, DEF093223 at 225.

37.     The written terms confirmed that Plaintiffs could cancel Eligo's variable rate service at any time and for any reason. Ex. 16, DEF000138 at 139; Ex. 17, DEF093223 at 225.

6

38.    The written terms also reflected that at least 30% of the electricity supplied by Eligo would be derived from renewable sources. Ex. 16, DEF000138 at 139; Ex. 17, DEF093223 at 225; Ex. 15, Schuster Dep. at 99:08–12.

39.    Eligo's written terms constitute a legally enforceable contract between Eligo and each of the Plaintiffs and will therefore be referred to as the "contract" throughout this document. *See, e.g.*, Ex. 15, Schuster Dep. at 7:9–13 (referring to the terms as the "contract").

**D.     Plaintiffs Did Not Read the Contract and Nevertheless Paid Eligo's Bills for Years Without Complaint.**

40.    Michelle Schuster testified that she "skimmed over" Eligo's written contract for only "a minute or two" before filing it away. Ex. 15, Schuster Dep. at 94:21–95:25.

41.    Ms. Schuster never reviewed the contract again after that initial skim. *Id.* at 95:22–25.

42.    Ms. Brous testified that her husband, Ira Brous, was not in the custom of reading the terms and conditions of consumer service contracts. Ex. 18, A. Brous Dep. at 106:22–107:2; 112:15–17.

43.    Anne Brous testified that she had not read the Eligo agreement before pursuing this lawsuit. Id. at 112:15–17; 116:15–22.

44.    After enrolling with Eligo, both Plaintiffs received monthly itemized utility bills that separately identified Eligo's supply charges and disclosed Eligo's per-kilowatt-hour rates. Ex. 19, PLAINTIFFS_0278; Ex. 20, PLAINTIFFS_0025.

45.    Those monthly bills separately disclosed the rate Eligo was charging for supply service each month. Ex. 19, PLAINTIFFS_0278; Ex. 20, PLAINTIFFS_0025.

46.    Ms. Schuster understood that she could compare Eligo's rate to her utility's rate if she chose to do so. Ex. 15, Schuster Dep. at 109:14–111:10.

47.     After the expiration of the introductory fixed-rate period, Plaintiffs remained on Eligo's month-to-month variable-rate service. *See* Ex. 19, PLAINTIFFS_0278; Ex. 20, PLAINTIFFS_0025.

48.     Plaintiffs continued to receive monthly bills reflecting Eligo's supply charges and per-kilowatt-hour rate after the introductory fixed-rate period ended. *See* Ex. 19, PLAINTIFFS_0278; Ex. 20, PLAINTIFFS_0025.

49.     Plaintiffs did not exercise any contractual right to cancel Eligo's service after receiving the written terms or after the expiration of the introductory fixed-rate period. Ex. 19, PLAINTIFFS_0278; Ex. 20, PLAINTIFFS_0025.

50.     Ms. Schuster claims that she was charged a fee of $4.93 by Eligo on forty-four separate occasions between July 2018 and March 2022. Compl. ¶ 114; Ex. 15, Schuster Dep. at 104:13–16.

51.     That $4.93 fee was identified and disclosed on Ms. Schuster's utility bills as an "energy charge." Ex. 20, PLAINTIFFS_0025 (Schuster Itemized Bill) at 7.

52.     Plaintiffs did not complain to Eligo about Eligo's variable rates and continued to pay their monthly bills during the period they remained Eligo customers. *See* Ex. 15, Schuster Dep. at 100:8–24; Ex. 18, A. Brous Dep. at 65:15–66:7.

53.     Each Plaintiff remained on Eligo's variable-rate service and paid monthly bills reflecting Eligo's variable rate for more than six years, totaling more than 72 monthly billing cycles. *See* Ex. 19, PLAINTIFFS_0278; Ex. 20, PLAINTIFFS_0025.

54.     After Ira Brous's death, Anne Brous, as executor of the Estate of Ira Brous, was substituted into this action as plaintiff. See ECF No. 192, Order Regarding Plaintiffs' Motion to Substitute Anne Brous as Plaintiff.

55.     Anne Brous testified that her son urged her and Ira Brous to participate in this lawsuit. Ex. 18, A. Brous Dep. at 22:3–23:18.

56.     Ms. Schuster testified that she terminated her Eligo account after seeing a lawyer advertisement soliciting claimants for being overcharged by Eligo. Ex. 15, Schuster Dep. at 23:18–27:3.

57.     Likewise, Ramsey Brous, Anne Brous's son, testified that he contacted class counsel after concluding that his parents had been overcharged by Eligo because, based on his own understanding, he believed the Eligo arrangement was akin to a cost-plus agreement. *See* Ex. 39, R. Brous Dep. at 13:22–14:23, 19:4–8, 29:18–21, 43:24–44:11.

**E.      Eligo Set and Adjusted Variable Rates Using Market-Based Factors.**

58.     Before 2018, Eligo forecasted costs associated with variable-rate customers using customer data, including current customer rate, prior usage, size of customer's last bill, forecasted usage, and other available cost components and factors. Ex. 21, Sandler 30(b)(6) Dep. at 14:12–15:18; Ex. 22, Defs.' Second Suppl. Resps. to Pls.' First Set of Interrogatories, No. 8.

59.     Before 2018, Eligo applied a markup that varied by utility territory and was determined based on "unique market conditions in various utilities." Ex. 21, Sandler 30(b)(6) Dep. at 15:22–16:1.

60.     Before 2018, any suggested variable rate was subject to a maximum rate or rate cap set after accounting for the rates of competitor ESCOs in the market. *Id.* at 34:14–35:5.

61.     Eligo's Chief Information Officer testified that Eligo set maximum rates such that its prices were "toward the bottom" of the rates of competing ESCOs. *Id.* at 35:1–3.

62.     ████████████████████████████████████████

████████████████████████████████ Ex. 23, Carr Dep. at 56:11–13, 97:23–98:1.

9

63.  Ex. 24, DEF000236; Ex. 25, DEF003310; Ex. 22, Defs.' Second Suppl. Resps. to Pls.' First Set of Interrogatories, No. 8; Ex. 26, Ashuev Dep. at 89:5–16.

64.

65. Ex. 21, Sandler 30(b)(6) Dep. at 112:24–113:7; Ex. 23, Carr Dep. at 105:17–106:4.

66.

67.

68.

69.

70.

71. Eligo incurred numerous costs in serving retail electricity customers beyond the procurement cost of electricity itself, including customer acquisition costs, administrative and operational expenses, compliance costs, customer-service expenses, purchase-of-receivables

charges, and other overhead expenses. Ex. 30, Mar. 13, 2026 LaPointe Decl. ¶¶ 5–7; Ex. 31, DEF093355.

72.     Eligo's accounting data produced in discovery at DEF093355 reflects revenues, energy costs, and other business expenses incurred in operating Eligo's retail electricity business. Ex. 30, Mar. 13, 2026 LaPointe Decl. ¶ 5.

73.     ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████ Ex. 30, Mar. 13, 2026 LaPointe Decl. ¶ 7; Ex. 31, DEF093355.

74.     Based on Eligo's accounting data, pricing electricity at the cost of energy plus a five- or six-percent margin would not have covered those expenses, let alone Eligo's other business costs. Ex. 30, Mar. 13, 2026 LaPointe Decl. ¶ 7.

75.     Eligo's New York margins during the relevant years ranged from approximately two percent to fourteen percent. Ex. 30, Mar. 13, 2026 LaPointe Decl. ¶ 11, Ex. 1 thereto.

76.     Eligo attempted to set rate caps "in line with what other suppliers charged based on [Eligo's] view of the business condition and territory." Ex. 26, Ashuev Dep. at 90:13–91:8.

77.     Where competitor-rate data were publicly available, Eligo used that data in setting rate caps. *Id.* at 91:9–92:6.

78.     Where Eligo lacked a set of rates it believed to be market-based for a territory, it extrapolated and applied calculated margins to forecasted costs to arrive at suggested rate caps. *Id.* at 93:4–19.

79.     Eligo's rates underwent additional checks against regulatory rules and other "regulatory and market filters," including checks to ensure Eligo's rates were in line with competing ESCOs. Ex. 14, Pedotto Dep. at 87:4–12, 101:12–103:10; Ex. 32, LaPointe Dep. at 22:2–22.

11

80.     If a rate did not satisfy one of the applicable requirements, it was changed. Ex. 14, Pedotto Dep. at 87:4–12.

81.     Eligo's internal documents described the prices charged to variable customers as "market-based prices." Ex. 33, DEF001845 at 1853.

82.     Eligo's internal documents further stated that its "machine learning powered variable pricing models contain[ed] caps to ensure our prices don't exceed market prices." *Id.*

**F.     Eligo's Rates Were Within the Relevant Market for Renewable Energy Products.**

83.     Eligo's residential variable rates were within the range of variable rates charged by competing ESCOs in the same utility territory, zone, and quarter in New York.[2] Ex. 1, Aron Report ¶¶ 115, 119, 24.

84.     The comparison of Eligo's rates to competing ESCO rates was based on quarterly pricing data reported to the NYPSC from 2014 Q2 through 2024 Q4 and was limited to residential variable electricity rates. Ex. 1, Aron Report ¶¶ 116–118.

85.     Eligo's variable rate was the highest in only 44 of 809 analyzed utility-zone-quarters, or 5.4 percent. Ex. 1, Aron Report ¶ 119.

86.     Across most geographic areas and most quarters during the class period, Eligo's average residential variable rate was well within the range of variable rates charged by competing ESCOs. Ex. 1, Aron Report ¶ 124.

87.     Before 2021, before Eligo increased the renewable-energy content of its product, Eligo's average residential variable rate was consistently within the 25th and 75th percentiles of

---

[2]  *See* ESCOs' historical pricing data from the NY PSC website (Matter Number 14-02555), http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=46965&MNO=14-02555 (last visited Apr. 7, 2026).

variable rates charged by other ESCOs, and within the range of the relevant utility price, where utility price data were available. *Id.* ¶¶ 119, 124.

88.    Since 2021, while Eligo's average residential variable rate generally increased, it remained within the range of variable rates charged by competitor ESCOs and almost always remained below the maximum average variable rate observed among ESCOs in each utility zone and quarter. *Id.* ¶ 124.

89.    Those individualized attributes included customer-specific cost-to-serve considerations that varied by customer, time, geography, and other factors. *Id.*; *see also* Ex. 23, May 13, 2025 Carr Deposition, Exhibit 8, pp. 132:11-145:20 (explaining Groove used several factors to set rates).

### G.    Plaintiffs' Expert Interprets "Market Pricing" to Mean the Wholesale Market and Uses a Fixed Margin.

90.    Eligo operates in both a retail market, where it sells electricity in competition with other ESCOs, and a wholesale market, where it procures energy. Ex. 37, Macan Dep. at 137–38, 174.

91.    Plaintiffs' expert, Edo Macan, testified that Eligo participates in both the retail and wholesale electricity markets. *Id.* at 137–38, 174.

92.    In his expert report, Macan opined that "Market Pricing" in Eligo's contract means the "wholesale market." Ex. 38, Expert Report of Edo Macan ¶ 130.

93.    Macan also opined that "it would not be commercially or economically unreasonable for the fact finder to adopt 6% as a reasonable fixed-rate margin" for purposes of calculating damages. *Id.* ¶ 13(j).

Dated: April 7, 2026

Respectfully submitted,

/s/ Ryan Watstein
Ryan D. Watstein (*pro hac vice*)
David Meadows (*pro hac vice*)
Leo P. O'Toole
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Tel: (404) 782-0695
ryan@wtlaw.com
dmeadows@wtlaw.com
lotoole@wtlaw.com
*Attorneys for Defendants Eligo Energy, LLC and Eligo Energy NY, LLC*

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2026, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein
